UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:18-cr- |
| v. | ) | |
| | ) | Wire Fraud |
| IMRAN ALRAI, | ) | (18 U.S.C. § 1343) |
| | ) | (Count 1) |
| | ) | |
| Defendant. | ) | Notice of Forfeiture |
| | ) | (18 U.S.C. § 981(a)(1)(C) & |
| | ) |  28 U.S.C. § 2461(c)) |
| | ) | |

INDICTMENT

THE GRAND JURY CHARGES THAT:

COUNT 1

[18 U.S.C. § 1343 – Wire Fraud]

Introduction

1.     Defendant Imran Alrai ("Alrai") resided in Windham, New Hampshire.

2.     "Org1" is a regional charitable organization headquartered in Boston, Massachusetts.  From March 2012 until June 2018, Alrai was employed full-time as Senior Director of Information Technology ("IT") and later Vice President, Information Technology ("IT"), for Org1.  Org1 initially paid Alrai an annual salary of $150,000; by July 2017, Alrai's annual salary had increased to more than $179,000.  Alrai also received benefits from Org1, which permitted him to work much of his time remotely.  As an officer, Alrai had a fiduciary duty to Org1.

3.     "Corp1" is a national business with offices in Foxboro, Massachusetts.  In March 2012, when his employment with Org1 began, Alrai was employed full-time as Chief

1

Information Officer for Corp1.  Alrai held both positions until September 20, 2013, when he separated from Corp1.

4.       Alrai's father, "MC," was a retired doctor, and lived with Alrai in Windham, New Hampshire.

5.       DigitalNet Technology Solutions, LLC ("DTS") was formed in Delaware in August 2012, and was transferred to Massachusetts on September 26, 2014.  According to its formation papers, MC formed DTS.  DTS had its principal address and leased "virtual office" space at 300 Brickstone Square, Suite 201, Andover, Massachusetts.  DTS maintained checking and saving accounts at Pentucket Bank, with branches in Massachusetts and New Hampshire.

6.       Alrai formed AISA Consulting Group, LLC ("AISA"), in February 2012. Acccording to its corporate records, AISA was located in Windham, New Hampshire.  AISA had no employees, and it maintained bank accounts at Pentucket Bank.

<u>The Scheme</u>

7.       From in or about February 2012 through in or about July 2018, Alrai devised and intended to devise a scheme to defraud his employer Org1, and to obtain money and property, including the intangible property right to control one's assets, from Org1 by means of materially false and fraudulent pretenses, representations, and promises.

<u>Manner and Means</u>

It was a part of the scheme that:

8.       Beginning in 2012, and continuing through July 2018, Alrai, who controlled Org1's IT department, obtained more than $6.6 million in payments for IT services supposedly provided to Org1 by an independent outside contractor, DTS, while misrepresenting material

facts about DTS, and fraudulently concealing that DTS was actually a shell company operated
and controlled by Alrai.

9.      Alrai falsely told his supervisor at Org1 that he was not close to and did not
personally know the owners and employees of DTS.  Beginning in March 2012 and continuing
throughout his employment at Org1, Alrai operated under a Code of Ethics and was required to
sign an annual Conflict-of-Interest Disclosure form.  Alrai's material false statements on the
disclosure forms, and his longstanding concealment of his relationship to and control over DTS,
represented a violation of Org1's conflict of interest policies, and of his fiduciary responsibilities
to Org1.

10.      Beginning in or about June 2012, Alrai induced Org1 to hire DTS to conduct an
IT "Health Assessment" at Org1, while concealing that he operated and controlled DTS.  As a
result of DTS's health assessment, in late 2012, Org1 issued a Request for Proposals ("RFP") for
IT services from an outside vendor.

11.      Alrai steered and directed the RFP process for Org1 and was placed in charge of
scoring the responses from competing vendors.  He fraudulently rigged the process so that DTS
would prevail.  According to Alrai, 13 vendors responded to the RFP request.  As scored by
Alrai, the final three vendors in the RFP process (one of which was DTS) scored very closely,
but in the end DTS outscored the others in every category, and came in at $50,000 less than the
others.

