**<u>NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-10-2020</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   18-CR-192-01-JL
            v.                  *   December 10, 2019
                                *   1:47 p.m.
      IMRAN ALRAI               *
                                *
* * * * * * * * * * * * * * * * *
```

<u>TRANSCRIPT EXCERPT OF TESTIMONY OF MUNAWAR ALRAI</u>
<u>BENCH TRIAL - DAY SEVEN - AFTERNOON SESSION</u>
<u>BEFORE THE HONORABLE JOSEPH N. LAPLANTE</u>

<u>APPEARANCES</u>:


<u>For the Government</u>:          John S. Davis, AUSA
                              Matthew Hunter, SAUSA
                              Cam T. Le, AUSA
                              U.S. Attorney's Office




<u>For the Defendant</u>:           Timothy M. Harrington, Esq.
                              Timothy C. Ayer, Esq.
                              Shaheen & Gordon, P.A.


<u>Interpreter</u>:                Amara Alim


<u>Court Reporter</u>:             Susan M. Bateman, RPR, CRR
                              Official Court Reporter
                              United States District Court
                              55 Pleasant Street
                              Concord, NH 03301
                              (603) 225-1453

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MUNAWAR CHAUDHARY | | | | |
| By Mr. Davis | 6 | | 58 | |
| By Mr. Harrington | | 46 | | |

| EXHIBITS: | | | FOR ID | IN EVD |
|---|---|---|---|---|
| Government's Exhibit 883. | | | | 45 |

```
 1                     P R O C E E D I N G S
 2             THE CLERK:  For the record, we have an
 3   interpreter on the line, Amara Alim, from Washington,
 4   D.C.
 5             THE COURT:  Ms. Alim, can you hear me okay?
 6             THE INTERPRETER:  Yes, I can.
 7             THE COURT:  Thank you.  Why don't you identify
 8   yourself for the record for me.
 9             THE INTERPRETER:  Yes, sir.
10             My name is Amara Alim.  I am a language
11   specialist with the FBI, Federal Bureau of
12   Investigation.
13             THE COURT:  All right.  I believe we have a
14   copy of your CV, a resume here in the courtroom, which
15   we've marked as Court's Exhibit 1.
16             You provided that to the prosecutors earlier
17   today?
18             THE INTERPRETER:  Yes, sir, I did.
19             THE COURT:  All right.
20             Obviously, Mr. Davis, you've reviewed that,
21   right?
22             MR. DAVIS:  Yes.
23             THE COURT:  Mr. Harrington, have you reviewed
24   it as well?
25             MR. HARRINGTON:  I have, your Honor.
```

1          THE COURT:  All right.  Do either -- just give
2     me a moment here.
3          Do either of you have any -- well, the
4     prosecution is proffering the language specialist as an
5     interpreter for the courtroom, which is done a little
6     bit in a pinch, because the Court was having some
7     difficulty understanding the witness before the lunch
8     break.
9          Rule 604 requires, "An interpreter must be
10    qualified and must give an oath or affirmation to make a
11    true translation."
12         So the prosecution has proffered this language
13    specialist as an interpreter.
14         Does the defense have any objection to her
15    serving as an interpreter in this criminal trial?
16         MR. HARRINGTON:  Judge, we don't.  I reviewed
17    her resume and in particular her specialty in the area
18    of my understanding is West Punjabi and Urdu.
19         Additionally, she has no connection to this
20    case, and so I have no issue with her acting as an
21    interpreter, obviously subject to your questioning and
22    swearing in of her regarding her duties to act as a
23    translator in this case.
24         THE COURT:  All right.  I appreciate that.
25         And let me just ask you, Mr. Alrai.  Do you

1  have any objection to this procedure?

2             THE DEFENDANT:  No, your Honor.

3             THE COURT:  All right.  I will instruct you,

4  Mr. Alrai, as the defendant, and the witness, that as

5  you listen to the interpretation or translation, what

6  have you, if you have any disagreement with it, you

7  should make it known.

8             THE WITNESS:  Thank you, your Honor.

9             THE COURT:  You should make it known and then

10 I'm happy to listen to what you want to tell me about

11 it.  Do you understand?

12            THE WITNESS:  Thank you.  Thank you.

13            THE DEFENDANT:  I do, your Honor.  Thank you.

14            THE COURT:  All right.  Given that there's no

15 dispute over this, and also having reviewed the CV, the

16 Court finds that the FBI specialist who has been

17 proffered is qualified under Rule 604, but we're going

18 to administer the oath, which is also required, over the

19 phone.

20            Is there any objection to that procedure?

21            MR. HARRINGTON:  There is not from the

22 defense, your Honor.

23            MR. DAVIS:  No, your Honor.

24            THE COURT:  Charli.

25            (Deputy Clerk swears in the interpreter)

1          THE CLERK:  For the record, please state your

2   name and spell your last name for the record.

3          THE INTERPRETER:  Amara Alim, A-L-I-M.

4          THE COURT:  All right.  We'll do this in the

5   normal way.  I would like both the questions and the

6   answers to be interpreted by the language specialist,

7   please.

8          You can proceed, Mr. Davis.

9          MR. DAVIS:  Thank you.

10     CONTINUED DIRECT EXAMINATION OF MUNAWAR CHAUDHARY

11   BY DAVIS:

12     Q.   Mr. Chaudhary, when we broke we were speaking

13   about DigitalNet Technology Solutions.

14          THE INTERPRETER:  Can you repeat the name of

15   the company, sir?

16          MR. DAVIS:  DigitalNet Technology Solutions.

17     A.   Yes.

18     Q.   Now, Mr. Chaudhary, were you aware that in the

19   U.S. DigitalNet was registered in Delaware in August

20   2012?

21     A.   Yes.

22     Q.   And what role did you have in registering

23   DigitalNet in August 2012?

24     A.   I contacted an attorney's office and they

25   asked me to sign paperwork, and I signed the paperwork.

1       Q.    I'm showing you now Exhibit 209.  Is this an

2    application for DigitalNet registration?

3       A.    Let me read it.

4             (Witness reviews document)

5             Yes, correct.

6       Q.    And can we see the second page, please.

7       A.    I'm looking at it.

8       Q.    And do you recognize the signature at the

9    bottom of the page?

10      A.    Yes, these are my signature.

11      Q.    That is your signature, sir?

12      A.    Yes, they are my signature.

13      Q.    Okay.  Why does your son and his name not

14   appear on the DigitalNet document?

15      A.    Because I made it and I registered it.

16            THE INTERPRETER:  He created it and registered

17   it.

18      Q.    Did your son direct you to do so?

19      A.    No, it was my own choice.  I wanted to do

20   this.

21      Q.    Sir, do you recall being interviewed on the

22   day of the search warrant at your house on June 12th of

23   2018?

24            THE INTERPRETER:  I'm sorry.  Can you repeat

25   the date?

1          MR. DAVIS:  On June 12th of 2018.

2          THE INTERPRETER:  I'm sorry.  Can you repeat

3  that?

4     Q.   Do you recall being interviewed on the day of

5  the search warrant at your house on June 12th, 2018?

6     A.   Yes, I remember.

7     Q.   And do you remember being interviewed by Mr.

8  Todd Donnelly and federal agents about facts in the

9  case?

10     A.   Yes, I remember.

11     Q.   And when that happened you had not been placed

12  under arrest, correct?

13     A.   Yes, that's correct.

14     Q.   And the agents spoke to you in the living room

15  of your home, correct?

16     A.   That's right.

17     Q.   And you spoke voluntarily to the agents; that

18  is, no one made you talk to the agents?

19     A.   That's not correct.

20     Q.   You were made to speak to them?

21     A.   Yes.

22     Q.   Can you explain that?

23          THE INTERPRETER:  Okay.  Stop and let me

24  interpret that.

25     A.   So Mr. Todd and a female took me to the living

1   room and showed me a piece of paper which I couldn't --

2   which was a little bit further away and I could not read

3   it well.  And they started questioning me and they had

4   guns on them and they had handcuffs on them, and I was

5   very frightened.

