*NO COPY OF THIS TRANSCRIPT MAY BE COPIED PRIOR TO JUNE 22, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:18-cr-192-JL
            v.                    *   December 5, 2019
                                  *   1:47 p.m.
IMRAN ALRAI                       *
                                  *
* * * * * * * * * * * * * * * * * *
```

EXCERPT TRANSCRIPT OF BENCH TRIAL
DAY FOUR - AFTERNOON SESSION
TESTIMONY OF ELAINE SINGER, DOMENIC PALLARIA
AND JOHN MEYER
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office




For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon PA




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                        I N D E X

 2

 3   WITNESS:           Direct    Cross    Redirect    Recross

 4
     ELAINE SINGER                  3        31          --
 5

 6   DOMENIC PALLARIA     37       67        --

 7
     JOHN MEYER           74
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  All right.  Before I forget,
 3    tomorrow we're starting at 8:00.  We can go till 1:00
 4    p.m.  Does that work for everybody?
 5              MR. HARRINGTON:  Yes, your Honor.
 6              THE COURT:  So we'll get pretty close to a
 7    decent day in, but it won't be quite the same length,
 8    but 8:00 to 1:00.
 9              All right.  Let's proceed.  You may begin your
10    cross.
11                    CROSS-EXAMINATION
12    BY MR. AYER:
13         Q.   Ms. Singer, where you sort of left off was --
14    well, you predated Imran Alrai at United Way, correct?
15         A.   Correct.
16         Q.   By how long?
17         A.   He came in, what year, '14 --
18         Q.   2012.
19         A.   -- 2014, and I came in 1999, I believe.
20         Q.   Okay.  So by over a decade?
21         A.   Yes.
22         Q.   And you'd been there working in the same
23    field --
24         A.   Yes.
25         Q.   -- prior to then?
```

1        And so you were relatively familiar with how

2   things were and how they worked --

3        A.   Yes.

4        Q.   -- in your department?

5        A.   Yes.

6        Q.   And at the time that Mr. Alrai arrived in

7   2012, the IT department was not in good shape, right?

8        A.   It was reasonable shape.

9        Q.   And, in fact, in February of 2013, you helped

10  prepare a report to show the current state of the IT

11  environment, right?

12       A.   I don't remember.

13       Q.   All right.  So if I showed you what's been

14  marked and admitted as M-2, do you remember having a

15  part in creating this technology update?

16       A.   Yes.  I don't remember the back -- back of it.

17       Q.   But you had a hand in creating it?

18       A.   Yes.

19       Q.   And in creating that, you did this diagram of

20  what you call the current status?

21       A.   Yes.

22       Q.   You note that numerous systems that do not

23  automatically share data?

24       A.   Right.

25       Q.   And we can see there's a whole bunch of arrows

1     there going every which way?

2          A.    Right.

3          Q.    And there are some boxes that aren't even

4     connected to the others?

5          A.    Right.

6          Q.    And so that system needed updating?

7          A.    Yes.

8          Q.    And that system had been in place prior to

9     Mr. Alrai's arrival?

10         A.    Yes.

11         Q.    And that was essentially the system that

12    existed under Nancy Powers?

13         A.    Not the only system, yes.  I mean, looking at

14    this, this -- I think -- I can't read what's in the

15    black box.

16         Q.    Right.  The black box in the middle, I can

17    tell you this is a copy, it says Rainbow.

18         A.    Rainbow, yes.  So that was a system we had

19    already been off for ten years and then these were

20    brought -- brought in.

21               So, yes, Nancy Powers and I started that

22    program --

23         Q.    Okay.

24         A.    -- back then, yes.

25         Q.    And then the plan was to move to Andar,

```
 1   correct?
 2        A.   Yes.
 3        Q.   And the goal of Andar was this, right?
 4        A.   That was the goal, yes.
 5        Q.   To streamline the communications and
 6   streamline the organization of the department --
 7        A.   Yes.
 8        Q.   -- and the technology at United Way?
 9        A.   Right.
10        Q.   And that did happen, right?
11        A.   Some of it did, yes.
12        Q.   And things did get streamlined when Mr. Alrai
13   joined United Way?
14        A.   Because we went to Andar.
15        Q.   Right.  And that happened under him?
16        A.   Yes.  We -- yes.  But there were issues that
17   that didn't all get streamlined.
18        Q.   And then prior to my client arriving at the
19   United Way, you were dealing with, and we heard on your
20   direct, with CWAIN?
21        A.   Yes.
22        Q.   And can you describe what CWAIN was?
23        A.   CWAIN was a company that was to design a new
24   Rainbow system that would do a CRM --
25        Q.   Uh-huh.
```

1      A.   -- and bring in everything else.   So they were

2   designing that system.

3      Q.   So just so I can try to oversimplify it, CWAIN

4   was -- CWAIN was intended to be -- intended to serve

5   this function here; you know, this is the Andar map, but

6   CWAIN was intended initially to serve this function of

7   streamlining everything we saw in this document into

8   CWAIN?

9      A.   That was not CWAIN's idea.   CWAIN's was to

10   replace Rainbow.

11      Q.   So as we spoke, Rainbow is, you know, this --

12   sorry, my hands are in focus -- Rainbow is this middle

13   rectangle --

14      A.   Yes.

15      Q.   -- here?

16      A.   Right.

17      Q.   And so CWAIN was supposed to do that?

18      A.   Yes.

19      Q.   But instead what you did was -- because CWAIN

20   was working out, right?

21      A.   Right.

22      Q.   You'd spent about $2 million on it?

23      A.   Or more, yes.

24      Q.   Or more.   And you either didn't get a product

25   or you got an inferior product, which was it?

1     A.    It was a product in process.  They were trying

2  to create a CR -- Microsoft CRM --

3     Q.    Uh-huh.

4     A.    -- to a Rainbow.

5     Q.    And it didn't work out?

6     A.    No.

7     Q.    And that was a product that was being worked

8  on under Nancy Powers as well?

9     A.    Yes.

10     Q.    And when Mr. Alrai was hired and he came on,

11  was Andar used instead of CWAIN?

12     A.    No.  We were in the process of looking for a

13  replacement.

14     Q.    Okay.  So Andar and CWAIN are not the same

15  thing?

16     A.    No --

17     Q.    Okay.

18     A.    -- two different companies.

19     Q.    Not serving the same function?

20     A.    No.

21     Q.    Okay.  But CWAIN was jettisoned at that point?

22     A.    Was trying to replace Andar, yes.

23     Q.    And so after you with CWAIN spent over

24  $2 million and not gotten a product, it was decided that

25  you'd just stop working with them?  How was the

1  relationship ended?

2      A.    There were a couple investigations on it,

3  looking into, you know, confirming that the system did

4  not work.  And then once they confirmed that, then Nancy

5  Powers was let go and CWAIN was let go and we started

6  looking for a new product.  And so we -- Imran was there

7  and we did several searches.

8      Q.    Okay.  So I want to back up, because you just

9  said a lot there.

10     A.    Yes.

11     Q.    So you did investigations.  That was not --

12 we're not talking like police, FBI, or anything --

13     A.    No.

14     Q.    -- we're talking internal United Way

15 investigations.

16     A.    Yes.

17     Q.    It was determined CWAIN didn't work?

18     A.    Yes.

19     Q.    And then it was decided you were not going to

20 continue with CWAIN?

21     A.    Right.

22     Q.    Was there any action taken against CWAIN, any

23 lawsuits or anything like that?

24     A.    I don't think so, no.

25     Q.    Just decided we're not doing this anymore,

```
1    stop work, we're moving on?
2         A.   Right.
3         Q.   And then you said Nancy Powers was let go?
4         A.   Yes.
5         Q.   Was that related to what happened with CWAIN?
6         A.   Yes.
7         Q.   It was decided that either -- I guess the
8    corporate parlance is you were going in a different
9    direction?
10        A.   By the -- what do you mean by that?
11        Q.   That the CWAIN had gone so badly that they
12   wanted somebody else to run the department at that
13   point?
14        A.   CWAIN was not running the IT department.
15   CWAIN was --
16        Q.   No, I understand.
17        A.   Okay.  Okay.
18        Q.   But CWAIN, the project, went badly?
19        A.   Yes.
20        Q.   And did that cause people to lose faith in
21   Nancy Powers?
22        A.   Yes.
23        Q.   Okay.  So the two are related?
24        A.   Those two, yes.
25        Q.   All right.  You had also been using an outside
```

1    vendor for IT since about 2007?

2         A.    Yes.

3         Q.    Who was that outside vendor?

4         A.    I forget what they're called, but Dave Burke

5    was the owner of that company --

6         Q.    Okay.

7         A.    -- that was -- yes.

8         Q.    So prior to Mr. Alrai arriving and prior to

9    DigitalNet becoming an outside vendor, United Way had

10   been working with outside vendors for IT?

11        A.    Yes.

12        Q.    And you also, prior to Mr. Alrai arriving at

13   United Way, had also been looking at Andar or is that

14   something that happened after he arrived?

15        A.    After.

16        Q.    Okay.  Now, when Mr. Alrai arrived, he did not

17   spend every day at the office, you mentioned at

18   direct -- on direct?

19        A.    No.

20        Q.    He worked outside of the office about three

21   days a week?

22        A.    Yes.

23        Q.    But he was responsive via email?

24        A.    Email, yes.  He wouldn't get back to us right

25   away, but yes.

```
1          Q.    And he was not the only person in the

2     department who worked remotely several days a week?

3          A.    No.

4          Q.    In fact, you worked remotely at least one day

5     a week?

6          A.    I got that privilege only after he came.

7     There was another employee that worked three days at

8     home.

9          Q.    All right.  But you did get that privilege?

10         A.    Just one day.

11         Q.    And then you mentioned another employee who

12    worked three days at home.  That was Susan Piscatelli,

13    right?

14         A.    Yes.

15         Q.    So she also worked three days at home?

16         A.    Yes.

17         Q.    So within the department it was not unheard of

18    that an employee would work from home?

19         A.    No.

20         Q.    And with IT, which is something, as we're

21    hearing, you can do remotely from Saudi Arabia and

22    Pakistan, it's not impossible to do that remotely --

23         A.    Right.

24         Q.    -- right?

25         A.    Right.
```

1      Q.   And you also discussed, I think in depth, the

2  invoicing process.

3      A.   Yes.

4      Q.   You mentioned that before Mr. Alrai arrived,

5  you didn't -- you were not involved in that?

6      A.   Right.

7      Q.   You only became involved with that as a result

8  of Mr. Alrai asking you to do it?

9      A.   Right.

10     Q.   Otherwise, he would have done the invoicing

11 himself?

12     A.   Yes.

13     Q.   So the invoices would have come to him --

14     A.   Right.

15     Q.   -- and he would have signed off on them --

16     A.   Right.

17     Q.   -- and then sent them on to finance?

18     A.   Correct.

19     Q.   And you would never have seen them?

20     A.   Right.

21     Q.   But he had you brought in the loop on that?

22     A.   Right.

23     Q.   So you did see every invoice?

24     A.   Every invoice.

25     Q.   And you did sign off on them?

1      A.   Yes.  I signed -- yes.

2      Q.   And then those invoices, once they were signed

3 off on, there were a few people who were involved.  So

4 it was you, right?

5      A.   Uh-huh.

6      Q.   There was Imran?

7      A.   Uh-huh.

8      Q.   And then there was a budget director?

9      A.   Uh-huh.

10      Q.   And who was that?

11      A.   Dom.

12      Q.   Dom -- and that's Dom Pallaria?

13      A.   Yeah.

14      Q.   And then finance?

15      A.   Yes.

16      Q.   And who in finance would be dealing with it?

17      A.   Sonia processed the payments.

18      Q.   And all those people had to see the invoices

19 and sign off on them before they could get paid?

20      A.   Clarify that.

21      Q.   They all saw the invoices along that way,

22 right?

23      A.   They saw it, yes.

24      Q.   They all physically had them and looked at

25 them?

1      A.    Yes.

2      Q.    And at any point could one of them have said,

3   hey, there's an issue here, we shouldn't pay this?

4      A.    Yes.

5      Q.    And so for an invoice to get paid, all four of

6   those steps -- you, Mr. Alrai, Mr. Pallaria, and then

7   finance -- had to see them and okay them to get paid?

8      A.    Yes, but there was a PO that was signed by

9   people approving that money to go, to be spent on that.

10      Q.    Describe that, please.

11      A.    So like --

12      Q.    First of all -- and I'm sorry to interrupt you

13   before you start answering.

14      A.    Yes.

15      Q.    First of all, tell us what PO is and then

16   describe that.

17      A.    A PO is a purchase order.

18      Q.    Okay.

19      A.    Blanket order is a -- a BO is a blanket order,

20   meaning that it's signed in July 1 and it covers the

21   year to June 30th.

22            So invoices will come in and as long as I

23   have money on that budget -- on that blanket order, I

24   would -- I could sign it and put it through.  Once there

25   was no money, then it would come back.

1      Q.   Okay.

2      A.   So once it was expensed.

3           So my signing it is just saying, yes, we have

4   money, pay it.

5      Q.   Okay.  And then it still has to go through

6   Imran and then Dom --

7      A.   Imran didn't -- a lot of times he didn't see

8   it because I still had money.

9      Q.   Okay.

10     A.   I would tell him that, hey, this invoice came

11  in, I paid it, you know.

12     Q.   Okay.  So the billing sometimes would go just

13  from you directly to Mr. Pallaria to finance?

14     A.   To Sonia --

15     Q.   Sonia.

16     A.   -- and then finance, yes.

17     Q.   Okay.  And they would all see those; even the

18  POs, as you described it, they would see those?

19     A.   Yes.

20     Q.   And you could also, if there was an issue with

21  an invoice, it could be raised beyond that; for example,

22  Jack Rotondi could get involved if there was an issue?

23     A.   I don't -- it was rare unless it was in his

24  budget.

25     Q.   But he could get involved?

 1      A.    Not for IT unless it was a contract, prior to

 2   mine.

