*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 22, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   1:18-cr-192-JL
              v.                        \*   December 6, 2019
                                        \*   8:10 a.m.
                                        \*
IMRAN ALRAI                             \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



EXCERPT TRANSCRIPT OF BENCH TRIAL
DAY FIVE - MORNING SESSION
CONTINUED TESTIMONY OF JOHN MEYER
BEFORE THE HONORABLE JOSEPH N. LAPLANTE



Appearances:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office




For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon PA




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

1                        I N D E X

2

3      WITNESS:              Direct    Cross    Redirect    Recross

4

5      JOHN MEYER                3       30        95         --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              THE CLERK:  The Court has before it for
3    consideration today day five of the bench trial in
4    criminal case 18-cr-192-01-JL, United States of America
5    vs. Imran Alrai.
6              THE COURT:  All right.  The witness will
7    resume the stand, which he's doing right now.
8              Sir, you're still under oath.  Good morning.
9              Mr. Hunter, you may resume.
10             MR. HUNTER:  Good morning, Mr. Meyer.
11             THE WITNESS:  Good morning.
12                 CONTINUED DIRECT EXAMINATION
13   BY MR. HUNTER:
14        Q.   Before we continue where we left off, I just
15   want to follow up on I think a question the Court asked
16   you about the network scans.
17        A.   Uh-huh.
18        Q.   The network scans that we were talking about
19   yesterday, that's different from the snapshot OVH took
20   of its servers, right?
21        A.   Correct.
22        Q.   And the OVH snapshot, what was the purpose of
23   that?
24        A.   The purpose of it?
25        Q.   Yes.
```

1      A.    The purpose was to -- if we had to restore the
2    servers for any reason, we had copies of them prior to
3    June 12th.
4      Q.    Okay.  And the concern was just in case
5    something happened after June 12th?
6      A.    Correct.
7      Q.    And there was the concern that when you were
8    placing the person who was in control of the IT
9    environment, things could go wrong?
10     A.    Correct.
11     Q.    Did you end up needing to use those snapshots?
12     A.    We did not.  We did not need them, no.
13     Q.    And OVH maintained custody of those?
14     A.    Yes.
15     Q.    You or United Way never possessed them?
16     A.    Yes.
17     Q.    I'll just ask my last question again.
18           You testified yesterday that you -- United Way
19    stopped using OVH in December of 2018?
20     A.    That is correct.
21     Q.    And that -- was that when you moved to Amazon
22    Web Services for web hosting?
23     A.    Yes.
24     Q.    All right.  So when we left off yesterday, you
25    were describing what a geographically dispersed high

1    availability environment was.

2         A.   Uh-huh.

3         Q.   Do you recall that?

4         A.   Yes, I do.

5         Q.   Okay.  And you illustrated that for the Court

6    and for us.  And is another term for that redundancy?

7         A.   Yes.

8         Q.   Though that's not as technically precise as

9    what you were describing.

10        A.   It's not, no.

11        Q.   And I am going to go ask that we try not to

12   speak over each other because we have a court reporter

13   here and we need to make sure the record remains clear.

14             Is there a difference between this type of

15   redundancy and a data backup?

16        A.   Yes.

17        Q.   What's the difference?

18        A.   Redundancy is a -- it allows your systems to

19   continue to run if a portion of your system is down.  So

20   if server A goes offline, server B picks up where server

21   A left off.  That's redundancy.  That's called

22   redundancy or failover.

23        Q.   Okay.

24        A.   A backup is a data backup that you can rebuild

25   a server from that data backup if a disaster occurs.  If

1    all your production servers fail and you cannot restore

2    them, your data backup is used to rebuild those servers

3    from the ground up.

4         Q.   Okay.  So if you have -- sort of these

5    redundant systems are so that you don't experience an

6    interruption in service if one server fails; is that

7    right?

8         A.   Yes.

9         Q.   And backup is if everything -- if everything

10   dies, you have something that you can go back to to

11   rebuild?

12        A.   That is correct.

13             MR. HUNTER:  Okay.  Ms. Sheff, could you

14   please pull up Exhibit 657, which is in evidence.  I

15   think every exhibit's in evidence.

16        Q.   Is this an email -- starting here, is this an

17   email that you sent in June of 2018?

18        A.   Yes.

19        Q.   And so this is shortly after you arrived

20   on-site at United Way?

21        A.   That is correct.  Yes.

22             MR. HUNTER:  And, Ms. Sheff, can you go to the

23   next --

24        Q.   Actually, could you just read the first

25   sentence here.

1        A.    Yeah.

2              "I have put together a list of items I have

3    identified as important projects to address in the short

4    term and long term."

5              MR. HUNTER:  Ms. Sheff, can you go to the next

6    page, please.

7        Q.    Okay.  And this is the list of items?

8        A.    Yes.

9        Q.    And I think you've already talked about some

10   of these --

11       A.    Uh-huh.

12       Q.    -- but what's the first item, infrastructure

13   at OVH?

14       A.    Can you zoom in on that?  Thank you.

15             Yes, the infrastructure of OVH is a public

16   cloud instead of a private cloud.

17       Q.    Why is that important?

18       A.    Well, a public cloud means that your servers

19   are mixed in with lots of other organizations.  You

20   don't see them, but they're -- they're technically

21   there.

22       Q.    All right.  And why should it be a private

23   cloud?  Why --

24       A.    Well, a private cloud means you have your

25   own -- your own what's called bare-metal servers that

1  are separated from the rest of the hosting environment.

2       Q.   Okay.  And you talked yesterday -- for items 2

3  and 3, I think you talked about this already; some of

4  the Windows --

5       A.   Yes.

6       Q.   -- environments were out of date?

7       A.   Yes.  Servers and Windows 7, yes.

8       Q.   Okay.  And I believe you talked about this as

9  well, but can you explain 4 and 5?

10      A.   Active directory?

11      Q.   Yes.

12      A.   Yes.  At the time that we had done our first

13 initial evaluation of active directory, which is

14 essentially all your -- your user accounts within the

15 network that there were -- there were hundreds of

16 accounts that were existing that -- that those folks

17 didn't work at the organization any longer, which

18 creates a risk of access that doesn't necessarily need

19 to be there.

20      Q.   Okay.  And also when you got there, number 5,

21 you were not able to find a password expiration policy?

22      A.   Yeah.  There wasn't an expiration policy and

23 the complexity of the passwords were weak.

24      Q.   Okay.  And then let's talk about disaster

25 recovery plan and data cleanup.  What are those?

1    A.    Well, a disaster recovery plan kind of reverts

2  back to your backup question a few minutes ago.

3         That's what a -- a backup, data backup,

4  basically allows you to recover from a disaster.  So if

5  you're -- all your production servers go down, your

6  backup helps you to restore your data to new servers

7  that you would build.

8         So a disaster recovery plan did not exist at

9  the time of our original investigation.

10   Q.    And if a disaster recovery plan did exist,

11 where would you find it?

12   A.    It should be in a document, essentially, of

13 what -- data that is being backed up, where it exists,

14 what servers they go with, the -- the level of

15 importance of that data.  And so that allows you to

16 rebuild your systems without having to build that

17 disaster recovery plan once the disaster happens.  That

18 plan should already be in place.

19   Q.    So is that -- would that plan be part of this

20 documentation we were talking about yesterday?

21   A.    Yes.

22   Q.    And this is part of why that documentation is

23 important; is that right?

24   A.    That's right.

25   Q.    Now, it says:  Having data backups is great;

1  however, not having the servers run on it is the main

2  issue.

3         Why -- why did you write that?

4     A.    Because it -- after the initial investigation,

5  there was no redundancy.  So not -- there was data

6  backups, but there was not a -- there wasn't a failover

7  in place.  So if the servers failed, you were just

8  offline at that point.  So there was no high

9  availability in place where servers would continue to

10 run.

11    Q.    Okay.

12    A.    So having your data backed up is great and

13 it allows you to recover from a disaster, but if a

14 disaster happens, you're -- you're essentially offline

15 and that -- that is the reason why we wrote that.

16    Q.    All right.  Thank you.

17    A.    Uh-huh.

18    Q.    So you said that when you got there, you

19 discovered there was no redundancy; there wasn't this

20 geographically dispersed high availability environment?

21    A.    Correct.

22    Q.    And how did you determine that?

23    A.    Just by looking at the OVH portal and

24 deciphering what was actually there.  It was in plain

25 sight that there was not high availability in place.

1      Q.    Okay.  Were you also informed by the network

2  scan that you ran?

3      A.    Yes.

4      Q.    And what would you expect to see if there were

5  a high availability environment?

6      A.    You would see all those elements within that

7  scan.  You would see the devices there.

8      Q.    Was there any evidence that you saw that this

9  redundancy was provided through a vendor other than OVH?

10      A.    No.

11            MR. HUNTER:  Ms. Sheff, can you pull up

12  Exhibit 655?

13      Q.    Do you recognize this email from August 7,

14  2018?

15      A.    Yes.

16            MR. HUNTER:  Ms. Sheff, could you go down to

17  the bottom email or to the next page.

18            Okay.  And could you zoom in on the message

19  here.

20      Q.    So this is an email from Rich Voccio to you

21  with a -- is this a draft of an email that is going to

22  be sent to the United Way staff?

23      A.    Yes.  That was after a communication that I

24  had sent to Rich regarding an outage that was currently

25  taking place.

1        Q.    Okay.  So we'll read the email in a second,

2   but can you explain what gave rise to this email?

3        A.    The -- the content of this email is to advise

4   the staff as the -- what the current situation was

5   during an outage that was -- that lasted three days,

6   four days, in length, where their systems were

7   completely offline.

8        Q.    Okay.

9        A.    And so this was informing the staff as to

10  where we were with that.

11       Q.    And here it says:  It's unfortunate the VMware

12  does not have redundancy cloud environment that could

13  have avoided the service interruption.

14       A.    Uh-huh.

15       Q.    Is that part of what you were referring to

16  before?

17       A.    That's correct.

18       Q.    And if there had been redundancy -- and would

19  this have been on OVH's servers?

20       A.    Yes, this was -- we were in OVH's environment

21  at this time, yes.

22       Q.    Okay.  And did you learn what caused the

23  failure?

24       A.    The cause of the failure was due to a

25  lightning strike in the area during a storm that took

1    the data center offline.

2         Q.    And where was this data center?

3         A.    In Reston, Virginia.

4         Q.    And so had there been geographically dispersed

5    redundancy, if that data center went down, what should

6    have happened?

7         A.    It would have failed over to another data

8    center.

9         Q.    In a different geographic location?

10        A.    Correct.

11        Q.    After the outage, did you reach out to OVH to

12   try to add high availability backup with regional

13   diversity?

14        A.    We did.  I had discussions with their lead

15   technician at the data center directly.  He informed me

16   that that was not an option at that time, but they were

17   working on --

18             MR. HARRINGTON:  Objection, Judge; hearsay.

19             THE COURT:  Yeah, sustained.

20             MR. HUNTER:  Okay.

21        Q.    So, Mr. Meyer, did you have a discussion with

22   OVH about adding high availability backup?

23        A.    I did.

24        Q.    Were you able to add that through OVH?

25        A.    No.

