**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-7-2020**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   18-cr-192-01-JL
          v.                    *   December 2, 2019
                                *   10:10 a.m.
     IMRAN ALRAI                *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
DAY ONE - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           U.S. Attorney's Office



For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon, P.A.



Also Present:              John J. Commisso, Esq.



Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

I N D E X

Opening statement by Mr. Davis, page 35

Opening statement by Mr. Harrington, page 59

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

LORISSA GUZMAN:

By Mr. Davis        77


VOIR DIRE EXAMINATION OF LORISSA GUZMAN:

By Mr. Harrington, page 88

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibits 101 thru 925. | 3 | |
| Defendant's Exhibits A thru Y. | 3 | |

```
 1                 P R O C E E D I N G S

 2              THE CLERK:  In the case of United States of

 3  America versus Imran Alrai, docket number 18-cr-192-JL,

 4  for the record, the government has premarked Exhibits

 5  101 through 925.  All exhibits are marked for

 6  identification at this time.

 7              Defendant has premarked Exhibits A through Y.

 8  All exhibits are marked for identification at this time.

 9              The Court has before it for consideration this

10  morning day one of the bench trial in 18-cr-192-JL,

11  United States of America versus Imran Alrai.

12              THE COURT:  All right.  We're here for the

13  criminal trial in this matter.

14              First things first.  The Court e-mailed

15  counsel, I think it was the day after Thanksgiving,

16  expressing its preference for a jury trial and

17  considering revoking its approval of the bench trial.

18  We could have a conversation about that, but I probably

19  want to cut through it and ask defense counsel, what's

20  your position on that?  Do you still prefer a bench

21  trial?

22              MR. HARRINGTON:  We do, Judge.  After you sent

23  us the e-mail we had renewed discussions, my client and

24  I, the various reasons to opt for a bench trial.  He has

25  decided that he would like to stay with that.  I
```

1    explained to him that that option under the court rules

2    that the Court has the discretion to deny that.  He

3    understands that.  And so if we do a jury trial, we're

4    ready to proceed with that as well, but he has not

5    changed his decision to proceed with a bench trial.

6              THE COURT:  Understood then.  Rather than just

7    waste everyone's time, I won't revoke the authority and

8    we'll proceed with the bench trial.  I'd much prefer a

9    jury trial but -- I'd prefer a jury trial generally, but

10   given that we've had sort of a change in the

11   prosecution's sort of theory of the law in the case, I

12   thought it would allow the Court to focus on that during

13   the jury trial, you know, because with a bench trial of

14   course I'll be focused a hundred percent on the

15   evidence, on the witnesses, the testimony and the

16   exhibits, and I will have to do the legal work sort of

17   when we're not in court.

18             But that's not how I want that to -- I don't

19   want that to trump the defendant's preference so we'll

20   stay with a bench trial.  That's the better course here.

21             I'll also conduct a colloquy on the waiver of

22   the right to a jury trial before we start today just to

23   make sure that that's -- I don't think I have to do it

24   before we start, but I'll do it anyway just to make sure

25   we're covered.  I know that's been done, but I'll make

1    sure to conduct that today.

2           Okay.  So second, just some housekeeping then,

3    what's the -- if I remember right, all witnesses are

4    sequestered except for the case agent?

5           MR. DAVIS:  Yes, your Honor.  Well, two

6    exceptions.  One is the government's case agent, which

7    is Todd Donnelly, who's at counsel table next to Mr.

8    Hunter.

9           THE COURT:  Welcome.

10          MR. DAVIS:  And he'll be the only case agent.

11   We're not going to ask for two.

12          Our other request is that under Rule 60, a

13   fairly new rule --

14          THE COURT:  Yeah.

15          MR. DAVIS:  -- the victim, United Way, has a

16   right to be present, a presumptive right anyway, and I'm

17   referring to Rule 60(b) -- I'm sorry, 60(a)(2), the

18   right to attend a proceeding, and that says the Court

19   must not exclude a victim from a public court proceeding

20   involving a crime unless the Court determines by clear

21   and convincing evidence that the victim's testimony

22   would be materially altered if the victim heard other

23   testimony in that proceeding.

24          What we're talking about here, your Honor, is

25   Mr. Richard Voccio, who is in the courtroom.  He is the

1   chief administrative officer of the United Way in

2   Boston.  So he's the number two.

3            THE COURT:  Is he going to be a witness?

4            MR. DAVIS:  He is going to be a witness, he's

5   our third witness, but he -- and John Commisso can also

6   speak as the lawyer for United Way, but he has asked to

7   attend the entire trial and represent United Way, and

8   under that rule I believe he has that right.  He wants

9   to be --

10           THE COURT:  Well, United Way has a right.  He

11  doesn't have a right.

12           MR. DAVIS:  Correct.

13           THE COURT:  Let's just get to it.  Do you

14  object?

15           MR. HARRINGTON:  I do, Judge.

16           THE COURT:  All right.  You're going to have

17  to find another corporate representative to sit through

18  the whole trial.  I'm not going to allow a witness to

19  sit.  That's the ruling.

20           What's next?  I mean, he doesn't have a right

21  to sit -- the corporation has a right to sit through the

22  trial.  They're the victim.  He's not the victim.  Why

23  would I insert another complication into this trial when

24  there's probably --

25           MR. DAVIS:  Because it's the right of the

1  victim in the case, your Honor.

2        THE COURT:  Do you have any authority for the

3  proposition that when it's a corporate victim, the

4  victim has a right to choose a witness to sit in the

5  trial?

6        MR. DAVIS:  I don't think the victim chose --

7  so the short answer is no, I don't think this is -- I

8  doubt it's been litigated.  Certainly a victim in a rape

9  case is going to be a witness and would have the same

10  absolute right, and it's not an absolute right but it's

11  also --

12        THE COURT:  It's a corporate victim.  He's not

13  the victim.  Maybe we're just miscommunicating.  What's

14  his name again?

15        MR. DAVIS:  His name is Richard Voccio.  He's

16  right there, your Honor.

17        THE COURT:  Well -- but he doesn't have a

18  right to be present at the trial.  The United Way has a

19  right to be present at the trial.  That's the law.  This

20  man is not the victim of the crime and while I certainly

21  have no objection to him sitting in the courtroom, the

22  defendant does because he's a witness.  So the

23  corporation, which is the victim, can obviously

24  designate someone else to sit in the trial.

25        MR. DAVIS:  Could I ask that if Mr. Commisso

1    wishes --

2             THE COURT:  Here's my second question.  Maybe

3    I already addressed this at the final pretrial.  Did I

4    already give a contrary ruling?

5             MR. DAVIS:  I don't think so.

6             THE COURT:  No, and the reason I didn't,

7    right, was because nobody brought it up, right?  So

8    instead of holding up the trial with this conversation,

9    which was totally unnecessary and could have been

10   fleshed out a long time ago, I'm going to rule in a way

11   that preserves the defendant's rights to a fair trial

12   and is consistent with the rules.  So United Way may

13   have a corporate representative sit in the trial, the

14   entire trial, absolutely, but it's not going to be a

15   witness in the case unless the defendant withdraws its

16   objection to that.

17            MR. DAVIS:  Your Honor, I'd just say I think

18   Mr. Commisso asked me about Mr. Voccio quite recently,

19   so I did not mean to delay bringing the issue up at the

20   pretrial conference.  I actually thought it was going to

21   be the CEO who is not a witness.

22            THE COURT:  And that makes perfect sense.  I

23   appreciate you explaining that to me, but it's certainly

24   not a situation where I'm going to create an issue that

25   could complicate the matter later.  I want the victim to

1   exercise his right to be present at the trial, but the

2   victim is the company and the company has -- even though

3   I know it's a nonprofit, it does have several employees.

4            MR. DAVIS:  And if I could say, the last thing

5   I'll say on this, I would just ask the Court to afford

6   Mr. Commisso an opportunity to speak, if he wishes, as

7   the victim's counsel.

8            THE COURT:  I'm happy to listen to Mr.

9   Commisso.  Yeah, sure.

10           MR. COMMISSO:  Thank you, your Honor.  Good

11   morning.  My name is John Commisso.  I just have one

12   follow-up question to that.

13           THE COURT:  We spoke on the phone.

14           MR. COMMISSO:  Yes.  Exactly.  Thank you.

15           So my one follow-up question is Mr. Voccio is

16   going to testify as the third witness.  Once he's

17   testified, would he then be permitted to stay in the

18   courtroom after he's testified?

19           THE COURT:  Normally I would allow that, yes.

20   Normally I would.  Any problem with that?

21           MR. HARRINGTON:  I guess the only question

22   would be, Judge, is that if that's done he's not going

23   to be subject to recall.

24           THE COURT:  Right.  He won't be able to be

25   called as a rebuttal witness you recall, that's true,

1   but after that I have no problem with him sitting in the

2   trial.  You're right, that's a good point.  He's an

3   early witness.  So he'll have to wait until he testifies

4   to be sitting and watching the other witnesses, but up

5   till then he'll be sequestered.

6           MR. COMMISSO:  Okay.  Thank you, your Honor.

7           THE COURT:  And by the way, anybody else,

8   anybody else in the company is obviously welcome to sit

9   through the entire proceedings.

10          MR. COMMISSO:  I understand.  Thank you.

11          THE COURT:  Okay.  Thank you, sir.  So that's

12  the ruling.  United Way may be present at the trial, but

13  trial witnesses will be sequestered until they testify.

14          Are both sides going to do opening statements?

15          MR. DAVIS:  Yes.

16          MR. HARRINGTON:  Yes, Judge.

17          THE COURT:  Who are today's witnesses?

18          MR. DAVIS:  We have four planned, your Honor.

19  They are Lorissa Guzman, Nadeem Yousuf, Richard Voccio

20  and Pat Latimore.

21          THE COURT:  Thank you.  And you were already

22  aware of that?

23          MR. HARRINGTON:  I was, Judge.

24          THE COURT:  All right.  Exhibits all

25  premarked?

1          MR. DAVIS:  Yes.

2          MR. HARRINGTON:  Yes, Judge.

3          THE COURT:  All right.  Now, given that we're

4    having a bench trial and the prosecution's theory now is

5    that it need not prove that the substantive counts,

6    let's just focus on the wire fraud counts now, be proven

7    as part of a scheme to defraud both victims, what's your

8    position on the motion in limine?

9          MR. HARRINGTON:  Judge, you should, I believe,

10   grant the defendant's motion in limine to exclude -- one

11   of the things, if you look at the indictment, one of the

12   things that the prosecution has done, and I can see why

13   it doesn't want to kind of proceed under its previous

14   position, is because if you look at each introduction to

15   the charges --

16          THE COURT:  The substantive charges?

17          MR. HARRINGTON:  Correct, Judge, the actual

18   substantive charges.

19          THE COURT:  So I'm looking at count, let me

20   see here, it says the offenses on page 34.  Oh, there it

21   is.  Counts 1 through 17 are listed on page 10 of the

22   indictment.

23          MR. HARRINGTON:  So if you look, Judge, at

24   paragraph 34, the offenses.

25          THE COURT:  Right.

1          MR. HARRINGTON:  After my client's name, "for

2   the purpose of executing the scheme described above, and

3   attempting to do so, caused to be transmitted by means

4   of wire communication in interstate commerce, writings,

5   signs, signals --"

6          THE COURT:  You need to slow down for the

7   reporter.

8          MR. HARRINGTON:  I apologize, Judge.

9          Basically saying that -- and actually that's

10  not the paragraph I was looking at, Judge.  Give me one

11  moment.

12         THE COURT:  You're probably looking at page,

13  like for example, page 11, Count 18, paragraph 36.  It

14  says, "for the purpose of executing the scheme described

15  above," which the scheme described above involves two

16  victims.  Is that what you're focused on?

17         MR. HARRINGTON:  Actually, if you go to, for

18  example, page 11, Judge, you'll see in paragraph 37,

19  Counts 19 through 30.

20         THE COURT:  Right.

21         MR. HARRINGTON:  The money laundering.  "Did

22  knowingly engage in monetary transactions in criminally

23  derived property of a value greater than $10,000 that

24  was derived from specified unlawful activity; namely,

25  wire fraud as alleged in Counts 1 through 18 of the

1   superseding indictment."

2           THE COURT:  Which are the United Way counts.

3           MR. HARRINGTON:  Yup.

4           THE COURT:  Right.

5           MR. HARRINGTON:  "In that the defendant caused

6   to be wired funds that Org1, which is United Way, had

7   paid to DTS from a DTS account," and then they go

8   through those counts.

9           Similar language if you look at the money

10  laundering, Counts 31 through 42, and you go to page 13,

11  it's actually page 12 to 13, same exact kind of

12  allegation, talking about the transmission of $5,000 or

13  more knowing the same to have been stolen, converted or

14  taken by fraud, in that the defendant caused to be wired

15  funds that Org1 had paid DTS from a DTS account.

16          THE COURT:  Yeah.

17          MR. HARRINGTON:  And then the same on all the

18  other counts.

19          And if you go to the wire fraud charges, it's

20  the same allegation.  It's all funds relative to funds

21  paid by United Way to DTS.

22          So my point of all of that, Judge, is that not

23  one allegation relative to the actual criminal charges

24  involves Robert Allen.

25          THE COURT:  Org1 is United Way?

1          MR. HARRINGTON:  Correct.  And so as you can
2     see, and I think the government had conceded in prior
3     discussions with the Court that it need not have one
4     single piece of evidence relative to Robert Allen in
5     order to convict on all counts relative to United Way
6     because there's no evidence that's even -- or facts
7     alleged in those counts relative to Robert Allen.
8          THE COURT:  It did take that position and I
9     think it's maintained that position in its, you know,
10    re-explained position.  It still I think maintains that
11    position.  I don't think the government is wrong about
12    that, by the way, do you?
13         MR. HARRINGTON:  As far as?
14         THE COURT:  I don't think they --
15         MR. HARRINGTON:  Oh, as far as needing
16    evidence.
17         THE COURT:  Yeah.
18         MR. HARRINGTON:  No, and that's why -- going
19    back to whether the Robert Allen information should even
20    be in front of you, I would suggest to you if we get
21    into one of the topics that you raised relative to the
22    indictment, you know, narrowing, broadening the
23    indictment, I think where we're at with this is it's
24    clear that the evidence that would be adduced at
25    trial --

1          THE COURT:  Narrowing.

2          MR. HARRINGTON:  Narrowing.

3          THE COURT:  I think the government agrees with

4   that.

