**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-7-2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   18-cr-192-01-JL
          v.                    *   December 3, 2019
                                *   1:45 p.m.
       IMRAN ALRAI              *
                                *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF BENCH TRIAL
DAY TWO - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:      John S. Davis, AUSA
                         Matthew Hunter, AUSA
                         Cam T. Le, AUSA
                         U.S. Attorney's Office



For the Defendant:       Timothy M. Harrington, Esq.
                         Timothy C. Ayer, Esq.
                       ` Shaheen & Gordon, P.A.



Also Present:            John J. Commisso, Esq.


Court Reporter:          Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

```
                    I N D E X


WITNESSES:              Direct    Cross    Redirect    Recross


CHARLES CIOFFI


By Ms. Le               3                    30

    By Mr. Harrington            20                      36



DEAN RIVIERA


By Ms. Le               42




EXHIBITS                               FOR ID     IN EVD

Government's Exhibit 702                              72

Government's Exhibit 705                              74

Government's Exhibit 706                              76

Government's Exhibit 709                              98

Government's Exhibit 710                             101

Government's Exhibit 711                             108

Government's Exhibit 720                             115

Government's Exhibit 722                             125

Government's Exhibit 723                             129
```

1                    P R O C E E D I N G S
2              THE COURT:  Sir, you're still under oath.
3         You may proceed.
4              MS. LE:  Thank you, your Honor.
5          CONTINUED DIRECT EXAMINATION OF CHARLES CIOFFI
6    BY MS. LE:
7         Q.   Sir, when we left off we were talking about
8    ERP.  I get all my acronyms messed up.
9         A.   Yes.
10         Q.   Who was in charge of that process that
11    resulted in Robert Allen Group hiring DigitalNet for the
12    four contracts you described?
13         A.   Imran.
14         Q.   Okay.  What specifically was he tasked with
15    doing?
16         A.   Well, we had -- this was for the website
17    development.  There were multiple projects here we're
18    talking about, right, four contracts.  We had lost an
19    RPG programmer who passed away and then we had a need
20    for a .NET programmer, that's a Microsoft language, to
21    help us program, and I think we were promoting somebody
22    internally.  And then we had the need for -- we talked
23    about our telephone systems and the showrooms needed to
24    be replaced, and then we had developed this website.
25         Q.   Right.

1   A.   And we didn't have the internal resources on

2   the website that we needed to develop it so we had to go

3   outside.

4   Q.   Okay.  And who was supposed to go outside and

5   figure out the best vendor to provide these services?

6   A.   That was Imran's responsibility.

7   Q.   But who ultimately decided whether his

8   recommendation should be accepted?

9   A.   Me.

10   Q.   Did he bring you more than one option?

11   A.   Not that I recall.

12   Q.   Okay.  So before you entered into the contract

13   with DigitalNet, what did you know about that company?

14   A.   I never heard of it before.

15   Q.   Okay.  Did Imran tell you anything about the

16   company and its ability to perform those contracts?

17   A.   I don't remember that specific assertion, but

18   I would have thought through my normal line of inquiry I

19   would have asked those questions, if they were capable

20   of performing and meet the needs that we needed.

21   Q.   Okay.

22   A.   And let me clarify.  It's not a big deal on --

23   the two contract positions aren't hard to find somebody

24   to do the work.  It's really the website development

25   that requires a lot more expertise.

1     Q.   Okay.  And in order to figure out who would be

2  best suited or what company would be best suited to help

3  Robert Allen with the website, did other people besides

4  Imran have input into the types of skill sets that you

5  were looking for?

6     A.   Not to my recollection.

7     Q.   Like would the marketing department have had a

8  say in their needs?

9     A.   The marketing department had input into --

10  it's a multiple phase project that entails developing

11  the wire frames.  That's the look and feel of the

12  website.  And we had hired an organization called

13  Something Digital to do that aspect of it.  And then you

14  have the back end.  So when you go to look at a website,

15  you have all the back end connections that need to be

16  made to a database and how pages are served up, and that

17  was the task of the IT department to figure out that

18  part of it.

19     Q.   Okay.  So the marketing department worked with

20  another company called Something Digital to design the

21  look and feel?

22     A.   Yes.

23     Q.   And then the IT department led by Mr. Imran

24  (sic) was in charge of figuring out the vendors who do

25  the back end stuff to make the website work; is that

1    right?

2         A.    That's correct.

3         Q.    Okay.  Now, at the time that Mr. Alrai made

4    the recommendation of DigitalNet to you, were you aware

5    of any relationship he had with that organization?

6         A.    No.

7         Q.    Okay.  And since then did you come to know of

8    a connection between Mr. Imran Alrai and DigitalNet?

9         A.    Yes.

10        Q.    Okay.  And if you knew then what you know now,

11   would you have done anything differently in terms of

12   entering those four contracts?

13        A.    Yes.

14        Q.    What would you have done differently?

15        A.    Well, first of all, even though it was the

16   stated policy of our company to disclose conflicts of

17   interest, I also think it's business ethics so that you

18   disclose any relationship of a vendor that you're trying

19   to get your company to use.  The rigor that I would have

20   gone through would have been much more intense in terms

21   of validating the qualifications of that party.

22        Q.    Okay.  But at that time you didn't know any of

23   this information, right?

24        A.    That's correct.

25        Q.    And did you -- would it be fair to say that

1    you relied upon Mr. Alrai's recommendation?

2         A.    I did.

3         Q.    Okay.  Now, I'd like to go through some of

4    those contracts with you just very briefly.

5         A.    Okay.

6               MS. LE:  And, your Honor, these contracts have

7    all been admitted into evidence by agreement.

8               THE COURT:  Understood.

9         Q.    Let's start with Exhibit 305.

10              MS. LE:  And Ms. Sheff, could you flip through

11   to page 225.

12              I'm referring to the Bates number, your Honor.

13        A.    Is that me?

14        Q.    Ms. Sheff is going to flip to the next page.

15              What is the date of this contract, sir?

16        A.    At the top this one says August 1, 2013.

17        Q.    Okay.

18              MS. LE:  Ms. Sheff, if you can turn to page

19   235.

20        Q.    Mr. Cioffi, this is the signature page; is

21   that right?

22        A.    That's correct.

23        Q.    Whose signature on behalf of the Robert Allen

24   Group is there?

25        A.    That is my signature.

1    Q.   And who signed for DigitalNet?

2    A.   That's Mac Chaudhary or something like that.

3  I can't pronounce the last name.  I apologize.

4    Q.   Were you physically with Mr. Chaudhary when

5  these contracts were signed?

6    A.   No.

7    Q.   What is your recollection about how this

8  contract was presented to you?

9    A.   I signed one set and they signed -- I guess

10  Imran presented them to the other party to sign, I don't

11  remember which order it was, but he was not present when

12  I signed the agreement.

13    Q.   Okay.

14    A.   "He" being Mac.

15    Q.   Okay.

16         MS. LE:  Can you go to the next page, Ms.

17  Sheff, 236.

18    Q.   And can you explain to us what is the schedule

19  of work, what does this tell you?

20    A.   This specifies the nature and extent of the

21  services to be provided.

22    Q.   Okay.  And what was the total value of this

23  contract?

24    A.   This one was for a total of -- it was 12

25  months at 10,000 a month, $120,000.

1          Q.   Okay.  All right.  Thank you very much, sir.

2               MS. LE:  Let's move on to Exhibit 306.

3          Q.   And which contract is this, sir?

4          A.   This is -- the fancy words are -- basically

5     this is a telephone system for the showrooms.

6          Q.   Oh, I'm sorry.  I forgot to ask you the last

7     Exhibit 305, that was for the RPG programmer, was that

8     right?

9          A.   Yes.

10         Q.   So contract positions who replaced an employee

11    in your office?

12         A.   That's right.

13         Q.   Okay.  So this is a fancy name for telephone

14    services.  All right.

15              MS. LE:  Ms. Sheff, if we could go to page

16    1625.

17         Q.   This is the signature page, sir?

18         A.   Yes.

19         Q.   What is the date of this contract?

20         A.   August 5, 2013.

21         Q.   And who signed the contract?

22         A.   I signed on behalf of Robert Allen.

23         Q.   Who signed on behalf of DigitalNet?

24         A.   Mac.

25         Q.   M. A. Chaudhary?

1        A.   Yes.

2        Q.   And again, did you sit down on August 5, 2013,

3   and sign this contract with Mr. Mac Chaudhary?

4        A.   No.

5        Q.   How was this contract presented to you for

6   your signature?

7        A.   Imran presented it to me.

8             MS. LE:  Ms. Sheff, could you move on to page

9   1629?

10       Q.   Sir, what is the total project value for this

11  contract?

12       A.   $122,948.62.

13       Q.   Thank you.

14            MS. LE:  Ms. Sheff, can we go to Exhibit 307?

15       Q.   Sir, do you recognize this exhibit?

16       A.   Yes.

17       Q.   Which contract is this for?

18       A.   This is the professional services for the .NET

19  I believe -- no, I can't tell from this.  I need to see

20  --

21            MS. LE:  Can we go to the next page, Ms.

22  Sheff?

23       Q.   Do you see services there, sir?

24       A.   Right.

25            MS. LE:  And then we'll go to the schedule of

1    work, which is Exhibit A.  I think that's on page 222.

2         Q.    Okay.  You see schedule of work?

3         A.    Yes.

4         Q.    So based on the schedule of work, what is this

5    contract for?

6         A.    This is the services, the support services in

7    connection to website development.

8         Q.    The back end stuff that you were telling us

9    about?

10        A.    That is correct.

11        Q.    What is the total value of this contract; do

12   you know?

13        A.    $230,000.

14             MS. LE:  Ms. Sheff, can we go back to 221?

15        Q.    All right.  Signature page again.  Whose

16   signature on behalf of Robert Allen?

17        A.    My signature.

18        Q.    And who signed for DigitalNet?

19        A.    M. A. Chaudhary.

20             MS. LE:  And Ms. Sheff, you can move to the

21   next page, 222.  222, yes.

22        Q.    What was the date that this contract was

23   entered?

24        A.    August 9, 2013.

25        Q.    So a similar question to before, were you and

1    Mr. Chaudhary together when you signed this contract?

2         A.    No.

3         Q.    Who presented this contract to you for your

4    signature?

5         A.    Imran.

6         Q.    Thank you.

7              MS. LE:  Let's move on to Exhibit 308.  Can

8    you go to the next page?  Thank you.

9         Q.    What is the date of this contract, sir?

10        A.    August 14, 2013.

11        Q.    And what is the purpose of this contract?

12        A.    This is the staff person for the .NET

13   programming.

14        Q.    Okay.

15             MS. LE:  And let's move on to page 248.

16   That's the signature page.

17        Q.    Whose signature on behalf of Robert Allen?

18        A.    My signature.

19        Q.    Whose signature on behalf of DigitalNet?

20        A.    M. A. Chaudhary.

21        Q.    And sir, same thing, did you sit down with Mr.

22   Chaudhary and sign this contract?

23        A.    I did not.

24        Q.    Who presented this contract to you for your

25   signature?

13

1        A.    Imran.

2              MS. LE:  Ms. Sheff, could you please turn to

3   page 249?

4        Q.    What was the total value of this contract,

5   sir?

6        A.    It was $72,000.  Eight months -- I'm sorry.

7   Nine months at $8,000 a month.

8        Q.    Now, you didn't meet Mr. Chaudhary in signing

9   these contracts, right?

10       A.    No, I did not.

11       Q.    Did you ever meet Mr. Chaudhary?

12       A.    No, I did not.

13       Q.    Did you ever request a meeting with Mr.

14  Chaudhary?

15       A.    I did not.

16       Q.    Did you know other people in your company who

17  requested meetings with Mr. Chaudhary?

18       A.    Yes.

19       Q.    And who requested a meeting with Mr.

20  Chaudhary?

21       A.    Dean, I'm --

22       Q.    Riviera?

23       A.    Dean Riviera.  Thank you.

24       Q.    Thank you, sir.  Did you ever talk directly

25  with Mr. Chaudhary during the negotiation of the

1    contract or during the performance of the contract?

2         A.   Not to my recollection.

3         Q.   Did you ever personally meet with any of the

4    representatives for DigitalNet other than Mr. Chaudhary?

5         A.   No.

6         Q.   Okay.  And who was the point of contact at the

7    Robert Allen Group during the negotiation of these

8    contracts?

9         A.   Imran.

10        Q.   And were these contracts signed before or

11   after Mr. Alrai's separation from the Robert Allen

12   Group?

13        A.   Before.

14        Q.   Thank you.

15             MS. LE:  Ms. Sheff, I'd like to show the

16   witness Exhibit 310.  All right.  Can you flip through,

17   Ms. Sheff, just briefly?

18        Q.   So these are invoices submitted from

19   DigitalNet to the Robert Allen Group; do you see that?

20        A.   Yes.

21        Q.   Okay.

22             MS. LE:  Ms. Sheff, could you pull up the top

23   part of the invoice?

24        Q.   What address is listed there for DigitalNet?

25        A.   300 Brickstone Square, Suite 201.

15

1      Q.    And where is that located?

2      A.    Andover, Massachusetts.

3      Q.    And what phone number is provided?

4      A.    978-662-5333.

5      Q.    Thank you.

6            MS. LE:  And Ms. Sheff, can you highlight the

7    bottom section over here?  Okay.

8      Q.    So based on this information, how did your

9    company pay DigitalNet for its services?

10     A.    Electronically via ACH.

11     Q.    Does it have the bank account there?

12     A.    Yes.

13     Q.    Pentucket Bank, 1 Merrimack Street, Haverhill,

14   Massachusetts?

15     A.    Yes.

16     Q.    And the account is in the name of DigitalNet

17   Technology Solutions?

18     A.    Yes.

19     Q.    There's a bank routing number; do you see

20   that?

21     A.    I do.

22     Q.    And there's a checking account number, right?

23     A.    Correct.

24     Q.    And does that account end in 2684?

25     A.    Yes.

1    Q.   And what is the e-mail address if one had

2  questions about this invoice?  What e-mail address is

3  listed?

4    A.   Info@digitalnet.us.

5    Q.   Thank you.

6        MS. LE:  Thank you, Ms. Sheff.

7    Q.   Now, Mr. Cioffi, after Robert Allen and

8  DigitalNet entered into these four contracts, and I'm

9  mostly concerned with the website project, was there a

10  consensus about the quality of work that was being

11  produced?

12    A.   Yes, there was a consensus.

13    Q.   What was that consensus?

14    A.   After Imran left and we hired Dean Riviera, we

15  discovered the work wasn't being performed up to our

16  expectations.

17    Q.   Okay.  How about the two programmers you

18  hired, were those projects going well?

19    A.   From my understanding they were okay.

20    Q.   How about the phone services?

21    A.   That was okay, but subsequently discovered it

22  was outdated technology and we were overpaying for it.

23    Q.   Okay.  Now, in early 2014 did you make a

24  decision about the contractual relationship between

25  Robert Allen Group and DigitalNet?

```
1        A.    Yes.

2        Q.    What was that decision?

3        A.    We decided to engage counsel to assist us in

4   drafting a letter after we tried to successfully --

5   tried to negotiate an outcome where we got a credit for

6   the $200,000 we paid, but we decided that we would

7   demand a refund of the $200,000 turning over the

8   telephone numbers that we had, and there was one other

9   condition that escapes me at the moment.

10       Q.    Okay.  So did they agree to do those things,

11  refund the $200,000 for the website project and turn

12  over the telephone numbers?

13       A.    No, they rejected our offer.

14       Q.    Okay.  Did you continue to pay on the invoices

15  that were submitted to you?

16       A.    No.

17       Q.    Okay.  Why not?

18       A.    We were not getting the value we had bargained

19  for.

20       Q.    Okay.  And did you file a lawsuit?

21       A.    We did not.

22       Q.    Why not?

23       A.    We evaluated our options, and like many

24  businesses, we felt that it would be better just to let

25  it go.  They had proposed a counteroffer after rejecting
```

1    ours and demanding us to make a payment.  I can't

2    remember, maybe it was -- it was more than the amount,

3    it might have been $250,000 or something like that, and

4    we just decided just to let it go.

5         Q.    Okay.  Now, was there a situation involving

6    the phone service, because you said that you had

7    requested they turn over the phones?

8         A.    Right.

9         Q.    Explain that situation to the Court.

10        A.    Well, when Dean came on board and we were

11   evaluating technologies that we wanted to go to, he

12   determined that we were, again, like I said, overpaying

13   for it, the three showrooms that were up, and we didn't

14   want to expand the footprint out and we decided that we

15   would stop the entire relationship given the experience

16   that we had with the web services.

17        Q.    Okay.

18        A.    So in connection with that process they

19   demanded payment of -- we stopped paying on the monthly

20   services for the phone system and ultimately we were

21   able to port back the four numbers to our company.

22        Q.    Okay.  Explain this whole porting thing, if

23   you have the ability to do so.  If not, we can ask

24   another witness who may --

25        A.    I think it's -- ask Dean, but my understanding

1    it's similar like anybody's mobile phone, okay?  You

2    have a phone number and you want to port those phone

3    numbers because it's your phone number, that's how

4    people get in touch with you, over to a different phone

5    provider.

