**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-7-2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   18-cr-192-01-JL
            v.                  *   December 5, 2019
                                *   9:10 a.m.
      IMRAN ALRAI               *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:        John S. Davis, AUSA
                          Matthew Hunter, AUSA
                          Cam T. Le, AUSA
                          U.S. Attorney's Office



For the Defendant:         Timothy M. Harrington, Esq.
                          Timothy C. Ayer, Esq.
                          Shaheen & Gordon, P.A.




Also Present:              John J. Commisso, Esq.



Court Reporter:            Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JANE GRADY | | | | |
| By Mr. Davis | 3 | | 40 | |
| By Mr. Ayer | | 32 | | |
| MOHAMAD KAL WAHBE: | | | | |
| By Ms. Le | 41 | | 114/126 | |
| By Mr. Harrington | | 93 | | 128 |

ELAINE SINGER

(Previously transcribed under separate cover)

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibit 609. | | 8 |
| Government's Exhibit 412. | | 10 |
| Government's Exhibit 639. | | 20 |
| Government's Exhibit 407. | | 31 |
| Government's Exhibit 703. | | 73 |
| Government's Exhibit 620. | | 76 |

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has for consideration
 3    this morning day four of the bench trial in criminal
 4    case 18-cr-192-01-JL, United States of America versus
 5    Imran Alrai.
 6              THE COURT:  All right.  It's day four of the
 7    trial.  Please call your next witness.
 8              MR. DAVIS:  Jane Grady.
 9                         JANE GRADY
10         having been duly sworn, testified as follows:
11              THE CLERK:  For the record, please state your
12    full name and spell your last name.
13              THE WITNESS:  Jane Grady, G-R-A-D-Y.
14              THE CLERK:  Thank you.  Please be seated.
15                      DIRECT EXAMINATION
16    BY MR. DAVIS:
17         Q.    And Ms. Grady, did you work with United Way?
18         A.    Yes, I did.
19         Q.    And for how long?
20         A.    Almost 22 years.
21         Q.    And when did you leave United Way?
22         A.    At the end of March of this year.
23         Q.    So 2019?
24         A.    Yes.
25         Q.    And what state do you live in now?
```

4

```
 1          A.    North Carolina.

 2          Q.    Is it snowing down there?

 3          A.    No.

 4          Q.    All right.  What was your job and job title

 5   when you left United Way?

 6          A.    Vice president of human resources and ethics

 7   officer.

 8          Q.    So were you the ethics officer for United Way

 9   for a number of years?

10          A.    Yes.

11          Q.    And how long?

12          A.    Approximately 15 years.

13          Q.    Okay.  And did you know Imran Alrai at United

14   Way?

15          A.    Yes, I did.

16          Q.    And do you see him in the courtroom today?

17          A.    I do.

18          Q.    Did you participate in his hiring?

19          A.    Yes, I did.

20          Q.    And what was your participation in that,

21   briefly?

22          A.    Once he was selected for employment, my office

23   was responsible for reference checks and employment

24   paperwork.

25          Q.    Okay.  And what position was he hired for?
```

1    A.    Senior director of information technology.

2    Q.    And was he later promoted?

3    A.    He was.

4    Q.    To what position?

5    A.    Vice president of IT.

6    Q.    Okay.  And who handled the reference checks

7    for you?

8    A.    Nicole Nash.

9    Q.    Okay.  And were all of those reference checks

10   documented?

11   A.    Yes, they were.

12   Q.    And were some of the reference checks in this

13   case by e-mail?

14   A.    I believe all of them were by e-mail.

15   Q.    And was it unusual to have e-mail references?

16   A.    Yes, it was.  It's not standard practice.  It

17   certainly happens sometimes, but it's not the standard.

18   Q.    In any event, the references were deemed

19   acceptable?

20   A.    Yes.

21   Q.    And Mr. Alrai was on board?

22   A.    Yes, he was.

23   Q.    Okay.  In the orientation of a new employee --

24         THE COURT:  Can I ask a question?

25         Why do you think the e-mail references and the

1  sort of unorthodox vetting was -- why do you think that

2  happened in this case?

3          THE WITNESS:  My assistant, Nicole Nash, said

4  that she was unable to reach the references that were

5  listed.  She was unable to reach them by phone.  So when

6  she couldn't reach them, she reached out via e-mail.

7          THE COURT:  All right.  That part I get.

8          I'm asking, why do you think that was deemed

9  acceptable instead of some other -- that's my question.

10  It feels like to the Court, right, and I don't know if

11  this is true, like exceptions were made, allowances were

12  made.  Do you have any opinion why?

13          THE WITNESS:  There's always an urgency to

14  getting somebody in the door.

15          THE COURT:  I see.  Okay.

16          THE WITNESS:  And things are overlooked.

17          THE COURT:  Okay.  Understood.  Thank you.

18          Sorry.

19          MR. DAVIS:  That's quite all right.

20      Q.   So as part of the orientation of a new

21  employee, is an employee given a number of forms?

22      A.   Yes, they are.

23      Q.   And are those forms explained?

24      A.   Yes.

25      Q.   And is one of the important forms called the

1    conflict of interest form?

2         A.   Yes, it is.

3         Q.   And did Mr. Alrai receive and sign a conflict

4    of interest form?

5         A.   He did.

6         Q.   And we'll look at that in just a minute.

7              What was the policy of United Way about that

8    form for successive years once a new employee came in?

9    How was that form used and implemented?

10        A.   Annually, at about the same time every year,

11   that form is sent out to all employees and board members

12   so that we can collect all of that information.  If

13   anyone reports a conflict of interest or a possible

14   conflict of interest, we can collect that form and

15   report it to the audit committee.

16        Q.   And why is the information reported to the

17   audit committee?

18        A.   It's part of their role in overseeing the

19   function of the organization, and we do it every year

20   because it is that important.

21        Q.   Okay.  Does every employee sign that form at

22   United Way?

23        A.   Yes, they do.

24        Q.   And is it sometimes difficult to get employees

25   to sign the forms by the due date?

1      A.   Yes.

2      Q.   And so do people spend time tracking down

3  employees to get them to sign the form?

4      A.   That happens every year.

5      Q.   All right.  And showing you Government Exhibit

6  618, which is an e-mail involving Diane Coughlin and Mr.

7  Alrai, do you recognize that as an e-mail in the United

8  Way domain between --

9      A.   Yes, I do.

10          MR. DAVIS:  Your Honor, we move to admit 618

11  and strike the ID.

12          MR. AYER:  No objection, your Honor.

13          THE COURT:  It's admitted.

14          (Government's Exhibit 609 admitted)

15      Q.   And just in the middle, the "Hi, Imran" on

16  March 24th of 2014, what is Ms. Coughlin saying?

17      A.   She said, "We still have not received your

18  form.  The audit committee meeting is on Wednesday and

19  Pat," that's Pat Latimore, "was hoping to have

20  everyone's forms by then.  Is there any way you can

21  e-mail it to me.  Diane Coughlin."

22      Q.   Okay.  And Mr. Alrai said that he will, and

23  the next day he does send the form attached, correct?

24      A.   Yes.

25          MR. DAVIS:  Can we see the -- is there an

1    attachment to this item?  Okay.

2        Q.   And that's one of the forms that we'll go

3    through in a minute, correct?

4        A.   Correct.

5        Q.   Okay.  Were there staff meetings at United Way

6    on a regular basis about the conflict of interest form?

7        A.   So, yes, we held all-staff meetings about once

8    a month, and during the time of year that the conflict

9    of interest forms were distributed to staff we would

10   have reminders at those meetings.  We would also talk

11   about the importance of getting the information in so

12   that there is no appearance of or an actual conflict of

13   interest by our staff.

14       Q.   Is there a particular risk that United Way has

15   with respect to conflicts?

16       A.   Because United Way relies on its reputation to

17   be able to raise money in the community, it's really

18   important that we not -- that our staff not have

19   conflicts of interest and that we're upfront about any

20   concerns that somebody might have in that area.

21       Q.   Okay.  And to what extent are employees

22   advised that if they have questions about the form,

23   there are people to answer the questions?

24       A.   So at those all-staff meetings and in other

25   kinds of communications we would identify that they

1    could always come to me as the ethics officer.  They

2    could go to Pat Latimore since she oversaw this work as

3    well.  They had several opportunities to be able to ask

4    their questions.

5           MR. DAVIS:  All right.  So let's go to

6    Government Exhibit 412, which is a series of forms, and

7    can we look at the --

8       Q.   All right.  Are these the conflict of interest

9    forms signed by Mr. Alrai?

10          MR. DAVIS:  Can we flip through those fairly

11   quickly?

12      A.   Yes.

13      Q.   Okay.

14          MR. DAVIS:  Your Honor, I move to admit 412

15   and strike the identification.

16          MR. AYER:  No objection, your Honor.

17          THE COURT:  It's admitted.

18          (Government's Exhibit 412 admitted)

19          MR. DAVIS:  All right.  Let's go to the form

20   in 2013.

21      Q.   All right.  So this is the form Mr. Alrai

22   signed in March of 2013.  Do you see that?

23      A.   Yes.

24      Q.   Okay.  Can you just read, please, the

25   information in A and the note at the top of the form,

1    and maybe we can blow that up.  What does it say there?

2         A.    Do you want me to read from the top or just

3    the A section?

4         Q.    Just the A section.

5         A.    Okay.  Thank you.

6               "To the best of your knowledge is the United

7    Way of Massachusetts Bay, Inc., engaged in any

8    transaction with any of the following?"

9               "Note:  For this purpose a transaction

10   includes the sale, exchange, other transfer or lease of

11   property to or from a related party, loans of money to

12   or from a related party, making an investment in a

13   related party, the furnishing of goods, services or

14   facilities to a related party, or by a related party,

15   for compensation, payment of wages, salary or other

16   compensation to a related party, or the transfer of

17   income or assets to a related party."

18        Q.    All right.  So that's the basic question on

19   the form, right?

20        A.    Right.

21        Q.    All right.

22              MR. DAVIS:  So can we go back to the --

23   looking at the main form.

24        Q.    Now, is there -- can you read the definitions

25   in 1 and 2 first?

1      A.   So in number one we're asking if you, the

2   employee, has that kind of conflict, and then there's a

3   yes or no box to check.

4      Q.   And what's the reason for the carve-out for

5   other than W-2 and 1099 income?

6      A.   Because all employees receive that salary,

7   that's the exception to this question.

8      Q.   In other words, that's salary from United Way,

9   correct?

10      A.   Correct.

11      Q.   Okay.  And then what's in 2?

12      A.   "Any of your relatives, as follows:  A,

13   spouse; B, children; C, grandchildren; D, siblings; E,

14   parents, F, grandparents."

15      Q.   Okay.  And then let's go to 3.  What does

16   section 3 say?

17      A.   "Any entity, for profit or nonprofit, that is

18   owned by or controlled by, A, you; B, by any of your

19   relatives as listed above; or C, by any combination of

20   you or your relatives as listed above and individuals,

21   besides yourself, serving as directors, officers or

22   managers of the United Way."

23      Q.   And then can you read the note?

24      A.   "For the purpose of this question, owned means

25   directly or indirectly holding more than 35 percent of

1   voting membership rights or voting stock in an entity,

2   and controlled means comprising over 35 percent of the

3   directors, trustees or other members of the governing

4   body of an entity."

5      Q.   Okay.  And let's go to part 4 and part 5.

6   Let's do those together, please.

7      A.   "Any entity with which you are associated as

8   an officer, director, trustee, partner, or manager."

9         And No. 5, "Any entity with which any of your

10  relatives, as listed above, is associated as an officer,

11  director, trustee, partner, or manager."

12     Q.   And then what does it say you do if you

13  answered yes?

14     A.   "If you have answered yes to any of the

15  questions above, please identify the related party in

16  question, state the relationship involved and describe

17  the transaction or transactions involved, including the

18  amount if known."

19        MR. DAVIS:  Okay.  Let's go to the second

20  page.

21     Q.   What is the question in part B?

22     A.   "Are you, or is any one or more of your

23  relatives as listed in part A above, associated with any

24  United Way partner or other agency as an officer,

25  director, trustee, partner or manager?"

```
1         Q.    All right.  And what is a United Way partner
2    or agency?
3         A.    What is it?
4         Q.    Yes, what does that encompass?
5         A.    Any of the agencies that we grant money to.
6         Q.    Right.  So that would not encompass vendors to
7    the United Way, correct?
8         A.    Correct.
9         Q.    So the partners are the people in the
10   community actually receiving --
11        A.    That's right.  Those agencies that receive
12   grant funding.
13        Q.    Okay.  And then there's a certification after
14   that, right?
15        A.    Yes.
16        Q.    Can you read what the employee certifies each
17   year?
18        A.    The --
19              THE COURT:  He just wants you to read it.  Go
20   ahead.
21        A.    "I understand that every United Way staff and
22   volunteer is responsible for adhering to the principles
23   and standards of the code of ethics.  I am in compliance
24   with the previously mentioned document and recognize
25   that this certification process is mandatory for all
```

1    United Way staff and volunteers.  I also recognize that

2    all United Way staff and volunteers are responsible for

3    reporting without delay to the ethics officer or a

4    member of the audit committee any activities or

5    situations which appear to be in breach of any of the

6    code of ethics."

7              "Furthermore, I hereby certify that I or any

8    related party is in compliance with all applicable

9    anti-terrorist, financing and asset control laws,

10   statutes and executive orders."

11             "By signature below, I acknowledge that I have

12   received and read my personal copy of the United Way's

13   code of ethics."

14        Q.   Okay.  So -- by the way, when an employee

15   indicates yes and not no to everything -- when you say,

16   yes, I do have a conflict, what happens?

17        A.   So that information is collected through this

18   process.  That list of possible conflicts is provided to

19   the audit committee.  They're responsible for reviewing

20   all of those and determining how serious the conflict

21   may be and either approve that it's allowed or they

22   address the issue with that employee to say you can no

23   longer do this.

24        Q.   Okay.  And at times are the conflicts actually

25   reported in the form 990?

1          A.   I believe they are, yes.

2          Q.   Okay.  And that can actually be filed with the

3     IRS potentially, that disclosure?

4          A.   Yes, I believe so.

5          Q.   Okay.  And roughly -- if you know, roughly how

6     many potential conflicts went to the audit committee

7     each year?

8          A.   I would -- less than ten every year.

9          Q.   But some?

10         A.   But some.  That's right.

11         Q.   And if you raise a conflict, you don't

12    necessarily get fired, right?

13         A.   That's right.

14         Q.   I mean, there are ways to deal with it,

15    correct?

16         A.   Yes.

17         Q.   All right.  So let's look at just these forms

18    quickly.

19              We're looking at the March of 2013 form.  You

20    can see -- what does Mr. Alrai answer to all of the

21    questions?

22         A.   He has checked off no as the response.

23         Q.   All right.  And he signed the form on page 2,

24    the next page there?

25         A.   Yes, he has.

17

