**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-7-2020**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA      \*
                              \*   18-cr-192-01-JL
            v.                \*   December 9, 2019
                              \*   9:05 a.m.
      IMRAN ALRAI             \*
                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF BENCH TRIAL
DAY SIX - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:      John S. Davis, AUSA
                         Matthew Hunter, AUSA
                         Cam T. Le, AUSA
                         U.S. Attorney's Office



For the Defendant:       Timothy M. Harrington, Esq.
                         Timothy C. Ayer, Esq.
                         Shaheen & Gordon, P.A.



Also Present:            John J. Commisso, Esq.



Court Reporter:          Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

```
                        I N D E X


WITNESSES:           Direct    Cross     Redirect     Recross


JILL LAROE


By Mr. Hunter        4                    52

By Mr. Ayer                    33



JOHN MULVANEY


By Mr. Hunter        57                   105

By Mr. Harrington              89                      107



MICHELE CURTIS

By Ms. Le            109

 (No cross-examination)


ERIC LEUTERITZ


By Ms. Le            145
```

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  The Court has before it for
 3  consideration this morning day six of the bench trial in
 4  United States of America versus Imran Alrai, criminal
 5  case 18-cr-192-01-JL.
 6           THE COURT:  All right.  I hope everyone had a
 7  good weekend.  Let's proceed.
 8           Oh, we have to put something on the record
 9  before we start.  I received the prosecution's timeline,
10  spent some time with it.  It wasn't what I anticipated
11  but it's still very helpful.  I thought you were going
12  to try to work on a timeline together.  This is more of
13  an advocacy piece.  It's still very helpful in terms of
14  setting forth the timeline.
15           I don't want you to think this requires a
16  response from you, Mr. Harrington.  You have no burden
17  in this proceeding at all.  You're free to file
18  something because a lot of these time entries
19  characterize the evidence in a very inculpatory way, and
20  I was more looking just for, like, vanilla events, but I
21  can tell what the events are and the timeline is very
22  helpful.  I just don't want you to think you're in a
23  position of having to respond to this and that if you
24  don't, you've agreed to any of these characterizations.
25  You haven't.
```

1          MR. HARRINGTON:  Thank you, Judge.  I actually

2    was going to ask you at some point today your position

3    on that, so I appreciate you clarifying that.

4          THE COURT:  Yeah.  If it's a matter of fact,

5    not a matter of characterization but like in terms of

6    the day of an event or something or a person's name or

7    something, you think there's a mistake, feel free to

8    correct it, but I don't view this as something you've

9    waived any right to challenge if any amount of time goes

10   by.  This is just an advocacy piece and I appreciate

11   that it was filed.  It helps me keep track of some of

12   the dates.

13         You can go ahead, Mr. Hunter.

14         MR. HUNTER:  Thank you, your Honor.

15         THE COURT:  Agent, you're still under oath.

16         THE WITNESS:  Yes.

17      CONTINUED DIRECT EXAMINATION OF JILL LAROE

18   BY MR. HUNTER:

19      Q.   Good morning, Special Agent Laroe.

20      A.   Good morning.

21      Q.   Before we get started, did you speak with

22   anybody on the prosecution team regarding your testimony

23   over the weekend?

24      A.   No, I did not.

25         MR. HUNTER:  Ms. Sheff, will you please pull

1   the chart up, page 2?

2       Q.   We're looking at Exhibit 925.  Is this the

3   chart we were talking about last week?

4       A.   Yes, it is.

5       Q.   Okay.  Before we start where we left off, I

6   just want to go through a couple of things here on page

7   2.

8            So we talked about this e-mail that was sent

9   on 5/11/2015.  Do you recall that?

10      A.   Yes.

11      Q.   And when was the next time that Mr. Alrai

12  swiped in at United Way?

13      A.   May 12, 2015, at 9:20 a.m.

14      Q.   So that's the next day after the e-mail was

15  sent?

16      A.   Yes.

17      Q.   And let's look at the next charged e-mail,

18  next badge swipe.  We talked about this e-mail as well.

19  When was that e-mail sent?

20      A.   I'm sorry?

21      Q.   When was that e-mail sent?

22      A.   June 15, 2015.

23      Q.   And when did Mr. Alrai next swipe in at work?

24      A.   June 16, 2015.

25      Q.   Is that the next day?

1      A.   Yes, it is.

2      Q.   Okay.  And the next e-mail, is that June 19th?

3      A.   Yes.

4           MR.  HUNTER:  And then, Ms. Sheff, could you

5  go to the next page, please?

6      Q.   And the e-mail charged in Count 4, when was

7  that one sent?

8      A.   June 22, 2015.

9      Q.   And that attaches some invoices from

10 DigitalNet to United Way?

11     A.   Yes.

12     Q.   And when did Mr. Alrai next swipe in to work?

13     A.   June 23, 2015.

14     Q.   That's the next day?

15     A.   Yes.

16     Q.   Okay.

17          MR. HUNTER:  Ms. Sheff, could you please pull

18 up Government Exhibit 103?

19     Q.   Okay.  So here's an e-mail.  This is the

20 e-mail that corresponds with Count 3 in the superseding

21 indictment; is that right?

22     A.   Yes.

23     Q.   And this is the June 19th e-mail we were

24 talking about?

25     A.   Yes.

1      Q.    And here you can see a note from Mohammad?

2      A.    Yes.

3            MR. HUNTER:  And could you just scroll through

4    that, Ms. Sheff?

5      Q.    And we have these two invoices attached?

6      A.    Yes.

7            MR. HUNTER:  Ms. Sheff, can you pull up

8    Exhibit 103a?

9      Q.    Okay.  This is the same e-mail with the header

10   information.  Do you see that?

11     A.    Yes.

12           MR. HUNTER:  And then, Ms. Sheff, can you pull

13   up 103b, please?

14     Q.    Are these the DigitalNet invoices attached to

15   that e-mail that were found on Mr. Alrai's home computer

16   in Windham?

17     A.    Yes, they were.

18     Q.    And is this generally how the exhibits are

19   organized?  101 would be the e-mail sent from United

20   Way; is that right?

21     A.    Correct.

22     Q.    And then 101a is the same e-mail with the

23   header information; is that right?

24     A.    Yes.

25     Q.    The IP header.  And then 101b, that's the

1    files that were found on Mr. Alrai's computer that were

2    attached to the e-mail; is that correct?

3         A.   Correct.

4         Q.   Okay.  So I think when we were last talking --

5              MR. HUNTER:  And actually, let's go to page 2

6    of the chart, Ms. Sheff?

7         Q.   All right.  The e-mail corresponding with

8    Count 5, this is Exhibit 105, you can see that e-mail

9    was sent --

10             MR. HUNTER:  And if you pull up that in the

11   badge swipe, Ms. Sheff?

12        Q.   When was that e-mail sent?

13        A.   June 23, 2015.

14        Q.   When did Mr. Alrai next swipe in to work?

15        A.   He swiped in on June 24, 2015.

16        Q.   That was the next day?

17        A.   Yes.

18        Q.   After the invoices were sent.

19             MR. HUNTER:  And the e-mail corresponding with

20   Count 6, Ms. Sheff, can you pull that up along with the

21   badge swipe that immediately follows -- or sorry, could

22   you zoom in on the chart?  We've already gone through

23   some of these e-mails last week.

24             This is on page 3.  Can you pull it up along

25   with the badge swipe data for the following day, Ms.

1    Sheff?  There we go.

2          Q.    So this is the e-mail that corresponds to

3    Exhibit 106; is that correct?

4          A.    Correct.

5          Q.    And when was that one sent?

6          A.    June 29, 2015.

7          Q.    And when did Mr. Alrai next swipe in to work

8    at United Way?

9          A.    June 30, 2015.

10         Q.    Okay.

11               MR. HUNTER:  Ms. Sheff, can you go to page 4?

12         Q.    We have two e-mails sent on August 12, 2015,

13   is that right, Ms. Laroe?

14         A.    Yes.

15               MR. HUNTER:  Ms. Sheff, can you just zoom in

16   on the second 8/12 e-mail and the badge swipe

17   information?

18         Q.    So this is the e-mail charged in Count 8, so

19   that would be Exhibit 108; is that correct?

20         A.    Correct.

21         Q.    And when was that e-mail sent?

22         A.    August 12, 2015.

23         Q.    Okay.  And that's also attaching DigitalNet

24   invoices sent to Mr. Alrai?

25         A.    Yes.

1      Q.   And when did Mr. Alrai next swipe in to work

2  at United Way?

3      A.   August 13, 2015.

4      Q.   Thank you.

5           MR. HUNTER:  And Ms. Sheff, could you please

6  zoom in on the Count 9?

7      Q.   Okay.  So here -- this is the e-mail we were

8  talking about when we broke for the weekend?

9      A.   Yes.

10     Q.   When did Mr. -- when was the e-mail sent

11 charging Count 9?  This would be Exhibit 109.

12     A.   August 27, 2015, at 10:06 a.m.

13     Q.   When did Mr. Alrai swipe in to work?

14     A.   August 27, 2015, at 1:05 p.m.

15     Q.   So later that afternoon; is that right?

16     A.   Correct.

17          MR. HUNTER:  Ms. Sheff, could you please pull

18 up Exhibit 109?

19     Q.   Okay.  Ms. Laroe, who is this e-mail to and

20 from?

21     A.   It is to Imran Alrai at supportunitedway.org

22 and it is from info@digitalnet.us.

23     Q.   Okay.  And can you read the top e-mail,

24 please?

25     A.   "PFA our comments as discussed on telephone.

1    Thanks and regards.  Mohammad."

2        Q.   And PFA, what do you think that means?  Could

3    it be please find attached?

4        A.   Yes.

5        Q.   Okay.  And it looks like there's -- actually,

6    if you read the next e-mail down also from

7    info@digitalnet.

8        A.   "Hello Imran.  PFA the updated SOW and

9    contract.  We really don't see a need for this contract

10   in light of the existing MSA with United Way, but we did

11   comply with your request because we value our

12   relationship.  Our legal has reviewed and updated

13   accordingly.  Irrelevant parts were also deleted.

14   Please contact if any questions.  Thanks and regards,

15   Mohammad."

16       Q.   Thank you.

17            MR. HUNTER:  Now, can you please scroll down

18   to the attachment.  Okay.  So could you zoom in, Ms.

19   Sheff, on these comments on the side here?

20       Q.   And we were talking about these when we broke

21   on Friday, is that right, Ms. Laroe, or Agent Laroe?

22       A.   Yes.

23       Q.   And these are comments that appear to be Jack

24   Rotondi asking why certain language was removed from the

25   agreement; is that correct?

1    A.    Yes.

2          MR. HUNTER:  Ms. Sheff, can you go to the next

3    page, please?  Okay.  Could you zoom in on that comment?

4    Q.    Can you please read Mr. Rotondi's comment?

5    A.    "The alternative version of his verbiage

6    provided by the vendor is a substantially weakened

7    version.  Why was it changed?  What specific concerns

8    does the vendor have?"

9    Q.    And what's the response?

10   A.    "We merged the sections to make it a mutual

11   responsibility to resolve any conflicts arising from

12   either party.  The language is essentially the same."

13   Q.    Okay.  Thank you.

14         MR. HUNTER:  Could you scroll down, Ms. Sheff?

15   Could you zoom in on these comments?

16   Q.    Can you please read Mr. Rotondi's comment?

17   A.    "This is precisely the opposite of the

18   original intent.  Unacceptable.  This version basically

19   says that the vendor can charge us anything they wish as

20   long as they claim it was a service they provided even

21   if it is not included in SOW."

22   Q.    Could you please read the response to that

23   comment?

24   A.    "This needs to be read in conjunction with the

25   language in SOW.  We have waived annual subscription fee

```
1   for sync engine.  We feel strongly that this language
2   needs to stay as suggested or completely removed."
3        Q.    Thank you.
4             THE COURT:  Can we go back to that?  I'm not
5   clear on who's talking to who anymore.
6             Admin is the defendant, right?
7             MR. HUNTER:  Or purporting to be from the
8   info@digitalnet e-mail, your Honor, I believe.
9             THE COURT:  Oh.  Okay.  So this is a
10  conversation between --
11            MR. HUNTER:  So yes, the defendant, would be
12  the government's position.
13            THE COURT:  Who is JR7 then?
14            MR. HUNTER:  Jack Rotondi.
15            THE COURT:  Right.  So he's speaking -- he's
16  dealing directly here with DigitalNet or he's dealing
17  with Alrai whose work is out by DigitalNet?
18            MR. HUNTER:  The top e-mail, your Honor, is an
19  e-mail sent from Mohammad to Mr. Alrai attaching this.
20            THE COURT:  Yeah.
21            MR. HUNTER:  So there's still -- Mr. Alrai --
22  the government's position would be that Mr. Alrai is
23  still serving as a go-between here.
24            THE COURT:  He's a go-between, but is this
25  internal conversation at United Way regarding what
```

1    DigitalNet is demanding or is this a conversation

2    between United Way and DigitalNet?

3              MR. HUNTER:  A conversation between United Way

4    and DigitalNet, your Honor.

5              THE COURT:  Do you concur?

6              MR. HARRINGTON:  I do, Judge.  That was going

7    to be my clarification.

8              THE COURT:  Thanks.

9              MR. HUNTER:  Next page, please.

10        Q.   Can you please read this comment from Mr.

11   Rotondi, Ms. Laroe?

12        A.   "This revision by the vendor is completely

13   counter to the intent of our original language.  We

14   should not pay a subscription license, or fee of any

15   kind, to continue to use our own website which has

16   numerous backend components developed by the vendor.

17   The only exception to this would be the use of specific

18   software or networking tools but not the backend work

19   itself.  This clarification would be acceptable."

20        Q.   And could you please read the response from

21   Admin?

22        A.   "There is no subscription fee for any backend

23   components.  This language was amended due to sync

24   engine.  That is the only subscription fee for this

25   project which has been waived under certain conditions

1   as outlined in SOW."

2       Q.   Thank you.

3           MR. HUNTER:  Could you go to the next page,

4   please?  And to the next page, please, Ms. Sheff.

5       Q.   Could you please read Mr. Rotondi's comment?

6       A.   "Unacceptable.  Only work done through date of

7   termination should be billable."

8       Q.   Could you please read the response?

9       A.   "This only applies to termination of contract

10  without the reasons outlined below.  This is United Way

11  language.  We just clarified it."

12      Q.   Thank you.

13          MR. HUNTER:  The next page, please.

14      Q.   Can you read Mr. Rotondi's comment here on

15  page 9 of this document?

16      A.   "Why is this clause removed?  It is standard

17  verbiage."

18      Q.   And can you read the comment?

19      A.   "We have an MSA in place that was accepted and

20  executed by both parties.  No new agreement can

21  supersede that."

22      Q.   Thank you.

23          MR. HUNTER:  And the next page.  So going to

24  the chart here, back to the chart we have two e-mails

25  now.  Can you zoom in along with the badge swipe data?

1     Q.   All right.  So the e-mail corresponding to
2  Count 10, when was that sent, Ms. Laroe?
3     A.   September 4, 2015.
4          MR. HUNTER:  And Ms. Sheff, would you please
5  pull up Exhibit 110?
6     Q.   Is this the e-mail that corresponds to that
7  entry in the chart?
8     A.   Yes.
9     Q.   Okay.  And this looks, appears to be a
10 continuation of the prior e-mail chain that we saw; is
11 that right?
12    A.   Correct.
13    Q.   And could you read the top e-mail from
14 info@digitalnet?
15    A.   "Hello Imran.  PFA the executed contract.
16 Thanks and regards, Mohammad."
17         MR. HUNTER:  Ms. Sheff, can you scroll
18 through?
19    Q.   Okay.  And here we see the professional
20 service agreement but now it appears to be signed; is
21 that right?
22    A.   Yes.
23         MR. HUNTER:  Can you keep scrolling through,
24 Ms. Sheff?  Okay.  And can you zoom in on the
25 signatures?

1    Q.    Who is it signed by for DigitalNet?

2    A.    Mac Chaudhary.

3    Q.    And for United Way?

4    A.    Patricia Latimore.

5    Q.    And then attached to that it follows with the

6    statement of work.  Do you see that, Agent Laroe?

7    A.    Yes, I do.

8    Q.    Okay.  And what's the date of that?

9    A.    August 24, 2015.

10   Q.    Okay.

11        MR. HUNTER:  Ms. Sheff, can you please pull up

12   Exhibit 111?

13   Q.    Does this correspond with the e-mail dated 9/7

14   in the chart, Agent Laroe?

15   A.    Yes, it does.

16   Q.    Okay.  What is this e-mail?

17   A.    It's the managed services and supplies for

18   Beverly office invoices.

19   Q.    So a series of invoices from info@digitalnet

20   to Imran Alrai at supportunitedway.org?

21   A.    Yes.

22        MR. HUNTER:  Ms. Sheff, can you just scroll

23   through those invoices?  And Ms. Sheff, could you pull

24   up Exhibit 111a?

25   Q.    Is this that same e-mail but this time with

1   the e-mail header information?

2        A.   Yes, it is.

3        Q.   Okay.

4             MR. HUNTER:  And can you go down a couple

5   pages, Ms. Sheff?

6        Q.   And we see in X originating IP of 75.68.37.59.

7   Do you see that?

8        A.   Yes.

9             MR. HUNTER:  Ms. Sheff, could you please pull

10  up Exhibit 111b?

11       Q.   Are these the invoices attached to that e-mail

12  that were found on Mr. Alrai's home computer?

13       A.   Yes.

14       Q.   And back to the chart.  So this e-mail --

15  again, what day was that e-mail sent?

16       A.   September 7, 2015.

17       Q.   And when did Mr. Alrai next swipe in to work

18  at United Way?

19       A.   September 8, 2015.

20       Q.   All right.

21            MR. HUNTER:  Could we go to the next page of

22  the chart, Ms. Sheff?  All right.  Could you please pull

23  up Exhibit 112?

24       Q.   Okay.  What is Exhibit 112, Agent Laroe?

25       A.   It's an e-mail for invoices in November from

1    DigitalNet to the United Way.

2         Q.   And it's dated October 7, 2015?

3         A.   Yes.

4              MR. HUNTER:  Ms. Sheff, could you just zoom

5    in?

6         Q.   Does that correspond to this entry in the

7    chart, October 7, 2015?

8         A.   Yes, it does.

9         Q.   Okay.  And it's attaching invoices.

10             And is Exhibit 110a, that's the same e-mail

11   showing the e-mail header information -- or I'm sorry,

12   112a?

13        A.   Yes.

14             MR. HUNTER:  And could you pull up 112b,

15   please, Ms. Sheff?

16        Q.   Are these the invoices attached on Mr. Alrai's

17   home computer?

18        A.   Yes.

19        Q.   Again, what day was the e-mail sent?

20        A.   October 7, 2015.

21        Q.   And when did Mr. Alrai next swipe in to work

22   at United Way?

23        A.   October 8, 2015.

24        Q.   And was there any badge swipe data indicating

25   that Mr. Alrai swiped into work on October 7th?

1        A.    No, there's not.

2        Q.    All right.

3              MR. HUNTER:  Ms. Sheff, could you please pull

4   up Exhibit 113?

5        Q.    And what is this, Agent Laroe?

6        A.    This is an e-mail from info@digitalnet to Mr.

7   Alrai at unitedway.org for invoices for December.

8        Q.    Is that Mohammad saying, please remit payments

9   at your earliest?

10       A.    Yes.

11       Q.    And is it attaching some invoices?

12       A.    Yes.

13       Q.    Again, 113a contains the same e-mail and

14  invoices but with the e-mail header information; is that

15  right?

16       A.    Correct.

17             MR. HUNTER:  And could you, Ms. Sheff, please

18  pull up 113b?

19       Q.    Are these the invoices attached that were

20  found on Mr. Alrai's home computer?

21       A.    Yes.

22       Q.    In Windham, New Hampshire?

23       A.    Yes.

24       Q.    All right.  And again, what day was the e-mail

25  sent?

1    A.    November 2, 2015.

2    Q.    When did Mr. Alrai next swipe in to work?

3    A.    November 3, 2015.

4    Q.    Was he swiped in on November 2nd?

5    A.    No, he was not.

6    Q.    Okay.  So the next entry in the chart, this

7    looks like an e-mail sent on December 15, 2015; is that

8    right?

9    A.    Correct.

10        MR. HUNTER:  Ms. Sheff, could you please pull

11   up Exhibit 114?

12   Q.    Is this the e-mail corresponding with that

13   entry in the chart?

14   A.    Yes.

15   Q.    Okay.  And what is this e-mail?

16   A.    This is an e-mail from info@digitalnet.us to

17   Imran Alrai at supportunitedway.org regarding invoices

18   for the web development and managed services.

19   Q.    Mohammad again is asking to remit payment as

20   soon as you can.  Do you see that?

21   A.    Yes.

22   Q.    And can you go through and you see the

23   invoices?

24   A.    Yes.

25   Q.    And again the following Exhibits 115a and b,

1    are those e-mails containing the IP header information

2    -- sorry, 114a and b, is that again e-mails showing --

3    the same e-mail with IP header information or e-mail

4    header information?

5         A.   Yes.

6         Q.   As well as the invoices, PDFs of the invoices

7    that were found on Mr. Alrai's home computer in Windham?

8         A.   Yes.

9         Q.   Okay.  And again, what day or the e-mail sent?

10        A.   December 15, 2015.

11        Q.   Did Mr. Alrai's -- was there any badge swipe

12   data indicating Mr. Alrai swiped into work that day?

13        A.   No.

14             MR. HUNTER:  Can we go to the next page in the

15   chart?

16        Q.   When did Mr. Alrai next swipe in to work?

17        A.   December 17, 2015.

18        Q.   So two days later this time?

19        A.   Yes.

20        Q.   Okay.

21             MR. HUNTER:  Can you pull up Exhibit 115,

22   please, Ms. Sheff?

23        Q.   What is this, Agent Laroe?

24        A.   This is an e-mail from info@digitalnet.us to

25   Imran Alrai at supportunitedway.org.

page 23

1    Q.   Okay.  Dated January 18, 2016?

2    A.   Yes.

3    Q.   Does it also attach some invoices from

4  DigitalNet to United Way?

5    A.   Yes.

6    Q.   And again, when did Mr. Alrai -- was Mr. Alrai

7  swiped in at United Way at 1/18/2016?

8    A.   No, he was not.

9    Q.   When did he swipe in next?

10    A.   January 19, 2016.

11    Q.   Again, that's the next day?

12    A.   Yes.

13    Q.   And Exhibit 115a, what is this?

14    A.   That is the header information for the same

15  e-mail.

16    Q.   Okay.  And that shows the originating IP

17  address of the e-mail?

18    A.   Yes.

19        MR. HUNTER:  And 115b, Ms. Sheff.

20    Q.   What is this?

21    A.   Those were the invoices found on Mr. Alrai's

22  home computer.

23    Q.   That were attached to that e-mail?

24    A.   Correct.

25    Q.   Okay.

24

1          MR. HUNTER:  And Ms. Sheff, will you please

2   pull up Exhibit 116?

3        Q.    Okay.  What is this, Agent Laroe?

4        A.    This is an e-mail from info@digitalnet.us to

5   Imran Alrai at supportunitedway.org attaching invoices.

6        Q.    What's the date of this e-mail?

7        A.    February 15, 2016.

8        Q.    Okay.  Was Mr. Alrai swiped in at United Way

9   on that date?

10        A.    On February 15th, no.

11        Q.    When did he next swipe in?

12        A.    February 16th.

13        Q.    And again, that's the next day after this

14   e-mail was sent; is that right?

15        A.    Yes.

16        Q.    Okay.

17          MR. HUNTER:  Ms. Sheff, can you scroll through

18   this e-mail?

19        Q.    Are these the invoices that were attached?

20        A.    Yes.

21          MR. HUNTER:  Ms. Sheff, could you please pull

22   up 116a?

23        Q.    What is this?

24        A.    That's the same e-mail with the header

25   information.

25

1    Q.   Okay.  That again shows the originating IP?

2    A.   Yes.

3    Q.   And as were the others, is it 75.68.37.59?

4    A.   Yes.

5    Q.   All right.

6         MR. HUNTER:  And Ms. Sheff, can you please

7    pull up 116b?

8    Q.   What is this?

9    A.   Those are the invoices that were attached to

10   the e-mail that were located on Mr. Alrai's home

11   computer.

12   Q.   Thank you.

13        MR. HUNTER:  Okay, Ms. Sheff, could we go to

14   page 7 of the chart?  Okay.  And could you please pull

15   up Exhibit 117?

16   Q.   Okay.  We're looking at Exhibit 117, Agent

17   Laroe.  What is this?

18   A.   That is an e-mail from info@digitalnet.us to

19   Imran Alrai at supportunitedway.org regarding an invoice

20   for infrastructure work.

21   Q.   Okay.  And what's the date of the e-mail?

22   A.   April 21, 2016.

23   Q.   And what's the time of the e-mail?

24   A.   8:31 a.m.

25   Q.   Okay.  And when did Mr. Alrai next swipe in at

1  United Way?

2       A.   10:11 a.m.

3       Q.   On April 21st?

4       A.   Yes.

5       Q.   Okay.

6            MR. HUNTER:  Ms. Sheff, can you scroll through

7  the e-mail?

8       Q.   And these are the invoices that were attached?

9       A.   Yes.

10           MR. HUNTER:  Ms. Sheff, can you pull up 117a?

11      Q.   What is this exhibit?

12      A.   This is the same e-mail with the header

13 information.

14      Q.   Okay.

15           MR. HUNTER:  And 117b.

16      Q.   What is this?

17      A.   The invoice that was attached that was located

18 on Mr. Imran's (sic) home computer.

19      Q.   Okay.  So looking back at the chart we see a

20 series of swipe-ins.  What's the date range of the

21 swipe-ins before the next e-mail on the chart?

22      A.   April 21, 2016, to July 12, 2016.

23      Q.   Okay.  And actually let's go back to April

24 21st.  The e-mail was sent at 8:31.  So about how long

25 between when the e-mail was sent and when Mr. Alrai was

1  swiped in at United Way?

2       A.   About an hour and a half, two hours.

3       Q.   Okay.  Thank you.

4            MR. HUNTER:  You can take that down, Ms.

5  Sheff.

6       Q.   And so he swiped in on July 12, 2016.

7            MR. HUNTER:  Now I want to look at Exhibit

8  118.  Ms. Sheff, can you go to the bottom of the 118

9  e-mail?

10      Q.   Is this an e-mail chain between a Mac --

11           MR. HUNTER:  Oh, could you go up a little

12 further, Ms. Sheff, and could you please go to page 7 on

13 the chart?

14      Q.   Okay.  So this e-mail chain in Exhibit 118,

15 does it begin with an e-mail from Mr. Alrai?

16      A.   Yes, it does.

17      Q.   And could you just read the first paragraph

18 there?

19      A.   "Hello, Mac.  As per our conversation, I am

20 sending this e-mail to introduce you to Jack Rotondi, VP

21 of organizational operations for the United Way of Mass

22 Bay.  United Way has a new procurement policy in place

23 for all large vendors effective July 1, 2016, and Jack

24 is requesting the following to update his files:

25           Certification of financial health, banking

1    reference letter of good standing, total number of
2    clients, and a sample client list.  Jack, Mac is the VP
3    of business development at DigitalNet.  He can be
4    reached via e-mail, mac.chaudhary@digitalnet.com or
5    phone, 978-662-5333.  Feel free to reach out to him with
6    any questions.  Thank you, Imran Alrai."
7         Q.   Thank you.
8              MR. HUNTER:  Ms. Sheff, can you go up to page
9    2 of the document?
10        Q.   Okay.  Can you please read this e-mail from
11   Jack Rotondi, Agent Laroe?
12        A.   "Mac, it's a pleasure to virtually meet you.
13   Please don't hesitate to contact me if you have any
14   questions about what we're requesting.  Also, please let
15   me know if you might be in a position to provide the
16   requested items by COB this Friday.  We'd like to move
17   forward as soon as possible with the various pieces of
18   work we're jointly engaged in.  This new policy simply
19   requires certain documents to be on file for our larger
20   vendors.  Thanks, Jack."
21        Q.   Could you please read Mac's response at 3:50
22   p.m. on July 13th.
23        A.   "Good afternoon, Jack.  Likewise, nice to meet
24   you.  Urgency is understood.  We are contacting the bank
25   to request a reference letter.  We'll have the docs to

1    you within a few working days.  My best, Mac Chaudhary."

2           MR. HUNTER:  Ms. Sheff, can you go to page 1

3    of the e-mail?

4        Q.   Here it looks like Jack says, Mac, excellent,

5    much appreciated.

6        A.   Yes.

7        Q.   And could you read -- and what was the date of

8    that response from Jack?

9        A.   July 13th, 2016, at 3:51 p.m.

10       Q.   Okay.  And then can you please read Mac's next

11   e-mail on July 18th at 2:00 p.m.?

12       A.   Jack and Imran, reference your e-mail dated

13   July 13.  Please find documents attached to your WITS as

14   requested.  My best, Mac.

15       Q.   Thank you.  And what time is Jack Rotondi's

16   response?

17       A.   July 18 at 2:08 p.m.

18       Q.   So that's about eight minutes later?

19       A.   Correct.

20       Q.   And can you read Jack's response, please?

21       A.   "Thank you for your e-mail and the

22   attachments.  I'm hoping you can also provide total

23   number of clients and a sample client list.  It may have

24   been part of a page 2 of the third document which

25   mentions verticals but not actual clients and total

1    number.  That didn't come through.  Thanks, Jack."

2        Q.    And can you read Mac Chaudhary's response:

3        A.    Didn't save PDF properly.  Try this."

4        Q.    And what time is that response sent?

5        A.    July 18th at 5:33 p.m.

6        Q.    Okay.

7              MR. HUNTER:  And Ms. Sheff, can you scroll

8    down to the attachment?

9              THE COURT:  Can you stay with this, please?

10             MR. HUNTER:  Yeah, absolutely.

11             THE COURT:  Oh, I see.  Okay.  I see.

12             MR. HUNTER:  Could you scroll down to the

13   attachment to this document, Ms. Sheff?

14       Q.    This is the attachment, DigitalNet portfolio

15   of services?

16       A.    Yes.

17       Q.    Is this page 1 of the attachment?

18       A.    Yes.

19             MR. HUNTER:  And Ms. Sheff, can you scroll to

20   page 2 of the attachment?

21       Q.    Do you see this?

22       A.    Yes.

23       Q.    And what was the last -- actually, could you

24   just read the facts at a glance?

25       A.    "17,000 plus users managed, 20,000 plus

1  network and wireless devices managed, 15,000 plus

2  virtual machines managed, hundreds of millions of direct

3  plus third-party e-mails per year, 5 plus PB data

4  managed and backed up, 650 plus digital eCommerce web

5  and mobile app solutions delivered, 105 plus global

6  clients served."

7       Q.   And what follows is a sample list of

8  customers.  Do you see that, Agent Laroe?

9       A.   Yes.

10      Q.   Okay.

11           MR. HUNTER:  Ms. Sheff, can we go to the next

12  page on the chart, please?

13      Q.   Was a Word version of this document found on

14  Mr. Alrai's home computer?

15      A.   Yes.

16           MR. HUNTER:  Ms. Sheff, could you please pull

17  up Exhibit 118d, please?

18      Q.   Is this the properties field from that Word

19  document?

20      A.   Yes, it is.

21      Q.   And who's the author of that Word document

22  listing the customers of DigitalNet?

23      A.   Imran.

24      Q.   Last saved by?

25      A.   Imran.

1      Q.   Could you read the content -- what was the

2  content created date of that Word document?

3      A.   July 18, 2016, 9:54 a.m.

4      Q.   That's the same day as the e-mail that we saw?

5      A.   Yes.

6      Q.   Date last saved of the Word document?

7      A.   July 18, 2016, at 5:25 p.m.

8      Q.   And last printed date of the Word document?

9      A.   July 18, 2016, at 4:41 p.m.

10      Q.   Total editing time?

11      A.   Six hours, 13 minutes.

12      Q.   So Special Agent Laroe, you mentioned after

13  the search that you supervised the search of Mr. Alrai's

14  home?

15      A.   Yes.

16      Q.   That included seizing his desktop computer?

17      A.   Yes.

18      Q.   And were there two laptops as well?

19      A.   Yes.

20      Q.   And an external hard drive?

21      A.   Yes.

22      Q.   And so what did you do to maintain the chain

23  of custody of those devices?

24      A.   I took them to Boston to enter them into our

25  evidence and then -- and provided evidence of the chain

33

1    of custody.

2         Q.   And those devices were then forensically

3    imaged --

4         A.   Correct.

5         Q.   -- by FBI forensic examiners?

6         A.   Yes.

7              MR. HUNTER:  Nothing further at this time,

8    your Honor.

9              THE COURT:  Thank you.

10             Cross.

11                         CROSS-EXAMINATION

12   BY MR. AYER:

13        Q.   Special Agent Laroe, this search you talked

14   about occurred on June 12, 2018?

15        A.   Yes.

16        Q.   And that was done while Mr. Alrai was in

17   interviews and conversations at the United Way?

18        A.   Yes.

19        Q.   And it was planned that way, right?  Was it

20   planned to have these search warrants executed at the

21   time that he was being interviewed?

22        A.   It was planned to do the search warrants on

23   June 12, 2018, correct.

24        Q.   And it was also planned to do the interview

25   that day, right?

1     A.   I did not have anything to do with the

2   planning of the interview, sir.

3           THE COURT:  Did you know their plans?

4           THE WITNESS:  I knew that United Way was

5   planning on speaking with him, yeah.

6           THE COURT:  Just so you know, if you know,

7   answer his questions.  If you don't have personal

8   knowledge, just explain that.

9           THE WITNESS:  Okay.

10    Q.   And there were special agents from I believe

11  the FBI or Homeland Security at United Way during those

12  interviews?

13    A.   Not in the United Way building.  They were

14  outside of United Way.

15    Q.   Okay.  But they were on --

16    A.   They were not on United Way property, no.

17          THE COURT:  All of a sudden the tension just

18  went through the roof and people are kind of like --

19  just ask the questions at a reasonable pace.  Take a

20  breath and answer it.  I don't want to referee this.

21  Let's go.

22    Q.   They were close to the United Way?

23    A.   Yes, they were.

24    Q.   Close enough that, for example, somebody could

25  walk out of the United Way premises and physically talk

1    to the agents?

2         A.    If the agents approached them, yes.

3         Q.    And the agents were there because of this

4    investigation?

5         A.    The agents were there because we had a search

6    warrant for Mr. Alrai's person.

7         Q.    They were at the United Way because of the

8    search warrant for his person?

9         A.    Because we knew Mr. Alrai was at work at the

10   United Way.

11        Q.    Because you had discussed that with the United

12   Way?

13        A.    We asked the United Way if he would be at work

14   that day and they said yes, he would be.

15        Q.    Did you discuss that they were going to be

16   having a meeting or meetings with him that day at which

17   they confronted him about this alleged activity?

18        A.    I was not part of those discussions, no.

19             THE COURT:  Well, I'm curious, what are you

20   trying to establish?  What would you have me infer from

21   this?

22             MR. AYER:  I'm getting it might be a little

23   while at this point given the pace, your Honor, simply

24   the connection between the United Way's conversation

25   with Mr. Alrai and what was going on at his home at the

```
 1    same time.
 2               THE COURT:  Sure.  Again, just tell me.  You
 3    don't get this opportunity with a jury.  What are you
 4    trying to get me to infer from this?  Even though she
 5    can hear it, I want you to tell me anyway.  Actually,
 6    you know what, it's a good point.  I want --
 7               MR. AYER:  Can I ask a few more questions and
 8    then I can --
 9               THE COURT:  Let me finish talking.  Come on.
10               Proceed.
11        Q.    Well -- so back up a second.  You had not
12    spoken to Mr. Alrai about this prior to June 12th?
13        A.    No, I had not.
14        Q.    To your knowledge nobody from Homeland
15    Security or the FBI had talked to him about this prior
16    to June 12th?
17        A.    No, they had not.
18        Q.    To your knowledge nobody at the United Way
19    confronted him about this prior to June 12th?
20        A.    No.
21        Q.    The first discussions about this alleged
22    scheme between the FBI and Homeland Security, the United
23    Way and Mr. Alrai, involving Mr. Alrai occurred on June
24    12th?
25        A.    I don't understand.
```

1      Q.    Okay.   The first discussions between anybody

2  connected with the government investigation, FBI and

3  Homeland Security, and Mr. Alrai about this alleged

4  scheme happened on June 12, 2018?

5      A.    Yes.

6      Q.    The first discussions to your knowledge

7  between anybody at the United Way and Mr. Alrai about

8  this alleged scheme occurred on June 12, 2018?

9      A.    Yes, to my knowledge.

10      Q.    While you were searching Mr. Alrai's house,

11  one of the things you were searching for was a safe,

12  correct?

13      A.    Among other things, yes.   We weren't

14  specifically looking for a safe.   We were conducting a

15  search for anything that could be connected to this

16  scheme.

17      Q.    Which included in your mind potentially

18  finding a safe there?

19      A.    I guess.   I mean, when we do any kind of a

20  search warrant we look for a safe.

21      Q.    And you expected to find a safe containing

22  documents with passwords on it, right?

23      A.    No.   We didn't have any knowledge about a safe

24  containing passwords.

25      Q.    While you were executing the search warrant,

1  your testimony here is that you did not expect to find a

2  safe there containing his passwords?

3       A.   We did not have any knowledge of a safe

4  containing passwords.

5            THE COURT:  Did you have any expectation

6  outside of knowledge, like just based on your training

7  and experience?

8            THE WITNESS:  I mean, we expected to find a

9  safe.  Most people have a safe in their home.

10            THE COURT:  I guess that's what he was asking.

11  Go ahead.

12       Q.   During your investigation of this case as well

13  you looked through Mr. Alrai's father's phone?

14       A.   Yes.

15       Q.   And on that phone you found e-mails regarding

16  the rental of office space at Regis for DTS?

17       A.   Yes.

18       Q.   On his father's phone?

19       A.   Yes.

20       Q.   During your investigation at some point you

21  also spoke to John Meyer?

22       A.   Yes.

23       Q.   John Meyer was the technical -- well, I guess

24  he was the IT person who United Way had brought in to

25  sort of help them do this transition?

1      A.   Yes.

2      Q.   And during your conversation with him you

3 discussed that he had been working with Coalfire?

4           MR. HUNTER:  Objection, your Honor.  This is

5 calling for hearsay, I believe.

6           MR. AYER:  Your Honor, this was raised with

7 Mr. Meyer during his testimony.  He testified he had no

8 knowledge of it.  It came up with him, and this is to

9 get in his prior statements through a witness who may

10 have personal knowledge of them.

11           THE COURT:  Okay.  Proceed.

12      Q.   So did you discuss Coalfire with Mr. Meyer?

13      A.   I would have to review the 302, sir.

14      Q.   Okay.

15           THE COURT:  He was confronted with that and

16 given a chance to explain?

17           MR. AYER:  Correct.  Yes, he was, your Honor.

18      Q.   Is this the report, interview of John Meyer?

19      A.   Yes.

20      Q.   September 18, 2019?

21      A.   Yes.

22      Q.   And is this the report you drafted as part of

23 your investigation here?

24      A.   Yes.

25      Q.   And you wrote that report closely after you

1    had that interview with Mr. Meyer?

2        A.    Yes, I did.

3        Q.    Trying to get down all the pertinent details

4    of your conversation with Mr. Meyer?

5        A.    Yes.

6        Q.    And if I can direct you to this paragraph

7    here, "Mr. Meyer advised that during his first two

8    months of being at the United Way, TBS sent the United

9    Way servers to a company called Coalfire to be imaged

10   and analyzed."

11              THE COURT:  Please slow down.  Please slow

12   down for the reporter.

13              MR. AYER:  I'm sorry.

14       Q.    Is that what that says there?

15       A.    Yes, it is.

16       Q.    So he did discuss Coalfire with you?

17       A.    That's what he said about it.  I don't recall

18   if there was more.

19       Q.    Okay.  Does seeing that in your report refresh

20   your recollection as to that part of the conversation?

21       A.    I believe it was a fairly brief part of the

22   conversation, yes.

23       Q.    Okay.  Going on to the next page, he discusses

24   Coalfire more, right?

25       A.    Yes.

1      Q.   About Coalfire's recommendations on what

2  should happen next?

3      A.   Yes.

4      Q.   So you were made aware in January of 2019, at

5  this point almost a year ago, that the United Way

6  servers had been imaged and analyzed by this outside

7  company?

8      A.   I believe that report was from September of

9  2019, sir.

10      Q.   I'm sorry, you're right.  So about three

11  months ago that the servers had been copied by Coalfire?

12      A.   Yes.

13      Q.   And the servers would have been from the

14  United Way, affecting United Way in this case?

15      A.   Yes.

16      Q.   And they could potentially have had some

17  electronic data that would have been relevant to this

18  case?

19      A.   I don't know, sir.

20      Q.   Did you ask Mr. Meyer about that?

21      A.   I did not, sir.

22      Q.   Did you ask him for a copy of the servers?

23      A.   I did not, sir.

24      Q.   Did you ask him for a copy of the analysis?

25      A.   No, sir.  I don't recall.

1      Q.   Did you follow up with Coalfire?

2      A.   No, sir.

3      Q.   Did he offer to get them to you without you

4 asking?

5      A.   I don't recall, no.

6      Q.   Do you remember asking him whether those may

7 be relevant to this case?

8      A.   No, sir.

9      Q.   Or how they might be relevant?

10      A.   No, sir.  I was not directing that interview,

11 sir.  I was taking notes.  I was not the one asking

12 questions.

13      Q.   All right.  But you were there to observe the

14 conversation about Coalfire?

15      A.   I was there to observe the interview and take

16 notes and write the report, sir.

17      Q.   So you were there to observe the conversation

18 about Coalfire?

19      A.   Yes.  Yes.

20      Q.   And do your notes here -- does your report

21 accurately reflect your then recollection of that

22 conversation?

23      A.   Yes, sir.

24      Q.   Do you also remember a portion of the

25 conversation in which you discussed a company called

1   RSM?

2        A.   Vaguely.  I'd have to look at the report, sir.

3        Q.   Okay.  Would it be in that same report?

4        A.   I would assume so.

5        Q.   I want to point you to -- I'll put it up here.

6   Do you recognize this report?

7        A.   Yes.

8        Q.   It states that John Meyer was interviewed

9   telephonically by you and United Way attorney, John

10  Commisso?

11       A.   Yes.

12       Q.   And it says the date of that is August 8,

13  2018?

14       A.   Yes.

15       Q.   And is that your report from that

16  conversation?

17       A.   Yes.

18       Q.   And again, you drafted that report shortly

19  after the conversation?

20       A.   Yes.

21       Q.   To the best of your recollection of that

22  conversation?

23       A.   Yes, sir.

24       Q.   So to the best of your knowledge and

25  recollection it accurately reflects your memory of that

1    conversation?

2        A.    Yes, sir.

3        Q.    And as part of that conversation -- actually,

4    I'll drag that down so it's already highlighted for you.

5        A.    Okay.

6        Q.    It says, "This server has been completely

7    protected within a few days and the forensic image of

8    the server was taken and sent to RMS," I believe we

9    discussed earlier that should have been RSM, "for

10   review."

11            So does that say that there was a server that

12   was forensically imaged and sent to this company for

13   review?

14            MR. HUNTER:  Objection, your Honor.  I don't

15   believe Mr. Meyer testified to anything inconsistent

16   with this on direct, and so I don't think this is proper

17   impeachment if that's what it's being offered for.

18            MR. AYER:  Your Honor, my recollection is --

19            THE COURT:  Overruled.  Go ahead.

20       Q.    So that discusses a forensic image of the

21   United Way servers being taken and sent to this company

22   for a review?

23       A.    Yes.

24       Q.    And that was communicated to you in August of

25   2018?

1      A.   Yes.

2      Q.   And that company was going to be doing a

3  review to determine if it says anything was accessed and

4  taken, right?

5      A.   Correct.

6      Q.   And below it confirms a forensic image of the

7  servers are also being completed and that information is

8  being passed to RMS for review?

9      A.   Yes.

10     Q.   Did you ever get a copy of that?

11     A.   No, I did not.

12     Q.   And that was an interview at this point that

13  you conducted, right?

14     A.   Yes.

15     Q.   And did you ask him for a copy of those?

16     A.   I did.

17     Q.   What was his response?

18     A.   I was told it was privileged information and

19  they would have to look at it and consult us.

20     Q.   Did you follow up with him about that?

21     A.   It was not really my place.  I told the

22  prosecutors about it, and they were the ones that were

23  dealing with that, not me.

24     Q.   I'm sorry?

25     A.   The prosecutors were dealing with working with

1    the United Way on privileged information, not me.

2         Q.   Okay.  Do you remember whether you documented

3    that conversation with the prosecutors in any report?

4         A.   I don't recall, sir.

5         Q.   Okay.  Off the top of your head can you point

6    to a report where you would have talked about that

7    conversation with the prosecutors?

8         A.   I probably wouldn't put that in a report, sir.

9         Q.   I'm sorry?

10        A.   I would not document that in a report, sir.

11        Q.   You would not document a conversation about

12   your seeking to obtain evidence in a report?

13        A.   No, sir.  I would just talk to them about it,

14   sir.

15        Q.   And that conversation occurred not even two

16   months after that June 12, 2018, conversation with Mr.

17   Alrai?

18        A.   Say that again.  I didn't understand.  I'm

19   sorry.

20        Q.   All right.  This occurred on August 8, 2018,

21   right?

22        A.   Yes, yes.

23        Q.   And did the conversation with Mr. Meyer occur

24   that day or was this report written later?

25        A.   The date on the bottom of the report should

47

```
 1    have the date of when the conversation occurred with Mr.

 2    Meyer.

 3         Q.   Okay.  It says investigation August 8, 2018,

 4    date drafted August 8, 2018?

 5         A.   So it was the same day.

 6         Q.   You would have drafted this report the same

 7    day as the conversation?

 8         A.   Yes, sir.

 9         Q.   And August 8, 2018, is less than two months

10    beyond June 12, 2018, right?

11         A.   Yes.

12         Q.   And June 12, 2018, is when you executed the

13    search warrant?

14         A.   Yes.

15         Q.   And when the conversations with Mr. Alrai at

16    the United Way occurred?

17         A.   Yes.

18         Q.   And so that early into the investigation you

19    had been told that a forensic image of the servers had

20    been created, right?

21         A.   Yes.

22         Q.   And that forensic image of the servers could

23    have had information relevant to this case on them,

24    right?

25         A.   I don't know, sir.  I didn't see them.
```

1     Q.   Your understanding was Mr. Alrai was the chief

2  information officer at this company, right?

3     A.   Yes.

4     Q.   And the allegations against him included

5  having a company under his control perform IT work for

6  United Way?

7     A.   Yes.  Yes, sir.

8     Q.   So information regarding the United Way's IT

9  system could be relevant to that investigation of what

10  work was done, right?

11     A.   Yes, sir.

12     Q.   And that would have been on those forensic

13  images?

14     A.   Possibly.

15     Q.   You also testified on direct examination that

16  the Boston U.S. Attorney's Office had gotten involved in

17  this case or investigation or related investigation,

18  right?

19     A.   They received a phone call from the United

20  Way.

21     Q.   And your testimony was they had reviewed it

22  and had contacted you or Homeland Security about it,

23  right?

24     A.   No, sir.

25     Q.   No?

1      A.    The Boston U.S. Attorney -- my understanding

2  is the Boston U.S. Attorney's Office received a phone

3  call from the United Way.  They then contacted the

4  Boston FBI.  The Boston FBI agent deconflicted the case

5  through the FBI systems and located an investigation I

6  had already opened in December of 2017 regarding this

7  matter.

8      Q.    All right.

9      A.    He contacted me and put us -- put myself and

10  the prosecutors in contact with the AUSA in Boston.

11      Q.    Uh-huh.

12      A.    That person helped us coordinate with the

13  United Way and meet with the United Way, and then

14  because our investigation was already ongoing they

15  stepped aside.

16      Q.    Okay.  And they stepped aside because they

17  felt there wasn't any criminal activity, right?

18      A.    No, sir.

19      Q.    No?  It was a deconflicting process?

20      A.    It was deconflicting because New Hampshire

21  already had a case open.

22      Q.    Okay.  So there is a report done on June 26,

23  2018, that states United Way representative Attorney

24  John Commisso, Richard Voccio, and John Mulvaney were

25  interviewed telephonically by you, correct?

1      A.    Yes.

2      Q.    Todd Donnelly?

3      A.    Yes.

4      Q.    Darlene Cacace?

5      A.    Yes.

6      Q.    And AUSA John Davis?

7      A.    Yes.

8      Q.    And the next paragraph states that United Way

9  contacted the USAO in Boston, advised they had a report

10 on the defendant, and later here it says, "It was

11 determined by the USAO of Boston that there was not any

12 criminal activity at that point."  Right?

13     A.    The United Way contacted Boston U.S.

14 Attorney's Office on two occasions, sir.  The first

15 occasion that they contacted them I believe they said

16 they did not have any criminal activity.  The second

17 time they contacted them on June 1, 2018, they advised

18 that they felt that there was now criminal activity,

19 sir.

20     Q.    And that paragraph states that the United Way

21 continued their internal investigation and called the

22 USAO in Boston --

23     A.    Again.

24     Q.    -- on June 1, 2018, right?

25     A.    Uh-huh.

1      Q.   And advised that they, that being the United

2  Way --

3      A.   Yes.  Sorry.  I'm sorry.

4      Q.   Advised that they -- and they means the United

5  Way, right?

6      A.   Yes.

7      Q.   -- felt that there was criminal activity?

8      A.   Yes.  That's what the United Way felt and the

9  U.S. Attorney's Office -- that is at the point when the

10 U.S. Attorney's Office then contacted the FBI as well.

11     Q.   Okay.  But nowhere in that paragraph does it

12 say now the USAO in Boston now feels like there was any

13 criminal activity, right?

14     A.   No, sir, but I can tell you about the

15 conversations we had.

16     Q.   And nowhere in that report does it discuss the

17 deconflicting process, does it?

18     A.   No, that would not be in the report, sir,

19 because it was a report of an interview, not a report of

20 what my actions were.

21     Q.   And in fact the deconflicting process doesn't

22 appear in any report in this case, does it?

23     A.   No.

24     Q.   Just the USAO of Boston's opinion that there

25 was no criminal activity?

52

```
1          A.    After the initial call.
2                MR. AYER:  That's all I have, your Honor.
3                I'm sorry about my pace early on.
4                THE COURT:  No problem.
5                MR. HUNTER:  Thank you, your Honor.
6                        REDIRECT EXAMINATION
7     BY MR. HUNTER:
8          Q.    Special Agent Laroe, you were asked some
9     questions about whether or not you had requested imaged
10    hard drives from United Way to get relevant information
11    to the case.  Do you recall that?
12         A.    The questions, yes, sir.
13         Q.    Yes.  And you said you didn't, you didn't
14    request full images of servers; is that right?
15         A.    Correct.
16         Q.    But there were subpoenas issued to United Way
17    to get documents relevant to the case; is that correct?
18         A.    Yes, sir.
19         Q.    And the government received voluminous
20    documents from the United Way --
21         A.    Yes, sir.
22         Q.    -- that were relevant to the investigation; is
23    that correct?
24         A.    Yes, sir.
25         Q.    I guess to start where you left off with
```

1  conversations with the United States Attorney's Office

2  in Boston, the last 302 that we were looking at, that

3  was a report of interview?

4      A.   Yes, it was.

5      Q.   Can you just describe the context of that

6  interview?

7      A.   I believe that was the initial interview with

8  the United Way to determine their knowledge of what was

9  going on with DigitalNet and what they reported has

10  happened in their internal investigation.

11      Q.   And looking at what we were just looking at,

12  it looks like United Way initially reached out to the

13  Boston U.S. Attorney's Office in May early in their

14  investigation; is that right?

15      A.   Yes.

16      Q.   And they reached out later saying we have more

17  evidence?

18      A.   Yes.

19      Q.   And I think you were asked by defense counsel

20  about conversations you had with the Boston U.S.

21  Attorney's Office about whether or not they thought the

22  case was criminal?

23      A.   Yes, sir.

24      Q.   Did you have conversations with prosecutors of

25  the Boston U.S. Attorney's Office about whether they

1    thought this was a criminal case worth prosecuting?

2         A.   I actually did, sir, yes.

3         Q.   Can you describe it?

4              MR. AYER:  I would object at this point, your

5    Honor.  The reason being that that was offered as

6    essentially a prior inconsistent statement as to her

7    explanation of the history here.  I don't think any

8    further discussion of that issue from the U.S.

9    Attorney's Office in Boston is relevant to whether her

10   statements on direct were consistent with her statements

11   in the report, so we would ask you to limit this

12   testimony.

13             THE COURT:  Well, yeah, let me put it this

14   way.  If I'm supposed to be concerned for 20 seconds

15   about the opinion of the U.S. Attorney's Office in

16   Boston, you don't need to worry about that.  As a person

17   who formerly worked there as a prosecutor, I know what

18   that's worth.  That was a joke.  Nobody needs to worry

19   about it.  I'm almost sort of chuckling up here

20   listening to people talk about it.

21             It was offered to impeach a prior statement.

22   You can explore it however you want.  I'm not going to

23   limit you in any way, but to the extent I'm supposed to

24   be influenced by it, it won't happen.

25             MR. HUNTER:  And, your Honor, the reason why

1   I'm offering it is to show that there was no

2   inconsistency in her testimony.

3              THE COURT:  That's perfectly appropriate.  So

4   overruled.

5      Q.    So, Ms. Laroe, you were asked whether or not

6   the Boston U.S. Attorney's Office thought this case was

7   worth prosecuting and impeached with that report.  Did

8   you have conversations with the Boston U.S. Attorney's

9   Office where they indicated whether or not they were --

10             THE COURT:  You have to slow down.

11     Q.    Sorry.  Did you have conversations with the

12  Boston U.S. Attorney's Office where they indicated they

13  were interested in prosecuting the case?

14     A.    Yes, sir, I did.

15     Q.    And were they able to prosecute the case in

16  Boston?

17     A.    They were not because we were already working

18  on it up here.

19     Q.    Okay.  Finally, you were asked some questions

20  about June 12th and coordinations with United Way in

21  their interview with Mr. Alrai?

22     A.    Yes, sir.

23     Q.    Did the FBI or Homeland Security ever direct

24  United Way as to how they should conduct their internal

25  investigation?

1      A.    No.

2      Q.    Did you ever ask them what questions to ask

3  Mr. Alrai when they confronted him on June 12th?

4      A.    No.

5      Q.    Did you ever receive a report from United Way

6  about what they talked about with Mr. Alrai?

7      A.    No.

8      Q.    And in fact it was well over a year later when

9  you finally saw notes from that interview; isn't that

10 correct?

11     A.    Yes.

12     Q.    And I think you testified that you were aware

13 that Mr. Alrai was -- or the FBI was aware that Mr.

14 Alrai was going to be in the office on June 12th?

15     A.    Yes.

16     Q.    And did law enforcement coordinate the timing

17 so that they could execute search warrants while Mr.

18 Alrai was in the office?

19     A.    Yes.

20     Q.    And execute search warrants in his house when

21 Mr. Alrai wasn't going to be at home?

22     A.    Yes.

23     Q.    But again, did you or did Homeland Security

24 ever direct United Way in how they conduct their own

25 internal investigation?

1      A.    No.

2            MR. HUNTER:  No further questions, your Honor.

3            THE COURT:  Recross?

4            MR. AYER:  No, your Honor.

5            THE COURT:  Thank you.

6            THE WITNESS:  Thank you.

7            MR. HUNTER:  The government calls John

8   Mulvaney.

9                         JOHN MULVANEY

10       having been duly sworn, testified as follows:

11           THE CLERK:  For the record, state your name

12   and spell your last name.

13           THE WITNESS:  Yes.  My name is John Mulvaney,

14   M-U-L-V-A-N-E-Y.

15                     DIRECT EXAMINATION

16   BY MR. HUNTER:

17       Q.    Good morning, Mr. Mulvaney.

18       A.    Good morning.

19       Q.    I'm sure you've testified before but as you

20   can see we, we have a court reporter in the courtroom.

21   I would just ask that you speak slowly and clearly, some

22   instructions that I often do not follow, and speak into

23   the microphone.

24       A.    Okay.

25       Q.    Sir, how are you employed?

1      A.    So I'm employed by CBIZ, which is a public

2  accounting firm.

3      Q.    A public accounting firm, you said?

4      A.    Correct.

5      Q.    And what do you do for CBIZ?

6      A.    So I lead the white collar and government

7  enforcement practice.  We conduct internal

8  investigations on behalf of companies who are victimized

9  by employees through some type of fraudulent scheme.  We

10 also represent companies who find themselves as targets

11 or subjects of law enforcement or regulatory inquiries.

12     Q.    How large is CBIZ?

13     A.    We're about the tenth largest public

14 accounting firm in the country.  We have approximately a

15 hundred offices and 3,000 employees here in the U.S.

16     Q.    How do the accounting and investigation arms

17 of CBIZ interrelate, if at all?

18     A.    It's a separate entity within CBIZ.  So

19 traditionally CBIZ and a lot of public accounting firms

20 are largely audit and tax oriented, but our practice,

21 the advisory practice, is a very small practice within

22 the company itself.

23     Q.    Okay.  How many investigations have you

24 conducted since being involved with CBIZ?

25     A.    I would say approximately ten while I've been

1   with CBIZ over the last six years.

2       Q.   Okay.  On average, about how many per year?

3       A.   Approximately two, two per year.

4       Q.   What did you do before you worked at CBIZ?

5       A.   Well, I started -- I was with the FBI for 26

6   years, and then after retiring from the FBI went to work

7   for the Special Inspector General's Office for the

8   Troubled Asset Relief Program commonly referred to as

9   TARP.  After two years there I did a brief stint at

10  Grant Thornton before joining CBIZ in 2013.

11      Q.   As part of your work at CBIZ were you involved

12  in an internal investigation at United Way regarding

13  Imran Alrai?

14      A.   Yes, I was.

15      Q.   And when was that?

16      A.   May of 2018.

17      Q.   And was CBIZ engaged by United Way's outside

18  counsel for its internal investigation?

19      A.   Yes.  Yes, we were.

20      Q.   And as part of that initial engagement in May

21  of 2018, did United Way agree to pay CBIZ for your time

22  in preparing and testifying for trial?

23      A.   Yes, it did.

24      Q.   Now, are you an employee of CBIZ?

25      A.   Yes, I am.

1    Q.    Are you an owner?

2    A.    I am not.

3    Q.    Are you paid a salary at CBIZ?

4    A.    Yes, I am.

5    Q.    Do you occasionally get a bonus?

6    A.    Yes.

7    Q.    Are your bonus or salary in any way dependent

8    on the outcome of any of your investigations at CBIZ?

9    A.    No.

10   Q.    And that includes the United Way

11   investigation?

12   A.    Correct.

13   Q.    Are your salary and bonus tied to the time

14   spent on any particular investigation at CBIZ?

15   A.    No, it's based on the financial performance of

16   our group for each year.  It has nothing to do with the

17   outcome of any of the investigations that we handle.

18   Q.    And to be clear, United Way is not paying you;

19   they're paying CBIZ?

20   A.    Correct.

21   Q.    So going back to May of 2018, what were you

22   asked to do?

23   A.    We were asked to investigate a previously

24   undisclosed relationship between their IT director, Mr.

25   Imran Alrai, and one of their third-party vendors,

1    DigitalNet Technology Solutions.

2         Q.    While you were conducting your internal

3    investigation at United Way, were you aware of any

4    potential criminal investigation into Mr. Alrai's

5    conduct?

6         A.    Initially we were not.

7         Q.    Okay.  When did you become aware of any

8    criminal investigation?

9         A.    I think it was approximately late May, early

10   June is when we first learned of a criminal

11   investigation.

12        Q.    Okay.  At any point in your internal

13   investigation were you told what to do by any law

14   enforcement officers?

15        A.    No.

16        Q.    Were any questions you asked Mr. Alrai --

17   strike that.

18             Did you ever meet with Mr. Alrai and talk with

19   him?

20        A.    Yes.

21        Q.    Did law enforcement, the FBI, Homeland

22   Security, or any other law enforcement tell you what to

23   ask Mr. Alrai?

24        A.    No.  We were conducting our internal

25   investigation on behalf of United Way and the board of

1  directors.  We were not directed at any way, shape, or

2  fashion by the DOJ, the FBI, or the U.S. Attorney's

3  Office.

4      Q.   Okay.  And in 2018 did you share any of the

5  information you learned in your interview with Mr. Alrai

6  to law enforcement?

7      A.   We shared a little bit.  I mean, the

8  investigation was an attorney-client privileged

9  investigation so we shared a little bit of information.

10  The initial contact that Mr. Commisso had made with the

11  U.S. Attorney's Office in Boston, he outlined the --

12  generally what the investigation was about.  I don't

13  think -- without even naming who the subject of the

14  investigation was, and it was shortly after that that we

15  learned that an investigation was already being

16  conducted from the U.S. Attorney's Office in New

17  Hampshire.

18          We did have some conversations, a few

19  conversations with the U.S. Attorney's Office leading up

20  to the interview of Mr. Alrai on June 12th, but they

21  were very limited.

22      Q.   Okay.  You were never told what to do?

23      A.   No, not at all.

24      Q.   All right.  So let's talk about June 12th.

25  Did you interview Mr. Alrai on June 12, 2018?

1    A.    I did, along with Mr. -- or Attorney John

2  Commisso.

3    Q.    And again, not to belabor the point, but were

4  any law enforcement agencies involved in that interview?

5    A.    They were not.

6    Q.    And prior to June 12, 2018, did you ever

7  interact with Mr. Alrai?

8    A.    No.

9    Q.    And have you interacted with him since?

10    A.    No.

11    Q.    Generally, what did you do to prepare for that

12  June 12th meeting?

13    A.    During the approximately four to five weeks

14  between the time we were retained and the actual

15  interview of Mr. Alrai, we reviewed many documents that

16  had been provided to us by United Way.  We had

17  interviewed several United Way members of the senior

18  management team and I believe we reviewed some public

19  documents, documents that we had obtained publicly.

20    Q.    Okay.  What was the goal of the meeting with

21  Mr. Alrai?

22    A.    So the goal was really twofold.  Number one,

23  it was -- we really wanted to determine if in fact

24  DigitalNet Technology Services (sic) was a legitimate

25  organization, you know, whether or not it was an

1   independent third-party vendor of United Way or was it

2   simply a part of this apparent scheme that Mr. Alrai had

3   employed to defraud United Way.

4           The second most critical objective of the

5   interview was to locate -- identify, locate, and regain

6   custody of the data that was stored on many of these

7   servers belonging to United Way.

8           At that point in time United Way was not able

9   to ascertain where these servers were and whether or not

10   the information that was contained on those servers was

11   adequately protected.

12      Q.   Okay.  Could you describe how the June 12th

13   meeting began?

14      A.   At the outset of the interview Attorney

15   Commisso and myself advised Mr. Alrai of our identities,

16   why we were conducting this interview.  Mr. Alrai was

17   advised of the Upjohn warnings by Mr. Commisso, and then

18   shortly after those formalities we began talking to him

19   about DigitalNet.

20      Q.   Okay.  Can you briefly describe what an Upjohn

21   warning is?

22      A.   The Upjohn warnings are similar to Miranda

23   warnings in that Mr. Alrai was advised that we were

24   conducting the investigation on behalf of United Way,

25   the privilege resided with United Way, and that any

1  information that Mr. Alrai provided to us could be

2  disclosed by United Way at any time.

3         He was also advised that because he was an

4  employee of the company, he was required to cooperate

5  with the investigation or with the interview.

6     Q.   Okay.  The meeting started.  What was Mr.

7  Alrai's demeanor?

8     A.   I described it -- I would describe it as he

9  was wary of myself and Mr. Commisso, and I think that

10 wariness continued throughout the entire interview.  He

11 was reserved, and I think he was very careful in

12 providing the answers to the questions that we posed of

13 him.

14    Q.   And where did the interview take place?

15    A.   It took place in a small conference room at

16 the offices of the United Way.

17    Q.   Was that a conference room with windows

18 looking outside?

19    A.   It had a window or windows looking outside.

20    Q.   Did you shut the door for privacy?

21    A.   We did close the door because of privacy, yes.

22    Q.   So what was the first thing you talked about

23 with Mr. Alrai?

24    A.   We talked about DigitalNet in generality, you

25 know, who comprised of the IT community within United

1    Way.  Other than Mr. Alrai, he had two embedded

2    DigitalNet employees, Nadeem Yousef and Jasmin Iqbal.

3    He also had two United Way employees who acted or worked

4    as analysts on behalf of Mr. Alrai.

5         Q.   Okay.  I'm just shifting gears a little bit.

6    Did you ever talk about Robert Allen Group in the

7    interview?

8         A.   We eventually got to Robert Allen when we were

9    going over Mr. Alrai's employment history.  He had

10   advised us that he had worked at Robert Allen from 2006

11   to 2012 before he was employed at United Way.

12        Q.   Did he ever indicate that his employment

13   overlapped with Robert Allen?

14        A.   I don't ever recall him stating that his

15   employment with Robert Allen overlapped with his

16   employment at United Way.

17        Q.   At some point did he give a date of his

18   employment at Robert Allen ending in 2013; do you

19   recall?

20        A.   He did.  I believe it went into 2013, but it

21   didn't have any meaning to us at that point in time.  We

22   were just trying to obtain as much information -- so the

23   2013, I certainly didn't pick up on it initially.

24        Q.   Did Mr. Alrai say anything about how he found

25   out about DigitalNet?

1    A.    He learned about -- Mr. Alrai said that he

2    learned about DigitalNet when he was at Robert Allen

3    Group he had done -- he had used them for some small

4    projects.  He could not provide us the names of the

5    DigitalNet employees that he worked with on those small

6    projects.

7         Q.    Did he say anything about whether there were

8    any formal contracts between DigitalNet and Robert Allen

9    Group?

10        A.    I don't know if he said anything about

11   contracts, but he was specific about hiring DigitalNet

12   to perform some IT related services on behalf of Robert

13   Allen.

14             MR. HUNTER:  Your Honor, may I approach to --

15        Q.    Will your notes refresh your recollection

16   about --

17        A.    Yes, they would.

18             MR. HUNTER:  Your Honor, may I approach?

19             THE COURT:  Of course.  You may throughout

20   your examination.

21        Q.    Mr. Mulvaney, I'm just directing your

22   attention to this note here.

23        A.    Yeah, my notes indicate that he used the

24   DigitalNet services but no formal contracts.

25        Q.    And that's what Mr. Alrai told you?

68

1      A.    Yes.

2      Q.    So while he was at Robert Allen Group there

3  were no formal contracts between Robert Allen Group and

4  DigitalNet --

5      A.    Correct.

6      Q.    -- but he did use their services.  That's what

7  he said.

8          All right.  Did you discuss Mr. Alrai's role

9  at United Way?

10     A.    Yes, we did.

11     Q.    Okay.  What did you discuss?

12     A.    He was hired in 2012 as the director of their

13 IT services, their internal IT community.  Shortly after

14 arriving at United Way he conducted an assessment of the

15 IT community itself and realized that it had some

16 serious issues.  There was no data discovery program in

17 place.  He had approximately 30 different programs that

18 were not integrated or speaking with each other.  I

19 think their credit card account had been hacked into the

20 previous year and a lot of unhappy end users.

21     Q.    Did you talk at all with Mr. Alrai about the

22 2012 and '13 RFP process to hire an outside IT vendor?

23     A.    Yes, we did.

24     Q.    What did you talk about?

25     A.    Shortly after that assessment was performed by

1    Mr. Alrai they agreed that they had to put out a

2    proposal for services.  So he, along with Ms. Pat

3    Latimore, who was his direct supervisor, and Mr. Stanley

4    Burrows, who was on the steering committee, worked

5    together in putting together that RFP process.

6           Q.    And again, this was what Mr. Alrai was telling

7    you?

8           A.    Yes.  That's what he said to us, yes.

9           Q.    Okay.  What else did he say?

10          A.    Mr. Alrai was very important or an integral

11   part of that entire process writing the technical

12   aspects of the RFP itself.  He worked along with Ms.

13   Latimore and Mr. Burrows in preparing that RFP and

14   eventually sending it out to potential responders.

15          Q.    What did Mr. Alrai say about the responses

16   that came back?

17          A.    He said there were approximately seven to

18   eight companies that had responded.  We had reviewed

19   some of the RFP documents and there was a list of 13 I

20   think, I believe, companies that they intended on

21   soliciting, and Mr. Alrai said approximately seven to

22   eight of those companies responded.

23          Q.    Did he talk about how they were scored?

24          A.    Pardon me?

25          Q.    Did he talk about how the responses were

1    scored?

2        A.    Through e-mail, through telephone calls.

3        Q.    Did you ask Mr. Alrai where records regarding

4    the RFP process would be located?

5        A.    We did.

6        Q.    What did he say?

7        A.    He said he may have had some of those records

8    in his office.  He believed that some of them were with

9    the procurement department within United Way as well as

10   the accounting and finance department.

11       Q.    Did Mr. Alrai say who was responsible for

12   circulating the RFP to potential respondents?

13       A.    I don't know if he specifically said who was

14   responsible, but I -- I don't recall.

15       Q.    All right.  What did Mr. Alrai say about the

16   companies that responded to the RFP?

17       A.    He said there were three or four companies

18   that -- well, I should say there were seven to eight

19   companies that initially responded and then between

20   three and four companies were finalists, deemed

21   finalists in the process.

22       Q.    Did Mr. Alrai say that he met with the

23   respondents, the finalists?

24       A.    He said he met with -- over a two-month period

25   he met with the respondents as well as communicated with

1    them via e-mail and telephone.

2         Q.   Did Mr. Alrai talk about DigitalNet's RFP

3    response?

4         A.   He did.

5         Q.   What did he say?

6         A.   He said DigitalNet was one of three finalists.

7    There were three or four finalists -- there were

8    actually three finalists based on the documents that we

9    reviewed that were provided to us by United Way.

10   DigitalNet was one of those, one of the three finalists.

11   Two representatives from DigitalNet had actually met

12   with Mr. Alrai and Ms. Latimore at the United Way

13   office.

14        Q.   Did Mr. Alrai say whether or not DigitalNet

15   employees met with Mr. Burrows?

16        A.   Met -- I'm sorry?

17        Q.   With Mr. Burrows?  If you recall.

18        A.   I don't know if he specifically said that.  It

19   was my impression that he had.

20        Q.   Okay.  Did you talk with Mr. Alrai about

21   employees at DigitalNet?

22        A.   Yes.

23        Q.   Who did he mention as DigitalNet employees?

24        A.   As far as meeting at United Way or --

25        Q.   In general.

1        A.    In general.  He mentioned -- the primary

2   person that Mr. Alrai dealt with on a weekly or at least

3   a monthly basis was Mohammad Hassan.  Most of the

4   invoices that Mr. Alrai received from DigitalNet came

5   directly from Mr. Hassan via an e-mail or DropBox.  Kal

6   Wahbe was an employee.  He was considered the architect

7   of the IT infrastructure.  He also mentioned an

8   individual by the name of Mike.

9        Q.    Did you get Mike's last name?

10       A.    No, Mr. Alrai could not provide us the last

11  name of Mike.

12       Q.    What did he say about Mike?

13       A.    Mr. Alrai said that he believed Mike lived in

14  Massachusetts and that he did have his contact

15  information but he would have to provide it to us at a

16  later time.

17       Q.    Okay.  Who else did you talk about?

18       A.    He did refer to -- one of the two people that

19  had actually met with a United Way representative was

20  Kal Wahbe and then another individual whose name he

21  could not recall, he said that that person was in charge

22  of business development for DigitalNet.

23       Q.    Okay.  So he said there was another person in

24  charge of business development but he wasn't sure of the

25  name?

1       A.   He could not recall the name of that person.

2       Q.   Okay.  Did he talk about employees embedded at

3  United Way?

4       A.   I'm sorry?

5       Q.   Did he talk about employees embedded at United

6  Way?

7       A.   Yes.

8       Q.   And who were they?

9       A.   Nadeem Yousuf was one of the two.  He had been

10  there for five years, since the beginning of the

11  contract with DigitalNet, and then a Jasmin Iqbal I

12  believe is the second employee who was embedded at

13  United Way.  She had been there for about two years.

14       Q.   Just regarding Mohammad, did Mr. Alrai

15  indicate whether anyone else at United Way had ever met

16  Mohammad, Mohammad Hassan?

17       A.   I don't believe so.

18       Q.   So you mentioned part of the -- this was about

19  figuring out where United Way's data was stored.  Did

20  you ask Mr. Alrai about the companies hosting United

21  Way's servers?

22       A.   I believe we did ask him that, yes.

23       Q.   Okay.  And did he indicate what the companies

24  were, where the servers were located?

25       A.   You mean as far as the outside services that

1    provided that?

2         Q.   Yes.

3         A.   I believe it was VMWare was one company, and

4    then I think IBM provided the infrastructure, the

5    physical or the hardware for the IT services.

6         Q.   Was it IBM or OVH?

7         A.   It could have been OVH.  It was one of the

8    two.  I think one had succeeded the other at one point

9    in time.

10             MR. HUNTER:  May I approach, your Honor?

11             THE COURT:  Of course.  Throughout your exam.

12        Q.   Showing you a page from your handwritten

13   notes, would you just review that and see if it

14   refreshes your recollection?

15        A.   So Virtual Data Systems was the cloud

16   computing company.  OVH was part of the VMWare.

17        Q.   And again, this is all coming from Mr. Alrai?

18        A.   Yes.

19        Q.   Did you talk at all with Mr. Alrai about

20   DigitalNet invoicing?

21        A.   Yes.

22        Q.   Can you describe that conversation?

23        A.   We had asked him how he received the invoices.

24   As I just mentioned, he received them from Mohammad

25   Hassan via e-mail or DropBox.  After Mr. Alrai had an

1    opportunity to review that invoice or invoices, he then

2    provided them to accounts payable, at which time they

3    were later paid.

4         Q.   Okay.  What did Mr. Alrai say about how much

5    DigitalNet was paid by United Way?

6         A.   He estimated on an annual basis between

7    900,000 and a million dollars, I believe.

8         Q.   What services did Mr. Alrai say DigitalNet was

9    providing for that money?

10        A.   It provided all aspects of the IT.  They

11   provided the software, the services, the infrastructure.

12   They handled all of the issues, common issues that occur

13   on a daily basis.

14        Q.   Did you talk with Mr. Alrai about the due

15   diligence done at United Way when DigitalNet was brought

16   on in 2013?

17        A.   Yes.

18        Q.   Could you describe that conversation, please?

19        A.   He -- DigitalNet had provided to Mr. Alrai and

20   to Ms. Latimore information pertaining to DigitalNet

21   explaining the nature of the company, where it worked.

22   It worked in South Asia, the Middle East, as well as the

23   North Americas.  There were three principals of the

24   company.  And also at one point in time Ms. Latimore had

25   asked for references.  Mr. Alrai had communicated with

1    Mr. Mohammad Hassan asking for those references.  Three

2    of those references were provided by Mr. Hassan.

3        Q.   Did Mr. Alrai talk at all about any further

4    due diligence done with Jack Rotondi in 2016?

5        A.   2016 Ms. Latimore had some concerns about the

6    company.  They requested again additional references

7    from DigitalNet.

8        Q.   Did Mr. Alrai indicate whether or not that had

9    been provided?

10       A.   Yes, he did.

11       Q.   What did he say?

12       A.   I'm sorry?

13       Q.   What did he say?

14       A.   He just said that they dealt with Jack Rotondi

15   in obtaining those references.

16       Q.   Now, at some point in the conversation did

17   John Meyer come into the room?

18       A.   Yes.

19       Q.   And who is John Meyer?

20       A.   John Meyer was the leader of TBS, which is an

21   IT consulting business.  They had been hired by United

22   Way just prior to the interview of Mr. Alrai for

23   purposes of taking over control of the IT system after

24   Mr. Alrai was interviewed.

25       Q.   Okay.  Was Mr. Meyer looking for passwords?

1    A.    He was looking for passwords.  He came into

2    the room and advised us that the passwords that they had

3    obtained from interviews of other DigitalNet and United

4    Way employees were not working.  At that point in time

5    they could not access any of this data.

6        Q.    How did Mr. Alrai respond to this request for

7    passwords?

8        A.    He said -- Mr. Alrai said that he had that

9    information in his residence, at his residence.

10       Q.    Did he say where in his residence?

11       A.    He said it was in a safe in his residence.

12       Q.    What happened after Mr. Alrai said the

13   passwords were in a safe in his home?

14       A.    I asked Mr. Alrai if it was appropriate for

15   passwords such as these to be maintained at an

16   individual's residence.

17       Q.    How did Mr. Alrai respond?

18       A.    His reply to me was, you tell me.

19       Q.    What was his demeanor when he said that?

20       A.    I was taken aback by it.  I think it was

21   viewed as being somewhat aggressive.  I think -- my

22   sense is that he was acknowledging that it was not

23   appropriate for one person such as Mr. Alrai to have

24   access to those passwords, one and only person, and it

25   was inappropriate to maintain those passwords at

1  someone's residence rather than on the premises of his

2  employer.

3         MR. HARRINGTON:  Objection, Judge.  I'd move

4  to strike the testimony as speculative.

5         THE COURT:  I'm not going to strike it, but I

6  view it as a very subjective interpretation of the

7  interview, but that's what you asked for and that's what

8  he gave you for what it's worth.

9         MR. HUNTER:  Thank you, your Honor.

10         THE COURT:  I won't strike it, but --

11     Q.    Did you ever ask Mr. Alrai about AISA

12  Consulting?

13     A.    Yes.

14     Q.    Why did you ask him about that?

15     A.    AISA Consulting was a company that United Way

16  had initially discovered in early 2018 as a company that

17  was owned by Mr. Alrai, and they linked the address of

18  AISA Consulting to that -- to one of two addresses that

19  DigitalNet utilized.

20     Q.    What did Mr. Alrai say about AISA Consulting?

21     A.    He said that AISA Consulting was a company

22  that he owned.  It had a small office space in Windham,

23  New Hampshire.  He had used it for small consulting jobs

24  but had not used it in a while.

25     Q.    Okay.  Just for clarity, I'm saying AISA,

1    you're saying AISA.

2          A.    AISA, I'm sorry.

3          Q.    This is spelled A-I-S-A, all caps?

4          A.    Correct.

5          Q.    Did you also ask Mr. Alrai about an AISA or

6    AISA Corporation?

7          A.    Yes.

8          Q.    Why did you ask him about that?

9          A.    Mr. Alrai's resume indicated that he worked

10   for AISA Corporation from May of 1998 until 2006 before

11   he went to work for Robert Allen Group.  We also

12   observed or reviewed a public document that indicated

13   that Mr. Alrai was the only employee of AISA Corporation

14   beginning in July of 2004 in Reston, Virginia.

15               MR. HUNTER:  Okay.  Ms. Sheff, could you put

16   on the screen Exhibit 405?

17         Q.    Is this Mr. Alrai's resume?

18         A.    Yes.

19               MR. HUNTER:  Could you go to page 3, Ms.

20   Sheff?

21         Q.    Okay.  And is this the entry regarding AISA

22   Corporation in Reston, Virginia?

23         A.    Yes.

24               MR. HUNTER:  Ms. Sheff, could you please pull

25   up Exhibit 208?

1

2          Q.   This says AISA Corporation at the top.

3               MR. HUNTER:  Could you go down to the next

4   page, Ms. Sheff?

5          Q.   So this is Imran Alrai, Reston, Virginia.

6   Now, have you seen this document in particular before,

7   Mr. Mulvaney?

8          A.   No, I have not.

9          Q.   But you did a Lexis search; is that right?

10         A.   Correct.

11         Q.   And it discussed the incorporation of AISA

12  Corporation in Virginia?

13         A.   Yes.

14         Q.   This is a document that's in evidence.

15              MR. HUNTER:  Could you go to the next page,

16  Ms. Sheff?

17         Q.   That's the certificate of incorporation for

18  AISA Corporation?

19         A.   I've never seen this document.

20              MR. HUNTER:  Keep going, Ms. Sheff, just on

21  the screen.

22         Q.   Does this document list the directors of AISA

23  Corporation as Imran Alrai and Saima Alrai?

24              MR. HARRINGTON:  I'm just going to object,

25  Judge.  It's already in evidence.  The testimony has

1    been covered already.  This seems to be cumulative.

2            THE COURT:  That's true.  Why do you want to

3    cover it again?

4            MR. HUNTER:  Yes, your Honor, just to provide

5    the Court with context of AISA Corporation and Mr.

6    Mulvaney --

7            THE COURT:  Why don't you lead him a bit, hit

8    the highlights and move on.

9            MR. HUNTER:  Thank you, your Honor.

10       Q.   So, Mr. Mulvaney, this -- and the address for

11   Mr. Alrai, is that 11703-C Summerchase Circle in Reston,

12   Virginia?

13       A.   I'm sorry?

14       Q.   The address listed here is Reston, Virginia?

15       A.   Yes.  That's the same address that we observed

16   on a Lexis-Nexis document.

17       Q.   Thank you.

18            MR. HUNTER:  You can take this down, Ms.

19   Sheff?

20       Q.   Were you also aware that Mr. Alrai had listed

21   as references for himself when he came to United Way and

22   then later references for DigitalNet had been provided

23   from AISA Corporation?

24       A.   Well, when he began work -- well, prior to

25   being hired at United Way he had provided references

1    from AISA Consulting.

2         Q.    Okay.

3              MR. HUNTER:  Ms. Sheff, could you put Exhibit

4    601 on the screen, please?

5         Q.    Is this the document providing references?

6         A.    Yes.

7         Q.    And do you see Steve R. Anderson, Chairman and

8    CEO of AISA Corporation?

9         A.    Yes.

10        Q.    With an AISA Consulting e-mail address?

11        A.    Correct.

12        Q.    And then Faisal Bhatti, Senior Vice President

13   North America of AISA Corporation with an AISA

14   Consulting e-mail address.  Do you see that?

15        A.    Correct.  Yes.  Those are the two references

16   that we picked up on when we saw the e-mail addresses

17   for both of them.

18        Q.    Thank you.

19              MR. HUNTER:  And could you pull up Exhibit

20   613, please, Ms. Sheff?  Can you scroll down?  Up one

21   page.

22        Q.    This is a reference for DigitalNet; is that

23   correct?

24        A.    Correct.

25        Q.    And again, Steve R. Anderson, CEO, AISA

1   Systems Corporation in Fairfax, Virginia?

2        A.   A little different name, but it was still AISA

3   Systems Corporation, correct.

4        Q.   Okay.  And also Steve Anderson?

5        A.   Yes.

6        Q.   When you initially brought up AISA

7   Corporation, what did Mr. Alrai say at first?

8        A.   He initially said he didn't know anything

9   about the company.

10        Q.   Now, as you discussed it more -- and actually

11   after he said that, you were aware generally of these

12   documents or the fact that there was an AISA Corporation

13   registered to Mr. Alrai?

14        A.   Yes.  Correct.

15        Q.   So as you discussed AISA Corporation more, did

16   Mr. Alrai eventually admit to knowing of AISA

17   Corporation?

18        A.   He admitted to working for Mr. Anderson at

19   AISA Corporation.  He worked there for approximately

20   five years I think he said.  He managed the IT systems.

21   We asked Mr. Alrai how we could get in touch with Mr.

22   Anderson.  Mr. Alrai said that he had not kept in touch

23   with Mr. Anderson and could not provide us with any

24   contact information.

25        Q.   Did Mr. Alrai say anything about whether AISA

1    Consulting or AISA Corporation worked with DigitalNet?

2        A.    He said neither company worked with

3    DigitalNet.

4        Q.    So up to this point in the interview how was

5    Mr. Alrai's demeanor?  What was the tenor of the

6    conversation?

7        A.    Well, it wasn't an easy exchange of

8    information.  As I said earlier, he was very wary at the

9    outset and that wariness I think continued to the point

10   where he advised us that he no longer wanted to answer

11   any questions.

12       Q.    Okay.  Was that when you started asking more

13   pointed questions about AISA?

14       A.    It was shortly after that, yes.  We were

15   talking about AISA -- just before we started talking

16   about AISA we had asked if we could image his telephone.

17   He refused to provide us consent to do that.  We spoke

18   then again -- or I should say we spoke then about AISA

19   Consulting, and then we switched to his father, Munawar

20   Chaudhary.

21       Q.    And it was at that point he said he didn't

22   want to answer anymore questions?

23       A.    It was at that time he did not want to answer

24   any further questions.

25       Q.    And did he keep answering questions when you

1   asked him?

2       A.   Yes, he did.

3       Q.   So what did you ask Mr. Alrai about Munawar or

4   Mac Chaudhary?

5       A.   Well, we knew at that time that his father's

6   name was listed on an employee document that we observed

7   taken from his personnel folder.  It was emergency

8   contact information.  He had listed Munawar Chaudhary as

9   his father who lived in Massachusetts.

10          And then we showed him a document, it was a

11  Massachusetts application for a foreign LLC where Mr.

12  Munawar, middle initial A., Chaudhary's name appeared on

13  that document.

14          MR. HUNTER:  Ms. Sheff, would you put Exhibit

15  209 on the screen, please?

16          THE COURT:  I want to give the court reporter

17  a little break.  She's been going an hour and a half.

18  We'll take the morning break.

19          (RECESS)

20          THE COURT:  Mr. Hunter, you may proceed.

21          Mr. Mulvaney, you're still under oath.

22          THE WITNESS:  Yes, your Honor.

23      Q.   Mr. Mulvaney, we were talking about, you were

24  beginning to ask the defendant about Mac Chaudhary or

25  Munawar Chaudhary.  Is this the document you were

1    referring to, incorporation document?

2         A.   Yes, it is.

3         Q.   And we see here it says for DigitalNet

4    Technology Solutions, LLC with a principal business

5    office of 31 Lowell Road, Suite 1, in Windham, New

6    Hampshire?

7         A.   Correct.

8         Q.   And did you also see that same address

9    associated with AISA Consulting, Mr. Alrai's company?

10        A.   Yes.

11        Q.   And then at the bottom here, this is listing a

12   manager, Munawar A. Chaudhary, with that same address?

13        A.   Yes.

14             MR. HUNTER:   And Ms. Sheff, could you go to

15   the next page?

16        Q.   And again, Munawar Chaudhary is also listed up

17   here?

18        A.   Yes, that's correct.

19        Q.   As the person authorized to execute,

20   acknowledge, or deliver a record for the company?

21        A.   Yes.

22        Q.   So you asked Mr. Alrai -- did you ask Mr.

23   Alrai about Munawar A. Chaudhary?

24        A.   Yes, we did.

25        Q.   And can you describe that conversation,

1   please.

2        A.   We showed the document to Mr. Alrai, and he

3   said he was not aware of his father's name appearing on

4   the document.

5        Q.   And there's a signature on the bottom here.

6   What did Mr. Alrai say about the signature?

7        A.    Mr. Alrai said that he did not sign his

8   father's name to the document.

9        Q.   Did you ask Mr. Alrai about his father's

10  middle initial?

11       A.   Yes.

12       Q.   What did Mr. Alrai say?

13       A.   He did not know what the middle initial A.

14  stood for.

15       Q.   Did you also ask Mr. Alrai about the United

16  Way conflict of interest form that he signed?

17       A.   Yes.

18            MR. HUNTER:  Ms. Sheff, can you please pull up

19  Exhibit 412, and please go to the 2016 form?

20       Q.   Is this the form you showed Mr. Alrai?

21       A.   Yes, it is.

22       Q.   Okay.  What did you ask him about this?

23       A.   I asked Mr. Alrai if the form was accurate.

24       Q.   How did he respond?

25       A.   He said he did not know.  He refused to answer

1    yes or no.

2         Q.   Okay.

3              MR. HUNTER:   Could you go to the next page,

4    Ms. Sheff?

5         Q.   This appears to be signed by Mr. Alrai on

6    March 15, 2016?

7         A.   Yes.

8         Q.   Did you ask Mr. Alrai about his wife working

9    at Pentucket Bank?

10        A.   Yes.

11        Q.   What did he say?

12        A.   He confirmed that his wife worked as a manager

13   at the Pentucket Bank.

14        Q.   Was that in Salem, New Hampshire?  Did you ask

15   him about the location?

16        A.   I don't believe we asked him what location it

17   was.

18        Q.   At the end of the interview did you ask Mr.

19   Alrai again about whether he manipulated the scoring

20   process --

21        A.   Yes.

22        Q.   -- of the RFP?  The RFP that led to DigitalNet

23   being hired by United Way?

24        A.   Yes.

25        Q.   And what did from Mr. Alrai say?

1       A.   Mr. Alrai said that he did not manipulate the

2  scoring system at all with respect to the RFP and he did

3  not provide any inside information or sensitive

4  information to DigitalNet prior to the awarding of the

5  contract.

6       Q.   At any point in the interview did Mr. Alrai

7  indicate or say that he had provided false information

8  to United Way about DigitalNet?

9       A.   No, he did not.

10      Q.   Did he say he provided false information about

11 DigitalNet's customers?

12      A.   No.

13      Q.   Or DigitalNet's experience?

14      A.   No.

15      Q.   At any point did Mr. Alrai indicate that he

16 owned DigitalNet?

17      A.   No.

18      Q.   Did he indicate in any way in this

19 conversation that he was associated with DigitalNet in

20 any way?

21      A.   No.

22           MR. HUNTER:  Nothing further at this time,

23 your Honor.

24           THE COURT:  Cross.

25                     CROSS-EXAMINATION

1    BY MR. HARRINGTON:

2        Q.    Good morning, Mr. Mulvaney.

3        A.    Good morning.

4        Q.    How are you today, sir?

5        A.    Fine, thank you.

6        Q.    Sir, let me ask you, you were an FBI agent I

7    think you indicated for a while, over 25 years?

8        A.    26 years.

9        Q.    26.  And as part of that I would assume your

10   duties were to investigate criminal activity?

11       A.    Correct.

12       Q.    And part of that would be to question suspects

13   and other witnesses?

14       A.    Yes.

15       Q.    And one of the things that you want to do when

16   you're questioning a suspect or a witness is make sure

17   that all the information that you were able to obtain

18   from them is accurate and correct when you obtain it

19   from them, right?

20       A.    Yes.

21       Q.    And one of the ways that you do that when

22   you're interviewing somebody is you might take notes,

23   correct?

24       A.    Correct.

25       Q.    And then you would take those notes and create

1   a report, usually in close proximity to the time you

2   take the notes, right?

3          A.    Correct.

4          Q.    Usually same day?

5          A.    Within the FBI it was a five-day rule.

6          Q.    So pretty quick?

7          A.    Correct.

8          Q.    Additionally, another way, probably the most

9   accurate way would be to actually record the interviews,

10  whether it's a questioning of a suspect or the

11  questioning of a witness, because you're getting their

12  words on tape, right?

13         A.    We were prohibited from recording interviews

14  in the FBI unless we got authorization.

15         Q.    Okay.  I'm talking about like a witness

16  interview or a questioning of a suspect.  You wouldn't

17  sit down and ask, you know, hey, I'm going to question

18  you about something, is it okay if I record you?

19         A.    It is one method, but it's not a method that

20  I've ever used.

21         Q.    Okay.  You don't have to get special

22  permission if they agree to a recording, right?

23         A.    In what instance now?  In this --

24         Q.    In the FBI?

25         A.    No, I would have to get authorization before

1    doing it, and then, of course, yes, we would have to ask

2    for consent from the individual that we were

3    interviewing to be taped, correct.

4         Q.   Okay.  So you would agree with me, and tell me

5    if you don't, would you agree with me that recording an

6    interview is more accurate than taking notes about the

7    interview?

8         A.   You know, I don't know, because I've never

9    recorded a conversation -- or an interview.

10        Q.   So let's talk about you as a human being and a

11   person who is intelligent and common sense, right?

12        A.   Yes.

13        Q.   So let me ask you the question again.  And if

14   you don't know, you don't know, and if you disagree, you

15   disagree.

16             If you interview somebody, whether it's a

17   suspect or a witness, and you record that interview on

18   an audio or a videotape, would you agree with me that

19   that would be potentially a more accurate accounting of

20   what that person said versus your handwritten notes of

21   the interview?

22        A.   Potentially, yes.

23        Q.   Potentially?

24        A.   Potentially, sure.

25        Q.   So you think that your handwritten notes of a

1    lengthy interview would be just as accurate as the

2    actual recording?

3         A.   My interview notes reflect the interview of

4    Mr. Alrai.

5         Q.   I'm talking to you in general terms right now,

6    not about Mr. Alrai.

7              THE COURT:  I accept the proposition that

8    audio recording is a more accurate representation of

9    exactly what was said than notes.

10             MR. HARRINGTON:  Thank you, Judge.

11        Q.   Now, you indicated I think that you became

12   involved in this matter -- was it in May of 2018?

13        A.   Correct.

14        Q.   And your first interaction with Mr. Alrai was

15   June 12th of 2018?

16        A.   Yes.

17        Q.   And the notes that you took, they've been

18   provided in discovery.  If you need to take a look at

19   them, let me know, but it looks like it's about, you

20   know, 14 pages of notes, and that was over the course of

21   about a three-hour interview, right?

22        A.   Correct.

23        Q.   And you also did a summary.  I would

24   assume these are yours, and if you need to take a

25   look -- let me just pop it up here real quick to make

1    sure that -- so we were kind of given these notes.  Are

2    those kind of notes that you kind of reduced or is that

3    not your work product?

4        A.   No, I prepared this document.

5        Q.   Okay.  And this would be kind of your notes of

6    the interview with Mr. Alrai; is that fair to say?

7        A.   That was prepared based on my review of my

8    handwritten notes, yes.

9        Q.   Okay.  So you took the handwritten notes and

10    then made these further notes.  And you agree with me

11    it's not a narrative, it's just notes, right?

12        A.   Correct.

13        Q.   Did you write a report?

14        A.   No.

15        Q.   Okay.  And so let me ask you about what you

16    did in preparation for your testimony here today.

17        Did you review your handwritten notes as well

18    as your typed notes?

19        A.   I did.

20        Q.   Did you review any reports of any kind?

21        A.   I reviewed the documents that we reviewed

22    prior to Mr. Alrai's interview.

23        Q.   Okay.  Did you review any law enforcement

24    reports?

25        A.   No.

1      Q.   Okay.  Were you prepared for your testimony by
2  the U.S. Attorney's Office?
3      A.   I was.
4      Q.   How many times did you meet with the U.S.
5  Attorney's Office in preparation of your testimony?
6      A.   Once.
7      Q.   Okay.  And how long did your meeting with the
8  U.S. Attorney's Office last?
9      A.   It was less than an hour.  45 minutes
10 approximately.
11     Q.   Okay.  And during that preparation were you
12 shown any reports from law enforcement to refresh your
13 recollection about anything?
14     A.   No.
15     Q.   Okay.  So in regard to what your testimony is,
16 it's really based upon your notes, both handwritten and
17 typewritten, right?
18     A.   Correct.
19     Q.   As well as you made kind of a general
20 reference to documents that you had reviewed as part of
21 your internal investigation?
22     A.   Yes.
23     Q.   Okay.  Now, when you made these notes, you
24 have -- your handwritten notes have a date on it of June
25 12th, obviously the same day?

1       A.   Yes.

2       Q.   Do you know when your typewritten notes were

3  done?

4       A.   I believe I prepared those in December of

5  2018.

6       Q.   So about six months after, and part of your

7  typewritten notes is based on your handwritten notes?

8       A.   Correct.

9       Q.   And then you gave a recorded interview -- or I

10 shouldn't say recorded.  You gave an interview to the

11 FBI on September 5th of 2019.  Do you recall that?

12      A.   Yes.

13      Q.   And there are a number of individuals present

14 for that interview, correct?

15      A.   Yes.

16      Q.   And that included the United Way attorney,

17 John Commisso?

18      A.   Correct.

19      Q.   And is he the one who had hired CBIZ?

20      A.   Yes.

21      Q.   And you also had -- CBIZ's attorney was

22 present, correct?

23      A.   Correct.

24      Q.   And was it just one attorney from CBIZ or was

25 it two attorneys?

97

1      A.    There were two attorneys representing CBIZ.

2      Q.    Okay.  And then there were also several

3 attorneys from the U.S. Attorney's Office, correct?

4      A.    Yes.

5      Q.    And there was also a couple of case agents,

6 Ms. Laroe and Darlene Cacace, correct?

7      A.    Correct.

8      Q.    And that interview was approximately 15 months

9 after your interview of the defendant on June 12th of

10 2018, right?

11     A.    Yes.

12     Q.    And between June 12th of 2018 and your

13 interview on September 5th of 2019, other than the notes

14 and the typewritten notes you've indicated there was no

15 other reports prepared by you detailing your interview

16 with the defendant, correct?

17     A.    Correct.

18     Q.    And so you were at that point going just off

19 of your memory?

20     A.    Yes.

21     Q.    Okay.  Did you have your notes with you while

22 you were being interviewed?

23     A.    Yes.

24     Q.    Okay.  Did you have to refer to your notes

25 while you were being interviewed?

1      A.    At times I did, yes.

2      Q.    Okay.  And likewise, not everything that you

3  told to the FBI was specifically contained within your

4  notes.  Part of it is just you going based off your

5  recollection and memory of questions and answers between

6  you and Mr. Alrai, correct?

7      A.    It was based on my recollection as well as my

8  handwritten notes, correct.

9      Q.    That's all I'm getting at is not everything is

10 in your notes, right?

11     A.    Correct.

12     Q.    Okay.  And in that regard you agree with me

13 the things that aren't in your notes we have to rely on

14 the accuracy of your memory and your recollection?

15     A.    Yes.

16     Q.    And you agree with me that even here today

17 several times the government has had to come up and show

18 you your notes so that they could refresh your memory?

19     A.    Yes.

20     Q.    Because memory is imperfect, isn't it?

21     A.    Yes.

22     Q.    And it fades over time, doesn't it?

23     A.    Yes.

24     Q.    And that's actually one of the reasons why a

25 recorded interview is better than notes, right?

1        A.    Yes.

2        Q.    You had actually confirmed I think, and I just

3  want to make sure I understand, you had indicated in

4  your questioning of Mr. Alrai you had asked him about

5  the status of the IT environment prior to him coming on.

6  Do you remember that?

7        A.    Yes.

8        Q.    Okay.  And in essence what he said, it was in

9  bad shape in a nutshell, right?

10       A.    Correct.  Yes.

11       Q.    And you independently actually confirmed in

12  your internal investigation with the United Way that

13  their IT environment was actually not in good shape

14  before they brought Mr. Alrai on, correct?

15       A.    Correct.

16       Q.    During questioning you indicated that Mr.

17  Meyer had come in the room at one point.  I'm switching

18  gears a little bit.  And you indicate Mr. Meyer came in

19  the room and had some questions about passwords, right?

20       A.    Yes.

21       Q.    And was he in the room for very long?  Was it

22  five minutes, two minutes, a half an hour, an hour?

23       A.    At most he was in there for just a couple of

24  minutes.  I don't recall him being in there for an

25  extended period of time.

1     Q.   Okay.  So if he testified that he had

2  questioned Mr. Alrai for 30 or 40 minutes, that would be

3  inaccurate, right?

4     A.   I don't know what he testified to.  I don't

5  know if he ever interviewed Mr. Alrai.

6     Q.   So let me be more specific.  If he testified

7  that he had questioned Mr. Alrai for 30 or 40 minutes

8  while he was in the interview room with you and Mr.

9  Commisso, that would be inaccurate, correct?

10     A.   That's not my recollection, correct.

11     Q.   Your recollection is it was just a few

12  minutes?

13     A.   Correct.

14     Q.   Now, let me ask you in regard to that.  During

15  that period of time when Mr. Meyer was asking about the

16  passwords, you indicate that Mr. Alrai had talked about

17  the passwords being in a safe at his residence, right?

18     A.   Yes.

19     Q.   And did you or anybody that you're aware of

20  pass that information along to Agent Donnelly or Agent

21  Laroe or anybody else in law enforcement?

22     A.   I don't recall if we did or not.  It seems to

23  me that we did pass that on to them, yes.

24     Q.   Okay.  And when you say that you recall that

25  you did pass that on, is it your recollection that it

1    was you specifically that passed that on to -- who?

2        A.   Well, I never spoke to Mr. Donnelly until

3    today.

4        Q.   Okay.

5        A.   I think he was present during a telephone call

6    before the June 12th interview, but I don't recall who

7    passed that information on to Mr. Donnelly.

8        Q.   Okay.  So you don't -- obviously if it was

9    you, you'd recall that, right?  Or maybe not.

10       A.   Yeah, I just don't recall having that

11   conversation or discussing that specific information.

12   That's certainly not to say that somebody else passed it

13   on, but I don't recall having that conversation with

14   someone.

15       Q.   Okay.  But you believe that information was

16   passed on to the agents?

17       A.   I believe it was.

18       Q.   Okay.

19       A.   I'm just not certain.

20       Q.   Okay.  And you were aware that they were

21   searching Mr. Alrai's residence that same day you were

22   questioning Mr. Alrai, right?

23       A.   We did not know -- we knew that they had

24   sealed affidavits for search warrants.  We did not know

25   where they were searching.  We did not know if they were

1    searching his house or the AISA Consulting location.  We

2    just didn't know until after the interview.

3         Q.   Okay.  And so just to make sure that my

4    question is a little more accurate, not necessarily that

5    they were searching his house, you were aware that the

6    FBI was executing search warrants that same day that you

7    were questioning Mr. Alrai.  I'm not focusing in on

8    where.  I'm just talking about the fact that they were

9    executing search warrants that day.

10        A.   I knew they were going to execute search

11   warrants.  I didn't know when they were going to do it.

12   I assumed that they were doing it that day, but they

13   never disclosed to us when those search warrants would

14   be executed.  They did not provide us very much

15   information about their ongoing criminal investigation

16   at any time.

17        Q.   Okay.  And if you have a memory of it, would

18   you agree with me that the information about passwords

19   being in the safe was passed on the same day that the

20   FBI was executing the search warrants?

21        A.   If I had a memory of it -- I don't have a

22   memory of that specific information being passed on.

23        Q.   Fair enough.

24        A.   It may have been passed on by someone else.  I

25   just do not have a recollection of that conversation.

1      Q.    And in that regard, let me ask you about --
2  you were the one who was in charge of the CBIZ
3  investigation, right?
4      A.    Yes.
5      Q.    Or excuse me, for CBIZ of the investigation
6  into Mr. Alrai?
7      A.    Yes.
8      Q.    Okay.  Did you have other -- I don't know if
9  you'd refer to them as case agents.  I'm not sure.  What
10  would be the terminology of someone working with you?
11      A.    No, I was the only representative from CBIZ
12  involved in the investigation.
13      Q.    Okay.  And if that's the case, wouldn't that
14  follow that you would be the only one that would pass on
15  to the FBI or Homeland Security that passwords were in
16  the safe?
17      A.    It's possible that Mr. Commisso passed that
18  information on.
19      Q.    Oh, okay.  Fair enough.  But apart from Mr.
20  Commisso, you're the only one who is in the room with
21  Mr. Alrai --
22      A.    It was either me or Mr. Commisso.  I don't
23  recall any representatives from the United Way ever
24  speaking with the FBI.  We were the ones that were
25  speaking with the FBI.

1    Q.    To your knowledge was Mr. Commisso at any

2    point leaving the room and making telephone calls?

3    A.    During the interview?

4    Q.    During your interview with Mr. Alrai.

5    A.    I don't know -- he left the room on several

6    occasions.  I don't recall why he was leaving the room.

7    He may have been making some telephone calls.  I just

8    don't recall.

9    Q.    And to your personal knowledge, are you aware

10   of whether he was communicating with the FBI or Homeland

11   Security during your questioning of Mr. Alrai?

12   A.    Again, I don't have a distinct recollection of

13   that occurring.  It may have, but I just don't recall

14   that.

15   Q.    Okay.  Was there a security guard posted

16   outside the door of the room in which you were

17   questioning Mr. Alrai?

18   A.    I believe there was -- United Way had hired a

19   retired law enforcement officer for safety reasons.  I

20   don't recall where that person was during the interview,

21   but he was in the vicinity I believe.

22   Q.    Okay.  And obviously the purpose of that is to

23   make sure that he would be near Mr. Alrai if necessary;

24   is that fair to say?

25   A.    He was there just to protect any of the

1    employees from anything that may occur.

2        Q.   Okay.  And your memory is -- you don't have a

3    recollection of him being posted outside the door to the

4    interview room?

5        A.   I don't recall him being posted outside the

6    door.  I recall him being nearby, but certainly not

7    outside the door.

8        Q.   Okay.  And you indicated this interview of Mr.

9    Alrai took about three hours?

10       A.   Yes.

11       Q.   And additionally, you advised him that he was

12   required to cooperate with your questioning as an

13   employee of the United Way?

14       A.   Yes.

15            MR. HARRINGTON:  Judge, I don't have any other

16   questions for Mr. Mulvaney.

17            THE COURT:  Redirect?

18            MR. HUNTER:  Briefly.

19                     REDIRECT EXAMINATION

20   BY MR. HUNTER:

21       Q.   Mr. Mulvaney, you were asked a number of

22   questions about whether information about a safe in Mr.

23   Alrai's home was communicated to the FBI.  I believe you

24   testified that you don't know if that information was

25   ever communicated?

1      A.    Yes.  That's correct.

2      Q.    You didn't communicate it?

3      A.    I don't recall relating that information to

4  the FBI.

5      Q.    Okay.  So you don't know if it was

6  communicated or not?

7      A.    I don't know.  I only recall after the

8  interview that we were advised by the FBI that a safe

9  was not in the house.

10     Q.    Okay.

11     A.    But that's the only recollection I have of a

12 conversation pertaining to a safe being in Mr. Alrai's

13 house.

14     Q.    Okay.  And you also testified about Mr.

15 Commisso going in and out of the room.  You don't

16 know -- again, I think you were asked to speculate a

17 little bit about what he might be doing, but you don't

18 know?

19     A.    I don't recall.  There was a lot going on in

20 the office that day.  There were other interviews being

21 conducted simultaneously with Mr. Alrai's interview, so

22 we were interrupted at times, both of us, to respond to

23 questions or concerns that other people had.

24     Q.    Okay.  And you would exit the room

25 occasionally, too, to deal with --

1      A.   Yes.  Correct.  Yes.

2      Q.   And everything you testified to today is based

3  on your review of your notes and memory of the parts of

4  the interview that you were present for; is that

5  correct?

6      A.   That's correct.

7           MR. HUNTER:  Nothing further, your Honor.

8           THE COURT:  Any recross?

9           MR. HARRINGTON:  Briefly, Judge.

10                    RECROSS-EXAMINATION

11  BY MR. HARRINGTON:

12      Q.   You indicated that you learned after the

13  search of the residence that there was no safe and that

14  the FBI communicated that to you?

15      A.   Yes.

16      Q.   They communicated that to you the same day of

17  the search?

18      A.   I believe it was the following day.  I'm not

19  sure.  It was either that day or the following day.  It

20  was in close proximity to the actual interview.

21           I remind you that at that point in time the

22  greatest concern we had was locating these servers.  We

23  had no idea where this was, so it was incredibly

24  important that we obtain those passwords as quickly as

25  possible.

1       Q.    Which agent communicated to you regarding the

2    safe?

3       A.    Pardon me?

4       Q.    Which agent communicated to you regarding the

5    safe?

6       A.    Special Agent Jill Lavoie.

7       Q.    Jill Laroe or --

8       A.    I'm sorry, Jill Laroe, yes.

9       Q.    Communicated to you regarding -- okay, so they

10   were specifically looking for a safe and then they

11   communicated to you that they found no safe?

12      A.    Yes.  That's my recollection.

13      Q.    And does it strike you as odd, sir, that they

14   would communicate to you regarding not finding a safe if

15   there was no communication from you or counsel in this

16   case about the safe?

17      A.    Well, I didn't say there was no communication

18   from us to the FBI.  I don't have an independent

19   recollection of speaking with the FBI and relaying that

20   information.

21      Q.    Okay.  One of the things that you were

22   concerned about, and you specifically note this in your

23   interview, is that you did not want to appear to be an

24   agent of the FBI or any law enforcement agency, right?

25      A.    Certainly, yes.

1    Q.   Because if you were considered to be an agent

2    of the FBI in this particular situation, then there

3    would be a whole different scenario that might come into

4    play here regarding Miranda warnings and things of that

5    nature, correct?

6         A.   Yeah, potentially, sure.

7              MR. HARRINGTON:  I have no other questions,

8    Judge.

9              THE COURT:  You're excused.  Thank you.

10             THE WITNESS:  Thank you.

11             MS. LE:  Good morning, your Honor.

12             THE COURT:  Good morning.

13             MS. LE:  The government calls Michele Curtis

14   to the stand, please.

15                       MICHELE CURTIS

16        having been duly sworn, testified as follows:

17             THE CLERK:  For the record, please state your

18   full name and spell your last name.

19             THE WITNESS:  Michele Curtis.  The last name

20   is C-U-R-T-I-S.

21             THE CLERK:  Thank you.  Please be seated.

22                     DIRECT EXAMINATION

23   BY MS. LE:

24        Q.   Good morning, Ms. Curtis.

25        A.   Good morning.

1          Q.    If you could just keep your voice up and speak

2     into the microphone.

3          A.    Okay.

4          Q.    Thank you very much.  Ms. Curtis, where do you

5     work?

6          A.    At Pentucket Bank in Haverhill, Mass.

7          Q.    How long have you been with Pentucket Bank?

8          A.    I started in March of 2014.

9          Q.    Thank you.  And just for the record, would you

10    spell Pentucket?

11         A.    P-E-N-T-U-C-K-E-T.

12         Q.    Thank you, ma'am.  What did you do prior to

13    joining Pentucket Bank fifteen (sic) years ago?

14         A.    I worked as a business manager for two

15    different nonprofits.

16         Q.    I'm sorry.  I said that you worked there for

17    fifteen years.  You haven't, right?  How long have you

18    been with Pentucket?

19         A.    Pentucket Bank, just shy of six years.

20         Q.    Six years.  Thank you.

21               And what did you do before you joined

22    Pentucket Bank?

23         A.    I was a business manager for two nonprofit

24    corporations in Massachusetts.

25         Q.    Okay.  And the location you work at in

1   Haverhill, is that the main office or a branch location?

2       A.   I believe they consider it the main office.

3   They have the administration office in the new building

4   across the street, but I would say it's the main office.

5       Q.   Thank you very much.  What is your current job

6   title?

7       A.   I'm vice president of customer support and the

8   team supports deposit operations and electronic banking.

9       Q.   And have you held that position the entire

10  time you've been employed by Pentucket Bank?

11      A.   Yes, I have.

12      Q.   What are your responsibilities on a general

13  level?

14      A.   I manage a team of ten persons who, as I said,

15  they support all the functions to support the customers

16  for their checking accounts, their certificate accounts,

17  and then also manage the electronic banking side.  So we

18  have customers with their online banking questions,

19  their bill pay process, their ACH transactions, their

20  wires.

21      Q.   Thank you.  And the group that works on wire

22  transactions, where are they located?

23      A.   They work for me in the team at 1 Merrimack

24  Street in Haverhill.

25      Q.   Thank you, ma'am.  So I'd like to talk briefly

1    about ACH transactions which you just mentioned.  Does

2    Pentucket have a provider that helps process its ACH

3    transactions?

4         A.    Yes.  That would be our core vendor, Finastra.

5         Q.    How do you spell Finastra?

6         A.    F-I-N-A-S-T-R-A.

7         Q.    Is there an online portal or something like

8    that?

9         A.    Well, we are outsourced so -- our service

10   bureau, so all of our computers are -- we can log into

11   the system.

12        Q.    Okay.  So you at Pentucket communicate with

13   Finastra online?

14        A.    Yes.

15        Q.    So when a Pentucket customer receives an ACH

16   credit to their account, what if anything does Pentucket

17   have to do?

18        A.    We don't have to do anything.  We receive the

19   transactions, they call it in the warehouse, and they

20   get released on their effective date and automatically

21   post.

22        Q.    Thank you very much.  Now, I'd like to talk a

23   little bit about wire transfers.

24              When Pentucket Bank wants to initiate a wire

25   transfer, how would they go about initiating that

1    transaction?

2         A.    So when one of our customers wants to do a

3    wire?

4         Q.    Yes, ma'am.

5         A.    Well, they have choices of how they want to do

6    their wire.  So we have -- the process is centralized at

7    their location.  So they can either come into one of our

8    branch offices to do paperwork to do a wire or they can

9    choose to use our business online banking platform, and

10   then if they did that, they would get a wire transfer

11   agreement, or they can also get a wire transfer

12   agreement, and if they don't want to use the computer,

13   then they can fax the wire to us, but we have a

14   centralized wire team.

15        Q.    Okay.  So are customers generally allowed to

16   e-mail the wire transfer form?

17        A.    To the operations center?

18        Q.    Yes, ma'am.

19        A.    No.

20        Q.    How about to the local branch?

21        A.    That's not supposed to be the process.  If you

22   go to the branch -- the whole point is to properly

23   authenticate and identify the customer and make sure

24   that person has authority to transact the wire.  So if

25   they're coming into the branch, it's the branch's

1    responsibility to meet with the customer and identify

2    them and make sure the funds are available and such.  So

3    it's not an e-mail, it's a face-to-face.

4         Q.   Okay.  And does Pentucket Bank have a written

5    policy regarding how wire transactions are supposed to

6    be processed, how the customer is supposed to submit the

7    forms to the branch location?

8         A.   Yes, we have a policy and procedures.

9         Q.   Thank you.  So what happens once a customer

10   fills -- is there a form that a customer fills out to

11   initiate the wire?

12        A.   Yes, it's a transaction form, and on that form

13   it's where you would put all the details of how the

14   money is supposed to get to the end desired location.

15        Q.   Okay.  So what happens once a client, the

16   customer submits the form to the local branch?  What's

17   the next step?

18        A.   So the customer would fill it out with the

19   retail staff and it would be properly completed and

20   checked and everything, and then they can fax it over to

21   us in operations or they can scan it and e-mail it to

22   operations, and then they either have to call us or

23   e-mail us to say that it's coming so that we're

24   expecting it.

25        Q.   So in addition to taking the forms and filling

1    it out with the client, what else does the bank

2    representative at the local branch do?

3        A.   So obviously they would identify the customer,

4    make sure that they're authorized, get their

5    identification, make sure the funds are in their

6    account, make sure the funds are collected, and then

7    they actually would withdraw the funds for the wire.

8        Q.   What does that mean, collect the funds, in

9    this context?

10       A.   They just want to make sure -- like, say if a

11   check had been deposited yesterday, that maybe that

12   check hasn't been cleared yet.  So you want to make sure

13   the funds are available to be withdrawn.

14       Q.   Would the bank representative at the local

15   branch go into the computer and debit the money from the

16   account?

17       A.   Yes.  Yes.

18       Q.   Okay.  And so if you are at a branch say in

19   Salem, New Hampshire, and you need to process a wire

20   transaction, where does the money actually go or where

21   does that flow of information go from the local bank to

22   Haverhill; is that what happens?

23       A.   So we're a realtime bank.  So the money will

24   automatically come out of the customer's account and go

25   into, like, a suspense general ledger account, because

1   then we're going to transfer it to the Federal Reserve.

2        Q.   Okay.  Thanks.  So who communicates with the

3   Federal Reserve?

4        A.   The operations center does through a program

5   that we use called WITS.  So we key in the wire

6   information into the WITS program.  Employee 1 does

7   that.  Then employee 2 verifies the data and transmits.

8   So everything is dual checking, dual authority, and then

9   that program is interfaced to transmit the data to the

10  Federal Reserve.

11       Q.   You used an acronym WITS, is that W-I-T-S?

12       A.   Yes.  That's a wire transfer system, a piece

13  of software, software program.

14       Q.   You referred to employee 1 and employee 2.

15  Where are those two employees located?

16       A.   Both said 1 Merrimack Street and customer

17  support.

18       Q.   Okay.  Thank you.  So after this information

19  is communicated to the Federal Reserve, what happens

20  next?  Say the money is all there, the forms are

21  properly filled out, you communicate to the Federal

22  Reserve, what happens next?

23       A.   So the money would go on its way from there

24  and the next day we get our -- well, you get a

25  confirmation from the Federal Reserve, a unique code

1    that they identify to each transaction called an IMAD,

2    and then the next day we get our accounts from the

3    Federal Reserve.  We balance our account every day with

4    them.

5         Q.   Okay.  Ms. Curtis, if a customer from

6    Pentucket would like to send a wire internationally, are

7    there any differences in place versus domestic wires?

8         A.   There are a few differences.  We're a small

9    community bank so we don't have a lot of corresponding

10   banking accounts.  So we ask the customer if it's going

11   to a foreign country that you have to provide us with

12   the U.S. corresponding bank that it's to go through if

13   it's in U.S. dollars.

14             If the customer wants to send foreign dollars,

15   we do have a corresponding banking relationship with

16   Bankers' Bank.  But anything in U.S. dollars you'd go

17   through a corresponding bank say in New York, for

18   example, to further credit the final destination.

19        Q.   So it sounds like at least one more banking

20   entity is involved before the money goes to its final

21   destination?

22        A.   Normally in a foreign transaction, yes,

23   especially with a bank our size.

24             MS. LE:  Your Honor, may I approach the

25   witness?

1            THE COURT:  You may.

2            MS. LE:  Your Honor, bringing the witness

3   Exhibit 524.

4       Q.   Ms. Curtis, are you familiar with these

5   international wire transfer forms that are in Exhibit

6   524?

7       A.   Yes.

8       Q.   And you reviewed these in preparation for your

9   testimony today; is that right?

10      A.   Yes.

11      Q.   Would you tell us the date of the first wire

12  transaction?

13      A.   September 19, 2013.

14      Q.   What is the date of the last wire transaction?

15      A.   May 21, 2018.

16      Q.   And Ms. Curtis, if you know, in that top

17  left-hand corner where it has a name and then an

18  address, line two, is the address on each of these forms

19  300 Brickstone Square, Suite 201, Andover,

20  Massachusetts?

21      A.   Yes.

22      Q.   And do you know if -- what country did all of

23  these wire transactions go to?

24      A.   To Pakistan.

25      Q.   And do you know which branch initiated each of

1    these wire transactions?

2         A.    Salem, New Hampshire.

3         Q.    Thank you.  Let's go to the very first wire

4    transaction form that's Bates number page PEN-01963.  Do

5    you see that?

6         A.    Yes.

7         Q.    What is the person whose name is listed as the

8    originator?

9         A.    Munawar Chaudhary.

10        Q.    Okay.  Do you know if the other forms used the

11   same name or if there was a different name that was used

12   as the originator?

13        A.    The originator on the other forms was

14   DigitalNet Technology.

15        Q.    Thank you very much.

16             MS. LE:  May I approach the witness, your

17   Honor?

18             THE COURT:  You may throughout the

19   examination.

20             MS. LE:  Thank you very much.

21        Q.    Ms. Curtis, I'm giving you a stack of forms,

22   some of which I'll review with you and some of which I

23   won't, but I'd like you to start looking at Exhibits 119

24   and 119a.  When you're ready, just let me know.

25        A.    Okay.

1       Q.    Okay.  So I'd like to start with Exhibit 119.

2   And if we can go to page ending PEN-02784.

3             Do you see this e-mail at the bottom there

4   from April 16, 2014?

5       A.    Yes.

6       Q.    At 8:31 a.m.?

7       A.    Yes.

8       Q.    Can you just into the record read the author

9   of the e-mail, the name of the author?

10      A.    Munawar Chaudhary.

11      Q.    And what e-mail address did this person use?

12      A.    DigitalNet support, info@digitalnet.us.

13      Q.    Thank you.  And it's addressed to Brenda

14  Hernandez; do you see that?

15      A.    Yes.

16      Q.    Who's Brenda Hernandez?

17      A.    She's an employee at the Salem, New Hampshire,

18  branch.

19      Q.    And I'll just read the body of the e-mail into

20  the record:

21            "Good morning, Brenda.  I am looking to send a

22  wire to DigitalNet's account in Pakistan for $15,000

23  from the DigitalNet checking account at Pentucket.  You

24  have all the instructions on file, as we send money

25  every month.  Could you please get the paperwork ready

1    and let me know via reply to this e-mail.  I will stop

2    by later to sign it.  Thanks for all your help as

3    always.  Regards, Munawar Chaudhary."

4             Is that correct, ma'am?

5        A.   Yes.

6        Q.   Okay.  Based on your review of the e-mail

7    exchange here, do you know what date this wire transfer

8    of $15,000 to Pakistan was processed?

9        A.   I believe it was on the same day.

10       Q.   If you look up above.

11       A.   Oh.  I see.  April 21, 2014.

12       Q.   Thank you, ma'am.

13            If you'll turn to Exhibit 119a, and I'll ask

14   you to flip to the last page which is Bates number

15   PEN-02933.

16       A.   Okay.

17       Q.   What is this form that we're looking at?

18       A.   This is our internal foreign wire transfer

19   request form.

20       Q.   Okay.  So this is the wire transfer form that

21   we're talking about in this transaction?

22       A.   Yes.

23       Q.   What does a check mark indicate to you?

24       A.   Those are my employees double checking the

25   data entry.  So as I said, employee number 1 enters it

1    into the WITS system, and then employee number 2

2    verifies the accuracy before they hit transmit to the

3    Federal Reserve.

4         Q.   So employees 1 and 2, where are they located?

5         A.   At 1 Merrimack Street in customer support.

6         Q.   Thank you.  And that's in Haverhill; is that

7    right?

8         A.   Excuse me?

9         Q.   That's in Haverhill?

10        A.   Yes.

11        Q.   Thank you very much.  Do you recognize any of

12   the signatures or initials on this form?

13        A.   Yes, I do.

14        Q.   Whose signatures and initials do you

15   recognize?

16        A.   I recognize the officer's signature, Erin

17   Daly.  She's a loan officer.  And the initials R.D. is

18   Ramona Desombre.  And the other one is Sue Celeste,

19   S.C., and that's just a reference for -- it's just wire

20   No. 4 for that day in the WITS system.

21        Q.   Right here?

22        A.   At the bottom, yes.

23        Q.   Okay.  Thank you very much.

24             At the very top of the form, do you see that,

25   it looks like a -- it says Pentucket Bank, Salem,

1    there's a fax number 603-894-7840?

2         A.   Yes.

3         Q.   What fax number is that?  Would that be

4    Salem --

5         A.   Well, I'm not going to -- I don't know all the

6    fax numbers by heart.

7         Q.   Sure.

8         A.   But that looks reasonable that it's Salem's

9    fax number.

10        Q.   Okay.  And do you know if this form was faxed

11   to Haverhill, Mass., from Salem, New Hampshire?

12        A.   Yes.

13        Q.   And is it?  Was it?

14        A.   Yes, and that's how we get the transactions

15   from the branches.

16        Q.   Thank you.

17             MS. LE:  If we can just turn to, same exhibit,

18   but Bates number page PEN-1788.

19        Q.   Do you see the highlighted transaction there,

20   ma'am?

21        A.   Yes, I do.

22        Q.   What does this tell us?

23        A.   This is the customer's checking account

24   statement and it's just showing that on April the 21st

25   they had the outgoing foreign wire along with a $40 fee.

124

1      Q.    The $40 fee is this number here?

2      A.    Yes.

3      Q.    Thank you very much.  Ms. Curtis, if you can

4  take a few seconds and look at Government's Exhibits 120

5  and 120a.

6            Let's start with Exhibit 120.  I'd like you to

7  go to Bates number page PEN-02516, and if you can go to

8  the e-mail that's dated June 20, 2014, at 8:13 a.m.  Do

9  you see that?

10     A.    Yes.

11     Q.    Okay.  It looks like the author is Munawar

12 again from info@digitalnet.us?

13     A.    Yes, it is the same.

14     Q.    Okay.  And it's addressed again to Brenda

15 Hernandez?

16     A.    Yes.

17     Q.    Would you please read the body of that e-mail?

18     A.    "Good morning, Brenda.  It is that time again.

19 We need to wire 15,000 to DigitalNet Pakistan.  Could

20 you please get the paperwork ready and I'll stop by

21 today around 2 to sign it?  Thank you very much.

22 Munawar."

23     Q.    And also can we go up to Brenda's reply?

24     A.    "Good afternoon, Munawar.  Here's the

25 confirmation for today's wire."  And she gives him the

1    reference number and the IMAD number.  "Have a nice

2    weekend.  Brenda."

3        Q.    And who provides the reference number and the

4    IMAD number?

5        A.    Those are the unique identifying numbers that

6    are generated from the Federal Reserve once you transmit

7    it, so that would have been somebody from the wire

8    transfer team in customer support in Haverhill.

9        Q.    And again, just for the record, IMAD is

10   I-M-A-D?

11       A.    Yes.  It's the just the -- it's the input

12   message, I forget what the A stands for, authorization

13   data or something.  Like I said, it's a unique

14   identifier that the Fed generates from each transaction.

15       Q.    Thank you.  Let's go on to Exhibit 128.  And

16   I'd like to go to the last page, which is Bates number

17   page PEN-01969.

18            Again, do you recognize any -- the date of

19   this wire is what?

20       A.    June the 20th, 2014.

21       Q.    And do you recognize any of the signatures or

22   handwriting or initials on this particular form?

23       A.    Yes.

24       Q.    Whose signatures or initials do you recognize?

25       A.    Jodi Pickles I know, and Phyllis Monigle, and

1    I believe that's Sue Celeste's as well.  And again, this

2    is reference No. 21 of the day, wire transfer of the

3    day.

4        Q.   And who is Jodi Pickles?

5        A.   Jodi Pickles was an assistant branch manager

6    at the time.  She doesn't work for the bank right now,

7    but she was an assistant branch manager.

8        Q.   At which location?

9        A.   The last I knew she was at the Westgate

10   branch, but I can't speak to when -- they take turns.

11   If somebody is out sick or on vacation, then they share

12   jobs, but she was stationed at the Westgate branch.

13       Q.   Okay.  And who is Phyllis?

14       A.   Phyllis Monigle was a wire transfer specialist

15   that worked for me.

16       Q.   Where was she located?

17       A.   At 1 Merrimack Street in Haverhill in the

18   customer support department.

19       Q.   At the very bottom of the page, it's

20   upside-down, but do you see there's a date, Pentucket

21   Bank, the 603 fax number again?

22       A.   Yes.

23       Q.   And do you know whether this particular form

24   was faxed from Salem, New Hampshire, to Haverhill,

25   Massachusetts?

1    A.   As far as I know, it was.  That's the normal

2  course of business.

3    Q.   That's consistent with the information on this

4  form?

5    A.   Yes.

6    Q.   Thank you very much.

7       MS. LE:  Let's turn to the same exhibit, Ms.

8  Sheff, but to Bates number page PEN-1913.

9    Q.   What does the highlighted section tell us?

10    A.   So this statement is this business savings

11  account for DigitalNet, and that is a transfer

12  transferring from the savings to the business's

13  checking.

14    Q.   Oh, did I highlight the wrong one?  Hold on.

15       MS. LE:  Ms. Sheff, can we go out?  Where is

16  the wire form?  Go back one more page, Ms. Sheff.  I may

17  have highlighted the wrong form.  I think we have the

18  wrong exhibit for this one.

19    Q.   Ms. Curtis, based on what is on Exhibit 120,

20  was this money taken out of the account?

21    A.   Yes.

22    Q.   Okay.

23       MS. LE:  I'm sorry about that mistake, your

24  Honor.

25       Let's go to Exhibit 122 and 122a.  Let's start

1    with Exhibit 122, Bates number page PEN-2483.

2        Q.   Do you see this e-mail on January 19, 2015, at

3    4:49 p.m.?

4        A.   Yes.

5        Q.   It looks like there's an attachment.  Would

6    you please read the body of that e-mail from Mac

7    Chaudhary from DigitalNet?

8        A.   "Hello, Brenda.  Attached please find a

9    foreign transfer request for $12,000.  Kindly process as

10   soon as you can and send an e-mail confirmation.  Thanks

11   much.  Mac Chaudhary."

12       Q.   Okay.  So some of the other e-mails we saw

13   reference Mac coming in person and processing the form?

14       A.   Uh-huh.

15       Q.   At some point it looks like it seemed okay to

16   e-mail wire transfer forms to the Salem branch.  Would

17   that be fair to say?

18       A.   I don't feel comfortable to speak to that.

19   That's not normal.  I don't know.

20       Q.   Okay.  But it appears like that happened?

21       A.   It appears, though -- and we do help customers

22   on occasion if they are tight for time, if they need

23   paperwork done, say if they're opening a new account or

24   something --

25       Q.   Sure.

1        A.    -- to come in so --

2        Q.    Okay.  Let's go to --

3              MS. LE:  Can you flip through the rest of that

4   e-mail?  Let's start with Exhibit 122.  Go to the

5   first page, Ms. Sheff.

6        Q.    Okay.  So it looks like Brenda had an exchange

7   with Phyllis Monigle in your office, right?

8        A.    Yes.

9        Q.    And Phyllis actually provided the confirmation

10  number?

11       A.    Yes.  She's giving the confirmation number

12  from the Fed.

13       Q.    And then that information was forwarded to Mr.

14  Chaudhary by Brenda; is that right?  If you look at page

15  2481.

16       A.    Yes.

17       Q.    Okay.  All right.

18             MS. LE:  So let's go to 122a and look at the

19  wire transfer form at PEN-01976.  That must be the last

20  page, Ms. Sheff.

21       A.    Okay.

22       Q.    Do you see the date there, January 20, 2015?

23       A.    Yes.

24       Q.    $12,000?

25       A.    Yes.

1    Q.    And do you recognize any of the signatures or

2    handwriting or initials?

3    A.    Yes.  The initials, R.D. is Ramona Desombre.

4    P.M., Phyllis Monigle.  And retail staff, the signature,

5    that's Brenda Hernandez.

6    Q.    Right here.  Okay.  And again, at the bottom

7    of the page we see Pentucket Bank and a 603 fax number.

8    Do you see that?

9    A.    Yes.

10   Q.    Okay.  Thank you.  So as far as you can tell,

11   was this form faxed from Salem, New Hampshire, to

12   Haverhill, Massachusetts?

13   A.    Yes.  And as you can see, they also indicate

14   that they called the eBanking at 9:09 and spoke to

15   Phyllis.

16   Q.    Right here?

17   A.    It's part of the process so that we know it's

18   coming and that the fax communicated okay.

19   Q.    Great.  Thank you very much.

20         MS. LE:  Let's go to page PEN-1830.

21   Q.    What does the highlighted section tell you?

22   A.    Again, this is the customer's bank statement,

23   that they had an outgoing wire for $12,000 on the 20th

24   of January and a fee of $40.

25   Q.    Thank you very much.  And we see the 40 right

1   here?

2        A.   Yes.

3        Q.   Thank you very much.

4             MS. LE:  Let's move on to Exhibits 123 and

5   123a.

6        Q.   Starting with 123, Bates page PEN-2471, and

7   I'd like you to read the body of the e-mail sent from

8   Mac Chaudhary to Brenda Hernandez on May 18, 2015, at

9   1:26 p.m.

10       A.   "Hello, Brenda.  Attached please find a wire

11  transfer request for 16,960.  Kindly process as soon as

12  you can and send an e-mail confirmation.  Thanks much,

13  Mac Chaudhary."

14       Q.   Thank you.  And up above that there is a reply

15  from Brenda to Mr. Chaudhary on May 18, 2015.  Would you

16  please read that into the record?

17       A.   "I faxed the wire to our operations

18  department.  I will forward the confirmation number as

19  soon as I receive it from my operations department.

20  Thank you. "

21       Q.   All right.

22            MS. LE:  Let's go to Exhibit 123a, the last

23  page, which is Bates number PEN-01980.

24       A.   All right.

25       Q.   This is the May 18, 2015, wire form?

1    A.    Uh-huh.

2    Q.    And do you recognize any main signatures or

3  initials?

4    A.    Yes.  Again, that's -- the retail staff is

5  Brenda Hernandez, and Phyllis Monigle is entering, and

6  I'm not sure of the second one.

7    Q.    But these all would be your staff in

8  Haverhill?

9    A.    Yes, yes.

10   Q.    And again, we have the time of 2:07 p.m. call

11 eBanking end time?

12   A.    Yes.

13   Q.    Who would fill that out?

14   A.    The retail staff.

15   Q.    And that would be Brenda Hernandez in this

16 case?

17   A.    It should have been, yes.

18   Q.    Okay.  There's no fax information on this

19 particular piece of paper; do you see that?  At least

20 this version that we have.

21   A.    Yeah, there doesn't appear to be.

22   Q.    Okay.  But based on Brenda's e-mail May 18,

23 2015, do you know whether this particular form was faxed

24 from Salem, New Hampshire, to Haverhill, Massachusetts?

25   A.    I have no reason to doubt it, and it's filled

1    in as a branch at the top that it was an in-branch

2    transaction and it has all the check marks that are

3    typical that my staff does, and it has the WITS.  It has

4    everything on it, the WITS number.

5        Q.    Thank you.  So up here I've circled branch.

6    That's how you know it was done at the branch location

7    versus Haverhill?

8        A.    Uh-huh.

9        Q.    Thank you.

10       A.    Well, it means it's in person.

11       Q.    Oh, in person.  I see.

12       A.    Branch.

13       Q.    All right.  Let's go to the same exhibit,

14   Bates number page PEN-1846.  What does the highlighted

15   section here tell us?

16       A.    That the customer had an outgoing foreign wire

17   on May 18th for 16,960 and again, you can see the fee

18   right underneath.

19       Q.    Thank you very much.  Let's move on to Exhibit

20   129 and 129a.

21             We'll start with Exhibit 129 and I've asked

22   you to read the body of the e-mail that Mac Chaudhary --

23   one second.

24             If you could just read the body of the e-mail

25   from Mac Chaudhary that was sent to Brenda Hernandez on

1    February 16, 2018, at 4:02 p.m.

2        A.    "Hello, Brenda.  Attached please find the wire

3    transfer request for 15,960.  Please process as soon as

4    possible and send confirmation via e-mail.  Please

5    review the form for any errors or discrepancies.

6    Thanks, Mac Chaudhary."

7        Q.    Thank you very much.  Let's move on to Exhibit

8    129a, the last page, which is Bates number PEN-02016.

9    And this is for February 16, 2018?

10       A.    Yes, it is.

11       Q.    Okay.  Do you recognize any signatures or

12   initials?

13       A.    Yes, I do.  The retail signature is Jennifer

14   Orlando, and the staff and customer support is Rachel

15   Johnson and Phyllis Monigle.

16       Q.    Okay.  Where does one see Phyllis's -- if you

17   can draw on the screen, we can --

18       A.    Phyllis Monigle?

19       Q.    Yes.

20       A.    It's in the bottom right-hand corner.

21       Q.    Great.  Thank you.

22       A.    And Rachel Johnson is up here.

23       Q.    Thank you.

24             THE COURT:  R.J.

25             THE WITNESS:  R.J., yes.  Rachel doesn't

1    work -- neither one works there anymore but they were

2    both my employees.

3          Q.    In Haverhill, Massachusetts?

4          A.    Yes.

5          Q.    Jennifer Orlando, what branch does she work

6    at?

7          A.    She is a float officer, and so she covers

8    whatever office is needing assistance for vacations

9    or --

10         Q.    Okay.  At the very bottom we see that

11   upside-down fax information, again Pentucket Bank with

12   that 603 number?

13         A.    Yes.

14         Q.    Thank you.  So is it your understanding that

15   this form was also faxed from Salem, New Hampshire, to

16   Haverhill, Massachusetts?

17         A.    Yes, and with the same thing that they note

18   the time that they called and spoke to Rachel.

19         Q.    That's box 19 here?

20         A.    11:30 they called eBanking team.

21         Q.    Okay.  Thank you very much.

22               Let's go to Exhibit 120 -- same exhibit, let's

23   go to page PEN-635.  What does this highlighted section

24   tell us?

25         A.    Again, on the customer's bank statement,

1    February the 16th, they had an outgoing foreign wire for

2    15,960 with the $40 fee.

3         Q.   Okay.  Let's move on to Exhibits 130 and 130a.

4    And starting with Exhibit 130, I'll have you read the

5    body of the e-mail from Mac Chaudhary to Brenda

6    Hernandez on March 15, 2018, at 2:29 a.m., UTC.

7         A.   "Hello, Brenda.  Attached please find the wire

8    transfer request for 16,500.  Please process as soon as

9    possible and send confirmation via e-mail.  Please

10   review the form for any errors or discrepancies.

11   Thanks.  Mac Chaudhary."

12        Q.   Let's go to Exhibit 130a, the last page, the

13   wire transfer form, that's at Bates number page

14   PEN-2017.

15             Ma'am, do you recognize any signatures or

16   initials on this form from March 15, 2018?

17        A.   Yes, I do.  The retail signature is Allison

18   Field, she's the bank's branch administrator, and

19   Phyllis Monigle has initialed it along with Sue Celeste.

20        Q.   Could you circle Sue's initials?  And how

21   about Phyllis's?  Great.

22             And again, here we don't see, at least on this

23   version that we have, proof of the fax, but do you know

24   whether this form would have been faxed from Salem, New

25   Hampshire, to Haverhill, Massachusetts?

1      A.    Yes.

2      Q.    And what do you base that on?

3      A.    I base that on, again, the branch check box up

4  here and all the markings as is our normal process, that

5  they're checking all the data entry fields with the

6  check marks.

7      Q.    And that's your usual practice also?

8      A.    Yes, and the fact that the two employees

9  are -- this is their process as they enter it into the

10 WITS system.

11     Q.    Great.  Let's go to Bates number page PEN-638.

12 What does this tell us, the highlighted section?

13     A.    That on March the 15th the customer had an

14 outgoing foreign wire for 16,500, again with a fee of

15 $40.

16     Q.    Thank you very much.  We're almost done.  I'm

17 going to approach you with some new exhibits.

18           So I've given you folders containing Exhibits

19 119b, 120b, 121b, 122b, 123b, 124b, 125b, 126b, 127b,

20 128b, 129b, and 130b.  Are you familiar with these

21 exhibits?

22     A.    Yes.  These are printouts from the wire system

23 called WITS.

24     Q.    Okay.  And these all pertain to select wire

25 transactions, some of which we've discussed, right?

1        A.    Yes.

2        Q.    Okay.  And these all relate to international

3    wire transactions from DigitalNet's Pentucket bank

4    account that ends in 2684; is that right?

5        A.    Yes, it is.

6        Q.    Okay.  How are these wire detail reports

7    generated?

8        A.    Do you mean --

9        Q.    Where does this information come from?

10       A.    So we have the software program called WITS,

11   so we key in this data, and this is just a printout of

12   the screens that we keyed in.

13       Q.    Okay.

14       A.    And then the data is exported to the Federal

15   Reserve.

16       Q.    Okay.  So I'd like to just pull up Exhibit

17   119b just as an example.  We won't go through each and

18   every one of these for the Court.

19            This is a seven-page long document; is that

20   right, ma'am?

21       A.    Yes.

22       Q.    Okay.  So let's start on this first page,

23   02935.  Let's start with the entry information, that top

24   section.  What is this information here?

25       A.    The entry, well, it's telling you it's gone

1    through the Fed, that the origination was in branch, at

2    the branch in person, it's normal.  It gives you the

3    date and the time and the person that was doing the data

4    entry, Heather McGowan.

5         Q.   Great.  Let's go to the next section that's

6    called transaction information.  What does this section

7    tell us?

8         A.   It tells the amount of the wire and the

9    account number that it came out of, and the fee for this

10   one, I can see she keyed the wrong fee, but that's the

11   fee.

12        Q.   What is the right fee?

13        A.   $40.

14        Q.   $40.  And when you said the account number, is

15   this the account information here?

16        A.   Yes, it is, the checking account.

17        Q.   Thank you very much.  All right.  Let's go to

18   the next section, customer information.  What does this

19   tell us?

20        A.   So the system is able to -- so for customers

21   that have wire transfer agreements the system is able to

22   process the charges to the account for the transaction

23   because it's interfaced with our core system.  So as you

24   can see, it has balance information about the checking

25   account that's being used.  And it has the officer

1    number 124, which is the officer number in our core

2    system, Finastra.  Everyone that does a wire in the WITS

3    system has a customer number, so it has the WITS

4    customer number, the account branch, the date and time.

5          Q.   Here it shows a last teller hold.  What does

6    that line mean?

7          A.   Well, in the branch transactions the

8    transactions are posted at the branch.

9          Q.   Okay.

10         A.   Operations doesn't post the transactions for

11   the branch because they are responsible to make sure the

12   money is there, the money is collected, so they do that

13   transaction.

14         Q.   So that's when you were talking earlier the

15   branch employees accepting the form, checking the

16   account to make sure there's the money, and then they

17   debit the account automatically right there?

18         A.   Yes, before they send it to us.

19         Q.   Transaction flag, there's another section

20   about transaction flags.  What does this information

21   tell you?

22         A.   I don't have a lot to add on that section.

23         Q.   Okay.  But no flags here?

24         A.   No.

25         Q.   Okay.  There's import/export information.

1    What is import/export information?

2          A.    Basically when you key in the wires, they go

3    into batch.  So this is showing that it's file batch

4    No. 2.  It must have been of the morning.

5          Q.    Okay.

6          A.    And the person that did it, Heather McGowan,

7    she worked in the department at that time.

8          Q.    So taking money out of the account and sending

9    it out, is that right, to the Fed, is that what you're

10   talking about, or is it something different?

11         A.    This would be exporting not the -- well, the

12   customer's account has already been charged.  This is

13   exporting the data to the Federal Reserve to then

14   further go on its way to the end destination.

15         Q.    I see.  Thank you very much.  There's a

16   section called OFAC information.  Can you tell us what

17   your bank does with OFAC?

18         A.    That's the Office of Foreign Asset Control.

19   The program -- we get updates for people and places,

20   addresses that are on this list regularly, at least once

21   a month, sometimes more, so the database matches I guess

22   that to make sure it's valid to send it.

23         Q.    Okay.  Thank you.  There are no issues here;

24   is that right?

25         A.    No.

1    Q.   And posting information, what does this tell

2  you?

3    A.   It's just another kind of repetitive that that

4  was the amount of the transaction, 15,000, the fee done

5  by Heather McGowan, the date and time.

6    Q.   Okay.  And again the fee is wrong, right?  It

7  should be $40?

8    A.   Correct.

9    Q.   Let's go to the next Bates labeled page 2936.

10  What does this page tell us?

11    A.   Again, it has the employee that entered the

12  transaction, the amount.  There's no limits on this

13  account.  They don't have a wire agreement so there's no

14  wire limit.  Customers with wire agreements have a wire

15  limit.

16    Q.   Okay.

17    A.   And it gives you the name and address of the

18  customer originating the wire, including their phone,

19  text ID.  That's where the -- at the end of the day we

20  generate a receipt for the wire transactions so that's

21  where the advice is going to go, and then the bottom

22  half is the originator of the transaction, which is the

23  same in this instance.

24    Q.   Okay.  Let's go to the next page, 2937.

25  Sending institution, that's your bank; is that right?

1      A.    Yes.

2      Q.    And the receiving institution, what does this

3 tell us?

4      A.    So we're the originator, so Pentucket Bank, so

5 it gives our ABA number and our address, you know,

6 that's on record with the Federal Reserve.  In this case

7 the money before it gets to Pakistan has to go to

8 Standard Chartered Bank in New York, so that tells me

9 they have a correspondent relationship with the bank in

10 Pakistan.

11      Q.    Okay.  Because this is a wire transaction,

12 you're a small bank, you don't have a corresponding

13 foreign bank, it goes through this bank?

14      A.    Right.

15      Q.    Okay.  And what is the beneficiary

16 institution?

17      A.    The final destination is the NIB Bank Limited

18 in Lahore, Pakistan.

19      Q.    Okay.  Let's go to the next page, 2938.  Okay.

20 There is a section called callback information, but

21 there's nothing there.  Is that unusual?

22      A.    Yeah.  I haven't seen that used.  Again, you

23 have to understand that this program has a lot of data

24 fields and a lot of functionality, so that's not a

25 section that we would use in this wire.

1      Q.    Okay.  So the beneficiary name is the entity

2  that's receiving the funds; is that right?

3      A.    Yes.

4      Q.    And here this is DigitalNet Technology

5  Solutions somewhere in Lahore, Pakistan; is that right?

6      A.    Correct.

7      Q.    Okay.  And I see again IBAN number for bank to

8  bank, what does this mean?

9      A.    That's an international bank identification

10  number.

11      Q.    Okay.  And the IMAD number that you mentioned

12  earlier, right?

13      A.    Yes.  And again, at's input messaging data

14  number.

15      Q.    Okay.  All right.  Let's go to page -- there's

16  a lot, so I don't think we're going to cover every

17  single page.  I just wanted you to give the Court a

18  little bit of flavor of what that series of WITS

19  transaction forms represent.

20            Thank you very much, Ms. Curtis.

21            MS. LE:  Your Honor, the government tenders

22  the witness.

23            MR. AYER:  No cross, your Honor.

24            THE COURT:  Thank you.  You're excused.

25            THE WITNESS:  Thank you.

1          MS. LE:  Your Honor, the government calls Eric

2     Leuteritz to the stand.

3                         ERIC LEUTERITZ

4          having been duly sworn, testified as follows:

5          THE CLERK:  For the record, please state your

6     full name and spell your last name.

7          THE WITNESS:  Eric George Leuteritz.  My last

8     name is L-E-U-T-E-R-I-T-Z.

9          THE CLERK:  Thank you.  Please be seated.

10          MS. LE:  Your Honor, may I just approach just

11     to move some of the exhibits that we're not using with

12     this witness?

13          THE COURT:  Throughout your examination you

14     may approach.

15                       DIRECT EXAMINATION

16     BY MS. LE:

17          Q.   Good morning.

18          A.   Good morning -- good afternoon.

19          Q.   Good afternoon.

20               Mr. Leuteritz, where are you employed?

21          A.   Pentucket Bank.

22          Q.   How many locations does Pentucket Bank have?

23          A.   Six.  Seven.  Seven with the headquarters.

24     Six branches.

25          Q.   Okay.  Where's the main office?

1    A.   Haverhill, New Hampshire -- Haverhill, Mass.

2    Q.   Are you a little nervous?

3    A.   I am.

4    Q.   Do you hate seeing me?  Does it make you

5    nervous?

6    A.   No, it will be fine.

7    Q.   And where are the branch locations, if you

8    know?

9    A.   All the branch locations?

10   Q.   Yes, sir.

11   A.   So there are three in Haverhill, one in North

12   Andover, Massachusetts, one in Hampstead, New Hampshire,

13   and one in Salem, New Hampshire?

14   Q.   How long have you been with Pentucket Bank?

15   A.   Nine years.

16   Q.   What's your current job title?

17   A.   I am a senior vice president and commercial

18   loan officer.

19   Q.   How long have you been the senior vice

20   president, commercial loan officer?

21   A.   Senior vice president a year, and then I was a

22   vice president, commercial loan officer for three years

23   before that, four years before that.

24   Q.   Okay.  How many total years of experience do

25   you have in finance?

1       A.    In finance, about 29 years.

2       Q.    Okay.  What are your responsibilities as a

3  commercial loan officer?

4       A.    I manage a portfolio of businesses that borrow

5  money from the bank.  So I manage the borrowing

6  relationships with them, but I also handle other

7  responsibilities for them for banking to a certain

8  extent.

9       Q.    Okay.  When you first started at Pentucket

10  Bank, what did you do?

11       A.    I was a financial analyst.

12       Q.    Was that in 2010?

13       A.    That was in 2010.

14       Q.    Which office did you work at?

15       A.    I was in the Haverhill headquarters at that

16  point.

17       Q.    At some point did you transfer from that main

18  office in Haverhill to the Salem, New Hampshire, branch?

19       A.    Yes, I did.

20       Q.    When was that, sir?

21       A.    That was in late 2014.

22       Q.    Okay.  And did your job change as well?

23       A.    It did.  I moved from an analyst position to a

24  lending position.

25       Q.    What's the difference?

1        A.    One is more backend office analyzing the

2    numbers, producing the reports.  When you're in a

3    lending role, it's more customer interaction, sales,

4    bringing in new accounts.

5        Q.    Sir, do you know Imran Alrai?

6        A.    I've met him a few times.

7        Q.    How do you know Mr. Alrai?

8        A.    So Saima Alrai was the branch manager at the

9    Salem office that I was located in, and Imran is her

10   husband.

11       Q.    Okay.  When did you first meet Mrs. Alrai?

12       A.    When I started -- well, when she started for

13   the bank.

14       Q.    When was that, sir?

15       A.    I'm not exactly sure.  I want to say 2013,

16   2012.  Somewhere around there.

17       Q.    So you first met her when she joined the bank,

18   and then did you come to work with her more closely when

19   you moved to the Salem, New Hampshire, branch?

20       A.    Yes.

21       Q.    Okay.  And how long did you work with Mr.

22   Alrai?

23       A.    About four and a half years.

24       Q.    How would you describe your relationship with

25   Mrs. Alrai?

1    A.   It was a very good relationship.  I enjoyed
2    working with her.  She did a great job, yeah.
3    Q.   And in addition to working together and having
4    that good working relationship, did you and she
5    socialize outside of the office?
6    A.   No, not really.  I would -- we both live in
7    the same town, our children are similar ages, so I would
8    see her occasionally at various events for the school,
9    but it's not like we ever went to each other's houses or
10   anything like that.
11   Q.   And have you kept in touch with Ms. Alrai
12   since she left Pentucket?
13   A.   We had lunch a few times after she left but
14   nothing for a while now.
15   Q.   Sir, did you handle any of Mr. Alrai's
16   accounts or accounts belonging to his businesses when he
17   banked at Pentucket?
18   A.   I didn't handle his accounts, no.
19   Q.   Why not?
20   A.   Generally he didn't have a commercial
21   borrowing relationship.  That's where I would get
22   involved.  He just had a depository relationship so the
23   branch handled those.
24   Q.   So he didn't borrow money from the bank, he --
25   A.   He was a depositor.

1    Q.    He was a depositor, all right.  Based on your

2    relationship with Mrs. Alrai, did you have an

3    understanding or appreciation of what her husband's job

4    was?

5    A.    I was told he was in the IT business.

6    Q.    Okay.  Anything about -- was he self-employed

7    or was he employed by a corporation?

8    A.    I was under the impression he was

9    self-employed.

10    Q.    Okay.  And do you know anything with more

11    detail other than just being in the IT business?

12    A.    No.  I know he did IT consulting.  I also

13    understood he developed some apps, but that was

14    basically my understanding.

15    Q.    Okay.  And did he or Mrs. Alrai tell you that

16    he was himself a programmer or did he have employees who

17    programmed?

18    A.    I was told he had employees that programmed.

19    Q.    Where were those employees located, if you

20    know?

21    A.    I was told at least some of them were in

22    Pakistan.

23    Q.    And who told you this information about Mr.

24    Alrai, was it Mr. Alrai or Mrs. Alrai?

25    A.    It was Mrs. Alrai.

1    Q.    Okay.  And do you know if Pentucket Bank has

2    any deposit accounts belonging to DigitalNet Technology

3    Solutions?

4    A.    Yes, they do.

5    Q.    Okay.  Did you know anything about DigitalNet?

6    A.    No.

7    Q.    Okay.  Were you involved in about three wire

8    transactions involving monies from that account, that

9    company's account?

10   A.    Yes.

11   Q.    Okay.  And what role did you have in

12   processing those wire transfers?

13   A.    I was an approver on three of those wires.

14   Q.    Can you explain, what is an approver?

15   A.    Sure.  So generally there are two types of

16   wires, but if you're required to do an in-branch, the

17   person comes into the branch, they generally get the

18   process started in the branch with the retail staff, and

19   then if it's a certain amount, it gets brought to me to

20   verify that we followed proper procedure.

21   Q.    Okay.  So it has to do with the money limit,

22   right?

23   A.    Correct.

24   Q.    Okay.  So the higher the number, then it has

25   to be kind of taken up a level?

1      A.    Correct.  Or if the person is taking that is

2   not an officer, they may need just an officer to sign

3   off on it.

4      Q.    You used the term officer.  What is an officer

5   versus somebody else in the bank?

6      A.    So an officer is a designation within a bank

7   where you're essentially able to sign on behalf of the

8   bank on certain items.  So you might be able to sign a

9   check or you might be able to sign a wire or something

10  along those lines.  So it generally starts officer, AVP,

11  VP, SVP.

12     Q.    Yeah.  I have no idea what all those initials

13  stand for.

14     A.    Assistant vice president, vice president,

15  senior vice president.  All have signature authority and

16  are generally given different levels for certain things.

17     Q.    And the people that one would see if you

18  walked into a bank, the tellers, the customer service

19  reps, they are not officers?

20     A.    Most of them are not.

21     Q.    Okay.  Now, I'd like you to take a look at

22  Exhibit 127.

23           MS. LE:  Ms. Sheff, if you could pull that up.

24     Q.    And there are physical copies in those folders

25  for you so if at any point you'd like to look at --

1        A.    I'm sorry, which number?

2        Q.    Exhibit 127.  They should be in numerical

3    order, sir.

4        A.    Okay.

5        Q.    Do you see this is a string of e-mails about

6    two pages long?

7        A.    Yes.

8        Q.    October 19, 2017, to October 20, 2017, is the

9    sequence?

10       A.    Yes.

11       Q.    Okay.  These are e-mails exchanged between

12   Brenda Hernandez and Mac Chaudhary; do you see that?

13       A.    Yes.

14       Q.    Okay.  What e-mail address is Mr. Chaudhary

15   using, if you could just read that into the record?

16       A.    He is using info@digitalnet.us.

17       Q.    Okay.  I'd like you to go to page 2397.

18       A.    Okay.

19       Q.    All right.  And do you see that e-mail there?

20       A.    Yes.

21       Q.    This was sent to Brenda Hernandez on October

22   19, 2017, at 12:23 p.m.  Would you please just read the

23   body of that e-mail?

24       A.    "Hello, Brenda.  Attached please find the wire

25   transfer request for $14,960 even.  Please process as

1    soon as possible and send confirmation via e-mail.

2    Please review the form for any errors or discrepancies.

3    Thanks, Mac Chaudhary."

4        Q.   Brenda Hernandez, where did she work in this

5    time frame?

6        A.   She worked in the Salem, New Hampshire, retail

7    branch.

8        Q.   And she's currently still an employee; is that

9    right?

10        A.   Yes.

11        Q.   And she's out on medical leave; is that

12    correct?

13        A.   That's my understanding.

14        Q.   Let's go to Exhibit 127a, and I'd direct your

15    attention to page 2011, that should be the last page,

16    the wire transfer form, that's dated October 20, 2017.

17    Do you see that?

18        A.   Yes.

19        Q.   Okay.  Do you recognize anyone's handwriting?

20        A.   Yes.

21        Q.   Whose handwriting do you recognize?

22        A.   Mine.

23        Q.   Where is your handwriting, sir?

24        A.   It's lower left.

25        Q.   You can touch the screen.  It's a smart

1   screen.

2        A.   Someone just circled it but yeah, right there.

3        Q.   That was me.  Go ahead.  Show us where your

4   signature is.

5        A.   My signature is right here.

6        Q.   Okay.  And what does your signature on here

7   indicate to you?

8        A.   Basically that this was brought to me, I asked

9   a series of questions to make sure procedure was

10  followed, and then I signed off on it saying it's

11  acceptable to send.

12       Q.   Do you have any specific recollection of this

13  wire transaction?

14       A.   Not this one, no.

15       Q.   Why not?

16       A.   I do a lot of these.  This one didn't stick

17  out.

18       Q.   And the usual practice, it looks like this

19  was -- where was this form processed originally?

20       A.   The Salem branch.

21       Q.   Okay.  And after this form is processed at the

22  Salem branch, what happens to it?

23       A.   Generally it gets sent down to the wire room

24  in the back office and then they initiate the wire.

25       Q.   Are you talking about Haverhill,

1    Massachusetts?

2         A.   Yes.

3         Q.   Okay.  And how is it sent over to Haverhill?

4         A.   I'm not a hundred percent sure.  I know it can

5    be sent by fax.  I don't know if it can be sent by

6    e-mail.  I'm not involved in that process.

7         Q.   Okay.  But your understanding for sure fax?

8         A.   Yes.

9         Q.   Let's go to Exhibit 128.  All right.  This is

10   a series of e-mails exchanged on December 20, 2017.  Do

11   you see that?

12        A.   Yes.

13        Q.   Okay.  Take your time and flip through before

14   I ask you any questions.  Am I right that the e-mails

15   involved Mac Chaudhary, Saima Alrai, Heather McGowan,

16   and Susan Celeste?

17        A.   Yes.

18        Q.   Okay.  So same e-mail address for Mac

19   Chaudhary, right, that info@digitalnet.us?

20        A.   Yes.

21        Q.   Who is Heather McGowan?

22        A.   She is a teller in our Salem branch.

23        Q.   Does she have a new title, universal

24   associate?

25        A.   I'm sorry.  What was that?

1    Q.    Does she have a new title now, universal
2    associate is it?
3    A.    I believe that's her title now, yes.
4    Q.    Okay.  So she's the bank employee of Salem?
5    A.    Yes.
6    Q.    Who is Susan Celeste?
7    A.    She works in our wire room.
8    Q.    And where's the wire room, sir?
9    A.    Haverhill, Massachusetts.
10   Q.    So I'd like you to go to page 2374, which is
11   on the screen here, and would you please read the
12   message that Mac Chaudhary wrote to Saima Alrai on
13   December 20th, 2017, at 10:10 a.m.
14   A.    "Good morning.  Please have the attached wire
15   transfer request of $190,000 even processed as soon as
16   possible and send back the confirmation.  Thanks, Mac
17   Chaudhary."
18   Q.    Okay.  And then up above do you see Mrs.
19   Alrai's response?
20   A.    Yes.
21   Q.    Okay.  And what does this information tell
22   you, if you know?
23   A.    I don't know, but I assume it's probably wire
24   confirmation numbers.
25   Q.    It actually says confirmation is --

1        A.    Yes, for the wire.

2        Q.    -- for the wire?

3        A.    Yes, but again, I don't deal with that

4   normally.

5        Q.    Sure.  No problem.  Let's go to Exhibit 128a,

6   and I'd like you to go to the page that's Bates number

7   PEN-02014, that's the last page, the wire request form

8   for this December 20, 2017, wire of $190,000, okay?  Do

9   you recognize any handwriting or initials here?

10        A.    Yes.

11        Q.    What do you recognize?

12        A.    My signature.

13        Q.    And if you could just show the Court where

14   that's located.

15             (Witness does so)

16        Q.    Okay.  And who else do you see, whose

17   handwriting do you recognize?

18        A.    Heather McGowan.

19        Q.    Where's that?

20        A.    (Witness indicates)

21        Q.    Okay.  Sir, do you have any specific memory

22   about this particular transaction?

23        A.    Yes.

24        Q.    What is your specific memory?

25        A.    This was a wire that Saima had brought to me

1    and asked me to sign.  She said that her father-in-law

2    was buying a piece of property in Pakistan that was

3    located between two of their business locations.

4        Q.    When you said she brought you the form, did

5    she physically bring you the form or did she e-mail it

6    to you; do you know?

7        A.    I believe she brought me the form.

8        Q.    And so when you signed this, did you know who

9    Mac Chaudhary was?

10        A.    I knew that it was her father-in-law.

11        Q.    Okay.  And when she gave you the form and told

12    you that the money was being used to buy some property

13    in Pakistan, what did you do?

14        A.    Well, I told her -- I asked if Mac was here

15    because he needed to be in the office and he wasn't, so

16    at that time I couldn't sign it.

17        Q.    Okay.  Is this the time or is it the next time

18    that you actually made him come in?

19        A.    Oh, no, you're right.  I apologize.  That was

20    the next time.  No, I signed this one and it went out.

21        Q.    Okay.  But you touched on the subject that

22    we've talked about.

23        A.    Sorry.

24        Q.    Pentucket Bank, does it have a written policy

25    regarding wire transactions?

1    A.   Yes.

2    Q.   Okay.  Is there a requirement that customers

3    come in person if they don't have a prior agreement on

4    file to initiate wire transactions?

5    A.   Yes.

6    Q.   Okay.  Did you follow that procedure on this

7    occasion?

8    A.   No.

9    Q.   Why not?

10   A.   I trusted Saima.  She and I were colleagues

11   and I had no reason to doubt that this was her

12   father-in-law's intentions.

13   Q.   Okay.  So she represented that this was her

14   father-in-law and that he wanted to make this

15   transaction?

16   A.   Yes.

17   Q.   Okay.  Because you didn't follow the rules for

18   this one, did you have a problem?

19   A.   I received a phone call saying that there was

20   an audit being done of the wires.  They had asked

21   questions if he was here or not.  I said no.  They said

22   he needs to be in the branch because he doesn't have a

23   wire agreement set up.  So going forward he would need

24   to be there for all of them.

25   Q.   So who told you you needed to enforce and

1  comply with the Pentucket Bank's written policy about

2  wire transactions?

3      A.   Diane Galvin.

4      Q.   And who is Diane Galvin relative to you?

5      A.   She is the chief operating officer of the

6  bank.

7      Q.   Okay.  So let's go to Bates number page 629.

8  Do you see -- what does this tell you here, sir?

9      A.   That looks to be part of a statement showing

10  that $190,000 left their account -- transferred from

11  operating -- I don't read these often.  I apologize.

12     Q.   Sure.  So it looks like there was a transfer

13  of money into the account?

14     A.   Yes.

15     Q.   And then the money was then transferred out of

16  the account; is that right?

17     A.   That's right.

18     Q.   I should have highlighted more.  That's my

19  fault.  And both of those transactions happened on

20  December 20th?

21     A.   That's correct.

22     Q.   Okay.  Thank you very much.  And just for the

23  record, on December 20th the transfer of $190,000 was

24  from an account ending in 3920; is that right?  Is that

25  what it says?

```
 1        A.   Oh, I'm sorry.  Which transaction again?
 2        Q.   The same one.
 3        A.   Yes, the money came in from an account ending
 4   3920.
 5        Q.   And the account belonged to DigitalNet as
 6   well, right?
 7        A.   Yes.
 8        Q.   It's the operating account; is that right?
 9        A.   Yes.
10        Q.   Okay.  Let's talk about another wire
11   transaction that you handled.  It's not part of those
12   folders.
13             MS. LE:  I'm going to ask Ms. Sheff to pull up
14   Exhibit 524 and go to Bates label page 20019.  You might
15   have to scroll through.  April 9, 2018.  I think that's
16   it.
17        Q.   All right.  Mr. Leuteritz, do you recognize
18   this wire transfer request form from April 9, 2018?
19        A.   Yes.
20        Q.   Do you recognize any handwriting?
21        A.   Yes.
22        Q.   Whose handwriting do you recognize?
23        A.   My signature.
24        Q.   Okay.  Would you just circle your handwriting
25   for the Court?
```

1          (Witness does so)

2      Q.    All right.  Do you have any specific memory

3  about this wire transfer of $16,960?

4      A.    Yes.

5      Q.    What was your recollection?

6      A.    This was the one where Saima had asked for a

7  wire transfer and I said I couldn't do it unless Mac was

8  in the building.

9      Q.    Okay.  So again, was this one of those

10  occasions where she physically approached you or did she

11  e-mail this to you?

12      A.    I believe on this one she approached me, but

13  I'm not a hundred percent certain.

14      Q.    Sure.  When you told Mrs. Alrai that you

15  couldn't process it without Mr. Chaudhary there, did he

16  come in?

17      A.    He did come in after that, yes.

18      Q.    Okay.  When did he come in?

19      A.    A short time later.  I don't recall how long.

20      Q.    So it was not like a day later or a week

21  later?

22      A.    No, it was the same day.

23      Q.    Same day.  And did you see Mr. Chaudhary in

24  person?

25      A.    Yes.

1     Q.   How did you know that he was in the building?
2     A.   I got a phone call that he was there and I
3  came down -- I worked on the second floor.  I came down
4  to the first floor where the retail office is, the
5  branch is.
6     Q.   Okay.  And this is again in Salem?
7     A.   Correct.
8     Q.   Okay.  And was anyone with Mr. Chaudhary when
9  you went downstairs to meet him?
10    A.   Yes, Mr. Alrai was with him.
11    Q.   Okay.  Did you have a conversation with Imran
12 Alrai at that time?
13    A.   Yes.
14    Q.   Will you tell the Court what your conversation
15 was about?
16    A.   Sure.  Essentially he was upset that he had to
17 drag his father down to the branch to have this wire
18 done, that he was a good customer, that Saima worked
19 there, that there seemed to be no reason for it.
20    Q.   When he said he was a good customer, who was
21 he referring to or what is your understanding?
22    A.   Alrai's businesses in general.
23    Q.   Okay.  And why did you describe him as being
24 upset?
25    A.   He was a little agitated.  We had a

1    conversation and at one point Saima even asked us to

2    move into the office, her office, so we were out of the

3    public part of the branch, but it was wrapping up

4    quickly so we did not.

5          Q.    Okay.  Did he tell you anything else at that

6    time?

7          A.    Nothing that I recall at this point.

8          Q.    Okay.  And did you speak with Mr. Chaudhary?

9          A.    I don't recall.  I mean, I may have asked him,

10   you know, when I walked in, I may have said, you know,

11   you're here, you want to send this wire to Pakistan.  If

12   anything, I might have done that.

13         Q.    Okay.  Now, did you eventually move into

14   Saima's office at all?

15         A.    No.

16         Q.    Okay.  So your interaction with Mr. Alrai and

17   Mr. Chaudhary, where did that all occur?

18         A.     In the branch.  In the main area of the

19   branch.

20         Q.    Okay.

21               THE COURT:  All right.  I've got to conduct a

22   short hearing.

23               MS. LE:  Sure.

24               THE COURT:  It's an in camera hearing that

25   I'll be doing in chambers, or behind the courtroom, so

166

1    we'll take the lunch break.

2            We will reconvene at 1:30.

3            MS. LE:  Your Honor, I just have like two more

4    questions.  Is there enough time to do that or should we

5    just wait for everything?

6            THE COURT:  Well, are you going to cross?

7            MR. HARRINGTON:  Potentially, your Honor, yes.

8            THE COURT:  Well, go ahead.

9            MS. LE:  No, no.  We'll just wait, your Honor.

10   I'm sorry.

11           (RECESS)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5   foregoing transcript is a true and accurate

6   transcription of the within proceedings, to the best of

7   my knowledge, skill, ability and belief.

8

9

10  Submitted: 4-8-20          /s/    Susan M. Bateman _____
                               SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25