**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-7-2020**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   18-cr-192-01-JL
          v.                      *   December 12, 2019
                                  *   1:30 p.m.
     IMRAN ALRAI                  *
                                  *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
DAY NINE - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:      John S. Davis, AUSA
                         Matthew Hunter, AUSA
                         Cam T. Le, AUSA
                         U.S. Attorney's Office



For the Defendant:       Timothy M. Harrington, Esq.
                         Timothy C. Ayer, Esq.
                         Shaheen & Gordon, P.A.



Also Present:            John J. Commisso, Esq.



Court Reporter:          Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JASON SGRO | | | | |
| By Mr. Harrington | 3 | | 33 | |
| By Mr. Hunter | | 22 | | 38 |
| REBUTTAL TESTIMONY OF GREG NAVILOFF | | | | |
| By Mr. Davis | 41 | | | |
| By Mr. Harrington | | 65 | | |

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibit 927. | | 42 |
| Government's Exhibit 207c. | | 53 |

```
1                    P R O C E E D I N G S
2              THE COURT:  Mr. Harrington, you may resume.
3              MR. HARRINGTON:  Thank you, Judge.
4              THE COURT:  Sir, you're still under oath.
5              THE WITNESS:  Thank you, your Honor.
6          CONTINUED DIRECT EXAMINATION OF JASON SGRO
7   BY MR. HARRINGTON:
8       Q.   Mr. Sgro, I think we left off when you were
9   talking about SIP.US, and you had gotten to the point I
10  think where you were talking about the flat fee for
11  management services and the contracts I think.
12            Do you recall?
13      A.   Yes, I recall.
14      Q.   Okay.  So what is it that you had observed in
15  regard to that and in regard to the contracts that you
16  were referencing for the Judge?
17      A.   Yes.  Well, as I previously stated, the SIP.US
18  invoice to DTS, and eventually to the United Way, is
19  only a portion of the service provided -- or the
20  services required to build a Telephony system, and we
21  talked about, a little bit about networking and security
22  and phones and lines, and all of that stuff needs to be
23  provided.
24            Now, in Mr. Naviloff's review he points to the
25  IT managed services contract from 2013 and a line in
```

1    that contract saying there's a $3,500 fee for services

2    like Telephony management.

3              Now, that at first glance looks to be

4    appropriate for covering the services that would be

5    required, the additional services for the phone system.

6    However, that contract predates the investment in

7    SIP.US.  And what that means is that that contract was

8    intended in those Telephony management services, and the

9    subsequent security services and networking services

10   were all related to the legacy PBX-based on-prem phone

11   system.

12        Q.   And that's the original one that was in place

13   when Mr. Alrai came to work at the United Way as you

14   understand it, correct?

15        A.   As I understand it, that is correct.

16              And so that was for the management of that,

17   and so that could not possibly be for the management of

18   the SIP.US service because the SIP.US service didn't

19   exist when that contract was executed.

20        Q.   And was there also a separate contract entered

21   into relative to Telephony services?

22        A.   Yes, there is a Telephony services contract

23   between DTS and the United Way wherein they agreed on a

24   comprehensive price of $70 per line.

25              And so during that migration SIP.US was used

 1    as part of that service delivery by DTS, but that

 2    contract rolled up those managed services, networking,

 3    security, those sorts of things, to be included in that

 4    $70 line, and that's a fairly common practice.

 5         Q.   Okay.  And with that in mind, I want to show

 6    you a visual.  And who made this visual?

 7         A.   I did.

 8         Q.   Okay.  Can you explain what it's for in

 9    relation to what you were just testifying about?

10         A.   Yes.  So much like the kind of error that is

11    made in analyzing the contracts for SIP.US, CloudConnect

12    is similarly analyzed.

13         Q.   And so I want to just stop you briefly because

14    we're kind of segueing into a different topic --

15         A.   Correct.

16         Q.   -- from SIP.US to CloudConnect.

17         A.   Yeah, we're now talking about -- this

18    references CloudConnect, the CloudConnect service.

19         Q.   Okay.  And if you could explain what that

20    means and this demonstrative aid for the Judge relative

21    to CloudConnect.

22         A.   Yes.  So before I explain that, I think it's

23    important to note the contracts, the way they were

24    analyzed in the RSM report suggests that the

25    CloudConnect services which were used as part of the

1  service delivery between DTS and the United Way, that

2  DTS didn't really add value to those and passed through

3  those costs at a considerable markup.

4       Q.   So the idea and the testimony you heard was

5  that CloudConnect basically provided these services?

6       A.   Right.

7       Q.   They could have done so without DTS in the

8  middle and just dealt directly with the United Way?

9       A.   That's correct.

10      Q.   Okay.  And you believe that's correct or

11  incorrect?

12      A.   That's incorrect for a couple of reasons.

13           The first is that CloudConnect states on its

14  publicly available website that it doesn't deal directly

15  with end consumers.  They always work in through a

16  third-party model.  And the way the third-party reseller

17  model works is original providers, such as CloudConnect,

18  will keep their prices -- their price margins low enough

19  so that third party resellers can consume their

20  services, resell them at a profit, and build services

21  within those environments.  I think it was stated before

22  by Mr. Meyer that it was a sandbox, if you will, and so

23  this diagram is a picture of what that sandbox might

24  look like.

25           And the contracts between DTS and the United

 1   Way versus the contracts between CloudConnect and DTS
 2   appear at first glance to be referencing similar type
 3   items, that being cloud hosting of sorts, but not really
 4   here.  What you'll see is, in the bottom left-hand
 5   corner, the CloudConnect hosting component is only one
 6   part of that service delivery.  Application development,
 7   systems troubleshooting, patching, security, performance
 8   monitoring, the building of VDI images, and that again
 9   is virtual desktop image, and testing and regression
10   testing both of primary features and any kind of issues
11   that might arise through changes in the environment is
12   what regression means, all of that are examples, and
13   that's not a comprehensive list, are the things that go
14   into making this service useful.
15          And so what we need to understand here, what
16   I'll try to impress upon you, is that if you take the
17   CloudConnect service directly from CloudConnect, it's
18   fundamentally useless to an end consumer.  It doesn't do
19   anything.  It would be like buying a server box in the
20   cloud, right, somewhere else, and not having any
21   software and not having any network to get to it and not
22   having any user accounts or any of the things that are
23   listed on this diagram.
24          And so when you look at hosting as a
25   service -- infrastructure as a service, excuse me, and

1    hosting as referenced between DTS, the DTS and United

2    Way contract, it's fundamentally different than the

3    hosting provided by CloudConnect to DTS.

4         Q.   And let me ask you a little bit about the

5    contract terms because you reference them.

6              You took a look at the contracts, correct,

7    with CloudConnect and with DTS?

8         A.   I did.

9         Q.   Okay.  And you noticed that there were

10   similarities in several of the provisions within the

11   contract, right?

12        A.   Many, yes.

13        Q.   Did that surprise you?

14        A.   No.

15        Q.   And why is that?

16        A.   It is common practice.  So when an original

17   manufacturer, right, an original provider of services

18   intends their services to be reselled through a

19   reseller, they're making a commitment to those

20   resellers.

21             Those technologies -- this lower left-hand box

22   called CloudConnect hosting here, the services in that

23   are going to be passed forward to the end customer,

24   which in this case was the United Way.  And so it makes

25   sense to me, and is common practice in the industry, to

1    take certain provisions, things that DTS doesn't do for

2    itself and relies on CloudConnect for, to pass those

3    forward in the contract.

4        Q.    So basically mirroring certain provisions of

5    the contract because it basically is taking the language

6    of CloudConnect and passing it through the contract?

7        A.    Correct.  So, as an example, going back to the

8    idea of geographic diversity, geographic diversity is

9    something that is provided by CloudConnect inside of

10   their infrastructure and has promised that to DTS.  DTS

11   is now saying to the United Way there exists this

12   provision for regional diversity, and that is passed

13   through using the language of CloudConnect.

14       Q.    Okay.  Let me ask you, what are some of the

15   significant costs that someone like DTS might incur in

16   this environment if they're providing services to the

17   United Way?

18       A.    Yes.  So a lot of it has to do with expertise,

19   right?  In order to provide these types of services, a

20   cloud service, you need various roles, right?  You need

21   a networks engineer, a security person, application

22   engineers.  And many of those specializations, as well

23   as some of the things that I've listed here as examples

24   on the blocks, are not spelled out anywhere in these

25   contracts.  Nowhere will you find something like VDI

1  imaging, right, but that requires a specialist in order

2  to go in and create those images and make them

3  available.  That's a service that is something DTS would

4  have had to do in order to make the VDI environment

5  useful.

6       Q.   So let me ask you in regard to that idea of

7  having people necessary to create this, is there a

8  difference between how many people you might need to

9  kind of create these environments versus once they're

10  created to maintain them?

11      A.   Yeah, so that's a different skill set

12  altogether.

13           So when you're creating the environment,

14  there's kind of a flurry of activity of course, there's

15  a lot of engineering expertise that is required, and

16  then ongoing support could be less.

17      Q.   Okay.  So, for example, you heard Mr. Meyer

18  testify relative to the number of individuals he's

19  using.  If I recall correctly -- well, actually let me

20  ask you.  What was your recollection of his testimony on

21  how many people he needed to kind of run the system?

22      A.   Yeah, I recall him saying that in -- well,

23  this is now, right, so this is a different time period,

24  I recall him saying that it was six to eight people plus

25  himself.

1      Q.   Okay.  And compared to the initial setup if

2  you had to initiate a system like this --

3      A.   Yeah.

4      Q.   -- generally what would you think in your

5  expertise it would take to kind of initiate this

6  process, not just maintain it?

7      A.   Yeah, I wouldn't be able to exactly pinpoint

8  it without analyzing the environment, which of course we

9  couldn't do, but it would be more.  It would be more

10  than that.

11      Q.   So let me ask you, in regard to the cost of

12  running programs.  So, for example, you heard the

13  testimony of Mr. Meyer as to the costs of currently

14  maintaining the IT environment at the United Way,

15  correct?

16      A.   That's correct.

17      Q.   Okay.  And do you recall generally what his

18  annual costs were, roughly?

19      A.   I don't remember exactly, but I believe it was

20  in the realm of a million or so, something like that.

21  Maybe you can remind me.

22      Q.   Sure.  Does around 800 plus thousand sound

23  about right?

24      A.   Yeah, that sounds right.  Yeah, thank you.

25      Q.   So in regard to that, and maintaining it,

1    would the cost to kind of initiate and design and

2    implement these programs add any significant cost versus

3    just maintaining it once it's up and running?

4         A.   Yes.  So there's two things you would have to

5    look at in order to evaluate that.

6              The first is that the overall cost of cloud

7    solutions over the last say five years has dramatically

8    reduced, and so the cost of even maintaining the same

9    service is going down and is less in today's money.

10             It also would have required a greater cost in

11   the beginning because there would have been frankly more

12   engineering activity in order to build them.  You need

13   less people in general to maintain a system than you do

14   to build it in the first place.

15        Q.   So if I understand you correctly, to build it

16   and implement it you potentially are going to need more

17   people and there's going to be a higher up front cost,

18   and to maintain it is going to potentially cost less,

19   especially in light of the technology today where costs

20   are less for IT?

21        A.   That's correct.

22        Q.   Okay.  I want to ask you a little bit about

23   profitability and outsourcing.

24        A.   Sure.

25        Q.   Can you talk a little bit to the Judge about

1   what your view of the model that United Way had, you

2   know, in-house versus outsourcing and your review of

3   that?

4       A.   Yeah.  So the model that they used in terms of

5   offshoring and outsourcing IT is fairly common.  It's

6   fairly common in the industry to look to international

7   providers in order to keep costs constrained in an

8   appropriate way, and yeah.

9       Q.   And so, for example, outsourcing services to,

10  for example, Pakistan and hiring programmers or

11  engineers in Pakistan, would you agree with the idea

12  that that is going to be a lower cost for those services

13  versus the cost if you paid that same engineer in the

14  United States?

15      A.   Typically, yes.  The salaries in countries

16  such as Pakistan are dramatically lower.

17      Q.   And as a result, would you agree that that can

18  increase the profit margin of a company utilizing that

19  outsourcing model?

20      A.   Yes.  So to give an example, in my own company

21  we use software engineers in Costa Rica who are

22  potentially -- that are paid half roughly of what a

23  person here would cost, and they're mixed in where

24  appropriate, but the hourly rate to the customer is

25  roughly the same.  And so the profitability on one of

1    those engineers is significantly more.

2        Q.    And so in general terms when you use this

3    outsourcing model that we're talking about and using an

4    individual that may cost half of or significantly less

5    than an individual in the United States, what is

6    typically the profit that you might see an IT company

7    such as DigitalNet and other similar companies make?

8        A.    Yeah, so for an onshore company using current

9    resources, you know, on shore resources, we generally

10   see software development and IT services profit margins

11   sitting somewhere in the neighborhood of 30 percent.

12            In offshore environments of course it's

13   situationally dependent but can be north of that.

14       Q.    So above 30 percent?

15       A.    Sure.  Yeah, without an issue.

16       Q.    I want to ask you a couple of questions about

17   metadata.

18            MR. HUNTER:  Objection, your Honor.  None of

19   this was in Mr. Sgro's report.  We've received no

20   information about what he's going to testify to or the

21   basis of his testimony.

22            THE COURT:  Why is that?

23            MR. HARRINGTON:  Yeah, I'm asking him to

24   comment on testimony that's been adduced during the

25   course of trial relative to metadata.  I think he could

1  comment on things that might be relative to other

2  testimony.

3          THE COURT:  Why do you think that?  I mean,

4  he's an expert.  Isn't he supposed to disclose his

5  opinions in advance and the basis for them?

6          MR. HARRINGTON:  I assumed, Judge, that given

7  other information that sometimes comes up during the

8  course of trial that he would be able to comment on

9  that.

10          THE COURT:  Sure, other information that comes

11  up during the course of trial vis-a-vis opinions he's

12  disclosed, but this sounds like it's not an area he

13  disclosed; is that right?

14          MR. HARRINGTON:  Yeah, and I would agree with

15  that, Judge.  We didn't disclose anything relative to

16  metadata in his expert disclosure.  I was asking him to

17  comment relative to other testimony that's been adduced

18  at trial.

19          THE COURT:  I'm going to overrule the

20  objection even though it should be sustained.

21          Go ahead.  Go ahead.

22     Q.    So in regard to metadata --

23          THE COURT:  You just gave an opinion about

24  profitability.  Have you reviewed the markups in this

25  case?

1          THE WITNESS:  I've worked in this model for

2  quite a bit of time, yeah.

3          THE COURT:  I don't know what that means,

4  worked in this model.

5          THE WITNESS:  I own a company that works on

6  this model.

7          THE COURT:  No, have you reviewed the markups

8  in this case, the evidence in this case, several hundred

9  percent routinely?

10         THE WITNESS:  Yeah.

11         THE COURT:  Do you have an opinion about it?

12         THE WITNESS:  No.

13         THE COURT:  Okay.  All right.

14     Q.   So what is metadata on a computer?

15     A.   So metadata is data that is attached to a file

16  that shows things about the creation and storage and

17  movement of that file that is not visible in the file

18  itself.

19     Q.   Okay.  And metadata can be changed?

20     A.   Metadata changes all the time.

21     Q.   And how is that?

22     A.   So metadata is pretty sensitive.  If you were

23  to open a file, that would change potentially the

24  metadata.  If you were to move it from one place to

25  another, that could potentially alter the metadata.  If

1    it was created and copied, that copy of the metadata

2    would maybe be different depending on the way it was

3    reproduced.  So there's a lot of ways that metadata can

4    be changed.

5         Q.   Okay.  And would that include moving documents

6    say from one computer to another?

7         A.   Yeah.  So there's a possibility where when you

8    take a file from one computer and move it to the other

9    that the metadata could be changed if it was not moved,

10   you know, in a forensic way where that metadata was

11   assured to be preserved.

12        Q.   Okay.  And --

13             THE COURT:  Say that part again.

14             Wait a minute.  Let me just read it.

15             If it was not moved in a forensic way, what do

16   you mean by that?

17             THE WITNESS:  So there's a way of moving a

18   file and preserving its metadata so that you know that

19   the copy of it is absolutely exact.  And if you don't

20   move it in that way, then the file will change.

21             THE COURT:  Like, what, downloading it to a

22   thumb drive and saving the thumb drive?

23             THE WITNESS:  That would change the metadata.

24             THE COURT:  Oh, it would change the metadata?

25             THE WITNESS:  Yes.  Correct.

1          THE COURT:  Okay.  I thought -- let me ask you

2    a question about this.  I learned a little bit about

3    metadata in this trial that I didn't know.  I always

4    thought metadata was a way of perhaps seeing prior

5    drafts of the same document in its various forms as it

6    got to the final version.

7          THE WITNESS:  That would be a revision

8    history.

9          THE COURT:  That's a revision history.  Is

10   that a type of metadata?

11         THE WITNESS:  That can be stored as a type of

12   metadata, yes.

13         THE COURT:  Not the type that was presented

14   here.  The type that was presented here shows me more

15   like who was the author and --

16         THE WITNESS:  Location, author, correct.

17         THE COURT:  Those are all different types?

18         THE WITNESS:  Yeah, that's all metadata, but

19   it is different components of the metadata, correct.

20         THE COURT:  Okay.  I see.

21     Q.   In that regard, if you had a document, let's

22   say a contract --

23     A.   Yes.

24     Q.   -- but you had multiple versions of that same

25   contract --

1        A.    Uh-huh.

2        Q.    -- the metadata for each contract might be

3   different based on when it was viewed, correct?

4        A.    Correct.

5        Q.    When it was opened?

6        A.    Correct.

7        Q.    When it was edited?

8        A.    Where it was created, yes.  That's correct.

9        Q.    Okay.  In regard to profit -- I want to pick

10  up on a question the Judge had raised.  You heard some

11  testimony -- you listened to the testimony of Kevin

12  Kennedy in this case, correct?

13       A.    Yes, I did.

14       Q.    And you heard him talk about the profits that

15  were reported on Mr. Alrai's tax returns, correct?

16       A.    Yes, I did.

17       Q.    And those profits were in say the 30 percent

18  range, correct?

19       A.    32.5, I believe, yeah.

20       Q.    Okay.  Is that, based on your knowledge of the

21  industry and experience, in the range of what would be

22  considered a profit with this outsourcing model, a

23  reasonable profit based on this outsourcing model?

24       A.    Yeah, I would consider 32.5 percent

25  reasonable.

1    Q.   Now, the last thing that I wanted to ask you

2  about was in regard to the provision of services by

3  DigitalNet in regard to the contracts.

4         You reviewed all of the contracts that were

5  issued between United Way and DigitalNet, correct?

6    A.   I did.

7    Q.   Okay.  And in order to provide those services

8  that were called for under the contract, would that

9  require a team of providers?

10    A.   Yes.  Certainly.

11    Q.   Okay.  And based on your review and listening

12  to Mr. Naviloff and Mr. Kennedy testify, do you have any

13  opinions or conclusions relative to the Pakistan office

14  of United Way in the provision of services?

15    A.   Yeah.  IT engineers are generally specialized,

16  and so in order to provide the totality of those

17  services it would have taken various engineers, and I

18  think Mr. Meyer even alluded to currently in the

19  quote-unquote better state of IT, it still takes him six

20  to eight, plus himself, so seven to nine people.

21         I would expect no less than that to have

22  existed out in the Pakistan business unit as a result

23  and potentially more.

24    Q.   And where would the potentially more piece

25  come in relative to the provision of services?

1    A.    Well, Mr. Meyer -- the environment Mr. Meyer

2    inherited and has since migrated is in much better shape

3    than what my analysis would show Mr. Alrai inherited and

4    what he was working with, and so the amount of

5    engineering activity that is ongoing would have to be

6    less than what was originally needed.

7        Q.    Okay.  And therefore, in your opinion more

8    individuals or more staff would have been needed

9    potentially to implement those services?

10       A.    Yeah, more staff because more subject matter

11   expertise would have been required.

12           MR. HARRINGTON:  Judge, I don't have any other

13   questions for Mr. Sgro.

14           THE COURT:  All right.  We'll do the

15   cross-examination after my -- I have to have another

16   hearing very briefly.

17           I do anticipate being back down here by 2:15

18   though, so we'll do the cross-examination then.

19           MS. LE:  Your Honor, should we clear the

20   courtroom for your next hearing?

21           THE COURT:  I'm doing it upstairs.  Thank you

22   for offering.

23           (RECESS)

24           THE COURT:  Mr. Sgro, you're still under oath.

25           You may proceed.

1          MR. HUNTER:  Thank you, your Honor.

2                    CROSS-EXAMINATION

3    BY MR. HUNTER:

4          Q.   Good afternoon, Mr. Sgro.

5          A.   Good afternoon.

6          Q.   I just have a few questions to ask.  Hopefully

7    not too many.

8               Isn't it true you testified that you thought

9    Mr. Naviloff's report was thorough and he did an

10   analysis of the invoices and comparing it to the

11   contracts?

12         A.   Yes.

13         Q.   And you didn't conduct the same type of

14   analysis of the contracts and the invoices; is that

15   correct?

16         A.   No.  Many areas of his analysis are beyond my

17   scope of practice and expertise.

18         Q.   And you also heard testimony from John Meyer;

19   isn't that right?

20         A.   That's correct.

21         Q.   And isn't it true that John Meyer, as you

22   testified, is in a better position than you or Mr.

23   Naviloff to assess the system he inherited from

24   DigitalNet and Mr. Alrai?

25         A.   I would agree that he knows potentially more

1    about the existing IT system, correct.  I was not given

2    an opportunity to analyze it.

3        Q.    Right.  He's in a better position to evaluate

4    the system?

5        A.    Based on my inability to analyze it, yes.

6        Q.    Yes.  And isn't it true that Mr. Meyer

7    testified that he had about five to eight people I think

8    working on the United Way account?

9        A.    Yes.  If that's true, yes.  It sounds about

10   right.

11       Q.    And he also had testified -- isn't it true he

12   testified that he transitioned from OVH hosting United

13   Way's IT environment to Amazon Web Services, AWS?

14       A.    He did testify that, yes.

15       Q.    And that would include the engineering and

16   programming involved in that transition, right?

17       A.    If he provided that engineering, then yes.

18       Q.    Yes.  And Mr. Meyer testified that that type

19   of service was included in his monthly charge, right?

20       A.    He charges a flat rate of $44,800 a month for

21   all of those services, right.

22       Q.    Yes.  And Mr. Meyer also testified that he

23   transitioned from SIP.US to 8x8 for the phone system?

24       A.    He did testify that, yes.

25       Q.    And it's true he also testified that included

1    in his flat rate was the services in transitioning to

2    that system?

3         A.   He did testify that, yes.

4         Q.   And that -- and he also testified that DTS is

5    currently maintaining and supporting this, I think as

6    you described it, a living system of networks, virtual

7    desktops, and phones.  Isn't that right?

8         A.   Yes.

9         Q.   That includes hosting and maintaining the IT

10   environment.  Isn't that right?

11        A.   If he said so, yes.

12        Q.   And the phones?

13        A.   8x8 is the company that currently hosts the

14   phones.

15        Q.   Now, you also talked a little bit about the

16   phone system and the services charged by DigitalNet for

17   that phone system.  Do you recall testifying to that?

18        A.   Yes, I recall.

19        Q.   And you talked a little bit about the pricing

20   and the managed IT services agreement under I think it

21   was application, operating system, and database

22   management for Telephony related consulting?

23        A.   I'm sorry.  Can you put that back up?

24        Q.   Oh, sure.  You testified about this service,

25   right, included an application, OS, and database

1  management?

2      A.   Yes.   That's correct.

3      Q.   Okay.  And on direct isn't it true you

4  testified that that cost appears appropriate to manage

5  phone services?

6      A.   No, that's incorrect.  I testified that that

7  cost was what they were charging as a flat fee to manage

8  the legacy phone system that existed.

9      Q.   Correct.  The legacy phone system that was

10  existing before SIP.US was brought in?

11      A.   Correct.  I didn't attest to the

12  appropriateness of it, just that that was what they were

13  charging.  That's correct.

14      Q.   Okay.  And you testified that that would no

15  longer go toward managing the phone system after they

16  moved to SIP.US, right?

17      A.   I didn't testify that.  I actually would note

18  that there's a lot of things in that service bucket,

19  right, so there's -- if you wouldn't mind putting it

20  back up.  That's not only for Telephony services but

21  also things like SQL, which is database, Windows Server,

22  many things which still existed.

23          In this type of flat fee, if you would,

24  bucket, it's normal -- each one of these services does

25  not make up a proportional -- an equal component of that

1    $3,500.  So it's reasonable to me that that $3,500 may

2    or may not have been appropriate depending on these

3    other systems that were there.

4        Q.   Sure.  But that $3,500 is charged to provide

5    those services regarding operating system and database

6    management?

7        A.   Comprehensively the $3,500 is for all of those

8    services, yes.

9        Q.   Right.  And that includes management of the I

10   guess legacy phone system?

11       A.   That did include the management of the legacy

12   phone system to my understanding.

13       Q.   And I believe you testified that that does

14   not -- that once switched to SIP.US, the Telephony

15   contract, the cost of managing the phone system was then

16   wrapped up in that $70 per month phone line fee?

17       A.   The management required for SIP.US is

18   included, to my understanding, in the $70 per month per

19   line charge.

20       Q.   But isn't it true that DigitalNet never

21   charged less than that $3,500 per month, which included

22   phone maintenance for the legacy system, after moving to

23   SIP.US?

24       A.   That is true that the $3,500 in my evaluation

25   was not reduced, but it is not $3,500 for managing the

1   phone system.  It's the totality of that work.

2           And so if there was any kind of change in the

3   rest of those services, then a reduction in costs

4   wouldn't have been appropriate.

5       Q.   All right.  But there was no reduction in

6   cost?

7       A.   No.

8       Q.   And they were no longer providing services for

9   the legacy phone system after moving to SIP.US?

10      A.   As a subset of that $3,500 block, they would

11  no longer have been supporting the legacy system after

12  moving to SIP.US, correct.

13      Q.   Now, you also testified a little bit about

14  geographic diversity.

15      A.   I recall.

16      Q.   And was it your testimony that geographic

17  diversity could refer to the location of the servers and

18  the client?

19      A.   No.  I was attesting that -- geographic

20  diversity is in relation to two systems that may host

21  either the same types of data or data may move between

22  them.

23           What I was speculating was that those systems

24  could have been partially at the office of the United

25  Way and one data center or one data center and another

1    data center that was not owned by OVH.

2        Q.    In your report you said that you saw no

3    evidence in the contracts between DigitalNet and its

4    subcontractors, or DigitalNet and United Way, that

5    suggests regional diversity of servers or fault

6    tolerance beyond redundancy and backup.

7             THE COURT:  You're going way too fast.

8             MR. HUNTER:  I'll slow down.

9        Q.    In your report, Mr. Sgro, you said that you

10   saw no evidence in contracts between either DigitalNet

11   and its subcontractors, nor DigitalNet and United Way,

12   that suggests regional diversity of servers or fault

13   tolerance beyond that of server redundancy and backup.

14             Isn't that right?

15       A.    Could you put that on the slide so I might

16   reference it?

17       Q.    Oh, yeah, I can.

18             THE COURT:  AUSA Hunter, I know you think

19   you're slowing down --

20             MR. HUNTER:  But I'm not.

21             THE COURT:  You're not, yeah.  It's a little

22   bit of a struggle, so do your best.

23             MR. HUNTER:  Okay.

24       Q.    So forgive me for underlining, but is this a

25   line from your report?

1      A.    Yes, that is correct.

2      Q.    Okay.  Now, you were here for Mr. Naviloff's

3   testimony?

4      A.    I was.

5      Q.    And you saw the slides, right, where

6   DigitalNet was saying they would provide a

7   geographically diverse dispersed high availability

8   environment, right?

9      A.    You're referencing the 2013 IT managed

10  services contract?

11     Q.    Yes.

12     A.    They did state that.

13     Q.    And the CloudConnect contracts referred to

14  different geographic locations of the CloudConnect

15  infrastructure.  Isn't that right?

16     A.    Yes, the CloudConnect wording suggested that

17  they had multiple data centers and were regionally

18  diverse at that time.

19     Q.    And that would be a contract between

20  DigitalNet and one of its subcontractors, right?

21     A.    Sure.  Yes.

22     Q.    That suggests regional diversity of servers.

23     A.    That does suggest regional diversity of

24  servers.

25     Q.    Okay.  So did you just miss that when you were

1  writing your report?

2      A.    Could you put the report up?  I would like to

3  read that in context.

4      Q.    Yeah, absolutely.

5      A.    So when I was -- I'm sorry, can you leave that

6  up?

7      Q.    Sorry.

8      A.    I apologize.

9      Q.    No problem.

10      A.    I made that comment with regard to the service

11  outage that Mr. Meyer discussed in his interview with

12  the FBI.  And so within the service outage described by

13  Mr. Meyer, I see no evidence in the contracts between DN

14  and the United Way that suggests regional diversity of

15  servers or fault tolerance.

16      Q.    So regarding the service outage, that was when

17  United Way was contracting with OVH, right?

18      A.    That's correct.

19      Q.    But not with CloudConnect?

20      A.    Yes.  That appears to be a mistake.

21      Q.    Okay.  You also mentioned that setup is the

22  most expensive part -- setup was the most expensive

23  charge compared to the ongoing service charge, the

24  month-to-month charge of the hosting environment?

25      A.    It is typical for setup charges and the

1    building of infrastructure to exceed the cost of its

2    ongoing maintenance.

3         Q.   And isn't it true that during the six years

4    the cost that DigitalNet -- and so isn't it true then if

5    that's the most expensive cost, you're going to expect

6    to see costs down over time?  Isn't it true --

7              THE COURT:  Hey, slow down.

8              MR. HUNTER:  I will take a breath and slow

9    down, your Honor.

10             THE COURT:  Yeah, please.

11        Q.   Isn't it true, Mr. Sgro, that you would expect

12   then the amount that DigitalNet charged to go down over

13   time if that one-time cost of setup is paid?

14        A.   I wouldn't necessarily expect that, no.

15        Q.   For it to ever go down?

16        A.   You would have to -- in order to understand

17   whether or not the costs should be reduced over time,

18   you would have to analyze the environment and understand

19   what services were being used and whether or not there

20   was an increase in the amount of services.

21             For instance, licensing costs could go up

22   after the initial build-out as a result of hiring

23   employees or things like that.  And so without seeing

24   the environment and not being able to analyze it, I

25   wouldn't be able to give you an accurate answer to that.

1     Q.    Right.  So you don't know what extra services

2  DigitalNet provided above and beyond what was built from

3  the vendor and what's in their contracts, right?

4     A.    I was never able to analyze the environment,

5  correct.

6     Q.    You did receive a two terabyte hard drive with

7  images of the IT help desk computers on Mr. Alrai's

8  United Way computer though, right?

9     A.    I received a drive that had those computers on

10  those, but those are not the environment that we're

11  speaking of.

12     Q.    Of course.  And regarding the setup of the

13  phones and of the servers, isn't it also true, based on

14  the invoices, that DigitalNet billed separately for all

15  that setup?

16     A.    DigitalNet did bill separately for setup of

17  certain services; that is correct.

18     Q.    Just a moment.

19          Sir, what kind of markups do you and your

20  company bill for your clients' IT services that you

21  provide?

22     A.    The services we provide fall into various

23  buckets.  In general, we provide markup that is, you

24  know, anywhere from 30 to maybe 45 percent depending on.

25     Q.    Okay.  So a 32 percent markup is reasonable, I

1  think you said?

2       A.   That would be reasonable for our services,

3  yes.

4       Q.   Okay.  Is a hundred percent markup reasonable?

5       A.   I would have to evaluate the service in order

6  to understand what is reasonable, but in our business

7  that would not be typical.

8       Q.   Okay.  Is a 500 percent markup reasonable?

9       A.   My answer would be the same.

10      Q.   What about a 1000 percent markup; is that

11  reasonable?

12      A.   Still the same, counselor.

13           MR. HUNTER:  Nothing further.

14           MR. HARRINGTON:  May I inquire, your Honor?

15           THE COURT:  You may as long as you speak

16  slower.

17           MR. HARRINGTON:  I haven't been chastised yet,

18  Judge.

19           MR. AYER:  But the rest of us have.

20           MR. HARRINGTON:  Blame Mr. Hunter.

21           THE COURT:  For what it's worth, you know, I

22  was a big violator of that rule myself when I had your

23  job, and I understand how easy it is to get moving.

24           Go ahead.

25           MR. HARRINGTON:  Thank you, Judge.

1          REDIRECT EXAMINATION

2     BY MR. HARRINGTON:

3          Q.    So just a couple of questions for you.

4                Attorney Hunter had put up the part of your

5     report that was talking about the outage with OVH,

6     correct?

7          A.    That's correct.

8          Q.    And you had indicated that there was a mistake

9     relative to the mention of CloudConnect versus OVH,

10    right?

11         A.    Yeah, I believe we were talking about one data

12    center versus the other.

13         Q.    Sure, but the information -- the mistake was

14    saying CloudConnect versus OVH, correct?

15         A.    Yeah, we transposed the name of the company by

16    accident.

17         Q.    So the information or the substance of the

18    statement is not a mistake.  It's just the reference to

19    CloudConnect versus OVH?

20         A.    That's correct.

21         Q.    Okay.  In regard to -- I want to talk to you

22    just very briefly about SIP and the invoice that we were

23    talking about.

24                You may recall it was the invoice for SIP

25    which was roughly about $1,000 per month, correct?

1      A.   I recall.

2      Q.   And then there was a bill from DigitalNet that

3 was for about $13,000 roughly, correct?

4      A.   That's correct.

5      Q.   And one of the things that you were trying to

6 explain to the Court was relative to the different

7 services that were being provided by DigitalNet relative

8 to that $13,000 cost, correct?

9      A.   That's correct.

10     Q.   Okay.  And so when you were talking about

11 that, one of the questions that was asked of you by the

12 Judge, and the prosecutor just touched on it as well,

13 was relative to markup.  I wanted to kind of bring you

14 back to that because I wasn't sure after listening to it

15 whether you were tracking the same question I was.  I

16 want to make sure I'm on the same page and that you

17 answer the Judge's question if you can.

18     A.   Fair enough.

19     Q.   Which is, we have a $1,000 bill from SIP and a

20 $13,000 bill from DigitalNet, and that was characterized

21 as there's a markup in that, correct?

22     A.   That's how it was characterized in the RSM

23 report.

24     Q.   And so one of the things the Judge asked you

25 is, you know, what do you think of that markup, do you

1    have an opinion about that markup, and I want to make

2    sure that you have an opportunity to answer that in a

3    little bit more detail because one of the things you

4    were talking about were other services that were beyond

5    that 1,000.  So if you could answer that question a

6    little more fully, I would appreciate it.

7         A.   Yeah, so in my analysis I would not call that

8    markup.  It is true that the SIP.US component of that

9    service cost DTS roughly a thousand dollars a month.

10   However, there are many other services that go into

11   providing a Telephony system, networking, setup of

12   the -- not just the initial setup, but setup of new

13   phones.  There is the messaging system.  There's all

14   sorts of technical expertise that is required to make

15   the phones work the way we expect when the phone is

16   picked up.

17              Now, it's very hard to trace into the

18   invoices, and we see that example, which is actually an

19   example that was brought up by Mr. Naviloff.  There's I

20   believe it's an $890, $899 charge, forgive me, I'm over

21   here trying to remember, for bandwidth for the service

22   that was not able to be traced into any of the invoices,

23   and that is another component which would have been a

24   cost paid as part of delivering the Telephony service.

25              You can see that it's not -- it's not clear

1  without really analyzing the system itself and its setup

2  and how it is used in order to say, you know, what part

3  of those services -- or what part of that money would

4  have been truly markup in terms of profit versus the

5  cost of providing that service.

6      Q.   And so in that regard we're talking about this

7  $13,000 bill from DigitalNet?

8      A.   Right.

9      Q.   And that bill comes in as managed Telephony

10 services, correct?

11     A.   That's correct.

12     Q.   Okay.  And in that regard you weren't trying

13 to tell the Judge, well, geez, I don't have any comment

14 on that markup.

15          Would it be fair to say that based on what you

16 understand would be required to manage a Telephony

17 service as it existed in the cloud, that type of invoice

18 or cost would be an appropriate cost?

19     A.   Yeah.  Again without analyzing the actual

20 environment, it's hard to actually give an opinion on

21 the appropriateness of cost.

22          What I can say definitively is that much of

23 that cost should have been costs incurred by DTS to

24 provide that service, right, but from an engineering

25 standpoint and other providers, such as bandwidth.

1       Q.   Okay.  And so certainly in regards to saying

2   that you didn't have a comment on the markup, you're not

3   trying to tell the Judge that you think there was an

4   inappropriate markup in price or it was too high a

5   markup, that's not the message you're trying to convey

6   to the Judge?

7       A.   No, not at all.

8            MR. HARRINGTON:  I have no other questions,

9   Judge.

10           MR. HUNTER:  Very, very briefly, your Honor.

11                    RECROSS-EXAMINATION

12  BY MR. HUNTER:

13      Q.   Regarding the OVH outage, Mr. Sgro, I think

14  you said outages are fairly normal?

15      A.   Technical systems break.

16      Q.   Is a three-to-four day outage a normal

17  occurrence?

18      A.   Depending on the circumstances of the

19  occurrence I would say it is not typical that services

20  would go down that long, but it's not out of the realm

21  of possibility surely.

22      Q.   Regarding costs incurred by DigitalNet to

23  provide various services, isn't it true that you didn't

24  analyze DigitalNet's financial records or other business

25  records to determine the costs that they incurred in

39

1   providing those services?

2       A.   No.   That would be outside of my scope of

3   practice.

4       Q.   So that sort of accounting work is outside

5   your scope of practice?

6       A.   Certainly.

7       Q.   So if the Court adopts the accounting analysis

8   of Mr. Naviloff or some of the analysis done by Mr.

9   Kennedy, which again you say is beyond your expertise in

10  the accounting, would you agree that a 1,000 percent

11  markup is abnormal for IT?

12      A.   Well, there's two parts of your question.

13  I'll try to answer them separately.

14          The first is that -- yeah, so if the Court

15  adopts that analysis, I would say my only issue with the

16  analysis is it seems to be bucketed, from my

17  understanding of the testimony, into the analyzed

18  services and not analyzed services, and there's a lot of

19  inferences and discussions about how services belong --

20  which services belong in which bucket, and I think

21  there's still questions in my mind about how that was

22  achieved given that we don't have the ability to analyze

23  the actual environment or the communications, the

24  delivery of the actual engineering services.

25          But in any case, yeah, I would say that a

1    thousand percent markup, if that were in fact the case,

2    would seem abnormal at least for my business.

3        Q.   And just to be clear, isn't it true you have

4    no opinion about Mr. Naviloff's analysis of the money

5    being spent on personal versus business related

6    expenditures?

7        A.   I did not analyze any of the personal

8    expenditures.

9            MR. HUNTER:  No further questions.

10           MR. HARRINGTON:  I have nothing else for the

11   witness, your Honor.

12           THE COURT:  Thank you, sir.

13           THE WITNESS:  Thank you.

14           MR. HARRINGTON:  Your Honor, the defense

15   rests.  We have no further witnesses to present.

16           THE COURT:  Thank you, Mr. Harrington.

17           All right.

18           MR. DAVIS:  Your Honor, the government would

19   like to call Mr. Naviloff briefly in rebuttal.

20           THE COURT:  What's your position?

21           MR. HARRINGTON:  I'm not sure what the

22   rebuttal is.  I guess we'll find out.

23           THE COURT:  Do you object to them calling a

24   rebuttal witness, and if so, on what grounds?

25           MR. HARRINGTON:  I don't have an objection to

1  a rebuttal witness if the subject matter is appropriate.

2          THE COURT:  Thank you.

3          Mr. Naviloff, you may retake the stand.

4          You don't need to be sworn in again.  You're

5  still under oath.

6          THE WITNESS:  Understood.

7          MR. DAVIS:  Your Honor, the subject matter is

8  the testimony by both defense experts about profit

9  margin and the relevant profit margin based on tax

10  records.

11          THE COURT:  Please proceed.

12          MR. DAVIS:  All right.

13              REBUTTAL TESTIMONY OF GREG NAVILOFF

14                   DIRECT EXAMINATION

15  BY MR. DAVIS:

16      Q.  Good afternoon, Mr. Naviloff.

17      A.  Good afternoon.

18      Q.  Now as part of your work in this case as an

19  expert, did you have occasion to review the expensing

20  that was done in connection with Mr. Alrai's taxes?

21      A.  Yes, I did look at the tax returns for the

22  years that they were provided, which was --

23      Q.  And as part of that, did you examine items

24  from Mr. Terry's file that were both tax returns and

25  work papers pertaining to Mr. Alrai?

1        A.    Yes, I did.

2        Q.    All right.  And did you notice a change over

3   time in the profit margin that Mr. Alrai was showing in

4   his returns between 2013 and 2018?

5        A.    Yes.  It fluctuated significantly among those

6   years.

7        Q.    So showing you first Exhibit 927, the first

8   page, are these slides that you prepared and have

9   previously been disclosed?

10       A.    Yes, it's my understanding.

11             MR. DAVIS:  Your Honor, I move to admit 927

12   and strike the ID.

13             MR. HARRINGTON:  No objection to that.

14             THE COURT:  It's admitted.

15             (Government's Exhibit 927 admitted)

16       Q.    All right.  And just looking briefly at this,

17   this is a summary of the tax returns on the 1040

18   Schedule C which we've already looked at a little bit,

19   profit or loss from business, correct?

20       A.    That's correct.

21       Q.    And it's for the years 2013 through 2017,

22   which are the tax years you had from Mr. Terry?

23       A.    Correct.

24       Q.    All right.  And it shows -- you show on the

25   bar charts gross receipts or sales on Schedule C and

1    also gross receipts or sales per the bank statement

2    deposits from United Way and Robert Allen, correct?

3         A.   That's correct.

4         Q.   All right.  And you also show on the gray line

5    another calculation; is that right?

6         A.   Yes.

7         Q.   All right.  And what does that gray line show?

8         A.   That is taken from Schedule C, line 5, so it's

9    actually a calculation based upon that line, but it

10   would take the gross sales and compare it as a

11   percentage of the gross profit that was being reported.

12              So the difference between the gross

13   receipts/sales and the gross profit would be the cost of

14   services, right?  And so, in essence, the cost of doing

15   all the labor and materials associated with providing IT

16   solutions to DigitalNet's customers.

17        Q.   Okay.  So it's actually a gross profits line

18   item on the Schedule C on the tax return, right?

19        A.   Correct.

20        Q.   All right.  And you used it to calculate a

21   percentage that represents the gross profit percentage,

22   right?

23        A.   That is correct, yes.

24        Q.   And did you hear the defense experts testify

25   that 32 percent, 32.5 percent might be reasonable in the

1    IT business?

2         A.    Yeah.   I believe they were referring to the

3    net income, I'm guessing, rather than the gross profits.

4              However, Mr. Sgro made reference to

5    essentially the gross profits, and I believe that may

6    have been more apples to apples at 35 percent, but it

7    wasn't quite clear which lines they were referring to.

8         Q.    Okay.   All right.   But what you've calculated

9    for 2013 is a gross profit.   And just looking at the

10   scale on the right there, you're right around almost 80

11   percent in 2013, correct?

12        A.    Yes.   That's correct.

13             Also, in just making mention of Mr. Sgro's

14   testimony, you know, the statement that was made was

15   that in essence that there would be more costs related

16   to structuring and man-hours and potentially labor that

17   was incurred up front as DigitalNet and Mr. Alrai looked

18   to overhaul the system that was inherited and revamp it

19   to function more efficiently.

20        Q.    In other words, you would expect a lot of

21   start-up costs early?

22        A.    Yes.   Exactly.

23        Q.    All right.   So in 2014 your chart shows gross

24   profit went, what is that, somewhere north of 80

25   percent, right?

1          A.    That's correct, yes.

2          Q.    All right.  And then something happened to the

3     gross profit amount, right?

4          A.    Yes, I agree.  So we go from in excess of 80

5     percent gross profit percentage to somewhere north of 50

6     percent and continued downward significantly into 2016

7     where it was slightly over 40 percent and remained.

8          Q.    All right.  So 2016 we're showing gross profit

9     there at just maybe even slightly under 40 percent,

10    right?

11         A.    Correct.

12         Q.    Okay.  Now what happened?

13         A.    Well, that's what I wanted to know.  It was

14    the source of some head-scratching as far as

15    understanding what was occurring in the business.

16         Q.    Okay.  So let's look at Exhibit 207, page 568,

17    which is a work paper from the 2016 Mr. Terry work

18    papers.

19              MR. DAVIS:  I'm sorry.  Exhibit 207, page 568.

20              I'll have to go back.

21              THE COURT:  Take your time.

22         Q.    All right.  Do you see that page?

23         A.    Yes, I do.

24         Q.    And is that from the work papers that were

25    used based on information provided by Mr. Alrai to his

1   CPA?

2          A.    That's my understanding, yes.

3          Q.    And we can see the income.  The income for

4   DigitalNet that year is about 1.5 million at the top,

5   right?

6          A.    That's what the schedule is showing, yes.

7          Q.    Okay.  And then there's some expenses you

8   would expect to see in a business, and that's payroll

9   and payroll taxes and subcontractors, right?

10         A.    That's correct.

11         Q.    So payroll is all the people you're employing

12  working for you, right?

13         A.    Yes.

14         Q.    And then subcontractors is the vendors you

15  have subcontracted with to provide services, right?

16         A.    Correct.

17         Q.    Okay.  And that could be say a CloudConnect

18  that's providing a service to United Way?

19         A.    It very well could be, yes.

20         Q.    Okay.  All right.  But that whole total there,

21  and I'm just looking at ballpark, that's only a little

22  bit more than $500,000, right?

23         A.    That's correct.

24         Q.    All right.  And so the difference between the

25  1.5 at the top and the cost of your employees and your

1    subcontractors is a million bucks, right?

2        A.    That's correct.

3        Q.    All right.  And then we see a bunch of

4    expenses.  There's telephone, there's insurance, office,

5    and then a whole lot of other stuff, household,

6    utilities, travel, parking, professional fees, I guess

7    that's lawyers, automobile, meals and entertainment,

8    recreational, right?

9        A.    Correct.

10       Q.    All right.  But none of those is big money on

11   this chart, right, except for maybe the 60,000 in

12   travel?

13       A.    Well, I would say that those are all

14   attractive dollars to me, but they don't -- in total

15   they're maybe a little over a hundred thousand.

16       Q.    Right.  But you've still got a big delta

17   between the 1.5 million you're earning and what you're

18   actually showing as expenses for your business, right?

19       A.    Correct.

20       Q.    All right.  But then we have another item,

21   don't we, and it says IT support.  What is that?

22       A.    I'm not sure.

23       Q.    Well, what's the amount?

24       A.    It's $1,048,769.94.

25       Q.    All right.  And COS, is that cost of service?

48

1       A.     That is what would commonly be COS in a

2   business of this type.

3       Q.     All right.  So now we're talking real money,

4   right?

5       A.     Well, it's over a million.

6       Q.     Right.  And what this sheet shows is that

7   against an income for DigitalNet of 1.5 we can account

8   for 1.8 in business expenses, right?

9       A.     The key to this schedule and the way I viewed

10  it, the cost of sales, and I believe it's that combined

11  with the subcontractors, gets you to the total that was

12  reported on Schedule C as the cost of sales that gets

13  you from that gross receipts down to the gross profit

14  that we were showing in the last slide.

15      Q.     Okay.  So there are components already in

16  there that are counted in the cost of services?

17      A.     So to analyze the Schedule C, I needed to

18  understand the components.

19      Q.     Okay.

20      A.     And one of those components and the largest of

21  those components was this cost of service IT support

22  line.

23      Q.     All right.  So you had questions about IT

24  support, right?

25      A.     That's correct.

1    Q.   All right.  So let's look very briefly at the

2    returns.

3         MR. DAVIS:  Exhibit 153, if we can go just to

4    the 1040 face sheet.  So that's the estate and trust at

5    the beginning, but if we flip through that -- we've done

6    this once before.

7    Q.   Okay.  So now we're at the -- this is Exhibit

8    153, and we're at the 2016 individual return, right?

9    A.   Yes.

10   Q.   All right.  And what we see is a business

11   income or loss on line 12 of almost 300,000, right?

12   A.   That would be business income, yes.

13   Q.   Right.

14        MR. DAVIS:  Business income on line 12.  Do

15   you see that, Ms. Sheff?

16   Q.   Okay.  So that's the bottom line that goes on

17   the front of the 1040, right?

18   A.   Yes.

19   Q.   But to understand how it got there, we have to

20   go to Schedule C, right?

21   A.   Correct.

22   Q.   And Schedule C, if we flip through just past

23   Schedules A and B, here we are, profit or loss from

24   business, right?  And this shows on line 1 $2 million

25   gross receipts or sales, right?

1       A.    Correct.

2       Q.    Okay.  And then on line 4 what does it show?

3       A.    That's the -- it says cost of goods sold, but

4    essentially, given the nature of this organization, it's

5    the cost of services.

6       Q.    All right.  So that's more than $1.4 million

7    cost of goods sold, right?

8       A.    Yes.  1,446,000.

9       Q.    And you subtract that right from gross

10   receipts or sales and you get your gross profit in line

11   5, right?

12      A.    Correct.

13      Q.    And your gross profit is now 585 grand, right?

14      A.    Correct.

15      Q.    Okay.  So that year we had a 1.4 cost of goods

16   sold.  Let's just compare again 2013.

17            MR. DAVIS:  Can we go to Exhibit 204 briefly.

18      Q.    Back in 2013 we had the same 1040 filed,

19   right?

20      A.    That's correct.

21      Q.    And that year we showed in line 12 business

22   income of over $900,000, right?

23      A.    Correct.

24            MR. DAVIS:  All right.  And let's go to

25   Schedule C.

1      Q.    On Schedule C here, a profit or loss from

2  business, we see gross receipts of sales of 1.2 million,

3  right?

4      A.    That's correct.  That agrees with the amounts

5  that the United Way and --

6      Q.    Okay.  Then we go to cost of goods sold, line

7  4, and what do we see?

8      A.    So the cost of services listed here, cost of

9  goods sold, is 224,836.

10      Q.    All right.  And this is the first year that

11  DigitalNet is reporting taxes, right?  This is kind of a

12  start-up year, 2013?

13      A.    My understanding is that AISA Consulting, I

14  think it was incorporated or, excuse me, registered in

15  maybe 2012.  I'm not sure if there's a tax return for

16  2012.

17      Q.    All right.  But this is early in the story,

18  not late, right?

19      A.    Seemingly.

20      Q.    Right.  And on line 5 DigitalNet is showing --

21  or the profit or loss from business sheet is showing

22  more than a million dollar gross profit in 2013, right?

23      A.    Yes.

24      Q.    And three years later, in 2016, we just saw

25  they're only showing 500,000 and something gross profit,

1   right?

2        A.   Yes, it decreases.

3        Q.   All right.  And that's because the cost of

4   goods sold over those same three years went from 224K in

5   2013, right, right in front of us?

6        A.   Correct.

7        Q.   And then 1.4 million in 2016, right?

8        A.   Correct.

9        Q.   So you had a question?

10       A.   Yes.  The 1 million related to IT services in

11  2016.

12       Q.   And did you then endeavor to look at a little

13  more closely in 2016 what were the components of this

14  cost of goods sold claim of 1.4 million?

15       A.   That was my question and that was what I began

16  to search through the information, the tax information

17  and accounting support.

18       Q.   Okay.  So showing you 207c, which is -- I'm

19  sorry.  Is 207c also among the work papers Mr. Terry

20  provided?

21       A.   Yes.

22       Q.   All right.

23            MR. DAVIS:  Your Honor, move to admit 207c and

24  strike the ID.

25            MR. HARRINGTON:  No objection.

```
1                 THE COURT:  Admitted.

2                 (Government's Exhibit 207c admitted)

3           Q.    And you can see on the top this is 2016

4     combined from all spreadsheets?

5           A.    Correct.

6           Q.    All right.  And what on this sheet was

7     important to you as you went about your inquiry?

8           A.    Well, I could tell from at least the far right

9     column that there were certain adjustments being made

10    presumably to take information that Mr. Alrai provided

11    to his accountant to presumably what ended up in various

12    parts of his tax return and identified the cost of goods

13    sold, initials, or acronym next to the subcontractors

14    and the IT support, which are the very two bottom rows.

15          Q.    Okay.

16          A.    The total of which agreed to the amount shown

17    on Schedule C, cost of goods sold.

18          Q.    Okay.  So you're talking about the number at

19    the very bottom down there, right?

20          A.    Correct.

21          Q.    All right.  Now, did you also look at the

22    associated work papers for Mr. Alrai that showed the

23    activity in the DigitalNet bank account over that same

24    period?

25          A.    Yes.  That is correct.
```

1        Q.    And this is again for 2016?

2        A.    Correct.

3        Q.    All right.  And did this particular page come

4   to your attention?

5        A.    It did.  This and the following page.

6        Q.    Okay.

7        A.    So this is the bottom section of this page

8   after the sales of 1,532,000.

9        Q.    So that sales, that's an income number, right?

10       A.    Yes, that ties partially to their income.

11       Q.    All right.  But below that, what did you find?

12       A.    This is a listing of dates, amounts and

13   transaction type, along with a description indicating

14   that they were payments to vendors for utilities, goods,

15   and services.

16       Q.    All right.  And they go all the way down the

17   page, right?

18       A.    Correct.

19       Q.    And then they go on over to another page,

20   right?

21       A.    Correct.  I believe they are in date order.

22       Q.    All right.  And I'm showing you that next page

23   of Exhibit 207c.  There's all these other checks, right?

24       A.    Correct.

25       Q.    All through 2016.  And then a total for

1    something called IT support.  Do you see that?

2          A.    Yes, I do.

3          Q.    All right.  Again, that number has nothing to

4    do with payroll for programmers or help desk people,

5    right?

6          A.    Well, looking at this I don't know what it

7    relates to.  I know it rolls up to and it's a jargon for

8    meaning that number can be taken and added to the

9    subcontractor amount, and that total equals the cost of

10   services.

11         Q.    All right.  So the subcontractor amount is

12   also separate.  This isn't the money being paid to the

13   CloudConnects of the world to provide IT services,

14   right?

15         A.    Presumably not.

16         Q.    Okay.  All right.  So, did you then decide to

17   look at some of these checks to try to figure out what

18   they were?

19         A.    I did.  I made a judgmental sample selection.

20         Q.    All right.  So showing you now the second

21   slide on Exhibit 927 -- we just have four slides there.

22   This is the second one.

23               What does this show, Mr. Naviloff?

24         A.    This indicates the cost of goods sold analysis

25   that I performed based upon information contained in the

1    1040 schedules from 2013 through 2017.

2          Q.    All right.  And at the top we can see the

3    growth from 224 to 1.4 million that we've already talked

4    about, right?

5          A.    That's correct.

6          Q.    But what are these five entries with dates in

7    2016?  What did they refer to?

8          A.    Those are the dates that appeared on the

9    spreadsheet that you showed the Court just a moment

10   earlier.

11         Q.    Okay.  And are those particular transactions

12   on those dates that interested you?

13         A.    Well, like I said, this is really a judgmental

14   sample.  I looked at larger disbursements from that

15   list, and you can see here, in the far right column,

16   these are either larger amounts over 50,000 or they were

17   round dollar amounts.  So I picked a couple of

18   relatively smaller amounts that were $10,000 of

19   disbursement.  So my judgment came into play here, and I

20   picked the ones that were either a large amount of

21   dollars, large dollars, or smaller round dollars.

22               MR. DAVIS:  Okay.  So next slide, please, the

23   third page of Exhibit 927.

24         Q.    What does this show?

25         A.    This is -- if you go back to the last item, it

1   may be helpful.

2          MR. DAVIS:  All right.  Go back, if you would,

3   please.

4          A.    This is just support for the first one that I

5   tested, and you can see from my observation there

6   $82,181.06.  That amount I was able to look back at the

7   bank statements and identify that as I guess, number

8   one, looked back at the DigitalNet invoices and noticed

9   it was the same amount as invoice 15042 plus 15532.  So

10  it was essentially what appeared to be the payment of

11  two invoices from United Way to DigitalNet matched that

12  $82,181.06.  So that's amount tied to cash coming in,

13  not cash coming out, and that cash came in on April 12,

14  2016, according to the bank records.

15         Q.    In other words, you're saying that you tied an

16  $82,000 revenue for DigitalNet to an 82,000 expense

17  being claimed by DigitalNet; is that right?

18         A.    Yes.  Exactly that.

19         Q.    All right.  And what else did you find and

20  particularly involving inter-agency or inter-account

21  transfers?

22         A.    Well, similar to that, if you look at the next

23  transaction, I tested another 400,000.  And once again,

24  this is an instance where I didn't see necessarily a

25  revenue amount equating to this dollar amount, so it

1   wasn't similar to the last one, a revenue that appears

2   to have been stated as an expense, but rather this one

3   was an amount that was transferred between Mr. Alrai's

4   accounts, or the DigitalNet accounts, between DigitalNet

5   anyway and -- I'm going to mispronounce it -- AISA

6   Consulting.

7          So this is a transfer between two accounts,

8   not an outflow, that was apparently recorded as an

9   expense.

10      Q.   Well, it certainly is an outflow of the

11  DigitalNet operating account, right?

12      A.   It was an outflow from DigitalNet to an AISA

13  account.

14      Q.   But it's just going to an AISA account, which

15  is a separate bank account also controlled by Mr. Alrai,

16  correct?

17      A.   Yeah, I'll refer back to the testimony that I

18  gave yesterday.  The analysis I was able to perform

19  identified seven accounts that include both the AISA

20  accounts as well as the accounts that DigitalNet owned

21  as an entirety that explained the money coming in and

22  out of the business.

23      Q.   Okay.  And very briefly, because I want to

24  wrap up, what is the $93,000 amount also in red?

25      A.   That's one where -- similar to the April 19th

1    amount for 82,000, this -- there was no amount, no

2    disbursement amount I could identify associated with the

3    93,000.

4              However, I did identify a positive 99,166,

5    which was close.  But once again, this is one where

6    there were transfers similar to the March 31, 2016,

7    400,000, and there were transfers in this amount but

8    they appeared to be between accounts and not out of the

9    account.

10        Q.   Okay.  All right.

11             MR. DAVIS:  So let's go to the next slide now.

12        Q.   And just briefly, this slide is entitled

13   inter-account transfers within the analyzed accounts,

14   example of movement of funds with analyzed accounts

15   after receipt of revenue from the United Way, correct?

16        A.   Yes.  And I'll apologize to your Honor for all

17   these numbers on the spreadsheet.  It's meant to

18   demonstrate the cash activity as per the bank

19   statements, the combined bank statements of the seven

20   accounts that contained all the activity for DigitalNet,

21   and it included the AISA Consulting accounts.

22        Q.   All right.  And just one quick way to look at

23   it is this counterparty account column, right?

24        A.   Yes.

25        Q.   Many of the counterparties are not some

60

1  business, right?

2       A.   That is correct.

3       Q.   They are a DigitalNet account or they're --

4  well, mostly DigitalNet accounts, right?

5       A.   That is correct.

6       Q.   Including this one here.  It's a $60,000

7  transfer from one DigitalNet account to another one,

8  right?

9       A.   Correct.

10       Q.   And then an $18,000 transfer below that from

11  one DigitalNet account to another, right?

12       A.   Correct.

13       Q.   And then a $60,000 one from AISA back to a

14  DigitalNet, right?

15       A.   Correct.

16       Q.   All right.  So what's the bottom line on these

17  ten inter-account transfers?  What do you show here?

18       A.   Yeah, so the takeaway here, if you look at

19  that column, if you add up all that activity, it nets to

20  zero.  From my analysis some of these appear to be

21  savings accounts so there could be money going from one

22  account to another to earn interest.  So that's

23  certainly a plausible explanation for some of the

24  transfers.

25            But if you look back at April 12, 2016, that's

1    the source or money coming into the account during this

2    time period.  So during this April 12th through April

3    22nd time period the only money coming in is from United

4    Way, and it's the $82,181.06 that I mentioned earlier.

5    So this is the amount that was essentially the same

6    amount that was recorded as expense as IT related cost

7    of services.  However, it ties to this revenue amount.

8              Now, when you look at the inter-account

9    activity, it nets to zero.  So that's just all noise.

10   It's just money moving around.

11        Q.   Are you familiar with the phrase -- or the

12   word churning?

13        A.   Yeah, it's a -- yeah, I guess churning just

14   means, yeah, moving around.

15        Q.   All right.  And so again at the bottom line

16   you've got 82 grand in revenue for that period, right?

17        A.   Correct.

18        Q.   And that comes down to a $121,000 expense

19   claim on a tax return, right?

20        A.   Well, yeah, if I can walk you through the

21   other transfer column.

22              So you've got 82,000 in revenue coming in, and

23   then when you look specifically at the line -- and this

24   is the -- well, let's start with the other transfers.

25              So the other transfers are money going out.

1   Those are the ones that we could determine there was a

2   check and money left that combined seven accounts.

3       Q.   Right.

4       A.   And that totaled $44,498.59.

5       Q.   Right.

6       A.   If you look at the list, there's -- the first

7   amount is Commonwealth of Massachusetts.  So some sort

8   of payment presumably for taxes.  There's a few other

9   smaller amounts for telephone and other seemingly small

10  expenses.  There's $9,000 for the credit card expenses,

11  and my testing of that revealed much of that or some of

12  that at least is likely personal in nature.

13          And then, you know, the next one we see on

14  this list, and the largest on this list, is the Pakistan

15  payment, so 17,960.

16          And then on the very bottom you can see the

17  wages.  Those would be the direct wages paid as well as

18  the payroll related to those.

19          So you can see -- it's a good snapshot of the

20  type of activity that was happening in DigitalNet's

21  business for approximately a one-month period of time

22  and the types of expenses they were incurring.

23          Now, what I take away from this is the amount

24  sitting in the inter-account transfers of 82,181, which

25  is the first transaction on April 19, 2016.  So that

1   amount appears to get pushed or recategorized as a

2   transfer out when it's really just a transfer between

3   accounts as I mentioned.

4          You add that 82,181 to the $44,498.59, and

5   that's how you get to the $121,971.65 that is being

6   portrayed in the tax returns -- expenses in the tax

7   returns.

8          Q.   Okay.  So last slide.

9          What is this?  It's entitled inter-account

10  transfers within the analyzed accounts, example of

11  movement of funds with analyzed accounts after receipt

12  of revenue from the United Way.

13         A.   Yeah, so this is just highlighting the math I

14  just did, right?  So if you look at the first

15  transaction on April 19th of 2016, you need to add that

16  to the amounts that were transferred out to tie out to

17  the expense that was recorded in his tax return.

18         Q.   Okay.  So is it fair to say that your analysis

19  at least for this month showed a significant inflation

20  of the actual cost being claimed by DigitalNet?

21         A.   Yeah.  So the first three selections that I

22  made all resulted in this same observation, that amounts

23  that appeared to net out to zero as inter-account

24  transfers was taken as expenses within the tax returns.

25         Q.   All right.  And you found -- do you recall how

1  many inter-account transfers you found?

2       A.   Over 500.

3       Q.   All right.

4            MR. DAVIS:   And going back, finally, to the

5  first slide again.

6       Q.   So, Mr. Naviloff, you showed in 2013 right

7  about 80 percent gross receipt versus gross profit

8  percentage, right, gross profit percentage?

9       A.   Correct.

10      Q.   And in 2014 you showed it looks like over 80

11 percent gross profit percentage, right?

12      A.   Correct.

13      Q.   And as we've already seen, that's cut in half

14 by 2016, right?

15      A.   Correct.

16      Q.   Now, based on what you found regarding the

17 inter-account transfers and the inflation of the cost of

18 goods sold, do you have any confidence in a conclusion

19 that DigitalNet was making 32 percent profit and that

20 was reasonable?

21      A.   No.  I would have no ability to rely on the

22 tax returns as a basis for measuring the reasonableness

23 of the profits of DigitalNet or AISA Consulting.

24           MR. DAVIS:   Nothing further.  Thank you.

25           THE COURT:   Cross-examination.

1                    CROSS-EXAMINATION

2     BY MR. HARRINGTON

3          Q.   So, Mr. Naviloff, on I think it was my

4     cross-examination yesterday of you, I think you agreed

5     with me that you did not conduct an audit of Mr. Alrai's

6     tax returns.

7          A.   I did not, no.

8          Q.   Okay.  And so all the information that you

9     have just testified to for the last half hour or so as

10    far as the tax returns and gross profit, all that, you

11    did not actually conduct an audit of the returns, right?

12         A.   I did not.

13         Q.   Okay.  So as a result, one of the things that

14    is being talked about here were expenses, right?

15         A.   That's correct.

16         Q.   Okay.  And as one of the things that you would

17    do in an audit, which you didn't do, is you would go and

18    you would take a deeper dive and try to verify expenses

19    and things of that nature to make sure they were either

20    an appropriate or inappropriate expense, right?

21         A.   That's correct, yes.

22         Q.   Okay.  This graph that's up on the table here

23    that the Judge has been seeing I just want to highlight

24    because I know we've thrown a few terms around, and I'm

25    certainly not a tax professional, but we're talking

1    about gross profit, correct?

2         A.    That's correct.

3         Q.    Okay.  And obviously a different term that can

4    also be used is net profit, right?

5         A.    Yes.

6         Q.    Okay.  And obviously net profit is much

7    different than your gross profit, correct?

8         A.    Correct.  Yes.

9         Q.    And by virtue of the net, your net profit is

10   typically going to be lower than your gross profit,

11   right?

12        A.    Correct.

13        Q.    Okay.  And in the testimony that was given by

14   Mr. Kennedy and the references that were made to, you

15   know, 32 or 35 percent were relative to net profit, not

16   gross profit, correct?

17        A.    I do recall net profit, yes.

18        Q.    Okay.  And so that characterization -- because

19   obviously up here I'm just trying to clarify between the

20   two, you have talked about, you know, 80 percent, 70

21   percent, 60 percent, stuff like that.  Obviously that

22   percentage of gross profit is different than net profit

23   that was referred to by Mr. Kennedy and claimed on the

24   tax returns, correct?

25        A.    Yes.

1      Q.    Okay.

2            MR. HARRINGTON:  I don't have any other

3      questions, Judge.

4            THE COURT:  All right.

5            MR. DAVIS:  No questions.  Thank you.

6            THE COURT:  Okay.  All right.  You may step

7      down.  Thank you, sir.

8            Anymore witnesses?

9            MR. DAVIS:  No, your Honor.

10           MR. HARRINGTON:  Nothing from the defense,

11     your Honor.

12           THE COURT:  All right.  I need to look at

13     tomorrow here.

14           My calendar is not functioning because it's

15     completely empty.  It's not working.

16           THE CLERK:  I can tell you what you have,

17     Judge.

18           You have a 10 o'clock motion hearing, an 11

19     o'clock discovery conference, a 1 o'clock plea and a 3

20     o'clock telephone conference.

21           THE COURT:  10, 11, 1 and 3?

22           THE CLERK:  Uh-huh.

23           THE COURT:  I need to look at it because some

24     of that is going to have to go away, obviously.  I

25     thought tomorrow was, you know, maybe just one thing in

1    the morning.  All right.

2              THE CLERK:  The 10 and 11 are Micronics.

3              THE COURT:  Yeah.  What are the ones in the

4    afternoon?

5              THE CLERK:  The 1 o'clock plea is counsel

6    coming from New York.

7              THE COURT:  It's a plea?

8              THE CLERK:  Uh-huh.

9              THE COURT:  Okay.  And what's at 3?

10             THE CLERK:  It's a telephone conference in a

11   criminal case regarding a status conference.

12             THE COURT:  Okay.  1 o'clock is a plea?

13             THE CLERK:  Yes, Judge.

14             THE COURT:  Let's go off the record.

15             (Bench trial adjourned at 3:40 p.m.)

16

17

18

19

20

21

22

23

24

25

69

C E R T I F I C A T E

        I, Susan M. Bateman, do hereby certify that the

foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 4-8-20          /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR