*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:18-cr-192-JL
            v.                  *   December 3, 2019
                                *   9:35 a.m.
IMRAN ALRAI                     *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:          John S. Davis, AUSA
                             Matthew Hunter, AUSA
                             Cam T. Le, AUSA
                             United States Attorney's Office

For the Defendant:           Timothy M. Harrington, Esq.
                             Timothy C. Ayer, Esq.
                             Shaheen & Gordon PA

Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

```
                            I  N  D  E  X
```

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RICHARD VOCCIO | 4 | 52 | 76 | -- |
| MAUREEN JOHNSON | 79 | 95 | 99 | -- |
| PHILIP KOWALCZYK | 100 | 118 | 129 | -- |
| CHARLES CIOFFI | 134 | | | |

| EXHIBITS: | FOR ID | IN EVD |
|---|---|---|
| Government's 410 | | 17 |
| Government's 404 | | 29 |
| Government's 655 | | 35 |
| Government's 600 | | 37 |
| Government's 101 | | 43 |
| Government's 102 | | 44 |
| Government's 103 | | 44 |
| Government's 104 | | 44 |
| Government's 105 | | 44 |
| Government's 106 | | 44 |
| Government's 107 | | 44 |
| Government's 108 | | 44 |
| Government's 109 | | 44 |
| Government's 110 | | 44 |
| Government's 111 | | 44 |

| EXHIBITS: | FOR ID | IN EVD |
|---|---|---|
| Government's 112 | | 44 |
| Government's 113 | | 44 |
| Government's 114 | | 44 |
| Government's 115 | | 44 |
| Government's 116 | | 44 |
| Government's 117 | | 44 |
| Government's 118 | | 45 |
| Government's 724 | | 88 |

```
1                    P R O C E E D I N G S
2              THE CLERK:  The Court has before it for
3    consideration today day two of the bench trial in
4    criminal case 18-cr-1923-01-JL, United States of America
5    vs. Imran Alrai.
6              THE COURT:  All right.  Let's have the witness
7    resume the stand.
8              MR. DAVIS:  Mr. Voccio.
9              THE COURT:  Sir, you're still under oath.
10             Counsel, you may proceed.
11                 CONTINUED DIRECT EXAMINATION
12   BY MR. DAVIS:
13        Q.   Good morning.
14        A.   Good morning.
15        Q.   When we broke, we were talking about
16   March 27th, 2018, when Dom Pallaria came to see you.  Do
17   you recall that day?
18        A.   Yes, I do.
19        Q.   All right.  And I'm not going to ask you what
20   he said to you, but did he bring you documents?
21        A.   He did.
22        Q.   And did the documents pertain to DigitalNet
23   and also the AISA Consulting Group company?
24        A.   Yes.
25        Q.   And did they show an apparent connection based
```

1   on some prior addresses in corporate documents that

2   showed an apparent connection between AISA and

3   DigitalNet?

4       A.   He did.  There was one particular address that

5   connected the two.

6       Q.   All right.  And did that -- did that strike

7   you as significant as the chief administrative officer?

8       A.   It did.  It did.  You know, one, I had never

9   heard of AISA Corporation -- Consulting, ever, and

10  knowing that we were doing business with DigitalNet and

11  it was connecting those two, it did raise a red flag and

12  concern.

13      Q.   Right.  And did you understand also that AISA

14  was the name associated with Mr. Alrai from the

15  beginning when he came to United Way?

16      A.   I -- at that time, in that conversation, I

17  wasn't aware of it, but I was aware of it subsequently.

18      Q.   Okay.  Now, again, without -- without saying

19  what Mr. Pallaria told you, did you make a decision

20  about whom to notify?

21      A.   I did.

22      Q.   Okay.  And did you, after that time, treat

23  Mr. Pallaria's complaint as a whistleblower complaint?

24      A.   I'm sorry.  Can you repeat that again?

25      Q.   Did you, after that time, treat Mr. Pallaria's

1  statement to you as a whistleblower event?

2      A.   Oh, I did.  I did.  I mean, I -- I did.

3      Q.   Okay.  And who did you notify at the

4  company -- what can you tell about that?

5      A.   First thing I did was I read the whistleblower

6  document, the policy, and I looked at the document.  The

7  first person I talked to was my supervisor, Mike

8  Durkin --

9      Q.   Okay.

10     A.   -- and consulted with him.  And then we were

11 in agreement and to notify the audit committee chair,

12 Ms. Dorothy Puhy, who also leads as our corporate ethics

13 officer for the corporation.

14     Q.   Okay.  And how do you spell Dorothy's last

15 name?

16     A.   P, as in Paul, U, H, as in Harry, Y.

17     Q.   Okay.  Did you also speak to Azim

18 Mazagonwalla?

19     A.   No, I did not.

20     Q.   Did you speak to Pat Latimore?

21     A.   I did at the -- at the request of Mike Durkin.

22 When I notified Mike Durkin, he -- he asked if it would

23 be okay to bring Pat into the conversation and I said

24 sure.

25     Q.   And did you also bring in Jane Grady?

1          A.    Later on, we did.  Yes, we did.

2          Q.    Okay.  And Jane Grady is the chief HR person?

3          A.    She's chief HR person.  She's also the staff

4     ethics employee that reports to the ethics officer.

5          Q.    And after that time, did United Way begin to

6     conduct an internal investigation?

7          A.    We did.

8          Q.    All right.  And in doing that investigation,

9     did you notify Mr. Alrai that you were doing it?

10          A.    No.

11          Q.    All right.  And did you -- did you limit the

12     number of people at United Way who knew that it was

13     going on?

14          A.    Oh, absolutely.  It was a very small group.

15          Q.    Okay.  And why was that?  Why did you keep it

16     to a small group?

17          A.    One was we wanted to -- you know, we wanted to

18     understand -- ascertain more information.  As -- you

19     know, I explained to Mr. Pallaria that this is

20     information, but, you know, I'm not making any

21     assumptions on the information until we do the due

22     diligence.

23          Secondly, you know, Mr. Alrai's position as

24     our chief IT officer had access to all of our computer

25     systems.  So, you know, we were -- I was concerned about

1    making certain we could keep the company's operations

2    moving on IT.  So, you know, we kept it to a very

3    limited, very discreet number of people.

4        Q.   Right.  And did you also stop emailing each

5    other about the subject of the investigation?

6        A.   Yes.  We stopped using corporate email,

7    corporate phone systems.  Any corporate access that

8    Mr. Alrai or someone else might have access to, we

9    stopped using.

10       Q.   All right.  Now, directing your attention to

11   April of 2018, did you go on what could be called a

12   field trip on that day?

13       A.   I did --

14       Q.   Okay.

15       A.   -- early -- early April.

16       Q.   Okay.  And can you describe what you did?

17       A.   Sure.  With the knowledge of -- of Mike Durkin

18   and Pat Latimore, I planned a road trip from my

19   residence down in southeastern Massachusetts to --

20   instead of going into work that day was to -- to drive

21   up to Windham, New Hampshire, and to -- specifically to

22   do a site visit of AISA Consulting.

23            And I -- I -- I don't know how much detail you

24   want me to go into, but --

25       Q.   So showing you Exhibit 410 for identification,

1    I believe it's the first photo --

2         A.   Uh-huh.

3         Q.   -- do you recognize that item?

4         A.   Yes.  Yes.

5         Q.   And is that a photograph of AISA?

6         A.   That's -- yes, it is.  That's the side of the

7    building, yeah.

8         Q.   Okay.

9         A.   I had taken my own pictures when I was there

10   as well.

11        Q.   Okay.  And what did you -- what did you find

12   there in Windham, New Hampshire, at the AISA building?

13        A.   So when I -- when I arrived there

14   approximately around 11 o'clock in the morning, what I

15   noticed that in the -- there was a big sign from the

16   street level, there was a big sign AISA Corporation on

17   the front of the building and there was also a sign for

18   a family dentist that occupied the front of the

19   building.

20             So I noticed that, I noticed there were cars,

21   you know, occupying where the dentistry was and it

22   looked like it was very open for business.

23             And then the side of that entrance where AISA

24   Consulting was, every single window was -- all the

25   blinds were drawn, completely drawn.  You could not look

1    in.  Even the front entrance was drawn.  And there was a

2    sign on the front entrance, you know, if we're not

3    here -- something to the effect of, you know, like a

4    website address.  You can contact us at this site.

5            There was also on the side of the entrance,

6    you know, basically a security, be aware, you know, it

7    didn't -- was not inviting.

8            There was no cars.  I couldn't find any car

9    with a DigitalNet -- you know, if he had like a company

10   van or something like that.  I couldn't find anything.

11   No vehicles with DigitalNet.  It didn't look like they

12   were open.

13        Q.   Of course, this isn't DigitalNet; this is

14   AISA?

15        A.   AISA.  I'm sorry, AISA.  Yeah.  There was

16   nothing -- there was nothing there for AISA.  I couldn't

17   find anything.  I also --

18        Q.   All right.  Showing you the second photo in

19   410, can you zoom in on the sign there?  Is that the

20   door at the same building?

21        A.   Yes.  Yes, that is it.

22        Q.   And it does at least have a sign up saying

23   AISA Consulting Group?

24        A.   Oh, yeah.  It has a sign, AISA Consulting,

25   inside the door, too.

1      Q.   Okay.  All right.  So what did you do after

2  visiting the AISA building?

3      A.   So I also looked at the marquee.  There's an

4  entrance to the -- there's a marquee there.  What I was

5  also trying to find out -- because there was the linkage

6  of the DigitalNet corporate address to this same

7  location -- I was hoping to find a DigitalNet address on

8  the marquee.

9      Q.   Right.

10      A.   And when I didn't see that, I only saw AISA,

11  that raised a question as to just understanding why it

12  wasn't there.

13      Q.   All right.

14      A.   So then I got in the car and I drove to -- I'd

15  never been to DigitalNet's corporate office in Andover,

16  so I -- I got in the car, I drove down to Andover, and I

17  got to the -- to the -- to the corporate office complex.

18  There's three -- there's a 100, a 200 and a 300, big

19  buildings.

20      Q.   Okay.  Pretty large building there?

21      A.   Oh, yeah, huge buildings.

22      Q.   All right.

23      A.   Big marquees out front on the 100, the 200,

24  and the 300.  And I started off, I believe, at the 100,

25  couldn't find anything with DigitalNet.  I went to the

1    200, couldn't find anything.  So then I asked somebody,

2    I said, I'm looking for DigitalNet's offices.  And --

3           Q.   Okay.  Don't say what they said.

4           A.   Yeah, but I couldn't find -- so -- so I went

5    to the third building.  And I was perplexed because I

6    just couldn't find it.

7                So then I went back to the documents I had and

8    I said, well, it says this address, suite such and such.

9    So when I looked in the -- on the marquee, there was

10   a -- a marquee for that location is a Regus -- R as in

11   Richard, e-u -- e-g-u-s.  And I wasn't familiar with

12   them.  You know, I figured out later it was like a

13   WeWorks, but at that time I didn't know what it was.

14               So I got in the elevator, went to the second

15   floor.  And as soon as you walk off the elevator, that

16   suite is right there and there's a marquee to the side

17   of it with a listing of about, oh, approximately 20

18   companies in that suite.  And I looked through there

19   and -- and I knew I had the right address, but I didn't

20   see anything for DigitalNet.  So I went to the front

21   attendant.  I asked the front attendant --

22          Q.   And don't say what she said to you.

23          A.   Yeah, but I was asking the front attendant,

24   just to find out if DigitalNet was there.

25          Q.   Okay.  So showing you some footage at the back

1    of Exhibit 410, just to see if you -- you actually took

2    some pictures that day, right?

3              So all the way to the ones that are sort of

4    darker, in the middle of these -- okay, so here.  Sorry,

5    one back.

6              Do you recognize that photo in 410, which is

7    the darker photo that shows a multistory building?

8        A.   Yes.  Yeah, that's the Andover -- that's the

9    location I was at.

10       Q.   And did you take that picture?

11       A.   I took pictures.

12       Q.   Yeah.

13       A.   I -- I can't tell you if I took that exact

14   picture or not --

15       Q.   Okay.

16       A.   -- but I know I took quite a few pictures of

17   the location there.

18       Q.   All right.  Do you recognize that scene?

19       A.   Oh, yeah.  I remember -- I recognize that.

20       Q.   And is that 301 Brickstone Place, Andover,

21   Mass.?

22       A.   I believe it is with that front entrance.  I

23   mean, there were three buildings that looked sort of

24   similar.  So without looking at the whole complex, but I

25   believe that's 301.

1      Q.    And did you also take some pictures of signs

2   and marquees?

3      A.    I did.

4      Q.    All right.  Let's go to the next photo.  That

5   shows 300?

6      A.    Yes.

7            MR. DAVIS:  And can we go back?

8      Q.    So -- and that lists a number of companies?

9      A.    Yes, it does.

10      Q.    But does it have DigitalNet on that list?

11      A.    No.

12            MR. DAVIS:  Okay.  And next photo, please.

13      Q.    This begins -- this shows Regus; is that

14   right?

15      A.    This is -- this is right in front of the -- as

16   soon as you walk off the elevator, this is the -- I call

17   the marquee, the listing of the companies within that

18   suite.

19      Q.    So that, what we're looking at now that starts

20   with Regus, is actually inside the building?

21      A.    Inside the Regus suite, yes.

22      Q.    And any sign of DigitalNet there?

23      A.    No.

24      Q.    All right.  And next photo, another Regus one?

25      A.    Yes.

1    Q.   Is that more businesses associated with the

2    Regus office?

3    A.   Yes, those are more -- more entities within

4    the Regus 201 suite.

5    Q.   All right.  And, again, no DigitalNet,

6    correct?

7    A.   No DigitalNet.

8        MR. DAVIS:  And is that the last photo?

9    Okay.

10   Q.   All right.  In if all the years you'd been

11   dealing with DigitalNet, did United Way ever have an

12   address for DigitalNet Technology different from

13   Brickstone Place, Andover, Mass.?

14   A.   Not that I'm aware of.  All the invoices, the

15   correspondence, reference this address.

16   Q.   Okay.  So you said there were -- you were

17   having no communications with Imran Alrai about this

18   particular matter, correct?

19   A.   Correct.

20   Q.   Were you also trying to -- to take control or

21   to potentially be able to control, take control, of your

22   IT systems?

23   A.   If we needed to go down that path, absolutely.

24   Q.   All right.  And what were you doing to prepare

25   for that?

1    A.   We were -- we hired counsel, we hired a --

2    counsel hired an investigator.  And then we also, with

3    the small committee that we were working with, hired --

4    went through a small search to bring in another IT firm

5    that could assist us with, you know, taking control of

6    the system and safeguarding the system.

7    Q.   Very good.  And was the -- what firms did you

8    hire for your technical assistance?

9    A.   We hired a company called TBS, Technical

10   Business Solutions.  They're a company out of

11   New Jersey.

12   Q.   Okay.  And did they have, as one of their main

13   people, a guy named John Meyer?

14   A.   Yes.

15   Q.   And is John Meyer today United Way's IT head?

16   A.   He is.  He's -- he's hired as an -- we call as

17   an external CIO providing support to the United Way.

18   Q.   Okay.  And did you also hire a company called

19   CBIZ?

20   A.   We did.  CBIZ is a -- we hired -- CBIZ is

21   already our accountants --

22   Q.   Okay.

23   A.   -- for our annual audit, but we did some

24   additional engagement with CBIZ as well.

25   Q.   Okay.

1        A.    IT-related.

2               MR. DAVIS:  So just for record-keeping, your

3    Honor, I will move to admit 410 for ID.  Now, it does

4    have --

5               THE COURT:  410?

6               MR. DAVIS:  It does have photos in the -- 410,

7    your Honor.

8               It does have photos in the middle that have

9    are of the Windham home office and this witness did not

10   see that, so I've not shown them.  A later witness will

11   testify, but if counsel doesn't object, I'll move to

12   admit.

13              MR. HARRINGTON:  There's no objection to the

14   entire exhibit, your Honor.

15              MR. DAVIS:  Very good.  Thank you.

16              THE COURT:  Admitted.

17              (Government's Exhibit 410 admitted.)

18        Q.    So we're talking about CBIZ and as of May of

19   2018, was there a plan to do what was called a risk

20   assessment IT audit?

21        A.    Yes.  Yes.

22        Q.    Okay.

23        A.    The audit committee had made the

24   recommendation in April and we engaged with CBIZ,

25   specifically Ray Gandy at CBIZ, to engage in a risk

1    assessment.

2        Q.    Okay.  And this is Ray Gandy, G-a-n-d-y?

3        A.    Correct.

4        Q.    He was their chief on this?

5        A.    He was.

6        Q.    Okay.  And what is -- as you understood it, it

7    was a risk assessment IT audit and what was the reason

8    for doing it at this time?

9        A.    The risk assessment was to use the best

10   protocols in IT.  There's a national standard of 20 --

11   20 control mechanisms that CBIZ would come in and do an

12   initial assessment.  We hadn't had one completed in a

13   while and to come in and work with -- a cross-functional

14   group of employees at United Way, engage and learn more

15   about United Way's IT infrastructure, and to understand

16   where our controls were and where maybe some of our

17   weaknesses were and what we could do better.

18       Q.    And, again, you're undertaking this without

19   notifying anyone else about the internal investigation

20   you're doing after the whistleblower complaint, correct?

21       A.    Correct.

22       Q.    All right.  Now, was there a meeting where

23   staff, including Mr. Alrai, was given notice of the CBIZ

24   risk assessment about to happen?

25       A.    Yes.  I mean, there was an email sent, I

1    believe I had sent out the email, inviting them to a

2    meeting that we would be having with Ray Gandy and I

3    believe his associate, Michele White.

4        Q.   Okay.

5        A.   And that we would be embarking on this body of

6    work, the audit committee had made the recommendation,

7    and that there were -- we were going to be scheduling a

8    meeting sometime in May and, you know, we were asking

9    them to participate in that conversation.  It was a

10   cross-functional group.

11       Q.   Okay.  And when was the meeting,

12   approximately?

13       A.   It was -- I want to say it was sometime in

14   early May -- early, mid May.

15       Q.   Okay.  And do you recall the meeting?

16       A.   I do.

17       Q.   And do you remember who you sat by?

18       A.   I sat at the very corner of the desk, at the

19   end, facing Ray and Michele.  And I believe Imran Alrai

20   sat right -- he sat right next to me on the corner.

21       Q.   Okay.  And what was his reaction as far as you

22   could tell to the idea of a CBIZ risk assessment being

23   done on the IT system once he was given notice of that?

24       A.   Well, his initial reaction prior to the

25   meeting was he was surprised that we were having the

1    meeting, he was surprised that he wasn't given more

2    advanced notice, and it was explained to him and

3    everyone else that this is what the audit committee had

4    wanted.  And I chair the staff -- chair the audit

5    committee, so I was taking direction from the audit

6    chair; this is the work they want completed, we haven't

7    done this in a while.

8          Q.    Okay.

9          A.    So that was a surprise there.

10         Q.    And then at the meeting, what did you observe

11   about Mr. Alrai?

12         A.    He sat there with a -- like a diary that, you

13   know, he would bring to meetings.  You know, that was

14   standard protocol.  But he sat there -- in my opinion,

15   he sat there looking down, very disengaged from the

16   conversation, looking down, making notes like under --

17   like under the table, sort of not -- you know, and I

18   would look over and -- and he would just -- no eye

19   contact with Ray or with Michele unless he was asked a

20   specific question, which he'd give a short answer and

21   then return back to his, you know, just not engaging.

22         Q.    So Mr. Alrai did respond to questions, though,

23   that Ray Gandy asked?

24         A.    Oh, he did.  Yeah, very professional.

25         Q.    And among the questions asked, was he asked

1   about where the servers were for the DigitalNet -- for

2   the United Way IT system?

3         A.   Yes.

4         Q.   And what did Mr. Alrai say?

5         A.   I believe he mentioned for the cloud servers

6   that the servers were located in Virginia and there was

7   a backup somewhere on the west coast.  I don't recall

8   exactly where.

9         Q.   Okay.  All right.  So what happened two days

10  after that meeting?  Did Mr. Alrai make an announcement?

11        A.   He did.

12        Q.   All right.  What happened?

13        A.   He made an announcement via email that he was

14  going to -- or DigitalNet was going to be having to do

15  some server work over the weekend and there could be

16  interruptions during that weekend to do that kind of

17  work.  And we got a two-day notice for that.

18        Q.   Okay.  And was it server work or was that --

19  was it actually moving cloud servers to another

20  provider, do you recall?

21        A.   I believe it was moving cloud service to

22  another provider.

23        Q.   Okay.  And had Mr. Alrai said anything at the

24  team meeting with Ray Gandy two days earlier about a

25  need to move data to a different provider in the cloud?

1      A.    None.   First notice I got of it was via an

2  email.

3      Q.    And that was going to be happening in the

4  upcoming weekend?

5      A.    That was -- that was midweek and I believe it

6  was going to happen that weekend.

7      Q.    All right.  And what was United Way doing at

8  that time that -- where was United Way in its cycle in

9  mid May of 2018?

10      A.    Extremely busy time for United Way.  Our

11  fiscal year ends on June 30th.  We are -- a ton of

12  fund-raising activity ongoing, trying to follow up with

13  donor gifts and recording them, various committee

14  meetings, every single committee -- and I'm talking like

15  several committees.  We've got people working weekends

16  trying to get ready for the committees.  Everything from

17  audit finance, campaign committee, community investment

18  committees.  We're trying to wrap up the course of

19  business going into the board meeting in mid-June.  So

20  it's a really busy time for us at United Way.

21      Q.    So what effect did -- did it -- with short

22  notice a moving of all the data have on United Way as

23  you saw it in May of 2018?

24      A.    I had people come to me who just didn't

25  understand why we got the short notice; that why wasn't

1    this planned, you know, with a lot more lead time so

2    that we would have worked around it.  And it put a hurt

3    on individuals to be able to juggle the work they had to

4    get accomplished or things they might be doing, you

5    know, over the weekend to try to get things done.

6        Q.   Okay.  Now -- and do you recall accessing your

7    own computer that weekend at United Way?

8        A.   I accessed my computer remotely, which we have

9    access to through the VMware, a VDI session from my

10   residence in -- from my residence.

11       Q.   And did that work?  How do that work?

12       A.   It initially worked and then I got bumped off.

13   I -- all of a sudden it just went -- nothing.  Nothing

14   was working.

15       Q.   All right.

16       A.   Because and the reason I was on it I was being

17   told that I had to have access to get back onto the

18   system.  I had critical work I needed to get completed

19   that weekend.

20       Q.   Okay.  Did -- did Mr. Alrai ever explain to

21   you why that particular move that particular weekend

22   needed to happen?

23       A.   The explanation I can recall is that there was

24   something going on with the cloud provider at OVH and it

25   was something that was unanticipated, just had to

1    happen.

2        Q.    Okay.  Now, in late May, was Mr. Alrai asked

3    to meet directly with Ray Gandy about IT matters?

4        A.    Yes.

5        Q.    And did Ray Gandy, as part of this IT risk

6    assessment specifically, want to interview Mr. Alrai?

7        A.    He did.

8        Q.    Okay.  And what happened about that?

9        A.    Initially Ray was -- we wanted the two of them

10   to meet instead of having the full group to meet because

11   there was a lot of detail that the two of them could

12   just disseminate.  It would be much more efficient and

13   effective.

14            So I stewarded the contact between the two of

15   them to try to schedule that and Ray made two or three

16   attempts to try to get that thing scheduled with -- that

17   meeting schedule with Imran.  And it wasn't going well

18   to try to get that scheduled.

19       Q.    Okay.  Was it originally scheduled for

20   May 29th, 2018?

21       A.    I believe so.

22       Q.    And was that canceled because Mr. Alrai could

23   not make it?

24       A.    Yes.

25       Q.    And then rescheduled for June 7th?

1        A.    Yes.

2        Q.    And as far as you know, did Ray Gandy meet

3    with Mr. Alrai June 7th?

4        A.    Eventually they met.  I'm assuming it was

5    June 7th, but, yes, they did meet.

6        Q.    Okay.  Now, by June 12th of 2018, were you

7    ready to confront Mr. Alrai, essentially?

8        A.    We were.

9        Q.    And did you have a plan on how to get him in

10   the office, that is, so -- where you could actually talk

11   to him face to face?

12       A.    We did.

13       Q.    All right.  What happened?  What was the plan?

14       A.    So the plan was we had not paid -- because we

15   were paying DigitalNet in advance their monthly invoice

16   and we had not paid the invoice we had received in May

17   for the month of June.  There was one major invoice and

18   I think there was a secondary invoice, but we hadn't

19   paid it.

20       Q.    And what --

21       A.    I particularly held up those payments.

22       Q.    How much money was that that DigitalNet was

23   invoicing you for?

24       A.    I believe roughly a hundred, $110,000, the two

25   combined invoices.

1    Q.   Okay.  And so what did you do?

2    A.   I -- I requested with Pat Latimore and with

3  Imran to let's have a meeting in person and I wanted to

4  meet in the -- in the office --

5    Q.   Okay.

6    A.   -- to discuss it.

7    Q.   And did you identify that you wanted

8  specifically to talk about the invoice before paying it?

9    A.   Absolutely.  We were at the -- we were at

10 year-end, so I was concerned that the -- we were going

11 over in excess of the IT budget and I wanted to

12 understand more about the whys from both Imran and Pat

13 before I was going to have finance approve payment.

14   Q.   Okay.  And so on June 12th, were you scheduled

15 to meet with Mr. Alrai to discuss that invoice?

16   A.   Yes.

17   Q.   All right.  And what happened on June 12th,

18 from your perspective?

19   A.   On June 12th?

20   Q.   Yes.

21   A.   We met midmorning.  Mr. -- Imran was up -- his

22 office was on the third floor.  He came down to the

23 second floor where Pat Latimore and myself, our office

24 is in that area, and the three of us were connected and

25 I requested that we, you know, walk into a senior team

1  office to discuss the invoices.

2       Q.   Okay.  And did you actually have that meeting

3  or did you take him to a different meeting?

4       A.   I took him to a different meeting.

5       Q.   Okay.  And what was that meeting?

6       A.   That meeting was to meet with our attorney and

7  also our investigator from CBIZ to sit down and have a

8  conversation where the two of them would have a

9  conversation with Imran.

10      Q.   Okay.  And so that happened at United Way on

11 June 12th?

12      A.   It happened at United Way on June 12th.

13      Q.   Okay.  And at the end of that conversation,

14 was -- what happened formally with Mr. Alrai's

15 employment at United Way?

16      A.   After that meeting happened, he was -- he

17 was excused to leave.  He was still employed with the

18 organization and he was, you know, he -- he was led --

19 he was led out.  You know, it was part of a group of

20 individuals that led him out off the premises.

21      Q.   Okay.  And what was his status at that point

22 in terms of termination or a suspension?

23      A.   He was still employed.

24      Q.   Okay.

25      A.   He was -- he was not -- I don't believe he was

1    suspended.  I don't believe he was terminated as of

2    June 12th at that point in time.

3         Q.   Okay.  So did that status change after that?

4         A.   It did.  I think -- I believe it changed

5    within two to three days.

6         Q.   All right.  And how did it change?

7         A.   It changed to he was terminated and I

8    believe that was done by HR -- HR did the official

9    communications via email or via, you know, written

10   correspondence.

11        Q.   Okay.  And did you actually walk him out on

12   June 12th?  Were you among the people that did?

13        A.   I was among the three or four individuals that

14   walked him out.

15        Q.   And do you remember any interaction with

16   Mr. Alrai that day?

17        A.   I did.  It was very minimal.  We were in the

18   elevator.  You know, he did not make eye contact with

19   me.  And he made a glance and I had a -- I was -- I had

20   possession of his backpack.  I was told to hold his

21   backpack.  And he made a movement to -- to grab the --

22   take possession of the backpack and I made a comment

23   that -- I said, look, I'm not allowed to give you this

24   backpack until we're off the premises.

25        Q.   Okay.  So did you go to the door and --

1      A.   Yeah.  We walked out the turnstiles of the --

2   of the door and at that point in time I handed him his

3   backpack and the only comment I gave him was I said, you

4   know, have a nice day.

5      Q.   And since that time until this trial, have you

6   ever seen him?

7      A.   No, this is -- yesterday was the first time

8   I've seen him since that day.

9      Q.   Okay.  Now, soon after the -- soon after

10  June 12th, did you receive a letter at United Way from

11  Mr. Alrai's or, rather, from DigitalNet's attorneys?

12     A.   We did.

13     Q.   All right.  And showing you Government

14  Exhibit 404, do you recognize that letter?

15     A.   I do.

16     Q.   And is that the letter your company received

17  from attorneys representing DigitalNet on -- what's the

18  date of it?

19     A.   June 26th, 2018.

20          MR. DAVIS:  Okay.  Your Honor, I'd move to

21  admit Exhibit 404.

22          MR. HARRINGTON:  No objection.

23          (Government's Exhibit 404 admitted.)

24          MR. DAVIS:  And just to -- could we go to the

25  middle paragraph there?

1    Q.   Is among the things being discussed in the

2    letter from Mr. Alrai's attorneys the telephone service

3    at United Way?

4    A.   Yes.

5    Q.   And can you read the paragraph that begins

6    "indeed"?

7    A.   "Indeed, before terminating its relationship

8    with DigitalNet, United Way received information

9    technology and unified communication/telephone services

10   for which it has not paid.  Invoices for these services

11   were provided to United Way in line with the company's

12   protocol and should be paid immediately upon receipt of

13   this letter via bank check."

14   Q.   All right.  And let's -- I won't read all of

15   the letter.  Let's go to the last paragraph of the same

16   letter, which I think is on the third page.

17        All right.  Yeah, there, third page.

18        Can we blow up that paragraph?

19        And can you read that last paragraph?

20   A.   "To be clear, DigitalNet is ready, willing,

21   and able to help United Way transition its services to

22   another third-party information technology provider, but

23   it cannot proceed with doing so without payment for all

24   services provided and payment for the transitional

25   services it supplied thereafter.

1              "Absent United Way's agreement to the

2     foregoing by the close of business Friday, July 6th,

3     2018, DigitalNet will presume United Way does not want

4     DigitalNet's transition services and, thus, will

5     terminate United Way's permission to use UCS and its

6     proprietary applications.  Should you or your client

7     wish to further discuss the subject matter of this

8     letter, please direct all future communications and

9     correspondence to my attention."

10         Q.   So UCS is the telephone system, right?

11         A.   Yes.

12         Q.   Right.  So that's referring to United Way's

13    telephone service, right?

14         A.   Correct.

15         Q.   What would the effect have been in late June

16    of 2018 to your using or -- losing your telephone

17    service abruptly?

18         A.   It would cripple the organization to be able

19    to communicate with customers.  The month of June is an

20    extremely busy time for us following up with outstanding

21    pledge obligations from customers that gave the prior

22    year and we're trying to chase down their -- their

23    pledges for the current year.

24         Q.   Okay.

25         A.   It would be -- it would put a lot -- put a lot

1    of burden on the organization.  We would be required to

2    use cell phones, but incoming calls from constituents,

3    they would get a -- they wouldn't be able to get through

4    to the organization.

5         Q.   All right.

6         A.   It would be a big problem.

7         Q.   So what did United Way -- briefly, what did

8    United Way do about this communication from DigitalNet's

9    attorneys?

10        A.   We -- we, you know, we took advice from our

11   own counsel and --

12        Q.   I'm not asking about that advice.  But what

13   did you do about the telephones?

14        A.   The telephone system, we -- we worked with

15   TBS, who was on-site, and we contacted SIP.US.

16        Q.   That's S-I-P.US?

17        A.   Yes, S-I-P.US, who was the actual provider or

18   reseller of the -- of the actual phone lines.

19        Q.   Okay.

20        A.   And we tried to work with them to plead our

21   case that those lines that were in the name of

22   DigitalNet, the ultimate customer was United Way of

23   Merrimack Valley -- Massachusetts Bay, Merrimack Valley,

24   and that it was important that those lines not be turned

25   off and shut off.

1    Q.   Right.  And so did SIP readily agree to
2    continue to provide telephone service to United Way?
3    A.   I don't know if it was readily agreed upon,
4    but with some help with TBS, we were able to secure that
5    and work through that.
6    Q.   Okay.  And so did you end up paying DigitalNet
7    the money they were looking for on -- by July 7th or
8    whatever it was of 2018?
9    A.   No.
10   Q.   You didn't make that payment?
11   A.   We didn't make that payment.
12   Q.   And did you have any problem with your
13   telephones?
14   A.   No.
15   Q.   Why not?
16   A.   Because we had the -- because of the work that
17   TBS, the -- the ability of them while working on our
18   behalf to secure the lines with SIP, we were able to
19   transfer the phone over to the name of United Way
20   Massachusetts Bay.
21   Q.   Right.  And after that you just dealt directly
22   with SIP, right?
23   A.   We did.
24   Q.   No DigitalNet in the middle?
25   A.   No DigitalNet in the middle.

1          Q.   Okay.  Now, in August of 2018, do you recall

2     having an outage on the computer system?

3          A.   Yes.

4          Q.   All right.  And did you have -- did you

5     have -- was it easy to figure out your computer systems

6     and take control of everything?  Was that an easy

7     process?

8          A.   No.

9          Q.   Why not?

10         A.   Why not?  Because a lot of our systems are not

11    documented and the information was not readily available

12    to figure out, you know, what the protocol would be and

13    where we would go.  Eventually we ended up finding out

14    the outage was with OVH, the cloud provider.

15         Q.   Okay.  So that was the current cloud provider

16    that DigitalNet had --

17         A.   Yes.

18         Q.   -- apparently made arrangements with?

19         A.   Yes.

20         Q.   Okay.  Showing you Government Exhibit 655, did

21    you draft an email to the staff about that?

22              And it's on the second page.  Do you see a

23    draft email from you about that outage?

24         A.   I'm familiar with this, yes.

25              MR. DAVIS:  All right.  Your Honor, I'd move

 1  to admit 655 and strike the ID.

 2         MR. HARRINGTON:  No objection, Judge.

 3         THE COURT:  Admitted.

 4         (Government's Exhibit 655 admitted.)

 5     Q.   And could you just read those two paragraphs,

 6  briefly.

 7     A.   Sure.

 8         "Dear United Way Mass Bay staff:  You have

 9  been receiving updates from John Meyer.  He and his team

10  have been working around the clock on communications

11  with our cloud vendor, VMware, on the outage issue.  It

12  is unfortunate that VMware does not" --

13         THE COURT:  Please slow down a little bit.

14         THE WITNESS:  Sorry.

15         THE COURT:  No problem.

16         THE WITNESS:  "It is unfortunate that VMware

17  does not have a redundancy cloud environment that could

18  have avoided this service interruption.  You have our

19  commitment that this will be reviewed and discussed in

20  the near future.  We cannot have this situation

21  repeated.

22         "We might be without cloud computing for the

23  entire day today, so with that in mind, if you have the

24  capability of working from home with access to a

25  computer, I would suggest you work from home.  If you do

1    not have that capability, but have the ability to work

2    on other projects that do not require a computer, then

3    attend to those items today in the office.

4              "Rich."

5         Q.   So, Mr. Voccio, you used a phrase "redundancy

6    cloud environment."  And what do you mean by that

7    phrase?

8              MR. HARRINGTON:  I'm just going to object at

9    this point, Judge.  I don't know if this witness has

10   particular personal knowledge about the IT system or if

11   this is really the matter of Mr. Meyer, who, as I

12   understand it, was the person who dealt with all this.

13             I'm just concerned that this information is

14   all coming from other people.  So I'm just not sure of

15   the basis of this witness's knowledge.

16             MR. DAVIS:  I'll withdraw it, your Honor.

17             THE COURT:  Lay a foundation.

18             MR. DAVIS:  Sorry.  I'll withdraw it and move

19   on.

20             THE COURT:  Okay.

21        Q.   Now, as part -- you've testified before that

22   you gathered relevant emails about the relationship with

23   Digital and Imran Alrai as part of the internal

24   investigation in 2018?

25        A.   Correct.

1      Q.   And among the things, did you compile -- did

2  you compile a number of emails from a person named

3  Mohammad?

4      A.   Yes.

5      Q.   And was that at an address called

6  info@digitalnet.com?

7      A.   Yes.

8      Q.   And were they typically sent to Mr. Imran

9  Alrai at his United Way domain email account?

10      A.   They were.

11      Q.   All right.  Showing you Exhibit 600,

12  Government Exhibit Number 600, looking at the first

13  email, is that an example of one of these emails from

14  Mohammad?

15      A.   Yes.  That's being sent to Mr. Alrai and then

16  Mr. Alrai's forwarding it to another colleague in the IT

17  department.

18      Q.   And I said info@digitalnet.com.  It's actually

19  info@digitalnet.us, correct?

20      A.   Correct.

21          MR. DAVIS:  All right.  Your Honor, I'd move

22  to admit 600 and strike the ID.

23          MR. HARRINGTON:  No objection, your Honor.

24          THE COURT:  Admitted.

25          (Government's Exhibit 600 admitted.)

1    Q.   All right.  And so let's just -- let's take

2    one random one, say a few years in.  Let's just go to

3    2014 or 2015.

4              THE COURT:  Let me just ask, are we in a

5    situation where you didn't go over these exhibits and

6    premark them as full or you were just basically -- he

7    was basically standing on objections until you laid a

8    foundation?  I mean, why are we doing this is what I'm

9    asking.

10              MR. DAVIS:  So we premarked it and, your

11    Honor, we have been talking about agreement and

12    Mr. Harrington told us this morning that probably with

13    one more evening and time with his client we can -- we

14    can make an agreement.

15              THE COURT:  Sure.

16              MR. DAVIS:  We are -- we are -- we're not

17    going to object to striking the ID on any defense

18    exhibit that's been premarked and shown to us, so we --

19              THE COURT:  Those are all -- so all defense

20    exhibits that have been premarked are full exhibits,

21    Charli.

22              THE CLERK:  Thank you, Judge.

23              THE COURT:  All right.  They're all admitted.

24              And I appreciate the effort.  Thank you.  You

25    can continue.  Thanks for filling me in.

1          MR. DAVIS:  And does this have an attachment

2     with a DigitalNet invoice?

3          MS. SHEFF:  Yes.

4          MR. DAVIS:  All right.  So let's go to the

5     email prior to that.  Can you zoom in on the email so we

6     can read it?

7     Q.   This is, again, Exhibit 600.  And this is an

8     email sent in January '14, correct?

9     A.   Correct.

10    Q.   All right.  And it's from DigitalNet support

11    at info@digitalnet.us, right?

12    A.   Correct.

13    Q.   And it's sent to Imran Alrai on the United Way

14    email account, right?

15    A.   Yes.

16    Q.   And then it says, invoices for February 2014?

17    A.   Yes.

18    Q.   And can you read the message there?

19    A.   The message:  Hello Imran, PFA invoices for

20    February 2014 that are requested via ACH by end of

21    January.  Thanks and regards, Mohammad.

22    Q.   And do you know what PFA means?  Might it be

23    please find attached?

24    A.   Could be --

25    Q.   Okay.

1          A.    -- yeah.

2          Q.    So -- and let's go to the attachments then.

3                What is attached to this email that Mohammad

4     has sent to Mr. Alrai?

5          A.    This is the -- the monthly invoice --

6          Q.    All right.

7          A.    -- for this particular month.

8          Q.    And is this a typical invoice in the form that

9     United Way received over the years?

10         A.    It is.

11         Q.    Okay.  And can we look at the -- the actual

12    description part in the middle of the invoice?

13         A.    Okay.  You want me to read it?

14         Q.    Yes, just what are some of the line items on

15    it.

16         A.    I'll just read from top to bottom:

17    Infrastructure as a service and hosting for $14,300.

18         Q.    All right.

19         A.    On-site IT support, $12,500; after-hours IT

20    support and systems monitoring, $3,500; data management

21    and high-availability backup storage up to 10 terabyte,

22    $7,500; virtual desktops as a service with Microsoft

23    Office Suite 2013, $15,000; applications, database, and

24    O/S management, $3,500.

25         Q.    Okay.  You don't have to read the mileage and

1    parking reimbursement --

2         A.    Yup.

3         Q.    -- but what's the total amount there at the

4    bottom of that invoice?

5         A.    $56,542 and no cents.

6         Q.    Okay.  And is there another invoice attached

7    to that same email from Mohammad?

8         A.    Yes.

9         Q.    And so that's the next item in Exhibit 600.

10   What's the date on that invoice again?

11        A.    The date of the invoice is January 15th, 2014.

12        Q.    And for what month is it?

13        A.    It's for the following month.  It's for

14   February 2014.

15        Q.    So you're getting invoiced in early January

16   for services for February, right?

17        A.    Correct, in advance.

18        Q.    And what are the items on the description

19   there?

20        A.    These items -- these are phone office services

21   for our various locations; the Lowell office, Seacoast

22   up in Portsmouth --

23        Q.    All right.

24        A.    -- New Hampshire, Boston.

25        Q.    All right.  So this is a phone service bill

1  that DigitalNet's sending you, right?

2       A.    Correct.  It's a per unit cost --

3       Q.    All right.

4       A.    -- that we're paying.

5       Q.    All right.  And how much is that total?

6       A.    That's $13,638.75.

7             MR. DAVIS:  Okay.  So let's go to an invoice,

8  say, at the end of 2017, just one more that has some --

9  an email and invoices attached to it.  If you could just

10  click ahead in the compilation.

11       Q.    Mohammad did not send just invoices, though;

12  he also sent -- would also send, say, drafts of

13  contracts with revisions on them.  Were you familiar

14  with that?

15       A.    That was probably before -- the contracts were

16  before my time --

17       Q.    Right.

18       A.    -- but I'm reading the email that illustrates

19  that.

20             MR. DAVIS:  Yup.  Okay.  So have -- where are

21  we?

22             MS. SHEFF:  I'm trying to find 2017.

23             MR. DAVIS:  All right.  Well, let's move on.

24       Q.    But is it fair to say that the invoices that

25  were received from United Way came in this way, by

1    email, attached to an email from Mohammad to Mr. Alrai?

2         A.    Yes.

3         Q.    Okay.  Now, let me show you some particular

4    ones that pertain to the actual wire fraud counts.

5              Showing you first -- and these are just

6    examples of the same thing we've just seen -- showing

7    you Government Exhibit 101.

8              Is that an email from Mr. -- from DigitalNet

9    support to Imran Alrai dated May 11th of 2015?

10        A.    It is.

11             MR. DAVIS:  Your Honor, I move to admit

12   Exhibit 101 and strike the ID.

13             MR. HARRINGTON:  No objection, Judge.

14             THE COURT:  Okay.

15             (Government's Exhibit 101 admitted.)

16             MR. DAVIS:  And let's go to 102.  I don't want

17   to go through every one of them.

18        Q.    The next one is Exhibit 102.  And is that an

19   email in June of 2015 from info@digitalnet to Mr. Alrai

20   with an invoice for Andar and eContract:  Please find

21   attached the invoice.

22        A.    It is.  It references an invoice number.

23             MR. DAVIS:  Your Honor, I move to admit 102

24   and strike the ID.

25             MR. HARRINGTON:  No objection, Judge.

44

```
 1                    MR. DAVIS:  And, similarly, were --
 2                    THE COURT:  Admitted.
 3               (Government's Exhibit 102 admitted.)
 4                    MR. DAVIS:  -- I move to strike the ID of 103,
 5      104, 105, 106, 107, 108, 109 --
 6                    Do you need to see them, Tim?  Sorry.  I'm
 7      intending to strike the ID of 103 through 117.
 8                    THE COURT:  Corresponding Counts 1 through 17?
 9                    MR. DAVIS:  Correct, which are all emails from
10      Mohammad to Mr. Alrai.
11                    MR. HARRINGTON:  No objection, your Honor.
12                    THE COURT:  Admitted.
13          (Government's Exhibits 103 through 117 admitted.)
14                    MR. DAVIS:  So 113 to -- I'm sorry.  103
15      through 117 are admitted.  Thank you.
16          Q.   All right.  So let's go to Exhibit 118.  This
17      is a little different.  Did United Way also receive an
18      email from a Mac Chaudhary that contained information
19      regarding inquiries that were being made in July of
20      2016?
21          A.   Yes.
22          Q.   All right.  And did that particular email go
23      to Jack Rotondi?
24          A.   Yes, it did.
25          Q.   And who is Jack Rotondi?
```

1      A.    Jack -- at that time, Jack Rotondi was the VP

2  of organizational operations within the administration

3  and finance division.

4      Q.    Okay.  And at that time were members of United

5  Way's staff seeking additional information about

6  DigitalNet because of the ongoing contracts with

7  DigitalNet?

8      A.    Correct.

9           MR. DAVIS:  Your Honor, I move to admit

10  Exhibit 118 and strike the ID.

11           MR. HARRINGTON:  No objection, your Honor.

12           MR. DAVIS:  All right.

13           THE COURT:  Admitted.

14           (Government's Exhibit 118 admitted.)

15      Q.    Let's just -- let's for now just look at the

16  attachments to that exhibit.

17           So the attachment shows -- can you just focus

18  in on the top of the page and can you read what that

19  says at the top?

20      A.    The paragraph is:  DigitalNet offers

21  state-of-the-art information technology services with

22  exceptional value to our ever-growing global client

23  base.  Our clients come from various market verticals

24  including academia, not-for-profit, mercantile,

25  technology, entertainment, manufacturing, distribution,

1    e-commerce, fashion, and healthcare.

2         Q.   Okay.  And, again, this is coming in an email

3    from Mac Chaudhary?

4         A.   Yes.

5         Q.   Okay.  And let's go to the second page of the

6    attachment.  And look at the -- first at the top, the

7    Facts at a Glance part.  What does that say about

8    DigitalNet?

9         A.   It's got some statistics, 17,000 users

10   managed; 20,000-plus network and wireless devices

11   managed; 15,000-plus virtual machines managed; hundreds

12   of millions of direct third-party emails per year, five

13   PB data managed and backed up; 650-plus digital

14   e-commerce, web, and mobile app solutions delivered;

15   105-plus global clients served.

16        Q.   And did that same document -- let's look at

17   the second part of it -- did it have a sample list of

18   clients?

19        A.   It does, and it has it by various industries.

20        Q.   All right.  And, to your knowledge, did United

21   Way ever actually try to figure out if any of those

22   companies actually exist or if any of them had ever

23   actually been provided services by DigitalNet?

24             MR. HARRINGTON:  Objection, Judge.  If he has

25   personal knowledge, but -- otherwise, I would object.

1      MR. DAVIS:  I'm just asking about his

2  knowledge.

3      A.   My knowledge, no.

4      Q.   Okay.  All right.  But how many -- how many

5  customers are on that list of the sample customers?

6      A.   One, two, three, four, five, six, seven,

7  eight, nine, 10, 11.  Right?  Eleven.

8      Q.   Very good.  Okay.  Did United Way, by the way,

9  ever hire DigitalNet to make computer games or to do

10  game programming for United Way?

11      A.   No.

12      Q.   All right.  Let me show you some other

13  invoices that -- that have been marked in this case.

14          The first is Exhibit 415 and these are

15  exhibit -- these are invoices for CloudConnect.  Are you

16  familiar with CloudConnect?

17      A.   I'm familiar with cloud services.

18      Q.   All right.

19      MS. SHEFF:  415?

20      MR. DAVIS:  Yes.

21      Q.   So you're not familiar with CloudConnect?

22          415, Ms. Sheff.

23      A.   If I could see the exhibit maybe.

24      MR. DAVIS:  Oh, it's on a CD.  Okay.

25      Q.   Well, we'll deal with that otherwise.

1        A.    I mean, cloud services or CloudConnect.   If

2    it's the cloud environment that we're using, then, yeah,

3    I'm familiar with that.

4        Q.    Okay.   I didn't mean to surprise you with

5    that.   It's on a disk, so -- I don't think there's an

6    objection, but we'll deal with it with another witness.

7             Okay.   So just a few more questions,

8    Mr. Voccio.

9             Were you -- did you do some research and

10   actually compile statistics that compared comparable

11   United Ways and compared their amount of IT spending as

12   of June of 2018?

13       A.    Yes, I did.

14       Q.    And can you just say how you did that?

15       A.    Pretty much a standard business that I had

16   used when I was the CFO in United Way Rhode Island in

17   Providence.

18            We used a benchmark from the tax return, the

19   Form 990, that's readily available from either GuideStar

20   or from United Ways.   It's on their websites.

21       Q.    All right.

22       A.    So I took the information off their -- off

23   their 990s, the statement of functional expenses is part

24   of a core form.   There's standardized reporting from

25   that and it has a line item for information technology

1    spend, among other expenses.

2         Q.   Okay.  And did you study particularly a group

3    of approximately 20 United Ways, other United Ways?

4         A.   Yes.

5         Q.   And how did you choose the other United Ways?

6         A.   I've been in the United Way system for about

7    15 years.  I mean, I -- I'm very well versed with the

8    United Way entities.  And I specifically wanted to find

9    like United Ways that were of our size.

10             So just to give you example, I didn't include

11   the United Way of Providence, Rhode Island.  I wanted

12   the bigger United Ways that are the metro -- as we call

13   metro ones, top 15 United Ways, top 20 United Ways.

14        Q.   And of the United Ways that you surveyed in

15   that entire group, including United Way Boston, which

16   United Way at that time had the highest IT spend?

17        A.   United Way of Mass Bay and Merrimack Valley.

18        Q.   So every other United Way was lower?

19        A.   Yes.  There was one close.

20        Q.   And where was that?

21        A.   The name's changed, but it's Southwestern

22   Pennsylvania.  And I was extremely familiar why their IT

23   expense -- they were working on some special projects

24   that I -- over the years I was familiar with.

25        Q.   Okay.

1      A.    So it didn't surprise me for them.

2      Q.    And did you put your findings on a

3 spreadsheet, a single-page spreadsheet?

4      A.    I did.

5           MR. DAVIS:  All right.

6           And, your Honor, that's been disclosed as

7 Commisso 288, if counsel needs it.  I'm not going to

8 mark it, though.

9           THE COURT:  All right.

10      Q.    All right.  So I wanted to ask you about

11 the -- the efforts that United Way took, both to

12 investigate and remediate your IT situation in the wake

13 of the termination of Mr. Alrai and the separation from

14 DigitalNet.

15           Did you incur significant expenses?

16      A.    We -- we did, and we still continue to incur

17 those expenses.

18      Q.    All right.  And have you made an effort to at

19 least roughly determine the amount of spend for United

20 Way in investigating and remediating Mr. Alrai and

21 DigitalNet?

22           MR. HARRINGTON:  Judge, I'm just going to

23 object at this point as to relevance of the charges.

24           THE COURT:  What's the relevance?

25           MR. DAVIS:  It has to do with loss.

1          THE COURT:  Admitted.  Overruled.

2     A.    To date, we have a spreadsheet we're tracking.

3 The cost that we've made to vendors is north of

4 $1.3 million and we're anticipating that will be

5 somewhere around at least a million five.

6     Q.    All right.

7     A.    That's not including staff effort and other

8 time that we've put into this.  That's just paying

9 vendors.

10     Q.    Okay.  You've used the term opportunity costs

11 to refer to this situation.

12     A.    Yes.

13     Q.    And can you explain that briefly for the

14 Court?

15     A.    Sure.  The -- the opportunity cost is -- you

16 know, United Way as a system has been known to be

17 struggling with, you know, IT as a movement and a lot of

18 United Ways are trying to get ahead of that and try to

19 do more with their technology to get ahead and connect

20 with our donors.

21          And the opportunity costs lost at, you know,

22 United Way Mass Bay is we're spending the time to do the

23 remediation now.  Had the systems been in place the way

24 they could have been, we could have been using much more

25 of our resources strategically to engage in the

1  communities, engage with our donors, using technology as

2  a strength to really help us grow as a company.  And

3  we've actually taken a step backwards just trying to get

4  the foundation and the groundwork up running.

5          And comparing to other United Ways that I'm in

6  contact with and have been in contact with, they're

7  clearly ahead of us on that and we're trying to play

8  catch up to get back to where they're at.

9          MR. DAVIS:  Nothing further.  Thank you.

10          THE COURT:  Cross-examination.

11          MR HARRINGTON:  Thank you, Judge.

12          THE COURT:  Let's go off the record for a

13  minute.

14          (Off-the-record discussion.)

15                  CROSS-EXAMINATION

16  BY MR. HARRINGTON:

17      Q.   Mr. Voccio, I don't have a lot of questions of

18  you, but I do have a few.  Those are the famous last

19  words of a lawyer.

20          I want to ask you about -- kind of going back

21  to the beginning of this, if you will.

22          If you can remind the Court, when did you

23  start at United Way of Massachusetts Bay?

24      A.   I started on -- May 1st, 2017, was my first

25  day.

1      Q.   Okay.  So May 1st of 2017.  And Mr. Alrai was

2  walked out of the building on June 12th of 2018; is that

3  right?

4      A.   That's correct.

5      Q.   Okay.  So you were there for about 13 months;

6  is that about right?

7      A.   That's about right.

8      Q.   Yeah.  As part of your kind of investigation,

9  if you will, you kind of participated in a number of

10  interviews with counsel, which was Mr. Commisso, for

11  United Way, right, and the FBI, Homeland Security; you

12  were kind of part of that process, right?

13      A.   I'm part of that process, yes.

14      Q.   Okay.  And so as part of that, you came to

15  learn certain information, right?

16      A.   That was protected under attorney-client

17  privilege.

18      Q.   Well, I'm not going to ask you about any

19  protected information, obviously, and I'm sure

20  Mr. Commisso would object if I did, but one of the

21  things I wanted to ask you about is you looked into the

22  RFP process going back to 2013, right?

23      A.   Correct.

24      Q.   Okay.  And one of the things you learned is

25  that there was an RFP committee, correct?

1      A.   Correct.

2      Q.   And that RFP committee was actually

3 specifically an IT RFP committee, right?

4      A.   I believe so, it was.

5      Q.   And that included Patricia Latimore, correct?

6      A.   Correct.

7      Q.   And at that time her position was?

8      A.   Chief financial officer.

9      Q.   Okay.  So she was the CFO.  That's obviously

10 one of the senior executives on par with the chief

11 administrative officer, correct?

12     A.   Correct.

13     Q.   Stan Burrows was part of that IT RFP

14 committee, correct?

15     A.   Correct.

16     Q.   And Stan Burrows was actually an independent,

17 kind of outside IT expert that was recruited by United

18 Way to serve on the IT RFP committee, right?

19     A.   Yes.  He also serves on the administration and

20 finance committee, our finance committee.

21     Q.   So an outside person, but involved in the

22 United Way process?

23     A.   Yes.

24     Q.   Additionally on that committee was Azim

25 Mazagonwalla?

1        A.   I believe so.

2        Q.   Okay.  And then also Imran Alrai?

3        A.   Yes.

4        Q.   And, lastly, Diane Dragoff was also a part of

5   that IT RFP committee, correct?

6        A.   I'm assuming so on that one.

7        Q.   Okay.  So in that regard, you had indicated

8   that you had gone through and you'd looked at emails and

9   things of that nature, right?

10        A.   Correct.

11        Q.   Okay.  And you saw that there was actually

12   communication amongst these participants of the IT RFP

13   committee, correct?

14        A.   Yes.

15        Q.   And some of those communications related to

16   the actual drafting of the RFP that would be put out to

17   the public for bid, right?

18             MR. DAVIS:  Objection as to specificity;

19   confusing.  We have no objection to showing an email at

20   United Way, but a question about some of those

21   communications -- the objection, I guess, is best

22   evidence rule.  If it's about the document, we should

23   see the document at the time of the questioning.

24             THE COURT:  Best evidence rule is about the

25   admissibility of a document or I guess evidence in a

1    document.  Is that what you're driving at?

2           MR. DAVIS:  Yes.  If the question is about

3    evidence in emails, I would just ask that the email be

4    presented to the witness --

5           THE COURT:  Yeah --

6           MR. DAVIS:  -- because that's what the

7    question is about.

8           THE COURT:  Yeah, I -- I understand your

9    point, but I think this is proper questioning.  I'm

10   going to allow it.

11          Go ahead.

12          MR. HARRINGTON:  Thank you.

13          THE COURT:  But, then again, it might help

14   your examination to do exactly what he's saying.  I just

15   don't know where you're going.

16          MR. HARRINGTON:  Yeah.  I think -- all I'm

17   trying to establish is the communication, Judge.  I

18   don't really need to get into the specifics of the

19   emails.

20          THE COURT:  Right.  I think that's probably

21   why the best evidence rule doesn't apply.

22          MR. HARRINGTON:  Yeah.

23          THE COURT:  Go ahead.

24          MR. HARRINGTON:  Thank you, Judge.

25          And I can also tell you, Judge, that I'm going

1   to go into a little bit more detail on those with

2   another particular witness that the government's going

3   to be calling, so I don't think there's any need to

4   cover it twice.

5            THE COURT:  Sure.

6        Q.   So, again, just to kind of follow up on that,

7   you were aware that there were communications among the

8   RFP IT committee?

9        A.   I was aware of communications.  Specifically,

10  I can't recall what those communications were.

11       Q.   Sure.  And you were aware that they were about

12  the subject matter of the RFP that was going to be put

13  out to bid, correct, for IT services?

14       A.   I believe so, but I don't have a recall of

15  that.

16       Q.   Okay.  What else would the RFP committee be

17  talking about?

18       A.   Oh, they would be -- they were going out for

19  an RFP, but specific to what they were talking about,

20  without seeing an exhibit, I can't have that instant

21  recall.

22       Q.   Sure.  Fair enough.

23            You would agree with me that Patricia

24  Latimore, she was at the time I think you indicated the

25  CFO back in 2013, the time frame that we're talking

1  about, right?

2       A.   Yes, she was.

3       Q.   Okay.  And she was actually Mr. Alrai's direct

4  supervisor, correct?

5       A.   And she continued to be his direct supervisor

6  after I -- I joined the organization in 2017.

7       Q.   Right.  So, really, as you understand it, for

8  the entire time with a brief exception of when Nancy

9  Powers was there in 2012, 2013, your understanding is

10  that Patricia Latimore, essentially for about five years

11  or so, was Mr. Alrai's direct supervisor?

12       A.   Yes.

13       Q.   Okay.  And you would agree with me that as

14  part of that, she would be in a good position to be able

15  to kind of talk about things that had been done by

16  Mr. Alrai, accomplishments, things of that nature,

17  right?

18       A.   She would be supervising him, yes.

19       Q.   Okay.  And that was not your job, right?  You

20  had no supervisory oversight over Mr. Alrai, correct?

21       A.   Correct.  The terms of my hire for United Way

22  Mass Bay was that I would be assuming all of her

23  responsibilities except the IT.

24       Q.   Okay.  So now let me ask you a little bit

25  about DigitalNet.

1          You would agree with me that when you joined,

2   Nadeem Yousuf and Jasmin Iqbal were on the IT help desk;

3   they were the DigitalNet kind of embedded employees at

4   the United Way in Boston, right?

5          A.    They were.

6          Q.    Okay.  And you would agree with me that they

7   were proactive, polite, even-tempered people?

8          A.    Polite, even-tempered, I would agree; most of

9   the time proactive.  I wouldn't say all the time they

10  were proactive.

11         Q.    You would agree with me they were good at

12  their work?

13         A.    For the things they were being asked to do

14  at -- yes, but what they were being asked to do were

15  sort of plug in the computers, help out the -- the basic

16  kinds of things that needed to be done.  But they were

17  good at it.

18         Q.    Okay.  And you actually told the police that,

19  or you told the FBI and Homeland Security that, right,

20  that they were good at their work?

21         A.    I don't have an instant recall of that, but I

22  probably did.

23         Q.    Okay.  In regard to that, let's talk a little

24  bit about the services that were provided.

25               Would you agree that DigitalNet was hired

1    because United Way needed to be brought up to speed,

2    that the IT program was very poor, this was one of the

3    things that needed to be done starting back in 2012,

4    2013?

5             MR. DAVIS:  Objection; personal knowledge.

6    Your Honor, this is a -- this goes back to 2012 and it

7    was well before Mr. Voccio came.  I have no objection to

8    a business record from that time, but to ask him, with

9    his knowledge, to evaluate the IT situation in 2012, he

10   doesn't have the personal knowledge.

11            THE COURT:  Well, we don't know if he has it

12   or not.  He may have it from other sources besides

13   having worked there.

14            So I'll let you lay the foundation and if you

15   have one, you can ask him; if Mr. Davis is right, you

16   can't.  Go ahead.

17            MR. HARRINGTON:  Sure.

18       Q.   Let me ask the question this way.

19            You were interviewed by Jill Laroe and Todd

20   Donnelly on June 5th of 2018, right?

21       A.   Correct.

22       Q.   And as part of that, one of the things that

23   you told them was that Alrai and DigitalNet did provide

24   services to the United Way?

25            MR. DAVIS:  Objection; hearsay.  It's not

1    impeachment.  I'm not sure what it is.  It's a prior

2    statement.  He hasn't denied saying that.

3              THE COURT:  Overruled.

4         Q.   You -- you told the police that Alrai and

5    DigitalNet provided services to the United Way, correct?

6         A.   If that's what's written in the record, then

7    that was written, yes.

8              THE COURT:  What's your memory?

9              THE WITNESS:  My -- my memory is that, yeah, I

10   would say yes.

11             THE COURT:  All right.

12             THE WITNESS:  They provided services.

13        Q.   And, additionally, that they -- DigitalNet and

14   Mr. Alrai -- brought the IT program at United Way up to

15   speed?

16             MR. DAVIS:  Same objection.  This is improper

17   impeachment.  He's not being impeached.  He's just

18   reading a prior statement of the witness.

19             MR. HARRINGTON:  I'm not impeaching him.  I'm

20   asking if these statements are true.

21             THE COURT:  Yeah.  Overruled.

22             He has made statements in the past.  What's

23   the problem?

24             MR. DAVIS:  But he's asking him -- he's

25   reading the statement and saying did he make the

1    statement.

2           THE COURT:  Well, he has a good faith basis to

3    do that.  He has a record to suggest he did make that

4    statement, doesn't he?

5           Isn't that what you're using?

6           MR. HARRINGTON:  Yes.

7           THE COURT:  What's the problem?

8           MR. DAVIS:  But he should ask -- he can ask

9    the substance of the question.

10          THE COURT:  He should conduct the examination

11   the way he wants.  He's not doing anything inadmissible.

12   He's not -- he's not limited to impeaching.  He's

13   allowed to bring out evidence in any proper way, right?

14          I mean, I guess he could just ask him the

15   questions in open air and if he disagrees, he can

16   impeach him, but, you know, does he really need to go

17   through that exercise?  We don't have a jury here.  I

18   don't have a problem with this.

19          Go ahead.

20      Q.   So --

21          THE COURT:  And you'll have the same latitude,

22   by the way.

23      Q.   So, Mr. Voccio, you told in this interview

24   that we're talking about --

25      A.   Uh-huh.

1      Q.   -- that Mr. Alrai and DigitalNet brought

2   United Way's IT program up to speed, correct?

3      A.   Correct.  I -- this conversation happened

4   about a year and a half ago, but if that's what's

5   written, then yes.

6           THE COURT:  Here's the question -- you need to

7   understand.

8           THE WITNESS:  Yes.

9           THE COURT:  Answer his question --

10          THE WITNESS:  Yup.

11          THE COURT:  -- but if you -- answer it, but if

12   you want to explain it --

13          THE WITNESS:  Yeah.

14          THE COURT:  -- in any way or put it in

15   context, you can do that.

16          THE WITNESS:  Oh, okay.  Then, yeah, he -- I

17   mean, he brought it up --

18          THE COURT:  You just did.  You explained,

19   well, that's an old conversation.  But --

20          THE WITNESS:  Yeah.

21          THE COURT:  -- feel free to answer his

22   questions, but if you need to explain it to put it in

23   some kind of context you want me to know, go ahead.

24          THE WITNESS:  Okay.  Then, yeah, I'd like to

25   elaborate on that a little bit more, if I could.

1              THE COURT:  Go ahead.

2              THE WITNESS:  So when you say brought up to

3    speed, from where they were in the past, it was

4    definitely better, but the context of up to speed and

5    what that would mean, that -- that could be a wide range

6    of things as up to speed as to -- compared to what?  You

7    know, if you want to go on a conversation as compared to

8    the other top 15 United Ways, I would not use that

9    content of up to speed.  I would be using a different

10   content.

11        Q.   So in regard to DigitalNet, you agree with me

12   that DigitalNet provided services to the United Way that

13   Alrai didn't provide as the CIO or vice-president in

14   charge of IT?

15        A.   That's -- I mean, Imran was our CIO and we

16   were relying on the vendor to provide the services.

17   That was the understanding.

18        Q.   Okay.  So DigitalNet was providing services

19   that Alrai did not, right?

20        A.   That's my -- that's my understanding.  In

21   actuality, if that was actually happening or not, I

22   can't attest to that.

23        Q.   Fair enough.

24        A.   My understanding when I came to work that he

25   was our CIO and DigitalNet was the vendor to provide the

1    external services on behalf.

2         Q.   Okay.  Well, you -- you advised in this

3    interview with Ms. Laroe and others, Mr. Donnelly, that

4    you were -- DigitalNet was one of the largest

5    expenditures --

6         A.   Yes.

7         Q.   -- for United Way and they were -- they were

8    providing services such as site management, right?

9         A.   Correct.

10        Q.   Virtual desktop?

11        A.   Yes.

12        Q.   On-site people, like we just talked about with

13   Ms. Iqbal and Mr. Yousuf, right?

14        A.   Correct.

15        Q.   Network infrastructure?

16        A.   I'm not an IT expert, so I can't attest to

17   whether they were providing that or not.  My background

18   is administration finance and I supervise IT, but I'm

19   not an IT expert, so I'm not going to -- I can't --

20   whether we're doing it or not, I couldn't tell you.

21        Q.   Okay.  So whether they were doing it or not --

22        A.   Uh-huh.

23        Q.   -- I understand that you take issue with.

24        A.   Yeah.

25        Q.   What I'm saying is you told the law

1    enforcement personnel that were interviewing you --

2         A.   Yeah.

3         Q.   -- that that's what DigitalNet did; they --

4         A.   Based on the invoices that I had in front of

5    me --

6         Q.   Let me finish the question, sir.

7         A.   Yeah.

8         Q.   Okay?  Is that one of the things was network

9    infrastructure.  That's what you told them.

10        A.   Yes.

11        Q.   Desktop software?

12        A.   Desktop software, absolutely.

13        Q.   Google?

14        A.   Yes.  Google Suite, yes.

15        Q.   Great Plains?

16        A.   That's our accounting system.

17        Q.   Andar/360?

18        A.   The accounting system was also being managed

19   by another vendor.

20        Q.   Sure.

21        A.   So they were -- the hosting was being done by

22   DigitalNet.  The actual software support was being done

23   by another vendor day to day.

24        Q.   Okay.  And Andar/360?

25        A.   Similar to the accounting system, Andar/360

1    was being supported by Helix.  The hosting of the Andar

2    was being supported by DigitalNet.

3        Q.    Okay.  In addition to that, you also advised

4    law enforcement that there had been one-time contracts

5    between the United Way and DigitalNet regarding

6    specific, discrete projects?

7        A.    Yes.

8        Q.    Okay.  And that those payments for these

9    separate contracts would sometimes come either from

10   capital costs or operating costs, right?

11       A.    Correct.

12       Q.    Okay.  And in regard to payment, you described

13   a process earlier in which invoices would come in,

14   correct, and then they would be -- gone through a kind

15   of chain of review before they were paid, right?

16       A.    Correct.

17       Q.    Okay.  And that happened -- even with the

18   invoices that were kind of reviewed today with you, that

19   process was complied with, the internal controls,

20   correct?

21       A.    Correct.

22       Q.    Okay.

23       A.    There were approval processes within the

24   department, in the IT, and there were also approval

25   processes within the -- within the normal payment

1    process within the finance department.

2         Q.   Yeah.  And they were followed?

3         A.   Correct.

4         Q.   Let me ask you, in regard to -- if I could

5    just have one moment.

6              So let me ask you about your site visits.  You

7    had talked about after Mr. Pallaria had come to you and

8    raised some concerns that you decided to kind of on your

9    own kind of investigate things a little bit, you know,

10   make sure things were okay.

11        A.   It was not on my own.

12        Q.   Well, I guess what I'm talking about is you

13   went there by yourself, I guess is what I'm referring

14   to.

15        A.   That's -- that's correct.

16        Q.   I understand others at United Way were

17   involved.  I didn't mean it that way.

18        A.   Yeah.

19        Q.   So when you went, you said you went to the

20   AISA office in Windham, but nobody was there?

21        A.   Correct.

22        Q.   Okay.

23        A.   It didn't look like the place was open for

24   business.

25        Q.   Sure.  And you agree with me that DigitalNet

1    doesn't have any contracts -- or excuse me -- United Way

2    doesn't have any contracts with AISA Consulting?

3        A.    That's correct.

4        Q.    Okay.  And there was some notice and contact

5    information, you had indicated, was left on the door; if

6    people were to come and nobody's there, they left some

7    contact information?

8        A.    I would agree with that, but I'd also agree

9    with my 20 years' experience supervising IT, I've worked

10   with many IT telecom vendors and when I've gone to their

11   place of business, you would see vehicles parked out

12   front, you would see shop vehicles with the logos on it,

13   you would see something.  I didn't see anything here.

14       Q.    Yeah, this wasn't DigitalNet, though, was it?

15   This was AISA Consulting.

16       A.    But you didn't see anything at AISA.  You

17   didn't see a car there, you didn't see any sense of

18   vehicles parked there.  The blinds were drawn, no lights

19   were on, and this was eleven o'clock in the morning.

20       Q.    Sure.  So let's talk about the Andover space,

21   the DigitalNet space.

22             You went there to -- is it 300 Brickstone

23   Commons in Andover, right?

24       A.    Correct.

25       Q.    You ultimately locate building 300?

1          A.    It took me a while, but I found it.

2          Q.    Yup.  And you go up there and find the Regus

3    kind of sign and go up there to the appropriate floor

4    for that?

5          A.    I actually was looking for -- I wasn't looking

6    for the Regus sign.  I was looking for cross-referencing

7    the 201 suite because that was what I had on

8    DigitalNet's invoice.

9          Q.    Yup.

10         A.    And I was perplexed when I saw Regus and said,

11   this does not add up.  I didn't know -- understand what

12   Regus was, but I proceeded up to the 201 suite.

13         Q.    Yeah.  And you ultimately found out that it

14   was like a common WeWork space?

15         A.    I found out that it was a common WeWork space

16   and I was -- also found out that DigitalNet did not

17   self-identify on the marquee.

18         Q.    Yup.  But, in fact, although it didn't

19   self-identify on the marquee, they actually had access

20   to and rented space in that location?

21         A.    Yes.

22         Q.    Okay.

23         A.    And the other vendors all identified

24   themselves on that space, on that marquee.

25         Q.    You had talked about -- I'm going to switch

1    gears, Mr. Voccio, to the letter that you talked about

2    that United Way had received from DigitalNet's lawyers,

3    McLane Middleton.  Do you recall talking to the

4    prosecutor about that?

5         A.   I'm sorry.  Say -- repeat.

6         Q.   Do you recall talking to the prosecutor about

7    that letter?

8         A.   We -- we saw it here, yeah.

9         Q.   Yeah.  And that was about the telephony

10   services?

11        A.   It was a telephone services -- I believe it

12   was more than just the telephone services.  It was also

13   about a board portal that we had in addition to the

14   telephone services.

15        Q.   And what I want to kind of drill in on is that

16   there was discussion about the payment of the bill or

17   that DigitalNet, you know, wouldn't continue with the

18   service and there was a concern that United Way might

19   have an interruption in service, right?

20        A.   Correct.

21        Q.   Okay.  And that actually never happened,

22   right?  There was never an interruption in service?

23        A.   The interruption in service never happened

24   because without your client's assistance, TBS was able

25   to ascertain all of the user passwords and get all of

1     the activity working with various entities and a lot of

2     hard work to do all of this work.  And none of that was

3     being provided willingly on June 12th by your client and

4     we felt very confident at the time what we were trying

5     to do was this -- safeguard the assets and make certain

6     that we could keep our business open.  The month of June

7     was highly critical to that we could close on business

8     that we conduct for pledges.

9         Q.   And the point of the question is DigitalNet

10    didn't take any steps to interrupt the service of United

11    Way, did they?

12        A.   In the end, no.  But the letter, when we read

13    it, it came across like it was threatening that they

14    would.

15        Q.   Okay.  But they didn't, did they?

16        A.   Correct.

17        Q.   Okay.

18        A.   But that was after our attorney sent two

19    letters back to -- I believe to that attorney's office

20    asking for additional information and asking for what

21    was going back.  So that wasn't the only correspondence.

22    There was correspondence back and forth that took over a

23    place of about a course of two or three weeks.

24        Q.   Sure.  And part of that information -- you

25    just tried to characterize my client as uncooperative

1  and not providing information.  In fact, part of the

2  information that got exchanged through attorneys was a

3  lot of information about the network and information

4  about passwords, things of that nature, that my client

5  gave, through counsel, to United Way's counsel?

6      A.    But there was no information exchanged during

7  the interview on June 12th, when TBS was asking for

8  specific information, IT to IT technical person, that

9  would have helped us in the moment attain that activity.

10     Q.    That's an answer, but it's not the answer to

11 the question that I gave you.

12     A.    Uh-huh.

13          MR. DAVIS:  Objection to counsel testifying.

14          THE COURT:  Yeah.

15          MR. HARRINGTON:  Okay.  I'll rephrase it.  So

16 let me rephrase the question again.

17          THE COURT:  Sustained.

18     Q.    You had indicated that there was no

19 information provided by my client and you talked about

20 other letters that went back and forth between counsel.

21          Part of my question to you is as part of that

22 exchange, counsel for Mr. Alrai provided a number of

23 pieces of information that were requested through

24 Mr. Commisso and the United Way; right?

25     A.    I don't recall the specifics, but I believe

1    there was some information provided.  Whether it was

2    useful or not, I can't attest to that either.

3              But I would suggest --

4         Q.   Now --

5         A.   -- the timing of it was late, after we had

6    already ascertained all of that information on June 12th

7    and shortly thereafter.

8         Q.   True.  Let me ask you, in regard to --

9              If I may have just one moment, Judge?

10             THE COURT:  Yup.

11             MR. HARRINGTON:  Judge, thank you for that.

12        Q.   Let me ask you this, Mr. Voccio.

13             Were you familiar with the performance

14   reviews of Mr. Alrai during the time that he was the

15   vice-president and CIO at United Way?

16        A.   No.  I was not his direct supervisor.  That

17   would have been Patricia Latimore.

18        Q.   Okay.  And what I asked was whether you were

19   aware of his performance reviews during that time

20   period.

21        A.   I wasn't intimately familiar with his reviews,

22   nor of any of her other direct reports.  I was familiar

23   with the direct reports that I supervised.

24        Q.   Okay.  So you're not aware -- I'm just not

25   certain of what your answer is.  Are you --

1      A.   So if you would ask me if -- was I aware of

2  the specifics of what was in his -- with his review, I

3  would say no.

4      Q.   Okay.

5      A.   I have not reviewed his documents.

6      Q.   Okay.  Are you aware that he received positive

7  reviews for all the years that he was there?

8      A.   I didn't receive them.  I -- can you rephrase

9  the question?

10     Q.   Sure.

11          THE COURT:  He's asking if you're aware --

12          THE WITNESS:  Yeah.

13          THE COURT:  -- that he -- that he received

14  positive reviews during his years of employment with the

15  United Way.

16     A.   I would assume so, just like any other

17  employee would have.  If they were unpositive reviews,

18  they probably wouldn't still be employed with the

19  organization.

20          MR. HARRINGTON:  Okay.  I have no other

21  questions, Judge.

22          THE COURT:  Charli, what time did we start?

23          THE CLERK:  10:30, Judge.

24          THE COURT:  Oh, we've been going -- 10:30?

25          THE CLERK:  I'm sorry.  9:30, Judge.

1           THE COURT:  Yeah.  That was a long 30 minutes.

2           So it's time for the morning break.  Let's

3    take -- we're in recess.

4           MS. LE:  How long, your Honor?  I'm sorry.

5    How long is our morning break?

6           THE COURT:  The usual 15.

7           MS. LE:  Thank you.

8        (Recess taken from 11:01 p.m. until 11:25 a.m.)

9           MR. DAVIS:  Briefly on redirect, your Honor.

10          THE COURT:  Sure.

11          MR. DAVIS:  This is called free range.

12          THE COURT:  What happened?

13          MR. DAVIS:  It's okay.  Mr. Voccio just --

14          THE COURT:  No, I'm asking what happened to

15   it.  Oh, it's over there?  Okay.

16          MR. HARRINGTON:  Cam is going to be sitting

17   here, Judge, or standing here, and so I'm going to

18   relocate.

19          THE COURT:  Okay.  Go ahead.

20                    REDIRECT EXAMINATION

21   BY MR. DAVIS:

22       Q.   Mr. Voccio, you were asked whether the

23   invoices that DigitalNet provided to United Way were

24   paid under a process and approved under a process at

25   United Way.  Do you recall that?

1     A.   Yes, I do recall that.

2     Q.   All right.  And I'm showing you now on

3 Exhibit 309, I believe it's page 17 of that exhibit, do

4 you see that in front of you?

5     A.   Yes, I do.

6     Q.   And that's a $40,000 and some change invoice

7 sometime in the summer of 2013, right?

8     A.   I see someone's date on that, yes, 2013, yes.

9     Q.   Okay.  And does that have a note on it in

10 handwriting?

11     A.   It does.  It --

12     Q.   Okay.  And what does it say?

13     A.   There's a few lines on here.  It looks like

14 various print.

15     You've got okay to pay, ACH only -- so we're

16 not going to pay via a check, this was going to be an

17 electronic funds payment.

18     It's got Imran Alrai, spelled out.  I've got a

19 date of 8/27/2013, and then it's referencing -- I want

20 to say contract 2008.

21     Q.   Okay.

22     A.   I don't know if that makes sense.

23     And then it's got some stampage, normal batch

24 stamping from the accounting department when we're going

25 to pay the invoice.

1      Q.    So, Mr. Voccio, was it part of United Way's

2   policy and process that an officer of a department with

3   a direct conflict of interest on a $40,000 payment could

4   approve that payment?

5      A.    Absolutely not, no.

6            MR. DAVIS:  Nothing further.

7            MR. HARRINGTON:  I have nothing on that,

8   Judge.

9            THE COURT:  Now, sir, you're excused.  You

10  were under the sequestration, but I know you want to

11  watch the proceedings, so you're welcome to do that now.

12           Understand, Counsel, you won't be able to

13  recall him.

14           MR. DAVIS:  So, your Honor, we've conferred

15  and we -- Mr. Voccio will not be in the courtroom for --

16  so that he can be available for recall, if necessary.

17           THE COURT:  Okay.

18           MR. DAVIS:  We don't anticipate it, but just

19  if that might happen.

20           THE COURT:  Well, understood.

21           THE WITNESS:  And, your Honor, the intent of

22  my being here for the rest of the counsel was just to

23  let you know that there's -- someone representing the

24  corporation was going to be here, but we chose otherwise

25  to not do that.

```
 1                    THE COURT:  Thanks.

 2                    THE WITNESS:  Okay.

 3                         (Witness excused.)

 4                    MS. LE:  Good morning, your Honor.

 5                    THE COURT:  Good morning.

 6                    MS. LE:  The government calls Maureen Johnson

 7     to the stand, please.

 8                    THE CLERK:  Good morning.  If you'd like to

 9     step this way, please, come down the center and cut

10     through the tables.

11                    If you could step into the witness box and

12     remain standing, please.

13                    Please raise your right hand.

14                    MAUREEN JOHNSON, having been first duly sworn,

15     testified as follows:

16                    THE CLERK:  For the record, please state your

17     full name and spell your last name.

18                    THE WITNESS:  My name's Maureen Johnson.  Last

19     name is spelled J-o-h-n-s-o-n.

20                    THE CLERK:  Thank you.  Please be seated.

21                         DIRECT EXAMINATION

22     BY MS. LE:

23          Q.   Good morning, Ms. Johnson.

24          A.   Good morning.

25          Q.   You see we have a court reporter who's going
```

1    to be taking notes of this proceeding.  There's also a

2    microphone.  Could you please speak into the microphone

3    and keep your voice up.

4         A.   Okay.  Sure.

5         Q.   Thank you very much.

6              Ms. Johnson, where do you work?

7         A.   I currently work for a company called RADG

8    Holdings.

9         Q.   That company, was it previously known as the

10   Robert Allen Group or Robert Allen Duralee Group?

11        A.   Yes, it was.

12        Q.   Same company, in essence?

13        A.   Same company, yes.

14        Q.   How long have you been with Robert Allen?

15        A.   I've worked with the company for 14 years.

16        Q.   What is your current job title?

17        A.   I am currently the vice-president of human

18   resources.

19        Q.   Okay.  And before your current position as VP

20   of human resources, what other positions did you hold at

21   the Robert Allen Group?

22        A.   I was the director of human resources.

23        Q.   And have you worked your entire career in the

24   HR field?

25        A.   Yes, I have.

1    Q.   And how many years of total HR experience do

2    you have?

3    A.   Over 30.

4    Q.   Thank you, ma'am.

5         So I'd like you to give the Court a little bit

6    of background about the Robert Allen Group.  What type

7    of business does it operate?

8    A.   The Robert Allen Group is a wholesaler of home

9    furnishings such as textiles and furniture.  We sell

10   primarily to the interior design industry.

11   Q.   Okay.  And are there physical locations of

12   that business?

13   A.   Yes, there are.

14   Q.   Tell the Court a little bit about those

15   physical locations.

16   A.   We have multiple locations.  We have our

17   office currently in Mansfield, Massachusetts; we have a

18   distribution center in Gaffney, South Carolina; we also

19   have a design and marketing office in Brooklyn,

20   New York; and we have seven showrooms that are located

21   throughout the country.

22   Q.   Thank you.

23        Are there online sales?

24   A.   Yes, there are online sales.  We have two

25   websites.  One is Robert Allen and one is Duralee

1    Fabrics.  Both accept orders online.

2         Q.   Okay.  And can a customer like myself come

3    into the store or the showrooms or purchase items from

4    Robert Allen Group online?

5         A.   No, we -- again, we sell primarily to what we

6    would call the trade, which is, again, interior

7    designers.  We're a wholesaler.  We do not sell direct

8    like a retail store.

9         Q.   Thank you, ma'am.

10        At some point was there a Foxborough location,

11   Foxborough, Massachusetts, location?

12        A.   Yes.  We were based -- when I started with the

13   company, we were based in Foxborough, 225 Foxborough

14   Boulevard.

15        Q.   Okay.  Was there also a New York City

16   location?

17        A.   Yes, there was.

18        Q.   Okay.  What's the difference between the

19   Foxborough location and the New York City location?

20        A.   The Foxborough location was primarily kind of

21   operations; our finance team located there, IT team,

22   purchasing, human resources, along with credit and

23   product management.

24        In our New York location, you would find

25   mostly our design team, the designers who actually help

1  create the fabric, the marketing team, along with

2  several of our senior executives.

3      Q.   Thank you, ma'am.

4           So do you know Imran Alrai?

5      A.   Yes, I do.

6      Q.   How do you know Mr. Alrai?

7      A.   I actually hired Imran back in May of 2006.

8      Q.   Tell the Court briefly what your role was in

9  the hiring process of Mr. Imran Alrai.

10     A.   Sure.  We were looking for an operating

11 vice-president-level position in IT.  I was the HR

12 person based in the Foxborough location and I was

13 responsible for the recruitment of that position.

14          I made the job offer to Imran.  I did not make

15 the final hiring decision.  That would have been the CIO

16 at the time.  His name was Cliff Hubbard.  But I

17 extended the offer to Imran.  I also would have done the

18 HR on-boarding of Imran into the company.

19     Q.   Thank you, ma'am.

20          You mentioned a name Cliff Hubbard.  Would you

21 please spell Mr. Hubbard's name?

22     A.   Sure.  Cliff, C-l-i-f-f, Hubbard,

23 H-u-b-b-a-r-d.

24     Q.   Thank you, ma'am.

25          What date did Mr. Alrai join the Robert Allen

1    Group?

2         A.   That would have been May 30th, 2006.

3         Q.   At that time, your role was?

4         A.   I was the director of human resources at that

5    time.

6         Q.   Okay.  And was there someone above you in

7    terms of HR?

8         A.   Yes, there was.  I reported directly to Judy

9    Fishman, who was the senior vice-president of human

10   resources.

11        Q.   And will you spell Fishman for the record?

12        A.   F-i-s-h-m-a-n.

13        Q.   What was Mr. Alrai's title when he started at

14   the Robert Allen Group?

15        A.   His title was director of communications,

16   desktop and technology.  Excuse me.  Operating

17   vice-president of communications, desktop and

18   technology.

19        Q.   That's a long title.

20        A.   Yes.

21        Q.   Was he a supervisor?

22        A.   Yes.

23        Q.   Did he report to anyone?

24        A.   He did.  At the time he was hired he reported

25   to Mr. Hubbard.

1          Q.    The CIO?

2          A.    Correct.

3          Q.    Okay.  Now, tell the Court a little bit about

4     that on-boarding process that you mentioned earlier.

5          A.    Sure.  So when Imran was hired, typically

6     there is human resources forms that need to be

7     completed, compliance forms like an I-9, W-4, other HR

8     documents that we would require new hires to sign.  They

9     would actually also sign something called a Code of

10    Conduct as well.

11         Q.    Okay.  And did you -- were you the person who

12    went through the office -- the company's policies and

13    procedures with Mr. Alrai?

14         A.    Yes.  The code of conduct would have been gone

15    through by me and he would have signed off on an

16    acknowledgment form as well.

17         Q.    Okay.  And this all happened on the first day,

18    the first week?

19         A.    First day.

20         Q.    Okay.  Now, let's talk a little bit about the

21    conflict of interest or the Code of Conduct form you

22    mentioned.

23         A.    Uh-huh.

24         Q.    What is the Code of Conduct form?

25         A.    The Code of Conduct includes, actually, a

1    summary of several policies.  It would include policies

2    such as conflict of interest, sexual harassment, design

3    integrity.  There were several policies on computer

4    security and communication systems and those were kind

5    of behind -- the Code of Conduct would sit on top and

6    then the policies would be behind that.

7        Q.   Okay.  So did you physically give him the

8    company policies, the Code of Conduct form, that kind of

9    thing?

10       A.   Yes --

11       Q.   And did he sign --

12       A.   -- we did that with every hire.

13       Q.   I'm sorry.

14       A.   Yes.

15       Q.   Please repeat that.  I'm sorry.  I spoke over

16   you.

17       A.   Yes, I did give that to him.  We do that with

18   every new hire.  And, yes, he did sign an acknowledgment

19   form.

20       Q.   Did the Robert Allen Group have an outside

21   employment policy?

22       A.   Yes, we did.

23       Q.   Can you tell the Court a little bit about the

24   outside employment policy?

25       A.   Sure.  So the outside employment policy was

1    designed to make sure that if people were to hold two

2    jobs at any point in time that they were employed with

3    the company, that they were to notify their supervisor

4    first.

5           The goal was really to make sure that the

6    individual's primary responsibility would be to Robert

7    Allen and not to the second job and that it wouldn't

8    interfere with the hours or the work and their primary

9    responsibilities at Robert Allen.

10        Q.   And was this outside employment policy written

11   anywhere?

12        A.   Yes, it was.  It was in our policy manual as

13   well as on our intranet.

14        Q.   Thank you.

15           Now, for the purposes of -- actually, may I

16   ask Ms. Sheff to pull up Exhibit 724.

17           And, ma'am, on the screen we're going to pull

18   up the exhibit.  Do you see that?

19        A.   Yes.

20        Q.   Do you recognize this exhibit?

21        A.   Yes, I do.

22        Q.   What is it?

23        A.   It's an email from my previous supervisor,

24   Ms. Fishman, to Mr. Alrai.

25        Q.   Okay.  And there's also a response from

1   Mr. Alrai; is that right?

2       A.   Correct.

3            MS. LE:  Your Honor, the government moves to

4   admit 724.

5            MR. HARRINGTON:  No objection.

6            THE COURT:  Admitted.

7            (Government's Exhibit 724 admitted.)

8            MS. LE:  Thank you.

9       Q.   Now, Ms. Johnson, there is also a name, a cc

10  here, Paul Luba, L-u-b-a.  Who is Mr. Luba?

11      A.   Mr. Luba would have been Mr. Alrai's

12  supervisor at the time of this email.

13      Q.   Okay.  I'm just highlighting the first email.

14  Do you see that at the bottom?

15      A.   Yes.

16      Q.   And that's a date of November 29th?

17           Thank you.

18      A.   Yes.

19      Q.   I'm going to clear the screen, my marking.

20           All right.  So you see this.  What was the

21  purpose of this email?

22      A.   It had been brought to our attention that

23  Imran was teaching college-level classes, I believe it

24  was at Hesser College and ITT, and had not made the

25  company aware that he was teaching.

1     Q.   Okay.  And based on this email, can you say

2  whether the defendant was aware of the company's outside

3  employment policy?

4     A.   He looks -- he was made aware of the policy.

5     Q.   Let's go to the top part of that exhibit, 724,

6  Mr. Alrai's response, also on November 29, 2010.

7     A.   Correct.

8     Q.   Okay.

9     A.   And basically at the time he was given a copy

10 of the policy.  It was emailed -- it was attached to

11 that email is my understanding and at the time he was

12 not teaching when that discussion was had with

13 Ms. Fishman.

14    Q.   Okay.  So is it your understanding that he was

15 aware of the outside policy; that was brought to his

16 attention --

17    A.   Yes.

18    Q.   -- in 2010?

19    A.   Yes.

20    Q.   Thank you very much.

21         Ms. Johnson, at some point was the defendant

22 promoted to CIO?

23    A.   Yes, he was.  He was promoted to CIO in June

24 of 2007.

25    Q.   How long did he serve as the CIO?

1      A.      Until he left the company in September of

2   2013.

3      Q.      And within the Robert Allen Group, is the CIO

4   considered an executive-level position?

5      A.      Yes, it was.

6      Q.      What was his area of responsibility as the

7   CIO?

8      A.      Imran oversaw the entire information

9   technology department, which would have included groups

10  such as our business intelligent team, our kind of help

11  desk support area, along with many of our programers and

12  analysts.

13     Q.      Now, he was the CIO for some time.  On

14  average, how many people reported to him?

15     A.      On average, about 15.

16     Q.      Okay.  And did his direct reports work on-site

17  at the Foxborough office?

18     A.      Yes, they did.

19     Q.      Okay.  How about an individual named Kal Wahbe

20  or Mohamad Kal Wahbe?

21     A.      Kal worked for many years in the Foxborough

22  office and there was a period of time where he worked

23  remotely for about one year.

24     Q.      Okay.  Now, when Mr. Alrai became the CIO, did

25  he have an office at the Foxborough location?

1          A.    Yes, he did.

2          Q.    Okay.  And what was his work schedule on-site,

3     generally?

4          A.    Generally, when Imran first started with the

5     company, he was on-site pretty much most days, almost

6     every day.  Monday through Friday would have been a

7     normal work schedule.

8                As he spent more time with the company, his

9     work schedule reduced or his presence in the office

10    became less.

11         Q.    Okay.  Near the end, how often was he at

12    Robert Allen's Foxborough location?

13         A.    My best recollection would be maybe one day a

14    week.

15         Q.    Okay.  Now, is the position of CIO a full-time

16    job at Robert Allen Group?

17         A.    Absolutely.

18         Q.    And in HR speech, what is -- what -- is there

19    a number of hours that is considered full-time work?

20         A.    A full-time -- what we would consider would be

21    40 hours and I would expect that a CIO would probably do

22    absolutely 40 plus.

23         Q.    Okay.  Now, did you become aware that the

24    defendant had dual employment at the United Way?

25         A.    I did.

1      Q.    How did you become aware of that situation?

2      A.    In May, June of 2012, I had attended a human

3  resources conference regarding 401(k) planning.  As I

4  was registering for the conference, I got a name badge

5  which I put on my jacket and had Maureen Johnson and the

6  Robert Allen Group on my name badge.

7            I was getting a cup of coffee to enter into

8  the conference and a woman came up beside me and

9  introduced herself.  I don't recall her name.  And she

10  noticed my name badge and said, oh, you work for the

11  Robert Allen Group.  And I responded, yes, I did.  And

12  she said, oh, we just hired one of your former

13  employees.

14            And I'm thinking to myself, that's great --

15  the company had recently gone through some layoffs, so

16  I'm thinking in my head that's good, someone got a

17  job -- and she proceeded to tell me, yes, we just hired

18  Imran Alrai.

19      Q.    Okay.  What was your reaction?

20      A.    I was kind of dumbfounded.

21      Q.    Why?

22      A.    Because Imran was still working for the Robert

23  Allen Group.

24      Q.    Okay.  Can you describe the person who had

25  this conversation with you during that conference?

1    A.    Sure.  Again, I don't remember her name, but

2  she was an African-American woman.  I'm going to say

3  probably about 50-ish.

4    Q.    Okay.  Now, you said you were dumbfounded.

5  Did you say anything to this person from United Way?

6    A.    I did not.

7    Q.    What did you do instead?

8    A.    I sat with her through the conference and she

9  had other colleagues from the United Way there as well

10  and I sat with them for lunch.  I was trying to see if I

11  could get more information about Mr. Alrai's employment.

12  Didn't necessarily come up, but I didn't ask questions

13  either.

14    Q.    Okay.  How long was that conference?

15    A.    Probably about six hours.

16    Q.    Where was that conference that you --

17    A.    I believe it was in Waltham, Mass.

18    Q.    Okay.  After that conference, what did you do?

19    A.    I went back to my office.  My supervisor, Judy

20  Fishman, was on vacation and I proceeded to call our

21  CEO, Phil Kowalczyk.

22    Q.    Can you spell Mr. Kowalczyk's last name?

23    A.    I will.  K-o-w-a-l-c -- K-o -- sorry.

24  K-o-w-a-l-c-z-y-k.

25    Q.    Thank you.  Where was Mr. Kowalczyk when you

1    called him, if you know?

2        A.   I don't recall.

3        Q.   Okay.  He wasn't at the Foxborough office?

4        A.   He was not.  He was not normally based in the

5    Foxborough office.

6        Q.   Okay.  What did you -- and you told him what

7    you experienced?

8        A.   I told him what just happened at the

9    conference.

10       Q.   Okay.  At some point there was a termination

11   process involving Mr. Alrai, right?

12       A.   Correct.

13       Q.   Were you involved in the termination process

14   of Mr. Alrai?

15       A.   I was not.

16       Q.   Okay.  But do you know when he separated from

17   the Robert Allen Group?

18       A.   September 18th, 2013.

19       Q.   Ma'am, you know, these events happened many

20   years ago.

21       A.   Uh-huh.

22       Q.   Are you confident about the time frame in

23   which you learned about Imran Alrai's employment at the

24   United Way?

25       A.   Yes, I am.

1    Q.   Okay.  What makes you -- makes it stand out in

2  your mind?

3    A.   I'd never had that happen in my career, have

4  someone at a senior level working at one company while

5  working at another company.

6         MS. LE:  Okay.  Thank you, ma'am.

7         Your Honor, the government tenders the

8  witness.

9         THE COURT:  Thank you.

10                    CROSS-EXAMINATION

11  BY MR. HARRINGTON:

12    Q.   Good morning, Ms. Johnson.

13    A.   Good morning.

14    Q.   Just a few questions, ma'am.

15         Let me pick up where Ms. Le left off.

16         You indicate that you found out that Mr. Alrai

17  was employed at another company, the United Way, and I

18  think you indicated sometime in the summer of 2012; is

19  that correct?

20    A.   Correct, May or June.

21    Q.   May or June?

22    A.   Uh-huh.

23    Q.   Okay.  And you indicated that I think the next

24  day you told the CEO or maybe it was the same day.

25    A.   Same day.

1       Q.    Same day, you told the CEO, Phil Kowalczyk,

2   about it?

3       A.    Correct.

4       Q.    Okay.  So the most senior person at Robert

5   Allen was made aware of it the same day you found out

6   about it?

7       A.    Correct.

8       Q.    Okay.  And you also indicated to the

9   prosecutor that Mr. Alrai remained employed at Robert

10  Allen until September of 2013.  So roughly another, you

11  know, year and four months, year and five months,

12  roughly; is that fair to say?

13      A.    Yes.

14      Q.    Okay.  And so would it be fair to say that

15  after you learned of it, you told the CEO, Mr. Alrai was

16  approached about the subject, correct?

17      A.    I believe he was, but I was not involved in

18  that process.

19      Q.    Okay.  Were you aware that the Robert Allen

20  Group attempted to negotiate a contract to keep him and

21  maintain his employment with Robert Allen even though he

22  was also working at the United Way?

23      A.    No, I wasn't.

24      Q.    Okay.  But, nevertheless, you would agree that

25  everybody was aware of it, right, of the dual

1    employment?

2        A.   Yes.

3        Q.   Okay.  And it was allowed to go on for

4    another, as we've indicated, you know, year and four

5    months, year and five months?

6        A.   Yes.

7        Q.   And during that time period, Mr. Alrai

8    remained in his position as a -- I don't want to get the

9    title wrong, but I think you had indicated it was

10   initially the operations vice-president, but then later

11   he was promoted to the chief information officer.

12       A.   Correct, yes.

13       Q.   And so for that year and four, year and

14   five months, he remained as the chief information

15   officer?

16       A.   Correct.

17       Q.   Okay.  You had mentioned the outside work

18   policy initially, kind of at the beginning of your

19   testimony.  Do you recall talking about that a little

20   bit?

21       A.   Yes.

22       Q.   Okay.  And one of the things you had mentioned

23   is that early on, Mr. Luba was Mr. Alrai's direct

24   supervisor, right?

25       A.   Correct.

1      Q.    And although we saw that email and you
2   indicated Mr. Alrai wasn't currently working outside at
3   the time, it was permitted through Mr. Luba that he be
4   allowed to work outside, teaching -- ITT, college, stuff
5   like that, that was approved?
6      A.    I don't recall.
7      Q.    Okay.  So you've indicated that this policy
8   existed, correct?
9      A.    Yes.
10     Q.    But not -- not -- excuse me -- about kind of
11  not allowing dual employment, right?
12     A.    It would be allowed with approval.
13     Q.    Okay.  And would it be fair to say that since
14  you and the CEO knew for about a year and four months or
15  a year and five months, Mr. Alrai could reasonably
16  assume that that was approved since it wasn't stopped
17  and he wasn't directed to stop?
18     A.    Mr. Alrai didn't report to me.  It wasn't up
19  to my -- up to me to make a decision whether it was
20  approved or not.
21     Q.    Okay.  The CEO, obviously, would have the
22  authority to terminate that if he chose, correct?
23     A.    Yes.
24           MR. HARRINGTON:  Okay.  Judge, I have no other
25  questions for this witness.

1          THE COURT:  Any redirect?

2                REDIRECT EXAMINATION

3  BY MS. LE:

4      Q.   Ms. Johnson, to your knowledge, before the

5  defendant got his second full-time job with the United

6  Way, did he ask permission from anyone at the Robert

7  Allen Group, if you know?

8      A.   Not that I'm aware of.

9          MS. LE:  Thank you.  No further questions,

10 your Honor.

11         MR. HARRINGTON:  I have nothing else, Judge.

12         MS. LE:  Thank you, Ms. Johnson.  You're

13 excused.

14                (Witness excused.)

15         MS. LE:  Your Honor, the government calls Phil

16 Kowalczyk to the stand, please.

17         THE COURT:  Thank you.

18         THE CLERK:  Good morning, sir.  If you'd like

19 to step this way, please.  If you could step into the

20 witness box and remain standing.

21         THE WITNESS:  Sure.

22         THE CLERK:  Please raise your right hand.

23         **PHILIP KOWALCZYK**, having been first duly

24 sworn, testified as follows:

25         THE CLERK:  For the record, please state your

1   full name and spell your last name.

2          THE WITNESS:  Philip H. Kowalczyk.  And it's

3   spelled K-o-w-a-l-c-z-y-k.

4          THE CLERK:  Thank you.  Please be seated.

5                    DIRECT EXAMINATION

6   BY MS. LE:

7      Q.   Thank you, Mr. Kowalczyk.

8          You see we have a court reporter and a

9   microphone.  Please speak into the microphone and keep

10  your voice up.

11     A.   Okay.

12     Q.   Thank you.

13          Mr. Kowalczyk, where do you reside?

14     A.   Raleigh, North Carolina.

15     Q.   Did you retire recently?

16     A.   I did recently retire.

17     Q.   Okay.  And before your recent retirement, what

18  did you do for a living?

19     A.   I was a managing director at Deloitte

20  Consulting.

21     Q.   How do you spell Deloitte Consulting?

22     A.   Deloitte is D-e-l-o-i-t-t-e and Consulting is

23  C-o-n-s-u-l-t-i-n-g.

24     Q.   Could you give the Court a -- some brief

25  background on your work history.

1    A.    Sure.  The easiest way to think about my work

2  history is half of a career spent in consulting, both in

3  my early career and then at the very end of my career,

4  and in the middle I ran three different consumer

5  products companies, ranging from Lóreal to Talbots to

6  then Robert Allen, which was a bit of a mix, more of a

7  B-to-B business.

8    Q.    Okay.  And when you say B and B business --

9    A.    Oh, I'm so sorry.

10    Q.    -- what does mean?

11    A.    Business to business, as opposed to business

12  to consumer.

13    Q.    So not a retail, you sell to the trade --

14    A.    To the trade.

15    Q.    -- wholesale?

16    A.    Yes, exactly.

17    Q.    Thank you, sir.

18         You mentioned the Robert Allen Group.  When

19  did you work for Robert Allen?

20    A.    I joined Robert Allen November 1st of 2011.

21    Q.    When did you leave Robert Allen Group?

22    A.    At end of March in 2018.

23    Q.    Was it '18 or '17?

24    A.    '17.  '17, that's right.

25    Q.    Thank you, sir.

1         What positions did you hold at the Robert

2  Allen Group?

3        A.    I was the president and CEO.

4        Q.    And did you have a role with the board as

5  well?

6        A.    And I was chairman of the board.

7        Q.    Was the Robert Allen Group a publicly traded

8  company?

9        A.    It's not a publicly traded company.  It was

10 family-owned and then owned by a private equity group.

11 So it's privately held.

12       Q.    Thank you, sir.

13             What were your responsibilities as the CEO and

14 president of the Robert Allen Group?

15       A.    So I'm responsible or was responsible for both

16 the future strategy as well as the current operations of

17 the company, largely responsible for, obviously, the

18 care and development of our employees, making sure we

19 have the right products and that our customers are

20 getting not only the best products, but also best

21 services.

22       Q.    Where was the business located?

23       A.    The business had a number of different

24 locations.  We had -- our design center was in New York;

25 a lot of the key operations of the company, HR, finance,

1   IT, were located in Foxborough, Massachusetts; and then

2   we had a significant operation in Gaffney, South

3   Carolina, which was a blend of distribution center, but

4   also our call centers were there.

5       Q.   Did you have showrooms as well throughout the

6   country?

7       A.   We had showrooms throughout the country and

8   then also in Canada and in London.

9       Q.   Thank you, sir.

10          Where were you physically located?

11      A.   Most of my work was in New York.  I obviously

12   went to all of our different offices.  I occasionally

13   hung out in Raleigh, but for the most part I was in

14   New York and took responsibility over the design and

15   sales functions there.

16      Q.   Since you were in the New York office, who ran

17   the day-to-day operations at the Foxborough location?

18      A.   So we had a couple of executives there, but

19   Chuck Cioffi, who was our CFO, was basically the senior

20   executive in charge of that facility.

21      Q.   Will you spell Mr. Cioffi's name for the

22   record?

23      A.   Sure.  C-i-o-f-f-i.

24      Q.   Thank you, sir.

25          Sir, do you know Imran Alrai?

1     A.    Yes, I do.

2     Q.    How do you know him?

3     A.    He was the CIO at Robert Allen when I joined

4  Robert Allen and he was the CIO for a couple of years

5  while I was there.

6     Q.    Thank you, sir.

7           How much interaction did you have with

8  Mr. Alrai?

9     A.    He was on our senior management team and so

10  when the whole team would get together, he would

11  obviously be there.  But his direct report was -- he was

12  directly reporting to Chuck Cioffi, our CFO.

13           So it wasn't a lot of interaction.  If I was

14  in Foxborough, I would see him.  If he was in New York,

15  he would come and see me.  If we had specific things to

16  discuss with regard to projects that affected IT, we

17  would have those conversations and anything that related

18  to, you know, sort of macrobudgeting and aligning that

19  with projects.

20     Q.    Okay.  When you joined the Robert Allen Group,

21  what was the state of the IT department?

22     A.    So the state of the IT -- well, so when I

23  joined the company, it was in a fairly significant

24  turnaround state, so we had a lot of things to do.

25           Specifically related to IT, the way I would

1    express it is the trains were on the tracks.  So the --

2    we could get data, we were getting accurate data.  The

3    reporting was accurate, but not very powerful.  Sort of

4    antiquated is the way I would think about it.

5            So the systems were relatively old, the

6    reporting structures were relatively old, and so there

7    were several things that we needed to do to upgrade and

8    to make it, you know, more current was on the agenda.

9            So functioning, but old.

10   Q.   Old.  Okay.  Is the IT department important to

11   the success of the business?

12   A.   Yes.

13   Q.   How so?

14   A.   Very -- very important.

15           So Robert Allen is primarily a design and

16   marketing company.  We don't manufacture, per se, but we

17   design product and sold it.  And being able to have

18   access to who your customers are, what they're buying,

19   being able to keep track of things like custom furniture

20   that might be coming through, all of that is

21   data-driven.

22           And so having histories of purchases, having

23   accurate information with regard to inventory and, in

24   particular and increasingly, the ability to keep track

25   of what customers are buying in order to be able to

1    market to them more what they want.  Those are all vital

2    to what you -- what you're developing and providing.

3        Q.   So when you came on at Robert Allen Group,

4    given the old system, the old state of the technology,

5    what were your goals?  What did you want to see change

6    in the IT department?

7        A.   So our -- our need was significant.  We needed

8    to be able to keep -- keep the accuracy of all of the

9    data and the histories.  So one of the things to keep in

10   mind, there's a big history at Robert Allen and a lot of

11   our customers had a lot of data.  We wanted to be able

12   to keep all of that, but, more importantly, collect new

13   information so that we could, again, keep track of, you

14   know, a term called C R M, customer relationship

15   management, as an example.

16            It's one thing to have customer data; it's

17   something else to be able to have that data and be able

18   to use it to go back to your customer and say, you liked

19   this product, you might also like this product.

20            So the need to really get more agile, more

21   specific information was critical.  The ability to keep

22   track of -- we have sample books and sample books cost

23   money and you want to be able to keep track of them.  We

24   had no method of being able to do that when I came into

25   the company.  Being able to put barcodes on them, being

1   able to track them, would be, you know, very important.

2   So change and evolution was the key asset.

3        Q.   Okay.  Did the company at that time have a --

4   a functioning website?

5        A.   We had a website.  Functioning.

6        Q.   What was the state of the website?

7        A.   So we had a website and, in part, because we

8   were to the trade, I think the original website was

9   really geared much more toward providing information, as

10  opposed to really being able to conduct commerce, so for

11  people to actually buy directly.

12            And the website needed significant revamping.

13  It was one of the big initiatives that we had was to

14  create it not only as a more dynamic site that you could

15  see product and see it in application, but also that you

16  could purchase directly from it as a designer.

17       Q.   Okay.  How long did you and Mr. Alrai work

18  together at the Robert Allen Group?

19       A.   So I joined in autumn of 2011 and Imran left

20  in the fall of 2013.  So two years, not quite two years.

21       Q.   Not quite two years.

22            How would you describe his job performance

23  during that almost two-year period of time?

24       A.   So -- mixed.  There were -- as I say, one of

25  the things that was important -- the context of the

1    company is it was a company with a lot of change and a

2    lot of areas to focus on.  Imran and the team, you know,

3    were able to provide information.  We were -- you know,

4    we had the data that we needed from an historical

5    context and it was coming out, you know, accurately and

6    that was important.  So on that front, it was good.

7           Where the frustration started to come was when

8    we started launching new initiatives in order to be able

9    to start to do some of the things like barcode a sample

10   book, launch a new website, put WiFi in showrooms.

11          There -- you know, there were a list of

12   projects that needed to be done and it got to be very

13   frustrating because every time we went to make

14   advancements or changes, you know, the cost estimate

15   would come back or the time estimate would come back and

16   it -- everything was long and expensive.

17          So very frustrating to me because we were

18   trying to move quickly in order to be able to advance

19   and I was getting very frustrated because it seemed to

20   be taking a very long and expensive route to get

21   anything -- to get IT advancements.

22      Q.   And was Chuck Cioffi there when you first

23   started?

24      A.   No.  I don't remember exactly when Chuck came

25   on board, but Chuck would -- Chuck came on in -- working

1    on my memory here, but probably about a year after I was

2    in place.

3         Q.    Okay.  So some of these conversations would

4    not have involved Chuck Cioffi at that time?

5         A.    No.

6         Q.    Okay.  During the almost two years that you

7    worked with Imran Alrai, were there any -- ever any

8    issues about outside employment?

9         A.    Well, yes.  We finished up with two different

10   incidents.  One was shortly after I had joined.  Our

11   head of HR made me aware of the fact that Imran was, in

12   addition to his work with us, doing work with

13   universities locally.  And so I had a conversation with

14   Imran and asked about that and he said that he had had a

15   previous agreement with the -- with the management prior

16   to me that it was okay for him to be involved with the

17   universities.

18              And I said, well, we're in the middle of a

19   turnaround; I don't see where you could have the time to

20   be able to do that.  I get that that's a worthy thing,

21   but I don't see how we can have time to do that.  And he

22   said, well, he's not currently doing that.  And I said

23   that's fine.

24              So we -- we did have a policy -- as a result

25   of that, I asked the question, you know, do we have a

1    policy related to this.  And my understanding is that,

2    you know, we have a policy that people can have outside

3    employment, but they're supposed to disclose it and it

4    has to be approved.

5           Q.    Okay.

6           A.    And so I reiterated that with Imran and said,

7    you know, if you're going to take on a teaching

8    assignment, then we have to have that conversation.

9           Q.    Okay.  So when did you have this conversation

10   with him about teaching at local universities and

11   getting approval and notification from him?

12          A.    So, again, I'm relying on memory, but it would

13   be sort of the spring of 2012.

14          Q.    Okay.  And you mentioned -- was there another

15   incident later involving outside employment of

16   Mr. Alrai?

17          A.    So that was much later, 2013, late summer,

18   early fall, where, again, a conversation -- I got a call

19   from my head of HR who said that she had been at a

20   meeting in Boston with other executive -- other HR

21   executives from lots of different organizations in the

22   Boston area and a woman approached her and said, oh, I

23   see you're from Robert Allen.

24                And Maureen said, yes, I am.  And she said,

25   oh, well, I've got to tell you we just -- we love Imran

1    Alrai and I know he's, you know, from Robert Allen.  And

2    Maureen said, oh, how do you know him?  Oh, he's -- you

3    know, he's doing work with us.

4            So Maureen came back to the office and called

5    me and I said, well, you know, there -- there can be two

6    sides to this; maybe -- you know, it's a nonprofit -- it

7    was United Way.  It's a nonprofit, maybe he's

8    volunteering to help them, maybe it's just an occasional

9    thing.  Let's have the conversation.

10            And so --

11        Q.    Let me just stop you right now.

12        A.    Sure.

13        Q.    You've mentioned Maureen a few times.  Are you

14    referring to Maureen Johnson?

15        A.    I'm sorry, yes, Maureen Johnson.

16        Q.    And you just said you believe this happened in

17    the fall or summer of 2013?

18        A.    Yes.

19        Q.    How did you come up with this time frame?  I

20    know it happened a long time ago, so ...

21        A.    Well, so there -- so -- we had been in the

22    process of thinking through some strategies through

23    early 2013 to help Imran decide to move on to something

24    else.  I don't know how to say that other than I didn't

25    want to fire him because it's not that he wasn't doing

1    the job, it's just the job wasn't being done well and it

2    wasn't being done quickly enough.

3            So we developed some strategies for how we

4    might be able to transition Imran out without putting

5    risk on the business.

6        Q.   Let me stop you there.  Who's this "we" that

7    was --

8        A.   Oh, sorry.  That was a combination of Chuck

9    Cioffi and myself and -- I'm sorry, I don't remember if

10   it was Judy or Maureen.  HR, but it -- I think it was

11   Maureen.

12       Q.   Okay.  And you've mentioned earlier that Chuck

13   Cioffi did not start in November of 2011 with you?

14       A.   No.

15       Q.   He started a year later?

16       A.   He started in 2012.

17       Q.   Okay.  All right.  So, please, so you --

18       A.   So, anyway, so those discussions were

19   happening behind the scenes in order to be able to offer

20   some opportunities to provide some continuity for Imran,

21   but, actually, I wanted to begin interviewing for a new

22   CIO --

23       Q.   Okay.

24       A.   -- and I wanted to do that with full

25   disclosure, so Imran knew that we were moving on.

1    Equally, I didn't want to just throw the baby out with

2    the bath water and say, you know, is there a way to be

3    able to transition us.

4             That all came to a screeching halt when this

5    question came up of does he already have another job.

6    And so I said, well, I think we have to have the

7    conversation with Imran to find out does he actually --

8    is he actually working there or is he just volunteering

9    there, what's the circumstance.

10        Q.   Did you have that conversation with him?

11        A.   We did.

12        Q.   Okay.

13        A.   I had that conversation.  And -- and he was

14   very straightforward about it.  He said, yes, I'm

15   working with United Way.  And I said, what are you doing

16   for them?  Well, I'm their CIO.  And I said, is that a

17   full-time job?  And he said yes.  And I said, so let me

18   get this straight.  You're full time with us and you're

19   full time with them.  Yes.  And you don't see a problem

20   with that?  No, I'm doing both jobs very well.

21            And I said, well, I'm sorry, but I need -- you

22   know, I -- you know, I -- a choice has to be made and I

23   think the choice should be that you should go with

24   United Way.

25        Q.    Okay.  So what -- was this an in-person

1   meeting or a phone call, do you recall?

2        A.    You know, I really have thought about this.

3   Ordinarily I would have that circumstance -- I would

4   have that conversation as an in-person.  I think if I

5   had had it as an in-person, it would be very clear in my

6   memory that I had looked at Imran and that we looked

7   each other in the eye and that we had that conversation.

8   I don't have that.  So I believe that it was a phone

9   conversation.

10       Q.    Okay.  And in terms of the time frame between

11  when Maureen told you about the conference, the HR

12  conference, and finding out about the dual employment at

13  United Way and when you had the conversation with the

14  defendant, are we talking about months, weeks?

15       A.    Oh, no.  At most -- at most, weeks.

16       Q.    Okay.

17       A.    Yeah.

18       Q.    Now, is it possible that you learned about the

19  dual employment at United Way in 2012 and you waited a

20  year before you addressed this issue?

21       A.    That's not possible.

22       Q.    Why not?

23       A.    Well, a couple of different reasons.  One,

24  while it's certainly not illegal to do that, I'd have an

25  ethical issue with it, not least of which is it's not

1   disclosed, but, secondly, a lot of people in that

2   company were working 24 hours a day in order to get it

3   turned around.  It wouldn't be okay to not -- to not --

4   it couldn't -- that couldn't be tolerated.

5        Q.   Okay.  So did you make the decision during

6   that meeting to terminate Mr. Alrai?

7        A.   Well, as I say, we were already in discussions

8   about, you know, finding ways to talk with Imran in

9   order to be able to have him move on in a very peaceable

10  kind of way.  This just was -- you know, there was just

11  no need in having to, you know, coach around it in any

12  way.  It's just -- it was a clear problem.  And so, yes,

13  we decided at that point we need to transition.

14        But we didn't want to do it in a way which

15  said, you know, you're -- you know, you're done, you'll

16  be escorted to your desk, we're taking your number and

17  so and on so forth.  We still wanted to do it with a

18  degree of respect and, you know, said, we think you

19  should resign; we think, you know, we should do this in

20  an orderly way.  And -- and that's what we did.

21        Q.   Okay.  And the "we" you keep referring to, is

22  that you and someone else?

23        A.   It's the triumvirate.  So, again, this is --

24  this is a little awkward because he's a direct report to

25  Chuck, so it's Chuck's ultimate call to work through the

1   details of, you know, here's your last day, here's when

2   we're going to be working things through, and so on and

3   so forth.  But, you know, at that point, you know,

4   there's -- there's an HR part of this conversation,

5   there's his direct report, which is Chuck, and then me.

6   So the three of us were in agreement.

7        Q.   Now, was he allowed to resign versus being

8   fired?

9        A.   Yes.

10       Q.   Okay.  Do you recall when he left?

11       A.   It was in -- I think it was in September.  I

12   don't know exactly which date.

13       Q.   Of 2013?

14       A.   Of 2013.

15       Q.   Okay.  Now, by the time Mr. Alrai resigned

16   from Robert Allen Group, had Robert Allen Group hired a

17   new CIO?

18       A.   So the exact timing of that -- we started the

19   interviewing process.  I believe the -- his replacement,

20   Dean Rivier, came in November.  So, you know, we would

21   have had a bridge period there.

22       Q.   How do you spell Dean's last name?

23       A.   That's trickier than Cioffi.  I -- it's

24   R-i-v -- R-i-v-i-e-r and I think there's an E at the end

25   of it.

1      Q.   E or an A?

2      A.   I don't know if it's Riviera.  Oh, sorry.

3    It's an A.  It's Riviera.

4      Q.   Okay.  Thank you.

5           And how long did Mr. Dean Riviera work for you

6    as CIO at the Robert Allen Group?

7      A.   So Dean was there from November 2013 until I

8    left, which was March of 2017.

9      Q.   And how would you describe his performance as

10   CIO?

11     A.   Dean was terrific on a lot of fronts.  Much of

12   what we were looking for was this idea of being able to

13   respond quickly to be able to deal with the fact that in

14   some cases we had antiquated systems, but there had to

15   be solutions that could be brought to bear.  And he did

16   exactly that, brought a number of different capabilities

17   and, in some cases, you know, less expensive options to

18   be able to get the job done.

19          So, yeah, Dean -- Dean was a very good hire

20   and did a lot of very good things at Robert Allen.

21     Q.   Sir, are you familiar with a company called

22   DigitalNet Technology Solutions?

23     A.   Yes, and now, obviously, a little more so.

24     Q.   Sure.  But then?

25     A.   But then, yes.  They were -- they were a part

1  of -- they were a company that was being recommended to

2  help with some of the software changes that we were

3  making website-related.

4      Q.   And who made those recommendations for

5  DigitalNet to do work for Robert Allen Group?

6      A.   Imran.

7      Q.   Okay.  Were you then aware of any relationship

8  Imran Alrai had with DigitalNet Technology Solutions?

9      A.   No, of course not.

10     Q.   Okay.  Have you come to know that?

11     A.   I have now, yeah.

12     Q.   What, if any, role did you have in the

13  contracts and negotiations and the work that DigitalNet

14  performed on behalf of Robert Allen Group?

15     A.   None.

16          MR. LE:  Okay.  Thank you, sir.  Your Honor,

17  the government tenders the witness.

18          THE COURT:  Cross.

19                    CROSS-EXAMINATION

20  BY MR. HARRINGTON:

21     Q.   Good afternoon, Mr. Kowalczyk.

22     A.   Good afternoon.

23     Q.   So you're coming up from -- is it

24  North Carolina, did you say?

25     A.   Yes.

1    Q.   Are you enjoying the weather?

2    A.   It feels like Christmas outside.

3    Q.   So I have a few questions for you,

4 Mr. Kowalczyk.

5         In regard to Mr. Alrai working at the United

6 Way and at Robert Allen, you indicated that when you

7 found out about it from Ms. Johnson, you talked to Imran

8 directly relatively quickly?

9    A.   Yes.

10   Q.   And your recollection is that that was

11 sometime in the spring of 2013?

12   A.   I think fall of 2013, late summer.

13   Q.   Okay.  And when you say the summer of 2013,

14 you know, what time frame are you talking about?  Do

15 you -- can you pinpoint it any better?  If you can't,

16 you can't.

17   A.   I -- trust me, in preparation for this, I've

18 really been thinking about it.  I don't recall.  But,

19 again, the sequence in timing would be, you know,

20 related to the fact that, you know, in September Imran

21 was gone.  It would be a relatively short time period in

22 front of that.

23   Q.   Okay.  Would it surprise you to learn that

24 Ms. Johnson indicates that she advised you of the work

25 with the United Way at some point in, she believes,

1    2012, summer 2012?

2         A.    Yes, that would surprise me a lot.

3         Q.    Okay.  Would you agree with me that after you

4    spoke with Imran about this and you basically had

5    suggested to him, you know, you should go to United Way

6    and stay, that he actually stayed for a period of time

7    working both jobs?

8         A.    Yes, there was a -- we -- as I said, we were

9    trying to work an amicable agreement.

10        Q.    Okay.

11        A.    We were very clear about the fact that we were

12   recruiting for his replacement.  We didn't see -- there

13   wasn't anything that said, you know, Imran is doing

14   damage to the business and, therefore, needs to be gone;

15   if he's going to work on a transition period, then we'll

16   transition out, allowing him to resign, allowing us to

17   keep the trains on the tracks.

18        Q.    Okay.  And it would be fair to say that you're

19   not certain how long that time frame was?

20        A.    Yes.

21        Q.    I wanted to make sure I understood the answer

22   that you gave when you were asked about when you talked

23   with him about United Way and Robert Allen.

24             You indicate that he was very straightforward

25   with you about it?

1        A.    Completely.

2        Q.    Okay.  He didn't try to hide it or

3   misrepresent it to you in any way?

4        A.    Absolutely not.

5        Q.    Okay.  And you indicated, I think, that

6   Mr. Alrai was doing the job as the CIO, but there was a

7   general belief that, you know, it could be done better;

8   it wasn't being done well, you wanted it to be done

9   better.  Is that fair to say?

10        A.    Yes.  If you hear a question mark at the end

11   of it, it's to do with the fact that the job was not

12   being done badly, but it was not being done

13   sufficiently.

14        Q.    Okay.  And let me ask about that, because one

15   of the -- the questions that I wanted to talk to you

16   about was you said that when you took the job as CEO --

17   and I think you said you started in about the fall of

18   2011, right --

19        A.    '11, correct.

20        Q.    -- that Robert Allen was at like a significant

21   turnaround point, I think was your terminology; right?

22        A.    Yup.

23        Q.    Okay.  And one of the things you indicated is

24   that, you know, the trains were on the track relative to

25   IT --

1      A.    Yes.

2      Q.    -- but you're talking about old systems?

3      A.    Uh-huh.

4      Q.    Okay.  And you just need to kind of

5 verbally --

6      A.    Yeah, sure.  I got it.

7      Q.    Now, in that regard, you had indicated that

8 this was a family business when you came in, right?

9      A.    Yes.

10      Q.    And would it be fair to say that there wasn't

11 a sufficient investment in IT?

12      A.    Yes.

13      Q.    Okay.  And you would agree with me that

14 Mr. Alrai was managing the system that he had?

15      A.    Yes.

16      Q.    Okay.  But part of your job and what you

17 wanted to do at this turning point is you wanted to move

18 forward and make some significant changes to IT?

19      A.    Yes.

20      Q.    Now, in regard to DigitalNet, as the CEO, were

21 you familiar with the contracts that were entered into

22 on behalf of Robert Allen and DigitalNet?

23      A.    No, not very much.

24      Q.    Was that staffed out to somebody?

25      A.    So -- right.  Chuck Cioffi would have been --

1    well, to be honest, most of that would be Imran, both

2    making recommendation of choice, but also working

3    through the details of the contract because ultimately

4    as the CIO he would be responsible for making sure they

5    execute.  He would then probably work through some of

6    those details with Chuck.

7         Q.   Okay.

8         A.   Sorry, Chuck Cioffi.  Sorry.  I should --

9         Q.   And are you aware that -- either directly or

10   through Mr. Cioffi -- that there was some discussion and

11   an attempt to enter into a contract with Mr. Alrai to

12   stay at Robert Allen for a period of time while he was

13   at United Way as well?

14        A.   No.

15        Q.   You're not aware of that?

16        A.   So, again, the reason that I have to hesitate

17   is we had worked through a number of different

18   discussions, you know, Chuck -- sorry, Mr. Cioffi,

19   Ms. Johnson and myself, we'd worked through a number of

20   different discussions of ways to transition Imran out

21   prior to being aware of United Way and then post being

22   aware of United Way.

23             So we were trying to work this as a pretty

24   smooth transition.  It is entirely conceivable that

25   Chuck would have worked something or attempted to work

1    something out with Imran to say, you know, for this

2    bridge period until we have a new CIO, will you continue

3    to oversee things.  That's possible.

4         Q.   Okay.  And that wouldn't be a direct report to

5    you, that type of a situation?

6         A.   Uh-uh.

7         Q.   Okay.

8              THE COURT:  Is that a no?

9              THE WITNESS:  Sorry?

10             THE COURT:  Not a direct report to you?

11             THE WITNESS:  Mr. Cioffi is a direct report to

12   me.

13             THE COURT:  The question was and that wouldn't

14   be a direct report to you type of situation.

15             We have an uh-huh (sic), but I don't know if

16   you mean yes or no.

17             THE WITNESS:  Oh, I'm sorry.

18        A.   Unless we actually entered into that

19   agreement, it wouldn't come to me.

20        Q.   Okay.  So you're indicating that -- that the

21   discussion about it -- let's say that there was a

22   contract that was being negotiated by Mr. Cioffi back

23   and forth with Mr. Alrai.  You wouldn't be informed of

24   that at all unless it was entered into, the contract?

25        A.   The concept of it is something that we would

1  talk about, yes.

2      Q.   Yeah.  And that's what I meant by direct

3  report, that Mr. Cioffi would say, you know, you're the

4  CEO, I'm thinking of doing this, we're going to maybe do

5  a contract --

6      A.   Oh, yes --

7      Q.   -- with Imran?

8      A.   -- yes, yes.  Yeah, for sure.  I misunderstood

9  the question.

10      Q.   But you don't recall having that conversation?

11      A.   No.

12      Q.   With Mr. Cioffi?

13      A.   No.

14      Q.   Okay.  In regard to the CIO, would that be a

15  direct report to you --

16      A.   No.

17      Q.   -- the chief information -- who's going to

18  report to Mr. Cioffi --

19      A.   Yes.

20      Q.   -- who's the direct -- okay.

21      A.   Yes.

22      Q.   Okay.  So Dean Riviera would be a direct

23  report to Mr. Cioffi?

24      A.   That's correct.

25      Q.   And I'm probably not saying his name

1    correctly.  Is it Cioffi?

2        A.    You know what, when he's here, ask that

3    question.  Because he will answer --

4        Q.    You're the CEO.

5        A.    He will answer to both.  I've always said

6    Cioffi.  He does answer to Cioffi.  So ask him his

7    preference.

8        Q.    So let me ask you this, Mr. Kowalczyk.

9            In regard to contracts that were entered into

10   with DigitalNet -- because you are aware that Robert

11   Allen entered into four contracts with DigitalNet?

12       A.    Yup.

13       Q.    Okay.  And as part of that, did either

14   Mr. Cioffi as a direct report to you communicate the

15   status of the contract between Robert Allen and

16   DigitalNet as perhaps reported to him by Mr. Riviera?

17       A.    Okay.  So I just need to understand the

18   question.

19       Q.    Want me to repeat it --

20       A.    Yes.

21       Q.    -- in a different way?

22       A.    Yes, please.

23       Q.    So would you start -- let's look at the

24   business hierarchy --

25       A.    Yup.

1    Q.    -- you as the CEO --

2    A.    Yes.

3    Q.    -- Mr. Cioffi as your direct report --

4    A.    Yup.

5    Q.    -- and under him, Dean Riviera?

6    A.    Now, Dean, he's here.  Okay, yes.  Now I get

7    the timing.  That's what I was confused on.  Okay.

8    Q.    So the contracts that are entered into between

9    DigitalNet and Robert Allen --

10   A.    Uh-huh.

11   Q.    -- would those discussions, like what's going

12   on with the contracts, how are they being performed,

13   things okay, that type of thing, is that going to kind

14   of funnel up to you and you're going to have discussions

15   about it with your --

16   A.    Not on a day-to-day basis, but in this

17   particular case it did because Dean was there a

18   relatively short period and discovered that things were

19   not getting done the way they were supposed to get done.

20   We'd already paid a significant amount of money,

21   delivery was not happening, and he lacked the belief

22   that it was going to be getting any better.

23          At one point there was a recommendation that

24   we actually get legal involved and say, there's a breach

25   of contract, we should, you know, be refunded funds and

1  so on and so forth.

2       Q.   Okay.

3       A.   So certainly by the point that we're going to

4  get into a litigious discussion that would come up to

5  me.

6       Q.   Okay.  But the day-to-day stuff is going to

7  probably stay down with Mr. Cioffi and Mr. Riviera?

8       A.   Uh-huh.

9       Q.   Okay.  You would agree with me, as the CEO,

10 obviously, you would have this ultimate decision, I

11 would assume, as to whether to file a lawsuit or engage

12 in litigation; that would be why it would funnel up to

13 you, right?

14      A.   Correct.

15      Q.   Okay.  And in this particular case, no lawsuit

16 was ever filed against DigitalNet for a breach of

17 contract, right?

18      A.   We did engage an attorney in order to be able

19 to start that process of saying, look, we want to go on

20 the record, we are not -- you know, we're not happy, we

21 believe there's a breach, we believe that we should have

22 refunds, and that sort of thing --

23      Q.   Yup.

24      A.   -- but I don't believe that we went down the

25 path of actually conducting a suit.

1      Q.   Sure.  And it makes sense; you're going to

2 engage counsel, find out what your rights and

3 obligations are, and make an informed decision.  Right?

4      A.   Uh-huh.

5      Q.   Okay.  And as you've indicated, ultimately

6 that decision, after consulting with counsel, was that

7 you were not going to file a lawsuit against DigitalNet

8 for breach of contract, correct?

9      A.   Correct.

10         MR. HARRINGTON:  Okay.  May I just have one

11 moment, Judge?

12         THE COURT:  Yup.

13         MR. HARRINGTON:  I have no other questions for

14 this witness.

15         THE COURT:  Any redirect?

16         MR. HARRINGTON:  Thank you, Mr. Kowalczyk.

17         MS. LE:  Thank you, your Honor.

18                REDIRECT EXAMINATION

19 BY MS. LE:

20      Q.   Mr. Kowalczyk, you said that you would be

21 surprised if the conversation between Maureen Johnson

22 and the person at United Way occurred in 2012.

23      A.   Very much so --

24      Q.   Okay.

25      A.   -- yes.

1      Q.    Why is that?

2      A.    Just from a point of -- just from a point of

3   view of -- look, it's not illegal to have two jobs, but

4   I have to ask the question from an ethical point of view

5   that says is that -- is that okay.  And then, secondly,

6   we have a company policy that says if you're going to do

7   that, you have to disclose it.

8           So if you've breached company policy, as the

9   CEO, I can't stand by and say, well, and we'll just sort

10  of look the other way on this.

11          So, again, you know, my recollection of the

12  situation is that we became aware of it, we had the

13  conversation verified that it was true, and then we said

14  then you can't continue here and let's find a smooth way

15  to have you exit.

16     Q.    And your recollection is this happened in

17  2013?

18     A.    That's correct.

19           MS. LE:  Thank you.

20           I have no further questions, your Honor.

21           THE COURT:  Let me just drill down that a

22  little bit.

23           THE WITNESS:  Sure.

24           THE COURT:  You mentioned -- you mentioned

25  that answer what I think of as three issues:  The

1  ethical standpoint, the company policy standpoint, and

2  just plain, good business standpoint, right?

3           I understand the latter two.  The policy is

4  the policy; sharing your chief information officer with

5  another company, probably not good business.

6           What do you mean by the ethical point?  What

7  was your first point?

8           THE WITNESS:  So the -- this may just be a

9  personal philosophy, but -- but the idea that you are

10 committed in your work, to your work is, you know, a

11 fundamental of -- of a good leader.  And CIO is a

12 very senior executive in a company and if you are

13 demonstrating that you're, you know -- one foot on the

14 boat and one foot on the dock is not -- that -- that

15 belies pure passion for your job.

16          THE COURT:  Uh-huh.

17          THE WITNESS:  So that's -- you know, that's

18 where -- that's where I feel like it really crosses a

19 line.

20          The second part of it is omission -- it's one

21 thing to answer the question directly, are you working

22 for another company, and for somebody to look back at

23 you and go, yeah, completely, which I have to say was

24 pretty shocking to me.  I admire the honesty, but not

25 the outcome.

1      There's another side of it is if I hadn't

2  asked the question, how long would this have gone on?

3  So --

4          THE COURT:  I see.

5          THE WITNESS:  Does that answer your question?

6          THE COURT:  It does.  When you're talking

7  about a foot on the dock or out of the boat -- and I

8  don't want to put words in your mouth, so it's very

9  important here that if this isn't what you're conveying,

10  just explain it to me.

11          THE WITNESS:  Okay.

12          THE COURT:  One aspect of that is just a lack

13  of 100 percent commitment to one's job duties.  The

14  other one is that if your foot's off the boat and is on

15  another boat, that might be viewed by some as a

16  conflict.

17          Is that what you -- are you driving at that as

18  well or are you not talking about that?

19          THE WITNESS:  So thank you for the clarity.

20          It is about the hundred percent commitment.

21  If he were -- if the second job was working for a

22  competitor or working for a supplier, then I'd have a

23  much bigger ethical, possibly even legal, challenge of

24  the conflict you're talking about.

25          In this particular instance, United Way,

1    Robert Allen, I didn't see it as poor judgment from a

2    conflict point of view, but certainly not a hundred

3    percent passion to what we needed to be done.

4             THE COURT:  Thank you.

5             If anybody wants to follow up on that --

6    actually, I didn't even give you your recross yet, so go

7    ahead.

8             MR. HARRINGTON:  No, Judge.  I don't have any

9    follow-up questions.  Thank you.

10             MS. LE:  Nothing --

11             THE COURT:  Attorney Le, anything?

12             MS. LE:  -- further.

13             THE COURT:  Thank you, sir.

14             MS. LE:  Thank you, Mr. Kowalczyk.  Safe

15    travels, sir.

16             THE WITNESS:  Thank you.

17                    (Witness excused.)

18             MS. LE:  Your Honor, the government calls

19    Chuck Cioffi or Cioffi.  We will ask him what his

20    preference is.

21             THE COURT:  It won't solve the mystery because

22    he'll have relatives that do it differently.

23             THE CLERK:  Good afternoon, sir.  If you'd

24    like to step this way, please.

25             Please step into the witness box and remain

1    standing.

2              THE WITNESS:  Sure.

3              THE CLERK:  Please raise your right hand.

4              **CHARLES CIOFFI**, having been first duly sworn,

5    testified as follows:

6              THE CLERK:  For the record, please state your

7    full name and spell your last name.

8              THE WITNESS:  Charles Cioffi, C-i-o-f-f-i.

9              THE CLERK:  Thank you.  Please be seated.

10                     <u>DIRECT EXAMINATION</u>

11   <u>BY MS. LE:</u>

12        Q.   So we had a debate earlier about how to

13   pronounce your name properly.  What is your preference,

14   sir?

15        A.   Cioffi.

16        Q.   Cioffi?

17        A.   Cioffi, yeah.

18        Q.   Okay.

19        A.   Cioffi.

20        Q.   Not Cioffi?

21        A.   That was how my grandfather -- when he came

22   to America, he Americanized it.  I went back to the

23   Italian --

24              THE COURT:  I told you.

25        Q.   Mr. Cioffi, are you also known as Chuck?

1      A.   I am.

2      Q.   Mr. Cioffi, where do you live?

3      A.   I live at 848 --

4      Q.   Oh, please, don't give me your full address --

5      A.   Okay.

6      Q.   -- just the city and state.

7      A.   Sorry about that.

8      Q.   Thank you.

9      A.   I live in St. Louis, Missouri.

10     Q.   Have you lived in St. Louis, Missouri, your

11 whole life?

12     A.   All but seven years.

13     Q.   Okay.  During those seven years, where did you

14 live?

15     A.   I lived in Connecticut and I've lived in the

16 Boston area, in Foxborough, and I've lived in Baltimore.

17     Q.   Okay.  What do you do for a living, sir?

18     A.   I'm currently a chief financial officer.

19     Q.   What company employs you?

20     A.   Contegix.

21     Q.   How do you spell that?

22     A.   C-o-n-t-e-g-i-x.

23     Q.   How long have you been with Contegix?

24     A.   Since January of 2018.

25     Q.   I'd like you to give a brief background on

1    your work history for the Court.

2         A.    Sure.  I have about -- I have 34 years of work

3    experience.  My professional business career can be

4    broken down into three chunks.  The first part of my

5    career was spent in the professional services industry.

6    I worked for Ernst & Young as a CPA.

7              After spending 12 years, I then began my

8    private industry experience.  I worked in the -- what I

9    would call the direct-to-consumer industry.  I worked

10   for a company called Knights Direct.

11             At Knights Direct, I was hired as a CFO to

12   orchestrate a turnaround.  And Knights Direct had two

13   brands, Home Decorators Collection and Soft

14   Surroundings.

15        Q.    Okay.

16        A.    From there, we sold the business to Home Depot

17   and Home Depot promoted me to become the general manager

18   running that business and I was there for four years.

19             I left there after four years, after five

20   bosses, and I was -- a headhunter reached out to me --

21   I'm sorry.  Between there, I worked for HDA, Home Design

22   Alternatives, and they were a retailer that sold books

23   and magazines to retail stores, to over 14,000

24   throughout the United States.

25        Q.    Okay.

1    A.    From there I became Robert Allen's chief

2  financial officer, worked there for four years, and was

3  promoted to COO and ultimately left there to go work for

4  a grill company in Baltimore, stayed there for a year,

5  and after that I returned to St. Louis and January 18th

6  I got my current position.

7    Q.    Great.  Now, sir, what time period did you

8  work for the Robert Allen Group?

9    A.    I worked for Robert Allen from the period of

10  August 2012 to August of 2016.

11    Q.    Okay.  You started off as CFO and then

12  eventually became the COO?

13    A.    Yes, I held dual titles.

14    Q.    Okay.  When you first started, you were just

15  the CFO, right?

16    A.    That's correct.

17    Q.    Okay.  Not just, I don't mean --

18    A.    Yeah.

19    Q.    -- to imply --

20    A.    I understand what you mean.

21    Q.    In August of 2012 when you joined the Robert

22  Allen Group, what was the management structure?

23    A.    The management structure, I reported directly

24  to Phil Kowalczyk, the CEO, and there were probably I

25  think seven other direct reports that Phil had.

1    Q.   Okay.  Who reported to you?

2    A.   I had -- the vice-president of finance

3  reported to me, I had the assistant vice-president of

4  credit, the director of logistics, the CIO.  I also had

5  the vice-president of operations reporting to me.

6    Q.   Okay.  Where were you physically located when

7  you worked for the Robert Allen Group as their CFO?

8    A.   I was located in Foxborough, Massachusetts.

9    Q.   Okay.  You mentioned the people that you

10  oversaw.  Do you have a broader area of oversight than

11  your direct reports?

12    A.   I did.  I was responsible for the legal

13  capacity of the company, overseeing all contracts, and

14  in addition to that I was overseeing the real estate

15  properties of the organization.

16    Q.   Thank you, sir.

17         Mr. Cioffi, do you know Imran Alrai?

18    A.   Yes.

19    Q.   How do know Mr. Alrai?

20    A.   He was the CIO of Robert Allen when I was

21  hired.

22    Q.   Okay.  And how long did you and Mr. Alrai work

23  at Robert Allen Group together?

24    A.   A little over a year.

25    Q.   He was the CIO, so what was his area of

1  responsibility?

2      A.   As CIO, he was responsible for ensuring the

3  company had the information technology to support its

4  business missions, encompassing a whole bunch of facets

5  to that.

6      Q.   Okay.  And is the IT department important to

7  Robert Allen Group's business operations?

8      A.   Yes.

9      Q.   How so?

10     A.   In multiple facets.  Robert Allen, unlike a

11  lot of other businesses, went to market in multiple

12  channels.  It had retail showrooms, it had a book, a

13  sample book, it had a website, and it actually had a

14  sales force.  And so you had multiple sources of

15  information and different channels that you sold your

16  product through.

17     Q.   Okay.  How many people reported to Mr. Alrai

18  during that year that you overlapped with him?

19     A.   I -- I would have to guess between 13 and 15,

20  I think.

21     Q.   Okay.  And when he was the CIO, he reported to

22  you directly?

23     A.   Correct.

24     Q.   Okay.  And during your year of overlap, did he

25  work on-site at the Foxborough location?

1      A.   No.

2      Q.   What was his work situation?

3      A.   He came in the office several times a week.

4      Q.   Okay.  What is several times a week?  What do

5   you mean?

6      A.   I think -- I don't remember exactly.  I think

7   it was at least two -- two times a week.

8      Q.   Okay.

9      A.   Could have been three.

10      Q.   And what kind of manager are you?  Do you need

11   to know where your people are all the time, what they're

12   doing all the time?

13      A.   No.

14      Q.   Okay.  So with respect to supervising Imran

15   Alrai since he was a CIO and worked off-site part of the

16   time, how did you manage that?

17      A.   I managed that with respect to him

18   understanding what the objectives were and what the

19   corporate initiatives and his job in terms of executing

20   those in a timely fashion.

21      Q.   Okay.  To your knowledge, did any other Robert

22   Allen executives who were located in Foxborough work

23   remotely?

24      A.   Not to my knowledge.

25      Q.   Okay.  When you joined the Robert Allen Group

1  in 2012, what was the state of the IT department?

2      A.   It was stable.  The department had a lot of

3  projects that were placed upon it because of the

4  corporate initiatives that we were in a turnaround mode.

5      Q.   So someone else has used the term turnaround.

6  Would you explain what that means?

7      A.   Sure.  Robert -- a turnaround is a situation

8  of a company where the company's financial performance

9  is not meeting expectations.  There could be some

10 distress, it could be a financially oriented situation,

11 or it could be because of some competitive pressures in

12 the marketplace.

13     Q.   Okay.  And what was the situation at Robert

14 Allen when you joined in 2012?

15     A.   The company had just been purchased by a

16 private equity firm and as a result, the private equity

17 firm had some plans to grow the business.  But first, in

18 order to grow, we had to restructure the business and

19 put more technology in and different business processes

20 and organize a -- organize our businesses in a more

21 effective manner.

22     Q.   So with respect to the turnaround and how

23 information technology would help in that turnaround,

24 can you tell us about some of those initiatives that you

25 were trying to bring in?

1        A.    Sure.   They were multifaceted in terms of --

2   because as I previously said, the company operated in

3   multiple channels.   So the company at that time I

4   believe had approximately 15 corporate trade showrooms

5   throughout the United States.   Those showrooms had been

6   neglected, both not only in terms of the size, its

7   infrastructure, from the telephone system, to lacking

8   WiFi, to lacking the ability for clients when they came

9   in to order things, so we had initiatives to improve the

10  showroom technology.

11        We had -- Robert Allen actually pioneered the

12  sample book and the sample book, we -- approximately

13  150,000 of these sample books were distributed annually

14  to interior designers and we didn't have a good way to

15  track the performance or even where the -- the sample

16  book was at.   So we had an initiative to be able to

17  track the sample book and track its performance.

18        We needed to upgrade the company's ERP system

19  that was put in 1998.   It was outdated.   It was costly

20  to run.   So those --

21        Q.    What is ERP?

22        A.    Yeah, ERP stands for enterprise resource

23  planning.

24        Q.    Okay.   You said it hadn't been updated since

25  1988?

1      A.    Correct.

2      Q.    What does the ERP system have to do with the

3  business operations?

4      A.    It's extensive in nature.  An ERP system by

5  its nature allows the functional departments to have a

6  central point, a computer system, to execute the

7  business from the standpoint of customers placing an

8  order in different locations to the actual fulfillment

9  of the order, the inventory system that manages the

10 inventory, to purchase the inventory, et cetera.  It's

11 all-encompassing.

12     Q.    Okay.  Now, so with respect to these kind of

13 IT initiatives that you've just mentioned --

14     A.    Uh-huh.

15     Q.    -- briefly, what, if any, responsibilities did

16 the defendant have as the CIO?

17     A.    He was central to the execution of all those.

18     Q.    Okay.  Now, how would you describe the

19 defendant's job performance during that year that he

20 worked as CIO under you?

21     A.    I would describe that they were adequate, but

22 I felt after being there for six months or so that he

23 lacked the knowledge and the talent to get us to the

24 next level to encompass a digital transformation.

25     Q.    Okay.  Did something happen during that ERP

1    process that you mentioned earlier that made you come to

2    this conclusion?

3         A.   Yeah, that was an element of it.  The element

4    was the fact that how it was being conducted, I don't

5    recall us doing a bottoms-up business requirements,

6    which is essential for us to determine how to -- how to

7    select the right application.

8         Q.   Okay.  And what was his role in that ERP

9    process?

10        A.   He was the central point person for that in

11   order to work with all the various business departments

12   to gather up their requirements and then to either

13   document them in various forms, could be flow chart, it

14   could be a swimlane, so you can actually understand how

15   the business process operates.

16             Because when you implement an ERP system, it's

17   not just the computer.  You have to develop changed

18   management and how you do things.

19        Q.   Okay.  And what was -- was there any feedback

20   about his role in the ERP process?

21        A.   Yeah.  From a lot of the folks I spoke with,

22   they were frustrated with the process.  They felt they

23   didn't have an active role in it and didn't really

24   understand what we were accomplishing.

25        Q.   Okay.  And was there any -- any of those

1  concerns directed towards Mr. Alrai?

2       A.   Yes.

3       Q.   What were those concerns that were directed at

4  Mr. Alrai?

5       A.   As I just mentioned.

6       Q.   Oh, all those concerns --

7       A.   Yes --

8       Q.   -- were about him?

9       A.   -- uh-huh.

10      Q.   Okay.  Did you have any concerns about his

11 leadership of his staff in the IT department?

12      A.   Yes.

13      Q.   What were those concerns?

14      A.   Well, one, I think after a while it became

15 apparent to me that given all of the initiatives that

16 you need to have a physical presence.  That became one.

17           I felt there was a lack of project management.

18 It's really central to running multiple projects to be

19 able to manage time effectively of a staff and I didn't

20 feel that that was being done effectively.

21      Q.   At some point did you communicate with

22 Mr. Alrai about your concerns related to the ERP

23 process, the IT department, that kind of thing?

24      A.   Yeah, we had discussions.

25      Q.   Was it an ongoing process?

1     A.    We had periodic meetings.  We met biweekly --

2     Q.    Okay.

3     A.    -- and we would discuss the various tasks that

4  were being done.

5     Q.    Okay.  Now, sir, at some point did you become

6  aware that Mr. Alrai had a second job at the United Way?

7     A.    I don't recall when I became aware of that.

8     Q.    Okay.

9          THE COURT:  Well, the question wasn't when;

10  the question was at some point did you become aware

11  during your time there.

12          THE WITNESS:  I knew that he was -- I was made

13  aware that he was employed as -- I don't -- in some type

14  of I think it's called University of Southern

15  New Hampshire in some role as an educator.  Okay?

16          THE COURT:  Yup.

17          THE WITNESS:  And that's what I became aware

18  of first.

19     Q.    Okay.  So you were aware of outside

20  employment --

21     A.    I was aware --

22     Q.    -- for teaching?

23     A.    Correct.

24     Q.    Okay.  At some later point, did you also

25  become aware of an issue related to the United Way?

1      A.   I don't know if I recall that, whether it was

2   United Way or not.

3      Q.   Okay.  But you have a specific recollection

4   about teaching --

5      A.   Absolutely --

6      Q.   -- outside teaching?

7      A.   -- I recall the teaching.

8      Q.   Okay.

9      A.   Because I remember discussing the teaching

10  classes that he was teaching.

11     Q.   Okay.  Tell me about that conversation.

12     A.   It was just briefly, you know.  We would talk

13  about those type of things.  I can't remember all the

14  details about it, but we would talk about the nature,

15  that he was teaching and some of the details about

16  class.  I don't remember what they were.  It's been six

17  years, so ...

18     Q.   Okay.  So did you give him approval to teach?

19     A.   No.

20     Q.   Okay.  What is your understanding about any

21  approvals he received to teach?

22     A.   That was done before I got there.

23     Q.   Okay.  Now, I want to talk to you a little bit

24  about a company called DigitalNet Technology Solutions.

25  Okay?

1           Are you familiar with them?

2      A.   Yes.

3      Q.   Okay.  How are you familiar with DigitalNet

4  Technology Solutions?

5      A.   It was a company that Robert Allen entered

6  into four contracts with.

7      Q.   Who introduced DigitalNet to the Robert Allen

8  Group?

9      A.   Imran.

10     Q.   Okay.  And what kind of services did you

11 contract with DigitalNet for, just generally?

12     A.   One contract was -- there were two contracts

13 for staff augmentation; one of the contracts was for a

14 RPG programmer, another contract was for a .net

15 contractor; another contract was for a telephony phone

16 system for three of our showrooms; and the other

17 contract was for staffing services to help us develop a

18 new website.

19     Q.   Okay.  Did you just mention six contracts or

20 four?

21     A.   I thought I mentioned four.

22     Q.   Okay.  What are the four contracts?

23     A.   There's -- I said there were two professional

24 services:  One RPG, one .net, one telephony, and one

25 professional services for the website development.

1          Q.    Okay.

2          A.    Sorry if I was confusing you.

3          Q.    Okay --

4          A.    That's four.

5          Q.    -- so let's be clear.

6                You had two different programers, right?

7          A.    Right.

8          Q.    The .net and the RPG program?

9          A.    Correct.

10         Q.    And for phone services?

11         A.    Yes.

12         Q.    And one for people to help you with the

13    website?

14         A.    Correct.

15         Q.    All right.  Good.

16               THE COURT:  Ms. Le, let me ask you --

17               MS. LE:  Sure.

18               THE COURT:  -- and I don't want to rush you at

19    all.  How much more time do you have on direct?

20               MS. LE:  I'm only about halfway through, your

21    Honor.

22               THE COURT:  Let's take a lunch break then.

23    Let's try to reconvene at 1:45.

24                  (Lunch recess taken at 12:45 p.m.)

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.



Submitted: 4/10/2020        /s/  Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR