*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                 *
UNITED STATES OF AMERICA         *
                                 *   1:18-cr-192-JL
          v.                     *   December 4, 2019
                                 *   2:01 p.m.
IMRAN ALRAI                      *
                                 *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
DAY THREE - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

<u>Appearances</u>:


<u>For the Government</u>:        John S. Davis, AUSA
                            Matthew Hunter, AUSA
                            Cam T. Le, AUSA
                            United States Attorney's Office




<u>For the Defendant</u>:         Timothy M. Harrington, Esq.
                            Timothy C. Ayer, Esq.
                            Shaheen & Gordon PA




<u>Court Reporter</u>:           Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603)225-1442

```
                         I N D E X
```

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|
| PATRICIA LATIMORE | | 3 | 43 | -- |
| FAISAL BHATTI | 51 | -- | | |
| KHURRA KHAN | 72 | -- | | |
| NABIL EJAZ | 88 | -- | | |
| NICOLE NASH | 98 | -- | | |
| DIANE DRAGOFF | 116 | 134 | -- | |

| EXHIBITS: | FOR ID | IN EVD |
|-----------|--------|--------|
| Government's 654 | | 58 |
| Government's 604 | | 61 |
| Government's 603 | | 70 |
| Government's 405 | | 100 |
| Government's 208 | | 103 |
| Government's 601 | | 104 |
| Government's 602 | | 108 |
| Government's 615 | | 114 |
| Government's 648 | | 125 |
| Government's 643 | | 126 |
| Government's 209 | | 130 |
| Government's 650 | | 131 |

```
 1                   P R O C E E D I N G S
 2              THE COURT:  All right.  You may proceed with
 3    your cross.
 4              MR. HARRINGTON:  Thank you, Judge.
 5                      CROSS-EXAMINATION
 6    BY MR. HARRINGTON:
 7         Q.   Good afternoon, Ms. Latimore.
 8         A.   Good afternoon.
 9         Q.   My name is Tim Harrington, ma'am.  I'm just
10    going to have a few questions for you.  I wanted to kind
11    of pick up just very briefly close to where you ended
12    with Attorney Davis.
13              And you were talking about where United Way
14    was going to conduct a review in 2016.  And I think you
15    had indicated it was the end of the three-year contract
16    you had initially entered into with DigitalNet, correct?
17         A.   Yes.
18         Q.   And Attorney Davis had gone through with you a
19    few emails, some of which requested additional
20    information, kind of doing some due diligence, I think
21    as you had indicated, correct?
22         A.   Correct.
23         Q.   Okay.  And he asked you why you would go
24    forward with the contracts if you didn't get kind of a
25    perfect response to the questions, like all of the
```

1    information that you had asked.  And I think, in

2    essence, what you had answered is you kind of had a

3    relationship with DigitalNet and you were satisfied with

4    their work and so, you know, you were willing to kind of

5    move forward based on that.

6             And based on the responses that you had and

7    that it was a new procurement process I think you

8    indicated as well, that was why you decided to go

9    forward.  Is that fair to say?

10        A.   That's correct.

11        Q.   Okay.  You -- for most of the time that

12   Mr. Alrai was employed at DigitalNet -- and I'm going to

13   change to a different subject now -- you were his direct

14   supervisor.  I know you indicated Nancy Powers was for

15   six months or so, but then you became Mr. Alrai's direct

16   supervisor, correct?

17        A.   That's correct.

18        Q.   And you remained his direct supervisor until

19   his last day of employment on June 12th of 2018,

20   correct?

21        A.   That's correct.

22        Q.   Okay.  And would it surprise you, ma'am, that

23   on his last day of employment, you indicated that he was

24   advised that he was terminated for cause?  Would it

25   surprise you that that was actually not the case, that

1  he wasn't terminated for cause on June 12th of 2018,

2  that he was actually suspended?

3       A.   Well, no.  Then I misspoke.  I absolutely know

4  he was suspended and then terminated later.

5       Q.   Okay.  So June 12th, he wasn't terminated for

6  cause?

7       A.   Uh-uh.

8       Q.   You misspoke?

9       A.   Yes.

10      Q.   Okay.  And kind of talking about it now,

11  does that kind of refresh your recollection of the

12  conversation?  Because obviously you had indicated you

13  had a conversation where you said you informed him,

14  along with the human resource --

15      A.   We --

16      Q.   Just let me finish the question, okay --

17      A.   Sorry.

18      Q.   -- and then you can answer as fully as you

19  would like.

20           You had indicated that you had a conversation

21  with Mr. Alrai, you and I think you said -- is it senior

22  human resource officer, Ms. Grady?

23      A.   That's Ms. Grady, yeah.

24      Q.   Okay.  Where you informed him that he had

25  been terminated for cause.  But that's a mistake or

1    misspeaking, correct?

2         A.   That's correct.

3         Q.   Okay.

4         A.   We suspended him, knowing that given where we

5    were that it was probably going to be a termination.

6         Q.   Sure, sure.  And it's already been testified

7    to --

8         A.   Uh-huh.

9         Q.   -- that there were other things going on --

10        A.   Uh-huh.

11        Q.   -- for, you know, at least a month or so.

12        A.   Uh-huh.

13        Q.   And you were aware of that, right?

14        A.   I was.

15        Q.   Okay.  Now, let me ask you -- I want to talk

16   to you just briefly about Mr. Alrai and the time that he

17   was there.

18             So as a direct supervisor for Mr. Alrai, you

19   would do performance evaluations or a performance

20   review, I would assume that's the more correct

21   terminology; is that right?

22        A.   That's correct.

23        Q.   Okay.  And you would agree with me that you

24   did his reviews for the years 2013, correct?

25        A.   Yes.

```
 1        Q.   '14?

 2        A.   Correct.

 3        Q.   '15?

 4        A.   I did.

 5        Q.   '16?

 6        A.   I did.

 7        Q.   And '17?

 8        A.   Yes.

 9        Q.   Okay.  And would you agree with me that all of

10   your evaluations of Mr. Alrai spoke pretty glowingly and

11   positively about his performance in the information

12   technology sector.  Initially, what was the name of his

13   position?

14        A.   I believe it was senior director of IT.

15        Q.   And then that he was subsequently promoted.

16   We'll talk about that in a little bit.

17        A.   Uh-huh.

18        Q.   But your reviews generally talked in very

19   positive terms about his job performance in the role?

20        A.   That's correct.

21        Q.   Okay.  And you would agree with me that that

22   would be the case for each of those years, 2013 --

23        A.   Correct.

24        Q.   -- through '17?

25        A.   Correct.
```

1      Q.    And oftentimes in those performance

2 evaluations, you would note positive achievements that

3 had been achieved during the review period, correct?

4      A.    That's correct.

5      Q.    And oftentimes one of those things was

6 managing outside vendors, correct?

7      A.    Yes.

8      Q.    Okay.  And that basically they were being

9 managed effectively and that the deliverables were being

10 received by the United Way?

11      A.    So, yes, that is correct, but if I could add

12 to that, I --

13      Q.    Absolutely.

14      A.    -- I did not know that he was managing a

15 company that he controlled.

16            So, you know, it's kind of interesting when

17 you say -- yes, in retrospect, I certainly would not

18 have said that if I had known that it was controlled by

19 him.

20      Q.    Certainly?

21      A.    But the services --

22      Q.    Yeah.

23      A.    -- as you said, we said he was delivering on

24 certain things.

25      Q.    Yeah.  And let me -- let's focus in on that,

1  because that's really the gist of what you're getting

2  at.  I respect what you're saying is that you didn't

3  understand that there was a relationship as you're

4  indicating you're aware of now, between Mr. Alrai and

5  DigitalNet.  So understand that.

6          What I'm focusing on is that the delivery of

7  services to the United Way, if you take that aside, that

8  relationship, right, the delivery of services to the

9  United Way was successful during that period of time

10 that you were his supervisor, correct?

11     A.    So I would say partially correct --

12     Q.    Okay.

13     A.    -- in the sense that we did get services.

14     Q.    Uh-huh.

15     A.    In retrospect, I mean, it's hard to know at

16 this point were the services on par because we didn't

17 have a real comparison.  We were counting -- we were

18 looking at our old situation.

19     Q.    Yup.

20     A.    Our situation from prior to Mr. Alrai's

21 employment improved.

22     Q.    And I'm going to go to that in a minute.  Let

23 me ask you this, because you bring up a really good

24 point that I wanted to ask you about.

25          One of the things you're talking about is

1    having a comparison, right?  And the question -- one of

2    the questions that that can raise is in regard to the

3    cost -- so you were receiving services.  The question

4    that I think you're kind of raising is could there have

5    been a better cost or savings to United Way if other

6    providers had been looked at; is that fair to say?

7         A.    That's fair, but I would also say in terms of

8    quality of services.

9         Q.    Sure.

10        A.    Now having experienced a different company

11   providing service --

12        Q.    Yeah.

13        A.    -- I recognize services that we did not

14   receive even though they might have been -- I was -- I

15   thought they were there.

16        Q.    Sure.  Understood.

17        A.    Uh-huh.

18        Q.    And so basically what you're talking about is

19   cost as well as potentially other quality of services,

20   if you had compared them; is that correct?

21        A.    That would be correct.

22        Q.    Okay.  Now, you would agree with me that prior

23   to Mr. Alrai being hired -- so we're talking about

24   roughly 2012 or so, and obviously -- when did you start

25   at United Way?

1          A.    I started in 2009.

2          Q.    In 2009.  So obviously you were well aware

3     that before Mr. Alrai came on board that United Way did

4     have some significant IT challenges?

5          A.    Yes, I was.

6          Q.    Okay.

7          A.    This is why he was hired.

8          Q.    Yup.  And, in fact, one of the things that was

9     talked about, and this was before Mr. Alrai was hired,

10    is doing kind of an IT health assessment and that

11    subject actually came up before Mr. Alrai was hired.

12         A.    We have -- so I can't tell you exact timing of

13    that.  I can tell you that Mr. Alrai asked for an IT

14    health assessment.  That I know.  I can't remember the

15    timing of it.  I actually do not remember how long in

16    advance.

17         Q.    Understood.  And I'm not saying that Mr. Alrai

18    did not ask for one, so don't get my -- the gist of my

19    question wrong.

20               What I'm saying is that prior to Mr. Alrai

21    coming on, the United Way had already discussed doing

22    an IT health assessment itself.  You're aware of that,

23    right?

24         A.    I -- as I said, I'm not aware of the timing of

25    that.  We'd been talking about IT and how we would

1   improve it.  We had talked about things like penetration

2   testing and things like that.  But if you said that if

3   we were talking about a more broad health assessment, I

4   don't believe we were having serious discussions prior

5   to Mr. Alrai coming on board.

6         Q.   Okay.  Well, let me ask you this.

7         A.   But I do --

8         Q.   I'm sorry.  Go ahead, ma'am.  I didn't mean to

9   cut you off.

10        A.   No, I'm sorry.  I cut you off.

11        Q.   No, you say what you need to say.

12        A.   I said I'm not -- I don't remember those

13  discussions --

14        Q.   Okay.

15        A.   -- prior to that.

16        Q.   So do you remember giving an interview to Jill

17  Laroe on November 7th of 2018 at the U.S. Attorney's

18  Office in Boston?

19        A.   Yes.

20        Q.   Okay.  And if I showed you a document

21  detailing your interview, would that help refresh your

22  recollection on the subject that we're talking about?

23        A.   Yes.

24             MR. HARRINGTON:  Okay.  Judge, may I approach

25  the witness?

```
1              THE COURT:  Yes.
2       Q.   You can look at as much of this as you want.
3       A.   Uh-huh.
4       Q.   I'm just going to point you to a particular
5  section --
6       A.   Uh-huh.
7       Q.   -- and then feel free to read whatever you
8  need to, but then let me know when you're done reading.
9  Okay?
10      A.   Okay.  Are you asking me to read the --
11      Q.   This section is the one I would point --
12 direct you to --
13      A.   Okay.
14      Q.   -- but feel free to read before or after that
15 if you feel you need to have like context or something.
16           So -- and just tell me when you're done.
17      A.   I'm ready.
18      Q.   Okay.  Let me take a look.  I'm going to take
19 that back from you because I'm going to put it up on the
20 screen.
21      A.   Yeah.
22      Q.   So after taking a quick look at that, do you
23 recall telling Ms. Laroe that the United Way board had
24 also requested an IT health assessment to be done
25 previously so that it seemed reasonable when Mr. Alrai
```

1   had requested it?

2        A.    I probably spoke of it, but as I said, the

3   board had asked us -- we had done a risk assessment and

4   the board had asked us to look at risk and penetration

5   testing.

6             So not as broad, frankly, as a total

7   environment health assessment.  The board never made a

8   request to us to do that.  But they had made requests

9   for us to look at risk, the risk to our environment.

10       Q.    Okay.  So when you read that statement, is the

11  report not accurately capturing what you said?

12       A.    It's -- it's capturing accurately what I said,

13  but from a clarification standpoint, when we talked

14  about a health assessment, it was a -- when Mr. Alrai

15  did it, it was to actually look at and make

16  recommendations for the future of our environment.  That

17  is not the same kind of assessment that the board asked

18  us to make.  The board was much more narrowly focused --

19       Q.    Okay.

20       A.    -- around the risk of an outsider penetrating

21  our environment.

22       Q.    And so in your discussions -- and what you're

23  telling the judge now is that asking for the IT health

24  assessment by Mr. Alrai, when he asked, that made sense,

25  given previous discussions the board had had and given

1   what the state of the IT system was?

2       A.   Yes.

3       Q.   Okay.  And you would agree that after that

4   health assessment was done by Mr. Alrai, you actually

5   sat down with Nancy Powers and Mr. Alrai and went over

6   the report?

7       A.   I went over a summary of the report.  Not the

8   actual report, but a summary.

9       Q.   Okay.  And, again, I want to point your

10  attention to that same interview that I'm talking

11  about --

12      A.   Okay.

13      Q.   -- that you conducted with Ms. Laroe.  Okay?

14           And, again, it's that kind of starred section

15  and the last line down here -- we'll use this board.

16  It's a little easier.

17           You indicated that afterwards you sat with

18  Nancy Powers and Alrai to go over the report from the

19  health assessment.  Didn't indicate to them that you

20  were going over a summary of the assessment, you advised

21  them that you went over the report with Ms. Powers and

22  Ms. Alrai -- Mr. Alrai.  Is that correct?

23      A.   As I said, we -- I did not go over the report

24  with either one of them.  I went over it -- when I speak

25  of a report, I mean that they reported to me the

1  assessment -- what was conducted in the assessment.  I

2  had never seen the health assessment report.  And I -- I

3  wasn't expecting it at that time, either, I guess.

4      Q.   Okay.  Did you advise Ms. Laroe that you went

5  over a summary or is it just that the report's not

6  accurately capturing what you intended to say?

7      A.   I think the report accurately captures what I

8  say.  I think, though, that when you're speaking, as I'm

9  talking to you now, and if you're digging more into

10 it --

11     Q.   Yup.

12     A.   -- that if you want to say what is a report

13 that you had, I don't remember Ms. Laroe asking me,

14 well -- although at subsequent meetings she did ask me,

15 did you ever see the report and I told her at that point

16 or Mr. Davis that I never saw the report, that I got a

17 report.  So maybe I've been using the word report too

18 often, but I got a report from Mr. Alrai and Ms. Powers,

19 but it was not a document from DigitalNet that was a

20 report that I was reviewing.

21     Q.   Okay.  And was it a document, a summary

22 document?

23     A.   It was a summary document.

24     Q.   Okay.

25     A.   Uh-huh.

1    Q.   I want to talk to you a little bit about the

2  RFP process that you spoke about for the IT managed

3  services.  All right?

4    A.   Uh-huh.

5    Q.   Now, you would agree with me that there were a

6  number of individuals -- I think you said that there

7  were two different levels; you had an IT steering

8  committee and then you had an IT RFP committee; is that

9  correct?  I might be using different terminology.

10    A.   You used absolutely different technology.  I

11  think we called it the IT advisory committee and we had

12  a group that was working with Mr. Alrai as the RFP team.

13    Q.   Okay.

14    A.   Uh-huh.

15    Q.   And so just to make sure I have it correctly,

16  we have the IT steering committee, right?  I think you

17  indicated that was a committee.

18    A.   It is a committee.

19    Q.   Okay.  And then underneath it is the one that

20  I may be using the different terminology, but the IT --

21  I think you said -- what was the terminology you used,

22  IT?

23    A.   I think I'm confusing -- could you restate

24  what it is that you're asking me?

25    Q.   Yes.  Let me ask -- and I don't mean to be --

1    A.   I'm just not clear what you're asking me, I

2    guess.

3    Q.   Yup.  So in regard to the RFP process --

4    A.   Uh-huh.

5    Q.   -- right?  My understanding is that there were

6    two levels of committees I thought you had described to

7    Attorney Davis:  That there was one -- that there was an

8    IT steering committee and then beneath that there was an

9    IT I think maybe you said advisory committee that was

10   kind of in charge of the RFP process?

11   A.   I don't believe I actually said it exactly

12   like that.

13   Q.   Okay.  Well, let me ask you the question then,

14   because I'm trying to understand it.

15   A.   But I want to clarify -- yeah, if you want me

16   to clarify.

17   Q.   Yeah.  If you could tell us --

18   A.   Uh-huh.

19   Q.   -- what was the committee structure for the IT

20   and the RFP process.

21   A.   So on our -- the RFP side, there -- if you're

22   speaking of a board level committee --

23   Q.   Uh-huh.

24   A.   -- none of the board actually was -- had

25   responsibility for actually approving or -- the RFP for

1   managed services.

2        Q.   Uh-huh.

3        A.   That was true, that stops at a managerial

4   level, but the administration and finance committee was

5   informed and we recommend -- we said, this is what we're

6   going to be doing.  So we informed them about the

7   process and we informed them of the selection.

8        Q.   Okay.  But --

9        A.   And then there was an IT advisory committee.

10  The IT advisory committee, which Stan Burrows headed,

11  also reviewed the process and offered advice and counsel

12  to the organization, to Imran in particular, around

13  the -- the RFP process.  But they weren't an approval

14  body.

15       Q.   And so --

16       A.   The approval -- they would ask for approval.

17       Q.   And so who was the group in the RFP, the RFP

18  group?

19       A.   So on the team?

20       Q.   Yeah.

21       A.   The RFP team, Diane Dragoff, Azim

22  Mazagonwalla, led by Imran Alrai.

23       Q.   Okay.  And would you agree with me that

24  Mr. Alrai had conversations with Stan Burrows, he had

25  sought the advice of Stan Burrows relative to the RFP

1    process?

2         A.    He -- yes, Mr. Burrows reviewed the RFP

3    document.  He offered to review the RFP responses.  To

4    my knowledge, did not give -- Imran did not allow him to

5    review the responses.

6         Q.    Okay.  In regards to the RFP process itself,

7    like crafting the actual RFP --

8         A.    Uh-huh.

9         Q.    -- that was going to be sent out, you would

10   agree with me that Mr. Alrai spoke with Mr. Burrows and

11   others to get input into actually crafting the RFP?

12        A.    Yes, I would.  He spoke to me and he spoke to

13   Mr. Burrows and I -- and I thought other people, too.

14        Q.    Okay.  And in addition to that, would you

15   agree with me that there are other agencies that were

16   kind of pulled upon -- I think it would have been people

17   on the IT committee.

18             For example, there was an individual that was

19   working at Liberty Mutual -- and I'll get you his name

20   in just a moment -- Ray Levesque at Liberty Mutual.  Are

21   you familiar with Mr. Levesque?

22        A.    I am.

23        Q.    And his input was sought as well relative to

24   the RFP proposal that was going to be crafted, correct?

25        A.    Not independently.  Mr. Levesque was a part of

1   the IT advisory committee.

2        Q.    Yup.

3        A.    The RFP document was reviewed with them at

4   the -- at a meeting and was sent to them.  And so they

5   had all -- everyone on that committee had an opportunity

6   to give feedback.

7        Q.    And would you agree with me that the people

8   that are involved in this process would be, for example,

9   obviously you, you're involved in the process, correct?

10       A.    Yes.

11       Q.    Dennis Langwell?

12       A.    He was the chair of the administration and

13   finance committee.

14       Q.    Okay.  And so he was involved in the process,

15   correct?

16       A.    No.

17       Q.    He was copied on emails regarding the RFPs,

18   correct?

19       A.    I guess when you say -- I'd like a

20   clarification.  I mean, you say involved in the process.

21       Q.    Uh-huh.

22       A.    And what do you mean?  Because I can tell you

23   what I mean when I said no and maybe we were -- I'm

24   speaking wrongly to you.

25       Q.    Yeah, absolutely.  Would have an opportunity

1   to make comment and suggestions.

2       A.    So on the RFP process, I would say Langwell

3   did not have an opportunity to make a comment on the

4   process, but we -- because he was involved with the --

5   he understood that there was a process going on.  He was

6   chair of the administration and finance committee.

7       Q.    Uh-huh.

8       A.    So he was aware that there was a process going

9   on.  He was not involved in it.  He was aware that the

10  IT advisory committee was reviewing it and we presented

11  to the A&F committee the results of the RFP process.

12          So I guess technically, yes, he could have had

13  a -- had input, but practically that's not typically the

14  role of the chair of the A&F committee.

15      Q.    Okay.  Ultimately, after the RFP process is

16  done -- and you do indicate that people other than

17  Mr. Alrai have input into the process and crafting and

18  shaping the RFP, right?

19      A.    Uh-huh.

20      Q.    Correct?

21      A.    Yes.

22      Q.    And so once that's done, who ultimately

23  approves the RFP that goes out?

24      A.    So once Mr. Alrai got all of the input back,

25  he sent me a copy of it and we met and we agreed that

1    the RFP itself was ready to go out.

2         Q.   Okay.  And so is that -- you have the final

3    approval on the RFP or does it have to go to like a

4    board?

5         A.   No, it didn't have to go to anyone else.

6         Q.   Okay.  So ultimately you make the final

7    decision as to whether it's ready to go?

8         A.   Yes.

9         Q.   Okay.  Now, after the RFP goes out, you're

10   aware that there were -- I think you said there were

11   13 -- there was a list of 13 individuals, or I should

12   say companies, that were sent the RFP, right?  You're

13   aware of the list?

14        A.   I'm aware of the list and it was my

15   understanding that they went to 13 companies.  I don't

16   know if it actually did at this point.

17        Q.   Sure.  You are aware that there were a number

18   of responses back and I understand you're questioning,

19   you know, whether certain ones came in, you're

20   questioning or doubting, but you do know, in fact, there

21   were at least three separate companies other than

22   DigitalNet that responded; you've seen those?

23        A.   I'm not aware of that, actually.

24        Q.   Okay.

25        A.   Because at the -- as I said, I never saw the

1    RFP responses.  I'm aware now that the team that was the

2    RFP team, we could not find any documents related to any

3    RFP responses, which was very unusual.

4         Q.   Okay.

5         A.   So I would have to conclude that -- I don't

6    know what to conclude, I should say, in that --

7         Q.   Okay.

8         A.   -- unless Mr. Alrai has all of the RFP

9    responses and they're not on premises and they're not in

10   our --

11        Q.   So let --

12        A.   -- in our systems.

13        Q.   So let me ask you this in regard to that.

14             So basically what you appear to be saying is

15   you question whether there are actually any responses to

16   the RFP.  It seems to be what you're questioning, right?

17        A.   So let me just say my experience having done a

18   number of RFPs at the United Way is that an RFP comes

19   back via an electronic medium.  And if it does -- did,

20   then there would be some record of it in our system.

21        Q.   Okay.  And so --

22        A.   And our systems have been checked for it.  I

23   don't see any and I'm aware -- and I'm sure you'll talk

24   to others about their experience with the -- from the

25   team --

```
 1        Q.    Okay.
 2        A.    -- but I'm aware that they don't have the
 3   documents in their possession.
 4              So I have to conclude that either Mr. Alrai
 5   has all of them and they went to a non-United Way email
 6   address --
 7        Q.    Uh-huh.
 8        A.    -- which would be a little bit atypical --
 9        Q.    Yeah.
10        A.    -- or that they weren't done.
11        Q.    Okay.  Or the United Way lost them?
12        A.    I don't think that we lose electronic records.
13   I mean --
14        Q.    Okay.
15        A.    -- emails.
16        Q.    So --
17        A.    We have never not -- we have never -- there's
18   no evidence that our systems have lost --
19        Q.    Okay.
20        A.    -- email records and especially of 10 or 12
21   email records.  Usually, you know, vendors send back a
22   number of requests.  They ask for clarification on what
23   do you mean by this, can I do this and that.  So
24   there's -- you know, it's not just a one time thing --
25        Q.    Understood.
```

1      A.    -- so it wasn't like -- and we seem to have

2 the rest of the records on it.

3      Q.    Sure.  So if individual providers such as EZ

4 Castle or mindSHIFT --

5      A.    Yeah.

6      Q.    -- had provided that and had documentation

7 that it was sent to the United Way, that would

8 demonstrate that --

9      A.    Yes, it would.

10      Q.    -- perhaps United Way might have just

11 unfortunately misplaced or deleted the files somehow.

12      A.    I would have to -- if they have the records, I

13 would have to agree with that.  All I am saying is I'm

14 not aware of the records.

15      Q.    Fair enough, ma'am.

16            And so following up on that, right, in regard

17 to the actual responses to the RFP, you're indicating

18 that it was Mr. Mazagonwalla -- I think I'm pronouncing

19 his last name incorrectly, but Mazagonwalla,

20 Mazagonwalla?

21      A.    Mazagonwalla.

22      Q.    Mazagonwalla, thank you, and Ms. Dragoff were

23 part of this group, as well as with Mr. Alrai or led by

24 Mr. Alrai, as I think you've said.  And is it your

25 testimony that they never reviewed responses?

1    A.    I'm not aware that they did --

2    Q.    Okay.

3    A.    -- is what my testimony is.

4    Q.    Okay.  And if it was -- if that was the case,

5  right, if Mr. Mazagonwalla and Ms. Dragoff didn't review

6  the responses to RFPs that were submitted to the United

7  Way, then they didn't do their job, did they?

8    A.    You would have to ask them that.  As I said,

9  I'm not aware that -- if they reviewed them, I had -- we

10  have not been able to find them.

11    Q.    You're the CFO of this company?

12    A.    I am.  I was.

13    Q.    And you're now the COO?

14    A.    I am.

15    Q.    Okay.  And would you agree with me that in

16  that position, you would be able to determine whether or

17  not someone in this organization did or didn't do their

18  job?

19    A.    I would be aware of that.  And you're asking

20  me to make -- but as I said, in -- when you're on a

21  team, three people on a team, my experience in RFP

22  processes is many times you do rely on the lead person.

23  And they -- I don't know what they were thinking.

24  You'll have to ask them that question.

25    Q.    So --

1      A.    In terms of their job, they make the --

2      Q.    Yeah.

3      A.    I don't know what their assumption was in

4  terms of reviewing original documentation.  I would have

5  said that they should have reviewed original

6  documentation --

7      Q.    Yup.

8      A.    -- but I also -- when you say that they

9  weren't doing their job, that's a little bit stronger --

10     Q.    Okay.

11     A.    -- than I would use.

12     Q.    So let's talk about just the RFP -- my

13 question was as relative to the RFP group.

14     A.    Uh-huh.

15     Q.    And if they're part of that group, part of

16 their job is to review the RFP responses, right?

17     A.    That is true.

18     Q.    Okay.  And so my question, again, is if they

19 didn't do that, then they didn't do their job, correct?

20     A.    On that particular instance, I agree with you

21 on that one.

22     Q.    Would you agree with me, changing gears a

23 little bit to the IT health assessment, so going back

24 kind of again to 2012, the time that Nancy Powers was

25 there, what was her position at United Way before she

1   left?

2       A.    She was the -- she was the vice-president of

3   operations.

4       Q.    Okay.  Would you agree with me that Ms. Powers

5   was one of the people that was pressing to do an IT

6   health assessment in United Way?

7       A.    I -- I think that Ms. Powers wanted to do an

8   IT health assessment, yes.

9       Q.    Okay.  And you would agree with me that she

10  was the person who handled the decision of who to use to

11  do the IT health assessment and that you signed off on

12  her choice?

13      A.    I think that there was a process where people

14  make a decision around which vendor to use.  I know that

15  Ms. Powers did not know DigitalNet at the point -- at

16  the time we made the decision, so I know that -- that

17  Mr. Alrai brought them into the process.

18            I -- and, clearly, neither Ms. Powers nor

19  myself thought that it was a -- you know, we agreed.  We

20  signed off on that decision.

21      Q.    So let me ask -- I'll ask you the question

22  again.

23            Do you remember, again, giving an interview

24  with Ms. Laroe on November 7th, that's the one at the

25  U.S. Attorney's Office in Boston?  And I'm going to

1    point you to a particular section here.

2              This particular section, you agree with me

3    here it's saying that Ms. Latimore advised that Powers

4    handled the decision of who to use for the IT health

5    assessment and Latimore signed off on it?

6         A.    I agree with that.  I stand by that.

7         Q.    And you go further to say:  Alrai was still

8    learning how to do the system and Powers would have

9    gotten prices from multiple companies and do the price

10   comparison?

11        A.    She definitely -- I would assume she would.  I

12   know -- I knew her very well.  I knew her work.  And so

13   my assumption was that she would have done multiple

14   price assessments.

15        Q.    Okay.

16        A.    So my -- but I know that DigitalNet was

17   suggested by Mr. Alrai.

18              The other piece on that -- so I know that

19   there was -- I assume that there were multiple

20   assessments and -- but when you have somebody in the

21   process who has knowledge of it, it's pretty easy for

22   them to come back with a lower price or steer the -- the

23   decision toward one group.  But Ms. Powers did manage

24   it.

25        Q.    And let me -- I want to clarify something with

1   you in regard to Stan Burrows, so I'm jumping to a

2   different subject.  Okay?

3        A.   Okay.

4        Q.   You would agree with me that Mr. Burrows had

5   an oversight role on the IT Advisory Council

6   specifically for the RFP process, correct?

7        A.   As I said, oversight meaning he had

8   advisory -- he was an adviser to us.  He was not an

9   oversight meaning that he had the power to intervene in

10  the RFP process.  No.  He -- but he had the right to

11  advise.

12       Q.   Understood.  I want to again switch gears to

13  talk to you just very briefly about budget for IT.

14       A.   Okay.

15       Q.   Before Mr. Alrai came in, were there times

16  where the budget for IT was at about the $2 million

17  level?

18       A.   The budget for I -- yes.  There were -- we had

19  specific projects that were going on.  As I said before,

20  a CRM system, the board approved us to have, I believe,

21  an additional million dollars for it.

22       Q.   Sure.  And so you would agree with me that --

23  and I'm not trying to say that that was normal, but what

24  I'm getting at is typically the IT budget for United Way

25  Massachusetts Bay was typically in excess of a million

1    dollars year to year?

2         A.   Yes.

3         Q.   Okay.  And you would agree with me that during

4    the time that Mr. Alrai was at the United Way that his

5    bottom line stayed at 1.1 million per year?

6         A.   I agree.

7         Q.   Okay.  Just a couple more questions,

8    Ms. Latimore.

9              If I could ask the government -- could you

10   bring up that exhibit we were talking about earlier?

11             MS. SHEFF:  Okay.

12             MR. HARRINGTON:  Sorry, I forgot I keep having

13   to turn that on here.

14             MS. SHEFF:  That was --

15        Q.   I'm showing you what's been marked as

16   Government's Exhibit 401 and that's dated March 1st of

17   2013.  And these are your notes relative to your

18   discussion of the references that you indicated you

19   followed up with, correct?

20        A.   Yes, they are.

21             MR. HARRINGTON:  Okay.  And if I could go to

22   the next page.

23        Q.   Again, this is the -- Mr. Ejaz and there's

24   really two notes that you have:  You have Mr. Ejaz and

25   then you have Mr. Khan, correct?  The first page you

1    looked at was Mr. Khan and this is Mr. Ejaz.

2         You agree with me that you took these notes

3    contemporaneously?

4         A.   I did.

5         Q.   Okay.  And dated them?

6         A.   I did.

7         MR. HARRINGTON:  Okay.  So I want to ask if

8    you would bring up I think it's Government Exhibit 300a.

9         This is the managed services contract.  It's

10   dated February 20th, correct?

11        A.   Yes.

12        Q.   On the cover page anyway.

13        A.   Yes, it is.

14        MR. HARRINGTON:  And if I could ask to go to

15   the signature page, I think that's page 7, maybe.  It

16   might be the next page, actually.

17        Q.   And I want to go back up.  You have this

18   signed and it's dated February 22nd of 2013.  And this

19   is the date that you executed the agreement, correct?

20        A.   It is.

21        Q.   Okay.  And the reviews or reference checks

22   that you did weren't for another week or so, until

23   March 1st, after the contracts were executed?

24        A.   I signed on the 22nd.

25        Q.   Okay.

1        A.    We did not forward this to Mr. -- to

2   Mr. Chaudhary until after I did the interviews, the

3   reference checks.

4             MR. HARRINGTON:  Now -- and that's okay.  You

5   can bring that down.

6             MS. SHEFF:  Pardon me?

7             MR. HARRINGTON:  You can bring that down.

8   You're all set.

9             MS. SHEFF:  Okay.

10       Q.    Do you know when that document was executed

11   finally by DigitalNet Services?

12       A.    We had -- we sent what we did, and I think it

13   was -- as I've said before, we had a few extra questions

14   for DigitalNet --

15       Q.    Uh-huh.

16       A.    -- and we asked for that information to come

17   to us before we got -- we sent the -- the signed

18   document.  I don't remember the exact circumstances, but

19   I -- I know that it might have been that I may not have

20   been in the office or something later on, but the -- so

21   I signed in advance.  We informed them that they had

22   a --

23       Q.    Uh-huh?

24       A.    -- that we'd made a decision, and that it was

25   pending reference checks and the other things.

1          So the date of it, yes, it was a little bit in

2    advance.

3          Q.   Okay.  And were you ever able to find or

4    obtain a fully executed copy of the contract?

5          A.   Not -- I assume not, but --

6          Q.   Okay.

7          A.   -- we -- we definitely had one.

8          MR. HARRINGTON:  If I may have one moment,

9    Judge?

10          THE COURT:  Yup.

11          Q.   I want to again switch gears a little bit on

12    you in regard to your meeting with Mac Chaudhary in your

13    Boston office.

14          A.   Uh-huh.

15          Q.   You indicate that he came alone, right?  Or I

16    should say Mr. Alrai escorted him to you.

17          A.   That's my memory of it, yes.

18          Q.   Yeah.  And then left you alone with

19    Mr. Chaudhary and then you met for about a half-hour and

20    I would assume you brought him back to Mr. Alrai?

21          A.   I didn't -- yes, Mr. Alrai -- Alrai was -- my

22    office and where he sat or where the IT people sat was

23    very close by each other.

24          Q.   Now, do you recall actually telling in an

25    interview with Ms. Laroe on June 25th -- you actually

1    did a telephonic interview on June 6th of 2018 with Jill

2    Laroe; do you recall that?

3         A.   Yes.

4         Q.   Okay.  And do you recall telling Ms. Laroe

5    that you had a meeting with Mr. Chaudhary at your office

6    and he brought an infrastructure architect with him when

7    he came to your office and you believe that that

8    architect was Kal Wahbe?

9         A.   Well, I don't think that that's captured

10   exactly right.  Kal Wahbe was in the office on that day,

11   I believe, and it -- or he was in the office multiple

12   times.  And I knew that he was an infrastructure

13   architect based upon what Mr. Alrai had told me.

14        Q.   Okay.

15        A.   But we --

16        Q.   You're saying you didn't meet him --

17        A.   No, I did not meet him at that meeting.  I had

18   met Mr. Kal Wahbe before and I saw him afterwards also.

19        Q.   Okay.  Well -- and so Kal Wahbe was there

20   on-site at United Way is what you're saying?

21        A.   Yes, he was --

22        Q.   Okay.

23        A.   -- at various times, uh-huh.

24        Q.   And you're indicating he was there that day

25   that Mr. Chaudhary was there, he just wasn't part of the

1  meeting.

2      A.   He was not part of the meeting.

3      Q.   Okay.

4      A.   He may have been there that -- my remembrance

5  of this --

6      Q.   Uh-huh.

7      A.   -- and this is years ago --

8      Q.   Sure.

9      A.   Is that there were a number of DigitalNet folks

10  in the office that day and I said --

11      Q.   Okay.

12      A.   -- that I believe Kal was also there.

13      Q.   But you would agree with me that Mr. Wahbe

14  didn't work for the United Way, right?  He worked for

15  DigitalNet.

16      A.   Yes, he did.

17      Q.   And you previously testified that you met with

18  Mr. Chaudhary prior to the contract being signed?

19      A.   I didn't say that.  I said I met with

20  Mr. Chaudhary prior to -- and I believe it was in March,

21  so ...

22      Q.   So you're saying it wasn't prior to --

23      A.   Or early -- yeah, maybe early March.  I don't

24  know.  I don't remember the exact dates, but it was

25  after Digital -- it was the week that DigitalNet started

 1    with us.
 2          Q.    Okay.
 3          A.    And I don't remember the exact date.  No one
 4    has asked me that.  I would have to refresh my memory
 5    when they started.
 6          Q.    Yeah.  So let me ask you, just to make sure I
 7    understand what your answer is, okay --
 8          A.    Uh-huh.
 9          Q.    -- because I don't want to put words in your
10    mouth?
11          A.    No.
12          Q.    You're saying that you met with
13    Mr. Chaudhary --
14          A.    I did.
15          Q.    -- in your office in Boston, correct?
16          A.    Correct.
17          Q.    Yeah.  And that you met with him alone in your
18    office for about a half an hour, correct?
19          A.    Correct.
20          Q.    Okay.  And that that day Mr. Wahbe was in the
21    building, but didn't participate in the meeting with you
22    and Mr. Chaudhary?
23          A.    I'm making the assumption that
24    Mr. Chaudhary -- Mr. Wahbe was in the building, but I
25    don't know that for -- I can't tell you that for a fact.

1          I'm saying that Mr. Wahbe -- I believe that

2   they were meeting -- that there was a meeting with

3   DigitalNet folks and I assumed that Mr. Kal Wahbe was

4   there, but I can't really say that that's exactly a

5   hundred percent true.

6          MR. HARRINGTON:  Okay.  If I may approach the

7   witness, Judge?

8          THE COURT:  What did you say?

9          MR. HARRINGTON:  If I may approach the

10  witness?

11         THE COURT:  Yeah, of course.

12     Q.   I'm just going to show you what's -- you can

13  look at other sections if you want, just the date and

14  November 7th, the interview at the U.S. Attorney's and

15  go on to a different page and I'm just pointing you to

16  this section.  If you could kind of read that to

17  yourself and tell me when you're done.

18     A.   Uh-huh.  That's correct.

19     Q.   Okay.  And so you would -- after taking a look

20  at that statement, does that kind of refresh your memory

21  of what you have spoke to Mr. Laroe about, indicating

22  that Mr. -- your meeting with Mr. Chaudhary occurred

23  before the signings of the contract?

24     A.   So, as I said, I'm not a hundred percent clear

25  on the exact day.  My understanding before we executed

1   the contract that, yes, that I did meet with him before

2   then or around then.  It might have been the day of.  I

3   don't know.

4        Q.   Okay.  And it would obviously -- if you met

5   with Mr. Chaudhary before signing the contracts --

6        A.   Uh-huh --

7        Q.   -- it would be odd for Mr. Wahbe to be in the

8   building because you hadn't yet signed the contracts and

9   he wasn't an employee of the United Way, right?

10       A.   He was never an employee of the United Way.

11       Q.   Okay.

12       A.   So -- and I don't know if it would have been

13  odd or not.  I believe that -- as I said, I don't know

14  if he was in the building --

15       Q.   Okay.

16       A.   -- at that time, but I thought that that's

17  what was going on.  I'm not a hundred percent sure of

18  exactly who else was in the building or when the timing

19  of that was and so I --

20       Q.   Okay.

21       A.   -- I can't tell you that.  I mean ...

22       Q.   Let me ask you about your trip up to

23  Andover --

24       A.   Uh-huh.

25       Q.   -- to see the DigitalNet offices.

1      A.    Uh-huh.

2      Q.    You're indicating that you went to the

3  building -- you had the address, correct?

4      A.    Uh-huh.

5      Q.    And that you saw a placard that was on --

6      A.    Or something.

7      Q.    -- on the wall?

8      A.    Uh-huh.

9      Q.    And what did the placard say?

10     A.    I don't know exactly, but it said DigitalNet

11  and I went to the room and there was somebody there, I

12  went in, and that was it.

13     Q.    Okay.  And when you went into the office, was

14  it a designated office specifically for DigitalNet?

15     A.    Yes and no.  That facility is a little bit of

16  an open --

17     Q.    Sure.

18     A.    -- concept.

19     Q.    Yup.  And you -- when you went in there, are

20  you saying that you met with staff and they escorted you

21  around the DigitalNet offices, kind of to show you the

22  place?

23     A.    I met with somebody who said this is our

24  space.

25     Q.    And they walked you around the space and

1    showed you the space?

2         A.    There wasn't much walking around, but yes.

3         Q.    Okay.  You reviewed the space?

4         A.    It's small.

5         Q.    Okay.  Would it surprise you, Ms. Latimore, to

6    learn that there was never a placard indicating

7    DigitalNet was in that building?

8              MR. DAVIS:  Objection; misstates the evidence,

9    the word never.

10             THE COURT:  She doesn't have to accept his

11   question.  There's no such objection as misstates the

12   evidence.  If she doesn't accept it, she can reject it.

13             MR. DAVIS:  All right.

14             THE COURT:  He's allowed to ask questions he

15   has a good faith basis to ask.

16             Go ahead.

17        A.    Would it surprise me?  Yes, it would, because

18   I believe I saw a sign, but I don't know.  I mean, if

19   you're saying there never was a sign --

20             THE COURT:  Well, he's not saying anything.

21   He's asking you.

22             THE WITNESS:  I think I saw a sign or at least

23   I went to an office that had a sign.

24             THE COURT:  When you talked to him about it

25   being on a tombstone --

```
1                    THE WITNESS:  I thought --

2                    THE COURT: -- are you talking about the

3      directory in the lobby?

4                    THE WITNESS:  I thought that's how I got in.

5                    MR. HARRINGTON:  Judge, I don't have any other

6      questions for Ms. Latimore.

7                    THE COURT:  Thank you.

8                    Mr. Davis.

9                         REDIRECT EXAMINATION

10     BY MR. DAVIS:

11          Q.   So, Ms. Latimore, you were asked a lot of

12     questions about when you signed the contract and whether

13     you met with Mac Chaudhary before or after you signed

14     the contract.  Do you recall that?

15          A.   Yes.

16          Q.   Now, you -- you testified, though, that what

17     you remember is that you think Mr. Chaudhary came in on

18     a day when DigitalNet people were actually starting in

19     your space?

20          A.   That's what I think happened.

21          Q.   Right.  And that would have been in March,

22     right, of 2013?

23          A.   I believe so.

24          Q.   All right.

25          A.   I mean, they were in the -- somebody -- there
```

1   were people in the space meeting with Mr. -- or I can't

2   tell you that it -- what the actual date was, but they

3   were meeting with Mr. Alrai.

4        Q.   And showing you again Government Exhibit 611,

5   and your very first email at the bottom of 611 -- no,

6   I'm sorry, all the way, last page, or first page,

7   however you put it.

8             Okay.  So you -- this email here at the bottom

9   from you to Mr. Alrai is dated February 23rd, right?

10       A.   Uh-huh.

11       Q.   And what you're telling him is I signed the

12  contract, right, but you don't have business or

13  financial information on DigitalNet.  Right?

14       A.   Not that was in the file.  Mr. Alrai said

15  that there was information in the RFP, but in my

16  conversations with Azim Mazagonwalla, he said that we

17  need more documentation.

18       Q.   All right.  So DigitalNet -- or United Way is

19  not ready to start at this very minute --

20       A.   No.

21       Q.   -- with DigitalNet, right?

22       A.   No, we weren't.

23       Q.   In fact, you're just starting to get

24  references as a result of this email --

25       A.   Uh-huh.

1    Q.    -- right?

2    A.    Yes.

3    Q.    And what date does Mr. Alrai give you

4    references?  Is that in here --

5    A.    Somewhat later.

6    Q.    Yeah, that's not even until the end of

7    February or a little bit later, February 25th, right?

8    A.    A couple days later.

9    Q.    You get -- next page, I think -- but you get

10   some references and -- it's actually in the other email.

11   It wasn't even in this email.

12         But you know what date you called, right?

13   A.    March 1st.

14   Q.    March 1st.  Because that's on your notes.  So

15   you're first starting to call your references March 1st,

16   right?

17   A.    (Nods head.)

18   Q.    And then it took longer than that to talk to

19   Steve Anderson, right?

20   A.    Yes, it did.

21   Q.    Okay.  Okay.  All right.  So DigitalNet would

22   not have been in your space until sometime after the

23   beginning of March, right?

24   A.    That's correct.

25   Q.    All right.  And so even though you signed the

1   contract, that doesn't mean you were ready to go on

2   February 23rd, right?

3       A.   We didn't sign the -- I signed the contract,

4   not as a final document.  I don't, as I said, recall why

5   I did it on the 22nd, but it wasn't to be -- there was

6   pending -- it was pending additional information and I

7   don't know why that was.  It could have been, as I said,

8   that I might have been out of the office the following

9   week --

10       Q.   Okay.

11       A.   -- or whenever.

12       Q.   All right.  Well, let's -- but you remember

13   someone named Mac meeting with you when DigitalNet was

14   starting in your space?

15       A.   Yes or -- yeah, thereabouts, yes.

16       Q.   And you also know Kal, right?  Do you know

17   what Kal looks like?

18       A.   I do.

19       Q.   And was the person you met with Kal?

20       A.   No.

21       Q.   You're sure of that?

22       A.   Quite -- yes.

23       Q.   All right.

24       A.   I know what Kal looks like.  Kal was in our

25   space somewhat regularly.

1    Q.   Okay.  And you were also asked a lot about

2    United Way records about the RFP process, right?

3    A.   Yes.

4    Q.   And you were asked about whether it meant that

5    someone didn't do their job in finding records.  Do you

6    remember those questions?

7    A.   I do.

8         MR. HARRINGTON:  Judge, just to interject, I

9    didn't ask or suggest that people didn't obtain records.

10   My question was, well, did they do their job.  I just

11   want to make sure my question was accurately portrayed.

12        THE COURT:  Well, nobody object anymore about

13   how other people ask questions unless they're doing

14   something inappropriate.  You're allowed to twist and

15   misportray each other's questions.  That's called a

16   trial.

17        Seriously.  It's up to the witness to accept

18   or reject it or the trier of fact.  I'll let you go.  I

19   don't mean to take over.  There's no jury.  But if this

20   was in front of a jury, it would bother me.

21        So, you know, that's not an objection, that it

22   misstates the evidence or twists the question.  That's

23   up to the witness and the trier of fact to determine.

24   It's not up to you to interfere with each other's

25   questions.

1          So I'll give you latitude to do it because
2     there's no jury, but understand it's not going to be
3     sustained.  Go ahead.
4          Q.   Whose job was it as of 2013 at United Way to
5     keep accurate electronic records on -- on United Way's
6     electronic database?
7          A.   That was Mr. Alrai's job.
8          Q.   All right.
9          A.   So if things were missing --
10         Q.   I'm sorry?
11         A.   If the records are missing, then I don't know
12    why.
13         Q.   And whose property was the official
14    submissions of legitimate vendors who are submitting a
15    confidential proposal in response to a United Way RFP?
16    When they actually do the work, go to the trouble of
17    sending United Way a proposal, whose property does that
18    become?
19         A.   It becomes the United Way's property.
20         Q.   It's the company's property --
21         A.   Yes, it is.
22         Q.   -- right?
23              And is it, in your experience, the usual
24    course that a record of an RFP and the proposals that
25    are submitted is kept at United Way?

1      A.    Absolutely.

2      Q.    Did Mr. Alrai have permission from you or from

3 anyone at United Way that you know of to store on his

4 personal computer at his home in New Hampshire RFP

5 proposals that were sent to United Way in 2013 and

6 aren't at United Way anymore?  Did he have permission to

7 do that?

8      A.    No.

9      Q.    Did he ever tell you he was doing that?

10     A.    I -- until you just mentioned that, I did not

11 know that.

12     Q.    You were also asked questions about DigitalNet

13 and quality of service.  Do you recall that?

14     A.    I do.

15     Q.    And you said -- well, what did you -- what did

16 you say about your view of the quality of service that

17 you were getting from DigitalNet back when DigitalNet

18 was your managed IT services provider?

19     A.    I said that the services that we received from

20 DigitalNet was much better than it was prior to -- with

21 our old environment, in our old -- the old providers.

22     Q.    It was actually improved?

23     A.    It was improved.

24     Q.    All right.  But then you also said that you

25 had some additional views as a result of having

1   experienced your -- or having hired and experienced the

2   services of your current provider; is that right?

3        A.   That's absolutely true.

4        Q.   And does that give you a slightly different

5   perspective on the quality of service that DigitalNet

6   provided?

7        A.   It does.

8        Q.   And can you explain that?

9        A.   Well, I can tell you that our current provider

10  is providing more services than what we had under

11  DigitalNet for significantly less dollars at a minimum

12  of the same quality and, in some cases, better quality.

13            MR. DAVIS:  Nothing further.

14            THE COURT:  Thank you.

15            MR. HARRINGTON:  I have no other questions,

16  Judge.

17            THE COURT:  Thank you.

18            THE WITNESS:  Thank you.

19            THE COURT:  You are excused.  Next witness.

20                 (Witness excused.)

21            MR. HUNTER:  The government calls Faisal

22  Bhatti.

23            THE COURT:  Spell that last name.

24            MR. HUNTER:  B-h-a-t-t-i.

25            He's using the facilities, your Honor.

```
 1                  THE COURT:  That's okay.
 2                  THE CLERK:  Good afternoon, sir.  If you'd
 3   like to step this way, please.
 4                  If you could step into the witness box and
 5   remaining standing, please.
 6                  Please raise your right hand.
 7           FAISAL BHATTI, having been first duly sworn,
 8   testified as follows:
 9                  THE CLERK:  For the record, please state your
10   full name and spell your last name for the record.
11                  THE WITNESS:  First name is Faisal
12   F-a-i-s-a-l; last name Bhatti, B-h-a-t-t-i.
13                  THE CLERK:  Thank you.  Please be seated.
14                       DIRECT EXAMINATION
15   BY MR. HUNTER:
16        Q.   Good afternoon, Mr. Bhatti.
17        A.   Good afternoon.
18        Q.   We have a court reporter here in the courtroom
19   and a number of people need to hear you, so I'd just ask
20   that you speak directly into the microphone.
21        A.   Sure.
22        Q.   Mr. Bhatti, where are you from?
23        A.   From Houston, Texas.  Actually, Stafford,
24   Texas.
25        Q.   Is that where you live now?
```

1  A. Yes.

2  Q. And where did you live before that?

3  A. I was in Atlanta for three years and for the

4 most part, I was in Houston or in Stafford.

5  Q. Did you ever live in Pakistan?

6  A. Yes.

7  Q. And when was that?

8  A. Actually, most of my life, I lived in Oman.

9 Oman is a country in the Middle East and I was in

10 Pakistan for four years, from 1986 to 1989, I believe.

11  Q. Okay.  And what is your current job, sir?

12  A. I'm in IT.  My title is IT system analyst.

13  Q. With what company?

14  A. Stewart Title.

15  Q. How long have you had that job?

16  A. Two years.

17  Q. Have you been in IT most of your career?

18  A. Yes.

19  Q. Have you ever worked for an IT company called

20 DigitalNet?

21  A. No.

22  Q. Or AISA Consulting?

23  A. No.

24  Q. Or AISA Corporation?

25  A. No.

1      Q.   Do you know a gentleman named Imran Alrai?

2      A.   I do.

3      Q.   Do you see him in the courtroom?

4      A.   I do.

5      Q.   Can you point him out?

6      A.   Right there.

7           THE COURT:  He's identified him.

8           MR. HUNTER:  Thank you.

9      Q.   When did you first meet Mr. Alrai?

10     A.   It was in summer 1991.

11     Q.   And where did you meet him?

12     A.   In Sahiwal, Pakistan.

13     Q.   And -- what was the circumstances of you guys

14  meeting?

15     A.   So we were there similar to ROTC training that

16  we have here.  So it's a similar training that we went

17  in Pakistan.  We got extra credit for doing that.  So

18  that's where I met him --

19     Q.   Okay.

20     A.   -- in summer of 1991.

21     Q.   And was this when you were about in high

22  school?

23     A.   I was in 11th grade, yes.

24     Q.   11th grade.

25          THE COURT:  All right.  So it was part of your

54

1    high school education?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Not part of college, not -- not a

4    scholarship --

5            THE WITNESS:  No, sir.  No.

6            THE COURT:  Okay.  Thank you.

7       Q.   And how long were you with Mr. Alrai during

8    that period?

9       A.   I believe it was six-week training.

10       Q.   Okay.  And after -- after you completed high

11   school -- that training in high school, what did you do?

12       A.   So after the training, I went back to Oman.

13   And Imran, he came from Saudi Arabia.  So we went back.

14   He went to Saudi and I went back to Oman.

15       Q.   Okay.  Did you keep in touch with Mr. Alrai?

16       A.   Not when I was in Oman.

17       Q.   Okay.  And at what point did you come to the

18   U.S.?

19       A.   1992, fall of 1992.

20       Q.   And did you see Mr. Alrai at some point after

21   that?

22       A.   After I came to U.S.?

23       Q.   Yes.

24       A.   Yes.  So I believe it was in 1994 or 1995, he

25   called me.  He was in Arkansas at that time and he told

1    me that he -- he's also in U.S.  Because I wasn't aware

2    that he's in U.S.

3         Q.   Okay.

4         A.   So, yes, I think that was in 1993 or '94.  I

5    don't remember exactly the year, but around that time.

6         Q.   Okay.  And it's perfectly fine if you don't

7    remember the exact year.

8              And where were you living when Mr. Alrai

9    reached out to you?

10        A.   I was in Houston.

11        Q.   And did Mr. Alrai move to Houston?

12        A.   He did.

13        Q.   And were you roommates for a period of time in

14   Houston?

15        A.   We were roommates, at least for a year, then

16   we moved to a different apartment with some other

17   roommates.  But we were roommates.  Like I said, for at

18   least a year we were roommates.

19        Q.   Okay.  And did Mr. Alrai eventually move out

20   when he got married?

21        A.   He did.

22        Q.   All right.  And did -- and did Mr. Alrai

23   eventually leave Texas?

24        A.   He did.

25        Q.   And when did you interact with him next?

1    A.    So he got married in Houston.  I attended that

2    wedding.  I don't remember the exact year, but I think

3    it was late '90s or early 2000 when he got married.

4    Soon after, I find out that he moved out of Houston.

5         After that, I believe I met him in 2001 or

6    2002.  I was in Virginia for a friend's wedding.  I met

7    him there.  He brought some homemade food and we chatted

8    for a few hours.

9         After that we met in 2006 or 2007.  Again, I

10   don't remember the exact year, but it was not 2008.  I

11   think it was 2006 or 2007.

12   Q.    Okay.

13   A.    We met in New York.  I was there -- we were

14   there to -- with our friend, Mr. Khan.  We were there

15   for I think two or three days.  That was, like I said,

16   in 2007.

17        After that I met him in 2014.

18   Q.    And was that in Houston?

19   A.    That was in Houston, yes.

20   Q.    Is that the last time you saw him?

21   A.    That was the last time I met him, yes.

22   Q.    And what -- what was it that brought you

23   together in Houston?

24   A.    In 2014?

25   Q.    Yes.

1      A.   So my father passed away in 2013, September,

2  and he came to -- just to convey his condolences in

3  2014.

4      Q.   At that time did Mr. Alrai mention he was

5  trying to start a business?

6      A.   He did.  He briefly mentioned that he opened

7  an IT company.  I asked him what kind of business.  He

8  said it's an IT services company.  I didn't ask him the

9  details.  But, yes, he did mention that.

10     Q.   Did he mention the name?

11     A.   He did, and I actually forgot the name until I

12  talked to Agent Todd.  And when he mentioned that name,

13  then it came back to me that he did mention DigitalNet,

14  I think.

15     Q.   You think the name was DigitalNet?

16     A.   Yes.

17     Q.   And you mentioned you'd never worked for

18  DigitalNet.  Is that -- is that true?

19     A.   That is correct.

20     Q.   Okay.  Have you and Mr. Alrai ever been

21  employed by the same company?

22     A.   You mean DigitalNet?

23     Q.   Any -- any company.

24     A.   No.

25     Q.   Thinking back to 2012, did Mr. Alrai ever use

1   you as a job reference or did he ask -- rather, did he

2   ask to use you as a job reference?

3         A.   He did.  He did.

4              MR. HUNTER:  All right.  I'd like to put

5   Government Exhibit 654 on the screen.

6         Q.   Okay.  And so do you recognize this document?

7   If we need to --

8         A.   I do.

9         Q.   Okay.  What is it?

10        A.   This is an email that Imran sent me in -- on

11   March 12th, 2012.

12        Q.   Okay.  And it looks like in August 2019, you

13   forwarded it to Mr. Donnelly?

14        A.   That is correct.

15             MR. HUNTER:  Okay.  I move to strike the

16   identification of this exhibit.

17             MR. HARRINGTON:  No objection, Judge.

18             THE COURT:  Admitted.

19             (Government's Exhibit 654 admitted.)

20             MR. HUNTER:  All right.  Ms. Sheff, could you

21   go down a page, page 2, to the bottom email.

22        Q.   Okay.  Is this an email from Mr. Alrai to you?

23        A.   Yes.

24        Q.   And do you recognize this email address?

25        A.   Yes.

1       Q.   Imran.Alrai@gmail.com?

2       A.   Yes.

3       Q.   And is this your email before that?

4       A.   That's correct.

5       Q.   Could you please read the email?

6       A.   It says:  AOA, Faisal, I have given your name

7    as a reference with a job with United Way.  If they

8    contact you, please give me a call before talking to

9    them.  Much appreciated.  Hope all is well.  Imran

10   Alrai.

11      Q.   Thank you.

12           And, Ms. Sheff, can you go to the next email

13   in the chain?  Or, actually, can you see that, how you

14   responded?

15      A.   Yes, I can see that.

16      Q.   What did you say?

17      A.   I said I will do.

18      Q.   And did Mr. Alrai write back?

19      A.   He said what is the best number to call you?

20           MR. HUNTER:  Okay.  Can you go up to the next

21   page, Ms. Sheff.

22      Q.   And does your reply appear?

23      A.   That is correct.

24      Q.   Okay.  Is that your phone number?

25      A.   That is correct.

1    Q.    Okay.  So you provided your phone number as a

2    reference.  What email would you expect to be used as a

3    job reference?

4    A.    I had this AOL account for the last 21 years

5    and this is the only email I use for -- for my job

6    posting, when I would apply for a job.  This is the only

7    email address that I use.

8    Q.    So this AOL account is your only --

9    A.    That's correct, yes.

10    Q.    -- email address?

11    A.    Yes.

12    Q.    Let me just ask that again.  Just for the

13    court record, we can't talk over each other?

14           Is this AOL email address the only email

15    address you use?

16    A.    That is correct.

17    Q.    Did you ever speak with someone from United

18    Way to provide a reference for Mr. Alrai?

19    A.    I don't think anyone reached me from United

20    Way.

21    Q.    Did you ever email with anyone --

22    A.    No.

23    Q.    -- from United Way?

24    A.    No.

25    Q.    Did you ever email with anyone from United

1    Way?

2         A.    No, I did not.

3         Q.    And prior to your initial interview with

4    Mr. Donnelly, did you know whether or not Mr. Alrai ever

5    got a job with United Way?

6         A.    I was not aware of it.

7              MR. HUNTER:  Okay.  Could we please put

8    Exhibit 604 on the screen.  Yes.  It's marked -- okay.

9              Ms. Sheff, can you go down to I think it's

10   page 2 or 3 of this document?

11             THE COURT:  Well, which is it, 2 or 3?

12             MR. HUNTER:  That is -- that's a good

13   question, your Honor.

14             MR. HUNTER:  All right.  So -- and, actually,

15   I will say we anticipate calling a witness who can

16   authenticate this, but does defense counsel object if we

17   strike the identification on this document?  I can --

18             MR. HARRINGTON:  Yup.  No, I don't.  Go ahead.

19   Mark it.

20             MR. HUNTER:  All right.  I move to admit this

21   as an exhibit, a full exhibit.

22             THE COURT:  What number?

23             MR. HUNTER:  This is Exhibit 604.

24             THE COURT:  604, admitted.

25             (Government's Exhibit 604 admitted.)

1          MR. HUNTER:  All right.  So let's just start

2   with this email here.  Ms. Sheff, could you zoom in on

3   this March 1st email from Nicole Nash?

4          MS. SHEFF:  The next one?

5          MR. HUNTER:  Oh, no, this is good.

6      Q.   So Ms. Nash is saying:  Great, one more thing,

7   if you have a moment, please send me three business

8   references, thank you, Imran, signed Nicole.

9          Do you see that?

10         THE WITNESS:  I do.

11         MR. HUNTER:  Okay.  Ms. Sheff, could you go to

12  the next page or page 2?

13     Q.   All right.  And so could you read the "from"

14  field here?

15     A.   From Imran Alrai.

16     Q.   Is that Mr. Alrai's Gmail account address that

17  we were talking about earlier?

18         Can you zoom in on that?

19     A.   Yes, it is.

20     Q.   Okay.  Thank you.

21         And you see where it says:  Hi Nicole,

22  following are the business references you requested.

23         Do you see that?

24     A.   I do.

25     Q.   All right.  And at the very bottom, is that

1   your name, Faisal Bhatti, Senior Vice-President North

2   America?

3        A.   That's my name.

4             MR. HUNTER:  Okay.  Ms. Sheff, could you go to

5   the next page?  The email continues on to page 3, and

6   could you zoom in on this.

7        Q.   Okay.  So Senior Vice-President North America,

8   AISA Corporation.

9        A.   AISA.

10       Q.   Have you ever worked for AISA Corporation?

11       A.   No, I did not.

12       Q.   Is this your phone number?

13       A.   That's my phone number.

14       Q.   And is that the number you've provided

15   Mr. Alrai in the prior email we saw?

16       A.   That is correct.

17       Q.   And then here's an email address.  Could you

18   read that, please?

19       A.   Faisal.Bhatti@ASIAconsulting.com.

20       Q.   Okay.  So the company is AISA Corporation, but

21   the email address is AISA Consulting; is that right?

22       A.   That is correct.

23       Q.   Did you ever have that email address?

24       A.   I never had that email address.

25       Q.   And did you ever work for a company called

1    AISA Consulting?

2         A.    No, I have not.

3         Q.    And it also says preferred frequent traveler.

4    Do you see that?

5         A.    I do.

6         Q.    Do you consider yourself to be a frequent

7    traveler?

8         A.    I don't.

9         Q.    How often do you travel?

10        A.    Once or, at the most, twice with the family,

11   twice a year.

12        Q.    Twice a year?

13        A.    Once or twice a year, yes.

14             MR. HUNTER:  All right.  Now, Ms. Sheff, could

15   you go to page 1 of this email chain.

16             Okay.  Could you zoom in on this March 12th

17   email?  It looks like it's from an email address

18   resume@supportunitedway.  And could you just zoom in to

19   include the person who signed the email?

20             MS. SHEFF:  Yeah.

21             MR. HUNTER:  Sorry about that.

22        Q.    Okay.  Could you just start where it says

23   "I've emailed."  Could you read that --

24        A.    I have emailed Steve and Faisal as you

25   suggested today after leaving a voicemail last week.  Is

1   Steve or Faisal a previous supervisor of yours?  If not,

2   would you be able to send me a manager or supervisor

3   reference?  Nicole.

4       Q.   So that's signed by Nicole Nash; is that

5   right?

6       A.   Correct.

7       Q.   All right.

8       A.   Yes.

9       MR. HUNTER:  Okay.  And, Ruth, could you go to

10   the top email.

11       Q.   Okay.  Who is this email from?

12       A.   It appears it came from Imran.

13       Q.   Okay.  And you recognize his Gmail address

14   again.  Do you recognize his Gmail address?

15       THE COURT:  I do.  Go ahead.

16       MR. HUNTER:  Okay.  Thank you, your Honor.

17       Q.   All right.  Could you read this email from

18   Mr. Alrai?

19       A.   "Hi Nicole, Steve is the CEO and I was

20   reporting directly to him.  Faisal managed the North

21   American operations and I had a dotted-line relation to

22   him as well.  Both of them should be able to shed some

23   light on my personality and work ethics from supervisory

24   point of views.  Thanks, Imran Alrai."

25       Q.   Have you ever supervised Mr. Alrai?

1          A.    No, I have not.

2          Q.    Have you ever managed North American

3     operations, presumably for AISA Corporation?

4          A.    No, I have not.

5          Q.    Are any of the statements in this email about

6     you true?

7          A.    It's not.

8                MR. HUNTER:  Okay.  Ms. Sheff, could you

9     please put Government Exhibit 603 on the screen.

10               Could you please just zoom in on the to-from

11    information at the top.

12         Q.    Mr. Bhatti, is that your name?

13         A.    That is my name.

14         Q.    I know we've covered this ground, but have you

15    ever sent an email from ASIAConsulting.com?

16         A.    I have not.

17         Q.    Have you ever sent an email to Nicole Nash?

18         A.    I never sent an email to Nicole Nash.

19         Q.    Okay.  And so how does Faisal in this email

20    start the email?

21         A.    I'm sorry.  Can you repeat the question?

22         Q.    How does the email begin?  Could you just read

23    the first line?

24         A.    "Nicole, see my comments below."

25               MR. HUNTER:  Okay.  And so, Ms. Sheff, could

1    you actually just go down to the bottom of the email

2    really quickly, page 3?  Page 2.

3           Could you just -- yeah, just zoom in on that

4    top paragraph.

5        Q.   Is this an email from Nicole Nash reaching out

6    to Mr. -- a Mr. Bhatti?

7        A.   Yes.

8        Q.   And could you just read the last -- could you

9    just read the last two sentences?

10       A.   Last two sentences?

11       Q.   Yes.  Or you can read the whole email.  You

12   can read the whole email.

13       A.   "My name is Nicole Nash and I am reaching out

14   to you because you have been given as a reference for

15   Imran Alrai.  He has applied for our senior director

16   information technology position.  I would like to know

17   more about your working relationship with Imran.  Please

18   take a moment to respond to the following questions."

19           MR. HUNTER:  Okay.  And now we can go to the

20   top email, page 1.

21       Q.   Okay.  Sir, you read this where it says Nicole

22   "see my comments below," and here does it appear that

23   there are bold responses to each of the questions

24   Ms. Nash asked on the prior page?

25       A.   Yes.

1      Q.   Okay.  So let's read the first question:   How

2  long have you known Imran.

3           What's the response?

4      A.   Since 1998.

5      Q.   Is that true?

6      A.   No.

7      Q.   Okay.

8           "What is your working relationship with

9  Imran?"

10          What does it say there?

11      A.   "He worked with me at AISA.  I depended

12  heavily on him and his staff to provide support for the

13  North American services.  We worked very closely

14  together and enjoyed a great relationship."

15      Q.   Is that accurate?

16      A.   No, it's not.

17      Q.   Did you write that?

18      A.   I did not.

19      Q.   Okay.  The next question:  How would you

20  describe organization -- his organizational skills and

21  work ethic?

22      A.   Do you want me to read that?

23      Q.   Well, I can -- did you -- does this describe

24  his work ethic as excellent, perfect, and exemplary?

25      A.   I'm sorry?

1    Q.    You can read it, sir.  You can read it.

2    A.    Okay.

3         "Excellent, perfect, exemplary.  He was always

4    ahead of schedule and paid great attention to details,

5    well organized and proactive, great personal morals and

6    highest level of work ethics.  I learned a lot from him

7    and his management style."

8    Q.    Did you write that?

9    A.    I did not.

10    Q.    "What are his greatest strengths and

11    weaknesses?"

12    A.    You want me to read that out?

13    Q.    Please do.

14    A.    "People management skills and overall

15    knowledge that he offered added the most value for me.

16    I respect him as a very responsible individual who took

17    his commitments very seriously.  I never had to worry

18    about any" --

19    Q.    I think it goes on to the next page.

20    A.    -- "responsibilities that I assigned to him

21    or he volunteered for.  He was very successful at

22    negotiating with both internal and external clients to

23    build mutual stakes and partnerships."

24    Q.    Did you write that?

25    A.    I did not.

```
 1           Q.   And, finally, "how is he to work with?"
 2                Can you read the --
 3           A.   "He was a joy to work with, had great
 4     attitude, always optimistic and upbeat.  I found him to
 5     be very knowledgeable, very wise person, and a trusted
 6     partner, full of positive energy and creativity."
 7           Q.   And did you write that?
 8           A.   I did not.
 9                MR. HUNTER:  I move to admit Exhibit 603.
10                MR. HARRINGTON:  Oh, I apologize, Judge.  I
11     was talking to my client.  There's no objection.
12                THE COURT:  Admitted.
13                (Government's Exhibit 603 admitted.)
14                MR. HUNTER:  No further questions.
15                THE COURT:  Thank you, Counsel.
16                Cross-examination.
17                MR. HARRINGTON:  No questions for this
18     witness, Judge.
19                THE COURT:  Sir, you're excused.  Thank you.
20                THE WITNESS:  Thank you very much, sir.
21                     (Witness excused.)
22                THE COURT:  Charli, how are we doing on time?
23                THE CLERK:  I think about five minutes more
24     and it will be break time.
25                THE COURT:  All right.  Who's your next
```

1    witness, Counsel?

2          MS. LE:  Khurra Khan, your Honor.

3          May I have a restroom break before we get

4    started, though?

5          THE COURT:  Yes.

6          MS. LE:  Thank you.

7          THE COURT:  See how easy it is?  All right.

8    Thank you.  After the recess.

9        (Recess taken from 3:29 p.m. until 3:47 p.m.)

10         MR. HUNTER:  Your Honor, one housekeeping --

11         THE COURT:  Yeah.

12         MR. HUNTER:  -- matter.

13         Mr. Bhatti asked if he could stay in the

14   courtroom for the rest of the day.

15         THE COURT:  Sure.

16         MR. HUNTER:  The government doesn't intend to

17   recall him.  I defer to defense counsel.

18         THE COURT:  Sure.

19         MS. LE:  Your Honor, the government calls

20   Khurra Khan to the stand, please.

21         THE CLERK:  Good afternoon, sir.  Would you

22   like to come through the gate and step this way.

23         If you could step into the witness box and

24   remaining standing, please.

25         Please raise your right hand.

1          **KHURRA KHAN**, having been first duly sworn,

2     testified as follows:

3          THE CLERK:  And for the record, please state

4     your full name and spell your last name.

5          THE WITNESS:  Sure.  First name is Khurra,

6     K-h-u-r-r-a, last name is Khan, K-h-a-n.

7          THE CLERK:  Thank you.  Please be seated.

8          THE WITNESS:  Thank you.

9                    DIRECT EXAMINATION

10    BY MS. LE:

11         Q.   Good day, sir.

12         A.   Good day.

13         Q.   Mr. Khan, where do you live?

14         A.   I live in Long Island, New York.

15         Q.   How long have you lived in Long Island,

16    New York?

17         A.   Almost ten years.

18         Q.   Thank you for traveling here for this case.

19         A.   Thank you.

20         Q.   Sir, do you work?

21         A.   Yes.

22         Q.   What do you do for a living?

23         A.   I work in IT.

24         Q.   Okay.  Do you have an educational background

25    in IT?

73

1      A.    Yes, I do.

2      Q.    Would you tell the Court a little bit about

3  your educational background?

4      A.    Sure.  I never complete the bachelor's degree,

5  but I have a few hours shy of bachelor's degree.  So

6  that is what I have.  But I have completed multiple

7  certifications in IT.  And that is what I have.

8      Q.    Okay.  And have you worked in IT?

9      A.    Yes.

10      Q.    Can you give the -- I'm sorry.

11      A.    Yeah, all my life.

12      Q.    All your life?

13      A.    Yes.

14      Q.    Can you give the Court a little summary about

15  your work background in IT?

16      A.    Sure.  Currently I'm working for the Catholic

17  Health Systems.  It's a hospital system in Long Island,

18  New York.

19            Prior to that, I was working for another

20  health system called Northwell.  Prior to that I was

21  working for a Japanese company called Fujitsu,

22  F-u-j-i-t-s-u.  And prior to that, I was working

23  installing info systems.

24      Q.    Okay.

25      A.    And before that, I was working in Barneys.

1      Q.    Okay.  So how long have you been with the

2  Catholic Health System, your current employer?

3      A.    Three months.

4      Q.    Three months.  What is your title there?

5      A.    Director of desktop services.

6      Q.    And your job immediately prior to your current

7  job, what was that?

8      A.    Northwell system, I was a manager of desktop

9  services.

10     Q.    Okay.  How long were you there?

11     A.    Three -- six months.

12     Q.    Okay.  And did you ever work for a company

13  called Heritage Health in Harlem?

14     A.    Yes.

15     Q.    How long did you work there?

16     A.    I worked over there briefly three months.

17     Q.    Okay.  What time frame did you work for --

18     A.    That was --

19     Q.    -- Heritage Health?

20     A.    That was somewhere between last year from

21  October till December.

22     Q.    So October, December 2018?

23     A.    Yes.

24     Q.    Okay.  How long did you work for Fujitsu?

25     A.    Four years.

```
1        Q.   Okay.  And when was that?

2        A.   From 2014 to 2018.

3        Q.   Sir, do you know Imran Alrai?

4        A.   I'm sorry?

5        Q.   Do you know Imran Alrai?

6        A.   Yes, I do.

7        Q.   Okay.  Do you see him in court today?

8        A.   Yes, I do.

9        Q.   Is he at counsel table in the middle right

10  there?

11       A.   That is correct.

12       Q.   Thank you.  How --

13            THE COURT:  He has identified him.

14            MS. LE:  Thank you, your Honor.

15       Q.   How do you know Mr. Imran Alrai?

16       A.   I met him through Faisal Bhatti back in 1995,

17  '96.

18       Q.   So what is that, like 23, 24 years?

19       A.   23 years.

20       Q.   Would you give the Court just a little bit of

21  a background on your relationship with Faisal Bhatti and

22  Imran Alrai?

23       A.   We are friends.  We met through school.  We

24  all used to go to Texas Southern University, but Faisal

25  and I went to classes together and all of that.  Imran
```

1    would never be in my classmate or anything like that.

2        Q.    Okay.  And was Texas Southern University in

3    Houston, Texas?

4        A.    That is correct.

5        Q.    You didn't attend classes together.  Did you

6    become friends through Mr. Bhatti, then, with Mr. Alrai?

7        A.    That is correct.

8        Q.    Okay.  And through the years have you

9    maintained that friendship?

10       A.    That is correct.

11       Q.    How?

12       A.    Through phone calls, through sometimes --

13   because we live pretty far away from each other, so we

14   rarely meet, but usually from the phone.

15       Q.    Okay.  And have you been to his home?

16       A.    Twice.

17       Q.    Okay.  Where have you visited him?

18       A.    When he used to live in I believe in Boston

19   and when he purchased a house in New Hampshire.

20       Q.    Okay.  So you've been to his home in Windham,

21   New Hampshire?

22       A.    That is correct.

23       Q.    Okay.  Has he been to your home?

24       A.    Yes, twice.

25       Q.    Okay.  And where did you live when he visited

1  you?

2       A.    When I used to live in Farmingdale,

3  Long Island, he visited once over there and then one

4  time he came out for a business purpose and we just met.

5       Q.    Okay.

6       A.    Yeah.

7       Q.    And did you and Mr. Imran visit Mr. Bhatti at

8  some point in Houston, Texas?

9       A.    Yes, we all get together once.

10      Q.    Okay.  And when was that, sir, if you

11 remember?

12      A.    I do not recall the year, but it was like

13 three years back or four years maybe.

14      Q.    Okay.  Now, I want to talk to you about a

15 company called DigitalNet Technology Solutions.  Okay?

16 Are you familiar with that company?

17      A.    Yes.

18      Q.    Okay.  How do you know the name of that

19 company?

20      A.    Through Imran.

21      Q.    Okay.  What did Imran tell you?

22      A.    That he opened his business and that is his

23 company name.

24      Q.    When would he have told you first about

25 DigitalNet?

1     A.    I believe four years, five years back.

2     Q.    Okay.  Was this on the same -- around the same

3  time you went to visit Mr. Bhatti in Houston or was this

4  a different time?

5     A.    I believe that is the same time.

6     Q.    Okay.  And what did he tell you about the

7  business?

8     A.    He told me about that it's a consulting

9  company.  He does lots of IT-related and I never asked

10  so many questions on to it.  He shared his website.

11  That is it.

12     Q.    Okay.  Did you help him with anything?

13     A.    No.

14     Q.    Okay.  Did you -- did he ask you to review the

15  website or give him any other advice?

16     A.    I visited his website because he shared, you

17  know, we talk about professionally said the website

18  looks very good and all that.  Besides that, never any

19  professional or any kind of input in it.

20     Q.    Okay.  Now, have you ever been a personal

21  reference for when Imran Alrai looked for work?

22     A.    No.

23     Q.    Okay.  Have you ever been a reference for

24  Imran Alrai through his company DigitalNet?

25     A.    No.

1      Q.    Okay.  When you -- when -- remember he told

2  you that he'd opened a new company?  Did he tell you who

3  worked for him?

4      A.    No.

5      Q.    Okay.  Did he tell you who the clients were?

6      A.    No.

7      Q.    Okay.  So what did you know about DigitalNet?

8      A.    I visited the website when he told me that and

9  that is it.  That is all I know about.  It's a

10  consulting company.  He does lots of things.  Besides

11  that, I do not know about his business, what he does,

12  who his clients and all of that.

13      Q.    Okay.  Did he tell you the company was based

14  in the U.S. or in some other place?

15      A.    That is -- that is what my understanding,

16  maybe the company is in U.S.  Besides that, I never

17  asked.

18      Q.    Okay.  Did he tell you about any employees in

19  Pakistan, for instance?

20      A.    He never told me that, but I kind of figure it

21  out myself.

22      Q.    How so?

23      A.    I believe because through the consulting

24  business and it's -- offshore is much cheaper.  So that

25  is how.  But he never told me where in Pakistan and all

1    that.  So I'm not aware who his employees are or

2    anything like that.

3         Q.   So it sounds to me, based on your answer,

4    you're making an assumption, you don't actually know.

5         A.   That is correct.

6         Q.   Okay.  Now, have you ever used the services of

7    DigitalNet?

8         A.   Yes.

9         Q.   When?

10        A.   At Heritage Health, when I was employed over

11   there, and one of our servers went down.  So I asked him

12   to help me out because his company or himself, they may

13   have expertise.  So I asked him and he said that he can

14   do it; he can help me out.

15        Q.   And this is when you worked at Heritage

16   Health, that company in Harlem --

17        A.   New York --

18        Q.   -- is that right?

19        A.   -- that is correct.

20        Q.   And you worked there for three months, right?

21        A.   That is correct.

22        Q.   What was your job title there when you were --

23        A.   Director of IT.

24        Q.   Okay.  So was this a long-running project or a

25   pretty short duration project?

1      A.    No, just a small project.  It's not even a

2  project.  We need immediate help and we don't have an

3  in-house, any expert person.  So that's why I seek his

4  help.

5      Q.    Okay.  So this happened in 2018?

6      A.    That is correct.

7      Q.    Before 2018, did you use DigitalNet for any

8  services?

9      A.    No, ma'am.

10     Q.    Did any of the companies you worked for use

11  DigitalNet for any services?

12     A.    No.

13     Q.    Okay.  In February or March of 2013, were you

14  working?

15     A.    I believe so.

16     Q.    Were you working at Barneys at that time?

17     A.    That is.

18     Q.    Okay.  Where was Barneys located?

19     A.    In Midtown Manhattan, New York.

20     Q.    Did you have an office in the Midtown office?

21     A.    I have an office in Midtown Manhattan and in

22  Lyndhurst, New Jersey.

23     Q.    Okay.  And how would you split your time

24  between the Barneys New York office and the Barneys

25  New Jersey office?

1      A.    I'd start my day in Manhattan and then around

2    like 11:30, I traveled to New Jersey.

3      Q.    How would you travel from Midtown Manhattan to

4    New Jersey?

5      A.    I used the company's van.  They take -- they

6    shuttle the employees.

7      Q.    Okay.  Do you know the defendant's father, Mac

8    Chaudhary?

9      A.    No.

10      Q.    Okay.  You've never met Imran Alrai's father?

11      A.    I met him --

12      Q.    Okay.

13      A.    -- twice.

14      Q.    Twice.  Do you know his name?

15      A.    No, not really.

16      Q.    Okay.  When you would meet Imran's father, how

17    would you address him?

18      A.    Just like sir or with respect and all of that

19    because it's my friend's father.

20      Q.    All right.  So during your relationship with

21    Imran over 20-plus years, you never learned the name of

22    his father?

23      A.    It never goes through my mind should I ask him

24    his father's name.

25      Q.    Okay.  That's fair.

1          Sir, what is your ethnic background?

2      A.   We are Pakistanis.

3      Q.   Okay.  And how about Imran's ethnic

4  background?

5      A.   Pakistani.

6      Q.   Okay.  Did you ever learn what Imran's father

7  did for a living?

8      A.   I believe he -- a long time ago, he told me

9  his father was a doctor.

10      Q.   Okay.  Were you ever told that his father

11  worked in IT?

12      A.   No.

13          MS. LE:  Okay.  Now, I'd like to show you

14  Government Exhibit -- let's see -- 610.

15          Ms. Sheff, could you pull that up, please, and

16  if you could turn to page 580.

17          This has already been admitted into evidence,

18  your Honor, just for the record.

19          THE COURT:  Yup.

20          MS. LE:  Okay.

21      Q.   So here there is a section called Customers?

22      A.   Uh-huh.

23      Q.   All right.  And it reads:  DigitalNet has

24  presence in the U.S., South Asia, and Middle East, with

25  many contented customers.  As per DigitalNet's security,

1    privacy, and legal compliance policy, we do not share

2    any specific customer information without their prior

3    consent.

4            And below it says:  Please provide two to

5    three customer references U.S.-based.

6            Do you see there's a name at the bottom there?

7        A.   Yes.

8        Q.   K. Salman Khan, IT director, Barneys New York,

9    New York, New York, phone 212-450-8667?

10       A.   That is correct.

11       Q.   Okay.  Is K. Salman Khan your name?

12       A.   Yes.

13       Q.   Okay.  Were you ever the IT director at

14   Barneys?

15       A.   No.

16       Q.   What job did you hold at Barneys?

17       A.   IT manager.

18       Q.   Okay.  And that phone number, do you recognize

19   it?

20       A.   Yes.  That is my desk number.

21       Q.   Which desk?

22       A.   In New York office.

23       Q.   Okay.  During your tenure at Barneys, which I

24   believe you said was about -- sorry.  How long did you

25   work at Barneys?

1    A.   Three months.

2    Q.   Three months.  During those three months that

3    you worked at Barneys, did DigitalNet ever do any work

4    for Barneys?

5    A.   No.

6    Q.   Okay.  And, to your knowledge, has DigitalNet

7    ever performed any work for Barneys?

8    A.   No.

9         MS. LE:  Ms. Sheff, can you turn to page 581?

10        Okay.  The section here, Ms. Sheff.

11   Q.   Okay.  This is just a continuation from the

12   last page.

13   A.   Uh-huh.

14   Q.   Do you see a name that you recognize?

15   A.   No.

16   Q.   Do you know a person named Nabil Ejaz?

17   A.   Yes.

18   Q.   Okay.  Do you know a Nabil Ejaz who works as

19   IT director, Abilities, Incorporated, New York,

20   New York?

21   A.   No.

22   Q.   Okay.  Who is the Nabil Ejaz that you know?

23   A.   If I'm not mistaken, if it is the same Nabil

24   Ejaz, then we used to work together.

25   Q.   Okay.  Tell us about your relationship with

1    Nabil Ejaz.

2        A.    We were in completely two different

3    departments --

4        Q.    Okay.

5        A.    -- and we just briefly say hello if you ran

6    into each other.  That's it.

7        Q.    Okay.  Did you know Mr. Ejaz from your work

8    together at the Merchant Marine Academy?

9        A.    That is correct.

10       Q.    When did you work at the Merchant Marine

11   Academy?

12       A.    I believe in 2016 --

13       Q.    Okay.

14       A.    -- if not mistaken.  I'm not recalling the

15   date.

16       Q.    Sure.  So you don't know for sure, but you do

17   agree you worked with him?

18       A.    Yes.

19       Q.    All right.  As far as you know, does Nabil

20   Ejaz who worked with you know Imran Alrai?

21       A.    No, I never knew that.

22       Q.    One more question.  Where was the Merchant

23   Marine Academy located?

24       A.    It's in Kings Point, Long Island, New York.

25              MS. LE:  Thank you, your Honor.  No further

```
 1    witness.  We tender the witness.
 2             THE COURT:  Can you put that exhibit back up?
 3             MR. DAVIS:  610.
 4             MR. HARRINGTON:  Judge, I don't have any other
 5    questions.
 6             THE COURT:  Okay.
 7             MS. LE:  Do you want it on the last page that
 8    we were on, your Honor?
 9             THE COURT:  Yeah.
10             MR. HARRINGTON:  I had that as 580, Counsel.
11             MS. LE:  581 was the last page we were on.
12    I'll clear the screen.
13             THE COURT:  All right, sir, you're excused.
14    Thank you.
15             THE WITNESS:  Thank you so much.
16                     (Witness excused.)
17             MR. DAVIS:  Government calls Nabil Ejaz.
18             THE CLERK:  Good afternoon, sir.  If you'd
19    like to step this way.
20             If you could step into the witness box and
21    raise your right hand.
22             Please raise your right hand.
23             NABIL EJAZ, having been first duly sworn,
24    testified as follows:
25             THE CLERK:  For the record, please state your
```

1    full name and spell your last name.

2         THE WITNESS:  Nabil Ejaz, E-j-a-z.

3         THE CLERK:  Thank you.  Please be seated.

4                       DIRECT EXAMINATION

5    BY MR. DAVIS:

6         Q.   Please state your name.

7         A.   Nabil Ejaz.

8         Q.   And could you lean forward, please, and get a

9    little closer to the microphone.

10        A.   Sure.

11        Q.   Thank you.

12             And how are you employed?

13        A.   I work for the U.S. Merchant Marine Academy.

14        Q.   And speak slowly, please, because the court

15   reporter is taking it down.

16             What do you do for the U.S. Merchant Marine

17   Academy?

18        A.   I'm a senior network engineer.

19        Q.   And how long have you been working at Merchant

20   Marine?

21        A.   About seven years almost.

22        Q.   All right.  And did you start in March of

23   2012?

24        A.   I did.

25        Q.   Okay.  And can you state a little bit about

1  your background and education?

2       A.    Sure.  I went to New York Tech for my

3  bachelor's in computer science and moved out to a

4  full-time job, got some certifications in the meantime

5  IT-related, also started pursuing my master's for a bit,

6  but I kind of dropped off with that and kept working

7  full time.

8       Q.    Okay.  And you're now in the IT department at

9  Merchant Marine Academy?

10      A.    Yes, I am.

11      Q.    Okay.  Let me show you Exhibit 401, the second

12 page of Exhibit 401.  These are some handwritten notes.

13 Do you see those?

14      A.    Yes, I do.

15      Q.    And you see the date March 1st of 2013,

16 right --

17      A.    (Nods head.)

18      Q.    -- up on the left?

19      A.    Yes, I do.

20      Q.    And there's a phone number.  Is that your

21 name, Nabil Ejaz?

22      A.    Yes, it is.

23      Q.    And the phone number 516-527-0880, do you

24 recognize that phone number?

25      A.    That is my phone number.

```
 1        Q.    And is it your phone number now?

 2        A.    It is, yes.

 3        Q.    And was it your phone number in 2013?

 4        A.    Yes, it was.

 5        Q.    Okay.  So you said you started at Merchant

 6   Marine Academy in 2012, right?

 7        A.    That's correct.

 8        Q.    So on this date, on this document, on

 9   March 1st, you were not at Abilities New York, right?

10        A.    I was not.

11        Q.    You were actually at the Merchant Marine

12   Academy?

13        A.    That's correct.

14        Q.    Okay.  And where was your prior job before

15   Merchant Marine Academy?

16        A.    I worked for a company in upstate New York

17   called BTX Technologies.

18        Q.    BTX?

19        A.    Yes, sir.

20        Q.    Okay.  And what was the job there?

21        A.    I was IT manager.

22        Q.    And what part of New York or what town?

23        A.    That's in Hawthorne, close to White Plains.

24        Q.    Okay.  So that's upstate to you, huh?

25        A.    Yeah.  From Long Island, it is.
```

1      Q.   Very good.  All right.  And what was the time

2 frame of your job at BTX?

3      A.   I had started there in October 2010 and I was

4 there till right before I started at the Merchant Marine

5 Academy, so March 2012.

6      Q.   Okay.  So from October '10 to March '12,

7 correct?

8      A.   That's correct.

9      Q.   And before BTX, where did you work?

10      A.   I worked at Abilities.

11      Q.   You worked at Abilities New York?

12      A.   That's correct.

13      Q.   All right.  Were you the IT director at

14 Abilities?

15      A.   I was the director of Smeal Learning Center,

16 which was their online multimedia department, so to say.

17      Q.   Okay.  So not the IT director?

18      A.   I was not, no.

19      Q.   Okay.  All right.  So let me show you

20 Exhibit 610 again, which is already in evidence and it

21 references -- go back -- this page is fine.

22           MS. SHEFF:  Okay.

23           MR. DAVIS:  Sorry.

24      Q.   On so on page 518, do you see your name, Nabil

25 Ejaz, IT director, Abilities, Inc., New York, and the

1    phone?

2         A.    I do.

3         Q.    And that, again, is your phone number?

4         A.    That's correct.

5         Q.    Okay.  And who -- can you read down this email

6    who is signing it at the bottom?  Do you see that it's

7    signed by someone named Mohammad?

8         A.    Right.

9         Q.    Okay.  And do you see that -- can we see the

10   email address that Mohammad is writing from on the page

11   before that?

12              Okay.  So had you ever heard of a -- or have

13   you ever heard of a company called DigitalNet Technology

14   Solutions?

15        A.    I had not, no.

16        Q.    Okay.  Did you ever do any business with

17   DigitalNet Technology Solutions?

18        A.    I have not.

19        Q.    Did any company you ever worked for do

20   business with DigitalNet Technology Solutions?

21        A.    Not that I know of.

22        Q.    Okay.  And have you ever heard of anyone who

23   did do business with DigitalNet?

24        A.    I have not.

25        Q.    Okay.  And what about a company called AISA

1    Corporation or AISA Consulting, spelled A-I-S-A; have

2    you ever heard of that company?

3         A.   I have not.

4         Q.   Or AISA Consulting Group, have you heard of

5    that?

6         A.   No, sir.

7         Q.   Okay.  And do you know a man named Imran

8    Alrai?

9         A.   I do not.

10        Q.   All right.  Have you -- you don't know that

11   you've ever met him?

12        A.   Not to my knowledge.

13        Q.   Directing your attention to counsel table to

14   my left, to the gentleman in the middle of the table,

15   have you ever seen that person before?

16        A.   I have not.

17        Q.   Do you have any idea how your name and phone

18   number were listed as a business reference for

19   DigitalNet Technologies?

20        A.   I'm not sure.

21        Q.   All right.  So you do know Mr. Khurra Khan?

22        A.   I do, yes.  We were colleagues.

23        Q.   Sorry?

24        A.   We were colleagues at the U.S. Merchant Marine

25   Academy.

1      Q.    And that's Mr. Khan, K-h-a-n, right?

2      A.    Correct.

3      Q.    Do you recall how long you worked with him and

4  where -- what year it was at Merchant Marine?

5      A.    He was already employed there when I started

6  and I believe he left after a few months for a different

7  opportunity.  So I would say maybe three, four, five

8  months or so.

9      Q.    So it was really at the very beginning of your

10 being at Merchant Marine?

11     A.    That's correct.

12     Q.    And then he left, correct?

13     A.    Yes, sir.

14     Q.    And had he already left by March 1st of 2013,

15 the day of those handwritten notes we saw or do you

16 know?

17     A.    To the best of my recollection, I would say he

18 had left by then.

19     Q.    You think he had already left --

20     A.    Yes.

21     Q.    -- Merchant Marine?

22     A.    I believe so.

23     Q.    Okay.  And, of course, you were nowhere near

24 Abilities, Inc.; at that point, you were two jobs beyond

25 it, right?

1        A.      That's correct.

2        Q.      Okay.  Did you speak to Mr. Khan after he'd

3   left?

4        A.      We spoke a couple of times for some things he

5   needed help with as far as documentation and whatnot for

6   his new job.

7        Q.      Okay.  And did he ever make a -- he, Mr. Khan,

8   did he ever make an offer to you?

9        A.      An offer?

10       Q.      Did he ever offer to help you in some way?

11       A.      No, he did not.

12       Q.      Are you sure?  Did he -- did he ever help

13   you -- offer to help you get into a company?

14       A.      He may have, but I think I never really took

15   him up on the offer because I think after he had left,

16   he went to some corporate firm in the city.  And, of

17   course, being in IT, you're always looking for the next

18   best job that you can have something permanent and we

19   were contractors at U.S. Merchant Marine Academy.

20               So he may have offered.  I just -- I don't

21   recall if he did.

22       Q.      Okay.  So you now work for Merchant Marine

23   Academy?

24       A.      I still do, yes.

25       Q.      Is that a U.S. Government facility?

```
1          A.   Yes, it is.

2          Q.   Is it part of the Department of Defense?

3          A.   It is not.  It's actually under the Department

4     of Transportation.

5          Q.   Okay.  What is its mission?

6          A.   Their mission is to train cadets to become

7     U.S. merchant mariners so they can work in the

8     commercial and U.S. military fleets.

9          Q.   All right.  So is it your testimony, sir, that

10    you never gave a reference for DigitalNet Technologies?

11         A.   That's correct.

12         Q.   Did you ever get a call for a reference from

13    DigitalNet Technologies?

14         A.   I -- no.

15         Q.   And would you have given a reference for a

16    company you don't know anything about?

17         A.   I would not.

18              MR. DAVIS:  Nothing further.

19              THE COURT:  Cross-examination.

20              MR. HARRINGTON:  No questions, your Honor.

21              THE COURT:  Just so I'm clear, the handwritten

22    exhibit you were using, right, what was that again?

23              MR. DAVIS:  Your Honor, that was 401.  Those

24    were previously admitted notes of Ms. Latimore.

25              THE COURT:  Right.  That's what I thought.
```

1    Okay.  The inference being that wasn't really him they

2    were talking to, right?

3              MR. DAVIS:  (Shrugs shoulders.)

4              THE COURT:  You don't know.  What's your

5    position?  You're going to have to close.  What are you

6    going to argue?

7              MR. DAVIS:  Mr. Hunter has to close, your

8    Honor.

9              THE COURT:  Ah, good dodge.  All right.  I --

10   well, I just want to make sure I'm following, drawing

11   whatever inference -- what inference --

12             MR. DAVIS:  The facts are what they are, your

13   Honor, but Mr. -- Mr. Alrai gave a reference with this

14   man's name in it --

15             THE COURT:  I know.

16             MR. DAVIS:  -- and this man, we've spoken to

17   him, and he's now testified --

18             THE COURT:  That that wasn't him who was

19   involved in the conversation with Latimore.

20             MR. DAVIS:  Correct.

21             THE COURT:  Yeah.  Okay.  I guess I'm

22   following you.

23             Thank you, sir.

24             THE WITNESS:  Thank you.

25                       (Witness excused.)

1          MR. DAVIS:  Government calls Nicole Nash.

2          THE CLERK:  Good afternoon.  If you'd like to

3    step this way, please.

4          Please step into the witness box and remain

5    standing.

6          THE WITNESS:  All right.

7          THE CLERK:  Please raise your right hand.

8          **NICOLE NASH**, having been first duly sworn,

9    testified as follows:

10          THE CLERK:  For the record, please state your

11   full name and spell your last name.

12          THE WITNESS:  Nicole L. Nash, N-a-s-h.

13          THE CLERK:  Thank you.  Please be seated.

14                   DIRECT EXAMINATION

15   BY MR. DAVIS:

16      Q.   Please state your name.

17      A.   Nicole L. Nash.

18      Q.   And how are you employed?

19      A.   I work at the United Way.

20      Q.   And what do you do at the United Way?

21      A.   I'm their human resources coordinator.

22      Q.   All right.  And how long have you worked at

23   United Way?

24      A.   19 years.

25      Q.   And what are your duties as a human resources

1   coordinator?

2       A.   Recruitment, administrative, and coordination,

3   meeting coordination.

4       Q.   Okay.  And, Ms. Nash, I'll ask you to lean a

5   little closer to the microphone so the Court can hear.

6       A.   Uh-huh.

7       Q.   In 2012, who did you immediately work for?

8       A.   Jane Grady.

9       Q.   All right.  And do you know a Mr. Imran Alrai?

10      A.   Yes.

11      Q.   And when did you first meet him?

12      A.   When -- during the recruitment process, 2012.

13      Q.   All right.  And as a human resources

14  coordinator, do you have duties in the recruitment

15  process?

16      A.   Yes.

17      Q.   And can you explain what those are, briefly?

18      A.   Posting, sorting resumes, coordinating

19  interviews, phone screens, reference checks, and

20  extending offers.

21      Q.   Okay.  Now, in the case of Mr. Alrai's hiring

22  process, did you have a particular role?

23      A.   Yes.

24      Q.   And what was that?

25      A.   I helped in the recruitment process and I

1    worked with the hiring managers.  I also did screenings.

2        Q.   All right.  And did you -- did you -- as part

3    of that, do you make phone calls to references?

4        A.   Yes.

5        Q.   And did you do that here?

6        A.   Yes.

7        Q.   Did you know the company he was coming from?

8        A.   Yes.

9        Q.   And what was that?

10       A.   In looking -- I'd have to look back at

11   records.

12       Q.   All right.  So I'm showing you Exhibit 405.

13   Among the documents you obtained, did you obtain a

14   resume from Mr. Alrai?

15       A.   That's -- yes, I did.

16            MR. DAVIS:  Your Honor, move to admit

17   Exhibit 405 and strike the ID.

18            MR. HARRINGTON:  No objection, Judge.

19            THE COURT:  It's admitted.  Thank you.

20            (Government's Exhibit 405 admitted.)

21       Q.   Do you recognize 405 as the resume of

22   Mr. Alrai?

23       A.   Yes.

24       Q.   Okay.  So this is submitted to you in early

25   2012, presumably?

1      A.    Yes.

2      Q.    All right.  And the first job, here on the

3  first page, is Robert Allen Group, vice-president IT and

4  CIO.  Do you see that?

5      A.    I do.

6      Q.    Okay.  That -- the next page of the resume

7  describes another job.  Actually, one more page.

8            Do you see this job here, AISA Corporation,

9  Reston, Virginia?

10     A.    Yes.

11     Q.    And it says that he worked from May of '98 to

12 May of 2006, correct?

13     A.    Yes, it does.

14     Q.    And did he get -- did it give you the title

15 that he had there?

16     A.    Yes.

17     Q.    And what was that?

18     A.    Senior vice-president of operations and chief

19 information officer.

20     Q.    Okay.  And before that, director of IT and

21 deputy chief?

22     A.    Yes.

23     Q.    All right.  And just going down a little bit,

24 can you read the first few sentences there in the

25 "manage globally" paragraph?

1    A.    Uh-huh.  Let me get a little closer.  Thank

2  you.

3         "Manage globally disbursed teams of finance,

4  operations, human resources, facilities, customer

5  service, and information technology associates in a 24/7

6  high-pressure environment for this IT consulting and

7  business process outsourcing organization."

8         Keep going?

9    Q.    Please.

10   A.    "Provide global vision and hands-on leadership

11  for formulating, evaluating, and implementing corporate

12  policies and initiatives that prove -- that improve,

13  excuse me -- the quality and efficientness (sic) --

14   Q.    Effectiveness?

15   A.    -- effectiveness, sorry, of the organization

16  and efficiencies of its business operations.

17         "An integral member of the executive committee

18  and as a participant in all committees tasks and

19  responsibilities, formed a chair -- formed and -- form

20  and chair the strategic IT governance committee to

21  prioritize business initiatives that leverage

22  technology."

23   Q.    All right.  Now, did you have any separate

24  information about something called AISA Corporation

25  other than this resume when you got it?

1    A.   No.

2    Q.   All right.  I'm showing you Government

3  Exhibit 208.

4         Okay.

5    A.   Okay.

6         MR. DAVIS:  And go to the second page, if you

7  would.

8         This shows this is a record from the

9  Commonwealth of Virginia.

10        And I move to admit Exhibit 208 and strike the

11  identification.

12        MR. HARRINGTON:  No objection, Judge.

13        THE COURT:  Admitted.

14        (Government's Exhibit 208 admitted.)

15   Q.   And can you see that AISA Corporation is being

16  registered for $75 in July of 2004 by Imran Alrai in an

17  address in Reston, Virginia?

18   A.   Yes.

19   Q.   Did you have that information back when you

20  were hiring Mr. Alrai?

21   A.   No.

22   Q.   All right.  Now, did you ask for references

23  from Mr. Alrai?

24   A.   Yes, I did.

25   Q.   And did you send an email to him in the email

1    address he'd given you?

2         A.   Yes.

3         Q.   And was that dated March 1st?

4         A.   Yes.

5         Q.   All right.  Showing you Exhibit 601, briefly,

6    we've already seen this.

7              Is this in evidence?

8              MS. SHEFF:  Yes.

9              MR. DAVIS:  601 in evidence, your Honor.

10             MS. SHEFF:  No, it is not.  I'm sorry.

11             MR. DAVIS:  I'm sorry.

12        Q.   Is this the email chain of your correspondence

13   with Mr. Alrai?

14        A.   Yes, it is.

15             MR. DAVIS:  And, your Honor, I'd move to admit

16   601 and strike the ID.

17             MR. HARRINGTON:  No objection.

18             THE COURT:  Admitted.

19             (Government's Exhibit 601 admitted.)

20        Q.   And going back to the first page, does this

21   have your email message to Mr. Alrai?

22        A.   Yes.

23             MR. DAVIS:  I'm sorry; to the last page,

24   whatever we call it.

25             Okay.  So scroll up.

1      Q.   You actually had several communications with

2   him, right?

3      A.   Uh-huh.

4           MR. DAVIS:  So scroll up to the page before

5   that.

6      Q.   And this is talking about interviews, but at

7   the very top on March 1st, can you read what you wrote,

8   Ms. Nash?

9      A.   Uh-huh.

10          "Great.  One more thing.  When you have a

11  moment, please send me three business references.  Thank

12  you, Imran.  Nicole."

13     Q.   Okay.  So this is March 1st and, again, to the

14  first page, do you see the names you got from Mr. Alrai?

15     A.   It's not showing first, but I saw the business

16  references.

17     Q.   Yeah, the very first page, sorry.  I mean the

18  top of the email.

19     A.   Yes.

20     Q.   Here we have it.

21     A.   Yes.

22     Q.   On March 5th, you get the following business

23  references?

24     A.   Yes.

25     Q.   And they are Bassam Alqassar, Steve Anderson,

1    and Faisal Bhatti, correct?

2         A.   Yes.

3         Q.   "Thank you, Imran Alrai."

4              Okay.  So did you actually follow up on those

5    references?

6         A.   Yes.

7         Q.   And what happened first?

8         A.   I believe I reached out to all of them by

9    phone and was -- ended up getting -- sending emails as

10   well to the folks that I did not reach initially by --

11   by phone.

12        Q.   Okay.  And of them, how many did you actually

13   speak to on the phone?

14        A.   One.

15        Q.   Sorry?

16        A.   One.

17        Q.   And was that the first one, Mr. Bassam

18   Alqassar?

19        A.   Yes.

20        Q.   And he's listed as chief information officer

21   at Princess House?

22        A.   Yes.

23        Q.   And you actually spoke to him?

24        A.   On the phone, yes.

25        Q.   And did he give you a positive reference on

1   behalf of Mr. Alrai?

2       A.   Yes.

3       Q.   Okay.  Now, the next name is Steve Rampal

4   Anderson.  Do you see that?

5       A.   Yes.

6       Q.   He was supposedly chairman of the AISA

7   Corporation --

8       A.   According --

9       Q.   -- right?

10      A.   -- to this, yes.

11      Q.   All right.  Now, what happened when you tried

12  to reach him and how did you actually connect with him?

13      A.   I ended up emailing him --

14      Q.   Okay.

15      A.   -- because he was a traveler.  And I must have

16  ended up leaving a message initially, but I emailed him

17  as well.

18      Q.   Okay.  And his -- his email address is at this

19  ASIAConsulting.com email domain; is that right?

20      A.   Yes, that would be the only email that I would

21  have for him, yes.

22      Q.   Okay.  And did you actually get an email back

23  from Mr. Anderson?

24      A.   I did.

25      Q.   Showing you Exhibit 602, is this the email you

1    received from Mr. Anderson when you asked for a

2    reference?

3         A.   Yes.

4              MR. DAVIS:  Okay.  And, your Honor, I move to

5    admit 602 and strike the ID.

6              MR. HARRINGTON:  No objection, Judge.

7              THE COURT:  Admitted.

8              (Government's Exhibit 602 admitted.)

9         Q.   All right.  So you received this on March 12th

10   of 2012; is that correct, Ms. Nash?

11        A.   Yes.

12        Q.   All right.  Can you read, please, just the

13   body of the email from Mr. Anderson?

14        A.   "Dear Ms. Nash, I have known Imran for about

15   15 years and he was a part of my cabinet as the senior

16   vice-president.  He managed the operations for our

17   company that included finance, HR, info tech, customer

18   service, and facility services.

19             "Imran is a unique individual and I found him

20   well-organized, proactive, and very responsive.  He was

21   always up-to-date on his tasks and I have -- and I don't

22   remember having any issues under his direct areas of

23   responsibilities.  Imran is very strategic with his

24   approach and always carries a broad vision.  I

25   benefitted most from his unique ability to think outside

1  the box and bring solutions to the problems -- to

2  problems.  He got things done for me the right way, on

3  time and on budget.  He always brought all parties to

4  the discussion table and took a team approach in

5  decision-making.  He was a major player in creating a

6  true sense of team environment at our company.  He is

7  very easy to work with.  I could always talk to him

8  about a lot of subject matters and he always -- oops --

9  and he was always a good counsel to me.  I am glad that

10  you are considering him for a senior role at your

11  organization.  Let me assure you that he will be an

12  asset to you and you will see major improvements due to

13  his presence from day one.  If you have more questions,

14  please feel free to contact me, thanks, Steve."

15      Q.   All right.  And did you regard this as a

16  positive reference, obviously?

17      A.   Yes, I did.

18      Q.   Okay.  Now, you also corresponded with

19  Mr. Faisal Bhatti; is that right?

20      A.   Yes.

21      Q.   And also at an ASIAConsulting.com email?

22      A.   Yes.

23      Q.   And did that concern you at all as a -- as a

24  part of the hiring process that you were talking to two

25  people from the same company?

1    A.    No.

2    Q.    Why is that?

3    A.    It's happened before and it depends how long a

4 person has been with a company.  Sometimes they want to

5 stay within the same company because if it's -- their

6 current employer may not know that they're looking.  So

7 it didn't come across as odd.

8    Q.    Okay.  So I'm showing you now Exhibit 603.

9          Is 602 in evidence?  Did I move that in?

10          MS. SHEFF:  Yes, it is.

11          MR. DAVIS:  Okay.  603 is in evidence, I

12 believe.

13          MS. SHEFF:  Yes.

14          MR. DAVIS:  Okay.

15    Q.    And we won't -- let's just go to the bottom,

16 Ms. Nash, to -- or the beginning of it.

17          Did you actually reach out yourself to

18 Mr. Faisal Bhatti at that ASIAConsulting.com email?

19          Can we see the beginning of the email?

20    A.    Yes.

21    Q.    All right.  And you have a list of questions

22 here:  Hello, Mr. Bhatti, my name is Nicole Nash.

23          Is that you?

24    A.    Yes.

25    Q.    Okay.  And, again, why did you decide to go

1    the email route with Mr. Bhatti as opposed to still

2    trying to talk to him on the phone?

3         A.   I was -- he was traveling and we wanted to get

4    the references back as quickly as possible.

5         Q.   Okay.  So we have -- we won't go through this

6    again, but did you get a written response back from

7    Mr. Faisal Bhatti that was again very positive about

8    Imran Alrai?

9         A.   Yes.

10        Q.   Okay.  Now, did you also reach back out to

11   Mr. Alrai with one additional question about this?

12        A.   Yes.

13        Q.   And what was that additional question about?

14        A.   Whether or not any of the folks were -- that

15   he had given me was a -- previous supervisor or manager.

16        Q.   Okay.  And why was that important?

17        A.   We always ask -- we ideally like a previous

18   supervisor or current supervisor as a reference.

19        Q.   Okay.  And showing you now Exhibit 604, is --

20   do you recognize 604?

21        A.   Yes.

22        Q.   And is that an email correspondence between

23   you and Mr. Alrai about your follow-up question?

24        A.   Yes.

25             MR. DAVIS:  Okay.  Your Honor, move to admit

```
 1   Exhibit 604 and strike the ID.

 2              MR. HARRINGTON:  No objection.

 3              THE CLERK:  It's admitted.

 4              THE COURT:  It's admitted.

 5              MR. DAVIS:  Okay.

 6        Q.   And we don't have to read that again, but what

 7   you offered in your email, it says, if not, would you be

 8   able to send me a manager/supervisor reference, correct?

 9        A.   Yes.

10        Q.   Because you'd already communicated with Steve

11   and with Faisal, right?

12        A.   Right.

13        Q.   But you just wanted to find out if they were

14   previous supervisors; otherwise, he could send you

15   another name, right?

16        A.   Correct.

17        Q.   But what he said is they're both supervisors,

18   essentially, correct?

19        A.   Yes.

20        Q.   So did you get any other names from Mr. Alrai?

21        A.   No.

22        Q.   All right.  Now, what did you do with the

23   references you received from Mr. Alrai?

24        A.   Shared them with my hiring managers.

25        Q.   You shared them with your --
```

1          A.     The hiring managers.

2          Q.     Okay.  So you passed them along in the hiring

3     process?

4          A.     Yes.

5          Q.     And was he -- was Mr. Alrai promptly hired in

6     the IT job?

7          A.     Yes.

8          Q.     Okay.  So just one other area.

9                 Did you also work on distributing PowerPoints

10    for officewide meetings?

11         A.     Yes.

12         Q.     And do you recall a particular PowerPoint that

13    happened in May of 2013 related to an IT themed meeting?

14         A.     Yes.

15         Q.     And what was that about?

16         A.     Our IT staff was presenting to -- to all staff

17    in regards to some of the upcoming changes being

18    implemented in our organization.

19         Q.     Okay.  And the -- when you say our IT staff,

20    that would have been led by that time with -- by Imran?

21         A.     By Imran, correct.

22         Q.     Right.  And at that time, had -- that was more

23    than a year after you hired him, correct, May of --

24    2013?

25         A.     Yes.

1        Q.    And at that point, were you aware whether

2   DigitalNet was already a contractor now for the United

3   Way and providing IT services?

4        A.    Yes.

5        Q.    Okay.  So directing your attention to

6   Exhibit 615, is this the email attaching the PowerPoint

7   from Mr. Alrai to you?

8        A.    Yes.

9             MR. DAVIS:  Your Honor, I move to admit

10   Exhibit 615 and strike the ID.

11             MR. HARRINGTON:  No objection, Judge.

12             THE COURT:  Don't take it off yet.

13             Admitted.

14             (Government's Exhibit 615 admitted.)

15        Q.    It says:  Hello, Nicole, attached please find

16   the IT update PowerPoint, correct --

17        A.    Yes.

18        Q.    -- that he is going to go over during the

19   staff meeting tomorrow.

20        A.    Yes.

21        Q.    And your job was to circulate this and get it

22   to the right people?

23        A.    Yes --

24        Q.    Okay.

25        A.    -- and have it ready for the meeting.

1    Q.   Okay.  So let's look at the attachment.  It's

2  an all staff meeting technology update, right?

3    A.   Yes.

4    Q.   Let's go to the next to last page.

5         Okay.  Here, see where it says IT services at

6  the top?

7    A.   Yes.

8    Q.   Can you read what it says after that?

9    A.   "Contract awarded to DigitalNet, based in

10  Andover, Mass., offices around the globe, leader in

11  cloud computing and technology modernization.

12         "How are they -- how are they doing?  Feedback

13  from the user company -- community.

14         "CWAIN update, services will not be needed

15  after full implementation of Andar/360."

16         MR. DAVIS:  Excuse me, your Honor.  I'm sorry.

17         THE COURT:  That's okay.

18         MR. DAVIS:  Nothing further.  Thanks.

19         MR. HARRINGTON:  I have no questions for

20  Ms. Nash, your Honor.

21         THE COURT:  Thank you.  You're excused.

22         THE WITNESS:  Thank you.

23               (Witness excused.)

24         MR. DAVIS:  Government calls Diane Dragoff.

25         THE CLERK:  Good afternoon.  If you'd like to

1    step this way.

2              THE WITNESS:  Thank you.

3              THE CLERK:  If you could step into the witness

4    box and remain standing.

5              Please raise your right hand.

6              **DIANE DRAGOFF**, having been first duly sworn,

7    testified as follows:

8              THE CLERK:  And, for the record, please state

9    your full name and spell your last name.

10             THE WITNESS:  Can I sit?

11             THE CLERK:  Yes, you may sit.

12             THE WITNESS:  Okay.

13             THE CLERK:  Just state your full name and

14   spell your last name.

15             THE WITNESS:  My name is Diane Dragoff.  My

16   last name is spelled D-r-a-g-o-f-f.

17             THE CLERK:  Thank you.

18                     DIRECT EXAMINATION

19   BY MR. DAVIS:

20        Q.   And Ms. Dragoff, are you currently retired?

21        A.   Yes, I am.

22        Q.   And did you work at the United Way prior to

23   retirement?

24        A.   Yes, I did.

25        Q.   For how many years?

1      A.    Almost 18.

2      Q.    Almost 18 years?

3      A.    17 and change, yes.

4      Q.    And what was your job title there when you

5  finished?

6      A.    Senior director of organizational operations.

7      Q.    Okay.  And who did you report to between

8  approximately 2012 and 2018?

9      A.    I believe I reported to Jack Rotondi at that

10  point.

11      Q.    Okay.  So your title is a mouthful.  Can you

12  explain what you -- what you did?

13      A.    I basically did anything that other people

14  didn't want to do, which meant purchase of insurance,

15  facilities management in terms of working with

16  landlords -- we didn't own any buildings -- working with

17  the landlords, maintenance, working with vendors,

18  et cetera, along with my original -- what I came in

19  there to do was purchasing manager.  So I did that, too.

20      Q.    Okay.  And would it have been accurate to

21  describe you as someone in procurement?

22      A.    At times.

23      Q.    Yeah.  Okay.  But certainly you did a lot of

24  buying things for the organization --

25      A.    Yes.

1    Q.   -- right?

2         Okay.  Did you know Imran Alrai?

3    A.   Yes.

4    Q.   Okay.  And when did you meet him?

5    A.   At United Way.

6    Q.   And --

7    A.   At United Way.

8    Q.   And did you meet him when he started in 2012?

9    A.   When he started, yeah.

10   Q.   Okay.  And how much interaction did you have

11   with him?

12   A.   Just a normal colleague at work.

13   Q.   Normal colleague?

14   A.   Yeah.

15   Q.   Okay.  All right.  Now, do you recall a --

16   about a year after Mr. Alrai came on board, not quite,

17   an RFP process in which United Way was attempting to

18   identify a vendor to become its managed IT services

19   provider, to be a major contractor with United Way?

20   A.   I'm not quite sure of dates and times.

21   Q.   Okay.

22   A.   Okay.  There have been several vendors during

23   the time I was at United Way.

24   Q.   Okay.  Do you remember the vendor CWAIN, C --

25   A.   I remember the name, yes.

1    Q.   All right.  And do you remember the vendor

2    DigitalNet?

3    A.   I know the name, yeah.

4    Q.   Okay.  And this would have been the process

5    that resulted in the hiring of DigitalNet, the

6    contracting with DigitalNet?

7    A.   Okay.

8    Q.   Okay?  Now, do you recall whether you were

9    tasked to be on a -- a group with two other people to

10   work on the RFP process for that RFP?

11   A.   The original?

12   Q.   For the original RFP for DigitalNet.

13   A.   I -- I don't -- if I saw a document I could

14   tell you, but I don't recall other than being asked to

15   do bits and pieces later on.

16   Q.   Okay.

17   A.   I might have -- I'm not sure.  I can't recall.

18   Q.   All right.  On -- let me see.

19        I'm showing you Exhibit 607 in evidence.

20        So just -- can we go to the first page?

21        MS. SHEFF:  The first page or the last?

22        MR. DAVIS:  The first for now, and then first

23   page of the attachment.

24        MS. SHEFF:  Okay.

25   Q.   So this is -- we're on page 81395.  It's a

1  request for a proposal information technology manages --

2  managed services provider.  It's dated January 14th,

3  2013.

4          Do you see that, Ms. Dragoff?

5      A.   Yes, I do.

6      Q.   And do you remember this RFP process?

7      A.   I've been through a number of these.  I would

8  have to see --

9      Q.   Okay.  But this is still not ringing any

10 particular bells in your memory?

11     A.   I've been through a number of these processes.

12 I'm sorry I can't be more specific.

13     Q.   That's okay.

14     A.   Yeah.

15     Q.   That's okay.

16     A.   Yeah.

17     Q.   So this still is not ringing bells, correct?

18     A.   No.

19     Q.   Let me ask it a different way.  Were you -- do

20 you recall being on a committee with Azim Mazagonwalla

21 and led by Mr. Imran Alrai to review RFPs?

22     A.   For IT specifically?

23     Q.   For an IT RFP just like this.

24     A.   I worked on phone stuff.  I worked on other

25 tech -- not technology, but credit card things.  I -- I

1   don't recall -- I can't recall.

2        Q.   Understood.  And I'm not trying to badger you.

3        A.   Okay.  I'm sorry I can't give you anything

4   more specific.

5        Q.   You can only say what you can remember.

6        A.   Correct.

7        Q.   All right.  Let me ask this.  Did you have any

8   particular knowledge or expertise in the IT field?

9        A.   No, and I made no bones about that because

10  it's not my training.

11       Q.   Do you come from an IT background?

12       A.   Not at all.

13       Q.   And if someone gave you an RFP proposal for a

14  big IT contract, would you be confident that you could

15  evaluate it properly?

16       A.   I would have to ask a lot of questions and get

17  a lot of detail.

18       Q.   Okay.

19       A.   It's not something that I could read and

20  understand --

21       Q.   Right.

22       A.   -- on my own.

23       Q.   So let me just ask you, do you recall ever

24  reviewing a proposal in response to this RFP for a big

25  IT managed services provider?

1     A.   I don't recall.

2     Q.   Okay.  And if you had been shown proposals

3  coming in from legitimate vendors that are basically

4  bidding on this contract to United Way about a big IT

5  services contract, would you have known what you were

6  looking at if you got those RFPs, proposals?

7     A.   I read a lot of proposals --

8     Q.   Right.

9     A.   -- but I would have questions and all what I

10  can do an analysis on is who's higher, who's lower.  As

11  far as going in the weeds and the technical stuff, I

12  couldn't do that part of it.

13     Q.   Okay.  All right.  And last question about

14  that, do you have any memory of dealing with Azim about

15  this same thing, Azim Mazagonwalla?

16     A.   I can't tell you specifically.

17     Q.   Okay.  All right.  Now, let me ask you about a

18  different thing.

19          In 2016, do you recall you were working for

20  Jack Rotondi?

21     A.   Yes.

22     Q.   And do you recall a due diligence effort where

23  you were assigned to do some research about DigitalNet?

24     A.   Yes.

25     Q.   Okay.  I'm showing you now Exhibit 643.

1              Okay.  Let's go to the back of that and -- the

2    next page, I think.

3              And Jack Rotondi was vice-president of

4    organizational operations?

5         A.   Right.

6              MR. DAVIS:  Okay.  And even a little further

7    back, that -- there you had it.

8         Q.   We're looking now at page 8761.  Do you see

9    that?

10        A.   Yes.

11        Q.   And do you see the paragraph 4 and then a

12   letter (a)?

13        A.   Yes.

14        Q.   Okay.  Could you read that briefly, please.

15        A.   Okay.

16             "4.  Simultaneously with item number 1 above,

17   (a), Diane to perform literature/web search, in quotes,

18   on DigitalNet to uncover any current highlights or low

19   lights.  In parenthetical, Diane, colon, please contact

20   me tomorrow on this, closed paren."

21        Q.   Okay.  And then what does 4(b) say?

22        A.   "Imran to provide Jack and Diane via email

23   with the following three things for each of the five

24   POs:  List of competitive vendors, competitive pricing

25   offered by those respective vendors, why we chose the

1  final vendor."

2      Q.   Okay.  So -- and let's go back to the top of

3  the email, of that same email.

4          You write a note to -- one more back to the

5  front of it.

6          Here in the middle of the page on July 18th of

7  2016, do you see what you wrote then, Ms. Dragoff?

8      A.   Yes.

9          "I saw it this morning.  I'm actually working

10  on it now.  DigitalNet is tricky.  There are several

11  companies using that name.  I'm not coming up with

12  anything other than websites.  I'll continue

13  researching."

14      Q.   Okay.  So that's enough on 643.

15          Did you keep working, trying to find out

16  information about DigitalNet?

17      A.   Yes, I did.

18      Q.   Okay.  Showing you now Exhibit 648, do you

19  recognize that as an email from Jack Rotondi to you at

20  United Way?

21      A.   Yes.

22          MR. DAVIS:  And, your Honor, I'd move to admit

23  Exhibit 648 and strike the ID.

24          MR. HARRINGTON:  No objection, Judge.

25          THE COURT:  Admitted.

```
 1              (Government's Exhibit 648 admitted.)
 2         Q.   Okay.  Now, on the middle of that page --
 3              THE COURT:  Let me just ask you, for planning
 4    purposes now, not for anything else, about how much
 5    longer on direct, roughly?
 6              MR. DAVIS:  Five minutes.
 7              THE COURT:  How much cross do you have
 8    planned?
 9              MR. HARRINGTON:  Quick, if any, Judge.
10              THE COURT:  Go ahead.
11              MR. DAVIS:  I just made an unfortunate
12    slash --
13              THE COURT:  Yeah, if you have any other
14    witnesses today, by the way, you can send them home.
15              MS. EPHRAIMSON:  I did.
16              THE COURT:  Thank you.
17              MS. EPHRAIMSON:  You're welcome.
18              THE COURT:  I want to pay the prosecution a
19    compliment, by the way.  You know, you really did a good
20    job having all of your witnesses ready to go today.
21    That was efficient.  Well done.
22              MR. DAVIS:  Your Honor, we appreciate that,
23    but we would be remiss if we did not tell you that the
24    person most responsible for that is Ms. Ephraimson, in
25    the back of the courtroom.
```

1          THE COURT:  Yeah, I know.

2          MR. DAVIS:  Yeah.

3          THE COURT:  I can see her making a beeline out

4    of here in a few minutes.

5          Don't worry.  I get it.

6          MR. DAVIS:  And, your Honor, I do move to

7    admit Exhibit 643 and strike the ID, which is the one we

8    just looked at.

9          MR. HARRINGTON:  Oh, the prior exhibit.  I

10   thought it was already in.  No objection.

11         MR. DAVIS:  I was told it wasn't.

12         MS. SHEFF:  I don't think it --

13         MS. LE:  It wasn't moved before.

14         MR. DAVIS:  Okay.

15         THE COURT:  Regardless, it's in now.

16         (Government's Exhibit 643 admitted.)

17         MR. DAVIS:  And 648 is in, correct?

18         MS. SHEFF:  You just did.

19         MR. DAVIS:  Okay.

20     Q.   So at the middle of the page, Ms. Dragoff, do

21   you see what you wrote there?

22     A.   Yes.  There's a typo.  It says:  No remarks

23   God, which should be good, or bad at BBB.

24     Q.   And what's BBB?

25     A.   Better Business Bureau.

1      Q.    Okay.

2      A.    "No membership in MV, which is Merrimack

3  Valley, Chamber of Commerce, not included in town of

4  Andover businesses."

5      Q.    You also, though, did find the website,

6  correct?  Because you've got it up there at the top.

7      A.    Yes.

8      Q.    Their website is here in the middle, right

9  where we just -- we just had it where we looked at it.

10           MS. SHEFF:   Sorry.

11     A.    I'm sorry, their Web -- the website is

12  http://DigitalNet.com/index.html.

13     Q.    Okay.  And was there much information on that

14  website?

15     A.    I don't recall.

16     Q.    Okay.  So let's go to the end of that same

17  email -- or really the beginning, but the last page, I

18  think.

19           All right.  So do you see what you wrote on

20  July 18th at 6:19 p.m.?

21     A.    Yes.  Yes.

22     Q.    All right.  And was this some of the results

23  of your research?

24     A.    Yes.

25     Q.    Would you read that, please?

1    A.   "Jack, I found no industry trade information

2  about DigitalNet.  They are on LinkedIn.  No listing for

3  jobs on Monster or Glassdoor.

4         "I did find the original Delaware LLC filing

5  and the Massachusetts foreign LLC filing.  They also

6  filed an annual report in 2015 with the Mass. Secretary

7  of State as required to retain their Massachusetts LLC.

8         "Here's the Massachusetts info."

9    Q.   And you don't have to read all of that --

10   A.   Okay.

11   Q.   -- technical stuff.

12   A.   Okay.

13   Q.   Can you skip to the registered agent?

14   A.   "The registered agent on file for this company

15 is Registered Agent, Inc., and is located at 82 Wendell

16 Ave., Suite 100, Pittsfield, Mass., 01201.  The

17 company's principal address is 300 Brickstone Square,

18 Suite 201, Andover, Mass., 01811."

19   Q.   Okay.  And the last sentence, what does that

20 say?

21   A.   "The company has one principal on record.  The

22 principal is Mac Chaudhary from Andover, Massachusetts."

23   Q.   Okay.  Showing you now Exhibit 209 for

24 identification, is that the Commonwealth of

25 Massachusetts foreign LLC application for DigitalNet?

1        A.    Uh-huh.

2              MR. DAVIS:  Your Honor, I'd move to admit 209

3     and strike the ID.

4              MR. HARRINGTON:  No objection, your Honor.

5              THE COURT:  Admitted.

6              (Government's Exhibit 209 admitted.)

7        Q.    Okay.  And is this the record that you

8     apparently found when you did that research three years

9     ago?

10       A.    Aside from the address, and I don't -- you'd

11    have to go back.  I don't know what the date was that I

12    had on there.  But essentially, yeah, it's the same.

13       Q.    Okay.  And at the very bottom, number seven,

14    the name of each manager is Munawar Chaudhary, manager,

15    at 31 Lowell Road in Windham, New Hampshire, correct?

16       A.    Correct.

17       Q.    All right.  Okay.  Just a few more -- so did

18    you provide all the information you had about DigitalNet

19    to Jack Rotondi?

20       A.    I gave him the email that I sent, as you saw,

21    and it was up to them to get back if they wanted

22    anything else.  But I don't recall if they did want

23    anything else from me.

24       Q.    Okay.  So that's enough on 209.

25             So the last thing I wanted to ask you about,

1  Ms. Dragoff, is -- is the purchase orders and

2  requisition forms that Mr. Alrai submitted for various

3  IT expenses.  Do you recall that?

4       A.   We had a variety of them, yes.

5       Q.   Okay.  And do you recall also invoices from

6  DigitalNet to United Way?

7       A.   I know there were invoices to the United Way.

8       Q.   Okay.

9       A.   I did not process them.  That was not part of

10  my work.

11       Q.   Okay.  But did you have a particular -- did

12  you notice something about requisition orders that

13  Mr. Alrai filed as the IT head that you noticed?

14       A.   I had one requisition form that was completely

15  signed off that had just a very minimal description and

16  it was for a lot of money.

17            So I went back and asked Imran and also Elaine

18  that worked in that department if maybe a backup

19  something was missing that had more explanation.  And I

20  didn't get anything.

21            I brought it to Jack Rotondi and I then asked

22  Jack, you know, what should I do with this.  It was

23  technically signed off and I could enter it into the

24  accounting system, but I felt there should be more

25  descriptive language.

1   Q.   All right.  So I'm showing you Exhibit 650,

2   which is an email in 2017.  And going to the back of it,

3   the beginning of it, are you familiar with a Sonia

4   Curiel?

5   A.   Curiel, yes.

6   Q.   All right.  And who is she?

7   A.   Sonia is in charge of AP.

8   Q.   Accounts payable at United Way?

9   A.   United Way, yes.  Correct.

10   MR. DAVIS:  Your Honor, I'd move to admit

11   Exhibit 650 and strike the ID.

12   MR. HARRINGTON:  No objection, Judge.

13   THE COURT:  Admitted.

14   (Government's Exhibit 650 admitted.)

15   Q.   You see the note to you from Sonia down at the

16   bottom?

17   A.   Yeah.

18   Q.   And you see that it says:  She will scan

19   approved requisition for blanket setup or amendments so

20   you're able to set them up in GP.  And I want to -- I'd

21   like to move ahead before things get too crazy and I'm

22   attaching copies of the following requisitions.

23   And then can we go and see what those

24   copies -- who those requisitions are?  The last page.

25   Do you see at the top of the page now?

1      A.    Correct.

2      Q.    And what does that say?

3      A.    That says the two that she was sending was,

4 number one, DigitalNet web development, general ledger

5 number by, and she says primarily Spanish speaker, by

6 $75,000.

7      Q.    Okay.  So that's -- so that's it.  Now, did

8 you have a reaction when you saw that requisition for

9 DigitalNet for $75,000?

10     A.    Yes.

11     Q.    Okay.  And what was that?

12     A.    I need a little more information, like some

13 information.  Maybe something else needed to go with it.

14     Q.    Okay.

15     A.    And I was going to enter it to -- basically,

16 in March, we're getting a jump on the season, meaning

17 when the new fiscal year starts, or if something is

18 renewing.  Okay?  So it's been in force for one year.

19          I asked her for clarification, even though it

20 was signed off, to say this really -- should it really

21 be a contract or is more information forthcoming.

22     Q.    Okay.  And can we just look at the first two

23 sentences starting with "I will be happy" and also the

24 sentence below that, "seems like DigitalNet."

25          Can you read that, please?  That's what you

1    wrote back to Sonia?

2        A.   Right.

3             "I will be happy to enter these as blankets to

4    get a jump on the season, but would like to get some

5    further clarification even though you've run them by

6    Jack.  It seems that the DigitalNet -- seems like the

7    DigitalNet should be a contract since its dollar amount

8    is for 75,000.  All it says is web development.  Is

9    there more definitive info."

10       Q.   All right.  So after that, did you get a reply

11   from Mr. Imran Alrai?

12            And go to the beginning?

13       A.   Okay.  Yes.  It says:  Diane, it is not a

14   contract, but continuation of existing services.  All

15   reqs should come to me.  Please do not include IT

16   service team members in any contract-related or UW

17   finance-related matters.  They are outside contractors,

18   not employees.

19       Q.   That's enough.  Thanks.

20       A.   Okay.

21       Q.   So -- and what did you do about this at this

22   point?

23       A.   I went to Jack.

24       Q.   Okay.  And did you ever get more detail on

25   that $75,000 expenditure?

1      A.   He was going to take it up with Imran, as it

2    says down the bottom, and he gave it back to me and

3    said, just put it into Great Plains, put it into the

4    accounting system.

5           MR. DAVIS:  Very good.  No further questions.

6    Thank you.

7           THE COURT:  Cross-examination.

8           MR. HARRINGTON:   Just very brief, Judge.

9                    CROSS-EXAMINATION

10   BY MR. HARRINGTON:

11     Q.   Just picking up on that last point,

12   Ms. Dragoff.

13     A.   Yes.

14     Q.   You indicated that you brought the issue

15   ultimately to Mr. Rotondi?

16     A.   Correct.

17     Q.   And he advised, go ahead and put it through

18   and make the payment?

19     A.   Correct.

20     Q.   Okay.  And you indicated that he was going to

21   take that up with Mr. Alrai and then at some point --

22   and let me back up, because I don't want to confuse you.

23           You brought it up with Mr. Rotondi?

24     A.   Correct.

25     Q.   He indicated he was going to take the matter

1    up with Mr. Alrai?

2        A.    Correct.

3        Q.    Okay.  He then got back to you at some point

4    after that and said, go ahead and put it through.

5        A.    I believe he gave me the document back.  It

6    was all signed off to put into the accounting software.

7        Q.    Okay.  And so you had gotten some paperwork,

8    supporting documentation, back and processed it; is that

9    fair to say?

10       A.    All I got back was what I gave him, which was

11   the req -- signed-off requisition.

12       Q.    Yup.

13       A.    No backup -- no --

14       Q.    No additional paperwork?

15       A.    Correct.

16       Q.    Okay.  But you got the further approval from

17   Mr. Rotondi that it was okay to go ahead and do it?

18       A.    Yes.

19       Q.    Okay.  Let me ask you just a very general

20   question.

21            Before Mr. Alrai was hired, you indicated you

22   were at the United Way for some time, I think, correct?

23       A.    Yes.

24       Q.    The IT environment before Mr. Alrai was hired,

25   would you agree that it was -- needed improvement, the

1    IT systems?

2         A.    I'm no expert in that, but it seemed possible

3    that we had to make another leap into the 21st century.

4         Q.    Okay.  Get a little bit of updated technology?

5         A.    Yes.

6         Q.    And would you agree that after Mr. Alrai hired

7    and in the years that followed, the IT environment did

8    improve at the United Way?

9         A.    It seemed that it did.

10             MR. HARRINGTON:  Okay.  I don't have any other

11   questions, Judge.

12             THE COURT:  All right.  Any redirect?

13             MR. DAVIS:  None.  Thank you.

14             THE COURT:  You're excused.  Thank you.

15             THE WITNESS:  Thank you.

16                   (Witness excused.)

17             THE COURT:  All right, Counsel.  It's

18   5 o'clock, end of the day.  Anything for the Court?

19             MS. LE:  Your Honor, may we talk about

20   scheduling for tomorrow?

21             THE COURT:  Sure.  Let's get off the record,

22   though.

23                   (Off-the-record discussion.)

24        (Proceedings adjourned for the day at 5:00 p.m.)

25

C E R T I F I C A T E


         I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 4/10/2020     /s/  Liza W. Dubois
                         LIZA W. DUBOIS, RMR, CRR