*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


      * * * * * * * * * * * * * * * * * *
                                        *
      UNITED STATES OF AMERICA          *
                                        *  1:18-cr-192-JL
                      v.                *  December 5, 2019
                                        *  1:47 p.m.
      IMRAN ALRAI                       *
                                        *
      * * * * * * * * * * * * * * * * * *


                  EXCERPT TRANSCRIPT OF JURY TRIAL
                   DAY FOUR - AFTERNOON SESSION
                BEFORE THE HONORABLE JOSEPH N. LAPLANTE


<u>Appearances</u>:


<u>For the Government</u>:          John S. Davis, AUSA
                              Matthew Hunter, AUSA
                              Cam T. Le, AUSA
                              United States Attorney's Office




<u>For the Defendant</u>:          Timothy M. Harrington, Esq.
                              Timothy C. Ayer, Esq.
                              Shaheen & Gordon, PA




<u>Court Reporter</u>:             Liza W. Dubois, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              55 Pleasant Street
                              Concord, New Hampshire 03301
                              (603)225-1442

1               I N D E X

2

3   WITNESS:          Direct   Cross   Redirect   Recross

4   ELAINE SINGER       (Transcribed under separate cover.)

5   JACK ROTONDI          3       32        42         --

6   DOMENIC PALLARIA    (Transcribed under separate cover.)

7   JOHN MEYER          (Transcribed under separate cover.)

8

9

10  EXHIBITS:                    FOR ID            IN EVD

11  Government's 616                                   8

12  Government's 632                                  17

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2         (Elaine Singer transcribed under separate cover.)

 3              MR. DAVIS:  Jack Rotondi.

 4              THE CLERK:  Good afternoon, sir.  If you'd

 5    like to step down the center here.

 6              If you'd like to step into the witness box,

 7    please, and remain standing.

 8              Please raise your right hand.

 9         JACK ROTONDI, having been first duly sworn,

10    testified as follows:

11              THE CLERK:  For the record, please state your

12    full name and spell your last name.

13              THE WITNESS:  John Volpe Rotondi,

14    R-o-t-o-n-d-i.

15              THE CLERK:  Thank you.  Please be seated.

16                      DIRECT EXAMINATION

17    BY MR. DAVIS:

18         Q.   Good afternoon, Mr. Rotondi.

19         A.   Good afternoon, Attorney.

20         Q.   Did you work at United Way?

21         A.   Yes, I did.

22         Q.   And what were the approximate dates of your

23    employment?

24         A.   Roughly 2013, 2014, to I believe it was 20 --

25    July 2018, June, July 2018.
```

1      Q.   All right.  And what was your job title?

2      A.   I was the assistant vice-president of

3  organizational operations at the latest part of my

4  tenure.

5      Q.   All right.  And what department was that in?

6      A.   That was part of -- gosh, what was the name of

7  that department, that division, at the time?  I don't

8  recall.

9      Q.   Was it finance, was it administration?

10      A.   Administration and finance, sorry.  A&F I

11  think typically it was referred to.

12      Q.   Okay.  And describe your duties.  What did you

13  basically do for United Way?

14      A.   I managed many of sort of the internal

15  operations.  I managed a team of people who did data

16  processing, gift processing, a lot of data management,

17  worked with some of our corporate partners to help them

18  with their fund-raising efforts on a sort of more

19  data-driven manner.

20           I also managed a team of people who were

21  involved with internal print production, in-house print

22  production.

23           Also facilities management was a critical part

24  of my job.  Procurement, contracts, there was a

25  budget -- you know, budget piece, my own budget, as well

```
 1    as managing the -- the larger sort of procurement effort

 2    for the organization.

 3              It was a -- sort of a jack-of-all-trades A&F

 4    role.

 5         Q.    So to speak.

 6         A.    So to speak.

 7         Q.    And can you summarize briefly your

 8    professional experience prior to coming to United Way?

 9         A.    Uh-huh.  Certainly.

10              I had worked for I think approximately maybe

11    20 years or so working for regional and local nonprofits

12    in various roles, but primarily administration and

13    finance or fund-raising systems management roles,

14    including Harvard Medical School, Suffolk University; I

15    worked for Endicott College, UMass Lowell, and perhaps

16    one or two others in my tenure.

17         Q.    Okay.  Did you know Imran Alrai?

18         A.    I did.

19         Q.    And did you work with him?

20         A.    Yes, I did.

21         Q.    And on what kinds of matters did you work

22    together?

23         A.    Imran and I worked together on matters that

24    related to the intersection of my role in organizational

25    operations and his role in IT.
```

1          So an example might be when we -- when we

2     brought a -- when we brought in our insurance portfolio

3     to include cybersecurity, we would reach out to various

4     parties.  And one of the parties that we reached out to

5     was Imran to ask questions about our IT infrastructure

6     and things of that ilk.

7          We worked on project teams, including a

8     project team to decide what contract management system

9     we should bring on board.  I would have conversations

10    with him on occasion when it came to disconnects between

11    our respective teams that I felt it needed to have a

12    face-to-face or at least a personal interaction with him

13    on, when there was friction or some disagreement that

14    seemed to be better suited to two managers, you know,

15    having a conversation.

16         Budget items, contract items, RFPs, were also

17    part of the mix.

18         Those are some things that come to mind.

19    Q.   Okay.

20    A.   We gave a presentation together to the full

21    staff about protecting yourself with hacking and

22    phishing and, you know, we talked about the power of

23    password management software, which I became a big

24    proponent of, and I recall that joint presentation to

25    all staff.

1     Q.   All right.  Did you have a good relationship

2  with Mr. Alrai?

3     A.   I would describe our personal relationship as

4  positive.  I believe we had lunch together, we broke

5  bread at least on maybe two or more occasions.  I found

6  him just personally to be delightful, curious,

7  interested and interesting.

8          Professionally, there were occasions where I

9  was -- experienced a bit of frustration around a lack

10  of -- I would refer to it as timeliness and

11  thoroughness.

12     Q.   Okay.  And can you elaborate just a little

13  bit?  What do you mean lack of timeliness, thoroughness?

14     A.   There were -- again, you know, this is some

15  time in the past, but I have recollections of at least

16  one face-to-face conversation I had with him in one of

17  our conference rooms where I expressed some concerns

18  about whatever project it was, about it not -- not

19  getting as much feedback from him in as timely a manner

20  and thorough a manner as I had hoped and just, you know,

21  tried to put my cards on the table in a very firm, yet

22  diplomatic way.

23     Q.   All right.  And did he take that well?

24     A.   Yes.  He -- he was consistently adept at

25  hearing that type of thing and sort of acknowledging it

1   openly and not sort of, you know, deflecting or being

2   overly defensive about it.  I would say that was -- that

3   would be accurate.

4       Q.   Okay.  So you mentioned cybersecurity.  I want

5   to show you Government Exhibit 616, 6-1-6, which goes

6   back to July of 2013.

7            And I move to admit 616 in evidence and strike

8   the ID.

9            MR. AYER:  No objection.

10           THE COURT:  Admitted.

11           (Government's Exhibit 616 admitted.)

12      Q.   So going back to the initial part of this

13  email, you can see Mr. Alrai is providing some

14  information here; is that correct?

15      A.   That's correct.  I believe the information

16  was originally requested by my colleague and someone

17  who -- a direct report of mine named Diane Dragoff.

18      Q.   All right.  And so Diane Dragoff is asking

19  questions about the cybersecurity insurance policy

20  application; is that right?

21      A.   That's correct.

22      Q.   Okay.  And so let's go to the front page

23  again.

24           Can you read just Diane's short note at the

25  top of the page to Imran?  I'm sorry, the one below

1   here.

2        A.   Not at all.

3        Q.   This here.  Very good.

4        A.   "Imran, thank you for the information.  Who

5   did the network assessment last year and what was the

6   result of the security portion?  Were the defects from

7   the prior assessment, one, software patch management

8   needed improvement; two, antivirus software maintenance

9   needed updating; three, other medium risk

10  vulnerabilities would be, quote, remediated by hardening

11  the web server configurations in accordance with best

12  practice security standards, repaired?  Please let me

13  know.  Diane."

14       Q.   Okay.  And can you read Mr. Imran Alrai's

15  response to that?

16       A.   "DigitalNet performed the assessment.  They

17  found the same issues as outlined below in your message.

18  Thanks."

19       Q.   Okay.  So you also mentioned you worked on

20  contracts and RFPs from time to time.

21       A.   Yes.

22       Q.   Okay.  And was -- one of your interests in

23  RFPs was knowing about the different proposals that were

24  made by the competing vendors?

25       A.   Correct.

1      Q.    All right.  And showing you Exhibit 629 -- and

2  this is August of 2015 -- and you can see the subject

3  there.  Can you read the subject?

4      A.    "Web development RFP."

5      Q.    Okay.  And so this is from you to Diane --

6      A.    Correct.

7      Q.    -- at the top?

8            And then below that is an email from you to

9  Mr. Alrai about the same subject, correct?

10      A.    Correct.

11      Q.    And can you read that email, please.

12      A.    "Imran, good morning.  Please forward me and

13  Diane D the two proposals you have received no later

14  than 2:00 p.m. today, if at all humanly possible.

15            "Pat is deeply and rightly concerned that

16  procurement staff, Diane and me, have not yet received

17  these proposals to review, yet she is being asked to

18  sign off on certain things.

19            "I know that the ups and downs of this process

20  have been a source of frustration for you, but my team's

21  role in this is critical and mandatory.  Our job is to

22  ensure that before monies are spent, particularly

23  hundreds of thousands of dollars, that the money is

24  spent appropriately.

25            "Please advise.  Thanks, Jack."

1    Q.   So, no offense, but you seem to have taken a

2  preachy bent in that email; is that fair?

3    A.   That's fair to say.

4    Q.   And any idea why you would have done that?

5    A.   Because instead of expressing my own

6  frustration and I think perhaps -- and this is not --

7  this is not uncommon for how I would do business in

8  situations like this.  Instead of expressing my

9  frustration, I thought the carrot was better than the

10 stick; to acknowledge that he may have frustration and

11 then basically use honey instead of vinegar.

12    Q.   Okay.

13    A.   Sorry for the metaphor.

14         THE COURT:  You were saying you were putting

15 it on with the vinegar.  That's what he said.  He's

16 asking you why the vinegar.

17         THE WITNESS:  Exactly.  Well --

18         THE COURT:  Well, you're telling him why you

19 used the honey.  What's -- what's got you riled up?

20         THE WITNESS:  There was a significant delay,

21 if I'm -- if I remember correctly, in having read this,

22 these emails, of course, between the time I had

23 originally requested the information from the time now

24 that my boss has been presented with something to

25 sign --

1             THE COURT:  Yeah.

2             THE WITNESS:  -- but for which we do not have

3    the adequate collateral to back up that request.

4             MR. DAVIS:  And if I may, your Honor, let's go

5    back to the beginning of that email one more time.

6        Q.   What was the date of Diane Dragoff's initial

7    email on this or -- let's see.  I'm sorry, I said Diane.

8             One page up.

9             So you wrote a note, June 18th, correct?  Do

10   you see that at the bottom of the page, Mr. Rotondi?

11       A.   Right.  But I was asking -- actually asking

12   about, quote, timeline and schedule which was already

13   established and had already been provided to -- to

14   Imran.

15       Q.   Right.  But you asked there, "please forward

16   me any proposals that have been submitted by the

17   vendors," right?

18       A.   Correct.

19       Q.   And Mr. Alrai replies to you right away, "will

20   do," correct?

21            Do you see that right above you?

22       A.   I do.  On June 18th.

23       Q.   Okay.  And then on July 7th, you're back,

24   right?  And what do you say here?

25       A.   "Imran, any new news on this front, any

1   proposals received?  If so can you forward them.  Next

2   steps?  Projected key milestone dates moving forward,

3   thanks, Jack."

4        Q.   Okay.  And how does Mr. Alrai respond to that,

5   going over to the first page?  Also gets right back to

6   you.

7        A.   "Our RFP needs to be updated.  Waiting more

8   info from marketing."

9             And then there's some more on page -- on the

10  subsequent page.

11       Q.   Okay.

12       A.   "Will keep you in the loop.  Thanks, Imran."

13       Q.   And that was July 7th of 2015.  And about,

14  what is that, five weeks later, you come back, right?

15       A.   Correct.

16       Q.   And all that time, have you gotten any web

17  development RFP proposals from Mr. Alrai?

18       A.   I don't recall, but ostensibly, based on the

19  email I sent on Friday, August 14th of 2015, no.

20       Q.   Okay.  So let's go to Exhibit 630, which is a

21  couple days later, August 16th.

22             Is that, again -- do you recognize that as an

23  email from Mr. Alrai to you and Diane Dragoff?

24       A.   That's what it is.

25       Q.   Okay.  And, again, I'm not asking you if you

1    specifically recall it --

2        A.    Fair enough.

3        Q.    -- whether you recognize the email --

4        A.    I do.

5        Q.    -- here.

6              Okay.  And what does this say?  What's the

7    subject of this?

8        A.    The subject is the website RFPs.

9        Q.    All right.  And so what does Mr. Alrai write

10   to you that Sunday?

11       A.    "Hello, Jack and Diane.  Attached are the two

12   responses that I received to the website RFP.  Please

13   let me know if you have any concerns with the language

14   or terms by close of business tomorrow, Monday,

15   August 17th, if possible.  I have decided to move

16   forward with DigitalNet.  Please feel free to reach out

17   with any questions or concerns.  Thanks, Imran."

18       Q.    Okay.  And did you also get involved in

19   actually suggesting and negotiating contract language

20   with Mr. Alrai?

21       A.    I was generally involved in helping to

22   negotiate and manage contract language for many of our

23   contracts.  There are basically two primary scenarios.

24   If you wish, I can explain.

25       Q.    Please, briefly.

1      A.    The two primary scenarios are, A, the language

2   was default language that the company provided; or, B,

3   there was default language that we provided them.  We

4   had -- we had a template and iterations of that template

5   that we would use and provide to the vendor.  We could

6   work both ways.  We were flexible in that respect.

7            MR. DAVIS:  Okay.  So let me show you

8   Government Exhibit 632.

9            All right.  And is that just a one-pager,

10  Ms. Sheff?

11           MS. SHEFF:  It's ten pages.

12           MR. DAVIS:  All right.  So let's get --

13     Q.    Okay.  So do you recognize this -- or, again,

14  not asking if you remember it specifically, but as

15  conversation about the contract for this web project

16  with DigitalNet?

17     A.    A website RFP?  I see --

18     Q.    Yes.

19     A.    -- that in the subject line.

20     Q.    Okay.  And Mr. Alrai had already told you he's

21  decided to go with DigitalNet, correct?

22     A.    Correct.

23     Q.    Okay.  And can you read his response to you?

24     A.    "Thank you, Jack.  I will send this to the

25  vendor to comment on your concerns.  As discussed on the

```
 1    phone, they pushed back on this contract because of the
 2    MSA."
 3         Q.   What's MSA, do you know?
 4         A.   Master service agreement --
 5         Q.   Okay.
 6         A.   -- or services agreement.
 7              "They wanted to have the SOW," the statement
 8    of work, "signed by both parties and thought that it was
 9    enough.  They said that nothing could supersede the MSA
10    that was already signed and accepted by both parties and
11    all terms and conditions are already there.
12              "Thanks for all your help, Imran."
13         Q.   And do you read this now as Mr. Alrai
14    reporting to you what someone else's response to and
15    position was, someone else at DigitalNet?
16         A.   That's correct.
17         Q.   When he talks about what they wanted?
18         A.   That's correct.
19              THE COURT:  When you say -- when you say
20    someone else at DigitalNet, someone at DigitalNet.
21              MR. DAVIS:  Someone at DigitalNet, correct.
22              THE COURT:  Because it's not -- was it known
23    to you at this point that Imran was DigitalNet --
24              THE WITNESS:  No.
25              THE COURT:  -- or at DigitalNet.
```

1          THE WITNESS:  No.

2          THE COURT:  Neither.  All right.  I just

3  wanted to make sure I didn't miss it.

4          MR. DAVIS:  Right.  Sorry, your Honor.

5          THE COURT:  Yup.  Okay.

6          THE WITNESS:  Your Honor, I'm sorry.

7          THE COURT:  You don't need to do that.  That's

8  okay.

9          MR. DAVIS:  Your Honor, I'd move to admit 632

10  and strike the ID.

11          THE COURT:  Counsel?

12          MR. AYER:  No objection.

13          MR. HARRINGTON:  He said no objection, your

14  Honor.

15          THE COURT:  Oh, I didn't hear you.  I'm sorry.

16  It's admitted.  No problem.

17          (Government's Exhibit 632 admitted.)

18     Q.   All right.  So you -- you also -- well, let me

19  ask this.

20          Do you recall an effort that began in mid-'16

21  to strengthen the due diligence process, the vetting

22  process that pertained to big contractors with United

23  Way?

24     A.   I recall personally initiating a process.  I

25  don't remember exactly the date range, so I can't speak

1    to the mid-2016, whereby over a period of time -- and

2    again I don't know what period of time -- I brought

3    people from various parts of our organization together

4    to try to build what would be a cohesive and, you know,

5    agreeable to many, much beefier due diligence process,

6    especially for -- it applied to all contracts, but

7    especially to the larger contracts.  The larger the

8    contract, the more requirements were associated with

9    that tier of contract.

10           Q.   Okay.  And were you trying to develop that

11   process in mid-'16 or do you not remember the dates

12   exactly?

13           A.   I don't remember the dates --

14           Q.   All right?

15           A.   -- but having read, you know, a certain set of

16   emails, there was a time frame that I was either in the

17   process or was about to begin the process of bringing

18   people together to, you know, initiate that project of

19   getting to a -- a stronger due diligence effort.

20           Q.   And did you know that DigitalNet was one of

21   the larger contractors for United Way?

22           A.   Correct.  I did.

23           Q.   Okay.  So showing you Exhibit 638 --

24                And I believe without objection, your Honor.

25   I move to admit 638 and strike the ID.

1          MR. AYER:  In my defense, I hadn't had a

2  chance to object.

3          MR. DAVIS:  I'm sorry.

4          MR. HARRINGTON:  And, Judge, just if I could

5  interject, we had had some conversations.  There's no

6  objection to all the government's exhibits at this

7  point.

8          THE COURT:  So from now on they're exhibits.

9          MR. DAVIS:  But what about the --

10          MR. HARRINGTON:  I already -- I had already

11  had some conversation with Matt.  The other stuff that

12  we had talked about relative to the metadata, we're

13  going to address that in cross-examination.

14          MR. DAVIS:  But no objection to its admission?

15          THE COURT:  Metadata, all right.

16          MR. HUNTER:  Just to clarify, so there's --

17          MR. HARRINGTON:  I didn't say I knew what

18  metadata was, Judge.

19          THE COURT:  Look.  Defense counsel just stood

20  up and said they don't object to any of those exhibits.

21  That's when you quit while you're ahead.

22          MR. DAVIS:  The government moves --

23          MR. HUNTER:  Yes, your Honor.

24          MR. DAVIS:  The government moves to admit all

25  marked exhibits on the government's exhibit list.

1          THE COURT:  There you go.

2          So no more striking ID, no more introducing.

3   You can just show him exhibits.

4          MR. DAVIS:  Thank you, your Honor.

5          THE COURT:  I appreciate that on both sides.

6          MR. DAVIS:  And thank you, Counsel.

7      Q.   All right.  Just a couple of things I wanted

8   to show you on 638.

9          Down at the bottom of the first page, do you

10  see the information about Insight Direct?

11     A.   I do.

12     Q.   Okay.  And this is information being provided

13  by Mr. Alrai to you?

14     A.   Correct.

15     Q.   All right.  And what does he say about Insight

16  Direct?  Could you read just the first three sentences

17  or so?

18     A.   Certainly.

19          "We are using this vendor to utilize VMware

20  cloud services for our environment.  Due to recent

21  upgrade of our infrastructure, this is a must have.  I

22  worked with Insight to secure the best possible" --

23          THE COURT:  Slow down just a little bit for

24  the reporter, please.

25          THE WITNESS:  Sorry.

1           THE COURT:  No problem.

2      A.   "I worked with Insight to secure the best

3 possible price.  I started out with some research on

4 pricing and talked to a few other companies, but Insight

5 was the best option in terms of service and pricing."

6      Q.   Okay.  That's enough.  Thank you.

7           Now, what -- what are the contracts being

8 discussed below that?  Who are they with?

9      A.   I'm sorry?

10     Q.   What are the contracts below the Insight

11 contract, numbers 2 and 3 there?

12     A.   DigitalNet and DigitalNet.

13     Q.   Okay.  And then going to the next page, a

14 continuation of that same message.

15          MS. SHEFF:  Sorry.

16          MR. DAVIS:  That's all right.

17     Q.   Do you see the top there, two more

18 DigitalNets?

19     A.   I see number 4, DigitalNet; number 5,

20 DigitalNet.

21     Q.   Okay.  Including now the web development

22 contract that we talked about from 2015, correct?

23     A.   I don't know if it's the one from 2015, but

24 it's clearly a web development integration reference.

25     Q.   Okay.  So if we could -- in the middle of the

1   page, Mr. Alrai talks to you about IT vendor selection.

2   Do you see that?

3        A.    I do.

4        Q.    And do you see the -- the paragraph that

5   begins "we formed a committee"?

6        A.    I do.

7        Q.    Okay.  Could you read that paragraph, please.

8        A.    Certainly.

9             "We formed a committee that consisted of

10   internal UW folks, led" -- should be led -- "by chairman

11   of the IT advisory committee.  We put together an RFP

12   and vendor assessment criteria to evaluate each

13   response.

14             "We invited over a dozen existing and new

15   vendors to respond.  7/8 of those showed interest by

16   responding.  Four of them didn't meet the basic

17   requirements to offer all services by a single vendor.

18             "We had three or four finalists that we held

19   a -- we had three or four finalists that we held a

20   calls," sic, "answered and asked questions and exchanged

21   information with.  It came down to two finalists with

22   DigitalNet being stronger technically.  I then requested

23   them to revise their pricing and submit the best and

24   final number.

25             "DigitalNet was chosen with mutual consent

1  based on their technical abilities, customer service,

2  customer references, and pricing."

3      Q.   Okay.  So let's go on to Exhibit -- let's go

4  on to 640, please.  And do you see this is

5  correspondence from someone named Mac Chaudhary at

6  DigitalNet.com to you, copying Mr. Alrai?

7      A.   Correct.

8      Q.   Do you see the subject is introduction?

9      A.   Correct.

10     Q.   And the attachments include bank reference

11 letter for United Way, letter to United Way, and

12 portfolio of services to United Way.  Do you see that?

13     A.   Correct.

14     Q.   Okay.  Okay.  Let's go to the second page.

15 That's your initial note to Mac.

16          You can see Mr. Alrai at the bottom is sending

17 an email to Mac to introduce him to you, Jack Rotondi,

18 correct?

19     A.   Correct.

20     Q.   And he's explaining to Mr. -- to Mac that

21 United Way has a new policy in place for all large

22 vendors effective July 1st?

23     A.   Correct.

24     Q.   Okay.  And so you write a note to Mac on

25 July 13th of 2016.  And what do you say to him?

1    A.   "Mac, it's a pleasure to virtually meet you.

2  Please don't hesitate to contact me if you have any

3  questions about what we're requesting.

4         "Also, please let me know if you might be in a

5  position to provide the requested items by close of

6  business this Friday.  We'd like to move forward as soon

7  as possible with the various pieces of work we're

8  jointly engaged in.  This new policy simply requires

9  certain documents to be on file for our larger vendors.

10         "Thanks, Jack."

11    Q.   Okay.  And going to the first page, the

12  initial page, what is -- what is Mac writing you on

13  reference your email dated July 13th?  Up at the top,

14  sir.

15    A.   "Good afternoon, Jack.  Likewise, nice to meet

16  you."

17    Q.   And at the -- at the top of the email, when he

18  writes on July 18th?

19    A.   "Jack and Imran, reference your email dated

20  July 13th, please find documents attached herewith as

21  requested.  My best, Mac."

22    Q.   Okay.  And, again, the third attachment is

23  called Portfolio of Services to United Way; is that

24  right?

25    A.   This document's header is DigitalNet Portfolio

1  of Services.

2      Q.   Okay.  And it deliver -- it describes various

3  services, talks about delivering peace of mind to our

4  clients there at the bottom.  Do you see that?

5      A.   I do.

6      Q.   Okay.  And just going back to the top, the

7  beginning of the email, again, the title of the

8  attachment here in the attachments is Portfolio of

9  Services, right?  Do you see that, Portfolio of --

10     A.   I see a reference in the attachments field to

11 Portfolio of Services.

12     Q.   And that doesn't say customer list, does it?

13     A.   No, it does not.

14     Q.   Okay.  So let's go now to email 6-4-2,

15 Government Exhibit 642 in evidence.  And let's go just

16 to your note, starting on Monday, July 18th, to Mac.

17          I'm sorry, up one.

18          Good.  Thank you.

19          What do you write to Mac on July 18th?

20     A.   "Mac, thank you for your email and the

21 attachments.  I'm hoping you can also provide total

22 number of clients and a sample client list.  It may have

23 been part of a page 2 of the third document which

24 mentions verticals but not actual clients and total

25 number.  That didn't come through?

1          "Thanks, Jack."

2     Q.    So you're suggesting what might have happened

3  here, right?

4     A.    Correct.

5     Q.    Okay.  And so what do you get back from Mac,

6  and what time is that that he gets back to you on

7  July 18th?

8     A.    5:33 p.m.

9     Q.    All right.  So that's about -- what is that,

10  three and a half hours after your request for page 2?

11     A.    Correct.

12     Q.    Right.  And what does Mac say to you?

13     A.    "Didn't save PDF properly.  Try this."

14     Q.    Okay.  And let's go back to the attachments.

15          We've already seen this in this case, but the

16  first page is the DigitalNet Portfolio of Services.

17  That came the first time, right?  At least as the emails

18  show.

19     A.    Absolutely.

20     Q.    Okay.  And the second page was what?

21     A.    Facts at a Glance is the first thing you see

22  on this document.

23     Q.    And then below that?

24     A.    Sample List of Clients.

25     Q.    Okay.  All right.  And can we just see the

1    rest of the attachments here?  Just scroll through the

2    attachments.

3              MS. SHEFF:  That's it.

4              MR. DAVIS:  That's it.  Okay.

5         Q.   All right.  Let's go now to Government 644.

6    Just three more emails and we're done.

7              Showing you now Exhibit 644 in evidence.  And

8    you see that's --

9         A.   I do.

10        Q.   -- an email from Mr. Alrai to you?

11        A.   Yes.

12        Q.   Okay.  And that provides various information

13   about DigitalNet and DigitalNet contracts?

14             You can just leave it as it is for now.

15             Okay.  And let's go to the second page.

16             All right.  And back to the next page after

17   that.

18             Okay.  Let's -- and can you read your email on

19   July 19th here?  So this is after you've gotten the

20   customer list.  What does that email say?

21        A.   "Imran, we now have all the requested

22   documents from DigitalNet.  I've stored them in the

23   contract repository and attached them here.  Diane has

24   done her online literature search, also attached.

25             "How are you coming along on your to-do?"

1          And, in quotations, "Imran to provide Jack and

2     Diane via email with the following three things for each

3     of the five POs:  List of competitive vendors,

4     competitive pricing offered by those respective vendors,

5     why we chose the final vendor."

6          And then below that, "with your piece, we'll

7     have everything we need to move forward.  Please advise.

8     Thanks, Jack."

9        Q.   Okay.  And so can we go back to the beginning

10    of the same email?

11          Okay.  I just want to look at that.

12          You see number 3 in the response from

13    Mr. Alrai?

14        A.   I do.

15        Q.   Can you read that, please?

16        A.   "Three, pricing fluctuates depending on market

17    trends and services used.  Our environment has grown and

18    modernized since 2013.  I believe DigitalNet pricing is

19    competitive."

20        Q.   Okay.  So let's go to Exhibit 645 in evidence.

21    And this is still July of 2016; is that right?

22        A.   Correct.

23        Q.   Okay.  And at the very top, what does

24    Mr. Alrai report to you?

25        A.   "Jack, I have updated the document.  See bold

1    text for new information.  Thanks."

2        Q.   Okay.  So can we -- and is -- have you seen

3    this, there's bold text that shows information that

4    Mr. Alrai has provided in --

5             Not on this page, but keep scrolling, please.

6    Keep going.  Keep going.

7             Okay.  And here is bold text, right?

8        A.   Correct.

9        Q.   Okay.  For number 3, can you -- can you -- do

10   you see the bold text there for number 3 about the

11   748,000 IT support matter?

12       A.   Yes, I see it.

13       Q.   And what did he write there?

14       A.   "RFP went out in 2013 to a number of vendors.

15   It was a competitive process managed by a committee that

16   was chaired by Stan Burrows, chairman of the IT advisory

17   committee and board member.  DigitalNet was selected

18   based on their expertise, ability to consolidate all

19   services into one vendor, customer service, and pricing.

20   Their pricing was very competitive and they had good

21   customer references where they performed similar tasks.

22   Pat oversaw the due diligence paperwork and checked

23   customer references before signing the contract."

24       Q.   All right.  Lastly, let's go to Exhibit 647.

25   And is this still from July of 2016, as you're asking

1  for information from Mr. Alrai?

2       A.   Correct.

3       Q.   Okay.  And does this document contain the

4  attachments with the information you compiled about

5  DigitalNet in this effort?

6       A.   I'm sorry.  Could you please repeat that

7  question?

8       Q.   Does this email include the attachments which

9  include the online search document, the bank reference

10  letter for United Way, the letter to United Way and the

11  portfolio of services to United Way?  Are those the

12  attachments you were gathering as you're vetting

13  DigitalNet in this process?

14       A.   I believe so.  I don't know if this -- what's

15  listed here under attached is a comprehensive list of

16  what was requested/received --

17       Q.   Sure.  Right.

18       A.   -- but these are certainly some of the

19  documents that were requested and I believe received.

20       Q.   Okay.  And what do you write -- what do you

21  write at the top to Mr. Alrai?

22       A.   "Imran, we now have all the requested

23  documents from DigitalNet.  I've stored them in the

24  contract repository and attached them here.  Diane has

25  done her online literature search, also attached."

1      Q.   Okay.  So that's sufficient.

2           So let's go and just quickly look at the

3   attachments.

4           If you could just scroll through, please.

5           All right.  Stopping there, do you see this

6   letter dated July 14th of 2016?

7      A.   Yes.

8      Q.   And that's from Pentucket Bank, the branch

9   manager there?

10     A.   Yes.

11     Q.   Okay.  And what does it say about DigitalNet?

12     A.   "To whom it may concern, this letter is to

13  verify that DigitalNet Technology Solutions, LLC, has

14  been an active customer in good standing with Pentucket

15  Bank.

16          "DigitalNet Technology Solutions, LLC, has

17  multiple open and active deposit accounts with us and

18  has no outstanding debts.

19          "If you have any inquiries regarding this

20  company, please contact us at" phone number.

21     Q.   Phone number.  Okay.

22          Can we look at the next attachment document?

23          And this one's dated July 18th of 2016 --

24     A.   Yes.

25     Q.   -- right?  And signed by a Mac Chaudhary,

1    vice-president of business development and operations?

2        A.   Correct.

3        Q.   Can you read the text of the letter briefly?

4        A.   "This letter is to affirm that DigitalNet

5    Technology Solutions, LLC, is a privately held IT

6    services company with offices in North America,

7    Middle East, and South Asia.  DigitalNet is a

8    financially strong, reputable organization with a

9    growing customer base worldwide.  We take immense pride

10   in being a debt-free organization that is up to date

11   with its financial obligations.

12           "If you have any questions regarding this

13   letter, please feel free to contact us at" number.

14           MR. DAVIS:  No further questions.  Thank you.

15           THE COURT:  Thank you.

16           Cross.

17                     CROSS-EXAMINATION

18   BY MR. AYER:

19       Q.   Mr. Rotondi, you testified that you worked for

20   United Way starting in about 2013, right?  '13 or '14?

21       A.   Somewhere in the 2013 neck of the woods.

22       Q.   So it was after the initial contracts with

23   DigitalNet were signed?

24       A.   I believe so.

25       Q.   And you were not involved in that process?

1          A.    I do not believe so.

2          Q.    You don't have any personal knowledge about

3    that process?

4          A.    I don't recall.

5          Q.    Your day-to-day job did involve review of

6    contracts?

7          A.    I'm sorry, sir?

8          Q.    Your day-to-day job did involve the review of

9    contracts?

10         A.    Yes, it did, sir.

11         Q.    And you reviewed scores of contracts?  I think

12   you said a hundred contracts.

13         A.    I would say roughly 50 to a hundred each year

14   that I was in that role.

15         Q.    And you reviewed them -- well, what did you

16   review them for?

17         A.    I reviewed them to ensure that the language

18   was in our best interests in lieu of having counsel,

19   which on very rare occasions was involved.  It was my

20   job to make sure that the language, to the best of my

21   nonlegal skill set, reflected and defended the rights of

22   our organization, but also reflected a certain degree of

23   mutuality and -- in the agreements.

24         Q.    And so during your tenure at the United Way,

25   you reviewed them yourself; you could also ask that they

1    be reviewed by a lawyer, you just said?

2         A.    On a rare occasion, I would ask my boss,

3    whoever that would have been under -- during my tenure,

4    Pat or Rich, if they wished to have counsel involved.

5         Q.    Okay.  And did you do that for only new

6    contracts or did you also review existing contracts?

7         A.    I do not recall.

8         Q.    At any point you don't recall whether you just

9    did new contracts or not?

10        A.    I don't recall if I requested whether counsel

11   should be involved from my bosses, differentiating

12   between old or new contracts.  I don't remember a

13   differentiation between those two.  Is that the

14   question?

15        Q.    Well, taking counsel out of it; you, yourself,

16   in your function, did you yourself only review new

17   contracts as they came in or did you also go back and

18   review existing contracts --

19        A.    In my function, typically I was reviewing

20   contracts only when they were being initiated and

21   processed.  Once they went through the entire vetting

22   process and the signature process, I would not typically

23   be involved with reevaluating that contract.

24             If the contract needed to be refreshed, if we

25   needed a new contract, even if it was very comparable to

1  a past contract, part of my role was to review that new

2  contract.

3       Q.   Okay.  And you also in your function you

4  worked from home about two days a week?

5       A.   I think that's roughly accurate, maybe two to

6  three days a week on average, but not for my entire

7  tenure.  I don't think I worked from home in the

8  beginning of my tenure.  I don't know exactly when it

9  started, but maybe after year one, somewhere in year two

10  or three.

11       Q.   And in your function, you had contact with

12  some DigitalNet employees?

13       A.   I had contact with DigitalNet employees on

14  occasion, yes.

15       Q.   And you had contact with the -- the two people

16  who were in the United Way, right?

17       A.   I certainly had contact with the analysts,

18  customer support analysts, however you want -- might

19  want to refer to them.

20       Q.   And you had telephone contact with Kal Wahbe?

21       A.   On very, very rare occasions, I spoke to Kal.

22  I couldn't tell you how many times I spoke to Kal, but

23  it was fairly rare that I would have a conversation with

24  Kal and I don't recall under what circumstances.

25       Q.   All right.  But you -- now, do you remember,

1    did you reach out to him or did he reach out to you?

2         A.    I do not recall.

3         Q.    But you do recall speaking to him on the

4    phone?

5         A.    Yes, I do.

6         Q.    Now, do you recall a point at which you

7    sought to -- to resell United Way of Massachusetts Bay

8    Merrimack Valley's campaign management and processing

9    services to other United Ways?

10        A.    I'm sorry.  Could you repeat the question?

11        Q.    Sorry.  That was a long one.

12        A.    Not at all.

13        Q.    Do you remember a time at which you sought to

14   resell the campaign management and processing services

15   that your branch of the United Way used to other United

16   Ways?

17        A.    I'm not familiar with the term resell in this

18   context.

19        Q.    Did you try to talk about it to them to have

20   them adopt it?

21        A.    I'm sorry.  I'm not tracking.

22              THE COURT:  To persuade them to do it.

23              THE WITNESS:  To persuade who to do what?

24        Q.    Other offices of the United Way, did you

25   discuss with them adopting the campaign management and

1  processing services that the United Way, your branch of

2  the United Way, was using?

3      A.   The only thing that I can associate that might

4  be related to that would be conversations with another

5  United Way to do some of -- to do some campaign

6  processing for them.  It wasn't necessarily -- was it an

7  ongoing -- ongoing and permanent basis or was it -- I

8  don't -- I don't recall an ongoing and permanent basis,

9  but I certainly remember conversations that came to

10  fruition with -- I don't recall the United Way, I'm

11  sorry --

12      Q.   Was it in Manchester?

13      A.   -- where we actually -- I'm sorry?

14      Q.   Was it the one in Manchester, New Hampshire?

15      A.   I don't recall, but we --

16           THE COURT:  It's cross-examination.  Just lead

17  him.  Just put it in front of him.

18           MR. AYER:  Well, I can't lead if I don't know

19  if he knows it.

20           THE COURT:  Oh, you're asking questions you

21  don't know the answers to.

22           MR. AYER:  Well, I assume I know the answer.

23  I don't know if he knows the answer.

24           THE WITNESS:  So we did work with another

25  United Way and basically made arrangements to do some

1   campaign processing for them which involved a certain

2   amount of back-and-forth where they would -- they would

3   ship us certain paper documents related to their

4   fund-raising effort; we would then take those documents,

5   do different things with them that involved processing

6   on our end, and there would be output that we would then

7   be able to provide back to the other United Way.

8        Q.    And you were responsible for some fund-raising

9   and campaign management at your branch?

10       A.    Yes, I managed the -- a small team.  I was

11  responsible for data processing, gift processing, as

12  well as a team that was -- a subteam that worked with

13  companies and other entities to help them manage their

14  data around their fund-raising campaigns.

15       Q.    All right.  And you used the Andar software

16  for that?

17       A.    During my tenure -- I believe we started using

18  Andar shortly after I started, somewhere in the late

19  2013, 2014 time frame.

20       Q.    All right.  And you didn't have any complaints

21  about that software?

22       A.    Did I have any complaints about that software?

23  I don't recall -- I don't recall specific complaints

24  that I personally had.  I recall, vaguely, conversations

25  with members of my team and other members of the -- you

1    know, the -- the organization with challenges that they

2    had with the software.

3            I came on board at a time where I believe we

4    were actually trying to bring the software live and I

5    think one of my earliest roles in the company was to try

6    to sort of bring certain members of different teams

7    together to kind of get on the same page about that sort

8    of -- that onboarding process.

9        Q.   And the onboarding process with any sort of

10   software is going to be a little bit difficult?

11       A.   Not necessarily with anything, but I had

12   directed a number of conversions at my prior roles.  In

13   fact, I would say that professionally that was probably

14   what I was best known for and perhaps one of the reasons

15   they primarily hired me is that I had helped manage

16   conversions, some significant ones, where there was a

17   merger between Beth Israel and Deaconess, for example,

18   and we had to merge our fund-raising systems.

19           So you know -- Harvard was one of the largest

20   conversions, actually, in academic, you know, history in

21   terms of the fund-raising.  Harvard agreed that they

22   were all going to convert to the same software

23   management system.  So I was in charge of HMS in dental

24   school.

25       Q.   All right.  So I've asked you two sort of

1  related questions:  One, you were happy with the

2  campaign management system that you were using, the

3  fund-raising system you were using?

4        A.    Which one, sir?

5        Q.    Andar.

6        A.    I didn't actually use Andar on a day-to-day

7  basis.  What I --

8        Q.    I thought you just said you did.

9        A.    I did not personally use it --

10        Q.    Okay.

11        A.    -- on a day-to-day basis.

12             My team members used it -- a number of them

13  used it on a daily basis.  Not all of my team.  Some of

14  my team was more physical plant and house production,

15  like Diane Dragoff and her people, but there were other

16  members of my team that used it very, very much on a

17  daily basis.

18             So I was -- I would occasionally -- I don't

19  recall specifically, but occasionally play a role when

20  they had a challenge with the software or some process

21  internally.  Sometimes -- I don't recall, but it wasn't

22  just about the software, of course.  It's about

23  operationally the fluidity of how things moved and if

24  there were challenges working with other members of the

25  team to effect certain processes.

1      Q.   Okay.  Is that the software that you would

2  have used, for example, when you were offering to run

3  other offices' campaigns and do that work for them?

4      A.   I -- I had never previously been exposed to

5  Andar, I think primarily because Andar is -- I think

6  it's fairly common knowledge that it's very much a

7  United Way -- not solely United Way, but I believe it --

8  United Way was a significant part of its customer base.

9           The software programs I had previously used

10 were all fund-raising management tools, but I had not

11 previously been exposed to Andar.

12     Q.   All right.  So we just talked about how you

13 were offering to organize and run some campaigns for

14 another United Way office a little while ago.  Do you

15 remember that?

16     A.   Correct.

17     Q.   And we discussed how Andar was the campaign

18 management system you were using?

19     A.   At that time, I believe, yes.

20     Q.   So that's the system you would have used to

21 help run the campaign for the other office, right?

22     A.   Correct.

23          MR. AYER:  Okay.  That's all I have, your

24 Honor.

25

1          REDIRECT EXAMINATION

2    BY MR. DAVIS:

3          Q.   And just very briefly, you were asked about

4    Andar.

5               Andar is a --

6               THE COURT:  Counsel, just give me one second.

7               MR. DAVIS:  Sure.

8               THE COURT:  Thank you.

9          Q.   Did you know enough about Andar to know

10   whether it was a bespoke, customized, unique software

11   used just at the Boston United Way or whether Andar was

12   a product designed and used by offices all over the

13   country?

14         A.   The latter.

15         Q.   All right.  So the Andar you were using was

16   not some custom-designed thing?

17         A.   Anything but.  I'm not saying there wasn't

18   customization involved on the back end, but Andar, as a

19   tool, was used very, very widely by many United Ways.  I

20   don't know how many United Ways, but very broadly used.

21              MR. DAVIS:  No further questions.

22              THE COURT:  Recross?

23              MR. AYER:  No, your Honor.

24              THE COURT:  Thank you, sir.

25              THE WITNESS:  Thank you.

1                        (Witness excused.)

2              (Testimony of Domenic Pallaria transcribed

3    under separate cover.)

4              (Testimony of John Meyer transcribed under

5    separate cover.)

6         (Proceedings adjourned for the day at 5:01 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 4/10/2020       /s/  Liza W. Dubois
                           LIZA W. DUBOIS, RMR, CRR