*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:18-cr-192-JL
            v.                  *   December 6, 2019
                                *   8:11 a.m.
IMRAN ALRAI                     *
                                *
* * * * * * * * * * * * * * * * *
```


EXCERPT TRANSCRIPT OF JURY TRIAL
DAY FIVE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office



For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon PA



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

```
1                    I N D E X

2

3    WITNESS:           Direct   Cross   Redirect   Recross

4
     JOHN MEYER         (Transcribed under separate cover.)
5
     AZIM MAZAGONWALLA      4       30        --
6
     CHRISTINE BOWRY       48       --
7
     JILL LAROE            53
8

9

10
     EXHIBITS                        FOR ID     IN EVD
11
     (None marked.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2             THE CLERK:  The Court has before it for
 3    consideration today day five of the bench trial in
 4    criminal case 18-cr-192-01-JL, United States of America
 5    vs. Imran Alrai.
 6             THE COURT:  All right.  The witness will
 7    resume the stand, which he's doing right now.
 8             Sir, you're still under oath.  Good morning.
 9             Mr. Hunter, you may resume.
10             MR. HUNTER:  Good morning, Mr. Meyer.
11             THE WITNESS:  Good morning.
12             (Testimony of John Meyer transcribed under
13    separate cover.)
14             MR. DAVIS:  The government calls Azim
15    Mazagonwalla.
16             THE CLERK:  Good morning, sir.  If you'd like
17    to step this way, please.
18             How are you this morning?
19             THE WITNESS:  Good, thank you.
20             THE CLERK:  If you could step into the witness
21    box and remain standing.
22             Please raise your right hand.
23             AZIM MAZAGONWALLA, having been first duly
24    sworn, testified as follows:
25             THE CLERK:  For the record, please state your
```

1    full name and spell your last name.

2              THE WITNESS:  Azim Mazagonwalla,

3    M-a-z-a-g-o-n-w-a-l-l-a.

4              THE CLERK:  Please be seated.

5                    DIRECT EXAMINATION

6    BY MR. DAVIS:

7         Q.   Good morning, sir.  Did you use to work at

8    United Way?

9         A.   That's correct.

10        Q.   And what was your position at United Way?

11        A.   I was the senior director of accounting,

12   policy and treasury services.

13        Q.   And what department were you in?

14        A.   I was in the accounting -- accounting, finance

15   department.

16        Q.   And how long were you there?  What was your

17   term?

18        A.   I was there from December 2010 to almost

19   August 2017.

20        Q.   So 2010 to 2017?

21        A.   Yes.

22        Q.   And --

23        A.   End of 2010.

24        Q.   So did you know Imran Alrai at United Way?

25        A.   Yes, I did.

1        Q.    All right.  Could you summarize, please,

2    briefly your professional background and experience

3    before you got to United Way?

4        A.    Yes.  I am a -- I am a CPA from Rhode Island.

5    I got -- and I worked in public accounting for about six

6    years and then went private nonprofit for another,

7    eight, nine years now.

8        Q.    All right.  Now, were you involved in Imran

9    Alrai's hiring at United Way?

10       A.    No, I was not.

11       Q.    Were you aware that United Way wanted to make

12   changes in IT at that time?

13       A.    Yes, I did.

14       Q.    And can you summarize from a general view,

15   what was United Way trying to accomplish, as you

16   understood it?

17       A.    Yes, so -- so we were going through a process,

18   the United Way was going through a process of having its

19   IT services really built in-house.  So we had a service

20   provider who was doing all our software and moving away

21   from that system to having a provider who will provide

22   us most of our software that we would have to manage.

23       Q.    And one of -- was one of the concerns cost,

24   the cost that United Way was paying, say, at the

25   beginning of 2012?

1    A.    Yes, there was -- one of the issues was cost.

2    Q.    Yeah.

3    A.    But the other issue was also just relying on a

4    single provider.

5    Q.    Okay.  Do you remember the IT health

6    assessment that was done in 2012?

7    A.    No, not -- not -- not in any sense of detail

8    except that something was done.

9    Q.    Okay.  And were you aware of whether that was

10   recommended by the finance committee?

11   A.    Not specifically, but I knew that such

12   decision processes went through the finance committee.

13   Q.    Okay.  And were you -- do you recall yourself

14   ever reviewing an IT health assessment as a result of

15   that?

16   A.    No, not in -- not in detail, no.

17   Q.    Okay.  But were you aware that Mr. Alrai made

18   a presentation to the finance committee after the

19   assessment?

20   A.    Yes --

21   Q.    All right.

22   A.    -- I was a part of the -- I was a part of the

23   finance committee staff --

24   Q.    Okay.

25   A.    -- staffing on the financial --

1          Q.   Can you explain that?  What's a finance

2     committee and what was your role with it?

3          A.   So my role, when it came to accounting policy

4     and treasury services.  So I managed the investment side

5     of it, the cash side of it, and also accounting policy.

6     When policy changes, I had to come in front of the

7     committee to get approvals.

8               So I was there most and almost -- most or all

9     of the finance committee meetings.

10         Q.   Okay.

11         A.   Integral to that part of the financial

12    committee was an IT function --

13         Q.   Okay.

14         A.   -- and so Imran presented it.

15         Q.   Do you remember the -- the direction of the

16    presentation that Mr. Alrai made to the finance

17    committee after the health assessment?

18         A.   Yes, and that was consistent with what we were

19    thinking about, which was moving away from that, kind of

20    building our own systems or United Way building its own

21    systems to -- bringing out vendors that have multiple

22    clients.

23         Q.   Okay.  All right.  Now, were you aware at the

24    very end of 2012 and beginning of 2013 of an RFP process

25    that was geared toward hiring a single company to be a

1    managed IT services provider?

2        A.   Yes.  And just -- at that time, the start of

3    the RFP process was more about what is the services that

4    we need.

5        Q.   Okay.  And were you involved in that

6    discussion?

7        A.   I was involved, yes, to a point where I was

8    making sure that there were three bids that were

9    received by the United Way --

10       Q.   Okay.

11       A.   -- the three-bid process, the bid process was

12   in place.

13       Q.   And why were you concerned about there being

14   three bids?

15       A.   Because it was a significant enough contract

16   that in order to really test our processes, we would

17   have to have three bids.

18       Q.   Okay.  And you talked about the beginning of

19   it was really identifying the services needed.  Were

20   you -- did you know what -- what those services were

21   that were identified?

22       A.   No.  No, I did not.

23       Q.   Okay.

24       A.   No, I did not.

25       Q.   And do you have an IT background that enables

1    you to review technical details in an IT contract, let's

2    say?

3         A.   No, I don't.

4         Q.   You're more a finance guy?

5         A.   I'm an all finance person.

6         Q.   Okay.  Now, were you actually assigned to be

7    on a -- on a small team of United Way employees to -- to

8    coordinate that RFP process when it happened?

9         A.   No, not that I recollect, because I think it

10   was more handled by the board -- by a board member and

11   by Imran's team.

12        Q.   Okay.  And did you have a role in the RFP

13   process?

14        A.   No.  I accepted that extent of basically

15   saying that three proposals in here and that somebody is

16   evaluating it to pick one of the three.

17        Q.   Okay.  When you say a -- when you identify a

18   board member, whom do you mean?

19        A.   I -- Stan.  Stan -- I forget his last name.

20        Q.   Do you mean Stan Burrows?

21        A.   Stan Burrows, that's correct.  Thank you.

22        Q.   He was not an actual member of the board, was

23   he?

24        A.   No, he was a member of the finance committee.

25        Q.   And was he on an advisory IT committee?

1      A.    Yes.  Yes, he was the -- he was the finance

2  committee member assigned to the IT group.

3      Q.    But Stan Burrows was not a United Way

4  employee.

5      A.    Not a United Way employee, yes.

6      Q.    He's a volunteer, right?

7      A.    That's correct.  He's a volunteer.

8      Q.    And his advisory committee was available to

9  advise about the RFP process --

10     A.    Correct.

11     Q.    -- is that correct?

12     A.    Correct.

13     Q.    Do you recall that?

14     A.    Yes, I do.

15     Q.    All right.

16     A.    Yes.

17     Q.    So and -- if I could call you Azim?

18     A.    Yes, please do.

19     Q.    So, Mr. Azim, if someone testified that there

20  was -- there were three people led by Imran Alrai, the

21  defendant --

22     A.    Yes.

23     Q.    -- but also included Diane Dragoff --

24     A.    Yes.

25     Q.    -- from procurement --

1      A.   Yes.

2      Q.   -- and you --

3      A.   Yes.

4      Q.   -- from finance, would that be mistaken?

5      A.   That -- that would not be correct.

6      Q.   Okay.  Can you explain that?

7      A.   Because -- so -- so let's go one by one.

8           Diane's role was more purchasing, so it was

9  more about making sure that the RFPs went out and then

10  came back in.

11      Q.   Okay.

12      A.   My role was to make sure that at least three

13  came back in to evaluate.

14          Both of us did not have the technical capacity

15  to really understand the differences between each of

16  those proposals.

17      Q.   Okay.  What do you remember doing, actually

18  doing, in that process?

19      A.   It's basically making sure that there were

20  three proposals --

21      Q.   Okay.

22      A.   -- in place.

23      Q.   But what did you do to make sure there were

24  three proposals?

25      A.   So I -- I remember looking at a report in

1    which there was a tabulation of the three proposals.

2         Q.    Okay.  Was that the so-called summary document

3    that showed the scoring as between DigitalNet and

4    mindSHIFT and EzeCastle?

5         A.    That would be appropriate, yes.

6         Q.    Okay.  You remember seeing that?

7         A.    Yes, I do.

8         Q.    Okay.

9         A.    Yeah.

10        Q.    So who wrote the RFP that went out from United

11   Way, as you recall it?

12        A.    It was Imran.

13        Q.    Mr. Alrai --

14        A.    Mr. Alrai.

15        Q.    -- right?

16              And who sent it out to different vendors, as

17   far as you knew?  Who was actually doing that?

18        A.    I -- I do not know specifically who sent it

19   out.

20        Q.    All right.  Did you do it?

21        A.    No, I did not send them out.

22        Q.    Okay.  And who received the RFP proposals that

23   came back from vendors?

24        A.    I do not know specifically who received that.

25   It would be either Diane or it would be Imran.

1     Q.   And did you receive them personally?

2     A.   No, I did not receive them personally.

3     Q.   All right.  Now, did you yourself ever review

4  any RFP proposals from outside vendors?

5     A.   No, not on an individual level.  On a summary

6  level, yes --

7     Q.   All right.

8     A.   -- to review summaries.

9     Q.   So all you saw was the summary sheet; is that

10  correct?

11     A.   That's correct.

12     Q.   And who wrote that summary sheet?

13     A.   It was Imran, yeah.

14     Q.   Now, as you look back on it, was that the

15  correct way to handle the RFP at United Way?

16     A.   It was of a technical nature and so the only

17  technical person qualified in that group would be

18  Mr. Alrai.  So --

19     Q.   All right.  But you didn't entirely answer my

20  question.

21     A.   Yeah.

22     Q.   As you look back on it now --

23     A.   Now, yeah.

24     Q.   -- was that the correct way to handle the RFP

25  process?

1    A.    No.  No.  Because it -- you know, usually

2    purchasing would do the tabulation.  Diane would do the

3    tabulation.

4    Q.    So explain that.  Why would purchasing do that

5    as opposed to --

6    A.    Because, you know, the process should be, you

7    know, the technical person writes the RFP, gives it to

8    the purchasing person, which would be Diane Dragoff; she

9    sends it out, she collects it, and tabulates it based on

10   the criteria that was given when the RFP was sent.

11   Q.    Okay.

12   A.    And once that gets tabulated, then it begins

13   to get reviewed.

14   Q.    Okay.  But in this case, at least it appears,

15   those various functions were centralized in one person,

16   correct?

17   A.    Yes.  Yeah.

18   Q.    And what you saw was a summary document at the

19   end of it created by Mr. Alrai?

20   A.    Correct.

21   Q.    Okay.  Let me show you Exhibit 612.

22   A.    Yeah.

23   Q.    Do you recognize this as an email from

24   Patricia Latimore to you in February of 2013?

25   A.    Yes.

1      Q.    Okay.

2      A.    Yes.

3      Q.    And let's just go back to the next page.

4      A.    Yeah.

5      Q.    So you can see that DigitalNet has provided

6  information to Mr. Alrai about DigitalNet?

7      A.    Yeah.

8      Q.    And then going back to the beginning of the

9  page -- we don't have to go through all of it again --

10     A.    Yeah.

11     Q.    -- the beginning of the page, can you read

12  what Pat says at the top to you?

13     A.    Yeah.  Yeah.  "Attached are our files."

14     Q.    So what does she say?

15     A.    She's asking me to process an ACH payment,

16  yeah.

17     Q.    Okay.  And that she left the invoice with Dom

18  for coding?

19     A.    Yeah.

20     Q.    Okay.  So what -- why would you be asked to

21  process the ACH tomorrow?

22     A.    So, I mean, I have -- so I had primary release

23  of cash from United Way as part of my function.  So when

24  check -- when a check comes -- so let me just go through

25  the process.

1          When a check request comes, it goes through

2     the accounting process, it goes to Domenic's office, the

3     checks get generated.  I review the final list and sign

4     off on it, on Pat's signature, before they release it.

5          When it comes to wires and ACH, I personally

6     do that.

7          Q.   Okay.

8          A.   There are very small numbers of them and in

9     cases of this, what happens is because it's an ACH

10    process, the control people -- the -- the process is

11    always -- it's -- it goes through the purchasing process

12    and it takes time before it gets kicked back and said,

13    oh, it's an ACH process, it has to get finalized and

14    finally go to Azim for release.

15         But I want everybody to sign off.  I'm just --

16    I'm not approving anything.  I'm just releasing the

17    checks or releasing the cash.

18         Q.   Okay.

19         A.   And this was -- that's what I was saying.

20    Everything has been signed off, release the cash.

21         Q.   So at the end of the RFP process --

22         A.   Yeah.

23         Q.   -- and the receiving information from

24    DigitalNet --

25         A.   Yeah.

1        Q.   -- on February 28th of 2013, United Way is

2    ready to release the process and start paying?

3        A.   First, yes.  First ACH, yes.

4        Q.   Okay.

5        A.   I think it's most likely this would be the

6    first ACH.

7        Q.   Okay.  And let me ask you about Exhibit 609,

8    because you talked about the summary sheet.

9        A.   Yeah.

10       Q.   I'm sorry, wrong exhibit, 608.

11            MR. DAVIS:  Can we see --

12       A.   Okay.

13            MR. DAVIS:  -- attachments to that?

14       A.   Yeah.

15       Q.   Do you recall seeing the list of companies

16   solicited from Mr. Alrai?

17       A.   Yes, I -- I remember seeing documents.

18       Q.   And did you regard that as appropriate -- an

19   appropriate number of companies to be solicited?

20       A.   Yeah, I -- we left a lot of this to Imran's

21   judgment, reason that I felt it was sufficient that we

22   were doing a big enough sweep.

23       Q.   Okay.  And back to 609, let's look at that

24   item.

25       A.   Yes.  Yeah.

```
1              MR. DAVIS:  Okay.  And can you go flip through
2      it a little further, second page?
3              MS. SHEFF:  I'm not on 609 yet.
4              MR. DAVIS:  I'm sorry.  Is there any
5      attachment here to 609?
6              MS. SHEFF:  No.
7              MR. DAVIS:  Okay.  I'm sorry, I'm looking for
8      the summary sheet.
9              Can we look at 607?
10        Q.    All right.  That's the actual RFP.
11        A.    Yeah.
12             MR. DAVIS:  All right.  I guess I'm not sure
13     where I missed it.
14             I'm sorry, your Honor.
15             THE COURT:  No problem.
16             MR. DAVIS:  It's actually part of -- it's part
17     of 610.  There's a large number of attachments to 610.
18     We were on it earlier.
19             Ms. Sheff, can you find the -- the document
20     that was presented as the summary sheet for 610?
21             Here we are.
22             THE WITNESS:  Yeah.
23        Q.    Okay.  We're looking at RFP selection
24     criteria --
25        A.    Uh-huh.
```

```
1          Q.    -- and this is page 597 Bates stamp.
2                And do you see the three companies summarized
3    here, mindSHIFT, DigitalNet, and EzeCastle?
4          A.    Yes.
5          Q.    And is this the document you saw?
6          A.    It was a long time ago.  I do not recollect.
7    But yes, a similar document, something like that --
8          Q.    All right?
9          A.    -- in terms of this sheet.
10         Q.    This is what you would have seen?
11         A.    Correct.
12         Q.    Okay.  All right.  Now, after DigitalNet is
13   brought on, were you aware that DigitalNet was a major
14   IT services vendor for United Way?
15         A.    Yes.
16         Q.    And did you make observations about who was
17   the way to communicate with DigitalNet from United Way?
18         A.    Now, can you ask me that question again?
19         Q.    I'm sorry.
20         A.    Yeah.
21         Q.    Who was the person at United Way that handled
22   communications with DigitalNet?
23         A.    Mr. Alrai.
24         Q.    Sorry?
25         A.    Mr. Alrai.  Imran was the --
```

1    Q.   Okay.  And what do you remember about that?

2    A.   That every time he had a question about

3  invoices, the invoices always came through Imran.

4    Q.   And were you --

5    A.   That was one.

6    Q.   Were you directed by Mr. Alrai that that's the

7  way it was going to be or was -- did it just sort of go

8  that way?

9    A.   It just went that way.  Yeah, it just went

10  that way.

11    Q.   And did you ever speak to anyone at DigitalNet

12  other than the people at the help desk?

13    A.   Very, very rarely to the next level of

14  communication with a gentleman, I think his name was

15  Kal.

16    Q.   All right.

17    A.   I've never seen him, but sometimes when a

18  technology issue got escalated more on the technology

19  side rather than the administration side.

20    Q.   Right.  So you talked to Kal on the phone?

21    A.   Yes.

22    Q.   And, again --

23    A.   A couple of times in five -- in about six --

24  five, six years that I was there when this contract was

25  there, less than -- less than a handful of times.

1      Q.    Less than a half what?

2      A.    Less than a handful of times.

3      Q.    Handful.  I see.  Okay.

4            And did you speak to anyone at DigitalNet

5      besides help desk employees and Kal?

6      A.    No.

7      Q.    Okay.  Let me show you Exhibit 3 -- I'm sorry,

8      Exhibit 624.

9            And do you see this is an email from Mr. Alrai

10     in March of 2015 that copies you?

11     A.    Yeah.

12     Q.    Okay.  So let's go to the -- let's go to the

13     beginning of it on the next page.  Okay.  At the top of

14     the page, do you see Sonia's note to Imran and Diane

15     copying you?

16     A.    Yeah.

17     Q.    And can you read that note, please.

18     A.    "I am working with Panera Bread with a credit

19     application submitted for catering services to our

20     office.  Two of our references listed are not responding

21     to provide our business relationship with our United

22     Way.

23            "As you are the main contact with these

24     accounts, can you please -- can you help with a call to

25     other vendors to call or respond to this request?

1          "I will appreciate your attention to this

2     matter."

3          Q.    Okay.  So Sonia's asking Mr. Alrai and Diane

4     Dragoff to call two different vendors, right?

5          A.    Yeah, right.

6          Q.    Right.  And one of them is Diane Dragoff's

7     vendor --

8          A.    Mostly purchasing, right.

9          Q.    -- and we don't know who that is, right?

10         A.    Yeah.

11         Q.    But who is the vendor that Mr. Alrai is being

12    asked to call?

13         A.    DigitalNet.

14         Q.    DigitalNet --

15         A.    DigitalNet.

16         Q.    -- right?

17              So let's go on.  At the bottom of the first

18    page now, how does Mr. Alrai respond to Sonia's email?

19         A.    "I talked to Mohammad at DigitalNet and he

20    assured me that he will take care of -- it will be taken

21    care of today.  They just received inquiry in the right

22    department yesterday.  It was sent to Nadeem originally,

23    who isn't authorized to handle such matters."

24         Q.    Okay.

25         A.    "In the future" --

1     Q.   Okay.  Nadeem, of course, was on the help

2   desk, right?

3     A.   Yeah, he was the help desk.

4     Q.   Okay.  And so what does Mr. Alrai advise about

5   the future?

6     A.   And he's -- "In the future, please use the

7   following contact, Mohammad Hassan," you know, his email

8   address at info@digitalnet.us, and a phone number,

9   978-662-5333.

10    Q.   Okay.  And did you, yourself, ever meet or

11  speak to Mohammad Hassan?

12    A.   No, I did not.

13    Q.   Okay.  So that's enough for that exhibit.

14         Now, Mr. Azim, did you notice in dealing with

15  Mr. Alrai about IT projects -- and, particularly, small,

16  little IT projects -- any -- any difficulties that you

17  had?

18    A.   I mean, there are small IT projects that were

19  authorized and there were small, small -- it's -- and

20  there were small goal organizations that we had that we

21  went to him for consult on.

22         So there are two different ways looking at it.

23  Yes, it comes to a contract, a project like a contracts

24  project that was authorized and budgeted, he was

25  extremely helpful and was very proactive in working with

1   our teams.  But when it came to smaller projects like

2   the purchase order projects, he seemed to be slower in

3   terms of operating.

4         Q.   Okay.  And what was Mr. Alrai's style in

5   dealing with those non -- noncontracted-for, nonpaid-for

6   smaller projects?  What did you observe about how he

7   would deal with that?  Would he refuse to do it

8   entirely?

9         A.   No, no, no, he wouldn't refuse.

10        Q.   What would he do?

11        A.   It just wasn't coming up to our -- those

12  issues were never getting solved over a few months or

13  a couple or -- or multiple months.

14        Q.   And what would Mr. Alrai say?

15        A.   He wouldn't agree or disagree.  It just -- you

16  know, to get four people in a room together was, all

17  right, with Mr. -- with Imran was -- took some time for

18  us.  Like, we wanted to do budgets on a piece and it

19  just stretched out for a long time.

20        Q.   Okay.

21        A.   But it wasn't -- it was just every -- just

22  being busy about it and not being able to assign time to

23  get it done.

24        Q.   Okay.  Now, were you concerned about something

25  called SOCI reports or S-O-C-I reports?

1      A.    They're called SOC 1 reports, S-O-C 1 --

2      Q.    Yeah, correct.

3      A.    -- reports.

4      Q.    SOC 1 reports, can you explain to the Court

5  what that is?

6      A.    So a SOC 1 report is a report on internal

7  controls of a vendor.

8      Q.    All right.  So it's a report not about United

9  Way's internal controls, but about a vendor's --

10      A.    Correct.

11      Q.    -- internal controls?

12      A.    Because -- because when you outsource a lot of

13  your business to an organization, you need to be -- you

14  need -- before your auditor can give you a clean

15  opinion, he knows that the person that you outsource

16  this to has a controlled environment that the auditor

17  can rely on.

18      Q.    Okay.

19      A.    A very good example would be a payroll

20  company.

21      Q.    A payroll company.

22      A.    Because you are -- everybody now outsources to

23  a payroll company.  So if you cannot get a payroll

24  company to give you a SOC 1 report, you will always fail

25  your audit.

```
1          Q.   Okay.

2          A.   Okay.

3          Q.   So you have to get the SOC 1 report from the

4    vendor, right?

5          A.   From the vendors, the material vendors, yes.

6          Q.   All right.  And where does the SOC 1 report

7    go?  Who receives it?

8          A.   So we had to comply -- so it comes to the

9    organization that hired this vendor.

10         Q.   The United Way.

11         A.   United Way in this case, yes.

12         Q.   And then where does it go from there?

13         A.   So it basically -- your auditor looks at this

14   to make sure that your controls are in place for your

15   material vendors.

16         Q.   Okay.  So it actually is used by the auditor

17   of United Way --

18         A.   Right.

19         Q.   -- to make sure the vendor is --

20         A.   The material vendor has controls, yes.

21         Q.   Okay.  Now, was there a particular employee,

22   Amanda Roberts?

23         A.   Yes.

24         Q.   And did she work on the SOC 1 reports?

25         A.   So she -- she used to work on the 990 -- so
```

1   how the SOC -- how your -- how this thing comes to light

2   is within your 990, your federal form that you fill out,

3   you have material contracts, material vendors.

4          So if you think of United Way's material

5   vendors, you think about your payroll company, your

6   health insurance company and, in our case, DigitalNet.

7   So those were the --

8          Q.    They were in the major contracts?

9          A.    The major -- major vendors.

10         Q.    Okay.

11         A.    Right.

12         Q.    So what did the SOC 1 have to do with the 990?

13         A.    So now you've identified -- the 990 has helped

14   you identify immediately who your material contracts

15   are.

16         Q.    Okay.

17         A.    So then it's easier for Amanda to say, okay,

18   now I need these three people's -- the rest of the --

19   oh, there's one for $200,000, I'm not going to do that,

20   but I have to do the top three because they're obviously

21   reported on the 990.  Everybody is going to see that.

22   The auditor by default will look for that.

23         Q.    Okay.  So is Amanda Roberts assigned to

24   actually make sure the SOC 1 reports are getting sent to

25   United Way?

1      A.    Absolutely.  Yes, absolutely.

2      Q.    All right.  And did she have some

3 difficulties?

4      A.    Yes, she had difficulties.

5      Q.    And what was the difficulty?

6      A.    The difficulty was that we could not get a

7 SOC 1 report from DigitalNet.

8      Q.    And who was Amanda Roberts trying to go

9 through to get that SOC 1 report from DigitalNet?

10      A.    I don't know, but she communicated

11 significantly with Imran.

12      Q.    All right.  And to your knowledge, did

13 DigitalNet ever, in the years that it was contracted

14 with, ever provide a SOC 1 report to United Way?

15      A.    No, they did not.

16      Q.    So how did that happen?  How could that have

17 gone on for many years that DigitalNet never filed a

18 SOC 1 report?

19      A.    You know, hindsight is always 20/20.  I think

20 at that time you look at it saying, you know, do we have

21 a strong enough internal person to give us assurances

22 that everything is doing well.  And so there was a high

23 reliance on Imran's competency to saying we are relying

24 on Imran to know that they have good internal controls

25 and that's -- and so you make a decision that way and

1    you waive it and saying, okay, we're going back and

2    back; we're not getting this 990; this SOC 1 report, can

3    we pass on it.

4              And, you know, if you think about it, again,

5    the auditors always get in trouble for this, but, you

6    know, all the reports that we provided the auditors,

7    there's one SOC 1 report missing; can they do a little

8    bit more testing and pass on it and not write us up for

9    a bad audit.  But, yes, in hindsight, we should have

10   insisted on that.

11        Q.   All right.  Last area.

12             In approximately March of 2018 --

13        A.   Yes.

14        Q.   -- do you recall a phone conversation with

15   Dom Pallaria?

16        A.   Yes.  Yes, I do.

17        Q.   And do you recall whether you gave him any

18   advice or suggestion about what to do?

19        A.   Yes, I do.

20        Q.   And what did you suggest he do?

21        A.   So, you know, his call was telling me that

22   he -- that he had evidence that the organization -- that

23   DigitalNet was a part of -- was owned by Mr. Imran.  And

24   I said, you know, our accounting rules basically tells

25   you, when you see a fraud, you go one level above your

1  immediate management, so I said to take it to that next

2  level up.  You know, I told him that I knew about the

3  whistleblower policies at the United Way.  So I gave him

4  the options.

5       Q.   Okay.  And so one level above for Dom Pallaria

6  would have been who?

7       A.   Would have been Rich Voccio.

8       Q.   I'm sorry?

9       A.   Rich Voccio.

10      Q.   Rick -- Rich Voccio.  Very good.

11           MR. DAVIS:  Nothing further.  Thank you.

12           THE COURT:  I had something come up here.

13  I've got to take a very short break.  I promise it'll be

14  five minutes or less.

15      (Recess taken from 11:15 a.m. until 11:21 a.m.)

16           THE COURT:  All right.  Let's resume.

17           MR. AYER:  Thank you.

18                     CROSS-EXAMINATION

19  BY MR. AYER:

20      Q.   Hi, Mr. Mazagonwalla.

21      A.   Hi.  Azim is fine.

22      Q.   Okay.  I can do either.

23      A.   Thank you.

24      Q.   So prior to Mr. Alrai coming on to the United

25  Way, the United Way was not happy with the IT services

1   they were receiving, right?

2        A.   That's correct, yes.

3        Q.   They were costing over $2 million a year?

4        A.   The cost was high, yes.

5        Q.   And it was about -- it was about 2 million a

6   year?

7        A.   That sounds right, yes.

8        Q.   And there were lots of complaints regarding

9   the service?

10       A.   No, that -- I do not know about that, no, not

11  completely.

12       Q.   You gave an interview to the FBI earlier this

13  year in about January regarding this case, right?

14       A.   Yes, that's approximate.  I do not know the

15  exact month, but --

16       Q.   So that was within the last year?

17       A.   Yes.

18       Q.   And they asked you about this case?

19       A.   They did, yes.

20       Q.   And they asked you about some background to

21  the case?

22       A.   Yes.

23       Q.   I'm showing you a copy of the report from that

24  interview that you did.  Can you read that?

25       A.   Yes.

1        Q.    And it says --

2        A.    Yeah.

3        Q.    Is that January 2019 and that's your name on

4   the report?

5        A.    Yes.

6        Q.    And if you look at that report --

7        A.    Applied to the United Way of --

8        Q.    I'm -- I'll direct you, if I can, to --

9        A.    Sure, yeah, please.

10        Q.    -- to -- around here, where it states that:

11   Mazagonwalla advised that there were a lot of complaints

12   regarding the service provided by that vendor.

13              Do you see that?

14        A.    Yes.

15        Q.    Is that a statement that you gave to the FBI?

16        A.    Yes.

17        Q.    And you gave that statement to the FBI because

18   it was true?

19        A.    That -- the issues are what the technology was

20   providing and what the service complaints were.  There's

21   a help desk piece -- so let's just -- I want to make

22   sure I understand the question.

23        Q.    Okay.

24        A.    I do not know -- well, yes.

25        Q.    All right.

```
 1              THE COURT:  No, no, no, no, no. Let him finish
 2   his answer.  You can follow up.
 3              MR. AYER:  Okay.
 4        A.   There's one thing about how you saw technology
 5   and how you saw the service piece to our -- to our
 6   employees.
 7        Q.   Uh-huh.
 8        A.   My answer to you was more about the service to
 9   the employees piece of it --
10        Q.   Okay.
11        A.   -- which I don't know about.
12              In terms of the technology piece, in terms of
13   how we had gone about with that technology -- technology
14   procurement, there was complaints against that.
15        Q.   Okay.  So just to make sure we're talking
16   about the same thing, starting about here --
17        A.   Yes.
18        Q.   -- to here --
19        A.   Yeah.
20        Q.   -- you say:  The IT vendor in place at the
21   United Way during that time --
22        A.   Yes.
23        Q.   -- that time being prior to Mr. Alrai coming
24   on --
25        A.   Yeah.
```

1    Q.    -- was costing almost $2 million a year.

2          That was true?

3    A.    That's true, yeah.

4    Q.    "Mazagonwalla advised that there were a lot of

5    complaints regarding the service provided by that

6    vendor."

7          True?

8    A.    True.

9    Q.    "And the fact that they had everything,

10   servers, being housed on-site at the United Way."

11   A.    Yes.

12   Q.    True?

13   A.    True.

14   Q.    So there were complaints about the prior IT

15   vendor?

16   A.    True.

17   Q.    And because of that, the United Way brought on

18   Mr. Alrai to be the director of IT?

19   A.    It's more -- it's -- the -- the reason was

20   more about saying we need to move away from the

21   technology infrastructure that we had to an

22   infrastructure that is more -- that we can have more

23   selection in terms of the vendor processing piece.

24          So there's more about -- other than having

25   in-built -- software built specifically for the United

1    Way which it could market software, that would be --

2    that's one of the reasons, yes.

3         Q.   Okay.  But he was brought on as a result of

4    dissatisfaction with the current state of the IT at the

5    United Way?

6         A.   That would be appropriate, the current state

7    of IT and outside vendors.

8         Q.   And he was initially brought on as the IT

9    director, right?

10        A.   Correct.

11        Q.   He wasn't brought on as the chief information

12   officer or vice-president?

13        A.   Correct.

14        Q.   That happened later.

15        A.   That happened later.

16        Q.   And when he came on, it was decided that the

17   United Way was going to go through an RFP process to

18   bring on a new outside vendor to provide services?

19        A.   That's correct.

20        Q.   And your role during that RFP process was to

21   ensure that there were three bids being placed?

22        A.   Yes.

23        Q.   And to ensure that the internal process was

24   complied with?

25        A.   Complied with, yes.

1          Q.   You mentioned in your direct that you're not

2     an IT person, right?

3          A.   Correct.

4          Q.   And you don't know a ton about IT in a way

5     that would be necessary to assess these --

6          A.   Correct.

7          Q.   -- responses?

8               But there's two parts to an RFP, right?

9     There's the substantive IT part, right?

10         A.   Yeah.

11         Q.   And then there's also the procedural part,

12    which is are we following our own processes to make sure

13    this happens --

14         A.   Right.

15         Q.   -- correct?

16              And the procedure for that is to ensure that a

17    bid goes out?

18         A.   Yeah.

19         Q.   That responses are received, right?

20         A.   Correct.

21         Q.   And, I'm sorry, we -- we told other witnesses

22    about this, but you need to make sure you speak out loud

23    because we're making a transcript of this.

24         A.   Okay.  Thank you.  I appreciate --

25         Q.   I'm not trying to be picky.

```
 1        A.    No, no.  Please, that's fine.  I don't mind.

 2        Q.    So you get the bids back --

 3        A.    Yes.

 4        Q.    -- right?

 5        A.    Yeah.

 6        Q.    You need to make sure that the bids are from

 7   legitimate companies?

 8        A.    Yeah.

 9        Q.    You get sufficient bids back?

10        A.    Yes.

11        Q.    And you get appropriate bids back?

12        A.    True.

13        Q.    And that they're reviewed by the appropriate

14   people?

15        A.    True.

16        Q.    And that's all procedural, right?

17        A.    Correct.

18        Q.    You don't need an IT background to assess that

19   procedure?

20        A.    True.

21        Q.    And your job was to ensure that that procedure

22   was followed?

23        A.    True.

24        Q.    And another person who should have been

25   involved in that procedure was Diane Dragoff, right?
```

1     A.    True.

2     Q.    Her position should have been to collect the

3 initial bids?

4     A.    True.

5     Q.    To have them come in directly to her or ensure

6 that they came to her in some way?

7     A.    If you -- if you consider your staffing plan

8 to include everybody in the group -- so it would be, as

9 you said, Imran, myself, Diane -- you have to trust, in

10 a staffing pattern, each other's competencies and rely

11 on each other's competencies to get the right amount of

12 work done.

13         And in this case, you know, you rely on the

14 competencies of Imran to basically be the point person.

15     Q.    Well, as we discussed, though, there's two

16 parts to the RFP, right?

17     A.    Correct.

18     Q.    There's trusting his technological knowledge,

19 right?

20     A.    Yeah.

21     Q.    But then there's also trusting everybody's

22 knowledge of the procedures to appropriately do the RFP?

23     A.    Correct.

24     Q.    And Mr. Alrai, when this happened, was a

25 relatively new employee, right?

1    A.   Mr. Alrai was for more than six months.  I

2 think he'd already established some credibility for

3 himself.

4    Q.   But he'd never gone through an RFP process

5 with the United Way?

6    A.   But he was experienced enough.  I mean, he was

7 the senior director of IT.

8    Q.   But he'd never done an RFP with the United

9 Way, right?

10    A.   Not to my knowledge, no.

11    Q.   But you had?

12    A.   Yes.

13    Q.   And Diane Dragoff had?

14    A.   Yes.

15    Q.   And it was Diane Dragoff's job to collect the

16 initial bids and then provide them to Mr. Alrai,

17 correct?

18    A.   You know, if you're thinking about a contract

19 for $10,000 or $20,000, it's very different.  If you're

20 thinking of a contract that's significantly higher,

21 that's much more complex, you have to rely on the

22 technical competencies of senior staff.

23    Q.   Okay.  So I want to go back to this interview

24 with the FBI.

25    A.   Sure.

1      Q.   This is page 2 of that.  Do you see at the

2  top, January 3rd, 2019 --

3      A.   Yeah.

4      Q.   -- your name, 2 of 3?

5           In the highlighted section here --

6      A.   Yeah.

7      Q.   -- you see that it states very clearly --

8      A.   Yeah.

9      Q.   -- "in retrospect, Mazagonwalla advised that

10 the way the bid process should have gone is that

11 Dragoff," misspelled, "collected the initial bids and

12 then provided them to Alrai."

13     A.   Yeah.

14     Q.   All right.  That's what you told the FBI?

15     A.   Yeah.

16     Q.   Earlier this year?

17     A.   Yeah.

18     Q.   And you told that to the FBI, because at the

19 time when you stated it, you believed it to be true?

20     A.   Yes.  I -- and I still believe it to be true

21 that Diane should have done it, but relying on Imran's

22 skill is not something I would condone at that time or

23 at this time.  I mean, you -- you work in a group of

24 technically competent people.  You rely on each other.

25     Q.   Right.

1      A.    That's the way that --

2      Q.    And you rely on Imran --

3      A.    Yes.

4      Q.    -- for his technical, substantive expertise?

5      A.    Yes.

6      Q.    And what you were saying here is you should

7   have relied on Diane Dragoff for her procedural

8   expertise in collecting the bids and ensuring they were

9   done?

10     A.    Yes.  But it also happens that, you know, if

11  you -- if you look at the document that was provided in

12  which we had the 15 vendors, right, the -- understanding

13  of who the vendors are in a specialized field, you have

14  to rely on your senior staff.

15     Q.    Uh-huh.

16     A.    And Diane Dragoff, relying on that -- on that

17  kind of list that was provided, right, earlier in this

18  conversation, was, I think, appropriate.

19           So Imran, following up that -- or Diane asking

20  Imran to do that, I don't see anything wrong.  Yes, it

21  is, as I said, in that -- in that knowledge.

22     Q.    Uh-huh.

23     A.    Diane also should have followed up on it, but

24  relying on Imran is not something I -- I condone.

25     Q.    But what you told the FBI in January was she

1  should have collected the bids and given them to Imran.

2      A.   Yeah.  That would have been the right process,

3  right.

4      Q.   And that wasn't followed?

5      A.   Yes, because she relied on Imran's competency.

6  All right?

7      Q.   But nobody forced her to not follow it, right?

8      A.   Nobody forced her to not follow it.  Not to my

9  knowledge, no.

10      Q.   Just like nobody forced you to not personally

11  view three bids to ensure that the three bids were

12  received.

13      A.   I was told that three bids were received.

14      Q.   And you could have had followed up on that,

15  right?  You could have demanded to see them?

16      A.   There was a lot of things I could have done.

17      Q.   Okay.  And you chose not to do that, right?

18      A.   But my -- my role was that of the compliance

19  person, to make sure that -- there is no need for me

20  to -- I mean, I don't understand why you feel that that

21  is a need for me to look at all of the contracts that

22  come in.

23          THE COURT:  Well, what he thinks is not

24  important; what you think is what we're trying to find

25  out.  Just tell him what you think.

1           THE WITNESS:  Yeah.  For me, looking at the --

2    on every document that I looked -- thank you, Judge.

3           Every document I looked at is a summary of

4    the -- the summary followed process of doing it.  I

5    think looking at the summary statement is sufficient for

6    me to know that underlying documents exist.

7        Q.   Okay.

8        A.   I don't expect senior staff to have -- commit

9    fraud and that does not -- that is not how -- who I am

10   as a person.  I mean, you work with people, you don't

11   expect them to do that, do you?  I don't.

12       Q.   Again, my point is nobody forced you not to

13   look at the bids themselves, right?  That's a decision

14   you made on your own.

15       A.   I wasn't forwarded the proposals and saying,

16   here are the proposals for you to review.  This was not

17   sent to me as an email for me to review.  All right?  If

18   somebody -- if you would have sent it to me to review

19   and I didn't open my email, that's a different question.

20   I was sent -- the document that I was sent I read.

21       Q.   Uh-huh.

22       A.   And the document that was sent reflected that

23   three contracts were received.

24       Q.   And you considered that sufficient at the

25   time?

1    A.    I considered that sufficient at that time,

2 yes.

3    Q.    And that was a decision you made at the time

4 without any -- you know, anybody telling you to make

5 that decision; you made that on your own, right?

6    A.    I made that decision based on having three

7 master's degrees, a CPA, and 15 years' experience.

8    Q.    All right.  And that's what led you to make

9 that decision?

10    A.    That's what led me to make that decision.

11    Q.    And were you aware that at some point during

12 this process Stan Burrows had said, you know, maybe this

13 is going too fast or we should get more bids?

14    A.    No.

15    Q.    You were not made aware of that?

16    A.    No.

17    Q.    And you also discussed the invoicing process

18 for paying things as they came up with --

19    A.    Yeah.

20    Q.    -- DigitalNet, right?

21    A.    Yeah.

22    Q.    And your testimony was that Imran controlled

23 the whole invoicing process for DigitalNet?

24    MR. DAVIS:  Objection.

25    THE WITNESS:  Yeah.

1          MR. AYER:  I guess it misstates the evidence.

2          MR. DAVIS:  Yup.

3          THE COURT:  You know what, I've been saying

4    this the whole trial.  Maybe you guys can elucidate me.

5          I'm not aware of a trial objection -- of a --

6    that somebody misstated the evidence.  I -- I am aware

7    if someone doesn't have a good faith basis to advance a

8    proposition.  That's different.  But having a different

9    interpretation of what the prior evidence is not that.

10          So what do you really mean by that?

11          MR. DAVIS:  I think the objection is assumes

12   facts not in evidence.

13          THE COURT:  Also not a trial objection.  He

14   doesn't have to accept any fact proposed to him.

15   Neither do I, as the trier of fact.  If it's not in

16   evidence, all you've got to do is tell me, that that was

17   not in evidence.  But it's not objection to a question.

18          MR. DAVIS:  In this case, I don't think there

19   was any testimony about Mr. Alrai controlling invoices.

20          THE COURT:  That's true.  And if he wants to

21   say, isn't it true, sir, that the Easter Bunny didn't

22   really visit you last night, that's also not in evidence

23   either and he can answer it.  It's up to witnesses and

24   the trier of fact to decide if facts are in evidence.

25          It's not up to a -- it's not an evidentiary

1    objection.  But you're free to point it out in your

2    argument anytime you want and you're free to point it

3    out when you do redirect, but it doesn't make his

4    question improper unless it's put forth in bad faith and

5    I don't put that kind of question in that category.

6    Different people have different views of the evidence.

7         So it's well-taken, but I'm not going to

8    sustain it.

9         MR. DAVIS:  Okay.

10         THE COURT:  Go ahead.

11    Q.    All right.  Is it your opinion that Mr. Alrai

12    controlled the invoices from DigitalNet?

13    A.    No, I don't know.

14    Q.    Okay.

15    A.    No.

16    Q.    And, I'm sorry.  I thought you said something

17    to that effect on direct.

18         But the invoices from DigitalNet, to your

19    knowledge, all went through the appropriate review

20    process?

21    A.    So the -- so the way I view your question is

22    very broad in the first question.  But if you'd like --

23    if you get back into how invoices were received, they

24    were mostly received through Imran.  And what would

25    happen -- and I do not know how they were initially

1    released or initially came into the office, but usually

2    it would come out that -- where I would get approached

3    by either Sonia or by Domenic, saying, we need to pay

4    this invoice.  And usually Imran walks it over and says,

5    hey, this invoice has not been paid.  I don't know how

6    it was received.

7         Q.   So there were several people involved in those

8    invoices and getting them paid?

9         A.   Yes.  So there's the accounts payable piece,

10   which is Sonia's piece; and there was Domenic, who was

11   basically overseeing Sonia; and then myself, who had the

12   control over cash and cash invoices.

13        Q.   Okay.  So you also reviewed the invoices?

14        A.   I did not review the invoices.  I was supposed

15   to basically sign off on the final release of the

16   payment.

17        Q.   Okay.  And then you're aware that Elaine

18   Singer was also involved in handling the invoices from

19   DigitalNet?

20        A.   Not to my knowledge.  It's just -- I think it

21   was more clarification issues.

22        Q.   Okay.

23        A.   But I do not know about Elaine Singer, no.

24             MR. AYER:  That's all I have, your Honor.

25             THE COURT:  All right.

```
 1              MR. DAVIS:  No questions.  Thank you.
 2              THE COURT:  Thank you.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Thank you, sir.
 5                   (Witness excused.)
 6              MS. LE:  Good morning, your Honor.  The
 7    government calls Christine Bowry to the stand, please.
 8              THE CLERK:  Good morning.  If you'd like to
 9    step this way, please.  If you could step into the
10    witness box and remain standing.
11              Please raise your right hand.
12              CHRISTINE BOWRY, having been first duly sworn,
13    testified as follows:
14              THE CLERK:  For the record, please state your
15    full name and spell your last name.
16              THE WITNESS:  My full name is Christine
17    Margaret Bowry, B as in boy, o-w-r-y.
18              THE CLERK:  Thank you.  Please be seated.
19                   DIRECT EXAMINATION
20    BY MS. LE:
21         Q.   Good morning, Ms. Bowry.
22         A.   Good morning.
23         Q.   Ms. Bowry, where do you work?
24         A.   I work for Citizens Bank in Riverside,
25    Rhode Island.
```

1        Q.    How long have you been with Citizens Bank?

2        A.    19 years.

3        Q.    And can you tell us a little bit about

4   Citizens Bank on a very general level?

5        A.    So we are primarily in the New England and

6   Midwest region.  We're a $164 billion asset company

7   and ...

8        Q.    That should be fine.

9        A.    Okay.

10        Q.    Ms. Bowry, there's a microphone.  You're a bit

11   soft-spoken.  We have a court reporter who's taking

12   notes of this conversation and we're trying to create a

13   record.  Okay?  So if you could just keep your voice up

14   and speak into the microphone.

15        A.    Will do.  Thank you.

16        Q.    Thank you very much.

17              What is your current job title?

18        A.    I'm vice-president, a department manager, for

19   ACH payment operations.

20        Q.    Okay.  How many people do you manage?

21        A.    I have 19.

22        Q.    What does your job as the ACH payment

23   operations manager entail?

24        A.    It entails primarily dealing with electronic

25   transactions, so processing incoming and outgoing

1    electronic payment instructions.

2         Q.   Thank you.

3              How long has Citizens Bank been involved in

4    the ACH system?

5         A.   Since the early '80s.

6         Q.   And on a very general level, what is the ACH

7    system?

8         A.   It's an automated clearinghouse.  It interacts

9    with other financial institutions throughout the

10   company -- the country to transfer funds electronically.

11        Q.   Okay.  And, again, on a general level, how are

12   ACH transactions processed through the system?

13        A.   Customers would create a NACHA-formatted file.

14   NACHA is the National ACH Association.  It's a specific

15   format that can speak to any financial institution in

16   the country.

17             So our customers would be contracted.  They

18   would pass us their payment instructions and we would

19   pass them on for further payment.

20        Q.   Okay.  Who would you pass that information on

21   to?

22        A.   We would pass it on to the Federal Reserve

23   Bank or the Clearinghouse.  Those are the two ACH

24   operators.

25        Q.   So either the Federal Reserve itself or the

1    ACH Clearinghouse, which is another organization, right?

2        A.   That's correct.

3        Q.   Okay.   In preparation for your testimony

4    today, did you review Citizens Bank accounts to the

5    United Way of Massachusetts Bay?

6        A.   Yes, I did.

7        Q.   Okay.   And did the United Way have ACH

8    agreements with Citizens Bank?

9        A.   Yes, they did.

10       Q.   And with those ACH agreements, what was the

11   United Way of Massachusetts Bay able to do?

12       A.   They were able to submit their payment

13   instructions to us.

14       Q.   Okay.   And did you review the ACH payments

15   made from United Way's accounts at Citizens Bank to a

16   Pentucket Bank account belonging to DigitalNet

17   Technology Solutions, ending in 2684?

18       A.   Yes, I did.

19       Q.   Okay.   And how were those ACH payments made by

20   the United Way to Pentucket Bank processed by Citizens?

21       A.   They were -- the payment instructions were

22   sent to us two ways, one through an online banking

23   portal, which we called Access Money Manager, and the

24   second was a direct send or a direct transmission in the

25   NACHA-formatted file.

1      Q.    Okay.  And once your customer, United Way,

2   submitted that information to you, what happened?

3      A.    We would collect the files and then prepare

4   them to their financial destination.  We would then,

5   during a processing window, we would forward those on to

6   the Federal Reserve, who would then do the same thing,

7   batch process them and send them on to the receiving

8   bank.

9      Q.    And here your customer was in the Boston area.

10  Where was the processing by Citizens Bank done?

11     A.    In East Providence, Rhode Island.

12     Q.    Okay.  So what happens at the operations

13  center in Rhode Island?

14     A.    We would strip out any payments belonging to

15  other Citizens Bank account holders and then we would

16  then forward those on to the Federal Reserve in

17  New Jersey, who would then kind of do the same thing;

18  they would do a batch process and separate those

19  transactions and pass them on to the receiving bank for

20  posting.

21     Q.    And did the receiving bank have to do

22  anything to receive the funds that United Way was making

23  to the -- to the payee?

24     A.    Well, they would receive the instructions on

25  their incoming ACH file and they are required to post

1  them to the account based on the settlement date

2  instructed by the originator.

3          MS. LE:  Thank you very much.  Your Honor, the

4  government tenders the witness.

5          MR. AYER:  No cross, your Honor.

6          THE COURT:  No cross?

7          MR. AYER:  No cross.

8          THE COURT:  You're excused.  Thank you.

9                  (Witness excused.)

10          MR. HUNTER:  The government calls Special

11  Agent Jill Laroe.

12          THE CLERK:  Good morning.  If you'd like to

13  step this way, please.

14          If you could step into the witness box and

15  remain standing.

16          THE WITNESS:  Yes.

17          THE CLERK:  Please raise your right hand.

18          **JILL LAROE**, having been first duly sworn,

19  testified as follows:

20          THE CLERK:  For the record, please state your

21  full name and spell your last name.

22          THE WITNESS:  Jill Laroe, L-a-r-o-e.

23          THE CLERK:  Thank you.  Please be seated.

24                    DIRECT EXAMINATION

25  BY MR. HUNTER:

1      Q.    Good morning, Ms. Laroe.

2      A.    Good morning.

3      Q.    As you can see, we have a court reporter in

4    here, so just please speak clearly into the microphone

5    and let's try not to talk over each other.

6      A.    Okay.

7      Q.    I know that can be hard.

8            How are you employed, Ms. Laroe?

9      A.    I am a special agent with the FBI.

10     Q.    How long have you been an FBI special agent?

11     A.    Since 2002.

12     Q.    Could you briefly describe your job duties

13   from 2002 to present?

14     A.    I have been a special agent working criminal

15   investigations to include drug trafficking, white-collar

16   crime, crimes against children, basically every --

17   everything.  I've been assigned to the Boston division

18   and -- as well as the Lowell RA and the Bedford resident

19   agency.

20     Q.    How long have you been in New Hampshire?

21     A.    Approximately four years.

22     Q.    Four years.  Were you ever involved in an

23   investigation of Imran Alrai?

24     A.    Yes, I was.

25     Q.    How did that investigation begin?

1      A.    That investigation began in December of 2017,

2  based on source information that I received --

3      Q.    Okay.  And --

4      A.    -- of --

5      Q.    -- what was the nature of that information?

6      A.    Large amounts of money was being --

7           MR. AYER:  I would object at this point to

8  hearsay, your Honor.  I'm not sure the nature of the

9  information.

10          THE COURT:  It depends -- it depends how she

11  explains it.

12          In other words, what was the nature of it,

13  what kind of -- what kind of -- go ahead, just -- just

14  ask.

15          THE WITNESS:  I received information that

16  large amounts of money was being transferred overseas.

17     Q.    Okay.

18     A.    And we began an investigation to determine

19  what was happening.

20     Q.    Okay.

21          THE COURT:  So it's admitted to prove why they

22  started the investigation, not for its truth.

23          MR. AYER:  That's what I was going to ask.  I

24  don't know if I need to do a standing objection, but for

25  the future, just to use to explain what she did, but not

1    necessarily for its substantive truth.

2              THE COURT:  Say that again.

3              MR. AYER:  I don't know if I need to do this

4    every time she talks about why she did the next step,

5    but we'd just ask your Honor as it comes in, if it does,

6    to be used simply to explain her next step, if

7    necessary, but not --

8              THE COURT:  Yeah, I'm not -- I'm not dealing

9    with the next step.  That's not what I -- that wasn't my

10   ruling.  My ruling was it explains why they conducted an

11   investigation.  It's not offered for its truth.

12             You can object as much as you want.  Don't

13   worry about it.  Don't feel like you're bothering me.

14   If you think it should not come in, object.

15             Go ahead.

16        Q.   So what did you do after you received this

17   information about wire transfers?

18        A.   We began to do an investigation and do open

19   source investigation and determine what was going on,

20   where the wire transfers were going, who was making the

21   wire transfers and so forth.

22        Q.   And so at this point did you believe there

23   were wire transfers coming from Pentucket Bank in

24   New Hampshire to Pakistan?

25        A.   Yes, we did.

1      Q.   And what did you do next in your
2  investigation?
3      A.   We talked to the U.S. Attorney's Office here
4  in New Hampshire and coordinated with them in order to
5  do -- to obtain investigative tools to further the
6  investigation.
7      Q.   So the U.S. Attorney's office in New Hampshire
8  opened a case and the investigation continued; is that
9  it?
10      A.   Yes, it did.
11      Q.   And at some point did you -- how did this
12  case -- how did the name Imran Alrai come up in your
13  investigation?
14      A.   During the open source checks of the wire
15  transfers, the company DigitalNet Technologies, Imran
16  Alrai, and Munawar Chaudhary all came up.
17      Q.   And from there did you determine whether or
18  not Imran Alrai worked at United Way?
19      A.   During the open source checks, we determined
20  that he also -- he worked at United Way and that
21  DigitalNet had a -- one of the larger contracts at the
22  United Way.
23      Q.   All right.  Do you also see that on United
24  Way's website?
25      A.   Yes, you do.

1    Q.    Once you learned this information, what were

2    your -- what were your next steps?

3    A.    We obtained -- we contacted the U.S.

4    Attorney's Office and obtained some investigative tools,

5    such as subpoenas and so forth, to determine the extent

6    of where -- what was the employment and so forth.

7    Q.    Employment and where the wires were going --

8    A.    Right.

9    Q.    -- and that sort of thing?

10    And did you ever reach out to United Way?

11    A.    Not until after they had contacted the U.S.

12    Attorney's Office in Boston.

13    Q.    We'll get to that in a minute, but prior to

14    the United Way contacting the U.S. Attorney's Office in

15    Boston, were there discussions about whether to reach

16    out to United Way?

17    A.    Yes, there were.  We were -- we were trying to

18    determine the best way to do that.

19    Q.    And you wanted -- so before you reached out to

20    United Way, what happened?

21    A.    We -- I received a call from an FBI agent

22    assigned to a white-collar squad down in Boston who had

23    received a phone call from the U.S. Attorney's Office in

24    Boston.

25    Q.    And from that phone call, was it your

1    impression that United Way had approached the Boston

2    U.S. Attorney's Office?

3         A.    Yes.

4         Q.    What happened next?

5         A.    I spoke with the agent because the U.S.

6    Attorney's Office in Boston asked him to look into

7    DigitalNet and what the United Way had called them about

8    and he noticed that I already had an investigation

9    opened, so he contacted me and put me in contact with

10   the U.S. Attorney's Office in Boston.

11        Q.    Okay.  Is this also sometimes known as

12   deconflicting a case?

13        A.    Yes, it is.

14        Q.    Is this a fairly common occurrence in federal

15   investigations?

16        A.    Yes, it is.

17        Q.    And so can you describe how the case was

18   deconflicted?

19        A.    I contacted the U.S. Attorney's Office here,

20   and we contacted together the U.S. Attorney's Office

21   down in Boston who assisted us in coordinating with the

22   United Way to further our investigation.

23        Q.    So the case continued to be investigated in

24   New Hampshire?

25        A.    Yes, it did.

1    Q.   All right.  So from your conversations with

2  the Boston U.S. Attorney's Office, was it your

3  understanding that they wanted to prosecute this case or

4  investigate it?

5    A.   No, it was not.  It was because our case was

6  already opened and moving along.

7    Q.   All right.  So when about was this that these

8  conversations --

9    A.   This is late May.

10    Q.   Late May?

11    A.   In 2018.

12    Q.   2018.  And so did you execute any search

13  warrants in this case in June of 2018?

14    A.   Yes, we did.

15    Q.   And when was that?

16    A.   June 12th, 2018.

17    Q.   Did you execute a search warrant of the

18  defendant's home in Windham, New Hampshire?

19    A.   Yes, we did.

20    Q.   And was that --

21         Ms. Sheff, could you put Government

22  Exhibit 882 on the screen?  This is in evidence?

23         All right.  So is this a photograph -- or what

24  is this a photograph of?

25    A.   This is a photograph of 31 Lowell Road, which

1  was the offices for AISA Consulting.

2        Q.    Okay.  And what town is that in?

3        A.    In Windham, New Hampshire.

4              MR. HUNTER:  Okay.  The next picture,

5  Ms. Sheff.

6        Q.    Is this another photograph of that same

7  building?

8        A.    Yes, it is.

9        Q.    I think --

10             Oh, can you go back up, Ms. Sheff?  Can you

11  zoom in on the sign?  It's a little blurry, but --

12             It's hard to read.  Does that say AISA

13  Consulting?

14       A.    Yes, it does.

15       Q.    I'm saying AISA, you're saying AISA, but we're

16  referring to the name A-I-S-A; is that correct?

17       A.    Yes.

18       Q.    All right.

19             Next picture, Ms. Sheff.

20             What's this a picture of?

21       A.    This is a picture of 9 Corliss Road in

22  Windham, New Hampshire.

23       Q.    Okay.  And that's Mr. Alrai's residence in

24  Windham?

25       A.    Yes, it is.

1          MR. HUNTER:  Okay.  Next photo, Ms. Sheff.

2     Can we zoom in on the top one?

3          Q.   So were you the supervisor of the search

4     warrant executed on Mr. Alrai's home?

5          A.   Yes, I was the supervising agent at the

6     residence.

7          Q.   And what was your role as the supervising

8     agent?

9          A.   I was -- my role was to coordinate the search,

10    make sure that everything was being done -- logged

11    correctly, that items that were being seized were items

12    that we would want to be seized, that we weren't taking

13    unnecessary items, et cetera.

14         Q.   Okay.  What are we -- what picture are we

15    looking at?

16         A.   This is Mr. Alrai's home office with his

17    desktop computer.

18         Q.   Okay.  And is that an HP Envy computer?

19         A.   Yes, it is.

20         Q.   Was that computer seized as part of the search

21    warrant?

22         A.   Yes, it was.

23         Q.   And it looks like it's plugged into an

24    Ethernet cable there, doesn't it, potentially?

25         A.   Potentially.

1    Q.    Okay.  Next photo, please.

2          Is this the computer from another angle?

3    A.    Yes, it is.

4          MR. HUNTER:  Okay.  Next photo, please.  The

5    next one down, Ms. Sheff, or, actually, go two down.

6    We'll go back to that one later.  Yeah, could you just

7    zoom in on this, the bottom picture here.

8    Q.    Is that a printer?

9    A.    Yes, it is.

10   Q.    And you've reviewed this photograph before,

11   right?

12   A.    Yes, I have.

13   Q.    Is that an HP OfficeJet 7500a printer?

14   A.    Yes, it is.

15         MR. HUNTER:  Okay.  Can you go to the next

16   photo, Ms. Sheff?

17         MS. SHEFF:  The top one?

18         MR. HUNTER:  I think there's one more.  We'll

19   just look through these.  Maybe not.  I guess the one of

20   the box here.

21   Q.    Okay.  And is this a box of documents found in

22   Mr. Alrai's home office?

23   A.    Yes.

24   Q.    Did you ever find a safe in Mr. Alrai's home?

25   A.    No, we did not.

64

1        Q.    If you had found a safe, would you have

2   searched it?

3        A.    Yes, we would have.

4        Q.    And have you reviewed documents found during

5   the search of Mr. Alrai's home?

6        A.    Yes, I have.

7        Q.    Did you find a number of documents addressed

8   to DigitalNet both with the -- an Andover address and/or

9   the Windham, New Hampshire, address?

10       A.    Yes, I did.

11       Q.    Did you find hard copy documents of wires from

12  Pentucket Bank to Pakistan?

13       A.    Yes, I did.

14       Q.    Generally speaking, these business-related

15  documents, were these found in Mr. Alrai's home office?

16       A.    Yes, they were.

17       Q.    Have you reviewed Government's Exhibit 842 to

18  882?

19       A.    Yes, I have.

20       Q.    And I'm just making sure my numbers are right

21  here.

22             Or, actually, 882 is the search warrant

23  photographs we just looked at; is that right?

24       A.    Right.

25       Q.    So 842 to 881 --

1       A.    Yes.

2       Q.    -- have you reviewed those?

3             And are those documents that were found in the

4   search of Mr. Alrai's home?

5       A.    Yes, they were.

6       Q.    And they've already been admitted into

7   evidence, so I just want to go through a few of them.

8             Ms. Sheff, can you please put Exhibit 859 on

9   the screen?

10            MS. SHEFF:  I'm sorry.  I just need a second

11  here.  The presentation is not working.

12            MR. HUNTER:  No problem.

13            MS. SHEFF:  It'll just take a second.

14            THE COURT:  Why don't we take a recess and let

15  you get it straightened out.

16            MS. SHEFF:  Okay.  Sorry.

17            THE COURT:  What we'll do is we'll take a --

18  let's take about 15, we'll reconvene and go to one

19  o'clock and then we'll recess for the day.  It'll give

20  you a few seconds to get that straightened out.

21       (Recess taken from 11:56 a.m. until 12:10 p.m.)

22            MR. HUNTER:  Thank you, your Honor.

23       Q.    We have up on the screen Exhibit 859, now in

24  evidence.

25            Was this one of the documents found in

1   Mr. Alrai's home?

2        A.   Yes, it was.

3        Q.   Okay.  And this appears to be a limited

4   liability company application for registration for the

5   Commonwealth of Massachusetts.  Do you see that?

6        A.   Yes.

7        Q.   What's the name of the company?

8        A.   DigitalNet Technology Solutions, LLC.

9        Q.   And the date of the organization in the

10  jurisdiction of Massachusetts, what date is that?

11       A.   August 7th, 2012.

12            MR. HUNTER:  Okay.  And, Ms. Sheff, could you

13  zoom in on number 5?

14       Q.   It says the business address of its principal

15  office; do you see that?

16       A.   Yes, I do.

17       Q.   What address is listed?

18       A.   31 Lowell Road, Suite 1, Windham,

19  New Hampshire.

20            MR. HUNTER:  Ms. Sheff, could you unzoom --

21  zoom in on 6 and 7.

22       Q.   And it also lists a business address in the

23  principal of the Commonwealth.  Is that the Commonwealth

24  of Massachusetts?

25       A.   Yes.

1      Q.   And it lists -- what address does it list?

2      A.   300 Brickstone Square, Suite 201, and that's

3   in Andover, Massachusetts.

4      Q.   You're familiar with the evidence in this

5   case, aren't you, Ms. Laroe?

6      A.   Yes.

7      Q.   Is that the address given on the DigitalNet

8   invoices?

9      A.   Yes.

10      Q.   And then there's also the name and business

11   address, if different from the principal office

12   location, of each manager.  Do you see that?

13      A.   Yes.

14      Q.   Who's listed as the manager and what's his

15   address?

16      A.   Munawar Chaudhary, 31 Lowell Road, Suite 1,

17   Windham, New Hampshire.

18          MR. HUNTER:  Go to the next page, Ms. Sheff.

19      Q.   We also see Mr. Chaudhary's name listed up

20   here.

21      A.   Yes.

22      Q.   Do you see that?

23      A.   Yes.

24      Q.   And this is not an executed form; is that

25   correct?

1          A.    Correct.

2          Q.    So there's no signatures on this form?

3          A.    Correct.

4                MR. HUNTER:  Okay.  Ms. Sheff, can you pull up

5     Exhibit 858.

6                THE COURT:  Forgive me for being dense here or

7     missing a detail.  Munawar is Mohammad Chaudhary, no?

8     Is that the same person?

9                MR. HUNTER:  Munawar Chaudhary is the

10    defendant's father, your Honor.

11               THE COURT:  Right.  And what about Mohammad

12    Chaudhary?  He's on the defense witness list.  Is it the

13    same person?

14               MR. HUNTER:  So we spoke with defense counsel

15    about that.  It's the same person.  His middle name --

16               THE COURT:  Is it the same person?

17               MR. HUNTER:  The person on the defense witness

18    list is the same person, yes, your Honor.

19               THE COURT:  Thanks.

20               MR. HUNTER:  Sorry.

21               THE COURT:  No problem.

22               MR. HARRINGTON:  I'm sorry, too.  I just

23    didn't understand the question.  That's why I wasn't

24    responding.

25               THE COURT:  No problem.

1          Go ahead.

2     Q.    Is this another document found in the

3  defendant's home?

4     A.    Yes.

5     Q.    And it's sent to DigitalNet in Windham; do you

6  see that?

7     A.    Yes.

8     Q.    And it appears to be providing a notice to

9  DigitalNet regarding corporate filings?

10    A.    Yes.

11         MR. HUNTER:   Okay.  Ms. Sheff, can you please

12 put on Exhibit 850.

13    Q.    Okay.  Is this another document you found in

14 Mr. Alrai's home?

15    A.    Yes, it is.

16    Q.    And this appears to be a contract that has

17 some writing on it, Professional Services Agreement.

18         Ms. Sheff, can you zoom in on the top of that,

19 please.

20         Can you just read the first paragraph?

21    A.    "This professional services agreement, the

22 agreement, is by and between DigitalNet, a Delaware

23 corporation, with offices located at 300 Brickstone

24 Square, Suite 201, Andover, Mass., 01810, the service

25 provider or DigitalNet, and United Way of Massachusetts

1    Bay, Inc., doing business as United Way of Massachusetts

2    Bay and Merrimack Valley, doing business as United Way

3    of the Greater Seacoast, United Way, located at

4    51 Sleeper Street, Boston, Mass., 02210.

5         Q.   Thank you.

6              Ms. Sheff, could you scroll down through this

7    document, please.

8              MS. SHEFF:  Scroll down?

9              MR. HUNTER:  Yes, to the next page and kind of

10   go through the pages here.

11        Q.   And here we have a signature page.  We can see

12   that it's signed by Patricia Latimore --

13        A.   Yes.

14        Q.   -- do you see that?

15             There's not yet a signature from DigitalNet

16   Technologies.  Do you see that?

17        A.   Yes.

18             MR. HUNTER:  Ms. Sheff, can you please put

19   Exhibit 844 on the screen.

20        Q.   This is another document found in Mr. Alrai's

21   home?

22        A.   Yes.

23        Q.   Do you see the date of that is July 14th,

24   2016?

25        A.   Yes.

1          MR. HUNTER:  Ms. Sheff, could you just zoom

2    in -- or -- on this part.

3         Q.   Okay.  And who is it addressed to?

4          THE COURT:  To whom it may concern.

5         A.   To whom it may concern.

6         Q.   Okay.  Sorry.  And then the address is

7    DigitalNet in Andover.  Do you see that?

8         A.   Yes.

9         Q.   And then could you just read the body of the

10   letter?

11        A.   "This letter is to verify that DigitalNet

12   Technology Solutions, LLC, has been an active customer

13   in good standing with Pentucket Bank.

14          "DigitalNet Technology Solutions, LLC, has

15   multiple open and active deposit accounts with us and

16   has no outstanding debts.

17          "If you have any inquiries regarding this

18   company, please contact us at 978-372-7731."

19          MR. HUNTER:  Ms. Sheff, would you please pull

20   up Exhibit 855.

21          THE COURT:  Wait a minute.  Who's that signed

22   by?

23          MR. HUNTER:  Can you go back?

24          MS. SHEFF:  850, you said?

25          MR. HUNTER:  Yes, to 844.

```
 1                MS. SHEFF:  844?

 2                THE COURT:  Okay.  Thanks.

 3                MR. HUNTER:  Just a moment, your Honor.

 4                Could you -- Ms. Sheff, could you pull up -- I

 5      believe it's 641.  Actually, try 640.  Okay.  I think

 6      this one --

 7           Q.   So this, Special Agent Laroe, is an email sent

 8      from Mac Chaudhary to Jack Rotondi at United Way.  Do

 9      you see that?

10           A.   Yes.

11                MR. HUNTER:  Ms. Sheff, could you go down to

12      the attachments.

13           Q.   Okay.  This appears to be a July 14, 2016,

14      letter from Pentucket Bank --

15           A.   Yes.

16           Q.   -- regarding DigitalNet?

17                Thank you.

18                Ms. Sheff, could you please pull up

19      Exhibit 855.

20                This appears to be a similar kind of letter.

21      Do you see that?

22           A.   Yes.

23           Q.   But dated February 27th, 2013?

24           A.   Yes.

25                MR. HUNTER:  Ms. Sheff, can you pull up -- I
```

1    believe it's 611 -- actually, 613, Exhibit 613.

2         Q.   Okay.  And could you go down, scroll through

3    the -- it's going to be in the attachments, so toward --

4    a little further.

5              Okay.  Do we see here is a letter dated

6    February 27th, 2013?

7         A.   Yes.

8         Q.   And this is a document saying -- it appears to

9    be the same document you found in Mr. Alrai's home in

10   Windham; is that correct?

11        A.   Yes.

12             MR. HUNTER:  Ms. Sheff, can you please pull up

13   854?

14             MS. SHEFF:  Excuse me?

15             MR. HUNTER:  854, please.

16        Q.   Okay.  This is a -- and what's the date of

17   this letter?

18        A.   July 18th, 2016.

19        Q.   And who does it purport to be from?

20        A.   Mac Chaudhary.

21        Q.   And is this on DigitalNet Technologies

22   letterhead?

23        A.   Yes, it is.

24        Q.   And the address down below, is that the

25   Andover, Massachusetts, address of DigitalNet?

1      A.   Yes, it is.

2      Q.   This is a document you found in Mr. Alrai's

3  home office in Windham?

4      A.   Yes, it is.

5      Q.   Okay.  Thank you.

6           And can -- Ms. Sheff, can you zoom in on the

7  body of the letter, please.

8           Can you just read the --

9           THE COURT:  Let's not do that anymore.

10          MR. HUNTER:  Okay.

11          THE COURT:  You blow up what you want me to

12 read, I'll read it.

13          MR. HUNTER:  Okay.  Understood, your Honor.

14          THE COURT:  Just give me a second.

15          All right.

16          MR. HUNTER:  Thank you.

17          And, Ms. Sheff, could you put 640 back on the

18 screen, please.

19      Q.   Okay.  This is the email we were looking at

20 before from Mac Chaudhary to Jack Rotondi --

21      A.   Yes.

22      Q.   -- can you see that?

23          Ms. Sheff, can you go down further in the

24 email to the attachments?  The next one, please.  Could

25 you -- oh, up one.

1          Okay.  And could you just zoom in on the

2    content of that letter for the Court.  And this is Bates

3    04788, for the record.

4          THE COURT:  So it's another letter from Mac

5    Chaudhary describing DigitalNet.

6      Q.   Appears to be the same financial attestation

7    letter.  Do you see that?

8      A.   Yes.

9          MR. HUNTER:  Ms. Sheff, could we please pull

10   up Exhibit 853.

11         THE COURT:  They're letters from the banks --

12   from the bank.  Are there -- will there be any

13   evidence -- are you presenting any evidence that those

14   are not authentic bank letters, that they're not really

15   written by the purported authors or is the point just

16   that you found them where you found them?

17         MR. HUNTER:  The point is we found them where

18   we found them, your Honor.

19         THE COURT:  Thank you.

20         MR. HUNTER:  Can you pull up 853, please,

21   Ms. Sheff.

22     Q.   All right.  Is this a DigitalNet -- does this

23   appear to be a DigitalNet employee profile?

24     A.   Yes, it does.

25     Q.   Can you read the employee name, please?

1      A.    Nadeem Yousuf.

2      Q.    And where's the location?

3      A.    Windham, New Hampshire.

4            MR. HUNTER:  All right.  Could you just scroll

5   through the document, please, Ms. Sheff.

6      Q.    And this, again, was found in Mr. Alrai's home

7   in Windham?

8      A.    Yes.

9            MR. HUNTER:  Ms. Sheff, could you please pull

10  up 862.

11     Q.    Is this another DigitalNet employee profile?

12     A.    Yes.

13     Q.    And what's the employee name?

14     A.    Mohamad Wahbe.

15     Q.    And there's a K in the middle of that?

16     A.    Yes, there is.

17     Q.    From your knowledge of the investigation, do

18  you know what K stands for?

19     A.    Kal.

20     Q.    And it also lists location?

21     A.    Windham, New Hampshire.

22           MR. HUNTER:  Ms. Sheff, could you please

23  scroll through that?

24           MS. SHEFF:  It's just one page.

25           MR. HUNTER:  Oh, just one page.  Thank you.

1              And 864, 864 -- oh, that is 864.  Can you

2     scroll down?  I may have -- all right.  You can -- you

3     can take that off the screen.  I didn't mean to pull

4     that one up.

5              Could you please pull up Exhibit 849, please,

6     Ms. Sheff.

7         Q.   Okay.  Is this another document found in the

8     defendant's home in Windham, New Hampshire?

9         A.   Yes.

10        Q.   And can you just --

11             Ms. Sheff, can you just zoom in on the top

12    part of the agreement here for the Court to read?

13             Does it say it's an agreement from August 17,

14    2012?

15        A.   Yes.

16        Q.   All right.  Between United Way and DigitalNet;

17    do you see that?

18        A.   Yes.

19        Q.   All right.  You can take that off the screen.

20             And then down below, could you zoom in on the

21    signature block?

22             Signed by Patricia Latimore for the client.

23    Do you see that?

24        A.   Yes.

25        Q.   And who's signing for the DigitalNet

1    representative?

2         A.    Munawar Ahmad.

3         Q.    Ahmad, A-h-m-a-d?

4         A.    Yes.

5         Q.    As VP of business development --

6         A.    Yes.

7         Q.    -- do you see that?

8               All right.  You can take that off the screen.

9               Ms. Sheff, could you please put Exhibit 842 on

10   the screen and then scroll down to page 31.

11              Okay.  I just want to zoom in on this UW part

12   of the screen.  So that date is 5/1/17.  Do you see

13   that?

14        A.    Yes.

15        Q.    Okay.  And it lists IT support, has a number,

16   and then add, and another number.  Do you see that?

17        A.    Yes.

18        Q.    It looks like a number crossed out and a

19   little lower number is put in.  Do you see that?

20        A.    Yes.

21        Q.    Same with Vo -- VoIP int, same thing, a

22   number, then add, and then there's another number that's

23   been adjusted a little bit.  Do you see that?

24        A.    Yes, I do.

25              MR. HUNTER:  Okay.  Ms. Sheff, can you unzoom

1    and just go to this thing on the bottom here.

2         Q.    And we have -- looks like remaining -- capital

3    remaining, digital CapEx, and various numbers.  Do you

4    see that?

5         A.    Yes, I do.

6              MR. HUNTER:  Okay.  You can take that off the

7    screen, Ms. Sheff.

8         Q.    And do you -- if you're aware from your time

9    in the investigation, is May close to the end of the

10   fiscal year at United Way?

11        A.    Yes, it is.

12             MR. HUNTER:  All right.  You can take that off

13   the screen, Ms. Sheff.

14             Could you please put Exhibit 880 on the

15   screen, Ms. Sheff?  Okay.  Scroll through to the next

16   page.

17        Q.    Okay.  What is this, Agent Laroe?

18        A.    It is a wire transfer request form.

19        Q.    Okay.  And we see a customer signature?

20        A.    Yes.

21        Q.    But no customer name is printed there yet,

22   right?

23        A.    No, there's not.

24        Q.    All right.  And where's the wire going to and

25   where is it coming from?

1          A.    It is going to Lahore, Pakistan, and it is

2     coming from DigitalNet Technology Solutions.

3          Q.    This is the Andover address?

4          A.    The Andover address.

5          Q.    And this is a wire transfer form found in

6     Mr. Alrai's home office in Windham?

7          A.    Yes.

8               MR. HUNTER:   Okay.  Could you scroll down,

9     Ms. Sheff?

10         Q.    And the remaining pages of this are other

11    foreign wire transfer forms.  Do you see that?

12         A.    Yes.

13              MR. HUNTER:   Ms. Sheff, could you please put

14    Exhibit 881 on the screen?

15         Q.    Okay.  And we're not going to go through all

16    of these, but are these other Pentucket Bank wire

17    transfer forms?

18         A.    Yes, they are.

19         Q.    Also transferring wire and money to Pakistan?

20         A.    Yes.

21         Q.    Keep scrolling.  We'll just scroll through

22    them, just so we can see.

23              All right.  And so we can see sometimes

24    Mac Chaudhary is handwritten, sometimes it's typed.  Do

25    you see that, Agent Laroe?

1      A.   It looks like it's all handwritten.

2      Q.   Okay.

3           THE COURT:  Sometimes it's printed and

4      sometimes it's printed by a different --

5           MR. HUNTER:  Yeah.

6      A.   Right.

7           THE COURT:  There are clearly two different

8      hand writers writing the name, although signing the

9      name, it looks quite similar.

10          MR. HUNTER:  Yes.

11          THE COURT:  Do you have any evidence on that

12     signature?  Yes or no is fine.  Do you have any evidence

13     on that signature, who wrote it?

14          MR. HUNTER:  Yes, we will have some evidence

15     on that.

16          THE COURT:  I see.  Okay.

17          MR. HUNTER:  All right.  All right, Ms. Sheff,

18     could you please put 878 on the screen.

19     Q.   Okay.  So, again, this is a -- who is this

20     addressed to?

21     A.   It is addressed to DigitalNet Technology

22     Solutions.

23     Q.   Okay.  Addressed to the Andover location?

24     A.   Yes.

25     Q.   And, again, this was found in Mr. Alrai's home

1   in Windham?

2        A.   Yes.

3        Q.   All right.  Can you please read the -- or zoom

4   in on the first paragraph and could you just read

5   starting "we have been retained."

6        A.   "We have been retained by Robert Allen in

7   order to investigate potential claims of fraud,

8   misrepresentation, and breach of contract against

9   DigitalNet Technology Solutions, LLC, DigitalNet, and

10  its constituents.

11          "Specifically our client has reason to believe

12  that DigitalNet and its constituents acted in bad faith

13  by intentionally misrepresenting DigitalNet's

14  professional capabilities related to the website

15  development project."

16          MR. HUNTER:  You can take that off the screen,

17  Ms. Sheff.

18       Q.   And then the letter goes on to explain issues

19  that Robert Allen was purporting to have with

20  DigitalNet.  Do you see that?

21       A.   Yes.

22          MR. HUNTER:  Okay.  So, actually, could you

23  zoom in on the top two paragraphs -- the two body

24  paragraphs here.

25          Could you read the first -- I'll defer to the

1    Court's reference if the Court would rather read these

2    paragraphs or have the witness read them.

3              THE COURT:  Give me a second.

4              I get the gist.

5              MR. HUNTER:  All right.

6              You can take that down, Ms. Sheff.

7         Q.   I'll just direct -- just one -- one sentence

8    down here where we just have -- actually, never mind.

9              Can you pull up Exhibit 845, please.

10             Okay.  This is a letter addressed to Mohamad

11   Wahbe.  Do you see that?

12        A.   Yes.

13        Q.   And, again, this was found in Mr. Alrai's

14   home?

15        A.   Yes.

16             MR. HUNTER:  Okay.  That's enough, Ms. Sheff.

17   You can pull that down.

18             And Exhibit 876.

19        Q.   Okay.  This appears to be some handwritten

20   notes.  Do you see that?

21        A.   Yes.

22        Q.   And does this say at the top, "app," it looks

23   like it might say UltPult or something like that?

24        A.   Yes.

25             MR. HUNTER:  Okay.  If you could scroll

1    through this document, please, Ms. Sheff.  Okay.  You

2    can take that off the screen.

3            Could you please put Exhibit 860 on the

4    screen?

5        Q.   This is a -- what -- does this appear to be a

6    corporate document from the state of New Hampshire

7    Department of State?

8        A.   Yes, it does.

9        Q.   Okay.  Could you scroll to the next page,

10   Ms. Sheff.

11           Okay.  Here we have AISA Consulting Group.

12           Can you zoom in on the name of owners, and can

13   you read the name of owners, please, Ms. Laroe?

14       A.   Imran Alrai, manager.

15       Q.   Okay.  And that's of AISA Consulting Group,

16   LLC?

17       A.   Yes.

18       Q.   And what address is provided?

19       A.   31 Lowell Road, Suite 1, Windham,

20   New Hampshire.

21       Q.   And that's the office that we saw the picture

22   of earlier, the --

23       A.   Correct.

24       Q.   All right.  Did you execute a search warrant

25   of that location?

1          A.    Yes, we did.

2          Q.    And did you find any evidence of AISA doing

3    business there?

4          A.    No, we did not.

5          Q.    Any evidence of DigitalNet doing business

6    there?

7          A.    No, we did not.

8                MR. HUNTER:  Okay.  Ms. Sheff, can you bring

9    that down?  Can you zoom in on the signature line?

10         Q.    It says, must be signed by all owners, and

11   there's a signature there.

12               Do you see that?

13         A.    Yes, I do.

14         Q.    And then it says, print or type name.  What

15   does that say?

16         A.    AISA Consulting Group, LLC, Imran Alrai,

17   manager.

18               MR. HUNTER:  Thank you.  You can take that

19   down, Ms. Sheff.

20               Keep scrolling through.

21               THE COURT:  Let me just ask --

22               MR. HUNTER:  Yup.

23               THE COURT:  The -- the signature looks

24   somewhat similar to the signature that was -- I can't

25   tell, actually.  I'll have to look at the paper.

1          MR. HUNTER:  Okay.

2          THE COURT:  I don't want to interrupt you.

3          MR. HUNTER:  No, no problem, your Honor.

4          Keep scrolling down, Ms. Sheff.

5          Okay.  Stop here for a moment.

6     Q.   So this is a -- could you just read the top

7  line here, Ms. Laroe?

8     A.   Which --

9     Q.   That certificate of formation.

10    A.   "Certificate of formation, New Hampshire

11 limited liability company."

12         MR. HUNTER:  Okay.  Thank you.  You can take

13 that down, Ms. Sheff.

14    Q.   And can you read -- actually, just zoom in on

15 this block here, please, Ms. Sheff.

16         And.  Ms. Laroe, can you just read that,

17 please?

18    A.   The name of the limited liability company is

19 UltPult, LLC.  The nature of the primary business or

20 purposes are multimedia, 2D/3D animation, CGI and video

21 game development and production.

22         The name of the limited liability company's

23 registered agent is Imran Alrai and the street address,

24 town, city, including zip code and post office box, if

25 any, of its registered officers, agents, business

1    address, 31 Lowell Road, Suite 1, Windham,

2    New Hampshire.

3        Q.   Okay.  And that's the same address we've seen

4    on other documents addressed to both DigitalNet and

5    AISA; is that correct?

6        A.   Correct.

7             MR. HUNTER:  Okay.  Could you keep scrolling

8    through, Ms. Sheff.

9        Q.   And, again, we have another signature here.

10   Do you see that?  It says Imran Alrai, manager.

11       A.   Yes.

12            MR. HUNTER:  Keep scrolling through.  All

13   right.  That's good for that document, Ms. Sheff.

14            Could we please put Exhibit 845 on the screen?

15            MS. SHEFF:  Excuse me?

16            MR. HUNTER:  845.  All right.  I already put

17   that one up.

18            846.

19       Q.   Okay.  So this is a letter, an insurance

20   letter, and who is it addressed to?

21       A.   DigitalNet Technology Solutions, 31 Lowell

22   Road, Unit 1, Windham, New Hampshire.

23            MR. HUNTER:  Go to the next page, Ms. Sheff.

24            Okay.  And could you go to Exhibit 870,

25   please?

1      Q.   Okay.  And so here we have a letter addressed

2  to Mohammad.  Do you see that?

3      A.   Yes.

4      Q.   And at what address is it --

5      A.   DigitalNet Technology Solutions, 31 Lowell

6  Road, Suite 1, Windham, New Hampshire.

7      Q.   Okay.  And actually, Ms. Sheff, can you just

8  go to page 2 of 845?

9           MS. SHEFF:  845.

10          MR. HUNTER:  Yes, please.

11          Okay.  Could you please put -- bring up --

12          THE COURT:  I can read that fine.

13          MR. HUNTER:  Okay.  Thank you.

14          THE COURT:  Where do you want me to look?  Do

15  you want me to read just the four names?

16          MR. HUNTER:  That's fine, your Honor.

17          THE COURT:  Okay.

18          MR. HUNTER:  All right.

19          Ms. Sheff, could you please pull up 861.

20      Q.   Okay.  And, again, we see a letter addressed

21  to DigitalNet in Windham.  Do you see that?

22      A.   Yes.

23          MR. HUNTER:  Okay.  Could you scroll down?

24      Q.   And, again, this is a -- it appears to be an

25  insurance statement?

```
 1         A.   Yes.
 2              MR. HUNTER:  Okay.  Keep scrolling down,
 3    please.  All right.  Ms. Sheff, could you please bring
 4    up 872.
 5         Q.   Okay.  Again, another certificate of liability
 6    insurance; do you see that?
 7         A.   Yes.
 8         Q.   To DigitalNet in Windham, New Hampshire?
 9         A.   Yes.
10              MR. HUNTER:  Okay.  Next page.
11         Q.   And here's another one for AISA Consulting,
12    LLC, in Windham, New Hampshire?
13         A.   Yes.
14              MR. HUNTER:  All right.  Could you please put
15    Exhibit 848 on the screen?
16         Q.   Okay.  And this is a letter from Bank of
17    America addressed --
18              And can you zoom in on the address, please?
19              Who is this addressed to?
20              THE COURT:  The defendant at DigitalNet in
21    Windham.
22              MR. HUNTER:  Thank you.
23              All right.  Could you please put Exhibit 869
24    on the screen?
25              Okay.  Can you zoom in on the title of this
```

1    document, Ms. Sheff, the application.

2         Q.   Can you read that, Ms. Laroe?

3         A.   "Application for professional liability errors

4    and omissions insurance."

5         Q.   Thank you.

6              And can just -- and now the name of the

7    applicant.  I'm sorry, Ms. Sheff.  Can you zoom in on

8    the name of the applicant?

9              THE COURT:  DigitalNet.

10        Q.   All right.  DigitalNet in Andover.

11             And do you see the nature of the services?

12        A.   Yes.

13        Q.   And it's IT services, infrastructure, hosting,

14   that sort of thing; is that right?

15        A.   Yes.

16             MR. HUNTER:  All right.  You can take that

17   off.

18             All right.  And could you go to the next page,

19   please, Ms. Sheff.

20             All right.  Could you go zoom in on number 9,

21   please, "year established."

22             THE COURT:  Let me ask a question.

23             MR. HUNTER:  Yes, your Honor.

24             THE COURT:  These exhibits that were seized

25   pursuant to a search warrant, are other witnesses in the

 1 case going to testify about them as well or is this

 2 going to be my sort of one and only look?

 3          MR. HUNTER:  This is -- yes, this will be your

 4 one and only look, your Honor.

 5          THE COURT:  Okay.  Proceed.

 6          MR. HUNTER:  That's why we're going through

 7 it.

 8          THE COURT:  Proceed.

 9          MR. HUNTER:  Other than potentially in

10 closing.

11          THE COURT:  Of course, of course.

12     Q.   "Year established," can you read that please,

13 Ms. Laroe?

14     A.   2012.

15          MR. HUNTER:  Thank you.  Could you take that

16 down?

17          Okay.  Could you zoom in on the employees

18 here?

19     Q.   All right.  So the first one is M. Ahmad

20 Chaudhary?

21     A.   Yes.

22     Q.   And the defendant's father's name is Munawar

23 Ahmad Chaudhary; is that correct?

24     A.   Correct.

25     Q.   All right.  And his professional

1    qualifications, it says seasoned manager.  Do you see

2    that?

3         A.    Yes.

4         Q.    And that he's been in practice for 27 years?

5         A.    Yes.

6         Q.    And principal or partner for 15 months.

7               Do you see that?

8         A.    Yes.

9         Q.    And then who else is listed here?

10        A.    Kal Wahbe, Nadeem Yousef, Idir Gherbi, and

11   Ahmad Hassan.

12        Q.    Ahmad Hassan.  Okay.  Thank you.

13              Then here we have some customers listed.  So

14   we have United Way, right?

15        A.    Yes.

16        Q.    And we see Robert Allen Group?

17        A.    Yes.

18        Q.    And then it looks like these are two

19   companies, Lahore Real Estate and Rahim Clinic?

20        A.    Yes.

21        Q.    Do you see that?

22              Are any of these companies Barneys in

23   New York?

24        A.    No.

25        Q.    Or AISA?

1      A.   No.

2      Q.   Or Abilities in New York?

3      A.   No.

4      Q.   And let's look at the amount of money here.

5           So United Way -- and, again, this is -- we've

6  got IT managed services, 230,000, 2013, do you see that?

7      A.   Yes.

8      Q.   Robert Allen, 120,000, 2013.  Do you see that?

9      A.   Yes.

10     Q.   So the Rahim Clinic IT consulting, 19,500 in

11 2012.  Do you see that?

12     A.   Yes, I do.

13     Q.   And Lahore Real Estate IT, risk assessment,

14 5,500 bucks.  Do you see that?

15     A.   Yes, I do.

16          MR. HUNTER:  Okay.  Keep scrolling.

17     Q.   And then can you see down here, does it say

18 estimated cost of goods sold for current fiscal period?

19     A.   Yes, I do.

20     Q.   And what's noted here in the margin?

21     A.   New business.

22     Q.   Thank you.

23          Keep going.

24          And here we've got a couple signatures,

25 A. Hassan; do you see that?

1        A.    Yes.

2        Q.    That's sort of distinctive block writing.  Do

3    you see that?

4        A.    Yes.

5        Q.    7/31/2013?

6        A.    Yes.

7        Q.    And here we have another signature.  Does that

8    look similar to the one on the wires, if you can tell?

9    It's fine if you can't.

10       A.    I --

11       Q.    That's fine.

12             And, for the record, Ms. Laroe indicated she

13   didn't want to indicate.

14             And it says vice-president?

15       A.    Yes.

16       Q.    Signed 9/3/13, do you see that?

17             THE COURT:  It's your interpretation that it

18   looks similar to the signature on the lines right there,

19   right?

20             MR. HUNTER:  That's what I was attempting to

21   elicit and Ms. Laroe did not testify to that.

22             THE COURT:  I heard.  You're representing that

23   it is.

24             MR. HUNTER:  Yes.

25             THE COURT:  All right.

1          Q.    So you said you executed a search warrant for

2    AISA in Windham; is that correct?

3          A.    Correct.

4          Q.    Did you execute a search warrant for down in

5    Andover?

6          A.    No, we did not.

7          Q.    Why is that?

8          A.    We did not have reason to believe there would

9    be any -- anything there.

10         Q.    You didn't have evidence that business was

11   conducted in that location?

12         A.    Correct.

13         Q.    Or reason to believe --

14         A.    Reason to believe.

15         Q.    -- based on -- and what was that based on?

16         A.    Based on investigative steps that we had done,

17   we had served them with a subpoena, we had served Regus

18   with a subpoena.

19              MR. AYER:  Same objection, your Honor.  That's

20   used to explain why they didn't, but --

21              THE COURT:  I want to make sure I understand.

22              You didn't have reason to believe business was

23   conducted there because investigative steps we had done,

24   we served them with a subpoena --

25              What's your objection?

1          MR. AYER:  Oh, just that here for the hearsay

2    purpose, that there was no reason to believe that there

3    was any business there.  We ask that it not be allowed

4    in simply to explain why they did not execute a search

5    warrant.

6          THE COURT:  What's the hearsay?

7          MR. AYER:  That they had information external

8    to what we're hearing here.  She didn't say that it was

9    from her own personal knowledge.

10         THE COURT:  She said, "We tried to serve a

11   subpoena," I guess is what you're saying, right?

12         THE WITNESS:  Yes.

13         THE COURT:  What are you saying anyway?

14   Because I don't understand why you wouldn't think

15   business was conducted there.

16         THE WITNESS:  We served a subpoena on Regus.

17   They provided information that they received mail there

18   and had use of a conference room, but did not maintain

19   an office there.

20         THE COURT:  All right.  Yeah, that is hearsay.

21         So it's not offered for its truth, but it is

22   offered to explain why you'd do a search there.

23         MR. HUNTER:  Yes, your Honor.  That is why --

24         THE COURT:  That's sustained.

25         MR. HUNTER:  And I was eliciting it for the

1   purpose of why they didn't execute a search warrant,

2   your Honor.

3            THE COURT:  That's the purpose for which it

4   was admitted.

5       Q.   Okay.  Ms. Laroe, were you involved in the

6   preparation of a chart summarizing the badge swipe data

7   and emails sent from the address info@digitalnet.us?

8       A.   Yes, I was.

9       Q.   Okay.  And as part of preparing that chart,

10  did you review the badge swipe data provided by United

11  Way in this case?

12      A.   Yes, I did.

13      Q.   This was the badge swipe data of Mr. Alrai

14  entering the United Way offices in Boston?

15      A.   Yes.

16           MR. HUNTER:  Ms. Sheff, could we put that

17  document on the screen and I'll get you an exhibit

18  number shortly.

19           MS. SHEFF:  It's 925.

20           MR. HUNTER:  407, please.

21           MS. SHEFF:  Oh, 407?

22           MR. HUNTER:  Yup.

23           MS. SHEFF:  Sorry.

24      Q.   Is this the bad swipe data that you reviewed?

25      A.   Yes, it is.

1    Q.    Thank you.

2          And did you also review emails sent --

3    received from United Way sent from info@digitalnet.us?

4    A.    Yes, I did.

5    Q.    Okay.  And did you determine the number of

6    emails chart -- the number of emails sent from

7    info@digitalnet.us while Imran was swiped in at United

8    Way?

9    A.    Yes.

10   Q.    How many?

11   A.    I would have to review.

12         MR. HUNTER:  Okay.  Ms. Sheff, could you

13   please put the chart on the screen, which is in evidence

14   at 925.

15   Q.    All right.  So is this a summary chart that

16   you assisted in preparing?

17   A.    Yes, it is.

18   Q.    Okay.  So how many emails sent from

19   info@digitalnet.us were sent while Mr. Alrai was swiped

20   in at United Way?

21   A.    None.

22   Q.    Based on your review of the badge swipe data

23   what was the average number of days per month that

24   Mr. Alrai was swiped in to work from April 2015 to

25   May 2018?

1      A.    Five and a half days.

2      Q.    And just to be clear, this is badge swipe

3  data, so you don't have a video camera of Mr. Alrai

4  being on premises.

5      A.    Correct.

6      Q.    It's just the days that his badge swiped in to

7  work; is that right?

8      A.    Correct.

9      Q.    All right.  And the average number of days his

10  badge swiped in at United Way in 2015 beginning in

11  April, what -- how many was that?

12     A.    6.9.

13     Q.    And for 2016, the average number of days per

14  month that Mr. Alrai swiped in at United Way in Boston?

15     A.    6.6.

16     Q.    And for 2017, the average number of days

17  Mr. Alrai's badge swiped in at United Way?

18     A.    4.3.

19     Q.    And then the average number of days

20  Mr. Alrai's badge swiped in at United Way in 2018?

21            THE COURT:  You've got to slow down.

22            MR. HUNTER:  Sorry.

23     Q.    The average number of days Mr. Alrai's badge

24  swiped in at United Way 2018 -- through May of 2018?

25     A.    3.4.

1       Q.   Okay.  And Mr. Alrai was suspended from

2 employment on June 12th, 2018; is that right?

3       A.   Correct.

4          MR. HUNTER:  Okay.  Could we go to the next

5 page, Ms. Sheff.

6       Q.   All right.  So here we have a chart; is that

7 right?

8       A.   Correct.

9       Q.   And this is summarizing the email -- wire

10 fraud emails charged in Counts 1 through 18 compared

11 against the badge swipe data received from United Way;

12 is that correct?

13       A.   Yes.

14       Q.   Okay.  And so the -- so just starting at the

15 beginning, do we see Mr. Alrai swiped in on 5/5 and 5/7

16 of 2015?

17       A.   Yes.

18       Q.   And this is the time of his first swipe-in on

19 each of those days; is that right?

20       A.   Yes.

21       Q.   Because -- in your review of the badge swipe

22 data, did you -- on most of the days, in fact, nearly

23 all of them, did Mr. Alrai swipe in or did his badge

24 register a swipe-in on multiple times -- at multiple

25 times?

```
1        A.    Yes.

2        Q.    And at multiple locations?

3        A.    Yes.

4        Q.    And is it your understanding that there were

5   multiple areas to swipe in in the United Way building?

6        A.    Yes.

7        Q.    Okay.  And then here we have 5/11/2015 at

8   10:17 p.m., an email from Mohammad, info@digitalnet.us.

9   Do you see that?

10       A.    Yes.

11       Q.    Okay.  Is this the email charged in Count 1?

12       A.    Yes, it is.

13       Q.    Okay.  Now it says it's from IP address

14   75.68.37.59.  Do you see that?

15       A.    Yes, I do.

16             THE COURT:  You've got to slow down.

17             MR. HUNTER:  Okay.  Thank you, your Honor.  I

18   will.

19             MR. HUNTER:  Ms. Sheff --

20             THE COURT:  I do appreciate you trying to move

21   along.  I know that's what you're doing and I'm

22   grateful, but you've got to be reasonable.

23             MR. HUNTER:  I understand.  I will slow down.

24             Could you please put Exhibit 101a on the

25   screen, please, Ms. Sheff.
```

1                    Okay.  Could you scroll down, please.

2          Q.    Okay.  Is this that email?

3          A.    Yes, it is.

4                    MR. HUNTER:  Okay.  Could you scroll down?

5          Q.    And is this header information from that

6    email?

7          A.    Yes, it is.

8          Q.    Okay.  We'll be having testimony later about

9    what header information is; is that correct?

10         A.    Correct.

11         Q.    Do you understand that?  Okay.

12                   Could you go up, Ms. Sheff?

13                   And could you just read the X-originating-IP

14   of that email.

15         A.    75.68.37.59.

16         Q.    Okay.  All right.

17                   THE COURT:  Well, I guess I'll hear later what

18   the header information is, but what is -- what's your

19   representation about what this header information is

20   supposed to signify?

21                   MR. HUNTER:  So the header information shows

22   the IP address from which the email was sent.  That's

23   what the X-originating-IP is.  And I anticipate --

24                   THE COURT:  Are you going to say it's the

25   defendant's computer and not Mohammad's?

1          MR. HUNTER:  It's going to be the defendant's

2  home computer that we saw in his home office, your

3  Honor, is what I anticipate.

4          THE COURT:  I'll wait to hear that evidence.

5  Thank you.

6          MR. HUNTER:  Thank you.

7          All right.  And could you scroll down, please,

8  Ms. Sheff.  Continue down.

9      A.   Okay.

10     Q.   And we see two invoices are attached?

11     A.   Yes.

12     Q.   Were PDFs of those invoices found on the

13  defendant's home computer?

14     A.   Yes, they were.

15         MR. HUNTER:  All right.  Ms. Sheff, could you

16  go back to the summary chart, 925.

17     Q.   All right.  And so here we have more summaries

18  of badge swipe data.  Do you see that, from 5/12/2015 to

19  6/9/2015?

20     A.   Yes, I do.

21     Q.   And then 6/15/2015 at 10:52 p.m., there's

22  another email.  Do you see that?

23     A.   Yes, I do.

24         MR. HUNTER:  And, Ms. Sheff, could you pull up

25  102a.

1      Q.   Is this a similar email with header

2   information?

3      A.   Yes, it is.

4           MR. HUNTER:  Could you scroll down, please.

5      Q.   And is this that email?

6      A.   Yes, it is.

7           MR. HUNTER:  Okay.  Keep scrolling down.

8      Q.   We see the same X-originating-IP?

9      A.   Yes.

10          MR. HUNTER:  Can you please continue

11   scrolling.

12     Q.   It's attaching another invoice?

13     A.   Yes.

14     Q.   Okay.  Thank you.

15          Can you go back, Ms. Sheff, to 925.

16          All right.  So we see there's another swipe-in

17   on 6/16/2015 at 9:29 a.m.; is that correct?

18     A.   Correct.

19     Q.   And that's followed by a 6/19/2015 email?

20     A.   Correct.

21     Q.   And that's the email charged in Count 3; is

22   that right?

23     A.   Yes.

24     Q.   For the superseding indictment?

25     A.   Yes.

1    MR. HUNTER:  Okay.  Could we please put up

2  Exhibit 103a, Ms. Sheff.

3    Okay.  Is this that email?

4    A.    Yes.

5    Q.    Okay.  So this is the email.  And it has the

6  same X-originating-IP information, is that correct,

7  Ms. Laroe?

8    A.    Correct.

9    Q.    And it -- and does this email also attach an

10  invoice?

11    A.    Yes, it does.

12    Q.    And was a PDF of that invoice found on

13  Mr. Alrai's home computer in Windham?

14    A.    Yes.

15    Q.    Could we go to -- back to 925, please.

16    So we were just talking about the 6/19 email.

17  On the next page we see a 6/22/2015 email that charges

18  Count 4 in the superseding indictment, Ms. Laroe?

19    A.    Yes.

20    Q.    And is this the -- the same where it had

21  the same X-originating-IP and it was attaching two

22  DigitalNet invoices?

23    A.    Yes.

24    Q.    And those invoices were found on the

25  defendant's home computer in Windham?

1      A.   Yes.

2      Q.   Okay.  So that -- the date of that email is

3  6/22 --

4           Actually, Ms. Sheff, could we pull that up,

5  104?  I guess we can pull up 104a, just so we can see

6  the date.

7           Okay.  So that's June 22, 2015.  Do you see

8  that?

9      A.   Yes, I do.

10          MR. HUNTER:  Okay.  And, Ms. Sheff, could we

11  put the chart back up, page 3 of the summary chart.

12     Q.   Okay.  So that -- that was the email that we

13  saw 6/22/2015.  When did Mr. Alrai last -- next swipe in

14  to work?

15     A.   On June 23rd, 2015.

16     Q.   Okay.  And that's at 9:33 a.m.?

17     A.   Yes.

18     Q.   Okay.  And it looks like the last swipe-in was

19  6/23/15 at 12:04 p.m.  That's around noon?

20     A.   Yes.

21     Q.   And there's no swipe-out data, right?  So we

22  don't know exactly from this when Mr. Alrai left; is

23  that correct?

24     A.   Correct.

25     Q.   Okay.  But the next charged email is sent

1    6/23, so a day Mr. Alrai did swipe in to work.  Do you

2    see that?

3         A.   Yes.

4         Q.   What time was it sent?

5         A.   At 10:31 p.m.

6              MR. HUNTER:  Ms. Sheff, can you please put

7    105a on the screen, please.

8         Q.   Okay.  Okay.  It looks like there was -- so

9    this says 7:30 p.m. with PDT.  Do you see that?

10        A.   Yes.

11        Q.   That's Pacific time.  So that would be the

12   time difference between 10:30 p.m. and 7:30 p.m.

13             Ms. Sheff, could you please put Exhibit 105 on

14   the screen, please.

15             Okay.  And this is -- this is -- you can see

16   it down below.  It has the UWY2 Bates number.

17             So this is the email received from United Way?

18        A.   Yes.

19        Q.   And it has the 10:31 p.m. time?

20        A.   Correct.

21        Q.   Again, this is an email purporting to be from

22   Mohammad attaching two DigitalNet invoices?

23        A.   Yes.

24        Q.   And so between 12:04 p.m. and 10:31 p.m.,

25   that's -- what was that, one, two, three, four, five,

1    six, seven, eight, nine, ten -- ten hours?

2         A.   Yes.

3              MR. HUNTER:   All right.   Could you please go

4    back to Exhibit 925, Ms. Sheff, page 2 or 3.

5         Q.   Okay.   So it looks like Mr. Alrai's badge

6    swiped in again on 6/24/2015 at 10:29 a.m.   Do you see

7    that?

8         A.   Yes, I do.

9         Q.   Okay.   And the next charged email 6/29/2015,

10   at 7:10 p.m., do you see that?

11        A.   Yes, I do.

12        Q.   And, again, that's for Count 6 --

13        A.   Yes.

14        Q.   -- charged in the superseding indictment?

15        A.   Yes.

16        Q.   Was a PDF of the invoice sent in this email

17   found on Mr. Alrai's home computer?

18        A.   Yes, it was.

19        Q.   That's the Envy desktop, the HP Envy desktop

20   that we saw pictures of on his desk in Windham?

21        A.   Yes.

22             MR. HUNTER:   Okay.   And, for the record, the

23   exhibits corresponding to that would be 106, 106a and

24   106b.

25        Q.   And we see another string of badge swipe

1  entrances or it looks like Mr. Alrai's badge swiped in

2  on 6/30/2015?

3       A.   Correct.

4       Q.   And then it goes through a few days and then

5  7/29/2015.  Do you see that?

6       A.   Yes, I do.

7       Q.   And then there are no badge swipe-ins between

8  7/29 and the next info email; is that right?

9       A.   Correct.

10       Q.   Okay.  So this is the email corresponding to

11  Count 7; is that right?

12       A.   Correct.

13       Q.   Sent on August 12th, 2015?

14       A.   Yes.

15       Q.   And, again, from Mohammad from the same

16  originating IP, 75.68.37.59; is that right?

17       A.   Yes.

18       Q.   And attaching a DigitalNet services proposal;

19  is that right?

20       A.   Yes.

21            MR. HUNTER:  Ms. Sheff, could we put 107 on

22  the screen, please.

23            Okay.  Could you scroll down?

24            DigitalNet Services Proposal, is this -- this

25  is the document.  Could you just scroll through this

1   document, Ms. Sheff?

2           Thank you.

3       Q.    Were PDF and Word documents of this services

4   proposal found on Mr. Alrai's home computer in Windham?

5       A.    Yes, there were.

6       Q.    Okay.  And another email was sent on

7   August 12th.

8           Could we go to page 4 of the chart.

9           Is that this email here?

10      A.    Yes.

11      Q.    And, again, Mr. Alrai did not swipe in at

12  United Way on 8/12/2015; is that right?

13      A.    That is correct.

14      Q.    And this is an email attaching PDFs of

15  invoices?

16      A.    Yes.

17      Q.    And this email was charged in Count 8?

18      A.    Correct.

19      Q.    With the same originating IP address as

20  75.68.37.59; is that right?

21      A.    That is correct.

22          MR. HUNTER:  Okay.  Ms. Sheff, could we please

23  bring up 108.

24          Could you scroll through this?

25      Q.    PDFs of these invoices were found on

1    Mr. Alrai's home computer; is that right?

2         A.   Correct.

3              MR. HUNTER:   Okay.   If we could go back to the

4    chart, please, Ms. Sheff, page 4.

5         Q.   Okay.   So the email -- this email was sent on

6    8/12 and it looks like Mr. Alrai swiped in the next day,

7    on 8/13?

8         A.   Yes.

9         Q.   And we have a few other entries and then the

10   last swipe in is 8/25.   Do you see that?

11        A.   Correct.

12        Q.   So August 25, 2015, 9:59 a.m.?

13        A.   Yes.

14        Q.   Okay.   And then the next email sent from

15   Mohammad at info@digitalnet from our IP address of

16   57.68.37.59 was on --

17             THE REPORTER:   Excuse me.

18             MR. HUNTER:   Oh, sorry.   Sorry.

19             THE REPORTER:   Start again, please.

20        Q.   So the next email -- when was the next email

21   sent from info@digitalnet?

22        A.   When were they sent?

23        Q.   Right.

24        A.   August 27th, 2015.

25        Q.   And this is -- is this the e-mail that

1    corresponds to Count 9 in the superseding indictment?

2         A.   Yes, it is.

3         Q.   Okay.  So let's take a look here.

4              So the email is sent at 10:06 a.m.  Do you see

5    that?

6         A.   Yes, I do.

7         Q.   And Mr. Alrai's badge did swipe in at United

8    Way in Boston that day; do you see that?

9         A.   Yes, I do.

10        Q.   What time was the first swipe-in for

11   Mr. Alrai?

12        A.   1:25 p.m.

13        Q.   So around three and a half hours, roughly?

14        A.   Yes.

15             MR. HUNTER:  And, Ms. Sheff, could you bring

16   up the email at 109, please.

17        Q.   This is the email?

18        A.   Yes, it is.

19        Q.   Sent at 10:06 a.m.?

20        A.   Yes.

21             MR. HUNTER:  Could we scroll down to see the

22   attachments?

23        Q.   So here we see this is a track changes -- a

24   Word document with track changes.  Do you see that?

25        A.   Yes.

1          MR. HUNTER:  Ms. Sheff, could you zoom in on

2    these comments -- go up to the top, the comments.

3       Q.    This is attached to an email from Mohammad at

4    info@digitalnet?

5       A.    Yes.

6       Q.    Okay.  So here we have a comment from JR1.  Do

7    you see that?

8       A.    Yes.

9       Q.    And could you just read that comment, please.

10      A.    "Why has this clause been removed?  We need

11   this information to ensure that the vendor has done

12   comparable work for other clients.  It is a

13   reasonable" --

14          THE COURT:  Hold it.  When you read, you have

15   to really slow down for the reporter.

16          THE WITNESS:  Okay.  I'm sorry.

17          THE COURT:  How about if I do it.

18          THE WITNESS:  Okay.

19          THE COURT:  JR1 says:  Why has this clause

20   been removed?  We need this information to ensure that

21   the vendor has done comparable work for other clients.

22   It is a reasonable request.  Just because we have worked

23   with DigitalNet in the past does not mean we know with

24   clarity what work they have done in this arena.

25          Their response -- no, it's another comment

1  from admin:  We merged the sections and it doesn't fit

2  there anymore.  We can provide any references that you

3  need.

4           That's actually an answer -- the -- the tan

5  response is to the purple comment.

6           Is that the inference you want me to draw?

7           MR. HUNTER:  Yes.  Yes, your Honor.

8           THE COURT:  Do you want me to read the one

9  below?

10          MR. HUNTER:  Yes, please.

11          THE COURT:  The comment:  Permitted

12  subcontractor language is standard stuff; why was it

13  removed.

14          And the answer:  We can't be bound by this in

15  a contract.  We hire contract workers and use

16  subcontractors as a regular part of our business.

17          I assume the admin response -- your position

18  is they came from the defendant?

19          MR. HUNTER:  Yes, your Honor.

20          THE COURT:  And who's making the purple

21  comments?

22          MR. HUNTER:  Jack Rotondi, your Honor.

23          THE COURT:  Ah, okay.  He testified.  All

24  right.

25          MR. HUNTER:  And I see that we're at 1:00 p.m.

1          THE COURT:  Yeah, it's time to go.

2          MR. HUNTER:  Okay.

3          THE COURT:  Unfortunately, I have a

4   commitment.

5          All right then.  You're excused for the

6   weekend.  No conversation with trial counsel over the

7   weekend.  You'll be back on the stand Monday morning at

8   9:00 a.m.

9          THE WITNESS:  Okay.

10          THE COURT:  Thank you, Agent.

11          THE WITNESS:  Thank you.

12          THE COURT:  This is off the record.

13              (Off-the-record discussion.)

14          THE COURT:  Thank you.

15      (Proceedings adjourned for the day at 1:01 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 4/10/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR