*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   1:18-cr-192-JL
              v.                        \*   December 10, 2019
                                        \*   9:02 a.m.
IMRAN ALRAI                             \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



EXCERPT TRANSCRIPT OF JURY TRIAL
DAY SEVEN - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE



Appearances:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office




For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon PA




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

```
 1                    I N D E X

 2

 3   WITNESS:           Direct   Cross   Redirect   Recross

 4
     CARLOS REYES           3       --
 5
     STANLEY BURROWS       21       32       41         --
 6
     KIMBERLY TERRY        42       54       --
 7
     TRAVIS TERRY          56      109      116
 8
     MUNAWAR CHAUDHARY
 9

10

11   EXHIBITS                       FOR ID         IN EVD

12   Government's 153c                                61

13   Government's 207a                                83

14   Government's 207b                                91

15   Government's 153d                               102

16   Government's 884                                132

17

18

19

20

21

22

23

24

25
```

```
1                        P R O C E E D I N G S
2              THE CLERK:  The Court has before it for
3    consideration this morning day seven of the bench trial
4    in criminal case 18-cr-192-01-JL, United States of
5    America vs. Imran Alrai.
6              MS. LE:  Good morning, your Honor.
7              THE COURT:  Good morning.
8              MS. LE:  If the Court is ready to proceed, the
9    government is prepared to call Carlos Reyes to the
10   stand.
11             THE COURT:  Please.
12             THE CLERK:  Good morning, sir.  If you'd like
13   to step this way, please.
14             If you could step into the witness box and
15   remain standing.
16             Please raise your right hand.
17             **CARLOS REYES**, having been first duly sworn,
18   testified as follows:
19             THE CLERK:  For the record, please state your
20   full name and spell your last name.
21             THE WITNESS:  Carlos Reyes, R-e-y-e-s.
22             THE CLERK:  Thank you.  Please be seated.
23                       DIRECT EXAMINATION
24   BY MS. LE:
25        Q.   Good morning, Mr. Reyes.
```

1      A.    Good morning.

2      Q.    Welcome back.

3      A.    Thank you.

4      Q.    Mr. Reyes, where do you work?

5      A.    I work for Citizens Bank.

6      Q.    Mr. Reyes, do you see there's a microphone in

7  front of you?

8      A.    Yes.

9      Q.    Would you please move towards the microphone

10  and speak up and into the microphone?

11      A.    Okay.

12      Q.    Thank you very much, sir.

13            Sir, how long have you been with Citizens

14  Bank?

15      A.    Seven years, almost eight.

16      Q.    What is your current job title?

17      A.    I am a business relationship manager.

18      Q.    What does that mean?

19      A.    I manage a book of business customers to help

20  just manage their banking relationship.

21      Q.    Okay.  Do you cover a certain branch or a

22  series of branch locations?

23      A.    Currently I cover six branches, three in

24  Nashua and two in Milford and one in Amherst.

25      Q.    Okay.  And those are all in New Hampshire?

1       A.    In New Hampshire, yes.

2       Q.    Okay.  Before your current position, what did

3   you do?

4       A.    I was the branch manager for the Windham,

5   New Hampshire, branch.

6       Q.    How long were you the branch manager in

7   Windham, New Hampshire?

8       A.    Three years.

9       Q.    And as branch manager, what were your

10  responsibilities?

11      A.    I was responsible for the entire branch,

12  overseeing everything.

13      Q.    Okay.  Did you have interactions with

14  customers on a daily basis as the branch manager?

15      A.    Yes, I did.  Yup.

16      Q.    Okay.  Do you know the defendant, Imran Alrai?

17      A.    I do, yup.

18      Q.    How do you know Mr. Alrai?

19      A.    So Mr. Alrai came over -- I actually opened

20  his accounts at the bank.

21      Q.    Okay.

22      A.    The accounts were brought over by the

23  current -- the relationship manager at the time.

24      Q.    Okay.  So the person who held your job?

25      A.    Yes, yes.

1          Q.   Okay.  And this was in the Windham,

2     New Hampshire, location; is that right?

3          A.   That is correct, yes.

4          Q.   Okay.  All right.  Do you know when you met

5     Mr. Alrai?

6          A.   I actually met him at the account opening.

7          Q.   Okay.  When was that, approximately?

8          A.   June, July of 2017, around there.

9          Q.   Okay.  Thank you.

10              When you were opening Mr. Alrai's accounts,

11    did you have any conversations about his needs as a

12    banking customer?

13         A.   Yes, we did.  We discussed just normal

14    procedure, tried to understand his business.  I mean,

15    there wasn't like a ton to talk about because the

16    account had -- had been brought over by the relationship

17    manager.

18         Q.   Sure.

19         A.   But we did have conversations, you know, about

20    what he does -- what he did, and he did tell me that he

21    was an IT consultant.

22         Q.   Okay.

23         A.   Yeah.

24         Q.   Okay.  In fact, he opened a -- the first

25    account he opened was for AISA Consulting; is that

1   right?

2        A.    That is correct.

3        Q.    That's the consulting business he told you

4   about?

5        A.    Yes.

6        Q.    Did he tell you anything about what kind of IT

7   services that company provided?

8        A.    No, he just told me that it was just

9   consulting --

10        Q.    Okay.

11        A.    -- business consulting.  You know, we kind of

12   started chatting a little bit more about -- if I

13   remember correctly, he told me that he owned a video

14   game store -- sorry -- development studio.

15        Q.    Okay.  A video game developing company; is

16   that what you're saying?

17        A.    Yes.  That is correct, yeah.

18        Q.    Okay.  And where was the business located, if

19   he told you?

20        A.    Well, the business, if I recall correctly, was

21   home-based.

22        Q.    Okay.

23        A.    The -- the ISI (sic) -- yeah, the ISI was

24   home-based, if I remember correctly, yeah.

25        Q.    AISA was home-based?

1      A.   Yes, that's correct.

2      Q.   And did you get the impression from him that

3  AISA, the consulting company, was the business that made

4  the games or is that another business he told you about?

5      A.   I believe probably it was a different

6  business.

7      Q.   Okay.

8      A.   We didn't go into much detail into that

9  business.

10     Q.   Sure.  And when you were discussing with

11  Mr. Alrai his business needs, what was he primarily

12  interested in?  What types of services or benefits to

13  bring his business to Citizens was he interested in?

14     A.   Just -- just checking account and a money

15  market, because of the rate.  We had a promotional rate

16  at the time.

17     Q.   Okay.  Was the promotional rate important to

18  him?

19     A.   Yes.

20     Q.   Okay.

21     A.   I would say yes.

22     Q.   Tell us a little bit more about -- were you

23  able to get him a good promotional rate to bring in his

24  business?

25     A.   I was.  I actually had to request a rate

1    exception.  If I remember, the rate probably was running

2    out or had run out and -- but we were able to get the

3    exception from the -- my boss's boss at the time.

4         Q.   Okay.  So did he put money into a money market

5    account or a CD or into a checking account?

6         A.   It was deposited into a -- into a money market

7    account.

8         Q.   Okay.

9         A.   And then -- because it was a requirement to

10   open a checking as well, a checking was opened, too.

11        Q.   Okay.  Now, did he tell you what he needed the

12   money for?  Like did it need to be liquid or did he want

13   to invest it long term with you?

14        A.   No, he didn't want to invest it long term.

15   The money needed to be liquid.

16        Q.   The money had to be what?  I'm sorry.

17        A.   Needed to be liquid, yup.

18        Q.   Okay.  So you told us that he had to open a

19   checking account to open that money market account?

20        A.   That is correct.  That was part of the promo,

21   yeah.

22        Q.   Okay.  Did he later come back and open

23   additional accounts with or at the bank?

24        A.   Personal accounts, yes.

25        Q.   Okay.  Great.

1          So why did you ask Mr. Alrai about what he did

2     for a living?

3          A.   Normal standard procedures for the bank.  We

4     need to get to know our customers --

5          Q.   Okay.

6          A.   -- to understand their business and --

7          Q.   You just used the term know your customer.

8          A.   Yes.

9          Q.   Is there an acronym, NYC?

10         A.   KYC.

11         Q.   KYC.

12         A.   Know your customer, yes.

13         Q.   Okay.  Is that important in your training and

14    experience as a bank officer?

15         A.   Yes.

16         Q.   Why?

17         A.   Because that way, by knowing your customer,

18    we're able to identify if there's -- if we suspect that

19    there's fraud or anything like that.

20         Q.   Okay.  And as a bank officer with Citizens, do

21    you also receive training about money laundering or

22    anti-money laundering techniques?

23         A.   We do, yes.

24         Q.   Okay.  Tell me a little bit about your

25    anti-money laundering training.

1    A.    So there's courses that we need to take,

2    sometimes quarterly.

3    Q.    Okay.

4    A.    And there's tests, so we're tested on it as

5    well.

6    Q.    Okay.  And are there certain red flags that

7    you are supposed to watch out for when you are a bank

8    officer for Citizens?

9    A.    Yes, there is.

10   Q.    What are some of those red flags that you look

11   for when you open a new account?

12   A.    For example, if there's -- if they open an

13   account and funds are being wired, for example, like

14   right away, constantly, out of the country.

15   Q.    Uh-huh.

16   A.    There's -- there's different -- different

17   types, but that would be like one of them.

18   Q.    Okay.  So I'd like you to -- do you remember

19   how he opened the account with you?  Like how was the

20   money used to open the account?

21   A.    There was a check that was deposited.

22   Q.    Okay.  And how much was that check, if you

23   recall?

24   A.    I think it was a million dollars.

25   Q.    Okay.  I'd like to show you Exhibit 525.  In

1   front of you there's a hard copy folder, but we'll also

2   pull it up on the computer screen.

3        A.   Yes.

4        Q.   Okay.  Do you recognize this check?

5        A.   I do, yes.

6        Q.   How do you recognize it?

7        A.   Because the account number on the back, those

8   are my letters.  I wrote those.

9        Q.   Okay.  So at the bottom of the screen here, we

10  see account number starting 33 and then ends 5155; is

11  that right?

12       A.   55, that is correct, yes.

13       Q.   So is that your handwriting, sir?

14       A.   That is my handwriting.

15       Q.   Okay.  How long did Mr. Alrai maintain this

16  account for AISA Consulting at your branch?

17       A.   If I recall, it was probably maybe a little

18  bit over a year --

19       Q.   Okay.

20       A.   -- I would say.

21       Q.   And the date on this check, July 17, 2017,

22  does that refresh your memory about the exact date that

23  you opened the account?

24       A.   A bit, yes.

25       Q.   So about that time?

1      A.   Yes.  About that time, yeah.

2      Q.   Okay.  So were you involved in Mr. Alrai

3  closing his account a year later?

4      A.   I was, yes.

5      Q.   Okay.  What was your role?

6      A.   I was the branch manager still.

7      Q.   Okay.  Do you have a specific recollection of

8  interactions with Mr. Alrai when he came in to close his

9  account?

10     A.   Yes.  I believe the accounts were frozen and

11  he did come in to close the account.

12     Q.   Okay.

13     A.   I was helping out at the teller line as well

14  because I was short-staffed and I -- I took care of him

15  personally myself.

16     Q.   Okay.

17     A.   And we wrote a check to close the account.

18          If I recall correctly, the account that was

19  frozen was the money market --

20     Q.   Okay.

21     A.   -- and we closed the checking account, which

22  we ended up dividing it into two checks.

23     Q.   Okay.  So he had the money market account and

24  a checking account open?

25     A.   That's correct.

1      Q.    They were funded with this million dollars?

2      A.    I believe so, yes.

3      Q.    The money market account was already frozen?

4      A.    Yes, if I recall.

5      Q.    By federal agents, I assume.

6      A.    I believe so.

7      Q.    Okay.  And how much money was left in the

8  checking account?

9      A.    Like 500,000.

10      Q.    Okay.  I know that you initially -- eventually

11  issued checks --

12      A.    Uh-huh.

13      Q.    -- for that amount of money, but didn't --

14  what -- how did he want the money originally?  How did

15  Mr. Imran Alrai want the money delivered to him when he

16  came into your -- to the bank?

17      A.    I believe he asked if it could have been cash,

18  but we normally don't carry that amount of cash.

19      Q.    Right.

20      A.    And then I had suggested one check, but he

21  wanted it to be split into two checks.  If I remember

22  correctly, we ended up splitting it into 250,000 each

23  check.

24      Q.    Okay.  Sir, I'd like to -- do you -- are

25  you aware that there is surveillance -- some

1    surveillance footage from the interaction with Mr. Alrai

2    and yourself that day?

3        A.   Yes.

4        Q.   Okay.  I'd like to go ahead and play Exhibit

5    532, which is surveillance footage from Citizens Bank

6    branch in Windham, New Hampshire, on June 20th, 2018.

7             Just give us a moment to start it, Mr. Reyes.

8        A.   Okay.

9                      (Recording playing.)

10       Q.   Sir, the gentleman who's right there, who is

11   that?

12       A.   That is Imran.

13       Q.   Okay.  And is this footage from when he came

14   into the bank on June 20th, 2018, to withdraw money from

15   his checking account for AISA Consulting?

16       A.   Yes, that is correct.

17       Q.   Okay.  And down here we can see a date and

18   time stamp, is that right, sir?

19       A.   Yes.

20       Q.   So it says 6/20/18 and the time is 1555.  Is

21   that about right?

22       A.   That is correct, yeah.

23       Q.   And over here it says teller number 4,

24   Windham, New Hampshire.  Do you see that?

25       A.   Yes, teller number 4, yeah.

1      Q.   So at this time right here, who's in the

2  computer -- who's on the surveillance screen talking to

3  Mr. Alrai, this gentleman who's right here?

4      A.   So that person, his name is Barry.  He was the

5  licensed banker for my branch at the time.

6      Q.   Okay.  And where were you, sir?

7      A.   I was -- I was off screen, actually, towards

8  the left side.

9      Q.   Okay.

10     A.   I believe he must have come over to -- if I

11 recall correctly -- to give me an override because the

12 system that the bank has requires two colleagues to make

13 sure large transactions are being done correctly.

14     Q.   Okay.  And what is Barry's last name?

15     A.   Stelmack.

16     Q.   Can you spell that for the record?

17     A.   S-t-e-l-m-a-c-k.

18     Q.   Thank you, sir.

19          So what is going on?  What are we looking at

20 now?  What was happening that you recall?

21     A.   I believe we were just talking about -- if I

22 recall correctly -- maybe the transactions and probably

23 the reason why we were closing the account.  I -- I

24 don't recall 100 percent exactly what --

25     Q.   Sure.  And then Barry's head is back on the

1   screen?

2        A.   Yes, yes.

3        Q.   Okay.

4        A.   Yeah.  So, actually, he's probably typing in

5   his credentials right now --

6        Q.   Okay.

7        A.   -- because I can see the box there on the

8   screen itself.

9        Q.   Okay.  You can actually see Barry's screen on

10   the -- on the other side of his head right there now,

11   right?

12        A.   No.

13        Q.   There you go.

14        A.   Yeah.

15        Q.   So what is Barry doing at this part of the

16   video?

17        A.   So he just got out of the way and I came over

18   into frame for a second there.

19        Q.   Okay.

20        A.   I -- he's signing for the withdrawal, because

21   there has to be a withdrawal on the account.

22        Q.   Mr. Alrai, you mean?

23        A.   Yes.  That is correct, yeah.

24        Q.   So he's looking at a little screen right

25   there, right?

1     A.    There is a PIN pad on the other end, an

2  electronic signature pad that you sign electronically

3  for the withdrawals.

4     Q.    So he's done that and now what's happening

5  next?

6     A.    The system is asking again for the -- for his

7  credentials.  It's asking him to verify the transaction.

8  And I am assuming that the check might have been

9  printing there, probably.

10    Q.    Okay.  Do you see he's leaving with a -- some

11  documents in his hand?

12    A.    That's correct.  I signed the check, the

13  official check, and gave him his receipt and then he

14  left.

15    Q.    Okay.  Thank you, very much.

16          Ms. Sheff, we can close this out and return to

17  the -- to the documents.

18          Sir, I'd like -- in front of you there is a

19  folder with Exhibit Number 150.  If you could just take

20  your time to review the documents in Exhibit 150 and

21  I'll ask you some questions about some of those

22  documents.  Okay?

23    A.    Okay.

24    Q.    All right.  First I'd like you to look at

25  Exhibits 256 and 258.

1            Ms. Sheff, I might just use the ELMO.  I'll

2   just use the document camera.

3            Thank you.

4            So, sir, I'm putting 258 and 256 on the

5   screen.  There are two checks.  Do you see that?

6       A.   Yes, I do.

7       Q.   There's two checks for $250,000 apiece?

8       A.   That is correct.

9       Q.   Are those the two checks that we've been

10  talking about, the official checks that you issued to

11  Imran Alrai when he closed his account on June 20th,

12  2018?

13      A.   That is correct, yes.

14      Q.   Okay.

15      A.   My signature is on the bottom there.

16      Q.   That's your signature?  Is that your

17  signature?

18      A.   That is my signature, yes.

19      Q.   Okay.  Thank you.

20           Also in Exhibit 150, I'm going to show you

21  pages 255.  Just give it a moment.

22           So there's 255.  Do you see that?

23      A.   Yes, I do.

24      Q.   And then next to it I'm putting Exhibit -- I

25  mean page 257.  Do you see that?

1          A.   I do, yeah.

2          Q.   Okay.  Official check purchase, can you

3     explain what these two documents tell the Court?

4          A.   So the one on the right --

5          Q.   This one?

6          A.   -- yes, the one on the right -- they're just

7     purchases for the -- each of the official checks.

8          Q.   Okay.

9          A.   And there on the bottom it shows that the

10    amount is 250,000.

11              MS. LE:  Okay.  Thank you very much, sir.

12              THE WITNESS:  You're welcome.

13              MS. LE:  Your Honor, the government has no

14    further questions.  We tender the witness.

15              MR. AYER:  No cross, your Honor.

16              THE COURT:  You're excused.  Thank you.

17                   (Witness excused.)

18              MR. DAVIS:  Government calls Stan Burrows.

19              THE CLERK:  Good morning, sir.  If you'd like

20    to step this way, right through here.

21              If you could step into the witness box and

22    remain standing, please.

23              Please raise your right hand.

24              **STANLEY BURROWS**, having been first duly sworn,

25    testified as follows:

1          THE CLERK:  For the record, please state your

2    full name and then spell your last name.

3          THE WITNESS:  Stanley W. Burrows,

4    B-u-r-r-o-w-s.

5          THE CLERK:  Thank you.  Please be seated.

6                  <u>DIRECT EXAMINATION</u>

7    <u>BY MR. DAVIS</u>:

8        Q.   Good morning, Mr. Burrows.  Would you please,

9    when you speak, lean forward a little bit and be close

10   to that microphone.  You can pull that to you so your

11   voice is picked up.

12       A.   Yup.

13       Q.   Thank you.

14            Mr. Burrows, how are you employed?

15       A.   I'm retired.

16       Q.   All right.  And can you summarize, please,

17   your professional career, briefly, as briefly as

18   possible.

19       A.   40-odd years in software engineering and

20   information technology.

21       Q.   And have you worked for a number of different

22   companies as an IT professional?

23       A.   Yes.

24       Q.   And can you just give some of the highlights?

25       A.   Well, I was chief information officer for a

1    couple of organizations, executive office of

2    environmental affairs, chief information officer for a

3    for-profit company called Arbitron, which specializes in

4    radio ratings and it's located in Manhattan.

5         I was a software engineering manager for

6    Digital Equipment Corporation, for Lotus Development

7    Corporation, for a couple of startup companies, small

8    companies.

9         Q.   All right.  And when did you finally retire?

10        A.   Well, I'm sort of semiretired right now.  I'm

11   consulting to United Way of Massachusetts Bay.

12        Q.   All right.  And so you still are doing some

13   work for pay?

14        A.   Yes.

15        Q.   All right.  Now, at some point did you become

16   formally affiliated with United Way as a volunteer and

17   board member?

18        A.   Yes.  12, 14 years ago, a mutual friend

19   introduced me to Pat Latimore because of my background

20   with technology, encouraging her to take advantage of my

21   background as a volunteer on the United Way's

22   administration and finance committee, which I have done

23   since then.

24        Q.   All right.  So is that a board committee

25   called the finance and administration committee at

1  United Way?

2       A.   Yes, it is.

3       Q.   And are you still a member of that committee?

4       A.   Yes, I am.

5       Q.   And so how long have you actually served on

6  the administration and finance committee?

7       A.   I think it's probably 12 or 15 years.  I'm not

8  sure exactly how long.

9       Q.   All right.  Do you have a personal admiration

10  for United Way?

11       A.   A personal what?

12       Q.   Admiration or --

13       A.   Yes, I do.

14       Q.   -- commitment.

15       A.   Yes, I do.

16       Q.   Okay.  And can you describe that just briefly?

17  What is that and where does it come from?

18       A.   Well, I was, I guess, introduced to the idea

19  of public service by my father, who was an attorney and

20  I went to the Kennedy School of Government at Harvard

21  University and got a master's degree when I was working

22  for the Federal Reserve Bank in Boston.

23            And I guess I've always thought that I was

24  lucky and that I ought to find opportunity to contribute

25  to the community I lived in.

1      Q.   All right.  And you see United Way as doing

2   just that?

3      A.   Yes, I do.

4      Q.   All right.  Now, at some point while -- after

5   you started on the administration and finance committee,

6   did you become involved in helping create what was

7   called an IT advisory group at United Way?

8      A.   Yes.  Pat and I thought it would be

9   advantageous for her to have the advice of technology

10  professionals, especially since Greater Boston is an

11  innovation hub and there are lots of entrepreneurs who

12  could help United Way make sure it was getting maximum

13  value for its dollar.

14     Q.   Okay.  And so what was the idea and who was

15  going to be on this advisory committee, IT advisory

16  committee?

17     A.   Well, we -- we sought volunteers like myself

18  who were in established careers in technology or

19  computer software engineering and were only limitedly --

20  limited in our success of finding people who would

21  volunteer.

22     Q.   Right.  And who was the leader of the IT

23  advisory committee at United Way?

24     A.   Well, I guess it was Pat or me or Imran.  It

25  was one of us.  I had a limited amount of time that I

1   could invest in volunteer activities at United Way and

2   we weren't really successful in establishing a voluntary

3   group to advise United Way.

4          And, you know, I'm not really sure why, but we

5   weren't finding the level of commitment and willingness

6   to volunteer amongst technology professionals that Pat

7   had found with finance professionals.

8          Q.   All right.  But on the volunteer IT advisory

9   committee as it was formed, were you the volunteer

10  leader?  That is, of the volunteers, were you the chief,

11  the ranking member, so to speak?

12         A.   I think so, yeah.

13         Q.   Yeah.  Okay.  Now, you mentioned Imran Alrai.

14  Did you meet him when he was hired?

15         A.   Sometime after he was hired.

16         Q.   Okay.  And after that time, did you have a

17  number of meetings, either with him or with him and Pat

18  Latimore, about the direction United Way was going with

19  IT?

20         A.   Yes.

21         Q.   All right.  And did you have lunch with him?

22         A.   At least twice.

23         Q.   All right.  And did you -- do you recall

24  approximately how many meetings that you and Pat

25  Latimore had with Mr. Alrai?

1     A.   It's hard to say.  I think, you know, the

2  administration and finance committee met, I think, four

3  times a year and probably the most the technology

4  advisory group met was twice in any one year.

5     Q.   Okay.  So what observations did you make about

6  Mr. Alrai as United Way's IT chief in his style, in his

7  interests, in his effectiveness?  What do you recall

8  about him?

9     A.   I thought he was competent and effective and

10  had a sense of humor and a grasp of what was required of

11  him.

12     Q.   Okay.  You had no problem dealing with him

13  when he came -- once he came in?

14     A.   None.

15     Q.   All right.  How did you find he responded to

16  the idea of volunteer advice and/or volunteer oversight?

17  How did he respond to that?

18     A.   I think he was open to suggestions.  I'd been

19  on maybe both sides of the equation where I had

20  volunteers helping me at certain points and as a

21  volunteer, I was sensitive to the fact that I wasn't a

22  full-time employee of the enterprise, wasn't engaged

23  day-to-day in the management or supervision, and didn't

24  have direct responsibility for oversight and wasn't

25  interested in overstepping my bounds as a -- you know,

1    an outsider and as a volunteer.

2         Q.    Right.  But as to Mr. Alrai, did he come to

3    you and say, I want you to give me advice, I want you to

4    suggest ways to move?  Did he seem to want additional

5    input from you or not?

6         A.    Not really.  I think he was -- you know, there

7    was between us, I think, established a gentlemanly

8    distance.

9         Q.    A gentlemanly distance?

10        A.    Yeah, where I wasn't welcome to get too

11   involved in the day-to-day decision-making and I didn't

12   necessarily want to get too involved in the day-to-day

13   decision-making.

14        Q.    Okay.  And so you didn't get --

15        A.    Correct.

16        Q.    -- involved in the day-to-day; is that fair?

17        A.    Yup.

18        Q.    All right.  Now, do you remember in early 2013

19   that United Way went through an RFP process to identify

20   an outside company that would be the major IT provider

21   going forward?

22        A.    Yes.

23        Q.    All right.  And what was your role and

24   involvement in that process, as you recall it?

25        A.    Just as a part-time contributor with maybe a

1    lot of experience in negotiating and contracting support

2    from one organization for another organization and

3    wanting the process to be as effective for United Way as

4    possible.

5         Q.   Okay.  And in that regard, did you have some

6    email exchange with Mr. Imran Alrai about the RFP

7    process?

8         A.   Yes, I did.

9         Q.   And so I'm showing you Exhibit 608.

10        A.   Okay.

11        Q.   All right.  And do you recognize that as an

12   email from Imran Alrai to you, copying Pat Latimore and

13   others?

14        A.   Yup.

15        Q.   And that on the email, Mr. Alrai is attaching

16   a list of companies solicited for the managed IT

17   services proposal and the RFP evaluation and selection

18   criteria?

19        A.   Yup.

20        Q.   Now, underneath that is a fairly lengthy email

21   dated January 29th of 2013 and that appears to be from

22   you.  Is that your email address?

23        A.   Yes, it is.

24        Q.   And what are you doing in that -- that email

25   to Mr. Alrai on January 29th?

 1          A.   Well, I was trying to give him the benefit of

 2     my experience in making sure the process results in the

 3     best possible outcome for United Way.

 4               MR. DAVIS:   Okay.   Can we look at the second

 5     page?

 6          Q.   Okay.   And you're saying, among other things,

 7     we need more bidders; correct?

 8          A.   Yup.

 9          Q.   And you -- you evaluated his RFP that he

10     drafted and distributed was good, correct?

11          A.   Yup.

12          Q.   Okay.   And then you give a list of what we

13     should do next, correct?

14          A.   Yup.

15          Q.   Okay.   All right.   Let me show you now

16     Government Exhibit 609.

17               And is this an email between Patricia Latimore

18     and you about a volunteer opportunity for United Way?

19          A.   What was the question?

20          Q.   Is that an email between Patricia Latimore and

21     you regarding a volunteer opportunity for United Way?

22          A.   Yes.

23          Q.   Okay.   And, in particular, is Ms. Latimore

24     advising you that you should reach out to Brian and

25     Dennis, who would perhaps join the advisory group or

1    give you some good candidates?

2         A.   Yeah.

3         Q.   And is that referring to the IT advisory

4    committee that you were in charge of with --

5         A.   Yes, I believe it is.

6         Q.   Sorry?

7         A.   Yes, I believe it is.

8         Q.   Yes.  And can you see there that Pat says in

9    the second sentence:  Imran is in the process of scoring

10   the RFPs?

11        A.   Yes, I do.

12        Q.   Okay.  Now, in that regard, Mr. Burrows, you

13   recall receiving the criteria and the list of companies

14   that the RFP was going to be sent to by Mr. Alrai?

15        A.   Yes, I do.

16        Q.   Do you remember ever receiving any actual

17   responses from actual outside vendors to that RFP?

18        A.   No, I don't.

19        Q.   And what -- do you remember whether you

20   expected to receive them or wanted to receive them or

21   what do you remember about that, if anything?

22        A.   No, I don't remember specifically whether I

23   expected to or wanted to, but let me reiterate that

24   there's a balance here between how much I wanted to

25   participate and how much I was welcome to participate

1    and how much I had to offer in terms of time and energy.

2         Q.   Sure.

3         A.   I wanted to help Imran do a good job for

4    United Way as opposed to doing a job for him.  I wasn't

5    going to score the proposals myself, nor second-guess

6    his scoring of the proposals.  I wanted to give him the

7    facility to do a good job for United Way scoring the

8    proposals.

9         Q.   All right.  So if Mr. Alrai had asked you,

10   Mr. Burrows, I have several proposals from outside

11   vendors for this RFP, I'd like to send them to you and

12   get your take on them, would you have been willing to do

13   that as the volunteer IT advisory committee person?

14        A.   I think so.

15        Q.   Did he ever ask you to do that?

16        A.   No.

17        Q.   Okay.  So did you -- you said you don't recall

18   ever being shown RFP responses.  Do you recall ever

19   being involved in actually scoring or actually

20   evaluating RFP --

21        A.   No.

22        Q.   -- responses?

23        A.   No.

24        Q.   Okay.  And do you recall how you found out

25   about the results of the RFP process?  Do you recall

1    seeing a summary or being briefed about a summary sheet?

2         A.   No, I don't.

3         Q.   So do you remember anything about how you

4    learned about the results?

5         A.   No, I don't.

6         Q.   Okay.  And after that, do you recall knowing

7    about DigitalNet Technology Solutions as the -- the IT

8    vendor at United Way going forward?

9         A.   I don't remember an event that I could

10   characterize as learning that someone had won the

11   bidding.

12        Q.   Okay.  And do you remember at any point, did

13   you ever review a proposed contract between United Way

14   and DigitalNet?

15        A.   No.

16             MR. DAVIS:  Nothing further.  Thank you,

17   Mr. Burrows.

18             THE COURT:  Hold on one second.

19             Cross-examination.

20                      CROSS-EXAMINATION

21   BY MR. HARRINGTON:

22        Q.   Good morning, Mr. Burrows.

23        A.   Good morning.

24        Q.   How are you today, sir?

25        A.   Very well.  Thank you.

1        Q.    So you have been at the United Way, I think

2   you indicated, about 12 to 15 years, roughly?

3        A.    Something -- yup.

4        Q.    Okay.  And would you agree with me that when

5   you came on board, you were aware that the United Way

6   had been struggling relative to their IT process inside?

7        A.    I'm not sure I was aware of them struggling.

8   I was aware of their wrestling with the competition an

9   enterprise like this has in terms of how to spend money

10  effectively and appropriately and there not being enough

11  to go around.

12       Q.    Okay.  Do you recall talking with Homeland

13  Security -- in particular, Todd Donnelly, as well as IRS

14  Agent Daniel Fornash -- at the Harvard Club in Boston on

15  August 23rd of 2018?  Do you recall meeting with law

16  enforcement at the Harvard Club with you?

17       A.    Could you refresh my memory?  I'm --

18       Q.    Sure.  Let me do that.

19            THE COURT:  So you don't recall?  He asked you

20  if you recall.  The answer is you do recall or you don't

21  recall.  If you don't recall, he can't refresh your

22  memory.

23       A.    Well, just give me the dates and the personnel

24  again.

25       Q.    Sure.

1          THE COURT:  Do you remember the meeting?

2          THE WITNESS:  Was it my invitation with my

3   guests at the Harvard Club?

4          THE COURT:  He really has to ask you the

5   questions.

6          Do you remember a meeting, any meeting?

7          THE WITNESS:  No, I guess.

8          THE COURT:  You may refresh.

9          MR.  HARRINGTON:  Thank you, Judge.

10          I'll approach first, Judge, and then I'll put

11   it up on the screen.

12          THE COURT:  Not a problem.

13          MR.  HARRINGTON:  John, you have that, right?

14          MR. DAVIS:  Yes, thanks.

15      Q.   So let me show you this, Mr. Burrows, and

16   obviously take as much time as you need with this, sir.

17   Okay?

18      A.   Okay.

19      Q.   So this is kind of a cover sheet that just

20   talks about meeting with you on August 23rd.  And then

21   I'm going to flip to the more substantive part of it,

22   but take a look at this paragraph here and tell me when

23   you're done reading it.

24      A.   Okay.

25      Q.   Okay?  And then I'm going to go over to this

1  section of the report and I'm going to draw your

2  attention down to this paragraph.

3          I'm at the bottom paragraph on the second

4  page, Counsel.

5          This section.  Read that section to yourself,

6  and you can go on to the second page where it finishes

7  as well.  And feel free to read as much of that as you

8  want, but take a look at that section, okay, and I'm

9  going to ask you a couple questions about it.

10     A.    Okay.

11     Q.    Does that refresh your memory a little bit,

12 Mr. Burrows, with regard to the meeting?

13     A.    Yeah.

14     Q.    Okay.  So after taking a look at that, do you

15 recall that there was a meeting at the Harvard Club with

16 these law enforcement officers?

17     A.    Yes.

18     Q.    And after taking a look at that, would you

19 agree with me that it appears you talked to these

20 officers in regard to telling them that the United Way

21 was struggling with its IT infrastructure about ten

22 years prior; is that fair to say?

23     A.    Well, let me give you some context.

24          I've always thought, and do so to this day,

25 that there's an opportunity for a greater return if

1   United Way spends a larger proportion of its budget on

2   technology than it has in the past and is currently

3   doing.

4        Q.   Okay.

5        A.   And that's typical of what a technology

6   professional would say about an enterprise like United

7   Way, that they aren't taking advantage of technology the

8   way they should.

9        Q.   And that holds true, I think as you've

10  indicated, that for the United Way, it was your opinion

11  that they had really not invested appropriately in IT

12  and they could do more to improve that process --

13       A.   Yeah.

14       Q.   -- is that right?

15            Okay.  Would you agree with me that you also

16  told law enforcement that after Alrai came on board and

17  was hired -- because obviously you were there at the

18  United Way before Mr. Alrai was hired, correct?

19       A.   Correct.

20       Q.   And then after Mr. Alrai came on board, the

21  IT process within the United Way actually improved,

22  correct?

23       A.   Correct.

24       Q.   And that was under both Mr. Alrai as well as

25  the work that was done in conjunction with DigitalNet

1  Technology, the internal IT process or infrastructure

2  improved?

3       A.   I agree it improved.

4       Q.   Okay.  One of the things that you were

5  involved with as part of -- I think you had indicated

6  you were kind of the chief of the IT advisory committee,

7  right?  Even though you're a volunteer, it's part time,

8  you considered yourself the chief of the IT advisory

9  committee, correct?

10      A.   Yes.

11      Q.   Okay.  And one of the things that you did in

12 that regard was there was some exchange back and forth

13 between you and Mr. Alrai and Patricia Latimore relative

14 to drafting the RFP that was going to be put out to bid,

15 right?

16      A.   Correct.

17      Q.   Okay.  And that was one of the emails that

18 Attorney Davis had shown you was kind of detailed

19 suggestion of information that the United Way might want

20 to address in the process, right?

21      A.   Yeah, that was rare.  I think that's the only

22 instance, in which I volunteered that level of detail.

23      Q.   Yup.

24      A.   And it wasn't -- it didn't happen other times

25 and wasn't a pattern that we repeated.

1      Q.   Okay.  And you would agree with me, I think as

2  you had indicated to Attorney Davis, that you did review

3  the RFP that was drafted, right?

4      A.   Before it was sent out.

5      Q.   Correct.  Okay.  And you agree that the RFP

6  was actually good; the manner in which it was drafted,

7  it was a good RFP?

8      A.   I had some suggestions for improving it.

9      Q.   Okay.  But I think you indicated a few moments

10  ago to Mr. Davis that your opinion was that the RFP was

11  good?

12     A.   I thought it was a good start.

13     Q.   Okay.  And you felt it was ready to go out?

14     A.   I had made suggestions which I thought would

15  make it a stronger RFP.

16     Q.   Okay.

17     A.   And I didn't feel as if it was my position or

18  responsibility to suggest whether or not it was ready to

19  go out.

20     Q.   So as kind of the chief, if you will, of the

21  IT advisory committee, are you telling the judge that --

22  because you knew Patricia Latimore, right?

23     A.   I had met her at United Way.

24     Q.   Okay.  And you had a decent relationship with

25  her, correct?

1      A.    Still do.

2      Q.    Okay.  And you -- if necessary, if you felt

3 that the RFP shouldn't have gone out or it wasn't good,

4 you certainly would be free to discuss that with her or

5 with Mr. Alrai, right?

6      A.    Yeah, don't ascribe too much authority to my

7 role as a volunteer.  I didn't have influence to the

8 extent that you're suggesting.  I only contributed

9 rarely and only in one instance did I outline specific

10 actions which I thought Alrai should take.

11             MR. HARRINGTON:  Okay.  Ms. Sheff, if you

12 could pull up Exhibit 608, please, and if we could go to

13 the second page, please.

14      Q.    And I want to draw your attention down to this

15 section right here.  Can you see that okay?

16      A.    Yup.

17      Q.    Okay.  And here you indicate:  Finally, the

18 RFP you drafted was good.  The direction the United Way

19 takes in the application of technology is your

20 responsibility shared with Pat.  I'm an outside advisor.

21 I'd like to help you, but I do not want to get in your

22 way.

23             Correct?

24      A.    Yup.

25             MR. HARRINGTON:  Okay.  If you could go up to

1  the top page, please.  Next page -- no, I meant first

2  page.

3          MS. SHEFF:  First page?

4          MR.  HARRINGTON:  First page.

5      Q.   And you can see in this first part he gives

6  you here a list of the companies that were solicited,

7  correct?

8      A.   Uh-huh.  Yes.

9      Q.   And the RFP selection criteria, correct?

10     A.   Yup.

11         MR. HARRINGTON:  Okay.  And you can take that

12  down, Ms. Sheff.  Thank you.

13     Q.   In regard to Mr. Alrai himself, you

14  characterize him as someone who was competent and

15  effective, correct?

16     A.   I did.

17     Q.   And that he had a good grasp of what was

18  needed at the United Way to improve its technology

19  needs, correct?

20     A.   Yup.

21     Q.   Okay.  And you also characterized your

22  relationship with him as you had no problem dealing with

23  Mr. Alrai?

24     A.   None.

25     Q.   And you also felt that he was open to

1    suggestions?

2         A.    Correct.

3              MR.  HARRINGTON:  Judge, I don't have any

4    other questions for Mr. Burrows.

5              THE COURT:  Any redirect?

6              MR. DAVIS:  Briefly.

7                        REDIRECT EXAMINATION

8    BY MR. DAVIS:

9         Q.    Mr. Burrows, you testified about your general

10   view that you saw, and still see, an opportunity for a

11   nonprofit like United Way to take greater advantage of

12   technology in its business operation and, therefore, a

13   need to spend more money on IT; does that fairly

14   summarize your view?

15        A.    Yes, it does.

16        Q.    Would you also agree, though, Mr. Burrows,

17   that as a nonprofit spends more and more money on IT,

18   and particularly on outside vendors providing IT

19   services, that there is an increasing need for checks

20   and balances and rigorous oversight about how the

21   nonprofit is spending its money?

22        A.    Absolutely.

23              MR. DAVIS:  Nothing further.  Thank you.

24              MR.  HARRINGTON:  I have no other questions,

25   Judge.

1        THE COURT:  You're excused, sir.  Thank you.

2                  (Witness excused.)

3        MR. DAVIS:  Government calls Kim Terry.

4        THE CLERK:  Good morning.

5        THE WITNESS:  Good morning.

6        THE CLERK:  How are you?

7        THE WITNESS:  Good, thanks.

8        THE CLERK:  You can step this way, please.

9        You can step into the witness box and remain

10   standing.  Thank you.

11        Please raise your right hand.

12        **KIMBERLY TERRY**, having been first duly sworn,

13   testified as follows:

14        THE CLERK:  For the record, please state your

15   full name and spell your last name.

16        THE WITNESS:  Kimberly Terry, T-e-r-r-y.

17        THE CLERK:  Thank you.  Please be seated.

18                  DIRECT EXAMINATION

19   BY MR. DAVIS:

20     Q.   Good morning, Ms. Terry.  Please scoot forward

21   a little bit and use that microphone as needed to make

22   sure your voice is amplified.

23        Ms. Terry, what is your occupation?

24     A.   I run a payroll service company.

25     Q.   And what's the name of the payroll services

```
1    company?
2         A.    Rockingham Payroll Services.
3         Q.    And where is that located?
4         A.    In Salem, New Hampshire.
5         Q.    Very good.
6               And are you married?
7         A.    Yes.
8         Q.    And who is your husband?
9         A.    Travis Terry.
10        Q.    Sorry?
11        A.    Travis Terry.
12        Q.    Travis Terry?
13        A.    Uh-huh.
14        Q.    And what is his business?
15        A.    He's a certified public accountant.
16        Q.    Okay.  Please slow down a little bit.
17        A.    Sorry.
18        Q.    And speak a little more clearly.
19              And is Rockingham Payroll colocated with
20   Mr. Terry's CPA tax accounting business?
21        A.    No.
22        Q.    Oh, it's not.  So where is Rockingham Payroll?
23        A.    We're on Stiles Road in Salem.
24        Q.    Okay.  So you're actually in a separate
25   business?
```

1    A.    Correct.

2    Q.    I have not been there, right?

3    A.    No.

4    Q.    Okay.  So can you describe the service you

5  provide and also the service your husband provides or

6  makes available, just briefly as you understand it?

7    A.    Uh-huh.  We run a payroll service.  We

8  outsource payroll for small businesses and provide

9  things like direct deposit, tax payment services.  My

10  husband also does bookkeeping, accounting, tax

11  preparation.

12    Q.    Very good.  And so for some clients, do you

13  offer tax work and bookkeeping work and payroll?

14    A.    Yes.

15    Q.    Okay.  Now, did you ever have a client named

16  DigitalNet Technology Solutions?

17    A.    Yes.

18    Q.    And who was the person you dealt with

19  regarding DigitalNet Technology Solutions?

20    A.    Imran was my initial contact.

21    Q.    Okay.  He was your initial contact?

22    A.    Uh-huh.

23    Q.    And when you say Imran, do you mean the

24  defendant in this case?

25    A.    Yes.

1    Q.    And do you see him at counsel table?

2    A.    I have not met him in person before.

3    Q.    You've actually never seen him before?

4    A.    Correct.

5    Q.    Okay.  So when you say he's the person you

6    initially dealt with, what happened to make you say

7    that?  Why did you say I was dealing with Imran?

8    A.    The introduction was made through Travis's

9    office.  Most of it was done through email and I believe

10   we may have spoken on the phone once or twice along the

11   way.

12   Q.    Okay.  And what was the -- what was the year

13   that DigitalNet Technology Solutions hired you?

14   A.    2014.

15   Q.    And was it early in 2014?

16   A.    Yes.

17   Q.    Okay.  And after that time, did you provide a

18   payroll service for DigitalNet?

19   A.    Yes.

20   Q.    Okay.  When you communicated regarding the

21   DigitalNet account, you said you used email?

22   A.    Yes.

23   Q.    All right.  And do you recall the -- the

24   account that you dealt with, that is, what was the email

25   address?

46

```
 1          A.    Info@digitalnet.us, I think.

 2          Q.    Okay.  Info@digitalnet.us?

 3          A.    I believe, yes.

 4          Q.    And was that essentially always the email

 5   address you used?

 6          A.    Yes.

 7          Q.    Okay.  And you said you might have spoken to

 8   Mr. Alrai a couple of times by phone?

 9          A.    Yes.

10          Q.    Did you ever speak to anyone else by

11   telephone?

12          A.    No.

13          Q.    And you said you didn't meet personally

14   with --

15          A.    I don't recall meeting personally.

16          Q.    I'm sorry?

17          A.    I don't remember meeting personally, no.

18          Q.    Okay.  Very good.

19                Now, when you ran the payroll for DigitalNet,

20   how many employees were you doing the pay for?

21          A.    There were three.

22          Q.    Okay.  And did that number ever change?

23          A.    I don't believe so.

24          Q.    It was always three people?

25          A.    I believe so.
```

1      Q.   And did you understand where those people were

2  based, that is, whether they were based in the U.S. or

3  whether they were based in some other country?

4      A.   The U.S.

5      Q.   Okay.  And were all three of those people

6  salaried employees?

7      A.   Yes.

8      Q.   And were all paid every two weeks?

9      A.   Yes.

10     Q.   And how did you -- how were the payments

11 actually made?

12     A.   Via direct deposit.

13     Q.   Okay.  So how does that work?  Does DigitalNet

14 give you a pot of money and you set up some kind of

15 escrow account and make payments or how -- how does that

16 actually work with Rockingham Payroll?

17     A.   For direct deposit, we would debit the

18 employer's account and deliver those funds to the

19 employees.

20          For taxes, we would debit the employer's

21 account and then pay those out to the appropriate

22 agencies at the appropriate intervals.

23     Q.   Okay.  And when you say the employer's

24 account, what account do you mean here?

25     A.   DigitalNet.

1        Q.    And do you know what bank DigitalNet had its

2   employer's account at?

3        A.    I believe it was Pentucket.

4        Q.    Pentucket Bank?

5        A.    Uh-huh.

6        Q.    And they had a branch right in Salem, correct?

7        A.    Correct.

8        Q.    And did the employees get actual hard copy

9   checks?

10       A.    They received direct deposit stubs through our

11  employee portal.  So they would log on and receive their

12  stubs.

13       Q.    Okay.  So they actually had a portal?

14       A.    Uh-huh.

15       Q.    And did you also mail W-2s to the employees at

16  year-end?

17       A.    Yes.  And those were available electronically

18  as well.

19       Q.    Okay.  And do you remember the names of the

20  employees?

21       A.    Alkiri (sic), I think was one; there was a

22  Mohamad Wahbe, I believe; and Yousuf Nasad (sic), I

23  believe.

24       Q.    Okay.  So the first name, do you recall

25  whether that was Adir Gherbi?

1      A.   Yes, that was -- yes, thank you.

2      Q.   And do you recall whether that name changed at

3  one point to a Jasmin Iqbal?

4      A.   I don't recall that.

5      Q.   Okay.  But you do remember a Mohamad Wahbe?

6      A.   Yes.

7      Q.   Yes?

8      A.   Yes.

9      Q.   And you remember a Nadeem Yousuf?

10     A.   Yes.

11     Q.   All right.  And did you know where Mr. Wahbe

12  was actually working from?

13     A.   I believe it was either -- one was in Mass.,

14  one was in Rhode Island.

15     Q.   Okay.  Were you -- you were never told he

16  worked overseas?

17     A.   No.

18     Q.   Okay.  So at some point while working for

19  DigitalNet, did you receive emails that were signed by

20  someone named Mohammad?

21     A.   Yes.

22     Q.   All right.  And did you ever know who that

23  Mohammad was?

24     A.   No.

25     Q.   Did you ever speak to that Mohammad?

1    A.    No.

2    Q.    And you never saw him at the office, Mohammad?

3    A.    No.

4    Q.    Okay.  And do you recall whether you ever saw

5  a last name with a Mohammad?

6    A.    Hassan.

7    Q.    And do you remember how many times you saw

8  that Hassan last name?

9    A.    Anytime there was a communication, it was

10  either signed Mohammad or Mohammad Hassan.

11    Q.    Okay.  Now, do you recall whether you and your

12  husband's businesses collectively provided bookkeeping

13  services to DigitalNet?

14    A.    Mine did not.  I don't know about my

15  husband's.

16    Q.    Okay.  All right.  And do you recall whether

17  Mr. Alrai paid for bookkeeping services, at least at one

18  point?

19    A.    I do not know.

20    Q.    Okay.

21    A.    The billing was handled through my husband's

22  office.

23    Q.    Okay.  So is it fair that all of the bills

24  were paid through Travis Terry's business, not through

25  Rockingham Payroll?

1      A.    Correct.

2      Q.    And then you could -- you could split it

3  because you're married, right?

4      A.    Correct.

5      Q.    Okay.  Now, do you remember after June 12th of

6  2018 --

7            THE COURT:  I'm sorry.  Excuse me.  They could

8  split what?

9      Q.    The -- so I'm asking about the payments from

10 DigitalNet to you for your services.  Okay?  Your

11 payroll services.

12           THE COURT:  Right.

13     A.    Correct.

14           THE COURT:  Whereas her husband's business

15 provided bookkeeping services.

16     Q.    And tax services, correct?

17     A.    To my knowledge, yes.

18     Q.    And you're not sure about bookkeeping,

19 correct?

20     A.    Correct.

21     Q.    Okay.  But he did --

22           THE COURT:  So split what?

23           MR. DAVIS:  Your Honor, I'll ask that --

24           THE COURT:  Are you saying that they worked --

25 they both worked on the defendant's business?

1              MR. DAVIS:  Yes.

2              THE COURT:  Oh, okay.

3              MR. DAVIS:  But I'm saying two separate

4     entities, Rockingham Payroll and Travis Terry, CPA, both

5     worked for DigitalNet, but there was one payment stream

6     and that went to Travis Terry, CPA.

7              THE COURT:  And that's what you mean by split.

8              MR. DAVIS:  Yeah.  I'm sorry.  I don't mean to

9     make it complicated.

10             THE COURT:  Gotcha.  Thank you for clarifying.

11        Q.   Now, I'm asking you about after June 12th of

12     2018.

13        A.   Uh-huh.

14        Q.   Do you recall a series of emails from Mohammad

15     in June 12th of 2018?

16        A.   Yes.  In June of 2018, yes.

17        Q.   Okay.  So what do you remember about that?

18     What's your -- what's your memory of how that went?

19        A.   That they were terminating payroll services at

20     the time and that they were just waiting on another

21     contract.

22        Q.   They were waiting on another contract?

23        A.   Uh-huh.

24        Q.   You should say yes or no.

25        A.   Yes.

1      Q.    Okay.

2      A.    I'm sorry.

3      Q.    And did -- were these emails with Mohammad?

4      A.    Yes.

5      Q.    Okay.  And so did you immediately stop making

6  payroll payments to the DigitalNet employees?

7      A.    Correct.

8      Q.    Okay.  And what did you do to wrap up the

9  account?

10      A.    We would have closed out any quarterly amounts

11  due and we would have sent year-end information at the

12  end of the year, the W-2s.

13      Q.    Okay.  And you did all that?

14      A.    Yes.

15      Q.    Okay.  And do you recall what it -- do you

16  recall what address you had for DigitalNet where you

17  would actually send things?

18      A.    I believe it was an Andover address.  I don't

19  know it off the top of my head.

20      Q.    That's Andover, Mass.?

21      A.    Yes.

22      Q.    Okay.  And after you closed out, did you hear

23  from Mohammad again?

24      A.    Not that I recall.

25      Q.    And did you hear from the defendant, Imran

54

1    Alrai, again?

2         A.   No.

3         Q.   Last question.  Were you ever told that

4    DigitalNet had employees in Pakistan --

5         A.   No.

6         Q.   -- who were being paid?

7         A.   No.

8              MR. DAVIS:  All right.  Nothing further.

9    Thank you.

10                        CROSS-EXAMINATION

11   BY MR. HARRINGTON:

12        Q.   Good morning, Ms. Terry.

13        A.   Good morning.

14        Q.   Just a few questions for you.

15        A.   Yup.

16        Q.   In regard to the payroll that you did

17   handle --

18        A.   Yes.

19        Q.   -- for DigitalNet, I assume that you took out

20   all appropriate withholdings?

21        A.   Yes.

22        Q.   Okay.  And what types of withholdings are we

23   talking about?

24        A.   Federal withholding, social security,

25   Medicare, any of the employer taxes as well.

1      Q.   Okay.  And then if the employees wanted, you

2  know, a certain amount of withholdings, you would do

3  that if they had indicated such to you?

4      A.   Based on their federal W-4, yes.

5      Q.   Okay.  So, in essence, you complied to the

6  best of your knowledge with all applicable laws that

7  would relate to withholdings for payroll?

8      A.   Yes.

9      Q.   Okay.  And the extent of your involvement in

10 this process with DigitalNet was really to do just that,

11 was just payroll?

12     A.   Correct.

13          MR.  HARRINGTON:  Okay.  I have no other

14 questions, Judge.

15          THE COURT:  Redirect?

16          MR. DAVIS:  None.  Thank you.

17          THE COURT:  Thank you.

18          THE WITNESS:  Thank you.

19               (Witness excused.)

20          MR. DAVIS:  Your Honor, the next witness is

21 Travis Terry.  If I could just have a moment with

22 counsel, I have some other notes from him that he just

23 found.

24          Travis Terry, your Honor.

25          THE COURT:  Please.

```
 1              THE CLERK:  Good morning, sir.  How are you?
 2   If you'd like to step this way, please.
 3              If you could step into the witness box and
 4   remain standing.
 5              THE WITNESS:  Yup.
 6              THE CLERK:  Please raise your right hand.
 7              TRAVIS TERRY, having been first duly sworn,
 8   testified as follows:
 9              THE CLERK:  For the record, please state your
10   full name and spell your last name.
11              THE WITNESS:  It's Travis Terry, T-e-r-r-y.
12              THE CLERK:  Thank you.  Please be seated.
13                        DIRECT EXAMINATION
14   BY MR. DAVIS:
15        Q.   How are you employed, sir?
16        A.   I'm self-employed.
17        Q.   And what's your business?
18        A.   It's CPA firm, Travis Terry & Company, CPAs.
19        Q.   And where is it located?
20        A.   Salem, New Hampshire.
21        Q.   And how long have you been in business?
22        A.   Since 2000.
23        Q.   And are you a certified public accountant?
24        A.   Yes.
25        Q.   Could you briefly describe your background?
```

1        A.     Sure.  So I received my certificate in the

2    state of New Hampshire in 1996 and I have a couple of

3    master's degrees as well in taxation, an MBA.  And

4    before I was self-employed, I worked for a firm in

5    Manchester, New Hampshire.

6        Q.     All right.  And can you describe the nature of

7    your business at Travis Terry & Associates in Salem;

8    what do you actually provide?

9        A.     Sure.  We provide bookkeeping services, tax

10   services, and tax planning.  It's mostly taxes.  And we

11   do audited financial statements for companies that need

12   audits, reviews, and compilations.

13       Q.     Okay.  And do you also have a sister company

14   owned and run by your wife, Kim?

15       A.     Yes.

16       Q.     And what's that called?

17       A.     It's Rockingham Payroll.

18       Q.     And is that also in Salem, New Hampshire?

19       A.     Yes.

20       Q.     Now, directing your attention to approximately

21   January of 2014, do you recall meeting a man named Imran

22   Alrai?

23       A.     Yes.

24       Q.     All right.  And how did you meet him?

25       A.     I believe he was referred to us from a local

 1    attorney.

 2         Q.   All right.  And do you see the man you met as

 3    Imran Alrai here in the courtroom?

 4         A.   Yes.

 5         Q.   All right.  Would you point him out, please?

 6         A.   Over there.

 7         Q.   All right.  At counsel table?

 8              Okay.  What did he say when he came in and

 9    talked to you?  What did he want you to do?

10         A.   That he was starting a new business, so he

11    wanted us to help with the tax returns for that and the

12    bookkeeping for it.

13         Q.   So he wanted tax and bookkeeping?

14         A.   Correct.

15         Q.   All right.  And did he also want payroll

16    through your wife's company?

17         A.   Yes.

18         Q.   Okay.  Now, did you make some notes when you

19    talked to him on the date of January 29th of '14?

20         A.   I did.

21         Q.   And did that reflect what he told you that

22    day?

23         A.   Correct.  That was my summary of our meeting.

24         Q.   Okay.  Showing you 153c -- did you, in fact,

25    just locate this recently?

1     A.    Yes.

2     Q.    You previously provided a set of documents

3  pursuant to a subpoena from the government?

4     A.    Correct.

5     Q.    But this is something you just found,

6  basically?

7     A.    Correct.

8     Q.    All right.  And are these, as far as you know,

9  the only notes you have about you meeting with Imran

10  Alrai and writing down notes?

11     A.    Correct.

12     Q.    Okay.  Can you just interpret the notes for

13  us?  What do they say you talked about with him on

14  January 29th of '14?

15     A.    Right.  So he started an LLC that was a

16  Delaware LLC, but it was registered in New Hampshire.

17  It was to be -- do IT work and cloud computing.  And he

18  let me know that there was going to be some people

19  overseas and some people in the USA.

20     Q.    It says 17 people overseas; is that right?

21     A.    Yup.

22     Q.    And then three -- and then four people in the

23  USA?

24     A.    Correct.

25     Q.    Okay.  And what else?

1    A.    And then we needed to do -- this is where we

2  got our job responsibilities.  We were going to do W2s

3  and payroll taxes from Rockingham Payroll; and then he

4  asked me about Pakistan, to send money to Pakistan; and

5  then we were going to get his monthly bank statements,

6  do payroll and bookkeeping, and I guess I was coming up

7  with a quote there of what it would be.

8    Q.    Okay.  So he -- he did tell you that he was

9  going to be sending money to Pakistan?

10    A.    I would guess so from the note, yes.

11    Q.    Do you recall that separately or no?

12    A.    No.

13    Q.    All right.  And do you recall whether he gave

14  you the name of the IT work cloud computing company

15  registered in Delaware?

16    A.    I'm not sure.

17    Q.    Did he later give you that name?

18    A.    The name I had was the AISA Consulting.

19    Q.    AISA Consulting --

20    A.    Correct.

21    Q.    -- right?  And did you also hear and see the

22  name DigitalNet?

23    A.    I believe so.

24    Q.    All right.  And do you recall your

25  understanding from Mr. Alrai of how DigitalNet and AISA

1    related to each other?

2        A.   That they were single-member LLCs; that one

3    owned the other one.  So in that case, we treated it all

4    as one for tax purposes.

5        Q.   Okay.  So for tax purposes, you treated AISA

6    and DigitalNet as one thing; is that right?

7        A.   Correct.

8            MR. DAVIS:  Okay.  Your Honor, I'd move to

9    admit 153c and strike the ID.

10           MR.   HARRINGTON:  No objection, your Honor.

11           THE COURT:  Admitted.

12           (Government's Exhibit 153c admitted.)

13       Q.   All right.  So did Mr. Alrai sign an

14   engagement letter with your firm?

15       A.   I believe so.

16       Q.   And did he re-sign or reengage you every year?

17       A.   I believe so.

18       Q.   And did you continue to pay taxes between tax

19   year 2013 and tax year 2018?

20       A.   Yes.

21       Q.   Okay.  And how did -- how did he pay for your

22   services?  Was it one sum, was it monthly?  How did it

23   work?

24       A.   Oh, so I -- when we first started, I believe

25   he was paying me monthly and then after a couple years,

62

1   we just moved it to annual fee, I believe.

2        Q.   Okay.  Now, you mentioned bookkeeping.  Did he

3   initially ask your firm, Travis Terry, CPA, to provide

4   bookkeeping for his IT consulting business?

5        A.   Yes.

6        Q.   And if you had done that, what did you need

7   from him to make that happen?  What -- what do you need

8   to do to actually do bookkeeping?

9        A.   In -- to provide bookkeeping services for a

10  client, we would get their monthly bank statements,

11  their -- any credit card statements they have, any

12  source documents for the business so we could compile

13  that and print out monthly financial statements.

14       Q.   And you'd actually do a monthly financial for

15  the company?

16       A.   Correct.

17       Q.   All right.  And do you have lots of

18  bookkeeping clients that you do that for?

19       A.   Yes.

20       Q.   Now, did Mr. Alrai initially sign up to pay

21  you for bookkeeping?

22       A.   Yes.

23       Q.   And what happened with that?

24       A.   I believe that the bookkeeping part never

25  happened, so after a couple years, we figured that out

63

1    and reduced the fee accordingly.

2         Q.   Okay.  Did he actually ask to reduce the fee?

3         A.   I believe so.

4         Q.   All right.  But for a while, he was paying for

5    bookkeeping?

6         A.   Yes, and the payroll.  We wrapped it all

7    together in one fee.

8         Q.   Okay.  And why weren't you doing bookkeeping

9    for his company?

10        A.   I -- we just couldn't get the source documents

11   to --

12        Q.   All right.  And when you say you couldn't get

13   the source documents, did you ask for them?

14        A.   Yes.

15        Q.   All right.  And what happened?

16        A.   I just don't think we got them to do the

17   bookkeeping.

18        Q.   All right.  Okay.  So you actually never did

19   bookkeeping for his company; is that right?

20        A.   Correct.

21        Q.   Okay.  Did you meet Mr. Alrai's wife?

22        A.   Yes.

23        Q.   And how many times?

24        A.   She would come in maybe once a year to help

25   sign the tax return.

1      Q.    Okay.  And did Mr. Alrai and his wife, did

2 they file married filing jointly?

3      A.    Yes.

4      Q.    Okay.  And you were aware that your wife's

5 company was handling payroll for his company; is that

6 right?

7      A.    Yes.

8      Q.    Okay.  Now, how did you get information from

9 Mr. Alrai about his in common expenses, including his in

10 common business expenses?  How did that work?

11      A.    So I would get an annual summary from him,

12 which was downloaded from a bank account, like an Excel

13 dump of all the bank information.

14      Q.    Okay.  And do you know what account that Excel

15 dump of bank information was from?

16      A.    I don't believe it was on the Excel download.

17      Q.    Okay.  But it was basically a long list of

18 debits to an account; is that right?

19      A.    Correct, all the debits and credits.

20      Q.    Okay.  And did you also get, as part of that,

21 from Mr. Alrai a categorization of expenses?

22      A.    Yes.  If we couldn't tell what it is from the

23 Excel sheet, we asked for clarification.

24      Q.    All right.  And -- and using that, what did

25 you do?

1          A.    We prepared the Schedule C for the company.

2          Q.    Okay.  And a Schedule C, is that a profit and

3    loss from a business?

4          A.    Yes.

5          Q.    And is that used by, let's say, a taxpayer

6    who is an owner of a single-member LLC to reflect the

7    revenue and expenses from that business?

8          A.    Yes.

9          Q.    And all of that can be passed through and

10   actually included on the bottom line in the person's

11   personal 1040, right?

12         A.    Correct.

13         Q.    So, to your knowledge, did all of the revenue

14   from this IT consulting company, was all of that paid

15   for via Mr. Alrai's personal tax return?

16         A.    Yes.

17         Q.    And, to your knowledge, did AISA Consulting

18   Group ever file its own separate tax return?

19         A.    No, it would be the Schedule C that we did.

20         Q.    And did DigitalNet Technology Solutions, to

21   your knowledge, ever file its own separate tax return?

22         A.    No.

23         Q.    It was all just on his one personal tax

24   return, correct?

25         A.    Yes.

1      Q.   Okay.  Now, let me show you a couple of

2  examples.

3           First let's go to grand jury -- I'm sorry, to

4  Exhibit 153b, which is -- I'll represent to you is a

5  bunch of documents provided pursuant to the subpoena you

6  received.

7           The first one, if I could get the Bates

8  stamp -- 153b?

9           MS. SHEFF:  Is it part of 153 --

10          MR. DAVIS:  It is.  153b, Bates stamp 444, so

11  00444.

12     Q.   Okay.  And do you see 153b, number 444?

13     A.   Yes.

14     Q.   And is that a -- it's labeled at the top, 2015

15  Other Expenses?

16     A.   Yes.

17     Q.   And is this an example of the kind of

18  information that you got from Mr. Alrai for preparing

19  his tax returns?

20     A.   Yes.  I'm just not sure if this is a summary

21  of the Excel or if that's what he provided us already

22  totaled.

23     Q.   Okay.  I'll represent to you this is not the

24  actual Excel spreadsheet, but it is a document provided.

25     A.   Yes.

1     Q.   Okay.  And you see there there's various

2  categories:  For 2015 charitable donations, 78,000.  Do

3  you see that?

4     A.   Yes.

5     Q.   And then business travel of 42,000, right?

6     A.   Yes.

7     Q.   And then further down on the category list

8  there's a total R&D-related IT projects.  Do you see

9  that?

10    A.   Yes.

11    Q.   And what's R&D?

12    A.   Research and development.

13    Q.   And what's the amount in that category?

14    A.   247,000.

15    Q.   Okay.  And then there's some notes that says:

16  Mass. income tax reimbursement, in Boston two days per

17  week, rest work remotely from New Hampshire.

18         Do you see that?

19    A.   Yes.

20    Q.   And then a question about eligibility for home

21  office deductions?

22    A.   Yes.

23    Q.   And then a note for a volunteer miles.

24         Do you see that?

25    A.   Yes.

1      Q.   What's a volunteer mile and why is that

2  relevant to a tax return?

3      A.   So depending on certain circumstances, that

4  could be a charitable deduction for your tax return.

5      Q.   Okay.  And can you summarize briefly the

6  circumstances; when is it appropriate to claim a

7  volunteer mile as a deduction?

8           MR.  HARRINGTON:  I'm just going to object at

9  this point, Judge.  I don't know what the relevance of

10 this testimony is to the charges against the defendant.

11          THE COURT:  What's the relevance?

12          MR. DAVIS:  Your Honor, it's -- it's -- it's

13 part of the scheme that the defendant is maximizing his

14 profits in part by claiming deductions he's not entitled

15 to.

16          He's not charged with tax fraud and I'm

17 not going to belabor this, but I do want to show --

18 particularly the cost of goods sold is a huge part of

19 his tax returns.  These tax returns are in, he prepared

20 them, and I think it's appropriate to ask questions

21 about some of these items.

22          THE COURT:  Well, I'll admit I was curious

23 when I saw the cash for overseas trips for $42,000, but

24 I mean, I still don't see -- you just said it's part of

25 the scheme.  I mean, you haven't described at all the

1   indictment as part of the scheme.  What do you mean --

2   you might be right.  I just don't think I understand.

3   Why is it part of the scheme?

4           MR. DAVIS:  It's not part of the scheme to

5   defraud the two -- the two companies --

6           THE COURT:  No.

7           MR. DAVIS:  -- that's correct, your Honor.  It

8   is part of a general effort to maximize profit through

9   fraud and to misrepresent his expenses repeatedly in his

10  tax returns and so to minimize his tax obligation.

11          THE COURT:  Well, I haven't heard any evidence

12  that -- I think it probably is relevant and admissible

13  as evidence of use of -- use of funds derived from this

14  relationship with RAG and United Way because I can't

15  imagine why any overseas business travel would be

16  necessary in either of -- in any of his functions,

17  either as an employee or as a vendor of either of those

18  two businesses.

19          So I -- I think I'm going to allow it.

20          MR. DAVIS:  All right.

21          THE COURT:  Go ahead.

22  Q.    And just briefly, when is it appropriate to

23  charge -- to claim a volunteer mile?

24  A.    If I remember correctly, I think you need to

25  be either on the board of directors of a nonprofit or a

1   substantial person in a nonprofit in order to take

2   volunteer miles, but it would allow you a charitable

3   deduction for -- I think in that year it was 12 cents

4   per mile.

5       Q.   Okay.  So just moving quickly, do you see the

6   businesses that need to be included on the 2015 filings?

7       A.   Yes.

8       Q.   And the first one is 31 Lowell Road Property

9   Trust, correct?

10      A.   Yes.

11      Q.   The second one, do you see that as DigitalNet

12  Technology Solutions filings?

13      A.   Yes.

14      Q.   Third is AISA Consulting Group?

15      A.   Yes.

16      Q.   And fourth is UltPult, registered in December

17  '15.  Do you see that?

18      A.   Yes.

19      Q.   Okay.  Showing you now from Exhibit 153b

20  another document and that's number 446.  And do you see

21  this as -- has other expenses listed?

22      A.   Yes.

23      Q.   Okay.  And I just wanted to ask you at the

24  middle of the page there's a question about AISA

25  Consulting and the outgoing foreign wire transfers.  Do

1    you see that?

2        A.    Yes.

3        Q.    Okay.  Can you read the question and then the

4    answer in all caps?

5        A.    Sure.

6              "On the checking account Excel file on the

7    history tab, the payments due vendors, utilities, goods,

8    and services, I need you to break it down further."

9        Q.    And the answer?

10       A.    "Almost all of it are third-party services,

11   support, and software that we use from vendors like

12   Google, Microsoft, CloudConnect, et cetera, to provide

13   services to our customers.  We are not purchasing any

14   good (sic) technically.  Does it clarify?"

15       Q.    Okay.  And throughout your relationship with

16   Mr. Alrai, did he ever mention that he was being paid by

17   United Way of Boston?

18       A.    No.

19       Q.    Did you have any knowledge of United Way of

20   Boston?

21       A.    I believe that's where his W-2 was done and

22   that's the only knowledge that --

23       Q.    Okay.  And the second -- that second bullet

24   under AISA Consulting, there's a question about outgoing

25   foreign wire transfers.  Do you see that?

1        A.     Yup.

2        Q.     And could you read that question and answer,

3   please?

4        A.     "The outgoing foreign wire transfers to cover

5   business expenses, should this all be booked to travel?

6              "No, it is part of the business expenses

7   to maintain the office in Lahore, Pakistan, not

8   travel-related."

9        Q.     Okay.  And last one in this series, can I show

10  you number 00457 Bates stamp, all part of 153b.  There

11  are two earlier.

12             Okay.  And can you read just the information

13  at the very top down to income?  What does that say for

14  2015?

15       A.     So just the income part?

16       Q.     Or the label there under 2015, what does it

17  say?

18       A.     "DigitalNet solely owned by AISA Consulting."

19       Q.     Okay.  And then for 2015, you have numbers for

20  AISA Consulting's Schedule C, correct?

21       A.     Yes.

22       Q.     And you have three columns there.  One says

23  PBC.  What does PBC mean?

24       A.     That means prepared by client.

25       Q.     Okay.  So that's the actual information you

1  get from the client?

2      A.    Correct.

3      Q.    And then AJE, what does that refer to?

4      A.    That's adjusting journal entries.

5      Q.    Okay.  So that's something your accounting

6  service is doing to adjust a number, correct?

7      A.    Yes.

8      Q.    And then TR, what is that?

9      A.    Tax return.

10     Q.    For the -- that's actually the number that

11 goes on the tax return?

12     A.    Yes.

13     Q.    Okay.  And for 2015, according to the client,

14 what was the DigitalNet income he was reporting?

15     A.    1,206,303.

16     Q.    So $1.2 million, correct?

17     A.    Yes.

18          MS. SHEFF:  Okay.  Let's look at one other --

19 same exhibit, 153b, at page 751.  This is for the year

20 2017.

21     Q.    Okay.  Now, you've -- you've referred to a

22 data dump or a spreadsheet.  Is this an example of that

23 for 2017?

24     A.    Yes.

25          MR. DAVIS:  Okay.  And can we just blow up the

1    top part so you can see the letters a little bit better?

2        Q.    And this is a 2017 business accounts

3    statement; is that correct?

4        A.    Correct.

5        Q.    And then this is what you would actually get

6    from the client to show various payments and expenses;

7    is that right?

8        A.    Yes.

9        Q.    Okay.  And for each year, would you get

10   another sort of data dump purporting to be from a

11   business account showing expenses?

12       A.    Yes.

13       Q.    Okay.  All right.  Now, let's -- when the tax

14   returns were filed, did the Schedule C show the gross

15   receipts of the business as you calculated it from his

16   information?

17       A.    Yes.

18       Q.    And did it also show the cost of goods sold?

19       A.    Yes.

20       Q.    And what is cost of goods sold and how does

21   that affect -- what's the tax effect of a cost of goods

22   sold?

23       A.    So it would be a deduction from your income, a

24   cost of goods sold.

25       Q.    Okay.  So it results in your paying fewer

```
1   taxes; is that correct?
2        A.   Yes.
3        Q.   All right.  Let me show you grand -- I'm
4   sorry -- Exhibit 204.  You said the first tax return you
5   did was in 2013, right?
6        A.   Yes.
7        Q.   All right.  And in 2013, do you see line 12,
8   the business income or loss?
9        A.   Yes.
10       Q.   And what does that show as business income or
11  loss that year?
12       A.   $902,914.
13       Q.   Okay.  And so that's in addition to 332,000 in
14  wages/salaries, correct?
15       A.   Yes.
16       Q.   And, again, that was for both the defendant
17  and for his wife?
18       A.   Yes.
19            MR. DAVIS:  Okay.  And so let's go back to
20  Schedule C for this 2013 return in 204, just briefly.
21            MS. SHEFF:  What page, John?
22            MR. DAVIS:  Just keep flipping, please.  Okay.
23  Here we are.
24       Q.   So do you see Schedule C profit and loss from
25  business, right?
```

1      A.   Yes.

2      Q.   And this is for AISA Consulting Group, LLC,

3   correct?

4      A.   Yes.

5      Q.   But as you said, you were treating AISA and

6   DigitalNet as essentially one entity, correct?

7      A.   Yes.

8      Q.   All right.  And so what do you show for the

9   cost of goods sold on line 4 for -- for 2013?

10      A.   $224,836.

11      Q.   Okay.  And so that's backed out of the gross

12   receipts, correct?

13      A.   It's a deduction from it, yes.

14      MR. DAVIS:  Okay.  All right.  Now, let's look

15   at another year.  Let's look at tax year 2017, which is

16   Exhibit 206, and start with the first page.

17      I'm sorry.  I may have a -- all right.  I

18   think that -- I think we just had the first page there,

19   going back.  Sorry I don't have a page reference.

20      So next -- I thought we saw it.  Next page.

21   That's estates and trusts.  Next page.  Keep going.

22      Q.   All right.  Here we are.

23      So this is the 1040 for 2017 for Imran and

24   Saima Alrai, correct?

25      A.   Yes.

1    Q.   Okay.  And that year -- so that's four years

2  after the 2013 one, correct?

3    A.   Yes.

4    Q.   All right.  And that year, what do we see for

5  the business income in -- on line 12?

6    A.   $291,946.

7    Q.   Okay.  So under $300,000 is business income

8  that year, correct?

9    A.   Yes.

10   Q.   And now let's go to Schedule C for this same

11 return.

12        All right.  Profit or loss from business,

13 going to the income part, do you see the -- do you see

14 the gross receipts or sales on line 1?

15   A.   Yes.

16   Q.   And what is that amount being reported?

17   A.   $1,899,420.

18   Q.   And do you also see the cost of goods sold on

19 line 4?

20   A.   Yes.

21   Q.   And what is that number?

22   A.   $1,364,592.

23   Q.   So the defendant is claiming there 1.3 million

24 in cost of goods sold, right?

25   A.   Yes.

1      Q.   All right.  And that leaves a gross income of

2  a mere 534,000, right?

3      A.   Yes.

4      Q.   And that's followed by expenses for business

5  use of the home in part 2.  Do you see that?

6      A.   Yes.

7      Q.   Including at line 8, $12,000 for advertising.

8  Do you see that?

9      A.   Yes.

10      Q.   All right.  Do you recall -- that's enough on

11  that exhibit.

12           Do you recall, would the defendant, in dealing

13  with you, ever refer to someone named Mohammad?

14      A.   No.

15      Q.   You don't remember that?

16      A.   No.

17      Q.   Okay.  I'm showing you on 153b Bates number

18  390, which is dated March 16th of '16.

19           Okay.  Do you see that email?

20      A.   Yes.

21      Q.   And do you recognize Cathy Lane as one of your

22  employees?

23      A.   Yes.

24      Q.   And Cathy has written an email to Mr. Alrai

25  sharing with him a new way to share information back and

1    forth.  Do you see that?

2         A.   Yes.

3         Q.   And what does Mr. Alrai say?

4         A.   It says:  Thanks, I already had Mohammad send

5    the files via secure drawer yesterday.  Please confirm

6    receipt.

7         Q.   Okay.  All right.  Now, were you also aware

8    that Mr. Alrai had his father and mother living with

9    him?

10        A.   Yes.

11        Q.   And do you recall the name of his father?

12        A.   I don't.

13        Q.   Do you -- is the name Mac Chaudhary familiar

14   to you?

15        A.   I think they're on the tax returns, so, yeah.

16        Q.   Okay.  And were they claimed as dependents on

17   the tax returns?

18        A.   Yes.

19        Q.   And what does that mean to claim your parent

20   as a dependent on a tax return?  What do you have to do

21   to qualify for that?

22        A.   In those years that we filed, it would -- I

23   believe you have to provide 50 percent of their support

24   and they need to make under $4,050 of income.

25        Q.   Okay.  And if you do that, you -- you get a --

80

1      some sort of exemption or deduction?

2           A.    A dependency exemption.

3           Q.    Okay.  And did Mr. Alrai claim Mr. Mac

4      Chaudhary as a dependent for each tax year we're talking

5      about here, 2013 through '18?

6           A.    Yes.

7           Q.    Okay.  And we also talked briefly about the

8      home office deduction.  Showing you same exhibit, 153b,

9      Bates-stamped 402 to 404, page 402 on the Bates stamps.

10     All right?

11               Do you recognize the name Peter Tremblay?

12          A.    Yes.

13          Q.    And do you see this email is April 3rd of 2017

14     between Mr. Alrai and Mr. Tremblay?

15          A.    Yes.

16          Q.    And Mr. Tremblay is one of your employees at

17     Travis Terry & Company, CPA?

18          A.    Yes.

19          Q.    Okay.  Let's go to page -- two pages back, to

20     page 404.

21               And do you see the note on April 3rd from

22     Mr. Alrai to Mr. Tremblay?

23          A.    Yes.

24          Q.    And what does -- can you just read, "hello

25     Peter," what does that say?

1      A.   "Hello Peter, thanks for the follow-up.  Did

2  you take into consideration that I work from home mostly

3  and not in Boston?  I know it gives me a Mass. tax

4  break.  Does everything look okay to you guys?  Thanks."

5      Q.   Okay.  And so did Mr. Alrai actually claim

6  each year a deduction for his expenses associated with

7  his home office?

8      A.   Yes.

9      Q.   Okay.  Now, did the subject of research and

10  development credit come up with Mr. Alrai?

11      A.   I believe so.

12      Q.   Okay.  And what's an R&D credit?  How does

13  that work?

14      A.   So it's a credit that the -- you can get for

15  increasing your R&D expenses year over year.

16      Q.   Okay.  And meaning expenses in developing new

17  technologies?

18      A.   Yes.

19      Q.   Okay.  So showing you now same exhibit, 153b,

20  and Bates number 203 to 205, okay.  And do you recognize

21  this at Bates 203 as an email exchange between you and

22  Mr. Alrai?

23      A.   Yes.

24      Q.   And do you see in the top there Mr. Alrai is

25  identifying the amount of R&D spent in his email on

1  Friday, March 6th?

2       A.   Yes.

3       Q.   And that in 20 -- he's claiming that "in 2014,

4  we spent around 165,000"?

5       A.   Yes.

6       Q.   Right?  And for the previous year, 130,000 in

7  2013?

8       A.   Yes.

9            MR. DAVIS:  All right.  So let's go to page

10  205.  And just go back.

11       Q.   Can you see this is part of Mr. Alrai's email

12  to you providing various kinds of information?

13            Can you go forward one to see the authorship?

14            See at the bottom here, this says "Hello,

15  Travis" from Mr. Alrai; do you see that?

16       A.   Yes.

17       Q.   And it's March 5th of 2015?

18       A.   Yes.

19       Q.   All right.  So looking at the email, can you

20  read number 7 from Mr. Alrai?

21       A.   "Please let me know how we can take advantage

22  of R&D credit.  We do a lot of research around color

23  matching, pattern matching, face recognition and object

24  recognition.

25            "I would also like to know if we can go back

1    and claim a credit for 2013 tax year as well."

2        Q.    Okay.  Did you ever talk to him about a face

3    recognition technology business or enterprise that he

4    was in?

5        A.    No.

6            MR. DAVIS:  All right.  So let's go to the

7    newly marked exhibit, also from -- okay.

8            So let's go to 207a.  And this is

9    Bates-stamped 737.  Do you recognize 207a?

10       A.    Yes.

11       Q.    And is this, again, an expense summary sheet

12   for 2017 from Mr. Alrai?

13       A.    Yes.

14           MR. DAVIS:  All right.  Your Honor, I move to

15   admit 207a and strike the ID because this is not

16   previously admitted.

17           MR. HARRINGTON:  No objection, Judge.

18           THE COURT:  Admitted.

19           (Government's Exhibit 207a admitted.)

20           THE COURT:  Let's take the morning break.

21   Reconvene in 15.

22       (Recess taken from 10:46 a.m. until 11:03 a.m.)

23           THE COURT:  Mr. Davis, you may resume.

24           Sir, you're still under oath.

25           THE WITNESS:  Yes.

1    Q.   Mr. Terry, when we broke, we were talking

2  about Government Exhibit 207a.  And down at the bottom,

3  other considerations, on the left, do you see that the

4  same four business entities are identified, the Lowell

5  Property Trust, DigitalNet, AISA, and UltPult?

6    A.   Yes.

7    Q.   All right.  And do you see in the category

8  list the total R&D-related IT projects?

9    A.   Yes.

10    Q.   And do you see the number associated with R&D

11  for the tax year 2017?

12    A.   Yes.

13    Q.   And how much is that?

14    A.   $465,000.

15    Q.   All right.  That's enough on that.

16         Now, do you recall whether the defendant ever

17  asked you if he could wire money to Pakistan?

18    A.   Yes.

19    Q.   And what do you remember about that and what

20  advice did you give him?

21    A.   I believe I said as long as it's within any

22  government regulations or, you know, that type of thing.

23    Q.   Okay.  And was that early in the relationship

24  or late in the relationship?

25    A.   Early.

1        Q.    Okay.  Now, did your firm have what was called

2   an annual tax organizer?

3        A.    Yes.

4        Q.    And what is that?

5        A.    It's a -- kind of like a booklet that goes out

6   to every one of our individual clients so we can get a

7   summarization of what happened during the year to

8   prepare their tax return.

9        Q.    Okay.  And does it have a questionnaire, a

10   series of questions?

11        A.    Yes.

12        Q.    And is it fairly detailed?

13        A.    Yes.

14        Q.    And do you send it routinely, that is, every

15   year to every client?

16        A.    Yes.

17        Q.    All right.  And among the questions, are there

18   questions about foreign assets?

19        A.    Yes.

20        Q.    That is, property, money, held in a foreign

21   country?

22        A.    Yes.

23             MR.  HARRINGTON:  I'm just going to object at

24   this point.  I don't have a copy of the organizer I

25   think that counsel's referring to or the questions that

1   are asked, nor do I think there's any direct testimony

2   by this client that this information was sent to my

3   client.  For those reasons, I would object.

4              THE COURT:  The organizer.

5              MR. DAVIS:  So, your Honor, the organizer was

6   provided in discovery at Bates number 2018 in Exhibit

7   153b.

8              MR.  HARRINGTON:  And I think what that is is

9   that's a -- like the general tax organizer.  It's not a

10  copy of what was sent to my client.

11             Basically, I think the testimony is in general

12  terms, this is what I did every year, this is a copy of

13  what I do every year, but they didn't, as I understand

14  it, retain copies of what was sent to my client.

15             MR. DAVIS:  That's not my understanding, your

16  Honor.  My -- I -- and could I ask the witness about

17  that and lay the foundation?

18             THE COURT:  Yeah.  Try and develop it and see

19  what we can figure out.

20       Q.   The other organizer is also provided in

21  discovery at Bates stamp 706, and particularly questions

22  about page 736.

23             THE COURT:  Do you need a minute to get that

24  stuff in front of you?

25             MR.  HARRINGTON:  No.

1          MS. SHEFF:  He was given that this morning as

2     207b.

3          MR. DAVIS:  I'll ask the witness what he

4     understands.

5          You guys good?

6          MR.  HARRINGTON:  This the one -- is this the

7     one we got this morning?

8          MR. DAVIS:  Yes.

9          MR.  HARRINGTON:  Okay.

10          MR. DAVIS:  But that's -- that was provided in

11     discovery.

12          THE COURT:  But was it provided this morning

13     or in discovery or both?

14          MR. DAVIS:  Both.

15          THE COURT:  Okay.

16          MR. DAVIS:  So it was not marked as an

17     exhibit, but it's Bates-stamped as provided, your Honor.

18          THE COURT:  Do you need a minute, Counsel,

19     to --

20          MR.  HARRINGTON:  No, I'm ready to proceed,

21     Judge.

22          THE COURT:  All right.  Go ahead.

23          MR. DAVIS:  All right.

24     Q.   So I was asking you about whether the

25     questionnaire asked about foreign assets.  What is the

1  reason why your tax accounting firm needs to have

2  information about foreign assets held?

3      A.   There might be a filing requirement to the

4  government based upon the dollar amount of any foreign

5  asset.

6      Q.   Okay.  And in addition, are you interested in

7  foreign income?

8      A.   We could be, yes.

9      Q.   Okay.  And under what -- let's assume that a

10  U.S. taxpayer has an interest in a business operating in

11  a foreign company -- I'm sorry, in a foreign country.

12  Could that taxpayer potentially be liable to pay taxes

13  on the income earned in the foreign country by that

14  business entity?

15      A.   It depends on, I guess, how it would be set up

16  and --

17      Q.   Right.

18      A.   -- that type of thing.

19      Q.   So it could be, but it depends; is that right?

20      A.   Yes.

21      Q.   But it's certainly relevant to the information

22  you need?

23      A.   It could be, yes.

24      Q.   Okay.  All right.  So let me show you Exhibit

25  153b, the 2014 organizer, and that's at page 218.

1            Okay.  And do you see how this is labeled at

2      the top?  It says 2014 organizer, correct?

3           A.   Yes.  Yes.

4           Q.   And then it says, Alrai, 6099, correct?

5           A.   Yes.

6           Q.   And what does that mean, in your company's

7      records?

8           A.   That's just his ID for our tax software.

9           Q.   All right.  And so is this document in your

10     company's file for Mr. Alrai?

11          A.   If it has been sent back to us, we would have

12     kept it.

13          Q.   Okay.  And so it is in your file?

14          A.   Yes.

15          Q.   All right. And I'm showing you page 2D.  If

16     you look at the top right corner, there's a page 1.  Can

17     you go to 2D, please, of this same document.

18            And do you see the question for foreign

19     matters?

20          A.   Yes.

21          Q.   Okay.  And can you read those four questions,

22     please?

23          A.   Let's see here.

24            "Did you or your spouse perform any work

25     outside of the U.S. or pay any foreign taxes?"  That

1    would be question one.

2          "Were you or your spouse a grantor or

3    transferor for a foreign trust, have any interest in or

4    a signature or other authority over a bank account,

5    securities account, or other financial account in a

6    foreign country?

7          "Do you or your spouse create or transfer

8    money or property to a foreign trust?

9          "Do you or your spouse own any foreign

10   financial assets?"

11        Q.   Okay.  And so those questions all relate to

12   foreign property and foreign income, correct?

13        A.   Yes.

14        Q.   Now, I see on this form, this page, there are

15   no check marks yes or no on this form, right?

16        A.   Right.

17        Q.   And do you require the client to make a yes or

18   no answer to every question?

19        A.   No.  We would hope they would, but we don't.

20        Q.   All right.  And is it -- with what frequency

21   does a client send back the organizer without all the

22   questions answered?

23        A.   I'm not sure of a percentage, but it happens

24   all the time.

25        Q.   All right.  Okay.  Let's turn to another

1    organizer which was at 706 in discovery.  And this has

2    been newly marked as 207b, Bates stamp 706.

3           Is this a client organizer topical index --

4        A.   Correct.

5        Q.   -- that was sent to Mr. Alrai for the tax year

6    2017?

7        A.   Yes.

8           MR. DAVIS:  And let's go to -- or, your Honor,

9    I move to admit 207b and strike the ID.

10          MR.  HARRINGTON:  No objection, your Honor.

11          (Government's Exhibit 207b admitted.)

12          MR. DAVIS:  Let's go to Bates stamp page 736.

13       Q.   Okay.  Do you see kind of halfway down in that

14   list of questions?

15       A.   Yes.

16       Q.   And, again, this is for Alrai, Imran and

17   Saima, with their account number, correct?

18       A.   Yes.

19       Q.   And it's for 2017 year.  Can you read the

20   questions that begin "did you receive a distribution

21   from," please?

22       A.   "Did you receive a distribution from or were

23   you a grantor or transferor of a foreign trust?"

24       Q.   Next?

25       A.   "Did you have a financial interest in or

1    security authority (sic) over a financial account such

2    as a bank account, securities account, or brokerage

3    account located in a foreign country?"

4         Q.   And next?

5         A.   "Did you have any foreign financial accounts,

6    foreign financial assets, or hold interest in a foreign

7    entity?"

8         Q.   Okay.  All right.  And that's enough.

9              And did you get an affirmative answer from

10   Mr. Alrai on -- on any of those questions?

11        A.   I don't believe so.  I think it would have

12   been checked there if we did.

13        Q.   Okay.  So what is your -- are you familiar

14   with the so-called FBAR, the Foreign Bank Account Report

15   requirement?

16        A.   Yes.

17        Q.   And, briefly, what is the FBAR?

18        A.   I believe it's a reporting requirement of

19   foreign assets if you have $10,000 or more in a foreign

20   account at any point during a year.

21        Q.   Okay.  And if you do have 10,000 or more in a

22   particular foreign bank account, you're required to

23   report that to the IRS, right?

24        A.   Yes.

25        Q.   And what is the reason, as you understand it,

1    for the FBAR requirement by the IRS, do you know?

2        A.    I would believe it's just so they can see what

3    assets are held outside of the United States.

4        Q.    Okay.  Now, what is your -- what is your

5    firm's practice if a client does not affirmatively

6    indicate in the questionnaire that he or she has a

7    foreign bank account?

8        A.    If there's no affirmative, then we don't ask

9    any further.

10        Q.    Okay.  So it's not your practice to sit down

11    and actually go through all these questions and ask the

12    question again, correct?

13        A.    Correct.

14        Q.    You rely on your client to flag the issue if

15    it's an issue?

16        A.    Yes.

17        Q.    All right.  And what is your firm's practice

18    regarding the questions actually on the tax return about

19    FBAR if you've got no information about a foreign bank

20    account?

21        A.    Our tax return defaults, it has a set default

22    to no for answers on that; unless we know that they do,

23    we have to go in and change it as a yes.

24        Q.    Okay.

25        A.    So it would default to print no on the tax

1  return.

2      Q.   So your tax return is going to say no about

3  foreign bank accounts unless you're given some

4  information from the client, right?

5      A.   Yes.

6      Q.   Okay.  And, to your knowledge, based just on

7  your memory, do you ever recall discussing the issue of

8  FBARs and foreign bank accounts with Mr. Alrai?

9      A.   I don't recall that.

10      Q.   Did he ever have a question about it or raise

11  the issue to you, as far as you know?

12      A.   Not that I remember.

13      Q.   And is the same true of his wife, Saima Alrai?

14      A.   Correct.

15      Q.   Issue never came up, as far as you know?

16      A.   Not that I remember.

17      Q.   Okay.  Now, let me show you Exhibit 152.  And

18  this is the actual tax return for 2014, correct?

19      A.   For the trust?

20      Q.   That's -- it starts with a trust, yes.  So

21  keep going, please.

22      All right.  So now -- so let's -- we're at

23  page 130 Bates stamp.  This is the actual 1040, correct?

24      A.   Yes.

25      Q.   And this shows adjusted gross income for that

95

1  year of 682,000, correct?

2      A.   Yes.

3      Q.   And you can see Munawar Chaudhary claimed as a

4  dependent in the exemptions part of that page.  Do you

5  see that --

6      A.   Yes.

7      Q.   -- as a parent and also Afza Munawar, his

8  mother, correct?

9      A.   Yes.

10          MR. DAVIS:  Okay.  So let's go to Schedule B

11  of 2014.  Just keep going, please.  Schedule A -- okay.

12  We're there.  Schedule B.

13     Q.   All right.  Do you see at the bottom of

14  Schedule B -- you're at Schedule C now, so go back,

15  please.  Go back one more.  Stop there.

16          Do you see at the top, Schedule B interest and

17  ordinary dividends for 2014?

18     A.   Yes.

19     Q.   All right.  And do you see the bottom of this

20  tax return?

21     A.   Yes.

22     Q.   Okay.  And do you see any -- what do you see

23  for Part III, Foreign Accounts and Trusts?  Can you read

24  the -- can we blow that up and just read that part?

25     A.   "So you must complete this part if you had

1    over $1,500 of taxable interest or ordinary dividends,

2    had a foreign account, or received dividends" -- excuse

3    me -- "distribution from or were a grantor of or a

4    transferor to a foreign trust."

5         Q.    Okay.  And then question 7a, what does that

6    say?

7         A.    "At any time during 2014, did you have a

8    financial interest in or signature authority over a

9    financial account such as a bank account, securities

10   account, or brokerage account located in a foreign

11   country, see instructions."

12        Q.    All right.

13        A.    "If yes, you are required to fire FinCen Form

14   114."

15        Q.    And FinCen Form 114 is also called Report of

16   Foreign Bank and Accounts, FBAR; is that right?

17        A.    Yes.

18        Q.    All right.  And then keep reading, please.

19        A.    "If you are required to file FinCen Form 114,

20   enter the name of the foreign country where the

21   financial account is located."

22              And then:  During 2014, did you receive a

23   distribution from or were you the grantor of or

24   transferor to a foreign trust?  If yes, you may have to

25   file Form 3520."

1    Q.   Okay.  So next to -- next to those questions

2  there's yes and no columns, correct?

3    A.   Yes.

4    Q.   Now, are they filled out in this case?

5    A.   No.

6    Q.   And why is that?

7    A.   Because we didn't receive an affirmative on

8  that organizer, so it just defaults to the -- to not put

9  a yes or a no.

10    Q.   Okay.  So there's no answer at all, right?

11    A.   Correct.

12    Q.   And what's the next page of Schedule B?  Is

13  there anything there about -- here we have interest and

14  dividends from various banks, right?

15    A.   Yup.

16    Q.   But nothing about a bank in Pakistan, correct?

17    A.   Correct.

18         MR. DAVIS:  All right.  So let's go to tax

19  return for tax year 2016, which is Exhibit 153.

20    Q.   Okay.  And you -- do you recognize 153, once

21  we get to the 1040 front page?

22         All right.  Here we are at Bates stamp 499.

23  Do you see that?

24    A.   Yes.

25    Q.   And for 2016, we again have -- we have

1   adjusted gross income down at the bottom of about

2   506,000, right?

3        A.   Yes.

4             MR. DAVIS:  Okay.  So let's go to Schedule B

5   of -- this is Schedule B?  All right.  And let's blow up

6   the bottom.

7        Q.   Again, Part III, Foreign Accounts and Trusts,

8   do you see that?

9        A.   Yes.

10       Q.   And so for the question in 7a, "At any time

11  during 2016, did you have a financial interest in or

12  signature authority over a financial account located in

13  a foreign country," do you see that?

14       A.   Yes.

15       Q.   And how is that question answered?

16       A.   It says no.

17       Q.   Okay.  And question 8, "Did you receive a

18  distribution from or were you the grantor of a foreign

19  trust" also says no, correct?

20       A.   Correct.

21       Q.   All right.  And do you know why this tax form,

22  the FBAR question is marked no in -- for 2016, but was

23  not marked no for 2014?

24       A.   I think we got a new tax program that year and

25  it again defaulted to a no automatically if there was no

1    affirmative, where I believe the old tax program didn't

2    even put a yes or a no --

3         Q.   Okay.

4         A.   -- with an affirmative.

5         Q.   So in either year if Mr. Alrai had answered

6    yes to question 7a and, further, if in either year the

7    foreign account in question had more than 10,000 in it

8    at any single point, what would have happened?

9         A.   We would have inquired more to help him fill

10   out the FBAR forms for compliance.

11        Q.   Okay.  And would you have, in fact, filed an

12   FBAR with the IRS if you'd known about it?

13        A.   Yes.

14        Q.   All right.  But you didn't know about it, did

15   you?

16        A.   No.

17        Q.   Did he ever tell you he had a bank account, a

18   business bank account, in Pakistan?

19        A.   I don't believe so.

20        Q.   All right.  You did have some discussion with

21   Mr. Alrai about foreign tax issues, at least in one

22   context, is that right, email conversation?

23        A.   I -- I don't remember that.

24        Q.   All right.  So let me show you 153b.

25             And this is Bates number 193.

1          Okay.  And do you recognize this as an email

2    you provided between Peter Tremblay of your firm and

3    Mr. Alrai?

4          A.   Yes.

5          Q.   And it's regarding 2014 bookkeeping?

6          A.   Yes.

7          Q.   All right.  And what does -- what does

8    Mr. Tremblay say here?

9          A.   "Here is the link to the IRS website regarding

10   foreign earned income," the link to it, "and note that

11   farther down the page it talks about the two tests I

12   mentioned below in order to qualify."

13         Q.   Okay.  So let's move further back in the

14   email.

15              Is there further information about how this

16   was raised?  You can see that Mr. Tremblay is writing

17   him with information about foreign income.  Do you see

18   that?

19         A.   Yes.

20         Q.   All right.  And let's go back further in the

21   email.

22              Okay.  And here we are on page 196.  At the

23   bottom of the page, Cathy Lane was touching base

24   regarding 2014 bookkeeping.  Do you see that?

25         A.   Yes.

1      Q.   Okay.  And then there's a response from

2  Mr. Alrai at the top of the page, a paragraph beginning

3  "four months ago," do you see that?

4      A.   Yes.

5      MR. DAVIS:  All right.  Can you -- can we

6  highlight that paragraph and just -- right about that.

7      Q.   What does that say?

8      A.   "Four months ago, I called to speak to Travis

9  and I was told that he was busy.  I left a message and

10  am still waiting for the call back.  I have an employee

11  who is a U.S. citizen, but he lives in Dubai now.  He

12  wants me to pay him directly there so he can -- doesn't

13  have to pay any taxes on his salary.  Please share your

14  thoughts on how we can make it happen legally.  I know

15  of a lot of companies that do that for their employees

16  and employees don't have to pay taxes if they make less

17  than 85,000 per year overseas."

18      Q.   Okay.  So Mr. Alrai is asking you about the

19  tax implications of paying an employee overseas,

20  correct?

21      A.   Yes.

22      Q.   But, again, he never asked you anything about

23  the tax implications of owning a bank account in

24  Pakistan, correct?

25      A.   Correct.

1    Q.   All right.  Now, directing your attention to

2  March 19th of 2019, so March of this year, did you get

3  an email from Mr. Alrai regarding FBARs?

4    A.   Yes.

5    Q.   And was that the first time FBARs had ever

6  come up between you and him?

7    A.   I believe so.

8    Q.   All right.  Showing you an exhibit marked 153d

9  on the ELMO -- that doc cam, Ms. Sheff.

10         MS. SHEFF:  Yes.

11    Q.   Do you recognize 153d as an email between

12  Mr. Alrai and you on -- in March of 2019?

13    A.   Yes.

14         MR. DAVIS:  Your Honor, I move to admit 153d

15  and strike the ID.

16         MR. HARRINGTON:  No objection, Judge.

17         THE COURT:  It's admitted.

18         MR. DAVIS:  All right.

19         (Government's Exhibit 153d admitted.)

20    Q.   Did this email come to you with any warning?

21    A.   No, just I -- "can you help me file the

22  FBARs."

23    Q.   Okay.  So can you read the paragraph at the

24  bottom beginning "also I would like you," what does that

25  say?

1        A.    "Also I would like you to file FBAR reports

2   for me since 2012.  I have been operating an expense

3   account in Pakistan since 2012 that received money from

4   here.  There's no revenue or interest to report for that

5   account because all the money would get spent right away

6   on business expenses, including payroll.  I can send you

7   the account statements from Pakistani bank.  How fast

8   can you do it for me?  I need to have it done as soon as

9   possible.  Here is the link from the IRS website that

10  explains the process for late filings.  I don't believe

11  there will be any penalties since we are doing it

12  voluntarily and reported all taxable income."

13       Q.    So he actually sent you a link to an IRS

14  website; is that right?

15       A.    If it's on there, yes.

16       Q.    All right.  And going further in the email,

17  can we see that?

18       A.    Yup.

19       Q.    Okay.  Delinquent FBAR submission procedures

20  is apparently the link he's sending?

21       A.    Yes.

22       Q.    All right.  And does he then give you a

23  breakdown in this same exhibit of what he's actually --

24  what he's actually got?

25       A.    Yes.

1      Q.   All right.  So can you read the information
2   Mr. Alrai provides beginning "below is the bank info"?
3      A.   "Below is the bank info to file FBAR since
4   2013.  Please try to have it done as soon as possible
5   and send me proof of filing for each year.  We have to
6   catch up because I didn't know it was required.  Please
7   make sure we file it annually going forward with my
8   taxes.
9          "Since it is voluntary and we reported all
10  income, I don't believe there will be any penalties for
11  late filings.  Please confirm."
12     Q.   All right.  Does he give the bank name?
13     A.   Yes.
14     Q.   And that's MC Bank Limited?
15     A.   Yes.
16     Q.   And then a particular address?
17     A.   Yes.
18     Q.   And that's Multan Road branch in Lahore,
19  Pakistan?
20     A.   Yes.
21     Q.   And then an account number, correct?
22     A.   Yes.
23     Q.   And then the account type, he says, is
24  business checking, correct?
25     A.   Yes.

1      Q.    The date of account open is April 3 of 2013,

2  correct?

3      A.    Yes.

4      Q.    And then can you read the purpose of the

5  account?

6      A.    "To manage business expenses for office in

7  Lahore, including payroll.  This account has no income

8  from Pakistan.  All money was wired from the U.S.

9  business account to Pakistan business account with the

10 same business name title.  This is a business account

11 and I have signature authority."

12     Q.    Signatory authority, right?

13     A.    Yes.

14     Q.    And then does he also list what he says is the

15 highest balance in U.S. dollars per year?

16     A.    Yes.

17     Q.    And for the first three years, which are 2013,

18 2014, and 2015, all of the amounts are between 12- and

19 15,000 as the highest balance, correct?

20     A.    Yes.

21     Q.    And then in November of 2016, what does he

22 list as the highest balance?

23     A.    $159,571 U.S.

24     Q.    Okay.  And then in December of 2017, what does

25 he list as the highest balance?

1        A.    $165,760 U.S.

2        Q.    And then in 2018, it's back down to 18,000; is

3    that right?

4        A.    Yes.

5        Q.    And he provides you his -- the exchange rate

6    as on Google on March 19th of 2019, that day, correct?

7        A.    Yes.

8        Q.    Okay.  So after you got this email, what

9    happened?

10        A.    We prepared the FBARs for those years that he

11    asked us for.

12        Q.    Okay.  And were those FBARs, those foreign

13    bank account reports, were they for the years 2013

14    through 2018?

15        A.    Yes.

16        Q.    And when were they filed?  Were they filed

17    approximately March 23rd of 20 -- I'm sorry, March 23rd

18    of 2019, so just a few days later?

19        A.    I think we did them pretty quickly --

20        Q.    Yeah.

21        A.    -- as he asked us to, yes.

22        Q.    You jumped right on it?

23        A.    Yes.

24        Q.    And did Mr. Alrai ever sit down with you and

25    talk about what had happened about the FBAR filings?

1      A.   No, we did them online for him.  So we just

2  went on online and filed them.

3      Q.   So other than his saying here in this text, "I

4  didn't know it was required," did he ever give you any

5  other explanation?

6      A.   No.

7      Q.   Did he blame you for not filing?

8      A.   No.

9      Q.   Just no mention of it, right?

10      A.   No.

11      Q.   And any discussion since about FBARs and

12  Mr. Alrai's foreign businesses?

13      A.   No.

14      Q.   All right.  I'm showing you now some bank

15  statements.  The first is Exhibit 545.

16           All right.  Can you see 545 is a bank

17  statement from the MCB Islamic Bank Limited --

18      A.   Yes.

19      Q.   -- with an account title of DigitalNet

20  Technology Solutions?

21      A.   Yes.

22      Q.   All right.  And can you see for this one the

23  date of account open is January 6th of 2016?

24      A.   Yes.

25      Q.   And that's a super saving account; do you see

1    that?

2         A.    Yes.

3         Q.    All right.  And this number and available

4    balance is in rupees, not dollars.  You understand that,

5    correct?

6         A.    Yes.

7         Q.    All right.  So that's -- that's one account.

8               Let's see Exhibit 546.

9               And can you see at the top this is a -- an

10   account for the MC Bank Limited -- MCB Bank Limited?

11        A.    Yes.

12        Q.    And do you see the branch?  Can you -- without

13   reading the numbers, can you read the words there?

14        A.    Multan Road branch.

15        Q.    And do you know whether Multan Road is in

16   Lahore, Pakistan?  You wouldn't know that, right?

17        A.    I have no idea.

18        Q.    All right.  And the account title is what?

19        A.    DigitalNet Technology Solutions.

20        Q.    And the date of the account being opened is

21   what?

22        A.    April 3rd, 2013.

23        Q.    Okay.  And until today, have you ever seen

24   these bank statements from Pakistan?

25        A.    No.

1      Q.   And did the defendant ever ask you any

2    follow-up questions about his foreign bank accounts?

3      A.   No.

4           MR. DAVIS:  Nothing further.  Thank you.

5           THE COURT:  Thank you, Counsel.

6           Cross.

7                    CROSS-EXAMINATION

8    BY MR. HARRINGTON:

9      Q.   Good morning, Mr. Terry.

10     A.   Hi.

11     Q.   How are you doing today, sir?

12     A.   Good, thank you.

13     Q.   So I want to begin somewhat where you left

14   off.

15          In regard to the FBARs, you agree with me

16   that in the conversation or exchange that you had with

17   Mr. Alrai, he had indicated he wasn't aware that he

18   needed to file them, correct?

19     A.   Correct.

20     Q.   And although you sent out the questionnaires

21   that have been referred to, you agree those

22   questionnaires came back and they didn't have any boxes

23   checked, right?

24     A.   Correct.

25     Q.   And so there wasn't a representation to you

1    that he either had or didn't have those accounts, right?

2         A.    Correct.

3         Q.    All right.  And you indicated that your

4    software for preparing the taxes would either leave it

5    blank because there was no response, right --

6         A.    Yes.

7         Q.    -- or in one situation where you were shown,

8    because there was no response, it defaulted to no,

9    correct?

10        A.    Yes.

11        Q.    Okay.  So there were never any affirmative

12   representations made to you by Mr. Alrai in any way that

13   he did not have foreign bank accounts; it was just an

14   absence of information given to you --

15        A.    Yes.

16        Q.    -- correct?  Okay.

17             And when you had this exchange about the FBAR

18   by email, the prosecutor had asked about whether

19   Mr. Alrai blamed you for not filing the FBARs and you

20   indicated he didn't blame you for it, right?

21        A.    No.

22        Q.    Okay.  And he had indicated to you in the

23   email that he just wasn't aware that he had to do it,

24   right?

25        A.    Correct.

1    Q.    Would that indicate to you, despite all the

2    other information that you went over in the tax forms,

3    that he simply didn't read, perhaps, potentially, the

4    information that was sent to him?  Is that a fair

5    assessment?

6    A.    It could be.

7    Q.    Okay.  In addition, when the prosecutor had

8    asked you about whether Mr. Alrai had asked you any

9    questions about the FBAR when he was asking you to file

10   them for him, he asked you about whether he (sic) had

11   any more questions or anything like that and you

12   indicated no, right?

13   A.    Correct.

14   Q.    Okay.  And, likewise, you didn't have any

15   additional questions for him about it, right?

16   A.    Correct.

17   Q.    Okay.  And so I'm showing you what's been

18   marked as -- and I think probably an easier way to do

19   this is for me to approach.  I'm going to show him

20   these.

21          And if you need to take a look at any

22   additional sections of this, feel free to let me know,

23   Mr. Terry, but I'm going to show you -- these have been

24   marked as Defendant's Exhibit AA numbers 1, 2, 3, 4, 5,

25   and 6.

1    A.    Yup.

2    Q.    And if you could take a look, I'm showing you

3    what's been marked as AA1, Defendant's AA1.  Can you

4    indicate what that is?  And I'll point you to that

5    section.

6    A.    Yup.  So I believe my staff helped file these

7    and he went online to file them.  So those are the

8    confirmations of the filing.

9    Q.    Okay.  And what year is this confirming the

10   filing for?

11   A.    For 2013.

12   Q.    Okay.  Let me flip you to page 2 of that.

13   There's a section here that indicates what the filing --

14   like if you're filing late, you have to indicate a

15   reason why you're filing late --

16   A.    Yup.

17   Q.    -- right?

18   A.    Yup.

19   Q.    And what does this indicate relative to the

20   2013 filing?

21   A.    It says:  Did not know that I had to file.

22   Q.    Okay.  And I'm showing you what's been marked

23   as AA2.  Can you take a look at that and I'm going to

24   ask you the same question relative to this and the

25   second page.

1    A.    Yup.   So this is an electronic acknowledgment

2    of filing for 2014 FBAR.

3         Q.    Okay.  And then flip to the second page.

4              What's the reason given for the late filing?

5         A.    Third page maybe.

6         Q.    Third page.  Flip over to that.

7         A.    "Did not know that I had to file."

8         Q.    Okay.  Going to Defendant's Exhibit AA3,

9    again, same information on page 1?

10        A.    Yes, the electronic receipt of FBAR filing for

11   2015 and the reason is didn't -- "did not know that I

12   had to file."

13        Q.    Okay.  And then Defendant's Exhibit AA4?

14        A.    Electronic receipt for FBAR for 2016 and "did

15   not know that I had to file" was the reason.

16        Q.    Okay.  And, almost done, Defendant's Exhibit

17   AA5.

18        A.    Electronic receipt for FBAR for 2017 and "did

19   not know that I had to file."

20        Q.    Okay.  And then lastly, Defendant's Exhibit

21   AA6.

22        A.    FBAR for 2018.  And this one, I think, was on

23   time.

24        Q.    On time?

25        A.    Yeah.

1     Q.   And in regards to those years that were filed,

2   so we're talking about filing for -- late filing for

3   '13, 2014, 2015, 2016, 2017, and then an on-time filing

4   for 2018, correct?

5     A.   Yes.

6     Q.   Okay.  And then in regard to that, especially

7   the late filings, would you agree with me that they were

8   accepted by the IRS?

9     A.   Yes.

10     Q.   And there were no taxes or penalties or

11   anything that was owed?

12     A.   I don't believe so.  There would have been

13   some notices if that happened.

14     Q.   Okay.  So simply it was filing the required

15   notice and that resolved the matter in the eyes of the

16   IRS, to your knowledge?

17     A.   Yes, I believe so.

18     Q.   Okay.  Just a couple more questions,

19   Mr. Terry.

20          You were asked by the prosecutor about a

21   number of deductions that were taken by my client, for

22   example, business expenses, correct?

23     A.   Yes.

24     Q.   Claiming his father and mother as dependents,

25   correct?

1        A.    Yes.

2        Q.    Research and development credits, correct?

3        A.    Yes.

4        Q.    Okay.  As well as others that were gone

5    through.  I know there were many.

6              One of the things that you did is you relied

7    upon the information that was given to you by Mr. Alrai,

8    correct?

9        A.    Yes.

10       Q.    And where appropriate in your opinion,

11   follow-up documentation was requested, correct?

12       A.    Yes.

13       Q.    And when requested, documentation would be

14   provided by Mr. Alrai?

15       A.    Yes.

16       Q.    And then you would complete the returns, they

17   would be signed and filed with the IRS?

18       A.    Yes.

19       Q.    Okay.  And, to your knowledge, all of the

20   deductions, credits, things of that nature, as far as

21   you understand it, were things that Mr. Alrai could take

22   advantage of under the tax code legally, to your

23   knowledge?

24       A.    Yes.

25             MR. HARRINGTON:  Judge, I don't have any other

1    questions for Mr. Terry.

2          MR. DAVIS:  Briefly, your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. DAVIS:

5          Q.    Mr. Terry, what is your firm's practice

6    regarding whether clients are sent the finalized tax

7    return to review before it is signed?

8          A.    So if a client wants to have a finalized copy,

9    we send it to them.  If not, some clients come in and

10   review them with me directly.

11         Q.    Okay.

12         A.    So those are the two methods that we would do.

13         Q.    All right.  And do you recall what Mr. Alrai

14   requested on that score?

15         A.    I believe lately we would just put it in our

16   secure portal for him to review --

17         Q.    Okay.

18         A.    -- and then he would get back to us with any

19   comments or questions on it.

20         Q.    And did he, in fact, give you comments and

21   questions on tax returns?

22         A.    I believe so.

23         Q.    Yeah.  And is it fair to say that Mr. Alrai

24   took significant interest in his tax situation?

25         A.    Yes.

1    Q.   Did he -- did he seem to care about it, ask

2 questions about it, and provide you information about it

3 each year?

4    A.   Yes.

5    Q.   And it's fair to say he had a fairly complex

6 tax return for an individual?

7    A.   Yeah.  Yes.

8    Q.   Okay.  And, again, the question of FBARs never

9 raised, right?

10    A.   Correct.

11         MR. DAVIS:  Nothing further.  Thank you.

12         THE COURT:  Recross.

13         MR.  HARRINGTON:  I have no recross, your

14 Honor.

15         THE COURT:  You're all set, sir.

16         THE WITNESS:  Thank you.

17                (Witness excused.)

18         MR. DAVIS:  Next witness is Mr. Chaudhary.

19         And, your Honor, we do have the matter of the

20 motion.

21         THE COURT:  Is it docketed?

22         MR. DAVIS:  It's not.  I just have a -- I

23 actually wasn't sure, but I just brought a conventional

24 filing.

25         THE COURT:  Yeah, give it to the deputy clerk.

1          MR. DAVIS:  So it's a motion with a proposed

2     order.

3          It also has attached, your Honor, the letter

4     of authorization from the Deputy Assistant Attorney

5     General Acting in the criminal division.

6          THE COURT:  Thank you.  Yeah, I'm familiar

7     with the process.

8          MR. DAVIS:  And Mr. Nicholson is here

9     representing Mr. Chaudhary.

10         MR. NICHOLSON:  Good morning, your Honor.

11         THE COURT:  Has Mr. Harrington been given a

12     copy of this motion?

13         MR. DAVIS:  He's been shown it, yes.

14         I'm sorry.  Did you ask Mr. Nicholson or --

15         THE COURT:  Mr. Harrington.

16         MR.  HARRINGTON:  I was shown a copy of it by

17     counsel.  I have had a chance to review it, your Honor.

18         THE COURT:  You've had a chance?

19         MR.  HARRINGTON:  I have, Judge.

20         THE COURT:  Any objection?

21         MR.  HARRINGTON:  No.

22         THE COURT:  Let me just review it.

23         All right.  I'm signing the order.

24         Mr. Chaudhary is ordered to testify, compelled

25     to testify with immunity, pursuant to Section 602 of the

1    United States Criminal Code.  That's Title 18.

2              And I'm handing the order to the deputy clerk

3    to be docketed.

4              THE CLERK:  Thank you, Judge.

5              THE COURT:  You may proceed.

6              MR. DAVIS:  Mr. Munawar Chaudhary.

7              THE CLERK:  Good morning, sir.  If you'd like

8    to step this way, please.

9              THE COURT:  And he's here with counsel today?

10             MR. NICHOLSON:  Yes, your Honor.  Neil

11   Nicholson.  I'm here with Mr. Chaudhary.

12             THE COURT:  Thank you, Counsel.  So you've

13   advised your client that he is -- not only that he's

14   being compelled to testify, he can testify freely?

15             MR. NICHOLSON:  Yes, Judge, although I did

16   have one question.

17             On the order, it indicates that he needs to

18   first assert his Fifth Amendment privilege while he's

19   testifying in order for the order to go into effect.  I

20   don't know if I can assert that on his behalf or if you

21   would like him to assert that or if you just tell him

22   that the order is now in effect, he will go ahead and

23   testify.

24             THE COURT:  I'm comfortable with your

25   assertion on his behalf.

1          Are you, Counsel?

2          MR.  HARRINGTON:  I am, Judge.

3          THE COURT:  All right.  That's sufficient.

4          And you may testify with immunity.

5          MR. NICHOLSON:  Thank you, your Honor.

6          THE COURT:  Thank you, Counsel.

7          THE CLERK:  Mr. Chaudhary, please raise your

8    right hand.

9          **MUNAWAR CHAUDHARY**, having been first duly

10   sworn, testified as follows:

11         THE WITNESS:  I solemnly swear that I will

12   speak the truth, the whole truth, and nothing but the

13   truth.

14         THE CLERK:  Thank you.

15         For the record, please state your full name

16   and spell your last name.

17         THE WITNESS:  Munawar M. Chaudhary is my full

18   name and last name is C-h-a-u-d-h-a-r-y.

19         THE CLERK:  Thank you.  Please be seated.

20                    DIRECT EXAMINATION

21   BY MR. DAVIS:

22      Q.   Good morning, Mr. Chaudhary.

23      A.   Good morning.

24      Q.   Can I ask you to pull up a little closer to

25   the microphone and try to speak into the microphone when

1   you speak so it picks up your voice.

2        A.   Okay.

3        Q.   Okay?

4        A.   (Nods head.)

5        Q.   Now, Mr. Chaudhary, are you the father of the

6   defendant, Imran Alrai?

7        A.   Yes.

8        Q.   All right.  And where do you live?

9        A.   I live these days on 9 Corliss Road, Windham.

10       Q.   Okay.  And is that in the house of your son --

11       A.   Yes.

12       Q.   -- Imran Alrai?

13       A.   Yes.

14       Q.   Okay.  And please let me finish before you

15   answer so the court reporter can get the question and

16   the answer.  Okay?

17       A.   (Nods head.)

18       Q.   All right.  And are you a naturalized U.S.

19   citizen?

20       A.   Yes.

21       Q.   And when did you become a U.S. citizen?

22       A.   I'm -- I don't remember exactly, but it's -- I

23   think it's '14, 2014, around 2014 or '15.

24       Q.   Okay.  All right.

25       A.   Not -- 2014, most probably.

1          Q.    Okay.  And try not to speak too quickly.

2     Speak slowly.  Okay?

3          A.    (Nods head.)

4          Q.    All right.  Where were you born?

5          A.    I was born in Pakistan.

6          Q.    And what is your profession through your

7     career?

8          A.    Medical doctor.

9          Q.    Okay.  And when did you become a medical

10    doctor, approximately?

11         A.    1971.

12         Q.    And in what countries did you practice

13    medicine?

14         A.    Started my practice in -- I joined the service

15    in 1971 in Pakistan Army.

16         Q.    Okay.

17         A.    And then after six -- around five years plus

18    service in Pakistan Army, I got retirement and then I

19    went to Saudi -- I stayed in Pakistan for two or

20    three years after that and then I went to Saudi Arabia

21    and stayed there for 23 years with -- practicing in

22    Saudi Arabia.

23              THE REPORTER:  I'm sorry.

24         Q.    So you worked for 23 years in Saudi Arabia?

25         A.    23 years.

1        Q.    Okay.  So you're speaking a little fast.

2   Again, please slow down.

3        A.    I'll take care.

4        Q.    Okay?  Just go slow.

5        A.    All right.

6        Q.    Okay.  Did you ever practice as a doctor in

7   the United States?

8        A.    No, sir.

9        Q.    And when did you come to the United States

10  from Saudi Arabia?

11       A.    From Saudi Arabia, I went to Pakistan.

12       Q.    Okay.  And when you went to Pakistan, where

13  did you live?

14       A.    I lived in Lahore.

15       Q.    In Lahore, Pakistan?

16       A.    Yes.

17       Q.    And do you recall the address where you lived?

18       A.    My address?

19       Q.    Yes.

20       A.    162 -- I -- stayed in different places.  I --

21  when I came to Pakistan, I stayed in -- at different

22  places in the community.  And then in the community, I

23  built my house and then I shifted there, built my house,

24  and the address is 162C Multan Road, Multan Colony,

25  Lahore.

1      Q.   162C on that road in Lahore, correct?

2      A.   Uh-huh.

3      Q.   And did you come from there to the

4   United States?

5      A.   Yes.

6      Q.   And did you stay in Massachusetts after that?

7      A.   Yes, sir.  Yes.

8      Q.   And what year did you come to Massachusetts?

9      A.   I think 2008.

10     Q.   Okay.  And did you stay in an apartment --

11     A.   Yes.

12     Q.   -- that was owned by Mr. Alrai, your son?

13     A.   Yes.

14     Q.   And was that in Methuen?

15     A.   Yes, sir.

16     Q.   And then did you come to Windham,

17   New Hampshire, to live with him in his home?

18     A.   Yes.  I got sick and my wife got sick and then

19   we came on temporary basis there, but then we could not

20   go back because our conditions became worse every day.

21     Q.   All right.  So you stayed in New Hampshire

22   with Mr. Alrai --

23     A.   We are staying with him now because we cannot

24   stay alone now.  We need somebody to attend to us.

25     Q.   All right.  And did you -- when did you move

1    to Windham, New Hampshire, to live with your son?

2           A.    I don't remember.  Maybe two, three years.

3           Q.    Two, three years ago?

4           A.    Yeah, maybe.  I'm not sure, sir.  Maybe two --

5    three years.  Two, three years, most probably.

6           Q.    Okay.  Did you ever practice as a doctor in

7    the United States?

8           A.    No.

9           Q.    Okay.  And did you ever become trained in

10   information technology and computers?

11          A.    I don't have any formal training in

12   information technology.

13          Q.    Do you have any expertise in IT?

14          A.    No.

15          Q.    All right.  Now, I want to ask about your

16   income.  Since you've come to the United States, have

17   you been retired?

18          A.    Pardon me, sir?

19          Q.    Since you have come to the United States, have

20   you been retired?

21          A.    Retired?  What does that mean?

22          Q.    Meaning you're not working for pay.

23          A.    Yeah, no, I'm not working for pay.

24          Q.    Okay.  And that's been true since you came in

25   2008, I think you said --

1      A.   Yes, I did -- no, no job.

2      Q.   And you don't file income taxes that show you

3  earn income, correct?

4      A.   No, I don't have any income.

5      Q.   And you don't have any business income from a

6  business that goes to you; is that correct?

7      A.   I have a business, but I don't take salary

8  from that.

9      Q.   Okay.  And are you talking about DigitalNet?

10     A.   Yeah.

11     Q.   All right.  But you don't -- you don't get any

12 money from DigitalNet --

13     A.   No, no, I don't get any money from there.

14     Q.   Okay.  I think you just interrupted me again,

15 so please let me finish the question before you answer.

16 Okay?

17     A.   (Nods head.)

18     Q.   All right.  And do you know whether Mr. Alrai

19 claims you as a dependent on his tax form?

20     A.   I think so.

21     Q.   Okay.  And do you have a credit card?

22     A.   Yes.

23     Q.   And is that a personal credit card or a

24 business credit card?

25     A.   I have no knowledge.

1     Q.   Okay.  And do you know who pays the credit

2  card bill that comes?

3     A.   My son.

4     Q.   Okay.  He covers all your expenses?

5     A.   Yeah, he -- he's caring for us.

6     Q.   Okay.  All right.  Now, are you familiar with

7  a company called AISA or AISA Consulting Group?

8     A.   Yes.

9     Q.   And what is that?  What do you know about it?

10    A.   It's a company created by my son.

11    Q.   All right.  And what is it for?

12    A.   It's IT consulting.

13    Q.   IT --

14    A.   It's an IT, information technology, consulting

15  company.

16    Q.   Okay.  And do you know where it is

17 headquartered?

18    A.   Pardon me?

19    Q.   Where is the headquarters of the company?

20    A.   It doesn't have any headquarters yet.

21    Q.   Okay.  Does it have a rented office space?

22    A.   We -- they had a place, but they did not open

23 office there.

24    Q.   Okay.  And is that the address in Windham,

25 New Hampshire?

1     A.    Pardon me, sir?  I'm hard of hearing, as you

2   know, so I take -- I'm sorry.

3     Q.    It's fine.

4           Is the business address in Windham,

5   New Hampshire, the office?

6     A.    We -- we own a place in Windham.  We had

7   talked of opening of it here, but due to circumstances,

8   we couldn't open an office and the (indiscernible).  We

9   had to spend a lot of money on repair.  Now we have

10  rented it out.  We don't have office there.

11    Q.    Okay.  So --

12    A.    And --

13    Q.    Go ahead.

14    A.    Initially we wanted to open office there.

15    Q.    All right.  And is that at 31 Lowell Road

16  in --

17    A.    Yes.

18    Q.    -- Windham?

19    A.    Yes, sir.

20    Q.    So it's now owned, but being rented to another

21  company?

22    A.    Pardon me, sir?

23    Q.    It's now owned, but rented to another --

24  another company?

25    A.    Yes.  It is -- it is rented to somebody else.

1      Q.   All right.  And who owns the business -- who

2   owns the building?

3      A.   I think it's a trust that owns the building.

4      Q.   Okay.  And who is the beneficiary of the

5   trust, do you know?

6      A.   Probably my son or my daughter-in-law.

7      Q.   Okay.  It's not you, correct?

8      A.   I -- even I'm not sure of that also.

9      Q.   Okay.  And does AISA have any clients that you

10  know of?

11     A.   I don't know any information about his

12  clients.

13     Q.   Okay.  And do you know what year AISA was

14  founded?

15     A.   No.

16     Q.   And do you know where the name comes from,

17  A-I-S-A?

18     A.   Yes.

19     Q.   Can you explain that?

20     A.   I have two grandkids from Imran and my

21  daughter-in-law.  The first letter, A, is from Ahmed, I

22  is from Imran, S is from Saima, and A is from Ali.  It's

23  all four members of that family that makes AISA.

24     Q.   Okay.  Now, I want to ask you about another

25  company, DigitalNet Technology Solutions.  Are you

1    familiar with that company?

2         A.    That is my company.

3         Q.    Okay.  You say that's your company.  Do you

4    mean you own the company?

5         A.    I start -- I created this company in Pakistan.

6    I was the one responsible for this company and then

7    we -- when I moved to United States, we opened a -- we

8    got a certificate here, so it became an international

9    company.  Initially this was started in Pakistan.

10        Q.    You're saying you started a company called

11   DigitalNet in Pakistan?

12        A.    That's what I mean, yes.

13        Q.    And what year was that?

14        A.    Pardon me, sir?

15        Q.    What year?

16        A.    I think, I'm -- it's 2000 and -- 2006 and --

17   end of 2006, beginning of 2007.

18        Q.    All right.  And why did you form a company

19   called DigitalNet in Pakistan right before you were

20   moving to the United States to retire?

21        A.    My family, my kids, they are educated and

22   two of them, they have master's degrees in information

23   technology.  They're highly educated and my -- my

24   son-in-law, he's also very highly educated in

25   information technology.

1          So my daughter, she has a master's in

2    accounting and commerce, so for me it was easy to start

3    this business because I had support from my family

4    members and I have even more people to help me out.

5          Q.   Okay.  Now, what is your -- do you -- do you

6    own DigitalNet Technology in Pakistan?

7          A.   Yes.

8          Q.   You do?

9          A.   I started -- now I don't know who owns it

10   because I then wanted my son Imran to take over it.

11         Q.   Okay.  And did he --

12         A.   When DTS started, I was the owner and then

13   when I came here, I wanted Imran, my son, to take care

14   of it and run it.

15         Q.   All right.  And so did Mr. Alrai become the

16   owner and CEO of DigitalNet Technology in Pakistan?

17         A.   For particular purposes, yes, but, however, I

18   don't know today that -- who has the name as owner in

19   Pakistan on this day.

20         Q.   Okay.  So let me show you just a couple of

21   exhibits marked for identification.

22              Showing you first 884 for ID.

23              Now, do you recognize the signature on that

24   document?

25         A.   Yes.

1      Q.   And is that your son Imran Alrai's signature?

2      A.   Yes.

3           MR. DAVIS:  Your Honor, I move to admit 884 in

4  evidence and strike the identification.

5           MR.  HARRINGTON:  No objection, your Honor.

6           THE COURT:  Leave it up for a second.

7           THE WITNESS:  Pardon me, sir?

8           MR. DAVIS:  Sorry, your Honor?

9           THE COURT:  Leave it up for a second.

10          Thank you.

11          (Government's Exhibit 884 admitted.)

12     Q.   So, Mr. Chaudhary, you can see this letter is

13  dated November 11th of 2013?

14     A.   Yes, sir.

15     Q.   And it's an authorization letter to add

16  Jawad Munawar to an account --

17     A.   Yes, sir.

18     Q.   -- right?

19          And that's an account at NIB Bank.  Is that in

20  Lahore?

21     A.   Yeah.

22     Q.   "And he must be granted full access to operate

23  the account on behalf of the company."

24          Do you see that?

25     A.   Yes.

1      Q.    And is Jawad your son?

2      A.    Yeah, Jawad is my son.

3      Q.    Okay.  And Mr. Alrai is signing as CEO of

4   DigitalNet Technology Solutions, right?

5      A.    Yes.

6      Q.    So was that true, at least at that time in

7   2013, whatever was DigitalNet in Pakistan was run by

8   your son, not by you, correct?

9      A.    I was president of that -- I mean, I was

10   president.  He was CEO.  And he -- he gave this

11   authorization with mutual consent.  My -- Jawad Rahim is

12   managing the company there.  His master's also in IT,

13   he's a master in computer sciences with certification

14   from Microsoft and Cisco.  So, no, he's the one who is

15   managing the company there.

16              THE COURT:  Counsel approach.

17                      AT SIDEBAR

18              THE COURT:  This is fairly important testimony

19   and I can't understand him.  He doesn't speak well

20   enough English to testify in this trial.  Can you line

21   up somebody to be a translator, because this is

22   important testimony and I can't understand him.  I'm

23   reading along with what the reporter is gleaning, but,

24   you know, what the reporter's gleaning isn't the

25   evidence.  It's what I hear.  And I'm just -- I'm

1   struggling.

2          MR.  HARRINGTON:  And, to be honest, I'm not

3   trying to pile on, but I'm following like, you know, 50,

4   60 percent of what he's saying, but I'm having

5   difficulty as well.

6          THE COURT:  You're doing better than me.

7          MR. DAVIS:  Your Honor, an alternative would

8   be for me to completely ask yes or no questions, because

9   he does comprehend very well and he's a -- he's -- I

10  think that's proper under 611(c), because he's -- he's

11  identified with the defendant, but I think I can do

12  that --

13         So short answer is I don't have a translator

14  today.  We might be able to get one for tomorrow --

15         THE COURT:  Yeah.

16         MR. DAVIS:  -- and maybe that's the best way.

17         THE COURT:  It might be.  What do you think

18  about his suggestion about leading him?

19         MR.  HARRINGTON:  Again, I -- I just -- I

20  would be concerned that he would not be able to say what

21  he wants to say if he's just led through it.

22         THE COURT:  Right.  Because we always tell

23  witnesses they can answer yes or no, but they can

24  explain.  Like that last question was a perfect example

25  of when he was -- he wanted to answer your question sort

1    of with a yes but with an explanation and that's when I

2    kind of gave up because I couldn't understand the

3    explanation and I could tell he was trying to explain

4    it.

5              MR.  HARRINGTON:  Yup.

6              THE COURT:  He was basically trying to explain

7    that, yeah -- I think he was trying to say that the

8    defendant was the CEO, but he was trying to suggest that

9    he had some level of involvement himself and that -- and

10   he was explaining the content of the letter, and the

11   content of the letter was not what you were driving at

12   at all.  You were driving at that the defendant signed

13   it as CEO as of at that date.

14             MR. DAVIS:  Right.

15             THE COURT:  I'm just -- you know, I -- I don't

16   want to have a trial where I don't understand a

17   witness's --

18             MR. DAVIS:  Understood.  We can --

19             THE COURT:  I think -- I don't know.  I think

20   I might be able to understand it if it went slower, but

21   he's -- you know, he sees himself as somewhat of an

22   adversary to you, so he's not that focused on making it

23   slow and digestible to the Court and I'm not sure what

24   the best approach is.

25             MR. DAVIS:  And, honestly, your Honor, I

1  expected -- I expect to be impeaching him at different

2  times --

3           THE COURT:  Yeah.

4           MR. DAVIS:  -- based on prior statements.

5           THE COURT:  Right.

6           MR. DAVIS:  My -- my other thought is maybe

7  Mr. Nicholson could contribute to this.  I don't know,

8  Attorney --

9           MR.  HARRINGTON:  And I would add, too, that

10  given that likelihood of potentially impeaching him, it

11  might even make it more important that there's a

12  translator.

13          THE COURT:  Absolutely.  Because you're

14  impeaching him in a language that's not his first

15  language with -- probably with documents and some type

16  of statements that aren't in his first language that --

17  I just think that -- I think it -- I mean, I hate to do

18  anything that's going to make this interminable trial

19  longer.  I don't mean that as an insult; it's just long.

20  But I --

21          MS. LE:  Your Honor, can we find out what

22  language he speaks most comfortably in and then we can

23  inquire of the interpreter services whether we can have

24  an interpreter over the phone to do that kind of thing

25  versus bringing someone in.  It may be more difficult to

1    bring an interpreter into court to New Hampshire --

2             THE COURT:  I doubt it.  I doubt it's that

3    hard.

4             MS. LE:  Okay.

5             THE COURT:  I mean, yeah, you're -- well,

6    depending on the language --

7             MS. LE:  Right.

8             THE COURT:  -- of course, you're right.

9             MS. LE:  Yeah.

10            MR. DAVIS:  So, your Honor, could I propose we

11   break for -- that we break for lunch now and over the --

12   because I know DOJ has very good telephone service and

13   if we get the correct language, we could probably do

14   that as early as this afternoon.  If not, I'm hoping,

15   you know, tomorrow.  And then if -- we could also

16   inquire about getting an actual person in here.

17            THE COURT:  Yeah.  So what are you --

18            MS. LE:  Well, I was suggesting that because

19   the court also has an interpreter service --

20            THE COURT:  Yeah, we do.

21            MS. LE:  -- versus our contractors through

22   DOJ.  That's a different process altogether.

23            THE COURT:  Charli -- hold on a second.

24            Sir, what -- what is your native language?

25   You can sit.  What is your native language?

 1              THE WITNESS:  My mother language is Punjabi,
 2    but my language is Urdu.
 3              THE COURT:  Okay.
 4              THE WITNESS:  I'm multilingual, but --
 5              THE COURT:  What is your most comfortable
 6    language?
 7              THE WITNESS:  Urdu.
 8              THE COURT:  Urdu.
 9         Charli, do you know, do we have any access to
10    that?
11              THE CLERK:  I mean, we have a language bank,
12    but the government is required to provide an interpreter
13    for their witnesses.
14              THE COURT:  Yeah.  In a pinch, we can provide
15    one and send them a bill.
16              MS. LE:  Okay.
17              THE CLERK:  We can check with Erin Callahan.
18    She's the point of contract for that.
19              THE COURT:  All right.  Well, let's -- I think
20    your suggestion about taking a lunch break is a good one
21    to give you some time to try to regroup on this.
22              It is 12:10.  I've got a plea at 1:00, so it's
23    going to be kind of a longer break today.
24              Why don't we stop now and reconvene at 1:30.
25              MR. DAVIS:  All right.

1      MR. HUNTER:  All right.

2      THE COURT:  See what you can put together.  I

3  don't mean to be a pain, but --

4      MR. DAVIS:  No.

5      THE COURT:  All right.  All right.  So we're

6  in recess until 1:30 --

7      THE CLERK:  All rise.

8      THE COURT:  -- and let's get counsel here for

9  a moment.

10     (Mr. Nicholson joined the conference at sidebar.)

11     THE COURT:  I'd like Mr. Chaudhary's counsel

12  to please identify himself for the record.

13     MR. NICHOLSON:  Sure.  Neil Nicholson.

14     THE COURT:  We're just going to take the lunch

15  recess early and we're going to work on trying to get an

16  interpreter for your client.  You heard what I just

17  asked him.

18     MR. NICHOLSON:  Yes, I did.

19     THE COURT:  He said his most comfortable

20  language is Urdu, so we're going to try to line up an

21  interpreter because I can't understand him --

22     MR. NICHOLSON:  Okay.

23     THE COURT:  -- or enough -- I can understand

24  him, but not well enough to be the trier of fact on an

25  important witness like this.  So we're going to try to

 1   line up some kind of translation.

 2            MR. NICHOLSON:  Very good.

 3            THE COURT:  All right.  Or interpreter -- or

 4   an interpreter.

 5            So thank you.  So I wanted you to be aware.

 6   Can you explain that to your client?

 7            MR. NICHOLSON:  I will.  Thank you, Judge.

 8            THE COURT:  Thanks.

 9                    CONCLUSION OF SIDEBAR

10            THE COURT:  All right.  We're in recess.

11   1:30.

12            (Lunch recess taken at 12:11 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 4/10/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR