*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 9, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA                  \*
                                          \*   1:18-cr-192-JL
              v.                          \*   December 12, 2019
                                          \*   9:07 a.m.
IMRAN ALRAI                               \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



EXCERPT TRANSCRIPT OF JURY TRIAL
DAY NINE - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE




Appearances:


For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office




For the Defendant:         Timothy M. Harrington, Esq.
                           Timothy C. Ayer, Esq.
                           Shaheen & Gordon PA




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

```
1                    I N D E X

2

3    WITNESS:           Direct    Cross    Redirect    Recross

4
     TODD DONNELLY          3        18        51          52
5
     KEVIN KENNEDY         88       109       132         133
6
     JASON SGRO           135
7

8
     GOVERNMENT RESTS                                     55
9
     MOTION                                               64
10

11
     EXHIBITS                       FOR ID           IN EVD
12
     Government's 924                                     55
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2            THE CLERK:  The Court has before it for
3   consideration this morning day nine of the bench trial
4   in criminal case 18-cr-192-01-JL, United States of
5   America vs. Imran Alrai.
6            THE COURT:  All right.  Are we ready to
7   continue?
8            MR. DAVIS:  Yes.
9            THE COURT:  Please proceed.
10           MR. DAVIS:  Todd Donnelly.
11           THE COURT:  Good morning.
12           THE WITNESS:  Good morning.
13           THE COURT:  You're still under oath.
14           THE WITNESS:  Yes, your Honor.
15                CONTINUED DIRECT EXAMINATION
16  BY MR. DAVIS:
17      Q.   Good morning, Mr. Donnelly.
18      A.   Good morning.
19      Q.   Yesterday I asked you about June 12th, 2018,
20  and whether your gun was visible.  Do you recall that?
21      A.   I do.
22      Q.   And did you notify me yesterday that you
23  wanted to correct your testimony on that point?
24      A.   Yes, sir.
25      Q.   All right.  And what do you remember about
```

1   your weapon and whether it was visible on June 12th of

2   2018?

3       A.   Well, I had wanted to -- I had wanted to talk

4   to you about my answer.  It's quick -- I'm easy -- it's

5   easy for me to say that my weapon was not visible

6   because that's how I carry myself 95-plus percent of the

7   time.  So I just wanted to clarify my answer.

8           I still feel that it probably was not, but I

9   just did not want to leave it as an absolute because,

10   you know, there are occasions where it may be visible

11   and while I do not recall it being visible that day, I

12   would hate to say that, you know, it absolutely was not.

13   So ...

14       Q.   Okay.  So is it fair to say you -- you don't

15   recall today whether your weapon was visible on

16   June 12th?

17       A.   That's correct.

18       Q.   Is it also fair to say that it's your

19   practice, generally, not to have your weapon visible

20   when you're working?

21       A.   Yes.

22       Q.   Okay.  Now, I asked you yesterday, or I was

23   beginning to ask you, did you participate in the seizure

24   of assets shortly after June 12th of 2018?

25       A.   Yes, I did.

1    Q.    And, indeed, on that day itself?

2    A.    Yes.

3    Q.    And did you author and sign various affidavits

4    establishing probable cause that those assets were

5    proceeds of this scheme?

6    A.    Yes, sir.

7    Q.    All right.  And between June 12th and

8    July 27th of 2018, did you execute a number of warrants?

9    A.    I -- excuse me.  Between -- over that period

10   of approximately a month and a half, we executed five

11   seizure warrants pertaining to six bank accounts and one

12   investment retirement account that were under the

13   control of Mr. Alrai.

14   Q.    Okay.  Let's briefly go through those.

15         On June 12th of 2018, did you execute seizure

16   warrants at Pentucket Bank?

17   A.    Yes.  So there were three accounts at

18   Pentucket and those were DigitalNet accounts in the name

19   of DigitalNet.  Those accounts had a combined total of

20   $979,000 and -- the approximate total -- and that's what

21   was seized on that day, yes.

22   Q.    So DigitalNet had almost a million dollars

23   cash at Pentucket on June 12th, correct?

24   A.    Yes, sir.

25   Q.    And was one of those accounts the so-called

1  DigitalNet operating account that ends in 2684?

2      A.   Yes, it was.

3      Q.   All right.  On July 13th of 2018, did you go

4  to a different bank?

5      A.   Yes.  So the second seizure warrant was served

6  on Citizens Bank.  That was an account that was in the

7  name of AISA Consulting Group.  That account was opened

8  approximately a year prior, in July of 2017.

9          The same month that it was opened, Mr. Alrai

10  deposited a check of $1 million that was drawn off his

11  Pentucket account in the name of AISA Consulting and

12  deposited that into the Citizens Bank account.

13          That account remained dormant for

14  approximately a year or up until June 20th of 2018.  So

15  approximately a week after we served the seizure

16  warrants, Mr. Alrai went into the bank, as we've heard

17  testimony prior, and withdrew a half a million dollars

18  from that account in the form of two bank checks.

19      Q.   So what was left in the Citizens Bank AISA

20  account on July 13th of 2018?

21      A.   Approximately $456,000.

22      Q.   And did you seize that?

23      A.   Yes, sir.

24      Q.   Directing your attention to July 23rd of 2018,

25  was there a warrant or a freezing of assets at a

1    Pershing account?

2        A.    Yes, there was.   Pershing LLC is an investment

3    company in New Jersey and that account was opened by

4    Mr. Alrai in 2014.   That was an IRA.   And my -- the

5    affidavit on my seizure for the seizure warrant would

6    reflect that approximately $263 (sic) that had been

7    deposited into that account over the course of

8    approximately four years from 2014 to 2018 would

9    represent proceeds of illicit funds.

10           I believe the seizure warrant was for $212,000

11   and the reason for that is -- so when the account was

12   opened in 2014, it was done so with two checks and the

13   source of those two checks came from two different

14   accounts.   One of those accounts was Mr. Alrai's 401(k)

15   with Fidelity from the Robert Allen Group from his time

16   working at Robert Allen; the other check of

17   approximately 51,000 came from a Pentucket account.   So

18   when the account was opened in 2014, it had a balance of

19   I believe it was approximately $84,000.

20           The following four years, Mr. Alrai would

21   annually deposit between 51 and $54,000 into that

22   account from Pentucket, from the AISA Pentucket account

23   that was funded through DigitalNet.

24           So the -- the difference between the two 12

25   and the 263 is that first check or the -- or in 2014,

1    the first deposit, we did not touch the money that was

2    rolled over from the Robert Allen Group.  I did

3    incorporate the 51,000 from Pentucket.

4            So that's -- and I question whether or not

5    that should still be a part of it today, but ...

6        Q.    In any event, the money from the Robert Allen

7    Group 401(k) was not touched, correct?

8        A.    Yes, sir.

9        Q.    So what was the total amount frozen at

10   Pershing in July of 2018?

11       A.    Approximately $212,000.

12       Q.    And did you also go to Service Credit Union on

13   July 27th?

14       A.    Yes.  So the -- the final two seizure warrants

15   were on two different credit unions, Service Credit

16   Union and Bellwether Community Credit Union.  And those

17   accounts were both opened, again, shortly after the --

18   the search warrants were served on June 12th.  Service

19   Credit Union, I believe was opened on June 27th;

20   Bellwether on June 20th, the same day that the money was

21   withdrawn from Citizens Bank.

22            So when Mr. Alrai withdrew the half a million

23   dollars from Citizens Bank in the form of two checks in

24   the amount of $250,000, he proceeded to deposit those

25   funds into the two credit unions, Bellwether, which was

1   opened on, again, on the 20th, the same day that he

2   withdrew the funds, had two accounts opened, a savings

3   and a checking, and both of those accounts had a CD

4   attached to them.

5          Mr. -- the accounts were joint accounts in the

6   name of both Mr. and Mrs. Alrai and the CDs that were

7   attached to the checking and savings at Bellwether had

8   beneficiaries of their two children.  And those accounts

9   had -- the 250 deposited into Bellwether was split

10  between the CDs for those two accounts, 125 in each.

11         I believe the -- the account overall was

12  opened with approximately 300,000.  We only seized the

13  250 that was transferred from Citizens Bank.

14         Likewise, with the Service Credit Union

15  accounts, that was opened with -- there was three

16  accounts with Service Credit Union and there was

17  approximately $350,000 deposited into those accounts.

18         One of those accounts also had a CD attached

19  that had $300,000 in it and we seized 250,000 of that,

20  again representing the proceeds from the Citizens Bank

21  account.

22     Q.   All right.  So, all told, between June 12th

23  and July 27th of 2018, how much in proceeds did you

24  seize?

25     A.   Between 2.1 and $2.2 million, approximately

1    2,148,000, I believe.

2        Q.    All right.  Did you also participate in -- in

3    civil forfeiture actions involving lis pendens against

4    real estate?

5        A.    Yes, sir.

6        Q.    And, briefly, what were the real estate

7    properties and what were the lis pendens filed?

8        A.    So the two properties were 9 Corliss Drive

9    in Windham, which is Mr. Alrai's residence, and

10   21 Hampshire Road, Unit 115, in Methuen, which is his

11   prior address.

12           These properties were both owned by Mr. and

13   Mrs. Alrai.  The Methuen property was purchased in 2006

14   and at that time, two mortgages were taken out against

15   the property which totaled approximately $248,000.

16           The 9 Corliss Road property was purchased in

17   2011 with one note against that property for

18   approximately $403,000.

19           All three notes pertaining to these properties

20   were discharged between June of 2014 and January of

21   2015.  The Methuen property, both of those notes, one in

22   June, I believe the other one in January, when those

23   were discharged, I traced back approximately $221,000

24   of the proceeds pertaining to that note as being licit,

25   whereas 9 Corliss Drive property, that note, which

1   was -- which was discharged in June of 2014,

2   approximately three years after its origination, only

3   60 -- I think it was 61-, 62,000 -- I don't remember the

4   exact amount, I think it was 62 -- was traced back to

5   illicit proceeds.

6           And the reason for that -- as the reason for

7   that being that it was only 61 when the note was much

8   higher is that I believe most of the proceeds that went

9   into paying off that note came from Mr. and Mrs. Alrai's

10  salary.

11       Q.   Okay.  And, again, that was the -- the salary

12  amounts were not treated as fraud proceeds, correct?

13       A.   That's correct.

14       Q.   All right.  I want to ask you just about some

15  documents briefly.  Let's look at Exhibit 144,

16  pertaining to Count 44, one of the money laundering

17  counts, and the check page, which is following.

18           And the bottom check is to Pershing, LLC?

19       A.   Yes.

20       Q.   All right.  And I'll ask you to look at the

21  word Pershing as it's written, handwritten, on the

22  check.  Do you see that?

23       A.   I do.

24           MR. DAVIS:  Can you blow that up, please,

25  Ms. Sheff, further?  Are you able to like double all

1    that?

2              MS. SHEFF:  I don't think so.  Let me see.

3    Maybe.

4         Q.   I want to ask you about the letter G in that

5    word.  Do you see the G in Pershing, Agent Donnelly?

6         A.   Yes, sir.

7         Q.   And do you notice anything distinctive about

8    that G?

9         A.   I -- I think that --

10             MS. SHEFF:  Let me see if I can make it

11   bigger.

12        A.   I would say the G in itself is distinct the

13   way that it's written.

14        Q.   And what about in particular?  What feature of

15   the G would you point out as saying, well, that's kind

16   of unusual?

17        A.   Kind of the right angle that goes straight

18   down and over.

19        Q.   Okay.  That -- that line that goes down sort

20   of below it, right?

21        A.   Yes.

22        Q.   All right.  Let me show you Exhibit -- and

23   this check, by the way, is signed by Mr. Alrai, correct,

24   the Pershing, LLC --

25        A.   Yes, sir.

1      Q.    -- check?

2            All right.  So let's look at Exhibit 145 and

3      the checks associated with 145, and particularly the one

4      to New View Landscaping for $27,000.  Do you see that?

5      A.    I do.

6      Q.    And is that one signed by what looks like

7      Mac Chaudhary's signature?

8      A.    Yes, sir.

9      Q.    But look at the word landscaping.  Do you see

10     the G in that?

11     A.    Yes.

12     Q.    And what do you see about it?

13     A.    It's the same as the Pershing.

14     Q.    All right.

15           THE COURT:  Are you talking about the fact

16     that it looks like basically like a C with a sharp

17     90-degree right angle drawn, you know, on and to the

18     right?

19           MR. DAVIS:  Yes.

20           THE COURT:  Yeah.  And that goes -- that it

21     dips below the line on which the words are written,

22     yeah.  That's your point?

23           MR. DAVIS:  Yes.

24     Q.    And just one more document.  I want to go to

25     Exhibit 201 and page 563 of 201.

1          Did you seize in this case a set of journals,

2    business journals, of Mr. Alrai's?

3          A.    Yes, sir.

4          Q.    And did those journals have lots and lots of

5    handwriting of Imran Alrai in them detailing different

6    meetings and events?

7          A.    Yes, hundreds of pages.

8          Q.    All right.  So if we go to the -- we see on --

9    do you see page 563?

10         A.    Yes.

11         Q.    And do you see the word meeting at the top?

12         A.    Yes.

13         Q.    And what do you notice about the G in meeting?

14         A.    Well, it goes straight down like all the other

15    Gs.

16         Q.    All right.  And next -- next time meeting

17    comes up on that same page?

18         A.    Once again.

19         Q.    All right.  And next meeting on that page?

20         A.    Appears the same.

21         Q.    All right.  And there's no question that this

22    handwriting is the defendant's, correct?

23         A.    That's correct.

24         Q.    All right.  Now, Special Agent Donnelly, did

25    you do anything in terms of investigative work -- well,

1    I'm sorry.  Let me -- let me start with Exhibit 610.

2            And do you recall that references were

3    provided to United Way that had some names of

4    references?

5        A.   Yes.

6        Q.   All right.  And can we scroll down in 610 a

7    little further to the names of the references?  These

8    were provided by Mohammad, correct?

9        A.   That's correct.

10           MR. DAVIS:  All right.  Keep going.  Those are

11   principals, please.  I think it's the next page.  Here

12   we are -- you were there.  Go back one.

13           Okay.  At the top of that page, can we

14   highlight that?

15       Q.   And do you see that name?

16       A.   Steve R. Anderson.

17       Q.   And what is his office?

18       A.   CEO, AISA Systems Corporation, Fairfax,

19   Virginia.

20       Q.   With a phone number, correct?

21       A.   Yes.

22       Q.   And you heard the testimony that Pat Latimore

23   had some difficulty tracking him down, but thinks she

24   spoke to him or spoke to someone who gave a good

25   reference for DigitalNet, right?

1      A.   That's correct.

2      Q.   Now, did you as the case agent in this case

3   make any effort to identify something called AISA

4   Systems Corporation?

5      A.   Yes.

6      Q.   In Fairfax, Virginia?

7      A.   Yes.

8      Q.   And what did you find?

9      A.   Well, there was an AISA Systems Corporation,

10  as we've learned, that was established in Fairfax, but

11  not much else.

12     Q.   All right.  And that AISA Systems -- that AISA

13  Corporation was not AISA Systems Corporation, right?

14     A.   No.

15     Q.   It was just called AISA Corporation?

16     A.   Correct.

17     Q.   And showing you briefly 208, Exhibit 208 in

18  evidence, and the next page.  Any other page here?

19          MS. SHEFF:  I'm sorry.  My mouse is not

20  cooperating.

21          MR. DAVIS:  The mouse is cold.

22     Q.   And this shows that there was an AISA

23  Corporation in Virginia, right?

24     A.   Yes, Reston.

25     Q.   And that -- and there's a letter in Virginia

1    dated July 27th, 2004, with an effective date of the

2    certificate of incorporation?

3         A.   Yes.

4         Q.   But the person forming that corporation is

5    who?

6         A.   Imran Alrai.

7         Q.   At an address in Reston, right?

8         A.   That's correct.

9         Q.   So there is an AISA -- AISA Corporation, or

10   was, but did you find any other AISA Corporation that

11   had lots of employees and global business and various

12   officers?

13        A.   No, sir.

14        Q.   And what did you do to try to find it?

15        A.   We did a lot of open and closed source

16   searching.  We checked many databases, but -- you know,

17   as we did Mr. Anderson, it was -- there was nothing

18   there.

19        Q.   Okay.  And so, lastly, did you specifically

20   try to find Steve R. Anderson, who was the CEO of AISA

21   Corporation?

22        A.   Yes, also referred to as Steve Rampal Anderson

23   in other documents.  We did many searches, again, open

24   and closed source.  I went through a lot of passport

25   applications as well to see if I might be able to find

1    one there.  But no, we did not find a Steve Anderson.

2            Steve Anderson is a very common name and

3    oftentimes it can become very cumbersome to go through

4    hundreds of names.  But in the end, we have not found a

5    Stephen R., Steve Rampal Anderson, that would fit this

6    investigation.

7            MR. DAVIS:  Nothing further.  Thank you.

8            THE COURT:  Thank you, Counsel.

9            Cross-examination.

10                    CROSS-EXAMINATION

11   BY MR. HARRINGTON:

12       Q.   Good morning, Agent Donnelly.

13       A.   Good morning, sir.

14       Q.   How are you doing this morning?

15       A.   I'm doing well.

16            MR. HARRINGTON:  Ms. Sheff, could you pull up

17   Exhibit Number 886.  And if you could go to -- it has

18   Bates 890 on it.  I don't know what page it is.

19            Thank you.

20       Q.   So, Agent Donnelly, I'm going to ask you a few

21   questions and if at any time you need me to rephrase it

22   because you're not understanding what I'm asking, please

23   do so.  Okay?

24       A.   Sure.

25       Q.   And, likewise, if I need to repeat anything or

1   clarify anything for you, please make sure you ask me to

2   do that.  Okay?

3       A.   Yes, sir.

4       Q.   So do you recall looking at Exhibit 886

5   yesterday?

6       A.   Yes, sir.

7       Q.   And there were a number of pages you looked

8   at, so if you need to look at anything else on this

9   exhibit, please indicate that and we'll have Ms. Sheff

10  bring it up for you.  Okay?

11      A.   Sure.

12      Q.   I wanted to focus on this particular page.

13  This is the Acceptance by Trustee that you indicated was

14  signed by Mr. Chaudhary, correct?

15      A.   Yes.

16      Q.   Okay.  And this is something that is a

17  notarized document, correct?

18      A.   Yes.

19      Q.   Okay.  And in your experience, what that

20  typically means is that when a notary signs off on

21  this -- and you can see that there was a notary that

22  signed off on it, right?

23      A.   Yes.

24      Q.   And it has the notary's commission and the

25  date it expires, correct?

1        A.    It appears that way.

2        Q.    Okay.  And the notary seal appears to be

3   within its appropriate time frame, October 26th, 2016 --

4   I'm looking at this particular section here.

5        A.    Yes.

6        Q.    Okay.  And that obviously is within the time

7   frame in which the signature would have been put on it,

8   correct?

9        A.    That's correct.

10        Q.    Okay.  And in your experience, when somebody

11   executes a document like this and it's notarized, the

12   typical process would be for that person to appear in

13   person and swear oath that the content is true to the

14   best of their knowledge and belief, correct?

15        A.    Typically, yes.

16        Q.    Okay.  And so as far as you know from looking

17   at this document, Mr. Chaudhary signed this document and

18   swore an oath to the content; is that fair to say?

19        A.    I mean, I really have no idea.  Based on the

20   document itself, I guess one could come to that

21   conclusion, but I really couldn't testify to that.

22        Q.    Okay.  But based on the view of the document

23   and the notary and your understanding of how a notarized

24   process would take place, that would be the typical

25   process as you understand it, right?

1        A.    Sure.

2        Q.    A notary isn't supposed to notarize something

3    unless the person appears personally and swears oath

4    that it's true to the best of their knowledge and

5    belief.  That's your experience, correct?

6        A.    That's my understanding.

7              MR. HARRINGTON:  Okay.  And, Ms. Sheff, could

8    you pull up side by side Exhibit Number 145 and go down

9    a couple of pages to the check section.

10             And if you could pull up this one here and

11   blow that one up, check number 1864, I think it is.

12   Yes, correct.

13             And is there any way, Ms. Sheff, that you're

14   able to kind of move -- shrink this a little so the

15   signatures on each document can be viewed by the

16   witness?  Or perhaps -- I don't know if you go out of

17   this and just highlight the signature section.

18             MS. SHEFF:  Okay.  You want it to be larger?

19             MR. HARRINGTON:  If you can, Ms. Sheff.

20             Okay.  And actually, why don't you bring that

21   down.  I'm just going to go with what's on each page and

22   I'll have the witness look at what's on the page.

23       Q.    So if you look at this signature over here

24   first, correct --

25       A.    Yes.

1      Q.    -- and then this signature over here.  Based

2   on your review of that, do you notice anything kind of

3   distinct about the signature?

4      A.    They appear very similar.

5      Q.    Okay.  And one of the things that is kind of

6   unique to it is you notice there's a little kind of dash

7   or slash, kind of at the end of the signature?

8      A.    Yes.

9      Q.    There's also kind of a little flurry at the

10  end, kind of going up like that?

11     A.    Yes.

12     Q.    And I think, as you've already indicated, it

13  would appear that these signatures are very similar to

14  each other, in your opinion?

15     A.    Yes.

16     Q.    Okay.  And if you were to make an opinion on

17  it -- obviously we know you're not a handwriting expert,

18  right?

19     A.    Correct.

20     Q.    Okay.  But in viewing that and looking at it,

21  you would indicate that that would appear to be signed

22  by the same person; it looks like a very similar

23  signature?

24     A.    Yes.

25              MR. HARRINGTON:  Ms. Sheff, you can take those

1   documents down.  Thank you.

2            And, Ms. Sheff, if you could pull up again

3   check number -- excuse me, Exhibit 145 and go to the

4   check section, please.  And if you could bring up this

5   check?

6            MS. SHEFF:  Which one?

7            MR. HARRINGTON:  The middle one.  I apologize.

8   Yup.

9        Q.   You were -- you recall being asked about this

10  check by Mr. Davis, correct?

11       A.   Yes.

12       Q.   And you were asked about the letter G and you

13  talked about how the -- the similarities in that,

14  correct?

15       A.   Yes.

16       Q.   Okay.  And the similarities were relative to

17  this section of the check kind of being filled out and

18  your comment on the G and you compared that to some

19  other documents, correct?

20       A.   Yes.

21       Q.   Okay.  And the idea being that Mr. Alrai may

22  have wrote out or filled out this middle section of the

23  check; that's the idea, right?

24       A.   Yes.

25       Q.   Okay.  And that certainly could have been.

1           And then in connection with the execution of

2   this check, we see this signature that you've already

3   indicated appears to be consistent, appears to perhaps

4   have been signed by Mr. Chaudhary?

5       A.   Yes.

6       Q.   Okay.  And so that certainly wouldn't be

7   something that would be out of the realm of what could

8   be reasonably thought of about this check, that perhaps

9   Mr. Alrai does fill out this middle section, talks with

10  his father about it, and then his father signs the

11  check, right?

12      A.    Right.

13           MR. HARRINGTON:  You can take that check down,

14  Ms. Sheff.  Thank you.

15      Q.   I want to ask you -- I'm going to switch gears

16  now, Agent Donnelly, to a different subject.

17           You had spent some time with the prosecutor

18  yesterday talking about the interview with

19  Mr. Chaudhary, right?

20      A.   Yes.

21      Q.   Okay.  And some of the things that you've

22  indicated to the judge you believe were said during I

23  believe it was the June 12th, 2018, interview you had

24  with him, correct?

25      A.   Yes.

1      Q.   And also a February 7th, 2019, interview

2    during a proffer, correct?

3      A.   Yes.

4      Q.   Okay.  So I want to talk a little bit about

5    that.

6           In regard to the June 12th interview that you

7    did, you indicated that you go to the residence.  How

8    many agents went to the residence that day?

9      A.   There were many.  I don't recall how many.

10     Q.   And you don't have to give me a specific

11   number.  I'm looking kind of for your best recollection.

12     A.   Yeah.

13     Q.   Because the question is, you know, there would

14   obviously be a difference between if it was you and

15   Ms. Laroe versus if it was -- and I may be

16   mispronouncing her name.

17     A.   Laroe.

18     Q.   Laroe.  I apologize.

19          There would be a difference if there was you

20   and Ms. Laroe versus you, Ms. Laroe, and maybe, you

21   know, a dozen other agents, right?

22     A.   Right.

23     Q.   So as best you can recall, how many agents do

24   you think were there, aside from you and Ms. Laroe?

25     A.   Yeah, there was probably a dozen or more.

1    Q.   Okay.  So while this is going on, and while

2    you're interviewing Mr. Chaudhary, there are about a

3    dozen other agents.  Are these all FBI agents?  Are they

4    Homeland Security?  Is it a mix of both?

5    A.   It's a combination.

6    Q.   Okay.  And I'm not going to ask you to tell

7    me, you know, how many of which, but in regards to these

8    agents, were they dressed in a way that would identify

9    themselves?

10   A.   For the most part, yes.

11   Q.   And how was that that they would identify

12   themselves?  Is it the kind of common thing that we see

13   with like the windbreaker?

14   A.   Yes.

15   Q.   Okay.  And that windbreaker would have like an

16   ID tag, like on the front breast, right?

17   A.   Sure.

18   Q.   And then big kind of globe letters on the back

19   of it identifying the agency, right?

20   A.   Yes.

21   Q.   Okay.  And for FBI, obviously, it's FBI; for

22   Homeland Security, what would be the badge or the --

23   A.   HSI.

24   Q.   HSI.  Okay.  And, additionally, would you

25   agree with me that the -- those agents, those dozen or

1    so agents, in addition to that, did they have badges

2    displayed like neck badges or badges on their vests?

3           A.    It's possible.

4           Q.    Okay.

5           A.    It would not be uncommon.

6           Q.    Okay.  And in regard to, you know, how they

7    would also have been dressed, were they wearing any type

8    of tactical gear like bulletproof vests?

9           A.    Again, that would not be uncommon.

10          Q.    Okay.  And firearms on their sides?

11          A.    Sure.

12          Q.    Okay.  And, additionally, would they have a

13   tactical belt, bullets, handcuffs, things of that nature

14   on a tactical belt?

15          A.    They could, yes.

16          Q.    Okay.  Let me ask you in regard to when the

17   search warrant's being executed, would it be fair to say

18   that as this is being executed, there are a lot of

19   things that the agents are actually taking out of the

20   house; computer equipment, right?

21          A.    Well, later on; not initially, no.  Upon the

22   initial execution, we were just securing the scene and,

23   you know, we don't really begin the search until a while

24   later.  But eventually things are taken out, yes.

25          Q.    Okay.  And that would involve all of the

1    agents kind of going in and out of the house, right?

2         A.    Yes.

3         Q.    Going through different rooms, things of that

4    nature, right?

5         A.    That's correct.

6         Q.    Okay.  And in regard to how you were dressed,

7    I appreciate the information that you gave early this

8    morning about you're not sure if your firearm was --

9         A.    Exposed.

10        Q.    -- exposed or could be seen by Mr. Chaudhary.

11   Basically, you're not sure.  It could have, he indicated

12   he saw it, you wouldn't dispute that, right?

13        A.    That's fair.

14        Q.    Okay.  And in addition to that, you had

15   indicated that you were dressed, I think you said kind

16   of casually or corporate casual, is that the word you

17   used?

18        A.    Business casual.

19        Q.    Okay.  Did you have a badge displayed like a

20   neck badge?

21        A.    I doubt it.

22        Q.    Okay.  And how about a windbreaker identifying

23   the agency that you were with, HSI?

24        A.    Probably not.  I believe I just had on a

25   collared shirt and khakis.

1     Q.    Okay.  And did you have anything else on,

2   aside from the collared shirt?

3     A.    No.  So, I mean, this warrant, I knew what

4   my -- you know, what I needed to do during this warrant.

5   We had a good idea that Mr. Chaudhary was going to be

6   home.  Myself and another agent were planning on

7   interviewing him.  I was not part of the initial team

8   that went in to secure the residence, to search the

9   residence.  You know, my mission was to talk to

10  Mr. Chaudhary.

11          So I don't -- I typically don't wear a lot

12  of that stuff.  I mean, it depends on what I'm doing.

13  So ...

14    Q.    And so you indicated you believe you were

15  wearing khakis and a shirt, right?

16    A.    Yes.

17    Q.    Were you wearing a sport coat?

18    A.    I don't think so.

19    Q.    Okay.  Where would your firearm be located on

20  your person?

21    A.    Well, that depends.  I often will wear it

22  on my ankle.  Sometimes -- sometimes I will wear it on

23  my -- on my side and, you know, if that's the case, I

24  would have had my badge next to it, not around my neck.

25    Q.    Okay.  And so in this particular case, you're

1  wearing the corporate casual.  If you don't have a coat

2  or windbreaker or anything like that on and you have

3  your firearm, that's going to be on your belt or your

4  ankle, you've indicated?

5      A.   Uh-huh.

6      Q.   And if it's on your belt, you're also going to

7  have your badge next to it.  So it wouldn't be covered

8  up or concealed if you don't have a sport coat or

9  windbreaker on, right?

10      A.   Right.  And I don't want to say -- I'm pretty

11  confident I didn't have a jacket on.  I can't say for

12  sure.  There's always a chance.  But I remember, you

13  know, it was a warm day out, so -- you know, it was in

14  June, so probably --

15      Q.   Okay.

16      A.   I'm guessing I did not.

17      Q.   Now, let me ask you this.  And it -- in regard

18  to your role there today, you indicated specifically

19  that you knew your -- one of your functions there, and

20  it sounds like your prime function, was going to be to

21  interview Mr. Chaudhary; is that right?

22      A.   Yes.

23      Q.   Okay.  And in that regard, how long had you

24  been taking to kind of prepare in executing the search

25  warrant and knowing that you were going to interview

1    Mr. Chaudhary, how many days or weeks went into that

2    before you got there on June 12th?

3         A.   It happened very quickly, you know, we had the

4    meeting with United Way in late May, spent a lot of time

5    afterwards drafting search warrants and the seizure

6    warrants to execute.  There wasn't a whole ton of

7    preparation just going into simply interviewing

8    Mr. Chaudhary, to be honest with you, because there

9    wasn't time for it.

10        Q.   Yeah, and I'm not necessarily talking about

11   preparation time.  I'm talking about you knew your role

12   going in, at least for several days before you actually

13   went on June 12th, that you intended personally to

14   interview Mr. Chaudhary.

15        A.   Yeah, I don't remember when we developed the

16   plan, if it was several days, the day or two before.  I

17   really don't recall.

18        Q.   Okay.  Fair enough.

19             In regard to that, the interview that you did

20   with him that day, did you ever ask him to provide a

21   written statement of -- kind of going over like you

22   interview him and say, hey, I'd like you to reduce this

23   down to a written statement; did you do that?  You

24   didn't ask him to provide a written statement in this

25   case, right?

1      A.    No.

2      Q.    Okay.  In regard to recording statements, you

3  heard -- obviously you were in the courtroom, you heard

4  some questions that I had asked about other witnesses

5  and recording interviews.

6            I'm assuming -- does Homeland Security have

7  that same issue; you have to get permission in order to

8  record or can you record at your discretion?

9      A.    We can generally record at our discretion.

10     Q.    Okay.  So unlike the FBI, Homeland Security --

11  and, in particular, you -- don't have to go and get

12  preapproval or permission to do that; that's your

13  testimony, correct?

14     A.    Yes.

15     Q.    And, in this case, there was no recording made

16  of Mr. Chaudhary, correct?

17     A.    No.

18     Q.    Okay.  And you would agree with me that at the

19  proffer on February 7th, there was no recording made of

20  the proffer session either, correct?

21     A.    No.  I kind of wish there was now, but no,

22  there was no recording.

23     Q.    Okay.

24     A.    Yeah.

25     Q.    And obviously -- and I appreciate the candor

1     about you kind of wish there was because what I'm

2     driving at and what I think the judge has already said,

3     you know, he understands, is that the recording of that

4     would obviously be the best evidence of the questions

5     that were asked and the answers that were given, right?

6          A.    Sure.  And, you know, I obviously said that

7     somewhat tongue in cheek and I will say it's not our

8     general practice to record interviews.  We did in a

9     couple of instances in this investigation because we

10    were traveling out of state to, you know, Missouri and

11    Ohio and those were nearly full-day interviews.  So, you

12    know, that's why I took the liberty to record those

13    interviews.  But outside of that, I would say generally

14    we do not record any interviews with witnesses.

15         Q.    And, actually, you kind of beat me to the next

16    question I was going to ask you, which is you actually

17    did do recorded interviews in this case of some

18    witnesses?

19         A.    Yes, sir.

20         Q.    Okay.  And that was, in part, because some of

21    those interviews were lengthy, right?

22         A.    Lengthy and out of -- and they were a long

23    ways away.

24         Q.    Okay.

25         A.    Yes.

1     Q.   And you would agree with me Mr. Chaudhary's

2  proffer was somewhat lengthy; I think you indicated

3  yesterday that it lasted approximately three hours or

4  so, right?

5     A.   Yes, but I will also say that I -- I -- my

6  practice in other proffers, many of which are just as

7  lengthy and even longer, is not to -- not to record

8  them.

9     Q.   Sure.  Understood.

10        In regard to the proffer on February 7th,

11  whose job was it or whose role was it to take notes of

12  the interview?

13     A.   Special Agent Laroe.

14     Q.   Okay.  And how were those notes taken?  Did

15  you observe how they were taken?

16     A.   I didn't watch her take them.  I mean, she was

17  sitting next to me taking them, but --

18     Q.   Yeah.  And how?

19     A.   -- we don't really discuss that.

20     Q.   No, I'm talking about the manner in which the

21  notes were taken.  Like what did she do?  Was it pen and

22  paper and --

23     A.   Yes, I believe it was pen and paper.

24     Q.   Okay.  And so in this particular case,

25  obviously it went from pen and paper, being written

1   down, to being formalized in a typewritten narrative,

2   correct?

3        A.   Yes, sir.

4        Q.   Okay.  And your name is actually on that as

5   well as Ms. Laroe's and Ms. Cacace's, right?

6        A.   Yes, I reviewed and read the 302.

7        Q.   Okay.  And so that's done on February 7th.

8   And then is it accurate -- we've heard testimony

9   about -- from Mr. Chaudhary and I think yourself as

10  well, I don't recall if Ms. Laroe said anything about

11  it -- but the next time that Mr. Chaudhary sees this

12  narrative that has been typewritten now of the

13  February 7th proffer is I think he indicated

14  November 21st of 2019.  Is that your recollection as

15  well?

16       A.   It's my understanding.  I was not there.

17       Q.   Okay.  And then based on that, once that was

18  provided, this narrative report summarizing the proffer,

19  you would agree with me that Mr. Chaudhary made numerous

20  corrections to that document and returned it to the U.S.

21  Attorney's Office, correct?

22            MR. DAVIS:  Objection, hearsay.

23            THE COURT:  Yeah, the basis would be hearsay,

24  wouldn't it?

25            MR. HARRINGTON:  I'm not asking actually for

1    the substance of the actual statements, Judge, or the

2    corrections.  I'm asking him if he's aware that the

3    defendant made corrections.  Defendant has actually

4    already testified -- excuse me -- Mr. Chaudhary has

5    already --

6                THE COURT:  Sure.  I think he sat there for

7    that.  So if that's the basis of his awareness, I don't

8    know how that's objectionable.

9                MR. HARRINGTON:  Well, not necessarily just

10   that, but if he was aware of it before as well, Judge,

11   because he sat in on the proffer, his name is on the

12   report, and --

13               THE COURT:  Sure.

14               MR. HARRINGTON:  I'm asking him if he is aware

15   that corrections were made to that.

16               THE COURT:  Overruled.

17               MR. DAVIS:  No objection to that question.

18               THE COURT:  Objection to that question?

19               MR. DAVIS:  I don't object to ask Special

20   Agent Donnelly if he's aware --

21               THE COURT:  No objection to that question.

22               MR. DAVIS:  No objection.

23               THE COURT:  Got it.  Okay then, go ahead and

24   answer if you understand what's going on here.

25          Q.   If you need me to repeat the --

1      A.    I got a little bit confused there, so why

2  don't we rephrase it.

3      Q.    Let me repeat the question.

4            So you are aware that Mr. Chaudhary received

5  this narrative report on or around November 21st of

6  2019?

7      A.    Yes.

8      Q.    Okay.  And you were also aware that after

9  that, he had made corrections and revised it and sent

10 that back to the U.S. Attorney's Office, correct?

11     A.    I learned that after the fact, yes.

12     Q.    Okay.  And you learned that -- obviously

13 you've been sitting here during the whole trial, right?

14     A.    Yes.

15     Q.    You didn't learn about the revisions during

16 trial; you knew that revisions had been made before

17 trial started, right?

18     A.    You know what, I don't -- I can't say for

19 sure --

20     Q.    Okay.

21     A.    -- to be honest.

22     Q.    Fair enough.

23           Were you also aware that as early as December

24 the U.S. Attorney's Office was contacted relative to

25 Mr. Chaudhary wanting to meet and make more corrections

1    to the report?

2        A.    No, I was not aware of that.

3        Q.    You were not aware of that?

4        A.    No.

5        Q.    You agree -- you heard Mr. Chaudhary testify

6    in this case and you heard him testify that he did so,

7    correct?

8        A.    I -- yes, I heard him testify.  I don't

9    remember him saying that he contacted them wanting to

10   make more changes, but it's certainly entirely possible.

11             THE COURT:  Is that what you're saying he

12   said?

13             MR. HARRINGTON:  Yes, sir.

14             THE COURT:  Okay.  Okay.

15       Q.    Now, would you agree with me, Agent Donnelly,

16   that initially when you first started investigating this

17   case, you were focused on what you believed to be

18   DigitalNet and DigitalNet as it existed in the

19   United States, correct?  When you began your

20   investigation.

21       A.    To be honest, that's kind of hard to say.  I

22   was focused on seeing money go overseas, a lot of money

23   going overseas, and it wasn't long after that we learned

24   that there was a DigitalNet overseas.  So I guess I

25   can't necessarily go along with that.

1          Q.    Okay.  Fair enough.

2                Mr. Chaudhary did tell you during his

3    interviews that there was a DigitalNet Pakistan office,

4    correct?

5          A.    Yes, he did.

6          Q.    Okay.  And you didn't really dive deeply into

7    that discussion with him about, you know, who was there,

8    who was staffing it, how long it had been in existence,

9    things of that nature; you didn't really dive that

10   deeply into that with Mr. Chaudhary, correct?

11         A.    On June 12th, we did not get too deep into

12   that.

13         Q.    Okay.  So I want to talk to you a little bit

14   about --

15               If I may approach the witness, Judge?

16               THE COURT:  Of course.

17               MR. HARRINGTON:  So there's going to be an

18   objection; we might as well try to address it now,

19   Judge.

20               What I was going to do is approach with this

21   narrative report that has a number of markups from

22   Mr. Chaudhary on it --

23               THE COURT:  Yup.

24               MR. HARRINGTON:  -- and then ask the witness

25   about these markups and the changes to it.  I believe

1  that that would be appropriate questioning based on the

2  impeachment that was done.  This would be done more as

3  rehabilitative relative to that subject talking about

4  prior consistent statements as well as talking about

5  some of the corrections that were made.  And I think --

6           THE COURT:  Those are corrections to a 302,

7  right?

8           MR. DAVIS:  Correct.

9           THE COURT:  Who wrote the 302?

10          MR. DAVIS:  Jill Laroe.

11          MR. HARRINGTON:  And Todd Donnelly's name --

12  it actually says by Jill Laroe, Todd Donnelly, and

13  Darlene Cacace.

14          THE COURT:  And this agent was present during

15  the conversation?

16          MR. DAVIS:  No, he wasn't, your Honor.  And

17  what he's reading --

18          THE WITNESS:  Is that the proffer or is that

19  November --

20          MR. DAVIS:  It's the proffer with some of

21  Mr. Chaudhary's writing on it.

22          THE WITNESS:  Oh.

23          MR. DAVIS:  So it's a copy of the February 7th

24  proffer and that's why Mr. Donnelly's name is on it.

25  But what Mr. Chaudhary -- I can explain what happened,

1  Judge.

2          THE COURT:  You're explaining.

3          MR. DAVIS:  I'm happy to approach --

4          THE COURT:  You're explaining, yeah, you

5  can --

6          MR. DAVIS:  All right.  So what happened was

7  Mr. Chaudhary's interviewed June 12th --

8          THE COURT:  Yeah.

9          MR. DAVIS:  -- as this Court has heard.  He

10  got counsel.  We sent him a subject letter, and we made

11  a proffer agreement with counsel --

12          THE COURT:  Yeah.

13          MR. DAVIS:  -- and we did an extensive

14  interview on February 7th of 2019 where a number of

15  documents were shown to him and --

16          THE COURT:  And that's the 302 from the

17  proffer?

18          MR. DAVIS:  And that's the 302.

19          THE COURT:  Right.

20          MR. DAVIS:  Now, prior -- just prior to trial,

21  say two weeks before trial, November, something like

22  that --

23          THE COURT:  Yeah.

24          MR. DAVIS:  -- I called Mr. Chaudhary and

25  said, I would like you, if you're willing -- and

1    understanding it's an awkward situation, of course --

2           THE COURT:  Yeah.

3           MR. DAVIS:  -- I would like to sit down with

4    you about your testimony and the questions I'm going to

5    ask you.

6           Mr. Nicholson came in with Mr. Chaudhary, and

7    Jill Laroe and I met with him as one of dozens of

8    witness prep interviews that we were doing.  And at that

9    interview, I took out the February 7th proffer.  And I

10   don't usually show 302s to witnesses because the 302s,

11   of course, is a statement of the FBI agent or the

12   whatever agent and not --

13          THE COURT:  Sure, it's the statement of the

14   FBI agent summarizing the witness's statement.

15          MR. DAVIS:  Correct, correct.

16          And I actually read it to him slowly and at

17   various points he said, well, no, he wants to correct

18   that.

19          THE COURT:  Yeah.

20          MR. DAVIS:  So I gave him that opportunity.

21   And I ensured that -- and so Mr. Chaudhary gave what

22   became -- and a lot of it was the same, maybe 80 percent

23   of it was the same, 20 percent of it was different.

24   Okay?

25          THE COURT:  So when he -- when he -- when he

1    took issue with something that was in the old proffer

2    302 and writing was made on the copy of the 302 --

3              MR. DAVIS:  Correct.

4              THE COURT:  -- was that done by the witness or

5    by the agent?

6              MR. DAVIS:  It was done by the witness.

7              THE COURT:  All right.

8              MR. DAVIS:  Okay?

9              THE COURT:  Yeah.

10             MR. DAVIS:  And I asked Jill Laroe, the case

11   agent, to do a complete 302 documenting each change or

12   correction that he made.

13             THE COURT:  Yes.

14             MR. DAVIS:  Now, at this point, I -- I don't

15   see the difference between a correction and a change in

16   story.  And, in fact, what I've now heard is four

17   different versions in it different ways --

18             THE COURT:  Understood.

19             MR. DAVIS:  -- by Mr. Chaudhary.

20             So -- but we went through that process, he

21   wrote -- and wrote various things --

22             THE COURT:  That's a great -- that's a great

23   explanation of what happened.

24             MR. DAVIS:  Yeah.

25             THE COURT:  And it's exactly what I thought

1    happened.

2              MR. DAVIS:  Yeah.

3              THE COURT:  My question for you is what

4    difference does any of that make to his exercise of

5    approaching the witness with that 302 and questioning

6    him about it?

7              MR. DAVIS:  Because the question -- the

8    witness has no knowledge of it, wasn't present, didn't

9    draft that, and was not there for that interview.

10             THE COURT:  Oh.

11             MR. DAVIS:  I turned over that document, I've

12   also turned over the full 302.  They could have called

13   Mr. -- Jill Laroe about those matters.

14             Now, I also don't think they're prior

15   consistent statements because, as the Court knows, under

16   Rule 801, the prior consistent statement must have been

17   made before there was a motive to fabricate.  And this

18   is a prior consistent statement to --

19             THE COURT:  Actually, I think that's been

20   removed from the rule of evidence, believe it or not.  I

21   don't think that's a requirement anymore, the whole --

22   the whole tying to the reason to fabricate.

23             I could -- I know the rule's been changed to

24   some degree with respect to that issue --

25             MR. DAVIS:  Yeah.

1       THE COURT:  -- I mean, but, look, the point is

2    this.  I thought the witness was there.  I thought this

3    witness was present --- -

4            MR. DAVIS:  No --

5            THE COURT:  -- for those changes.

6            MR. DAVIS:  -- he wasn't.

7            THE COURT:  I don't -- I can't imagine why

8    it's appropriate to approach him with that if he wasn't

9    present for the changes, so I'm going to sustain the

10   objection unless I'm missing the point, Mr. Harrington.

11       I think it would be very different if he was

12   there.  He would have heard these changes and be able to

13   say, yeah, that's what happened or, no, that's not what

14   happened, or I can't remember.

15       But he wasn't there, so I can't imagine how

16   that's -- this is stuff for you to tell me about in your

17   closing or to establish through another witness, but I

18   don't think it's appropriate, either impeachment or just

19   general questioning, for this witness, so I'm going to

20   sustain the objection.

21           MR. HARRINGTON:  Sure.  I understand, Judge.

22   I'll move on to a different subject.

23           THE COURT:  Okay.

24       Q.   Let's talk about the interview that you did on

25   June 12th of 2018, okay, Agent Donnelly?

1      A.   Sure.

2      Q.   And so at that time, when you met with

3 Mr. Chaudhary, it was you and Agent Laroe?

4      A.   No, myself and Agent Blackwood.

5      Q.   Blackwood.  Okay.  And was Mr. Chaudhary alone

6 when you spoke with him or was anybody else there?

7      A.   He was alone.

8      Q.   All right.  Now, given what we've talked

9 about, with the number of agents that were present on

10 scene, right?

11     A.   Yes.

12     Q.   And the manner in which they were dressed and

13 so on, do you believe it would be a reasonable thing for

14 Mr. Chaudhary to be scared?

15     A.   You know what, I -- I'm not going to sit back

16 and judge anybody for being scared or not.  I -- all I

17 will say is that Ms. Blackwood and I brought

18 Mr. Chaudhary to a private room where there were no

19 other agents present.  We treated him with the utmost

20 respect and professionalism and there was absolutely no

21 intimidation whatsoever imposed by either of us.

22         So if Mr. Chaudhary was scared based on the

23 presence of agents and law enforcement in his home that

24 had guns and raid jackets on, then I'm not here to judge

25 him for that.

1        Q.   And I'm not asking you to judge him.  What my
2   question was is --
3             THE COURT:  That wasn't his question, though.
4   Listen to the question.
5        Q.   What my question was is do you think it would
6   be reasonable for a person in Mr. Chaudhary's situation
7   to be scared in that situation.
8        A.   I don't think it was reasonable when we were
9   interviewing him to be scared, no.
10       Q.   Okay.  And you don't agree -- or let me ask
11  you, do you agree that the situation in which we've
12  described, you know, about a dozen agents combined of
13  FBI and Homeland Security, in addition you and Ms. --
14  was it Blackwood?
15       A.   Yes.
16       Q.   Okay.  That that might be an intimidating
17  situation for somebody?
18       A.   Sure.
19       Q.   Okay.  So you would agree that that could be
20  an intimidating situation?
21       A.   Sure.
22            THE COURT:  Just for academic reasons, I just
23  checked the rule of evidence about your point about
24  prior consistent statements and the -- the timing.  And
25  you're right, Mr. Davis.  It -- there were two -- the

1   rule was changed with respect to prior consistent
2   statements in 2014, but the comments say that the
3   amendment retains the requirement set forth in *Tome v.*
4   *U.S.* that under Rule 801(d)(1)(B), a consistent
5   statement offer to rebut a charge of reasoned
6   fabrication or improper influence or motive must have
7   been made before the alleged fabrication or improper
8   influence or motive arose.
9           So you're right.  It doesn't make a difference
10  with respect to the ruling, but it was just kind of
11  nagging at me.  Sorry for that interruption.
12          MR. HARRINGTON:  No problem, Judge.
13      Q.   So you would agree with me that during your
14  interview you also understood and observed that
15  Mr. Chaudhary spoke with a heavy accent?
16      A.   Yes.
17      Q.   Okay.  And you would agree with me based on
18  that observation you understood that English was not
19  Mr. Chaudhary's native language, correct?
20      A.   Correct.
21      Q.   Did you know what his native language was?
22      A.   I assumed it was either Punjab or, you know,
23  an Islamic language.
24      Q.   Okay.  You also understood at that time that
25  he had some difficulty hearing and he has hearing aids,

1    correct?

2        A.   Yes.

3        Q.   Okay.  Do you know whether he had his hearing

4    aids in at the time that you spoke with him or not?

5        A.   I do not.

6        Q.   Okay.  And you did indicate that you had some

7    difficulty communicating based on these things, but you

8    felt that you were able to work through it, correct?

9        A.   Yes, sir.

10       Q.   Okay.  In regard to -- I'm going to switch

11   gears now, Agent Donnelly, and go to, very briefly, the

12   seizure of assets that you talked about.  Okay?

13       A.   Yes.

14       Q.   In general terms, one of the things that you

15   tried to do when you were executing these warrants for

16   the seizure of assets is you wanted to make sure that

17   you didn't seize assets that might have come from

18   legitimate sources, correct?

19       A.   Yes.

20       Q.   Okay.  And you tried to do that to the best of

21   your ability and some of the accounts had more money in

22   them than were for the warrants for that very reason,

23   right?

24       A.   Yes.

25       Q.   Okay.  And you would agree with me that part

1    of the warrants, it's based on the information -- when

2    you're trying to calculate how much and what the warrant

3    is going to seize, part of that is based on the

4    information that you're getting from the financial

5    analysts that have testified, right?

6         A.   Some of it was.  Darlene and I spoke a lot

7    during this time.

8         Q.   Okay.

9         A.   I performed -- I did a lot of analysis myself.

10        Q.   Okay.  And so that analysis, obviously we've

11   heard some talk about dirty money, clean money, right?

12        A.   Yes.

13        Q.   And so you would agree with me that when

14   you're doing the seizure of the assets in this case,

15   you assumed that all monies that came from either

16   Robert Allen or the United Way were dirty money, just

17   like Ms. Cacace agreed -- thought, right?

18             Aside from Mr. Alrai's salary.  I should

19   exclude that, obviously.

20        A.   Right.  Yes.

21        Q.   Okay.  So during the seizure -- and obviously

22   I understand this is difficult.  Money's kind of a

23   fungible thing.

24        A.   Uh-huh.

25        Q.   But, essentially, with that conclusion, that

1    doesn't give any credit or anything like that to any

2    work that was legitimately provided or services provided

3    to the United Way.  That's just basically, as was said,

4    taking all the money that came from the United Way under

5    the contracts and all the money that came from Robert

6    Allen under the contracts, and then trying to seize

7    assets in that total amount?

8         A.   Yes.

9              MR. HARRINGTON:  Okay.  Judge, I don't have

10   any other questions for Agent Donnelly.

11             THE COURT:  Redirect?

12                       REDIRECT EXAMINATION

13   BY MR. DAVIS:

14        Q.   Briefly, Special Agent Donnelly, let me show

15   you 886 again and the signature of Mac Chaudhary.

16             Next page, I think, or next.  There.  Even

17   further, I think.  The one after that.  Very good.

18             Do you see the signature of Mr. Chaudhary?

19        A.   Yes, I do.

20        Q.   And you'll agree it's distinctive?

21        A.   Yes.

22        Q.   And did you see it on many documents relevant

23   to this investigation?

24        A.   Yes, sir.

25        Q.   Did you also find an electronic image of that

1  signature on Mr. Alrai's home computer in Windham?

2      A.   I did.   There was a blank document that had

3  two signatures electronically transposed onto that

4  document.   One of them was Mr. Chaudhary's; the other

5  one, I believe it was Pat Latimore.

6      Q.   Did it look essentially just like this?

7      A.   Yes, it did.

8      Q.   All right.   You were also asked about the

9  seizure of money in this case.   You testified that you

10  seized more than $2.1 million in cash on June 12th of

11  2018, right?

12      A.   On June 12th, we seized --

13      Q.   I'm sorry.

14      A.   -- 979,000, but the overall seizure, yes, was

15  over 2.1 million.

16      Q.   Right.   And by definition, given where that

17  money was, in accounts that Mr. Alrai owned and

18  controlled, was any of that 2.1 million going to pay a

19  vendor or some contractor to do services for United Way?

20      A.   No.

21          MR. DAVIS:  No further questions.

22          MR. HARRINGTON:  Very briefly, Judge.

23          THE COURT:  Yup.

24                    RECROSS-EXAMINATION

25  BY MR. HARRINGTON:

1      Q.   So talking just briefly about the money,

2  Special Agent Donnelly, are you aware of whether -- if

3  we assume that that money was obtained from Robert Allen

4  and United Way, do you know whether or not that can

5  constitute in whole or in part profits that Mr. Alrai

6  would have realized on the provision of services to

7  United Way and Robert Allen?

8      A.   Do I know whether or not that money included

9  profit?

10      Q.   On the services that were provided to Robert

11  Allen and United Way.

12      A.   No.

13           MR. HARRINGTON:  No other questions, Judge.

14           THE COURT:  Just give me a minute.

15           I'm not sure I understood the last question

16  and answer, but what were you trying to establish,

17  Mr. Harrington?  It might be something very simple,

18  like -- it seems like maybe it's a very simple concept,

19  but I'm not sure what you were driving at.  What do you

20  mean?

21           MR. HARRINGTON:  So what I was driving at,

22  Judge, is they -- as the agent has testified, all the

23  money that was seized, they tried to make sure that it

24  was money that was derived from either Robert Allen or

25  United Way.

1              And my question was in that regard, the money

2    that was seized, are you able to determine whether or

3    not -- because what the government is saying is it's all

4    illicit and ill-gotten goods.

5              My question was are you able to determine,

6    since it's all kind of determined dirty money, whether a

7    portion would be legitimate --

8              THE COURT:  Earned money.

9              MR. HARRINGTON:  -- earned money and profits

10   by Mr. Alrai.

11             THE COURT:  So it is simple.  It's what I

12   thought you were driving at.  I wanted to make sure.

13             MR. HARRINGTON:  Thank you, Judge.

14             THE COURT:  It's kind of the whole theme of

15   the case.

16             MR. HARRINGTON:  It is, Judge.

17             THE COURT:  Yeah.  Okay.

18             MR. DAVIS:  No further questions.

19             THE COURT:  All right.  You're excused, Agent.

20             THE WITNESS:  Thank you, Judge.

21             THE COURT:  Thanks.

22                   (Witness excused.)

23             MR. DAVIS:  Your Honor, the government moves

24   to admit Exhibit 924 and strike the ID, which I believe

25   is the final set of slides by Mr. Naviloff.

```
 1              THE COURT:  Yeah.

 2              MR. HARRINGTON:  No objection, Judge.

 3              THE COURT:  Admitted, 924.

 4              (Government's Exhibit 924 admitted.)

 5              MR. DAVIS:  Is that correct?

 6              MS. SHEFF:  It is correct.

 7              MR. DAVIS:  And, with that, the government

 8  rests --

 9              MR. HUNTER:  Well, actually --

10              MR. DAVIS:  Oh, sorry.

11              MR. HUNTER:  We also -- we swapped out the

12  inside invoices, Tim -- I just wanted to make sure --

13  416, the final set of inside invoices.

14              MR. DAVIS:  Is that correct?

15              MS. SHEFF:  That's correct.

16              MR. DAVIS:  Yes.  So 416 is already in.

17              THE COURT:  416?

18              MS. SHEFF:  Yes, sir.

19              THE COURT:  It's already in.  All right.

20              All right.

21              MR. DAVIS:  Government rests.

22              THE COURT:  So the United States rests its

23  case.

24              Does the defense -- is the defense going to

25  put on any evidence?
```

```
 1              MR. HARRINGTON:  Yes, Judge.
 2              And, Judge, one of the questions I have -- and
 3   it's a little odd, because there's no jury -- but is the
 4   moving forward judgment of acquittal under Rule 29.
 5   Obviously the timing can sometimes be important.
 6              THE COURT:  Yeah.
 7              MR. HARRINGTON:  I would make that now, but I
 8   didn't know if you would want to reserve that, as I know
 9   you can under the rule, but --
10              THE COURT:  My usual practice is to take a
11   Rule 29 motion under advisement, but I think the more
12   basic question is whether, you know, Rule 29 is even a
13   cognizable motion without a jury.  I don't know the
14   answer to that.
15              MR. HARRINGTON:  That's why I raised it,
16   Judge, because the only distinction when I looked at the
17   rule was that if I make it at the close of the
18   government's evidence, you're supposed to make your
19   decision, even if you rule at a later time --
20              THE COURT:  Sure.
21              MR. HARRINGTON:  -- based on the evidence that
22   existed at that time --
23              THE COURT:  Yeah.
24              MR. HARRINGTON:  -- versus if I present
25   additional evidence.
```

 1              So that may be a distinction without a

 2     difference since you are, you know, the trier of fact in

 3     this case, but I wanted to raise it to make sure that we

 4     proceeded in a, you know, fashion that was appropriate

 5     for the Court.

 6              THE COURT:  Okay.  Just give me a moment.

 7              Is anybody aware of any authority -- you know,

 8     I've been meaning -- it's one of those things I've been

 9     meaning to check for two weeks and haven't checked.

10     I've done a lot of checking on Rule 23, but not so much

11     on Rule 29.

12              Any authority for the proposition that a Rule

13     29 motion is not a cognizable request for relief in a

14     nonjury trial?  Anybody know?

15              MR. DAVIS:  I am not, Judge.  I -- I would

16     have said that the defense can make such a motion, even

17     in a bench trial.

18              THE COURT:  Yeah, me, too, I think.

19              MR. DAVIS:  Although the -- the rule does talk

20     specifically about before submission to the jury.  So

21     there's lots of references to the jury.

22              THE COURT:  On one hand, the rule references a

23     jury.  On the other hand, why shouldn't the defense be

24     able to say at the end of the case in chief that they

25     haven't satisfied the burden?  It seems like a motion

1   that should be available, at least to the Court.

2          You're on your feet.

3          MR. AYER:  I am, your Honor.  Thank you.

4          I did some research into this.  I wasn't able

5   to find any law directly on point, but I agree with your

6   Honor, though, because in related cases that are not

7   directly on point, they discuss the difference between

8   the state of the case at the close of the government's

9   case in chief and the potential for the defendant to put

10  on evidence that may help the government in its case,

11  even if the defendant also feels like it helps himself.

12         THE COURT:  Yeah.

13         MR. AYER:  So I think for that -- I mean, for

14  that reason, I think that it should be cognizable at

15  this point were we to make one.

16         THE COURT:  I think it's a good -- I think it

17  makes sense.  So you're making the motion?

18         MR. HARRINGTON:  I am, Judge.

19         THE COURT:  Here's my thought.

20         Generally it's been my practice to take these

21  under advisement, but I will say this.  I guess I want

22  to hear you talk about it a little bit because -- a

23  little bit of an argument about it because it's a

24  motion.  We can argue it.  And the argument, whether or

25  not it's decided in your favor, might inform your

1    decision about what evidence you put on and how to
2    approach it.
3              I'm addressing defense counsel.
4              So here's my thought.  There's -- there are a
5    few counts here that I think are on the line.  One --
6    let me just take a look at the indictment again.
7              I think, based on the evidence I've heard,
8    that Counts 52 and 53 are arguably vulnerable to
9    dismissal at this point because the evidence I have
10   heard -- I was chatting about this with my law clerk
11   last night, that we might have -- we might be
12   misapprehending something, but the evidence I've heard
13   is that the defendant didn't know about the obligation
14   to make these filings and there's a -- there's a
15   scienter requirement in these charges.
16             If the defendant didn't know he was required
17   to make the filings and that it was a violation of law
18   to fail to file, it seems to me there might be
19   reasonable doubt here on those two counts.
20             What do you say about that, Mr. Davis, or
21   anybody on the prosecution's side?
22             MR. DAVIS:  So, your Honor, I'm prepared to
23   argue the willfulness element.  And I do agree it's a
24   circumstantial case and I also agree it's not the
25   strongest count.

```
 1              THE COURT:  Yeah.
 2              MR. DAVIS:  But given the inferences in this
 3   stage, and it's whether any reasonable trier -- finder
 4   of fact could find proof beyond a reasonable doubt --
 5              THE COURT:  Yeah.
 6              MR. DAVIS:  -- we certainly think it's a
 7   maintainable charge.
 8              But -- but, yes --
 9              THE COURT:  Your point is that a jury could
10   return a guilty verdict on those counts.
11              MR. DAVIS:  Yes.
12              THE COURT:  Is there evidence on -- here's
13   what it sort of comes down to for me.
14              What I was wondering is we have evidence where
15   he put in writing, I didn't know I had to make these
16   filings.  I think it was -- he checked the form or there
17   was a reason for failure to file.  But the -- were there
18   filings he made contemporaneously that did comply with
19   the law that would have shown knowledge of the
20   requirement?  I don't think there was, but --
21              MR. DAVIS:  No, I --
22              THE COURT:  Okay.
23              MR. DAVIS:  There's no evidence of that,
24   correct.
25              THE COURT:  Okay.  So there's those counts.
```

1    That's under advisement.

2            The other one is, you know, the one I raised

3    yesterday.  I think the contemporaneously first few

4    money laundering -- I think there's four of them, that

5    occurred before the wire -- the wire fraud substantive

6    counts are arguably vulnerable to dismissal.  It's not

7    that I think Mr. Davis's version of the law is

8    necessarily wrong, that the entire scheme -- the entire

9    scheme can constitute the unlawful conduct that makes

10   these funds currently derived, it's just that the way

11   it's charged in the indictment strongly suggests that

12   the criminal conduct is the substantive wire fraud

13   counts that were part -- you know, that are part of the

14   larger scheme, but are still -- all of which postdated

15   this laundering conduct, this alleged laundering

16   conduct.

17           I don't need to hear argument about that.  I

18   just want to put you on notice.  You've made your point

19   to me and I understand your arguments on it, on that

20   issue.

21           MR. DAVIS:  I do have two cases.  We did

22   research that point last night.  And so I -- I will

23   provide the Court with the cases, if that's okay.

24           THE COURT:  Do you have it handy?

25           MR. DAVIS:  Yes.

1          The cases, for the record, are --

2          THE COURT:  Even just the cite, yeah.

3          MR. DAVIS:  *United States vs. Lo*, L-o, in the

4    Ninth Circuit, which is 839 F.3d, 777.

5          THE COURT:  839 F.3d 777.  Yeah?

6          MR. DAVIS:  Yes.  And then the First Circuit

7    case which cites *Lo* is *United States vs. Cox*, 851 F.3d

8    113.

9          And your Honor --

10          THE COURT:  Say that again.

11          MR. DAVIS:  I'm sorry.  851 F.3d, 113.

12          THE COURT:  Thank you.

13          MR. DAVIS:  Neither case is precisely on

14    point.

15          THE COURT:  Yup.

16          MR. DAVIS:  But both cases stand for the

17    proposition that in a wire fraud context, the proceeds

18    of the wire fraud are the proceeds of the scheme and are

19    not limited to particular counts of wirings in the

20    indictment.

21          THE COURT:  Yeah.  Well, certainly not limited

22    to particular counts.  I mean, I -- certainly not

23    limited to particular wirings probably.  The way you're

24    describing the law actually does make sense to me.  What

25    I'm wondering about is as a trier of fact, trying to

1    appreciate the indictment for the -- the language it

2    uses, might I be -- might I take a different view of

3    just the evidence as you've charged it.  That's a

4    question that's up to me and I'll have to -- I'll have

5    to figure it out.

6              MR. AYER:  I'll just point out, you know,

7    obviously we'll reserve further argument if need be, but

8    on a first review of the *Cox* case, it appears to be a

9    sentencing case where obviously the standard is

10   different for what money's related, what the Court can

11   do, and what standard the Court uses to get to that

12   money.

13             THE COURT:  Sure.

14             MR. AYER:  So I'll review the case in more

15   detail, but it appears to be a sentencing issue, not

16   the sufficiency of an allegation in an indictment with

17   regard to the remainder of the indictment.

18             THE COURT:  All right.

19             MR. AYER:  So I feel like the issue before

20   this Court may require the Court to take a narrower

21   view.

22             THE COURT:  Understood.

23             So I've expressed my views.  I'm taking -- on

24   those issues, I'm taking it under advisement.  You may

25   have wanted to be heard, though, Mr. Harrington, on --

```
 1    you may have wanted to be heard more on this motion, so
 2    if you do, please proceed.
 3              MR. HARRINGTON:  And, Judge, what I would do
 4    is as far as the motion for judgment of acquittal, I
 5    would just -- by way of the record, I would incorporate
 6    the discussion that we just had because those are the
 7    arguments that we wanted to make on those issues.  And
 8    so I don't think I need to belabor by doing them again.
 9    I think they're appropriately vetted for your
10    consideration.
11              What I would suggest then in more general
12    terms relative to the case as a whole for you to
13    consider is that there is insufficient evidence for you
14    to conclude beyond a reasonable doubt the defendant's
15    guilt on these charges.
16              I think what you have before you, if you even
17    take the evidence in the light most favorable to the
18    government, is that if the defendant is to have done
19    what the government alleges, which is perhaps committing
20    a breach of his fiduciary duty to the United Way by not
21    disclosing his relationship to DigitalNet and by then
22    later, after contracts were entered into, not disclosing
23    or providing information relative to DigitalNet that may
24    have been puffery, according to Mr. Chaudhary, relative
25    to the number of people, the locations, things of that
```

1    nature, what I would suggest to you is that that in and

2    of itself, misrepresentations, do not amount to a fraud.

3            And what I'm asking you to do is essentially

4    take a broader view, Judge, of what else is there that

5    would show you intent in this case.  And what I think is

6    showing and telling is the contracts and the performance

7    on the contracts.  And we would argue to you that the

8    contracts that were entered into were fully performed.

9            I think if you go back and you think and

10   listen to the testimony of any of the United Way

11   employees in this case, Ms. Latimore in particular, who

12   was the defendant's supervisor, said that they were

13   satisfied with the performance of the contracts with

14   DigitalNet and that there was no testimony that the

15   services that were contracted for were not provided.

16           THE COURT:  Uh-huh.

17           MR. HARRINGTON:  Nobody from United Way said

18   that.  And, in fact, the testimony was that after

19   DigitalNet was hired, the IT environment improved and

20   got better.

21           So the idea of the misrepresentations, I

22   understand that, and those are issues that are not

23   flattering for Mr. Alrai.  However, I think what goes

24   more to intent than did he have a scheme to defraud

25   performance of the contracts and providing the services

1    would indicate that, no, there is no intent to defraud

2    United Way.  His intent was to fully perform the

3    contracts, and he did.

4              What I would also suggest is that if you

5    accept that proposition, that these contracts were

6    performed, that there was not an intent to defraud

7    United Way of money, that by virtue of that, there can

8    be no wire fraud and as a result, all the other charges

9    would fall in a domino fashion because --

10             THE COURT:  Oh, yeah.

11             MR. HARRINGTON:  -- because it's all

12   derivative.

13             THE COURT:  Yeah.

14             MR. HARRINGTON:  So that's what we are arguing

15   to you, Judge, and I think that you can see other

16   evidence relative to the performance of the contracts,

17   relative to Robert Allen, for example.  Although it's

18   not part of the charges, the information is out there.

19   There were four contracts that were entered into.

20             The testimony was, from the people who

21   testified from Robert Allen, that three of those

22   contracts were performed satisfactorily; that there was

23   one contract in particular, the telephony contract, that

24   they were -- excuse me, the web development contract

25   that they were unsatisfied with, and ultimately they

1    stopped payment on it, chose not to pursue a lawsuit.

2           I would argue to you there would be issues

3    on both sides of that.  And although there was some

4    satisfaction expressed by Mr. Riviera relative to the

5    telephony system, there was no indication that the

6    services that were contracted for were not provided.

7           Again, I think that gives further support to

8    the idea that there was no intent to defraud.

9           And I'd also point to the fact of the timing,

10   that Mr. Alrai was there for about one month before he

11   left Robert Allen and began at United Way and was no

12   longer part of Robert Allen at that point in time.

13          The other thing that I would point to, Judge,

14   is that if you look at the other evidence that

15   Ms. Latimore testified to and that others testified to

16   relative to Mr. Alrai and his performance at United Way,

17   he got nothing but superlative reviews at the United

18   Way.  He was promoted to vice-president and CIO.

19   Comments, which are in the exhibits for you to consider,

20   talk about how he basically did great at managing

21   vendors, that the services provided were good.  So you

22   have all of these positive reviews of someone who is

23   doing their job.

24          So all of that said, Judge, I think that the

25   government fails on the issue of intent here and, as a

1    result, you should issue a judgment of acquittal.

2           Thank you, your Honor.

3           THE COURT:  Thank you, Counsel.

4           Mr. Davis, or anyone.

5           MR. DAVIS:  Your Honor, addressing first the

6    FBAR in Counts 52 and 53, the -- a reasonable trier of

7    fact could find proof of guilt beyond a reasonable

8    doubt, albeit based on circumstantial evidence.

9           The Court is correct, there is no direct

10   evidence that the defendant knew about the FBAR

11   requirements and that the mens rea in this tax-type

12   offense does require knowledge of the law effectively.

13          However, the circumstances include the

14   following:  There are two client organizers, one for

15   2014, one for 2017, with different versions of language

16   that Mr. Terry specifically testified were sent that had

17   Mr. Alrai's and his wife's name on them, that had

18   information in them, and that were specifically sent to

19   the client.  And those organizers raised the issue of

20   foreign assets and --

21          THE COURT:  That was sent by the accountant,

22   right?

23          MR. DAVIS:  That that was sent by the

24   accountant --

25          THE COURT:  Okay.

1          MR. DAVIS:  -- correct.  But the accountant

2     also said that -- and I'm familiar with this myself --

3     sometimes people don't read them; some people don't send

4     them back.

5          THE COURT:  Sure.

6          MR. DAVIS:  And we acknowledge that.  But that

7     organizer at least is a part of the evidence that the

8     defendant must have known of the FBAR requirement.

9          The second -- the second point beyond the

10    organizer is the tax returns themselves, and that's

11    really the strongest evidence.

12         The tax returns have, as the Court knows, all

13    kinds of places where you put numbers.  It doesn't have

14    many questions.  But that part of Schedule B has

15    questions that address this directly and as clearly

16    as -- as possible.  And that part of Schedule B is there

17    every year and in the two charged years, which are 2014

18    and 2016, and they ask the taxpayer:  Do you have a

19    foreign bank account?  If so, you need to file an FBAR

20    or you may need to file an FBAR.

21         And that leads to the -- the further

22    circumstantial point, which is that Mr. Alrai is highly

23    intelligent, deeply involved in every aspect of his very

24    complicated financial life, and controls every detail of

25    his complex tax profile.

1            Lots and lots of people go to their CPA in

2    March and dump a bunch of documents on them.  That's not

3    what he does.  What he does is say, I don't want you

4    bookkeeping for me, but what I'm going to give you is a

5    spreadsheet, a seven-page long, dense spreadsheet with

6    every expense out of DigitalNet account all categorized

7    by him and then questions about every deduction known to

8    man and every possible exemption.

9            And so all of that is -- is obtained.  And yet

10   Mr. Alrai, when this one -- one issue about do you have

11   a foreign bank account, a fairly basic question for an

12   American taxpayer, that he knows nothing about.  That's

13   just not believable.

14           He also has -- and this is relevant

15   circumstantially -- he has a powerful motive to conceal

16   that bank account in Pakistan, both from the IRS and

17   from his CPA.  And that's because once he says, oh,

18   yeah, I've got a business account in Pakistan, I'm

19   wiring 1.2 million to it and it pays expenses over there

20   and that's DigitalNet Pakistan, then he's got someone

21   asking questions and saying, okay, show me the expenses

22   you're claiming, like the $435,000 in one year of R&D.

23   Right?

24           And so what Mr. Alrai has in the existing

25   world, where no one ever acknowledges a Pakistan bank

account, is he's got complete control.  He always has

complete control.  And the control is here is everything

about my expenses and you have to take my word for it

and it's based on the Pentucket account and no mention

that there is another account over there, that if any of

these R&D expenses or payroll expenses, if any of those

are real, they would be in his bank account.

But he conceals the bank account and the fact

that he's got that motive and that it's consistent with

all of his other operating in this case is also

evidence.

He -- two other points.  He sent his own CPA

the IRS website about FBARs.  Now, that didn't happen

until 2019.

THE COURT:  Yeah.

MR. DAVIS:  It didn't happen until after he

was charged, but it still shows, once again, this is an

adult, very much an adult, a very smart adult --

THE COURT:  Yeah.

MR. DAVIS:  -- who -- who is perfectly able to

understand what he understands when his tax form that

he's signing says no.

And the last point is he did ask questions

during -- during the scheme about -- about how the

Kal Wahbe issue and about foreign income in Dubai.  And

1   there was back and forth, there was an email about that,

2   asking about the tax implications of foreign income and

3   how to report that and how to pay that.

4           So he's certainly aware that overseas

5   financial activity is going to have special rules that

6   could apply, but he avoids that subject about the

7   Pakistan account.

8           THE COURT:  Yeah.

9           MR. DAVIS:  So it's circumstantial, your

10  Honor.  It's not as strong as the rest of the case,

11  frankly, but it's still -- given that all inferences are

12  taken in the light most favorable to the government,

13  it's still sufficient under the Rule 29 standard.

14          MR. HARRINGTON:  And I just have one brief

15  comment, Judge --

16          THE COURT:  Yeah.

17          MR. HARRINGTON:  -- in regard to the FBARs and

18  I just want to highlight it for the Court.

19          It sounds like you've already honed in on

20  this, but I just want to flag it in case, which is some

21  of the documents that were provided -- you may recall on

22  the tax documents and on the questionnaires, they were

23  all left blank relative to the foreign bank accounts and

24  the FBAR stuff.

25          And then there was a section where they were

1    filled where it says, no, you don't have them, and

2    Mr. Terry had indicated those were autofill.  If there

3    was no response to it, they would autofill no.

4           So there was never any documentation of a

5    response either yea or nay --

6           THE COURT:  Yeah.

7           MR. HARRINGTON:  -- and I just want to flag

8    that for you.

9           Lastly, on the FBAR, that as you heard from

10   Mr. Terry, they were filed, no taxes, no penalties went

11   with it.  And as was indicated when it was submitted,

12   the reason that was given, which appears to -- I

13   understand the government's circumstantial argument, but

14   at least the statement that the defendant made, I was

15   unaware I had to do it.

16          THE COURT:  That's the problem I'm having.

17   First of all, let me say, Mr. Davis.

18          That's an interesting argument you just made.

19   You pointed me to some evidence -- you pointed to some

20   evidence that is inculpatory that I, you know, hadn't

21   put in that context.  It's helpful.

22          One of the points you made, though, is that,

23   you know, while you said there's no direct evidence of

24   his knowledge, the problem is there is direct evidence

25   of a lack of knowledge.  That's why I'm struggling with

1    it.  It's evidence that you put in, in candor, and you

2    know, I think in -- to try to satisfy your burden, but

3    there's direct evidence of a lack of knowledge and

4    knowledge is part of the burden.

5              So, look, I'm not going to rule on it now.  I

6    just think -- I'm not saying anything more than I agree

7    with Mr. Davis's point that it's not your strongest

8    count, but that's something to think about there.

9              Let me ask --

10             MR. DAVIS:  Can I --

11             THE COURT:  Yeah, go ahead.

12             MR. DAVIS:  Sorry.  I was sitting down, but I

13   hadn't finished because I wanted to talk about --

14   respond to Mr. Harrington's other argument.

15             MR. HARRINGTON:  I thought you were done,

16   John.  I apologize.

17             MR. DAVIS:  Very briefly, Judge.

18             The defense is arguing generally that there

19   was insufficient evidence of intent to -- to perpetrate

20   a scheme to defraud United Way and Robert Allen Group.

21   And, again, under all the other inferences, the

22   government submits the evidence is overwhelming that

23   Mr. Alrai intended to -- to work at least some economic

24   harm on his employers.

25             THE COURT:  Let me -- on that point, let me

1     interrupt you with a question.  And I want to hear this.

2             I was just looking for it in your trial brief

3     and I couldn't find it.  And I know it's in here

4     somewhere in one of your filings, where you made the

5     point -- you've made the point in your brief, look, we

6     don't have to prove unjust enrichment and we don't even

7     really have to prove economic loss.  But the way we're

8     going to prove this, the way we're going to prove this

9     scheme and intent, is I think it was you named three

10    things.  I think you said the markups, the nondelivered

11    services, and one other thing.

12            Do you remember what I'm talking about here?

13    I thought --

14            MR. DAVIS:  Yeah.

15            THE COURT:  -- there were three things.

16            MR. DAVIS:  Yeah.  The last is duplicate

17    billing.

18            THE COURT:  Duplicate billing, markups, and

19    undelivered services, basically.

20            MR. DAVIS:  Correct.

21            THE COURT:  All right.  That's the three?

22            MR. DAVIS:  That's the three elements of loss

23    as identified by Mr. Naviloff as making up the

24    3.1 million.

25            And so, your Honor --

1          THE COURT:  Go ahead.

2          MR. DAVIS:  -- yes, the government does

3    strongly contend that there is a significant loss; about

4    half the money paid by United Way is a loss amount.  But

5    we also argue that we don't have to prove loss.  We have

6    to prove an intent to at least put United Way at a risk

7    of loss, to do economic harm to United Way.

8          And that certainly occurred here, given that

9    they hired a fledgling firm with no experience and, in

10   some cases, no qualifications and certainly just signing

11   these contracts put United Way and Robert Allen Group at

12   a risk of loss, as Robert Allen Group rather bitterly

13   discovered in its short time with DigitalNet.

14         But the other aspect of the -- the fraud,

15   though, and the proof of the fraud is that there is --

16   there is a kind of property that -- that is intangible

17   rights.  And there's not much left of it after *Skilling*,

18   but there are good cases that we cited that Mr. Hunter

19   knows a lot about that say that even after *Skilling*, it

20   is a deprivation or can be a deprivation of a property

21   right when a -- when a defendant knowingly and willfully

22   deprives an employer of the right to control its own

23   assets.

24         When the -- when the -- when the employer --

25   when the employee secretly, deceitfully arranges things

1   so that United Way makes a decision and puts one -- you

2   know, puts a whole lot of money out there for years, but

3   has been deprived of a fair opportunity to make its own

4   decision about how it wants to spend that money.  And

5   that's exactly what happened here, your Honor.

6           Just a couple more points.  The defendant's

7   main argument is, well, the contracts were fully

8   performed.  I would say quickly first, no, they weren't.

9   The Court heard evidence that at least as to the -- the

10  geographically dispersed high availability backup for a

11  significant period, United Way's paying -- paying a good

12  bit of money for that -- for that aspect of the service

13  and they're not getting it.

14          They're not getting anything, because OVH and

15  CloudConnect don't provide it.  And -- and so, you know,

16  two months after he's gone, they have a four- or

17  five-day outage because they don't have that backup.  So

18  they didn't get what they bargained for.

19          I would also say, your Honor, even though

20  there's a performance of a service, if the performance

21  of the service is at a 1,300 percent upcharge, that's

22  fraud.  A 1,300 percent upcharge that is entirely driven

23  by this man's own -- own acts.

24          And so, yes, things were -- things were

25  accomplished in many cases, but that -- that -- what was

1    accomplished was -- was so often at a cost far in excess

2    of what it was worth and what United Way should have

3    been paying.

4         I would also say that the defense cites, well,

5    United Way was satisfied and they quickly say, you know,

6    various people thought oh, yes, it seemed pretty good.

7         Well, the reason for that is, as we said from

8    the beginning, IT is a place where people are

9    vulnerable, where companies are vulnerable, where the

10   good people at the United Way need help and they need

11   help from a trusted expert.  And they hired this guy to

12   be that expert.

13        And so, sure, for a lot of this, it seemed

14   better, but what Pat Latimore also said was that it did

15   seem better until they finally got a legitimate vendor

16   after he's fired and John Meyer is there and then they

17   can see, we get better service now at a whole lot less

18   cost.

19        And I submit that United Way people who

20   understand the changeover and what could have been with

21   all that money spent and all that opportunity cost and

22   spending it on DigitalNet and his bank accounts, they

23   now know they didn't get good -- good performance.

24        Last thing, intent to defraud.  Everything

25   this man did for six years was concealed.  He led a

1    double life to everyone he knew, including -- including

2    DigitalNet employees like Nadeem Yousuf.  Even at the

3    end, he's still pretending.  He's still pretending that

4    if Nadeem Yousuf has a personnel matter, he's going to

5    talk to them to find out.  It became -- well -- and

6    so -- and so he conceals and he lies.

7             He lies to -- he lies to CBP when he comes in

8    the country, he lies on every invoice submitted to

9    United Way on the email account and goes to the trouble

10   of writing himself a separate email signed by Mohammad,

11   just to show that -- that somehow he's not DigitalNet

12   and there is some entity out here that's different.

13            And he uses people.  He uses the people

14   closest to him.  He uses his dad.  He uses his friends

15   to be references.  And -- and that concealment and that

16   falsehood is at the heart of fraud.  Fraud is deceit

17   that is motivated by an intent to obtain property,

18   property and money.  And that's what he did here.  And a

19   reasonable jury could amply find sufficient proof of

20   specific intent to defraud in this case.

21            I have a note from Mr. Hunter.

22            Last point, your Honor, is that, again, going

23   back to the, well, the contracts were fully performed,

24   the contracts are negotiated on both sides by the

25   defendant.  And so if there are terms being met, and

1    there are, they aren't terms that are set in an

2    arm's-length -- in an arm's-length negotiation, a real

3    contract.  They aren't.  They're set on -- they're set

4    by one person who's on both sides of the equation.

5              THE COURT:  Understood.

6              Can I ask you a question, Mr. Harrington?

7              MR. HARRINGTON:  Yes, Judge.

8              THE COURT:  Because I know you've got

9    something you want to say.  We'll take a break right

10   after this exchange and you say what you want to say.

11             Understanding your argument correctly, both

12   with respect to this motion and in general, here's how I

13   understand it and I want you to tell me if I'm wrong

14   about it.

15             Is it -- when you talk about things like

16   markups, nondelivered services or nonperformance of a

17   contract and then double billing, I understand -- in

18   terms of nonperformance of a contract, that's just

19   something the defendant denies.  He says the contracts

20   were performed.  That's -- that's just -- you disagree.

21             On double billing -- on double billing and

22   markups, which there's evidence of, I understood your

23   argument not so much to be anything about those in

24   substance, but that to the extent those things occurred,

25   they weren't undertaken with an intent to defraud,

1   right?

2           A markup is what it is.  You do the math.

3   Whether or not it occurred, though, the government must

4   prove that your client undertook it with intent to

5   defraud and that is what the government has failed to

6   prove.  Is that your argument?

7           MR. HARRINGTON:  It is, Judge.

8           THE COURT:  That's what I thought.

9           Okay.  The double billing -- I mean, the

10  nonperformance is just denied, but the other two are,

11  look, you can evaluate the evidence for what it is,

12  Judge.  The fact is, though, it doesn't prove an intent

13  to defraud.  Right?

14          MR. HARRINGTON:  I think that's right.

15          THE COURT:  Okay.  I just want to make sure I

16  understood.

17          Go ahead.

18          MR. HARRINGTON:  And one of the other things,

19  I was just handed a note from my colleague, is about the

20  line of cases that are post-*Skilling* that talk about

21  contracts and the breach of contract and a fraud scheme

22  talk about having an intent to defraud at the time that

23  the contracts were entered into.

24          And so I'd just flag that for your

25  consideration as well.  I think you can look at the

1    totality of the circumstances to inform your decision --

2           THE COURT:  Yeah.

3           MR. HARRINGTON:  -- but I also think you focus

4    in on at time contracts are entered into.

5           THE COURT:  I do think that -- what do you say

6    about the fact, though -- I guess here's the hard part

7    of a bench trial.  The jury doesn't get to do this to

8    you, I know.

9           But, I mean, yeah, you're right -- I accept

10   the idea that if you're going to -- if you're going

11   to -- if you're going to evaluate the contracts not

12   being arm's length or whatever as a form of fraud,

13   there's got to be intent at that time.

14          But if there's a failure to disclose the

15   relationship and the affiliation with DigitalNet at that

16   time, how could -- how can I say a jury couldn't find

17   that intent?  Isn't the failure to disclose the

18   relationship with DigitalNet very persuasive evidence of

19   intent to defraud.

20          MR. HARRINGTON:  I don't think it is, Judge.

21   I think it can be fairly found by the Court that that

22   would be a breach of its fiduciary duty to the United

23   Way.  There's a conflict form that was signed, I think

24   for every year except for 2015, they couldn't locate it.

25          And so I think in that realm, the distinction

1   I would make or argue to you, Judge, is that that is

2   more of a civil issue, not a fraud issue.  If he

3   breached his fiduciary duty, then obviously the United

4   Way is well within its rights to terminate him, which

5   they did, and if they thought that there were services

6   that weren't rendered under the performance of the

7   contract because of that breach of fiduciary duty, they

8   would certainly have rights that they could pursue under

9   the contracts if they chose.  But I don't think it's

10  necessarily because he didn't -- because he didn't

11  disclose, that in and of itself is fraud.

12          Do I agree with you that you could potentially

13  draw an inference from that?  I think you could, because

14  you have that right as the trier of fact.  But I

15  wouldn't say that it -- because there's an omission of

16  failure to disclose that it is automatically fraud.  I

17  think you have to look a little deeper and my suggestion

18  is the deeper look is the performance of the contracts.

19          THE COURT:  Okay.

20          MR. HARRINGTON:  And I know that's difficult

21  because -- on one hand, you're looking at what's the

22  fraud at the time of the contract, and I'm saying, you

23  know, you need to look a little further down the road,

24  but --

25          THE COURT:  But subsequent conduct can inform

1    the question of intent.

2              MR. HARRINGTON:  And that's argument to you,

3    Judge.

4              THE COURT:  Understood.

5              MR. HARRINGTON:  The other things that I would

6    bring up, Judge, just very briefly, is the government

7    had talked about some law about the -- basically

8    damaging or infringing on United Way's ability to

9    control its assets.  And sometimes you see that more

10   commonly under, you know, the kickback schemes and

11   there's a line of cases that talk about that.

12             And one of the things that there are a number

13   of circuits, I think the Second and Sixth Circuit, I'm

14   sure there's others as well, have talked about in this

15   realm is that failure -- an infringement on the failure

16   to control assets in and of itself is not enough.  You

17   have to have a little bit more.

18             And typically what they want you to see or as

19   the trier of fact determine is has there been a tangible

20   economic harm that goes with it.  And I would suggest,

21   again, that that's part of our argument that there is no

22   tangible economic harm here.

23             So if you find that okay, yes, there was an

24   infringement on the ability to control assets based on

25   omissions or misrepresentations, you would still need to

1  go one step further to say, okay, do we have tangible

2  economic harm here.

3          One other thing that I would bring up for you,

4  Judge, is in regard to the aggravated ID theft -- I

5  failed to bring this up -- I bring it up for your

6  consideration, I know you're just going to take these

7  matters under advisement -- is that in regard to -- it's

8  Count 51, if I recall correctly, and it's the aggravated

9  ID charge.

10         One of the things I would ask you to consider,

11  and it is Count 51, Judge, is I would suggest that the

12  government has failed to prove that case, again, with

13  sufficient evidence.  I point you to Exhibit 118, which

14  I think is the exhibit admitted on this particular issue

15  in there.

16         This particular charge is that they

17  incorporate Counts 1 through 18 and then they say that

18  without lawful authority or means of identification of

19  another person, namely, his father, Mac Chaudhary, from

20  MC's email account at DTS to an officer that falsely

21  claimed an attachment, among other things, DTS had

22  105-plus global clients and included a false list of

23  sample customers at DTS.

24         So there's a very specific email that they're

25  referring to that was shown to Mr. Chaudhary.

1   Mr. Chaudhary's testimony is that he does recall the

2   substance of the emails, that he believes he sent those

3   emails, that that information was provided to him by the

4   Lahore office, and that he incorporated that

5   information.

6           And that -- I think the government has failed

7   on that count to prove that that email and the content

8   of that were sent by my client as alleged in the

9   indictment.  So I think, based on that, that charge as

10  well suffers.

11          Thank you, Judge.

12          THE COURT:  All right.  We'll take the morning

13  break.

14      (Recess taken from 10:52 a.m. until 11:12 a.m.)

15          THE COURT:  All right, Mr. Harrington.  You

16  may proceed.

17          MR. HARRINGTON:  Thanks, Judge.

18          THE COURT:  The motion's under advisement.

19          MR. DAVIS:  Judge, the government does object

20  to the ag ID motion and, briefly, on the ground that --

21          THE COURT:  The what motion?

22          MR. DAVIS:  The aggravated ID theft.

23          THE COURT:  Okay.

24          MR. DAVIS:  So we do object to that.  I'm

25  happy to say more if the Court needs it, but if --

1          THE COURT:  No.

2          MR. DAVIS:  -- it's under advisement --

3          THE COURT:  It's under advisement.

4          MR. DAVIS:  Okay.

5          THE COURT:  And I assumed you objected to it.

6          MR. DAVIS:  Thank you.

7          THE COURT:  All right.  Let me just think for

8  a moment.

9          So the motion's under advisement.  We did find

10  some authority, believe it or not, we just looked, that

11  suggested that Rule 29 is not appropriate for --

12          MR. DAVIS:  Oh, really.

13          THE COURT:  However, I think Mr. Harrington's

14  argument makes a lot of sense.  The decision on a Rule

15  29-type argument could inform your decision about how to

16  proceed with your case, so I -- I think it's appropriate

17  and, therefore, I entertained the motion as appropriate

18  and I took it under advisement.

19          MR. HARRINGTON:  Thank you, Judge.

20          THE COURT:  Yes.

21          MR. HARRINGTON:  And just out of curiosity,

22  Judge, the authority for that, did it come out of the

23  First Circuit, do you know?

24          THE COURT:  We'll share it with you.  I'll

25  print it up.

1          Oh, no, don't think it came out of the First

2    Circuit.  Well, there's some.  Let's see here.  No, not

3    mostly.

4          MR. HARRINGTON:  Okay.

5          THE COURT:  No.

6          MR. HARRINGTON:  The defense calls to the

7    stand Kevin Kennedy, your Honor.

8          THE COURT:  So you don't have to fire any

9    associates, Mr. Harrington.

10          MR. HARRINGTON:  Merry Christmas.

11          THE CLERK:  Good morning, sir.  How are you

12    today?

13          THE WITNESS:  I'm fine.  How are you?

14          THE CLERK:  Very well.  If you could take the

15    stand.

16          Please raise your right hand.

17          **KEVIN KENNEDY,** having been first duly sworn,

18    testified as follows:

19          THE CLERK:  For the record, please state your

20    full name and spell your last name.

21          THE WITNESS:  Kevin Clement Kennedy,

22    K-e-n-n-e-d-y.

23          THE CLERK:  Thank you.  Please be seated.

24                    DIRECT EXAMINATION

25    BY MR. HARRINGTON:

1        Q.    Good morning, Mr. Kennedy.

2        A.    Good morning.

3        Q.    I'd like to first talk to you a little bit

4   about your educational background.

5              Could you tell the Court a little bit about

6   your education?

7        A.    I received my bachelor's in accounting some

8   time ago, in the 1990s.  I'm also a certified public

9   accountant, I have been for about 25 years now, which

10  includes a certain level of education requirement,

11  including ongoing education requirements.

12             I'm also a certified fraud examiner and that

13  also requires certain education requirements for

14  purposes of not only ongoing education, but tasks to

15  obtain your certification.

16       Q.    Do you serve on any boards relative to your

17  role as a CPA and a certified fraud examiner?

18       A.    Yes.  As a certified public accountant, I

19  serve on the board of trustees for the New Hampshire

20  Society of CPAS.  I'm also one of the co-chairs on the

21  Tax in the Legislation committee.

22             As a certified fraud examiner, I'm on the

23  board for the New Hampshire Chapter of the Association

24  of Certified Fraud Examiners.

25       Q.    Okay.  If you could, for the Court, explain a

1    little bit about your employment history as it pertains

2    to being a CPA and certified fraud examiner.

3         A.    Well, so I've been a CPA, as I mentioned, for

4    25 years.  I've worked both in public and private

5    practice.

6              For the last 15 years or so, I've been

7    self-employed.  I'm currently a partner at Maloney &

8    Kennedy, a CPA firm.  We've been together for over

9    ten -- partners for over ten years now.  And so I -- my

10   function in that capacity, of course, is as a partner.

11             Relative to my certified fraud activity, I get

12   engaged by law firms or public defenders or other people

13   to assist, usually with fraud issues.

14             I also am involved with audits, our company

15   does financial statement audits, which incorporates a

16   certain comprehension relative to fraud which we have to

17   apply when using generally accepted auditing standards.

18        Q.    Have you testified before in New Hampshire as

19   an expert?

20        A.    I have.

21        Q.    And what types of cases have you testified in?

22        A.    Largely, they've been restitution cases.

23   Largely, there's either an issue of a fraud or some sort

24   of matter in which we have to determine was there a loss

25   and, if so, how do we calculate that.

1          MR. HARRINGTON:  Okay.  Your Honor, I'd tender

2    this witness as an expert in the area as a CPA and

3    certified fraud examiner.

4          MR. HUNTER:  No objection.

5          THE COURT:  He's qualified and may testify and

6    form an opinion.

7          MR. HARRINGTON:  Thank you, Judge.

8      Q.    Now, Mr. Kennedy, I understand that you've

9    reviewed documentation in this case regarding United

10   States vs. Imran Alrai.  Is that correct?

11     A.    That's correct.

12     Q.    And what documentation have you reviewed?

13     A.    Well, there was a significant amount of

14   materials that were provided.  They include bank

15   statements, invoices, certain amount of emails.  Much of

16   the documentation was provided to me via counsel from

17   the prosecution and it includes, of course,

18   Mr. Naviloff's report.

19     Q.    Okay.  And did you issue your own report

20   after you had reviewed these items and, in particular,

21   Mr. Naviloff's report?

22     A.    I did.

23     Q.    Okay.  Based on your review, did you have any

24   issues or concerns relative to the RSM report and the

25   information you reviewed that you can express to the

1    Court?

2        A.    Yes.   So, broadly speaking, there were a few

3    areas, five or six areas, where I had some concerns over

4    the RSM report.   And in general respects, one, the

5    report failed to mention the positive performance

6    reviews that Mr. Alrai got during his tenure at the

7    United Way.

8              There wasn't any reference to the IT system

9    that was in place prior to Mr. Alrai being hired which,

10   based on some of the documentation I read, there were

11   issues with the IT system.

12             There wasn't any reference in the report

13   relative to the budget numbers that existed prior to

14   Mr. Alrai's employment, which I understand were roughly

15   in line with his time there over the course of his

16   employment with the United Way.

17             There -- there wasn't much indicated relative

18   to the management at the United Way and the fact that we

19   appear to have well-educated, experienced individuals

20   who did have some oversight relative to the budgeting

21   process.

22             And, of course, there was nothing referenced

23   that I recall in the Naviloff report that identified the

24   fact that the budget was approved, I think, by other

25   layers of management at the United Way and, of course,

1    invoices, even though they included Mr. Alrai's

2    approval, also had other signatures on it that appeared

3    to approve the invoices for payments.

4         Q.   Okay.

5         A.   And, lastly, based on the report, I was

6    concerned relative to Mr. Naviloff's qualifications, as

7    you were, relative to the IT system environment and his

8    assessment of it, particularly where it indicated --

9    seemed to indicate that he himself was not an IT expert.

10        Q.   So let's talk a little bit more in detail

11   about the summary that you had just indicated in those

12   points.

13             Can you point to some specifics as you go

14   through that summary?

15        A.   All right.  So relative to the performance

16   review items, it appears as though Mr. Alrai received

17   performance reviews twice a year and in most of these

18   that I read, he received usually at least achieves

19   expectations or excels and he received usually some very

20   positive comments on it.

21             And I won't read all of them that are

22   referenced in my report, but just to acknowledge a

23   couple of them, on a June 2013 manager performance

24   summary, Mr. Alrai was acknowledged -- "the significant

25   progress with the daunting challenge of the numerous

1    aspects of the IT system at the United Way."

2            In another performance review in 2000 -- for

3    fiscal year '14, he received positive comments and it

4    was noted that he had gone through various

5    implementations and negotiated effectively with vendors

6    and had a good handle on his budget and knows how to

7    best utilize it for the greatest impact.

8            Of course, he was ultimately promoted to

9    vice-president during his tenure there, which seems to

10   relay some indication of his success at the company.

11           In the announcement relative to his being

12   vice-president, it was noted that there were significant

13   efficiencies to both developmental and A&F and that

14   technology is a critical component of the UM -- United

15   Way's future success.

16       Q.   And what did you take that term A&F to mean,

17   development and A&F?

18       A.   Oh, gosh.  I'm sorry, I don't recall.  I did

19   know.  I don't know now what the acronym stands for.

20       Q.   Does administration and finance --

21       A.   That's right.  That's what it stands for.

22   Thank you.

23           In a fiscal year '15 review, it was noted he

24   strives to deliver excellent service, delivery of wide

25   desktop upgrades, the mobile platform, Google apps for

1  nonprofits, and that given the limited resources

2  available, Imran manages his budget well.

3      Q.  Okay.

4      A.  And, again, some other items, there was a

5  midyear performance review in 2000 -- January 2017 where

6  it was noted he accomplished a number of key projects

7  and initiatives.  And also in fiscal year '17, he

8  received positive comments including he was an effective

9  partner and worked on a number of major application

10  enhancements.

11      Q.  Okay.  In regard to the status of issues with

12  IT, you indicated that was another area?

13      A.  Uh-huh.

14      Q.  Could you point the judge to some specifics

15  that you had reviewed relative to that --

16      A.  Yes.

17      Q.  -- issue?

18      A.  So there was a representation by a Mr. Azim

19  Mazagonwalla, I believe it's pronounced, forgive me if

20  I've mispronounced it.  He was the senior director of

21  treasury services and accounting policy.  And I guess he

22  was first hired in 2010 and he had noted, I believe in

23  an interview:  The IT vendor in place at the United Way

24  during the time was costing almost $2 million a year and

25  there were a lot of complaints regarding the service

1    provided by that vendor.

2            Mr. Naviloff, prior to when he was working for

3    the United Way directly, he issued or there -- was

4    provided some presentation that he prepared.  And on it

5    I believe there was a slide that indicated multiple

6    slide -- personnel who indicated the prior IT system

7    never truly functioned in a reliable manner.

8            I had also been given information that the

9    United Way outsourced a critical part of their internal

10   computer system and there were reference -- technical

11   references to other vendors, CWAIN and Navisite.

12           So it appears that in conjunction with the

13   performance evaluations that he got that he was able to

14   take a system for which there appears to be complaints

15   and was able to successfully migrate it into something

16   which allowed them to give him very positive performance

17   reviews.

18       Q.    Now, closely associated with this you also

19   made some observations relative to budget comparisons --

20       A.    Uh-huh.

21       Q.    -- is that correct?

22       A.    That's correct.

23       Q.    Okay.  And could you tell the judge a little

24   bit about that?  And in a moment we'll pull up a visual

25   as well.

1      A.   All right.  So I was provided a spreadsheet

2   that seems to be a comparison of the United Way IT

3   budget to actual.  And, you know, the bottom line

4   essentially is that based on the schedules, while there

5   were variances from year to year, the budget expense was

6   about 2.5 percent over budget.

7           So the variance to budget seems to have been

8   fairly much in line over the course of this time frame.

9      Q.   And what do you mean by that, when you're

10  talking about the variance to budget and the time frame,

11  more specifically?

12     A.   All right.  So the time frame was 2014 to 2018

13  on this schedule that I was provided.  And essentially

14  it provided a budgeted number and it compared it to

15  actual expenses.

16          So if your budget is a million dollars and you

17  spend a million dollars, you've met the budget for the

18  year.  If you spend a million-one, you've gone over

19  budget; if you spend 900,000 you are under budget.

20          MR. HARRINGTON:  Okay.  If you could bring

21  that --

22     Q.   And I'm showing you a document.  This is

23  Bates-stamped number 18R148 RSM 00087.

24     A.   Uh-huh.

25          MR. HARRINGTON:  I think you have that,

1    Counsel, so it'll be admitted as an exhibit.

2        Q.    I'm showing you this document.  Is this in

3    line with what you were just talking about?

4        A.    Yes.  So this was --

5        Q.    And before we do that, do you recognize what

6    this is relative to your review in this case, whose

7    report this is?

8        A.    Yes.  So this -- this was the RSM -- as you

9    can see from the bottom right, it's got RSM referenced

10   there.

11           So this was a slide presentation prepared by

12   Mr. Naviloff.  I believe it was in association with an

13   insurance claim.

14       Q.    Okay.

15       A.    And, you know, the -- the slide is very well

16   done; it presents what it seems to do, wants to do.  He

17   notes that the IT budget during the three-year period

18   prior to Mr. Alrai's employment ranged from 1.0 to 1.4.

19   He specifically indicates that Mr. Alrai reduced the

20   annual IT budget by 125 in his first year and actually

21   spent 7K less than budget.  And that there was an

22   increase over the fiscal year period.

23           But generally, as you see, even though there

24   was an increase, you know, 2012, it was prior to

25   Mr. Alrai's being hired -- I believe he was hired in

1    2012, but that would have been a budget in place prior

2    to him being.

3            So it went down in 2013.  And as you see, the

4    actual expenditures are generally in line with the

5    budget amount.  There is a notable discrepancy maybe in

6    2018 and I'm unclear if there were just some other

7    projects that occurred during that particular budget

8    period.

9        Q.   And this slide also indicates that the

10   increase in spending of seven percent occurred over six

11   fiscal years, correct?

12       A.   That's correct.

13       Q.   And it also indicates that Mr. Alrai only

14   exceeded budget one time by less than $10,000 and that

15   was in fiscal year 2018, correct?

16       A.   That's correct.

17            MR. HARRINGTON:  Okay.  If you could go to the

18   next page.

19       Q.   This is also -- this is the next page of that

20   same document.  Can you explain what this page is

21   relaying to you?

22       A.   Yes, I believe this is the next page in the

23   same presentation that Mr. Naviloff prepared.  And as it

24   states, IT expenditures were less than budget for four

25   of the six years that he managed the department; he

1   spent one percent less than budgeted over the six-year

2   period.  And then he references, of course, the expenses

3   increasing over a seven-year period.

4        Q.   Okay.  So this is actually indicating taking

5   these years as a whole, 2013 through 2018, that the IT

6   expenditures under Mr. Alrai's tenure were actually one

7   percent less than what was budgeted?

8        A.   That appears to be the case, yes.

9        Q.   Okay.  In reviewing the documentation in this

10  case in regard to procurement, were you able to make any

11  observations regarding the procurement and payment

12  process in this case?

13       A.   I did.  So I -- I viewed various documentation

14  that indicated to some degree the involvement of people

15  at the United Way.

16            So it -- there was a document from Jack

17  Rotondi, the vice-president who it was stated he was

18  heavily involved in the vetting of contracts.  Diane

19  Dragoff, the senior director of organization operations

20  was apparently involved in the procurement process and

21  she was referenced as a procurement specialist on the

22  document that I reviewed.

23            There appears to have been committees and

24  multimember people from other departments that were in

25  place.  I made -- I was -- I read reference to a Stan

1   Burrows, who had the oversight role on an IT Advisory

2   Council for the RFP process and that there appears to

3   have existed an IT oversight council, which I believe

4   had five or six members consisting of CIOs and chief IT

5   officers at a number of different companies who worked

6   on the RFP details.

7          I also noticed that United Way had written

8   policies for procurement, including fixed asset

9   procedures and procurement questions.  There was a whole

10  Q and A section on, well, what if the purchase is over

11  $10,000.  And so --

12      Q.   Is the point that you're saying that there was

13  a review process, a checks and balances process, in

14  place from what you saw?

15      A.   Based on the documentation I saw, there

16  certainly were people in place who seemed to have been

17  involved in the budgeting process and the procurement

18  process.

19      Q.   Now, let me ask you, in regard to

20  Mr. Naviloff's report, did you have any other comments

21  regarding the services provided and loss calculations?

22      A.   Well, so in his report, Mr. Naviloff's

23  references to the assessment of the IT system struck me

24  as rather vague.  He did make reference to the fact that

25  he had IT professionals at his firm and in his report he

1    also references discussions with Mr. Meyer and other

2    people at the United Way.

3            However, the details relative to those

4    discussions or that analysis weren't really referenced

5    in the report.  You know, he didn't mention any specific

6    names or what their qualifications were and he didn't

7    mention what the nature of those discussions were.

8            So it wasn't clear to me, based on the report,

9    who he spoke to, what their qualifications were, and

10   more specifically, what exactly was their involvement.

11   There was no independent reference to I spoke to this

12   individual at my firm who has these qualifications and

13   this is what they contributed.  He seemed to just sum

14   everything up by saying, I spoke to IT people and they

15   said this is the same thing or they were involved, in my

16   understanding.

17           So in reading the report, I was rather

18   concerned about it.

19           Continuing that on, I was present for

20   Mr. Naviloff's testimony yesterday where he seemed to

21   better identify who the people were and to some degree

22   their qualifications.  Again, I wasn't very clear what

23   was their involvement; was it simply a review of a few

24   pieces of paper in which they said, oh, yeah, that's the

25   same thing, it's apples to apples, or did they -- did

1    they actually say, oh, no, this -- this comparison here,

2    for instance, the hosting and infrastructure as a

3    service, is exactly this and here's why.  And so I'm not

4    very clear or comfortable that the -- that -- to what

5    extent that analysis was done.

6            And even beyond that, the analysis -- my

7    understanding of what I've read and from Mr. Naviloff's

8    testimony is the analysis was largely based on the

9    paper, the comparison of contracts and things like that,

10   the invoice review, and yet he did acknowledge that --

11   if I'm recalling his testimony correctly -- nobody

12   contacted any of the other service providers directly.

13   The system at the time was not preserved and so there

14   wasn't an analysis done by him or any of the IT

15   professionals he had in his firm.

16        Q.    And let me stop you just briefly --

17        A.    Sure.

18        Q.    -- because you referenced that the system

19   wasn't preserved.  What do you mean by that?

20        A.    Well, I'm also not an IT specialist, so I

21   can't speak too technically about it, but my

22   understanding is that in consideration of a litigation

23   matter, you try to preserve the environment exactly as

24   it is so that --

25        Q.    When you're talking about the environment,

1  you're talking about the IT environment?

2       A.    The IT environment.  And, again, I can't speak

3  technically as to, well, what does that mean, but, you

4  know, it's like a crime scene, I guess; you know, you

5  try to preserve everything at the time.

6            And my understanding is that that wasn't --

7  whatever the servers were, the backup system, the

8  management system, I can't tell you, but my

9  understanding is that was all changed over the course,

10  after Mr. Alrai left.  I believe Mr. Meyer altered the

11  systems there.  And so what was exactly in place is not

12  available for analysis or was not available for analysis

13  by Mr. Naviloff and certainly wasn't used by him based

14  on his testimony or his team and it certainly wasn't

15  available to -- to us, to me.

16       Q.    What comments can you make relative to the

17  personal enrichment testimony that Mr. Naviloff had made

18  referencing and including funds received by DigitalNet

19  from both United Way and Robert Allen?

20       A.    So there's a few comments that I just noted

21  relative to his presentation.

22            Of course, Mr. Naviloff acknowledged that he's

23  simply using his professional opinions to determine the

24  number of people that were in, say, Pakistan providing

25  support and he -- in the presentation yesterday, he was

1    provided subsequent information regarding the payroll

2    information and so he extrapolated a number based on

3    what information he had of what the anticipated payroll

4    would be in Pakistan.

5             And so, first, I'm not sure that that analysis

6    is quite complete.  But he mentions that we have these

7    people out there and he doesn't quite know how many

8    there is.  And I don't know how many there is, though

9    what little understanding I have about IT systems, it

10   did seem odd that there were so few people supporting

11   the system, which I understand -- and, again, I can't

12   speak technically about it.

13            But beyond that, to the extent that you have

14   people someplace, you know, they have other costs.  Now,

15   he mentioned he did determine rent, but I would also

16   presume the same individuals, how many there are, would

17   require other things like hardware, software.  I presume

18   they're working in a building that has utilities.  There

19   could be other costs.  So that was one concern.

20            Mr. Naviloff also expressed that, you know, he

21   saw these personal expenditures which he used to

22   determine the personal enrichment -- oh, I forgot to

23   mention, on his determination of personal enrichment,

24   if I'm recollecting what he did, he included the

25   $1.2 million that was transferred to the Pakistan

1   account to come up with this final $3.7 million number,

2   but then later on he acknowledged there was a payroll

3   number that he ultimately calculated, but I don't think

4   he actually took that out of his personal enrichment

5   number.

6          So I -- if nothing else, I think his personal

7   enrichment number was overstated by at least this amount

8   he calculated to be what would have gone for payroll

9   unless he's taking another position relative to that

10  payroll.

11         And, of course, that 3.7 also included the

12  Robert Allen income, which would have produced some

13  level of profitability presumably.  So that 3.7 million,

14  of course, is not just the United Way, though he does

15  make reference to the fact that that is -- Robert Allen

16  is a source of that.

17         Beyond that, in terms of the personal

18  enrichments, he -- he did even mention the credit card

19  charges and the personal cost for that.  The only thing

20  I'm unclear of is when you're a sole proprietor, a Form

21  1040 Schedule C, the entity is something of an extension

22  of the owner.  It's different than an S Corp. and a C

23  Corp.

24         So as a sole proprietor makes money, they're

25  allowed to draw the money out of the company and a draw

1    is not a taxable event because the entity income is

2    taxed directly to the sole proprietor.  So it was

3    unclear to me relative to these credit card charges

4    which are done on a personal credit card -- I'm sorry,

5    on a business credit card -- were these actually used as

6    deductions on the tax return.

7            Certainly the business credit card appears to

8    have been used and if you accept that everything that

9    Mr. Naviloff identified is personal, which, again, is --

10   he's somewhat speculating, airfare and things like that

11   on some of the items.  It's possible that they weren't

12   used to -- as a deduction on the tax return and as such

13   it wouldn't be necessarily -- I have several proprietors

14   who do use a company credit card for personal costs.

15   They take it as a draw, which is perfectly acceptable to

16   the IRS.

17        Q.   And that's the --

18        A.   And one of the reasons they do it is they like

19   to build up points on their credit card or something

20   like that.

21        Q.   And that was the question I had.  In that

22   situation you've described as taking a draw, that is an

23   acceptable method under the IRS laws?

24        A.   Yes.  The IRS wouldn't necessarily be

25   concerned of the fact that a company credit card was

1    used for something personal.

2         Q.    The issue is whether or not it's claimed as an

3    inappropriate or an appropriate deduction?

4         A.    Deduction, that's correct.

5         Q.    Did you make some further observations that

6    you can relay to the Court regarding your assessment in

7    this matter?

8         A.    The only other thing that I think I'd like to

9    contribute, you know, I did review the tax returns,

10   which I understand Ms. Terry was here and provided them.

11            Relative to this same item, relative to the

12   personal expenses, you know, I also, like Mr. Naviloff,

13   I didn't perform an audit of any kind of the

14   transactions, but Ms. Terry appears to be capable.  My

15   reading of the tax work papers, including emails,

16   implies that she made inquiries relative to the

17   appropriateness of deductions and allocations of things

18   and so I have no reason to believe that those numbers

19   are necessarily inaccurate.

20            So if you take those numbers over a four- or

21   five-year period and you come up with a net profit, the

22   net profit was about 32.5 percent.

23        Q.    Okay.  So --

24        A.    And --

25        Q.    -- I want to stop you there briefly --

1      A.    Sure.

2      Q.    -- because we've heard some characterization

3  of, you know, 900 percent markup, you know, things of

4  that nature.  You're going more over to the tax return

5  and what the documents show as far as reported income

6  that was received by Mr. Alrai, correct?

7      A.    That's correct.

8      Q.    And in that regard, I'd like you to proceed

9  with that, relative to what the profit, if I'm using the

10  correct terminology, was.

11      A.    Uh-huh.  So essentially the net profit that I

12  was calculating was essentially just to take the bottom

13  line, the taxable income, that was included on the

14  return, which, of course, might exclude deductions that

15  are not allowed by the IRS, 50 percent meals and

16  entertainment.

17          And so I basically said, well, if you took all

18  of the receipts for each of these years and then you

19  take the bottom line and you simply divide the bottom

20  line by the receipts, what are you coming up with as a

21  net profit on the entire -- based on the tax returns.

22  And that came out to about 32.5 percent over the

23  five-year period.  There were fluctuations every year.

24          MR. HARRINGTON:  Okay.  Your Honor, I don't

25  have any other questions for Mr. Kennedy.

1          THE COURT:  Okay.

2                    CROSS-EXAMINATION

3   BY MR. HUNTER:

4      Q.   Good morning, Mr. Kennedy.

5      A.   Good morning.

6      Q.   So I just want to start with a few questions

7   beginning where you left off regarding your analysis of

8   Mr. Alrai's tax returns.

9          So you're saying you relied on those tax

10  returns as having true statements about Mr. Alrai's

11  expenses and income?

12     A.   That's correct.

13     Q.   Did you do any sort of analysis of the tax

14  returns and underlying records to test that assumption?

15     A.   No, only the -- there was supporting

16  documentation and so relative to -- I saw some emails

17  where there were inquiries about expenses, but other

18  than that, no.  As I stated, I didn't do an audit.

19     Q.   Okay.  And so you didn't analyze Mr. Alrai's

20  bank records to confirm, for example, that the cost of

21  goods sold actually represented costs of goods sold and

22  wasn't just an interaccount transfer between Mr. Alrai's

23  many business accounts?

24     A.   That's correct.

25     Q.   So, essentially, you're taking Mr. Alrai at

```
 1   his word?
 2        A.   I'm taking the tax returns prepared by his
 3   professional --
 4        Q.   Right.
 5        A.   -- and Mr. Alrai, yes.
 6        Q.   Of course.
 7             Can we pull up Exhibit 207a?  Okay.  And
 8   here -- can we zoom in on that, please, Ms. Sheff.
 9             So these are expenses and other income
10   provided by Mr. Alrai to his accountant?
11        A.   Uh-huh.
12        Q.   Do you see he has a lot of donations and
13   deductions, travel expenses?
14        A.   Yup.
15        Q.   Total R&D projects, R&D-related IT projects,
16   he takes a huge deduction.
17             Again, you're assuming DigitalNet was actually
18   doing R&D and IT projects?
19        A.   Yes.
20        Q.   We have business travel expenses deducted.
21   He's taking a deduction for everything, right?
22        A.   Well, I -- what do you mean by everything?  I
23   believe everything on this list, though I don't recall
24   specifically tracing this to the tax return.
25        Q.   Okay.
```

1    A.    But potentially all of this was listed as a

2   deduction, if the source of this is from the work papers

3   of the accountant, which I --

4    Q.    Yeah.

5    A.    -- it looks like it was.

6    Q.    So as a business deduction for DigitalNet, we

7   have the Methuen apartment rental condo fee and

8   maintenance for that apartment?

9    A.    It's listed as rental property.  So if --

10    Q.    Yup.

11    A.    -- it was listed as rental, then -- on the

12   Schedule C, then yes.  Again, I haven't traced that

13   number.

14    Q.    Of course, of course.  Internet access for his

15   home office is listed?

16    A.    Is which line?  I'm sorry.

17    Q.    Right here.

18    A.    Internet access for home office, right.

19         Well, that's labeled home office utilities and

20   so there's a business use of home deduction on the tax

21   return where the cost of certain things are allocated

22   based on the business use percentage.

23         And so I believe that because that's listed as

24   home office that those total costs are not included on

25   the Schedule C, but are apportioned based on the

1  business use portion of the home.

2       Q.   Of course.  Yeah.

3            Can we go to the next -- I guess go back to

4  207, Ms. Sheff.  This is only a one page exhibit.

5            MS. SHEFF:  207b maybe?

6            MR. HUNTER:  We'll hone in on the right page.

7  I'll move on to something else here for now.

8       Q.   So, Mr. Kennedy, did you review -- in terms of

9  assessing --

10           Oh, actually, let's try 207b.  Yes, let's try

11 that.

12           Okay.  Here we go.  This is the client

13 organizer.

14      A.   Uh-huh.

15           MS. SHEFF:  That's not it.

16           MR. HUNTER:  Never mind.

17           MS. SHEFF:  Take it down?

18           MR. HUNTER:  Yup.

19      Q.   So you testified a little bit about the

20 procurement process at United Way and you reviewed

21 certain documents showing that there were processes and

22 procedures in place to make sure that contracts were

23 entered into legitimately; is that correct?

24      A.   Yes.

25      Q.   And you'd agree with me that having a good

1    procurement process is important for a business to make

2    sure that they're engaging in an arm's-length

3    transaction --

4         A.   That's --

5         Q.   -- in entering into a contract; is that right?

6         A.   It's good practice, right.

7         Q.   And part of that is so that the business knows

8    what they're getting into when they're entering into a

9    contract, right?

10        A.   It provides for assessment of the procurement

11   beyond one person.

12        Q.   Right.  Yeah, you want more than one person

13   involved in making the decision when a business is going

14   to be entering into a contract for -- in this case, it

15   ended up being over a million dollars a year, right?

16        A.   That's correct.

17        Q.   You want to make sure there's appropriate

18   oversight, right?

19        A.   It's, again, good practice.

20        Q.   Yeah.  And you want to make sure that you're

21   hiring a -- you know the qualifications of the vendor

22   and the competing vendors before you pick which one

23   you're going to hire, right?

24        A.   In an RFP process, yes.

25        Q.   Yes, I -- exactly.  I'm referring to an RFP

1   process --

2        A.   Sure.

3        Q.   -- which is what I believe you testified

4   about; is that right?

5        A.   That they're -- also in regards to the budget,

6   there were -- appears to be some level of oversight

7   relative to the final approval of the IT budget.

8        Q.   Yes.  And when -- and I do want to talk to you

9   a little bit about the budget, but right now I just want

10  to talk about the IT procurement -- or the procurement

11  process.

12       A.   Sure.

13       Q.   And part of that is so you can assess

14  competing bids, right, and you know which one -- what

15  services each bid's providing and how much they're

16  charging for those services in making your decision?

17       A.   That's usually part of the procurement

18  process, to have competing bids.

19       Q.   And it's important for a company, in making

20  that decision, to have an accurate understanding of what

21  the options are; is that right?

22       A.   It can be, yes.

23       Q.   Would it be -- is it not helpful to have

24  accurate information?

25       A.   Of course it's helpful to have accurate

1    information.

2        Q.    And I think you testified that there were

3    people involved in the procurement process like Stan

4    Burrows.

5        A.    That's correct.

6        Q.    Did you -- are you aware of Mr. Burrows'

7    testimony that he never reviewed any RFP responses?

8        A.    No, I'm only aware of the document that I read

9    and I don't know who provided -- I believe it was an

10   interview, though I don't know if it was Stan Burrows or

11   not.  And, no, I wasn't here for any of the testimony

12   provided by any of the United Way people.

13       Q.    Okay.  So you're not -- you're not aware that

14   Stan Burrows testified that he wasn't part of that RFP

15   process --

16       A.    No.

17       Q.    -- in terms of reviewing --

18       A.    That's correct.

19       Q.    And that, in fact, he'd asked Mr. Alrai if he

20   could assist and Mr. Alrai told him, no, he didn't want

21   him to review the RFP responses.

22       A.    Again, I wasn't here for his testimony, so --

23       Q.    Right.  So you don't know that?

24       A.    That's correct.

25       Q.    And you mentioned a report of interview from

1    Azim Mazagonwalla, I believe is the last name, right?

2        A.   Yes.

3        Q.   And you -- and I think you testified regarding

4    him talking about problems with the prior IT vendor,

5    which we'll get to, but, right, you remember that --

6        A.   Yes.

7        Q.   -- testimony?

8             And, again, are you aware that he testified

9    that, likewise, when -- because he was part of the

10   procurement -- the RFP process, that he also didn't

11   review the RFP responses?

12       A.   Again, I wasn't here for --

13       Q.   You --

14       A.   -- any of the testimony of --

15       Q.   You weren't here for that, so you don't -- you

16   don't know.

17            And were you -- were you aware that he

18   testified repeatedly that throughout the procurement

19   process, he was relying on Imran Alrai as the IT expert?

20            MR. HARRINGTON:  Judge, I'm just going to

21   object.  This witness wasn't here for any of that

22   testimony.

23            THE COURT:  Yeah.

24            MR. HUNTER:  And, your Honor, I think it goes

25   to the factual basis of his opinion that the --

1          THE COURT:  I guess the way you asked it

2    then -- you could go with a hypothetical and ask if it

3    would change his view in any way, but --

4          MR. HUNTER:  I'll --

5          THE COURT:  -- flogging him for not being

6    here, not really helpful.

7          MR. HUNTER:  Sure.  Understood, your Honor.

8          THE COURT:  I know.  I'm not -- you know.

9    Q.    And, Mr. Kennedy, I truly don't intend to flog

10   you.

11         THE COURT:  That was my word.  That was my

12   word.  I'm sorry.

13   Q.    All right.  So let's pose some hypotheticals

14   that might -- you know, and see how these affect the

15   factual basis.

16         So is it your opinion that an RFP process is

17   legitimate or helpful if one of the bidders, one of the

18   three responding bids, edits and submits its response

19   after reviewing the other bids?

20   A.    I'm sorry.  Could you repeat that?

21   Q.    So if there are three or four bidders to an

22   RFP --

23   A.    Yes.

24   Q.    -- is the RFP process fair if one of those

25   bidders reviews the bids -- other bids before submitting

1    their response and edits their response?

2        A.    No.   I mean, obviously the RFP that's provided

3    should presumably remain unchanged.

4        Q.    Okay.   And is it your opinion that the RFP

5    process is legitimate if one of the bidders is also the

6    only person scoring those RFP responses?

7        A.    It's -- it's certainly potentially

8    problematic.

9        Q.    Potentially problematic?

10       A.    Yes.

11       Q.    So it's not always problematic to have one of

12   the bidders of an RFP -- one of the people that

13   submitted a bid in an RFP to also be the only person

14   scoring the responses?

15       A.    It's problematic.

16       Q.    Okay.   What about if one of the bidders

17   reviews the other bids and edits its response before

18   submitting its response and then that bidder who edited

19   his own response then grades the responses?   Is that

20   still a legitimate RFP process?

21       A.    Again, no, it's problematic.

22       Q.    Okay.   And what if the RFP were for something

23   technical, like IT services, and the person grading the

24   RFP responses is -- not only is he one of the bidders,

25   one of the people that submitted a bid, but he's also

1    the only person involved in the process with the

2    technical expertise required to evaluate the responses

3    and the values of them.  Is that a legitimate RFP

4    process?

5            A.   It's also problematic.

6            Q.   Why is it problematic?

7            A.   Well, because obviously you have an individual

8    involved in the procurement process who is not

9    necessarily independent on your hypothetical and who is

10   apparently the only person involved in the -- as you

11   indicated, has the only IT experience with it.

12               I, of course, would add that that being the

13   case, these individuals at the United Way who were at

14   management positions, it's unclear maybe why wouldn't

15   they ask more questions or ask specifically for a

16   repository of the RFPs.

17           Q.   And you -- and, again, you said you weren't

18   here for the testimony of those witnesses?

19           A.   That's right.

20           Q.   And you didn't hear their responses to

21   questions --

22           A.   Of course.

23           Q.   -- regarding those issues --

24           A.   Right.

25           Q.   -- right?

1          Let's talk about budgeting, again, the

2    legitimacy of the budgeting process.  If you're

3    saying -- you know, you've testified Mr. Alrai generally

4    came within budget or within the parameters of the

5    budget.

6          A.    Yeah, based on the slides prepared by

7    Mr. Naviloff.

8          Q.    Right.  Yeah.  And would your opinion change

9    about the weight to give that if Mr. Alrai were the one

10   preparing the budget and he prepared it in a way that

11   was very vague and actually got a lot of pushback from

12   accounting and was constantly trying to circumvent the

13   budgeting procedures in process?

14         A.    I'm sorry.  Could you repeat the question?

15         Q.    Sure.

16         A.    I'm not sure I'm clear on it.

17         Q.    If Mr. Alrai is drafting a budget --

18         A.    Yeah.

19         Q.    -- and providing the minimal level of detail

20   to get it through the required oversight --

21         A.    Uh-huh.

22         Q.    -- consistently year after year, would that

23   change your view at all about the weight you give the

24   fact that he comes within budget?

25         A.    Well, it would certainly make me wonder in

1    terms of the people who finally approved it, why did

2    they finally approve the budget.  Presumably they

3    received what information they felt was needed in order

4    to approve it.

5         Q.   And, again, you weren't here for the testimony

6    from those individuals?

7         A.   Right.

8         Q.   And, again, would it change -- would it

9    change your view -- actually, just posing another

10   hypothetical -- if part of the reason these budgets are

11   approved and contracts are entered into is because

12   they're relying on the IT expertise of their guy, the

13   person they hired to be in their corner for these

14   issues, Mr. Imran Alrai?

15        A.   Well, certainly I would expect them to rely on

16   Mr. Alrai for the technical side of things.  Again, I

17   wasn't here for their testimony --

18        Q.   Right.

19        A.   -- but I would like to think that they were

20   intelligent people who had history of IT budgets prior

21   to Mr. Alrai being there and had some sense of what the

22   cost was going to be.

23        Q.   And that goes to the prior IT environment

24   issue that you touched on, Mr. Kennedy.

25             Again, just looking at the factual basis of

1  your opinion, would it change in any way if part -- if

2  you understood that part of the reason why Mr. Alrai was

3  hired was because there was actually concern about the

4  cost of IT and concern that there -- the person who was

5  overseeing their major outside vendors might have too

6  close a relationship with those vendors?

7      A.   Would it change my opinion relative to the

8  budget numbers?  I'm not sure that it would necessarily.

9  So there was concern apparently, as you've indicated

10  before, but I'm not sure concern necessarily means that

11  there was a problem and I'm not aware that there was a

12  problem.  If there was, I'm not aware of it.

13      Q.   We'll talk about loss in a minute here, but

14  Mr. Kennedy, what is your opinion about the amount of

15  loss suffered by United Way?  What's -- what's the

16  number?

17      A.   I didn't come up with an opinion.  I wasn't

18  engaged to do a loss calculation.

19      Q.   Okay.  So you have no opinion about the loss

20  United Way suffered?

21      A.   No.

22      Q.   Did you do an analysis or review of the

23  DigitalNet invoices to United Way and the -- and their

24  contracts in conducting any of your analysis?

25      A.   I did some level of review, although to

1   Mr. Naviloff's credit, he seemed to have been very

2   thorough relative to his review of the invoices and the

3   disbursements.  And after some rather cursory review, I

4   determined that there really wasn't a need to replicate

5   that information and I relied on the amounts actually

6   paid.

7       Q.   Okay.  So one thing you noted in your report,

8   you know, regarding DigitalNet invoices -- I think this

9   is regarding the services billed by Insight on the

10  double billing --

11      A.   Yes.

12      Q.   -- issue.  I think you said something like it

13  may be that DigitalNet provided services that occurred

14  at the implementation of the Insight services -- and

15  from trial testimony, this would be sometime in the

16  2016, 2015 -- late 2015 --

17      A.   Uh-huh.

18      Q.   -- time period, which were no longer

19  recurring, but were built into the recurring cost,

20  right?  So there may be a recurring cost that includes

21  implementation costs.

22      A.   Yes, and that really just speaks to my being

23  unfamiliar with the systems and IT environment.

24      Q.   Okay.  You said you did a cursory review.  Are

25  you aware that DigitalNet billed over $300,000 to United

1    Way to set up servers and virtual desktops and that sort

2    of thing when they switched from OVH to Insight?

3        A.   Yes.  But because of -- again, because of my

4    technical inexperience with these things, I don't know

5    to what extent the 300,000 represents all of the setup

6    or if that incorporates some level of setup for which

7    additional setup was included in the ongoing fee.

8        Q.   Okay.  So we talked a -- you talked a little

9    bit about wires to Pakistan and whether those were

10   business or personal expenses and that sort of thing.

11       A.   Well, what I indicated was on the personal

12   enrichment piece, Mr. Naviloff included the entire

13   $1.2 million --

14       Q.   Right.

15       A.   -- as personal enrichment.  There seemed to be

16   some indication that there was payroll out there, he had

17   a schedule indicating, you know, 17 to 23 people at

18   various points, and he included the entire 1.2 under his

19   personal enrichment analysis.

20            I don't believe he then subsequently deducted

21   his calculation relative to the payroll, though there

22   may have been reasons why he didn't do it.

23       Q.   Right.  It was based on a review of documents

24   received and relied on -- it was reciprocal and expert

25   discovery, so relied on either by you or Mr. Sgro about

1   where the money was going in Pakistan?

2       A.   That's right.

3       Q.   And are you aware that there's been

4   testimony -- and are -- would your opinion change at all

5   in any way if there was evidence that Mr. Alrai spent

6   about $400,000 on real estate in Pakistan?

7           Or put in other ways, money coming from United

8   Way to purchase real estate --

9       A.   Uh-huh.

10       Q.   -- is that a -- is that classified as an

11   expense for services for United Way?

12       A.   Presumably not.  If it -- unless for some

13   reason it had some sort of relationship to the business,

14   but -- I'm sorry, relationship to the United Way

15   activity.

16       Q.   To United Way?

17       A.   But I don't know what that would be.

18       Q.   And so if it weren't related -- so on that

19   point, I think you saw that the payroll activity

20   continued after DigitalNet ended its contract with

21   United Way.

22       A.   Yes.

23       Q.   Why wouldn't payment to run a separate

24   business be a personal expense?  So if the -- if there

25   are people in Pakistan working on other businesses,

1   would that be a personal expense rather than a United

2   Way related --

3        A.   Well, you just said it was a business, so it

4   would be a business expense.

5        Q.   Well, a business expense, but not related to

6   work being done for United Way.

7        A.   Yes.  So if what you're saying is there's

8   another business which has nothing to do with United Way

9   and the payroll that's being paid is for this other

10  entity, then obviously it doesn't relate to United Way.

11       Q.   Right.  And all of that payroll is being

12  funded by wire transfers that can be traced back to

13  funds obtained by United Way, from United Way?

14       A.   If you say so.

15       Q.   I'm -- in this hypothetical.

16       A.   Sure.

17       Q.   So if there were evidence, for example, that

18  the defendant had another company that was making apps

19  and games, UltPult, and their activity is continuing

20  through the period of payroll records, that's not an

21  expense for services provided at United Way?

22       A.   Well, certainly, presumably after the --

23  Mr. Alrai was terminated, certainly anything after that

24  point.  But as I understand from Mr. -- you know, from

25  the documentation that was provided by Mr. Naviloff, you

1    know, there weren't time sheets or anything, so --

2         Q.    Right.

3         A.    -- I don't know what those people were working

4    on during Mr. Alrai's employment.

5         Q.    Right.  And in speaking to that lack of time

6    sheets and other things, like the time sheets to figure

7    out how much DigitalNet Pakistan employees are spending

8    on United Way versus any of Mr. Alrai's other business

9    ventures, those would be DigitalNet business records,

10   right?

11        A.    I am not sure.

12        Q.    If DigitalNet's paying them to do work --

13        A.    Yeah.

14        Q.    -- and they're billing by the hour, presumably

15   DigitalNet would keep track of the work they're doing

16   and --

17        A.    Well, if they're -- if they're DigitalNet

18   employees, then ideally there'd be some kind of payroll

19   records on them, yes.

20        Q.    And the payroll records for DigitalNet

21   Pakistan are DigitalNet records?

22        A.    Well, you've referred to it as UltPult --

23   UltPult, UltPult?  Whatever that other company is.

24        Q.    Right.

25        A.    So if they're UltPult employees, perhaps the

129

1    DigitalNet company is providing loans or funding to help

2    this other company.  So the payroll records may be

3    UltPult.

4        Q.    Okay.  Let's talk about the payroll records

5    for DigitalNet in Pakistan.

6              Again, the records about what those employees

7    are doing, the hours they're spending on United Way

8    projects, the value they're providing to United Way,

9    right, those would be DigitalNet business records --

10       A.    Presumably.

11       Q.    -- right?  So if we wanted to know what work

12   they were doing and how much, those would be records in

13   DigitalNet's possession and control; isn't that right?

14       A.    Yeah, although the actual company was AISA or

15   ASIA --

16       Q.    AISA, A-I-S-A?

17       A.    Yeah.

18       Q.    What do you mean when you say the actual

19   company was AISA?

20       A.    Wasn't the company name that -- the tax return

21   was not labeled DigitalNet; it was that company, I

22   believe, AISA Consulting.

23             And so in terms of the -- the payroll for

24   DigitalNet, I'm referring -- I presume you're referring

25   to that entity on the Schedule C.

1          Q.    And is it your understanding, Mr. Kennedy, if

2    you've reviewed the documents, that the money funding

3    the AISA bank accounts are -- is money coming from

4    DigitalNet?

5          A.    That's my understanding.

6          Q.    And that money coming from DigitalNet is all

7    money coming from United Way and Robert Allen Group?

8          A.    Again, that's my understanding.

9          Q.    Okay.  And that for tax purposes, AISA was

10   treated as DigitalNet; AISA is essentially a --

11         A.    Yeah, Mr. Naviloff -- I didn't do any

12   particular -- my own research on it.  Mr. Naviloff

13   indicated that DigitalNet and AISA were basically

14   consolidated on the Schedule C of Mr. Naviloff.

15         Q.    All right.  Now, let's talk about, I guess,

16   business expenses on the credit card.  You haven't done

17   a separate analysis, certainly not one that I've seen,

18   analyzing the expenses charged on the DigitalNet credit

19   card --

20         A.    That's correct.

21         Q.    -- is that right?

22               And if Mr. Alrai claimed all of the credit

23   card expenses as a deduction on his taxes, presumably he

24   would be saying that was all business related; is that

25   right?

1        A.    Yes.

2        Q.    Okay.  So would you say that buying granite

3  countertops is a legitimate business account for an IT

4  services company operating out of a home office?

5        A.    I don't know the answer to that.

6  Presumably -- unless they needed counters at the office

7  they were using.

8        Q.    But for purposes of this, let's assume a home

9  office.

10       A.    For the home office, not completely

11  deductible, no.

12       Q.    Would plastic surgery be a legitimate business

13  expense for an IT services company?

14       A.    Unlikely.

15       Q.    What about jewelry?

16       A.    Again, unlikely.

17       Q.    What about a trip to Niagara Falls with your

18  wife?  Is that a legitimate business expense for an IT

19  services company?

20       A.    Well, depends.  If there was a seminar going

21  on in Buffalo or something and you took your wife, then

22  you know, there may be some legitimacy to it, but ...

23            MR. HUNTER:  Can we go to page 568 of

24  Exhibit 207.  And that's Bates 48, I --

25            MS. SHEFF:  Are you sure that's right?  Oops,

1   here we go.

2       Q.   Okay.  These are the 2016 expenses for

3   DigitalNet?

4       A.   Uh-huh.

5       Q.   And did you review this?

6       A.   I saw it, yes.

7       Q.   Okay.  You saw it.  And, again, you said you

8   didn't do an audit of the bank statements?

9       A.   No, I really didn't do any -- any analysis of

10  the work papers supporting the tax returns.

11      Q.   Okay.  So do you think 59 grand for travel is

12  deducted for a business expense?

13      A.   If that was used on the Schedule C, yes.

14      Q.   Okay.  Let's look at IT support, the cost of

15  services, one -- okay.

16           I see a total of 1.8 million in expenses.

17      A.   Uh-huh.

18      Q.   So that's about $300,000 more than the income

19  of the company.  Do you see that?

20      A.   Yes.  And I don't have the Schedule C, but I

21  don't recall a year in which he reported a loss, so I

22  don't know how these numbers tie to the --

23      Q.   Right.

24      A.   -- items that were actually reported on the

25  tax return.

1        MR. HUNTER:  Nothing further at this time.

2        THE COURT:  Thank you.

3        Redirect.

4                    REDIRECT EXAMINATION

5    BY MR. HARRINGTON:

6        Q.   Mr. Kennedy, I just have one topic I want to

7    cover with you.  It may take a series of questions to

8    get there.

9             But you were asked on cross-examination about

10   if an appropriate expenditure would be considered a

11   business expense, I think was how it was put,

12   particularly whether DigitalNet used money to buy a

13   building in Pakistan or land in Pakistan.  Do you recall

14   that question?

15       A.   Yes.

16       Q.   And you were asked about whether that would be

17   like an appropriate business expense as it related to a

18   service being provided to the United Way, correct?

19       A.   Correct.

20       Q.   Let me ask you the same scenario, but once

21   DigitalNet earns money or is paid money --

22       A.   Uh-huh.

23       Q.   -- for example, by United Way, would it be

24   fair to say that they could use that money in any way

25   they deemed appropriate for a business expense that

1    might include buying land or a building?

2        A.    Of course.

3            MR. HARRINGTON:  Okay.  I have no other

4    questions, Judge.

5            MR. HUNTER:  Just quickly.

6                    RECROSS-EXAMINATION

7    BY MR. HUNTER:

8        Q.    Would it change your opinion at all if the

9    business didn't own the land, but the defendant owned it

10   personally?

11       A.    Well, again, it would depend.  If the -- as I

12   mentioned before, it's a sole proprietorship, so the

13   profits generated by the sole proprietor really can be

14   used however they deem appropriate.  It can be used as a

15   draw.  It could be potentially a -- technically, it

16   could be a draw to the owner purchase personally, but

17   still be used for business.

18           And so I -- often we recommend to people that

19   real estate purchases are done separate from the entity

20   in order to limit liability.

21           MR. HUNTER:  Okay.  And these -- these --

22   nothing further.

23           THE COURT:  All right.  You're excused, sir.

24           THE WITNESS:  Thank you.

25           THE COURT:  Thank you.

```
 1                      (Witness excused.)

 2              MR. HARRINGTON:  Your Honor, the defense calls

 3   to the stand Jason Sgro.

 4              THE COURT:  Thank you.

 5              THE CLERK:  Good afternoon, sir.

 6              THE WITNESS:  Good afternoon.

 7              THE CLERK:  If you'd like to step this way,

 8   please.

 9              If you could step into the witness box and

10   remain standing.

11              Please raise your right hand.

12              JASON SGRO, having been first duly sworn,

13   testified as follows:

14              THE CLERK:  For the record, please state your

15   full name and spell your last name.

16              THE WITNESS:  Jason Joseph Sgro, S-g-r-o.

17              THE CLERK:  Thank you.  Please be seated.

18                      DIRECT EXAMINATION

19   BY MR. HARRINGTON:

20        Q.   Good afternoon, Mr. Sgro.  How are you today?

21        A.   Good afternoon.  I am well.

22        Q.   So I want to first ask you some questions

23   about your education --

24        A.   Sure.

25        Q.   -- background.
```

1       If you could, for the judge, explain what your

2    educational background is, please.

3       A.    Sure.  I have a bachelor of arts from

4    Northeastern University.  I am a certified ITIL expert,

5    and that's information technology infrastructure

6    library, which is the de facto international

7    certification for professionals delivering IT services.

8       I am a certified project management

9    professional for IT service delivery from the Project

10   Management Institute, which is also a globally

11   recognized body.

12      Q.    And let me ask you, in regard to your

13   experience in the IT, could you detail for the judge

14   your work history relative to the areas that you've just

15   talked about?

16      A.    Sure.  Right now I'm a senior partner at the

17   Adam Group, which is an IT services and security

18   software company.  I've been doing that for about four

19   years, where I am an equity partner and owner.

20      Before that, I was the chief information

21   security officer and head of corporate IT for a company

22   by the name of Agamatrix, which is a medical device

23   company, wherein I ran software development and IT

24   services in four countries -- the United States, Korea,

25   China, and Vietnam -- and performed IT services for

1    700 -- about 700 employees.

2            Before that, I've had about 20 years or

3    20 totalish years of IT experience both in global

4    outsourcing as well as building up IT operations and

5    supporting IT and software development.

6        Q.   And let me ask you, do you act as a consultant

7    to any organizations relative to IT and bring your

8    expertise to them in that area?

9        A.   Yes, many.  I am currently, I believe, the

10   only senior advisor to the State of New Hampshire

11   legislative branch, the president of the Senate, the

12   speaker of the house, as well as liaising on IT service

13   delivery and cybersecurity matters throughout the

14   legislative branch.

15           I'm also the advisor for security and privacy

16   for the Validation Institute, which is a national

17   company that accredits medical device claims and medical

18   claims, where I advise them and the remainder of the

19   board there on matters of security, privacy, IT

20   operations, and outsourcing.

21           MR. HARRINGTON:  Okay.  Judge, I would tender

22   this witness as an expert in the area of information

23   technology.

24           MR. HUNTER:  No objection.

25           THE COURT:  He may testify and form an

1   opinion.

2           MR. HARRINGTON:   Thank you, Judge.

3       Q.   Mr. Sgro, did you have an occasion to be

4   involved in a review of the case of United States vs.

5   Imran Alrai?

6       A.   I did.

7       Q.   Okay.  And did you also have the opportunity

8   to sit in and listen to the testimony of Mr. Meyer?

9       A.   I did.

10      Q.   As well as Mr. Naviloff?

11      A.   Yes, that's correct.

12      Q.   Okay.  In that regard, are there some areas

13  that you would flag for the judge as areas that you

14  would talk to to provide further information relative to

15  the IT process as well as the testimony of Mr. Meyer and

16  Mr. Naviloff?

17      A.   Yes, there are a couple, and I would start

18  with a fundamental understanding of the IT service

19  delivery.

20           There's -- there's many instances in both

21  the testimony that I heard as well as the documents I

22  reviewed where -- the RSM report from Mr. Naviloff --

23  where these services are being --

24      Q.   I just want to stop you briefly.

25      A.   Sorry.

1      Q.    If you can talk just a little bit --

2      A.    Oh, sure.

3      Q.    -- more slowly --

4      A.    Sorry.

5      Q.    -- because the stenographer is taking all of

6  this down.

7      A.    My apologies.

8            As well as the RSM report produced by

9  Mr. Naviloff.

10           These IT services are part of a conjoined

11 system.  They are not disparate things.  So when we talk

12 about servers and cloud, when we talk about telephony

13 services and security and applications, these are part

14 of a living system.  There's a system by which the

15 United Way does business every day and those systems are

16 ever-changing.

17           And so -- I can give you a quick example of

18 that.

19           When we talk about the telephony services,

20 over the course of the discussion that I have heard and

21 what I have read and I reviewed, there's actually three

22 sets of telephony services.

23           So there was the Legacy telephone system that

24 preexisted Mr. Alrai.  There's the SIP.US system, which

25 was implemented by him during his time, and then there's

1    the 8x8 system that was implemented by Mr. Meyer.

2           And so you can see that these services are

3    evolving and living constantly.  And I want -- when we

4    go through some of the issues that I've -- that I would

5    like to bring up, I think it's important to keep in mind

6    that these services are changing and the services that

7    surround them are changing.

8           What I would mean to say by that is if you

9    take information security, right, if you look at

10   Mr. Naviloff's report, he'll say that information

11   security or security in general is a line item that

12   equates to $3,500 a month in cost to United Way.

13          Well, the information security for telephony

14   and the information security for something like VDI,

15   the virtual desktop environment, they -- they are

16   intertwined, right?  If one system is insecure, it could

17   impact the other systems.

18          And so it is very difficult to line up the --

19   which services are going to -- which subservices are

20   going to which main services the way Mr. Naviloff's laid

21   it out.

22       Q.   And is that -- and is that due to the

23   different skills that would need to be brought to bear

24   to manage those systems?

25       A.   It -- it's really due to two things.  The

1    first is in order to understand -- accurately understand

2    what happened in an IT environment, you need to be able

3    to see that environment.  Right?  And I have not been

4    able to analyze any servers or any cloud environments in

5    that environment because I was told that they were

6    either not preserved or too burdensome in order for us

7    to -- or not possessed or too burdensome in order to

8    allow us to analyze those.

9            In lieu of --

10       Q.   And in -- just stop you on that briefly.

11       A.   Yeah.

12       Q.   In that regard, how does that impact your

13   ability as an expert in this area to testify about what

14   those systems were that were in place?

15       A.   It makes it very difficult, right, because in

16   order to accurately describe something and analyze

17   something, you need to be able to see something.  In

18   lieu of seeing something, what you can do,

19   alternatively, is look at -- do a forensic analysis of

20   email communications or help desk communications.

21            And why those are important is none of these

22   services are simple.  They all require a decent amount

23   of engineering activity.  When there are issues with

24   them, those issues were raised -- would be raised, you

25   know, hypothetically, to a help desk and the help desk

1    would ticket them and use that as a -- and almost a

2    management tool in order to deploy IT services within

3    the environment.

4            And so, normally, if there was no environment

5    to look at, we would look at forensic copies or

6    complete, comprehensive copies of email accounts and

7    help desk records.  And we were unable to do that as

8    well because those were either not preserved or too

9    burdensome to be made available.

10       Q.   Okay.  So let's circle back now relative to a

11   couple of different topics.

12            For example, did you have occasion to look

13   into the issue of what they would refer to as duplicate

14   of billing?  You've heard some testimony about that.

15       A.   I did.

16       Q.   And you heard that that revolved around

17   Insight versus DTS and CloudConnect, correct?

18       A.   Yes.  And this is what I'm talking about when

19   I state that the services, without being able to see

20   them, it's very difficult to understand exactly what's

21   happening.

22            And I appreciate the analysis that

23   Mr. Naviloff did.  However, I believe there's an error.

24       Q.   And what is that error?

25       A.   The Insight bill and the DTS invoice for the

1    CloudConnect services are actually not duplicate bills.

2    Those are not for the same thing.

3              And what I mean by that is one is for a VDI,

4    which is a virtual desktop environment; that's how

5    employees use their computers.  It appeared in my

6    analysis that potentially there was a migration, that

7    they were moving services from DTS CloudConnect to

8    Insight.

9         Q.   And when you say they, what do you mean by

10   that?

11        A.   This would have been the -- the DTS

12   organization was moving those services.

13             And so when you analyze those services at the

14   invoice level, the details are really important, right,

15   because we don't have an environment to look at.  So we

16   have to really look at these details.

17             And what you will see in the DTS cloud

18   agreement -- invoice is that these are for

19   infrastructure as a service and hosting in the

20   CloudConnect environment, which is a specific software

21   environment.

22             In the Insight environment, this is a VMware

23   and IBM-based environment.  These are fundamentally

24   different softwares.  And they provide a similar

25   service, but in a much different way.

1              And so there's a bunch of different ways you

2    can analyze this and one of them is certainly that,

3    okay, they're the same, but I think the invoices show

4    clearly that they are not the same.

5              When you are transitioning from one service to

6    another, you don't take the things all out of one

7    bucket, throw them in the air, and quickly try to build

8    the other bucket.  You bring them both up in parallel.

9    At that time you pay for two services that are maybe

10   similar, but are fundamentally different and you migrate

11   over to them or it's very typical in many cases where

12   those two environments have pros and cons, maybe one

13   environment performs faster than the other environment,

14   so certain users in your infrastructure are migrated to

15   the new environment, in which case it is -- it is

16   plausible that both environments are intended to be

17   there in perpetuity.

18        Q.   Okay.  Now, one of the other things that you

19   looked at was the issue of geographic diversity.

20        A.   Yes.

21        Q.   That's been a topic that's been discussed a

22   few times as a service that was contracted for --

23        A.   Correct.

24        Q.   -- but not provided.

25              Could you speak to the judge a little bit

1   about your review of that issue?

2        A.   Yes.  So geographic diversity was actually

3   discussed during the testimony of Mr. Meyer, wherein he

4   used two cups to show the two data centers that would be

5   in geographically diverse locations, wherein data could

6   pass between them and potentially mitigate a service

7   interruption.  That is one version of regional

8   diversity.

9             There's also another version of regional

10  diversity where one data center is used and the business

11  is used as the other region.  So, for instance, a data

12  center in Virginia would be regionally diverse from a

13  business in Massachusetts.  Those are regionally

14  diverse.

15            But, again, because we don't have engineering

16  communication or the environment to analyze, we can't

17  see if there was data flow or systems present in both of

18  those places to satisfy the regional diversity.

19            With regard to the promise of regional

20  diversity from DTS, it is in the 2013 version of the IT

21  managed services contract, says there'll be regional

22  diversity at which time CloudConnect was built.  And

23  during the testimony where we saw the two -- the reuse

24  of the CloudConnect verbiage as -- what do you call it,

25  DigitalNet contract, right, where they're passing those

1  services, CloudConnect did show in their service

2  agreement that there was regional diversity and

3  redundancy.

4          I think in the case where an outage occurred,

5  there was -- this was in the OVH data center in

6  Virginia.  And two assumptions are made in that

7  testimony that I think are not fair.  The first is that

8  the -- the contract that was signed in 2013 that

9  promised the delivery of those services was never

10  updated to reflect the installation of an OVH service,

11  right?  This was --

12      Q.   So just to be clear, when you're talking about

13  the change from CloudConnect --

14      A.   Right.

15      Q.   -- to OVH --

16      A.   Correct.

17      Q.   -- there wasn't an amendment to the contract

18  to reflect the difference between CloudConnect and OVH?

19      A.   Correct.  This is five years now or four years

20  in the future.  And so that's -- that's one point.

21          The other point is that that environment was

22  not available for analysis.  And so while I think it's

23  reasonable to assume that perhaps OVH does not have a

24  regionally diverse data center, that doesn't mean that

25  there was no regional diversity.  And what I mean by

1    that is the presence of an outage does not mean that

2    redundancy or regional diversity wasn't in play.

3           I'll give you a hypothetical.  Facebook has

4    dozens -- literally dozens of data centers across the

5    globe to achieve regional diversity.  They certainly

6    have a high availability fault tolerant environment for

7    their infrastructure and they have outages, right?

8    These are ultimately computer systems and despite our

9    best efforts as technologists, they will go down.  So it

10   does not follow that because there is

11   an outage, therefore, it was not regional diversity.

12          So that is a case where I would rely on either

13   the communications, which we were not able to analyze,

14   or a review of the environment, which also we weren't

15   able to analyze.

16      Q.   And let me ask this question, because I want

17   to clarify.

18      A.   Uh-huh.

19      Q.   We've heard the term high availability backup

20   and we've heard the term regional diversity.

21      A.   Correct.

22      Q.   Are those two connected to each other or are

23   they distinct?

24      A.   No, they're -- those are distinct in that the

25   high availability -- they're really three things.

1        High availability is the availability of a

2   system to withstand a component failure within that

3   system.  Right?

4        So, for instance, it could be two hard drives

5   in storage so that one hard drive fails and the other

6   hard drive is okay; there could be two servers or three,

7   you know, as an example.  There's plenty of examples

8   there.

9        Backup is your ability to recover from a

10  systemwide failure.  So if both of those two hard drives

11  were to fail, you would then restore them from a backup.

12        Regional diversity mitigates maybe a whole

13  building being down or maybe a region having a hurricane

14  where power was lost for an extended period of time.

15  But those are really three distinct things.

16       Q.   And in your review of this case and your

17  listening to the testimony, are you aware of whether

18  there was high availability backup made available?

19       A.   I'm not aware.  We were not able to analyze

20  that.

21       Q.   And this again goes to the area where you

22  weren't able to analyze the environment nor were you

23  able to review emails that might discuss the issue; is

24  that right?

25       A.   Yeah, that's correct.  So we weren't able to

1    view any forensic copies or comprehensive copies of

2    email communication, the help desk, or any of the IT

3    environments.

4        Q.   Okay.  Let me ask, were you also able to

5    review and listen to testimony regarding SIP, S-I-P.US?

6        A.   That's correct.  Yes, that's correct.

7        Q.   Can you tell the judge a little bit about your

8    analysis of that area?

9        A.   So SIP is a place where, while I can

10   appreciate the thoroughness of Mr. Naviloff's RSM

11   report, things need to be placed accurately in time.

12            And what I mean by that is, first, SIP is part

13   of a telephony system.  Right?  They provide a service

14   that combined with networking and security and phone

15   systems and wiring and all of that, and bandwidth, would

16   comprehensively create a phone system.

17       Q.   And let me ask you, when we talk about SIP --

18   and you talked about that it's part of --

19       A.   Yes.

20       Q.   -- a telephony system, all of those things

21   that you just described --

22       A.   Yeah.

23       Q.   -- is that what SIP is providing?

24       A.   No, that's not what SIP is providing.  SIP is

25   only providing the protocol by which these phones work.

1  So basically the ability for the number to leave the

2  building and call somebody else.

3       Q.   All right.  So all the other stuff that's

4  attached to the -- the telephony system --

5       A.   Yeah.

6       Q.   -- SIP is providing the line in and out?

7       A.   Essentially -- not the physical line, but the

8  capability for --

9       Q.   The capability --

10      A.   -- for the line, yes, correct.

11      Q.   -- to go in and out.

12           And all the other services that you're talking

13  about -- and, again, if you'd recap them -- this is in

14  addition to or separate from what SIP is doing?

15      A.   Yes.  These are in addition, correct.

16      Q.   And what are those again?

17           THE COURT:  Can I interrupt?

18           MR. HARRINGTON:  Yeah.

19           THE COURT:  Can you estimate how much for

20  direct you have?

21           MR. HARRINGTON:  I would say maybe another 15,

22  20 minutes, Judge.

23           THE COURT:  We'll take a lunch break then.

24           MR. HARRINGTON:  Okay.

25           THE COURT:  We'll take a lunch break and

1    reconvene at 1:30.

2              (Lunch recess taken at 12:32 p.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 4/10/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR