*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     * No. 1:18-cr-192-JL
              v.                      * October 10, 2019
6                                     * 10:34 a.m.
      IMRAN ALRAI,                    *
7                                     *
                      Defendant.      *
8     * * * * * * * * * * * * * * * * *

9

10                        MOTION HEARING

11
                 BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13
      APPEARANCES:
14

15    For the Government:       Matthew Hunter, AUSA
                                United States Attorney's Office
16

17    For the Defendant:        Timothy M. Harrington, Esq.
                                Timothy C. Ayer, Esq.
18                              Shaheen & Gordon PA

19

20    Court Reporter:           Brenda K. Hancock, RMR, CRR
                                Official Court Reporter
21                              United States District Court
                                55 Pleasant Street
22                              Concord, NH 03301
                                (603) 225-1454
23

24

25

1              P R O C E E D I N G S

2          (Chambers conference held off the record)

3          THE CLERK:  All rise for the Honorable Court.  The

4    Court has before it for consideration this morning a motion

5    hearing in criminal case 18-cr-192-01-JL, United States of

6    America versus Imran Alrai.

7          THE COURT:  Okay.  A couple of housekeeping issues,

8    and we'll get into this Motion for Venue.  I was just talking

9    to my law clerk about this repatriation motion.  Refresh my

10   memory a little bit on a couple things about it.

11         First of all, the objection that's been filed to it

12   was not your objection, right, Mr. Harrington, it was prior

13   counsel?

14         MR. HARRINGTON:  That's correct, your Honor.

15         THE COURT:  Which was who?  I forgot.

16         MR. HARRINGTON:  That was Attorney Peter Anderson,

17   your Honor.

18         THE COURT:  Oh, yeah, okay.  So, there's that.

19         My memory is -- Mr. Hunter, you can probably refresh

20   my recollection, because I don't think your co-counsel was on

21   the case at that time, but we had a conversation about it in

22   chambers, and I think, I think -- I'm trying to answer the

23   question of why I haven't resolved this sooner, and I think we

24   had a conversation that it actually could be kind of put aside

25   for a while until after some other issues got resolved.  Am I

1    wrong about that?

2            MR. HUNTER:  My recollection, your Honor, which may

3    well be mistaken, but it was discussed in chambers about

4    addressing it today with the venue motion.

5            THE COURT:  That makes perfect sense.

6            MR. HUNTER:  And then Mr. Davis reached out to

7    chambers after this was scheduled, and the response we got was

8    that we would only be addressing venue today.

9            THE COURT:  We did just talk about it at length in

10   chambers, and perhaps at the end of this hearing we can talk

11   about it a little bit more.  The prosecution at this point

12   would like a pretrial hearing about it.  Defense counsel would

13   prefer to address it I guess as part of the bench trial.

14           MR. HUNTER:  Yes, your Honor.

15           THE COURT:  It's just that there's not a ton of time

16   between now and the bench trial.  We were talking about in

17   chambers having a hearing on that in November, but I think, if

18   we're going to do it at all, we should probably try to do it in

19   October.  Just for the record, that's document number 7, the

20   Motion to Repatriate Property.  Okay.  So the motion to

21   repatriate property is still under advisement.

22           Document number 14, the Motion for a Bill of

23   Particulars, defense counsel informed the Court in chambers

24   that it was withdrawing its objection because the superseding

25   indictment cured the relief requested, right?

1          MR. HARRINGTON:  That's correct, your Honor.

2          THE COURT:  So, number 14, Charli, is withdrawn.

3          THE CLERK:  Thank you, Judge.

4          THE COURT:  Okay.  So, what we have before the Court

5    is document number 32, a Motion to Dismiss for Improper Venue,

6    which has been objected to.  I guess the way to go about it is

7    there's sort of a legal issue and then there's the factual

8    issue.  The legal issue is whether the Court should hear

9    evidence on this or hear argument that goes beyond, consider

10   information that goes beyond the allegations in the indictment.

11   Mr. Harrington, for the defendant, is urging me to do so.

12   Prosecution says it's not necessary or even permissible,

13   necessarily.  But why don't you address the Court on that, and

14   then, if necessary, we'll get into an evidentiary showing to

15   satisfy the venue requirement.

16          MR. HARRINGTON:  Thank you, Judge.

17          THE COURT:  All right.

18          MR. HARRINGTON:  So, Judge, what I'm asking the Court

19   to do, and I would, I guess, start out by saying I agreed with

20   the government, and I think we set it forth in our motion, that

21   typically the Court's only going to look at the four corners of

22   the indictment.  In this case, which I would suggest to the

23   Court is unique and there is a unique issue, which is the issue

24   of venue, which I don't think has really specifically been

25   decided, and it's a little bit different than other motions,

1   is, if you look at a motion for venue, what we're talking about

2   is a particular issue in this case, which is whether the wire

3   was used interstate, and if the wire wasn't used interstate,

4   then I would suggest that this Court doesn't have venue, and it

5   may even call into question whether there's a federal charge.

6   I would not have filed a Motion to Dismiss relative to venue if

7   I had seen in the discovery documentation that would have

8   supported an interstate wire.  I would have just relied on

9   that.  I think part of what is incumbent on me is, not seeing

10  that evidence in the discovery, to file the Motion to Dismiss

11  pretrial, which I think would be required, and then address the

12  issue now and potentially perhaps readdress the issue further

13  during the bench trial that's going to take place in December.

14  But I felt it was incumbent to raise that issue now.

15         With the government suggesting that, rightly so, that

16  we don't want to get into a trial on the merits on a venue

17  motion, what I would suggest is the Court doesn't have to.

18  This is a very limited issue, Judge.  We're talking about a

19  very limited evidentiary issue, which is the state could simply

20  produce what documentation it has, which I believe is from

21  Comcast, to show that the IP address was in Windham, New

22  Hampshire, and that that IP address was used to send what

23  they're saying are documents and invoices to the United Way in

24  Boston, Massachusetts.  If that's the case, if that's

25  established, I, as I said in chambers, wouldn't contest that

1    venue is appropriate.  But I have not seen that in the

2    discovery, and that's the limited issue.  So, I don't think

3    that you have to go deep into a trial on this.  I think it's

4    just a very limited issue.

5         I would also suggest to you that, in regard to the

6    counts we're talking about, Counts 1 through 18, those are the

7    wire fraud charges, the government needs to establish venue on

8    each one of those counts.  If they do, then I think the

9    remaining counts, 19 through 52, are going to all get

10    piggybacked, because they're all derivative counts.

11         So, the focus, I think, of your consideration will be

12    that.  I think it is a very limited issue that we're asking to

13    look beyond relative to the indictment.  There's not a trial.

14    I think it's a very appropriate consideration for you to look

15    at and does not create an onerous burden for the government.

16         So, for those reasons, Judge, I would ask you to look

17    beyond the four corners of the indictment.  I don't think

18    you're necessarily creating new law.  I think it would be an

19    appropriate evidentiary consideration for you, because, if you

20    don't do it now, you're going to be doing it when we go to

21    trial, and at that point in time the government has indicated

22    that it has, I think they said they have, like, 52 witnesses.

23    Some are coming from out of the country, some are coming from

24    out of state.  They've blocked this off for about, I think, two

25    weeks.  That's a significant amount of time and resources to be

1    brought to bear to do it at the trial stage.  I would suggest a

2    good use of resources would be to address the issue now.

3              THE COURT:  Understood.

4              MR. HARRINGTON:  Thank you, Judge.

5              THE COURT:  So, basically, if I understand you

6    correctly, three main points.  Number one, the Court, in your

7    view, is not limited to the allegations in the indictment to

8    make the venue determination, number one.  It should look to

9    evidence to the extent we're talking about not so much an

10   evidentiary presentation at trial but evidence that's in the

11   discovery record that establishes that the case is properly

12   venued, number one.  The Court is not limited to the indictment

13   and should look further.  Number two, you don't think there's

14   evidence to support venue outside of the indictment's

15   allegations.  And, three, to the extent the Court finds that

16   the case is properly venued on the mail fraud counts -- excuse

17   me -- the wire fraud counts, Counts 1 through 19, you concede

18   that the remaining counts are properly venued.

19             MR. HARRINGTON:  I do, Judge.

20             THE COURT:  All right.

21             MR. HARRINGTON:  And I would say on that, if you look

22   at the indictment, if you scrutinize the specific allegations

23   in the indictment, you'll see that they're very, very broad;

24   it's, you know, in the District of New Hampshire and elsewhere.

25             THE COURT:  Oh, yeah.  Very standard language in a

1    federal indictment.

2              MR. HARRINGTON:  And there are some allegations

3    relative to, you know, New Hampshire, but it's, for example,

4    that the defendant lived in New Hampshire, that his father

5    lived in New Hampshire.  There are some other broader

6    allegations about wire transfers, but if you look closely at

7    what those allegations are which were summarized by the

8    government in its objection, you will see that those really all

9    pertain to the money laundering charges and not really to the

10   wires that are in Counts 1 through 18.  So, I would just point

11   that out for your consideration as well, your Honor.  So, if

12   you look at just the indictment, I think you are left with very

13   barebones, and you just need a little bit more, which is why

14   we're suggesting you're not limited, you would make the call,

15   and if you wanted to hear a little bit more evidence, I think

16   you're well within your right as the trial judge in this case

17   to do that.

18             THE COURT:  Would you also agree, though, that

19   applying the law as generally understood that the Courts in

20   determining venue traditionally only review the indictment, if

21   the Court was limited to reviewing the indictment here, the

22   case is properly venued because of the allegation, right?

23             MR. HARRINGTON:  I agree 100 percent, Judge.  I think

24   if you wanted to say, Attorney Harrington, I believe I'm bound

25   by the four corners of the indictment --

1          THE COURT:  Sure.

2          MR. HARRINGTON:  -- I think you can find jurisdiction.

3          THE COURT:  Venue.

4          MR. HARRINGTON:  Excuse me.  I keep saying

5    "jurisdiction."  I mean venue.  That puts us in an odd

6    situation as we get to trial, because I think the venue issue

7    is going to arise again at the trial.

8          THE COURT:  As a matter of evidence.

9          MR. HARRINGTON:  Yeah.

10         THE COURT:  That's a good point.  Okay.

11         MR. HARRINGTON:  Thank you, Judge.

12         MR. HUNTER:  Thank you, your Honor.  So, the

13   defendant's argument is actually one that has been expressly

14   rejected by the First Circuit.  So, one case I cite in my

15   brief, United States versus Guerrier, which was an appeal out

16   of this District, where Judge McAuliffe denied a defendant's

17   Rule 12 motion for jurisdiction, that's a different Rule 12

18   motion, the First Circuit summarized the defendant's argument

19   as alleging the prosecutors had produced no evidence during

20   discovery that the defendant's acts affected interstate

21   commerce.

22         THE COURT:  Slow down, please, for the reporter.

23         MR. HUNTER:  Sorry, sorry.  The prosecutors have

24   produced no evidence during discovery that the defendant's acts

25   had affected interstate commerce, leaving them unable to

1    satisfy the jurisdictional prerequisite, which is a similar

2    argument in substance as to what the defendants made here

3    today.  The First Circuit said that Judge McAuliffe made quick

4    work of the defendant's motion, denying it in a margin order,

5    and that, by not considering strength of the government's

6    evidence but only looking at the four corners of the

7    indictment, the First Circuit said the District Court got the

8    matter exactly right.  This case is a First Circuit case

9    directly on point out of this District that runs directly

10   contrary to the defendant's argument.

11         And this is unsurprising, given the text of Rule 12,

12   which directs that Rule 12 be three motions, such as a motion

13   to dismiss for improper venue, to be made pretrial only if the

14   basis of the motion is reasonably available and the motion can

15   be determined without a trial on the merits.  And there's a lot

16   of case law out of the First Circuit and other Circuits

17   basically saying Rule 12 is not a mechanism to test the

18   evidence that's going to be presented at trial.  Rather, it's a

19   mechanism to dismiss legally defective charging documents, and,

20   as the defendant just conceded, as defense counsel just

21   conceded, the charging document itself is not legally

22   defective.  It properly alleges venue.

23         Applying these principles, at least two judges in this

24   District, Judge DiClerico and Judge McAuliffe, have dismissed

25   venue challenges, both of them holding -- and I think Judge

1    DiClerico was quoting Judge McAuliffe -- when a defendant moves

2    to dismiss an indictment prior to his or her trial the Court

3    will accept as true all of the factual allegations set in the

4    indictment.  This, as the Court has alluded to, is sort of

5    bedrock law in criminal procedure --

6                    THE COURT:  Yeah.

7                    MR. HUNTER:  -- that you only look to the four corners

8    of the indictment.

9                    THE COURT:  Otherwise, we have Motion to Dismiss

10   practice in criminal cases, like we do in civil cases.

11                   MR. HUNTER:  Exactly.  And there's no summary process

12   in a criminal case.  So, the defendant is simply wrong on the

13   law.  But also the defendant in his Motion to Dismiss doesn't

14   fully represent the evidence produced in discovery, and, though

15   the government does not think the Court needs to or should

16   consider the underlying facts or the underlying evidence, if

17   the Court would like, the government is prepared to proffer for

18   each count at least a high-level summary of what the evidence

19   will be, and, as we discussed in chambers, we can either do

20   that here on the record, or we can have conversations with

21   defense counsel and point them to the discovery that we're

22   discussing here.  So, I guess, I'm happy to proceed with a

23   factual proffer, if the Court would like.

24                   THE COURT:  Let's get started with it, I think.  It

25   may be that, after I hear your proffer with respect to a couple

1    of, two or three of the first few counts --

2              MR. HUNTER:  Sure.

3              THE COURT:  -- if I'm seeing a pattern I may suspend

4    it and make a suggestion about how we can proceed at trial.

5    But why don't you get started and tell me what you think your

6    evidence is going to show.

7              MR. HUNTER:  Yes, your Honor.  So, as alleged in the

8    indictment, the defendant worked from a home office in Windham,

9    New Hampshire.  And so, the evidence that has been produced in

10   discovery that the government will proffer at trial

11   demonstrates that this is fundamentally a New Hampshire case.

12   The defendant asserts in his motion that his professional life

13   existed in Massachusetts, but -- well, actually I'll start with

14   sort of the most direct evidence.  For every single one of the

15   wire fraud emails, Counts 1 through 18, we produced those

16   emails to the defense in native format, and we've also produced

17   -- we all have the same metadata to work with, but we've also

18   produced a report for each of these counts showing the IP

19   addresses, the source IP address for each one of these emails,

20   and that IP address is associated with Windham, New Hampshire.

21             So, that's the first and perhaps the most direct piece

22   of evidence.

23             But, in addition, we have the defendant's key card

24   data, so we can see when he was at United Way in Boston, how

25   many days per month, for example, was he in the office in

1    Boston, and I think he was there on average during the time

2    frame for which we have his key card data, he was in the office

3    approximately five and a half days per month, so about one

4    quarter of the month.  I think there was one month of January

5    '18 he was only in the office one day, and there were a couple

6    of months where he was in the office 10 days, but, on average,

7    about five and a half days per month.

8            When we look at the dates of the info@digitalnet email

9    and all of the emails charged in the wire fraud counts, and

10   compare that to the key card data, it shows that, when those

11   emails were sent the defendant was not in the office in Boston.

12   The pattern doesn't hold true 100 percent of the time, but

13   often an email would be sent for the defendant through the

14   info@ditigalnet address emailing himself at United Way an

15   invoice the day before the defendant would then go to the

16   office.

17           In addition, the defendant's tax returns, which have

18   already been produced in discovery, show that from 2013 to 2017

19   the defendant claimed a tax deduction for using 500 square feet

20   of his 4,000 square foot home for his business.  And when we

21   executed a search warrant of the defendant's house, we found

22   his home office with a large desktop computer and printers and

23   scanners and other things, and that computer was searched

24   pursuant to a search warrant, and on that computer the

25   government found either the attachments to each of the charged

1   wire fraud emails or the templates that were used to create the

2   attachments.  So, the invoices were emailed in PDF format, and

3   we found the Word document template used to create those

4   invoices.

5           THE COURT:  Hold on a second.  Charli, I'm on the

6   docket.  What document number is the superseding indictment?

7           MR. HUNTER:  Document 27, your Honor.

8           THE COURT:  Thank you.  All right.  So, you're telling

9   me about his key card in Massachusetts when he was at work

10  during the day.  You're telling me about his tax returns where

11  he claimed deductions for business expenses for a New Hampshire

12  office.  That's all good.  That's all good.

13          MR. HUNTER:  For counts -- going through each count,

14  your Honor, we have an IP address from which those emails were

15  sent.

16          THE COURT:  So, let me get to it.  Let me get to the

17  part of the indictment where you do this.

18          MR. HUNTER:  The IP address --

19          THE COURT:  Hold on.

20          MR. HUNTER:  Yes, your Honor.

21          THE COURT:  All right.  So, on page 10 of the

22  indictment you list out the first 17 counts.

23          MR. HUNTER:  Yes, your Honor.

24          THE COURT:  On Count One, dated May 11th, 2015

25  apparently two invoices were submitted for $76,000 and $16,000

1    respectively.

2            MR. HUNTER:  Yes, your Honor.  Those were sent by IP

3    address 75.68.37.59.

4            THE COURT:  IP address again what?  Slow down about

5    3,000 percent.

6            MR. HUNTER:  75.68.37.59.

7            THE COURT:  And that's an IP address associated with?

8            MR. HUNTER:  With New Hampshire, your Honor.

9            THE COURT:  What's that mean?  Associated with his

10   apartment, with his office, with what?

11           MR. HUNTER:  So, yes, your Honor.  We anticipate a

12   witness from Comcast who would say that IP address is

13   associated with nh.comcast.net --

14           THE COURT:  All right.

15           MR. HUNTER:  -- and is associated with Windham, New

16   Hampshire.

17           THE COURT:  Usually evidence I've heard about an IP

18   address -- that's great venue evidence, I guess, but usually

19   when I've heard evidence about IP addresses it's in child

20   sexual abuse image cases.

21           MR. HUNTER:  Yes, your Honor.

22           THE COURT:  And it's not just a town, it's an address.

23           MR. HUNTER:  Yes, your Honor, and we have served

24   Comcast with a trial subpoena.

25           THE COURT:  I see.

1      MR. HUNTER:  We anticipate getting more evidence,

2  which we'll produce to defense as soon as we have it, but the

3  evidence as it exists right now shows that it is a New

4  Hampshire IP address and the email was sent from New Hampshire.

5      THE COURT:  Email is sent from New Hampshire.  So,

6  that ties an email, I guess, an email which attached and

7  submitted invoices -- right?

8      MR. HUNTER:  Yes, your Honor.

9      THE COURT:  -- to in a way that certainly would -- and

10  the United Way was in the Commonwealth.  So, that means we've

11  got New Hampshire, we've got federal jurisdiction, we've got

12  using a facility of interstate commerce to do a wire

13  communication, right?  So, we have the IP address.  I'm

14  thinking about the other types of evidence you described, like

15  the key card evidence.  Is there key card evidence you are

16  aware of for May 11th, 2015?

17      MR. HUNTER:  So, your Honor, let me find my chart

18  here.

19      THE COURT:  Yeah.

20      MR. HUNTER:  So, from May 11th, no, he did not enter

21  into a United Way on May 11th.  He entered United Way on May

22  8th and May 12th.

23      THE COURT:  I see.  So, the inference being, if he

24  wasn't in his office in the Commonwealth, he was in his office

25  in New Hampshire.

1        MR. HUNTER:  Yes, your Honor.

2        THE COURT:  Was that like a home office?

3        MR. HUNTER:  Yes, your Honor, he had a home office in

4    Windham, New Hampshire, and he also for one of his other

5    businesses, AISA Consulting, my understanding had some space

6    rented in Windham, New Hampshire as well.

7        THE COURT:  And you don't know yet, only because the

8    subpoena hasn't been responded to yet from Comcast, whether

9    this IP address is at the home or at the office?

10        MR. HUNTER:  Me standing here today doesn't know.  I

11    know that investigators have talked with someone from Comcast.

12    I just don't remember off the top of my head if they just said

13    Windham or gave us a specific address.

14        THE COURT:  Now, that IP address you just read off to

15    us associated with Windham, can you give me now a discovery

16    Bates stamp number that defense counsel can look at?  He's

17    telling me he can't see any of this evidence.

18        MR. HUNTER:  Yes, your Honor.  I do not have the Bates

19    stamp in front of me, but I can easily email defense counsel

20    after this hearing --

21        THE COURT:  Okay.

22        MR. HUNTER:  -- the Bates number for each one of these

23    emails.

24        THE COURT:  Anything else you want to say about Count

25    1?

1          MR. HUNTER:  No, your Honor.

2          THE COURT:  Let's do Count 2.  Count 2 is a submission

3     of an invoice on June 15th, 2013 for $15,300.

4          MR. HUNTER:  Yes, your Honor.

5          THE COURT:  What's your venue evidence on that?

6          MR. HUNTER:  That the email was sent from the same IP

7     address, and, likewise, the defendant did not swipe into work

8     on June 15th.  The badge data shows that he was at work on June

9     9th and again on June 16th.

10          THE COURT:  I see.  Anything else you want to say

11     about Count 2?

12          MR. HUNTER:  Well, only that the documents attached,

13     and this applies to all 17 counts on page 10, were either the

14     document itself was found in a search of his computer in

15     Windham, his desktop computer --

16          THE COURT:  The invoice.

17          MR. HUNTER:  The invoice.  Or, as we get down, there

18     were some draft contracts and finalized contracts or the

19     template he used to create the invoice.  So, the invoice was a

20     PDF, but it was created in I think it was Microsoft Word and

21     then converted to PDF.

22          THE COURT:  I'm just curious.  So, the invoices came

23     from the business.  The business, was it DTS?

24          MR. HUNTER:  Or DigitalNet.

25          THE COURT:  DigitalNet.  And did the invoice say

1   DigitalNet on it with a New Hampshire address?

2           MR. HUNTER:  It said DigitalNet on it.

3           THE COURT:  That's kind of Stone-Age-type evidence,

4   but I'm just curious.

5           MR. HUNTER:  Yes, your Honor, it definitely said

6   DigitalNet on it, and I don't have a copy of the invoices in

7   front of me.

8           THE COURT:  Is DigitalNet a New Hampshire corporation?

9           MR. HUNTER:  I believe DigitalNet was incorporated in

10  Massachusetts.

11          THE COURT:  I see.  Okay.  All right.  Let's do Count

12  3.

13          MR. HUNTER:  Count 3 is the same evidence, your Honor,

14  the same IP address.

15          THE COURT:  Okay.

16          MR. HUNTER:  And, again, the documents found on the

17  defendant's computer, and, again, he was not in the office in

18  Massachusetts, according to the key card data, on 6/19.  Badge

19  entry data shows he was in on 6/16 and again on 6/23.

20          THE COURT:  And how were these invoices paid?  Were

21  they paid with a check or were they paid with a wire transfer?

22          MR. HUNTER:  It was a wire transfer, your Honor.

23          THE COURT:  A wire transfer from a bank account

24  affiliated with the United Way in Massachusetts to what bank

25  account?

1      MR. HUNTER:  To DigitalNet's Pentucket Bank account,

2  your Honor, and then from that bank account ultimately through

3  the Pentucket Bank branch in Salem, New Hampshire.  The money

4  was wired, at least some if it, to Pakistan.

5      THE COURT:  What is the evidence going to be?  Because

6  the defendant's motion says to that Pentucket branch in

7  Haverhill, not in Salem.  What is the evidence going to be that

8  it was wired to the Pentucket branch in Windham?

9      MR. HUNTER:  So, your Honor, we have evidence,

10  including anticipated testimony from bank employees from Salem,

11  New Hampshire that the Salem, New Hampshire branch was where

12  the defendant originated all of those wire transfers, and I

13  believe, and Ms. Le has dug more deeply into this part of the

14  case --

15      THE COURT:  Sure.

16      MR. HUNTER:  -- but we have documents from the Salem

17  branch of Pentucket Bank.  And, in addition, the defendant's

18  wife was a bank manager at the Salem branch of the Pentucket

19  Bank in New Hampshire.

20      THE COURT:  All right.

21      MR. HUNTER:  And the defendant's, his IRA

22  contributions that, again, are some of the other counts alleged

23  in the money laundering counts.  The point of contact for

24  managing his IRA, his physical location, according to the

25  documents that we've produced in discovery, was the Pentucket

1    Bank branch in Salem, New Hampshire.  So, the defendant did his

2    banking in Salem, New Hampshire at Pentucket Bank.

3             THE COURT:  All right.  And vis-a-vis both the emails

4    out with the IP address and the invoice payments from the

5    Commonwealth to New Hampshire Salem Branch of Pentucket Bank,

6    you have Bates stamp discovery pages that you can communicate

7    to defense counsel to make that showing?

8             MR. HUNTER:  Yes, your Honor.

9             THE COURT:  All right.  Let me ask you, then,

10   Mr. Harrington.  So, we've done three counts.  If what

11   Mr. Hunter represents is true, you would agree with me there's

12   venue here?

13            MR. HARRINGTON:  There's a couple of corrections I

14   would make, Judge, if I could.

15            THE COURT:  Please.  You're not going to answer my

16   question.

17            MR. HARRINGTON:  I am going to answer your question,

18   Judge.

19            THE COURT:  I know.  Go ahead.

20            MR. HARRINGTON:  I know you're going to make me.  So,

21   the company, because you had asked a question about where was

22   this company, DTS.  DTS was a Delaware corporation, and it had

23   an office in Andover, Massachusetts, and it also had at United

24   Way in Boston two individuals who were lodged there as IT for

25   DTS, real people doing stuff for the company.  So, I wanted to

1    clear up that issue.

2         The other issue that I think is important is you asked

3    about the bank, because Pentucket Bank is mainly a

4    Massachusetts bank with a couple of branches.

5         THE COURT:  Yeah.

6         MR. HARRINGTON:  That account, the account that we're

7    talking about, where the United Way would wire money into the

8    Pentucket Bank, was the branch where the account was opened,

9    which is in Haverhill, Massachusetts.  So, I would take

10   issue --

11        THE COURT:  What's the proof of that going to be?

12        MR. HARRINGTON:  Well, the government, I think, has

13   represented that they have documentation that the money was

14   wired, it sounded like -- I don't want to mischaracterize it,

15   but it was wired into Pentucket branch in Windham or Salem, New

16   Hampshire.

17        THE COURT:  Salem.

18        MR. HARRINGTON:  And I don't think that's accurate.  I

19   don't see that.

20        THE COURT:  You don't see that in the discovery, is

21   what you're saying?

22        MR. HARRINGTON:  I don't see that.  I see that it was

23   wired to the Pentucket Bank.  The branch that had it was where

24   the account was opened, which was Haverhill, Massachusetts.

25        THE COURT:  When you say, "The branch that had it was

1    in Haverhill," is that just an inference that you're drawing,

2    or is there some type of record that -- by the way, I don't

3    even think banks discuss location of money in this way anymore.

4    I don't think that's the way it's conceived or thought of.

5    There's people maybe doing things, keeping records, but I'm not

6    sure how either of you are going to be able to make this

7    showing, but what's your version?

8              MR. HARRINGTON:  My understanding is the account --

9              THE COURT:  The account was opened in Haverhill.

10             MR. HARRINGTON:  In Haverhill, Massachusetts, and that

11   the bank, if money is wired into it, there's going to be a

12   specific account that's associated with that bank and that

13   location; versus if he had opened the account in Salem, New

14   Hampshire and money was wired in there, there would be a

15   different number associated with that.  So, that's my

16   understanding.

17             THE COURT:  Account numbers are opened at branches,

18   but they don't really attach to branches.  We all can walk into

19   any branch of any bank we do business with, and that's really

20   going to be, I guess, probably the key here, where are people

21   doing things, or where are electronic impulses originating and

22   landing.

23             MR. HARRINGTON:  Yup.

24             THE COURT:  Anyway, so his theory is, since the

25   account -- either of you can speak -- his theory is, since the

1    account was opened in Haverhill, which is Massachusetts, that

2    when invoices were paid they were paid to a Haverhill location.

3    You disagree?

4         MR. HUNTER:  Well, your Honor, I think the defendant's

5    correct that the account may have been opened in Haverhill,

6    Massachusetts.

7         THE COURT:  Yeah.

8         MR. HUNTER:  But I anticipate what we'll see at trial

9    is that this money is moving around between the defendant's

10   bank accounts, including bank accounts for AISA Consulting and

11   his personal bank account in New Hampshire.  He's wiring money

12   around, and that he's doing his banking primarily out of Salem,

13   New Hampshire, and there will be --

14        THE COURT:  Does that mean he's walking into a Salem,

15   New Hampshire branch, or does that mean he's at a computer

16   somewhere directing the bank to undertake conduct vis-a-vis his

17   money?

18        MR. HUNTER:  Both, your Honor.  We have evidence of

19   him going to the Salem, New Hampshire branch to conduct some of

20   his banking as well as emails sent to Salem, New Hampshire.

21        THE COURT:  Okay.

22        MR. HARRINGTON:  And what I would say, Judge, is with

23   regard to those statements, I think going back to the question

24   you were posing to me is, I'm focusing on Counts 1 through 18,

25   which I think a lot of the stuff the government is talking

1   about now is relative to the money laundering, transportation.

2   It's not relative to my client sending stuff to United Way or

3   United Way sending things to my client.

4          THE COURT:  You anticipated my next question, which

5   is, yeah, it sounds like you were talking about moving money

6   around, which is laundering money.  And I'm just making this up

7   as I go along, because I don't know which one of you is right.

8   Let's assume an invoice is paid -- first of all, if an invoice

9   really is submitted from New Hampshire, not to be overly

10  simplistic about the analysis here, but that's the ball game

11  for venue.  We're going to get back to you answering my

12  question in a minute, Mr. Harrington, but that's ball game.

13  That's venue.

14         But let's keep with this idea about the invoice

15  payment.  Lets suppose the invoice is being paid and Mr.

16  Harrington's right, it lands, the money is received at

17  Haverhill branch of Pentucket Bank, but then defendant is

18  sitting at his -- he's sitting in his office or home in

19  Windham, and he's at a computer, and he's moving money.  That's

20  the laundering part of it.  That's not the wire fraud part of

21  it.  Or am I wrong about that?  I think the wire fraud part is

22  submission of the invoice, payment of the invoice.

23         MR. HUNTER:  So, your Honor, he wires -- the specific

24  wires that are charged in the indictment are the emails sent

25  from New Hampshire that the defendant sends to himself.

1          THE COURT:  Yeah.

2          MR. HUNTER:  Those are the charged wire fraud counts.

3    I think, and I cite a case in my brief, with wire fraud I think

4    you can establish venue either by showing the electronic pulse

5    came from the state or that the defendant committed acts that

6    caused that electronic pulse, even if the pulse itself wasn't

7    within the state.

8          THE COURT:  We agree.

9          MR. HUNTER:  And so, here, and that's where I was

10   going with the evidence, and this is alleged in the indictment,

11   the defendant is preparing these invoices from his computer in

12   Windham, New Hampshire.  So, by having these draft documents,

13   templates and sometimes the documents themselves on his

14   Windham, New Hampshire computer, what the government is showing

15   by a preponderance is that the defendant is preparing --

16         THE COURT:  I know.  That's what I just said.

17         MR. HUNTER:  Right.

18         THE COURT:  I just said, like, if the invoices are

19   sent from New Hampshire, it's ball game, there's venue.

20         MR. HUNTER:  Yes, your Honor.

21         THE COURT:  But now it's your turn to answer my

22   question, which is what about academically?  Take out the

23   submission of the invoices.  Look at the payment of the

24   invoices.  All right?  I'm just not clear yet.  His theory is,

25   if the account was opened in Haverhill, that's where the money

1    is received.  That may or may not be right.  I don't know.  But

2    you represented that money will be demonstrably received at a

3    Windham, New Hampshire branch of the Pentucket Bank or Salem,

4    New Hampshire branch of the Pentucket Bank.  That's something

5    you can demonstrate with evidence?

6         MR. HUNTER:  Are you talking about the wire transfer

7    from United Way to DigitalNet's bank account?

8         THE COURT:  I guess that's the case, yes.

9         MR. HUNTER:  I think the way I understood your

10   question, your Honor, was where did the defendant access the

11   money, and I think we have demonstrable evidence that he

12   received the money and accessed it from a Salem, New Hampshire

13   Pentucket Bank branch.  I would have to look closer at the

14   evidence, or I can probably talk to one of the case agents back

15   here.

16        THE COURT:  The fact is we're probably talking about

17   these concepts in a very antiquated, rudimentary way.  The idea

18   of money being located at any of these locations is probably

19   not even an accurate way to describe or conceive of the

20   location of this money.  It might not exist at any specific

21   location in the way banking is generally done now, anyway.

22        Look, let me get back to you, Mr. Harrington.

23        MR. HARRINGTON:  Yes, Judge.

24        THE COURT:  The fact is you agree with me, right?  If

25   they can show the defendant was sitting in New Hampshire when

1   he pressed "Send" to send an invoice, that's venue?

2           MR. HARRINGTON:  Yes.

3           THE COURT:  All right.  Here's what we're going to do,

4   then.  We're not going to do all 18 counts.  That would be

5   silly.  What I suggest -- I don't want to overstep my

6   authority, so I'm not going to order this, I'm going to suggest

7   this.  Prepare a chart.  You don't have to do it for the

8   defendant's benefit, because it's not your job to help him

9   defend the case, but it very much is your job to help me

10  understand the evidence at trial.  So, I suggest, I'm not

11  asking for it to be done pretrial, but when it comes to the

12  trial prepare a demonstrative exhibit that specifically

13  addresses venue and show me for each count, anchor it to an

14  exhibit, and it can even be a Bates stamp, because I know

15  you're probably not going to put it in every piece of paper in

16  the case, but just anchor it to venue implicating exhibits and

17  evidence, maybe a column about where an email was sent from or

18  where a wire transfer was originated and received, just so I

19  can have a good idea about venue so I can actually decide this

20  motion.

21          MR. HUNTER:  Yes, the government will gladly do that

22  and was intending to do that at trial.

23          THE COURT:  Sure.  Anything else you want to say about

24  venue?

25          MR. HARRINGTON:  No, Judge, I think we've covered it.

1          THE COURT:  So, here is my ruling:  The motion is

2     denied.  The Motion to Dismiss is denied, because, frankly, the

3     law is in this Circuit that the Court's focus is to be on the

4     four corners of the indictment and the allegations in the

5     indictment.  That said, venue is something you can challenge at

6     trial.  I think there's a case -- I had a venue issue at a

7     trial.  I think it was Valenzuela Celaya.  It was a Sinaloa

8     Cartel case where the defendant was a lawyer from Mexico who

9     challenged venue of the indictment because it was a Mexican

10    drug cartel case, but there was a meeting that took place in

11    Portsmouth, and the question was, was that enough of a venue

12    anchor, and I decided it, but it also went to the Circuit, and

13    there's been law on this, that the venue hook doesn't have to

14    be particularly deep, to be honest, the showing doesn't have to

15    be particularly robust.

16         So, the motion is denied, but it's denied without

17    prejudice to a revisiting and ruling on venue, and I'll do that

18    hopefully aided by the evidence at trial.  But at this point,

19    pretrial, the motion is denied.  All right.  I guess we can go

20    off the record.

21                   (Discussion held off the record)

22         (WHEREUPON, the proceedings adjourned at 11:09 a.m.)

23

24

25

1                       C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United States v. Imran*

9    *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date: ___4/12/20              */s/ Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
15                                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25