*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    * No. 1:18-cr-192-JL
            v.                       * December 2, 2019
6                                    * 1:40 p.m.
     IMRAN ALRAI,                    *
7                                    *
                     Defendant.      *
8    * * * * * * * * * * * * * * * * *

9

10                    TRANSCRIPT OF BENCH TRIAL
                   DAY ONE - AFTERNOON SESSION
11

12          BEFORE THE HONORABLE JOSEPH N. LAPLANTE

13

14   APPEARANCES:

15

16   For the Government:      John S. Davis, AUSA
                              Matthew Hunter, AUSA
17                            Cam T. Le, AUSA
                              United States Attorney's Office
18

19   For the Defendant:       Timothy M. Harrington, Esq.
                              Timothy C. Ayer, Esq.
20                            Shaheen & Gordon PA

21

22   Court Reporter:          Brenda K. Hancock, RMR, CRR
                              Official Court Reporter
23                            United States District Court
                              55 Pleasant Street
24                            Concord, NH 03301
                              (603) 225-1454
25

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LORISSA GUZMAN (Resumed) | | | | |
| By Mr. Davis | 3 (Cont'd) | | 34 | |
| By Mr. Harrington | | 18 | | 36 |
| NADEEM YOUSUF | | | | |
| By Mr. Davis | 41 | | 92 | |
| By Mr. Harrington | | 79 | | 92 |
| RICHARD VOCCIO, JR. | | | | |
| By Mr. Davis | 93 | | | |

E X H I B I T S

| No. | In Evd. |
|---|---|
| Govt's | |
| 300 | 107 |
| 301 | 108 |
| 303 | 110 |
| 304 | 110 |
| 309 | 111 |
| 651 | 123 |
| 652 | 125 |

P R O C E E D I N G S

1

(Lunch recess taken)

2

THE CLERK:  All rise for the Honorable Court.

3

THE COURT:  All right, Mr. Davis, you may resume.

4

MR. DAVIS:  Thank you, Judge.

5

THE COURT:  You're still under oath.

6

THE WITNESS:  Yes, sir.

7

**LORISSA GUZMAN**, having been previously duly sworn, was

8

further examined and testified as follows:

9

CONTINUING DIRECT EXAMINATION BY MR. DAVIS:

10

Q.   Ms. Guzman, responding to the questions asked on voir

11

dire, just a few questions.  When you were doing the secondary

12

interview of Mr. Alrai, were you alone or with another officer?

13

A.   I was alone.

14

Q.   And was the area where it happened open, or was it a

15

small, closed, locked room?

16

A.   It was an open area, with both passengers and other

17

officers.

18

Q.   Okay.  Did you show weapons or show handcuffs?

19

A.   I had them on my duty belt, but I didn't take them out of

20

their holsters.

21

Q.   Did you ever refer to them?

22

A.   No.

23

Q.   Okay.  And did you tell the defendant at any point that he

24

could not leave?

25

1    A.    No, I did not.

2    Q.    All right.  And you asked questions about work and money

3    and subcontractors and his trip to Pakistan; is that right?

4    A.    Yes, sir.

5    Q.    And who he worked for; is that right?

6    A.    Yes, sir.

7    Q.    At any point did you suggest that you were investigating

8    criminal activity?

9    A.    No.

10   Q.    Did you raise the issue of drug smuggling?

11   A.    No.

12   Q.    So, at no point did crimes come up or potential crimes?

13   A.    No, sir.

14   Q.    Okay.  And what was the approximate duration of the period

15   of the questioning, the questioning part?

16   A.    It took place over -- the entire inspection took place

17   over about two hours, but the questioning was about 30 minutes.

18   Q.    Okay.  So, you were done asking questions in 30 minutes?

19   A.    And I had gone back after the initial 30 minutes to go

20   back, if I had to clarify something, and I would go back and

21   speak to him.  So, over the course of about 30 minutes I spoke

22   to him, in total.

23   Q.    Okay.  And after that time he waited to get his phone

24   returned; is that right?

25   A.    Yes, sir.

1   Q.   Okay.  And that was the reason the whole thing took two

2   hours?

3   A.   And before I released him I have to double check my

4   report.  So, I can't release him until I make sure I have all

5   my questions answered.

6   Q.   And when you use the word "release," you don't mean

7   release from custody, do you?

8   A.   No.  Just give him back his passport and allow him to walk

9   out the door with his passport.

10   Q.   Okay.  Now, you said before that he denied owning any

11   property abroad?

12   A.   Yes, sir.

13   Q.   Did you do a baggage exam?

14   A.   Yes, sir.

15   Q.   And did you find any paperwork there that drew your

16   attention?

17   A.   Yes, sir.

18   Q.   And what was that?

19   A.   There was a couple of pieces of paper, and they looked

20   like property lines, and one of them had 162 and 163.  It

21   looked like subdivided lots.  And he was listed as -- I don't

22   know the exact name.  I know that we did submit that paperwork

23   for review, but he was listed as the owner on the paperwork,

24   which made me want to ask him about this property and if he

25   owned it.

1    Q.    Okay.  So, when you say "162 and 163," you're referring to

2    the property that he said he had stayed at in Lahore?

3    A.    Yes.

4    Q.    With his brother?

5    A.    Yes.

6    Q.    All right.  So, did you talk to him about that document

7    and the apparent ownership of property?

8    A.    Yes, sir, I did.

9    Q.    And what did he say?

10   A.    He stated that he inherited the property from his parents,

11   but he said -- so he said that he inherited them from his

12   parents, and his brother lives at the other property, the 162,

13   I think.

14   Q.    All right.  So, there are two numbers, 162 and 163?

15   A.    Yes, sir.

16   Q.    And did he say he inherited both of them?

17   A.    Yes, both of them.

18   Q.    He said his brother, Jawad, lived at one of them?

19   A.    Yes.

20   Q.    Okay.  And did he say whether Jawad was paying him rent

21   for the property?

22   A.    I asked him if his brother paid him rent for the property,

23   and he stated that they worked things out financially, because

24   his brother is the manager of his business he called "UltPult."

25   Q.    Okay.  Ultpult, U-l-t-p-u-l-t?

1    A.    Yes, sir.

2    Q.    When you said "his business," what was the defendant

3    saying?

4    A.    So, at this point in the conversation he had never

5    mentioned that he owned another business; he never mentioned

6    that in his career.  So, this drew my attention because he

7    didn't mention it prior.  So, I had asked him --

8    Q.    So, just to clarify, so he's not saying that Jawad's

9    business was UltPult?

10   A.    No, sir.  He was saying that he owned UltPult.

11   Q.    "He," the defendant, owned it?

12   A.    The defendant, yes, sir.

13   Q.    Okay.  So, that drew your attention why?

14   A.    Because, when I initially asked him what he did for work,

15   he did not mention that he was a business owner.

16   Q.    And did you also ask him if he had any international

17   business ties?

18   A.    I did, sir.

19   Q.    And he said, "No"?

20   A.    Yes, sir.

21   Q.    Okay.  So, did he explain that, why he hadn't mentioned

22   UltPult earlier?

23   A.    I do not recall if he explained why he did not mention it

24   earlier.

25   Q.    Okay.  Did he give you more information about UltPult?

1    A.    He did.

2    Q.    What did he say?

3    A.    He stated that about three years ago he created UltPult,

4    which is a New Hampshire based gaming company.  It's a studio

5    company.  It creates games for Apple and Android operating

6    systems.

7    Q.    Okay.  And did he say who in Pakistan was working for

8    UltPult?

9    A.    He said his brother Jawad runs UltPult in Pakistan, but he

10   has seven to eight computer programmers in the Lahore area that

11   does the work for him.  The defendant claimed that he's the

12   only U.S.-based person for UltPult.

13   Q.    So, the defendant is the only one in the U.S.; the other

14   people are in Pakistan?

15   A.    Yes, sir.

16   Q.    And this is some sort of gaming programming company?

17   A.    That's what he stated, yes.

18   Q.    Okay.  Did he explain why he had workers in Pakistan

19   working for UltPult?

20   A.    Yes, sir.  He said it was cheaper, it was more cost

21   effective.

22   Q.    Okay.  Did he say whether or how he sent money or provided

23   finances for UltPult?

24   A.    He did.

25   Q.    What did he say?

1    A.    He stated that he sends money transfers from his Bank of

2    America account and his Pentucket Bank account over to Jawad's

3    account at a bank that he identified as "NIB," which is a bank

4    in Lahore.

5    Q.    So, that's a bank in Pakistan?

6    A.    Yes, sir.

7    Q.    And he said it was Jawad's account?

8    A.    That's what he stated, yes.

9    Q.    Did he say anything about it being DigitalNet's account?

10   A.    He did not.

11   Q.    All right.  And did he say whether the account from which

12   the money was sent, the account in the U.S., whether that had

13   anything to do with DigitalNet?

14   A.    No.  When I asked him about the accounts, he just said

15   that he sends them from his accounts from those specified banks

16   over.  I did not ask him specifically if they belonged to a

17   business.

18   Q.    Okay.  Did you ask him if he had ever sent more than

19   10,000 at a time overseas?

20   A.    Yes, I did.

21   Q.    And what did he say?

22   A.    He denied that he's ever sent over $10,000 overseas

23   through a money transfer.

24   Q.    All right.  And why were you interested in transfers of

25   more than $10,000 at a time?

1    A.    Part of my job at the Border is to ensure that people

2    aren't bringing more than $10,000 in hand in or out of the

3    border.  So, if he has been sending money out of the country,

4    then that would be more of a red flag to me to say, "Hey, have

5    you brought more than $10,000 into the country today or out of

6    the country?"  So, that was why I asked him about the money

7    transfer specifically.

8    Q.    Okay.  Did you ask about whether he was aware of a

9    particular reporting requirement?

10   A.    I did.

11   Q.    All right.  And what reporting requirement did you ask him

12   about?

13   A.    I asked him about the FinCEN reporting requirement, which

14   is the requirement that we enforce as Customs and Border

15   Protection Officers.  When people are bringing or -- taking

16   $10,000 out of the country or bringing $10,000 into the country

17   they have to fill out a piece of paper.  It's called a "FinCEN

18   105," which then gets filed just to keep track of the money

19   going in and outbound.

20   Q.    And that's $10,000 or more; is that right?

21   A.    Yes, sir.

22   Q.    And is that in cash?

23   A.    It can be cash or an endorsed check.

24   Q.    And what did he say about whether he was aware of that

25   reporting requirement?

1    A.    He claimed he was aware of the reporting requirement.

2    Q.    Okay.  And did you ask him again whether he had any other

3    businesses?

4    A.    Yes.  At this point, when I discovered that he had

5    UltPult, when he didn't tell me that earlier, then I asked him

6    again, "Well, do you have any other businesses at this time?

7    And he denied having any additional businesses.

8    Q.    Okay.  Did you then look at a particular notebook that he

9    had in his luggage?

10   A.    I did, sir.  I continued my baggage exam, and I came

11   across a journal, a notebook, and when I looked into the

12   notebook I found multiple different acronyms within the journal

13   that I asked him to explain.

14   Q.    All right.  And was the notebook, did it appear to be like

15   a business journal that had dates and meetings and topics of

16   meetings?

17   A.    Yes.

18   Q.    And did the notebook have at the left upper corner of each

19   entry a particular letter designation?

20   A.    I can't recall exactly that, so I don't want to answer

21   that question.  So, I can't answer that.

22   Q.    You don't recall?

23   A.    I don't recall, no, sir.

24   Q.    Do you recall seeing "UW" in that notebook?

25   A.    "UW"?

1    Q.    For "United Way"?

2    A.    Yes, I do recall seeing that.

3    Q.    And do you recall seeing the letters "DN"?

4    A.    Yes.

5    Q.    And do you recall seeing the letters "ACG"?

6    A.    Yes, sir.

7    Q.    And did those acronyms get your attention?

8    A.    Yes, sir.

9    Q.    And why?

10   A.    "UN" for United Way, "DG" -- because I had asked him what

11   they all meant, just out of curiosity, I'm going through his

12   notebook, what did they mean.

13   Q.    All right.

14   A.    And first we started with "DN," and he said "DN" stood for

15   DigitalNet, and I asked him what DigitalNet was, and he said,

16   "Oh, those are in relation to gaming products and taskings."

17   Q.    All right.  So, Mr. Alrai told you then that DigitalNet

18   was used for gaming products?

19   A.    Yes.

20   Q.    And taskings?

21   A.    Yes.

22   Q.    And did he say anything about DigitalNet was doing United

23   Way business?

24   A.    He did at the onset of the interview, when I initially

25   asked him about DigitalNet, but this was a few minutes later

1   on, during the baggage exam, and I didn't put two and two

2   together at that point in regards to the differences in

3   explanations for what he initially said about DigitalNet and

4   then what he said once I had the notebook in front of me.  So

5   he gave me two different stories.

6   Q.   All right.  So, when you first asked him about his

7   subcontracts, going back toward the beginning of the interview,

8   when you asked him about each subcontractor, including Helix

9   and DigitalNet -- right?

10  A.   Yes, sir.

11  Q.   Did you ask him then about whether he had points of

12  contact or a point of contact for DigitalNet?

13  A.   Yes, I did.

14  Q.   And how did that conversation go?

15  A.   I had specifically asked him about a point of contact for

16  DigitalNet.

17  Q.   Slow down, please.

18  A.   And he stated, "Well, I have many points of contact for

19  DigitalNet," and he tried to blow it off, and he kind of talked

20  around -- like, at that point he didn't answer my question.  He

21  said, "Well, I have many contacts for DigitalNet.  We have a

22  very strong working relationship."

23  Q.   He said he had a very strong working relationship with

24  DigitalNet?

25  A.   Yes, sir.

1   Q.   But did he ever give you a point of contact for the

2   company?

3   A.   No, sir.

4   Q.   Okay.  And did he give you any other details about

5   DigitalNet?

6   A.   No, he did not.

7   Q.   All right.  And did he say anything about his father,

8   Munawar Chaudhary, being associated with DigitalNet?

9   A.   No, sir.

10   Q.   Okay.  You also found "ACG;" is that right?

11   A.   Yes, sir.

12   Q.   And did you ask about that?

13   A.   I did.

14   Q.   All right.  And how did that conversation go?

15   A.   He stated that "ACG" stood for "AISA Consulting Group."

16   Q.   When you say "AISA," is that spelled A-i-s-a?

17   A.   Yes, sir.

18   Q.   Okay.

19   A.   And I had asked him, "What is AISA Consulting Group?"  And

20   he stated, "Oh, that's my company."

21   Q.   All right.  Did you notice any change in his demeanor at

22   this point?

23   A.   Yes, I did.

24   Q.   Can you describe that?

25   A.   When I asked him -- at this point now I have revealed that

1    he has another company that he didn't tell me about at the

2    onset, so I had asked him, "Why didn't you mention this company

3    at the initial interview, during the initial interview?"  And

4    he stated -- he stuttered his words, bowed his head, and

5    stated, "You're right.  I didn't mention it."

6    Q.   All right.  What else did he say about AISA Consulting

7    Group?

8    A.   He then tried to say that it's a brand new company, that

9    it's like in the initial workings, the beginning stages.  Then

10   I asked him about if he's made any money from it.  He said he's

11   made no financial transactions.  I asked him if he has any

12   clients.  He said he doesn't have any clients or customers.

13   And he also said that -- he was explaining what AISA Consulting

14   Group was going to do.  Would you like me to go into that?

15   Q.   Yes.

16   A.   Okay.  He stated that he -- him and his wife are on --

17   that own the company, Saima.  He denied any employees or any

18   international ties to this company.  He claimed that his vision

19   for AISA is to work in disaster recovery, so if a customer's

20   network crashes or is affected by hacking the AISA Consulting

21   Group will have a solution to fix the issue.

22   Q.   Okay.

23   A.   He's also looking for a way to support cloud computing to

24   host servers for companies so they can have access to multiple

25   systems from any location, because the systems will be stored

1    on a cloud.

2    Q.   Okay.  So, that was the defendant's vision for AISA that

3    he told you about?

4    A.   Yes, sir.

5    Q.   Okay.  Did you ask him again about whether he had any

6    other companies?

7    A.   Yes, sir, I did.

8    Q.   And what did he say?

9    A.   He denied having any additional international business

10   ties, and he also denied having any additional companies.

11   Q.   And was that the end of the substantive part of the

12   interview?

13   A.   Yes, sir.

14   Q.   Okay.  Did he wait for his phone and his documents to be

15   returned?

16   A.   Yes, sir.

17   Q.   And did you return his stuff to him?

18   A.   Yes, sir.

19   Q.   And did he talk to you there about a secondary inspection?

20   A.   Yes, sir.

21   Q.   What did he say?

22   A.   He stated that he was -- whenever I end my interviews with

23   anybody I talk to, I always ask if they would be willing -- "If

24   I had any questions could I call you, would you be open for

25   further contact?"  So, same with the defendant.  I ended my

1    interview with that same statement, "Could I call you if

2    there's any questions?"  And he was very cooperative.  He said,

3    "I'll do whatever it takes to make it so this does not happen

4    again," as in a secondary inspection.  He expressed his concern

5    about being inspected again the next time he travels, and he'll

6    do whatever it takes to and speak to whomever wants to contact

7    him in order to make sure this does not happen again.

8    Q.   And did he say what he was doing next?

9    A.   I asked him how he was getting home from the airport.

10            THE COURT:  Go with the small bites.

11            MR. DAVIS:  Okay.

12   Q.   Did he say he was taking an Uber to New Hampshire?

13   A.   Yes.

14   Q.   And when did you write your report?

15   A.   After the subject left.

16   Q.   Immediately after?

17   A.   Immediately after.

18   Q.   And you wrote that from memory right afterwards?

19   A.   Yes.

20   Q.   Okay.  And how did you -- did you make a note in the

21   report of how you would characterize that interview?

22   A.   I did.

23   Q.   And what did you say?

24   A.   I said that when interviewing the subject he was deceptive

25   yet cooperative throughout the entire exam.

1    Q.   Is that like a category or like a thing that you use, a

2    deceptive but cooperative interview?

3    A.   That's what I use, because the subject, he answered the

4    majority of my questions.  He didn't cause a scene.  He wasn't

5    irate.  He was cooperative in regards to having a conversation

6    with me, although he did get caught in multiple lies throughout

7    the interview, which is why I used the word "deceptive."

8            MR. DAVIS:  No further questions.  Thank you.

9            THE COURT:  Cross.

10           MR. HARRINGTON:  Thank you, Judge.

11                        CROSS-EXAMINATION

12   BY MR. HARRINGTON:

13   Q.   Agent Guzman, you said that this questioning lasted -- and

14   I shouldn't say the "questioning."  But the time that you had

15   Mr. Alrai at the secondary inspection location, it lasted I

16   think you said a little over two hours?

17   A.   Yes, sir.

18   Q.   Let me ask you about the secondary inspection location.

19   A.   Okay.

20   Q.   Is there a secure area where secondary inspections are

21   done?

22   A.   How do you -- what do you mean by "secure area"?

23   Q.   Is there a specific area --

24   A.   A specific area?

25   Q.   -- where secondary inspections are done, designated area?

1    A.   Yes, sir, there is.

2    Q.   Is that where this was done, in the designated area?

3    A.   Yes, sir.

4    Q.   Okay.  Is it a secure area?

5    A.   Yes, it's secure.

6    Q.   And how so?

7    A.   As in it's secure, nobody can come in from outside, like

8    in the regular rest of the airport.  They cannot come in, so it

9    is a secure area.

10    Q.   So, this questioning didn't take place like out by the

11    luggage carousel; this took place in a secured area?

12    A.   No, sir, that's incorrect.  It took place right outside of

13    the luggage carousel, because about 20 yards from the luggage

14    carousel is a baggage belt.  There's about seven or eight

15    baggage belts all in open view for everybody to see, with

16    multiple different passengers all around.

17         THE COURT:  What's a "baggage belt"?

18         THE WITNESS:  A "baggage belt" is about the size of

19    this wall right here, and it's about four feet -- well, about

20    this wide (indicating), and it's just a small, it goes up to

21    like your hips, and it's where you put the luggage on top, and

22    it goes up and over and down, and that's where we conduct our

23    inspections, just so we can have the bag up there and we can

24    talk to people.

25    Q.   And I guess what I'm getting at, and you'll have to

1    correct me if I'm incorrect, but the secondary inspection area,

2    where Mr. Alrai was I thought you indicated is a secure area.

3    A.   The whole federal inspection site is a secure area, sir.

4    Q.   And it's an area where people, like the public, can't just

5    walk into the area?

6    A.   No, sir.

7    Q.   And what I'm driving at is that is where Mr. Alrai was

8    brought for you to conduct the secondary questioning?

9    A.   Everybody getting off a plane is still in that federal

10   inspection site until they walk out the door into the nonsecure

11   area.

12          THE COURT:  All right.  Here's the problem:  I don't

13   know about you, but I can't understand what you're trying to

14   describe.  Is this a room where you can interview people

15   privately, or is it wide open where people could be listening

16   in to your conversation?  You keep saying it's secure.  I can't

17   have that, like, law enforcement speak.

18          THE WITNESS:  Okay.

19          THE COURT:  I've got to know where this took place and

20   how it took place.

21          THE WITNESS:  Okay.  So, can I explain it?

22          THE COURT:  Yes.

23          THE WITNESS:  Okay.  So, when you get off a plane, you

24   come through the primary area, which is a bunch of booths

25   people walk through.  Then you walk downstairs and everybody

1    can get their bags.  There's about seven carousels of bags

2    where you get your bags like you would in any airport.  Next to

3    the carousels is another area where there's benches and

4    seating, and there's baggage belts, which are what I call --

5    they're probably about 20 yards long, and you can stand at

6    them.  There's also a podium.  So, this is the secondary area.

7    So, it's open to the public, everyone can see it.  It's secure,

8    because when we have people getting off the plane we can't have

9    anybody come into the inspection area.  It has to be secure in

10   that regards.  There's nobody at the door blocking people from

11   coming in, but there is a one-way out door, the door only opens

12   to go out.  So, that's what I mean by "secure."

13          So, he was in that area, but within that area the

14   public is also there, the public as in the people getting off,

15   other passengers getting off the planes.  There's other

16   officers there.  It's an area that's the size of this entire

17   width of the building, all open.

18          THE COURT:  When you say a "baggage belt," are you

19   talking about, like, the baggage conveyor belt that the bags

20   ride on?

21          THE WITNESS:  Not that they -- it's like a mini

22   version of a baggage conveyor belt.  So, if you picture, like,

23   it goes up like this on both sides and then across

24   (indicating), and I put it on one side, it goes up, over, I

25   talk to somebody over the bag, and then the bag goes down, and

1    they take it off.  It's just an easier way to move baggage, but

2    it's only about 15 yards long.  It's not long.

3              THE COURT:  Okay.

4              MR. HARRINGTON:  All set, Judge?

5              THE COURT:  No, but that's okay.

6    BY MR. HARRINGTON:

7    Q.   So, you say it's open to the public, and by that you mean

8    people who are disembarking from planes?

9    A.   Yes, sir.

10   Q.   Not people who are just coming in off the street and

11   walking in?  They're not able to do that?

12   A.   Correct, sir.

13   Q.   So, in regard to this area that you talked for -- you said

14   he was there for about two hours, you would agree with me that

15   you went back and forth talking with him, and then you would

16   actually go back and you would talk to other members of Border

17   Patrol as well as Homeland Security?

18   A.   Yes, that's correct.

19   Q.   So, you would ask him questions, and then you would go

20   back and you would speak to Agent Donnelly, Agent Laroe, maybe

21   members of your own team at Border Patrol, get some more

22   questions that you wanted to cover, and then you would go back

23   out and you would ask him more questions?

24   A.   Yes, sir.

25   Q.   At that point in time, when you were doing that, how many

1   times do you think you actually did that in the two hours that

2   he was there?

3   A.   I cannot recall that.

4   Q.   Would you agree with me it was probably several times,

5   multiple times that you did that?

6   A.   I cannot recall, sir.

7   Q.   I don't want to press the issue, but I'm going to press it

8   a little bit.  It was obviously more than once, right?

9   A.   Yes.

10   Q.   Do you think it was more than twice?

11   A.   I cannot recall if it was more than twice.

12   Q.   You really don't know.  Okay.  So, let me ask you about

13   this:  At the time --

14        THE COURT:  Are you asking how many times she left the

15   area and came back?

16        MR. HARRINGTON:  I did, Judge.

17        THE COURT:  That's what you were asking?  I'm just

18   trying to follow.

19        MR. HARRINGTON:  I did.  I was asking her if she knew

20   how many times she questioned him, left the area, talked to the

21   agents, then came back and questioned him further.

22        THE COURT:  Understood.

23   Q.   And in response to that, my understanding is you're not

24   sure, Agent; is that correct?

25   A.   Yes, sir, that's correct.

1    Q.   Would you agree with me that when that happened, when you

2    went back and forth, you were aware that the FBI and Homeland

3    Security were conducting a criminal investigation?

4    A.   I was aware that they requested questions for me to ask

5    the subject, but they didn't tell me specifics about any

6    investigation.

7    Q.   I'm not asking if they told you specifics about an

8    investigation.  I asked whether you were aware that they were

9    conducting a criminal investigation.

10   A.   I was aware that he was a subject of interest for them,

11   yes.

12   Q.   Okay.  So, I don't really want to dance with you about the

13   lingo.  Person of interest.  I get it, right?

14   A.   Okay.

15   Q.   It's a very specific question, Agent.

16   A.   Sir, I don't do investigations, so I can't answer that.  I

17   don't know what that -- my job is to do inspections.

18   Q.   So, let me ask you a question.

19            THE COURT:  Let her finish.  Let her finish.

20            MR. HARRINGTON:  Sure.

21   A.   So, I don't know what it takes for them to have an

22   investigation against him, because I've never done one.

23   Q.   Sure.  So, let me ask you, it's a yes-or-no question, if

24   you feel like you need to expound on it, feel free to expound

25   on it.  While you were talking with him and going back and

1   forth and questioning Mr. Alrai, were you aware that Mr. Alrai

2   was the subject of a criminal investigation?

3   A.   No.

4   Q.   You were not?

5   A.   No.

6   Q.   And what is it that you thought the FBI would be

7   interested in him for or Homeland Security would be interested

8   in him for?

9   A.   I cannot answer that, sir, because I was just told to ask

10  specific questions.  They don't give me details on what they're

11  doing with the information.

12  Q.   Okay.  And, as you just indicated, they told you what

13  questions to ask, correct?

14  A.   Yes, sir.  Not the direct questions, but they gave me an

15  idea of questions to specifically ask about, yes.

16  Q.   They told you specific areas that they wanted you to cover

17  with Mr. Alrai?

18  A.   Yes, sir.

19  Q.   And you did that?

20  A.   Yes, sir.

21  Q.   And you did so at the direction of Homeland Security and

22  the FBI?

23  A.   Yes, sir.

24  Q.   Did you make any recording of the statements that

25  Mr. Alrai gave that you're saying he made today?

1    A.    No.

2    Q.    Did you ask Mr. Alrai if he would provide you a written

3    statement, given that he was cooperative with you, regarding

4    the subject matter upon which you spoke?

5    A.    No, sir.

6                          (Pause)

7              THE WITNESS:  Sir, can I respond to that, that last

8    question?

9              THE COURT:  Sure, go ahead.

10             THE WITNESS:  Every person I speak to throughout the

11   day of my daily duties, I have to make a written report of what

12   I spoke to them about, which is why I have the report about

13   Mr. Alrai.  So, I've never had permission from anybody to do

14   that.  That's just what I do every day, is to have a written

15   documentation of the conversation I have with any passenger

16   that comes into the country.

17             THE COURT:  When you interact with someone you do a

18   report.

19             THE WITNESS:  Yes.

20             THE COURT:  And I think you said earlier that one of

21   the things you do is, before you release a person, you check

22   your report to make sure it's accurate.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  What do you do, just check against your

25   memory?

1          THE WITNESS:  Yes.

2          THE COURT:  All right.

3     Q.   Let me ask you this, Agent Guzman:  In regard to the time

4     that you were with him, there was a point in time -- because he

5     was there for about two hours, right?

6     A.   Yes, sir.

7     Q.   There was a point in time that he told you he was tired,

8     right?

9     A.   I do not recall.

10    Q.   And there was a point in time that he said that he would

11    like to go home?

12    A.   I do not recall.

13    Q.   And you advised him that he could go home when you were

14    done with him?

15    A.   I do not recall.

16    Q.   So, let me ask you, because this is very specific answer

17    and it's a clear answer, you don't recall.  You're not saying

18    that it didn't happen.  What you're saying is you don't recall?

19    A.   I don't recall.

20    Q.   Let me ask you this, Officer:  In regard to the inspection

21    that was done of his phone, did you make a copy of it?

22    A.   Yes.

23    Q.   Did you have a warrant?

24    A.   No.  Border search.

25    Q.   Okay.  So, let me ask you this:  You took his phone, and

1    you had it for about an hour and a half; is that right?

2    A.   Yes, sir.

3    Q.   And during that period of time who was it that was

4    searching the phone?

5    A.   My partners.

6    Q.   Was Homeland Security and the FBI allowed to look on and

7    see what the phone revealed?

8    A.   No.  We took that information and we passed it along,

9    though.

10   Q.   Okay.

11            THE COURT:  Hold on.  You took that information and

12   you passed it along?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  To?

15            THE WITNESS:  To Homeland Security Investigations,

16   Officer -- Agent Donnelly.

17   BY MR. HARRINGTON:

18   Q.   And did you do so at their request and direction?

19   A.   Yes.

20   Q.   And had they asked you to perform this phone search?

21   A.   Yes.

22   Q.   Again, so you did that at the direction of Homeland

23   Security and the FBI?

24   A.   Yes.

25   Q.   Correct?

1    A.    Sorry.

2    Q.    And you've indicated that you were able to do that because

3    this was a Border Patrol thing, and you don't need a search

4    warrant to do it, right?

5    A.    Correct, sir.

6    Q.    But Homeland Security, based on your understanding, or

7    perhaps the FBI, might have needed a warrant if they wanted to

8    do it, right?

9    A.    Homeland Security sits in the office next door to us.

10   They also have border search authority.  So, I can't answer

11   what their protocol is, but I know that they also have border

12   search authority.

13   Q.    How about the FBI?

14   A.    I cannot answer that question, sir.

15   Q.    Okay.  Did you ever ask them if they had a warrant?

16   A.    I did not.

17   Q.    So, let me see if I have this correct.  You actually had

18   my client's passport, correct?

19   A.    Yes, sir.

20   Q.    And you had his phone?

21   A.    Yes, sir.

22   Q.    And you had that until basically the conclusion of this

23   two-hour period of time that he was there.  Then you gave it

24   back to him and he was set to leave?

25   A.    Yes, sir.

1  Q.   Okay.  And what you were saying to the judge earlier is

2  that, well, he could have left but he would have had to have

3  left without his passport and without his phone if he didn't

4  want to answer your questions?

5  A.   Yes, that's correct.

6  Q.   And I think you already answered a little bit earlier and

7  you agreed that, if you had someone's passport and now you have

8  their phone, a reasonable person might feel that they're not

9  free to leave in that situation.  You already indicated that

10  would be a fair assessment, wouldn't it?

11  A.   Yes, sir.

12  Q.   Let me ask you, in regard to the money -- just a few more

13  questions -- the money you had indicated was the focus of some

14  questions about money that would be brought into the country,

15  into the United States, or that someone would leave with would

16  be the focus of questions you might have, right?

17  A.   Yes, sir.

18  Q.   The discussions that you had with Mr. Alrai weren't

19  relative to wire transfers, correct?

20  A.   Yes, they were.

21  Q.   And that's a concern for Border, money crossing, or is

22  that more a question that was put relative to the FBI and

23  Homeland Security?

24  A.   It was associated to my line of questioning for the day.

25  Q.   Wire transfers?

1   A.   About supporting the international business that he did

2   not initially tell me about.

3   Q.   Okay.  So, your concerns went beyond just money being

4   brought into the United States in cash or check?

5   A.   Yes.

6   Q.   You would agree with me that wire transfers would be a

7   completely separate area, not really related to people bringing

8   money in on their person, right?

9   A.   It is a separate area, yes, sir.  That's correct.

10  Q.   And a perhaps completely legal area to wire money that is

11  no restrictions on like -- what did you say?  I think it was

12  $10,000 is a restriction on how much cash you could bring in?

13  A.   Yes, sir.

14  Q.   Or how much cash you could leave with?

15  A.   Yes, that's correct.

16  Q.   And you would need to have less than 10,000 you wouldn't

17  have to report it?

18  A.   Correct.

19  Q.   Because if it's 10,000 or more you have to report it?

20  A.   Yes, sir.

21  Q.   Wire transfers.  Are you aware of some restriction in the

22  amount of wire transfers that can be made from one country to

23  another?

24  A.   No, sir, I'm not aware.

25  Q.   At the time that you were questioning him I would assume

1   that you made no reference to the fact that the FBI or Homeland

2   Security were interested in these questions and that you needed

3   to kind of flesh this out with him?

4   A.   No, I did not.

5   Q.   And you're saying that the amount of time that he's there

6   was about two hours, but the length of the conversation kind of

7   all patched together you said lasted about 30 minutes?

8   A.   Approximately, yes.

9   Q.   Could it be less?

10  A.   No.

11  Q.   So, it's at least 30 minutes?

12  A.   Yes.

13  Q.   Okay.  And would you agree with me that 30 minutes of

14  questioning that's broken up may not be a detailed, deep dive

15  on questions relative to corporate structure, entities, where

16  they exist, things of that nature?  You're talking about half

17  an hour, right?

18  A.   I cannot answer that question, sir.

19  Q.   Okay.

20        MR. HARRINGTON:  If I could just have one moment,

21  Judge.

22        THE COURT:  Sure.

23                    (Pause)

24  Q.   One final thing.  In regard to the phone and it was

25  copied, did you ever advise Mr. Alrai that you had made a copy

1    of his phone?

2    A.   No, sir.

3    Q.   In fact, he asked you if you made a copy of his phone, and

4    you told him you didn't, right?

5    A.   I do not recall.

6    Q.   You don't recall.

7         MR. HARRINGTON:  Okay.  I have no other questions for

8    this witness, your Honor.

9         THE COURT:  You have some redirect, I assume.

10        Counsel can even tell me; the witness may or may not

11   know.  What does a copy of a phone mean?  Does that mean

12   everything on his phone was imaged?  What does that mean, a

13   copy of his phone?

14        MR. HARRINGTON:  I didn't delve into it, Judge.  My

15   understanding is that it was a copy of the entire contents of

16   his phone.

17        THE COURT:  All right.  Let me ask a much more basic

18   question that may just cut through everything.  Is there going

19   to be evidence introduced in this trial that was copied from

20   his phone?

21        MR. DAVIS:  No.

22        THE COURT:  All right.

23        MR. DAVIS:  And the entire contents of what Homeland

24   Security got has been turned over in discovery.

25        THE COURT:  Okay.

1          MR. HARRINGTON:  And the reason that I elicited that,

2     Judge, just so that you are aware, was not necessarily relative

3     to like a discovery or an evidentiary issue.  It was really

4     more relative to the nature of the relationship between the

5     Border Patrol, Homeland Security and FBI relative to the extent

6     of what they were doing together relative to Mr. Alrai.  So,

7     really more relative to the custody and that issue.

8          THE COURT:  Yeah.  You're trying to establish that

9     that was part of a criminal investigation.

10          MR. HARRINGTON:  Correct, Judge.

11          THE COURT:  Okay.  Understood.

12          Go ahead, Mr. Davis.

13                      REDIRECT EXAMINATION

14     BY MR. DAVIS:

15     Q.   Ms. Guzman, when the phone was imaged did that happen with

16     a supervisor's approval?

17     A.   Yes, sir.

18     Q.   And who was that supervisor?

19     A.   Supervisor Jennifer Goodnow.

20     Q.   And did you need that supervisor's approval to image the

21     phone?

22     A.   Yes, sir.

23     Q.   And why is that?

24     A.   Because -- and I also need her to get approval from a

25     watch commander, which is a boss above her.

1  Q.   You said "watch" what?  Sorry.

2  A.   Watch commander.

3  Q.   A watch commander?

4  A.   Yes, sir.  It's like the step above a supervisor.

5  Q.   And is that someone else in Customs and Border Protection?

6  A.   Yes, sir.

7  Q.   And does that involve a determination about reasonable

8  suspicion?

9  A.   Yes, sir.

10  Q.   And did the CBP supervisors approve the imaging of the

11  phone?

12  A.   They did, yes.

13  Q.   And was that a decision that FBI or Todd Donnelly directed

14  you to make?

15  A.   No.

16  Q.   How frequently do you get briefings from investigators as

17  part of secondary inspections that you do?

18  A.   On a weekly basis.

19  Q.   It happens every week?

20  A.   Yes.  We work very close with the interagency community in

21  regards to these types of inspections.

22  Q.   When you say "interagency community," what do you mean?

23  A.   The Joint Terrorism Task Force, JTTF, which is a part of

24  the FBI, Homeland Security Investigations, the Department of

25  Commerce.  This is a common occurrence that we work with other

1    agencies, sir.

2              MR. DAVIS:  Okay.  Nothing further.

3              THE COURT:  Do you have any recross?

4              MR. HARRINGTON:  Very briefly, Judge.  Just a couple

5    of questions.

6                         RECROSS EXAMINATION

7    BY MR. HARRINGTON:

8    Q.   I just want to make sure I understand correctly.  Your

9    previous testimony was that you were asked by FBI and Homeland

10   Security to copy the phone.  You indicated that was correct,

11   right?

12   A.   I did indicate that, yes, sir, but I cannot -- can I

13   respond to that?

14             THE COURT:  Of course.

15   A.   So, I cannot copy a phone or even look at a phone based on

16   another agency's request.  I have to have my own articulable

17   facts in order to provide them to my supervisor and my watch

18   commander in order for them to allow me to do that.

19   Q.   So, with that said, which leads into my next question, is,

20   where are those individuals located, the supervisor -- and you

21   indicated there was one more level, watch commander.

22   A.   A watch commander.

23   Q.   Where are those people located?

24   A.   They are about 20 yards away from me in the same building

25   in a different office.

1  Q.   Okay.  Did they come over and participate in the process

2  at all?

3  A.   Yes.  My supervisor was very involved.

4  Q.   Okay.  And so, that supervisor had dealings with the FBI

5  and Homeland Security as kind of part of the briefing, I would

6  assume?

7  A.   Yes, she was aware.

8  Q.   So, what about the other, the watch commander?  Did that

9  person participate in the process as well?

10  A.   He was not involved in the process, no, but he gets

11  briefed on what we are doing.

12  Q.   Okay.  So, you and your supervisor connect with Homeland

13  Security, FBI, you do as you have testified to the judge, and

14  then -- this is just all relative to the phone.  Then you go

15  and you go to the watch commander, you and your supervisor, I

16  would assume --

17  A.   Yes, sir.

18  Q.   -- do a briefing, and then that person provides the

19  ultimate approval, and then you go copy the phone?

20  A.   Yes.  And it's more my supervisor talks to the watch

21  commander, so it's not necessarily me talking to the watch

22  commander.

23          THE COURT:  I was wondering that.

24  Q.   Fair enough.  And then, as you indicated, once that

25  process is done, you actually provide a copy of that to

1    Homeland Security and FBI at their request?

2    A.   Yes, I do.

3            MR. HARRINGTON:  No other questions, Judge.

4            MR. DAVIS:  Nothing further.

5            THE COURT:  So, okay, if I understand correctly, the

6    FBI and Homeland Security requested that you image the phone,

7    but you had to establish your own reasonable suspicion in order

8    to do that?

9            THE WITNESS:  Yes.

10            THE COURT:  You did that through your supervisor?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Your supervisor was aware of FBI and

13    Homeland Security's request?

14            THE WITNESS:  Yes.

15            THE COURT:  Do you know if your watch commander was

16    made aware of their interest?

17            THE WITNESS:  Absolutely.  Yes, sir.

18            THE COURT:  You answered, "Yes"?

19            THE WITNESS:  Yes.

20            THE COURT:  Would you have imaged the phone had they

21    not asked you to do it?

22            THE WITNESS:  With all the articulable facts that I've

23    gained from the conversation, between his deception and him

24    lying about multiple things, multiple international companies

25    that he didn't want to tell me about, I didn't know if they

1     could have been tied to different transnational criminal

2     organizations back in Pakistan.  I'm not sure of that.  It was

3     a national security concern of why we looked at the phone and

4     why we imaged the phone.  Yes.

5               THE COURT:  All right.  So, is that a "Yes"?

6               THE WITNESS:  Yes.

7               THE COURT:  Just so it's clear, you don't have to

8     defend your conduct here at all.  I just have to make some

9     legal decisions.

10              THE WITNESS:  Okay.

11              THE COURT:  It's not like you're under a microscope

12    here.  I don't want to give you that impression.

13              THE WITNESS:  Okay.

14              THE COURT:  And then you turned that information over

15    to FBI and Homeland Security?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Now, Customs and Border Patrol is part of

18    Homeland Security, right?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Just a different operation?

21              THE WITNESS:  Yes, sir.  We all --

22              MR. DAVIS:  For the record, your Honor, it's, I

23    believe, Customs and Border Protection, not Patrol.

24              THE COURT:  Yes.  Border Patrol is a whole different

25    outfit, right?

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  Thank you, Counsel.

3          You were trying to say something?

4          THE WITNESS:  So, Homeland Security Investigations is

5    like the investigative branch of all of Homeland Security.  So,

6    I'm more of an officer.  I do daily inspections and speak to

7    people.  I don't do investigations.  So, if I find something

8    that deems an investigation, we would talk to our partners at

9    Homeland Security, and they would follow through with an

10   investigation.

11         THE COURT:  Understood.  You're securing the border.

12         THE WITNESS:  Yes, sir.

13         THE COURT:  All right.  I think I understand.  Thank

14   you.

15         THE WITNESS:  Thank you.

16         THE COURT:  You're excused.

17         THE WITNESS:  Thank you, sir.

18                    (Witness stepped down)

19         MR. DAVIS:  Next witness?  The government calls Nadeem

20   Yousuf.

21         THE CLERK:  Good afternoon.  Would you like to step up

22   there, please.  Please raise your right hand.

23         **NADEEM YOUSUF**, having been duly sworn by the Clerk,

24   was examined and testified as follows:

25         THE CLERK:  And for the record, please state your full

1   name and spell your last name.

2          THE WITNESS:  Thank you.  I am Nadeem Yousuf.

3                   DIRECT EXAMINATION

4   BY MR. DAVIS:

5   Q.   So, go ahead and sit down, Mr. Yousuf, please.

6   A.   Thank you.

7   Q.   And can you lean forward and get the microphone close to

8   your face, please, and please speak slowly and clearly.

9   A.   Sure.

10  Q.   How are you employed?  How are you now employed?

11  A.   I am employed, yeah.

12  Q.   And where are you working?

13  A.   I am working for Motion Recruitments, and I'm working at

14  Boston Medical Center.

15  Q.   So, you work at Boston Medical Center in Boston?

16  A.   That is correct.

17  Q.   And are you a contractor there for Motion Recruitments?

18  A.   That's right.

19  Q.   And what do you do there?

20  A.   I'm a system analyst working with the network engineering

21  team doing IT stuff.

22  Q.   So, you're a computer IT person?

23  A.   That is correct, yeah.

24  Q.   And did you previously work at the IT help desk at United

25  Way for approximately six years?

1    A.    That's right, yeah.

2    Q.    Okay.  And are you a Canadian citizen?

3    A.    I am a Canadian citizen.

4    Q.    And how long have you been a citizen in Canada?

5    A.    I immigrated to Canada in the year 2000, and I became a

6    citizen in the year 2004.

7    Q.    All right.  And where were you born originally?

8    A.    I was born in Sialkot, Pakistan.

9    Q.    And what was the first word?

10   A.    Sialkot.  It's a city.  Sialkot.  S-i-a-l-k-o-t.

11   Q.    Very good.  And what is your education in?

12   A.    I'm a mechanical engineer.  I got my engineering degree

13   from Pakistan, and then I did a few courses in IT.

14   Q.    Okay.  And are you certified in various software areas?

15   A.    That's right.  I have quite a few Microsoft

16   certifications.  I started with NT way back in 1999.  Then I

17   continued with, you know, involving their desktop and server

18   installations, and then I did my Cisco certification as well.

19   Q.    All right.  You're Cisco certified?

20   A.    That is correct.

21   Q.    And I'll ask you to keep your voice up.  Do you have

22   family in Canada?

23   A.    I do.

24   Q.    And where do they live?

25   A.    They live in Vaudreuil-Dorion.  It's next to Montreal.

1    Q.    In Quebec?

2    A.    In Quebec, yeah.

3    Q.    All right.  And do you come to the U.S. for work?

4    A.    I come -- yeah, that's right.  I do.

5    Q.    And do you come under work visas when you come?

6    A.    Yes.  I have a TN status here.

7    Q.    Okay.  And were you employed by a company called

8    "DigitalNet" between about March of 2013 and June of 2018?

9    A.    That's right.  Yeah, I was.

10   Q.    So, that was five years, two months or so, right?

11   A.    That is correct.  Yeah.

12   Q.    Okay.  Now, in July of 2012 what was your situation?  Were

13   you working then?

14   A.    Yeah.  I was working with MIT, it's Mohawk Internet

15   Technology Company in Montreal, and then I lost my job because

16   I had a work accident.  So, in July my job was finished there,

17   so I remained jobless for about a few months.

18   Q.    Okay.  And so, you're between jobs as of the fall of 2012,

19   looking for work?

20   A.    That's right.  That's right.  Yeah.

21   Q.    And did you need a job?  Yes?

22   A.    Yes.  Yeah.  At that time, yes, I needed a job.

23   Q.    "Yes."  Okay.  And do you have a friend named Nasir Qadri?

24   A.    That's right.

25   Q.    And is that N-a-s-i-r and then Q-a-d-r-i?

1    A.    That is correct.

2    Q.    And was he in Canada as well?

3    A.    No, he was in here.  He was a friend of mine from Canada,

4    so he moved with his family to U.S.  He was working in Boston

5    or in Massachusetts.

6    Q.    Okay.  And did Nasir make a recommendation to you?

7    A.    Yeah.  He called me and said, since he knew that I was

8    looking for a job, so he asked me, "Do you need a job in the

9    States?"  I said, "Yes.  Why not?"  So, that's how I came here.

10   Q.    Okay.  And did he give you a reference of someone to

11   contact?

12   A.    That's right.  He gave me a phone number of Imran, and at

13   that time I was in Houston visiting my sister, so I called

14   Imran, and we spoke about the job.

15   Q.    Okay.

16   A.    Yeah.

17   Q.    And when you say "Imran," do you mean the defendant in

18   this case?

19   A.    Imran Alrai, yeah.

20   Q.    And can you point him out for the Court, please?  Do you

21   see him?

22   A.    Yes.  He's sitting right there (indicating).

23          THE COURT:  He identified him.

24   Q.    All right.  So, you actually talked to Mr. Alrai on the

25   phone?

1    A.    I did, yeah.

2    Q.    And what did he tell you he was looking for?

3    A.    Well, we spoke about my skills, my experience, my skills,

4    and he asked me if he was -- I was interested to work in U.S.

5    I said, "Yes," and he said they were looking for a person to

6    work in Downtown Boston for a company.

7    Q.    Okay.

8    A.    And I said, "Yes."  So, we spoke, and then we planned for

9    an interview.

10   Q.    All right.  And did he give you an email address?

11   A.    Yes, he did.

12   Q.    And which email address did he give you?

13   A.    It's a gmail account.  imranalrai or

14   imran.alrai@gmail.com, I believe.

15   Q.    So, what happened next?

16   A.    We scheduled an interview, so -- well, I went back to

17   Montreal from Houston in November.  So, by the end of November

18   I came here.  We scheduled a date.  I think it was November

19   28th, 2012.

20   Q.    Okay.  Now at that point had Mr. Alrai given you the name

21   of the company that you were applying for a job with?

22   A.    No, he did not.  At that time I think I didn't have -- or

23   maybe if he might have mentioned it, I don't remember.

24   Q.    All right.  So, did you actually meet for an interview?

25   A.    I did, yeah.

1    Q.    And where did that happen?

2    A.    It happened at a restaurant in Mansfield, Fresh Catch

3    Restaurant.

4    Q.    Fresh Catch in Mansfield, Massachusetts?

5    A.    That's right.

6    Q.    And did that happen on November 28th of 2012?

7    A.    That's right.  Yeah.

8    Q.    And was Mr. Alrai alone or with someone else?

9    A.    No.  He was alone.

10   Q.    Okay.  And how did the interview go?  What was discussed?

11   A.    It went well.  Again, we discussed about my experience and

12   my skills, and I was told about the job description, what I

13   needed to do there in Downtown Boston, and it went well.

14   Q.    Okay.  Now, did you leave it with the job, or were you

15   still negotiating about the terms of the job?

16   A.    No, at that time I was not offered the job right away.

17   Q.    Okay.

18   A.    He said that he was going to let me know later, and --

19   Q.    Did you go back to Canada?

20   A.    I did, yeah.  I drove back to Canada the same day, yeah.

21   Q.    And what happened about that?

22   A.    Then I waited and then I received -- I think I called him,

23   and I asked about the job status.  He said that still we are

24   under process, so it was not decided at that time.

25   Q.    When you say "him," again, you're calling "him" the

1    defendant, Mr. Alrai?

2    A.    That's right.  Yeah.

3    Q.    And you still don't have a name of a company?

4    A.    At that time, no.

5    Q.    All right.  And so, what happened then?

6    A.    Then I was offered a job, and then, since I needed -- so,

7    I accepted the job.

8    Q.    Okay.  And who offered you the job and in what form?  Was

9    it on the phone, or by email, or how?

10   A.    No.  On phone.

11   Q.    Okay.

12   A.    On phone, yeah.

13   Q.    And was that, again, Mr. Alrai?

14   A.    That is correct.  Yeah.

15   Q.    And did he talk about a salary at the job?

16   A.    Salary, yeah.  We spoke about salary.  I was offered

17   $50,000 at that time.

18   Q.    $50,000 a year?

19   A.    $50,000 a year, yeah.

20   Q.    And did you initially say that was good, you would take

21   that?

22   A.    Yeah, I said, "Yes," at that time, but when I went back

23   home and I Googled a little bit about housing and other things,

24   I thought 50,000 might be a little bit low, on the low side.

25   So, I requested that it should be brought up to at least 55, so

1   it was agreed upon.

2   Q.   When you say, "It was agreed upon," who did you raise the

3   issue of making it 55,000 with?

4   A.   With Imran.

5   Q.   With Mr. Alrai?

6   A.   Yeah.  I asked him to negotiate with DigitalNet, at that

7   company, so they would -- he said, "Okay."  So, finally it was

8   agreed upon, so $55,000, that was settled.

9   Q.   Okay.  And you mentioned "DigitalNet."  So, did Mr. Alrai

10  at some point identify that company?

11  A.   At that point of time I didn't know.  Since -- later I

12  joined that company, so now I know that it was DigitalNet.

13  Q.   Okay.  All right.  So, do you know when he finally used

14  the word "DigitalNet" to tell you who you would be working for?

15  A.   I was told that I would be working at Downtown Boston at

16  United Way, but if DigitalNet name was mentioned, I apologize,

17  I don't remember at this time if it was mentioned or not.

18  Q.   Understood.  Did Mr. Alrai tell you that he owned or

19  controlled the company that you'd be working for?

20  A.   No, he did not.

21  Q.   Okay.  So, you said you settled on a $55,000 salary; is

22  that right?

23  A.   That's right.  Yeah.

24  Q.   Okay.  And did you have a written contract of employment?

25  A.   No, no written contract.  The only thing I got was a job

1    letter.

2    Q.   All right.  And was that in February of '13, 2013?

3    A.   That is correct.  Yeah.

4    Q.   And was that letter on DigitalNet stationery?

5    A.   That's right.  It was on DigitalNet letterhead, yeah.

6    Q.   Okay.  And was that letter -- who was that letter signed

7    by?

8    A.   It was signed by M.A. Chaudhary.

9    Q.   So, M.A. Chaudhary?

10   A.   Chaudhary.  Yeah, that's right.

11   Q.   Did it have Imran's Alrai's name on it anywhere?

12   A.   No, it did not.

13   Q.   Okay.  And what was the return address for DigitalNet on

14   that letter?

15   A.   It was -- I believe it was 300 Brickstone, somewhere in

16   Andover.

17   Q.   Andover?

18   A.   Andover, Massachusetts.  Yeah.

19   Q.   So, it's an address in Massachusetts?

20   A.   That's right.

21   Q.   And did you know then that a person named M.A. Chaudhary

22   was actually the defendant's father?

23   A.   No, I did not.

24   Q.   Okay.  And did the letter tell you who you would be

25   reporting to?

1    A.    Yeah.  It said "Mohamad Wahbe."

2    Q.    Does that person have a name that everyone calls him?

3    A.    I'm sorry?

4    Q.    Not "Mohamad," but what is that person called?

5    A.    Mohamad Wahbe.  That was the name written.  I would report

6    to him.

7    Q.    Yeah.  But, I mean, what is -- do you know Mohamad Wahbe?

8    A.    I don't know Mohamad Wahbe.

9    Q.    Do you know a person named Kal?

10   A.    Yes, I do.  Yeah.

11   Q.    And did you later work for years with Kal?

12   A.    With Kal.  Exactly, yeah.

13   Q.    Did you know that Kal is Mohamad Wahbe?

14   A.    No, I didn't know that.

15   Q.    Okay.  But the letter said you would be reporting to

16   Mohamad Wahbe?

17   A.    Mohamad Wahbe, yeah, yeah.

18   Q.    Okay.  And, again, no mention of Imran Alrai in the

19   letter?

20   A.    No.

21   Q.    Now, did you at some point actually see Mr. Munawar

22   Chaudhary, the defendant's father?

23   A.    Yeah, I saw him.  I met him, met with him.  When I used to

24   go back to Montreal, in Methuen I used to stop by for Friday

25   prayers.

1    Q.   At the mosque in Methuen, Mass?

2    A.   At the mosque in Methuen, yeah.  So, I saw him a few times

3    there.

4    Q.   Okay.  And did you know his name?

5    A.   No, I didn't know.  You know, in our culture we don't --

6    just father, so I met him, like greetings.  So, I didn't know

7    his name at that time.

8    Q.   And did you know that he was Mr. Alrai's father?

9    A.   That's right.  Yeah.

10   Q.   You did know then?

11   A.   Yeah, yeah, yeah.

12   Q.   And how many times did you meet him at the mosque?

13   A.   Maybe six, seven times during all these years at

14   DigitalNet.

15   Q.   All right.  And at any point did he say he was Munawar

16   Chaudhary from DigitalNet who signed your letter of employment?

17   A.   No, I didn't know that.

18   Q.   And did Imran Alrai ever tell you that the man you were

19   meeting at the mosque is the guy who's signing your paperwork

20   when you're coming onboard?

21   A.   No, he did not.

22   Q.   Okay.  All right.  So, when you began working for

23   DigitalNet did you start out by getting paychecks, actual, real

24   checks?

25   A.   Yeah, I used to get checks in the mail.

1    Q.   All right.  And were they signed by someone?

2    A.   I don't think so.  They were computerized checks --

3    Q.   Okay.

4    A.   -- issued by the bank.

5    Q.   And later on you got direct deposit?

6    A.   That's right.  Yeah.

7    Q.   Okay.  All right.  So, did Munawar Chaudhary ever have

8    anything to do with you and DigitalNet again besides that first

9    letter, do you know?

10   A.   No, I never heard from him again.

11   Q.   Okay.  Now, let's talk about your work at DigitalNet.  Do

12   you recall what day you started?

13   A.   I think I started 18th of March, 2013.

14   Q.   Okay.  And where did you go to start your day?

15   A.   First day I went to Lowell.

16   Q.   And that's Lowell, Mass?

17   A.   Lowell, Mass, yeah.

18   Q.   And does Lowell have its own United Way branch?

19   A.   Yes, they do, at 100 Merrimack Street, Lowell.

20   Q.   And who was there to meet you that day?

21   A.   I met Imran and Kal there.

22   Q.   Imran and Kal?

23   A.   Yeah, that's right.

24   Q.   Anyone else from DigitalNet there?

25   A.   Well, there were employees of DigitalNet in that office.

1    Q.    Of DigitalNet or United Way?

2    A.    Oh, I'm sorry.  United Way.  United Way employees in

3    Lowell.  So, I met them, but only actually Imran and Kal.  I

4    went with them, yeah.

5    Q.    Okay.  But anyone else from DigitalNet besides Imran and

6    Kal?

7    A.    No, no.  They were all United Way employees.

8    Q.    All right.  And did you then go to Boston and start work

9    there at the help desk?

10   A.    That's right.  Yeah.

11   Q.    And where was your help desk located at United Way?

12   A.    51 Sleeper Street.

13   Q.    So, at United Way you were a contractor, but you were

14   embedded in with the workplace at United Way, right?

15   A.    That's right.  That's right.

16   Q.    And that's kind of like what you're doing now at Boston

17   Medical Center?

18   A.    Exactly.  Yeah.

19   Q.    Now, when you started was there a person named Idir

20   Gherbi, spelled I-d-i-r, G-h-e-r-b-i?

21   A.    Yeah.  He worked with me at United Way.

22   Q.    All right.  And when did he start as opposed to when you

23   started?

24   A.    I think maybe a few weeks later.  I don't remember the

25   exact date when he started, but it was felt that one person was

1    not enough.

2    Q.   All right.

3    A.   So, we needed another person.

4    Q.   So, the help desk at United Way soon had two different

5    people, you and Idir?

6    A.   That's right, yeah.

7    Q.   Okay.  What was Kal's role when you started?  What was he

8    doing?  Was he actually at United Way?

9    A.   Well, I saw him there, but later I learned that he was --

10   he would take care of back-end stuff, like networking,

11   switching.

12   Q.   You said "back-end stuff"?

13   A.   Back-end, like back-end stuff.  Like, he was supposed to

14   work with, you know, switches, servers, firewalls.

15   Q.   Okay.  And did you understand where Kal would be located?

16   A.   No.  For a few days he was there.

17   Q.   At United Way?

18   A.   At United Way with us, but I knew that he wouldn't be

19   there permanently, so he left.

20   Q.   And do you know where he went to?

21   A.   He was -- in the beginning he was in Mass, but later I

22   heard that he moved to Middle East.

23   Q.   Okay.  And did you later on speak to him by telephone

24   frequently?

25   A.   Yeah, exactly.  Whenever I needed to speak with him or we

1   had meetings, you know, technical things, I used to call him.

2   Q.   Now, did you have a conversation with Mr. Alrai when you

3   started about who you would report to?

4   A.   Yeah.  From DigitalNet I would report to Kal.

5   Q.   Okay.

6   A.   But from United Way I would report to Imran.

7   Q.   And who were you to talk to about HR matters at DigitalNet

8   like, say, days off or sick days?

9   A.   Well, I used to call -- I used to talk to Imran about

10  those things.

11  Q.   Did you talk to anyone else about those things?

12  A.   No, I did not.

13  Q.   So, he would tell you when you could take a sick day or

14  when you could take a day off --

15  A.   Yeah.

16  Q.   -- if you asked?

17  A.   That's right.  Yeah.

18  Q.   Did he treat you well as an employee?

19  A.   Oh, yeah, yeah, yeah.  He was always well with us, yeah.

20  Q.   Okay.  We talked about Idir.  How was Idir hired?  Did you

21  have some role in that?

22  A.   No.  We actually -- I think -- well, I was there when he

23  was hired.  We interviewed him.

24  Q.   When you say, "We interviewed" Idir, who was that?

25  A.   Imran, Alrai, Kal and myself.

1    Q.   The three of you?  The three of you did?

2    A.   Yeah, exactly.

3    Q.   How many candidates did you have for that help desk job?

4    A.   Well, I think seven or eight candidates, maybe, so he was

5    chosen from them.

6    Q.   Okay.  And where did the interviews occur?

7    A.   In a hotel in Chelsea, I believe.

8    Q.   A hotel in Chelsea?

9    A.   That's right.

10    Q.   And this was for another position at DigitalNet, right?

11    A.   Another position at -- I'm sorry?

12    Q.   Another job at DigitalNet, someone else who would be

13    working for DigitalNet.

14    A.   That is correct.  Yeah.

15    Q.   Right.  And this is Imran, Kal and you, correct?

16    A.   And myself, yeah.

17    Q.   Who made the decision to hire Idir?

18    A.   Well, I was there, but I believe Imran and Kal, they made

19    the decision.  My input was there.

20    Q.   Okay.  All right.  Now, when you worked at United Way at

21    the help desk what did you do?

22    A.   We used to -- my job was to make sure that the system was

23    working fine.  We used to create accounts, new user accounts.

24    Whenever someone was hired we used to create accounts and their

25    credentials, and when someone left we used to terminate their

1    access, and I used to make sure that everything was working

2    fine.  Like, I used to take the backups and other day-to-day,

3    you know, stuff.  If someone has an issue with internet or

4    maybe help with their computers, so we used to take care of

5    that.

6    Q.   You mentioned backups.  What are "backups"?  How often did

7    you do backups?

8    A.   It was an automated process.  It was done every night.

9    Q.   It was every night?

10   A.   Every night, yeah.

11   Q.   Okay.

12   A.   It was an automated process.  It was done every night,

13   yeah.

14   Q.   And so, what did you, as an IT help desk person, have to

15   do about the backups?

16   A.   We had to check that everything was fine, the data which

17   was being backed up, its integrity was there.  And sometimes if

18   someone, you know, has lost some documents, so one of my jobs

19   was to restore their files and folders, whatever they have

20   lost.  So, from the backup I used to restore them as well.

21   Q.   Okay.  Now, who supervised your actual work assignments at

22   the help desk?

23   A.   Well, I used to report to Imran for anything.

24   Q.   Okay.  You reported to Mr. Alrai for anything?

25   A.   For anything, exactly.  So, anything happens I had to, you

1  know, I had to convey to him.  So, then I used to take

2  instructions from him as well.

3  Q.   Okay.  And how often did you see Mr. Alrai at United Way?

4  A.   Twice a week, I believe.

5  Q.   Okay.  And what days of the week were those?

6  A.   Tuesdays.  Tuesdays and Thursdays.

7  Q.   And did you have a weekly meeting with Mr. Alrai?

8  A.   Every Tuesday we had meetings, our weekly meetings.

9  Q.   So, he would come into the office, and you would have a

10  meeting?

11  A.   That's right, yeah.  There was a conference room just next

12  to our office, so we used to meet there.

13  Q.   And who participated in that meeting?

14  A.   Initially, Imran, myself, Idir, and Imran -- or, sorry --

15  Kal over the phone.

16  Q.   Okay.  And later, when Idir left, did Jasmin participate?

17  A.   Jasmin.  That is correct.

18  Q.   Anyone else in those meetings you had once a week?

19  A.   No.

20  Q.   But those were DigitalNet meetings, correct?

21  A.   DigitalNet meetings with United Way, yeah.

22  Q.   Okay.  And other than the meeting time on Tuesdays, what

23  time was the meeting usually?

24  A.   Close to noon.  Sometimes 11:00, 12:00, or maybe sometimes

25  1:00, depending upon Imran's schedule there.

1    Q.   Okay.  And other than that meeting did you have regular

2    personal contact with him, or was that the time you got to talk

3    to him?

4    A.   Not really, actually.  A few times did you go to a lunch,

5    and other than that I had sometime -- a few times I met him at

6    the mosque, but we never discussed work there.

7    Q.   Okay.  And when you had the meetings did you talk about

8    professional matters having to do with the IT help desk?

9    A.   That's right, yeah.  How to improve the system, week-end

10   review kind of meetings, how everything went last week and what

11   we need to do next.

12   Q.   Right.  And did you talk about finances?  Did you talk

13   about how much money DigitalNet was getting paid for whatever

14   it was doing?

15   A.   No, no.

16   Q.   Okay.  Did you talk about any other jobs that Mr. Alrai

17   had?

18   A.   I didn't know about that.

19   Q.   Did you know that he also worked at Robert Allen Group

20   until September of 2013?

21   A.   I did not know about that.

22   Q.   You had no idea he had another job?

23   A.   No, I did not.

24   Q.   All right.  So, you talked about Kal.  What did you know

25   about what Kal was doing?  You said he did back-end work; is

1  that correct?

2  A.   That's right.  Yeah.

3  Q.   And you met him when you joined, right?  Yes?

4  A.   I'm sorry?

5  Q.   Did you meet Kal when you joined United Way?

6  A.   That's right.  Yeah, I met him.  Yeah.

7  Q.   And then how often did you see Kal after that?

8  A.   For a few days he was there.  Then I think he visited

9  twice.

10  Q.   And that's after he had gone to the Middle East?

11  A.   That's right.  That's right.  Yeah.

12  Q.   So, he came back twice that you remember?

13  A.   I think, yeah, two times he came back.

14  Q.   And did he come to the United Way office then?

15  A.   That's right.  Yeah.

16  Q.   Did he have a phone number you would call him on, Kal?

17  A.   I don't remember.  But, yeah, he had a phone number.

18  Yeah.

19  Q.   Do you recall whether it was a U.S. phone number?

20  A.   Yeah, a U.S. number.  California number, I would say.

21  Q.   California number?

22  A.   California number, yeah.

23  Q.   And could you call Kal at any time?

24  A.   I could call him, but I know that he was in a different

25  time zone, so I used to call him when it was convenient for

1    him.

2    Q.   Okay.  And did you call him -- was that sort of midday at

3    your time?

4    A.   That's right.  Yeah.

5    Q.   And did you ever ask him, "Why do you have a U.S.-based

6    phone"?

7    A.   No, I did not.

8    Q.   Okay.  Was he a good worker for DigitalNet?

9    A.   A very good professional, yeah, I would say.

10   Q.   And, remember, keep your voice up.

11   A.   Yeah.  He's a good professional.

12   Q.   Okay.  You worked with Idir as well, Idir Gherbi at the

13   help desk?

14   A.   I did, yeah.

15   Q.   And do you know whether he knew Mr. Alrai any differently

16   than you did?

17   A.   I don't think so.

18   Q.   Okay.  And you've talked about the job process where the

19   three of you interviewed people and you chose Mr. Gherbi,

20   right?

21   A.   Mm-hmm.

22   Q.   And what happened with Idir Gherbi?

23   A.   He worked for us for a few years.  Then he left.  He found

24   a new job, so he left.

25   Q.   Okay.  All right.  And did someone replace Idir Gherbi on

1    your help desk?

2    A.   Well, for a few weeks I worked alone again, and then

3    Jasmin was hired.

4    Q.   And Jasmin, do you know her last name?

5    A.   Iqbal, Jasmin Iqbal.

6    Q.   And was Jasmin Iqbal working at the help desk with you all

7    the way up until the end in June of 2018?

8    A.   That is correct.

9    Q.   Okay.  Now, did you get any direction from Mr. Alrai about

10   what you were to do if someone at United Way asked to contact

11   DigitalNet and who they were supposed to go through?

12   A.   Well, yeah.  I was told that, "If someone asked about

13   DigitalNet, just refer them to me," to Imran.

14   Q.   Okay.  And so, did you do that?

15   A.   I did, yeah.

16   Q.   And so, if someone asked some question about DigitalNet,

17   you would say, "Call Imran"?

18   A.   Yeah, that's right.  I would ask them to contact Imran.

19   Q.   And for you, in terms of what you knew, is there anyone

20   you could have contacted who you knew at DigitalNet?

21   A.   No, I did not.

22   Q.   Okay.  Was there a name on an email that you did use when

23   you wrote to -- did you send emails to DigitalNet sometimes?

24   A.   I did Mohammad.  Yeah.

25   Q.   Okay.  And so, this is a person named Mohammad?

1    A.    That's right.  Yeah.

2    Q.    And did you ever know Mohammad's last name?

3    A.    Well, as such, no, but if I take that name from my

4    appointment letter, job letter, last name was Wahbe, but I

5    didn't know if it was the one person or they were different

6    people.

7    Q.    Okay.  But no one ever told you that the Mohammad is Kal

8    Wahbe, right?

9    A.    No.

10   Q.    And who gave you the name Mohammad to contact DigitalNet?

11   A.    Imran gave it to me.

12   Q.    Okay.  And did he give you an email address to use --

13   A.    Yeah.

14   Q.    -- in writing to Mohammad?

15   A.    It was support address, support@digitalnet.us., I believe.

16   Q.    So, info --

17   A.    Info, info, yeah.  info@digitalnet.us, I think.

18   Q.    And so, that email address is what you used to write to

19   Mohammad?

20   A.    That's right.  Yeah.

21   Q.    And what did you think Mohammad did at DigitalNet?  Did

22   you know?

23   A.    No, I did not.

24   Q.    Okay.  Did you ever speak to Mohammad on the telephone?

25   A.    No, I did not.  Never.

1    Q.   Did you ever meet him in person?

2    A.   No, I did not.

3    Q.   But you had email correspondence with him?

4    A.   Yes, I did.  Yeah.

5    Q.   And you would send emails to info@digitalnet and get

6    something back from Mohammad?

7    A.   Yeah.  He replied to me.  Yeah.  That's right.

8    Q.   And what were the kinds of things that you would email

9    Mohammad about?

10   A.   Well, initially I had to contact him when I was going

11   through the visa process to my work visa.  At that time we had

12   a few, you know, exchanged emails about the visa.

13   Q.   And so, you used that info@digitalnet then?

14   A.   That's right.  Yeah.

15   Q.   And after that, once you started at United Way, what did

16   you use that email address for?

17   A.   For myself?

18   Q.   Yes.

19   A.   Yes.  Well, I was given the IT service desk address.  I

20   also had a DigitalNet address as well,

21   nadeem.yousuf@digitalnet.r, I believe.

22   Q.   But what I'm asking is what kinds of things would you

23   write to info@digitalnet about?  Why would you be using that

24   email account when you sent to info@digitalnet, support at

25   DigitalNet?

1    A.    Yeah.  As I said, initially I used that address, but most

2    of the time I didn't have to contact anyone at info.

3    Q.    Okay.  So, mostly did you just talk to Imran Alrai about

4    any questions you had?

5    A.    That is correct.  Yeah.

6    Q.    Okay.  Do you recall getting other correspondence from

7    someone named Mohammad at info@digitalnet?

8    A.    Not later, but initially, as I said, when my visa process

9    was going on, at that time we did have an exchange of a few

10   emails.

11   Q.    But not much after that?

12   A.    Not much, yeah.  That's right.

13   Q.    Okay.  Now, did you know anything about any other

14   customers that DigitalNet had?

15   A.    I was not aware of -- no, I did not.

16   Q.    Did you ever hear or see any discussion about DigitalNet

17   having a different customer than United Way?

18   A.    I'm not -- no, I did not.

19   Q.    And when you had the weekly meetings with Mr. Alrai did he

20   ever talk about how things were going with other customers at

21   DigitalNet?

22   A.    No.  No, he did not.

23   Q.    You were always talking about United Way?

24   A.    Yeah.  United Way, yeah.  Work at United Way, yeah.

25   Q.    And let me finish, please, because otherwise the court

1    reporter has to type both at once.

2         Okay.  Did you know anything about the Andover office

3    at DigitalNet?

4    A.    Well, I just went out of curiosity, once I was coming

5    back.  Initially when I joined DigitalNet, when I was coming

6    back from Montreal normally I used to come quite late at night,

7    so I just went there out of curiosity.  I put the address of

8    DigitalNet in my GPS.  I just wanted to see what it looks like.

9    And that's it.  I just drove by, I just saw that office, and I

10   went back to my home.

11   Q.    And this is 300 Brickstone Place in Andover?

12   A.    That's right.  That's right.

13   Q.    In all of your time working for DigitalNet did you ever go

14   to a meeting in that place?

15   A.    No, I never went there.

16   Q.    And did you ever do any sort of function for DigitalNet at

17   that building or office?

18   A.    No, I did not.

19   Q.    So, it wasn't used by you ever, correct?

20   A.    No.  I never went there.  I mean, inside the building, I

21   never went inside the building.

22   Q.    Okay.  Where did you work?  I take it United Way in

23   Boston, right?

24   A.    That's right.  Yeah.

25   Q.    And was that five days a week?

1    A.    Five days a week.

2    Q.    All right.  And did you also go to the other United Way

3    offices?

4    A.    Yes.  I used to go to Portsmouth and Lowell, and later we

5    acquired Beverly, Beverly office.  I used to go to Beverly as

6    well.

7    Q.    And you would be doing United Way business there?

8    A.    That's right.

9    Q.    And did you have a practice of making a list of problems

10   before going so you could cover them?

11   A.    Yeah.  That was our normal practice, because, since it was

12   once -- a 15-day or once-a-week visit, so I used to make a list

13   of any issues they might have and to prepare what could be done

14   to, you know, to resolve those issues.  So, yes, I used to make

15   a list of those issues, and I would try to, you know, resolve

16   as much as I could.

17   Q.    Okay.  Did you believe that DigitalNet also had personnel

18   in Lahore, Pakistan?

19   A.    Yes, I do.

20   Q.    And why is that?  Why did you think that?

21   A.    Because at one point of time we decided to have a

22   ticketing system for United Way.

23   Q.    And a ticketing system for the help desk; is that right?

24   A.    That's right.  Yeah.

25   Q.    Is that when the employees call in and they're complaining

1   about their computer, they get a ticket system?

2   A.   That's right.  They could call, they could send an email

3   to that address, and the ticket would generate itself, and then

4   that was sent to help desk.

5   Q.   So, you were trying to get a ticketing system at United

6   Way, correct?

7   A.   That's correct.

8   Q.   For the help desk?

9   A.   That's right.  Yeah.

10  Q.   All right.  And so, what happened with the programmers in

11  Lahore?

12  A.   I talked to one of them a few times about that system, but

13  eventually it was never implemented.

14  Q.   All right.  And do you remember who you spoke to?

15  A.   Yeah.  I know his name is Anwar.

16  Q.   Is that Anwar, A-n-w-a-r?

17  A.   Yeah.

18  Q.   And did he say whether he was related to the defendant,

19  Mr. Alrai?

20  A.   No, he never mentioned that.

21  Q.   What did he talk to you about?

22  A.   Oh, we talked about that program.  At that time they were

23  testing the program for deployment at United Way, and it took a

24  while, but later that was, you know, that was that plan.  It

25  never went through.

1    Q.   And did you talk to anyone else in Pakistan in these

2    DigitalNet calls about the ticketing system?

3    A.   Not about the ticketing system, but I used to, when I

4    called at one time I called to speak with Anwar and someone

5    named Ahmed, he attended the phone and he said, Okay, Anwar was

6    not there at that time, and he said that he will have Anwar

7    call me back.

8    Q.   Okay.  And was that person Ahmed, A-h-m-e-d?

9    A.   That is correct.

10   Q.   So, the ticketing software never got implemented?

11   A.   No, it never did.

12   Q.   Do you recall any other reason that you were calling and

13   speaking to anyone in Lahore for DigitalNet?

14   A.   No.  After that, no, never.  Yeah.  Sometimes if there was

15   a problem with SQL server, I think someone from Lahore was also

16   working on SQL, S-Q-L, server at United Way, but I was not

17   involved with that.  So, they would log on remotely and work by

18   themselves, but what they were doing I have no idea.

19   Q.   So, how many total calls did you, yourself, ever have with

20   someone in Pakistan for DigitalNet?

21   A.   Maybe six, seven, maybe ten.

22   Q.   Okay.

23   A.   Not so many.

24   Q.   Okay.  And did you ever hear of a company called

25   UltPult --

1   A.   No.

2   Q.   -- a gaming company that did gaming programming?

3   A.   No, I did not.

4   Q.   Okay.  All right.  And, otherwise, did Mr. Alrai talk

5   about programmers in Lahore, Pakistan at your weekly meetings?

6   A.   Not that much, I would say.

7   Q.   Okay.  Now, at some point did you suspect that DigitalNet

8   was actually Mr. Imran Alrai?

9   A.   Well, I couldn't say for sure, but the influence --

10  because for any work related with DigitalNet I was asked by

11  Imran to contact him, and, I mean, whatever -- whenever I

12  needed anything, so I used to talk to him, and in return I

13  never spoke with anyone else, so I was not sure if he was the

14  owner of that company, but one thing for sure was that he had

15  quite an influence on DigitalNet.

16  Q.   Okay.  Now, during your five years working for DigitalNet

17  did anyone from DigitalNet ever come visit you at United Way?

18  A.   No, never.

19  Q.   Okay.  Did that seem strange to you?

20  A.   It is, yeah.  It is.

21  Q.   Sorry?

22  A.   It is.  It does, yeah.

23  Q.   And why does it seem strange?

24  A.   Well, normally if you are working for a company the

25  company, they contact you asking about your well-being, if

1    you're doing okay, if you need anything else or is there

2    anything they could do for you, like job -- you know, how you

3    are doing there.

4    Q.   Right.

5    A.   So, nothing happened like that.

6    Q.   And that never happened for DigitalNet, right?

7    A.   That never happened from anyone else at DigitalNet, yeah.

8    Q.   Okay.  And at DigitalNet did you get a year-end bonus?

9    A.   No, I did not.

10   Q.   Did you get any insurance?

11   A.   No, I did not.

12   Q.   Did you have any health insurance from DigitalNet?

13   A.   No, I did not.

14   Q.   Did you get any overtime?

15   A.   I did not.

16   Q.   And were there ever performance evaluations that

17   DigitalNet Technology Solutions conducted?

18   A.   I did not receive any letter from them regarding my

19   performance evaluations.

20   Q.   Okay.  And did anyone ever meet with you and say, "You did

21   outstanding this year or you met expectations"?

22   A.   No, never.

23   Q.   Okay.  And after three years there had you gotten any

24   raise?

25   A.   Well, for first three years I did not get any raise, but

1   after three years I actually wanted -- of course it was

2   getting, you know, harder and harder for me, so I requested for

3   a raise, and I spoke with Imran, and I was told that, since

4   United Way, they have cut their budget, IT budget a lot,

5   probably that might not happen, but he said that he will try to

6   get a raise.  So, he did not say that he will do it.  He said

7   that he will have them do it, like he will have DigitalNet do

8   that.

9   Q.   Okay.  And so, did that eventually happen?

10  A.   Yeah.  It happened in two stages.  First, I was told that

11  my salary would be increasing $5,000 a year right away,

12  bringing it to $60,000, and after six months eventually it came

13  to $65,000 a year.

14  Q.   Okay.  In all the time you were working at DigitalNet at

15  United Way did Mr. Alrai always speak as if he was the

16  middleman between you and DigitalNet?

17  A.   I would assume so, yes.

18  Q.   I'm not asking you to assume, but is that the way he

19  always --

20  A.   Yeah, that's right.  That is correct.

21  Q.   So, he never said, "I'll do that for you."  He always

22  said, "I'll talk to them to see if they will do it"?

23  A.   That is correct.  Yeah.

24  Q.   And did he ever let down that way of doing business?

25  A.   I don't think so.

1    Q.    Okay.  It was always DigitalNet is someone else, correct?

2    A.    That is correct.  Yeah.

3    Q.    All right.  Now, do you recall June 12th of 2018, the day

4    you were terminated at United Way?

5    A.    Yes, I do.

6    Q.    And what happened that day?

7    A.    On that day I was going to Lowell because we had -- we

8    were expecting a vendor to install fiber, a new fiber

9    connection at that location.  I was going there, and while I

10   was driving I received a call from Pat Latimore asking me what

11   I was doing.  I said I was driving.  I told her that I was

12   driving to Lowell.  So, she said that, "Can you come back as

13   early as you can?"  I said, "Yes," I could, but I had to hand

14   over the keys to vendor because they had to access a certain

15   area of that building, so I had the keys for that.  So, I said,

16   "Okay, as soon as I hand over the keys to the vendor I would

17   come back."

18   Q.    And when you came back to United Way in Boston, what

19   happened?

20   A.    Well, she asked me to, "Don't go to your office.  Just

21   come to me straight."  I said, "Okay," and I asked her if

22   everything was okay.  She said, "No, it was very serious, so

23   you had better come as soon as you could."

24   Q.    Okay.

25   A.    So, just before noon I went back to 51 Sleeper Street,

1   back to Boston, and, as I was directed, I went to her, and then

2   she led me into an empty office in the marketing area on the

3   second floor of United Way, and there she introduced me to two

4   gentlemen.

5   Q.   All right.  And who were they?

6   A.   One was a United Way attorney, John, and the other one was

7   -- I don't remember his name.  So, he was also there.

8   Q.   And he was working with the attorney for United Way?

9   A.   That's right.  Yeah.

10  Q.   And did you -- did he ask you some questions?

11  A.   Yeah.  He asked me about what I was doing there, what were

12  my job functions, about my --

13  Q.   All right.  And did he ask you who hired you at

14  DigitalNet?

15  A.   Yes, he did ask me that.

16  Q.   Okay.  And what did you tell him?

17  A.   Well, I don't know -- I didn't tell him that Imran Alrai

18  hired me.  I told him that -- well, he asked me, "Who

19  interviewed you?"  So, I apologize, but I said, "Kal.  Kal

20  interviewed me."  And right away I regretted that.  I shouldn't

21  have, you know, concealed that.  But later, right away sitting

22  there I felt that it was not a good thing to do, so -- and when

23  we were led out of the building, so I went to federal agents

24  and I corrected that right away, telling them -- they asked me,

25  "Who hired you?"  I said, "Imran hired me."

1    Q.    So, that same day, when federal agents talked to you, you

2    told them that Imran Alrai hired you?

3    A.    That's right.  Yeah.  Same day after an hour or so, maybe.

4    Q.    Okay.  So, were you told your job at United Way was over?

5    A.    Well, I knew that.  I mean, the way we were led out, we

6    were escorted out of the building, I knew that, yeah, our time

7    at United Way was done.

8    Q.    And Jasmin, too, was led out?

9    A.    She was, yeah.

10   Q.    All right.  And so, what did you do?

11   A.    I'm sorry?

12   Q.    What did you do then?  Did you go back to Quebec?

13   A.    No, not the same day.  Actually, I asked those federal

14   agents if I was required to stay there or I could go back home,

15   because they knew everything about me.  So, I told them that --

16   I asked them if I could go.  They said, "Yeah you can go, but

17   if we needed you, we would --" they had my contact number.

18   They verified my contact number, phone number, address, home

19   address, home phone number, and they said, "Yeah, you can go,

20   and whenever we need you we will contact you."  And I said,

21   "Okay."

22   Q.    Okay.  So, did you go back to Quebec then?

23   A.    Next day, yeah.

24   Q.    All right.  And did you start to wonder what was your job

25   status at DigitalNet?

1    A.    Sorry?

2    Q.    Did you start to wonder about what is your job status at

3    DigitalNet?

4    A.    Yeah, because I thought the contract between United Way

5    and DigitalNet was over at that time.  But since I was not a

6    United Way employee, I thought my job at DigitalNet was still

7    intact.

8    Q.    So, who did you call about that?

9    A.    A few days later from Montreal I called Imran.  I asked

10   him about what to do next.

11   Q.    And what did he tell you?

12   A.    He said, well, DigitalNet was trying to get new contracts,

13   so I was not told that, "Your job is terminated," but I was

14   told that probably they would get new contacts, and if

15   something like that comes I will be contacted.

16   Q.    All right.  And did you get any further word from

17   Mr. Alrai?

18   A.    No.  After that, no.

19   Q.    And, so did you figure out you didn't have a job anymore?

20   A.    Yeah.  I think -- I waited for about a month and a half,

21   in August.  Then I realized, no, it's all done.  So, it's done,

22   so there's nothing for me at DigitalNet.

23   Q.    How did you feel about losing your job at United Way?

24   A.    It was painful.

25   Q.    Sorry?

1  A.   It was painful, very painful.

2  Q.   Why was it painful?

3  A.   Yeah, because, you know, the people at United Way, they

4  were very good people.  I mean, they all -- my tenure, during

5  all my stay or tenure at United Way they treated us very well.

6  They were respectful, they were caring, and we got a lot of

7  respect from them.  You know, normally, when you leave certain

8  organizations you bid them goodbye, you know, say goodbye to

9  them, to those people you have worked for for more than five

10  years, and, unfortunately, I did not get a chance to see any

11  one of them, because we were just escorted out of the building.

12  Q.   All right.  So, in early 2019, this year, did you find

13  that you needed your W-2 form for tax purposes?

14  A.   Yes, I did.

15  Q.   And what did you do about that?

16  A.   Well, I called Kal about it, and I asked him, "If you have

17  received your W-2."  He said that I think at that time he did

18  not receive -- he said, "No, I haven't," but he advised me to

19  contact, to send an email to info@digitalnet address.

20  Q.   Right.

21  A.   So, I sent an email to info@digitalnet with a carbon copy,

22  CC to Imran.  I think maybe next day or same day I did get a

23  reply back from Imran.

24  Q.   So, Mr. Alrai replied to you?

25  A.   Replied to me, yeah.

1   Q.   And what did he do?

2   A.   That email had a copy of the W-2, my W-2 for 2018.

3   Q.   All right.  So, you got your W-2 from Mr. Alrai?

4   A.   I did, yeah.

5   Q.   One other area, briefly.  Rebooting.  Did you do rebooting

6   for United Way when you were working for DigitalNet?

7   A.   Rebooting?

8   Q.   Rebooting the system.

9   A.   Yeah.  Sometimes you have to reboot the system if

10  something was wrong.

11  Q.   All right.

12       THE COURT:  That's the universal fix.

13  A.   Yeah.  You have to reboot.  I mean, all the time when your

14  desktop is not working sometimes if you just reboot it works.

15  Q.   Does that mean you turn it off and turn it on?

16  A.   Yeah.

17  Q.   Even I knew that.

18  A.   Yeah.  That's called "rebooting."

19  Q.   But is rebooting anything else besides that?

20  A.   Well, you can reboot anything.  You can reboot firewalls,

21  you can reboot switches, you can reboot servers, you can reboot

22  desktops.

23  Q.   And was it a regular practice at DigitalNet to reboot the

24  server for United Way?

25  A.   Well, normally it's one of the trouble-shooting steps to

1   make sure that there are no memory clutters in the system.

2   Normally, if systems are, you know, they are not being used

3   after a month or two months, companies do reboot their systems.

4   Q.   So, did you do rebooting in that situation at United Way?

5   A.   Yeah.  Sometimes, if needed be, yes, I would.  I did,

6   yeah.

7           MR. DAVIS:  Thank you.  Nothing further.

8           THE COURT:  All right.  We've been going 90 minutes.

9   It's time for the afternoon break.  We'll take 15.  We're in

10  recess.

11          THE CLERK:  All rise.

12           (Recess taken from 3:22 p.m. to 3:40 p.m.)

13          THE CLERK:  All rise for the Honorable Court.

14          THE COURT:  Mr. Harrington, you may inquire.

15          MR. HARRINGTON:  Thank you, Judge.

16                      CROSS-EXAMINATION

17  BY MR. HARRINGTON:

18  Q.   Good afternoon, Mr. Yousuf.

19  A.   Good afternoon.

20  Q.   Sir, if I ask you any questions that you're not sure what

21  I'm asking you, please let me know and I'll try to rephrase it.

22  Okay?

23  A.   Sure, sure.

24  Q.   So, when you were hired to work at the United Way office

25  would you agree with me you understood that you would be

1   providing IT support to the United Way?  Correct?

2   A.   That is correct.  Yeah.

3   Q.   But you wouldn't be actually working for the United Way,

4   correct?

5   A.   That is correct too, yeah.

6   Q.   And you ultimately found out that the company you would be

7   working for was DigitalNet?

8   A.   That's right, yeah.

9   Q.   But you're not exactly sure when you found out the name

10  DigitalNet?  You're just not sure?

11  A.   That's right, yeah.

12  Q.   Now, would you agree with me that the paperwork that you

13  needed so that you could work at DigitalNet was handled by

14  DigitalNet and the staff in Pakistan?

15  A.   I'm sorry?

16  Q.   The paperwork that you needed to submit and get

17  approved --

18  A.   Yeah.

19  Q.   -- that was handled by DigitalNet for you, correct?

20  A.   That is correct.  Yeah.

21  Q.   And you worked very early on, I think you said was it

22  about June of 2018?  Is that about when you started?  Excuse me

23  not June.  I mean --

24  A.   March 2012.  '13.  2013.

25  Q.   March of 2013.  Thank you.  And when you first started at

1    the United Way, would you agree with me that their IT

2    environment was not in good shape?

3    A.    I agree.

4    Q.    It needed a lot of work, right?

5    A.    It did, yes.

6    Q.    And there was a lot of work that was done between 2013,

7    when you started, and June 12th of 2018, when you left.  There

8    was a lot of work done in that five-plus years, wasn't there?

9    A.    I agree.  Yeah.

10   Q.    And let me ask you, before I get into it, because I do

11   want to talk to you about some of the work that was done, let

12   me ask you a little bit about DigitalNet.  Over that five years

13   you interacted quite a bit with the United Way staff, right?

14   A.    Yeah, I did.

15   Q.    You would talk with them pretty much every day, right?

16   A.    Every day, yeah.

17   Q.    And would you agree with me they knew that you worked for

18   DigitalNet?

19   A.    They knew, yes.

20   Q.    And, in general terms, United Way was very happy with the

21   work that DigitalNet had done?

22            MR. DAVIS:  Objection.  Basis?

23            THE COURT:  You can lay a foundation.  He can talk

24   about what he's been told, but you can't do it that way.

25            MR. HARRINGTON:  Sure.  Understood, Judge.

1   Q.   So, let's talk about some of the work.  We'll go at it

2   that way, okay?

3   A.   Mm-hmm.

4   Q.   So, one of the things that you were responsible for were

5   virtual desktops, right?

6   A.   That is correct.  Yeah.

7   Q.   And you would agree with me that that was something new

8   that was added in, virtual desktops?

9   A.   That's right.  Yeah, that was new.

10  Q.   Okay.  Do you recall the Andar upgrade that was done,

11  A-n-d-a-r?

12  A.   That's right.  Yeah, I knew about that.

13  Q.   And that was a big project, right?

14  A.   It was, yeah.

15  Q.   You also were able to arrange that all employees could

16  work remotely if they wanted?

17  A.   Yes, they could.  Initially, we had desktops, they had to

18  work locally, but later on they were able to work from their

19  homes as well.  Yeah.

20  Q.   And that was as a result of the work that DigitalNet had

21  done to create that?

22          MR. DAVIS:  Objection.  Basis of knowledge.

23          THE COURT:  Yeah.  Sustained.  It doesn't mean you

24  can't explore it.  It just means you have to lay the

25  foundation.

1    MR. HARRINGTON:  Sure.

2    Q.   So, the working remotely, who is it that created that, the

3    ability to work remotely?  How was that done?

4    A.   Well, I was also involved in that.  I was the one who

5    actually, you know, I transformed the regular desktops into,

6    you know, thin clients.  We acquired a software for that.  But

7    it was done by DigitalNet.

8    Q.   Okay.  Now, let me ask you about the installation of

9    things like routers.  Those were things that were installed,

10   correct, by DigitalNet?

11   A.   Yeah, but that was not by me.  It was, but not by me.

12   Q.   Okay.  Switches?

13   A.   Yeah.  Again, not by me.

14   Q.   Let me talk to you a little bit about some of the things

15   that were done like patching.  What is "patching"?

16   A.   "Patching" is the installation of updates coming from,

17   like, manufacturers, Microsoft, Cisco.  If they come up with,

18   you know, kind of updates or they work on security

19   vulnerabilities --

20   Q.   So, security is, like, one of the patches that might be

21   used?

22   A.   It's all the time, yeah.  It's always there, yeah.

23   Q.   Would you be involved in that process?

24   A.   To some extent, yes.

25   Q.   In regard to switching things over from desktop

1   environment and servers to a cloud environment were you there

2   when that was happening?

3   A.   I was there when it happened, yeah.

4   Q.   Let me ask you a little bit about backups.  How often

5   would the system at United Way while you were there be backed

6   up?  Would it be --

7   A.   Every night.

8   Q.   Every night?

9   A.   Every night, yeah.

10  Q.   And where were the backups located, do you know?

11  A.   Well, initially, we had a storage server at the local

12  facility right there at the data center on the first floor.

13  Q.   So, right at the United Way?

14  A.   Yeah, right at United Way.  But later it was switched to

15  cloud.

16  Q.   And so, all of the backups were in the cloud?

17  A.   That's right.  Yeah.

18  Q.   And let me ask you about the outages during your time at

19  the United Way.  Were there any outages that you recall during

20  that five years that you were there?

21  A.   Yeah, quite a few.  Sometimes -- most of the outages, they

22  were related with ISP, internet service providers.  It was

23  because of them, you know, their service got interrupted for

24  any reasons.  And sometimes there were power, you know, power

25  maintenances in the buildings.  So, at that time I used to work

1    there.  And then most of the time they used to work with power

2    over the weekends so that it would not, you know, no work was

3    disturbed, so I used to go there and turn on the other system

4    one more time.

5    Q.   And so, in regard to that, what you're indicating, if I

6    understand correctly, is that with outages it would have been a

7    source for like power or the internet provider, not a problem

8    with the network at United Way?

9    A.   Yeah.  Most of the times it was because of the outages,

10   power or ISP, you know, at their end, but the network was okay

11   at United Way, pretty solid.

12   Q.   So, the network was solid.  So, let me ask you this:  In

13   regard to retrieving -- so the backups, right?  Would you be

14   approached by United Way staff from time to time about

15   retrieving things that had been lost or deleted?

16   A.   Yeah, so many times.

17   Q.   So many times?

18   A.   Yeah.  Many a times, yeah.  For example, if they lose some

19   file, they deleted some file and later they realized that,

20   okay, they needed a file back, I used to tell them that, "If

21   you made changes on the file today, probably that won't happen,

22   that it's gone, but from last night's backup I can give you

23   back."  So, whatever was stored last night they would get back.

24   Q.   Okay.  And you were able to go, and you said that happened

25   all the time, you would be able to go and retrieve it from the

1    backup system?

2    A.    That's right.  Yeah, I did.

3    Q.    You actually helped support multiple locations, I think

4    you indicated, right?

5    A.    I did, yes.

6    Q.    And just to make sure we understand the locations, that

7    was going to be the Boston office?

8    A.    51 Sleeper Street, one in Merrimack, Lowell.

9    Q.    Lowell, Beverly?

10   A.    Beverly and Portsmouth.

11   Q.    So, we have four different locations?

12   A.    That's right.

13   Q.    And at some point while you were there did you actually

14   work as part of integrating these offices on the network?

15   A.    No, I would not, because integration, interconnectivity of

16   the offices were done by Kal, not by me.

17   Q.    Let me ask you in regard to rebooting the system.  You

18   were asked about rebooting it.  That was not part of a formal

19   process that you would do every night, right?  You wouldn't

20   reboot the system every night?

21   A.    No, not every night.  Not every night.

22   Q.    You rebooted the system I think you indicated kind of as

23   necessary, if a system hadn't been used in a while or something

24   like that, right?

25   A.    Yeah, that's right.  But I think at some point in time we

1   implemented a policy that systems, particularly servers, they

2   should get rebooted every Sunday morning, I mean, on a weekly

3   basis.

4   Q.   But not on a nightly basis?

5   A.   No.  Not every day, no.

6   Q.   So, in regard to --

7   A.   Can I make a correction?

8   Q.   Yes.

9   A.   I think we scheduled for every last Sunday night of the

10  month.

11  Q.   So, not --

12  A.   I'm so sorry.  Yeah, not weekly.  I just remember, I

13  recall now it was last Sunday morning, between Saturday and

14  Sunday morning of the last of every month.

15  Q.   So, on a monthly basis?

16  A.   Monthly basis.  That's right.  Yeah.

17  Q.   Let me ask you in regard to some of the systems that were

18  on the network.  Licensing.  Were those enterprise licenses?

19  A.   Enterprise licenses, yeah.

20  Q.   So, the licenses that DigitalNet had were not like

21  personal home-use licenses; they were enterprise licenses?

22  A.   Enterprise licenses.  That's right.

23  Q.   And, if you would, can you describe what's the difference

24  between an enterprise license and a personal or home-use

25  license?

1    A.    Well, enterprise license -- well, licensing had different

2    kinds:  volume license, enterprise license.  Enterprise

3    license, of course, they are issued to the companies, to the

4    corporate sector, and they go into agreement with the provider

5    vendor, like Microsoft, Cisco, whatever, and they could use in

6    their premises, versus individual licenses.  That is issued to

7    the individuals to work at home or their small offices.

8    Q.    Okay.  Likewise, the software that was used was not trial

9    software, correct?

10   A.    No, no.  It was licensed.  Licensed software, yeah.

11   Q.    During the time that you were with DigitalNet, that

12   five-plus years, would you agree with me there was never any

13   major outage or network problem?

14   A.    Well, "major" means if nobody was able to work, yes, there

15   were a few, but because of -- you know, since everything went

16   into the cloud, so we heavily relied upon internet, so when

17   internet service provider was gone, if there was an outage due

18   to weather or certain calamities, I mean, at that time that

19   would cause a major impact or major outage.

20   Q.    Sure.  And you would agree with me that's an internet

21   outage; it wasn't an outage relative to DigitalNet, right?

22   A.    Yeah.  Because being in cloud, everything was connected

23   through cloud, so everyone's desktop there were in cloud,

24   because they were using only thin clients.  They're called

25   "dumb terminals."  So, to do anything like, for example, this

1   is a local computer, and you want to do anything you can do it,

2   right?

3   Q.   And in regard to if there was an outage because of an

4   interruption, say, with an internet service provider, the ISP

5   you indicated, you were able to actually recover all the data

6   information because it had been secured in a backup, right?

7   A.   That is correct.  Yeah.  But, as I said, if something was

8   lost for that day, that could not be recovered.  The only thing

9   that could be recovered was from the last backup, which was

10  taken on a nightly basis.

11  Q.   Understood.  I want to talk to you a little bit about Kal,

12  Kal Wahbe.  You understood that Kal's job was different than

13  yours, right?

14  A.   That is correct.  Yeah.

15  Q.   And you understood that Kal's work was more relative to

16  the network, right?

17  A.   That's right.

18  Q.   Switching, servers, things like that?

19  A.   That's right.

20  Q.   Firewalls?

21  A.   Firewalls, yeah.

22  Q.   And you also understood that there was a team of people in

23  Pakistan that worked for DigitalNet as well, right?

24  A.   That's right.  Yeah.  There was an office there, yeah.

25  Q.   Okay.  And at one point in time you actually had, if you

1   recall, on your phone at United Way there was an extension that

2   was designated that you could use to call Pakistan?

3   A.    Yeah.

4   Q.    Correct?

5   A.    That's right.  Yeah.

6   Q.    And that would be, if you needed some support yourself and

7   Kal wasn't available, that could be another option for you; is

8   that fair to say?

9   A.    Well, for local access, for local help I never contacted

10   the Lahore office, because the only contact I had was Kal.  So,

11   I did have extension for Lahore on my phone.  One was for

12   local, like for United Way; another was for the Lahore office.

13   Q.    How often did you speak to Kal?  Was it frequently?

14   A.    Not on a regular basis.  Mostly when -- well, we used to

15   speak every week because when we had our weekly meetings.  So,

16   he was there, so just say, "Hello," "Hi," other than, you know,

17   the stuff we would discuss.  And other than that, whenever I

18   needed his help I used to call him.

19   Q.    So, you had weekly meetings and then, as needed, calls?

20   A.    That's right.  Yeah.

21   Q.    And if there was an issue that was brought to your

22   attention by a United Way employee you would resolve that

23   issue, such as a lost file or something like that?

24   A.    Yeah.  So many issues, like with the hardware, initially

25   once we had local desktops, I used to do imaging as well.  So

1    if someone has lost a hard drive, so I would re-image.  But

2    later, since things were gone to cloud, so at that time most of

3    the time the problems were with the desktop, remote desktops

4    and with backups as well, yes.

5    Q.   Lastly, Mr. Yousuf, you had indicated towards the end of

6    your testimony that on June 12th of 2018, when you left the

7    United Way and you were asked about who had hired you and you

8    said, "Kal," and you regretted that.

9    A.   I did.

10   Q.   Understandable.  I just want to ask you, it's true that

11   Mr. Alrai never asked you to lie for him; isn't that correct?

12   A.   No, no, no, no.  Never.

13   Q.   He never asked you to conceal information for him,

14   correct?

15   A.   No.  As a matter of fact, the only -- the day I called him

16   about my job status after going back to Montreal, I never

17   called him back, or he never called me, I never called him.

18   The last contact we had was kind of a one-way contact, when I

19   sent an email to info for my W-2.  He sent back, and the only

20   thing I replied was, "Thank You."  That's it.

21   Q.   And you had asked for the W-2, and that was provided to

22   you I think you said the next day?

23   A.   Yeah.

24        MR. HARRINGTON:  Judge, I don't have any other

25   questions for Mr. Yousuf.

1              THE COURT:  Redirect?

2              MR. DAVIS:  Briefly.

3                        REDIRECT EXAMINATION

4    BY MR. DAVIS:

5    Q.   Briefly, just about the backups again, how frequently were

6    the backups?  Were they every night or every month, do you

7    know?

8    A.   Well, there are different -- well, first of all, every

9    night, the backup every night done is called "incremental

10   backup."  So, only files that would change that day would be

11   backed up.

12   Q.   Okay.

13   A.   And then every month there was a full backup.

14   Q.   And for that full backup every month do you know if the

15   backup went to multiple physical locations, that is, multiple

16   servers, or were they all on site?  Do you know?

17   A.   No.  Initially, the backup was on site, but later on, as I

18   said, it was sent to cloud, so it was somewhere on data center

19   maybe somewhere.  But I was not aware of the locations where

20   that was being backed up, but I knew that that was going to

21   cloud.  That's called "cloud backup."

22             MR. DAVIS:  All right.  No further questions.  Thanks.

23             THE COURT:  Anything else?

24                        RECROSS EXAMINATION

25   BY MR. HARRINGTON:

1  Q.   The only other question I would have for you is in regard

2  to the backups.  Would you agree with me that in your position

3  and in your role there in the five years there was no data ever

4  lost relative to the backup system; it worked successfully?

5  A.   Yes, it did.

6       MR. HARRINGTON:  No other questions, Judge.

7       THE COURT:  Sir, you're excused.  Thank you.

8       THE WITNESS:  Thank you

9            (Witness stepped down)

10      MR. DAVIS:  The government calls Rich Voccio.

11      THE COURT:  Spell that for me, please, Counsel.

12      MR. DAVIS:  V-o-c-c-i-o.

13      THE CLERK:  Good afternoon, sir.  If you'd like to

14  step this way, please.  Please raise your right hand.

15      **RICHARD VOCCIO, JR.**, having been duly sworn by the

16  Clerk, was examined and testified as follows:

17      THE CLERK:  For the record, please state your full

18  name and spell your last name.

19      THE WITNESS:  Richard Matthew Voccio, Jr.

20      THE CLERK:  And spell your last name.

21      THE WITNESS:  V, as in "Victor, o-c-c-i-o.

22      THE CLERK:  Thank you.  Please be seated.

23                 DIRECT EXAMINATION

24  BY MR. DAVIS:

25  Q.   Please state your name.

1    A.    Richard Matthew Voccio, Jr.

2    Q.    Can you spell your last name.

3    A.    V, as in "Victor," o-c-c-i-o.

4    Q.    You already did that, didn't you?  What is your job,

5    please?

6    A.    My job is Chief Administrative Officer for the United Way

7    of Massachusetts Bay and Merrimack Valley.

8    Q.    So, you're the CAO?

9    A.    CAO.

10   Q.    And is that, effectively, the number two person in the

11   organization under the CEO, the Chief Executive?

12   A.    It's one of four positions underneath the CEO.  There's a

13   Chief Operating Officer, Chief Development Officer, and then

14   there's the Chief Administrative Officer.

15   Q.    Okay.  And can you summarize your previous relevant job

16   experience.

17   A.    So, I've been here almost three years with this United

18   Way.  Prior to that --

19   Q.    Sorry.  You started in May of 2017; is that correct?

20   A.    May 1st, 2017.

21   Q.    And you work in Boston every day?

22   A.    I work in Boston every day, yup.

23   Q.    All right.  So, your previous jobs were what?

24   A.    Prior to this United Way, I worked for 11 years as the

25   Chief Financial Officer at the United Way of Rhode Island in

1    Providence, Rhode Island, and then prior to that I worked

2    almost nine years as the Chief Financial Officer for the

3    Newport County Chapter Ark Regional Services Direct Support

4    Agency.

5    Q.    So, you had been a CFO for about 20 years before you came

6    to United Way?

7    A.    Correct.

8    Q.    And did you have experience supervising and managing IT

9    policy and IT projects?

10   A.    Yes.  In those 20 years I had that responsibility in those

11   two jobs.

12   Q.    Okay.  So, United Way of Merrimack Valley and

13   Massachusetts Bay, that's your business, right?

14   A.    Correct.

15   Q.    Describe that company.  What is it?

16   A.    So, we're a community fundraising organization supporting

17   currently 151 communities in Eastern Massachusetts all the way

18   from up here in the Seacoast area in Portsmouth, New Hampshire,

19   just to communities south of Boston, Massachusetts.  We run

20   corporate annual appeal campaigns.  We also work with Federal

21   Government, state government, private corporations for grant

22   funding, and we provide services for that.  We work with

23   agencies to invest in agencies to do good for the community.

24   We're big into homelessness, financial stability, financial

25   coaching, are some of the marquis things that we've worked on.

1        Our United Way has had a Pay for Success to end

2   chronic homelessness social innovation bond that is very unique

3   to the United Way system, something we're very proud of.

4   Q.   So, what's the relation between your United Way in Boston

5   and the national United Way entity?  Can you explain that a

6   little bit?

7   A.   Yes.  So, our United Way, we're one of 1,100 chapters in

8   the United States.  There are several United Ways in the State

9   of Massachusetts.  Each United Way runs independently.  They

10  have their own 501(c)(3) designation with the IRS, and United

11  Way worldwide operates as our advocacy as well as policy

12  governance and best practices for United Way.  So, we have to

13  follow membership requirements as a local United Way with

14  United Way worldwide.

15  Q.   But you're your own separate local business, correct?

16  A.   Correct.

17  Q.   And really nonprofit, right?

18  A.   Nonprofit, yeah.  That's our mission.  Yeah.

19  Q.   Are you regulated by the charitable trust people in

20  Massachusetts?  Is there a government entity that actually

21  regulates United Way?

22  A.   Yes.

23  Q.   What is that?

24  A.   We have to report to the Attorney General's Office

25  charitable -- I'm going to get this wrong -- the charitable

1    divisions for nonprofits.  We have to file with them the Form

2    PC, which is taking our tax return and our annual filing with

3    them.  We also have to file with the Secretary of State an

4    annual report as well with them.

5    Q.   All right.

6    A.   But we have to follow their practices as well as those of

7    the IRS and United Way worldwide.

8    Q.   And talking about the IRS, are you familiar with the IRS

9    Form 990?

10   A.   Very familiar with it.  I was part of a United Way team

11   when the form changed in 2008-2009 to rewrite the regs on how

12   United Ways would abide, live into those guidelines.

13   Q.   And, just briefly, what is a 990 and what is its

14   significance at United Way?  What do you do with it, where does

15   it go, what does it have in it?

16   A.   So, in its core form the 990 is a public document that,

17   while we file it with the IRS, the IRS wants to know

18   financially, you know, revenue that we've received, expenses

19   that were expensed.  But since 2009, when they rewrote the

20   document, it's more of a public statement document, like what's

21   our mission, what do we do, what do we do on behalf of our

22   mission to better the communities that we serve?  And so, you

23   go right to the second page of the document, it's a narration.

24   It's got numbers in it, but it talks about what we do and

25   everything and what we're doing with the money that we receive

1    and how we spend that.

2           There's also big sections in the document on corporate

3    governance, best practices for corporate governance, full

4    disclosure on executives' compensation, not just the numeric

5    side of it, but I would say also how we go about it, how is the

6    CEO's salary reviewed by the Board of Directors, the

7    Compensation Committee?  So, the reader of that document can

8    get really an insight of not just our mission but the inner

9    workings, how we go about conducting business day in and day

10   out.

11   Q.    And where you're spending money, correct?

12   A.    Absolutely.

13   Q.    Including on salaries of executives?

14   A.    Salaries of executives in two different locations, on the

15   core form and also on Schedule J.

16   Q.    And then money paid to contractors?

17   A.    Yes.  There's a schedule that I believe has the top five

18   vendors are supposed to be listed on that schedule as well.

19   Q.    And, in fact, was as of 2018 DigitalNet Technology

20   Solutions listed on United Way's 990 as the second largest

21   vendor getting contract payments?

22   A.    Yes.

23   Q.    All right.  And is that posted right on the website?

24   Anyone looking at United Way on your web page can go and see

25   what the 990 says?

1    A.    If you give me a computer I could show you in three clicks

2    you could be on that site.

3    Q.    Okay.  Of the national United Ways, do you know where the

4    Boston United Way ranks in terms of revenue?

5    A.    We're in the top 15.  I think currently we're ranked at 13

6    out of the top 15 United Ways.

7    Q.    And the approximate annual revenue is what?

8    A.    The approximate annual revenue is about 45, $46 million.

9    Q.    And how many offices are there besides Boston?

10   A.    So, we have four regional offices.  The newest one is in

11   Attleboro, Massachusetts.  We acquired the United Way of

12   Greater Attleboro, Taunton about a year ago and did a

13   consolidation of that small United Way.  We have offices in

14   Beverly, Mass. at the Cummings Center, we have an office in the

15   Seaport District, right near the Air Force base in Portsmouth,

16   New Hampshire, and we have our last office is in Lowell, Mass.,

17   right Downtown Lowell.

18   Q.    Okay.  How many employees, approximately?

19   A.    Currently, we're somewhere between 80 and 85 employees.

20   Q.    And how many donors, roughly?

21   A.    Roughly, about 20,000 donors.

22   Q.    And are those both corporations and individuals?

23   A.    Yes.  Yes.  Our fundraising is done at the corporate

24   level.  Depending on who you talk to, we consider them either

25   an individual or an employee of the corporation, but roughly --

1   they're all included in that 20,000.

2   Q.   And you receive federal grants and state grants, you said?

3   A.   Yes, we do.  That's been a bigger piece of our annual,

4   that 46 million.  That's become a bigger piece of our business

5   in United Way and in Massachusetts Bay and Merrimack Valley.

6   Q.   And approximately how many different local agencies do you

7   fund for doing good things in the community right now?

8   A.   Approximately about 150.

9   Q.   150.  Okay.  All right.  So, as the Chief Administrative

10  Officer, are you familiar with the United Way business records

11  that have been gathered in this case --

12  A.   Yes, I am.

13  Q.   -- and that pertain to DigitalNet Technology as a

14  contractor and the money paid to DigitalNet by United Way?

15  A.   Yes, I am.

16  Q.   All right.  And are you familiar also with the job of

17  Mr. Imran Alrai?

18  A.   Yes, I am.  Yeah.

19  Q.   And did you meet him when you came onboard in May of '17?

20  A.   I think I met him on the first or second day on the job.

21  Q.   All right.  Could you point him out, please?

22  A.   He's right over there, the gentleman sitting over there

23  (indicating).

24            THE COURT:  Identified.

25  Q.   So, when you came on, what were his duties, as you

1    understood them?

2    A.    He was the VP of Information Technologies, so he had

3    oversight of all of our information technologies, all of our

4    internal technologies that our staff would use, our external

5    technologies.  So, he was the lead person for that.

6    Q.    Okay.  What else?

7    A.    He didn't report to me, which for me was a little bit

8    unique.  On the 20 years in my last two jobs, as the CFO I was

9    responsible for IT directly, and in this job, when the offer

10   was made as the administrative officer, that role was going to

11   move to one of my colleagues.

12   Q.    Was that Pat Latimore?

13   A.    Yes, it was.  Yeah, yeah.  Yup.

14   Q.    Did Mr. Alrai also provide advice about IT services and IT

15   expenditures to United Way?

16   A.    Yes.  He was one of seven or eight people that sat around

17   the senior team room.  We had meetings every single Tuesday,

18   10:00 to 11:30.  We had representation from -- besides

19   Mr. Alrai in IT, HR was there, we had community investments, we

20   had the marketing team, and then you had the four officers, you

21   know, the Development Officer, myself, the Operating Officer

22   and the Chief Executive Officer there, too.

23   Q.    And in that room was he the person charged with

24   representing United Way as in all matters information

25   technology?

1    A.    Yes.

2    Q.    For United Way, after employee salary and benefits, what

3    are the biggest spend areas every year?

4    A.    In the spend on the internal budget we had -- we were

5    spending about $14 million.  10 million of it I would say

6    salary, wages, benefits, pension plan.

7    Q.    After that what?

8    A.    After that, IT and occupancy were your two biggest line

9    items.

10   Q.    So, "occupancy" is rent?

11   A.    Right.  That's rent for the Boston office.  It's also rent

12   on the four regional offices as well.

13   Q.    And IT is right there with rent?

14   A.    Right there.  It's a big line item.

15   Q.    And you're spending more than $1,000,000 a year on IT,

16   correct?

17   A.    Well over $1,000,000.

18   Q.    Okay.  What was Mr. Alrai's salary at the end in 2018?

19   A.    I believe his last salary that I was aware of, his salary

20   was $175,000.

21   Q.    And what benefits, briefly, was he receiving from United

22   Way?

23   A.    To the best of my recall on this, I'm assuming that I

24   would have got the same package that everyone else would have

25   gotten, and that would have been he would have got a pro rata

1  share of medical benefits.  I think it was a 70/30 co-pay

2  percentage.  So, the company paid 70 percent of the healthcare.

3  Dental benefits, vision benefits.  There was an allowance for

4  VPs for commuting benefits.  He would have also had a parking

5  space over at the Necco surface lot.  We had four of those, I

6  believe.  We also had another one for the DigitalNet staff as

7  well, a dedicated spot there.  He would have received the

8  pension plan contribution, both the match and as well as the

9  employer contribution.  And this is the one area I'm not quite

10  certain of, the HR department would have to finalize, is we had

11  people at a certain level that were also entitled to bonus

12  compensation, and I'm not quite certain if his position

13  qualified for that or not.

14  Q.  All right.  And did you do a study of approximately how

15  much for salary and benefits United Way paid Mr. Alrai over the

16  six years he worked for United Way?

17  A.  Yes.  Salary and benefits was somewhere between 1.3,

18  $1.4 million.

19  Q.  All right.  And did he have what was called an alternative

20  work arrangement also?

21  A.  Yeah.  The acronym that we use around the United Way is

22  "AWA."

23  Q.  And what was Mr. Alrai's AWA?

24  A.  His AWA, he was working three days remotely and two days

25  in the Boston office.

1    Q.   And why was that?

2    A.   The way it was explained to me, because it was a little

3    bit unique, that he was an adjunct professor at Southern New

4    Hampshire University, and he had some classes that I think were

5    taught in the afternoon hours.  So, it was sort of convenient

6    for him if he could be, you know, in New Hampshire and not have

7    to be in the Boston office.

8    Q.   Okay.  And under the AWA, was he required to have a home

9    office where he worked out of?

10   A.   Yeah.  If you're working on AWA, you would have to list a

11   residence.  So, our staff would work -- if they had an AWA they

12   were working from their residence, and they would have to have

13   the computer equipment and so forth to be able to work and be

14   able to do the same duties they would work in the Boston office

15   or regional office.

16   Q.   All right.  Did United Way have a conflict of interest

17   form and conflict of interest policy that applied to officers

18   like Mr. Alrai?

19   A.   Yes, all United Ways.  I mean, that was one of the best

20   practices when the 990 was rewritten back in 2008, 2009.  It's

21   right on the 990 tax return.  So, United Ways had it prior to

22   then, but it was really like, you know, this is something you

23   really want to do.

24   Q.   And does every officer and employee have to sign and file

25   a conflict of interest form each year at United Way?

1    A.    Yes, yes.  All the employees need to file one as well as

2    the Board of Directors.  Volunteers do that.

3    Q.    If an employer or an officer identifies a conflict, that

4    is, some situation where the employee or officer may be

5    benefiting or may appear to be benefiting from expenditures

6    being made by United Way, is there a disclosure process?

7    A.    There is.  So, the disclosure -- and Providence was very

8    similar to how we handled it in Boston.  That process, so you

9    would have a Staff Ethics Officer on staff, and for us it was

10   our HR director, Jane Grady, and that staff ethics officer, she

11   would be the person that would be accumulating all of the

12   conflict of interest forms, all of the disclosures, if there

13   were any disclosures, and then she would accumulate that and

14   bring that in front of the Board of Directors ethics for

15   discussion, so that they would actually review one by one and

16   would review that, and usually that would be done in, like, an

17   executive session.

18   Q.    And would the IRS be notified if a conflict disclosure was

19   actually made?

20   A.    I don't know if the IRS would be notified, but the

21   disclosure -- on the governance section of the 990 it asks yes

22   or no, and then on Schedule O, which is the narrative, it might

23   ask for more detail in the narrative, and you would write that.

24   It would behoove you for you to come forward and explain what

25   the conflict is.

1    Q.   And what's the general purpose of the conflict of interest

2    form at United Way?  Why do you have it?

3    A.   It's a spirit of transparency.  It's letting the donors

4    that entrust us with their monies to do the very best for the

5    communities that we serve, and, if there is a conflict, is to

6    be able to say what that conflict is and disclose what it could

7    be.

8    Q.   All right.  So, I want to ask you now about contracts with

9    DigitalNet that were signed over the period of Mr. Alrai's

10   employment.  Are you familiar with those contracts?

11   A.   I'm familiar seeing those contracts.

12   Q.   Okay.  And are you aware that the initial contract was to

13   do an IT health assessment in 2012?

14   A.   Yes.

15   Q.   And do you know, roughly, the amount of money United Way

16   paid DigitalNet for that health assessment?

17   A.   I want to say somewhere around 55-, $60,000.

18   Q.   All right.  And then the first ongoing services contract

19   with DigitalNet was signed in February of 2013, after an RFP

20   process, correct?

21   A.   Correct.

22   Q.   And then later additional contracts were signed?

23   A.   I believe one or two more were signed in 2013.

24   Q.   So, let me show you, then, please, Government Exhibit 300.

25   Do you see that on the screen?

1  A.   Yup.

2  Q.   And do you recognize that as the Master Service Agreement

3  with DigitalNet?

4  A.   Mm-hmm.  And the logo, too.

5       MR. DAVIS:  Can you scroll through it.

6  Q.   And is there a signature page?

7  A.   Yup.  There's one there with Patricia Latimore's, Pat

8  Latimore's signature.

9  Q.   Okay.  And did Pat Latimore sign, I think, all of the

10  contracts with DigitalNet?

11  A.   Yeah.  Up until my arrival on May 1st, 2017 there were

12  only two people that could sign contracts.  That was the Chief

13  Financial Officer, who was Pat, and the CEO, Mike Durkin, and

14  even as we speak today the only two people that when I got

15  onboard, Pat moved into the COO role, the only two people who

16  could sign contracts was either myself or Mike Durkin.

17       MR. DAVIS:  Move to admit Exhibit 300 and strike the

18  ID, your Honor.

19       MR. HARRINGTON:  No objection, Judge.

20       THE COURT:  Folks, we're going to take a very brief

21  recess, less than five minutes.

22       MR. HARRINGTON:  No objection.

23       THE COURT:  Admitted.

24     (Government's Exhibit No. 300 received into evidence)

25       THE CLERK:  All rise.

1          (Recess taken from 4:23 p.m. to 4:31 p.m.)

2               THE CLERK:  All rise.

3    Q.   So, Mr. Voccio, showing you now, as quickly as I can,

4    Exhibit 301 for ID, another contract, do you recognize that

5    Statement of Work with DigitalNet?

6    A.   I do.

7    Q.   And does that have a signature page?

8    A.   Right there.  Yes, it does.  Yup.  Page 3 of 10.

9    Q.   And, again, signed by Patricia Latimore?

10   A.   Yes.

11              MR. DAVIS:  All right.  And can you blow up, please,

12   the signature and signature block below that, Ms. Sheff.

13   Q.   And what does that say?

14   A.   That's "M.A. Chaudhary, VP Business Development."

15   Q.   And the printed part is printed in a very distinctive

16   block handwriting; is that correct?

17   A.   I would agree.

18   Q.   All right.  And then the signature is, well, an unusual

19   signature for Mr. Chaudhary, right?

20   A.   It's different, yes.

21              MR. DAVIS:  Your Honor, move to admit 301 and strike

22   the ID.

23              MR. HARRINGTON:  No objection, Judge.

24              THE COURT:  It is admitted.

25          (Government's Exhibit No. 301 received into evidence)

1    Q.   Showing 302 For Identification a Managed Cloud Telephony

2    Services Agreement between United Way and DigitalNet dated

3    August of 2013, do you recognize that contract?

4    A.   I do.

5    Q.   Is that another contract entered into with DigitalNet?

6    A.   It is.

7              MR. HARRINGTON:  And, Judge, if I can just interrupt

8    counsel, if there are a number of contracts relative to United

9    Way and DigitalNet that he wants to -- I'm not going to require

10   any foundation, so if he wants to just --

11             MR. DAVIS:  Thank you.

12             MR. HARRINGTON:  -- pull up the contracts and admit

13   them, I am happy to just do that.

14   Q.   So, if we could just look at the -- that's signed also by

15   Patricia Latimore?

16             MR. DAVIS:  And I appreciate it, Counsel.

17   A.   Yes, it's signed by Patricia Latimore.

18   Q.   Okay.  And that doesn't have the DigitalNet signature,

19   correct?

20   A.   Correct.  It doesn't.

21   Q.   All right.  And then I'm referring to 303, which is an

22   August 17th, 2012 Health and Security Assessment Agreement For

23   Identification.  I just wanted to look at that briefly.  Can we

24   stop at the signature page.

25             Again, Pat Latimore signed that for United Way?

1    A.    Yes.

2              MR. DAVIS:  Your Honor, move to admit 303 for ID.

3              THE COURT:  Admitted.

4         (Government's Exhibit No. 303 received into evidence)

5              MR. DAVIS:  And, lastly, 304 for ID, which is a

6    Professional Services Agreement dated September 2nd of 2015, I

7    move to admit 304 and strike the ID.

8              MR. HARRINGTON:  No objection, Judge.

9              THE COURT:  Admitted.

10        (Government's Exhibit No. 304 received into evidence)

11   Q.    All right.  So, over the years United Way signed a number

12   of contracts with DigitalNet, correct?

13   A.    Correct.

14   Q.    And the annual spend, the annual amount paid to DigitalNet

15   came to be approximately what?

16   A.    About $1.1 million.

17   Q.    Now, in all of your gathering records relevant to

18   DigitalNet after this all blew up, has United Way ever found

19   RFP proposal documents from vendors besides DigitalNet?

20   A.    No, not that I'm aware of.

21   Q.    And what have you done to look for them?

22   A.    Well, we did a paper trail look.  We had several people,

23   we had administrative files.  We actually looked at Mr. Alrai's

24   desk area and went through his records.  So, we did that.  We

25   also, we have an email system.  I mean, a lot of our documents

1   come in through email commerce.  So, we've gone through all the

2   email records.  We've gone through all the email files.

3   Executive administrative assistants keep a lot of the

4   administrative correspondence.  We've gone through that.  We

5   scoured the whole place, and we could not find anything.

6   Q.   And, again, what I'm talking about is RFP proposals from

7   other legitimate vendors who are trying to get the contract,

8   the first managed services contract with United Way.  You never

9   could find any of those proposals, could you?

10  A.   No.  Specifically the contracts, proposals from 2013, we

11  could not find any.

12  Q.   All right.  Now, are you also familiar in your gathering

13  of business records with the invoices that United Way received

14  from DigitalNet?

15  A.   Yes, I am.

16  Q.   And did you receive -- let me show you Exhibit 309 For

17  Identification.  Do you recognize 309?

18  A.   I do.  This is one of many invoices, but, yes.

19  Q.   Okay.  And this is a -- can you just quickly flip through.

20  This is a batch exhibit of multiple invoices.  Are all of these

21  invoices that came from DigitalNet?

22  A.   Yes, they are.

23  Q.   And that were processed for payment by United Way?

24  A.   Yes.  I recognize various signatures and accounting

25  coding.

1          MR. DAVIS:  Your Honor, I move to admit 309 and strike

2    the ID.

3          MR. HARRINGTON:  No objection, Judge.

4          THE COURT:  Admitted.

5     (Government's Exhibit No. 309 received into evidence)

6          MR. DAVIS:  So, let's just stop on the invoice we're

7    on now.  Can you zoom in, please, on the top left-hand corner,

8    what that says.  All right.

9    Q.   So, that's DigitalNet Technology Solutions, LLC.  It gives

10   an address in Andover, Mass., correct?

11   A.   Correct.

12   Q.   And then it gives a phone number, which is a 978 number,

13   correct?

14   A.   Correct.

15   Q.   And then it's addressed to you at United Way?

16   A.   No.  It's addressed to the Accounts Payable Department.

17   Q.   To the United Way of Massachusetts Bay?

18   A.   Yes.

19   Q.   All right.  And on the right side what do we have?  We

20   have the logo, right?

21   A.   Mm-hmm.

22   Q.   And we have an invoice number, correct?

23   A.   Correct.

24   Q.   And then the subject says "Managed Telephony Services."

25   So, this is a telephone services bill, correct?

1    A.    Yes.  It's for the month of December 2013.

2    Q.    And it's dated what?

3    A.    November 12th, 2013.

4    Q.    Okay.  So, let's look at the body of the email itself, if

5    we can blow that up a little bit.  So, there's various phone

6    services.  Is this a hardware invoice, or what is this invoice

7    for, do you know?

8    A.    No.  This invoice is for the -- this is for the Lowell

9    office, the Seacoast office, the Boston office.  These are for,

10   like, users.  So, each desk is getting charged a flat fee from

11   DigitalNet.

12   Q.    And so, the total being assessed here is $13,473.75 for

13   the month of December?

14   A.    Correct.

15   Q.    And you were getting a similar bill each month from

16   DigitalNet?

17   A.    Yes.  We were getting an individual bill each month.

18   Q.    And you see, "Okay to pay," and a date and "Elaine

19   Singer."  Was Elaine Singer an employee at United Way?

20   A.    Yes.  Elaine worked in the IT Department.  She recently

21   retired.

22   Q.    Who was her direct supervisor?

23   A.    Imran Alrai.

24   Q.    All right.  And it says "ACH" on it.  What does that

25   indicate?

1   A.    The ACH indicates we're going to pay electronics funds

2   transfer versus paying, you know, with a live check.

3   Q.    And so, was United Way making ACH payments, that is,

4   direct transfers to DigitalNet's bank account at Pentucket Bank

5   in Massachusetts?

6   A.    Correct.

7   Q.    And always to the same account at Pentucket Bank?

8   A.    To best of my knowledge, yes, at the same bank account at

9   Pentucket Bank.

10  Q.    Okay.  What were the requirements, by the way, about how

11  these invoices got paid in terms of who had to approve them?

12  A.    So, I'm looking at these signatures on these invoices, so

13  you're going to notice there's a blanket 461.  What that means

14  is at the beginning of the year there was a blanket purchase

15  order that would have to have been, one, prepared; two, would

16  have had to have been signed off by the IT area, would have

17  been signed off by Imran; then it would have also had to have

18  been signed off by the Finance Department; and then it also

19  would have been signed off by Pat Latimore, or since 2017 I

20  would have signed those off.

21         So, the blanket order would have been signed off, and

22  then invoices themselves, when they come in monthly, they refer

23  them against the blanket.  So, if there's no blanket we've got

24  nothing to pay off the invoice against the purchase order.  So,

25  what Elaine is doing here is she's referring to blanket 641 and

1    she's writing, "Okay to pay," because she's reviewed it against

2    the blanket, she would have had a copy of it, and she's dating

3    that 12/12/13 to pay, and she's making a note "ACH."  And then

4    the other note there is, that looks like Alison Ginsberg, the

5    VP of Finance in the Finance Department.  So, now Finance is

6    collaborating to say, "Yeah, we're okay with that.  We're okay

7    to pay."

8    Q.   Okay.  So, have you calculated the approximate total

9    amount of money that United Way paid to DigitalNet from the

10   beginning through June 2018?

11   A.   Yes.

12   Q.   And what was that amount?

13   A.   $6.7 million.

14   Q.   All right.  Now, did you -- were you familiar, once you

15   came in, with a pattern of requests or interests involving

16   Mr. Alrai and the payments to DigitalNet?

17   A.   I was familiar with the monthly process; that, yeah, we

18   were paying DigitalNet monthly for various invoices.

19   Q.   I'm sorry.  What I'm asking is were you aware that

20   Mr. Alrai from time to time was urging the prompt payment and

21   making -- prodding people to get the money paid to DigitalNet?

22          MR. HARRINGTON:  Objection, Judge.  Unless he has

23   personal knowledge, I'd object to hearsay.

24   Q.   Do you have personal knowledge?

25   A.   I have personal knowledge.

1          THE COURT:  What is the basis of your personal

2     knowledge?  How do you know what you know?

3          THE WITNESS:  How do I know what I know?  Because I

4     have people in my Financial Department telling me.

5          THE COURT:  Let me hear it.  Develop the foundation.

6     I'll decide after I hear it.

7     Q.   Did people in your Finance Department indicate to you that

8     Mr. Alrai was urging the payment of a particular invoice from

9     DigitalNet?

10         THE COURT:  That's hearsay, and he has an objection.

11         MR. DAVIS:  Your Honor, it's not offered for the

12    truth.

13         THE COURT:  Seems like it is, actually.  You're

14    offering it to show that he was pursuing that method and timing

15    of invoice, right?

16         MR. DAVIS:  Yes.

17         THE COURT:  If there's a different reason, tell me.

18         MR. DAVIS:  I'll withdraw it.  You're right.

19    Q.   Are you aware personally -- did anyone -- well, were you

20    aware of -- let me just drop this.  It's not going well.

21         THE COURT:  Okay.  There's probably a way to get at

22    it.

23    Q.   What days did Mr. Alrai work?

24    A.   He worked two days in the Boston office.  I believe it was

25    Tuesdays and Thursdays.  He had flexibility to change it, but I

1   believe it was Tuesdays and Thursdays.

2   Q.   And did you have the senior management meetings on

3   Tuesday?

4   A.   Yes.  That was one of the reasons why it was, I don't want

5   to say mandatory, but Mike wanted everyone to be around the

6   table and not calling in as best you could.  So, Tuesdays was

7   the day you were in the Boston office.

8   Q.   You certainly knew Nadeem and Jasmin on site?

9   A.   Oh, yeah.  I met them my first day on the job.

10   Q.   And did they provide competent help desk service to United

11   Way?

12   A.   Oh, very competent, very friendly.  I really enjoyed

13   working with them.

14   Q.   Did you ever see anyone else from DigitalNet on site at

15   United Way?

16   A.   No.

17   Q.   All right.  Now, when you came on did you ask at some

18   point to have a regular meeting with Imran Alrai?

19   A.   Yes.

20   Q.   And why did you want to have that?

21   A.   I wanted to have that twofold.  One was, I wasn't managing

22   the IT function, but the IT function was doing a lot of support

23   for the division that I was responsible for; and, secondly, you

24   know, strategically I wanted to be able to work as a senior

25   colleague, is to be able to work together.  And I had the

1    budget responsibility.  He had a big piece of that budget.  I

2    really wanted to get more of an understanding of how, you know,

3    we could collaborate and work together.

4    Q.   Okay.  So, what happened about that, briefly?

5    A.   So, briefly, we would schedule the meetings in the Boston

6    office on the days that he was going to be there, because at

7    that time I was working five days a week in Boston, I wasn't

8    working any regional offices, and so the first couple of times

9    I think they were like ad hoc meetings or we had scheduled

10   them -- you know, we had scheduled them but not that far in

11   advance.  It wasn't like a routine meeting.

12           And so, we had a couple of those meetings, and it was

13   interesting enough that in both those meetings Pat Latimore

14   impromptu had also showed up for the meeting, and I wasn't

15   expecting Pat to be in the meeting, but she was, and we had a

16   cordial meeting, the three of us.  We talked about IT and did

17   that.

18   Q.   And did you then try to have a one-on-one, face-to-face

19   meeting with Mr. Alrai?

20   A.   Yeah.  Besides those two meetings, what I was trying to do

21   with Imran is like I do, with a lot of staff.  It's, "Let's get

22   a monthly scheduled meeting."  Like, I meet with some staff

23   weekly, some biweekly.  With IT it was like.  "All right.

24   Let's meet on a -- let's make a meeting -- I want it face on

25   face once a month."

1    Q.   So, did you eventually schedule the first face-to-face

2    meeting with Imran Alrai?

3    A.   I did.  We actually put it in the calendar.

4    Q.   And when the day came what happened?

5    A.   So, when the day came, to my surprise, I was expecting we

6    would be having a face-on-face meeting in one of the senior

7    team conference rooms, and I went to the rooms and waited for

8    Imran, because Imran was up, upstairs on the third floor, I

9    worked on the second floor, and about five minutes into the

10   meeting he's not showing up.

11        So, I don't know exactly how I figured it out, but I

12   found out that he wasn't in the office.  So, I ended up calling

13   him, and he picked up the phone and the conversation went

14   something to the request (sic) of, "Oh, I thought we were doing

15   this over the phone."  I says, "Where are you?"  He says, "I'm

16   up in New Hampshire.  I'm working in New Hampshire today."  I

17   said, "Well, no, these meetings -- I was pretty direct with

18   you.  I wanted these meetings face on face a day that you were

19   going to be here in the office, and I don't want to continue to

20   have this meeting.  We'll reschedule this another time, and

21   then let's have the meeting."

22   Q.   All right.  So, did you then actually reschedule and have

23   a face-to-face meeting in Boston?

24   A.   We did, yeah.

25   Q.   Was that in approximately December of 2017?

1    A.    It was.  It was in December of '17.

2    Q.    And how did that conversation go, and what projects did

3    you talk about?

4    A.    The conversation went really well.  I really appreciated

5    his open and honesty, and hopefully he appreciated my open and

6    honesty.  We had a couple of projects that weren't getting

7    supported or, should I say, they weren't being completed, and

8    we talked open about it.  Some of it was on the IT team.  He

9    had a lot of pressure on working on some other things.  At the

10   same time, you know, my staff was disappointed that the

11   projects weren't going well.

12   Q.    All right.  So, was one of the projects automating the tax

13   receipt process?

14   A.    Yes.

15   Q.    And tax receipts are something donors get so they can get

16   a deduction for a charitable donation?

17   A.    Yes.  We were trying to automate that.

18   Q.    Did you discuss that at this meeting with Mr. Alrai?

19   A.    We did.  We talked about that, and we talked about another

20   project.

21   Q.    And did he have ideas about how DigitalNet could be

22   involved with that process?

23   A.    Specifically to that one, he thought that DigitalNet could

24   do some custom work on that to give us a solution.

25   Q.    Presumably for additional payments?

1    A.    For digital receipting.

2    Q.    Sorry?

3    A.    Digital receipting, for tax receipting.

4    Q.    All right.  But, I mean, he was suggesting that you could

5    contract with DigitalNet to get additional work done on that

6    project?

7    A.    Yes, as opposed to like what we've done on other projects,

8    is, we'll buy off-the-shelf, canned software that someone has

9    got a solution, and we'll procure that.

10   Q.    Did you also talk about software to automate accounts

11   payable?

12   A.    Yes, we talked about that.

13   Q.    And how did that discussion go?

14   A.    The discussion was that, what I was trying to emphasize to

15   Imran was that I'm trying to automate things, and, you know, I

16   really needed his support to help us go out and see what

17   solutions possibly could be out there and help us try to find

18   the right solution for United Way Mass. Bay.

19   Q.    So, at the end of that face-to-face meeting did you

20   believe there were some deliverables on Mr. Alrai's part?

21   A.    Deliverables on his part, deliverables on my finance

22   team's part, yeah.  There were deliverables, yeah.

23   Q.    What actually happened?

24   A.    So, what actually happened was maybe a day, two days later

25   I get an email, I don't know if it was from -- I think it was

1    from Pat, but there was an email saying that Imran was going to

2    be on leave of absence for -- I don't know if it was personal

3    reasons or medical, it didn't say specifically, but he was

4    going to be out of the office for several weeks.

5    Q.   All right.  And what happened to the two projects you had

6    just discussed with him?

7    A.   One, I was surprised, because I thought we were going to

8    be working on those projects, you know, immediately, and

9    nothing happened.  Nothing happened on the tax receipting.  And

10   then on the other project I got impatient and didn't want to

11   continue to wait, and we started to do our own research with my

12   leadership doing some research on that project.

13   Q.   Was that the last face-to-face meeting you were able to

14   have with Imran Alrai?

15   A.   One-on-one, yes.

16   Q.   All right.  Okay.  So, did Mr. Alrai come back in the new

17   year in 2018 at some point?

18   A.   He did.

19   Q.   All right.  And did he engage in the budget process for

20   payments to DigitalNet, among other things, and the IT

21   Department?

22   A.   Yes, he did.

23   Q.   And was there an over-budget problem with DigitalNet in

24   2018 in the budget process?

25   A.   We were headed into that direction towards the end of the

1   fiscal year.

2   Q.   The end of the fiscal year is July 1 at United Way?

3   A.   June 30th.

4   Q.   And what was the projected overspend on DigitalNet as of

5   early 2018?

6   A.   I can't recall the exact dollar amount, but I want to say

7   it was, you know, somewhere under $100,000.  But, you know,

8   that's significant money for us.

9   Q.   Okay.  And so, did you engage with Mr. Alrai in an attempt

10  to address that budget issue?

11  A.   Yes.  And besides talking about the budget issue for the

12  current year, in the February-March time frame we're planning

13  for the future year that starts on July 1, so it was also

14  important to get a really clear understanding of what the IT

15  budget spend was going to be both on the operating side and on

16  the capital spend for the -- that would have been FY '19's

17  budget.  So, we were working on that as well.

18           MR. DAVIS:  All right.  Excuse me, your Honor.

19           THE COURT:  Yup.

20  Q.   Was there a particular employee who worked on the budget

21  in finance, Dom Pallaria?

22  A.   Dom Pallaria was our controller.  He was responsible for

23  the collating and the reporting out of the budget.

24  Q.   And did you have communications with him about the budget

25  situation and, particularly, the IT Department budget?

1    A.    Yes.

2    Q.    Showing you Exhibit 651, can you see that item?

3    A.    I see it's an email.

4    Q.    Are you able to read it?  Can you recognize it?

5    A.    Yeah.  Do you want me to read it now?

6    Q.    No.  But who is it from and to?

7    A.    It's from Imran to Dom, and I'm being copied.

8          MR. DAVIS:  Your Honor, I move to admit 651 and strike

9    the ID.

10         MR. HARRINGTON:  No objection, Judge.

11         THE COURT:  It's admitted.

12    (Government's Exhibit No. 651 received into evidence)

13   Q.    So, "Dom" is Dom Pallaria, correct?

14   A.    Correct.  He's the controller.

15   Q.    And starting down at the bottom of the email, what is the

16   origin of this email?

17         MR. DAVIS:  Are you able to show that?

18   A.    If you could scroll down a little bit further.  It looks

19   likes Imran is looking for a 15 percent placeholder.  Without

20   reading the whole email, I'm assuming this is like an increase

21   from the prior year's budget, and he's also stating that it's

22   not including anything to Digital Services Operating Group,

23   that's what "DSOG" stands for, and Salesforce Philanthropy

24   Cloud, those were new things that United Way Mass. Bay was

25   working with United Way worldwide.  So, he was basically saying

1    not including that.

2    Q.   So, the next email up, what does that say?  This is from

3    Dom to Mr. Alrai; is that correct?

4    A.   Yeah.  I'm just paraphrasing without reading the whole

5    thing.  It's basically that Dom is looking for a detailed

6    budget, and part of this is, this was my directive, because

7    this was my first owning the budget for United Way Mass. Bay in

8    my tenure.  The budget prior to that was developed under Pat's

9    leadership.

10   Q.   All right.  And is it fair to say that Dom Pallaria was

11   frequently troubled by the lack of detail that he received from

12   Mr. Alrai in the budget process?

13   A.   Yes.

14   Q.   And so, at the top of the email how does Mr. Alrai respond

15   to Dom Pallaria?

16   A.   It's pretty directive what he's looking to ask -- what he

17   wants from Imran.

18   Q.   So, that's the email from Dom?

19   A.   Yes.

20   Q.   And you received communications like this between Dom and

21   Imran Alrai with some frequency?

22   A.   During the budget process, yes.

23   Q.   Okay.  So, showing you also 652 For Identification, and is

24   that an email at the top?  Can you see who that's to and from?

25   A.   Yes.

1    Q.   Okay.  And is that from Mr. Pallaria to you --

2    A.   Yeah.

3    Q.   -- about the fiscal budget request?

4    A.   Yes, it is.

5              MR. DAVIS:  Move to strike the ID on 652.

6              MR. HARRINGTON:  No objection, Judge.

7              THE COURT:  Admitted.

8         (Government's Exhibit No. 652 received into evidence)

9    Q.   Okay.  And how does that email begin from Dom?

10   A.   The email begins with he's letting me know there's a file

11   attached with some detail.

12   Q.   I'm sorry.  Down at the origin of the email.

13   A.   I'm trying to find out --

14   Q.   Sorry.  All right.  These are budget instructions coming

15   out to the various department heads?

16   A.   Yes.  I mean, IT and all the other departments have

17   generic instructions.  Everyone's supposed to follow the same

18   instructions as to what's being asked of the controller to

19   develop their budgets.

20             MR. DAVIS:  And can you scroll up on the email now,

21   please.

22   Q.   Okay.  And what does this say?

23   A.   This is saying that the department budget is correct and

24   10 percent less.  He's congratulating him for being the first

25   to return it.  Regarding the allocate, that was probably for

1   the department cost center, and then there's an allocated

2   expenses that I had questions of, "Looking for clarification

3   from you," I'm assuming that's Imran, "and not completely sure

4   how much explanation he's looking for, however, he believes two

5   questions."  One was, "Why are we requesting operating expenses

6   up $95,000 over last year?  Where are the increases?  And

7   $180,000 increase in capital costs.  What, if anything has been

8   budgeted for sales force, and can you get me some of the

9   specifics for that?"

10          So, Dom's asking some followups of Imran.

11  Q.   And Dom, the controller, is asking Mr. Alrai directly,

12  "Why are your proposed budgets going up?"  Correct?

13  A.   Yeah.  That's his responsibility.

14  Q.   All right.

15  A.   He would ask anybody that.

16  Q.   That's enough on that exhibit.  Thanks.

17          So, on March 27th of 2018 did a whistleblower emerge

18  in your company?

19  A.   Yes.

20  Q.   All right.  And who was that whistleblower, as it turned

21  out?

22  A.   It was Dom Pallaria, the controller.

23          MR. DAVIS:  Your Honor, this might be a good place to

24  break.  I probably --

25          THE COURT:  You're right.  I actually didn't realize

1    the time.  It's time to break.  It's 5:00.  Good idea.  All

2    right.

3            You can step down, sir.

4            THE WITNESS:  Okay.

5                    (Witness stepped down)

6            THE COURT:  We'll resume with this witness tomorrow,

7    Mr. Davis?

8            MR. DAVIS:  Yes, your Honor.  It probably will be no

9    more than 30 minutes more.

10           THE COURT:  All right, then.  Anything for the Court

11   you want to talk about on the record right now?

12           MR. DAVIS:  I don't think so, Judge.

13           THE COURT:  All right, then.  We're off the record.

14   We're in recess.

15                    (Discussion held off the record)

16       (WHEREUPON, the proceedings adjourned at 5:00 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of my

8   stenotype notes taken in the matter of *United States v. Imran*

9   *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date:  ___4/12/20              */s/ Brenda K. Hancock*
                                  Brenda K. Hancock, RMR, CRR
15                                Official Court Reporter

16

17

18

19

20

21

22

23

24

25