*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    *  No. 1:18-cr-192-JL
              v.                     *  December 4, 2019
6                                    *  9:10 a.m.
     IMRAN ALRAI,                    *
7                                    *
                    Defendant.       *
8    * * * * * * * * * * * * * * * * *

9

10                  TRANSCRIPT OF BENCH TRIAL
                   DAY THREE - MORNING SESSION
11

12            BEFORE THE HONORABLE JOSEPH N. LAPLANTE

13

14   APPEARANCES:

15

     For the Government:      John S. Davis, AUSA
16                            Matthew Hunter, AUSA
                              Cam T. Le, AUSA
17                            United States Attorney's Office

18

     For the Defendant:      Timothy M. Harrington, Esq.
19                            Timothy C. Ayer, Esq.
                              Shaheen & Gordon PA
20

21

     Court Reporter:         Brenda K. Hancock, RMR, CRR
22                            Official Court Reporter
                              United States District Court
23                            55 Pleasant Street
                              Concord, NH 03301
24                            (603) 225-1454

25

1                              I  N  D  E  X

2    WITNESSES:            DIRECT      CROSS      REDIRECT    RECROSS

3    DEAN RIVIERA
     By Ms. Le                                      40
4    By Mr. Harrington               3

5    PATRICIA LATIMORE
     By Mr. Davis          52

6

7                          E  X  H  I  B  I  T  S

8                     No._____ In Evd.
                      Govt's
9                     714....................50
                      605....................59
10                    606....................63
                      607....................66
11                    608....................70
                      609....................71
12                    610....................74
                      613....................80
13                    401....................92
                      617...................112
14                    300a..................113
                      301a..................113
15                    301b..................114
                      304a..................114
16                    635...................119
                      628...................126
17                    630...................127
                      645...................129
18                    644...................131

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  All rise for the Honorable Court. |
| 3 | THE COURT:  Good morning. |
| 4 | THE CLERK:  The Court has before it for consideration |
| 5 | this morning day three of the bench trial in United States of |
| 6 | America versus Imran Alrai, Criminal Number 18-cr-192-01-JL. |
| 7 | THE COURT:  All right.  All right, Mr. Riviera, you |
| 8 | are still under oath. |
| 9 | THE WITNESS:  Yes. |
| 10 | THE COURT:  You may proceed.  Cross-examination. |
| 11 | MR. HARRINGTON:  Thank you, Judge. |
| 12 | **DEAN RIVIERA**, having been previously duly sworn, was |
| 13 | further examined and testified as follows: |
| 14 | CROSS-EXAMINATION |
| 15 | BY MR. HARRINGTON: |
| 16 | Q.   Good morning, Mr. Riviera.  And am I pronouncing your name |
| 17 | correctly, sir?  Is it Riviera? |
| 18 | A.   Riviera, like the French Riviera. |
| 19 | Q.   All right.  So, I want to ask you a few questions about |
| 20 | what you testified to yesterday.  Now, would you agree with |
| 21 | this, that a lot of the information that you have provided to |
| 22 | the judge for his consideration is based on your opinion? |
| 23 | A.   Define "a lot."  We discussed a lot yesterday. |
| 24 | Q.   Sure.  Would you agree with this proposition in general |
| 25 | terms:  that the judge is going to have to rely on your |

1   personal opinion for parts of your testimony?  Would that be

2   fair to say?

3   A.   Correct, as well as factual.

4   Q.   Sure.  And as part of that you are relying on your opinion

5   for those pieces that he has to rely on just your opinion; and

6   let's maybe separate it out, we'll say your opinion versus

7   things that might be supported by documents, for example,

8   right?  In regard to that, obviously, that has to be

9   information that the judge can trust and find trustworthy, able

10  to rely on it.  Would that be fair to say?

11  A.   Correct.

12  Q.   Okay.  So, I want to ask you --

13          MR. HARRINGTON:  If we could pull this up.

14  Q.   So, one of the things that you had indicated to the judge

15  yesterday was in regard to Windows XP.  Do you remember talking

16  to the judge about that?

17  A.   Correct.

18  Q.   And one of the things you had indicated is that, when you

19  came into Robert Allen, Windows XP was outdated, correct?

20  A.   Correct.

21  Q.   And that it was no longer being serviced by Windows,

22  right?  Or Microsoft, I should say.

23  A.   Yes.

24  Q.   Correct?

25  A.   No longer being supported by Windows.

1 Q. And that would mean, for example, Microsoft wouldn't be

2 providing patches and security updates, things of that nature,

3 right?

4 A. Correct.

5 Q. And in that regard I think you had said to the judge that

6 Windows XP had been outdated by some 25 years, I think you had

7 indicated was the number; is that correct?

8 A. Correct.  It was originally introduced in 1985, and

9 Microsoft sunsetted it in 2009, officially sunsetted XP in

10 2009.

11 Q. And we're confirming this is Windows XP, correct?

12 A. Windows XP.

13    MR. HARRINGTON:  If you could bring up --

14    MS. LE:  Objection, your Honor.  May we approach to

15 address this?

16    THE COURT:  You want to address it outside of his

17 hearing?

18    MS. LE:  Yes.

19    THE COURT:  All right.  Then, you may approach.

20    MS. LE:  Thank you.

21 (SIDEBAR CONFERENCE AS FOLLOWS):

22    THE COURT:  Okay.

23    MS. LE:  Your Honor, I'm objecting to the use of

24 Google.

25    THE COURT:  He can hear you.

1          MS. LE:  Okay.  You might want to excuse him, because

2     I don't have an indoor voice.

3          THE COURT:  I get it.

4          MS. LE:  I would object to this extrinsic use of

5     Google searches to cross-examine this witness, your Honor.  If

6     he wants to impeach the witness, he can put together whatever

7     and put it to him so we're not pulling up Google to do

8     searches.  This is inappropriate use of extrinsic evidence, if

9     it's even evidence at all for the purposes of this hearing.

10          THE COURT:  Are you attempting to introduce any of

11     this?

12          MR. HARRINGTON:  No.

13          MS. LE:  Then it shouldn't be on the screen.

14          MR. HARRINGTON:  Well, it's not being introduced as an

15     exhibit, Judge; it's being introduced to question the witness

16     about it and if the testimony he gave he was accurate.

17          THE COURT:  If you're going to put it in front of him

18     to cross-examine him about it, I don't have a problem with it

19     being on the screen, because if it's on the screen you can all

20     see it, you can see what he's doing.

21          MS. LE:  Right.  But if this was a jury trial, your

22     Honor, it would not be appropriate for the trier of fact to see

23     what is on there.

24          THE COURT:  You're absolutely right.  That said --

25          MR. HARRINGTON:  One of the other things I'll be able

1  to do as well, Judge, is I have an expert in IT that's going to

2  be testifying.  It's going to come in that way as well.

3          THE COURT:  So, you are going to put it in?

4          MR. HARRINGTON:  Given that he's already testified to

5  it, I'm going to have my expert comment on it.

6          THE COURT:  Comment on it.  But you're not going to

7  try to introduce the actual, like, Google pages?  I don't

8  understand -- anyway, the bottom line is here, respectfully, I

9  don't think it's inappropriate to confront the witness with

10  almost anything.  It's not necessarily impeachment.  It's just

11  more questioning.  It's testing.  I don't have a problem with

12  it.  I don't think there is a rule of evidence that prohibits

13  it, unless you're going to introduce it as evidence.  But

14  having him react to things that happen to come from the

15  internet or some other third-party source, I don't think that's

16  improper impeachment, and I'm not aware of any law that it is.

17          So, I guess I'm overruling the objection.  That said,

18  if this turns into shoveling evidence into the record, which I

19  think is what you're really most concerned about, I'll police

20  it myself and I'll raise it, and you shouldn't feel constrained

21  to object again if you think something is going too far.  I

22  don't have a problem with that either.

23          But I think witnesses, fact and expert, can be

24  confronted with just about anything, and there's more than one

25  way to impeach, and it's not always prior inconsistent

1   statements or parts of an expert witness's files.  You can

2   confront them with almost anything.  So, I'm going to allow it.

3   So, overruled.

4   (END OF SIDEBAR CONFERENCE)

5          THE COURT:  Let me say this:  The objection is

6   sustained to the extent -- and this will be going forward.  The

7   objection is sustained to the extent they are trying to

8   introduce this as evidence, and that includes doing it in a

9   backdoor way.  So, I would ask you to restrict yourself to the

10  type of impeachment that you're trying to conduct here.  It's

11  not impeachment by prior inconsistent statement, but it may be

12  simply to confirm with the witness information that you think

13  contradicts his opinions or his testimony.

14         MR. HARRINGTON:  Thank you, Judge.

15         THE COURT:  Okay.

16  BY MR. HARRINGTON:

17  Q.   And do you see that on your screen?

18  A.   Yes.

19         MR. HARRINGTON:  Charli, it's not coming up on this

20  screen.

21         THE COURT:  It's coming up on the Court's screen.

22         How about opposing counsel?  Are you getting it?

23         MS. LE:  Yes, your Honor.

24         MR. HARRINGTON:  I think it was just the power wasn't

25  on, Judge.  There we go.

1  Q.   And while we've been trying to get this up, have you had a

2  chance to take a look at that?

3  A.   Yes.

4  Q.   Okay.  And this talks about the support for Windows XP

5  ending, correct?

6  A.   That's what it says.

7  Q.   And it talks about after 12 years support for Windows XP

8  ended on April 8th of 2014, correct?

9  A.   That's what it says.

10  Q.   Okay.  And you had indicated that you started at Robert

11  Allen in -- I think you said was it mid-November of 2013?

12  A.   Late November.

13  Q.   Late November?

14  A.   Yeah.  November 20th.

15  Q.   November 20th of 2013?

16  A.   Correct.

17  Q.   So, according to this that you're looking at, the Windows

18  XP would have still been supported by Microsoft until April 8th

19  of 2014, several months, five, in fact, a little over five,

20  while you were the CIO at Robert Allen, correct?

21  A.   That's what it says.  Can I clarify?

22            THE COURT:  Of course.

23  A.   When Windows came out with their Windows product, it was

24  introduced in 1985.

25            MR. HARRINGTON:  Well, this is about Windows XP, your

1    Honor, not about the introduction.  If he has a comment about

2    Windows XP, I think that's appropriate, but if he just wants to

3    talk about Windows, that's not my questioning.  I think that's

4    beyond the scope of clarification.

5              THE COURT:  I disagree.  Go ahead.

6              THE WITNESS:  Continue?

7              THE COURT:  Yes.

8    A.   Since the introduction in 1985, it went through several

9    versions, the latest version in 2009.  Microsoft came out and

10   officially announced in 2009 that they were officially no

11   longer supporting it.  What had happened is the user

12   community --

13             THE COURT:  Rebelled.

14   A.   -- rebelled.

15             THE COURT:  Yeah, I remember.

16   A.   They rebelled and said too many corporate companies

17   already have XP installed, so Microsoft came back and

18   created -- or provided an extension until the date of April

19   8th, 2014 to allow companies to migrate -- you know, upgrade.

20   But their official announcement was in 2009.

21             THE COURT:  And that was XP.

22             THE WITNESS:  That was XP, correct.

23             THE COURT:  The only really antiquated, out-of-date

24   institutions like the Federal Court system were using XP, if I

25   remember correctly.

1    BY MR. HARRINGTON:

2    Q.   You would agree with me that time frame that we're talking

3    about, if we're talking about Windows XP, if you look here, and

4    I'm showing it says October 25th, 2001, that Windows XP was

5    released to manufacturing on August 24th of 2001, and then

6    broadly released to the retail just shortly thereafter, on

7    October 25th.  It talks about development beginning in the late

8    '90s, but it talks about released to manufacturing August 24th,

9    2001.  That's the release date for Windows XP, correct?

10   A.   That's what it says.

11   Q.   Okay.  And that's not 25 years, is it?

12   A.   I think you have to take a look at this from, you know,

13   the evolution of Windows.  Windows went through a series of

14   version controls with different names, whether it's NT or XP or

15   others.  So, the final XP is the final foundation of the

16   product as they built it.

17   Q.   Okay.  And what you had said in your testimony was that,

18   when you arrived at Robert Allen in late November of 2013, that

19   Windows XP was outdated by 25 years.

20   A.   I was referring to since the inception.

21   Q.   But Windows XP had only been released since 2001, right?

22   A.   That's the commencement of that named version name.

23   Q.   Okay.

24   A.   But it's built upon the foundation of Windows.

25   Q.   Understood.

1    A.    Right?

2    Q.    Understood.

3    A.    Are we splitting hairs here because of the different

4    version control names?

5    Q.    I'm not splitting hairs, Mr. Riviera.  I'm talking about

6    the specific testimony relative to Windows XP.

7         THE COURT:  I understand your point you're trying to

8    establish.  Let me just say this, one of those rare times in

9    the trier of fact will share its impression.  If you're trying

10   to draw the distinction between XP and prior versions between

11   12 years and 25 years, point taken.  I think the witness did

12   explain what he meant by it.  But if you're trying to establish

13   that this software wasn't completely outdated under your

14   client's supervision, I don't take that inference.  I think it

15   was completely outdated, and the idea that a company like that

16   was still utilizing it, do I think it has much to do with

17   proving a wire fraud case?  No.  Or any of this?  No.  But the

18   prosecution was going to great lengths yesterday trying to show

19   that the defendant was underperforming.  It goes to that issue.

20   I think it probably shows that, but I don't think it does much

21   in the way of satisfying its burden of proof.  But it was old

22   software, no question about that.

23        MR. HARRINGTON:  I'm not disputing that.  And the only

24   other question, Judge, since we're talking about that, is

25   relative to the questioning about whether updates were

1   available, which I think Mr. Riviera agrees that updates were

2   available until April 8th of 2018, which -- excuse me -- 2014.

3          THE COURT:  Yeah, '14.

4          MR. HARRINGTON:  Which was after he arrived and

5   security and patches and all of that was updated, which, I will

6   follow up with the question, but I think it's obvious from the

7   evidence it was after my client left.

8          THE COURT:  It was possible to use the software, sure,

9   up till and through the time he left.  I'll just make one more

10  point.  This might have been what AUSA Le was trying to tell me

11  at sidebar and I didn't listen carefully enough.  In terms of

12  making a record here, you're bringing up, quote, unquote, the

13  internet on the screen.  It isn't as if there's going to be a

14  record of what you showed the witness here except to the extent

15  you get him to adopt what you say.  So, I would just ask that,

16  to the extent we can make a good record while we're using --

17  just bringing up the internet in the courtroom, let's do that.

18  All right?

19         MR. HARRINGTON:  Understood, Judge.  Yeah.

20         THE COURT:  Okay.

21  BY MR. HARRINGTON:

22  Q.   Mr. Riviera, I want to move on to some other topics at

23  this point.  You had talked about the telephony contract.  Do

24  you recall your testimony?

25  A.   Yes.

1    Q.   And one of the things that you indicated in regard to the

2    telephony contract was that there were problems with the phone,

3    correct?

4    A.   Correct.

5    Q.   And part of that problem was relative to the bandwith,

6    correct?

7    A.   Correct.

8    Q.   And in regard to that, you had basically indicated what

9    the troubles were that you had specifically, yourself, noticed,

10   which I think you even pulled some of the terms to explain them

11   to us in the contract, which was latency, jitter and packet

12   loss, right?

13   A.   Correct.

14   Q.   And I'm going to break that down a little bit so that

15   we're all kind of back and refreshed and we're on the same

16   page.  The packet loss might be, if you don't have appropriate

17   bandwith on the phones, result in low-quality audio or dropped

18   calls, correct?

19   A.   Correct.

20   Q.   And that's one of the things you indicated that you had

21   noticed?

22   A.   Correct.

23   Q.   You also indicated that relative to -- if you don't have

24   the appropriate bandwith relative to jitter, again, might

25   result in low-quality audio, correct?

1    A.    Correct.

2    Q.    And then you had talked about latency.  Again, if you

3    don't have appropriate bandwith it could result in choppy

4    calls, which I think is what you had talked about where you

5    might miss words like you're missing stuff in the middle of a

6    conversation.  Is that correct?

7    A.    Correct.

8    Q.    And you do agree with me that in the contract, because you

9    indicated you reviewed the contracts, that in regard to that

10   the DigitalNet contract specifically said that you, the client,

11   Robert Allen, need to contact your internet service provider to

12   ensure your bandwith meets the minimum requirements for your

13   needs.  That's specifically in the contract, right?

14   A.    Correct.

15   Q.    And it goes on to say in that contract, which has already

16   been admitted as an exhibit, we're on page 7, that if the

17   network had insufficient hardware or the ISP delivers

18   poor-quality bandwith, the following might occur, and then it

19   talks about latency, jitter and packet loss, correct?

20   A.    In my recollection?

21   Q.    Yeah.

22   A.    Because it's not on the screen.

23   Q.    I will put it on the screen so you can see it, okay?  I'm

24   putting on page 7 of the contract.

25            MS. LE:  What exhibit number, Counsel?

1          MR. HARRINGTON:  Oh, I think that was page 7.  So, it

2     was the Robert Allen telephony system contract.

3          MS. LE:  Is that Exhibit 306, Counsel?

4          MR. HARRINGTON:  Let me see.  I think that is.  It is.

5     That's 306.

6          MS. LE:  What page are we referring to?

7          MR. HARRINGTON:  Page 7 of the contract.

8          MS. LE:  Which is what Bates number?  I'm sorry.

9          MR. HARRINGTON:  18R148_ROB-00201.

10         MS. LE:  Thank you.

11    Q.   And let me kind of zoom in on that a little bit.  Can you

12    read that okay, or should I kind of get that a little bit

13    further?  Does that work for you?

14    A.   That's good.

15    Q.   Okay.  So, in regard to that, where it says "Network

16    Quality," I've highlighted a section.  It says, "If your

17    network has insufficient hardware, or your ISP delivered poor

18    quality bandwith the following issues may occur," and it goes

19    through those issues, correct?

20    A.   Yes.

21    Q.   And you would agree with me that the contract specifically

22    says up at the top, and you'll see and I'll point to this

23    section here, it specifically says that, "Please contact your

24    internet service provider to ensure your bandwith meets the

25    minimum requirements for your needs."  Correct?

1    A.   Correct.

2    Q.   So, that puts the obligation onto Robert Allen to ensure

3    that they have appropriate bandwith, correct?

4    A.   Correct.  There's a clarification, though.

5         THE COURT:  Go ahead.

6    A.   That clarification, when I saw that, and I observed not

7    only being on the phone myself and hearing the latency or

8    choppy phone calls, I had many people in the company say,

9    "Dean, what's wrong with the phones?  Can we fix the phones?"

10   Well, I knew, based on the common denominator, the internet

11   bandwith was an issue, so we did reach out to our ISP.  So,

12   that process did take place.

13        THE COURT:  Let me give you a general instruction

14   here.  What you just said there is totally appropriate.  All

15   right?  Answer the question yes or no, if it's a yes-or-no

16   question, which you've been doing, and whenever you feel the

17   need to explain your answer to make your answer clearer, you

18   can do that.  What you shouldn't get into is thinking that

19   you're on someone's team here.

20        THE WITNESS:  No.

21        THE COURT:  I know you don't.  Let me just finish for

22   the record.  You're not on the prosecution's team, you're not

23   on Robert Allen Group's team.  You're on my team.  Help me find

24   out what happened here.  So, if you need to clarify the answer,

25   you can always do it, but you don't need to take an opportunity

1    to push a different agenda.  Do you follow me?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Go ahead.

4    BY MR. HARRINGTON:

5    Q.   So, let me move on to a different subject, okay,

6    Mr. Riviera?  It's my understanding that you started in, I

7    think you said -- was it November 20th of 2013, correct?

8    A.   Correct.

9    Q.   And then you would agree with me on December 12th of 2013

10   you had made your referral to Mr. Cioffi that they should

11   consider or consult with the Legal Department or Legal; is that

12   right?

13   A.   Correct.

14   Q.   So, that is what, about three weeks you had been at Robert

15   Allen when you had recommended that Mr. Cioffi consider taking

16   legal action relative to DigitalNet?

17   A.   Correct.

18   Q.   Now, I want to talk to you about kind of time frame, if

19   you will.  Would you agree with me that during this period of

20   time after you started you were kind of starting to learn new

21   information, correct?

22   A.   Yes.

23   Q.   And one of the things that you had learned about was that

24   DigitalNet had not been provided some information that was

25   needed, because work hadn't been getting done and Robert Allen

1    had needed to provide information to DigitalNet and it hadn't,

2    correct?

3    A.   Can you provide some specificity?

4    Q.   I can.  Do you recall that, though?

5    A.   I recall the conversation, yes, but --

6    Q.   Okay.  And, in fact, you spoke with I believe it was

7    Mr. Courtois.  You had actually sent him an email about it,

8    correct?

9    A.   Correct.

10   Q.   And one of the things that you wanted to know was with

11   regard to the website whether scheduled payments had been made,

12   correct?

13   A.   Correct.

14   Q.   And one of the things that you wanted to know was, and

15   this was to Ray Courtois -- and if you want me to show you the

16   email if that would be more helpful for you to remember --

17   A.   Yes, okay.

18              MR. HARRINGTON:  So, if I may approach the witness,

19   your Honor.

20              THE COURT:  You may approach throughout your

21   examination.

22              MS. LE:  Your Honor, may I see the --

23              MR. HARRINGTON:  I apologize.  Yeah.  Let me show it

24   to you.

25              THE COURT:  Go ahead.

1          MS. LE:  I think this was already admitted, right?

2          MR. HARRINGTON:  Yes.

3          MS. LE:  So, you can just pull it up on the screen, if

4    you want to do that, so we can all see the same --

5          MR. HARRINGTON:  I will put it on the screen.

6          THE COURT:  Proceed.

7    Q.   So, showing you what's been marked as Defendant's Exhibit

8    X-1, and you can review as much of the document as you want,

9    Mr. Riviera, but this is the section that I'm interested in,

10   number one one?

11   A.   Okay.

12   Q.   If you want, why don't you take a minute, read that to

13   yourself, and then tell me when you're done.

14   A.   (Witness read document).  Okay.

15   Q.   So, one of the things that you had talked to Mr. Courtois

16   about -- and am I pronouncing his name correctly?

17   A.   Courtois.

18   Q.   Courtois.  Thank you -- Mr. Courtois about was obviously

19   the money that had been paid to DigitalNet so far, correct?

20   A.   Correct.

21   Q.   And the question that you had had for them is, basically,

22   "Do you know if we had been paying them the $40,000 basically a

23   month for the past two to three months, although they had not

24   had the specs to get started on the project?"  Right?

25   A.   Yes.

1    Q.   And so, you would agree with me that the specs to get

2    started on the project, what that was was information that

3    Robert Allen was supposed to give to DigitalNet so that they

4    could work on the project, right?

5    A.   Yes.

6    Q.   And you would agree with me that Mr. Courtois answered

7    your question with a little bit more detail and also indicated

8    that they had provided -- or excuse me -- that DigitalNet were

9    given licenses, and they were doing as much as possible until

10   they were able to provide what they called a wire frame,

11   correct, which was provided in October 28th, Mr. Courtois

12   indicates?  Correct?

13   A.   Correct.

14   Q.   Now, there was other information, and I'll go to that now,

15   that DigitalNet had requested, and I guess I would want to

16   preface this also by saying you would agree with me, and I'm

17   not sure if you know the time frame, were you aware that Robert

18   Allen had been without a chief information officer since

19   mid-September, before you came onboard?

20   A.   I knew that there was a gap, but I was not aware of the

21   departure.

22   Q.   So, you knew there was a period of time where there was

23   not a CIO involved?

24   A.   Correct.

25          MR. HARRINGTON:  I apologize, Judge.  I just need one

1    moment.

2                              (Pause)

3    Q.   Now, you had talked about some of the information that had

4    been -- or communications that had gone back and forth between

5    you, Mr. Courtois and Anwaar Hussein, correct?

6    A.   Correct.

7    Q.   You had also talked about some of the information that had

8    gone back and forth between you and Mohammad, correct?

9    A.   Correct.

10   Q.   And also you talked about information that had gone back

11   and forth between you and Mac Chaudhary, correct?

12   A.   Correct.

13   Q.   So, I want to show you what's been marked as Exhibit 2,

14   excuse me, Exhibit X-2, and I'm showing you page 1.  I'm going

15   to zoom out a little bit, and I want to go to this section here

16   first.  This is an email from DigitalNet support, correct?

17   A.   Correct.

18   Q.   And it's sent on December 4th, and it's sent to you,

19   Mr. Courtois, and Bob Powers?

20   A.   Correct.

21   Q.   And remind the Court, if you will, who Bob Powers was.

22   A.   Bob Powers was our infrastructure/data center/operations

23   guy.

24   Q.   And one of the things that is indicated here is, "Attached

25   to this email you'll find another detailed project report with

1    progress to date."  Correct?

2    A.    Correct.

3    Q.    Down in this section the email says, "For the sake of

4    clarity and getting things moving, the following information is

5    requested as soon as possible.  If the information is not

6    readily available, please provide the expected date so we can

7    update the project plan.  Please understand that this

8    information is subject to change based on Robert Allen's

9    requirements and will ask for further information as required

10   to complete the tasks."  You see that, correct?

11   A.    Correct.

12   Q.    And attached to this is a kind of laundry list of things

13   that is being asked for, in particular, ten specific items,

14   correct?  You recall this email?

15   A.    Yes.

16   Q.    And so, they asked for a copy of SQL database, correct?

17   A.    Correct.

18   Q.    Access to the current net environment or .net environment,

19   and they indicate they have limited access, and they are

20   experiencing issues with connectivity, correct?

21   A.    Correct.

22   Q.    They ask for digital assets for the new website, saying

23   they've only received a final wire frame document on November

24   11 and functional specs, and they have been working with what

25   they have, but more information is needed, correct?

1    A.    Correct.

2    Q.    They also talk specifically about website design, saying

3    standard and responsive.  Without this critical information,

4    not a whole lot can be done or accomplished on the front end to

5    show marketing and other stakeholders.  Correct?

6    A.    Correct.

7    Q.    And, again, this is on December 4th, correct --

8    A.    Correct.

9    Q.    -- of 2013?  Okay.

10         MR. HARRINGTON:  Page 2 of that exhibit, Counsel.

11   Q.    They further go on to ask for additional information,

12   color search requirements, and down at the end here they

13   indicate, "This could potentially have a negative impact

14   overall project timeline, as this was added after the fact."

15   Right?

16   A.    Correct.

17   Q.    They go on to ask for stuff relative to the internal ERP

18   business logic and system processing, asking to provide

19   information for multiple different reasons.  You see that

20   highlighted, number 6, and it has many different subparts,

21   correct?

22   A.    Correct.

23         THE COURT:  What's the date on this email, again?

24         MR. HARRINGTON:  It is December 4th, 2013, Judge.

25         THE COURT:  Thank you.

1    Q.   Additionally, you were asked here, "We've requested

2    information a number of the above processes" -- excuse me.   "We

3    have requested information on a number of above processes in

4    the past and are still waiting for a response."  Correct?

5    A.   Correct.

6    Q.   It also asks for project field mapping, here in number 8,

7    for the database synchronization.   "This will help synchronize

8    and update product and other relevant information on the new

9    Magento website."  Going on to the last page, number 9,

10   "Magento extensions, the functional specs documents outline a

11   number of extensions.   There are some that require purchasing.

12   When will Robert Allen have those available to us for

13   integration," they ask, correct?

14   A.   Correct.

15   Q.   And then they ask for number 10, security and

16   compliance-related directives and requirements for the new

17   website.

18          And then I want to point down to this section here.

19   They indicate -- because you had just started a couple of weeks

20   earlier, right?

21   A.   Correct.

22   Q.   And they say, "With your arrival, we are hopeful things

23   will pick up pace again."  Would you say that that suggests

24   that things had been lacking as far as communication between

25   Robert Allen and DigitalNet prior to your arrival?

1    A.   That would be my understanding reading that.

2    Q.   They go on to say, "We still have approximately three

3    months, and there's no reason we can't accomplish this project,

4    provided that all related information is received without any

5    further delays," and then, "Please don't hesitate to contact me

6    for anything," and so on.  And that's signed off on by

7    Mohammad, right?

8    A.   Yes.

9    Q.   So, that was as of December 4th of 2013, as I've

10   indicated, right?

11   A.   Yes.

12   Q.   And you would agree with me that that is a fairly detailed

13   list of requests from Robert Allen?

14   A.   Yes.

15   Q.   And eight days after that you're suggesting that legal

16   action be taken or reviewed to Mr. Cioffi?

17   A.   Yes.  Can I clarify?

18        THE COURT:  I already told you, you can clarify.  The

19   answer is "Yes."

20   A.   Yes.  I made the recommendation to Chuck Cioffi to have

21   Legal start to take a look at this, and it was in reference to

22   the $200,000 specifically for the refund or credit.

23   Q.   Okay.

24        MR. HARRINGTON:  Sorry about my delays, Judge, here.

25   I need a bigger binder.  My stuff keeps falling out.

1          THE COURT:  It's okay.

2                         (Pause)

3   Q.   Now, you had indicated that I think in your time you had

4   tried to give law enforcement kind of a summary of your

5   contacts from the time that you started at Robert Allen that

6   you had with DigitalNet, and you tried to give them kind of a

7   summary of your contacts, correct?

8   A.   Correct.

9   Q.   And you would agree with me that --

10         THE COURT:  The last exhibit number, what was it

11  again?

12         MR. HARRINGTON:  That was Exhibit X --

13         THE CLERK:  2.

14         MR. HARRINGTON:  2, I believe, Judge.  X-2, your

15  Honor.

16         THE CLERK:  It's in the black binder, Judge, the

17  defendant's exhibits.

18         THE COURT:  Hang on a minute.

19                         (Pause)

20         THE COURT:  Okay.  So, this email is from DigitalNet

21  support, and it's to Mac, and you're copied on it, right?

22         THE WITNESS:  Yes.

23         THE COURT:  So, who did you think it was from?  If

24  there was a person you would assign to this in your own mind at

25  the time -- was there a person?

1          THE WITNESS:  If it's coming from the support --

2          THE COURT:  Oh, it says "Mac."  It says "Mac."

3          MR. HARRINGTON:  Actually, if you go just a little bit

4     further down, Judge, you'll see it says, "Greetings, Dean."

5          THE COURT:  So, why does the email header say it's to

6     Mac from DigitalNet support?  I'm not following.

7          MR. HARRINGTON:  I'm not sure the copy, if it was like

8     a copy forwarded or something like that, Judge, but it was

9     addressed to Dean.

10          THE COURT:  Do you know?

11          THE WITNESS:  That support is normal email

12     correspondence support that Ray Courtois and I had with Anwaar,

13     so we just figured it was --

14          THE COURT:  Anwaar.

15          THE WITNESS:  -- Anwaar or representing from that

16     perspective.

17          THE COURT:  So, it's an email from let's just say

18     Anwaar for a minute.  It's from DigitalNet support.

19          THE WITNESS:  Correct.

20          THE COURT:  To Mac.  You're copied on it, but it's,

21     "Greetings Dean."

22          THE WITNESS:  Correct.

23          THE COURT:  Does that strike you as weird?

24          THE WITNESS:  Yes, very much so.

25          THE COURT:  Why?

1       THE WITNESS:  Because, normally, whoever is on the

2   "To" would have the name presented.

3       THE COURT:  Okay.  For the same reason I think it's

4   weird?

5       THE WITNESS:  Yeah.

6       THE COURT:  Okay.  I thought there was some internal

7   company reason it's weird.

8       MS. LE:  Your Honor, may I just help to clarify?  If

9   you look at the rest of it, and it's part of a chain, and I'm

10  sure the sender did not intend to direct the email to, quote,

11  Mac.

12      MR. HARRINGTON:  If we go down to page 3 in the

13  Exhibit --

14      THE COURT:  I see Mohammad.

15      MR. HARRINGTON:  And, actually, if you go to page 3

16  it's Bates stamp ending in 01709, Judge, you'll see it says

17  "Mac Chaudhary."  It's on the bottom half of the page.

18      THE COURT:  At this point does RAG have any inkling

19  that its former Chief Information Officer is affiliated with

20  DigitalNet?

21      THE WITNESS:  No.

22      THE COURT:  I know it's an obvious question, but I

23  just want to make sure I didn't miss some fact that would have

24  put you on notice of that.  No, right?

25      THE WITNESS:  Right.

1          THE COURT:  Okay.  Go ahead, Counsel.

2          MR. HARRINGTON:  Thanks, Judge.

3     BY MR. HARRINGTON:

4     Q.   I'm going to refer you to Exhibit W-1 that I'll put up for

5     you.

6          MR. HARRINGTON:  And, Counsel, I'm going to go to page

7     00055.

8          MS. LE:  What exhibit?

9          MR. HARRINGTON:  I'm sorry.  I though I had said it to

10    you already.  It's Exhibit W-1.

11         MS. LE:  W-1.

12         MR. HARRINGTON:  Yeah, and ending in page 00055.

13         MS. LE:  Just 55 at the end?

14         MR. HARRINGTON:  Yeah.

15         MS. LE:  Thank you, sir.

16         THE COURT:  Just a heads-up just so you can think

17    ahead.  I'm not going to ask you to do this today or overnight

18    or anything.  Usually, what I do in a bench trial, most of my

19    bench trials are civil injunction hearings, like last week

20    Monday, Tuesday and Wednesday I had one.  For any bench trial

21    what I generally order is a timeline be prepared that's

22    stipulated, although in a criminal case that indicates

23    different things.  You don't have an obligation to stipulate to

24    anything, I know, but I'm finding myself a little bit confused

25    sometimes about timing of some of these issues, so I'm going to

1    ask for next Monday that you prepare a timeline, that the

2    prosecution prepare a proffered timeline of how you understand

3    the time of these events as they played out.  It doesn't have

4    to be *War and Peace*, just the important events.  I just asked

5    the witness, "Were you on notice yet that the former CIO of the

6    company was affiliated with DigitalNet?", and he said, "No."  I

7    don't even know when they ever became aware.  You're probably

8    going to show me that.  I know.  It might have even been just

9    during the investigation.  I don't know.

10          But I don't know the answers to those questions, so I

11   would like a timeline.  To the extent you differ from it, you

12   can submit one, too.  It would be good if you could stipulate

13   to one, but I'm not going to order in a criminal case the

14   defendant to stipulate to anything, because I think it violates

15   the defendant's constitutional rights.  Go ahead.

16          MS. LE:  Sure.  And, your Honor, I started kind of a

17   working timeline where we could present it to defense counsel

18   whether they agree or not.  We borrowed it from a format that

19   one of the other judges had used in a civil trial, so maybe

20   that would help.  It breaks it down into different segments.

21          THE COURT:  Yeah.  I can give you one of my timelines

22   from one of my other cases to go by, but it doesn't have to be

23   anything special, it doesn't have to be formatted like a

24   pleading.  Any kind of timeline is fine.  And then, to the

25   extent that the defendant agrees, that's fine.  To the extent

1    the defendant disagrees, he can file an alternative.  Thank

2    you.

3            MR. DAVIS:  I would only add, your Honor, the most

4    confusing period I think is the period where Robert Allen Group

5    is going on at the same time that events are happening at

6    United Way.

7            THE COURT:  Sure.  That makes sense.

8            MR. DAVIS:  It is confusing.

9            THE COURT:  It does make sense.

10           All right.  Proceed.  Thank you.

11           MR. HARRINGTON:  Thanks, Judge.

12   BY MR. HARRINGTON:

13   Q.   So, kind of on the topic, still, of communication, if you

14   will, that last exhibit we talked to, obviously the header you

15   had indicated was kind of odd, but you understood the email was

16   directed to you.  It named you, correct?

17   A.   Correct.

18   Q.   Okay.  And in regard to communication with Mr. Courtois,

19   you and Barbara Marcoon -- am I pronouncing her last name

20   correctly?

21   A.   Marcoon.

22   Q.   -- Marcoon would be in communication with Mr. Hussein,

23   correct?

24   A.   Anwaar?

25   Q.   Yeah.  Anwaar Hussein, correct.  And that is correct,

1    right?

2    A.    Correct.

3    Q.    Okay.  And there are times that meetings were set and you

4    were going to have regularly scheduled meetings, right?

5    A.    Yes.

6    Q.    And sometimes people missed those meetings from Robert

7    Allen?

8    A.    Correct.

9    Q.    And sometimes you missed several days in a row of

10   meetings, right?

11            MS. LE:  Your Honor, may I just object at this point?

12   I'm sorry if counsel -- it doesn't seem like counsel has laid a

13   foundation --

14            THE COURT:  Just tell me what your objection is.

15            MS. LE:  -- whether this witness has a basis of

16   knowledge to answer these questions.  They're talking about

17   other people.  He can speak to whether he missed meetings with

18   DigitalNet.

19            THE COURT:  He can speak to whether other people

20   missed meetings if he was at the meetings.

21            Answer if you know.  If you don't know, say you don't

22   know.

23            And if your objection is that there's no foundation

24   for this, I'll sustain it.

25            Lay the foundation, Mr. Harrington.

1          MR. HARRINGTON:  Do you want me to lay a foundation,

2     Judge?

3          THE COURT:  It's pretty simple.  "Do you know?"  "How

4     do you know?"

5     Q.   So, in regard to meetings, were you aware that other

6     people, like Mr. Courtois and Ms. Marcoon, missed meetings,

7     scheduled meetings with DigitalNet?

8     A.   I was aware.

9     Q.   And also, obviously, you missed meetings that were

10    scheduled with DigitalNet?

11    A.   I missed one.

12    Q.   Okay.

13    A.   One that I was supposed to be part of or departed early.

14    Q.   Let me ask you, in regard to things that were done, I'm

15    referring you to --

16         MR. HARRINGTON:  This is, again, Exhibit 1, Counsel.

17         MS. LE:  W-1.

18         MR. HARRINGTON:  Yes, Exhibit W-1 ending in page 61.

19    Q.   And I want to put this up for you, Mr. Riviera.  This is

20    an email that was sent to you from Mr. Anwaar Hussein, correct?

21    A.   Correct.

22    Q.   And he addresses -- you, Dean and Bob are in the email,

23    correct?

24    A.   Correct.

25    Q.   And up in that kind of part where it says, "Only visible

1    to," up here, kind of indicates only visible to Anwaar Hussein,

2    DigitalNet Administrator, Barbara Marcoon, Dean Riviera, and

3    two others, right?

4    A.   Correct.

5    Q.   And it's basically saying, "We finished our development

6    work as per the new design on the account/studio detail page as

7    per our plan."  And this is sent to you in February, February

8    12th of 2014, right?

9    A.   Correct.

10   Q.   And it says, "Please find below the list of the pages that

11   are completed with respect to the new design, and it goes

12   through a number of pages:  home page, sign-in page, my

13   account, account dashboard, my account order, my account, my

14   studio, my account, my studio/detail, right?

15   A.   Correct.

16   Q.   And it advises that the pages have been published on the

17   Magento kind of worksite, correct?

18   A.   Correct.

19   Q.   And it indicates that you may not be able to view the

20   exact same look due to the nonavailability of fonts on file,

21   right?

22   A.   Correct.

23   Q.   This thing goes on to say that, again, that they're

24   missing things from Robert Allen, right?  And it's basically

25   saying here, "Please find the below list of pending items,"

1    that they want from Robert Allen, and there's a list of missing

2    design fonts, number one, right?

3    A.    Correct.

4    Q.    FS document and other comments describing the services

5    detail to invoke some action on the buttons, so on and so

6    forth.  Number 3, a list of Db2 web services detail from Mike

7    that are still needed to be developed.  Number 4 TinEye API and

8    account information to integrate color base search

9    functionality and Magento extensions.

10          So, another list of items that Robert Allen is being

11    requested to provide to DigitalNet, correct?

12    A.    Correct.

13    Q.    And there were some times -- were you aware that there

14    were some times where DigitalNet had trouble accessing areas

15    that were controlled by Robert Allen relative to this website

16    design?

17    A.    Can you clarify?  I'm not familiar.

18    Q.    Sure.  Let me show you exhibit -- this is still W-1, page

19    ending in 59.  So, you'll see here on January 20th Mr. Hussein

20    is asking Ray Courtois, "Please send us the web address where

21    you have published web services that we have developed so we

22    can start utilizing the new web services in our Magento code

23    based upon our understanding and the document describing the

24    web methods in your current website."

25          Mr. Courtois then says, "Here is the link."

1       Then Mr. Anwaar gets back to him saying, "We are
2    unable to access this.  I have checked it from two different
3    networks but unable to access."
4       And then Mr. Courtois again responds, "Currently,
5    these services are in our test environment, so you have to be
6    logged into our VPN to access these.  Eventually we will move
7    them to production."
8       Correct?
9    A.   Correct.
10   Q.   Okay.  So, there were occasions on which access was not
11   immediately available to DigitalNet to accomplish some of the
12   tasks, correct?
13   A.   That email --
14   Q.   If you don't know, sir, it's okay to say you don't know.
15   A.   I don't know.  I was not in the loop.
16   Q.   Fair enough.
17   A.   Yeah.
18   Q.   Just a couple of further questions in regard to the
19   telephony system.  So, I'm going to switch gears a little bit,
20   okay, Mr. Riviera?
21   A.   (Witness nodded).
22   Q.   The services for telephony, I think you indicated to the
23   judge yesterday payment had been stopped on the telephony
24   services for several months, right?
25   A.   I was aware of it, yes.

1   Q.   Yes.  And so, you had received the notices relative to

2   that?

3          MR. HARRINGTON:  And this is in as an exhibit.  If you

4   wouldn't mind blowing up Exhibit 722.

5   Q.   And while we're pulling that up, would you agree with me,

6   and we may not have to pull it up if you remember the answer to

7   the question, that in regard to the telephony services I think

8   you indicated yesterday that services for that had not been

9   paid for December, January, February or March.  Does that

10  confirm in your recollection?

11  A.   That's what I saw, but I was not in the loop.  I was aware

12  of the email, but I'm not accountable.

13  Q.   Understood.  I'm just saying that you can confirm for the

14  judge that Robert Allen had not paid for telephony services to

15  DigitalNet for December, January, February and March, right,

16  based on your understanding of the email exchanges?

17  A.   Correct.

18  Q.   And, as a result of that, there were notices that were

19  sent from DigitalNet to Robert Allen saying that services were

20  going to be terminated, right?

21  A.   Correct.

22  Q.   And, in fact, it wasn't just, like, one notice; there were

23  two notices sent, as you recall, correct?

24  A.   Correct.

25  Q.   And you would also agree with me that DigitalNet did not

1    take any action to actively interrupt Robert Allen's telephony

2    services?  You turned them over to different providers, but

3    DigitalNet did not take any steps to actually stop the service?

4              THE COURT:  Hold on.

5              MR. HARRINGTON:  I'm sorry, your Honor?

6              MS. LE:  No, please.  Sorry.

7    Q.   DigitalNet did not take any active steps to stop the

8    service before you switched it over to a new provider?

9              MS. LE:  Objection.  No basis of knowledge of what

10   DigitalNet would have done actively versus what this person

11   knew, your Honor.  How would he know what DigitalNet did

12   actively or inactively?  And then we also have other evidence

13   that they did take steps to cancel the contract, your Honor.

14             THE COURT:  I saw what steps they took.  I've seen it.

15   I've seen the evidence.  He's asking his opinion about

16   characterizing whether he took steps or not.  To the extent

17   you're objecting about whether he had personal knowledge, it's

18   overruled.  He was the recipient of the exchanges.

19             MR. HARRINGTON:  Email.

20             THE COURT:  So, overruled.  Go ahead.  I saw what

21   steps they took.  Did they actually cut it off?  No.  They

22   threatened to.  That's the steps they took.  I'm not a jury,

23   guys.  Let's get it going.  We're spending way too much time on

24   all of this.  This isn't a civil case about whether he was good

25   at his job.

1        Do you know they took steps?

2            THE WITNESS:  I don't know.  I was not in the loop.

3    When I received that communication about the discontinuing

4    notice, I forwarded it to Chuck Cioffi.  I was completely out

5    of the loop, and that was a financial thing, so I don't know.

6            THE COURT:  You may continue.

7    BY MR. HARRINGTON:

8    Q.   And then you had indicated to the judge you took steps to

9    switch the phone system over?

10   A.   According to discussions with Chuck Cioffi.

11   Q.   And then you did that, right?

12   A.   Yes.

13   Q.   And you were able to do that without any interruption in

14   services for the telephony?

15   A.   Correct, because we were going in parallel.

16   Q.   Understood.

17   A.   Yeah.

18           MR. HARRINGTON:  Judge, I don't have any other

19   questions for Mr. Riviera.  Thank you, Mr. Riviera.

20           THE COURT:  Redirect.

21           MS. LE:  Thank you, your Honor.

22                    REDIRECT EXAMINATION

23   BY MS. LE:

24   Q.   All right.  Sir, you were asked about that contract,

25   Exhibit 306, the telephony contract?

1   A.   Yes.

2   Q.   Okay.  That was signed in August of 2013, correct?

3   A.   Correct.

4   Q.   This was based on what you've learned through your

5   cross-examination by counsel that the defendant left as CIO in

6   September of 2013.  Who was CIO when that contract was signed?

7   A.   I have no idea.

8   Q.   Was it Imran Alrai?

9        MR. HARRINGTON:  Objection, Judge.  He said he had no

10   idea.

11        THE COURT:  He just said he had no idea.

12        MS. LE:  Okay.

13        THE COURT:  Do you know if it was Imran Alrai?

14   Q.   Who was the prior CIO --

15        THE COURT:  Hold on.  Let me ask a question.

16        MS. LE:  Sure.

17        THE COURT:  You said you didn't know.  She followed up

18   with did you know it was Imran Alrai?  Did you know it was

19   Imran Alrai?

20        THE WITNESS:  No.

21   Q.   There was a period of time -- counsel asked you that there

22   was a period of time where there was no CIO at Robert Allen

23   Group, right?

24   A.   Correct.

25   Q.   And are you familiar with -- are you aware of who the CIO

1    was before you started there?

2    A.    Yes.

3    Q.    And who was that person?

4    A.    Imran Alrai.

5    Q.    Okay.  Now, sir, you were talking about bandwith, and

6    there was some issue about phone problems because of the poor

7    bandwith available in the system, right?

8    A.    Correct.

9    Q.    And when you came on you noticed those problems?  Is that

10   what you said?

11   A.    I observed those problems, yes.

12   Q.    Did you address those issues with the bandwith?

13   A.    Yes, I did.

14   Q.    How did you address those issues with the bandwith on the

15   phone system?

16   A.    Well, Kal Wahbe was our network engineer, so I met with

17   Kal to start taking a look at what we can do with the network

18   as is and start taking a look at a fiber network to upgrade it.

19   Q.    And were you able to upgrade into a fiber network?

20   A.    Yes, eventually.

21   Q.    Counsel asked you about the contract that made it clear

22   that the bandwith was going to be Robert Allen Group's

23   responsibility, right?

24   A.    Correct.

25   Q.    And that is actually on page 221 of Exhibit 306; is that

1   right?

2   A.   That's correct.

3   Q.   Okay.  And you attempted to explain that to us, that

4   requirement about bandwith.  Do you recall that?

5   A.   Correct.

6   Q.   And do you remember your testimony on direct about that

7   particular page --

8         MS. LE:  Actually, can we pull it up, Ms. Sheff, 306,

9   page 221.  306, yes.  You have the right page.  Can you click

10  through?

11        Maybe, Counsel, we had the wrong page when we were

12  talking about it earlier.

13        All right.  Go back a few pages.

14  Q.   Right here.  This section?

15  A.   Yes.

16        MS. LE:  Okay.  All of it, Ms. Sheff.  I'm sorry.  The

17  section on bandwith.  Okay.

18  Q.   Sir, as CIO, you read this information, right?

19  A.   Correct.

20  Q.   Why did you read this information?

21  A.   Because the bandwith and the firewalls and the network

22  quality is the basis for a good phone call.

23  Q.   Okay.  And if you build a fancy phone system on a weak

24  infrastructure, what happens?

25  A.   It crashes.  You have latency.  You have quality of

1    service issues.

2    Q.   And you didn't enter into this contract?

3    A.   Correct.

4    Q.   You had no role in negotiating this contract?

5    A.   Correct.

6    Q.   And if you were to negotiate a similar contract what would

7    you have done?

8    A.   I would have -- that section on bandwith pops off the

9    page.  I would have made sure that we would have performed a

10   network analysis on the network to make sure that the network

11   was adequate.  So, there are speed tests, there are bandwith

12   tests, there are monitoring tests to take a look at that

13   network to see if it's sufficient enough for the company.

14   Q.   And have you done this in the past in setting up new phone

15   systems for your various companies?

16   A.   Yes.  That's primarily one of the first things you do,

17   take a look at bandwith and make sure, because there's

18   different spikes and levels in a company.  You know, when

19   everybody logs onto their email in the morning the network

20   spikes because there's a high influx of network bandwith and

21   data flowing.  You also see it at noontime and at the end of

22   the day.  When you run these network tests you have an idea

23   that you have high-volume activity between 8:00 a.m. and

24   9:00 a.m. and noontime and at the end of the day.  You want to

25   make sure that you have sufficient headroom to accommodate all

1       levels of network activity.

2       Q.    And this type of assessment and making sure that your

3       system has the bandwith to support the new phone system you are

4       considering bringing into the company, is that a normal

5       responsibility of a CIO or his staff under him?

6       A.    Yes.

7       Q.    Now, during that gap that counsel referred to from when

8       your predecessor CIO at Robert Allen Group left and when you

9       came onboard, are you aware were there people at Robert Allen

10      Group working with DigitalNet on designing that website?

11      A.    Prior to me coming onboard?

12      Q.    Yes, sir.

13      A.    Yes.

14      Q.    And who was that?

15      A.    That was Ray Courtois, Barbara Marcoon and Mike Martino.

16      Q.    And do you have an understanding about whether when your

17      predecessor CIO left, that period between when he left and when

18      you came on, whether DigitalNet and Robert Allen Group decided

19      they were not going to work on it until the new CIO came

20      onboard?

21      A.    I didn't know about that until I read the contract when I

22      came onboard.

23      Q.    No.  But is it your impression that there was work being

24      done in the meanwhile?  Based on your review of the

25      communications, are you aware of whether there was ongoing

1    conversations between DigitalNet and Robert Allen Group on the

2    website project?  Do you know?

3    A.    No, no.

4    Q.    You would not have personal knowledge?

5    A.    No, I would not have personal knowledge.

6    Q.    Right.  Because you weren't there yet.

7    A.    I weren't there.

8    Q.    So, counsel went through with you some chats between

9    Anwaar and various people on your team; is that right?

10   A.    Correct.

11   Q.    In November, December, January into February; is that

12   right?

13   A.    Correct.

14   Q.    Okay.  But those aren't the only communications between

15   Robert Allen Group and DigitalNet?

16   A.    Correct.

17   Q.    Okay.  And you remember yesterday we talked about two

18   conference calls that you had?

19   A.    Correct.

20   Q.    There were more conference calls, correct?

21   A.    Correct.

22   Q.    All right.  Do you remember having a phone call -- let's

23   see.  So, we talked about a December 3rd phone call, right?

24   A.    Correct.

25   Q.    Let me double check my notes.  Did you have another

1    conference call in January 2014?  And I can show you an email,

2    if that helps you refresh your memory, if your memory is

3    exhausted.

4            MR. HARRINGTON:  Judge, I'm just going to interject

5    and pose a brief objection, which is I believe, if I'm not

6    mistaken, that counsel covered all of this on direct

7    examination about the conference calls and things of that

8    nature.  I'm not insinuating that there weren't.  I'm just

9    pointing out that there was also some lack of communication.

10   I'm not insinuating there weren't others.  I thought counsel

11   had gone through it fairly extensively in direct about the

12   communications that they had.  It seems to be a little

13   repetitive, so I don't know if it's necessary.  I think it's

14   cumulative for you.

15           THE COURT:  If she thinks she's repairing, I'm going

16   to allow it.

17           MR. HARRINGTON:  Thank you, Judge.

18           THE COURT:  Point taken.

19   Q.   Sir, is your memory exhausted about the exact dates when

20   you may have had additional conversations other than the ones

21   we talked about during your direct examination?

22   A.   There was four conversations with Mac only.

23   Q.   There were four conversations with Mac?

24   A.   27th, December 3rd, December 6th, and December 11.

25   Q.   Do you remember having a conversation on January 24th,

1    2007?

2    A.    No.

3    Q.    Or thereabouts?  Or with DigitalNet?  I'm sorry.  May I

4    show you something --

5    A.    Yeah, sure.

6    Q.    -- and ask if you remember this?  I'm going to show you,

7    this is from Bates label page 513, and this is not an exhibit

8    that we're introducing, but, sir, do you see the date of that

9    email?

10   A.    Yes.

11   Q.    And who's the author?

12   A.    Me.

13   Q.    And the date is January 24, 2014?

14   A.    Correct.

15   Q.    "Ray, Barbara and myself had another bad meeting with

16   DigitalNet."  Read the email.  So, does that refresh your

17   memory about whether you had another conference call with

18   DigitalNet in January 2014?

19   A.    Yes.  "Hi, Chuck, FYI, Ray, Barbara and myself had another

20   bad meeting with DigitalNet.  Mac told Anwaar to stop moving

21   our assets to our servers until RAD provides payment.  In

22   addition, they are doing a very poor job developing the web

23   pages.  We will never get a quality product -- "

24             THE COURT:  Slow down.  The reporter is struggling to

25   keep up with you.  You've got to slow down.

1          THE WITNESS:  Okay.

2          THE COURT:  We all read fast when we start reading.

3   Just take it slow.

4          THE WITNESS:  Start over?

5          THE COURT:  Yeah.

6   A.   "Hi, Chuck, FYI, Ray, Barbara and myself had another bad

7   meeting with DigitalNet.  Mac told Anwaar to stop moving our

8   assets to our servers until RAD provides payment.  In addition,

9   they are doing a very poor job developing the web pages.  We

10  will never get a quality product from DigitalNet even if they

11  deliver the assets.  See comments below.  Ray is going to

12  summarize some comments for us to add to our audit trail."

13  Q.   So, does that refresh your memory about whether you had a

14  phone conference with somebody at DigitalNet?

15  A.   With someone at DigitalNet, specifically Anwaar.

16  Q.   Okay.  So, it wasn't with Mac?

17  A.   Correct.

18  Q.   So, the four meetings with Mac were the four you just

19  named for the Court?

20  A.   Correct.

21  Q.   All right.  Let me see.  I'm showing you --

22          MS. LE:  Ms. Sheff, if you can pull up Exhibit 714.

23  Q.   Okay, sir, do you recognize this email?

24  A.   Yes.

25  Q.   How do you recognize this email?

1   A.   Because it's an email from Ray Courtois to Chuck Cioffi,

2   CC myself and Bob Powers.

3   Q.   And is this that follow-up you were discussing earlier?

4   A.   A follow-up on the invoice.

5   Q.   And does this email list all the things that Robert Allen

6   Group had provided as part of the discussions with DigitalNet

7   about the website project?

8   A.   Yes.  Correct.

9        MS. LE:  Your Honor, at this time the Government moves

10  to admit 714 and strike the identification.

11       MR. HARRINGTON:  No objection, your Honor.

12       THE COURT:  Admitted.

13     (Government's Exhibit No. 714 received into evidence)

14  Q.   So, can you go ahead and just read this part into the

15  record.

16  A.   Yes.  "So far to date we have, at our instance --

17  insistence, engaged DigitalNet with daily 9 a.m. meetings to

18  move progress forward on this project.  Daily calls have only

19  resulted in more frustration on the progress of the project.

20  We have turned over many items required beginning 9/25/13,

21  including wire frame documents, functional specification

22  documents, design element detail documents, mobile wire frame

23  documents, database layout and diagram documents, design font

24  data files, SQL web procedure documents, current website

25  functionality detail document, project plan according to Robert

1    Allen Group specifications, Magento account access codes,

2    access to RAD all development servers.  The data has resulted

3    in the following home page.  HTTP --"

4         THE COURT:  You don't have read that.

5    A.   Okay.  "Creation on the front end.  There is no real

6    functionality behind this page yet, and since no other assets

7    have been shared with us we cannot verify that any additional

8    work has been completed.  Please contact myself or Dean with

9    any additional questions."

10   Q.   Thank you.  Sir, during your -- how many years were you

11   employed at Robert Allen Group, again?

12   A.   From 2013 to 2017.

13   Q.   And during that period of your employment at the Robert

14   Allen Group did you learn about the defendant's connection to

15   DigitalNet?

16   A.   No.

17   Q.   When did you learn about the defendant's connection to

18   DigitalNet?

19   A.   When I was subpoenaed.

20   Q.   Oh, to appear for this trial?

21   A.   Yeah.

22   Q.   Was it when you were interviewed by the officer?

23   A.   By Mr. Davis and Todd Donnelly.

24   Q.   So, as part of this investigation?

25   A.   Correct.

1          MS. LE:  Thank you, your Honor.  No further questions.

2          THE COURT:  Thank you, Counsel.

3          MR. HARRINGTON:  I have no follow-up questions, your

4     Honor.

5          THE COURT:  Now you can leave.

6                    (Witness stepped down)

7          THE COURT:  I've got to tell you, you are a very

8     precise thinker, clear communicator, honest witness.  I thought

9     you did your duty.

10         THE WITNESS:  Thank you.

11         MR. DAVIS:  Pat Latimore, your Honor.

12         THE COURT:  I'm sorry.  Who did you call again?

13         MR. DAVIS:  Patricia Latimore, L-a-t-i-m-o-r-e.

14         THE CLERK:  Good morning.  Please remain standing.

15    Raise your right hand.

16         **PATRICIA LATIMORE,** having been duly sworn by the

17    Clerk, was examined and testified as follows:

18         THE CLERK:  For the record, please state your full

19    name and spell your last name.

20         THE WITNESS:  Patricia Latimore, L-a-t-i-m-o-r-e.

21         THE CLERK:  Thank you.  Please be seated.

22                    DIRECT EXAMINATION

23    BY MR. DAVIS:

24    Q.   Good morning, Ms. Latimore.

25    A.   Good morning.

1   Q.   Please speak slowly and use the microphone as needed.

2   That will help amplify your voice.

3   A.   Okay.

4   Q.   How are you employed?

5   A.   I'm the COO for the United Way of Massachusetts Bay and

6   Merrimack Valley.

7   Q.   All right.  And get a little closer, if you would, to

8   that, or maybe it can bend a little more.  Good.  Okay.

9        How long have you worked at United Way?

10  A.   I've worked there for 10 years.

11  Q.   So, did you come in in approximately 2009?

12  A.   I came in in 2009.

13  Q.   And did you come in as the CFO, the Chief Financial

14  Officer, of United Way?

15  A.   Yes, I did.

16  Q.   And are you currently the Chief Operating Officer of

17  United Way?

18  A.   Yes, I am.

19  Q.   Okay.  Can you briefly summarize your relevant

20  professional experience before you came to United Way.

21  A.   Yes.  I have an MBA from Columbia Business School.  I have

22  worked for a number of years for technology companies.  Ten

23  years prior to coming to the United Way I worked for a

24  financial services company as a controller.  I've been in the

25  financial area, administration area for most of my career.

1    Q.    And do you have experience supervising IT functions at

2    companies?

3    A.    Yes, I do.

4    Q.    All right.  Now, do you know Imran Alrai?

5    A.    Yes, I do.

6    Q.    Would you point him out for the Court, please.

7    A.    He's over there (indicating).

8    Q.    And did you supervise him or did he report to you for a

9    number of years at United Way?

10   A.    Yes, he did.

11   Q.    Now, do you recall that he was hired early in 2012?

12   A.    I do.

13   Q.    And were you involved directly in that hiring process?

14   A.    I was involved in the hiring process after it had been

15   narrowed down to two candidates, and I interviewed him and

16   another person.

17   Q.    Okay.  And was it understood that he was coming on to be

18   supervised by you or by a different person at that time?

19   A.    He was coming on to be supervised by someone else.

20   Q.    And was that Nancy Powers?

21   A.    Yes, it was.

22   Q.    And what was her job at United Way?

23   A.    Nancy was the VP of Operations and IT.

24   Q.    So, Mr. Alrai reported to Nancy Powers after he started

25   until when?

1    A.   Until September of 2012.

2    Q.   And is that when Nancy Powers left?

3    A.   Yes, it was.

4        MR. DAVIS:   And, Judge, can the Court hear

5    Ms. Latimore's voice well?

6        THE COURT:   Oh, yeah.

7        MR. DAVIS:   Okay, good.

8    Q.   All right.  What was Mr. Alrai hired as?

9    A.   He was hired as Senior Director of IT.

10   Q.   Okay.  Now, can you say a little bit about the status of

11   IT at United Way in early 2012.  In 2012 was the company trying

12   to move in a different direction regarding IT?

13   A.   Yes.  The company was -- we had had a lot of discussions

14   about where IT was for the company.  There was a lot of

15   dissatisfaction internally with IT.  In addition, we all

16   recognized that our infrastructure and applications needed to

17   be updated, especially if we needed to accomplish some of the

18   goals that we had for ourselves on the business side.

19   Q.   All right.  And did you have an outside vendor prior to

20   2012 and during 2012 called CWAIN?

21   A.   Yes, we did.

22   Q.   And is that C-W-A-I-N?

23   A.   Yes, it is.

24   Q.   And was the general attitude at the United Way regarding

25   CWAIN a happy and contented one or not?

1    A.    It was mostly discontented.  We had been trying to

2    implement a CRM system with them, which was the system that

3    controls most of our business, and it had been going very

4    poorly for three to four years, and so there was a lot of

5    discontent.

6    Q.    And, in addition, was CWAIN regarded as a fairly expensive

7    outside vendor?

8    A.    Yeah.  We knew that they were fairly expensive.

9    Q.    All right.  And so, in hiring the person or the position

10   that Mr. Alrai filled, were you at United Way attempting to

11   address those problems and to move in a different direction?

12   A.    Yes, that was exactly our intent.  We were trying to fill

13   this position because we recognized that internally to the

14   company that we did not have the expertise on the IT side that

15   we needed to manage vendors appropriately and also execute on

16   an IT strategy that would work for the company.

17   Q.    Okay.  So, you didn't hire Mr. Alrai directly, but you did

18   participate in hiring him?

19   A.    Yes.

20   Q.    What did you view as his strengths as a candidate when he

21   was hired, just briefly?

22   A.    Well, we viewed that he had been at a number of companies

23   but, in particular, a company that was roughly the size -- a

24   little bit bigger than ours but roughly had the same scope,

25   that he was a hands-on person, that he seemed very technical.

1   He told us that he was a professor at one of the local

2   universities.  And so, we were very impressed by the fact that

3   he had the skill set that seemingly would fulfill the need that

4   we had.

5   Q.   Okay.  Did you check his personal references in any way?

6   A.   I did not, but our Human Resource Department did.

7   Q.   And did you also know that you weren't contacting his

8   present employer at his request?

9   A.   I did.  My understanding from Nancy Powers was that, since

10  he was working at his company, that he had asked us not to

11  contact them, as you would if you did not get the job.

12  Q.   And that's not unusual?

13  A.   It's not unusual.

14  Q.   Okay.  And was the current company he was working for the

15  Robert Allen Group?

16  A.   Yes, it was.

17  Q.   Okay.  All right.  Now, once Mr. Alrai came aboard, did

18  the subject of an IT health assessment come up?

19  A.   Yes, it did.  Mr. Alrai asked us to do an IT health

20  assessment which would help him to understand the current

21  landscape, looked at vulnerabilities, but also make

22  recommendations for how we would start to go about an

23  improvement plan for our IT.

24  Q.   And you recall that he, Mr. Alrai, made that suggestion

25  affirmatively?

1    A.    Yes, he did.

2    Q.    All right.  And what was done to vet that?  Did it go to

3    any committees at United Way?

4    A.    Yes, it did.  We had a discussion with the Finance and

5    Administration Committee, and they thought that it was a good

6    idea to actually do this, because we had been talking about

7    risk and also a lot about improving the IT infrastructure, and

8    so it was agreed upon by pretty much the management as well as

9    our board of volunteers (ph).

10   Q.    Okay.  So, United Way has a Board of Directors, correct?

11   A.    Yes, it does.

12   Q.    It also has an Audit and Finance Committee?

13   A.    Yes, it does.

14   Q.    Is that a board committee?

15   A.    It's a board committee that is staffed by both board

16   members but also non-board members.

17   Q.    Okay.  Regarding the IT health assessment, do you know

18   whether there was a formal RFP or request for proposals process

19   for it?

20   A.    I don't believe there was a formal RFP process, but my

21   understanding was Mr. Alrai went out and did a survey of a

22   couple of -- of several companies.

23   Q.    And was a company ultimately proposed by Mr. Alrai to do

24   the health assessment?

25   A.    Yes, it was.

1    Q.   And what company was that?

2    A.   DigitalNet.

3    Q.   All right.  I'm showing you Government Exhibit 605, and do

4    you see that email?

5    A.   Yes, I do.

6    Q.   And does that email indicate it's attaching the

7    Infrastructure Assessment Contract for United Way?

8    A.   Yes, it does.

9         MR. DAVIS:  I move to admit 605 and strike the ID.

10        MR. HARRINGTON:  No objection, Judge.

11        THE COURT:  It's admitted.

12    (Government's Exhibit No. 605 received into evidence)

13   Q.   So, I want to go in just a minute to the attachment, but

14   this is communication between you and Mr. Alrai about the

15   Infrastructure Assessment Contract?

16   A.   It's part of a long email chain, but, yes, the top of it

17   is.

18   Q.   Okay.  And the second email down, is that an email from

19   DigitalNet support to Mr. Alrai signed by Mohammad?

20   A.   Yes, it is.

21   Q.   And do you recall seeing other emails that Mr. Alrai sent

22   you that had communications by someone named Mohammad?

23   A.   Yes, I have.

24   Q.   And did you ever meet that person, Mohammad?

25   A.   I'm looking at the -- let me just make sure I understand

1    -- I met someone whose name was Mac Chaudhary, and so I met him

2    once or twice.

3    Q.   So, you met Mac?

4    A.   Mm-hmm.

5    Q.   Do you know whether his first name is Mohammad or Munawar?

6    A.   Munawar, I thought it was, but not Mohammad, and I never

7    met -- so, I've never met a Mohammad.

8    Q.   Okay.  So, let's go to, just briefly, to the first page of

9    the contract:  So, this is the network -- is this the so-called

10   IT health assessment --

11   A.   Yes, it is.

12   Q.   -- referring to Page 281 Bates stamp?  Does this have a

13   signature page, next page, or third page?  So, this states the

14   agreement, the health assessment agreement is made August 17th,

15   correct?

16   A.   Yes, it does.

17   Q.   And is that your signature for United Way as agreeing and

18   accepting the contract?

19   A.   Yes, it is.

20   Q.   Now, do you remember the assessment actually going on?

21   A.   No, I don't remember it actually going on.  I was aware

22   that it was going on, if you mean did I actually see people in

23   the office or anything like that, but I was given updates that

24   it was in progress.

25   Q.   All right.  And who gave you the updates?

1    A.   At that time Nancy Powers, and I believe I had a couple of

2    conversations with Mr. Alrai also.

3              MR. DAVIS:  So, we can take down 605.

4    Q.   Eventually did Mr. Alrai come back with results of the

5    health assessment and recommendations?

6    A.   Yes, he did.

7    Q.   Now, do you recall whether you ever saw an actual report

8    by someone called DigitalNet that was entitled the "IT Health

9    Assessment"?

10   A.   I do not recall seeing the report.  I did see summaries of

11   the report that Mr. Alrai provided to me as well as to the

12   board committees.

13   Q.   Okay.  And did Mr. Alrai then make presentations

14   summarizing what that health assessment had come back with?

15   A.   Yes, he did.

16   Q.   And was that in the fall of 2012?

17   A.   Yes.

18   Q.   And after that?

19   A.   Yes, he did.

20   Q.   And can you summarize, as you recall them, the basic gist

21   of the health assessment recommendation for United Way?

22   A.   Yeah.  The basic gist was that our IT network and

23   infrastructure was fairly broken, that it needed to be rebuilt

24   from the start, that we should look at a unified vendor for

25   most of our IT needs, and that we would -- and there was a map

1    that showed, like, what would the future state look like, and

2    so that was basically it.

3    Q.    Okay.  And when you say "unified vendor," what do you mean

4    by that?

5    A.    Meaning one, to bring all of our IT support under one

6    vendor.

7    Q.    Okay.  And do you recall the phrase "spaghetti strands"?

8    A.    Yes, of course.

9    Q.    And what was that?

10   A.    Well, at the time we had a number of disparate systems.  I

11   can't remember how many, but it was more than 10 or 12.  And

12   they were either connected or not connected or integrated into

13   each other, and so it was like they were all over and they were

14   spaghetti, all tangled up like you would have.  And so, what

15   Mr. Alrai presented to us was a picture that actually

16   simplified that, kind of putting in one centralized

17   infrastructure with, you know, just a few nodes.

18   Q.    Okay.  And so, whose idea was consolidating into a single

19   vendor at United Way?

20   A.    Mr. Alrai.

21   Q.    Is it fair to say that even prior to Mr. Alrai coming

22   there was interest in moving in that direction?

23   A.    I would say that we had had some conversations, but I

24   wouldn't say that there was any direction until Mr. Alrai came

25   onboard that this was the direction that we should go, with one

1    vendor.  And, in fact, I would say that we had been looking at

2    multiple vendors before.  We knew that that process wasn't

3    working great but we didn't come to the conclusion that we

4    could have one -- we should have one vendor.

5    Q.   Okay.  So, showing you now Government Exhibit 606, which

6    is an email from Mr. Alrai to you with an attachment, do you

7    see that?  Is that an email from him to you in December of

8    2012, "Notes on future IT strategy"?

9    A.   Yes, it is.

10           MR. DAVIS:  Your Honor, I move to admit Exhibit 606

11   and strike the ID.

12           MR. HARRINGTON:  No objection, Judge.

13           THE COURT:  Admitted.

14       (Government's Exhibit No. 606 received into evidence)

15   Q.   If we could look at the attachment.  And so, the first

16   page shows some fiscal numbers, current United Way IT model,

17   correct?

18   A.   Yes.

19   Q.   All right.  And the next page.  Okay.  And so here at this

20   page it says "Proposed United Way IT model and strategy,"

21   correct?

22   A.   Yes, it does.

23   Q.   And can you read the first line in that proposal?

24   A.   "Consolidate enterprise IT systems into a single,

25   interconnected platform."

1    Q.   Okay.  And the next-to-last one that begins "Consolidate."

2    A.   "Consolidate vendors and establish stronger relationships

3    with only two to three partners for all outsource manage

4    on-site support and software coding services."

5    Q.   Okay.  So, this document was drafted by Mr. Alrai?

6    A.   Yes, it was.

7    Q.   All right.  And were there meetings with the IT Advisory

8    Committee in the fall of 2012?

9    A.   Yes, there was.

10   Q.   And what was the IT Advisory Committee and what was its

11   function?

12   A.   The IT Advisory Committee was made up of five to six CIOs

13   from many of our donor companies, and it was headed by Stan

14   Burrows, and the intent in it was a subcommittee of the Finance

15   and Administration Committee, and the intention was to provide

16   advisory services to us as we looked at making decisions around

17   IT.

18   Q.   And Stan Burrows.  Burrows is B-u-r-r-o-w-s?

19   A.   Correct.

20   Q.   And is he a person in the Boston area with very deep

21   experience in IT businesses?

22   A.   Yes, he is.

23   Q.   Okay.  And were you hoping that Mr. Burrows would be and

24   could be a valuable resource to Mr. Alrai as your new IT chief?

25   A.   That's why we set up the committee, would be to provide

1    some advice and counsel to him so that he would have the

2    benefit of their experience and expertise.

3         MR. DAVIS:  All right.  So, we can take down that

4    exhibit.

5    Q.   Was a decision made to move forward with an RFP process to

6    identify an appropriate vendor to provide the basic IT services

7    for United Way?

8    A.   Yes, there was.

9    Q.   And when did that happen, and what happened?

10   A.   That was the fall of 2012, and so we created an RFP and

11   reviewed the RFP with the IT Advisory Committee, told the A and

12   F Committee, the Administration and Finance Committee, that we

13   were proceeding forward with that, and created a committee or a

14   task group to help manage the process.

15   Q.   All right.  And you said "Administration and Finance."  I

16   always say "Audit and Finance," but it is "Administration and

17   Finance"?

18   A.   It's actually "Administration and Finance" for us.

19   Q.   Okay.  Thank you.  You said you created a task group?

20   A.   Mm-hmm.

21   Q.   What was the task group?

22   A.   Well, they were to help administer the RFP process.

23   Q.   And who was on that group?

24   A.   So, the committee was headed by Imran Alrai, as the IT

25   director.  Azim Mazagonwalla represented finance, and one of

1    our other staff, Diane Dragoff, was doing the procurement piece

2    of it.

3    Q.   So, it was a procurement person, a finance person, and

4    Mr. Alrai was to lead; is that correct?

5    A.   Yes, it was.

6    Q.   And who drafted the RFP?

7    A.   Mr. Alrai.

8    Q.   And did you assist with that?

9    A.   No, I didn't assist with it.  I did review it.

10   Q.   Okay.  Showing you Exhibit 607, and do you recognize that

11   as an email from Mr. Alrai to Stanley Burrows, copying you,

12   about the IT managed services RFP?

13   A.   I do.

14        MR. DAVIS:  All right.  Your Honor, I move to admit

15   607 and strike the ID.

16        MR. HARRINGTON:  No objection, Judge.

17        THE COURT:  It's admitted.

18        (Government's Exhibit No. 607 received into evidence)

19   Q.   If we can look briefly at the attachment, and so the

20   Request for Proposal is IT Managed Services Provider January

21   14, 2013, correct?

22   A.   Yes.

23   Q.   And can we look at the next page.  There is a lengthy

24   table of contents showing eight pages.  It includes an

25   introduction to United Way and a timeline and schedule,

1    correct?  So, it looks like you're aiming to do this in January

2    and have someone selected by February of 2013, correct?

3    A.    Yes.

4    Q.    Okay.  Now, were you closely or directly involved with the

5    soliciting of companies?

6    A.    No, I was not.

7    Q.    And what do you know or what did Mr. Alrai or anyone else

8    tell you about the soliciting of companies for the RFP process?

9    A.    So, Mr. Alrai said that he was going to send the RFP to a

10   dozen to 15 companies, and that he was hoping that they would

11   all respond.  We talked about the types of companies and who

12   they were, and so I was aware of the company and the list of

13   companies that it was being sent to.

14   Q.    And what company were you aware of?

15   A.    I was aware of all of them, frankly.  I mean, there was a

16   bunch of companies.  As I said, there was a long list of

17   companies.

18              THE COURT:  Let's take the morning break, Counsel.

19              MR. DAVIS:  Very good.

20              THE COURT:  So, we'll reconvene at 11:00.

21              THE CLERK:  All rise.

22              (Recess taken from 10:45 a.m. to 11:06 a.m.)

23              THE COURT:  Please be seated.

24              Ms. Latimore, you're still under oath.

25              You may proceed, Counsel.

1    Q.   Ms. Latimore, we were talking about the RFP in January of
2    2013.  Let's take a step back, briefly.  How is the RFP process
3    at the United Way supposed to work, or how does it typically
4    work?
5    A.   So, typically, we always have a leader.  The leader is the
6    functional leader.  So, it's usually someone like Mr. Alrai,
7    whoever has the most expertise.  It is typically you have a
8    small team of usually a finance person, and then procurement is
9    also always involved, and you have another person also a lot of
10   times who has some expertise in it.  The group -- usually the
11   leader does draft the RFP.  It is usually reviewed by all the
12   whole team for input.  And then, in general, the CFO normally
13   weighs in on it, because the CFO has responsibility for
14   contracts and has to sign any contract that's completed by the
15   United Way.

16           And after that the team goes out, sends out the RFP to
17   the companies, get a response.  The responses are usually
18   shared with the team, and then the team reviews them.
19   Different people have different expertise.  So, on the finance
20   questions the finance person will take the lead.  If it's a
21   more functional or technical issue, the person who is leading
22   the RFP normally leads that piece of it.  And then that group
23   usually puts together a scoring sort of protocol, and they
24   score it and then make a recommendation, and that
25   recommendation goes to wherever the RFP is coming out to the

1    division head.

2    Q.   And in other RFP processes that you've been involved in

3    have you actually, as a member of the group, actually reviewed

4    the proposals made by the different vendors?

5    A.   As the CFO, when they were financial RFPs I have.

6    Q.   All right.  Now, in this case did you review, yourself,

7    any proposals from vendors?

8    A.   No, I did not.

9    Q.   And, to your knowledge, did anyone other than Imran Alrai

10   in this case review the RFP proposals?

11   A.   During the time I thought that the committee had.

12   Subsequently, I understand that they did not actually see the

13   proposals.

14   Q.   And, to your knowledge, has United Way identified in its

15   own records, including its email records, any RFP proposals

16   that came back on this RFP?

17   A.   No, we have not.

18   Q.   Have you ever seen, ever, an RFP proposal made on this

19   January 2013 RFP?

20   A.   You mean a response?

21   Q.   A response.  Sorry.

22   A.   No, I have never seen one.

23   Q.   All right.  Now, Mr. Alrai did send a list of companies

24   solicited, correct?

25   A.   Yes, he did.

1    Q.   And you've talked about that list.  Let's look, briefly,

2    at Government's Exhibit 608.  And you recognize that as an

3    email from Mr. Alrai to Stan Burrows, copying you?

4    A.   Yes, I do.

5         MR. DAVIS:  Your Honor, I move to admit 608 and strike

6    the ID.

7         MR. HARRINGTON:  No objection, your Honor.

8         THE COURT:  It's admitted.

9    (Government's Exhibit No. 608 received into evidence)

10   Q.   And here you can see that Mr. Alrai is telling Stan that

11   there's a list of companies solicited and an evaluation and

12   selection criteria, correct?

13   A.   Yes.

14   Q.   So, let's go to the attached list.  All right.  And so,

15   this is Bates number 10219.  You can see that there is a list

16   of 13 companies, correct?

17   A.   Yes, I do.

18   Q.   And the fourth one is called DigitalNet?

19   A.   Yes.

20   Q.   And you testified also you recognize most or all of the

21   other companies?

22   A.   I wouldn't say most of them.  I recognize some of them.

23   Automation Concepts & Technologies was a vendor of ours, and a

24   number of them were vendors.

25   Q.   Okay.

1   A.   Mm-hmm.

2   Q.   All right.  So, there's a list of companies.  Mr. Alrai

3   tells you what?  What does he tell you that's happening?

4   A.   As the document says, he said these are the companies that

5   he had sent the RFP to, to companies to solicit for response.

6   Q.   And did he then advise you about getting responses and

7   beginning to grade them?

8   A.   He told us -- he told me in my one-on-ones with him that

9   he got responses from most of them, not all of them, I believe,

10  and I can't remember the exact number, but probably nine or ten

11  responses, and that he and the group had developed a criteria

12  for scoring.

13  Q.   Okay.  Scoring or grading?

14  A.   Mm-hmm.

15  Q.   Okay.  And showing you Government Exhibit 609, do you

16  recognize that as an email dated February 13th of 2013 from you

17  to Stan Burrows?

18  A.   Yes, I do.

19        MR. DAVIS:  All right.  Your Honor, I move to admit

20  609 and strike the ID.

21        MR. HARRINGTON:  No objection, Judge.

22        THE COURT:  Admitted.

23     (Government's Exhibit No. 609 received into evidence)

24  Q.   Can you read the second paragraph there in your brief

25  email to Stan?

1    A.    "Imran is in the process of scoring the RFPs.  He is

2    reviewing the results with me this week, so you should hear

3    back from him next week.

4    Q.    Okay.  And you said, "Imran was scoring."  Did you also

5    believe that Azim or Diane Dragoff was also involved in the

6    scoring?

7    A.    I did, although, I also understood that this was a

8    very -- that many portions of this was very technical, and that

9    Imran would be the only person who could actually score some

10   portions of this.  But, yes, I do believe -- I did believe that

11   Diane and Azim had seen the RFP responses and that they were

12   reviewing appropriately.

13   Q.    Okay.  And had you also been at an IT Advisory Committee

14   meeting where Stan Burrows had said something to Mr. Alrai

15   about responses to the RFP?

16   A.    I had.

17   Q.    And can you describe that and what was said?

18   A.    Stan had two concerns, if I recall.  The first was that he

19   was concerned that we did not get enough responses back.  The

20   second was that he was concerned that the timing, that maybe we

21   had too short a time frame to actually review the RFP

22   responses.

23   Q.    And what did he say to Mr. Alrai at the meeting?

24   A.    He said exactly that.  He said he was concerned about us

25   taking the amount of time because something to the nature of

1    that this was a once-in-a-long-time opportunity for the United

2    Way, so we shouldn't rush through the process.

3    Q.    This was a big one, it was recognized, for the United Way?

4    A.    Yes, absolutely.

5    Q.    But did Mr. Burrows also say anything about his

6    willingness to review responses to Mr. Alrai?

7    A.    He absolutely said --

8              THE COURT:  You have to let him finish the question.

9              THE WITNESS:  Oh, I'm sorry.

10   Q.    Did Mr. Burrows say anything to Mr. Alrai about

11   Mr. Burrows' willingness to review responses?

12   A.    Yes.  He offered to review the responses.

13   Q.    And what did he say, as you recall it?

14   A.    Mr. Burrows?

15   Q.    Yes.

16   A.    He said that he would be -- he knew that it could be very

17   complicated going through a number of RFP responses, and that

18   he was available to work with Mr. Alrai.

19   Q.    And Mr. Alrai was present at the meeting?

20   A.    Yes.

21   Q.    And how did he respond to that offer from Mr. Burrows?

22   A.    He thanked them and then declined.

23   Q.    Okay.  So, did you see from Mr. Alrai what purported to be

24   a summary of RFP proposals?

25   A.    Yes, I did.

1    Q.   And was that summary used, then, to make decisions and to

2    brief the board and appropriate committees?

3    A.   I reviewed the summary with Mr. Alrai in advance of an

4    advisory council discussion, and I believe also at the

5    Administration and Finance Committee we also talked about the

6    process and the responses and our decision, recommendation.

7    Q.   So, showing you Exhibit 610 -- I'm sorry.

8        MR. DAVIS:  So, just keep clicking through that.  It

9    should be right after this.  Okay.  So, go back to page 1 of

10   this.  One back, I think.

11   Q.   Okay.  So, is this -- we're looking now at page 596, is

12   the Bates number, which is part of Exhibit 610, which is the

13   RFP summary sheet.  Do you recognize that worksheet?

14   A.   I do.

15       MR. DAVIS:  And, your Honor, I move to admit 610 and

16   strike the ID.

17       MR. HARRINGTON:  No objection, Judge.

18       THE COURT:  It's admitted.

19   (Government's Exhibit No. 610 received into evidence)

20   Q.   And did you understand who had written this document,

21   Ms. Latimore?

22   A.   Mr. Alrai authored the document.  I understood that Azim

23   and Diane had reviewed it.  I also reviewed it.

24   Q.   Okay.  And you can see the first page here is "Criteria

25   and Points Available."  Do you see that?

1    A.    Yes.

2    Q.    All right.  Let's go to the second page.  Now, here do you

3    see the various selection criteria that are being used on the

4    left, Hostings, Data Management, et cetera?

5    A.    I do.

6    Q.    And then there are points available in each of those

7    categories, correct?

8    A.    Yes.

9    Q.    And then there are three companies in three separate

10   columns, right?

11   A.    Yes.

12   Q.    And what are the three companies?

13   A.    mindSHIFT, DigitalNet and Eze Castle.

14   Q.    Okay.  And then the score sheet purports to give each of

15   them kind of a grade in each of these categories, right?

16   A.    Yes.

17   Q.    And so, the ultimate number is how much of 100 percent are

18   they deemed to have earned in the scoring, correct?

19   A.    Correct.

20   Q.    And when you look at Percentage Earned, you can see that

21   Eze Castle was somewhat behind, at 60.  Well, that's cost.  It

22   actually doesn't have a total there, right?  Let's just go to

23   final score, which is the bottom item and that list of

24   criteria.  You can see that Eze Castle in the totals scores at

25   93, correct?

1    A.    Correct.

2    Q.    And then mindSHIFT is at 95.5.  Pretty good, right?  In

3    the first column mindSHIFT gets a 95.5?

4    A.    Correct.

5    Q.    But the winner is who?

6    A.    DigitalNet.

7    Q.    And they're at 98.5, correct?

8    A.    Correct.

9    Q.    All right.  And can we just go through the other pages of

10   the score sheet document.  There are some comments here and

11   kind of explanations for each company and each grade, right?

12   A.    Correct.

13          MR. DAVIS:  Next page.  Okay.  Keep going, please.

14   Q.    MindSHIFT and Eze Castle charged extra for antivirus and

15   antispam, right?

16   A.    Correct.

17   Q.    And for other items.  It's noting areas where they're

18   going to charge more money to United Way, right?

19   A.    Yes.

20          MR. DAVIS:  And keep going.

21   Q.    And cost, total points for cost and estimated.  So,

22   mindSHIFT is rated at the highest, which is 738,435, correct?

23   A.    Correct.

24   Q.    That is the last column?

25   A.    Correct.

1    Q.    I'm sorry.  That's Eze Castle, right, the last column,

2    738?

3           MR. DAVIS:  Can you blow up the estimated.  I'm sorry.

4    On that page, the last page the estimated annual cost in U.S.

5    dollars, right here, can you blow that up?

6    Q.    All right.  The third column corresponds to Eze Castle,

7    correct?

8    A.    Yes, it does.

9    Q.    And that's annual cost at 738k, right?  The first column

10   corresponds to mindSHIFT, which is 665k, right?

11   A.    Yes.

12   Q.    And, again, the winner, the lowest bidder, is DigitalNet,

13   right?

14   A.    Correct.

15   Q.    Okay.  And in all of the RFP process for this major

16   contract for United Way did Mr. Alrai produce any other

17   documents scoring and analyzing the RFP proposals besides this

18   seven-page document?

19   A.    Not to my memory.

20   Q.    All right.  Do you remember talking with Mr. Alrai about

21   the finalists and, particularly, the two best finalists and his

22   kind of summary of whether they were competent?

23   A.    Yes, I do.  I mean, we talked, actually, about the three

24   finalists and that any of them could do the job, and it was

25   that we were making a decision based upon, as you could see,

1   the scoring was marginally better for DigitalNet, but that all

2   three were reasonable.

3   Q.   But did he have in the end a recommendation?

4   A.   Yes, because the scoring said DigitalNet was on not only

5   costs but on other criteria, as you saw in the seven pages.

6   Q.   So, he didn't come in and tell you DigitalNet is hands

7   down the obvious choice here, did he?

8   A.   No.

9   Q.   It was much closer than that?

10  A.   It was closer.

11  Q.   But in the end DigitalNet wins?

12  A.   Yes, they did.

13  Q.   Okay.  At any time in that discussion did Mr. Alrai

14  identify himself as having anything to do with DigitalNet?

15  A.   Absolutely not.

16  Q.   And did he identify any family member as having anything

17  to do with DigitalNet?

18  A.   No.

19  Q.   And did he identify any benefit, personal, financial or

20  otherwise, that he might be getting from a contract between

21  United Way and DigitalNet?

22  A.   No.

23  Q.   And for the next six years did he ever do that?

24  A.   No, he did not.

25  Q.   All right.  Did Mr. Alrai ever talk to you about his

1    concerns about Stan Burrows at least potentially overstepping

2    his bounds?

3    A.   Yes.  We had several conversations about that.  He felt

4    that Stan wanted to be too helpful, and that he was stepping

5    into managerial issues as opposed to advisory.

6    Q.   Okay.  So, how did United Way actually make the decision

7    to contract with DigitalNet?  What steps had to be taken?

8    A.   Well, as you saw, we reviewed the scoring.  I sat with

9    Imran and the team and talked it through, kind of the scoring

10   pieces and their recommendation.  We then took the

11   recommendation for review, but we were telling the Advisory

12   Committee that this was our decision and looked -- and telling

13   them what the process we had used, and then we went back to the

14   Administration and Finance Committee and told them that this

15   was our recommendation and did they have any particular issues

16   with it.

17   Q.   Okay.  And what happened after that?

18   A.   It was approved, and then we notified DigitalNet that they

19   had won the contract but there was some more information that

20   we needed to get from them.

21   Q.   So, DigitalNet had won pending further information,

22   correct?

23   A.   Yes.

24   Q.   And who did you rely on to notify DigitalNet that they

25   were the presumptive winner?

1    A.    Mr. Alrai.

2    Q.    Okay.  Now, is the next step doing reference checks for

3    DigitalNet?

4    A.    Yes, we did reference checks.

5    Q.    Okay.  And did you specifically ask for references?

6    A.    I asked for references, and I received three references.

7    Q.    Okay.  And let's go to Exhibit 613, and let's go down to

8    the bottom of that, the last email.  Do you recognize that as

9    an email chain involving you and Mr. Alrai, among others, about

10   the DigitalNet information?

11   A.    Yes, I do.

12         MR. DAVIS:  I move to admit Exhibit 613 and strike the

13   ID, your Honor.

14         MR. HARRINGTON:  No objection, your Honor.

15         THE COURT:  Admitted.

16      (Government's Exhibit No. 613 received into evidence)

17   Q.    So, this all starts in February 2013.

18         MR. DAVIS:  Can you scroll through to the last page,

19   please.  I'm sorry.  One back.

20         MS. SHEFF:  Keep going?

21         MR. DAVIS:  Keep going down.  There's a Patricia

22   Latimore email.  One more.  There.  Stop there.

23   Q.    So, on page 10170 Bates stamp.  Do you see that?

24   A.    Yes.

25   Q.    All right.  Can you just highlight your email on February

1    23rd to Mr. Alrai, and could you read that, please.

2    A.   "Although I signed the contract, I still did not get

3    information business/financial on DN," which is DigitalNet.  "I

4    know you've worked with them in the past, but I really do not

5    know them, and there is not much information available about

6    them online.  Can you provide me with the following

7    information:  Who are the principals?  Is it privately held?

8    Headquarter location, financials, customer lists and

9    references.  What percent of their review do we represent?  I

10    assume that you have much of this information, so please get it

11    to me by Monday or Tuesday."

12    Q.   Okay.  So, when you said there that, "I know that you've

13    worked with them in the past," what were you referring to?

14    A.   So, Mr. Alrai and I had a conversation, so I was aware

15    that they had done the assessment at that time.  I was also

16    aware that -- so, he knew who they were.  We talked about did

17    he know them personally outside of sort of a business

18    relationship, and he said, "No," he didn't have any particular

19    personal relationship with them.  He had a professional

20    relationship with them.

21    Q.   Okay.  So, let's go to the beginning of the next email up.

22    One down.  Your email --

23         THE COURT:  So, you just said he told you, "I don't

24    have a personal relationship with them.  I have a professional

25    relationship with them."  Is that your best memory of his exact

1    words?

2             THE WITNESS:  It's my best -- it's not, of course, his

3    exact words, but it is something that -- I was concerned

4    because they were a small company that I had not heard of.  I

5    also was aware that the principals were Pakistanis, so I was

6    asking, you now, it's a small community in Boston, "Do you have

7    a personal relationship with them?"  And he said, "No, I have a

8    professional relationship with them."

9             THE COURT:  Was that the end of the conversation, or

10   was there more of a back and forth?

11            THE WITNESS:  With him?

12            THE COURT:  Yeah.

13            THE WITNESS:  That was about it.  And then we tried,

14   with the finance team, with Mr. Mazagonwalla, to find out more.

15            THE COURT:  When you asked him, "Do you have a

16   personal relationship," I guess what I'm trying to figure out

17   is what were you driving at?

18            THE WITNESS:  I was driving at the fact, as I said,

19   that in Boston in the technology space it's a small community.

20   I came out of the space.  I know a lot of people, some of them

21   I have personal relationships with.  And also the fact that the

22   principals were Pakistanis I assumed maybe he had --

23            THE COURT:  Some association?

24            THE WITNESS:  -- some association, and he said, "No."

25            THE COURT:  Were you concerned -- were you just trying

1    to figure out if he had some nonprofessional relationship in a

2    way that he knew them, or were you concerned about too close of

3    a relationship?

4           THE WITNESS:  I was concerned about too close of a

5    relationship.  We have a conflict of interest -- as a

6    charitable organization, conflict of interest is very

7    important.  So, for us we are dealing with not shareholders'

8    money or our money, we're dealing with other people's money.

9    So, how we manage the fiduciary responsibilities is really

10   important.  So, it was more of -- I mean, I would say at the

11   time I didn't have a real strong suspicion or anything.  I just

12   had normal questions.  It was, like, "If you have something,

13   then disclose it."  I mean, all of us have to sometimes.  I

14   have to do a disclosure --

15          THE COURT:  Sure.

16          THE WITNESS:  -- of a relationship that I have with

17   companies that we give to.

18          THE COURT:  I'm familiar with the form.  I did some

19   nonprofit work.  It's obviously the case with United Way.

20          THE WITNESS:  Mm-hmm.  And I would say that for the

21   United Way the standard of that form was invented by the United

22   Way system.

23          THE COURT:  No kidding.

24          THE WITNESS:  So, we take that very importantly.

25   BY MR. DAVIS:

1    Q.   All right.  So, looking at Mr. Alrai's response at the

2    bottom you can see he says, "Hi, Mohammad," and then going back

3    to the last page can you read his first two paragraphs there?

4    A.   "Please provide the following information, even though I

5    have most of it as a part of RFP process, but I would like to

6    get a DigitalNet profile that I or Pat can share with the

7    United Way team members.  Please have it to me by Tuesday the

8    latest.  Also, I did contact Aziz today.  Thanks for setting it

9    up.  I would like him to be here starting next week so we can

10   begin a smooth transition.  It is imperative that the

11   organization sees a positive change from day one.  No

12   exceptions."

13   Q.   Okay.  So, once again, Mr. Alrai is sending an email off

14   to Mohammad in a matter that you're involved with, right, or to

15   info@digitalnet?

16   A.   Yeah.  I don't know if it was Mohammad.  I don't recall

17   now who it was addressed to, but it was still to DigitalNet.  I

18   know that.

19   Q.   So, let's go to the top now, very top of the email,

20   beginning of it.

21   A.   It had Mohammad.

22   Q.   You seek out a bunch of information here, right?

23   A.   Yeah.

24   Q.   The very first page.

25            MR. HARRINGTON:  Can you tell me the exhibit number?

1          MR. DAVIS:  The exhibit number is 613.

2          MR. HARRINGTON:  Thank you.

3     Q.   All right.  So, you have some back and forth between Imran

4     and you, and Mohammad is there on the first page?  Do you see

5     that?  See the information in red below, right?

6     A.   Yes.

7     Q.   Let's go to the second page.  Okay.  And this is, again,

8     from DigitalNet support to Mr. Alrai on Monday, February 25th.

9     This is page 10161.  The question is, "Can I get the

10    principals' bio and location," right?  You had asked for that?

11    A.   (Witness nodded).

12    Q.   And what three names are identified there?

13    A.   Jawad Munawar, M. Ahmad Chaudhary, Ahmad Hassan.

14    Q.   And going to Jawad Munawar, DigitalNet is telling Imran

15    that Mr. Munawar has over 20 years' experience, correct?

16    A.   Yes.

17    Q.   And serves as a CEO and manages the Middle East operations

18    and is currently based in UAE; is that right?

19    A.   That's correct.

20    Q.   And at any point did Imran Alrai tell you that he had a

21    brother named Jawad?

22    A.   No.

23    Q.   All right.  And then the next person is M. Ahmad

24    Chaudhary, right?

25    A.   Yes.

—

1    Q.   And that says, "Over 30 years of management experience in

2    diverse industries, including healthcare," and his various

3    degrees, and he's responsible for business development and

4    operations and is currently based in the U.S., right?

5    A.   Yes.

6    Q.   Did Mr. Alrai ever tell you that that was his father's

7    name?

8    A.   No.

9    Q.   And did he ever tell you that what we're talking about

10   there is Mac?

11   A.   I understood M. Ahmad Chaudhary was called "Mac."

12   Q.   All right.  So, you assume that's Mac we're talking about,

13   right?

14   A.   Yes.

15   Q.   And then Mr. Ahmad Hassan, over 15 years of business and

16   management experience, master of science.  He manages

17   operations in South Asia, right?

18   A.   Yes.

19   Q.   Did Mr. Alrai ever tell you that Ahmad Hassan was his

20   brother-in-law?

21   A.   No.

22   Q.   And, as you look at those three names, do you have any

23   inkling that those people are related?

24   A.   I would have assumed they were not.

25   Q.   And do you have any inkling that they're related to Imran

1    Alrai?

2    A.    At the time, no.  Almost up until now, no.

3    Q.    So, let's go to the next page.  "Please provides the DUNS

4    identifier for the company."  What did you get back there on

5    that request at the top of the page about the DUNS number?

6    A.    I think that the response -- I'm trying to think.  It

7    says, oh, they don't have one because they are a privately held

8    company.

9    Q.    So, due to its private status, zero debt and no UCC

10   filings, right?

11   A.    Mm-hmm.  Yeah.

12   Q.    And then they say, "As a proof of our financial strength

13   and good credit standing we are attaching a reference letter

14   from our bank."  Right?

15   A.    Correct.

16   Q.    And you, in fact, did get a reference letter from

17   Pentucket Bank, right?

18   A.    Yes, we did.

19   Q.    And then you can see the locations listed.

20        MR. DAVIS:  Can you highlight that, please, Ms. Sheff.

21   Q.    And those list 300 Brickstone Square in Andover, Mass.,

22   right?

23   A.    Yes.

24   Q.    And then Marghzar Colony, Lahore Pakistan, Number 162,

25   right?

1   A.   Yes.

2   Q.   And then 68 Discovery Gardens in Dubai, UAE, right?

3   A.   Yes.

4   Q.   And then it says under that, "Please confirm U.S.

5   equipment and staffing," right?

6   A.   Yes, it does.

7   Q.   Now, have you asked for that, a confirmation of U.S.-based

8   equipment and staffing?

9   A.   I don't know so much about equipment.  We had asked about

10   staffing.

11   Q.   All right.  And can you explain why that mattered to you?

12   A.   We knew that they were a company with Pakistani

13   principals, and so we were trying to assess if the staffing was

14   going to be off the U.S. shore or what was in the U.S. and did

15   they have presence in the U.S.

16   Q.   Okay.  So, let's see what you got back.  Do you see under

17   your sentence the information provided?

18        MR. DAVIS:  Can you highlight where it begins,

19   "Currently."

20   A.   Yes.

21   Q.   What does that say, please?

22   A.   "Currently there are 23 associates in the U.S.  All sales,

23   marketing, HR, data center, infrastructure, telephony and

24   related services are housed in the U.S. for all U.S.

25   customers."

1   Q.   So, nothing there about programmers in Pakistan, right?

2   A.   No.

3   Q.   Okay.  And then under the next part it says, "Please

4   provide two to three customers' references, U.S. based,"

5   correct?

6   A.   Yes.

7   Q.   And you definitely wanted those references, right?

8   A.   We did.

9   Q.   All right.  And you got three references, right?

10  A.   We did.

11  Q.   Okay.  And who are they?

12  A.   K. Salman Khan, IT Director Barneys New York; Steve R.

13  Anderson, CEO, AISA Systems Corporation; Nabil Ejaz, IT

14  Director Abilities, Inc.

15  Q.   Had you ever heard of AISA Systems Corporation in Fairfax,

16  Virginia?

17  A.   No.

18  Q.   But you were interested in the references because you were

19  going to be directly involved in that, right?

20  A.   I called the references.

21  Q.   You also got some revenue information, right?

22  A.   I did.

23  Q.   And what did that say?

24  A.   "United Way's managed IT services contract will represent

25  approximately 9 percent of DigitalNet's total annual revenue."

1    And then the question was, "What percent of revenue does

2    DigitalNet's top five customers represent with and without the

3    United Way?"  And the answer was, "United Way's managed IT

4    service contract will represent approximately 5.093 percent of

5    our global revenues.  This contract will represent

6    approximately 9 percent of DigitalNet's U.S. based revenues."

7    And then it says, "Our top five customers represent

8    approximately 20.78 percent of our total global revenues.  Top

9    five including the United Way (4 plus UW) will represent

10   approximately 21.22 percent of our global revenues."

11   Q.   Okay.  And next page.  Okay.  So, is it fair to say that,

12   after getting this information, you thought that DigitalNet was

13   actually a legitimate IT services vendor?

14   A.   I thought that they were a qualified IT services vendor by

15   our standards.

16   Q.   And did you have any idea that DigitalNet was Mr. Imran

17   Alrai, your IT chief's company run out of his home office on a

18   computer in Windham, New Hampshire?

19   A.   No.

20   Q.   All right.  So, let's talk about the references.  Did you

21   have a script for checking references?

22   A.   I did.

23   Q.   And how did that script go?

24   A.   It asks about, like, who was -- you know, what was the

25   company's relationship with DigitalNet, how long had they been

1    in business with them, what kind of services did they get and

2    were they satisfied, and did they have any suggestions for

3    improvement, and, lastly would they be willing to talk to us

4    about transition.

5    Q.    Okay.  And did you call them fairly quickly after getting

6    those references?

7    A.    I did.

8    Q.    All right.  And why was that?

9    A.    Well, we were trying to start up the work.  The company

10   that we had doing our network infrastructure support had

11   actually exceeded the past due date.

12   Q.    So, you wanted to move on this, right?

13   A.    We did.

14   Q.    And did you let Mr. Alrai know that you were going to be

15   calling these references?

16   A.    I did.

17   Q.    And did he have anything to say about that that you

18   remember?

19   A.    Not that I remember.

20   Q.    Okay.  So, did you end up talking directly to the first of

21   them, Mr. Khan?

22   A.    I did.

23   Q.    And did you keep notes of that and maintain them as United

24   Way records?

25   A.    I did.

1  Q.   And showing you Government Exhibit 401, the first page of

2  that, I think it's the first page, do you recognize that as

3  your notes from your reference check with Mr. Khan?

4  A.   I do.

5       MR. DAVIS:  Your Honor, I move to admit Exhibit 401

6  and strike the ID.

7       MR. HARRINGTON:  No objection, Judge.

8       THE COURT:  It's admitted.

9  (Government's Exhibit No. 401 received into evidence)

10 Q.   And is this document dated March 1, 2013 in your

11 handwriting?

12 A.   Yes, it is.

13 Q.   And what was your purpose in checking this reference?

14 What were you trying to accomplish?

15 A.   I was trying to assert if the company, what kind of

16 relationship they had with DigitalNet, and were the services

17 delivered to them appropriately.

18 Q.   Okay.  And so, did you actually reach Mr. Khan on the

19 telephone?

20 A.   I did.

21 Q.   And did you recognize Barneys, New York as somewhere you

22 knew?

23 A.   Absolutely.

24 Q.   All right.  And so, using the notes as appropriate, can

25 you recount your conversation with Mr. Khan?

1    A.    Yeah.  We talked about what services did they use.  He

2    told me what they were.  He said that -- I told him what

3    services we were looking for.  He said that he thought that

4    they would be -- DigitalNet would be a perfect match for us.

5    He said that he had four years of experiences with them, that

6    they were very happy with them.

7    Q.    You said "four years"?

8    A.    Four years.  It looked like I underlined that, so I say

9    that was four years.  Very happy.  He told me what services

10   they have had.  We talked about areas, what weaknesses or where

11   they could improve.  He said that they weren't huge but that

12   they had very good individuals, good customer service and was

13   very responsive, the people were very knowledgeable.  And then

14   I asked them if we could talk, if Imran could talk to them

15   about their experience during the transition.

16   Q.    Why did you want or why did you talk about having

17   Mr. Alrai talk to Mr. Khan in this reference?

18   A.    My conversation was around references to ensure that they

19   were -- that they had customers in the U.S. and that they were

20   a reputable company, what Mr. Alrai's possibly need was a more

21   technical view about, like, what things came up, and also I was

22   trying to connect him with others in the field.

23   Q.    Okay.  And Mr. Khan told you he was the IT Director and

24   Infrastructure Manager at Barneys; is that right?

25   A.    That's what he said.

1   Q.   And you called the number you had been given, a 212

2   number, to call him?

3   A.   Yes, I did.

4   Q.   Okay.  Let's look at the next page.  Did you also call the

5   second reference on the same day, Mr. Nabil Ejaz?

6   A.   I did.

7   Q.   And did you call that same number you had been given, the

8   516 number at the top of the page?

9   A.   I did.

10  Q.   And did he purport to be the IT Director at Abilities, New

11  York?

12  A.   Yes, he did.

13  Q.   And can you summarize your conversation with Mr. Ejaz?

14  A.   He said that he had a two-year relationship with

15  DigitalNet, happy with the services, that they had helped him

16  to bring down his budget, that he had four people on site --

17  well, he had had four people, and now DigitalNet had helped

18  them to really rationalize their staffing.  He said that the

19  user experience was excellent, and that DigitalNet was experts

20  in their field.  He did say that there was a little initial

21  difficulty moving to an outsource model, but he thought that

22  they were very good and the principals were very good.

23  Q.   And so, did you regard these first two references as very

24  positive for DigitalNet?

25  A.   Absolutely.  Yeah.

1    Q.   All right.  Now, what do you remember doing about Steve

2    Anderson of AISA?

3    A.   Yeah.  We could not find my notes, but I remember having a

4    conversation with Mr. Anderson and basically got kind of the

5    same types of references.

6    Q.   Okay.  Do you recall any information about whether he

7    traveled and was available?

8    A.   Yeah.  I mean, I know that the reason why -- we had a hard

9    time setting him up, because he was the CEO of AISA and that he

10   was not available easily, but I do remember having a

11   conversation with him.

12   Q.   And, again, it was positive about DigitalNet?

13   A.   Yes.

14   Q.   Okay.  Now, once you got the three references, did you

15   speak to Mr. Alrai about it?

16   A.   I did.

17   Q.   And what did you tell him, and what happened?

18   A.   I told him that the references were really great and that

19   we can proceed forward.

20   Q.   Okay.  Did you also tell him that any of the references

21   were willing to speak with him further?

22   A.   I did.  I told him all of them were willing to speak with

23   him.

24   Q.   And please speak up.

25   A.   All of them were willing to have a conversation with him.

1    Q.   And what did he say about that?

2    A.   I don't remember exactly, but I know that he said that he

3    would contact, you know, he'd follow up.

4    Q.   All right.  Now, soon after that, in March of 2013, did

5    you have an in-person meeting at United Way with someone from

6    DigitalNet?

7    A.   I did.

8    Q.   All right.  And tell the Court how that came about.

9    A.   It was a courtesy for a vendor that was now our largest

10   vendor relationship outside of our healthcare plans, and so I

11   asked to have one of the principals come and see me.

12   Q.   And who did you ask?

13   A.   Imran.

14   Q.   And you asked for one of the principals?

15   A.   Well, Mac Chaudhary, who was the U.S.-based person.

16   Q.   Okay.  And so, what happened?

17   A.   I had a meeting with him.

18   Q.   All right.  And how did that -- where did the meeting

19   occur?

20   A.   In my office.

21   Q.   And do you remember the time of day, what day of the week

22   it was?

23   A.   No, I don't remember the day of the week.  I remember it

24   was, of course, during the day.

25   Q.   Right.  And do you remember any efforts you made to find

1    it on your calendar?

2    A.   I looked back to see it on my calendar.  I could not find

3    it on my calendar, but I'm not surprised at that.  My memory is

4    I believe Mr. Alrai said he was coming into the office as the

5    team kind of got onboard, and that he would just, you know,

6    sort of bring him in as I had time during that day.

7    Q.   So, Mr. Alrai offered to bring in this principal from

8    DigitalNet to meet with you?

9    A.   Yes.

10   Q.   Okay.  And do you remember how the meeting began?

11   A.   I mean, yes.  I mean, I know that it was cordial, that I

12   would have welcomed them onboard, said that we were looking

13   forward to working with them, talked a little bit about like

14   what they were going to do and how the startup would happen.

15   Q.   All right.  How many people came into your office for that

16   meeting?

17   A.   Well, just one, with Mr. Alrai coming in to bring him in.

18   Q.   So, Mr. Alrai brought in Mr. Chaudhary?

19   A.   Mm-hmm.

20   Q.   Yes?

21   A.   Yes.

22   Q.   Okay.  And did Mr. Alrai stay after that?

23   A.   I don't think so.

24   Q.   Okay.

25   A.   In fact, I'm pretty sure no.

1    Q.    So, he left just you and Mr. Chaudhary to talk?

2    A.    Yes.

3    Q.    Okay.  How long did the meeting last?

4    A.    Maybe a half hour.

5    Q.    Thirty minutes?

6    A.    Mm-hmm.

7    Q.    And did you explain any -- your desire about the timing of

8    getting started and any issues you had?

9    A.    I would have, because we had had some -- for whatever the

10   reason, I can't recall why, but DigitalNet was supposed to

11   start a few days earlier.  They did not, and so it was a little

12   bit of concern about, like, is this an omen of things to happen

13   for the future.  And so, we would have talked about that.

14   Q.    So, DigitalNet had not come and started quite as quickly

15   as you had hoped?

16   A.    Yeah.  I can't remember why, but --

17   Q.    Okay.  So, let's talk about Mac, the person in your

18   office.  How old was he?

19   A.    I would have guessed maybe in his 50s.

20   Q.    Okay.  And describe him further.  How did he look?

21   A.    He was of South Asian descent, tallish.  That's my only

22   memory, basically.

23   Q.    Do you remember his hair?

24   A.    Short, very short, I think, or balding maybe.

25   Q.    Sorry?

1    A.    Potentially balding, but short.

2    Q.    And do you remember his build, his just size, body size?

3    A.    Yes.  Not huge, but, you know, a regular-sized male.

4    Q.    Okay.  And how was his English?

5    A.    Good.

6    Q.    Any problems communicating?

7    A.    No.

8    Q.    Would you have described him as having a thick accent?

9    A.    No.

10   Q.    Good English?

11   A.    Good English.

12   Q.    Okay.  And how was his fluency in IT from what you could

13   tell?

14   A.    We didn't talk -- you know, I'm not a technical person.

15   We wouldn't have talked details about, like -- but he seemed,

16   you know, appropriate for a business development person,

17   understood what we needed and was there to deliver.

18   Q.    Okay.  And did you understand that he was business

19   development for DigitalNet?

20   A.    I thought -- yes.  That was his title.

21   Q.    Was Vice President for Business Development?

22   A.    Yes.

23   Q.    Okay.  And did you talk to him about DigitalNet's

24   business?

25   A.    Probably a little bit.  Well, definitely we talked about

1    DigitalNet expanding.

2    Q.    Okay.  And did he say where they had existing customers in

3    the U.S. for DigitalNet?

4    A.    Primarily --

5            MR. HARRINGTON:  Objection, Judge.  Hearsay.

6            THE COURT:  Did he say.  She can answer yes or no.

7    Hold on.  Ask it again.

8    Q.    So, did you ask him about whether DigitalNet had customers

9    in the U.S.?

10   A.    Yes.

11   Q.    And did he tell you that he did?

12   A.    Yes.

13   Q.    And did he say where they were?

14           MR. HARRINGTON:  Objection, Judge.  Hearsay.

15           THE COURT:  I can't imagine he's offering it for its

16   truth.  He's offering it because it's a lie, right?

17           MR. DAVIS:  Correct.

18           THE COURT:  He says it's a lie.  Go ahead.  Overruled.

19   Q.    So, you can answer.

20   A.    Oh, okay.  Yes, he said that they had a number of

21   customers in the U.S.

22           THE COURT:  It's your client.  Everything he says is

23   an admission, right?

24           MR. HARRINGTON:  She's talking about another

25   individual.

1          THE COURT:  Okay.

2          MR. HARRINGTON:  And I would say this, Judge:  I

3    understand the government is proposing this as a misstatement

4    or a falsity.

5          THE COURT:  Yes.

6          MR. HARRINGTON:  But what they're offering it is to

7    show that is a statement that was made, that it was, in fact,

8    made.  In that sense it's offered for the truth of that, not

9    necessarily for the information, if you follow what I'm saying.

10         THE COURT:  I know, but she can say he made a

11   statement.  That's not hearsay.  And the content of the

12   statement is not offered for its truth, so how could it be

13   hearsay?

14         MR. HARRINGTON:  I think it's being offered for the

15   truth of the matter asserted, which is that there are different

16   companies.  I think the fact that the government is

17   characterizing it as a false statement doesn't take it out of

18   the hearsay rule.

19         THE COURT:  It's not -- okay.  So, what was the

20   response?

21         THE WITNESS:  That they had U.S. customers.

22         THE COURT:  That they had U.S. customers.  Okay.  Now,

23   the truth -- he's not offering it to prove that they have U.S.

24   customers.

25         MR. DAVIS:  Correct.

1        THE COURT:  He's not offering it for its truth, so

2    it's not hearsay.  Overruled.

3    BY MR. DAVIS:

4    Q.   And to be clear, Ms. Latimore, the person sitting in your

5    office at that moment was not Imran Alrai, correct?

6    A.   No, he was not.

7    Q.   Whoever he was, he was not the defendant, right?

8    A.   He was definitely not the defendant.

9    Q.   But the defendant had brought him in and introduced you,

10   correct?

11   A.   Yes.

12   Q.   All right.  So, did Mac, the person in your office, tell

13   you any more about DigitalNet customers in the Boston area?

14   A.   We talked about Boston-area customers, and my

15   understanding is we were the only one, and we talked about why

16   they were in -- why they had their headquarters here, and he

17   said, "Because we're expecting to expand in the Boston area."

18   Q.   All right.  And you knew about the Andover address; is

19   that right?

20   A.   I did.

21   Q.   And did he say how long DigitalNet had been in business,

22   how long they had had clients?

23   A.   I don't remember that specifically, but reading from the

24   documents that we just showed from the references, at least

25   four years was what one of the references said.

1    Q.    All right.  But you don't recall that exactly?

2    A.    I don't remember having a conversation about how long.

3    Q.    Did you recall the matter of whether United Way would be a

4    reference for DigitalNet?  Did that come up?

5    A.    Yes.

6    Q.    What happened there?

7    A.    We said that we were just starting and that we weren't

8    going to be -- we couldn't be a reference.

9    Q.    Okay.  Did you ask about whether the company was hosted

10   overseas, DigitalNet?

11              THE COURT:  Was what overseas?  Hosted?

12              MR. DAVIS:  Hosted.

13   A.    I don't remember specifically asking him, but in the

14   information that was supplied to me we were under the

15   understanding that we would be hosted in the U.S.  As you saw

16   from the letter from Mohammad, one of the answers to my

17   question was, "What are your assets in the U.S.?"  And he said,

18   "All U.S. customers are hosted and serviced in the U.S."

19   Q.    And did the person sitting in your office --

20              THE COURT:  What does "hosting" mean?

21              MR. DAVIS:  I think it means having servers.

22              THE WITNESS:  Having servers in the U.S.

23              THE COURT:  Oh, in the technical sense.

24              THE WITNESS:  In the technical sense, and that we

25   would have servers in the U.S.

1    Q.   Did at any point the man sitting in your office say that

2    he was related to Imran Alrai?

3    A.   No.

4    Q.   Okay.  And would that have given you pause?

5    A.   It would have stopped everything.

6    Q.   All right.  Okay.  And do you recall whether you talked to

7    Mr. Alrai later about how the meeting with Mac had gone?

8    A.   I don't specifically recall, but I'm sure I would have

9    said something.

10   Q.   All right.  And do you recall how the meeting with Mac

11   ended?

12   A.   I thought it was a very, you know, positive, cordial

13   conversation.

14   Q.   And, to your knowledge, did you ever see that man again?

15   A.   I don't know if I saw him again.  I do remember visiting

16   their offices briefly in Andover, and I'm not sure who let me

17   in.

18   Q.   So, you might have seen him when you went to Andover?

19   A.   Could have.

20   Q.   Sorry?

21   A.   Could have.

22   Q.   Is there any other time you can think of that you saw that

23   man?

24   A.   I don't recall seeing him.

25   Q.   All right.  So, let's go to the visit --

1      THE COURT:  Hold on a second, Counsel.  I just need a

2   second.  I, obviously, missed an important part of that

3   testimony.  I just need to review it for a second to see if I

4   have any questions about it, because I clearly missed the

5   point.

6                          (Pause)

7      THE COURT:  Yeah.  This was a meeting she looked for

8   on her calendar.  She couldn't find it.  Okay.  Thank you,

9   Counsel.

10      MR. DAVIS:  Does the Court have any questions?

11      THE COURT:  No.  I just missed an important part of

12   that, and now I get it.

13   Q.   Okay.  Now, Ms. Latimore, speaking of going to the Andover

14   office, did that happen soon after the meeting with Mac

15   Chaudhary?

16   A.   Yes, within weeks, you know, a couple of weeks.  I had not

17   gone specifically to -- I mean, I told them I was coming, but I

18   went for some other purpose to Andover, so I stopped by.

19   Q.   All right.  So, you were actually going to Andover for

20   personal reasons?

21   A.   Mm-hmm.

22   Q.   All right.  And so, do you remember speaking in advance

23   with Mr. Imran Alrai about your visiting the Andover office at

24   Brickstone Place?

25   A.   I don't know how else I would have communicated it, so I

1    don't remember specifically about that, but I do -- but it had

2    to have been through Mr. Alrai.

3    Q.   All right.  And so, it had to be through Mr. Alrai why?

4    A.   Because there was no one else in contact with DigitalNet

5    at that point.

6    Q.   Okay.  And so, what would you have told Mr. Alrai to make

7    that meeting happen?

8    A.   That I was going to be --

9         MR. HARRINGTON:  Objection.  She said she didn't even

10   recall having the discussion.

11        THE COURT:  Yeah, but she can tell me what she would

12   have -- it depends on how deep you get, but if it's very

13   superficial she can tell me what she would have discussed.

14   That's okay.  Go ahead.  Overruled.

15   A.   I would have just said that I wanted to visit at a certain

16   day, time, and that I would just see the office.

17   Q.   All right.  And so, do you recall any discussion with

18   Mr. Alrai where he told you that there's not much to see there?

19   A.   We talked -- I don't know who --

20        THE COURT:  Go ahead.

21   A.   Yes.  I knew that there wasn't much to see at the office,

22   and I know that when I spoke to Mr. Alrai and Mr. Chaudhary

23   that most of their staff would be in the field.

24   Q.   All right.  Why did you want to go to the Andover office?

25   A.   Just because I just wanted to see the office.  I mean, I

1    just wanted to see the establishment.

2              THE COURT:  Why did you want to see it?

3              THE WITNESS:  Well, it's sort of good practice to see

4    if there was -- you know, what was it.  I mean, I knew that

5    they were recently established in Massachusetts, and so, like,

6    what was it?  And it was just an office building.

7              THE COURT:  Is that something you do with all your

8    vendors?

9              THE WITNESS:  Yeah, pretty much.  I mean, normally the

10   vendors invite me, so I don't have to ask to go.

11   Q.   But you had not been invited here, correct?

12   A.   No, no.

13   Q.   All right.  And did you go alone?

14   A.   I did.

15   Q.   So, did you drive to Andover?

16   A.   I did.

17   Q.   What happened?

18   A.   Saw the office, saw that they had a name on the tombstone

19   and looked at the office briefly and left.

20   Q.   You said they had a name on a tombstone?

21   A.   Well, on the -- I call it a "tombstone," you know, in the

22   lobby.

23   Q.   You saw the name "DigitalNet" there?

24   A.   Yeah.

25   Q.   And do you know who you met with for DigitalNet?

A.    I don't remember who it is -- was at that point.  I

assumed it was Mac Chaudhary, but I don't know that, because

that's the only -- I believe up until I knew that Mr. Alrai was

associated with DigitalNet that I only met five people from

DigitalNet.

Q.    Okay.  And so, do you think it was one of those five?

A.    I knew it wasn't most of those five.

Q.    Okay.  And you say five people.  Can you just clarify for

the Court who were the five people you met for DigitalNet?

A.    So, I met Mr. Chaudhary, I met Kal Wahbe, I met our three

on-site folks, who were Nadeem, Jasmin and Idir.  The three

people weren't there all at the same time.  There were two of

them at different times, the on-site folks.

Q.    All right.  And those are the only people you ever met

with DigitalNet?

A.    Those were the only people I ever met.

Q.    All right.  And do you think that one of those people was

at Andover at the office when you came to visit that time?

A.    Yes, and I know that it wasn't the on-site people.

Q.    And you know it wasn't who?  Sorry?

A.    The on-site people.  I know it wasn't Nadeem or Idir.

Q.    And was Mr. Imran Alrai there?

A.    No.

Q.    Okay.  And so, what happened at that meeting?

A.    Nothing.  I just walked in, saw the office, said, "Hello."

1    There was not anyone, basically, there.  It was an office.

2    Q.   Okay.  And after that time did you ever go back to the

3    Andover, Massachusetts headquarters at DigitalNet?

4    A.   No.

5    Q.   Why not?

6    A.   There wasn't any reason to go there.  I know that Imran

7    had a number of meetings with their team in our offices.  I

8    would see them around, and sometimes I would pop my head in and

9    say, "Hello, but that would be about it."

10   Q.   And when you say "their team," do you mean Nadeem and then

11   either Idir and after that Jasmin?

12   A.   Yes, but I was thinking more about Nadeem, Idir and Kal --

13   and Kal.  There may have been others, but those are the ones

14   that I remember.

15   Q.   Okay.  You talked about Kal.  Did you meet Kal at United

16   Way?

17   A.   Yeah, I did.

18   Q.   And how many times?

19   A.   I can't really tell you, but a number of times in the

20   beginning.

21   Q.   All right.  And after the beginning did you not see him at

22   United Way much?

23   A.   I saw him initially in meetings with Imran or walking

24   through the halls, and then at some point, and I don't remember

25   when, he wasn't around as much, but I didn't expect him to be

1   around as much, because he was supposed to be the IT

2   architecture person.

3   Q.   Okay.  Did you know where Kal was based after that?

4   A.   Specifically, no.  In the U.S., yes.

5   Q.   And why do you say he was in the U.S.?

6   A.   Because when I met him he said he was a U.S. employee of

7   DigitalNet, and I do remember having conversations with Imran

8   about how fortunate it was that we had someone of Kal's caliber

9   who was available to us.

10  Q.   And when you say "available to us," are you referring to

11  in the U.S., or what do you mean?

12  A.   In the U.S.  Available to us as someone who we could call

13  but also available to us in the U.S.

14  Q.   All right.

15  A.   And he was on site.

16  Q.   And did Mr. Alrai ever tell you he was actually in the

17  Middle East?

18  A.   No.  I didn't know he was in the Middle East.

19  Q.   All right.  So, moving forward, did United Way begin to

20  sign other contracts with DigitalNet?

21  A.   Yes, we did.

22  Q.   And was one of those a telephony contract for the

23  telephone service?

24  A.   Yes.

25  Q.   And whose idea was that of putting DigitalNet in charge of

1   the telephone service?

2   A.   So, if you go back to Imran's proposal for the IT

3   environment, that was a part of that discussion, that we would

4   over time migrate a number of our -- the IT services that we

5   have with other people to DigitalNet.

6   Q.   Okay.  And did Mr. Alrai say anything about DigitalNet's

7   experience in managing telephones?

8   A.   I was told that they managed a number of customers'

9   telephone systems, and that one of the reasons why we would

10  want to go with them is their expertise in working with other,

11  you know, telephone providers and other companies, and also

12  that we would gain some cost efficiencies.

13  Q.   Some cost efficiencies?

14  A.   Mm-hmm.

15  Q.   Okay.  So, did you then negotiate a telephone contract

16  with DigitalNet?

17  A.   Mr. Alrai did.  Mm-hmm.

18  Q.   Sorry?

19  A.   Mr. Alrai did.

20  Q.   All right.  And showing you Exhibit 617, do you recognize

21  that as an email from you to Imran at the top regarding terms

22  of the telephony contract in August of 2013?

23  A.   Yes.

24       MR. DAVIS:  And, your Honor, I move to admit 617 and

25  strike the ID.

1          MR. HARRINGTON:  No objection, Judge.

2          THE COURT:  It's admitted.

3      (Government's Exhibit No. 617 received into evidence)

4   Q.   In here are you asking various questions to Mr. Alrai, one

5   last question, "What is the disconnection fee"?  Do you see

6   that at the bottom?

7   A.   At the bottom, yes.

8   Q.   And the next page, please.  So, this is back and forth

9   between you and him about the telephone contract, right?

10  A.   Yes.

11  Q.   All right.  And eventually did you sign that contract in

12  approximately August of 2013?

13  A.   I did.

14  Q.   And after that was DigitalNet fully responsible for United

15  Way's telephone service?

16  A.   Yes, it was.

17  Q.   All right.  I want to just show you just some other

18  contracts, because we entered some contracts but not all.

19  Showing you first 300A for identification, that's a Managed IT

20  Services Agreement?

21  A.   Mm-hmm.

22  Q.   That's, actually, the first main one, February 20th of

23  2013, correct?

24  A.   Yes, it is.

25          MR. DAVIS:  And can we go to the signature page.

1   Q.   And did you sign that for United Way?

2   A.   I did.

3   Q.   And did Mr. M.A. Chaudhary sign it for DigitalNet?

4   A.   Yes.

5         MR. DAVIS:  Your Honor, I move to admit 300A and

6   strike the ID.

7         MR. HARRINGTON:  No objection, Judge.

8         THE COURT:  Admitted.

9   (Government's Exhibit No. 300a received into evidence)

10  Q.   A second contract is 301a, a statement of work for the

11  Thrive and Drive -- I'm sorry -- the Thrive and Five Drive

12  application hosting in 2016.  Is this another contract with

13  DigitalNet?

14  A.   Yes.

15  Q.   And did you sign that for United Way?

16  A.   I did.

17        MR. DAVIS:  Your Honor, I move to admit 301a and

18  strike the identification.

19        MR. HARRINGTON:  No objection, Judge.

20        THE COURT:  It's admitted.

21  (Governments Exhibit No. 301a received into evidence)

22  Q.   Showing you now 301B, that's a statement of work regarding

23  the Andar platform in August of 2015.  Is this another project

24  with DigitalNet?

25  A.   It's actually the website integration.

1   Q.   This is actually the website project?

2   A.   Mm-hmm.

3   Q.   And, again, Mr. Chaudhary was identified as a principal?

4   A.   Yeah.

5   Q.   And did you enter into that statement of work with

6   DigitalNet?

7   A.   I did.

8        MR. DAVIS:  Your Honor, I move to strike the ID and

9   enter 301b in evidence.

10        MR. HARRINGTON:  No objection, Judge.

11        THE COURT:  It's admitted.

12   (Government's Exhibit No. 301b received into evidence)

13   Q.   Lastly, 304A For Identification.  Do you recognize that

14   item, Ms. Latimore?

15        MR. DAVIS:  And can you go to the end?

16   A.   Yes, I do.

17   Q.   And this is signed in July of '16 and also signed by Mac

18   Chaudhary of DigitalNet?

19   A.   Yes.

20        MR. DAVIS:  Your Honor, I move to admit 304a and

21   strike the identification.

22        MR. HARRINGTON:  No objection, your Honor.

23        THE COURT:  It's admitted.

24   (Government's Exhibit No. 304a received into evidence)

25   Q.   So, you signed a number of contracts with DigitalNet?

1    A.    I did.

2    Q.    And did they become your -- where did they rank in terms

3    of your outside vendors?

4    A.    As I said before, they were the second highest paid of our

5    vendors.

6    Q.    And what was the approximate annual spend on DigitalNet,

7    all told?

8    A.    At the end of the day something like a million two or

9    three.

10   Q.    A million two or a million three?

11   A.    Mm-hmm.

12   Q.    Okay.  Don't say "Mm-hmm," please.  Please say "Yes" or

13   "No."

14   A.    Yes.

15   Q.    All right.  So, let's talk about supervising Mr. Imran

16   Alrai.  He always reported directly to you, correct?

17   A.    He reported initially for the first six months, I believe,

18   of his employment to Nancy Powers.

19   Q.    But after that to you, right?

20   A.    To me.

21   Q.    Did he have a home office?

22   A.    Yes, he did.

23   Q.    And how did you know that?

24   A.    Because when he came onboard he asked to work from home on

25   a couple of days a week, and one of our criteria is that you

1   have a place that you can work and equipment.

2   Q.    And did you approve his request to work out of his home

3   office?

4   A.    Well, yes, I guess.  Nancy would have submitted it at that

5   point.

6   Q.    Okay.

7   A.    But I did do subsequent ones, yeah.

8   Q.    I'm sorry?

9   A.    I approved subsequent ones.

10   Q.    Okay.  So, how many days a week did he come into the

11   office?

12   A.    He was there three days a week.

13   Q.    And did that change over time?

14   A.    Unofficially, yes.

15   Q.    And what do you mean by that?

16   A.    He started coming in to the office two days a week.

17   Q.    And what days were those?

18   A.    I don't really recall, but I think that they were Tuesday

19   and Thursday, but I don't know.

20   Q.    And, as his supervisor, were you concerned about that?

21   A.    Initially I was concerned that he was working from home

22   when I was not his supervisor, because he was a new employee in

23   a very complex space, but after time went on I was not as

24   concerned.

25   Q.    Okay.  Did you also know that he had a teaching job?

1    A.    I did.

2    Q.    And what was that and when was that?

3    A.    I believe he was teaching throughout his tenure with us.

4    He taught at New Hampshire -- is it NHU?

5    Q.    Southern New Hampshire University?

6    A.    Southern New Hampshire University.

7    Q.    Okay.

8    A.    He talked about that.

9    Q.    And was that approved by you?

10   A.    Yes.  I mean, as long as it did not interfere with his

11   time on the job.  It was after work.

12   Q.    Did he ever tell you that he was working for Robert Allen

13   Group?

14   A.    No.  I mean, he came from Robert Allen.

15   Q.    But did he tell you that he continued to work for them for

16   18 months after he started with United Way?

17   A.    No.

18   Q.    All right.  Do you remember an IT conference in California

19   for CIOs that he talked to you about?

20   A.    Yes, I did.

21   Q.    Tell the Court about that.

22   A.    At some point we had talked about continuing education for

23   him, and he did not take -- I asked him to find things that

24   might be useful for him.  At one point he told me that he was

25   going to California to a CIO conference.  I offered to pay for

1    it.  He said that it wasn't necessary, that he would pay for it

2    himself.  And I authorized him to go to the conference.

3    Q.    Okay.  He said he was willing to pay for it himself?

4    A.    Yes, he did.

5    Q.    And, of course, Mr. Alrai was given vacation time; is that

6    right?

7    A.    Yes.

8    Q.    Did he take much vacation?

9    A.    He didn't take much vacation.  We had a number of

10   conversations about that he would lose vacation time if he did

11   not take it.

12   Q.    All right.  And did he give you any explanation for why he

13   wasn't using all of his vacation days?

14   A.    He said that his job was very intense, there were always a

15   number of projects that he was working on, that he just didn't

16   know how he could fit in vacation.  And we also extended his

17   vacation time I think probably 60 days beyond what we typically

18   would have so that he could take advantage of it.

19   Q.    Okay.  Throughout his time working with you did Mr. Alrai

20   continue to suggest DigitalNet as the IT vendor solution for

21   United Way?

22   A.    Yes, he did.

23   Q.    All right.  So, showing you -- do you recall the PIP

24   database, the P-I-P database question?

25   A.    Yeah.

1   Q.   Showing you Exhibit 635, do you recognize that as an email

2   from Mr. Alrai to you in November of 2015 about the hosting of

3   the PIP database?

4   A.   Yes.

5        MR. DAVIS:  All right.  Your Honor, I move to admit

6   635 and strike the ID.

7        MR. HARRINGTON:  No objection, your Honor.

8        THE COURT:  It's admitted.

9   (Government's Exhibit No. 635 received into evidence)

10  Q.   Let's go back to the back of the email, the beginning of

11  it.  This is an email from someone called Sunindiya?

12  A.   Sunindiya.

13  Q.   Sorry?

14  A.   Sunindiya.

15  Q.   And who is she?

16  A.   She was a director in our community impact area.

17  Q.   Okay.  And can you just read the first part of her email

18  that she wrote.

19  A.   She says, "Hi, Imran.  Thanks for taking the time to read

20  through all the information on the PIP database for drive and

21  coming up with some hosting options.  After our meeting, I met

22  with Carle, copied, Jesse, Gina and Jane and shared this

23  information.  They wanted to know why you were suggesting going

24  with DigitalNet over Microsoft or Amazon, and I was wondering

25  if you could share the pros and cons.  Jessie mentioned she may

1   have a possible connection at Amazon, and Mike had mentioned to

2   Carle and I that he thought Microsoft might be willing to do

3   this for a discounted cost."

4   Q.   That's enough.  So, Sunindiya is suggesting that Microsoft

5   or Amazon might be a good solution for this database and is

6   wondering why Imran suggested going with DigitalNet, correct?

7   A.   Exactly.

8   Q.   All right.  And so, let's go to the first part in

9   Mr. Alrai's response.  Can you read from at least the beginning

10  part of that response.

11  A.   "Microsoft and Amazon are just hosting platforms.  We need

12  to have a full support, maintenance, backup and disaster

13  recovery, compliance and security ECO system to host enterprise

14  applications.  DigitalNet is a vendor that we use often, and we

15  know the quality of services they provide.  Their cloud

16  services are built exclusively for businesses such as ours.

17  Another benefit is that we have their people already working

18  with us, so it is much easier to talk to them in real time to

19  work through an issue and resolve it fast.  We will not have

20  the flexibility with other vendors, and you will have to

21  completely rely on them for all assistance.  Internal UWMV IT

22  team will be of no use, unfortunately."

23  Q.   Okay, that's enough.  Thank you.  All right.  So, I want

24  to ask about invoices and budget.  Did DigitalNet send United

25  Way invoices essentially monthly for you to pay?

1    A.    Yes.

2    Q.    And did you have conversations with a person named Dom

3    Pallaria about the DigitalNet invoices?

4    A.    I have had.

5    Q.    And who is Dominec Pallaria?

6    A.    Currently, he's our controller, but he's always been in

7    charge of accounting.

8    Q.    And did you -- you supervised Imran, correct?

9    A.    I did.

10   Q.    Did you also supervise Dom Pallaria?

11   A.    At the time.  Well, throughout the time of Imran's, and

12   then I don't currently.

13   Q.    All right.  And were you aware of friction between Dominec

14   Pallaria or at least involving Dominec Pallaria and the

15   DigitalNet invoices?

16   A.    Yes.

17   Q.    And what was that friction?

18   A.    There were a couple of things.  We did not -- before

19   DigitalNet we didn't do ACHs to corporations, and so Dom

20   questioned why would we do ACH for DigitalNet.  Then Dom had a

21   number of questions about the detail nature of the -- or lack

22   of detail of the DigitalNet invoices.

23   Q.    Okay.  And so, that was an issue.  Did that recur over the

24   years?

25   A.    Yes, it did.

1    Q.   Another topic is conflict of interest forms.  Were you

2    familiar with those at United Way?

3    A.   I ran the conflict of interest process, yes.

4    Q.   And can you describe it and why it was important?

5    A.   It's important, as I previously stated, because we are

6    funded by donors, and those donors have a right to expect that

7    we are using their money in the best way and that we are

8    exercising appropriate fiduciary responsibility toward them.

9    So, we as our system and then as our United Way, in particular,

10   did an annual conflict of interest form to ensure that there

11   was no undue influence of an employee or volunteer or someone

12   else associated with us as we disburse the funds that we had

13   responsibility for.

14   Q.   And, to your knowledge, did Mr. Alrai, the person you

15   supervised, ever make a disclosure on a conflict of interest

16   form?

17   A.   I know he did not.

18   Q.   All right.  And did you ever talk to him about the

19   conflict of interest forms and relations with vendors, say?

20   A.   We've had various conversations with them, because one of

21   the pieces, as I said, because DigitalNet was the second

22   largest relationship we had, a small company, and we had had

23   conversations about the previous vendor, CWAIN, and how the

24   perception was that some members of our staff was too close to

25   them.  So, yes, we did have conversations.

1    Q.   And any issues from that conversation when you spoke to

2    Mr. Alrai?

3    A.   No.  Him just acknowledging that he was aware of the

4    issues, that you could get too close to a vendor, and that we

5    could not allow that to be a perception.

6    Q.   And did he ever have any questions of you about that

7    conflict of interest policy or process?

8    A.   No.

9    Q.   Okay.

10             THE COURT:  Are you done with that issue?

11             MR. DAVIS:  Yes.

12             THE COURT:  Can I inquire?

13             MR. DAVIS:  Sure.

14             THE COURT:  A couple of questions about that.  What

15   personnel were required to fill out the form?  I assume

16   directors.  Directors, officers, all employees?

17             THE WITNESS:  Every employee.

18             THE COURT:  Every employee?

19             THE WITNESS:  We do 100 percent every employee every

20   year.

21             THE COURT:  Okay.

22             THE WITNESS:  And we report to the Audit Committee.

23   And we also try to get 100 percent of all of our volunteers.

24   We don't necessarily get 100 percent of our volunteers, but we

25   typically get close to 90 percent of all volunteers to complete

1    them, because we harass them until they do.

2            THE COURT:  Been there.  It was your job to execute

3    this program?

4            THE WITNESS:  To execute -- yes, it was my ultimate

5    responsibility.

6            THE COURT:  Who assigned you that task?

7            THE WITNESS:  The Audit Committee.

8            THE COURT:  And you may or may not have an answer to

9    this, I don't know, but I'm going to ask you.  Is it your

10   understanding that that was just a matter of United Way policy,

11   was it a requirement of federal law, was it a requirement of

12   Commonwealth law?  What was your understanding, if you have

13   any?

14           THE WITNESS:  My understanding is that it's a good

15   practice and it's a recommendation, you know, with the state,

16   with the Attorney General, but it is not a requirement.  But it

17   is a requirement to be a United Way member, a part of the

18   federation.  We on an annual basis certify that we do a

19   conflict of interest.

20           THE COURT:  Those forms, are they filed under -- are

21   they required to be notarized or anything like that?

22           THE WITNESS:  No, they are not notarized.  You mean

23   the actual individual forms?

24           THE COURT:  Yes.

25           THE WITNESS:  No, they are not notarized.  We are

1    counting on the person saying -- there is a statement at the

2    end that says, "To the best of my knowledge, I have no

3    conflicts," or, "I've disclosed all the conflicts."  And then

4    we then report that to our Audit Committee.  We take great

5    pride in reporting 100 percent completion by every employee,

6    and then we tell them who on the volunteers, key volunteers in

7    particular, that we do not have, and then we go to the board

8    and disclose to the board the same information.

9            THE COURT:  The Audit Committee does or you do?

10           THE WITNESS:  Well, the Audit Committee does a report

11   to the board, which typically the CFO would do.

12           THE COURT:  Are you a member of the Audit Committee by

13   virtue of that position?

14           THE WITNESS:  Not anymore.

15           THE COURT:  I see.

16           THE WITNESS:  At the CFO level I was.  I was a

17   staff -- I wouldn't say member.  I was a staff.

18           THE COURT:  Thank you.

19           THE WITNESS:  Thank you.

20           MR. DAVIS:  Just one follow up on that, Judge.

21   Q.   Do you know, Ms. Latimore, whether the conflict of

22   interest disclosures are required to be disclosed on the 990,

23   the IRS 990 form?

24   A.   Yes.  There is a statement do you do them, yeah.  Mm-hmm.

25   Q.   Okay.  All right.

1          THE COURT:  And that's sort of exactly what I was

2    wondering about, the 990, and I don't know the answer to the

3    question of whether that's just information gathering or if

4    there is some type of penalty or sanction for not having full

5    compliance with that.  I don't know the answer.  Regardless,

6    it's helpful for me to understand.  Thank you.

7    Q.   Let me show you another exhibit, Exhibit 628, regarding

8    the RFP for the website.  We've talked previously about the

9    website contract.  Do you see 628?

10   A.   I do.

11   Q.   And it's an email from you -- I'm sorry -- from Mr. Alrai

12   to you with the RFP for the website contract, correct?

13   A.   Yes.

14         MR. DAVIS:  Your Honor, I move to admit 628 and strike

15   the ID.

16         MR. HARRINGTON:  No objection, Judge.

17         THE COURT:  It's admitted.

18       (Government's Exhibit No. 628 received into evidence)

19         MR. DAVIS:  And can we see the attachment, please.

20   Q.   All right.  So, that's the request for proposal in May of

21   2015 from United Way?

22   A.   Yeah.  Yes.

23   Q.   Do you know who won this RFP process?

24   A.   DigitalNet.

25   Q.   All right.  And I'm showing you Exhibit 630, another

1    email, and do you recognize that as an email from Mr. Alrai to

2    Jack Rotondi and Diane Dragoff?

3    A.    I do.

4    Q.    All right.  About the website RFPs, correct?

5    A.    Yes.

6          MR. DAVIS:  All right.  Your Honor, I move to admit

7    630 and strike the ID.

8          MR. HARRINGTON:  No objection, your Honor.

9          THE COURT:  Admitted.

10   (Government's Exhibit No. 630 received into evidence)

11   Q.    And can you read just the first part of Mr. Alrai's

12   message there to Rotondi and Dragoff.

13   A.    "Hello, Jack and Diane.  Attached are the two responses

14   that I received to the website RFP.  Please let me know if you

15   have any concerns with language or terms by close of business

16   tomorrow, Monday, 8/17, if possible.  I have decided to move

17   forward with DigitalNet."

18   Q.    That's enough.  Thank you.  So, who ran this RFP process?

19   A.    So, in this particular instance there were four people

20   involved.  Imran would lead.  The client internal for this

21   would be our head of marketing, and so he had involvement or

22   someone from his team.  And then Jack and Diane, which is why I

23   had said make sure they were involved.

24   Q.    All right.  So, in 2016 did United Way begin a due

25   diligence effort regarding DigitalNet?

1    A.    Yes.

2    Q.    And how did that come about, and can you explain that?

3    A.    So, as I said, they were the second largest contract we

4    had.  Small company.  We didn't still have a lot of information

5    about them.  And so, I asked Jack Rotondi, who was head of

6    operations and had the procurement function, to look into let's

7    do another review, because their contract, which the initial

8    contract with them was three years and it was over, so it was

9    time to relook, and then we wanted to make a decision about

10    should we go out to RFP again.

11    Q.    All right.  And what kind of information were you looking

12    for?

13    A.    Very similar to what we were looking for in the beginning

14    of it, you know, their financial viability, who their customers

15    were, any references they could provide to us, had they

16    expanded their business, were there any major transactions that

17    had happened, have people left the organization.  You know,

18    sort of viability from a business, ongoing business concern.

19    Q.    All right.  So, you actually asked for a customer list as

20    part of that?

21    A.    Yes, we did.

22    Q.    And were you aware of how difficult or easy it was to get

23    information about DigitalNet just by checking on the internet?

24    A.    There was very little information about DigitalNet on the

25    internet.

1    Q.    Okay.  And so, why was this due diligence process

2    important to United Way?

3    A.    As I said, because they were our second largest vendor.

4    Q.    All right.  And so, who did you go through to get the

5    information in the due diligence?

6    A.    Jack and Diane, once again, led the due diligence process.

7    Azim Mazagonwalla also participated.  He was from finance.

8    Q.    And who was the person you would speak with about getting

9    information from DigitalNet?

10   A.    I talked to Jack, and I also talked to Imran.

11   Q.    To Imran Alrai?

12   A.    Mm-hmm.

13   Q.    Okay.  Showing you Exhibit 645, do you recognize this as

14   an email from Mr. Alrai to Jack Rotondi copying you and Diane

15   Dragoff?

16   A.    Yes.

17   Q.    And is this related to the due diligence process in July

18   of 2016?

19   A.    Yes.

20         MR. DAVIS:  Your Honor, I move to admit 645 and strike

21   the ID.

22         MR. HARRINGTON:  No objection, Judge.

23         THE COURT:  Admitted.

24   (Government's Exhibit No. 645 received into evidence)

25   Q.    Can we just scroll down.  Okay.  And we're on page 8745.

1   Can you see the list of to dos there that Jack Rotondi has

2   written to Mr. Alrai?

3   A.   Yes.

4   Q.   And can you just read that, please.

5   A.   He says, "Imran, here are the to dos coming out of today's

6   conversation with Pat:  1.  Imran advised DigitalNet that UWMB

7   has a new procurement policy in place for all large vendors

8   effective July 1, 2016.  I'll be contacting the appropriate

9   person at DigitalNet to request: certification of financial

10  health, banking reference, total number of clients, sample

11  client list.  2.  Imran to provide Jack with contact

12  information of appropriate person at DigitalNet.  3.  Jack to

13  speak to that person and acquire the three items above.  4.

14  Simultaneous with the item 1 above Diane to perform literature

15  web search on DigitalNet to uncover any current highlights or

16  low lights.  Diane, please contact me tomorrow on this.  B.

17  Imran to provide Jack and Diane via email with the following

18  three things for each of the five POs: List of competitive

19  vendors, competitive pricing offered by those respective

20  vendors, why we chose the final vendor.  Imran and Pat, do I

21  have this right?  Any edits?"

22  Q.   All right.  And was that a good summary of what you were

23  trying to accomplish in the due diligence process?

24  A.   It's pretty good.

25  Q.   Okay.  And did you eventually get sufficient information,

1   in your view, to move forward?

2   A.   I got information sufficient to move forward.  We did not

3   get -- it was pretty difficult to get some of the information,

4   but we got some.

5   Q.   Okay.

6   A.   And we did move forward.

7   Q.   And did you stay in your relationship with Mr. Alrai --

8   I'm sorry -- with DigitalNet?

9   A.   Yes, we did.

10  Q.   All right.  And showing you Exhibit 644 as part of that

11  process did he, as asked, summarize the results from the prior

12  RFP process?

13  A.   Yes.

14  Q.   All right.  And do you recognize 644 as an email dated

15  July 19th of 2016 from Mr. Alrai to Jack Rotondi copying you

16  about the DigitalNet debrief and next steps?

17  A.   Yes.

18       MR. DAVIS:  And, your Honor, I move to admit that

19  exhibit and strike the ID.

20       MR. HARRINGTON:  No objection, your Honor.

21       THE COURT:  Admitted.

22  (Government's Exhibit No. 644 received into evidence)

23  Q.   And here Mr. Alrai gives some numbers, correct?

24  A.   Yes.

25  Q.   And did he also describe the web development bid numbers

1    which included DigitalNet and Krish?

2    A.    Yes.

3    Q.    And does he also describe for IT services the bids from

4    Eze Castle and mindSHIFT and then DigitalNet showing DigitalNet

5    as the winner?

6    A.    Yes.

7    Q.    Okay.  And then does he show for the VoIP internet

8    services comparative pricing with Verizon and EarthLink and

9    showing DigitalNet as the winner?

10   A.    Yes.

11   Q.    Okay.  And at the end he says -- can you read his last

12   sentence?

13   A.    "Pricing fluctuates depending on market trends and

14   services used.  Our environment has grown and modernized since

15   2013.  I believe DigitalNet's pricing is competitive."

16   Q.    "All right.  And showing you also Exhibit 118 in evidence

17   and just going to the attachments, can you see these are emails

18   between Mr. Alrai and Mr. Rotondi, going to the beginning of

19   that?

20   A.    Yes.

21   Q.    And I'm sorry.  I said Mr. Alrai is copied, but it's

22   actually from Mac Chaudhary, correct?

23   A.    Mac Chaudhary and Imran copying Jack.

24   Q.    Okay.  And this is all part of that effort to do due

25   diligence on DigitalNet?

1    A.    Yes.

2    Q.    And let's go to the second page of that attachment we just

3    saw.  Do you see the customer list?

4    A.    I do.

5    Q.    And do you see the "Facts at a glance"?

6    A.    I do.

7    Q.    And so, after receiving this information United Way

8    continued to contract with DigitalNet?

9    A.    Yes, we did.

10          MR. DAVIS:  Your Honor, we're almost finished.  I

11   would think about five more minutes, if that's good.

12          THE COURT:  I'm not worried.  We have five minutes

13   till the break, I think.  Right, Charli?

14          THE CLERK:  Correct.

15          THE COURT:  Yeah.

16          MR. DAVIS:  Good.

17   Q.    Now, turning to 2018 -- let me ask one more question about

18   the RFP process or the due diligence process.  Why were you

19   willing to accept less than perfect documentation about

20   DigitalNet in July of '16?

21   A.    Well, one, because we had had experience working with

22   them, and so we assumed that -- and we were, in terms of the

23   services provided, happy with the infrastructure networking

24   support, and then, in addition -- so, we were sort of going

25   like, okay, this is a checkup, and even though they didn't

1    completely comply with everything we asked for we said, "Okay."

2    And we were in the process of building our new procurement

3    process for large vendors, and so we were hoping that -- this

4    was the first year, and we knew that it would have some

5    hiccups.

6    Q.   All right.  And then going forward you would have a better

7    process in place?

8    A.   We would have a better handle on how to get Jack and Diane

9    more engaged.

10   Q.   Okay.  Now, going to 2018, which is the last year of

11   Mr. Alrai's employment, do you recall in May a situation where

12   the network was moved?

13   A.   Yes, I do.

14   Q.   And what notice was given to the company about the moving

15   of the network?

16   A.   Like, less than 24 hours.

17   Q.   All right.  And who was doing that?

18   A.   Mr. Alrai.

19   Q.   And did you have a reaction to that?

20   A.   I did.  I was very unhappy that the notice was so short.

21   Q.   All right.  And how did you communicate that, and how did

22   he respond?

23   A.   I communicated directly to him, I talked to him, that this

24   was an issue for me as well as for the rest of the company.  As

25   I recall, what he said was that he had no control over the

1   process, that there had been a corporate action at the company,

2   and that they needed to move the environment.

3   Q.   Needed to move the environment?

4   A.   Mm-hmm.  And so he was -- I believe that was the answer.

5   Q.   Okay.

6   A.   That's what he told me.  Yeah.

7   Q.   All right.  Did you become aware of the whistleblower and

8   an investigation at United Way?

9   A.   I was.

10  Q.   And were you aware of the intention to suspend Mr. Alrai

11  on June 12th of 2018?

12  A.   Yes, I was.

13  Q.   What happened on that day?

14  A.   Well, lots happened on that day.  We brought in a new

15  vendor, who took over our environment.  We made sure that the

16  current employees who were on staff did not have access to our

17  environment, including Mr. Alrai.

18        And then after the lawyers and some of our -- the

19  folks that we had hired to help us through this process went

20  through a number of things with Mr. Alrai, including with the

21  FBI, we ended up, myself and Jane Grady, who is our HR

22  Director, VP, we ended up terminating Mr. Alrai.

23  Q.   All right.  And did you and Jane Grady actually go in to

24  see him on June 12th?

25  A.   Yes, we did.

1   Q.   Sorry?

2   A.   Yes.

3   Q.   I think you said with the FBI.  Just to be clear, FBI was

4   not --

5   A.   No, they were not in the room.  No, no.  I'm saying there

6   was a lot happening that day.  You asked me what was happening

7   the day.

8   Q.   Right.  Do you recall whether FBI was present in the

9   United Way on June 12th?

10   A.   Outside of the United Way.

11   Q.   Outside.  Okay.

12   A.   At the door.

13   Q.   So, directing your attention to when you and Jane Grady

14   went in, what time of day was that approximately on --

15   A.   The middle of the day, maybe early afternoon.

16        THE COURT:  I need you to let him finish the

17   questions.  The reporter is struggling a little bit.

18   A.   Okay.  Sorry.

19   Q.   Okay.  It was about the middle of the day?

20   A.   (Nodding).

21   Q.   And who is Jane Grady?

22   A.   Jane Grady is our VP of HR, was VP.

23   Q.   So, what happened when you went in?

24   A.   We told Mr. Alrai that he was being terminated for cause.

25   Q.   All right.  And what was his mood and manner at that time?

1   A.   His mood was a little bit surprise, it seemed.  He asked

2   me why didn't I just ask him to explain what was going on and

3   that I knew that he would never do anything to harm the United

4   Way or me.

5   Q.   He said that to you?

6   A.   Absolutely.

7   Q.   And did you say anything back to him?

8   A.   No.

9   Q.   Had he ever talked to you over the years of his employment

10  about his belief in the United Way?

11  A.   Yes.  We talked a lot about that.

12  Q.   And what did Mr. Alrai tell you?

13  A.   He told me that working for the United Way was very

14  consistent with his values and his religious principles, and

15  that he was happy to be a part of the United Way and thought

16  that the work that we did was important.

17           MR. DAVIS:  Nothing further.  Thank you.

18           THE COURT:  Thank you.

19           I want to talk to the lawyers for a minute.  We're

20  going to take the lunch break.  I'd like you to come back for

21  cross-examination at 1:45.

22           THE WITNESS:  Okay.  Thank you.

23           THE COURT:  Thank you.

24           Let me just ask you, Mr. Davis, I was going back

25  through your trial brief thinking I might have overlooked this.

1   I assume you're going to be presenting evidence at some point

2   regarding the actual evidence of the defendant's affiliation

3   with DigitalNet.  As I looked at the trial brief, it says that

4   his father formed DigitalNet.  It doesn't make any reference to

5   sort of IRS records or Massachusetts, Commonwealth records that

6   actually list him as an employee.  Will there be any evidence

7   like that?

8           MR. DAVIS:  So, your Honor, the corporate formation

9   documents just have Mac Chaudhary.  They don't Imran Alrai on

10  them anywhere.

11          THE COURT:  That's what the trial brief says, yeah.

12          MR. DAVIS:  Right.

13          THE COURT:  So, will there be any evidence that

14  actually documents his employment with DigitalNet?

15          MR. DAVIS:  Not employment, no.  The evidence of his

16  control is everything you're hearing and also the evidence from

17  his home office and all the things from DigitalNet that are on

18  his computer.

19          THE COURT:  Okay.  That third thing is interesting.

20  Yeah.

21          MR. DAVIS:  The other thing that shows --

22          THE COURT:  Everybody can speak here.

23          MR. DAVIS:  The other thing, your Honor, is the bank

24  records.  The bank records show his control of the money.

25          THE COURT:  Yes.  And how do they show his control of

1    the money?

2            MR. DAVIS:  Well, they show that he's in some cases

3    writing checks, that money is going to AISA accounts, and that

4    he's spending it on all kinds of things.

5            THE COURT:  Writings checks from his computer or

6    writing checks with a pen?

7            MR. DAVIS:  Actually signing some checks.

8            THE COURT:  All right.

9            MR. DAVIS:  Lots of checks --

10           THE COURT:  As Imran Alrai?

11           MR. DAVIS:  As Imran Alrai.

12           THE COURT:  I see.  That's control, sure, or it

13   certainly is at least affiliation with DigitalNet.  I'm just

14   wondering what that evidence is going to be in this case,

15   because you're saying it's everything I'm hearing.  Everything

16   I'm hearing isn't all that clear, but I know there is a long

17   way to go.  It's just that if I'm to assume your theory of the

18   case, well, he also took measures to conceal his affiliation

19   and control.  So, what I'm hearing is what looks suspicious,

20   but eventually there's going to have to be proof here of his

21   affiliation and control.  Certainly signing DigitalNet checks

22   is control.

23           MR. DAVIS:  Right.

24           THE COURT:  But you said something else a minute ago.

25           MR. DAVIS:  I would add that the tax filings show that

1    DigitalNet costs and DigitalNet revenue were passed on to AISA

2    and then part of his personal tax filings every year, and there

3    will be evidence of that.

4              THE COURT:  As you say here in the trial brief, he

5    formed AISA in 2012.

6              MR. DAVIS:  Correct.

7              THE COURT:  Okay.  Thank you.  If you want to say

8    anything about, that you're free to.  I'm a little impatient.

9    I know I'm jumping ahead.  I'm just trying to put it all

10   together.  Is there anything you want to say about what I just

11   asked?

12             MR. HARRINGTON:  No, thank you, Judge.

13             THE COURT:  All right, everybody.  I'll see you in an

14   hour.

15             THE CLERK:  All rise.

16                 (Lunch recess taken at 12:50 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of my

8   stenotype notes taken in the matter of *United States v. Imran*

9   *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date: ____4/12/20              */s/ Brenda K. Hancock*
                                  Brenda K. Hancock, RMR, CRR
15                                Official Court Reporter

16

17

18

19

20

21

22

23

24

25