*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    *  No. 1:18-cr-192-JL
              v.                     *  December 9, 2019
6                                    *  1:35 p.m.
     IMRAN ALRAI,                    *
7                                    *
                     Defendant.      *
8                                    *
     * * * * * * * * * * * * * * * * *
9

10                  TRANSCRIPT OF BENCH TRIAL
                  DAY SIX - AFTERNOON SESSION
11

12          BEFORE THE HONORABLE JOSEPH N. LAPLANTE

13

14   APPEARANCES:

15

     For the Government:      John S. Davis, AUSA
16                            Matthew Hunter, AUSA
                              Cam T. Le, AUSA
17                            United States Attorney's Office

18

     For the Defendant:      Timothy M. Harrington, Esq.
19                            Timothy C. Ayer, Esq.
                              Shaheen & Gordon PA
20

21

     Court Reporter:         Brenda K. Hancock, RMR, CRR
22                            Official Court Reporter
                              United States District Court
23                            55 Pleasant Street
                              Concord, NH 03301
24                            (603) 225-1454

25

I  N  D  E  X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ERIC LEUTERITZ | | | | |
| (Resumed) | | | | |
| By Ms. Le | 3(Cont'd) | | | |
| By Mr. Ayer | | 4 | | |
| RENEE SYLVESTER | | | | |
| By Ms. Le | 7 | | | |
| RICHARD AZIZ, JR. | | | | |
| Ms. Le | 26 | | | |
| Mr. Ayer | | 52 | | |
| CHRISTOPHER BECKSTROM | | | | |
| By Mr. Hunter | 58 | | 123,129 | |
| By Mr. Harrington | | 114 | | 127 |

1                     P R O C E E D I N G S

2                    (Lunch recess taken)

3          **ERIC LEUTERITZ**, having been previously duly sworn, was

4     further examined and testified as follows:

5          THE COURT:  Sir, you're still under oath.

6                CONTINUING DIRECT EXAMINATION

7     BY MS. LE:

8     Q.   So, sir, let's go back to Exhibit 524, Page 2019.

9          MS. LE:  That was near the end, Ms. Sheff.  It was

10    April 9th, 2018.

11    Q.   All right.  So, Mr. Leuteritz, before the break we talked

12    a little bit about your conversation with Mr. Alrai on April 9,

13    2018; is that right?

14    A.   That's right.

15    Q.   Okay.  Did you also speak with Mac Chaudhary?

16    A.   Again, I'm not sure if I spoke to him or not, but I might

17    have.

18    Q.   Was that the first time you met Mr. Chaudhary, or had you

19    met him before?

20    A.   I might have met him again at a school function or

21    something like that when I bumped into the Alrais, but that was

22    the first time I had met him, at the bank.

23    Q.   That's the first time you met him, at the bank.  Okay.

24    And after this April 9th incident did you see Mr. Chaudhary

25    come into the bank again?

1   A.   Not to my recollection, no.

2   Q.   Okay.  So, you don't recall whether you talked to

3   Mr. Chaudhary other than to ask about his identification?

4   A.   Again, if I spoke to him at all it was basically just, "Is

5   this your intention?  Is this wire what you want to happen?"

6   Q.   Were you comfortable that Mr. Chaudhary wanted this

7   transaction to go through?

8   A.   Yes.

9   Q.   But relative to the conversations you had that day about

10  the transaction and about Mr. Chaudhary coming in, who did you

11  have most of that discussion with?

12  A.   In the branch was Mr. Alrai.

13  Q.   All right.

14       MS. LE:  Thank you, your Honor.  No further questions.

15  We tender the witness.

16       THE COURT:  Cross.

17                      CROSS-EXAMINATION

18  BY MR. AYER:

19  Q.   Mr. Leuteritz, is that how you say your name?

20  A.   That's fine.  Thank you.

21  Q.   So, we just heard a lot of testimony about transactions

22  that were requested by Mac Chaudhary; is that right?

23  A.   That's correct.

24  Q.   And when that came to your attention, especially the one,

25  the $190,000 one, you were aware that Saima was his

1    daughter-in-law, right?

2    A.    Correct.

3    Q.    And you were aware that Imran was his son?

4    A.    Yes.

5    Q.    And you were aware that the business was connected to the

6    family?

7    A.    Yes.

8    Q.    And that wasn't kept from you in any way?

9    A.    No.

10   Q.    You didn't feel like you were deceived about that in any

11   way?

12   A.    No.

13   Q.    No?  It was pretty open?

14   A.    Yes.

15   Q.    And then with regard to the $190,000 wire transfer, the

16   only issue with that was that he was supposed to have been

17   there in person?

18   A.    Correct.

19   Q.    And he was not there in person?

20   A.    Correct.

21   Q.    Otherwise the transfer, as far as the bank was concerned,

22   was fine?

23   A.    Correct.

24   Q.    And then, when it was told to him that he had to come in

25   person, he did?

1    A.    Correct.

2            MR. AYER:  That's all I have, your Honor.

3            MS. LE:  Nothing further, your Honor.

4            THE COURT:  You're excused, sir.

5            MS. LE:  Your Honor, before we call the next witness,

6    may I address something, just recordkeeping, with the Court?

7            THE COURT:  Of course.

8            MS. LE:  I'll wait for the witness to leave first.

9            THE COURT:  Let me ask you while we're doing this --

10   we can go off the record for this.

11                (Discussion held off the record)

12           THE COURT:  You want to take care of something on the

13   record?

14           MS. LE:  Yes, your Honor.  Since we have Pentucket

15   Bank witnesses here, I didn't know if the Court would require

16   any testimony to the effect of their FDIC insurance status.  We

17   already have an exhibit that's in the record, 501.  So, does

18   the Court need me to elicit any testimony?

19           THE COURT:  It's not what I need.  It's whether he

20   stipulates to it.  You've got to prove it.

21           Do you stipulate to that, that it's a federally

22   insured financial institution?

23           MR. HARRINGTON:  Yeah.  No objection to that, Judge.

24   We'll stipulate to FDIC insurance.

25           MS. LE:  And it was already pre-admitted, the

1    certificate from the FDIC itself, your Honor.

2            THE COURT:  That's evidence that's admitted.  It

3    doesn't mean he's agreed to it.

4            MS. LE:  Sure.

5            THE COURT:  But the Court will assume that to be

6    proven.

7            MS. LE:  All right.  Thank you, your Honor.

8            THE COURT:  Thank you.

9            MS. LE:  The government will call Renee Sylvester to

10   the stand.

11           THE CLERK:  Please raise your right hand.

12           **RENEE SYLVESTER**, having been duly sworn by the Clerk,

13   was examined and testified as follows:

14           THE CLERK:  And, for the record, please state your

15   full name and spell your last name.

16           THE WITNESS:  Renee Sylvester, S-y-l-v-e-s-t-e-r.

17           THE CLERK:  Thank you.  Please be seated.

18                          DIRECT EXAMINATION

19   BY MS. LE:

20   Q.   Good afternoon, Ms. Sylvester.

21   A.   Hi.

22   Q.   Hi.  How are you?

23   A.   Good.  How are you?

24   Q.   Great.  Ms. Sylvester, where do you work?

25   A.   I work for Enterprise Bank.

1    Q.   How long have you been with the Enterprise Bank?

2    A.   It will be two years in January.

3    Q.   What location do you work at?

4    A.   I work in their main office in Lowell.

5    Q.   Great.  And prior to joining Enterprise Bank about two

6    years ago, where did you work?

7    A.   I worked for Pentucket Bank.

8    Q.   Any particular location?

9    A.   I worked in the Salem office.

10   Q.   And what was your title before you left the Salem, New

11   Hampshire branch of Pentucket Bank?

12   A.   Assistant Branch Manager.

13   Q.   Do you need some water, ma'am?

14   A.   I'm getting over a cold.  I'm sorry.  My voice is not the

15   best.  I apologize.

16   Q.   Sure.  No worries.  Please just speak into the microphone,

17   and, if you can, just keep your voice up.  Thank you very much.

18   A.   Oh, sorry.

19   Q.   When you were the Assistant Branch Manager in Salem who

20   was the branch manager?

21   A.   Saima Alrai.

22   Q.   Did that mean that you reported to her then?

23   A.   Yes.

24   Q.   When you worked together did you interact or socialize

25   outside of the office?

1   A.   Just at bank functions.

2   Q.   And have you kept in touch with Mrs. Alrai since you left

3   Pentucket Bank?

4   A.   No.

5   Q.   Do you know the defendant, Imran Alrai?

6   A.   Sorry?

7   Q.   Do you know the defendant, Imran Alrai?

8   A.   Yes.  He was a customer.

9   Q.   In addition to being a customer, what was his relationship

10   with Mrs. Alrai?

11   A.   Her husband.

12   Q.   Thank you.  And did you know Mr. Alrai as a customer of

13   Pentucket Bank before his wife joined Pentucket?

14   A.   Yes.  I'm so sorry.

15   Q.   Oh, please take your time.  There's water.  Please help

16   yourself to some water.  When you're ready, we'll start again.

17            THE COURT:  Take your time.

18                        (Pause)

19   A.   I'm sorry.

20   Q.   Oh, nothing to apologize for.  Now, while you were working

21   at Pentucket Bank did you service any accounts belonging to

22   DigitalNet Technology Solutions?

23   A.   Yes.

24   Q.   What did you know about DigitalNet?

25   A.   It was a computer consulting firm with offices in Andover.

1    Q.   How did you know that information?

2    A.   They would have told us that when they opened the account.

3    Q.   And who was involved in opening the account?

4    A.   Gosh, it was a while ago now, but probably Imran and Mac

5    Chaudhary.

6    Q.   Mac Chaudhary. And did you know their relationship?

7    A.   That's Imran's father.

8    Q.   And who was the authorized signer on DigitalNet's accounts

9    at Pentucket Bank?

10    A.   Mac.

11    Q.   Did you know anything about Mr. Chaudhary's background?

12    A.   I think he was a doctor in Pakistan.

13    Q.   Please take your time, as much time as you need. And how

14    did you learn that Mac Chaudhary had been a doctor in Pakistan?

15    A.   Saima mentioned it.

16    Q.   Do you know how he went from being a retired doctor in

17    Pakistan to running an IT company?

18    A.   No.

19    Q.   Did you ever have any conversations about DigitalNet with

20    anyone, with Mac Chaudhary, Imran Alrai?

21    A.   I suppose I must have. I don't remember exactly.

22    Q.   Okay. And what was your impression of the business

23    operations?

24    A.   That they did a lot of, like, remote computery consulting

25    stuff that was way beyond my technical understanding.

1    Q.   Did you know anything about Imran Alrai's background?

2    A.   He was a computer person, an IT professional.

3    Q.   And did you know where he worked?

4    A.   I thought he worked in Andover.

5    Q.   Where?

6    A.   I'm sorry.  At DigitalNet with -- my understanding was

7    that Mac ran the company.  I just assumed that Imran worked

8    there.  And he had another account under another business name

9    that was also a computery thing.

10   Q.   Were you aware of his employment at the United Way?

11   A.   No.

12   Q.   So, I'd like you to take a look at Exhibit 501b.

13        MS. LE:  Can you pull up 501b.

14   A.   Is that this on the screen?

15   Q.   It will be on the screen, and then I have some copies for

16   you as well.

17   A.   Thank you.  501b, you said?

18   Q.   Yes.

19   A.   Okay.

20   Q.   Do you recognize Exhibit 501b?

21   A.   Yeah.  It looks like a reference letter that I signed back

22   in 2013 just saying that DigitalNet was an active customer in

23   good standing with Pentucket Bank.

24   Q.   Okay.  Why did you write this letter?

25   A.   I probably wrote it -- I would have written it at Mac's

1  request, the account holder's request.  Typically, a letter

2  like that would have gotten written if they were bidding on a

3  job or something.

4  Q.   And this is a common practice, to issue these types of

5  letters?

6  A.   Absolutely.

7  Q.   And what is the purpose of this letter, if you know?

8  A.   Just like a character reference, I guess, for a business.

9  Q.   Can you take a look at 501A.  So, this letter is from July

10  14, 2016, and it's from a person named Mike Gueli.  Do you know

11  Mike Gueli?

12  A.   Mike Gueli was the manager at the branch in Haverhill for

13  Pentucket Bank.

14  Q.   Other than the date and the signature block, it's

15  virtually identical to your letter, is it not?

16  A.   Yes.

17  Q.   So, do you know was this a form letter that Pentucket Bank

18  used or something that you and Mr. Gueli used?

19  A.   I don't recall it being a specific form letter, but it's

20  typical to the style of letter I would have written.

21  Q.   Sure.  I'd like to talk to you a little bit now about some

22  wire transfers from DigitalNet accounts at Pentucket Bank to

23  Pakistan.  Okay?

24  A.   Mm-hmm.

25  Q.   Did you process international wire transactions?

1    A.    Yes.

2    Q.    Did those international wire transactions go to the same

3    place, if you know?

4    A.    I believe they all went to Pakistan.  I don't remember the

5    specific account anymore.

6    Q.    Now, when you processed those wire transfers for

7    DigitalNet how were those wire transfers initiated?

8    A.    I would get an email form from Mac -- or from DigitalNet

9    but signed by Mac requesting that I sign and requesting that I

10   send the wire transfer.

11   Q.    So, once you received the email from DigitalNet what did

12   you do with that information?

13   A.    I printed the form that was attached to -- the signed form

14   attached to the email, verified that the funds were available

15   in the account, debited the checking account, kind of signed

16   the form myself, called it into the wire room and faxed it to

17   Haverhill.

18   Q.    Why would you have to fax the form to Haverhill, Mass.?

19   A.    Because the wires are actually processed out of Pentucket

20   Bank's main office in Haverhill.

21   Q.    Ms. Sylvester, are you familiar, are you aware that

22   Pentucket Bank has a written wire transfer policy?

23   A.    Mm-hmm.

24   Q.    Okay.  And are you aware that your practice of accepting

25   email requests to initiate the wire transactions is in

1    violation of -- was in violation of the Pentucket policy?

2    A.    Yes.

3    Q.    So, why did you engage in this practice of accepting wire

4    transfer forms via email?

5    A.    When I first did it I thought it was okay on an exception

6    basis, based on people that I worked with at the time, and then

7    later on I knew it was against policy, but I didn't want to

8    make waves.  I know it was for Saima's family.

9    Q.    You didn't want to make waves?  What does that mean?

10   A.    Well, I didn't want things to be -- so, we had been doing

11   if that way for years, and that I knew it was against policy,

12   but I didn't want to upset Saima, and I knew it was for her

13   family.

14   Q.    Who is the "we" that you are referring to that had been

15   doing it for years?

16   A.    Well, people in the branch.

17   Q.    Okay.  Is it correct that at some point you had

18   transferred shortly from Salem to another branch?

19   A.    Yes.

20   Q.    And at the other branch was this practice acceptable?

21   A.    We didn't really do a lot of wire transfers at the other

22   branch.  It was a different sort of clientele.  Fewer business

23   customers.

24   Q.    But at that branch you did not accept wire transactions

25   via email; is that right?

1    A.    No.

2    Q.    And then you transferred back to Salem?

3    A.    Mm-hmm.

4    Q.    And when was that that you transferred back to Salem?

5    A.    About 2013, 2014, maybe.

6    Q.    And when did Saima become the branch manager at the Salem,

7    New Hampshire branch?

8    A.    Six months to a year before I transferred back to Salem.

9    Q.    So, the first time you worked at Salem branch she was not

10   a branch manager?

11   A.    No.

12   Q.    The second time you came back to the Salem location she

13   was the branch manager?

14   A.    Yes.

15   Q.    So, let's talk about some specific wire transactions that

16   you initiated, okay?

17   A.    Sure.

18   Q.    I'd like to talk about Exhibits 121 and 121a.  There are

19   physical folders in front of you, if you want to look at any of

20   those things.  Sometimes it's easier.  We'll start with Exhibit

21   121.  We'll have it on the computer screen, too.

22   A.    Mm-hmm.

23   Q.    Okay.  So, we'll start with the first email December 17th,

24   2014 at 7:23 p.m.  Do you see that?

25   A.    Yeah.  Yes.

1    Q.    Who is Brenda Hernandez?

2    A.    Brenda Hernandez was a customer service rep in the Salem

3    branch of Pentucket Bank.

4    Q.    Do you recognize that email address from DigitalNet

5    support?

6    A.    Yeah.  That's the email address that the wires came from.

7    Q.    And the full email address is info@digitalnet.us; is that

8    right?

9    A.    Yes.

10   Q.    Would you please read the body of that email?

11   A.    "Hello, Brenda.  Attached please find a foreign wire

12   transfer request for $13,260.  Kindly process as soon as you

13   can and send an email confirmation.  Thanks much and happy

14   holidays, Mac Chaudhary."

15   Q.    Thank you very much.  Now, would you go up to the email

16   sent to Saima Alrai on December 17, 2014 at 7:25 p.m. from

17   info@digitalnet.us.

18   A.    "Hello Saima.  I'm forwarding you a copy just in case --"

19         THE COURT:  I need you to read it much slower.

20   A.    I'm sorry.

21         THE COURT:  No problem.

22   A.    "Hello, Saima.  I'm forwarding you a copy just in case

23   Brenda is out of the office."

24         THE COURT:  I need you to read much slower.  You've

25   got to read like I'm talking right now.

1        THE WITNESS:  I'm sorry.

2        THE COURT:  No problem.

3   A.    "Hello, Saima, forwarding you a copy just in case Brenda

4   is out of the office.  This needs to go out tomorrow.  Kindly

5   make sure.  Thank you."

6        THE COURT:  Thank you.

7   Q.    You're looped into this email chain, right?

8   A.    Yes.

9   Q.    So, according to the email from Saima on December 18th,

10  2014 at 8:18 a.m. what was your instruction from Saima?

11  A.    "Since Brenda is out, can you please send this wire out.

12  Thank you."

13  Q.    And did you process the wire transfer of $13,260 that was

14  requested on December 17th, 2014?

15  A.    According to the email, yes, I did.

16  Q.    And you got that instruction on the following day, right,

17  the 18th?

18  A.    Yes.

19  Q.    Okay.  So, let's look at Exhibit 121a, the last page,

20  which is Bates number 1975.  Is this the wire transaction form

21  for that December 18th, 2014 wire?

22  A.    Yes.

23  Q.    Do you recognize any of the signatures or initials?

24  A.    Yeah.  It's signed by myself at the bottom where it says

25  "Officer Signature," and it's signed by Mac just above that

1   where it says "Customer Signature."

2   Q.   There is a box here?

3   A.   Mm-hmm.

4   Q.   It says, "Called E-banking and time"?

5   A.   Mm-hmm.

6   Q.   It says "Renee 9:50 a.m."?

7   A.   Yes.

8   Q.   Did you write that?

9   A.   I did.  So, when I processed the wire, part of the

10  procedure is to call the wire room and you make a note as to

11  what time you spoke to them and then who you spoke to.  So,

12  next to it, it says "Phyllis."  So, I spoke at 9:50 a.m., and I

13  spoke to Phyllis.

14  Q.   And at the bottom there is a handwritten note that has a

15  phone number 978-521-9250.  Is that the fax to the wire room in

16  Haverhill, Massachusetts?

17  A.   I believe so.

18  Q.   Thank you.  And up here you can see part of a fax

19  transmission report.  Do you see that at the very top left?

20  A.   Yes.

21  Q.   All right.  Let's turn to the bank statement excerpt at

22  Page 1826.

23  A.   Yeah.

24  Q.   Would you have been the one who debited the account here?

25  A.   Yes.

1    Q.   And does this, in fact, show the money being taken out of

2    the account?

3    A.   Yes, it does.

4    Q.   Thank you very much.  Let's move on to Exhibits 124 and

5    124a.  Let's start with Exhibit 124 at Page 2725.  Would you

6    please just read the body of the email that was sent from

7    DigitalNet support on Monday, July 18, 2016 at 9:48 a.m. to

8    you.

9    A.   "Good morning, Renee.  Attached please find a wire request

10   for $19,960.  Please process as soon as you can and send

11   confirmation.  Thanks."

12   Q.   All right.  Ms. Sylvester, I'd like you to go ahead and

13   read your response on July 18, 2016 at 2:25 p.m.

14   A.   "Good morning, Mr. Chaudhary.  This wire has been sent.

15   Going forward, please use page 1 of the attached wire transfer

16   request form for any wire requests.  This is an updated

17   version.  Thank you, Renee."

18   Q.   Can you explain that email?

19   A.   Periodically the bank would review and update their forms

20   and at that time the bank had issued a new wire transfer form

21   with some revisions, so I sent him a copy.

22   Q.   Great.  Let's go ahead to Exhibit 124a, the last page,

23   which is PEN-1995.  Is this the wire request form for July 18,

24   2016?

25   A.   Yes.

1    Q.    Okay.  Do you recognize any of the handwritings or

2    signatures or initials?

3    A.    Yeah.  Again, it's signed by Mac for the customer

4    signature, and it's signed by myself for the officer's

5    signature.

6    Q.    Okay.

7    A.    And there's a note that I called the wire room at 9:51

8    a.m. and spoke to Phyllis.

9    Q.    And at the top you can see part of the fax report?

10   A.    Mm-hmm.  Yes.

11   Q.    Now, I notice Mr. Chaudhary's handwriting or signature

12   varies quite dramatically between the various exhibits.  Did

13   you ever check the signatures?

14   A.    To be honest with you, I got used to them coming in, so at

15   some point I didn't pay as much attention as I may have

16   earlier.

17   Q.    I see.  Let's turn to Bates number PEN-577.  Do you see

18   the highlighted section?

19   A.    Yes.

20   Q.    It shows the debit from the account on July 18th.  Would

21   you have been the one who processed the debit on the account?

22   A.    Yeah, most likely.

23   Q.    Thank you very much.  Let's go to Exhibits 125 and 125a.

24   Okay.  Would you please read Mr. Chaudhary's instructions to

25   you on November 21st, 2016 at 4:05 p.m.

1    A.   "Hello, Renee.  Attached please find the wire request for

2    $70,000.  Please process as soon as you can and send a

3    confirmation.  Thanks, Mac Chaudhary."

4    Q.   Thank you.  Let's go to Exhibit 125a, the last page,

5    PEN-1999.  Is this the wire transaction form for November 21st,

6    2016?

7    A.   Yes, it is.

8    Q.   All right.  And do you recognize any of the handwriting

9    here?

10   A.   Yes.  It looks like it's signed by Mac as the customer and

11   myself as the officer.

12   Q.   So, this was Mac's signature here?

13   A.   I would assume so.

14   Q.   Okay.  The name is typed this time; is that right?

15   A.   Yeah.

16   Q.   And, again, box 19, it says Renee at 11:12 a.m.?

17   A.   Yeah.  That was when I called the wire room and spoke to

18   Sue Celeste.

19   Q.   I don't see any fax confirmation information on this

20   version, but did you fax this, as far as you know?

21   A.   Yes, I would have.

22   Q.   Thank you very much.  Let's go to the highlighted section

23   on page 588.  Ma'am we see the $70,000 debited from the account

24   on November 21st.  Would you have processed this debit?

25   A.   Most likely, yes.

1    Q.   Let's go to Exhibits 126 and 126a.  And on Exhibit 126 I'd

2    like you to read the instructions to you on November 28th,

3    2016.

4    A.   It says, "Hello, Renee.  Please find the transfer request

5    for $145,000.  Please process as soon as you can and send a

6    confirmation.  Thanks, Mac Chaudhary."

7    Q.   So, we just saw transactions for $70,000, and this is

8    $145,000.  Are there any additional requirements as the amount

9    increases in terms of signatures from bank employees?

10   A.   There are, but as long as it was within my wire authority,

11   my limit, I wouldn't have had to do anything extra.

12   Q.   Okay.  And you're a bank officer; is that right?

13   A.   I was at the time, yes.

14   Q.   Let's go to 126a Bates number page PEN-2000.  Do you see

15   this form, ma'am?

16   A.   Yes.

17   Q.   Is this the wire transaction form for November 28th, 2016?

18   A.   Yes, it is.

19   Q.   And do you recognize any of the signatures?

20   A.   Yeah.  It's signed by myself and what I would have assumed

21   was Mac's signature.

22   Q.   Right here?

23   A.   Mm-hmm.

24   Q.   And the customer name is printed this time, right?

25   A.   Yes.

1    Q.   And on box 19 it says "Renee at 1:17 p.m."?

2    A.   That's when I called the wire room.

3    Q.   And, again, on this version of the form we don't have the

4    fax transmission data, but --

5    A.   I would have faxed it up.  That was the procedure.

6    Q.   Thank you very much.  Let's go to the bank statement

7    excerpt at 588.  Here it shows a November 28th debit of

8    $145,000.  Do you see that?

9    A.   Yes, ma'am.

10   Q.   Do you see right above that particular transaction there

11   is transfers --

12   A.   Yes.

13   Q.   -- on November 21st?

14          MS LE:  Actually, Ms. Sheff, can we go out to the big

15   page.  Can you just go back to the main page.  Okay.

16   Q.   Specifically here, November 21st.

17   A.   Mm-hmm.

18   Q.   Do you see that?

19   A.   Yes.

20   Q.   There is one transfer from account 3920 of $60,000?

21   A.   Yes.

22   Q.   And then you see there is the prior transaction that we

23   talked about, the $70,000, right?

24   A.   Yes.

25   Q.   All right.  Thank you very much.

1        Now, at some point, Ms. Sylvester, did you stop

2   processing or accepting email requests for wire transactions

3   from DigitalNet?

4   A.   Yes, I did.

5   Q.   What happened?

6   A.   I had become more and more uncomfortable with the process,

7   as I knew it was against the bank's policy, and eventually I

8   told Saima that I wasn't going to accept them and process them

9   via email anymore.

10  Q.   And do you remember when that would have been?

11  A.   Not exactly.

12  Q.   But after November 28th of 2016?

13  A.   Certainly.

14  Q.   And were there additional wire transactions that occurred

15  after that date --

16  A.   Yes.

17  Q.   -- to your knowledge?

18  A.   I believe so.

19  Q.   And when Mr. Chaudhary -- in order to process those

20  transactions for this account, what would be needed?

21  A.   Well, per the policy he was supposed to come into the

22  branch.  A compromise of sorts was struck where he sent them

23  through the drive-up window.

24  Q.   Who's the "he"?

25  A.   I'm sorry.  Mac went through the drive-up teller and sent

1    the wire transfer form through the tube.

2    Q.   Okay.  And that was acceptable, too?

3    A.   Yeah.  I guess it was hard for him to come into the

4    branch, so I don't know why, but that's my impression, and I

5    don't remember the specifics anymore.  It was quite a while

6    ago.

7    Q.   Do you know Mr. Chaudhary drove?

8    A.   I thought he did.

9    Q.   So, if there were circumstances where he needed to drive

10   to the bank, he could drive himself, as far as you know?

11   A.   Yeah.  Or there was a problem with it for a while.  I

12   think he had something with his eyes, but I don't remember the

13   specifics.

14   Q.   And where would you have gotten this impression that there

15   was something with his eyes?

16   A.   From Saima.

17            MS. LE:  All right.  I have no further questions.  We

18   tender the witness.

19            THE WITNESS:  Thank you.

20            THE COURT:  Cross.

21            MR. AYER:  No cross, your Honor.

22            THE COURT:  You're excused.  Thank you.

23            THE WITNESS:  Thank you, sir.

24            THE COURT:  Feel better.

25            THE WITNESS:  Oh, thank you.

1          (Witness stepped down)

2          MS. LE:  Your Honor, the government calls Rich Aziz to

3     the stand.

4          THE COURT:  Yes.

5          MS. LE:  I'm sorry.  Richard Aziz, Jr.

6          THE CLERK:  Good afternoon, sir.  How are you?  If

7     you'd like to step this way, please.  Please step into the box

8     and remain standing.  Please raise your right hand.

9          **RICHARD AZIZ, JR.,** having been duly sworn by the

10    Clerk, was examined and testified as follows:

11         THE CLERK:  For the record, please state your full

12    name and spell your last name.

13         THE WITNESS:  Richard Michael Aziz, Jr.  Last name is

14    Aziz, A-z-i-z.

15         THE CLERK:  Thank you.  Please be seated, sir.

16                    DIRECT EXAMINATION

17    BY MS. LE:

18    Q.   Good afternoon, Mr. Aziz.  Aziz?

19    A.   Yeah.  Aziz is fine.

20    Q.   What is your preference for pronouncing your name?

21    A.   Aziz.

22    Q.   Aziz.  Okay.  Where do you work, sir?

23    A.   Pentucket Bank.

24    Q.   How long have you been with Pentucket Bank?

25    A.   I started August 2016.

1    Q.    Prior to joining Pentucket Bank what did you do?

2    A.    I worked at JPMorgan Chase, similar role, anti-money

3    laundering roles, fraud.

4    Q.    And before you joined JPMorgan Chase, what did you do?

5    A.    I was a compliance officer for a marketing firm in

6    Massachusetts.

7    Q.    How many total years of experience do you have in

8    anti-money laundering for financial institutions?

9    A.    So, I started with Chase in 2011, so since 2011.  Yeah.

10   Q.    What is your educational background?

11   A.    I have a master's degree in Criminal Justice from the

12   University of Massachusetts.  My bachelor's is in Criminal

13   Justice.  I have a graduate certificate in Homeland Security.

14   I'm a Certified Fraud Examiner for the Association of Certified

15   Fraud Examiners.  I'm a Certified Financial Crimes Investigator

16   from the International Association of Financial Crime

17   Investigators.  That's it.

18   Q.    Okay.  And to do your job do you stay up to date with

19   changes in the law relative to the Bank Secrecy Act, that kind

20   of thing?

21   A.    Yeah, I do.  So, part of the certifications, the

22   requirement is to stay abreast of changes and keep up.  It's

23   called "continuing education credits."  And also part of my

24   role at the bank when regulations change I go to conferences

25   annually.  And then self-reading.

1    Q.   And do you participate in training inside the bank as well

2    as outside the bank?

3    A.   Yeah.  So, inside the bank we have annual anti-money

4    laundering training for all staff.  We all get the same

5    training upon hire and then annually after that.  So, we get

6    annual training there.  And then I do some trainings for, like,

7    branch staff when fraud trends come up.  I'll go to a branch

8    and I'll show them check fraud or something, show them what to

9    look for.  And then external trainings.  Yeah, that's the

10   majority of my being able to keep certifications, is doing

11   external trainings.  I have to have external trainings.

12   Q.   What's your current job title?

13   A.   So, I am the BSA/AML Officer of Pentucket Bank.  I'm

14   Assistant Vice President of Pentucket Bank.

15   Q.   You used some acronyms.  What is BSA?

16   A.   I'm sorry.  So, "BSA" stands for Bank Secrecy Act.  "AML"

17   stands for anti-money laundering.  So, it's BSA/AML Officer.

18   Q.   So, generally speaking, what are your responsibilities as

19   the BSA/AML officer?

20   A.   Yeah.  So, more so after 9/11, when the Patriot Act was

21   born, all banks have to have a BSA officer, so they have to

22   have one of me.  Anti-terrorist financing is really what the

23   purpose of the Bank Secrecy Act is.

24   Q.   Mr. Aziz, may I just ask you to slow down just a little

25   bit.  We have a court reporter, and her fingers are flying

1   quite fast over the keys.

2   A.    Sure.  So, if you could repeat the question.

3   Q.    Sure.  What are your responsibilities as the Bank Security

4   Act/Anti-Money Laundering Officer at Pentucket Bank?

5   A.    So, I also do fraud and keeper of records at Pentucket

6   Bank.  So, in the AML fraud area, so my role is to protect the

7   bank as far as regulations on the Bank Secrecy Act.  There are

8   many requirements under the Bank Secrecy Act that banks have to

9   follow.  So, an example, the types of information that we

10   collect from customers when they get accounts, we're

11   responsible for monitoring customer account activity,

12   identifying low, medium, high-risk customers and transaction

13   monitoring.  I think I mentioned that already.  But whenever

14   fraud or something occurs it's centralized into my area.  And

15   then from keeper of records area it's kind of processing legal

16   requests and levies and garnishments and stuff like that.

17   Q.    Sure.  At Pentucket Bank do you work within a group, or

18   are you your own person?

19   A.    So, it's myself, and I report to the Compliance Officer.

20   Her name is Claire Koffman.  She handles all realms of

21   compliance at the bank, so commercial lending compliance

22   marketing type of compliance.  I'm focused primarily on

23   anti-money laundering and fraud only and the Bank Secrecy Act.

24   I have a direct report.  He is a BSA/AML analyst, and his name

25   is Ronald Lavallee.  He reports to me.

1    Q.    So, let's stop for just a minute.  So, your group, what is

2    that group called?  Compliance?

3    A.    Compliance, yeah, yeah.

4    Q.    And the Compliance Officer is Claire Koffman, you said?

5    A.    Yeah.  And then we report through risk area ultimately to

6    the Chief Risk Officer.

7    Q.    Claire Koffman, is that K-o-f-f-m-a-n?

8    A.    Yes.

9    Q.    Claire with an "e"?

10   A.    Yes.

11   Q.    Okay.  And your direct report, the analyst, Ron Lavallee,

12   you said?

13   A.    Yup.

14   Q.    L-a-v-a-l-l-e-e?

15   A.    Yes.

16   Q.    All right.  So, tell me what your analyst, Mr. Lavallee,

17   does.

18   A.    So, Ron's daily duties, we'll start with his, he monitors

19   new account reports.  So, when a new account is opened there's

20   certain information we have to collect from customers:  a name,

21   date of birth, Social Security number, address.  That's called

22   "CIP."  That's under the Bank Secrecy Act, one of the

23   regulations.  So, he monitors all of the accounts that are

24   opened next day to make sure we've got all of those pieces of

25   information on every customer.  He is also responsible for

1    submitting what's called a "CTR," a Currency Transaction

2    Report.  So, he's also responsible for transaction monitoring.

3    We have an AML or transaction monitoring system and some manual

4    reports in our bank system, our core system, that he goes

5    through on a daily basis, along with myself.

6    Q.   Mr. Aziz, you mentioned an acronym "CIP."  What does "CIP"

7    stand for?

8    A.   "CIP" stands for "Customer Identification Program."

9    Q.   That's all the personal identifying information you just

10   mentioned?

11   A.   Yeah, both for consumers, businesses.  Personal and

12   business, yeah.

13   Q.   So, when do you get involved?

14   A.   So, I do transaction monitoring as well, because it's a

15   lot of work for one person.

16   Q.   Sure.

17   A.   So, what Ron will do is, he will work the daily alerts,

18   and if something appears unusual he'll escalate it to what we

19   call a "case," and I will work the cases.  So, I will get

20   involved with the more unusual types of activity.  Ron more so

21   handles what's normal.  What's abnormal falls outside of the

22   bucket, and it gets passed to me, internal referrals from staff

23   members of the bank.  So, if a fraudulent customer comes into

24   one of the branches and passes a bad check, the staff member at

25   the branch will call me to help out, make a few phone calls.

1    I'm responsible for approving and filing the suspicious

2    activity reports, SARs.  I'm responsible for any law

3    enforcement requests, so levies, garnishments, subpoena

4    requests, that sort of thing, more so like the law enforcement

5    liaison for the bank.  So, any requests are centralized to me.

6    Q.   And, in fact, when the government requested records from

7    Pentucket Bank in this case are you the person who processed

8    those requests?

9    A.   Yes, they came to me.  Yeah.  My contact information is on

10   what's called a "call report," too.  It's part of the Bank

11   Secrecy Act.  It's a contact that law enforcement knows who to

12   contact at a financial institution.

13   Q.   Thank you, sir.

14   A.   Yeah.

15   Q.   Are you involved in any internal training for the staff at

16   Pentucket Bank?

17   A.   Yeah.  So, new staff, along with myself, we all take an

18   online-based training when we're hired.  There's an assessment

19   at the end of it.  When I started at the bank in 2016 I

20   implemented a face-to-face training, so I actually meet with

21   all new hires now as part -- to supplement our already existing

22   training program.  So, I give them a crash course, if you will,

23   on what anti-money laundering is and what the Bank Secrecy Act

24   is.  That way it's not the first time they're reading it when

25   they go and take an assessment, kind of alleviate stress,

1    basically.  And then I'll also, like I mentioned prior, I will

2    go to the branches if something were to occur, such as a fraud

3    theme, I will go to each individual branch, and I'll kind of

4    teach them what occurred at this branch and kind of help them

5    mitigate future issues.

6    Q.   And are there annual trainings that the bank puts on that

7    you're involved in?

8    A.   Not annually.  Actually, I'm sorry.  So, the Board of

9    Directors gets AML training as well annually.  We have a

10   company that will come in, that's our auditing company, they'll

11   do it biannually.  So, in the interim years I will do the

12   training for the Board of Directors, too.

13   Q.   And, again, "AML" is anti-money laundering?

14   A.   Yes.

15   Q.   So, you mentioned that some cases get escalated to you and

16   you'll open a case.  What types of investigative steps do you

17   take when you are referred a matter?

18   A.   So, we have the alert system.  Sometimes things will

19   trigger or create flags of activity that the system thinks is

20   unusual, but it may be completely normal.  We will clear those

21   alerts.  An example, Christmas tree salespeople that sell

22   Christmas trees.  They may trigger in our system for an

23   increase in sales.  That's normal activity.  The cases when

24   they're moved to case, we may do what's called enhanced due

25   diligence or additional levels of research, if you will.  So, I

1    may Google the business, I may look at their -- may conduct a

2    site visit.  We may look on the Massachusetts or the New

3    Hampshire Secretary of State website to see the business

4    formation documents.  We may make a phone call to the branch

5    employee -- the branch manager, their relationship manager of

6    the customer to say, "Hey, do you know Richard Aziz,

7    Incorporated," type of thing.  Because we are a small community

8    bank, sometimes our staff know our customers better than what I

9    could find online.

10   Q.   Right.

11   A.   We'll do a lookback of the customer's activity to see if

12   the reason why they're flagging in our system, to see if

13   there's a reasonable explanation for that.  Maybe Ron didn't

14   see it and it's something that I'm familiar with.  So, I'll do

15   a secondary review.  Things like that.  Yeah.

16   Q.   When you say "lookback," what does that mean?

17   A.   So, we have so many rules and algorithms in that system

18   that may look at one transaction or may look at the last week's

19   wroth of transactions.  So, I may look back a year prior or two

20   years or three years prior to see if it's something seasonal.

21   An example, that Christmas tree farmer who is spiking now

22   probably did it last year, too.  So, that's normal.

23   Q.   Do you know Imran Alrai, sir?

24   A.   Personally, no.

25   Q.   Do you know who he is?

1    A.   Through all this now I do, yeah.

2    Q.   Do you know his wife, Saima Alrai?

3    A.   From the bank, yeah.  Not personally but from working at

4    the bank.

5    Q.   You don't have a personal relationship with her at all?

6    A.   No.

7    Q.   In the course of your duties as the BSA/AML Officer for

8    Pentucket did Imran Alrai come to your attention?

9    A.   Yes.

10   Q.   Can you tell the Court what happened that brought him to

11   your attention.

12   A.   It's been a while, but if I can recall, there was a large,

13   I'll call it large, a check had cleared.  It was for

14   $1,000,000.  I don't remember the date.  I think it was in

15   maybe summertime 2017.

16   Q.   How about we do this:  Let's pull up Exhibit 525.  All

17   right.  Does that help refresh your memory a little bit?

18   A.   Yeah, that's it.

19   Q.   What's the date of this check?

20   A.   July 17th, 2017.

21   Q.   Okay.  And tell us what happened when you saw this -- what

22   about this check came to your attention?

23   A.   So, our CFO, our Chief Financial Officer, monitors account

24   variances in accounts along with the finance team.  These types

25   of checks clear -- they could clear all the time through

1    customers' accounts.  It doesn't necessarily mean it's unusual.

2    For whatever reason this variance brought -- maybe brought the

3    balance of the account down, or something happened in the

4    account where it tripped some report in finance, which led to

5    the referral to risk to review the check, not necessarily

6    anything wrong with it, but to take a look at it.  Because

7    we're a small community bank, so it's not all the time we see

8    these large checks, but when they happen we teach our staff

9    members it's not their problem or their job to really

10   differentiate what is unusual or if they're right or wrong.

11   They're just told to escalate anything to BSA to review, and

12   that's what our branches do, so in this case that's what our

13   finance area did.  So, I went to the Chief Risk Officer and

14   then from the Chief Risk Officer to -- I report to the Chief

15   Risk Officer for that organization.

16   Q.   Sure.  And the CFO you're referring to, is that David

17   Bennett?

18   A.   Yea.

19   Q.   B-e-n-n-e-t-t?

20   A.   I think so.  Yeah, I'm pretty sure.

21   Q.   Let's talk a little bit about Exhibit 525.  What is the

22   date of the check?

23   A.   July 17th, 2017.

24   Q.   What is the name of the account holder?

25   A.   AISA Consulting Group, LLC.

1  Q.   And to whom is it addressed?

2  A.   AISA Consulting Group.

3  Q.   And the amount is $1,000,000?

4  A.   Yes.

5  Q.   That's the person who signed on the account?

6  A.   That is the maker's signature.  Without the signature

7  card, I'm not sure whose signature that was.  I would imagine

8  whoever the authorized signer is on that account.

9  Q.   Do you know that Imran Alrai was the authorized signer on

10  this account?

11  A.   Yes.

12  Q.   And the account number ends at 6882; is that right?

13  A.   Yes.

14  Q.   And we also have the back of that check, where it's

15  endorsed?

16  A.   Yup.

17  Q.   And it looks like it was endorsed to an account ending

18  5155; is that right?

19  A.   Yes.

20  Q.   And this is not a Pentucket account that this was

21  deposited into?

22  A.   Correct.

23  Q.   So, after this particular transaction was brought to your

24  attention, what did you do, sir, in terms of following up?

25  A.   So, like I said, these types of things come across my desk

1    from staff members, so I did what I normally do.  I looked at

2    the AISA Consulting Group's account that the check was clearing

3    from.  I looked to see, naturally, in -- my role is to kind of

4    follow the money.  So, I wanted to see where AISA Consulting

5    Group received the $1,000,000 to have to begin with, and that's

6    basically where I started a review, and my review included who

7    is AISA Consulting.  I didn't know who AISA Consulting Group

8    was.  So, we have a lot of business accounts at Pentucket Bank.

9    I don't know all of the businesses that we have at Pentucket

10   Bank until they come to light, and that's when I'll do a review

11   of the business to see who is this business -- because some of

12   the businesses that have been on our books prior to me arriving

13   I didn't know.  So, I didn't know who AISA Consulting Group,

14   LLC was, so I did a review of who they were.

15   Q.   Okay.  But the first thing you said is that you followed

16   the money?

17   A.   Yes.

18   Q.   Okay.  Were you able to determine where this money came

19   from?

20   A.   Yeah.  Ultimately, so at the end of it the funds came from

21   -- let me think correctly here.  I traced it back ultimately

22   from -- AISA Consulting Group was paid through checks for the

23   majority, for the most part, by a company called DigitalNet,

24   DigitalNet Technology -- I don't know if it's Solutions.

25   Q.   Solutions?

1    A.   Yeah.  So, DigitalNet Technology Solutions.  That's where

2    the funds came from.

3    Q.   So, did you do research into both AISA Consulting and

4    DigitalNet?

5    A.   Yeah, because I didn't know who DigitalNet was either.

6    So, I knew AISA Consulting, the authorized signers were Imran

7    and I believe Saima.  I'm not 100 percent certain without

8    looking at the signature cards.

9    Q.   Sure.

10   A.   DigitalNet did not have Imran or Saima on that account.

11   DigitalNet was someone different.  That was, I think it's a

12   Munawar.

13   Q.   Chaudhary?

14   A.   Yeah, Chaudhary.  And when I looked at AISA -- we collect

15   a business risk profile form when we board business accounts,

16   and it's basically a biography of the business.  What is the

17   business going to sell, where are they located, their phone

18   number, basic information about the business.  If my memory

19   serves correctly, AISA was like a computer information security

20   type of service company, and DigitalNet was a similar line of

21   business.  It was a technology company, computer information

22   support type of thing.

23   Q.   Okay.

24   A.   DigitalNet -- so, naturally, I came to DigitalNet, because

25   that's where the funds entered from AISA, and from DigitalNet

1     the funds entered DigitalNet from a company United Way.

2     Q.    Okay.  And was there any connection between United Way and

3     AISA, as far as you could tell?

4     A.    No.

5     Q.    Did that affect your thinking in any way?

6     A.    Yeah.  So, in the whole totality of the review AISA

7     Consulting Group, LLC I knew had authorized signers of Saima

8     and Imran.  I knew that -- I checked the Secretary of State

9     website.  DigitalNet, when I reviewed, I found DigitalNet had a

10    Munawar Chaudhary.  That was a Delaware corporation that was

11    formed in Delaware, and in my prior roles when I look at

12    businesses that are formed in Delaware I'm not sure what the

13    rhyme or reason is, but I tend to look a little deeper into

14    companies that are formed from Delaware, California, Florida,

15    Texas.  In my mind it's always those kinds of states, and I

16    work at a small community bank, so most of our businesses are

17    Massachusetts and New Hampshire.

18          So, DigitalNet had a Munawar Chaudhary, so I kind of

19    wondered why DigitalNet was getting paid from United Way,

20    because in DigitalNet's account there was really minimal

21    activity other than the United Way and then transfers or

22    checks, rather, to AISA, so I wasn't sure why, like, AISA could

23    just work with United Way.  So, not my job, no rhyme or reason,

24    so I kind of looked through things.  I looked at United Way,

25    because I really wasn't sure what United Way would be paying

1    another company for.  I thought they are a charity

2    organization.  Kind of vaguely familiar with United Way.  I

3    looked at their business documents online, because they are a

4    charitable organization, so they have certain forms that are

5    publicly available, and some documents, some tax documents I

6    found it actually listed DigitalNet Technology as a vendor --

7    Q.    Okay.

8    A.    -- or a contractor, rather.  And then I actually found

9    that Imran was listed on that same form as an employee of

10   United Way.  So, that's kind of where I put -- kind of where I

11   was able to say, okay, that's kind of how it's involved.  I

12   wasn't really sure how or why they were involved or what the

13   relationship was, because my job at the bank, it's not for me

14   to determine, but that's the observation I made at that time.

15   Q.    You said a lot right there.

16   A.    Yeah.

17   Q.    So, I want you to break it down a little bit.  You said

18   when you saw those tax forms for United Way, which is a

19   charity, are you referring to the Form 990?

20   A.    That sounds familiar, yeah.  There was only one that was

21   online.

22   Q.    Okay.  And you noticed that Imran Alrai was an employee of

23   the United Way?

24   A.    Yeah.  I think they list out I want to say it's the top

25   ten or something executives or something like that.  United Way

1   also had a website, and they listed their executive team, too,

2   and Imran was listed as an executive or information type of

3   role, information security type of role.

4   Q.   Sure.  And you also noticed on that same tax form that

5   DigitalNet was one of their highest contractors; is that right?

6   A.   I wasn't sure if it was the highest contractor, but it was

7   a listed contractor.  I don't think it was the only contractor,

8   but they were listed, and it listed --

9        THE COURT:  Slow down.

10  A.   Yeah.  It listed what the salaries were as well for those

11  individuals getting paid by United Way.  And then DigitalNet,

12  it identified the monies that were sent to DigitalNet.

13  Q.   So, what is the two and two that you put together?

14  A.   So, I wasn't quite sure what the reason would be other

15  than, you know, my red flags were kind of going off in my head,

16  because I wasn't quite sure, because I'm not there at United

17  Way there to know why Imran would be an employee getting paid

18  but then also ultimately benefiting from the funds from

19  DigitalNet, and he wasn't on the DigitalNet account, so I

20  wasn't sure why United Way would pay DigitalNet.  DigitalNet

21  almost was like a tool almost.  The money was moved from

22  DigitalNet to AISA, and ultimately the beneficial owners of

23  AISA is Imran, and we had Imran and Saima's personal accounts

24  at the bank, at Pentucket Bank as well.  So, I could see funds

25  then leaving AISA and being moved to Imran and Saima's account.

1   Q.    You mean their personal accounts?

2   A.    Personal accounts.

3   Q.    Okay.

4   A.    I had also seen DigitalNet would take a portion of the

5   funds when they received them from United Way and send them to

6   Pakistan.  We have a reporting in the bank that monitors for

7   foreign wires and wires.  We have a wire department.  So, funds

8   were leaving the country.

9         Again, small community bank, foreign wires, they

10  happen but not too frequently.  So, I went to see where those

11  wires were being sent to in Pakistan.  I think it was Lahore.

12  They were being sent to another entity, similar name,

13  DigitalNet Technology.  I'm not sure if it's the same,

14  Solutions, but it was a DigitalNet.  And when I went online to

15  look for DigitalNet to see who is DigitalNet, Imran's name

16  popped up for DigitalNet in the Pakistan version, business of

17  DigitalNet.  So, I really didn't know.  I was trying to put

18  together why or what -- trying to rationalize what's occurring.

19  Q.    So, what is the common denominator in all this research

20  and convoluted look-through that you did between all these

21  accounts?

22  A.    So, ultimately, fast forward to today, the beneficial --

23  the beneficiary of the majority of the funds was Imran and

24  DigitalNet Technology in Pakistan, whoever owns DigitalNet in

25  Pakistan.  The funds had gone to DigitalNet in Pakistan and

1   ultimately to AISA, which was owned and operated by Imran.  So,

2   I would say Imran or AISA.

3   Q.   Let me ask you this question:  It sounds like you did some

4   research, online research, about DigitalNet in Pakistan; is

5   that right?

6   A.   Yeah.

7   Q.   And you found some kind of suggestion that Imran Alrai was

8   connected to that Pakistan company?

9         MR. AYER:  Objection to that.  It's hearsay at this

10  point, your Honor.  The testimony I understand he's asked to

11  agree to is he Googled this and found information on the

12  internet about this, and it's being offered as essentially his

13  substantive testimony.

14        MS. LE:  I'm really offering it more for the next

15  steps.

16        THE COURT:  I just don't understand how it's hearsay.

17        MR. AYER:  Because it's an out-of-court statement

18  because he found it on the internet.  We don't even know who

19  the speaker is.

20        THE COURT:  I thought he was just basically going

21  through everything he just testified -- it's already all in

22  there, and now you're objecting because he said he got it off

23  Google?

24        MR. AYER:  I don't know if that part of it is in

25  there.  I think they're going into DigitalNet, Pakistan, which

1    she hasn't gone into yet.

2            THE COURT:  Oh, I see.  I thought he was saying he got

3    -- I thought he was saying that what he had described so far

4    was from internet research.  Maybe I just need to hear you ask

5    it again.

6            MS. LE:  Sure.  How about I just rephrase, your Honor?

7            THE COURT:  Yeah.  But your objection is not overruled

8    yet.

9            MR. AYER:  Okay.

10   BY MS. LE:

11   Q.   Mr. Aziz, how did you find information about DigitalNet in

12   Pakistan?  What did you do?

13   A.   You just go to google.com and type in "DigitalNet," and

14   DigitalNet in Andover, Massachusetts popped up, and DigitalNet

15   in Lahore, Pakistan was one of the search results.

16   Q.   Was there any indication, based on your research, that the

17   two DigitalNets were connected, at least based on the publicly

18   available web information?

19   A.   Yeah.  The only information that I gathered was there were

20   job postings for the Pakistan-based DigitalNet, and I don't

21   remember entirely, but I'm pretty sure the email address or the

22   web address was similar.

23   Q.   Okay.  How so?

24           THE COURT:  That's hearsay.

25           MS. LE:  Okay.

1      THE COURT:  So, that's sustained, disregarding that

2  the email addresses were similar.

3  Q.   Sir, as part of your investigations when it's escalated to

4  your level, you mentioned earlier a site visit?

5  A.   Yes.

6  Q.   When would you employ a site visit as one of your

7  investigative tools?

8  A.   So, we do site visits for onboarding for cash-intensive

9  businesses, so certain businesses at a higher risk, convenience

10  stores or restaurants.  We would also do site visits any

11  time -- a risk-based is what I would call it, risk-based site

12  visits.  So, in this case I went out and did a site visit, it

13  was in Andover, Massachusetts.  I did a site visit of

14  DigitalNet Technology Solutions.

15  Q.   Why did you decide that that was an investigative tool

16  that you needed to deploy for this matter?  What prompted you

17  to --

18      THE COURT:  Why did you do the site visit?

19      THE WITNESS:  It's at my discretion.  I do a site

20  visit.

21      THE COURT:  Why did you go?  What was it that made you

22  say, "I've got to go visit"?

23      THE WITNESS:  Based on everything I had put together

24  on not knowing -- I wasn't really able to form who DigitalNet

25  was or why they were being used --

1              THE COURT:  So, you were suspicious.

2              THE WITNESS:  Yeah.

3              THE COURT:  Okay.  Go ahead.

4     BY MS. LE:

5     Q.   Let's go back to the CIP requirements.  Does the bank need

6     to know where its business customers are located?

7     A.   The bank is required to know where their business

8     customers are located, yes.

9     Q.   So, if that's one of the bank's requirements, is it

10    important for you to go and see the business location?

11    A.   Absolutely.

12    Q.   All right.  So, your site visit, was that on January 2nd,

13    2018?

14    A.   January 2018, yeah.

15    Q.   Did you take some photographs during your visit?

16    A.   I did.

17              MS. LE:  Let's pull up Exhibit 526, Ms. Sheff.  Let's

18    go to the next page, second page of this.  All right.

19    Q.   So, this is your site visit photographs?

20    A.   Yeah.

21    Q.   Tell us what happened when you went on your site visit on

22    January 2nd, 2018.  Where did you go?

23    A.   So, the address in our system for this business was 300

24    Brickstone Square, I think the name of it is, in Andover,

25    Massachusetts, and it was the same address that was listed on

1    the Secretary of State forms that was used to identify the

2    business.  So, for all intents and purposes that was the

3    address that our business should be located at.  So, I went to

4    300 Brickstone Square.  I took this picture just of the tenants

5    of the business.

6    Q.   The top picture, the directory with the number 300?

7    A.   Yeah, it's on the outside of the building.

8    Q.   Okay.

9    A.   And then there is elevators.  I think there was a suite

10   there, where I took the elevator up to the location that was on

11   our address, and the elevator doors opened, and there was a

12   company Regus or Regus.

13          MS. LE:  Can you pull up the other picture, Ms. Sheff.

14   A.   Oh, there it is.  So, R-e-g-u-s was who was there.

15   Q.   So, this first picture we have with the directory, the

16   number 300 on top and some corporations listed, when you saw

17   this what, if any, thoughts did you have?

18   A.   None yet, because this could be an outdated directory.

19   Q.   Okay.

20   A.   Yeah.

21   Q.   So, you went into the office suite that you were supposed

22   to go to?

23   A.   Yeah.

24          MS. LE:  Can we pull up this picture down here,

25   Ms. Sheff.

1    A.    Yeah.  So, that second picture is the actual tenants who

2    are in that.  So, I ended up learning that's a shared type of

3    office space.  So, Regus is a company that kind of rents space

4    to businesses.  So, all these businesses rent space from Regus.

5    Regus is just the people, the landlords, if you will.

6    Q.    So, the suite number is 201 right here?

7    A.    Yes.

8    Q.    And all these placards with names underneath Regus, who

9    are they?

10   A.    Those are -- to my understanding, those are tenants that

11   have office space at Regus.

12   Q.    Is DigitalNet listed on here?

13   A.    No.

14   Q.    What thoughts, if any, did you have when you saw that

15   DigitalNet was not listed as one of the tenants?

16   A.    So, this is right off the elevator, so I approached the --

17   there is a reception desk, and I asked, because when we have an

18   address for a business or any customer we send statements to

19   that address, too, so we send mail to that address, so I asked

20   if there was a DigitalNet there at that location.

21   Q.    Sir, I'm going to stop you, because you're about to

22   testify to hearsay.  Without telling the Court what was told to

23   you -- you're not allowed to do that.

24   A.    Yup.

25   Q.    Okay.  So, you spoke to someone at Regus; is that correct?

1    A.   Yes.

2    Q.   Someone within the reception area?

3    A.   Yes.

4    Q.   Okay.  Did you do anything else after during that site

5    visit?

6    A.   No, aside from inquiring.

7    Q.   While you were on site did you visit any office space

8    belonging to DigitalNet?

9    A.   No.

10   Q.   Did you find any evidence that DigitalNet actually

11   conducted business from this location?

12   A.   No.  For the purpose of Pentucket Bank it was a failed

13   site visit.

14   Q.   What does that mean, sir?

15   A.   The business wasn't at the location they said that they

16   were at, which is for us, for Pentucket Bank, it was a problem,

17   because that's part of the CIP requirements.  So, there is an

18   elevated risk that we had a bad address on a customer, and

19   that's extremely important to have on a customer.

20   Q.   What are the consequences when there's a failed

21   inspection?

22   A.   So, it's a requirement, it's law where there are certain

23   pieces of information that banks have to collect and validate

24   through documentary and non -- so, collecting paperwork from

25   customers and validating we are banking -- and the people are

1   who they say they are.  So, if we're banking identity thieves

2   or fraudsters we have to really know who real people are,

3   because there's a lot of fraud out there.  So, if one of our

4   elements of CIP is not validated, they are not in compliance

5   with our own internal policies and the Bank Secrecy Act,

6   Patriot Act.

7   Q.   Sir, at some point did you become aware of the federal

8   investigation into Imran Alrai?

9   A.   I did, yeah.

10  Q.   Were you involved in the closure of the AISA accounts,

11  DigitalNet and the Alrais' personal accounts at the bank?

12  A.   Based on everything that I found, I don't have the power

13  to close accounts at the bank.  I can submit recommendations to

14  close.  But the decision went through senior management.  But I

15  was involved with collecting the information to get to that

16  decision.  That, combined with what we've learned on it

17  being -- you know, requests from law enforcement, we found it

18  necessary to close the accounts.

19  Q.   And were those accounts closed in June of 2018?

20  A.   I think so.  I think we sent -- we sent a letter stating

21  our intent to close the relationship.  It's pursuant to our

22  deposit agreement.  We can give a 30-day notice, 10 days,

23  immediately.  And, if I remember correctly, we sent a notice,

24  but prior to the date of the closure on that notice Imran came

25  to the branch and closed the accounts himself.

1   Q.   Which accounts did he close?

2   A.   The personal accounts and AISA -- because I'm not entirely

3   sure.  I know the personal accounts for sure.

4        MS. LE:  Thank you.  No further questions.  We tender

5   the witness, your Honor.

6        THE COURT:  Thank you.

7        Cross.

8                        CROSS-EXAMINATION

9   BY MR. AYER:

10  Q.   Mr. Aziz, you said that part of your investigation was

11  into DigitalNet having a contract with United Way?

12  A.   Yes.

13  Q.   Sorry.  DigitalNet being paid by the United Way, right?

14  A.   DigitalNet received incoming credits from United Way.

15  Q.   Right.

16  A.   Yeah.

17  Q.   And you said you looked into the United Way's online

18  documents to find publicly?

19  A.   Yeah, yeah.

20  Q.   You didn't contact the United Way?

21  A.   No.

22  Q.   You didn't ask them whether DigitalNet had any employees

23  embedded at the United Way?

24  A.   No, never had any contact with United Way.

25  Q.   Whether they had contracts with DigitalNet?

1    A.    No.

2    Q.    The nature of those contracts?

3    A.    No.

4    Q.    The size of them?

5    A.    No.

6    Q.    What they were for?

7    A.    No.

8    Q.    Whether they were happy with their service from

9    DigitalNet?

10   A.    Correct.

11   Q.    You didn't talk to them about any of that, correct?

12   A.    Never.  No.

13   Q.    You simply saw that money was coming into DigitalNet

14   from --

15            THE COURT:  I mean this in the most respectful way.

16   What are you trying to establish?  He's a banker who did some

17   due diligence.  He went to the place.  They weren't there.

18   What difference does any of it make whether he asked any of

19   these questions of United Way?  I know the answers to all these

20   questions.  I've been sitting here for a week and a half.  Come

21   on.  What difference does it make what he did?  Tell me.

22            MR. AYER:  Your Honor, it just goes into the

23   thoroughness of the investigation, but I can move on to the

24   final point that I was going to make.

25            THE COURT:  Tell me why the thoroughness of his

1   investigation matters.

2           MR. AYER:  Well, I think that -- I mean, first of all

3   there is a bias inherent in any witness, and here I think we

4   have somebody who thought he found something, may not have

5   known the whole story, and I want to establish that.

6           THE COURT:  Sure.  But he's offering an infinitessimal

7   part of the story.  I don't know.  I guess you've got to make

8   the record.

9           MR. AYER:  I guess there's just one more area that I

10  would like to go into that I think is relevant to something he

11  said on direct that I'd like to clarify.

12          THE COURT:  I don't mean to bootstrap you, and I mean

13  this for everybody.  When I ask a question it doesn't mean stop

14  what you're doing.  It means explain to me why you're doing it.

15  That's what I'm trying to ask.

16          I can't imagine, though, why undermining or

17  demonstrating his bias makes any difference in the context of

18  this big picture, right?  He offered what he offered.  It's

19  part of the burden, I get it, but it's not a big part of the

20  burden.  It kind of helps tell the story of how different parts

21  of the elements got wind of this situation.  I don't think he

22  needs to demonstrate that he's an FBI agent who looked under

23  every rock or that if he didn't it means he's biased against

24  your client.  He's offering a tiny little piece in the mosaic,

25  so treat him that way.

1      MR. AYER:  Okay.

2      THE COURT:  Do what you want, but my advice is treat

3  him that way.

4      MR. AYER:  Okay.

5  Q.   Mr. Aziz, you also said in your direct that you reviewed

6  bank accounts from DigitalNet?

7  A.   We had accounts.  We had the bank accounts of DigitalNet,

8  yeah.

9  Q.   And you reviewed -- and I think your testimony was that a

10  significant portion of their money went to AISA Consulting.

11  A.   Portions went to AISA Consulting and to DigitalNet in

12  Pakistan, split between them.  Not split evenly, but I don't

13  recall what the amounts were.

14  Q.   And when you reviewed the accounts, that's not the only

15  place that payments were going, though, was it?

16  A.   From DigitalNet?

17  Q.   Right.

18  A.   I don't recall.

19  Q.   You don't recall whether you saw any payments to employees

20  of DigitalNet in those bank accounts?

21  A.   No, I don't remember that.

22  Q.   Just to clarify, you're saying that you didn't see it, or

23  you simply don't remember?

24  A.   I don't remember.  Without looking at the statements -- if

25  you have a statement I can certainly -- I don't remember.

1    Q.   Okay.

2    A.   Yeah.  I know -- part of the review we also look for is to

3    see if, like, we would look for bills to be paid, utilities to

4    be paid, or are other customers paying them for services or

5    what not.  So, my only observation, whether correct or

6    incorrect, my job at the bank is credits were from United Way

7    to DigitalNet, from DigitalNet to Pakistan DigitalNet and Imran

8    and Saima's personal's accounts, AISA Consulting.

9    Q.   So, just to unpack all of that, one of the things you

10   would look for when you're reviewing an account like DigitalNet

11   would be are there other bills being paid from that account?

12   A.   Yeah.

13   Q.   For example, utilities?

14   A.   Yup.

15   Q.   And you would look for whether insurance is being paid

16   from that account?

17   A.   Yup.

18   Q.   Whether employees were being paid from that account?

19   A.   Yup.

20   Q.   Whether any liabilities to the government were being paid

21   to that account?

22   A.   Yup.  From DigitalNet, yeah.

23   Q.   Whether there were potential payments to charitable

24   organizations from that account?

25   A.   Payments to charitable organizations?

1    Q.    Yes.

2    A.    Yes.  I'm not sure which account it was, because it's been

3    a while, whether it was AISA or that personal account, but

4    there were payments to the government.  I don't remember the

5    amounts, but I think it came out of the personal accounts.  I

6    don't think it was DigitalNet.  But I think I remember IRS --

7    tax payments with "IRS" on one of the statements.  I'm not sure

8    which account it came from.

9    Q.    Okay.  And so, those were all the things you would look

10   for to say, like, is this a legitimate business going on?

11   A.    Yeah.  That coupled with due diligence of the onboarding

12   documentation and the site visit and everything else.

13              MR. AYER:  Okay.  That's all I have, then, your Honor.

14              THE COURT:  Thank you.

15              MS. LE:  Nothing, your Honor.  Thank you.

16              THE COURT:  You're excused, sir.  Thank you.

17              THE WITNESS:  Thank you very much.

18                      (Witness stepped down)

19              MR. HUNTER:  Apologies, your Honor.

20              THE COURT:  No problem.

21              MR. HUNTER:  I thought I had another witness in

22   between this.  The government calls Chris Beckstrom.  Actually,

23   your Honor, may I take a quick break before we get started with

24   Mr. Beckstrom?

25              THE COURT:  Yeah, that makes sense.  We'll take five.

1          THE CLERK:  All rise.

2          (Recess taken from 2:50 p.m. to 2:56 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  Okay, please proceed.

5          MR. HUNTER:  The government calls Christopher

6    Beckstrom.

7          THE CLERK:  Good afternoon, sir.  If you'd like to

8    step this way.  If you'd step into the witness box and remain

9    standing.  Please raise your right hand.

10          **CHRISTOPHER BECKSTROM**, having been duly sworn by the

11    Clerk, was examined and testified as follows:

12          THE CLERK:  For the record, please state your full

13    name and spell your last name.

14          THE WITNESS:  Christopher Beckstrom,

15    B-e-c-k-s-t-r-o-m.

16          THE CLERK:  Thank you.  Please be seated.

17          THE WITNESS:  Thank you.

18                    <u>DIRECT EXAMINATION</u>

19    <u>BY MR. HUNTER:</u>

20    Q.    Good afternoon.

21    A.    Good afternoon.

22    Q.    As you can see, we have a court reporter here in the

23    courtroom, and I just ask that you speak slowly, that we try

24    not to talk over each other, and speak clearly into the

25    microphone.  Okay?

1    A.    Yes, sir.

2    Q.    Mr. Beckstrom, how are you employed?

3    A.    I'm employed by the Department of Justice, Federal Bureau

4    of Investigation.

5    Q.    What is your job with the FBI?

6    A.    I'm an Information Technology Specialist Forensic

7    Examiner.

8    Q.    And how long have you had that job?

9    A.    Four years.

10   Q.    Is this job, an IT Specialist and Forensic Examiner,

11   sometimes referred to as a CART examiner?

12   A.    Yes, sir.

13   Q.    And can you describe, briefly, what you do as an FBI CART

14   examiner?

15         MR. HARRINGTON:  And, Judge, if I could interject

16   briefly, with regard to this witness being proffered as an

17   expert witness, we have no object to that.  To the extent that

18   the government feels it needs to lay the foundation, there's no

19   need on my part.  However, obviously, if they want to get his

20   qualifications out for your consideration, I understand that.

21         THE COURT:  How long have you been with the Bureau?

22         THE WITNESS:  Four years.

23         THE COURT:  What's your education?

24         THE WITNESS:  I have a master's degree in Computer

25   Science from the University of Illinois, Springfield.

1          THE COURT:  He may testify in the form of an opinion.

2     You may proceed.

3          MR. HUNTER:  Thank you, your Honor.

4          THE COURT:  If there's something about his background

5     that you think I need to know, I'm not cutting you off.  I'm

6     just letting you know if you want to ask his opinions about

7     issues, you may do so, and the defense has agreed to it.

8          MR. HUNTER:  Okay.  Thank you, your Honor.

9     BY MR. HUNTER:

10    Q.   Mr. Beckstrom, you said you had a master's degree in

11    computer science.  Could you just -- have you been trained in

12    making and reviewing forensic images of computers?

13    A.   Yes.

14    Q.   And about how many times have you made a forensic image of

15    a computer?

16    A.   More than 200.

17    Q.   And how often are you reviewing these forensic images?

18    A.   It's my daily job.

19    Q.   What does it mean to make a forensic image of a computer

20    or of a hard drive?

21    A.   A "forensic image" is simply a verifiable container.

22    Essentially, you take all the data from an element and put it

23    into a single container that's verifiable.

24    Q.   Okay.  So, could you break down what you mean by

25    "verifiable" and "container"?

1    A.    What I mean by "verifiable" and "container."  "Verifiable"

2    means it has some sort of fingerprint, such as an MD5 checksum

3    or a SHA1 checksum.  "Container" is simply a term I'm using to

4    define one single item instead of multiple items.

5    Q.    So, an MD5 checksum.

6    A.    MD5 checksum.

7    Q.    What is that?  Is that also sometimes referred to as the

8    hash value?

9    A.    The hash value or the digital fingerprint, yes.

10   Q.    Okay.  And what is that?

11   A.    What is that?

12   Q.    Is it a long mathematical number?

13   A.    It's a mathematical number.  Essentially, it takes all the

14   1s and 0s and puts them into the identical size number for any

15   particular item.

16   Q.    And in determining whether or not a forensic image has

17   been compromised in any way, can you compare this hash value?

18   A.    Yes.

19   Q.    Could you explain that process, please.

20   A.    Well, essentially the 1s and 0s are unique to each

21   individual item, and you can have a hash value or digital

22   fingerprint created, and then down the road you can check to

23   see if that number is the same.  If the numbers are the same,

24   then nothing has changed from point A to point B.

25   Q.    Okay, understood.  So, does the forensic image maintain

1    the integrity of metadata in files on electronic devices that

2    are imaged?

3    A.   Well, anything that's in the image is frozen in time.

4    Q.   So, is the purpose of this process of examining hash

5    values to be certain that the integrity of the image is the

6    same today as it was when it was created?

7    A.   Yes, sir.

8    Q.   In your experience as a forensic examiner, have you also

9    analyzed forensic images to determine the IP addresses used by

10   those electronic devices?

11   A.   Yes.

12   Q.   Sir, what is an "IP address"?

13   A.   An "IP address" is a digital identifier for a device.  It

14   allows devices in one network to communicate with devices in

15   other networks.

16   Q.   What is an "outgoing IP address"?

17   A.   An "outgoing IP address" would be the IP address leaving

18   the computer that you're sending something from.

19   Q.   So, if a computer is hooked to an internet network, does

20   that network have an IP address that it's sending out into the

21   internet?

22   A.   Yes, it does.

23   Q.   Is that a, perhaps, colloquial way to put it?

24   A.   You have either an incoming or an outgoing IP address, a

25   source or a destination IP address.

1    Q.    Okay.  What is an "incoming IP address"?

2    A.    It would be the IP address of where the item is arriving

3    from.

4    Q.    All right.  Did you conduct a forensic examination of

5    electronic devices seized from Imran Alrai's home at 9 Corliss

6    Road in Windham, New Hampshire?

7    A.    Yes.

8    Q.    And what devices did you examine?

9    A.    There were two laptops and a desktop.

10   Q.    Was the desktop an HP Envy desktop?

11   A.    Yes, sir.

12   Q.    Did you examine the forensic images made of those devices?

13   A.    Yes, sir.

14   Q.    And prior to your examination or during your examination

15   did you confirm that the hash value -- did you analyze the hash

16   value to ensure the integrity of the images?

17   A.    Yes, sir.

18   Q.    And what did you find?

19   A.    The hash values matched.  I had no issues with the

20   integrity of the evidence.

21   Q.    And in conducting your forensic analysis of the computers

22   found at the defendant's home, did you determine if they

23   connected to an internet network with an outgoing IP address of

24   75.68.37.59?

25   A.    Yes.

1   Q.   Did you determine that the devices connected to such an
2   internet network?
3   A.   Yes.
4   Q.   And, again, that's an internet network with an outgoing IP
5   address of 75.68.37.59; is that correct?
6   A.   Yes.
7   Q.   So, could you describe what you did in doing that
8   analysis?
9   A.   Describe what I did in doing that analysis.  Well, the
10  images, we ran the IP address, the 75.68.37.59 versus the
11  entire data set, found multiple results of that IP address.
12  Also ran multiple geolocation searches for Londonderry and
13  Windham against that same data set and found numerous artifacts
14  related to the IP address from internet cache or cookie data.
15  There was an HP printer install artifact.
16  Q.   We'll get into some of that later.  We don't need to go
17  into everything you did, but we'll get into some of the
18  highlights.
19       So, did you determine that the desktop found in
20  Mr. Alrai's home, the HP Envy, had connected to an internet
21  network with an outgoing IP address of 75.68.37.59?
22  A.   Yes.
23  Q.   Now, you mentioned one of the artifacts you found was
24  showing the downloading of a printer driver for an HP printer?
25  A.   Yes.

1    Q.    And was that in 2017?

2    A.    Yes.

3    Q.    And could you just describe what that digital -- or where

4    you found that digital artifact and what it showed.

5    A.    Where I found that digital artifact?  The path was

6    actually on the local computer I think under the user's name.

7    Q.    Was the user Imran Alrai?

8    A.    Yes, sir.

9    Q.    Thank you.  Continue.  Did it show that the user had

10   downloaded a driver from HP for an HP Office Jet Printer?

11         MR. HARRINGTON:  Judge, I'm just going to object.

12   It's a little bit leading.  I would ask that counsel not lead

13   so much on this, please.

14         THE COURT:  That's fine.  You've been letting them

15   lead a lot in the trial, so they got in the habit of moving it

16   along.

17         Don't lead so much.

18         MR. HUNTER:  Understood.

19   Q.    So, Mr. Beckstrom, could you -- did you find an artifact?

20   Could you describe the artifact that you found.

21   A.    Yes, sir.  It was an HP printer artifact.  It was for a

22   model number that comes out to be like a 74-, 7500A HP printer.

23   It's an all-in-one.

24   Q.    Okay.  Are you familiar with this printer?

25   A.    Yes.

1       MR. HUNTER:  Ms. Sheff, could you put Exhibit 882 on

2   the screen, please, and go down a few pages.  Knowing that you

3   can't tell from the artifact -- go down another page, please,

4   Ms. Sheff, and another.  Could you zoom in on this, please.

5   Q.   Knowing that you can't tell from the artifact the exact

6   printer that was referred to, but is this an HP Office Jet

7   7500A?

8   A.   Yes.

9   Q.   Did that artifact --

10       MR. HUNTER:  You can take that down, Ms. Sheff.  Thank

11   you.

12   Q.   Did that artifact also show that the HP Envy was connected

13   to an internet network with an outgoing IP address of

14   75.68.37.59?

15   A.   Yes.

16   Q.   Did you also find evidence on a backup file on this

17   computer of that IP address, that outgoing IP address?

18   A.   There were numerous artifacts in a backup from 2014 that

19   appeared to have that same IP address.  Yes.

20   Q.   And so, the HP Envy that you were examining, do you know

21   the approximate age of that computer?

22   A.   That computer is probably from 2017, a newer computer

23   model.

24   Q.   And you said there was a backup on that computer?

25   A.   Yes.

1    Q.    And in that backup did you find a number of files?

2    A.    There were a number of Google internet cache files and

3    other cookie-type data.

4    Q.    Okay.  And the cookies that you found on the backup on the

5    computer you said went back to 2014?

6    A.    2014?  The date of the path for the file was something

7    like August 21st, 2014.  I'd have to see the exact path.

8    Q.    Okay.  Could you describe some of the information you

9    found, some of the cookies that you found on the computer.

10   A.    There was internet data for several websites, such as

11   cnn.com, weather.com, other -- go ahead.

12   Q.    Thank you, Mr. Beckstrom.  What is a "cookie?"  Could you

13   explain that to the Court, please.

14   A.    A "cookie" is a morsel of goodness that the internet

15   company decides to take regarding your computer so that they

16   can better advertise or provide you information or get back to

17   you in an easy manner.

18   Q.    Okay.  And so, a cookie --

19   A.    It's information about the user of their website.

20   Q.    And did you find a cookie, for example, from weather.com?

21   A.    Yes.

22   Q.    And did that indicate that the computer was connected to

23   an internet network with an outgoing IP address of 75.68.37.59?

24   A.    Yes, sir.

25   Q.    And did some of these cookies have location information

1    appended to them?

2    A.    Yes.

3    Q.    Could you describe that, please.

4    A.    It had location -- Londonderry, I believe, on those items.

5    Q.    Did some have Windham, New Hampshire as well?

6    A.    Those particular cookies, no, but others did, yes.

7    Q.    So, some cookies had Londonderry, some had Windham?

8    A.    Yes.

9    Q.    Does an IP address provide general geolocation

10   information?

11   A.    Yes.

12   Q.    Does it provide geolocation data as precise as a GPS?

13   A.    Could, but not necessarily.

14   Q.    Is Londonderry the next town I think north of Windham?

15   A.    I believe it is, yes.

16   Q.    So, on both the backup files that you found on the

17   computer and in the local files did you find a subfolder

18   "Personal Business Initiatives"?

19   A.    Yes.

20   Q.    And, in summary, the backup data from a prior computer

21   that you found on the HP Envy, does that show that beginning

22   somewhere around 2014 it connected to an internet network with

23   an outgoing IP address of 75.68.37.59?

24   A.    Yes.

25   Q.    And did you also find local data on the HP Envy seized

1  from the defendant's home office in Windham showing that it was

2  connected to an internet network with an outgoing IP address of

3  75.68.37.59 at least in 2017?

4  A.   Yes.

5  Q.   Switching gears, Mr. Beckstrom, what is "email header

6  information"?

7  A.   "Email header information"?

8  Q.   Yes.

9  A.   "Email header information" is essentially the envelope to

10  move an email, a transit ticket, addressing that help it move

11  through the internet.

12  Q.   Have you reviewed header information for certain emails

13  from info@digitalnet.us sent to Imran Alrai at United Way?

14  A.   Yes.

15       MR. HUNTER:  Ms. Sheff, could you please put Exhibit

16  101a on the screen.

17  Q.   Is this one such document, Mr. Beckstrom?

18  A.   Yes.

19  Q.   So, what are we looking at on this first page?

20  A.   What are we looking at on this first page?  You're looking

21  at a header.  It has the source information, it has a message

22  ID, it has the created dates, the location information, what

23  the attachments -- this is the -- what else did you need to

24  know?

25  Q.   That's fine.  Thank you.

1          MR. HUNTER:  Ms. Sheff, could you go to the next page.

2     Q.   And is this the body of the email?

3     A.   That would be the body.

4          MR. HUNTER:  The next page, please, Ms. Sheff.

5     Q.   Now, are these the headers?

6     A.   Yes.

7     Q.   So, starting at the bottom, where it says

8     X-Originating-IP, could you explain what that is?

9     A.   The X-Originating-IP is the -- anything X is put on by the

10    mail transfer agent, in this case Google, and it would be the

11    originating IP of the email.

12    Q.   Okay.  And what is an X-Originating-IP?

13    A.   The X-Originating-IP is the starting point of the email.

14    Q.   And I think you said that Google put it on there.  How

15    does Google put that on the header?

16    A.   Well, they define what they put in the X elements.

17    Q.   So, just so that we all understand it, is this saying that

18    the email was sent from an internet network with an outgoing IP

19    address of 75.68.37.59?

20    A.   Yes.

21    Q.   So, what is all of this other information showing?

22    A.   Well, you have some -- the DKIM signatures are essentially

23    verifications of the emails, just to make sure that the emails

24    are what they are as they move through the mail server.  You

25    have the different places it went on its pathway to get to the

1    ultimate result up there of ialrai@supportunitedway.

2    Q.   So, I guess from the X-Originating-IP delivered to

3    ialrai@supportunitedway where did the email go?

4    A.   Where did it go?  Well, it essentially follows a received

5    path, and it went to these different mail-transfer locations,

6    and then there's Google Spot, and then there's received by

7    Protection Global Outlook.  So, this went to an Outlook 365 of

8    some type.  Actually, I think that might be in the UK, only

9    because I ran the IP address once, but I'm not sure if it's

10   this one or not.  And then you can see that it went from that

11   mail transfer agent ultimately to the United Way.

12   Q.   Okay.  So, is it fair to summarize what you said, it

13   started in internet -- the email started in an internet network

14   with this X-Originating-IP?

15   A.   Yes.

16   Q.   It bounced around to some other servers, including

17   possibly going to the UK, before landing in Mr. Alrai's United

18   Way email inbox?

19   A.   Yes.

20        MR. HUNTER:  Ms. Sheff, could you pull up 102A,

21   please.

22   Q.   And have you reviewed this document as well,

23   Mr. Beckstrom?

24   A.   Yes.

25        MR. HUNTER:  Ms. Sheff, could you scroll down.

1    Q.   Here we see other header information.  Is this similar to

2    what we saw in the last exhibit?

3    A.   Yes.

4    Q.   And does it have the same X-Originating-IP?

5    A.   Yes.

6    Q.   And what is the X-Originating?

7    A.   75.68.37.59.

8    Q.   And, again, does that indicate that this email originated

9    from an internet network with that outgoing IP address?

10   A.   Yes.

11        MR. HUNTER:  Ms. Sheff could you pull up 103A.

12   Q.   You see this is -- is this another email?

13        MR. HUNTER:  Could you go up to the first page,

14   Ms. Sheff.

15   Q.   Is this another email?

16   A.   Yes.

17   Q.   Sent from info@digitalnet to Imran Alrai?

18   A.   Yes.

19        MR. HUNTER:  And, Ms. Sheff, could you go down to the

20   header information.  One more page, I think.

21   Q.   We see an X-Originating-IP.  Is that the same

22   X-Originating-IP?

23   A.   Yes.

24   Q.   Could you read it, please.

25   A.   75.68.37.59.

1   Q.   Okay.  And that's the same -- that originating IP

2   corresponds to the outgoing IP of the internet network that

3   Mr. Alrai's home computer had connected to?

4   A.   Yes.

5        MR. HUNTER:  And could you go to 103, please.  Sorry.

6   103A.  All right.  And we can see this is another email.  Can

7   you scroll down, please, Ms. Sheff.  We'll try to move through

8   these.  One more page, please.

9   Q.   Does this have the same X-Originating-IP address?

10   A.   Yes, sir.

11   Q.   Could you --

12   A.   75.68.37.59.

13   Q.   All right.  Thank you.  And 104A, please.  And here we see

14   the same X-Originating-IP address?

15   A.   Yes.  75.68.37.59.

16        MR. HUNTER:  Ms. Sheff, could you pull up 105A.

17   Q.   Could you read the X-Originating-IP address for this

18   email?

19   A.   75.68.37.59.

20        MR. HUNTER:  106A, please, Ms. Sheff.  Actually,

21   Ms. Sheff, could you go back to the first page?  I just have a

22   question of Mr. Beckstrom.

23   Q.   On the first page it says "Source IP."  What does that

24   mean?

25   A.   The source IP?  Well, that generally means -- the source

1   is usually the location of where it starts.

2   Q.   So, where this email was pulled from?

3   A.   This is -- this item here, this invoice, I'm not sure

4   where that -- the source IP is the originating location --

5   Q.   Okay.

6   A.   -- for this particular item.

7   Q.   But the email header information has the X-Originating-IP?

8   A.   Right.  That's like -- that other item -- this is the

9   header, this is the actual email header, and the other item is

10  the body of the email, the other item.

11  Q.   And so, the header information is actually telling you

12  where the email came from; is that right?

13  A.   Yes.

14       MR. HUNTER:  Okay.  Could you go to the next page,

15  please, Ms. Sheff.  And the next page.  One more.  Another one,

16  please.  Can you go another one, Ms. Sheff.  Okay.  Go back up.

17  I think I must have missed it.

18  Q.   X-Originating-IP, right there.

19  A.   75.68.37.59.

20       MR. HUNTER:  Okay.  Could you pull up 107A, please,

21  Ms. Sheff.  Okay.  Continue down.

22  Q.   So, here we have the X-Originating-IP for 107A.  What is

23  that, Mr. Beckstrom?

24  A.   75.68.37.59.

25  Q.   And this one is a lot shorter than the last one.  Why is

1    this header information so much more condensed?

2    A.   Well, it possibly took less path to get to where it needed

3    to get.

4    Q.   Okay.  Did it still route through Google servers?

5    A.   Definitely.  I see Google.  Yes, went to Google.  Google

6    had neutral opinion about DigitalNet.  It was received by

7    Google mail, moved, the return path was info@digitalnet, and it

8    was delivered to ialrai@supportunitedway.

9    Q.   Thank you.

10        MR. HUNTER:  Could you pull up 108A, please Ms. Sheff,

11   and could you go down to the header information, please.

12   Q.   And could you please read the X-Originating-IP of this

13   email, please, Mr. Beckstrom?

14   A.   75.68.37.59.

15   Q.   And, again, that corresponds with the outgoing IP address

16   of the internet network that Mr. Alrai's home computer was

17   connected to?

18   A.   Yes.

19        MR. HUNTER:  Could you pull up 109A, please,

20   Ms. Sheff.  Could you go down to the header information.

21   Q.   And could you read the X-Originating-IP of this email,

22   please.

23   A.   75.68.37.59.

24        MR. HUNTER:  All right.  111A, please, Ms. Sheff.

25   Q.   We're almost there.  And could you read the

1    X-Originating-IP of this email.

2    A.    75.68.37.59.

3          MR. HUNTER:   112A, please, Ms. Sheff.

4    Q.    What's the X-Originating-IP of this email?

5    A.    75.68.37.59.

6    Q.    So, all of these emails, Mr. Beckstrom, are sent from

7    info@digitalnet.us.  So, does that mean the email is being sent

8    from that email address from this X-Originating-IP address?

9    A.    Yes.

10         MR. HUNTER:   Okay.  113A, please, Ms. Sheff.  Could

11   you go down to the header information, please.

12   Q.    Could you read the X-Originating-IP for this email?

13   A.    75.68.37.59.

14         MR. HUNTER:   And 115A, please, Ms. Sheff.  Oh, 114.  I

15   apologize.  Could you go down to the header information,

16   please, Ms. Sheff.

17   Q.    Would you read the X-Originating-IP, Mr. Beckstrom?

18   A.    75.68.37.59.

19         MR. HUNTER:   Now, 115A, please, and could you please

20   go to the header information.

21   Q.    Could you please read the X-Originating-IP?

22   A.    75.68.37.59.

23   Q.    Okay.  And that's the same one we've been talking about;

24   is that right?

25   A.    Yes, sir.

1          MR. HUNTER:  116A, please, Ms. Sheff.  This is 116A,

2    and please go down to the header information.

3    Q.   And could you please read the X-Originating-IP of this

4    email, Mr. Beckstrom?

5    A.   75.68.37.59.

6    Q.   And, again, this is an email sent from info@digitalnet.us?

7    A.   Yes.

8    Q.   Is that right?

9          MR. HUNTER:  117A, please, Ms. Sheff.  Could you

10   please go to the header information.

11   Q.   And, Mr. Beckstrom, could you read the X-Originating-IP?

12   A.   75.68.37.59.

13         MR. HUNTER:  Ms. Sheff, could you pull up 118A,

14   please.

15   Q.   So, this is an email sent from Mac Chaudhary to Jack

16   Rotondi.  Do you see that, Mr. Beckstrom?

17   A.   Yes, sir.

18   Q.   And if we go down to the header information -- you've

19   reviewed this document, haven't you?

20   A.   Yes, I've seen this.

21   Q.   Was there an X-Originating-IP in the header information

22   for this email?

23   A.   I don't believe there was.

24   Q.   Is it unusual for there not to be an X-Originating-IP in

25   header information?

1    A.   Maybe a little bit, but it's not unprecedented, because

2    it's added by the mail server.

3    Q.   So, sometimes a mail server like Google will not include

4    that information in the header information?

5    A.   The X-Originating-IP is not always there.

6    Q.   Okay.  Mr. Beckstrom, were you also asked to review the

7    forensic image of the HP Envy to find certain documents?

8    A.   Yes.

9    Q.   Okay.  And in your review of the documents that you found,

10   again, did you confirm the integrity of the forensic image?

11   A.   Yes.

12   Q.   And could you describe what you did?

13   A.   In the review of the documents, the documents that were

14   exported.  I either re-exported them and compared the MD5

15   checksum of the document to the image MD5 checksums, or I just

16   ran the new MD5 checksum on the document and compared it.

17   Q.   After you pulled the document from the image, how did you

18   confirm the integrity of the document pulled?

19   A.   By the MD5 checksum.

20   Q.   Okay.  I'm showing you Exhibit 101b.

21        MR. HUNTER:  And there's a couple of pages to it,

22   Ms. Sheff.  Could you scroll to both pages.

23   Q.   Did you find both of these documents on Mr. Alrai's home

24   computer?

25   A.   Yes.

1          MR. HUNTER:  Ms. Sheff, could you pull up 103B,

2     please.

3     Q.   This is a one-page document.  Did you find this document

4     on Mr. Alrai's home computer?

5     A.   Yes.

6          MR. HUNTER:  104B, please, Ms. Sheff.  This document

7     is two pages.  Can you show both pages?

8     Q.   Did you find both of these documents on the image of

9     Mr. Alrai's home computer?

10    A.   Yes.

11    Q.   105B, please.  Did you find this document on Mr. Alrai's

12    home computer?

13    A.   Yes.

14    Q.   106B.  Did you find this document on Mr. Alrai's home

15    computer?

16    A.   Yes.

17         MR. HUNTER:  All right.  Ms. Sheff, could you pull up

18    107B.

19    Q.   Could you just read this here?

20    A.   "Digital services proposal.  The information contained in

21    this document outlines the response to the website integration

22    and data exchange platform development RFP from United Way of

23    Massachusetts Bay and Merrimack Valley.  July 16, 2015."

24    Q.   Did you find this on Mr. Alrai's home computer?

25    A.   Yes.

1          MR. HUNTER:  Ms. Sheff, could you pull up Exhibit

2     108b, please.

3     Q.   Again, this is two pages of invoices.  Did you find this

4     in Mr. Alrai's home computer?

5     A.   Yes.

6     Q.   And how many of these documents were found in a subfolder

7     called "Personal Business Initiatives"?

8     A.   I don't know how many exactly, but many.

9     Q.   Okay.

10          THE COURT:  All right.  It's 3:30, so we should take

11     the afternoon break.  So, you're excused.

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  We'll reconvene at about 3:45.  All right.

14          Let me ask counsel before we break.  I have a question

15     for the prosecution.  This may be directed at Mr. Davis.  I'm

16     not sure.  I spent some time over the weekend with your trial

17     briefs and reading some of the cases you cited.  I don't want

18     you to misinterpret this question, because I don't perceive

19     this as necessarily a problem; it's more just a question.

20          If the Court finds that there's a scheme here, a

21     scheme or artifice, and there's intent, sufficient intent,

22     pretty much any wire communication that was sent during it, not

23     any one, but many of them could be deemed to be in furtherance

24     of the wire fraud, right?  Almost any email, really, right?  Do

25     you agree with that?

1          MR. DAVIS:  Yes.

2          THE COURT:  So, what I'm wondering is, and there may

3    not be a reason for this, and it may not matter that much, but

4    you chose for the substantive counts these invoices mostly,

5    right, emails conveying the invoices?  And I guess I want to

6    know why is that?  Because there are -- if I accept your theory

7    of the prosecution, as I think I understand it, these sent

8    invoices for what you say are either services that are

9    overbilled or not really rendered or whatever, but there are

10   other emails that contain what you've tried to show me are

11   demonstrable deceptions and untruths.  So, why the invoices as

12   opposed to other emails that contain what might be more, I

13   guess, more clearly deceptive content?

14         MR. DAVIS:  Part of the reason, your Honor, is that

15   the --

16         THE COURT:  You'll have a chance to respond to this.

17         MR. DAVIS:  -- we need to show venue in New Hampshire,

18   and emails sent in Massachusetts to Massachusetts, there may

19   not be New Hampshire venue.  Certainly, we agree there are many

20   different kinds of emails, including ones more or less

21   deceptive.

22         THE COURT:  But you were going for venue.

23         MR. DAVIS:  To have a substantive wire fraud count,

24   obviously, we need venue in New Hampshire.  So, one of the

25   clearest --

1          THE COURT:  Commonalities.

2          MR. DAVIS:  -- commonalities here is that email from

3     Mohammad asking for money from United Way that we can show,

4     forensically, is sent from New Hampshire and is an interstate

5     wire.

6          THE COURT:  Right.  And, again, assuming I accept your

7     theory of the prosecution, it could have been two emails, it

8     could have been probably 50 emails, if you wanted it to be,

9     right?  Except with venue, you can tie venue, you can at least

10    proffer venue as to these originating from this IP address.

11         MR. DAVIS:  Correct.

12         THE COURT:  I see.

13         MR. DAVIS:  Ms. Le has critiqued me as recently as

14    lunchtime saying, "Why are there so many counts?"

15         MS. LE:  I suggested four is always enough with one

16    defendant, Judge.  That's my opinion.

17         THE COURT:  Yeah.  Although, I don't ask that -- it's

18    not my point that you have too many counts.  My question was

19    why the invoices, and I think you've given me an answer.  Okay.

20         Is there anything you want to say in response to that

21    one way or the other?

22         MR. HARRINGTON:  No, thank you, Judge.

23         THE COURT:  All right.  It's not that I'm accepting

24    the theory.  I'm wondering about why those counts.  I think I

25    understand a little better now.  All right.  Take 15.

1          THE CLERK:  All rise.

2          (Recess taken from 3:35 p.m. to 3:54 p.m.)

3          THE COURT:  You may retake the stand, sir.

4          You may proceed.

5          MR. HUNTER:  Thank you, your Honor.

6   CONTINUING DIRECT EXAMINATION BY MR. HUNTER:

7   Q.   Mr. Beckstrom, before we continue to look at documents, I

8   want to ask you a couple more questions about IP addresses.

9   A.   Okay.

10  Q.   Do you know the difference between a dynamic and a static

11  IP address?

12  A.   Yes.

13  Q.   What is it?

14  A.   Dynamic is essentially an IP address that updates its

15  routing tables automatically, as opposed to a static IP address

16  that requires the individual to update the routing tables

17  manually.

18  Q.   So, is another way to put it a dynamic IP address can

19  change?

20  A.   Well, the dynamic element of the IP address is that it

21  updates the IP address regularly -- updates the routing tables

22  regularly.  Both IP addresses can change, static or dynamic.

23  Q.   Okay.  So, with the outgoing IP address of an internet

24  network, could that change to be a different outgoing IP

25  address at a different period of time?

1   A.   Yes.

2   Q.   And based on your review of the forensics of Mr. Alrai's

3   computer, is it your view that the outgoing IP address of the

4   internet network that it was hooked to had the same IP address

5   from approximately 2014 to 2017?

6   A.   Yes.

7          MR. HUNTER:  Okay.  Could we please put Government

8   Exhibit 414 on the screen, please.  This is a document from

9   Comcast that is in evidence.  Could we scroll down, please.

10  Continue down another page.  Okay.

11  Q.   So, this is showing the IP address.  Do you see that?  Is

12  that our IP address?

13  A.   Yes.  75.68.37.59.

14  Q.   And this is -- and what is -- can you just read this line

15  here.

16  A.   75.68.37.59 assigned on the date of the subpoena

17  11/25/2019 at 0000.

18  Q.   And what town is it assigned in?

19  A.   Windham, New Hampshire 03087.

20  Q.   And, Mr. Beckstrom, is it your understanding that IP

21  addresses are generally assigned regionally?

22  A.   Yes.

23  Q.   And it says "IP assignment."  What does it say?

24  A.   "Dynamically assigned."

25  Q.   And so, as of the date of this subpoena response,

1    11/25/2019, was this IP address still assigned to Mr. Alrai --

2    to the internet network at Mr. Alrai's home address in Windham?

3    A.   I have no way of knowing that.

4    Q.   Based on this document?

5    A.   Based on this document, I have no way of knowing that.

6    Q.   Okay.

7    A.   I mean, likely not, based on the email user IDs.

8    Q.   So, just to be clear, as of last month this was no longer

9    the outgoing IP address of Mr. Alrai's home network, but it was

10   assigned to another network in Windham, New Hampshire?

11   A.   That appears to be the case, yes.

12   Q.   But, again, going back to the forensics of the computer,

13   it's your view that this was the outgoing IP address of

14   Mr. Alrai's home internet network from roughly 2014 to '17?

15   A.   Yes.

16        MR. HUNTER:  All right.  Moving on to the -- you can

17   take that down, Ms. Sheff.

18   Q.   Going back to documents you found on the computer --

19        MR. HUNTER:  Ms. Sheff, could you pull up 110B,

20   please.

21   Q.   Is this a document that you found on Mr. Alrai's home

22   computer?

23        MR. HUNTER:  And you can scroll through this, please,

24   Ms. Sheff.

25   A.   Yes.

1          MR. HUNTER:  Okay.  Ms. Sheff, could you just go up to

2     the signature page.

3     Q.   And here we see -- who signed this for DigitalNet

4     Technology Solutions?

5     A.   Mac Chaudhary.

6     Q.   And who signed it for United Way?

7     A.   Patricia Latimore.

8          MR. HUNTER:  Thank you, Ms. Sheff.  And the next page.

9     Q.   Can you just read the date and the title of the document?

10    A.   "Statement of Work.  August 24th, 2015."

11         MR. HUNTER:  Ms. Sheff, could you pull up 111B,

12    please.

13    Q.   This is three documents.  Did you find each of these

14    invoices on Mr. Alrai's home computer?

15    A.   Yes.

16    Q.   And this is, again, the HP Envy?

17    A.   Yes.

18         MR. HUNTER:  112B, please, Ms. Sheff.  Could you

19    scroll through both documents.

20    Q.   Did you find both of these invoices on Mr. Alrai's home

21    computer in Windham?

22    A.   Yes.

23    Q.   113B, please.  Did you find both of these documents on

24    Mr. Alrai's home computer in Windham?

25    A.   Yes.

1          MR. HUNTER:  Pull up 114B, please, Ms. Sheff.

2  Q.   This appears to be three documents.  Did you find all

3  three of these documents on Mr. Alrai's home computer?

4  A.   Yes.

5  Q.   115B, please.  Two pages.  Did you find both of these

6  documents on Mr. Alrai's home computer?

7  A.   Yes.

8  Q.   116B, please.  Did you find both of these documents on

9  Mr. Alrai's home computer?

10  A.   Yes.

11  Q.   And, again, we're talking about the HP Envy?

12  A.   Yes.

13  Q.   117B, please.  Did you find this invoice on Mr. Alrai's

14  home computer in Windham?

15  A.   Yes.

16          MR. HUNTER:  Ms. Sheff, can you please pull up 118B.

17  Q.   Is this a document you also found on Mr. Alrai's home

18  computer?

19  A.   Yes.

20  Q.   And did you find both a Word and a PDF version of this

21  document?

22  A.   Yes.

23          MR. HUNTER:  Ms. Sheff, could you go to the next,

24  second page.

25  Q.   Can you just read what it says here on the last bullet of

1   "Facts At a Glance"?

2   A.   Last bullet?

3   Q.   Yes.

4   A.   "105 plus global clients served."

5   Q.   And then the sample list of customers.

6   A.   "Seba Energy, C & D Auto Paint, Fujitsu, America --"

7   Q.   Thank you, Mr. Beckstrom.  You don't need to read all of

8   them.  But you see a number of sample customers listed; is that

9   right?

10  A.   Yes.

11  Q.   All right.  And did you also check the metadata associated

12  with the Word version of this document?

13  A.   Yes.

14       MR. HUNTER:  Ms. Sheff, could you please pull up 118C,

15  first of all.

16  Q.   This is -- obviously, it's not in Word format to present

17  to the Court, but is this the Word document, the Word version?

18  A.   Yes.

19  Q.   Or you checked it.

20       MR. HUNTER:  Can you pull up 118D, please.  118C and

21  118D, please.

22  Q.   So, is this the properties pane for Microsoft Word

23  associated with the Word document found on Mr. Alrai's home

24  computer?

25  A.   Yes.

1 Q. Can you just describe, briefly, how this properties pane

2 is populated?

3 A. This properties pane is a Microsoft -- Microsoft using the

4 properties, right-click properties, of an exported document

5 from the image.  It puts the metadata that's known by Microsoft

6 into the -- and displays it for view.

7 Q. So, is this a user-friendly way to view the metadata?

8 A. It's a very user-friendly way, yes.

9 Q. So, who is listed as the author of the document?

10 A. Imran.

11 Q. How is that field populated?

12 A. The authors?

13 Q. Yes.

14 A. Authors can be populated by the user can select and type

15 in whatever they want to put there, or frequently it's picked

16 from the user of the -- whatever the user profile is of the

17 computer at the time the document was --

18 Q. So, it's either the user profile of the computer, or this

19 could be edited manually by the user?

20 A. Yeah.

21 Q. And "Last saved by," how is that field populated?

22 A. Likely, again, by the user profile.

23 Q. Is that something that the user can edit easily?

24 A. Well, they can set it, but, no, they wouldn't be able to

25 edit it easily.  They could clear it.

1    Q.    So, you could clear the metadata of the document; is that

2    what you're saying?

3    A.    Yes.  Right there, "Remove properties and personal

4    information."

5    Q.    But you mentioned you could edit the author.  Can you edit

6    the Last saved by in the same way?

7    A.    Not in the same way.  There is ways to -- I mean, that's

8    going to be whatever the user established on the computer, and

9    you can make that profile whatever you need to make that

10   profile.

11   Q.    Okay.  So, in order to change it you have to change the

12   user information on the computer?

13   A.    Yeah, you would have to make a user profile.

14   Q.    What do you mean by "make a user profile"?

15   A.    Well, "make a user profile" is, you know, you have

16   different users on your computer, John, Jane, Joe, Imran,

17   Chris.

18   Q.    Right.  Okay.  So, if you logged in as Chris?

19   A.    That would probably say "Last saved by Chris."

20   Q.    Okay.  And what's the "Content created date"?

21   A.    That's likely the date the document was originally

22   created.

23   Q.    And what is the Content Created Date for this document?

24   A.    7/18/2016.

25   Q.    At what time?

1    A.   9:54 a.m.

2    Q.   What is the Date Last Saved?

3    A.   7/18/2016, 5:25 p.m.

4    Q.   And does the Date Last Saved correspond with Last Saved

5    By?

6    A.   Yes.

7    Q.   So, is that saying that --

8    A.   The "Last Saved By Imran" last saved this on 7/18/2016 at

9    5:25 p.m.

10   Q.   And what is "Last Printed"?

11   A.   That's the last date the document was printed hard or

12   digital.

13   Q.   So, that means either printed to paper or to PDF?  Is that

14   what that means?

15   A.   Yes.

16   Q.   And when was this last printed?

17   A.   7/18/2016 at 4:41 p.m.

18   Q.   Thank you.

19        MR. HUNTER:  Now, Ms. Sheff, can you pull up Exhibit

20   800, please.

21   Q.   Actually, that also had a "Total editing time,"

22   Mr. Beckstrom.

23        MR. HUNTER:  Could you pull that back up.  Sorry about

24   that.

25   A.   The Total Editing Time?

1    Q.   Yes.  What is that?  What does it mean?

2    A.   I don't have a great answer for how they calculate the

3    Total editing time.

4         MR. HUNTER:  Okay.  Could you pull up Exhibit 800,

5    please, Ms. Sheff.

6    Q.   Is this another document that you found on Mr. Alrai's

7    home computer?

8    A.   Yes.

9    Q.   Could you just read the title of the document?

10   A.   "Network Health and Security Assessment Agreement."

11        MR. HUNTER:  And could you go down to the signature

12   page, Ms. Sheff.

13   Q.   You can see it's unsigned.  Is this document signed?

14   A.   No.

15        MR. HUNTER:  Ms. Sheff, could you pull up 801, Exhibit

16   801, please.

17   Q.   Did you find this on Mr. Alrai's home computer?

18   A.   Yes.

19   Q.   And is this document actually executed?

20   A.   Yes.

21   Q.   And who signed it?

22   A.   Patricia Latimore, CFO.

23   Q.   And is there any signature for DigitalNet on this

24   document?

25   A.   No.

1    Q.   Did you also find a Word version of this document on

2    Mr. Alrai's home computer?

3    A.   Yes.

4         MR. HUNTER:  Ms. Sheff, could you pull up 802.

5    Q.   Is this the Word version?

6    A.   It's representative of, yes.

7    Q.   Representative of it.

8         MR. HUNTER:  Could you pull up Exhibit 803, please,

9    Ms. Sheff.

10   Q.   What is this?

11   A.   It's another metadata of an exported -- of the exported

12   document.

13   Q.   This is the metadata that corresponds with the Word

14   version of that Network Health --

15   A.   I see the title.

16   Q.   So, under "Author," can you read that?

17   A.   "Prepared by Mohamad Wahbe."

18   Q.   So, again, what does that mean, that it says "Prepared by

19   Mohamad Wahbe?"  What does that signify to you?

20   A.   That was probably manually entered at the beginning of the

21   genesis of the document 126 revisions ago.

22   Q.   Why do you say you think it was manually entered?

23   A.   Well, "Prepared by" doesn't typically show up in the entry

24   list manually entered by somebody.

25   Q.   And it says "Last saved by," and who last saved the

1   document or what user last saved the document?

2   A.   Alrai, Imran.

3   Q.   And did you identify the user profile on Mr. Alrai's

4   computer?

5   A.   Yes.

6   Q.   Was there a user profile for Imran Alrai?

7   A.   Yes, sir.

8   Q.   And what was the Content created date of this document?

9   A.   8/14/2012 at 8:56 p.m.

10   Q.   And the Date last saved?

11   A.   8/17/2012 at 2:54 p.m.

12   Q.   And the Date Last Printed?

13   A.   8/17/2012 at 2:54 p.m.

14   Q.   So, I want to switch gears a little bit here to the ELMO.

15   I'm showing you Defense Exhibit B-6.  Did you find this

16   document on Mr. Alrai's computer?

17   A.   Yes.

18   Q.   I'm going to show you B7.  Did you find this document on

19   Mr. Alrai's home computer?

20   A.   Yes.

21   Q.   Actually, take a look at this one here.  "All systems

22   integration," and here you can see it's dated 1/25/2013?

23   A.   Yes.

24   Q.   Did you find this document -- Defense Exhibit B-8.  Did

25   you find this document on Mr. Alrai's home computer?

1    A.    Yes.

2    Q.    And this says, I think, "Eze Castle" at the top?

3    A.    Yes.

4    Q.    And could you just read the name of the document and the

5    date.

6    A.    "Proposal for IT Integration Services.   January 25th,

7    2013."

8          MR. HUNTER:   Ms. Sheff, could you pull up 803.1 --

9    sorry.

10   Q.    Actually, were these Word documents or PDFs on Mr. Alrai's

11   computer?

12   A.    Were they Word or PDF documents?

13   Q.    Do you recall?

14   A.    I don't recall.

15         MR. HUNTER:   Actually, let's move on to 803 --

16   actually, let's go to 803.1D.   Go down to the next page,

17   please.

18   Q.    Is this a report you created, Mr. Beckstrom?

19   A.    Yes.

20         MR. HUNTER:   Go down to the next page, please.

21   Q.    Okay.   And so, here this says, "UWMV Managed Services

22   Proposal V5."   Do you see that?

23   A.    Yes.

24   Q.    And down here "Eze Castle United Way RFP response"?

25   A.    Yes.

1    Q.    Now, we have three -- we have Created, Modified and

2    Accessed, and there are three dates.  Do you see those?

3    A.    Yes.

4    Q.    So, could you describe what the modified date means,

5    Saturday, January 26, 2013?

6    A.    Yes.  The modified date is likely the date it was created

7    on the different media.  In other words, the document was

8    created on the NER 260, which is the SIM drive backup for the

9    UWMV on Tuesday, September 12th 2017, and then when it was

10   created on that date it supplemented the created date that was

11   there.  The modified date could have been the date it was

12   modified in 2013.  It could have been the date it was created

13   in 2013, the different media, is the answer to that question.

14   Q.    So, obviously, we can't go back and time to determine

15   exactly what happened, but I think you testified earlier that

16   the HP Envy computer was a computer from 2017; is that right?

17   A.    Yes.

18   Q.    And you found backup data on that computer importing files

19   from another device; is that right?

20   A.    Yes.

21         MR. HUNTER:  Could you go to the next page, please,

22   Ms. Sheff.  This is corresponding again.  This is the Eze

23   Castle.  Could you go to the next one.  Actually, go up a page,

24   Ms. Sheff.  One more.

25   Q.    And both of these have the same metadata, modified January

1    26th, 2013 with that create date in 2017.  I apologize.  So,

2    does this correspond with Mr. Beckstrom with the mindSHIFT RFP

3    response?

4    A.   The Eze Castle.

5         MR. HUNTER:  Well, go to the next page, please, Ms.

6    Sheff.  I apologize.

7    Q.   Is this one the Eze Castle?

8    A.   Yes, this is the Eze Castle.

9    Q.   And we see the same created and modified dates,

10   Mr. Beckstrom?

11   A.   Yes.  This is the Eze Castle one.  No.  So, it looks like

12   the pagination might be off.  You have to go by the MD5

13   checksums there.  They are all the same for the same documents.

14   Q.   Let me put the question to you this way, sir:  Did you

15   confirm that defense Exhibit B-6, the mindSHIFT document and

16   defense Exhibit B-8, the Eze Castle document, both had the

17   modified date of January 26, 2013?

18   A.   I'd have to look at it again.  I'm sorry.  Off the top of

19   my head, I don't know.

20   Q.   We can move on.  We can move on.

21        MR. HUNTER:  Could you please put 803.1 on the screen,

22   please.

23   Q.   Is this another Managed IT Services Proposal dated January

24   25th, 2013?

25   A.   Yes.

1    Q.    And what company does this one purport to come from?

2    A.    DigitalNet.

3    Q.    Did you find this in both Word and PDF on Mr. Alrai's

4    computer?

5    A.    Yes.

6          MR. HUNTER:  Ms. Sheff, could you please put 803.1A on

7    the screen.

8    Q.    Is this the Word metadata from that document?

9    A.    Yes.

10   Q.    Okay.  So, the author, again, says -- what does it say?

11   A.    "Prepared by Mohamad Wahbe."

12   Q.    Last saved by?

13   A.    "Alrai, Imran."

14   Q.    And what was the content created date for this document?

15   A.    1/21/2013, 2:40 p.m.

16   Q.    What's the date last saved?

17   A.    1/29/2013, 6:47 p.m.

18   Q.    And last printed date of this document?

19   A.    1/29/2013, 6:45 p.m.

20         MR. HUNTER:  Ms. Sheff, could you pull up the document

21   again, 803.1.  Or -- yeah, 803.1.

22   Q.    What's the date of the document itself?

23   A.    January 25th, 2013.

24   Q.    And, again, so the last printed, it says 1/29/13 at 6:45

25   p.m.  Do you see that?

1   A.   Yes.

2   Q.   Did you also find a PDF of this document on Mr. Alrai's

3   computer?

4   A.   Yes.

5   Q.   And when it last printed can that include printing

6   something to a PDF?

7   A.   Yes.

8        MR. HUNTER:  Ms. Sheff, could you pull up 803.1B, and

9   could you pull up 803.1C.

10  Q.   Now, 803.1C, this is a screen shot of metadata from the

11  PDF that you received from the U.S. Attorney's Office; is that

12  correct?

13  A.   Yes.

14  Q.   And so, that's why it looks like the date created and

15  folder path information, that no longer reflects what's on

16  Mr. Alrai's computer; is that correct?

17  A.   Yes.

18  Q.   The date modified date, did you confirm that date remains

19  the same as it was on Mr. Alrai's computer?

20  A.   It's the same date, 1/29/2013, 6:45 p.m.

21  Q.   Is that the same date of the last print date of the Word

22  document?

23  A.   Yes.

24       MR. HUNTER:  Ms. Sheff, could you pull up 804, please.

25  Q.   Could you read the name of this document and the date,

1   Mr. Beckstrom?

2   A.   "Managed IT Services Agreement.  February 20, 2013."

3   Q.   Did you find a Word version of this document on

4   Mr. Alrai's home computer in Windham?

5   A.   Yes.

6        MR. HUNTER:  Ms. Sheff, could you please pull up 805.

7   Q.   Is this the Word display of the metadata from that Word

8   document?

9   A.   Yes.

10  Q.   So, who is the author of that document?

11  A.   info@digitalnet.us.

12  Q.   And last saved by?

13  A.   Alrai, Imran.

14  Q.   The revision number, we've seen that a few times.  What

15  does "revision number" mean?

16  A.   Every time a document is changed and a save to a document

17  happens they make a little -- a new document.  That's how you

18  can go back and change things.  Each time you do that it adds

19  one to the revision number.

20  Q.   And, again, last saved by, that's the user of the

21  computer --

22  A.   Yes.

23  Q.   -- that last saved the document?  And then content created

24  date.  What is that?

25  A.   2/19/2013, 8:52 p.m.

1    Q.    And the date last saved and last printed?

2    A.    2/22/2013, 4:16 p.m. and 2/22/2013, 4:16 p.m.

3    Q.    I'm just pulling up Government Exhibit 806.  This is a

4    bulk exhibit of several DigitalNet invoices to the Robert Allen

5    Group.  Did you find these invoices to Robert Allen on

6    Mr. Alrai's home computer?

7    A.    Yes.

8    Q.    Okay.  We don't need to look through all of them.  We can

9    move on to 807.  What is this document, Mr. Beckstrom?

10   A.    It's a Master Service Agreement.

11   Q.    Again, from DigitalNet?

12   A.    Yes.

13   Q.    Did you find a Word version of this on Mr. Alrai's home

14   computer?

15   A.    Yes.

16         MR. HUNTER:  Ms. Sheff, could you please pull up

17   Exhibit 808, please.

18   Q.    Is this the Word property display of the metadata from

19   that document?

20   A.    Yes.

21   Q.    The author field is blank.  Do you see that?

22   A.    Yes.

23   Q.    What does that signify to you?

24   A.    That it was cleared at some point.

25   Q.    So, at some point someone deleted the author information?

1   A.   Yes.

2   Q.   And it says, "Last saved by Alrai, Imran."  Do you see

3   that?

4   A.   Yes.

5   Q.   What's the content created date?

6   A.   1/1/2013 at 2:14 p.m.

7   Q.   What date was it last saved and printed?

8   A.   5/1/2013, 11:14 a.m., 5/1/2013, 11:13 a.m.

9   Q.   And, again, the date last saved would have been last saved

10  by user Alrai, Imran?

11  A.   Yes.

12       MR. HUNTER:  Ms. Sheff, could you pull up 809, please.

13  Q.   What's the title of this document, Mr. Beckstrom?

14  A.   "Managed Cloud Telephony Services."

15  Q.   And the date?

16  A.   August 1st, 2013.

17       MR. HUNTER:  Could you please pull up 810, Ms. Sheff.

18  Q.   Is this the Word display, the properties displaying the

19  metadata of that Word document?

20  A.   Yes.

21  Q.   The Word document of the 809?

22  A.   The Managed Cloud Telephony Services, yes.

23  Q.   Okay.  And who is listed as the author?

24  A.   No author.

25  Q.   It's blank again?

1    A.    Blank.

2    Q.    And who's listed as last saving the document?

3    A.    Alrai, Imran.

4    Q.    And when was the content created?

5    A.    4/30/2013 at 10:08 p.m.

6    Q.    What is the date last saved?

7    A.    8/3/2013 at 3:10 p.m.

8    Q.    Last printed?

9    A.    8/2/2013 at 10:46 a.m.

10   Q.    It looks like this was either printed or saved to PDF the

11   day before it was last saved.  Is that what it looks like?

12   A.    Well, I don't know if it was PDF, but, yes, printed or

13   PDF.

14   Q.    Either.

15         MR. HUNTER:  Ms. Sheff, could you pull up Exhibit 302.

16   And could you go to page 2, please.

17   Q.    Again, does this appear to be the same document?

18   A.    Yes.

19         MR. HUNTER:  All right.  Can you pull up Exhibit 811,

20   Ms. Sheff, and put it on the right-hand side of the screen,

21   please.  811, Ms. Sheff.

22   Q.    What is this document that we're looking at,

23   Mr. Beckstrom?

24   A.    It's a file listing a spreadsheet summary of the invoices

25   that were exported.

1    Q.    And were these Word documents of invoice templates found

2    on Mr. Alrai's home computer?

3    A.    It's a summary of the metadata that we made screen shots

4    of.  Yes.

5    Q.    Okay.  So, is this a summary of the metadata of Word

6    versions of invoice templates that you found on Mr. Alrai's

7    home computer?

8    A.    Yes.

9         MR. HUNTER:  Ms. Sheff, can you pull up 812 and put it

10   on the other side.

11   Q.    We don't need to go through each one of these, but 812,

12   does that correspond to number 2, line 2 on the spreadsheet?

13   A.    Yes.

14        MR. HUNTER:  Could you pull up 813 on the side,

15   please.

16   Q.    Does this 813 correspond to number 3?

17   A.    Yes.

18   Q.    814, please.  Does 814 correspond to line 4 on the

19   spreadsheet?

20   A.    Yes.

21   Q.    And going down the spreadsheet, does 815 correspond to

22   line 5, Exhibit 815?

23   A.    Yes.

24   Q.    Again, these are Word documents found on Mr. Alrai's

25   computer; is that right?

1    A.    Yes.

2    Q.    816, does that correspond to line 6?

3    A.    Yes.

4    Q.    817, does that correspond to line 7 on the spreadsheet?

5    A.    Yes.

6    Q.    818, does this correspond to line 8 in the spreadsheet?

7    A.    Yes.

8    Q.    819, does this correspond to line 9 in the spreadsheet?

9    A.    Yes.

10   Q.    820, does this correspond to line 10 in the spreadsheet?

11   A.    Yes.  Yeah, it's Managed Telephony Services.

12   Q.    And 821, does this correspond to line 11 of the

13   spreadsheet?

14   A.    Yes.

15   Q.    822, does this correspond to line 12?

16   A.    Yes.

17   Q.    823, does this correspond to line 13, Managed IT Services?

18   A.    Yes.  It says April, and it says -- maybe the day is

19   different or maybe it's the same.  I'm not sure off the top of

20   my head.  It's probably the same.  I don't know.  I don't

21   remember.

22   Q.    Okay.  824, does it correspond to line 14, the metadata in

23   line 14?

24   A.    Yes, I believe so.

25   Q.    825, does this correspond to the metadata in line 15?

1   A.   Yes.

2   Q.   826, does this correspond with the metadata in line 16?

3   A.   Yes.

4   Q.   Then 827, does this correspond with the metadata in line

5   17?

6   A.   Yes.

7   Q.   And 828, does it correspond with the metadata in line 18?

8   A.   Yes.

9        MR. HUNTER:  All right.  So, just scrolling through --

10  Ms. Sheff could you pull up Exhibit 830, please.  You can take

11  down the other spreadsheet.

12  Q.   Is this an Excel spreadsheet that was found on Mr. Alrai's

13  computer?

14  A.   Yes.

15  Q.   And what was the title of the spreadsheet, the name of it,

16  if you recall?

17  A.   I don't remember.

18  Q.   Okay.

19  A.   There's two copies of it, one for 2016, one for 2017, I

20  believe.

21       MR. HUNTER:  And could we go to the Overall Expenses

22  tab, Ms. Sheff.

23  Q.   This lists DigitalNet Technology Solutions and AISA

24  Consulting Group with an address of 31 Lowell -- 31 Lowell Road

25  Property Trust.  Do you see that?

1   A.   Yes.

2        MR. HUNTER:  Can we go over, the next tab over, next

3   tab, next tab.

4   Q.   There's charity donations listed, and this is listing a

5   bunch of funds.  Can you describe where the money is listed as

6   going?

7   A.   To an IRA, 401(k) for Saima, IRA 401(k) for Imran, AISA

8   savings, AISA checking, UltPult checking, Abdu Amin checking,

9   Abdu Amin savings.  Alrai savings, Alrai money market, Alrai

10  checking Pentucket, Ahmad savings, Alrai savings, gold,

11  apartment rent.

12  Q.   What's the total?

13  A.   The total.  $1,595,197.39.

14       MR. HUNTER:  Ms. Sheff, can you pull up 832, please.

15  Q.   Is this the Excel properties for that document,

16  corresponding to that document?

17  A.   Yes.

18  Q.   And here we see a last saved by?

19  A.   Imran.

20  Q.   And it looks like the name of the document "DN business

21  expenses tax year 2016.xlsx."  Do you see that?

22  A.   Yes.

23       MR. HUNTER:  Ms. Sheff, could you pull up 831, please.

24  Q.   Is this a similar document?

25  A.   Yes.

1    Q.    And could you read the list of funds and where they're

2    allocated to?

3    A.    The list of funds.  IRA 401(k) Saima, IRA 401(k) Imran,

4    AISA savings, AISA checking.

5    Q.    And under AISA savings, what's that number there?

6    A.    $1,000,010.

7    Q.    You can keep going.

8          THE COURT:  This is very similar to the last one,

9    right?

10          MR. HARRINGTON:  It is, your Honor.

11          THE COURT:  So, what's the point here?  What's going

12    on?

13          MR. HUNTER:  It's a second document from the next year

14    with similar --

15          THE COURT:  The following year?

16          MR. HUNTER:  The following year.

17    Q.    Could you continue reading after AISA checking, please.

18    A.    UltPult checking, Abdu Ahmi checking, Abdu Ahmi savings,

19    DN Savings (MM plus SC), Alrai money market, Alrai checking

20    Pentucket, Ahmad savings, Alrai savings, gold, apartment rent.

21    Q.    What's the total?

22    A.    1,842,091.65.

23          MR. HUNTER:  Ms. Sheff, please bring up 833.

24    Q.    833.  Is this the Excel readout of the metadata associated

25    with that document?

1    A.   Yes.

2    Q.   And here could you read the title of the document or the

3    name of the document?

4    A.   "DN Business Expenses Tax Year 2017.xlxs.

5    Q.   And last saved by?

6    A.   Imran.

7         THE COURT:  Okay.  I may be dense.  The reason you're

8    showing me metadata is you want to show me who saved it last?

9         MR. HUNTER:  Yes, your Honor.

10        THE COURT:  Okay, thanks.

11        MR. HUNTER:  Could we pull up 834, please, Ms. Sheff.

12   Q.   And could you just read the top of this and the first

13   paragraph?

14   A.   "Contract renewal.  This is a renewal to the managed IT

15   services contract entered into by and between United Way of

16   Massachusetts Bay, Inc. (hereinafter referred to as "client")

17   and DigitalNet Technology Solutions LLC (hereinafter referred

18   to as "company") dated February 22, 2013."

19   Q.   Thank you.

20        MR. HUNTER:  And 835, please, Ms. Sheff.

21   Q.   Again, who is -- what's the author listed in this

22   document?

23   A.   info@digitalnet.us.

24   Q.   And last saved by?

25   A.   Imran.

1    Q.   And all of the dates, content created, date last saved and

2    date last printed, what day is it?

3    A.   7/2/2016.

4    Q.   Thank you.

5         MR. HUNTER:  All right.  Ms. Sheff, could you pull up

6    836.

7    Q.   Do you recognize this document, Mr. Beckstrom?

8    A.   Yes.

9    Q.   Where did you find it?

10   A.   On the HP Envy computer.

11   Q.   What's the date of this document?

12   A.   July 13th, 2016.

13   Q.   Could you please read the body of the document.

14        MR. HUNTER:  Ms. Sheff, can you blow it up.

15   A.   "To whom it may concern:  This letter is to affirm that

16   DigitalNet Technology Solutions, LLC is a privately held IT

17   services company with offices in North America, Middle East and

18   South Asia.  DigitalNet is a financially strong reputable

19   organization with a growing customer base worldwide.  We take

20   immense pride in being a debt-free organization that is up to

21   date with its financial obligations.  If you have any questions

22   regarding this letter, please feel free to contact us at

23   978-662-5333."

24   Q.   Thank you.

25        MR. HUNTER:  You can you take that down, and can you

1    zoom in on the signature, please, Ms. Sheff.

2    Q.   Does this signature appear to be a handwritten signature

3    or an electronic file put into the document?

4    A.   It looks like a handwritten signature that was cut and

5    pasted in there from something else.

6    Q.   And why do you say that?

7         THE COURT:   You can see the rectangle outline of it.

8    It was pasted there.

9         MR. HUNTER:   Thank you, your Honor.

10   Q.   Did you find both a PDF and a Word version of this

11   document on Mr. Alrai's computer?

12   A.   Yes.

13   Q.   Sorry.   What was the answer to that?

14   A.   Yes.

15   Q.   Thank you.

16        MR. HUNTER:   Ms. Sheff, could you pull up 837.

17   Q.   Is this the Word version?

18   A.   Yes.

19   Q.   Now, the date here says September 11th, 2019.   Why is

20   that?

21   A.   This had a dynamic date in it.   This document, when you

22   opened up the document, it automatically puts the date inside

23   the Word document.

24   Q.   So, this is likely the date when this document was

25   processed into a --

1   A.   This document was opened by somebody on September 11th,

2   2019, and it put that date in there, because it's not in an

3   image.  This was exported from the image, and so it's a live

4   document.

5   Q.   So, this may have been when the document was processed for

6   discovery?

7   A.   That's quite possible.  Yes.

8   Q.   But it's a Word document of the PDF that we saw earlier

9   that was dated in July of 16; is that right?

10  A.   Yes.

11        MR. HUNTER:  All right.  Ms. Sheff, could you pull

12  up --

13  Q.   It has the same digital signature?

14  A.   Yes.

15        MR. HUNTER:  All right.  Ms. Sheff, could you pull up

16  838, please.

17  Q.   Is this the Word properties display of the metadata

18  associated with that Word document?

19  A.   Yes.

20  Q.   What user is listed as the author?

21  A.   Imran.

22  Q.   What user is listed as last saving the document?

23  A.   Imran.

24  Q.   What's the content create date?

25  A.   7/13/2016, 10:57 p.m.

1    Q.   Date last printed -- or date last saved, rather?

2    A.   7/13/2016, 11:39 p.m.

3    Q.   And last printed?

4    A.   7/13/2016, 11:38 p.m.

5    Q.   Thank you.  Finally, Mr. Beckstrom, Exhibit 839, is this

6    duplicative of what we were looking at in Exhibit 118c?

7    A.   Yes.

8    Q.   And 840, is this the metadata that we were looking at

9    again of the DigitalNet portfolio services from 7/18?

10   A.   Yes.

11   Q.   Is that duplicative of Exhibit 118d?

12   A.   Yes.

13        MR. HUNTER:  All right.  Ms. Sheff, could you pull up

14   841.

15   Q.   Was this document also found on Mr. Alrai's computer?

16   A.   Yes.

17   Q.   And what's the date of this document?

18   A.   February 26, 2013.

19   Q.   Could you just read the body of the document, please.

20   A.   "To whom it may concern:  This letter is to verify that

21   DigitalNet Technology Solutions, LLC has been an active

22   customer in good standing with Pentucket Bank since August

23   2012.  DigitalNet Technology Solutions, LLC has multiple open

24   and active deposit accounts with the Pentucket Bank and has no

25   outstanding debts.  If you have any further inquiries regarding

1    this company, please contact me in our Salem, NH office at

2    603-893-3588."

3    Q.   Thank you.  And who is this addressed to?

4    A.   This is DigitalNet Technology Solutions, LLC, 300

5    Brickstone Square, Suite 201, Andover, MA, 01810.

6    Q.   We were talking about a digital signature earlier,

7    Mr. Beckstrom.  Did you find a Word document with digital

8    signatures in it, if you recall, on Mr. Alrai's home computer?

9    A.   I don't recall.

10   Q.   Okay.  Nothing further at this time.

11         THE COURT:   Thank you, Mr. Hunter.

12         Cross?

13                        CROSS-EXAMINATION

14   BY MR. HARRINGTON:

15   Q.   Good afternoon, Mr. Beckstrom.

16   A.   Good afternoon, sir.

17   Q.   How are you doing today, sir?

18   A.   I'm fine.  Thank you, sir.

19   Q.   Let me ask you in regard to the documents that you found,

20   and I know you went through many of them so I'm kind of talking

21   in general terms, okay?  You talked about a lot of invoices and

22   contracts, things that were found on the computers that you

23   analyzed, right?

24   A.   Yes.

25   Q.   And you talked about the metadata associated with those

1    documents found on the computer, correct?

2    A.    Yes.

3    Q.    And you talked about specific dates, like date created,

4    correct?

5    A.    Yes.

6    Q.    Date printed, right?

7    A.    Date printed, yes.

8    Q.    And the date last saved, right?

9    A.    Yes.

10   Q.    Now, to the extent that it's of any significance, you

11   would agree with me that those documents that you found don't

12   necessarily correlate with the documents that were in the

13   possession, for example, of the United Way, correct?

14   A.    You're asking me to say that the documents that were found

15   on the computer aren't necessarily the documents at the United

16   Way?

17   Q.    Correct.  There's no way for you to tell that, right?

18   A.    Not without an MD5 hash, no.

19   Q.    So, all you can tell the judge is, is that the documents

20   that you found on the computer and all the dates, that just

21   relates to the stuff that's on the computer, not necessarily

22   that's in the possession of somebody else, right?

23   A.    Correct.

24   Q.    Now, let me ask you in regard to -- and I'm going to

25   switch over to your report.  You prepared a Report of

1    Examination in this case, right?

2    A.    Yes.

3    Q.    And one of the things that -- and if you need to look at

4    that report at any time, just let me know, okay?

5    A.    Yes, sir.

6    Q.    You were asked to kind of take a look at specific

7    information.  Specifically, you were asked by Agent Laroe to

8    search for any geolocation data as well as IP address artifacts

9    relative to the computers that you were searching, right?  Or

10   analyzing?  I didn't mean to say "searching."

11   A.    I was requested to look for a specific IP address in a

12   specific location.

13   Q.    And, in particular, and I think this might be an easier

14   way to do it, you were given very specific dates.  I'll put

15   this up, and I'm going to -- so, let me kind of go down here

16   first.  This is your report, right?

17   A.    Yes, sir.

18   Q.    And then I'm going to slide this up a little bit, and

19   there are some specific dates that you're asked to take a look

20   at, right?  And I'm going to just kind of point them down here,

21   and I'm going to go through them with you just so it's on the

22   record.

23         Specifically, you were looking for an IP address or

24   artifacts that might correlate to these specific dates, right?

25   Is that fair to say?

1    A.    I was asked to look for the IP address.

2    Q.    Yes.

3    A.    And they were interested in these dates, yes.

4    Q.    And so, you wanted to see if you could find anything on

5    the computer that had these dates related to it and maybe even

6    is connected to the IP address, right?

7    A.    These dates and the IP address, not necessarily artifacts

8    on the computer.

9    Q.    Okay.  So, let's talk about just that for a second.  You

10   have very specific dates.  May 11th, 2015, correct?

11   A.    Yes.

12   Q.    June 15th, 2015?

13   A.    Yes.

14   Q.    6/19/2015?

15   A.    Yes.

16   Q.    6/22/15?

17   A.    Yes.

18   Q.    6/23/15?

19   A.    Yes.

20   Q.    6/29/15?

21   A.    Yes.

22   Q.    8/12/15?

23   A.    Yes.

24   Q.    8/27/15?

25   A.    Yes.

1    Q.    9/4/15?

2    A.    Yes.

3    Q.    9/7/15?

4    A.    Yes.

5    Q.    10/7/15?

6    A.    Yes.

7    Q.    11/2/15?

8    A.    Yes.

9    Q.    12/15/15?

10   A.    Yes.

11   Q.    1/18/16?

12   A.    Yes.

13   Q.    2/15/16?

14   A.    Yes.

15   Q.    And 4/21/16?

16   A.    Yes.

17   Q.    And would you agree with me that in regard to all of those

18   dates you were not able to connect the IP address that you've

19   talked a fair amount about with those specific dates?

20   A.    To my knowledge, I did not find that IP address connected

21   to those dates in particular, no.

22   Q.    Okay.  And I just want to make sure that we're clear in

23   regard to the IP address, because I just want to flag it up

24   here, because we've talked a lot about it.  75.68.37.59, right?

25   A.    Yes.

1    Q.   And that's the IP address that we're talking about.  You

2    couldn't connect anything on the computers relative to these

3    dates to that IP address, correct?

4    A.   I don't recall finding those dates with that IP address.

5    Q.   Okay.

6            THE COURT:  I don't understand the question.  What do

7    you mean by "those dates"?

8            MR. HARRINGTON:  So, these dates down here, Judge, May

9    11, all those ones we just read off.

10           THE COURT:  Okay.

11           MR. HARRINGTON:  And if you look, Judge -- and I'm

12   sure I'm being the master of the obvious here.

13           THE COURT:  No.  If it was obvious I wouldn't be

14   asking it.

15           MR. HARRINGTON:  If you look at the counts in the

16   indictment, those are all the specific dates relative to the

17   indictments that they're alleging wire fraud and we're

18   connecting that or attempting to connect that specifically to

19   the IP address, demonstrating that there's no evidence that

20   they were actually sent using that IP address, which I think

21   this witness has just testified to.

22           THE COURT:  Okay.

23   Q.   Is that fair to say, Mr. Beckstrom?

24   A.   What's fair to say?

25   Q.   Again, this IP address up here --

1    A.    Yes.

2    Q.    -- and all of these dates, you weren't able to find

3    anything on the computer that you searched connecting those two

4    things?

5    A.    The dates are probably found on the computer.  The IP

6    address was found on the computer.  The IP address and the

7    dates was likely not found on the computer.

8              THE COURT:  When you said -- put it back.  The IP

9    address is obviously found on the computer.

10             THE WITNESS:  Yes.

11             THE COURT:  And you said the dates aren't found on the

12   computer.  What does that mean?

13             THE WITNESS:  Well, I mean, those dates -- there could

14   be other artifacts, other things that have those dates that

15   aren't related necessarily to the IP in the search.

16             THE COURT:  Those are dates that, obviously, the

17   computer and IP address existed.  That's your point?

18             THE WITNESS:  The IP address existed.  His point is

19   that those items -- I didn't find this IP 75.68.37.59 with the

20   date 5/11/15.

21             THE COURT:  I don't know what that means.  Does that

22   mean that you can't find evidence on the computer that the

23   invoices were sent by an email from that IP address on that

24   date?

25             MR. HARRINGTON:  Correct.

1        THE COURT:  Is that right?

2        THE WITNESS:  That's what he's --

3        THE COURT:  Is that what you're saying?

4        THE WITNESS:  Well, just because the dates aren't

5   there with the IP address would not mean that those dates

6   weren't the dates, that those dates -- that things didn't

7   happen on those dates.  I just don't have any evidence of that.

8        THE COURT:  Understood.  Sorry about that, but I just

9   need to understand it better.  But you don't see evidence in

10  the data that on those dates from that IP address invoices were

11  sent?

12       THE WITNESS:  Well, most of the data we have with

13  regard to the IP is like cache data or other artifacts that the

14  date codes might not match up with that.  It's just proof that

15  the IP address was there on the computer, not necessarily the

16  date the IP was used on that computer.

17       THE COURT:  All right.

18  Q.   And let me ask you a little bit about that, because one of

19  the other things that you looked at when you couldn't find

20  anything specific like that, one of the other things you looked

21  at is to see if you could find some artifacts that might be

22  associated with that IP address that we're talking about,

23  right?

24  A.   Yes.

25  Q.   And that was a way that you might be able to try to

1    demonstrate that that computer was using that particular IP

2    address, right, because you have artifacts on it?

3    A.   Yes.

4    Q.   And, Mr. Beckstrom, in regard to metadata, metadata in a

5    document can change, right?

6    A.   Yes.

7    Q.   It doesn't necessarily -- for example, you talked about a

8    lot of, like, who saved it last, right, and when was it last

9    saved, and there was the name of the individual?

10   A.   Yes.

11   Q.   A lot of it was Alrai or Imran, right?

12   A.   Yes.

13   Q.   That doesn't necessarily indicate to you who's actually on

14   the keyboard, right?

15   A.   No.

16   Q.   You can't figure that out, right?

17   A.   No, it does not say anything about who was actually using

18   it.

19          MR. HARRINGTON:  Judge, I don't have any other

20   questions for Mr. Beckstrom.

21          THE COURT:  Thanks.  Before you do your redirect, I

22   guess, assuming I'm not misunderstanding and that the witness

23   has not found evidence on the computer that the invoice emails

24   were sent on the days in question, what is it that you

25   established with your direct?  Because I thought that was what

1    you established with your direct.

2          MR. HUNTER:  Yes, your Honor.  I can either explain,

3    if you like or --

4          THE COURT:  Explain.

5          MR. HUNTER:  So, we have the email header information

6    from the emails that show the IP address that's the source of

7    the email.  That wasn't found on Mr. Alrai's computer.  That

8    was an email that was received from United Way, and that

9    metadata was extracted from that email.

10          THE COURT:  The email itself.

11          MR. HUNTER:  From the email itself.

12          THE COURT:  Okay.

13          MR. HUNTER:  And then I'm happy to inquire of the

14    witness regarding the dates.

15          THE COURT:  Make the record you think you need to

16    make.

17          MR. HUNTER:  Thank you.

18                    REDIRECT EXAMINATION

19    BY MR. HUNTER:

20    Q.   Mr. Beckstrom, on cross you were asked about whether you

21    found the outgoing IP address we've been discussing,

22    75.68.37.59, associated with a series of specific dates.  Do

23    you recall that line of questioning?

24    A.   Yes.

25    Q.   And you said that you did not find the IP address

1    associated with those exact dates; is that correct?

2    A.    Yes.

3    Q.    But you did testify on direct that you did find that IP

4    address in the computer associated with a range of dates over a

5    period of time; is that correct?

6    A.    Yes.

7    Q.    And in looking at those artifacts, cookies and other data

8    on the computer, is it your view that Mr. Alrai's computer was

9    connected to an internet network with an outgoing IP address of

10   75.68.37.59 from approximately 2014 through 2017?

11   A.    Yes.

12   Q.    And so, although you didn't find that IP address

13   associated with the exact dates of the request, you did find

14   evidence on the computer that it was connected to an internet

15   network with that outgoing IP address during the period of time

16   encompassed by those dates; is that correct?

17   A.    Yes, sir.

18   Q.    And just to be clear, Mr. Beckstrom, you located this on

19   Mr. Alrai's HP Envy desktop?

20   A.    Yes.

21   Q.    Or the image of the desktop?

22   A.    The image of the desktop, yes.

23   Q.    So, Mr. Beckstrom, regarding email header information --

24   A.    Yes.

25   Q.    -- that information wasn't pulled from Mr. Alrai's

1    computer; is that correct?

2    A.   No.  It was provided separately.  I believe it came from

3    the United Way.  In fact, I stumbled on the cover sheet with

4    the United Way information on it, because it wasn't part of the

5    header that I looked at.

6    Q.   But you reviewed emails received from United Way?

7    A.   I reviewed the header information from the emails that

8    were provided to me.

9    Q.   And those were native versions of those United Way emails?

10   A.   Yes.

11   Q.   And you reviewed the header information from those emails

12   received from United Way?

13   A.   Yes.

14   Q.   And we went through them on direct.  I'm not going to go

15   through them again now.

16   A.   Yes.

17   Q.   But those were emails --

18   A.   They were primarily the invoices.

19   Q.   I believe those were Exhibits 101, I think it's v is the

20   -- or 101a, 102a, et cetera, through Count 118a -- or Exhibit

21   118a?

22   A.   Yes.

23   Q.   And you examined the header information from those emails.

24   How is that header information extracted from the emails?

25   A.   How is that header information extracted from the email?

1    Q.    Yes.

2    A.    The header -- I mean, I used a forensic program to process

3    it, and it presents the data with the email and the header.

4    Q.    Is that header information information contained in the

5    email itself?

6    A.    Yes.

7    Q.    And for the emails that we've reviewed for Counts 1

8    through 17, so 101a and so on through 117a, each one of those

9    emails had an X-Originating-IP of 75.68.37.59; is that correct?

10   A.    Yes.

11   Q.    And so, does that indicate that that email was sent from a

12   computer logged into an internet network with an outgoing IP

13   address of 75.68.37.59?

14   A.    Yes.

15   Q.    And just to bring it all full circle, Mr. Beckstrom, based

16   on your prior testimony that Mr. Alrai's home computer was

17   connected to such a network from approximately 2014 to 2017,

18   would it then be that those emails were sent from that same

19   internet network with that outgoing IP address 75.68.37.59?

20   A.    Yes.

21        MR. HUNTER:  Does the Court have any further questions

22   regarding this issue?

23        THE COURT:  I appreciate that, but, no, I understand

24   your point now.

25        MR. HUNTER:  Thank you.

1     THE COURT:  But I want to give you a chance to inquire

2     again, Mr. Harrington.

3                        RECROSS-EXAMINATION

4     BY MR. HARRINGTON:

5     Q.   So, in regard to your testimony, Mr. Beckstrom, you've

6     indicated that you believe that the computer -- and I think

7     we're talking about the desktop Envy, right --

8     A.   Yes.

9     Q.   -- had this IP address that we've been talking about, and

10    I think you've indicated that you believe that it had that

11    from -- was it 2014 through 2017?  Was that your testimony?

12    A.   The artifacts on the computer are -- include the 2014

13    backup that includes that IP address, and there is the HP

14    printer artifact from the 2017.  So, that would imply the date

15    ranges 2014 to 2017.

16    Q.   And there's actually even some information I think that

17    you found from 2018, right, some artifacts?

18    A.   There is 2018 artifacts?  You'd have to show me which ones

19    you're referring to.

20         THE COURT:  I know it's 5:00, but we're going to

21    finish this witness.

22         MR. HARRINGTON:  I don't have long, Judge.

23         THE COURT:  No problem at all.

24    Q.   So, I'm just approaching you with pages 3 and 4.

25    A.   Yes, sir.

1   Q.   So, I think we're referencing the desktop, correct?

2   A.   Okay.

3   Q.   And I'm referring over to this section, and feel free to

4   look at any portion of your report that you need to.

5   A.   No, I know what you're referring to.  So, you're talking

6   about the last written date, and the last written date is the

7   date in which the registry key was last written to.  In this

8   case it correlates with the install date, I believe, of May 13,

9   2018, and so the whole key wrote to these items on that date.

10  Q.   And so, this really isn't -- the 2018 information isn't

11  really an artifact relative to the IP address, then; is that

12  fair to say?

13  A.   The 2018 date is the last written date to that key.

14  Q.   Okay.  So, in regard to the statement that you've

15  indicated or the opinion that you've given that the IP address

16  is connected to this computer from 2014 to 2017, you agree with

17  me that that opinion is based on the artifacts that were found,

18  correct?

19  A.   Yes.  It's based on the data in the computer, yes.

20  Q.   And the artifacts that you found were relative to kind of

21  specific discrete information that you found, right?  And

22  you're just looking at it saying, okay, this IP address was

23  used at this point in time in 2014?

24  A.   The IP address information from 2014 is based on the date

25  in the artifact.  There are some expiration dates, actually, of

1    the artifact that are 2014 for when those cookies would have

2    expired.  So, there's fairly concrete information that it's

3    possibly connected to that network.

4    Q.   And one of the things I'm driving at is you've indicated

5    that the IP addresses can be dynamic and then they can change,

6    correct?

7    A.   Yes.

8    Q.   And what I'm really kind of driving at is that you're

9    drawing a conclusion or an opinion based on the artifacts.  You

10   can't tell the judge with certainty that the IP addresses, and

11   I want to kind of point to this information (indicating), that

12   the IP addresses were used in this time frame, from May 11th,

13   2015 up through and including April 21st of 2016, you can't

14   tell the judge that these computers were using that IP address

15   during that window?

16   A.   I can't know that, no.

17          MR. HARRINGTON:  I have no other questions, Judge.

18                  FURTHER REDIRECT EXAMINATION

19   BY MR. HUNTER:

20   Q.   Mr. Beckstrom, very quickly.  Sorry for all the back and

21   forth.  I think we discussed a little bit on direct, and

22   obviously nothing is 100 percent certain here, but to a

23   reasonable degree of certainty, based on your experience and

24   expertise as a forensic examiner, can you say that Mr. Alrai's

25   computer and the device from which the backup is derived was

1  connected to an internet network with an outgoing IP address of

2  75.68.37.59 from approximately 2014 to 2017?

3  A.   Yes.

4       MR. HUNTER:  Nothing further, your Honor.

5       MR. HARRINGTON:  I don't have any other questions for

6  Mr. Beckstrom, your Honor.

7       THE COURT:  All right, Mr. Beckstrom.  Thank you.

8  You're excused.

9       THE WITNESS:  Thank you, sir.

10                  (Witness stepped down)

11       THE COURT:  All right, folks, a little bit over, but

12  not much.  It's well done.  Anything for the Court on the

13  record right now?

14       MR. DAVIS:  Judge, we will likely have the motion for

15  an order compelling testimony tomorrow.

16       THE COURT:  Yeah.

17       MR. DAVIS:  I have -- it's a brief motion signed by

18  the U.S. Attorney.  I'll have it for the Court.

19       THE COURT:  Yeah.  And does the witness have counsel?

20       MR. DAVIS:  Yes, he does.

21       THE COURT:  Oh, yeah, we had that conversation last

22  week.  You told me that.  Okay.  Anything else for the Court?

23       Okay.  We're in recess.  Off the record.

24    (WHEREUPON, the proceedings adjourned at 5:07 p.m.)

25

1

2

3

      C E R T I F I C A T E

4         I, Brenda K. Hancock, RMR, CRR and Official Court

5  Reporter of the United States District Court, do hereby certify

6  that the foregoing transcript constitutes, to the best of my

7  skill and ability, a true and accurate transcription of my

8  stenotype notes taken in the matter of *United States v. Imran*

9  *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14  Date: ___4/12/20          */s/ Brenda K. Hancock*
                           Brenda K. Hancock, RMR, CRR
15                            Official Court Reporter

16

17

18

19

20

21

22

23

24

25