*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:18-cr-192-JL
              v.                      *  December 11, 2019
6                                     *  11:30 a.m.
      IMRAN ALRAI,                    *
7                                     *
                     Defendant.       *
8     * * * * * * * * * * * * * * * * *

9

10                   TRANSCRIPT OF BENCH TRIAL
                             DAY EIGHT
11
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13
      APPEARANCES:
14

15    For the Government:        John S. Davis, AUSA
                                 Matthew Hunter, AUSA
16                               Cam T. Le, AUSA
                                 United States Attorney's Office
17

18    For the Defendant:        Timothy M. Harrington, Esq.
                                 Timothy C. Ayer, Esq.
19                               Shaheen & Gordon PA

20

21    Court Reporter:           Brenda K. Hancock, RMR, CRR
                                 Official Court Reporter
22                               United States District Court
                                 55 Pleasant Street
23                               Concord, NH 03301
                                 (603) 225-1454
24

25

1                           I   N   D   E   X

2       WITNESSES:          DIRECT      CROSS      REDIRECT    RECROSS

3       TODD DONNELLY
        By Mr. Davis           5

4

5       (Transcript of testimony of Darlene Cacace filed under separate
        cover)

6       Transcript of testimony of Greg Naviloff filed under separate
        cover)

7

8

9                           E   X   H   I   B   I   T   S

10                      Govt's_____      In Evd.
                            886..................7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  The Court has before it for consideration

3    this morning Day Eight of the bench trial in Criminal Case

4    18-cr-192-01-JL, United States of America versus

5    Imran Alrai.

6          THE COURT:  All right.  AUSA Le, let's proceed.

7          MS. LE:  Good morning, your Honor.  Your Honor, before

8    we recall the witness, the parties have a stipulation about the

9    FDIC insured status of Citizens Bank.

10         THE COURT:  FDIC, you mean?

11         MS. LE:  Yes.  The bank is FDIC insured, your Honor.

12         THE COURT:  Yup.  So, you're stipulating that the bank

13   is FDIC insured?

14         MR. HARRINGTON:  That's correct, your Honor.

15         THE COURT:  Understood.

16         MS. LE:  Thank you, your Honor.  We call Darlene

17   Cacace to the stand, please.

18      (Continued testimony of Darlene Cacace transcribed and

19   filed under separate cover)

20         MR. HUNTER:  Thank you.  The government calls Greg

21   Naviloff.

22         MS. LE:  Your Honor, may I clear the exhibits from the

23   witness stand?

24         THE COURT:  You may.

25          (Testimony of Greg Naviloff transcribed and filed

1   under separate cover)

2          MR. DAVIS:  The government calls Todd Donnelly.

3          THE COURT:  Your last witness, right?

4          MR. DAVIS:  Yes, I think, Judge.

5          THE CLERK:  Please raise your right hand.

6          **TODD DONNELLY**, having been duly sworn by the Clerk,

7   was examined and testified as follows:

8          THE CLERK:  For the record, please state your full

9   name and spell your last name.

10          THE WITNESS:  Todd Donnelly, D-o-n-n-e-l-l-y.

11          THE CLERK:  Thank you.  Please be seated.

12          THE COURT:  Mr. Davis, one of the questions I asked

13   you yesterday was whether after Dr. Chaudhary's testimony was

14   there going to be some sort of 613(b) extrinsic evidence.

15          MR. DAVIS:  Yes.

16          THE COURT:  Is this the witness that that is coming

17   through?

18          MR. DAVIS:  Yes.

19          THE COURT:  I see.

20          MR. DAVIS:  It's just six areas, but it will be fairly

21   specific, your Honor.

22          THE COURT:  I'm not asking you to truncate that in any

23   way.  I think that's important evidence.

24          MR. DAVIS:  Thank you.

25

DIRECT EXAMINATION

BY MR. DAVIS:

Q.   How are you employed, sir?

        MR. AYER:  Before we start, our expert is still in the
room.  I just wanted to make sure we didn't start taking
testimony with the witness in here.

        MR. HARRINGTON:  Sorry about that, Judge.

        THE COURT:  No need to apologize.

A.   I'm employed as a Special Agent with HSI, which is
Homeland Security Investigations within the U.S. Department of
Homeland Security.

Q.   And would you summarize, please, your law enforcement
experience briefly?

A.   Sure.  I've been working in law enforcement for over 25
years.  I began -- my first nine years were spent working as a
patrolman and later as a detective.  In 2003 I was hired with
the United States Customs Service as a Special Agent.  This is
also the same approximate time frame in which the U.S.
Department of Homeland Security was formed.

        During that time one of the things that occurred was
that two legacy U.S. federal law enforcement agencies were
merged, one of them being the United States Customs Service,
the other being the former INS, Immigration and Naturalization
Service, to form the investigative arm of DHS.  So, that was in
2003.  And for the last 16 years I've been working as a Special

1    Agent for what is now HSI, Homeland Security Investigations.

2    Q.   And are you one of the case agents for the Imran Alrai

3    investigation?

4    A.   Yes, I am.

5    Q.   And have you been working on that investigation since late

6    2017?

7    A.   Yes, I have.

8    Q.   And were you the affiant in many of the search and seizure

9    warrants filed in this case?

10   A.   Yes, sir.

11   Q.   The Court asked yesterday about a declaration of trust

12   relating to 31 Lowell Road in Windham, New Hampshire.  Are you

13   familiar with that trust?

14   A.   Yes, I am.

15   Q.   And was that one of the documents seized in the search at

16   the defendant's house at Corliss Road in Windham?

17   A.   Yes.

18   Q.   Showing you now Exhibit 886, which I think is not in, do

19   you recognize that item?

20   A.   Yes, I do.

21   Q.   And is that a copy of the trust, an executed copy that was

22   found in the search of the house on June 12th of 2018?

23   A.   Yes.

24        MR. DAVIS:  Your Honor, I move to introduce 886 in

25   evidence and strike the ID.

1          MR. HARRINGTON:  No objection, your Honor.

2          THE COURT:  Admitted.

3      (Government's Exhibit No. 886 received into evidence)

4    Q.   And, just briefly, can we look at the signature page of

5    that document.  And does this page at page 9, executed November

6    27, 2013, show the defendant and his wife as both grantor and

7    trustee of the trust?

8    A.   Yes, it does.

9    Q.   And moving on to -- and continuing, please, is there an

10   Appointment of Trustee also signed by the defendant and his

11   wife?

12   A.   Yes.

13   Q.   And does that appoint Mr. Munawar Chaudhary, the

14   defendant's father?

15   A.   Yes, it does.

16   Q.   And then the last signed page, I think.  And does this

17   show that the defendant and his wife are beneficiaries of this

18   trust?

19   A.   Yes.

20   Q.   Okay.  Now, I want to ask you a little bit about June

21   12th, 2018.  Were you at the house at 9 Corliss Road in Windham

22   that morning to execute search warrants?

23   A.   I was.

24   Q.   And was one of your assignments to interview Mr. Munawar

25   Chaudhary, who lived there?

1   A.   Yes.

2   Q.   And what time did you go in, approximately, that morning?

3   A.   I think it was around maybe 10:00 in the morning.  I don't

4   remember exactly, but it was late morning.

5   Q.   How were you dressed?

6   A.   Business casual.

7   Q.   And did you have a visible firearm?

8   A.   No.

9   Q.   Did you have visible handcuffs?

10  A.   No.

11  Q.   Okay.  And did you actually encounter Mr. Chaudhary?

12  A.   Yes, I did.

13  Q.   And describe that encounter, please.

14  A.   So, we encountered Mr. Chaudhary out in the backyard.

15  There was some landscaping being done.  Myself and Agent

16  Blackwood with the FBI approached him and explained the

17  circumstances of our being there.  I provided him with a copy

18  of the search warrant for him to examine and advised him that I

19  had a few questions and wanted to know if he would be willing

20  to speak with us further.

21  Q.   All right.  And who were you working with at that time,

22  which agent?

23  A.   Special Agent Kim Blackwood.

24  Q.   And is she an FBI Special Agent?

25  A.   Yes, she is.

1   Q.   And was she dressed similarly to you?

2   A.   Yes.

3   Q.   And, again, no firearm or handcuffs?

4   A.   That's correct.

5   Q.   How did Mr. Chaudhary respond when you approached him?

6   A.   He was very cooperative and accommodating.  We went inside

7   and went into a living room that was unoccupied and sat down.

8   Agent Blackwood and I were on one sofa, he was on another sofa,

9   and we proceeded to talk to him.  Agent Blackwood took notes

10  and wrote a report afterwards.

11  Q.   And did you explain to him why you were there?

12  A.   I did.  I didn't get into a lot of details, but we told

13  him that we were there to conduct a search warrant.

14  Q.   And did you threaten him in any way?

15  A.   No.

16  Q.   Did you trick him in some way?

17  A.   No, sir.

18  Q.   During the interview was there any change in his level of

19  cooperativeness?

20  A.   No.

21  Q.   And at any point did he say he couldn't understand you and

22  needed a translator?

23  A.   No.

24  Q.   Did you note that he had a significant accent?

25  A.   Yes.

1   Q.   Did it make it hard for you to understand him?

2   A.   At times.

3   Q.   But were you able to work through that?

4   A.   Yes.

5   Q.   All right.  And how long did the interview last?

6   A.   I want to say it was probably over an hour and less than

7   two.

8   Q.   All right.  Now, directing your attention to February 7th

9   of 2019, so whatever that is, eight months later, did you again

10   interview Mr. Chaudhary?

11   A.   Yes.

12   Q.   And where did that happen?

13   A.   That happened at the U.S. Attorney's Office.

14   Q.   Here in Concord, New Hampshire?

15   A.   Correct.

16   Q.   And was that in a conference room?

17   A.   Yes.

18   Q.   And who was present for that interview?

19   A.   There was Special Agent Jill Laroe, Forensic Accountant

20   Darlene Cacace, yourself and myself.

21   Q.   And Mr. Chaudhary, of course?

22   A.   Mr. Chaudhary and his attorney, Mr. Nichols.

23   Q.   All right.  And how long did that interview occur?

24   A.   That was a lengthy interview.  I want to say it was at

25   least three hours, maybe longer.

1    Q.    And was that pursuant to an agreement?

2    A.    Yes.  There was a proffer letter that was signed prior to

3    the start of the interview.

4    Q.    And was Mr. Chaudhary's attorney present throughout?

5    A.    Yes, he was.

6    Q.    And how was Mr. Chaudhary's mood and manner in that

7    interview?

8    A.    It was fine.  Once again, it was cooperative.  There were

9    no problems, no conflicts or -- it was fine.  There was no

10   issues.

11   Q.    Okay.  And did an agent take notes on that occasion?

12   A.    Yes.  Special Agent Laroe took notes.

13   Q.    All right.  And did she write a detailed report about the

14   interview?

15   A.    Yes, she did.

16   Q.    And did that go on for multiple pages?

17   A.    Yes, it did.

18   Q.    All right.  Now, I want to ask you about just a few areas

19   in the interviews.  The first area is the registration of

20   DigitalNet, the corporate formation documents to register.  Did

21   you talk to Mr. Chaudhary about that subject when you

22   interviewed him?

23   A.    Yes.

24   Q.    And did you talk to him on June 12th of 2018?

25   A.    Yes.

1    Q.   And did you also talk to him about that on February 7th of

2    2019?

3    A.   I did.

4    Q.   And on June 12th did Mr. Chaudhary tell you that

5    Mr. Alrai, his son, did all of the work and filled out all the

6    paperwork to create DigitalNet?

7    A.   Yes.

8    Q.   And did Mr. Chaudhary also tell you June 12th that it was

9    his son's idea to register in Delaware?

10   A.   Yes.

11   Q.   And did he also tell you that he did not know in whose

12   name DigitalNet was registered in Delaware?

13   A.   Yes.

14   Q.   And then on February 7th, the later interview, did he tell

15   you that he does not recall signing any paperwork for the LLC

16   and did not know why it was set up in Delaware instead of New

17   Hampshire?

18   A.   Yes.  Both times he was really oblivious as to the

19   formation of the company overall.  He said he had nothing to do

20   with it.  That was his son's doing.

21   Q.   All right.  Now, did you also talk to him on February 7th

22   about the email exchange in July of 2016 between someone

23   signing himself as Mac and Jack Rotondi at United Way?

24   A.   Yes.

25   Q.   And showing you Exhibit 118 did you actually show him this

1    series of emails on that occasion?

2    A.   Yes, I did.

3    Q.   All right.  And this is the email, if you recall, that

4    contains the attachment that has the customer list and other

5    information about DigitalNet?

6    A.   Yes.

7    Q.   And did he tell you on that occasion that he did not write

8    the email chain between Mac and Jack Rotondi and does not know

9    anything about it?

10   A.   Yes.  He was very clear about it.

11   Q.   All right.  Now, did you also ask him about the

12   info@digitalnet.us account?

13   A.   Yes.

14   Q.   And that's the account that we've seen numerous emails to

15   United Way that are signed by Mohammad, correct?

16   A.   Correct.

17   Q.   And on February 7th did Mr. Chaudhary tell you that he

18   never sent or received emails using the info@digitalnet email

19   account?

20   A.   Yes.

21   Q.   All right.  Now, did you also talk to Mr. Chaudhary about

22   the meeting at United Way in approximately March of 2013, back

23   when DigitalNet was coming onboard --

24   A.   Yes.

25   Q.   -- that happened in Pat Latimore's office?

1    A.    Yes.

2    Q.    All right.  What did he say about that meeting?

3    A.    Well, we asked him if he had attended a meeting at the

4    United Way, and he acknowledged that he had.  He said it was

5    prior to the signing of the contracts; that he wasn't sure

6    where the meeting took place, but it could have been at the

7    United Way in Boston, so he was a little unsure on the

8    location.  He said that the meeting occurred with one man and

9    that Mr. Alrai was not present during the meeting.

10   Q.    All right.  And then did he give you, again, still on June

11   12th of 2018, did he give you more information about that same

12   meeting?

13   A.    Yes.  So, we continued to talk, and really just a moment

14   later he paused, and he said that he wanted to go off the

15   record, and he further stated that he wanted to strike his last

16   statement, and he wanted to change what he said.  It was very

17   strange.  I've never had this happen to me in an interview

18   before.  It was almost like he wanted to erase -- and he wanted

19   us almost to acknowledge him and like we were not going to

20   include that last part in our report, and there were several

21   statements like that made by him.  He said he made a mistake,

22   he didn't want to get in trouble.  He said he never had a

23   meeting.  He didn't know why he said it.  He said it would be

24   cleaner that way, which was kind of confusing.  So, we

25   continued to talk, and, obviously, we weren't going to remove

1    it from our report.

2    Q.   And so, you recorded both statements in the report, right?

3    A.   Yes.

4    Q.   And so, in essence, he told you at first that he did go to

5    the meeting at United Way, although with a man?

6    A.   Right.

7    Q.   And then, second, that he never went to that meeting,

8    right?

9    A.   Yeah.  He said it was foolish of him to say that, and he

10   didn't know why he was making that comment.

11   Q.   All right.  Now, did you also talk to him on February 7th

12   about the wired funds that were sent to Pakistan and the amount

13   of those wires?

14   A.   Yes.

15   Q.   And did he tell you again on February 7th of 2019 that he

16   did not provide the amount to be sent to the bank employees,

17   and that Imran Alrai told them how much to wire?  Is that what

18   he said?

19   A.   Yes.  We were talking about the emails with Pentucket, and

20   he said that he did not -- the decision about what amount to

21   put in the wires was not his.  That was made by his son.

22   Q.   And, lastly, did you talk to him on February 7th about the

23   name Mohammad Hassan?

24   A.   Yes.

25   Q.   And did you actually show him a document that had been

1  purported to be signed by Mohammad Hassan?

2  A.   I did.

3  Q.   And did he say to you then, again, February 7th, that he

4  does not know who Mohammad Hassan is and does not recognize his

5  signature?

6  A.   That's correct.

7  Q.   All right.

8         THE COURT:  We need to suspend for the day.  The

9  reporter has been going for over an hour and a half, and I have

10  a couple of questions, anyway, so I am going to have you step

11  down.  We'll resume tomorrow at the usual time.

12              (Witness stepped down)

13         THE COURT:  Can you refresh my memory, both sides?  I

14  thought there was testimony from someone at the United Way

15  about meeting with Mac Chaudhary.

16         MR. DAVIS:  Yes.  Pat Latimore, your Honor, testified

17  that she met with a man in her office, it was about a 30-minute

18  meeting, who was represented to her as Mac Chaudhary, who went

19  by that name and who was brought in her office by the

20  defendant.  So, she had a 30-minute conversation with someone

21  she believed to be named Mac Chaudhary.  And we don't dispute

22  that.  We think that happened.

23         THE COURT:  Okay.

24         MR. DAVIS:  But Mr. Chaudhary says it wasn't him.

25         THE COURT:  Same meeting, though?  That's my question.

1    Is it possible that there's a reference -- that this is a

2    discussion about a different meeting?

3            MR. DAVIS:  I think it's possible, your Honor, but

4    Ms. Latimore -- and I've talked to her more than once about

5    this -- Ms. Latimore remembers a single meeting at United Way

6    around the time of the first big contract with DigitalNet with

7    the person represented to be the principal of DigitalNet.

8            THE COURT:  And I don't remember her being, at least

9    during the trial, asked to describe or identify a photo of Mac

10   Chaudhary.  Has she ever done that?  Well, it's not evidence if

11   she's done it or not.

12           MR. DAVIS:  She was asked to describe, your Honor, and

13   we can summarize that.

14           THE COURT:  I can look it up.

15           MR. DAVIS:  I would say lastly, and I guess this is

16   just an opinion, not evidence, but --

17           THE COURT:  You'll be arguing it anyway, so I'll hear

18   it.

19           MR. DAVIS:  It seems to me unlikely that it actually

20   was Mr. Chaudhary, given his accent and given his lack of IT

21   knowledge.  That is, DigitalNet would not have sent someone in

22   there who couldn't talk IT at least somewhat.

23           THE COURT:  That's a fair point.

24           Mr. Harrington, regarding this line of questioning, is

25   there anything you want to say about it?

1          MR. HARRINGTON:  The only thing I would say is, if you

2     recall, and I'm sure you'll look it up, I think Ms. Latimore's

3     testimony is that she's not an IT person and they didn't speak

4     relative to IT matters.  It was more of a brief meeting.  And

5     so, as far as DigitalNet sending somebody in with IT knowledge

6     or something like that, I don't think that was the nature of

7     the meeting.

8          THE COURT:  Is there any inference you want me to draw

9     about whether that meeting, the meeting that Ms. Latimore

10     described, was with Mac Chaudhary or not, or do you just have

11     no position on it one way or the other?

12          MR. HARRINGTON:  I think it's one of those things,

13     Judge, is that there are -- it could go either way, to be frank

14     with you, because I think if you listen to the description that

15     Ms. Latimore --

16          THE COURT:  But will you be arguing for me to look at

17     it one way or the other?  That's my question.

18          MR. HARRINGTON:  I need to think on it a little bit

19     more.  If I'm going to argue it, I'm not sure at this point,

20     Judge, based on the facts, because it really is one of those

21     things that there are some oddities to that meeting.

22          THE COURT:  Understood.  Can we bring Exhibit 920 up?

23          MS. SHEFF:  Oh, goodness.

24          THE COURT:  Oh, is it shut down?

25          MS. SHEFF:  It'll just take a second.

1          THE COURT:  No, no, no.  They will know what I'm

2     talking about.  You don't need to bring it up.

3          MR. HARRINGTON:  There's hard copies right here.

4          THE COURT:  I've got them right behind me, actually.

5          MS. SHEFF:  I'm sorry, Judge.

6          THE COURT:  Please don't apologize.  You've been doing

7     a great job.

8          MR. DAVIS:  Particularly given that she's almost

9     frozen, your Honor.

10          THE COURT:  Almost frozen.  Oh, is the courtroom cold?

11          Here's my question.  I have it in front of me now.

12     You don't need to bring it up.

13          Remember when I asked you a few days ago about how did

14     you decide to use the invoice emails as your wire fraud?

15     Remember that?  And you explained it to me, you did, and it's

16     just a sort of charging decision.  So, my understanding is that

17     everything on the exhibit, if I understood the testimony,

18     everything coming after these three yellow highlighted

19     transfers was considered by the FBI witnesses as dirty money.

20     Am I right about that?

21          MR. DAVIS:  That's correct.

22          THE COURT:  So, that said, how did you choose the 12

23     you did to allege -- to present to the Grand Jury and have them

24     indict as money laundering counts when there's so many?  Is

25     there something I should view as tying them together or

1    distinguishing them?

2           MR. DAVIS:  They had to be more than $5,000 to satisfy

3    the theft statute, interstate theft, and they had to be more

4    than $10,000 to satisfy 1957, the money laundering statute, and

5    they had not to be 57 counts, because my colleagues would not

6    have let me do that.

7           THE COURT:  Sure, sure.  I get it.  All right.  I see.

8    You had jurisdictional or legal floors you needed to get over,

9    and that's how you chose your counts?

10          MR. DAVIS:  Yes.  And, honestly, it would have been

11   too many counts.

12          THE COURT:  Who's counting, right?  Okay.  Is there

13   anything you want to say about that?

14          MR. HARRINGTON:  No, Judge.

15          THE COURT:  Okay.

16          MS. LE:  Your Honor, may I make a correction?  It's

17   not everything after the yellow highlighted.  All of these

18   would have been with dirty money, according to Ms. Cacace's

19   testimony, because this all came from --

20          THE COURT:  Oh.

21          MS. LE:  So, the first one is from DigitalNet funds

22   from United Way, because, if you recall, United Way started

23   paying DigitalNet first.  Then there's Robert Allen Group

24   payments, and then we're going back to DigitalNet.  So, these

25   all trace back to, quote, dirty funds relative to Robert Allen

1    Group and DigitalNet.

2            THE COURT:  Then, remind me what I'm to distinguish

3    with the three highlighted transactions.

4            MS. LE:  The three are the Robert Allen, the three

5    transactions that are traced directly to Robert Allen Group

6    funds versus the dirty funds that come only from United Way.

7    Does that make sense, your Honor?  Because we have two sources

8    of dirty funds:  Robert Allen Group and United Way.

9            THE COURT:  Oh, that much makes sense.

10           MS. LE:  Okay.

11           MR. HARRINGTON:  And that's not charged conduct,

12   Judge.

13           THE COURT:  Yeah, yeah.  It's not under the statute,

14   is the problem.  It's too early.  Okay.

15           Here's my other question:  The money laundering counts

16   describe the specified unlawful activity as the wire fraud as

17   alleged in Counts 1 through 18, right?

18           MR. DAVIS:  Correct.

19           THE COURT:  Some of the money laundering counts

20   involve money that took place -- that involve transactions that

21   took place before Counts 1 through 18 temporally.  Am I bound

22   by the emails and invoices and the money associated with that

23   on Counts 1 through 18, your substantive counts, and

24   considering this money laundering?

25           MR. DAVIS:  No.

1          THE COURT:  Or is it your argument that it's the

2    entire scheme?

3          MR. DAVIS:  It's the entire scheme.

4          THE COURT:  I think that's probably true.  I just

5    wanted to make sure I understood your position.  All right.

6          Do you have anything to say about that at all?  You

7    haven't been really making those types of arguments, but if

8    that's what you're thinking, I'd like to know.

9          MR. HARRINGTON:  I think that's going to be part of

10   our argument, is that the government should be bound by the

11   language that's specified in the indictment.

12         THE COURT:  Yeah, yeah.  It's a little layered,

13   because, of course, the language of the indictment is of a

14   scheme, and the scheme includes those emails and invoices but

15   isn't necessarily limited to them.  That's been a point.  We

16   have been talking about this since the final pretrial.

17         MR. AYER:  If I could add, your Honor, in the trial

18   brief I think, and I don't know if I made it as explicit as I

19   intended, but we do believe that all the counts beyond rise and

20   fall with Counts 1 through 18 of the indictment, so they do

21   need to be related to those.  I'm sorry.

22         THE COURT:  All the counts beyond what?

23         MR. AYER:  All the counts beyond Counts 1 through 18,

24   so the money laundering, transportation of stolen money that in

25   the indictment are tied to the language here being --

1          THE COURT:  The money in those invoices, 1 through 18.

2          MR. AYER:  Correct.  It says wire fraud as alleged in

3    Counts 1 through 18 we think do have to be proven to be related

4    to 1 through 18 and rise and fall with those specific counts.

5          MR. HARRINGTON:  If I recall correctly, isn't the

6    language money derived from?

7          MR. AYER:  Yes, derived from specified unlawful

8    activity, mainly wire fraud as alleged in Counts 1 through 18.

9    So, we feel like --

10          THE COURT:  It's a little bit of a dilemma, because

11    you can say "As alleged in 1 through 18" means they're

12    substantive counts and it's sort of limited in that way.  But,

13    of course, as Mr. Davis has been pointing out, what they allege

14    is that those are just wire communications pursuant to a larger

15    scheme, and I'll have to make up my mind.

16          MS. LE:  And, your Honor, just to be clear, Mr. Ayer

17    is referring to the trial brief defense filed this morning?

18          MR. AYER:  No.  The one --

19          MS. LE:  Or the first one?

20          MR. AYER:  The first one.

21          MS. LE:  Okay.

22          THE COURT:  That makes a difference?

23          MS. LE:  I just wanted to know which trial brief so

24    that we can refer back to that material, because there was a

25    trial brief filed today.

1          MR. AYER:  The one this morning was a supplement with

2     additional case law --

3          THE COURT:  Regarding fraud.

4          MR. AYER:  -- relating to the wire fraud itself.

5          THE COURT:  Honestly, when I came in I picked that up

6     and I planned to read it on the bench today, but the evidence

7     was detailed, and I had to focus on it, so I hadn't read your

8     brief yet, but I'll read it.

9          MR. AYER:  That's fine.

10         THE COURT:  Anything else for the Court?

11         MR. DAVIS:  No, thank you, your Honor.

12         THE COURT:  Let's go off the record.

13         (WHEREUPON, the proceedings adjourned at 5:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of my

8     stenotype notes taken in the matter of *United States v. Imran*

9     *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14     Date: ____4/12/20              /s/ *Brenda K. Hancock*
                                   Brenda K. Hancock, RMR, CRR
15                                 Official Court Reporter

16

17

18

19

20

21

22

23

24

25