*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/11/20

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:18-cr-192-JL
              v.                      *  December 13, 2019
6                                     *  8:22 a.m.
      IMRAN ALRAI,                    *
7                                     *
                      Defendant.      *
8     * * * * * * * * * * * * * * * * *

9

10                  TRANSCRIPT OF BENCH TRIAL
                            DAY TEN
11
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13

APPEARANCES:
14

15    For the Government:      John S. Davis, AUSA
                               Matthew Hunter, AUSA
16                             Cam T. Le, AUSA
                               United States Attorney's Office
17

18    For the Defendant:       Timothy M. Harrington, Esq.
                               Timothy C. Ayer, Esq.
19                             Shaheen & Gordon PA

20

21    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
22                             United States District Court
                               55 Pleasant Street
23                             Concord, NH 03301
                               (603) 225-1454
24

25

I   N   D   E   X

PAGE

CLOSING ARGUMENT BY MR. HUNTER...........3

CLOSING ARGUMENT BY MR. HARRINGTON.......33

REBUTTAL CLOSING ARGUMENT BY MR. DAVIS...65

VERDICTS................................83

1              P  R  O  C  E  E  D  I  N  G  S

2           THE CLERK:  The Court has before it for consideration

3    this morning the closing arguments in the bench trial in

4    criminal case 18-cr-192-01-JL, United States of America versus

5    Imran Alrai.

6           THE COURT:  Good morning, Mr. Hunter.

7           MR. HUNTER:  Good morning, your Honor.

8           THE COURT:  It looks like you're ready to proceed.

9           MR. HUNTER:  I am.

10           THE COURT:  Go ahead.

11           MR. HUNTER:  Good morning.

12           THE COURT:  Good morning.

13                       CLOSING ARGUMENT

14    BY MR. HUNTER:  Over the course of this trial we have learned a

15    great deal about Mr. Alrai.  Perhaps most importantly, we've

16    learned just how far Imran Alrai is willing to go and how much

17    he is willing to lie, cheat and steal to enrich himself at the

18    expense of those who trust him.

19           And it's not just United Way and Robert Allen, though,

20    that are the ones who suffered actual economic harm here.

21    Mr. Alrai also used his family and betrayed his friends, all to

22    enrich himself.

23           As my colleague, John Davis, explained at the

24    beginning of this trial, this is a case about the defendant's

25    deception, greed and betrayals.  Deception because for six

1    years the defendant went to extraordinary lengths to pretend

2    that DigitalNet was someone other than him and composed

3    multiple emails to himself from this supposed Mohammad to

4    perpetrate his scheme; greed because, by ensuring that his two

5    employers directed more and more of their resources to

6    DigitalNet, the defendant quietly and quickly made himself a

7    multimillionaire in just a few years; and betrayal because the

8    defendant used his family and friends to prop up his scheme and

9    to sabotage his employers' efforts where they were most

10   vulnerable, information technology, even though both employers

11   paid and relied on Imran Alrai to be the one person who would

12   always look out for their best interests about IT matters.

13          As the Court knows, this is a 53-count indictment.

14   The first 18 counts are wire fraud.  The defendant planned and

15   executed a scheme to defraud, lied in furtherance of the

16   scheme, and sent interstate emails from his home office to his

17   email account at United Way.  The money laundering counts, the

18   transportation of stolen money counts, Counts 19 through 50,

19   the first set of money laundering counts and transportation of

20   stolen money deal with the international wires to Pakistan, and

21   the others relate to domestic financial transactions --

22          THE COURT:  I hate to say this to you this early, but

23   you're going to have to slow down.

24          MR. HUNTER:  -- where the defendant spent fraud

25   proceeds to benefit himself and his family.  Count 51 charges

1    aggravated identity theft, relates to the same email charged in

2    Count 18.  And, finally, Counts 52 and 53 charge the FBAR

3    crimes.

4         So, beginning with the FBAR counts, the evidence is

5    undisputed that the defendant did not file an FBAR for tax

6    years 2014 and 2016.  Now, unsurprisingly, there's no email

7    from the defendant saying, "I intend to violate the tax laws,"

8    but there is strong circumstantial evidence that he willfully

9    failed to file an FBAR.

10        First, the defendant annually received a detailed

11   client organizer that specifically asked questions about

12   foreign-held assets.  Second, the Schedule B of the 1040, which

13   the defendant approved every year under penalty of perjury,

14   states you must complete this part if you had a foreign

15   account.  It requires a yes-or-no answer to the question, "At

16   any time during the tax year did you have a financial interest

17   in or signature authority over a financial account located in a

18   foreign country?," and it expressly refers to FBAR.  I'd point

19   the Court to Exhibit 153 as an example.

20        Third, in correspondence with his tax accountants the

21   defendant specifically raised questions and received

22   information about the tax implications of earning income in a

23   foreign country.  That's Exhibit 153b.  And related to this the

24   defendant is highly intelligent and detail oriented, and he was

25   heavily engaged in every aspect of preparation of his tax

1    returns.  This includes taking the chore of providing

2    categorized spreadsheets to his accountant.  And also we see

3    the layering of funds, layering of transactions in his bank

4    accounts to decrease his profit margin and decrease his tax

5    liability.  This is not a hands-off guy with his taxes.  As

6    demonstrated in this trial, Imran Alrai likes to control and

7    pays attention to detail and took an especially, especially

8    hands-on approach to his taxes.

9         Finally, the defendant had a powerful motive to

10   conceal his bank account in Pakistan from both the IRS and his

11   own CPA, because disclosing information about the account would

12   help the lie to his claims to the gargantuan business expenses

13   that he took great efforts to conceal by inflating the cost of

14   goods sold on his taxes.  Tellingly, the only, quote, direct

15   evidence of the defendant's lack of knowledge and intent comes

16   from a single self-serving email that the defendant wrote after

17   he was indicted on the FBAR charges in the superseding

18   indictment.  It was after he had a reason to lie.  As evidenced

19   throughout this trial, the defendant has had no problem

20   crafting misleading and downright false emails, including

21   self-serving emails from Mohammad and Mac Chaudhary to conceal

22   his role at DigitalNet from Robert Allen and the United Way.

23   When he sent that email to his accountant he had every motive

24   to lie, to create a self-serving trial exhibit in this case.

25        Counts 19 through 30 charge money laundering, and

1    Counts 31 through 42 charge transportation of stolen money.

2    Both sets of counts relate to the defendant's sending of

3    international wires, proceeds of the fraud scheme, about

4    $1.2 million in all, from DigitalNet's bank account from Salem,

5    New Hampshire to a bank account in Pakistan.  As Ms. Cacace

6    testified and her summary exhibits demonstrate, each of these

7    wires transferred proceeds of the scheme to Pakistan.

8          And as the testimony regarding Mr. Alrai's

9    inter-account transfers of United Way and Robert Allen money to

10   his various business accounts demonstrates, Mr. Alrai knew

11   where the money was coming from, United Way and Robert Allen,

12   and he was taking active steps to hide it through over 500

13   inter-account transfers and then shipping it off to Pakistan.

14         Counts 43 and 50 are just domestic examples of the

15   same thing, Mr. Alrai using fraud proceeds to benefit himself

16   and his family.  He's paying off mortgages, he's fattening his

17   retirement accounts, paying for landscaping, and in July of

18   2018, soon after the search warrants in this case, the

19   defendant withdrew half a million dollars of fraud proceeds

20   from one of his bank accounts and placed the money in two new

21   accounts at different financial institutions.

22         Now, for purposes of money laundering, "proceeds" is

23   defined statutorily, and this is laid out in the government's

24   trial brief, to mean any property derived from or obtained or

25   received directly or indirectly through some form of unlawful

1    activity, including the gross receipts of such activity.  In

2    other words, even if some of the proceeds went to providing

3    legitimate services from Pakistan, the defendant's guilty of

4    money laundering if he committed wire fraud.

5          So, let's talk about wire fraud.  The evidence in this

6    trial demonstrates that the defendant orchestrated a scheme to

7    create and use his company, DigitalNet, as a means of

8    embezzling money from his employers, United Way and Robert

9    Allen Group.  He then used this money to pay off his house in

10   Windham, pay for plastic surgery, take fancy vacations, fatten

11   his bank and investment accounts for himself and his family,

12   and as seed money for his other business ventures.

13         The key to the scheme was Mr. Alrai's executive-level

14   position as the head of IT for both United Way and Robert Allen

15   Group.  From there he could ensure his new and inexperienced

16   company got lucrative contracts, and he could shield DigitalNet

17   from scrutiny when it failed to deliver.

18         The story of DigitalNet begins after Mr. Alrai was

19   hired at United Way.  Unknown to both his employers at the

20   time, Mr. Alrai was purportedly working full time as the IT

21   Director at both companies.  When United Way hired Mr.  Alrai,

22   they had some concerns about their IT costs.  They were too

23   high.  They didn't think they were getting value.  And, as Pat

24   Latimore testified, there was some concern that some of the

25   staff at United Way were too close to their current IT vendor,

1 | CWAIN.

2 | So, United Way made a reasonable business decision.

3 | They hired their own IT expert, something they didn't have.

4 | They wanted somebody in their corner who understood this stuff

5 | to make sure that they hired the right vendors and that they

6 | didn't get taken advantage of.

7 | If there's one thing that's clear from this trial,

8 | aside from, the government will argue, the defendant's guilt,

9 | is that IT is complicated stuff.  There's a lot of jargon.

10 | It's easy to get lost and not understand what service is being

11 | provided and how much it's worth.  Every single witness from

12 | United Way testified as much, and we've had three experts

13 | testify about IT services, costs and reasonable markups.  It's

14 | complicated, it's technical.  That's the reason why Imran Alrai

15 | was able to dupe United Way and Robert Allen and continue to

16 | milk United Way for millions of dollars over six years.

17 | United Way was looking for a guy to get their house in

18 | order, but Mr. Alrai lied about -- he breached -- he broke his

19 | employer's trust right from the very beginning.  First, he lied

20 | to get the job by providing fake references and a false resume.

21 | Once at United Way, the defendant suggested an IT risk

22 | assessment and, naturally, recommended DigitalNet for the job,

23 | and, of course, DigitalNet was hired and paid $50,000.

24 | Now, it's not exactly clear what DigitalNet actually

25 | did for the health assessment.  Kal Wahbe recalls remoting into

United Way's system and telling Mr. Alrai about what he saw.
But the folks at United Way didn't recall seeing anyone from
DigitalNet on site actually conducting the assessment.  But one
thing is clear.  Even if DigitalNet didn't do its job and
conduct a risk assessment of United Way's IT infrastructure,
Imran Alrai did conduct a different type of risk assessment at
United Way.  He assessed the company's risks and
vulnerabilities and determined just how he was going to exploit
them.  Mr. Alrai saw that there was a poor IT environment at
United Way, and that the company was paying way too much for
IT.  Even a little improvement would deflect any concern about
the work that DigitalNet was doing.  He also knew about the
weaknesses in United Way, in their system, particularly the RFP
process and the trust that United Way employees had in each
other.  United Way didn't have an IT expert.  That's why they
hired him.  They would defer to his expertise, and that is
exactly what happened.

Every United Way witness that knew anything about the
2013 RFP process, Pat Latimore, Azim Mazagonwalla, Diane
Dragoff, Stan Burrows, testified that Mr. Alrai, alone,
circulated the RFP, received the RFP responses, reviewed them
and scored them.  This is also reflected in contemporaneous
emails, examples Exhibit 609, Pat Latimore writing to Stan
Burrows, "Imran is in the process of scoring the RFPs.  He's
reviewing the results with me this week."  And he did.  He

1    reviewed the score sheet with Pat Latimore.  "Imran is in the
2    process of scoring the RFPs."  And Imran did review the score
3    sheet with Pat Latimore.  She testified to that.  But United
4    Way relied on Mr. Alrai, their IT guy, the expert in their
5    corner, to pick the right vendor, and of course they did.
6    That's why they hired him.  As Mr. Mazagonwalla put it, "I
7    don't expect senior staff to commit fraud."

8         Stan Burrows was the only other IT guy around, but he
9    was a volunteer.  He gave advice.  He even asked Mr. Alrai if
10   he could help score the RFPs and the RFP responses.  Imran
11   Alrai said, "No."  He declined the invitation.  He didn't want
12   oversight.  When cross-examined, Mr. Burrows cautioned the
13   defense, "Don't ascribe too much authority to my role as a
14   volunteer.  I don't have the influence you're suggesting."
15   Again, Mr. Alrai controlled the process here.

16        The RFP Mr. Alrai circulated on January 13th had a
17   deadline -- next slide -- of January 25th at 5:00 p.m. Eastern
18   Standard Time, and on January 25th, 2013 Mr. Alrai got three
19   responses, one from All Systems Integration, one from
20   mindSHIFT, one from Eze Castle dated January 25th, 2013.  And
21   there's also a response, an RFP response, from DigitalNet also
22   dated January 25th, 2013.  Despite its best efforts, United Way
23   has not been able to find these responses on their systems, and
24   we know they maintained RFP responses.  They got a 2011 RFP
25   response from TBS, that's John Meyer's company, among the files

1   at Mr. Alrai's desk at United Way.  The reason why we have

2   these RFP responses from mindSHIFT, Eze Castle and DigitalNet

3   is because they were found on the defendant's personal

4   computer.  He had PDFs of the first three responses, All

5   Systems, mindSHIFT and Eze Castle, and in a subfolder called

6   "Personal Business Initiatives" had a word and PDF version of

7   the DigitalNet RFP response, 803.1 and 803.1a.  And the

8   metadata of that Word document shows that four days after

9   receiving the other responses on January 29th, 2013 Imran Alrai

10  was in the Word document.  He saved it.  He printed it to PDF.

11  Imran Alrai edited DigitalNet's RFP response, and he backdated

12  it to January 25th, 2013, and then he went on to score the

13  responses.  He not only had the answers to the test in advance,

14  but he graded the test.  It's no surprise that DigitalNet got

15  an A.

16          After getting the contract, Mr. Alrai wasn't in the

17  clear.  Pat Latimore wanted more information.  She wanted to

18  make sure that DigitalNet was an established company with many

19  customers and wanted to get references.  United Way wanted to

20  do their due diligence, and, again, they relied on Mr. Alrai.

21          Exhibit 612 shows, in response to Ms. Latimore's

22  request, Imran Alrai, using the fake name "Mohammad" from the

23  info@digitalnet.us email account, provided three references,

24  three fake references.  There's Mr. Khan, who is purported to

25  be the IT Director at Barneys in New York, Steven R. Anderson,

1    the CEO of AISA Systems Corporation in Fairfax, Virginia, and

2    Nabile Ejaz, the supposed IT Director of Abilities, Inc. in New

3    York.  And we heard testimony from Mr. Khan and Mr. Ejaz.  They

4    said they didn't provide a reference.  And it's apparent from

5    the bank records that DigitalNet never did any work for Barneys

6    or Abilities in New York.  And AISA Systems Corporation, that

7    company doesn't exist, but AISA in Virginia certainly does, and

8    that was Mr. Alrai's company.  He also provided Steve Anderson

9    as a reference when he applied to get the job at United Way

10   using an AISA Consulting email address.

11          And then, in response to Pat Latimore's inquiries for

12   diligence, again, writing as Mohammad, Mr. Alrai said the

13   contract with United Way would only represent 9 percent of

14   DigitalNet's revenues in the U.S.  Of course, the Court has

15   seen the financial analytics of DigitalNet's bank accounts.  It

16   was a lot more than 9 percent.  United Way and Robert Allen

17   were DigitalNet's only U.S.  customers.  That was simply a lie.

18          DigitalNet was a new company with no experience.  It

19   was formed ten days -- next slide, please, Ms. Sheff -- ten

20   days before Mr. Alrai brought DigitalNet to United Way to do

21   the risk assessment.  It was formed in Delaware 8/7/12.  The

22   bank accounts opened 8/15/2012.  8/17 is when DigitalNet

23   contracted with United Way to conduct a health and security

24   assessment.  And only after securing the contract with United

25   Way did DigitalNet Pakistan open a bank account on April 3rd of

1    2013.

2         So, United Way did their best.  They called the fake

3    references.  Pat Latimore even met with someone she thought was

4    a principal of the company, Mac Chaudhary, at United Way.

5    Ms. Latimore describes the man she met as in his 50s, of South

6    Asian descent, tallish, said his English was good, they had no

7    problem communicating.  She said he did not have a thick

8    accent.  The Court saw and heard Mac Chaudhary when he

9    testified.  Whoever Mr. Alrai brought to DigitalNet to meet

10   Ms. Latimore, it was not Mac Chaudhary.  And Alrai's buddy kept

11   up the charade.  He claimed DigitalNet had many customers and

12   never said a word about DigitalNet being Mr. Alrai's company.

13        It worked.  United Way thought they had hired an

14   experienced IT vendor, and Mr. Alrai had established his money

15   stream.  So, he decided to do the same thing at Robert Allen,

16   his other employer.  In August of 2013, only a few months after

17   fraudulently obtaining the United Way contracts for DigitalNet,

18   the defendant convinced Robert Allen to hire DigitalNet to

19   provide IT services, including for website development and

20   telephone services.

21        Now, Robert Allen didn't have a formal procurement

22   process, so it was easier this time for Mr. Alrai.  As

23   Mr. Chaudhary testified, "When it came to the contract, I

24   relied on Imran's recommendation."  After all, Mr. Alrai was

25   their CIO.  He had been working there for a while.  They

1    trusted him on IT matters.  As far as Robert Allen Group knew

2    at that time, Imran Alrai wasn't working for anyone else.

3         The scheme at both companies played out in strikingly

4    similar ways.  At both Robert Allen and United Way he used the

5    same front company, DigitalNet.  He exploited his position as a

6    trusted executive and IT expert to control the process and

7    secure the contracts, including providing both companies with a

8    fake client list.  He foiled every effort to determine who

9    DigitalNet actually was.  He used the same bank accounts at

10   Pentucket to receive and launder revenues.  He used the same

11   bank account in Pakistan to receive proceeds of the scheme.  He

12   used his father as a straw principal to hide his ownership of

13   the company.  And he sent messages to the victims signed by

14   Mohammad and Mac Chaudhary to, again, conceal his identity and

15   his connection with DigitalNet.  And even after the jig was up

16   he attempted to extort additional funds from both Robert Allen

17   and United Way by threatening to terminate the company's phone

18   services.

19        The only difference between DigitalNet and United Way

20   is that Robert Allen left United Way; in fact, he was pushed

21   out after Robert Allen found out that he was also employed by

22   United Way and a new independent IT person came in and figured

23   out what was going on.  Now, Mr. Riviera didn't figure out that

24   Mr. Alrai was DigitalNet, but he immediately saw that, despite

25   DigitalNet receiving hundreds of thousands of dollars in a

1    short period of time, DigitalNet wasn't qualified and wasn't

2    doing the work it was hired to do.  Once there was an actual IT

3    expert checking Alrai's work, Robert Allen was able to cut

4    through the web of lies, cut through the jargon, and see that,

5    despite DigitalNet creating a document noting that a lot was

6    100 percent complete, DigitalNet had just built a bridge to

7    nowhere and didn't actually produce anything.

8            In gaining the website contract, again, DigitalNet had

9    claimed its expertise that it didn't have, just like it did

10   with United Way.  And because of this, because someone was

11   actually checking his work, Alrai was only able to bilk

12   $400,000 from Robert Allen Group.  You see, this is critical.

13   At the core of the scheme is that Mr. Alrai needed to be *the* IT

14   guy so he can direct his employers to hire his company and can

15   run interference to make sure that no one can truly scrutinize

16   DigitalNet, what they are charging and what they're doing.

17           The testimony from Robert Allen and United Way

18   witnesses are strikingly similar.  Chuck Cioffi from Robert

19   Allen, Pat Latimore, Azim Mazagonwalla, Diana Dragoff, Jack

20   Rotondi from United Way, they also trusted Imran.  They relied

21   on Mr. Alrai.

22           This is illustrated vividly with what happened in

23   2016, when United Way tried to do additional diligence on

24   DigitalNet.  Jack Rotondi wanted some documents from DigitalNet

25   and wanted to communicate directly with Mac Chaudhary, the

1    supposed principal of the company.  Naturally, he relied on

2    Imran Alrai to make the connection, and, of course, as we've

3    seen time and again, despite wanting to talk with Mac, they

4    only communicated by email.  And Rotondi wanted some documents.

5    He wanted a certification of financial health, a banking

6    reference letter of good standing, and a total number of

7    clients and sample client list.  And part of what was going on

8    here also is Diane Dragoff doing -- I think it was Diane

9    Dragoff -- doing that additional web search of DigitalNet, not

10   finding much of a web presence.  They wanted to figure out is

11   this really the established, experienced IT company that we

12   think that it is?  And in his July 13, 2013 email Mr. Alrai

13   introduced Jack Rotondi to Mac, again by email, and that same

14   day, July 13th, 2013, Imran Alrai got to work to create the

15   documents that Jack Rotondi was requesting.

16          Now, the letter from Pentucket Bank, that actually was

17   provided by Pentucket Bank, and that letter was found at

18   Mr. Alrai's home office in Windham.  But then there's this July

19   18th, 2016 financial health attestation signed by Mac

20   Chaudhary, and this document that was received by Jack Rotondi

21   is hand signed by Mac.  But the Word version of the document

22   that we found on the defendant's computer shows a couple of

23   things.  First, it shows that the author was Imran, and it's

24   created on July 13th.  That's the day.  That's the day he

25   introduced Jack to Mac.  And the letter, though the content is

1     the same, obviously the date is different, but the first draft

2     of the letter he's using a really fake-looking digital

3     signature.  And so, Mr. Alrai had his dad sign it, sign the

4     letter.  The only difference between what they actually got is

5     that Mr. Alrai had Mac Chaudhary sign the document that he

6     drafted, and, as we heard from Mac Chaudhary, he never refused

7     to sign a document that his son put in front of him.

8           Now, I want to spend some time with Exhibit 118.  So,

9     this is not only a wire fraud count, but it's also the

10    aggravated identity theft count, Count 51.

11          On July 18th, 2016, at 5:53 p.m., Mr. Rotondi received

12    an email from Mac Chaudhary attaching a fake client list for

13    DigitalNet.  Now, Mr. Chaudhary at the trial claimed for the

14    first time that he actually did send this email -- he denied it

15    in the past -- and he got the list of clients from the office

16    in Pakistan.  But let's get real.  At this point in 2016 United

17    Way is examining DigitalNet.  An income stream for Imran Alrai

18    over $1,000,000 per year is at risk.  There is no way that Mr.

19    Alrai is going to let his dad, a retired doctor who knows

20    nothing about IT, send this email.  There's also no way that

21    Imran Alrai is going to rely on programmers in Lahore to draft

22    this critical document.  That's why we found the Word document

23    on Mr. Alrai's computer.

24          And Mr. Alrai had no qualms about using other people's

25    identities before, whether it's stealing his friend Faisal

1    Bhatti's identity to provide a fake reference to get a job,

2    stealing Mr. Khan and Mr. Ejaz's identities to provide fake

3    references for DigitalNet, or stealing his own father's

4    identity by getting a buddy to pretend to be Mac Chaudhary to

5    convince Pat Latimore that DigitalNet is a legitimate company.

6            And we also have the forensic evidence from the

7    computer, again, the email to Jack Rotondi sent July 18th, 5:35

8    p.m.  We found a Word version of this document providing the

9    fake clients, the author of that Word document, Imran; last

10   saved by Imran; content created in the document July 18th,

11   2016, same day as the email, 9:54 a.m.; Documents printed, and

12   we saw the PDF showing it was printed to PDF 7/18/2016 at 4:41

13   p.m.  Date last saved.  Again, last saved by Imran July 18th,

14   2016, 5:25 p.m., eight minutes before Jack Rotondi received the

15   document from Mac.  There is no reasonable doubt that Imran

16   Alrai sent that email.

17           As laid out in the government's trial brief, it

18   doesn't matter if Mr. Chaudhary gave permission.  What matters

19   is that Mr. Alrai used his father's identity unlawfully in this

20   case to further his scheme to defraud.  And that's exactly what

21   happened here.  Imran Alrai used his father's identity to short

22   circuit United Way's due diligence efforts and keep the money

23   flowing from United Way into his bank accounts.

24           So, what about the other wire fraud counts?  How do we

25   know that Mr. Alrai sent those emails?  How do we know that he

1    is Mohammad?  First, it's important to note that Mr. Alrai need

2    not send the email to be guilty of the charged counts.  He only

3    needs to cause the wire to be sent.  And this is also true of

4    the money laundering counts.  He needs to cause the wires; he

5    doesn't have to be the actual sender.  And what the evidence of

6    this case demonstrates, nothing happens at DigitalNet that

7    Mr. Alrai doesn't cause.  He retains tight control of

8    everything.  So, even if there's some guy named Mohammad

9    camping out in Mr. Alrai's backyard and sending the emails,

10   Mr. Alrai caused the wire.  But the evidence here is

11   overwhelming that Mr. Alrai sent the emails charged in Counts 1

12   through 17 of the superseding indictment, that he was Mohammad.

13          So, let's count some of the ways.  There's about 14 of

14   them.  First, and I direct the Court to summary Exhibit 925,

15   Mohammad sends emails only when the defendant's at home and

16   never while the defendant's at work at United Way.  Mr. Alrai

17   and Mohammad are like Clark Kent and Superman; they're never in

18   the same place at the same time.  Mohammad sends emails from

19   the IP address of the defendant's home internet network.  All

20   of Mohammad's invoices are stored on the defendant's home

21   computer, as are the Microsoft Word versions of the templates

22   used to create those invoices, all on Mr. Alrai's home computer

23   in Windham, New Hampshire.  The defendant usually corresponds

24   with Mohammad only when he's going to be at United Way the next

25   day to present the DigitalNet invoice for payment.  The

testimony was a little tedious, but the Court saw the pattern
in the summary chart that more often than not, in fact, most of
the time Mohammad sends an email from info@digitalnet from the
defendant's home internet network.  The next day Imran Alrai is
swiping in at United Way to process the invoice for payment.
The phone number Mohammad uses for his invoices goes to an
Andover, Massachusetts phone number, but no one works in the
Andover office.  They just get mail there.  All of the HR files
from Mohammad's employees are, again, stored in the defendant's
home office in Windham, New Hampshire.

          And the defendant gets Mohammad's mail.  Here's an
example, Exhibit 879, found in the defendant's home office in
the search warrant addressed to Mr. Mohammad Hassan referring
to DigitalNet as his company.  The defendant corresponds with
Mohammad only when the subject involves extracting money from
United Way and Robert Allen Group.  The defendant never emails
Mohammad about staffing challenges or other subjects that
real-life business colleagues discuss.  Mohammad seems to
always be on the job; no one's filling in for him.  He only
sends emails during working hours in the U.S. and, again, only
when Imran Alrai is not at work at United Way.  And Mohammad
apparently works for free.  There's no payroll or bank record
paying a Mohammad Hassan.  Mohammad never calls or visits his
valued employees embedded for years at United Way, and no one,
including other DigitalNet employees, has ever seen Mohammad.

1    No one, including other DigitalNet employees, has ever spoken

2    to Mohammad.   Imran Alrai is DigitalNet.   Imran Alrai is

3    Mohammad.

4            The evidence is also overwhelming that Mr. Alrai

5    intended to defraud his victims.   Now, in the context of wire

6    fraud, the First Circuit defines a "fraud" to mean to deceive

7    another in order to obtain money or property.   That's from the

8    First Circuit jury instructions.   The evidence here is

9    overwhelming that Mr. Alrai intended to deceive United Way and

10   Robert Allen Group to obtain money or property.   He got over

11   $7,000,000 through his deceit.   He also intended to deprive

12   United Way and Robert Allen Group of their intangible right to

13   control their assets, and this is also alleged in the

14   superseding indictment.

15           Again, the government need not show actual harm to the

16   victims, only that, by depriving the victim of necessary

17   information to make discretionary economic decisions, there was

18   a risk of economic harm.

19           Alrai used his position, again, as an insider at these

20   two companies to undermine their procurement process and got

21   his under-qualified company, DigitalNet, lucrative contracts

22   with his employers.   And then in 2016 he scuttled the due

23   diligence efforts, again using his position by providing false

24   information about the RFP process and about DigitalNet's

25   experience and capabilities.

1          As laid out in the cases cited in the government's

2     trial brief, this deceit denied the victims of their intangible

3     right to control their assets by depriving them of the

4     information necessary to make discretionary economic decisions,

5     which created a risk of economic harm.

6          But, again, let's get real here.  This was all about

7     lying to get money.  If the defendant was acting in good faith

8     and he was really just wanting to provide value and the lies

9     were just incidental, why did he repeatedly refuse to engage in

10    new IT projects unless DigitalNet could be brought in and

11    usually at a much higher cost?

12         And I direct the Court, there's an example of this,

13    Exhibit 635, and Dom Pallaria testified about an IT project he

14    was trying to get started that was scuttled because he wouldn't

15    bring in DigitalNet because it was too expensive.  Why did the

16    defendant lie year after year on his conflict of interest form

17    about his lack of relationship with DigitalNet?  As an

18    executive at United Way, he must have known that he was

19    exposing United Way to a risk, not only in filing a false 990,

20    but if the conflict were ever found out by donors, there's a

21    real risk of harm to United Way's reputation and ability to

22    collect donations.

23         THE COURT:  Hold on a minute.  All right.  I'm

24    actually trying to make sure I'm keeping with you, not just the

25    reporter.

1          MR. HUNTER:  Okay.  And why, again, if he was acting

2     in good faith, he was trying to run a legitimate business, why

3     did he use so many separate accounts at different banks to

4     launder money, cheat on his taxes and hide his profits?  Why

5     did he use AISA as a shell holding company to hide his

6     connection with DigitalNet and hide the money he gained from

7     the scheme?  Why immediately after the search warrants did the

8     defendant move and shelter $500,000 of proceeds into new bank

9     accounts?  Why wasn't United Way able to find records of the

10    RFP process, and, despite having them on his personal computer,

11    why didn't the defendant provide them when they were doing

12    their due diligence in 2016 and wanted to -- and were asking

13    questions about what happened in 2013?  Why did the defendant

14    move servers at United Way without notice after the

15    announcement of the CBIZ risk assessment and immediately being

16    asked about the location of where United Way's data was being

17    stored?  Why did he use his father to sign all DigitalNet

18    documents and wire funds?  Why did he use Elaine Singer, who

19    never had any accounting role at United Way, to approve United

20    Way invoices to give himself a layer of separation?  This is a

21    recurring theme, again, Mr. Alrai spinning this web to create

22    this appearance of separation between him and DigitalNet, and

23    we've talked about some of that, his father, the bank accounts,

24    Elaine, and also after the fact Stan Burrows.  He is the one

25    that graded the RFPs, apparently.

1        Why send emails pretending to be Mohammad?  Why ask

2   Kal Wahbe directly and indirectly to hide Imran Alrai's

3   ownership and connection with DigitalNet from United Way?  Why

4   is he maximizing and pushing the limits of the budgeting

5   process to make sure the maximum amount of money possible is

6   going to DigitalNet?  Why threaten both Robert Allen and United

7   Way to terminate phone services once the jig was up?  Why

8   didn't he cooperate with United Way's efforts to regain control

9   of their IT system and lie about a safe in his home with

10  passwords and other documentation of the system?  Why did he

11  lie to Lorissa Guzman about having no overseas business

12  interests and no international wirings over $10,000?  And after

13  he was found out why did he continue to lie to John Mulvaney,

14  when he could have come clean?  Again, he said all the

15  passwords and documentation were in his safe because he didn't

16  actually have them at United Way.  When he was asked about who

17  worked with him at DigitalNet he, again, lied about this

18  Mohammad character and made up a new name, a character named

19  Mike who works with Kal.  He claimed he had never heard of AISA

20  Corporation, despite forming it and it having headquarters at

21  his then home address in Virginia and using AISA Corporation as

22  a reference both for him to get a job and as a reference for

23  DigitalNet.  He told John Mulvaney he didn't know his father's

24  middle name.

25        And then there's the kicker.  Mr. Alrai ends the

1    interview with John Mulvaney by saying he never supplied

2    DigitalNet with inside information during the RFP process.

3    This is despite Mr. Alrai knowing that he is DigitalNet and

4    that he edited the DigitalNet RFP response after getting the

5    other bids.  He could have come clean.  He could have

6    explained, "I was just trying to get my company started, I lied

7    to get the contract, but I've really provided value here.  No

8    harm, no foul."  But he didn't do that.  The reason he lies is

9    because the defendant knows that the truth of what he's done is

10   indefensible.  That is consciousness of guilt.  That is intent

11   to defraud.

12          Then, of course, there's Mr. Alrai's extreme profits,

13   the large delta between revenues and costs.  A person acting in

14   good faith who isn't trying to defraud his victims would not

15   have run up so much personal wealth so quickly.

16          So, let's talk about the millions of dollars Mr. Alrai

17   made through his scheme.  The evidence in this trial

18   demonstrates in four independent ways that Alrai used

19   DigitalNet to steal over

20   3.5 million bucks from his victims even after accounting for

21   any possible value provided by DigitalNet.  First, we've got

22   the $400,000 paid to Robert Allen Group and all the testimony

23   from Dean Riviera about nothing being done for that money.

24   Then Greg Naviloff did a detailed analysis of United Way's

25   invoices and contracts, an analysis that even Mr. Alrai's

1    experts had to concede was thorough, and concluded that through

2    a combination of exorbitant markups, billing United Way for

3    services not actually provided and getting United Way to pay

4    twice for the same services, Alrai stole over $3.1 million from

5    United Way.  Averaged out, that's a 914-percent markup for the

6    services that Mr. Naviloff analyzed, a figure even the

7    defendant's own IT expert agreed probably is not reasonable.

8         But the DigitalNet invoices are vague, as a number of

9    witnesses testified.  It was hard to tell what DigitalNet was

10   billing for and what they actually did.  This is an important

11   part of the scheme.  United Way had to rely on Mr. Alrai to

12   check on DigitalNet and make sure they were getting what they

13   paid for.  So, Mr. Naviloff checked his work, he tested his

14   assumptions by conducting an independent analysis, looking at

15   Mr. Alrai's bank accounts and taxes to determine Mr. Alrai's

16   personal enrichment from the scheme.  The Court heard the

17   testimony, saw the summary slides.  Bottom line:  Mr. Alrai

18   pocketed about 3.7 million bucks.

19        But there's more.  John Meyer testified about the cost

20   of services United Way is receiving now.  As noted by Pat

21   Latimore, now that United Way is using a different vendor, she

22   sees that United Way is receiving services that she thought

23   they had but didn't with DigitalNet.  And Mr. Meyer testified

24   that, although United Way is now paying more for servers with

25   more memory so they don't have to keep rebooting them to keep

1    the system up, they're paying more for high-availability backup

2    that they didn't have when he got there, and they're paying

3    more for phones with more security and more bells and whistles,

4    the overall spend for United Way is less, and, again, because

5    the CIO's compensation services are included in his fee,

6    they're paying less over the same period of time to the tune of

7    $3.7 million.

8          But the evidence doesn't stop there.  We actually have

9    a window into the actual spend for DigitalNet from

10   Mr. Naviloff's analysis of Mr. Alrai's business accounts.

11   After clearing out the clutter of the inter-account transfers

12   Mr. Alrai used to artificially inflate DigitalNet's cost of

13   goods sold and decrease his purported profit, and even

14   including charges on the DigitalNet credit card, which, as the

15   Court has heard, included a lot of personal expenses,

16   DigitalNet actually paid about $44,500 a month for vendors,

17   payroll and other operating expenses.  This is roughly in line

18   with TBS's, United Way's current vendor, monthly flat rate of

19   $44,800 that United Way is now paying.

20         So, if we cut through the smoke, cut through the

21   jargon, the numbers line up.  The scheme worked.  In just five

22   years Imran Alrai stole well over $3.5 million from his

23   victims.

24         Now, Mac Chaudhary testified in this case, the

25   defendant's father.  It's clear from Mr. Chaudhary's testimony

1   that he loves his son and that he would do anything for him,

2   even lying under oath.  It's also apparent from his testimony

3   that Mr. Chaudhary is not an IT expert, and he's not really a

4   businessman.  He's a retired doctor who doesn't speak English

5   very well and was completely financially dependent on his son.

6         One point of Mr. Chaudhary's testimony was

7   particularly revealing.  While talking about how he would sign

8   anything that his son put in front of him, that he never

9   refused to sign anything, Mr. Chaudhary said something to the

10   effect of, "In the beginning I used to read them, the

11   documents, but later on I used to glance over it quickly, and

12   if it looked right I would sign."  Then he paused briefly and

13   said, "He is my son."  We may never know exactly how much

14   Mr. Chaudhary knew about Mr. Alrai's lies and deceit, but we do

15   know that he trusted his son and that his son abused that

16   trust.

17         Part of what makes Imran Alrai's fraud particularly

18   troubling is Mr. Alrai's willingness to use and betray those

19   closest to him to enrich himself.  We've talked about the

20   defendant's father, but the defendant also used his wife in her

21   position of trust at Pentucket Bank to get around the bank's

22   requirement that people fill out international wire transfer

23   forms in person in order to get his money over to Pakistan.

24   And when he was called on it, Mr. Alrai was upset.  He drove to

25   the bank and had a confrontation, a confrontation that

1    Mrs. Alrai was trying to get into a personal office so he

2    wouldn't make a scene.  It was going to be a little less

3    convenient for him to launder his money if he had to actually

4    drive his dad to the bank to fill out the form instead of just

5    getting him to sign it at his house before Imran Alrai emailed

6    it to the bank using his father's email address.

7           And then there's Mr. Alrai's long time friend, Faisal

8    Bhatti, friends since high school, roommates.  Mr. Alrai stole

9    his identity to provide himself with a glowing reference at

10   United Way, and not two years later Mr. Alrai went to

11   Mr. Bhatti's funeral to console him.  At that funeral Mr. Alrai

12   made an interesting admission, this is 2014, speaking to a

13   friend who's far away from New Hampshire and Boston, far away

14   from the locus of the fraud, and Mr. Alrai said that he had

15   started a new IT company, DigitalNet, and was working to get it

16   off the ground.  It was his company.  He was just starting it.

17   And despite Mr. Chaudhary now trying to take the blame for his

18   son and claiming with immunity that he, a retired doctor who

19   doesn't know the first thing about information technology,

20   started an internet -- and IT services company, there's no

21   doubt, reasonable or otherwise, that DigitalNet was Imran

22   Alrai's company.  Alrai was DigitalNet.

23          And speaking of Mr. Chaudhary, an interesting pattern

24   emerged during his testimony.  When Mr. Chaudhary thought his

25   answer would hurt his son, he would change his story from what

1   he'd previously said, and he'd lie, but when he didn't know

2   what he had to say would hurt Mr. Alrai glimmers of truth came

3   through in his testimony.  For example, for the first time at

4   trial Mr. Chaudhary suddenly remembered that DigitalNet

5   apparently did have an employee named Mohammad Hassan who, of

6   course, was located in Pakistan.  Apparently, that's where all

7   the exculpatory evidence is.  But Mr. Chaudhary didn't know

8   about the forensics done on the emails, the wire fraud emails

9   from Mohammad, and he didn't know about the forensics done on

10  Mr. Alrai's computer.  He didn't know that we knew that

11  Mohammad sent his emails from Imran Alrai's home internet

12  network in Windham, New Hampshire.  So, he said Mohammad's in

13  Pakistan.  And when questioned about whether he, who was also

14  at the home in Windham, ever sent a Mohammad email, he said,

15  "No."  Mr. Chaudhary is not an IT guy.  He didn't know that

16  answer would hurt his son.

17        Mr. Chaudhary also tried to describe DigitalNet

18  Pakistan as this long-standing business with lots of

19  programmers, a business with lots of clients, and that UltPult

20  had nothing to do with DigitalNet.  But then he said that, once

21  the government froze the accounts in America, those are the

22  DigitalNet and AISA accounts that contain the proceeds from

23  Robert Allen and United Way, the United Way money, that the

24  UltPult programmers suddenly had to be paid through an account

25  in Pakistan, and that they were running out of money to pay all

1    the programmers from DigitalNet.  In other words, once the

2    United Way gravy train was shut down, UltPult and DigitalNet

3    Pakistan are going to have to close shop.

4            Now, that glimmer of truth that Mr. Alrai is using

5    money stolen from United Way to fund his other business

6    projects is supported by other evidence in this case.  Now that

7    they have to close shop without cash from United Way,

8    DigitalNet Pakistan payroll is continuing after United Way

9    terminates its relationship with DigitalNet.  They're not doing

10   United Way work.

11           During Mr. Alrai's interview with Ms. Guzman he first

12   denied a connection with DigitalNet, but, when confronted, he

13   claimed that DigitalNet was being used to develop gaming

14   products in Pakistan -- that's UltPult -- and that DigitalNet

15   was working on other projects.  And at other times Mr. Alrai

16   claimed DigitalNet Pakistan was involved in R and D for facial

17   recognition software and other software completely unrelated to

18   United Way.  They do everything.

19           There's no doubt that Mr. Alrai is an entrepreneur.

20   He's got a lot of business ideas, and he outlines some of these

21   ideas in the journals of his that are in evidence.  But, like

22   any good entrepreneur, Mr. Alrai needs capital, and so

23   Mr. Alrai conscripted United Way and Robert Allen Group to be

24   unknowing angel investors in his other business projects.

25   That's not the American dream, like the defense counsel called

1    it in his opening.  That's fraud.  And that was the scheme, to

2    abuse his position of trust in an area where his victims were

3    most vulnerable, information technology, and to steal their

4    money to enrich himself.  There is no reasonable doubt that

5    Imran Alrai knowingly and wilfully orchestrated and

6    participated in a scheme to defraud United Way and Robert Allen

7    Group, and that he sent interstate wires in furtherance of that

8    scheme.  The government asks that the Court return the verdict

9    that the evidence demands and find the defendant guilty on all

10   counts of the superseding indictment.  Thank you.

11           THE COURT:  Thank you, Counsel.  We'll take a recess,

12   and then we'll hear defense argument.

13           THE CLERK:  All rise.

14           (Recess taken from 9:15 a.m. to 9:30 a.m.)

15           THE CLERK:  All rise for the Honorable Court.

16           THE COURT:  Please be seated.

17           All right.  Mr. Harrington, please proceed.

18           MR. HARRINGTON:  Thank you, Judge.

19                          CLOSING ARGUMENT

20   BY MR. HARRINGTON:  Your Honor, the government started by

21   saying that there was betrayal and deception, but what I would

22   suggest to you is, regardless of whether you find betrayal or

23   deception, the issue is really whether my client had an intent

24   to commit a fraud against United Way, and what I'm suggesting

25   to you is that the evidence shows that there was no intent to

1    defraud, and I'll go into those factors as to why in a few

2    moments, but I wanted to start by focusing on a couple of other

3    charges first, and then I'm going to circle back to this topic.

4           Now, the FBAR charges I want to touch base with

5    briefly.  As you heard from Mr. Terry and in regard to the

6    government's arguments, the forms, as you saw, for every year

7    that the FBAR had not been filed, from 2013 through 2018, my

8    client filed, filed late, and, once he had learned of the

9    requirement, he clearly communicated with Mr. Terry, and on

10   those forms, which are in evidence for you as exhibits, you see

11   that the stated reason was, "Not aware I needed to file."

12          The government points to other things that you should

13   consider as evidence that he knew or he should have known, I

14   suppose, but really what we're talking more about is a willful,

15   which is not just negligence.

16          THE COURT:  He should have known --

17          MR. HARRINGTON:  Yeah.  And so, that's what I would

18   suggest to you, is that, although the kind of file was sent to

19   Mr. Alrai from the CPA with a checklist of things that you

20   should look at, it's clear that that checklist was not ever

21   sent back to Mr. Terry.  He indicated as such.

22          Additionally, he indicated that when the IRS tax

23   documents were filled out the section that related to the issue

24   of whether that had been done with a foreign bank account,

25   again, were left blank.  So, there was no attestation by Mr.

1    Alrai that he did or didn't.  It was just left unaddressed.

2          There was a couple of documents you saw, Judge, where

3    the document was checked "No," as not having a foreign account,

4    but you may recall Mr. Terry actually said that was due to the

5    fact that he had had a new program for tax preparation in those

6    years, and if it was not answered it would simply default to

7    "No."

8          So, again, we're left in a situation where there is

9    actually no affirmative response by Mr. Alrai, which is

10   indicative of simply not being aware of it, consistent with

11   what he filed when he did his late filing.  There's no

12   indication that he affirmatively said, "No, I don't have it,"

13   which, obviously, would be clear evidence that he was aware of

14   it if he indicated, "No, I don't have foreign bank accounts."

15   But we just don't have that.

16         Additionally, what's considerable for you to consider

17   and disregard is, when he did the late filing he did so without

18   penalty and without any tax issues related to it.  It was

19   simply a notification that he had failed to do.

20         So, one of the things that you do, I would

21   respectfully suggest -- the government is arguing a series of

22   circumstantial inferences they want you to take.  I'm

23   suggesting to you that you also have direct evidence, which is

24   a specific statement by the defendant and would ask you, based

25   on that, to enter findings of not guilty relative to the FBAR.

1          Judge, the other charge I wanted to talk about,

2     briefly, before I go back to what I consider to be the main

3     charge, is the aggravated identity theft.  Contrary to what the

4     government has suggested, it seems clear, based on Exhibit

5     Number 118, which has been discussed, which you have, which

6     you've seen several times, Mr. Chaudhary specifically said

7     that, as the government conceded in its closing, that he sent

8     that email.  They don't want to believe that, and, obviously,

9     that's their decision to make, but that was his testimony.  He

10    said that that was not sent, and, as a result, in that regard

11    on the aggravated identity theft charge, if you choose to

12    believe that portion of his testimony you have that direct

13    evidence, again, that my client did not use his email and

14    assume that identity, and, therefore, again, the aggravated

15    identity theft charge would fail.

16          Likewise, I would suggest to you, respectfully, that

17    the government has not introduced any evidence that

18    Mr. Chaudhary prohibited my client from using the email address

19    as well.  So, in regard to that, that's why I believe that the

20    ID theft -- or, excuse me -- aggravated identity charge should

21    be dismissed as well, your Honor.

22          I want to switch now, Judge, to talk about the money

23    laundering and transportation of stolen money counts, because

24    there is a legal argument that I want to make to you before I

25    get into the issues that I want to kind of give you an

1    historical.  So, with that, the money laundering charge, if you

2    look at Counts 19 through 22 -- and I guess I should step back

3    for a moment, because I think you need to frame this argument

4    I'm going to make to you now with the first counts, Counts 1

5    through 18, and they give you a specific time frame,

6    specifically starting with Count 1, May 11th of 2015, and then

7    sequentially through Count 17 and Count 18 of July 13th, 2016,

8    and those are all the wire fraud charges.  So, you have a date

9    range of May 11th, 2015 through July 13th, 2016.

10          Now, when you go to the first set of charges relative

11   to money laundering, Counts 19 through 30, Judge, I'll draw

12   your attention, first, to Counts 19 through 22 and those dates,

13   Count 23, and that date of May 18th, and then the following

14   sequential dates from July 18, '16 through March 15, 2018.  And

15   if you go back to the language just preceding the counts, it

16   says that Mr. Alrai did knowingly engage in monetary

17   transactions in criminally derived property of a value greater

18   than $10,000 that was derived from specified unlawful activity,

19   namely wire fraud, as alleged in Counts 1 through 18.

20          So, the government has chosen, for whatever its

21   reasons and rationale, to specifically talk about the money

22   laundering charges in Counts 19 through 30 as tied to the funds

23   received in Counts 1 through 18.  Now, could the government

24   have chosen a different path?  Certainly, it could have.  I

25   know the Court questioned the government a few times during the

1    course of trial about decisions it made relative to certain

2    indictments.  So, the government chose this path.

3            So, if you look at Counts 19 through 22 of the money

4    laundering charges, Judge, you have dates ranging from April

5    21st, 2014 to January 20th of 2015.  All four of those dates,

6    Judge, precede the first date of May 11th, 2015 of the wire

7    fraud transactions, and, as a result, it would be a factual

8    impossibility for any funds to be derived from those wires,

9    and, as a result, those counts must fail.

10           I would also suggest, Judge, if you look closely at

11   Counts 35 through 42, Count 35 is actually May 18th, 2015 and

12   is actually the only date in these money laundering charges

13   that we're looking at that falls within the date range of

14   Counts 1 through 18.  All the other dates from Counts 36

15   through 42 fall outside and after the counts alleged in Counts

16   1 through 18.  And I would suggest that's important, Judge,

17   because the government is alleging that the money in these

18   specific counts, 36 through 42, came from the funds in Counts 1

19   through 18.

20           Now, if we look at this -- and I'll give somewhat of a

21   hypothetical, if you will.  If we have money coming from United

22   Way into a bank account to DTS, being paid to DTS, and you

23   heard the government produce evidence relative to the fact that

24   it did not try to distinguish between funds received that were

25   legitimate and funds that were illegitimate, it took all money

1    from Robert Allen and all money from United Way and put it into

2    one bucket that it called "dirty money."  However, how can you,

3    as the trier of fact, tease out what is clean money and dirty

4    money for services that were performed and appropriately

5    compensated if all the money is in one bucket and it's all

6    considered dirty?  That means with these counts -- these would

7    have to be Counts 36 through 42 -- if there is money in these

8    accounts I would suggest that an inference you would need to

9    draw, if there's circumstantial evidence that we're talking

10   about, if there is a reasonable and rational explanation

11   consistent with innocence, that you would draw that rational

12   and reasonable inference towards innocence, which would mean

13   the funds that could have been used and derived appropriately

14   and legitimately could have been the subject of these counts

15   versus what the government wants you to characterize as dirty

16   money.

17            THE COURT:  Can you hold on for a second?

18            MR. HARRINGTON:  Yes, Judge.

19                      (Pause)

20            THE COURT:  I don't mean to hold you up.  Okay.

21   Please proceed.

22            MR. HARRINGTON:  So, again, Judge, the argument that

23   I've laid out to you relates to the predicate Counts 1 through

24   18, and then the other counts, 19 through 22, which I've

25   indicated precede Counts 24 through 30, which come after the

1    dates in Counts 1 through 18, again, Count 23, the only one

2    that falls within that time frame.  And, again, the government

3    specifically used this language leading into that paragraph for

4    the money laundering tying it to Counts 1 through 18.

5           I'm going to skip over to Counts 31 through 42 for a

6    moment and focus in on Counts 43 through 50, and it's the same

7    argument, Judge, that I'm going to make to you.  Because if you

8    look at the language in the paragraph preceding this series of

9    charges, and, obviously, these are additional money laundering

10   charges, Counts 43 through 50, Counts 43 and 44, again, predate

11   the time frame alleged in Counts 1 through 18, so a factual

12   impossibility.  Counts 47, 48, 49 and 50 are all after the

13   dates alleged in Counts 1 through 18.  So, Counts 45 and 46

14   would be the only dates in this series of charges that fall

15   within the date range of Counts 1 through 18.

16          Turning back to, Judge, because there is a distinction

17   here that I want to draw your attention to, if you look at the

18   Paragraphs 31 through 42, so we've done the first set of

19   charges on the money laundering, and then we go over to this

20   transportation of stolen money series, the language is

21   different.  It does not specifically reference Counts 1 through

22   18 and the money relative to that.  And the reason I raise that

23   is I'm not making the same argument relative to this paragraph.

24   And I also point it out because it's very specific language

25   that the government chose for the paragraphs relative to Counts

1    19 through 30 and Counts 43 through 50.  For some reason it

2    chose not to put that language in this paragraph.  So, clearly

3    a conscious decision by the government to choose this language.

4             THE COURT:  Hold on a minute.  Make this point again.

5             MR. HARRINGTON:  Sure.

6             THE COURT:  I noticed a difference between the stolen

7    money counts and the wire fraud, the variance in the language.

8    I'm not sure I understand the one you're making now.

9             MR. HARRINGTON:  I think we're talking about the same

10   thing, Judge.

11            THE COURT:  Oh, okay.

12            MR. HARRINGTON:  So, the variance is in counts on the

13   money laundering, if you look at the counts, you have Counts 19

14   through 30.

15            THE COURT:  They cross-reference paragraphs --

16            MR. HARRINGTON:  1 through 18.

17            THE COURT:  -- 1 through 18.

18            MR. HARRINGTON:  Yup.

19            THE COURT:  And the point is the one I had noticed in

20   my review of the situation was that that wasn't the case

21   vis-a-vis transportation of stolen money.

22            MR. HARRINGTON:  Correct, Judge.

23            THE COURT:  Is that what you're saying?

24            MR. HARRINGTON:  It is.  Yup.

25            THE COURT:  Okay.  And so, I know what inferences I

1    draw from that, but I was getting a little lost trying to find

2    it, what you were just talking about.  So, make your argument

3    again, please.

4              MR. HARRINGTON:  I will, Judge.  So, if you look at,

5    just by comparison, because I think we are talking about

6    exactly the same things, you look at the introductory paragraph

7    on Counts 19 through 30.  So, you go to Paragraph 37, and then

8    you have the defendant's name, and then you get into, "Did

9    knowingly engage in," and that's where you have the specific

10   language relative to Counts 1 through 18.  That same language,

11   if you go to Counts 31 through 42 and the introductory language

12   there --

13             THE COURT:  In Paragraph 39, right?

14             MR. HARRINGTON:  That language is not there.  You go

15   over to the following page, it just talks about knowingly.

16             THE COURT:  Right.  That frees those counts from any

17   tie-in, right?

18             MR. HARRINGTON:  Correct.  I agree, and that's why I'm

19   distinguishing those counts.

20             THE COURT:  To make the point that the language

21   matters in the money laundering counts?

22             MR. HARRINGTON:  Correct.

23             THE COURT:  Okay.

24             MR. HARRINGTON:  And I would also suggest to you,

25   Judge, that, although that is distinguished, as you have

1   pointed out in some questions that you've brought up a few

2   times, the government has specifically alleged the crimes

3   charged and really has tied this whole indictment, in the

4   defense's opinion, to Counts 1 through 18.  So, when you're

5   looking at these counts in paragraphs or charges 31 through 42,

6   I would suggest you can reasonably look back to Counts 1-18 as

7   your framework for judgment.  I don't think that you can

8   necessarily look back beyond those, but I think you can confine

9   yourself, given the way that the government has drafted it.

10          THE COURT:  Vis-a-vis money laundering.

11          MR. HARRINGTON:  Yes, Judge.  So, I think that you

12   have the gravamen of those arguments that I'm making, Judge, so

13   I'm going to move on to a different subject, but I would

14   suggest to you, respectfully, because of this --

15          THE COURT:  But didn't a few minutes ago you make an

16   argument regarding Counts 36 to 42, and those were the

17   transportation of money laundering counts, and you said,

18   because they occurred outside and after the Counts 1 through 18

19   time period I should acquit on those, and I didn't understand

20   that, because for the very reason -- the argument you're making

21   now, there's no anchoring language to those wire fraud counts.

22          MR. HARRINGTON:  There isn't.  And you know what I

23   think I did, is I think I misspoke.  When I was saying Counts

24   31 through 42, I think I said --

25          THE COURT:  All that argument was directed toward

1    money laundering.

2         MR. HARRINGTON:  Correct, 19 through 30, and then I

3    think it's 43 through --

4         THE COURT:  You just alleviated a great deal of

5    confusion.

6         MR. HARRINGTON:  Yeah.  And that was my mistake,

7    Judge.  I misspoke on the counts.

8         THE COURT:  Okay.

9         MR. HARRINGTON:  So, with that said, Judge, based on

10   those arguments to you regarding the crafting of the

11   indictment, the time frames that are specified, I'm suggesting

12   on those counts that I've specified to you that you should

13   enter a dismissal based on that, because it basically is an

14   impossibility for the government to sustain its burden, given

15   the time frames and the structure of the indictment.

16        Obviously, this is more of a legal argument to you,

17   Judge.

18        I want to move now into more a factual and historical

19   piece of the case.  So, in this regard, Judge, the government

20   had talked about this case kind of starting in 2013, but, in

21   fact, the case actually started, as Munawar Chaudhary had

22   testified, in roughly 2007, when he established DigitalNet

23   Pakistan before he came to the United States, and that he had

24   his son-in-law Ahmad and his son Jawad and his daughter as the

25   initial startup there, and he testified additionally that

1    Pakistan DigitalNet had anywhere from 20 to 30 employees, that

2    there was a large boom in Pakistan in the IT industry, and they

3    were trying to capitalize on it, and that they did have

4    businesses throughout the Middle East.

5         He comes over to the United States roughly in 2008 due

6    to medical reasons and ultimately starts residing with my

7    client and his wife and children.  My client is working in the

8    field of IT, ultimately working with Robert Allen and then

9    crossing over into the United Way.  During this time

10   Mr. Chaudhary is talking with his family members, including my

11   client.  He wants to start DigitalNet in the U.S. and he talked

12   and testified about the fact that he wanted to establish

13   something that he could leave to his family when he passed.

14   And he talked further about the qualifications of the people in

15   his family, his son, who was an IT expert, Jawad, his son, who

16   also had significant training, education in IT, and his

17   son-in-law, again, also someone who had significant IT training

18   and skills.

19        So, the basis was started many years before we get to

20   2013.  And the reason that that's important, Judge, is one of

21   the things that the government is trying to argue is this was a

22   scheme -- this creation of DigitalNet was a scheme created to

23   defraud Robert Allen and United Way, but it was not.  It was a

24   business that had been started years before.  So, in that

25   regard I would suggest the government would fail on this idea

1    of DigitalNet being, you know, developed, started and

2    instituted as a scheme to defraud.

3         In regard to I think a central question that you have

4    to ask yourself in this case, Judge, is does an omission

5    constitute fraud, does a breach of a fiduciary duty, a failure

6    to disclose the relationship between the defendant and

7    DigitalNet constitute fraud, and I would suggest to you, and

8    you asked me that question the other day, I am arguing to you

9    that it does not, that in and of itself the failure to disclose

10   is not fraud as it relates to the contract, that these

11   contracts, as you've seen, went through a process, an RFP

12   process.  Although many of the witnesses wanted to downplay

13   their roles, there are many emails relative to this that are in

14   evidence, starting with the exhibits that the defense has put

15   in, starting with Exhibit L, and all the way through.  There

16   are numerous, numerous emails that the Court will be able to

17   look at that talk about the contract terms, that talk about the

18   RFP process, that talk about the scoring process, and in that

19   regard that process was an open and fair process.

20        The fact that members of the United Way may have

21   chosen not to further engage in the process is different than

22   my client concealing or refusing them to participate in the

23   process or any of those things.  This was a process that was at

24   the top overseen by Patricia Latimore.  There were other

25   members such as Nancy Powers, Dominec Pallaria.  We also had

1     outside people such as Stan Burrows, Jack Rotondi.  All of

2     these people involved in the process were able to ask

3     questions, to criticize contract formation and ultimately sign

4     off on the contracts.  So, to try to portray this as simply

5     something that my client did all by himself is not an accurate

6     or fair characterization of the process.

7             Perhaps United Way's process was flawed, perhaps it

8     could have been better, but it was not a process that my client

9     created.  Contrary to what the government had asserted, they

10    said that my client knew the United Way RFP process and

11    exploited it, he had never done an RFP process with the United

12    Way, never.  He was hired in 2013 and had never done an RFP

13    process.  The whole process that was done at the United Way was

14    done according to their own internal RFP process.  They

15    appointed people to the committees they wanted to appoint.

16    Those individuals had duties and responsibilities.  Whether

17    they followed those responsibilities, whether they should have

18    dug deeper or things of that nature, that's not my client's

19    obligation.  He had a fair and open process.  The documents

20    were available to people.  If they wanted to ask, they could

21    have asked.

22            And one thing that is very interesting, Judge, and

23    will be I think also a critical thing for you to think about,

24    because one of the arguments I'm making to you is that the

25    United Way received the benefit of the bargain, that all the

1    contracts that were entered into between DigitalNet and United

2    Way were fully performed and all services provided.  And the

3    reason that that's an important factor to consider is, if you

4    listen and go back and think of all the testimony from United

5    Way personnel, nobody said that the services contracted for

6    weren't provided.  Patricia Latimore, in particular, said the

7    services were provided, that United Way was satisfied with the

8    services provided, although she gave a caveat saying, "I think

9    that the services we're getting now are better."  Well, that

10   may be, and that may be her opinion, but that doesn't mean that

11   the services weren't delivered, and, clearly, according to

12   their own testimony, the services were satisfactory.  Couple

13   that with the exhibits that you have regarding Mr. Alrai's job

14   performance and evaluations, all of them glowing, all talking

15   about superior achievements and achieving their goals and so

16   much so that after two years at United Way he was promoted and

17   promoted to Vice President and Chief Information Officer;

18   that's how satisfied the United Way was with the improvement in

19   their IT process and the services that they were receiving.

20         Also important for you to consider, Judge, is in

21   regard to services provided think about the budget and some of

22   the information you've heard about budget.  And this comes from

23   Mr. Naviloff.  So, the government has talked about markups,

24   exploitation, basically gouging, those types of things.  So,

25   when my client came onboard in 2013 to the United Way they were

1    in an IT mess, and you've heard that clearly from many

2    witnesses, and that they wanted to go in a new direction.

3            You'll see emails both in 2012 and into 2013 in the

4    defense exhibits talking about how they had 19 separate

5    vendors, that the services were a mess and not being provided,

6    and they wanted someone to change that.  Mr. Alrai comes in and

7    an IT health assessment is done.  You heard testimony relative

8    to that.  And, although the government kind of wanted to make

9    it sound like it was Mr. Alrai's idea to do the IT health

10   assessment, there was also clear testimony that the United Way,

11   even before Mr. Alrai was hired, was talking about doing an IT

12   health assessment in the years preceding 2013.  You heard

13   Mr. Meyer say that, when somebody comes on and an organization

14   is thinking about a change in IT vendors, it is appropriate and

15   routine to do an IT health assessment.  So, trying to say that

16   Mr. Alrai made up this idea of doing an IT health assessment so

17   that he could then get DigitalNet onboard is not accurate.  An

18   IT health assessment was done, and I think, contrary to what

19   the government had indicated, it was discussed with Pat

20   Latimore.  Ms. Latimore talked about it and talked about the

21   fact that there was an IT health assessment done and was

22   reviewed with Mr. Alrai, and then they moved forward with it.

23           Now, in regard to pricing and the budget, I want to

24   come full circle to that.  When Mr. Alrai came onboard, the IT

25   budget at United Way had gone up and down, and there are

1    exhibits for your review where it was always over $1,000,000,

2    1.2, 1.3.  There was a spike before Mr. Alrai even got there of

3    I think $2,000,000 the year before he even got there.  And then

4    you heard Mr. Naviloff say in the entire six years that

5    Mr. Alrai was there as the CIO -- well, senior and then CIO --

6    but in the six years he stayed within United Way's budget for

7    the entire time period, and there was only one time that he

8    went over, I think he said, by approximately $10,000 in 2018.

9    So, the IT budget for the United Way does not dramatically

10   increase.  There are no gouges, there's no exploitation.  The

11   budget remained consistent, the services were delivered and the

12   services improved all within the same budget with the United

13   Way.  That, I would suggest to you, shows clear evidence of

14   delivery of services and, as a result, the delivery of services

15   is central and key, because if those services are delivered on

16   the contracts there is no intent to defraud the United Way.

17   Performance on all the contracts, delivery of the services.

18   Then, where is it that the crime has been committed?  Simply in

19   the deception?  I would suggest no.  That's why you need more

20   than just the omission.

21          One of the other things that I think is very important

22   on this budget and cost analysis for the Court to consider is

23   what other evidence has the government produced that the

24   pricing that was done by Mr. Alrai was inappropriate in the

25   context of IT vendors?  None.  The only other information you

1    have is from Mr. Meyer, and the information provided by

2    Mr. Meyer indicates that he and his company are paying or being

3    paid over $800,000 a year, but that does not include other

4    services and other services that were provided by DigitalNet on

5    special projects, on capital expenditures for things such as

6    computers, phones, wiring, routers, all of those things.

7    Mr. Meyer said, "Yeah, that's not included in what my costs

8    are; they have to pay extra for that, and if there are special

9    projects that have to be done, those can be additional costs to

10   United Way."  So, that is not an apples to apples comparison,

11   and the government has no other information, no other vendors

12   that they can say, "Oh, yeah, the $13,000 a month for

13   telephony, that's an inappropriate charge, or $3,500 for

14   managing the Insight," or I should say, "SIP.US is an

15   inappropriate charge."  They have no other comparables, so they

16   just want you to conclude that it's inappropriate.

17          The other thing that I think is very significant for

18   you to consider in this case, and I would suggest you could

19   draw a negative inference against the government for this, is

20   the failure to preserve the IT environment in this case.  So,

21   you heard testimony that Mr. Meyer came in I want to say in

22   April of 2018, about a month or so -- excuse me, I think it was

23   May, I apologize -- about a month before Mr. Alrai is

24   terminated on June 12th of 2018, and at that time he knew that

25   United Way was conducting an internal investigation.  He also

1    knew that there was a criminal investigation going on, he knew

2    that law enforcement was involved, and they don't do anything

3    to preserve the IT environment as it existed on June 12th of

4    2018 so it could be analyzed, so that the Court could actually

5    see what was in place that this man had done relative to the

6    services the government is saying weren't provided.

7            And Mr. Meyer actually even went so far as to say he

8    initially did make a copy of certain servers, the OVH, as a

9    precaution but then never got them.  He let OVH keep them and

10   then ultimately confirmed, he says, with OVH that they were

11   destroyed.  And you have communication, clear communication

12   between Mr. Meyer and law enforcement, both Homeland Security

13   and FBI, about all of this stuff, and they never asked.  I

14   mean, they know what this case is about.  Law enforcement never

15   asked or even seeks to get that IT environment.

16           THE COURT:  I want to make sure I understand.  I

17   understand your argument.  This is an argument, though, as to a

18   failure of proof on the government's part, right?

19           MR. HARRINGTON:  It is, Judge.

20           THE COURT:  I tried to be careful about not letting

21   Mr. Meyer testify about anything that wasn't disclosed to you.

22   That's not what you're saying here, right?

23           MR. HARRINGTON:  No, Judge.

24           THE COURT:  This isn't an evidentiary objection; this

25   is an argument about failure of proof?

1          MR. HARRINGTON:  Correct, Judge.

2          THE COURT:  Okay.

3          MR. HARRINGTON:  Yup.  And that's why I think it is a

4    very sizeable and significant failure of proof on the

5    government's part, because they want you to make decisions

6    about specific services such as CloudConnect, Insight and SIP

7    that I'm going to talk about in a minute, but they didn't even

8    preserve the environment.  All they want you to go off of are

9    the invoices.  And you even heard Mr. Naviloff, or actually --

10   yeah, it was Mr. Naviloff, talk about the fact that there was a

11   difficult process trying to match up DigitalNet invoices to

12   Insight and SIP invoices to basically figure out what the

13   services were.  He was trying to make apples-to-apples

14   comparisons, but we have no guaranties if that's the case.  The

15   only thing that would have guaranteed that is that IT

16   environment.  Then there would be no dispute about what

17   services were in place.

18          And that includes a number of issues that the

19   government brought up and tried to adduce testimony on, such as

20   geographic diversity, high-availability backup.  None of that

21   stuff is available for you except through the testimony of

22   Mr. Meyer, I suppose, and Mr. Meyer is the one who told

23   Mr. Naviloff about it.  There isn't even an IT expert that came

24   in for the government to talk about this stuff.

25          One of the things that I want to focus on in regard to

1    CloudConnect, Judge, is you heard from the defense expert,

2    Jason Sgro, that his opinion was that Mr. Naviloff had made a

3    significant mistake in misunderstanding what the CloudConnect

4    service was that was being provided, and he tried to

5    characterize this as kind of just simply a pass-through

6    Mr. Naviloff did, and that if DigitalNet wasn't even in the mix

7    you could simply have gotten the services from CloudConnect

8    directly to United Way and without the markup, because he's

9    saying DigitalNet pays CloudConnect, you know, $300,000, let's

10   say, but United Way is billed $900,000 and I'm using just

11   random numbers.  But that's not the case.  There was a basic

12   and fundamental misunderstanding by Mr. Naviloff about what the

13   role of CloudConnect was, and Mr. Sgro explained that.

14   CloudConnect does not deal with end users.  There has to be a

15   third-party vendor, and that was DigitalNet.

16          Additionally, another fundamental misunderstanding is

17   about what services CloudConnect was providing.  You heard the

18   example of a sandbox, that CloudConnect provides the sandbox,

19   but all the stuff that's in the sandbox that has to be built is

20   done by the third-party vendor, and that included the hosting,

21   the security, all the infrastructure, all of those things.  And

22   there was a little sheet that Jason Sgro put up, that visual of

23   all the services that are provided by the third-party vendor

24   and that were provided by DigitalNet in this case.  But the

25   assumption by Mr. Naviloff, erroneously, was that CloudConnect

1   was doing all of that, and they weren't.  That's not what they

2   do.

3         And so, the whole characterization, and you'll see

4   when you look at the records, the CloudConnect money that

5   they're talking about here, it's the biggest amount that

6   they're saying DigitalNet was paid for and shouldn't have been,

7   and it's based on a fundamentally flawed premise, and it's

8   based on the fact that Mr. Naviloff is not an expert in IT, and

9   he relied, it appears, on statements of Mr. Meyer and perhaps

10   some of his own IT, but we never got any statements or reports

11   from those individuals, and they are just wrong about

12   CloudConnect.  And he even indicated in his testimony, when

13   cross-examined about it, that he didn't learn until later that

14   CloudConnect would only deal with third-party vendors.

15         And in this regard and the source of information from

16   Mr. Naviloff one of the things I would suggest you consider is

17   Mr. Meyer.  Mr. Meyer, who is now the CIO at United Way,

18   through his business TBS he owns, he owns TBS himself.  He owns

19   TBS.  And it was interesting to note that there was no RFP

20   process for TBS being awarded this contract, that he actually

21   is acting in a dual role as the Chief Information Officer in a

22   full-time, he said, 40 hours a week, every day in the office in

23   United Way, and he's also maintaining his full-time job for

24   TBS.  So, this sounds somewhat familiar, the only difference

25   being United Way knows Mr. Meyer's conflict.

1          THE COURT:  Well, there's another big difference,

2     isn't there?  He's not drawing a salary as an official at

3     United Way.  Basically, TBS is the CIO of United Way now.  It's

4     not as if there's a CIO -- I don't mean to interrupt.

5          MR. HARRINGTON:  No, that's okay.

6          THE COURT:  But that's a difference, too.

7          MR. HARRINGTON:  That is a difference.  You may recall

8     the questions about that, that his salary is rolled into that

9     cost, and he's also drawing a full-time draw on his job at TBS.

10    But I agree with you that is a distinction.  Yup.

11         THE COURT:  In addition to the one that you pointed

12    out, which is that everybody knows.

13         MR. HARRINGTON:  Everybody knows.  That's right.  And

14    this goes to does the omission itself constitute the fraud.

15         THE COURT:  Understood.  You're asking me -- and I

16    appreciate this -- you're asking me to think about fraud in a

17    deep, thoughtful way and to really consider the fact that

18    misunderstanding or even omissions, failures to disclose don't

19    necessarily constitute fraud.

20         MR. HARRINGTON:  Yes, Judge.

21         THE COURT:  Or, more importantly, I think much more

22    importantly, actually, is that it undermines proof of intent to

23    defraud.

24         MR. HARRINGTON:  That's right.  The other thing in

25    regard to the information, just to focus on Mr. Meyer for

1    another minute, is the cost.  You heard testimony about the

2    cost of running the IT systems, and Mr. Sgro, the defense

3    expert, told you that the cost to run it now would actually be

4    less than the cost to initially start it and get programs in

5    place and run it, and that's because you're going to have

6    additional expenditures, you're going to have much more

7    hardware installed, things of that nature.  So, Mr. Meyer came

8    in and basically took over the process that was in place, and

9    he subsequently made changes to it, but there was already the

10   update that had taken place by DigitalNet over the course of

11   almost six years, and so you are, by virtue of that,

12   potentially going to have something that is less expensive.

13            The other thing that I wanted to talk about in regard

14   to cost, Judge, is one of the things that I know you were

15   interested in and there was a little bit of discussion back and

16   forth was about markup, and it raises the question of what's an

17   appropriate markup and is it a markup, and, in particular, I

18   want to focus in on the SIP relationship, because, as you heard

19   from Jason Sgro, SIP is not a service provider.  They basically

20   provide the bandwith or the line that will go in and out of the

21   business.  The other stuff that goes with it to manage the

22   telephony system, whether it's the management of it, whether

23   it's fax, whether it's mobile, all of those other things, those

24   are other costs that get layered onto that.

25            And you heard Mr. Sgro testify about the difference in

1    the timing when the phone systems were implemented.  There was

2    a PBX system, which was the initial system Mr. Alrai inherited.

3    They then transitioned that into the cloud, and then it appears

4    that, after that, it was transferred by Mr. Meyer to 8x8.  So,

5    there's a transitional migration, and there's a couple of

6    contracts that relate to that, and so you have a change,

7    potentially, in the pricing.  So, you were shown these

8    invoices, one for a thousand bucks from Insight and then one

9    for $13,000 from DigitalNet, and you were saying, "What do you

10   think of that markup, Mr. Sgro?", and he had no comment.  We

11   then kind of fleshed it out a little bit with some further

12   questions, because I didn't think he was clear on what that

13   meant, and that's when he talked to you about the other managed

14   pieces that could be rolled into that invoice, because you see

15   the DigitalNet bill says "Managed Telephony" on the invoice.

16   That's the $13,000.  The bill from SIP is only for the lines.

17   That's it.  That's the difference between those.  You're not

18   comparing apples to apples.

19          And so, the markup, as Mr. Sgro had said, is you have

20   to look at what's an appropriate payment or price for managed

21   telephony, and so the markup the government talks about, you

22   know, 900 percent, 1,000 percent, stuff like that, it's not an

23   accurate characterization of markup.

24          Likewise, in regard to Insight, which was ultimately

25   the kind of middleman for OVH and the servers, again, we don't

1    have the IT environment preserved, so we just are going on

2    testimony and so forth.  But, again, no environment to analyze,

3    and you're going based just on invoices, and they, again, are

4    not, I would suggest to you respectfully, comparing apples to

5    apples on that.

6            You heard Mr. Sgro talk about the fact that the

7    diversity, if you will, geographic diversity, can be done in a

8    number of ways, one of which is you could have the company have

9    two different geographic areas where they have servers, but you

10    could also have diversity where you have the company have its

11    own servers and then the company itself, United Way in this

12    instance, having its own servers, and that is an acceptable

13    geographic diversity for backup, but we don't have the IT

14    environment to analyze to demonstrate that that was, in fact, a

15    geographic diversity in place.

16            Additionally, there was some comment about high

17    availability, and Mr. Sgro had distinguished between the fact

18    that, if an OVH center goes down, like it did here, there was

19    testimony it went down for a few days, that doesn't have

20    anything to do with whether the services were provided or not;

21    all it has to do with is whether the service went down.  It

22    doesn't mean it didn't have this, you know, high-speed, high

23    availability.

24            So, a few more points, Judge.  In regard to a couple

25    of points that were raised by the government in its closing,

1    one of the things it talks about is that, again, there was a

2    score sheet that was done in the RFP process, and it talks

3    about my client being the only one doing it and so on.  So,

4    I've commented a little bit about the openness of the process,

5    the involvement of others.  You'll see that in the email

6    communications between United Way personnel.

7            But one of the other things that is interesting is

8    have you heard any evidence that the scoring was actually

9    incorrect?  And you can assume, for the sake of argument --

10   let's take it to its conclusion -- that my client scored it.

11   Let's just say he scored it; nobody else even looked at it.  If

12   that scoring is accurate, that goes to whether or not there's a

13   fraudulent intent.  Has the government shown you -- and

14   certainly it had availability of the contracts that they

15   received, they could have had somebody else, such as an IT

16   expert, independently score them and say, "Yeah, this is way

17   off.  DigitalNet never should have got this contract.  It was

18   inappropriate scoring."  But they didn't, and you don't have

19   any evidence to that.

20           They talk about metadata, and one of the things they

21   want to argue is that, because of the metadata you saw relative

22   to a proposal submitted by DigitalNet, they had the answers to

23   the test.  You may recall them saying they had four days that

24   they could look at stuff and then submit, and so they were able

25   to look at the other proposals.  The problem is that they don't

1    have that information to back up, because the metadata, as you

2    heard, can be changed easily by a last view, a last save.  That

3    doesn't have anything to do with when the United Way actually

4    received the RFPs on January 25th.  So, they want you to make

5    the conclusion, they want you to make that jump, but there's

6    nothing in between.  They just want you to make that leap.

7         They also talked to you about the references, and this

8    is an oddity, Judge, that I don't know what to do with.  Pat

9    Latimore -- I guess maybe it goes to a credibility issue or a

10   believability issue.  The government is basically saying that

11   my client made up references with Mr. Khan, Mr. Anderson and

12   Mr. Ejaz, with Mr. Anderson it was my email, Ms. Latimore

13   didn't speak to him, but she then says -- she testified

14   specifically that she had the correct phone number for

15   Mr. Khan, she had the correct phone number for Mr. Ejaz, and

16   the government actually confirmed with both Mr. Khan and

17   Mr. Ejaz when they were on the stand that those were their

18   numbers.  And Ms. Latimore said she actually called them on

19   those numbers and spoke to them.

20        So, what to make of that?  Were the witnesses

21   basically not wanting to get involved and not wanting to admit

22   that they actually did give references?  Perhaps.  It just

23   seems a very odd disconnect that Ms. Latimore is saying she

24   called those very numbers, spoke with those individuals that

25   answered, and this is what they told them.

1      In regard to Robert Allen, Judge, there were four

2   contracts, you heard.  Three of the contracts were performed.

3   You heard a number of the executives talk about that.  The one

4   that wasn't performed that they had issue with was the web

5   development.  Mr. Riviera did say that he had some issues with

6   the phone contract, but the other witnesses didn't indicate any

7   issues with that.  They indicated the other three contracts

8   were satisfied; the web one was the issue.

9      In that regard I'll point you to the exhibits that the

10   defense has submitted relative to extensive communications

11   between DigitalNet staff and Robert Allen relative to that

12   project.  I'd point out to you that it was a six-month

13   contract, and for two of those months Robert Allen didn't have

14   a CIO in place, that there is email correspondence saying that,

15   even though this project got off track, DigitalNet's saying,

16   "We still think we can get this done for you."  I submit to you

17   that, essentially, they had a new CIO come in, he wanted to

18   make changes, and he did, and part of that change was he didn't

19   want to go through with that web contract with DigitalNet.

20      And you heard testimony from Nadeem Yousuf, who had

21   actually also worked with Mr. Riviera, that the phone system

22   actually was fine in his system, and he was actually in charge

23   of that system.  Oh, I apologize, Judge.  I think I said

24   "Nadeem Yousuf," and I meant Kal Wahbe.  My apologies.

25      THE COURT:  Understood.

1          MR. HARRINGTON:  One of the other things that the

2     government talked about was tax fraud or Mr. Naviloff's review

3     of the taxes, but the government also agreed in some questions

4     that the Court had submitted that my client isn't charged with

5     tax fraud, he's not charged with cheating.  Mr. Naviloff

6     admitted that he didn't do an audit of the taxes, yet they want

7     to kind of do a dive into it to some extent and try to say you

8     should make some conclusions that he took inappropriate

9     deductions, even though they haven't had a formal audit done.

10    You should reject that relative to deductions and things of

11    that nature.

12          In regard to the harm that was done, so I want to come

13    full circle to one of the issues in this case relative to

14    fraud, and the government talked about that one of the things

15    that's at issue is it believes that the defendant interfered

16    with and harmed the intangible right of United Way to make

17    discretionary economic decisions, and that it only needs to

18    show that there is a possible resulting harm.  What I would

19    suggest to you is that there's actually one further step, and

20    many of the courts who have reviewed these issues have talked

21    about is, it's not just possible harm.  It should be more than

22    that, because the wire fraud statute can be so broad, as the

23    Courts have recognized, that there needs to be a showing of

24    actual tangible economic harm, not just a possibility, and

25    that's done in a way to try to limit the very, very broad scope

1    of the wire fraud statute.

2         In this case you have an individual that had contracts

3    put in place.  There was a process for it.  There was other

4    individuals who were involved in that process and the payment

5    of the contracts.  You heard testimony relative to a whole

6    layer of individuals that payments had to go through to pay

7    DigitalNet from the United Way.  This process was followed

8    internally.  My client did not control it or have control over

9    it.  The checks were paid.  United Way paid DigitalNet.  And

10   those monies were earned by the services that were provided.

11   Because all those services were provided, there is no fraud,

12   and what DigitalNet did with the money once it received it and

13   provided the services is beyond the scope of the indictment.

14   It is not fraud.  They can buy land, they can invest in other

15   things, whatever they want to do.  That's the money that's

16   earned.

17        And, as a result, if you go back to the beginning of

18   this, if you look at what intent is in this case for

19   defrauding, you will have your judgment informed by the fact

20   that services were provided, there was no economic loss that's

21   been proven, and, as a result, you should find Mr. Alrai not

22   guilty on all counts, Judge.  Thank you.

23             THE COURT:  Rebuttal?

24             MR. DAVIS:  Good morning, your Honor.

25             THE COURT:  Good morning.

REBUTTAL CLOSING ARGUMENT

1

2    BY MR. DAVIS:  Let's start with aggravated ID.  Mr. Harrington

3    said that when Mr. Chaudhary testified he said that he sent the

4    email to Jack Rotondi in 2016; he now remembered that.  But

5    Mr. Chaudhary just a few lines later in his same testimony

6    said, well, he couldn't remember sending that email, and that

7    whatever he had said was based on his, Mac Chaudhary's, email

8    address.  His own testimony in this trial, which is hardly

9    believable, was that he couldn't remember sending the email,

10   and that statement was impeached.

11         The important point, though, is whatever happened

12   between Mr. Chaudhary and his son about those emails, the

13   defendant controlled it and the defendant caused it, and even

14   if Mr. Chaudhary himself did send that email at his son's

15   direction, it's still a crime, and an authorization or a

16   consent to use his name in an email, if done for an unlawful

17   purpose, as here, is not consent -- is not lawful authority

18   under the aggravated ID statute.  The case law is clear on

19   that.  And so, the entire argument about Mr. Chaudhary and

20   whether he sent it is a red herring.

21         Now, another legal argument the defendant presses is

22   that the proceeds that were wired in this case are somehow tied

23   to or limited to the actual substantive counts charging wire

24   fraud, and that suggestion simply misunderstands the nature of

25   wire fraud.  Wire fraud is three elements.  Wire fraud is a

1    particular intent, and it's a scheme to defraud, and then it's

2    a wiring, or in the case of mail fraud it's a mailing, and that

3    wiring and that mailing are essentially jurisdictional

4    predicates.  They're like a firearm having crossed

5    interstate -- a state line.  It creates, allows the assertion

6    of federal jurisdiction over the act.

7        But the mailing or the wiring is not the crime.  The

8    crime is the fraud scheme, and the proceeds are the proceeds of

9    that fraud scheme, and that's the definition that applies here.

10   The definition is in 1956(c)(9).  It says "proceeds" is any

11   property derived from or obtained or retained directly or

12   indirectly through some form of unlawful activity, including

13   gross receipts.

14       Now, every -- all 18 counts in this case happen at

15   different times and involve different things, and that's always

16   true in mail fraud or wire fraud.  Each wiring, each mailing is

17   a specific instance and a specific act.  But the scheme charged

18   in Counts 1 through 18, which is very detailed in the

19   indictment, is the same, and it doesn't change over time, and

20   it's not limited if the wiring happened in 2015 or it happened

21   in 2016.  It's the same scheme, the same scheme charged in the

22   indictment.  And that's what the cases that I offered the Court

23   yesterday say, the Lo case from the Ninth Circuit, the Cox case

24   from the First Circuit.  When you talk about proceeds in a wire

25   fraud or mail fraud context, you are talking about the proceeds

1    of the scheme; you are not talking about proceeds that is

2    somehow tied to or limited by the jurisdictional predicate that

3    allows the government to prosecute the scheme.

4           And that makes sense, in part, because think about it.

5    Lots and lots of wirings and mailings cannot be tied to a

6    financial amount, a number.  You could have an interstate

7    wiring to set up a meeting.  You could have an interstate

8    wiring to do just about anything in furtherance of a scheme,

9    and you can't say, well, $70,000 is attributable to that wiring

10   or $15,000 is attributable to that mailing.  It's just a

11   jurisdictional predicate.  And so, it would not make any sense,

12   as the defendant argued in the Lo case and was overruled, it

13   wouldn't make any sense to say, well, if the mailing in the

14   case was about a $500 payment and that was the only thing it's

15   directly tied to, then the only proceeds in a six-year fraud

16   scheme are that $500.  That can't be, and that's not the law.

17   That's clearly not the law, and Lo says that, Cox says it.

18          THE COURT:  I agree with you, but --

19          MR. DAVIS:  Yeah, okay.

20          THE COURT:  Well, wait.  I agree with you on the law,

21   but can't it be narrowed by the way you've charged the case?

22   Can't the language of the indictment narrow it?  I think it

23   can.

24          MR. DAVIS:  I think language in the indictment

25   certainly can narrow just about anything, but this language --

1   I mean, the question is what is the reference to when it says

2   wire fraud is charged in Counts 1 through 18?  And, again,

3   you've got to go back to first principles.  Wire fraud is more

4   than the jurisdictional predicate act.  Wire fraud is

5   essentially a fraud scheme.

6           THE COURT:  Sure, but your introductory paragraphs in

7   1 through 18 is Paragraph 34, and it says -- this is the intro

8   paragraph, not the count -- it is says, "On or about the dates

9   set forth below."  It says the crime was committed "on or about

10  the dates set forth below," and the date range is "May 11th,

11  2015 to April 21, 2016."  I agree with your point on the law.

12  I think it's all 100 percent correct.  All of those wire

13  statements were pursuant to a scheme, whether it was for one

14  victim or two.  The fact is, though, the way you've charged the

15  case here says "on or about the dates set forth below."  This

16  crime was committed, according to your indictment, "on...the

17  dates set forth below."

18          MR. DAVIS:  But, your Honor, any mail fraud or any

19  wire fraud happens at a particular time with a particular

20  wiring, but that language is correct.

21          THE COURT:  That language is correct, but it also

22  could have broadened the scope, and it didn't.  That's a choice

23  somebody made, the Grand Jury made, but you could have said

24  from the beginning, as you alleged earlier in these paragraphs

25  that are explanatory, it alleged that the scheme took place

1    over a much longer period of time.  And I think all of your

2    legal arguments make very good sense, and that these wire fraud

3    counts -- I'm sorry -- these money laundering counts could have

4    cross-referenced a broader timetable.

5          But how do I find that it was derived from the

6    criminal activity that you say is Counts 1 through 18 when you

7    describe the wire fraud count as occurring, occurring "on or

8    about the dates set forth below" in the dates of Counts 1

9    through 18?

10          MR. DAVIS:  The top of the indictment, your Honor, at

11    Page 1 --

12          THE COURT:  I'm looking at what the indictment says.

13    I'm agreeing with all that.  I'm asking you a question about

14    Paragraph 34.  You're alleging that the offense took place --

15    it says "the offense," next paragraph, "on or about the dates

16    set forth below," and you list however many dates it is.  It's

17    17 dates.

18          MR. DAVIS:  And I've referenced the scheme described

19    above.

20          THE COURT:  The crime was committed pursuant to this.

21    We agree on the law, we really do, and I agree you proved it.

22    I think you've got a problem with the way you charged it.

23          MR. DAVIS:  So, your Honor, the other thing I would

24    say about that is I have never seen a mail fraud or wire fraud

25    indictment that doesn't have just this language, and part of

1   the reason is, if you said, "On or about the dates of the

2   scheme," you would be giving constitutionally insufficient

3   notice to the defendant.  The law requires an individual,

4   specific, concrete act.

5          THE COURT:  Which you provided in your Counts 1

6   through 18 by referencing dates.  It wouldn't make any

7   difference that you --

8          MR. DAVIS:  But that doesn't limit the scheme or the

9   scope of the scheme or the length of the scheme that's

10  referenced.  It's the same scheme throughout.  There's no

11  ambiguity about that, your Honor.

12         THE COURT:  I think we agree mostly on the law.  I

13  think we agree mostly on the law.  I think you've -- well, I

14  think what I think, and we have had the conversation.

15         MR. DAVIS:  I don't know how else to charge wire fraud

16  or mail fraud, and I've never seen it charged a different way,

17  and each time identifying the date of the mailing or the date

18  of the wiring as the offense is correct and proper.

19         THE COURT:  Are you really trying to tell me that

20  Paragraph 34 of your indictment, if it said something like on

21  or about -- the usual language I've seen in, I want to say

22  thousands, but I'm going to say hundreds because I don't want

23  to exaggerate, that say "during an unknown period but on or

24  about at least starting this date and through this date --"

25         MR. DAVIS:  That's a conspiracy count, your Honor.

1        THE COURT:  No, it isn't, necessarily.  It can be a

2   scheme count.  Sure, it's a conspiracy count, but it also can

3   be a way of discussing a scheme.  Or you could have been very

4   specific.  You could have just chosen the very first date that

5   you did allege here, by the way, very comprehensively,

6   Paragraph 8, beginning in 2012, the scheme.  You say "from on

7   or about February 2012."  I don't know why you're telling me it

8   would be improper to allege it there, not reallege it in

9   Paragraph 34, because that would give me at least a way of

10  hanging your money laundering -- it's only a few of the counts,

11  by the way, let's face it.  It's not most of them, but there's

12  a few.  A few of these counts predate your first wire fraud

13  substantive count, not most of them, a small amount.

14        But, look, I think to consider the crimes as charged

15  in the indictment I've got to live with the language you've

16  chosen, and I don't think any of your legal arguments are

17  flawed.  I think they all make sense.  I just think it's a

18  charging decision, a language decision that I'm considering

19  whether it has impact on your ability to prove guilt beyond a

20  reasonable doubt.

21        MR. DAVIS:  Understood.

22        THE COURT:  You understand.

23        MR. DAVIS:  And, your Honor, the only other thing is,

24  the last point I'd make about that is, to do it otherwise --

25  because what I think the Court is suggesting is what the

1    government should have done is said the wire fraud offense

2    occurred in a six-month period or in a six-year period, each

3    charge, each separate -- but that would be constitutionally

4    imprecise, and it would raise double jeopardy problems if the

5    defendant is acquitted of something or not acquitted.  What is

6    the charge?  The government has to choose a date, it has to

7    choose a wiring and choose a mailing, and the defendant can

8    defend against that, and if he is not guilty of that mailing or

9    that wiring, if that wiring didn't occur, the government loses,

10   your Honor.  It doesn't matter if the other six years there was

11   a scheme.  The point of the indictment --

12        THE COURT:  I think this wire fraud could have been

13   charged in any number of ways, and as long as the jury or the

14   trier of fact found unanimity as to at least one statement made

15   over the wires in furtherance of a scheme there wouldn't have

16   been a double jeopardy problem, as long as we had either a

17   Court finding or a jury verdict form that showed unanimity

18   around a wire fraud statement.  I don't think a broader

19   definition in Paragraph 34 than the one you've chosen would

20   have put the defendant in any constitutional jeopardy.

21        MR. DAVIS:  All right.  I'll move on, your Honor.

22        THE COURT:  All right.

23        MR. DAVIS:  I want to talk about Pakistan a little bit

24   and the Lahore programmers.  Mr. Harrington says, well, the

25   case started in 2007, and there's this family business with

1   global clients and all kinds of things going on, and somehow

2   that is a defense in this case.  Your Honor, the Lahore office

3   is a red herring, and nothing that the evidence showed about

4   Lahore is a defense here.

5            Remember that the bank account in Pakistan opens in

6   April 2013, which is right after DigitalNet gets its first

7   contract.  Remember that DigitalNet doesn't even begin in the

8   U.S. until August 2012, right before the contract for the

9   health assessment.  Remember that the defendant, himself, tells

10  his tax preparer there's no income over there in Pakistan.  And

11  remember that, whatever that operation is, it shuts down pretty

12  soon after the United Way spigot is turned off.  There isn't

13  anything going over there that isn't sustained by United Way

14  largesse.  Remember also the wires to Pakistan, 1.2 million, a

15  lot of money, but they're actually a small fraction of the

16  $7,00,000 in this case.  There's $7,00,000, almost 6,000,000

17  all was in the U.S., and we're asked to look repeatedly at 1.2

18  million that got sent over there over a period of years.  A

19  much larger fraction is sitting now or was sitting in the

20  defendant's personal accounts.  Also remember that the work of

21  the programmers, whoever they were, was never more than a few

22  hundred thousand dollars, at most, for the actual United Way

23  projects.

24            What do we know about the money that was sent over

25  there?  We know that the defendant spent $400,000 on real

1    estate to buy property for himself; we know that he started a

2    separate gaming business that actually needs programmers; and

3    we hear some truth in his admission to Lorissa Guzman that

4    what's going on over there had nothing to do with United Way

5    but was all about his gaming business.

6         So, your Honor, 1.2 million went over there.  Some of

7    that may have actually benefited United Way, but that doesn't

8    matter, because the definition of "proceeds" includes gross

9    receipts, and the money that United Way and Robert Allen wired

10   to that Pentucket Bank account was surely gross receipts and

11   proceeds.  So, the Pakistani programmers, much as we talk about

12   them, are not a defense to anything in this case.

13        I want to talk about contracts a little bit, because

14   most of the defense here, other than intent, is that there was

15   value, there was performance on the contracts, that services

16   were delivered on the contracts, and one thing you notice in

17   the defense here is how much of a continuation of Mr. Alrai's

18   professional modus operandi this defense case is, and that case

19   is always to shroud yourself in the uncertainties of IT

20   services, always to suggest that there are additional costs,

21   there are shadowy additional IT management customized ingenuity

22   that's being provided for clients.  It's like magic.  And

23   that's what DigitalNet was doing.

24        Well, let's try to get real for a minute about the

25   business that Mr. Alrai was in, and I just want to bring up a

1    slide I showed from Mr. Terry's, which is Exhibit 153b, and

2    it's Bates 446, I think.  There in the middle there is a

3    question that's being asked by the tax people, and the answer

4    to it says a lot.  Every once in a while you get the truth from

5    Mr. Alrai.  And here the question is, "On the checking account

6    Excel file in the history tab the payments to vendors,

7    utilities, goods and services, I need you to break it down

8    further."  And what Mr. Alrai says is, "Almost all of it are

9    third-party services support and software that we use from

10    vendors like Google, Microsoft and CloudConnect, et cetera to

11    provide services to our customers."  Almost all of it

12    third-party services.

13           All right.  So, let's go to another page, which I had

14    previously shared in the same Exhibit, 153b.

15           Ms. Sheff, do you have the other page we discussed?

16           This is in Exhibit 207, Page 568.  It really isn't

17    that complicated what Mr. Alrai does.  Look at the very top,

18    the numbers at the very top.  The income is $1.5 million for

19    this year, 2016, and the expenses are basically two things.

20    They are payroll, and those are the good, hard-working

21    DigitalNet employees Kal and Mr. Yousuf and Jasmin and,

22    presumably, perhaps a few programmers who get a little bit for

23    United Way projects.  But that's about 125 grand.  And then

24    under that are subcontractors, and that's the big one.  That's

25    almost 400 grand, and that's people like CloudConnect and

1     Microsoft and Google and various original vendors that

2     DigitalNet is buying from and providing.  But that's it.  It's

3     about 525 grand, not quite, and it leaves a huge delta,

4     $1,000,000 versus $500,000.

5          And Mr. Alrai tries real hard, and he's very detailed

6     here, to identify other business expenses, but a lot of these

7     things are parking and meals and entertainment, and nowhere in

8     there is all this IT value, IT management, IT added service.

9     It's just this.  And, as we saw, what Mr. Alrai further does

10    is, by using inter-account transfers, he adds $1,000,000 to his

11    cost of goods sold and shows a much lower profit margin than he

12    otherwise had.  But the point is, your Honor, it's not really

13    magic.  What it is, is paying people to do -- paying Kal to

14    manage the network, paying the IT people, and then it's paying

15    these subcontractors for a lot of stuff that anyone can buy who

16    knows what they're doing in IT.

17         But the defendant always, always talks about what he

18    does, and so he talks about CloudConnect and about all of these

19    non-pass-through costs.  I will say a couple of things about

20    that.  The first is, and the important part is, that, when

21    DigitalNet sets up something, when it buys hardware, it always

22    bills separately, and all of the invoices are in, your Honor,

23    and tons of those invoices are not just about the monthly

24    service, but they're about startup costs, setup costs,

25    hardware.  He's getting every penny.  You can bet he's getting

1   every penny paid for him, right?  So, that is billed for, and

2   to say that this is sort of part of the valuable magic that

3   DigitalNet provides is just nonsense.

4          And the other point is that Mr. Naviloff, when he did

5   his analysis, he specifically excluded startup costs.  Hundreds

6   and thousands of dollars are not being charged as loss to this

7   guy.  What is being charged as loss is the enormous markups in

8   this case.

9          So, the whole thing about this kind of intangible

10  magic is not real, and Mr. Alrai is where he is today because

11  he's been so good at pretending that it is real, but it isn't.

12         Also about the contracts, your Honor, well,

13  Mr. Harrington says DigitalNet performed on the contract, but

14  the truth is it didn't perform.  There were services not

15  provided, as we've talked about, and there are many things that

16  are included, such as 23 associates in the U.S., which are not

17  true.  The main system manager is in Syria, is not even in the

18  U.S., and he promised they were in the U.S., and they're not.

19         And the biggest promise, the biggest service that was

20  supposed to be performed is that DigitalNet was supposed to be

21  a legitimate, qualified, experienced, real IT vendor, and he

22  said it over and over again as he's getting through the vetting

23  processes.  He lied about that, and that's part of the

24  contract.  Part of the contract is who is DigitalNet, and that

25  part is all fraud.

1            But the other problem with relying on the contract is

2       the contract itself is a corruption.  The deceit goes to the

3       core of the contract in this case, as the cases talk about, the

4       Second Circuit case.  There was no arm's length negotiation.

5       There was no fair market competition.  The terms were dictated

6       by United Way's own trusted IT officer.  There was no real

7       ability to enforce United Way's rights under the contract when

8       Mr. Alrai runs the show and holds all the cards.  And so, your

9       Honor, a contract like this, these contracts entered into under

10      false pretenses are void at their inception.  They are fraud.

11      They offer no shield and no haven in this case, because whether

12      there's a contract or not, on these facts it's still an

13      old-fashioned rip-off.

14            The last thing I want to talk about is intent.

15      Defendant says, well, there is no intent to defraud, and one of

16      the first things he asks is, "Well, does an omission constitute

17      fraud?"  Are you kidding?  This case is not about omissions.

18      It's about lies, affirmative lies every single year on a

19      conflict of interest form, over and over again in an RFP

20      process, over and over again in a vetting process in 2016, and

21      then in a million ways to his co-workers, to DigitalNet

22      workers, to everyone around him as the scheme is perpetrated,

23      and it's every single time Mohammad sends an invoice to get

24      paid.  This case is not about omissions.

25            The defendant also says, "Well, the RFP process was

1    fair and open," and I think the argument is, well, because

2    United Way had a flawed RFP process, because, well, they could

3    have asked more questions, they could have been more involved,

4    the defendant is not guilty.  He's just benefiting from a lax

5    attention at United Way, and it's kind of tough luck, you know,

6    in a way.  "You screwed up on your process, and so you're

7    stuck."  Well, that's not really right.  He says, well, the

8    government says he did it all by himself, but that's exactly

9    what he did.  He shanghaied the process, and he did do it all

10   by himself.  He received the submissions, he read the

11   submissions, he rigged the system so that DigitalNet's RFP

12   response won, and he went forward.  So, to say that somehow the

13   United Way's flaws excused the conduct makes no sense.

14          It's also baloney that United Way didn't want to get

15   involved.  He did an excellent job, as he always did, in

16   fending off whatever controls were present.  Stan Burrows

17   specifically offered to help and said that to him, and he said,

18   "No."

19          The other important part to think, your Honor, about

20   the RFP process is the process happened in two phases.  The

21   first phase was getting the submissions and choosing a

22   presumptive winner of the bid, and that's phase one.  But phase

23   two is when United Way actually tries to vet this new company

24   DigitalNet and find out facts about it, and that's doing due

25   diligence.  It's about calling references, it's about finding

1    out who the principals are, it's about getting some business

2    history.  And you can criticize United Way all you want, but

3    they actually did ask questions, and they did gather that

4    information, and at every single step of that process Mr. Alrai

5    lied again.  So, to say that the RFP process was fair and open

6    and this whole thing is fine is simply untenable.

7        The defendant also talks about cost and pricing and

8    suggests somehow that United Way was really getting here a good

9    deal, or that at least it wasn't such a bad deal.  I suggest

10   the evidence shows otherwise.  What it shows is in a market

11   where IT costs are actually going down a little bit as

12   efficiencies are achieved and technology improves, Mr. Alrai

13   took his budget from about 900 grand to about 1.4 million and

14   was doing very well at United Way, so well that Jane Grady, as

15   the Court heard, the HR person at United Way, writes an email

16   sort of saying, "What is going on here?  We've got 120

17   employees and we're paying 15- to $20,000 per employee just for

18   computers."  This is not a huge business, your Honor.  It's not

19   a high-tech business.  It's about charity.  But that's a lot of

20   money.

21       And another confidence one can get is from Rich

22   Voccio, because Rich Voccio knows United Way.  He's been in the

23   business many, many years.  He worked at Rhode Island.  He did

24   a benchmark calculation that the Court saw, and the benchmark

25   calculation shows that United Way was number one, number one in

1     IT costs among comparable United Ways.  So, to say that this is

2     not an expensive IT service is simply wrong.

3             And then they point to John Meyer, and they suggest

4     he's -- I don't know.  I'm not sure what they're suggesting,

5     but, as the Court pointed out, John Meyer is very different

6     from DigitalNet.  With John Meyer United Way knows what it's

7     getting.  He's getting no CIO salary.  The whole thing costs

8     less now and the service is better, and even Pat Latimore is

9     quick to acknowledge that:  "We thought we were happy with

10    DigitalNet.  Now we really have seen the way it is."  And so,

11    to say that somehow that the cost excuses this doesn't work.

12            The defendant also says, well, the references for

13    DigitalNet, the right number was called, and so these people

14    said something.  But the point is, your Honor, about the

15    references, whatever happened there, and it is odd, it's odd

16    that someone calls a phone number for the real person and a

17    conversation occurs, and then they say later they never were

18    involved in that and don't know anything about that or

19    DigitalNet, the important point is whatever happened was a

20    fraud and a fraud orchestrated by Mr. Alrai, once again,

21    because what is very clear is that the companies those people

22    work with had never heard of DigitalNet and never done business

23    with DigitalNet, as is true of every company in the U.S., but

24    they said they did and DigitalNet got a positive reference, and

25    that could not be and it could not be true, and it only

1    happened because, once again, Mr. Alrai controlled it in some

2    way that we don't even know, but he did.

3         But the last thing I'd say about intent, your Honor,

4    is that in all of the defense in this case the defense never

5    deals with the lies.  And Mr. Hunter said at the beginning, and

6    I say it now, the way you know that this man knows that he

7    intended fraud is not so much the lies at the beginning but the

8    lies at the end, when in April of 2018 he's being talked to by

9    a CBP officer and he says that DigitalNet just is doing gaming

10   over in Pakistan, and that he doesn't have any international

11   business dealings, and he never wired money over $10,000.  And

12   then he sits down with John Mulvaney in what is, obviously, an

13   important final -- what could be final interview at United Way,

14   at his employer where he's been working for six years, and he

15   could have said, "You know what?  I lied to get this business

16   because I was trying to get my -- you know, pull myself up by

17   my bootstraps, and I'm really embarrassed and I'm really sorry,

18   but, boy, have I worked hard for this company and, boy, am I

19   sure that I provided value."  But that's not what happened.

20   Mr. Imran Alrai dug in, he doubled down, he lied over and over

21   again to John Mulvaney, and the only reason to do that is

22   because you know that the truth can't be defended.

23         Your Honor, 42 witnesses have come before this Court.

24   Their sworn testimony proves overwhelmingly that the defendant

25   committed fraud, that this really was an old fashioned rip-off

1    by someone who was trusted to do otherwise.

2              THE COURT:  I had 38 witnesses.  You had 42?

3              MR. DAVIS:  I was told the government had 40, and then

4    there were two defense witnesses.

5              THE COURT:  It doesn't matter.  I've got 17 pages of

6    notes here with 38 witnesses.

7              MR. DAVIS:  All right.  Sorry, your Honor.  I'll sit

8    down.

9              THE COURT:  Not a problem.

10             MR. DAVIS:  The defendants had a fair trial --

11             THE COURT:  No question.

12             MR. DAVIS:  -- and the evidence is overwhelming, and

13   it shows he is guilty as charged.

14             THE COURT:  Thank you, sir.

15             Well, this won't take long.  We have civil counsel

16   waiting for the next hearing, which was supposed to start half

17   an hour ago, but we've been going about 95 minutes.  I won't

18   take much time with this, but I think it's important to do to

19   move things along a little bit.

20             As I just said, I've got 17 pages of notes here,

21   careful, typewritten notes -- you probably saw me tapping away

22   with my law clerk -- which I spent last night most of the night

23   going through and considering each witness one by one again.  I

24   did it that way because I want to approximate what a jury does.

25   We always tell juries not to deliberate until they have all the

1    evidence.  So, I didn't deliberate with myself about all the

2    evidence until I had it all, and I went through it carefully,

3    thought about the law, read your trial briefs again.  Defense

4    counsel submitted some proposed findings this morning, which I

5    received in the spirit of a trial brief, advocacy piece, and I

6    considered it carefully.

7         So, I'm going to render these verdicts now.  I want to

8    say this first:  This was a long trial, obviously, two straight

9    weeks, two solid weeks.  I can't think of a trial I remember

10   that was so professionally and collegially tried and well

11   tried.  AUSAs Hunter, Le, Davis, Defense Counsel Ayer and

12   Harrington, very -- I've got to say, Mr. Alrai, you received

13   excellent representation in this case -- it's just a pleasure

14   to watch you work and learn the evidence here through your

15   presentation.  There wasn't a moment in this trial of bickering

16   or fighting or anything except the most highly collegial --

17   even when you were contesting each other, objecting, arguing,

18   disagreeing -- it couldn't have been done in a more

19   professional way.  You're really a credit to the Bar, all five

20   of you.

21        The Rule 29 motions are denied.  Well, there was

22   really one motion at the end of the prosecution's case.  I

23   think a reasonable finder of fact, given all the inferences

24   that are required under the rule, could return a guilty verdict

25   on every charge, even the ones I'm going to enter a verdict of

1    not guilty on, an acquittal, except for there's a few that

2    arguably could not as a matter of law, just based on the

3    charging language in the indictment; there's an argument that

4    they could not be the basis for a guilty verdict, but whether

5    or not that's true on those counts I'm just not convinced

6    beyond a reasonable doubt.

7           But, anyway, here are the verdicts:  Counts 1 through

8    18 charging wire fraud, guilty.  Whether or not these wire

9    communications were for the purpose of furthering or in

10   furtherance of a scheme to defraud one victim, the United Way,

11   or two victims, the United Way and Robert Allen Group, they

12   were in furtherance of a scheme to defraud, and that is

13   sufficient.  I find that it was sufficient both beyond a

14   reasonable doubt both with respect to the scheme to defraud the

15   United Way viewed alone or a scheme to defraud both United Way

16   and Robert Allen Group.  And I spent a lot of time last night

17   crossing off any evidence pertaining to Robert Allen Group and

18   viewing it as a single scheme against one victim as well,

19   instead of two, and literally not considering it in the context

20   of a scheme against one victim, and either way there's proof

21   beyond a reasonable doubt with respect to all 18 wire fraud

22   counts.

23          The duplicate billing, the failure to render services

24   in some cases, the astronomically excessive markups establish

25   fraud, as did the depravation of the victims' control over

1    their property and assets.  That's when viewed through the

2    light of the defendant's many lies, deceptions and concealments

3    of various facts, material facts, including his conflict of

4    interest and affiliation with DTS.

5         On the money laundering counts, the Court finds the

6    defendant not guilty on Counts 19, 20, 21 and 22 for the

7    reasons -- I won't flesh it out.  It's set forth in my

8    conversation with Mr. Davis, who makes a very good-faith

9    argument which is correct on the law, I think, but I just

10   disagree that the only way to charge this wire fraud was the

11   way that it was charged.  The wire fraud counts could simply

12   make reference to wire fraud as alleged in the indictment or a

13   scheme of a certain time period, but both the wire fraud counts

14   are tied to very specific dates, and the money laundering

15   counts are tied to very specific counts.  So, I just view it in

16   the way it's alleged I am not convinced beyond a reasonable

17   doubt that there was money laundering with respect to Counts

18   19, 20, 21 and 22.

19        The Court finds the defendant guilty on Counts 23, 24,

20   25 and 26, 27, 28, 29 and 30, all of which are money laundering

21   counts.

22        With respect to the transportation of stolen money

23   counts, Counts 31 through 42, the Court finds the defendant

24   guilty.

25        With respect to the next set of money laundering

counts, Counts 43 and 44, the Court enters the verdict of not
guilty for the same reasons the Court explained with respect to
Counts 19, 20, 21 and 22.  These were money transactions that
occurred before the first substantive count, Count 1, and,
therefore, it couldn't have laundered that money.  I do
understand the argument that they could have -- what I'm about
to say applies to Counts 43, 44 as well as 19, 20, 21 and 22.
Those counts certainly could allege or they allege -- strike
that.  There is proof with respect to those counts that money
was laundered derived from criminal activity, including a
specified unlawful activity, which is wire fraud, as defined,
however, not vis-a-vis the counts referenced in the money
laundering counts that post-date some of these alleged money
laundering transactions in Counts 19, 20, 21, 22, 43 and 44.

With respect to money laundering counts 45, 46, 47,
48, 49 and 50, the Court finds the defendant guilty.

The aggravated ID theft is a difficult count for the
Court.  My view of Count 51 is that I am persuaded that the
defendant committed aggravated identity fraud by a
preponderance.  I'm persuaded even by clear and convincing
evidence.  I'm not persuaded beyond a reasonable doubt, because
there's direct evidence from Mr. Chaudhary that he sent the
email, and I don't agree 100 percent with the prosecution's
argument that -- I agree that even causing him to send that
email could be an aggravated identity theft, but under the

1   circumstances in this case I'm not persuaded beyond a

2   reasonable doubt.

3          I don't think that's an inconsistency with Count 18,

4   because I still think it could be wire fraud and not be

5   aggravated identity theft if Mr. Chaudhary sent the email.

6   And, again, we had direct testimony.  We had direct evidence.

7   Mr. Chaudhary is a witness that lacks credibility, to say the

8   least.  The problem is it's hard to know which time he was

9   lying.  More likely he was lying in court than lying to the

10  investigators, but he could have been lying to the

11  investigators to distance himself from the defendant's schemes

12  as a way of protecting himself in some way.  It's less likely

13  than the lying in court, but I'm not sure.  And, look, I hope

14  my bar for reasonable doubt isn't too high, but when I'm

15  dealing with a person's liberty what I need to know is I need

16  to feel like I know what happened, and that doesn't mean

17  knowing with absolute certainty.  There's no such thing in

18  life.  But beyond a reasonable doubt for me means pretty well

19  that I know, and I don't know about Count 51.

20          The same goes for Count 52 and Count 53.  The Court

21  enters verdicts of not guilty on the failure to file the FBAR,

22  and that's only because, look, again, that one I'm actually

23  less -- I'm not even persuaded by clear and convincing evidence

24  that the defendant is guilty of those offenses, because we have

25  a lot of circumstantial evidence that Mr. Davis pointed out and

1   Mr. Hunter pointed out both today and yesterday in court, I

2   think it was on the Rule 29 motions, that Mr. Davis made a very

3   compelling argument regarding motive and a lot of

4   circumstantial evidence.  It was a great argument, very

5   persuasive.

6          But the only direct evidence we have, which is an

7   exhibit and some testimony, is that the defendant said he

8   didn't know, and there's a scienter requirement about these

9   counts.  It's not proven beyond a reasonable doubt.  So, the

10  Court enters verdicts of not guilty on Counts 52 and 53.

11         As to forfeiture, I'm going to order forfeiture in an

12  amount to be determined.  We'll figure out a way to nail it

13  down.  I'm actually hoping you can come to some agreement on

14  that, but if you can't, of course I'll issue the appropriate

15  rulings.  But the Court is ordering forfeiture, just not in a

16  specific amount.

17         That leaves two other issues.  Then we'll take a small

18  break before we get to the civil case.

19         I'm sorry, Counsel, for keeping you waiting.

20         Neither party has invoked Rule 23(c) requesting

21  written or oral findings of fact or rulings of law before the

22  verdict, so those are the verdicts.

23         I want to reconvene after the civil hearing, so I'm

24  going to say -- I think totally it's going to take about an

25  hour, Counsel.  Does that sound about right, civil Counsel,

1    about an hour?  So, what I'd like you to do is -- and I have

2    another hearing at 1:00.  So, I would like you to return at

3    12:30, and we're going to talk about detention or release.

4            Mr. Alrai, my instinct right now is to not let you

5    leave the courthouse.  No disrespect.  I have an obligation,

6    though, to ensure that you continue to appear.  But you're with

7    counsel I trust, so if they leave the courthouse to get lunch

8    or whatever, you can be with them, but I don't want you to

9    leave your counsel.  Do you understand?

10           THE DEFENDANT:  I do.

11           THE COURT:  All right.  You've been completely

12   appropriate the entire trial, and from everything I hear you've

13   been exemplary under supervision, but the circumstances have

14   changed, so we're going to have to have a conversation and

15   hearing about detention or release.

16           Any questions, Counsel?

17           MR. DAVIS:  No, your Honor.

18           MR. HARRINGTON:  No, Judge.

19           THE COURT:  We're in recess.

20           THE CLERK:  All rise.

21   (Detention hearing transcript filed under separate cover)

22       (WHEREUPON, the proceedings adjourned at 11:18 a.m.)

23

24

25

1                        C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5      Reporter of the United States District Court, do hereby certify

6      that the foregoing transcript constitutes, to the best of my

7      skill and ability, a true and accurate transcription of my

8      stenotype notes taken in the matter of *United States v. Imran*

9      *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14     Date: ___4/12/20                    */s/ Brenda K. Hancock*
                                           Brenda K. Hancock, RMR, CRR
15                                         Official Court Reporter

16

17

18

19

20

21

22

23

24

25