*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6/24/20

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:18-cr-192-JL
            v.                        *  December 11,2019
6                                     *  11:28 a.m.
      IMRAN ALRAI,                    *
7                                     *
                     Defendant.       *
8     * * * * * * * * * * * * * * * * *

9

10          EXCERPT TRANSCRIPT OF BENCH TRIAL DAY EIGHT
              CONTINUED TESTIMONY OF DARLENE CACACE
11
            BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13
      APPEARANCES:
14

15    For the Government:       John S. Davis, AUSA
                                Matthew Hunter, AUSA
16                              Cam T. Le, AUSA
                                United States Attorney's Office
17

18    For the Defendant:        Timothy M. Harrington, Esq.
                                Timothy C. Ayer, Esq.
19                              Shaheen & Gordon PA

20

21    Court Reporter:           Brenda K. Hancock, RMR, CRR
                                Official Court Reporter
22                              United States District Court
                                55 Pleasant Street
23                              Concord, NH 03301
                                (603) 225-1454
24

25

I  N  D  E  X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DARLENE CACACE (Resumed) | | | | |
| By Ms. Le | 3(Cont'd) | | 43 | |
| By Mr. Ayer | | 33 | | 48 |

1          P   R   O   C   E   E   D   I   N   G   S

2                              EXCERPT

3          **DARLENE CACACE**, having been previously duly sworn, was

4     further examined and testified as follows:

5                MS. LE:  Ms. Sheff, if you could bring up Exhibit 926.

6                  CONTINUING DIRECT EXAMINATION

7     BY MS. LE:

8     Q.   Good morning, ma'am.

9     A.   Good morning.

10               THE COURT:  Please be seated.

11    Q.   Ms. Cacace, when we left off yesterday, we were on Exhibit

12    926.  But before we go back and talk about this exhibit, would

13    you tell us how do you calculate the balance within any

14    accounts, whether it is clean funds left or dirty funds left

15    when money is spent from any of the accounts you reviewed?

16    A.   Sure.  As I explained yesterday, any deposits that were

17    not traced to the United Way or to the Robert Allen Group were

18    placed in the clean funds column.  Any deposits that were

19    traced back to the Robert Allen Group or the United Way were

20    placed in the dirty funds column.  The daily balance would be

21    calculated by adding these deposits, and any debits made to the

22    account would first be charged against the clean funds balance.

23    If there was a residual amount left over, then that amount

24    would be charged against the dirty funds balance.

25    Q.   So, any time there is spending you'd take it out of the

1   clean funds bucket first before you started taking money out of

2   the dirty funds bucket; is that right?

3   A.    That is correct.

4   Q.    So, we're on Exhibit 926.

5         THE COURT:  But on the dirty funds bucket you didn't

6   make any attempt to distinguish between -- to do any kind of

7   discount for services actually rendered.  You assumed if it

8   came from United Way or RAG, dirty money?

9         THE WITNESS:  That's correct.

10        THE COURT:  All right.

11        MS. LE:  Thank you, your Honor.

12  Q.    Ms. Cacace, we're looking at Exhibit 926, which traces the

13  funding that resulted in the expenditure of check number 428;

14  is that right?

15  A.    Yes.

16        MS. LE:  And, your Honor, just for the record, this

17  particular exhibit and this testimony relates to Count 43 of

18  the superseding indictment.

19        THE COURT:  Thank you.

20  Q.    Okay.  Ms. Cacace, let's start with the initial funding

21  account, which is the DigitalNet Technology Solutions Pentucket

22  account ending 2684.  Can we start there and work our way down

23  again -- I'm sorry -- because I couldn't remember how far we

24  got yesterday.

25  A.    We got through the whole chart.  Do you want to go through

1    the whole chart again?

2            MS. LE:  Oh, did we go through the whole chart

3    yesterday, your Honor?

4            THE COURT:  Was it 926 yesterday?  I don't remember.

5            MS. LE:  This is starting off with 926.

6            THE COURT:  I know, but did you do 926 yesterday?

7            MS. LE:  Yeah, I believe we started it, but did we

8    finish?

9            MR. AYER:  I thought we did, but you can go through it

10   again.  I won't object.

11           MS. LE:  Okay.

12           MR. DAVIS:  Yes, it was marked.  It was shown.

13           MS. LE:  Okay.  Did we finish it?

14           THE COURT:  So, I think you covered it.

15           MS. LE:  Okay, great.

16           THE COURT:  That goes to Count 43?

17           MS. LE:  Count 43, your Honor, of the superseding

18   indictment.

19   Q.   I think yesterday when we -- how about we take up here

20   from when the funds were in the Pentucket Bank account for the

21   Alrais ending 4534?  Why don't you start there and explain what

22   happened next.

23   A.   Sure.  On 7/25/2014 there was a transfer from Pentucket

24   Bank Account 1576 in the name of Imran and Saima Alrai that was

25   composed of dirty funds.  This transfer was into Pentucket Bank

1    Account 4534 in the name of Imran and Saima Alrai.  On this

2    same date that the transfer was made check number 428 was

3    written to Santander Bank.  The balances in Pentucket Bank

4    account 4534 in the name of Imran and Saima Alrai as of

5    7/28/2014, the clean funds balance was zero, the dirty funds

6    balance was $46,724.34.  7/28 was the day before the check

7    cleared on 7/30/2014.

8    Q.    Thank you very much, ma'am.  Let's go to Exhibit 909.

9    Ms. Cacace, what does Exhibit 909 show the Court?

10   A.    This exhibit is a summary of deposit sources and payees

11   for Pentucket Bank Account 0076 in the name of Aisa Consulting

12   Group for the time period April 2014 through June 2016.

13   Q.    Okay.  Let's start with the top section for the deposit

14   sources.  You notice the first row there are ten transactions

15   from DigitalNet Technology Solutions totaling $1,236,891.12.

16   Where do these deposits come from?

17   A.    These come from a DigitalNet account at Pentucket Savings

18   Bank.  These are checks from account 2684, which is the main

19   operating account of DigitalNet Technology Solutions.

20   Q.    Okay.  Down here there's one transfer of $347,000 from an

21   account ending 6882.  Which entity owns that account?

22   A.    This is a Pentucket Bank account in the name of Aisa

23   Consulting Group.

24         MS. LE:  Ms. Sheff, can we go to the payee's section

25   of this exhibit.

1    Q.    Ms. Cacace, where did the money in this account for Aisa

2    Consulting Group 0076 go?

3    A.    Most of the payees for this account went into two accounts

4    at Pentucket Bank in the name of Imran and Saima Alrai.  Those

5    accounts are 1576 and 4534.  The other two accounts receiving

6    the funds from this account are in the name of Aisa Consulting,

7    and that's transfers to account 3912 and account 6882.

8    Q.    So, let's talk about the money that went to the two

9    accounts owned by the Alrais, accounts ending 1576 and 4534.

10   It looks like two transactions; is that right?

11   A.    Correct.

12   Q.    What is the total of those two transactions?

13   A.    $425,095.96.

14   Q.    How about the nine transactions to the two Aisa accounts

15   3912 and 6882?  What's the total value of those nine

16   transactions?

17   A.    $1,167,637.

18   Q.    Is it 37 or $36?

19   A.    637.

20   Q.    Okay.  Thank you.  Let's go to Exhibit 910.  Ms. Cacace,

21   what does Exhibit 910 show the Court?

22   A.    This is a summary of the transactions occurring in Aisa

23   accounting (sic) Group account at Pentucket Bank ending in 3912

24   for the period June 2016 through May 2018.

25   Q.    And what was this Aisa account used for?

1   A.   This is a money market account, so mainly for bearing

2   interest.

3   Q.   Okay.  So, there's not a lot of transactions here, right?

4   A.   Correct.

5   Q.   So, let's talk about the June 21st, 2016 transfer of

6   $1,000,000 to this account.

7   A.   Yes.  This transfer is from Pentucket Bank account 0076.

8   Q.   And what entity owns that account?

9   A.   That is in the name of Aisa Consulting Group.

10        MS. LE:  Thank you, Ms. Sheff.

11   Q.   Let's talk about the next big transaction, July 17, 2017,

12   a transfer of $1,000,000 from this account.

13   A.   This amount was transferred into another account at

14   Pentucket Bank in the name of Aisa Consulting Group ending in

15   6882.

16   Q.   Okay.  And did you prepare a summary that traced the

17   movement of the $1,000,000 to the various accounts controlled

18   by Imran Alrai?

19   A.   Yes.

20        MS. LE:  And we'll talk about that near the end, your

21   Honor.  That will be Exhibit 923.

22        THE COURT:  All right.

23        MS. LE:  And this is relevant to Counts 48 and 50 of

24   the superseding indictment, your Honor.

25        THE COURT:  Counts 48 and 50?

1          MS. LE:  Yes, your Honor.

2          THE COURT:  All right.

3          MS. LE:  But we'll end with the summary exhibit

4    showing the flow of money.

5    Q.   Let's go to Exhibit 911.  Ms. Cacace, what does Exhibit

6    911 show the Court?

7    A.   This is a summary of deposit sources and payees for

8    Pentucket Bank account 6882 in the name of Aisa Consulting

9    Group for the period August 2012 through April 2018.

10   Q.   Let's start with the deposit sources on top.  Do you see

11   there's only four deposit sources here?

12   A.   Yes.

13   Q.   Let's start with the DigitalNet Technology Solutions

14   deposit sources, 12 transactions totalling $1,432,055.  Do you

15   see that?

16   A.   Yes.

17   Q.   What was the source of these deposits?

18   A.   The source of these deposits were checks from account 2684

19   at Pentucket Bank in the name of DigitalNet Technology

20   Solutions.

21   Q.   The main operating account?

22   A.   Yes.

23   Q.   Thank you.  There's a $25 deposit.  Do you see that?

24   A.   Yes.

25   Q.   Who owns that account?

1  A.   That account is a Pentucket Bank account in the name of

2  Imran and Saima Alrai.

3  Q.   And it looks like there are nine transactions in total,

4  eight from an account 0076 and one from account ending 3912.

5  Do you see that?

6  A.   Yes.

7  Q.   What entity owns those two accounts?

8  A.   Those two accounts are owned by Aisa Consulting Group, and

9  they are at Pentucket Bank.

10 Q.   Great.  Let's go to the payee section.  Let's start with

11 the first row, Aisa Consulting Group, one transaction involving

12 $1,000,000.  Can you tell the Court about this transaction?

13 A.   Yes.  This transaction was a check numbered 1018 payable

14 to Aisa Consulting Group and negotiated at Citizens Bank to an

15 account in the name of Aisa Consulting Group.

16      MS. LE:  Your Honor, this particular portion as well

17 as the next exhibit relate to Count 48.

18      Let's go to Exhibit 148.  If you could just bring up

19 side by side, Ms. Sheff.  And if we can go to Bates number page

20 156.

21 Q.   All right.  Is this the check that we were discussing that

22 was involved in that transaction?

23 A.   Yes.

24 Q.   Do you know where this check number 1018 to Aisa

25 Consulting Group was negotiated?

1   A.   Citizens Bank.

2   Q.   Who was the -- what entity owned that Citizens Bank

3   account?

4   A.   Aisa Consulting Group.

5   Q.   And at the bottom do you see there is a "For Deposit Only"

6   and an account number?

7   A.   Yes.

8   Q.   What are the last four digits of that account number, if

9   you can make that out?

10   A.   5155.

11   Q.   Thank you very much.

12        MS. LE:  Ms. Sheff, let's move back to Exhibit 911

13   over here to the top column -- I mean to the bottom column.

14   So, summary of payees.

15   Q.   Ma'am, I see entries for the Commonwealth of

16   Massachusetts, the State of New Hampshire and the U.S.

17   Treasury.  Do you see that?

18   A.   Yes.

19   Q.   What do those entries represent?

20   A.   These represent tax payments to the various entities.

21   Q.   Okay.  There are also four entries for payments totalling

22   $212,000 to Pershing LLC.  Do you know what Pershing LLC is?

23   A.   This is a retirement account in the name of Imran Alrai.

24        MS. LE:  Okay.  I'd like to talk a little bit more

25   about each of those transactions.  Let's start with Exhibit

1    144.

2           Your Honor, this exhibit relates to Count 44 of the

3    superseding indictment.  And let's go to Bates number page

4    1553, check number 1008.  We can bring that up.  It's actually

5    the next one.  Right here.  Thank you.

6    Q.   All right.  What is the date of this check number 1008?

7    A.   April 8th, 2015.

8    Q.   What is the amount?

9    A.   $52,000.

10   Q.   What does the memo line read?

11   A.   The memo line reads "2014 SEP IRA contributions."

12   Q.   And whose name is right there?

13   A.   "Imran Alrai."

14   Q.   And it's written to "Pershing LLC"?

15   A.   Correct.

16   Q.   Thank you very much.  Let's go to Exhibit 146, which

17   relates to Count 46 of the superseding indictment.  If we can

18   go to Bates page number 1253, check number 1011.  Ma'am, what

19   is the date of this check written out to Pershing LLC?

20   A.   3/30/2016.

21   Q.   What is that amount?

22   A.   $53,000.

23   Q.   What does the memo line say?

24   A.   "2015 SEP contribution Imran Alrai."

25   Q.   Thank you.  Let's go to Exhibit 147, which corresponds

1    with Count 47 of the superseding indictment.  Let's go to page

2    1205 and check number 1015.

3           All right, ma'am.  What is the date of this check

4    1015?

5    A.    3/24/2017.

6    Q.    How much is it?

7    A.    $53,000.

8    Q.    And the payee, again, is Pershing LLC?

9    A.    Correct.

10   Q.    What does the memo line read?

11   A.    "2016 SEP contribution Imran Alrai."

12   Q.    Thank you, ma'am.  Let's go to Exhibit 149, which relates

13   to Count 49 of the superseding indictment, and if we can go to

14   page 1566 and check number 1019.

15          Ma'am, what is the date of this check?

16   A.    4/6/2018.

17   Q.    What is the amount?

18   A.    $54,000.

19   Q.    What does the memo line read?

20   A.    "Imran Alrai SEP 2017."

21   Q.    And, again, the payee is Pershing LLC?

22   A.    Correct.

23   Q.    Thank you very much.  Let's move on and talk about the

24   DigitalNet Technology Solution accounts, okay, ma'am?  Let's

25   start with Exhibit 912.  This is a three-page summary.  Can you

1    tell the Court what this summary is?

2    A.   This is a summary of all transactions in a clean-dirty

3    fund analysis for Pentucket Bank account 6882 in the name of

4    Aisa Consulting Group for the period August 2012 through April

5    2018.

6          MS. LE:  Okay.  Can we scroll through to the next

7    page, Ms. Sheff.  Next page.  All right.  And can we go back to

8    the first page.

9    Q.   Ms. Cacace, what were the sources of clean funds for this

10   account?

11   A.   The sources of clean funds for this account were on

12   4/13/2012.  There was a $25 transfer from account 1576.  That's

13   a Pentucket Bank account in the name of Imran and Saima Alrai.

14   Further down on the first page there are several transfers from

15   account number 0076.  This is an account in the name of Aisa

16   Consulting Group at Pentucket Bank.  There was a missing

17   deposited item into that account that these transfers came

18   from, so that is why they are listed as clean funds.

19   Q.   Meaning, that you gave him the benefit of the doubt

20   because you didn't know the source of those missing items?

21   A.   Correct.

22         MS. LE:  Okay.  Next page, please, Ms. Sheff.  5006.

23   All right.

24   A.   And on the next page the first two transactions also

25   relate to that missing deposited item transferred from account

1    number 0076.  And then there is one more on 3/30/2016,

2    transfer.

3    Q.   One more page?

4    A.   No.

5         MS. LE:  Can we go to 5007, Ms. Sheff?

6    A.   Still on the same --

7    Q.   Oh, I'm sorry.  Still on the same page.  Go ahead.

8    A.   And there's one more transaction 3/30/2016.  $22 of that

9    transfer was clean funds.  And then a little further down,

10   7/17/2017 there was a transfer from account number 3912, which

11   is another Aisa Consulting account.  $50 was clean funds.

12   Q.   Okay.  And how did you estimate that that was $50 of clean

13   funds versus dirty funds?

14   A.   The clean funds balance as of that day would have been

15   $50.

16   Q.   So, when you do these summaries, you look to go back to

17   the source and make sure you can attribute it to Robert Allen

18   Group or United Way funds before you decide which bucket to put

19   it in; is that right?

20   A.   Correct.

21   Q.   Thank you.  Let's go to Exhibit 914.  Ma'am, what does

22   Exhibit 914 show the Court?

23   A.   This is a summary of deposit sources and payees from

24   Pentucket Bank account 7206 in the name of DigitalNet

25   Technology Solutions for the period January 2013 through May

1    2018.

2    Q.   Let's start with the deposit sources.  The last row says,

3    "Transfer from 2684," and it represents 99.06 percent of the

4    deposits totalling $4,460,000 -- $4,460,112.06.  Do you see

5    that?

6    A.   Yes.

7    Q.   What entity owns the account that ends 2684?

8    A.   This is a Pentucket Bank account in the name of DigitalNet

9    Technology Solutions.  It's the main operating account.

10   Q.   Thank you.  Let's go to the summary of payees.  Now, we

11   see most of this money went to transfers to 2684 and 3920; is

12   that right?

13   A.   Yes.

14   Q.   What entity owns those two bank accounts?

15   A.   These are other Pentucket Bank accounts in the name of

16   DigitalNet Technology Solutions.

17   Q.   And, based on your review, what was account 7206 used for?

18   A.   7206 was basically a pass-through account.

19   Q.   What does that mean?

20   A.   Which means the money went in and out of the account

21   with (sic) any significant activity.

22   Q.   Thank you very much.  Let's go to Exhibit 916.  Ma'am,

23   what does Exhibit 916 show the Court?

24   A.   This is a summary of payees and deposit sources for

25   Pentucket Bank account 3920 in the name of DigitalNet

1  Technology Solutions for the period June 2016 through May 2018.

2  Q.   So, the first section, the payees -- well, actually, can

3  we start at the bottom, the deposit sources?  Where did the

4  money in this account come from?

5  A.   The main deposit sources came from Pentucket Bank account

6  ending in 2684 and Pentucket Bank account ending in 7206.

7  These both are accounts in the name of DigitalNet Technology

8  Solutions.

9  Q.   Let's go to -- and I'm sorry.  What is the total for the

10  deposits from those two accounts owned by DigitalNet?

11  A.   $1,694,242.60.

12  Q.   And what percentage of the deposit sources do those two --

13  the transfers from those two accounts comprise?

14  A.   Approximately 99 percent.

15  Q.   Thank you.  Let's go to the payees.  100 percent, except

16  for a $10 bank fee, went to an account ending 2684; is that

17  right, ma'am?

18  A.   Yes.

19  Q.   What entity owns account 2684?

20  A.   DigitalNet Technology Solutions.

21  Q.   And based on your review of the records, what did

22  DigitalNet use account ending 3920 for?

23  A.   This was a pass-through account.

24  Q.   Which, again, means what?

25  A.   The money went in and out of the account with (sic) any

1    significant activity occurring.

2    Q.    Without any?

3    A.    I'm sorry.  Without any significant activity occurring.

4    Q.    Thank you.  Let's go to Exhibit 918.  Ms. Cacace, what

5    does Exhibit 918 show?

6    A.    This is a summary of deposit sources into Pentucket Bank

7    account 2684 in the name of DigitalNet Technology Solutions for

8    the period August 2012 through May 2018.

9    Q.    This is that main operating account we've been talking

10   about?

11   A.    Correct.

12   Q.    All right.  There is an entry showing 16 payments from

13   Robert Allen N-T-E-O-T-H-I-N-V totalling $409,576.43.  Do you

14   see that?

15   A.    Yes.

16   Q.    Do you know what these payments represent?

17   A.    These payments represent contracts with the Robert Allen

18   Group.

19   Q.    With DigitalNet?

20   A.    Correct.

21   Q.    Thank you.  Then I see transfers from accounts ending 3920

22   and 7206.  What entity owns those two bank accounts, ma'am?

23   A.    These two bank accounts are Pentucket Bank accounts in the

24   name of DigitalNet Technology Solutions.

25   Q.    And how much money was deposited from those two DigitalNet

1    accounts?

2                              (Pause)

3    A.    Sorry.  $5,092,002.  Sorry.  My calculator is not going

4    out far enough.

5    Q.    And 11 cents?

6    A.    And 11 cents.

7    Q.    Thank you very much.  I also see two entries for United

8    Way.  One says "United Way," and one says "United Way of MA."

9    Are these two different United Ways, ma'am?

10   A.    No.  This is the same United Way from Boston.

11   Q.    What percentage of this account's deposits came from

12   United Way?

13   A.    Approximately 54 percent.

14   Q.    And how much money in total did the United Way pay this

15   DigitalNet account ending in 2684 for the period August 2012

16   through May 2018?

17   A.    $6,768,295.

18   Q.    And 35 cents?

19   A.    Correct.

20   Q.    Thank you very much.  Let's go to Exhibit 919.  This is a

21   two-page exhibit.  What does this show the Court?

22   A.    This is a summary of the payees from Pentucket Bank

23   account 2684 in the name of DigitalNet Technology Solutions for

24   the period August 2012 through May 2018.

25   Q.    So, this is the same account we've just talked about,

1    right?

2    A.    Correct.

3    Q.    And so, this is how they spent the money; is that right?

4    A.    Yes.

5    Q.    And based on your review of the records, what was this

6    account used for in terms of expenditures?

7    A.    This appears to be the main operating account of

8    DigitalNet Technology Solutions as is evidenced by salary

9    payments, tax payments, different vendor and business expenses.

10   Q.    So, I'd like to direct your attention to the top of the

11   page.  There are two entries for Aisa -- do you see that --

12   Consulting Group?

13   A.    Yes.

14   Q.    Aisa Consulting Group, LLC?

15   A.    Yes.

16   Q.    How much money in total went to the Aisa accounts from

17   this account?

18   A.    $2,668,946.12.

19   Q.    Thank you very much.  So, I'd like to direct your

20   attention to the DigitalNet Technology Solutions.  There are

21   two rows.  Do you see that?

22   A.    Yes.

23   Q.    All right.  So, the first row has 58 transactions

24   totalling $1,220,400.  Do you see that?

25   A.    Yes.

1     Q.   Okay.   What do these transactions represent?

2     A.   57 of these transactions represent wires from the

3     DigitalNet account to a bank account over in Pakistan in the

4     name of DigitalNet Technology.   The one outstanding transaction

5     was a check payable to DigitalNet Technology Solutions in the

6     amount of $15,200.   That check was deposited into a Bank of

7     America account.

8     Q.   Okay.   Thank you.   And there's a second row with

9     DigitalNet Technology Solutions as the payee, and it totals

10     $10,045.   Do you see that?

11     A.   Yes.

12     Q.   Where did this money go?

13     A.   This money went to Bank of America as well.

14     Q.   And we don't have summaries for those accounts, right, the

15     Bank of America account, for trial purposes?

16     A.   Not for trial purposes.

17     Q.   Okay.   Thank you.   Let's go to page 2 of Exhibit 919.

18     There are entries showing transfers to accounts ending 3920 and

19     7206.   Do you see that?

20     A.   Yes.

21     Q.   Okay.   What entity owns those two accounts?

22     A.   These are other Pentucket Bank accounts in the name of

23     DigitalNet Technology Solutions.

24     Q.   And how much money was transferred from this account to

25     those two other DigitalNet accounts at Pentucket Bank?

1    A.    $5,979,354.

2    Q.    And 72 cents?

3    A.    And 72 cents.

4    Q.    Thank you, ma'am.  Let's go to Exhibit 917.  And, ma'am,

5    for this exhibit I'd like you to work from the paper copies

6    that are in front of you, because this is an 87-page summary

7    chart.  Is that right?

8    A.    Yes.

9    Q.    Tell the Court what does Exhibit 917 show?

10   A.    Exhibit 917 is a summary of all the transactions and a

11   clean-dirty fund analysis for Pentucket Bank account 2684 in

12   the name of DigitalNet Technology Solutions for the period

13   August 2012 through May 2018.

14   Q.    Thank you.  And, ma'am, now I'd like to go through and

15   talk about specific transactions related to counts of the

16   superseding indictment, okay?

17   A.    Okay.

18   Q.    So, let's start on the Bates number page 5047, and if we

19   can go to the wire transaction on April 21st, 2014.  Do you see

20   that, ma'am?

21   A.    Yes.

22   Q.    So, the Court's already heard testimony about the wires

23   themselves.  What I want to ask you is on April 21st, 2014,

24   when $15,000 was wired abroad, how much was in the clean fund

25   column?

1   A.   Zero.

2        MS. LE:   Let's go to Bates number page -- I'm sorry,

3   your Honor.   That particular testimony relates to Counts 19 and

4   31 of the superseding indictment.

5        Let's go to page 5051, and, Ms. Sheff, that's on page

6   25, if that helps.   Great.

7   Q.   And I direct your attention to the June 20th, 2014 wire

8   transaction of $15,000, which relates to Counts 20 and 32 of

9   the superseding indictment.

10        Ma'am, before this amount of money was wired from the

11   account, what was the clean funds balance?

12   A.   Zero.

13   Q.   Thank you.   Let's go to Bates number page 5063.   And,

14   ma'am, I'll direct your attention to the December 18, 2014

15   wire, $13,260, which relates to Counts 21 and 33 of the

16   superseding indictment.   Before this wire transfer abroad how

17   much was in the clean funds balance?

18   A.   Zero.

19   Q.   Let's go to Bates number page 5065.   I direct your

20   attention to the transaction on January 20th, 2015, a wire of

21   $12,000, which relates to Counts 22 and 34 of the superseding

22   indictment.   Before this wire what was the clean funds balance?

23   A.   Zero.

24   Q.   Let's go to Bates number page 5072.   I direct your

25   attention to the wire transfer on May 18, 2015 in the amount of

1   $16,960, which relates to Counts 23 and 35 of the superseding

2   indictment.  Before this wire transaction what was the clean

3   funds balance in this account?

4   A.   Zero.

5   Q.   Let's go to Bates number page 5078, and I'll direct your

6   attention to August 28, 2015, check number 184 --

7   A.   Yes.

8   Q.   -- to New View Landscaping.  Do you see that?

9   A.   Yes.

10  Q.   This is $27,257?

11  A.   Correct.

12  Q.   And this relates to Count 45 of the superseding

13  indictment, ma'am?

14  A.   Yes.

15  Q.   Before this check posted what was the clean funds balance?

16  A.   Zero.

17        MS. LE:  Ms. Sheff, if we can pull up Exhibit 145 side

18  by side, and if we can go to page 531, check number 184, this

19  one right here.

20  Q.   Do you see check 184?

21  A.   Yes.

22  Q.   Is this the transaction we were just discussing?

23  A.   Yes.

24  Q.   All right.  What is the date of the check?

25  A.   August 26, 2015.

1    Q.    Who is the payee?

2    A.    New View Landscaping.

3    Q.    What is the amount?

4    A.    $27,257.

5    Q.    Do you see the address for DigitalNet Technology Solutions

6    for the payor?

7    A.    Yes.

8    Q.    Okay.  300 Brickstone Square, Suite 201?

9    A.    Yes.

10   Q.    In Andover, Massachusetts?

11   A.    Yes.

12   Q.    Are you aware that that address is a part of an office

13   complex?

14   A.    Correct.

15   Q.    So, based on your knowledge that the address of the

16   business is part of an office complex, what were your thoughts

17   when you saw the $27,000 check for landscaping?

18   A.    I had no reason to believe that DigitalNet Technology

19   Solutions would pay for the landscaping in this office complex

20   campus.

21   Q.    Thank you very much.  Let's go back to Exhibit 917.  Let's

22   go to page 5095, and I'll direct your attention to a wire on

23   July 18, 2016 in the amount of $19,960, which relates to Counts

24   24 and 36 of the superseding indictment.  Before this wire

25   transaction what was the clean funds balance of this account?

1    A.    Zero.

2    Q.    Let's go to page 5098.  I'll first direct your attention

3    to the November 21st, 2016 wire of $70,000, which relates to

4    Counts 25 and 37 of the superseding indictment, as well as a

5    November 28, 2016 wire of $145,000, which relates to Counts 26

6    and 38.  Do you see those?

7    A.    Yes.

8    Q.    What was the clean funds balance on this account before

9    those two wire transactions?

10   A.    Zero.

11   Q.    Let's go to Bates number page 5108.  I'll direct your

12   attention to the wire transaction October 20th, 2017 in the

13   amount of $14,960, which relates to Counts 27 to 39 of the

14   superseding indictment.  Were there any clean funds in this

15   account before the wire transactions went through?

16   A.    No.

17   Q.    Let's go to Bates number page 5109.  I'll direct your

18   attention to the wire transaction on December 20th, 2017 in the

19   amount of $190,000.  This wire relates to Counts 28 and 40 of

20   the superseding indictment.  Before this wire of $190,000 were

21   there any clean funds in this account?

22   A.    No.

23   Q.    One more in this exhibit.  Let's go to Bates number page

24   5111, and I'll direct your attention, first, to the wire on

25   February 16, 2018 for $15,960.  This relates to Counts 29 and

1    41 of the superseding indictment.

2         Ma'am, were there any clean funds in this account at

3    the time of the wire?

4    A.   No.

5    Q.   Now I'd like to direct your attention to the wire

6    transaction on March 15, 2018 in the amount of $16,500.  This

7    relates to Counts 30 and 42 of the superseding indictment.

8         Ma'am, before this wire transaction were there any

9    clean funds in the account?

10   A.   No.

11   Q.   Thank you.  Let's move on to Exhibit 920.  I'm sorry.  One

12   moment.

13        Ma'am, what does Exhibit 920 show the Court?

14   A.   This is a summary of the international wires from

15   Pentucket Bank account 2684 in the name of DigitalNet

16   Technology Solutions for the period August 2012 through May

17   2018.

18   Q.   And so, does this exhibit relate back to Counts 19 through

19   42 of the superseding indictment?

20   A.   Yes.

21   Q.   Thank you, ma'am.  What country did all these wire

22   transactions go to, ma'am?

23   A.   These went to NIB Bank in Pakistan.

24   Q.   Thank you.  What does the yellow highlighted section show

25   the Court?

1    A.   These are wires that were previously associated with the

2    clean funds.  These wires were traced to money received from

3    the Robert Allen Group.

4    Q.   Okay.  And because the money was traced back to the Robert

5    Allen Group, what did I ask you to do?

6    A.   You asked me to update this chart, because previously I

7    was just asked to trace the deposits received from the United

8    Way.

9    Q.   Thank you very much.  So, what was the total amount of

10   money wired attributable to Robert Allen Group payments?

11   A.   $35,710.

12   Q.   And what was the total amount of money wired to Pakistan

13   attributable to United Way payments?

14   A.   $1,169,490.

15   Q.   And what was the total amount of money wired to Pakistan

16   that you attributed to dirty funds obtained by DigitalNet?

17   A.   $1,205,200.

18   Q.   Thank you.  Let's flip through to the second page, just so

19   the Court can see that.  And your total right there of total

20   wired and associated with dirty funds is at the bottom, ma'am?

21   A.   Yes.

22   Q.   Thank you very much.  Let's go to Exhibit 922.  We're

23   switching accounts again.  What does this exhibit show the

24   Court?

25   A.   This exhibit shows a summary of transactions in two

1    Citizens Bank accounts in the name of Aisa Consulting Group for

2    the period June 2017 through June 2018.

3    Q.   So, account ending 5163 is a business checking account; is

4    that right, ma'am?

5    A.   Correct.

6    Q.   And the account ending 5155 is a money market account; is

7    that right?

8    A.   Correct.

9    Q.   So, let's start with that money market account in 5155.

10   Ma'am, where did the money deposited into this account come

11   from?

12   A.   The money deposited into this account came from first a

13   7/5/2017, a Pentucket Bank treasurer's check, and, secondly, on

14   7/17/2017 a check from Pentucket Bank numbered 1018.   The

15   Pentucket Bank owner of the account was Aisa Consulting Group.

16   Q.   And that was a check that we talked about earlier, right?

17   A.   Correct.

18   Q.   What did Aisa Consulting use this Citizens Bank account

19   for?

20   A.   This was a money market account, so basically to accrue

21   interest.

22   Q.   Okay.   Do you know what happened with the money in this

23   account?

24   A.   I know $500,000 of it was withdrawn on 6/20/2018, and this

25   went to fund two accounts over at Bellwether Credit Union and

1    one account over at Service Credit Union.

2    Q.   So, this transaction that I'm doing a bad job of

3    highlighting -- Ms. Sheff, could you help me with that -- from

4    June 20, 2018, is that the transaction you're telling me about?

5    A.   Yes.

6         MS. LE:  So, let's go to Exhibit 150.  If you want to

7    just bring it up side by side, Ms. Sheff, that's okay, or bring

8    up a new screen.  And I'd like you to go to Exhibit 150, and it

9    will be pages 258 and 256.  There's 258.

10        MS. SHEFF:  Did you want another?

11        MS. LE:  Yeah.  Can you also bring up 256?  It's not

12   possible?

13        MS. SHEFF:  No.

14   Q.   Hold on.  Let me do this.  I'm going to switch over to the

15   document camera.  The first check I'm putting down is from page

16   256, and then the second check I'm putting down is from page

17   258.  Do you see those checks, ma'am?

18   A.   Yes.

19   Q.   Can you tell us anything about these two checks?

20   A.   Yes.  These two checks came from a $500,000 withdrawal on

21   the same date of June 20th, 2018.  One check was sent over to

22   Service Credit Union, and another check was split in half and

23   funded two accounts over at Bellwether Credit Union.

24   Q.   So, check number 6369 was used to fund the Bellwether

25   Credit Union accounts?

1    A.    Yes.

2    Q.    And then check ending 6351, that was used to fund which

3    account, ma'am?

4    A.    A Service Credit Union account.

5    Q.    Who owned the Service Credit Union account?

6    A.    Imran and Saima Alrai.

7    Q.    And who owned the two Bellwether Credit accounts?

8    A.    Those were in trust for the Alrai children.

9          MS. LE:  Your Honor, those checks relate to Count 50

10   of the superseding indictment.

11         THE COURT:  Count 50?

12         MS. LE:  50.  Yes, your Honor.

13         THE COURT:  Thank you.

14         MS. LE:  That was Exhibit 150 and Bates number page

15   258 and 256.

16   Q.    Let's go to Exhibit 921.  All right.  So, what does

17   Exhibit 921 show the Court?

18   A.    This exhibit shows the two accounts opened at Bellwether

19   Community Credit Union funded by the Citizens Bank official

20   check that we just spoke about and also by a check from

21   Pentucket Bank account 4534 in the name of Imran and Saima

22   Alrai.

23   Q.    Thank you.

24         MS. LE:  And, your Honor, this exhibit and the

25   following testimony relates to Counts 50 and 48 of the

1    superseding indictment.

2         THE COURT:  Yes.

3    Q.    Ma'am, did you trace the monies that was used to open this

4    account from the beginning to the end?

5    A.    Yes.

6    Q.    Okay.  And how did you do that?

7    A.    I did that by going through all the bank records that we

8    received.

9    Q.    And did you prepare a summary exhibit of your findings?

10   A.    I did.

11   Q.    I'd like to show you Exhibit 923, and if we can start from

12   the beginning and explain your summary chart to the Court.

13   A.    Yes.  So, if we start at the top left-hand side of the

14   chart we have the Aisa Consulting Group account over at

15   Pentucket Savings Bank, and on the date of 6/21/2016,

16   $1,000,000 was transferred into another Aisa Consulting Group

17   account at Pentucket Bank ending in 3912.  On 7/17, $1,000,000

18   was transferred into another Aisa Consulting Group account over

19   at Pentucket Bank ending in 6882.  This caused a check to be

20   written on the same day, check number 1018, to Aisa Consulting

21   Group and deposited into Citizens Bank account 5155.  From

22   there, on 6/20/2018 a $5 00 (sic) withdrawal was made.

23   Q.    500,000?

24   A.    I'm sorry, 500,000 withdrawal was made.  This was split

25   into two official checks, one ending in 6369, one ending in

1    6351.  The check ending in 6369 funded two accounts over at

2    Bellwether Community Credit Union in trust for the Alrai

3    children.  The official check ending in 6351 funded a Service

4    Credit Union account in the name of Imran and Saima Alrai.

5         Also from this Citizens Bank account there were two

6    checks written to DigitalNet Technology Solutions.  These two

7    checks were deposited into a Bank of America account.

8    Q.   Thank you very much.

9         MS. LE:  Your Honor, we tender the witness.

10        THE COURT:  Cross.

11        MR. AYER:  Thank you, your Honor.

12                     CROSS-EXAMINATION

13   BY MR. AYER:

14   Q.   Ms. Cacace, you were asked to do a financial analysis in

15   this case, right?

16   A.   Correct.

17   Q.   Tracking the money flowing from bank accounts, into them

18   and out of them?

19   A.   Correct.

20   Q.   And you were asked to determine at a basic level when a

21   transaction involved solely dirty money, right?

22   A.   Yes.

23   Q.   And from what I gathered from your direct examination,

24   that analysis was -- it's very basic level, and I don't want to

25   oversimplify the work that you did -- but when there was no

1   more clean money in an account the transaction had to involve

2   dirty money?

3   A.   Clean funds were spent first, and then dirty funds were

4   spent.

5   Q.   So, at the point where clean funds were zero, then you

6   determined this was a transaction that involved dirty money?

7   A.   Correct.

8   Q.   And your definition of "dirty money" was anything that you

9   could determine was derived from the United Way or the Robert

10   Allen Group?

11   A.   Yes.

12   Q.   And you didn't separate out -- in your chart we saw the

13   column for dirty money.  You didn't separate out what was from

14   United Way or Robert Allen; it was simply one dirty money

15   column, right?

16   A.   That is correct.

17   Q.   So, if we were to try to determine what solely came from

18   the United Way or what solely came from the Robert Allen Group,

19   that question is not answered by that chart, right?

20   A.   The question is answered by the summary of deposit sources

21   where they are broken out, money received from Robert Allen,

22   money received from the United Way.

23   Q.   But where we have that one, the one exhibit that you did,

24   the 85-page exhibit where it says "Dirty money," that "Dirty

25   money" column is the sole column to determine money from United

1    Way and Robert Allen, right?

2    A.    Right.

3    Q.    And that's not separated out?

4    A.    Well, it's separated out in a column over to the left

5    where it lists the payee, and the United Way or the Robert

6    Allen would be listed in that column.

7    Q.    Okay.  So, with a little extra work you could determine --

8    you could essentially suss out what's Robert Allen and what's

9    United Way within that dirty money column?

10   A.    I could have split the dirty money column into two.  Is

11   that what you're asking me?

12   Q.    Yes.

13   A.    Make one Robert Allen and one United Way?

14   Q.    Yes.

15   A.    Yes, that could have been done.

16   Q.    And as it stands, though, that was not done?

17   A.    That's correct.

18   Q.    But it could be done with some extra work?

19   A.    Correct.

20   Q.    You also didn't separate out money that was fairly earned

21   versus money that wasn't from the United Way and Robert Allen

22   Group, right?

23   A.    Yes.

24   Q.    The assumption was any money from the United Way or any

25   money from Robert Allen was dirty?

1    A.    That's correct.

2    Q.    So, if there was money that was fairly earned, that's not

3    reflected in your charts?

4    A.    That's correct.

5    Q.    And that assumption, from what I gathered from one of the

6    questions on direct, was based on assumptions you were told

7    by -- was it the U.S. Attorney's Office?

8    A.    The format of the chart was decided in conjunction with

9    the prosecutors.

10   Q.    And your definition of "dirty money," was that based on an

11   assumption provided to you from the U.S. Attorney's Office?

12   A.    Yes.

13   Q.    The other thing I wanted to clarify is how long this

14   analysis took you from getting the initial records to producing

15   your report.

16   A.    I would have to estimate a couple of months.

17   Q.    And were you working on other cases during that period?

18   A.    Yes.

19   Q.    So, if you could -- and if you can't that's a fine answer

20   as well -- could you estimate the number of hours it took you

21   to determine essentially the answers to the question of when

22   dirty money was used?

23   A.    I really can't estimate hours.

24   Q.    Okay.  I mean, are we talking in the hundreds of hours?

25   A.    I'm not comfortable estimating hours.

1    Q.   All right.  But it took a couple of months of work --

2    A.   Yes.

3    Q.   -- for you to determine from the initial receipt of the

4    records when dirty money was being used?

5    A.   Correct.

6         MR. AYER:  And if we could bring up, please, Exhibit

7    150, page 256.

8    Q.   Do you know whose signature that is on that check?

9    A.   I do not know whose signature is on the check.

10   Q.   Were you ever asked to compare signatures on the checks?

11   A.   I was not.

12   Q.   Is that something that's within your expertise?

13   A.   No, it is not.

14   Q.   And if we can bring up -- I believe you also testified

15   about, I believe it was Exhibit 145.  If we can go to check

16   184, do you remember being asked about that check --

17   A.   Yes.

18   Q.   -- in your direct?  And at that point -- and do you know

19   whose signature that is on that check?

20   A.   I do not know whose signature is on the check.

21   Q.   So, we heard at the beginning of this that, when you

22   initially got these records in for this case to do your

23   analysis, they were, I think the word was "voluminous"?

24   A.   Yes.

25   Q.   You had information about many different bank accounts?

1   A.   Correct.

2   Q.   And many different financial transactions?

3   A.   Yes.

4   Q.   And it wasn't as easy as there was a single account where

5   the quote, unquote, dirty money came in and the dirty money

6   went out, right?

7   A.   That's correct.

8   Q.   There were a lot of accounts where what you deemed dirty

9   money based on the assumption from the prosecutors came in as

10   well as clean money, right?

11   A.   Yes.

12   Q.   And there were, similarly, as part of your analysis there

13   were many accounts where dirty money came in and clean money

14   went out?

15   A.   Correct.

16   Q.   Sorry.  Let me rephrase that.  That was awkwardly worded.

17        There were accounts where dirty money and clean money

18   came in, right?

19   A.   Yes.

20   Q.   And where dirty money and clean money went out?

21   A.   Yes.

22   Q.   And that was in a lot of those accounts, right?

23   A.   The money was transferred amongst all of the accounts.

24   Yes.

25   Q.   And so, you got those records in, and you initially had to

1   digest the information, right?

2   A.    Yes.

3   Q.    And then you had to create what I assume would be

4   spreadsheets and charts of all the different transactions?

5   A.    Yes.

6   Q.    Because you had to lay it out in a more easily digestible

7   way to be able to do anything with it, right?

8   A.    Yes.

9   Q.    Because the records themselves, as they came in, made it,

10   maybe not for you, but maybe for a lay person impossible to

11   determine when clean money was coming in and when dirty money

12   was coming in, when clean money was going out, when dirty money

13   was going out?

14   A.    Right.  The accounts needed to be scheduled, so that was

15   the easiest way to trace the money received from Robert Allen

16   and the United Way with the amount of accounts involved and

17   with the amount of transfers amongst all of the accounts.

18   Q.    And so, once you laid them out you had to then compile

19   them into the charts that we saw, right?

20   A.    Yes.

21   Q.    And then you had to essentially do the addition and

22   subtraction to determine when clean money was at zero and it

23   was a dirty money transaction?

24   A.    Yes.  It was done by a software program, but, yes.

25   Q.    And that took, as you said, months of analysis?

1    A.    Yes.

2    Q.    And it was only after engaging in that process and those

3    months of analysis that you were able to know when a dirty

4    money transaction took place?

5    A.    It was after going through the data and processing it that

6    I was able to determine what was clean and what was dirty.

7    Q.    Right.  So, I mean, after your entire months-long process,

8    that's when you were able to know that a transaction involved

9    solely dirty money?

10   A.    Right.

11           THE COURT:  Give me a moment, Counsel.

12           MR. AYER:  Yes, your Honor.

13           THE COURT:  I want to just review what you just

14   elicited.  Hold on a second.

15                        (Pause)

16           THE COURT:  Am I wrong in assuming -- I'm going to let

17   you finish your examination before I ask questions.

18           MR. AYER:  Your Honor, I'm moving on to another

19   subject area.  If you want to address this now, I'd be happy

20   with that.

21           THE COURT:  Well, the principle -- if I understood

22   your direct, the principle that guided your analysis here is

23   that money out was always credited against clean money first.

24           THE WITNESS:  That's correct.

25           THE COURT:  That's how you made sure you weren't

1     overestimating any disbursements from dirty money?

2             THE WITNESS:  That's correct, your Honor.

3             THE COURT:  Why did you do that?

4             THE WITNESS:  To give the benefit of the doubt to the

5     defendant.

6             THE COURT:  Thank you.

7             MS. LE:  I'm sorry, your Honor.  I didn't hear the

8     answer.

9             THE COURT:  "To give the benefit of the doubt to the

10    defendant."

11            MS. LE:  Thank you, your Honor.

12            THE COURT:  Which is shorthand, but I do understand

13    it.

14            Go ahead, Counsel.

15    BY MR. AYER:

16    Q.  You would agree that the accounts themselves, as they

17    existed in just the cold records, didn't reflect overtly clean

18    money versus dirty money, right?

19    A.  Right.

20    Q.  And if you were to simply at any given point in time look

21    at the account balance, the balance itself wouldn't tell you

22    "I'm clean" or "I'm dirty" or "I'm some of each"?

23    A.  That's correct.

24    Q.  If we can pull up Exhibit 918, I think it was.  I hope

25    this is the right one.  Okay.

1    So, this is a summary of deposit sources from

2    Pentucket Bank 2684 for DigitalNet, right?

3    A.   Yes.

4    Q.   And this shows every deposit made into that account over

5    that approximately six-year period?

6    A.   Yes.

7    Q.   And it shows a total of about $12.3 million coming into

8    that account, right?

9    A.   Yes.

10   Q.   So, for example, we see 53 transactions totaling

11   $3.3 million, approximately, coming from the United Way?

12   A.   Yes.

13   Q.   Do you see that highlighted?  We also see about 451

14   transactions of deposits from other accounts -- in another

15   account, right?

16   A.   Yes.

17   Q.   And so, this is just a clarification for my benefit.  Some

18   of that money going from -- you know, coming into the account,

19   going out, coming back in would be counted twice, right?

20   A.   Some of the money could have been counted twice.

21   Q.   So, where we see $12.3 million, that's not $12.3 million

22   of new money coming from an external source into that account;

23   that could be going out of the account and then back in?

24   A.   Yes.

25   Q.   And it's, essentially, double counted, right?  So, if I

1  can give you a hypothetical to clarify.  If this account had

2  $1,000,000 come in from the United Way, and then that

3  $1,000,000 was sent to a different account and then a month

4  later brought back into that account, that would show two

5  deposits of $1,000,000 each, right?

6  A.   Correct.

7  Q.   Showing a total of $2,000,000 in deposits, right?

8  A.   Correct.

9  Q.   When there only ever was $1,000,000?

10  A.   Yes.

11  Q.   Okay.  Is that one of the reasons why your analysis took

12  so long, because the money would go out and come back in

13  frequently?

14  A.   The analysis took long because we had a lot of records,

15  and I wanted to make sure that the analysis was accurate.

16         MR. AYER:  Okay.  All right.  Thank you, your Honor.

17  I don't have anything further.

18         THE COURT:  That's it?

19         MR. AYER:  That's it.

20         MS. LE:  Thank you.  Can we pull up Exhibit 917?

21                    REDIRECT EXAMINATION

22  BY MS. LE:

23  Q.   So, ma'am, following on what counsel just asked you about

24  possibly double counting because money gets moved in, the same

25  amount of money can move out, then can be moved back in again,

1    right?

2    A.    Correct.

3    Q.    What is the purpose of this running total in the far right

4    columns of clean funds balance and dirty funds balance?

5    A.    The clean funds balance and the dirty funds balance

6    differentiates between the deposit sources, and tying out these

7    two numbers will tie out to the balance on the bank statement.

8    Q.    So, for your purposes of -- while you're keeping track of

9    spending to see whether money going out of the account is clean

10   or dirty, are you double counting here?

11   A.    No, I'm not.

12   Q.    What is the purpose of maintaining both a clean funds

13   column, dirty funds column, clean funds balance and dirty funds

14   balance?

15   A.    The purpose of maintaining those is being able to trace

16   the deposit sources to the United Way or the Robert Allen Group

17   and keeping those separate from deposit sources that didn't

18   originate from those two entities.

19   Q.    Okay.  And can you look at Exhibit 917 in front of you and

20   just flip through, and then I'll ask you a question when you

21   are done flipping through each of those pages.  And what I'd

22   like you to note, while you're reviewing 917, is when the clean

23   funds were exhausted from this account, which is the main

24   operating account for DigitalNet.

25   A.    They were exhausted on 12/10/2012.

1    Q.    Between 12/10/2012 and May 2018 were there any additional

2    clean funds that were deposited into the account?

3    A.    There were some clean funds on page 2.

4    Q.    Okay.  Let's go to page 2.

5    A.    $5,500 and 23 cents and 41 cents.  And then on page 3,

6    $9,600; page 4, $79; page 5, $1,500; page 9, $108; page 10,

7    $2,120; page 13, $149; page 20, $145; page 26, $145; page 33,

8    $113; page 39, $502.  Twice on that page $502.  Page 40, $222;

9    another transaction for $5.86; another transaction for $228;

10   page 41 a transaction for $9,719.

11   Q.    Let me just stop you right there.  A lot of these

12   transactions that we talked about as clean funds came from

13   account ending 7206, right?

14   A.    Correct.

15   Q.    And you counted those as clean funds as a result of

16   missing deposit items; is that right?

17   A.    Correct.

18   Q.    And in those circumstances you gave him the benefit of the

19   doubt; is that right?

20   A.    That's correct.

21   Q.    All right.  Keep going, ma'am.

22   A.    Still on page 41, $9,719, $308; page 42, $5,100, $309 and

23   another transaction for $9.

24   Q.    And all of those, again, from 7206, right?

25   A.    Yes.

1    Q.   With that same benefit of the doubt because of the missing

2    items?

3    A.   Yes.

4    Q.   Okay.

5    A.   On page 45 a transaction for $609, and also another

6    transaction for $302, and one more transaction of $4.

7    Q.   I think we can keep going on this for a while, but would

8    it be fair to say that most of the funds deposited in this

9    account are attributable to dirty funds rather than clean

10   funds?

11   A.   Yes.

12   Q.   And that the number of deposits and also the value of the

13   deposits are primarily dirty funds?

14   A.   Yes.

15   Q.   Okay.  Let's move on.  I don't really want to belabor the

16   point.

17         Ma'am, Mr. Alrai's salary from United Way, was that

18   considered clean or dirty?

19   A.   That was considered clean.

20   Q.   How about his salary from the Robert Allen Group?  Was

21   that considered clean or dirty?

22   A.   Clean.

23   Q.   So, when you say payments directed from United Way and

24   Robert Allen Group, you mean the contracts that DigitalNet had

25   with those two companies; is that right?

1  A.   Yes.

2  Q.   Okay.  Counsel asked you a lot of questions about the time

3  that you spent reviewing the accounts and whether your analysis

4  was complicated, essentially, right?

5  A.   Yes.

6  Q.   Okay.  Did that have anything to do with the number of

7  accounts the defendant and his companies had?

8  A.   Yes, it did.  In this case, this is really one of the

9  first cases I've had where there have been so many accounts

10  involved with such a high volume of transfer back and forth

11  amongst all of the accounts.

12  Q.   Okay.  And are you familiar with the concept of layering

13  of bank accounts?

14  A.   Yes.

15  Q.   Can you tell us a little bit about layering?

16  A.   So, layering is when money is transferred amongst accounts

17  back and forth and back and forth to hide the origination of

18  the money.

19  Q.   And how many years have you been with the FBI as a

20  forensic accountant?

21  A.   27.

22  Q.   And in your 27 years of experience how does this analysis

23  and the web of accounts compare to your other cases?

24  A.   This was a case where many accounts were involved and the

25  analysis was very involved and very detailed.

1    Q.   But how does it compare to your other cases that you've

2    worked these 27 years?

3    A.   I've never had a case with this many accounts involved.

4         MS. LE:   Thank you.  No further questions, your Honor.

5         THE COURT:   Thank you.

6         Any recross?

7         MR. AYER:   Briefly, your Honor.

8                          RECROSS-EXAMINATION

9    BY MR. AYER:

10   Q.   You just testified on redirect again similarly -- well, I

11   think you said it for the first time on redirect, but I'll

12   check again -- that part of your analysis was to give the

13   defendant the benefit of the doubt, right?

14   A.   Mm-hmm.

15   Q.   You didn't want to overstate the number of transactions

16   that may involve, quote, unquote, dirty money?

17   A.   Correct.

18   Q.   But that your assumption was that dirty money was

19   everything he was paid by the United Way and Robert Allen

20   Group?

21   A.   That is how I was told to do the analysis.

22   Q.   Were you ever provided the report of the prosecution's

23   expert, Greg Naviloff?

24   A.   I have seen excerpts from that report.

25   Q.   Were you asked to give the defendant the benefit of the

1    doubt based on the loss calculation of Greg Naviloff?

2    A.    I was not.

3              MR. AYER:  That's all I have.  Thank you.

4              THE COURT:  Okay.  Thank you.

5              MS. LE:  Your Honor, may Ms. Cacace stay and watch the

6    remainder of the trial?

7              THE COURT:  Defense position?

8              MR. AYER:  I think the same as the other witnesses; as

9    long as she's not subject to recall.

10             THE COURT:  That's your call.

11             MS. LE:  She's not subject to recall, your Honor.

12   Thank you.

13             THE COURT:  Then, you may watch the proceedings.

14             THE WITNESS:  Thank you, your Honor.

15                      (Witness stepped down)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4         I, Brenda K. Hancock, RMR, CRR and Official Court

5 Reporter of the United States District Court, do hereby certify

6 that the foregoing transcript constitutes, to the best of my

7 skill and ability, a true and accurate transcription of my

8 stenotype notes taken in the matter of *United States v. Imran*

9 *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14 Date: ___3/26/20              */s/ Brenda K. Hancock*
                                Brenda K. Hancock, RMR, CRR

15                             Official Court Reporter

16

17

18

19

20

21

22

23

24

25