*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6/24/20

1                        UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:18-cr-192-JL
              v.                      *  December 11,2019
6                                     *  12:40 p.m.
      IMRAN ALRAI,                    *
7                                     *
                        Defendant.    *
8     * * * * * * * * * * * * * * * * *

9

10          EXCERPT TRANSCRIPT OF BENCH TRIAL DAY EIGHT
                    TESTIMONY OF GREG NAVILOFF
11
            BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13
      APPEARANCES:
14

15    For the Government:        John S. Davis, AUSA
                                 Matthew Hunter, AUSA
16                               Cam T. Le, AUSA
                                 United States Attorney's Office
17

18    For the Defendant:         Timothy M. Harrington, Esq.
                                 Timothy C. Ayer, Esq.
19                               Shaheen & Gordon PA

20

21    Court Reporter:            Brenda K. Hancock, RMR, CRR
                                 Official Court Reporter
22                               United States District Court
                                 55 Pleasant Street
23                               Concord, NH 03301
                                 (603) 225-1454

24

25

I   N   D   E   X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GREG NAVILOFF | | | | |
| Mr. Hunter | 3 | | 111 | |
| By Harrington | | 82 | | 123 |

P R O C E E D I N G S

EXCERPT

1       THE CLERK:  Good morning, sir.  Actually, good

2  afternoon.  If you would like to step this way.  If you could

3  step into the witness box and remain standing.  Please raise

4  your right hand.

5       **GREG NAVILOFF**, having been duly sworn by the Clerk,

6  was examined and testified as follows:

7       THE CLERK:  And, for the record, please state your

8  full name and spell your last name.

9       THE WITNESS:  Greg Naviloff.  N-A-V, as in "Victor,"

10  I-L-O-F-F.  Naviloff.

11       THE CLERK:  Thank you.  Please be seated.

12       MR. HUNTER:  Thank you.  And, for the record, the

13  defendant's experts are observing this testimony.

DIRECT EXAMINATION

BY MR. HUNTER:

Q.   Good afternoon, Mr. Naviloff.

A.   Good afternoon.

Q.   How are you employed, sir?

A.   I'm employed by RSM US LLP.

Q.   What is RSM?

A.   RSM US LLP is an accounting, tax and consulting firm that

employs approximately 10,000 employees in the U.S. and 40,000

globally.

1    Q.   And what is your role at RSM?

2    A.   I lead the Financial Investigation Dispute Services Group

3    for New England.

4    Q.   Do you do forensic accounting work as part of your job

5    duties?

6    A.   Yes.  As part of that I perform forensic accounting

7    procedures.

8    Q.   And what is "forensic accounting"?

9    A.   "Forensic accounting" is a term that is used to describe a

10   body of professional services that includes accounting analysis

11   related to financial statement fraud, corruption and asset

12   misappropriation.  It typically involves asset tracing,

13   quantification of losses.  It includes the use of procedures,

14   accounting and data analytic procedures to identify suspicious

15   and unusual accounting activity and transactions.

16   Q.   Thank you.  Where did you work prior to RSM?

17   A.   Prior to RSM I worked for another large international

18   accounting firm, Deloitte, and prior to that -- I worked with

19   them for several years, and prior to that I worked with several

20   other larger consulting firms but, generally speaking, working

21   with a group of individuals since Arthur Andersen's demise.

22   Q.   And what were those other consulting firms?

23   A.   Huron Consulting Group, Arthur Andersen, as I mentioned,

24   and Grant Thornton briefly.

25   Q.   What type of work did you do for those accounting firms?

1    A.    Similar work.  I was responsible for performing financial

2    accounting and forensic accounting exercises.

3    Q.    And before Arthur Andersen where did you work?

4    A.    I worked for BDO Seidman in New York City, where I

5    performed financial statement audits and attest services.

6    Q.    What is BDO Seidman?

7    A.    BDO Seidman is another large accounting firm, one of the

8    larger U.S. firms that provides similar accounting, tax and

9    consulting services.

10   Q.    Sir, could you explain your education and any training or

11   certifications you have related to forensic accounting.

12   A.    Sure.  I have a bachelor's degree, bachelor's of science

13   in accounting.  I am a certified --

14            MR. HARRINGTON:  Judge, if I can interject just

15   briefly?

16            THE COURT:  Yes.

17            MR. HARRINGTON:  If the government is attempting to

18   lay a foundation to qualify him as an expert, I have no issue

19   with that.  They're just trying to give you additional

20   information regarding his background.  I just wanted to make

21   sure the Court and the government knew I'm not objecting --

22            THE COURT:  So, he may testify that he formed an

23   opinion under 702.  If there's other information you want me to

24   know, Mr. Hunter, you can elicit it, but if you're just laying

25   the foundation to get the opinions, you may proceed with the

1    opinions.

2              MR. HUNTER:  Thank you, your Honor.  I'll explore this

3    a little bit more and then move on to the opinion.

4              THE COURT:  Sure.

5    Q.   Sir, could you continue to explain your certifications.

6    A.   Sure.  I'm a Certified Public Accountant.  I've been a

7    Certified Public Accountant for over 20 years, and I'm a

8    Certified Fraud Examiner, certified in financial forensics and

9    also accredited in business evaluation.  The certifications

10   with the exception of the CFE, Certified Fraud Examiner, are

11   issued by the American Institute of Certified Public

12   Accountants, and the CFE designation is by the Association of

13   Certified Fraud Examiners.

14   Q.   Are you also accredited in business valuation?

15   A.   Yes.  That's part of my AICPA certifications.  Yes.

16   Q.   And, briefly, since you've already been qualified as an

17   expert, could you just describe, in general, your experience as

18   a forensic accountant?

19   A.   Over the years I've assisted numerous organizations, both

20   large and small, with factfinding generally around allegations

21   of financial statement fraud, corruption, asset

22   misappropriation and employee misconduct.  The factfinding and

23   forensic accounting analysis has largely been used by the

24   stakeholders within organizations; report those findings, those

25   factfindings, to those stakeholders, which often includes the

1    board of directors, special committees convened on behalf of

2    the organization, external enforcement agencies, as well as

3    others with interests in the investigations.

4    Q.    And do you have any experience in quantifying loss

5    associated to fraud or other activity?

6    A.    Yes.  So, another area of analysis or needs typically when

7    performing this factfinding is quantifying losses with the

8    alleged activities, and that's done for both purposes of

9    providing information to enforcement agencies as well as

10   certain insurance policies, fiduciary -- fidelity claims,

11   excuse me, from insurance providers which would cover theft

12   from employees and other losses.

13   Q.    And, finally, have you ever been appointed as an

14   accounting expert?

15   A.    I'm currently assisting on a matter in Federal Courts in

16   the U.S. Virgin Islands as a court-appointed expert.

17   Q.    And that's under Federal Rule of Evidence 706?

18   A.    That's correct.  Yes.

19   Q.    And, generally, what financial analysis are you doing in

20   that matter?

21   A.    Sure.  Yeah.  So, that's a public matter.  So, working

22   with Judge Gomez and assisting the two parties to a pension

23   plan dispute in the U.S. Virgin Islands where it required

24   forensic accounting assistance, looking into historical pension

25   plan contribution requirements, as well as what had been paid

1   by the employer, which is the government of the Virgin Islands,

2   over to the pension plan administrator.

3   Q.   And, finally, you've published -- have you published a

4   number of articles and/or book chapters regarding forensic

5   accounting and other accounting matters?

6   A.   Yes.  So, some of the recent publications include

7   authoring a chapter in an economics damage handbook for

8   forensic professionals and litigation support professionals.

9   My chapter was focused on performing financial forensic

10  examinations and some of the common procedures that are

11  employed by forensic professionals when performing internal

12  corporate investigations.

13  Q.   And is the name of the book *The Comprehensive Guide to*

14  *Economic Damages*?

15  A.   Yes, that's the name of it.

16  Q.   Sir, were you asked to conduct a forensic accounting

17  analysis regarding an investigation of Imran Alrai?

18  A.   I was, yes.

19  Q.   Was RSM initially retained by United Way to conduct this

20  analysis?

21  A.   Initially retained through Commisso Law to assist the

22  United Way.  That's correct.

23  Q.   And was that part of their internal investigation?

24  A.   Yes.  My understanding is that they had an issue that

25  required investigation.  The initial investigator was their

1    prior accounting firm, and they required an independent firm to

2    come in and assist them.

3    Q.   And as part of that did a team from RSM assist United Way,

4    their outside counsel, in document collection?

5    A.   There was a separate team, our digital forensic team, that

6    worked alongside me and worked with Commisso Law to assist with

7    the capture of the IT environment and examine the environment

8    for separate purposes aside from the issue with regards to

9    potential losses.

10   Q.   Okay.  And so, you mentioned forensically capturing

11   documents.  Was that information turned over to Commisso Law

12   and an e-discovery vendor where information was extracted into

13   an e-discovery database?

14   A.   Yes, that's my understanding of the use of some of that

15   data.  Some of it.  I don't know that all of it was loaded into

16   the e-discovery platform.  Some of it was tangentially related

17   to matters unrelated to discovery and the concept of

18   identifying facts related to the information, the

19   user-generated information from the organization.

20   Q.   Okay.  So, let me break this down.  So, some of the data

21   was relevant to your loss analysis?

22   A.   Yes.

23   Q.   And that was the financial records from United Way.  And

24   there was also documents uploaded to an e-discovery database;

25   is that correct?

A.    That's correct.  The user-generated files.  That's my

understanding.

Q.    And those documents were used in the internal

investigation and subsequently to produce records to the

government as part of the criminal investigation; is that

right?

A.    Correct.  Yes.

Q.    Was there also a separate team at RSM separate from your

team that was involved in an investigation at United Way

regarding the issue of data breach?

A.    Yes.  It's the separate incident that I was alluding to.

Yes.

Q.    Okay.  And did your team have access to any of the server

images involved in that investigation?

A.    I did not, no.  My team did not.

Q.    And can you explain that a little bit more?

A.    So, my --

Q.    Or was there a firewall in place?

A.    Yeah.  So, my digital forensic team has a lab based in

Chicago, and images and/or copies, my understanding, were taken

to that lab, and that's where those images would have resided.

The access to files in that lab are restricted to the employees

in that digital forensic group.

Q.    So, sir, is it your understanding that United Way has not

waived privilege as to the data breach investigation?

1    A.    That's my understanding, yes.

2    Q.    But just to be clear, that you and your forensic

3    accounting team, in determining loss for United Way as part of

4    the internal investigation and then subsequently when you were

5    retained by the government, you have never seen or had access

6    to any of the forensic images or data done by this separate

7    data breach team; is that correct?

8    A.    Correct.  Not that I'm aware of.

9    Q.    Is that because there is a firewall in place preventing

10   you from accessing it?

11   A.    Yeah, there's physical security preventing us from

12   accessing it, and it wasn't necessary for, at least based on my

13   understanding of the facts here, wasn't necessary for purposes

14   of quantifying the loss.

15   Q.    And so, you've never seen it or reviewed it in quantifying

16   loss?

17   A.    Correct.

18   Q.    So, subsequent to your engagement with United Way, did you

19   conduct a financial analysis and loss analysis for the United

20   States Attorney's Office --

21   A.    I did.

22   Q.    -- in this criminal case?

23   A.    Yes, I did.

24   Q.    Could you describe, generally, what your analysis

25   entailed?

1          MR. HUNTER:  And, Ms. Sheff, could you pull up the

2     summary exhibits for Mr. Naviloff.  924.

3     A.   So, generally speaking, the calculations -- two

4     calculations.  The first analysis and calculation was based on

5     an assessment of the loss to United Way based upon our or my

6     review of the services that were being rendered, and those

7     included certain services that were overbilled, duplicate

8     billed or were not delivered.

9     Q.   Okay.  Did you do a separate analysis of Mr. Alrai's

10    personal enrichment?

11    A.   Yes.  And then the second of those analyses, which were

12    done in conjunction with one another, was an analysis based

13    upon the records produced by the U.S. Attorney's Office that

14    contained Aisa Consulting and DigitalNet's financial statement

15    information as well as the personal tax returns of Mr. Alrai

16    and all the supports, supporting documents from an accountant.

17    Ms. Terry, I believe, is her name.

18    Q.   So, sir, regarding your calculation of the loss to United

19    Way, I think you mentioned you analyzed invoices and contracts.

20    Is that --

21    A.   Yes.

22    Q.   So, what material was relevant to that analysis?

23    A.   So, the materials and the procedures, generally speaking,

24    we obtained all the invoicing activity that occurred, the

25    universe of invoicing activity that occurred between DigitalNet

1    and United Way from inception through the termination of the

2    relationship.

3    Q.    Did you also review vendor invoices and contracts?

4    A.    Yes.  So, the invoices from DigitalNet as well as the

5    contracts and service agreements between the parties were

6    collected, as were other service agreements from other IT

7    providers.  We collected the disbursement records for United

8    Way for purposes of analysis, and we also had access to the

9    e-discovery materials to perform ad hoc searches as needed.

10   Q.    Yes.  And this e-discovery database, that's what we were

11   talking about before?

12   A.    Yes.

13   Q.    And is it your understanding that the documents from that

14   that your team viewed have been produced in this case?

15   A.    Yes.  That's my understanding, yes.

16   Q.    And did you also review United Way financial statements?

17   A.    There was limited review of United Way's financial

18   statements as a whole.  In part of that analysis I did observe

19   some benchmarking that United Way did itself with respect to IT

20   spend.  Some of the other analysis that we did was with respect

21   to understanding fixed assets and what was capitalized and IT

22   costs for purposes of reporting or assisting the external

23   auditors to understand the impact of the alleged asset

24   misappropriation to the financial statements of the United Way.

25   Q.    Sir, regarding your separate analysis of Mr. Alrai's

1    personal enrichment from the fraud, what records did you

2    analyze?

3    A.   The records analyzed there largely consisted of records

4    turned over by the U.S. Attorney's Office, and they largely

5    consisted of tax returns; they consisted of bank statement

6    records for Mr. Alrai's various businesses; and they also

7    included some detailed schedules, including Chase corporate

8    credit card or what appeared to be Chase corporate credit card

9    activity including spending and where it occurred and

10   descriptions of what the spending related to at a fairly high

11   level; and then there were other various notes in the files

12   with respect to the accountant who prepared the taxes.

13   Q.   Okay.  So, those were Mr. Alrai's tax records from his

14   accountant?

15   A.   Yes.  They appeared to be so, yes.

16        MR. HUNTER:  All right.  Ms. Sheff, could you go down

17   to the slide 4.  Let's start there.

18   Q.   So, Mr. Naviloff, could you describe what we're seeing

19   here in this slide, this summary of loss quantification?

20   A.   Sure.  Yeah.  So, as I was mentioning earlier, part of the

21   procedures that we performed was to take all of the invoices

22   that had been paid.  So, we matched the paid invoices from

23   DigitalNet, and from the paid invoices we evaluated the various

24   line items on those invoices.  The various line items were

25   placed into buckets consistent with the service agreements that

1   were in place.  We also evaluated other service providers to

2   identify any duplicate charges or -- excuse me -- duplicate

3   services, other IT providers providing similar services, and as

4   part of that analysis this is essentially the resulting

5   analysis that came from that process.

6   Q.   Okay.  So, what is the total amount that United Way paid

7   to DigitalNet?

8   A.   So, out of the areas that -- or the total amount that we

9   analyzed was $6,768,295.  So, that's the amount of the invoices

10  that were paid.

11  Q.   Okay.  And we have two buckets here.  One are the total

12  amounts of invoices that you analyzed, and that service is

13  related to infrastructure hosting virtual desktops, data

14  management and high availability backups and office phone

15  storage; is that correct?

16  A.   That's correct.  Yes.

17  Q.   And I want to focus, for a moment, on the total amount not

18  analyzed.  Why did you not analyze -- or, first, what services

19  didn't you analyze?

20  A.   So, generally speaking, these are the non-reoccurring

21  charges that appeared in the invoices.  They in many instances

22  relate to ad hoc services provided without an underlying

23  service agreement or statement of work.  Typically -- part of

24  the recurring service was a charge for help desk and escalated

25  support.  It appears to be anything above and beyond that as

1   well as the initial setup of the items identified above in the

2   areas that we did review.  So, those would all be included down

3   below here, as far as areas where individual consulting was

4   happening on an ad hoc basis, time and material and/or a fixed

5   fee basis, presumably these amounts were charged to United Way.

6   Q.   So, included in the amounts charged by DigitalNet to

7   United Way that you didn't consider in your loss analysis did

8   it include the cost of hardware and software for setting up the

9   servers and phone system?

10  A.   Yes, that is correct.

11          THE COURT:  All right, Counsel.  We should take a

12  break.  We've been going about 95 minutes.  Let's go off the

13  record.

14              (Discussion held off the record)

15                   (Recess taken)

16          THE CLERK:  All rise for the Honorable Court.

17          THE COURT:  Sir, you're still under oath.  Mr. Hunter,

18  you may proceed.

19  CONTINUING DIRECT EXAMINATION BY MR. HUNTER:

20  Q.   All right.  Mr. Naviloff, we were on slide 4 of Exhibit

21  924.  So, in terms of the categories that you analyzed --

22          MR. HUNTER:  Ms. Sheff, could you pull up exhibit --

23  strike that.

24  Q.   Mr. Naviloff, are these services described in contracts

25  that DigitalNet had with United Way?

1    A.    Yes.

2    Q.    And for these services, in particular, were you focused

3    primarily on the Managed IT Services Agreement and the

4    Telephony Agreement?

5    A.    Yes.  So, these relate to two agreements, a Managed IT

6    Service Agreement and a cloud telephone agreement, and they

7    were February of 2013 and, I believe, August of 2013,

8    respectively.

9          MR. HUNTER:  Ms. Sheff, could you put 300a on the

10   screen, please.

11         MS. SHEFF:  Would you like for it to be split screen?

12         MR. HUNTER:  Sure.

13   Q.    What is Exhibit 300a, Mr. Naviloff?

14   A.    This is the February Managed IT Service Agreement that I

15   just referenced associated with the infrastructure hosting

16   virtual desktop and data management and high-speed backup.

17         MR. HUNTER:  Ms. Sheff, can you scroll down to page

18   11.  It might be page 12 of the PDF but page 11 of the

19   contract.

20   Q.    So, here we see several services listed and priced out.

21   So, in terms of what you analyzed and did not analyze, did you

22   analyze the hosting and virtual desktops and data management

23   categories of invoices?

24   A.    Yes.  So, it's the first three boxes on this pricing page.

25   Q.    And where there's line items and invoices that you had not

1   analyzed we see there are other categories.  Application.  What

2   does "OS" stand for in this context?

3   A.    I think -- I believe operating systems.

4   Q.    And is "DB" database management?

5   A.    Correct.  Yes.

6   Q.    And then, "Onsite support, off-hour support, email and

7   mobile device access and initial deployment."  Were those all

8   services that DigitalNet billed for that you did not analyze in

9   your loss analysis?

10  A.    Correct.  You'll notice a footnote to this describing

11  further costs that had not yet been quantified also part of

12  that.

13         MR. HUNTER:  And, Ms. Sheff, could you pull up Exhibit

14  302.

15  Q.    Is this the telephony contract that you mentioned from

16  August of '13?

17  A.    Correct.

18         MR. HUNTER:  And, Ms. Sheff, could you scroll down.  I

19  think it's page 6.  Go up one.  Here we go.

20  Q.    And does this summarize the services that DigitalNet was

21  going to bill United Way for related to telephone services?

22  A.    Yes, that's my understanding of this agreement.

23  Q.    And did you find DigitalNet billing for most of these

24  services in their invoices?

25  A.    Yes, I did.

1    Q.   And we'll get into this in more detail later.  So, in

2    terms of the categories that you did not consider, I think you

3    said there was database management, operating system

4    management, the cost of hardware, the cost of --

5         MR. HUNTER:  You can bring down Exhibit 302.  You can

6    pull the slide show back up, Ms. Sheff.

7    Q.   Did you also not consider the management of the phone and

8    IT systems?

9    A.   Correct.  So, the management was the separate line item in

10   the February 2013 agreement.

11   Q.   What about costs associated with the implementation of the

12   phone system?

13   A.   That's excluded.

14   Q.   Again, that was separately billed?

15   A.   Separate.

16   Q.   And building server environments and that sort of thing?

17   A.   That's correct.  The build-out and the initial setup costs

18   were all separate from this analysis up here for the 3,524,000.

19   Q.   All of those services were separately billed?

20   A.   Correct, separated from my analysis.  Some of them may

21   have appeared on invoices but were separated out.

22   Q.   They were separate line items?

23   A.   Separate line items, yeah.

24   Q.   And is the total cost for the services that you did not

25   analyze in your loss analysis about $3.24 million?

1    A.   That is accurate.  Yes.

2         THE COURT:  What does "not analyzed" mean?

3         MR. HUNTER:  I'm getting to that, your Honor.  I'll

4    ask some questions.

5    Q.   So, when I say "not analyzed," it was "not analyzed," what

6    does that mean, Mr. Naviloff?

7    A.   So, these are charges that appeared on invoices.  Many of

8    these were ad hoc, so they were unassociated with either

9    statement of works or any sort of service agreements.  These

10    were charges for -- largely charges for special projects, such

11    as website development; they were for other types of hosting

12    arrangements.  And there was also charges for categories such

13    as the help desk, remote IT support after hours, and various

14    hardware and software purchases.

15    Q.   And so, when we've been talking about not analyzing them,

16    Mr. Naviloff, you did analyze them to the extent that you

17    determined --

18    A.   I quantified -- yeah.

19    Q.   That you quantified the costs of those services?

20    A.   Yeah.  Just to clarify, so unlike the areas above which

21    were analyzed, the 3.5 million, these were areas where there

22    was no way of easily identifying the underlying costs to

23    deliver these services, and that's because, typically, in a

24    professional services organization you're billing by the hour,

25    it's time and material; or at least there's records of the

1       hours so that you understand how much money you made or didn't

2       make on a specific project for a specific client.

3               In this context we looked for and searched for any

4       available information that could help us understand and

5       identify the level of effort that went into these discrete

6       projects.  However, we didn't have the detailed time records;

7       we didn't have any sort of budget actuals with regards to the

8       projects; we didn't have any of the preliminary cost estimates

9       that would allow us to understand what the related costs were

10      and who was performing some of that service.

11      Q.   So, Mr. Naviloff, were these services -- did you assume

12      that DigitalNet provided the value that they charged for in

13      rendering those services?

14      A.   For purposes of analysis, yeah, we assumed value was

15      rendered.

16              THE COURT:  You assumed what?

17              THE WITNESS:  That value was --

18              THE COURT:  "Value was rendered"?

19              THE WITNESS:  Rendered or service received, yeah.

20      Q.   Again, so essentially for your loss analysis you're

21      assuming no loss for about $3.24 million related to these

22      services that you were able to identify?

23      A.   That is correct.

24      Q.   So, you do not express an opinion whether or not

25      DigitalNet provided value for those services; you're assuming

1   value?

2   A.   Assuming.  This is an assumption.

3   Q.   So, for the identified services that you did analyze in

4   determining a loss figure, why were you able to break these out

5   and analyze these?

6   A.   These were services where we found underlying or other

7   entities providing the underlying service for the benefit of

8   United Way.  So, with the top three the vendor providing

9   underlying services that was passed through DigitalNet, that

10   was an entity called CloudConnect initially, and that switched

11   over to Insight.  So, there was two vendors that, based on

12   review of information that was made available to us, that had

13   either invoices or service arrangements for which we could --

14   that I was able to connect to these, the delivery of these

15   services.

16   Q.   So, in other words, you were able to -- and, Mr. Naviloff,

17   please, we have a court reporter.  Speak clearly into the

18   microphone.

19   A.   Yes.  Sorry.

20   Q.   And try to speak slowly.  And also, as we're talking,

21   let's try not to talk over each other so we can create a clear

22   record.

23        So, for these services you were able to identify an

24   underlying vendor that was providing those services?

25   A.   That's correct.  For the office phone services it was

1    SIP.US.

2    Q.   So, you were able to compare the costs that DigitalNet was

3    charging for those services against the amount that the vendor

4    was charging for those services?

5    A.   Yes.  An apples-to-apples comparison of the underlying

6    vendor, what they charged versus what DigitalNet in turn

7    charged United Way.

8    Q.   Okay.

9         THE COURT:  So, you determined the markup.

10        THE WITNESS:  The markup.  Correct.

11        MR. HUNTER:  Ms. Sheff, could we go to slide 3, one

12   slide up.

13   Q.   Sir, what is this?

14   A.   This is a summary, similar format.  You'll see the same

15   amount of $3.5 million, 3,524,000.  That relates to the revenue

16   to DTS, payments made by United Way, and that was the amount

17   that was analyzed as part of my loss calculation.  Here I take

18   into account payments that were made to two of the three

19   vendors that I just mentioned.

20   Q.   And, sir, why isn't Insight listed as a vendor here?

21   A.   Insight isn't listed here, as Insight ultimately was paid

22   by United Way.  No payments were made that we could observe by

23   DigitalNet to Insight.  Insight was introduced, based upon the

24   records I've seen, as a new vendor sometime around, I believe

25   it was November of 2015, upon which the costs for the services

1    rendered by Insight, which were the infrastructure hosting and

2    virtual desktop, were paid directly by United Way to Insight.

3    Q.    And yet in your review of DigitalNet invoices did

4    DigitalNet continue to bill United Way for those same services?

5    A.    Yes, they did.

6    Q.    Okay.  And so, we'll get into some of your underlying

7    analysis, but the bottom line, what was the difference between

8    the cost that DigitalNet charged United Way and that United Way

9    paid DigitalNet for the services versus what the vendor charged

10   DigitalNet for those services?

11   A.    Sure.  So, in this instance we -- I identified $3,524,000

12   in revenues to DTS.  The costs associated with delivering those

13   services, the direct costs, were 327,000 that I could calculate

14   based upon DTS's own records, payments to those vendors.

15            Now, for SIP.US there were a few months at the start

16   of the SIP.US relationship as well as some time period at the

17   end of the SIP.US relationship where we believed services were

18   being or continued to be provided by SIP.US and had to estimate

19   those.

20   Q.    We'll get into that when we talk more about SIP.US.

21   A.    Sure.  So, adding the 327,000 to the 20,000, removing

22   those from the 3.5 million results in a calculation of

23   $3,176,851.

24   Q.    So, a 914 percent markup overall?

25   A.    Yes.

1          MR. HUNTER:  Ms. Sheff, could we go to slide 5,

2     please.

3     Q.   So, let's talk about the phone services.  You started

4     discussing this.  Does this slide summarize your loss

5     quantification for the phone services?

6     A.   Yes.  This is specific to phone service and the services

7     that SIP.US provided.

8     Q.   Okay.  And so, we have -- how did you arrive at this

9     number for the monthly recurring charges for the phone

10    services?

11    A.   So, monthly invoices rendered by DTS to United Way

12    contained a specific line item charges for office phone

13    services, and I totalled those charges from those invoices in

14    which those invoices were paid, and they totalled $852,419.

15    Q.   How did you come up with the amount paid to SIP.US by

16    DigitalNet?

17    A.   So, the amount paid by SIP.US, this includes that

18    bifurcated amount shown on the earlier slide.  So, the first

19    tranche of that was the $24,642, that first SIP.US line, and

20    that translates to payments that I identified within DTS's

21    records that were made available by his accountant.  I believe

22    those related primarily to charges made to his -- or made

23    against his credit card for services.

24    Q.   Let me stop you there.  So, the DigitalNet credit card

25    paid SIP.US?

1   A.   That's my understanding.  Yes.

2   Q.   And then the estimated vendor payments, how did you arrive

3   at that figure?

4   A.   So, that took a little bit more effort.  So, in those

5   instances, looking back at the invoices by DTS to United Way,

6   there was an indication of the number of phone lines and users.

7   So, I recalculated, based upon the number of users, the likely

8   cost of the SIP.US invoice to DigitalNet, based upon the number

9   of users during those missing time periods.

10  Q.   Okay.  So, you didn't have any records showing that

11  DigitalNet actually paid for the phone services, but you

12  assumed for your analysis that DigitalNet did provide a phone

13  service and that they paid for it?

14  A.   Yes.  We couldn't locate that 20,000 in payments in their

15  accounting records.

16  Q.   Okay.  And so, that brought the total cost to DigitalNet

17  to almost $45,000?

18  A.   That's correct.

19  Q.   All right.  And let's talk about, again, the costs related

20  to the phone service that you did not include in your loss.

21  Could you explain -- so "DTS phone equipment purchase and

22  setup," was that a separate line item in the DigitalNet

23  invoices?

24  A.   So, the "DTS phone equipment purchase and setup," that is

25  a combination of several invoices that DTS had issued to United

1  Way, and if you look back at the earliest agreement, which is

2  the February 2019 agreement, there's discussion of voice over

3  internet protocol and telephone services and that essentially

4  being billed at some point in the future in the setup charges.

5  So, I guess fast-forward to August of 2013, where there was a

6  separate SOP and presumably separate procurement of the phone

7  system by United Way independent from the procurement that

8  occurred prior to that.  In that agreement, that second

9  agreement, there is some indication of the costs associated

10 with setup, and then these are separate invoices that followed

11 that August 2013 agreement, where additional costs were

12 invoiced to United Way.

13 Q.   Okay.  So, let me see if I understand what you just said.

14 Are you saying that you looked at DigitalNet invoices to United

15 Way and for phone equipment purchase and setup DigitalNet

16 billed and United Way paid about $219,000?

17 A.   That is correct.

18 Q.   Okay.  And you also excluded costs related to application,

19 operating system management, and we'll take a look in a minute

20 at the contract, but did that include in the contract telephony

21 consulting and management services?

22 A.   Yes, it did.  So, that's a separate charge that appears

23 both in the service agreement, and then we found, I identified

24 as a monthly invoice amount that was charged to United Way.

25 Q.   Okay.  So, in total there's $435,000, roughly, related to

1    the ongoing maintenance of the phone system, the purchase and

2    setup of the phone system that you're assuming value was

3    provided?

4    A.    Yeah.  And that's a high estimate.  The application OS

5    included many other things other than the telephone, consulting

6    and management.  So, unable to allocate the 216,000 to just the

7    one line item.

8    Q.    Understood.  In addition, there was IT help desk services

9    at United Way that were not included?

10   A.    Yes.  In addition to this there was IT help desk and

11   escalation services that, presumably, at least according to my

12   tech team that was part of -- technology consulting team that

13   was part of my team conveyed that they would be assisting.  So,

14   essentially SIP.US offers the root service, which then gets

15   configured as part of the setup costs.

16   Q.    Okay.  So, the IT help team that is embedded at United Way

17   and the costs charged for that, you're assuming United Way

18   received value for that?

19   A.    Yes.

20   Q.    And any services they provided in maintaining and managing

21   the phone system, you're assuming that United Way received

22   value for that?

23   A.    Yes.

24        MR. HUNTER:  All right.  Could we go to the next

25   slide, please, Ms. Sheff.  Actually, let's stay on this for a

1    minute.

2    Q.    Just going through the numbers, so when you take the

3    monthly recurring fee for phone services from DigitalNet and

4    subtract out the cost related to that monthly fee, not the

5    other phone costs, what was the gross markup?

6    A.    So, the gross markup here is $807,462.

7            MR. HUNTER:  Okay.  Next slide, please, Ms. Sheff.

8    Next one.

9    Q.    Is this an example of the DigitalNet phone services

10   invoice?

11   A.    Yes, it is.

12   Q.    And can you explain what we're seeing in each of these

13   lines.

14   A.    So, the United Way has several offices, and this is a

15   breakdown of the number of phone lines by office.  So, if you

16   take the Lowell office, for example, it says "Lowell office

17   phone service 19."  "19" represents the number of lines,

18   telephone lines.  In accordance with the underlying service

19   agreement, telephone service agreement, they were to be charged

20   at 70 a line.  So, 70 times 19 gets you a total amount shown to

21   the right there of $1,330.

22   Q.    Okay.  And there's also this -- "DID" is retention fee?

23   A.    Yeah.  In addition to each of the office charges for

24   per-line services, you also see DID charges, which is also

25   consistent with what is found in the underlying service

1    agreement.

2    Q.   And then there's, it looks like, tax and regulatory fee,

3    about $1,000?

4    A.   Yes.  And that's an amount that could not be tied back to

5    the service agreement.  However, we do see charges in SIP.US

6    for federal, state and local regulatory fees, although less

7    than that.

8            MR. HUNTER:  Okay.  Could we go to the next slide.

9    Q.   So, this is an example of a SIP.US invoice.  It's dated

10   August of 2018.  So, is this after Mr. Alrai left United Way?

11   A.   Yes.  We became aware of the SIP.US relationship after

12   Alrai departed, and our investigation team spoke with

13   Mr. Meyers and sought to obtain a copy of the invoice for

14   SIP.US, which was the telephone service provider.  So, this is

15   the only invoice we were able to obtain at the time of our

16   investigation.

17   Q.   Okay.  So, is this the first invoice after Mr. Alrai left

18   that SIP.US issued after Mr. Meyer was able to get the account

19   into United Way's name?

20   A.   Correct.  Here you can see the "Bill to" had changed over

21   to United Way.  Correct.

22   Q.   We see an invoice total of about $1,000?

23   A.   That is correct.

24   Q.   And is that roughly consistent with the amount that you

25   saw DigitalNet paying SIP.US in looking at their records?

1    A.    Historically, yes.  It varied.  As you can see to the left

2    here on the quantity column in this invoice, it's a

3    quantity-based billing, and you have a red box around the 187,

4    which, once again, indicates the lines that were being charged

5    at a unit price of $1 per line.

6    Q.    Okay.  So, where they're charging a dollar a line,

7    DigitalNet is charging a little bit more; is that right?

8    A.    The dollar is only part of the charge here.  There's trunk

9    charges and other charges.  So, the average cost per line is

10   higher than the dollar, but to that point it was significantly

11   higher.

12   Q.    So, how did you -- once you had this pricing information

13   and DigitalNet's payment information, how did you compare this

14   against what DigitalNet was charging?

15   A.    So, we added the total amount that we believe was paid to

16   SIP.US with the total amount that United Way paid for those

17   services that were charged by DigitalNet.  So, for this one

18   month, as an example, the pricing was approximately -- would

19   have been approximately 13,000.  We utilized the pricing by

20   DigitalNet and multiplied 187 lines by $70.  So, that

21   represents a markup here for this one month of approximately

22   1,300 percent.

23          MR. HUNTER:  Could we go to the next slide, please,

24   Ms. Sheff.

25   Q.    Could you explain this slide to the Court, Mr. Naviloff.

1    A.    This slide here contains excessive billing over time, and

2    it includes three lines.  So, the top line is the line

3    representing the amount paid per year by United Way to

4    DigitalNet; the bottom line, the blue line, that represents the

5    amount that was paid by DigitalNet to SIP.US; and the

6    difference between those two lines is the amount in which

7    DigitalNet retained as profits associated with this resell

8    agreement.

9          MR. HUNTER:  Ms. Sheff, could you please pull up

10   Exhibit 302 -- actually, we can go here.

11   Q.    So, how do you know, Mr. Naviloff -- we're looking here

12   at -- is this an excerpt from Exhibit 302, the telephony

13   services agreement?

14   A.    Yes, it is.

15   Q.    Okay.  And so, how do you know that you're comparing

16   apples to apples here, that the cost per line that DigitalNet

17   is charging corresponds to what they're paying SIP.US?

18   A.    So, the costs here are laid out in easily readable format,

19   that the per line fee, the managed cloud telephony service

20   agreement is $70, right?  And then there's also incoming calls,

21   and then it's also laid out easily with DIDs and other charges.

22   So, these line up nice and neatly with what SIP.US was charging

23   for these services.

24   Q.    Did you see any evidence that either SIP.US or DigitalNet

25   was charging the $900 high-speed circuit?

1   A.   So, that was the one line item included in this service

2   agreement where I was unable to trace that dollar amount into

3   any invoices that were issued by DigitalNet to United Way.

4   Q.   And let's just assume, for a moment, that the $900 was

5   baked into that.  Obviously, this is not the way the contract

6   was set up, but let's assume that $900 DigitalNet was providing

7   it.  They just didn't break it out in their invoice and

8   included it in the $70 per month fee.  Would that come close to

9   explaining the $800,000 markup?

10  A.   No, it would not.

11        MR. HUNTER:  Ms. Sheff, could you go to the next

12  slide, please.

13  Q.   Is this showing the one-time fees that are laid out in the

14  contract?

15  A.   Yes.  So, the top section of the managed cloud telephony

16  service has four line items that were all listed as one time.

17  That amount then seemed to be fairly consistent with other

18  payment schedules in our own analysis of invoicing activity

19  that occurred from 2013 through 2018.

20  Q.   And it looks like here there's about a $100,000 difference

21  between what the contract says they charged and what DigitalNet

22  actually charged.  But did you include that $100,000 in the

23  loss figure?

24  A.   No, I did not.  So, looking at that agreement, it looked

25  like there was an initial setup cost, but in 2014 you can see

1    after that initial setup there was another approximately

2    78,000.  I didn't analyze that, as mentioned earlier in my

3    testimony, as these were one-time amounts for which the level

4    of documentation support wasn't available.

5            THE COURT:  I'm not following the -- hold on a minute.

6    That arrow on top under the cost box, it looks like it's only

7    pointing to the top item, the setup and customized virtual

8    product cost.

9            THE WITNESS:  Yeah.  That should be pointing to all

10   four.

11           THE COURT:  All four?

12           THE WITNESS:  Yeah, correct.  Good observation.

13           THE COURT:  Yup.  And I need you to explain it again.

14           THE WITNESS:  Yup.  Sure.  So, the top box here, the

15   four items that are in red, the setup and virtual private PBX

16   of 85,000, that's a one-time.  And then the Cisco --

17           THE COURT:  That's close to a million bucks there.

18   Oh, no.  Okay.

19           THE WITNESS:  These are $100, and they are supposed to

20   be multiplied by per set.

21           THE COURT:  I was several zeros off.

22           THE WITNESS:  Yeah.  So, you get the quantity of per

23   sets on the other tables.

24           THE COURT:  Now I totally understand.

25           THE WITNESS:  Okay.

1          THE COURT:  Okay.  I'm sorry.

2          MR. HUNTER:  No problem, your Honor.

3     Q.   And so, again, this is $100,000 that you're assuming

4     DigitalNet provided value, even though it's a slight

5     discrepancy from what was stated in the contract?

6     A.   Yes.

7          MR. HUNTER:  Next slide, please.

8     Q.   You had mentioned this line in the Managed IT Services

9     Agreement, and, again, this is page 11 of Exhibit 300a, or page

10    12 of the PDF, page 11 as it states on the document.  So, as

11    part of the OS and DB management was there a telephony

12    consulting fee?

13    A.   Yes.  So, this is, as mentioned earlier, the application

14    line which we see monthly from inception, from February 2013

15    through the termination of the agreement, which I believe was

16    in the June of 2018 time period we see this charge.

17         MR. HUNTER:  Okay.  Ms. Sheff, could you just pull up

18    Exhibit 309, please, page 7.  Just pull up a couple of

19    examples.

20    Q.   Okay.  And so, here is this an example of a DigitalNet

21    invoice, Mr. Naviloff?

22    A.   Yes, it is.

23         MR. HUNTER:  Ms. Sheff, could you just zoom in on the

24    things that are being charged here.

25    Q.   And so, here we see this is that applications database and

1    OS management?

2    A.   Yes.  This is an example of one month's charge for the

3    application database and OS management which, per the service

4    agreement, would include telephone.

5         MR. HUNTER:  Ms. Sheff, could you just flip over to

6    page 89, please.  I'm just picking two invoices toward the

7    beginning and end here.

8    Q.   And, again, this has the same cost applications database

9    and OS management?

10   A.   Yes.  Once again, you can see the line one, two, three,

11   four, five, six down, 3,500.  This is another example.

12   Q.   You saw this charge recur monthly?

13   A.   Every month.

14   Q.   And, again, you're assuming that DigitalNet is providing

15   value for these services?

16   A.   Yes.  It's an assumption.

17        MR. HUNTER:  All right.  And, Ms. Sheff, can you pull

18   up 300a, page 11 again.  I just want to take one -- since we've

19   been talking about that line item, let's just see what it

20   involved.  Sorry.  12.  One more page down.  Okay.

21   Q.   So, this involves compliance, consulting, mobile device

22   management and support and other -- basically other ways to

23   support and manage the services that DigitalNet was providing;

24   is that right?

25   A.   Correct.  That's what's stated here, yes.

1          MR. HUNTER:  Okay.  So, Ms. Sheff, if you could go to

2     slide 13.

3          MS. SHEFF:  Page 13?

4          MR. HUNTER:  Sorry.  Back to 924, page 13.

5     Q.   All right.  So, after analyzing the telephony services

6     where you found roughly an $800,000 markup, did you also do an

7     analysis of the markup associated with infrastructure, virtual

8     desktops and high-availability backup?

9     A.   Yes, I did.

10    Q.   How did you analyze that?

11    A.   Similar to the telephone analysis, this one, where

12    telephone was largely related to SIP.US or entirely related to

13    SIP.US, this analysis for infrastructure, virtual desktop, and

14    high availability, geographically disbursed backup relates back

15    to CloudConnect.  So, with respect to identifying the universe

16    of invoices that were paid by United Way, I broke out the

17    amounts related to the specific services that were being paid

18    or provided by CloudConnect, and the total of those three

19    services, infrastructure hosting, virtual desktop and data

20    management and high-availability backup storage, amounts to

21    $2,672,090, and those were established on Exhibit 1b of my

22    report.

23    Q.   And, again, there's a category of loss that you did not

24    consider or where you assumed that DigitalNet provided value.

25    Were these also costs broken out in the invoices?

1    A.    Yes.  Similar to phone system setup, I observed setup

2    costs, ad hoc invoices for setup of both the infrastructure and

3    the virtual desktop as well as a general charge for vendor

4    deployment setup fees, and this would include equipment

5    purchase setup and implementation costs.

6    Q.    All right.  And there's also the cost, the large item

7    cost, of the IT help desk where you're, again, assuming that

8    United Way got value for the help desk services?

9    A.    Yes.  Help desk escalation and then overall $3,500 a month

10   charge that we referred to previously that are not part of this

11   analysis.

12   Q.    And you are assuming that United Way got value from

13   DigitalNet for the setup and implementation of their

14   infrastructure hosting and virtual desktop environments?

15   A.    Yes, that's correct, an assumption.

16   Q.    And you mentioned initially DigitalNet was contracted with

17   a provider or was using a provider, CloudConnect, to provide

18   these services?

19   A.    Yes, that's correct.

20   Q.    All right.  And did you look at documents, a contract and

21   other documents, between CloudConnect and Mr. Alrai in

22   analyzing the services that CloudConnect was to provide?

23   A.    Correct, to identify the services CloudConnect was

24   providing and the parallel services that Insight was providing

25   -- or, excuse me -- that CloudConnect -- DigitalNet was

1    providing to United Way or claiming to provide.

2           MR. HUNTER:  So, can we please -- actually go to the

3    next slide, please, Ms. Sheff.

4    Q.   Okay.  So, is this a comparison of language from the

5    DigitalNet Managed IT Services Agreement, that's Exhibit 300a,

6    and a CloudConnect platform specifications document received by

7    Imran Alrai in 2012?

8    A.   That's correct.  So, 19, approximately 19 items on the

9    CloudConnect platform specification sheet.  This is four of

10   those items, high availability being more relevant to the issue

11   at hand here, however, and this is just an example of the

12   language.  The others had similar patterns of replacing

13   CloudConnect with DigitalNet where appropriate.  Generally

14   speaking, this is just indicative of DigitalNet relying upon

15   CloudConnect to provide these services as specified in the

16   agreement with United Way.

17   Q.   So, is it fair to characterize what you said this way,

18   just to explain it another way:  that you saw multiple examples

19   in the Managed IT Services Agreement where DigitalNet was

20   essentially copying and pasting language from CloudConnect?

21   A.   So, yes, the CloudConnect language per the specification

22   sheet was used within the DigitalNet agreement with United Way.

23   Q.   And were there other examples where language from the

24   CloudConnect contract was used in the DigitalNet agreement with

25   United Way?

1    A.   Yes.  This is four of 19 categories where the other had

2    similar patterns.

3         MR. HUNTER:  Ms. Sheff, can you pull up I think it's

4    415b, which is in evidence as part of Exhibit 415.

5    Q.   Is this an email from October 4th, 2012 from CloudConnect

6    to imran.alrai@gmail.com?

7    A.   Yes.

8    Q.   All right.  And it's saying, "This outlines the security,

9    business continuity and performance features of the

10   CloudConnect platform."  Do you see that?

11   A.   Yes.

12        MR. HUNTER:  All right.  Ms. Sheff, can you go to the

13   next document, 415c.

14   Q.   Is this one of the documents you analyzed in comparing the

15   language?

16   A.   Correct.  This is the document that that language came

17   from for comparative purposes.

18        MR. HUNTER:  All right.  Ms. Sheff, could you please

19   pull up Exhibit 415a.

20   Q.   Mr. Naviloff, what document is this?

21   A.   This is the partnership agreement between CloudConnect and

22   DigitalNet.  Or, actually, it's a consulting, I believe this

23   one is.

24        MR. HUNTER:  Can you scroll down, Ms. Sheff?  Again,

25   next page.  Go up one page to where you see the handwriting.

1    Q.   So, here we see --

2    A.   Yes.  Aisa Consulting.  Yes.

3         MR. HUNTER:  Ms. Sheff, could you zoom in on "Service"

4    under the definitions section.

5    Q.   So, how does this contract define "service," Mr. Naviloff?

6    A.   "'Service' shall mean CloudConnect's information

7    technology service, commonly known as virtual desktop

8    infrastructure, virtual private servers and other

9    software/hardware technologies necessary to provide virtual IT

10   infrastructure as a service to small and mid-sized businesses."

11        MR. HUNTER:  Thank you.  And, for the record, this has

12   already been admitted as part of 415.  It was just on a disc of

13   other documents.

14        And could you go to page 21, please, Ms. Sheff.

15   Q.   And, again, this is describing CloudConnect host IT

16   services, commonly known as virtual desktop infrastructure,

17   remote desktop services, and virtual private servers?

18   A.   Correct.

19        MR. HUNTER:  Ms. Sheff, could you pull up exhibit --

20   actually, we can do a side-by-side.  Pull up 300a, page 5.  Can

21   you go to page 5.

22   Q.   Again, here we see that DigitalNet will provide desktop as

23   a service, virtual desktops?

24   A.   Correct.

25   Q.   And in the CloudConnect agreement --

1    MR. HUNTER:  And can we go to page 11, please, of

2  300a, Ms. Sheff.  Page 12.  Okay.  And could we go to 415a,

3  page 23, I believe.  Or, actually, this is it right here.

4  Q.   So, sir, here, under the CloudConnect agreement, under

5  "High availability," what does it say?  If we need to, we can

6  zoom in on it.

7  A.   So, "high availability" is defined here as, "CloudConnect

8  shall operate at least two geographically separated hardware

9  instances of the CloudConnect platform, a primary instance and

10  a disaster recovery instance.  CloudConnect will replicate

11  client data to the disaster recovery instance at commercially

12  reasonable intervals.  In the event of a total or partial

13  failure of the primary instance or any critical subsystem

14  thereof which will require -- "

15  Q.   Thank you, Mr. Naviloff.

16    MR. HUNTER:  Ms. Sheff, can you zoom in on the hosting

17  here.

18  Q.   And, likewise, DigitalNet is providing geographically

19  disbursed high-availability backed environment?

20  A.   That's correct.

21  Q.   And it looks like we also have managed system and nightly

22  and weekly backups in the DigitalNet agreement?

23  A.   Yes, that is correct.

24  Q.   Going back to the CloudConnect agreement, is CloudConnect

25  also providing nightly backups?

1    A.    Yes.  Section 9 states, "Nightly backup."  I'm happy to

2    read it, if you would like.

3    Q.    That's fine.  That's fine.

4          MR. HUNTER:  And, Ms. Sheff, could you zoom in on

5    number 10, and right down to the bottom there.

6    Q.    So, this is in the CloudConnect agreement regarding

7    retention of backup data?

8    A.    Correct.

9    Q.    Can you read that, please, Mr. Naviloff?

10   A.    Sure.  So, the retention of backup data in paragraph 10,

11   10.1:  "CloudConnect will hold subscriber backup data for at

12   least the lessor of, one, the termination of this agreement or,

13   two, in accordance with the following retention policy:  7 most

14   recent nightly backups or 10 most recent weekly backups."

15   Q.    Thank you.

16         MR. HUNTER:  And, Ms. Sheff, could you go to page 5 of

17   the DigitalNet agreement.  Actually, no.  One more up.  Sorry.

18   Can you zoom in on this, please.

19   Q.    Can you just read down to the second bullet there,

20   Mr. Naviloff.

21   A.    "DigitalNet will manage the backup in accordance with the

22   following retention policy."  It's similar to the last slide.

23   "7 most recent nightly and 10 most recently weekly backups."

24   Q.    Okay.  Thank you.  So, based on your team's review of

25   these documents and others that were provided, what did you

1   conclude about the services CloudConnect was providing

2   vis-à-vis what DigitalNet was providing to United Way?

3   A.   For the monthly recurring services, based upon my

4   observations and reviews, it was the underlying service

5   provider for those services.

6   Q.   So, is CloudConnect providing virtual desktops and hosting

7   for Aisa Consulting and, ultimately, United Way?

8   A.   Yes, some level of hosting as well as virtual desktop.

9   Q.   And were they also --

10  A.   And backup.

11  Q.   And were they providing nightly backups?

12  A.   Per that language, yes.

13  Q.   Okay.  And were they providing a geographically diverse

14  high availability backup environment?

15  A.   Yes.

16  Q.   Now, the CloudConnect agreement specifically does not

17  provide for on-site support; is that right?

18  A.   It does not.

19  Q.   But DigitalNet was providing that at United Way?

20  A.   That is correct.

21  Q.   Is that your understanding?

22  A.   Yes.

23        MR. HUNTER:  Okay, Ms. Sheff, could we go back to 924.

24  Could you go to slide 13.

25  Q.   Okay.  So, again, I think we've discussed this, but did

1   DigitalNet bill United Way separately for technical support,

2   server setup and maintenance related to these cloud hosting

3   services?

4   A.   Yes.  As highlighted in this yellow box, part of my

5   analysis was to capture in rough dollar magnitudes the setup

6   and equipment purchases where it was described in sufficient

7   detail within the invoices issued by DigitalNet to United Way.

8   Q.   So, when you were comparing the costs that DigitalNet paid

9   CloudConnect versus what United Way paid DigitalNet, you

10  excluded costs related to technical support, server setup and

11  maintenance; is that correct?

12  A.   That is correct.  Yes.

13  Q.   All right.  Could we go to slide 15, please.  Okay.  Can

14  you explain this slide to the Court.

15  A.   So, this is a snapshot summary for CloudConnect-related

16  services of the flow of funds, and the flow of funds begins in

17  the right here from United Way, where they paid 1.5 million,

18  you can see in the bottom in red, to DigitalNet; and that 1.5

19  million, 1.2 million was withheld by DigitalNet, and the

20  remaining 303,000, approximately, was passed along to

21  CloudConnect.  So, this evidences the payment flow, which are

22  the green arrows, from United Way down to CloudConnect.

23  DigitalNet sat between these two parties.

24  Q.   So, after you identified sort of this apples-to-apples

25  comparison, United Way paid DigitalNet 1.5 million, and

1    DigitalNet turned around and paid CloudConnect 303,000 for the

2    same services?

3    A.    That's correct.

4    Q.    You said at some point the vendor providing hosting and

5    virtual desktop services for United Way changed?

6    A.    Yes, that's correct.  In I believe it was November of 2015

7    we identified Insight as a vendor to United Way through United

8    Way's own records.

9    Q.    And is that because United Way was paying invoices to

10   Insight?

11   A.    The invoices were paid directly to Insight as the service

12   provider, not to DigitalNet -- via DigitalNet.  Excuse me.

13   Q.    So, did the nature of DigitalNet's overcharge change when

14   the vendor providing these services changed?

15   A.    This is what I describe in my report as duplicative

16   charging.  So, this scenario here with CloudConnect is the

17   overcharge of 1.2 million.  So, beginning after this time

18   period with Insight the amounts paid by United Way were paid

19   twice, so duplicate billing.

20   Q.    Okay.  And so, despite the fact that United Way is now

21   paying Insight, did the payment structure between DigitalNet

22   and United Way change?

23   A.    No.  The payment terms per the service agreement that was

24   entered in February 2012 -- or 2013 were unaltered.  The

25   payment amounts remained consistent in accordance with that

1    underlying service agreement.

2    Q.    And how is it that you know that Insight was providing

3    infrastructure and hosting services and virtual desktop

4    services?

5    A.    Sorry.  Repeat the question.

6    Q.    How do you know what services Insight was providing?

7    A.    So, within the invoices that Insight provided there was no

8    underlying service agreement with Insight.  However, the

9    invoices with Insight were fairly descriptive as of the

10   services that they were providing to United Way.

11   Q.    And John Meyer testified to this, but did you also learn

12   from John Meyer that Insight billed for hosting services

13   provided by a company called OVH?

14   A.    Yes.  So, my understanding is Insight is in and of itself

15   a reseller.

16   Q.    So, OVH is the actual company providing the hosting

17   services?

18   A.    That's my understanding from discussions with Mr. Meyer.

19             MR. HUNTER:  Okay.  So, Ms. Sheff, can you pull up

20   again 300a, page 11, on one side of the screen and Exhibit 416,

21   we'll start with page 9, on the other.

22             MS. SHEFF:  416?

23             MR. HUNTER:  416.

24             MS. SHEFF:  It's not coming on.

25             MR. HUNTER:  I can move on.

1        MS. SHEFF:  Maybe it's on CDs.

2        MR. HUNTER:  Oh.  I'll move on.  So, actually, can we

3    pull up, I guess, slide 17?

4        MS. SHEFF:  Of 924?

5        MR. HUNTER:  Yes, please.

6    Q.   Is this an excerpt, again, of an Insight invoice, which is

7    part of Exhibit 416, and a DigitalNet invoice, which is part of

8    Exhibit 309?

9    A.   Yes, this is.  Correct.

10   Q.   Okay.  And this charge for $19,200 infrastructure as a

11   service and hosting, do you see that, Mr. Naviloff?

12   A.   $19,200, yes, infrastructure as a service and hosting.

13   Q.   And are those services -- we've looked at them earlier,

14   but are those services laid out in Exhibit 300a on page 11?

15   A.   Yes.  They're labeled as host-related hosting services.

16   Q.   And here we see on the Insight invoice -- can you describe

17   how it is that this is providing hosting services or how it is

18   describing hosting services?

19   A.   Correct.

20   Q.   Could you go through it, please?

21   A.   Yeah, sure.  I'll start with the top.  So, the VMware

22   VCloud Air -- the VCloud Air is really marketing terms from

23   VMware for its infrastructure hosting services that can be

24   obtained just through a Google search, consistent with my

25   team's analysis of this, including my technology consulting

1    experts.

2          This top line is essentially the license, three-year

3    license, and it is a monthly fee driven for a Virginia-based

4    data center.  So, that's a subscription license for one public

5    IP address.

6          The second line also relates to VCloud Air, which,

7    once again, is the hosting and infrastructure.  And this is the

8    Windows server.  And this would also include the U.S. Virginia

9    data center as disclosed there.

10          The third one is --

11   Q.   The Virginia data center, Mr. Naviloff, is it your

12   understanding that that's the OVH data center in Virginia?

13   A.   That's my understanding, is that's where it's located.

14   Correct.

15   Q.   Thank you.

16   A.   So, the second one is for the Windows server 2012.  Then

17   the third one is for a license, and this appears to be the

18   data-driven, two front-end terabytes hosted, so it's a

19   data-driven element that appears as a monthly fee for two

20   terabytes.

21          MR. HUNTER:  And could we go to the next slide.

22   Q.   And did United Way pay both of these invoices?

23   A.   Yes, that's correct.

24   Q.   So, they are paying for these hosting services twice?

25   A.   Correct.

1    MR. HUNTER:  The next slide, please, Ms. Sheff.

2    Q.   And here did Insight also charge for virtual desktops?

3    A.   Yes.  So, this is a side-by-side invoice from DigitalNet,

4    once again, with Insight in highlight of the virtual desktop.

5    Q.   And DigitalNet is also charging for virtual desktops?

6    A.   That's correct.

7    Q.   Next slide.  And, again, United Way paid both of these

8    invoices?

9    A.   That is correct.

10   Q.   Go ahead, Mr. Naviloff.

11   A.   So, on that last slide there's reference to Horizon, and

12   Horizon is the marketing name for the desktop service.  So, if

13   you look at VMware's marketing literature on that, they call it

14   "Horizon"?

15   Q.   Horizon is the virtual desktop service --

16   A.   Yes.

17   Q.   -- that it's marketed as?

18   A.   Yes.

19   MR. HUNTER:  Next slide, please.

20   Q.   Is this another virtual desktop invoice from DigitalNet?

21   A.   Yes.  It's another example of virtual desktop.

22   Q.   Again, billed out at 16,500?

23   A.   Correct.

24   Q.   And we see another invoice from Insight for those

25   services; is that right?

1  A.    That is correct.

2  Q.    And United Way paid both of these invoices?

3  A.    That is correct.

4  Q.    What is DAAS?

5  A.    That's the desktop as a service, DAAS.

6  Q.    So, it's an abbreviation of the line item that we saw on

7  the prior invoice?

8  A.    Yes.

9  Q.    So, sometimes the invoices abbreviated it a little bit

10 differently?

11 A.    Correct.  It's not always easy to interpret these.

12 Q.    So, despite the fact that there's a change from

13 CloudConnect to Insight in providing hosting and virtual

14 desktop services, was there any change in the payment

15 structure -- I think you said this -- between DigitalNet and

16 United Way?

17 A.    No.  Some of the charges changed based upon volume, but

18 the underlying substance of it is the service agreement,

19 managed IT service agreement.

20 Q.    So, the payment structure remained the same?

21 A.    Correct.

22 Q.    So, in other words, DigitalNet moved from excessive

23 billing for a service to double billing for the same service?

24 A.    Yes.  They're paying both invoices.

25 Q.    Did that result in more profit to DigitalNet?

1    A.    That does.

2          MR. HUNTER:  Can you go to the next slide, please,

3    Ms. Sheff.  The next slide.

4    Q.    Okay.  Can you explain this illustrative slide, please,

5    Mr. Naviloff?

6    A.    So, this illustrative slide demonstrates, similar to the

7    earlier one, the cash flows associated with the relationship

8    with Insight.  On the far right, once again, you'll see United

9    Way as the payor, and you'll see standing in the middle, once

10   again, is DigitalNet.  Although, in this instance you can see

11   they didn't, in fact, stand in the middle; they stood as a

12   separate party with invoices and payments going to and from

13   Insight as well as invoice and payments going to and from

14   DigitalNet.  And the total amount of payments that were made to

15   DigitalNet were 864,000.  The amount paid to Insight is not on

16   the slide, but it was 250,000.

17   Q.    So, DigitalNet charged 864,000 for a 200,000-or-so-dollar

18   service they didn't provide?

19   A.    That's correct.

20   Q.    In addition with the change to Insight was there a change

21   in the services that were being rendered for United Way?  Or

22   put it this way, Mr. Naviloff:  We talked a little bit about

23   the high availability backup services provided through

24   CloudConnect.  Did Insight provide such services?

25   A.    So, it's a good question.  The agreement with Insight and

1    the invoices were silent with regards to backup.

2    Q.   So, there was no line item for high availability backup on

3    the Insight invoice?

4    A.   There's no line item, yes.  As part of the procedures I

5    performed, I inquired with John Meyer to understand his

6    understanding of the relationship with Insight, because Insight

7    continued to provide services directly to or continued

8    providing service directly to United Way after Mr. Alrai's

9    departure, and as part of the conversation that was shared with

10   me between Insight that there was no backups similar to --

11          MR. HARRINGTON:  Judge, I'm just going to object.  If

12   it was going to be a discussion with Mr. Meyer and information

13   Mr. Meyer provided this expert, I get that, but if we're going

14   one more step removed and it's information provided by Insight

15   to Meyer to this expert, I'm going to have an objection based

16   on that.  I think that's getting a little bit removed.

17          THE COURT:  It is getting a bit removed but not in a

18   way that's unusual for an expert, is it?

19          MR. HARRINGTON:  As far as having access to that

20   information, I don't have that information.  I think the

21   prosecutor is attempting to elicit information that Insight

22   provided Mr. Meyer to this expert.  So, this is new information

23   to me, Judge.

24          MR. HUNTER:  I can elicit the testimony that John

25   Meyer gave in this trial, your Honor.

1          THE COURT:  If that's the way you want to approach it,

2     because counsel hasn't had an opportunity to hear that.  So,

3     why don't you approach it in the way as you just proposed.

4          MR. HUNTER:  Thank you.

5          THE COURT:  Sustained.

6     BY MR. HUNTER:

7     Q.   Mr. Naviloff, John Meyer testified that he attempted to

8     get geographically diverse high availability backup services

9     from OVH but was unable to do so.  Is that consistent with your

10    understanding from John Meyer, that those services were not

11    available through OVH?

12    A.   Yes.  He informed me of that much or my team.

13    Q.   And so, from your understanding from John Meyer that high

14    availability backup was not available through OVH and that it

15    was not billed for in the Insight invoices --

16    A.   Correct.

17    Q.   -- you're assuming that that's a factual basis in your

18    report that those services were not provided?

19    A.   Yeah.  Further evidence to the lack of that service, my

20    understanding is that there was an incident that resulted in

21    five days of total downtime at United Way during the time

22    period in which RSM was conducting its investigation.

23    Q.   And I believe was that in August of 2018?

24    A.   That's correct.

25    Q.   And Mr. Meyer also testified to the effect that there was

1   an outage at the hosting -- OVH hosting facility that resulted

2   in a multiday outage that would not have occurred had there

3   been geographically diverse high availability backup.  Is that

4   consistent with your understanding?

5   A.   That's consistent with my understanding of the events,

6   yes.

7        MR. HUNTER:  Could you go to the next slide, please,

8   Ms. Sheff.

9   Q.   So, we're now back to your summary of loss from United

10  Way.  So, again, can we just walk through this?  We spent some

11  time talking about infrastructure hosting, virtual desktops,

12  data management and high availability backup and phone

13  services.  So, what does this number represent at the bottom?

14  A.   So, if you add up those four components of amounts of

15  invoicing to the United Way by DTS, essentially the revenue to

16  DTS, and then you total that amount, it's $3,524,509 for the

17  specific services that we've been discussing.

18  Q.   So, this is the amount, the 3.5 million, that's the amount

19  that United Way paid DigitalNet for the monthly recurring costs

20  associated with those four services?

21  A.   That's correct.

22  Q.   Then the next category, CloudConnect and SIP.US, are these

23  the actual expenses to DigitalNet for those services?

24  A.   Those were the expenses that I was able to identify within

25  the records of DTS as having been paid to support the services

1    that were delivered by the underlying service providers.

2    Q.   Okay.  And that's $327,342?

3    A.   That is correct.

4    Q.   And then this bottom number, the $20,000, what is that?

5    A.   As mentioned earlier, there were time periods in, I

6    believe, 2013 as well as 2017 or '18 for which we could not --

7    I could not locate payments through the credit cards of

8    DigitalNet for SIP.US; nor could I locate them in disbursements

9    from cash accounts.  It seems likely that those services

10   continued to be delivered during that time period, as we heard

11   no information from United Way that phones were out.  So, we

12   had estimated a cost that was likely incurred by DigitalNet of

13   20,000.

14   Q.   316?

15   A.   20,316.  Apologies.

16   Q.   So, again, the difference between the cost paid by United

17   Way and the cost paid by DigitalNet for those services was

18   what?

19   A.   $3,176,851.

20   Q.   And that's a markup of about 914 percent?

21   A.   That's correct.

22   Q.   All right.  Mr. Naviloff, did you conduct a separate

23   analysis of the amount of money paid by United Way and Robert

24   Allen Group to DigitalNet that Mr. Alrai used for his own

25   personal enrichment?

1    A.    Yes.  That was the second analysis that I described at the

2    beginning of my testimony.

3    Q.    Okay.  And what records did you rely on for this analysis?

4    A.    As mentioned earlier, the analysis was of the files

5    obtained from Mr. Alrai's accountant, Mrs. Terry, and those

6    files as well as bank records and bank statements obtained from

7    the various banks that Mr. Alrai's business had relationships

8    with, at least the ones that were obtained by the U.S.

9    Attorney's Office.

10         MR. HARRINGTON:  Judge, I'm just going to object to

11   this testimony.  I think it's not relevant to the charges.  I

12   think it's also actually been covered by Ms. Terry, I think

13   also by other witnesses that have been called by the

14   government.

15         THE COURT:  That's assuming you know exactly where

16   he's going.

17         Is he right about where you're going?

18         MR. HUNTER:  Your Honor, this is an analysis of the

19   defendant's bank records, his business bank records and credit

20   card statements, to show money that went to -- for personal

21   rather than business-related expenses.  I don't think that has

22   been covered by prior testimony.

23         THE COURT:  Well, it was sort of covered to a degree

24   by the last witness.  Is that what you're talking about?

25         MR. HARRINGTON:  I think it was, and I also think

1   Mr. Terry went through tax returns for I think it was '13

2   through '18.  So, I think it has been covered.  I also think

3   that it doesn't seem necessarily relevant to the criminal

4   charges that have been brought against him.  Personal

5   enrichment is not necessarily a part of any element that the

6   government has to prove in this case.

7          THE COURT:  It's not necessarily a part of an element,

8   but it's certainly relevant and admissible.

9          MR. HARRINGTON:  And I understand that, Judge.

10  Obviously, if the Court wants to hear this evidence, it just

11  seems to be cumulative to me.  If you feel that it's necessary,

12  then, obviously, you're going to want to consider it.

13         THE COURT:  Well, all right.  I'm going to overrule

14  the objection for now, but if my boredom level, having heard it

15  before, reaches a new plateau here, I'll change my mind.

16         MR. HUNTER:  Thank you, your Honor.

17         THE COURT:  So, that's overruled for now.

18  Q.   All right.  So, Mr. Naviloff, why did you conduct the

19  separate analysis of Mr. Alrai's personal enrichment?

20  A.   Yeah.  So, as we discussed earlier, there's a large dollar

21  amount, over 3,000,000, of services that were rendered for

22  which no one else's was performed.  So, when evaluating the

23  overall context of my analysis, one of the concerns I had is

24  that essentially there could be some amount of value in excess

25  of billings for that 3,000,000.  So, said another way, there

1    could be an offset between the category that I analyzed and a

2    category I couldn't analyze that would reduce the 3.1 million

3    to some other number, perhaps even closer to zero.  So, this

4    analysis is important to analyze the totality of the amount of

5    money that the business earned in order to assess the 3.1

6    million and how reliable or accurate that is for purposes of

7    these proceedings.

8    Q.   So, in other words, what you're saying, Mr. Naviloff, is

9    it's a way to confirm that there's not some other bucket of

10   services that DigitalNet is providing that you didn't account

11   for in your analysis of the invoices and contracts at United

12   Way?

13   A.   Yes.  This is essentially that catchall, understanding

14   what services are being provided and what are cash inflows and

15   outflows.  This is really looking at what was left after the

16   business took money in and spent it, because there's some

17   amount that's going to be residual that will further evidence

18   what occurred in this case and the amount of loss to United

19   Way.

20   Q.   Thank you.

21        MR. HUNTER:  Slide 26, please, Ms. Sheff.

22   Q.   So, you said you analyzed some bank accounts from

23   Mr. Alrai, and were you able to determine money that went into

24   those accounts?

25   A.   Yes.  So, the amount of money coming into the bank for

1   DigitalNet and Aisa Consulting came from two primary sources:

2   United Way, which we mentioned before, which is 6.7, 6.8

3   million.  That agrees with the amount in United Way's records,

4   which is always good.  And then the other side of it was a new

5   party to my analysis, which is the Robert Allen Group, who pays

6   in -- who has paid in 410k into the accounts that have been

7   analyzed.  And then there was a small amount, 100,000, 102,000,

8   to be exact, for which the other payees had paid in money into

9   the accounts.

10  Q.   So, from the DigitalNet and Aisa accounts that you

11  analyzed, about 99 percent of the funds came from either United

12  Way or Robert Allen Group?

13  A.   Correct.

14       MR. HUNTER:  Next slide, please.

15  Q.   What is this slide showing?

16  A.   So, in any analysis, forensic analysis and asset tracing,

17  we want to make sure we got all the ins and outs.  So, we were

18  shared a lot of bank statements for a lot of banks.  When

19  looking at this set of seven accounts, I was able to -- a

20  significant amount of inter-account transfers were taken,

21  explained briefly, but the entirety of the cash coming in and

22  then the entirety of what appears to be cash going out to

23  business-related expenses all appeared to be self-contained

24  within these seven accounts.

25  Q.   Okay.  So, in analyzing these accounts --

1          MR. HUNTER:  Ms. Sheff, could you please put Exhibit

2     118 on the screen, please.  Exhibit 118.  And could you go down

3     to the bottom page.

4          MS. SHEFF:  The last page?

5          MR. HUNTER:  Yes, please.

6     Q.   Did you see any money coming into DigitalNet or Aisa's

7     accounts from the sample customers listed on the last page of

8     Exhibit 118?

9     A.   No, I did not.  The only other area, as mentioned before

10    in my analysis, there were a couple of additional names that

11    showed up, and they're part of my more detailed report that I

12    shared with the parties, but none of these names were names on

13    the list or included within the 102,000.

14    Q.   Did you see any deposits from Barneys in New York in the

15    DigitalNet accounts?

16    A.   I did not.

17    Q.   Or Abilities, Incorporated in New York?

18    A.   I did not.

19          MR. HUNTER:  Okay.  All right.  Ms. Sheff, can we go

20    back to 924, slide 28.

21    Q.   Is this a summary of your analysis of Mr. Alrai's personal

22    enrichment?

23    A.   Yes, it is.

24    Q.   Okay.  And what is this first category, "Increase in

25    assets and analyzed accounts"?

1   A.   So, out of the seven accounts that I examined, we looked

2   at the beginning balance, all of which occurred, at least the

3   first statements available to us from the records available,

4   and then those all had a zero balance, and they all, all the

5   account statements were as of the time period which we analyzed

6   for DTS, which were in the 2013 through 2019 time period.  So,

7   it started at zero and then went to some number, which in this

8   case was, last statement available indicated 1,467,643.  So,

9   this is the amount of cash captured in the seven accounts

10  during the time period for which this relationship between DTS

11  and United Way existed.

12       MR. HUNTER:  Ms. Sheff, could you go to the next

13  slide, please.

14  Q.   Is this summarizing the balances in those accounts?

15  A.   That is correct.

16  Q.   Okay.  And it looks like the total of the account balances

17  was the 1.467 million --

18  A.   Yes.

19  Q.   -- which is about $1,000 less than what the government

20  seized.  So, it looks like there was about a $1,000 withdrawal

21  before the government could freeze the funds?

22  A.   I believe it was 29,000, and that's mostly related to that

23  first account.  It looks like there was some amount of spend

24  between the last statement date of 485,941 on June 30th, and

25  some amounts were spent out of that account before it was

1    frozen.

2    Q.   So, why did you classify the $1.4 million sitting in the

3    Aisa and DigitalNet accounts as personal enrichment?

4    A.   This is money that wasn't spent.  So, just by that nature

5    money coming into the accounts which didn't have any sort of,

6    at least best we can tell -- we don't have all the open

7    invoices or payables records -- but this is amounts that the

8    company received for invoices that were billed to either United

9    Way or Ethan Allen (sic) Group.

10   Q.   So, in other words, over the course of 2013 to 2018 Aisa

11   and DigitalNet were able to build a nest egg of 1.4 million

12   bucks?

13   A.   Cash in and then cash out.  So, this is what's left after

14   the cash went out to pay bills.

15        MR. HUNTER:  Ms. Sheff, go back to slide 28.

16   Q.   "International wire transfers to Pakistan."  That's about

17   1.2 million?

18   A.   That's correct.

19        MR. HUNTER:  Okay.  And, Ms. Sheff, could you go to

20   slide 30.

21   Q.   All right.  We'll talk about this slide in a minute, but

22   in your report did you make any assumptions about costs related

23   to DigitalNet in Pakistan?

24   A.   Yes.  So, the transfers to Pakistan, at the time of my

25   report we didn't receive any business documents or support for

1    those payments, and in my report I assumed that total amount as

2    part of the personal enrichment to Mr. Alrai.  I came up with a

3    hypothetical example of kind of a back-envelope, saying, if

4    there were costs related to Pakistan, which I wasn't sure of at

5    the time, that they may include up to two individuals in my

6    hypothetical, similar to the number of individuals that are

7    currently, my understanding, helping United Way, and I had

8    performed a calculation to back into very high-level what the

9    cost of those two employees over the five-plus years would

10   cost, including rent.  And I didn't go into a lot of detail.

11   Obviously, I was missing certain other costs.

12   Q.   You were making assumptions based on public information

13   about salaries in Pakistan?

14   A.   Yeah.

15   Q.   And rent in Pakistan?

16   A.   Just high level, and I believe it came out to around

17   250,000.

18   Q.   Okay.  So, a difference between the wire transfers of

19   about 975,000?

20   A.   Correct.

21   Q.   Did you subsequently receive records from the defendant

22   regarding the payroll in Pakistan?

23   A.   I did.

24   Q.   And was this reciprocal discovery from the defense related

25   to his experts?

1    A.    It was.

2    Q.    And did you analyze those payroll records?

3    A.    I did, yes.

4          MR. HUNTER:  So, first Ms. Sheff, could you zoom in on

5    this table here.

6    Q.    So, is this table a summary of the payroll records

7    received from the defendant regarding payroll in Pakistan?

8    A.    That's correct.

9    Q.    Okay.  And what does it show?

10   A.    So, this shows that the transfers started in February of

11   2017, much later than the date in which the banking transfers

12   occurred.  So, this is payroll data.  So, this is the first

13   payroll that occurred in 2017.

14   Q.    So, we only received payroll from the defense going back

15   to 2017?

16   A.    Yes.

17   Q.    Okay.

18   A.    And it continued through June of 2019, which is past the

19   termination date of Mr. Alrai and DigitalNet.

20         THE COURT:  Hold on a second, Counsel.  I want to make

21   sure I heard your question.

22         MR. HUNTER:  Yes.

23                        (Pause)

24         THE COURT:  Understood.  I'm sorry.  Thank you.

25         MR. HUNTER:  No problem, your Honor.

1    Q.   And did the payroll records also list numbers of

2    employees?

3    A.   Yes.  To continue with my observations, the number of

4    employees is shown here.  I counted the number of employees on

5    a sheet, each of the payroll sheets.  In some instances the

6    names were blanked out, and the U.S. Attorney's Office informed

7    me that at least some of them may have been either in-laws or

8    relatives of Mr. Alrai.

9         However, the number of individuals listed on those

10   sheets ranged here from 17 to 21, and when converted into U.S.

11   dollars you can see that in the fourth column -- this is math

12   that I performed -- that math, if you add up all those amounts

13   for the time period, comes to 147,000.

14        Now, the last observation on this spreadsheet is that

15   the average amount per employee, while I calculated that annual

16   salaries were in the realm of 12,000 to 19,000 a year, so 1,000

17   a month, these suggest average salaries far less than that.  I

18   didn't have details of the number of hours worked and how much

19   people were being paid, but this suggests that these

20   individuals weren't full-time employees.

21   Q.   At least based on the public records?

22   A.   Based upon what I can gather, yeah.

23        MR. HUNTER:  Ms. Sheff, could you pull that down and

24   zoom in on this slide here on the upper right-hand corner.

25   Q.   So, what is this illustrating, Mr. Naviloff?

1    A.    So, this is a comparison of the 1.2 million that was

2    transferred to Pakistan through the seven accounts that we

3    observed compared with the amount of payroll support that was

4    provided.  Now, this isn't apples to apples, because that 147

5    includes a certain amount that transferred after DigitalNet's

6    relationship with United Way ceased, so it can't possibly be

7    explained by the 1.2 and the 147 presumably, but --

8    Q.    So, this isn't apples to apples?

9    A.    Not apples to apples.

10   Q.    Because the payroll continued after Mr. Alrai and

11   DigitalNet were terminated from United Way and the payroll

12   started after DigitalNet --

13   A.    Correct, yes.  Yeah, it's just off.

14   Q.    All right.

15   A.    Different periods.

16   Q.    And we'll get to that, because you did some projections to

17   try to account for that, correct?

18   A.    I did, yes.

19        MR. HUNTER:  So, you can take that down, Ms. Sheff.

20   And I just want to zoom in on this bottom right-hand slide.

21   Q.    So, what is this showing, Mr. Naviloff?

22   A.    Yeah.  This is just another way for the Courts to look at

23   the payments and show that, generally speaking, they were

24   consistent in size and frequency.

25   Q.    With one spike in May of 2018?

1    A.   Yeah, aside from the one spike in May.  So, generally

2    speaking, we have plotted these out just to show the timeline

3    February of 2017 through June of 2019, along with the date in

4    which the termination of the DigitalNet arrangement occurred,

5    which was June, and you can see the amount of payroll didn't

6    change in any significant meaning or manner after the

7    termination of the relationship.

8    Q.   So, in your opinion, there's no real change in the

9    payroll?

10   A.   Yeah.  I mean, that line is intended to represent an

11   average, a linear average of the payroll for that time period,

12   so it's just for reference purposes.

13   Q.   So, the payroll after DigitalNet is no longer working at

14   United Way, that's not going toward any United Way related

15   projects, presumably, correct?

16   A.   I don't know how that would be possible.

17        MR. HUNTER:  All right.  Could we go to the next

18   slide, please, Ms. Sheff.

19   Q.   Okay.  Could you explain to the Court the analysis you're

20   doing here.

21   A.   Yes.  So, the top line here is summarizing this start and

22   end date of the payroll support that was provided, and you can

23   see that's -- the time between June 3rd, 2019 and February 1st,

24   2017 represents 852 days.  Divide that by 365 and you get to

25   2.3 years.  So, if you divide the total amount of payroll,

1    which is 147,165 in U.S. dollars, by the 2.3 years, you come up

2    with an average annual amount of payroll of $63,046.

3              I next took that dollar amount and applied by the time

4    period for which foreign wire transfers occurred and applied it

5    assuming that equivalent amount which was paid going back in

6    time.  However, the assumption is that the records were lost,

7    destroyed or just not turned over.  So, multiply the 63,046 by

8    the difference in days, which is 5/21/18 minus September 1st,

9    2013, so 9/1/2013, you come out with 1,723 days, which is 4.7

10   years.  So, multiply 4.7 years times 63,046.

11             THE COURT:  You're going to have to slow down.  The

12   court reporter is really struggling here.

13             THE WITNESS:  Sorry.  I get excited.

14             MR. HUNTER:  Math can be fun.

15             THE WITNESS:  Yeah, this is fun for accountants.  So,

16   I'll restate the entirety of the last row.

17             THE COURT:  Do it real slow.

18             THE WITNESS:  I will.  So, the bottom line represents

19   the extrapolation of the annual number of 63,046 over the time

20   period from September 1st, 2013 to May 21st of 2018, and that

21   start and end date represents a period of 4.7 years.

22   Q.   And how did you pick that start and end date?

23   A.   That is the date in which the wire transfers began as well

24   as the wire dates ended, and those are dates from banking

25   records.

1    Q.   Okay.

2    A.   Now, that 4.7 years is then multiplied by 63,046 to come

3    up with an apples-to-apples number that can be compared to the

4    1.2 million of wire transfers.

5    Q.   And what was the difference between this calculation of

6    DigitalNet payroll going back to 2013 and the amount of money

7    DigitalNet wired to Pakistan?

8    A.   Yes.  So, the amount that I calculated for that time

9    period, 4.7 years, is 297,612, and that is 914,588 less than

10   the wire amount, which is 1,212,200.

11   Q.   All right.  So, even giving the defendant the benefit of

12   the doubt that he actually had employees in Pakistan during

13   this period, there's still a difference between the amount

14   wired and the amount paid of over $900,000?

15   A.   Yes.  If you look at it slightly differently, this would

16   suggest three to four full-time employees, if you start looking

17   at 12- to 19,000 and what I benchmarked as a salary for IT

18   professionals in Pakistan for the Lahore region.  So, not too

19   far off in dollar magnitudes of the 250,000.  Obviously, this

20   doesn't include rent, but it's getting somewhat similar to what

21   I had made as assumptions in my analysis.

22   Q.   And your assumptions were based on a higher salary than

23   what DigitalNet seems to be paying?

24   A.   Yes, but they appear to be employing, best I can tell,

25   people that are part time.

1    Q.   Okay.  Did you also look at the timing of the payroll

2    against public records and records produced in discovery

3    regarding the formation of UltPult, another company of the

4    defendant's?

5    A.   Yes.

6         MR. HUNTER:  Next slide, please, Ms. Sheff.

7    Q.   What is this that we're looking at on the screen?

8    A.   So, this is the screen shot from New Hampshire Department

9    of State showing business information, business detail, and

10   this can be found publicly at the newhampshire.gov website.

11   Q.   Does this show a business creation date of December 2015

12   for UltPult?

13   A.   Yes.  The business creation date, UltPult's name, and it

14   lists imran.alrai@aisaconsulting.com as the business email.

15        MR. HUNTER:  Next slide, please, Ms. Sheff.

16   Q.   This is a document in evidence, Exhibit 860.  Here we can

17   see a Certificate of Formation for UltPult signed by Imran

18   Alrai in October of 2015?

19   A.   That is correct.

20   Q.   Okay.

21   A.   And this predates the other document by approximately a

22   month or two.

23        MR. HUNTER:  So, the next slide, please, Ms. Sheff.

24   Q.   So, Mr. Naviloff, what is this slide showing?

25   A.   This is similar to earlier slides.  For the Court's

1    benefit, we have overlaid the transfers to Pakistan to the

2    purported DigitalNet payroll to show the apples-to-orange

3    comparison and when the money was sent and when it was spent.

4    And I've also overlaid the formation of UltPult, so with

5    UltPult formation being closer to the origination of when that

6    money began to be spent.  So, specifically in Q4 of 2015

7    UltPult was founded, and approximately a year later the payroll

8    records started to show individuals for which payroll was

9    provided.

10            Now, UltPult, if you look at the Google Play Store,

11   the Google Play lists a number of apps that were developed with

12   UltPult.  Those apps began to be developed in and around that

13   same time period.

14   Q.   By "that same time period," what time period?

15   A.   The time period beginning -- the earliest evidence that we

16   see from my inquiries into the Google Play Store and their

17   upload dates and their updates was early 2016, I believe, late

18   -- in that time period.  There's also music videos and

19   promotional videos on Google YouTube, and those videos include

20   some popular games in the Southeast Asia region with

21   promotional videos that are in language common to the Southeast

22   Asian area.

23   Q.   So, you found, just on searching publicly available

24   sources, some indication that UltPult had been doing stuff?

25   A.   Right.  Yes.  UltPult was active shortly after its

1   founding with building games that were geared towards Southeast

2   Asia.

3   Q.   We also see, so UltPult is founded, wire transfers of --

4   two spikes in wire transfers after that?

5   A.   Yes.

6   Q.   And they are obvious outliers.  And then the payroll

7   records that we received from defense begin in 2017?

8   A.   Yes.  And you can see up above here the time period for no

9   Pakistan payroll records for which wires occurred was the

10  majority of the 1.2 million.  It was 736,530.  And then after

11  the formation of UltPult and corresponding more closely with

12  the payroll records there was $475,670 transferred in that

13  later time period.

14  Q.   All right.  Mr. Naviloff --

15       MR. HUNTER:  Could you go to the next slide, please,

16  Ms. Sheff.  All right.

17       THE COURT:  We should break for the afternoon, we've

18  been going 90 minutes, to give the reporter a break.  So, we'll

19  convene in 15.

20       MR. HUNTER:  All right.  Thank you, your Honor.

21       THE CLERK:  All rise.

22       (Recess taken from 2:40 p.m. to 3:10 p.m.)

23       THE CLERK:  All rise for the Honorable Court.

24       THE COURT:  Please be seated.

25       All right.  Mr. Hunter, you may proceed.

1          Sir, you're still under oath.

2          THE WITNESS:  Yes.

3          MR. HUNTER:  Thank you, your Honor.

4          Ms. Sheff, could you pull up 924, slide 28.

5    Q.   We're back to your summary of your personal enrichment,

6    Mr. Naviloff.  We just talked about the international wire

7    transfers, and we're going to talk about the credit card in a

8    minute, but what are these last three categories, Transfer to

9    personal bank accounts, Transfers to an individual retirement

10   account, and a Mortgage payoff?

11   A.   So, I'll take it, first, with the Transfers to personal

12   bank accounts.  That amount was observed in the disbursements,

13   so the cash outflows of the accounts, the seven accounts that

14   were analyzed that I identified as representing the total

15   inflows and outflows related to the DigitalNet business.

16   Q.   And those were basically amounts from the DigitalNet

17   accounts into Mr. Alrai's personal bank account?

18   A.   So, the accounts for which the analysis was labeled, all

19   those accounts as far as account names showed either DigitalNet

20   or Aisa Consulting as the bank that the transfers were

21   occurring to.  So, there were transfers to Mr. Alrai in his

22   personal accounts that would have been labeled as "Alrai."

23   Q.   And you counted that as personal enrichment?

24   A.   We counted those as personal.

25   Q.   And Transfers to individual retirement account, an IRA?

1   A.   Similar.  So, these would have been transfers to accounts

2   with IRA titles to them.

3   Q.   And then, finally, a Mortgage payoff?

4   A.   And the last one is a mortgage payoff that occurred

5   related to a property or a loan, at least -- a mortgage.

6   Excuse me.

7   Q.   And so, was that a rental property out in Methuen,

8   Massachusetts?

9   A.   Yes, yes.

10  Q.   So, now let's talk about seemingly personal transactions

11  on a DigitalNet Chase business credit card.

12       MR. HUNTER:  Ms. Sheff, could you go to slide 35.

13  Q.   Could you describe your analysis here, Mr. Naviloff?

14  A.   Sure.  So, the key word there is "seemingly."  So, the

15  business records in this instance aren't necessarily complete

16  or available, but using my professional experience in

17  performing many travel and entertainment expense investigations

18  in fraud, waste, abuse assessments, typically what I see is the

19  higher risk categories relate to expenditures for non-business

20  expenses typically end up being in the places such as consumer

21  purchases, consumer-related dining establishments, such as --

22  or excuse me -- purchasing stuff from establishments such as

23  Home Depot or other areas where materials can be used at home

24  as well as at work, so some of the ambiguous categories where

25  purchases can potentially be construed as business related but

1      aren't.

2              In this instance there's not sufficient supporting

3      details with respect to who attended meals, what the purpose of

4      the airfare was for, a lot of the factors that go into

5      performing an analysis, and these are information that would be

6      required for IRS and for preparing expense items for purposes

7      of IRS deductions.  However, they weren't available as far as

8      my review.

9      Q.    Okay.  But based on your review, did you see about

10     $100,000 in airfare expenses using a DigitalNet credit card?

11     A.    I did, yes.

12     Q.    And $90,000 in shopping expenses?

13     A.    Yes.  Shopping expenses exceeded 90,000, hotel expenses

14     exceeded 35,000, gas station expenses 35,000, and dining

15     expenses, much of which was local, was 33,000.

16     Q.    And over what time period were these expenses incurred?

17     A.    This would have been during the duration for which we had

18     records, which I believe is 2013 through 2017.

19     Q.    And you listed some specific examples here.  You saw this

20     is on the DigitalNet credit card?

21     A.    Yes.  Starting from the top here, the 67,000 in

22     international airfare, that was flagged, as I also identified

23     through Customs documentation travel internationally with

24     family members.  It's a higher risk area.  The Home Depot, as I

25     mentioned earlier, that's an area that has both purchases that

1    can be personal in nature as well as those that could be

2    business, but without further support it's hard to discern.

3         Similar to that, the Napolitano marble and granite for

4    $10,480.

5    Q.   What is that business?

6    A.   That is a business that I believe sells marble countertops

7    and other marble-related and granite product.

8    Q.   Okay.  You saw about $6,200 for a plastic surgery bill?

9    A.   Yeah.  So, some of the other items that presumably are

10   personal in nature include the plastic surgery for Jonathan

11   Hall, jewelry purchases, and then also Canobie Lake Park, which

12   were $6,250 for plastic surgery, $4,410 for Al-Rais Jewelry,

13   and $1,750 for Canobie Lake Park, Amusement Park.

14        MR. HUNTER:  Next slide, please, Ms. Sheff.

15   Q.   So, is this slide summarizing the dining expenses you saw

16   on the DigitalNet business card?

17   A.   Yeah.  As I mentioned earlier, there was a significant

18   amount of local dining.  Here is a listing with a summary on

19   the left of the dining establishment names.  This came from the

20   Chase credit card information that was made available by the

21   CPA who prepared the tax returns.  Now, the count here and the

22   amounts are summarized for the time period, which were

23   available and listed in order of descending amount of visits.

24   Q.   And for all of these, these are all dining charges where

25   there were more than ten visits in that time period?

1  A.   That is correct.  So, in this one example I took Dunkin'

2  Donuts, looked at 119 visits and looked at the store locations,

3  and for that the store location closest to Mr. Alrai's home was

4  Dunkin' Donuts location number 346676.  That's what shows up in

5  the credit card statements.  And then you can see the number of

6  visits that occurred between 2013 through 2017.

7  Q.   So, in total, about $33,000 was spent on dining on the

8  DigitalNet business card from 2013 to '18?

9  A.   Yes, that's correct.

10      MR. HUNTER:  All right.  Could you go to the next

11  slide, Ms. Sheff.

12  Q.   So, this is medical and health-related expenses on the

13  DigitalNet business card?

14  A.   Yes.  And here would be instances where presumably

15  Mr. Alrai is covered from his health insurance plan through his

16  employment with United Way.  This is a charge that occurred in

17  February of 2014 for Jonathan Hall, as I mentioned earlier,

18  and, upon investigation, the services that are provided by this

19  location appear to be cosmetic in nature.

20  Q.   And there are other medical charges, again, charged with

21  the DigitalNet business card for about $15,000?

22  A.   That is correct.

23  Q.   And why did you classify these as personal?

24  A.   Generally speaking, individual costs for CVS and other

25  costs associated with healthcare, they're not items that should

1    be charged back to a business.

2            MR. HUNTER:  Slide 38, please.

3    Q.   You also analyzed travel.  So, here's a few examples of

4    travel.  Did you compare these travel expenses with CBP records

5    to determine whether or not Mr. Alrai was traveling with

6    family?

7    A.   Yes.  So, I was provided U.S. Customs forms of entry, and

8    comparing the dates in which border crossings had occurred I

9    called out and matched some of the spending for purposes of

10   what occurred on credit cards, the Chase credit card, with

11   travel dates, and you can see here there's three different

12   trips that are summarized and highlighted.

13   Q.   So, it looks like he went to Dubai twice with Saima.  And

14   this is all, again, with the DigitalNet business credit card;

15   is that right, Mr. Naviloff?

16   A.   Yes.

17   Q.   Including a trip to Niagra Falls?

18   A.   Yes.  There is a trip to Niagra Falls, as shown on the

19   left.  There's charges from August 24th through August 26th for

20   both hotel stay and for gas and food, food and lodging, and

21   consistent with that, those dates, there was an entry on

22   8/24/2013 to Niagra Falls, Canada.

23           MR. HUNTER:  All right.  And slide 39, please,

24   Ms. Sheff.

25   Q.   We're back to your summary slide, Mr. Naviloff.  So, just

1    in conclusion, we have the 1.4 million, Mr. Naviloff, that was

2    just sitting in the bank accounts?

3    A.    That's correct.

4    Q.    And you included in this 1.2 for the wire transfers?

5    A.    That is correct.

6    Q.    And then what's this total, $381,042?

7    A.    That is correct.

8    Q.    And that's the transactions you thought were seemingly

9    personal?

10   A.    Seemingly.  So, it's as much as 381,000.  Now, that

11   doesn't include other amounts where we see donations to

12   religious establishments and potentially other advances in

13   cash.  We just couldn't confirm whether they were to Mr. Alrai,

14   himself.

15   Q.    So, charitable donations you kept off?

16   A.    Yeah.  So, that 381,000 doesn't include other transactions

17   that may have been personal in nature but not individual

18   expenses.

19   Q.    Okay.  And then we talked about these, the other transfers

20   to personal bank accounts, retirement accounts and mortgages?

21   A.    That's correct.

22   Q.    So, what's the total, when you add all of this up?

23   A.    So, when you add up the personal expenditures, which

24   totalled 556,203, with the personal savings of 3,144,158, you

25   come to a total of 3,700,361.

1    Q.   All right.  Mr. Naviloff, based on your review of United

2    Way's financial statements and vendor invoices, did you form an

3    opinion about whether United Way suffered a loss from

4    Mr. Alrai's fraudulent activity?

5    A.   I did, yes.

6    Q.   And what is that amount?

7    A.   It's an amount no less than $3,170,000, approximately.

8    Q.   And based on your review of Mr. Alrai's bank account

9    records for his businesses and tax records, did you form an

10   opinion about whether or not Mr. Alrai is personally enriched

11   due to his fraudulent activity?

12   A.   Yes.  So, the corresponding amount suggests that the

13   personal enrichment and the corresponding loss to United Way

14   would be no more than $3,700,361.

15   Q.   Okay.  And in looking at this, where we have a

16   $3.7 million figure for personal enrichment, does that impact

17   your confidence in your loss analysis that you did in reviewing

18   invoices and contracts for United Way?

19   A.   It does significantly, yes.

20   Q.   Why is that?

21   A.   This allows at least an overview of or way of evaluating

22   the 3-plus million that I wasn't able to analyze in services

23   delivered by DigitalNet and the approximate cost, the outflows

24   associated with the delivery of those services.

25   Q.   So, if we were to put it another way, of the 6.7 million

1    that United Way paid to DigitalNet, this analysis shows that as

2    much as $3.7 million didn't go to services provided to United

3    Way?

4    A.    That's what this suggests, yes.

5              MR. HUNTER:  Nothing further at this time.

6              THE COURT:  Cross.

7                        CROSS-EXAMINATION

8    BY MR. HARRINGTON:

9    Q.    Good afternoon, Mr. Naviloff.

10   A.    Good afternoon.

11   Q.    How are you doing today, sir?

12   A.    I'm doing well.  Thank you.

13   Q.    So, I'm going to ask you a few questions, sir, and if you

14   don't understand my question, just tell me, and I can rephrase

15   it.  If you need me to repeat something, make sure you tell me

16   to do that.  I'm happy to do that.  Okay?

17   A.    Understood.  Thank you.

18   Q.    Now, when you did your analysis in this case, you

19   indicated that you were first hired to do an analysis in kind

20   of an internal investigation for the United Way; you were hired

21   by Attorney John Commisso or his law firm?

22   A.    Correct.

23   Q.    And one of the things that you indicated was that there

24   was some privileged information that United Way still hasn't

25   waived its privilege to?

1   A.   That's my general understanding, yeah.

2   Q.   Okay.  And one of the things that you had talked about and

3   that was raised by the prosecutor was that there were some

4   servers that were imaged that were given to RSM, correct?

5   A.   Yes, that's my understanding.

6   Q.   And you talked about that there was a firewall, I think

7   was the term that was used.  Do you recall that?

8   A.   Yes, I do.

9   Q.   Okay.  And is that the term that you would use, or is that

10  just a term that was given to you by the prosecutor?

11  A.   It was handed to me, that term.

12  Q.   Yeah.  What term would you use?

13  A.   We have a secure lab, a digital forensic lab that

14  information, when it's collected, it goes into a dedicated

15  server which is restricted to only those individuals within our

16  digital forensic group that have a need to access that

17  information.

18  Q.   And so, if you had wanted to access that information as an

19  employee of RSM and somebody who was conducting what would be

20  considered a forensic evaluation for the United Way, you could

21  request access to that information if you felt it was

22  necessary, right?

23  A.   I don't know that that's -- I have never tried, let's put

24  it that way, and I don't think that's protocol, meaning that

25  the digital forensic people are charged with the custody of

1    that data and are responsible for handling the data.  So, if

2    there would be an instance where I needed data from them, I

3    would ask them to process and extract information that's

4    relevant to my case.  So, it's big, huge, chunky data that's

5    unprocessed that they're typically dealing with, and that's

6    what their specialty is, taking ginormous chunks of data and

7    identifying relevant information when requested.

8    Q.   Okay.  And so, that's kind of my question, what I'm

9    driving at --

10   A.   Sure.

11   Q.   -- and I don't know if I'm being too simplistic --

12   A.   No.  That's okay.

13   Q.   -- is, if during the course of your evaluation you said,

14   you know, "Jeez, I really need to take a look at what's on

15   those servers and do some analysis to see if there's anything

16   relevant to my analysis," then you would submit a request and

17   see if they would be able to assist you.  That would be part of

18   their job, right?

19   A.   Yes.

20   Q.   So, saying that you don't have access to that information

21   is not 100 percent accurate.  You would have to take some steps

22   in order to access it?

23   A.   Yes.  It would take steps and costs on processing whatever

24   needs to be processed to get relevant data off of the devices.

25   Q.   Okay.  Thank you.  And so, you had completed an evaluation

1   for the United Way, and did you complete that evaluation for

2   the United Way before you were hired by the U.S. Attorney's

3   Office in New Hampshire?

4   A.   I did, yes.

5   Q.   So, you completed that evaluation, and then you were hired

6   by the U.S. Attorney's Office to do a new evaluation or just

7   kind of give them the evaluation you already did?

8   A.   It was to provide the evaluation that I already had done,

9   factfinding, right, and share the relevant information with the

10   government, and they had certainly collected information that I

11   did not have, so to evaluate any additional information that

12   they had that would be relevant to my opinion.

13   Q.   So, a little bit of both.  You had completed one

14   evaluation --

15   A.   Yeah.

16   Q.   -- for United Way.  The U.S. Attorney's Office gave you a

17   little bit more information, and you incorporated that into

18   your analyses that you've been talking about today?

19   A.   That's correct.  Yes, sir.

20   Q.   Now, you would agree with me that for the purposes of your

21   analysis for the U.S. Attorney's Office you were instructed to

22   assume that all of the contracts between the United Way and

23   DigitalNet were obtained fraudulently, correct?

24   A.   Yes, that is correct.

25   Q.   And for someone who is doing a forensic accounting into

1    activity that is alleged to be fraudulent, would you agree with

2    me that that might be an odd point to start from with an

3    assumption that all of the contracts were entered into or

4    obtained fraudulently?

5    A.   Well, this is where I would leave it to the attorneys as

6    far as understanding what the underpinnings of the law and

7    violations of the law and intent and fraud are.  So, that's not

8    an area that a forensic accountant, in my understanding, is

9    allowed to jump into, judgments of guilt.  With respect to

10   facts, we're factfinders.

11   Q.   Well, as an expert -- and you indicated you were a

12   Certified Fraud Examiner, right?

13   A.   Yes.

14   Q.   And that's a specialty kind of certification you have to

15   get as a CPA, right?

16   A.   That is a specialty, yes.

17   Q.   And so, as part of being a Certified Fraud Examiner, one

18   of the things that you would opine upon would be fraud, right?

19   A.   We are factfinders.  So, within the guidelines of

20   certainly the -- if you look back at the Association of

21   Certified Fraud Examiners, there's guidelines on us making

22   opinions or opining on guilt.  So, my work is to fact find and

23   lead up to the point where others would determine guilt and

24   would also determine what type of action should be taken,

25   whether it's dismissal or other sorts of disciplinary measures.

1          So, my role in investigation leads up to the

2     factfinding and the valuation, right?  You heard earlier that

3     I'm accredited in business valuation.  I do lots of lost

4     profits.  I help quantify things for insurance purposes.  So,

5     those are within the realm of what a forensic accountant does

6     and what I sought to do for the U.S. Attorney's Office as well

7     as my client, United Way.

8     Q.   Okay.  The bottom line is you were instructed to assume

9     fraud in all of the contracts, right, as far as them being

10    obtained by DigitalNet from United Way?

11    A.   Yes.  All of the contracts, yes.

12    Q.   Okay.

13          THE COURT:  Let me just ask, if he was going to offer

14    an opinion as to fraud, wouldn't you object?

15          MR. HARRINGTON:  Yes.

16          THE COURT:  Okay.  That's an honest answer.  Thank

17    you.  Especially in front of a jury.  He wouldn't be allowed to

18    tell the jury, because the trier of fact is the expert on fraud

19    to make the determination.  Okay, I gotcha.  But it's an

20    assumption he made.  It's not unusual, I guess.

21    Q.   And let me ask you, in addition to that assumption you

22    would agree with me that your analysis that you've provided to

23    the Court, your analysis doesn't constitute an audit?

24    A.   The attestation standards are different standards than the

25    consulting standards that I operate under.

1   Q.   Okay.  So, you would agree that your analysis in this case

2   was not an audit?

3   A.   Agreed.

4   Q.   And you would agree with me, as part of that you're not

5   issuing any type of opinion or an assurance regarding the

6   financial statements, in particular, those of Mr. Alrai or the

7   entities, that he reported taxes on or for the United Way,

8   right?

9   A.   I've observed transactions that from my analysis don't

10   appear to have economic substance to them, but I don't have an

11   opinion on the entirety of those financial statements.

12   Q.   Okay.  So, you can't tell the judge, you know, "I assure

13   you, Judge, that all of the stuff that I've talked about in

14   these financial statements is accurate and true"?  You can't

15   make those assurances; is that correct?

16   A.   Well, I'm not relying upon the financial statements.  I'm

17   relying upon the bank accounts and the underlying business

18   records.

19   Q.   Let me ask you, in regard to CloudConnect, I want to talk

20   to you about that, in regard to your analysis in this case --

21   you're not an IT expert; is that fair to say?

22   A.   I'm not an IT professional, no.

23   Q.   And in this particular case did you consult with any IT

24   experts in the rendering of your report?

25   A.   I did.

1    Q.    And who were those IT experts that you consulted with?

2    A.    John Meyer, Diego Rosenfeld and another couple of

3    associates that report to Diego Rosenfeld.

4    Q.    And are those people that work within RSM?

5    A.    Diego Rosenfeld is a principal with over 20 years of

6    experience, and he leads our practice in New England with

7    respect to providing technology consulting solutions to

8    middle-market clients for RSM.  Some of those are, you know,

9    valuated reseller type arrangements, outsourced CIO type

10   services, infrastructure needs, build-outs, setup.  We do --

11   RSM has over 1,200 technology consulting professionals within

12   our 10,000-plus workforce, so it's a large area that we consult

13   in.

14   Q.    So, he works for RSM?

15   A.    Yes.

16   Q.    And the associates you referred to work for RSM?

17   A.    They do.

18   Q.    Okay.  And did they provide any reports?

19   A.    No.  They worked for me.  I'm the expert, and they worked

20   under my supervision and quality control.

21   Q.    Okay.  You would agree with me that you didn't note in

22   your report that you consulted with these individuals?

23   A.    I mentioned members of my team, and I use the term "I" as

24   referencing both the work that I performed as well as the work

25   that I did -- that was done for me under my supervision.

1    Q.   Now, in regard to your report -- let me give you a

2    hypothetical, if you will, if I was going to build a house,

3    okay, and you and I contracted with each other, and I'm going

4    to build a house for you, okay, and that house is going to cost

5    $300,000 for me to build for you, we talk about the price,

6    okay?

7    A.   Yes.

8    Q.   And you agree that that's a fair price to pay, you're

9    going to pay it.  And then I build the house for you.  You

10   agree that that's, as we're speaking, a general arm's length

11   transaction; you're aware of what the price is going to be, I

12   quote it to you, I build it and that's the price you pay?

13   A.   Yes, that's arm's length.  If two willing parties agree

14   and there's transparency in the process, then it's arm's

15   length.

16   Q.   Okay.  Now let's say you sign a contract with me for that

17   same agreement, right, and in that contract there is an

18   agreement that I can use a subcontractor if I want to, and you

19   sign that contract that allows me to build that house for you,

20   and I go and I build that house for you for the $300,000, but I

21   pay the subcontractor to build it for you $100,000?  That's

22   still an arm's length transaction, right?  I built you the

23   house for $300,000.  I just paid somebody else less to do the

24   work?

25   A.   That suggests there's a considerable amount of risk in the

1   transaction, but, yeah.

2   Q.   But if you agree to the price, if you are aware of what

3   the price was, you agreed to it, but I'm able to do it for a

4   lesser amount with a subcontractor, especially if you're aware

5   of that term in the contract, that would be considered an arm's

6   length transaction, wouldn't it, fair, open, transparent?  I

7   don't have to tell you what I'm going to make for profit, do I?

8   A.   So, in a transparent manner, if someone were to enter into

9   subcontracting they would have to -- RSM would disclose the use

10  of subcontractors so it's transparent, but the pricing of those

11  subcontractors is typically not disclosed in a business

12  relationship, if that's what you're asking.

13  Q.   Yeah.  It doesn't have to be disclosed, right?

14  A.   In many instances it's not.

15  Q.   Okay.  And I want to bring to your attention what's been

16  marked as Defendant's Exhibit C.  And I think you looked at

17  this agreement.  There's some overlap in government and defense

18  exhibits in this case.

19  A.   Yes, I'm familiar with this.

20  Q.   Do you recall taking a look at this a little bit earlier,

21  the Master Services Agreement?

22  A.   I don't know that this was shared as part of my testimony,

23  but I'm familiar with this agreement.

24  Q.   Yeah.  One of the things you had indicated to the judge

25  earlier is you had reviewed all the contracts in the case,

1   right?

2   A.   Yes.  Yeah, correct.

3   Q.   And one of the provisions that's in this Master Services

4   Agreement is relative to subcontractors, right?

5   A.   Yes.

6   Q.   And "Company" in reviewing this contract -- and if you

7   need to have me show you any other pages, you let me know.  In

8   the context of this Master Services Agreement "Company" is

9   referring to DigitalNet, right?

10  A.   Yes, DigitalNet is -- I'd have to review the front page to

11  confirm that, but --

12  Q.   Would you like to look at that?

13  A.   I have no reason to doubt that that's not the case.

14  Q.   Okay.  Fair enough, sir.  So, you would agree with me

15  "Company" is DigitalNet, and it says here, "Company may

16  subcontract part or all of the services to one or more third

17  parties, provided, however, that Company shall be responsible

18  for and shall guaranty all the work performed by the

19  Company-designated contractor as if the Company performed such

20  work itself."

21  A.   Mm-hmm.

22  Q.   Right?  Okay.  And, "Notwithstanding the foregoing,

23  Company shall not delegate or subcontract any services that are

24  expressly designated as being nondelegable by the client on a

25  statement of work."  Accurate reading, correct?

1   A.   Accurate.

2   Q.   So, with that in mind, you agree with me that the Master

3   Services Agreement that we were just talking about is just kind

4   of as it sounds, a master agreement that will typically cover

5   terms of later contracts that could be entered into between

6   DigitalNet and United Way, correct?

7   A.   Correct.  Yes.

8   Q.   And so, with that in mind, if you're talking about

9   telephony services, which is one of the main contracts you

10  looked at, right, or cloud computing services, which is kind of

11  the CloudConnect piece of it -- right?

12  A.   Mm-hmm.

13  Q.   And you just need to be verbal.

14  A.   Yes.

15  Q.   This Master Services Agreement would cover those

16  contracts?

17  A.   I haven't traced back and forth to see which would be

18  covered and which are separate agreements that don't reference

19  the -- I probably did at one point, it's just not in front of

20  me right now -- but, generally speaking, the MSA would cover

21  anything that's referenced as being covered by the MSA.

22  Q.   Okay.  So, with that in mind, let me talk to you a little

23  bit about CloudConnect, and there's two different ways I want

24  to talk to you about it.  One is as this kind of subcontractor,

25  if you will, because one of the things that you had indicated

1    in regard to CloudConnect was that it basically had provided

2    the services for the cloud contract that DigitalNet said it was

3    providing, correct?

4    A.    Yes.

5    Q.    That's a fair statement of what your testimony was?

6    A.    Correct.

7    Q.    And so, there was a significant differential in the cost

8    that CloudConnect was charging to I think at that point it was

9    Aisa Consulting versus DigitalNet, correct?

10   A.    I butchered the pronunciation of that, if it's supposed to

11   be Aisa.  Okay.  Yes.

12   Q.    Just to make sure we're talking about the same thing?

13   A.    Yes.

14   Q.    And then the payments that United Way was making to

15   DigitalNet for those services, right, big difference?

16   A.    There's a difference, yes.

17   Q.    Now, in the scenario that we had talked about as a

18   subcontractor, if you will, if DigitalNet pays CloudConnect to

19   provide these services that you've indicated you believe were

20   provided by CloudConnect, charges a premium for them and makes

21   a significant profit off of it, and that's covered by this

22   subcontractor agreement, then DigitalNet is operating within

23   the scope of the contract to subcontract the work out, if it

24   chooses?

25   A.    Yes.

1    Q.   Now, let me talk to you in a different regard in regard to

2    the same subject, CloudConnect, but a different kind of idea,

3    if you will, which is are you aware -- did you speak to anybody

4    at CloudConnect about the actual services that they provided to

5    DigitalNet?

6    A.   I did not, no.

7    Q.   Did anybody on your team do that?

8    A.   I don't believe so.

9    Q.   And so, the services that you are saying you believe and

10   you concluded were provided by CloudConnect are based on your

11   review of the contract; is that fair to say?

12   A.   It's based upon the contract, the invoices and the sheet

13   containing a summary of the services, technical specs.

14   Q.   And you are aware that, tell me if you're not, but you are

15   aware that CloudConnect does not directly deal with businesses

16   such as United Way or other businesses directly; they require a

17   third-party vendor to be between them and the company that's

18   being serviced?  You're aware of that, right?

19   A.   I believe the agreement suggested some pricing at the end

20   of it that would have been pricing that would be conveyed to

21   the end customer, so it wasn't clear from that agreement.  And

22   certainly the way in which the billing occurred wasn't

23   consistent with at least the description of what was the

24   expected billing in the agreement that was signed.  So, another

25   way of saying there is discussion of how billing should occur

1    or could occur and what did occur was different.  So, I don't

2    know whether or not services could or could not be offered

3    under that agreement.

4    Q.   Okay.  So, let me ask it a little bit different way.  Are

5    you familiar with CloudConnect in the IT industry?  Are you

6    familiar with them?

7    A.   My tech team has heard of them before.

8    Q.   And based on them hearing of it before and speaking with

9    you, did you become aware that they don't deal directly with

10   the end users, they deal with third-party vendors?  Did you

11   become aware of that or not?

12   A.   I believe the U.S. Attorney's Office shared that with me

13   at one point.

14   Q.   Okay.  So, at some point you became aware that

15   CloudConnect only dealt with third-party vendors, not end

16   users?

17   A.   Yes.

18   Q.   But that was really not part of the calculation you made

19   in the report, correct?

20   A.   No.  I don't know that it's relevant.  In fact, Insight

21   took over, and Insight is doing services directly for United

22   Way, and if -- I guess, yeah, I don't know how it's relevant.

23   Q.   Okay.  Well, part of the -- one of the diagrams that you

24   had brought up and talked with the judge about was the services

25   flowing from CloudConnect directly to United Way, right, like

1    this cash flow and services, right, with DigitalNet kind of

2    being in the middle?  You remember that diagram, right?

3    A.    Money was not flowing from United Way to CloudConnect.  It

4    was flowing through DigitalNet, yes.

5    Q.    And you put kind of -- in that diagram for the judge you

6    put in DigitalNet kind of in the middle, even though it didn't

7    really need to be in the middle.  If it was taken out, the

8    services would have just flowed from CloudConnect to United

9    Way, and the money could have flowed directly as well.  That

10   was kind of the point of the diagram, right?

11   A.    Correct.

12   Q.    But if CloudConnect doesn't deal with end users, they only

13   deal with intermediary, third-party vendors, then that diagram

14   wouldn't necessarily be accurate, right?

15   A.    So, the diagram is based upon the economic of the

16   transaction showing the amount of capture by DigitalNet.  Now,

17   if you're suggesting that the economics would be different

18   under a different vendor providing those services, I'd say it

19   could be, but I don't know that that would be.

20   Q.    Okay.

21   A.    Insight, presumably, was less expensive or, I don't know,

22   similar in expense, and was providing those services directly

23   to the United Way.  Obviously, there were significant margins

24   and significant markup, infinite markup, because in the later

25   period Insight -- obviously those bills were being paid

1    directly by United Way.  So, there could be another vendor in

2    place in an alternative universe, if you're asking me for a

3    hypothetical.

4    Q.   So, let me ask you, in regard to the services -- let's

5    talk about that, the CloudConnect and services.  You indicated

6    that the things that you were looking at relative to those

7    services were infrastructure, virtual desktop, and data

8    management/high availability backup, right?

9    A.   Yes.

10   Q.   That's the CloudConnect piece, right?

11   A.   Correct.

12   Q.   And in that regard you've already indicated to the judge

13   you didn't -- you or nobody on your team spoke with anybody at

14   CloudConnect to confirm what services they were actually

15   providing, right?

16   A.   We reviewed the invoices for what they claimed they were

17   providing.

18   Q.   Okay.  And in that regard are you aware that CloudConnect

19   actually is a platform where they provide space to IT engineers

20   to actually build the infrastructure, the virtual desktops,

21   things of that nature?

22   A.   Yes.  It's essentially a sandbox for loading applications

23   and running them for infrastructure purposes.

24   Q.   And so, it actually requires programmers or engineers to

25   go in and actually work within the environment that

1    CloudConnect provides, correct?

2    A.    Yes.

3    Q.    And are you aware that DigitalNet actually provided those

4    services, the infrastructure, the creation of the virtual

5    desktops and the other programs that were running on the

6    CloudConnect platform?

7    A.    Are you saying that they created the -- I'm sorry.  What's

8    the --

9    Q.    That they were the ones that actually had created the

10   infrastructure, the virtual desktop environments and everything

11   that went with them, that they were the ones that actually

12   created it, not CloudConnect.  Are you aware of that?

13   A.    So, they loaded the software and created the IT

14   environment?  Is that what you're saying?

15   Q.    Correct.  And that they're actually, as you had kind of

16   given the analogy, the sandbox, right?

17   A.    Yes.

18   Q.    So, you go into the kind of the empty sandbox, but then

19   you have to build structures within it, right?

20   A.    Yes.  Loading software and doing the wiring and doing the

21   plumbing, yeah.

22   Q.    And so, what I'm suggesting to you and asking you is are

23   you aware that DigitalNet did all of those things, all of the

24   plumbing, and that CloudConnect was just the platform?

25   A.    Yes.

1    Q.   I want to switch gears with you, Mr. Naviloff, a little

2    bit and actually ask you about -- and let me get the slide for

3    you.  You were talking a little bit about the wiring money

4    overseas and employees of DigitalNet in Pakistan.  I want to

5    ask you a few questions about that.  Give me just one moment.

6                        (Pause)

7              MR. HARRINGTON:  If you could pull up Exhibit 924.

8    Oh, let me switch it over.  I'm sorry.  It's Exhibit 924, slide

9    30.

10   Q.   So, you recall talking to the prosecutor about this

11   particular slide, correct?

12   A.   Correct.

13   Q.   And this is information that is relative to what you had

14   indicated were payroll, monthly payroll; is that right?

15   A.   What was represented as payroll for Pakistan employees,

16   yes.

17   Q.   Okay.  And so, if we look at these numbers here, we have,

18   let's see, one, two, three, four -- if you want to highlight

19   that, go ahead.  Let's just count the number of dates we have

20   here.  We have one, two, three, four, five, six, seven, eight,

21   nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen

22   months represented there; is that accurate?

23   A.   Yes.

24   Q.   And would it also be fair to say that, when you look at

25   that, your numbers, obviously, are based just on the months

1    that are provided here on the screen, those 16 months?

2    A.   Yes, that's correct.

3    Q.   So, if we look at that, though, it's actually not a

4    month-to-month transfer.  So, for example, if you look at the

5    beginning, you have February 1, 2017, then it skips to April.

6    So, we're missing March, right?

7    A.   I don't know.  Do you know if we're missing it?

8    Q.   Well, I'm asking you if it's here.

9    A.   What's that?

10   Q.   I'm asking you if it's here on this chart.

11   A.   I don't know if it's missing or not.

12   Q.   I'm asking you if it's on your chart.

13   A.   Was there a March payment?  Is that what you're saying?

14   Q.   Yes.  I'm asking if the monthly payroll --

15   A.   Is this monthly payrolls, or is it ad hoc whenever it's

16   paid?  I don't know.

17   Q.   Okay.  So, my question is the month of March is not

18   included on this chart, right?

19   A.   If one occurred.

20   Q.   Okay.  And would it be fair to say that you go to April,

21   right, and it's April to July?  So, the months of May and June

22   aren't included on that, right?

23   A.   If they occurred.

24   Q.   Okay.  And the same, we go July to October, and it's

25   August and September are not included, correct?

1    A.    If they occurred, yeah.

2    Q.    Okay.  And you can go like that, you know, through.  So,

3    for example, you get to the next series, and you have January,

4    February, March, three months in a row?

5    A.    Yup, if they occurred.

6    Q.    So, going between this date of February 1, 2017 and June

7    3rd of 2019, you can take a look at this, you would agree with

8    me that it's not month to month based on what's here; there's a

9    number of months that aren't included on the chart?

10   A.    There is irregular payment activity.  None of the

11   underlying supporting documents with regards to the

12   compensation agreements with any of these individuals or even

13   the name of certain individuals that are blacked out were

14   provided to me.

15   Q.    And so, let me ask you to make this assumption.

16   A.    Yeah.

17   Q.    If you assume that payroll was done month to month, this

18   would not be an accurate reflection of month to month; it would

19   be missing months, right?

20   A.    Correct.

21   Q.    Okay.  And if that assumption is correct, this number that

22   we have down here and then converted over into U.S. dollars

23   would be underestimated.  Would that be fair to say based on

24   that assumption?

25   A.    If documents that weren't available to me exist, then I

1    would update this to reflect any documents that exist

2    evidencing payroll.

3    Q.   Okay.  And so, if payroll -- the payroll, if we're

4    assuming that's what this is, it remains generally consistent,

5    right, as far as how much is transferred on the months that

6    they're transferred?

7    A.   Correct.  Yes.

8    Q.   And so, if that remained consistent for the months that

9    we're talking about that aren't included, as I'm indicating to

10   you here, these numbers could be significantly higher.  We're

11   talking about roughly 13 months that aren't included in this

12   range, right?

13   A.   That's correct.  Yes.  I didn't count the months missing,

14   but if you did, then, I'm not going to --

15   Q.   You also had indicated that one of the things you had

16   noticed is that in reference to UltPult and the payroll that

17   was going on, it was taking place at a time when Mr. Alrai

18   wasn't at United Way any longer and the payments from United

19   Way weren't going to DigitalNet, and so you had made that

20   observation, correct?

21   A.   Correct.

22   Q.   And in that regard would you agree that that view, looking

23   at that and DigitalNet and UltPult working on other things,

24   indicates that they have ongoing payroll and they were engaged

25   in other activities?

1    A.    I was observing UltPult as a potential source of work for

2    the Pakistani employees, which would demonstrate the use of

3    United Way funds for business purposes other than United Way,

4    and that's consistent with thus far the evidence that's been

5    produced.

6    Q.    Now, one of the things that you tried to do when -- I'm

7    going to switch gears and go to a different subject.  One of

8    the things that you tried to do is you tried to compare apples

9    to apples when you were looking at invoices, right?

10   A.    Yes.

11   Q.    And the reason that you were trying to do that is --

12   A.    You mean in payroll or invoices?

13   Q.    Invoices.  So, let me clarify, because I'm switching

14   gears.

15   A.    Okay.  Sure.  Okay.

16   Q.    When you are looking at invoices that are coming from

17   DigitalNet and, for example Insight, and you're trying to

18   compare those two -- which you did, right?

19   A.    Correct.

20   Q.    And we're now talking about telephony services?

21   A.    Okay, telephone.

22   Q.    One of the things that you tried to do is you tried to

23   make sure that when you were looking at those invoices you were

24   comparing apples to apples to make sure that the invoices were

25   for the same things?

1    A.    That's correct.

2    Q.    Because if the invoices were for different things, then

3    the calculation that you're making about loss or services that

4    were provided would be incorrect, right?

5    A.    That is correct.

6    Q.    And one of the things that you did is, and, again, I

7    understand that you're doing the best that you can when you're

8    looking at these things, but this was not an easy process, was

9    it, comparing the invoices and trying to figure out what the

10   DigitalNet invoice included when you compared it to, for

11   example, an Insight invoice?

12   A.    In terms of forensic accounting analysis they're never

13   clean.  Was this any harder than ordinary?  No.

14   Q.    Okay.  And so, because it's not clean, you have to make

15   certain assumptions and conclusions based on your review of the

16   invoices that they are covering the same services?

17   A.    Based on the descriptions provided in the invoices, yes.

18   Q.    And the invoices that you had received or reviewed from

19   DigitalNet did not contain a lot of detail; they would just

20   simply say, for example, "Managed telephony services," correct?

21   A.    That's correct.

22   Q.    And then you would take that and you would look at a bill

23   from Insight that might provide a number of pieces of

24   information, more detail relative to things that were done by

25   Insight?

1    A.    We have moved off telephone, but, yes, there's vendors

2    providing services that have descriptions in their invoices.

3    Q.    And I apologize.  I probably should have said SIP,

4    correct?

5    A.    Sorry?

6    Q.    You said we had moved off telephone.  I should have

7    referred to it as SIP instead of Insight, correct?

8    A.    Yes, SIP.  Yeah, okay.  Back to SIP.  Yup.

9    Q.    And you encountered that same kind of task when you

10   compared a DigitalNet invoice to a SIP or an Insight invoice;

11   you had to kind of make some opinions and conclusions because

12   there wasn't a lot of detail on the DigitalNet invoices

13   compared to the Insight or SIP invoices?

14   A.    Yeah.  Once again, we had the service agreements in place

15   as well to draw parallels between what was expected to be

16   delivered, what was invoiced, and what the underlying service

17   provider was charging.  So, more than just an invoice, but the

18   service agreement as well in parallel.

19        MR. HARRINGTON:  And, Ms. Sheff, if you could pull up,

20   I believe it is slide 5.  I believe it's slide 5.  Keep going.

21   Keep going.  Keep going.  Yeah, stop right there.  Thank you.

22   If you back up one.

23   Q.    So, I'm kind of giving you an example of the invoices.  If

24   you look here, you have an invoice from DigitalNet on the top

25   section, correct, on the left?

1   A.   Yes.

2   Q.   And it is dated, and it says, "Managed IT services,"

3   correct?

4   A.   Yes.

5   Q.   And then you have this blockout, and you have this one

6   line, "Infrastructure as a service and hosting," correct?

7   A.   Correct.  DigitalNet, yes.

8   Q.   And then you correlate that, when you look at the Insight

9   bill, to this information that you have blocked off here

10  regarding VMware, vCloud Air, Virtual Private Cloud.  You're

11  basically saying this up top here is this through Insight

12  (indicating), right?

13  A.   Yes.

14  Q.   When you were doing that and making those comparisons did

15  you ever talk to anybody at Insight, whether it's you or your

16  team, talk to anybody at Insight or SIP relative to what your

17  comparisons were?

18  A.   Did I share my damage calculation with them?

19  Q.   No.  I'm asking when you were interpreting these invoices,

20  trying to compare apples to apples, did you talk with the

21  providers like Insight and SIP to tell them, "This is what I'm

22  doing," and to try to get guidance from the people who were

23  actually providing you the bills that had actually matched up

24  with what DigitalNet's bill was?

25  A.   Those are subscriptions, monthly reoccurring subscription

1     services, where the services were spelled out in pretty good

2     detail.  No.  So, the response is no.

3     Q.   So, you didn't talk to them?

4     A.   No.

5     Q.   Fair enough, sir.

6            THE COURT:  So, what's the explanation for it?  You're

7     saying it wasn't necessary?

8            THE WITNESS:  Well, with SIP.US we called and

9     contacted them and tried to obtain historical invoicing

10    activity and the details, and they wouldn't provide the

11    details, so there was no reason -- my understanding was they

12    weren't going to share us details because their relationship

13    was with DigitalNet.

14           With respect to Insight, we were having conversations

15    indirectly through the interim IT director with respect to

16    services that were and weren't being performed and including

17    the cloud computing and the infrastructure as well as backups.

18    And we had discussion with my team director, Mr. Meyer, who

19    indicated that backup wasn't being provided at all, and there

20    is no evidence that backup was being provided outside of

21    imaging of two servers that were scans that were done, and that

22    the other two services with regards to the cloud computing were

23    being delivered.

24           When DigitalNet was removed from the services it

25    didn't interrupt delivery of those services in any way from

1    Insight.

2           So, if there were other services it wasn't clear to

3    John Meyer or my technology consulting team what those services

4    were in addition to the services listed on the page.

5           THE COURT:  Okay.

6    Q.   So, let me switch gears on that.  I have another question

7    that's really talking about United Way's IT budget.  One of the

8    things that you did when you were doing your analysis, is you

9    wanted to get an idea of what United Way's kind of annual IT

10   expenditures were, right?

11   A.   The annual expenditures --

12   Q.   For IT, just as their budget.

13   A.   Yes.  There's the budget set annually that Mr. Alrai was

14   involved in, yes.

15   Q.   Okay.  And you took a look both before Mr. Alrai was

16   involved and after to kind of get a broader picture?

17   A.   A thousand-foot view, yes.

18   Q.   Yes.  Okay.  And you would agree with me that there was

19   one year that was kind of an outlier of, like, $2,000,000 plus

20   for a budget, but generally United Way's annual budget was

21   about $1,000,000, $1.1 million, in that area, correct?

22   A.   My recollection is generally about there, yeah.

23   Q.   And I'm not trying to get to an exact number.

24   A.   Yeah, understood.

25   Q.   But in general terms.

1    A.    It's just a ballpark.

2    Q.    And in that regard you would agree with me that during the

3    time that Mr. Alrai was at the United Way that the budget

4    stayed in that same area, there were no drastic increases in

5    the IT budget while Mr. Alrai was there; it maintained that

6    kind of steady, you know, million-dollar give or take a little

7    bit?

8    A.    My recollection is that the IT group budget grew

9    significantly before Mr. Alrai's arrival, and it remained

10   elevated during the duration of his tenure there and grew

11   slightly from that elevated level.

12   Q.    Yeah.  So, before he gets there the IT budget elevates,

13   Mr. Alrai gets there, and then it remains consistent at that

14   elevated level; is that fair to say?

15   A.    It continued to grow at some rate that I don't have in

16   front of me, but if you have the analysis I'm happy to look at

17   it.  And that's just my recollection from work that was done a

18   while ago.

19            MR. HARRINGTON:  May I just have one moment, Judge?

20            THE COURT:  Yes.

21                       (Pause)

22            MR. HARRINGTON:  Judge, I don't have any other

23   questions for Mr. Naviloff.

24            THE COURT:  Okay.  Thank you.

25            MR. HUNTER:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. HUNTER:

Q.   So, Mr. Naviloff, I just want to start with one question.

We ended on about how you knew you were comparing apples to

apples with the invoices regarding Insight.  I think you

mentioned you had had a conversation with John Meyer, this is

consistent with his trial testimony, that Insight was billing

for OVH's services and hosting?

A.   That's correct.

Q.   Was that one of the assumptions you made in making that

apples-to-apples comparison?

A.   Yes, yes.

Q.   Was it your understanding, again, through those

conversations, that they also at one point were providing

virtual desktop services --

A.   Correct.

Q.   -- that DigitalNet was also providing?

A.   That is correct, and duplicate billing.

Q.   And, likewise, that SIP.US was billing a per-phone-line

fee as well as some other fees --

A.   Yes.

Q.   -- that corresponded to what DigitalNet was billing?

A.   A trunk fee as well as per-line fees in SIP.US which were

consistent with telephone per-line charges in the DigitalNet

agreement.

1    Q.   So, in talking about comparing the invoices, you were

2    asked some questions about the difficulty in comparing the

3    invoices.  I think the way defense counsel put it was because

4    the DigitalNet invoices don't provide a lot of detail.  Do you

5    remember that line of questioning?

6    A.   I do.

7    Q.   So, did that require a little digging on your part to dig

8    into the contracts to figure out what does this line item mean

9    and what is it providing?

10   A.   Well, that's the forensic element that I alluded to.  So,

11   when there's a short description, in this instance we would go

12   back to the longer description, which was in the service

13   agreements.

14   Q.   So, you looked at the description in the service

15   agreements trying to see if it lined up with what was in the

16   invoices, and then, based on that more detailed description in

17   the service agreements, you would compare that, then, to the

18   vendors that were actually providing the services?

19   A.   Correct.  Yes.

20   Q.   And so, through that analysis you were able to eliminate

21   costs for other services, like for, in the instance of

22   CloudConnect, services DigitalNet provided in building the IT

23   infrastructure on the platform that CloudConnect provided?

24   A.   That is correct.

25   Q.   That was billed for separately by DigitalNet?

1    A.   That's correct.

2    Q.   And just going back to the DigitalNet invoices and their

3    lack of specificity, you're a forensic accountant, you have

4    been doing this, and you were saying that they don't have a lot

5    of detail, made it hard to judge just the invoice that

6    DigitalNet had; is that right?

7    A.   I guess the question is the lack of detail in an invoice?

8    Q.   Yeah.

9    A.   I would be speculating as to why.

10   Q.   I'm not asking you to speculate as to why, sir, but you're

11   comparing the line item on the Insight invoice to the

12   DigitalNet invoice?

13   A.   Yeah.  It's more work, if that was an instance, right?

14   Now you're talking infrastructure.  You needed to know that

15   infrastructure is a reference for hosting and then go back to

16   service agreement, so it would take a finance person

17   considerable more effort.

18   Q.   And so, if someone wanted to -- had to approve a

19   DigitalNet invoice to confirm payment, it would be hard to tell

20   on the face of the invoice what work was done and whether that

21   price is justified, right?

22   A.   It is more work, yes.

23   Q.   And is it fair to say that you might need to rely on the

24   person who has the relationship with the vendor, in this case

25   the VP of technology at the company, to say, "Yes, this service

1    was provided"?

2    A.    It would be common for finance department to rely on IT to

3    understand the nature of the services and whether they've been

4    delivered.

5    Q.    Now, you were asked some questions about the separate

6    forensic team, the data breach team and the servers they had.

7    Why didn't you request any information from those servers?

8    A.    It wasn't relevant to this analysis.

9    Q.    Why not?

10   A.    We're talking about servers that house databases and

11   customer databases and credit card information, which has

12   nothing to do with the issues at hand here.

13   Q.    So, you relied on documents that were collected and

14   eventually reviewed and produced to the government?

15   A.    Yeah.    User-generated content was key to understanding

16   what occurred, who knew what when, were others involved.    You

17   know, certainly understanding from a factfinder's perspective,

18   we don't know who knew what, and part of this is really getting

19   to the bottom of that and understanding the communications that

20   occurred during that time period.

21   Q.    Regarding the payroll analysis, again, that analysis is

22   based on payroll records that you received from the U.S.

23   Attorney's Office through defense through reciprocal discovery,

24   right?

25   A.    That is correct.

1    Q.    So, you're working with the best information that we have?

2    A.    Well, it's whatever was produced to you is, presumably,

3    made available to me and it's the basis of my analysis.

4    Q.    And one thing that was apparent on that, and we had the

5    chart up, is that DigitalNet payroll continued even after

6    Mr. Alrai was fired from United Way?

7    A.    Correct.

8    Q.    And that would indicate that there wasn't a huge spend on

9    United Way related IT services in Pakistan; is that right?

10   A.    Well --

11   Q.    You can explain.

12   A.    So, at one point from the slide that I shared there is

13   over $800,000 transmitted prior to I believe it was UltPult and

14   essentially the start of the payroll that ended up occurring or

15   at least the records for payroll.  So, unless there were some

16   activity over there, which I haven't seen any record of any

17   workforce in Pakistan, then that money, presumably, would have

18   sat in an account and would have been available for other

19   business ventures.  The timing of these time sheets,

20   considering they continued after United Way was no longer a

21   customer, suggests that there were alternative uses of the

22   money that went over there.

23   Q.    All right.  Now, I guess, going back to these invoices and

24   your analysis, obviously you had to make some assumptions in

25   lining up the services on the invoices from the contracts and

1    the other vendors; is that right?

2    A.    That's correct.

3    Q.    And you laid out those assumptions in your testimony and

4    in your report; isn't that right?

5    A.    I did, yes.

6    Q.    And so, is that why you did that separate personal

7    enrichment analysis?

8    A.    We have to look at this at two ways, right?  I mentioned

9    in my testimony earlier that looking at this from an analysis

10   that is focused on only three or four areas has the potential

11   for a flaw, meaning that the areas I didn't analyze could have

12   been offered at a loss to DigitalNet.  In that instance, then

13   it really would be misleading to present the numbers that I

14   presented.  So, by tying it to the amount of money when you're

15   looking at the total amount coming in and the total amount

16   going out, what's left is essentially the amount of money that

17   was a loss to -- the maximum amount that would be the loss to

18   United Way.

19   Q.    So, you figured out there's a bunch of money that's just

20   going into Mr. Alrai's pocket?

21   A.    Yes.

22   Q.    It's over $3 million that's not going to any service

23   provided to United Way?

24   A.    Yes, to the best that I can tell, based upon the data

25   available.

1    Q.    Based on the available data?

2    A.    Yes.

3    Q.    And that's consistent with what you saw in your loss

4    analysis?

5    A.    It's highly -- it's extremely supportive.

6    Q.    And I think you testified on direct, like, one of the

7    things that you were looking at in doing this personal

8    enrichment analysis is to see whether your assumptions were

9    supported.

10   A.    It was, yes, to support the assumption that other services

11   weren't performed at a loss, at least break even.

12   Q.    So, the services that you gave, the 3.25 --

13   A.    Yes, the 3.2 million.  Yes.

14   Q.    Let me just break this down.  So, the issue could be you

15   carved out $3.25 million that you assumed DigitalNet provided

16   value for United Way?

17   A.    Correct.

18   Q.    And so, the personal enrichment -- and those services

19   included some of the things that defense counsel talked to you

20   about:  building servers and supporting phone systems and

21   things of that sort?

22   A.    Yes, yes.

23   Q.    And so, part of the personal enrichment analysis is to

24   make sure that DigitalNet wasn't operating at a loss in that

25   bucket that you assumed provided value?

1    A.    Yes, exactly.  One hundred percent.

2    Q.    But that's not where the hidden value of DigitalNet lied,

3    was in that $3.25 million?

4    A.    Exactly.

5    Q.    Okay.  I guess that's another way -- you were talking

6    about plumbing.  That's one way you accounted for the cost in

7    plumbing?

8    A.    The plumbing cost is completely separate, apples to

9    apples, from what we had done, because, when looking at the

10   total amount of enrichment it corroborates the amount of

11   3.1 million minimum amount.

12   Q.    And so, to account for the plumbing, and I don't want to

13   go into all of this again, but you looked at the line items

14   that DigitalNet was billing for to set up the services?

15   A.    Correct.

16   Q.    Connect the pipes?

17   A.    Correct.

18   Q.    And that led you to the $3.1 million loss figure, when you

19   accounted for all of that in your financial accounting?

20   A.    Correct.

21   Q.    And then that was confirmed or supported by the personal

22   enrichment analysis?

23   A.    That's correct.

24   Q.    And are these two independent analyses, different

25   methodologies?

1   A.   Certainly different methodologies of approaching the loss.

2   Q.   You were looking at two different sets of records?

3   A.   Completely separate, yes.

4   Q.   So, Mr. Naviloff, you were asked some questions about

5   building a house in an arm's length transaction?

6   A.   Yes.

7   Q.   Do you remember that, that line of questioning?  So, what

8   if this supposed house buyer that we've been talking about

9   hires a trusted agent?  He doesn't know much about real estate

10  and he's new to New Hampshire; he doesn't know all the hidden

11  taxes and fees that exist in our real estate market.  So, he

12  hires a trusted agent to give him sound advice about real

13  estate matters and other property, and the agent convinces him,

14  "You've got to pay $300,000 for this house," but it turns out

15  that the agent actually owns the house, which he didn't tell

16  him, and the house is only worth, you know, 100,000, maybe

17  250,000, and they reach an agreement, shake hands.  Is that an

18  arm's length transaction?

19  A.   No.  There's an undisclosed relationship in that, so

20  there's certainly an element that isn't known to the other

21  party.

22  Q.   Or how about this:  What if you hired a trusted agent to

23  help you navigate the waters of the New Hampshire real estate

24  market and you're interested in -- there are three or four

25  houses that you're interested in, and your agent is sitting

1    right there?  Let's just assume, for purposes of this analysis,

2    that they are all worth $300,000, they all have pros and cons,

3    but they're all worth the same amount.  What you don't know is

4    that your agent owns one of the houses, and he convinces you to

5    buy that house.  Is that an arm's length transaction?

6    A.    Still for the same issue, if there is unknown elements to

7    the transaction, then it may not be arm's length.

8            THE COURT:  What if there's no agent involved, it's

9    just a deal, buyer and seller, purchase and sale, right, and,

10   like most home sales, is subject to an inspection and the buyer

11   asks the seller to recommend an inspection -- let's say subject

12   to an appraisal or inspection, whatever, the usual terms,

13   right?

14           THE WITNESS:  Yeah.

15           THE COURT:  Purchaser says, "Can you recommend

16   anybody?"  And the seller of the house recommends her brother

17   to do the appraisal and her sister to do the inspection,

18   doesn't disclose that they're related.  But there's no broker

19   in the middle of the deal.  Someone just recommends those two.

20   What do you think?

21           THE WITNESS:  I would say that I would hate to be the

22   buyer in that situation.

23           THE COURT:  Is there a duty to disclose that

24   relationship on the part of the seller?

25           THE WITNESS:  Well, that's a matter of contract and

1    law.  I would say in most real estate it's, you know, let the

2    buyer beware.  So, not being a specialist in real estate, I

3    couldn't answer as to whether there is a duty to disclose.  I'm

4    sure each state has its own laws, and it's a very, very heavily

5    regulated area.

6              THE COURT:  Sure.  But you're not willing to say

7    that's fraud?

8              THE WITNESS:  Would I say that that's fraud, referral

9    and self-dealing?  I'm not -- well, I don't attest to what

10   fraud is.

11             THE COURT:  Understood.  That's a good point.  Okay.

12   Does it render the transaction, though, less arm's length in

13   any way to provide an inspector and an appraiser with an

14   undisclosed relationship?

15             THE WITNESS:  If those parties are acting in good

16   faith and performing in a professional manner -- we do this

17   every day as consultants, right?  We get hired by clients, and

18   we have attestation clients and we have consulting clients and

19   we have the concern over conflict, right?  If I'm helping an

20   attest client in a courtroom setting I'm forbidden by my AICPA

21   regulation and guidelines participating in that.  So, it's a

22   conflict, right, an independent issue?  So, some of this is

23   driven by professional standards, others driven by, I imagine,

24   laws.  I don't know the laws well enough to offer any sort of

25   advice.

1          THE COURT:  Understood.

2    Q.    I'm just going to tweak the Court's hypothetical just a

3    little bit.  And let's just say you, again, you've got this

4    undisclosed relationship between the seller and the home

5    inspector that hasn't been disclosed, and one of the things

6    that's most important to you, and you've made this known to the

7    seller, is that there are certain problems with the house that

8    are very important that you need to know about, and those

9    problems exist in the house but they're not disclosed.  Would

10   that impact the fairness or the arm's length nature of the

11   transaction?

12   A.    If there were issues in the house and the inspector knew

13   that there were issues and the reason that they weren't

14   disclosed was because of relationships with the seller, that

15   would be -- is that the scenario?

16   Q.    To get the sale to go through.

17   A.    Yeah.  For me, that would certainly warrant some amount of

18   loss to the buyer, right?  Had they known about that

19   information, they would have asked for a price concession,

20   likely, or may not have moved forward with the deal altogether

21   if there were considerable issues that they found during their

22   due diligence.  So, there's certainly harm, if that's the

23   question.  There's a significant amount of harm.

24         THE COURT:  For what it's worth, I don't think my

25   appraiser or inspector hypotheticals are particularly apt, to

1  be honest.  I think the broker one is better on these facts.

2         THE WITNESS:  What I can say here is the margins one

3  would expect from a business, and given that RSM's in this

4  business of providing technology consulting, generally speaking

5  the margins on pass-through activity are not at the level seen

6  here.  So, this is certainly, from a pricing perspective, is

7  strikingly unusual for at least my team looking at these

8  amounts in the pricing.

9         MR. HUNTER:  Nothing further.

10         THE COURT:  Recross.

11                    RECROSS EXAMINATION

12  BY MR. HARRINGTON:

13  Q.   Mr. Naviloff, I think you had indicated the personal

14  enrichment piece -- was it 3.6 million?  I forget the number.

15  Do you recall?

16  A.   3.7 million.

17  Q.   3.7 million.  And that was over the course of the

18  contracts, roughly?  We're talking about six years, roughly,

19  right?

20  A.   That's correct.

21  Q.   So, we're talking about 3.7 million over six years.  I'm

22  sure you're good with math.  That works out to a little bit, if

23  we average it out over the six years, to a little over $600,000

24  per year?

25  A.   Correct.

1    Q.   And so, the personal enrichment, another way to look at

2    that would be profit?

3    A.   Yes.

4    Q.   And so, my client is essentially profiting a little over

5    $600,000 per year, again, we're averaging over the six years,

6    and that's where that number is kind of coming from.  That's

7    fair to say, right?

8    A.   So, the analysis is based upon inflows and outflows from

9    accounts.  Yes.

10   Q.   Understood.  And I'm taking your number on its face, and

11   we're just talking about the annual profit would roughly be

12   about a little over $600,000 per year, if we average it, right?

13   A.   Six years times 600,000 is 3.6 million.

14   Q.   And so, I'm just ball-parking it.

15   A.   Yeah.

16   Q.   I'm not being exact.

17           MR. HARRINGTON:  Okay.  I have no other questions,

18   Judge.

19           MR. HUNTER:  Nothing further, your Honor.

20           THE COURT:  Yeah, I have a couple of questions.  I'm

21   not sure.  They are really more for counsel.  I just wanted to

22   consider keeping the witness on the stand.  But, no, no, it's

23   not necessary.  You're excused.

24           THE WITNESS:  Thank you.

25                    (Witness stepped down)

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United States v. Imran*

9    *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date: ___3/26/20            */s/ Brenda K. Hancock*
                                 Brenda K. Hancock, RMR, CRR
15                               Official Court Reporter

16

17

18

19

20

21

22

23

24

25