UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:18-cr-192-JL |
| v. | ) | |
| | ) | |
| IMRAN ALRAI | ) | |

## DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

Imran Alrai hereby requests that this Court dismiss these charges, as recently disclosed discovery reveals that the government engaged in shocking and flagrant discovery violations when it failed to disclose voluminous exculpatory evidence and engaged in a pattern of ridicule against defense counsel and false statements to the Court denying the existence of the very same documents when requested prior to trial.  Due to these repeated *Brady* violations,[1] this Court must now determine:

A. Did the government fail to disclose exculpatory *Brady* material and is there a reasonable probability that the result of the trial would have been different if this evidence were disclosed prior to trial?

B. Is the government responsible for the failure to disclose exculpatory evidence when some of the non-disclosure is attributable to a person or persons working with the prosecution?

C. Did the government's failure to preserve the IT environment at the United Way violate the defendant's due process right to potentially exculpatory evidence?

## I.    Introduction

This is a motion alleging *Brady* violations based upon the recent production of exculpatory evidence.[2]  Much of this new discovery relates to the expert testimony the government presented through Greg Naviloff, who concluded that United Way's ("UW") IT records showed that DigitalNet/Mr. Alrai engaged in astronomically excessive markups, duplicate billing and did not deliver services as contracted.  Doc. 130: 22-25; Doc. 130:46; Doc. 130:54.  This Court relied on this evidence in finding Mr. Alrai guilty.  Doc. 116: 85.  During his cross-examination at trial, Naviloff

---

[1] Defense counsel have only had these materials for less than a week, and the emails referenced herein only include those emails in which there is an obvious *Brady* violation and the non-disclosure is patently material.  It is likely that further review of these emails will reveal additional *Brady* violations.

[2] Much of this new discovery came only after this Court ordered it.  Doc. 156.

rebuffed defense counsel questions on his lack of IT expertise by claiming that he consulted with Diego Rosenfeld, an IT expert at his firm who had 20 years of IT experience. Doc. 130: 89. This was almost entirely untrue. More globally, the new discovery reveals the government's investigation, expert, witnesses, and case against Mr. Alrai were largely orchestrated by UW's attorney, John Commisso. Further, the government deputized Commisso to fulfill the government's *Brady* obligations, trusting him (as we now know, improperly) to turn over relevant evidence. Unfortunately, the new discovery reveals that Commisso withheld exculpatory evidence and the government sat idly by, while making what we now know to be false statements to Mr. Alrai's counsel and to this Court.

In the face of repeated pre-trial discovery demands, the government failed to disclose exculpatory evidence and instead made repeated representations that the sought-after materials did not exist. A recent discovery production not only contains voluminous impeachment evidence but also contains evidence impeaching the integrity of the investigation, including, *in part*;

- Emails and billing records which reveal that Naviloff's IT analysis was done by a relatively inexperienced associate at RSM, as opposed to a seasoned expert as suggested at trial (Exhibit 1);
- An email from RSM staff expressing concerns that they should bring a more senior IT expert "in the loop" as they were gearing up for testifying in the criminal case to make sure "he agrees with what we are relaying to counsel/AUSA;" (Exhibit 1)
- An email revealing a discussion about an earlier version of RSM's report on UW's losses where the RSM team decided to leave out a chart that showed that there was no significant change in IT costs during Alrai's/DigitalNet's tenure because it was not "fruitful;" (Exhibit 2);
- Emails from RSM employees discussing the possibility of getting forfeiture and restitution from Mr. Alrai, despite not being asked for their input on such matters;
- An email discussion with Naviloff where he considers whether producing a more expansive preliminary report to UW may allow Alrai access to the report during future criminal discovery (Exhibit 3);
- An email from John Commisso, counsel for UW, suggesting changes to an earlier version of RSM's findings that would make Mr. Alrai look more culpable and portray UW management in a better light (Exhibit 4);
- Emails that reveal that the U.S. Attorney's Office ("USAO") ceded to Attorney John Commisso their duty to discover exculpatory evidence; (Exhibit 5 at 2).
- An email that establishes that RSM and Attorney Commisso were on notice as to the defendant's pre-trial discovery request for any documents that formed the basis of

Naviloff's opinions (Exhibit 5 at 3-4);

- An email from Attorney Commisso to staff at RSM stating that he would review documents covered by the defendant's discovery request for "any issues regarding redaction, privilege, disclosure to the defendant, etc." (Exhibit 5 at 2); and

- Multiple instances of exculpatory evidence that was not disclosed due to the government allowing Attorney Commisso to be the gatekeeper of the discovery.[3]

The most troubling revelation from the recent document production is that the government made several false statements about the discovery in this case, including statements that the defendant has "everything that Naviloff relied upon" (Doc. 50:6), the defendant "has every document Mr. Naviloff considered" (Doc. 51: 4), and, more recently, that "there were no notes or memos memorializing" RSM's interviews with UW personnel. (Exhibit 7). Recent discovery has revealed hundreds of emails from other RSM staff that contain and/or reference charts, diagrams, calculations, notes of interviews, memoranda, and analyses relied on by Naviloff that was not produced prior to trial. This new discovery has also revealed that Naviloff's opinions were heavily shaped by consulting with Commisso. This fact, along with Commisso's biased involvement with the USAO's investigation of, and gathering of evidence against, Mr. Alrai, taints the scope of that investigation and of the government's case. These records would have provided voluminous impeachment materials demonstrating bias, motive and lack of credibility, would have undermined the testimony of John Meyer and Richard Voccio, and would have undermined the integrity of the government's entire case.

## II.    Procedural and Factual Background

On May 25, 2018, Attorney John Commisso, acting as UW's counsel, approached the USAO in Boston to report that Imran Alrai had been conducting "inappropriate activity." (Exhibit 8). On that date, the USAO determined that there was not enough evidence of criminal activity. Commisso and UW continued an internal investigation and, on June 1, 2018, approached the USAO a second

---

[3] There are far too many relevant emails to include in this Motion and only select emails are primarily submitted with this Motion. To ease the burden on this Court, a summary chart is provided as an Exhibit to this Motion, outlining Commisso's extensive involvement in the government's investigation, as a gatekeeper of evidence and decider of what was relevant to the prosecution, and his influence on the government's expert's report and opinions. Exhibit 6.

time.  *Id.*  The USAO in Boston did not pursue the case.  It is unclear why the N.H. USAO did.

On June 4, 2018, Commisso met with the FBI and N.H. Assistant U.S. Attorney, John Davis. At the time, Commisso and UW's Chief Administrative Officer, Richard Voccio, detailed the findings of their internal investigation regarding Mr. Alrai.  *Id.*  During the June 4, 2018 meeting, Commisso stated that he had hired a company called TBS to "work behind the scenes" regarding their investigation of Mr. Alrai.  *Id.*  On June 8, 2018, Commisso continued to communicate with the FBI and assisted them in responding to a grand jury subpoena involving this case.  (Exhibit 9).

On June 12, 2018, Imran Alrai was terminated by UW during an investigation that ultimately led to the charges before this Court.  Doc. 79:78. On June 19, 2018, Mr. Alrai, though counsel, sent a letter to Commisso requesting that he instruct UW to preserve all IT data during the ongoing investigation.  (Exhibit 10).  As Commisso was working with the USAO in June of 2018, it is a reasonable inference in that Commisso advised the USAO of this preservation request.  It is also a reasonable to conclude that the government had the ability to ensure the preservation of evidence in the control of UW, as it was working closely with UW at the time of the preservation request.

In July of 2018, Commisso hired RSM to conduct a forensic accounting investigation related to DigitalNet's services.  Doc. 130: 82 & Doc. 79: 78.  Recent emails reveal that much of their work at the time was focused on filing an insurance loss claim, asserting that they suffered loss due to Alrai's alleged fraud.  *See*, *e.g.*, (Exhibit 11).  The recent emails also show that RSM and Commisso were compiling a report to the board of directors of United Way regarding this same issue. (Exhibit 3).  The new emails show that Commisso took an active part in this investigation, including sending documents to RSM to consider and even, strikingly, reviewing documents from RSM to decide whether they should be sent to the USAO, *after* RSM was retained by the USAO as an expert.  *See*, *e.g.*, (Exhibit 12).

The new emails also demonstrate that Naviloff primarily relied on the analyses and opinions

of Ryan Gilpin, who graduated from college two-and-a-half years' earlier,[4] as opposed to RSM's more seasoned IT expert, as Naviloff claimed at trial.  Doc. 130:89.  In one email titled "Meeting to Discuss IT Related Info Requests and Questions to Date," Naviloff said, "Ryan you are central to the team." (Exhibit 13).  The RSM team refers to "Ryan's analysis." (Exhibit 14).  Gilpin sent an email to the RSM team, reporting on his findings regarding DigitalNet web development costs.  (Exhibit 14). Gilpin sent an email and chart to the RSM team detailing the status of one of his findings.  (Exhibit 15).  A member of the RSM team told Gilpin to "move it along."  (Exhibit 14).  More emails show that members of RSM relied on Gilpin to conduct IT analyses. (Exhibit 16). Gilpin's central role in the IT analysis is material because, at trial, Naviloff claimed that he relied on an IT expert at RSM when, in fact, he was heavily relying upon an inexperienced associate.  These new documents are also material as they are inconsistent with Naviloff's trial testimony that the associates who worked for him did not provide any reports to him.  (Doc. 130 at 89).

RSM continued to work on preparing a report for UW into the fall of 2018. (Exhibit 3). Another new email, sent on September 10, 2018, revealed a discussion about an earlier version of RSM's report where the RSM team decided to leave out a chart that showed that there was no significant change in IT costs during Alrai's/DigitalNet's tenure because it was not "fruitful." (Exhibit 2).  On October 4, 2018, Commisso sent an email to Naviloff and other members of the RSM "team," making numerous revisions to their findings, including a suggestion that Naviloff  "delete reference to collusion among multiple individuals…change to Alrai executed a complex fraud scheme, which included gaining trust and deceiving multiple individuals." (Exhibit 3).  In this same email, Commisso queried Naviloff as to whether RSM should present a more expanded version of their data or a truncated version. (Exhibit 3).  In response to this question, Naviloff stated: "Perhaps a matter of

---

[4] It appears that Gilpin did receive a master's degree in IT in 2018.  These dates are not on Mr. Gilpin's CV and counsel found this information on Mr. Gilpin's LinkedIn page.  *See* https://www.linkedin.com/in/rpgilpin/.

privilege and what would be available by Imran if he is charged and requests docs as part of discovery."
(Exhibit 3).  In another email around the same time, Commisso provides extensive revisions and
"requested changes" to RSM's findings. (Exhibit 17).  In fact, in that same email chain, Naviloff admits
that the "level of subjectivity" as to RSM's findings on excessive billing ($1.8 million in loss) is higher
than that for duplicative billing and services not performed (only $1.6 million), indicating that all three
findings were influenced by subjective considerations, but particularly the findings that represent more
than half of the loss calculation.  *Id.*

      In November of 2018, RSM began to shift its focus to the looming criminal case against Mr.
Alrai.  In one of the newly disclosed emails from November 2018, Naviloff states: "I had a good
meeting with the US Attorney – sounds like much of the case will fall upon RSM's testimony if they
bring criminal charges." (Exhibit 18).  Another responds, "Great news." (Exhibit 19).  A fair
assumption is that RSM anticipated receiving additional revenue, which it clearly did.  *See* Doc. 154-5.

      As documented in another email, on November 28, 2018, Naviloff told the RSM team: "Call
with U.S. Attorney went well based on info you provided." (Exhibit 20).  Another new email reveals
that, on November 28, 2018, a RSM team member sent an email to Naviloff observing that RSM
should bring a more senior IT expert "in the loop," as they were gearing up to testify in the criminal
case, to make sure "he agrees with what we are relaying to counsel/AUSA." (Exhibit 1). On November
29, 2018, Commisso emailed Naviloff, stating that Imran had been indicted.  (Exhibit 21).

      On July 17, 2019, Greg Naviloff began working for the USAO as an expert witness. (Exhibit
22).  As Naviloff said that he was retained to "provide the evaluation that I already had done" for UW,
any prior claim of confidentiality as to Naviloff's evaluation done for UW was thus waived.  *See* Doc.
130:85; *United States v. MIT*, 129 F.3d 681, 687 (1st Cir. 1997); *In re Tyco Intern., Inc. Multidistrict Litigation*,

2004 WL 556715, at *1 (D.N.H.,2004).[5]  On July 30, 2019, counsel for Mr. Alrai sent a detailed letter

to the USAO, *see* Exhibit 5 at 3-4, requesting, in part:

1) all reports prepared by Greg Naviloff, RSM and its employees…relative to RSM's investigation of the loss resulting from Mr. Alrai's alleged fraudulent conduct;
2) A copy of all documents and other data collected and reviewed by RSM in calculating UWMB's loss; and
3) Any explanation of the methodology used by RSM in calculating UWMB loss.

Trial counsel's request was forwarded to both Naviloff and Commisso.  *Id.* at 2.  In response,

Commisso emails Naviloff, "I'm going to review these and consider any issues regarding redaction,

privilege, disclosure to the defendant, etc."  *Id.*[6]  The government did provide Naviloff's report on

October 18, 2019, Doc. 47: 2, but nearly all the requested documents went unproduced.[7]  Yet,

Naviloff's report noted that some work was "performed by staff under my supervision" and that he

"had discussions with various UWMB employees" regarding his findings.  Doc. 154-2, at 3, 6.

Mr. Alrai's efforts to gain access to the relevant data from UW culminated in a motion to

exclude Naviloff's expert testimony at trial.  Doc. 47.  The government replied by stating: "[i]f such

documents existed, they were provided to the government and produced to the defendant."  Doc. 50:

2.  The government dismissively labeled the assertions in Mr. Alrai's motion as "false."  Doc. 50:6.

The government further claimed that "defendant [has] everything that Mr. Naviloff relied upon…"

Doc. 50: 6.  On the eve of trial, the government did provide the names of UW employees interviewed

by RSM, though RSM claimed they have no documentation of those interviews.  *See* Doc 154-3.  To

---

[5] "[A] party may not waive the attorney-client privilege for its own benefit to a third-party government agency, then hide behind the privilege in civil litigation." *Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 596–97 (N.D.Fla. 2010) (citation omitted); *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414,1418 (3rd Cir. 1991) (disclosing documents to the SEC and the DOJ to cooperate with investigation waived privilege).  "Indeed, even if the disclosing party requires, as a condition of disclosure, that the recipient maintain the materials in confidence, this agreement **does not prevent the disclosure from constituting a waiver of the privilege**; it merely obligates the recipient to comply with the terms of any confidentiality agreement." *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 480 (S.D.N.Y. 1993) (citation omitted).
[6] It is worth noting that Naviloff continued to consult with Commisso about document production, even though he had been retained to work for the USAO.
[7] None of the emails discussed in this Motion were produced prior to trial.

clarify, the government has never, to this day, produced any work "that was done for [Naviloff]."

On June 2, 2020, the defendant sent a post-conviction discovery request letter to the government. *See* Doc. 138-1. After objecting to a related motion, on July 28, 2020, the government provided some, though not all, of the materials requested. *See* Doc. 154-4. On that date, the government provided summary billing statements from RSM to the USAO. These show that RSM billed for 384 hours in preparing their expert report. *See* Doc. 154-5. Of that 384 hours, Naviloff billed only 89 hours, which is about 25% of the time spent. Rosenfeld, upon whom Naviloff claimed he relied for IT expertise, billed only one hour. In the July disclosure, the government confirmed that there were a "limited number" of relevant internal RSM emails, yet they initially refused to provide them. *See* Doc. 154-4. This, too, appears to have been inaccurate, in light of the *hundreds* of emails recently disclosed. *See* Exhibit 23. On top of that, during a separate attempt to determine why the government's pre-trial discovery production was inadequate, the government represented that there were no notes or memoranda memorializing RSM's interviews with UW staff. (Exhibit 7). The recently disclosed emails reveal this, too, was misleading. (Exhibit 24). One inaccurate representation may be just reckless; but when a pattern has developed of misleading the defendant to believe no sought-after evidence exists, there are deeper and more problematic concerns at issue.[8]

Finally, it is worth noting that RSM billed the government more than $100,000 for their expert services in this case and billed the UW more than $400,000. Doc. 154-6. Additionally, UW has

---

[8] Interestingly, these latter misrepresentations come during a period of time throughout which the government has accused Mr. Alrai of providing incomplete statements with regard to repatriation. Having been caught making misleading and incorrect statements which have had profound effects on Mr. Alrai's case, the government's intentions in that regard should be examined far more skeptically. **Notably**, despite the government's speculative and over-the-top assertions that Mr. Alrai was untruthful in filings with this Court, its attempts to benefit from that speculation, and its latest demands that he "show cause" for why he should not be held in contempt, the government has made ***absolutely no effort to correct the record and withdraw the false statements it made to this Court***. Specifically, the government represented to this Court that the defendant has "everything that Naviloff relied upon" (Doc. 50:6) and the defendant "has every document Mr. Naviloff considered" (Doc. 51: 4). There can be no dispute: this was a clearly false statement. Yet, despite the ethical obligation it has to correct the record (the same obligation Mr. Alrai's prior counsel felt and which the government has tried to use against Mr. Alrai), the government has failed to meet its ethical duty.

claimed that it has paid a whopping **$486,980.50** in legal fees related to this case and an additional **$56,159.22** in "E-Discovery Expenses." (Exhibit 25). Thus, UW supposedly paid Commisso and an e-discovery vendor more than **half-a-million dollars** relating to this case.  If Commisso was not, for all intents and purposes, the government's associate, then it is difficult to explain these expenses. Along with the emails, this paints a clear picture of Commisso's intimate involvement in Mr. Alrai's prosecution, as an agent of the government.  In fact, Commisso admitted as much in the very same letter.  *See id.* (citing case law to support his claim to expenses for "**participation in the government's investigation and prosecution of the offense**," noting that he "first spoke with an Assistant U.S. Attorney in late May 2018 and had the first meeting with the prosecutor and agents in early June 2018," and claiming fees for "[o]versight of the e-discovery and document production efforts," "[w]itness preparation and witness meetings with prosecutors and agents," and "[m]eetings, correspondence, and telephone calls with prosecutors and agents").

And the government was long aware of Commisso's biased role.  *See, e.g.*, (Exhibit 26) (in an October 2019 email from Naviloff to the USAO, relating to Mr. Alrai's pre-trial discovery requests, Naviloff notes that Commisso "controlled" the "investigation procedures" and that Commisso assisted in "identif[ying] the [ ] potential relevant emails" relating to RSM's findings in preparation for trial).  In fact, in light of the recent discovery, yet another pre-trial misrepresentation is identified.  In that October 2019 email, Naviloff tells the government, which then represents to Mr. Alrai, that there was "no documented email communication or interview notes" regarding Andar and "'figures' used in our proof of loss claim."   We now know this to be incorrect.   Indeed, there were email communications regarding Andar and its "figures," and Gilpin actually notes, in an email to Naviloff, that he will write a "final summary memo" documenting his meeting with Andar. (Exhibit 14).

III.   **Legal Arguments**

"[A] district court may dismiss the indictment when the prosecution's [*Brady* violation] actions

rise . . . to the level of flagrant prosecutorial misconduct." *United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008).[9]  "The prosecution is trusted to turn over evidence to the defense because its interest 'is not that it shall win a case, but that justice shall be done.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1133-34 (9th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

A.  The government failed to disclose exculpatory *Brady* materials and, had they been disclosed, there is a reasonable probability that the result of the trial would have been different.

The afore-mentioned evidence demonstrates that the government's *Brady* violations involved evidence which would have significantly undermined Naviloff's bias, motive, credibility and expertise, and the government cannot credibility dispute this.  One of the arguments the defense anticipates from the government is that these *Brady* violations would not have resulted in a different outcome and/or they were not responsible for the non-disclosure, as the documents were in the possession of a third party.  This fails because the damage done to the government's case by this new evidence is not confined to Naviloff, but would have provided counsel with an opportunity to challenge the good faith and integrity of the entire investigation.  *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995).  Instead of taking control of the evidence in this case, the government ceded its duty to discover relevant and exculpatory evidence to Naviloff and Commisso, whose biases are on display in the hundreds of emails recently disclosed.  The new emails show that Commisso was a gatekeeper of documents, influenced the language and findings in the expert report, and had numerous discussions about the case with other trial witnesses.  *See, e.g.*, Exhibit 27.  These emails also show that Commisso and RSM were motivated to get the loss number as high as possible.  And the emails show that Naviloff and Commisso were in cahoots, early on, to shield exculpatory information from Mr. Alrai.  *See* Exhibit 3.

Not only would this evidence have been fodder for cross-examination of Naviloff, but it would have undermined the entire case, as Commisso was the gatekeeper of all the evidence.  *See, e.g.*, Exhibit

---

[9] Although Mr. Alrai asserts that the government's flagrant misconduct, as detailed exhaustively herein, necessitates a dismissal with prejudice, Mr. Alrai reserves, as an alternative remedy, dismissal without prejudice.

28; Exhibit 29; Exhibit 26; Exhibit 17.  Whether he withheld significant exculpatory evidence (as RSM and Commisso were caught doing, *see* (Exhibit 2)) should have been an adverse inference this Court should have been entitled to draw.  And, more broadly, it would have been an opportunity to challenge the good faith and integrity of the entire investigation, which should, itself, be grounds for dismissal. *See Kyles*, 514 U.S. at 445.  As the emails demonstrate, RSM's credibility issues are not confined to Naviloff.  RSM interviewed other witnesses in this case, under the direction and supervision of Commisso, with Commisso deciding who had access to evidence, how witnesses were prepared, and how evidence and witnesses would be incorporated into RSM's opinions and, more generally, the government's case. *See*, *e.g.*, Exhibit 27.  In short, these issues infected the government's entire case.

Compounding the prejudice from these non-disclosures is the fact that the government affirmatively misrepresented to the defense that it had everything relevant to Naviloff's opinions, successfully misleading the defense to believe that it had no ability to properly impeach Naviloff, the government's star witness as to *actual fraud*.  The government even referred to what we now know to be a legitimate discovery request as a "desperate fishing expedition." Doc. 50:10. The government's misleading assertions resulted in a likely change in trial strategy and significant prejudice.  As the government relied heavily on Naviloff, and as Naviloff's testimony formed the basis of the Court's convictions, the government fully exploited its misrepresentations.  Moreover, the government appears to have made other pre-trial misrepresentations, with regard to specific requests for discovery. *See* (Exhibit 26); (Exhibit 14).  And its misrepresentations did not stop when the government obtained favorable verdicts.  In recent months, the government has made (at least) two additional inaccurate and misleading statements as to exculpatory evidence: (1) that there was only a "limited" number of emails responsive to Mr. Alrai's requests, made prior to the disclosure of 600+ emails; and (2) that no notes or memoranda exist as to RSM's meetings with UW staff, made prior to the disclosure of emails referencing note-takers and even a specific person whose specific job it was to take notes of those

11

meetings, *see* (Exhibit 24). The government should not be able to make affirmative misrepresentations that affect the viability of its case against Mr. Alrai and get away with it.

A brief examination of trial testimony demonstrates the obvious prejudice.  Prior to trial, the government stated that "Mr. Naviloff has not and will not opine about the legitimacy or the contract procurement process or the legal conclusion of whether the defendant defrauded UWMB…"  Doc. 51: 4. At trial, Naviloff testified that he reviewed numerous documents that he claimed established that the services rendered by DigitalNet included services that "were overbilled, duplicate billed or were not delivered." Doc. 101: 12.  Mr. Naviloff gave side by side comparisons of the value of certain IT services, as he offered opinions that records demonstrated that the defendant engaged in mark-ups,[10] double billing[11] and billing for services not provided.[12]  Trial counsel attempted to discredit this testimony by cross-examining Naviloff on the fact that he was not an IT expert.  Doc. 130: 88-89. Naviloff fended off this attack on opinion by stating that he consulted with Diego *Rosenfeld*, who Naviloff described as having 20 years of experience in "technology consulting solutions." Doc. 130:89.

If the government had made a pre-trial disclosure of the billing information disclosed post-conviction, trial counsel would have been able to cross-examine Navliloff on the fact that 75% of the billing time on this case was done by persons other than himself. (Exhibit 30). They could have cross-examined Naviloff on the fact that the only person who worked on his expert report was the inexperienced Gilpin.  *Id.* This would have been *particularly* successful where Naviloff had testified at trial that he relied upon Rosenfeld to render IT opinions, a statement we now know was untruthful. In fact the recent emails reveal an obvious attempt at covering up Gilpin's inexperience and would have seriously undermined Naviloff's testimony: Rosenfeld billed only *one hour* in this matter, did so *on the eve of trial*, and did so *after* RSM conspired to cover up its lack of IT expertise.  Doc. 154-5;

---

[10] *See* Doc. 130: 22; Doc. 130: 24; Doc. 130: 32: 55.
[11] *See* Doc. 130: 23; Doc. 130: 45-46; Doc. 130: 48-51.
[12] *See* Doc. 130: 54.

Exhibit 1.  Trial counsel could have moved to exclude Naviloff's testimony because it violated his right to cross-examine witnesses against him.  *See Bullcoming v. New Mexico*, 564 U.S. 647, 663 (2011). They could have challenged Naviloff's expertise under Fed. R. of Evid. 702.  *See Williams v. Illinois*, 567 U.S. 50, 80 (2012).  Trial counsel could have issued subpoenas to the other RSM staff who contributed to the expert report and questioned them about their lack of expertise in IT.  And trial counsel could have cast doubt on the entirety of Naviloff's testimony and the credibility of the government's case, based on Commisso's and RSM's biased evaluation of which evidence was relevant to the government's case. Further, by leading the defense astray, stating it had "everything that Mr. Naviloff relied upon," the government misled the defense to believe that the evidence we now know exists, did not exist.  *See McCambridge*, 266 F.3d at 24 (citation omitted).  This likely led the defense to change its strategy and deprived the defense of what would have been an effective strategy at trial.  *See id.*

Perhaps just as prejudicial was the government's failure to provide *Brady* material relating to Meyer's opinions, information concerning his IT environment analysis, and Commisso's involvement, which inhibited the defense from undermining the credibility of Meyer's testimony.  Not only did the government fail to provide the necessary impeachment and exculpatory evidence, but the government went further—it held its failure to do so *against Mr. Alrai*, crossing his expert as follows: "And isn't it true that John Meyer, as you testified, is in a better position than you or Mr. Naviloff to assess the system he inherited from DigitalNet and Mr. Alrai."  Doc. 101: 22.  Not only was Mr. Alrai prevented from effectively cross-examining Meyer, but the government exacerbated that prejudice.  This is important, because Meyer provided corroboration for Naviloff's compromised opinion.  Because these violations *directly*[13] resulted in convictions, the government's prejudicial misconduct was flagrant.

---

[13] In finding the defendant guilty, this Court quoted from Naviloff's testimony, stating, "The duplicate billing, the failure to render services in some cases, the astronomically excessive markups establish fraud, as did the depravation of the victims' control over their property and assets. That's when viewed through the light of the defendant's many lies, deceptions and concealments of various facts, material facts, including his conflict of interest and affiliation with DTS." Doc. 116: 85-86.

One recent Ninth Circuit case is strikingly similar to this case, down to the government's pre-trial hyperbolic (and inaccurate) assertions that the defense was engaging in a "fishing expedition." *See United States v. Bundy*, No. 18-10287, 2020 WL 4517572 (9th Cir. Aug. 6, 2020). In *Bundy*, the Ninth Circuit affirmed a decision dismissing, with prejudice, the indictments after evidence and testimony came to light, days into trial, that "was arguably useful to the defense and should have been produced to the defendants well before trial." *Id.* at *1. The case stemmed from a standoff between the Bundys, a group of armed followers, and the federal government. *Id.* "A central pillar of the government's case was the allegation that the defendants recruited armed followers by intentionally deceiving those followers into believing that the Bundys feared for their lives because the government snipers surrounded their ranch," which the government echoed in opening statements. *Id.* at *4. The defendants had made a number of pre-trial discovery requests for potentially exculpatory evidence, including evidence that could negate the government's scienter theory, showing the presence of armed officers surrounding the ranch, and of threat assessments the federal government had completed on the defendants. *Id.* at *4-6. Instead of providing the requested information, the government fought through a discovery dispute, referring to the requests as a "fantastical fishing expedition." *Id.*

When trial began, however, testimony and late disclosures by the government revealed that the requested evidence did, indeed, exist. *See, e.g., id.* at *5-6. At first, "[t]he court [ ] expressed its dismay with the government that important evidence was being produced so late and, in particular, that the government had made 'representations . . . that things did not exist but ultimately were found to exist.'" *Id.* at *5. Ultimately, as more evidence was discovered, the district court dismissed the indictment with prejudice, finding in part that the government had been "misleading in its earlier representations" and reasoning "that retrying the case would only advantage the government by allowing it to strengthen its witnesses' testimony based on all the knowledge gained from the information provided by the defense and revealed thus far." *Id.* at *7, *9 (brackets omitted). The

government's failure "to look beyond the FBI file . . . constituted a reckless disregard for its constitutional obligations to learn and seek out favorable evidence." *Id.* (punctuation omitted).

The Ninth Circuit found that some of the material could have "undermined the government's theory that the defendants intentionally lied about fearing government snipers," even if the "significance of the evidence" was arguably not great. *Id.* at *10. It found that other evidence, even if duplicative, could have had impeachment value. *Id.* at *10-11. The court noted that "once the government turned over the *Brady* material, it may have realized it might be difficult to pursue the case it had promised in the indictment and the opening statement . . . not only would the *Brady* documents affect the *defendant's* strategy, it might well have altered the *prosecution's* strategy." *Id.* at *19. As "other courts have recognized," the court found "great prejudice [ ] when a defendant is denied access to evidence challenging the government's central theory of the case until mid-trial." *Id.* at *20.

Although the government claimed inadvertency, the court noted that the "government made no effort to locate the [relevant] documents" and that "[t]he prosecution has an affirmative obligation to learn of potentially favorable evidence and provide it to the defense." *Id.* at *15 (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). This includes "favorable evidence known to the others acting on the government's behalf." *Id.* But "[r]ather than looking into the request and locating the documents before trial began, the government chose to fight rather than respond to the request. This was a deliberate choice." *Id.* at *15-18. Although the government, "[i]n an effort to absolve itself of responsibility," pointed to a discovery order not requiring disclosure, the court stated: "A court does not have the same degree of familiarity or access to the evidence that a prosecutor has. Hence, it is prosecutors, not courts, that are presumed to recognize the significance of evidence." *Id.* at *15-16 (punctuation omitted). "[P]rosecutors cannot hide behind a court's discovery order." *Id.* at *16.

The similarities to this case—specifically, the *Brady* violations as to Naviloff—cannot be missed. Almost identical to *Bundy*, the government here claimed that Mr. Alrai was engaging in a

"desperate fishing expedition." Doc. 50:10. Just like in *Bundy*, it turns out that it was not so desperate after all. Instead, just like in *Bundy*, the government fought Mr. Alrai's discovery requests, leading to a discovery dispute, a misleading assertion that Mr. Alrai had everything that existed, a forced abandonment of trial counsels' strategy, and a doubling down on the government's central theory in relying nearly entirely on Naviloff to establish loss. Unlike *Bundy*, however, the government here actually had *knowing possession* of at least some of the requested impeachment evidence, namely, Naviloff's billing, showing that Mr. Alrai's concerns that Naviloff's opinions relied heavily on those of others were well-founded and that the government's assurances to the contrary were, in fact, untrue. Unfortunately, just like in *Bundy*, Mr. Alrai discovered for the first time *during trial* that information he suspected might exist, and had specifically requested, indeed did exist. Mr. Alrai also discovered during trial that Meyer would render expert opinions and would testify as to facts and opinions of others.

These violations ultimately led to Mr. Alrai's convictions. Specifically, just like in *Bundy*, the late-disclosed evidence was central to undermining the government's primary theory. The government presented evidence through Naviloff of duplicative billing, astronomical markups, and services not rendered, all of which required expertise in IT services. The government did not, however, disclose that Naviloff relied upon IT expertise of others or the identities of those others. And the Court explicitly relied upon the testimony of Naviloff in convicting Mr. Alrai. Doc. 116: 85-86. The Court and Mr. Alrai's trial counsel found out, for the first time, that Naviloff relied on IT opinions of others at trial, during Naviloff's testimony. The government's recent disclosures reveal that numerous others billed **75%** of the hours worked by RSM in compiling Naviloff's opinions. They reveal that an inexperienced associate was "essential" to Naviloff's IT opinions. They reveal that the government's expert, collaborating with Commisso, actively attempted to shield exculpatory evidence from Mr. Alrai. They reveal that the government handed over the reins to Commisso to investigate the case, collect evidence, and present what turned out to be evidence that only helped the government's case.

16

And they reveal that Commisso himself was actively involved in preparing Naviloff's expert report and preparing witnesses such as Meyer. Despite the existence of these disclosures, the government had claimed—just like the government did in *Bundy*—that Mr. Alrai had everything he needed. That was misleading. And, based on that misleading assertion, this Court denied Mr. Alrai's pre-trial motion to exclude Naviloff's testimony. But just like in *Bundy*, this Court did not have the information that the government had all along: significant impeachment evidence relating to the government's key witness and exculpatory evidence as to the credibility and good faith nature of the government's entire investigation and case against Mr. Alrai. This is significantly prejudicial. *See United States v. Shafer*, 987 F.2d 1054, 1056, 1058-59 (4th Cir. 1993) (dismissing the case where the government lost evidence that significantly undermined the testimony of key witnesses, reasoning that the government cannot enjoy the benefit of a "dry run" of the case, able to correct the deficiencies it caused).

And if, just like in *Bundy*, the government were to claim that Mr. Alrai knew that Naviloff relied on the expertise of others, that argument would be mitigated by the fact that Mr. Alrai had no *specific* information that he could use to impeach Naviloff. *See Bundy*, No. 18-10287, 2020 WL 4517572, at *10. Mr. Alrai needed this information to challenge *the* key witness on *the* central theme of the government's case—which the government needed to prove or else be left with a failure to disclose a conflict of interest which does not, by itself, constitute fraud.[14] He needed to be able to point to the young, inexperienced associate as the brain behind the IT opinions, rather than the 20-year veteran falsely represented as the person on whom Naviloff relied. Because the government did not offer Meyer as an IT expert, and in light of Naviloff's newfound credibility issues, the defense likely would have changed its strategy with regard to Meyer, which would have been bolstered by the newly

---

[14] *United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016) (stating that if a defendant "merely 'induce[d] [the victim] to enter into [a] transaction' that he otherwise would have avoided," but the victim nevertheless received the benefit of his bargain—i.e., suffered no harm to a monetary or property interest, which is to say a financial interest—that would be "'insufficient' to show wire fraud.").

discovered impeachment evidence on Meyer. And to the extent the government argues that there was independent evidence of fraud, absent Naviloff or Meyer, this newly disclosed discovery would have undermined the credibility of any independent evidence or witness testimony, as Mr. Alrai would have been able to cast due doubt on the government's investigation and case based on Commisso's role in infecting the entire case. The government would then be left trying to prove that Mr. Alrai lied about DigitalNet's capabilities and experience. But without IT valuation expert testimony, without a credible Naviloff, and without an expert-qualified and credible Meyer, that effort would have failed spectacularly and the government surely would have had to abandon it. The entire prosecution would then stand on whether Mr. Alrai's conflict of interest and omissions as to his relationship with DigitalNet were, alone, sufficient to establish fraud. The case law is clear: that is simply not sufficient. *United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016) (emphasis in original), *as modified on reh'g*, 838 F.3d 1168, 1170 (11th Cir. 2016) (stating that if a defendant "merely 'induce[d] [the victim] to enter into [a] transaction' that he otherwise would have avoided," but the victim nevertheless received the benefit of his bargain—i.e., suffered no harm to a monetary or property interest, which is to say a financial interest—that would be "'insufficient' to show wire fraud"); *see also*, *generally*, Doc. 137.

In sum, the government's *Brady* violations and explicitly misleading pre-trial assertions directly affected the defense's strategy at trial. But, just like in *Bundy*, its disclosure would have altered the prosecution's strategy as well. The government would have had to acknowledge that it would be difficult to pursue the case it had promised in the indictment, opening statement, and throughout trial. Had the defense been able to attack Naviloff's, Meyer's, and others' credibility, the government's case would have collapsed. And had the defense been able to reveal the government's "investigation," scope of evidence, and the credibility of its case for what it really was—doctored, with the government's permission, by UW's own counsel—the government would have been in dire straits, on the precipice of what would have been a failed prosecution.

18

The government's failure to abide by its *Brady* obligations is more than just simple negligence. At best, it is reckless. More accurately, however, it was, to some degree, intentional. For example, the billing records that the government has now deemed appropriate to disclose were known to the government before trial, as those billing statements were addressed to the USAO. And yet the government, in a clear example of flagrant misconduct, not only failed to disclose this information, but also fought Mr. Alrai's attempts to discover it, going as far as to assert, misleadingly, that Mr. Alrai had everything that existed and that he was "desparate[ly]" searching an abyss. But even if the government did not have possession of the billing, and other information, regarding Naviloff, Meyer, Commisso, and others, it still would have been obliged to seek information that may be favorable to the defense. The government hired Naviloff and RSM and elicited prosecutorial help from UW and Commisso, making them the government's subordinates and agents and triggering a *Brady* obligation with regard to material they held, just like the various agencies assisting the government in *Bundy*. It even went so far as to allow Commisso to pick and choose which evidence best fit the government's case, while ignoring any exculpatory evidence. The government either willfully disregarded this information, and the discovery it has now deemed safe to disclose, or the government intentionally withheld it. And all along (and to this day) the government has cast aspersions at the defense and mocked its discovery efforts. This is flagrant misconduct and grounds for dismissal with prejudice.

B.  The government is responsible for the failure to disclose because RSM's and/or Commisso's roles in the case were the functional equivalent of being part of the prosecution team.

"The government's duty to disclose extends beyond material in the prosecution's possession." *Moreno-Morales v. United States*, 334 F.3d 140, 146 (1st Cir. 2003). "A prosecutor 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . ..'" *Id.* (quoting *Kyles*, 514 U.S. at 437). This duty covers material that prosecutors witness or observe and those which prosecutors have *access* to. *Id.*; *Moreno-Morales*, 334 F.3d at 147. And this makes sense, as prosecutors cannot solicit the help of others or use others' records or materials to gather prosecution

evidence while ignoring or failing to retrieve defense evidence.  *See, e.g., United States v. Cerna*, 633 F. Supp. 2d 1053, 1060 (N.D. Cal. 2009) ("Once inside the stacks with permission to rummage about for prosecution evidence, the federal authorities must search for and retrieve defense evidence bearing on the same question.").  In fact, the government has a duty "to turn over all favorable evidence known to the prosecutor or that he *could have learned from others acting on his behalf*."  *Id.* (emphasis added).  That "other" person or entity "has voluntarily obligated itself to the *Brady* obligation," as it "has invited the federal authorities into its file room and given access to the evidence."  *Id.*  In other words, the government cannot enlist the help of others as partners in the prosecution, but then turn a blind eye to defense evidence or allow for the destruction of same.  Such would be fundamentally unfair.

Even more improper is refusal of, or an incomplete response to, a "specific and relevant" request for disclosure.  *See United States v. DiCarlo*, 575 F.2d 952, 958-59 (1st Cir. 1978) ("Refusal of a 'specific and relevant' request 'is seldom, if ever, excusable.'") (citation omitted); *see also McCambridge v. Hall*, 266 F.3d 12, 23-24 (1st Cir. 2001) (noting that a failure to respond completely to a specific discovery request "suggests to the defense that such evidence does not exist" and results in a "misleading representation [which] can result in important changes in trial strategy," especially where such a misleading representation is "fully exploited" by the government at trial).

Finally, the government's duties extend to a duty to investigate *Brady* material.  *See Moreno-Morales*, 334 F.3d at 146; *In re Sealed Case No. 99–3096*, 185 F.3d 887, 892 (D.C. Cir. 1999) (noting a violation can "include both the failure to search for *Brady* material and the failure to produce it"); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  "[T]he government cannot shield itself from its *Brady* obligations by willful ignorance or failure to investigate." *United States v. Quinn*, 537 F. Supp. 2d 99, 110 (D.D.C. 2008); *id.* ("[L]ack of timely investigation by the government [is] an action that constitute[s] a breach of the government's 'duty to search' for *Brady* information.") (quotations omitted).

To be clear: the government had knowing possession of the previously undisclosed billing

records,[15] which, in and of itself, is notice of material exculpatory evidence. Any third-party issue is limited only to the previously undisclosed emails. But the government here was under a duty to disclose information in the possession of UW, RSM, Commisso, and Meyer. This is because the government enlisted their help in its prosecution. The government began this effort before Meyer was even associated with UW, before the IT environment was destroyed, and before Naviloff began his review. Exhibit 8; Doc. 79:78; Exhibit 9. The government then proceeded to use UW and RSM to conduct investigations, to uncover helpful evidence, and, ultimately, to assist it at trial.

And, all along, Commisso was orchestrating the government's case. Indeed, much of the discovery in this case is labeled "COMMISSO." *See*, *e.g.*, Exhibit 31. As the newest discovery reveals, the government allowed Commisso to collect and filter the evidence for it and relied on Commisso as the gatekeeper of relevant documents: what was deemed inculpatory was passed on to the government while the exculpatory evidence, apparently, remained hidden. And Commisso's involvement did not end after RSM became the government's expert—rather, Commisso remained in close talks with Naviloff and RSM, continuing to influence the information that made its way to the USAO and continuing to influence the government's expert's opinions. All of this clearly makes UW, Naviloff, RSM, Commisso, and Meyer the government's "agents" or "subordinates" for the purpose of disclosing *Brady* material. In fact, the government appears to have already admitted that documents and material in Commisso's possession was in the government's "possession, custody, or control" for the purpose of its discovery obligations. *See* (Exhibit 32) ("We have provided, on 9/30/19, certain UW policies and other documents: 18R148_**COMMISSO**-00020 – 200. No **additional responsive documentation** is in our possession, custody, or control." (emphasis added)). Therefore, the government was responsible for inquiring about, searching for, preserving, and disclosing evidence favorable to the defense which was in the possession of UW, RSM, Naviloff, Commisso, and Meyer.

---

[15] The billing records were address to the USAO and apparently delivered contemporaneously.

This is especially true where the defense specifically requested, via an ultimate discovery dispute, the evidence as to Naviloff's opinions. Doc. 47.[16]  As to Meyer, the government should have voluntarily disclosed such material.[17]  *See* Doc. 154 (setting forth *Brady* material relating to Meyer and others).

Thus, the government, having deputized UW and its employees from the very beginning in pursuit of its case against Mr. Alrai, was required to disclose favorable information in the possession of, or relating to, UW, RSM, Commisso, Naviloff, and Meyer.  *See, e.g., Quinn,* 537 F. Supp. 2d at 110 ("[T]he government, even once on notice of a serious issue regarding [a witness's] truthfulness, made no pre-trial effort to review the [relevant] materials and assess [his] truthfulness or culpability…..").

C. <u>The government failed to ensure the preservation of necessary defense evidence.</u>

Prior to trial, Mr. Alrai retained the services of Jason Sgro, an IT expert with certifications in IT infrastructure and IT project management.  Doc. 109: 136.  At trial, Sgro testified that to "accurately understand the IT environment [at UW], you need to see that environment."  Doc. 101: 141-142.  The government—despite recruiting UW as partners in Mr. Alrai's prosecution—allowed UW to destroy the IT environment, despite a request from Mr. Alrai to preserve same.

Courts have found that the government's failure to ensure the preservation of evidence that is potentially useful to the defense is grounds for dismissal.  *See California v. Trombetta,* 467 U.S. 479, 489 (1984) (holding that the government violates the defendant's right to due process if the evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"); *Arizona v. Youngblood,* 488 U.S. 51, 56–57, n. * (1988) (noting that the bad faith analysis in this context turns on the government's knowledge of the apparent exculpatory value).

---

[16] It should be noted that, even though Meyer offered numerous expert opinions at trial, the government did not disclose him as an expert.  Accordingly, the defendant likely did not pursue discovery requests as to Meyer's underlying opinions, as the government did not represent that Meyer would render any opinions.

[17] This is especially true where the government failed to disclose that Meyer would even be rendering expert opinions, which he did.  *See* Doc. 150.

In *United States v. Zaragoza-Moreira* 780 F.3d 971 (9th Cir. 2015), for instance, defense counsel sent a letter to preserve a video relevant to the defense. *Id.* at 976. Two months later, a trial court ordered the government to preserve the video, but it had already been destroyed a month after the defense had requested it. *Id.* The court concluded that the video was potentially useful evidence and found there to be a "conscious effort to suppress exculpatory evidence," because there was "no attempt" to preserve or even view the video before it was destroyed. *Id.* at 978, 980. The court found it "particularly disturbing" that the government failed to act in response to defense's letter. *Id.* at 981.

Moreover, courts have found that it is not necessary for a defendant to show that the government itself was party to the destruction of evidence. If the government permits (or blindly allows) a third party to destroy evidence, that is enough to warrant dismissal. For example, in *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), the court found that due process was violated where a waste disposal company, hired by the DEA to remove and store meth labs, destroyed the items pursuant to its company policy but not at the explicit direction of the DEA. The DEA knew it had to request preservation. *Id.* at 930. The defendant contacted the DEA to ask for the return of the labs, noting its exculpatory value. *Id.* The DEA responded that the labs were being held as evidence (but did not make a preservation request). *Id.* In finding a due process violation, the court noted that the exculpatory value of the evidence was repeatedly suggested to government agents. *Id.* at 931. In finding no comparable evidence (and upholding the dismissal), the court rejected the government's argument that if the evidence was preserved, there would still be a "battle of the experts," noting the "power of physical evidence." *Id.* at 933. It also stated: "[The defendants] might be lying; weighty, exculpatory evidence might never have existed . . . The defendants' version of the facts . . . had at least a ring of credibility. They should not be made to suffer because government agents discounted their version and, in bad faith, allowed its proof, or its disproof, to be buried in a toxic waste dump." *Id.*

The instant case presents even stronger cause for dismissal. Here, the government was

intimately involved with UW prior to the destruction of the IT environment; it would have known that the environment would be important to both the prosecution and defense. It would have known that UW may routinely change and/or destroy technological environment(s) and information. And there is little doubt that the government was aware of Mr. Alrai's specific attempts to ensure the preservation of the IT environment. This put the government on notice, before the evidence was destroyed, that it may have had exculpatory value. *See*, *e.g.*, *United States v. Beckstead*, 500 F.3d 1154, 1160 (10th Cir. 2007) (identifying notice provided by defense as one of five factors in assessing if destruction was done in bad faith). Just like in *Cooper*, the government sat idly by as UW destroyed exculpatory evidence, knowing Mr. Alrai's claims to its exculpatory value. This is of particular concern where the new discovery reveals Commisso's and RSM's attempts, early on, to hide relevant discovery from Mr. Alrai and imputes a degree of bad faith into the environment's destruction.

Should there be any residual doubt that the government could have ensured preservation, such is eliminated by the fact that the government was sending preservation letters *before Mr. Alrai was even terminated*. *See* Exhibit 33. When considered with Mr. Alrai's specific notice and the government's relationship with UW, this is enough to conclude that the government permitted the destruction of exculpatory evidence in bad faith.[18]

The government's failure in this regard resulted in prejudice. Aside from the obvious—and irreplaceable—exculpatory value in the IT environment (*e.g.*, evidence to rebut erroneous claims of services not provided, double billing, and high markups), the government's tactics at trial compounded that prejudice, as it used its own failure to preserve the IT environment against Mr. Alrai. First, it used Meyer (the very same person who actually destroyed that IT environment), whose testimony Mr. Alrai could only have refuted with the IT environment. Then, the government went further, crossing

---

[18] To the extent the government argues that, even with the IT environment, there would still have been a "battle of the experts" or if it disputes Mr. Alrai's claims to its exculpatory value, *Cooper* resolves those issues in Mr. Alrai's favor.

Sgro as follows: "And isn't it true that John Meyer, as you testified, is in a better position than you or Mr. Naviloff to assess the system he inherited from DigitalNet and Mr. Alrai." Doc. 101: 22. To protect Mr. Alrai's constitutional rights, it was necessary that Sgro had access to the same materials as Meyer and/or Naviloff in preparing their testimony. Mr. Alrai was deprived of evidence that could have exculpated him by showing that all contracted-for services were provided and UW suffered no loss. And not only was he so deprived, but that very deprivation was then used against him at trial. It can hardly get more prejudicial than that. These actions rise to the level of flagrant misconduct and, accordingly, Mr. Alrai's convictions must be dismissed with prejudice.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the case against Mr. Alrai should be dismissed. No memorandum of law is filed with this motion as the applicable authority is stated within.

WHEREFORE, the defendant, Imran Alrai, respectfully requests that this Court:

A.   Dismiss the case and convictions against him, with prejudice; and/or

B.   Grant such other relief as is just and proper.

> Respectfully submitted,
> Imran Alrai
>
> By his attorneys,
> Wadleigh, Starr & Peters, PLLC

Dated: September 2, 2020                    By: <u>*/s/ Donna J. Brown*</u>
> Donna J. Brown, Bar No. 387
> Michael G. Eaton, Bar No. 271586
> Wadleigh, Starr & Peters, PLLC
> 95 Market Street
> Manchester, NH  03101
> (603) 669-4140

CERTIFICATE OF SERVICE

I, Donna J. Brown, hereby attest that a true copy of the foregoing has been delivered to all counsel of record through the Court's e-filing system.

> <u>*/s/* Donna J. Brown</u>
> Donna J. Brown