**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/7/21

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:18-cr-00192-JL
      vs.                             *  June 10, 2020
6                                     *  3:15 p.m.
                                      *
7     IMRAN ALRAI,                    *
                                      *
8                    Defendant.       *
                                      *
9     * * * * * * * * * * * * * * * * *

10

                   TRANSCRIPT OF MOTION HEARING
11                      VIA VIDEOCONFERENCE
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13

      APPEARANCES:
14

15    For the Government:       AUSA John S. Davis
                                AUSA Matthew Hunter
16                              AUSA Cam T. Le
                                United States Attorney's Office
17

18    For the Defendant:        Donna J. Brown, Esq.
                                Wadleigh Starr & Peters PLLC
19
      Also Present:             John J. Commisso, Esq.
20                              United Way

21

22    Court Reporter:           Brenda K. Hancock, RMR, CRR
                                Official Court Reporter
23                              United States District Court
                                55 Pleasant Street
24                              Concord, NH 03301
                                (603) 225-1454
25

1              P  R  O  C  E  E  D  I  N  G  S

2          THE CLERK:  The Court has before it for consideration

3    this afternoon a motion hearing in criminal case

4    18-cr-192-01-JL, United States of America versus Imran Alrai.

5          And for the government's attorneys, we have Attorney

6    John Davis, who will be doing the arguing, we have Matt Hunter,

7    Cam Le.  Rob Rabuck is listening in.

8          For defense counsel, we have Donna Brown, and

9    Mr. Alrai is present.  For United Way we have Attorney John

10   Commisso and Rich Voccio.

11         And for Probation we have Sean Buckley and Matt

12   Senesi.

13         And the court reporter is Brenda Hancock.

14         And, as you can see, our interns are also available to

15   listen in.

16         THE COURT:  Right.  I think some of the other offices

17   who are participating in the hearing also have interns on the

18   call, which is perfectly fine and, actually, good.

19         Officer Senesi, I assume you've been handling the

20   supervision of Mr. Alrai, correct?

21         PROBATION OFFICER SENESI:  Yes, Judge.

22         THE COURT:  Thank you.  Okay.  I just want to make

23   reference here to start, I want to make reference to start to

24   the fact that we're on a videoconferencing platform.

25         Attorney Brown, my understanding is that you and

1    Mr. Alrai can speak by telephone, if necessary, correct?

2    You're on mute.  You're on mute, Attorney Brown.  You're still

3    on mute.  You're still muted.  There you go.

4              MS. BROWN:  Can you hear me now?

5              THE COURT:  I can.

6              MS. BROWN:  Sorry about that.  As I was saying, yes,

7    that's correct, your Honor, and we've also made arrangements so

8    we can communicate by email and text messages throughout the

9    hearing as well.

10             THE COURT:  That's fine.

11             Mr. Alrai, I want you to be aware that if you at any

12   point in the hearing would like to confer or consult with your

13   counsel outside of our hearing and privately, you may do that.

14   Just get my attention either through the hand-raising function

15   or just by speaking, and I will arrange for that.  You can mute

16   your mics, and you can speak all you want.  You can talk to

17   your lawyer as much as you want, as many times as you want for

18   as long as you want during this proceeding.

19             Do you understand that, sir?

20             THE DEFENDANT:  I do.  Thank you, Judge.

21             THE COURT:  Ms. Brown, it's my understanding that you

22   would prefer to proceed for this proceeding by a

23   videoconferencing platform as opposed to physical presence in

24   the courtroom?

25             MS. BROWN:  I hadn't really discussed that with my

1    client, but, since we're all here, then I'm fine with

2    proceeding this way.

3         THE COURT:  All right.  Mr. Alrai, do you have any

4    objection to proceeding in this fashion?

5         THE DEFENDANT:  No, Judge.

6         THE COURT:  Do you need to talk to your lawyer about

7    that privately?

8         THE DEFENDANT:  I think we're good.

9         THE COURT:  Okay.  Mr. Davis, where you are you?  I'm

10   looking for you.  There you are.  Any objection to proceeding

11   by videoconference platform?

12        (Attorney Davis indicated nonverbally)

13        THE COURT:  Okay, no objection.  That's how I'll

14   interpret your thumbs down, no objection.

15        Okay.  I just do want to make reference to certain

16   orders that the Chief Judge of the court and the court as a

17   whole have made regarding the operations of the court due to

18   the public health emergency that's attributable to the

19   coronavirus pandemic.  The Court has made a number of

20   administrative orders that make specific factual findings and

21   legal conclusions regarding the situation, and I want to refer

22   to them here and incorporate them by reference.  They are

23   Administrative Orders 20-5, 20-6, 20-7, 20-8, 20-9, 20-11,

24   20-12, 20-13, 20-14 and, finally, 20-17 and 20-18.  Those are

25   all incorporated by reference.

1        Okay.  I have read your submissions, Counsel, done

2   some research, because some of Attorney Brown's arguments are

3   based on her argument of the viability of an appeal and

4   ineffective assistance claim, so it's required some research on

5   my part, and I've done that, but I have read all your arguments

6   and I'm prepared to listen.

7        Mr. Davis, this is your motion.  I'll let you proceed.

8        MR. DAVIS:  Judge, thank you.  I'll address both the

9   motion to reconsider the release order and also the defendant's

10  motion to continue, if that's okay.

11       THE COURT:  It is.

12       MR. DAVIS:  All right.  The defendant -- starting with

13  the motion to reconsider, your Honor, the defendant has the

14  burden to prove by clear and convincing evidence that he's not

15  a flight risk.  We're asking the Court to reconsider a release

16  order made on April 9th, about two months ago.  So, the

17  question is what has changed since the release order in April?

18  Several things.

19       First, the central idea of the release order, I think

20  it's fair to say, was to encourage and facilitate repatriation.

21  It is now crystal clear that the defendant isn't ever going to

22  cooperate about repatriation and making an accounting

23  therefore, notwithstanding the Court's express order of April

24  9th or its very pointed directive on May 19th; that is, none of

25  the $1.2 million in funds sent to Pakistan is repatriated.

1    There are no additional bank records or other documents showing

2    where that money went.

3            The defendant deceived his own lawyers about his

4    compliance with repatriation, forcing their withdrawal.  On

5    April 23rd previous defense counsel notified the Court that

6    they were seeking the defendant's passport records to assist

7    Mr. Alrai in cooperating with the government in its

8    repatriation efforts.  We got close, but six days later prior

9    counsel abruptly moved to withdraw, and the government has not

10   received any additional documents about repatriation or

11   accounting.

12           THE COURT:  Mr. Davis, can you -- and I did read that

13   in your submission, and I understood it.  Can you elaborate for

14   me a little bit?  When you say you got close, what do you mean

15   by that?

16           MR. DAVIS:  So, what I mean by that is, although

17   defense counsel did not -- was not express on exactly what they

18   were doing, but what they did do was say in an email to the

19   Clerk of the Court that, in connection with assisting

20   Mr. Alrai --

21           THE COURT:  Passport.

22           MR. DAVIS:  Yes.  In assisting the government in its

23   repatriation orders he expressly referenced that, that

24   passports, two different passports were needed, both the U.S.

25   passport and the Pakistan passport, and specific pages were

1    used.  So, we don't know exactly where they were, but it was

2    clear that they had a particular task that they were following

3    up on, and they had every reason to think they're moving

4    forward to actually comply, and, again, that just dropped off a

5    cliff, and six days later they're withdrawing.

6         The Court then made a procedural order, and I just

7    want to quote that, I hope the only quote I have.  The Court

8    stated, "Unless the defendant shows cause to the contrary with

9    an appropriate filing with supporting evidence, the Court must

10   assume that Alrai's accounting was deficient, that he may

11   retain direct or indirect interest in or control of the assets

12   ordered repatriated, and that he has failed to comply with the

13   Court's repatriation order."

14        That was an extraordinary directive, it could not have

15   been clearer, and yet here we are June 10th, the defendant has

16   never shown cause for Mr. Alrai's failure to comply.  His

17   response to this motion barely mentions repatriation and,

18   instead, argues ineffective assistance of trial counsel and

19   various theories.

20        It is not an overstatement to say he has simply blown

21   off the Court's order, and for that reason alone in the

22   government's view there must be a consequence.

23        So, that's one way things have changed.  Another way,

24   your Honor, is it's clear now the defendant is seeking months

25   of additional delay in the sentencing hearing, and I'll talk

1   about that a little more in talking about the motion to

2   continue.  The next way is that it's also clear now that the

3   defendant intends to spend a good bit of those additional

4   months litigating the same meritless defense he has used all

5   along, namely, that there was no fraud and no loss.  That was

6   his pretrial mantra, and that was the defense at trial.  He was

7   convicted, as the Court knows, at trial beyond a reasonable

8   doubt.  That was six months ago, and there's still not a hint

9   of contrition or acceptance of responsibility.  Now he's filing

10   untimely post-conviction motions for judgment of acquittal and

11   new trial using the same theories and variance thereof, and he

12   also seeks post-trial discovery of additional documents held by

13   third parties in what is a blatant fishing expedition.

14          What else has changed?  Well, the defendant is now

15   clearly financing the new wave of post-conviction litigation

16   with the victim's money or with money destined for the victim

17   either because it's proceeds or because it's substitute

18   property that the government could freeze if we had an

19   appropriate order of forfeiture under Rule 32.2.  We are still

20   without such an order as we await the forfeiture hearing that

21   we have attempted to schedule twice.  We have frozen everything

22   we know about, but the defendant is bankrolling his legal

23   defense now with additional funds.

24          The point is that the defendant is not just ignoring

25   the repatriation order; he is actively and deliberately

1    diminishing the funds otherwise available to compensate the

2    victim whose money he stole.

3          The last factor is the most important.  The last thing

4    that's changed is the most critical, and that is the risk of

5    flight is even greater, first, because the defendant is no

6    longer effectively grounded by the pandemic as was much more

7    true back in early April.

8          THE COURT:  Yup.

9          MR. DAVIS:  Second, because all that has happened

10   amounts to compelling proof that the defendant can't be trusted

11   to comply with the Court's orders and that he will readily

12   violate them when it serves his own ends.

13         Third, and most importantly, as shown in the

14   government's objections to the PSR that were just filed on

15   Friday, the defendant actually faces more than five years or

16   six years, as was talked about back then.  He faces 168 to 210

17   months in prison under the sentencing guidelines.  That's 14

18   years to 17 1/2 years and the looming reality of being

19   potentially incarcerated until he's 60 years old.  Your Honor,

20   the most significant incentive for flight is the prospect of

21   lengthy incarceration even in a person with strong community or

22   family ties, and for a defendant who has significant assets and

23   family in a foreign country the flight risk is even greater.

24         For all of those reasons, your Honor, the Court should

25   reconsider its release order of April 9th and detain the

1    defendant pending his sentencing in this case, because the

2    evidence is not clear and convincing, and a flight in this case

3    would be a disaster and a real contravention of justice.

4           THE COURT:  It would be.  Let me ask you a question

5    based on that, Mr. Davis.  One of the other things that's

6    changed is new counsel.  Should that matter?

7           MR. DAVIS:  Your Honor, I think it matters as to the

8    motion to continue, sure, and there is a right to effective

9    assistance.  We don't think that right requires two more

10   months, but certainly it does matter.  But as to the flight

11   risk issue and the motion to reconsider, it shouldn't matter.

12   It doesn't matter that I know of.

13          THE COURT:  Yeah, and you hit part of what I was

14   thinking about, which is the delay issue, the continuance, but

15   what about the effort to get to the bottom of repatriation?  I

16   was hoping, I knew it was probably maybe a naive hope, but I

17   was hoping that I might hear about maybe a breakthrough or

18   progress based on Attorney Brown's participation, because it

19   seemed that -- at first, as you say, it did seem like we were

20   making real progress on the repatriation issue, and I think

21   you're correct in saying, I don't mind saying it, that it was

22   an important component of the release, because I thought it was

23   a good motivating factor that would help bring about a just

24   result in the case vis-a-vis the victims and also be an

25   anchoring force for the defendant.  It sounds like you're

1    telling me that there hasn't been any progress there at all.

2         MR. DAVIS:  Well, we can only say what has been shared

3    with us, and we have received nothing.

4         THE COURT:  Okay.

5         MR. DAVIS:  You know, I would say further Mr. Alrai is

6    not being asked to do the impossible, but he is being asked

7    either to repatriate funds in his control or to give a full

8    accounting of where the money went.

9         THE COURT:  Yeah.

10        MR. DAVIS:  And for some reason he refuses to do that

11   and has refused to do it from the beginning, and he's had

12   enough chances, and he's in direct violation of the court.

13   He's also obstructing justice under 3C1.1, which specifically

14   references violating a repatriation order as a reason, as an

15   actual reason to apply the obstruction of justice enhancement,

16   as we argue.

17        So, your Honor, just briefly on the motion to

18   continue --

19        THE COURT:  You know what?  Mr. Davis, I know I said

20   you could address both, but I think I want to hold off on that

21   for now.  I promise you'll be heard.  I promise you'll be

22   heard, but I want to continue with this conversation for a

23   minute, because my understanding regarding repatriation was

24   that what Mr. Alrai said at the outset when Mr. Harrington, who

25   was his second lawyer, was in the case was that regarding the

1    Court's order to direct all entities or persons holding such

2    assets to make the arrangements to repatriate the funds, and

3    his response was that there are no such persons because they're

4    in the bank, and he's the only person with the authority to

5    direct the banks to repatriate the funds, but that it was

6    impossible because of the security measures at least at that

7    time imposed by the banks.

8            So, my only way of understanding that is to say it's a

9    representation that these funds are under Mr. Alrai's control

10   and under his control in the sense that he was the only person

11   with custody and control of the money aside from any financial

12   institutions holding the money, but that he didn't have access

13   to them because of the law.  But there's been suggestion that

14   that's changed and that there are different ways to access and

15   gain directive control over those accounts.  Has any of that

16   changed in terms of information coming to you?

17           MR. DAVIS:  Your Honor, I'll yield to Ms. Le or

18   Mr. Hunter on that point.  I'm not aware of any, but I think

19   they know that better.

20           MR. HUNTER:  I can speak briefly, and then Ms. Le can

21   jump in.  Regarding that point, your Honor, if that specific

22   representation is one that prior counsel withdrew -- and I

23   think part of the reason for that is, as the government argued,

24   the ability for the defendant to access those funds absent

25   biometric verification that went into effect prior to the

1    accounting that the defendant filed.  So, he filed that

2    accounting, I believe it was in November, and it was earlier

3    that year of June and October when that requirement changed,

4    and there was a press release that we, I believe, attached to

5    one of our pleadings when we were litigating this before.  So,

6    at the time defense counsel filed that accounting claiming that

7    Mr. Alrai couldn't access those funds absent biometric

8    verification, that was not true.

9              THE COURT:  I see.

10             MR. HUNTER:  And later, when Nixon Peabody withdrew,

11   they withdrew the statement both that he couldn't access the

12   funds absent biometric verification and that he was the only

13   person who could access the funds.

14             THE COURT:  Oh.

15             MR. HUNTER:  Both of those were withdrawn by

16   Mr. Strauss.

17             THE COURT:  Oh.  So, the inference you're making or

18   the inference you're asking me to make is the one you're

19   making, which is that, it's kind of bad news, actually, is that

20   there may be other people who had access to those funds.  My

21   suspicion would be that if there was anybody else that had

22   access to those funds beside Mr. Alrai the odds of recovering

23   or repatriating those funds are very low.

24             MR. HUNTER:  But Mr. Alrai could have directed those

25   individuals to provide records.  And so, our argument is, in

1    addition to the documents we attached showing that the

2    statement itself was false, prior counsel's withdrawal of those

3    representations to the Court is an acknowledgment that those

4    statements are, in fact, false and were false when they were

5    made.

6           THE COURT:  Okay.  Understood.  All right, then.  I'll

7    hear from Attorney Brown.  Thank you.

8           MS. BROWN:  Thank you, your Honor.  Where to start.  I

9    first of all want to say any representations I make today are

10   made on my best efforts to review this file, which is very far

11   from complete.  If I misstate anything, it will be

12   unintentional; it will be a product of my not having completely

13   reviewed the file.

14          THE COURT:  That would be my assumption.  I wouldn't

15   assume anything different.

16          MS. BROWN:  Okay.  So, I just wanted to say that.

17          One thing that, you know, the Court's saying that you

18   released Mr. Alrai in mid-April with the intention that he

19   would help repatriate, and now the government is here saying,

20   well, he didn't do that, so he's in clear, flagrant violation

21   of the Court's order.  Almost all of that time he was not

22   represented by counsel or a counsel who was desperately trying

23   to get up to speed.

24          THE COURT:  Wait a minute, wait a minute.  I've got to

25   say something, though, here.

1          MS. BROWN:  Yeah.

2          THE COURT:  You just said, well, the Court's saying

3     now and the government's saying.  It's not what I'm saying or

4     what counsel is saying.  That's what happened.  That's the

5     reason your client's released.  It had nothing to do with

6     COVID, nothing to do with COVID, had nothing to do with

7     anything except that I thought this was an opportunity and a

8     way that anchored him to facilitate the process.  So, that was

9     the reason it happened, and it hasn't moved an inch, and he did

10    have counsel for most of that time who seemed very interested

11    in working on that process.  He wasn't represented by you, but

12    the idea that he wasn't represented by counsel, I don't know

13    what you mean by that.

14         MS. BROWN:  Well, that's what I'm going to try to

15    explain, and I didn't mean to say that that -- what I was

16    trying to explain is the government's assertion that he has

17    been flagrantly ignoring that is what I take issue with.

18         THE COURT:  Well, respectfully, Counsel, respectfully,

19    all right, your objection really surprised me, and it's not

20    because you're making -- it's not because you've alleged plain

21    error on the Court's part for accepting Naviloff's testimony;

22    it's not because you're alleging ineffective assistance.  All

23    that was expected.  What wasn't expected is that you would

24    completely ignore the point of the argument that the

25    prosecution made in their motion.  You literally have not said

1    a word about it in your papers, not a word.  So, I suggest, I

2    suggest you address it.

3         MS. BROWN:  Okay.  And that's where I was going, your

4    Honor.  And so, in terms of looking at the previous file around

5    the end of April, it appears that predecessor counsel

6    discovered they had a conflict.  It looks like, once they at

7    least were starting to explore the conflict or have memos or

8    whatever about it, that they ceased having communication with

9    Mr. Alrai.

10        Also, and this is clear from the record, is that they

11   may have also had intentions of dealing with the repatriation

12   issue.  It's very clear from the file that the COVID-19

13   litigation completely took over.  I forgot.  I counted at some

14   point.  There's at least 13 documents on that and not even

15   counting exhibits.  So, that pretty much took over their

16   attention to the case, too.

17        I will be quite honest with you, I don't feel

18   comfortable saying anything about repatriation in the current

19   atmosphere of this case.  The government seems to be after

20   Mr. Alrai, and that is the understatement of the year, and I

21   don't want to be in the same position that predecessor counsel

22   was in, which is saying something that either hurts my client's

23   position or making some representation that now I'm

24   incriminating him obviously unintentionally or I don't know all

25   of the facts.  What I do know is that six months ago the

1   government was saying the guideline range was 87 months, and

2   now they're saying it's 168 months.  So, that makes me nervous.

3   That makes me think that there's, like, you know, I'm in the

4   middle of a bunch of land mines right now, and that they're out

5   to get my client, and so I'm being very cautious, I'm not

6   saying anything about this until I have very carefully reviewed

7   everything, and that's why I haven't said anything, because, as

8   I said, I could be in the same position as predecessor counsel,

9   and then my client will get a continuance, because he'll have

10  to, because then I'll have a conflict.  That's the problem.

11        And the government doesn't seem to care about that.

12  They don't seem to care about the fact that I've only been on

13  the case three weeks.  I don't even know how many documents are

14  there.  I'll take them at their word at some point that said

15  there were 40,000 documents alone just as to Mr. Naviloff, and

16  that's documents, not pages.  That's a real important

17  distinction.

18        And I have tried to get through the repatriation

19  issue.  I have read stuff.  I have tons of these yellow pages

20  where I've made notes to myself about it.  I've read all the --

21  I've identified ten pleadings that talk about it.  I mean, some

22  of the things you were saying right now are new to me; I didn't

23  know that.  And so, I am -- my first goal is to be effective.

24  My second goal is to try to get up to speed on that issue.

25        But I certainly get from the tone of the government's

1   motion, from the tone of their arguments today, that they want

2   to -- they will do anything to get my client in jail, they will

3   do anything to get as long a sentence as they can, and I'm

4   going to be cautious about that, your Honor.

5          THE COURT:  They'll do anything to get your client

6   in -- I'm lost.  Your client was convicted of several felony

7   counts.  He was in jail.

8          MS. BROWN:  I understand that, your Honor, but he

9   could be charged with more things, and if I misstate something

10  unintentionally, obviously, as you said, and I start to say

11  things, one, if I say things to the government, now I'm in the

12  same process and then -- I'm not saying it because I think my

13  client's lying to me.  I'm just saying I don't know what's come

14  before, that I have a duty to investigate.

15         So, I do know that from December to April the

16  government did not seem to care about the repatriation issue as

17  much as they did after the motions regarding detention were

18  filed.

19         THE COURT:  I must stop you, I must, because, look,

20  I've been in a lot of conferences with counsel in this case on

21  both sides, and the prosecution brought up repatriation

22  literally every time we were together with counsel on this

23  case.  The Court -- I'll admit they allowed the Court to sort

24  of back-burner it for a while, but it's just not accurate to

25  suggest that it only became an issue for the prosecution here

1   when it became a sort of pressure point for detention.  It's

2   not a fair characterization of what's happened here at all.  A

3   minute ago you said you weren't aware of something until it was

4   just said.  I don't know if you meant by me or by the

5   prosecution.  What were you referring to?

6         MS. BROWN:  Well, you were talking about prior

7   conversations about repatriation and about whether the

8   defendant had control over the accounts in Pakistan or someone

9   else, and I wasn't following you.

10         THE COURT:  It's literally -- these are literally

11   pleadings your client filed in this case.  I wasn't talking

12   about bench conferences or chambers conferences.  These are

13   representations.  Document number 48, page 4 is what your

14   client said about repatriation.  It's not a mystery.

15         By the way, I'm not suggesting -- I am sympathetic to

16   your position here to an extent.  You need time.  Look,

17   Mr. Alrai's counsel will have time to represent him.  That's

18   not an issue for me.  I understand.  But Mr. Alrai has traded

19   out his lawyers several times now, and, respectfully, you might

20   feel like you're in a mine field, but as far as I know, this

21   court didn't appoint you to represent him in the mine field;

22   you were retained and agreed to represent him in the mine

23   field.  So, while I'm going to be sympathetic to your -- I

24   really do, because you have a difficult job here, but I'm

25   struggling with this idea that you're in the middle of some

1    type of unfair proceeding.  I'm trying to keep my composure at

2    that suggestion, because we've been putting things off and

3    putting things off.

4         The idea that it's some other party's doing, like some

5    desire on the prosecution's part to, quote, get your client --

6    the prosecution tried not a jury trial, tried a case, a felony

7    trial, and he was convicted, and counsel at that point argued

8    for release.  The Court detained him, because the Court thought

9    there was risk, given that it looked like prison was imminent.

10   But the Court released him for very specific reasons, and it

11   seems like we're not talking about those reasons.

12        I'm going to continue to listen to your presentation,

13   but expect me to be sensitive to suggestions that there's

14   something going on here that is different than any other case

15   of post-verdict detention or release.

16        MS. BROWN:  And, your Honor, I certainly didn't mean

17   to say and I don't think I said this proceeding wasn't fair.  I

18   don't think it's unfair.  You've given us a hearing and given

19   us time.  What I was trying to say is that it is very apparent

20   that the government, and that's who I'm talking about here in

21   terms of being cautious, that they are -- I mean, they've

22   already filed a letter, the response to the PSR saying that

23   this whole litigation right now about the repatriation, they

24   want him to do more prison time because of this litigation, so

25   I already know that's a land mine.  It's not your land mine,

1     you didn't set it up, and I know that, and I'm not saying that,

2     and there's nothing unfair that the Court did about that.  But

3     when I see that letter and they're saying, oh, the fact that

4     he's delayed this repatriation and to the extent I am

5     responsible for that is what they're indirectly saying, is that

6     because I, as his counsel, have not proceeded to do that, now

7     it's like, okay, this isn't just a bail issue, this isn't just

8     a detention issue.  Now it's how many years in prison is he

9     going to do based on the repatriation issue?

10          So, it's almost like a new charge now in terms of

11    getting more time, that I have to think about it that way and

12    be prepared for it to respond to it, and so I could say

13    something that I don't mean to say.  I could end up in one of

14    their letters or end up at the sentencing hearing saying, Well,

15    Attorney Brown said so and so, and so, therefore, he should

16    get, you know, two points' adjust, upward adjustment because

17    she said so and so.  And that's where I am right now, and I'm

18    not -- I have no problems doing that if I'm prepared.

19          And I do have to take issue with the fact that I did

20    nothing on that.  I just haven't done all that I think I need

21    to.  As I said, I spent literally days and days going through

22    all these pleadings.  The one you just held up, I know those

23    are in pleadings.  I did an outline, I did a graph to try to

24    understand this issue.  I have charts to wrap my head around

25    it.  But, still, we're up to document what, 131, something,

1   138?  I don't know.  Some of them -- the last ones are mine, so

2   obviously I know them better.

3          THE COURT:  Is what you're saying -- I need to

4   understand this.  Is what you're saying that -- there's a bail

5   condition that your client cooperated with repatriation.  It

6   was not objected to.  It was actually offered by your client,

7   literally his idea, okay?  Are you saying to the Court that

8   you're not prepared to participate in that process because you

9   feel like it might be -- I'm just trying to understand this.

10  If that's what you're saying, I need you to say it.  If you're

11  saying your client can't comply with the bail order and you're

12  not prepared to facilitate it to assist him in doing it, I need

13  to understand that, but I don't think you have to exhaustively

14  evaluate your ineffective assistance claims to work on the bail

15  condition.  Now, it might be because you think it's fraught,

16  because now the prosecution is using it as some type of

17  sentencing ratchet.  I get it.  But I need you to tell me what

18  you mean.

19         MS. BROWN:  Okay.  Just a few minutes ago you had to

20  correct me because I misstated something, which I obviously

21  didn't mean to do.  I could keep doing that throughout the

22  whole hearing, that's my point, so that I'm not being an

23  effective advocate for my client when I am getting corrected by

24  the judge because, "You weren't here, Attorney Brown, you

25  didn't know this, you didn't know that.  That's not true,

1    Attorney Brown.  If you knew about this you knew that" -- I

2    mean that's how this hearing is going, and it's going that way

3    because I'm not prepared, and that's why I like to be prepared.

4    I don't like to have judges say, "You don't know what you're

5    talking about."  That's what's happening here.

6         And you're probably right; you know the case better.

7    You sat through a ten-day trial and I definitely take you --

8    you know, I know that you're right, but I want to be able to

9    advocate for my client in a way that I'm not misstating things,

10   obviously unintentionally, but I don't feel that I can do that

11   at this point.

12        I made -- as I said, I've spent days looking at the

13   repatriation stuff.  We got 145 pages last week on this case,

14   and it's not 145 pages of like, you know, text.  It's, you

15   know, charts and diagrams.  And there's bank records.  And I

16   agree I don't think I need to read every page of every

17   discovery; that is certainly not my plan.  But I don't think

18   that I'm at the point -- as I said, I have started to collect

19   stuff on repatriation.  I've read as much as possible.  I've

20   tried to read as many motions that have dealt with it.  As I

21   said, I think there's more response on repatriation, but I will

22   be ineffective if I talk about it, because, one, I can get the

23   Court angry because I've misstated something.  I could do

24   something that hurts my client at sentencing and gets him an

25   upward adjustment because of this issue.

1        So, I never meant to say that I feel that there's land

2   mines from the Court, but I think those land mines are there,

3   that if I'm not careful as to what I say, then I could be, you

4   know, adding more time to my client, and that's obviously not

5   my job.  I don't want the Court to believe I've done nothing on

6   this issue.  I just haven't got to the point where I feel that

7   I can make representations or even work with the government in

8   a way that I might not be harming my client.

9        THE COURT:  Well, I don't know.  Here's the thing:  I

10  don't think repatriation means forfeit.  I think it means bring

11  back into the custody and control of the court.

12       If I'm wrong about that, Mr. Hunter, and I know you're

13  probably the first team over there on repatriation or whatever,

14  but I don't view it as forfeiture.  I view it as bringing it

15  back within the custody and control of this litigation.

16       Now, given the theories that you're pushing, right,

17  which is that he shouldn't have been convicted anyway, I don't

18  know how that harms your client.  It isn't like there's a

19  question about whether this money is in Pakistan.  That's been

20  demonstrated.  That's not something that you would be

21  facilitating proof of.  It seems to me that this effort could

22  proceed in a way that might not result -- suppose you -- of

23  course, if you got -- either if it could be demonstrated that

24  the money wasn't proceeds of crime or you got a reversal or a

25  new trial or something, it seems to me that that would not be

1    inculpatory.  I hope I'm not oversimplifying it, but it doesn't

2    seem to me that simply -- it seems like an uncomplicated thing

3    unless the money, after going through the veins and arteries

4    from here to Pakistan, it's split into a million capillaries.

5    That's a different story, I think; it could be get a little

6    complicated.  But in terms of repatriation, if the money is

7    accessible, it doesn't seem to me an inculpatory act for that

8    to be facilitated.  Again, it was your client's idea.

9         MS. BROWN:  That may be true, but it also may be --

10   there's a whole bunch of possibilities.  One of the

11   possibilities is it may not be able to be repatriated.

12        THE COURT:  Of course, but that's all -- see, but,

13   remember, the order was to either repatriate it or give an

14   accounting.

15        MS. BROWN:  Right.  That's where I was going, and so,

16   let's just say if -- this is a hypothetical right now, so if it

17   can't be repatriated, then I agree, the order is that there

18   should be an accounting.  That's where the land mines are.  So,

19   he could do an accounting, and now the way that he does the

20   accounting the government then tries to use that against him

21   because he could have done that six months ago, and so now he's

22   going to get an obstruction of justice adjustment, because if

23   he could account for it now why couldn't he account for it in

24   November, so therefore -- and I don't know.  That's a complete

25   hypothetical.  But I can see about six things like that in

1   terms of that it creates a risk for my client to just say, you

2   know, I'll put him on the phone with Attorney Davis and have

3   him talk and tell him everything he knows.  I mean, that's not

4   what defense attorneys do.  And I just think that I need to

5   know this issue to make sure I protect his Constitutional

6   rights and to be effective.

7           As I said, I've already been proven to be ineffective,

8   because I've been corrected at this hearing and I may be

9   corrected again.  I'm trying very hard to get up to speed on

10  this case.

11          THE COURT:  I think you know better than to suggest

12  you're ineffective.  You're certainly not.

13          MS. BROWN:  I do have some other remarks regarding

14  Attorney Davis's comments.

15          THE COURT:  Please do.  I promise I won't interrupt.

16  Go ahead.

17          MS. BROWN:  Okay.  So, as I was saying, that it was

18  around the end of April that, from at least what I can tell

19  from the file, that attorneys at Nixon Peabody started having

20  meetings, memos, all of that stuff, of having conflicts, and

21  that they stopped speaking with Mr. Alrai, and then we came in

22  the case on May 11th, and we weren't counsel in any real sense

23  other than -- you know, we were of record, but we were

24  completely unfamiliar with the file.  I'm not going to get into

25  the untimely motions.

1        The government's assertion, you know, that the defense

2   arguments regarding appeal issues are completely frivolous,

3   they may have had another adjective in there as well, we cite

4   to two United States Supreme Court cases on the point; so to

5   say that the defendant's argument is completely frivolous and

6   without merit is without merit.  I know in their last motion

7   they cite to the Williams case.  My most recent pleading said

8   that Williams is completely inapplicable in this case in terms

9   of confrontation.  This is a nonfrivolous claim.  It is a

10  meritorious claim.  There's two United States Supreme Court

11  cases on point.  There's the other issues that I'm not going

12  through.  I don't see this hearing today as a hearing on the

13  merits of either of the motions for a new trial or a judgment

14  of acquittal, but what it is, is whether there's some merit to

15  that, and we feel there is merit to the ineffective assistance

16  of counsel claims and that he has merit on the appeal.

17       The government also says, well, this has been

18  litigated over and over and over.  As we put in our motions,

19  there were cases that were not pointed out to the Court, and

20  when you just look at these cases on this issue of fraud

21  they're split right down the middle.  This is not a slam-dunk

22  issue, that there are so many cases that have been reversed on

23  this.  I have never -- I've been a lawyers for 30 years.  I've

24  never seen an area of law where there's so much reversal in

25  terms of finding that it did not meet the fraud requirements.

1   So, to say that those arguments are completely and wholly

2   without merit, it's not like we went and found some, you know,

3   case in Alaska that's out there on its own and that no one's

4   following it.  We found two United States Supreme Court cases,

5   and it is not a frivolous claim.

6           In terms of the prospect of incarceration, the

7   government's been saying this now for six months, and

8   Mr. Alrai's right there (indicating).  He hasn't gone anywhere.

9   They said that at the trial.  That's when they said he's facing

10  87 months.  And then they said that when there was a litigation

11  in April regarding his release.  They said that now, now that

12  he's convicted, he's got incentive to leave and run away, and

13  then he was released, and he didn't run away.  And now they

14  sent a letter on Friday saying, "Oh, it's not 87 months.  We

15  were mistaken on that.  It's 168 months."  He's still there,

16  he's still at his house, he's still taking pictures with the

17  *Union Leader*.  Well, this argument that, well, now things are

18  different, they're not different.  He has family in this

19  country.  He has children who were born in this country.  It's

20  an argument without merit.

21          Of course he knew he was facing prison before trial,

22  after trial.  Now, none of that has changed, and none of it has

23  affected whether he's a risk of flight.  The fact that he --

24  again, this makes it very hard for me to reply in terms of the

25  repatriation order, but the reason I focus on that is it seems

1     that that's all they've got.  That's what they've got to say he

2     should go back to prison, is this repatriation, and this is why

3     it is a big thing.  And I know the Court made that part of the

4     order, I get that, but the defendant should have time with his

5     new attorney to work with the government on that and not be

6     forced or pressured into doing things that are inadvisable in

7     terms of being prepared, and that's what we're in a position of

8     doing right now, of not being prepared on that issue.

9          As I said, you've already found one misstatement that

10    I made.  I don't want to make any others, and, as I said, I

11    don't want Mr. Alrai to be looking for a new attorney in two

12    months because I said something that I shouldn't have said

13    because I was forced into addressing an issue that I was not

14    prepared to address.  The untimely motions, we've addressed

15    that in the motions.  I think those go to the merits, and the

16    court can decide that.

17         I do disagree with the government.  You asked them the

18    question, "Do you think there's an issue here as to the fact

19    that there's new counsel," and they said, "Only to the issues

20    regarding the continuance."  And that is just incorrect.  This

21    goes right to the issue of the repatriation, and we are not

22    prepared on that.  We have -- we are trying to be prepared on

23    that.  We intend to have conversations with the government.

24    But this has been, you know -- you are right, I was retained on

25    this case, but it has been a whirlwind of three weeks.  I

1    haven't had a day off since then.  I might not get one for the

2    rest of the summer.  That's okay, that was my choice, but

3    there's only so many hours in a day, there's only so much I can

4    read in one day, and we're just not there yet.

5          THE COURT:  Yeah.  Look, I want to be open with you

6    that, when I asked Mr. Davis that question about, well, doesn't

7    the fact that there's a new lawyer make a difference, I was

8    actually thinking more along the lines of what you just said,

9    that maybe that new counsel may just need a chance to sort of

10   get traction with this issue.  I'm not sure if that's the case,

11   because it doesn't, honestly, and I mean this respectfully, Ms.

12   Brown, it doesn't sound like you were really focused on the

13   repatriation issue as a bail issue, even though it was, like,

14   literally the central issue for that bail order and at the bail

15   hearing, because nothing else really had changed.

16         MS. BROWN:  Can I just address that quickly, your

17   Honor?

18         THE COURT:  Yes.

19         MS. BROWN:  We're focused on it.  As I said, I spent

20   days looking at that issue, trying to read all the pleadings,

21   but I did not feel that at the time that we had the deadline to

22   reply to this motion I was up to speed on it.  That's why I put

23   that in there.  Because this was due, what, like last week?  I

24   don't know.  We filed it I think it was on the 21st or 22nd.

25   But it was due several weeks -- so, I think we were on the case

1     not even two weeks when we had to respond to their motion, and

2     when we came on the case the deadline to respond to their

3     motion had already gone.  So, at the time that we responded to

4     that motion we had not even been on the case two weeks, so I

5     did not feel comfortable, as I said, even though it's been in

6     all these pleadings, I did not feel comfortable saying things

7     about it.

8            And at first I also note, too, in this case, as you've

9     mentioned and as mentioned in the pleadings, there was lots of

10    conferences about this and chambers conferences which I wasn't

11    privy to.  If you look at the docket report this week, we

12    ordered a transcript of the hearing on repatriation.  I thought

13    we had had it originally, and we didn't, and I went and had

14    that ordered this week so I could read that, and I read that

15    this week, but I didn't get that till after we had to reply to

16    their motion to reconsider detention.  So, that motion was

17    fixed in time as to when we filed it and the deadline that we

18    had, but we have been working on it a lot, as I said, just the

19    fact that we ordered that transcript.

20           And that's the other thing, as I said, that there have

21    been all these conversations, there have been all these

22    meetings.  I don't even know if I have all the transcripts.

23    That was one that I didn't have, and I didn't see it on the

24    docket that it had been ordered previously, so we ordered it.

25           So, those are the types of efforts we've been making,

1    but every time I get something new, I'm like, oh, I didn't know

2    that, and now I've got to go back and -- you know what I mean?

3    So, that's kind of what the process has been, that I've been

4    constantly learning new things about that whole history of the

5    case, and I don't want to make misstatements about it.

6            THE COURT:  Yeah, I understand.

7            MR. COMMISSO:  Excuse me, your Honor.  This is John

8    Commisso on behalf of the United Way, and at the appropriate

9    time I'd like an opportunity to speak on behalf of the victim

10   with respect to the issues, the issues of detention or release,

11   repatriation and the motion to continue the sentencing hearing.

12   So, I guess I'm asking when would be that appropriate time to

13   address you on those issues?

14           THE COURT:  Understood.  Message received.  To be

15   honest, in a case like this -- well, does the either side have

16   any objection to my hearing from Mr. Commisso on these issues

17   after I've exhausted your arguments?

18           MS. BROWN:  I take no position, your Honor.

19           MR. DAVIS:  No objection, your Honor.

20           THE COURT:  All right.  I'll get to you, Mr. Commisso,

21   I promise.

22           MR. COMMISSO:  Thank you very much.

23           THE COURT:  Yeah.  You know, I don't see the appeal

24   issues here as particularly strong or the ineffective

25   assistance issue.  I just don't.  That Circuit split, that

1    looked like it came out of a cert petition where the Solicitor

2    General really disputed the idea that there was a Circuit

3    split, and the Court didn't grant cert.  That was that Aldissi

4    case.  I think it was the Aldissi case, and I think the facts

5    of this case are very different from most of the fraud law

6    you're citing.  I don't know how deep I want to get into it

7    today, but I don't view these arguments as particularly

8    compelling as arguments that are persuasive as to detention or

9    release.

10          You are right, though, Ms. Brown, as you put in your

11   papers, that the Court did say I really don't want to be in a

12   position of detaining someone whose conviction isn't affirmed,

13   and I try to err on the side of release in those situations.

14   And there are other examples.  I think you're representing

15   Suzanne Brown, right?

16          MS. BROWN:  Yeah.

17          THE COURT:  That's an example, okay, another case that

18   I don't think it's a particularly strong argument, but I have

19   not ordered it, and that's even post appeal.  We're just on a

20   2255 now, and she's still out because I don't really want to

21   detain people.  I don't view this as anything remotely close to

22   that, and that's not even a strong argument.  So, I mean, this

23   does come down to your client's compliance with this

24   repatriation order.  It's important to note that the

25   repatriation order was to repatriate or give accounting, and

1    I'm just -- I don't know how any of the things anybody has said

2    to me so far erect a barrier between -- to finding an

3    accounting.  It doesn't seem possible to me.  And to the extent

4    that you're worried about inculpatory evidence, I have to

5    remind you this was your client's idea; this was a proposal

6    made by your client, not by -- the government never injected

7    this into detention or release.  The defendant injected it into

8    detention or release, and the Court welcomed it, because I

9    think it's good for the victim and it's good for justice, but

10   if the accounting says the money's gone, well, that in a way is

11   complying with the order.  But we don't have that information.

12        Let me ask you this question:  What I don't want to do

13   is this:  If you're telling me that you just have not been in a

14   position to assist your client to comply, I guess I need to

15   know do you foresee your ability to do that, and if it's just

16   something you don't think is a good idea for your client to

17   cooperate in that, I understand that.  I do.

18        MS. BROWN:  Yeah -- I'm sorry.

19        THE COURT:  But that's what I want to know.

20        MS. BROWN:  Yeah, I do think we can do that, your

21   Honor, and just to give you another example, you know, one of

22   the things that I've identified is I've looked at your order

23   from last fall on repatriation, and then I looked at a letter,

24   a very long, I think it was three-page letter that the

25   government sent to predecessor counsel saying, "Here's what he

1    needs to do."  And so, I look at those two things, and one

2    seems much more expansive than the other.  So, one of the

3    things, like one of the first things that we identified in the

4    case is are they asking for too much, are they asking for him

5    to do more than what was ordered in the original order from

6    yourself, and are they asking for more information that could

7    potentially be inculpatory?

8              So, what I'm trying to do is look at your order, see

9    what complies with that, and to the extent that they're making

10   demands for things that go beyond that, then I would come back

11   to you and say, "Hey, they are making demands for things that

12   go beyond that, but we're willing to go with your order."

13   That's what we're using as the benchmark of what he needs to

14   do, not these other -- well, they may or may not be other

15   things, but at least to me right now they seem broader than

16   what your order is, but that might be because I don't

17   understand the case completely.

18             THE COURT:  It also might be because, look, they're

19   litigators like you are, and I've ordered him to comply with

20   the repatriation order.  But they're your adversaries, and if

21   you ask them what they want, they're going to say, "Why don't

22   you report to BOP on July 1st and drop the money off at our

23   office on the way."  That's what they're going to ask for,

24   that's what they should ask for, but his bail condition is to

25   comply with the repatriation order.

1          MS. BROWN:  Exactly.  But they're sending this letter

2     saying in order -- from their position, as advocates, I agree

3     with that -- as advocates they believe in order for him to

4     comply he has to do all these things in this letter, and so I

5     have to be an advocate, too, and if I just say, you know, well,

6     we'll do whatever you want, then I'm not being an advocate, and

7     so that is to me right now what I'm trying to separate out of

8     what is specifically needed by your order and what they're

9     asking for, whether they're asking for too much.  The answer to

10    that is easy.  I come back to you and say this is what we think

11    does comply.  But those -- that letter that -- and I invite

12    Attorney Davis to correct me if I'm wrong, it was around

13    mid-April that that letter went to predecessor counsel saying,

14    "Here's all the things he needs to do to either repatriate or

15    prove that he has complied with that," and within a week of

16    that predecessor counsel has developed a conflict.  So, that

17    letter, they have sent it to me, and I appreciate it.  They

18    also sent a whole bunch of discovery that wasn't -- the

19    previous file wasn't organized in such a way that I could go

20    just find all the repatriation information in one place, and

21    the government has been sending that to me.  But that's an

22    issue that I am researching right now, I have been researching

23    from day one since when they sent me that letter, but that's

24    something that I need to be able to respond to in a way that

25    I'm going to be an advocate for my client as well.

1          THE COURT:  All right.  Mr. Davis, before we move on

2     to the schedule, the continuance, I want to give you the last

3     word here on detention or release.

4          MR. DAVIS:  Judge, with due respect to Ms. Brown, what

5     the defendant has actually done in the last month is what

6     matters and not excuses and not stuff about how big the file

7     is.  What strikes me as so telling about the defendant's own

8     priorities and the defendant's own intention to comply is what

9     happened yesterday afternoon.  This hearing has been scheduled

10    for at least a while.  All of us here knew that we'd be before

11    the Court at 3:00 p.m. this afternoon, and all of us were aware

12    of the May 19th order with a directive about the repatriation

13    issue, which we have raised and spoken with Ms. Brown about

14    from the beginning.  And yesterday afternoon -- and during this

15    time of COVID, you know, not much going on, but things start to

16    arise, and one of the things that arise is a 14-page motion for

17    judgment of acquittal with lots of research and a

18    well-developed argument and a remarkable claim that the time

19    limits prescribed by Rule 29 do not apply and this motion is

20    timely.  And so, even though we have a rule that says you can

21    file a motion for judgment of acquittal 14 days later, and it

22    would be pretty easy, I would think for two attorneys down from

23    that trial, someone to come in and say, "Well, one thing we

24    don't have to worry about is filing a motion for judgment of

25    acquittal, because that lapsed two weeks ago," no.  They filed

1     this (indicating).  And so, that's issue number one.

2          And then the next thing comes, and that's a Rule 33

3     motion for a new trial, and that's 12 pages long with all of

4     its cases, including a novel excusable neglect argument that,

5     even though the rule also says that you can't file a new trial

6     motion after 14 days unless it involves newly discovered

7     evidence, this is excusable neglect because -- I guess because

8     they're not the same counsel that were trial counsel 14 days

9     later.  And so, I take it from their argument, and, again, I

10    know we're not arguing this, I take it from their argument that

11    Mr. Alrai could hire new counsel any time he wants, and that

12    new counsel could come in under this theory and say, "Well, we

13    get to file a Rule 33 motion, even though it's many months

14    late, because it's excusable neglect that what the original

15    trial counsel did," et cetera, et cetera.  Anyway, we get that

16    motion.

17         We then get a motion for discovery that asks for all

18    kinds of things, largely records in the possession of a third

19    party, your Honor, not us but RSM, a whole different company,

20    and what they're saying is they want all these communications,

21    they want billing records, they want various things that they

22    don't even send us a letter about that; we'd already replied

23    about that.  This is all to impeach the government's witness at

24    trial.

25         And, of course, this is going to take time, if it gets

1    granted, and it's going to cost money, but that's no object,

2    and all of these additional things are essential and material

3    for the cross-examination of Mr. Naviloff at sentencing where

4    we're not even sure we're going to call him, although maybe we

5    will.  But the point being, your Honor, the defendant has been

6    quite industrious here, and in terms of motions and pleadings

7    they've actually moved very quickly and put a lot on paper, but

8    now they come in and say, well, they didn't really have time to

9    look at and understand the repatriation order.  And at some

10   point, your Honor -- I'm not blaming Ms. Brown, and it's not

11   that I want to get Mr. Alrai.  I'm just trying to enforce the

12   law.  This man was convicted in December, and it is absolutely

13   clear that we're getting nowhere on repatriation, and enough is

14   enough.

15            MS. BROWN:  Your Honor, could I briefly address a

16   couple of arguments?

17            THE COURT:  Yeah.  You should --

18            MS. BROWN:  I would be very brief.

19            THE COURT:  Fine.  You should address his point,

20   though, because it's a good point.  I understood your point

21   that you felt a little bit constrained about repatriation

22   because you didn't want to make a step, a misstep that could

23   inculpate your client.  I get that.  But he does make a good

24   point that to say you didn't have time, you had time to do a

25   lot more litigating than probably any other lawyer in this case

1    up till now.  Those are serious motions you filed, and there

2    was time for that.  So, when you comment, you should include

3    that.

4           MS. BROWN:  And that's exactly -- so when I came into

5    the case I read, as I said, there's about 13 motions regarding

6    detention and release, and I read all of the government's

7    arguments and to prepare for those arguments, and the

8    government made several arguments.  One of the arguments that

9    they made was the repatriation issue was a reason why at least

10   -- and they made it in terms of why he shouldn't be released

11   and then they made it why his release should be reconsidered.

12   They also made the argument that there is absolutely no appeal

13   issues here whatsoever.  And those were basically their two

14   arguments.  Especially as to the issue of appeals, that tracks

15   the statute.  There's obviously no issue of dangerousness.  So,

16   they have -- their arguments were he's a risk of flight because

17   he hasn't repatriated or at least done an accounting and he has

18   no appeal issues, for those reasons the Court should

19   reconsider.

20          So, my job, as Mr. Alrai's attorney, is to respond to

21   both of those arguments.  So, how am I going to respond to

22   that?  I start by reading the transcripts, and when I read the

23   transcripts I see what I think, obviously that's arguable,

24   ineffectiveness in not objecting to the testimony of Mr.

25   Naviloff and the underlying opinions that helped establish

1   fraud.  So, as I'm going through all of these motions regarding

2   whether detention should be reconsidered, I spot that issue.

3          At the same time I'm also looking at the repatriation

4   issue as well.  There's a lot more to that in terms of

5   documents, in terms of materials that I have to look at.  It's

6   more dense than just reading the transcript.  But as I said, we

7   have been looking at that.  We've ordered transcripts, we've

8   read materials.  I've read the materials that the government

9   sent.  There was 145 pages there.  There's other records that

10  that goes to.  So, I also, as I understand the government's

11  argument, you should reconsider my client -- I mean, they're

12  saying, yes, that they've put all this work into these other

13  cases, but that was a duty that I had if I felt that that was

14  an issue that went to detention, and I did feel it was an issue

15  to go to detention.  They seem to be arguing more than that.

16  They seem to be arguing that you should hold it against my

17  client that he is litigating his Constitutional rights to have

18  this Court consider whether the verdict in this case is infirm

19  or not, and that is improper to ask the Court to consider the

20  fact that he is challenging this.

21          I do have to say quickly on the Rule 29, I got that

22  idea from your Honor.  You actually in the transcript made some

23  reference to whether Rule 29 applies in bench trials, and you

24  said that you had read cases that it didn't apply in bench

25  trials.  I went and found those cases, and you were right, it

1     didn't apply in bench trials.  So, that's what I argued.

2          So, I just want to put that out there, not to argue

3     the merits of this, but this constant, like, Counsel is

4     ridiculous, counsel is making these ridiculous arguments and

5     unmerited, and that is just not true.  As I said earlier,

6     there's two United States Supreme Court cases on point here and

7     regarding a witness who is critical to the state's case.

8          So, as I said, we have ordered those documents.  If

9     the Court reschedules this matter we will continue to work with

10    the government.  I've explained that my concern about this is

11    it's not just a matter -- you know, it's not that we're saying

12    we're not going to help or we're not going to repatriate; it's

13    that I'm trying to wrap my head around this in a way that I'm

14    not going to be ineffective.

15         That was my big concern that I identified right away,

16    was the letter that the government sent seemed to be more

17    expansive of what they were looking for than how I read your

18    order, and I've been trying to research that, be prepared for

19    it.  That's why we ordered a transcript of the hearing, so I

20    could read what was actually said at the hearing.  Now I know

21    there's other hearings that this was discussed, and I may have

22    to go get those transcripts to read those as well.

23              THE COURT:  Look, you can read them.  The whole point

24    was we weren't talking about it.  That was what was annoying

25    the government.  We weren't talking about it.  They just wanted

1    to keep reminding me it was out there, and I finally had a

2    hearing on it, and I ordered it.  That's all it was.  It wasn't

3    like -- and, by the way, if I remember that hearing right, it's

4    not going to give you a lot of insight.  It's basically, if I

5    remember right, Attorney Harrington saying, "Look, we can do

6    this, go ahead and order it."  That's what I remember.  He had

7    some arguments, but it didn't amount to much, and I ordered it.

8    Look -- all right.

9              MR. COMMISSO:  Your Honor, sorry again to interrupt.

10   This is John Commisso.  I just want to again request an

11   opportunity to address the Court on behalf of the victim.

12             THE COURT:  Yup, absolutely.  Why don't I hear you

13   now, Mr. Commisso.  Go ahead.

14             MR. COMMISSO:  Thank you, your Honor.  As I said, my

15   name is John Commisso.  I represent the United Way of

16   Massachusetts Bay, which is the victim in this matter, one of

17   the victims.  Also with us today on this call is Richard

18   Voccio, who is the Chief Administrative Officer of the United

19   States of Massachusetts Bay, and thank you for the opportunity

20   to give some voice to the victim and the concerns that

21   specifically impact the victim.

22             And so, we ask the Court to grant the government's

23   motion, because Mr. Alrai is a risk of flight, and he has

24   failed to comply with the Court's conditions of release.  Mr.

25   Alrai has repeatedly refused to comply with the Court's order

1    to repatriate more than $1.2 million of United Way's money

2    which he illegally transferred to Pakistan.

3         Mr. Alrai is guilty of a crime that continued for six

4    years while he lied to the United Way every single day.  He

5    stole more than $6.6 million from the United Way.  It has been

6    two more years since the United Way fired Mr. Alrai and the

7    government began the prosecution of this case.  After all this

8    time, United Way seeks justice and closure.

9         There is no justice for the victims in this case until

10   the defendant is punished for his crime, and that punishment

11   includes a lengthy period of incarceration, repatriation of

12   stolen money, and the payment of victim restitution.  It would

13   be a great tragedy if Mr. Alrai does not serve time and does

14   not pay victim restitution.

15        He is clearly a flight risk, which would deprive the

16   victim of justice, he's a proven liar, he lied to the United

17   Way for six years, he lied to his attorneys, he ignores this

18   Court's order, and there's just no reason to believe that he

19   won't flee, and that risk of flight increases every day as he

20   gets closer to the day when he has to serve his sentence.

21        I feel very comfortable in saying that Mr. Alrai has

22   done nothing to help with repatriation of the money stolen from

23   the United Way and spirited it away to Pakistan, and he's done

24   nothing with respect to victim restitution.  Where is the

25   $1.2 million of United Way's money that was transferred to

1    Pakistan?  Is he still using that money to benefit his family

2    and himself?  Is he using that money for legal fees?  Is he

3    using this time delay and violation of this Court's orders to

4    transfer that money and further hide it from the Court?  We

5    don't know, but this much is clear:  He has never cooperated,

6    and he's still not cooperating.  He has no remorse.  He has not

7    accepted any responsibility.

8           The Court's order setting conditions of release

9    requires Mr. Alrai to cooperate regarding the repatriation of

10   the United Way's stolen money, but there has been no effort by

11   the defendant.  Mr. Alrai has had four different law firms

12   represent him, and yet he has not repatriated any money, and he

13   has provided no accounting.

14          We ask that you hold him accountable now for his

15   failure to comply with the repatriation order by ordering him

16   into custody until sentencing.  We also ask that you reject the

17   defendant's motion to continue sentencing and other deadlines

18   for 60 days, because that continued delay is too long.  There

19   will be no justice, no closure for the victims in this case

20   until Mr. Alrai is sentenced, begins serving his sentence of

21   imprisonment and is ordered to pay victim restitution.  Until

22   that happens, the victims continue to suffer harm.

23          Just a couple of brief examples of what the United Way

24   continues to deal with because of Mr. Alrai's crimes.  After

25   the conviction in December and after the recent motions that

1  were filed there have been several news articles about this

2  case.  Each news event causes the United Way to expend time and

3  resources addressing these issues with their donors, their

4  community partners, their employees, their volunteers and other

5  constituents to deal with the harm that is caused and continues

6  to be caused by Mr. Alrai's crime.

7          In addition, the United Way is subject to oversight by

8  several outside agencies, like the Massachusetts Attorney

9  General's Office and the U.S. Department of Education.  That

10  outside scrutiny continues and is going to continue as long as

11  this case is pending.

12          A continued delay in sentencing means the harm to the

13  victims will continue and there will be no justice, no closure

14  and no healing for the victims until Mr. Alrai is sentenced,

15  incarcerated and ordered to pay restitution.  We request that

16  you order Mr. Alrai into custody, you order him to comply with

17  the repatriation of the United Way's stolen money, and that you

18  hold the sentencing hearing as soon as possible.  These things

19  are necessary to protect the victims from Mr. Alrai.

20          Thank you, your Honor, and I'm happy to respond to any

21  questions or issues.

22          THE COURT:  Well, Mr. Commisso, I have a lot of

23  thoughts about some of the things you said.  I'll be up front.

24  I agree with much of what you said, but I disagree with some of

25  what you said.  I don't view the United Way as a victim.  I

1    view the United Way's donor recipients and donors as victims,

2    and if I thought -- understand what I'm doing.  You want him

3    immediately detained.  You have to understand that detention is

4    not punishment.  That detention is only meant -- you know

5    this -- it's only meant to secure his appearance at these

6    proceedings, nothing more.  Punishment hasn't come yet.  The

7    restitution doesn't come until he's sentenced.  I have to

8    determine how much restitution he owes, and the assets that

9    anybody has identified are pretty much in the custody and

10   control of this Court, so that will be available for

11   restitution.

12          What the Court is attempting to facilitate is the

13   repatriation of funds outside the United States, and there's a

14   tension.  Understand, every decision I've made regarding his

15   detention is focused on the victims, because there's a tension

16   between his detention and his ability to work on repatriation.

17   It might be that I'm being naive about that, and it might be

18   time for the Court to give up.  If that's what the prosecution

19   is trying to tell me, they're trying to say, "We told you,

20   Judge, it wasn't going to work and, look, it's not working," I

21   understand, but from my perspective there's a better chance of

22   repatriating money if he's not detained and he can work with

23   counsel.  That's my thinking.  It's actually victim-directed.

24   Punishment hasn't come yet.  We haven't reached that point.

25          I understand your justice delayed is justice denied

1    type argument.  I'm not sure -- and I hate that the United Way

2    had to spend time and resources addressing this, because I know

3    I'm involved in a lot of nonprofits myself, and I understand

4    you have people who want answers, donors and beneficiaries of

5    United Way.

6         Yesterday I worked at a United Way food bank unloading

7    and loading trucks.  I get what you do, I get that you have

8    donors who want answers, and I get that you have beneficiaries

9    who want answers.

10        I hope that doesn't give you any pause, Attorney

11   Brown, that I did a little volunteer work that's related to the

12   United Way, but if it does you should know about it anyway, and

13   you can make your request for relief.  You should know that.

14        But that's what I'm focused on.  Let me just ask you,

15   Ms. Brown, because I'm trying to decide what to do about this

16   situation, and then we can move on to talking about

17   continuance.  Look, are you prepared to represent to the Court

18   that there are funds in Pakistan that are potentially subject

19   to repatriation, or are you prepared to represent that there

20   are no such funds?  Do you have information that you can

21   provide to the Court that could help guide the Court to a

22   decision here?

23        MS. BROWN:  I know that there has been an accounting

24   previously, but I can't say one way or the other at this point,

25   and I'm trying not to be difficult, your Honor, on that, and

1     that's why understanding what the government's letter and

2     looking at your order, and I want to be able to understand that

3     order.  But I can't at this point say one way or the other.

4           What I can say is that I will work with my client to

5     follow the judge's order, follow your order from last November,

6     and that's what we had been attempting to do in terms of

7     understanding the order and looking at the materials that

8     relate to that order.

9           THE COURT:  Well, look, we're talking to each other

10    right now.

11          MS. BROWN:  Mm-hmm.

12          THE COURT:  What is it about my order that you don't

13    understand?

14          MS. BROWN:  Well, it's not that I don't understand

15    your order, your Honor.  I think your order is fairly simple.

16    As I said, we've got this demand letter from the government

17    which just lists all the -- and it's somewhere, I have it

18    handy, but it lists all these things, that, You have to get

19    this, and you have to get that, and you have to get this, and,

20    as I said, and maybe what they're saying is, for lack of a

21    better word, gettable, but I need to understand it before I

22    reply to it, and to the extent there is some concern on our

23    part that it is over expansive, and I don't mean over expansive

24    in terms of repatriation, but like what he would have control

25    of -- like, just for an example, what I've read in discovery he

1    has family over there, and he has family who have property over

2    there.  Is that his property or is it his family's property?

3    Those are things I don't know the answers to right now, and I

4    need to get those answers, and I need to, you know, understand

5    what the government -- I intend to work with them and ask them,

6    you know, go through, like, "Tell me what you want here in

7    terms of information."

8              THE COURT:  Well, it's not my job to tell you how to

9    handle your case.

10             Go ahead, Ms. Le.  I see you want to say something.

11             MS. LE:  Yes, your Honor.  Since I'm the author of

12   that letter, I just want to bring up the letter was addressed

13   to prior counsel on April 13th.  As soon as Ms. Brown was

14   involved in the case I forwarded that information to her as

15   well as other material, because we have the pending motion

16   before the Court, to help her understand the issue, and knowing

17   that it was in a letter to prior counsel, I wanted her to have

18   it as well as our email exchange with Mr. Strauss and

19   Mr. Davis.

20             My letter referenced the Court's order, the order for

21   release as well as the repatriation order, your Honor.  I

22   specifically cited and listed items we believe the victim had

23   based on his representations to the Court.  All of this,

24   though, your Honor, was in a letter that predated prior

25   counsel's motion to withdraw and reaction to those statements.

1      So, whatever he represented to prior counsel, both sets of

2      prior counsel, your Honor, we now know is not true.  It's not

3      before the Court.  So, I sent that letter to Ms. Brown only as

4      an aid to her to understand what the issues were.

5          I think that the more important issue here is the

6      Court's procedural order, which is ECF number 125, and on page

7      2 the Court gave Mr. Alrai an opportunity to explain what has

8      happened, because only Mr. Alrai and his counsel know what

9      happened between them that prompted counsel to withdraw

10     representations that related to the accounting filed with the

11     Court.  To date we still have not received any kind of

12     accounting, any kind of explanation of what went on.

13         So, for counsel, for Ms. Brown now to keep referring

14     to the April 13th letter I sent to prior counsel I don't think

15     has anything to do with the defendant's failure to, once again,

16     explain what happened to the money that was sent to Pakistan

17     and specifically the Court's order.  I believe this order was

18     dated May 19th.  So, we are now here on June 10th.  We still

19     don't have an explanation in response to your Honor's order of

20     May 19th.  And I just wanted to communicate that our

21     correspondence from April to prior counsel was based on

22     representations that were made earlier that have now been

23     retracted.  So, I don't think it should have any bearing as to

24     what is going on in this hearing, your Honor.

25              THE COURT:  I understand that.

1          MS. LE:  Thank you.

2          THE COURT:  Vis-a-vis the letter, here's what I think,

3     Attorney Brown:  Just to use your example, you just talked

4     about properties in Pakistan.  It seems to me very simple to

5     have a conversation with your client to find out, A, what his

6     interest is in those properties, if any, and the extent to

7     which those interests are liquidatable and repatriatable or, B,

8     what are not in his name but remain under his control, because

9     there's potentially property like that, too, that he could

10    direct repatriation of.  I don't think those are complicated

11    conversations, and I'm using your example.

12         Number two, my order is what he needs to comply with.

13    You've, again, raised counsel's letter as some type of barrier

14    to that.  I'm not going to tell you how to represent your

15    client, but, look, I would view my order as what you need to

16    comply with.  I would view Ms. Le's letter as what you need to

17    comply with if you want them to stop objecting to further

18    release.  If you want them to go along with release, that's

19    what I would use as a benchmark, her letter.  Her letter is not

20    my order.  They are two different things.

21         I'm going to wrap this up, and then we're going to

22    move on to the continuation.  I'm going to tell you what I'm

23    doing with this, and then we're going to take a short break,

24    because the court reporter has been going for 90 minutes, and I

25    need to give her a break.  Okay?

1          Here's the situation:  What happened with this motion

2     is that counsel are talking past each other a bit.  The motion

3     is based on the fact, I think correctly, that there's a

4     provision of the release order that requires cooperation with

5     the repatriation effort, which, again, was proposed by the

6     defendant.  It's a component of it.

7          The prosecution has made two basic arguments about it:

8     one, that he hasn't complied with the Court order, and that's

9     reason enough to revoke his release; and, second, that it, to

10    an extent, informs the issue of risk of flight.  I'm less

11    persuaded by that, but it's not an unreasonable argument, the

12    second one.  That's number one.

13         The defense is arguing a completely different issue.

14    They are arguing about their likelihood of a successful appeal

15    or a new trial.  That's true.  It's just that I think the more

16    relevant consideration is the prosecution's motion.  I don't

17    think there's a lot of merit -- I'm not prejudging them, of

18    course, Ms. Brown, but I'm going to read all your papers and

19    we're going to decide these motions, but vis-a-vis likely I

20    don't see much demonstration of prejudice, I don't see much

21    demonstration of likelihood of success or deficient practice by

22    counsel.  I'm very skeptical of these claims.  I can explain

23    why more in a minute, but I want to give the court reporter a

24    break.

25         But that's not the issue.  The issue is compliance

1   with the Court's order.  The prosecution happens to be correct

2   about that.  And despite Mr. Commisso's plea, I understand his

3   position, the Court's decisions are highly focused on

4   compliance with its order and how that relates to risk of

5   flight and justice for the victims.  To the extent those

6   interests coincide with detention or release the Court wants to

7   address them.

8           The Court's going to take this matter under

9   advisement.  It anticipates issuing its order probably in 14

10  days.  If information comes to the Court's attention regarding

11  compliance with that provision of the order, the Court will

12  consider it, but the Court is strongly leaning toward -- I'm

13  not offering this as a gun to anybody's head.  This was a

14  proposal made by the defendant.  The Court will consider

15  information, though, regarding compliance with its order if

16  that changes in the meantime.  But I want to consider it more,

17  and I want to take a little bit more time to look at these

18  appeal and new trial issues, to the extent that should be.  But

19  I anticipate ruling in a couple of weeks on this.  It's going

20  to be under advisement for a while, and I'll pay attention if

21  you provide information that informs the analysis.  All right.

22  So, that's under advisement.

23          I'm going to take a few-minute break and give the

24  reporter a chance to kind of recoup, and then I will resume the

25  hearing.  If anybody disappears in the meantime, I won't take

1   any offense, as long as the lawyers stay onboard.  All right?

2   By the way, that means -- I know there's three prosecutors

3   here.  As long as one of you is there when I get back, that's

4   enough.  All right.  Charli, ten minutes.

5           THE CLERK:  Okay, Judge.  Thank you.

6           (Recess taken from 4:46 p.m. to 5:00 p.m.)

7           THE COURT:  Are you guys seeing a screen with a

8   schedule on it, like a blank email with a schedule on it?  Are

9   you seeing that?

10          MR. HUNTER:  Yes.

11          MS. BROWN:  Yes.

12          THE CLERK:  All right.  Let me say this briefly about

13  the last ruling, and I took the matter under advisement.  Look,

14  I realize there's some tension between the idea of ruling on

15  the defendant as a flight risk and announcing I'm going to take

16  it under advisement for two weeks, a little bit of logical

17  tension there, and, of course, I recognize that, but the real

18  point is whether there's conditions he'll comply with, okay?  I

19  do think those conditions do inform the question of flight

20  risk, but it's more a situation that I issued a set of

21  conditions of release and they haven't been complied with, and,

22  frankly, my fear is that, my fear, based on the objection Ms.

23  Brown filed, is that, and I'm not trying to put words in her

24  mouth, but I'm not sure she appreciated the nature of the

25  centrality of that to the release.  Now, maybe I'm not giving

1    her enough credit, maybe I'm giving her too much credit.  I

2    don't know.  But the fact is, I don't mean anything by that,

3    Ms. Brown, except that it surprised me when you didn't address

4    it, and it makes me think maybe you weren't as focused on it as

5    a condition of release.  Okay.  So, it's a bit of a window

6    there.

7           I do want to talk about, because I'm not persuaded by

8    the appeal issues, new trial issues at this point yet -- it

9    doesn't mean I've rejected them, of course, we're going to have

10   to litigate them, but there are basically two issues here.

11   They're both ineffective assistance, and one is regarding the

12   Naviloff testimony and whether Naviloff's testimony in reliance

13   on -- I forget his name now -- whether his reliance on the

14   United Way employee -- what's his name again?

15           MR. HUNTER:  John Meyer, your Honor?

16           MS. BROWN:  Rosenfeld was the one who didn't testify.

17           THE COURT:  Whether that amounted to a Sixth Amendment

18   confrontation violation.  The report Naviloff filed said --

19   it's document 50-1 -- it said, "I received assistance from

20   professional staff at RSM working under my direct supervision.

21   Throughout this report I make reference to procedures

22   performed; those procedures in some instances may have been

23   performed by staff under my supervision."  He also says in his

24   report, document 50-1, "Per discussions with IT professionals

25   at my firm as well as professional research, such a server

environment generally requires redundant (duplicative) servers in geographically diverse locations to allow server administrators the ability to effectively 'switch over' the client to an alternative server, with minimal delay."

And then in his trial testimony he admitted, Naviloff admitted he was not an IT professional, that he consulted with IT experts in the rendering of his report.  He named them: Meyer, Rosenfeld, Diego Rosenfeld, which seems to be the person at issue.  Rosenfeld was described as a principal with over 20 years of experience and leads the practice in New England. With respect to providing technology consulting solutions to middle-market clients for RSM, he said that some of those are, you know, "valuated reseller-type arrangements, outsourced CIO type services," like this, in this case, "infrastructure needs, build-outs, setup," et cetera.  "RSM has over 1,200 technology consulting professionals within our 10,000-plus workforce, so it's a large area that we consult in."

He admitted that Rosenfeld works for RSM, and when asked if they provided reports, Naviloff said, "They worked for me.  I'm the expert, and they worked under my supervision and quality control."  The question from then Attorney Harrington was, "You would agree with me that you didn't note in your report that you consulted with these individuals?"  And the answer was, "I mentioned members of my team, and I use the term 'I' as referencing both the work that I performed as well as

1    the work that I did -- that was done for me under my

2    supervision."

3            I don't find this to be unusual expert scenario at

4    all.  Experts are even permitted to rely on inadmissible

5    testimony -- inadmissible information as long as it's available

6    to the other side.  I also don't know what the prejudice would

7    be over -- I don't know what prejudice would be demonstrated by

8    what I've read.  I'll have to wait and see that, but I can't

9    imagine what prejudice there was to having to deal with

10   Naviloff and not Diego Rosenfeld.

11           There's the other issue regarding the theory of fraud.

12           By the way, counsel makes the point in her objection

13   that these issues are interrelated and to an extent they both

14   have to be in play to work, although a Constitutional violation

15   like the Sixth Amendment could be a standalone issue, but the

16   argument in the papers from the defendant is that they need to

17   be together, taken together.  I'm not even sure there would

18   need to be an acquittal even if the defense is correct that

19   there's a theory that the depravation of an intangible right to

20   control is not fraud.  The dispute here seems to be solely on

21   that "such that it constituted fraud" point, whether Alrai

22   factually interfered with the right to control is not an issue,

23   it's not an issue in the case.  If an indictment says, quote,

24   that the defendant committed the fraud by doing A, B and C or

25   X, Y and Z, but it turns out that one of those say Y is not

1     fraud but was only deceptive and reprehensible but not fraud, I

2     don't think the conviction has to be overturned if the

3     defendant did A, B and X and Z, as long as they are fraud.  A

4     jury verdict might be tough to sort out if you didn't have a

5     specialized verdict form, but we don't have that problem here.

6     I made findings, and I can make more findings.

7           I also don't think the Circuit split argument is very

8     persuasive.  I'm not sure there is a Circuit split on this

9     issue.  The Solicitor General disputes that there's a Circuit

10    split, and the court, Supreme Court, denied cert on <u>Aldissi</u>

11    <u>versus United States</u>.

12          I also think Mr. Alrai's conduct here is very

13    distinguishable from any of the cases that defense counsel

14    cites that purportedly show no fraud.  He's arguing that, while

15    his alleged deceit may have influenced the United Way's

16    decision to enter into the contract, it had no bearing on the

17    object of the contract or the contract's benefits or burdens.

18          But the problem is here Alrai was embedded within the

19    United Way's IT decision-making structure, so his scheme

20    affected and manipulated the IT objectives the United Way

21    pursued and the United Way's assessment of the benefits and

22    burdens of those vendor relationships and other decisions they

23    made, and I don't see any cases where the defendant has cited

24    examples where this kind of infiltration in the defendant's

25    decision-making didn't constitute fraud.

1          So, I know the briefing isn't done on this yet, but

2     I'm skeptical, and the likelihood of a new trial or appeal, a

3     successful appeal, isn't moving the needle for the Court on

4     detention or release.  It comes down to the issue the Court

5     already discussed, compliance with its order.

6          Now, let's talk about the other motion, the motion to

7     continue.  The schedule you see up on the screen there, that's

8     something that Alex and I sort of worked up together as an

9     alternative schedule.  Let me say this:  I want this sentencing

10    done before the end of August.  That's my goal, if I give a

11    continuance.

12         I don't know if that's workable for you, Ms. Brown,

13    but that's what I'm thinking.

14         It's difficult for me to go right ahead, straight

15    ahead when we don't have -- when we have new counsel.  It's

16    just -- now, it doesn't mean that there's not time to get

17    prepared, but I do want to give counsel time to prepare.

18         And, by the way, this schedule that I'm sort of

19    proposing here, this could change, of course, if the issues

20    that Ms. Brown has raised now require resolution before

21    sentencing.  I have to look into that.  I don't think they do.

22    I may have you guys brief that issue.  I may have counsel brief

23    that issue.  Sorry to refer to you as "you guys;" I apologize

24    for that little slip there.

25         There's some First Circuit law on this issue, and,

1   Ms. Brown, we dealt with it a little bit on -- you saw the

2   vestiges of it with the <u>Suzanne Brown</u> case, right?  And in that

3   case it was raised, but then decided to proceed.  So, I think

4   that that could throw a monkey wrench into this.

5           But assuming we don't have to resolve those

6   presentencing, this is the type of schedule I'm thinking about,

7   and I guess I want to know what you think about it.

8           I understand -- Mr. Davis, are you still speaking for

9   the United States in the hearing?

10                  (Mr. Davis indicated nonverbally)

11          THE COURT:  Okay.  Well, what are your thoughts on

12  this?  By the way, I know you object to the continuance.  I

13  know you object to the continuance at all, period, but I want

14  to know what you think about this schedule.

15          MR. DAVIS:  I think the schedule works, Judge.  I

16  don't have any objection to the schedule.

17          THE COURT:  All right.  And I'm not suggesting you're

18  waiving your objection to the continuance.  You've made that

19  clear.  All right.

20          What do you think about the schedule, Ms. Brown?

21          MS. BROWN:  I want to make sure I'm not on mute.  We

22  were looking for the very end of August, and so this complies

23  with what we were looking for, is the end of August --

24          THE COURT:  All right.

25          MS. BROWN:  -- with the exception that you mentioned

1    earlier regarding whether to litigate ineffectiveness claims

2    pre-direct appeal or post-direct appeal, but kind of putting

3    that aside right now in terms of -- those were dates we were

4    looking at, was the very end of August.

5           THE COURT:  All right.  So, unless I conclude that the

6    post-trial motions that Ms. Brown has filed require resolution

7    before sentencing, expect me to order something along these

8    lines, Counsel.  All right?

9           Let me ask you quickly, Ms. Brown, do you have an

10   opinion -- I know your preference, of course, is to litigate

11   those issues that you've raised presentencing, but do you know,

12   do you have an opinion about the applicability of First Circuit

13   law regarding whether they must be?  Do you think they must be

14   resolved.

15          MS. BROWN:  Well, as I understand it, there's some

16   generalized language that says, if they can be, then they

17   should.  I don't know if I saw anything with the word "must" in

18   there, but we're still researching it.  But the whole idea of

19   if something can be resolved in an expeditious manner before

20   direct appeal, I think a lot of how this turns is whether it's

21   something that's apparent from the record or whether it's going

22   to be very involved, involved calling prior counsel.

23          And so, the case law tends to suggest that, if it's

24   going to be a situation where it's going to be beyond the

25   record, beyond the transcript, that those are the cases where

1      the Court has a preference for it being litigated in a 2255

2      motion, but if there's something that can be determined from

3      the record alone, that then the Court may -- I don't know if

4      there is a "must" out there.  There is just some language that

5      in terms of balancing whether to litigate it or not.  I mean,

6      there certainly is a situation where if it's already on direct

7      appeal then you can't because of jurisdiction.  But whether

8      there is a situation that you must do it, I can't say that I

9      found that case.  I found some cases that suggest you should if

10     it's something that's easy to determine.

11             THE COURT:  But based on the standard you just

12     described, this doesn't even sound like a "should," does it?

13     This is not a let's wrap it up on the record case.  This is

14     ineffective assistance on some fairly dicey issues.  It seems

15     complex to me.

16             MS. BROWN:  It's complex, but I don't think it really

17     involves a lot beyond the record, but, you know, we'll be

18     arguing that.  It reminds me very much -- there's a case from

19     New Hampshire Supreme Court that's State v. Thompson where I

20     think it's the only case where they've ever decided

21     ineffectiveness on direct appeal or they've reversed it based

22     just on the transcript, because their finding was there can be

23     no tactical reason.  As you know, obviously, if there is an

24     ineffectiveness claim one of those things the government can

25     argue is, Oh, the lawyer just made a tactical decision not to

1    make this objection, and, therefore, it's legitimate.  The

2    State v. Thompson case says there couldn't be any legitimate

3    reason for not objecting to this, because it was, like, the

4    government's whole case.  Like a victim who -- the testimony

5    that was the hearsay, if they had objected to it, the

6    government just wouldn't have had a case.  So, that's the case

7    that I kind of have in mind.  But to take a position that the

8    two issues can be decided, I can't say right now whether the

9    case law says they must be decided other than the admonition of

10   trying to litigate things as soon as possible and not have them

11   drag out for years.

12        THE COURT:  All right.  I don't know if you've ever

13   dealt with this issue, Mr. Davis, or if anybody on the

14   prosecution team has, if you have opinion on that, whether the

15   issues raised -- I know your preference is sentencing first,

16   but on the legality of it do you have any opinion on whether

17   these claims are the types that can or should be resolved

18   presentencing?

19        MR. DAVIS:  I don't, Judge, and I'm not sure why

20   theoretically they could not wait.  Of course, there's a huge

21   emphasis on finality in the rules, and that's why there are

22   deadlines.  The deadlines have been ignored here, and we're

23   going to argue very strongly that they should be enforced.

24        THE COURT:  Understood.  Okay.  All right, folks.

25   I'll get an order out.  It's going to grant to an extent -- I

1    don't want to hide the ball here.  It's going to grant to an

2    extent this continuance, and it might -- by the way, this is

3    sort of the outside edge of late August, what you requested,

4    Ms. Brown.  I haven't sort of settled on that yet, but I might

5    go with that if I need to, and I will also be getting -- I

6    might ask you folks to issue -- to brief kind of quickly the

7    timing issue of your post-trial motions, and I mean the timing

8    of the resolution, do they need to be presentence or not.  My

9    read right now is that they don't need to be, but it's a funny

10   issue.  Even in the <u>Suzanne Brown</u> case the Court kind of

11   addressed it on appeal in a way that wasn't particularly

12   illuminating, to be honest.

13          MS. BROWN:  Can I add one more thing regarding the

14   timing, your Honor?  And I'm glad if you are going to take a

15   couple of days, because what I'll try to do as soon as possible

16   is touch base with my experts.  I don't know if anybody's

17   taking vacations these days or not, but on the off chance that

18   one of them may be taking a vacation, I will check with them

19   ASAP, and if I don't get back to the Court or to Charli within

20   48 hours, you can assume that these dates are otherwise okay.

21   But I'll try to do that as soon as possible so we don't run

22   into that issue.

23          THE COURT:  Okay.  Understood.  Yeah, it will take a

24   few days.  All right, then.

25          Alex, is there anything I haven't addressed or asked

1    you would like me to ask or address?

2              MR. PEPPER:  I don't believe so.

3              THE COURT:  Okay.  All right, then.  Anybody want to

4    say anything else to the Court before I adjourn the hearing?  I

5    know it was longer than we needed to do, but I really did think

6    this was a situation where counsel were talking past each

7    other.  I just thought that the prosecution's emphasis was sort

8    of the proper one, but I wanted to give defense counsel a full

9    opportunity to sort of lay out her positions.

10             Anybody have anything they want to add?  Okay.  I'll

11   get an order out here shortly.  Thank you.  Hold on a second.

12             Officer Buckley, did we lose the other Probation

13   Officer?  Yeah, I think we did.

14             PROBATION OFFICER BUCKLEY:  Yes.  Matt Senesi took

15   off.  Do you want me to relay anything to him?

16             THE COURT:  No.  No, I think I'm fine.  I think I'm

17   fine.

18             PROBATION OFFICER BUCKLEY:  Okay.

19             THE COURT:  I can get in touch with him if I need to.

20             PROBATION OFFICER BUCKLEY:  Okay.

21             THE COURT:  Thank you.  Charli, I want to stay on the

22   conference with the interns and Alex, so don't shut down the

23   meeting, please.

24             THE CLERK:  I won't.  You're the host, Judge.

25             THE COURT:  I'm the host.  So, everybody who doesn't

1      work for me, you can bail.

2                PROBATION OFFICER BUCKLEY:   Thank you.

3                MR. HUNTER:   Thank you, your Honor.

4           (WHEREUPON, the proceedings adjourned at 5:22 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

C E R T I F I C A T E

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of my

8   stenotype notes taken in the matter of *United States v. Imran*

9   *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date: ____10/09/20          */s/ Brenda K. Hancock*
                                 Brenda K. Hancock, RMR, CRR
15                               Official Court Reporter

16

17

18

19

20

21

22

23

24

25