12.      Alrai falsely and materially described DTS as a successful and experienced IT
vendor, even though as of early 2013 DTS had no customers and had never done business other
than at Org1.  In response to questions from his supervisor in February 2013, Alrai provided

3

false names in listing the principals of DTS.  Alrai falsely stated that DTS had headquarters in Pakistan, Dubai, and Andover MA, and had "many contented customers."  According to information Alrai provided to Org1, DTS had 23 associates in the United States, and "[a]ll sales, marketing, HR, data center, infrastructure, telephony and related services" were "housed in the US for all US customers."  Alrai provided three false references for DTS, one of whom was CEO of "AISA Systems Corporation" in Fairfax, Virginia, and induced unknown persons to provide glowing and false references to Org1 about DTS.  Alrai also falsely stated to his supervisor that the services DTW would provide to Org1 would represent approximately 9% of DTS's annual revenues, when in fact nearly all of DTS's revenue was from Org1.

13.     In or about early 2013, Alrai arranged a fraudulent charade, in which he brought in to Org1 and introduced to his supervisor an unknown man who said he was MC, and who claimed to be a principal and IT professional at DTS.  Alrai did not tell his supervisor that the unknown man was his father, or that Alrai had any connection with the man or DTS.  The unknown man spoke with the supervisor for approximately 30-45 minutes, and falsely and materially described work DTS had supposedly done for other customers in the past 2-3 years. After the meeting, Alrai's supervisor at Org1 never saw the unknown man again.

14.     In February 2013, Org1 awarded a contract for IT services to DTS, for a term of three years, at $300,000 per year.  MC signed the contract as DTS's "Vice President for Business Development."  Once the contract was awarded, Alrai became and remained Org1's primary point of contact for all matters relating to DTS.

4

15.     Throughout the period of the contract, Alrai fraudulently concealed from Org1 that MC, a supposed principal of DTS who signed checks and corporate documents for DTS, was his live-in father.

16.     After the initial contract with DTS was signed, with Alrai directing all of its IT functions and fraudulently steering additional revenues towards DTS, Org1 added additional services to DTS's contract, which rapidly increased Org1's payments to DTS.  By 2018, Org1 was paying DTS a total of approximately $1.1 million annually, making DTS one of Org1's largest single outside vendors.  In all, between September 2012 and May 2018, Org1 paid more than $6.6 million to DTS's Pentucket Bank account.

17.     After the original RFP process ended in early 2013, Org1 made no attempt to undertake another RFP process for IT support services.  In 2016, however, Org1 requested additional information from DTS about its business.  In response, Alrai caused the submission of a fraudulent written response from DTS, including a fictitious "Sample list of Clients" identifying numerous companies which supposedly had hired DTS, while omitting the only other client DTS had ever had, Corp1.

18.     Alrai regularly created on his home computer and caused the submission of monthly invoices in paper form from DTS to Org1, while fraudulently representing to Org1 that the invoices were sent by an outside entity, including by a person named "Mohammad."  Alrai would then oversee and monitor the payment process at Org1, which generated direct monthly ACH payments from Org1 to DTS's account at Pentucket Bank.  The invoices were unsigned and bore DTS's logo and Andover, MA, address, and concealed Alrai's involvement and control over DTS.  In general, the invoices were generic and non-specific, and provided little or no

information about DTS's actual costs.  For example, DTS's invoice # 15060, dated October 2, 2017, contained the following line items:  "Infrastructure-as-a-service & Hosting, $18,000.00"; "Data Management & High Availability Backup Storage up-to 15 TB, $10,000.00"; and "Virtual DAAS Services, $15,000.00."

19.     Alrai fraudulently created invoices from DTS that billed Org1 for IT services, including Infrastructure Hosting and Virtual Desktops, that Org1 was already paying for from a legitimate outside vendor, resulting in duplicate payments.  According to Org1's calculations, Alrai's duplicative billing fraud resulted in a loss to Org1 of at least $1 million.

20.     Alrai fraudulently created invoices from DTS that billed Org 1 for services far in excess of the actual cost of the service.  For example, DTS invoiced Org1 a total of more than $770,000 for Office telephone services whose total actual cost was only about $11,000. According to Org1's calculations, Alrai's excessive billing fraud resulted in a loss to Org1 of at least $1.8 million.

21.     Alrai fraudulently created invoices from DTS that billed Org1 for services that were never rendered.  For example, DTS invoiced Org1 a total of nearly $600,000 for Data Management and High Availability Backup Storage services, while providing no such services. According to Org1's calculations, Alrai's billing for services not performed resulted in a loss to Org1 of nearly $600,000.

22.     Alrai insisted that DTS be paid in advance for its services, unlike other vendors at Org1, who were paid only after work was completed.  Alrai also used his position at Org1 to ensure prompt payments to DTS.

23.     To conceal his control of DTS and to mislead Org1 regarding whether other persons ran DTS's business, Alrai used a false name, "Mohammad," in correspondence to and from Org1 on a DTS email account.

24.     DTS, as operated by Alrai, employed two help-desk employees who worked on-site at Org1.  DTS also employed an IT network consultant, KW, who resided in Syria, but was available by telephone at certain limited hours to Org1 employees.  DTS employed no other personnel at Org1.  Throughout the period of DTS's contracts with Org1, Alrai insisted that Org1 representatives have no contact with DTS except through him.

25.     Alrai controlled all documents and information regarding Org1's IT infrastructure, equipment, and expenditures, and concealed and held many of the documents and information off-site.  As a result, even after Org1 discovered in the Spring of 2018 that Alrai controlled DTS, Org1 in some instances could not fully determine aspects of its IT systems.

26.     Alrai, with the assistance of MC (who signed DTS checks), exercised complete control over the disposition and spending of the funds Org1 wired to DTS's Pentucket Bank account, including by paying more than $900,000 to AISA accounts, and establishing and funding various other bank accounts for himself and his family members.

27.     In addition, between November 2013 and May 2018, Alrai caused 56 international wire transmissions totaling $1,190,200, of which at least $1,154,490 constituted proceeds of the fraud scheme alleged in this Indictment, to be wired from DTS's account at Pentucket Bank in Salem, New Hampshire, to an account in the name of DTS in Lahore, Pakistan.

28.     In April 2018, while returning to the United States following a nine-day trip to Pakistan, Alrai continued to conceal his control of DTS by falsely stating to United States Customs and Border Protection agents that he had no personal connection or association with DTS.

29.     Even after Org1 discovered Alrai's misconduct and confronted him in June 2018, Alrai continued to insist on payment of a DTS invoice charging $22,500 for certain meeting software, and threatened to terminate Org1's office telephone services if DTS did not promptly receive full payment.

<u>The Offense</u>

30.      On or about April 21, 2016, in the District of New Hampshire and elsewhere, the defendant,

IMRAN ALRAI,

for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals, namely, an email message from <u>info@digitalnet.us</u> to Alrai's email account at Org1, purporting to be signed by "Mohammad" and enclosing a DTS invoice to Org1 in the amount of $167,985.00.

(All in violation of Title 18, United States Code, Section 1343.)

NOTICE OF CRIMINAL FORFEITURE PURSUANT TO
18 U.S.C. § 981(A)(1)(c) AND 28 U.S.C. § 2461(c)

FORFEITABLE PROPERTY

The allegations of Count One of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  Upon conviction of the offense set forth in Count One of this Indictment, the defendant, Imran Alrai, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to, the following:

1. $38,600.65 in U.S. Currency, more or less, from Pentucket Bank Account #535042684, in the name of DigitalNet Technology Solutions, LLC;

2. $5,003.55 in U.S. Currency, more or less, from Pentucket Bank Account #700007206, in the name of DigitalNet Technology Solutions, LLC;

3. $936,078.51 in U.S. Currency, more or less, from Pentucket Bank Account #600053920, in the name of DigitalNet Technology Solutions, LLC;

4. $456,941.18 in U.S. Currency, more or less, from Citizens Bank Account #3314825155, in the name of AISA Consulting Group, LLC;

5. $125,000.00 in U.S. Currency, more or less, from Bellwether Community Credit Union Account #0000152921-100, in the name of Imran Alrai;

6. $125,000.00 in U.S. Currency, more or less, from Bellwether Community Credit Union Account #0000152928-100, in the name of Imran Alrai;

7. $250,000.00 in U.S. Currency, more or less, from Service Credit Union Account #47512154-66, in the name of Imran Alrai; and

8. Funds located in Pershing LLC Account #6FY-450381, in the name of Imran Alrai, up to the amount of $212,000.00 in U.S. Currency.

9. $1,154,490.00 in U.S. Currency, more or less, wired from DTS's Pentucket Bank Account #535042684 to Digitalnet Technology Solutions, 162-C Marghzar Colony, Multan Rd., Lahore, Pakistan.

(All in accordance to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

Date:  November 28, 2018                          /s/ Grand Jury Foreperson
                                                  Grand Jury Foreperson

SCOTT W. MURRAY
United States Attorney

/s/ John S. Davis
John S. Davis
Assistant United States Attorney