6        Q.   Any more?

7        A.   They didn't explain any rules to me and just

8   started questioning me.

9        Q.   When you spoke to them that day, did you tell

10  them the truth?

11       A.   I tried my best to speak the truth.

12       Q.   Okay.  And were you asked that day about the

13  formation of DigitalNet?

14       A.   I think I was asked about it.

15       Q.   All right.  And didn't you tell the agents on

16  June 12th that your son, Imran Alrai, did all of the

17  work and filled out all the paperwork to create

18  DigitalNet and that it was your son's idea to register

19  DigitalNet in Delaware?  Didn't you say that?

20            THE INTERPRETER:  Can you repeat the first

21  part again?

22       Q.   Didn't you say to the agents that Imran Alrai,

23  your son, did all of the work and filled out all the

24  paperwork to create DigitalNet?

25       A.   Okay.  That day it was Ramadan and I was

1   fasting, and I was very confused and very frightened and

2   I don't remember what I told them -- what I told them.

3       Q.   Did you tell them that it was your son's idea

4   to register the company in Delaware?

5       A.   Actually, it was attorney who suggested and

6   who filled out all the paperwork, and actually all the

7   paperwork was completed in the attorney's office and I

8   was present there and you can contact them.

9       Q.   So I'm asking you if you told the agents on

10   June 12th of 2018 that it was your son's idea to

11   register in Delaware.  Did you say that to them or not?

12       A.   It was necessary to register the company and

13   we were unaware of the system here, so that's why we

14   contacted the attorney.

15       Q.   Sir, I'm asking you whether on June 12th,

16   2018, you said to the agents or whether you didn't say

17   to the agents that it was your son's idea to register in

18   Delaware.  Did you say that or not?

19       A.   I don't remember all the detail that I -- I

20   don't remember in detail what I told them.

21       Q.   Okay.  Also on this same day did you tell the

22   agents that you did not know in whose name DigitalNet

23   was registered?

24       A.   I don't remember.  I have bad memory.  I

25   forget.  I don't remember.

1    Q.   Okay.  Do you remember speaking to me and the

2    agents on February 7th of 2019?

3    A.   Yes, I remember.

4    Q.   And do you remember that you were represented

5    by your attorney, Mr. Nicholson, when you met with us?

6    A.   Yes, I remember.

7    Q.   And do you remember that I signed a proffer

8    letter that agreed that what you said in the interview

9    with us would not be used against you?

10        THE INTERPRETER:  I'm sorry.  Can you repeat?

11   Did you give him the proffer letter or did he sign the

12   proffer letter?

13        MR. DAVIS:  We both signed it, as I recall.

14        THE INTERPRETER:  Okay.

15        Can you repeat the last part?

16   Q.   Do you recall that in the proffer letter I

17   promised that what you said in the interview on February

18   7th of 2019 could not be used against you?

19   A.   Yes, I remember.

20   Q.   All right.  And during that interview on

21   February 7th do you remember telling us that you did not

22   recall signing any paperwork for DigitalNet and did not

23   know why it was set up in Delaware instead of in New

24   Hampshire?

25        THE INTERPRETER:  Was it New Hampshire?

1    Q.   Did not know why it was set up in Delaware

2  instead of in New Hampshire.

3    A.   Okay.  I might have just said that, but when I

4  got the proffer letter from the government on November

5  21st, 2019, I read it with concentration and then I

6  understood what it was.  And after getting the proffer

7  letter I remembered it.  I have amnesia, and you can

8  talk to attorney's office about this.  They gave me copy

9  of my proffer statement on November 21, 2019, and then I

10 remember -- then I paid attention and I remembered what

11 it was, and then I tried to tell them, and then I tried

12 to tell that to my attorney.

13   Q.   Sir, did you speak with your son prior to your

14 testimony today about your testimony?

15   A.   He knows that I have to testify, but he

16 doesn't discuss it with me and I don't discuss that with

17 him.

18   Q.   Okay.  Now, what was your role with DigitalNet

19 in the United States?

20   A.   I did the administrative role to contact in

21 Pakistan and handle the administrative matters.

22   Q.   Were you the vice president for business

23 development?

24   A.   Yes, something like that.

25   Q.   And what did that mean?

1      A.    That means that whatever needed to be done, I

2   used to sign the administrative aspects of it.

3      Q.    You would sign documents for DigitalNet?

4      A.    Yes, I did.  For the first two or three years

5   the contracts in the U.S. I did sign.

6      Q.    Okay.  After the first two or three years did

7   you have less involvement with DigitalNet?

8      A.    Yes.

9      Q.    And in fact at the end in 2017 and 2018 you

10  had almost no involvement in DigitalNet; is that

11  correct?

12     A.    I used to manage the DigitalNet's account.

13  Except for that, I really didn't have any other

14  involvement.

15     Q.    You managed the DigitalNet account.  When was

16  that?

17     A.    From the very first day when DigitalNet became

18  operational in the U.S.

19     Q.    All right.  Well, let's -- are you talking

20  about the DigitalNet bank account at Pentucket Bank?

21  Are you saying you managed that?

22     A.    I was a signing authority on that.

23     Q.    You were assigning the quality?  Is that what

24  you said?

25          INTERPRETER:  Signing authority.

1          Q.    What do you mean by that, sir?

2          A.    That means that the transfer of money, the

3    money transaction would happen as per my signature.

4          Q.    Okay.  But you're signing documents is

5    different from you're managing the account.  Would you

6    agree with that?

7          A.    I have nothing to say about that.

8          Q.    All right.  Well, let's talk more about

9    DigitalNet.  You had an e-mail account assigned to you,

10   is that right?

11         A.    That's correct.

12         Q.    And that was mac.chaudhary@digitalnet; is that

13   correct?

14         A.    That's correct.

15         Q.    All right.  And did you ever use that e-mail

16   account?

17         A.    Yes, I used to do that in the beginning.

18         Q.    Only in the beginning?

19         A.    I used it actively for the first few years.

20         Q.    Okay.  So I'm showing you now Exhibit 118.  Do

21   you see that exhibit, Mr. Chaudhary?

22         A.    Yes, I am reading it.

23         Q.    And do you see that it's from

24   mac.chaudhary@digitalnet.com?

25         A.    Yes, I can see that.

1      Q.    Okay.  Did you write that e-mail?

2      A.    Yes.

3      Q.    Sir, you understand that you could be

4   prosecuted for perjury for a knowing false statement in

5   this courtroom?  Do you understand that?

6      A.    Yes, I know that.

7      Q.    And do you recall being shown that same e-mail

8   in a prior meeting with the government, and you're

9   saying you knew nothing about it?

10      A.    I did tell them during the prep meeting that I

11   know the subject and that I sent this one.

12      Q.    You're saying you did tell them that you sent

13   this e-mail?  You told the agents that?

14      A.    Yes, I definitely told them and made them have

15   a correction on it.

16      Q.    Okay.  So when we see, didn't save PDF

17   properly, try this, you're saying, Mr. Chaudhary, that

18   you wrote that?

19          THE INTERPRETER:  Can you repeat that again?

20      Q.    When the e-mail says, didn't save PDF

21   properly, try this, you're saying, Mr. Chaudhary, that

22   you wrote that, correct?

23      A.    I don't remember.  This is my e-mail.  I must

24   have written it.

25      Q.    You don't remember?

1          A.   No.

2          Q.   So I'm trying to get it clear, Mr. Chaudhary.

3    Are you saying that you remember writing this e-mail,

4    Exhibit 118, or not?

5          A.   I remember the subject.  I remember the

6    subject, but I did not remember the detail.  Now I'm

7    looking at it now.

8          Q.   So do you remember writing the e-mail or not?

9          A.   I remember the attachment that were with it.

10         Q.   Okay.  So let's look at that attachment.

11   Let's look at page 2.

12              MR. DAVIS:  Next page.

13         Q.   Do you see the attachment, Mr. Chaudhary?

14         A.   Yes, I can see it.

15         Q.   Is that true about DigitalNet?

16         A.   The Lahore office provided this information to

17   us, and I can explain it.

18         Q.   You're saying the Lahore office sent you that

19   information?

20         A.   Yes, that's what I'm saying.

21         Q.   And when did that happen?

22         A.   It was in those days, but I don't remember the

23   date.

24         Q.   And do you believe that it's true that

25   DigitalNet had 105 plus global clients served?

1       A.   It is my understanding that the staff that

2   they had, the experience of the staff, it was written

3   about that in here, about the staff and the experience

4   most probably.

5       Q.   Did you write this document also?  Did you

6   compose it on the computer, Mr. Chaudhary?

7       A.   I did not compose it.  I received it from the

8   office.

9       Q.   So let's look at 118d.  You're saying you

10  received it from the office?

11      A.   I'm reading it.

12      Q.   Do you know what metadata is, Mr. Chaudhary?

13      A.   Which data?

14           MR. DAVIS:  Sorry?

15           THE COURT:  He said which data.

16      Q.   Metadata, M-E-T-A-D-A-T-A.

17      A.   I don't recall this document, and I don't know

18  what metadata is.

19      Q.   But you just said that the document was sent

20  to you from the Lahore office of DigitalNet, correct?

21      A.   Yes.

22      Q.   Do you know why 118d says that Imran is the

23  author, that Imran last saved it, that its total editing

24  time was six hours and thirteen minutes on the day it

25  was due to United Way, and it was last saved at 5:25

1    p.m. on July 18th?  Do you know why the metadata

2    indicates that about this document?

3            THE INTERPRETER:  Can you repeat that?

4            MR. DAVIS:  I'm going to withdraw the

5    question.

6        Q.    So it's your testimony that your son did not

7    write the list of customers and the description of

8    DigitalNet that was just shown as sent to United Way, is

9    that right?

10       A.    I'm not saying that.  I got this from the

11   office.  I'm not a technical guy, and I don't know all

12   these techniques.  I don't understand these technical

13   matters.

14       Q.    Okay.  Do you agree that your son, Imran,

15   handled all of the technical decisions for DigitalNet?

16       A.    Yes, I agree.

17       Q.    And do you agree that you were not actually

18   the vice president of anything?

19       A.    Okay.  I was not dealing with the public.  I

20   was not having any public dealings.  I was the vice

21   president.  I did not have any public dealings.  I did

22   not have an office.

23       Q.    All right.  Who were the -- well, let me ask

24   it this way.  Did you know that DigitalNet had three

25   employees in the United States other than your son and

1    yourself, and they were Nadeem and Jasmin and Kal, who

2    was in the Middle East?

3            THE INTERPRETER:  And what was the third name?

4            MR. DAVIS:  Kal, K-A-L.

5        A.   Yeah, I know them.

6        Q.   All right.

7        A.   I don't know them personally, but I know that

8    they were working here.

9        Q.   Okay.  And did you know any other DigitalNet

10   employees in the United States?

11       A.   No.

12       Q.   And you know of no one other than your son as

13   being an owner of DigitalNet; is that correct?  No one

14   else owned DigitalNet?

15       A.   Maybe my name was in it, too, but I'm not

16   sure.

17           MR. DAVIS:  I'm sorry?  Can you repeat?

18           THE INTERPRETER:  Maybe my name was in it,

19   too, but I'm not sure.

20       Q.   But no one besides Imran, and perhaps you --

21   no one besides you was an owner of DigitalNet, correct?

22       A.   Yes.

23       Q.   Okay.  And as of June of 2018 DigitalNet had

24   only one client, the United Way, correct?

25           THE INTERPRETER:  Can you repeat name of the

```
1   company?
2           MR. DAVIS:  United Way.
3       A.   I think it was Robert Allen, too, but I don't
4   remember.  He can't recall.  Maybe Robert Allen was
5   there, but I don't recall.
6       Q.   Okay.  Do you remember that DigitalNet had
7   office space in Andover, Massachusetts?
8       A.   Yes, I know.
9       Q.   And do you know that the rental was taken out
10  in your name, Mr. Chaudhary?
11      A.   I'm not really sure.  The rental I think was
12  deducted from the credit card perhaps, but I'm not
13  really sure about that.  The rental used to get deducted
14  from the credit card automatically, but I'm not really
15  sure if it was deducted from my credit card or someone
16  else's credit card.
17      Q.   And if it was your credit card, then Mr. Alrai
18  paid for the credit card, correct?
19      A.   Yes, that's true.
20      Q.   And you went to the rental space in Andover
21  about three or four times a year to collect the mail,
22  correct?
23      A.   Yes, that's correct.
24      Q.   And DigitalNet had that space primarily for
25  mail purposes, is that right?
```

1       A.   Yes, that's true.

2       Q.   And you never met anyone on behalf of

3   DigitalNet at the space in Andover, correct?

4       A.   No, I never met.

5       Q.   And you never conducted business for

6   DigitalNet at that space?

7       A.   No, I did not.

8       Q.   And neither did your son, Imran Alrai, conduct

9   business at that space in Andover; is that correct?

10      A.   I don't know that.

11      Q.   You don't know?

12      A.   I don't know if he conducted that business

13  there.  I have no knowledge.

14      Q.   Okay.  All right.  So you're aware that

15  DigitalNet had a bank account at Pentucket Bank?

16      A.   Yes, I know.

17      Q.   And you had signature authority for that bank

18  account?

19      A.   Yes, that's true.

20      Q.   And you would sign checks for checks out of

21  that account, correct?

22      A.   Yes, that's correct.

23      Q.   And you would go to the bank if your son,

24  Imran Alrai, needed you to go, correct?

25      A.   Yes, I used to go.

1      Q.    Okay.  And he would direct you when to go to

2  the bank and to make withdrawals or pay money, correct?

3      A.    This was basically a routine.  We knew when to

4  send money to Pakistan and when to go to the bank.  So

5  that was a routine.

6      Q.    All right.  And would he tell you when to go

7  to the bank and how much money to send?

8      A.    Who used to tell me?

9      Q.    Your son, Imran Alrai.

10     A.    So it was a routine to send money to Pakistan.

11 We used to get a monthly forecast for the next month,

12 and I would decide, you know, how much to send to

13 Pakistan based on the monthly forecast for next month,

14 and that was a routine.

15     Q.    You're saying that you decided how much to

16 send to Pakistan, sir?

17     A.    The next month's forecast from Lahore, we used

18 to then decide how much to send there.

19     Q.    Who is we?

20     A.    Basically it was me, but sometimes I used to

21 consult with Imran directing how much should we send.

22     Q.    Showing you Exhibit 1 -- let's take a look at

23 128.

24           Do you see, Mr. Chaudhary, an e-mail from

25 info@digitalnet.us to Saima at the bank?

1          THE INTERPRETER:  Was that the e-mail?

2          (Witness reviews document)

3     Q.   Do you see that e-mail, sir?

4     A.   I'm reading it.  I'm trying to recall it.

5          (Witness continues to review document)

6          I don't recall.

7     Q.   All right.  So let's look at the wire transfer

8  request form attached to it.  Let's look at -- so the

9  wire statement is not on that.

10         MR. DAVIS:  Can we see 128a?

11    Q.   All right.  Do you see the wire transfer

12 request form, Mr. Chaudhary?

13    A.   Yes, I can see it.

14    Q.   Did you sign that wire request transfer form

15 to send $190,000 of DigitalNet money to Pakistan?

16    A.   Yes, I signed it.

17    Q.   Now, who decided to send $190,000 to Pakistan?

18 Was that you?

19    A.   I don't remember exactly, but I think the

20 money was sent for the extension of the office and

21 construction that was going on.

22    Q.   So did Mr. Imran Alrai have anything to do

23 with the decision to send $190,000 to Pakistan?

24    A.   I think it was our mutual decision.

25    Q.   When you say our mutual, do you mean yours and

1  Mr. Alrai's?

2       A.   Yes.

3       Q.   And is that true of the other wires to

4  Pakistan that you sent; that it was your mutual decision

5  to send them?

6       A.   Since this was a big amount, we had a

7  discussion about it, but the other amounts usually were

8  like 10 to $15,000 and they were usually for payroll, so

9  sending those a discussion wasn't needed, but since this

10 was a higher amount we discussed it mutually.

11      Q.   Let's look at 126a.  And we see the wire

12 transfer record at Pentucket Bank.  That's dated

13 November 28th of 2016.  Do you see that, sir?

14      A.   Yes, I can see it.

15      Q.   And did you sign that document, too?

16      A.   Yes, I signed it.

17      Q.   And you can see that the wire amount was for

18 $145,000, correct?

19      A.   Yes, that's correct.

20      Q.   And was that also a mutual decision with you

21 and your son to send --

22      A.   Yes.

23      Q.   All right.  Now let's talk about United Way.

24           You knew that your son was the vice president

25 of IT at United Way, correct?

1     A.   I knew he worked there but what he was working

2   there as or for, I didn't have any clarification.

3     Q.   Now, you also knew that United Way did not

4   know that you were Imran's father, correct?

5     A.   I can't answer that.  They will be able to

6   answer that.  I can't answer this.

7     Q.   So you don't remember saying on June 12th to

8   the agents when they interviewed you at your home the

9   United Way does not know that you are Imran's father?

10  You didn't say that?

11    A.   I don't remember, but it doesn't seem right.

12  I can't say.  How can I talk on United Way's behalf?

13  They would be able to tell if they knew that I'm his

14  father or not.  How can I speak to that?

15    Q.   Okay.  Now, were you involved in the invoices

16  that your son sent to the United Way?

17    A.   I don't know anything about that.

18    Q.   You had nothing to do with sending the

19  invoices, correct?

20    A.   No, I had no hand in that, nothing to do with

21  that.

22    Q.   Okay.  And you also knew that Imran generated

23  the invoices that went to the United Way, correct?

24    A.   I'm not aware of that.

25    Q.   You're not aware that your son generated the

1    invoices and sent them to the United Way?  Are you

2    saying you don't know that?

3         A.   No, I don't know who generated them.

4         Q.   All right.  Do you recall saying again on June

5    12th of 2018 when you were interviewed by the agents at

6    your house that Imran generates the invoices for

7    DigitalNet and also sends them to the United Way?

8         A.   At that time I was fasting and I was very

9    frightened and scared, and I don't know what I said.

10        Q.   All right.  And you also knew that your son

11   sent the e-mails to United Way on an account called

12   info@digitalnet.us, correct?

13            THE INTERPRETER:  Can you repeat the first

14   part of the question?

15        Q.   You also knew that your son sent the invoices

16   using an account called info@digitalnet.us?

17        A.   I'm not aware.  As far as invoices are

18   concerned, I don't know who sent what from which

19   account.

20        Q.   Are you familiar with the e-mail account

21   info@digitalnet.us?

22        A.   Yes, I know.

23        Q.   And your son used that account, correct?

24        A.   A lot of people used that account.  I used

25   that account.  People in the Lahore office used that

1   account.   The senior folks used that account.

2       Q.   You're saying that you used the account at

3   info@digitalnet.us?

4       A.   I did in the beginning a few years, but then I

5   didn't use it.

6       Q.   Sir, do you remember when you spoke to me and

7   the agents on February 7th, 2019, that you said you had

8   never sent or received e-mails using the info@digitalnet

9   account?   Do you remember saying that to us?

10      A.   I might have used it.   I don't want to use the

11  word never.   I might have used it.

12      Q.   I asked you whether you told us on February

13  7th that you never sent or received e-mails using that

14  account.

15      A.   I made the correction that I don't want to use

16  the word never.   Maybe I used it.   I made that

17  correction then that I don't want to use the word never.

18      Q.   But you did use the word never, correct?

19      A.   I don't know if I used the word never or not.

20  This word is being used.   Never say never.

21      Q.   So I'm showing you now Exhibit 117.   Do you

22  see that's an e-mail from info@digitalnet?

23      A.   Yes, I'm looking at it.

24      Q.   And do you know who Mohammad is?

25      A.   I don't know who this Mohammad is.

1    Q.   All right.  You'll agree that you knew no one

2    named Mohammad?

3    A.   I'm talking in regards to the document which

4    is being shown to me.  The Mohammad being referred in

5    this document, I don't know this Mohammad.

6    Q.   Okay.  All right.  So I want to ask you, did

7    you ever go to United Way and have a meeting with Pat

8    Latimore?

9    A.   No, I never went.

10   Q.   Are you sure about that?

11   A.   Yes.

12   Q.   Now, when you met with the agents on June 12th

13   of 2018 at your house, didn't you first tell them that

14   you did go to that meeting for DigitalNet and meet with

15   Pat Latimore?  Didn't you say that at first?

16   A.   When I received the copy on November 21st,

17   then I realized that I might have said that.

18        I got this statement corrected.  At that time

19   of the interview I was confused and I was frightened.

20   And I do wear a hearing aid, and at that time I was not

21   wearing a hearing aid.  I have lack of hearing, too, so

22   that's why.  Then later I got this statement

23   corrected -- my statement corrected here.

24        THE INTERPRETER:  Okay.

25   A.   I got this statement corrected right away.  I

1    composed myself and I got this statement corrected right

2    there and then.

3        Q.    And you then told them still on June 12th that

4    you did not go to United Way and you did not meet with

5    Pat Latimore, correct?

6        A.    Yes, that's correct.

7        Q.    Did your son ever tell you that he had brought

8    someone else to United Way who would be using your name?

9        A.    No.

10       Q.    Did you give him permission to use your name

11   in that way?

12       A.    No.

13       Q.    All right.  Have you been to the Andover --

14   well, you've already said you've never been to the

15   Andover office to have a meeting for DigitalNet,

16   correct?

17       A.    That's correct.  I never went.  I never went

18   for a meeting.

19       Q.    Okay.  Now, you remember that DigitalNet for a

20   while had contracts with the Robert Allen Group,

21   correct?

22       A.    Yes, I know.

23       Q.    And your son, Mr. Alrai, brought you the

24   contracts between DigitalNet and Robert Allen Group for

25   you to sign, correct?

1      A.   Yes.   That's correct.

2      Q.   Okay.   Now, do you remember being on

3  conference calls with the Robert Allen Group in late

4  2013?

5      A.   Yes, I remember.

6      Q.   And did you do that?   Were you on those calls?

7      A.   Yes, I was.

8      Q.   And those calls were with Robert Allen Group

9  employees?

10      A.   The CEO, Dean, and some of the staff members

11  would attend those.

12      Q.   And did Imran Alrai, your son, ask you to

13  participate in that call?

14      A.   Yes.

15      Q.   And was Imran Alrai present with you when you

16  were on the call?

17      A.   No.

18      Q.   You're sure about that?

19      A.   Yes, I'm sure.

20      Q.   And did you know that Robert Allen Group did

21  not know that Imran controlled DigitalNet?

22      A.   I'm not aware.

23      Q.   And in fact if you had known that your son,

24  Imran, was hiding from Robert Allen that he controlled

25  DigitalNet, you would have told him not to because to

1  withhold it is unethical and wrong, correct?

2          THE INTERPRETER:  Can you repeat that one more

3  time?

4      Q.   You -- if you knew that Imran was withholding

5  from Robert Allen Group that he, their former CIO, was

6  the director and controller of DigitalNet, you would

7  have told your son not to do that because to withhold

8  information like that is unethical and wrong, correct?

9      A.   Yes.  You're correct.

10     Q.   All right.  Now, let's talk about the wiring

11 money from Pentucket.

12          You would go to the bank to sign the forms to

13 wire the money to Pakistan, correct?

14     A.   Yes, that's correct.

15     Q.   And you would not fill out the forms, but you

16 would just sign them, correct?

17     A.   Yes.  That's correct.

18     Q.   And you would not provide the amount to be

19 sent to the bank employees, correct?

20     A.   Sometimes I would tell them to do it, and

21 sometimes I would just do it myself.

22     Q.   Do you recall on February 7th that you told me

23 and the agents that you did not provide the amount to be

24 sent to the bank employees, that Imran told them how

25 much?  Do you recall saying that to us?

1        A.    The regular, the routine amounts was not a

2   problem, but for larger amounts me and Imran we used to

3   discuss and come up with a mutual decision on how much

4   needs to be sent.

5        Q.    And when you went to the bank, usually Imran

6   took you there, correct?

7        A.    Yes.   That's correct.

8        Q.    And you would always go to the Salem, New

9   Hampshire, branch of the Pentucket Bank, correct?

10       A.    Yes.   That's correct.

11       Q.    Your visits to the bank usually were less than

12  five minutes, is that right?

13       A.    That's not correct.   That's not correct, and I

14  got that corrected.   Sometimes, you know, there will be

15  a lot of people there and I would have to wait.   There

16  would be people there to make deposits and stuff and I

17  would have to wait.

18       Q.    All right.   And you remember that the bank had

19  told Imran that you had to come in personally to sign

20  the documents, right?

21       A.    Yes, I remember.

22       Q.    All right.   And you also remember that you did

23  not send any of the e-mails to Pentucket Bank about the

24  wires?

25       A.    Okay.   So I just remembered.   Your answer to

1  this question is associated with the answer to the

2  previous one.  I had a surgery and I couldn't physically

3  go to the bank, and I talked to them and they said that

4  I can just, you know, do it over the e-mail, send them

5  e-mails, and that was because of the surgery, but then

6  after that I did start going to the bank.

7       Q.   And you did not send any of the e-mails to

8  Pentucket Bank, correct?

9       A.   No.  At the time of the surgery I did send

10  them e-mails.

11       Q.   When was the surgery?

12       A.   I don't remember the date.

13       Q.   Okay.  Now you also -- as part of your work

14  for DigitalNet, you signed a lot of documents that Imran

15  gave you to sign, is that right?

16       A.   Whatever documents Imran would bring to me, I

17  would sign them.

18       Q.   All right.  And you would sign things he would

19  bring you and then you would leave it up to him to

20  handle it, correct?

21            THE INTERPRETER:  I don't understand what you

22  are saying.

23            THE WITNESS:  No, I don't understand what you

24  are saying.

25            THE INTERPRETER:  Oh, for me?  Okay.

1     A.   I'm not technical so all the technical matters

2   Imran used to handle.

3     Q.   Okay.  And sometimes Imran would bring you

4   documents and you would sign them without reading them,

5   correct?

6     A.   Okay.  In the beginning I did used to read

7   them, but later on I used to glance over it quickly, and

8   if it looked right, I would sign it.  He's my son.

9     Q.   And you did not say no to Imran when Imran

10   asked you to sign things, correct?

11     A.   That's true.

12     Q.   Okay.  I just want to ask you one more

13   question about 118, Exhibit 118 and the attachment.

14     A.   Okay.

15         MR. DAVIS:  Can we bring up 118, please.

16     Q.   And looking at the attachment, you don't

17   recognize any of the sample customers on the list of

18   clients, do you?

19     A.   This is not my field.  I'm not technical.

20     Q.   So you don't recognize any of those companies

21   as doing business with DigitalNet, correct?

22     A.   I received them from the Lahore office.  I

23   don't know.

24     Q.   All right.  You knew your son had a company or

25   was trying to start a company called UltPult, correct?

```
 1                THE INTERPRETER:  What was the name?
 2                MR. DAVIS:  UltPult, U-L-T-P-U-L-T.
 3         A.   I know.
 4         Q.   And that company used programmers in Lahore,
 5    Pakistan, correct?
 6         A.   Yes.
 7         Q.   And who paid those programmers for working for
 8    UltPult?
 9         A.   DigitalNet did not pay for them.
10         Q.   Who paid for them?
11         A.   We had money for them in Pakistan.
12         Q.   Who is we?
13         A.   I had money.
14         Q.   You had money in Pakistan?
15         A.   Yes.
16         Q.   How much?
17         A.   I don't know.
18         Q.   Do you have a bank account in Pakistan?
19         A.   I used to, yes.
20         Q.   You don't anymore?
21         A.   No, not anymore.
22         Q.   So who paid the programmers in Lahore who were
23    working for UltPult?
24         A.   So all of our bank assets in America is
25    frozen, so they are being paid from the money in the
```

1    bank accounts in Pakistan.  We sold some property there.

2        Q.    And what property did you sell?

3        A.    I had a few shops.

4        Q.    Sorry?

5        A.    I had a few shops.

6        Q.    You had a few shops?

7        A.    Yes, shops.

8        Q.    So you sold property in Pakistan to pay

9    programmers in Lahore to work for UltPult, is that

10   right?

11       A.    Currently also the people who are working for

12   DigitalNet I'm paying them through that.

13       Q.    You're paying them through DigitalNet?

14       A.    DigitalNet's account is frozen.

15       Q.    So how are you paying them through DigitalNet?

16   How are you paying the programmers through a DigitalNet

17   account?

18       A.    Okay.  So we were paying them through the

19   money that was earned by selling the shops, and now we

20   have run out of money and that's why the office is going

21   to be closed.

22       Q.    All right.  So as of 2018, Imran Alrai owned

23   the house and the offices at 162-C Multan Road, correct?

24              THE INTERPRETER:  Can you repeat the address?

25              MR. DAVIS:  162-C Multan Road.

1          A.    I don't remember the date, but I have awarded

2     this to him in an inheritance.

3               THE COURT:  We've been going 90 minutes so

4     it's time for the afternoon break.

5               MR. DAVIS:  I have probably no more than

6     fifteen more minutes, ten to fifteen.

7               THE COURT:  I think his cross is going to be

8     fairly long.  That's fine.  I appreciate you telling me.

9               Let me ask -- if I've been understanding

10    correctly, he had two interactions with FBI agents that

11    I know of, at the time of the search and at a meeting

12    that you were in attendance at -- did you say in

13    January?

14              MR. DAVIS:  That was February 7th of 2019, and

15    it was under a proffer letter agreement with counsel.

16              THE COURT:  And has there been any more recent

17    contact?

18              MR. DAVIS:  Yes.  We had spoken to him just

19    before the trial.

20              THE COURT:  All right.  Maybe I didn't grasp

21    that.  Thank you.  When was that?

22              MR. DAVIS:  That was in November.

23              THE COURT:  Yeah, you did mention that.  I

24    think you mentioned that a few minutes ago.  So there's

25    three interactions?

1        MR. DAVIS:  Yes.  I will only use to impeach

2   the first two.

3        THE COURT:  Because you have a report?

4        MR. DAVIS:  And he has reports from all three,

5   yes.  Counsel does, yes.

6        THE COURT:  Should I anticipate some Rule 613

7   extrinsic evidence regarding all of this?

8        MR. DAVIS:  Yes.

9        THE COURT:  I think the trial just got longer.

10        MR. DAVIS:  It won't be that much, your Honor.

11        THE COURT:  Okay.  I get it.

12        That's an observation, not a criticism.  I'm

13   just trying to keep track of the time.

14        All right.  Let's take fifteen, and we'll

15   resume then.  Fifteen minutes.  Thank you.

16        (RECESS)

17        THE COURT:  I remind you, Doctor, you're still

18   under oath.

19        Are we still in touch with Washington?

20        THE CLERK:  Yes, your Honor.

21        THE COURT:  All right.  Mr. Davis, you may

22   proceed.

23    Q.   Mr. Chaudhary, when we broke we were talking

24   about the purchase of real estate in Lahore by your son.

25    A.   Yes.

1    Q.   And do you recall that in the end of 2017 your

2    son, Imran, purchased the lot next to 162 which was

3    known as 163?

4    A.   Yes.

5    Q.   And the sales price of that property was

6    around $200,000, U.S. dollars?

7    A.   Approximately, yes.

8    Q.   And that land is directly next to the house

9    that you lived in when you last lived in Lahore, is that

10   right?

11   A.   Yes.

12   Q.   And that land has no houses and no buildings

13   on it, correct?

14   A.   We have made a parking lot there, constructed

15   a parking lot there.

16   Q.   All right.  And you said that the house that

17   you lived in at 162-C you gave to your son, Imran, as

18   part of the inheritance?

19   A.   Yes.

20   Q.   And the inheritance you gave him was in the

21   form of a discount on the price of that house, correct?

22   A.   Yes, that's correct.

23   Q.   And your son, Imran, had to give you

24   approximately $200,000 to buy the house at 162-C,

25   correct?

1          A.    I'm not clear.

2          Q.    Your son gave you -- paid you approximately

3    $200,000 to purchase the building at 162-C, correct?

4          A.    The money that Imran gave me, I spent it on

5    the extension of the office and construction of the --

6               MR. DAVIS:   I'm sorry?

7               THE INTERPRETER:   Extension and construction

8    of the office.

9          Q.    How much did Imran pay you for the building?

10         A.    Almost $200,000.

11         Q.    So Imran paid $200,000 for the land at 163,

12   correct?

13         A.    Yes.

14         Q.    And he also paid you almost $200,000 for the

15   house at 162-C, correct?

16         A.    Yes.

17         Q.    Where did the money come from?

18         A.    I think the money came from my daughter-in-law

19   and DigitalNet and my son's salary, also, but I'm not

20   sure.

21         Q.    You said your daughter-in-law and DigitalNet,

22   is that right?

23         A.    No, no.  I'm not clear.

24         Q.    So I'm showing you 128a, Exhibit 128a again,

25   and going on to the wire transfer record.  So this is

1  December of 2017, correct?

2      A.    Yes.

3      Q.    Did your son use this money to buy real estate

4  in Pakistan?

5      A.    It's possible.

6      Q.    All right.  So let's talk a little more about

7  DigitalNet and Pakistan.

8      A.    Okay.

9      Q.    We've already seen documents showing that your

10 son, Imran, presented himself as CEO of DigitalNet

11 Pakistan, correct?

12     A.    Right.

13     Q.    And initially the office manager of the

14 Pakistan office for DigitalNet was your son-in-law, Mr.

15 Ahmad Hassan, correct?

16     A.    Yes.

17     Q.    And Mr. Hassan is married to your daughter,

18 Rehab, correct?

19     A.    Yes.

20     Q.    And they have two children in Lahore, correct?

21     A.    Yes.

22     Q.    So Mr. Ahmad Hassan worked until Jawad took

23 over as manager of DigitalNet Pakistan, correct?

24     A.    Yes.

25     Q.    And Jawad is your youngest son; is that

1  correct?

2       A.   Yes, he's the youngest, and then I have two

3  younger daughters.

4       Q.   And Jawad is trained in IT, correct?

5       A.   Yes.

6       Q.   And your daughter, Rehab, also worked for

7  DigitalNet in Pakistan, correct?

8       A.   Yes.

9       Q.   And she was an accountant for a while, is that

10 right?

11      A.   She was working regularly previously, but now

12 she works part-time.

13      Q.   She works part-time for DigitalNet in

14 Pakistan, is that right?

15      A.   Yes.

16      Q.   All right.  So money wired to Pakistan from

17 Pentucket Bank, that went to benefit your son-in-law,

18 Ahmad, when he was office manager, correct?

19      A.   He was employee of DigitalNet so that was his

20 salary.

21      Q.   All right.  And so that went to benefit him,

22 correct?  The fact that he was on the payroll of

23 DigitalNet and getting a salary from DigitalNet

24 benefited your son-in-law, correct?

25      A.   Obviously he was getting his salary.

1      Q.   All right.  And so was Jawad, your son, who

2   was later the office manager, he also got a salary from

3   DigitalNet, right?

4      A.   Yes.

5      Q.   And then Rehab got money also for working for

6   DigitalNet, correct?

7      A.   Yes.

8      Q.   Any other family members on the payroll at

9   DigitalNet Pakistan?

10      A.   No.

11      Q.   All right.  Was DigitalNet doing research and

12   development work in Pakistan?

13      A.   Nowadays or before?

14      Q.   In let's say 2017 was DigitalNet doing

15   research and development work in Pakistan?

16      A.   This is more a question on the technical side,

17   aspect of it.  I don't have the answer.

18      Q.   Do you know if United Way was paying

19   DigitalNet to do research and development work in

20   Pakistan?

21      A.   No, I'm not aware.

22      Q.   Okay.  Now, you never authorized Imran Alrai

23   to sign your name on documents, correct?

24      A.    It was never discussed, but I would never want

25   him to sign.

1      Q.    Why would you not want him to sign your name

2  on a document?

3      A.    That would not be right.

4      Q.    And you also never gave your son, Imran,

5  permission to sign your name on an e-mail, correct?

6      A.    We never discussed it, but I would never want

7  him to do that.

8      Q.    And your son, Imran, never told you that he

9  was sending e-mails and signing your name, correct?

10     A.    I don't think he would do that.

11     Q.    Okay.  And if you had known about it, you

12  would not have allowed that to happen, correct?

13     A.    Yes.  That's right.

14     Q.    So I'm showing you 883 for identification on

15  the ELMO, and you see this document is dated September

16  11, 2013?

17     A.    Yes.

18     Q.    And it shows that you're the buyer of the

19  property at 31 Lowell Road, correct?

20     A.    Yes, I can see it now.

21     Q.    Okay.  You can see that Mac Chaudhary is the

22  buyer there?

23     A.    This document is an intent of purchase

24  document.

25     Q.    Okay.  Understood.

1          MR. DAVIS:  Your Honor, I move to admit 883

2    and strike the ID.

3          MR. HARRINGTON:  No objection.

4          THE COURT:  It's admitted.

5          (Government's Exhibit No. 883 admitted)

6      Q.   Now, sir, the fourth page of this document,

7    that has an acceptance by trustee that appears to be

8    signed by you, correct?

9      A.   Yes, that's correct.

10     Q.   And who now owns the property at 31 Lowell

11   Road in New Hampshire?

12     A.   I'm not completely sure, but I think it

13   belongs to the trust.

14     Q.   All right.  And the beneficiaries of the trust

15   are your son, Imran; is that right?

16     A.   I'm not -- I can't recall.

17     Q.   Okay.  Fair enough.  So I'm showing you the --

18         THE COURT:  I didn't hear the answer.  What

19   was the answer?

20         MR. DAVIS:  I think he said he can't recall

21   that.  Sorry, Judge.

22         THE COURT:  I can't recall.  Okay.

23     Q.   I'm showing you the third page of that same

24   document, which is 883.  Do you see the signature there

25   over Mac Chaudhary?

1      A.    Yes, I can see it.

2      Q.    Is that your signature?

3      A.    Yes, that's possible.

4      Q.    That's possible?

5      A.    That's not the way I usually signed, but may

6  have just like initialed it.  I may have done that.

7  That's not my usual signature.

8            MR. DAVIS:  Nothing further.  Thank you.

9            THE COURT:  Cross.

10                    CROSS-EXAMINATION

11 BY MR. HARRINGTON:

12     Q.    Good afternoon, Mr. Chaudhary.

13     A.    Good afternoon, sir.

14     Q.    I want to ask you a few questions about you

15 establishing DigitalNet in Pakistan.

16     A.    Okay.

17     Q.    You said that it was your idea to set up

18 DigitalNet in Pakistan, correct?

19     A.    I was the one who created it in Pakistan.

20     Q.    And part of the reason that you wanted to

21 create DigitalNet in Pakistan was for a family business?

22     A.    I wanted to establish my family, and, you

23 know, for something for them after I die.

24     Q.    And part of that was to have your son Jawad,

25 your son-in-law Ahmad, your daughter Rehab, and Imran

1   involved in this business?

2       A.    Okay.  They were not a part of this because

3   they were my kids.  They were part of it because they

4   had the skill set.  If they did not have, you know, the

5   skill set, then I would have hired other people.

6       Q.    And you did this and set up DigitalNet in

7   2006/2007 I think you said, correct?

8       A.    Yes.

9       Q.    Now, let me ask you about the office in

10  DigitalNet.  When you first set it up, how was it

11  staffed?

12          THE INTERPRETER:  Let me complete here.

13      A.    So Rehab worked in accounting and payroll, and

14  Jawad and Ahmad Hassan were very good in IT.  And before

15  2006 there was a big computer boom in Pakistan.  I'm

16  trying to explain this to you.

17          THE INTERPRETER:  Go ahead, Mr. Chaudhary.

18      A.    So before 2006 there was this large computer

19  boom in Pakistan, and there was a lot of opportunity,

20  and all the businesses were going computerized.  So this

21  was just an opportunity for me from a business point of

22  view so I can, you know, leave and do something for my

23  kids and leave something for my kids.

24      Q.    And when did you come to the United States?

25      A.    In 2008 most probably.

1     Q.    And in the time that you were in the United

2  States did DigitalNet in Pakistan grow?

3     A.    DigitalNet was in very good standing.

4     Q.    And during the times from say 2008 to 2018,

5  how many people would be employed at DigitalNet in

6  Pakistan?

7     A.    So it depended on the workload.  Usually 20

8  plus or at the very most 30 plus.

9     Q.    And would you agree that DigitalNet in

10  Pakistan worked on things other than United Way jobs?

11     A.    Yes.  They worked in Pakistan and in Middle

12  East.

13     Q.    Let me ask you, in regard to -- I'm going to

14  change subjects now.

15          You were shown an e-mail earlier that was

16  signed by Mohammad?

17     A.    Yes.

18     Q.    And you indicated that you did not recognize

19  just the name Mohammad from the e-mail signature,

20  correct?

21     A.    I can explain it if you give me the permission

22  to do so.

23     Q.    My question is -- and you can explain it in

24  any way you want.  My question is, you are familiar with

25  a particular individual by the name of Mohammad Hassan

1     who works at DigitalNet in Lahore, Pakistan, correct?

2          A.   Yes, I know him.

3          Q.   And you agree with me that the staff or

4     workers at Lahore -- in Lahore, Pakistan at DigitalNet

5     were able to access the info@digitalnet.com e-mail

6     address, correct?

7          A.   Yes, the senior staff had access.

8          Q.   And you agree with me that the staff at

9     DigitalNet in Pakistan or senior staff in DigitalNet

10    Pakistan would also be able to connect through the use

11    of a VPN to conduct conference calls with, for example,

12    Robert Allen or the United Way, correct?

13         A.   They used to have conference calls with Robert

14    Allen.

15         Q.   Now, I want to ask you about -- to kind of

16    clarify, you were asked about a money source or selling

17    businesses in Pakistan to pay the programmers for

18    UltPult.  Do you recall those questions?

19              THE INTERPRETER:  Can you repeat the name of

20    the company?

21              MR. HARRINGTON:  UltPult, U-L-T-P-U-L-T.

22         A.   Yes, that's true.

23         Q.   And you talked about having a bank account.

24    Do you recall that?

25         A.   Yes, I remember.

1       Q.    And would you agree with me that the bank

2   account that you were referring to was more of a family

3   bank account relative to your son, Jawad?

4       A.    Yes.   That's because Jawad used to manage it.

5       Q.    And so the money from the sale of the

6   properties you talked about went into that bank account

7   that Jawad managed to pay the UltPult programmers?

8       A.    Yes.

9       Q.    I want to ask you about the statements that

10  you gave to the police.

11      A.    Okay.

12      Q.    When was the first time you were shown a copy

13  of your proffer statements?

14      A.    My proffer was in February, but I got the copy

15  of the proffer on November 21st.

16      Q.    And did you see that there were corrections

17  that you needed to make to that proffer letter or the

18  statement?

19      A.    Yes.

20      Q.    And did you provide those corrections to your

21  attorney and the government?

22      A.    My attorney got them last night and he sent

23  them over to me last night.

24      Q.    Well, let me ask you in regard to November

25  21st -- getting your proffer statement then you

1    indicated, right?

2         A.    Yes.

3         Q.    Did you make corrections to that?

4         A.    There were some mistakes in it.

5         Q.    And did you most recently get additional

6    information from the government that were attributing

7    statements to you?

8         A.    Can you repeat the question?

9         Q.    Well, let me ask this way.  When was the last

10   time you received information from the government

11   documenting your statements?

12        A.    Last night.

13        Q.    Okay.  And did you have to make corrections to

14   that and send it back to the government?

15        A.    There were a lot of things there which were

16   not my words.

17        Q.    Before last night did you receive a document

18   that had statements in it that you had to correct?

19        A.    I received documents from my attorney on the

20   21st of November, and then I requested a meeting with my

21   attorney.

22        Q.    And did you try to make corrections to the

23   documents that you had received?

24        A.    Yes.

25        Q.    And based on your review of the documents, did

1   you feel that the government had accurately caught the

2   statements that you believe you made to them?

3        A.   The wording that they have used, that has

4   altered the meaning of some of the statements.

5        Q.   In regard to the statements on June 12th that

6   you were asked about that you gave to the police when

7   there was a search warrant at your home, you recall

8   being questioned about that?

9        A.   Police did not give me the search warrant.

10  They showed me the search warrant, but they did not give

11  me to read it.

12       Q.   And in regard to any statements that you made

13  that day on June 12th, have you ever been provided with

14  any document that you could review to see if it's

15  correct?

16       A.   I got that on November 21st, 2019.

17       Q.   And those are some of the statements that

18  you've indicated to the Judge that you were trying to

19  correct?

20       A.   Yes.

21            THE COURT:  I guess I'm confused of the trying

22  to correct.  I mean, he has a lawyer.  What was he

23  having to correct?  If I've overlooked it, I'm sorry.

24            MR. HARRINGTON:  I can ask a further question

25  on it, Judge.

1      THE COURT:  All right.  Thanks.

2      MR. HARRINGTON:  And I'm talking obviously in

3 general terms about corrections to the --

4      THE COURT:  302s or something?

5      MR. HARRINGTON:  It's actually a report, if

6 you will, kind of a narration thing, these are the

7 things that he said, and then he corrected them, and he

8 went through correcting them.

9      THE COURT:  He went through correcting them.

10 Okay.  All right.  I'm just not clear on how this all

11 happened.  It seems like you're trying to get to it, but

12 I just don't get it.

13      I mean, do you have his corrections?

14      MR. DAVIS:  I do.

15      THE COURT:  Oh.  Okay.

16      MR. DAVIS:  Can I -- I can explain it.

17      THE COURT:  Well, it depends.

18      Do you want him to explain it to me in front

19 of the witness?  I'll listen, but I also don't want

20 to --

21      MR. DAVIS:  I'll withdraw that, your Honor.

22      THE COURT:  Okay.

23      MR. HARRINGTON:  So let me see if I can kind

24 of clarify it, Judge.

25      THE COURT:  I got the sense that you were

1  surprised by this.  If you had corrections, I think you

2  would still be surprised, but you might be less

3  surprised.  That's all I'm saying.  That's all I'm

4  trying to get to.  I didn't get the sense that you saw

5  this coming, but you did apparently because you got

6  corrections, right?

7          MR. DAVIS:  I would say as to some and not as

8  to others.  I was surprised by some and not by others.

9          THE COURT:  Thank you.

10         MR. HARRINGTON:  And so it sounds like you do

11 have it, Judge.  I'm going to leave it at that.  I don't

12 think I need to get further into it.

13         THE COURT:  All right.

14         MR. HARRINGTON:  Judge, I don't have any other

15 questions for Mr. Chaudhary.

16         THE COURT:  Okay.  Wait a minute.  Let me just

17 ask a couple questions just generally before you do any

18 redirect and before you finish your cross.

19         Have I heard evidence about his access to

20 different computers at the home address?

21         MR. DAVIS:  No.

22         THE COURT:  No, I haven't.  Okay.

23         Mr. Hunter, the IP address --

24         MR. HUNTER:  Yes, your Honor.

25         THE COURT:  -- is that attributable to the

1     defendant's computer or just the wireless service at

2     the --

3               MR. HUNTER:  It would be the Internet network

4     on the property.

5               THE COURT:  The Internet network on the

6     property.

7               MR. HUNTER:  Yes.

8               THE COURT:  Okay.  So neither side has

9     proffered any evidence about access to computers.

10    That's the state of the evidence.

11              The trust that he referred to, have those

12    trust declarations been entered into evidence?

13              MR. DAVIS:  Exhibit 838 is, yes.

14              THE COURT:  Thank you.  838?

15              MR. DAVIS:  But I'm not sure if the actual

16    trust document is marked, your Honor.

17              THE COURT:  What's 838?

18              MR. DAVIS:  I'm sorry.  883 is DigitalNet

19    Technology Solutions, and it is an intent to purchase

20    the property at 31 Lowell Road in Windham.

21              THE COURT:  By?

22              MR. DAVIS:  And the buyer is Mac Chaudhary,

23    and there is an existing trust that does pay taxes as

24    part of Mr. Terry's tax service.

25              THE COURT:  Yeah.

1      MR. DAVIS:  So there is still I think an

2  entity that owns property.

3      THE COURT:  Oh, it sounds like there's a

4  trust.  You asked him repeatedly, who's the beneficiary

5  of the trust, and I want to be clear.  I'm asking are

6  the trust declarations, which would tell me who the

7  trust beneficiaries are, are they in evidence yet or are

8  they going to be in evidence?

9      MR. DAVIS:  I don't think so, your Honor.  I

10  don't think they are in evidence, and we will endeavor

11  to introduce them before --

12      THE COURT:  I'm not asking you to put on any

13  evidence.  I'm just asking what is the evidence.

14      MR. DAVIS:  All right.

15      THE COURT:  Did you want to say something?

16      MR. HARRINGTON:  Yes.  I actually would follow

17  up.  I thought he had already testified, Judge, relative

18  to his use of the info@digitalnet.com --

19      THE COURT:  E-mail address.

20      MR. HARRINGTON:  -- e-mail address, and I

21  think I should ask a little bit further about --

22      THE COURT:  I think he testified about that,

23  too.

24      MR. HARRINGTON:  And so I would follow up to

25  clarify that.  It was an assumption that I should have

1    dug a little deeper on.

2        Q.   Mr. Chaudhary, I want to ask you a little bit

3    about your use of the info@digitalnet.us e-mail address.

4        A.   Yes.

5        Q.   When you would use that, would you access that

6    through the home office where you live?

7        A.   We had one computer that has a scanner and

8    printer attached to it, and myself and Imran would both

9    use that computer.

10       Q.   And is this computer the one that's located in

11   the home office where you reside with Imran and his wife

12   and children?

13       A.   Yes.

14       Q.   And did you share a password or access to that

15   computer with Imran?  Were you both able to access that

16   computer?

17       A.   We both had the same login and password.

18       Q.   And the login and password information was

19   relative to accessing the computer, not for accessing

20   the info@digitalnet.com e-mail, correct?

21       A.   Yes.  To enter the computer, yes.

22            MR. HARRINGTON:  No other questions, your

23   Honor.

24            THE COURT:  Redirect.

25

| | |
|---|---|
| 1 | REDIRECT EXAMINATION |
| 2 | BY MR. DAVIS: |
| 3 | Q.   So Mr. Chaudhary, you now say there's a |
| 4 | Mohammad Hassan in Pakistan; is that right? |
| 5 | A.   Yes. |
| 6 | Q.   When you were interviewed on February 7th of |
| 7 | 2019, you told us that you did not know who Mohammad |
| 8 | Hassan is and you do not recognize his signature, |
| 9 | correct? |
| 10 | A.   I was shown a document that has signature on |
| 11 | it.  I couldn't relate that signature to Mohammad |
| 12 | Hassan. |
| 13 | Q.   You told us that you did not know who Mohammad |
| 14 | Hassan is, right? |
| 15 | A.   I said that as for referencing the document, I |
| 16 | have three Mohammads who work for me.  So I have three |
| 17 | Mohammads who work for me.  There's Mohammad Fayyaz, |
| 18 | Mohammad Atif, and Mohammad Hassan.  These are the only |
| 19 | three who worked on the administrative side. |
| 20 | On the technical side there are more |
| 21 | Mohammads.  Mohammad is a common name. |
| 22 | Q.   You have people working for you now in |
| 23 | Pakistan; is that right? |
| 24 | A.   By me, you mean DigitalNet? |
| 25 | Q.   Yes, I guess so.  Yes. |

1        A.    Yes.

2        Q.    But I thought you said the money to pay this

3   payroll had run out.

4        A.    It's most likely that if I'm not able to

5   arrange money from somewhere else, then the office will

6   shut down after this month.

7        Q.    All right.  And just to be clear, if there's

8   an e-mail sent to someone that's signed by Mohammad on

9   info@digitalnet.us, you did not write that e-mail, did

10  you?

11       A.    Mohammad Hassan that you're talking about,

12  he's been with me before the creation of DigitalNet.

13       Q.    No, sir.  I asked you if there's an e-mail on

14  info@digitalnet that is signed by Mohammad, you, Mac

15  Chaudhary, did not write that e-mail, correct?

16       A.    When the office was initially established in

17  the U.S., it was possible.  He used to send me e-mails

18  and I used to send e-mails.

19       Q.    Did you write e-mails and sign Mohammad's name

20  to them?

21       A.    I will write my name.  Why would I write

22  Mohammad's name?

23            THE COURT:  Is that a no?  Is that a no?

24            THE WITNESS:  Yes, Judge.  That's a no.

25            MR. DAVIS:  I'm sorry.  What was the answer?

1          THE WITNESS:  No.

2          THE COURT:  When you said, why would I write

3  Mohammad's name, you're telling me that you did not

4  write Mohammad's name on that e-mail?

5          THE WITNESS:  I did not write that name.  Yes,

6  sir.  Yes, your Honor.

7          MR. DAVIS:  Nothing further.

8          THE COURT:  All right.

9          MR. HARRINGTON:  No recross.

10          THE COURT:  Sir, you're excused.  You may go.

11          THE WITNESS:  Thank you, sir.

12          (Conclusion of requested excerpt)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 12-11-19      /s/   Susan M. Bateman _____
                         SUSAN M. BATEMAN, RPR, CRR