 3      Q.    So describe -- so what do you mean, if it was

 4   a contract?

 5      A.    If a company wants to do business with us,

 6   with the United Way, they would put -- and we want to

 7   put them on a long term, then we would sign a contract.

 8   And once that contract was approved, then a blanket

 9   order or PO would be created.

10      Q.    Okay.

11      A.    So ...

12      Q.    And if there is an issue vis-a-vis a contract,

13   would that go to Jack potentially?

14      A.    Probably go to Jack in finance, yes.

15      Q.    All right.  And then -- I mean, I think we've

16   also heard that sometimes if there was a bill that

17   seemed strange, it would get up to Pat Latimore?

18      A.    Pat Latimore is Imran's manager --

19      Q.    Okay.

20      A.    -- supervisor, so she would have -- so Imran

21   could sign it at a certain level, then Pat would get a

22   certain level and then it would go up the chain, signing

23   the contract.

24      Q.    Okay.  And as far as you were -- as far as you

25   were aware, that procedure, whichever procedure it went,

1    depending on the invoice, was followed?

2         A.    Uh-huh.

3         Q.    For all of the invoices from DigitalNet?

4         A.    As far as -- yes.  Yes.

5         Q.    So to use sort of an absurd example to make a

6    point, what would have happened in your experience -- if

7    you can say.  Here's a hypothetical.

8              If you got an invoice from DigitalNet that

9    said $1 million for delivery of M&Ms -- just something

10   completely absurd -- what would your process have been?

11        A.    If I had nothing -- I just had the invoice and

12   nothing?

13        Q.    Correct.

14        A.    Correct?  Yeah.  I would give it to Imran.  He

15   would have to start the process of getting the money,

16   the budget, and everything processed and getting it

17   approved to be paid.

18        Q.    Even if it was something absurd like that,

19   would you raise any questions?  Would you bring it to

20   somebody?

21        A.    Yes.

22        Q.    Who would you bring it to?

23        A.    Well, I would always start with Imran on

24   things like that.

25        Q.    And, again, just to use, again, an absurd

1  example to make a point, what if Imran had said, yeah,

2  we got two boxes of M&Ms from them, we're paying them a

3  million dollars, sign it, we're paying it?

4       A.   I couldn't sign anything other than the

5  approval that the money was already approved by finance,

6  by Pat Latimore, and everybody that had to sign it.

7  Once that -- once the blanket order or purchase order

8  was approved, then I could sign it, saying, okay, we

9  received the item, we can pay it.

10      Q.   What if you said, you know, this seems like an

11 extreme thing to pay for two boxes of M&Ms; is there

12 anybody you would have beyond Imran you would have gone

13 to to say, listen, I think there's something squirely

14 here?

15      A.   At my level, I could -- could have.

16      Q.   And who would you have gone to?

17      A.   That probably would have gone to -- I would --

18 you know, if -- you mean like going over Imran's head?

19      Q.   Right.

20      A.   I would have to go to Pat Latimore.

21      Q.   Okay.  It's a person in your point of

22 conduct --

23      A.   Yes.

24      Q.   -- if you got a bill that you thought was

25 wrong for some reason?

1      A.   Right.

2      Q.   And did you do that at any point with any

3 DigitalNet invoice?

4      A.   No, because everything was signed, approved.

5      Q.   You also testified that you had contact with

6 several people from DigitalNet while they were working

7 there, right?

8      A.   Yes.

9      Q.   You had contact with Kal?

10      A.   Yes.

11      Q.   And you had direct contact with him?

12      A.   I met him once in the office and direct on the

13 phone.

14      Q.   Okay.  And you had an open line to him when

15 you felt you needed it?

16      A.   After several years, yes.

17      Q.   All right.  You also mentioned there were help

18 desk employees who were there?

19      A.   Yes.

20      Q.   Okay.  And I'm assuming you spoke to them if

21 they were in the office?

22      A.   Oh, yes --

23      Q.   Both --

24      A.   -- every day.

25      Q.   -- in passing socially and professionally?

1          A.    Yes.

2          Q.    Nobody ever limited your contact with them?

3          A.    No.

4          Q.    You felt they did a good job?

5          A.    Yes.

6          Q.    Were they pleasant to have in the office?

7          A.    Yes, they were.

8          Q.    You also mentioned that you spoke to

9     programers and you were aware there were programers in

10    Pakistan.

11         A.    Yes.

12         Q.    And you spoke to them over the phone?

13         A.    Yes.

14         Q.    And did you communicate with them via email?

15         A.    A little probably, but mostly it went through

16    Imran.

17         Q.    All right.  If you were going to communicate

18    with them via email, what email address would you use?

19         A.    I'd never -- okay.  Let me clarify that.

20               I didn't communicate them with Imran --

21    with -- it was always through Imran.  If I needed to get

22    something to them or a document, I put it on Google

23    Drive --

24         Q.    Okay.

25         A.    -- and then Imran would have them get it --

1    Imran would take it and get it to them.

2         Q.   Okay.  But I thought on direct you said you

3    did speak to the programers.

4         A.   On the phone --

5         Q.   You did --

6         A.   -- with Imran in the room.

7         Q.   Okay.  But you had conversations with them?

8         A.   Yes.  Again, with Imran.

9         Q.   And you also had experience while you were

10   doing your job, being aware that the programers from

11   Pakistan were doing work in the background?

12        A.   Yes.

13        Q.   And like actively as you were doing it, they

14   were working on it as well?

15        A.   Yes.

16        Q.   You also saw all the invoices that came in,

17   correct?

18        A.   Yes.

19        Q.   And all the invoices had --

20        A.   As far as -- all -- I've seen all that I know

21   of --

22        Q.   Uh-huh.

23        A.   -- yes.

24        Q.   And you noted -- can we bring up I think it's

25   Exhibit 309, please.

1          Okay.  So is this an example of an invoice

2    you'd get from DigitalNet?

3        A.    This was an odd one, yes.

4        Q.    Okay.  And on this invoice, we see -- before I

5    make a mess of things, on this invoice we see here --

6    oh, boy, that's the wrong one -- we see here an address

7    for DigitalNet --

8        A.    Uh-huh.

9        Q.    -- as well as a phone number to them?

10       A.    Yes.

11             MR. AYER:  And then if we can reduce that,

12   please.  Thank you.

13       Q.    We also see on this an email address down

14   here?

15       A.    Yes.

16       Q.    Along with the phone number as well?

17       A.    Yes.

18       Q.    And then when you got these invoices -- you

19   know, for example, if we look over here, it shows you

20   what the invoice is for.  For example, this says it's

21   for the eContract software infrastructure setup job,

22   right?

23       A.    Yes.

24       Q.    So it indicates what portion of the contract

25   or which contract they're billing on?

1       A.    Right.

2             MR. AYER:  If we can reduce that, please.

3       A.    Well, that indicates the project.  This was

4   not --

5       Q.    Correct.

6       A.    What this was -- I don't remember what this

7   was paid for, but I think IT -- they wanted an eContract

8   software.

9       Q.    Uh-huh.

10      A.    This is not a -- that's not a PO or anything

11  to pay this.  You know what I'm saying?

12      Q.    But it gives you the general category --

13            THE COURT:  I don't know what you're saying.

14            THE WITNESS:  Okay.  I'm sorry.

15            So I got the impression that he was saying

16  this -- the invoice number was paying the contract,

17  meaning the PO of it, of -- for whatever the 10,000 was

18  for.  I think it's a terminology of mixing things.

19            So they were --

20            THE COURT:  So, respectfully, just tell me in

21  English what you're trying to say.

22            THE WITNESS:  This was for a program for

23  eContract software.  So --

24            THE COURT:  When you say "this was for," what

25  does that mean?

1              THE WITNESS:  This invoice.

2              THE COURT:  This invoice was requesting

3    payment for what?

4              THE WITNESS:  For creating -- for getting or

5    setting up a contract program to process other vendor

6    contracts in it and keeping it electronically.

7              THE COURT:  Okay.

8              THE WITNESS:  That's what they were trying to

9    do.

10             When he said that, I -- I took it as, well,

11   this invoice is paying the PO instead of I'm not going

12   to use contract in there.  I -- so I misunderstood it

13   then because the $10,000 in the body of it -- can I see

14   the body?

15        Q.   Yup.

16        A.   It just says electronic software setup.  There

17   -- I did not see -- I don't remember the PO --

18        Q.   Uh-huh.

19        A.   -- that went with this.  I had to have it in

20   order for me to sign this and go through.

21        Q.   Uh-huh.

22        A.   So that might have paid for it and I did sign

23   that and I did put it through, but there had to have

24   been other paperwork attached that's not here.

25        Q.   Right.  But this is an example of an invoice

1   you would have gotten from them, right?

2        A.   Yes.  This is one of the unusual ones.

3        Q.   Right.

4        A.   Yes.

5        Q.   And it has a section like we discussed up here

6   in the corner that sort of gives you the category of

7   things they were working on in that --

8        A.   Yes.

9        Q.   That was different on different invoices,

10  right?

11            THE COURT:  It sort of gives you the category.

12       A.   Yes.

13       Q.   If we can go to the next page, please.

14            For example, so this one's different, right?

15            THE COURT:  Here's a tip.  When I say I don't

16  understand something, find a way to make me understand.

17            MR. AYER:  I'm trying to do that right now,

18  your Honor.

19            THE COURT:  All right.

20            MR. AYER:  So if we go to the next page, can

21  we highlight this section?

22       Q.   So this is a different category of work they

23  were doing, right?

24       A.   Yes.

25       Q.   This is ERP and CRM infrastructure setup.

1        A.    Again, that's out of the norm.

2        Q.    Uh-huh.

3        A.    This is another unusual -- this is an off

4   project that he was sitting on -- working on.

5        Q.    Right.  But that gives you --

6        A.    It doesn't give me enough --

7        Q.    No?

8        A.    -- but yes.

9        Q.    But there's another part of this invoice,

10   isn't there?

11        A.    Yes.

12        Q.    And if we can click down here.  So then we see

13   that they were working on Phase I here?

14        A.    Yes.

15        Q.    And so that gives you more detail?

16        A.    Right.

17        Q.    And then, as you said, there would have been

18   other paperwork to go along with that you would have

19   reviewed?

20        A.    Right.  So if I'm looking at this, this is

21   paying out of the capital budget.

22        Q.    Uh-huh.

23        A.    One is hardware and one is software.

24        Q.    Right.

25        A.    So ...

1      Q.   And then you obviously reviewed that

2  paperwork, decided it was okay to pay here?

3      A.   Yes.

4      Q.   And that was your handwriting?

5      A.   Yes.

6      Q.   And then we see this here.  And whose initials

7  are these?

8      A.   I don't know.

9      Q.   Would that have been another level of

10  approval?

11      A.   It would have been.  I was -- you know, I

12  don't know if that's an M-A-L.

13           THE COURT:  Looks like it, M-A-C, maybe Mac,

14  M-A-L.

15           THE WITNESS:  M-A-C, M-A-L -- I don't know who

16  the M A --

17      Q.   That would have been somebody else at the

18  United Way who would have seen this --

19      A.   Yes.

20      Q.   -- and approved it to go out?

21      A.   Right.

22      Q.   Okay.

23      A.   Right.

24      Q.   And then we see up here somebody else has

25  looked at it?

1      A.    It's a note to Azim.  And, again, I can't

2   read --

3            THE COURT:  There's a question.  Was it paid?

4   That's what he's asking --

5            THE WITNESS:  Yes.

6            THE COURT:  -- was this already paid?

7            THE WITNESS:  Yes.

8            THE COURT:  Azim says, what, requires

9   something backup, please provide, signed -- from -- do

10  you recognize that?

11           THE WITNESS:  Is that Sonia?

12           THE COURT:  I don't know.

13           THE WITNESS:  Yeah.  Could be Sonia.

14           MR. AYER:  I don't want to give you testimony.

15           THE COURT:  Is there someone named Sonia in

16  this?

17           THE WITNESS:  Yes.  Yes.

18           THE COURT:  Looks like Sonia.

19      Q.    So that looks like several people would have

20  seen this, several people would have handled it; right?

21      A.    Right.

22      Q.    Several people would have written on it?

23      A.    Right.

24      Q.    And several people would have reviewed it?

25      A.    Right.

 1      Q.    And ultimately it was paid?

 2      A.    As far as I know --

 3      Q.    All right.

 4      A.    -- it was paid.

 5      Q.    And that's true of all of these invoices; it

 6   would have gone through that chain.  Maybe not this

 7   precise one?

 8      A.    No, because if it had a blanket order and it

 9   had money on it and it fit whatever the blanket order

10   was paying, it would have been paid.

11      Q.    But you would have seen all of them?

12      A.    Yes.

13      Q.    And that was not the case before Imran started

14   at DigitalNet?

15      A.    No.

16      Q.    And he could have kept that to himself and he

17   could have done all that?

18      A.    Yes.

19      Q.    But he had you brought in on it?

20      A.    Yes.

21      Q.    You mentioned he was a relatively good

22   supervisor?

23      A.    Fair, yes.

24      Q.    Hands off?

25      A.    Hands off.

1          Q.    The IT department improved under him?

2          A.    Some, yes.

3          Q.    And the IT environment and structure of the

4     United Way improved during his tenure?

5          A.    Not everything.  I mean, the VDI, yes, it did

6     improve.  He brought in a new phone system.  It improved

7     some, yes.  Other features on it, yes.

8                Email, no.  He switched us from Outlook to

9     Gmail.

10         Q.    Uh-huh.

11         A.    It was not a good choice to go to Gmail in a

12    company like this.

13         Q.    And do you know why he said he did that?

14         A.    No cost.

15               MR. AYER:  Right.  That's all I have, your

16    Honor.

17               THE COURT:  Okay.  Thank you.

18               Redirect?

19               MR. DAVIS:  Just briefly.

20                     REDIRECT EXAMINATION

21    BY MR. DAVIS:

22         Q.    So going back to 309 and the second page you

23    were just shown.  So the invoice number is 91492.  Do

24    you see that?

25         A.    Yes.

1    Q.   Does that suggest to you that maybe DigitalNet

2 is -- has now done well over 91,000 invoices in its

3 business life?

4    A.   I would assume that, yes.

5         MR. AYER:  Objection; speculation.

6    Q.   What's that?

7    A.   I would assume that, yes.

8         THE COURT:  Well, before -- there may be

9 speculation.

10        Why do you assume that?

11        THE WITNESS:  Well, because, you know,

12 sometimes you -- they start numbers at 1,000 or --

13        THE COURT:  Who's they?

14        THE WITNESS:  A company.  A company may start

15 it at 1,000 or they may start -- instead of starting

16 with like a five-digit number, they'll start at 10,000

17 to avoid a 0 leading.

18        So, yes, but I would assume that's how many

19 invoices they've done.

20        THE COURT:  Your assumption is based on your

21 experience?

22        THE WITNESS:  My experience.  If I got a

23 check, my number is -- goes sequential --

24        THE COURT:  Sure.

25        THE WITNESS:  -- you know, and invoice numbers

1    generally would go sequential.

2             THE COURT:  I'll allow it.  It's an opinion,

3    not a -- you know, it's an opinion.  I'll allow it.

4        Q.    All right.  So what's the amount of this

5    invoice?

6        A.    70,000.

7        Q.    And the date, again, is what?

8        A.    I don't see --

9        Q.    Do you see it?

10       A.    Oh, okay.  January 2013.

11       Q.    All right.  Do you know the date when

12   DigitalNet actually was awarded the managed IT services

13   contract with United Way?

14       A.    I don't remember the date.  I remember having

15   Pat sign it, but I don't remember the date.

16       Q.    I'll ask you to assume it was in -- the

17   initial signature -- signing was in February, late

18   February, of 2013.  Okay?

19       A.    Okay.

20       Q.    And let's go to the first invoice.  And you

21   see the invoice number there?

22       A.    The 9314 -- yes, in the previous number.

23       Q.    All right.  And the date of that one is what?

24       A.    January 15th.

25       Q.    Of 2013, right?

1      A.   Yes.

2      Q.   So Mr. Alrai has been on board for nearly a

3  year, not quite a year, right?

4      A.   Yes.

5      Q.   It's January 2013, right?

6      A.   Right.

7      Q.   But DigitalNet hasn't won any big contract

8  after a fair RFP process yet, has it?

9          MR. AYER:  Objection, your Honor.  She didn't

10  testify to anything about the RFP process and we didn't

11  go into it on cross.

12         MR. DAVIS:  Well --

13         THE COURT:  That's true.

14         MR. DAVIS:  I'll withdraw that.

15         THE COURT:  Okay.

16     Q.   I'd just ask you to assume that the managed IT

17  services contract was not signed until February,

18  correct?

19     A.   Yes.  I -- okay.

20     Q.   Okay.  So what's the amount of this invoice?

21     A.   10,000.

22     Q.   All right.  So that's $80,000, right?

23     A.   Uh-huh.  Yes.

24     Q.   Do you know if Mr. Alrai at any point in the

25  RFP process pointed out to the rest of the committee

1    that he'd already paid $80,000 to this great outside

2    vendor?

3         A.   Yes.

4         Q.   What's that?

5         A.   Yeah, I don't know if he did that, but you're

6    right, he did.

7         Q.   I'm right what?

8         A.   That he paid 80,000.

9         Q.   No, but I'm asking you do you know whether he

10   told anyone at --

11        A.   Oh --

12        Q.   -- United Way during the --

13        A.   -- I'm sorry.

14        Q.   -- RFP process --

15        A.   No.

16        Q.   -- I've already committed 80 grand this year

17   right away to DigitalNet?

18        A.   I don't know if he told them that, no.

19        Q.   All right.  What would have happened if

20   Mr. Alrai, for any of these invoices, had said to you,

21   by the way, I own DigitalNet when you're about to send

22   it off for okay to pay?  What would have happened?

23        A.   I would have -- I would have asked him if

24   could -- had mentioned that to the United Way, to Jane

25   Grady or Pat Latimore or anybody --

```
 1        Q.    All right.
 2        A.    -- because he signs a conflict of interest.
 3              MR. DAVIS:  Nothing further.  Thanks.
 4              MR. AYER:  Nothing further, your Honor.
 5              THE COURT:  You're excused.  Thank you.
 6              THE WITNESS:  Thank you.
 7                       (Witness excused.)
 8                     (Conclusion of excerpt.)
 9          (Testimony of Jack Rotondi not requested.)
10              MR. DAVIS:  Proceed?
11              THE COURT:  Yeah.
12              MR. DAVIS:  Dom Pallaria.
13              THE CLERK:  Good afternoon, sir.  If you'd
14  like to step this way, please.
15              If you could step into the witness box and
16  remain standing.
17              Please raise your right hand.
18              DOMENIC PALLARIA, having been first duly
19  sworn, testified as follows:
20              THE CLERK:  For the record, please state your
21  full name and spell your last name.
22              THE WITNESS:  My name is Domenic Louis
23  Pallaria.  Last name is P-a-l-l-a-r-i-a.
24              THE CLERK:  Thank you.  Please be seated.
25
```

<u>DIRECT EXAMINATION</u>

1

2   <u>BY MR. DAVIS</u>:

3       Q.   Mr. Pallaria, did you work at United Way and

4   do you still work there?

5       A.   I do.

6       Q.   And what's your title?

7       A.   Controller.

8       Q.   How long have you been at United Way?

9       A.   14 years.

10      Q.   And can you summarize briefly your

11  professional experience prior to coming to United Way?

12      A.   I worked at a nonprofit just prior to the

13  United Way as a director of administration and finance

14  called Employment Resources, Inc., and I worked prior to

15  that for about nine years for the Economic Development

16  and Industrial Corporation as an accounting manager.

17      Q.   All right.  And as United Way's comptroller,

18  what are your duties and what do you spend your time

19  doing?

20      A.   I prepare financial statements and prepare

21  financial reports for various committees and for the

22  board.  I prepare our audited financial statement.  I

23  supervise the accounts payable, accounts receivable, the

24  general ledger accountant, and the payroll processor.

25      Q.   Okay.  And as of 2016 through 2018, who was

1  your immediate supervisor?

2       A.   I believe that that would -- well, I worked

3  for Pat Latimore and transferred to Alison Ginsberg.  I

4  believe Alison Ginsberg is the most recent last couple

5  of years.

6       Q.   All right.  Do you know Imran Alrai?

7       A.   I do.

8       Q.   And did you meet him when he was hired in

9  2012?

10      A.   I did.

11      Q.   And what sort of matters did you work with him

12  on at United Way?

13      A.   On the annual budget.  In preparation to the

14  annual budget, I would begin with managers that had

15  budgets for the whole organization.  Imran would prepare

16  a budget for IT costs and I would deal with processing

17  of bills and matters as it related to the budget as it

18  was spent.

19      Q.   Okay.  And so did you have multiple

20  communications over time with Mr. Alrai about the budget

21  for the IT department?

22      A.   Yes.

23      Q.   All right.  And when was that budget due every

24  year, when were you getting it finalized?

25      A.   We would typically begin in February for

1   certain departments, including IT, and then a budget

2   would be presented in April.  And there's -- several

3   committees would review it and it would be finalized

4   typically in May or June by the final approval by the

5   board.

6        Q.   All right.  And what was the relative size of

7   the IT department budget at United Way compared to other

8   departments and expenditures?

9        A.   The IT department became, say, the second

10  largest area of expense.  So the way that I'm speaking

11  about it is salary and fringe costs and the people costs

12  tend to be somewhere in the like 80 percent range, 70s

13  to 80 percent range in our total cost, and then the next

14  two would be occupancy and IT.  And I believe IT at

15  around that time became the second highest cost for the

16  organization.

17       Q.   All right.  Occupancy would be rent for the

18  building or the various buildings?

19       A.   Right.

20       Q.   All right.  Is it fair to say you -- you

21  criticized at various times Mr. Alrai's budget --

22  budgeting performance?

23       A.   Yes.

24       Q.   Okay.  And what were your complaints about

25  him?  What did you notice that irked you?

1    A.   I would say -- well, we would direct

2   typically, because we were trying to cut costs, for

3   people to submit budgets lower --

4    Q.   Right.

5    A.   -- than the prior year.  That was not done.

6   It was typically resubmitted higher.

7    Q.   Okay.

8    A.   And the level of information that I was

9   looking for was often difficult to obtain.  It was --

10   people work with you at various levels and cooperate

11   with you and have different skills on budgeting, but I

12   can -- I can say that I -- I felt I was getting minimal

13   information.

14    Q.   Why did you care about the level of detail in

15   the budget being submitted for IT department or any

16   other department at United Way?

17    A.   Well, the budget is a plan and that's what we

18   were presenting to our boards and -- and to the CEO.

19   And the plan needs to be understood and then variances

20   from the plan as you go through the year you're able to

21   explain and see what's going on with the business.

22        And so having a good budget and a good plan is

23   really proper management, in my view.

24    Q.   All right.  Showing you Exhibit 614 in

25   evidence, 6-1-4.  All right.  So let's go down to the

1   next page.

2           All right.  This is good.

3           Starting "Hi, Dom," do you see that?

4       A.   Yes, I do.

5       Q.   And is that Mr. Alrai writing to you on your

6   United Way email account?

7       A.   Yes.

8       Q.   And can you read what he says there?

9       A.   It says:  Attached you will find the version 1

10  fiscal '14 budget.  We are just sticking to categories

11  for now without any vendor names.  Operating is flat and

12  I am still collecting requests for capital projects.

13          THE COURT:  I need you to slow down when you

14  read a little bit for the court reporter.

15          THE WITNESS:  However, I have pencilled in

16  450,000 as a placeholder for now.

17          Please note, both operating expenses and --

18  OpEx and CapEx are subject to change based on the

19  feedback from the leadership team members.  We will get

20  together to discuss when I am back in the office.

21  Imran.

22      Q.   Okay.  So let's go -- let's go back to the

23  first page.

24          And you respond on March 1st; is that right?

25      A.   Yes.

1      Q.    And just -- if you can just read the first

2  part there, what does that say?

3      A.    It says:  Hello Imran, the information you

4  sent me is not complete enough for us to explain it to

5  other, Mike, senior managers next week.

6      Q.    Mike is the CEO?

7      A.    Mike is the president and CEO.

8      Q.    Okay.

9      A.    "I did tell you that I didn't need to know

10  what vendor you were purchasing from.  However, we still

11  need to know what you are paying for in a way that we

12  can explain it.  A single number for the expense code

13  isn't enough for us to do that.  Additionally, these

14  amounts are higher than last year; Allocated budget,

15  1.1 million up 36,000, no details that would allow me to

16  explain -- no details that would allow me to explain

17  what it's for.  I need you to" -- let's see.

18      Q.    Top of the page.

19      A.    "I need to know what this is for.  We need to

20  explain -- yeah -- we need to explain this next week.

21  The following week it will be incorporated into the

22  budget forms and sent out.  Waiting until you return to

23  adjust numbers will be very problematic because of the

24  amount of prep time needed for the forms that are

25  distributed.  After the numbers are put into them" --

1      Q.    Okay.  So that's enough.

2            Can we read Mr. Alrai's response on top of

3      that to you?

4            No, one down from that.  Yeah.

5            On Friday March 1st, how does he respond?

6      A.    He says:  Please reread my note.  All capital

7      information is subject to change based on feedback from

8      the user community and discussions in IT steering.  The

9      final numbers will require an approval.  These were just

10     placeholders for us to discuss and not to be distributed

11     prior to discussion.

12     Q.    Okay.  And how did you respond there at the

13     top?

14     A.    I said:  I'm sorry, Imran, but I didn't ask

15     for placeholders.  I asked for a budget.  The budget

16     process began a month ago with my requests to you and

17     HR.  End of February was the deadline for the allocated

18     costs.  I have HR's numbers with explanation.  I don't

19     have yours.  I still need it.

20     Q.    Okay.  Did this become a chronic issue, in

21     your view?

22     A.    That was -- yes, that was not an uncommon

23     pattern.

24     Q.    All right.  Did you take efforts to address it

25     with Mr. Alrai?

1    A.    I did.  I spoke to him on a number of

2    occasions, explaining the need for a budget plan and

3    more information and provided spreadsheets that were

4    from the past that could be filled in and completed in a

5    manner that was consistent with the past and asked for

6    numbers that were consistent with the instructions from

7    the CFO, typically, to reduce costs.

8    Q.    All right.  And did he get better in giving

9    you a more detailed budget?

10   A.    He did -- he did give me a more detailed -- he

11   did fill in the spreadsheets I gave him and I would say,

12   yes, in terms of responding in a manner that would work

13   and giving me numbers with some vendor names, yes, we

14   did find a pattern that worked in terms of getting the

15   numbers.

16   Q.    Okay.  And you also mentioned you -- you felt

17   that his budgets increased at a time when other -- when

18   other budgets were asked to reduce; is that right?

19   A.    Yes.  Fairly consistently.

20   Q.    All right.  I want to show you Government

21   Exhibit 623.  Okay.  And let's go back a page.

22         Okay.  And at the bottom of the page, you're

23   writing -- this is 2015 now.  What do you write to him?

24   A.    Yes.

25         "I need your budget as soon as possible.

1  You're holding up the budget process and I cannot

2  proceed without it.  Please provide it."

3      Q.   All right.  And then one above that, how does

4  he respond?

5      A.   He responds:  Please find the attached IT

6  capital and operating budgets for fiscal -- FY16.  There

7  are a lot of moving parts and the decisions -- and

8  decisions that are yet to be made, so this is the best

9  that I can do at the moment.  My apologies for the extra

10  time that it took.

11     Q.   Okay.  And then above that, how do you

12  respond?

13     A.   My response is:  Thank you for these budget.

14  Given that we are looking for a level budget and these

15  represent a 293K increase, we need to understand what

16  the increases are for.

17     Q.   So that's $293,000?

18     A.   It is.

19     Q.   All right.

20     A.   "I also want to be sure we are not double

21  budgeting anything.  The best way to accomplish this

22  might be a meeting that includes Pat.  I would like to

23  schedule that meeting ASAP unless you think there is a

24  better way.  Do you have details we can look that

25  explain these numbers and increases."

1      Q.    All right.  So in addition to seeking to

2   increase the budget, did you also have experiences with

3   him in going over his budget at the end of the year,

4   overspending the budget?

5      A.    Yes.  We had conflicts in that the vendor

6   was -- some of the vendors, DigitalNet in particular,

7   was paid in advance and it would tend to overspend.

8      Q.    All right.

9      A.    There were some capital budget -- it was less

10  than an issue I'd say on the capital budget, but yes.

11     Q.    So on the vendor side, can you explain that?

12  Why would being paid in advance cause one to overspend

13  on a budget amount?

14     A.    Well, you start off at one point and if you're

15  paying somebody, you know, May and June, you're paying

16  in May and June and -- and you've already -- you've

17  already paid in advance the last May and June, you're

18  basically paying them twice and it would -- it would

19  pressure the budget and so we would get into a conflict

20  at year-end where there was overexpenditure -- there

21  was -- he would reach the limit of all the payments that

22  were allowed for that particular vendor and would be

23  trying to process payments either for the same months

24  that had already been paid or process payments for

25  months coming up that had not yet happened and we're

47

1    trying to fit a 12-month period.

2         Q.    All right.

3              THE COURT:  Counsel -- Counsel, about how much

4    more direct do you have?  And take all the time you

5    need.

6              MR. DAVIS:  I would say 15 minutes on direct.

7              THE COURT:  Let's take the afternoon break.

8    15.

9         (Recess taken from 3:22 p.m. until 3:37 p.m.)

10             THE COURT:  All right, Mr. Davis.  You may

11   continue with your direct.

12             Sir, you're still under oath.

13        Q.    So, Mr. Pallaria, we were talking about

14   overspending on the IT department budget.  Let me show

15   you Exhibit 622, another email, this email from 2014.

16   Do you see that?

17        A.    I do.

18        Q.    And do you see your message to Mr. Alrai in

19   the middle of the page there in those two paragraphs?

20        A.    Yes.

21        Q.    All right.  Could you read that, please, and,

22   again, so the court reporter can get it.

23        A.    "Hi Imran, I went over some budget variance

24   items with Pat.  She had some questions I'll need help

25   from you to answer.

1      "5,400 telephone, $146,400 budget, 108,295

2 spent, 47" -- oh, I'm sorry.  It was 146,400 is spent

3 and the budget was 108,295.

4      It looks like I got that backwards.  But in

5 any case, it's 47,295, 78 percent over budget.

6      Q.   All right.  And what did you write there?

7      A.   "Cost charged paid for telephone to DigitalNet

8 Technology Solutions, LLC, total over 101K, six

9 payments, $16,005 growing to 17,800, in parens, for the

10 first five months of 2014.  That's way over the budget

11 and much more than the prior costs when we were not

12 voiceover IP.

13      "I don't know if there are other costs being

14 inappropriately charged there or if they are now much

15 higher and were underbudgeted.  It also seems our costs

16 are growing and we are paying a month ahead.  Why is

17 this so far ahead of budget?  Will it be over budget?"

18      Q.   And then the next one?

19      A.   Is 55,600 outsourced services, 746,824, budget

20 364,212, spent 57,035 and -- I'm sorry, begin paren,

21 53,035 minus 17 percent.  Most of that is DigitalNet.

22 The current spending rate is both over budget and

23 increasing, begin parens, eight percent increase in

24 monthly payments to them in five months, end paren.

25 We're on track to overspend by 200,000 on this line.

1  Why?  Will it be over budget?

2      Q.    All right.  So let's go to another exhibit,

3  Exhibit 652, and let's go to the next page.

4          All right.  So in the middle of it, starting

5  in the middle of the page on Friday, March 16th of

6  2018 -- so this is the last year of Mr. Alrai's

7  employment, correct?

8      A.    Correct.

9      Q.    All right.  Can you read the email he writes

10  to you?

11     A.    It begins:  You are welcome.  We have cut

12  operating expenses consistently for the last five years.

13  This current fiscal we will be over by seven percent to

14  eight percent, which means we have to keep the operating

15  budget to where I proposed for FY19 to sustain

16  operations.  I have discussed with Pat and she is aware.

17          Capital does include IT related sales force

18  costs.  Unless something dramatically -- drastically

19  changes, we will not need additional money for both DSOG

20  and SPC-related back end work.  This does not include

21  any licensing or usage fees for sales force.

22  Hopefully -- hope this explains it.

23     Q.    All right.  And then at the top of the page in

24  small print you write, and then there's a chart.  Can we

25  look at that?

1    A.   Yes.  I replied:  Your recollection, in

2  quotes, we have cut operating expenses consistently for

3  the last five years, end quote, is inaccurate.  There

4  was a $60,000 cut last year exclusive of DSOG.  I am

5  pretty sure saying that you spoke with Pat isn't what we

6  were looking for.  It's not an explanation of why costs

7  went up.

8         And then I show a chart down below with the

9  operating cost budget beginning in 2015 through '18 with

10  increases in each of the years for '16, '17 and '18.

11    Q.   So you're showing, just between 2015 and 2018,

12  well over a $400,000 increase in the IT operating

13  budget; is that right?

14    A.   That's correct.

15    Q.   Okay.  Now, were you familiar with DigitalNet

16  as a United Way employee?

17    A.   I was familiar with -- that we had a contract

18  with DigitalNet for network support and general

19  outsource support of our IT.

20    Q.   And did you know the IT desk employees?

21    A.   I knew -- yes, I did.  I interact with them

22  fairly regularly.

23    Q.   All right.  And were they good employees?

24    A.   Yes.

25    Q.   And that was Nadeem and Jasmin at the end?

1        A.    Nadeem and Jasmin, that's correct.

2        Q.    Okay.  Did you ever interact with anyone else

3   from DigitalNet that you recall?

4        A.    Kal.

5        Q.    And what were your interactions with Kal?

6        A.    Kal did network support when we needed help

7   for various work we were doing on our accounting system,

8   which was on a separate server and required some

9   additional -- not -- additional network -- networking

10  support.

11       Q.    And was that Great Plains, that's --

12       A.    Yeah.  It's Dynamics GP, formerly Great

13  Plains, yes.

14       Q.    Okay.  Anyone else you dealt with from

15  DigitalNet besides the help desk people and Kal?

16       A.    There was one other employee prior to Jasmin

17  that I dealt with, but no.

18       Q.    And that was Kadir?

19       A.    That's right.

20       Q.    Okay.  Did you notice anything unusual about

21  the timing of payments to DigitalNet?

22       A.    Yes, they were frequently well in advance of

23  when services were provided.

24       Q.    And can you explain that a little more?  What

25  do you mean?

1      A.   I mean that if we were paying for support in

2   September, we might cut that check in July.  And that's

3   typically for support that would be for the month and it

4   was a bit unusual in that many vendors providing those

5   kinds of services were paid after --

6      Q.   Right.

7      A.   -- but we were paying them, it seemed, always

8   something like a month and a half ahead or two months

9   ahead and in advance of when the services were

10  performed.

11     Q.   Okay.  Did you also make observations about

12  the level of detail in DigitalNet invoices?

13     A.   Yes, I did.  I found it typically to be

14  minimal and somewhat inadequate.

15     Q.   And did you ever raise complaints about that

16  or do anything about the lack of detail on the invoices?

17     A.   Yes.  Yes, I -- I brought that to the

18  attention of my supervisor, my supervisor's supervisor,

19  Rich Voccio, and I even discussed that at times with

20  Imran.

21     Q.   And did that improve or change over your time

22  before Mr. Alrai left?

23     A.   No, it did not improve.

24     Q.   Okay.  Do you recall instances where Mr. Alrai

25  was suggesting that DigitalNet become involved in -- or

1    DigitalNet provide additional services that might be

2    needed by United Way --

3        A.    Yes.

4        Q.    -- more than, sorry, more than he'd already

5    contracted for?

6        A.    Yes.  Pretty much every new project that

7    involved anything related to IT went to DigitalNet.

8    There was one specific to a project I was working on

9    trying to implement where we did our purchasing and our

10   purchasing approvals online.

11       Q.    Okay.  So I'll get to that in a minute, but

12   let me show you first Exhibit 634.  And this is the

13   so-called eContract system.  And let's go back to the

14   beginning of this email chain.  This is from October of

15   2015.

16            Okay.  And you can see October 28, 2015,

17   Mr. Alrai is sending a presentation with screenshots of

18   the electronic requisition and contract management

19   system that we demoed last week.  Do you see that?

20       A.    Yes.

21       Q.    Okay.  Now, let's go to the front page.  Now,

22   did you have a response to that, Jack responds,

23   Mr. Rotondi, but you then respond on October 29th in the

24   middle there.  Can you read your response?

25       A.    Yes.

1              My response is:  I have to say, I am a

2    little -- I am more than a little surprised to see what

3    appears to be if -- a DigitalNet branded product being

4    presented.  I'm also surprised to see something that

5    looks done, but that finance seems to not been involved

6    with at all as it was developed.  This has not been a

7    very inclusive process.  I am hopeful, however, that

8    what has been done will be useful.  There's certainly a

9    need for it.  I suspect there may be some changes,

10   challenges, to deal with given how this was developed.

11   It will be important to plan in our process to allow

12   efforts to address them now since we did not do that

13   earlier.

14        Q.   Okay.  So why were you surprised that a

15   DigitalNet branded product was being presented at this

16   stage?

17        A.   Because my expectation was that we were going

18   to seek vendors that already did this type of business

19   and that we would get a more off-the-shelf and a more

20   commercially available product.

21        Q.   All right.  And so how did Mr. Alrai respond

22   to you, also on October 29th?  Do you see that?

23        A.   Yeah.

24        Q.   At the top.

25        A.   Yes.  He says:  Sorry, I don't understand what

1    you found surprising with the presentation.  Please

2    elaborate.  This is eContract system by DigitalNet that

3    they presented to us at our request.  After the demo, we

4    asked them for a presentation with actual screenshots.

5    That is what I sent you.  Before you and Sonia joined

6    the group, it was Azim who represented finance.  He was

7    an integral part of the team and had a lot of input in

8    this.  It is still by no means a final solution.  We can

9    always change based on your need.  I am just trying to

10   assist.  Hope this explains it.

11        Q.    Okay.  So you mentioned before a product

12   having to do with an automated form --

13        A.    I believe.

14        Q.    -- for requisite.

15        A.    I believe we're talking about the same thing.

16        Q.    Oh, we're actually talking about the same

17   thing here?  Because this is 2015.

18        A.    It went back a number of years.

19        Q.    Okay.  So what do you remember about the

20   planning for that project?

21        A.    I remember that we had a need that had been

22   recognized for a long time supported by Pat, our CFO at

23   the time, and others in the management and we wanted to

24   bring a lot of paper-based processes online.

25        Q.    All right.  And what was that need

1   specifically for?

2        A.    It was for processing all types of payments

3   and -- and expense reimbursements and contract payments,

4   that sort of thing.

5        Q.    And this was all to go on an automated form?

6        A.    It was.

7        Q.    All right.

8        A.    Or it was in an automated -- yes, an automated

9   system where you would provide information and it would

10  be processed through emails and approved and that sort

11  of thing.

12       Q.    All right.  And was Mr. Alrai involved in

13  helping and assisting as part of the IT department in

14  this process?

15       A.    Absolutely.  It was very important to have IT

16  helping us with this and coordinating what we were

17  doing.

18       Q.    And so what happened in the -- in the course

19  of that coordination?

20       A.    Well, we got into a situation where we had a

21  number of meetings with a number of staff including

22  Jack Rotondi, who was in charge of operations, Alison,

23  my boss, and a number of others, and we got into a bit

24  of a struggle, I would say, where there was an effort to

25  steer the project to DigitalNet.  I was told at one time

1  that an estimated cost for that would be probably about

2  a hundred thousand.

3          There was a form that was presented in this

4  presentation, but I was under the impression that it

5  would be better for our business to seek somebody that

6  does that as a business rather than custom design

7  something and the prices for that were much less.

8      Q.   And who was it that was seeking to steer this

9  particular project to DigitalNet?

10      A.   Imran.

11      Q.   All right.  So how long did this go on and how

12  did it resolve?

13      A.   It went on for -- well, those were some of the

14  first emails about it, I believe.  It went on for years.

15  It just got dragged out.  And after a while, when it was

16  clear that it was not going to be going to DigitalNet, I

17  tried to enlist help from Imran and the IT staff to help

18  me to move it forward in a way that we could assess

19  vendors.  And it just -- it was just extended and

20  dragged on and extended and that help really never came.

21          We finally decided to move forward without

22  help from IT in around January of '18 and began seeking

23  vendors outside of that and have since, actually, put in

24  place a vendor called Concur.  And we pay about 20,000 a

25  year for that and that's working well.

58

1      Q.   All right.  But getting Concur, that happened

2   after Mr. Alrai left?

3      A.   We -- we stopped even asking him to help at

4   that point.

5      Q.   All right.  And how was it that DigitalNet was

6   not chosen for that project?  How -- why did that not

7   happen?

8      A.   I consistently argued against it.

9      Q.   All right.  And you prevailed there at least?

10      A.   I think so, yes.

11      Q.   Okay.  All right.  Now, going into 2018, did

12   you recall a particular invoice in February of 2018 that

13   brought -- that drew your attention, a $200,000 invoice;

14   do you remember that?

15      A.   I remember it well.

16      Q.   All right.  And what drew your attention about

17   that?

18      A.   It was a $200,000 invoice with, say, summary

19   and vague descriptions.  There was, I think, a box that

20   had a larger project and a number of smaller projects in

21   terms of the description.

22           It was submitted to be capital cost.  I'm

23   supposed to make sure that I'm properly recording

24   expenses and capital expenses and have sufficient

25   documentation as well as making sure that there's money

1    in the budget for it.

2              There was, in fact, money in the budget for

3    this.  Oh, I'm sorry.  Are we talking about the same

4    200,000 -- this is not the same 200,000.

5         Q.   I'm sorry.  I'm looking for it.  It's dated

6    February 5th of 2018; is that right?

7         A.   That sounds about right.

8         Q.   And the invoice number is 8 --

9         A.   Yes.

10        Q.   -- 89579?

11        A.   Yes, that's it.

12        Q.   So we found it now in Exhibit 309, Bates stamp

13   01216.  Is this the invoice you're talking about?

14        A.   It is.

15        Q.   Okay.  And so there's a lot of web page

16   development stuff there, right?

17        A.   There is.

18        Q.   And then there's a United for Good Platform

19   Development with various bullet points under it, right?

20        A.   That's correct.

21        Q.   So what do you find wanting in this invoice?

22        A.   Well, it's very difficult for me, looking at

23   this, to determine whether those are basic like web

24   maintenance and basic maintenance kinds of costs or

25   whether they are capital costs.  So I don't know if I'm

1   properly coding things.

2          I found that the 200 -- I couldn't, in looking

3   at it, determine -- some of these things looked like

4   they could be extremely minor effort and I looked at

5   this and I couldn't even just out of basic judgment tell

6   whether it was 50,000 or a hundred thousand or 200,000.

7          And 200,000 is an extremely rare number.

8   Typically, if you've got an invoice for a large dollar

9   amount like this, you'll have supporting information

10  like, you know, who was working, how many hours they

11  worked, what they did.  And it's usually going to work

12  out to some number that doesn't round up to this.

13         And the other thing is it's one page and it's

14  200,000 with kind of vague descriptions.  So for me, it

15  was unusual.

16     Q.   All right.  So what did you do about this

17  particular invoice?

18     A.   I took a scan of this invoice and I sent it to

19  Rich Voccio and Alison Ginsberg, my boss.  I had just

20  had some discussions with Rich about what might be

21  problematic in the budget and I explained to him that IT

22  was typically problematic.

23         I sent him this bill and I complained about

24  it, saying that, you know, this really -- you know, look

25  at this, one page, $200,000 is detail, I can't even tell

1    if it should be capitalized or not, you know, and it's a

2    problem and this is the kind of problem we're dealing

3    with.

4              They -- and that's -- that's what I did with

5    it initially.

6              I also had a brief discussion with Imran --

7         Q.   All right.

8         A.   -- saying some of the similar points.

9         Q.   All right.  Did you and Rich Voccio ultimately

10   talk to Mr. Alrai about the $200,000 invoice?

11        A.   Rich's response was to me was, what should I

12   do about it?

13             And I replied that we should get much more

14   detail and not accept this level of detail for this kind

15   of money.

16        Q.   All right.  And so what -- did you actually

17   meet with Mr. Alrai?

18        A.   Mr. Alrai stopped at my desk one day when I

19   had a copy of this bill on my desk, because I had wanted

20   to talk with my supervisor about it and had scanned it.

21   And we were talking about some other matter and I

22   brought it to his attention and -- and made some

23   comments about how I felt that it was very inadequate,

24   this is a lot of money, these are really not significant

25   details, I can't tell what it really should be or how

1    much it really should -- and that it makes us look like

2    we don't know what we're doing, like I don't know how to

3    do my job.

4        Q.    All right.  And how did he reply?  Did he say

5    anything about DigitalNet charges for this?

6        A.    He replied that we save a lot of money by not

7    requiring the vendor to provide a lot of, you know,

8    extra detail and extra work to support their bill;

9    that -- that saves us money because he does it that way.

10        Q.    Who does it that way?

11        A.    That -- in his dealing with the vendor, I

12    understood it to mean that because he deals with the

13    vendor directly and because he doesn't require them to

14    provide a lot of support for the invoices and the

15    billings that they're submitting that it saves the

16    United Way money because they would otherwise charge us

17    for that effort.

18        Q.    So United Way's getting a discount for getting

19    vague bills like this; is that right?

20        A.    That's correct.  Or that's how it was -- I

21    took it to be --

22        Q.    Did Mr. Alrai tell you how much it would have

23    cost United Way for this $200,000 job if you actually

24    had insisted on a regular, detailed invoice?

25        A.    No.

1      Q.   All right.  So later on in 2018, did you

2   become suspicious?

3      A.   I did.

4      Q.   And what was your suspicion, briefly?

5      A.   I thought that Imran must be receiving some

6   money as a part of this transaction because it did not

7   seem reasonable or supported and I just didn't believe

8   that that amount of level and effort was worth 200,000.

9      Q.   All right.  So what did you do again briefly?

10  What did you do about that?

11     A.   My first thing that I did about that was I

12  thought, well, he must be in some way connected to

13  DigitalNet and I Googled his name and DigitalNet.

14     Q.   And what'd you find?

15     A.   AISA -- I find him as a CEO of a company in

16  Windham, New Hampshire.

17     Q.   And that's called AISA Corporation?

18     A.   Yes.

19     Q.   And then did you go and look up AISA

20  Corporation documents?

21     A.   I did.  I searched the Internet, I found some

22  basic business information in an annual revenue amount

23  it was similar to our budget annually --

24     Q.   All right.

25     A.   -- other kinds of reports.

1      Q.   And as part of that basic information, did you

2  get an address?

3      A.   I did get an address.  I even looked on Google

4  and saw a picture of the company and the sign and the

5  whole bit.

6      Q.   All right.  And do you remember the -- where

7  the address was?

8      A.   Off the top of my head, I don't.

9      Q.   All right.  So showing you Exhibit 211 in

10 evidence, so you see this is business information about

11 AISA Consulting Group, LLC?

12     A.   Uh-huh.

13     Q.   And you see down at the bottom principal's

14 information?

15     A.   Yes.

16     Q.   And that this one says Imran Alrai, manager;

17 correct?

18     A.   Yes.

19     Q.   And what's the business address?

20     A.   31 Lowell Road, Suite 1, Windham,

21 New Hampshire, 03087, USA.

22     Q.   Okay.  And so what else did you do as you --

23 did you also get the corporate documents for DigitalNet?

24     A.   I did.  I did research on DigitalNet, tried to

25 find additional information, went to their location to

1    see what their office looked like.  I got incorporation

2    documents for both DigitalNet and this company as well.

3         Q.   All right.  And showing you 209, did -- did

4    the DigitalNet document also have an address on it?

5         A.   Yes, it did.

6         Q.   Okay.

7         A.   It said the business address of its principal

8    office was 31 Lowell Road, Suite 1, Windham,

9    New Hampshire, 03087.  That was not the address that we

10   had on file for that company.

11        Q.   Okay.

12        A.   We had the -- the 300 Brickstone Square, Suite

13   201 in Andover.

14        Q.   Okay.  All right.  So you have the same

15   New Hampshire address on two different documents, right?

16        A.   That's correct.

17        Q.   So what did you do?

18        A.   Well, when I saw that DigitalNet listed its

19   primary office as the business address of Imran's

20   business that we were unaware of, I believed that I was

21   looking at a situation where I needed to report

22   something that was fraudulent.

23        Q.   All right.  And did you call a particular

24   former employee about that?

25        A.   I had a phone call, I believe he called me,

1    but we -- we talk regularly.

2         Q.   All right.

3         A.   That was Azim Mazagonwalla.

4         Q.   So you spoke to Azim about this?

5         A.   I did.

6         Q.   And did he make a recommendation to you?

7         A.   He did.  He said that Dorothy Puhy --

8         Q.   Don't state what he said, but I just asked

9    what recommendation did he make?

10        A.   He said report -- he said that I should do

11   something to report it.

12        Q.   All right.  And did you do just that?

13        A.   I did.

14        Q.   What did you do?

15        A.   I scheduled a meeting with Rich Voccio, the

16   CFO, and I collected a bunch of printouts of the

17   materials that I found --

18        Q.   All right.

19        A.   -- and sat with him and displayed it.

20        Q.   All right.  And so after that time, did United

21   Way treat your report as a whistleblower complaint by an

22   employee at DigitalNet?  I'm sorry, at United Way.

23        A.   I believe they did.

24        Q.   All right.  And did you receive a small bonus

25   as a result of the whistleblower complaint that you

1  made?

2       A.   Yes.  I received $2,000.

3       Q.   All right.  And when was the last time before

4  this trial that you saw Mr. Imran Alrai?

5       A.   It would have probably been shortly before his

6  final day -- I did not see him on his final day at work,

7  so sometime in the days or weeks before then.

8            MR. DAVIS:  All right.  Nothing further.

9  Thank you.

10            THE COURT:  Cross-examination.

11                      CROSS-EXAMINATION

12  BY MR. AYER:

13       Q.   Mr. Pallaria, you testified initially on

14  direct that you had concerns about Mr. Alrai's budgets.

15       A.   Yes.

16       Q.   And that you didn't like how he sent them to

17  you initially, right?

18       A.   I didn't like that he would not give me

19  information that I asked for or in the form I wanted or

20  in a timely manner.

21       Q.   Right.  And you didn't like that his numbers

22  seemed to be going up when you didn't want them to do?

23       A.   We would direct him to give us back a result

24  and it was typically higher when we asked for lower.

25       Q.   And these concerns were at one point raised to

68

1    Pat Latimore?

2         A.   Yes.

3         Q.   And you raised them to her?

4         A.   I had conversations with Pat, yes, about this.

5         Q.   And you discussed specifically Mr. Alrai's

6    budgets with her?

7         A.   Yes, I did.

8         Q.   And her response was that he was generally

9    within his budget?

10        A.   No, she would in many cases approve -- well,

11   it would depend.  Are you talking about the budgets

12   themselves or are you talking about expenses submitted

13   against the budget?  I don't understand the question.

14        Q.   All right.  When you -- well, when you raised

15   the issue to Pat Latimore, her response was essentially

16   that it's okay, right?

17        A.   Yes, I think that's correct.

18        Q.   And her reasoning was that he was generally

19   within his budget?

20        A.   No.  She -- well, she would -- I can expand a

21   little bit on that if you'd like me to.

22             THE COURT:  You can go ahead.

23        Q.   Yes, go ahead.

24        A.   All right.  So if -- there are a number of

25   questions in terms of when you're talking about his

69

1    budget.

2           So he gets a budget established at the

3    beginning of the year and then he spends against it.  If

4    he was over budget and he was planning to be over

5    budget, in many -- and I had a discussion with her about

6    that -- she would not say that's okay.

7       Q.    Uh-huh.

8       A.    She would say all kinds of things:  I'll have

9    a discussion with him about it; she might say, tell him

10   not to do that; find out why and get back to me.  There

11   were a number of things along those lines in terms of

12   budget overspending that she would not say it's okay

13   about; she would say do something about it, I don't want

14   that to happen.  So that -- that was correct for that.

15          However, in terms of if I complained about

16   particular bills or other issues that I was having in

17   many cases, she'd be, well, he's the IT expert, so

18   that's okay.

19      Q.    Right.  Okay.  And when you -- I guess early

20   on in this case, back in July of 2018, you gave an

21   interview to the FBI in regards to their investigation

22   here?

23      A.    Yes.

24      Q.    And during that investigation, you raised this

25   same issue with them, right?  You told them that you

1    went to Pat Latimore?

2         A.    I -- I had gone to Pat Latimore, sure, and I

3    believe I would have said that to them, yes.

4         Q.    All right.  And do you recognize this as a

5    copy of the report generated from your interview with

6    them?

7         A.    I believe I'm seeing it for the first time,

8    but okay.

9         Q.    In that report, it stated that, you know --

10   highlight that here.

11        A.    I do recognize some statements in this that I

12   made.

13        Q.    So it says -- and looking around -- right

14   around here:  Pallaria advised that he went to Pat

15   Latimore several times about Alrai going over budget and

16   moving funds between capital and operating budgets.

17             Do you see that part?

18        A.    I do.

19        Q.    Do you see in the next line it says:  Latimore

20   was not concerned about the overage or movement because

21   he was somewhat within the budget?

22        A.    That's correct.

23        Q.    Furthermore, she would tell you to tell him to

24   stop going over budget, but she would not get involved.

25        A.    If he wanted to move -- if he was --

1    Q.   Let me back up for one second.

2    A.   Sorry.

3    Q.   Do you remember saying that to the FBI?

4    A.   That's consistent with what I spoke with them

5    about, yes.  I believe I could have said -- I could have

6    said that.

7    Q.   And, similarly, many of the departments of

8    United Way ate up their budgets every year?

9    A.   I'm sorry.  They did what?

10   Q.   Many of the departments at the United Way used

11   their full budgets every year?

12   A.   That's -- that happens, sure.

13   Q.   You also had concerns about the invoices that

14   you got, at least you've mentioned one, the $200,000

15   invoice?

16   A.   Yes.

17   Q.   And when you saw that invoice, that raised a

18   red flag to you and you reported it above you, right?

19   A.   That's right.

20   Q.   And you had people review it?

21   A.   Yes.

22   Q.   And that could have been done with any invoice

23   that raised concerns with you?

24   A.   Yes.

25   Q.   And you were with the United Way for the

1  entirety of Mr. Alrai's tenure?

2       A.   Yes.

3       Q.   You had significant concerns about his

4  performance?

5       A.   Not at -- I wouldn't say about his

6  performance.

7       Q.   Well, about his -- sorry.

8       A.   I had issues when it -- about budget

9  information and spending --

10       Q.   All right.  And you --

11       A.   -- and information that was submitted to

12  spend.

13       Q.   And you raised those with him?

14       A.   Yes.

15       Q.   And you -- did you raise those with his

16  supervisors?

17       A.   I did.

18       Q.   And if somebody is underperforming in their

19  job and your raise it to their supervisor, that person

20  can be, you know, disciplined, demoted, or released,

21  right?

22       A.   I would think so.

23       Q.   And Mr. Alrai -- Mr. Alrai was instead

24  promoted, correct?

25       A.   Correct.

73

```
 1          Q.    He was made a vice-president?

 2          A.    Correct.

 3          Q.    By his supervisor.

 4          A.    Yes.

 5                MR. AYER:  All right.  That's all I have, your

 6     Honor.

 7                THE COURT:  Thank you.

 8                MR. DAVIS:  No questions.

 9                THE COURT:  Sir, you're excused.

10                     (Witness excused.)

11                MR. HUNTER:  The government calls John Meyer.

12                THE COURT:  John Meyer?

13                MR. HUNTER:  Yes.

14                THE CLERK:  Good afternoon, sir.  You can step

15     this way, please.

16                If you could step into the witness box and

17     remain standing.

18                THE WITNESS:  Thank you.

19                THE CLERK:  Please raise your right hand.

20                **JOHN MEYER**, having been first duly sworn,

21     testified as follows:

22                THE CLERK:  For the record, please state your

23     full name and spell your last name.

24                THE WITNESS:  John S. Meyer, M-e-y-e-r.

25                THE CLERK:  Thank you.  Please be seated.
```

1          MR. HARRINGTON:  Judge, before we begin the

2    questioning, I'm going to bring one of my witnesses in

3    to observe the testimony, if I could just have one

4    moment.

5          THE COURT:  Any objection?

6          MR. HUNTER:  No objection.  It's the

7    defendant's expert in IT.

8                    DIRECT EXAMINATION

9    BY MR. HUNTER:

10       Q.   Good afternoon, Mr. Meyer.

11       A.   Good afternoon.

12       Q.   I would just ask -- we have a court reporter

13   here in the courtroom who's typing everything, so try to

14   speak clearly into the microphone.  And as we're going

15   through, let's try not to talk over each other.

16       A.   Gotcha.

17       Q.   Sir, how are you employed?

18       A.   I'm employed by Technology Business Solutions.

19   I am the current CEO and owner of that company.

20       Q.   Did you found the company?

21       A.   I did.

22       Q.   When was that?

23       A.   1995.

24       Q.   So, what is that, about 23 years ago or --

25       A.   Yeah, close to 24, yes.

1      Q.    24.   And what -- and is Technology Business

2  Solutions known as TBS?

3      A.    Yes.

4      Q.    And what does TBS do?

5      A.    TBS is an IT managed service company.  We

6  provide IT support, project management, and consulting

7  to various companies.

8      Q.    Okay.  How many employees do you have?

9      A.    Right now we're at about 40.

10     Q.    And how many clients or customers does TBS

11 have?

12     A.    Around a hundred customers.  It varies from

13 year to year.

14     Q.    Okay.  Are these customers various sizes?

15     A.    Yes.

16     Q.    And are these mostly corporate clients?

17     A.    They are all corporate clients.

18     Q.    About how many are the size of United Way

19 Massachusetts Bay?

20     A.    More than half.

21     Q.    And do you have others that are larger?

22     A.    Yes.

23     Q.    About how many?

24     A.    About a dozen that are very large.

25     Q.    And how many clients do you have that require

1   services similar to those -- actually, strike that.

2           Is TBS currently providing services to United

3   Way?

4       A.   Yes.

5       Q.   And how many clients do you have that require

6   services similar to those that you provide United Way?

7       A.   Most of those clients.

8       Q.   Okay.  And what type of services is TBS

9   providing United Way in Boston?

10      A.   We are providing help desk services, which

11  requires on support and remote support; we are providing

12  project management support, which supports all projects

13  that require specific -- topics that are very specific,

14  like Office 365 migrations; we provide website support.

15  So we -- we have a developer that helps to develop their

16  websites.  We manage their back end servers; we provide

17  consulting services.  Myself, I am the current acting

18  CIO of the United Way.

19      Q.   Okay.  And in your role as a CIO, that is a

20  service TBS is providing?

21      A.   Yes.

22      Q.   And the cost of your CIO services are included

23  in the monthly fee that TBS charges?

24      A.   That is correct.

25           MR. HUNTER:  Could we put Exhibit 400 on the

1   screen?

2   　　　　Q.　　This is in evidence as Exhibit 400.

3   　　　　　　　Could you move to the next page, Ms. Sheff.

4   　　　　　　　Is this a -- what is this document, Mr. Meyer?

5   　　　　A.　　This is a service level agreement that was --

6   that was generated by my company.

7   　　　　Q.　　Can you just keep going down?

8   　　　　A.　　This looks like an older one, however.

9   　　　　Q.　　Okay.  Is this an RFP response that TBS

10  submitted to United Way around 2011?

11  　　　　A.　　Yes, it is.

12  　　　　Q.　　Okay.  And did you get a contract out of this

13  RFP?

14  　　　　A.　　No, we did not.

15  　　　　　　　MR. HUNTER:  Okay.  You can pull that down.

16  　　　　Q.　　So when did TBS's relationship with United Way

17  begin?

18  　　　　A.　　In May of 2018.

19  　　　　Q.　　And what happened?  How did that relationship

20  begin?

21  　　　　A.　　I was contacted by the United Way.  I was

22  recommended to the United Way by another customer in the

23  Boston area.  That customer recommended us to the United

24  Way as a company that could help them with their current

25  IT support needs and consult with them on some issues

1    that they were currently having.

2         Q.   Okay.  What was your understanding of the

3    issues at the time?

4         A.   That they potentially had a problem with their

5    current IT director, that they -- they didn't get into

6    specifics, however, they were concerned that there may

7    be some issues with their current systems that they may

8    not have complete control over.

9         Q.   And so you said you were brought in in May of

10   2018?

11        A.   We were contacted in early May of 2018.

12        Q.   And what were you asked to do?

13        A.   We were asked to do a -- an investigation of

14   where their systems would be hosted from an outside

15   view.  We didn't have any access to their -- inside

16   their network, meaning we didn't -- we were not inside

17   their building, so we never entered their premise.

18        Q.   Okay.  How did you look at it from the

19   outside?

20        A.   We used a remote session with one of the

21   executives of the company from his home.

22        Q.   Was that Rich Voccio?

23        A.   Yes, it was.

24        Q.   And while you were doing this remote analysis,

25   did you learn anything about a movement of virtual

1    desktop servers at United Way in and around May of 2018?

2         A.    Yes, that was -- that was after we had started

3    our investigation.  We had started the investigation and

4    I believe, somewhere a week or two later, their virtual

5    desktop environment was moved from where it currently

6    was hosted to another environment.

7         Q.    Okay.  And what did you learn about that?

8         A.    We learned it was -- it was moved from the

9    current environment at OVH, which was the data center it

10   was hosted at, to a data center with VMware.

11        Q.    Do you understand whether or not there was

12   notice given prior to the server migration?

13        A.    I believe there was no notice given to the

14   executive that had reported this to me.

15        Q.    And is that Rich Voccio who reported it?

16        A.    Yes, it was.

17        Q.    Is it normal to move a virtual desktop

18   environment at a company without prior notice?

19        A.    Typically, no.

20        Q.    And why is that?

21        A.    Because typically there's coordination --

22   there's coordination with the different departments

23   within the company to alert them that there will be

24   changes.  There'll be downtime, there'll be no access to

25   certain things.  So typically you have a real line of

80

1  communication with the management of the firm that this

2  is about to take place.

3      Q.   Okay.  And the reason for -- and what's the

4  reason for that communication?

5      A.   So that they can coordinate with other folks

6  within the company that if they have -- let's say they

7  have a campaign going on at that time, they would --

8  they would be notified that no access to certain systems

9  would occur from X time to X time.

10      Q.   And you said prior to that, everything was

11  hosted at OVH; is that correct?

12      A.   Yes.

13      Q.   What is OVH?

14      A.   OVH is, from what I found, is a company based

15  out of France that had a data center in Reston,

16  Virginia.

17      Q.   It had one data center in Virginia?

18      A.   Yes.

19      Q.   So prior to moving the virtual desktop with

20  all of United Way's IT environment on that server --

21      A.   Their infrastructure and their virtual

22  desktops were in that environment, yes.

23      Q.   Okay.  So going back to your outside view

24  of -- of United Way's IT systems, do you complete a

25  report summarizing your analysis?

1          A.    Yes.

2                MR. HUNTER:  Can we put Exhibit 411 on the

3    screen, please, Ms. Sheff?

4          Q.    This is in evidence.  Is this the report you

5    prepared?

6          A.    Yes, it is.  This is a report that Mark

7    Wyzykowski with my team had put together for us.

8                MR. HUNTER:  Okay.  And, Ms. Sheff, could we

9    please go down to page 5.

10               Okay.  And could we zoom in on that first

11   block of text.

12         Q.    Could you please read the first bullet point,

13   Mr. Meyer?

14         A.    "The VDI environment is running Windows 7

15   Enterprise Service Pack One, build 7/6/01.  Windows 7 is

16   from the year 2009, so it is nearly ten years and two

17   full versions old in terms of the age of the operating

18   system," otherwise known as OS.

19         Q.    Okay.  And why -- why was this noted in the

20   report?

21         A.    This is typically noted because the operating

22   systems that were on these virtual desktops were quite

23   old.  Newer versions had come out and we wanted to alert

24   the management what they were actually working on.

25         Q.    Okay.  At this time, Windows was still

1   supporting Windows 7?

2        A.   Yes, and they still are until the end of this

3   year.

4        Q.   Okay.  And the second bullet point says you

5   would expect to see a VMware virtual desktop.  So that

6   was normal?

7        A.   Yes, that's normal.

8             MR. HUNTER:  Okay.  Go to page 7, please,

9   Ms. Sheff.

10       Q.   Okay.  This is talking about the server name

11   is -- going to the second bullet --

12       A.   Okay.

13       Q.   -- this is talking about Dynamics GP 2013?

14       A.   Uh-huh.

15       Q.   What is that referring to?

16       A.   That's referring to that server is not joined

17  to a domain.  In other words, it's sitting on its own,

18  just a separate instance of its own server, not joined

19  to a particular domain that's managed centrally.

20       Q.   Okay.  What -- why was that significant enough

21  to note in your report?

22       A.   Typically servers that are running Great

23  Plains, which is their financial package, should be

24  joined to a domain that's essentially controlled for

25  access, permissions, user names, passwords, et cetera.

1    Q.    And what do you mean by centrally controlled?

2    A.    Controlled by a -- a one central location such

3    as a domain controller that instead of having a server

4    that's separate, has to be separately managed to manage

5    the permissions to that server.

6    Q.    Okay.  And the judge can interject if he gets

7    it, but I don't completely.

8          What is a domain controller?

9    A.    A domain controller is a device that helps you

10   manage your users on your network.

11   Q.    Okay.

12   A.    If you have a server that's sitting on its own

13   island, per se, you have to manually manage that server

14   separately instead of being able to manage it from one

15   central location.

16   Q.    And does it create any issues, having this

17   sort of separate system not controlled centrally?

18   A.    Potentially, yes.

19   Q.    What potential issues?

20   A.    Well, if you have to centrally -- if you

21   manage that separately on its own, typically a lot of

22   times those things get long in the tooth.  You're not

23   managing it properly.  In other words, accounts stay

24   around, you're not deleting those accounts, you're not

25   adding new accounts.

1           Having it centrally managed from one

2    locational allows all your servers to stay up to date

3    with accounts that are within your -- your what's called

4    active directory.

5           MR. HUNTER:  Okay.  You can take that down,

6    Ms. Sheff.

7           Okay.  So just at the very bottom, could

8    you --

9           MS. SHEFF:  I'm sorry.

10          MR. HUNTER:  No problem.  Just highlight those

11   last two.

12          MS. SHEFF:  Was that 400?

13          MR. HUNTER:  411.

14     Q.   What was the -- and what was the overall

15   purpose of this report, Mr. Meyer?

16     A.   The overall purpose of this report was to help

17   the United Way of Massachusetts Bay figure out where

18   their systems were hosted and how we could potentially

19   preserve those systems.

20     Q.   Okay.  In this initial review, you didn't have

21   adequate access to do a full analysis of that?

22     A.   No, certainly not.

23          MR. HUNTER:  Okay.  So could you just zoom in

24   on this -- that last paragraph.

25     Q.   And so could you just read that last sentence

```
 1  and explain what that meant?

 2       A.   "TBS will begin the process the -- the

 3  investigation -- investigating how to regain control

 4  over your SoftLayer IBM hosted VDI environment in case

 5  you are unable to secure the admin credentials during an

 6  employee offboarding.

 7       Q.   Okay.  So that's the next step after this

 8  report?

 9       A.   Yes.

10       Q.   And what does -- what does that mean?

11       A.   Well, if the organization doesn't have control

12  over its environment, meaning it doesn't -- it's not

13  able to remove an employee from their system, they have

14  to then figure out a way to preserve that system while

15  the offboarding is taking place.

16       Q.   Okay.  And what do you mean by preserving the

17  system or preserving -- preserving the IT system?

18       A.   Basically protecting the integrity of those

19  systems and the data that lives on it.

20       Q.   During the offboarding process?

21       A.   Yes.

22       Q.   And why do you do that?

23       A.   You do that so you don't lose your data and

24  you don't lose your servers.

25       Q.   But why is there a concern of losing the
```

1   servers?

2       A.   There was a concern from the organization that

3   there possibly could be some nefarious activity during

4   this time period.

5       Q.   Okay.  So after you submitted this report,

6   what did you do?

7       A.   After we submitted this report, we worked with

8   the organization to contact the various organizations

9   that hosted servers for United Way, mainly software,

10  which ended up being OVH.  So figuring out the players

11  here, all the way from the company that was the reseller

12  all the way down to the actual data center that hosted

13  the servers.

14      Q.   Was Insight the reseller for OVH's hosting

15  services?

16      A.   Yes, they are, and they currently still are.

17      Q.   And so were you able to gain control through

18  OVH?

19      A.   Yes, we were able to -- prior to June 12th, we

20  were able to arrange that OVH would actually take

21  snapshots of the current servers and then the -- the

22  morning of June 12th, they were able to power down all

23  of the instances that controlled the servers within

24  their data center.

25      Q.   Okay.  And that's what you were talking about,

1    the preservation steps you were taking --

2         A.    That's correct.

3         Q.    -- in advance of June 12th.  And is that -- is

4    that correct?

5         A.    Yes.

6         Q.    And why was June 12th important?

7         A.    June 12th was the day that the offboarding was

8    to take place.

9         Q.    And that's the offboarding of Mr. Imran Alrai?

10        A.    That is correct.

11        Q.    Did you identify any other vendors hosting

12   United Way's servers?

13        A.    We identified that Google was the host of

14   their email.  However, we did not have much luck gaining

15   control over any of those systems prior to June 12th.

16        Q.    Okay.  And ordinarily server locations and

17   that sort of thing, would there be documentation of the

18   IT environment at United Way?

19        A.    Typically, yes.

20        Q.    Did you find any documentation of United Way's

21   IT environment?

22        A.    We found one document that was attached to the

23   wall in one of the offices that had some server names

24   and some IP addresses on it.

25        Q.    And we'll talk about that -- that was after

1    June 12th, though?

2          A.    Correct, yes.

3          Q.    So we'll talk about that later.

4                So let's talk about June 12th.  What happened

5    on June 12th, 2018?

6          A.    On June 12th, I arrived at the United Way for

7    the first time.  I --

8          Q.    I'm going to stop you right there, Mr. Meyer.

9                So prior to that you'd never been physically

10   on-site?

11         A.    No, I had not.

12         Q.    Okay.

13         A.    I had only had phone conversations and, you

14   know, virtual meetings with them.

15         Q.    Okay.  So continue.  You got to United Way on

16   June 12th.  And then what happened?

17         A.    On June 12th, I arrived, I met with some legal

18   representation.  I then was brought into a conference

19   room where I sat with Imran and we talked about the

20   environment and I questioned him on gaining access

21   administratively to some of those systems.

22         Q.    Okay.  What was the purpose of that

23   conversation?

24         A.    The purpose of the conversation was to gain

25   access to the systems that were hosted by OVH, by Gmail,

1 and several other items that were actually in that

2 building, such as routers and switches and firewalls.

3 So I requested that we gain access to those systems.

4   Q. And by requesting that you gain access, what

5 do you mean?

6   A. I asked for user names and passwords to those

7 systems.

8   Q. Did Mr. Alrai provide you with any user names

9 and passwords?

10   A. He did not.

11   Q. At all during the meeting?

12   A. No.

13   Q. Did you ask him about -- did he say that he

14 knew where some passwords were?

15   A. Yes.

16   Q. Where did he say they were located?

17   A. These passwords were in a document in a safe

18 in his home.

19   Q. What was your reaction when Mr. Alrai told you

20 he had passwords in a safe in his home?

21   A. My reaction was are you sure you don't

22 remember some of them off the top of your head.

23   Q. Why did you ask that question?

24   A. Typically an administrator that administrates

25 servers on a regular basis usually knows what those user

1   names and passwords are for the most part.

2        Q.    Okay.   Why do they know them?   I do not have

3   every password I use memorized.

4        A.    Well, if you're on them regularly, weekly,

5   biweekly, sometimes most administrators are on every

6   single day, you tend to have those passwords memorized.

7        Q.    Okay.   How did Mr. Alrai respond to that

8   question?

9        A.    He did not have them memorized.

10        Q.    Would you recommend storing administrative

11   passwords to your company's IT system in a home safe?

12        A.    I would recommend not doing that.   I would

13   recommend having them in a secure vault somewhere

14   on-site in an encrypted folder on a server potentially.

15        Q.    When you say secure vault, are you talking

16   about a physical safe in the company or are you

17   talking --

18        A.    Or in a file cabinet that's locked up --

19        Q.    Okay.

20        A.    -- that, you know, no one has access to except

21   the administrator or administrators of your system.

22        Q.    And in your --

23        A.    And some other executives within the company,

24   I might add.

25        Q.    Okay.

1      A.     They should have access, too.

2      Q.     And in your experience doing this type of work

3  for your other clients, is it typical for only one

4  person to have administrative passwords?

5      A.     No.

6      Q.     Why not?

7      A.     Because it leaves -- it leaves a layer of

8  problems that if that person is not available and you

9  have a situation where you need to get on those systems,

10  you only have one person that has those passwords.  It's

11  typically not a best way -- a practice of operating.

12      Q.     And do the other companies -- you mentioned

13  the vault or the filing cabinet.  Is that typically how

14  passwords are stored in the other companies that TBS

15  manages?

16      A.     Typically passwords are stored in -- in a

17  secured folder that are permissioned properly and that

18  people don't have access to except the administrators,

19  yeah.

20      Q.     And by a secured folder, you're talking about

21  an electronic folder?

22      A.     Yes, electronically, yes.

23      Q.     And did you ask Mr. Alrai about documentation

24  of United Way's IT environment?

25      A.     Yes.

1      Q.    What did he say?

2      A.    The documentation was home in his home safe.

3      Q.    Okay.  And could you describe what

4  documentation of an IT environment is?

5      A.    Sure.  Basically a road map of what your

6  network looks like.  If you want to take a map that you

7  used to use before GPS, it kind of shows you where to

8  go.  It instructs you of how your system is -- how your

9  servers are laid out, how the wiring in your IT closet

10  is laid out.  It will -- it will give you a map of

11  what's connected to what within your systems.  It allows

12  you to troubleshoot things when issues arise.

13      Q.    Okay.

14      A.    It allows others that are on your team to do

15  the same thing.

16      Q.    And is this type of documentation normal in

17  the industry?

18      A.    It is very normal, yes.

19      Q.    In dealing with other companies similarly

20  sized to United Way, do any of them lack this type of

21  basic documentation?

22      A.    After we're involved, no, but I have seen

23  other companies that do not have documentation.  But

24  typically firms of the United Way's size do and should

25  have documentation on their network.  Not only of how

1    the network is structured, but things like what software

2    is in use and IP address is in use and how many printers

3    you have, your -- your vendor information, your -- your

4    phone numbers to your ISP, your Internet service

5    providers, any software vendors that you work with on a

6    regular basis, vendors that you buy equipment from.  All

7    those things that should be documented -- very well

8    documented and things that -- in a place where you can

9    get at it fairly easily.

10        Q.    Would you typically store that in a safe in

11   your house?

12        A.    No.

13        Q.    Where would you keep that?

14        A.    I would keep that electronically within --

15   within the system that you're working in.

16        Q.    Okay.  And since TBS came on to provide IT

17   support and CIO services, have you looked for this

18   documentation?

19        A.    Yes.

20        Q.    Have you looked to see if DigitalNet or Imran

21   Alrai created any such documentation of United Way's IT

22   environment?

23        A.    Yes, we thoroughly looked.

24        Q.    Did you find anything?

25        A.    No.

1        MR. HUNTER:  Ms. Sheff, could you put

2  Government Exhibit 409 on the screen.

3      Q.   You mentioned that you'd found one handwritten

4  document.  Is this it?

5      A.   Yes, that's the document.

6      Q.   Is this the only evidence of documentation of

7  United Way's IT system that you found created by

8  Mr. Alrai at DigitalNet?

9      A.   Yes.

10      Q.   Is this adequate documentation of an IT

11  system?

12      A.   No.  In fact, this document here, a lot of

13  these items that are on this list were things that were

14  on premise at the United Way and were not in use much

15  anymore.  Some of the things that were in use were then

16  cloud-based and some of these things were not really

17  relevant any longer.

18      Q.   Okay.  So this was out-of-date?

19      A.   Yes.

20      Q.   If documentation were created, would it be

21  appropriate to share it with just one or two people and

22  the vendor and not with the client?

23      A.   No, it should be compared -- it should be

24  shared with your customer and with your entire team that

25  works on that customer and with internal people as well.

1          So if you have internal help desk people, they

2     should be in the know of this documentation as well.

3          Q.   So it should be everyone -- so in the case of

4     TBS, it would be everyone working for TBS as well as any

5     United Way employees that are working in IT?

6          A.   Yes.  Such as data analysts that work on-site

7     there.

8          Q.   Now, I just want to clarify something you

9     said, going back to your meeting with Mr. Alrai on

10    June 12th.

11         A.   Uh-huh.

12         Q.   You mentioned you don't -- you didn't think he

13    gave you passwords.  Do you mean he didn't provide you

14    any passwords that worked in giving you administrative

15    access?

16         A.   Yes, correct.

17         Q.   So did Mr. Alrai actually provide you with

18    some passwords during that meeting?

19         A.   His coworkers, Nadeem and Jasmin, provided us

20    with some passwords that -- that gave us some access to

21    some things --

22         Q.   Okay.

23         A.   -- yes.

24         Q.   Did any of the passwords you received on

25    June 12th provide you with administrative access to

1    United Way's systems?

2         A.   No.

3         Q.   Did you eventually, you know, after June 12th,

4    obtain passwords that you understood came from one of

5    Mr. Alrai's attorneys?

6         A.   Yes.  Yes.

7         Q.   And could you describe what those passwords

8    were?

9         A.   Some of those passwords were to the routers

10   and switches in the building.  We were unsuccessful at

11   using those passwords.  We took alternative action and

12   were able to get into those systems by breaking into

13   them.

14        The other password I think that was given to

15   us was for the current phone system that was there.  We

16   ended up using lower level access from Nadeem, his

17   password.  That gave us enough access to manage the

18   system.

19        Q.   Okay.  But did any of those passwords provide

20   you with the administrative access that you needed?

21        A.   No.

22        Q.   And you mentioned breaking into them.  What do

23   you mean by breaking into the system?

24        A.   We were able to use a -- what's called a

25   console cable with a laptop that -- and running some

1    commands that allow you to reset the system password.

2        Q.   All right.  So going back to your meeting with

3    Mr. Alrai on June 12th, other than talking about

4    passwords and documentation being in a safe at home, did

5    you talk about anything else?

6        A.   Basically I had asked him about some of the

7    other vendors that were used.  I -- I kept asking a lot

8    of the same questions about access to systems to the

9    Gmail platform, the OVH platform, and if there was any

10   other platforms that we should be made aware of that

11   would allow us to help the United Way manage their

12   systems.

13       Q.   And how did Mr. Alrai respond?

14       A.   During the entire sit-down, which didn't last

15   too long, there -- there -- there wasn't an engaging

16   sense that I felt.  It was more of a -- pretty much very

17   standoffish.  He didn't really want to communicate with

18   me.

19       Q.   Was he engaged in the conversation at all?

20       A.   No.

21       Q.   What do you mean by that?

22       A.   He spent most of his time on his phone.

23       Q.   So despite not getting administrative

24   passwords, as I think you were talking about earlier,

25   you were ultimately able to gain access and control of

1    United Way's systems; is that right?

2         A.    Yes.  Yes.  With the help of OVH, we were able

3    to gain control of those systems.

4         Q.    Okay.  And what -- what do you mean with the

5    help of OVH?

6         A.    They were able to -- to put administrative

7    passwords on their portals that allowed -- that then

8    allowed us to go in and manage those servers.

9         Q.    Okay.  Did you work with any other providers

10   to gain access to the systems?

11        A.    Well, we -- we gained access to the G Suite

12   from Nadeem and Jasmin, so that helped us manage their

13   email platform.

14             We were able to work with the phone vendor

15   several weeks down the road to gain access to that.  And

16   that's really the -- that's really the main systems that

17   we were able to take control over.

18        Q.    Okay.  And you mentioned the email was on the

19   G Suite.  What is that?

20        A.    G Suite is Google.  That's their -- that's

21   Google's email platform.  They are still currently on

22   that platform, but we are in the -- right in the middle

23   of migrating them over to Office 365.

24        Q.    Why are you migrating to Office?

25        A.    Well, Office 365 is a -- is more geared

1    towards corporate entities.  It has more products to

2    offer and, in my opinion, it's a more robust platform

3    for an organization of that size to be on.

4        Q.   Is it more expensive than G Suite?

5        A.   It does cost money, yes.

6        Q.   Okay.  Does G Suite cost anything?

7        A.   G Suite does not cost them anything, no.

8        Q.   Okay.  How much does Microsoft Office cost?

9        A.   It costs $4 a license.

10       Q.   Okay.

11       A.   Per user.

12       Q.   Per user?

13       A.   Yes.  And they get the -- they get a nonprofit

14   discount rate.

15       Q.   Is the $4 after the nonprofit discount?

16       A.   Yes.  It's typically around $20.

17       Q.   Okay.  So is part of the -- in general, have

18   you processed or have you reengaged with vendors so that

19   United Way pays their vendors directly for services?

20       A.   Can you repeat that again?

21       Q.   I'll come back again.

22       A.   Yeah.

23       Q.   We'll get to this later.

24            All right.  So after June 12th, 2018, is -- so

25   Mr. Alrai has left?

1      A.    Uh-huh.

2      Q.    Or, actually, when -- anything else on

3  June 12th?  Did you see Mr. Alrai leave the building or

4  anything like that?

5      A.    I did.

6      Q.    Okay.  So you watched him -- you -- what did

7  you see?

8      A.    I just saw him leave with several other people

9  that were escorting him out.

10      Q.    Okay.  And so after that --

11          THE COURT:  Excuse me, Counsel.  The Court

12  needs to take a quick recess.  Less than five minutes.

13      (Recess taken from 4:42 p.m. until 4:47 p.m.)

14          THE COURT:  I apologize for the interruption.

15  You may continue.

16          You're still under oath.

17          Mr. Hunter, you may continue.

18          MR. HUNTER:  Thank you, your Honor.

19      Q.    Mr. Meyer, when we took a break, we were just

20  starting to talk about the more hands-on role TBS took

21  after June 12th, 2018.

22      A.    Uh-huh.

23      Q.    Could you describe what TBS started doing at

24  that point?

25      A.    Well, in the early hours of I guess -- well,

1    the later hours of June 12th, we basically started

2    powering systems back on later that day.  And then

3    starting the next day, we really just started getting a

4    grasp of what goes on there on a daily basis.  We had

5    not really had the -- we weren't privy to any of the

6    daily operations that were ongoing every day that we had

7    to be aware of and things that were ongoing that we

8    needed to be aware of and how we could support the user

9    group of the United Way.

10           So we spent, really, the first -- I'd say the

11   first couple of weeks kind of getting a grasp on issues

12   that were current and things that we could take and

13   resolve quickly and things that we needed to do more

14   research on.

15       Q.   Okay.  So this early phase, you're just trying

16   to keep the lights on; is that --

17       A.   Correct, yes.

18       Q.   And, briefly, in a couple of words --

19       A.   Uh-huh.

20       Q.   -- what would -- how would you describe the IT

21   environment you inherited in June of 2018?

22       A.   I would describe it as running, but

23   inadequate.

24       Q.   Why is that?

25       A.   Because I feel that there were things that

1    were put in place that didn't lead the organization to

2    have a successful IT environment in the long run.

3         Q.   Such as what?

4         A.   Such as servers that could handle certain

5    processing loads, things -- things such as, you know,

6    things that we discovered as we went about our daily

7    work, things like the G Suite portal was not managed

8    properly.  There were many, many addresses that were

9    left in the system that could create security issues.

10   People that had not been working there any longer still

11   had accounts.  There were still accounts on their domain

12   controllers, giving people access to certain things.

13        Q.   And why is that -- why is that important?

14        A.   Well, that -- that's very important to an

15   organization that -- that takes in donations for

16   nonprofit organizations and deals with PII information.

17   It's important in any organization that has data that's

18   proprietary to that company that if you have accounts

19   that are not managed properly and are left in place, you

20   create a security risk by leaving those accounts there.

21        Q.   As part of your evaluation of the IT

22   environment, did you create a network scan of the

23   environment sometime after 2012?

24        A.   Yes.

25        Q.   So these are not marked as exhibits, but have

1  you reviewed them recently with the -- your network scan

2  produced at Bates number Commisso 00217?

3      A.   Have I reviewed it?

4      Q.   Yeah.

5           Could we pull that document up just so defense

6  counsel can see it?

7           Is this the network scan that you did?

8      A.   Yes.

9      Q.   Okay.  And have you reviewed another network

10  scan, a Net Detective result scan?

11      A.   There was another organization that did a

12  scan --

13      Q.   Okay.

14      A.   -- of the network.

15           THE COURT:  Wait a minute.  You just said this

16  is the network scan.

17           THE WITNESS:  Yes.

18           MR. HUNTER:  Yes, your Honor.

19      Q.   There are two network scans; is that right,

20  Mr. Meyer?

21      A.   Yes.

22           THE COURT:  Wait a minute.  Wait a minute.  I

23  mean, is this a -- is this -- what was the page you were

24  on before?  That's not the same page you testified

25  about.

```
1                  THE WITNESS:  No, that's a different page.
2       This scan -- this document you're looking at now is a
3       document created by RSM, which is a firm that did a
4       forensic view of the system.
5                  THE COURT:  Let's go back to the scan --
6                  MR. HUNTER:  Go back to the scan.
7                  THE COURT:  -- what you called the scan.
8                  THE WITNESS:  Yes.
9                  THE COURT:  So when you say -- what this is is
10      some kind of document that summarizes the scan?
11                 THE WITNESS:  Yes.
12                 THE COURT:  I mean, it's not the scan.
13                 THE WITNESS:  No.
14                 THE COURT:  Okay.
15                 THE WITNESS:  It is a scan.  What it does is
16      it puts out as best as it can see --
17                 THE COURT:  Yeah.
18                 THE WITNESS:  -- IP addresses, names of
19      servers, virtual desktops.  Anything it has that
20      responds back in the scan, it documents in this
21      document.
22                 THE COURT:  I see.  It documents what -- it
23      documents what -- what the scan revealed.
24                 THE WITNESS:  Correct.
25                 THE COURT:  Got it.  Okay.
```

1          THE WITNESS:  Yes, sir.  Yup.  It doesn't make

2     a drawing.  It basically just spits it out as written

3     text.

4          THE COURT:  Yeah.

5          MR. HUNTER:  You can take that down,

6     Ms. Sheff.

7          Q.   I do not want to go through the scans line by

8     line --

9          A.   I gotcha.  Yes.

10         Q.   -- but what was the purpose of these network

11    scans?

12         A.   The network scans, the purpose of it was to

13    see what devices were on the network at the time.

14         Q.   Okay.  Would that include servers connected to

15    the network?

16         A.   Yes; servers, routers, switches, firewalls,

17    printers, mobile phones.  Anything that is actually

18    getting an IP address from the network, it's going to

19    show you is there.

20         Q.   And from that were you able to evaluate things

21    like servers that were getting backed up or not getting

22    backed up?

23         A.   That scan will not show you what's getting

24    backed up.  That's a physical looking at a server, see

25    what software is running.  That's -- the scan is not

1      made for that purpose.  The scan is just to show you

2      what devices live on that network.

3           Q.   Understood.

4           A.   Uh-huh.

5           Q.   That -- you're referring to the scan that you

6      conducted?

7           A.   Correct.

8           Q.   Did the other scan discuss backup data at all,

9      in your review?

10          A.   That other scan did, however, that -- that

11     information was gathered from them.  We gave them that

12     information.

13          Q.   Okay.  So what observations -- or strike that.

14               What important observations or observations

15     that you thought were important did you glean from those

16     network scans?

17          A.   Well, I mean, we -- we really -- we did the

18     scan for -- as I mentioned, for the purpose of really

19     identifying what devices were on the network to see

20     what -- what systems we had to manage, what we were

21     dealing with.  This was done fairly early on so that we

22     could really kind of get a handle on what servers we

23     need to focus on, what systems we need to see.

24               This -- from talking to some of the people

25     within the United Way, they're not the technology

1   people.  So we ran these scans and we had internal

2   discussions to the best of their knowledge what these

3   systems were used for.

4       Q.   Okay.  All right.  Let's move on.

5            You mentioned in your initial report you

6   observed that the Windows operating system was

7   out-of-date.  Did you confirm that when you were

8   on-site?

9       A.   Yes.

10      Q.   Have you since updated Windows at United Way?

11      A.   We have.

12      Q.   Okay.  What operating system is running now?

13      A.   Server 2016.

14      Q.   Okay.  Did you notice any issues with

15  licensing when you were on-site?

16      A.   Yes, there were some systems -- there were

17  some softwares that were not licensed.  They were trial

18  versions of some licensing.

19      Q.   Okay.  Not every license was a trial?

20      A.   No.  No, that's correct.

21      Q.   Is it normal for a company of United Way's

22  size to have the number of trial licenses running that

23  you observed?

24      A.   It's not normal, but, however, it's not

25  unusual if a company is trying out certain software and

```
 1    it's left as a trial version if they're not using it any
 2    longer.  But it -- in some of these cases, licensing
 3    like Adobe and some of the Microsoft Office versions
 4    were not licensed.  What we did find is there were
 5    licenses that weren't applied in some cases.
 6             Q.   Okay.  So they had a license, but it wasn't
 7    applied?
 8             A.   Correct.
 9             Q.   And why might that be?
10             A.   That's just lack of applying a license key.
11             Q.   Is that something you'd ordinarily do as CIO
12    or have someone under you do?
13             A.   Yes.  You always want to try to be as
14    compliant as possible with licensing.
15             Q.   Okay.
16             A.   Nonprofit or otherwise.
17             Q.   Shortly after you and TBS arrived on-site,
18    were there reports of issues with the system?
19             A.   Yes.
20             Q.   Could you describe those reports?
21             A.   Yes.  The reports that we would receive
22    shortly after we arrived was the system would be slow,
23    systems were -- their Andar system, which is their
24    giving platform, would come to a screeching halt, it
25    would lock up.  So screens would freeze.  So somebody
```

1    sitting at their desk, their screen would freeze or be

2    dreadfully slow.  By -- by multiple people, not just one

3    person.

4        Q.   Did you investigate to figure out why that was

5    happening?

6        A.   Yes.

7        Q.   What did you do to investigate?

8        A.   Well, we -- we found that the -- some of the

9    systems, the Andar system in particular, would run out

10   of what's called random access memory.  It would

11   basically be using all its -- all its resources that it

12   had available to it.

13       Q.   Okay.  Can you describe what random access

14   memory resources are when you're referring to --

15       A.   Yes.  So if you have -- if you had a car that

16   would go 70 miles an hour and you were trying to go

17   80 miles an hour, you're exceeding that car's capability

18   by five percent, ten percent.  So they were exceeding

19   the ability of that device to continue to process at a

20   normal rate.

21       Q.   Is that because there wasn't enough memory for

22   the users that were involved or some other reason?

23       A.   Yes.  Yup.  And depending upon the workload of

24   the day -- so if they were in the middle of a campaign

25   and they were sending out massive email sends or they

1    were doing -- there were many people trying to log in to

2    give at that time, that could potentially slow the

3    system down.

4         Q.   Okay.  And so what -- what can be done to fix

5    that?

6         A.   Well, what was done at the time was we would

7    refresh that system, which essentially means we're

8    rebooting it.

9         Q.   Okay.  And why does that solve the problem?

10        A.   It clears out the memory of the system.

11        Q.   Okay.  Is rebooting the system the best way to

12   deal with an overutilized system?

13        A.   Well, at the time, if that's your only option,

14   that is the best way of dealing with it, yes.

15        Q.   Okay.

16        A.   The other way is, of course, by upgrading your

17   system to -- with more memory --

18        Q.   And is that --

19        A.   -- more capability.

20        Q.   Does it cost more money to add memory to a

21   system?

22        A.   It does.

23        Q.   Did you eventually do something -- so you said

24   you started by rebooting it?

25        A.   Yes.

1    Q.    Did you do something to implement a more

2    permanent fix?

3    A.    Well, we eventually moved the environment to

4    Amazon Web Services.

5    Q.    And when you say moved the environment, what

6    do you mean?

7    A.    All the servers were moved.  We moved to a

8    different host in December of 2018.

9    Q.    Okay.  And that was from OVH to Amazon Web

10    Services?

11    A.    Correct.

12    Q.    And how did the two environments compare?

13    A.    Well, the -- the Amazon Web Services

14    environment is far superior than the OVH environment.

15    Q.    How so?

16    A.    The offering that they provide, it is -- it

17    provides the United Way systems that are more scalable,

18    more reliable.  The United Way has not had any downtime

19    since December of 2018, so almost a completely -- almost

20    a full year.

21    Q.    Okay.  And December of 2018 is when you

22    switched to --

23    A.    Yes.

24    Q.    -- Amazon?

25    A.    Yes.

1      Q.    Does it cost more than what United Way was

2   paying OVH?

3      A.    It does cost more, yes.

4      Q.    And they were paying OVH through Insight; is

5   that correct?

6      A.    That is correct.

7      Q.    Okay.  Could we pull up Exhibit 311a on page

8   11, Ruth.

9            How are we on time?

10           MS. SHEFF:  311A?

11           MR. HUNTER:  Or 300a, page 11.

12     Q.    So this is the Master IT Services Agreement

13  that United Way had with DigitalNet.

14     A.    Uh-huh.

15           MR. HUNTER:  The next page, please, Ms. Sheff.

16           So can you just zoom in on this top part about

17  hosting.

18     Q.    And here under hosting it says:  A

19  geographically dispersed high availability environment.

20           Do you see that?

21     A.    Yes.

22     Q.    What is a geographically dispersed high

23  availability environment for hosting?

24     A.    Okay.  What that means is -- I'll use some

25  props up here, if you don't mind.

1          You have data center A in one geographical

2     area, say Reston, Virginia --

3          Q.   And, Mr. Meyer, it's most important that the

4     judge sees.

5               THE COURT:  I can see.  I can see.

6               MR. HUNTER:  Okay.

7          A.   You have one up here, you have another data

8     center here.  That's maybe in Texas or in California.

9               These data centers talk to each other.  They

10    replicate off one another.  Data is replicated in real

11    time and they what's called fail over to each other.

12              So if one data center goes offline, this one

13    picks up without the user even knowing that it's picked

14    up and you continue to operate as normal.

15         Q.   Is this sometimes referred to as redundancy?

16         A.   Yes.

17         Q.   Even though that might be a little less

18    technically precise; is that correct?

19         A.   Yes.

20              THE COURT:  For the record, the witness was

21    using plastic cups for props and put them about, I don't

22    know, three or four feet apart and made a point -- and

23    basically had them represent data centers and data

24    points.  And the Court understands.

25              MR. HUNTER:  Thank you.

1            THE COURT:  It's 5 o'clock.  How much more

2  time do you have on direct?

3            MR. HUNTER:  Quite a bit, your Honor.

4            THE COURT:  Okay.  So sorry you're coming back

5  tomorrow.

6            THE WITNESS:  That's okay.

7            THE COURT:  All right.

8            Oh, wait a minute.  Yeah, we're starting at

9  eight o'clock tomorrow --

10            THE WITNESS:  Yes.

11            THE COURT:  -- on the record.

12            So eight o'clock till, say, I guess it's one

13  o'clock tomorrow.  We won't break for lunch; we'll

14  just ...

15            And that's it, I guess.

16            Anything for the Court?

17            MR. HARRINGTON:  So just for planning

18  purposes, Judge, start at 8:00 and go straight through?

19            THE COURT:  Yeah.

20            MR. HARRINGTON:  Okay.

21            THE COURT:  Yeah, the usual 90-minute blocks

22  or thereabouts.

23            Does counsel have like five minutes to spend

24  with the Court after?  All right.  I'll see you behind

25  the courtroom.

1          Thank you, sir.

2          THE WITNESS:  Thank you.

3

4          THE COURT:  No discussion -- no contact or

5     discussion with trial counsel overnight.  Okay?

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.

8          (Proceedings adjourned at 5:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 3/24/2020          /s/  Liza W. Dubois
                              LIZA W. DUBOIS, RMR, CRR