1     Q.   Did you eventually -- did you eventually do

2  something to provide high availability with geographic

3  diversity at United Way through their hosting?

4     A.   Yes.

5     Q.   What did you do?

6     A.   We moved the service to Amazon Web Services.

7     Q.   When you arrived on-site at United Way, did

8  you also take steps to secure United Way's phone system?

9     A.   Yes.  That was several weeks into the

10  engagement, yes.

11     Q.   So this was like late -- was this late July or

12  August of 2000 --

13     A.   It was August time frame, yes.

14     Q.   Okay.  What did you do?

15     A.   Well, we researched who the actual phone

16  provider was.  We found that out.  I made contact with

17  them.

18     Q.   Who was the phone provider?

19     A.   A company called SIP.US.  It's S-I-P.US.

20     Q.   Okay.  So you made contact with them, and what

21  happened?

22     A.   We were able to have a letter written on

23  company letterhead that allowed us to change the

24  ownership of the account into the United Way.

25     Q.   Okay.  Why did you change the ownership of the

1   account into the United Way's name?

2       A.    The accountholder was DigitalNet Services.

3       Q.    Okay.  But why did you put in United Way's

4   name rather than TBS's?

5       A.    Because the ownership should be on the

6   company's information and not a vendor.

7       Q.    And did you do the same with Amazon Web

8   Services?

9       A.    That was already in the United Way's name.

10      Q.    Okay.  So after you got the accounts over into

11  United Way's name, what did you do?

12      A.    Well, at the time, we were also having some

13  issues with the phone system where calls would drop at

14  certain intervals during any given day.  Dial tone would

15  not exist for some people.

16          So we investigated as to why and we were told

17  that we had 25 concurrent either inbound or outbound

18  phone calls to -- that were able to occur at the same

19  time.  So in any given moment, 25 inbound or -- combined

20  of inbound or outbound phone calls could be happening at

21  any given time.  So we increased the amount of lines

22  eventually to 50.

23      Q.    Did that increase the cost of the SIP.US bill?

24      A.    Yes.

25      Q.    So what was it before?

1      A.    It was $980.

2      Q.    And then what did it increase to?

3      A.    Just shy of 2,000.

4      Q.    Did you also discover -- discover any problems

5  with the SIP phone lines related to robocalling and

6  hacking?

7      A.    Yes, there was several instances where we

8  had -- several of the numbers were compromised and being

9  used for robocalling out to thousands of phone numbers

10  during the day.

11      Q.    So what was your evaluation of the phone

12  system in July and August of 2018?

13      A.    Well, the phone system didn't have a lot of

14  bells and whistles to it that you would find in a more

15  robust cloud-based voiceover IP phone system.

16            There was voicemail to email; they had a

17  conference center that did not have PIN codes, so that

18  anyone could join a conference call without being

19  noticed.  So if a -- if the board of United Way was

20  having a phone call, somebody jumped in, you could just

21  jump on the call and nobody would know that you're

22  there.

23      Q.    And is -- in your experience with clients of

24  similar size as United Way, is that typical of their

25  phone system?

1        A.    No, typical phone systems provide other things

2   such as applications for your phone, applications for

3   your PC, that allows you to be mobile and use your phone

4   system from anywhere.  That -- that was not the case

5   with this particular phone system.

6        Q.    Okay.  Mr. Meyer, while you were working on

7   phones at United Way, did you become aware of a letter

8   from DigitalNet's counsel threatening to shut down the

9   phones?

10        A.    I did.

11        Q.    And what was your reaction to that?

12        A.    I had advised that I had already contacted the

13   vendor and we had already changed the ownership of the

14   account into the United Way and that there was no risk

15   of the phones being shut down.

16        Q.    If you hadn't secured the phone system, could

17   DigitalNet have canceled the account?

18        A.    Sure.

19        Q.    And would that have disrupted the phone

20   service?

21        A.    It would have.

22        Q.    So what did you do -- did you take any steps

23   to improve the phone system at United Way?

24        A.    Yes.

25        Q.    What did you do?

1     A.   We -- we contacted three different vendors in

2   the marketplace.  We created a focus group of users that

3   beta tested each one of these phone systems and we chose

4   a -- after about two months, we chose a new phone system

5   and we migrated them to a different phone system called

6   8x8.

7     Q.   8x8?

8     A.   Uh-huh.

9     Q.   All right.  So, now, the things we've been

10  talking about, documentation of the IT environment,

11  servers with increased memory that are connecting to a

12  private cloud, the improved phone system and

13  geographically dispersed high availability, did those

14  all cost more to implement than what United Way was

15  paying prior through DigitalNet?

16    A.   Yes.  Monthly costs have gone up for those

17  individual items, yes.

18    Q.   All right.  So how much does -- so at this

19  point, what is TBS contracted to do with United Way?

20    A.   We are the -- we're the service provider.  So

21  we don't actually provide -- we maintain the systems.

22    Q.   Okay.

23    A.   We don't bill for the service.  8x8 bills

24  United Way directly; VMware and AWS, they bill the

25  United Way directly.  The bills are not sent from TBS

1   for these services.  We help maintain them.  We help

2   maintain the servers, we help maintain the phone system,

3   we implement projects, we plan projects, we -- we are

4   the leadership group of the infrastructure for the rest

5   of the company, so we form focus groups and we -- we

6   have discussions on how these things should be rolled

7   out to the rest of the company.  These are all best

8   practice things that we're doing for the United Way.

9        Q.   So as part of TBS's engagement, does that

10   include you being embedded as chief information officer

11   at United Way?

12        A.   Yes.

13        Q.   And about how many hours are you at United Way

14   per week?

15        A.   40.

16        Q.   Is it important to have a CIO present?

17        A.   Yes, it is important.

18        Q.   And physically present?

19        A.   Yes.

20        Q.   Why is that important?

21        A.   It's important so that you have -- you have

22   the opportunity to meet with the different players

23   within the organization at different times.  There's

24   lots of different projects that go on on a weekly basis

25   that are -- that touch different -- different parts of

1    the community.

2              There are -- there are giving projects that go

3    on.  There are websites that need to be made.  There are

4    databases that need to be formed.  There are lots of

5    moving parts that a CIO would have input on of how to

6    make it run better, how to ensure that the organization

7    is getting a fair and equitable deal from other outside

8    vendors.

9              So there's lots of evaluation that goes on at

10   any given time that a CIO would have input on.

11        Q.   Does the -- does TBS also provide someone

12   embedded for infrastructure support?

13        A.   Yes.  We have three on-site technicians that

14   are there.  We also have a team of Tier III engineers

15   that work on the infrastructure on a daily basis and one

16   of those individuals helps with their website

17   development and SQL database management.

18        Q.   Okay.  And when you say three full-time

19   people, is that the IT help desk services?

20        A.   That is correct.

21        Q.   Does TBS also provide server management

22   maintenance?

23        A.   Yes.

24        Q.   And does TBS also do web -- included in TBS's

25   services, does that include website development?

1      A.    Yes.

2      Q.    Cloud configuration?

3      A.    Correct.

4      Q.    And setup and maintenance of the phone system?

5      A.    Correct.

6      Q.    How much does TBS charge for these services

7  per month?

8      A.    It's a combined charge of $44,000 and 800 --

9  $44,800.

10      Q.    $44,800 per month?

11      A.    Correct.  That's broken out into different

12  categories.

13      Q.    So about how many programers and other TBS

14  employees are servicing the United Way in Boston or

15  Massachusetts Bay and Merrimack Valley?

16      A.    Yeah.  We have a team of help desk people that

17  are remote people as well that -- that take and resolve

18  tickets.  So at any given time, there could be seven or

19  eight individuals working on the account.

20      Q.    Okay.  And all of that's included in this

21  monthly fee that we talked about?

22      A.    That is correct.

23      Q.    Is that a normal amount of people for a

24  company this size?

25            MR. HARRINGTON:  Objection, Judge.  I have no

1    information relative to other providers in the industry.

2    Nothing's been provided to me by the government relative

3    to this testimony.

4              MR. HUNTER:  I can -- I'll lay a foundation,

5    your Honor.  Would that be helpful?

6              THE COURT:  Well, not if it's -- not if it's

7    opinion testimony based on information that's not been

8    provide to the defense, no, it wouldn't be helpful.

9              Is it fact testimony or opinion?

10             MR. HUNTER:  Fact testimony.  Let me ask --

11   I'll rephrase it to ask about a question of fact, your

12   Honor.

13             THE COURT:  All right.  And if you have an

14   objection, you can raise it and I'll -- I'll just

15   listen.

16        Q.   All right.  Mr. Meyer, TBS manages other

17   companies of similar size as United Way; is that

18   correct?

19        A.   Yes.

20        Q.   About how many people does TBS have working on

21   those accounts?

22        A.   It varies from -- from company to company,

23   depending upon the need of the project.

24        Q.   Okay.

25        A.   So it -- you could have three people, you

1  could have ten people.

2      Q.   Okay.  Thank you.

3      A.   Uh-huh.

4      Q.   Do you need 20 to 30 programers to manage

5  United Way's IT needs?

6      A.   No.

7      Q.   Why is that?

8      A.   The need is not there for 20 programers.

9      Q.   How many programers have you employed to

10  manage it?

11     A.   One.

12     Q.   One.

13          Now, you mentioned you switched over to Amazon

14  Web Services.

15     A.   Uh-huh.

16     Q.   How much is United Way paying for that?

17     A.   Combined, it's -- Amazon Web Services is about

18  $19,000 a month.

19     Q.   How much was United Way paying Insight for the

20  server environment and virtual desktops when you

21  started?

22     A.   That's the total cost.  Oh, when I first

23  started?

24     Q.   Yeah, when you first started.

25     A.   It was just shy of $12,000.

1      Q.    Okay.  So United Way is paying more now?

2      A.    They are paying more now, correct.

3      Q.    What do -- and what do Amazon's current

4   hosting services include?

5      A.    They -- it includes the virtual desktops and

6   all the infrastructure, which includes the failover and

7   geographical dispersed data centers.  We have three -- a

8   three known cluster within that group.

9      Q.    Does TBS charge separately for these hosting

10  services?

11     A.    No.

12     Q.    Does TBS charge United Way a fee in addition

13  to the cloud infrastructure costs paid to Amazon and

14  VMware outside of the 44,800 we were talking about?

15     A.    No.

16     Q.    Is there any additional cost to TBS to build a

17  website or infrastructure to use these hosting services?

18     A.    No.

19     Q.    Again, other than the $44,800 we were talking

20  about.

21     A.    Correct.

22     Q.    That -- any building of infrastructure is

23  included in that fee --

24     A.    That is correct.

25     Q.    -- is that correct?

1      A.    Any project work is built into the monthly

2  cost.

3      Q.    Okay.  How do the current hosting services

4  compare to the hosting services United Way was paying

5  for when you came on-site in June of 2018?

6      A.    Their current hosting environment is a lot

7  more stable and robust than what they had previously.

8      Q.    How so?

9      A.    It's proven out by -- by the level of service

10 that we've continued to get from Amazon Web Services.

11 The stability of the system is -- has proven to the

12 organization that there has been no outages, no

13 downtime, since we have smoothed them over.

14     Q.    And the glitches related to insufficient RAM,

15 have you -- has that been resolved?

16     A.    Yes.

17     Q.    What's the monthly cost for the phone services

18 that TBS set up through the company 8x8 that you

19 mentioned?

20     A.    It is up to about $2,800 now.

21     Q.    $2,800?

22     A.    Uh-huh.

23     Q.    And I think you mentioned that United Way was

24 paying SIP.US a little under a thousand dollars when you

25 started?

1      A.    Yes.

2      Q.    And what does the current phone system include

3  that TBS implemented through 8x8?

4      A.    The current phone system includes obviously

5  your desktop phone, it includes an application that goes

6  on your cell phone that is an extension of your desk

7  phone so that when you walk away from your desk, your

8  application continues to ring if your desk phone rings.

9            You can make phone calls, you can set up

10  conference calls, you can have video calls, you have

11  voicemail to email.  You can manage your -- your phone

12  from your cell phone.  So when you walk away, you're not

13  disconnected if you're out at a meeting, if you're --

14  even if you're at home at night, you're expecting a

15  phone call, you're -- you're still connected, even

16  though you're not in the office.

17      Q.    Does TBS charge United Way a fee in addition

18  to the phone services paid to 8x8?

19      A.    No.

20      Q.    Again, other than the 44,800 we talked about?

21      A.    Correct.

22      Q.    Why is that?

23      A.    Because the management of the phone systems is

24  built into our service agreement.

25      Q.    Okay.  How does the current phone system at

1  United Way compare to the phone services United Way was

2  paying for in June and August of 2018 when you came on

3  board?

4       A.    It is certainly more robust than what they had

5  before.

6       Q.    How so?

7       A.    It allows the company to be nimble and mobile.

8  It also has been more reliable.

9       Q.    Have you increased the number of lines that

10 United Way has?

11      A.    Yes, we have.

12      Q.    So you've gone from 25 to 50; is that right?

13      A.    Well, each extension is its own line now.

14 There is not a --

15      Q.    Okay.

16      A.    -- there is not a limit to the amount of phone

17 calls that can be happening at any given time, where

18 prior to that there was a limit.

19      Q.    Can you explain that a little bit more?

20      A.    Sure.  Concurrently you could have -- when I

21 first started there, you could have 25 inbound or

22 outbound phone calls happening at the same time.  So if

23 you exceeded that 25, if the 26th person picked up the

24 phone, they would not be able to conduct a phone call at

25 that time.

1              Now they don't have that limitation.  Anyone

2    can pick up a phone.  They can also have as many

3    conference calls going on at the same time, each -- each

4    phone number is its own conference bridge.

5         Q.   Did that exist when you came on board?

6         A.   No, it did not.

7              MR. HUNTER:  Ms. Sheff, could you bring up a

8    chart in --

9              Your Honor, the government is not marking this

10   as an exhibit, but we have discussed it with defense

11   counsel.

12             THE COURT:  Sure.

13        Q.   So just to summarize what we've talked about,

14   your current monthly costs -- and this includes your CIO

15   services --

16        A.   Yes.

17        Q.   -- is $44,800?

18        A.   Uh-huh.

19        Q.   The hosting and virtual desktops through

20   VMware and Amazon, that's 19,000?

21        A.   Yup.

22        Q.   And the phone services are another 2,800 per

23   month; is that right?

24        A.   Correct.

25        Q.   So the total monthly spend for United Way is

1    about 66,600; is that right?

2         A.    Yes.

3         Q.    So if we multiply that over 63 months, which

4    is March 2013 through May 2018, I believe is about

5    63 months, does that come to $4,195,800?

6         A.    That sounds about right.

7         Q.    Now, again, you said that this cost, the

8    44,800, includes all of the maintenance and setup as

9    well as the cost to have you embedded as CIO for

10   40 hours a week; is that right?

11        A.    Yes.

12        Q.    And the Court heard testimony earlier that the

13   total amount paid by United Way for Mr. Alrai's salary

14   and benefits during his tenure was about 1.3 million.

15   So if we subtract that from the spend here, we get about

16   2.9 million, give or take?

17        A.    Uh-huh.

18        Q.    $2,895,000 and -- or $95,800.

19              Now, I think DigitalNet -- we've heard

20   testimony that DigitalNet charged about $6.7 million and

21   that United Way paid DigitalNet about $6.7 million, but

22   that some of that was before they -- about -- a hundred

23   thousand or change was a little bit more than -- was

24   before the 2013 managed IT services agreement.

25              So if we take an approximate DigitalNet cost

1    over 63 months of 6.6 million and subtract that 2.8 or

2    $2.9 million number, what's the difference?

3          A.    3,704,000.

4               MR. HUNTER:  Nothing further at this time,

5    your Honor.

6               THE COURT:  Cross.

7               MR. HARRINGTON:  Thank you, Judge.

8                         CROSS-EXAMINATION

9    BY MR. HARRINGTON:

10         Q.    Good morning, Mr. Meyer.

11         A.    Good morning.

12         Q.    How are you doing today, sir?

13         A.    Good, thanks.

14         Q.    Good.  So I'm going to start with something

15   that you kind of left off on a little bit earlier this

16   morning.

17              So you are employed as the CIO -- you're

18   employed as the CIO for United Way, correct?

19         A.    Yes.

20         Q.    And you indicated that that is a full-time

21   job, 40 hours a week?

22         A.    That is correct.

23         Q.    Okay.  And are you on-site or do you also work

24   remotely?

25         A.    I'm on-site every day.

1      Q.   Okay.  And in regard to TBS, are you employed

2   by TBS?

3      A.   I'm the owner of the company, yes.

4      Q.   Okay.  And do you work for TBS?

5      A.   I do work for TBS.

6      Q.   Okay.  And do you do additional work for TBS?

7      A.   Not while --

8      Q.   Kind of like at the same time, you know what I

9   mean?  You're -- so you're a full-time CIO --

10      A.   Correct.

11      Q.   -- at United Way --

12      A.   Uh-huh.

13      Q.   -- do you also have, kind of at the same

14   time -- you know, it might be different times of the

15   week or different times of the night or whatever it

16   is -- but do you do work for TBS as well?

17      A.   Not while I'm on-site at the United Way, no.

18      Q.   Okay.  But after hours?

19      A.   I do, yes.

20      Q.   Weekends?

21      A.   Early mornings, late nights, yes.

22      Q.   So whenever you're not working for United Way,

23   you might be doing some work for TBS?

24      A.   That is correct.

25      Q.   And in regard to that, for TBS do you draw a

1  full-time salary?

2      A.   I'm the owner of the company.  I take a draw,

3  yes.

4      Q.   Okay.  And in that regard, do you pay yourself

5  a full-time wage?

6      A.   I do.

7      Q.   Okay.  And so you would agree with me that

8  you're paid a full-time wage relative to your job at TBS

9  and you're also paid a full-time wage based on your job

10  at United Way?

11     A.   I'm not an employee of the United Way.  I'm

12  not on -- I'm not a full-time staff member at the United

13  Way.  But --

14     Q.   Okay.

15     A.   -- but part of the fees that we -- that we

16  bill them, you could technically say, yes, that's --

17  that's part of my services, of course, yes.

18     Q.   Okay.  So it's like two full-time jobs?

19     A.   Yes.

20     Q.   Okay.

21          THE COURT:  Did I miss something?  You don't

22  draw a salary from the United Way?

23          THE WITNESS:  I do not, no.

24          THE COURT:  Yeah.

25     Q.   Your salary, I think you indicated, is

1    included in the fees that you charge them?

2         A.    That is correct.

3               THE COURT:  That's my understanding.

4         Q.    Yeah.  And so in that regard, you -- would you

5    agree that your full-time pay is something that United

6    Way has to pay?

7         A.    That is correct, yes.

8         Q.    Okay.  In regard to the services that TBS

9    is providing, I think you indicated when you first

10   started -- and I'm going to kind of skip to when you

11   were first contacted and brought in to assist United

12   Way, okay?

13        A.    Uh-huh.

14        Q.    You initially charged them a fee to kind of do

15   an initial assessment, right?

16        A.    Correct.

17        Q.    Yeah.  And that was about a $5,000 fee?

18        A.    That is correct.

19        Q.    Okay.  And then after that, you entered

20   into -- they wanted to engage you to conduct further

21   services for them?

22        A.    Yes.

23        Q.    And you contracted with them for basically a

24   three-month window?

25        A.    Yes.

1      Q.   Okay.  And that was at a rate of $20,000 per

2  month for three months?

3      A.   That's correct.

4      Q.   For a total of $60,000?

5      A.   That's correct.

6      Q.   Okay.  So that initial work for roughly about

7  a three-month period, a little bit more than three

8  months, was about a $65,000 fee; is that fair to say?

9      A.   That's fair.

10     Q.   And then not long after that three-month

11 window, would you agree that you -- and you probably

12 recall the date, I don't have it off the top of my

13 head --

14     A.   Uh-huh.

15     Q.   -- but ultimately United Way engaged TBS to be

16 its IT kind of provider, correct?

17     A.   Correct.

18     Q.   And when was that contract entered into, as

19 best you recall?

20     A.   Yeah, September of '18.

21     Q.   Okay.

22     A.   Yeah.

23     Q.   So about three months, roughly?

24     A.   Yeah.

25     Q.   Kind of as that three-month contract you

1    entered into elapsed --

2         A.   Yeah.

3         Q.   -- you then get into the kind of full-time

4    contract that you talked about today?

5         A.   Correct.

6         Q.   Okay.  And would you agree with me that in

7    regard to that, there was no RFP process that was

8    engaged in by United Way?

9         A.   There was an initial RFP from -- for the

10   initial investigation as to what services we could

11   provide them --

12        Q.   Oh, in --

13        A.   -- for the -- for the contract that was

14   entered in September, no, there was not an RFP for that.

15        Q.   Okay.  And so there was no bidding process;

16   you -- they just said, you know, we'd like to engage

17   your services?

18        A.   Correct.

19        Q.   And since that time -- it's been, oh, just a

20   little bit over a year, right, that you've had that

21   contract?

22        A.   Yeah.  A year and three months, yeah, uh-huh.

23        Q.   And since that time, there hasn't been any

24   competitive bidding process for being the IT vendor for

25   United Way; you've just continued in the contract?

1          A.    That is correct.

2          Q.    Okay.  Is it a year-to-year contract or is it

3     a multiple --

4          A.    It's a year-to-year contract.  The RFP

5     process, they are ramping up to engage in that process.

6          Q.    Okay.  And so you've finished one year.  And

7     did you renew for a second year?

8          A.    We did.

9          Q.    Okay.  And so it won't be until sometime

10    September 2020, roughly, that your current contract

11    would expire, roughly?

12         A.    It's actually June of 2020.

13         Q.    June of 2020?

14         A.    Yes.

15         Q.    Okay.

16         A.    That's their fiscal year.

17         Q.    Let me ask you, I -- I'm going to switch gears

18    to a separate topic now.

19         A.    Uh-huh.

20         Q.    Would you agree with me that it is a common

21    practice for an IT assessment to be done when a company

22    is anticipating changing IT support?

23         A.    It's common practice, yes.

24         Q.    Okay.  When you spoke with the police in this

25    matter, the FBI --

1          A.    Uh-huh.

2          Q.    -- do you recall saying that you had -- you

3     recalled having some contact with Mr. Alrai that

4     predated your involvement in June of 2018 via an RFP

5     process?

6          A.    I remembered having communications with the

7     United Way, not necessarily Imran directly.  I do

8     remember filling out an RFP for them in 2012.

9          Q.    Well, do you recall that you told the FBI that

10    in 2013 Alrai had reached out to you relative to an RFP

11    process?

12         A.    Yes, I do recall that.

13         Q.    Okay.  And you had -- in regard to that, you

14    went into further detail and told the FBI -- and made

15    some specific comments about that RFP process, right?

16         A.    Yes.  My comments were I remember having an

17    RFP submitted, but I had never heard back on the RFP.

18         Q.    Okay.  And, additionally, you actually kind of

19    described the RFP and you said that you thought the RFP

20    was pretty cookie-cutter.  Do you recall telling the FBI

21    that?

22         A.    Yes.

23         Q.    Okay.  And you said that you believed it

24    appeared to be copied from the Internet.  Do you recall

25    telling the FBI that?

1      A.    That's correct.

2      Q.    Okay.  And you indicated, again to the FBI,

3  that you did respond to that RFP, but that you never

4  heard back from Alrai by phone or email --

5      A.    That is correct.

6      Q.    -- correct?  Okay.

7            And you would agree with me that, in fact, all

8  of that information that we just talked about, that

9  actually never happened, did it?

10     A.    Not with Imran, no; with a former employee of

11 the United Way.

12     Q.    Well, not only that, it didn't happen in 2013;

13 it actually happened several years earlier, when

14 Mr. Alrai wasn't even at the United Way?

15     A.    That is correct.

16     Q.    Okay.  And so all of that information that you

17 told the FBI about having email contact with Mr. Alrai,

18 about a cookie-cutter RFP that Mr. Alrai had shown you,

19 all that wasn't true, was it?

20     A.    No, I don't agree with that.

21     Q.    You don't agree with that?

22     A.    I don't agree that it's all not true, no.  The

23 only thing I agree with is that I didn't have contact

24 with him directly.

25     Q.    And you would agree with me, I think you

1     already have, that he wasn't even working at the United

2     Way at the time?

3         A.    I agree with you, yes.

4         Q.    So whatever RFP you responded to, he couldn't

5     even have possibly been a part of, could he?

6         A.    No.  And it ends up that he was not part of

7     that, that's correct.

8         Q.    So the characterizations that you made of

9     Mr. Alrai to the FBI were, in fact, not true; is that

10    fair to say?

11        A.    That's fair to say, sure.

12        Q.    In regard to the outage that you had talked

13    about -- again switching gears to a different topic --

14    you had talked about the United Way being basically down

15    or having an outage of their system for three or four

16    days, right?

17        A.    Uh-huh, yup.

18        Q.    And that was in the summer or fall of 2018?

19        A.    Yeah.  It was late August, yeah.

20        Q.    And you said that was due to a lightning

21    strike near or around the OVH site in Reston, Virginia?

22        A.    Yes.

23        Q.    Okay.  And you would agree with me that that

24    information, that type of information, an outage like

25    that, is something that is verifiable information,

1   correct?

2       A.   Sure.

3       Q.   Okay.  And would you agree with me that that

4   type of outage in the industry for IT, you know, a

5   three- or four-day downtime for a company like OVH,

6   would be considered a serious period of downtime?

7       A.   Yes.

8       Q.   And would you agree with me that something

9   like that, that type of outage, would be something that

10  would be well known or well documented in the IT

11  industry because it is so significant, correct?

12      A.   Yes.

13      Q.   Okay.  Now, let me ask you, in regard to the

14  United Way, you had indicated that after TBS came on

15  board, there was a period of time that you were getting

16  complaints about dropped calls?

17      A.   Uh-huh.

18      Q.   Okay.

19      A.   Yes.

20      Q.   And there was another complaint you had

21  mentioned about -- relative to Andar and the monitors

22  freezing, correct?

23      A.   Uh-huh.

24      Q.   Okay.  Are you aware that prior to TBS coming

25  in and taking over and doing what you've explained to

1   the judge that there were no such complaints relative to

2   phone drops or monitors freezing while DigitalNet was

3   monitoring the network?  Are you aware of that?

4        A.   I am aware of that.

5        Q.   Okay.  You had talked about moving the OVH --

6   or moving the servers from OVH to Amazon Web Services.

7   AWS is what it's sometimes referred to as, right?

8        A.   Yes.

9        Q.   Okay.  And I think in your direct testimony

10  you had indicated that you had decided to move the

11  servers from OVH to AWS because it was your opinion that

12  AWS provided better service?

13       A.   It's not necessarily my opinion.  It's an

14  industry opinion.  But we were also faced with a

15  situation where we had to move.  Whether it was to AWS

16  or another provider, we were given a 45-day notice from

17  OVH that they were closing that data center.

18       Q.   Okay.

19       A.   We had to move from there.

20       Q.   And that was really the point of the question

21  I was driving at is in your direct testimony, you kind

22  of, I think, indicated that it was an active decision

23  that you made; you were going to move, you know, the

24  servers from OVH to AWS.

25       A.   Uh-huh.

1     Q.   But part of that was you were actually told by

2   OVH, we're not going to be hosting you anymore after

3   45 days; you've got to move your stuff?

4     A.   Well, they offered to move us to another data

5   center of theirs that would have some added options for

6   redundancy and failover.  However, the pricing structure

7   of what they offered was way out of scope of what the

8   United Way could afford.

9          And prior to that notification that we had to

10  move, we were definitely looking at AWS anyway or a

11  company like Rackspace.  We had gone out and we had done

12  three RFPs with three different hosting companies to

13  gather that information.  We just didn't choose AWS and

14  move there.  We did our due diligence on different

15  options.

16    Q.   Okay.  And you agree with me that part of that

17  process, just to kind of make sure your testimony is

18  kind of fully developed --

19    A.   Uh-huh.

20    Q.   -- it wasn't just that you had made a decision

21  to move it; you were also given notice --

22    A.   That's correct.

23    Q.   -- that you would have to move it?

24    A.   Yes.  Yes.

25    Q.   Now, let me ask you -- you've given a fair

1   amount of testimony yesterday and this morning and one

2   of the questions I have for you, and this isn't by way

3   of saying that what you've said is not correct --

4        A.   Uh-huh.

5        Q.   -- but what I wanted to ask you is is all of

6   the testimony that you've given based on your own

7   personal review of systems at the United Way or is it in

8   part based on information that was given to you by other

9   employees of TBS?

10        A.   A combination of all.

11        Q.   Okay.  And so part of your testimony, you

12   would agree with me, is based on what other people have

13   told you about their review and analysis of United Way's

14   systems?

15        A.   That is correct.

16        Q.   Okay.

17        A.   But I will say that when I -- when I have the

18   opportunity to review what those folks have provided to

19   me, we collectively come up with the summary of that

20   review.  It's -- it is a -- a team effort.

21        Q.   Okay.

22        A.   It's not just one person's opinion.

23        Q.   And what I'm driving at, Mr. Meyer, is that

24   some of the things that you're talking about as far as

25   technical things that were reviewed, like servers and

1    remote access and mobile applications and things of that

2    nature --

3         A.    Uh-huh.

4         Q.    -- those things were not all necessarily

5    reviewed directly by you?

6         A.    Correct.

7         Q.    Okay.  And I understand you're saying there

8    was a team.  And in that regard, did -- did that team

9    generate written reports?

10        A.    Yes.  We have lots of documentation that we

11   have generated over the 16, 17 months we've been there.

12        Q.    Who were those reports given to?

13        A.    Those reports were given to myself and to

14   executives at the United Way.

15        Q.    So let me ask you this.  When you came in in

16   June of 2018 --

17        A.    Uh-huh.

18        Q.    -- you were aware that there was an

19   investigation ongoing at that point in time by the

20   FBI and Homeland Security, right?

21        A.    Uh-huh, yup.

22        Q.    You were also aware that the United Way,

23   obviously, would be conducting its own, you know,

24   thorough internal investigation, correct?

25        A.    That's correct, yes.

1      Q.   Okay.  And you spoke with the law enforcement

2  officers; whether it's Homeland Security or FBI, on

3  several occasions you were formally interviewed, right?

4      A.   Yes.

5      Q.   Did you ever provide the reports that you just

6  referenced to law enforcement?

7      A.   No.

8      Q.   Okay.  Did they ever ask you to provide those

9  reports?

10      A.   No.

11      Q.   Okay.  Would you agree with me, relative to

12  TBS --

13      A.   Uh-huh.

14      Q.   -- that TBS does not normally provide coding

15  or design software to its customers?

16      A.   We do not provide software.  We -- we

17  provide -- we can provide web development --

18      Q.   Okay.

19      A.   -- and SQL database management, but we do not

20  make software, no.

21      Q.   Okay.  And would it be fair to say -- and I

22  guess I might be kind of splitting hairs like lawyers

23  do --

24      A.   Uh-huh, yup.

25      Q.   -- but the thing I'm focusing in on is the

1    word kind of normally.

2              Is it fair to say that TBS does not normally

3    provide coding services to customers?

4         A.    Correct.  It's not normal -- it's not a -- we

5    don't have many other customers where we do that for.

6         Q.    Okay.

7         A.    We have the ability, but we don't -- other

8    customers use other -- other vendors to do that.

9         Q.    You can do it, but it's not a normal part of

10   your business structure?

11        A.    Correct.

12        Q.    Okay.

13             THE COURT:  Mr. Harrington, when you just were

14   questioning him about the reports --

15             MR. HARRINGTON:  Yes.

16             THE COURT:  -- that he never provided to law

17   enforcement and they never asked for it, what reports

18   exactly are you talking about?

19             MR. HARRINGTON:  One of the things -- and I'll

20   clarify a little bit, Judge.

21             THE COURT:  Okay.  You can do that.

22             MR. HARRINGTON:  Why don't I do that to

23   clarify for you.

24             THE COURT:  Totally fine.

25        Q.    So you recall what we were talking about, what

1   the judge is referencing, right --

2        A.   Uh-huh.

3        Q.   -- the reports?

4        A.   Yup.

5        Q.   So when you first started in -- on -- on or

6   about -- it was actually before June 12th, but when you

7   started --

8        A.   Yeah.

9        Q.   -- during that time, and even in the months

10  after as you were getting a handle, as you've indicated,

11  on like the United Way systems and so forth, reports

12  were written about the progress and findings that were

13  being made by you and your team members, right?

14       A.   Uh-huh.

15       Q.   You just need to verbalize.

16       A.   Yes.  Yes.

17       Q.   Okay.  And those reports would be something

18  that might detail some of the testimony that you've

19  given to the Court today relative to things such as, you

20  know, mobile apps, the IT infrastructure, mapping of the

21  network, things of that nature, right?

22       A.   Yes.

23       Q.   Okay.  And those reports, I think we've

24  already established, were kept with the United Way or

25  shared with United Way executives --

1      A.    That's correct.

2      Q.    -- is that correct?

3      A.    Yes.

4      Q.    But you didn't volunteer them to the law

5  enforcement officers and they didn't ask for them?

6      A.    That is correct.

7            MR. HARRINGTON:  Okay.  Judge, would you like

8  any more clarification on that?

9            THE COURT:  No, I think I get it.

10           Why didn't you volunteer them?  Was it just

11 because they didn't ask?

12           THE WITNESS:  Just because they didn't ask.

13           THE COURT:  That's all?

14           THE WITNESS:  Yeah.

15           THE COURT:  All right.

16     Q.    And would you agree with me in that regard

17 that the reports that we're talking about here, that

18 would have been, in your opinion, a good way for the law

19 enforcement officers that were investigating this matter

20 to review and kind of determine whether they believed

21 you were being accurate and consistent with what you

22 were telling them?

23     A.    You could say that, sure.

24     Q.    Okay.  And you would agree with me that in

25 some of the statements that you gave to the police, and

```
 1    I -- when I say police, obviously I'm --

 2         A.    Right.

 3         Q.    -- referring to FBI --

 4         A.    Right.

 5         Q.    -- and --

 6         A.    Right.

 7         Q.    -- Homeland Security.

 8               You actually even advised them that reports

 9    were being done by TBS?

10         A.    That is correct.

11         Q.    Okay.  So, clearly, if you're telling them

12    that, they're aware that these reports existed?

13         A.    Yes.

14         Q.    Let me ask you, Mr. Meyer, one of the things

15    that you had indicated in the report to law

16    enforcement -- and this is in regard to the telephone

17    system and DigitalNet.

18               You had indicated that DigitalNet represented

19    itself as an FCC telephone provider?

20         A.    Yes.

21         Q.    Okay.  Are you aware that there's no

22    documentation that references that?

23         A.    I'm --

24         Q.    Where does that come from?

25         A.    That's my -- that was my own opinion, that
```

1    you -- to provide a phone service, to say that you're

2    the actual host of the phone service -- typically, if I

3    was reselling a phone service, I would plainly state who

4    the provider was.

5         Q.   Okay.

6         A.   Right?

7         Q.   So when -- and I think I understand --

8         A.   Right.

9         Q.   -- what you were saying now --

10        A.   Yeah, yeah.

11        Q.   -- but I just want to be clear.

12             In the statements that you gave to law

13   enforcement, you said that DigitalNet represented itself

14   as an FCC approved telephone provider?

15        A.   Yes.

16        Q.   You would agree with me that that was an

17   opinion you had based on the service --

18        A.   That is --

19        Q.   -- it was providing?

20        A.   -- correct.  That's my opinion.

21        Q.   They didn't actually make a written or verbal

22   representation that you're aware of --

23        A.   No.

24        Q.   -- that they were an FCC-approved provider?

25        A.   They did not.

1    Q.    Okay.   You -- as part of the job that you did

2  for United Way, there was a company that -- that's named

3  Coalfire, correct?

4    A.    Yes.

5    Q.    Okay.   And can you explain -- Coalfire in the

6  industry for IT is a huge and very well-respected

7  company, correct?

8    A.    They are, yes.

9    Q.    And one of the things that they specialize in,

10  among many, is security for IT, correct?

11    A.    That's right.

12    Q.    Okay.   And one of the things that you did in

13  this case is you actually provided a number of United

14  Way servers to Coalfire to have Coalfire analyze them,

15  correct?

16    A.    They analyzed the entire system, not just a

17  couple of servers.   They -- they analyzed the entire IT

18  infrastructure.

19    Q.    Okay.   And you would agree with me that you

20  had talked to members of law enforcement and you advised

21  them that Coalfire was doing that, right?

22    A.    I did not advise law enforcement that Coalfire

23  was doing that.   I worked with the United Way and

24  Coalfire on that.   I did not have any interaction with

25  law enforcement about Coalfire.   My interaction with law

1   enforcement was at the very outset of this.  After that,

2   we went into the mode of helping the United Way of

3   remediation services and running their day-to-day

4   business.

5           So when you refer to me working with law

6   enforcement over the 18 months, it wasn't -- I wasn't in

7   contact with law enforcement the entire time.

8      Q.   So let me just make sure that I understand the

9   response correctly.

10          My question, just to be sure that I stated it

11  correctly --

12     A.   Uh-huh.

13     Q.   -- is you advised -- or maybe -- let me step

14  back.

15          Is your testimony that you never told anybody

16  from the FBI or Homeland Security that Coalfire was

17  imaging and -- or, excuse me -- that Coalfire was going

18  to analyze the servers at United Way?  You never said

19  that to --

20     A.   I said that to legal representation --

21     Q.   Okay.

22     A.   -- not necessarily to the FBI.

23          If you want to -- if you can kind of --

24     Q.   I will.

25     A.   -- pull that out for me a little better, who

1   from the FBI did I tell that Coalfire was going to be an

2   analysis of the United Way system --

3        Q.   No, I get you.

4        A.   Yeah.

5             MR. HARRINGTON:  I apologize, Judge.  I'm just

6   looking for a document.

7             THE COURT:  No problem.

8        Q.   So on September 18th of 2019, do you recall

9   speaking with Agent Jill Laroe with the FBI?

10       A.   I've spoken with Jill on several occasions,

11  but --

12       Q.   Okay.

13       A.   -- sure.  If -- I don't remember that date in

14  particular, but possibly.

15       Q.   And in that regard, we've talked about this

16  whole thing about Coalfire and -- I'm going to put a

17  document up here, and give me just a moment I'll get it

18  kind of into -- there you go.

19       A.   Sure.

20       Q.   So this is a report I've referenced.  I'm

21  going to scan this down here just to show the date,

22  September 18th, 2019.

23       A.   Yes.

24       Q.   And then here, in the very bottom part, you

25  see I got this little star over there.

54

1          A.    Yeah.

2          Q.    It says:  Meyer advised that during the first

3    few months of being at the United Way, TBS sent the UW

4    servers to a company called Coalfire to be imaged and

5    analyzed by Coalfire to determine the status of the

6    servers, security of the network -- and then second

7    page, Counsel -- et cetera.  And then Coalfire

8    immediately recommended that the servers be rebuilt from

9    scratch to remove any coding, et cetera.

10              So after taking a look at that, sir, does that

11   refresh your memory that you may have actually told the

12   FBI about Coalfire?

13         A.    I'm going to be honest with you.  No.

14         Q.    Okay.

15         A.    No.

16         Q.    So if Agent Laroe put that in her report,

17   obviously she had to get it from somewhere, right?

18         A.    Yes.

19         Q.    You're saying you just don't remember if it's

20   you?

21         A.    I don't remember talking -- I've talked to

22   lots of people about Coalfire within the United Way.

23         Q.    Okay.

24         A.    And, you know, we interviewed lots of

25   companies besides Coalfire.

1              But, no, I do not recall speaking to Agent

2     Laroe about Coalfire particularly.

3         Q.    Okay.  You agree -- and I would also

4     understand, sir, to be frank with you, that it's been a

5     while --

6         A.    Yes.

7         Q.    -- and it's possible you just might not recall

8     it --

9         A.    Yeah.

10        Q.    -- right?

11        A.    Yeah.

12        Q.    Okay.  And clearly in this report Ms. Laroe is

13    saying she spoke with you, this is what you said to her.

14        A.    Yeah.

15        Q.    Okay.  So regardless of whether you said it or

16    you remember it, you would agree with me that the FBI

17    was aware that you had provided service to Coalfire for

18    them to review and to take a look at the security of

19    those servers?

20        A.    Yeah.  Now, did you say that was in September

21    of this year?

22        Q.    I can show you the date as far as the --

23        A.    Okay.

24        Q.    -- the report.  It's right up at the top,

25    September 18th, 2019.

1       A.    Okay.  Okay.  Yeah, the -- Coalfire

2  examination had already been completed by that time.

3       Q.    Okay.

4       A.    That was completed in July of '19.

5       Q.    And in regard to that, you would agree with me

6  you didn't share the Coalfire -- I would assume Coalfire

7  generated a report and reported back to you; they were

8  hired for it, right?

9       A.    Yes.

10      Q.    Okay.

11      A.    And, sir, just to recall, that day in

12  September, I was in a conference room and Jill was

13  present and I did mention -- now I'm recalling back.

14  I'm trying to refresh my memory here.

15      Q.    Fair enough.

16      A.    I was in a conference room and we -- I

17  basically was giving the overview of what had been done

18  thus far.

19      Q.    Okay.  And we appreciate that.

20      A.    Correct.

21      Q.    So in that regard --

22      A.    But no details were given at that point.

23      Q.    I'm sorry.  Say that again.

24      A.    No details of the Coalfire testing were given

25  to the parties that were present that day.

1      Q.   Well, that's not entirely accurate, because in

2  regard to that --

3           THE COURT:  No testifying.

4           MR. HARRINGTON:  I apologize, Judge.

5           THE COURT:  Yup.

6      Q.   You shared with Ms. Laroe that there were

7  recommendations that were made by Coalfire --

8      A.   Yup.

9      Q.   -- so you certainly shared some of that

10  information with her, right?

11      A.   It was more of an overall -- not a detailed

12  process, because I didn't have the details with me at

13  that time.

14      Q.   Okay.  But you advised her about some of the

15  recommendations --

16      A.   Yes.

17      Q.   -- that Coalfire had given you?

18      A.   That's correct.

19      Q.   Okay.  And you went even further to say

20  that you were going to follow up on some of those

21  recommendations and comply with them --

22      A.   Yes.

23      Q.   -- as far as rebuilding servers?

24      A.   Correct.

25      Q.   Now, you would agree with me that you didn't

58

 1   provide -- and I may have asked this question.  I

 2   apologize if I already asked it --

 3        A.   Uh-huh.

 4        Q.   -- but I just want to make sure.

 5             You would agree with me that you did not

 6   provide any report to the FBI that was given to you by

 7   Coalfire?

 8        A.   No, we did not.

 9        Q.   Okay.  And a report was generated by Coalfire

10   for you?

11        A.   Yes.

12        Q.   Okay.  And the FBI never asked you for a copy

13   of that report, did they?

14        A.   No.  Not me directly.

15        Q.   Okay.  Are you aware that they asked anybody

16   at TBS for it?

17        A.   I am not aware.

18        Q.   Okay.  Would you agree with me that in

19   addition to Coalfire getting copies of the servers that

20   you've referenced, a company called RSM also received

21   copies of those servers --

22        A.   Yes.

23        Q.   -- copies of those servers?

24        A.   Yes.

25        Q.   And --

59

1          A.    Can I clarify something about copies of

2     servers?

3          Q.    Sure.

4          A.    They don't receive snapshots or, in other

5     words, they didn't -- they were able to scan those

6     servers.  They didn't take images of those servers off

7     site with them.  I just wanted to clarify that.

8               THE COURT:  What's the difference?

9               THE WITNESS:  The difference is that if you

10    create a copy of a server and you physically take it

11    with you versus doing an electronic scan remotely with

12    tools -- with scanning tools.

13              THE COURT:  I see.  In other words, examining

14    it from off site --

15              THE WITNESS:  Correct.

16              THE COURT:  -- or making a copy on-site and

17    taking it with you.

18              THE WITNESS:  Correct.

19              THE COURT:  But I mean is there a -- okay.

20              So I understand there's -- I understand the

21    difference, but -- I mean, that's like -- is that like

22    the difference between fishing off a boat and fishing

23    off the shore?  Is there really no difference?

24              THE WITNESS:  Yes.

25              THE COURT:  Okay.  Does it make a difference

60

```
 1   to you that I'm supposed to --
 2             MR. HARRINGTON:  It doesn't make a tremendous
 3   difference, but I'm going to follow up with a couple of
 4   questions on that right now, Judge.
 5             THE COURT:  Okay.
 6        Q.   Do you recall speaking with Jill Laroe and
 7   telling her that in addition to the Coalfire stuff we
 8   just talked about --
 9        A.   Uh-huh.
10        Q.   -- that United Way servers were secured?
11        A.   Yes.
12        Q.   Okay.
13        A.   Yup.
14        Q.   And that one -- you have an employee of yours,
15   last name of Wilson?
16        A.   Yes.
17        Q.   Okay.  What's his first name?
18        A.   Matthew.
19        Q.   Okay.  And what's his position at your
20   company?
21        A.   He is a Tier III engineer with us.
22        Q.   And is that kind of a top-end engineer?
23        A.   Yes, correct.
24        Q.   Okay.  And do you recall telling Ms. Laroe --
25   do you recall telling Ms. Laroe that Wilson was going to
```

1   make forensic images of each server and send it to RSM

2   for further review?

3        A.    No.

4        Q.    Okay.  So let me show you a copy of this.

5              It's paragraph 9, part of an affidavit

6   submitted by Ms. Laroe, and I'm going to point you down

7   to this section at the bottom.

8        A.    Uh-huh.

9        Q.    And after you have a chance to take a look at

10  that, would you agree with me that in this report it

11  indicates precisely that; that you had indicated to

12  Ms. Laroe that -- and if you need to go back up to the

13  top, obviously feel free --

14       A.    Okay.

15       Q.    -- but that you had advised her that it wasn't

16  a snapshot; it actually was a forensic image of servers

17  that was going to be sent to RSM.

18             And, actually, it looks like the letters,

19  they're kind of reversed there, but I think we all know

20  we're talking about RSM, right?

21       A.    Yes.  RSM was the firm that came in early on

22  and was doing their own investigation.

23       Q.    Okay.  So it wasn't a snapshot, at least as

24  you've indicated in -- or as is indicated in that report

25  from Ms. Laroe.  It was actually a forensic image.

62

1        A.    Yeah.  We were helping RSM gain access to

2   those systems.

3        Q.    Okay.

4        A.    Yeah.  As we did Coalfire.

5        Q.    And in that regard, in regard to RSM, you --

6   you would have received a report back from them

7   regarding the servers, correct?

8        A.    From RSM, the -- there was more of a forensic

9   financial audit.  That was their role.

10        Q.    Okay.  But --

11        A.    I did not personally receive a report back

12   from RSM.  I mean, I was privy to it and I was able to

13   review it, but it was -- it wasn't my area, per se.

14        Q.    Okay.  You would agree with me that what

15   you're indicating or what is indicated in this report is

16   that the forensic images of all the servers were being

17   made and being sent to RSM for their review and

18   analysis?

19        A.    Yes.

20        Q.    Okay.  And you're indicating to me that you

21   did not receive a report back from them about that?

22        A.    I did not receive it directly from them.  They

23   were communicating with other people within United Way

24   besides myself.

25        Q.    Was a report generated that you're aware of

1    regarding it?

2        A.    Yes.

3        Q.    Okay.  And did you share that with the FBI or

4    Homeland Security?

5        A.    No.

6        Q.    Okay.  Did the FBI or Homeland Security ask --

7             MR. HUNTER:  Objection, your Honor.  I believe

8    the witness said he didn't receive the report.

9             THE WITNESS:  I didn't receive it directly,

10   no.

11            THE COURT:  That's right.

12            MR. HARRINGTON:  Okay.

13            THE COURT:  That doesn't mean he can't ask

14   questions that don't make sense.  That's the nature --

15   they might make sense to him.

16            But the question is did it make sense to the

17   witness.  As the trier of fact, I understand your point,

18   but it's not an objection.  It's in the deposition, so

19   he can conduct the examination.

20            MR. HARRINGTON:  And I'll clarify that, Judge,

21   and I appreciate the objection and your point.  I'm

22   making an assumption.

23       Q.    So the kind of string of that question that

24   I'm getting at is did TBS -- you had indicated that you

25   didn't personally receive a copy of the report.  Did

1    your company, TBS, receive a copy of the report?

2         A.    No.

3         Q.    Are you aware of where the copy of that report

4    went?

5         A.    Yes, it went to Rich Voccio.

6         Q.    Okay.  At the United Way?

7         A.    Correct.

8         Q.    And are you aware -- because obviously you

9    mention it here in the report, right?

10        A.    Uh-huh.

11        Q.    Are you aware of whether or not that report

12   that was sent to Mr. Voccio was ever shared with -- by

13   Mr. Voccio to United Way?

14        A.    I am not aware.

15        Q.    Okay.  And are you aware of whether Ms. Laroe

16   ever asked the United Way or Mr. Voccio for that report?

17        A.    I am not aware of that either.

18        Q.    All right.  So I'm going to switch gears, sir.

19              Would you agree with me that most of the

20   United Way's network infrastructure was cloud-based and

21   not -- and let me give you a time frame, too.  I

22   apologize.

23        A.    Uh-huh.

24        Q.    So when you came in and you were first kind of

25   starting to analyze the system -- so that's the time

1    frame I'm talking about -- would you agree with me that

2    at that time most of the United Way's network

3    infrastructure was cloud-based and not based on servers

4    at the United Way?

5         A.   I would agree with that, yes.

6         Q.   Okay.  And one of those systems was a system

7    that you had referred to as Andar.  That was one of the

8    systems that was being supported by cloud services,

9    right?

10        A.   Right.

11        Q.   Okay.  And part of the testimony that you gave

12   in regard to -- oh, let me actually ask you this way.

13             Would you agree with me that when you are

14   going to add memory to a system in the cloud that you

15   can simply do that remotely by clicking on a couple of

16   icons and increasing the memory and increasing the cost,

17   but that's the way it's done in the cloud, right?

18        A.   In most circumstances, yes.  In some

19   circumstances, that's not available, depending on the

20   type of servers that you have.

21        Q.   Okay.  And in this particular case, you had

22   indicated that you were talking about the -- the Andar

23   system and that you were running out of memory.  Do you

24   recall that testimony from yesterday?

25        A.   That's correct, yes.

1      Q.    Okay.  And that in order to kind of -- I think

2  you were getting complaints that the screens were

3  freezing, right?

4      A.    Yes.

5      Q.    And you indicated that as a result of that,

6  you rebooted the system?

7      A.    That's correct.

8      Q.    And that was kind of a short-term fix?

9      A.    Correct.

10     Q.    Okay.  And one of the things that could be

11  done is what we're talking about is you could simply

12  kind of on that system make a few kind of clicks and

13  increase the memory relative to that system?

14     A.    That is correct.

15     Q.    And that ultimately was done?

16     A.    It was done, yes.

17     Q.    Okay.  And that's not an uncommon process when

18  you're operating in a cloud environment, right?

19     A.    That is a common process, yes.

20     Q.    So it's not like you have to, you know, go out

21  and order RAM and get it delivered and then go in and

22  take the hardware apart and put it in and add new

23  memory; this is a fairly simple process, isn't it?

24     A.    That is correct.

25     Q.    You would agree with this proposition that

67

1    having -- I'm going to change to a different topic about

2    administrative rights to a system.

3         A.    Okay, uh-huh.

4         Q.    You would agree with me that it is common for

5    only two or three people to have superadministrative

6    rights over an environment?

7         A.    Yes, it is common.

8         Q.    Okay.  And would you agree with me that in

9    this case, it was your understanding that Mr. Alrai and

10   a gentleman by the name of Kal Wahbe were the people

11   that had superadministrative rights over the system at

12   United Way?

13        A.    Yes.

14        Q.    And in reviewing all the documentation, it

15   appears that you never personally spoke with Kal Wahbe,

16   did you?

17        A.    No.

18        Q.    And he was one of the individuals that you

19   were aware of that had superadministrative rights,

20   right?

21        A.    Yes, we had -- we had discovered that after

22   being there at some -- you know, several days to a week,

23   yeah.

24        Q.    Okay.  And I would assume that probably from

25   the very get-go, you were told about Kal Wahbe; you

1    didn't learn that Kal Wahbe existed weeks later.  You

2    knew when you were --

3         A.    We knew of him from the get-go, yes.

4         Q.    Okay.

5         A.    Uh-huh.

6         Q.    And you -- strike that.

7              He would have been a potential access point

8    for TBS and you or your team to try to talk to relative

9    to access and different passwords if he had

10   superadministrative rights, correct?

11        A.    Yes.

12        Q.    But you're indicating that neither you nor any

13   of your team members that you're aware of ever attempted

14   to speak to Kal Wahbe?

15        A.    No.

16        Q.    Let me ask you, in regard to email -- I'm

17   going to switch a little bit to that topic.  Okay?

18        A.    Uh-huh, sure.

19        Q.    You indicated that you switched email from

20   G Suite to -- and I apologize.  Was it Microsoft Office?

21        A.    Office 365, yeah.  We're in the middle of that

22   migration now, actually.  We're not complete.

23        Q.    When did that process start, sir?

24        A.    It started in early November.

25        Q.    Okay.

1      A.   So we have a portion of the organization

2  switched already and we're doing the rest in a few

3  weeks.

4      Q.   And in regard to that, were you able to -- it

5  sounds like -- and I'm going to diverge a little bit

6  from the question on this topic -- in general terms, you

7  were able to do what you -- what task was, which was to

8  secure the environment, right --

9      A.   Uh-huh.

10     Q.   -- at United Way?  I'm going to talk kind of

11  in very general terms right now.

12     A.   Yeah.

13     Q.   Secure the environment for United Way; you did

14  that?

15     A.   Yes.

16     Q.   Okay.  And you would agree with me that no

17  data or information was lost, right?

18     A.   That is correct.

19     Q.   Okay.  You would agree with me that, to your

20  knowledge, DigitalNet did not try to actively interfere

21  or prevent or sabotage your efforts to do that in any

22  way?

23     A.   That is correct.

24     Q.   Okay.  And so in that regard, would you agree

25  that all of the emails that were in the system at the

1   time you took control of it would still exist?

2          A.   Yes.

3          Q.   Okay.

4          A.   To our knowledge, yes.

5          Q.   Okay.  And obviously you would be aware if you

6   lost data, right?

7          A.   I would -- I would -- I would venture to say

8   if individuals were missing data --

9          Q.   Uh-huh.

10         A.   -- that we would have been notified of that.

11         Q.   Okay.

12         A.   Yes.

13         Q.   And you would agree with this proposition,

14  too, that let's say that there were some people's emails

15  and those people were let go from the United Way.  Those

16  emails still exist in the system unless they're deleted

17  or taken out, right?

18         A.   That is correct.

19         Q.   Okay.  So if they're in the system, they're

20  going to be in there unless somehow the data is lost or,

21  you know --

22         A.   Or the account's deleted.

23         Q.   Or the account's deleted?

24         A.   Right, uh-huh.

25         Q.   And in this particular case, would you agree

1   with me that if there were any accounts associated with

2   Imran Alrai when TBS took over this system that your

3   organization would have made sure that none of those

4   emails were deleted because that would have been

5   something you knew people might want to look at, right?

6          A.   Yes.

7          Q.   Okay.  Were you ever asked, either you or any

8   of your employees, to provide a copy of Mr. Alrai's

9   entire email with the United Way to law enforcement?

10         A.   To law enforcement?  I don't believe so.

11         Q.   Okay.

12         A.   We secured those mailboxes for a forensic

13  view, yes.

14         Q.   Okay.  And where did those mailboxes go once

15  they were forensically secured?

16         A.   They are -- they still exist right now.

17         Q.   Okay.  And where did they go, like where do

18  they exist?

19         A.   Their -- their passwords were changed and

20  access is denied from the outside.  So they still exist.

21         Q.   Oh, I understand that.

22         A.   Yeah.

23         Q.   I apologize.  Let me ask the question better.

24         A.   Yeah.

25         Q.   Where?

1        A.    Where --

2        Q.    Where are they?

3        A.    Oh, they were forensically looked at by RSM --

4        Q.    Okay.

5        A.    -- during -- when they asked for the

6   mailboxes.  So they took a forensic image of that

7   mailbox.

8        Q.    Okay.  And, to your knowledge, do they -- they

9   were like given a copy of the mailbox; they had a copy

10  of the entire mailbox?

11       A.    They -- we -- we assisted them in taking those

12  images of those mailboxes, yes.

13       Q.    Okay.  So you guys were the IT behind it; you

14  did it and then delivered it to RSM?

15       A.    They delivered it themselves.  We provided

16  them access, they took the image with their own imaging

17  tools.

18       Q.    Okay.  So I think I get it now.

19       A.    Yeah.

20       Q.    So you allowed them access to the system?

21       A.    Correct.

22       Q.    They had their own forensic examiners that

23  came in and imaged those mailboxes, specifically

24  Mr. Alrai's?

25       A.    (Nods head.)

1       Q.    And then they were allowed to take that image?

2       A.    Yes.

3       Q.    Okay.  Do you know, to this date, if you have

4  the knowledge, does United Way still have a copy of all

5  of Mr. Alrai's emails, to your knowledge?

6       A.    Truthfully, I don't know.

7       Q.    Okay.  Do you know -- again, your knowledge --

8  do you know whether TBS or any of its employees would

9  have gone in and deleted those emails if they were

10  possessed by the United Way?

11       A.    No, we would not have done that.

12       Q.    You wouldn't have done that unless you were

13  directed to by United Way?

14       A.    Correct.  In fact, we have stayed away from

15  those mailboxes.

16            MR. HARRINGTON:  And, Judge, I have a few more

17  minutes.  Would now be a good time to take the morning

18  break?

19            THE COURT:  I was going to do it in five

20  minutes.

21            MR. HARRINGTON:  Okay.

22            THE COURT:  Yeah.  You know, I think we

23  started at ten past, so I'm going to go till -- up till

24  9:40.

25            MR. HARRINGTON:  Fair enough.  I'll keep

74

1   going, Judge.

2          THE COURT:  All right.

3      Q.   So let me ask you this as well in regard to --

4   I'm going to switch topics a little bit, kind of

5   related --

6      A.   Okay.

7      Q.   -- but I'm talking about preservation.

8      A.   Uh-huh.

9      Q.   And, again, in regard to Mr. Alrai, we talked

10  about his email.  Would his virtual desktop be included

11  in that imaging that we talked about that was copied?

12     A.   Yes.

13     Q.   Okay.  And would that also include any other

14  network information that would have gone along with

15  that?  That would have been copied and provided to RSM?

16     A.   Correct.

17     Q.   And does the same hold for this information,

18  that, to your knowledge, your organization, TBS, didn't

19  delete that information from United Way's servers --

20     A.   No --

21     Q.   -- correct?

22     A.   -- no.

23     Q.   And so, to your knowledge, unless somebody at

24  United Way took that out of their system, it would still

25  exist on their system?

1      A.    Correct.

2      Q.    Let me ask you, in regard to -- again, I'm

3   going to switch gears to a snapshot that was referenced.

4      A.    Okay.

5      Q.    And you indicate that OVH made a snapshot of

6   United Way's servers and the purpose of that was to --

7   you know, if things were lost, you'd have that to

8   rebuild, right?

9      A.    Yes.

10      Q.    Okay.  And you would agree with me that that

11   snapshot of the servers was -- I think you actually

12   indicated it in your testimony -- that TBS, whether it

13   was you or one of your workers, actually asked or

14   directed OVH to take the snapshot?

15      A.    Yes, that was me.

16      Q.    Okay.

17      A.    Yes.

18      Q.    And you're indicating to the judge that

19   the -- that snapshot -- and let's talk about the

20   snapshot just a little bit.

21            That snapshot is something that kind of shows

22   the whole system of servers --

23      A.    Yes.

24      Q.    -- the network of servers, right?

25      A.    Uh-huh, yeah.  It's a -- it's a -- it's a per

1    server's image of each server.

2         Q.    And so it would basically show you what the

3    network was, right?

4         A.    Yes, it would show you what servers you have

5    in that environment.

6         Q.    Okay.

7         A.    Yeah.  Not a total view of the network because

8    some of the network exists on-site --

9         Q.    Sure.

10        A.    -- outside of the -- the cloud environment, it

11   would show you the servers that were in that cloud

12   environment, yes.

13        Q.    And you'd be able to drill down on that stuff

14   because, as you've said, you'd be able to rebuild from

15   that snapshot?

16        A.    Right.  In a snapshot environment, you're able

17   to just restore that image, so you're right back up and

18   running as soon as that image is restored.  There is --

19   there's no rebuilding of the server, per se.  It's the

20   image is --

21        Q.    I get what you're saying.

22        A.    Yeah.

23        Q.    So it's basically like, you know, you lose it,

24   you got another copy right there.

25        A.    You put it right back, that's right.

1    Q.   And you -- you've indicated that that snapshot

2    of that environment, you never got it --

3    A.   No --

4    Q.   -- from OVH?

5    A.   -- we were never -- it was never needed to use

6    it.

7    Q.   Okay.

8    A.   We didn't have to utilize it.

9    Q.   So you asked them to do it?

10   A.   Correct.

11   Q.   They did it?

12   A.   Yup.

13   Q.   But you never asked them to give you a copy of

14   it?

15   A.   We did not need a copy of it.

16   Q.   Okay.  You didn't want to have a copy of that

17   in case something --

18   A.   They had it on -- they had it on their

19   systems.

20   Q.   Okay.  So I get it.  You're saying you make a

21   copy of it, you knew where it was if you needed it?

22   A.   Right.  Exactly.

23   Q.   I get it.  I got you.

24   A.   Also please realize that an image, a snapshot

25   of a server, because most servers are very large, you

1   can't just shoot it over the Internet to yourself.

2        Q.   Yeah, you may have a lot of information there.

3        A.   Right, right, exactly.  Yeah.

4        Q.   I got it.

5             Now, let me ask, in regard to that image,

6   right --

7        A.   Uh-huh.

8        Q.   -- one of the things that you've testified a

9   fair amount about with, you know, direct examination as

10  well as some questions I've asked you, is the system,

11  the kind of network that existed at United Way at the

12  time you came in to, you know, start trying to, you

13  know, take things over and do what United Way was asking

14  you to do.

15       A.   Uh-huh.

16       Q.   Would you be agreeable to this proposition

17  that the snapshot that we were just talking about would

18  be very good information to show what the cloud-based

19  network and servers were at the time you took those

20  systems over?

21       A.   Not necessarily, no.

22       Q.   You don't think it would be a good --

23       A.   It would be a piece of that puzzle, but not

24  the entire view of what your network looks like.

25       Q.   Okay.  And maybe not the entire network, but

1    the cloud-based systems at OVH, you would agree, would

2    be a good snapshot of that?

3        A.   If you have -- if you have physical images of

4    your servers, the only thing that accomplishes is it

5    helps you restore your servers if they happen to have an

6    issue.  If the production servers have a problem, that

7    snapshot helps you to restore and get back up and

8    running.

9        Q.   Okay.

10       A.   It doesn't give you documentation as to what

11   your network looks like.

12       Q.   Well, would you agree with me that with that

13   information, if you have a copy, the snapshot that we've

14   talked about --

15       A.   Uh-huh.

16       Q.   -- that if someone had access to that, say, an

17   expert such as yourself in IT, you would be able to go

18   into that and you would be able to analyze it, correct?

19       A.   Yes.

20       Q.   And you would be able to make determinations

21   and opinions about what that network was like, right?

22       A.   Or that individual server was like, yes.

23       Q.   And that would hold true for any of the

24   information that was in that snapshot for OVH for the

25   cloud environment; you would be able to go in there as

1  an expert and tease that information out of there,

2  right?

3       A.   Some of it, yes.  Not all of it.

4       Q.   Okay.

5            THE COURT:  Mr. Hunter --

6            MR. HUNTER:  Yes, your Honor.

7            THE COURT:  -- what are you thinking -- what's

8  your estimate on redirect after this?

9            MR. HUNTER:  I think there may be a fair

10 amount.

11           THE COURT:  Yeah.  We should take the break.

12           All right.  Morning break.  15.

13      (Recess taken from 9:44 a.m. until 10:12 a.m.)

14           THE COURT:  Sir, you're still under oath.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Mr. Harrington, you may proceed

17 with your cross.

18           MR. HARRINGTON:  Thank you, Judge.

19      Q.   Let me ask you, in regard to Windows 7, I just

20 want to kind of clarify, so going from a -- what we were

21 talking about to a new topic.

22      A.   Uh-huh.

23      Q.   I think you had already indicated to the Court

24 that Windows 7 was the operating system that was on

25 United Way when you got there in June of 2018?

1        A.    Their virtual desktops, yes.

2        Q.    Okay.  And you agree with me that that is

3   still being supported until January of 2020?

4        A.    That is correct.

5        Q.    So at the time that you got there, for the

6   virtual desktops there was about another year and had a

7   half of life left in the support; is that correct?

8        A.    Correct.

9        Q.    Okay.  Would you agree with this

10  proposition --  I'm going to switch to a different

11  topic.

12             You had talked about the financial database,

13  Great Plains, I think it's called, or GX?

14       A.    GP.

15       Q.    GP, I apologize.

16       A.    Yes.

17       Q.    And in regards to that, you had indicated that

18  it was not centralized, is that kind of how you would

19  characterize it, and that it would have been a good idea

20  to be centralized?

21       A.    Under central management, yes.

22       Q.    Okay.

23       A.    Uh-huh.

24       Q.    But would you also agree with this

25  proposition, that it is sometimes done in the IT world

82

1    to actually keep financial servers and financial

2    information separate from other information so that

3    access is restricted?

4         A.   No, I disagree with that.

5         Q.   So you don't believe that it can be a best

6    practice to actually have financial data separated from

7    other information?

8         A.   It's actually achieved by having it part of

9    your central management.

10        Q.   Okay.  You had talked about the migration from

11   G Suite to Microsoft Office.

12        A.   Yes.

13        Q.   And you had indicated that G Suite was a free

14   service and that it was also really more for personal

15   and home computing, correct?

16        A.   Correct.

17        Q.   Isn't it true, sir, that you're actually

18   confusing Gmail with G Suite?  Actually, what's offered

19   is a Gmail-level email service, which is personal and

20   home based; G Suite is actually a business product that

21   is used by businesses.

22        A.   It's on the same platform, however.

23        Q.   Right, right, but different servers, right?

24        A.   Different servers, but on the same platform.

25   There's not a lot of mincing of information there.  It

1    is on the same platform as your residential system.

2        Q.   Okay.  And you would agree with me that

3    G Suite is a business product?

4        A.   I would agree with you, yes.

5        Q.   Okay.  And likewise, G Suite is not free;

6    G Suite actually costs money compared to Gmail, which is

7    free.

8        A.   Correct, but to the United Way, it's free.

9        Q.   I understand.  Just kind of clarifying the

10   testimony --

11       A.   Yes.

12       Q.   -- because you had indicated in your direct

13   testimony it was free.

14       A.   It is free.  To the United Way, it is.

15       Q.   Okay.  But it's not necessarily a free

16   service; it's something that has to be paid for --

17       A.   If another business were to buy it, it would

18   cost money, correct.

19       Q.   Okay.  Fair enough.

20            In regard to -- you had talked about a

21   document that had been put in as an exhibit.

22            THE COURT:  Just waiting for it to pull up?

23            MS. SHEFF:  Yes.

24            THE COURT:  Okay.

25            MS. SHEFF:  Is that it?

1              MR. HARRINGTON:  It is.

2        Q.   So you had talked about this document.  You

3   recall seeing that?

4        A.   Yes.  This was generated by a piece of

5   software so-called Spiceworks.

6        Q.   Okay.  And you had indicated that this was a

7   network scan?

8        A.   Yes.

9        Q.   And in regard to network scan, were you

10  indicating that this was a network scan done for

11  security purposes?

12       A.   No.  This was a network scan to decipher what

13  was actually on the network.

14       Q.   Okay.  So this is really more what might be

15  referred to as an inventory; is that fair to say?

16       A.   Correct, yes, fair to say.

17       Q.   Because there is a particular mechanism

18  whereby you can do a network scan for security, correct?

19       A.   That's correct.  It's called a vulnerability

20  test, yes.

21       Q.   Okay.  And this Spiceworks software, is this

22  something that was owned or developed by TBS?

23       A.   No.

24       Q.   This is actually a free software --

25       A.   That's correct.

1    Q.   -- that is available over the Internet,

2  correct?

3    A.   That is correct.

4    Q.   And it's really not considered a high-end

5  program, is it, Spiceworks?

6    A.   Define high-end.

7    Q.   It's not very reliable; it's not considered a

8  high-end network scan software.

9    A.   I don't agree that it's not reliable.

10    Q.   Okay.

11    A.   It's certainly not high-end, but it does what

12  you need it to do, which is generate an inventory of

13  what's on your network.

14    Q.   Okay.  But you would agree with me that

15  this document does not represent a network scan that

16  would go -- kind of like on a dive down into security

17  relative to the network?

18    A.   That's correct.

19       MR. HARRINGTON:  Okay.  And I think,

20  Ms. Sheff, the next document was -- there was a second

21  network document?

22       MS. SHEFF:  Yes.

23       MR. HARRINGTON:  I think it was the next one.

24    Q.   You would agree with me that this is a -- kind

25  of a similar kind of inventory list of items, correct?

86

1      A.    Correct.  This is generated by RSM.

2      Q.    Okay.  And this is not something, again, that

3  would be a kind of deep dive into a network scan for

4  security purposes?

5      A.    Correct.

6      Q.    This is, again, kind of an inventory, correct?

7      A.    That's correct.

8            MR. HARRINGTON:  Okay.  And you can take that

9  down.  I'm all set.  Thank you.

10     Q.    In regard to the -- when TBS came in to kind

11 of take over in June of 2018, you had indicated a number

12 of things were preserved.  You talked about Mr. Alrai's,

13 you know, desktop, the VDI email system, all that stuff.

14     A.    Uh-huh.

15     Q.    Would you agree that in addition to that, the

16 IT service desk, that would have been preserved as well?

17     A.    The virtual desktop for that account?

18     Q.    Correct.

19     A.    Yes.

20     Q.    And the communications, emails, stuff like

21 that?

22     A.    Correct, yes.

23     Q.    Okay.  And would you agree with me that with

24 that information preserved, that would potentially be a

25 source that could be used either by you, RSM, FBI,

1    Homeland Security, to analyze the extent of the

2    communications between the IT help desk and DigitalNet?

3          A.    Yes.

4          Q.    Okay.  And that could be basically whoever

5    that was being communicated with; whether they were in

6    Pakistan or in the United States, it could document

7    that, correct?

8          A.    If there was communications sent to and from

9    that mailbox, yes.

10         Q.    Okay.  Now, in regard to -- I'm going to

11   switch gears to OVH and the snapshot that we talked

12   about.

13         A.    Uh-huh.

14         Q.    You had indicated to me that OVH had, at your

15   request, made this snapshot, correct?

16         A.    Yes.

17         Q.    That snapshot, would that include -- I think

18   you had indicated basically everything could be kind of

19   retrieved from that if it was lost, right?

20         A.    The snapshots are a direct image of a server.

21   So if you had ten servers and you took an image of each

22   server, you would have a snapshot, like -- look at it as

23   a picture --

24         Q.    Right.

25         A.    -- of each server.

1    Q.   And so for example, donor information, you

2  know, data like that, would be contained within that

3  snapshot, right?

4    A.   Correct.

5    Q.   Okay.  And in that regard, you indicated that

6  you never obtained the copy from OVH of that snapshot;

7  you said you never possessed it, never asked for it,

8  right?

9    A.   We did not need it because we didn't have to

10  restore those snapshots.

11    Q.   Okay.  And wouldn't you agree that that would

12  present a significant security issue because somebody

13  outside of the United Way, somebody outside of TBS, is

14  now in control of all of those images and you're not?

15    A.   No, those images were destroyed after we

16  determined we did not need them.  Those images were

17  dropped from their system.

18    Q.   Okay.  And in that regard, you verified that

19  because they told you?

20    A.   Correct.

21    Q.   Okay.  And prior to that, when they had them,

22  how long did they have them for?

23    A.   A couple of weeks.

24    Q.   Okay.  And during that period of time, all

25  that information was outside of the control of the

1    United Way and TBS, right?

2        A.    That is correct.

3        Q.    And you don't believe that's a security issue?

4        A.    No, because we entrusted other provider to

5    hold those snapshots in confidence and to destroy them

6    upon our request.

7        Q.    And what if they were the subject of some type

8    of malicious attack or hack?

9        A.    Sure, that could be a scenario.

10       Q.    Okay.

11       A.    Yeah.

12       Q.    And that was something that would be outside

13   of your control and your ability to make secure,

14   correct?

15       A.    That is correct.

16            MR. HARRINGTON:   Judge, I don't have any --

17   oh, actually -- I do actually have one more question.  I

18   apologize.

19            THE COURT:   All right.

20       Q.    I actually wanted to talk to you briefly, sir,

21   about cost.

22            You had indicated that -- and if you want, do

23   you have a phone with you, by any chance?

24       A.    I don't, no.

25       Q.    Okay.  Fair enough.

1          So you had indicated that the cost to United

2    Way right now for TBS services was $44,800 a month?

3        A.   That's correct.

4        Q.   Okay.  But on top of that, there are some

5    other costs that United Way is incurring for hosting and

6    phone services, right?

7        A.   That is correct.

8        Q.   Okay.  And in regard to the hosting, I think

9    did you indicate that was about, what, 19,000 did you

10   say?

11       A.   Yes.

12       Q.   Okay.  And in regard to the phone, I think you

13   said, what, 20 --

14       A.   800.

15       Q.   2,800?

16       A.   Uh-huh.

17          MR. HARRINGTON:  Okay.  So what I'm going to

18   do -- and if I may approach the witness, your Honor?

19          THE COURT:  Yes.

20       Q.   I'm going to give you this, sir, okay, a

21   calculator.  So if you can, put in the 44,800 and times

22   that by 12, so 12 months, and what do we get for that?

23       A.   $537,600.

24       Q.   Okay.  Now let's take the next one, which was,

25   I think you said --

```
 1              THE COURT:  You might want to keep your voices
 2   up.
 3        A.    19,000.
 4        Q.    The 19,000.
 5              THE COURT:  You're whispering to each other on
 6   the stand.  You have to speak up.
 7        A.    I was saying 19,000 times 12.
 8        Q.    And what would that equal?
 9        A.    228,000.
10        Q.    And then let's take that last one, the 2,800
11   times 12.
12        A.    28 times 12 is 33,600.
13        Q.    Okay.  So I want to add those together -- and
14   I'll give you the numbers.  Okay?
15        A.    33,600.
16        Q.    Plus 228,000 plus 537,600.
17        A.    799,200.
18        Q.    Okay.  Let me grab that from you.
19        A.    Yeah.
20        Q.    So I'm just going to put this up just quick.
21   I know the judge heard us, but -- so TBS services for a
22   year would be 537,600; hosting for a year that is paid
23   by United Way, 228,000; phone, 33,600.  Right?  Total
24   just shy of $800,000, right?
25        A.    Correct.
```

1          Q.   And that's what United Way is paying for your

2     services and the hosting and phone combined?

3          A.   Correct.

4          Q.   And you would agree with me that this that

5     we're talking about here is relative to the IT

6     environment for United Way?

7          A.   Yes.

8          Q.   Yeah.   In that regard, United Way, not

9     included in those numbers, you would agree with me can

10    be additional costs that United Way might incur for

11    other services, right, relative to IT?

12         A.   Yes.

13         Q.   And those could include, for example, costs of

14    hardware, correct?

15         A.   That's correct.

16         Q.   And that would be, for example, phones,

17    computers, right?

18         A.   Yup.

19         Q.   Routers, correct?

20         A.   Yes.

21         Q.   Switches?

22         A.   Yup.

23         Q.   Okay.   If system wiring had to be done, that

24    would be an additional cost that they would have to pay?

25         A.   Correct.

1     Q.    Okay.  There might be special projects that

2   could be done; for example, if an entirely new website

3   had to be created from scratch, that --

4     A.    Correct.

5     Q.    -- would be an additional cost that United Way

6   would have to pay?

7     A.    No, negative.  That's -- that's built into our

8   cost.

9     Q.    Okay.  So you -- you would not just update

10   website, you're saying your firm would actually create a

11   whole new website?

12     A.    That is correct.

13     Q.    Okay.  But that other information, for

14   example, that we talked about, there are other expenses

15   that can be related to IT that are not included in those

16   numbers that we talked about?

17     A.    Correct.

18     Q.    Okay.  So that roughly $800,000 number can be

19   even larger?

20     A.    Yes.

21     Q.    Okay.  Were you aware that during the time

22   that -- prior to you coming in for TBS and taking over

23   the system, you were aware that workers at the United

24   Way were able to work remotely, right?

25     A.    Yes.

1          Q.    Okay.  And that -- that would require, in

2     part, using that voiceover system, right?  The VoIP?

3          A.    If they had a phone in their possession, yes.

4          Q.    Okay.  And you were aware that members of

5     United Way were doing that, right?

6          A.    Yes, but only -- only a few that had actual

7     physical phones at their home offices.

8          Q.    Okay.  Additionally, you were aware that there

9     were mobile applications that employees of the United

10    Way were using?

11         A.    For?

12         Q.    To connect to the United Way.

13         A.    Yes.  Not for phones, though.

14         Q.    I'm sorry.  Say it again, please.

15         A.    Not for phone systems.

16         Q.    Okay.

17         A.    There was not a mobile application for

18    telephone at the time.

19         Q.    Yeah.  But there was --

20         A.    There is now, but there wasn't before.

21         Q.    Okay.  But there was a mobile application that

22    employees were using, just not connected to the phone?

23         A.    Correct.

24              MR. HARRINGTON:  Okay.  Judge, I don't have

25    any further questions for this witness.

1          THE COURT:  Redirect.

2          MR. HUNTER:  Thank you, your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. HUNTER:

5     Q.   Mr. Meyer, just -- briefly just going through

6    the math you just did with defense counsel -- and I

7    don't want to rehash all of it -- that $800,000, that

8    would also include your services as acting CIO; is that

9    correct?

10     A.   That is correct.

11     Q.   So United Way doesn't have to pay salary and

12    benefits separately for a chief information officer?

13     A.   No.

14     Q.   And also just to clarify some questioning that

15    defense counsel had regarding G Suite, you said it was

16    free to United Way.  Could you explain why?

17     A.   They're a nonprofit organization, so they --

18    the service to them is free.

19     Q.   So they get a discount?

20     A.   Yes.

21     Q.   And they also got a discount from Microsoft

22    Office?

23     A.   Yes, they do.

24     Q.   Okay.  And G Suite, you said, is a business

25    application, but you made the point that it's still

1    using the same -- did you say the same central platform,

2    the same -- or I guess how does it --

3          A.    The biggest issue with G Suite is that it's

4    not tied in to the active directory at the United Way.

5    That -- your data that people are storing within the

6    Google Docs is not centrally managed, therefore, we

7    don't know what data is in individual boxes for people.

8                That's the biggest issue with G Suite; it's

9    not part of the AD within the environment, which

10   presents a security problem.

11         Q.    And that's why you're moving it over?

12         A.    Yes.

13         Q.    Have you learned since coming to the United

14   Way that in approximately 2014, the -- the United Way's

15   email has moved from Outlook to the G Suite?

16         A.    Yes.

17         Q.    And have you looked for the old Legacy server

18   from Outlook from prior to 2014?

19         A.    Yes.

20         Q.    Have you been able to find it?

21         A.    No.

22         Q.    So any email prior to '14, if it was deleted,

23   it wasn't migrated to G Suite; is that right?

24         A.    Correct.

25         Q.    Who was responsible for IT services at United

1    Way in 2014?

2         A.    That would have been Imran and DigitalNet.

3         Q.    And was -- if you know, was Imran Alrai and

4    DigitalNet responsible for the migration from Outlook to

5    Gmail in 2014?

6         A.    Yes.

7         Q.    And prior to June 12th, 2018, who was

8    responsible for all preservation of email on United

9    Way's systems?

10        A.    DigitalNet and Imran.

11             MR. HUNTER:  Ms. Sheff, can you put

12   Exhibit 404 on the screen?

13        Q.    You were asked about thinking that DigitalNet

14   was a phone provider.

15             Could you go to page 2, Ms. Sheff?

16             Could you -- do you recognize this letter?

17   It's the letter from DigitalNet's counsel regarding

18   shutting off the phone systems.

19        A.    Yes.

20        Q.    And this bullet regarding phone systems, where

21   it says they're using the telephone service DigitalNet

22   provides, do you see that?

23        A.    Yes.

24        Q.    Did you assume based on this that DigitalNet

25   was claiming to be a phone provider?

1        A.    I did.

2        Q.    And that -- that was the basis for that

3    assumption; is that correct?

4        A.    Yes.

5        Q.    A letter from DigitalNet?

6        A.    Correct.

7              MR. HUNTER:  You can take that down,

8    Ms. Sheff.

9        Q.    Now, you were also asked some questions about

10   Coalfire.

11             Mr. Meyer, what is a -- what is a phone

12   provider?

13       A.    What is a phone provider?

14       Q.    Yes.

15       A.    A company that can provide telephone service

16   and dialing services to companies and individuals.

17       Q.    And is a phone provider required to have

18   licensing?

19       A.    Yes.

20       Q.    And if you don't have licensing -- can you

21   explain that a little bit more?

22       A.    Licensing means you're accredited with the

23   Federal Communications Commission.

24       Q.    Okay.  And if you don't have that licensing,

25   you cannot be a phone provider; is that correct?

1      A.   Correct.

2      Q.   Is a -- is a services organization that's

3 passing through phone services a phone provider?

4      A.   Can you repeat that again?

5      Q.   Sorry.

6      A.   It's okay.

7      Q.   So just going back to the letter --

8      A.   Yeah.

9           MR. HUNTER:  And, actually, Ms. Sheff, can you

10 put that letter back up?

11          MS. SHEFF:  What exhibit number was that?

12          MR. HUNTER:  404.

13          MS. SHEFF:  Page 2?

14          MR. HUNTER:  Yes, the same bullet point we

15 were ...

16     Q.   So where it says the phone service that

17 DigitalNet provides -- if you're a pass-through where

18 you're providing phone services of another provider --

19     A.   Yeah.

20     Q.   -- is that pass-through entity a phone

21 provider?

22     A.   Yes.  It should be plainly stated who the

23 provider is.

24     Q.   Okay.  What -- okay.  Could you explain that?

25     A.   Meaning that if DigitalNet is not truly

1  providing the service, that if it's another -- if you're

2  a reseller of the service, then typically you understand

3  who the actual provider.

4           Like if -- like we resell Microsoft.  We're a

5  Microsoft gold partner, so we can provide reselling

6  services of Microsoft Office if we choose to do so.  The

7  entities that are buying that understand they're buying

8  a product from Microsoft, not directly from TBS.

9           MR. HUNTER:  Okay.  You can take that down.

10     Q.    Okay.  You were asked a bit about OVH on cross

11  and the snapshot that OVH took.

12     A.    Uh-huh.

13     Q.    Was OVH hosting United Way servers at that

14  time?

15     A.    Yes.

16     Q.    And did those servers contain donor

17  information?

18     A.    Yes, it did.

19     Q.    So OVH was the trusted provider for United Way

20  to host the servers that contained all this sensitive

21  information; is that correct?

22     A.    Correct.

23     Q.    And as -- and as the host of that information,

24  did you also entrust them to retain the snapshot as long

25  as you might need it during this transition?

1      A.     That is correct.

2      Q.     You were asked on cross about financial data

3  and whether it should be kept separate --

4      A.     Uh-huh.

5      Q.     -- and you said something about some sort of

6  separation is achieved by a central platform, but I -- I

7  don't think you finished the thought.  What did you mean

8  by that?

9      A.     The -- having a server part of an active

10 directory environment is more effectively managed than a

11 server that's on its own island that you have to manage

12 separately.

13         If you -- if you have all your network

14 environment managed from one central location, meaning

15 access to that environment, permissions, user names,

16 passwords, level of permission, folder access, data

17 access, if it's controlled from one central location, it

18 is a much better scenario than having to manage multiple

19 platforms.

20     Q.     Could the financial data still be segregated

21 and --

22     A.     It can still be separated and controlled, yes.

23     Q.     So now I want to ask, you were asked quite a

24 bit about this company Coalfire and the analysis they

25 did.

1      A.   Yes.

2      Q.   Were they retained by United Way's legal

3   counsel and audit committee?

4      A.   Yes.

5      Q.   They weren't retained by TBS --

6      A.   No --

7      Q.   -- is that correct?

8      A.   -- they were not.

9      Q.   And were they retained in June of 2019 -- or,

10  rather, did they start their work in June of 2019?

11     A.   Yes.

12     Q.   And so their analysis of United Way's IT

13  environment began one year after Mr. Alrai left; is that

14  right?

15     A.   That is correct.

16     Q.   So you testified on direct about the state of

17  the IT environment as you saw it in 2000 and -- in the

18  summer of 2018.

19     A.   Uh-huh.

20     Q.   Was any of your direct testimony relying on

21  any analysis done by Coalfire?

22     A.   No.

23     Q.   You were also asked a couple of questions

24  about RSM and their server copy.  Do you understand --

25  if you know, do you know if that was done as part of a

1   document collection effort?

2       A.   Yes.

3       Q.   And so the -- the copies of the servers that

4   RSM assisted in collecting, do you -- again, if you

5   know, do you know if those were turned over to a

6   document review vendor and documents then uploaded for

7   review?

8       A.   I'm not aware who that vendor was.

9       Q.   I'm not asking if you know who the vendor was,

10  but I'm just -- are you aware of that process?

11      A.   Yes, I am.

12      Q.   And then documents were reviewed in that

13  database for the internal investigation and ultimately

14  to produce documents to the government; is that -- do

15  you understand that?

16      A.   Yes, I do.

17      Q.   You were asked a little bit about

18  superadministrative passwords and whether you learned

19  that Kal Wahbe had those.  Do you recall that --

20      A.   Yes.

21      Q.   -- line of questioning?  And you said you

22  didn't speak to Kal?

23      A.   No.

24      Q.   Why didn't you attempt to speak with Kal early

25  on to get those passwords?

1      A.    We actually attempted to -- I attempted to

2  call Kal on several occasions.

3      Q.    Were you ever able to get ahold of him?

4      A.    No.

5      Q.    And just going -- just circling back on the --

6  the document collection efforts, was that -- again, if

7  you know, was that done to secure the documents in a

8  forensically pure way to make sure that all evidence and

9  documentation was preserved?

10     A.    Yes.

11     Q.    But you never reviewed documents in this

12 document review database?

13     A.    No.

14     Q.    And, in fact, all of your direct testimony was

15 based on facts that you and your team observed once you

16 got to United Way in the summer of '18?

17     A.    Correct, yes.

18     Q.    You're not providing opinions based on other

19 third party companies' analyses?

20     A.    Not at all.

21     Q.    Okay.  You were asked a little bit about the

22 RFP response that TBS provided United Way in 2011.  Do

23 you recall that?

24     A.    I do.

25     Q.    And you were also asked about statements you

1  made in an interview with the FBI saying you thought you

2  responded to an RFP by Imran Alrai in 2013.

3      A.   Correct.

4      Q.   After making those statements about thinking

5  you replied to an RFP by Imran Alrai, did you go back

6  and review your records?

7      A.   I did.

8      Q.   And what did you learn after doing that?

9      A.   Well, I found that I had not communicated with

10  Imran.  It was another individual.

11      Q.   So you were mistaken about the exact time that

12  you --

13      A.   I was.

14      Q.   -- had --

15      A.   Yes.  It was seven years prior, yeah.

16      Q.   Or 2011 versus 2013, so --

17      A.   Oh, yes.  I'm talking about when I actually

18  made the RFP --

19      Q.   Okay.

20      A.   -- versus when I was asked about the RFP in

21  2018, yeah.

22      Q.   All right.  But you're -- otherwise, your

23  memory of the RFP process is generally the same?

24      A.   It was a general recollection of I did an RFP

25  for the United Way.  Who I communicated with, you know,

1    I -- I had not remembered at that particular time.

2         Q.    You misremembered --

3         A.    Correct.

4         Q.    -- is that right?

5               But you did reply; you did submit an RFP in

6    2011?

7         A.    We did.

8         Q.    And you didn't get it?

9         A.    Correct.

10        Q.    And you never heard back after submitting it?

11        A.    That is correct.

12              If I could make one more comment about the

13   RFP?

14        Q.    Sure.

15        A.    Partly the reason why I had stated I had

16   communicated with Imran is because I was told that the

17   RFP was found in his desk.  That's why I had made that

18   statement.

19        Q.    That an RFP response from TBS was found in his

20   desk?

21        A.    Yes, that's correct.

22        Q.    Okay.  And --

23        A.    Yeah.

24        Q.    And did you later learn that that was your

25   2011 response?

1      A.   Yes.

2      Q.   Okay.

3      A.   Yeah.

4      Q.   So -- so there was an RFP response found in

5   Imran's space at United Way?

6      A.   Correct.

7      Q.   And -- but it was yours from prior to Imran's

8   time there?

9      A.   That is correct.

10      Q.   All right.  Just another quick question about

11   the OVH snapshot.

12      A.   Uh-huh.

13      Q.   The purpose for that -- I think you testified

14   both on direct and cross that the purpose was in case

15   something happened during the transition when -- when

16   Imran was exiting the United Way.

17      A.   Correct.

18      Q.   And that's part of -- and -- but there were --

19   and, again, you testified there were no issues; there

20   wasn't any nefarious --

21      A.   That's correct.

22      Q.   I'm sorry.  Let me ask my --

23      A.   Sorry.

24      Q.   There were no nefarious attempts by Imran, to

25   your knowledge, or DigitalNet to try to gain access to

1    United Way's systems in 2012?

2         A.   Correct.

3         Q.   Or no -- or after June -- sorry.  2018, June

4    of 2018.

5         A.   Correct.

6         Q.   So you didn't end up needing to restore the

7    servers from that snapshot; is that right?

8         A.   That's right.

9         Q.   That snapshot wasn't part of your review of

10   United Way's systems to determine what steps you needed

11   to take; is that right?

12        A.   Right.

13        Q.   You were, sir, asked about reports that TBS

14   created, you know, during your time at United Way

15   assessing the systems --

16        A.   Uh-huh.

17        Q.   -- and those sorts of things.  Are those

18   reports in any way related to your efforts to document

19   the IT environment and determine what remediation you

20   needed to do?

21        A.   Yes.

22        Q.   Okay.  And you haven't provided or turned over

23   all the documentation work that you've done for United

24   Way; is that right?

25        A.   Yes.

1        Q.    Or you have not, right?

2        A.    No, we have not turned over everything, no.

3        Q.    Right.

4        A.    No.

5              MR. HUNTER:  Nothing further at this time.

6              MR. HARRINGTON:  I have no other questions,

7    your Honor.

8              THE COURT:  Sir, you're excused.  Thank you.

9              THE WITNESS:  Thank you.

10                    (Witness excused.)

11                    (Excerpt concluded.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 3/24/2020          /s/  Liza W. Dubois
                              LIZA W. DUBOIS, RMR, CRR