5          MR. HARRINGTON:  And so we're actually in a

6   position before we even start the evidence --

7          THE COURT:  So you're actually initiating the

8   conversation I was trying to initiate by this request

9   about -- so you maintain that you think the motion in

10  limine should be granted?

11         MR. HARRINGTON:  That's right, Judge.

12         THE COURT:  Who is talking?  Is it Mr. Davis?

13         MR. DAVIS:  Yes.

14         THE COURT:  I think -- see normally this whole

15  analysis of narrowing or expanding or anything like

16  that, or a variance in general, that usually would

17  happen in a case after trial or after the evidence part

18  of the trial, right, and you realize that there's been a

19  variance between what you alleged and what you proved

20  and the Court undertakes the -- I think, by the way,

21  you've correctly -- I think he's correctly set forth the

22  analysis in his memorandum about how to approach this

23  issue.  The problem is -- not the problem, but the issue

24  is that's normally an analysis that the Court really has

25  no choice but to undertake because the evidence part of

1     the trial is over.

2          But we're sitting here before the trial, and

3     we can eliminate this problem by eliminating evidence of

4     Org2, Robert Allen Group, because I don't -- as far I

5     can tell, you don't need it to prove your substantive

6     counts.  It could create a variance between a one-victim

7     scheme and a two-victim scheme.  I'm wondering if

8     there's something about the case that I don't understand

9     that makes you want this evidence in more.  I mean, I

10    don't think by excluding it from the trial you would be

11    excluding it as a sentencing issue as relevant conduct.

12    I think it would still be admissible for that purpose at

13    sentencing.  I think there would be an argument over it,

14    don't get me wrong, but I think it would be potentially

15    admissible at sentencing.

16          So I guess I'm wondering why we're buying this

17    complicated analysis when we're sitting here before

18    trial and we can eliminate it by granting this motion in

19    limine.  That's my question.

20          MR. DAVIS:  Your Honor, the indictment is

21    charged because there is a single scheme to defraud by

22    that one defendant involving that one company,

23    DigitalNet Technology Solutions; that at the same time,

24    during precisely the same months --

25          THE COURT:  Tell me a little bit about that.

1          MR. DAVIS:  -- in 2013 and 2014 was used to

2   defraud two different companies, both of whom employed

3   Mr. Alrai.  And the techniques used to carry out that

4   fraud were very much the same.  Mr. Alrai introduced

5   DigitalNet Technology.  He then pretended always to

6   everyone that he had nothing to do with DigitalNet

7   Technology, that he was a corporate officer acting in

8   good faith in a third party transaction.

9          He then ran the entire operation.  He used his

10  father to sign documents.  He sent multiple e-mails

11  signed with a false name Mohammad, and he got both

12  companies to pay him in advance in large sums, and from

13  both companies he took, well, he took over 400,000 from

14  Robert Allen.  He took -- but he got caught and he got

15  caught, the evidence is going to show, because he wasn't

16  working there anymore.

17          The only places ever victimized by DigitalNet

18  Technology are the two places that had the misfortune of

19  hiring Mr. Alrai.  And the fact that Robert Allen

20  eventually caught on and terminated, it only goes to

21  show how integral Mr. Alrai's role as an officer and

22  fiduciary was.

23          THE COURT:  So let me ask you it this way

24  then, unless you were going to answer my question.

25          MR. DAVIS:  It is a single scheme to defraud.

 1    It really is.
 2             THE COURT:  You're telling me why, and I don't
 3    have a hard time understanding it.  You're telling me
 4    why this was a single scheme to defraud two victims.
 5             MR. DAVIS:  Right.
 6             THE COURT:  But let me ask you it this way.
 7    Why are there no substantive counts involving statements
 8    to or money derived from RAG?
 9             MR. DAVIS:  Because of the statute of
10    limitations.  And that circumstance is not
11    extraordinary.  That circumstance happens -- as I said
12    to the Court before, it happens frequently in
13    complicated fraud cases where the government is left
14    with choosing among wirings that occurred or mailings
15    that occurred within five years even though the same
16    scheme extended further back.  That's our situation
17    here.
18             I would add, too, your Honor, one of our
19    witnesses in this case is Kal Wahbe.  Kal Wahbe is a
20    very interesting person because he was at Robert Allen.
21    He worked with Imran Alrai and for Imran Alrai and at
22    Robert Allen Group at the same time he worked for Imran
23    Alrai at DigitalNet with United Way.
24             So Kal Wahbe is a witness who straddles both
25    himself and he can talk about working at Robert Allen

1   and what Mr. Alrai was doing there.

2          THE COURT:  Consistent with your theory, he

3   can provide evidence of a single scheme involving two

4   victims.

5          MR. DAVIS:  Correct.  And that to understand

6   his testimony you really have to understand that --

7   there's two different employers.  They're both

8   contracting with DigitalNet.  This is going on at the

9   same time, and to make sense of Kal Wahbe's testimony is

10  a much more difficult thing.

11         The other thing I wanted to say, your Honor,

12  is --

13         THE COURT:  Say the last part again.  That's

14  important.  Say that last point again.

15         MR. DAVIS:  That is, for Kal Wahbe to be

16  called to the stand and to be told, well, you can't say

17  anything about Robert Allen Group would be nuts.  I

18  mean, the whole -- his whole role flows from I was at

19  Robert Allen.  I did know Imran Alrai.  I was under him.

20  I saw the introduction of DigitalNet, I saw what he was

21  doing, and he hired me to work at United Way.

22         And one thing Kal Wahbe -- anyway, it is the

23  story.  And it is not just a story, it's the scheme. And

24  so to truncate or bifurcate the scheme would be

25  artificial and difficult.

1          The other thing I would say, your Honor, is

2    we're talking about four witnesses.  We're not talking

3    about a huge part of this case.  It only went on for six

4    months or so and this is not going to be a laborious big

5    slog.  And I also think --

6          THE COURT:  The last thing I'm worried about

7    is the quantity of the evidence.  It's just not what I'm

8    focused on at all.  So don't worry about that.

9          MR. DAVIS:  Okay.

10          THE COURT:  Although I don't accept the

11    proposition that four witnesses in a criminal trial is

12    ever a small thing.  I do see your point.  Relatively

13    speaking, you're saying not a big part of the trial.

14          But for the Court, this isn't about, oh,

15    you're wasting my time or we're taking too long.  Not at

16    all.  It's about two things.  It's about unnecessarily

17    complicating legal determinations that are going to be

18    required as a result of this presentation of RAG group

19    evidence.  You've told me there are some good reasons to

20    do it, by the way, and I think they make sense, but I am

21    skeptical that it would prejudice your proof in any

22    meaningful way to have that witness in particular or any

23    witness neglect to discuss RAG.  You're making a good

24    point, though.

25          I guess the question this raises with me, and

1   I don't say this to be difficult, but I mean we had a

2   pretrial and there were three federal prosecutors there

3   and you told me, yeah, if we don't prove two schemes

4   it's an acquittal, or a single scheme of two victims

5   it's an acquittal.  I didn't really think you were right

6   about that, but I was happy to hear it because it made

7   things simple, and the defense said, sure, I withdraw my

8   objection.  So what happened?  I'm curious as to what

9   changed.

10          MR. DAVIS:  So your Honor, what changed is I

11   read the law --

12          THE COURT:  That's a straight answer.

13          MR. DAVIS:  -- and I immediately decided I

14   needed to file notice.  I notified Mr. Harrington I

15   think the next phone call we had --

16          THE COURT:  He hasn't been prejudiced by any

17   sort of notice.  That's true.

18          MR. DAVIS:  And I also notified the Court on

19   the phone that it was coming.  I didn't file it that

20   Saturday.  It is part of my obligation to correctly

21   advise you about the law.

22          THE COURT:  You misunderstand my question.  My

23   question isn't why did you get the law right, my

24   question is why did you get the law wrong.

25          MR. DAVIS:  So the answer is I fell short.

1          THE COURT:  All right.  You just misunderstood

2    it.  That's a straight answer.  I'm good.  Because I

3    thought there might be something to this that I'm

4    missing like maybe a strategic or tactical point.

5          MR. DAVIS:  I can say a little more, which is

6    that I knew that the government has to prove what the

7    First Circuit instruction says, and it says

8    substantially as charged in the indictment.

9          Now, that gave me pause, and I had not

10   researched it and --

11         THE COURT:  So you assumed the burden.

12         MR. DAVIS:  And I assumed the burden.  And in

13   my defense, your Honor, that was not -- this was a

14   motion to exclude evidence.  It was not a variance

15   constructive amendment argument.

16         THE COURT:  That's true.

17         MR. DAVIS:  So this was not an issue I

18   expected to be raised, but when I -- I think it was when

19   Ms. Le read the instruction it seemed to me, well, maybe

20   we do have to prove it, but we don't.  And it's clear

21   from the law, and particularly in a bench trial, your

22   Honor, that -- I mean, the last thing I'd say about this

23   I think is the fact that this is a bench trial ensures

24   that this is not a big issue because the issue of

25   prejudicial spillover effectively can't occur.

1          Your Honor, the government strongly believes

2     that there will be proof of a single scheme in this case

3     and that the Court is not going to have to spend a lot

4     of time or effort worried about an argument, well, it's

5     two separate schemes or one is a scheme and one isn't or

6     whatever it is.  But even if the Court does, as we

7     stated, if the United Way part of the scheme is proved,

8     then those allegations are surplusage and they're not

9     essential to a conviction and there's no prejudicial

10    variance and there's no constructive amendment.

11          So respectfully, I don't think it's now a hard

12    issue.  I really don't.

13          THE COURT:  You might be right about that on a

14    few points.  Just to be clear, I concur that it might be

15    surplusage, probably is in my view, but it's not

16    surplusage that you're willing to jettison at this

17    point, right?  You want to keep the evidence.

18          MR. DAVIS:  Correct.

19          THE COURT:  Secondly, the point here isn't to

20    have you fall on your sword and tell me you fell short.

21    That's not what I'm driving at here.  Sometimes the

22    Court knows the least about -- usually the Court knows

23    the least about the evidence in the case before trial,

24    and I thought there just might be either a strategic or

25    tactical reason that this was transpiring this way.

1    Doesn't appear to be the case.  And I appreciate the
2    candor, but it isn't as if it's the end of the world.  I
3    get it now.
4           Okay.  So anything else you want to say about
5    it, Mr. Harrington?
6           MR. HARRINGTON:  Yes, Judge.
7           The idea of kind of putting in other evidence
8    relative to a scheme or course of conduct, I would
9    understand that it would be relevant to kind of
10   background and context to let the Court understand what
11   the scheme is with United Way.  It kinds of flows from
12   one to the other.
13          THE COURT:  Yeah.
14          MR. HARRINGTON:  But that's not the case here.
15   They're separate from each other.  There's actually no
16   communication or linkage.  The only linkage that's
17   mentioned is this witness, Mr. Wahbe, and I understand
18   that --
19          THE COURT:  In fairness, he mentioned more
20   than that.  He did mention more than that.  He used that
21   as an example, but there seems to be more.  I haven't
22   heard it yet.  I've only heard the description.
23          What were you going to say?
24          MR. HARRINGTON:  So what I would suggest is
25   there's no -- as far as Mr. Wahbe goes, Judge, the

1    prosecutor indicated that it would be, you know, crazy

2    not to limit his testimony relative to Robert Allen.

3             THE COURT:  I think he said nuts.

4             MR. HARRINGTON:  Yeah, but he actually

5    summarized what his testimony relative to Robert Allen

6    could and should be, which is that he worked at Robert

7    Allen, he knew the defendant from Robert Allen, and that

8    ultimately my client hired Mr. Wahbe not to work at

9    United Way but to work at DigitalNet.  That would be

10   really all the Court would need to know.  It doesn't

11   need to know the other stuff.

12            So I think there is an issue of spillover that

13   potentially happens because really what we're talking

14   about in my opinion is other conduct, other bad act

15   evidence, and an effort to kind of show that he acted in

16   conformity with that during the time with the United

17   Way.

18            And although there might not be a danger of I

19   guess under our 404(b) analysis with the Court because

20   it's a bench trial, there is relevant law in the circuit

21   relative to the issue of whether it's an appropriate use

22   of the Court's time to consider four witnesses, which I

23   would suggest is probably going to be a day of

24   testimony.

25            THE COURT:  I agree.  That's the Court's job,

1    though.   That's the Court's job.

2              MR. HARRINGTON:   Understood.   But as far as

3    deciding whether or not it is a good use of the Court's

4    time to consider that relative to what you have to

5    decide in the case, I would suggest it would be an

6    inappropriate exercise of that discretion because it's

7    not necessary for you to make any findings relative to

8    Robert Allen in your decision and rational thinking

9    relative to United Way and all of the conduct that is

10   alleged against it.   Every single count and every single

11   description of what my client is alleged to have done

12   relates only to United Way, not one single thing to

13   Robert Allen, Judge.

14             THE COURT:   Yeah, that's true vis-a-vis

15   statements made and money derived, I agree, but it's not

16   true as far as the prosecution's theory is what these

17   substantive offenses were relating to or pursuant to,

18   which is a single scheme.   It is what the indictment

19   alleges.   It is what the grand jury found.

20             I appreciate your point that pretrial is an

21   appropriate time to exercise its discretion and maybe

22   provide some efficiencies here that won't otherwise be

23   part of the trial if we hear from the four witnesses,

24   but, you know, I've tried to twist Mr. Davis's arm about

25   jettisoning this evidence.   He's not biting.   I don't

1    think he's obligated to bite.  Your point is taken.

2           Here's what I'm going to do with the motion.

3    Look --

4           MR. HARRINGTON:  And I will say just one final

5    thing, Judge.

6           THE COURT:  Go ahead.

7           MR. HARRINGTON:  I think that you put your

8    finger on what the appropriate time is to deal with this

9    issue is if there were to be convictions, then clearly

10   it would be a sentencing factor to determine loss.

11          THE COURT:  Thank you.  I appreciate the

12   candor there, too.

13          Here's how we're going to approach it.  All

14   right.  The motion in limine, what number is it?

15          THE CLERK:  46, Judge.

16          THE COURT:  46.  Thanks, Charli.

17          It's granted in part and denied in part.  The

18   Court is not going to preclude the evidence from being

19   introduced at trial.  The Court will hear the evidence.

20          At the end of trial, though -- at the end of

21   the trial, though, the Court is going to reexamine this

22   evidence and to the extent the Court finds that there

23   were two schemes here instead of one, the Court is going

24   to consider either, A, excluding the evidence -- by two

25   instead of one I mean a separate scheme for the United

1  Way and the Robert Allen Group, two separate schemes,

2  rather than what the prosecution suggests this is, which

3  is a single scheme with two victims.

4      If the Court rules that there were two schemes

5  here, it's going to consider excluding it and outright

6  not considering the Robert Allen Group evidence at all

7  in its determination of guilt or innocence in its

8  rendering of verdicts.

9      Secondly, it's going to examine the witness

10 under Rule 105, which is the admission of evidence for a

11 limited purpose, for example, under Rule 404(b), or just

12 as background, as you pointed out, Mr. Harrington, just

13 as sort of a table setting to give the Court context, or

14 to explain the conduct of other witnesses and parties

15 and players in the case and not as evidence of guilt.

16     But it may turn out that the Court agrees with

17 Mr. Davis, that it's just plain admissible to prove a

18 single scheme against two victims and in that case the

19 Court will consider the evidence, but the Court is

20 deferring that consideration until later in trial when

21 it's heard some of the evidence and can place it in

22 context.

23     That's not a dangerous or problematic approach

24 because of course it's a bench trial, not a jury trial.

25 The Court won't be prejudiced by the evidence, won't be

1    misled or distracted.

2         I'm not saying the Court is a perfect assessor

3    of evidence completely free of any capacity to misapply

4    evidence, but I think the Court is qualified to weed out

5    evidence that's not admissible for some reason and

6    prejudicial to the defendant and will do so.

7         So we won't have any prejudicial spillover

8    onto that element of the analysis.

9         In that vein, though, I want to let the

10   prosecution know this, the Court is going to order the

11   prosecution -- I'll put an order in writing so it's very

12   clear -- to present proposed findings of fact and

13   rulings of law on this issue, on the issue of variance

14   in proof from the indictment with respect to the issue

15   of whether this is two schemes or a single scheme

16   involving two victims, and you'll be able to present it

17   in whatever the best light is that you think is most

18   advantageous to your case.

19        The defendant -- you won't be obligated --

20   since you have no obligation to present any proof,

21   you'll have no obligation to present proposed findings

22   and rulings, but you'll be free to either respond or

23   present your own at any time.  Do you understand?

24        MR. HARRINGTON:  Yes, Judge.

25        THE COURT:  All right.  So that's the ruling.

```
1                One bit of -- oh, I'm sorry.

2                MR. DAVIS:  I'm sorry.

3                THE COURT:  No, I didn't mean to -- just for

4    your planning, Friday we're going to have to have a half

5    day.  We'll start -- to salvage more of the day we'll

6    start evidence at 8 o'clock on Friday.  We'll start

7    evidence at 8:00 a.m.  Unless somebody is unavailable

8    for a childcare issue or something, 8:00 a.m., and we're

9    going to go till I'd say 11:30.  All right?  I'm just

10   not available the second half of the day.  I've got an

11   obligation elsewhere that I have to show up for.

12               Is there anything else anybody else wants to

13   raise before we start the trial?  No?

14               MR. HARRINGTON:  Nothing from the defense,

15   Judge.

16               THE COURT:  All right.  Let me conduct a

17   colloquy with the defendant before we start.

18               Mr. Alrai -- you can sit.  I want you to be

19   comfortable and I want you to hear what I'm saying.

20               Your prior counsel, Mr. Anderson, filed a

21   paper with the Court where he waived your right to a

22   jury trial and said you would prefer to have a bench

23   trial, a trial where the Judge is the finder of fact

24   instead of a jury, or more importantly, instead of 12

25   jurors, all right?  And the same filing the prosecution
```

1    agreed to it and the Court approved that.  And so the

2    Court has approved your desire to conduct a bench trial,

3    but before you go through with that, I do want to make

4    sure you understand what it is you're giving up, all

5    right?

6              You have a right here to a jury trial.  Do you

7    understand that?

8              THE DEFENDANT:  I do.

9              THE COURT:  A trial before a jury of your

10   peers selected randomly from the community.  We select

11   them using -- randomly from voter and motor vehicle

12   records.  So generally people are licensed drivers and

13   registered voters who are in the jury venire.  We select

14   the jury from those people chosen randomly.  Do you

15   understand?

16             THE DEFENDANT:  I do.

17             THE COURT:  Now, in that process your lawyer

18   would be allowed to participate.  Every time a juror was

19   called he would be able to have that juror called up to

20   sidebar here and we would have a conversation first of

21   all to see if there was any reason to excuse that juror

22   for cause, in other words, if there was any legal reason

23   to excuse the juror.  One of those grounds would be --

24   there are several grounds.  One is the juror's

25   unavailability, one is the juror's lack of a capacity to

1   perceive evidence, see or hear the evidence, right, and

2   one is whether the juror could be fair and impartial in

3   this case.  And your lawyer would have questions about

4   that and the right to question both the jury panel as a

5   group and each juror individually to make sure -- to

6   satisfy himself and satisfy you that that juror did not

7   suffer from unlawful bias or prejudice.  Do you

8   understand?

9           THE DEFENDANT:  I do.

10          THE COURT:  All right.  At that point your

11  lawyer would be able to make motions for me to exclude

12  the juror from the trial if the Court made a finding

13  that the juror was not fair or impartial.  Do you

14  understand?

15          THE DEFENDANT:  I do.

16          THE COURT:  All right.  Now, you also have a

17  right for a jury, 12 people, to find that each element

18  of all of these offenses individually has been proven

19  beyond a reasonable doubt for any of these counts.  I

20  think there's 52 counts, right?  For each count the jury

21  would have to find beyond a reasonable doubt that each

22  element of the offense had been proven, again, beyond a

23  reasonable doubt.  Do you understand that?

24          THE DEFENDANT:  I do.

25          THE COURT:  That would have to be based on

1    competent admissible evidence, in other words, evidence

2    that I decided was competent and admissible, in other

3    words, permissible to be heard by the jury.  Do you

4    understand that?

5              THE DEFENDANT:  I do.

6              THE COURT:  You also have a right to a

7    unanimous jury.  That means that all 12 jurors would

8    have to agree with respect to each and every element of

9    each count of which you were convicted that it had been

10   proven beyond a reasonable doubt.  Do you understand

11   that?

12             THE DEFENDANT:  I do.

13             THE COURT:  All right.  Instead, what will

14   happen if you have a bench trial is rather than the

15   prosecution having to persuade 12 people of proof beyond

16   a reasonable doubt of each element of each offense

17   individually and separately, they only have to prove it

18   to one person, the Court, myself.  Do you understand

19   that?

20             THE DEFENDANT:  I do.

21             THE COURT:  All right.  I don't want you to

22   tell me about your conversations with your lawyers, what

23   you said to each other, but did you consult your lawyers

24   about this decision before you go through with it?

25             THE DEFENDANT:  I did.

1               THE COURT:  All right.  And have you

2       considered their advice to you in making this decision?

3               THE DEFENDANT:  Yes.

4               THE COURT:  All right.  And it's your desire

5       to proceed with a bench trial rather than a jury trial?

6               THE DEFENDANT:  That is correct, your Honor.

7               THE COURT:  All right.  Do you understand that

8       if you wanted to, I'd accommodate you by allowing you to

9       have a jury for some counts and a judge for other

10      counts, I would separate it out for you; do you

11      understand that?

12              THE DEFENDANT:  I did not know that.

13              THE COURT:  Knowing that now, is it still the

14      same decision?

15              THE DEFENDANT:  Yes.

16              THE COURT:  All right.

17              Mr. Harrington, let me ask you, your client is

18      waiving his right to a trial by jury and instead opting

19      for a bench trial.  Do you have any reason at all to

20      think that that waiver isn't knowing, voluntary and

21      intelligent?

22              MR. HARRINGTON:  No, your Honor.

23              THE COURT:  All right.  Thank you.

24              We'll proceed then.

25              Who's opening?

1          MR. DAVIS:  I am, your Honor.

2          THE COURT:  Please proceed.

3          And by the way, when you're speaking to the

4    Court during the trial, you're free to use that podium

5    but you can stand wherever you like.  Be comfortable.

6    There's no jury here so you should allow yourself a

7    little bit of flexibility in your presentation.

8          MR. DAVIS:  Thanks, Judge.  Good morning.

9          This is a fraud case, as the Court knows.

10   It's about the defendant, Imran Alrai, who was a trusted

11   IT officer, the chief computer person at two companies

12   in Massachusetts.  One was Robert Allen Group, a

13   for-profit company, and the other was United Way, a

14   charity in Boston.

15         It's also about an obscure IT services company

16   called DigitalNet, DigitalNet Technology Solutions,

17   which generated $7 million in revenues in a six-year

18   period even though its only customers were the

19   defendant's two employers and even though no one it

20   seemed really knew who or what or where DigitalNet was,

21   and it's about the defendant's deception, greed and

22   betrayals.  Deception because for six years the

23   defendant went to extraordinary lengths to pretend that

24   DigitalNet was someone other than him, so much that he

25   even composed e-mails to himself from a fictional person

36

1  named Mohammad.

2          Greed, because by ensuring that his employers

3  directed more and more of their resources to DigitalNet,

4  the defendant quietly made himself a multi-millionaire

5  in a few years.

6          Betrayals, because the defendant sabotaged his

7  employers' efforts where they were at their most

8  vulnerable, knowledge of IT, even though both employers

9  were paying him and relying upon him to be the one

10  person who would always look out for their best

11  interests about IT matters.

12          The indictment contains 53 counts.  The first

13  18 charge wire fraud; namely, that the defendant planned

14  and executed a scheme to defraud his employers and made

15  repeated false statements in furtherance of the scheme

16  and sent lots of interstate wires, e-mails, from his

17  home office in New Hampshire to his own e-mail account

18  at United Way.

19          Counts 19 to 30 charge money laundering, and

20  Counts 31 to 42 charge transportation of stolen money,

21  and both sets of counts, those counts relate to the

22  defendant sending international wires of proceeds from

23  the fraud scheme, 1.2 million in all, from DigitalNet's

24  bank account using its Salem, New Hampshire, branch

25  office to a bank account in Pakistan.

1          Counts 43 to 50 also charge money laundering

2     but the theory is different.  They relate to various

3     financial transactions where the defendant spent the

4     fraud proceeds to benefit himself and his family, such

5     as the day in June of 2018, soon after the search

6     warrants in this case, when he withdrew a half million

7     dollars from one of his bank accounts and put the money

8     in separate investment accounts at other banks.

9          Count 51 charges aggravated ID theft.  It

10    relates to the same e-mails that are charged in Count

11    18.  So Count 18 and Count 51 are parallel.

12          THE COURT:  Correspond.

13          MR. DAVIS:  Yes.  And to the defendant's

14    signing of those e-mails with his father's name, Mac

15    Chaudhary, without lawful authority.

16          Finally, Counts 52 and 53 charge FBAR crimes;

17    that for multiple years on his tax returns the defendant

18    willfully failed to report to the IRS that he held bank

19    accounts in Pakistan.

20          The government expects the evidence to show

21    the following:

22          The defendant was an IT professional who lived

23    with his family in Windham, New Hampshire.  The

24    defendant's father, Munawar Chaudhary, often called Mac,

25    is a retired doctor from Pakistan without any experience

1   in IT.  Mr. Chaudhary and his spouse also live with the
2   defendant in Windham.
3        DigitalNet was formed in August of 2012.  The
4   defendant owned and controlled DigitalNet and all of its
5   money from the start, but according to its formation
6   papers Mr. Chaudhary and not the defendant started
7   DigitalNet.
8        DigitalNet had its principal address as a
9   virtual office space at 300 Brookstone Place in Andover.
10  It banked at Pentucket Bank with branches in
11  Massachusetts and New Hampshire.  So that was one
12  company, DigitalNet.
13       He also formed a second company called AISA,
14  A-I-S-A, Consulting Group.  That was founded in February
15  2012, so both companies founded in 2012, which was the
16  same year he came to United Way.
17       It was also located in Windham, New Hampshire.
18  It also had office space that wasn't used in New
19  Hampshire.  It had no employees and it, too, maintained
20  multiple bank accounts at Pentucket.
21       The defendant began full-time employment with
22  Robert Allen Group in Foxboro, Mass., in 2006.  From
23  June of '07 through September of '13 the defendant
24  served as the chief information officer of Robert Allen
25  and he controlled its IT department.  He had remote

1  access to Robert Allen's IT systems and he frequently

2  performed his work for Robert Allen remotely.

3          The second company, the second employer,

4  United Way of Massachusetts --

5          THE COURT:  Hold on a second.

6          MR. DAVIS:  Sure.

7          THE COURT:  Frequently performed remotely.

8  Okay.

9          MR. DAVIS:  United Way of Massachusetts, it's

10  actually called United Way of Massachusetts Bay and

11  Merrimack Valley, that's its formal title.  It's a

12  charity headquartered in Boston.  It has branch offices.

13  It has now four different branch offices in

14  Massachusetts and New Hampshire.

15          From March of '12 through June of '18 the

16  defendant worked full-time for United Way first as a

17  senior director of information technology and later as

18  vice president for IT.  The defendant won his new job at

19  United Way by using false personal references and a

20  falsified resume.  Eventually he made an annual salary

21  at United Way of $175,000.

22          Throughout his employment at United Way he

23  operated under a code of ethics and he signed every year

24  a conflict of interest disclosure form.  That form never

25  disclosed any connection to DigitalNet.

1          Remarkably in March of '12, when the

2   employment with United Way began, the defendant was

3   still employed as Robert Allen's chief information

4   officer and he kept his dual employment secret from both

5   employers after that.  Thus, for the last 18 months that

6   he worked at Robert Allen the defendant held a full-time

7   position at both Robert Allen and United Way and had

8   control over both companies' IT.

9          The defendant finally separated from Robert

10  Allen in September of 2013.  The date was September

11  20th.

12          So what is the scheme?  The scheme is that

13  from 2012 through July of 2018 the defendant obtained

14  approximately $7 million in payments for IT services

15  supposedly provided to Robert Allen and United Way by

16  this company called DigitalNet through misrepresenting

17  material facts about DigitalNet and fraudulently

18  representing and concealing that DigitalNet was actually

19  operated and controlled by the defendant.

20          The execution began in the summer of 2012.

21  After coming on board at United Way, the defendant

22  arranged for DigitalNet to conduct what was called an IT

23  health assessment at United Way.  As arranged all by the

24  defendant, United Way paid DigitalNet approximately

25  $50,000 for the health assessment, never knowing that

1   the supposed outside vendor coming in was its own

2   officer.

3          The defendant followed up later in 2012 when

4   United Way issued an RFP, a request for proposals, for

5   IT services at United Way, and that resulted in a

6   selection process that the defendant was in charge of as

7   the IT chief and that he rigged so DigitalNet would

8   prevail.

9          Unknown to United Way, the defendant waited to

10  receive RFPs from other legitimate companies and then he

11  revised and he backdated DigitalNet's RFP response on

12  his own home computer, as the evidence will show, and

13  then as United Way's IT expert he scored the RFP

14  responses and advised the decision makers at United Way

15  about the best choice of vendor.  Unsurprisingly,

16  according to Mr. Alrai, DigitalNet outscored the other

17  vendors in every category and its bid came in at 50,000

18  less than the other final vendors.

19         During the RFP process the defendant always

20  concealed his relationship and his control over

21  DigitalNet.  In February 2013 he was actually asked some

22  questions and in responding to the questions he

23  identified his own family members, including his father,

24  Mr. Chaudhary, as the principals of DigitalNet and he

25  falsified references for DigitalNet.  Even though

1  DigitalNet had no other customers besides United Way at

2  that time, according to information the defendant

3  provided DigitalNet had 23 associates in the United

4  States and the defendant told United Way that the

5  contract with United Way would represent just nine

6  percent of the annual revenues of DigitalNet when in

7  fact it was a hundred.

8          In early 2013 the defendant arranged a meeting

9  at United Way between his supervisor and an unknown man

10  who claimed to be Mac Chaudhary.  During that meeting

11  the individual came in, sat in the office with Pat

12  Latimore, and he falsely described work that DigitalNet

13  had previously completed for other customers over the

14  prior two to three years.  In fact, again, as of early

15  2013 there were no other customers.

16          In February 2013 United Way awarded DigitalNet

17  a contract for IT services for a term of three years,

18  and Mr. Alrai was off to the races.

19          Mr. Chaudhary signed the initial contract as

20  the vice president for business development.  This is

21  the retired doctor at home in Windham.

22          Once the initial contract was awarded, the

23  defendant became and remained United Way's primary point

24  of contact for all matters relating to DigitalNet.  This

25  was a key part of the scheme.  You could only talk to

1   DigitalNet through Imran Alrai.

2          Throughout the contractual period the

3   defendant never disclosed that Mac Chaudhary, the

4   officer who signed the documents, was his live-in

5   father, nor did he ever disclose his relationship to and

6   his control over DigitalNet.

7          So in the summer of 2013, while the defendant

8   was still employed at both companies and while

9   DigitalNet was already receiving payments from United

10  Way, Mr. Alrai introduced DigitalNet as a potential

11  outside vendor at his other employer, Robert Allen

12  Group, while again concealing that he owned and

13  controlled it.

14          In August of '13, after some preliminary work,

15  the defendant arranged for Robert Allen Group to sign

16  four different lucrative contracts with DigitalNet,

17  including one for a complete website redesign.  Mr.

18  Chaudhary, the father, again signed each of these

19  contracts as DigitalNet's vice president and so the

20  contracts were signed, the money stream was in place,

21  and a short time later on September 20th the defendant

22  separated from Robert Allen.

23          Throughout DigitalNet's brief contractual

24  relationship with Robert Allen the defendant actively

25  concealed from Robert Allen that he managed and

44

1    controlled the company, but the defendant's successor as

2    CIO who came into Robert Allen and some other Robert

3    Allen employees began asking more questions about

4    DigitalNet, who its staff was, and what its actual

5    capabilities were to perform on those four contracts.

6           The defendant frequently used his father's

7    name and the name Mohammad in correspondence with Robert

8    Allen just as he also did in corresponding with United

9    Way.  He refused and evaded repeated requests to come to

10   meet DigitalNet at its supposed office in Andover that

11   Robert Allen was making, and so on-site meetings were

12   never possible.

13          He also refused Robert Allen's request that

14   DigitalNet identify its full-time personnel devoted to

15   the website project.

16          The defendant also concealed that DigitalNet

17   did not have the confidence or the staffing to complete

18   the website project, and despite being paid $200,000

19   under the website contract very quickly and more than

20   400,000 in total over about five months, DigitalNet

21   produced nothing useful for the website.

22          In February of 2014 Robert Allen stopped all

23   payments to DigitalNet and demanded repayment of the

24   amount on the website contract.  Still without

25   identifying himself, the defendant refused to return the

1    money that Robert Allen had sunk into the website.  When

2    Robert Allen wanted access to the single web page that

3    DigitalNet had developed under the contract, DigitalNet

4    blocked that and wouldn't allow it.  They paid $200,000,

5    but they were not allowed to access that web page and

6    instead the defendant demanded an additional payment of

7    $30,000 to release that web page.

8              Because of DigitalNet's failure to deliver

9    anything of value, Robert Allen Group had to restart the

10   whole website redesign from scratch.

11             Robert Allen also asked that DigitalNet

12   immediately port all of its telephone services to a

13   designated carrier, but DigitalNet refused and

14   threatened to disconnect Robert Allen's phone services.

15   This is for a national business.

16             On April 30th of 2014, DigitalNet contacted

17   its telephone vendor and canceled Robert Allen's phone

18   service.  However, Robert Allen already had a new

19   platform for telephones and had gotten new telephone

20   numbers from another vendor, so the defendant did not

21   succeed in disrupting the phone service.

22             THE COURT:  Did you already tell me how big a

23   company Robert Allen Group was?

24             MR. DAVIS:  Robert Allen Group is publicly

25   traded.  If I could just consult Ms. Le.

```
1              THE COURT:  Actually, it's publicly traded?

2              MR. DAVIS:  It is publicly traded.  I know

3    that.  It's gone into bankruptcy, your Honor.

4              MS. LE:  I think it's now being -- there's a

5    holding company that purchased the company, but that was

6    more recently, your Honor, and it has seven showrooms

7    across the country.  It sells to the trade.  It's not a

8    place where you and I can go in and purchase goods.

9              THE COURT:  I see.

10             MR. DAVIS:  It's a fabric business, I think

11   high-end fabrics, your Honor.

12             THE COURT:  And principal place of business or

13   corporate office?

14             MS. LE:  Foxboro, Massachusetts, and New York

15   City, your Honor.

16             THE COURT:  Sorry to interrupt.  Go ahead.

17             MR. DAVIS:  Sure.  Meanwhile, at United Way

18   after the signing of the first contract between

19   DigitalNet and United Way, the defendant started

20   steering more IT services contracts to DigitalNet

21   resulting in increased payments and an increased revenue

22   stream.  Within a short time DigitalNet became the

23   second highest paid outside vendor at United Way Boston

24   receiving about $1.1 million annually.

25             As operated by the defendant, DigitalNet did
```

47

1    employ two help desk employees who worked on-site at

2    United Way.  They also employed a network consultant,

3    Kal Wahbe, who lived in Syria but was available by

4    telephone at certain hours to United Way employees.

5    DigitalNet had no other personnel at United Way.

6         And so it's clear, your Honor, the government

7    is not contending that the help desk employees or that

8    Kal Wahbe did not provide valuable service to United

9    Way.  They are all going to be witnesses in the case,

10   both Nadeem Yousuf on the help desk and Kal Wahbe, and

11   they provided real IT value.

12        But the point is that that was DigitalNet.

13   DigitalNet was the help desk, Kal Wahbe on the phone in

14   Syria, and Imran Alrai always hiding what he was doing.

15   That was DigitalNet.

16        THE COURT:  At United Way.

17        MR. DAVIS:  At United Way.  Although he was

18   paid as a full-time IT director of United Way, the

19   defendant routinely came to the United Way office only

20   two days a week, on Tuesdays and Thursdays.  The rest of

21   the time he worked virtually out of his home office in

22   Windham.

23        Throughout the period of contracts the

24   defendant always insisted that United Way

25   representatives have no contact with DigitalNet except

1    through him.  He was the sole handler of the vendor.

2            To conceal his control and mislead United Way

3    regarding whether other persons operated the business,

4    the defendant continued to pretend that other people

5    were calling the shots for the company and continued to

6    use his alias Mohammad in correspondence to and from

7    United Way on a DigitalNet e-mail account.

8            And so the Court will hear and see multiple

9    e-mails in this case that show a question that goes out

10   from an officer at United Way asking Imran, their

11   trusted IT chief, a question about DigitalNet.  Mr.

12   Alrai will write an e-mail to an e-mail address that

13   says info@digitalnet.com, it's the support that's sort

14   of a catchall e-mail address at DigitalNet, and he'll

15   write an e-mail and it will say, Mohammad, can you check

16   on this, please advise.  I've got this question.  I'm

17   paraphrasing here.

18           And the next e-mail in the chain is an e-mail

19   from info@digitalnet back to Mr. Alrai at United Way and

20   it's got some information in it and it's signed by

21   Mohammad.  And the point is that Mr. Alrai wrote all

22   those e-mails, and what he's doing is making a record

23   for United Way that somehow there's someone else.  He

24   did that all the time.

25           The scheme's headquarters was at the

1  defendant's home office in Windham where he created on

2  his computer and e-mailed monthly invoices from

3  DigitalNet to United Way.  For each invoice the

4  defendant represented to United Way that the invoices

5  came from or were sent to his United Way e-mail account

6  by Mohammad.  Each invoice was unsigned, it bore the

7  logo and the address at DigitalNet, and in general the

8  invoices were generic and nonspecific.  They provided

9  little or no detailed information about DigitalNet's

10  actual services.

11          After submitting the invoices supposedly from

12  Mohammad, the defendant would then oversee and monitor

13  the payment process at United Way.  He insisted that

14  DigitalNet be paid in advance.  They were always first

15  in the pecking order.  And unlike other vendors that

16  United Way had, he used his authority at United Way to

17  ask questions and to pry underlings to make sure that

18  DigitalNet was paid quickly.  Based on the monthly

19  invoices, United Way directed ACH payments that were

20  sent from its Citizens Bank account to DigitalNet's

21  account at Pentucket Bank.

22          One of the things that's simple in this case,

23  your Honor --

24          THE COURT:  Excuse me.  We lost Internet,

25  right?  We lost it?

1           THE CLERK:  Not that I'm aware of, Judge.

2           THE COURT:  Hang on a second.  Yeah, I lost

3    it.  I've got no signal.

4           There was something Mr. Davis just said and I

5    thought I misheard him, so I want to go back and -- I

6    had it a few minutes ago and now it's just -- now I have

7    to try to remember what I was looking for.  Yeah, so I

8    lost you there on something.

9           This idea that Mr. Alrai had control over the

10   payment order of invoices, is this just IT invoices or

11   all of the invoices?

12          MR. DAVIS:  DigitalNet invoices only.

13          THE COURT:  Okay.

14          MR. DAVIS:  So DigitalNet's a vendor, it's one

15   of the vendors sending invoices to United Way.  Mr.

16   Alrai took a particular interest in making sure that the

17   invoices from DigitalNet got paid and got paid quickly.

18   That's what the evidence will show.

19          THE COURT:  I guess I'll just wait to hear the

20   evidence on that.  I know what you mean, but --

21          MR. DAVIS:  One part of this case is simple,

22   your Honor, and that is the payment stream.  All of the

23   United Way payments went to the same bank account.  It's

24   one bank account.  It's a DigitalNet account.  It's in

25   Pentucket Bank.  And in one list of bank statements you

1    can see all the payments over six years going in.

2              The total payments between September 2012 and

3    May of 2018 were approximately $6.7 million going into

4    that account.

5              The defendant also exercised complete control

6    over the spending of the funds once DigitalNet got them

7    in its bank account, including by paying more than

8    900,000 to AISA accounts and establishing and funding

9    various other bank accounts for himself and his family

10   members.

11             THE COURT:  Well, it may be a dumb question

12   based on what I've heard, but there's nobody else at

13   DigitalNet, like, to even have any influence on those

14   decisions.  He's DigitalNet.

15             MR. DAVIS:  He is DigitalNet, correct.

16             THE COURT:  Is there anybody there who could

17   have influenced the disbursement decisions in any way,

18   shape or form?

19             MR. DAVIS:  Unless you believe that the

20   father, the retired doctor, Mac Chaudhary, is calling

21   the shots, no, there's no one else the evidence will

22   show.

23             In addition, the defendant wired proceeds from

24   the scheme to Pakistan.  The Court has heard about that.

25   Shortly after DigitalNet first got the United Way

1   contract the defendant opened a bank account in Lahore,

2   Pakistan, in the name of DigitalNet.  The defendant

3   regularly wired funds from the DigitalNet account at

4   Pentucket Bank where the defendant's spouse was the

5   branch manager to his bank account in Pakistan.

6           Between November 2013 and May of 2018 the

7   defendant made 57 international wire transmissions

8   totaling $1.2 million to Pakistan.  And despite sending

9   large sums to that account, on his tax returns filed for

10  tax years 2014 and '16 when he's asked the question

11  asking whether he had financial accounts located in a

12  foreign country, he said no, and therefore no FBAR was

13  filed and no notice was given to the IRS of the

14  existence of these accounts.

15          In July 2016 the United Way attempted to

16  exercise due diligence regarding DigitalNet at the

17  three-year mark of the contract, and at that time the

18  defendant created on his home computer a false

19  description of DigitalNet's business that included a

20  fake customer list.  The defendant e-mailed the customer

21  list to United Way and signed the e-mail with his

22  father's name, Mac Chaudhary.

23          That fraud scheme ran for six years and the

24  defendant profited enormously.  The total amount United

25  Way paid, as I said, was 6.7 million, and the defendant

1    simply pocketed more than half of that amount.

2            The defendant used the proceeds of the scheme

3    to pay off his house in Windham, to pay for plastic

4    surgery, to fatten bank and investment accounts for

5    himself and his family, and to wire money to Pakistan.

6            In total based on bank records from the

7    defendant's personal and business accounts, the expert

8    forensic accountant will testify that the defendant kept

9    about 3.7 million of the fraud proceeds for personal

10   expenditures or to increase personal assets.  3.7

11   million of the 6.7 total.

12           How did the scheme work?  In a word, big

13   markups.  The defendant signed contracts between

14   DigitalNet and legitimate services companies for the

15   benefit of United Way while concealing those contracts

16   from his employer, and then he paid those vendors at

17   their lower rates and then he invoiced United Way for

18   the same IT services at huge markups.  That's a lot of

19   what went on here, your Honor.

20           THE COURT:  Your allegation, so providing the

21   services through a vendor and then billing the

22   employer/client for the same services.

23           MR. DAVIS:  Correct.  And in many cases and

24   for a lot of its revenue DigitalNet is simply a

25   pass-through.  When it's hiring IT services people, it's

1   not a pass-through.  It actually has employees doing

2   something.  But for big chunks of the money that United

3   Way paid, DigitalNet is simply a middleman that's gone

4   out and identified a real provider and made a contract

5   with them.

6           And for an example, the defendant and

7   DigitalNet paid CloudConnect about $300,000 for a range

8   of basic IT services at United Way in a three-year

9   period but billed United Way 1.2 million for the same

10  services.  300,000 goes to 1.2 million; the defendant

11  pockets the difference.

12          And regarding United Way's telephone service,

13  for more than three years the defendant and DigitalNet

14  paid a company called SIP.US a total of less than

15  $25,000 for recurring monthly phone service.  It was

16  about a thousand a month for the entire company, but he

17  billed United Way more than 560,000 for the same thing.

18  So a thousand-dollar monthly bill goes to a $15,000

19  monthly line on the invoice.

20          There was also double billing in some cases

21  where United Way paid a vendor and also paid DigitalNet

22  for the same service, and there was billing for IT

23  services that weren't actually provided.  A forensic

24  accountant calculated that United Way's losses

25  attributable to this excessive billing and this double

1   billing and these services not provided was at least 3.1

2   million.

3          The scheme eventually and finally was

4   detected.  In late 2017 federal investigators began to

5   gather evidence related to unusual wire transfers from

6   New Hampshire to Pakistan.

7          In April of 2018 while returning to the United

8   States following a trip to Pakistan, the defendant

9   continued to conceal his control of DigitalNet when he

10  was interviewed in secondary by U.S. Customs and Border

11  Protection, and he told her in response to close

12  questioning that he did not own DigitalNet and had no

13  connection with it.

14         Separately, in the spring of 2018 a

15  whistleblower came forward at United Way who had

16  documented the defendant's apparent connection to

17  DigitalNet through the company AISA.  United Way began

18  an internal investigation into its employee's

19  misconduct.  By then the defendant controlled all the

20  documents and information about United Way's IT and he

21  concealed and held many of the documents and information

22  off-site.

23         On June 12, 2018, your Honor, that's the

24  pivotal day here, the defendant was confronted and

25  interviewed at United Way.  He continued to maintain

1    that DigitalNet had other customers, that the RFP

2    process was legitimate, that the Mac Chaudhary

3    associated with DigitalNet was not his father, and

4    ultimately he was summarily walked out of the United Way

5    and he never worked there again.

6            Also on June 12, 2018, the federal agents

7    executed a search warrant on the defendant's home office

8    and his big computer in Windham.  There they discovered

9    copies of many of the documents used in this fraud,

10   including DigitalNet invoices and wire transfer forms.

11           That's a summary of the evidence, your Honor.

12   Again, it's a story of deception and greed and

13   betrayals.  The evidence will prove beyond any

14   reasonable doubt that the defendant operated a six-year

15   scheme to defraud his employers and sent e-mails in

16   furtherance of the scheme, that he violated the money

17   laundering and theft statutes when he wired 1.2 million

18   to Pakistan and spent other proceeds to benefit himself

19   and his family, that he willfully failed to file reports

20   about his foreign bank accounts, and lastly, that he

21   used his father's name in a fraudulent e-mail without

22   lawful authority.

23           At the close of the evidence the government

24   will return to ask you to return a verdict of guilty on

25   all counts.

1         Thank you.

2         THE COURT:  Before you sit down, let me ask

3  you something here.

4         MR. DAVIS:  Sure.

5         THE COURT:  You told me earlier how Count 18

6  corresponded with a different count.

7         MR. DAVIS:  Count 51.

8         THE COURT:  Count 51, I believe.

9         MR. DAVIS:  Yes.

10         THE COURT:  I understand how they correspond

11  to each other, but can you tell me what -- I should

12  probably be able to tell from reading it, but how is

13  Count 18 distinguished from 1 through 17?  It's

14  obviously different because you didn't include it in the

15  list.  There's something different about Count 18.

16         MR. DAVIS:  Oh, I see.  All of Counts 1

17  through 17 are signed Mohammad.  Count 18 is signed Mac.

18         THE COURT:  Representations about DigitalNet.

19         MR. DAVIS:  It's the same idea in that it's an

20  e-mail that purports to be from a different person to

21  Imran Alrai that he wrote himself and that he's sending

22  simply to make a record to distance himself from

23  DigitalNet, but the first 17 are all Mohammad.  The 18th

24  is Mac.

25         THE COURT:  All right.

1          Mr. Harrington, as you know, you have no

2    obligation to prove anything or present any evidence,

3    but you may open if you would like.

4          MR. HARRINGTON:  Thanks, Judge.

5          THE COURT:  Let me ask you a question before

6    you start.

7          MR. HARRINGTON:  Yes, Judge.

8          THE COURT:  I frequently conduct bench

9    hearings like this, especially in preliminary

10   injunctions, I just finished one last week, and

11   sometimes I interrupt lawyers and ask them, hey, what

12   are you trying to establish with this line of

13   questioning or what's your position on this or that.  So

14   I may do this sometimes during the trial.

15          I want to say this.  You never have to answer

16   those questions.  I know you know that, but I'm just

17   saying it for the record.  You never have to have a

18   position on anything.  It won't be held against you or

19   your client.  You never have to say a word.  And so

20   please understand that.  I won't take offense or draw

21   any negative inferences whatsoever, but with your

22   permission I may interrupt you once in a while and ask

23   you a question.  Is that okay with you?

24          MR. HARRINGTON:  It is, Judge, and that gives

25   me a safe haven when I'm completely ignorant.

1           THE COURT:  You're just asserting your

2     client's right.  Okay.  Please proceed.

3           MR. HARRINGTON:   Thank you, Judge.

4           Your Honor, part of what the government didn't

5     indicate to you is that this so-called scheme or

6     artifice they want to portray to you as being created on

7     or around the time that he worked at Robert Allen and

8     United Way, but the testimony I think will show you that

9     DigitalNet actually existed before that time.  And part

10    of that, and part of what the government didn't tell you

11    is relative to DigitalNet in Pakistan, which is in fact

12    part of the company, and DigitalNet Pakistan was fully

13    staffed and operational and according to Mr. Chaudhary,

14    my client's father, in interviews with the government

15    were told that there would be anywhere from 20 and 30

16    employees there that would be doing things such as

17    programming, development, things that an IT company

18    does.

19           And so there really is substance behind this.

20    This is not a fictitious company that my client is just

21    some puppet pulling strings and smoke and mirrors.  This

22    is a real company.  Because think of it for a moment.

23    How could for six years no services be provided to

24    United Way?

25           THE COURT:  Well, I think the six-year

1   question was something I asked somebody in this case.

2   It was provided to Robert Allen for six years.

3           MR. HARRINGTON:  It was not, Judge.  It was a

4   very brief window with Robert Allen which I'll address

5   momentarily.

6           THE COURT:  I misunderstood then.

7           MR. HARRINGTON:  It was really United Way

8   which is I think the government's contention was six

9   years ultimately, but I'll get to that momentarily,

10  Judge.

11          The fact of the matter is, Judge, that the

12  contracts between DigitalNet and United Way were going

13  through a process that I'm going to talk about

14  momentarily as well, but what I'm going to drive at

15  through the course of this case is that United Way

16  received the full economic benefit of its bargain with

17  DigitalNet and that all services contracted for were

18  delivered, and you will see throughout the reviews my

19  client had at United Way are all superlative.  He was

20  given raises, promotions, different titles, bonuses,

21  because he was excellent at his job and he did what

22  United Way needed and wanted and in fact needed and

23  wanted before he even worked there.

24          So, for example, you will hear that United Way

25  was an IT mess before my client was hired and he was

1    hired specifically to come in and fix it, and you will

2    hear that he actually fixed it.  Part of that process

3    was DigitalNet.  And the government may say that there

4    were misrepresentations or omissions, but

5    misrepresentations or omissions don't constitute a

6    fraud.

7              For example, the Robert Allen Group.  Now, the

8    government mentioned four contracts that were entered

9    into with Robert Allen Group, one of which they said was

10   for a web development page or website development, but

11   in actuality the contract is for staff augmentation, not

12   web development, and it's very different.

13             And you didn't hear any comments or any

14   argument that the other three contracts weren't

15   satisfied, but this one contract wasn't satisfied.

16             The problem was Robert Allen didn't do what it

17   was supposed to do, which is DigitalNet provided the

18   staff and the staff augmentation.  Robert Allen was

19   required to use that staff to develop the websites, and

20   Robert Allen didn't provide necessary information, there

21   are e-mails documenting it, and ultimately Robert Allen

22   was disenchanted with DigitalNet, DigitalNet likewise

23   was not happy with the lack of information from Robert

24   Allen, and ultimately a new person came in, I think it

25   was Mr. Cioffi, ultimately wanted to cancel the

1   contracts.

2          DigitalNet stood by what its services were.

3   The information regarding the telephone contracts, the

4   government had suggested that DigitalNet was just going

5   to stop the phones or turn the phones off.  DigitalNet

6   actually sent warning notices to Robert Allen saying you

7   need to pay the invoice for these services relative to

8   the phone services that DigitalNet is providing or

9   they're going to be shut off.

10         So it gave warning.  They didn't just go and

11   turn out the lights.  They gave warning.  And that

12   actually allowed Robert Allen to go and do what I guess

13   it wanted to do, which was get other services from

14   somebody else that they wanted, which they did, and

15   they, as the government concedes, suffered no

16   interruption.

17         The fact that they didn't get the website that

18   they wanted was because they didn't create it or use the

19   staff that was provided.  You'll know, and I believe the

20   testimony will show, Robert Allen never sued DigitalNet.

21   Robert Allen never made a complaint to any law

22   enforcement agency or police department claiming that

23   there was something wrong because it was a business

24   decision.  It was a business contract that went awry and

25   it happens in business.  It was not due to some fraud.

1          Relative to United Way, Judge, the government

2    had mentioned a health assessment and that my client

3    steered this IT health assessment at the very beginning

4    of the process when he joined the United Way.  And in

5    fact, the contrary is actually the case.

6          The United Way had wanted to do an actual

7    health assessment, an IT health assessment before they

8    even hired my client.  To claim it was my client's idea

9    is actually factually and will be demonstratively shown

10   to not be the case.

11         When my client started working at United Way

12   he indicated as part of it they should do an IT health

13   assessment, but that existed before he even came there.

14   That IT health assessment was done and it confirmed what

15   the United Way already knew, which was that their IT

16   processes were a mess, and they had vendors all over the

17   place and they wanted to take that and shrink it down

18   and potentially have a single IT vendor dealing with all

19   their IT needs.  And as a result of that, there was an

20   RFP process that was put in place.

21         And the government indicates to you that it

22   was my client, my client was the RFP process, he's the

23   one that steered the whole thing.  Well, in fact there

24   was actually an IT RFP committee comprised of Pat

25   Latimore, who at the time I believe was the chief

1   operating officer, or actually CFO I think at the time,

2   and she'll be testifying; Stan Burrows, who was an

3   independent person from United Way but an IT expert;

4   Diane Dragoff, who was a United Way employee; Domenic

5   Pallaria or Azim Mazagonwalla, who were United Way

6   employees in finance, I believe; and my client.

7          And so there was an RFP process.  That RFP

8   process gets sent out independently to different

9   organizations for review.  Companies, for example, that

10  had IT professionals like at Liberty Mutual who reviewed

11  the RFP proposal and gave comments on what you should do

12  and how you could improve it, some of which was adopted

13  and ultimately approved by the CFO, Pat Latimore.  My

14  client engaged in the process, created documents, and

15  then provided it.  This was not a unilateral thing that

16  my client had control over by any stretch.  And

17  ultimately all of these things were approved by people

18  who were my client's supervisors, in particular, Pat

19  Latimore and Nancy Powers.

20         Now, one of the things I wanted to mention as

21  well, Judge, is the payment process that was mentioned

22  by the government, and I think that it's important to

23  understand the payment process because, and you'll see

24  from the testimony, the payment process would be that

25  bills would come in say from DigitalNet or some other

1    vendor, and this applied to DigitalNet and all vendors.

2    They would be prepared by a person at DigitalNet named

3    Elaine Singer to pay the invoice.  They would be signed,

4    for example, by my client for his department, Mr. Alrai.

5    They would then be reviewed and signed by the CFO,

6    Patricia Latimore, and then ultimately signed off by

7    someone in finance and then paid.

8            So to try to characterize this as my client

9    being the chief cook and bottle washer and, you know,

10   doing all this stuff with the money is not accurate.

11   There was a process in place and the best practices that

12   were followed.

13           And I want to make sure that the Court

14   understands that my client wasn't writing checks for

15   United Way.  It just was not happening.

16           The RFP process, if I can jump back to it,

17   Judge, was something where the RFP got put out to I want

18   to say it was -- well over a dozen different companies

19   were asked to participate in the process, and ultimately

20   United Way got back I want to say it was three or four

21   responses, one of which was DigitalNet.  Those were

22   scored by a committee.  Again, the government tries to

23   say that it was my client who was doing it, but there's

24   actually a committee and several individuals

25   independently scoring these RFP responses, and it is

1  ultimately determined that there are basically three

2  good candidates, one of which includes DigitalNet.

3  DigitalNet ends up being slightly better for various

4  reasons, including cost, which it was the lowest bid by

5  I think some $50,000, so it was less expensive than the

6  other bids.

7          It gets the contract.  This is not something

8  that my client was able to just decide.  This was part

9  of a committee decision.  He did not have control over

10 it.  Could he recommend?  Could he suggest?  Certainly.

11         THE COURT:  Committee comprised of?

12         MR. HARRINGTON:  Multiple individuals at the

13 United Way, Judge.

14         THE COURT:  United Way employees?

15         MR. HARRINGTON:  Correct, Judge.  The other

16 one I mentioned was like an IT steering committee for

17 the RFP process, but internally the United Way had its

18 own committee to score those.  And I think it might have

19 actually included one of the individuals outside the

20 company, Stan Burrows, who is an IT expert.  But the

21 point is it was independently scored and reviewed and it

22 was decided, and there was e-mail documentation talking

23 about it, that DigitalNet appeared to be the best one

24 for the contract.

25         The representations that my client would not

1    let anybody talk to anybody at DigitalNet, that he kind

2    of was going to protect it, Patricia Latimore will

3    actually tell you that that's not the case, he was not

4    protective.  And this is the now -- she was CFO, she's

5    now the COO as I understand it, and my understanding is

6    she will tell you he was not protective of DigitalNet.

7            And in addition, for example, you had Mr.

8    Yousuf who will be testifying.  Nadeem Yousuf was there

9    on-site embedded at the United Way in Boston.  Jasmine

10   Iqbal, again, help desk, embedded in Boston.  Kal Wahbe,

11   who was kind of a senior more technical person who was

12   available by phone and who they called.  And

13   additionally there were other individuals within the

14   United Way, I believe including Elaine Singer and Susan

15   Piscatelli, who communicated with actually staff in

16   Pakistan relative to development projects.  So to try to

17   characterize it as my client being the only one they

18   could talk to is not accurate.

19           Judge, I want to talk to you briefly about the

20   FBAR charges.  In regard to that, my client was unaware

21   of the FBAR obligation.  He had a tax professional, Mr.

22   Terry, who likely you're going to hear from at some

23   point during the course of the trial.  And in regard to

24   that, once Mr. Alrai found out about the FBAR

25   requirement he contacted his accountant, asked what

1    needed to be done to remedy the situation, they filed

2    the appropriate paperwork, and it was accepted by the

3    IRS without penalty and there was no money or any taxes

4    owed, zero, and he did that and backdated it for all

5    years.  I want to say it was for '13 through '18, if I

6    recall correctly.  And Mr. Terry will indicate in his

7    testimony I believe that all of those were taken care of

8    and there were no taxes owed.  It was a simple

9    notification process relative to having an overseas

10   account.

11           Going back, Judge, to kind of the nut of the

12   government's case relative to fraud, it really

13   highlights three areas for you to consider, and I hope

14   that you'll focus on these as well.  They basically said

15   that DigitalNet acted as a pass-through.  They talked

16   about double billing and billing for services that were

17   not provided.

18           I would suggest when the government starts

19   presenting its evidence on that, you will see that

20   that's not actually the case and that in regard to the

21   pass-through, which is probably the most substantial

22   allegations against my client, there's a fundamental

23   misunderstanding of what services were provided by

24   CloudConnect.  CloudConnect was not a service provider,

25   and in fact CloudConnect would not deal with entities

1    directly like the United Way.  It deals independently

2    with companies such as DigitalNet.  And in fact, you

3    could think of CloudConnect as really like a platform,

4    Judge, or a room if you will, and it's a platform or a

5    room that has tools in it.

6          And so CloudConnect is paid to provide that,

7    but what you do with it as a purchaser is different.

8    Building things within that, infrastructure, networks,

9    web pages, those types of things, the actual substantive

10   things that go into the room is what DigitalNet did.

11   CloudConnect didn't do it.  And so this characterization

12   of a pass-through is not correct.

13          Also, for example, with -- SIP was the other

14   one they mentioned as a pass-through, and SIP is

15   basically a telephone line.  And the government talked

16   about a thousand dollars per month basically versus

17   $15,000 a month charged by DigitalNet.  Again, you'll

18   see that there's a fundamental misunderstanding about

19   what SIP, or referred to as SIP, is.  SIP will charge

20   this thousand dollars a month to the organization for

21   its phone line.  That's it.  Nothing else goes with it.

22          So, for example, other things like conference

23   calls, fax, other things that can be associated with the

24   phone line have to be built in by the company such as

25   DigitalNet, which is what DigitalNet did, and that is

1   why there are additional costs.  It's not just

2   DigitalNet charging for a phone line.

3            As such, you can see there was no double

4   billing and there certainly was not billing for services

5   not provided.

6            One of the things that I think you'll see in

7   this case, Judge, that I think is really important is

8   that the government -- initially United Way when it felt

9   that there was something amiss -- it was I think

10   initially brought to their attention by an employee, a

11   Domenic Pallaria, that had concerns that Mr. Alrai may

12   have an association with DigitalNet, and so they did an

13   internal investigation.  They brought in a company

14   called CBIZ, and one of the people at CBIZ is a retired

15   FBI agent, Mr. Mulvaney, and worked I think out of the

16   Bedford office for some 20, 25 years.

17            THE COURT:  I'm familiar with Mulvaney.  Is

18   that going to be a problem?

19            MR. HARRINGTON:  He's going to be a witness in

20   the case.

21            THE COURT:  We're not social friends or

22   anything, but I'm a former prosecutor.  We worked cases

23   together.  I know him.  I don't have any special

24   connection with him, but I do know him.

25            MR. HARRINGTON:  And I don't think it will be

1    an issue, Judge.  I can talk further with my client

2    about it.  I kind of assumed, knowing your background,

3    that you would know Mr. Mulvaney.

4            The point of that matter, Judge, is that

5    there's this kind of internal investigation going on at

6    United Way, and at the same time the FBI is alerted.

7    You know, whether it's through United Way directly or

8    Mr. Mulvaney I'm not actually a hundred percent sure,

9    but the bottom line is that they kind of gather their

10   information.  They go to the U.S. Attorney's Office in

11   Boston who basically says there's nothing criminal here,

12   you know, we're not interested.

13           United Way goes away.  There's another meeting

14   at the U.S. Attorney's Office in Boston at some point,

15   and ultimately the case somehow makes its way here.

16   It's not really clear.  I'm sure that will come out

17   during some of the questioning about how we get up here.

18           But the bottom line is CBIZ and what they're

19   doing with United Way with their internal investigation

20   and the investigation by the federal authorities kind of

21   overlaps.  They're helping each other, which it would be

22   normal.  They're going to talk to each other.  And this

23   is all before my client is walked out of the building,

24   as the government says.  Probably for about a month or

25   so before that happens, because part of their concern

1    was that they didn't want to alert Mr. Alrai to their

2    concerns because they thought he might do some harm to

3    their organization or their IT infrastructure, and so

4    they were quietly doing this investigation.

5           Now, the reason I kind of paint this for you,

6    Judge, is the following:

7           One of the things that you won't see in this

8    case that is surprising, quite frankly, is that from

9    what I've seen in discovery neither CBIZ nor any federal

10   agency, whether it's the FBI or a U.S. Attorney's

11   Office, took any steps to preserve the IT environment

12   that existed at United Way on June 12th when my client

13   is walked out of the building or at any time before.

14          So one of the things that will be important is

15   they're going to try to tell you that I guess my client

16   didn't provide certain services or didn't have this or

17   didn't have that, when they actually didn't even

18   preserve the environment, and I would suggest that's an

19   important thing.

20          One of the other services they talk about

21   which I thought was very significant is that backup to

22   servers wasn't provided.  So no backup.  So if you lose

23   data, you're not going to be able to go get it, which is

24   interesting because you're going to hear testimony from

25   Mr. Yousuf, Ms. Iqbal, Mr. Wahbe that in fact there were

1    backup servers, that things were retrieved when lost,

2    and that periodic backups would take place.

3              THE COURT:  Got it.

4              That seemed to be sort of in the water during

5    our discussions in your other motion in limine regarding

6    your desire to have access to I guess what you just

7    referred to as the IT environment, right?

8              MR. HARRINGTON:  Correct, Judge.

9              THE COURT:  All right.

10             MR. HARRINGTON:  And you will hear -- I think

11   one of the witnesses the government is going to call is

12   one of the officers for CBIZ, who is going to come in

13   and I assume is going to talk about what he saw when he

14   got to United Way.  And we'll have to obviously question

15   him more about that, but part of that is if he wants to

16   say this didn't exist and this didn't exist, it's like,

17   okay, what did you do to preserve that environment so

18   that people could look at it to determine whether or not

19   you're telling the truth or whether you might be

20   misunderstanding things, things like CloudConnect or SIP

21   or stuff like that.

22             So in regard to that, Judge, what I would

23   suggest to you respectfully is this:  that some type of,

24   you know, omission or misrepresentation does not

25   constitute fraud, and if you look at this and come to

1   the conclusion that my client obtained these

2   contracts -- and by the way, these contracts, the

3   initial one for certainly United Way and through Robert

4   Allen, there were no misrepresentations made when those

5   contracts were entered into.  They're saying that my

6   client didn't tell them that he was behind DigitalNet.

7   Okay.  Well, we're not disputing that.  But the

8   misrepresentations that they're referencing, you know,

9   with client lists or, you know, stuff like that, you

10  will see through the testimony it doesn't even come

11  until some later time well into the contract.  So you'll

12  see that there's no fraudulent inducement into the

13  contracts, and I think what you would find is when you

14  listen to all the evidence that these contracts were all

15  performed and provided services.

16          And so if valued services and compliance with

17  all the contracts took place, there's no fraud.  Even if

18  you find that there's misrepresentations made, that's

19  not enough to find a fraud, and that's what you have

20  here is you have a situation in which these contracts

21  were obtained, services were rendered, valuable

22  services.  All the other stuff, you know, whether my

23  client wired money, whether he profited and enriched

24  himself and made a lot of money, well, hey, that's the

25  American dream and if you provided services and it was

1    at a markup and it was accepted in the industry as

2    appropriate, there's nothing wrong with that.  There's

3    nothing illegal about that.

4             I would respectfully suggest to you, Judge,

5    that the reason that the U.S. Attorney's Office in

6    Boston didn't want this is because it's not criminal.

7    It's a civil contractual dispute.  And if they wanted to

8    fire him, go ahead and fire him.  If you want to

9    terminate your contracts with DigitalNet, go ahead and

10   terminate your contracts, but he provided the services

11   and that really is the bottom line, Judge.

12            Thank you.

13            THE COURT:  Thank you, counsel.

14            All right.  It's about five minutes of 12:00.

15   We've been going a little over 90 minutes and I want to

16   give the reporter a break.  We'll take -- what we'll do

17   here today is adjust the schedule a little bit.

18   Generally we'll go in 90-minute blocks, 15-minute break,

19   with a break in the middle of the day for lunch.  Today

20   we're going to take a 15-minute break now and go

21   probably to 12:45 or thereabouts and then take a lunch

22   break and then we'll just do the afternoon in a regular

23   fashion.

24            All right?

25            MR. HARRINGTON:  What time do you like to go

1    till at the end of the day, Judge?

2              THE COURT:  Generally 5:00.  At some point

3    this week, I'm not sure which day, we'll break a little

4    bit early only because I have to teach my law school

5    class.  It was supposed to be today but they canceled

6    school.  So at some point this week at some point I'll

7    probably have to do a 4:45 exit.  That's no big deal.

8              All right.  We're in recess.

9              (RECESS)

10             MS. LE:  Your Honor, before we begin with

11   witnesses, may I bring a housekeeping issue?  Actually,

12   Mr. Harrison is the one and his client who observed

13   this.

14             One of our witnesses from Citizens Bank who is

15   not scheduled to testify for about a week came early.

16   He sat in the back, was here for the morning

17   proceedings.  Just wanted to bring that to the Court's

18   attention.  We weren't aware that he was here.  We

19   didn't instruct him to be here.

20             THE COURT:  That happens.  Is anyone seeking

21   any relief based on that?

22             MR. HARRINGTON:  Yeah, I move to dismiss,

23   Judge.

24             THE COURT:  Of course.

25             MR: HARRINGTON:  No, I brought it to their

1    attention.  I told them it was a non-issue, your Honor.

2            THE COURT:  Okay.  Thanks for letting me know.

3            You may proceed.

4            MR. DAVIS:  Lorissa Guzman.

5                        LORISSA GUZMAN

6        having been duly sworn, testified as follows:

7            THE CLERK:  For the record, please state your

8    full name and spell your last name.

9            THE WITNESS:  Lorissa Guzman.  Last name is

10   Guzman, G-U-Z-M-A-N.

11           THE CLERK:  Thank you.  Please be seated.

12                     DIRECT EXAMINATION

13   BY MR. DAVIS:

14       Q.   How are you employed?

15       A.   I am a Customs and Border Protection Officer

16   at Boston Logan Airport.  I work for Customs and Border

17   Protection, which is a branch of the Department of

18   Homeland Security.

19       Q.   Okay.  Thank you.  Please speak slowly for the

20   court reporter.

21           Can you summarize, please, your government and

22   law enforcement experience?

23       A.   I joined the Department of Homeland Security

24   in 2009.  I started as a border patrol agent down in

25   Moreno, Texas.  I was there until 2015 when I

1    transferred to Customs and Border Protection in Boston

2    at Boston Logan Airport, and I've been assigned there

3    since.

4              Throughout my career at Customs and Border

5    Protection in Boston, I joined a team in May 2017 and

6    it's called Tactical Terrorism Response Team.  This is

7    just a specialized team where we have an online working

8    relationship with other agencies.  So that's the team

9    that I've been assigned to since May 2017.

10         Q.   Okay.  And you were based at Logan Airport in

11   April of 2018?

12         A.   Yes, that's correct.

13         Q.   And is one of the things you did so-called

14   secondary inspections?

15         A.   Yes, that's correct.

16         Q.   And can you describe what a secondary

17   inspection is?  Again, speaking slowly.

18         A.   Okay.  When you come off a plane coming into

19   the border you start at the primary inspection area,

20   which is -- when you get off the plane when you come

21   into the United States you greet a person that's usually

22   a primary officer, anyone can play that role, and at

23   that point you talk to that primary officer and then you

24   can -- you are either passed through to be released or

25   you are secondary to a secondary officer.

1          During that time that you're speaking of in

2    April 2018 while I was on that team I played a secondary

3    role, so my role at that point was to talk to the people

4    that were referred to the secondary officer.

5          Q.   All right.  Directing your attention to April

6    23rd of 2018, were you working at Logan that day?

7          A.   Yes, that's correct.

8          Q.   And prior to his arrival, did you identify

9    Imran Alrai as someone for secondary inspection?

10         A.   Yes, that's correct.

11         Q.   And was that at the request of Homeland

12   Security?

13         A.   Yes, Homeland Security Investigations.

14         Q.   Right.  And were you advised that there was an

15   investigation ongoing regarding Mr. Alrai?

16         A.   Yes, that's correct.

17         Q.   All right.  And that day did both the Homeland

18   Security case agent Todd Donnelly and also the FBI case

19   agent Jill Laroe, did they come to Logan Airport and

20   meet with you?

21         A.   That's correct.

22              THE COURT:  Hold it.  You're on your feet.

23              MR. HARRINGTON:  Sorry.  I'm on my feet

24   because I really can't see the witness.

25              THE COURT:  If you want to relocate anywhere,

1    to the jury box or wherever you'd like, or stand.

2              MR. HARRINGTON:  Is this position okay, Judge?

3              THE COURT:  Yes, that's okay.

4              MR. HARRINGTON:  That's the only reason I'm

5    standing, Judge.

6         Q.   So did Mr. Alrai get off a plane that day?

7         A.   Yes.

8         Q.   And what time of day was that approximately?

9         A.   It was -- I don't know the exact time, but it

10   was between 12:00 and 2:00 p.m., around that time.

11        Q.   And where was he coming from?

12        A.   He was coming from a vacation in Lahore,

13   Pakistan.

14        Q.   All right.  And what happened when he got to

15   primary?

16        A.   So when he got to primary he was -- I did not

17   encounter him in primary, but he was encountered by

18   another officer in primary.  He was then selected for a

19   secondary exam and was sent down to the secondary team,

20   which is my team, and that is when I encountered him.

21              At that point I got his --

22              THE COURT:  This is at Logan?

23              THE WITNESS:  Yes, this is at Logan, sir.

24              THE COURT:  Go ahead.

25        Q.   And is the person you encountered that day,

1    Mr. Alrai, present in the courtroom?

2         A.    Yes.

3         Q.    Would you identify him, please?

4         A.    He's the gentleman sitting down over there

5    behind the lawyer that's standing.

6              THE COURT:  She's identified him.

7              MR. DAVIS:  Thank you, your Honor.

8         Q.    Now, did you get a briefing from Special

9    Agents Donnelly and Laroe prior to talking to Mr. Alrai?

10        A.    I did.

11        Q.    And can you describe that briefing?  What were

12   you asked to do?

13        A.    Okay.  I had a meeting with Mr. Donnelly and

14   Ms. Laroe and they had a series of questions that they

15   would like me to ask him beyond what we normally ask

16   him.  So I was planning on asking him just a basic five

17   Ws, which means who, what, when, where, why, where are

18   you coming from, how long were you gone, et cetera, and

19   then I get into basic information about your work,

20   because I talk to everybody about their work, what they

21   do for work.

22             THE COURT:  You have to slow down a little bit

23   for the reporter.

24             THE WITNESS:  Okay.  Sorry.  Sorry.

25        A.    So a basic 5W inspection:  who, what, when,

1   where, why, who he was, where he was coming from.

2        Q.   All right.  And then what additional areas

3   were you asked to question about?

4        A.   So in regards to his work I was asked to

5   specifically focus in on his work and what he does for

6   work, his different types of employment.  And then based

7   on his employment, what he provides, what his job

8   consists of and who he sublets work out to, if he has

9   any international business ties, if he has any

10   additional business ties himself, and just his role

11   specifically at the United Way.

12        Q.   All right.  And did you plan as part of the

13   secondary to look at any documents that he had with him?

14        A.   As a part of the secondary examination as a

15   Customs and Border Protection officer, I have to look at

16   everything once they are in secondary with me so I will

17   go through their wallet, their baggage, all of the

18   belongings that they're presenting at the border.

19        Q.   Okay.  And again asking you to slow down, you

20   really are -- you're just speaking more quickly.

21        A.   Okay.

22             THE COURT:  My suggestion, just ask really

23   small-bite questions so she can give you

24   two-or-three-word answers if that helps.  You can do

25   whatever you like, but it usually helps.

1       Q.   Ms. Guzman, did the agents remain on-site

2  while you had the encounter with Mr. Alrai?

3       A.   Yes, they did.

4       Q.   And were they able to hear or see the

5  interview from where they were?

6       A.   No, they weren't.

7       Q.   But were you able to go and consult with them

8  from time to time during the interview?

9       A.   Yes, I could.

10       Q.   And did you do that somewhat during the

11  interview?

12       A.   I did.

13       Q.   Okay.  And did you encounter the defendant in

14  secondary at about 2:04 p.m.?

15       A.   Yes, that sounds correct.

16       Q.   Okay.  And where was he then?

17       A.   At that point he was in the secondary baggage

18  area, which is right outside the office where I work.

19       Q.   Okay.  Had he filled out a declaration form?

20       A.   Now it's automated so you go through a machine

21  to do it, so I do not have a copy of the declaration

22  form if he did do it.

23       Q.   But did he report having cash with him?

24       A.   Not on the form.  He didn't -- on the

25  declaration form or the machine you can report if

1    there's over -- say that you have over $10,000 with you,

2    you check a box on the computer.  So he did not declare

3    having over $10,000 with him.

4        Q.    Which was correct, right, if he didn't have

5    10,000?

6        A.    Yes.  When I spoke to him, he stated that he

7    left with the same money that he came back in with,

8    which he claimed was $4500.

9        Q.    All right.  So he had 4500 cash?

10       A.    Yes.

11       Q.    And he said he left with that amount?

12       A.    Yes.

13       Q.    Okay.  Describe his manner and mood during the

14   interview that you had with him.  How was he as someone

15   to talk to?

16       A.    He was -- he talked to me.  He was easy to

17   talk to.  He would answer my questions.  Throughout the

18   interview I did find a couple different situations where

19   he had given me false information, but he was

20   cooperative throughout the entire interview.

21            MR. HARRINGTON:  Judge, I would like to make

22   an objection at this point.

23            And I don't know if this requires me to ask

24   some questions of the witness.

25            THE COURT:  You want to do a voir dire on

1   what?

2           MR. HARRINGTON:  Well, it was not clear from

3   the reports as to the involvement of Homeland Security

4   and that they had directed this agent to question my

5   client.

6           THE COURT:  I see.

7           MR. HARRINGTON:  And it appears now that she

8   was directed to cover certain areas with him.

9           THE COURT:  That's what she said.

10          MR. HARRINGTON:  And he was I would assume in

11  custody and not free to leave if he's in secondary

12  inspection, and so I have a concern about a Miranda

13  issue quite frankly, Judge.

14          THE COURT:  Understood.  Let me ask this

15  question, because he hasn't asked her any questions

16  about what he said yet so --

17          MR. HARRINGTON:  That's why I waited until

18  this point, Judge.  I think we're getting there.

19          THE COURT:  What are we trying to establish

20  here anyway generally?

21          MR. DAVIS:  False statements when questioned

22  about various aspects of his business, which we'll get

23  into.

24          THE COURT:  What's your position about whether

25  he was in custody at the time?

1          MR. DAVIS:  He was not in custody.  He's not

2     entitled to Miranda.

3          THE COURT:  What's the authority for that

4     proposition?

5          MR. DAVIS:  I haven't researched it.  I'll be

6     happy to.  There's been no motion.  We've turned over

7     her statement, we've also turned over the statement of

8     the Homeland Security agent, and whether --

9          THE COURT:  But let me ask this question.  You

10    established through appropriately leading questions that

11    she was directed by Homeland Security to ask the

12    questions, or was that a surprise to you?

13         MR. DAVIS:  No, no.  She was briefed by the

14    agents, yes, and she was asked to ask certain questions.

15    I think the witness would say she did her own secondary

16    inspection.

17         THE COURT:  Sure.

18         MR. DAVIS:  And wrote her own report about it.

19         THE COURT:  Yeah, I agree.  But was there

20    anything in the reports that would have put defense

21    counsel on notice that she had had contact with other

22    agents who requested that she cover certain issues?

23         MR. DAVIS:  Well, the Homeland Security agent

24    indicated that, and I'm looking at it now, Todd Donnelly

25    wrote it, it's clear that the information from the

1   extraction of the cell phone was provided to Todd

2   Donnelly afterwards.

3            THE COURT:  That's not the same thing.

4   Defense counsel just stood up and said he couldn't tell

5   from the reports that she had been directed or briefed,

6   and that puts this in a slightly different context.  If

7   he was for some reason a person of interest in some way,

8   shape, or form, he didn't have a way to know that based

9   on the reports.  Apparently you did know that because

10  you elicited it and he's asking me to let him inquire

11  and conduct voir dire.

12           MR. DAVIS:  I don't object to voir dire, but

13  the -- and I don't know how the presence of the agents

14  or their briefing or requests makes this any more or

15  less a Miranda issue than the report already did, and

16  there's never been a challenge and no suppression motion

17  filed.

18           THE COURT:  You're right.  It might not make

19  it any more custodial than it otherwise might be, but it

20  might make it more custodial than it otherwise would be

21  and we don't know yet.

22           Okay.  Go ahead and voir dire.

23           MR. HARRINGTON:  Thank you, Judge.

24           THE COURT:  You know, there probably is law on

25  this idea about a secondary -- about this being

1    custodial or not.  It doesn't appear anybody really

2    focused on that so --

3            MR. DAVIS:  This is the government's border

4    search authority and border questioning authority --

5            THE COURT:  Right.

6            MR. DAVIS:  -- that a customs agent has.

7            THE COURT:  I agree, but I think some of that

8    is custodial.

9            Okay.  Well, you can do your voir dire.  If

10   you want to move to suppress something based on that, go

11   ahead, but it doesn't appear that anybody in the

12   courtroom is that focused on this area of the law.  I'll

13   be looking it up as you voir dire.  Go ahead.

14           VOIR DIRE EXAMINATION OF LORISSA GUZMAN

15   BY MR. HARRINGTON:

16       Q.   Good afternoon, Agent Guzman.

17       A.   Good afternoon.

18       Q.   So let me ask you, you indicated that you had

19   a briefing from Homeland Security; is that correct?

20       A.   Yes, sir.

21       Q.   And who was there from Homeland Security?  I

22   would assume that was Agent Donnelly and Agent Laroe?

23       A.   Yes, sir.  Agent Donnelly was there for

24   Homeland Security and Agent Laroe was there from the

25   FBI.

1      Q.   And when they briefed you, it's my

2  understanding according to your testimony already, you

3  said that they had directed you to areas of questioning

4  that you would not normally cover in a secondary

5  inspection.  I think you already testified to that,

6  correct?

7      A.   I can't exactly agree with what you're saying,

8  because I would ask somebody about their work -- I ask

9  people about their work every day, but I focused more in

10  on their work as per their request.

11      Q.   Okay.  Did they specifically -- you indicated

12  that they had directed you -- your words.  I didn't make

13  it up.

14      A.   Okay.

15      Q.   That they had directed you to ask questions

16  relative to certain areas.  Is that fair to say?

17      A.   Yes.

18      Q.   Okay.  And in that regard let me ask you about

19  that briefing.  How long before my client landed did

20  that briefing take place?

21      A.   I would say -- I don't know the exact time,

22  but within 30 minutes.

23      Q.   Okay.  And so before my client got off the

24  plane there was already a plan to take him from I think

25  the primary inspection to secondary inspection, correct?

1        A.    Yes, sir.

2        Q.    So the primary officer, and if I'm using the

3   wrong term you tell me, there's a primary officer or

4   primary inspection?

5        A.    Yes, sir.

6        Q.    That officer was informed and directed that

7   when Alrai went through, Alrai needed to be handed off

8   to the secondary inspection, specifically you?

9        A.    Yes, sir.

10       Q.    All right.  Would you agree with me that but

11  for the direction of Homeland Security, Mr. Alrai may

12  never have been subject to a secondary inspection, he

13  may have just gone through primary and gone home?

14       A.    I can't answer that question because I don't

15  know what would have happened.

16       Q.    Okay.  But suffice it to say there was a plan

17  to do this?

18       A.    Yes.

19       Q.    Okay.  And when you do the secondary

20  inspection, where are you located?  Are you in an

21  office?

22       A.    No, I'm in an open setting in the baggage

23  area.

24       Q.    And when you're doing a secondary inspection

25  can a person just refuse to answer your questions and

1    leave or are they required to stay with you and answer

2    your questions?

3         A.    They can refuse to answer my questions if they

4    do so, and then I have their passport, though, because I

5    have to check them in.

6         Q.    So you're holding their passport?

7         A.    Yes, sir.

8         Q.    Okay.

9              THE COURT:  Can they leave without their

10   passport?

11             THE WITNESS:  Yes, if they want, but then I

12   have their passport.

13             THE COURT:  Understood.

14        Q.    And can you detain somebody?

15        A.    I can detain somebody.

16        Q.    And can you detain them if they refuse to

17   answer your questions?

18        A.    No.  Nobody has to answer my questions if they

19   don't want to.

20        Q.    Did you advise Mr. Alrai that he didn't have

21   to answer your questions?

22        A.    No.

23        Q.    Did you advise Mr. Alrai that he was free to

24   leave?

25        A.    No.

1      Q.   Do you think it would be a fair, reasonable

2  assumption if you're holding somebody's passport and

3  questioning them that they wouldn't feel like they would

4  be free to leave?

5           MR. DAVIS:  Objection.  Speculation.

6           MR. HARRINGTON:  Asking what her opinion is.

7           THE COURT:  Overruled.

8      A.   Can you repeat the question?

9      Q.   If you are holding somebody's passport and

10  you're questioning them, I would assume you have

11  identified yourself as a Customs and Border Patrol agent

12  and you're questioning them, do you think a reasonable

13  person would not feel free to leave?

14     A.   He did not ask to leave, so he didn't bring it

15  up as a concern.

16     Q.   Okay.  But I was asking your opinion.

17     A.   I agree that somebody wouldn't feel free to

18  leave if I have their passport, yeah, that's correct.

19     Q.   Would not feel free to leave?

20     A.   Would not feel free.

21          MR. HARRINGTON:  Judge, I don't have any more

22  questions on this subject.

23          THE COURT:  All right.

24          You may proceed.  Oh, did you want to say

25  something else?

1          MR. HARRINGTON:  What I would suggest, Judge,

2    is based on that and based on the questioning, I think

3    there is a Miranda issue.  I think that it is clear now

4    that Homeland Security in conjunction with border patrol

5    orchestrated a plan with which to question and

6    interrogate Mr. Alrai, that they did so using customs

7    and border patrol when they could have done so

8    themselves, and they did so in an environment that was

9    in fact custodial.  And as a result, I would suggest

10   respectfully, given this kind of agency relationship

11   that we're talking about between Homeland Security, FBI,

12   and border patrol, this is a Miranda issue.  If it was

13   just border patrol, this would not be an issue, but this

14   is a questioning and interrogation that's being directed

15   by Homeland Security and the FBI, and they're using

16   border patrol as the agent.  Therefore, I would suggest

17   respectfully Miranda should apply, it was not, and any

18   further statements should be suppressed.

19          THE COURT:  Your distinction between a border

20   patrol interview and interviews I guess directed by the

21   FBI and Homeland Security, that's not something I'm

22   familiar with.  I mean, I know there's a Fourth

23   Amendment exception for it.  I never really thought

24   about in the context of a Fifth Amendment as we're

25   talking about now.  I'm reading some law as you did the

1    questioning.

2              Here's what I would propose.  I would propose

3    to let Mr. Davis finish his examination, but I'll look

4    at the issue.  If it turns out that these statements

5    were obtained in violation of the defendant's Fifth

6    Amendment rights, I'll exclude them.  Is that okay with

7    you?

8              MR. HARRINGTON:  It is, Judge.

9              THE COURT:  All right.  You can proceed.

10             MR. DAVIS:  I would just raise an objection.

11             This suppression motion must be made before

12   trial under Rule 12(b)(3).  This is a motion for

13   suppression of evidence.  The Court chided me for not

14   being prepared to address legal issues.  This legal

15   issue has never been raised, and it's now being raised

16   in a trial with a witness on the stand.

17             THE COURT:  Well, I'm really sorry for chiding

18   you.

19             MR. DAVIS:  Don't apologize.

20             THE COURT:  But he said that he had no notice

21   of the fact that -- his whole motion is based on the

22   fact that this was an interrogation conducted through an

23   agent, through a different agency by the FBI or Homeland

24   Security, and he says he wasn't on notice of that fact

25   based on the report.  So -- and I don't have the reports

1    in front of me, but he tried to explain himself and now

2    he says he has the information and he did voir dire.

3    I'm allowing you to continue and I will suppress the

4    evidence if it was obtained in violation of his rights.

5    So let's proceed.

6            MR. DAVIS:  I would also just say Bates stamp

7    REP 00006 is Todd Donnelly's report.  It states about

8    this event:  At the time of the inspection Special

9    Agents Todd Donnelly and Jill Laroe were on-site at

10   Terminal E.

11           That was in a report that was disclosed.

12           THE COURT:  Suggesting a possibility that

13   maybe to some extent defense counsel was on notice.  I

14   get it.

15           MR. DAVIS:  Correct.

16           MR. HARRINGTON:  Judge -- and I would dispute

17   that, Judge, but there was nothing in there indicating

18   that they had had a debriefing, that they had talked

19   about, you know, questioning, things of that nature, or

20   that there was a plan to pull him from primary to

21   secondary.  That was all new and the agent testified.

22           THE COURT:  I mean, I guess my only question

23   for you before you proceed is this.  Let's suppose I

24   took your view of the situation and that Mr. Harrington

25   was on notice and he should have filed a pretrial

1   motion.  Would the result of that be I should allow

2   evidence obtained in violation of his client's rights?

3   I still don't think that would free you to do that.

4   Those rules are appreciated by me and everybody tries to

5   observe them, but I don't think it's a waiver of his

6   client's Fifth Amendment rights.

7          This sounds like it probably won't be a

8   suppression issue at the end of the day, but it might be

9   so I'll just keep that powder dry for now.

10          Please examine the witness.

11     CONTINUED DIRECT EXAMINATION OF LORISSA GUZMAN

12   BY MR. DAVIS:

13     Q.   Did you begin to interview the defendant?

14     A.   Yes.

15     Q.   And by the way, were you directed on how to

16   conduct this interview by any other person?

17     A.   No, I do my interviews on my own.

18     Q.   All right.  Did you ask him where he was

19   coming from?

20     A.   Yes.

21     Q.   And what did he say?

22     A.   He said he was visiting Lahore, Pakistan,

23   where he had family.

24     Q.   Did he say when he had left the United States?

25     A.   I think that the date is April 14th, or two

97

1    weeks prior.

2         Q.    All right.  Did you ask him what his purpose

3    was in making the trip?

4         A.    Yes.  He said it was vacation to see his

5    brother, sister, and his uncle.

6         Q.    And did he name his brother?

7         A.    He did.

8         Q.    And was that name Jawad?

9         A.    Yes, sir.

10        Q.    Did he name his sister?

11        A.    Yes, sir.

12        Q.    And what was her name?

13        A.    Rehab, is that correct?  I would have to

14    recall.  It's in my report.

15        Q.    All right.  Would your report refresh your

16    recollection?

17        A.    Yes, it would refresh my recollection.

18        Q.    So showing you Bates stamp CBP001.

19        A.    Rehab, excuse me.

20        Q.    Is that your report?

21        A.    Yes, sir, that's my report.

22        Q.    Did you write this report immediately after

23    the incident?

24        A.    Immediately after the incident.

25        Q.    And it does refresh your recollection?

1      A.    Yes, it does.  Thank you.

2            MR. DAVIS:  Your Honor, if counsel permits, I

3      would just like to leave the report present so that the

4      witness can refresh her recollection as needed.

5            MR. HARRINGTON:  I have no objection as long

6      as she's not reading it right now, Judge.

7            MR. DAVIS:  Thank you.

8      Q.    All right.  Ms. Guzman, was he traveling with

9      people or not?

10     A.    No, sir.  He was alone.

11     Q.    And did he say where he had stayed in

12     Pakistan?

13     A.    He stayed with his brother in Pakistan.

14     Q.    All right.  And did he say the address?

15     A.    Not initially, no.

16     Q.    All right.  Did he say later where he had

17     stayed?

18     A.    Yes, he did.  Later on.

19     Q.    And what address did he give you?

20     A.    I know that I -- can I refer to my report for

21     the exact details?

22     Q.    Please do.

23     A.    Thank you.

24           So he stated that he stayed at his brother's

25     house at 162-C, which is the address next door.  That's

1    the address that he said he stayed at, 162-C, but I

2    don't have the exact street as it's been redacted from

3    my report.

4         Q.    Okay.  Was it Marghzar Colony, Multan Road?

5         A.    Yes, that sounds correct.

6         Q.    All right.  And that's in Laroe, Pakistan?

7         A.    Yes.

8         Q.    And did he say how many times he goes per year

9    to see his family?

10        A.    He said he travels about twice a year.

11        Q.    Okay.  And did you ask Mr. Alrai if he owned

12   any property abroad?

13        A.    Yes, I did.

14        Q.    And did you ask him if he had any

15   international business ties?

16        A.    Yes, I did.

17        Q.    What did he say?

18        A.    He denied both.

19        Q.    He denied both?

20        A.    Yes, sir.

21        Q.    So he denied owning property in Pakistan?

22        A.    Yes, sir, that's correct.

23        Q.    And he denied having any business dealings

24   internationally?

25        A.    Yes, sir.

1      Q.   Okay.  Did he talk about what he actually did

2   for work?

3      A.   I did.  I asked him what he does for work as I

4   would ask any subject who I was interviewing, and he

5   stated that he was the vice president for IT, the

6   information technology department, for United Way.

7      Q.   Okay.  Did he say how long he'd worked for

8   United Way?

9      A.   Yes, sir, he did.

10      Q.   And how long?

11      A.   And he said that he has worked there for about

12   five years.

13      Q.   Okay.  Did he say whether he had any

14   employees?

15      A.   Yes.  He said he has two analysts that work

16   for him.

17      Q.   Who work for him at United Way?

18      A.   Yes, sir.

19      Q.   Okay.  And did he say whether he had another

20   part-time job?

21      A.   He did.  He said that he works part-time

22   teaching courses, maybe one or two courses a year at the

23   University of Southern New Hampshire.

24      Q.   Okay.  And did he explain the nature of his

25   job at United Way?

1     A.    Yes, he did.

2     Q.    What did he say?

3     A.    He said that he works for the IT department,

4  and I'm going to refer to my notes for this, part of his

5  job in the IT department is to subcontract work out.  So

6  at this point I had asked him details on who he

7  subcontracts work out to and for what reasons.

8     Q.    All right.  So the defendant told you he

9  subcontracts work out from United Way, IT work?

10    A.    Yes, sir.

11    Q.    Okay.  So did you ask for an actual list of

12  subcontractors?

13    A.    He didn't provide me a personal list, but I

14  asked him about different companies, and he gave me the

15  names of specific companies and then what he used them

16  for.

17    Q.    Okay.  And what companies did he identify?

18    A.    Sir, I'll have to refer to my notes for this

19  because it's lengthy, if that's okay.

20    Q.    Okay.

21    A.    Is that okay?  Okay.

22          He stated that he uses the company Helix, who

23  assists United Way with software development.

24    Q.    Okay.  And was that the first company he

25  listed?

1    A.    Yes.

2    Q.    Helix.  Okay.  And what was the next company

3  he identified?

4    A.    The next company he identified was DigitalNet,

5  and he stated that DigitalNet performs network solutions

6  and user systems.

7    Q.    Okay.  And when he mentioned DigitalNet, did

8  he say anything about any ownership that he had of it?

9    A.    No.

10   Q.    Did he say anything about any connection that

11 he had to it?

12   A.    No.

13   Q.    And did he say anything about DigitalNet being

14 involved with gaming software development and gaming,

15 like video games?

16   A.    At this point in the interview he did not

17 mention that.  Later on at the end of the interview I do

18 have in my report that he did mention DigitalNet was

19 associated with gaming.

20   Q.    Okay, so we'll get to that.  But at this point

21 he says he subcontracts to DigitalNet for network

22 solutions and user systems, correct?

23   A.    Yes, sir.

24   Q.    And then what other subcontractors did he

25 identify?

1    A.    He then identified VMware.  He uses that for

2    virtualization, and then Microsoft which he uses for a

3    platform software.  Google he also uses for a platform

4    software.  And Network Solutions he uses for a domain.

5    And then Sales Force, who is developing a platform

6    donation management tool which he hopes to be

7    implemented nationwide for the United Way.

8    Q.    He explained to you that he was hoping this

9    platform donation management tool could be made

10    nationwide in United Way?

11    A.    Yes.

12    Q.    And so did he say that that was all the

13    subcontractors he was doing business with at United Way?

14    A.    Yes, that's all he listed.

15    Q.    And did he continue to deny any international

16    business ties associated with his United Way position?

17    A.    Yes, sir, he did.

18    Q.    Okay.  Did you ask him about his professorship

19    at Southern New Hampshire?

20    A.    I did but very briefly.  I did.

21    Q.    And what did he say?

22    A.    He said that it's more of like a part-time

23    thing.  It's not, like, his main career.  But he said

24    that he teaches in the information technology and

25    project management department at Southern New Hampshire

1    University.  He's been there for about three years and

2    he teaches one to two courses a year.

3         Q.   And did he mention any other work that he was

4    doing for pay?

5         A.   No.

6         Q.   Okay.  Did you ask him about his family and

7    personal life?

8         A.   I did.

9         Q.   And what did he say, again slowly, please.

10        A.   Sorry.  He identified his wife.  He said that

11   she works as the assistant vice president at the

12   Pentucket Bank in Salem, New Hampshire, and he said he

13   has two children.  He also spoke about his parents.

14        Q.   Did he identify his father?

15        A.   Yes.

16        Q.   And did he say that his father was named

17   Munawar?

18        A.   Yes, sir.  Munawar Chaudhary.

19        Q.   And did he state what Munawar Chaudhary's

20   occupation was?

21        A.   Yes, sir.  He said he was a retired doctor.

22        Q.   And did he say where he had worked?

23        A.   He said that he worked in Pakistan and Saudi

24   Arabia.

25        Q.   Okay.  Did he say whether Dr. Munawar

1    Chaudhary was now employed?

2        A.    He said that he's retired and he's financially

3    dependent on Mr. Alrai and his wife.

4        Q.    Okay.  And did he say how long ago Mr. Munawar

5    Chaudhary had retired?

6        A.    Yes.  He stated about 12 years ago.

7        Q.    Okay.  And did he identify an uncle in

8    Pakistan?

9        A.    He did.

10       Q.    Who is that?

11       A.    Iqbal Chaudhary.  He said that he resides in

12   the village Okara, which is about a hundred miles from

13   Lahore, but he didn't see him during this trip as he

14   claimed.

15       Q.    So did you ask for contact information from

16   the defendant?

17       A.    I did.

18       Q.    And what did you ask for?

19       A.    I asked him for his telephone number, and he

20   gave me a telephone number and an e-mail address and

21   social media contact on Facebook.

22       Q.    Okay.  And was the e-mail address

23   imran.alrai@gmail.com?

24       A.    Yes, sir.

25       Q.    Did he give you a telephone number with a 978

1    area code?

2        A.    Yes.  When I initially asked for his phone

3    number, he gave me a 978 number, and when I saw his

4    phone, I looked at his phone and I said, well, what's

5    the number to this -- what is the phone number to this

6    phone, and he hesitated and he gave me a different phone

7    number.  He said that the first phone number was for

8    Google Voice.  The second phone number was for his

9    actual phone.

10       Q.    So the contact number he gave you was a Google

11   Voice number?

12       A.    Yes, sir.

13       Q.    All right.  But then he eventually gave you

14   his cell phone number?

15       A.    Only because I asked directly what phone

16   number was associated to his cell phone.

17       Q.    Okay.

18            THE COURT:  Counsel, just keeping track of

19   time.  About how much more direct do you have of the

20   witness?

21            MR. DAVIS:  I would say ten minutes, your

22   Honor.

23            THE COURT:  Okay.  We'll take the lunch break.

24            I'm going to ask the witness to excuse

25   yourself just for a moment so I can talk to the lawyers,

1    but we'll be reconvening here at 1:30.

2              THE WITNESS:  Okay.

3              (Witness leaves the courtroom)

4              THE COURT:  The customs and border patrol

5    agent just left the courtroom.  We're about to take a

6    recess.  We'll reconvene at 1:30.

7              The cases in the First Circuit on this issue

8    about whether secondary border interviews are custodial

9    appear to be the Molina-Gomez case from 2015 and the

10   Ventura case.  The law appears to be, I'll just

11   summarize it, all right, is that secondary inspection

12   interviews are not per se custodial.  So they don't

13   constitute in and of themselves a custodial

14   interrogation, but they're a factor and they may

15   constitute custodial interrogations.  In fact, it looks

16   like in the Molina-Gomez case the Court found the

17   secondary inspection to be a custodial interrogation.

18             The fact that Mr. Harrington identified

19   regarding the customs border patrol agents being

20   directed by other agencies doesn't appear to be a factor

21   in and of itself, but one of the factors that could make

22   it custodial is whether the questioning is routine

23   focused on entry or not routine focused on criminal

24   activity.  I'll let you do with that what you will.

25             The other factors that could turn a secondary

1  inspection custodial and thus require Miranda warnings

2  include that it was conducted in that case,

3  Molina-Gomez, in a small windowless room, that there

4  were two officers present, that it was an hour and a

5  half to two hours of questioning, and again the last one

6  I just mentioned about the focus being on criminal

7  activity as opposed to entry.

8          So based on the record I've heard so far, I

9  don't have enough to find this to be custodial

10 interrogation, but I will just leave that with you to do

11 with what you will.  At this point I'm allowing the

12 testimony to continue.

13         We're in recess.  Anything for the Court

14 before we recess?

15         MR. HARRINGTON:  Nothing from the defense,

16 your Honor.

17         THE COURT:  All right.  See you at 1:30.

18         (RECESS)

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 4-8-20            /s/   Susan M. Bateman _____
                             SUSAN M. BATEMAN, RPR, CRR