6         Q.    Okay.  And why couldn't you just do it

7    yourself?  It was your phone number.

8         A.    Because they had control of those phone

9    numbers.

10        Q.    And who had control exactly?

11        A.    DigitalNet.

12        Q.    Thank you.  Sir, you are the chief financial

13   officer, so do you know how much in total DigitalNet was

14   paid by Robert Allen Group?

15        A.    About 410,000.

16        Q.    Okay.  And how much of that money went to the

17   website project?

18        A.    200,000.

19        Q.    Now, when did the defendant leave Robert Allen

20   Group?

21        A.    Middle of September of 2013.

22        Q.    Okay.  And when Mr. Alrai left Robert Allen

23   Group had you hired a replacement CIO?

24        A.    Yes.

25        Q.    Okay.  Who was the replacement CIO?

1          A.    Dean Riviera.

2          Q.    When did Mr. Riviera start?

3          A.    Mid November of 2013.

4          Q.    Okay.  And how long did Mr. Riviera work for

5    you as CIO at the Robert Allen Group?

6          A.    The entire time that I was there.

7          Q.    Okay.  So how would you describe his

8    performance as CIO during that time?

9          A.    Exceptional.  Dean met and exceeded everything

10   I had wanted the business to accomplish.  He led the

11   digital transformation at Robert Allen.

12              MS. LE:  Thank you very much.

13              Your Honor, the government tenders the

14   witness.

15                        CROSS-EXAMINATION

16   BY MR. HARRINGTON:

17         Q.    Good afternoon, Mr. Cioffi.

18         A.    Hello.

19         Q.    Let me ask you just a couple of questions

20   about the contracts that the prosecutor was asking you

21   about, okay?  And by the way, if I ask you a question

22   that you're not sure what I'm asking you, just let me

23   know and I can try to rephrase it, and obviously if I

24   get something incorrect, you know, please feel free to

25   correct that, okay?

1          A.    Will do.

2          Q.    Okay.  So you had indicated that there were

3    four contracts, correct?

4          A.    Yes.

5          Q.    And I just want to make sure that I have this

6    correctly.  There was one contract for a .NET

7    programmer?

8          A.    Yes.

9          Q.    One contract for an RPG programmer?

10         A.    Yes.

11         Q.    And you indicated in regard to those two

12   contracts with DigitalNet for those programmers, your

13   understanding is that those contracts went okay?

14         A.    Correct.

15         Q.    In regard to the Telephony contract, the

16   telephones, that was another contract or the third

17   contract I'm referring to, you indicated that the phones

18   were okay but were outdated and ultimately felt that

19   Robert Allen was overpaying for that service?

20         A.    Yeah, the technology was outdated and we went

21   to a more up-to-date technology under Dean, and yes, we

22   felt that his analysis showed that we were overpaying

23   for those services.

24         Q.    Okay.  But you did indicate that the services

25   were okay but they weren't obviously up-to-date

1   technology?

2       A.   That's correct.

3       Q.   Okay.  So in regard to the web project, that's

4   the fourth and final contract we're talking about, you

5   indicated that although work -- and I'm paraphrasing --

6   although work was going forward on it, it just wasn't up

7   to expectations of what you expected and wanted?

8       A.   To clarify that, we had -- there was only --

9   ultimately one page was developed out of 50, one website

10  page, okay, out of 50, and that page did not contain the

11  proper operational functionality, and therefore it

12  shouldn't have cost $200,000 to develop just one page.

13      Q.   Okay.  And that was the page that was -- you

14  were given access to, correct?

15      A.   Correct.

16      Q.   You're not aware of all the other pages that

17  may have been developed and created that you didn't have

18  access to, right, the other back end information?

19      A.   That's correct.

20      Q.   So as far as what was developed and created,

21  there was other stuff; you just didn't have access to

22  it?

23      A.   To my knowledge there was nothing else because

24  upon multiple requests they refused to provide it to us.

25      Q.   Isn't it also true in regard to this contract

1   that there were numerous communications that you're

2   aware of that went pack and forth between DigitalNet and

3   Robert Allen wherein DigitalNet was requesting Robert

4   Allen to provide information and it wasn't provided

5   according to DigitalNet, correct?

6        A.   Ultimately it was provided to them when Dean

7   came on board.

8        Q.   Okay.  But you would agree with me DigitalNet

9   had been making multiple requests for certain

10  information relative to performing this job?

11       A.   I only subsequently learned about that once I

12  reread the e-mails that were provided in this discovery.

13       Q.   Okay.  But that's accurate, though, isn't it?

14       A.   It's an element of -- yes, there's an element

15  of accuracy to that.

16       Q.   Okay.  In regard to meeting in person with a

17  representative of DigitalNet, you would agree with me

18  that you didn't feel it was necessary, otherwise you

19  would have done it, right?

20       A.   That's correct.

21       Q.   Okay.  Likewise, in regard to being provided a

22  recommendation by Mr. Alrai for DigitalNet, you

23  indicated that you didn't recall if there were other

24  candidates that were presented to you; is that correct?

25       A.   Yes.

24

1      Q.    So I just want to clarify that answer to make

2   sure I understand it.

3      A.    Okay.

4      Q.    Which is you're not saying that other

5   candidates weren't presented, you just don't recall

6   whether other candidates were presented?

7      A.    That would be fair.

8      Q.    Okay.  If you had wanted -- you were actually

9   Mr. Alrai's direct supervisor, right?

10      A.    Yes.

11      Q.    And if you had chosen so -- you could have

12   directed him to bring you more candidates if you had

13   chosen?

14      A.    Yes.

15      Q.    Okay.  I also wanted to clarify with you that

16   you were asked about whether it was your decision to

17   accept the contracts and you indicated it was, correct?

18      A.    (Nods affirmatively.)

19      Q.    And you just need to give a verbal --

20      A.    Yes.

21      Q.    And I see you, but she has to take it down.

22      A.    I understand.

23      Q.    Okay.  You were asked a question about whether

24   you recalled having a specific conversation with Mr.

25   Alrai about qualifications of DigitalNet, and if I

1  understand your response correctly, again I want to

2  clarify, you indicated that you did not recall having a

3  conversation about the qualifications of DigitalNet; is

4  that accurate?

5         A.    That would be true.

6         Q.    But your testimony I think to the Judge was

7  but you think that you would have done so, you just

8  don't recall it?

9         A.    I don't recall it.  I relied on the judgment

10  of my CIO.  I was new to the Northeast, having lived in

11  the Midwest my entire life, and didn't have access and a

12  knowledge base or a network of technical folks and

13  resources to have access to.  So I relied upon him to

14  present to the company, and him being there longer than

15  I, folks who could accomplish what we needed to have

16  done.

17        Q.    Okay.  Now, let me ask you in regard to -- you

18  were asked a question about -- I'm switching gears on

19  you.  I'm going to ask you questions about working other

20  jobs and Mr. Alrai working other jobs.

21             You were asked whether you recalled if you

22  found out he had been working for the United Way, and I

23  think your testimony to the Judge was that you don't

24  recall that?

25        A.    That's true.  I don't recall.

1          Q.    Okay.

2          A.    I recall learning about it.  I don't remember

3     when I learned about it.

4          Q.    Okay.  So -- and I appreciate that

5     clarification.  So your testimony really is while you

6     were there you did learn about it.  You're just not sure

7     when?

8          A.    I don't recall if I learned about it then when

9     I was working there or after he left.

10         Q.    Okay.  So let me ask you -- you do recall

11    being interviewed by law enforcement in this case; is

12    that correct?

13         A.    Could you repeat the question, please?

14         Q.    Do you recall being interviewed by law

15    enforcement in this case, in particular I believe it was

16    Todd Donnelly, on October 11th of 2018?

17         A.    Yes.

18         Q.    Okay.  And you provided and met with him for a

19    fairly significant period of time, right?

20         A.    Yes.

21         Q.    Do you remember where you met with Agent

22    Donnelly?

23         A.    We met at the federal court building in St.

24    Louis.

25         Q.    And was anybody else with Mr. Donnelly when

1    you met with him?

2        A.   Yes, Mr. Davis was with.

3        Q.   Okay.  And how long did you meet with them

4    that day?

5        A.   Several hours.

6             MR. HARRINGTON:  And the prosecutors are

7    laughing at me because I'm messing up the screens.

8        Q.   When you spoke with the investigator that day,

9    you tried to provide accurate and detailed information

10   as you could, correct?

11       A.   Correct.

12       Q.   Do you recall telling them about your

13   knowledge of finding out that Mr. Alrai had been working

14   at the United Way?  Do you recall talking about that

15   subject?

16       A.   I do recall talking about that, yes.  I read

17   the transcript, too.

18       Q.   Okay.  And do you recall in that transcript --

19   you said you reviewed the transcript.  Do you recall

20   saying that although you weren't sure, it was possibly

21   in the fall of 2012 that you learned from Maureen

22   Johnson that Mr. Alrai was working at the United Way?

23   Do you recall telling Mr. Donnelly and Mr. Davis that?

24       A.   I recall reading what I said.  I've read it

25   twice.  And I also recall as you read through there, I

1    also further talk about him being employed at the

2    University of Southern New Hampshire.

3         Q.   Sure.

4         A.   And I may have been mixing up my recollection

5    of that.  It was, you know, six years ago.

6         Q.   Understood.  I'm just trying to get this

7    information.  I just want to make sure you understand,

8    I'm not accusing you of making a misstatement or

9    anything like that.

10        A.   Okay.

11        Q.   Because I think we all understand this is six

12   years ago.

13        A.   Right.

14        Q.   And part of the reason I bring up the report

15   for your consideration is sometimes those documents kind

16   of can refresh your memory.

17        A.   Uh-huh.

18        Q.   So just to be clear, I'm not accusing you of

19   withholding information, okay?

20        A.   Right.

21        Q.   So you do recall that now that we're talking

22   about it that it was in the report and you recall

23   conveying that information to Mr. Donnelly?

24        A.   Right.

25        Q.   And you agree with me that at the time that

1   you spoke to Mr. Donnelly and you said that you were

2   trying to provide accurate information as best you

3   could?

4         A.   Yes.

5         Q.   And at that particular time the recollection

6   was that possibly you learned about that in the fall of

7   2012 that Mr. Alrai was at the United Way?

8         A.   That's what it says.

9         Q.   Okay.  And you would agree with me that Mr.

10  Alrai didn't leave the employment of Robert Allen until

11  I think it was September of 2013?

12        A.   Yes.

13        Q.   Okay.  Just a couple of final questions, Mr.

14  Cioffi, and I'll be done.

15             I want to circle back to another subject, the

16  contracts again, and in particular the one that was

17  relative to the website.

18             In regard to that contract, would you agree

19  with me that that contract was relative to staffing for

20  the development of the website?

21        A.   That's what it states.  The understanding was

22  that because we didn't have those resources, they were

23  to basically produce for us the back end necessary for a

24  website.

25        Q.   I understand that, but what I want to focus in

1  on, and I know you've really just kind of focused in on

2  it, but the contract itself talks about staffing for it.

3  It does not talk about actually that they would develop

4  the website; isn't that correct?

5      A.   That's what it states.

6      Q.   Okay.

7      A.   That's not the understanding that Imran

8  represented to me it was supposed to be for.

9      Q.   Okay.  But that is the terms of the written

10 contract?

11     A.   Correct.

12     Q.   Okay.

13          MR. HARRINGTON:  I don't have any other

14 questions for this witness, your Honor.

15          THE COURT:  Redirect?

16          MS. LE:  Yes, just briefly.

17          Thank you, your Honor.

18                     REDIRECT EXAMINATION

19 BY MS. LE:

20     Q.   Who drafted that contract?  Who was involved

21 in negotiating and executing that contract for the web

22 services?

23     A.   Both Imran and myself.

24     Q.   Okay.  In terms of what you just said about

25 how the contract was for staffing to develop, did you

1    guys get staff from Robert Allen Group -- I mean from

2    DigitalNet to come to Robert Allen Group to create this

3    website with your team?

4        A.   No.

5        Q.   What were they supposed to do?

6        A.   It was supposed to be designed initially

7    remotely for services, but later on we discovered that

8    things were not getting done and we asked to meet with

9    them.

10       Q.   Okay.  By them, who were you trying to meet

11   with?

12       A.   The team from DigitalNet, the five

13   programmers.

14       Q.   Okay.  So the contract was for five

15   programmers to help you create this website?

16       A.   Yes.

17       Q.   Fair to say?

18       A.   Correct.

19       Q.   What exactly did Imran Alrai represent to you

20   that this contract was going to produce?

21       A.    It would help us take the wire frames and help

22   us develop a website that would be functionally

23   operating.

24       Q.   Okay.  Did you ever learn the identity of

25   those five programmers that were supposed to be staffing

1    this project?

2         A.   No.

3         Q.   Why not?

4         A.   Later they refused to meet with us.

5         Q.   Who is the they who refused to meet with you?

6         A.   I'm sorry.  DigitalNet refused to meet with

7    us.

8         Q.   Did DigitalNet ever give you a name for any of

9    the programmers?

10         A.   Not to my knowledge.

11         Q.   Okay.

12              MS. LE:  So let's pull back up the web

13   services contract very briefly.  Just give me a moment.

14   This is going to be Exhibit 307.

15              So we'll pull back up Exhibit 307.  This is

16   the professional services agreement for the website

17   project, and I'd like to go to page 222.

18         Q.   All right.  This is the schedule of work,

19   right?

20         A.   Yes.

21              MS. LE:  Ms. Sheff, could you just highlight

22   the services section?

23         Q.   Okay.  Can you just read the services out loud

24   that were supposed to be produced by DigitalNet to

25   Robert Allen Group?

1          A.    Starting the first paragraph?

2          Q.    Yes.

3          A.    "DigitalNet will provide the following

4    services as an extension of client's IT team virtually

5    in collaboration with client's senior technical staff

6    for the new website www.robertallendesign.com

7    development projects with Magento as the eCommerce

8    platform:  PHP development programming coding, MySQL

9    database administration, Linux systems administration,

10   Apache web server administration, back end ERP system

11   integration with assistance from client, and then

12   quality assurance.

13         DigitalNet will work directly with the

14   client's CIO, who has the authority on company's behalf

15   to nominate a representative or project manager for

16   daily tasks.  It is required that all final decisions

17   and approvals will come directly from the CIO and

18   DigitalNet is not responsible for seeking any approvals.

19   For any information requested or outstanding where it is

20   needed for DigitalNet to proceed with the assigned

21   tasks, client will follow up with a status in writing

22   via e-mail within one business day."

23         Q.    And at the time this contract was signed who

24   was the client CIO?

25         A.    Imran.

34

1          MS. LE:  Ms. Sheff, could you highlight that

2   section that's called Virtual Team Members.

3      Q.    There are three senior PHP programmers, one

4   senior MySQL database administrator, and one Linux and

5   Apache systems administrator.  Those were the five

6   programmers who were supposed to be working under this

7   contract?

8      A.    Yes.

9      Q.    And they were supposed to be provided by whom?

10     A.    DigitalNet.

11     Q.    Thank you.

12          MS. LE:  Can we go to the section called

13  Timings and Duration?

14     Q.    And what is this about?

15     A.    This talks about the hours, right, that they

16  will be working under the contract.

17     Q.    And what hours were they supposed to be

18  working?

19     A.    They were supposed to be working normal

20  working hours for client.  They would begin contracted

21  on Monday, August 12, 2013, to February 28, 2014, and

22  are extendable on a month-to-month basis after February

23  28, 2014, if required.

24     Q.    This is about a six-month-long contract?

25     A.    That's correct.

1      Q.    So in that six months what did you expect to

2  be done?

3      A.    We were expecting to have an operational

4  website with a functionality as we designed.

5      Q.    Okay.  And you terminated the contract in

6  February; is that right?

7      A.    That's correct.

8      Q.    What did you have in February when your

9  contract was terminated?

10     A.    Dean was on board at the time.

11     Q.    Oh, no, in terms of work products for the --

12     A.    Oh.  Nothing delivered except one web page.

13           MS. LE:  Next page, please, Ms. Sheff, 223.

14  Can we look at the payment schedule?  Actually, let's

15  start with the payment at the top.

16     Q.    So it looks like you negotiate a flat contract

17  fee of $230,000, right?

18     A.    Yes.

19     Q.    Okay.  And this is for up to 42 hours a week

20  per person for the five contractors, right?

21     A.    Yes.

22     Q.    Okay.  And then if you needed additional time

23  to do more work, there's a flat monthly fee; is that

24  right?

25     A.    Yes.

1      Q.   40 grand?

2      A.   Yes.

3      Q.   All right.

4           MS. LE:  Let's go to the payment schedule.

5      Q.   Okay.  Now, how much -- the total is $230,000;

6  do you see that?

7      A.   Yes.

8      Q.   By the time Dean came on, how much had Robert

9  Allen Group paid DigitalNet for this website?

10     A.   We paid -- Dean came on in November.  We would

11 have paid $160,000.  We made the payment in December, so

12 by the end of December there was $200,000 paid.

13     Q.   And is it correct that you never made this

14 last payment --

15     A.   Yes.

16     Q.   -- for $30,000 that was due on January 2nd?

17     A.   Yes.

18     Q.   All right.

19          MS. LE:  No further questions, your Honor.

20          THE COURT:  Any cross?

21          MR. HARRINGTON:  I do, Judge.

22                    RECROSS-EXAMINATION

23 BY MR. HARRINGTON:

24     Q.   Mr. Cioffi, in regard to the contract, you

25 were asked a question about DigitalNet coming to Robert

1    Allen.  Part of the contract it was agreed that these

2    would be remote workers, correct?

3         A.   Yes.

4         Q.   Okay.  You had talked about names of

5    individuals.  One of the individuals that was in charge

6    of this obviously was Mr. Riviera when he came on,

7    correct?

8         A.   Yes.

9         Q.   And you're aware that he had direct contact

10   with a named individual at DigitalNet named Anwaar

11   Hussain, correct?

12        A.   I saw that name.

13        Q.   And you were aware that Mr. Riviera was having

14   direct communication with that individual about the web

15   development, right?

16        A.   Yes.

17        Q.   And in fact they had many e-mails back and

18   forth, correct?

19        A.   Yes.

20        Q.   Additionally, you were aware that as far as

21   the staff that was provided, resumes and CVs of the

22   individuals were provided to Robert Allen?

23        A.   No.

24        Q.   You were not aware of that?

25        A.   Correct.

1      Q.   Okay.  You would agree with me that you're not

2  aware of the people at DigitalNet who were working

3  behind the scenes because they were working remotely,

4  right?

5      A.   Yes.

6      Q.   I wanted to ask you a couple of questions in

7  regard to the timing.  One of the things the prosecutor

8  asked you about was in the contract it talked about

9  working with the chief information officer, that

10  DigitalNet would work with the chief information officer

11  who at the time was Mr. Alrai.

12           You executed these contracts and I think you

13  went through the specific dates.  I'll just summarize

14  them.  August 1, 2013, was the RPG programmer contract,

15  August 5th was the Telephony contract of '13, August 9th

16  of 2013 was the professional service contract, and

17  August 14th was the staff augmentation contract.

18           That sounds like those are the right dates

19  that you talked to the prosecutor about?

20      A.   Yes.

21      Q.   Okay.  You agree with me that Mr. Alrai, I

22  think you had indicated, left in September of 2013 the

23  Robert Allen Group?

24      A.   Yes.

25      Q.   And so obviously during that time until

1    November there was no chief information officer at

2    Robert Allen, right?

3         A.    Correct.  But there was a person assigned, Ray

4    Courtois, who was responsible for leading this project.

5         Q.    Sure.  I wouldn't say that it would be an

6    empty void, but there was somebody else that had to kind

7    of fill that void, correct?

8         A.    Correct.  Yes.

9         Q.    Okay.  And would you agree with me that one of

10   the challenges that you faced when you came into Robert

11   Allen was the loss of employees, correct, to the .NET?

12        A.    No, I would not agree with that.

13        Q.    You would not?

14        A.    No, I would not agree with that.

15        Q.    Okay.  Again, I want to refer to the interview

16   that you gave on October 11th of 2018.

17              You talked to Mr. Donnelly about the decisions

18   that Robert Allen had made to outsource services,

19   correct?

20              And let me ask you this, would reviewing the

21   statements in the report help refresh your recollection?

22        A.    Sure, if you have something.

23              MR. HARRINGTON:  May I approach, Judge?

24              THE COURT:  Yes.

25              MS. LE:  Your Honor, may I just raise an

1    objection that it seems like this line of questioning is

2    outside of redirect and therefore outside the scope of

3    recross.

4              THE COURT:  It's probably true, but I'm

5    interested in knowing so I'll allow it, but you're

6    right.  The objection is sustained I guess, but I'm

7    going to instruct you to do it anyway.  Objection is

8    noted.

9         Q.   Mr. Cioffi, I'm just going to show you a

10   document.  And if you need to read more or less of it,

11   you let me know, but I'm going to just draw your

12   attention to this paragraph.

13        A.   Okay.

14        Q.   Read that to yourself and then when you're

15   done reading it, let me know.

16        A.   Okay.  Thank you.

17             (Witness reads document)

18        A.   I've read it.

19        Q.   I'll just grab that back from you.

20             So after reading that, does that refresh your

21   memory a little bit about the discussion you had with

22   Agent Donnelly back in October?

23        A.   Yeah, I know what I said.

24        Q.   Okay.  And would you agree with me that at

25   that time when you were talking about outsourcing

1    decisions, one of the reasons was because Robert Allen

2    had been losing people to the .NET and RPG projects?

3         A.   We had -- yes, we had lost an RPG programmer

4    who passed away.

5         Q.   Passed away.  Okay.  And also people to the

6    .NET?

7         A.   The .NET was -- we were actually going to

8    promote somebody, I think was my recollection, to run a

9    project, so we would need to backfill that position.

10        Q.   All right.  And the idea was that you thought

11   it would be more cost effective as a business to

12   outsource it?

13        A.   Yes.  But you said the challenge for Robert

14   Allen was a loss of employees, and I was disagreeing

15   with your assertion because that's a broad statement,

16   not specific to IT.

17        Q.   Okay.  And I apologize if the question wasn't

18   specific enough.  I was referring to --

19        A.   You didn't say IT, so that's why I said

20   something.

21        Q.   Not a problem.  Not a problem, Mr. Cioffi.  My

22   apology for not being more specific.

23        A.   Sure.

24             MR. HARRINGTON:  I have no other questions for

25   the witness, your Honor.

42

```
 1                    THE COURT:  All right.  Sir, you're excused.
 2                    THE WITNESS:  Thank you.
 3                    MS. LE:  Safe travels, Mr. Cioffi.
 4                    Your Honor, the government calls Dean Riviera
 5    to the stand.
 6                    THE COURT:  Please.  So this is the last RAG
 7    witness?
 8                    MS. LE:  Yes, your Honor.
 9                    Well, we have one more witness who potentially
10    -- used to work there, but we don't count it as this
11    group.
12                              DEAN RIVIERA
13         having been duly sworn, testified as follows:
14                    THE CLERK:  For the record, please state your
15    full name and spell your last name.
16                    THE WITNESS:  Dean Jake Riviera,
17    R-I-V-I-E-R-A.
18                            DIRECT EXAMINATION
19    BY MS. LE:
20         Q.   Good afternoon, sir.
21         A.   Hello.
22         Q.   How are you doing?
23         A.   Good.
24         Q.   Are you enjoying the New England weather?
25         A.   Yes, as much as possible.
```

43

1      Q.    Mr. Riviera, where do you live?

2      A.    In Columbus, Ohio.

3      Q.    And is it snowing in Columbus, Ohio, today?

4      A.    I haven't even checked.

5      Q.    Oh, good.  All right.  What do you do for a

6   living, sir?

7      A.    I am a self-employed consultant in the

8   technology field.

9      Q.    How long have you been a self-employed

10   consultant?

11      A.    Since departing Robert Allen.

12      Q.    When did you leave the Robert Allen Group?

13      A.    June 2017.

14      Q.    And I'd like you to just give the Court a

15   little bit about your background in information

16   technology services, okay?

17      A.    With regards to that specific or all,

18   everything?

19      Q.    Everything.  Just -- but on a general level.

20   We don't need to go through every date and degree that

21   you've ever earned.

22      A.    Okay.  All right.

23            Attended Colorado State University, computer

24   science engineering.  Departed, finished that in 1983.

25   Through 1992 founded my own company called Millennium

1    Software Solutions, developing software solutions for

2    the healthcare pharmaceutical industry as well as hotel

3    hospitality industry as well and transportation

4    logistics.

5            Moved on from Millennium to a company called

6    Safelite Glass Corp. starting in '92 to 2005.  I was

7    their director of IT and I spearheaded and provided

8    leadership for web development for the company, cyber

9    security, and retail point of sale systems and warehouse

10   distribution systems.

11           Left Safelite Glass Corp. starting in 2005

12   through 2006 to a company called Harmon Solutions Group

13   with a subsidiary company called Code Blue, it was a new

14   startup, to design and develop third-party insurance

15   claims for water, fire, or smoke property damage, okay?

16           That company, Harmon Solutions Group, was a

17   subsidiary company to the Dwyer Group, okay, and with

18   regards to that company it was very successful.  As the

19   CIO there, they asked me to be the CIO for all of their

20   portfolio companies.  They had approximately ten

21   different companies, the Dwyer Group has, primarily in

22   the service trade industry.  I was the CIO for them,

23   global transformation, all types of different services.

24   You've probably heard of some of their brands:  Mr.

25   Electric, Mr. Appliance, Rainbow International, et

1    cetera.  So provided responsibilities and leadership for

2    the entire digital landscape.

3            They were in 13 countries and I was

4    responsible for all of that digital landscape for all

5    the companies.  Each of those companies did have a

6    president with an organizational structure below them.

7    So as the CIO, I definitely had to collaborate and

8    communicate with all executive leadership.

9            Upon departing the Dwyer Group in 2013,

10   specifically November, my start date was around November

11   20th started with Robert Allen and departing in June

12   2017 with Robert Allen, and I was the CIO there.

13           So lots of digital landscape accountability

14   and responsibility for the Robert Allen Group.

15       Q.   So in total how many years have you had

16   experience as a CIO?

17       A.   Starting since 2005.

18       Q.   Okay.  Until you left Robert Allen Group in

19   2017?

20       A.   Correct.

21       Q.   Okay.  When you joined the Robert Allen Group

22   in June of 2017, what was the management structure

23   there?

24       A.   When I started, there was obviously a CEO,

25   CFO.  I reported directly to Chuck Cioffi at Robert

1   Allen.

2            The organizational structure, there was a VP

3   of product, a VP of HR, a VP of finance, VPSLs, VP of

4   contract, VP of merchandising, and a VP of operations

5   and distribution.

6        Q.    And all those VPs that you just named, were

7   they in Foxboro?

8        A.    No, they were in three different locales

9   between Foxboro, Mass., and New York corporate office

10  and then in Gaffney, South Carolina.

11       Q.    And as CIO, did you work with all of those

12  VPs?

13       A.    All of them.

14       Q.    Okay.  Did you work with other senior level

15  management?

16       A.    Yes.  All the directors and above.

17       Q.    And how would you describe your level of

18  oversight as CIO at the Robert Allen Group?

19       A.    Both as hands-on and as executive leadership

20  role providing strategy, collaboration, understanding

21  what needs each of the departments needs.  And as an IT

22  transformational leader, I wanted to know and understand

23  what is going to take that department and elevate it to

24  the next level, right?  What are your needs.

25       Q.    Did you do that?

1          A.    I provided that.

2          Q.    How did you get that insight to take Robert

3    Allen Group to the next level?

4          A.    Years of experience, you know.  I've been

5    working with all different types of -- sizes of

6    companies.  It doesn't matter whether it was corporate

7    size, small mom and pop, government companies, all sizes

8    and levels.  I know and understand communication is

9    important and I sat down with each of those leaderships

10   first, second, third, fourth day on my onboarding,

11   arriving, and meeting face-to-face and communicate and

12   say, how is IT doing for you, what are your needs?

13         Q.    Okay.  So that meeting was with the leadership

14   and your fellow VPs and those folks.  When you started

15   for the onboarding process that first week, what was the

16   consensus that you got about what can the IT department

17   do to help them?

18         A.    They were in desperate need of IT support.

19         Q.    What happened?

20         A.    Well, the feedback that I was receiving is,

21   you know, you don't necessarily want to hear this on

22   your first day, but they basically were telling me IT is

23   the worst department in the company.

24              MR. HARRINGTON:  Objection.  Hearsay.

25              THE COURT:  I can't tell yet so --

1          MS. LE:  How about I just rephrase the

2    question just a little bit, your Honor.

3          Q.   Sir, what was the state of the IT department

4    when you were there, when you first started in June

5    of 2007 -- November of 2013, I'm sorry?

6          A.   I think one word might sum it up, and that's

7    neglect.

8          Q.   How so?

9          A.   Well, when I arrived there, I immediately saw

10   some observations, okay?  The observations that I saw

11   looking at everybody's desktop, they were old.  They

12   were very old.  And in addition to that, those desktops

13   were running Microsoft XP.  Microsoft XP at that point

14   in time had already been sunsetted, meaning they no

15   longer support that operating system.

16          So in addition to that, there were some other

17   things.  With regards to the warehouse distribution

18   facility in Gaffney, there was no way at that point in

19   time, it was November, December, there was no way for

20   them to actually -- on an effective manner actually do

21   the barcoding and scanning of their inventory product,

22   okay?  So they had some challenges on scanning product

23   efficiently.  They had some devices but not enough.

24          In addition to that, the networks in the

25   company.  When you talk about networks, it means

49

1    communication bandwidth in the company.  Lots of people

2    were not receiving e-mails.  E-mails were being dropped.

3    The storage on the e-mail platform would -- they would

4    actually run out of storage so you couldn't get your

5    e-mails.  So some retooling had to take place due to the

6    e-mail problem.

7            The networks were inefficient in the company.

8    If the marketing department were actually sending large

9    images, which this is a textile company with high

10   resolution images, they needed to send them from New

11   York to the Foxboro location over the network.  We're

12   talking anywhere probably between 80 to 100 gigs of data

13   when they actually sent it.  It would actually crash the

14   network.  The networks needed to be upgraded.  They were

15   seriously out of date.

16           THE COURT:  So when you say Microsoft would no

17   longer support the desktops, is that what you said?

18           THE WITNESS:  Microsoft XP which was the

19   operating system, okay?  So --

20           THE COURT:  Microsoft would no longer support

21   that?

22           THE WITNESS:  They actually had sent out

23   notifications saying they are no longer going to go

24   ahead and support Microsoft XP.

25           THE COURT:  Do you remember how old that was

1    at the time?

2              THE WITNESS:  About 25 years old.

3              THE COURT:  Oh, okay.

4        Q.    Let me follow up on the Judge's question and

5    just break down what you just told us about.

6              The fact that the desktops were using outdated

7    Microsoft software, the XP system, and you said how long

8    had it been outdated?

9        A.    At that point in time it was approximately 25

10   years.

11       Q.    And whose job would it be to make sure that

12   the computers used by Robert Allen Group employees had

13   updated software?

14       A.    That's the infrastructure team.

15       Q.    And who would oversee the infrastructure team?

16       A.    Obviously it rolls up to the CIO, of course.

17       Q.    Okay.

18       A.    But there are specific individuals that had

19   oversight, which is the desktop team, the infrastructure

20   team, the network team actually managed that.

21       Q.    And this observation you made when in terms of

22   when you started?

23       A.    Within the first week.

24       Q.    First week.  Okay.  How about the network,

25   your observations about the network crashing and being

1   inefficient?

2        A.    Well, with the telephone systems going down,

3   obviously those two platforms, one in the showrooms,

4   right, and then there's another one for the corporate

5   side of things, so really two different entities you

6   have to actually take a look at.

7        Q.    Okay.

8        A.    Both of those platforms were having

9   challenges, okay?

10            Periodically throughout the day you would have

11  an outage or people would be on the phone speaking and

12  you will hear, you know, breaks in the call, or you

13  might hear every third word.  So those are periodically

14  transpiring throughout the day.

15            But me knowing and understanding technology --

16  there's really three pillars of technology you have to

17  take a look at.  Your infrastructure, which is your

18  servers that consist of, you know, all the software

19  riding on it, the second piece is the network, okay,

20  bandwidth, how you send data to and fro, and then the

21  application sits on top of it.

22            I immediately diagnosed that -- or observed, I

23  should say, if the phones are going down, if they're

24  having troubles with e-mails and storage and other

25  things, there's a common denominator between all of

1    them, and that's the network bandwidth.  That was a

2    major concern of mine, okay, so I knew that we actually

3    had to take care of what is causing the networks

4    contributing to these problems.

5         Q.   Okay.  So you've just given the Judge kind of

6    a big overview of the issues that you saw or diagnosed

7    immediately when you came on as CIO, right?

8         A.   Yes.

9         Q.   Okay.  Let's drill down a little bit and talk

10   about your department, the IT department as you

11   inherited it in 2013, okay?

12             How many people reported to you directly?

13        A.   There was four.

14        Q.   Who were the four people who reported to you

15   directly?

16        A.   That is Bob Powers, B-O-B, P-O-W-E-R-S.  Lauri

17   Powers, L-A-U-R-I, Powers, P-O-W-E-R-S.  Ray Courtois,

18   R-A-Y, C-O-U-R-T-O-I-S.  And Kal Wahbe, K-A-L,

19   W-A-H-B-E.

20        Q.   Great.  And were they kind of the supervisors

21   within your department?

22        A.   They were the directors of the team

23   specifically heading up each of the different functional

24   areas of IT.

25        Q.   And how many people comprised the entirety of

53

1    the IT department at the Robert Allen Group when you

2    first joined?

3         A.    All -- total employees?

4         Q.    Under the IT department umbrella.

5         A.    When I arrived, I'm not a hundred percent, but

6    maybe around 18, 17, somewhere in there when I started.

7         Q.    Okay.  And when you worked at the Robert Allen

8    Group did you work at a particular location?

9         A.    Yes.  Foxboro.

10        Q.    Okay.  Did you work on-site or did you work

11   remotely?

12        A.    I did not work remote, but I commuted.  My

13   residence was still in Columbus, Ohio.

14        Q.    So you commuted every day from Columbus, Ohio,

15   to Foxboro, Mass.?

16        A.    Just on weekends.

17        Q.    Okay.  And why did you do that?  Why not work

18   remotely?

19        A.    As a CIO, an executive leader, and experience,

20   I've worked with multiple different companies, multiple

21   different departments, multiple different department

22   heads, it's important you have that face-to-face

23   relationship.  Things are -- in technology, things get

24   miscommunicated or lost if you actually are working

25   remote and dialoguing over a phone.

54

1      Q.   Okay.  Now, did you know your predecessor CIO

2  at Robert Allen Group, Imran Alrai?

3      A.   I did not know him.

4      Q.   Okay.  Did you know that he was the previous

5  CIO?

6      A.   I heard the name at the point in time when I

7  arrived.

8      Q.   And during your tenure at Robert Allen Group

9  did you ever meet Imran Alrai?

10     A.   No.

11     Q.   Did you ever talk on the phone with him?

12     A.   No.

13     Q.   Okay.  Now, let me see.  Okay.  So you told

14  the Court a little bit about how outdated the network

15  and systems were for Robert Allen Group.  What needed to

16  happen to bring it up to date?

17     A.   Well, there's lots of things that have to

18  happen simultaneously.  So with regards to the network,

19  obviously I took a look, that it was an outdated network

20  running on an MPLS network that definitely needed to be

21  upgraded to a fiber network.  Most businesses today,

22  they all run off of fiber.  That was definitely one of

23  the major things that needed to be fixed.  So the next

24  step was to get quotes and start taking a look at cost.

25     Q.   Okay.  Now, did you become aware of some

1    contracts that Robert Allen Group entered into with

2    DigitalNet Technology Solutions?

3         A.   Yes.

4         Q.   Okay.  And those contracts were entered into

5    before you arrived, right?

6         A.   Correct.

7         Q.   And I'm not going to talk to you about all of

8    those contracts.  I want to talk to you about two

9    contracts in particular, the contract related to website

10   development and the contract related to the phone

11   services, okay?

12        A.   Okay.

13        Q.   All right.  Let's start with the website

14   contract.  I'm calling it the website contract.  I know

15   there's a fuller term.  I'd like to show you Exhibit

16   307.  Let me clear this.

17             Are you familiar with Exhibit 307, sir?

18        A.   Yes.

19        Q.   And is this the website contract?

20        A.   Yes.

21        Q.   Okay.

22             MS. LE:  And Ms. Sheff, if we can go to page

23   222, which is the schedule of work.

24        Q.   Do you see this, sir?

25        A.   Yes.

56

1      Q.   All right.  I'd like you to start with the

2    services section.  There's a lot of terminology that I

3    don't understand.  Could you explain to me in layman's

4    term what this services section represents?

5      A.   The bullet points or the narrative?

6      Q.   The whole thing.

7      A.   Okay.  The narrative is to actually design a

8    brand-new website called robertallendesign.com, okay?

9    Robert Allen already had an existing website, so this is

10   to build a new website with a new fresh look and feel

11   and build it on a Magento platform, an eCommerce

12   platform.  Magento is a content management system where

13   it allows you -- it's a tool that allows you to build a

14   website, okay?

15          The bullet points below, PHP programming and

16   development and coding, these are your developers, okay?

17   You need developers to build the website.

18          The MySQL database is obviously that, the

19   storage and the database.

20          Linux is the operating system that runs it.

21   Very similar to, as I've referenced before, the Windows

22   XP.

23          Apache web server is the front end

24   administration.  When it connects to the network and

25   connects to the cloud, that is that front end work.

1           The back end ERP is the integration to the

2   AS/400 platform.  AS/400 platform is the platform that

3   actually runs Robert Allen, which is the work orders,

4   the service orders, the distribution type system in the

5   back end.  So the website has to communicate to the back

6   end to the AS/400 platform, and then quality assurance.

7       Q.   So based on the services that are set forth

8   here, what are your expectations of DigitalNet's

9   deliverables?

10      A.   To build a brand-new website.

11           MS. LE:  Okay.  Ms. Sheff, can we go to this

12  part here.

13      Q.   All right.  Do you see this?

14      A.   Yes.

15      Q.   It talks about how they're going to get this

16  work done, how they're going to work with the client?

17      A.   Yes.

18      Q.   Okay.  And you were the client's CIO by the

19  time you entered, right?

20      A.   Yes.

21      Q.   So did you have any involvement working with

22  DigitalNet to see through the project?

23      A.   No.

24      Q.   To see through the project?

25      A.   Oh, see through the project, yes.

1      Q.    What was your role?

2      A.    My role was the CIO.  Chuck Cioffi chartered

3  me to take a look at the DigitalNet contract with

4  regards to the website.  He indicated that there is some

5  issues or problems with the website and if I can

6  actually take a look at it, get it back on track, or

7  whatever is needed.

8      Q.    Okay.

9            MS. LE:  Ms. Sheff, can we go back to the

10  whole page.  Can we highlight the virtual team members

11  section?

12      Q.    So what does this section tell us?

13      A.    That virtual team member says that the staff

14  -- to build the new website provided by DigitalNet, they

15  would provide three senior PHP programmers.

16      Q.    Okay.

17      A.    And a MySQL database person and a Linux Apache

18  administrator.

19      Q.    Okay.  Do you remember that previous section

20  we were talking about, how you as a CIO were supposed to

21  work with DigitalNet to see this contract through?

22      A.    Yes.

23      Q.    Did you ever learn the identity of those five

24  virtual team members?

25      A.    No.

1      Q.   Did you ever ask?

2      A.   Yes, multiple times.

3      Q.   Who did you ask?

4      A.   I asked Mac and I asked Anwaar.

5      Q.   Who are Mac and who is Anwaar?

6      A.   Mac Chaudhary is their business development

7  representative from DigitalNet, and Anwaar was their

8  project manager.

9      Q.   Okay.  And we'll go into detail more about

10 your discussions, but why weren't you ever given the

11 names of those five individuals who were supposed to

12 work on this project?

13     A.   I was told by Mac that they're virtual folks;

14 that we have to go through Anwaar.

15     Q.   Virtual folks like they're computer-generated

16 people?

17     A.   I have no idea.  I was trying to find the

18 names to these individuals.  If they're on our team and

19 they're supposed to develop the website as a team, they

20 need to know and understand the work efforts that are

21 being applied to build the website.

22     Q.   So did you ever get like a resume or a list of

23 qualifications of those supposed five virtual team

24 members?

25     A.   No.

1        Q.    Okay.

2              MS. LE:   Let's go to Timing and Durations,

3    which is the bottom section, Ms. Sheff.

4        Q.    Okay.  What does this section tell you?

5        A.    That those individuals would be working normal

6    working hours for the client, i.e., that would be Robert

7    Allen, on the scheduled project tasks that were as

8    applicable.

9        Q.    What were Robert Allen's normal working hours?

10       A.    8 to 5.

11       Q.    What time zone?

12       A.    Eastern.

13       Q.    Okay.  And what was the time period for this

14   contract?

15       A.    August -- commencing in August and -- you

16   know, the payables.

17       Q.    Okay.  So that actually says the date here

18   Monday, August 12, 2013, to February 28, 2014, right?

19       A.    Correct.

20       Q.    So about six months?

21       A.    Correct.

22       Q.    Okay.

23             MS. LE:   Ms. Sheff, can we go to page 223.

24       Q.    Now, sir, I know you didn't start until

25   November 2013, but let's go to the payment schedule in

1    the middle there.

2           Are you aware of any payments that Robert

3    Allen Group had made by the time you arrived?

4        A.   Yes.

5        Q.   How much had Robert Allen Group paid before

6    you even arrived?

7        A.   200,000.

8        Q.   Okay.  And when you arrived in November of

9    2013, what had been produced as part of this contract?

10       A.   Zero.

11       Q.   Can you be more specific?

12       A.   Yeah.  With regards to the website itself, we

13   were looking for at least one homepage, something built

14   on the web page that the marketing team -- this project

15   was a marketing team project -- that they could look at.

16   The marketing team provided them the design and page

17   layouts, and they were looking to see a web page that

18   looked like their design.

19       Q.   Okay.  If I'm hearing you correctly, the

20   marketing team had already provided the look and feel of

21   the website to DigitalNet to create the actual website,

22   right?

23       A.   Yes.

24       Q.   Okay.  Now, I don't know a lot about website

25   design.  So what goes into creating a website?

1      A.    There's multiple components in building a

2  website.  Actually, you have to have a computer server,

3  right, which is administration.  You have to have a

4  database to store the data, programmers to define and

5  build the software code that takes the design that the

6  marketing team provided, the design page look and feel,

7  take those wire frames and those page layouts, which is

8  the imagery and the text that goes into a web page,

9  extract that information and then superimpose it into

10 Magento.  The platform here is Magento, that's

11 important.  Magento is a web building tool so it

12 actually reduces the amount of time and work effort to

13 build a website.

14     Q.    And have you worked on other website

15 development projects before in your capacity as CIO?

16     A.    Yes.

17     Q.    And is a six-month term sufficient to create a

18 new website for what Robert Allen was looking for?

19     A.    For their site, yes.

20     Q.    Okay.  Do you see there's a section on page

21 223 called Notations?

22     A.    Yes.

23     Q.    I'd like you to talk a little bit about that

24 first bullet point there.  Can you read that out into

25 the record?

63

1      A.    "DigitalNet is only providing development

2  staff augmentation services and makes absolutely no

3  guarantees regarding any project timelines,

4  deliverables, or go live dates."

5      Q.    What did you think when you saw this notation?

6      A.    Very unorthodox.  I've never seen that

7  language in any of the contracts that I have experienced

8  in my career.

9      Q.    Okay.  So what does it tell you, though?  What

10 is DigitalNet representing to you in this notation?

11     A.    That they're providing staff augmentation

12 services to build the website.

13     Q.    So are they promising to give you some staff

14 members, those five programmers, but not necessarily

15 promising a website at the end of the day?

16     A.    I don't think I understand the question.

17     Q.    It says they're going to provide you with

18 staff, right?

19     A.    Correct.

20     Q.    Those five programmers and administrators we

21 talked about earlier?

22     A.    Yes.

23     Q.    Okay.  But they're also not guaranteeing that

24 they're going to meet any deadlines or provide any

25 deliverables or are going to meet any deadlines for

1    going live?

2         A.    Correct.

3         Q.    Given that caveat, what are your expectations?

4         A.    The expectation still is that they would

5    provide best effort to build the website.

6         Q.    So by the time that you arrived in November of

7    2013 was there an interface that had been created?

8         A.    Yes.  They did work on the API interface.

9         Q.    Okay.  What does that mean?

10        A.    It is taking the -- like building a bridge

11   from the AS/400 to the website to sync the data and the

12   work order.  Since it's an eCommerce site, if I place

13   eCommerce orders on the website, I need to be able to

14   send that order electronically through an API,

15   application interface, to the AS/400 platform so the

16   AS/400 can take that order and process it and fulfill

17   it.

18        Q.    So that was one of their services, right, to

19   build the integration?

20        A.    Correct.

21        Q.    Okay.  And what are your thoughts about them

22   having worked on the integration by the time you had

23   arrived?

24        A.    It's been my experience you do not do that.

25   When you're building websites, that's like a phase 2 or

1    a step 2 type thing.  It's not the first thing you do

2    when you build a website.

3         Q.    What's the first thing you do when you build a

4    website?

5         A.    When you build a website and you start

6    creating a pseudo or pilot homepage with the look and

7    feel, you provide demo data to populate that homepage or

8    product page or category page since it's an eCommerce

9    site.  You don't use real data at that point in time.

10   You're using dummy data to create a mock-up, and then

11   the users take a look at that and say, yes, that's what

12   we're expecting or not what we're expecting.

13        Q.    Okay.  So kind of putting the cart before the

14   horse?

15        A.    Correct.

16        Q.    All right.

17              Now, when you made these observations

18   reviewing the contract and trying to figure out what --

19   the status of the website project, did you do anything

20   to address your concerns?

21        A.    Yes.  I asked Ray Courtois to set up an

22   introductory meeting with DigitalNet.  I wanted to meet

23   the DigitalNet players, all five of these folks, and

24   meet with the staff.

25        Q.    Okay.  And was it your understanding that

1    DigitalNet was an actual company located in

2    Massachusetts?

3         A.    It was my understanding they were in Andover.

4         Q.    Okay.  And so did you have an impression that

5    there were people in a physical location?

6         A.    These five folks?

7         Q.    Or DigitalNet as a corporation.

8               THE COURT:  Did you think it was like a brick

9    and mortar --

10              MS. LE:  That's what I meant.

11              THE COURT:  You know, free-standing brick and

12   mortar --

13              THE WITNESS:  It was my impression, yes.  I

14   didn't have direct knowledge but impression.

15        Q.    Okay.  And were you able to communicate with

16   anyone at the -- so were you able to schedule a meeting?

17        A.    Yes, able to schedule a meeting.

18        Q.    Okay.  Did you have an in-person meeting?

19        A.    No.  It was a conference call.

20        Q.    Did you ever seek an in-person meeting?

21        A.    Yes.

22        Q.    How many times did you try to have an

23   in-person meeting?

24        A.    At least two or three times.

25        Q.    Were you ever successful in scheduling a --

1        A.    No.

2        Q.    Why not?

3        A.    In the conversations with Mac, because he was

4   our principal contact, he said due to logistics that was

5   not possible.  In addition to those five folks, he did

6   refer us that they were virtual, that we had to go

7   through Anwaar, which in my experience that's unheard

8   of.

9        Q.    Okay.  So let's talk about, again, what is

10  your -- when you were told these people were --

11            THE COURT:  That's interesting, though.  So

12  that's unheard of even in this realm?

13            THE WITNESS:  Even in this realm.

14            THE COURT:  Can you elaborate on that a little

15  bit?

16            THE WITNESS:  Yes.  Since I've done multiple

17  different building of websites, when you start to work

18  with the development team they all have special skills.

19  This is the reason why you have PHP developers, database

20  guy working on the database and the administration guy.

21  It's like saying this guy is a plumber.  This guy is an

22  electrician.  Different skill sets.

23            When you meet with these folks, there's

24  different stages of building a website.  And you refer

25  to that put the cart before the horse kind of thing?

1    Well, you have to make sure you know and understand what
2    does the website tree look like?  What does your site
3    map look like?  I have a contact us page.  I have a
4    homepage.  I have a product page.  You have to know what
5    that looks like.  You have to have a blueprint.  If
6    you're going to build a house, so to speak as an
7    analogy, you need a blueprint, right?  So you need that
8    blueprint.  The database guy needs a blueprint.  If you
9    are sending and receiving data and storing data, what do
10   you need to collect?  Name, address, city, state --
11              THE COURT:  When you say it's unheard of -- I
12   think I may have misunderstood you.  You weren't saying
13   it was unheard of not to see the people.  You're saying
14   it was unheard of not to see, I don't even know what the
15   word is, the data, the raw --
16              THE WITNESS:  You are correct.  It's both.
17   It's not able to see that and not be able to communicate
18   to those individuals.
19              THE COURT:  Thank you.
20        Q.   So Anwaar, A-N-W-A-A-R, something like that?
21        A.   I believe so.
22        Q.   Okay.  Do you know where Anwaar was located
23   allegedly?
24        A.   No.
25        Q.   Okay.  And if you wanted to speak to any of

1    those five people that that contract provided for, you

2    had to go through Anwaar?

3         A.   Correct.

4         Q.   And was Anwaar able to direct you to those

5    individuals?

6         A.   No.

7         Q.   Did Anwaar ever identify any of those folks?

8         A.   No.

9         Q.   Did Anwaar ever provide you with their

10   qualifications and skill sets?

11        A.   No.

12        Q.   Resumes?

13        A.   No.

14        Q.   A name?

15        A.   No.

16             THE COURT:  So obviously not contract

17   information either.

18             THE WITNESS:  Correct.

19             MS. LE:  Thank you, Judge.

20             THE COURT:  I didn't mean to do that.

21             MS. LE:  I warned the witnesses that your

22   Honor may interject and clarify when the lawyers fail to

23   be clear.

24             THE COURT:  That's not a failure.

25        Q.   Mr. Riviera, did you also have e-mail

1    communications with representatives of DigitalNet?

2         A.   Yes.

3         Q.   Okay.  And you were cc'd in some, you

4    initiated some of those e-mails; is that right?

5         A.   Correct.

6         Q.   So I'd like to go over a few of those e-mails

7    with you, and these are all related to the website

8    project.  I'd like to start with Exhibit 702.

9              And, sir, for your convenience, I know some of

10   these e-mails that we're going to go through are

11   multiple pages, I've put physical copies at the witness

12   table for you.

13        A.   Okay.

14        Q.   So, for instance, Exhibit 702 is nine pages

15   long.  Could you just flip through your physical copies

16   to make sure you are familiar with the set of e-mails

17   that I am going to ask you about.

18        A.   How do I reference for --

19        Q.   It should be labeled at the top.

20        A.   Yeah.  Oh, it's in this stack.  Sorry.  Okay.

21   Got it.

22        Q.   Flip through and make sure you recognize those

23   exhibits.

24        A.   Yes.

25        Q.   Okay.  Do you recognize these e-mails?

1      A.   Yes.

2      Q.   Okay.  And is this a series of e-mails

3  exchanged between a team member of yours, Ray Courtois,

4  and a person named Mohammad using the e-mail address

5  info@digitalnet.us?

6      A.   Yes.

7      Q.   And the first e-mail looks like it starts

8  September 25, 2013.  That's probably all the way in the

9  back.

10      A.   Yes.

11      Q.   Okay.  And it goes all the way to the front.

12  The first page is the last e-mail, right, the most

13  recent e-mail?

14      A.   Correct.

15      Q.   Okay.  And what was the date of the most

16  recent e-mail --

17      A.   November 27, 2013.

18      Q.   And this is actually Dean forwarding you some

19  information, right?

20      A.   Ray forwarding Dean, yes.

21      Q.   Okay.  So he's looping you in on the exchanges

22  he's had over the months with Mohammad; is that right?

23      A.   Correct.

24          MS. LE:  Your Honor, the government moves to

25  admit Exhibit 702 and strike the identification.

1          MR. HARRINGTON:  No objection, Judge.

2          THE COURT:  It's admitted.

3          (Government's Exhibit 702 admitted)

4          MS. LE:  Ms. Sheff, could you pull up that

5    e-mail at the bottom, Wednesday, October 2, 2013, at

6    11:31 a.m.

7          Q.   This is an e-mail from Mohammad.  Can you tell

8    me what this e-mail told you?

9          A.   This e-mail -- we were actually interested in

10   knowing what kind of other websites DigitalNet has

11   built, and this is their reply.

12         Q.   Okay.  And what did they represent to Robert

13   Allen Group in this e-mail?

14         A.   They represented that they have built hundreds

15   of sites in the LAMP stack.  LAMP represents Linux --

16   it's a technical term.

17         Q.   Sure.  But Magento is in there?

18         A.   Magento is in there, yes.

19         Q.   You talked about that platform?

20         A.   Yes.

21         Q.   Okay.  And they actually gave you some links

22   to websites they claimed they built in Magento; is that

23   right?

24         A.   That's correct.

25         Q.   Okay.  And then there's some stuff about

1    building mobile apps at the bottom; do you see that?

2         A.    Yes.

3         Q.    Okay.

4               MS. LE:  So let's turn to page 420.  That's

5    the first page.

6         Q.    All right.  So based on these representations

7    on page 420, that October 2, 2018, e-mail, what were

8    your expectations of DigitalNet's ability to perform on

9    that website contract?

10        A.    Well, according to appearance, they appeared

11   to have the skill sets and the experience to build the

12   websites.

13        Q.    Okay.

14              MS. LE:  Ms. Sheff, if we can go to Exhibit

15   705.

16        Q.    So 705 is a one-page e-mail.  Do you see that,

17   sir?

18        A.    Yes.

19        Q.    This was sent by whom?

20        A.    It was sent by me.

21        Q.    To whom?

22        A.    Mac Chaudhary.

23        Q.    All right.  And the date of the e-mail?

24        A.    The date of the e-mail is November 27, 2013.

25              MS. LE:  Your Honor, the government moves to

1    admit Exhibit 705.

2              MR. HARRINGTON:  No objection, Judge.

3              THE COURT:  It's admitted.

4              (Government's Exhibit 705 admitted)

5         Q.   The date of this e-mail, sir, I'm sorry?

6         A.   November 27, 2013.

7         Q.   And what are you asking Mac for here?

8         A.    I'm asking Mac, because I want to gain an

9    understanding of the whole project and what has been

10   done to date, so I wanted to see a project plan that

11   included timelines and deliverables, start and end dates

12   of the tasks, any outstanding issues of the project.  So

13   I want to gain an understanding of any speed bumps or

14   obstacles that are currently hindering the process.

15             Architectures.  When I say architectures, it's

16   all-encompassing.  It's the application architecture,

17   it's the database architecture, and it's the hardware

18   system platform architecture.  You need to know and

19   understand if the website, if it fails, if it has

20   disaster recovery type capabilities.

21        Q.   And the costs, too?

22        A.    In addition to the costs.

23        Q.   Why did you need information in these five

24   categories?

25        A.    Well, it gives me insight into how far the

1   project has evolved.  If we're behind schedule, since it

2   started in August, I'm expecting to see a timeline

3   sequence of events very similar to a Gantt chart, which

4   includes -- Gantt, G-A-N-T-T chart, that includes start

5   dates on tasks, end dates on tasks, who are the

6   resources assigned to each task, and cost allocation.

7   Need to know if we're ahead of budget, behind budget, to

8   gain that understanding.

9        Q.   Okay.  So you said resources assigned to the

10  tasks.  Are you talking about those virtual team

11  members?

12       A.   Yes.

13       Q.   So were you asking for names of those team

14  members there?

15       A.   Yes.

16       Q.   Okay.  And did Mac respond to this request?

17       A.   Mac did respond.

18       Q.   All right.  I'd like to go on to Exhibit 706.

19  Sir, this is also a multiple-page string of e-mails, 15

20  pages long.  Are you familiar with this string of

21  e-mails in Exhibit 706?

22       A.   Yes.

23            THE COURT:  Let me ask you, counsel, you're

24  going to be with the witness for a while here, right?

25            MS. LE:  Yes, your Honor.

1          THE COURT:  Yeah.  It's about time for the

2     afternoon recess.  So let's just take the break and

3     we'll resume with this e-mail string when we get back.

4     We're in recess.

5               (RECESS)

6          THE COURT:  All right.  Let's continue.

7     Q.    Can you look at Exhibit 706 to make sure

8     you're familiar with the e-mail string on these 15

9     pages?

10    A.    Yes.

11    Q.    Okay.  Is Exhibit 706 basically Mac

12    Chaudhary's response to the e-mail that we just talked

13    about in 705?

14    A.    Yes.

15          MS. LE:  Your Honor, at this time the

16    government moves to admit Exhibit 706 and strike the

17    identification.

18          MR. HARRINGTON:  No objection, your Honor.

19          THE COURT:  It's admitted.

20          (Government's Exhibit 706 admitted)

21    Q.    What is the date of this e-mail?

22    A.    December 3, 2013.

23    Q.    And it looks like there are a bunch of

24    attachments, too, right?

25    A.    Correct.

1      Q.    Okay.  And who has been cc'd in the e-mail?

2      A.    That would be Ray Courtois, Bob Powers, and

3  DigitalNet support.

4      Q.    And is DigitalNet support, your understanding,

5  Mohammad or someone else?

6      A.    Yes, that's my understanding.  I don't know

7  exactly who is behind it, just a representative from

8  DigitalNet.

9      Q.    Okay.  And this is Mac's response to you,

10  right?

11      A.    Correct.

12      Q.    Okay.  The subject line reads:  Follow-up on

13  today's call.

14            Did you talk to Mac Chaudhary on December 3,

15  2013?

16      A.    Yes.

17      Q.    Okay.  How long was that call with Mac

18  Chaudhary on December 3, 2013?

19      A.    I don't recall the actual duration.  Are you

20  asking me for an estimate?

21      Q.    Yeah, just an estimate is fine.

22      A.    I don't know, could have been 30 minutes.

23      Q.    Okay.  Did you make any observations about the

24  person who identified as Mac on that phone call?

25      A.    He represented himself as Mac and the

1    conference call was specifically to Mac.

2         Q.    Okay.  And did you note anything about his

3    speech?

4         A.    Well, his speech was -- there was an accent.

5         Q.    Okay.  A strong accent?

6         A.    Like a Middle Eastern accent.  It wasn't too

7    strong, but it was not strong enough that you couldn't

8    understand and get through the English language.

9         Q.    Okay.  Fluent in English, Mac?

10        A.    To the best of my recollection, yes.

11        Q.    Okay.  And based on your conversation, were

12   you guys talking about technical things?

13        A.    Yes.

14        Q.    Did Mac appear to be technically proficient?

15        A.    Well, that was my first introduction, so I

16   really didn't know his skill set behind talking about

17   these things.  I just knew I wanted to talk about those

18   five things.  Whether he was capable and had the skill

19   set to speak to it, I wasn't sure, but I was looking for

20   answers.

21        Q.    Okay.  And based on Mac's voice were you able

22   to estimate an approximate age?  Was it an elderly

23   person?  Was it a teenager?

24             MR. HARRINGTON:  I'm just going to object.

25   That just seems like rank speculation.  Based on his

1  voice?

2          THE COURT:  I think that's permissible.  It

3  just depends -- let me hear the answer and then I'll

4  decide whether I'm going to strike it.  Go ahead.

5      Q.   So you spoke with Mac Chaudhary or a person

6  who represented to be Mac Chaudhary for about 30

7  minutes, right?

8      A.   Correct.

9      Q.   And during that phone call you were able to

10 hear him speak in English, right?

11     A.   Correct.

12     Q.   Okay.  And were you able to, based on your

13 conversation, get a feel about the approximate age of

14 that person?

15     A.   Definitely mature.  Not elderly like, you

16 know, like you're a senior citizen, definitely a mature

17 adult.

18     Q.   Someone adult working age?

19     A.   40s, 50s.

20     Q.   Okay.

21          THE COURT:  How much experience do you have

22 talking with, you know, mature male adults with a Middle

23 Eastern accent?

24          THE WITNESS:  I would say not a lot, but

25 during our web development -- throughout my career we

1    worked with offshore developers, specifically through,

2    you know, the company Oracle, and they offshored their

3    developers in the Middle East and in India.  So everyday

4    working experience working with offshore developers,

5    years.

6              THE COURT:  So you're just saying it sounded

7    like a middle-aged male is the bottom line?

8              THE WITNESS:  Yeah.

9              THE COURT:  Okay.  I'll allow it.  It doesn't

10   have a lot of weight, but I'll allow it.

11             MS. LE:  Thank you, your Honor.

12        Q.   Now, what did you and Mac discuss on that

13   conference call on December 3, 2013?

14        A.   Well, a follow-up to my initial e-mail to find

15   out about the timelines, the deliverables, the project

16   plan, the architecture of the website.  I wanted to know

17   and understand what kind of architecture are you

18   building.  There's this concept called 3-tier

19   architectures.  3-tier architectures is obviously your

20   hardware platform, your middleware which is your

21   database, and your application infrastructure.

22             Traditionally you can build a website in two

23   tiers where it just has, you know, a simple database and

24   an application.  I just wanted to make sure that it's

25   fully robust and scalable, because it's a big website

1  with thousands and thousands of product SKUs on the

2  website.

3       Q.   So what happened during the call?

4       A.   Well, the call kind of started out okay.

5  These are the things that Dean is looking for.  A little

6  contentious here and there.  I mean nothing too

7  alarming, but it was -- the call went a little bit

8  different in a first introductory call.  I would have

9  figured, oh, yeah, Dean, these are things we're working

10  on.  We can provide these documents.  I understand where

11  you're coming from.  You're coming into this after it's

12  already been started, and I was just looking to get up

13  to speed.

14       Q.   Okay.

15       A.   Okay?

16       Q.   So that's what your expectations were.  What

17  actually happened during the call?

18       A.   Actually during the call, you know, I came to

19  find out when I started to ask where, you know, I

20  haven't seen these documents, where are they, and

21  talking to Mac, you know, I'm looking for this project

22  plan, but I'm used to more of a traditional project plan

23  in IT.  This is kind of something I would actually see

24  in a less skilled project plan.  I was expecting -- I

25  guess I was expecting a normal project methodology

82

1    called Agile.  Agile is an industry standard project

2    methodology.  Most companies use Agile.  This is not an

3    Agile project methodology, and I guess that's what I was

4    expecting to see and I didn't see it.  So in my mind

5    this was kind of like a yellow flag, a warning flag to

6    me.

7          Q.   Okay.  And at some point did you have a

8    discussion about how much had already been paid to

9    DigitalNet for the web page?

10         A.   Yes.

11         Q.   Okay.  For the website redesign?

12         A.   Yes.

13         Q.   Tell us about that conversation about the

14   payments.

15         A.   Well, the payments that -- $200,000 has

16   already been payable to DigitalNet, and I was looking to

17   see a quantifiable or a qualitative web page.

18         Q.   Okay.  Did you get that?

19         A.   Not till January.

20         Q.   Okay.  And so what happened during the

21   December 3rd call?

22         A.   The December 3rd call was just to gain

23   understanding of the project plan, the deliverables, you

24   know, just a response to my questions.

25         Q.   And did you talk about maybe getting a refund

1    on that money during that call?

2          A.    Yes, yes.

3          Q.    And who broached that subject of a $200,000

4    refund?

5          A.    I brought it up.

6          Q.    Okay.  What was the response from Mac?

7          A.    Mac was -- Mac's response was -- it didn't

8    happen till a later date when he had accepted it, which

9    was on the 6th, but on the 3rd he heard it, okay, and

10   then what I wanted to do was a follow-up and put it in

11   writing as a response to make sure it was clarified.

12         Q.    Okay.  So you broached the subject on the

13   December 3rd call?

14         A.    Correct.

15         Q.    And there was follow-up communications about

16   that later?

17         A.    Correct.

18         Q.    Okay.  So let's talk about some of the

19   attachments here.  Let's go to page 378.

20               Okay.  Do you see page 378?

21         A.    On the screen?

22         Q.    Yes, or on the physical copy if you have it as

23   well.

24         A.    Yes.

25         Q.    Okay.  What does this tell us?

1      A.    This is an overview document outlining the API

2   application interface from the AS/400 platform to the

3   website.   It's a high level overview.   It doesn't go

4   into any details whatsoever.

5      Q.    Did you ask for this?

6      A.    Well, I was expecting in a normal Agile

7   project methodology that I would see details behind

8   this.

9      Q.    Okay.   So was this product creation/update API

10   flow for Robert Allen useful to you at all?

11      A.    No.

12      Q.    Okay.   Let's turn to the next page, 379.

13            Robert Allen architecture 3-tier, what is

14   this, sir?

15      A.    This is the high level 3-tier architecture

16   that outlines down on the bottom row defining Magento

17   database, the actual server, and in the middle is the

18   middleware, the data access layer.   This is the reason

19   why I asked if this was a 3-tier architecture.   And then

20   up on the top is the application, the client's access to

21   the Internet and a mobile app.

22      Q.    When you were asking Mac for architecture, was

23   this what you were referring to?

24      A.    No.

25      Q.    What were you referring to?

1    A.    I wanted to see the details behind the boxes

2  of each of these -- down on the bottom these are called

3  database ILOs.  Each of those, I wanted to see the

4  database behind it.

5        So for instance, if I actually see RAAS 400

6  DB2, I want to see the tables of the data that resides

7  inside that database table.  And I know based upon what

8  I saw at Robert Allen, all the SKUs, all the products,

9  all the categories, all the data that they have, these

10  tables are pretty massive, and this is a high level --

11  this is -- at the end of the day this just doesn't tell

12  me much.

13    Q.    Okay.  So is it useful to you at all for your

14  purposes?

15    A.    No.

16    Q.    Okay.  Let's move to page 380.

17    A.    380.  Okay.

18    Q.    So let's go to page 380.  What does this show

19  you?

20    A.    Those are outlining some API tasks.  That is

21  the integration from the AS/400 platform to the website

22  outlining nine tasks.  They're in a pending state with

23  dates.

24    Q.    Okay.  What does being in pending state with

25  dates tell you?

1      A.    I don't want to speculate because I didn't put

2  this together so I don't know, but if you ask me what

3  the word pending means, it's on hold or they're looking

4  for information or --

5      Q.    So you received this in December, is that

6  right, December 3, 2013?

7      A.    Correct.

8      Q.    Okay.  So it looks like the first seven tasks

9  have been due already?

10      A.    It appears.

11      Q.    But they're still in pending status?

12      A.    Correct.

13      Q.    Did you have any thoughts about that when you

14  saw the fact that these seven tasks had already passed

15  their due dates?

16      A.    I was alarmed.

17      Q.    Okay.  So let's go to the next attachment

18  which is -- it's a ten-page document, it's from Bates

19  No. 381 to 390.  If you have the physical copy in front

20  of you, please take a look.

21      A.    Yes.

22      Q.    And I'll just have Ms. Sheff scroll through

23  those pages just so the Court can see it and then we'll

24  go back in detail and talk about it, okay?

25           So this attachment, pages 381 to 390, task

1    report RAG Magento Enterprise, right?

2          MS. LE:  If you go back to page 381, Ms.

3    Sheff?

4          Q.    So what does this tell you, all these tasks?

5          A.    Those are active tasks that actually reference

6    the web services, which is the API.

7          Q.    And for the first group of active tasks, do

8    you see that?

9          A.    Yes.

10         Q.    All right.  The first line that I've just

11   underlined, development of RA web service for SQL

12   server, it says:  Responsible Anwaar H.  Assigned by

13   Anwaar H.  Progress zero percent.

14         Do you see that?

15         A.    Correct.

16         Q.    And there's a date due of December 9, 2013?

17         A.    Correct.

18         Q.    So having seen this, what does this mean to

19   you?

20         A.    They're already behind schedule.

21         Q.    Okay.  Let's clear this.

22         In the following section underneath the zero

23   percent completion for that project, we have hundred

24   percents.  Do you see that?

25         A.    Yes.

1    Q.    What does this tell you?

2    A.    Well, those are the API tasks as we've already

3  mentioned, the putting the cart before the horse.  One

4  thing I see here that caught my attention immediately is

5  the progress percent actually said a hundred percent.

6  Remember, this is a bridge, building a bridge from the

7  AS/400 to a website that has not been built yet.

8  There's nothing to show for the website.  It clearly

9  articulated here a hundred percent.  At best, if you're

10  building the bridge to get from point A to point B and

11  the website's not built, that hundred percent would be

12  50 percent.  It's half built, but it's articulated here

13  as a hundred percent.

14        MS. LE:  Ms. Sheff, can you clear that.  Let's

15  go up to the section up here, Ms. Sheff.

16    Q.    So active task, this is the very top, Magento

17  Extensions for Robert Allen Magento Enterprise.  Do you

18  see that?

19    A.    Yes.

20    Q.    There's a description underneath.  What does

21  that tell you?

22    A.    The milestone?

23    Q.    Yes.

24    A.    Milestone Magento extension for Robert Allen

25  Group Magento Enterprise due December 20, 2013.

1    Q.   And it says:  Magento extension required from

2  Robert Allen Group as described in functional

3  specification document.

4         So were you guys supposed to provide something

5  to them so they could work on that?

6    A.   That was the marketing team's wire frames and

7  specifications on the page layouts.  It's a template

8  with the look and feel of the website to show you what

9  the website's going to actually look at.

10   Q.   Okay.  And what was the start date that was

11 given there?

12   A.   Well, the start date there says November 29th.

13   Q.   And the due date?

14   A.   December 20th.

15   Q.   Okay.  So a little less than a month for you

16 guys to provide that to them?

17   A.   Yes.

18   Q.   Okay.  And underneath Magento extension

19 installation and configuration, what is the percentage

20 complete for that?

21   A.   Zero.

22   Q.   And what does that mean exactly?

23   A.   The Magento extensions -- the Magento platform

24 has the capability to extend the platform to connect to

25 other third-party applications.  There are things and

1    requirements that Robert Allen needed:  color, TinEye,

2    several other things.  It's an open platform where you

3    can extend the project, bolt on a piece of software to

4    the existing platform to make it more functional and

5    versatile.

6         Q.   Okay.  So let's go to the second page, 382.

7              All right.  You see a bunch of hundred

8    completed here.  What is this area?

9         A.   That's still the same -- those are the

10   development functions, extensions, APIs.

11        Q.   Building that bridge?

12        A.   Building that bridge.

13        Q.   Let's go to the next page.

14             Okay.  I see some -- actually all 100 percent.

15   What is this hundred percent about?

16        A.   Those are the same thing, but in my mind that

17   hundred percent should have been 50 percent.

18        Q.   So all the work that had been completed all

19   had to do with building that bridge?

20        A.   Correct.

21        Q.   Okay.

22             MS. LE:  Next page, Ms. Sheff.

23        Q.   Same thing here.  We see some hundred percents

24   here?

25        A.   Correct.

1      Q.    All for that building the bridge?

2      A.    Correct.

3      Q.    Okay.

4            MS. LE:  Next page, Ms. Sheff.

5      Q.    We see some zero percents, but they're mostly

6  a hundred percent.  What is this area for, the hundred

7  percent?

8      A.    Same thing.  It's just in a different

9  extension, interfacing all the different database

10 components from the AS/400.

11     Q.    So the section that is zero percent right

12 here, can you tell me about that section?  What does

13 that tell you?

14     A.    Well, that tells me it's a development for web

15 services for Db2, which is the database for the AS/400.

16 So building the bridge, you build the link, but it's not

17 tying it to the database.  When you tie it to the

18 database, then it makes that connection.

19     Q.    Okay.  So they hadn't worked on the database?

20     A.    Correct.

21     Q.    Okay.

22           MS. LE:  Next page, Ms. Sheff.

23     Q.    Okay.  Data parsing at the top, active tasks,

24 data parsing, zero percent.  What does that mean?

25     A.    Data parsing means when you actually send the

1    data across the bridge, it needs to be formatted in a

2    certain manner.  There's different ways you can format

3    the data.  When you send a product description, it could

4    be 25 characters long, you can send it 25 characters or

5    you can send it in a format called XML, and it's just a

6    different way of sending data back and forth, but you're

7    actually parsing the data to send the data over the

8    bridge.

9         Q.   Okay.  But this isn't due until February 2014,

10   near the end of the contract, right?

11        A.   Right.  You normally do the APIs after.

12        Q.   Okay.  Good.  Let's talk about -- I'd actually

13   like to talk about pages 388 to 390.

14             So here we have all these active tasks to

15   develop database synchronization.  They're mostly zero

16   percent, is that right, sir?

17        A.   Correct.

18        Q.   All right.  So let's go to 388 and 390.  This

19   is development.  What does development tell you?

20        A.   Development is the core development to build

21   the website.  It builds the homepage and all the

22   functional components that compose a website.

23        Q.   So I see here initial setup.  It's a hundred

24   percent.  Do you see that?

25        A.   Yes.

93

1    Q.    Then all the following categories are zero

2  percent; is that right?

3    A.    That's correct.

4    Q.    And Magento at the very top, Magento CMS

5  setting, also zero percent; is that right?

6    A.    Correct.

7         MS. LE:  Ms. Sheff, next page, please.

8         Okay.  I think that we just covered this, 388.

9  Can we go to 389?

10   Q.    Okay.  What are all these categories about?

11   A.    Those are different sections of the website.

12 So obviously every website on the planet has different

13 menus and dropdown modules that you want to display to

14 your end consumer, and these are just different

15 features.  ELibrary page books is the Eline library

16 where we display our products, textile products.

17 There's the shopping bags, the checkout features, it's

18 an eCommerce site so you need to set up credit card

19 authorizations.  Different functional areas of the

20 website.

21   Q.    And it looks like these two columns here with

22 dates, these look like due dates, right?

23   A.    Correct.

24   Q.    And these are all past by the point you

25 receive this exhibit?

1      A.   Correct.

2      Q.   And you see they're all zero percent?

3      A.   Correct.

4      Q.   And they all say in the final column late, not

5  started?

6      A.   Correct.

7      Q.   What did that tell you?

8      A.   That this project is definitely behind.

9      Q.   And again, we're talking about you're in

10  December at this point, right?

11      A.   Correct.

12      Q.   Four months into the contract?

13      A.   Correct.

14           MS. LE:  Let's go to the next page, Ms. Sheff.

15      Q.   Again, what are we looking at here, sir, on

16  page 389?  Did we have you look at this?

17      A.   These are all areas of --

18      Q.   We've already looked at this.  390.  I'm

19  sorry.

20      A.   These are all areas of functionality of the

21  website.

22           MS. LE:  There you go.  390 at the bottom.

23      Q.   All right.  Page 390.  What is all this stuff?

24      A.   Above the Magento CMS settings, those are

25  still additional features required of the website:

1    pricing list, orders, the studio, the main page, et

2    cetera.  They're all components of the actual website.

3        Q.    And those projects hadn't -- those components

4    had not been due yet, right?  They're due later in

5    December into early January; is that right?

6        A.    Correct.

7        Q.    Who is Anwaar H., who's listed as the person

8    responsible for DigitalNet on this task form that we

9    just looked at?

10       A.    Anwaar was our project manager, programmer,

11   the guy that we had the daily interface to on building

12   the website.

13       Q.    And who did he work for?

14       A.    DigitalNet.

15       Q.    Okay.  Did you ever talk to him in person?

16       A.    Just conference call, not in person.

17       Q.    Only on the conference call.  Was he on the

18   December 3rd conference call?

19       A.    No.

20       Q.    Okay.  Was anyone else on the DigitalNet -- on

21   the December 3rd phone call with Mac Chaudhary from

22   DigitalNet?

23       A.    There's only one.

24       Q.    And who was that?

25       A.    Mac Chaudhary.

96

1     Q.    Okay.  Sir, before you do you see a book, a

2  redwell with a bunch of printouts?  Right in front of

3  you, that brown folder.

4     A.    This one?

5     Q.    Yes.  This is Exhibit 201.  These are pages

6  from the defendant's journal that we recovered during

7  the investigation.

8          I'd like you to go to the Bates number page

9  348.

10    A.    348?

11    Q.    Yes, sir.

12    A.    Got it.

13    Q.    Okay.  At the bottom do you see there's an

14 entry that says "DN," it's a December 3, 2013, entry,

15 "call RADG."  Would that be Robert Allen Duralee Group?

16    A.    Correct.

17    Q.    Do you recognize the names?

18    A.    Yes.

19    Q.    And what are the names?

20    A.    Bob Powers, Dean Riviera, Ray Courtois.

21    Q.    On call, right?

22    A.    Correct.

23    Q.    So was that the three people from Robert Allen

24 Group on that December 3rd conference call with Mac

25 Chaudhary?

1    A.    Yes.

2    Q.    Okay.  And what is the subject matter that's

3    listed there?

4    A.    Website project.

5    Q.    Okay.  Now, was Imran Alrai on your December

6    3rd call to the best of your knowledge?

7    A.    No.

8    Q.    Did he ever identify himself on the call?

9    A.    No.

10   Q.    And as far as you know there was only Mac

11   Chaudhary on the call, right?

12   A.    Correct.

13   Q.    Thank you.

14         MS. LE:  Ms. Sheff, if we can move on to

15   Exhibit 709.

16   Q.    All right.  Sir, this is an e-mail, it's about

17   three pages.  Could you review that chain of e-mails

18   that are in front of you in 709?

19   A.    Is that 709 in my stack here?

20   Q.    It should be, sir.

21   A.    Okay.  Hold on a second.

22   Q.    It's not in that big packet of paper.  Back in

23   the Manila folders.

24   A.    Oh, okay.  Got it.

25   Q.    It should be three pages, an e-mail chain; do

1   you see that?

2       A.   Yes.

3       Q.   Okay.  Do you recognize the e-mails in 709?

4       A.   Yes.

5       Q.   Are these a series of e-mails between you and

6   Ray Courtois, Mac Chaudhary, and DigitalNet support?

7       A.   Correct.

8            MS. LE:  Your Honor, at this time the

9   government moves to strike the identification and admit

10  Exhibit 709.

11           MR. HARRINGTON:  No objection, your Honor.

12           THE COURT:  It's admitted.

13           (Government's Exhibit 709 admitted)

14      Q.   Sir, let's start with the December 9, 2013,

15  e-mail that's at 8:59 a.m.  Do you see that?

16      A.   Correct.

17      Q.   Okay.  You sent this e-mail?

18      A.   Yes.

19      Q.   Okay.  Give us a summary of what happened.

20      A.   Well, as a result of our prior conversation, I

21  just wanted to have another conference call as a

22  follow-up.  As we discussed, you know, the website, the

23  200,000, I just wanted a recap those -- that discussion

24  topic.

25      Q.   Okay.  And specifically the discussion topic

1   talks about reapplying credit?

2        A.    Correct.

3        Q.    What does that mean?

4        A.    Taking that $200,000, originally asking for a

5   refund; if not for a refund, reapply it to other

6   internal resources, i.e., the .NET project which was our

7   corporate website, at that point in time the existing

8   one, or RPG project.  So refund or credit it towards

9   other services.

10       Q.    Okay.

11             MS. LE:  Ms. Sheff, if we can go up to the

12   e-mail from December 10, 2013, at 11:36 a.m.

13       Q.    So it says Attachments:  Addendum to

14   DigitalNet.docx.  Do you see that?

15       A.    Yes.

16       Q.    Okay.  Tell us about what Ray was informing

17   DigitalNet in this e-mail.

18       A.    Per that conversation I had asked Ray, Ray was

19   on the call as well, confirmation of the discussion on

20   refund of the 200,000.  I wanted to put it in writing.

21   Asked Ray to put together an addendum that would be

22   added to the existing contract to recognize it and add

23   it to the existing contract that that $200,000 would be

24   applied as credit.

25       Q.    Okay.

1          MS. LE:  Let's take a look at the addendum,

2   which is on page 1103.

3      Q.   Okay.  This is the addendum we're referring

4   to?

5      A.   Correct.

6      Q.   All right.  And this was e-mailed to Mac at

7   info@digitalnet in advance of that meeting the following

8   day, the phone call?

9      A.   Correct.

10     Q.   All right.  So did you in fact have another

11  phone call with Mac and other representatives of

12  DigitalNet on December 11, 2013?

13     A.   Yes.

14     Q.   Okay.  I'd like to show you Exhibit 710.

15          MS. LE:  Ms. Sheff.

16     Q.   And, sir, if you could just review the string

17  of e-mails.  This is a six-page document in Exhibit 710.

18     A.   Yes.

19     Q.   And is this a continuation of the e-mail

20  string that we just discussed?

21     A.   Yes.

22          MS. LE:  Your Honor, at this time the

23  government moves to admit 710 and strike the

24  identification.

25          MR. HARRINGTON:  No objection, Judge.

1            THE COURT:  It's admitted.

2            (Government's Exhibit 710 admitted)

3       Q.   Let's start with page 1054 actually, which is

4  your e-mail to Mac Chaudhary on December 11, 2013, at

5  4:46 p.m.  Do you see that, sir?

6       A.   Yes.

7       Q.   What was the point of this e-mail that you

8  sent?

9       A.   In that meeting -- the day before I had

10 already come to the conclusion that, you know, after

11 seeing all this information, not much progress has been

12 made on the corporate website.  So during that

13 discussion I just wanted to summarize my thoughts.  I

14 had to leave to another meeting, but if this meeting on

15 the call with Mac was productive, I would have foregone

16 my next meeting and canceled it.  But since nothing

17 materially materialized, I departed, Ray stayed on the

18 call, and I just put together a summary -- those four

19 summary items.

20      Q.   Okay.  And here you talk about the four

21 contracts.

22      A.   Correct.

23      Q.   Right?  There was the telephone project.  You

24 say it went okay, it's going okay.  You have the RPG

25 resources, that's for that programmer, the contract

1  position; is that right?

2      A.   Correct.

3      Q.   It looks like you said that was going okay.

4      A.   That was my understanding.  That's what Ray

5  communicated to me at that time because those contracts

6  were -- he was more privy to them than I was, more

7  involved, so I took his comments as it's okay.

8      Q.   The RPG and .NET programmers were contract

9  positions to fill open positions at Robert Allen Group;

10  is that right?

11     A.   Correct.

12     Q.   Okay.  And then the fourth point, it's all in

13  bold.  Why are you writing in bold?

14     A.   Because I wanted to express my concern here,

15  especially after articulating that on the phone, that

16  this project is not okay and to put it in bold to say,

17  hello, we've got a problem here.

18     Q.   Okay.  "So this project has not started and we

19  sent you 200K and RADG has not received any deliverables

20  for payment."

21          Okay.  Can you read your last paragraph right

22  there?

23     A.   "Three weeks have now elapsed since our

24  conversations started and this matter of issue No. 4

25  above is still not resolved.  Please advise on how this

1   can be resolved promptly in a timely manner.  You had

2   indicated that 200K is not possible because you spent

3   the money already."

4        Q.   Okay.  So they had already spent the money on

5   the website design, and what did you get for your

6   $200,000 by December 11, 2013?

7        A.   Nothing the website.

8        Q.   Okay.  So this was a phone conference?

9        A.   Correct.

10       Q.   Did you plan to meet over the phone that whole

11  time or had you tried to set up another in-person

12  meeting in Andover?

13       A.   Previously we were trying to meet in Andover

14  prior to this December 11th.

15       Q.   Okay.  Now, let's go to the e-mail on pages

16  1052 and it follows into 1053.  Let's start at 1052.

17  This is Mac's response, December 11, 2013, at 9:08 p.m.

18            You don't need to read this whole thing out

19  loud.  I'm sure you're familiar with it.  What did you

20  think when you got his response?

21       A.   Well, that's definitely not how I thought the

22  conversation took place.  It was different.

23       Q.   Okay.  How so?

24       A.   In the conversation expressly expressed in

25  bold print, we've got a problem with this website, what

1   can we do to resolve.  Here I receive this e-mail late

2   at night articulating each of these specific issues, and

3   I didn't get the sense that anything in there

4   articulates the initiative to solve the initial problem.

5           MS. LE:  And I would like, Ms. Sheff, to

6   highlight the section there and bring it forward.

7       Q.   Okay.  It says, "As in the contract,

8   DigitalNet is to provide virtual team members as an

9   extension to Robert Allen's internal IT team and to work

10  under the direct leadership of either the CIO or a

11  nominee."

12          So did you have a virtual team that was

13  answering to you provided by DigitalNet?

14      A.   No.

15      Q.   Okay.  "After the contract execution August

16  9th, the actual work on the contract started on August

17  12th and we immediately assembled a dedicated team of

18  five members as required and they have been at your

19  disposal on a full-time basis since."

20          Is that true?

21      A.   I never saw them.

22      Q.   Okay.  Did you even ever learn their names?

23      A.   No.

24      Q.   Did you ever get to direct any works to any of

25  those specific team members?

1    A.    No.

2    Q.    Okay.  "Our team has delivered everything that

3 was sent to us from Robert Allen."  What does that mean

4 to you?

5    A.    That it's wrong.

6    Q.    Okay.  "There was never a delay and there is

7 no overdue items in our to do list for Robert Allen,

8 even as I write this message to you."

9         Now, sir, having read that and remembering the

10 attachments we just went through earlier about all the

11 things that were overdue, would that be accurate?

12    A.    No.

13    Q.    Okay.  "The payment schedule is clearly

14 outlined on page 14 of the contract that has been

15 initialed by Robert Allen's SVP and CFO.  We invoiced

16 and received payments as stated in the contract."

17         So by this point you had already paid

18 $200,000, right?

19    A.    Correct.

20    Q.    Thank you.  So would it be fair to say that

21 Mac Chaudhary's recollection of your phone call on

22 December 11, 2013, was a bit rosier than your own

23 impression?

24    A.    Correct.

25    Q.    Sir, was anyone else from DigitalNet on the

1     phone call on December 11, 2013, that you had with Mac

2     Chaudhary?

3         A.   Yes.

4         Q.   Who else was on that phone call?

5         A.   Ray Courtois.

6         Q.   He's from your office, though, right?

7         A.   Correct.

8         Q.   Okay.  Anyone else?

9         A.   That's it.

10         Q.   I'd like you to go back to Exhibit 201, that

11    folder of papers from the journal.  I'd like you to flip

12    to page 351.

13         A.   351?

14         Q.   Yes, sir.

15         A.   Okay.

16         Q.   There's an entry for December 11, 2013; do you

17    see that?

18         A.   Yes.

19         Q.   Does that comport with the timeline of your

20    phone call with Mac Chaudhary?

21         A.   Yes.

22         Q.   Okay.  Do you see there's a notation about

23    addendum?  Right here.

24         A.   I'm sorry.  Yes.

25         Q.   Addendum?  There's a notation about four

1   contracts?

2       A.   Correct.

3       Q.   Can you read the next line?  Can you make that

4   out?

5       A.   What -- it appears, "What are your needs?"

6       Q.   Okay.  And then the next line?

7       A.   "You have no credit."

8       Q.   What about the next line?

9       A.   "What about the costs on --"

10           THE COURT:  Our end.

11      A.   "-- our end?"

12      Q.   Okay.  The next line?

13      A.   "Issue is the credit of 200,000."

14      Q.   And then there's 50,000 there?

15      A.   50,000.

16      Q.   Does the $50,000 number ring any bells with

17  you?

18      A.   None.

19      Q.   Okay.  Now, during your December 11th phone

20  call with Ray Courtois and Mac Chaudhary, did Imran

21  Alrai identify himself?

22      A.   No.

23      Q.   Thank you.

24           MS. LE:  Ms. Sheff, can we go to Exhibit 711.

25      Q.   Sir, 711 is the Manila folders.

1        This is a string of e-mails ten pages long.

2   If you will just review it to make sure you're familiar

3   with the communication therein.

4        A.   Yes.

5        Q.   Okay.  And is this basically a continuation of

6   the e-mail string we had just discussed?

7        A.   Yes.

8        MS. LE:  Your Honor, at this time the

9   government moves to strike the identification and admit

10  Exhibit 711.

11       MR. HARRINGTON:  No objection, Judge.

12       Q.   I'd like you to go to page 1094 first.

13       THE COURT:  It's admitted.

14       (Government's Exhibit 711 admitted)

15       Q.   Do you see this, this is your response to

16  Mac's December 11th e-mail, right?

17       A.   Correct.

18       Q.   All right.  Tell us, why did you ask for an

19  introduction to the three senior PHP programmers, one

20  MySQL database administrator, and the one Linux and

21  Apache systems administrator?

22       A.   Because if they're a part of our team, I need

23  to know what they're doing, how they're doing it.  We're

24  building a website.  It's a team effort.  I needed to

25  meet with them and needed to speak with them and see

1    what tasks are on their plate that they have completed

2    thus far.

3         Q.   Okay.  And you also asked for software codes,

4    right, in this e-mail?

5         A.   Correct.

6         Q.   Why did you need the software codes?

7         A.   Well, actually, I wanted to actually see if I

8    can't meet with the developers and I can't see a web

9    page and you are telling me that you have done some

10   development, well, show me the code.

11        Q.   Okay.

12        A.   The proof in the pudding is actually seeing

13   the code.

14        Q.   So you have already testified that you never

15   met those programmers?

16        A.   Correct.

17        Q.   You didn't get any website pages?

18        A.   Correct.

19        Q.   So did they give you the software or the

20   coding?

21        A.   No.

22        Q.   Okay.  Let's go to page 1091 to 1093 and this

23   was -- I think this is Mohammad's response to you, is

24   that right, or the person from DigitalNet support?

25        A.   Correct.

1    Q.   Okay.  Was Mohammad's e-mail responsive to

2    your request?

3    A.   No.

4    Q.   Why not?

5    A.   Because this outlines the APIs and other

6    things that are outside of the core website.  They were

7    chartered to build the website.

8    Q.   Okay.  He's telling you look at all the great

9    things we did, but all these great things are to build

10   that, again, bridge to nowhere?

11   A.   Yeah, bridge to nowhere.

12   Q.   Let's go to 1092.  How about this page, what

13   did it tell you here?

14   A.   Same thing.

15   Q.   But it looks like Robert Allen -- at least

16   DigitalNet by Robert Allen should be providing some more

17   information.  Look at this part right here.

18   A.   Yes.

19   Q.   Right?  So is it your fault that they hadn't

20   started the web page, that they had only built the

21   bridge, that they didn't have the software codes?

22   A.   Not Robert Allen's.  There was already -- they

23   were already provided the page layouts, the wire frames,

24   everything that you actually need to build the website.

25   If you're a professional services organization building

1    hundreds of websites, you know what to do.

2           If you contract out a plumber and an

3    electrician, the consumer doesn't ask you how to plug in

4    the pipes, right?  These guys are -- represented

5    themselves as a professional organization.  They should

6    have known what the next steps are.

7       Q.   And in fact did Mohammad not request --

8            MS. LE:  If we can just go out to the big

9    screen?

10      Q.   "Didn't they request the HTML?"  What does

11   that mean?

12      A.   HTML -- every website on the planet is built

13   in some kind of form of HTML.  The core functionality of

14   the Magento platform, since it's a website builder tool,

15   the Magento platform actually takes your content, which

16   is your text, which is your building of your eCommerce

17   pages, and converts it and automatically builds the HTML

18   content behind the scene.  That is your source code.

19           So when they said that we needed to provide

20   them HTML, that was to me like the third strike.  You do

21   not have the skill set and the understanding to actually

22   build a proper website.  To me at that point in time,

23   that was the last straw.

24      Q.   Okay.  So did you have any further substantive

25   communications with DigitalNet representatives about the

1    website project?

2        A.    Yes, they continued on through -- me

3    personally?

4        Q.    Yes.

5        A.    Just with Anwaar.

6        Q.    Okay.  Again, about the kind of bridge

7    projects and that kind of thing?

8        A.    Yes, yes.

9        Q.    And what happened in January in terms of

10   communication between Robert Allen and DigitalNet?

11       A.    It diminished and dramatically declined.

12       Q.    Okay.  And in January did DigitalNet finally

13   produce a single web page?

14       A.    Yes.

15       Q.    And was there -- did you have an opinion about

16   their work product on that one web page that they

17   finally delivered in January of 2014?

18       A.    Yes.

19       Q.    What is that?

20       A.    Very sub par.

21       Q.    Okay.

22       A.    It did not meet the expectations of the

23   marketing department.

24       Q.    Did you escalate this up your chain of

25   command, this issue?

1      A.   It was already at the highest levels.

2      Q.   Okay.  Did you have a conversation with Chuck

3  Cioffi about how to deal with this issue about moving

4  this project forward with DigitalNet?

5      A.   Yes.

6      Q.   And what was your recommendation to Chuck?

7      A.   My recommendation to Chuck is you need to get

8  the legal attorneys on board to review this.

9      Q.   Okay.  And in February was there a decision

10  made to stop payment to DigitalNet?

11      A.   In February?

12      Q.   In February.

13      A.   Yes.

14      Q.   Okay.  And by February the website project

15  should have been completed, right?

16      A.   Correct.

17      Q.   So by February what had in fact been produced

18  on the website project?

19      A.   Nothing.

20      Q.   Well, that one page?

21      A.   That one page, that's it.

22      Q.   Okay.

23      A.   But originally they had promised to have it

24  done by the end of January.

25      Q.   Okay.  So did you -- was the decision not to

1    pay them any further communicated to DigitalNet?

2         A.   That was not under my privy.  That was, you

3    know, my supervisor Chuck's.  I'm out of the loop by

4    then.

5         Q.   Okay.  Did they produce the coding for that

6    one page they produced to you?

7         A.   There was an attempt to, that Anwaar was going

8    to go ahead and send us the source code.  The intent

9    there was, okay, you know, this project went off the

10   rails, give us the source code, let us take a look at

11   it, and maybe we can do something with it to enable us

12   to move the project forward internally, okay?

13        Q.   That's the source code for that one web page?

14        A.   That's the source code for whatever they had.

15        Q.   Okay.

16        A.   All-encompassing.

17        Q.   Did they agree to do that?

18        A.   They proceeded to.  Anwaar was already moving

19   forward with Ray Courtois.  We had set up a connection

20   to our server so they would actually send that source

21   code directly to Robert Allen on our physical servers,

22   and in that process Anwaar was told to stop.

23        Q.   Okay.  And was there a condition in order for

24   Anwaar to be able to release that source code to you?

25        A.   Yes.

1     Q.    What was that condition?

2     A.    That condition was the remaining payment of

3  that 30,000 out of that $230,000 contract.

4     Q.    So would it be fair to say that they wanted

5  $230,000 for one page?

6     A.    Fair.

7     Q.    Okay.  I'd like to show you Exhibit 720.  What

8  is -- can you just take a look?  It's a four-page

9  document.

10    A.    Yes.

11    Q.    Okay.  What is Exhibit 720?

12    A.    Exhibit 720 is my summation after starting

13  with Robert Allen on November 20th, three weeks later

14  going through analysis of taking a look at my experience

15  with DigitalNet and nondeliverable of a website, came to

16  some conclusions.

17    Q.    Okay.

18          MS. LE:  Your Honor, at this time the

19  government moves to strike the identification and admit

20  Exhibit 720.

21          MR. HARRINGTON:  No objection, Judge.

22          THE COURT:  It's admitted.

23          (Government's Exhibit 720 admitted)

24    Q.    Let's go to page 949, and then 950.  So that's

25  two pages, and then 951 looks like to be a one-page

1   version of those first two pages?

2       A.   Yes.  My intent here was actually to share

3   this with Chuck Cioffi, my findings.  Actually, Chuck

4   was already in the loop.  I just wanted to formalize the

5   sequence of events that took place.

6            So this was my own version dated on February

7   1st just to outline the bullets in a draft form.

8       Q.   Okay.

9       A.   Okay?  So I put these bullets together and

10  outlined each of the conditions that I had experienced.

11      Q.   Okay.  So let's go to 949.

12      A.   Okay.

13      Q.   Okay.  So in total, how many people did you

14  have direct communications with who identified as

15  representatives from DigitalNet?

16      A.   There was Mac Chaudhary, Mohammad, I don't

17  know his last name, and Anwaar.  Those were the three

18  representatives.

19      Q.   Okay.  Now, do you know whether -- you

20  mentioned your recommendation was to seek legal advice

21  about how to terminate the contract and how to move

22  forward, right?  Do you know if legal action was ever

23  pursued?

24      A.   Yes.

25      Q.   There was no lawsuit, though, right?

1      A.    I don't know.  I brought it to Chuck's

2  attention.  I know Chuck worked with some attorneys and

3  then Chuck took it from there.

4      Q.    So that decision is beyond your --

5      A.    Yeah, it's beyond my scope.

6      Q.    Okay.  Now, did Robert Allen ever get their

7  new website?

8      A.    Eventually, yes.

9      Q.    When were you able to get that new website?

10      A.    That's a good question.  I don't recall right

11  offhand.  It went through a couple of different

12  iterations.  Coming to a conclusion when you got it, it

13  went through a couple iterations.

14      Q.    Okay.  But did you use an outside vendor to

15  create the website?

16      A.    Yes.

17      Q.    Okay.  Who was that outside vendor?

18      A.    That was Something Digital.

19      Q.    Okay.  The company that created the look and

20  feel that --

21      A.    The look and feel, yes.

22      Q.    Okay.  And was it built in Magento?

23      A.    It was built in Magento.

24      Q.    And how much did it cost for Something Digital

25  to build you that new website in Magento, if you recall?

1      A.    I don't remember.  Actually, at that point the

2  project shifted.  I wanted to shift that project to the

3  marketing team.  It's their project.  Let them outsource

4  their own resources.  That way they're in control and

5  not going through IT to build it.

6      Q.    But I assume that Something Digital didn't do

7  it for free.

8      A.    Right.  I believe it's around 230, 260, but

9  I'm not a hundred percent.

10      Q.    So something pretty comparable to what you had

11  paid DigitalNet, right?

12      A.    Correct.

13      Q.    All right. Let's shift gears.  Wait.  One

14  more thing.

15            Now, you told us that Anwaar started to

16  provide you the source code for what they worked on.

17      A.    Correct.

18      Q.    But he wasn't able to do that.  He was told

19  that you needed to pay additional money, right?

20      A.    Correct.

21      Q.    Do you know who told him that DigitalNet

22  needed to receive $30,000 before they would deliver the

23  source code?

24      A.    It was Mac.

25      Q.    And by Mac you mean Mac Chaudhary?

1      A.   Correct.

2      Q.   Okay.  So now let's shift gears a little bit

3  and talk about that Telephony system, okay?

4      A.   Okay.

5      Q.   I want to show you Exhibit 306.  This is the

6  phone contract.  This is already in evidence.  I'd like

7  you to go to page 1626 to the scope of work, statement

8  of work.

9           All right.  Do you see the scope of work

10  section?

11      A.   Yes.

12      Q.   So what services were being provided?

13      A.   Statement of work says -- scope of work,

14  correct?

15      Q.   Yes.

16      A.   "DigitalNet will offer an enterprise class

17  virtual private PBX in the cloud with a 99.99 percent

18  SLA.  SLA is a service level agreement hosted in a state

19  of the art data center to offer Telephony services for

20  up to 15 geographically dispersed corporate showroom

21  locations in the United States."

22      Q.   So they're going to provide phone service for

23  15 of your showrooms?

24      A.   Correct.

25      Q.   Okay.  There's some fancy lingo here.  What

1   does enterprise class virtual private PBX in cloud mean?

2       A.   Okay.   Enterprise cloud virtual private PBX in

3   a cloud is basically a telephone platform for the

4   showrooms that sits on a public network sitting in the

5   cloud where you're able to access the phone systems via

6   the cloud.

7       Q.   Okay.   And it says, "99.99 percent SLA service

8   level agreement."   What does that number mean?

9       A.   That 99.99 percent means it's the uptime.   The

10  uptime that the service that DigitalNet is agreeing that

11  the service will stay up.   Technology goes down, right,

12  things happen, but they're guaranteeing it's a 99.   That

13  equates to a downtime of only one minute --

14  approximately one minute per week.   In a given time when

15  you look at this, it's basically four weeks in a month,

16  basically four minutes of downtime allowable in one

17  given month.

18      Q.   Okay.   Now, when you joined Robert Allen

19  Group, did you look into their phone system at the

20  showrooms under this contract?

21      A.   Yes.

22      Q.   Okay.   And what was your assessment about the

23  quality of the phone service and the downtime that

24  Robert Allen was experiencing in the showrooms?

25      A.   They were having difficulty.   The quality of

1    service was not up to speed.  You would be on the phone

2    and you'd have a dropped call or you would hear every

3    other third word.  It was a frequent problem if not

4    every day, every other day, some kind of issue on the

5    phone people were experiencing.

6         Q.   Was it more than a minute a week or four

7    minutes a month?

8         A.   Far greater.

9         Q.   Okay.  Were there any big problems that you

10   noticed in terms of latency or downtime, that kind of

11   thing?

12        A.   Yes.

13        Q.   What were they?

14        A.   Chatter, hearing every other third word,

15   latency, dropped calls, normal things you do not want to

16   experience if you're in a showroom or a call center and

17   customers are calling you and you can't hear the

18   customer or the customer can't hear you.

19        Q.   And what was your opinion, if you had one,

20   about the quality of the phone service, the Telephony

21   platform that was being offered by DigitalNet?

22        A.   Very poor.

23        Q.   Okay.  Let's turn to page 1630.

24             THE COURT:  Same exhibit, right?

25             MS. LE:  Same exhibit, your Honor.  I'm

1    referring to the Bates number at the bottom.

2        Q.    There's a section called Client Side Network

3    and Infrastructure Requirements.  Do you see that?  Then

4    it has a bunch of things, routers, firewalls, internet

5    service provider, all of that?

6        A.    Yes.

7        Q.    What is this section about?

8        A.    That talks about the infrastructure that needs

9    to be in place in order for a given PBX telephone

10   platform to operate correctly.  Specifically, bandwidth.

11   That section in bandwidth requires that there's

12   approximately a typical T1, 1.5 megabits, 15 current

13   calls at that given time.

14             I noticed that if you have more than one phone

15   platform in a given showroom plus the networks were

16   slow, plus people were not receiving e-mails, plus you

17   had all these other bandwidth issues, putting a new

18   telephone platform, PBX platform on top of that existing

19   network bandwidth framework is opportunity for failure.

20       Q.    Okay.  So who should have seen that you can't

21   just put this new platform on the existing weak network

22   that Robert Allen had?

23       A.    Well, DigitalNet should have or did do or did

24   not, I don't know, but it would be normal practice if

25   you're implementing a telephone platform to monitor the

1    existing bandwidth network and see if you have the

2    proper throughputs and the speed of the internet to

3    handle these telephone calls.

4         Q.   Okay.  And did you --

5              MS. LE:  Can we go to the page with the

6    payments?  Scroll through.  I think it was earlier on,

7    Ms. Sheff.  Start at the beginning.  Maybe the second or

8    third page.  Okay.  Right here.

9         Q.   On page 1629.

10        A.   Okay.

11        Q.   Do you see the expenses, the timeline, it has

12   the costs and the payment schedule?

13        A.   Yes.

14        Q.   Okay.  And you see it's $122,948.62 in total?

15        A.   Yes.

16        Q.   All right.  Did you have an opinion about the

17   cost versus value that was received under this contract

18   by Robert Allen?

19        A.   It's hard to speculate my initial thoughts

20   when I saw this, but my initial thoughts implementing

21   other telephone platforms for much larger organizations,

22   I did not spend that amount of money to implement a

23   telephone platform for only 15 showrooms.

24        Q.   Is this expensive or inexpensive?

25        A.   Expensive.

1    Q.   Okay.  Now, did you make any recommendations

2  to your -- to Chuck about the Telephony system?

3    A.   Yes, I did.  I said, Chuck, this telephone

4  platform, this virtual private PBX platform, it appears

5  to be, for lack of a better word, probably a little bit

6  outdated.

7    Q.   Okay.

8    A.   And I said it probably -- we probably need to

9  look at this platform in more detail and probably

10  replace it.

11    Q.   Okay.  And when did you have this conversation

12  with Chuck about looking to replacing this outdated

13  expensive system?

14    A.   Probably February time frame I would say.

15    Q.   Okay.  At that point had Robert Allen Group

16  basically ended communications except through legal

17  counsel with DigitalNet?

18    A.   Yes.

19    Q.   Okay.

20    A.   Mid February.

21    Q.   Okay.  So did you inform DigitalNet at that

22  time that you were moving on to a different carrier?

23    A.   No.

24    Q.   Okay.  Why not?

25    A.   Well, because of the difficulties for lack of

1    a better word with the prior project on the web

2    development in receipt of not receiving our source code

3    and demanding that we paid $30,000, kind of feeling like

4    we're being held hostage, and because of the difficulty

5    and communication in getting to move the projects

6    forward, we felt if we brought this up that they could

7    shut off our phones and then we would have no phones.

8         Q.   Okay.  So I'd like to show you Exhibit 722.

9    This is a three-page document, if you'd just scroll

10   through and make sure you're familiar with it.

11        A.   Yes.

12        Q.   Okay.  Let's go back to the first page.  This

13   is a series of internal e-mails about and e-mails from

14   DigitalNet, right?

15        A.   Correct.

16        Q.   Forwarding invoices for April 2014?

17        A.   Correct.

18             MS. LE:  Your Honor, at this time the

19   government moves to admit Exhibit 722 and strike the

20   identification.

21             MR. HARRINGTON:  No objection.

22             THE COURT:  It's admitted.

23             (Government's Exhibit 722 admitted)

24        Q.   Let's talk about that e-mail from DigitalNet

25   support.

1        A.    Okay.

2        Q.    Okay.  What were the circumstances surrounding

3   this e-mail?  If you recall?

4        A.    Payment.

5        Q.    Okay.  You guys had stopped paying, right?

6        A.    Yes.

7        Q.    And what is in bold, the notice, from

8   Mohammad?

9        A.    Can you say that again?

10       Q.    Can you just read the notice part that's all

11   written in bold down at the bottom part before the

12   signature?

13       A.    "Notice.  Phone services for all Robert Allen

14   showrooms served by DigitalNet will be subject to

15   immediate termination due to nonpayment if all previous

16   and current payments are not received by Friday, April

17   11, 2014."

18       Q.    Okay.  So they were going to cut off your

19   phone service?

20       A.    Yes.

21       Q.    Okay.  Did you guys do anything to address the

22   issue of phone numbers?

23       A.    Yes.  With regards to the phone numbers, there

24   was a request by Bob Powers requesting our phone

25   numbers.  These are DID phone numbers that we own but

1   obviously have to be ported to DigitalNet so they can

2   communicate with the network service Telephony

3   providers.

4         Q.   These are your phone numbers.  You're paying

5   for it.  Why does DigitalNet control your phone numbers?

6         A.   It's just -- that happened before my time so I

7   don't know.

8         Q.   Okay.  All right.

9              All right.  Now --

10             THE COURT:  Well, not so much why in terms of

11   what motivated that decision, but what's the state of

12   affairs -- that's a different kind of why.  Why is it --

13   not why in the sense of why was that decision made, but

14   what is the structure that results in them controlling

15   your phone numbers -- DigitalNet controlling your phone

16   numbers.

17             THE WITNESS:  Because they control the PBX,

18   those DID numbers from the desk -- the phone sits on

19   your desktop, right, you have a DID, direct dial number.

20   Susie, Bob, whoever, that's their number.  What happens

21   is it goes through the PBX which is controlled by

22   DigitalNet.  DigitalNet actually then -- since they're

23   in control of that PBX, they actually connect to the

24   Telco provider.

25             MS. LE:  Thank you, your Honor, for that

128

1    clarification.

2        Q.   So they could pull the plug on your phones at

3    any time, right?

4        A.   Correct.

5        Q.   And would that have any impact -- if they did

6    that before you got a new phone service and new phone

7    numbers, what would the impact be?

8        A.   Traumatic.  It impacts the call center.  It

9    impacts -- not the call center.  My error.  It impacts

10   those showrooms.

11       Q.   Now, I'd like to -- is it -- approximately

12   about $2200 that you guys owed on the phone service?

13            MS. LE:  Do you want to flip to the next

14   invoice, 431, Ms. Sheff.

15       Q.   It's about two grand, 2200, that was owed for

16   those showrooms?

17       A.   Correct.

18       Q.   It looks like only about three showrooms had

19   been ported over to DigitalNet, right?

20       A.   Correct.

21       Q.   San Francisco, Dallas, and Los Angeles?

22       A.   Correct.

23       Q.   Did you guys pay that $2200 bill?

24       A.   I have no knowledge.  That's not in my scope.

25       Q.   Okay.  I'd like to show you Exhibit 723 now.

1    Okay.  Do you recognize this e-mail?

2         A.   Yes.

3         Q.   Okay.  Were you one of the recipients on the

4    undisclosed recipients list?

5         A.   Yes.

6         Q.   And this was from info@digitalnet.us?

7         A.   Correct.

8              MS. LE:  Your Honor, at this time the

9    government moves to admit Exhibit 723 and strike the

10   identification.

11             MR. HARRINGTON:  No objection.

12             THE COURT:  It's admitted.

13             (Government's Exhibit 723 admitted)

14        Q.   What was your reaction when you saw this

15   e-mail which was, by the way, written in bold and all

16   caps?

17        A.   Well, obviously it's a big warning flag

18   obviously, right?  And if payment was not going to be

19   made, they were actually going to shut it off.

20        Q.   And it says specifically, "Disconnected phone

21   numbers may not be ported to another carrier."

22             What does that mean?

23        A.   That means that our DID numbers, we would not

24   be able to get them back.  Because if you own a DID

25   number and your customers know that phone number, if

1    they call that number it's going to be blank air.  So

2    not only have you lost your existing DID number, you put

3    a burden on your existing customers because they have no

4    way to contact you.

5         Q.    Okay.  So did you guys end up losing phone

6    service?

7         A.    Yes.

8         Q.    With DigitalNet, right?

9         A.    Yes.

10        Q.    But had Robert Allen Group taken some steps to

11   get new phone numbers?

12        A.    Yes.

13        Q.    Tell us what had to happen.

14        A.    Because of that process to actually get our

15   numbers -- this is an industry standard thing -- those

16   DID numbers ported to the Telco carrier, that process to

17   actually move it from, for example, AT&T to Comcast or

18   whoever the other Telco provider is, that porting

19   process usually takes 45 days.

20             Well, if our service is going to be dropped,

21   we don't have 45 days.  We had to issue our own new DID

22   numbers.  And that Bobbie and Sue and Fred were issued

23   new numbers.  They had to reach out to their existing

24   customers and say, hey, I got a new phone number.

25   Here's my new number.

1          THE COURT:  What number is this again, 723?

2          MS. LE:  Yes, your Honor.  723.

3          THE COURT:  All right.  So I know you've

4   already explained this.  This is an e-mail from

5   DigitalNet support, unsigned though, it's not a human

6   being saying Mohammad or whatever.

7          THE WITNESS:  Correct.

8          THE COURT:  Who are your points of contact

9   with DigitalNet at this point?

10          THE WITNESS:  Since this was specifically sent

11   to Bob Powers and Bob Powers controlled the Telephony

12   contract, his contact was I believe Mohammad at

13   DigitalNet.

14     Q.   Did you ever know who Mohammad was?

15     A.   No.

16     Q.   Did you ever learn the last name for Mohammad?

17     A.   At the time I did.  Today I don't recall.

18     Q.   If it was suggested the name Mohammad Hassan,

19   would that sound familiar?

20     A.   Yes, that's correct.

21     Q.   Okay.  Did you ever personally speak with

22   Mohammad Hassan?

23     A.   Just via e-mail.

24     Q.   Okay.  So never voice to voice?

25     A.   No.

1      Q.   You never laid eyes on him?

2      A.   No.

3      Q.   You can't tell if that's a real person who is

4  Mohammad Hassan or an alias of somebody else?

5      A.   Correct.

6      Q.   Okay.

7           THE COURT:  Well, he can't tell.

8           MS. LE:  He wouldn't know.  I'm sorry.

9      Q.   Would you know?

10     A.   No.

11          THE COURT:  I'm just trying to make sure.  So

12  who is the universe of people at DigitalNet you deal

13  with during your period there?

14          THE WITNESS:  On a daily basis, or actually

15  biweekly basis on Tuesdays and Thursdays it was Anwaar,

16  the project manager for the development of the website,

17  and Anwaar escalated issues regarding the contract,

18  regarding other things, where's the project, it was

19  always with Mac.  So my main contacts, three or four

20  different conversations via voice on a conference call

21  directly with Mac, okay?  That's it.

22     Q.   So you had to get brand-new phone numbers for

23  your three showrooms that had been given DigitalNet

24  numbers, right?

25     A.   Correct.

1    Q.    Okay.  Was that a big deal or not that big a

2    deal?

3    A.    Well, fortunately I have great experience on

4    building Telephony platforms for very big companies,

5    global, and a few vendors that I've worked with in the

6    past.  I knew the new telephone platform definitely had

7    to be a voiceover IP platform working on a fiber

8    network, and obviously I knew I couldn't put it on the

9    existing Robert Allen's network because it was too slow,

10   right, the infrastructure was too slow.  So let's port

11   it into the cloud.  I worked with a company -- I knew

12   specifically for call center and telephone platforms

13   there's a special protocol to get quality of service for

14   telephones.  It's called SIP, okay?

15   Q.    S-I-P?

16   A.    S-I-P, okay?  And a company called Flowroute

17   actually offers that protocol.  So on a given network

18   when data is being transferred down the super highway so

19   to speak, right, you can segregate actual data versus

20   voice data, and SIP, SIP data, specifically targeted for

21   quality of service for telephone calls.

22   Q.    And you contracted directly with SIP?

23   A.    With Flowroute that provides the SIP protocol,

24   yes.

25   Q.    And how much did that cost you, by the way?

1      A.    It's not much.  It's really nominal.  I don't

2  know.  Less than $100 a month.

3      Q.    Less than $100 a month?

4      A.    For that SIP protocol, yes.  Now, the

5  telephone service, there's a charge over and above that.

6      Q.    Sure.

7      A.    So when you -- what I wanted to implement is

8  voiceover IP, a company called Cudatel, okay, they

9  provide all kinds of networking stuff.  Let's purchase a

10  PBX voiceover IP telephone platform that runs on

11  bandwidth.  Well, if you're already paying for bandwidth

12  in your company, your calls are almost virtually free,

13  right?  Let's not pay for an external service, have cost

14  overruns, additional expenses.  Run your call over the

15  Internet, and that's what we did.

16      Q.    So when you used this SIP protocol that you

17  discussed with the cloud voiceover IP, what was the

18  total cost for you monthly for your telephone services?

19      A.    Oh, I don't have that.  It was -- I don't know

20  that cost, but I do know based upon -- we did a -- the

21  finance team, the VP of finance and Chuck, we for the

22  whole company took a look at the total cost and did

23  comparisons, and this is what I do know.  It was

24  approximately an ROI expense of -- you know, it paid for

25  itself in less than a year.

1      Q.    I don't understand what you just said.

2      A.    All right.  So if I take cost A, which is

3  DigitalNet -- that number you presented, what was that,

4  122?

5      Q.    2200 a month.

6      A.    Yeah, okay.  That cost, compare it against if

7  I purchased a brand-new product called Cudatel, and then

8  do the cost analysis.  If you actually put together a

9  financial analysis of that, you would actually see a

10  return on your investment.  If I spent X, it would pay

11  for itself in less than one year.  Does that make sense?

12      Q.    Kind of.  But here's my question.  Was it

13  comparable to what DigitalNet was charging you at 2200 a

14  month for those three showroom phone services or was

15  it --

16      A.    No.  I think this is where I need to provide a

17  little bit more clarity.

18      Q.    Sure.

19      A.    The telephone platform that we would purchase,

20  okay, it's a hardware device.  It's not a service.  I

21  buy a black box.  It's a telephone black box.  I think I

22  paid eight or $9,000.  I purchased five of them to cover

23  the entire company.  One dedicated box for the

24  showrooms, one for corporate, corporate Foxboro, and a

25  different one for corporate New York and a different one

1  for corporate Gaffney.  So they all had their own

2  dedicated voiceover IP platform, okay?

3       Q.   Okay.

4       A.   I can connect them all together.  That's my

5  initial outlay of cost.  I don't know, approximately

6  seven, $8,000 times five.

7       Q.   Okay.

8       A.   Take that total.  Take a look at what it would

9  cost me to actually run a DigitalNet platform over a

10  given year, do the delta on it, and that's where you

11  actually see the return on your investment.  It's an

12  outlay of cash.

13       Q.   So you probably saved money, is that what

14  you're telling me?

15       A.   Net you save money.

16       Q.   You save money and you have better service?

17       A.   Better service.

18       Q.   Okay.  Now, last subject area I'm going to

19  cover very briefly, and I think the Judge was touching

20  on this a little bit.  Throughout your dealings with

21  DigitalNet, were you able to identify who the principal

22  of that company was, like who's the boss there?

23       A.   All I knew was the top level was Mac.  That's

24  all I know.

25       Q.   And during your dealings with DigitalNet from

137

1  November through February, March, April of 2014 -- I

2  mean November 2013 through say March or April of 2014,

3  were you aware of any relationship that Imran Alrai had

4  with DigitalNet?

5      A.   No.

6      Q.   And you know I showed you a couple journal

7  entries of his that suggest that he was involved in

8  phone calls with you.

9      A.   Yes.

10     Q.   Did that come as a surprise to you at all?

11     A.   Dramatic.

12         MS. LE:  Thank you very much, sir.

13         Your Honor, the government tenders the

14  witness.

15         THE COURT:  All right.  It's five minutes of

16  five.  You can start your cross if you like or I'll let

17  you wait till tomorrow if you'd like.

18         MR. HARRINGTON:  I'd prefer to wait till the

19  morning, Judge.

20         THE COURT:  Let's do that then.  So I guess

21  you're coming back.

22         Well, let me ask you this question, how much

23  cross do you have?  You have quite a bit, don't you?

24         MR. HARRINGTON:  It's going to be more than,

25  you know, five minutes.

1                    THE COURT:  Okay.  I wasn't going to say that,

2     but suppose -- you know, suppose it was going to be 20

3     minutes.  It's probably going to be more than that,

4     though, right?

5                    MR. HARRINGTON:  It's possible.  I don't know.

6                    THE COURT:  I'm not going to rush you.  You're

7     coming back tomorrow.

8                    THE WITNESS:  Should I reschedule my flight?

9                    MS. LE:  Yes, we'll reschedule your flight.

10                   THE COURT:  You have a flight tonight?

11                   THE WITNESS:  Tomorrow.

12                   MS. LE:  He doesn't have to leave until 11

13     a.m.  He is to be picked up out front at 11.

14                   THE COURT:  Okay.  That's enough time.  Thank

15     you.  You have my word on it.

16                   Anything for the Court at all?

17                   MR. HARRINGTON:  Nothing, your Honor.

18                   MR. DAVIS:  No.

19                   THE COURT:  All right.  We're in recess.

20                   (Bench trial adjourned at 4:58 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4         I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9
     Submitted: 4-8-20        /s/   Susan M. Bateman _____
10                            SUSAN M. BATEMAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25