```
 1          Q.   All right.  So let's -- so is this form
 2   -- this form is now signed in March of 2014, correct?
 3              MS. SHEFF:  The one we just looked at was '13,
 4   I believe.
 5              MR. DAVIS:  Okay.
 6          Q.   Sorry.  That was 2013.  Everything is no,
 7   correct?
 8          A.   Correct.
 9              MR. DAVIS:  All right.  Now let's go to the
10   form in 2014.
11          Q.   What has Mr. Alrai checked for that year?
12          A.   Also no.
13          Q.   And he signed and dated the form it looks like
14   March 24th of 2014?
15          A.   Yes.
16              MR. DAVIS:  Okay.  Let's go to 2015.
17          Q.   What does he check in that year?
18          A.   No in each box.
19          Q.   All right.  And going to the signature page,
20   did he sign and date in March of -- this is 2016
21   actually, correct?
22          A.   Correct.
23          Q.   All right.  And let's go to the next form.
24          A.   That is the next form, isn't it?
25          Q.   Okay.  Does this form show -- so the responses
```

1   in this form are -- you have to read below the word

2   response.

3           MR. DAVIS:  Can you circle the top one?

4       Q.   You can see no is under response?

5       A.   Yes.  Correct.

6       Q.   And so what did Mr. Alrai answer for this

7   newer form in --

8       A.   No.  He answered no.

9           MR. DAVIS:  Okay.  Can we go to the signature

10  page?

11      A.   There is no signature page.

12      Q.   Okay.  Is this an electronic form?

13      A.   It is.

14      Q.   Okay.  And was there a change in the format?

15      A.   Yes.

16      Q.   All right.  And how did that work?

17      A.   So we chose to use a different system to

18  distribute the questionnaire and get those responses in

19  to make reporting easier and quicker for all staff, but

20  it's essentially the same request for information.

21          MR. DAVIS:  Okay.  And is that the last item

22  in the exhibit?  Very good.  We don't seem to have a

23  form for 2015; is that correct?

24      Q.   Do you know whether there was a form in his

25  personnel file?

1       A.    I thought all the forms were there.  I believe

2  he submitted one each year.

3       Q.    All right.  So I'll look for that, but it

4  doesn't appear to be in the current exhibit.

5       A.    Okay.

6             MR. DAVIS:  We didn't do the very first year,

7  which was 2012.  Can we go back to that?

8       Q.    So this would have been signed very soon after

9  he started work in March of 2012, correct?

10      A.    That's right.

11      Q.    And what did Mr. Alrai answer on that

12  occasion?

13      A.    He checked no in each box.

14      Q.    All right.

15            MR. DAVIS:  Can we go to the signature page?

16      Q.    Is that signed and dated March 16th of 2012?

17      A.    Yes.

18      Q.    Okay.  Thank you.  So that's all on conflict

19  of interest forms.

20            Now, Ms. Grady, do you recall being concerned

21  about the relevant spending at United Way on IT versus

22  other departments and other segments of the business?

23      A.    Yes.

24      Q.    Okay.  And what was that concern in general?

25      A.    That during a time when we were -- we, as

1    managers of the organization, were asked to cut our

2    budgets, reduce our budgets, and that department was not

3    asked to do the same and I wrote something to that

4    effect.

5         Q.   All right.  When you say that department, what

6    department do you mean?

7         A.   The IT department.

8         Q.   All right.  Showing you Exhibit 639 for

9    identification, which is dated July 14, 2016, do you

10   recognize that as one of your e-mails at United Way?

11        A.   Yes, I do.

12             MR. DAVIS:  Your Honor, I move to admit 639

13   and strike the ID.

14             MR. AYER:  No objection, your Honor.

15             THE COURT:  It's admitted.

16             (Government's Exhibit 639 admitted)

17        Q.   All right.  So starting at the lower part of

18   the first page, you're writing a Mr. Jeff Hayward?

19        A.   Yes.

20        Q.   And he is another manager at United Way?

21        A.   Yes, he was a senior manager there.

22        Q.   Okay.  So what did you write to him?

23        A.   I wrote, "Did you know that our contract with

24   DigitalNet is now almost a million dollars?  Pat told me

25   that yesterday.  I asked her if that makes sense for us

1    to pay that much for an organization of essentially

2    let's say 120 people.  That doesn't include IT staff,

3    benefits or other expenses, hardware or software

4    purchases.  Holy crap, that's a lot of money."

5         Q.    Okay.  So Mr. Hayward responds, "OMG, and I'm

6    laying people off?"  Correct?

7         A.    Correct.

8         Q.    And then you write him back at the top, right?

9         A.    Yes.

10        Q.    And can you just read that response?

11        A.    "I was horrified by the number and it's not

12   even a complete total expense for that function so just

13   ballpark that total number has to be closer to 1.75

14   million all in out of an operating budget of 13.4

15   million.  DigitalNet is the single largest contract we

16   have, and Pat finally called Imran and Jack for

17   purchasing on the carpet for not having a competitive

18   process or a benchmark for that expense.  I reminded her

19   that Nancy lost her job.  It was unclear if she was too

20   close to that vendor.  Pat agreed."

21              Do you want me to keep going?

22        Q.    Please.

23        A.    "Should it really cost us 15 to 20,000 per

24   employee per year for computers and computer services?

25   1.75 million divided by 120 users equals 15,000.  I have

1  no idea but someone should."

2      Q.   So in that e-mail, Ms. Grady, when you refer

3  to Jack, who is that?

4      A.   Jack Rotondi.

5      Q.   And he was in purchasing?

6      A.   Yes.

7      Q.   And when you refer to Nancy, who is that?

8      A.   Nancy Powers.

9      Q.   And she was the prior supervisor for Mr.

10  Alrai?

11      A.   Correct.

12      Q.   Okay.  Now, did this concern get raised or go

13  anywhere of yours?

14      A.   I had a brief conversation with Pat and then

15  sent this e-mail to Jeff Hayward.

16      Q.   Okay.  You were aware of an effort being made

17  by Jack Rotondi and Pat Latimore in the summer of '16

18  regarding doing due diligence on contractors, including

19  DigitalNet?

20      A.   Yes.  That's the reference in there.

21      Q.   Okay.  And so what was your understanding of

22  what was going on at United Way about that?

23      A.   That they would look into comparable expenses

24  to see what a more realistic cost might be.

25      Q.   Okay.  So Ms. Grady, turning now to 2018, do

1   you recall being advised that a whistleblower had come

2   forward about Mr. Alrai and DigitalNet?

3        A.   Yes.

4        Q.   Okay.  What do you remember about how that

5   began and what happened with you?

6        A.   I was called by Rich Voccio and Pat Latimore

7   asking me to come in to see them.  I happened to be out

8   for a couple of days, and they asked me to come see

9   them.  That's when I was told about the whistleblower

10  coming forward to raise some issues.

11       Q.   All right.  But what steps did you take

12  thereafter?

13       A.   So once I heard the information and was made

14  aware of the whistleblower, I asked to meet with him so

15  I could get the information directly from that person

16  myself.

17       Q.   Okay.  And was that person Domenic Pallaria?

18       A.   Yes.

19       Q.   And did you meet with him?

20       A.   I did.

21       Q.   Okay.  And what did you do after that about

22  responding to that whistleblower complaint?

23       A.   So one of the first things I did was to call

24  Dorothy Puhy who was the chair of the audit committee.

25  That was my responsibility as the ethics officer to

1  report directly to her.

2       Q.   How do you spell Puhy?

3       A.   It's P-U-H-Y.

4       Q.   Okay.  So the audit committee was notified

5  almost immediately?

6       A.   Yes.

7       Q.   Okay.  And what generally did management do

8  after that?

9       A.   So there were only a few people who were made

10 aware of the concerns, and one of the things that we did

11 was also contact the audit firm, CBIZ I think is their

12 name --

13      Q.   Yes.

14      A.   -- so that we could draw on their expertise in

15 investigating what was happening, get more information.

16      Q.   Okay.  And did you also retain Mr. John

17 Commisso as an attorney?

18      A.   Yes.

19      Q.   Okay.  All right.  By June 12th of 2018 was

20 there a plan to confront Mr. Alrai about these concerns?

21      A.   Yes, there was.

22      Q.   All right.  And did you have a role in that

23 planning?

24      A.   Yes, I did.

25      Q.   And what was your role on June 12th?

1    A.    I was responsible for waiting until John

2  Commisso and John Mulvaney had met with Imran Alrai

3  to -- they had information they were trying to collect

4  from him, and once they finished that work it was my

5  responsibility to deliver a letter putting him on

6  suspension.

7    Q.    All right.  And just to be clear on the

8  record, was Mr. Alrai initially suspended?

9    A.    He was put on a leave of absence.  It was a

10  paid leave of absence.  So, yes, I would call it a

11  suspension, not a termination.

12    Q.    Okay.  And the date of that suspension was

13  effective was what?

14    A.    June 12th.

15    Q.    And following that was there another action?

16    A.    Yes.

17    Q.    And what was that?

18    A.    The termination followed two days later.

19    Q.    All right.  So that was June 14th of 2018?

20    A.    Correct.  That's right.

21    Q.    And was that a letter notification that he was

22  terminated?

23    A.    Yes, it was.

24    Q.    Okay.  Did you have -- did you plan how you

25  were going to present to Mr. Alrai?

1      A.    I did.

2      Q.    What did you have -- what were you using to do

3  that?

4      A.    So I had notes in front of me for that

5  conversation so that I could go through the information

6  that was in the letter and also some additional -- there

7  were additional requirements about turning over his

8  security badge, things like that, but I had notes in

9  front of me to deliver that message.

10     Q.    Okay.  And who accompanied you when you

11  actually went in and talked to him?

12     A.    Pat Latimore.

13     Q.    It was just the two of you?

14     A.    Correct.

15     Q.    And what time of the day was that about?

16     A.    It was about 1 o'clock.

17     Q.    Okay.  Describe what you did and what happened

18  at that meeting.

19     A.    Imran was already in the conference room after

20  he had met with the other two.  Pat and I went in and

21  sat down.  Imran was holding his phone.  He held it

22  through most of the meeting and didn't really look up at

23  us.  He was looking at his phone through most of that --

24  through most of my message.  Pat was responsible for

25  taking notes during the conversation.  That's what we

1    were asked to do.  There was very little communication

2    between the two of us.  Imran didn't say very much.

3         Q.   All right.  So how did that meeting end?

4         A.   Once I had finished delivering the message, we

5    were waiting then for John Commisso, and there were

6    several other people who needed to be ready to escort

7    Imran out of our building.  So we just sat and waited

8    for them.

9         Q.   And do you recall Mr. Alrai saying anything?

10        A.   He and Pat had a brief exchange.  I don't

11   remember the specifics.

12        Q.   Okay.  All right.  Now I want to ask you about

13   one other area, and that's the badging system at United

14   Way.

15        A.   Yes.

16        Q.   Are you familiar with that?

17        A.   Yes.

18        Q.   And was that system under your supervision as

19   HR head and ethics officer?

20        A.   Yes.  My benefits and payroll manager was

21   responsible for that system.

22        Q.   And what is that person's name?

23        A.   Richard Segerstedt.

24        Q.   Can you spell Segerstedt, please?

25        A.   S-E-G-E-R-S-T-E-D-T.

1   Q. Okay.  And so he was benefits and payroll

2 manager?

3   A. That's right.

4   Q. And how long was he at United Way?  Do you

5 know, roughly?

6   A. 22 years.

7   Q. And how much of that time did he operate the

8 badge and payroll -- I'm sorry, the badge system at

9 United Way?

10   A. The whole time.

11   Q. The whole time?

12   A. Yeah.

13   Q. All right.  Describe the system, if you would.

14   A. The system was used to identify -- actually,

15 let me start over.

16     When new employees started with us, they

17 received security badges that allowed them into the

18 building and into our office.  Our office was locked all

19 the time.  The building was open during regular business

20 hours, but our office doors were locked all the time.

21 So a person had to use their card to get into our office

22 even when the building was open.  The system recorded

23 when people used their cards and at what door they were

24 using them.

25   Q. Okay.  So did you have a receptionist at the

1    main entrance?

2         A.    We did not, which is why the doors were

3    locked.

4         Q.    Okay.

5         A.    The last several years we didn't have a

6    receptionist.  Before that, we did.

7         Q.    Okay.  So what would happen if you forgot your

8    card at United Way?

9         A.    You would have to call someone who was already

10   in the office to let you in or come in with someone else

11   who was entering the building.

12        Q.    Okay.  And did the system allow reports so

13   that one could identify when an actual employee, a

14   particular employee badged in and badged out?

15        A.    Yes.

16        Q.    Okay.  And who was responsible for maintaining

17   the system?

18        A.    Richard was.

19        Q.    Okay.  And who was responsible for upgrading

20   it as needed?

21        A.    With the help of the company that we paid,

22   Richard was responsible.

23        Q.    In other words, the system was installed by a

24   company?

25        A.    That's right.

1      Q.    And was that company called Infinias?

2      A.    I believe that's right, yes.

3      Q.    Okay.  And did Richard have the ability to add

4  employees onto this system and give them new badge

5  access?

6      A.    Yes, or replace badges.  Yes, he was.

7      Q.    And was he also able to take people off the

8  system to terminate their access?

9      A.    He was.

10      Q.    And did he do that routinely?

11      A.    He did.

12      Q.    Okay.  And on the day of the suspension on

13  June 12th, did you actually obtain Mr. Alrai's security

14  badge?

15      A.    Yes, I did.

16      Q.    Okay.  So when the -- when this investigation

17  was going on, did you have occasion to request a report

18  from Mr. Segerstedt?

19      A.    Yes, I did.

20      Q.    And what was the report that you asked for?

21      A.    I asked for a report showing when Imran's card

22  was used as far back as the system would provide.

23      Q.    Okay.  And did the system keep as a regular

24  course of business the entrances and exits of the United

25  Way employees?

1    A.   Yes.

2    Q.   Okay.  I'm showing you Exhibit 407.  Do you

3    recognize this event report?

4    A.   Yes, I do.

5    Q.   And what is that?

6    A.   What is it?

7    Q.   Yes.

8    A.   It shows the dates and times when Imran's card

9    was used, and you can see his name in the fifth column.

10   Q.   Okay.  And just leafing through, the top date,

11   appears to begin on April of 2015, or sorry, May of

12   2015?

13   A.   Yes.

14   Q.   And how far up does it go?  It goes all the

15   way to June of 2018, correct?

16   A.   Yes.

17        MR. DAVIS:  Your Honor, I move to admit 407 in

18   evidence.

19        MR. AYER:  No objection, your Honor.

20        THE COURT:  It's admitted.

21        MR. DAVIS:  And strike the ID, please.

22        (Government's Exhibit 407 admitted)

23        No further questions.

24        THE COURT:  Thank you.  Cross-examination.

25        MR. AYER:  Thank you, your Honor.

1                    CROSS-EXAMINATION

2     BY MR. AYER:

3         Q.   Ms. Grady, hi, my name is Tim Ayer.  I'm

4     representing Mr. Alrai in this -- one of the two

5     attorneys representing Mr. Alrai in this case, and I

6     have a few questions for you.

7              You testified on direct that you had some

8     concerns about the IT budget.

9         A.   Yes.

10        Q.   Do you remember that?

11        A.   Yes.

12        Q.   That you felt that it was too high?

13        A.   Yes.

14        Q.   And especially in the face of other

15    departments having their budgets cut?

16        A.   Correct.

17        Q.   Now, you raised those same concerns when you

18    spoke to the FBI in this case, right?

19        A.   I think so.  I don't remember.

20        Q.   What you said was that you also don't really

21    know how that process works and what it should cost,

22    right?

23        A.   Correct.

24        Q.   So while you were concerned about the budget

25    in relation to other department budgets -- would that be

1    your concern?

2         A.   Yes.

3         Q.   That you didn't have a context to say this is

4    what IT should cost?

5         A.   That's right.

6         Q.   Or this is what these services should cost?

7         A.   Exactly.

8         Q.   Or this is what these contracted, I don't want

9    to say employees, but these contractors should cost?

10        A.   Right.

11        Q.   So you don't know and you didn't know at the

12   time objectively whether this was a reasonable IT budget

13   or not?

14        A.   That's right.

15        Q.   But what you did know was that before Mr.

16   Alrai was hired the IT department was not in good shape,

17   right?

18        A.   Yes.

19        Q.   And that there was updating that needed to

20   happen?

21        A.   Yes.

22        Q.   And that it needed to work better in a lot of

23   ways?

24        A.   That's correct.

25        Q.   And that was a need that existed before Mr.

34

1    Alrai was hired?

2         A.   Yes.

3         Q.   And after Mr. Alrai was hired, that started to

4    get better?

5         A.   Correct.

6         Q.   And the services that he contracted for and

7    that he provided were effective in remediating those

8    problems?

9         A.   So that's not my expertise, but from my own

10   use of the system I would say that's true.

11        Q.   Did it work better after he was hired and

12   after his services came?

13        A.   Yes.

14        Q.   You noted, for example, when they moved the

15   servers, the servers worked better?

16        A.   Again, not my expertise.

17        Q.   But do you have a memory that when he moved

18   the servers that everything started to work better?

19        A.   I'm not sure how to answer that question.

20        Q.   Okay.

21             THE COURT:  It's really simple.  Do you

22   remember that the servers worked better after he moved

23   them or because he moved them or anything like that?

24             THE WITNESS:  Not really.

25             THE COURT:  There you go.

1       Q.   And you gave an interview to the FBI during

2  this investigation, right?

3       A.   Yes.

4       Q.   And have you reviewed the report that was

5  created based on that interview?

6       A.   No.

7       Q.   Have you ever seen it?

8       A.   I don't think so, no.

9       Q.   Okay.  I'm going to put a document here

10  hopefully in a way that you can read it.

11       This is the report based on your interview

12  with the FBI.

13       A.   Okay.  That looks right, yeah.

14       Q.   Okay.  I'll point you to the paragraph that is

15  in the main part of the screen here, and I'm going to

16  highlight a section about here.

17       In this paragraph it states that, "Grady was

18  also aware that there were servers on-site that were

19  moved by Alrai and things seemed to work better once

20  that happened."  Do you see that?

21       A.   Yes.

22       Q.   So seeing that, would you agree that at least

23  when you gave this interview your belief was when he

24  moved the servers things seemed to work better?

25       A.   Yes.

1      Q.    You also noted that Mr. Alrai brought in some

2   people to work the help desk, right?

3      A.    Yes.

4      Q.    He brought in several people?

5      A.    Yes.

6      Q.    And that those people seemed to be

7   knowledgeable?

8      A.    Yes.

9      Q.    And that they were responsive?

10      A.    Yes.

11      Q.    And that they were well liked?

12      A.    Yes.

13      Q.    And those were all services brought in when

14   Mr. Alrai began his position, right?

15      A.    Or just thereafter.

16      Q.    They did not exist there before Mr. Alrai did

17   that?

18      A.    Those people were not there before he arrived,

19   correct.

20      Q.    And then we saw in Exhibit 639 --

21            MR. AYER:   And I don't mean to give you

22   direction, but can you please bring up Exhibit 639

23   again?  Oh, I'm sorry.  I can actually bring up 639.

24      Q.    And this is an e-mail regarding your concerns

25   about the budget?

1      A.   Correct.

2      Q.   And that was in June of 2016?

3      A.   Yes.

4      Q.   And in this e-mail it's apparent that you were

5  aware of what the budget was?

6      A.   Yes.

7      Q.   That was not a secret?

8      A.   That's correct.

9      Q.   And you were able to voice those concerns?

10     A.   Yes.

11     Q.   And you did voice those concerns?

12     A.   Yes.

13     Q.   And there were several people that you voiced

14  them to.  First of all, this e-mail is to Jeff Hayward?

15     A.   Correct.

16     Q.   And he was made aware of the potential budget

17  issues?

18     A.   Yes.

19     Q.   You testified that you also had a conversation

20  with Pat Latimore about that?

21     A.   Yes.

22     Q.   And you were told that that budget was --

23  well, Jack Rotondi was aware of the budget, correct?

24     A.   Yes.

25     Q.   And he had approved it?

38

1          A.    That wasn't his role.

2          Q.    Okay.  I'm sorry.  I thought you said on

3    direct that Jack had approved the budget or somehow

4    acquiesced to it.

5          A.    Jack's role was to assist.  I don't think he

6    had the approval.

7          Q.    Okay.

8          A.    It was more Pat Latimore's level in the

9    organization.

10         Q.    All right.  But you're aware that Jack Rotondi

11   was aware of the budget?

12         A.    Yes.

13         Q.    And that he hadn't raised any significant

14   concerns with it?

15         A.    Right.  He was the one asked to help review

16   the budget.

17         Q.    And there are things that can be done if

18   there's an out of control budget, right?

19         A.    Yes.

20         Q.    It can be raised to the board?

21         A.    Management us responsible for the budget.

22         Q.    Okay.  And is that something that -- well,

23   when you say management, who is that?

24         A.    That's the senior management team of the

25   organization.

1          THE COURT:  She's HR.

2          THE WITNESS:  Yeah.  Exactly.  Thank you.

3          THE COURT:  I don't mean to cut you off.  We

4     got it.  We got it.  Go ahead.

5     Q.    In fact, there had been an IT vendor and an IT

6     person before Mr. Alrai, correct?

7     A.    Correct.

8     Q.    And they were essentially -- the vendor and

9     the prior person were let go because there were issues

10    and it needed updating?

11    A.    Yes.

12    Q.    And so that could have happened here, too.

13    A.    I'm sorry?

14    Q.    That could have happened here, too, in 2016

15    with that e-mail, the budget is out of control, and

16    there could have been changes made if that was

17    considered an issue?

18    A.    Yes.

19    Q.    Okay.  And that essentially in 2016 wasn't

20    done?

21    A.    I don't think this is very clear.  Could I try

22    to clarify what this was?

23    Q.    Yes.

24          THE COURT:  You can always answer the question

25    and then you can always explain your answer.

```
 1                THE WITNESS:  Okay.  All right.
 2         A.    So this e-mail between Jeff Hayward and myself
 3    was really a bit of venting from an HR person who
 4    doesn't have an IT background.  So my saying I have this
 5    information about the budget, we were all -- we, being
 6    the management of the organization, we were asked to cut
 7    our own budgets and look across the organization and
 8    find other places to cut budgets.  This was really my
 9    venting to my colleague to say, are you aware of these
10    costs, and, you know, the rest of us are asked to cut,
11    and I felt that IT was not asked to make those same
12    cuts.  That's really all it is.
13         Q.    Okay.  And you raised those to people who you
14    thought could address it if need be?
15         A.    Yes.
16         Q.    Okay.
17                MR. AYER:  That's all I have, your Honor.
18                THE COURT:  Thank you, counsel.
19                Any redirect?
20                       REDIRECT EXAMINATION
21    BY MR. DAVIS:
22         Q.    You were asked, Ms. Grady, about what IT
23    should cost, and you made clear that you really didn't
24    know what IT should cost, right?
25         A.    Right.
```

1     Q.   Who did United Way have on its staff and

2   payroll that United Way relied on to tell it how much IT

3   should cost?

4     A.   Imran Alrai as well as Pat Latimore since he

5   reported to her.

6          MR. DAVIS:  No further questions.

7          THE COURT:  Any recross?

8          MR. AYER:  No, your Honor.

9          THE COURT:  Thank you.

10          MS. LE:  Your Honor, the government calls

11   Mohamad Kal Wahbe to the stand, please.

12                    MOHAMAD KAL WAHBE

13       having been duly sworn, testified as follows:

14          THE CLERK:  For the record, please state your

15   full name and spell your last name.

16          THE WITNESS:  Mohamad Kal Wahbe.  Last name

17   W-A-H-B-E.

18          THE CLERK:  Thank you.  Please be seated.

19                    DIRECT EXAMINATION

20   BY MS. LE:

21     Q.   Good morning, sir.

22     A.   Good morning.

23     Q.   Mr. Wahbe, do you have a nickname?

24     A.   Kal.

25     Q.   That's spelled K-A-L?

1      A.   That's right.

2      Q.   Do most of your co-workers call you by Kal?

3      A.   That's right.

4      Q.   Mr. Wahbe, where do you live?

5      A.   Damascus, Syria.

6      Q.   And are you enjoying the New England weather?

7      A.   Yeah.

8      Q.   You say yes, but it doesn't sound like you

9   are.

10          Sir, what do you do for a living?

11     A.   A network administrator.

12     Q.   Did you receive any specialized training or

13   education to become a network administrator?

14     A.   Yep.

15     Q.   Tell the Court a little bit about your

16   background.

17     A.   I have a bachelor degree in MIS, management

18   information system, and I have some certificates in

19   Cisco and Microsoft.

20     Q.   Thank you, sir.

21          At some point did you live in the United

22   States?

23     A.   Yes, I did.

24     Q.   When did you first move to the United States?

25     A.   1988.

1      Q.    Why did you come to the U.S. in 1988?

2      A.    For education.

3      Q.    Where did you go to school?

4      A.    I went to CCRI, Community College of Rhode

5   Island, and then I went to New England Tech and then

6   Johnson and Wales.

7      Q.    Are all those schools in Rhode Island?

8      A.    Yes.

9      Q.    Sir, are you currently employed?

10      A.    Yes.

11      Q.    By whom are you employed?

12      A.    Princess House.

13      Q.    What kind of business is the Princess House?

14      A.    It's direct sales of kitchenware.

15      Q.    Okay.  So you have people who sell items to

16   other people without a retail store; is that right?

17      A.    Right.

18      Q.    Okay.  What do you do for the Princess House?

19      A.    I am self-employed.  So I'm a contractor for

20   them and I take care of their networks.

21      Q.    Okay.  Are you able to work -- where is

22   Princess House located, by the way?

23      A.    Taunton, Massachusetts.

24      Q.    Okay.  And are you able to work remotely then?

25      A.    Yes.

44

1      Q.    Okay.  And how much of your time do you work

2  remotely versus being on-site?

3      A.    Probably like a hundred percent.

4      Q.    Okay.  A hundred percent remotely?

5      A.    Remotely.

6      Q.    Okay.  At some point did you work for the

7  Robert Allen Group?

8      A.    I did.

9      Q.    When did you work for the Robert Allen Group?

10     A.    I started with them December 1998.

11     Q.    When did you leave Robert Allen Group?

12     A.    2014.

13     Q.    So about March 31, 2014?

14     A.    Uh-huh.

15     Q.    What positions did you hold while you were at

16  the Robert Allen Group?

17     A.    A few positions.  As an AS/400 systems

18  administrator, LAN-WAN specialist, network manager, and

19  IT director.

20     Q.    You used the acronym LAN-WAN.  Is that L-A-N

21  dash W-A-N?

22     A.    That's right.

23     Q.    What does that stand for?

24     A.    Local area network and wide area network.

25     Q.    Okay.  Were you a supervisor while you were at

1  the Robert Allen Group at some point?

2       A.   Yes.

3       Q.   Okay.  When were you a supervisor there?

4       A.   Around 2010 -- 2009/2010 time frame.

5       Q.   Okay.  Sir, do you know Imran Alrai?

6       A.   I do.

7       Q.   How do you know Mr. Alrai?

8       A.   He was my boss at Robert Allen.

9       Q.   Okay.  When did you first meet him?

10      A.   When he was hired by Robert Allen.

11      Q.   Okay.  And would that have been about 2006?

12      A.   Yes.

13      Q.   Okay.  When Mr. Alrai came on as your

14  supervisor in about 2006, were you working on-site?

15      A.   Yes.

16      Q.   Okay.  And what site location were you working

17  at?

18      A.   Foxboro, Massachusetts.

19      Q.   Okay.  Would you describe your working

20  relationship with Mr. Alrai at the Robert Allen Group?

21      A.   It was a great relationship.  It was like a --

22  it was professional.

23      Q.   Okay.  He was a good supervisor to you?

24      A.   Yeah, he was.

25      Q.   Okay.  Now, at some point did you have a

1  family situation that caused you to return to the Middle

2  East?

3        A.   That's right.

4        Q.   Can you tell the Court a little bit about

5  that?

6        A.   Yeah.  My father, he had a stroke around 2010,

7  and I had to go back.

8        Q.   Okay.  Where was your father living at that

9  time?

10       A.   Damascus, Syria.

11       Q.   Okay.  So you went home and took care of your

12  father.  Did you come back to work at Robert Allen

13  Group?

14       A.   I came back for a while, and then I moved and

15  I started working remotely there.

16       Q.   Okay.  Did you get permission to work remotely

17  from Syria for the Robert Allen Group?

18       A.   Yes.

19       Q.   Okay.  And did Mr. Alrai help you with getting

20  that approval process through?

21       A.   Yes.

22       Q.   Okay.  So did you always live in Syria during

23  the rest of your employment?

24       A.   No.  I lived in Syria for a while, and then I

25  moved to UAE.

47

1      Q.    The United Arab Emirates?

2      A.    United Arab Emirates.

3      Q.    Okay.  Did you live in Dubai or in one of the

4  other cities?

5      A.    Sharjh.

6      Q.    Would you spell that?

7      A.    S-H-A-R-J-H.

8      Q.    Okay.  So when did you live in the UAE?

9      A.    When?

10     Q.    Yes, sir.

11     A.    Around 2012 I moved there, or the end of 2011.

12     Q.    2011 through 2012?

13     A.    No.  The end of 2011 until recently, 2017.

14     Q.    Okay.  And since 2017 where have you lived?

15     A.    Damascus, Syria.

16     Q.    So it sounds like you worked remotely for

17  about four years while you were at the Robert Allen

18  Group.  Is that about right?

19     A.    Yeah.

20     Q.    Okay.  Would you travel back from time to time

21  to do work on-site?

22     A.    Yeah, I did travel a few times back.

23     Q.    Okay.  How many times did you make trips back

24  to the U.S.?

25     A.    Three or four times.

1      Q.   Okay.  If I named some dates, would that help

2   refresh your memory a little bit?

3      A.   Uh-huh.

4      Q.   Did you come back for about two weeks from

5   September 13, 2011, to October 1, 2011?

6      A.   Yeah.

7      Q.   Okay.  How about from May 13, 2012 to June 6,

8   2012, does that sound correct?

9      A.   Uh-huh.

10      Q.   Say yes or no, please.

11      A.   Yes, yes.

12      Q.   Thank you.

13           March 17, 2013, to April 13, 2013?

14      A.   Yes.

15      Q.   Okay.  And then February 16, 2014, to March

16   20, 2014, right?

17      A.   Yes.

18      Q.   And that last trip right before you left

19   Robert Allen Group?

20      A.   That's right.

21      Q.   Okay.  Sir, outside of your job at the Robert

22   Allen Group, did you ever do work for Imran Alrai?

23      A.   I did.

24      Q.   Okay.  Can you tell the Court what kind of

25   work you did for Imran Alrai outside of Robert Allen

1   Group?

2       A.    I worked for United Way.  He had some work at

3   United Way.  I performed the work there.

4       Q.    Okay.  And was it your understanding you were

5   being hired by United Way or by Imran Alrai?

6       A.    No, by Imran Alrai.

7       Q.    Okay.  And do you remember when that project

8   would have been?

9       A.    2011, '12.

10      Q.    2011 or 2012?  You're not quite clear?

11      A.    Yeah.

12      Q.    What kind of work were you supposed to do?

13      A.    To take care -- or actually we did a few

14  projects for United Way and maintenance and support of

15  their networks.

16      Q.    Okay.  But before there was, like, a contract

17  to do maintenance and network work, was there an IT

18  health assessment?  Does that help you?

19      A.    Yes.

20      Q.    Okay.  Was that the first project you did at

21  United Way at the request of Mr. Imran Alrai?

22      A.    Yes.

23      Q.    Okay.  Where were you located when you were

24  working on that project?

25      A.    Damascus, Syria.

1        Q.    Okay.  So how did you know to do work for

2    United Way through Imran?  What happened?

3        A.    Like how I did it?

4        Q.    Yes.  How did you do that work?

5        A.    There was another person named Aziz.

6        Q.    A-Z-I-Z?

7        A.    That's right.

8        Q.    What is Aziz's last name?

9        A.    I don't remember.

10        Q.    Okay.  Was it one of your former co-workers

11    from Robert Allen?

12        A.    Yes.

13        Q.    Okay.

14        A.    And he was like hands-on for me.  He went to

15    United Way, and then I was communicating with him over

16    the phone.

17        Q.    Okay.  What did you do, though, on your side?

18        A.    We scanned the network.  We checked out their

19    equipment.  We checked, like, performance issues, and we

20    draw the network diagrams and we listed all the

21    equipment they have.

22        Q.    Okay.  And how long did it take for you and

23    Aziz to do this project?

24        A.    Probably like a week, a week and a half.

25        Q.    Okay.  And did Imran do anything with the work

1   or was he kind of the supervisor telling you what you

2   needed to do?

3       A.   He was just like the supervisor.

4       Q.   Okay.  Now, were you paid to do that IT health

5   assessment for the United Way?

6       A.   I think so.  I think I got paid for it.

7       Q.   But do you remember how much?

8       A.   No, honestly.

9       Q.   Okay.  And when Mr. Alrai asked you to work on

10  that IT health assessment at the United Way, did you

11  know that he had a job at the United Way as well?

12       A.   Yes.

13       Q.   Okay.  How did you know about his job at the

14  United Way?

15       A.   I think he told me at that time that he is

16  involved with United Way.  Honestly, at that time I

17  wasn't sure if he had, like, a regular job or a contract

18  job or what type of job.

19       Q.   Okay.  So you understand that there was some

20  kind of arrangement with United Way at that time?

21       A.   Yes.

22       Q.   And when you did the IT health assessment was

23  he still employed as the CEO at the Robert Allen Group?

24       A.   Yes.

25       Q.   Okay.  And you were still working at the

1   Robert Allen Group, right?

2        A.    Right.

3        Q.    And he was your supervisor at the Robert Allen

4   Group?

5        A.    Right.

6        Q.    Did you tell anyone at the Robert Allen Group

7   of Imran's work with the United Way?

8        A.    No.

9        Q.    Why not?

10        A.    I was remote at that time.  My communication

11   is, like, you know, with the workers, limited to the

12   work I do, and I didn't feel like, you know, telling

13   anybody this information.

14        Q.    Okay.  And do you remember how much Imran paid

15   you for that?

16        A.    For the health assessment specifically?

17        Q.    Yes.

18        A.    I don't remember, honestly.

19        Q.    A few hundred dollars, a few thousand dollars?

20        A.    No, no, it wouldn't be.  It would be a few

21   hundred.

22        Q.    A few hundred.  Okay.

23              Now at some point after the health assessment

24   we just talked about did Imran have a contract to take

25   over the IT services for United Way?

53

1        A.    Yes.

2        Q.    Okay.  And would Imran be the one doing the

3   work?

4        A.    No.

5        Q.    Okay.  Who was going to do the work?

6        A.    I would do the work and Nadeem and Jasmin or

7   Idir at that time, yeah.

8        Q.    Okay.  And do you know if there was a company

9   that you guys were working for?  Who was your employer

10   when you were working at --

11        A.    DigitalNet.

12        Q.    DigitalNet.  Okay.  So are you aware of a

13   company called DigitalNet Technology Solutions?

14        A.    Yes.

15        Q.    Okay.  Were you involved in the contracts that

16   were negotiated between DigitalNet and United Way?

17        A.    No.

18        Q.    Do you recall when DigitalNet basically took

19   over the IT services for United Way?

20        A.    Like dates?

21        Q.    General dates if you don't remember the

22   precise dates.

23        A.    2012 maybe.

24        Q.    Okay.  Sometime in 2012?  Was it days, months,

25   years after the IT health assessment, if that helps you?

54

1      A.   Oh, no.  It would be like a few, couple of

2   months maybe or a little bit more.

3      Q.   Okay.  And when the contracts were first --

4   when you learned about the contract at DigitalNet,

5   between DigitalNet and United Way, where were you?

6      A.   Damascus, Syria.

7      Q.   Okay.  And did you do work remotely or did you

8   come to Massachusetts as part of the transition?

9      A.   I came to Massachusetts as part of the

10   transition.

11      Q.   Okay.  And so earlier we talked about a trip

12   on May 13, 2012, to June 6, 2012, that you came back?

13      A.   That would be it I think.

14      Q.   Okay.  So you would have been here during that

15   time?

16      A.   Uh-huh.

17      Q.   Okay.  Tell the Court a little bit about how

18   you were involved in the transition from United Way's

19   old IT system to the new system.

20      A.   Right.  We met with the previous company and

21   they gave us basically the user IDs, the passwords.

22   They told us about the equipment and the design of the

23   network at that time.  That's how.

24      Q.   Okay.  I mean, what exactly was your role in

25   the transition?

1       A.    I was like the technical background or the

2   technical person.

3       Q.    Okay.  And who else was involved in that

4   transition period?  Can you name them?

5       A.    Nadeem.

6       Q.    N-A-D-E-E-M?

7       A.    Right.

8       Q.    Yousuf?

9       A.    Yes.

10      Q.    Y-O-U-S-U-F?

11      A.    Uh-huh.

12      Q.    Who else was involved?

13      A.    I think at that time it was just me and

14  Nadeem.  I'm not sure if Idir Gherbi was there or if he

15  wasn't hired yet.

16      Q.    Okay.  So you think definitely Nadeem Yousuf

17  and yourself?

18      A.    Yes, definitely Nadeem and myself.

19      Q.    Okay.  And possibly Idir Gherbi?

20      A.    Right.

21      Q.    Idir being I-D-I-R?

22      A.    That's right.

23      Q.    G-H-E-R-B-I?

24      A.    Uh-huh.

25      Q.    But you're not certain.  Okay.

56

```
 1              And what role did Imran Alrai have during that
 2   period?
 3        A.   He was just supervising in general.
 4        Q.   Okay.  And at this point when you're on-site
 5   in Massachusetts -- in Boston, right?
 6        A.   Yes.
 7        Q.   At the United Way.  Did you have a clear
 8   understanding of what Imran Alrai's job was at the
 9   United Way?
10        A.   Yes.
11        Q.   What was that?
12        A.   He was vice president or CIO of United Way.
13        Q.   So he was an employee?
14        A.   Yes.
15        Q.   Not just a contractor, right?
16        A.   Right.
17        Q.   You were a contractor, right?
18        A.   Yes.
19        Q.   Okay.  Now, when DigitalNet first started
20   doing work for United Way during this period of time,
21   are you aware of any other clients that DigitalNet had?
22        A.   No.
23        Q.   You're not aware or they didn't have any?
24        A.   Yeah, I wasn't aware.
25        Q.   Okay.  So as far as you know, they didn't have
```

```
 1  any other --
 2       A.   You're talking about the whole period of
 3  the --
 4       Q.   No, just when you first started going there to
 5  United Way.
 6       A.   Oh, yeah, when I first start.  Yeah, not to my
 7  knowledge.
 8       Q.   Not to your knowledge.  Okay.
 9            Sir, after DigitalNet began to work on those
10  contracts at United Way, taking over the IT system,
11  right -- wait, let me step back.
12            So you were there for about a month, right?
13       A.   Uh-huh.  Yes.
14       Q.   Did you go back to Syria or United Arab
15  Emirates?
16       A.   Syria at that time.
17       Q.   Okay.  And then did you continue to work for
18  DigitalNet?
19       A.   Yes.
20       Q.   Doing stuff at United Way?
21       A.   Uh-huh.
22       Q.   And you continued to work for Robert Allen
23  Group, right?
24       A.   That's right.
25       Q.   Okay.  So after DigitalNet began taking over
```

1   United Way's IT services, did you become aware that

2   DigitalNet received contracts to do work for the Robert

3   Allen Group as well?

4        A.   Yes.

5        Q.   How did you learn about that?

6        A.   By Imran Alrai.

7        Q.   Okay.  Did he call you, e-mail you, to tell

8   you before you left?

9        A.   No, I think it was a talk.

10        Q.   Okay.  So other than Imran, did anyone else at

11   the Robert Allen Group know that you were doing work for

12   United Way while you were still at the Robert Allen

13   Group?

14        A.   No.

15        Q.   Did you do any work on behalf of DigitalNet

16   while you were working for Robert Allen Group?

17        A.   For Robert Allen?

18        Q.   Yes, at Robert Allen Group.

19        A.   No.

20        Q.   Okay.  Let me make that clearer.

21             While you were doing work -- I know you were

22   working for DigitalNet at United Way.

23        A.   Right.

24        Q.   When you were doing work for Robert Allen

25   Group and DigitalNet had contracts with Robert Allen

1    Group, did you work on those contracts?

2        A.   No.

3        Q.   Were you ever asked to work on any of those

4    projects that DigitalNet was doing for Robert Allen

5    Group?

6        A.   Yeah.  I mean, yeah, in the beginning, but I

7    said I don't want to work on a contract, on DigitalNet's

8    contract for Robert Allen.

9        Q.   Who did you tell that to?

10       A.   Imran.

11       Q.   Okay.  And what had he asked you to do that

12   made you say you didn't want to work on those contracts?

13       A.   It wasn't like he asked me -- it was a phone

14   project and he asked me if I can do the transitions from

15   the old phone system to the new phone systems.  And I

16   felt at that time this is like, you know, DigitalNet's

17   responsibility and I don't want to work for Robert Allen

18   and DigitalNet on the same project, and he was fine with

19   it.

20       Q.   Go ahead, sir.

21       A.   Yeah, he was okay.  I told him, like, you

22   know, I don't feel like working for that.

23       Q.   Okay.  Did you ever tell anybody at the Robert

24   Allen Group about Imran's relationship to DigitalNet

25   once he got those contracts?

```
1          A.    No.

2          Q.    Why not?

3          A.    Again, I wasn't here, like I wasn't seeing

4    people every single day and so we can talk about it.  I

5    was remote and I was doing work for Robert Allen.  I was

6    employed, but I wasn't like, you know, it was just doing

7    my work and I didn't feel like telling people.

8          Q.    You didn't feel like telling people.  Okay.

9                So at some point Imran left the Robert Allen

10   Group, right?

11         A.    Right.

12         Q.    About September 2013?

13         A.    Uh-huh.

14         Q.    Okay.  Did he tell you that he had left?

15         A.    Yes.

16         Q.    Okay.  What did he tell you?

17         A.    He called me.  He said he's no longer with

18   Robert Allen Group.

19         Q.    Okay.  And was his intention to then just work

20   at the United Way and DigitalNet?  Did he tell you

21   anything about that?

22         A.    He didn't say anything about that.

23         Q.    Okay.  You left Robert Allen Group in 2014,

24   March 2014?

25         A.    Uh-huh.
```

1      Q.    Okay.  Did you increase your work commitment

2   to DigitalNet after that?

3      A.    I did.

4      Q.    Okay.  In total, how many years did you work

5   for DigitalNet?

6      A.    So we're talking about like I think from 2011

7   to 2017.

8      Q.    Or '18?

9      A.    '18.

10      Q.    Okay.  Did you ever have an official job

11   title?

12      A.    No.

13      Q.    So what was your job then?

14      A.    I was doing all their network requirements or

15   network needs for any projects that has to do with the

16   hardware, not the software.

17      Q.    Okay.  So I know that you worked remotely, but

18   you made trips back and you did work at United Way and

19   DigitalNet, right?

20      A.    Yes.

21      Q.    Other than the United Way office in Boston,

22   did you go to a physical office for DigitalNet?

23      A.    No.

24      Q.    Okay.  Are you aware of an address that's

25   associated with DigitalNet?

1      A.    I'm aware of an address that's on the website

2    of DigitalNet, yeah.

3            Q.    The 300 Brickstone in Andover, Massachusetts?

4            A.    I believe so.

5            Q.    Okay.  Did you ever go to that location?

6            A.    No.

7            Q.    Why not?

8            A.    I wasn't asked to go there so I didn't go.

9            Q.    Okay.  And other than United Way and Robert

10   Allen Group, during your years with DigitalNet did it

11   have any other clients?

12           A.    There was a couple of clients, maybe potential

13   clients, but I worked with the Boys & Girls Club.

14           Q.    Okay.

15           A.    And there was another client at the end that

16   they were requiring to do some type of file server.  So

17   we looked for a solution for them, but that's it.

18           Q.    So you said -- you kind of clarified.  You

19   said potential clients.  What does that mean?

20           A.    Yeah, because I think it was -- it was just

21   like a health assessment.  So when we do that, it

22   doesn't mean like, you know, we have a contract and

23   we're doing the work.  We did some work but --

24           Q.    It's not like what happened at United Way when

25   you took over and managed the IT system?

1      A.    Right.   Exactly.

2      Q.    Right.   So tell me about the Boys & Girls

3  Club.   Where was that located?

4      A.    Honestly, I'm not sure because -- maybe New

5  Hampshire.

6      Q.    Okay.   And what year was that?

7      A.    I can't tell.

8      Q.    And what work did DigitalNet do for the Boys &

9  Girls Club?

10     A.    It's like a health assessment.

11     Q.    Okay.   And did you remote in and do the

12  assessment like you talked about earlier?

13     A.    Yeah.

14     Q.    Okay.   And the other company that you

15  mentioned near the end, where is that company located?

16     A.    I am not sure where that company is.

17     Q.    And did you remote in and do a health

18  assessment?

19     A.    No, it wasn't a health assessment.   They were

20  looking for a solution.

21     Q.    Okay.

22     A.    And I was like -- I was searching for a

23  solution for them.

24     Q.    Okay.   So it sounds like a bidding for a

25  contract.

64

1      A.   Yes.  That's right.

2      Q.   Okay.  And did DigitalNet get that contract?

3      A.   Not to my knowledge.

4      Q.   Okay.  Have you ever heard of a company called

5   UltPult?

6      A.   Yes.

7      Q.   Okay.  How have you heard about UltPult?

8      A.   It was on Imran's Facebook.

9      Q.   It was on Imran's Facebook?

10     A.   Right.

11     Q.   What did you know about UltPult based on your

12   review of Facebook?

13     A.   It's a gaming company.  They make games for

14   mobile or things like that.

15     Q.   And as far as you know, was there any overlap

16   in Imran's gaming company UltPult and DigitalNet?

17     A.   I don't know.

18     Q.   You don't know.

19          So I would like to talk to you a little bit

20   more about ownership and management of DigitalNet, okay?

21          Who worked at DigitalNet during your four,

22   five, six years there?

23     A.   In the states, to my knowledge, there was

24   Nadeem, Idir, and Jasmin.

25     Q.   Do you know Jasmin's last name?

1    A.    Iqbal.

2    Q.    Iqbal, I-Q-B-A-L?

3    A.    Yeah.

4    Q.    Okay.  And where did those folks work?

5    A.    United Way in Boston.  United Way's office.

6    Q.    Okay.  They were the help desk folks, right?

7    A.    Right.

8    Q.    Okay.  And then there was you?

9    A.    Yes.

10   Q.    And then Imran, right?

11   A.    That's right.

12   Q.    Okay.

13   A.    And there was another, like a whole team in

14   Pakistan.

15   Q.    Okay.  Did you ever meet that whole team in

16   Pakistan?

17   A.    Just over the hangout Scoles, yeah.

18   Q.    Okay.  How many people did you communicate

19   with directly in Pakistan?

20   A.    Oh, probably four or five at least.

21   Q.    Four or five.  Okay.

22         And how would you -- why would you communicate

23   with those folks in Pakistan?

24   A.    Well, they are programmers, and they may need

25   something on the hardware side or they may have an issue

66

1    so that's when we communicate.

2        Q.   Okay.  I would like to show you some exhibits,

3    all right?

4            MS. LE:  I would like Ms. Sheff to pull up

5    Exhibit 613, which has already been admitted, your

6    Honor.

7            THE COURT:  Yes.

8        Q.   Okay.  Sir, these are some e-mails in February

9    12, 2013, to February 28, 2013.

10           Do you recognize Imran Alrai's United Way

11   e-mail address?

12       A.   Yes.

13           MS. LE:  Okay.  And if you can go down to the

14   next e-mail address, the DigitalNet support.

15       Q.   Do you recognize that e-mail address?

16       A.   Yes, I do.

17       Q.   Okay.

18           MS. LE:  So let's go to page, the next page,

19   10161.  Maybe we can just highlight this section here

20   and bring it forward.

21       Q.   You've never seen this e-mail before, right?

22       A.   No.

23       Q.   Okay.  It says, "Hi, Imran.  Please find below

24   the information requested.  Principals.  Can I get the

25   principals, bio, and location?"

67

```
1              There are three names listed.  Do you see
2    that?
3        A.   Uh-huh.
4        Q.   M. Ahmad Chaudhary, Ahmad Hassan, Jawad
5    Munawar.  Do you see that?
6        A.   Uh-huh.
7             THE COURT:  Is that a yes or a no?
8        A.   Yes.  Yes, I do.
9             MS. LE:  Thank you, your Honor.
10            THE COURT:  No problem.
11       Q.   Sir, below each of those names there's a
12   description.  Can you just review that information to
13   yourself?
14       A.   Okay.
15            (Witness reads document)
16       Q.   Okay.  During your time working for DigitalNet
17   did you know a Jawad Munawar?
18       A.   There was somebody with the name Jawad working
19   in Pakistan.
20       Q.   Okay.
21       A.   I don't know about the last name, but
22   that's -- I think so.  I think Jawad was a person in
23   Pakistan.
24       Q.   It says that -- and the Jawad in Pakistan
25   named Munawar, was that the defendant's brother-in-law
```

1    or brother?

2         A.   Oh, I don't know.

3         Q.   Okay.  So you see it says this person is the

4    CEO and manages the operations in the United Arab

5    Emirates?  Do you see that?

6         A.   Yes.

7         Q.   Okay.  The person you knew as Jawad, were they

8    in the UAE?

9         A.   No.

10        Q.   Where were they located?

11        A.   Pakistan.

12        Q.   All right.  And was that person the CEO of

13   DigitalNet?

14        A.   I don't think so.  I'm not sure.  I mean,

15   based on my communication with him he was -- I think he

16   was on the network side in Pakistan.

17        Q.   Okay.

18        A.   I'm not sure of his title or what he has

19   there.

20        Q.   Okay.  The Jawad you're familiar with is

21   somebody in Pakistan and they work on the network side?

22        A.   Right.

23        Q.   Okay.  Do you see there's the middle person,

24   M. Ahmad Chaudhary.  Do you see that?

25        A.   Yes.

1    Q.    And the claim is this person is based in the

2  U.S.?

3    A.    Okay.

4    Q.    Okay.  Did you ever meet an M. Ahmad Chaudhary

5  in the U.S. DigitalNet operations?

6    A.    No.

7    Q.    Okay.  The third name is Ahmad Hassan.  Does

8  that name sound familiar to you?

9    A.    Ahmad Hassan or somebody with the last name

10 Hassan, we had a few calls one time when I was at United

11 -- at Robert Allen, and someone on the phone as I

12 remember with the last name Hassan, but I'm not sure if

13 this is the same person.

14   Q.    Okay.  But did you ever talk to a person with

15 the name Ahmad Hassan?

16   A.    No.

17        MS. LE:  Okay.  Let's go to the next page,

18 10162.  Let's go to this section here.

19   Q.    All right.  Sir, do you see the locations

20 listed?

21   A.    Yes.

22   Q.    For the Americas, U.S. headquarters, there's

23 that 300 Brickstone Square, Suite 201, Andover,

24 Massachusetts, address?

25   A.    Yes.

1    Q.   Is that the address that you're familiar with

2  as DigitalNet's address?

3    A.   The one on the website?

4    Q.   Yes.

5    A.   I'm not a hundred percent sure.

6    Q.   Okay.

7    A.   But I think it is Andover.

8    Q.   Yes.  And did you ever go -- in your years

9  working with DigitalNet, even with your trips coming

10  back, did you ever go to that U.S. headquarters?

11    A.   No.

12    Q.   Okay.  Are you familiar with the Asia

13  location, which is 162 Marghzar Colony in Lahore,

14  Pakistan?

15    A.   No.

16    Q.   Okay.  Are you aware that that's where Imran

17  Alrai's family lives?

18    A.   In Lahore?

19    Q.   No, that specific address.

20    A.   No, no.

21    Q.   Okay.  And there's a Middle East address which

22  is in Dubai, UAE.  Do you see that?

23    A.   Yes.

24    Q.   Okay.  How far are you from Dubai?

25    A.   Oh, like half an hour.

1      Q.   Okay.  Have you been to Dubai?

2      A.   Oh, yeah.

3      Q.   Do you go there regularly?

4      A.   Not regularly, but yeah.

5      Q.   Are you familiar with the Discovery Gardens,

6  which is a luxury apartment complex?

7      A.   Yes, I'm familiar with them.

8      Q.   Okay.  As far as you know, does DigitalNet

9  have office space in a luxury apartment complex at the

10  Discovery Gardens in Dubai?

11      A.   No.

12      Q.   Okay.  The next section here says, "Currently

13  there are 23 associates in the U.S., all sales,

14  marketing, HR, data center, infrastructure, Telephony,

15  and related services are housed in the U.S. for all U.S.

16  customers."

17           Do you see that?

18      A.   Yes.

19      Q.   Is that true?  Were there 23 associates

20  working for DigitalNet in the U.S.?

21      A.   Not to my knowledge.

22      Q.   Okay.  As far as you know, how many U.S.

23  associates did DigitalNet have?

24      A.   Three.

25           MS. LE:  Let's clear this.

1      Q.   Sir, did DigitalNet have an account manager as

2  far as you know?

3      A.   No.

4      Q.   And to your knowledge was there a vice

5  president of business development for DigitalNet?

6      A.   No.

7      Q.   I would like to show you Exhibit 703.  Do you

8  recognize the e-mail addresses up here?

9      A.   Yes.

10      Q.   Whose e-mail addresses do you recognize?

11      A.   This is Ray and Dean.  I recognize both of

12  them.

13      Q.   Those are people from Robert Allen Group,

14  right?

15      A.   Yes.

16      Q.   Okay.  And do you see the e-mail from October

17  23rd?

18      A.   Yes.

19      Q.   Where is that e-mail from?

20      A.   It looks like it's coming from DigitalNet.

21           MS. LE:  Your Honor, at this time the

22  government moves to strike the identification and admit

23  703.

24           MR. AYER:  No objection, your Honor.

25           THE COURT:  Thank you.  It's admitted.

1          (Government's Exhibit 703 admitted)

2      Q.    All right, sir, there's the name Mohammad on

3   there, and there's a little bit of information about

4   Mohammad Hassan.

5      A.    Okay.

6      Q.    Is it possible that the somebody Hassan that

7   you talked about earlier could have been Mohammad

8   Hassan?

9      A.    Yeah, it's possible.

10      Q.    Okay.  So let me just read the e-mail, "Hello,

11   Bob and Ray.  Mac has asked me to send you our contact

12   information.  I am sorry that for some reason I thought

13   you already had it.  I apologize sincerely.  Mohammad

14   Hassan, account manager.  I am responsible for the

15   entire relationship between our two organizations.  I am

16   your champion and advocate here at DigitalNet.  My phone

17   is 978-296-7944, extension 1002.  This is the best

18   e-mail address to reach me."

19          Do you see that?

20      A.    Yes.

21      Q.    So when you were working for DigitalNet did

22   you know about this account manager named Mohammad

23   Hassan?

24      A.    No.

25      Q.    Do you see that 978 extension number?

74

1        A.    Yes.

2        Q.    Is that a U.S. telephone number?

3        A.    Yeah, it looks like it.

4        Q.    A Massachusetts number, right?

5        A.    Uh-huh.

6        Q.    Okay.  Do you know a person named Mac

7   Chaudhary?

8        A.    No.

9        Q.    Okay.  And you see it says, "Mac Chaudhary, VP

10  of business development.  Mac oversees our business

11  development and I report to him.  His phone number is

12  978-296-7944, extension 1001."

13             Do you see that?

14       A.    Yes.

15       Q.    Okay.  So during your time did you know a Mac

16  Chaudhary who was the VP of business development for

17  DigitalNet?

18       A.    No.

19       Q.    Okay.  And likewise, that's a U.S. phone

20  number, right?

21       A.    Right.

22       Q.    A Massachusetts phone number; am I right?

23       A.    Yes.

24       Q.    Okay.  Sir, did you ever meet Imran Alrai's

25  father?

1      A.    No.

2      Q.    Would it surprise you that Imran Alrai's

3  father is apparently the VP of business development for

4  DigitalNet?

5      A.    Yeah.

6      Q.    Okay.  Did Imran ever tell you anything about

7  his dad?

8      A.    Yeah.

9      Q.    What did he tell you about his dad?

10     A.    That he is a retired doctor.

11     Q.    Okay.  Did you ever talk about Imran Alrai's

12  father having IT expertise?

13     A.    No.

14          THE COURT:  We'll take the morning break.

15          MS. LE:  Thank you, your Honor.

16          (RECESS)

17          THE COURT:  All right.  Sir, you're still

18  under oath.  Please proceed.

19          MS. LE:  Thank you, your Honor.

20     Q.    Mr. Wahbe, when you were working at the United

21  Way for DigitalNet, did you have a United Way e-mail or

22  a DigitalNet e-mail?

23     A.    A DigitalNet e-mail.

24     Q.    Okay.  How about Imran, did he have a United

25  Way e-mail or a DigitalNet e-mail?

1        A.    Both.

2        Q.    Both.   Okay.

3              MS. LE:   Ms. Sheff, can you pull up Exhibit

4    620.

5              Do you have any objections to this exhibit

6    or should I go through --

7              MR. HARRINGTON:   No objection.

8              MS. LE:   Your Honor, this has been admitted

9    with the consent of counsel, so can we strike the

10   identification?

11             THE COURT:   Yes.   It's admitted.

12             (Government's Exhibit 620 admitted)

13        Q.    Sir, let's start up here.   Who sent the

14   e-mail?

15        A.    That's me.

16        Q.    Kal Wahbe, right?

17        A.    Yes.

18        Q.    And your e-mail address is

19   kal.wahbe@digitalnet.com; is that right?

20        A.    That's right.

21        Q.    Okay.   Who did you send the e-mail to?

22        A.    I sent it to IT service desk and to Imran.

23        Q.    Okay.   The IT service desk e-mail address,

24   that's a United Way e-mail address?

25        A.    That's right.

1     Q.   So who's the recipient, if you remember?

2     A.   This would be Nadeem and Jasmin.

3     Q.   Okay.  So Nadeem and Jasmin had a United Way

4  e-mail address?

5     A.   I'm not sure if they had a United Way, but

6  they had this IT service desk.  They would receive

7  e-mails on it.

8     Q.   Okay.  That makes sense.  And then you also

9  sent it to Imran Alrai, right?

10    A.   Yes.

11    Q.   And the e-mail address that you used is

12  imran.alrai@digitalnet.com?

13    A.   That's right.

14    Q.   Okay.  So when you were communicating with

15  Imran by e-mail, when would you use the DigitalNet

16  e-mail address and when would you use his United Way

17  e-mail address?

18    A.   I would use his DigitalNet e-mail when it's

19  matters regarding DigitalNet.

20    Q.   Okay.

21    A.   And the other e-mail if it's related to the

22  United Way.

23    Q.   But isn't this e-mail about the United Way?

24  You can read it to yourself.

25    A.   Right, it is.  It could be by accident I sent

78

1   it to DigitalNet instead of the United Way.

2        Q.   Okay.  But you distinguished a little while

3   ago between when it's DigitalNet business versus United

4   Way business.

5        A.   Right.  Yes.

6        Q.   So in your mind what is United Way business

7   that you would communicate with Imran on his United Way

8   e-mail address?

9        A.   Right.  Like, for example, this should have

10  been done on the United Way e-mail.

11       Q.   Okay.  And when would you e-mail him about

12  DigitalNet stuff on his DigitalNet e-mail address?

13       A.   Probably like if I wanted to take time off.

14       Q.   All right.  That makes sense.  Let's see.

15            MS. LE:  Can we go to the second page, Ms.

16  Sheff?

17            So who is this e-mail from, the first e-mail

18  here?

19       A.   That's me.

20       Q.   That's to you, right?

21       A.   That's to me, yes.

22       Q.   Okay.  Imran is cc'd?

23       A.   Yes.

24       Q.   And it's from whom?

25       A.   From Nadeem.

1   Q.   It says here, "Kal, Dom just informed that GP

2   is crashing and giving disk full error.  Can you please

3   take a look into it and talk to CloudConnect about it.

4   We might need to add more storage."

5   A.   Okay.

6   Q.   Who is Dom?

7   A.   I have no idea.  It sounds like a user in

8   United Way.

9   Q.   Okay.  And what is GP?

10  A.   That's a system they used at United Way.

11  Q.   What does it stand for?

12  A.   I forgot what it stands for, but it's a

13  system, like it's a software they use.

14  Q.   Okay.  And disk full error, what does that

15  mean?

16  A.   As it says here, it's like the server has a

17  disk full error, like the disk is almost full.

18  Q.   Meaning there wasn't sufficient memory?

19  A.   Or disk space.

20  Q.   Or disk space.  So how does one fix that

21  problem?

22  A.   Well, first of all, we need to know if it's a

23  disk full error because we need more disk or just a

24  matter of we need to clean it out or we need to add more

25  disk.

1    Q.   Okay.  And so Nadeem asked you to look into

2  it.  How would you look into this issue?

3    A.   I would log into the server and troubleshoot

4  the problem.

5    Q.   Okay.  And it also suggests that you talk to

6  CloudConnect.  Who is CloudConnect?

7    A.   CloudConnect is the provider for -- the cloud

8  provider that -- we hosted the servers and the desktops

9  with them.

10    Q.   Okay.  So that's a vendor that DigitalNet

11  worked with in order to provide the cloud service?

12    A.   Uh-huh.

13    Q.   At least in 2014?

14    A.   Yes.

15    Q.   And it says, "We might need to add more

16  storage."  What does that mean?

17    A.   We need to add more disk space to the server.

18    Q.   Okay.  How does one do that?

19    A.   They would have to allocate disk space to us,

20  and then I would go into the server and go through the

21  process of adding the disk space.

22    Q.   Who would be giving you more disk space?

23    A.   CloudConnect.

24    Q.   Okay.  And so you talked to the vendor and

25  then you go and type and you add more disk space.  Easy

```
 1   like that?
 2         A.    Right.  Yes.
 3         Q.    Okay.  Adding more disk space, does it cost
 4   more money or no?
 5         A.    Yeah, sure.  Definitely.
 6         Q.    All right.  Does this happen a lot or is this
 7   kind of unusual?
 8         A.    No, it's not unusual.  It does happen.
 9         Q.    Okay.  While you were at the United Way did
10   this GP system crash and did you have to add more -- I
11   mean troubleshoot?
12         A.    Like so many times?
13         Q.    Yeah.
14         A.    I don't think so.  I mean, honestly I'm not
15   sure how many times, but there were so many systems they
16   have.  So GP is one of them.
17         Q.    Okay.  And were you involved in rebooting the
18   servers every evening?
19         A.    Every evening?
20         Q.    Yes.
21         A.    No.
22         Q.    Okay.  Did you reboot servers?
23         A.    We rebooted the servers.  We had maintenance
24   windows to reboot the servers and we rebooted if we need
25   to.  Like some servers we had some issues during certain
```

1    times where we had to reboot them every night.

2         Q.   Oh, tell me about that.

3         A.   I remember, like, one server was the printing

4    server, and we had some issues with it every morning.

5    So as a temporary fix, we would go and reboot the server

6    every morning.  It could be me, that I was rebooting,

7    because I am on different time zones, so yeah.

8         Q.   Right.  So how long did this go on for that

9    you had to reboot every single night?

10        A.   No, not every single server.  Again, it's just

11   specific servers if we have issues with them, yes.

12        Q.   Okay.  But it sounds like there was one server

13   that you had to reboot every night?

14        A.   Yeah, I remember now.  It was one specific

15   server we had some issues with, yes.

16        Q.   Sir, is it possible that the word GP here is

17   Great Plains?

18        A.   Yes.

19        Q.   Okay.  And are you aware that Great Plains was

20   the financial platform that United Way used?

21        A.   Yes, yes.

22        Q.   Okay.

23             MS. LE:  Can we clear out of this, Ms. Sheff?

24        Q.   So going back, there was one server that you

25   had a problem with and for a period of time you had to

83

1   go back and reboot every night or very early in the

2   morning, right?

3        A.    Right.

4        Q.    And what was the name of that?

5        A.    That's the print server.

6        Q.    The print server.  And how long did that go on

7   that you had to reboot every night?

8        A.    Honestly, I'm not sure.  A month maybe or so.

9        Q.    Okay.

10       A.    And we could have been -- we could have put it

11  on a schedule to be rebooted automatically.

12       Q.    You for a while had to manually reboot it?

13       A.    Just to make sure it's happening.

14       Q.    Okay.  Let's go back a little bit and talk

15  more about the management and ownership of DigitalNet,

16  okay?

17       A.    Okay.

18       Q.    So who hired you to work for DigitalNet?

19       A.    Imran.

20       Q.    Okay.  And were you involved in the hiring of

21  anyone else?

22       A.    Yes.

23       Q.    Who were you involved in hiring?

24       A.    Jasmin and Idir.

25       Q.    Okay.  Were you involved in the hiring of

84

1    personnel in Pakistan?

2         A.   No.  Um, no.

3         Q.   Okay.  Who made decisions about hiring at

4    DigitalNet as far as you know?

5         A.   Imran.

6         Q.   Earlier you mentioned sometimes you would

7    e-mail Imran at his DigitalNet account when you needed

8    time off, that kind of thing.  Did the other DigitalNet

9    employees do the same thing if you know?

10        A.   I am not sure.  I'm assuming yes, but I'm not

11   sure.

12        Q.   Okay.  And as far as you know, who managed

13   DigitalNet?

14        A.   Imran.

15        Q.   Did you ever have a situation with Imran where

16   you asked him something and he said let me check with my

17   supervisors?

18        A.   No.

19        Q.   Let me check with one of the other managers?

20        A.   No.

21        Q.   Okay.  As far as you know, who was the boss at

22   DigitalNet?

23        A.   Imran.

24        Q.   Did you ever -- when you came on, did you ever

25   have salary negotiations?

1        A.    Yeah.

2        Q.    Okay.  Who did you negotiate your salary with?

3        A.    Imran.

4        Q.    Okay.  And did you ever talk about increase of

5   pay or anything like that?

6        A.    Yeah, I did.

7        Q.    And who was that with?

8        A.    With Imran.

9        Q.    Okay.  So when you first started you said you

10   made a few hundred bucks maybe for that health

11   assessment.  Okay.  And while you were still working at

12   Robert Allen Group and DigitalNet were you getting paid

13   for that work by Imran?

14       A.    Yes.

15       Q.    Okay.  How much were you being paid by Imran

16   then?

17       A.    I think at the beginning I was getting like

18   $500 a week.

19       Q.    So about 2,000 a month?

20       A.    I think so.

21       Q.    So that's on top of your salary at Robert

22   Allen Group?

23       A.    Yes.

24       Q.    Okay.  And after you left Robert Allen Group

25   did your salary change for DigitalNet?

86

1      A.    Yes.

2      Q.    Okay.  And what was your salary when you first

3  started at DigitalNet?

4      A.    Either 50,000 or 55,000.

5      Q.    Did you ever get a salary increase, a raise or

6  a bonus or anything like that from DigitalNet?

7      A.    No.

8      Q.    No.  At some point did your -- I mean, over

9  the years has your working relationship with DigitalNet

10 changed?

11     A.    Yeah, after that it changed back again to

12 part-time.

13     Q.    With DigitalNet?

14     A.    With DigitalNet, yes.

15     Q.    When did that happen?

16     A.    I'm not sure.  It could be 2014.

17     Q.    2014, maybe even 2015?

18     A.    Yeah.

19     Q.    Okay.  What happened around that time?

20     A.    I got a job in Khatar.

21     Q.    Okay.

22     A.    So I ask Imran if I can, you know, work after

23 hours, you know, after 5 o'clock my local time there,

24 and he said, yes, for a couple hours a night.

25     Q.    Okay.  So the job in Khatar that you got in

1    2014 or 2015, was that supposed to be a full-time job?

2         A.   Yes.

3         Q.   Okay.  And did you report somewhere?

4         A.   Yeah.

5         Q.   Okay.  So what were your working hours when

6    you worked for that company in Khatar?

7         A.   8 to 5.

8         Q.   8 to 5 your local time?

9         A.   Uh-huh.

10        Q.   What's the time difference between the UAE and

11   Boston?

12        A.   Seven.

13        Q.   Seven hours?

14        A.   Seven hours.

15        Q.   Okay.  And so once you got that job, that

16   full-time job in Khatar, what was your arrangement with

17   Imran for DigitalNet work at United Way?

18        A.   It was like I should be available for two

19   hours, from 11:00 to 1:00 Eastern time.

20        Q.   11:00 to 1:00 a.m. or p.m.?

21        A.   11:00 a.m. to 1:00 p.m.

22        Q.   And that's Eastern time?

23        A.   Eastern time.

24        Q.   Okay.  What time was that in Syria then -- I

25   mean, in UAE then?

1      A.    That was, like, I think around 5 or 6 o'clock
2   in the afternoon.
3      Q.    Okay.  So just two hours you were working?
4      A.    Just two hours.  And if they need me in
5   emergency, I should be available.
6      Q.    Okay.  And how long did that go for?
7      A.    That went on for -- that arrangement with
8   DigitalNet?
9      Q.    Yes.
10      A.    That went on for two to three years.
11      Q.    Two to three years.  So for two to three years
12   you were only working about two to three hours a week
13   for United Way?
14      A.    A day.
15      Q.    A day?
16      A.    Yes.
17      Q.    Okay.  And did your salary change?
18      A.    Yeah, it went down to 35,000.
19      Q.    Okay.  How long did you keep that full-time
20   job in Khatar?
21      A.    It wasn't for long.  For probably like three
22   months, two months.
23      Q.    Okay.  But you continued this arrangement
24   with --
25      A.    I continued this arrangement with DigitalNet

1    hoping, like, I will find a permanent job there, like a

2    full-time, so I will keep -- I don't have to go back and

3    change back and forth.

4        Q.   Okay.  So did you have other jobs?

5        A.   No.

6        Q.   Okay.  You had other consulting work then?

7        A.   Yeah, I had some consulting work here with

8    Princess House at that time.

9        Q.   Okay.  So for three years you were doing two

10   to three hours a day for DigitalNet at United Way?

11       A.   That's right.

12       Q.   From 11:00 a.m. to 1:00 p.m. Eastern time?

13       A.   Uh-huh.

14       Q.   Okay.  Did you come back full-time?

15       A.   I did.

16       Q.   At DigitalNet?

17       A.   Yes.

18       Q.   When was that?

19       A.   I think that's around February of 2018.

20       Q.   Okay.  All right.  February 2018 you came

21   back.  Who did you talk to about getting your job back?

22       A.   Imran.

23       Q.   Okay.  And he agreed?

24       A.   Yeah.

25       Q.   Did you get your full salary back, too?

1      A.   Almost, yeah.

2      Q.   Almost.  Tell me what you got paid.

3      A.   I got 50,000.

4      Q.   Okay.  All right.  Now I want to direct your

5   attention to the events of June 12, 2018.  Do you

6   remember that day?

7      A.   Yes.

8      Q.   Okay.  Where were you?

9      A.   In Damascus, Syria.

10      Q.   Okay.  Did you find out about some stuff

11   happening between United Way and DigitalNet?

12      A.   Yes.

13      Q.   Okay.  How did you learn about those events?

14      A.   Well, I had a problem logging into the systems

15   that day so, you know, I was surprised.  I tried to call

16   Nadeem, call Jasmin, and no answer.  So finally I got in

17   contact with Imran, and he said that DigitalNet is no

18   longer, you know, doing work or something to that

19   effect.

20      Q.   Okay.

21      A.   For United Way.

22      Q.   Do you remember when you talked to Imran?

23      A.   I don't remember honestly, but maybe it was

24   even a message, it wasn't, you know, direct talk.  It

25   was just a message.  He said, like, Nadeem and Jasmin,

1  they are okay, but we're not doing any work for United

2  Way.

3      Q.   Did you talk to anyone else at DigitalNet

4  about what happened that day?

5      A.   I did talk to Nadeem afterward, yes.

6      Q.   Okay.  What was your reaction when you found

7  out that there was no longer any work between United Way

8  and DigitalNet?

9      A.   I mean, like, what do you mean?

10     Q.   I mean, you couldn't get in touch with your

11 co-workers.  You thought that was weird.

12     A.   Right.

13     Q.   You couldn't log on to the system.

14     A.   Right.

15     Q.   You finally get in touch with Imran and he

16 says there's no more?

17     A.   Right.

18     Q.   I mean, that's your job.  What was your

19 reaction?

20     A.   I mean, I was surprised.

21     Q.   Okay.  Why?

22     A.   To see what's happening, you know, like all

23 the sudden everything shuts down that way.  It's weird.

24     Q.   Did Imran ever talk to you later about what

25 happened?

1      A.    I think he did.  I think, yep, he did talk to

2  me about it, yep.

3      Q.    Okay.  Just a few more questions.

4      A.    Sure.

5      Q.    So earlier we talked about an e-mail address,

6  info@digitalnet.us.  Do you remember that?

7      A.    Yes.

8      Q.    Do you know who used that e-mail address?

9      A.    I don't know exactly.  Like, I'm not sure who

10 specifically used it.

11     Q.    Okay.  Were there multiple people who used

12 that e-mail address?

13     A.    There was no multiple people.  Like, the only

14 person I know is Imran Alrai in the company.

15     Q.    Who used that e-mail address?

16     A.    It could be him.

17     Q.    Okay.  Did you ever use that e-mail address?

18     A.    No.

19     Q.    How about Nadeem?

20     A.    I don't think so.

21     Q.    How about Jasmin?

22     A.    I don't think so.

23     Q.    How about Idir?

24     A.    No.

25     Q.    Were you involved in, like, preparing invoices

1   from DigitalNet to United Way?

2       A.   No.

3       Q.   Okay.  Did you ever send invoices from

4   DigitalNet to United Way?

5       A.   No.

6       Q.   Okay.  Did you ever use the name Mohammad in

7   any e-mails, like, did you claim to be Mohammad in any

8   e-mails?

9       A.   No.

10      Q.   How about Mac Chaudhary?

11      A.   No.

12           MS. LE:  No further questions, your Honor.

13           We tender the witness.

14           THE COURT:  Cross.

15                        CROSS-EXAMINATION

16  BY MR. HARRINGTON:

17      Q.   Good morning, Mr. Wahbe.

18      A.   Good morning.

19      Q.   How are you today, sir?

20      A.   Okay.

21      Q.   Let me ask you, Mr. Wahbe, I'm going to talk

22  to you a little bit about your work for DigitalNet as it

23  relates to United Way, okay?

24      A.   Okay.

25      Q.   Let me ask you, do you feel that you did good

1    work for DigitalNet in providing services to the United

2    Way?

3         A.    Absolutely.

4         Q.    Okay.  I want to ask you a few questions in

5    that regard and in particular about a couple of specific

6    issues.

7              You had said that your job -- although you

8    didn't have a title, you were a network person; is that

9    right?

10        A.    Right, right.

11        Q.    And if you could, can you explain to me, and

12   the Judge more particularly, being a network person,

13   what is the service that you're providing as a network

14   person.

15        A.    Okay.  Any projects related to the network,

16   whether new servers we need to put in or we need to put

17   in a new circuit, create a new network, securing the

18   network, this all comes to me and I will basically run

19   with it or do it.

20        Q.    So you would complete the task and the job?

21        A.    Yes.

22        Q.    Relative to those issues?

23        A.    Yes.

24        Q.    Okay.  Would that also include things like

25   making sure that there was adequate backup for the

1   system?

2        A.   Yes.

3        Q.   Okay.  And as part of this process, would you

4   also agree that -- you had just mentioned making sure

5   the network was secure.  So you would want to make sure

6   that you had adequate security in place for this network

7   as well, right?

8        A.   Yes.

9        Q.   Okay.  Let me ask you about a subject, a thing

10  called redundancy.  Is that a term that you're familiar

11  with?

12       A.   Yes.

13       Q.   Can you explain to the Judge, what does

14  redundancy mean?

15       A.   It means that you don't have one point of

16  failure on the network so you will have -- instead of

17  having one circuit, you will have two circuits.  If one

18  is down, the other one will pick up.  If you have one

19  environment, you will have two environments.  This way

20  you would have redundancy.

21       Q.   Okay.  And so in layman's terms, it's really

22  kind of like trying to have two of everything in case

23  one of them goes down?

24       A.   Almost, yes.

25       Q.   Okay.  Now, let me ask you about, with those

1    things in mind, security, redundancy, and backup, those

2    three topics, in regard to the services that you

3    provided to the United Way via DigitalNet.  Do you

4    believe that you had provided adequate security measures

5    for the IT network at the United Way?

6         A.    Yep.  Yes.

7         Q.    What did you do to make sure that you had

8    adequate security provided to the United Way?

9         A.    We had firewalls on the main locations, and so

10   all the networks, all the entry and exit points, they

11   are secured with firewalls, and we had Symantec

12   anti-viruses running, things like that.

13        Q.    Okay.  And in that regard, is part of the

14   security -- if there are updates to software, things of

15   that nature, is that part of the security process?

16        A.    Sure, yeah.

17        Q.    Okay.  And were those services provided to the

18   United Way through DigitalNet?

19        A.    Yes.  Definitely, yeah.

20        Q.    Okay.  Likewise, you had mentioned kind of

21   virus updates.

22        A.    Yes, virus updates, operating systems updates,

23   yeah.

24        Q.    And let me talk to you about that briefly.

25   Operating systems.  Again, kind of treating me like the

1    novice that I am.

2         A.    Okay.

3         Q.    Give a few examples of what an operating

4    system might be.

5         A.    Like Windows 7, Windows 10 for the PC, servers

6    will be maybe, you know, Windows 2012, Windows 2016, so

7    that's the operating system that runs on the server and

8    runs on the PC.

9         Q.    And how would updates to those systems be

10   conducted?

11        A.    Well, basically the updates, they're going to

12   come from Microsoft, but we have to manage the updates

13   because some updates can affect the system in a bad way.

14   So we run some tests on the network to make sure and

15   then we push the updates to the clients, to the servers

16   and the PCs.

17        Q.    And do you try to do that at particular times?

18        A.    Oh, yeah.  We have to do it off hours.

19        Q.    Okay.  And was that done in your time with the

20   United Way as a worker for DigitalNet?

21        A.    Oh, yeah.

22        Q.    Okay.  Let me ask you in regard to redundancy.

23   Had DigitalNet and the services that they provided to

24   the United Way created redundancy in the system?

25        A.    Yep.

1      Q.   Can you explain how that was done?

2      A.   We had multiple circuits going into the

3  buildings from different vendors in the different

4  location that United Way had.  This way if one circuit

5  goes down, the other circuit will pick up, and they will

6  not lose communication, especially at certain times when

7  they had their phone systems in the cloud.  So we had to

8  make sure everything is redundant.

9      Q.   Okay.  And you had indicated that that was

10  done for all of the United Way locations?

11      A.   I remember it was done definitely for Boston

12  and seacoast.  I think even for Lowell.

13      Q.   Okay.  Let me ask you in regard to backups and

14  the backup of data, was there a system in place relative

15  to data backups for the United Way that was provided by

16  DigitalNet?

17      A.   Yes.

18      Q.   Could you explain that to the Judge?

19      A.   We had a system that we backed up the file

20  systems to it.  We were on a schedule to backup the

21  data.

22      Q.   Okay.  And where was that data being backed up

23  to, because again, correct me if I'm wrong, there are

24  servers that they would get backed up to, right, like,

25  and those could be an actual, something that's on-site

1    at United Way, but there's also backup to the cloud

2    that's another way it can be backed up.

3         A.    Right.

4         Q.    How was the process at the United Way relative

5    to backup?

6         A.    Definitely we had a local backup, like we were

7    backing up to hardware on the premise, and I think we

8    backed up to the cloud, but I'm not a hundred percent

9    sure.  It's been a while.

10        Q.    Okay.  For example, there was a company called

11   CloudConnect, right?

12        A.    Yes, sir.

13        Q.    That was used by DigitalNet?

14        A.    Yes.

15        Q.    Okay.  And CloudConnect, is that a provider

16   basically of kind of space, if you will?

17        A.    Uh-huh.

18        Q.    For DigitalNet; is that correct?

19        A.    Yes.

20        Q.    Okay.  And does CloudConnect, would that be

21   one of the areas in which a backup could be utilized?

22        A.    Sure.  Oh, yeah.

23        Q.    Okay.  And are you familiar with a company

24   called OVH?

25        A.    Is that the company that they changed their

1   name after?

2       Q.   Uh-huh.

3       A.   Yeah.

4       Q.   And is that another kind of, like, off-site

5   area where backups can be made?

6       A.   Yes.

7       Q.   Okay.  And were you aware that through your

8   employment, as the kind of network person, that these

9   backup systems were in place for the United Way?

10      A.   Yes.

11      Q.   Let me ask you -- as a network administrator,

12  I would assume that you would have a kind of basic

13  documentation about the network and infrastructure, kind

14  of like diagrams, those types of things?

15      A.   Yes.

16      Q.   Okay.  And would those be provided or held on

17  the system?  Where would that information be located for

18  the United Way, you know, since you're working remotely?

19      A.   Honestly, mostly was like I would have a copy

20  and probably I would send it to Imran or Nadeem.

21      Q.   Okay.  And does the system itself have

22  information relative to the network?  Like if you logged

23  on to the system, does that also contain information

24  relative to the network structure?

25      A.   You can pull information from the system about

1    the network.  Like you can -- yeah, I guess.  I mean,

2    the question is --

3         Q.   Yeah, go ahead and explain, please.

4         A.   Like, if you want to find out about the

5    networks from one system, yes, you can.

6         Q.   So you could log in to the system and you

7    would be able to visualize and see the networks?

8         A.   Yes, you can.

9         Q.   And that's something that if somebody has

10   credentials to log into the system, they would be able

11   to go in and figure out the network structure?

12        A.   Yes, absolutely.

13        Q.   Okay.  So I'm going to switch gears for a

14   minute.  We'll probably come back to a couple of topics

15   that we were just talking about, but I want to switch

16   gears a little bit.

17             You are familiar with Patricia Latimore?

18        A.   Yes.

19        Q.   Okay.  Did you ever meet her outside of the

20   United Way?

21        A.   No.

22        Q.   Okay.  Did you ever meet Patricia Latimore

23   with a person named Mac?

24        A.   No.

25        Q.   Or M. Chaudhary?

1    A.    No.

2    Q.    Okay.  I want to ask you a little bit about

3  your work at the Robert Allen Group.

4    A.    Sure.

5    Q.    What was your -- what were you in charge of at

6  the Robert Allen Group in your time there?

7    A.    Well, like from the beginning or just the end?

8    Q.    Why don't we talk more towards the end.

9    A.    Towards the end I was responsible, same thing,

10  for the network and their phone infrastructure.

11    Q.    Okay.  And let me ask you about the phone a

12  little bit.

13          Did the phone system there have appropriate

14  bandwidth?

15    A.    Appropriate bandwidth?

16    Q.    And let me ask it to you this way, it will be

17  a more specific question.  During your time there at the

18  end -- and by the end, why don't we kind of put a

19  general date on that so the Judge is aware.  What time

20  frame are we talking about when you say towards the end?

21    A.    The last year or two years.

22    Q.    Okay.  So is that 2013, 2014?

23    A.    Yeah, and before.  Maybe 2012, too.

24    Q.    Okay.  So let's kind of bracket that 2012 to

25  2014, and that's where you would be kind of network

1    administrator and the Telephony system?

2        A.   Yes.

3        Q.   So let's talk about that time frame.  During

4    that time frame how would you characterize the quality

5    of the telephone system?

6        A.   Well, they had -- specifically in the

7    showrooms -- they had showrooms there.  Specifically in

8    the showrooms they had very old systems using old

9    technologies, not taking advantage of, you know, the new

10   technology out there, and the maintenance was tough on

11   those systems.

12       Q.   Okay.  Now, were you there when the DigitalNet

13   phone system kind of transitioned?

14       A.   Yes.

15       Q.   Okay.  And after that phone system

16   transitioned in, how would you characterize the quality

17   of the phone systems at that point in time?

18       A.   I think DigitalNet only performed a couple of

19   transitions for a couple of showrooms.  It wasn't like,

20   you know, the whole network.  But based on what I

21   remember, it was good experience.  They didn't have, you

22   know, big issues.

23       Q.   Okay.  And, for example, relative to the

24   systems that we're talking about for those few

25   showrooms, were there complaints that calls were being

1    dropped?

2         A.    I don't recall, honestly.

3         Q.    Okay.

4         A.    But it could be at the beginning of the

5    project.  It wasn't for long they had the systems.

6         Q.    Sure.  And would you agree with me that as the

7    network administrator and the person kind of responsible

8    for the Telephony system you would have been the person

9    that ultimately would have heard of complaints about the

10   system?  Is that fair to say?

11        A.    Yeah, it would come to me.

12        Q.    Okay.  And is it fair to say that you're

13   telling the Judge that you really don't have a

14   recollection of any complaints being forwarded to you

15   relative to the phone systems?

16        A.    I'm trying to remember honestly at this point.

17   I just want to give you an honest answer.

18        Q.    Yeah, and that's all I ask.  If you don't

19   remember, say you don't remember.

20        A.    I don't remember.  I don't remember.

21        Q.    Fair enough.  So let me ask you a little bit

22   about -- who was your immediate supervisor at Robert

23   Allen?

24        A.    When?

25        Q.    At the end, like say, like 2013, 2014?

1        A.    Dean.

2        Q.    Dean Riviera?

3        A.    Yes.

4        Q.    Okay.  And how long did you work with Mr.

5   Riviera for?

6        A.    Not for long.  Maybe four, five months maybe.

7        Q.    Okay.  And during that time period when you

8   worked with him did you find him easy to work with?

9        A.    Did I find him what?

10        Q.    Easy to work with?

11        A.    No.

12        Q.    No?

13        A.    No.

14        Q.    Would he give you tasks to --

15              MS. LE:  Objection, your Honor.  Relevance.

16              THE COURT:  I'm not sure.

17              MR. HARRINGTON:  I think the relevance is,

18   Judge, there's been testimony that Mr. Riviera kind of

19   directed some of the issues towards the end here

20   relative to DigitalNet and made certain decisions

21   affecting that relationship, and he has been portrayed

22   and characterized as kind of this consummate

23   professional, and Mr. --

24              THE COURT:  What?

25              MR. HARRINGTON:  Consummate professional.

1          And I think Mr. Wahbe -- we're not trying to

2   denigrate Mr. Riviera, but Mr. Wahbe may have some

3   insight as to what he was like to work with, which I

4   think would facilitate you, as the factfinder, relative

5   to how perhaps he was working with other people.

6   Specifically, DigitalNet.

7          THE COURT:  I guess -- here's my point.  I

8   don't think it's particularly relevant.

9          MR. HARRINGTON:  Okay.

10          THE COURT:  But I also don't think a lot of

11   the information we heard from Riviera was particularly

12   relevant to the case except that I know you're both

13   trying to make me understand some stuff I don't want to

14   describe in front of the witness.

15          So I'm going to allow you to do that.  We'll

16   talk about that during the break between witnesses.

17          Go ahead.  I'm going to allow this.

18          MR. HARRINGTON:  Okay.

19      Q.   So in regard to working with Mr. Riviera, you

20   I think indicated he could be difficult to work with.

21   Is that fair to say?

22      A.   Right.  Yes.

23      Q.   Would you agree with me there would be times

24   that he would give you tasks to do, correct?

25      A.   Uh-huh, yes.

1      Q.    You would do those tasks, correct?

2      A.    Yes.

3      Q.    You would then go back to him?

4      A.    Uh-huh.

5      Q.    And what would happen sometimes when you went

6  back in with these completed tasks?

7      A.    Well, sometimes I go back to him, I'm almost

8  done with the task, and he says, well, that's not what I

9  asked you to do.  I mean, I've been in this field by

10  then at that time like for fifteen years and I know what

11  I'm doing, and he was, like, no.

12           He basically was against everything we were

13  doing at Robert Allen whether, you know, from the

14  network from -- he wasn't happy with anything.

15      Q.    And did he try to bring in his own people to

16  try to work at Robert Allen as contractors?

17      A.    Yeah, he did.  Well, I don't want to say his

18  own.  I mean, what do you mean own people?

19      Q.    Why don't you tell us.

20      A.    Well, he brought companies to work on the

21  network.  Even myself and Bob Powers, who was the

22  manager for the network at that time because I wasn't

23  the manager, I was working remotely, we didn't find

24  it -- like, you know, why do you need to bring somebody?

25  Tell us what you need and we'll perform it.  He insisted

1    on bringing people to the picture.

2        Q.    Let me ask you a little bit about the IT

3    health assessment that you did for the United Way when

4    you worked at Robert Allen but also kind of working with

5    DigitalNet.

6        A.    Okay.

7        Q.    Have you done network health assessments in

8    the past?

9        A.    I did.

10       Q.    Okay.  At that time when you did this

11   assessment how much experience did you have in the field

12   of IT?

13       A.    Probably like ten years, twelve years.

14       Q.    Okay.  And you knew Azin (sic) who you worked

15   with, you said he was kind of the person --

16       A.    Aziz.

17       Q.    Aziz.  Excuse me.  He was the person who was

18   on-site?

19       A.    Right.

20       Q.    And you worked with him at Robert Allen?

21       A.    Yes.

22       Q.    Did you find him to be an experienced IT

23   person?

24       A.    Yes.

25       Q.    Was he experienced in doing the job that you

1    were assigned relative to the IT health assessment?

2          A.    Yes.

3          Q.    Did you work well together?

4          A.    Yes.

5          Q.    How did you feel about the quality of the IT

6    health assessment that you generated for DigitalNet?

7          A.    Very good.

8          Q.    And in regard to that, was that your -- you

9    indicated that Mr. Alrai acted as a supervisor, correct?

10         A.    Yes.

11         Q.    In regard to the work and the assessment, did

12   Mr. Alrai play any role in the actual assessment process

13   or was that for you and Mr. Aziz?

14         A.    Just for me and Aziz.

15         Q.    Okay.  And in regard to that IT health

16   assessment and the results of that, did Mr. Alrai ask

17   you to, you know, edit the report or change it in some

18   way that would make it not accurate?

19         A.    No.

20         Q.    So you believe that the health assessment that

21   you provided and gave was an accurate portrayal of the

22   IT system and potential needs that United Way had?

23         A.    Yes.

24         Q.    Would you agree with me that Mr. Alrai never

25   asked you to try to conceal his relationship with

1    DigitalNet in any way, correct?

2         A.   What do you mean?  I'm sorry.

3         Q.   Yeah, that's okay.  So you worked for -- let

4    me kind of paint the picture a little bit more.

5              Mr. Alrai worked at the United Way and you

6    also were aware that DigitalNet was part of something

7    that he was operating as well, right?

8         A.   Yes, yes.

9         Q.   He never asked you to conceal that from

10   anybody, did he?

11        A.   Not in a direct way.

12        Q.   Okay.  And I understand that you have talked

13   in your testimony about that you didn't let anybody

14   know.

15        A.   Right.

16        Q.   And that was a decision that you had made on

17   your own, you weren't going to talk about it, right?

18        A.   Right.  Like, yeah.

19        Q.   Okay.  I wanted to talk to you a little bit

20   about DigitalNet.  You were a very kind of task oriented

21   person as an employee of DigitalNet, right?

22        A.   Yes.

23        Q.   You weren't involved in kind of the business

24   side of the operation?

25        A.   No.

1      Q.    Would that be fair to say?

2      A.    Yes.

3      Q.    Okay.  So people who might have been involved

4  in other things relative to management of the company,

5  that would be something that you wouldn't even be aware

6  of.  Is that fair to say?

7      A.    Yeah, that's fair.

8      Q.    In regard to DigitalNet, you had also talked a

9  little bit about the Pakistan office.

10      A.    Uh-huh.

11      Q.    And you indicated to the government and to the

12  Judge that you were aware that they had many employees

13  there and that you had yourself talked to at least five

14  different individuals there.

15      A.    That's right.

16      Q.    And was that part of your job relative to your

17  work as a DigitalNet employee in providing services to

18  the United Way?

19      A.    Yes.

20      Q.    Okay.  And what role would the programmers

21  play in providing services to the United Way in

22  conjunction with your assistance as well?

23      A.    I don't know what projects they were working

24  on, but they were working, because they're programmers

25  and I'm not, so they were doing something like web

1    developments, I think, and maybe other projects.

2         Q.   Okay.  So, for example, what do programmers do

3    compared to a network administrator?

4         A.   Right.  In a simple term, we build the

5    infrastructure, we build the base, and they go and code

6    what's on top of it.

7         Q.   Okay.

8              MR. HARRINGTON:  Let me have just one moment,

9    Judge.

10             THE COURT:  Sure.

11        Q.   During your time with DigitalNet when you were

12   providing services to the United Way, were there any

13   significant outages that were experienced by United Way?

14        A.   For how long?

15        Q.   Why don't you characterize that answer

16   yourself.

17        A.   Because sometimes -- I mean, all the networks

18   they experience outages, but for how long is the key.

19        Q.   Okay.  And let me ask you in that regard,

20   given that you're a network administrator and you're

21   providing services, when those issues might crop up.

22   And when you say all systems, you're talking about like

23   for any company?

24        A.   For any company, oh, yeah.

25        Q.   So let me just finish with the question and

1   then you answer however you want.

2           In that regard in your services that were

3   provided to the United Way, would you characterize that

4   there were any ever significant outages that United Way

5   had during the time you were there?

6       A.   No, I don't remember there was a significant

7   time.

8       Q.   Okay.  Other than what might be normal

9   outages?

10      A.   Right, normal outages.

11      Q.   Okay.  And lastly, in regard to Mr. Alrai, you

12  had a fair amount of interaction with him since your

13  time at Robert Allen through the time at United Way.  Is

14  that fair to say?

15      A.   Yes.

16      Q.   And did you find him to be an experienced IT

17  professional?

18      A.   Yes.

19      Q.   Okay.  And did you find him to be

20  knowledgeable in the area of IT?

21      A.   Yes.

22      Q.   And did you find him to be a good manager of

23  IT?

24      A.   Yes.

25           MR. HARRINGTON:  I don't have any other

 1   questions, your Honor.

 2              THE COURT:  Go ahead.

 3                       REDIRECT EXAMINATION

 4   BY MS. LE:

 5        Q.   Mr. Wahbe, I just have a few questions for

 6   you.

 7        A.   Sure.

 8        Q.   During your time at Robert Allen Group were

 9   there issues with the phone?

10        A.   Yeah.

11        Q.   Because of the poor bandwidth?

12        A.   It wasn't a poor bandwidth because they have a

13   system that's not related to bandwidth.  They have old

14   systems.  We're running on copper -- I don't want to go

15   into detail.

16        Q.   Sure.  That old system, right, and that ran

17   for a long time?

18        A.   Yes.

19        Q.   Do you know how old that system was?

20        A.   Oh, that's a long time, 20 years maybe.

21        Q.   Twenty years?  By the time you left, it was 20

22   years old?

23        A.   Oh, at least.

24        Q.   Okay.  Now, Imran started as CIO in 2007 at

25   Robert Allen Group?  He started in 2006, right?

1    A.    Okay.

2    Q.    In 2007 he was promoted to CIO?

3    A.    Uh-huh.

4    Q.    He left in 2013?

5    A.    Uh-huh.

6    Q.    So what was that, seven years?

7    A.    Yes.

8    Q.    During those seven years did he ever do

9    anything to upgrade those phone lines other than bring

10   in DigitalNet?

11   A.    Not for the showrooms, no.

12   Q.    For anywhere?

13   A.    There was a project that we worked on for the

14   headquarters, but I'm not sure if it was under his time

15   or a different time maybe before him.  Maybe before.

16   Q.    Okay.  So it sounds like your testimony is

17   during his seven years as the CIO, or six and a half

18   years as the CIO, he did nothing to upgrade the phone

19   systems at Robert Allen Group except for bringing in

20   DigitalNet later, right?

21   A.    Yeah.

22   Q.    Okay.  And the phone system that DigitalNet

23   brought in, the managed cloud Telephony system, that had

24   to do with some bandwidth, right?

25   A.    That has to do something what?

1    Q.   It depended on bandwidth, right?  That was

2  supposed to be cloud service?

3    A.   Yes, cloud service.  Right.

4    Q.   So it would depend on the network's bandwidth?

5    A.   Yes.

6    Q.   Okay.  So he brought DigitalNet in?

7    A.   Yes.

8    Q.   He knew what the problems were at Robert Allen

9  Group?

10    A.   Yeah.

11    Q.   He knew how weak the bandwidth and the network

12  were, right?

13    A.   You mean to handle the new system?

14    Q.   Yeah.

15    A.   I don't think it was weak.

16    Q.   Okay.  But he knew what the issues were with

17  bandwidth at Robert Allen Group if there was issues?

18    A.   Yeah, he would have known.

19    Q.   Okay.  And he's the one who brought in

20  DigitalNet, right?

21    A.   Right.

22    Q.   In fact, he is DigitalNet, right?

23    A.   Okay.  Yes.

24    Q.   Well --

25    A.   Yes, yes, yes.

1     Q.   Okay.  So if there were any issues with the

2   phone line with the old system in place and bringing in

3   this cloud Telephony service that DigitalNet was

4   supposed to bring to the showrooms, Imran would have

5   known about all those issues?

6     A.   Sure.

7     Q.   Okay.  Fair to say you preferred Imran as a

8   supervisor over Dean Riviera?

9     A.   Yes.

10    Q.   You worked with Imran for a much longer time?

11    A.   Yes.

12    Q.   He took good care of you, right?

13    A.   Right.

14    Q.   He gave you flexibility, right?

15    A.   Right.

16    Q.   He didn't micromanage you?

17    A.   That's true.

18    Q.   He helped you when you had to go back to Syria

19   to take care of your family?

20    A.   That's right.

21    Q.   Okay.  When you needed a job after you left

22   Robert Allen Group, he picked up that extra work for

23   you; is that right?

24    A.   That's right.

25    Q.   Okay.  He's been good to you over the years?

1      A.   Yes.

2      Q.   You only worked with Dean Riviera for four or

3  five months, right?

4      A.   That's right.

5      Q.   You have no firsthand knowledge of what his

6  work product and expertise was after that time.  Am I

7  right?

8      A.   That's right.

9      Q.   Okay.  Now, you were asked about the IT health

10 assessment?

11     A.   Uh-huh.

12     Q.   Okay.  Did you write a report?

13     A.   I don't think we wrote like an actual report.

14     Q.   Okay.  Tell me what happened.

15     A.   As I remember, we did the health assessment

16 and Aziz I think e-mailed Imran the finding.

17     Q.   Okay.  Were you involved in typing what the

18 findings were?

19     A.   I don't think I was -- maybe.  I don't

20 remember at that time honestly if I was really actually

21 doing the typing or Aziz was doing the typing.

22     Q.   Okay.  So it would have been in some kind of

23 e-mail?

24     A.   Yes.

25     Q.   And who was that e-mail sent to?

1      A.    Assuming to Imran.  No, I mean to Imran, but

2   I'm not sure to what e-mail address.

3      Q.    Oh, sure.  You don't know if it was the United

4   Way one or the DigitalNet one?

5      A.    Right, right.

6      Q.    And so if there was anything that Imran

7   presented, you wouldn't have seen it, right?

8      A.    Right.  I wouldn't have seen it.

9      Q.    You didn't transmit anything to the people at

10   United Way making the decisions?

11      A.    No, no, no.

12      Q.    All right.  Now, counsel asked you if Imran

13   ever directed you to conceal his relationship at

14   DigitalNet to United Way folks, right?

15      A.    Right.

16      Q.    And I believe your answer was "not in a direct

17   way."

18      A.    Right.

19      Q.    Can you explain that answer?

20      A.    I mean, he never told me, like, to say, you

21   know, United Way, we don't want to go to Pat and tell

22   her that I work for DigitalNet.  He never said that but,

23   you know, my understanding is he wouldn't want me to

24   tell United Way about DigitalNet.

25      Q.    But you're making assumptions.  Why did you

1    think this?  He never told you not to say anything.

2         A.    Actually, there was an incident that I sent

3    him an e-mail to a DigitalNet account.  It was copied by

4    other employees at United Way.

5         Q.    Okay.

6         A.    And he told me not to do that again.  Just

7    direct it either to United Way or to DigitalNet.  Don't

8    mix them together.

9         Q.    Why not?

10        A.    He didn't say.

11        Q.    Okay.  But he didn't want you to be sending

12   him e-mail with his imran.alrai@digitalnet, right?

13        A.    Right.

14        Q.    When other people who have United Way e-mail

15   were on that same thing?

16        A.    Right.

17        Q.    All right.  Now, are you aware that Imran had

18   a responsibility as the VP of information technology to

19   disclose his relationship to outside vendors like

20   DigitalNet?

21        A.    Again, I'm sorry?

22        Q.    I'm sorry.  Let me be clear.

23              Did you know that he was the VP of information

24   technology?

25        A.    Yes.

1    Q.    Okay.  That's a high office, right?

2    A.    Yes.

3    Q.    It's a pretty big deal?

4    A.    Yes.

5    Q.    He's like the guy in charge of IT, right?

6    A.    That's right.

7    Q.    Okay.  And he's in charge of making sure

8    everything worked?

9    A.    That's right.

10   Q.    He's in charge of making sure everything works

11   as it's supposed to work?

12   A.    Yes.

13   Q.    Okay.  And he's managing the contract with

14   DigitalNet, right?

15   A.    Yes.

16   Q.    Making sure the DigitalNet people are doing

17   their job for United Way?

18   A.    That's right.

19   Q.    Okay.  And he's going to make sure that what

20   his employees at United Way need gets done, right?

21   A.    That's right.

22   Q.    Okay.  So do you know if he's considered an

23   executive within that organization?

24   A.    Sure.

25   Q.    And this is a big organization?

1      A.    Yep.

2      Q.    Over a hundred people, right?

3      A.    Yes.

4      Q.    Okay.  And you know they're a charity, right?

5      A.    Yes.

6      Q.    Okay.  Do you understand the concept of

7    conflict of interest?

8      A.    Yes.

9      Q.    What is your understanding of conflict of

10   interest?

11     A.    When you have -- when you are on two sides of

12   the equation.  In the middle there's, you know, an

13   interest, you know, you're supposed to be --

14          THE COURT:  He gets it.  So do I.

15     Q.    Sir, I would like you to look at Exhibit 412.

16   This has already been admitted.  Would you just read

17   this section to yourself?

18          MR. HARRINGTON:  Judge, I'm just going to

19   object at this point.  Isn't this cumulative?  It's

20   already in as an exhibit and it's been spoken about a

21   number of times.

22          THE COURT:  Is there something that he covered

23   about it on cross that you wanted to elaborate on?

24          MS. LE:  Yes, your Honor.

25          THE COURT:  What was it?

1          MS. LE:  His awareness of why Imran Alrai

2   would have wanted the relationship that Imran had with

3   DigitalNet to be kept away from the United Way.

4          THE COURT:  You're going to do it with this

5   exhibit?

6          MS. LE:  Yes, your Honor.

7          THE COURT:  All right.  Go ahead.

8      Q.   Can you read this, sir?

9      A.   Uh-huh.

10     Q.   Just let me know when you're done.  Just read

11  the whole page just so you understand the content.

12          (Witness does so)

13     Q.   Were you ever asked to fill out this form at

14  the United Way?

15     A.   No.

16     Q.   But you weren't a United Way employee, right?

17     A.   No, I wasn't.

18          MS. LE:  Okay.  Can you go to the second page,

19  Ms. Sheff, 3750.

20     Q.   Do you see that date, sir?

21     A.   Uh-huh.

22     Q.   March 16, 2012?

23     A.   Yep.

24     Q.   The name of the individual?

25     A.   Uh-huh.

1       Q.   Imran Alrai, right?

2       A.   Yes.

3       Q.   And do you recognize his signature?

4       A.   I don't know his signature.

5       Q.   Oh, you don't.  Okay.

6       MS. LE:  Can we go back to the first page,

7 3749.

8       Q.   Sir, this section here --

9       I don't know why it's drawing arrows on me.

10 There we go.

11       Okay.  So you know that Imran Alrai filled

12 this out in March of 2012.

13       A.   Okay.

14       Q.   Okay.  He clicked no on all of these things.

15 Based on what you know about DigitalNet and Imran

16 Alrai's relationship to it, is this information correct?

17       A.   No.

18       MS. LE:  Thank you.

19       No further questions, your Honor.

20       MR. HARRINGTON:  I have no follow-up questions

21 based on that, Judge.

22       THE COURT:  So when you said -- when you were

23 asked by Mr. Harrington, did Imran ever ask you to

24 conceal from United Way his relationship with

25 DigitalNet, you said not in a direct way.  That was your

1    answer, and you explained it on redirect a little bit.

2          I'm just trying to make sure I understand.

3    Was it conveyed to you in an indirect way that you

4    should not convey that information?

5          THE WITNESS:  Right.

6          THE COURT:  All right.  So you're saying it

7    was conveyed to you but not in a direct way?

8          THE WITNESS:  Yes.

9          THE COURT:  And in what way was it conveyed to

10   you?  How was it conveyed to you?  How were you made

11   aware that you shouldn't disclose that relationship to

12   the United Way?

13         THE WITNESS:  This is one of the examples, as

14   I said, in an e-mail sent, and he sent me an e-mail

15   saying don't mix them together.

16         THE COURT:  That's a direct way.

17         THE WITNESS:  Okay.  That's direct.

18         THE COURT:  I'm asking -- or at least in my

19   view it's a sort of direct way I guess, but were there

20   other things about the way he conducted the business or

21   conducted himself that made you understand that was not

22   something that you should disclose?

23         THE WITNESS:  Yeah, in the way he conducted

24   himself, you know, like when he's around United Way

25   employees.

1          THE COURT:  And that made you aware you

2   shouldn't make United Way employees aware that

3   DigitalNet and Imran were connected?

4          THE WITNESS:  That's right.

5          THE COURT:  All right.

6          Is there anything else you can tell me about

7   that, any more details at all about how it was

8   indirectly conveyed to you that you should not disclose

9   the relationship?

10          THE WITNESS:  No.

11          THE COURT:  All right.  Does anybody want to

12   follow up on that?

13          MS. LE:  Yeah, may I just elaborate on your

14   Honor's question?

15          THE COURT:  Both sides may.

16                    FURTHER EXAMINATION

17   BY MS. LE:

18       Q.   Mr. Wahbe, you said that -- what would happen

19   when other United Way workers were around and you would

20   interact with Mr. Alrai?  Tell me about that.

21       A.   Again, because I work remotely it's not clear,

22   like, you know, my involvement is very limited.

23       Q.   Right.

24       A.   But he wouldn't discuss, like, DigitalNet's

25   business in front of United Way employees if I am on the

1  call, like we are on a call for a conference or

2  something like this.

3      Q.   So was there a situation where you were on a

4  conference call with United Way about issues that were

5  coming up and you wanted to talk about taking a vacation

6  or something like that?

7      A.   If something like this would happen, I

8  wouldn't talk to him about it in front of the other

9  people, yeah.

10     Q.   But why not?

11     A.   Well, just because -- based on the way he

12 conducted himself, it was just like this is two

13 different environments.

14     Q.   Okay.  And there were occasions where you

15 would be physically on-site at United Way, right?

16     A.   Yeah, very limited, yes.

17     Q.   You would come for a couple of weeks at a

18 time?

19     A.   Yeah.

20     Q.   Every year or two or something like that,

21 right?

22     A.   Right.

23     Q.   Okay.  And were there interactions then --

24 because I think this is what you mentioned to the Court.

25 When other United Way workers were there and you were

1    there and Imran was there, tell us about that

2    interaction that gave you this impression.

3         A.   He would act as he is vice president of United

4    Way and it has nothing to do with DigitalNet.

5         Q.   Okay.  Were there ever any conversations that

6    brought up conversations with DigitalNet and Imran said,

7    I'll have to talk to DigitalNet about that?  That could

8    be a specific example if you can recall one.

9         A.   I don't recall, honestly.

10        Q.   Okay.  And in your mind that e-mail where you

11   accidentally sent an e-mail to Imran at his DigitalNet

12   account and included United Way people, that to you is

13   indirect?

14        A.   Right.  Maybe it's direct.

15        Q.   It's kind of hard to tell.  Thank you, sir.

16             THE COURT:  Anything further?

17             MR. HARRINGTON:  Thanks, Judge.  Just brief.

18                      RECROSS-EXAMINATION

19   BY MR. HARRINGTON:

20        Q.   So based on what you said on these kinds of

21   lines of questioning, would it be fair to say that Mr.

22   Alrai wanted to keep his role at United Way separate

23   from his role at DigitalNet?

24        A.   Sure.  Absolutely.

25        Q.   And he wanted to make sure that the

1    communications stayed in those different areas?

2        A.   Yes.

3        Q.   If it was a United Way communication, it went

4    to United Way, and if it was a DigitalNet communication,

5    it would go to him at DigitalNet?

6        A.   Yes.

7            MR. HARRINGTON:  No other questions, Judge.

8            THE COURT:  Well, okay, but he just asked you

9    was it clear that he wanted to keep his role at United

10   Way separate from his role at DigitalNet.

11           THE WITNESS:  Yes.

12           THE COURT:  Was it also clear to you -- you

13   can't read his mind, but I'm just asking you based on

14   the way he behaved was it also clear to you that he

15   wanted to keep his role at DigitalNet secret from United

16   Way?

17           THE WITNESS:  Yes.

18           THE COURT:  And I appreciate the follow-up by

19   the prosecutor or at least your use of an example of a

20   conference call.

21           So you would be on a conference call making

22   statements, and your statements are clearly statements

23   on behalf of DigitalNet, right?

24           THE WITNESS:  Right, right.

25           THE COURT:  And Mr. Alrai was on the call,

1    too?

2            THE WITNESS:  Uh-huh.

3            THE COURT:  And he's your boss?

4            THE WITNESS:  Yes.

5            THE COURT:  So he never made any statements or

6    representations on behalf of DigitalNet on one of those

7    calls?

8            THE WITNESS:  In front of United Way

9    employees?

10           THE COURT:  Right.

11           THE WITNESS:  I'll be honest with you, sir,

12   like even on those calls, because I am remote, he would

13   bring me in just for a technical question, a specific

14   question, and I'm out.

15           THE COURT:  All right.  Understood.  Right,

16   just to answer a question.  It wasn't like you were

17   participating as a policy maker.

18           THE WITNESS:  No.

19           THE COURT:  That's fair.  I appreciate that.

20           Anything else?  I never want to leave you guys

21   hanging on one of my questions.

22           MS. LE:  No, your Honor.

23           THE COURT:  By the way, if anyone objects to

24   one of my questions, I'm not going to take offense if

25   you object.  I assume you are, I don't want to say

1    comfortable, but you're permitting this question.

2              All right.  Go ahead.  Anything else?

3              MS. LE:  No, your Honor.

4              May the witness be excused?

5              THE COURT:  You are excused, sir.  Thank you.

6              (Testimony of Elaine Singer previously

7    transcribed under separate cover)

8              (RECESS)

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the
foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 4-8-20          /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR