No Copy Of This Transcript May Be Made Prior to 2/28/2021

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

v.                                    18-cr-00192-JL-1
                                      November 17, 2020
IMRAN ALRAI                           9:10 a.m.

* * * * * * * * * * * * * * * *

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Government: Cam T. Le, AUSA
                    John S. Davis, AUSA
                    Matthew Hunter, AUSA

For the Defense:    Donna J. Brown, Esquire
                    Michael Gregory Eaton, Esquire

Court Reporter:     Molly K. Belshaw, LCR, RPR
                    Duffy & McKenna Court Reporters
                    P.O. Box 1658
                    Dover, New Hampshire 03821
                    (800) 600-1000

Also Present:       John Commisso, Esquire
                    Neha Dewan, Esquire

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

2

1          INDEX OF EXAMINATION

2

3   WITNESS:   GREG NAVILOFF                      Page

4   DIRECT EXAMINATION

5      By Ms. Brown                               36

6   CROSS-EXAMINATION

7      By Mr. Davis                               172

8   REDIRECT EXAMINATION

9      By Ms. Brown                               185

10  RECROSS-EXAMINATION

11     By Mr. Davis                               191

12  REDIRECT EXAMINATION

13     By Ms. Brown                               196

14

15  WITNESS:   JASON SGRO

16  DIRECT EXAMINATION

17     By Mr. Eaton                               199

18  CROSS-EXAMINATION

19     By Ms. Le                                  242

20

21

22

23

24

25

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | INDEX TO PRE-MARKED EXHIBITS | |
|---|---|---|
| DEFENDANT'S EXHIBIT | DESCRIPTION | PAGE |
| A | (Exhibit not introduced.) | |
| B | (Exhibit not introduced.) | |
| C | (Exhibit not introduced.) | |
| D | RSM Emails re: loss | 108 |
| E | Emails re: offices files | 125 |
| F | Indictment email | 53 |
| G | (Exhibit not introduced.) | |
| H | Meyer CV | 228 |
| I | (Exhibit not introduced.) | |
| J | (Exhibit not introduced.) | |
| K | (Exhibit not introduced.) | |
| L | (Exhibit not introduced.) | |
| M | August 3, 2018 RSM Invoice | 45 |
| N | September 10, 2018 RSM Invoice | 45 |
| O | October 11, 2018 RSM Invoice | 45 |
| P | November 15, 2018 RSM Invoice | 46 |
| Q | January 8, 2019 RSM Invoice | 46 |
| R | (Exhibit not introduced.) | |
| S | Email re invoicing for UW | 49 |
| T | RSM email re: US questions | 51 |
| U | (Exhibit not introduced.) | |
| V | October 11, 2019 RSM Invoice | 59 |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          INDEX TO PRE-MARKED EXHIBITS (CONTINUED)
 2    DEFENDANT'S    DESCRIPTION                    PAGE
 3    EXHIBIT
 4    W              January 22, 2020 RSM Invoice    60
 5    X              Naviloff email re: if IA charged  102
 6    Y              Emails re Ryan analysis         131
 7    Z              RSM Report for United Way        38
 8    Aa             (Exhibit not introduced.)
 9    Bb             (Exhibit not introduced.)
10    Cc             Email re: Andar discussion recap  149
11    Dd             Emails re: open items and tasks   155
12    Ee             (Exhibit not introduced.)
13    Ff             November 28, 2018 RSM email      159
14    Gg             Emails re: updated presentation   169
15    Hh             (Exhibit not introduced.)
16    Ii             (Exhibit not introduced.)
17    Jj             (Exhibit not introduced.)
18    Kk             Sgro Supplemental Expert Report   265
19    Ll             (Exhibit not introduced.)
20    Mm             (Exhibit not introduced.)
21    Nn             RSM emails re: vendors          208
22    Oo             Email re: backup memo draft      81
23    Pp             Email re: telephone service      202
24    Qq             (Exhibit not introduced.)
25    Rr             RSM emails re: proposed work     229
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

5

| 1 | INDEX TO PRE-MARKED EXHIBITS (CONTINUED) | | |
|---|---|---|---|
| 2 | DEFENDANT'S | DESCRIPTION | PAGE |
| 3 | EXHIBIT | | |
| 4 | Ss | (Exhibit not introduced.) | |
| 5 | Tt | Email re Microsoft licensing | |
| 6 | | analysis | 234 |
| 7 | Uu | (Exhibit not introduced.) | |
| 8 | Vv | (Exhibit not introduced.) | |
| 9 | Ww | RSM Insurance loss write-up | 71 |
| 10 | Xx | (Exhibit not introduced.) | |
| 11 | Yy | (Exhibit not introduced.) | |
| 12 | Zz | (Exhibit not introduced.) | |

13

14

15

16

17

18

19

20

21

22

23

24

25

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The court has before it for
 3       consideration this morning an evidentiary
 4       motion hearing in criminal case 18-cr-192-JL,
 5       United States of America versus Imran Alrai.
 6            THE COURT:  Good morning, Counsel.  Let me
 7       just get started with a couple of things.
 8       Charli mentioned to me that you wanted to have
 9       a conversation about sequestration of
10       witnesses.
11            You want to do that?
12            MS. BROWN:  I can address that, Your
13       Honor.  This is Attorney Brown.
14            So we've subpoenaed four witnesses.  I
15       don't know that we'll call all of them.  We'll
16       probably reassess after the first two
17       witnesses.  But the four witnesses are in the
18       order we may call them.  Mr. Naviloff  --
19       Greg Naviloff.  Secondly is our expert,
20       Jason Sgro.  We are going to have our expert
21       listen to the testimony of Jason -- not
22       Jason -- of Greg Naviloff, because it may
23       relate to his opinion testimony.  And then we
24       would either call Attorney -- and is it
25       Commisso or Commisso?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | MR. DAVIS:  I believe it's Commisso. |
| 2 | Or is it Commisso -- Commisso? |
| 3 | MR. COMMISSO:  Commisso. |
| 4 | MR. DAVIS:  Yeah, my bad. |
| 5 | MS. BROWN:  I've heard many |
| 6 | pronunciations.  Commisso.  Okay.  I'll try to |
| 7 | get that right.  Thank you. |
| 8 | Before you joined us, Your Honor, the |
| 9 | Government expressed that they wanted |
| 10 | Attorney Commisso to be present during the |
| 11 | presentation of all the evidence, as he |
| 12 | represents the victim in this case.  He is also |
| 13 | a witness, and we are asking that he be |
| 14 | excluded. |
| 15 | THE COURT:  And the Government objects to |
| 16 | that? |
| 17 | MS. BROWN:  They do. |
| 18 | MR. DAVIS:  Judge, Mr. Commisso is the |
| 19 | victim's representative, and he has a right to |
| 20 | be present under rule 60(a)(2).  For the Court |
| 21 | to exclude him, the Court would have to find |
| 22 | clear and convincing evidence that listening to |
| 23 | the testimony would somehow affect his |
| 24 | testimony.  He's an officer of the court. |
| 25 | He's, by now, well known to the court.  There's |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1       no basis for that finding, and the Defendant
2       has not even argued it.
3            If the Court is inclined to exclude the
4       victim, we would ask that the Defense call
5       Mr. Commisso first and do his testimony and
6       complete it, and then release him from his
7       subpoena so that he can attend the rest of the
8       proceedings.
9            But United Way has a right to have its
10      paid attorney, who has represented them
11      throughout, be present here.  And the
12      Defendant's motion simply rides roughshod over
13      that right.
14           THE COURT:  I don't think I agree,
15      actually.  When you just cited the rule
16      regarding a finding the Court must make to
17      exclude him as a victim, you mean as the
18      victim; right?  You don't mean as victim's
19      counsel; right?
20           MR. DAVIS:  They are the same, Judge.  The
21      discussion in the committee notes of Rule 60
22      make it very clear that the rule applies both
23      to the victim and the victim's counsel.
24           He is the counsel for the victim, and he
25      is the way the victim asserts its right to be
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1       present in these proceedings.

2           THE COURT:  Yeah, but in a situation where

3       he's going to be a witness like today, why

4       can't they just send an officer of the

5       organization to allow for the sequestration?

6       Why is it so important that he not be

7       sequestered?  He's going to testify -- I mean,

8       he's central to this entire analysis.  I

9       mean -- that's not an aspersion, by the way,

10      but he's very central to it.

11          And I have to admit, I can't imagine he's

12      going to hear anything that would color his

13      testimony.  He's been literally up to his

14      eyeballs in this litigation.  He was at every

15      hearing with a defense agreement all along.

16          I remember, hearing after hearing, the

17      deputy clerk would contact me and say, "The

18      Government would like Mr. Commisso to

19      participate."

20          And I would always tell the deputy clerk,

21      "If it's okay with the Defendant, it's okay

22      with the Court."  And he was always there.  So

23      I don't have any objection to it, but this is a

24      little bit different.

25          Why do you want to fight on this?

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | MR. DAVIS:  Judge, I don't want to fight. |
| 2 | I just want to defend the victim's near |
| 3 | absolute right to be present here.  And I'll |
| 4 | add that the rule is very clear.  United Way, |
| 5 | because of the post-conviction litigation, has |
| 6 | had to pay -- I don't know how much money to |
| 7 | continue to be represented by counsel. |
| 8 | Mr. Commisso is their representative throughout |
| 9 | this litigation.  United Way has a right, that |
| 10 | is near absolute, for him to be present. |
| 11 | There is a real potential for abuse here |
| 12 | by the defendants simply designating him as a |
| 13 | witness and then saying, "We're going to call |
| 14 | him last," and keeping him out of the hearing. |
| 15 | In light of many aspects of this litigation, |
| 16 | that potential is very real. |
| 17 | Your Honor, I don't want to fight about |
| 18 | this, but if it is that important to the |
| 19 | Defense that he be sequestered, and the Court |
| 20 | is prepared to make the finding, I would ask |
| 21 | that he be first.  I don't know why the |
| 22 | Defendant has a right to a particular witness |
| 23 | order.  And what the victim has a right to is |
| 24 | for the Court to explore reasonable |
| 25 | alternatives.  That's right in 60(a)(2).  And a |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | reasonable alternative here is to call him |
| 2 | first.  The Defendant hasn't even stated a |
| 3 | reason or an objection to calling him first. |
| 4 | So, respectfully, I suggest we do that and |
| 5 | protect the victim's right. |
| 6 | THE COURT:  I do think that's a reasonable |
| 7 | suggestion.  It's very reasonable, actually. |
| 8 | MR. DAVIS:  Thank you. |
| 9 | THE COURT:  Why not just call him first, |
| 10 | Attorney Brown?  Then he can watch the rest of |
| 11 | the witnesses. |
| 12 | MS. BROWN:  Obviously, we've considered |
| 13 | that, Your Honor.  And as we've gone to prepare |
| 14 | the case over the last four or five days, it |
| 15 | just doesn't -- the foundation for things that |
| 16 | we would ask Attorney Commisso aren't there. |
| 17 | It does not flow in terms of what we're trying |
| 18 | to establish for the Court. |
| 19 | I think the first two witnesses, |
| 20 | especially Mr. Naviloff, really go to the heart |
| 21 | of the Brady issue.  And Attorney Commisso, |
| 22 | obviously, is much more related to whether this |
| 23 | is a third party or not a third party.  And |
| 24 | before we even get to that, we have to |
| 25 | establish that there was a Brady violation, and |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1           we intend to do that with the first two
2           witnesses.  So we had considered that.  We're
3           not doing it for any sort of tricky reason.  It
4           was just -- it didn't flow.  It didn't make
5           sense in terms of the presentation of the case.
6           And that's the only reason.
7                And as the Court knows, most every, if not
8           every, document we're going to talk about,
9           Attorney Commisso has seen, because they've
10          been attached to documents that I'm sure the
11          Government has shared with them.  Even though a
12          lot of the documents are under seal, they are
13          probably consulting with him.  He's aware of
14          what's happening.  This hearing is on the
15          record.  He can certainly listen to it
16          afterwards or read it afterwards and report
17          back to the victims as to what happened.
18               THE COURT:  But that's not -- if I exclude
19          him, I'm going to give them an opportunity to
20          -- doesn't Mr. Meyer work for United Way now,
21          or is he just a contractor?
22               MR. HUNTER:  He is a contractor for the
23          United Way, Your Honor.
24               THE COURT:  Thank you.
25               I mean, if I did exclude Mr. Commisso from
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          -- if I did sequester him -- I wouldn't exclude
 2     him, of course.  If I did sequester him, I
 3     would give him an opportunity to have someone
 4     from the victim participate in this hearing and
 5     be present.
 6          So he wouldn't have to review it later and
 7     all that.  I mean, it would be available, but
 8     it wouldn't really be necessary.  Let me just
 9     check the rule real quickly here.  I've got to
10     get my reading glasses.  Hold on here.  Okay.
11          It looks like 60(a)(2); right, Mr. Davis?
12          MR. DAVIS:  Correct, Judge, yes.
13          THE COURT:  Well, let me ask you -- I
14     mean, the victim is asserting -- the
15     prosecution is asserting the victim's right to
16     be present, Attorney Brown, and asserting that
17     through the attendance and participation of
18     Mr. Commisso.
19          I mean, I don't even know, Mr. Davis, if
20     sequestration equals exclusion.  It seems to be
21     an assumption.  You're telling me the committee
22     notes cover that?  I don't know.  But there's a
23     lot of moving parts to this.  There could be
24     other representatives here.  The fact that
25     they've chosen counsel doesn't mean that they'd
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

14

```
 1            be excluded.  So I'm just wondering about some
 2            of these things.
 3                 MR. DAVIS:  So, Judge, if I could point
 4            the Court to the Advisory Committee notes to
 5            the 2008 revision, (a)(2).
 6                 THE COURT:  I'm looking at it.  Yep.
 7                 MR. DAVIS:  The second paragraph of that
 8            addresses this.
 9                 It says, "Rule 615 of the federal rules
10            addresses the sequestration of witnesses.
11            Although Rule 615 requires the Court, upon the
12            request of a party, to order the witnesses to
13            be excluded so they cannot hear the testimony
14            of other witnesses, it contains an exception
15            for a person authorized by the statute to be
16            present.  And accordingly, there is no conflict
17            between Rule 615 and this rule, which
18            implements the provisions of the Crime Victims
19            Rights Act."
20                 THE COURT:  Yes.
21                 Again, though -- well, Ms. Brown, is it
22            your position that the victim's testimony --
23            Mr. Commisso's testimony -- would be materially
24            altered if he heard other testimony at that
25            proceeding?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              Before you answer that question --
 2       Mr. Davis, can you point to me -- I thought you
 3       made an argument earlier regarding -- it might
 4       not have been a rules-based argument --
 5       regarding the idea that counsel for the
 6       United Way is the United Way in this
 7       proceeding -- why an adequate substitute
 8       couldn't just be brought in from the
 9       United Way?
10            MR. DAVIS:  So subdivision (b) of the same
11       advisory committee notes -- it actually refers
12       to counsel, I think, in a couple of places.
13            But if you look at subdivision (b) --
14            THE COURT:  Let me just read it.  Thank
15       you.
16            MR. DAVIS:  -- in the notes.
17            THE COURT:  Yep.
18            MR. DAVIS:  "In referring to the victim
19       and the victim's lawful representative, the
20       committee intends to include counsel."
21            THE COURT:  Yep.
22            MR. DAVIS:  Judge, we don't want to fight
23       about this.  And we'd even readily agree to a
24       brief continuance if Ms. Brown is dead set
25       on -- and needs then to alter her order of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

16

1           proof and is somehow damaged by calling
2           Mr. Commisso first.  Let's give her some more
3           time.  That's fine.  But please do not
4           sequester the attorney for the victim here.
5                THE COURT:  I know, but the attorney for
6           the victim is really involved in the facts and
7           circumstances that gave rise to this motion to
8           dismiss; right?  His involvement is very much
9           at issue.
10               I am undecided about this motion.  My mind
11          is very much open.  And I think -- I'll
12          admit -- I'm going to be up front about this --
13          that Counsel's rule is not, to me, necessarily
14          the most important factor, okay, in this
15          analysis.  It's part of it.  I mean, we're at a
16          situation where the Defendant won't budge on
17          anything, so I guess I've got to make the
18          determination.
19               Is it your position, Ms. Brown, that under
20          rule 60(a)(2) -- which, I think, Mr. Davis
21          makes a reasonable argument applies to the
22          victim's counsel -- that his testimony would be
23          materially altered if he heard the testimony of
24          the proceedings?
25               MS. BROWN:  Yes, Your Honor.  And as a

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1        very brief offer of proof, as I said before,
2        it's very important in terms of presentation
3        that we start with Mr. Naviloff.  Because that
4        is the big issue here.  And much of what we're
5        going to be questioning Mr. Naviloff about is
6        emails that he exchanged back and forth between
7        Attorney Commisso, and that his -- it probably
8        won't go a minute without mentioning
9        Attorney Commisso in terms of involvement with
10       Mr. Naviloff and the sharing of the emails
11       between the both of them.  It's not a sort of
12       tangential reference.  And all the more reason
13       why, before we ask Attorney Commisso about some
14       of these emails, we have to lay the foundation
15       through Attorney -- not Attorney --
16       Mr. Naviloff.
17            MR. COMMISSO:  Your Honor, may I address
18       one or two issues?
19            THE COURT:  Sure.
20            MR. COMMISSO:  Thank you, Your Honor.
21            One issue is a concern about the
22       attorney-client privilege.  Mr. Naviloff and
23       Mr. Meyer are going to be questioned by the
24       Defendant.  And I am the only person who is in
25       a position to ensure that that examination and

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          the witness' answers don't infringe upon the
2          United Way's attorney-client privilege.
3                  THE COURT:  How would you possibly do
4          that?
5                  MR. COMMISSO:  How would I...
6                  THE COURT:  Have I admitted you as an
7          intervenor or -- I guess I've admitted you pro
8          hac vice; right?
9                  MR. COMMISSO:  Well, Your Honor, I filed
10         two documents.  One was for admission pro hac
11         vice.
12                 THE COURT:  I'm really about asking
13         questions and having an answer.  It's just the
14         way I operate.  I'm trying to remember, because
15         I think I remember granting you pro hac vice
16         admission.
17                 Did I do that or not?
18                 MR. COMMISSO:  I haven't seen it on the
19         docket.
20                 THE COURT:  Mr. Davis, do you know?
21         Because I thought I did.
22                 THE CLERK:  Yeah, Judge --
23                 THE COURT:  I did grant it, because I knew
24         you wanted to file a motion to intervene, so I
25         granted the motion.  All right.  So I guess you
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | are admitted, so you could assert.  Okay.  I've |
| 2 | answered my own question, kind of.  Good. |
| 3 | Go ahead and continue. |
| 4 | MR. COMMISSO:  Okay. |
| 5 | So one is the necessity for me to be |
| 6 | present during Meyer and Naviloff's testimony |
| 7 | to assert the privilege on behalf of the |
| 8 | victim.  Number two is the two experts are |
| 9 | going to be present during each other's |
| 10 | testimony.  So, obviously, there's room in the |
| 11 | rules of sequestration to allow for exceptions |
| 12 | to that rule.  And here the rule specifically, |
| 13 | as Mr. Davis already read -- the rule |
| 14 | specifically identifies the exception to the |
| 15 | sequestration rule. |
| 16 | And I'd also like to say, I'm not just |
| 17 | hired counsel in some generic sense.  I am |
| 18 | essentially, for all intents and purposes, |
| 19 | general counsel of the United Way of |
| 20 | Massachusetts Bay.  They don't have an in-house |
| 21 | counsel.  And if I held that title of general |
| 22 | counsel, I don't know that we'd be having this |
| 23 | discussion; but the board of directors and the |
| 24 | special committee authorized by the board of |
| 25 | directors passed a resolution to engage me as |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | the representative.  The corporation can only |
| 2 | act through representatives.  And I am the |
| 3 | corporation's representative.  I know these |
| 4 | issues better than anyone and more than anyone. |
| 5 | And the board and the special committee -- the |
| 6 | corporation -- has appointed me to represent |
| 7 | them before Your Honor. |
| 8 | And with that, I will pause. |
| 9 | THE COURT:  Yeah. |
| 10 | MR. DAVIS:  Judge, I would only add the |
| 11 | Court asked a direct question to Ms. Brown: |
| 12 | Would the testimony be materially altered? |
| 13 | Ms. Brown didn't answer that question. |
| 14 | She said that Mr. Commisso would come up in the |
| 15 | testimony, but she -- even she does not say |
| 16 | that an officer of the court and Mr. Commisso |
| 17 | would be shaping, or shading, or modifying his |
| 18 | testimony as a result of hearing any other |
| 19 | testimony in this case. |
| 20 | Again, it's her burden.  And the burden is |
| 21 | clear and convincing evidence.  She hasn't |
| 22 | anywhere near met that burden. |
| 23 | And the Court says, "Well, the Defendant |
| 24 | wouldn't budge."  The Government isn't |
| 25 | surprised by that, Your Honor.  The Defendant |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         has never budged at any point in this case.
 2         It's been two years of this, and so he isn't
 3         budging now.
 4              Well, we say, "So what?"
 5              THE COURT:  Well, actually, that's not how
 6         I remember it, Mr. Davis.  I admit this
 7         particular counsel has not been budging -- and
 8         she has no obligation to budge, by the way --
 9         none whatsoever.
10              But Mr. Harrington approached it
11         differently; right?  And some of the discovery
12         decisions we made going along here laid the
13         foundation for all this -- some of the
14         decisions I made based on agreements between
15         everybody.  But it wasn't as if everything was
16         fought tooth and nail.  And if defense counsel
17         wants to fight tooth and nail now, we all know
18         she has that right and, perhaps, that
19         obligation.  So, look -- but I've got to bring
20         this to an end because we've got to get on with
21         this.
22              My preference -- let me just tell you, as
23         a trier of fact of this, my preference would be
24         that he be sequestered; okay.  That's the way I
25         like accepting testimony.  I understand,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          though, Mr. Commisso's point that the victim
2          and its board has entrusted him with
3          representing them in this proceeding, and he's
4          the only one here doing that.
5               I guess I would ask you, Mr. Commisso, can
6          you arrange for, during your brief
7          sequestration here, that someone else in the
8          United Way be present?
9               MR. COMMISSO:  Perhaps it's possible, but
10         that individual couldn't really represent the
11         United Way in the way that I will, which, as I
12         said, there are these issues with respect to
13         privilege that are going to come up with two of
14         the witnesses' testimony.
15              And how do I then go back and advise the
16         United Way, and do my duty as their attorney to
17         provide them advice and counsel with respect to
18         what happens at this hearing, if I have been
19         excluded based on -- I guess it would be based
20         on the idea that, as a member of the bar with
21         20 years of experience practicing in the
22         federal court, that the Court couldn't be
23         satisfied that my testimony is not going to be
24         materially altered, where I've read every
25         document in the case, and I've attended the

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | entire trial and every hearing in the case, and |
| 2 | I know the issues as well as the attorneys who |
| 3 | are going to be making the arguments and |
| 4 | questioning the witnesses. |
| 5 | THE COURT:  Okay.  Here's the ruling.  I |
| 6 | cannot find -- I'll say it this way. |
| 7 | Despite my announced preference that |
| 8 | Mr. Commisso be sequestered and that I will |
| 9 | have to take this into consideration when I |
| 10 | evaluate the testimony -- despite signaling |
| 11 | that, I cannot find that there's clear and |
| 12 | convincing evidence that Mr. Commisso would -- |
| 13 | based on defense counsel's argument, I cannot |
| 14 | find, by clear and convincing evidence, that |
| 15 | Mr. Commisso's testimony would be materially |
| 16 | altered if he heard other testimony of the |
| 17 | proceeding.  There's just not a basis for that |
| 18 | based on this record.  So I'm going to deny the |
| 19 | motion to sequester Attorney Commisso. |
| 20 | Now, other witnesses, Ms. Brown, you'd |
| 21 | like sequestered, let me know. |
| 22 | MS. BROWN:  I think that would just leave |
| 23 | Attorney Meyer -- I keep saying "Attorney." |
| 24 | It would leave John Meyer to be |
| 25 | sequestered.  I don't know if the Government |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          would intend to call Mr. Naviloff after we
2          called Mr. Sgro, and whether he would need to
3          be --
4               THE COURT:  Experts are generally not
5          sequestered.
6               MS. BROWN:  Okay.  Then that would be the
7          only person -- would be Mr. Meyer.
8               THE COURT:  So any objection, Mr. Davis,
9          on Meyer?
10              MR. DAVIS:  No.
11              THE COURT:  So, Charli, Mr. Meyer will be
12         excluded during the testimony of either
13         witnesses, but -- well, didn't have to happen
14         yet, though.  We haven't started testimony yet.
15         He's still there.  Good.
16              Any other procedural matters,
17         Counsel Brown, before we start?
18              MS. BROWN:  Yes, Your Honor.  Two just
19         that I made a note I wanted to address.
20         Ordinarily, if we were going to show an exhibit
21         that was marked for ID, we wouldn't show it to
22         the trier of fact, but it's kind of hard to do.
23              So I just wanted to -- most of our
24         exhibits are marked for identification at this
25         point.  So to make them full exhibits, we'd
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          actually have to show them on the screen to the
 2          witness.  I just wanted the Court to see if the
 3          parties had any problem with us doing that.
 4               THE COURT:  Well, Counsel conferred about
 5          the exhibits.
 6               I mean, is there any debate about whether
 7          there's admissibility before me in this
 8          proceeding?
 9               MS. BROWN:  Most of them have already been
10          attached, if not all have been attached, to
11          motions.  So I just wanted to --
12               THE COURT:  Here's the ruling:  All
13          exhibits by either party are deemed admitted in
14          this proceeding.  However, that's what I'll
15          prejudice to both of you -- Mr. Davis, and
16          Ms. Brown, and any counsel -- if there's an
17          exhibit that's on the table that's been raised
18          and you think there's some barrier to its
19          admissibility, you should raise it.  It might
20          just be an argument that goes to weight rather
21          than admissibility.
22               But if you think there's an admissibility
23          argument, raise it, and I'll consider excluding
24          it.  But rather than having people lay
25          foundations for ID and all that this hearing,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1        that seems reasonable.
2              Any objection, Mr. Davis?
3              MR. DAVIS:  No.
4              MS. LE:  Your Honor, can I just point out
5        that Ms. Brown has marked for identification
6        exhibits that have been subject and are subject
7        to a protective order.
8              So we'd ask that Ms. Brown make sure that
9        those exhibits that are a part of the
10       protective order be filed under a CO,
11       Your Honor.
12             THE COURT:  Sure.
13             Do you know which ones, Ms. Brown, are
14       protective order-covered?
15             MS. BROWN:  I would say the vast majority,
16       if not -- except for maybe a couple of letters.
17       So I have no problem with having them all
18       placed under seal, just out of an abundance of
19       caution.
20             THE COURT:  The exhibits are all
21       admissible, but I'll also submit it under seal
22       at level one.
23             To honor the protective order, what I
24       would ask is that after the hearing, Ms. Le,
25       you consult with Attorney Brown.  And if there
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          are any exhibits not covered by the protective

2          order, I'll unseal those; okay?

3               MS. LE:  We will gladly do that,

4          Your Honor.  We just got dropped 1,000 pages of

5          exhibits, so it's hard to go through every

6          single page now.  Thank you.

7               THE COURT:  I understand.  Thank you.  And

8          I appreciate you bringing it up.  Well, let me

9          say this, then.

10               If you've been unfairly prejudiced by this

11          eleventh hour -- and I'm not accepting this.

12          I'm just accepting your representation -- sort

13          of a document dump at the eleventh hour, do you

14          need more time to prepare?

15               MS. LE:  No, Your Honor.  We can move

16          forward.

17               THE COURT:  Okay.  All right.

18               Anything else, procedurally, people need

19          to bring up?

20               MS. BROWN:  This isn't as much of a

21          procedural issue, Your Honor.  I just -- both

22          Attorney Eaton and myself, and our

23          examinations, are going to make every attempt

24          that when we talk about a document, that we

25          identify it as something that was either

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | produced pretrial or it was something posttrial |
| 2 | and, therefore, subject to the Brady issue. |
| 3 | And to the extent we get to do that and |
| 4 | the Court has a question like, "Hey, was this |
| 5 | pre?"  Feel free to interrupt us.  But we're |
| 6 | going to try -- there's going to be some |
| 7 | documents that were produced prior to trial |
| 8 | that are just important to lay the foundation |
| 9 | to the relevance and importance of the |
| 10 | documents after trial.  So we'll do our best to |
| 11 | identify those documents for the record, but I |
| 12 | just wanted the Court -- if it's not clear from |
| 13 | our examination, feel free to interrupt. |
| 14 | THE COURT:  Sure.  Okay.  That's fine. |
| 15 | I would ask -- are you talking about |
| 16 | exhibits -- if it's a document that's been |
| 17 | docketed, and it's 162-3, I would request you |
| 18 | use that.  And if it's -- excuse me. |
| 19 | If it's a trial exhibit, I would request |
| 20 | you use that.  Because for the court of |
| 21 | appeals, it's going to be difficult; all right. |
| 22 | So naming them as exhibits to this hearing -- |
| 23 | probably not particularly helpful in the long |
| 24 | run.  So do your best, please. |
| 25 | MS. BROWN:  Okay. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            THE COURT:  Okay.  Now I have three quick
 2    issues I want to nail down so I have a good
 3    foundation to do this today.
 4            One is time; right?  I'm looking at -- let
 5    me just look quickly -- yeah.  I mean, we have
 6    potentially four witnesses; right?  I'm sure
 7    you both have arguments you want to advance --
 8    just plain oral argument.  And I have
 9    questions.  I've got several questions.
10            So I think there's a decent chance this
11    hearing takes all day long.  I don't know that,
12    but it certainly is going to take more than up
13    to the lunch hour.  So I plan on working sort
14    of a normal trial day.  I hope people are
15    available.  But that's just my assumption right
16    now -- that we're going to spend the day in
17    courtroom doing this hearing.
18            Two questions for you.  As I understand
19    the motion, it's a motion to dismiss for
20    constitutional violation to the Brady
21    doctrine -- failure to produce exculpatory
22    evidence that the Defendant says amounted to
23    prejudice at trial; right?
24            There's no challenge to any discovery
25    ruling during the case; right -- in terms of,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              like, a failure to either comply with Rule 16
 2              or to comply with a court order on discovery.
 3              This is a constitutional motion for failure to
 4              produce exculpatory evidence.
 5                   Am I right, Attorney Brown?
 6                   MS. BROWN:  Yes, as far as I know, there
 7              wasn't a motion for discovery filed pretrial
 8              that's relevant to these issues.
 9                   THE COURT:  No.  The closest we came was
10              that motion to exclude Mr. Naviloff, which we
11              resolved through the production of some
12              discovery that, as of that time, had not been
13              provided.
14                   So I'm correct that there's no challenge
15              to a rule violation or an order violation.
16              It's a constitutional violation under Brady;
17              right?
18                   MS. BROWN:  Correct.  And just to the
19              extent that there was some back-and-forth on
20              this prior to trial, it's relevant to the
21              production and notice of some of these
22              documents.
23                   THE COURT:  Yep.
24                   Second question -- and this is for both
25              parties.  That first question for was Attorney
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1        Brown.  This is for both parties.

2             One question I have about this -- this is

3        a motion to dismiss, but there's nobody

4        addressing in the briefing, like, what is the

5        prescribed remedy here?  There's references in

6        both of your papers to the possibility of a new

7        trial.  And I guess my question for both of you

8        is this:  If I found a Brady violation -- let's

9        assume I found a Brady violation that amounted

10       to a failure to produce that was prejudicial,

11       and I found it in violation.

12            What's the remedy?  Is it possibly

13       dismissal, possibly new trial?  Is it either?

14       Both?  Like, what's the remedy?  Because that's

15       not really been focused on by the parties,

16       except by sort of references by both sides.

17            I guess I'll hear from the prosecutor

18       first.

19            MR. HUNTER:  Thank you, Your Honor.

20            I think the remedy would not be dismissal.

21       Because in order to show dismissal, the Court,

22       as I understand the Defendant's argument, would

23       have to show egregious prosecutorial

24       misconduct.  And I think if there was a

25       technical Brady violation -- which, of course,

```
1        the Government contests -- I don't think it
2        rises to the level of truly egregious
3        prosecutorial misconduct.  And so then we're in
4        the new trial framework.  Because ultimately,
5        this is a Rule 33 motion, with a clause that
6        the prosecutorial misconduct is so egregious it
7        warrants dismissal.
8            So then I think it would be -- again, if
9        the Court finds a violation that's sufficiently
10       problematic --
11           THE COURT:  Violative of the Constitution.
12           MR. HUNTER:  Right, sufficiently
13       violative -- then we're in Rule 33.  Which I
14       think, because this is a bench trial, the Court
15       has more flexibility than if this were a jury
16       trial.  And what the Court can do is, rather
17       than having a whole new trial, because the
18       Court was the finder of fact under Rule 33, the
19       Court can basically open the trial back up
20       again, hear additional evidence, hear
21       additional testimony, and then, if it deems it
22       appropriate, can amend the judgment.
23           And so we cite that rule in our papers.
24       But I think if the Court finds a sufficient
25       violation, the remedy would basically be for
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          the Court to hear additional trial testimony
2          based on this newly discovered evidence.
3              THE COURT:  All right.  Understood.  Yeah,
4          I appreciate you are putting a -- I saw the
5          reference to that in your papers, and now I
6          understand it better in the context of Rule 33,
7          Mr. Hunter.  Thank you for a clarification.
8          Okay.
9              Ms. Brown, what's your position?
10             MS. BROWN:  We do agree that the case law
11         is such that the first analysis goes to whether
12         a new trial can cure the Brady violation.  And
13         then after that, I agree that if the violation
14         was egregious enough, then it's a dismissal.
15         So we're in agreement on that.
16             The issue of hearing new evidence, I
17         think, is very complicated at this point.
18         Because I'll just say:  It's a failure to be
19         able to cross-examine someone.  So do you do a
20         do-over on the cross-examination?  And it's
21         sort of not this magical witness who was
22         missing that you come in and just add to it.
23         It's a very different type of thing.
24             So I don't think we have to deal with that
25         right now.  I do agree that's what the language
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        of Rule 33 says.  And I think that would be for
 2        the Court to deem whether that's a remedy.
 3        Obviously, if we don't think a new trial is an
 4        adequate remedy, we don't think that is an
 5        adequate remedy as well.
 6             THE COURT:  Right.  It focuses on the next
 7        level of egregiousness as to whether that
 8        process would cure.  Okay.  I will say this.
 9             While I have a very, very open mind about
10        whether this is a Brady violation -- there's a
11        lot of interesting questions here, and not a
12        lot of precedent in the cases for this type of
13        situation -- I will say this.
14             The Defendant's papers make some very,
15        very serious allegations and accusations
16        against the prosecution.  What I've read,
17        though, in terms of the briefing, the
18        documents, my memory of the trial -- this
19        doesn't really rise to what I would view as,
20        you know, egregious prosecutorial misconduct,
21        if it's misconduct at all.  It strikes me more
22        as, if it's a violation -- if it is, it was
23        more sort of a unique situation that presented
24        itself with an expert witness that had done
25        some work for the victim before, and very
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          pervasive involvement by the victim's counsel.
 2          It doesn't strike me as an intentional effort
 3          to manipulate the discovery process, or even,
 4          like, some sort of really gross negligence that
 5          might even rise to that level.
 6                I have an open mind about it.  And I'm
 7          going to listen, of course, to the evidence;
 8          but at this point, the egregiousness of it is
 9          not coming through to me in terms of
10          intentional misconduct and intentional
11          discovery abuses, or even -- so they might have
12          been impactful, but not impactful in such a
13          significant way that even a negligent violation
14          would have to be labeled "egregious."  That's
15          my sense early in the thing.  I just want you
16          to know that's where my head is now.  Of
17          course, I'm open to being persuaded by both
18          sides.  Okay.
19                While I do have questions, I think we
20          should get underway with the witnesses.  I
21          think that's the best approach.  So the burden
22          of proof here is on the Defendant.
23                I'll let you call your first witness,
24          Ms. Brown.
25                Let's sequester Mr. Meyer, please, Charli.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1                 THE CLERK:  Very good.
 2                 Mr. Meyer, I'm going to place you in the
 3        waiting room.
 4                 MS. BROWN:  And the Defense is going to
 5        call Mr. Greg Naviloff.
 6                 So if the Court could swear him in.
 7                 THE CLERK:  Mr. Naviloff, please raise
 8        your right hand.
 9                 Do you solemnly swear the testimony you're
10        about to give will be the truth, the whole
11        truth, and nothing but the truth, so help you
12        God?
13                 MR. NAVILOFF:  I do.
14                 THE CLERK:  And for the record, please
15        state your full name and spell your last name.
16                 MR. NAVILOFF:  Greg Naviloff,
17        N-A-V-I-L-O-F-F.
18                 THE CLERK:  Thank you.
19                 MS. BROWN:  Thank you.
20
21                      DIRECT EXAMINATION
22        BY MS. BROWN:
23    Q.  And, Mr. Naviloff, do you still work for RSM?
24    A.  Yes, I do.
25    Q.  And what role do you currently hold at RSM?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   I am a director within the financial
 2        investigation dispute services practice.
 3   Q.   And this was -- you were questioned about this
 4        briefly at trial.
 5             You are not an IT expert; correct?
 6   A.   I don't carry any credentials in IT services.
 7   Q.   And just for credentials, your credentials are
 8        in accounting, and specifically forensic
 9        accounting; correct?
10   A.   And business valuation and valuation as a
11        whole.
12   Q.   Now I am going to ask you about a couple --
13        well, strike that.
14             You've had, for lack of a better word, two
15        hats in this case; right?  You worked for
16        United Way; correct?
17   A.   Yes, I worked for United Way.  If the hats are
18        engagement letters, yes.  There's two
19        engagement letters -- two contracts or
20        agreements.
21   Q.   So somewhere in the middle of July of '18 up
22        until the spring of 2019, you were working for
23        United Way with an engagement letter that was
24        signed between you and Mr. Commisso; correct?
25   A.   That is correct, yes.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1   Q.   And then after that -- and to the summer of
2        2019 until today, you have engagement letters
3        with the Government -- the U.S. Government;
4        correct?
5   A.   Yes, I have a contract with the U.S. Attorney's
6        Office to assist.
7   Q.   So I want to go back and ask you some questions
8        about your representation -- not
9        representation -- your work for the United Way
10       back in summer of 2018.
11            And I'm going to ask the clerk to bring up
12       Exhibit Z, which is now a full exhibit.  And
13       just for the record, that is the report that
14       you did for the United Way.
15            (Pre-marked Defendant's Exhibit Z
16            introduced.)
17            MS. LE:  Ms. Brown, do you have the ECF
18       number for that exhibit?
19            MS. BROWN:  That one doesn't have an ECF
20       number because I don't think we attached that
21       before.  I have the ECF numbers for other
22       exhibits, but that one, I do not have.  And I'm
23       looking specifically at page 30 of Exhibit Z.
24            THE COURT:  Is that Deputy Clerk Uhrin
25       who's running this?

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1                    THE CLERK:  Yes.
 2                    MS. BROWN:  That's exactly what I'm
 3            looking for.  Thank you.
 4     Q.     (By Ms. Brown)  So, Mr. Naviloff, do you
 5            recognize this document?  And we're looking --
 6            I'm going by the PDF counter number in terms of
 7            number, but this is page 30.
 8                    Do you recognize this document?
 9     A.     Not specifically to a meeting, but, generally,
10            yes.
11     Q.     If I told you this was the -- I think in some
12            of your emails you used the word "slides," but
13            a presentation that you helped put together for
14            a committee at the United Way regarding
15            allegations of loss and theft regarding
16            Mr. Alrai, does that refresh your recollection?
17     A.     Well, we had a number of committee -- special
18            committee meetings, and board meetings, and
19            different groups within United Way that
20            received varying amounts of information.  So,
21            this appears to be a slide from one of those
22            meetings and/presentations.
23     Q.     Okay.
24                    And we'll get to it later, but there were
25            several emails back and forth regarding putting
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| 1 | | together some of these presentations for the |
|---|---|---|
| 2 | | United Way; correct? |
| 3 | A. | Emails back and forth between who? |
| 4 | Q. | Between you and your team at RSM. |
| 5 | A. | Yeah.  Presumably, we exchanged emails, yes. |
| 6 | Q. | And just for the Court's notation, this |
| 7 | | document, Exhibit Z, was produced prior to |
| 8 | | trial.  So this is a document I'm just setting |
| 9 | | a foundation for. |
| 10 | | So in this document, the bar at the top |
| 11 | | says "Potential Recoveries"; correct? |
| 12 | A. | Correct.  Yes. |
| 13 | Q. | And the purpose of this slide was to look at |
| 14 | | sources of funds to -- for United Way to |
| 15 | | recover regarding the losses involving |
| 16 | | Mr. Alrai; correct? |
| 17 | A. | That's correct. |
| 18 | Q. | And in the middle, there's a graph or a bar |
| 19 | | graph that identifies $1,025,000 of coverage |
| 20 | | that is available from the Chubb insurance |
| 21 | | policy that United Way had; correct? |
| 22 | A. | A column labeled "Coverage," yes, that contains |
| 23 | | two amounts that total that, yes. |
| 24 | Q. | Now, under that chart, there's another bullet. |
| 25 | | Actually, I think the second bullet. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | It says, "There is potential for |
| 2 | | additional recoveries as a result of the |
| 3 | | potential criminal action brought against Alrai |
| 4 | | by the U.S. Attorney's Office"; correct? |
| 5 | A. | Correct. |
| 6 | Q. | And the third bullet is "Counsel will prepare a |
| 7 | | proof of claim for insurance purposes and |
| 8 | | continue to support the U.S. Attorney's Office |
| 9 | | investigation and prosecution of Alrai"; |
| 10 | | correct? |
| 11 | A. | Correct.  Yes. |
| 12 | Q. | So when you're meting with the people in |
| 13 | | control at United Way, one of the sources of |
| 14 | | funds that you're looking at for loss is the |
| 15 | | criminal prosecution; correct? |
| 16 | A. | One of the avenues that I was made aware of by |
| 17 | | counsel was this process, yes. |
| 18 | Q. | And by "counsel," do you mean Attorney Commisso |
| 19 | | or the attorneys from the U.S. Attorney's |
| 20 | | Office? |
| 21 | A. | Attorney Commisso, yes.  This is a report -- |
| 22 | Q. | So he told -- |
| 23 | A. | Sorry.  If I can continue. |
| 24 | Q. | It's hard not to interrupt. |
| 25 | A. | No, that's okay. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              This is a report that, presumably, was
 2         prepared -- I believe most of these were
 3         prepared with Mr. Commisso, and Mr. Commisso
 4         either providing input or incorporating some of
 5         this informations himself into these slides.
 6    Q.   So when you were helping to put the slide
 7         together, there were conversations about the
 8         fact that a criminal prosecution might be a
 9         source of recovery for the United Way; correct?
10    A.   I don't recall any conversations.  I think this
11         may be an area that Mr. Commisso put this in
12         here.  I know generally, we were aware that the
13         U.S. Attorney's Office was investigating, but I
14         don't recall any real discussion in substance
15         around this.
16    Q.   But you were generally aware that a criminal
17         case may be a source of funds for the
18         United Way?
19    A.   Advising the special committee and advising
20         United Way, our mutual client, this was
21         certainly a potential.
22              (Audio drops for 37 seconds.)
23    Q.   (By Ms. Brown)  Here is a group of attorneys
24         and the United Way.
25              Does that look familiar to you?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1    A.   Yes, it does.
 2              MS. BROWN:  And I'm going to ask you,
 3         Tracy, to go to page six of this document.
 4    Q.   (By Ms. Brown)  And it shows your signature on
 5         page six; correct?
 6    A.   Correct.
 7    Q.   I'm going to go back to page one of this
 8         exhibit.  And I believe it is that -- if we can
 9         pull out the first paragraph after "Objective."
10              And as part of this agreement, you and RSM
11         agreed to provide "various accounting,
12         financial, economic, forensic, investigative,
13         or other services, including the preparation of
14         a Rule 26 expert report"; do you see that?
15    A.   Yep, I do.
16    Q.   What's your understanding of a "Rule 26 expert
17         report"?
18    A.   Rule 26 -- don't quote me on it, but I believe
19         it's a factual expert report.
20    Q.   So when you entered into this engagement letter
21         with Attorney Commisso and United Way, you
22         understood that that would include a Rule 26
23         expert report?
24    A.   We have standard language in our contracts,
25         engagement letters.  This is boilerplate
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            language -- what we include in our contracts as
 2            far as always a potential that some expert
 3            testimony may be necessary.
 4                 MS. BROWN:  If you could take that down,
 5            Tracy.  Thank you.  Actually, just take down
 6            that pullout or the magnification.  Go to page
 7            three of the same document.
 8    Q.      (By Ms. Brown)  Looking at the fourth paragraph
 9            of that document, it says that "the conclusion
10            of the engagement" -- yeah, right there.
11                 So this paragraph here talks about "at the
12            conclusion of the engagement," that "you will
13            protect any confidentiality involving your work
14            for the United Way"; does that sound like
15            boilerplate language as well?
16    A.      Yes.
17    Q.      And that was in that engagement letter as you
18            protecting work that you did for the
19            United Way; correct?
20    A.      Correct.
21                 MS. BROWN:  You can take that down, Tracy.
22    Q.      (By Ms. Brown)  Now, when you were working for
23            the United Way, you sent billings to
24            United Way; correct?
25    A.      Correct, yes.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1                (Pre-marked Defendant's Exhibit M
 2                introduced.)
 3   Q.   (By Ms. Brown)  And I'm going to pull up
 4        Exhibit M, which is the August 3, 2018 billing
 5        that RSM sent to Attorney Commisso.
 6             Does that look familiar to you?
 7   A.   Yes, it does.
 8   Q.   And that's a bill for -- I'm reading my notes
 9        and not that -- but for $45,171.70; correct?
10   A.   Correct.  Yes.
11             MS. BROWN:  And, Tracy, I'll have you pull
12        up Exhibit N.
13                (Pre-marked Defendant's Exhibit N
14                introduced.)
15   Q.   (By Ms. Brown)  Which is a September 10, 2018
16        invoice RSM sent to Commisso for $170,682.18;
17        correct?
18   A.   Correct.
19             MS. BROWN:  And pull up Exhibit O, which
20        is the October 11, 2018 invoice that RSM sent
21        to Attorney Commisso for -- actually, that
22        one's -- yeah.
23                (Pre-marked Defendant's Exhibit O
24                introduced.)
25             MS. BROWN:  So the one that has 113 is O,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           so the next one will be 30,000, which is --
 2           bring up Exhibit P.  Oh, I'm sorry.  I've got
 3           that at 55,000.
 4                (Pre-marked Defendant's Exhibit P
 5                introduced.)
 6                MS. BROWN:  And then I'm looking for
 7           Exhibit Q, which is a January 8, 2019 invoice.
 8                (Pre-marked Defendant's Exhibit Q
 9                introduced.)
10                MS. BROWN:  Now if you can -- I don't know
11           if it's possible, Tracy, to pull out the third
12           line that starts with the words "ad hoc
13           response."  Yes, that's good.
14      Q.   (By Ms. Brown)  So this billing talks about ad
15           hoc responses to U.S. Attorney's Office
16           regarding criminal investigation proceedings;
17           correct?
18      A.   Correct.  Yes.
19      Q.   So when you were working for the United Way,
20           you were billing the United Way for work that
21           you were doing with -- in conjunction with the
22           U.S. Attorney's Office in terms of meeting with
23           them and producing documents; correct?
24      A.   This would be as described -- "some responses
25           to requests from the U.S. Attorney's Office."
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1              I don't think those requests were made directly
2         to RSM, but I could be wrong.  I don't have my
3         recollection of January 2019.  But, most
4         likely, they would direct it to Mr. Commisso --
5         Attorney Commisso.  And we were assisting him.
6    Q.   Now, we talked a little while ago about the
7         fact that you had -- in your engagement letter,
8         it talks about confidentiality regarding your
9         work from the United Way.
10             When you started having conversations with
11        the U.S. Attorney's Office or emailing the U.S.
12        Attorney's Office or phone calls, did you
13        assert that privilege to those contacts?
14   A.   Any discussions we would have had with the U.S.
15        Attorney's Office would have been with
16        Attorney Commisso, who ultimately can choose to
17        waive or determine whether there is privilege
18        or what can be shared.
19             So we follow the lead of -- or I follow
20        the lead of Attorney Commisso with respect to
21        what can and can't be shared with the U.S.
22        Attorney's Office.
23   Q.   You don't have any recollection of
24        Attorney Commisso asserting attorney-client
25        privilege as to any of your contacts or
```

```
1         document productions with the U.S. Attorney's
2         Office, do you?
3    A.   I believe there was discussion -- ongoing
4         discussion with -- just about anything that was
5         requested, it was shared with Attorney Commisso
6         for that very reason; right?  So that he could
7         be the one responsible for determining what to
8         share.
9              There may have been isolated incidences
10        where there was maybe a phone discussion or
11        some sort of discussion with respect to
12        information that made its way to the U.S.
13        Attorney's Office directly from us, with a cc
14        to Attorney Commisso.
15             MS. BROWN:  Thank you, Tracy.  You can
16        take down that document.
17   Q.   (By Ms. Brown)  So we talked about the fact
18        that you worked -- you and RSM worked for
19        United Way through the summer and into the fall
20        of 2018; does that sound correct?
21   A.   That's correct, yes.
22   Q.   And part of that work you did was to prepare a
23        report we reviewed a few minutes ago; correct?
24   A.   There were multiple presentations that were
25        provided to the special committee and others,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          updating them periodically and including
 2          reports that included a loss quantification.
 3               (Pre-marked Defendant's Exhibit S
 4               introduced.)
 5               MS. BROWN:  I'm going to ask you some
 6          questions about Exhibit S, which is also
 7          Document No. 164-19.
 8               Tracy, if I could pull up the bottom half
 9          of that email that starts "From:  Naviloff,
10          Greg."  And that whole -- basically, the whole
11          half.  Yeah, if you could pull that out.
12     Q.   (By Ms. Brown)  Now -- and this is November 9,
13          2018; correct?
14     A.   Yes.
15     Q.   And you're still working for United Way and
16          Attorney Commisso at that point?
17     A.   Yes, that's correct.
18     Q.   Now, you send an email to one of your
19          colleagues at RSM, Chris Fitzgerald; correct?
20     A.   Correct.  Yes.
21     Q.   And in that email, you state, "I had a good
22          meeting with the U.S. Attorney's Office.
23          Sounds like the case will fall upon RSM's
24          testimony if they are to bring charges";
25          correct?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | And so you were telling the rest of your team |
| 3 | | that you met with the U.S. Attorney's Office; |
| 4 | | right? |
| 5 | A. | Correct.  Yes. |
| 6 | | MS. BROWN:  And you can take the pullout |
| 7 | | down, Tracy, in terms of the magnification. |
| 8 | Q. | (By Ms. Brown)  And the reply from |
| 9 | | Chris Fitzgerald says "great news"; right? |
| 10 | A. | Correct. |
| 11 | Q. | And the "great news" is that you're going to |
| 12 | | make more money off this case; right? |
| 13 | A. | No. |
| 14 | Q. | No, that's not the great news? |
| 15 | A. | No. |
| 16 | Q. | So the great news is that -- what is the great |
| 17 | | news?  Tell me what the great news is. |
| 18 | A. | Well, I said I had a good meeting with the U.S. |
| 19 | | attorney, right? |
| 20 | | Chris responded "great news."  So he |
| 21 | | thinks the fact that I had a good, productive |
| 22 | | meeting with the U.S. Attorney's Office is good |
| 23 | | news; right?  Because there's a lot that goes |
| 24 | | into calculations.  There's a lot that goes |
| 25 | | into fact-finding.  We were currently, at that |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | point in time, assisting Mr. Commisso/Commisso |
| 2 | Law with sharing information with the U.S. |
| 3 | attorney with respect to the work we had done. |
| 4 | So the fact that we had a good meeting was good |
| 5 | news to my team. |
| 6 | Q. But you did go on to be retained by the |
| 7 | Government in this case; correct? |
| 8 | A. Yeah, later down the road. |
| 9 | Q. In the following summer -- summer of 2019; |
| 10 | right? |
| 11 | A. Correct. |
| 12 | Q. And you made some money off of that; correct? |
| 13 | A. Well, I'm an employee of RSM, so... |
| 14 | Q. Well, your company makes money? |
| 15 | A. I'm not compensated off of any particular |
| 16 | engagement. |
| 17 | MS. BROWN:  Now I'm going to bring up |
| 18 | Exhibit T. |
| 19 | (Pre-marked Defendant's Exhibit T |
| 20 | introduced.) |
| 21 | Q. (By Ms. Brown)  And this is another email. |
| 22 | And in this email you say, "Call with U.S. |
| 23 | attorney went well based on info you provided." |
| 24 | A. I'm getting close to the screen because I'm |
| 25 | trying to find it. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   Yeah, me too.  I'm very nearsighted as well.
 2             So, I think, Tracy, if you see after the
 3        caption it says, "Thank you.  FYI."  If you can
 4        pull that out.  Yeah, right there.
 5             So it says, "Call with U.S. attorney went
 6        well based on info you provided"; correct?
 7   A.   Correct.  Yes.
 8   Q.   And that is directed at Chris Fitzgerald,
 9        Ryan Gilpin, Sean Renshaw?
10   A.   The entire team, for the most part.
11   Q.   Entire team.  Great.
12             You can take the pullout down, Tracy.
13        Thank you.
14             So this -- again, in the month of
15        November, you're talking to the U.S. attorney
16        about the criminal case; correct?
17   A.   Correct.  Yes.
18   Q.   And we already know from back -- in the report
19        in October that you did for RSM -- the internal
20        report -- one of your goals of the criminal
21        case was to recover money for United Way;
22        correct?
23   A.   That was a United Way goal -- to recoup its
24        losses.
25             MS. BROWN:  Now if I could bring up
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            Exhibit F.
 2                 (Pre-marked Defendant's Exhibit F
 3                 introduced.)
 4   Q.   (By Ms. Brown)  So this is a very brief email.
 5        It's an email regarding the fact that --
 6             It says, "I have attached the indictment."
 7        And that's from Attorney Commisso; correct?
 8   A.   Correct.
 9   Q.   And so he was sending that information to you
10        on November 29, 2018; correct?
11   A.   Correct.  Yes.
12   Q.   And you're still employed -- well, you and RSM
13        are still working for United Way at that
14        point -- not the Government; correct?
15   A.   That's correct, yes.
16   Q.   Now, you were hired by the Government -- if I
17        told you July 19, does that sound correct that
18        that's the specific date of your letter with
19        the Government?
20   A.   That does sound about right.  Yes.
21   Q.   And I'm referring to document 170-2:6.
22             You were hired by the Government to,
23        quote, "Update and refine the United Way loss
24        analysis reforms for United Way for purposes of
25        your trial testimony"; do you remember
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            testifying to that?
 2   A.   Yes, that's correct.
 3   Q.   And so, basically, you were hired to take work
 4        that you had, quote, "already done" and add to
 5        it?
 6   A.   To evaluate the Government's evidence, right,
 7        in conjunction with prior evidence.  And where
 8        it was consistent, obviously, then that was
 9        good.  And where there were contradictions,
10        then it would be taken to an accountant.  So
11        it's just evaluating new evidence.
12   Q.   And so they gave you additional evidence, and
13        you used some of your findings that you had
14        already made in your work for United Way and
15        put that all together; correct?
16   A.   Correct.  Yeah, so I looked at what they had,
17        and took what already existed, and pulled
18        together what was the most reasonable approach
19        to calculating losses, as well as personal
20        enrichment by Mr. Alrai, which is a completely
21        secondary calculation.
22   Q.   Now, you used the word "I," and you used that
23        at trial, too.
24            And at trial, I don't know if you recall,
25        you said, "When I use the word 'I,' I really
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         mean 'we.'"; remember that?
 2    A.   Yes, "I" is "we" in just about all my reports.
 3         I work for a consulting firm.
 4    Q.   So I want to talk about that a little bit.
 5              So even though "I" means "we," when you do
 6         billing on a case, you break it down for each
 7         person; right?
 8    A.   Correct.  Yes, most billings.
 9    Q.   And I'm going to show an example of that right
10         now, which is Exhibit M, which is information
11         regarding the billing records.  And if we go to
12         the next page of Exhibit M.
13              So here we can see that there's multiple
14         people working on this case; correct -- and by
15         "this case," I mean working for the Government?
16    A.   Yes.  Multiple phases and work streams, yes.
17    Q.   And in terms of -- well, actually, this is an
18         August bill, but this is your opinions that you
19         had given to United Way.  In this bill,
20         United Way -- RSM has billed United Way
21         159 hours.  And 23 of those hours were billed
22         by you.
23              Can you see that?
24    A.   Yes.
25    Q.   And if we could go to Exhibit N, and, again,
```

Case 1:18-cr-00192-JL  Document 200  Filed 11/30/20  Page 56 of 328

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         the second page.  This is September 2018.
 2              United Way's billed 397.9 hours, and 21 of
 3         those hours were billed by you; correct?
 4    A.   For all the work streams, yes.
 5    Q.   And during this period of time through the
 6         summer and the fall of 2018, one of the major
 7         tasks that you had, or you and RSM, was to look
 8         at a loss analysis, finding evidence of loss;
 9         correct?
10    A.   So both potential losses and internal control
11         evaluation is the phase two -- work stream two
12         of three.
13    Q.   But part of it was looking at evidence of loss?
14    A.   Yes.
15    Q.   Or "loss potential" is the word you used;
16         correct?
17    A.   Potential losses.
18    Q.   Yeah.
19              And "potential losses" means potential
20         recovery; right?
21    A.   Potential losses means that I don't have an
22         opinion as to whether a loss happened until we
23         complete our work; right?  So part of it is
24         evaluating whether there was a loss or not.
25    Q.   So let's go to exhibit -- we're still on
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              Exhibit N.  It says that Ryan Gilpin billed
 2         48 hours.
 3              Yeah, that's some -- slightly under
 4         "Technology Specialist" -- it's a little right
 5         under that, Tracy, if you could pull that out.
 6         It starts with "Diego Rosenfeld."  That's
 7         great.
 8              So under "Technology Specialist,"
 9         Ryan Gilpin has billed 48 hours for that month;
10         correct?
11    A.    Correct, yes.
12    Q.    And Diego Rosenfeld has billed one hour;
13         correct?
14    A.    Correct.  Yes.
15    Q.    Who is the more senior of those two people?
16    A.    Diego is partner, as is shown here, and Ryan is
17         an associate.  So partner is more senior than
18         associate.
19    Q.    And so at this period of time, when one of the
20         things you're working on is identifying
21         potential loss, Ryan Gilpin is doing the bulk
22         of the work, at least for the technology
23         specialist; correct?
24    A.    That's correct.  Yes.
25    Q.    Let's go to Exhibit O.  So this is Exhibit O.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         And this is the October 2018 billing.  If I
 2         could go to the second page.
 3              And if I told you that RSM billed
 4         283.8 hours that month, and 26.5 of those hours
 5         were billed by you, does that sound correct by
 6         looking at this document?
 7   A.    Correct, for all the work streams, including
 8         those that I was leading.
 9   Q.    And if we could then go to -- that was O -- P,
10         and second page again.
11              And it shows that RSM billed United Way
12         137 hours, and 33.2 hours of those were billed
13         by you; correct?
14   A.    Yes, that's correct.
15   Q.    And in this case, Ryan Gilpin billed 4.5 hours;
16         correct?
17   A.    Yes, that's correct.
18   Q.    So when we see billing from Ryan Gilpin, he's
19         under a different subheading than you; right?
20   A.    Yes.  He's listed as "Technology Specialist."
21   Q.    And you're listed under the forensic -- it says
22         "Forensic Team"?
23   A.    Yes, that's correct.
24   Q.    And by "forensic," that means forensic
25         accounting; correct?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   "Forensic" incorporates a larger profession
 2        than just forensic accounting.  For purposes of
 3        this?  Yeah, I guess it, quite technically,
 4        could be a -- renamed "forensic accounting," as
 5        that's the primary background for most of my
 6        team in this list.
 7   Q.   And then I'm going to pull up Exhibit Q, which
 8        is the January 2019 billing, and go to page
 9        two.  This is the one we talked about -- the ad
10        hoc work for the U.S. Attorney's Office.
11             And in this billing, you billed 26 --
12        United Way billed 26 hours, and ten of those
13        are billed by you; correct?
14   A.   It looks like there's five on top and ten
15        below.  So maybe a 15.5 -- 5.5 plus ten.
16   Q.   Would this have been the bill that would have
17        included you testifying at the trial?
18   A.   This is November 30.  This is pre-engagement.
19        I wouldn't have testified at this point.
20             MS. BROWN:  And so I'm going to kind of
21        switch gears now to talk about the work that
22        you did for the U.S. attorneys with Exhibit V.
23             (Pre-marked Defendant's Exhibit V
24             introduced.)
25   Q.   (By Ms. Brown)  And this is October 2019.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              So this would be when you were working for
 2         the U.S. Attorney's Office; correct?
 3    A.    Yes.  Addressed to Attorney Davis.
 4    Q.    And if we go to the second page of this, and it
 5         shows that there were -- I could see it --
 6         203 hours billed in working for the U.S.
 7         government, and 38.5 of them were billed by
 8         you; correct?
 9    A.    That's correct, yes.
10    Q.    Now, this bill looks a little different because
11         you don't have the subheadings with "Technology
12         Experts" versus "Forensic" that we looked at on
13         the other billing.
14              Am I reading that -- that it is different
15         from the other bill?
16    A.    Yeah, it's lacking subheaders.
17              MS. BROWN:  And so let's look at
18         Exhibit W, and a second page of that.
19              (Pre-marked Defendant's Exhibit W
20              introduced.)
21    Q.    (By Ms. Brown)  And that shows 181.2 hours that
22         RSM billed, and 51 of those hours were your
23         hourly billings; correct?
24    A.    Other -- so I get 50 -- yeah, 51.  Correct.
25    Q.    And I mistakenly referred to this earlier, but
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            this would have been the billing incorporating
 2            your testimony; correct?
 3    A.      That's correct, yes.
 4    Q.      So you, personally, would have had a higher
 5            billing for this period because you were
 6            getting ready to testify, and testifying;
 7            correct?
 8    A.      Yes.  My recollection is we had already gone
 9            over -- we said a set, agreed-upon amount for
10            this work.  So we had certainly utilized the
11            full amount that we could in terms of hours
12            we're going to bill.
13                 So I guess the best way to look at it is a
14            cap on what we agreed to bill the U.S.
15            Attorney's Office.  And for this matter, the
16            volume of work and the amount of work we did
17            exceeded what could be recovered.  So I think
18            you see here less time and excess of budget.
19                 So -- but, yeah, this looks like -- I'm
20            just reorienting myself with this.  So it looks
21            like it's the complete invoice with a credit
22            for excess over our cap.
23    Q.      And when you were working for the Government,
24            you still had that duty of confidentiality to
25            RSM?
```

```
 1   A.   Sorry, I don't understand the question.
 2   Q.   So you had signed an engagement letter with RSM
 3        saying that you had a duty of confidentiality
 4        to them; correct?
 5   A.   United Way?
 6   Q.   United Way, I'm sorry.
 7   A.   Yeah.
 8   Q.   You had a duty of confidentiality to United Way
 9        for the work you did for United Way?
10   A.   That agreement was still in force, yes.
11   Q.   But you're taking some of that work that you
12        did for United Way and incorporating it into
13        the work that you're doing for the U.S.
14        Attorney's Office; right?
15   A.   As permitted by Attorney Commisso and
16        United Way, yes -- or were permitted.
17   Q.   So in terms of what you were sharing with the
18        U.S. Attorney's Office, you were still under
19        the control of Attorney Commisso, because he
20        still controlled the confidentiality of your
21        previous work; is that how I understand this?
22   A.   Well, we had many work streams that we were
23        assisting with.  So he operated as a conduit to
24        make sure that what we were turning over was
25        areas that he had agreed to waive privilege.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

63

```
1           So, yes, we assisted with the transfer of
2      information.
3  Q.  And that role of Attorney Commisso of assisting
4      in the transfer of information -- that
5      continued after you went to work with the U.S.
6      Attorney's Office; correct?
7  A.  Where there was information related to the work
8      that we had done while engaged by United Way,
9      yes.
10 Q.  So as a hypothetical, if you are trying to put
11     together a report for the U.S. Attorney's
12     Office and you're like, "Hey, there's this
13     document that I remember when I worked for
14     United Way that is real important to this
15     analysis," did you call him up and say, "Hey, I
16     need to go back and use this report so I can
17     incorporate it and give a valid opinion to the
18     U.S. Attorney's Office"?
19          Is that how that work stream is going?
20 A.  Well, it sounds like you're coming up with a
21     hypothetical.  What I can say is actually what
22     happened, rather than hypothetically.
23          We received a number of requests from
24     either the U.S. Attorney's Office to us, with a
25     cc to Attorney Commisso; or to Attorney
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          Commisso and then passed along to us where
 2          certain information was being sought.  And when
 3          those requests came in, we made every effort to
 4          share everything and anything that was
 5          responsive to those requests in consultation.
 6    Q.    You said you "made every effort to share
 7          everything" that was covered by their requests?
 8    A.    Yes.  So I would ask the team to look through
 9          the -- our system of record, which is our
10          server folders, and share all responsive
11          materials that were relevant and available.
12    Q.    So if the U.S. Attorney's asked for it, you'd
13          go find it and give it to them?
14    A.    We would hand it to Attorney Commisso and/or
15          send it directly to the U.S. Attorney's Office
16          with a cc to Attorney Commisso.
17    Q.    So it sounds like there's at least two streams.
18          Sometimes there's a direct stream when you
19          decide it's important and give it directly to
20          the U.S. Attorney's Office; and then sometimes,
21          you're filtering it through Attorney Commisso
22          as a stream to get it to the U.S. Attorney's
23          Office; is that correct?
24    A.    Well, yes, it would -- and we're working in the
25          mode of not staring at any documents.  I'm
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              happy to stare at any documents you have.
 2                   But the general praxis was, if there was a
 3              volume of information that we thought couldn't
 4              easily be discussed with Attorney Commisso, we
 5              would send it to Attorney Commisso for his
 6              review.  If it was easy enough to discuss over
 7              the phone or through maybe even a Webex, talk
 8              through the documents, and then share them
 9              directly with a cc to Attorney Commisso.
10     Q.     But what I'm not understanding is if you have
11              this duty of confidentiality to the United Way,
12              wouldn't, in theory, you have to go through
13              Attorney Commisso for everything that you give
14              to the Government?
15     A.     And that's what we did, yes.  In one way,
16              shape, or form, Attorney Commisso was apprised
17              and aware of the documents that we were sharing
18              with the U.S. Attorney's Office.
19     Q.     So Attorney Commisso was deciding what the
20              Government was going to get for evidence in
21              this case?
22     A.     Was he reviewing his -- the documents for those
23              that remained under privilege?
24     Q.     No, I'm just saying that, as I understand what
25              you're saying, the Government would make a
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          request to you saying, "We need something
 2          related to" -- whatever.  Fill in the blank.
 3               And then you would go to Attorney Commisso
 4          and say, "They want this.  Can we give it to
 5          them?"
 6               And he'd say "yes" or -- well, he always
 7          said yes.  Can you say that he always said
 8          "yes" and he never said, "No, we're not giving
 9          that to you," or do you know?
10    A.    I don't recall any instances where he said,
11          "Don't share that," no.
12    Q.    So if the Government was looking for it, he
13          always shared it; correct?
14    A.    As long as it was in his -- if there was no
15          privilege issue, then, yes, it would be shared.
16    Q.    And are you aware of Attorney Commisso
17          asserting a privilege to something that you
18          thought the Government should have?
19    A.    No.
20    Q.    So you're their expert witness, and they say,
21          "We need this information."
22               And you go to Attorney Commisso and say,
23          "Hey, we need to share this information."
24               And he says, "Yes," every time you
25          remember?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   Yeah.  I mean, that's my recollection
 2        generally.  And I don't determine what's
 3        privileged.  I mean, that's -- well, everything
 4        I did with him was privileged; right?  So
 5        determining what was a -- can be waived -- I
 6        viewed that as his role.
 7   Q.   And so -- but he ultimately would be the
 8        gatekeeper as to what the Government would get
 9        from you in your role as an expert for the
10        Government?
11   A.   Correct.
12   Q.   So when you were working for the Government,
13        the Government was giving you instructions;
14        right?
15            They've retained you, and they'll say, "We
16        want you to write a report about 'X,' 'Y,' and
17        'Z'"; right?
18   A.   Correct.
19   Q.   And during that same period of time, you're
20        also working with Attorney Commisso to protect
21        the privilege of United Way and protect their
22        interests; correct?
23   A.   Yes.  There's multiple work streams, multiple
24        different tasks that were assigned as part of
25        making sure we didn't cross wires in everything
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | we shared. |
| 2 | Q. | But they were similar objectives; right? |
| 3 | A. | Similar objectives between... |
| 4 | Q. | To help the prosecution of the case against |
| 5 | | Mr. Alrai? |
| 6 | A. | So the objective with working for the U.S. |
| 7 | | Attorney's Office was to prepare a loss |
| 8 | | quantification, right, and an unjust |
| 9 | | enrichment.  And we assumed, right -- or I |
| 10 | | guess I assumed that a fraud occurred. |
| 11 | | With respect to United Way, we were |
| 12 | | assisting with various fact-finding.  People at |
| 13 | | RSM were doing discovery services.  We had a |
| 14 | | variety of different roles.  We were assessing |
| 15 | | internal controls and vulnerabilities to them. |
| 16 | | So there was a number of various, quote, |
| 17 | | unquote "objectives" that were quite dissimilar |
| 18 | | and unrelated to -- |
| 19 | Q. | But one of those objectives was to determine a |
| 20 | | loss -- to quantify loss regarding the |
| 21 | | allegations against Mr. Alrai; right? |
| 22 | A. | Correct.  That included the loss |
| 23 | | quantification, yes. |
| 24 | Q. | And as we saw from the report to the |
| 25 | | United Way, one of the objectives was to |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            recover that loss through the criminal
 2            prosecution?
 3    A.      Correct.
 4    Q.      So that objective was identical; correct?
 5    A.      Well, that was United Way's -- I think you said
 6            United Way's goal -- objective?
 7    Q.      Well, you're working for two entities in this
 8            case.  So you worked for United Way, who is
 9            identified as the victim in this case; correct?
10    A.      Correct.
11    Q.      And you've worked for the Government, who is
12            the prosecution in this case; correct?
13    A.      Correct.
14    Q.      So you have worked for both of them.
15                 And both of them have an identified
16            interest in getting money from Mr. Alrai
17            through the criminal prosecution?
18    A.      Correct.
19    Q.      That's the same for both United Way and the
20            Government?
21    A.      That's my understanding yes.
22    Q.      Now, in addition to your work for the
23            Government as an expert witness and your work
24            of writing a report for the United Way, you
25            also helped put together an investigation for
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | an insurance claim that the United Way made |
| 2 | | regarding the facts in this case; correct? |
| 3 | A. | There's an insurance claim, yes. |
| 4 | Q. | And you're working on that back in the fall of |
| 5 | | 2018 as well, when you were still working for |
| 6 | | United Way? |
| 7 | A. | That's correct. |
| 8 | Q. | And we saw a little bit about that in that |
| 9 | | slide we pulled up when we first started |
| 10 | | talking about -- that was one of the potential |
| 11 | | sources of recoveries -- was this insurance |
| 12 | | claim; correct? |
| 13 | A. | Correct. |
| 14 | Q. | And if I read that slide correctly, was the |
| 15 | | insurance claim on employee theft capped out at |
| 16 | | $1 million? |
| 17 | A. | That's my recollection, yes. |
| 18 | Q. | So I want to ask you about that insurance |
| 19 | | claim. |
| 20 | | You helped come up with some of the |
| 21 | | numbers and the calculations that were put into |
| 22 | | that claim; correct? |
| 23 | A. | That's correct, yes. |
| 24 | | MS. BROWN:  If we can pull up Exhibit Ww, |
| 25 | | specifically at page four. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1            (Pre-marked Defendant's Exhibit Ww

2            introduced.)

3   Q.   (By Ms. Brown)  So we'll start at the

4        beginning -- it says "Insured Proofs of

5        Loss" -- and then we'll go to four.

6            Do you recognize this document?

7   A.   Starting on page four, yes, it looks familiar.

8   Q.   And I'm going to specifically ask you about --

9        actually, if you can go back one page.  I think

10       it might be at the bottom of the previous page

11       that I was going to ask about.  Sorry.  Okay.

12           At the bottom, Tracy, if you can pull out

13       that bottom paragraph above the footnote

14       section.  Thank you.

15           And it says, "United Way has various

16       controls in place to prevent misconduct,

17       including potential employee theft; however,

18       Alrai circumvented these controls and the

19       controls in place.  And the associated breaches

20       of such controls by Alrai included, but are not

21       limited to" -- and now we can go to the next

22       page.

23           And then it describes the actions of

24       Mr. Alrai in page four; correct?

25   A.   It appears so, yes.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              MS. BROWN:  And just for the Court's
 2         summary, this document was produced prior to
 3         trial.  I know the sections before, I was
 4         talking about invoicing.  That was not -- none
 5         of the invoices that we referenced were
 6         produced prior to trial.
 7              So I'm going to go on to the next exhibit,
 8         which is Exhibit Z.
 9    Q.   (By Ms. Brown)  This is back  -- we talked
10         about this at the beginning of your
11         examination.  This is the report you did for
12         the United Way.  And I'm going to go page 32.
13         I think we're at page 30 now.  Yeah, 32.
14              So one of the things in the report for the
15         United Way was something that was called "root
16         cause analysis"; correct?
17    A.   Correct, yes.
18    Q.   And if we look on this page at B, one of the
19         things -- root cause analysis means "why did
20         this happen?  Why did this alleged theft happen
21         to United Way"; correct?
22    A.   Correct.  Yes.
23    Q.   And section B, the answer is "lack of adherence
24         to RFP policies and procedures.  Explaining RFP
25         policies and procedures appear to be poorly
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            drafted and communicated and were circumvented.
 2            The RFP process was overridden, circumvented in
 3            five key instances."
 4                 It explains that "managed IT services, RFP
 5            service did not have clearly documented RFP
 6            procedure requirements or adequate technical
 7            oversight"; do you see that?
 8    A.      Yes.  Correct.
 9    Q.      And then the next sections talk about "there's
10            no evidence of an RFP for telephonic services
11            which were awarded to DigitalNet"; correct?
12    A.      Correct.  Yes.
13    Q.      And section three says "no evidence of an RFP
14            for infrastructure hosting and virtual desktop
15            services order to DigitalNet, and failure to
16            identify duplication of services with those
17            performed by DigitalNet."  That's included in
18            that report as well; correct?
19    A.      That's correct.
20    Q.      And, finally, "No evidence of an RFP for ad hoc
21            web development services all awarded to
22            DigitalNet"; correct?
23    A.      Correct.
24    Q.      So in this report that you gave to the
25            United Way, you found serious problems with the
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| 1 | | RFP policies and procedures at United Way |
| 2 | | during Mr. Alrai's tenure; correct? |
| 3 | A. | That's correct, yes. |
| 4 | Q. | Those serious concerns about United Way's RFP |
| 5 | | policies and procedures did not make their way |
| 6 | | into the insurance request for the insurance |
| 7 | | claim, did they? |
| 8 | A. | I'm not sure. |
| 9 | Q. | Well, we just read from that which is |
| 10 | | Exhibit Ww that United Way's policies and |
| 11 | | procedures require due diligence be performed |
| 12 | | to obtain information about prospective |
| 13 | | vendors. |
| 14 | | That doesn't sound like, at least as to |
| 15 | | what you're saying to the insurance company, |
| 16 | | that there were any problems with United Way's |
| 17 | | RFP process, does it? |
| 18 | A. | Well, that's a statement, right, of fact with |
| 19 | | respect to what the requirements were, yes. |
| 20 | Q. | Okay. |
| 21 | A. | And this is a statement of fact to where some |
| 22 | | of the gaps occurred. |
| 23 | | MS. BROWN:  So I'm going to ask -- Tracy, |
| 24 | | bring up exhibit -- |
| 25 | | THE COURT:  Wait a minute. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              So, Ms. Brown, this document -- I'm a
 2        little bit -- I just got confused.
 3              MS. BROWN:  Oh, good.  I'll try to
 4        clarify.
 5              This was produced prior to trial,
 6        Your Honor.  So this is what I just talked
 7        about -- which is Z was produced prior to
 8        trial.  It basically was the report that RSM
 9        gave to United Way regarding their
10        investigation.
11              The document right before that was a
12        document that was sent to United Way's
13        insurance company asking for claims.  Both of
14        these were provided to counsel before trial.
15        They establish the foundation for the next
16        document I'm going to, which was not produced
17        prior to trial, which is Exhibit Oo.  So I'm
18        glad you asked that just so I could clarify.
19              THE COURT:  But you were just asking her
20        about whether it was -- I don't know -- relied
21        on, considered, produced, I don't know what --
22        with respect to the insurance coverage issue.
23              MS. BROWN:  Well, I think what the Defense
24        is arguing is that there are different reports
25        finding different things, and that that would
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1        go to the credibility of this witness.
2              THE COURT:  Okay.
3              MS. BROWN:  Because one report doesn't
4        mention any problems with the policies and
5        procedures regarding prospective vendors, and
6        the other one finds serious problems with those
7        procedures.  So these both were given to
8        counsel prior to trial.
9              The next document is an email that
10       discusses these two issues that was not
11       provided prior to trial; does that make sense?
12             THE COURT:  It does.
13             MS. BROWN:  So exhibit --
14             THE WITNESS:  Just to --
15             MS. BROWN:  I'm sorry.
16             THE WITNESS:  Can I clarify on the record?
17             THE COURT:  Sure.
18             THE WITNESS:  So you made reference to the
19       other document being drafted by RSM.  That's a
20       document that came from United Way.
21             MS. BROWN:  And by "United Way," do you
22       mean Attorney Commisso?
23             THE WITNESS:  Correct, yes.
24             MS. BROWN:  Thank you for clarifying that.
25             THE COURT:  Well, did you have any role in

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           drafting that document?

2               THE WITNESS:  We did, yes.  We shared

3           information that went into the formation of the

4           document, including the loss analysis.

5               THE COURT:  The one that went to the

6           insurance company?

7               THE WITNESS:  The calculation, yes -- the

8           loss calculation.

9               THE COURT:  Yeah, the document we were

10          just talking about?

11              THE WITNESS:  Correct, yes.

12              THE COURT:  Okay.

13          Look, it's been 90 minutes for the

14          reporter, so we're going to take the normal

15          break.  Just to let -- I want to have a brief

16          conversation, though, with Counsel about this.

17              So we'll take a 15-minute break and then

18          we'll reconvene.  I've got a 12:30 meeting

19          today, so you should plan your lunch hours for

20          12:30, about an hour for lunch.

21              Let me ask a question here, though,

22          Ms. Brown.  And I don't quibble at all with

23          your presentation.  But I have to wonder out

24          loud, I just -- I understand you're trying to

25          meet your burden.  You're trying to show that

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        evidence was exculpatory that should have been
 2        produced.  And, B, because it goes to
 3        credibility, both in terms of competency and
 4        bias.  And, B, that it was prejudicial; right?
 5             I guess what I'm wondering is this.
 6        Because you're obviously very much in the
 7        weeds, and I really don't have a problem with
 8        that.  But what would be the difference --
 9        like, suppose I granted your motion, and then
10        we either had a new trial or we took
11        Mr. Hunter's proposal and we had a do-over on
12        some witnesses, whether it was just cross or
13        directed cross; right?
14             I guess the question is, what would be the
15        difference between what you're doing today and
16        what that proceeding would look like?  It
17        sounds like you'd do the exact same thing;
18        right?
19             MS. BROWN:  Correct, Your Honor, except
20        now we're going to have -- so, two things.
21        It's a real easy -- so one thing that would be
22        different is now we're going to have ammunition
23        to impeach this witness that we didn't have.
24        And the second part of that, which is our next
25        witness, which is our expert, who will say
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           several things, and we anticipate will say --

2               THE COURT:  I don't want you to proffer

3           what the expert's going to say.

4               MS. BROWN:  Oh.  Okay.

5               THE COURT:  Oh, actually, wait a minute.

6           The experts can listen to each other, so it's

7           fine.  But here's my point again.

8               Same question, though; right?  Because now

9           you have what you call the "ammunition," which

10          would be the discovery; right?  But, again, how

11          is it going to look any different than what you

12          just did?  The only reason I ask -- it's really

13          not a critique, because it's interesting

14          information -- it really is.

15              But I guess it's almost a situation where

16          there's an analogy to the Suzanne Brown case.

17          You called your expert.  I heard what she said.

18          And I've got to make a decision about whether

19          it would affect the outcome; right?  And in

20          this case, it's even closer to the road,

21          because I'm the trier of fact.

22              And it's not meant to be a challenging

23          question, or even rhetorical, but what you

24          would do at trial is what you're doing right

25          now; right?  Because you have the ammunition

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        now.
 2              MS. BROWN:  Yes.  Right.  And that's our
 3        burden of showing how it could have been a
 4        different result -- is by going through this
 5        witness and showing the things that we weren't
 6        able to show.
 7              THE COURT:  I'm just wondering -- I'm just
 8        wondering if there's a different way to do it,
 9        only because -- it's very important, but it's
10        also very time-consuming.  And if this is going
11        to be exactly what happens again if I grant the
12        motion, I just wonder if there's a shorter way
13        to do it.  That's not to suggest, though, that
14        I know what it is, because I don't.
15              I want Counsel to think about that maybe
16        over the break.  It doesn't have to be over the
17        morning break.  We can talk about it over lunch
18        or something.  But this seems like a process
19        that is kind of -- it's not just a peek into
20        what should have been -- allegedly should have
21        been produced and its impact.  It's literally
22        the entire proceeding, which -- sounds like we
23        would almost just do over again, or just use
24        the record of this proceeding.
25              It's a strange kind of procedural posture
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           we're in here, and perhaps Counsel will have a
 2           suggestion for the Court.  I'm not asking you
 3           to do it right now.  We'll take a 15-minute
 4           break.  And then, again, assume a 12:30 lunch
 5           break.
 6                We're in recess for 15 minutes.
 7                (Brief recess taken at 10:47 a.m., and the
 8                proceedings resumed at 11:04 a.m.)
 9                THE COURT:  Back on the record.
10                Defense Counsel, you may proceed.
11                MS. BROWN:  If we can pull up Exhibit Oo.
12                (Pre-marked Defendant's Exhibit Oo
13                introduced.)
14    Q.   (By Ms. Brown)  And just to give some context
15         both to the Court and Mr. Naviloff, before the
16         break, we spoke about -- one of the duties that
17         RSM and yourself had for United Way was putting
18         together a report that was submitted on an
19         insurance claim; correct?
20    A.   Sorry.
21                Is that question for me?
22    Q.   Yes.  I was just giving some context where we
23         are -- that we had talked about the insurance
24         claim that RSM assisted Attorney Commisso in
25         terms of submitting to the insurance company.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| 1  | A. | Yes.  That's our last discussion, yes. |
| 2  | Q. | So in the context of that, I'm going to ask you |
| 3  |    | about an email exchange that is documented in |
| 4  |    | Exhibit Oo. |
| 5  |    | And just for the Court's benefit, this is |
| 6  |    | a document that was not produced prior to |
| 7  |    | trial.  It was produced as part of the Court's |
| 8  |    | recent discovery order. |
| 9  |    | So this document we're looking at is from |
| 10 |    | Ryan Gilpin -- at least the last email that |
| 11 |    | we're looking at at the top.  And it's to |
| 12 |    | yourself, and Chris Fitzgerald, and Ron Nahass |
| 13 |    | -- is that how he pronounces it? |
| 14 | A. | Nahass is, yep, correct. |
| 15 | Q. | And these are the team people at RSM who were |
| 16 |    | working on the United Way case involving |
| 17 |    | Mr. Alrai; correct? |
| 18 | A. | Yes, that's correct. |
| 19 |    | MS. BROWN:  So I'm going to ask the clerk |
| 20 |    | to scroll down to get to the beginning of this |
| 21 |    | email exchange here.  So it would be -- go back |
| 22 |    | one page.  Okay. |
| 23 | Q. | (By Ms. Brown)  So this email exchange starts |
| 24 |    | with an email from another accounting firm; |
| 25 |    | correct? |

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1    A.    That's correct, yes.
 2    Q.    And so on page three of Exhibit Oo, this is an
 3          email from this other accounting firm -- that
 4          they are representing Chubb insurance company
 5          regarding the claim of United Way in terms of
 6          the theft claim; correct?
 7    A.    That is correct, yes.
 8    Q.    And the accounting firm that's representing
 9          Chubb sends this email to Attorney Commisso.
10              And it says that "Good afternoon, John.
11          As you may be aware, we were the forensic
12          accountants retained by Kimberly Russell of
13          Chubb to assist in the analysis of the
14          above-captioned matter.  Based on our analysis
15          of the documentation provided to date, we
16          attached our follow-up request letter.  If you
17          have any questions or comments, please feel
18          free to contact me"; correct?
19    A.    Correct.
20    Q.    So that wasn't sent to you, but indirectly it
21          was, because then Attorney Commisso forwarded
22          it to you, correct, by email?
23    A.    Yes.  That's correct.
24    Q.    And if we can go back a page, which would be
25          page two of Exhibit Oo.  So he, on this page at
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            the bottom of the page -- this email's being
 2            forwarded to you.
 3                 And so he explains he's forwarding this
 4            letter from the accountants for Chubb about
 5            reviewing the proof of loss claim; right?
 6    A.      That's correct, yes.
 7    Q.      And it says, "As you can see from the letter,
 8            several requests for further documents,
 9            analysis, and information about RSM's loss
10            calculation.  It appears they are auditing
11            RSM's work as well as United Way's internal
12            controls"; correct?
13    A.      That's correct.
14    Q.      And Attorney Commisso goes on to say, "Please
15            review and let me know when you are available
16            to call to discuss"; correct?
17    A.      Correct.
18    Q.      And "we would like you to put together a plan
19            to prepare a response.  We need to understand
20            the most efficient division of labor and who --
21            we need to budget for anticipated cost";
22            correct?
23    A.      Correct.
24    Q.      And after that, Attorney Commisso says that
25            "the total spend for the IT investigation is
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            over $1 million"; right?
 2                That's what that says; right?
 3    A.    Correct.
 4    Q.    You understand that he's saying, "We've already
 5          spent $1 million on the investigation in this
 6          case.  We need to start budgeting here,"
 7          basically; is that how you took that email?
 8    A.    I took this email as he was looking for a
 9          budget for the response to this inquiry.
10    Q.    And then if we can go to the top of that email,
11          that same page would then be an email that --
12          so did you forward this email to the rest of
13          your team?  Or was this -- let me see.
14                It looks like you're the only one from RSM
15          copied on the email from Attorney Commisso;
16          correct?
17    A.    Correct.
18    Q.    So if we can go back a page to the first page
19          of this document, Oo.
20                So it looks like you then forwarded to
21          your team, who is Chris, Ryan, and Ron;
22          correct?
23    A.    Correct.
24    Q.    Diego Rosenfeld isn't on that team, is he?
25    A.    He's not on this email.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   And so you direct that email to your team at
 2        RSM, including Ryan Gilpin; right?
 3   A.   Correct.
 4   Q.   And you tell them that "we will need to come up
 5        with an estimate of hours, pulling information
 6        requested by forensic accountants hired to
 7        examine United Way's claim."
 8             So you're directing them that they need to
 9        put together a budget to shore up this claim;
10        correct?
11   A.   We need to come up with an estimate of hours to
12        collect information that they're looking for.
13   Q.   And you put that in different categories;
14        correct?
15   A.   Where do you see that?
16   Q.   Well, let's pull out the paragraph -- the
17        second paragraph from the bottom on the page
18        we're on right now, which is page one.
19             And it says "duplicate billing."
20   A.   Uh-huh.
21   Q.   So there you instruct your team to "please
22        explain how it was verified that DigitalNet did
23        not perform any of the services claimed as
24        duplicative billings.  CF" --
25             I'm assuming that's "Chris Fitzgerald"?
```

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1   A.   Yes.  Well --
2   Q.   Sorry -- what?
3   A.   So this section is -- if you read above, this
4        is where I said we need to potentially prepare
5        some written explanation in response to,
6        presumably, some of the forensic accountant's
7        questions that were asked.
8   Q.   So you, as to the issue of duplicate billing --
9        so they must have had questions about your
10       claim of duplicate billing; correct?
11  A.   Yes, but that's my understanding here.  I
12       haven't seen the file that was potentially
13       attached to this or associated with this.
14  Q.   We don't have it either.  Otherwise, I'd show
15       it to you.
16            So you direct your team to "please explain
17       how the document billing was verified that
18       these services were not performed."  And you
19       specifically direct CF, being Chris Fitzgerald,
20       "this will be a quick, straightforward
21       explanation"; correct?
22  A.   Correct.
23            MS. BROWN:  Tracy, if we can go down in
24       the next paragraph that start with "Excessive
25       billing."
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1    Q.    (By Ms. Brown)  So in this paragraph of your
 2          instructions to your team -- and I'm assuming
 3          "6A" is referencing this letter that we don't
 4          have -- "detail how the monthly office phone
 5          line count was determined for FY 2013 through
 6          2018.  Please provide any and all supporting --
 7          documenting the phone count for each year."
 8                And it says "Greg."  Are you directing
 9          that to yourself, or...
10    A.    Yeah, I'm not sure on this, based on this.
11    Q.    I'm not either.  That's why I'm asking.
12                So it says "Greg, don't think we know
13          this, but can indicate how the phone line count
14          compared to head count."
15                Do you know what that's talking about
16          there, when it says "phone line count compared
17          to head count"?
18    A.    Yeah.  I think there was some initial question
19          as to -- before the facts were gathered as to
20          how we knew it, and whether or not we had
21          the -- a phone line count or head count.  But
22          it appeared that Chris Fitzgerald said they
23          used a number of phone lines that were stated
24          on DigitalNet invoices.  So the basis for which
25          the calculation was calculated was known to
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1           Chris.
2    Q.    Chris Fitzgerald was doing the calculation as
3          to whether there was excessive billing as to
4          the phone services?
5    A.    Chris was familiar with the model, and this was
6          my attempt to have someone quickly look at the
7          model and pull out the answers to these
8          questions.  So Chris went back to the model and
9          pulled out these answers.
10   Q.    And Chris is not an IT guy, for lack of a
11         better word; right?
12   A.    Chris is also a forensic accounting -- he's in
13         our forensic group.
14   Q.    So were you instructing Chris to go back and
15         get the necessary information regarding the
16         calculation on the alleged excessive billing as
17         to the phones?  Or is this him giving his
18         answer to that?
19   A.    This is him just going back to our work papers
20         and pulling in the relevant response for
21         purposes of responding to the forensic
22         accountants who were reviewing our claim.
23   Q.    And, at least, it sounds here that the way he's
24         doing that is basically counting up how many
25         phone lines there are.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1    A.    Correct.
2              MS. BROWN:  Tracy, if we can go to the
3          next page, which, I guess, would be page two of
4          Oo.
5              And pull out the first half of it,
6          basically up until "RSM."
7    Q.    (By Ms. Brown)  So Ryan Gilpin is on this
8          exchange as well; correct?
9    A.    Yes.
10   Q.    And he sends an email saying he's "attached his
11         initial draft of a memo on data management and
12         backup that I believe Chris had later refined";
13         correct?
14   A.    Correct, yes.
15   Q.    And so this email tends to suggest that Ryan's
16         doing the calculation and the comparisons
17         regarding data management and backup; correct?
18   A.    I think this refers to the scan that was done
19         and the analysis related to observing whether
20         or not there were backups.  So I think he had
21         jotted some notes with respect to what was
22         being backed up and made it available to Chris,
23         again, to the extent he didn't already have
24         some notes in his files.
25   Q.    So it doesn't say "notes."
```

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | It says "draft of a memo"; right?  We |
| 2 | | agree that that doesn't say "notes" -- it says |
| 3 | | "draft of a memo"? |
| 4 | A. | Yep.  Correct. |
| 5 | Q. | And it says "draft of a memo on data management |
| 6 | | and backup"; correct? |
| 7 | A. | Correct. |
| 8 | Q. | And it sounds like from this that Ryan Gilpin |
| 9 | | is the one who's writing that draft of a memo |
| 10 | | on data management and backup; right? |
| 11 | A. | That's correct, yes. |
| 12 | Q. | It sounds like Chris refined it later; right? |
| 13 | A. | It says, I believe, "Chris had refined," |
| 14 | | meaning this may have been an old draft of |
| 15 | | something that Chris had looked at. |
| 16 | | This appears to be just transient |
| 17 | | communications with respect to discussions that |
| 18 | | went into formulating, ultimately, the claim |
| 19 | | that was presented. |
| 20 | | MS. BROWN:  Tracy, can we go back to page |
| 21 | | three of Exhibit O? |
| 22 | | And can we pull out that paragraph that |
| 23 | | says "Services not performed," not quite |
| 24 | | halfway down?  Thank you. |
| 25 | Q. | (By Ms. Brown)  So, again, this is still that |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          exchange going on regarding the insurance
2          company request.
3                And it has an "8."  Again, I'm assuming
4          that corresponds to a letter.
5                It says, "Please explain how DigitalNet
6          invoiced costs of $592,250 for data management
7          and high-availability backup storage, paid
8          during FY2013 through FY2018, were determined
9          to have been performed."
10               That sounds like that's what the insurance
11         company's accountants are asking for; right?
12    A.   Yes.  They're specifically asking us for
13         information on this.  This is one where we
14         ultimately determined from John Meyer, CVS
15         consulting, that -- his opinion was these were
16         rendered, which was consistent with our initial
17         assessment throughout this process.
18               And it looks like Ryan emailed around
19         making reference to the explanation.  I think
20         that's what was attached that you were
21         sharing -- that he had some explanation as to
22         what we had seen through the scans, which were,
23         once again, made available -- showing that
24         scans weren't being captured of the IT
25         environment.

```
1              And then it says -- Chris replies -- CF
2         says, "Yes, I believe we have an explanation
3         somewhere in the files."
4              And "Ryan, would you be able to find this
5         explanation and circulate?"  So it looks like
6         there was discussions and documents that were
7         transient in nature with respect to information
8         that they had to dig up and share.
9    Q.   So I just want to understand this.
10             So if I understood your explanation
11        regarding this issue, Ryan interviewed
12        John Meyer about this topic.  Then Ryan
13        generated a report about that and circulated it
14        to the rest of you.  That became part of your
15        findings.
16             Am I getting that correct?
17   A.   For purpose of this analysis, we -- I don't
18        know what, ultimately, was shared with the
19        forensic accountants here, but my recollection
20        here is that, yes, we had interviews with
21        John Meyer.  John Meyer's recollection of -- or
22        views with respect to high-availability backups
23        aligned with our analysis and the network scan
24        that was explained to me and shown to me.  And
25        that it was my opinion, for purposes of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        preparing information for these forensic
 2        accountants, that the high-availability backup
 3        storage did not take place, according to
 4        John Meyer and the documents that were
 5        explained to me with respect to --
 6   Q.   So are there documents somewhere that
 7        memorialize what John Meyer told you about this
 8        data management high-availability backup
 9        storage?
10   A.   My understanding is there was a number of
11        informal conversations that we had with
12        John Meyer.  I know that, generally speaking,
13        we had spoken with him on a number of
14        occasions.
15            So -- and I know, as a matter of all of
16        our interviews, we didn't maintain formal
17        notes.  So those would have been transient in
18        nature.  Any relevant information would have
19        made their way into one of these reports, as
20        far as any indication of what we learned or
21        found that was relevant to our overall
22        conclusions.
23   Q.   And that's what I understood you to say a few
24        minutes ago -- that the interviews with Meyer
25        on this issue were memorialized in a report
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

95

1       that Ryan did that was emailed around to
2       everyone explaining this issue.
3           Was that -- I'm just trying to understand
4       that.  Is that what happened?
5    A.  No.  I mean, I remember seeing a network scan
6       that showed there were two servers that were
7       backed up.  And just about everything else was
8       a two out of -- I think there was a number on
9       it in an email that he sent me.
10          And then with the desktop, similar -- it
11      was some count out of a much larger count that
12      may have received some sort of backup.  But the
13      way it was explained to me is that there was no
14      software found that was backing up any of the
15      networks on a real-time basis.  And, certainly,
16      for purposes of geographically dispersed high
17      availability, the threshold wasn't being met in
18      terms of what we found as evidence in the
19      files.
20          So these were largely verbal discussions
21      that I had, or an email or two that showed me
22      the accounts combined with the report that was
23      shared with the Defendant which shows the scan
24      that took place.  And whether that was Meyer
25      that did the scan or whether that was our

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          software, I don't recall at this moment.  But
2          the scan was part of what was shared with me,
3          along with John Meyer's conclusions on this.
4    Q.    So John Meyer isn't mentioned anywhere in this
5          paragraph, is he?
6    A.    In this paragraph?
7    Q.    No.
8    A.    Not this specific one, no.
9    Q.    Because if you read this paragraph, it sounds
10         like Ryan Gilpin is in charge of emailing
11         around an explanation about how he became aware
12         of this problem; right?
13   A.    Well, yes, Ryan is emailing us with respect to
14         high availability and what he had seen in terms
15         of his fact-finding.  And with that, the basis
16         of his analysis was a high -- or a report -- a
17         network scan that showed what was being backed
18         up and what wasn't.  And those key data points
19         were shared to me via email.
20   Q.    And -- but the analysis was done by
21         Ryan Gilpin; right?
22   A.    Like, what analysis?
23   Q.    I thought you just said that he did the
24         analysis of this issue and sent you an email on
25         it.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1    A.    Sorry.
2              The summary -- summary of the snapshot of
3          what was being backed up.  Summary analysis?
4    Q.    Oh, you didn't want "analysis"?
5    A.    "Analysis" is fine.
6    Q.    Okay.  Because that's what I thought you said.
7              So this is all after you get this question
8          from the insurance company to have more
9          documentation about your claim losses; right?
10   A.    Correct.
11   Q.    Now, this document, Exhibit O -- this was
12         not -- as far as you know, was not shared with
13         the Government or the Defense prior to trial;
14         right?
15   A.    This is part of, I'm guessing, the 600-plus
16         emails that were turned over.
17   Q.    After trial; right?
18   A.    Yes.
19   Q.    Yes, you are right.  It was part of the
20         600-plus emails that were turned over after
21         trial.
22             But my question was, as far as you know in
23         your role as the expert for the Government,
24         this was not turned over prior to trial; right?
25   A.    Correct.  With respect to the 600-plus, we
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          opted for an openly conservative approach,
 2          where we produced anything and everything that
 3          related to our work to date.  And that included
 4          transient emails such as this one, that
 5          contained some of our thoughts and impressions
 6          at the time that we were preparing some drafts.
 7     Q.   Well, this email is more than just thoughts and
 8          impressions.  This email is that an insurance
 9          company does not think you have given
10          sufficient documentation for your claims of
11          loss.
12               That's kind of a significant email;
13          wouldn't you agree?
14     A.   I wouldn't interpret it that way, no.
15     Q.   How would you interpret it?
16     A.   They were looking for further detail with
17          respect to the report we shared.  So it's part
18          of a back-and-forth with any insurance claim.
19          There's going to be questions.  So you're not
20          going to prepare a claim for a $1 million-plus
21          dollars with an insurance carrier without them
22          asking you questions.
23     Q.   But, again, you didn't share this with the
24          Government prior to trial; correct?
25     A.   That is correct.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   And you didn't share the fact that some of the
 2        persons who are doing the analysis on
 3        explaining these issues, such as services not
 4        provided, was a new associate; correct -- you
 5        didn't share that with the Government either?
 6   A.   Define "new associate."
 7             THE COURT:  Everybody, let's not jerk each
 8        other around.  Let's just ask questions and
 9        answer them.  We all know what we mean.  Let's
10        not play games.
11             THE WITNESS:  Okay.  So, say, Ryan Gilpin.
12   Q.   (By Ms. Brown)  So you would agree he would fit
13        the definition of a young associate at your
14        firm?
15   A.   Yeah, he's a second-year associate.  I believe
16        he was promoted to senior associate at this
17        time.
18   Q.   And you did not share with the Government the
19        fact that when you were questioned about some
20        of the findings, that you relied on Ryan Gilpin
21        to make some of that analysis?
22   A.   The work performed is all under my supervision
23        and under my quality control.  This is an area,
24        particularly with respect to the loss claim,
25        that I explicitly state in the report and
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           stated at testimony that John Meyer had
 2           testified and opined on this.  And this is part
 3           of my reliance on my expert report.
 4   Q.   But my question was, you did not share with the
 5           Government that you relied on Ryan Gilpin to
 6           make some of the calculations in this case?
 7   A.   I didn't rely upon Ryan to make any
 8           calculations.  He worked under my direction and
 9           control.  Calculation is mine.  I prepared it.
10           And I presented this loss analysis; right.  So
11           Ryan assisted with gathering evidence and facts
12           and putting them into spreadsheets for me to
13           review and to perform quality control
14           procedures.
15               THE COURT:  Attorney Brown, let me just
16           ask you, because we've been on this issue here
17           for a while.  Other than Gilpin's undisclosed
18           role, is there anything more I'm supposed to be
19           gleaning from this?
20               MS. BROWN:  I think this document is
21           exculpatory on several levels:  That the RSM
22           was questioned regarding their documentation.
23           And that in the -- when Mr. Naviloff sought
24           help to shore up this documentation, he didn't
25           go to the person with 20 years' experience --
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1       he went to the person with two years'
2       experience.
3              We'll come back to this again when our
4       expert testifies.  He'll explain a little bit
5       more about some of this.  So I just wanted to
6       set that up, but they'll be more on that
7       through our expert later.
8              THE COURT:  I know.  But we don't have a
9       jury here, so I'm just asking you questions.
10              MS. BROWN:  No, that's great.
11              THE COURT:  And I think I understand.
12              So it's not just Gilpin's role, which was
13       unknown to defense counsel when he
14       cross-examined this witness; but it's also the
15       idea that there was some pushback from the
16       carrier regarding the loss amount; right?
17              MS. BROWN:  Correct.  And, also, this
18       document gives us a little bit more -- lack of
19       a better word, peek behind the curtain as to
20       how these opinions were formed, which will
21       become more important with our expert.
22    Q.  (By Ms. Brown)  I think we talked about this a
23       little bit before, so I'm not going to go into
24       a lot of detail.
25              But you were involved in the discovery

```
 1        process in this case in terms of giving
 2        documents to the Government; correct?
 3    A.  That's correct, yes.
 4            (Pre-marked Defendant's Exhibit X
 5            introduced.)
 6    Q.  (By Ms. Brown)  And I want to talk about
 7        Exhibit X, which is an email where you and
 8        members of your team talk with
 9        Attorney Commisso about the presentation to the
10        United Way that we discussed earlier.  So
11        that's in Exhibit X.  Now if we could pull up
12        the first sentence beyond the caption of the
13        parties in the email.
14            It says "happy to discuss."
15            So in this part of the email, it says --
16        and we'll get to it in a minute, but it says,
17        "Happy to discuss.  Perhaps as much a question
18        of privilege and what would be available to
19        Imran if he is charged and requests docs as
20        part of discovery."
21            That is something -- so would it be fair
22        to say that based on this email, you were
23        thinking about what Mr. Imran might or might
24        not get if you produced documents to the
25        Government?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   No.  My concern here is my team was discussing
 2        content for purposes of presentation, where
 3        that fell upon John Commisso --
 4        Attorney Commisso to determine what was being
 5        presented to whom.  Because there's various
 6        constituents -- different special committees
 7        and different committees that information was
 8        being presented to.
 9             So it had everything to do with letting
10        Attorney Commisso decide what information was
11        being shared with whom, particularly since some
12        of those -- at least my understanding was some
13        of those individuals were further from the
14        special committee that was charged with our
15        oversight  -- the investigational oversight --
16        being clear to my team that some people are
17        going to receive information who may be outside
18        the sphere of privilege.
19   Q.   But you knew that if you shared certain
20        information, Mr. Alrai would get that
21        information; correct?
22   A.   Not necessarily.  I'm just making clear that
23        the word -- matters of privilege fall upon
24        Attorney Commisso to decide.  And that comes
25        down to what information he wants to share.
```

```
1   Q.   You discussed earlier that Attorney Commisso
2        never said, "Oh, I'm worried that the
3        Government might get this and it might help the
4        Government's case"; he never said that, did he?
5   A.   No.  No, he didn't express any concern with me
6        with respect to any specific document during
7        the course of our work.  I believe he trusted
8        us to mark things as privileged and
9        confidential, which we did, and allow him to
10       determine in terms of content for the various
11       constituents what information went into those
12       presentations.
13  Q.   This is dated October 4, 2018; correct?
14  A.   Correct.
15  Q.   And we -- from a previous email, Mr. Alrai
16       didn't get indicted until -- I think it was
17       November 28, 2018; right?
18  A.   Correct.
19  Q.   So this is almost two months before he's even
20       indicted, but you're thinking about what he
21       might get in discovery; right?
22  A.   I'm instructing my team that they should be
23       mindful of privilege.  That's all.
24  Q.   If we can get rid of that pullout and go down
25       in the bottom half of the same page of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        Exhibit X.
 2            So this is what you were talking about
 3        before -- that you get this email from
 4        Attorney Commisso, and he is basically giving
 5        you feedback on a preliminary version of your
 6        report to United Way; would that be a fair way
 7        to characterize that?
 8   A.   Correct.
 9   Q.   One of the things you're discussing here is
10        something "between a full deck and a thin
11        deck"; correct?
12   A.   That's what Attorney Commisso is discussing,
13        yes.
14   Q.   I mean, that's a fancy way of saying "more or
15        less information"?
16   A.   Correct.
17   Q.   I'd like to go to the second page of this
18        document.  So if you can just magnify pretty
19        much everything there.  Yeah.
20            So when he's giving you feedback, he's
21        going to specific pages on the document you
22        sent him; right?
23   A.   Correct.
24   Q.   So he's -- and at the top of this document,
25        which is X, he refers to page 32, first bullet,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1              "delete reference to collusion among multiple
2         individuals.  Change to 'Alrai executed a
3         complex fraud scheme which included gaining
4         trust and deceiving multiple individuals.'"
5              That was something that Attorney Commisso
6         told you to change; right?
7    A.   Correct.  Yes.
8    Q.   And you did change it; right?
9    A.   Yes.
10   Q.   You used the exact language that he told you to
11        use?
12   A.   This is an instance where the word "collusion"
13        could be confused in terms of -- internal
14        collusion, I think, was his point.  So I made
15        the changes.  I thought it was misleading.
16   Q.   But he added more of -- making it sound like
17        this is all Mr. Alrai who executed this complex
18        fraud scheme.
19             That was language he told you to use as
20        well; correct?
21   A.   I don't know what the specific changes were
22        here.  I think the concern was the word
23        "collusion."  I'd have to look to see what
24        changed between versions.  But the indication
25        here is that there was no known collusion or
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            evidence of collusion by United Way employees;
 2            right?  So by using that word, it would be
 3            confusing to the reader of this report, so it
 4            should be clear.
 5    Q.    And so you made the changes that
 6            Attorney Commisso told you to make; correct?
 7    A.    Yes, we made that change.
 8    Q.    And then you submitted the report with the
 9            changes that were made; correct?
10    A.    Correct.
11    Q.    Now, this email here that we've just gone
12            through -- that was an email that was not
13            shared with either the Government or the
14            Defendant prior to trial; correct?
15    A.    As part of our discovery, this is part of our
16            efforts to turn over every -- any and all
17            documents and communications that may be
18            relevant, beyond what may have specifically
19            been responsive to what had been requested
20            before.
21    Q.    And this was not turned over prior to trial?
22    A.    I'm not aware that it was.
23                MS. BROWN:  Tracy, can you pull up
24            Exhibit D?
25                (Pre-marked Defendant's Exhibit D
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1                       introduced.)

2              MS. BROWN:  And if you can go to the last

3        page on that, we'll sort of work our way

4        forward with the email exchange here.  Okay.

5   Q.   (By Ms. Brown)  So this email starts out with

6        an email from Attorney Hunter of the U.S.

7        Attorney's Office.

8              And it is to "Tim."  And as you'll see

9        from the next page, it's Attorney Harrington,

10       who was previous defense counsel.

11             And it says, "Please see the attached

12       letters regarding the Alrai case.  I've also

13       attached a supplemental production consisting

14       of Bates numbers" -- I'm not going to read

15       those out.

16             So this is not an email initially

17       involving you, but at some point it was

18       forwarded to you; correct?

19  A.   Well, you'd have to show me, but, yeah.

20  Q.   Okay.  Well, let's go back to the page before

21       this.  So then the exchange here is an email

22       from Attorney Harrington.

23             It says, "Matthew, thank you for the

24       information.  In regard to Mr. Naviloff,

25       although I appreciate the summary, has he

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1            prepared a report of his filings either for you
2            or the United Way?"
3                 And that is signed, "Best regards, Timothy
4            M. Harrington"; correct?
5       A.   Correct.  Yes.
6       Q.   And let's go a page before that.  So then
7            Attorney Hunter forwards -- then he has an
8            exchange with Attorney Harrington about -- the
9            Government had recently retained you, and that
10           you had not prepared a report.  And he expects
11           that you will and that they will deliver it
12           promptly.
13                So there's another email -- we're going to
14           go back a page -- from Attorney Harrington.  So
15           go back to the page before this -- the one with
16           all the outline.
17                So then there's a request that's addressed
18           to John and Matt of the U.S. Attorney's Office
19           from the defense attorney, saying, "After
20           reviewing the summary of Naviloff's expected
21           testimony, I'm requesting the following:  All
22           reports prepared by Greg Naviloff of RSM and
23           its employees, hereinafter collectively
24           referred to as 'RSM for the United Way'" --
25                THE COURT:  Donna, you've got to take it
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1              easy on the reporter when you're reading stuff
2              like this.
3                   MS. BROWN:  Okay.  Sorry about that.
4                   THE COURT:  We can see the document.  We
5              can read it.  Maybe just refer to the item
6              numbers.
7    Q.    (By Ms. Brown)  Okay.  Yeah.
8                   I'll refer to item number one of what
9              we're looking at now, which is D.  I think it's
10             page three.  It asks for all reports from RSM
11             regarding this case.
12                  Did you turn over all reports from RSM
13             regarding this case?
14   A.    Which letter are you on?  Sorry.
15   Q.    Well, A1?
16   A.    A1.  Got you.
17                  Yes, so all that I was aware of, yes.
18   Q.    So A2 says "copy of documents and other data
19             collected and reviewed by RSM in calculating
20             United Way's loss."
21                  Did you provide those documents in
22             discovery?
23   A.    We would have made available the documents for
24             review, yes -- a copy of all documents
25             collected and that served as the basis for our
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            calculation.
 2   Q.    Well, it doesn't say that served as the basis
 3         for your calculation.
 4              It says "reviewed."
 5   A.    We wouldn't have turned over everything.  I
 6         mean, there's GLs and all sorts of information
 7         that was collected as part of this that goes to
 8         the heart of United Way's operations.  What was
 9         utilized for the basis of our loss calculation
10         would have been made available.
11   Q.    The 600 emails that were produced after trial
12         were not made available; correct?
13   A.    Yeah.  As far as the emails, we opted for a
14         conservative approach, right, and made
15         available all these emails, even though, in my
16         opinion, there's -- only a little number of
17         these are responsive to the Court's order that
18         took place.  So this was our attempt to
19         comply with --
20              THE COURT:  No, she's asking you about
21         pretrial.
22   Q.    (By Ms. Brown)  Yes.
23   A.    Not the 600 emails?  Sorry, which --
24   Q.    I'll rephrase my question.
25              So we were talking about A2 here regarding
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          documents reviewed by RSM.
2    A.    Yeah.
3    Q.    What my question was, is that the 600 emails
4          that we received after trial -- you didn't
5          produce them before trial, consistent with this
6          request in number two?
7    A.    Yes.  Consistent with what I stated there, we
8          shared everything that was relevant to the
9          calculation and the making of the calculation,
10         as well as a discussion with counsel, right, of
11         available information that was necessary.
12   Q.    Well, I think you're answering a different
13         question than I'm asking.
14              This particular sentence says "documents
15         reviewed," not "documents relied on" or not
16         "documents incorporated into."  It says
17         "documents reviewed" --
18   A.    Yep.  There was discussions --
19   Q.    -- you looked at and decided wasn't important.
20              That would be covered by this sentence;
21         right?
22   A.    Yes.  And these are items that were discussed
23         with the U.S. Attorney's Office.  They were
24         made available, or at least known, that we had
25         general ledgers and all sorts of other

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1      documents that were collected that were part of

2      United Way's business records; right?  That we

3      performed a lot of collections.  And you can't

4      bifurcate what was collected for purposes of

5      loss analysis versus the five other reasons

6      they may have been collected; right?

7           Policies and procedures -- all sorts of

8      information that may have been part of that

9      response.  So the U.S. Attorney's Office was

10     made aware and Commisso Law was made aware of

11     what we had collected or the vastness of what

12     had been collected.

13          THE COURT:  So are you saying that the

14     U.S. Attorney's Office was made aware that

15     there were internal emails between you and

16     other RSM employees discussing these analyses?

17          THE WITNESS:  Well, yes, they would have

18     been aware that emails take place, and that

19     there's emails discussing analyses, and they

20     were transient upon preparing our work product;

21     right -- my final loss calculation.

22          THE COURT:  You say they "would have been

23     aware."  I don't know what that means.

24          Were they made aware by you, or were they

25     not?

No Copy Of This Transcript May Be Made Prior to 2/28/2021

114

```
 1              THE WITNESS:  I don't recall any direct
 2     conversations about transient emails, per se,
 3     that went to my team members in producing those
 4     emails with respect to this.
 5              THE COURT:  So how would they have known
 6     that?  So you just said they would have known
 7     that.  I asked you how.
 8              And you said, "Well, we didn't talk about
 9     it."  So how would they have known that?
10              THE WITNESS:  Well, by the nature of my
11     work, I'm emailing my team every day.
12              THE COURT:  How would they know that?
13              THE WITNESS:  That's just a normal mode of
14     communication, I guess.  I just assume they
15     would know that I was emailing my team.
16              THE COURT:  That's sensible.
17              What's a "transient email," by the way?
18     Is that a special kind of email?
19              THE WITNESS:  No.  As part of the work
20     performed, there were emails that had mental
21     impressions or thoughts at certain points in
22     time.  All the relevant information was taken
23     from those and put into my report.
24              THE COURT:  Except information you didn't
25     deem worthy of being in your report.  In other
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          words, when you read something and you wanted
2          to rely on it, you put it in the report.  But
3          things you chose not to rely on, you didn't
4          include in the report; right?
5               THE WITNESS:  Yeah.  And we discussed
6          generally whether we needed to do an email
7          review and turn over emails.
8               THE COURT:  Who is "we"?
9               THE WITNESS:  Commisso and, I believe, the
10         U.S. Attorney's Office as well.  I can't
11         remember exact discussions.
12              THE COURT:  And you?
13              THE WITNESS:  Yeah.
14              THE COURT:  Discussed turning over emails?
15              THE WITNESS:  We discussed whether or not
16         this was overly broad to include privileged
17         emails that happened with Commisso Law with
18         respect to what's being shared.
19              THE COURT:  Look, I don't mean to bear
20         down on you.
21              THE WITNESS:  It's fine.  I get it.  I
22         understand.
23              THE COURT:  I'm asking you whether you had
24         conversations -- I'm only using the U.S.
25         Attorney's Office and Mr. Commisso, because
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          that's what you said.  I don't want to put
2          words in your mouth because that's the last
3          thing I want to do.
4               THE WITNESS:  No, that's fine.
5               THE COURT:  But did you have conversations
6          with Attorney Commisso in the U.S. Attorney's
7          Office about the fact that you had internal
8          emails that you reviewed as part of your work?
9               THE WITNESS:  Yes, I would have made it
10         known that there were emails that had
11         communications between me and my team that I
12         considered part of Commisso's discussions --
13         privileged.  And that was made known.
14              THE COURT:  And as you already explained,
15         that information you relied on would be
16         included in the reports; but information you
17         chose not to rely on would not be included?
18              THE WITNESS:  That's correct, yes --
19         transient.
20              THE COURT:  Well, is that what "transient"
21         means?  I'm lost.
22              THE WITNESS:  "Transient" just means
23         information's being shared in emails.  The
24         information that is gleaned from the emails
25         that's relevant to my report is taken.  But the
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1        emails don't serve as the record of my work;
2        right?
3              THE COURT:  Well, I don't know.
4              THE WITNESS:  The report --
5              THE COURT:  In examining you as a witness,
6        I would want to know what you relied on, but I
7        would also want to know what you chose not to
8        rely on.  That would be important to me as
9        someone examining you.
10             And I'm not suggesting, by the way, that
11       emails like this are necessarily turned over in
12       civil or criminal discovery.  That's a
13       different conversation.  But it matters to me
14       whether this was discussed with the prosecution
15       or Mr. Commisso.
16             And my understanding is your answer to
17       that is "yes."
18             THE WITNESS:  Yes.  For the record, yes.
19       I'm aware that there's emails in our possession
20       that were with Commisso that discussed these;
21       right?  And these all contained, for the most
22       part, conversations with Attorney Commisso,
23       until we were engaged later on in 2019 by the
24       U.S. Attorney's Office.  And this one appears
25       to be with the U.S. Attorney's Office.  Yep.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1                  THE COURT:  I'm sorry to interrupt.
 2                  MS. BROWN:  Mr. Naviloff, your voice is
 3            dropping a little bit.
 4                  THE WITNESS:  My mic falls down, and I
 5            apologize.  I wish there was a way to control
 6            the volume on my mic.
 7       Q.   (By Ms. Brown)  I really do not want to belabor
 8            this, but I just want to follow up quickly on
 9            the Judge's point.
10                  You agree with me that relying on
11            something is different than reviewing
12            something; right?
13       A.   Relying and reviewing, yes, are different.
14       Q.   And you agree with me that at least what the
15            defense attorney was asking for here -- and I'm
16            not going to get into whether he got it or not.
17                  He was asking for documents reviewed, not
18            just documents relied on.  You knew that;
19            right?
20       A.   That's correct.  That was part of the
21            discussion with the U.S. Attorney's Office and
22            with Commisso Law.
23       Q.   And so you knew that's what the attorney was
24            getting at -- was getting at documents
25            reviewed, not just relied on?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And you talked about -- there were discussions |
| 3 | | about whether turning over the emails, but |
| 4 | | before that you talked about, well, there's |
| 5 | | really super confidential things about business |
| 6 | | records. |
| 7 | | That's separate than emails regarding your |
| 8 | | opinions from trial; right?  You know, if |
| 9 | | there's some internal documents regarding |
| 10 | | security, you can't lump that into the same |
| 11 | | discovery request as emails sharing information |
| 12 | | among experts. |
| 13 | A. | Are we talking about A2 here?  Or are we |
| 14 | | speaking just generally to -- |
| 15 | Q. | Well, I think when I first asked you about A2, |
| 16 | | you said, "Well, we can't just give them |
| 17 | | everything, because that could involve internal |
| 18 | | business records."  But I'm not asking about |
| 19 | | that right now. |
| 20 | | I'm asking about these emails between your |
| 21 | | team at RSM, either internal at RSM or between |
| 22 | | Attorney Commisso.  Those were documents that |
| 23 | | weren't turned over too; right? |
| 24 | A. | So A2 says "a copy of all documents and data |
| 25 | | collected and reviewed," right, in calculating. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1               So the documents and data collected --
2          that would be information from United Way;
3          right?
4    Q.    Yes.
5    A.    So the emails are part of my work and my team's
6          work.  So with respect to this whole discussion
7          on emails, I don't know how it fits into A2
8          with respect to what my team and I are
9          discussing in terms of analyzing and preparing
10         a report that served as the final record on my
11         opinion.
12              THE COURT:  What I want to know is, if it
13         didn't have anything to do with this, why were
14         you talking about it to the U.S. Attorney and
15         Mr. Commisso?
16              THE WITNESS:  Just generally speaking,
17         whether or not the emails were part of what
18         should be shared; right?  We wanted to be
19         overly broad throughout this process.  We had
20         discussed just generally what we should be
21         responding.  We understood that generally,
22         emails are off-limits.  And my understanding
23         was that was in agreement; right -- that what
24         was in our emails, like I said, is not -- it
25         was just transient in terms of a discussion

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        that I may have had with my team or a question
 2        I may have had with my team.  It didn't
 3        represent a final opinion on any matter.
 4             THE COURT:  All right.
 5   Q.   (By Ms. Brown)  You agree with me that an email
 6        is a document; right?
 7   A.   An email is a document.
 8   Q.   If I made a request for documents, emails would
 9        be included in that definition of documents?
10   A.   Yeah.
11             This says "collected and reviewed"; right?
12        So it wasn't something that I collected --
13        those emails.  Those were conversations
14        internally, the way I read this.
15             But I'm happy to -- I get the larger
16        context here with respect to the emails and
17        issues.  And as far as RSM is concerned, we
18        went above and beyond to produce everything
19        that we could produce in terms of emails, even
20        beyond what may have been part of the Judge's
21        order.
22             THE COURT:  Yeah, but understand
23        something, Mr. Naviloff.  This is a hearing
24        about pretrial.
25             THE WITNESS:  Yes.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1            THE COURT:  And I think -- did you just
2      say -- maybe I misheard you.  I thought you
3      just said you thought there was an agreement
4      that emails were off-limits.
5            THE WITNESS:  I said my understanding is
6      that, from emails we weren't producing, that
7      RSM was not producing them in terms of -- this
8      wasn't an area that was responsive to A2.
9            THE COURT:  That's fair.  Okay.
10           THE WITNESS:  That's all.  That's it.  I
11     didn't think it was responsive to A2.
12           THE COURT:  What was the basis for that
13     understanding that RSM would not produce
14     emails?
15           THE WITNESS:  Just a general discussion in
16     terms of "what is meant here?  Is this intended
17     to be an overly broad" -- just this discussion
18     we're having here; right?
19           Is this really intended to be some really
20     tight discussion, or something overly broad?
21     My fuzzy recollection is this probably came up
22     for discussion with you, Judge Laplante.
23           THE COURT:  I think you're probably right.
24           THE WITNESS:  This came to a head
25     somewhere in this process.  And I don't recall

No Copy Of This Transcript May Be Made Prior to 2/28/2021

123

1    what happened, but as part of this process,
2    there were directions that were given to RSM
3    that we followed.
4         THE COURT:  Okay.  So you just said,
5    though -- I asked what the basis for your
6    understanding was that emails would not be
7    produced in response to this, which I
8    understand.
9         THE WITNESS:  Yeah.
10        THE COURT:  I don't even think that's an
11   unreasonable interpretation at all, by the way.
12   But you said it was based on general
13   discussions.
14        General discussions between who?
15        THE WITNESS:  With the U.S. Attorney's
16   Office.  And I'm -- presumably, Commisso was a
17   part of those discussions, because he was in
18   most discussions that we had with the U.S.
19   Attorney's Office, just generally speaking.
20        THE COURT:  Thank you.
21   Q.  (By Ms. Brown)  So if I use this word
22   "transient" a lot -- and as I understood your
23   use of it, it explained a sort of work in
24   progress as to your opinions, findings, and
25   analysis in this case.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

124

1              Would that be a fair characterization of

2       that?

3    A.  Correct.  Yes.

4    Q.  So the next paragraph would be A3.

5       Attorney Harrington asks for an explanation of

6       the methodology used by RSM in calculating

7       United Way's loss.

8              So I understand that, looking at the

9       methodology, you didn't feel that these emails

10      that we've just looked at already that talk

11      about the calculations and collecting the data

12      -- you did not feel that was responsive to

13      number three?

14   A.  It looks like A3, to me, says, "Please write an

15      explanation of the methodology used by RSM to

16      calculate its loss."  And this is July of 2019.

17             The reports that were made available would

18      have had the calculations with prior losses.

19      But I don't recall us writing down, at this

20      point in time, what my revised opinion or

21      report would be, given that I was just

22      retained.

23   Q.  So let's go down to 4 -- I think it's F --

24      small F.

25             And one of the other requests is "witness

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1    interviews"; do you remember that?

2  A.  Correct.  Yes.

3  Q.  And my understanding is RSM's response to that

4       is "we don't write stuff down" kind of thing?

5  A.  If notes are taken, they were typically on

6       notepads for which relevant information made

7       their way into those fact-finding reports that

8       we had issued or shared -- or information that

9       we had shared with counsel.

10       But there was no formal memos -- or at

11       least my understanding from the team was that

12       they weren't asked to, nor did they keep, memos

13       in our record of retention, which is our shared

14       folder.

15       MS. BROWN:  Now I'm going to move to

16       Exhibit E.  And this is -- I'm going to go to

17       the last page of Exhibit E, which is also -- I

18       have as document 164-12.  There we go.

19           (Pre-marked Defendant's Exhibit E

20            introduced.)

21  Q.  (By Ms. Brown)  So this is an email that I

22       believe you sent out.  And it's kind of hard to

23       see because of the -- I think these are

24       hyperlinks here to other files, so they're not

25       in the same -- but you send, and I've counted,

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          15 files to Attorney Commisso.  And if we can
 2          pull up that section on the top half there to
 3          look at the files that you sent to
 4          Attorney Commisso on Exhibit E so we -- we
 5          can't see the dates very well, but we can see
 6          the titles.
 7               And four of these files have check marks
 8          on them; correct?
 9    A.    Correct.
10    Q.    And the four that have check marks -- one's
11          called "accounting exports;" right?
12    A.    Correct.
13    Q.    One is called "financial statements."
14    A.    Correct.
15    Q.    One is called "policies and procedures."
16    A.    Correct.
17    Q.    And one is called "bank statements."
18    A.    Correct.
19    Q.    At the bottom here of those 15 documents,
20          they're labeled "redacted data security."
21               And under "redacted data security," one
22          says "office phone invoices."
23    A.    Correct.
24    Q.    So did you make a determination that phone
25          invoices were protected by data security?
```

Case 1:18-cr-00192-JL Document 200 Filed 11/30/20 Page 127 of 328

```
 1   A.   If I'm interpreting this, I'm going to
 2        interpret that there was something under
 3        "redacted" -- the security -- some description
 4        under folder 11 that's been removed --
 5   Q.   Oh.  Okay.
 6   A.   -- by counsel.  That's my guess.
 7   Q.   I understand.
 8             So it's not that everything below that is
 9        redacted under data security; it's that there's
10        a -- file 11 is --
11   A.   Yes.  That would be my best guess.
12   Q.   And then there was a separate file where you
13        kept things involving the insurance claim?
14   A.   Correct.
15             MS. BROWN:  So, Tracy, if we can go back
16        to the previous page on this.
17   Q.   (By Ms. Brown)  And you are addressing an email
18        to John after you're sending these attached
19        links to these files.
20             "Let's discuss contents of these four
21        folders for potentially providing to the U.S.
22        Attorney's Office."  And we're assuming, from
23        what we just discussed, the four that had the
24        check marks on them; correct?
25   A.   That would be my best guess, yes.  My
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         recollection -- best recollection, I should
 2         say.
 3    Q.   Now, one of the questions I have about this
 4         email that hasn't been clear to me --
 5    A.   Yes.
 6    Q.   -- is do you have your own access to some of
 7         these files?  Or do you have to, like -- do you
 8         have to go through Attorney Commisso to get
 9         documents?  Or do you have access to documents
10         all on your own?  This seems to suggest that
11         you have access to documents on your own
12         without going through Attorney Commisso.
13    A.   That's correct.  So these are broad-based
14         categories -- those folders -- of types of
15         documents that my team collected and then put
16         into categorical folders during the work that
17         was performed -- the investigational work.  So
18         those would have been collected by us.  And
19         those folders would be appearing on our kind of
20         system of record -- our shared server file.
21    Q.   And this may sound like a dumb question, but it
22         seems that if you're able to send them to
23         Attorney Commisso, that you had access to all
24         of those files listed there; right?
25    A.   Yes.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | Q. | And would you agree with me that all of those |
| 2 | | files that are listed in this email, Exhibit E, |
| 3 | | were not provided to the Defense; correct? |
| 4 | A. | Can you share the next screen or the -- |
| 5 | Q. | Page two again? |
| 6 | A. | Yeah, thank you.  Sorry. |
| 7 | Q. | That's okay. |
| 8 | | And do you want to pull it out just so you |
| 9 | | can see what's -- |
| 10 | A. | A little bit bigger, yeah.  That would be |
| 11 | | great. |
| 12 | | So the question is whether the four check |
| 13 | | boxes were shared, or whether -- |
| 14 | Q. | So we're seeing -- of these files we see here, |
| 15 | | was everything shared with the Defense? |
| 16 | A. | I'm guessing no, but I don't recall all the |
| 17 | | details; right?  So what I do know is we went |
| 18 | | through the folders, and some of these -- many |
| 19 | | of these inside vendor phone invoices -- that |
| 20 | | stuff was all shared. |
| 21 | | So anything that was relevant to our |
| 22 | | calculation was shared.  There were some of |
| 23 | | these folders -- and I think there was the four |
| 24 | | here -- that related more broadly to financial |
| 25 | | statement information or accounting ledger |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          detailed activity, or detailed policies and
 2          procedures that were either collected for us to
 3          assess the internal controls or to perform
 4          testing that was outside of the loss
 5          calculation.
 6               So those were brought into a discussion
 7          with Attorney Commisso with respect to what
 8          information could be shared in terms of
 9          discussions then with the U.S. Attorney's
10          Office, which I assume proceeded next in terms
11          of what we had in terms that was relevant to
12          the loss calculation.
13    Q.    And one of the advantages of you being in
14          control of what gets sent to the U.S.
15          Attorney's is you know what you might be facing
16          for cross-examination; correct?
17    A.    We looked at this as many work streams.
18          Anything related to the loss calculation that
19          was in these files was shared out of an
20          abundance of caution.  There was no discretion
21          here.
22               It was really -- the discretion leaned on,
23          "Should we share stuff that had absolutely
24          nothing to do with the loss calculation that
25          may have been collected?"
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

131

```
1              MS. BROWN:  Can we pull up Exhibit Y?
2              And can we go to page -- is there a page
3        three?  Go back a bit.  Okay.
4              (Pre-marked Defendant's Exhibit Y
5              introduced.)
6   Q.   (By Ms. Brown)  So this starts off -- there's
7        an email from Ryan that he'll, quote, "Draw
8        something up, but on a high level.  It's really
9        just initial follow-up on opening document
10       requests."  So go back a page on this in terms
11       of to the end of the document.  Okay.  Well,
12       this starts out from Chris to Ryan and Ron.
13             "Do you have any issue with doing
14       John Meyer's meeting on Wednesday by phone?  It
15       could be Webex."  And then the discussion
16       ensues regarding that.  So let's go back to
17       page three of that document.  And it appears
18       some sort of document is sent to Ryan, and he
19       says he's going to draw something up.
20             Do you remember what that was about?
21  A.   "I'll draw something up.  Meeting to discuss IT
22       questions."  I think they were discussing --
23       I'm not on this, but they may have circulated a
24       list with respect to some question, maybe.  I'm
25       just guessing.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              "I'll draw up something."
 2   Q.   If we go up to the email after that, which
 3        appears to be from Chris Fitzgerald, he thanks
 4        Ryan for the work he's done on this particular
 5        project.
 6              And then there's a note addressed to Ron,
 7        and it says, "Ryan analyzed the one instance we
 8        currently have where we have an Insight invoice
 9        and a DigitalNet invoice for the same period.
10        We currently have two Insight invoices, a topic
11        for discussion."
12              So at least according to Chris,
13        Ryan Gilpin did analysis on this case; right?
14   A.   So, yeah, Ryan's -- I'm happy to fill in the
15        details there, at least what I know of the
16        process here.
17              Ryan was receiving and inventorying the
18        invoices for DigitalNet, and putting them into
19        spreadsheets, and taking the line item detail
20        from the DigitalNet invoices and putting them
21        categorically into the types of goods -- the
22        services and the equipment for purposes of us
23        quantifying the analysis -- the loss
24        calculation.
25              So he did some of the initial input.  That
```

|  |  |  |
|---|---|---|
| 1 |  | information was then reviewed by others on the |
| 2 |  | team, including myself as part of my quality |
| 3 |  | control, and served as part of the fundamental |
| 4 |  | quantification of the various amounts that were |
| 5 |  | charged by DigitalNet. |
| 6 |  | So this is early on in the process -- July |
| 7 |  | of 2018 -- and he was collecting DigitalNet |
| 8 |  | invoices.  And he had identified DigitalNet |
| 9 |  | invoices and was quantifying amounts -- |
| 10 |  | itemized amounts on those invoices. |
| 11 | Q. | And this was for calculating potential loss |
| 12 |  | regarding duplicative billing; is that what the |
| 13 |  | purpose of doing that analysis was? |
| 14 | A. | Let's see.  Currently, Insight and -- same |
| 15 |  | period.  So I would presume, if this is |
| 16 |  | Insight -- I'm just thinking.  Bear with me. |
| 17 |  | Yeah, so my recollection was Insight was |
| 18 |  | billing United Way directly.  And then we saw |
| 19 |  | DigitalNet also billing United Way.  So -- for |
| 20 |  | the same infrastructure-related services.  So |
| 21 |  | that's the -- under the managed IT agreement. |
| 22 | Q. | And so what we were just talking about -- that, |
| 23 |  | you would agree, would involve some at least |
| 24 |  | basic -- or some knowledge of IT services. |
| 25 |  | Because if you're looking at two documents |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          and saying that they're delivering the same
 2          thing, you would need to know about what
 3          they're allegedly delivering; right?
 4   A.     Yes, there's some basic level of understanding
 5          of IT services.  None of this was complex.  It
 6          came down to some acronyms and some jargon
 7          being included, and some marketing literature
 8          being included on some of the invoices.  So
 9          understanding what that jargon or marketing
10          literature meant in terms of aligning -- in
11          other instances, that we were verbatim.  So
12          there was no real judgment.
13               But here's where Ryan was helping to show
14          us where there was either marketing terms or
15          jargon used in the invoices, and making sure it
16          went into the proper category of services that
17          was being delivered.
18   Q.     And so you were relying on Ryan to interpret
19          the IT language and services to make this
20          analysis; correct?
21   A.     He was doing a first pass, is the way I would
22          describe it.
23   Q.     But he was doing a first pass as someone who
24          was a couple of years out of college; right?
25   A.     Correct.  This is a rather straightforward
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1        infrastructure hosting that we had --
2        agreement.  You've got services being charged
3        under agreement.
4            Does the invoice agree with the contract
5        for which the services were being delivered;
6        right?  Those kind of things that I would
7        expect any first- or second-year to be able to
8        perform.
9   Q.   And that was the opinion that you gave at
10       trial; correct -- that these were
11       straightforward.  You just had to compare
12       invoice to invoice, and anybody could do it;
13       right?
14  A.   Well, there's obviously words that are being
15       used in these invoices that require further
16       research.  And that was where some of the
17       background from both Diego as well as from Ryan
18       was useful.
19           But, yeah, overall, the analysis of
20       understanding the -- breaking down the invoices
21       from DigitalNet where there was detail -- I
22       mean, it was difficult in the fact that in many
23       of the line items on the DigitalNet invoices,
24       there wasn't sufficient detail.  But where
25       there was sufficient detail categorizing them,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | particularly consistent with the hosting |
| 2 | | services -- infrastructure hosting -- as well |
| 3 | | as the desktop as a service -- those were two |
| 4 | | core areas that were more straightforward. |
| 5 | Q. | So my question was that -- this was an opinion |
| 6 | | you gave at trial, which was this was very |
| 7 | | straightforward.  Maybe had to do a little |
| 8 | | looking stuff up, but that this was |
| 9 | | straightforward and you did not need IT |
| 10 | | expertise to make this analysis. |
| 11 | | That was your opinion at trial; correct? |
| 12 | A. | If you share it with me, then -- I don't know |
| 13 | | if I said those words directly or not, but... |
| 14 | Q. | Okay.  Did you say you didn't need IT expertise |
| 15 | | at trial, or -- I mean, I'm trying to -- |
| 16 | A. | No, I shared with you my -- what I testified to |
| 17 | | here today; right -- is that Ryan assisted |
| 18 | | looking at DigitalNet invoices, summarizing |
| 19 | | them, and categorizing them for further review |
| 20 | | by myself and my team. |
| 21 | Q. | And you're saying that his two or three years' |
| 22 | | experience was sufficient to make the technical |
| 23 | | analysis that was necessary? |
| 24 | | MR. DAVIS:  Objection.  Asked and |
| 25 | | answered.  Waste of time. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              THE CLERK:  You're on mute, Judge.
 2              THE COURT:  I'm sorry about that.
 3         I'm going to overrule the objection, but
 4    he is correct.  We are rehashing here, so let's
 5    not do that.
 6  Q.  (By Ms. Brown)  Okay.
 7         On Ryan Gilpin, as I understood your
 8    answer, you were saying that you thought the
 9    experience level that he had was sufficient to
10    the task that you had given him to make the
11    analysis of these invoices for duplicative
12    billing; does that summarize it?
13  A.  Yes, that's correct.  And as part of this
14    analysis, we also looked at the other ad hoc
15    stuff that wasn't being included or bucketized
16    with respect to these same services.  So some
17    of the initial hardware setup.  So looking at
18    the totality of the services being provided,
19    and carving out the reoccurring charges; right?
20         So it was an effort to create an
21    apples-to-apples comparison of where those
22    reoccurring charges existed for which they were
23    significantly inflated, as I reported in my
24    expert testimony.
25  Q.  And you've sat in at trial for the testimony of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          the defense expert, Jason Sgro; correct?
 2   A.    Yes.
 3   Q.    And you knew he disagreed with that opinion?
 4   A.    He did, yes.
 5   Q.    He disagreed that you could make the findings
 6          that you made based on your experience and the
 7          data that you had available to you; that was
 8          his opinion?
 9   A.    That's generally my recollection, yes.  His
10          view was that it's hard to make
11          apples-to-apples here.  And for the reasons
12          that I described earlier; right -- that there's
13          initial setup costs and other costs that come
14          into play here -- and I think he viewed that as
15          being too difficult of an exercise, perhaps,
16          for purposes of doing this analysis.
17   Q.    Now, one of the other areas that was asked for
18          by the Defense was information regarding market
19          data.  That was in that email that we talked
20          about before.
21              Do you remember that -- that there was a
22          request for market data?
23   A.    I don't recall, sorry.
24              MS. BROWN:  Well, actually if we could
25          pull up --
```

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              THE COURT:  Is there any dispute that he
 2         requested market data?  It's not disputed;
 3         right?  We don't need to pull up the doc to do
 4         that.
 5              MS. BROWN:  Okay.  Great.  I thought it
 6         was in there.  So I want to talk about that.
 7              And if I could pull up Exhibit Z, which is
 8         that RSM report, again.  We're going to page
 9         six of the RSM report of Exhibit Z.
10    Q.   (By Ms. Brown)  So this slide that -- for the
11         internal use for United Way talks about loss
12         quantification.
13              That's the title up on the bar; correct?
14    A.   Correct.  Yes.
15    Q.   And so there's four bullets here.  And I'm only
16         going to ask you about one, and that's the last
17         one.
18              And it says "Analysis of market data."
19              And you, in this presentation to the
20         United Way, said, "We identified IT vendors,
21         including national third-party application
22         development firm Andar and TBS Networks, to
23         establish" -- "to comparative quote amounts for
24         services reportedly delivered by DigitalNet to
25         United Way, and B, to order, to access, and
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

140

```
1         quantify potential excessive billings."
2              So in your reporting back to United Way,
3         one of the things that you're looking at in
4         terms of potential issues is the analysis of
5         market data; correct?
6    A.   This market analysis looks like it's particular
7         or pertaining to website development.  Andar
8         and TBS Network weighed in on a website
9         development cost, I believe.
10   Q.   And did you say that you remember that there
11        was a discovery request?  And I'll just say
12        it's at Aa, on October 11, where
13        Attorney Harrington specifically asked for
14        market data.
15             Do you not recall that now, or...
16   A.   Yeah, I believe you.  I have no reason to doubt
17        that.
18   Q.   In fact, he specifically referenced Andar and
19        TBS, which would tend to suggest that maybe he
20        was getting it right off of this very document;
21        right?
22             MR. DAVIS:  Objection.  Calls for
23        speculation.
24             THE COURT:  No, it doesn't.
25   Q.   (By Ms. Brown)  But he did ask for -- he
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           specifically referenced --

2                THE COURT:  Hold on.  Let me say this.

3                I overruled the objection, but I think I

4           do understand the sense of the objection, which

5           is that this is almost like a deposition now;

6           okay?  And I realize that you've got a burden

7           here, but, I mean, it isn't really about --

8           there's no discovery order violation or rule

9           violation.  Unless this market data-allotted

10          question you're going to leads to something

11          exculpatory, there's no reason to inquire about

12          it.  Because the issue isn't that the discovery

13          requests were not complied with.  The issue is

14          whether exculpatory evidence was not provided.

15               So connecting up to requests doesn't

16          really get us anywhere here.  Unless -- and

17          maybe you are -- unless you're going to

18          something exculpatory.

19               MS. BROWN:  Yes, Your Honor.  And that's

20          where I'm going.  So of the posttrial

21          discovery, this witness made representations

22          about market data not being relevant and not

23          turning it over.

24               THE COURT:  Okay.

25               MS. BROWN:  So I know this is somewhat

No Copy Of This Transcript May Be Made Prior to 2/28/2021

142

1        laborious, but in order for that to make any
2        sense, I needed to go through the fact that it
3        was part of his calculation.  There was a
4        request for it.  And then the fact that he
5        chose not to turn over that information, I
6        think, is relevant.
7              THE COURT:  Not unless it's exculpatory.
8        Because the issue isn't whether they complied,
9        again, with a discovery request or discovery
10       order.  The issue isn't really the prosecutors
11       here were on notice of exculpatory information,
12       or whether it should have been provided to them
13       both, right, but whether there's exculpatory
14       information that was not provided pursuant to
15       their constitutional obligation.
16             So I don't think you have to lay this
17       ten-question foundation.  I think you can raise
18       the evidence, establish for me whether it's
19       exculpatory or not in the best way you can, and
20       then you can tag it back to whether -- to show
21       me how either the prosecution knew about it or
22       should have known about it.
23             But we're spending a lot of time here.
24       And you're trying to lay it out, but I'm not
25       sure it's necessary.  And you've got a fairly

No Copy Of This Transcript May Be Made Prior to 2/28/2021

143

```
1              -- I don't want to call the witness
2        "uncooperative," but he's an adverse witness.
3        So as you go through it, it's laborious,
4        because he doesn't want to be led in a
5        direction he doesn't want to go, like any
6        witness.
7              So I would suggest you point to me the
8        exculpatory evidence.  And if I think you need
9        to -- if I have questions about whether it
10       should have been provided for some reason, I'll
11       ask.  But, I mean, a perfect example is those
12       emails; right?
13             Those types of emails, internally by an
14       expert, wouldn't normally be shared in civil
15       discovery.  That normally would not happen,
16       unless there was a request for it and it was
17       sort of worked out; right?  However, if the
18       prosecution is aware of it and either didn't
19       get it, or got it and didn't review it, or
20       reviewed it and didn't turn it over, well,
21       that's a different analysis.
22             It's not about whether market data was
23       necessarily requested.  It's about whether
24       exculpatory market data information was not
25       provided.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           MS. BROWN:  Well, just briefly -- I know
2      we're coming up to 12:30, Your Honor.
3           One of the cases that we are looking
4      towards in this case is the Bundy case that's
5      cited in our pleadings.  And the Court -- and
6      so one of the issues in Bundy was whether he
7      could get a new trial or it should be
8      dismissed.  And the Court spent a lot of time
9      talking about the fact that these items not
10      only were requested, and specifically
11      requested, and specifically requested for a
12      reason, but that then that puts the Government
13      on notice.
14           Like, "Oh, that's their defense.  That's
15      where they're going.  They're going with that
16      defense, so if we find anything that goes along
17      with that, as opposed to not supporting
18      that..."
19           So the fact that the Government was put on
20      notice about "here's what the defense was."
21      The Defendant's expert was repeatedly trying to
22      get to the basis of these opinions because he
23      thought that they were problematic and they
24      didn't have a sufficient basis.
25           And that's the other -- this goes back to

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            before -- why we decided not to call
 2            Attorney Commisso first.  Because this is -- we
 3            need to set this foundation.
 4                 But the -- most important goes to our
 5            expert, who is going to explain, like, "Hey,
 6            this would have helped me explain what I was
 7            trying to explain, which is" --
 8                 THE COURT:  So what evidence are you
 9            talking about?  Just tell me.
10                 MS. BROWN:  Okay.
11                 Well, one of the things is they're talking
12            about market data here, and making these
13            comparisons with Andar and other things.  And
14            so I want to establish that, especially the
15            previous email regarding having Ryan look at
16            comparing the invoices -- those are really
17            important to our expert, because it shows that
18            he can see how they made the mistakes.
19                 Like, he knew at trial that these opinions
20            were not correct.  And so now that he can see
21            these emails, he can see why.  He can see that
22            this young associate --
23                 THE COURT:  So what evidence are we
24            talking about?  What exhibits?  What evidence?
25                 MS. BROWN:  Well, for example, like we
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          were just talking about a few minutes ago about
2          looking at invoices and looking at terms, and
3          matching up the terms and saying, "Well, this
4          has the same terms, and this has the same
5          terms.  So, therefore, it must be duplicative."
6               Or saying, "DigitalNet provided this, and
7          something else provided that, so then it's
8          duplicative."  But DigitalNet may have added
9          value to the same thing that's not showing up.
10              THE COURT:  Sure.  But you're not hearing
11         me, I guess.  We're talking past each other.
12              What have you been given in the posttrial
13         discovery that should have been produced?  What
14         are you actually talking about?  That's all I'm
15         asking.
16              MS. BROWN:  Okay.  So these emails show
17         that --
18              THE COURT:  So it's in the emails?
19              MS. BROWN:  It is in the emails, yes.
20              THE COURT:  The point isn't that the raw
21         data wasn't provided; the point is that it was
22         a point of discussion in the emails?
23              MS. BROWN:  Right.  And the emails show
24         errors in their analysis that our expert can
25         now point to that he couldn't do before trial.
```

Case 1:18-cr-00192-JL  Document 200  Filed 11/30/20  Page 147 of 328

1            THE COURT:  That's what I wanted to know.
2       Thank you.
3            I don't know how much time you really need
4       to spend laying foundation.  I think the better
5       way to do this -- and that's why you're drawing
6       these objections, is it's just taking a long
7       time -- is maybe just make an offer of proof
8       that --
9            "Look, this was requested and not
10      produced.  It was requested by this exhibit and
11      not produced."  And if Mr. Davis disagrees,
12      he'll dispute it and you can develop it with
13      the witness.  But I think a lot of time you're
14      spending is laborious because the witness is an
15      adverse witness who -- I don't want to call it
16      pulling teeth, but it's slow going.  And he's
17      doing his best.  He's doing his best, but
18      there's a -- you know, it's an adverse witness.
19           So I would suggest after lunch, when you
20      want a big lead-up before you land the blow,
21      just make on offer of proof about, like, the
22      travel of the case; right?  There was this
23      letter.  And it was requested, and there was
24      discussion, and we have the exhibit.
25           That's what I would suggest.  I'm going to

No Copy Of This Transcript May Be Made Prior to 2/28/2021

148

```
1              let you do it as you want, by the way, but it's
2              just a suggestion because we are -- we've spent
3              half a day now, and we're partway through the
4              direct of one witness.  And it's -- I mean, the
5              case took how long to try?  It took -- I don't
6              remember.
7                   What did it take?  Anybody remember?
8              Seven days, Kim?  Yeah.  Anyways, thanks.  I
9              will see you at 1:30.
10                  (Recess taken at 12:32 p.m., and the
11                  proceedings resumed at 1:42 p.m.)
12                  THE COURT:  Okay.  Ready to resume.
13                  Anybody have anything we need to raise
14             before we continue?
15                  MS. BROWN:  Not from the Defense, Your
16             Honor.
17                  THE COURT:  Attorney Brown, please
18             proceed.
19                  MS. BROWN:  And just by way of an offer of
20             proof, prior to the break we established that
21             in the report to United Way, RSM made reference
22             to market data that they had relied on, and
23             that the Defense had made a specific request
24             for market data and also for witness interviews
25             in that same July 2019 request, which we had
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            talked about before.  So I'll go to the next
 2            step on that.
 3                 If we can pull up Exhibit Cc, Tracy.
 4                 (Pre-marked Defendant's Exhibit Cc
 5                 introduced.)
 6                 THE COURT:  Mr. Davis, while we're pulling
 7            that exhibit up, I probably don't need to say
 8            this, but if you hear anything in an offer of
 9            proof by defense counsel with which you don't
10            agree, please just make your objection known.
11                 MR. DAVIS:  Will do, Judge.
12       Q.   (By Ms. Brown)  And I'll find where --
13            Mr. Naviloff -- there you are.
14                 So this document that we are looking at,
15            which is Exhibit Cc, is an email from
16            Ryan Gilpin to -- we'll refer to it as several
17            members of the team, including yourself,
18            Mr. Nahass, Diego Rosenfeld, Trikinowsky
19            (phonetic).  And it speaks for itself, so I
20            won't read everybody's name on there.
21                 So this is dated August 20, 2018.  And a
22            couple things I want to ask you about on this
23            email -- and we'll pull out the first paragraph
24            first, just to kind of set what it's about.
25                 And so this is from Ryan saying that he
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          wanted to send out a recap after a call with --
2          I would pronounce that Riyal Banarg (phonetic)
3          -- from Andar "just to summarize what we
4          identified and what our next steps are with him
5          to tie up -- tie out support on the DigitalNet
6          web development cost."  So that's sort of the
7          topic.
8               So part of this email is he's discussing a
9          conversation he had with someone from Andar;
10         correct?
11    A.   Correct.  Yes.
12              MS. BROWN:  And just for the Court's
13         benefit, this is an email that was not produced
14         prior to trial, but was recently produced in
15         the -- we've heard reference to the 600-plus
16         emails.  This was part of that.
17              So, Tracy, if we can go to the next
18         paragraph in the same email, Cc.
19              So Mr. Gilpin goes on to summarize his
20         conversation with Riyal Banarg, and it said
21         that he reviewed pages identified in
22         DigitalNet's $200,000 web development invoice.
23              He estimated an approximate level of
24         effort of four hours per page "should they have
25         been developed individually and in a vacuum, so
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | we can likely estimate a lower range of time |
| 2 | | for subsequent pages developed after the |
| 3 | | first."  And then he provides an hourly rate. |
| 4 | | So would it be fair to say that this email |
| 5 | | is a summary of a witness interview? |
| 6 | A. | It appears to be so, yes. |
| 7 | Q. | And you knew that Attorney Harrington was |
| 8 | | looking for summaries of witness interviews, |
| 9 | | didn't you? |
| 10 | A. | Yes. |
| 11 | | MR. DAVIS:  Objection.  Relevance.  Waste |
| 12 | | of time. |
| 13 | | Your Honor, the web development costs were |
| 14 | | specifically excluded from Mr. Naviloff's loss |
| 15 | | calculation, as I understand it.  So this has |
| 16 | | nothing to do with his loss calculation. |
| 17 | | THE COURT:  Well, is it -- okay.  Yeah, |
| 18 | | market data was excluded from the loss |
| 19 | | calculation. |
| 20 | | You're saying it has no relevance to his |
| 21 | | loss calculation; right? |
| 22 | | MR. DAVIS:  I'm saying that the cost of |
| 23 | | web development that Mr. Alrai billed for was |
| 24 | | specifically excluded from Mr. Naviloff's loss |
| 25 | | analysis. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           THE COURT:  If that is true, Ms. Brown,
2      does that affect your desire to inquire?
3           MS. BROWN:  Well, Your Honor, I think that
4      this is -- I do know that this witness -- and
5      I'll make this by an offer of our proof -- does
6      say that when he specifically asked for this
7      data, he says he believes it's not relevant to
8      his opinion.
9           We feel that it's relevant to the analysis
10     that they've done in this case and the
11     progression of their opinions.  And,
12     specifically, it was represented to us that
13     they did not keep any sort of memorialization
14     of witness interviews.  And this appears to be
15     that.  So I don't intend to spend a lot of time
16     on this, but I think this is relevant that --
17          THE COURT:  Let me try.
18          MS. BROWN:  -- he was in charge of witness
19     interviews and memorialized them in email.
20          THE COURT:  So it's -- but is it also --
21     and I want to make sure I understood you.
22          Is it also going to be your -- are you
23     proffering me your expert will also say that
24     the failure to account for this factor in the
25     loss calculation was in some way a flaw in

No Copy Of This Transcript May Be Made Prior to 2/28/2021

153

```
1            Mr. Naviloff's analysis?
2               MS. BROWN:  No, I do not believe our
3         expert is going to say that.
4               THE COURT:  It just goes to this witness
5         interview thing?
6               MS. BROWN:  I'm sorry, what?
7               THE COURT:  It just goes to the witness
8         interview issue, the representation, and,
9         therefore, his credibility?
10              MS. BROWN:  Exactly.
11              THE COURT:  I'll allow it.
12   Q.   (By Ms. Brown)  So you would agree with me,
13        Mr. Naviloff, that this -- Ryan Gilpin
14        summarized a witness interview in this email;
15        correct?
16   A.   Yes.
17   Q.   And I won't go into the details of the next
18        paragraph, but if we can take down the pullout
19        and go to the next paragraph, he actually
20        interviewed another person and summarized that
21        interview as well; correct?
22   A.   Yes.
23   Q.   And when you were asked for documents regarding
24        market data, you said that it wasn't relevant
25        to your opinion; correct?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | A. | I was not aware of this email at the time.  If |
| 2 | | I've identified a document that I thought was a |
| 3 | | summary of the nature of the discussions, I |
| 4 | | would have proffered it.  I just wasn't aware |
| 5 | | of this.  And I don't know that when I asked my |
| 6 | | team to pull interview notes that they were |
| 7 | | aware of this interview at the time of the |
| 8 | | request. |
| 9 | | So this was one where this is not relevant |
| 10 | | to what I testified on, which may conflate the |
| 11 | | issue with my -- this document.  But, |
| 12 | | ultimately, when you look at this, this only |
| 13 | | serves to increase the amount of loss that I |
| 14 | | would have shown in my calculation had I |
| 15 | | testified to this matter or this issue of these |
| 16 | | different services that were provided. |
| 17 | Q. | But just to clarify, you are copied on this |
| 18 | | email; right? |
| 19 | A. | I was.  And, yeah, I have thousands upon |
| 20 | | thousands of emails.  And it's not always easy |
| 21 | | to distinguish every single email; hence, why |
| 22 | | we try to memorialize stuff within our shared |
| 23 | | folders so that we can share them. |
| 24 | Q. | If we can go on to Exhibit Y.  And I'm trying |
| 25 | | to find where the quote -- oh, it's the first |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            thing.
 2                  So the first full sentence after it says
 3            "Ryan" on the top -- can you pull that out,
 4            Tracy?  Thank you.  And this is an email by you
 5            to Ryan Gilpin.
 6                  It says, "You are central to the team.
 7            Having you on-site when possible is advisable.
 8            Thanks."
 9                  That is a statement you made about
10            Ryan Gilpin; correct?
11     A.     Correct.
12     Q.     And you would agree that he was central to your
13            team; correct?
14     A.     Yes.  He was one of several people that was in
15            the field doing work helping with fact-finding.
16                  (Pre-marked Defendant's Exhibit Dd
17                  introduced.)
18     Q.     (By Ms. Brown)  So I'd like to move to
19            Exhibit Dd, which is also document 164-15:3.
20                  So this email, which I think is a couple
21            of pages long, sets forth a list of tasks for
22            different people on the team.  And right on the
23            bottom of that page where I think it says --
24            where there's, like, a partial box.  And if we
25            could pull out that section with the partial
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1        box.  Yeah, that's it.
2             So this is a task for Ryan, which is to
3        follow up with John Meyer re: the $154,080
4        category special projects hosting fee.
5             So that's a task that Ryan had -- to meet
6        with John Meyer or talk with John Meyer and get
7        that information?
8   A.   That appears so, yes.
9   Q.   And, again, you don't have any emails
10       summarizing any conversations that Ryan Gilpin
11       had with Mr. Meyer?  Or you didn't produce any
12       in discovery; correct?
13  A.   I'm not aware.  If I found something in the
14       600-plus emails, I'm happy to see it.
15  Q.   And on this particular email here, the one --
16       Dd -- Diego Rosenfeld is not on the circle of
17       people who are discussing these issues in terms
18       of the tasks; correct?
19            MR. DAVIS:  Same objection.  Relevance.
20       Waste of time.  Special projects and hosting
21       fee are, again, specifically excluded from
22       Mr. Naviloff's expert report.  Counsel is
23       cross-examining on points which have no bearing
24       on Mr. Naviloff's testimony.  This is a waste
25       of time.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

157

| | |
|---|---|
| 1 | MS. BROWN:  Your Honor, the main point of |
| 2 | my cross-examination on this is the, to quote |
| 3 | Mr. Naviloff, "central role" that Mr. Gilpin |
| 4 | had in the collection of data, interviewing |
| 5 | witnesses, and analysis of IT data.  And this |
| 6 | email shows that role, and the responsibilities |
| 7 | and tasks that were given to this person that |
| 8 | go to this witness' credibility.  And that's |
| 9 | why we've chosen this particular email which is |
| 10 | cited in our motion. |
| 11 | THE COURT:  But if it's data collection |
| 12 | and involvement on issues that didn't go to the |
| 13 | opinion, is it relevant? |
| 14 | MS. BROWN:  I think that the fact that RSM |
| 15 | delegated to a very inexperienced and, we would |
| 16 | argue, unqualified associate to do the |
| 17 | investigation in this case, and collect data, |
| 18 | and analyze that data -- it's very relevant to |
| 19 | the opinions.  And that was a central theme the |
| 20 | Defendant tried to establish at trial, but was |
| 21 | unsuccessful because he didn't have these types |
| 22 | of documents that show how central Ryan Gilpin |
| 23 | was to the opinions that were offered at trial. |
| 24 | THE COURT:  But how could it be central to |
| 25 | the opinion if this wasn't included in the |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

158

```
 1            opinion?  That's really what the objection is
 2            saying, and that's what I'm asking you.
 3                 I can understand the bigger picture -- I
 4            really do.  But -- and also, well, yeah, I
 5            mean, they're not central to that opinion.
 6            That's the point.  Unless you have an argument
 7            that they should be, and it doesn't sound like
 8            Mr. Sgro is going to say that.
 9                 So I've got to say, in the interest of
10            some type of efficient proceeding, I've got to
11            sustain.  Let's stick with the offers of proof
12            and let's get right down into the documents.  I
13            really don't think you'll get objections from
14            the prosecution in most situations.
15    Q.      (By Ms. Brown)  Mr. Naviloff, do you remember
16            at trial that you were asked about the fact
17            that you were not an IT expert?
18    A.      Yes, I do.  I'm sorry.
19    Q.      Okay.  I didn't want to interrupt you.
20                 And that when you were asked about that,
21            you said that you had consulted with John Meyer
22            and Diego Rosenfeld; correct?
23    A.      That's correct, yes.
24    Q.      And you didn't mention Ryan Gilpin, did you, by
25            name?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | A. | I'd have to go back to the transcripts.  I know |
| 2 | | I mentioned in my report that it included |
| 3 | | others under his direction or other IT |
| 4 | | professionals, so... |
| 5 | Q. | And when you were asked about your lack of IT |
| 6 | | experience, you stated that in speaking with |
| 7 | | John Meyer and Diego Rosenfeld, you explained |
| 8 | | that Diego Rosenfeld was a principal with over |
| 9 | | 20 years of experience in technology solutions; |
| 10 | | do you remember that? |
| 11 | A. | Yes.  Correct. |
| 12 | | MS. BROWN:  Now I want to talk to you |
| 13 | | about an email -- it's documented 164-1.  It's |
| 14 | | also exhibit Ff, if we could pull that up. |
| 15 | | This one's really hard to see, so I have a copy |
| 16 | | here that I'm going to look along with. |
| 17 | | (Pre-marked Defendant's Exhibit Ff |
| 18 | | introduced.) |
| 19 | Q. | (By Ms. Brown)  So this is an email from |
| 20 | | Chris Fitzgerald to you.  If we can pull up the |
| 21 | | first sentence, we can get an idea of what this |
| 22 | | email is about.  So Mr. Fitzgerald was saying |
| 23 | | it would take nine hours over the course of a |
| 24 | | year to dip below 99.9 percent. |
| 25 | | And it sounds like the two of you are |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1         talking about some sort of analysis of
2         financial information you have regarding this
3         case; correct?
4    A.   Yeah, it looks like it's availability, right,
5         and a high availability for the backups.
6    Q.   And I'm going to skip down to the third
7         paragraph of that first email there, right
8         before Chris Fitzgerald's name, and pull that
9         out.
10            And this email says that "on another note,
11        I think we need to have a substantive meeting
12        with Diego to get him in the loop.  I'm a bit
13        worried now, now that we are communicating with
14        the U.S. Attorney's Office" -- or,
15        "communicating to the U.S. Attorney's Office
16        and relying solely on Ryan, who is only a
17        (newly promoted) senior associate.  In the
18        event Diego needs to testify, we need to be
19        sure he agrees with what we are relaying to
20        counsel/USAO."
21            So the fact that Mr. Fitzgerald is saying
22        "we need to have a substantive meeting with
23        Diego to get him in the loop," one could infer
24        from that he's not in the loop; would that be a
25        fair inference?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              (Audio dropped.)
 2    Q.    (By Ms. Brown)  Chris, part of your team, was a
 3          bit worried that now that you -- meaning you
 4          and RSM -- are communicating with USAO, that
 5          relying on Ryan, who is only a newly promoted
 6          senior associate -- that is something he stated
 7          to you; correct?
 8    A.    Yeah, that's here.
 9    Q.    I want to go to -- right after the second line,
10          "USAO," is the word "relying."
11              That's a word your team member used as to
12          Ryan Gilpin -- you said the word "relying" on
13          him; right?
14    A.    So this is a good question; right?  So this
15          email goes to the center of what we're
16          preparing and who's going to present evidence
17          with respect to the backup; right --
18          high-availability backup.  Certainly, I can
19          look at, and I saw, the report that inventoried
20          what was backed up at a point in time.
21              I'm not an IT expert and wouldn't testify
22          in this.  For purposes of my loss calculation
23          done earlier, there was a preponderance of
24          evidence collected throughout the investigation
25          which concluded other IT professionals.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

162

1           So when we're looking at the totality of
2      evidence when I was preparing my report,
3      John Meyer -- certainly, along with my team, I
4      had the utmost confidence, and continue to have
5      the utmost confidence, that they got the right
6      answer.
7           What the concern appears to be here -- and
8      this is Chris' concern -- is that we're going
9      to be asked to testify, or I would have been
10     asked to testify on something as technical as
11     what constitutes high availability.  And you
12     can see us breaking down the numbers here.  I
13     wouldn't know an industry -- whether it's
14     measured over a year, or two years, or how that
15     would work in terms of the standards as well as
16     testifying on this.
17          But from what I deduce from this whole
18     conversation is, Look, you've got a couple of
19     images.  What's contractually obligated or
20     promised was to have real time parallel system.
21     So I'm not testifying on that.  Chris knows I'm
22     not testifying on that.  And he knows Ryan's
23     not testifying on that.  That's not something
24     he's going to testify on.  He's not a seasoned
25     testifying expert.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | So to the extent that the U.S. Attorney's |
| 2 | | Office needs someone to testify, which, |
| 3 | | ultimately, John Meyer has, then that would |
| 4 | | have been a point of concern.  And I think |
| 5 | | that's -- I'm inferring from this whole |
| 6 | | conversation that that was a concern. |
| 7 | | Further, Diego and I had many |
| 8 | | conversations in the hallway.  He sits down the |
| 9 | | hallway from me.  And those conversations are |
| 10 | | outside the purview of Chris.  So with respect |
| 11 | | to where Diego was or wasn't with respect to |
| 12 | | some of these issues, I think he was a little |
| 13 | | bit outside the loop as well. |
| 14 | Q. | I've got a couple questions to follow up on all |
| 15 | | that. |
| 16 | A. | Sure. |
| 17 | Q. | You said that you were lacking in certain areas |
| 18 | | of expertise, and I'm not sure if I understood |
| 19 | | what that was. |
| 20 | | Was it solely as to the high-availability |
| 21 | | backup, or to other areas of IT?  I'm not sure |
| 22 | | if I followed your answers. |
| 23 | A. | Yeah.  What constitutes high-availability |
| 24 | | backup as an industry professional; right?  I |
| 25 | | mean, there's contractual terms that said |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

164

1    99.99, but I don't know that that had a
2    one-year requirement.  I don't know how that
3    was measured over what period of time.
4         So some of those special technical items
5    certainly aren't in an area that I would have
6    expertise in.  Chris knows that.  As far as --
7    I think there was an incident that immediately
8    followed the transition of the IT department,
9    where the organization did suffer downtime;
10   right?  And it was essentially on the same
11   platform, is my understanding.
12        So all that stuff goes into areas that I
13   wouldn't testify on, because why did the system
14   go down?  Whether or not that incident, which
15   appeared to result through the lack of services
16   that were promised, and how they contributed
17   with -- separate and apart from what I was
18   doing, which was an accounting analysis.
19        So Chris is right to have called out, from
20   an accounting analysis, this isn't what we're
21   -- or what I would testify on.  That these are
22   areas that get technical into whether or not
23   the proper backups were occurring.  I know we
24   saw the images, and I saw evidence that it
25   wasn't occurring.  But with respect to the

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | significance of all those events, and how they |
| 2 | | would translate into confirmation that |
| 3 | | high-availability backup didn't occur -- that's |
| 4 | | certainly an area that the U.S. Attorney's |
| 5 | | Office sought advice from John Meyer and |
| 6 | | others. |
| 7 | Q. | So is it your testimony that the gap that you |
| 8 | | had in your expertise, which you admit has to |
| 9 | | do on this particular area -- high-availability |
| 10 | | backup -- that John Meyer filled that gap in |
| 11 | | terms of a witness? |
| 12 | A. | Yeah, I believe I put an assumption in the |
| 13 | | report that -- there is an assumption that |
| 14 | | high-availability didn't occur, with John Meyer |
| 15 | | testifying to the fact.  I'm pretty sure that's |
| 16 | | how I phrased it in my report, or something to |
| 17 | | that effect. |
| 18 | | So to the extent that high-availability |
| 19 | | backup did occur, which doesn't seem like it |
| 20 | | did, according to either Ryan, to Diego, to |
| 21 | | John Meyer, that would be news to me.  But for |
| 22 | | purposes of what I was being asked to testify |
| 23 | | on as an accounting analysis, I was relying |
| 24 | | upon their expertise with respect to what, |
| 25 | | technically, is high availability, and was |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          having two copied servers that appeared to have
 2          been standalone and potentially not run in
 3          parallel -- once again, outside of my expertise
 4          whether or not that really satisfied the
 5          obligation under -- contractually.
 6     Q.   I'm just trying to follow you.
 7               Are you saying that the opinion that you
 8          relied on regarding high-availability backup
 9          came from John Meyer, or Diego Rosenfeld, or
10          both?
11     A.   It's John Meyer, but it was -- his opinion was
12          consistent with my team's view; right?  And
13          they weren't asked to offer an opinion to me or
14          to anyone.  They did fact-finding.  They shared
15          what they understood to be the evidence.
16          John Meyer had the same evidence, and
17          John Meyer testified, I believe.
18     Q.   So if they already had evidence from John Meyer
19          on this issue, and you weren't qualified, why
20          would you need to bring Diego Rosenfeld into,
21          quote, "the loop"?
22     A.   Bringing Diego into the loop is what may have
23          potentially -- this is predetermining who's
24          testifying on what, if anything.  So I didn't
25          know whether or not we were going to do more
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          work.  And, potentially, Diego would have
2          offered an opinion of his own, separate and
3          apart from what I'm doing, whether Diego would
4          potentially deliver an opinion that was
5          supportive of John Meyer's opinion or separate
6          entirely from what I was doing.
7     Q.   And just to emphasize the date on this, it's
8          November 28 of 2018, which is a significant
9          date in this case because that was the date
10         that Mr. Alrai was indicted; correct?  Remember
11         we talked about that in some earlier emails?
12    A.   Yeah, I believe so.  I don't know the exact
13         date, but I know this is all happening around
14         the same time.  And there's a discussion of who
15         would be testifying to what.

16              And I think that's part of what Chris is
17         getting at here -- is that I've done an
18         accounting analysis, and that the fundamental
19         math behind that analysis is solid.  The cost
20         comparison is solid.  What is absent is the
21         delivery.  Was it delivered or not?  So this
22         flips into simply whether it was delivered or
23         not to whether it was overbilled.
24              So, in my opinion, even if it it was
25         delivered, you fall back to my other

No Copy Of This Transcript May Be Made Prior to 2/28/2021

168

1      calculation of $3.7 million.  There's no cost
2      to support the level of billing for these
3      services.
4  Q.  So you will agree with me that this email shows
5      that at least one member of your team is
6      concerned about Ryan's lack of experience?
7  A.  His specific concern is, he states here -- I
8      mean, you can read it for yourself.  But my
9      understanding or what I infer from this is that
10     we have to potentially provide evidence to the
11     U.S. Attorney's Office, if asked.  And that may
12     include testifying.
13         And the understanding is that if we need
14     to testify -- meaning people at RSM -- those
15     identities of those individuals not known --
16     then we would need more than just Ryan to
17     testify with respect to what was, at a minimum,
18     overbilling, but may extend to undelivered
19     services.
20 Q.  But it doesn't say you need more than Ryan.
21         It says you need to bring Diego into the
22     loop instead of Ryan.
23 A.  I don't want to mince words, but that would be
24     more; right -- bringing another person?  And
25     this is also -- as I mentioned, this is

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         Chris Fitzgerald's perspective, without
 2         realizing that I -- I know he knows I sit down
 3         the hallway from Diego.  But the amount of
 4         communications that I have with each member of
 5         the team isn't necessarily known to other
 6         members of the team; right?
 7    Q.   In any event, you didn't share this email with
 8         either the Government or the Defendant prior to
 9         the trial; correct?
10    A.   I imagine this is one of the 600.
11    Q.   It is?
12    A.   Yeah, so I don't believe so.
13              MS. BROWN:  Can we bring up Exhibit Gg,
14         which is also docket number -- document number
15         164-2?  And if we could pull up the bottom
16         paragraph of that, "a couple of notes."
17              (Pre-marked Defendant's Exhibit Gg
18              introduced.)
19    Q.   (By Ms. Brown)  So in this email -- and maybe
20         it would be helpful if I gave a little bit of
21         background here.  This is October 1, 2018.  As
22         I recall, and feel free for you or even the
23         Government to correct me, you're putting
24         together the report for United Way -- the
25         slides that we saw earlier -- some version of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          them.
 2               And in discussing finalizing that report
 3          with who you refer to as "John C.," and this is
 4          from Chris Fitzgerald, he says that a "trending
 5          of total United Way MB budget v. IT budget was
 6          not" and he uses the word "fruitful" -- "over
 7          the period analyzed.  They each had a 7 percent
 8          cumulative increase, and generally trended
 9          together.  We have therefore not included a
10          slide to show this."
11               And you -- that email is actually directed
12          to you and Ron Haas; correct?
13     A.   Yes, it's directed to us.
14     Q.   So the team at RSM decided that doing a slide
15          about the budget comparisons either post, pre
16          Mr. Alrai were not fruitful, and that was
17          because they didn't show anything that tended
18          to establish loss or fraud; right?
19     A.   No, I don't know that the context -- I think
20          "fruitful" -- I don't know what the term was
21          intended to imply, other than you look at it --
22          number one, I think this was included in the
23          report.  And this is a report to the special
24          committee.
25               And, number two, I think this was part of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

171

```
1           my testimony in court.  So the fact that
2           United Way had an inflated IT budget before it
3           hired Imran, and then continued to be elevated
4           during Imran's tenure and go at a 7 percent
5           clip, was part of, I think, the factual
6           background of this case.  I think he was -- I
7           just don't know what was meant by the term
8           "fruitful" other than -- I just -- I would only
9           be speculating.
10   Q.     But a slide along the lines showing this was
11          not included in the presentation that you made
12          to United Way?
13   A.     Is that true?  I don't know.
14   Q.     Well, I'm asking you.
15   A.     I thought it was disclosed, yeah.  The budget
16          and the trends, I thought was.  I could be
17          wrong, but I thought it was.
18   Q.     It's just that the way I'm reading this email,
19          it sounds like that Chris left out a slide on
20          this.
21   A.     No, I think he was providing commentary.  I
22          don't know that it says it was left out.
23   Q.     Yeah, the last sentence it does.
24   A.     Okay.
25              Yeah, I don't recall whether it ultimately
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

172

1           was left out.  I have some inclination that it
2           was included, but I don't know why.  So,
3           apologies.
4                  MS. BROWN:  If I could just have a moment,
5           Your Honor.  I'm looking through my notes and
6           there's questions I've already asked.
7                  THE COURT:  Thank you.  Take your time.
8                  MS. BROWN:  Thank you.  It always happens
9           when I get close to the end.
10                 That is all of my questions.  I had asked
11          all the other ones already.
12                 THE COURT:  Mr. Davis, it's your witness.
13
14                       CROSS-EXAMINATION
15          BY MR. DAVIS:
16     Q.   So, Mr. Naviloff, you did an alternate loss
17          calculation based on personal enrichment; is
18          that right?
19     A.   Yes, that's correct.
20     Q.   And what was the approximate amount of loss
21          calculated using that technique?
22     A.   Approximately $3.7 million.
23     Q.   Have you been asked a single question in the
24          four hours you've been testifying about that
25          loss calculation?

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   I don't believe I have.
 2   Q.   You were asked about Mr. Commisso as a
 3        gatekeeper; do you recall those questions?
 4   A.   Yes, I do.
 5   Q.   Now, I want to ask you, what was Mr. Commisso a
 6        gatekeeper of once you were engaged by the U.S.
 7        Attorney's Office?  Do you recall?
 8   A.   Well, anything to do with United Way's books
 9        and records, particularly where they may not
10        have related to our loss calculation.  And that
11        was a significant concern of his, right, that
12        that information would be provided.  But aside
13        from that, nothing that the U.S. Attorney's
14        Office provided me was subject to his review,
15        or his inspection, or his analysis.
16   Q.   So just to be clear, well before you were
17        engaged, United Way provided the United States
18        Attorney's Office with a huge collection of
19        data from United Way; are you familiar with
20        that?
21   A.   That's correct, yes.
22   Q.   And that was in response to grand jury
23        subpoena?
24   A.   That was my understanding yes.
25   Q.   And that included essentially every document
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           about loss and your loss calculation that
 2           Mr. Commisso identified; correct?
 3    A.     Yes, that included significant documentation
 4           from DigitalNet and his other affiliated
 5           businesses, and the costs and revenues -- or
 6           monies received and monies spent associated
 7           with those businesses.
 8    Q.     And, of course, Mr. Commisso waived United
 9           Way's privilege regarding its internal
10           investigation about that loss calculation in
11           order to reveal all those documents; correct?
12    A.     Yes.  That's my understanding, yes.
13    Q.     United Way was not asserting a privilege
14           regarding anything that it had regarding your
15           loss calculation; correct?
16    A.     That's my understanding, yes.
17    Q.     But after you were engaged in the summer of
18           2019, as trial neared, there were additional
19           discovery requests for United Way documents; is
20           that correct?
21    A.     That's correct, yes.
22    Q.     And in those additional discovery requests,
23           there were new documents identified that were
24           in United Way's possession; right?
25    A.     "New documents in United Way's possession,"
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         meaning...
 2    Q.   That is, documents that had not been turned
 3         over initially.
 4              There were at least some additional
 5         documents?
 6    A.   Yes, there were additional documents --
 7         additional requests and additional documents
 8         that were provided.
 9    Q.   And there were also additional documents
10         provided by RSM from its engagement with
11         United Way; right?
12    A.   Correct.  Yes.
13    Q.   All right.
14              And when a new discovery request came in
15         as trial neared in 2019, Mr. Commisso did serve
16         as gatekeeper to determine whether particular
17         new documents were privileged; is that right?
18    A.   That's correct.  There was a lot of comingling
19         of work streams and certainly some sensitivity,
20         particularly with identifying the relevance of
21         some of the documents.
22    Q.   And in the case of new documents like that, one
23         of the things you did was communicate with
24         Mr. Commisso about whether there was a
25         privilege for specific documents; is that
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          correct?
 2    A.    Correct.
 3               MR. DAVIS:  I'm sorry.  I'm just trying to
 4          shield my face from the sun's rays.
 5               THE COURT:  If you need to get up and
 6          close that or whatever, feel free.
 7               MR. DAVIS:  Sorry, Judge.
 8               THE COURT:  No problem.  That's about as
 9          good as it gets.
10    Q.    (By Mr. Davis)  So, Mr. Naviloff, your personal
11          enrichment analysis depended on documents in
12          addition to United Way documents; is that fair
13          to say?
14    A.    That's correct.  Those are Mr. Alrai's business
15          records, primarily.
16    Q.    Was one of the things that you needed to review
17          the records, actually, of DigitalNet, the
18          company we're talking about here?
19    A.    Correct.
20    Q.    And did the Government share with you numerous
21          documents that had been seized at Mr. Alrai's
22          home in New Hampshire from his home office that
23          purported to be DigitalNet records?
24    A.    That's my understanding of the origin.
25    Q.    And you reviewed those documents as part of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          your work and your engagement for the
 2          Government; correct?
 3    A.    That is correct.  Yes, I did.
 4    Q.    And United Way and Mr. Commisso didn't have
 5          those documents right?  That's not something
 6          that was in their collection?
 7    A.    That is correct.
 8    Q.    And, in fact, one of United Way's great
 9          challenges in this entire investigation is that
10          they don't have any DigitalNet documents; is
11          that fair to say?
12    A.    That's correct.
13    Q.    That is, other than the documents that
14          DigitalNet submitted to them like invoices,
15          they don't have what actually happened at
16          DigitalNet; correct?
17    A.    They have -- they don't have, obviously,
18          DigitalNet's books and records.  They don't
19          have their costing information.  They don't
20          have cash receipts information -- those types
21          of records.
22    Q.    And the only records, as far as you know, that
23          exists of those things are what Mr. Alrai had
24          himself at his house; right?
25              MS. BROWN:  I have an objection.  I may be
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          missing something, but I don't know if the
 2          Government's argument is that the -- the Brady
 3          violation is excused because the Defendant
 4          didn't turn over documents.  I'm not following
 5          why that he didn't produce documents is
 6          relevant to them not producing documents.
 7               THE COURT:  He didn't -- when you say
 8          "he"...
 9               MS. BROWN:  Mr. Alrai.  That's what I'm
10          understanding this line of questions to be
11          about -- that there were documents that they
12          didn't get access to.
13               THE COURT:  I don't want to speak for
14          Mr. Davis, but what I'm drawing from this, for
15          better or worse, is that, basically, you can't
16          show prejudice because a lot of this work done
17          by the expert was not based on the loss
18          calculation as to United Way, but as to unjust
19          enrichment as to your client.  And, therefore,
20          any failure to produce any of these emails, et
21          cetera, is nonprejudicial.
22               Mr. Davis, have I got that right?  You can
23          tell me -- if I got it wrong, you can disabuse
24          me.
25               MR. DAVIS:  That's correct, Judge.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              THE COURT:  So it's not that it excuses
 2         it.  It's that it renders it nonprejudicial.
 3         That's the argument.
 4              Let me ask you this, Mr. Davis.  And this
 5         is not an attack.  It's just a question.
 6              Did you brief this argument?
 7              MR. DAVIS:  Judge, Mr. Hunter briefed it.
 8         I think he did, unless we were both in trial in
 9         front of you that month.
10              THE COURT:  It might have gone over me.
11              Mr. Hunter, did you brief this argument?
12              MR. HUNTER:  Yes.  I think it's both in
13         the -- I think definitely in our objection, and
14         I think I might have mentioned it in our
15         surreply.
16              THE COURT:  Thank you, sir.
17              You may proceed, Mr. Davis.  Objection
18         overruled.
19              MR. DAVIS:  Thank you, Judge.
20    Q.   (By Mr. Davis)  So Mr. Commisso was not the
21         gatekeeper of the DigitalNet documents that you
22         were able to review; is that correct,
23         Mr. Naviloff?
24    A.   That's correct.
25    Q.   Is it also fair to say that you reviewed a
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         great many bank records in this case?
 2   A.    Yes, that's correct.
 3   Q.    And did those bank records include the
 4         DigitalNet bank records?
 5   A.    Yes, they did.
 6   Q.    And did they also include the ASA Consulting
 7         bank records?
 8   A.    Yes, they did.
 9   Q.    And did they also include Mr. Alrai's and his
10         wife's bank records?
11   A.    I believe so, yes.
12   Q.    And did you also review investment accounts
13         that Mr. Alrai and his family held?
14   A.    I believe we had some information with respect
15         to transfers for investment accounts.
16   Q.    And did you also have information about real
17         estate purchases that Mr. Alrai had made?
18   A.    Yes.
19   Q.    And did you also have information about
20         $1.2 million that Mr. Alrai transferred to
21         Pakistan?
22   A.    Yes, that's correct.
23   Q.    And did you also have tax records for ASA
24         Consulting?
25   A.    Yes, that's correct.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   And did you have tax records that reflected the
 2        supposed business expenses and revenues of
 3        DigitalNet?
 4   A.   Yes, I did.
 5   Q.   And did you also have all of Mr. Alrai's own
 6        personal income tax filings?
 7   A.   Yes, I believe I did.
 8   Q.   And did all of those documents inform your
 9        judgment about personal enrichment by
10        Mr. Alrai?
11   A.   Yes, they did.
12   Q.   And did you also have credit card records that
13        showed Mr. Alrai's credit card expenditures
14        over years of conduct?
15   A.   Yes, I did.
16   Q.   Now, for any of the documents we've just
17        discussed, did Mr. Commisso serve as some sort
18        of gatekeeper?
19   A.   No, he did not.
20   Q.   Was he the puppet master of what you were able
21        to review in formulating your opinion?
22   A.   Not at any point.
23   Q.   All right.  Let's talk a little bit about
24        Ryan Gilpin.
25             How old is Mr. Gilpin?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1   A.   Well, 2020, so I'm doing my math in the head.
2            I believe that he's in his late 20s.
3        That's a guess.
4   Q.   And are you familiar with his educational
5        credentials?
6   A.   Yeah.  So he's got a bachelor's degree in
7        computer information systems, and a master's in
8        information technology, I believe, from
9        Bentley -- both from Bentley.
10  Q.   And when did he earn his master's degree in
11       information technology?
12  A.   I believe it was 2007.  I'm serving from
13       memory.  2017, sorry.
14  Q.   And did he do work in the field prior to
15       obtaining his master's degree in information
16       technology?
17  A.   Yes.  My understanding is he had worked with
18       the information technology departments at his
19       university prior to being employed by RSM.
20  Q.   And for how many years?
21  A.   I believe it was two years.
22  Q.   And do you know if he also worked in management
23       consulting in IT?
24  A.   For RSM, yes, for approximately two years.
25  Q.   And so was that before his assignment to work
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          on this particular loss analysis?
2    A.   Yeah, that's my recollection.
3    Q.   And do you know what his management consulting
4         work was done in?
5    A.   The area in and around IT outsourcing.  It
6         included automation and digital transformation.
7         It included IT consulting services that
8         included RSM's various software and hardware
9         solutions that we deliver to our clients.
10   Q.   And so has it been your experience with
11        information technology that sometimes, young
12        people are really indispensable to
13        understanding complicated IT stuff?
14   A.   Yeah, that's been my experience.  And Ryan did
15        a great job throughout this project.
16   Q.   That's why Mr. Davis relies on Mr. Hunter all
17        the time.
18             MS. LE:  I'm also called upon to help John
19        with IT issues. I just want to point that out.
20             MR. DAVIS:  I'm not going to comment on
21        Ms. Le's age, Your Honor.
22             THE COURT:  I'd pass that one up too.
23   Q.   (By Mr. Davis)  So, Mr. Naviloff, did you
24        regard Ryan Gilpin as essentially an
25        unqualified college intern who found himself

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | working on this project? |
| 2 | A. | Those would absolutely not be my words.  He's a |
| 3 | | bright young IT professional who performed well |
| 4 | | in the limited role that I provided to him, |
| 5 | | which was really fact-finding, and analyzing |
| 6 | | invoices, and putting facts together, right, |
| 7 | | with respect to information contained on the |
| 8 | | documents that were provided. |
| 9 | Q. | And when you were engaged by United Way to be |
| 10 | | an expert, did you believe that what you were |
| 11 | | supposed to do was to do all of the work on |
| 12 | | that account yourself and bill at your rate? |
| 13 | A. | United Way couldn't afford that.  But, yeah -- |
| 14 | | no, it's not how any of the projects I've ever |
| 15 | | worked on would transpire. |
| 16 | Q. | Can you explain that a little more?  What do |
| 17 | | you mean by that? |
| 18 | A. | Yeah. |
| 19 | | If you're doing basic data entry, you're |
| 20 | | not going to have a 20-plus-year experienced |
| 21 | | professional, at over $500 an hour, typing data |
| 22 | | into a spreadsheet; right?  So a lot of what we |
| 23 | | were doing was a data-intensive collection of |
| 24 | | invoice details so that we could put them in |
| 25 | | spreadsheets, so that we could then read/review |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           the specific text next to those descriptions,
 2           putting them in, collating them, and organizing
 3           them.  So there's some amount of just
 4           digitizing and structuring data organization.
 5           That's not work that would be done by
 6           senior-level individuals.
 7    Q.     Were you doing something deceptive or secret
 8           from your client, United Way, by using
 9           associates on various parts of the project?
10    A.     No.  This is common industry practice.
11               MR. DAVIS:  No further questions.
12               THE COURT:  Thank you.
13               Any redirect, Ms. Brown?
14               MS. BROWN:  Yes, a couple of things.
15
16                   REDIRECT EXAMINATION
17    BY MS. BROWN:
18    Q.     Mr. Naviloff, when you were cross-examined at
19           trial about your own lack of expertise in the
20           area of IT and you were cross-examined on that
21           by Attorney Harrington, your response wasn't
22           "Hey, I've got this young guy who's really
23           good.  We all know young people are better at
24           IT."
25               You didn't say that, did you?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1  A.   Did I say I had 1,200 consultants at RSM who
 2       provide IT services?  Did I say -- yes, I
 3       have Diego Rosenfeld informing me --
 4            THE COURT:  Mr. Naviloff, answer the
 5       question.
 6            THE WITNESS:  Did I mention Ryan by name?
 7       I'd have to go back.  I don't know.
 8  Q.   (By Ms. Brown)  My point is that when you were
 9       confronted with the lack of your own expertise,
10       your go-to response was to say, "I've got a
11       seasoned IT expert on my team"; that was your
12       go-to response; correct?
13  A.   And that's an accurate statement.
14  Q.   Yes.
15            And having a seasoned IT expert on your
16       team would add more credibility to your
17       opinions than, say, "I consulted with someone
18       right out --three, four years out of college."
19            That's why you went with the experienced
20       person as an example of someone you consulted
21       with --
22  A.   I believe my testimony was -- speaks for
23       itself, but it was reference to Diego Rosenfeld
24       and his team.  It was clear.  There was no real
25       ambiguity.  There was no trickery here.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   Now, the Government asked you several questions
 2        about the fact that you weren't asked about
 3        personal enrichment today, but that you
 4        testified about it at trial; correct?
 5   A.   Sorry.  Say that again.
 6   Q.   Okay.  Maybe I spoke too fast.
 7             When you were just examined by
 8        Attorney Davis, he asked you several questions
 9        about the fact that at trial, you testified on
10        personal enrichment by Mr. Alrai or unjust
11        enrichment by Mr. Alrai.
12   A.   Yes, that's correct.
13   Q.   And that you weren't asked questions by me
14        earlier during direct examination.
15             That was a question Attorney Davis asked
16        you; correct?
17   A.   Correct.
18   Q.   Now, a person's enrichment, in and of itself,
19        doesn't prove that they committed fraud; right?
20   A.   Well, I'd been asked to assume fraud occurred.
21        I'd performed two calculations, right, to
22        quantify the amount.
23   Q.   I understand you were asked to assume fraud.
24        Which means if you were asked to assume fraud,
25        you were not -- at least to what your position
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            is, you were not offering testimony to prove
 2            fraud; correct?
 3   A.   That's correct.  I was quantifying the loss in
 4            the enrichment.
 5   Q.   So you didn't offer any testimony to show or to
 6            prove that there was excessive billing in this
 7            case; right?
 8   A.   The monies that went into Mr. Alrai's accounts
 9            was from United Way.  That, I saw in the
10            records.
11   Q.   I'm trying to get back to the fact that you
12            have said and the Government has said you
13            didn't offer testimony regarding fraud;
14            right -- that's your testimony today?
15   A.   That's fair.  Yes, I'm assuming fraud.
16   Q.   So if you're assuming it, you're not proving
17            it; right?
18   A.   That's correct.
19   Q.   So if you're not proving fraud, then your
20            testimony -- you weren't attempting to prove
21            excessive loss.  You were just attempting to
22            show evidence of the loss -- excuse me.
23                You weren't trying to prove excessive
24            billing; you were trying to prove the loss
25            associated with this excessive billing;
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1           correct?
2    A.     There's a distinguishment.  I guess I'm trying
3           to pick up what you're distinguishing between.
4    Q.     I guess what my point is is that the Government
5           has represented several times, both before
6           trial and after trial, that you were not called
7           as a witness to prove fraud; is that your
8           understanding?
9    A.     Yes.
10   Q.     You were told to presume fraud and then get to
11          the next step, which was if there was fraud,
12          what was the loss associated with it?
13              That was your understanding of the purpose
14          of your testimony?
15   A.     Right.  That's the trier of fact to prove
16          fraud.
17   Q.     And if you were assuming that fact and not
18          proving it, then your testimony did not
19          establish that there was fraud; if anything, it
20          only established that -- what the loss was if
21          there was fraud?
22   A.     Correct.
23   Q.     And so to the extent that there was quote,
24          unquote, "unjust enrichment" on the part of
25          Mr. Alrai, that would be completely irrelevant
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

190

```
 1          if there was no fraud; right?  If he had money
 2          in that period of time, and got credit cards,
 3          and bought clothing, or whatever he bought --
 4          or houses, but there was no proof of fraud,
 5          having more money by itself doesn't prove that
 6          you committed fraud?
 7    A.    If that was a legitimate business, then, yeah,
 8          having excess -- having excess profits is what
 9          it is; right?
10    Q.    Right.
11               And "legitimate" being the operative word
12          here.  So either it's legitimate or it's not
13          legitimate, and that was what the issue was at
14          trial in terms of whether he committed fraud;
15          right?
16    A.    Yeah.  So we looked at it.
17               Undelivered, overbilled, right, or
18          duplicative; right?  So those, by their nature;
19          right -- if you're being paid twice, it could
20          be problematic; right?  Not delivering services
21          can be problematic, but those are contractual
22          issues and concerns as well.
23    Q.    But what you're admitting is -- you're
24          admitting that you made a conclusion that he
25          had been unjustly enriched; but the conclusion
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1           was based on a premise that may or may not be
2           true, but you didn't offer opinions on the
3           premise of whether he committed fraud?
4     A.    Correct.
5               MS. BROWN:  Nothing further.
6               THE COURT:  Mr. Davis?
7               MR. DAVIS:  You know, I have really just
8           one question.
9
10                   RECROSS-EXAMINATION
11          BY MR. DAVIS:
12    Q.    And it doesn't go so much into any kind of
13          disclosure.  It goes to more the job you were
14          given in this case.
15              The idea of assuming fraud and then
16          opining on a loss, which is what you're charged
17          with here; right?  I mean, obviously, it wasn't
18          as simple as deciding -- taking a date that he
19          started and picking a date that he ended, and
20          attributing all economic loss to the fraud;
21          right?  That's not how it's done.
22    A.    So from start to finish; right?  So I've used
23          two calculations.
24    Q.    Yeah.
25    A.    And these are estimates based upon the records
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          I've been able to look at.  So nothing is
 2          necessarily perfect when you don't have every
 3          granular detail.  But the first approach was to
 4          measure those three elements, right, where
 5          there were clear markups for reoccurring
 6          services that were related to the technology;
 7          right?  So, essentially, paying extra for
 8          bandwidth or paying extra for server --
 9    Q.    I've got to stop you.
10                I understand all that.
11    A.    Okay.  Got you.
12    Q.    What I'm saying is, you didn't just simplify --
13          simplistically pick two dates, start of
14          employment and end of employment, and attribute
15          everything to fraud; right -- that's not the
16          way you did it?
17    A.    No.  That's not now I calculated 3.1.  There
18          was lots of activities that could have been
19          legitimate that never made its way into the
20          3.1.
21    Q.    You're drawing exactly what I am --
22    A.    Yeah.
23    Q.    Here's my problem -- this idea of assuming loss
24          and -- assuming fraud and establishing loss.
25          To prove fraud, you've got to prove causation.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              You've got to prove that the fraudulent
 2         activity -- the conduct resulted in a loss of
 3         some amount.
 4              So isn't the idea of a loss inextricably
 5         tied to specific different instances of
 6         fraudulent conduct?  You can't just assume
 7         every dollar lost in the time period is
 8         fraudulently lost.  It's got to be attributed
 9         to something, some conduct of the Defendant.
10              Didn't that require you to make judgments
11         about what conduct was fraudulent?
12    A.    The formation of the business; right.  So that
13         business as a whole -- the way it was developed
14         was fraudulent.  And that's what we've been
15         asked to assume.  So the business, in and of
16         itself -- there's no practical need, if you're
17         an IT director, to go and create another
18         business that then marks up these costs and
19         then just passes them back to United Way;
20         right?  So the very construct of the business
21         is what was -- in my understanding, is what the
22         concern is.
23    Q.    You mean DigitalNet?
24    A.    Yes.
25    Q.    Okay.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   Sorry, DigitalNet, yes.  So that's the nexus
 2        for me; right.
 3             As soon as you say, "Okay.  I created an
 4        entity, and this is what I do for a living" --
 5        this isn't novel.  An entity is set up; right?
 6        It's not transparent.  And it's making excess
 7        profits; right?
 8             MR. HUNTER:  Your Honor, I can speak to
 9        what we asked him to assume specifically, which
10        is -- and this is in his report.  We asked him
11        to assume that Alrai fraudulently obtained all
12        the contracts between United Way and
13        DigitalNet.
14             And so the idea being is as Mr. Naviloff
15        just said -- because he fraudulently obtained
16        the contracts, any loss associated to that is
17        fraud as part of the scheme to defraud that was
18        proved at trial.
19             THE COURT:  Any loss associated with that;
20        right?  To be honest, I've been debating all
21        morning whether I should ask Counsel this
22        question or ask the witness, to be honest.
23        And, you're showing me where they both make
24        sense, but I just wanted the witness' take on
25        it.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

195

1           So any loss that you bring to that
2     business -- does that mean any dollars paid to
3     that business?  No -- right?  It doesn't,
4     because it has to be excess dollars, dollars
5     that wouldn't have otherwise -- right?
6           THE WITNESS:  Yes.
7           THE COURT:  I guess all I'm trying to say
8     is that I understand it's part of the
9     Government's argument that this testimony
10    didn't go to anything but loss; right?  Other
11    witnesses, other evidence established the
12    Defendant's fraudulent conduct.  But I think
13    that is a -- that's a difficult concept,
14    because the idea -- to me, the idea of opining
15    on loss requires not just assumptions that a
16    fraudulently created business leads to loss,
17    but that certain conduct by the business -- and
18    certain conduct by the business actually caused
19    loss -- not everything the business did.  Now
20    I'm opining.
21          But you're nodding, Mr. Naviloff.  You
22    understand what I'm saying?
23          THE WITNESS:  Yes, I do.
24          THE COURT:  I'll probably talk to Counsel
25    more about that at some point in this

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1     proceeding, but, thank you.

2          I think the witness is excused.

3          MS. BROWN:  Your Honor, real briefly,

4     there's just one question I have on this.  And

5     it's on this exact thing, so hopefully it will

6     illuminate.

7          I apologize.  I did not make this an

8     exhibit, but there was an email about this.

9     And I can -- I'll just share with the

10    Government, it's -- of the recent production,

11    it ends in 00-4-A.  But it's an email about

12    this, and I just want to ask a question about

13    this.

14

15               REDIRECT EXAMINATION

16    BY MS. BROWN:

17 Q.  So this email's dated November 7, 2018.  It's

18    from Fitzgerald to Naviloff.  And I just want

19    to read.

20          It says, "Greg, here are a list of items

21    that I would ask the USAO about.  One is

22    consideration of the 'net work method'" --

23    that's in quotes -- "analyze Alrai's networth

24    at 12/31/2011 versus 6/30/2018.  Change in

25    networth, less known income salary and known

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | expenses, mortgage, fraudulent proceeds." And |
| 2 | it basically explains whether he's using the |
| 3 | money for other things like developing an app |
| 4 | or sending money to Africa. |
| 5 | So I wanted to ask the witness, was that a |
| 6 | discussion that you had with the U.S. |
| 7 | Attorney's Office prior to indictment?  Because |
| 8 | that's about, I think, three weeks or two weeks |
| 9 | before the indictment. |
| 10 | Do you remember having a conversation |
| 11 | about using the "net work method"? |
| 12 | A.  Yeah, I don't think I did.  I know that was |
| 13 | something that Chris was suggesting.  But at |
| 14 | that point, we hadn't been engaged to do |
| 15 | anything.  I think there was just a question |
| 16 | mark as to -- and Chris perhaps being overeager |
| 17 | to figure out whether there was additional |
| 18 | analyses that could benefit the Government. |
| 19 | Whether we did that work or someone else |
| 20 | did that work, there were certainly other |
| 21 | analyses that would further serve to assist the |
| 22 | Government in their efforts, apart from the |
| 23 | work that we had done just to date with the |
| 24 | loss analysis. |
| 25 | Q.  And that is not an analysis you did when you |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1      were working for United Way?
2  A.  No.
3           MS. BROWN:  Thank you, Your Honor.
4           THE COURT:  Thank you.  All right.
5      Mr. Naviloff's excused.
6           Ms. Brown, you can call your next witness.
7           MS. BROWN:  Attorney Eaton is going to
8      call Mr. Sgro.
9           THE COURT:  Please proceed, Mr. Eaton.
10          MR. EATON:  Can the Court swear Mr. Sgro
11     in?
12          THE CLERK:  Mr. Sgro, please raise your
13     right hand.
14          Do you solemnly swear or affirm that the
15     testimony you're about to give will be the
16     truth, the whole truth, and nothing but the
17     truth, so help you God?
18          MR. SGRO:  I do.
19          THE CLERK:  For the record, please state
20     your full name and spell your last name.
21          MR. SGRO:  It's Jason Joseph Sgro,
22     S-G-R-O.
23          THE CLERK:  Thank you.
24
25

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1                        DIRECT EXAMINATION

2           BY MR. EATON:

3    Q.     Mr. Sgro, did you review the Defendant's motion

4           to dismiss, and the Government's objection to

5           that motion, and the other related pleadings?

6    A.     I did.

7    Q.     Did you also review the documents that had been

8           produced after trial?

9    A.     I did.

10   Q.     And did the Defense ask you to write a report

11          about your expert opinions related to that

12          motion to dismiss and the newly discovered

13          evidence?

14   A.     Yes, they did.

15   Q.     In writing that report, did you review the

16          trial transcripts in this matter?

17   A.     I did.

18   Q.     And did you address how the new discovery

19          impacts Mr. Naviloff's filings as to the

20          categories of loss?

21   A.     Yes, I did.

22   Q.     And do you recall the categories of loss that

23          Mr. Naviloff analyzed?

24   A.     Yes.  That's duplicative billing, billing for

25          services not rendered, and excessively billing.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1    Q.   So we're going to talk about some examples,
 2         and -- most of which you cite in that report of
 3         the new discovery -- and how that would have
 4         impacted your testimony.  So let's start with
 5         excessive billings, of the three categories.
 6              Are you aware that in finding Mr. Alrai
 7         guilty, the Court made a finding that there
 8         was, in fact, excessive billing, or
 9         astronomically excessive markups?
10    A.   I am aware of that, yes.
11    Q.   And do you recall that Mr. Naviloff testified
12         as to excessive billing or markups?
13    A.   Yes, I do recall that.
14    Q.   And do you recall that testimony was with
15         respect to the telephony system?
16    A.   Yes.  I believe it was with regard to the
17         company SIP.US.
18    Q.   Can you briefly describe what that opinion was?
19    A.   Yeah.
20              So Mr. Naviloff presented an opinion that
21         there was a really high markup -- I won't be
22         exact here, but, like, 800 percent or more on
23         the SIP.US. service as part of a markup for the
24         telephony services between DigitalNet and the
25         United Way.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1    Q.   And did you give testimony about that

2         particular opinion?

3    A.   I did.

4    Q.   And what was that testimony?

5    A.   So I believe that that's not accurate for a

6         couple reasons, first of which being that if

7         you look at the invoices for SIP.US -- to

8         between the SIP.US company and DigitalNet,

9         they're a couple hundred dollars a month --

10        something in that realm.  Excuse me that I'm

11        not being precise.

12             And then if you look at the invoices for

13        the entire managed telephony service between

14        DigitalNet and the United Way, it appears that

15        Mr. Naviloff is comparing those and assessing

16        that that's an apples-to-apples comparison,

17        when, in fact, SIP.US is a general fraction of

18        what it would cost to produce a telephony

19        service -- an actual working telephone.  And

20        just to put that in really easy terms, if you

21        were to buy just SIP.US and pick up the phone,

22        you don't get a dial tone.  Like, nothing

23        happens.  It's a part of a system.

24             And so to say that that is the totality of

25        the cost, and, thus, the markup must be all of

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          these -- you know, a 1,000 percent or
 2          800 percent or something, it is not accurate.
 3   Q.     Is there a specific document that you reviewed
 4          from the newly produced posttrial discovery
 5          that would have bolstered your opinion on the
 6          erroneous analysis that Mr. Naviloff gave as
 7          this issue?
 8   A.     Yes, there is.
 9              MR. EATON:  Tracy, can you pull up
10          Exhibit Pp?
11              (Pre-marked Defendant's Exhibit Pp
12              introduced.)
13   Q.     (By Mr. Eaton)  Mr. Sgro, is this one of the
14          documents that you looked at with regard to a
15          SIP.US issue?
16   A.     Yes.  This appears to be one of them, yes.
17              MR. EATON:  And what -- actually, I'll
18          have -- Tracy, if you can pull out the bottom
19          half of that email, starting with "all" and
20          going -- yeah, perfect.
21   Q.     (By Mr. Eaton)  So can you tell me, Mr. Sgro,
22          what this email says to you in terms of
23          Mr. Naviloff's opinion?
24   A.     Yeah.
25              So I believe -- I can't see the top, but I
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | believe that essentially, what this is is this |
| 2 | | is a conversation that is happening with a |
| 3 | | person by the name of Mark Amick, who is the |
| 4 | | COO at this SIP.US company.  And he is |
| 5 | | confirming that the service -- the account was |
| 6 | | set up in October 2014.  The service was active |
| 7 | | beginning November 2014.  And it talks briefly |
| 8 | | about the DID cost and 911 costs of the |
| 9 | | service. |
| 10 | Q. | Now, would having this information have |
| 11 | | bolstered your ability to respond to any claim |
| 12 | | that Mr. Naviloff made with regard to SIP.US |
| 13 | | service at trial? |
| 14 | A. | Yes. |
| 15 | | So this is important because this starts |
| 16 | | to show some of the cost modeling of SIP.US, as |
| 17 | | well as the service (audio drops) -- |
| 18 | Q. | I'm sorry.  I missed that last part. |
| 19 | | THE COURT REPORTER:  Same. |
| 20 | | THE WITNESS:  I apologize.  That was -- it |
| 21 | | talks to some of the cost modeling of SIP.US, |
| 22 | | as well as how many numbers were associated |
| 23 | | with the account and the start date of the |
| 24 | | service. |
| 25 | Q. | (By Mr. Eaton)  Okay. |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1              Now, do you recall at trial that
2         Mr. Naviloff asserted that the contract for the
3         management of the phone system that he was
4         reviewing, which was signed in 2013, relates
5         directly to the management of SIP.US?  Do you
6         recall, generally, that testimony?
7    A.   Yeah, I do recall that.  And I did testify, I
8         believe at trial as well, that this timeline is
9         inaccurate; right?  He is asserting,
10        incorrectly, that the -- a contract that is
11        signed, oh, a year, roughly, before this
12        service exists in the context of the United Way
13        is somehow to manage that service.
14   Q.   So now more broadly with respect to
15        Mr. Naviloff's opinion in terms of excessive
16        billing and markups, and based on this email
17        and the testimony that he gave at trial, what
18        does this tell you about his knowledge of
19        SIP.US versus a traditional, copper
20        wire-supported phone system?
21             What does it tell you about the validity
22        of his opinions when he's talking about this
23        telephony system?
24   A.   Yeah, so, I think we can clearly see, because
25        of the not apples-to-apples comparison that is

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           made over the costing, as well as kind of a
2           confusion about when contracts are signed and
3           what technical services those contracts belong
4           associated to shows that -- and I believe
5           Mr. Naviloff has asserted this as well -- that
6           he's not an IT expert.  And, yeah, so I would
7           say that that shows his lack of expertise in
8           this area.
9    Q.    Do you recall being cross-examined about the
10          various markups in this case?
11   A.    I do.
12   Q.    And do you also recall that the Judge asked you
13          at trial about your opinions on the markups?
14   A.    I do.
15   Q.    And do you recall your reply in reference to
16          these questions on markups was that you
17          couldn't say they were reasonable because you
18          weren't able to evaluate the service?
19   A.    Yeah.  So there's a couple -- there's always
20          some ways of kind of getting to the heart of a
21          technical analysis.  And one of the things that
22          would have been good to do is not only take the
23          SIP.US costs, but also an evaluation of the
24          other services -- the telephony phone-specific
25          services.  These are things like network,

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            voicemail, engineering management -- the actual
 2            software licensing that the phone runs.
 3                 All of this should be a part of an
 4            analysis of what the cost was to deliver the
 5            telephony service, as a comprehensive-managed
 6            telephony service, in order to present a
 7            correct analysis of this.
 8    Q.    So I'd like to now turn to "Duplicative
 9            Billing," the second of the three categories.
10                 Are you aware as well that in finding
11            Mr. Alrai guilty, the Judge made a finding that
12            there was, in fact, duplicative billing?
13    A.    I am aware that he made that finding.
14    Q.    And do you recall whether Mr. Naviloff
15            testified about duplicative billing?
16    A.    Yes, I believe he did.
17    Q.    Do you recall that testimony regarding
18            duplicative billing as to a service called
19            CloudConnect?
20    A.    Yes, I do recall that.
21    Q.    Can you briefly, if you can recall, describe
22            what that opinion was in terms of duplicative
23            billing?
24    A.    Mr. Naviloff's opinion?
25    Q.    Yes.
```

| 1 | A. | So Mr. Naviloff believed that during a period |
| 2 | | of some time, that there was duplicate invoices |
| 3 | | sent for similar or the same, I think, in his |
| 4 | | opinion, services.  And, thus, those invoices |
| 5 | | were duplicative. |
| 6 | Q. | And what was your response to that opinion? |
| 7 | A. | I don't find -- this goes to kind of my |
| 8 | | approach here. |
| 9 | | I made no assumption of fraud; right?  So |
| 10 | | I'm here to look at the actual facts in the |
| 11 | | environment that were presented, and analyze |
| 12 | | them as objectively as is reasonable for me to |
| 13 | | do so.  And so when you look at the data about |
| 14 | | those services, you actually -- you can't come |
| 15 | | just to the conclusion that these are |
| 16 | | duplicative.  And that's for a bunch of |
| 17 | | reasons; right? |
| 18 | | The first of which is they are -- services |
| 19 | | can be transitioned; right?  So that's when a |
| 20 | | company maybe starts one service and ends |
| 21 | | another, you overlap them for a time period; |
| 22 | | right?  That's a reasonable -- that's a reason |
| 23 | | for having maybe a duplicate invoice. |
| 24 | | You could also have the services in |
| 25 | | simultaneity, right, as a capacity.  And these |

```
1         are -- when you read these contracts, they are
2         not identical in every sense of the word from a
3         technical standpoint.  So there's a couple of
4         different options that could be possible here,
5         some circumstances where they would not be
6         duplicative.  And if you don't assume fraud, I
7         think you don't necessarily choose the
8         narrative that supports fraud.
9              MR. EATON:  So I'd like to look at another
10        post-trial discovery email.
11             And, Tracy, if you could pull up Nn.  And
12        can you zoom in on, I guess, the first half of
13        the page or so?  Hopefully, that will be big
14        enough.  That's good.
15             (Pre-marked Defendant's Exhibit Nn
16             introduced.)
17   Q.   (By Mr. Eaton)  Can you see that?
18   A.   I'll do my best.
19   Q.   Yeah, let us know.  We can zoom into it further
20        if there's something you want to discuss.
21             So I want -- you just mentioned that there
22        are plausible explanations for why two services
23        could be billed at the same time, even if they
24        appear similar.
25             And "plausible" was the word that you used
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1              to describe that possibility at trial; right?
2    A.    Yeah, I believe that that's a reasonable
3          alternative circumstance, yep.
4    Q.    But you didn't -- you didn't have anything to
5          point to; right?  You could speculate that
6          there could be these reasonable alternatives,
7          but you didn't have any document to show, like,
8          yep, this is what was happening?
9    A.    No.  I was certainly devoid of any information
10         like what we're looking at right now.
11   Q.    And that's a perfect segue.
12             Can you tell us what we're looking at
13         right now, and how that fits into what we're
14         discussing?
15   A.    So this appears to be an email from
16         Mr. Ryan Gilpin to Chris Fitzgerald, copying
17         Mr. Naviloff and a person by the name of
18         Evan DaSilva -- apologize if I mispronounce
19         that -- talking about the CloudConnect
20         duplicative billing.  Again, I'm just kind of
21         summarizing.
22             And the -- over the -- Mr. Gilpin is
23         saying in the maybe third paragraph down,
24         "There may have been some overlap in the
25         services provided by Insight and CloudConnect,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1            as it appears that the contract start for
2            Insight overlaps within a few months of the
3            CloudConnect contract, from approximately
4            January to April.  And it would appear that the
5            majority of the services rendered by
6            CloudConnect exists roughly between 2012 and
7            2016."
8                 And he's talking about kind of the -- he
9            does goes on -- or before to talk about the
10           types of environments.  And, actually, I'll
11           read from this as best I can.  Because, again,
12           it is small.
13                "The three-month overlap in services could
14           be explained by a change in access
15           technologies, as it would appear to take some
16           time to get people up to speed on how --
17           official and new technology."
18                So I think he's talking about a potential
19           transition of technologies here.
20      Q.   And that was precisely what you were trying to
21           explain at trial, but for which you didn't have
22           any --
23      A.   Yeah.  Again, so I was never able to take a
24           look at this environment, and so I can't say,
25           one way or the other, what the exact purpose of
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              these two different cloud environments were --
 2              whether one was replacing the other, or whether
 3              they were intended as services that would be
 4              kept in parallel, or what have you.
 5                   I just know that I think Mr. Gilpin and I
 6              both came to a similar conclusion that this
 7              might actually be a transition of services.
 8              And I think that speaks to just that it is a
 9              likely possibility.  Instead of duplicative
10              billing, it could just be transitional billing.
11      Q.      Now, when you were consulting with defense
12              counsel prior to trial, did you advise them to
13              get discovery from RSM, or United Way, or the
14              Government regarding the basis of these
15              opinions such as duplicative billing?
16      A.      Yeah.  So I advised Counsel to make various
17              discovery requests, searching, again, for more
18              information about how some of these opinions
19              were being rendered.
20      Q.      And was part of that because on paper, it
21              didn't technically -- it wasn't -- when you
22              read it, it wasn't technically correct, but you
23              couldn't point to the source of the errors; is
24              that --
25      A.      That's absolutely true.  And so this is part of
```

```
 1          why when you're doing an accounting -- and,
 2          again, accounting -- forensic accounting is
 3          beyond my scope.  That's why I rely on somebody
 4          like Mr. Kennedy, which I did during trial and
 5          whatnot, and why I'm sure Mr. Naviloff would
 6          rely on associates or whatnot.
 7               When you're looking at technical services
 8          and the cost to deliver technical services or
 9          something like that, it's important to look at
10          them through a technical lens.  And what I mean
11          by that is it's important to understand what
12          the service really is, how it is used.  And,
13          so, yes, it's absolutely important that we look
14          at this kind of through that technical lens.
15     Q.   And did you receive any documents that were
16          responsive to this request to get the
17          underlying technical analysis?
18     A.   No.  No, we did not.
19     Q.   Before trial, I should say?
20     A.   Before trial, we did not.
21     Q.   And then after trial, did you, in fact, receive
22          some of those documents?
23     A.   Yeah.  So there were documents that were
24          produced after trial, which I'd be happy to go
25          through.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

213

```
 1   Q.   So before we get into the documents themselves,
 2        what did you find in your review of the
 3        posttrial discovery as to who was kind of
 4        behind providing these IT assessments
 5        underlying Mr. Naviloff's opinions?
 6   A.   Yeah.  So we learned about Mr. Gilpin,
 7        primarily, and that he was the person doing --
 8        I would say, for lack of a better term -- the
 9        legwork of collecting and potentially
10        analyzing -- kind of putting the -- offering
11        the technical lens by which some of this data
12        was presented.  I know that these emails show
13        that Mr. Naviloff was aware of this activity
14        and his involvement.
15   Q.   And have you reviewed Mr. Gilpin's
16        credentials -- his qualifications?
17   A.   I have.
18   Q.   In your review of his qualifications, do you
19        believe he is qualified to be providing IT
20        expertise and analysis?
21   A.   No.  So while I would agree that the use of
22        associates is absolutely a common business
23        practice -- I use associates myself -- their
24        work has to be closely monitored and -- closely
25        and effectively monitored and reviewed by a
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

214

```
1          knowledgeable technical expert to make sure
2          that they're on the right track, providing good
3          data.
4               Somebody who is in their second year, kind
5          of recently promoted -- a sophomore associate,
6          if you will -- is certainly not somebody that I
7          would like to provide kind of a primary voice
8          in providing technical expertise.  I think that
9          both his experience, time, and industry, and
10         some of the analyses that he's provided here,
11         show his inexperience and perhaps his unfitness
12         as an expert.
13    Q.   So let me ask you this.
14              You heard Mr. Naviloff just testified
15         today; right?
16    A.   I did.
17    Q.   Now, he described what Mr. Gilpin was doing as,
18         quote, "rather straightforward," and something
19         that he would expect any first- or second-year
20         associate to do -- this technical analysis that
21         we're speaking of.
22              Do you agree with that?
23    A.   I actually don't agree with that.  I think that
24         that really simplifies a complex equation in a
25         way that I don't think is appropriate.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           These cloud environments are highly
2       complicated.  The technology, in kind of
3       laymen's terms, is like a mattress; right?
4       Excuse the example.  You don't know what's
5       inside of it; right?  You can look at two
6       mattresses and they look like the same thing,
7       but one of them is super cheap, and one of them
8       is expensive.  And if you don't have a
9       knowledgeable expert to tell you what's inside
10       the mattress and how those parts go together,
11       then your analysis of that is -- can be
12       fundamentally flawed by that; right?
13           And so that is part of what I see the --
14       my own role and the role of the IT experts in a
15       case is to really illuminate some of the more
16       complex subject matter, which I think
17       Mr. Gilpin was ineffective in doing here.
18  Q.   Now, Mr. Naviloff also noted that the buck
19       stops with him, basically.  That he was doing
20       quality control.  And I guess --
21           THE COURT:  Mr. Eaton, let me interrupt
22       you.
23           It's been 90 minutes.  I want to give the
24       reporter a break.  So we will take 15 and
25       reconvene at about 3:25.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

216

```
1                   (Recess taken at 3:08 p.m., and the
2               proceedings resumed at 3:25 p.m.)
3               THE COURT:  Go ahead, AUSA Le.
4               MS. LE:  Hi, Judge.  Just two things.
5               Number one, I don't think we're going to
6       get to Mr. Meyer today, considering the Court's
7       scheduled discussion earlier.
8               So would it be okay if we release
9       Mr. Meyer and he can still be under
10      sequestration?  This way he's not on for extra
11      hours.
12              THE COURT:  Yes.
13              MS. LE:  Thank you.  So we'll let him know
14      that.
15              Charli, can you relay that information to
16      him, please?
17              THE CLERK:  I can, yes.
18              MS. LE:  Thank you.
19              And, number two, Judge, we had originally
20      planned this until about noon.  I'm going to
21      have childcare issues at about 4:00.  I just
22      wanted to apologize that my daughter might be
23      coming home, and so I might ask for just a few
24      minutes to get her situated, and then Ill be
25      back on the screen, if that's okay as well.
```

| 1 | | THE COURT:  Of course. |
| 2 | | MS. LE:  Thank you. |
| 3 | | THE COURT:  All right. |
| 4 | | Go ahead, Mr. Eaton. |
| 5 | | MR. EATON:  Thank you, Your Honor. |
| 6 | | Tracy, can you pull us Exhibit Ff? |
| 7 | Q. | (By Mr. Eaton)  So, Mr. Sgro, we were just |
| 8 | | talking about Mr. Gilpin.  And you were |
| 9 | | describing why IT expertise is necessary to -- |
| 10 | | with regard to the IT assessments that underlie |
| 11 | | Mr. Naviloff's opinions. |
| 12 | | Have you had a chance to review this |
| 13 | | email? |
| 14 | A. | Yes, I have. |
| 15 | Q. | And, actually, we've seen this email today as |
| 16 | | well.  So can you zoom in on the first half of |
| 17 | | that email, just down to the RSM logo?  Yes, |
| 18 | | that's good. |
| 19 | | So what does this tell you in relation to |
| 20 | | the IT assessments that were performed in the |
| 21 | | process of calculating the categories of loss? |
| 22 | A. | Yeah.  I think, as was kind of discussed before |
| 23 | | too, this is an email from Chris Fitzgerald to |
| 24 | | Mr. Naviloff where they're talking about the |
| 25 | | potential -- or a calculation of downtime |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

218

1    percentage -- 99.9 percent, and how many hours
2    that would be.
3        And Mr. Fitzgerald raises a concern that
4    the USAO, and I'll quote, "The USAO is relying
5    solely on Ryan, who is only a newly promoted
6    senior associate."  And that Diego -- who I
7    take to be Diego Rosenfeld, needs to testify,
8    you want him to basically be aware -- agrees
9    with and be aware of what's being presented to
10   Counsel here.
11       And I think that both corroborates my
12   concerns about Mr. Gilpin's fitness to do this
13   unsupervised.  It seems like, to some degree,
14   it's possible that he is doing this in a way
15   that at least Mr. Fitzgerald feels would
16   require more involvement from Diego Rosenfeld.
17  Q.  Okay.
18       And as you heard, Mr. Naviloff was
19   discussing how he provides a quality control.
20   These are his opinions.  So even though he
21   might take explanations from Mr. Gilpin, he's
22   kind of vetting them to make sure they align
23   with his opinions so that he can incorporate
24   that.
25       Is that -- knowing Mr. Naviloff's

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          qualifications and his areas or expertise, is
2          that kind of a proper --
3    A.    Yeah.  So I find that to be problematic, only
4          because, again -- to use my mattress analogy,
5          which hopefully does not come back to haunt me
6          in cross-examination -- but I know that
7          Mr. Naviloff, by this email, is aware of
8          Mr. Gilpin's involvement.  I know that he's
9          saying that these are his opinions, and he's
10         the quality control person.  However, you have
11         to have the expertise to know what a good
12         quality technical analysis or a poor quality
13         technical analysis is in order to -- in order
14         to be the quality control gate; right?
15             So this is why if I go into -- if I'm
16         dealing with something in forensic accounting,
17         I rely on an expert in that field, and I stay
18         kind of within my scope of practice.  I think
19         it's important for all experts to kind of know
20         where they begin and end, and not try to put
21         their arms around too much.  Because, contrary
22         to the testimony I think we heard today by
23         Mr. Naviloff, my opinion would be that some of
24         this stuff is actually pretty hard to figure
25         out.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           And Mr. Naviloff did say earlier in his
2       testimony as I was listening that, perhaps
3       during trial, I was suggesting that maybe some
4       of this was just too hard to figure out.  And
5       that's not what I'm saying at all.  I'm just
6       saying that when you're analyzing this, you're
7       analyzing technical services and technical
8       contracts, and you need to have the voice of a
9       technical expert to inform that opinion in
10      order for those numbers to really be valid.
11          Because when you look at them just at a
12      contract level, it is quite easy to make
13      mistakes.  It's not cut-and-dry.  It can be
14      complicated.
15  Q.  Okay.  So with that, I'll turn to the third
16      category of loss that you spoke about, and
17      that's "services not rendered."
18          And, Tracy, if you could pull up
19      Exhibit Oo and then go to page three of that
20      exhibit.  And can you zoom in on that "services
21      not performed" paragraph?
22          Have you seen this document Mr. Sgro?
23  A.  I have.
24  Q.  And what does this tell you in terms of what
25      we're discussing -- the technical assessment

No Copy Of This Transcript May Be Made Prior to 2/28/2021

221

```
1        underlying this --
2   A.   First of all, it lets me know that there is
3        some kind of technical assessment happening,
4        which -- and this document is produced after
5        trial; that is correct?
6   Q.   Yes.
7   A.   Yeah, I believe I recognize this from the
8        posttrial discovery.
9             This is where we learn that there is some
10       technical discovery or analysis being done
11       about -- by Mr. Gilpin, primarily.  I'm
12       inferring that from this.  And that there's a
13       document explaining this -- that it is their
14       opinion that these services hadn't been
15       performed.
16  Q.   And you discussed that there was technical
17       assessment going on.
18            I assume -- and I'd ask you to confirm --
19       whether IT expertise is required to do this
20       assessment.
21  A.   There's a couple of things that are required.
22       The first is, I absolutely -- in order to
23       assess data management and high-availability
24       backup storage, that is -- that definitely
25       requires expertise in IT to assess.  And there
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1              is an assessment kind of being done here, which
 2              means they're looking at an environment.  And
 3              that's notable to me, because I was not
 4              permitted to look at any environments.  I know
 5              environments outside of some desktop images and
 6              cellphone which were provided before trial.
 7              None of these environments were provided kind
 8              of for my analysis.
 9                   And so this is a case where -- I think I
10              was concerned in reading this in two ways.  The
11              first was that there's an analysis perhaps
12              being done here by a person that does not have
13              the correct expertise to do so.  And there's an
14              environment to analyze that I really have no
15              knowledge or visibility into.  So this speaks
16              to Mr. Gilpin having access to an environment
17              that I don't have access to to perform any kind
18              of analysis of my own.
19       Q.     So we've been through the three categories, and
20              you've discussed the lack of technical
21              expertise underlying these opinions.  But,
22              well, let me ask you.
23                   Have you reviewed Mr. Naviloff's
24              declaration, which was attached to the
25              Government's objection?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   I have.
 2   Q.   And in it, he states, quote, "My analysis is an
 3        accounts analysis.  It is not an IT assessment,
 4        nor is my report an IT expert report."  And he
 5        goes on to describe his experience in
 6        evaluation.  He has, quote, "significant
 7        experience forensically evaluating business
 8        expenses and auditing financial statements,
 9        including capitalized assets such as IT
10        equipment and software, as well as IT
11        maintenance and depreciation expense."
12             So do you have a response to this?  I
13        mean, the suggestion is he's just doing an
14        accounting analysis.  IT doesn't play a role in
15        it, so he doesn't need IT expertise.
16             What's your kind of response to that?
17   A.   Yeah, so I think there's two things of note.
18             The first is that when he's asserting his
19        familiarity with IT assets and software, he's
20        speaking about capitalization and cost of --
21        not familiarity with analyzing those services;
22        right?  So he's certainly, I'm sure, seen the
23        cost of a computer or something before, and
24        that's what he's talking about there.
25             But these -- an analysis of these
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

224

1    contracts, in order to be correct, in order to
2    be accurate, can't be separated from a
3    technical analysis; right?
4         This goes back to the kind of SIP.US
5    example, where you don't realize what you're
6    looking -- without the technical analysis, you
7    don't realize that you're looking at a very,
8    very small component of a much bigger thing,
9    and then saying "the cost of this was marked up
10   to the cost of this." And Mr. Meyer, in his
11   testimony during trial, which I was present
12   for, even said for just -- let's use the
13   telephony example for telephones.  He charges a
14   flat fee per month per line; right?  And
15   forgive me -- I don't have the number, but it's
16   $50, $60, $70 a month per line -- something
17   like that.
18        And then during this analysis -- or during
19   Mr. Naviloff's analysis and in his opinion, he
20   says, "Oh, the cost is only the SIP.US piece";
21   right?  And so it's like, wait a minute.
22   You're an accountant.  You can't have it both
23   ways.  It's very strange.
24        And I actually gave, in my latest
25   report -- my supplementary report -- an example

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           that I think speaks to why you can't have the
 2           -- a proper financial analysis of technical
 3           services without technical expertise or someone
 4           with technical expertise informing you.
 5                And I gave kind of a fictitious example of
 6           if I sell you a car for $25,000, and before
 7           that I buy $1,000 worth of tires -- and maybe a
 8           person analyzing the $25,000 and the $1,000
 9           invoice says, "Oh, well, you only paid $1,000
10           for the car, and then marked it up to $25,000,"
11           when, in fact, that's not true.
12                I'm only talking about a piece of that --
13           a very small piece of that.  And so that
14           technical analysis really allows you to make
15           informed decisions about what these contracts
16           actually mean.
17      Q.   Now, we've -- as you've stated, your original
18           testimony at trial indicated that there were
19           errors in the analysis.
20                Now, with this post-discovery trial, as
21           you mentioned, you know the source of those
22           errors in terms of Mr. Gilpin and the
23           inadequate IT assessments?
24                THE COURT:  Mr. Eaton, he's your witness.
25           Why don't you not lead him, and why don't you
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1           conduct direct and open-ended questions?
2                MR. EATON:  Okay.  Sure.
3      Q.   (By Mr. Eaton)  So let me ask you this.
4                Why does it matter to you to be able to
5           point to the source of IT errors?
6      A.   Yeah, so I think there's a couple of reasons
7           that some of this posttrial discovery is
8           important to my analysis, and I'll try to scope
9           myself there.
10               The first is that we saw the scan data;
11          right -- the technical scans that were provided
12          posttrial that were not provided pretrial, that
13          clearly show some analysis of the environment
14          being done, and there being an environment to
15          do an analysis of, which I was not provided
16          access to.  I was not provided that scan data.
17          And so that really inhibits my ability to
18          inform my own opinion and to inform Counsel
19          about potential examination of expert
20          witnesses, because the one side has access to
21          things that the other side doesn't have access
22          to; right?  So that's the first problem.
23               The second problem is -- what I can see
24          now is there's a reason -- and, again, I did,
25          as you correctly said -- I did, at trial, point

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1         out many of the issues that I felt were issues
2         with Mr. Naviloff's opinion.  Now I can see a
3         lot of those issues are of the result of these
4         other associates or people we didn't really
5         know about before trial giving him an incorrect
6         or potentially flawed technical analysis.  To
7         what degree he incorporates that or doesn't
8         incorporate that, I can't speculate as to the
9         intention of Mr. Naviloff.  But I can say that
10        that appears to me to be part of why some of
11        these kinds of errors are made.
12   Q.   You obviously just listened to Mr. Naviloff's
13        testimony today.
14             Other than Mr. Gilpin, did he point to any
15        other person that he gained assistance from in
16        terms of understanding IT issues?
17   A.   Yeah.  He referenced Mr. Meyer, which is the
18        same as he referenced kind of at trial.
19   Q.   Have you reviewed Mr. Meyer's --
20   A.   I have, yeah.
21   Q.   -- qualifications?
22             THE COURT REPORTER:  Excuse me.  This is
23        the court reporter.
24             Can I please ask the witness to wait until
25        the attorney finishes his question before
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            answering?
 2                 THE WITNESS:  Oh, I'm sorry.
 3                 THE COURT REPORTER:  Thank you so much.
 4                 MR. EATON:  So, Tracy, can you pull up
 5            Exhibit H?
 6                 (Pre-marked Defendant's Exhibit H
 7                 introduced.)
 8    Q.   (By Mr. Eaton)  So have you reviewed this?
 9    A.   Yes, I have.
10    Q.   Okay.
11            So in your opinion, and in reviewing this
12            document, is Mr. Meyer qualified to provide IT
13            advice for assessment?
14    A.   So Mr. Meyer is, I think, clearly by the --
15            objectively by this, not an IT expert, has very
16            little technical experience himself, especially
17            at engineering or understanding modern
18            technologies.  His resume and experience as a
19            technical director and things predates all of
20            the technology that we are talking about today.
21            And I believe that's probably why he wasn't
22            entered as an expert at trial as well.  That's
23            my speculation.
24                 MR. EATON:  So let's go to another
25            posttrial discovery document.  This is
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          Exhibit Rr.
2               Tracy, if you could pull that up.
3               (Pre-marked Defendant's Exhibit Rr
4               introduced.)
5    Q.   (By Mr. Eaton)  Mr. Sgro, have you reviewed
6         this particular email?
7    A.   I have.
8    Q.   And what does this email tell you?
9    A.   So would you mind blowing up part of it?  I
10        apologize.  My eyes aren't what they used to
11        be.
12   Q.   Is the middle part what you're looking at?
13   A.   Yeah, I'm looking at the part saying "Chris."
14        Yeah, perfect.  Thank you so much.  Yeah.  So
15        this is from Sean Renshaw to Chris Fitzgerald
16        and Mr. Naviloff, as well as others.
17             He's saying, "We will need to coordinate
18        getting copies of the DMs, as well as the Gmail
19        he has preserved and any logs.  I believe Ryan
20        might be able to assist with that."
21             This is in reference to either virtual
22        machines or voicemails, whichever one "DM"
23        stands for, which would be -- both contain data
24        that would be part of my analysis.  As well as
25        Gmail -- he had preserved -- Gmail is where
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

230

1          Mr. Alrai's emails would have been stored and
2          preserved.
3     Q.   And would it have been important for you to
4          have this information prior to trial?
5     A.   Yeah.  So, many times, I asked -- I advised
6          Counsel to request the communications -- email
7          communications and environments in question,
8          especially the emails from Mr. Alrai.  And what
9          we received was a smattering of kind of
10         cherry-picked emails.
11              What we do learn from this, as well as we
12         learned during trial from Mr. Meyer, that he
13         did preserve the totality of Mr. Alrai's
14         emails, and those weren't provided to us.  Why
15         that's important is because we're talking about
16         millions of dollars in IT services.
17              When we're evaluating whether or not
18         services were provided, or maybe they were
19         duplicative, or there was billing that was in
20         excess of their value, one of the ways that we
21         do that is to look at the environments
22         themselves.  And I fully realize that that's
23         not always possible.
24              So when that's not always possible, the
25         other thing we rely on heavily is

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           communications, especially by executive leaders
 2           in the company.  So being able to review those
 3           emails and provide my own review of those
 4           emails would have been highly beneficial in
 5           informing my own opinion of kind of the facts
 6           of the case here.
 7    Q.     And just to be clear, were these produced --
 8           these emails that you're talking about -- were
 9           these produced prior to trial?
10    A.     No, they were not.
11    Q.     Were the help desk communications?
12    A.     Yes.  And so the help desk communications are
13           another place where I asked for -- help desk in
14           a company is very often the kind of
15           communication traffic cop of the organization.
16           All of the problems and resolutions come in and
17           out of there.  And so that's another place,
18           when you're talking about technical services,
19           that you can look and learn a lot about the
20           actual services -- what they look like,
21           problems with them, engineering work that is
22           being delivered in support of them.  And that
23           was not being provided at all, although it was
24           requested, by Counsel.
25    Q.     You indicated that Mr. Alrai's emails -- that
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1       Mr. Meyer had indicated Mr. Alrai's emails were

2       preserved.

3           Did you have any indication that the help

4       desk communications were preserved prior to

5       trial?

6    A.  Yeah.  Well, so at trial we learned that the

7       help desk -- I believe, if my recollection is

8       correct, we learned that the help desk was

9       preserved as well.

10   Q.  Mr. Meyer also testified that with regard to

11      the emails and help desk communications, quote,

12      "We provided RSM access.  They took the image

13      with their own imaging tools."  He also said

14      that they were forensically looked at by RSM.

15          So what does that tell you about the

16      access that RSM had to these documents that you

17      had requested prior to trial?

18   A.  This is similar to the issue with duplicative

19      billing and the cloud environments.  It appears

20      that engineers, or people who are associates,

21      or whomever at RSM had access to these

22      environments, whether forensic copies of these

23      environments, or access to the environments in

24      order to perform scanning -- those sorts of

25      things.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1              So it seems to me that RSM had access to
2        view this and make assessments that we did not
3        have.
4   Q.   Now, do you recall your cross-examination at
5        trial?
6   A.   Yes.
7   Q.   Maybe not every word of it, but --
8   A.   Yes.
9   Q.   Do you recall that one of the first questions
10       you got on cross-examination was whether
11       Mr. Meyer was in a better position to evaluate
12       the system that he inherited from DigitalNet
13       and Mr. Alrai than you were?
14  A.   I do remember that question, yes.
15  Q.   And do you recall that your response was
16       basically "yes, because I didn't get to see the
17       service"?
18  A.   Yeah, so -- and I'll clarify that, if that's
19       helpful.
20              What we have here is Mr. Meyer has access
21       to these environments, and has, in many cases,
22       provided access to these environments to RSM.
23       But he doesn't have the expertise in order to
24       evaluate these environments; right?  I, on the
25       other hand, am the only IT expert or technical
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

234

```
1          expert that I'm aware of on the case.  I have
2          the expertise to evaluate the environments;
3          however, I didn't have the access to.
4               So we were in a little bit of a stalemate
5          there as to who was in a better position.  The
6          answer is, certainly, Mr. Meyer had the access
7          to the environment that I did not to view what
8          it was.  But he simply does not also have the
9          expertise in which to analyze that environment.
10              MR. EATON:  Let's go to Exhibit Tt.
11              (Pre-marked Defendant's Exhibit Tt
12              introduced.
13              MR. EATON:  And can you zoom in on that
14          middle email exchange?  Yeah.  Okay.
15    Q.    (By Mr. Eaton)  So this is another posttrial
16          discovery email.
17              Have you reviewed this?
18    A.    I have.
19    Q.    And what does this email tell you?
20    A.    This is essentially the senior associate,
21          Mr. Gilpin, at RSM, conversing with a person by
22          the name of Mike Sack in Boston who works for
23          Microsoft on the licensing model and the amount
24          of license servers and products at the
25          United Way.  So, essentially, they are
```

Case 1:18-cr-00192-JL  Document 200  Filed 11/30/20  Page 235 of 328

```
 1              performing an analysis of whether or not
 2              Microsoft products were paid for.
 3    Q.    Okay.
 4              Do you recall whether Mr. Meyer testified
 5          at trial as to whether Mr. Alrai had allowed
 6          the Microsoft products at United Way to go
 7          unlicensed?
 8    A.    I do.  I believe -- and this is by
 9          recollection, so forgive me on accuracy.
10              I believe he said something to the effect
11          of there were many things that were on trial
12          versions or were unlicensed in the environment.
13    Q.    And does this email indicate anything about the
14          accuracy of that claim?
15    A.    Yeah, so this is a person, presumably, that
16          works for Microsoft actually saying that
17          there's no issue with the ownership; that there
18          are licenses that have been paid for.  And it
19          also means that Mr. Gilpin and -- or by way of
20          or in conjunction with Mike Sack are analyzing
21          this environment, and, I believe, produced a
22          report to this effect.
23    Q.    I'd like to go back to the IT environment
24          issue.  You had spoken about how you requested
25          it before trial.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

236

```
1              In your review of the Government's
2     objection, do you recall the Government arguing
3     anything about the IT environment -- the term
4     "IT environment" being unclear?
5  A.  Yeah.  I recall reading something to the effect
6     of that they didn't understand what the IT
7     environment was in the context we were asking
8     about it.
9  Q.  And what is your response to that?
10 A.  So, I mean, the term "IT environment" is fairly
11    well known throughout the industry.  I mean, an
12    IT environment being the technical environment
13    that's been analyzed -- or being spoken about,
14    sorry -- not necessarily analyzed -- by
15    Mr. Naviloff.
16            The cloud environments, the VPN
17    environments, the data backup -- those are all
18    examples of IT environments.  And I'm not sure
19    what the confusion is there.  That seems to be
20    something that's talked about fairly often.  So
21    in their objection, I'm not clear as to what is
22    unclear about that.
23 Q.  Mr. Meyer at trial described the IT environment
24    as a "road map of what your network looks like.
25    It will give you a map of what's connected to
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            what within your systems." Does that -- let me
 2            ask.
 3                 Is that a generally accurate idea of what
 4            an IT environment is?
 5     A.     Yeah.  I would say that those documents would
 6            describe an IT environment accurately.  That's
 7            obviously not a comprehensive list, but I would
 8            agree with that, generally.
 9     Q.     And do you also recall in reviewing the
10            Government's objection an argument about how
11            preserving the IT environment would be overly
12            burdensome or disruptive?
13     A.     I do.
14     Q.     Let me ask you.
15                 Would preservation of an IT environment --
16            would that disrupt the operations of United Way
17            or prevent a company such as Mr. Meyer's from
18            enacting any necessary remedial measures?
19     A.     Yes.  To the -- the short answer is no, I don't
20            believe that that would be burdensome.  The
21            reason for that is I think in clear cases, the
22            IT environments were preserved at least long
23            enough for RSM to perform an evaluation of
24            certain environments.  So in that case, it
25            wasn't burdensome.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1                  In general terms, IT systems are usually
2        backed up, and maybe nightly or whatever.  And
3        those backups could be easily used to
4        reconstitute an environment to a point in time
5        where it would not be at all burdensome to the
6        ongoing environment, or production, or the
7        business of the United Way.
8             So I think it's fairly common practice to
9        preserve your environments on an ongoing basis,
10       and safeguard it against things like accidental
11       damage, deletion, viruses, all of that.  We
12       could have easily taken a look at that kind of
13       stuff in order to make an assessment of the
14       environment.
15            THE COURT:  Can I interrupt here?
16            MR. EATON:  Sure.
17            THE COURT:  Mr. Eaton or Ms. Brown can
18       answer this question, because I don't know how
19       much time I want to spend listening to the IT
20       environment line.
21            Look, I know there was an IT environment
22       sort of litigation freeze requested by McLane
23       law firm early in the situation, and it doesn't
24       appear to have been honored.  Maybe
25       Mr. Commisso or the prosecution disputes that,

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          but the allegation is it wasn't honored.
2               But for me to attribute that to the
3          prosecution in this case, I have to basically
4          buy into the attribution theory, right, that
5          Mr. Commisso was part of the prosecution team
6          and that he somehow failed to make this happen.
7               Otherwise, I can't really tag that to the
8          prosecution; right?
9               MS. BROWN:  Can I just insert, Your Honor?
10              I think one of the things -- going back to
11         our motion, one of the factual things you put
12         in there is that Attorney Commisso, and at
13         least Attorney Davis, were talking in this case
14         and collaborating in this case weeks before
15         Mr. Alrai was even arrested.  And in that
16         time -- I think it was shortly after he was
17         arrested that the preservation letter went out.
18              And part of that is that Attorney Commisso
19         was on notice as to preservation during a
20         period of time when he was consulting with the
21         Government about production of documents.  I
22         think he even got the grand jury subpoena
23         June 4.  So it's all in the same period of time
24         that Attorney Commisso is handing over
25         documents to the Government -- and, we believe,

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            without asserting privilege, or at least moving
 2            to quash, or anything along those lines -- at
 3            the same time that he knows that the Defendant
 4            is asking to preserve.
 5                 So I think it's more than that, because of
 6            the closeness of -- and we've heard more of
 7            that from Mr. Naviloff today --
 8                 THE COURT:  Okay.  So --
 9                 MS. BROWN:  -- but most of the facts
10            you're looking for are in our motion.
11                 THE COURT:  I know.  I know they're in the
12            motion.  But I'm not looking for the facts.
13            I'm looking for the argument.
14                 MS. BROWN:  Yeah, that's the argument.
15                 THE COURT:  But I think you've answered
16            me.  Because your point is, I don't necessarily
17            have to buy into the attribution theory,
18            because of the temporal closeness and the
19            actual connections between Mr. Commisso and the
20            prosecutors during this time.
21                 MS. BROWN:  Correct.
22                 THE COURT:  Okay.
23                 Go ahead, Mr. Eaton.
24      Q.    (By Mr. Eaton)  Thank you.  I really just have
25            one more question on -- well, just one more
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

241

1        question.

2              Which was, do any of the new discovery

3        emails that you've reviewed -- does that

4        indicate that there were, in fact, aspects of

5        the environment that were preserved, but not

6        handed over to you?

7    A.   Yeah.  So it appears that any of the

8        environments that were -- that Mr. Gilpin or

9        somebody else was doing scanning from RSM on --

10       those environments have to exist in order to

11       perform scanning.  That is logical.  I have not

12       been able to see those environments.  Nor, in

13       all cases, did I see the scans.  We saw two

14       scans or so before trial, or as part of

15       pretrial discovery.  We have found others

16       afterwards.  There was more scanning done which

17       we didn't have.  So that certainly impacts my

18       ability to analyze that environment and inform

19       my opinion.

20             Also, a lot of these emails shows those

21       underpinnings, as we've discussed kind of at

22       length today, where these emails and these

23       conversations that are being had are talking

24       about analyses that are being done that we're

25       not privy to.  And so I can't comment on them.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

242

```
 1          I can't look at the validity of them.  And I
 2          can't inform Counsel as to how to examine those
 3          witnesses properly.
 4               MR. EATON:  Thank you.
 5               I don't have any further questions.
 6               THE COURT:  Who is conducting the
 7          cross-examination?
 8               MS. LE:  I am, Your Honor.
 9               THE COURT:  Please proceed.
10               MS. LE:  Thank you, Your Honor.
11
12                    CROSS-EXAMINATION
13     BY MS. LE:
14  Q.  Good afternoon, Mr. Sgro.
15  A.  Good afternoon, Counselor.
16  Q.  You've been working with the Defendant and his
17      attorney since before trial; is that right?
18  A.  That's correct.
19  Q.  When were you retained to begin with?
20  A.  I believe sometime in August of '19.  You can
21      fact-check me, but that is the rough area.
22  Q.  And, sir, am I right that you were retained to
23      provide technical analysis and expert opinions?
24  A.  That is correct.
25  Q.  And as part of your services to the Defendant
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | in preparation for his trial, did you have |
| 2 | | access to DigitalNet's business records? |
| 3 | A. | Their business records -- how do you mean, |
| 4 | | "business records"? |
| 5 | Q. | So most businesses maintain records, right, of |
| 6 | | the services they provide, the bills that they |
| 7 | | pay, the bills they send out to their clients; |
| 8 | | is that correct? |
| 9 | A. | Yeah.  So I was made aware of invoices and |
| 10 | | contracts of that nature, yeah, absolutely. |
| 11 | Q. | So what business records related to DigitalNet |
| 12 | | did you review? |
| 13 | A. | So I got to see IT contracts -- or contracts |
| 14 | | for IT and technical services.  I got to see |
| 15 | | invoices for those services.  And I don't |
| 16 | | recall much else. |
| 17 | Q. | Okay. |
| 18 | | So were those records that you just |
| 19 | | testified about records that were obtained |
| 20 | | through discovery from the United States |
| 21 | | Attorney's Office? |
| 22 | A. | They were given to me by defense counsel. |
| 23 | Q. | So are you able, after your extensive review |
| 24 | | and preparation for these hearings and your |
| 25 | | guidance to counsel, able to determine what |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            records you reviewed came from DigitalNet and
 2            your client versus records that were produced
 3            through the criminal discovery process from the
 4            Government?
 5     A.     I do not believe I am able to deduce the origin
 6            of the finding of those documents.  Those
 7            documents all came to me from defense counsel.
 8     Q.     So in the course of your analysis -- I think
 9            you've used that term sometimes -- did you ever
10            ask for additional records that perhaps
11            DigitalNet would have to kind of supplement
12            what was produced from United Way and other
13            sources?
14     A.     I've never made any requests to DigitalNet.
15     Q.     Why not?
16     A.     I was brought on to offer technical analysis of
17            the environments, and made requests through --
18            or advised counsel about the types of
19            information about those environments that would
20            be helpful to my analysis.
21     Q.     And based on your understanding of the evidence
22            that was presented at trial -- and here I have
23            to correct myself, Judge.  I think the trial
24            was nine days and not seven -- but you know
25            that DigitalNet was essentially Imran Alrai,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | | |
|---|---|---|
| 1 | | right, and it was his business; do you |
| 2 | | understand that? |
| 3 | A. | That's beyond the scope of my practice as a |
| 4 | | technical expert, but that is what I've -- I |
| 5 | | mean, that is -- if that is what you are |
| 6 | | saying. |
| 7 | Q. | Well, you've reviewed trial transcripts; right? |
| 8 | A. | I have, yes. |
| 9 | Q. | And the trial evidence has established that |
| 10 | | Imran Alrai was DigitalNet; is that right? |
| 11 | A. | If the transcripts say that, yes. |
| 12 | Q. | And you'll accept from me that the other |
| 13 | | company that was involved was the |
| 14 | | AISA Consulting, which is another business |
| 15 | | entity run and controlled by Imran Alrai; will |
| 16 | | you accept that? |
| 17 | A. | Yes. |
| 18 | Q. | So did you conduct an independent analysis of |
| 19 | | DigitalNet's expenditures for IT services to |
| 20 | | United Way of Massachusetts Bay? |
| 21 | A. | Of IT expenditures on behalf of those |
| 22 | | companies? |
| 23 | Q. | Yes, that DigitalNet provided to United Way. |
| 24 | A. | No. |
| 25 | Q. | Why not? |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   That's beyond -- so the -- a financial analysis
 2        of that type is generally beyond my scope of
 3        practice.
 4   Q.   Are you aware -- I understand that you
 5        confirmed with Mr. Kennedy, who was the
 6        Defendant's accounting expert; right?
 7   A.   That is correct.  I helped inform him of
 8        certain technical findings.
 9   Q.   And he -- actually, you reference his
10        conversation with you; is that right?
11   A.   That's correct.
12   Q.   And so let's start out with that.
13            What kind of technical advice did you give
14        to Mr. Kennedy for his testimony about the loss
15        calculations in this case?
16   A.   So, many of the questions that were asked to me
17        by Mr. Kennedy were of the nature -- explaining
18        what certain technical services were.  He's not
19        a technical expert.
20   Q.   And can you be more specific?
21   A.   I don't recall very specifically, but they were
22        generally an explanation of services -- service
23        types, what types of technology services do --
24        that sort of discussion.
25   Q.   Do you know whether your communications with
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           him that informed his opinion were documented
 2           in any way?
 3   A.     I do not know.
 4   Q.     And were these verbal communications, or were
 5           they written communications?
 6   A.     Generally, my communications are written.
 7           Certainly, there were phone calls between
 8           myself, Mr. Kennedy, and Attorney Harrington.
 9   Q.     And you were also present for Mr. Kennedy's
10           testimony at trial; is that right?
11   A.     That is correct.
12   Q.     And you testified right after Mr. Kennedy; is
13           that correct?
14   A.     I believe that's true.
15   Q.     And I understand that Mr. Kennedy testified
16           that Mr. Naviloff's loss calculations were
17           overstated; is that a fair assessment of his
18           general opinion?
19   A.     I believe that is Mr. Kennedy's opinion, yes.
20   Q.     But he, himself, offered no separate loss
21           calculation; is that correct?
22   A.     I believe that is correct.
23   Q.     Is it correct that Mr. Kennedy relied upon
24           Mr. Alrai's tax return as true statements of
25           his supposed expenses and income; is that
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1         right?
2    A.   I suppose so.  I'm a little hazy on exactly
3         what he would have put inside of his financial
4         analysis.  Again, that's well beyond the scope
5         of my practice.
6    Q.   Did you review his financial analysis?
7    A.   I read it, yes.
8    Q.   Okay.
9              And did you have any opinions about his
10        analysis?
11   A.   I -- no.
12   Q.   And I believe that in his report, he's offering
13        some guidance that you gave him about why
14        Mr. Naviloff's review could be incomplete; is
15        that right?
16   A.   Yeah, that sounds right.
17   Q.   Did you, at any time, suggest to Mr. Kennedy
18        that he could review DigitalNet's business
19        records to make a determination about what
20        services were actually provided by DigitalNet
21        to United Way?
22   A.   I don't believe I advised Mr. Kennedy on the
23        methods of forensic accounting, no.  That's
24        beyond the scope of my practice.
25   Q.   And here I'm going to make reference to
```

Case 1:18-cr-00192-JL   Document 200   Filed 11/30/20   Page 249 of 328

```
 1            Mr. Kennedy's trial testimony, which is that
 2       ECF number 109, starting at page 123 to 124.
 3       And if you recall this testimony -- I'll read
 4       it to you -- regarding Mr. Kennedy's view of
 5       invoices -- of DigitalNet's invoices to United
 6       Way.
 7            And he said, and I quote, "I did some
 8       level of review, although to Mr. Naviloff's
 9       credit, he seemed to have been very thorough
10       relative to his review of the invoices and the
11       disbursement.  And after some rapid cursory
12       review, I determined that there really wasn't a
13       need to replicate that information and I relied
14       on the amounts actually paid."
15            Does that comport with your recollection
16       of the testimony about why he did not conduct a
17       separate analysis of invoices?
18   A.   Yes.  If that's what the transcript says, yes,
19       absolutely.
20   Q.   Will you agree with me that United Way -- I'm
21       sorry.
22            Would you agree with me that your client,
23       Imran Alrai, would be in the best position to
24       know what his business's expenses were and
25       direct costs were for IT services provided to
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          United Way?
 2   A.    Yeah, perhaps.
 3   Q.    And if he was conducting a legitimate business
 4          and provided legitimate services, his company
 5          would be expected to have business records for
 6          those services; am I right?
 7   A.    Again, under normal circumstances, I think
 8          businesses have records generally; but, again,
 9          you're well outside of the scope of my
10          technical practice there.
11   Q.    And were you provided with any records or
12          corroborating information from your client
13          regarding the actual services he provided to
14          the United Way?
15   A.    Can you ask that again?
16   Q.    Sure.
17              Were you provided with any records or
18          corroborating information by your client to
19          establish what services he actually provided to
20          United Way through his company, DigitalNet?
21              Is that more clear?
22   A.    Yeah.
23              No, I don't believe so.  Not directly from
24          Mr. Alrai.
25   Q.    So you never saw any records about
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

251

```
1          subcontractor costs; is that right?
2    A.    Subcontractor -- what?  I apologize.
3    Q.    Any subcontractors costs that he might have
4          incurred in providing services to United Way?
5    A.    I don't believe so, but, again, this is kind of
6          within the financial analysis, which is outside
7          of what my report covers.
8    Q.    Do you remember your initial report -- expert
9          report that you provided right before trial?
10               Do you remember that report?
11   A.    I do.
12   Q.    And I think it's actually attached as Exhibit G
13         to Defendant's surreply or response.
14               Do you remember that?
15   A.    Yes.
16   Q.    Now, do you remember making some assessments
17         about services that were provided by DigitalNet
18         to United Way through Pakistan-based employees?
19   A.    So there is -- yeah, part of the discussion of
20         DigitalNet is that they have employees in
21         Pakistan.
22   Q.    Right.
23               And I think if you -- do you have your
24         report in front of you, sir?
25   A.    I do not, but I'd be happy to review it with
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         you.
 2    Q.   And do you want me just to read it to you, or
 3         do you want to pull it up on your computer
 4         screen?
 5    A.   I'm happy to do either.
 6    Q.   Okay.  Look at page six of your report,
 7         paragraph 26; okay.
 8              "In addition to being certified by major
 9         vendors and professional organizations Cisco,
10         Microsoft, and Project Management Institute,
11         PMI, the DM" -- and I assume that's
12         "DigitalNet" -- "in Pakistan have significant
13         capabilities in the areas of infrastructure,
14         networking, software development, and desktop
15         support consistent with the skills required to
16         fulfill the requirements of the contract
17         awarded to DN by UWMB through the RFP process."
18              Do you remember that statement that you
19         made?
20    A.   You are reading, yes.
21              THE COURT:  Hold on a minute.  Couple
22         steps at a time.
23              Were you able to attend to your childcare
24         issue?
25              MS. LE:  Yes, Your Honor.  She just came
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1          in and took care of herself.
2                  THE COURT:  Mr. Sgro, you don't have your
3          report with you?
4                  THE WITNESS:  I don't have it in front of
5          me right now.  I can pull a copy up of it, or
6          we can look at it together.
7                  THE COURT:  Well, yeah.
8                  Only because your audio is a little bit
9          tough, AUSA Le.
10                 MS. LE:  Oh, I'm sorry.
11                 THE COURT:  It's a little bit -- and I'm
12         sure the reporter is struggling, and maybe the
13         witness too.
14                 When you say you can pull it up, does that
15         mean that you can get it off a printer, or that
16         you have it right handy, Mr. Sgro?
17                 THE WITNESS:  I could get it out of our
18         files.  I can log into our server and get it.
19                 THE COURT:  Let's just put it up on the
20         screen.
21                 MS. BROWN:  Isn't it in our exhibits,
22         Mike?
23                 MS. LE:  Yes.  It's Exhibit G.
24                 THE WITNESS:  Perfect.
25                 MS. LE:  But I'm not sure that -- was that

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          part of the exhibits that you sent, Donna?
2              MS. BROWN:  His most recent exhibit was
3          what was included in what we gave yesterday.  I
4          don't know -- I think we had his original
5          exhibit too, didn't we?  Or -- I can't
6          remember.
7              MR. EATON:  No.  For this hearing, we only
8          have his supplemental report.  His original
9          report is not already an exhibit.
10             MS. BROWN:  I do think it's a document,
11         though, wasn't it, in our reply motion, maybe?
12             MR. EATON:  Yeah, yeah.  It's been --
13             MS. BROWN:  Might have been, like, F, or
14         G, or something like that, in our reply motion.
15             MS. LE:  I mean, I could tell the Court
16         I'm reading it.
17             MS. UHRIN:  This is Tracy.  If somebody
18         wants to just email me the document, I can put
19         it up on the screen.
20             THE COURT:  Well, is that going to happen?
21             Neha, do we have it?
22             MS. DEWAN:  Yeah.  I'm emailing it to
23         Tracy right now.  Just sent it.  It should be
24         in your email box now.
25   Q.   (By Ms. Le)  And, Tracy, if you can go to page
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            six, paragraph 26.
 2                 Mr. Sgro, can you see that?
 3   A.   Yes, I can.
 4   Q.   I'll let you read it.
 5   A.   Thank you.  Sorry about that.
 6   Q.   Where did you get this information that's in
 7        paragraph 26?
 8   A.   So there's a bunch of places that this
 9        information was pulled from.  The first was --
10        there is -- and I'm trying to recall.  There
11        was interviews or testimony with people that
12        worked for DigitalNet, but were U.S.-resident.
13        There was information that was provided about
14        the marketing and capabilities of DigitalNet
15        that was provided to me by Counsel, as well as
16        an overview of some of the skills and
17        capabilities that were there.
18   Q.   But what specific records or independent
19        confirmation did you have to make this
20        particular statement in your expert report?
21   A.   So I didn't do an independent analysis to
22        actually call these vendors or anything like
23        that, to find out if they were -- if these
24        certifications or these professional
25        organization assessments are true.  We relied
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1          on the documents that were provided by Counsel.
 2    Q.    And you know Mr. Naviloff's report -- fairly
 3          detailed; right?
 4    A.    Quite extensive, yes.
 5    Q.    And when he made a certain assessment, he
 6          actually cited, by Bates number, the source of
 7          his information; is that correct?
 8    A.    Yes, I believe in general, that is correct.
 9    Q.    Is it not common practice for you to do
10          something so that we can go back and pinpoint
11          where you got the source of the information
12          from?
13    A.    In general it is, and I think we've done that
14          in other places in the report as well.  I'm not
15          sure why that's not the case here.
16              MS. LE:  Let's go -- thank you, Tracy.
17          You can close out that particular screen.
18              Can you highlight paragraph 27?
19    Q.    (By Ms. Le)  Can you read that to yourself,
20          sir?
21    A.    You would like me to read it out loud?
22    Q.    No, just to yourself.
23    A.    Yes, I've read it.
24    Q.    So what does this tell us in kind of laymen's
25          terms?
```

| | | |
|---|---|---|
| 1 | A. | Yeah, so in laymen's terms, my understanding of |
| 2 | | the DigitalNet entity was that it uses or it |
| 3 | | leverages what I would call an |
| 4 | | industry-standard offshoring model. |
| 5 | | And by "industry-standard offshoring |
| 6 | | model," I simply mean the use of engineers in |
| 7 | | less expensive regions in order to pass -- |
| 8 | | regions of the world that have potentially |
| 9 | | lower salaries for those technical positions to |
| 10 | | pass savings to client companies.  That is a |
| 11 | | very typical model for any company operating |
| 12 | | offshore, because Massachusetts is a very |
| 13 | | expensive market for technology -- |
| 14 | | technologists. |
| 15 | Q. | So specifically as it relates to this case, are |
| 16 | | you referring to DigitalNet's operations in |
| 17 | | Pakistan? |
| 18 | A. | I'm speaking in this case about my |
| 19 | | understanding of the model that DigitalNet is |
| 20 | | operating in. |
| 21 | Q. | And specifically, other than some kind of |
| 22 | | operations in Pakistan, where else was |
| 23 | | DigitalNet subcontracting to work for |
| 24 | | United Way? |
| 25 | A. | Subcontracting its work for the United Way? |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   Yeah, because it sounds like they subcontracted
 2        services in less expensive parts of the world.
 3        The evidence at trial was that DigitalNet had
 4        at least some component in Pakistan.
 5             So where else was there services that were
 6        rendered to the benefit of United Way --
 7   A.   So my understanding of DigitalNet is that it
 8        operated in Pakistan as an entity in Pakistan,
 9        as well as having employees embedded or
10        adjacent to the United Way in Massachusetts.
11   Q.   Right.
12   A.   Yes, that's correct.   Correct.
13   Q.   And there's also a gentleman named Kal
14        (phonetic) --?
15   A.   That is correct.
16   Q.   And he sometimes lived abroad; sometimes in
17        Massachusetts; is that right?
18   A.   Reportedly, yes.
19   Q.   So can we agree, here you're probably talking
20        about Pakistan; right?
21   A.   Oh, in terms of that being an area of the world
22        that would fit this description, yes.
23   Q.   Are you aware of any other areas of the world
24        that would fit this description in your expert
25        report?
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   A.   I am aware of other areas of the world that
 2        would fit this description, but not where I
 3        know that DigitalNet operates.
 4   Q.   Just so we're clear, I only mean with relation
 5        to DigitalNet's operations with all of my
 6        questions; okay?
 7   A.   Fair.
 8            MS. LE:  So let's go to paragraph 29, if
 9        we can, please, Tracy.
10   Q.   (By Ms. Le)  In here you said, "I find no
11        evidence of duplicative billing or excessive
12        billing based on my review of the RSM report,
13        the services provided by DN or its
14        subcontractors"; right?
15   A.   Not -- I just apologize.  You read that
16        incorrectly.
17   Q.   Oh, I did?  I'm sorry.
18   A.   "I find no evidence of duplicative billing or
19        excessive billing based on my review of the RSM
20        report, services provided by DN or its
21        subcontractors."  So that refers to my review
22        of Mr. Naviloff's opinion, the RSM report, and
23        my review of the documents -- the data provided
24        by -- about the services for which DigitalNet
25        invoiced the United Way.  That's correct.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1   Q.   But it also has "or its subcontractors"; do you
 2        see that word?
 3   A.   I do see "or its subcontractors."
 4   Q.   So are you aware of any additional records
 5        relating to subcontractors that were employed
 6        or used by DigitalNet for services rendered to
 7        the United Way?
 8   A.   I don't believe so.
 9   Q.   So you don't have any additional invoices?
10   A.   I don't believe I'm in receipt of any invoices
11        that are not known to everyone, no.
12   Q.   Did you conduct any independent analysis of
13        DigitalNet's spending in Pakistan?
14   A.   Don't do an analysis of any spending.  That's
15        outside of my scope of practice.
16   Q.   Did you or anyone who was under you at your
17        business request any documentation or records
18        related to any expenses incurred by DigitalNet
19        in Pakistan related to United Way?
20   A.   So the expense calculation was something that I
21        talked to Mr. Kennedy about and was within his
22        scope.
23   Q.   Okay.
24            So it's something that you talked about
25        with Mr. Kennedy?
```

```
1    A.    Sure, yeah.
2    Q.    And would that have been helpful and important
3          to you of Mr. Kennedy to rebut Mr. Naviloff's
4          testimony regarding loss calculations?
5    A.    It -- sure, there's certainly -- so in a normal
6          -- sorry, didn't mean to say "normal."
7               In the case of performing an analysis of
8          the services and any evaluation of the -- maybe
9          those services on behalf of Mr. Kennedy or by
10         Mr. Kennedy, the cost of those services, I'm
11         sure, would be very helpful in assessing that,
12         yes.
13   Q.    And you'd agree with me that your client,
14         Imran Alrai, would know what Pakistan-based
15         expenses and direct costs were related to
16         services that DigitalNet provided to
17         United Way?
18   A.    Yeah, I would assume that.
19   Q.    And you would also expect that his company
20         would have those records; am I right?
21   A.    Yeah, under normal circumstances, I think
22         companies do keep records and that would be
23         reasonable.
24   Q.    And you were not provided with any of those
25         records or corroborating information for
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

|    |    |                                                       |
|----|----|-------------------------------------------------------|
| 1  |    | DigitalNet's expenses, or expenditures, or            |
| 2  |    | spending in Pakistan; right?                          |
| 3  | A. | I do not have records of that.                        |
| 4  | Q. | And are you aware that Imran Alrai had other           |
| 5  |    | business interests, including, like, a gaming         |
| 6  |    | or computer animation company in Pakistan?            |
| 7  | A. | I was not -- I was made aware of that, I               |
| 8  |    | believe, just pretrial, or made perhaps even at       |
| 9  |    | trial when some of that was discussed.                |
| 10 |    | MS. LE:  Tracy, can you also go to page                |
| 11 |    | eight of this same exhibit, paragraph 42?  And        |
| 12 |    | I'm looking at section E -- 42-E.                      |
| 13 |    | THE WITNESS:  Correct.                                 |
| 14 | Q. | (By Ms. Le)  Do you see that, sir?                     |
| 15 | A. | I do see that, yes.                                    |
| 16 | Q. | And feel free to read it out loud, so I don't         |
| 17 |    | misread it again.                                      |
| 18 | A. | Yeah.                                                  |
| 19 |    | "That both Mr. Alrai and DN were adding               |
| 20 |    | what appears to be a significant positive value       |
| 21 |    | to the United Way of Massachusetts Bay through        |
| 22 |    | Mr. Alrai's oversight of DN, DigitalNet, and          |
| 23 |    | DigitalNet's performance of the contracts             |
| 24 |    | awarded to DN."                                        |
| 25 | Q. | So it's your belief that he provided value; is        |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1        that right?
 2   A.   Yeah.  So in the case -- some of these are --
 3        we can objectively see value; right?  If
 4        they're contracted to provide a phone service
 5        and a phone service exists, then there's, of
 6        course, value there.  Much of the website, you
 7        can go to the website and see that there is
 8        value.
 9             And so we also got to see testimony or
10        statements by fellows -- or leadership at the
11        United Way, as well as his performance reviews.
12        And so we can see through those that,
13        generally, his peers felt that he was doing a
14        good job.  He received positive reviews.
15             And that's why I say "what appears to be
16        significant positive value."  There's certainly
17        IT projects being delivered, and they seem to
18        be happy with them as a result of a review of
19        that type of material.
20   Q.   Okay.
21             But you do understand that when DigitalNet
22        was hired to provide IT services for
23        United Way, they didn't know Mr. Alrai's
24        connection to DigitalNet; you know that, right?
25   A.   It's my understanding that that is true.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

264

| | | |
|---|---|---|
| 1 | Q. | Now, let's talk about Mr. Naviloff's loss |
| 2 | | calculations. |
| 3 | A. | Sure. |
| 4 | Q. | Because basically, here you kind of disagree |
| 5 | | generally with how he approached loss |
| 6 | | calculations; is that right? |
| 7 | A. | I disagree that -- my understanding is that |
| 8 | | when you talk about potential loss calculation, |
| 9 | | part of that is a value of services or what |
| 10 | | services -- where we're talking about those |
| 11 | | three categories of duplicative billing, |
| 12 | | services not rendered, or excess markup, I |
| 13 | | believe that there are elements of his analysis |
| 14 | | which are not properly technically informed. |
| 15 | | And so there are mistakes there, yes. |
| 16 | | MS. LE:  So, Tracy, what I'd like to do is |
| 17 | | pull up Mr. Sgro's most recent report that was |
| 18 | | attached as Exhibit F. |
| 19 | | MS. UHRIN:  I apologize, Attorney Le. |
| 20 | | Which exhibit? |
| 21 | | MS. LE:  F as in "fish." |
| 22 | | THE WITNESS:  I actually think it might be |
| 23 | | Kk for this hearing. |
| 24 | | MS. LE:  Oh, is it Kk?  Thank you. |
| 25 | | KK.  If we can start on page 12, that |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            would be great.
 2                 (Pre-marked Defendant's Exhibit Kk
 3                 introduced.)
 4   Q.   (By Ms. Le)  So, Mr. Sgro, let's start off with
 5        this before we go into detail.
 6            But you understand that Mr. Naviloff's
 7        loss calculation -- the first theory, right,
 8        totaled $3.5 million; is that right?
 9   A.   Something thereabouts, yes.
10   Q.   And he limited that analysis to infrastructure
11        hosting, virtual desktops, data management, and
12        high-availability backup storage and monthly
13        recurring phone services; is that right?
14   A.   That seems right, yes.
15   Q.   And Mr. Naviloff specifically did not include
16        the $3.245 million that he assumed value for
17        for "digital web development"; is that right?
18   A.   Yeah, I believe that that is true.
19   Q.   The "hosting fee"; is that right?
20   A.   I believe so.
21   Q.   "On-site and after-hours remote IT support"; is
22        that right?
23   A.   Yeah, that would be the help -- what we would
24        consider help desk.
25   Q.   And then the bucket that he called "special
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         assessments and miscellaneous expenses."
 2    A.   Yes, I recall that.
 3    Q.   And there's another bucket that he calls
 4         "hardware and software implementation and
 5         application, database and OS management"; is
 6         that right?
 7    A.   That is correct.
 8    Q.   So I'm going to focus my discussion with you
 9         only on the stuff you did consider; okay?
10    A.   Okay.
11    Q.   And I'm going to actually follow the model of
12         your report, the areas that you raise issue
13         with his analysis based on your review of
14         posttrial discovery; okay?
15    A.   Okay.
16    Q.   So we'll start here on page 12 and 13, which
17         relates to your analysis of the SIP invoices;
18         is that right?
19    A.   Yes, 12 is regarding SIP.US and the finding of
20         excessive billing.
21    Q.   So in this instance, DigitalNet charged
22         United Way, at least Mr. Naviloff testified,
23         $562,580 for managed telephony services; is
24         that right?
25    A.   That's correct.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

267

1    Q.   DigitalNet was billed $24,642 by SIP for
2         telephony services; was that right?
3    A.   Yes, that's correct.
4    Q.   And your position is that Mr. Naviloff, quote,
5         "incorrectly assessed this as an example of
6         excessive billing on the part of DigitalNet";
7         is that right?
8    A.   Yes, that's correct.
9    Q.   And this is where you brought in your
10        hypothetical about the car and the tires;
11        right?
12   A.   Right.
13             So just to be clear, the $24,000 that was
14        billed to DTS for telephony services -- so SIP
15        is a small piece of delivering a phone system.
16        It is not the totality of the componentry that
17        would be required to have voicemail, make a
18        dial tone, that sort of thing.  So that's why I
19        believe that it's not an apples-to-apples
20        comparison that $24,000 is not marked up to
21        $562,000, roughly.
22   Q.   Right.
23             But you do know that -- and Mr. Naviloff
24        specifically cited this in his report -- that
25        his evaluation did not include the initial

No Copy Of This Transcript May Be Made Prior to 2/28/2021

268

1          setup and equipment purchase, which DigitalNet
2          billed separately at over $200,000; isn't that
3          right?
4   A.     I agree, yes.  That's correct.
5   Q.     And he also didn't include "application OS from
6          database management," which was billed
7          separately at $3,500 a month; is that right?
8   A.     Yeah.  So "application OS and database
9          management" don't have anything to do with the
10         context of which I'm speaking here.
11  Q.     But isn't this a voice over IP phone service?
12  A.     It is indeed.
13  Q.     So tell me, what additional services did
14         DigitalNet provide on top of those things that
15         we just talked about that -- those additional
16         services that support the $540,000 gulf between
17         what they paid for SIP for the phone service
18         and what additional value they've provided to
19         United Way?
20  A.     All right.
21             So I think the first thing that we brought
22         up -- and I spoke to this before -- was the
23         timeline -- the contract of dates to which the
24         managed -- what you're calling the application
25         management bucket piece contract was signed.

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1              It actually predates the SIP service by a
2       considerable margin.  So we know that that does
3       -- if memory serves, we know that that is an
4       issue with how that relates to the service
5       directly.
6              With regard to what else is required
7       beyond the SIP services, right, you have most
8       of the features of the phone.  I agree that the
9       initial setup might have been covered.
10      Typically, the initial setup is paid for by a
11      company as a project, which I think
12      Mr. Naviloff identifies and moves out of the
13      scope of this discussion.  I would agree with
14      you.
15             But there is ongoing network and network
16      licensing.  There's ongoing data, data charges.
17      There's all the individual features of the
18      phone systems themselves; right?  So things
19      like voicemail, or cellphone twinning, which
20      is, like, when it goes to your cellphone.
21      There's all of these features and whatnot.
22             There's also engineering specific to all
23      you can -- creating and setting up new phones,
24      doing that deployment.  A phone system is not
25      just a one-and-done; right?  You don't just set

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          it up and kind of forget about it.  There's
2          setting up the -- what do you call?  You're --
3          all of the operator -- automated attendance.
4          There's a lot of moving pieces here that
5          require engineering expertise, that is not
6          necessarily a help desk item, that go into
7          providing these services.
8               And I think when you compare this to the
9          services that Mr. Meyer talks about
10         providing -- because Mr. Meyer replaced his
11         phone system with one -- kind of a -- that they
12         chose, to move away from -- move towards.  The
13         cost of that new phone system is actually not
14         that different than the cost of the phone
15         system as it was being managed by DTS; right?
16         So there's a very similar cost model there.
17    Q.   You listed a bunch of features.
18              Do you know for a fact which of those
19         features were provided by DigitalNet to
20         United Way in regards to the managed telephony
21         services?
22    A.   So I don't know that.  And that's part of the
23         issue of why assessing a number and a value of
24         this service is so difficult.
25              And I want to point out it's not -- I'm
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1        not trying to take a purist road on this and
2        saying "you have to look at everything and have
3        every scrap of data or you can't figure
4        anything out."
5            A lot of these services -- a lot of those
6        types of services are not detailed in the
7        invoices, right, and in the actual invoice and
8        contracts.  And so it would have been great to
9        be able to see this actual system in order to
10       help us understand what the real value of the
11       system was.
12           Because there was a system -- presumably,
13       there is a phone system -- during Mr. Alrai's
14       time and tenure at the United Way, there was a
15       phone system, and it was functioning; right?
16       So that does have a value.  And that value is
17       considerably higher than $24,000, which is the
18       cost of the SIP services; right?  And so that's
19       not a direct correlation of markup.
20   Q.  Sir, I think you might not be answering my
21       question.
22   A.  I apologize.
23   Q.  But let me just be clear.
24           You don't know what additional features
25       were offered by DigitalNet to United Way; is

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          that right?
2    A.    I do not know the totality of the features.
3          That is correct.
4    Q.    And your client, Mr. Imran Alrai, at the
5          relevant time was a CIO for United Way; right?
6    A.    I believe he was the director of IT or vice
7          president of IT-something during time, yes.
8    Q.    From September 2014 through September 2017, he
9          was in one of those IT high-level roles at
10         United Way; right?
11   A.    That is correct.
12   Q.    And for those relevant times, he was also the
13         principal of DigitalNet, which was providing
14         the managed telephony services; is that right?
15   A.    Yes.
16   Q.    So would you agree with me that your client,
17         Imran Alrai, would know what those extra
18         services were that were provided by DigitalNet
19         to United Way for managed telephony services?
20   A.    I would agree that it's possible that he knows,
21         yes.
22   Q.    And his company would have records of what
23         those additional features were that were
24         provided to United Way; right?
25   A.    I can't speak to the records that his company
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1           created or had; but, I mean, there's that
 2           chance, yes.
 3   Q.   Like you mentioned earlier, there's a lot of
 4           different ways to get the same information;
 5           right?
 6   A.   Sure.  There are definitely similar ways to get
 7           similar information, yes.
 8   Q.   One of the ways you suggested was having access
 9           to this, quote, "IT environment"; right?
10   A.   With regard to the telephony system, yes.  Or a
11           backup of it -- any copy or ability to see this
12           environment, that's correct.
13   Q.   And if one were the vendor providing said
14           services, one would expect the vendor to have
15           the records to support what services they've
16           provided; that's fair, right?
17   A.   I would think that that was possible, yes.
18   Q.   Would you agree with me --
19           THE COURT:  Well, let me ask a question
20           now.
21           I understand your line of questioning, and
22           it would make sense to me in a case of normal
23           discovery, like a discovery violation of a rule
24           or a court order.
25           But would you agree with me that even if
```

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

| 1 | the Defendant has the records you're talking |
| 2 | about, if they're exculpatory records and they |
| 3 | are in the possession of or under the control |
| 4 | of the Government, the Government still has an |
| 5 | obligation to produce them? |
| 6 | MS. LE:  Right.  But that is not my |
| 7 | argument, Your Honor.  The point is that there |
| 8 | can be no prejudice here if there was a |
| 9 | different way for Mr. Sgro to conduct his |
| 10 | analysis, as he has recognized, separate and |
| 11 | apart from records that we did not possess and |
| 12 | could not produce. |
| 13 | So this goes, again, to our discussion |
| 14 | about how can there be prejudice to the |
| 15 | Defendant with respect to Mr. Sgro's testimony |
| 16 | at trial, and his ability to assist counsel on |
| 17 | cross-examination of Mr. Naviloff, Mr. Meyer, |
| 18 | and any other quote, "technical witness," that |
| 19 | the Government presented, Your Honor? |
| 20 | THE COURT:  Well, which horse are you |
| 21 | riding on?  Is it didn't possess and can't |
| 22 | produce?  Or no prejudice, even if you could |
| 23 | produce it and you did possess?  I'm trying to |
| 24 | keep up. |
| 25 | MS. LE:  Number one, the records that have |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

275

| 1 | been produced since trial consisting of |
| 2 | email -- internal email communications of RSM |
| 3 | that were not in our possession -- Your Honor, |
| 4 | we cannot produce that, so we don't have an |
| 5 | obligation to produce that. |
| 6 | THE COURT:  You don't think -- |
| 7 | Mr. Naviloff said he met with the prosecutors |
| 8 | and with Commisso and discussed those emails. |
| 9 | MS. LE:  But -- |
| 10 | THE COURT:  Wait a minute.  Hold on. |
| 11 | MS. LE:  Sure. |
| 12 | THE COURT:  Now, you might not have had |
| 13 | possession of them, but you certainly knew |
| 14 | about them.  And you don't think a prosecutor |
| 15 | has an obligation to review internal expert |
| 16 | file information to determine if there's |
| 17 | anything exculpatory?  That's a problem here |
| 18 | that none of this is going to address. |
| 19 | And I need to understand from you -- |
| 20 | you're telling me, then -- and believe me, the |
| 21 | obligations of a prosecutor here is not |
| 22 | something there's a lot of precedent for.  I |
| 23 | recognize that.  But I think it's incumbent on |
| 24 | a prosecutor who knows about records in an |
| 25 | expert file to review them, and at least to |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

276

1          make a determination if they are exculpatory.

2                  They weren't ordered to be produced, I

3          agree.  And they weren't -- there's no court

4          rule that required production, we agreed.  But

5          once you know about them and they're in the

6          expert's file, there's at least an argument

7          that there's an obligation to review them for

8          exculpatory information.  All right.

9                  MS. LE:  Your Honor, I think this is --

10         the other difficulty here is that they --

11         "they" being the defense counsel -- have

12         alleged generally that everything that we

13         haven't handed over -- every single one of

14         those emails is exculpatory, for some kind of

15         indirect way that they could be used to either

16         impeach Mr. Naviloff about his colleagues on

17         whom he may have had conversations, or

18         information that Mr. Sgro could or could not

19         have reviewed, Your Honor.

20                 THE COURT:  Sure, but where you're going

21         to have a problem, AUSA Le, is that I don't

22         share that opinion that every single email is

23         exculpatory.  But I do share the opinion that

24         some of them were; all right?  And I concur

25         that you may or may not have had possession of

No Copy Of This Transcript May Be Made Prior to 2/28/2021

| | |
|---|---|
| 1 | them.  I don't really know.  But I do know, at |
| 2 | least, it was discussed.  And some of them were |
| 3 | exculpatory.  Witness credibility is |
| 4 | exculpatory.  That's the law.  And some of this |
| 5 | stuff goes to Mr. Naviloff's credibility. |
| 6 | And what I'm asking you is, very |
| 7 | specifically -- I think you answered me, by the |
| 8 | way, because you talked to me about prejudice. |
| 9 | It sounds like you're telling me that -- let's |
| 10 | assume for a moment that it was exculpatory.  I |
| 11 | know you're not agreeing to that.  But assuming |
| 12 | it is exculpatory, and if it was also available |
| 13 | somehow to Mr. Alrai, are you saying that that |
| 14 | relieved the prosecution of its obligation to |
| 15 | produce it? |
| 16 | MS. LE:  This goes back to the question of |
| 17 | prejudice. |
| 18 | THE COURT:  So there can't be prejudice if |
| 19 | the information was also readily available to |
| 20 | Mr. Alrai, is the idea? |
| 21 | MS. LE:  Right. |
| 22 | And this is another example that I will |
| 23 | speak with on Mr. Sgro later, because there is |
| 24 | an email that they reference about |
| 25 | CloudConnect.  And in the email, there are |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1         Bates-labeled records that are referenced.  And
2         they're discussing amongst themselves what --
3         those Bates-labeled records that came from
4         grand jury subpoenas that were provided by the
5         Government in pretrial discovery to the
6         Defendant.  So we give them the underlying
7         record.
8              Mr. Sgro could have come up with whatever
9         conclusions he had, which may or may not be on
10        the same page that RSM had.  But the basis is
11        it's the underlying records which are
12        exculpatory, potentially -- and that was
13        produced in discovery pretrial.  Mr. Sgro had
14        access to it.  We produced that to Defense
15        counsel.  Those were records that were not
16        possessed by the United Way, Your Honor.
17             THE COURT:  Wait a minute.
18             Not possessed by United Way?
19             MS. LE:  Right.
20             We got it through grand jury subpoena from
21        the vendors.  The CloudConnect records that
22        were referenced in Defense Exhibit -- let's
23        see -- in M, for example, Your Honor, which
24        Mr. Eaton went through with Mr. Sgro.  And
25        they're talking about -- communications between
```

1            RSM's employees about records that were
2            produced by grand jury subpoena.
3                 THE COURT:  Yeah.  Okay.  I get it.
4                 MS. LE:  So, I mean, Your Honor, there is
5            more than one source for the information that
6            is allegedly potentially exculpatory.  What the
7            problem is, and I think this is the Court's
8            struggle, and you kind of clued us into this,
9            which was -- what is the authority that says
10           that the Government has an obligation to
11           obtain, from its third-party expert witness,
12           delivered or processed email?
13                THE COURT:  Yeah.
14                MS. LE:  Now, do we, as a general idea,
15           know that people email one another?  I'm sure
16           that Mr. Sgro has emailed --
17                THE COURT:  Wait a minute.
18                But that's not the evidence now.  The
19           evidence is not -- is it a general idea.
20           Mr. Naviloff testified he told you about the
21           emails.
22                MS. LE:  With respect, Your Honor, I think
23           Mr. Naviloff said that he recalls some
24           conversation about whether there should be
25           emails that should be disclosed.  And the

1        general understanding was that they would not
2        have to be disclosed, Your Honor.
3              And my belief is that unless there is
4        something that bears to contradict what a
5        witness says, if a witness includes that
6        information -- the communication -- the
7        substance of the communication in their formal
8        reporting, that that is covered.  You don't
9        need all the same information repeated multiple
10       times.
11             THE COURT:  Again, first of all, just so
12       you know, my understanding of Naviloff's
13       testimony is that he talked to you and
14       Mr. Commisso about these emails.  All right.
15             MS. LE:  No, Your Honor.  I believe he
16       said Mr. Davis or Mr. Hunter.  I was not
17       involved any of those communications.
18             THE COURT:  I'm sorry.  I didn't mean you.
19       I didn't mean you, personally.  I meant the
20       office.
21             Now, that's my understanding of the
22       evidence.  But, again, it's -- the decision --
23       I even said it at the time to Naviloff.  The
24       decision not to produce the emails -- that
25       wasn't unreasonable.  It doesn't seem to have

1        been required by the rules of discovery.  I
2        think I agree with you.  But once the office
3        knows about the emails that the file contains
4        -- you're putting an expert on the witness
5        stand.  I mean, I just think it's at least good
6        practice.
7             And I don't know what the authority is --
8        I know that there's probably no authority
9        requiring the production of those in normal
10        criminal discovery; but I do wonder if there's
11        not a duty, in coming upon a prosecutor, to
12        review that to ensure that there's nothing
13        exculpatory.  And my view about some of these
14        emails -- none of this is devastating stuff, I
15        agree with you.  But some of it has exculpatory
16        value.
17             As to Mr. Sgro, I kind of interrupted you
18        there, and I apologize.  I -- to me, at least
19        from what I've heard so far, the value of any
20        of this has much more to do with examining
21        Naviloff on cross, or perhaps maybe even Meyer,
22        than it does arming Mr. Sgro with
23        more information.  I just think that for many
24        of the reasons you're pointing out here on
25        cross, that might not have made too much of a

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1    difference.

2        So for what that's worth -- anyway, I

3    interrupted you, and I'm sorry.  You answered

4    my questions, and I'll let you continue.

5        MS. LE:  Your Honor, I think that we're

6    going to have the transcripts of Mr. Naviloff's

7    testimony prepared at some point, so I'm just

8    speaking from my recollection and understanding

9    and appreciation of his testimony.

10       But it wasn't clear to me, and I think you

11   had a little bit of an exchange with him, about

12   when this conversation might have occurred

13   between Mr. Naviloff, Mr. Commisso, and some

14   member of the U.S. Attorney's Office -- whether

15   that was pretrial, I'm not clear on, but

16   certainly since trial -- do you see where the

17   confusion comes in about where our obligation

18   would have been?

19       THE COURT:  Sure.  Yes, I do see what

20   you're saying.

21       I took that testimony -- remember, I kept

22   telling Naviloff, "We're talking about

23   pretrial, not post."

24       Because he kept going into his whole

25   routine about, "Oh, well, it's 600 emails, and

| 1 | | we were so forthcoming."  And it's true, but we |
| 2 | | were focused on pretrial. |
| 3 | | Now, if I misunderstood that, yeah, I'll |
| 4 | | need to be disabused of that.  But, look, I |
| 5 | | think that's an easy thing to solve.  We're |
| 6 | | going to hear from Mr. Commisso.  And I would |
| 7 | | never put any of the AUSAs to the indignity of |
| 8 | | going under oath, but I assume you'll represent |
| 9 | | to me what happened there.  You'll explain it |
| 10 | | to me -- somebody will -- just during the |
| 11 | | context of this hearing at some point, so I'm |
| 12 | | sure I'll get that clarified.  But, yeah, to |
| 13 | | the extent that I misunderstood the timing, |
| 14 | | that's important.  Okay. |
| 15 | | MS. LE:  And, Your Honor, I might have |
| 16 | | misunderstood that timing too. |
| 17 | | THE COURT:  It could have been either of |
| 18 | | us. |
| 19 | | MS. LE:  Right.  Okay. |
| 20 | Q. | (By Ms. Le)  So let's move on and talk about |
| 21 | | your discussion of CloudConnect, which is the |
| 22 | | next section of your reporting; right -- the |
| 23 | | supplemental report? |
| 24 | A. | Can we pull that up? |
| 25 | | MS. LE:  I think if you move to |

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            page 15-16, Tracy.
 2    Q.    (By Ms. Le)  Mr. Sgro, can you review page 15
 3            and make sure this is the section you were
 4            talking about, "CloudConnect"?
 5    A.    I begin speaking about CloudConnect in section
 6            D, I believe.
 7    Q.    Right.
 8                There in document 130 -- that part?
 9    A.    Yeah, that looks to be true.  I apologize.  It
10            is very small.
11    Q.    Sure.
12                Tracy, can you highlight D through E?
13    A.    Yeah.
14    Q.    So this is your kind of analysis for why, based
15            on your review of posttrial discovery, you have
16            issues with his analysis; is that right?
17    A.    Yeah, this outlines some of the issues that I
18            have with the analysis.  That is correct.
19    Q.    Part of it is that this isn't really an
20            apples-to-apples comparison; is that right,
21            sir?
22    A.    That is correct.
23                MS. LE:  I think -- can we go to page 16,
24            Tracy?  And we'll go to the first two
25            paragraphs on top.
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1   Q.   (By Ms. Le)   Can you explain what it is that
2        you agreed with Mr. Naviloff, and what
3        additional services were delivered as far as
4        you know?
5   A.   Yeah.
6             So the first sentence is that
7        "CloudConnect is simply a sandbox in which
8        value-added resellers" -- so that would be
9        pretty much anyone like DigitalNet or any other
10       company that actually builds any engineering in
11       the Cloud.  We build for the client.
12       CloudConnect is not a service unto itself
13       outside of hosting; right?  So they provide a
14       sandbox.  A value-added reseller builds within
15       that sandbox.
16            I do agree with Mr. Naviloff on the point
17       -- well, let me just read this for a second.
18       Yeah, so the CloudConnect service; right -- the
19       actual infrastructure that's being provided
20       there is being used here in this example by
21       DigitalNet to perform -- to give them --
22       provide United Way with these services; right?
23            And those services, being what they are, I
24       believe -- and this is maybe out of context --
25       is the virtual hosting -- that would greatly

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            exceed the cost of just having a CloudConnect
 2            service; right?  Because that's  -- the value
 3            of what's provided to the United Way would, of
 4            course, logically outstrip the cost of just the
 5            sandbox itself.
 6   Q.   And you reviewed Mr. Naviloff's expert report
 7            where he kind of did a comparison using
 8            DigitalNet's contract with United Way for these
 9            services, and then pulled up CloudConnect's
10            platform specifications and put them together
11            in the chart; do you remember that?
12   A.   I do remember something to that effect, yes.
13   Q.   And in his mind -- at least in his analysis, he
14            saw that it was near identical language that
15            seemed to be cut and paste from CloudConnect's
16            platform specifications into DigitalNet's
17            contract with United Way; do you remember that?
18   A.   Yeah, I do, and I think I can go a step further
19            and try to explain that for you.
20            When a company like CloudConnect sells
21            their services through a value-added reseller,
22            the services that are provided by CloudConnect
23            are inherent to any services provided by the
24            reseller.  So, for instance, if CloudConnect
25            provides 99.99 percent uptime, as an example,
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1            then the things that are built within it could
 2            likely have that, and so they would translate
 3            that language through to the end customer as
 4            the value-added reseller.
 5                  We see this in software quite a bit;
 6            right?  So, very common for a value-added
 7            reseller to take the capabilities of the --
 8            kind of the principal -- a CloudConnect-like
 9            object and add those direct capabilities.  And
10            I would agree that it's not usually
11            copy-and-paste verbatim, but there's nothing
12            wrong with doing that, technically.  Because --
13            well, and any of the services that are used
14            that are gained through the CloudConnect
15            service are inherently passed on to the end
16            client when you build within it.
17    Q.    So maybe I should ask it this way.
18                  Did you, yourself, conduct an independent
19            evaluation of the DigitalNet services as it
20            relates to CloudConnect in that contract?  Did
21            you do a similar kind of analysis?
22    A.    So I was never permitted to see the
23            DigitalNet/CloudConnect services.
24    Q.    No, I mean, did you review the contract
25            language in the contract between DigitalNet and
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
 1         United Way?
 2    A.   Yes, I did.
 3    Q.   For this particular service?
 4    A.   Yes, I did.
 5    Q.   So in addition to the CloudConnect translated
 6         services, what other services did United Way
 7         give --
 8    A.   You would have to pull that up for me.
 9              MS. LE:  I think that Mr. Naviloff's
10         report -- I'm going to have to ask one of my
11         colleagues to email that to -- Mr. Hunter, can
12         you help me with that?
13              THE COURT:  You know what?  It's 4:48.
14         Let's pick it up next time.
15              All right.  I guess, you know what?  I'm
16         going to have counsel confer and schedule the
17         next time with Charli.  We're going to continue
18         the hearing.  We've got to get through the
19         evidence, and I want to hear your arguments,
20         and I have questions that I'll pose to you
21         then.  All right.  Sorry for the inconvenience
22         to anybody who's going to be coming back, but
23         we'll keep on keeping on here.
24              Anybody have anything they need addressed
25         before we adjourn?  Okay.  So get in touch --
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

```
1          confirm with each other and get in touch with
2          Charli.
3               Charli, if you could look and maybe send
4          them an email with some days or half days open
5          in the near future.  I know it's not easy.
6               THE CLERK:  Will do, Judge.
7               THE COURT:  Why don't we all commit to the
8          Friday after Thanksgiving?  Just kidding.
9               THE CLERK:  So I will be in touch.
10              Do you think we need a good half a day?
11              MS. LE:  At this rate, I think we're going
12         to need another full day.
13              Don't you think, Donna?
14              MS. BROWN:  To be on the safe side, I
15         think, yes.  I do not think that Meyer and
16         Mr. Commisso will be as long as these two
17         witnesses, but I think to be on the safe --
18         and, plus, we've got a lot of argument.  And,
19         as the Judge said, he had a lot of questions.
20         So to probably be on the safe side, I think
21         that's a good idea.
22              THE CLERK:  Okay.  I will send you all an
23         email and we'll select something.
24              Thank you.
25              (The hearing was adjourned at 4:59 p.m.)
```

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1        C E R T I F I C A T E

2            I, Molly K. Belshaw, a Licensed Shorthand
   Reporter for the State of New Hampshire, and
3    Registered Professional Reporter, do hereby certify
   that the foregoing is a true and accurate transcript
4    of my stenographic notes of the proceeding taken at
   the place and on the date hereinbefore set forth to
5    the best of my skill and ability under the
   conditions present at the time.  Read and sign was
6    not requested.

7            I further certify that I am neither
   attorney or counsel for, nor related to or employed
8    by any of the parties to the action in which this
   proceeding was taken, and further, that I am not a
9    relative or employee of any attorney or counsel
   employed in this case, nor am I financially
10   interested in this action.

11           The foregoing certification of this
   transcript does not apply to any reproduction of the
12   same by any means unless under the direct control
   and/or direction of the certifying reporter.

13

14

15

16

17

18

19                    Molly K. Belshaw
20                    RPR, LCR No. 00162

21

22

23

24

25

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

No Copy Of This Transcript May Be Made Prior to 2/28/2021

1

**$**

**$1** 70:16 85:1,5 98:20

**$1,000** 225:7,8,9

**$1,025,000** 40:19

**$1.2** 180:20

**$154,080** 156:3

**$170,682.18** 45:16

**$200,000** 150:22 268:2

**$24,000** 267:13,20 271:17

**$24,642** 267:1

**$25,000** 225:6,8,10

**$3,500** 268:7

**$3.245** 265:16

**$3.5** 265:8

**$3.7** 168:1 172:22

**$45,171.70** 45:9

**$50** 224:16

**$500** 184:21

**$540,000** 268:16

**$562,000** 267:21

**$562,580** 266:23

**$592,250** 92:6

**$60** 224:16

**$70** 224:16

**(**

**(b)** 15:10,13

**-**

**--three** 186:18

**0**

**00-4-A** 196:11

**1**

**1** 169:21

**1,000** 27:4 202:1

**1,200** 186:1

**10** 45:15

**109** 249:2

**10:47** 81:7

**11** 45:20 127:4,10 140:12

**113** 45:25

**11:04** 81:8

**12** 264:25 266:16,19

**12/31/2011** 196:24

**123** 249:2

**124** 249:2

**12:30** 77:18,20 81:4 144:2

**12:32** 148:10

**13** 266:16

**130** 284:8

**137** 58:12

**15** 81:6 126:1,19 215:24 284:2

**15-16** 284:1

**15-minute** 77:17 81:3

**15.5** 59:15

**159** 55:21

**16** 30:1 284:23

**162-3** 28:17

**164-1** 159:13

**164-12** 125:18

**164-15:3** 155:19

**164-19** 49:7

**164-2** 169:15

**170-2:6** 53:21

**18** 37:21

**18-cr-192-jl** 6:4

**181.2** 60:21

**19** 53:17 242:20

**1:30** 148:9

**1:42** 148:11

**2**

**20** 22:21 100:25 149:21 159:9

**20-plus-year** 184:20

**2007** 182:12

**2008** 14:5

**2012** 210:6

**2013** 88:5 204:4

**2014** 203:6,7 272:8

**2016** 210:7

**2017** 182:13 272:8

**2018** 38:10 45:4,15,20 48:20
49:13 53:10 56:1,6 58:1 70:5 88:6
104:13,17 133:7 149:21 167:8
169:21 196:17

**2019** 37:22 38:2 46:7 47:3 51:9
59:8,25 117:23 124:16 148:25
174:18 175:15

**2020** 182:1

**203** 60:6

**20s** 182:2

**21** 56:2

**23** 55:21

**26** 43:14,16,18,22 59:11,12 252:7
255:1,7

**26.5** 58:4

**27** 256:18

**28** 104:17 167:8

**283.8** 58:4

**29** 53:10 259:8

**3**

**3** 45:4

**3.1** 192:17,20

**30** 38:23 39:7 59:18 72:13

**30,000** 46:1

**32** 72:12,13 105:25

**33** 32:5,13,18 33:6 34:1

**33.2** 58:12

**37** 42:22

**38.5** 60:7

**397.9** 56:2

**3:08** 216:1

**3:25** 215:25 216:2

---
**4**

**4** 104:13 124:23 239:23

**4.5** 58:15

**42** 262:11

**42-E** 262:12

**48** 57:2,9

**4:00** 216:21

**4:48** 288:13

**4:59** 289:25

---
**5**

**5.5** 59:15

**50** 60:24

**51** 60:22,24

**55,000** 46:3

---
**6**

**6/30/2018** 196:24

**60** 8:21

**60(a)(2)** 7:20 10:25 13:11 16:20

**600** 111:11,23 112:3 169:10 282:25

**600-plus** 97:15,20,25 150:15 156:14

**615** 14:9,11,17

**6A** 88:3

---
**7**

**7** 170:7 171:4 196:17

---
**8**

**8** 46:7 92:3

**800** 200:22 202:2

---
**9**

**9** 49:12

**90** 77:13 215:23

**911** 203:8

**99.9** 159:24 218:1

**99.99** 164:1 286:25

---
**A**

**a.m.** 81:7,8

**A1** 110:15,16

**A2** 110:18 111:25 119:13,15,24 120:7 122:8,11

**A3** 124:4,14

**Aa** 140:12

**ability** 203:11 226:17 241:18 273:11 274:16

**above-captioned** 83:14

**abroad** 258:16

**absent** 167:20

**absolute** 10:3,10

**absolutely** 130:23 184:2 211:25 212:13 213:22 221:22 243:10 249:19

**abundance** 26:18 130:20

**abuse** 10:11

**abuses** 35:11

**accept** 245:12,16

**accepting** 21:25 27:11,12

**access** 128:6,9,11,23 139:25

178:12 210:14 222:16,17 226:16, 20,21 232:12,16,21,23 233:1,20, 22 234:3,6 243:2 273:8 278:14

**accidental** 238:10

**account** 152:24 184:12 203:5,23

**accountant** 54:10 224:22

**accountant's** 87:6

**accountants** 83:12 84:4 86:6 89:22 92:11 93:19 94:2

**accounting** 37:8,9 43:11 58:25 59:2,4 82:24 83:3,8 89:12 126:11 129:25 164:18,20 165:23 167:18 212:1,2 219:16 223:14 246:6 248:23

**accounts** 95:22 180:12,15 188:8 223:3

**accuracy** 235:9,14

**accurate** 186:13 201:5 202:2 224:2 237:3

**accurately** 237:6

**accusations** 34:15

**acronyms** 134:6

**act** 14:19 20:2

**action** 41:3

**actions** 71:23

**active** 203:6

**activities** 192:18

**activity** 130:1 193:2 213:13

**actual** 201:19 206:1 207:10 231:20 240:19 250:13 271:7,9 285:19

**ad** 46:12,14 59:9 73:20 137:14

**add** 10:4 20:10 33:22 54:4 186:16 287:9

**added** 106:16 146:8

**adding** 262:19

**addition** 69:22 176:12 252:8 288:5

**additional** 32:20,21 33:1 41:2 54:12 174:18,22 175:4,6,7,9 197:17 244:10 260:4,9 268:13,15, 18 271:24 272:23 285:3

No Copy Of This Transcript May Be Made Prior to 2/28/2021

3

**address** 6:12 17:17 24:19 199:18
275:18

**addressed** 60:3 109:17 132:6
288:24

**addresses** 14:8,10

**addressing** 31:4 127:17

**adequate** 15:7 34:4,5 73:6

**adherence** 72:23

**adjacent** 258:10

**adjourn** 288:25

**adjourned** 289:25

**admissibility** 25:7,19,21,22

**admissible** 26:21

**admission** 18:10,16

**admit** 9:11 16:12 21:6 165:8

**admitted** 18:6,7 19:1 25:13

**admitting** 190:23,24

**advance** 29:7

**advantages** 130:13

**adverse** 143:2 147:15,18

**advice** 22:17 165:5 228:13
246:13

**advisable** 155:7

**advise** 22:15 211:12

**advised** 211:16 230:5 244:18
248:22

**advising** 42:19

**advisory** 14:4 15:11

**affect** 7:23 79:19 152:2

**affiliated** 174:4

**affirm** 198:14

**afford** 184:13

**Africa** 197:4

**after-hours** 265:21

**afternoon** 83:10 242:14,15

**age** 183:21

**agree** 8:14 15:23 33:10,13,25
91:2 98:13 99:12 118:10,14 121:5

129:1 133:23 135:4 149:10
153:12 155:12 168:4 213:21
214:22,23 237:8 249:20,22
258:19 261:13 268:4 269:8,13
272:16,20 273:18,25 276:3 281:2,
15 285:16 287:10

**agreed** 43:11 61:14 62:25 276:4
285:2

**agreed-upon** 61:9

**agreeing** 277:11

**agreement** 9:15 33:15 43:10
62:10 120:23 122:3 133:21 135:2,
3

**agreements** 21:14 37:20

**agrees** 160:19 218:8

**ahead** 19:3 216:3 217:4 240:23

**AISA** 245:14

**align** 218:22

**aligned** 93:23

**aligning** 134:10

**allegation** 239:1

**allegations** 34:15 39:15 68:21

**alleged** 72:20 89:16 276:12

**allegedly** 80:20 134:3 279:6

**allowed** 235:5

**Alrai** 6:5 39:16 40:16 41:3,9
54:20 68:5,21 69:16 71:18,20,24
82:17 103:20 104:15 106:2,17
108:12 151:23 167:10 170:16
177:23 178:9 180:13,17,20
181:10 187:10,11 189:25 194:11
200:6 206:11 230:8 233:13 235:5
239:15 244:25 245:10,15 249:23
250:24 261:14 262:4,19 272:4,17
277:13,20

**Alrai's** 74:2 176:14,21 180:9
181:5,13 188:8 196:23 230:1,13
231:25 232:1 247:24 262:22
263:23 271:13

**alter** 15:25

**altered** 14:24 16:23 20:12 22:24
23:16

**alternate** 172:16

**alternative** 11:1 209:3

**alternatives** 10:25 209:6

**ambiguity** 186:25

**amend** 32:22

**America** 6:5

**Amick** 203:3

**ammunition** 78:22 79:9,25

**amount** 61:9,11,16 101:16
154:13 169:3 172:20 185:3
187:22 193:3 234:23

**amounted** 29:22 31:9

**amounts** 39:20 40:23 133:4,9,10
139:23 249:14

**analogy** 79:16 219:4

**analyses** 113:16,19 197:18,21
214:10 241:24

**analysis** 9:8 16:15 33:11 53:24
56:8 63:15 72:16,19 77:4 83:13,
14 84:9 90:19 93:17,23 96:16,20,
22,24 97:3,4,5 99:2,21 100:10
113:5 123:25 132:13,23 133:13
134:20 135:19 136:10,23 137:11,
14 138:16 139:18 140:4,6 143:21
146:24 151:25 152:9 153:1 157:5
160:1 164:18,20 165:23 167:18,
19 173:15 176:11 183:1 197:24,
25 202:6 205:21 206:4,7 212:17
213:20 214:20 215:11 219:12,13
221:10 222:8,11,18 223:2,3,14,25
224:3,6,18,19 225:2,14,19 226:8,
13,15 227:6 229:24 235:1 242:23
244:8,16,20 245:18 246:1 248:4,
6,10 249:17 251:6 255:21 260:12,
14 261:7 264:13 265:10 266:13,
17 274:10 284:14,16,18 286:13
287:21

**analyze** 157:18 196:23 207:11
222:14 234:9 241:18

**analyzed** 132:7 170:7 199:23
236:13,14

**analyzing** 120:9 184:5 213:10
220:6,7 223:21 225:8 235:20

**and/or** 64:14

**and/presentations** 39:22

**Andar** 139:22 140:7,18 145:13

No Copy Of This Transcript May Be Made Prior to 2/28/2021

4

150:3,9

**animation** 262:6

**announced** 23:7

**answering** 112:12 228:1 271:20

**answers** 18:1 89:7,9 163:22

**anticipate** 79:1

**anticipated** 84:21

**apologies** 172:3

**apologize** 118:5 196:7 203:20
209:18 216:22 229:10 251:2
259:15 264:19 271:22 281:18
284:9

**app** 197:3

**appeals** 28:21

**appeared** 88:22 164:15 166:1

**appearing** 128:19

**appears** 39:21 71:25 84:10 91:16
117:24 131:17 132:3 151:6
152:14 156:8 162:7 201:14
202:16 209:15 210:1 227:10
232:19 241:7 262:20 263:15

**apples-to-apples** 137:21
138:11 201:16 204:25 267:19
284:20

**application** 139:21 266:5 268:5,
8,24

**applies** 8:22 16:21

**appointed** 20:6

**appreciation** 282:9

**apprised** 65:16

**approach** 35:21 54:18 98:1
111:14 192:3 207:8

**approached** 21:10 264:5

**approximate** 150:23 172:20

**approximately** 172:22 182:24
210:3

**April** 210:4

**area** 42:11 99:23 122:8 164:5
165:4,9 183:5 185:20 205:8
242:21 258:21

**areas** 62:25 136:4 138:17 163:17,

21 164:12,22 219:1 252:13
258:23 259:1 266:12

**argue** 157:16

**argued** 8:2

**arguing** 75:24 236:2

**argument** 15:3,4 16:21 23:13
25:20,23 29:8 31:22 158:6 178:2
179:3,6,11 195:9 237:10 240:13,
14 274:7 276:6 289:18

**arguments** 23:3 29:7 288:19

**arming** 281:22

**arms** 219:21

**arrange** 22:6

**arrested** 239:15,17

**ASA** 180:6,23

**asks** 110:10 124:5

**aspects** 10:15 241:4

**aspersion** 9:9

**assert** 19:1,7 47:13

**asserted** 204:2 205:5

**asserting** 13:14,15,16 47:24
66:17 174:13 204:9 223:18 240:1

**asserts** 8:25

**assess** 130:3 221:23,25

**assessed** 267:5

**assessing** 68:14 201:15 261:11
270:23

**assessment** 92:17 220:25
221:3,17,20 222:1 223:3 228:13
238:13 247:17 256:5

**assessments** 213:4 217:10,20
225:23 233:2 251:16 255:25
266:1

**assets** 223:9,19

**assigned** 67:24

**assignment** 182:25

**assist** 38:6 83:13 197:21 229:20
274:16

**assistance** 227:15

**assisted** 63:1 81:24 100:11

136:17

**assisting** 47:5 51:1 62:23 63:3
68:12

**associate** 57:17,18 99:4,6,13,15,
16 145:22 157:16 160:17 161:6
214:5,20 218:6 234:20

**associates** 185:9 212:6 213:22,
23 227:4 232:20

**assume** 31:9 81:4 114:14 130:10
187:20,23,24 193:6,15 194:9,11
208:6 221:18 252:11 261:18
277:10 283:8

**assumed** 68:9,10 265:16

**assuming** 86:25 88:2 92:3
127:22 188:15,16 189:17 191:15
192:23,24 277:11

**assumption** 13:21 29:15 165:12,
13 207:9

**assumptions** 195:15

**astronomically** 200:9

**attached** 12:10 25:10 38:20 53:6
83:16 87:13 90:10 92:20 108:11,
13 127:18 222:24 251:12 264:18

**attack** 179:5

**attempt** 27:23 89:6 111:18

**attempting** 188:20,21

**attend** 8:7 252:23

**attendance** 13:17 270:3

**attended** 22:25

**attorney** 6:13,24 7:10 8:10
11:10,16,21 12:9 13:16 16:4,5
17:7,9,13,15 22:16 23:19,23
26:25 27:22 30:5,25 41:18,21
43:21 45:5,21 47:5,16,20,24 48:5,
14 49:16 50:19 51:3,23 52:5,15
53:7 60:3 62:15,19 63:3,25 64:14,
16,21 65:4,5,9,13,16,19 66:3,16,
22 67:20 76:22 81:24 83:9,21
84:14,24 85:15 100:15 100:2 102:9
103:4,10,24 104:1 105:4,12 106:5
107:6 108:6,9,22 109:7,8,14,19
116:6 117:22 118:15,23 119:22
120:14 124:5 126:1,4 128:8,12,23
130:7 140:13 145:2 148:17 151:7
185:21 187:8,15 198:7 227:25
239:12,13,18,24 242:17 247:8

264:19

**Attorney's** 38:5 41:4,8,19 42:13
46:15,22,25 47:11,12,15,22 48:1,
13 49:22 50:3,22 59:10 60:2
61:15 62:14,18 63:6,11,18,24
64:12,15,20,22 65:18 68:7 108:7
109:18 112:23 113:9,14 115:10,
25 116:6 117:24,25 118:21
123:15,19 127:22 130:9,15
160:14,15 163:1 165:4 168:11
173:7,13,18 197:7 243:21 282:14

**attorney-client** 17:22 18:2
47:24

**attorneys** 23:2 41:19 42:23
59:22

**attribute** 192:14 239:2

**attributed** 193:8

**attributing** 191:20

**attribution** 239:4 240:17

**audio** 42:22 161:1 203:17 253:8

**auditing** 84:10 223:8

**August** 45:4 55:18 149:21
242:20

**AUSA** 216:3 253:9 276:21

**AUSAS** 283:7

**authority** 279:9 281:7,8

**authorized** 14:15 19:24

**automated** 270:3

**automation** 183:6

**availability** 95:17 96:14 160:4,5
162:11 165:25

**avenues** 41:16

**awarded** 73:11,21 252:17 262:24

**aware** 12:13 41:16 42:12,16
65:17 66:16 83:11 96:11 107:22
110:17 113:10,14,18,23,24
117:19 143:18 154:1,4,7 156:13
200:6,10 206:10,13 213:13 218:8,
9 219:7 234:1 243:9 246:4 258:23
259:1 260:4 262:4,7

## B

**bachelor's** 182:6

**back** 12:17 17:6 22:15 32:19
38:7,10 39:25 40:3 43:7 52:18
63:16 70:4 71:9 72:9 81:9 82:21
83:24 85:18 89:8,14,19 91:20
101:3 108:20 109:14,15 127:15
131:3,10,16 140:2 142:20 144:25
159:1 167:25 186:7 188:11
193:19 216:25 219:5 224:4
235:23 239:10 256:10 277:16
288:22

**back-and-forth** 30:19 98:18

**backed** 90:22 95:7 96:17 97:3
161:20 238:2

**background** 59:5 135:17 169:21
171:6

**backing** 95:14

**backup** 90:12,17 91:6,10 92:7
94:2,8 95:12 161:17,18 163:21,24
165:3,10,19 166:8 221:24 236:17
265:12 273:11

**backups** 90:20 93:22 160:5
164:23 238:3

**bad** 7:4

**Banarg** 150:2,20

**bandwidth** 192:8

**bank** 126:17 180:1,3,4,7,10

**bar** 22:20 40:10,18 139:13

**barrier** 25:18

**based** 21:14 22:19 23:13,18 33:2
51:23 52:6 83:14 88:10 102:22
123:12 138:6 172:17 178:17
191:1,25 204:16 244:21 259:12,
19 266:13 284:14

**basic** 133:24 134:4 184:19

**basically** 32:19,25 49:10 54:3
75:8 85:7 89:24 90:6 105:4
178:15 197:2 215:19 218:8
233:16 239:3 264:4

**basis** 8:1 23:17 88:24 95:15
96:15 110:25 111:2,9 122:12
123:5 144:22,24 211:14 238:9
278:10

**Bates** 108:14 256:6

**Bates-labeled** 278:1,3

**Bay** 19:20 245:20 262:21

**bear** 115:19 133:16

**bearing** 156:23

**bears** 280:4

**begin** 219:20 242:19 284:5

**beginning** 71:4 72:10 82:20
203:7

**behalf** 19:7 245:21 261:9

**belabor** 118:7

**belief** 262:25 280:3

**believed** 207:1

**believes** 152:7

**belong** 205:3

**bench** 32:14

**beneficial** 231:4

**benefit** 82:5 150:13 197:18 258:6

**Bentley** 182:9

**bias** 78:4

**bifurcate** 113:4

**big** 17:4 147:20 208:13

**bigger** 129:10 158:3 224:8

**bill** 45:8 55:18,19 59:16 60:10,15
61:12,14 184:12

**billed** 55:20,21 56:2,3 57:1,9,12
58:3,5,11,12,15 59:11,12,13 60:6,
7,22 151:23 208:23 267:1,14
268:2,6

**billing** 45:4 46:14,20 55:6,11
58:1,18 59:8,11 60:13 61:1,5
86:19 87:8,10,17,25 89:3,16
133:12,18,19 137:12 168:2 188:6,
24,25 199:24,25 200:8,12 204:16
206:9,12,15,18,23 209:20 211:10,
15 230:19 232:19 259:11,12,18,
19 264:11 266:20 267:6

**billings** 44:23 55:8 60:23 86:24
140:1 200:5

**bills** 243:6,7

No Copy Of This Transcript May Be Made Prior to 2/28/2021

6

**bit** 9:24 55:4 70:8 75:2 101:4,18, 23 118:3 129:10 131:3 160:12 161:3 163:13 169:20 181:23 234:4 253:8,11 282:11 287:5

**blank** 66:2

**blow** 147:20

**blowing** 229:9

**board** 19:23,24 20:5 22:2 39:18

**boilerplate** 43:25 44:15

**bolstered** 202:5 203:11

**books** 173:8 177:18

**Boston** 234:22

**bottom** 49:8 71:10,12,13 84:1 86:17 104:25 126:19 155:23 169:15 202:18

**bought** 190:3

**box** 155:24 156:1 254:24

**boxes** 129:13

**Brady** 11:21,25 28:2 29:20 30:16 31:8,9,25 33:12 34:10 178:2

**breaches** 71:19

**break** 55:6 77:15,17 80:16,17 81:4,5,16 148:20 215:24

**breaking** 135:20 162:12

**briefed** 179:7

**briefing** 31:4 34:17

**briefly** 37:4 144:1 196:3 200:18 203:7 206:21

**bright** 184:3

**bring** 21:19 27:19 38:11 46:2 49:24 51:17 52:25 74:24 166:20 168:21 169:13 195:1

**bringing** 27:8 166:22 168:24

**broad** 115:16 120:19 122:17,20

**broad-based** 128:13

**broadly** 129:24 204:14

**brought** 15:8 41:3 130:6 244:16 267:9 268:21

**Brown** 6:12,13 7:5,17 11:10,12 13:16 14:21 15:24 16:19,25 20:11,13 23:20,22 24:6,17,18

25:9,16 26:5,8,13,15,25 27:20 28:25 30:5,6,18 31:1 33:9,10 35:24 36:4,19,22 38:17,19 39:2,4 42:23 43:2,4 44:4,8,21,22 45:3, 11,15,19,25 46:6,10,14 48:15,17 49:5,12 50:6,8 51:17,21 52:25 53:4 59:20,25 60:17,21 70:24 71:3 72:1,9 74:23 75:1,3,23 76:3, 13,15,21,24 77:22 78:19 79:4,16 80:2 81:11,14 82:19,23 87:23 88:1 90:2,7 91:20,25 99:12 100:15,20 101:10,17,22 102:6 107:23 108:2,5 110:3,7 111:22 118:2,7 121:5 123:21 125:15,21 127:15,17 131:1,6 137:6 138:24 139:5,10 140:25 141:19,25 144:1 145:10,25 146:16,19,23 148:15, 17,19 149:12 150:12 152:1,3,18 153:2,6,10,12 155:18 157:1,14 158:15 159:12,19 161:2 169:13, 19 172:4,8 177:25 178:9 185:13, 14,17 186:8 191:5 196:3,6 198:3,6,7 238:17 239:9 240:9,14, 21 253:21 254:2,10,13 289:14

**buck** 215:18

**bucket** 265:25 266:3 268:25

**bucketized** 137:15

**budge** 16:16 20:24 21:8

**budged** 21:1

**budget** 61:18 84:21 85:9 86:9 170:5,15 171:2,15

**budgeting** 85:6

**budging** 21:3,7

**build** 285:11 287:16

**builds** 285:10,14

**built** 287:1

**bulk** 57:21

**bullet** 40:24,25 41:6 105:25

**bullets** 139:15

**bunch** 207:16 255:8 270:17

**Bundy** 144:4,6

**burden** 20:20,22 35:21 77:25 80:3 141:6

**burdensome** 237:12,20,25 238:5

**business** 37:10 113:2 119:5,18 176:14 181:2 190:7 193:12,13,15, 18,20 195:2,3,16,17,18,19 213:22 223:7 238:7 243:2,3,4,11 245:1, 14 248:18 250:3,5 260:17 262:5

**business's** 249:24

**businesses** 174:5,7 243:5 250:8

**buy** 201:21 225:7 239:4 240:17

---

### C

**calculate** 124:16

**calculated** 88:25 172:21 192:17

**calculating** 54:19 110:19 119:25 124:6 133:11 217:21

**calculation** 54:21 77:7,8 84:10 88:25 89:2,16 90:16 100:9 111:1, 3,9 112:9 113:21 129:22 130:5, 12,18,24 132:24 142:3 151:15,16, 19,21 152:25 154:14 161:22 168:1 172:17,25 173:10 174:1,10, 15 178:18 217:25 247:21 260:20 264:8 265:7

**calculations** 50:24 70:21 100:6, 8 124:11,18 187:21 191:23 246:15 247:16 261:4 264:2,6

**call** 6:15,18,24 8:4 10:13 11:1,9 24:1 35:23 36:5 51:22 52:5 63:15 79:9 84:16 143:1 145:1 147:15 150:1 198:6,8 255:22 257:3 270:2

**called** 24:2 72:15 79:17 126:11, 13,15,17 164:19 183:18 189:6 206:18 265:25

**calling** 11:3 16:1 268:24

**calls** 47:12 140:22 247:7 266:3

**cap** 61:14,22

**capabilities** 252:13 255:14,17 287:7,9

**capacity** 207:25

**capitalization** 223:20

**capitalized** 223:9

**capped** 70:15

**caption** 52:3 102:12

No Copy Of This Transcript May Be Made Prior to 2/28/2021

7

captured 92:24

car 225:6,10 267:10

card 181:12,13

cards 190:2

care 253:1

carrier 98:21 101:16

carry 37:6

carving 137:19

case 6:4 7:12 11:14 12:5 20:19
21:1 22:25 23:1 29:25 33:10
37:15 42:17 49:23 50:12 51:7
52:16,21 55:6,14,15 58:15 65:21
68:4 69:8,9,12 70:2 79:16,20
82:16 85:6 100:6 102:1 104:4
108:12 110:11,13 123:25 132:13
144:4 147:22 148:5 152:10
157:17 160:3 167:9 171:6 175:22
180:1 188:7 191:14 205:10
215:15 222:9 231:6 234:1 237:24
239:3,13,14 246:15 256:15
257:15,18 261:7 263:2 273:22

cases 34:12 144:3 233:21 237:21
241:13

cash 177:20

categorical 128:16

categorically 132:21

categories 86:13 128:14 199:20,
22 200:5 206:9 217:21 222:19
264:11

categorizing 135:25 136:19

category 134:16 156:4 220:16

causation 192:25

caused 195:18

caution 26:19 130:20

cellphone 222:6 269:19,20

center 161:15

central 9:8,10 155:6,12 157:3,19,
22,24 158:5

certifications 255:24

certified 252:8

cetera 178:21

CF 86:24 87:19 93:1

challenge 29:24 30:14

challenges 177:9

challenging 79:22

chance 29:10 217:12 273:2

change 106:2,6,8 107:7 196:24
210:14

changed 106:24

characterization 124:1

characterize 105:7

charge 96:10 152:18

charged 102:19 103:14 133:5
135:2 191:16 266:21

charges 49:24 137:19,22 224:13
269:16

Charli 6:8 24:11 35:25 216:15
288:17 289:2,3

chart 40:24 286:11

cheap 215:7

check 13:9 126:7,10 127:24
129:12

cherry-picked 230:10

childcare 216:21 252:23

choose 47:16 208:7

chose 115:3 116:17 117:7 142:5
270:12

chosen 13:25 157:9

Chris 49:19 50:9,20 52:8 82:12
85:21 86:25 87:19 88:22 89:1,2,5,
8,10,12,14 90:12,22 91:12,13,15
93:1 131:12 132:3,12 159:20
160:8 161:2 162:21 163:10 164:6,
19 167:16 169:1 170:4 171:9
197:13,16 209:16 217:23 229:13,
15

Chris' 162:8

Chubb 40:20 83:4,9,13 84:4

CIO 272:5

circle 156:16

circulate 93:5

circulated 93:13 131:23

circumstance 209:3

circumstances 16:7 208:5
250:7 261:21

circumvented 71:18 73:1,2

Cisco 252:9

cite 32:23 200:2

cited 8:15 144:5 157:10 256:6
267:24

civil 117:12 143:14

claim 41:7 70:1,3,12,15,19,22
74:7 81:19,24 83:5,6 84:5 86:7,9
87:10 89:22 91:18 97:9 98:18,20
99:24 127:13 203:11 235:14

claimed 86:23

claims 75:13 98:10

clarification 33:7

clarified 283:12

clarify 75:4,18 76:16 154:17
233:18

clarifying 76:24

clause 32:5

clear 7:22 8:22 10:4 20:21 23:11,
14 28:12 103:16,22 107:4 128:4
173:16 186:24 192:5 231:7
236:21 237:21 250:21 259:4
267:13 271:23 282:10,15

clerk 6:2 9:17,20 18:22 36:1,7,14,
18 38:11,24 39:1 82:19 137:1
198:12,19,23 216:17 289:6,9,22

client 42:20 178:19 185:8 244:2
249:22 250:12,18 257:10 261:13
272:4,16 285:11 287:16

clients 183:9 243:7

clip 171:5

close 51:24 172:9 176:6 256:17

closely 213:24

closeness 240:6,18

closer 79:20

closest 30:9

clothing 190:3

**cloud** 211:1 215:1 232:19 236:16 285:11

**Cloudconnect** 206:19 209:19, 25 210:3,6 277:25 278:21 283:21 284:4,5 285:7,12,18 286:1,20,22, 24 287:14,20 288:5

**Cloudconnect's** 286:9,15

**Cloudconnect-like** 287:8

**clued** 279:8

**collaborating** 239:14

**collating** 185:2

**colleagues** 49:19 276:16 288:11

**collect** 86:12 157:17

**collected** 110:19,25 111:7 113:1, 4,6,11,12 119:25 120:1 121:11,12 128:15,18 130:2,25 161:24

**collecting** 124:11 133:7 213:9

**collection** 157:4,11 173:18 177:6 184:23

**collections** 113:3

**collectively** 109:23

**college** 134:24 183:25 186:18

**collusion** 106:1,12,14,23,25 107:1

**color** 9:12

**column** 40:22

**combined** 95:22

**comingling** 175:18

**comment** 183:20 241:25

**commentary** 171:21

**comments** 83:17

**Commisso** 6:25 7:1,2,3,6,10,18 8:5 9:18 10:8 11:16,21 12:9,25 13:18 16:2 17:7,9,13,17,20 18:5, 9,18 19:4 20:14,16 22:5,9 23:8, 12,19 37:24 41:18,21 42:3,11 43:21 45:5,16,21 47:4,5,16,20,24 48:5,14 49:16 53:7 62:15,19 63:3, 25 64:1,14,16,21 65:4,5,9,13,16, 19 66:3,16,22 67:20 76:22 81:24 83:9,21 84:14,24 85:15 102:9 103:3,4,10,24 104:1 105:4,12 106:5 107:6 113:10 115:9,17,25

116:6 117:15,20,22 118:22 119:22 120:15 123:16 126:1,4 128:8,12,23 130:7 145:2 173:2,5 174:2,8 175:15,24 177:4 179:20 181:17 238:25 239:5,12,18,24 240:19 275:8 280:14 282:13 283:6 289:16

**Commisso's** 14:23 22:1 23:15 116:12

**Commisso/commisso** 51:1

**commit** 289:7

**committed** 187:19 190:6,14 191:3

**committee** 8:21 13:21 14:4 15:11,20 19:24 20:5 39:14,17,18 42:19 48:25 103:14 170:24

**committees** 103:6,7

**common** 185:10 213:22 238:8 256:9 287:6

**communicate** 175:23

**communicated** 73:1

**communicating** 160:13,15 161:4

**communication** 114:14 231:15 280:6,7

**communications** 91:17 107:17 116:11 169:4 230:6,7 231:1,11,12 232:4,11 246:25 247:4,5,6 275:2 278:25 280:17

**companies** 245:22 257:10 261:22

**company** 51:14 74:15 75:13 77:6 81:25 83:4 92:2 97:8 98:9 176:18 200:17 201:8 203:4 207:20 231:2,14 237:17 245:13 250:4,20 257:11 261:19 262:6 269:11 272:22,25 285:10 286:20

**company's** 92:11

**comparative** 139:23

**compare** 135:11 270:8

**compared** 88:14,16

**comparing** 145:16 201:15

**comparison** 137:21 167:20 201:16 204:25 267:20 284:20

286:7

**comparisons** 90:16 145:13 170:15

**compensated** 51:15

**competency** 78:3

**complete** 8:6 56:23 61:21

**completely** 54:20 189:25

**complex** 106:3,17 134:5 214:24 215:16

**complicated** 33:17 183:13 215:2 220:14

**complied** 141:13 142:8

**comply** 30:1,2 111:19

**component** 224:8 258:4

**componentry** 267:16

**comport** 249:15

**comprehensive** 237:7

**comprehensive-managed** 206:5

**computer** 182:7 223:23 252:3 262:6

**concept** 195:13

**concern** 17:21 103:1 104:5 106:22 162:7,8 163:4,6 168:7 173:11 193:22 218:3

**concerned** 121:17 168:6 222:10

**concerns** 74:4 190:22 218:12

**concluded** 161:25

**conclusion** 44:9,12 190:24,25 207:15 211:6

**conclusions** 94:22 96:3 278:9

**concur** 276:24

**conduct** 181:14 193:2,6,9,11 195:12,17,18 226:1 245:18 249:16 260:12 274:9 287:18

**conducting** 242:6 250:3

**conduit** 62:23

**confer** 288:16

**conferred** 25:4

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**confidence** 162:4,5

**confidential** 104:9 119:5

**confidentiality** 44:13 47:8 61:24 62:3,8,20 65:11

**confirm** 221:18 289:1

**confirmation** 165:2 255:19

**confirmed** 246:5

**confirming** 203:5

**conflate** 154:10

**conflict** 14:16

**confronted** 186:9

**confused** 75:2 106:13

**confusing** 107:3

**confusion** 205:2 236:19 282:17

**conjunction** 46:21 54:7 235:20

**connected** 236:25

**connecting** 141:15

**connection** 263:24

**connections** 240:19

**conservative** 98:1 111:14

**considerable** 269:2

**considerably** 271:17

**consideration** 6:3 23:9 196:22

**considered** 11:12 12:2 75:21 116:12

**consistent** 54:8 92:16 112:5,7 136:1 166:12 252:15

**consisting** 108:13 275:1

**constituents** 103:6 104:11

**constitutes** 162:11 163:23

**Constitution** 32:11

**constitutional** 29:20 30:3,16 142:15

**construct** 193:20

**consult** 26:25

**consultants** 186:1

**consultation** 64:5

**consulted** 158:21 186:17,20

**consulting** 12:13 55:3 92:15 180:6,24 182:23 183:3,7 211:11 239:20 245:14

**contact** 9:17 83:18

**contacts** 47:13,25

**contained** 98:5 117:21 184:7

**content** 103:2 104:10

**contents** 127:20

**contests** 32:1

**context** 33:6 81:14,22 82:2 121:16 170:19 204:12 236:7 268:10 283:11 285:24

**continuance** 15:24

**continue** 10:7 19:3 41:8,23 148:14 162:4 282:4 288:17

**continued** 63:5 171:3

**contract** 38:5 135:4 204:2,10 210:1,3 220:12 252:16 268:23,25 286:8,17 287:20,24,25

**contracted** 263:4

**contractual** 163:25 190:21

**contractually** 162:19 166:5

**contradict** 280:4

**contradictions** 54:9

**contrary** 219:21

**contributed** 164:16

**control** 41:13 56:10 62:19 99:23 100:9,13 118:5 130:14 133:3 215:20 218:19 219:10,14 274:3

**controlled** 62:20 245:15

**controls** 68:15 71:16,18,19,20 84:12 130:3

**conversation** 6:9 77:16 117:13 150:9,20 162:18 163:6 197:10 203:2 246:10 279:24 282:12

**conversations** 42:7,10 47:10 94:11 114:2 115:24 116:5 117:22 121:13 156:10 163:8,9 241:23 276:17

**conversing** 234:21

**convincing** 7:22 20:21 23:12,14

**COO** 203:4

**coordinate** 229:17

**cop** 231:15

**copied** 85:15 154:17 166:1

**copies** 229:18 232:22

**copper** 204:19

**copy** 110:18,24 119:24 159:15 253:5 273:11

**copy-and-paste** 287:11

**copying** 209:16

**core** 136:4

**corporation** 20:1,6

**corporation's** 20:3

**correct** 13:12 30:14,18 37:5,9, 16,24,25 38:4 40:2,11,12,16,17, 21 41:4,5,10,11,15 42:9 43:5,6 44:19,20,24,25 45:9,10,17,18 46:17,18,23 48:20,21,23 49:13, 17,19,20,25 50:1,5,10 51:7,11,12 52:6,7,16,17,22 53:7,8,10,11,14, 15,17 54:2,15,16 55:8,14 56:3,9, 16 57:10,11,13,14,23,24 58:5,7, 13,14,16,17,23,25 59:13 60:2,8,9, 23,24 61:2,3,7 62:4 63:6 64:23 66:13 67:11,18,22 68:22 69:3,4,9, 10,12,13,18 70:2,7,12,13,22,23 71:24 72:16,17,21,22 73:8,11,12, 18,19,22,23 74:2,3 76:23 77:11 78:19 81:19 82:14,17,18,25 83:1, 6,7,18,19,22,23 84:6,12,13,16,17, 22,23 85:3,16,17,22,23 86:3,10, 14 87:10,21,22 90:1,8,13,14,17 91:4,6,7,11 93:16 97:10,25 98:24, 25 99:4 101:17 102:2,3 103:21 104:13,14,18 105:8,11,16,23 106:7,20 107:6,9,10,14 108:18 109:4,5 111:12 116:18 118:20 124:3 125:2 126:8,9,12,14,16,18, 23 127:14,24 128:13 129:3 130:16 134:20,25 135:10 136:11 137:4,13 138:1 139:13,14 140:5

145:20 150:10,11 153:15,21,25
155:10,11,13 156:12,18 158:22,
23 159:11 160:3 161:7 167:10
169:9,23 170:12 172:19 173:21
174:2,11,15,20,21 175:12,18
176:1,2,14,19 177:2,3,7,12,16
178:25 179:22,24 180:2,22,25
186:12 187:4,12,16,17 188:2,3,18
189:1,22 191:4 206:7 211:22
221:5 222:13 224:1 232:8 240:21
242:18,24 243:8 244:23 246:7,11
247:11,13,21,22,23 256:7,8
258:12,15 259:25 262:13 266:7,
25 267:3,8 268:4 272:3,11 273:12
284:18,22

**correctly** 70:14 226:25

**correlation** 271:19

**corresponds** 92:4

**corroborates** 218:11

**corroborating** 250:12,18 261:25

**cost** 84:21 140:9 150:6 151:22
167:19 168:1 201:18,25 203:8,16,
21 206:4 212:8 223:20,23 224:9,
10,20 261:10 270:13,14,16
271:18 286:1,4

**costing** 177:19 205:1

**costs** 92:6 138:13 151:13 174:5
193:18 203:8 205:23 249:25
251:1,3 261:15

**counsel** 6:6 8:19,23,24 10:7
13:25 15:5,12,20 16:22 19:17,19,
21,22 21:7,16 22:17 24:17 25:4,
16 35:1 41:6,17,18 75:14 76:8
77:16 80:15 81:1,10 101:13
108:10 112:10 125:9 127:6 149:9
156:22 194:21 195:24 211:12,16
218:10 226:18 230:6 231:24
242:2 243:22,25 244:7,18 255:15
256:1 274:16 276:11 278:15
288:16

**counsel's** 16:13 23:13

**counsel/usao** 160:20

**Counselor** 242:15

**count** 88:5,7,13,14,16,17,21
95:11

**counted** 125:25

**counter** 39:6

**counting** 89:24

**couple** 6:7 15:12 26:16 37:12
134:24 149:22 155:20 162:18
163:14 169:16 185:14 201:6,9
205:19 208:3 221:21 226:6
252:21

**court** 6:2,6 7:15,20,21,24,25 8:3,
14,16 9:2,22 10:19,24 11:6,9,18
12:7,18,24 13:13 14:4,6,11,20
15:14,17,21 16:5 17:19 18:3,6,12,
20,23 20:9,11,16,23 21:5 22:22
23:5 24:4,8,11 25:2,4,12 26:12,20
27:7,17 28:4,12,14,20 29:1 30:2,
9,23 31:21 32:9,11,14,16,18,19,
24 33:1,3 34:2,6 36:6 38:24 74:25
75:19 76:2,12,17,25 77:5,9,12
79:2,5 80:7 81:2,9,15 99:7 100:15
101:8,11 109:25 110:4 111:20
113:13,22 114:5,12,16,24 115:8,
12,14,19,23 116:5,14,20 117:3,5
118:1 120:12 121:4,22 122:1,9,
12,23 123:4,10,20 137:2 139:1
140:24 141:2,24 142:7 144:5,8
145:8,23 146:10,18,20 147:1
148:12,17 149:6 151:17 152:1,17,
20 153:4,7,11 157:11,24 171:1
172:7,12 176:5,8 178:7,13 179:1,
10,16 183:22 185:12 186:4 191:6
194:19 195:7,24 198:4,9,10 200:7
203:19 215:21 216:3,12 217:1,3
225:24 227:22,23 228:3 238:15,
17 240:8,11,15,22 242:6,9 252:21
253:2,7,11,19 254:15,20 273:19,
24 274:20 275:6,10,12 276:3,20
277:18 278:17 279:3,13,17
280:11,18 282:19 283:17 288:13
289:7

**Court's** 40:6 72:1 82:5,7 111:17
150:12 216:6 279:7

**courtroom** 29:17

**cover** 13:22

**coverage** 40:19,22 75:22

**covered** 27:1 64:7 112:20 269:9
280:8

**covers** 251:7

**create** 137:20 193:17

**created** 194:3 195:16 273:1

**creating** 269:23

**credentials** 37:6,7 182:5 213:16

**credibility** 76:1 78:3 153:9 157:8
186:16 277:3,5

**credit** 61:21 181:12,13 190:2
249:9

**Crime** 14:18

**criminal** 6:4 41:3,15 42:8,16
46:16 52:16,20 69:1,17 117:12
244:3 281:10

**critique** 79:13

**cross** 67:25 78:12,13 281:21,25

**cross-examination** 33:20
130:16 157:2 172:14 219:6 233:4,
10 242:7,12 274:17

**cross-examine** 33:19

**cross-examined** 101:14 185:18,
20 205:9

**cross-examining** 156:23

**cumulative** 170:8

**cure** 33:12 34:8

**cursory** 249:11

**curtain** 101:19

**customer** 287:3

**cut** 286:15

**cut-and-dry** 220:13

**CVS** 92:14

---

**D**

**damage** 238:11

**damaged** 16:1

**Dasilva** 209:18

**data** 90:11,17 91:5,10 92:6 94:8
96:18 110:18 119:24 120:1
124:11 126:20,21,25 127:9 138:7,
19,22 139:2,18 140:5,14 141:22
143:22,24 145:12 146:21 148:22,
24 151:18 152:7 153:24 157:4,5,
11,17,18 173:19 184:19,21 185:4
207:13 213:11 214:3 221:23
226:10,16 229:23 236:17 259:23

265:11 269:16 271:3

**data-allotted** 141:9

**data-intensive** 184:23

**database** 266:5 268:6,8

**date** 53:18 83:15 98:3 167:7,9,13 191:18,19 197:23 203:23

**dated** 104:13 149:21 196:17

**dates** 126:5 192:13 268:23

**daughter** 216:22

**Davis** 7:1,4,18 8:20 10:1 11:8 13:11,12,19 14:3,7 15:2,10,16,18, 22 16:20 18:20 19:13 20:10 21:6 24:8,10 25:15 26:2,3 60:3 136:24 140:22 147:11 149:6,11 151:11, 22 156:19 172:12,15 176:3,7,10 178:14,22,25 179:4,7,17,19,20 183:16,20,23 185:11 187:8,15 191:6,7,11 239:13 280:16

**day** 29:11,14,16 114:11 148:3 289:10,12

**days** 11:14 148:8 244:24 289:4

**Dd** 155:16,19 156:16

**dead** 15:24

**deal** 33:24

**dealing** 219:16

**debate** 25:6

**debating** 194:20

**deceiving** 106:4

**decent** 29:10

**deceptive** 185:7

**decide** 64:19 103:10,24

**decided** 112:19 145:1 170:14

**deciding** 65:19 191:18

**decision** 79:18 280:22,24

**decisions** 21:12,14 225:15

**deck** 105:10,11

**declaration** 222:24

**deduce** 162:17 244:5

**deem** 34:2 114:25

**deemed** 25:13

**deems** 32:21

**defend** 10:2

**Defendant** 8:1 9:21 10:22 11:2 16:16 17:24 20:23,25 29:22 35:22 95:23 107:14 157:20 169:8 178:3 193:9 240:3 242:16,25 274:1,15 278:6

**Defendant's** 8:12 31:22 34:14 38:15 45:1,13,23 46:4,8 49:3 51:19 53:2 59:23 60:19 71:1 81:12 102:4 107:25 125:19 131:4 144:21 149:4 155:16 159:17 169:17 195:12 199:3 202:11 208:15 228:6 229:3 234:11 246:6 251:13 265:2

**defendants** 10:12

**defense** 8:4 9:15 10:19 21:16 23:13 36:4 75:23 81:10 97:13 101:13 108:10 109:19 118:15 129:3,15 138:1,18 144:14,16,20 148:15,23 149:9 199:10 211:11 243:22 244:7 276:11 278:14,22

**Define** 99:6

**definition** 99:13 121:9

**defraud** 194:17

**degree** 182:6,10,15 218:13 227:7

**delegated** 157:15

**delete** 106:1

**deletion** 238:11

**deliver** 109:11 167:4 183:9 206:4 212:8

**delivered** 134:17 135:5 139:24 167:21,22,25 231:22 263:17 279:12 285:3

**delivering** 134:1,3 190:20 267:15

**delivery** 167:21

**deny** 23:18

**department** 164:8

**departments** 182:18

**depended** 176:11

**deployment** 269:24

**deposition** 141:5

**depreciation** 223:11

**deputy** 9:17,20 38:24

**describe** 134:22 200:18 206:21 209:1 223:5 237:6

**describes** 71:23

**describing** 217:9

**description** 127:3 258:22,24 259:2

**descriptions** 185:1

**designating** 10:12

**desire** 152:2

**desk** 231:11,12,13 232:4,7,8,11 265:24 270:6

**desktop** 73:14 95:10 136:3 222:5 252:14

**desktops** 265:11

**detail** 88:4 98:16 101:24 132:19 135:21,24,25 192:3 265:5

**detailed** 130:1 256:3 271:6

**details** 129:17 132:15 153:17 184:24

**determination** 16:18 126:24 248:19 276:1

**determine** 47:17 67:2 68:19 103:4 104:10 175:16 243:25 275:16

**determined** 88:5 92:8,14 249:12

**determining** 48:7 67:5

**devastating** 281:14

**develop** 147:12

**developed** 150:25 151:2 193:13

**developing** 197:3

**development** 73:21 139:22 140:7,9 150:6,22 151:13,23 252:14 265:17

**devoid** 209:9

**DEWAN** 254:22

**dial** 201:22 267:18

**Diego** 57:6,12,16 85:24 135:17

149:18 156:16 158:22 159:7,8
160:12,18,23 163:7,11 165:20
166:9,20,22 167:1,3 168:21 169:3
186:3,23 218:6,7,16

**difference** 78:8,15 282:1

**differently** 21:11

**difficult** 28:21 135:22 138:15
195:13 270:24

**difficulty** 276:10

**dig** 93:8

**digital** 183:6 265:17

**Digitalnet** 73:11,15,17,22 86:22
88:24 92:5 132:9,18,20 133:5,7,8
135:21,23 136:18 139:24 146:6,8
150:5 174:4 176:17,23 177:10,14,
16 179:21 180:4 181:3 193:23
194:1,13 200:24 201:8,14 233:12
243:11 244:1,11,14,25 245:10,23
248:20 250:20 251:17,20 252:12
255:12,14 257:2,19,23 258:3,7
259:3,24 260:6,18 261:16 262:22
263:21,24 266:21 267:1,6 268:1,
14 270:19 271:25 272:13,18
285:9,21 287:19,25

**Digitalnet also** 133:19

**Digitalnet's** 150:22 177:18
243:2 245:19 248:18 249:5
257:16 259:5 260:13 262:1,23
286:8,16

**Digitalnet/cloudconnect**
287:23

**digitizing** 185:4

**diligence** 74:11

**dip** 159:24

**direct** 20:11 36:21 47:4 64:18
86:1 87:16,19 114:1 148:4 187:14
199:1 226:1 249:25 261:15
271:19 287:9

**directed** 52:8 78:13 170:11,13

**directing** 86:8 88:8

**direction** 100:8 143:5 159:3

**directions** 123:2

**directly** 47:1 48:13 64:15,19 65:9
133:18 136:13 204:5 250:23
269:5

**director** 37:1 193:17 228:19
272:6

**directors** 19:23,25

**disabuse** 178:23

**disabused** 283:4

**disagree** 264:4,7

**disagreed** 138:3,5

**disagrees** 147:11

**disbursement** 249:11

**disclosed** 171:15 279:25 280:2

**disclosure** 191:13

**discovered** 33:2 199:12

**discovery** 21:11 29:24 30:2,7,12
35:3,11 68:13 79:10 82:8 101:25
102:20 104:21 107:15 110:22
117:12 119:11 140:11 141:8,12,
21 142:9 143:15 146:13 156:12
174:19,22 175:14 199:18 200:3
202:4 208:10 211:13,17 213:3
221:8,10 226:7 228:25 234:16
241:2,15 243:20 244:3 266:14
273:23 278:5,13 281:1,10 284:15

**discretion** 130:20,22

**discuss** 65:6 84:16 102:14,17
127:20 131:21 208:20

**discussed** 65:4 102:10 104:1
112:22 115:5,14,15 117:14,20
120:20 127:23 181:17 217:22
221:16 222:20 241:21 262:9
275:8 277:2

**discusses** 76:10

**discussing** 103:1 105:9,12
113:16,19 120:9 131:22 150:8
156:17 170:2 209:14 218:19
220:25 278:2

**discussion** 8:21 19:23 42:14
48:3,4,10,11 82:1 112:10 118:21
120:6,25 122:15,17,20,22 130:6
131:15 132:11 146:22 147:24
167:14 197:6 216:7 246:24
251:19 266:8 269:13 274:13
283:21

**discussions** 47:14 91:17 93:6
95:20 112:18 115:11 116:12
119:2 123:13,14,17,18 130:9

154:3

**dismiss** 16:8 29:19 31:3 199:4,
12

**dismissal** 31:13,20,21 32:7
33:14

**dismissed** 144:8

**dispersed** 95:16

**dispute** 37:2 139:1 147:12

**disputed** 139:2

**disputes** 238:25

**disrupt** 237:16

**disruptive** 237:12

**dissimilar** 68:17

**distinguish** 154:21

**distinguishing** 189:3

**distinguishment** 189:2

**division** 84:20

**DM** 229:22 252:11

**DMS** 229:18

**DN** 252:17 259:13,20 262:19,22,
24

**do-over** 33:20 78:11

**doc** 139:3

**docket** 18:19 169:14

**docketed** 28:17

**docs** 102:19

**doctrine** 29:21

**document** 12:8 22:25 27:13,24
28:16 39:5,8 40:7,8,10 43:3 44:7,
9 48:1,16 49:7 53:21 58:6 63:13
71:6 72:2 75:1,11,12,16 76:9,19,
20 77:1,4,9 82:6,9 85:19 87:17
97:11 100:20 101:18 104:6
105:18,21,24 110:4 121:6,7
125:18 131:9,11,17,18 140:20
149:14 154:2,11 155:19 169:14
173:25 202:3 209:7 220:22 221:4,
13 228:12,25 254:10,18 284:8

**documentation** 83:15 97:9
98:10 100:22,24 174:3 260:17

**documented** 73:5 82:3 159:13

247:1

**documenting** 88:7

**documents** 12:10,12 18:10 28:7, 10,11 30:22 34:18 46:23 64:25 65:1,8,17,22 84:8 93:6 94:4,6 102:2,24 107:17 110:18,21,23,24 112:1,14,15,16,17 113:1 118:17, 18,24 119:9,22,24 120:1 121:8,9 126:19 128:9,11,15 133:25 153:23 157:22 158:12 174:11,19, 23,25 175:2,5,6,7,9,17,21,22,25 176:11,12,21,25 177:5,10,13 178:4,5,6,11 179:21 181:8,16 184:8 199:7 202:14 212:15,22,23 213:1 232:16 237:5 239:21,25 244:6,7 256:1 259:23

**dollar** 193:7

**dollars** 98:21 195:2,4 201:9 230:16

**Donna** 109:25 254:1 289:13

**doubt** 140:16

**downtime** 164:9 217:25

**draft** 90:11 91:1,3,5,9,14

**drafted** 73:1 76:19

**drafting** 77:1

**drafts** 98:6

**draw** 131:7,19,21 132:1

**drawing** 147:5 178:14 192:21

**dropped** 27:4 161:1

**dropping** 118:3

**drops** 42:22 203:17

**DTS** 267:14 270:15

**due** 74:11

**dumb** 128:21

**dump** 27:13

**duplicate** 86:19 87:8,10 207:2, 23

**duplication** 73:16

**duplicative** 86:24 133:12 137:11 146:5,8 190:18 199:24 206:8,12, 15,18,22 207:5,16 208:6 209:20 211:9,15 230:19 232:18 259:11, 18 264:11

**duties** 81:16

**duty** 22:16 61:24 62:3,8 65:11 281:11

**E**

**earlier** 15:3 60:25 102:10 104:1 138:12 161:23 167:11 169:25 187:14 216:7 220:1 273:3

**early** 35:15 133:6 238:23

**earn** 182:10

**easily** 65:4 238:3,12

**easy** 65:6 78:21 110:1 154:20 201:20 220:12 283:5 289:5

**Eaton** 27:22 198:7,9,10 199:2 202:9,13,17,21 203:25 208:9,17 215:21 217:4,5,7 225:24 226:2,3 228:4,8,24 229:5 234:10,13,15 238:16,17 240:23,24 242:4 254:7, 12 278:24

**ECF** 38:17,19,21 249:2

**economic** 43:12 191:20

**educational** 182:4

**effect** 165:17 235:10,22 236:5 286:12

**effectively** 213:25

**efficient** 84:20 158:10

**effort** 35:2 64:3,6 137:20 150:24

**efforts** 107:16 197:22

**egregious** 31:23 32:2,6 33:14 34:20 35:14

**egregiousness** 34:7 35:8

**elements** 192:4 264:13

**elevated** 171:3

**eleventh** 27:11,13

**email** 49:9,18,21 51:21,22 53:4,5 76:9 82:3,10,21,23,24 83:3,9,22 85:7,8,10,11,12,15,25 86:1 90:10, 15 95:9,21 96:19,24 98:7,8,12 102:7,13,15,22 104:15 105:3 107:11,12 108:4,5,6,16,21 109:13 114:17,18 115:6 121:5,7 125:21 127:17 128:4 129:2 131:7 132:2

138:19 145:15 149:15,23 150:8, 13,18 151:4 152:19 153:14 154:1, 18,21 155:4,20 156:15 157:6,9 159:13,19,22 160:7,10 161:15 168:4 169:7,19 170:11 171:18 196:8,11 202:19,22 204:16 208:10 209:15 217:13,15,17,23 219:7 229:6,8 230:6 234:14,16,19 235:13 254:18,24 275:2 276:22 277:24,25 279:12,15 288:11 289:4,23

**email's** 84:1 196:17

**emailed** 92:18 95:1 279:16

**emailing** 47:11 96:10,13 114:11, 15 254:22

**emails** 17:6,10,14 39:12,25 40:3, 5 97:16,20 98:4 111:11,13,15,23 112:3 113:15,18,19 114:2,4,20 115:7,14,17 116:8,10,23,24 117:1,11,19 119:3,7,11,20 120:5, 7,17,22,24 121:8,13,16,19 122:4, 6,14 123:6 124:9 143:12,13 145:21 146:16,18,19,22,23 150:16 154:20 156:9,14 167:11 178:20 213:12 230:1,8,10,14 231:3,4,8,25 232:1,11 241:3,20, 22 275:8 276:14 279:21,25 280:14,24 281:3,14 282:25

**embedded** 258:9

**emphasize** 167:7

**employed** 53:12 182:19 260:5

**employee** 51:13 70:15 71:17

**employees** 107:1 109:23 113:16 251:18,20 258:9 279:1

**employment** 192:14

**enacting** 237:18

**end** 21:20 131:11 172:9 192:14 219:20 287:3,15

**ended** 191:19

**ends** 196:11 207:20

**engage** 19:25

**engaged** 63:8 117:23 173:6,17 174:17 184:9 197:14

**engagement** 37:18,19,23 38:2 43:20,25 44:10,12,17 47:7 51:16 62:2 175:10 177:1

No Copy Of This Transcript May Be Made Prior to 2/28/2021

engineering 206:1 228:17
231:21 269:22 270:5 285:10

engineers 232:20 257:6

enriched 190:25

enrichment 54:20 68:9 172:17
176:11 178:19 181:9 187:3,10,11,
18 188:4 189:24

ensues 131:16

ensure 17:25 281:12

entered 43:20 228:22

entire 9:8 23:1 52:10,11 80:22
177:9 201:13

entities 69:7

entity 194:4,5 245:15 257:2
258:8

entrusted 22:2

entry 184:19

environment 92:25 207:11
210:24 222:2,14,16 226:13,14
234:7,9 235:12,21,23 236:3,4,7,
10,12,23 237:4,6,11,15 238:4,6,
14,20,21 241:5,18 273:9,12

environments 210:10 211:1
215:1 222:4,5,7 230:7,21 232:19,
22,23 233:21,22,24 234:2 236:16,
17,18 237:22,24 238:9 241:8,10,
12 244:17,19

equals 13:20

equation 214:24

equipment 132:22 223:10 268:1

erroneous 202:6

errors 146:24 211:23 225:19,22
226:5 227:11

essentially 19:18 164:10 173:25
183:24 192:7 203:1 234:20,25
244:25

establish 11:18,25 75:15 139:23
142:18 145:14 157:20 170:18
189:19 250:19

established 148:20 189:20
195:11 245:9

establishing 192:24

estate 180:17

estimate 86:5,11 151:1

estimated 150:23

estimates 191:25

evaluate 23:10 54:6 205:18
233:11,24 234:2

evaluating 54:11 56:24 223:7
230:17

evaluation 56:11 205:23 223:6
237:23 261:8 267:25 287:19

Evan 209:18

event 160:18 169:7

events 165:1

everybody's 149:20

evidence 7:11,22 20:21 23:12,14
29:22 30:4 32:20 33:2,16 35:7
54:6,7,11,12 56:8,13 65:20 73:10,
13,20 78:1 95:18 100:11 107:1
141:14 142:18 143:8 145:8,23,24
161:16,24 162:2 164:24 166:15,
16,18 168:10 188:22 195:11
199:13 244:21 245:9 258:3
259:11,18 279:18,19 280:22
288:19

evidentiary 6:3

exact 78:17 106:10 115:11
167:12 196:5 200:22 210:25

examination 17:25 28:13 36:21
72:11 185:16 187:14 196:15
199:1 226:19

examinations 27:23

examine 86:7 242:2

examined 187:7

examining 117:5,9 281:20

examples 200:1 236:18

exceed 286:1

exceeded 61:17

exception 14:14 19:14

exceptions 19:11

excess 61:18,22 190:8 194:6
195:4 230:20 264:12

excessive 87:24 89:3,16 140:1
188:6,21,23,25 200:5,8,9,12
204:15 259:11,19 266:20 267:6

excessively 199:25

exchange 82:3,21,23 90:8 92:1
108:4,21 109:8 234:14 282:11

exchanged 17:6 40:5

exclude 7:21 8:3,17 12:18,25
13:1 30:10

excluded 7:14 14:1,13 22:19
24:12 151:14,18,24 156:21

excluding 25:23

exclusion 13:20

exculpatory 29:21 30:4 78:1
100:21 141:11,14,18 142:7,11,13,
19 143:8,24 274:2 275:17 276:1,
8,14,23 277:3,4,10,12 278:12
279:6 281:13,15

excuse 28:18 188:22 201:10
215:4 227:22

excused 178:3 196:2 198:5

excuses 179:1

executed 106:2,17

executive 231:1

exercise 138:15

exhibit 24:20 25:17 28:19 38:12,
15,18,23 40:7 43:8 45:1,4,12,13,
19,23 46:2,4,7,8 49:3,6 51:18,19
53:1,2 55:10,12,25 56:25 57:1,25
59:7,22,23 60:18,19 70:24 71:1
72:7,8 74:10,24 75:17 76:13
81:11,12 82:4 83:2,25 91:21
97:11 102:4,7,11 105:1 107:24,25
125:16,17,19 126:4 129:2 131:1,4
139:7,9 147:10,24 149:3,4,7,15
154:24 155:16,19 159:14,17
169:13,17 196:8 202:10,11
208:15 217:6 220:19,20 228:5,6
229:1,3 234:10,11 251:12 253:23
254:2,5,9 262:11 264:18,20 265:2
278:22

exhibits 24:24,25 25:5,13 26:6,9,
20 27:1,5 28:16,22 38:22 145:24
253:21 254:1

exist 241:10

No Copy Of This Transcript May Be Made Prior to 2/28/2021

15

**existed** 54:17 137:22

**exists** 177:23 204:12 210:6 263:5

**expect** 135:7 214:19 261:19
273:14

**expected** 109:20 250:5

**expects** 109:10

**expenditures** 181:13 245:19,21
262:1

**expense** 223:11 260:20

**expenses** 181:2 197:1 223:8
247:25 249:24 260:18 261:15
262:1 266:1

**expensive** 215:8 257:7,13 258:2

**experience** 22:21 100:25 101:2
136:22 137:9 138:6 159:6,9 168:6
183:10,14 214:9 223:5,7 228:16,
18

**experienced** 184:20 186:19

**expert** 6:19,20 34:24 37:5 43:14,
16,19,23 44:2 66:20 67:9 69:23
78:25 79:17 97:23 100:3 101:4,7,
21 137:24 138:1 143:14 144:21
145:5,17 146:24 152:23 153:3
156:22 158:17 161:21 162:25
178:17 184:10 186:11,15 199:11
205:6 214:1,12 215:9 219:17
220:9 223:4 226:19 228:15,22
233:25 234:1 242:23 245:4 246:6,
19 251:8 255:20 258:24 275:15,
25 279:11 281:4 286:6

**expert's** 79:3 276:6

**expertise** 136:10,14 163:18
164:6 165:8,24 166:3 185:19
186:9 205:7 213:20 214:8 217:9
219:1,11 221:19,25 222:13,21
223:15 225:3,4 233:23 234:2,9
270:5

**experts** 19:8 24:4 60:12 79:6
119:12 215:14 219:19

**explain** 86:22 87:16 92:5 101:4
145:5,6,7 184:16 210:21 283:9
285:1 286:19

**explained** 93:24 94:5 95:13
116:14 123:23 159:7 210:14

**explaining** 72:24 95:2 99:3
221:13 246:17

**explains** 73:4 84:3 197:2

**explanation** 87:5,21 92:19,21
93:2,5,10 96:11 124:5,15 246:22

**explanations** 208:22 218:21

**explicitly** 99:25

**explore** 10:24

**exports** 126:11

**express** 104:5

**expressed** 7:9

**extend** 168:18

**extensive** 243:23 256:4

**extent** 28:3 30:19 90:23 163:1
165:18 189:23 283:13

**extra** 192:7,8 216:10 272:17

**eyeballs** 9:14

**eyes** 229:10

---

## F

**face** 176:4

**facing** 130:15

**fact** 13:24 21:23 24:22 32:18 42:8
47:7 48:17 50:21 51:4 53:5 74:18,
21 79:21 99:1,19 116:7 135:22
140:18 142:2,4 144:9,19 157:14
158:16 160:21 165:15 171:1
177:8 187:2,9 188:11 189:15,17
200:8 201:17 206:12 212:21
225:11 241:4 270:18

**fact-check** 242:21

**fact-finding** 50:25 68:12 96:15
125:7 155:15 166:14 184:5

**factor** 16:14 152:24

**facts** 16:6 70:2 88:19 100:11
184:6 207:10 231:5 240:9,12

**factual** 43:19 171:5 239:11

**failed** 239:6

**failure** 29:21 30:1,3 31:10 33:18
73:15 152:24 178:20

**fair** 102:21 105:6 122:9 124:1
151:4 160:25 176:12 177:11
179:25 188:15 247:17 259:7

273:16

**fairly** 142:25 236:10,20 238:8
256:2

**fall** 48:19 49:23 56:6 70:4 103:23
167:25

**falls** 118:4

**familiar** 42:25 45:6 71:7 89:5
173:19 182:4

**familiarity** 223:19,21

**family** 180:13

**fancy** 105:14

**fast** 187:6

**features** 269:8,17,21 270:17,19
271:24 272:2,23

**federal** 14:9 22:22

**fee** 156:4,21 224:14 265:19

**feedback** 105:5,20

**feel** 28:5,13 83:17 124:9,12 152:9
169:22 176:6 262:16

**feels** 218:15

**fell** 103:3

**fellows** 263:10

**felt** 227:1 263:13

**Ff** 159:14,17 217:6

**fictitious** 225:5

**field** 155:15 182:14 219:17

**fight** 9:25 10:1,17 15:22 21:17

**figure** 197:17 219:24 220:4 271:3

**file** 18:24 87:12 127:10,12 128:20
275:16,25 276:6 281:3

**filed** 18:9 26:10 30:7

**files** 90:24 93:3 95:19 125:24
126:1,3,7 127:19 128:7,24 129:2,
14 130:19 253:18

**filings** 109:1 181:6 199:19

**fill** 66:2 132:14

**filled** 165:10

**filtering** 64:21

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**final** 113:21 120:10 121:3

**finalizing** 170:2

**finally** 73:20

**financial** 37:1 43:12 126:13 129:24 160:2 223:8 225:2 246:1 248:3,6 251:6

**find** 7:21 23:6,11,14 51:25 64:13 93:4 144:16 149:12 154:25 207:7 213:2 219:3 255:23 259:10,18

**finder** 32:18

**finding** 8:1,16 10:20 56:8 75:25 200:6,7 206:10,11,13 244:6 266:19

**findings** 54:13 93:15 99:20 123:24 138:5 246:8

**finds** 32:9,24 76:6

**fine** 16:3 28:14 79:7 97:5 115:21 116:4

**finish** 191:22

**finishes** 227:25

**firm** 55:3 82:24 83:3,8 99:14 139:22 238:23

**first-** 135:7 214:19

**fish** 264:21

**fit** 99:12 258:22,24 259:2

**fitness** 218:12

**fits** 120:7 209:13

**Fitzgerald** 49:19 50:9 52:8 82:12 86:25 87:19 88:22 89:2 132:3 159:20,22 160:21 170:4 196:18 209:16 217:23 218:3,15 229:15

**Fitzgerald's** 160:8 169:1

**flat** 224:14

**flaw** 152:25

**flawed** 215:12 227:6

**flexibility** 32:15

**flips** 167:22

**flow** 11:17 12:4

**focus** 266:8

**focused** 31:15 283:2

**focuses** 34:6

**folder** 125:14 127:4

**folders** 64:10 127:21 128:14,16, 19 129:18,23 154:23

**follow** 47:19 118:8 156:3 163:14 166:6 266:11

**follow-up** 83:16 131:9

**footnote** 71:13

**force** 62:10

**forensic** 37:8 43:12 58:21,22,24 59:1,2,4 60:12 83:11 86:6 87:6 89:12,13,21 93:19 94:1 212:2 219:16 232:22 248:23

**forensically** 223:7 232:14

**forget** 270:1

**forgive** 224:15 235:9

**form** 65:16

**formal** 94:16 125:10 280:7

**formation** 77:3 193:12

**formed** 101:20

**formulating** 91:18 181:21

**forthcoming** 283:1

**forward** 27:16 85:12 108:4

**forwarded** 83:21 84:2 85:20 108:18

**forwarding** 84:3

**forwards** 109:7

**fought** 21:16

**found** 31:8,9,11 73:25 94:21 95:14,18 156:13 183:25 241:15

**foundation** 11:15 17:14 21:13 28:8 29:3 40:9 75:15 142:17 145:3 147:4

**foundations** 25:25

**fourth** 44:8

**fraction** 201:17

**framework** 32:4

**fraud** 68:10 106:3,18 170:18 187:19,20,23,24 188:2,13,15,19 189:7,10,11,16,19,21 190:1,4,6,
14 191:3,15,20 192:15,24,25 194:17 207:9 208:6,8

**fraudulent** 193:1,6,11,14 195:12 197:1

**fraudulently** 193:8 194:11,15 195:16

**free** 28:5,13 83:18 169:22 176:6 262:16

**freeze** 238:22

**Friday** 289:8

**front** 16:12 179:9 251:24 253:4

**fruitful** 170:6,16,20 171:8

**fulfill** 252:16

**full** 24:25 36:15 38:12 61:11 105:10 155:2 198:20 289:12

**fully** 230:22

**functioning** 271:15

**fundamental** 133:3 167:18

**fundamentally** 215:12

**funds** 40:14 41:14 42:17

**future** 289:5

**fuzzy** 122:21

**FY** 88:5

**FY2013** 92:8

**FY2018** 92:8

**FYI** 52:3

---

**G**

**gained** 227:15 287:14

**gaining** 106:3

**games** 99:10

**gaming** 262:5

**gap** 165:7,10

**gaps** 74:22

**gate** 219:14

**gatekeeper** 67:8 173:3,6 175:16 179:21 181:18

**gathered** 88:19

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**gathering** 100:11

**gave** 16:7 54:12 73:24 75:9 135:9 136:6 169:20 202:6 204:17 224:24 225:5 248:13 254:3

**gears** 59:21

**general** 19:19,21 65:2 112:25 122:15 123:12,14 201:17 238:1 247:18 256:8,13 279:14,19 280:1

**generally** 24:4 39:9 42:12,16 67:2 94:12 115:6 119:14 120:16, 20,21 123:19 138:9 170:8 204:6 237:3,8 246:2,22 247:6 250:8 263:13 264:5 276:12

**generated** 93:13

**generic** 19:17

**gentleman** 258:13

**geographically** 95:16

**Gg** 169:13,17

**Gilpin** 52:9 57:1,9,21 58:15,18 82:10 86:2 90:7 91:8 96:10,21 99:11,20 100:5 132:13 137:7 149:16 150:19 153:13 155:5,10 156:10 157:3,22 158:24 161:12 181:24,25 183:24 209:16,22 211:5 213:6 214:17 215:17 217:8 218:21 221:11 222:16 225:22 227:14 234:21 235:19 241:8

**Gilpin's** 100:17 101:12 213:15 218:12 219:8

**give** 12:19 13:3 16:2 36:10 63:17 64:13,19 65:13 66:4 81:14 119:16 198:15 201:1 215:23 236:25 246:13 278:6 285:21 288:7

**giving** 66:8 67:13 81:22 89:17 102:1 105:4,20 227:5

**glad** 75:18

**gladly** 27:3

**glasses** 13:10

**gleaned** 116:24

**gleaning** 100:19

**GLS** 111:6

**Gmail** 229:18,25

**go-to** 186:10,12

**goal** 52:23 69:6

**goals** 52:20

**God** 36:12 198:17

**good** 6:6 19:2 24:15 29:2 36:1 46:13 49:21 50:18,21,22 51:4 54:9 75:3 83:10 161:14 176:9 185:23 205:22 208:14 214:2 217:18 219:11 242:14,15 263:14 281:5 289:10,21

**goods** 132:21

**government** 7:9,15 9:18 12:11 20:24 23:25 32:1 38:3 51:7 53:14, 16,19,22 55:15 60:7 61:23 65:14, 20,25 66:12,18 67:8,10,12,13 69:11,20,23 97:13,23 98:24 99:5, 18 100:5 102:2,25 104:3 107:13 109:9 144:12,19 169:8,23 176:20 177:2 187:1 188:12 189:4 196:10 197:18,22 211:14 236:2 239:21, 25 244:4 274:4,19 278:5 279:10

**Government's** 54:6 104:4 178:2 195:9 199:4 222:25 236:1 237:10

**grand** 173:22 239:22 278:4,20 279:2

**grant** 18:23 80:11

**granted** 18:25 78:9

**granting** 18:15

**granular** 192:3

**graph** 40:18,19

**great** 50:9,11,14,16,17,20 52:11 57:7 101:10 129:11 139:5 177:8 180:1 183:15 265:1 271:8

**greatly** 285:25

**Greg** 6:19,22 36:5,16 49:10 88:8, 12 109:22 196:20

**gross** 35:4

**group** 42:23 89:13

**groups** 39:19

**guess** 16:17 18:7,25 22:5,19 31:7,17 59:3 61:13 68:10 78:5,14 79:15 90:3 114:14 127:6,11,25 146:11 182:3 189:2,4 195:7 208:12 215:20 288:15

**guessing** 97:15 129:16 131:25

**guidance** 243:25 248:13

**guilty** 200:7 206:11

**gulf** 268:16

**guy** 89:10 185:22

## H

**Haas** 170:12

**hac** 18:8,10,15

**half** 49:8,11 90:5 104:25 126:2 148:3 202:19 208:12 217:16 289:4,10

**halfway** 91:24

**hallway** 163:8,9 169:3

**Hampshire** 176:22

**hand** 36:8 64:14 198:13 233:25

**handed** 241:6 276:13

**handing** 239:24

**handy** 253:16

**happen** 24:13 72:20 143:15 239:6 254:20

**happened** 12:17 56:22 63:22 95:4 115:17 123:1 177:15 283:9

**happening** 12:14 167:13 203:2 209:8 221:3

**happy** 65:1 102:14,17 121:15 132:14 156:14 212:24 251:25 252:5 263:18

**hard** 24:22 27:5 41:24 125:22 138:10 159:15 219:24 220:4

**hardware** 137:17 183:8 266:4

**Harrington** 21:10 108:9,22 109:4,8,14 124:5 140:13 151:7 185:21 247:8

**hats** 37:15,17

**haunt** 219:5

**hazy** 248:2

**he'll** 101:4 131:7 147:12

**head** 35:16 88:14,17,21 122:24 182:1

**hear** 9:12 14:13 31:17 32:20 33:1 149:8 283:6 288:19

**heard** 7:5 14:24 16:23 23:16 79:17 150:15 214:14 218:18 219:22 240:6 281:19

**hearing** 6:4 9:15,16 10:14 12:14 13:4 20:18 22:18 23:1 25:25 26:24 28:22 29:11,17 33:16 121:23 146:10 254:7 264:23 283:11 288:18 289:25

**hearings** 243:24

**heart** 11:20 111:8 205:20

**heavily** 230:25

**held** 19:21 180:13

**helped** 39:13 69:25 70:20 145:6 246:7

**helpful** 28:23 169:20 233:19 244:20 261:2,11

**helping** 42:6 134:13 155:15

**hereinafter** 109:23

**Hey** 28:4 63:12,15 66:23 145:5 185:22

**high** 95:16 96:14,16 131:8 160:5 162:11 165:25 200:21

**high-availability** 92:7 93:22 94:2,8 161:18 163:20,23 165:3,9, 14,18 166:8 221:23 265:12

**high-level** 272:9

**higher** 61:4 271:17

**highlight** 256:18 284:12

**highly** 215:1 231:4

**hired** 19:17 53:16,22 54:3 86:6 171:3 263:22

**hoc** 46:12,15 59:10 73:20 137:14

**hold** 13:10 36:25 141:2 252:21 275:10

**home** 176:22 216:23

**honest** 194:20,22

**honor** 6:13 7:8 10:17 11:13 12:23 16:25 17:17,20 18:9 20:7,25 24:18 26:4,11,23 27:4,15,21 31:19 75:6 78:19 141:19 144:2 148:16 151:13 152:3 157:1 172:5

183:21 194:8 196:3 198:3 217:5 239:9 242:8,10 252:25 274:7,19 275:3 276:9,19 278:16,23 279:4, 22 280:2,15 282:5 283:15

**honored** 238:24 239:1

**hope** 29:14

**horse** 274:20

**hosting** 73:14 135:1 136:1,2 156:4,20 265:11,19 285:13,25

**hour** 27:11,13 29:13 57:12 77:20 184:21

**hourly** 60:23 151:3

**hours** 55:21 56:2,3 57:2,9 58:4, 12,15 59:12 60:6,21,22 61:11 77:19 86:5,11 150:24 159:23 172:24 216:11 218:1

**house** 177:24

**houses** 190:4

**huge** 173:18

**hundred** 201:9

**Hunter** 12:22 31:19 32:12 33:7 108:6 109:7 179:7,11,12 183:16 194:8 280:16 288:11

**Hunter's** 78:11

**hyperlinks** 125:24

**hypothetical** 63:10,21 267:10

**hypothetically** 63:22

---

**I**

**ID** 24:21 25:25

**idea** 15:5 22:20 101:15 159:21 191:15 192:23 193:4 194:14 195:14 237:3 277:20 279:14,19 289:21

**identical** 69:4 208:2 286:14

**identification** 24:24 26:5

**identified** 69:9,15 133:8 139:20 150:4,21 154:2 174:2,23

**identifies** 19:14 40:19 269:12

**identify** 27:25 28:11 73:16

**identifying** 57:20 175:20

**identities** 168:15

**III** 216:24

**illuminate** 196:6 215:15

**image** 232:12

**images** 162:19 164:24 222:5

**imagine** 9:11 169:10

**imaging** 232:13

**immediately** 164:7

**impact** 80:21

**impacted** 200:4

**impactful** 35:12

**impacts** 199:19 241:17

**impeach** 78:23 276:16

**implementation** 266:4

**implements** 14:18

**imply** 170:21

**importance** 28:9

**important** 9:6 10:18 16:14 17:2 28:8 63:14 64:19 80:9 101:21 112:19 117:8 145:4,17 203:15 212:9,11,13 219:19 226:8 230:3, 15 261:2 283:14

**impressions** 98:5,8 114:21

**Imran** 6:5 102:19,23 171:3 244:25 245:10,15 249:23 261:14 262:4 272:4,17

**Imran's** 171:4

**in-house** 19:20

**inaccurate** 204:9

**inadequate** 225:23

**incidences** 48:9

**incident** 164:7,14

**inclination** 172:1

**inclined** 8:3

**include** 15:20 43:22 44:1 115:4, 16 168:12 180:3,6,9 265:15 267:25 268:5

**included** 49:2 59:17 68:22 71:20 73:17 98:3 106:3 116:16,17 121:9 134:7,8 137:15 157:25 159:2 170:9,22 171:11 172:2 173:25 174:3 183:6,7,8 254:3

**includes** 280:5

**including** 43:13 49:1 58:7 71:17 77:4 86:2 133:2 139:21 149:17 223:9 262:5

**income** 181:6 196:25 247:25

**incomplete** 248:14

**inconvenience** 288:21

**incorporate** 63:17 218:23 227:8

**incorporated** 112:16

**incorporates** 59:1 227:7

**incorporating** 42:4 61:1 62:12

**incorrect** 227:5

**incorrectly** 204:10 259:16 267:5

**increase** 154:13 170:8

**incumbent** 275:23

**incurred** 251:4 260:18

**independent** 245:18 255:18,21 260:12 287:18

**indication** 94:20 106:24 232:3

**indicted** 104:16,20 167:10

**indictment** 53:6 197:7,9

**indignity** 283:7

**indirect** 276:15

**indirectly** 83:20

**indispensable** 183:12

**individual** 22:10 269:17

**individually** 150:25

**individuals** 103:13 106:2 168:15 185:6

**individuals.'** 106:4

**industry** 162:13 163:24 185:10 214:9 236:11

**industry-standard** 257:4,5

**ineffective** 215:17

**inexperience** 214:11

**inexperienced** 157:15

**inextricably** 193:4

**infer** 160:23 168:9

**inference** 160:25

**inferring** 163:5 221:12

**inflated** 137:23 171:2

**info** 51:23 52:6

**inform** 181:8 220:9 226:18 241:18 242:2 246:7

**informal** 94:11

**information** 39:20 48:12 51:2 53:9 55:10 63:2,4,7 64:2 65:3 66:21,23 74:12 77:3 79:14 84:9 86:5,12 89:15 92:13 93:7 94:1,18 103:7,10,17,20,21,25 104:11 105:15 108:24 111:6 112:11 113:8 114:22,24 116:15,16,24 119:11 120:2 125:6,8 129:25 130:8 133:1 138:18 142:5,11,14 143:24 156:7 160:2 173:12 177:19,20 180:14,16,19 182:7,8, 11,15,18 183:11 184:7 203:10 209:9 211:18 216:15 230:4 244:19 249:13 250:12,18 255:6,9, 13 256:7,11 261:25 273:4,7 275:16 276:8,18 277:19 279:5 280:6,9 281:23

**information's** 116:23

**informations** 42:5

**informed** 225:15 247:1 264:14

**informing** 186:3 225:4 231:5

**infrastructure** 73:14 135:1 136:2 252:13 265:10 285:19

**infrastructure-related** 133:20

**infringe** 18:1

**inherent** 286:23

**inherently** 287:15

**inherited** 233:12

**inhibits** 226:17

**initial** 88:18 90:11 92:16 131:9 132:25 137:17 138:13 251:8 267:25 269:9,10

**initially** 108:16 175:3

**input** 42:4 132:25

**inquire** 141:11 152:2

**inquiry** 85:9

**insert** 239:9

**inside** 129:19 215:5,9 248:3

**Insight** 132:8,10 133:14,16,17 209:25 210:2

**inspection** 173:15

**instance** 106:12 132:7 266:21 286:24

**instances** 66:10 73:3 134:11 193:5

**Institute** 252:10

**instruct** 86:21

**instructing** 89:14 104:22

**instructions** 67:13 88:2

**insurance** 40:20 41:7 70:1,3,11, 15,18 74:6,15 75:13,22 77:6 81:19,23,25 83:4 92:1,10 97:8 98:8,18,21 127:13

**Insured** 71:4

**intend** 12:1 24:1 152:15

**intended** 122:16,19 170:21 211:3

**intends** 15:20

**intention** 227:9

**intentional** 35:2,10

**intents** 19:18

**interest** 69:16 158:9

**interesting** 34:11 79:13

**interests** 67:22 262:5

**intern** 183:25

**internal** 52:19 56:10 68:15 84:11 106:13 113:15 116:7 119:9,17,21 130:3 139:11 174:9 275:2,15

**internally** 121:14 143:13

**interpret** 98:14,15 127:2 134:18

**interpretation** 123:11

No Copy Of This Transcript May Be Made Prior to 2/28/2021

20

interpreting 127:1

interrupt 28:5,13 41:24 118:1
158:19 215:21 238:15

interrupted 281:17 282:3

intervene 18:24

intervenor 18:7

interview 151:5 153:5,8,14,21
154:6,7

interviewed 93:11 153:20

interviewing 157:4

interviews 93:20 94:16,24 125:1
148:24 151:8 152:14,19 255:11

introduced 38:16 45:2,14,24
46:5,9 49:4 51:20 53:3 59:24
60:20 71:2 81:13 102:5 108:1
125:20 131:5 149:5 155:17
159:18 169:18 202:12 208:16
228:7 229:4 234:12 265:3

inventoried 161:19

inventorying 132:17

investigating 42:13

investigation 37:2 41:9 46:16
69:25 75:10 84:25 85:5 157:17
161:24 174:10 177:9

investigational 103:15 128:17

investigative 43:12

investment 180:12,15

invoice 45:16,20 46:7 61:21
132:8,9 135:4,12 150:22 184:24
207:23 225:9 271:7

invoiced 92:6 259:25

invoices 72:5 88:24 126:22,25
129:19 132:10,18,20 133:8,9,10
134:8,15 135:15,20,23 136:18
137:11 145:16 146:2 177:14
184:6 201:7,12 207:2,4 243:9,15
249:5,10,17 260:9,10 266:17
271:7

invoicing 72:4

involve 119:17 133:23

involved 16:6 101:25 245:13
280:17

involvement 16:8 17:9 35:1
157:12 213:14 218:16 219:8

involving 40:15 44:13 82:16
108:17 127:13

IP 268:11

irrelevant 189:25

isolated 48:9

issue 11:21 16:9 17:4,21 27:21
28:2 33:16 66:15 75:22 87:8
93:11 94:25 95:2 96:24 100:16
131:13 141:12,13 142:8,10 153:8
154:11,15 166:19 190:13 202:7,
15 232:18 235:17,24 252:24
266:12 269:4 270:23

issued 125:8

issues 17:18 20:4 22:12 23:2
29:2 30:8 76:10 99:3 121:17
140:4 144:6 156:17 157:12
163:12 183:19 190:22 216:21
227:1,3,16 284:16,17

IT-SOMETHING 272:7

item 110:5,8 132:19 270:6

itemized 133:10

items 112:22 135:23 144:9 164:4
196:20

J

January 46:7 47:3 59:8 210:4

jargon 134:6,9,15

Jason 6:20,21,22 138:1 198:21

jerk 99:7

job 183:15 191:13 263:14

John 23:24 83:10 92:14 93:12,21
94:4,7,12 96:3,4 100:1 103:3
109:18 127:18 131:14 156:3,6
158:21 159:7 162:3 163:3 165:5,
10,14,21 166:9,11,16,17,18 167:5
170:3 183:18

joined 7:8

Joseph 198:21

jotted 90:21

Judge 7:18 8:20 10:1 13:12 14:3

15:22 18:22 20:10 122:22 137:1
149:11 176:7 178:25 179:7,19
205:12 206:11 216:4,19 244:23
289:6,19

Judge's 118:9 121:20

judgment 32:22 134:12 181:9

judgments 193:10

July 37:21 53:17 124:16 133:6
148:25

June 239:23

jury 32:15 101:9 173:22 239:22
278:4,20 279:2

K

Kal 258:13

keeping 10:14 288:23

Kennedy 212:4 246:5,14,17
247:8,12,15,23 248:17,22 260:21,
25 261:3,9,10

Kennedy's 247:9,19 249:1,4

key 73:3 96:18

kidding 289:8

Kim 148:8

Kimberly 83:12

kind 19:2 24:22 59:20 80:19,25
98:12 114:18 125:4,22 128:19
135:6 149:24 191:12 205:1,20
207:7 209:20 210:8 212:14 213:3,
10 214:4,7 215:2 217:22 218:22
219:2,18,19 221:3 222:1,7,17
223:16 224:4 225:5 227:18 230:9
231:5,14 238:12 241:21 244:11
246:13 251:5 256:24 257:21
264:4 270:1,11 276:14 279:8
281:17 284:14 286:7 287:8,21

kinds 227:11

Kk 264:23,24,25 265:2

knew 18:23 88:20 103:19 118:18,
23 138:3 142:21 145:19 151:7
275:13

knowing 218:25

knowledge 133:24 204:18
222:15

knowledgeable 214:1 215:9

---

**L**

---

labeled 35:14 40:22 126:20

labor 84:20

laborious 142:1 143:3 147:14

lack 37:14 72:23 89:10 101:18 159:5 164:15 168:6 185:19 186:9 205:7 213:8 222:20

lacking 60:16 163:17

laid 21:12

land 147:20

language 33:25 43:24 44:1,15 106:10,19 134:19 286:14 287:3, 25

Laplante 122:22

largely 95:20

larger 59:1 95:11 121:15

late 182:2

latest 224:24

law 33:10 51:2 113:10 115:17 118:22 238:23 277:4

lawful 15:19

lay 17:14 25:24 28:8 142:16,24

laying 147:4

laymen's 215:3 256:24 257:1

Le 26:4,24 27:3,15 38:17 183:18 216:3,4,13,18 217:2 242:8,10,13 252:25 253:9,10,23,25 254:15,25 256:16,19 259:8,10 262:10,14 264:16,19,21,24 265:4 274:6,25 275:9,11 276:9,21 277:16,21 278:19 279:4,14,22 280:15 282:5 283:15,19,20,25 284:2,23 285:1 288:9 289:11

Le's 183:21

lead 47:19,20 225:25

lead-up 147:20

leaders 231:1

leadership 263:10

leading 58:8

leads 141:10 195:16

leaned 130:22

learn 221:9 230:11 231:19

learned 94:20 213:6 230:12 232:6,8

leave 23:22,24

led 143:4

ledger 129:25

ledgers 112:25

left 171:19,22 172:1

legitimate 190:7,11,12,13 192:19 250:3,4

legwork 213:9

length 241:22

lens 212:10,14 213:11

lets 221:2

letter 37:23 43:20 44:17 47:7 53:18 62:2 83:16 84:4,7 88:3 92:4 110:14 147:23 239:17

letters 26:16 37:18,19 38:2 43:25 108:12

letting 103:9

level 26:22 32:2 34:7 35:5 131:8 134:4 137:9 150:23 168:2 220:12 249:8

levels 100:21

leverages 257:3

license 234:24

licenses 235:18

licensing 206:2 234:23 269:16

light 10:15

limited 71:21 184:4 265:10

lines 88:23 89:25 171:10 240:2

links 127:19

list 59:6 131:24 155:21 196:20 237:7

listed 58:20,21 128:24 129:2 270:17

listen 6:21 12:15 35:7 79:6

listened 227:12

listening 7:22 220:2 238:19

literally 9:13 80:21

literature 134:7,10

litigation 9:14 10:5,9,15 238:22

lived 258:16

living 194:4

log 253:18

logical 241:11

logically 286:4

logo 217:17

logs 229:19

long 28:23 29:11 66:14 147:6 148:5 155:21 237:22 289:16

looked 54:16 60:12 91:15 112:19 124:10 130:17 137:14 190:16 202:14 232:14

loop 160:12,23,24 163:13 166:21, 22 168:22

loss 39:15 41:14 49:2 53:23 56:8, 13,15,22,24 57:21 68:7,20,22 69:1 71:5 77:4,8 84:5,9 98:11 99:24 100:10 101:16 110:20 111:9 113:5,21 124:7,16 130:4, 12,18,24 132:23 133:11 139:11 151:14,16,18,21,24 152:25 154:13 161:22 170:18 172:16,20, 25 173:10 174:1,10,15 178:17 183:1 188:3,21,22,24 189:12,20 191:16,20 192:23,24 193:2,4 194:16,19 195:1,10,15,16,19 197:24 199:20,22 217:21 220:16 246:14 247:16,20 261:4 264:1,5,8 265:7

losses 40:15 52:24 54:19 56:10, 17,19,21 97:9 124:18

lost 116:21 193:7,8

lot 12:12 13:23 34:11,12 50:23,24 101:24 113:3 123:22 142:23 144:8 147:13 152:15 175:18 178:16 184:22 227:3 231:19 241:20 270:4 271:5 273:3 275:22 289:18,19

**lots** 192:18

**loud** 77:24 256:21 262:16

**lower** 151:1 257:9

**lump** 119:10

**lunch** 29:13 77:19,20 80:17 81:4 147:19

---

**M**

**machines** 229:22

**made** 15:3 21:12,14 24:19 41:16 47:1 48:12 51:12 54:14 64:3,6 70:1 76:18 90:22 92:23 94:19 106:14 107:5,7,9 110:23 111:10, 12,14 112:24 113:10,14,24 116:9, 13 121:8 124:17 125:6 138:6 141:21 145:18 148:21,23 155:9 171:11 180:17 190:24 192:19 200:7 203:12 205:1 206:11,13 207:9 227:11 243:9 244:14,17 252:19 256:5 262:7,8 281:25

**magical** 33:21

**magnification** 44:6 50:7

**magnify** 105:18

**main** 157:1

**maintain** 94:16 243:5

**maintenance** 223:11

**major** 56:6 252:8

**majority** 26:15 210:5

**make** 8:16,22 10:20 12:4 16:17 24:25 26:8 27:23 34:14 50:12 62:24 65:25 74:5 76:11 79:18 99:21 100:6,7 107:6 126:24 134:19 136:10,22 137:10 138:5, 10 142:1 147:7,21 149:10 152:5, 21 193:10 194:23 196:7 211:16 214:1 218:22 220:12 225:14 233:2 238:13 239:6 248:19,25 255:19 267:17 273:22 276:1 284:3

**makes** 16:21 51:14

**making** 23:3 67:25 92:19 103:22 106:16 112:9 134:15 145:12 194:6 251:16

**manage** 204:13

**managed** 73:4 133:21 201:13 266:23 268:24 270:15,20 272:14, 19

**management** 90:11,17 91:5,10 92:6 94:8 182:22 183:3 204:3,5 206:1 221:23 252:10 265:11 266:5 268:6,9,25

**manipulate** 35:3

**map** 236:24,25

**margin** 269:2

**mark** 104:8 197:16 203:3

**marked** 24:21,24 26:5 224:9 225:10 267:20

**market** 138:18,22 139:2,18 140:5,6,14 141:9,22 143:22,24 145:12 148:22,24 151:18 153:24 257:13

**marketing** 134:7,9,14 255:14

**marks** 126:7,10 127:24 193:18

**markup** 200:21,23 201:25 264:12 271:19

**markups** 192:5 200:9,12 204:16 205:10,13,16

**Massachusetts** 19:20 245:20 257:12 258:10,17 262:21

**master** 181:20

**master's** 182:7,10,15

**matching** 146:3

**material** 263:19

**materially** 14:23 16:23 20:12 22:24 23:15

**materials** 64:11

**math** 167:19 182:1

**Matt** 109:18

**matter** 61:15 83:14 94:15 121:3 154:15 199:16 215:16 226:4

**matters** 24:16 103:23 117:13

**Matthew** 108:23

**mattress** 215:3,10 219:4

**mattresses** 215:6

**MB** 170:5

**Mclane** 238:22

**meaning** 91:14 161:3 168:14 175:1

**means** 55:5 56:19,21 58:24 72:19 113:23 116:21,22 187:24 222:2 235:19

**meant** 79:22 122:16 134:10 171:7 280:19

**measure** 192:4

**measured** 162:14 164:3

**measures** 237:18

**meet** 77:25 156:5

**meeting** 39:9 46:22 49:22 50:18, 22 51:4 77:18 131:14,21 160:11, 22

**meetings** 39:18,22

**member** 22:20 161:11 168:5 169:4 282:14

**members** 102:8 114:3 149:17 169:6

**memo** 90:11 91:1,3,5,9

**memorialization** 152:13

**memorialize** 94:7 154:22

**memorialized** 94:25 152:19

**memory** 34:18 182:13 269:3

**memos** 125:10,12

**mental** 114:20

**mention** 76:4 158:24 186:6

**mentioned** 6:8 96:4 159:2 168:25 179:14 208:21 225:21 273:3

**mentioning** 17:8

**met** 20:22 50:3 95:17 275:7

**method** 197:11

**method'** 196:22

**methodology** 124:6,9,15

**methods** 248:23

**meting** 41:12

**Meyer** 12:20 17:23 19:6 23:23,24 24:7,9,11 35:25 36:2 92:14 93:12,

21 94:4,7,12,24 95:24 96:4 100:1
156:3,6,11 158:21 159:7 162:3
163:3 165:5,10,14,21 166:9,11,
16,17,18 216:6,9 224:10 227:17
228:12,14 230:12 232:1,10
233:11,20 234:6 235:4 236:23
270:9,10 274:17 281:21 289:15

**Meyer's** 93:21 96:3 131:14 167:5
227:19 237:17

**mic** 118:4,6

**Microsoft** 234:23 235:2,6,16
252:10

**middle** 37:21 40:18 229:12
234:14

**Mike** 234:22 235:20 253:22

**million** 70:16 85:1,5 168:1
172:22 180:20 265:8,16

**million-plus** 98:20

**millions** 230:16

**mince** 168:23

**mind** 16:10 34:9 35:6 229:9
286:13

**mindful** 104:23

**mine** 100:9

**minimum** 168:17

**minute** 17:8 74:25 79:5 102:16
224:21 252:21 275:10 278:17
279:17

**minutes** 48:23 77:13 81:6 94:24
146:1 215:23 216:24

**miscellaneous** 266:1

**misconduct** 31:24 32:3,6 34:20,
21 35:10 71:16

**misheard** 122:2

**misleading** 106:15

**mispronounce** 209:18

**misread** 262:17

**missed** 203:18

**missing** 33:22 178:1

**mistakenly** 60:25

**mistakes** 145:18 220:13 264:15

**misunderstood** 283:3,13,16

**mode** 64:25 114:13

**model** 89:5,7,8 234:23 257:4,6,
11,19 266:11 270:16

**modeling** 203:16,21

**modern** 228:17

**modifying** 20:17

**moment** 96:1 172:4 277:10

**money** 10:6 50:12 51:12,14
52:21 69:16 190:1,5 197:3,4

**monies** 174:6 188:8

**monitored** 213:24,25

**month** 52:14 57:9 58:4 179:9
201:9 224:14,16 268:7

**monthly** 88:4 265:12

**months** 104:19 210:2

**morning** 6:3,6 80:17 194:21

**mortgage** 197:1

**motion** 6:4 8:12 16:7,10 18:24,25
23:19 29:19 30:3,7,10 31:3 32:5
78:9 80:12 157:10 199:3,5,12
239:11 240:10,12 254:11,14

**motions** 25:11

**mouth** 116:2

**move** 27:15 125:15 155:18
270:12 283:20,25

**moves** 269:12

**moving** 13:23 240:1 270:4

**multiple** 48:24 55:13,16 67:23
106:1,4 280:9

**mute** 137:1

**mutual** 42:20

---

**N**

---

**N-A-V-I-L-O-F-F** 36:17

**Nahass** 82:12,14 149:18

**nail** 21:16,17 29:2

**named** 258:13

**naming** 28:22

**narrative** 208:8

**national** 139:21

**nature** 93:7 94:18 114:10 154:3
190:18 243:10 246:17

**Naviloff** 6:18,19,22 11:20 17:3,5,
10,16,22 24:1 30:10 36:5,7,13,16,
23 39:4 49:9 81:15 100:23 108:24
109:22 118:2 121:23 149:13
153:13 157:3 158:15 172:16
176:10 179:23 183:23 185:18
186:4 194:14 195:21 196:18
199:23 200:11,20 201:15 202:6
203:12 204:2 205:5 206:14 207:1
209:17 212:5 213:13 214:14
215:18 217:24 218:18 219:7,23
220:1 227:9 229:16 236:15 240:7
265:15 266:22 267:4,23 269:12
274:17 275:7 276:16 279:20,23
280:23 281:21 282:13,22 285:2,
16

**Naviloff's** 19:6 109:20 151:14,24
153:1 156:22,24 198:5 199:19
202:23 204:15 206:24 213:5
217:11 218:25 222:23 224:19
227:2,12 247:16 248:14 249:8
256:2 259:22 261:3 264:1 265:6
277:5 280:12 282:6 286:6 288:9

**neared** 174:18 175:15

**nearsighted** 52:1

**necessarily** 16:13 103:22
117:11 143:23 169:5 192:2 208:7
236:14 240:16 270:6

**necessity** 19:5

**needed** 115:6 142:2 176:16

**negligence** 35:4

**negligent** 35:13

**Neha** 254:21

**net** 196:22 197:11

**network** 93:23 95:5 96:17 140:8
205:25 236:24 269:15

**networking** 252:14

**networks** 95:15 139:22

**networth** 196:23,25

**newly** 33:2 160:17 161:5 199:12 202:4 218:5

**news** 50:9,11,14,16,17,20,23 51:5 165:21

**nexus** 194:1

**nightly** 238:2

**Nn** 208:11,15

**nodding** 195:21

**nonprejudicial** 178:21 179:2

**noon** 216:20

**normal** 29:14 77:14 114:13 250:7 261:5,6,21 273:22 281:9

**notable** 222:3

**notation** 40:6

**note** 24:19 132:6 160:10 223:17

**noted** 215:18

**notepads** 125:6

**notes** 8:21 13:22 14:4 15:11,16 45:8 90:21,24,25 91:2 94:17 125:5 154:6 169:16 172:5

**notice** 30:21 142:11 144:13,20 239:19

**November** 49:12 52:15 53:10 59:18 104:17 167:8 196:17 203:7

**number** 19:8 38:18,20 39:6,7,17 63:23 68:16 88:23 94:10,13 95:8 110:8 111:16 112:6 124:13 169:14 170:22,25 216:5,19 224:15 249:2 256:6 270:23 274:25

**numbers** 38:21 70:21 108:14 110:6 162:12 203:22 220:10

**numerous** 176:20

---

## O

**oath** 283:8

**object** 287:9

**objection** 9:23 11:3 24:8 26:2 136:24 137:3 140:22 141:3,4 149:10 151:11 156:19 158:1 177:25 179:13,17 199:4 222:25 236:2,21 237:10

**objections** 147:6 158:13

**objective** 43:9 68:6 69:4,6

**objectively** 207:12 228:15 263:3

**objectives** 68:2,3,17,19,25

**objects** 7:15

**obligated** 162:19

**obligation** 21:8,19 142:15 166:5 274:5 275:5,15 276:7 277:14 279:10 282:17

**obligations** 275:21

**observing** 90:19

**obtain** 74:12 279:11

**obtained** 194:11,15 243:19

**obtaining** 182:15

**occasions** 94:14

**occur** 165:3,14,19

**occurred** 68:10 74:22 187:20 282:12

**occurring** 164:23,25

**October** 45:20 52:19 58:1 59:25 104:13 140:12 169:21 203:6

**off-limits** 120:22 122:4

**offer** 17:1 147:7,21 148:19 149:8 152:5 166:13 188:5,13 191:2 244:16

**offered** 157:23 167:2 247:20 271:25

**offering** 188:1 213:10 248:12

**offers** 158:11

**office** 38:6 41:4,8,20 42:13 46:15,22,25 47:11,12,15,22 48:2, 13 49:22 50:3,22 59:10 60:2 61:15 62:14,18 63:6,12,18,24 64:15,20,23 65:18 68:7 88:4 108:7 109:18 112:23 113:9,14 115:10,25 116:7 117:24,25 118:21 123:16,19 126:22 127:22 130:10 160:14,15 163:2 165:5 168:11 173:7,14,18 176:22 197:7 243:21 280:20 281:2 282:14

**officer** 7:24 9:4 20:16

**official** 210:17

**offshore** 257:12

**offshoring** 257:4,5

**on-site** 155:7 265:21

**one's** 45:22 126:10 159:15

**one-and-done** 269:25

**one-year** 164:2

**ongoing** 48:3 238:6,9 269:15,16

**Oo** 75:17 81:11,12 82:4 83:2,25 85:19 90:4 220:19

**open** 16:11 32:19 34:9 35:6,17 289:4

**open-ended** 226:1

**opening** 131:9

**openly** 98:1

**operate** 18:14

**operated** 62:23 258:8

**operates** 259:3

**operating** 257:11,20

**operations** 111:8 237:16 257:16, 22 259:5

**operative** 190:11

**operator** 270:3

**opined** 100:2

**opining** 191:16 195:14,20

**opinion** 6:23 56:22 63:17 92:15 93:25 111:16 120:11 121:3 124:20 135:9 136:5,11 138:3,8 152:8 153:25 157:13,25 158:1,5 166:7,11,13 167:2,4,5,24 181:21 200:18,20 201:2 202:5,23 204:15 206:22,24 207:4,6 219:23 220:9 221:14 224:19 226:18 227:2 228:11 231:5 241:19 247:1,18,19 259:22 276:22,23

**opinions** 55:18 101:20 119:8 123:24 144:22 145:19 152:11 157:19,23 186:17 191:2 199:11 204:22 205:13 211:15,18 213:5 217:11 218:20,23 219:9 222:21 242:23 248:9

**opportunity** 12:19 13:3

**opposed** 144:17

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**opted** 98:1 111:13

**options** 208:4

**oral** 29:8

**order** 6:18 10:23 14:12 15:25 26:7,10,23 27:2 30:2,15 31:21 73:15 82:8 111:17 121:21 139:25 141:8 142:1,10 174:11 206:6 219:13 220:10 221:22 224:1 232:24 233:23 238:13 241:10 257:7 271:9 273:24

**order-covered** 26:14

**ordered** 276:2

**Ordinarily** 24:20

**organization** 9:5 164:9 185:4 231:15 255:25

**organizations** 252:9

**organizing** 185:2

**origin** 176:24 244:5

**original** 225:17 254:4,8

**originally** 216:19

**OS** 266:5 268:5,8

**other's** 19:9

**outcome** 79:19

**outline** 109:16

**outlines** 284:17

**outsourcing** 183:5

**outstrip** 286:4

**overbilled** 167:23 190:17

**overbilling** 168:18

**overeager** 197:16

**overlap** 207:21 209:24 210:13

**overlaps** 210:2

**overly** 115:16 120:19 122:17,20 237:11

**overridden** 73:2

**overrule** 137:3

**overruled** 141:3 179:18

**oversight** 73:7 103:15 262:22

**overstated** 247:17

**overview** 255:16

**ownership** 235:17

---

**P**

**p.m.** 148:10,11 216:1,2 289:25

**pages** 27:4 105:21 150:21 151:2 155:21

**paid** 8:10 92:7 190:19 195:2 225:9 235:2,18 249:14 268:17 269:10

**Pakistan** 180:21 251:21 252:12 257:17,22 258:4,8,20 260:13,19 262:2,6

**Pakistan-based** 251:18 261:14

**paper** 211:20

**papers** 31:6 32:23 33:5 34:14 89:19

**paragraph** 14:7 43:9 44:8,11 71:13 86:16,17 87:24 88:1 91:22 96:5,6,9 124:4 149:23 150:18 153:18,19 160:7 169:16 209:23 220:21 252:7 255:1,7 256:18 259:8 262:11

**paragraphs** 284:25

**parallel** 162:20 166:3 211:4

**part** 16:15 26:9 43:10 48:22 52:10 56:13,23 67:24 78:24 82:7 93:14 96:2 97:15,19 98:17 100:2 102:15,20 107:15 111:7 113:1,8 114:19 116:8,12 117:22 118:20 120:5,17 121:20 123:1,17 133:2,3 137:13 142:3 150:8,16 161:2 167:16 170:25 171:5 176:25 189:24 194:17 195:8 200:23 201:23 203:18 206:3 211:20,25 215:13 227:10 229:9,12,13,24 239:5,18 241:14 242:25 251:19 254:1 264:9 267:6 270:22 284:8, 19

**partial** 155:24,25

**participate** 9:19 13:4

**participation** 13:17

**parties** 25:3 30:25 31:1,15 102:13

**partner** 57:16,17

**parts** 13:23 185:9 215:10 258:2

**partway** 148:3

**party** 11:23 14:12 25:13

**pass** 134:21,23 183:22 257:7,10

**passed** 19:25 64:1 287:15

**passes** 193:19

**past** 146:11

**paste** 286:15

**pause** 20:8

**pay** 10:6 243:7

**paying** 192:7,8

**PDF** 39:6

**peek** 80:19 101:19

**peers** 263:13

**people** 25:24 27:18 29:14 41:12 55:14 57:15 68:12 82:15 103:16 155:14,22 156:17 168:14 183:12 185:23 210:16 227:4 232:20 255:11 279:15

**percent** 159:24 170:7 171:4 200:22 202:1,2 218:1 286:25

**percentage** 218:1

**perfect** 143:11 192:2 202:20 209:11 229:14 253:24

**perform** 86:23 100:13 130:3 135:8 222:17 232:24 237:23 241:11 285:21

**performance** 262:23 263:11

**performed** 73:17 74:11 87:18 91:23 92:9 99:22 113:3 114:20 128:17 184:3 187:21 217:20 220:21 221:15

**performing** 235:1 261:7

**period** 56:5 57:19 61:5 67:19 132:9 133:15 164:3 170:7 190:2 193:7 207:1,21 239:20,23

**periodically** 49:1

**permitted** 62:15,16 222:4 287:22

**person** 14:15 17:24 24:7 55:7 100:25 101:1 153:20 157:7

168:24 186:20 203:3 209:17 213:7 219:10 222:12 225:8 227:15 234:21 235:15

**person's** 187:18

**personal** 54:19 172:17 176:10 181:6,9 187:3,10

**personally** 61:4 280:19

**persons** 99:2

**perspective** 169:1

**persuaded** 35:17

**pertaining** 140:7

**pervasive** 35:1

**phase** 56:11

**phases** 56:16

**phone** 47:12 48:10 65:7 88:4,7, 13,16,21,23 89:4,25 126:22,24 129:19 131:14 201:21 204:3,20 206:2 247:7 263:4,5 265:13 267:15 268:11,17 269:8,18,24 270:11,13,14 271:13,15

**phone-specific** 205:24

**phones** 89:17 269:23

**phonetic** 149:19 150:2 258:14

**phrased** 165:16

**pick** 189:3 192:13 201:21 288:14

**picking** 191:19

**picture** 158:3

**piece** 224:20 225:12,13 267:15 268:25

**pieces** 270:4

**pinpoint** 256:10

**place** 36:2 71:16,19 94:3 95:24 111:18 113:18 231:13,17

**places** 15:12 255:8 256:14

**plain** 29:8

**plan** 29:13 77:19 84:18

**planned** 216:20

**platform** 164:11 286:10,16

**plausible** 208:22,25

**play** 99:10 138:14 223:14

**pleadings** 144:5 199:5

**PMI** 252:11

**point** 14:3 15:2 21:1 22:1 24:25 26:4 33:17 35:8 49:16 51:1 53:14 59:19 79:7 106:14 108:17 118:9 124:20 143:7 146:20,21,22,25 157:1 158:6 161:20 163:4 181:22 183:19 186:8 189:4 195:25 197:14 209:5 211:23 226:5,25 227:14 238:4 240:16 270:25 274:7 282:7 283:11 285:16

**pointing** 281:24

**points** 96:18 114:21 156:23

**policies** 72:24,25 74:1,5,10 76:4 113:7 126:15 130:1

**policy** 40:21

**poor** 219:12

**poorly** 72:25

**pose** 288:20

**position** 14:22 16:19 17:25 33:9 187:25 233:11 234:5 249:23 267:4

**positions** 257:9

**positive** 262:20 263:14,16

**possess** 274:11,21,23

**possessed** 278:16,18

**possession** 117:19 174:24,25 274:3 275:3,13 276:25

**possibility** 31:6 209:1 211:9

**possibly** 18:3 31:12,13

**post** 170:15 282:23

**post-conviction** 10:5

**post-discovery** 225:20

**post-trial** 208:10

**posttrial** 28:1 141:20 146:12 202:4 213:3 221:8 226:7,12 228:25 234:15 266:14 284:15

**posture** 80:25

**potential** 10:11,16 40:11 41:1,3 42:21 44:2 56:10,15,17,19,21 57:21 70:10 71:17 133:11 140:1,4

210:18 217:25 226:19 264:8

**potentially** 29:6 87:4,12 127:21 166:2,23 167:1,4 168:10 213:9 227:6 257:8 278:12 279:6

**Pp** 202:10,11

**practical** 193:16

**practice** 37:2 185:10 213:23 219:18 238:8 245:3 246:3 248:5, 24 250:10 256:9 260:15 281:6

**practicing** 22:21

**praxis** 65:2

**pre** 28:5 170:15

**pre-engagement** 59:18

**pre-marked** 38:15 45:1,13,23 46:4,8 49:3 51:19 53:2 59:23 60:19 71:1 81:12 102:4 107:25 125:19 131:4 149:4 155:16 159:17 169:17 202:11 208:15 228:6 229:3 234:11 265:2

**precedent** 34:12 275:22

**precise** 201:11

**precisely** 210:20

**predates** 228:19 269:1

**predetermining** 166:23

**preference** 21:22,23 23:7

**prejudice** 25:15 29:23 178:16 274:8,14,22 277:8,17,18

**prejudiced** 27:10

**prejudicial** 31:10 78:4

**preliminary** 105:5

**premise** 191:1,3

**preparation** 43:13 243:1,24

**prepare** 11:13 27:14 41:6 48:22 68:7 84:19 87:4 98:20

**prepared** 10:20 42:2,3 100:9 109:1,10,22 282:7

**preparing** 94:1 98:6 113:20 120:9 161:16 162:2

**preponderance** 161:23

**prescribed** 31:5

No Copy Of This Transcript May Be Made Prior to 2/28/2021

27

**present** 7:10,20 8:11 9:1 10:3,10 13:5,16 14:16 19:6,9 22:8 161:16 206:6 224:11 247:9

**presentation** 7:11 12:5 17:2 39:13 77:23 102:9 103:2 139:19 171:11

**presentations** 40:1 48:24 104:12

**presented** 34:23 91:19 100:10 103:5,8 200:20 207:11 213:12 218:9 244:22 274:19

**preservation** 237:15 239:17,19

**preserve** 230:13 238:9 240:4

**preserved** 229:19,25 230:2 232:2,4,9 237:22 241:5

**preserving** 237:11

**president** 272:7

**presume** 133:15 189:10

**pretrial** 28:1 30:7 111:21 121:24 226:12 241:15 262:8 278:5,13 282:15,23 283:2

**pretty** 105:18 165:15 219:24 285:9

**prevent** 71:16 237:17

**previous** 62:21 71:10 104:15 108:10 127:16 145:15

**primarily** 176:15 213:7 221:11

**primary** 59:5 214:7

**principal** 159:8 272:13 287:8

**printer** 253:15

**prior** 28:7 30:20 40:7 54:7 72:2,6 75:5,7,17 76:8,11 82:6 97:13,24 98:24 107:14,21 124:18 148:20 150:14 169:8 182:14,19 197:7 211:12 230:4 231:9 232:4,17

**privilege** 17:22 18:2 19:7 22:13 47:13,17,25 62:25 65:23 66:15,17 67:21 102:18 103:18,23 104:23 174:9,13 175:25 240:1

**privileged** 67:3,4 104:8 115:16 116:13 175:17

**privy** 241:25

**pro** 18:7,10,15

**problem** 25:3 26:17 78:7 96:12 176:8 192:23 226:22,23 275:17 276:21 279:7

**problematic** 32:10 144:23 190:20,21 219:3

**problems** 73:25 74:16 76:4,6 231:16,21

**procedural** 24:16 27:21 80:25

**procedurally** 27:18

**procedure** 73:6

**procedures** 72:24,25 74:1,5,11 76:5,7 100:14 113:7 126:15 130:2

**proceed** 81:10 148:18 179:17 198:9 242:9

**proceeded** 130:10

**proceeding** 14:25 15:7 22:3 23:17 25:8,14 78:16 80:22,24 158:10 196:1

**proceedings** 8:8 9:1 16:24 46:16 81:8 148:11 216:2

**proceeds** 197:1

**process** 34:8 35:3 41:17 73:2 74:17 80:18 92:17 102:1 120:19 122:25 123:1 132:16 133:6 217:21 244:3 252:17

**processed** 279:12

**produce** 29:21 30:4 31:10 112:5 121:18,19 122:13 156:11 178:5, 20 201:18 274:5,12,22,23 275:4,5 277:15 280:24

**produced** 28:1,7 40:7 72:2,6 75:5,7,16,21 78:2 80:21 82:6,7 98:2 102:24 111:11 123:7 146:13 147:10,11 150:13,14 199:8 202:4 212:24 221:4 231:7,9 235:21 244:2,12 275:1 276:2 278:13,14 279:2

**producing** 46:23 114:3 122:6,7 178:6

**product** 113:20

**production** 30:11,21 108:13 196:10 238:6 239:21 276:4 281:9

**productions** 48:1

**productive** 50:21

**products** 234:24 235:2,6

**profession** 59:1

**professional** 163:24 184:3,21 252:9 255:24

**professionals** 159:4 161:25

**proffer** 79:2

**proffered** 154:4

**proffering** 152:23

**profits** 190:8 194:7

**progress** 123:24

**progression** 152:11

**project** 132:5 183:15 184:1 185:9 252:10 269:11

**projects** 156:4,20 184:14 263:17

**promised** 162:20 164:16

**promoted** 99:16 160:17 161:5 214:5 218:5

**promptly** 109:12

**pronounce** 150:2

**pronounces** 82:13

**pronunciations** 7:6

**proof** 16:1 17:1 35:22 41:7 84:5 147:7,21 148:20 149:9 152:5 158:11 190:4

**Proofs** 71:4

**proper** 134:16 164:23 219:2 225:2

**properly** 242:3 264:14

**proposal** 78:11

**prosecution** 13:15 34:16 41:9, 15 42:8 68:4 69:2,12,17 117:14 142:21 143:18 158:14 238:25 239:3,5,8 277:14

**prosecutor** 31:17 275:14,21,24 281:11

**prosecutorial** 31:23 32:3,6 34:20

**prosecutors** 142:10 240:20 275:7

**prospective** 74:12 76:5

**protect** 11:5 44:13 67:20,21

**protected** 126:25

**protecting** 44:18

**protective** 26:7,10,14,23 27:1

**prove** 187:19 188:1,6,20,23,24 189:7,15 190:5 192:25 193:1

**proved** 194:18

**provide** 22:17 43:11 88:6 110:21 168:10 186:2 214:7 228:12 231:3 242:23 243:6 263:4,22 268:14 285:13,22

**provided** 30:13 48:25 51:23 52:6 75:14 76:11 83:15 99:4 129:3 137:18 141:14 142:12,14 143:10, 25 146:6,7,21 154:16 173:12,14, 17 175:8,10 184:4,8 209:25 214:10 222:6,7 226:11,12,15,16 230:14,18 231:23 232:12 233:22 245:23 248:20 249:25 250:4,11, 13,17,19 251:9,17 255:13,15 256:1 259:13,20,23 261:16,24 262:25 268:18 270:19 272:18,24 273:16 278:4 285:19 286:3,22,23

**providing** 42:4 127:21 171:21 213:4,19 214:2,8 251:4 270:7,10 272:13 273:13

**proving** 188:16,19 189:18

**provisions** 14:18

**pull** 43:9 45:3,11,19 46:11 49:8, 11 52:4 57:5 59:7 70:24 71:12 81:11 86:16 89:7 90:5 91:22 102:11 107:23 126:2 129:8 131:1 138:25 139:3,7 149:3,23 154:6 155:3,25 159:14,20 160:8 169:15 202:9,18 208:11 217:6 220:18 228:4 229:2 252:3 253:5,14 264:17 283:24 288:8

**pulled** 54:17 70:9 89:9 255:9 286:9

**pulling** 86:5 89:20 147:16 149:6

**pullout** 44:6 50:6 52:12 104:24 153:18

**puppet** 181:20

**purchase** 268:1

**purchases** 180:17

**purist** 271:1

**purported** 176:23

**purpose** 40:13 93:17 133:13 189:13 210:25

**purposes** 19:18 41:7 53:24 59:2 89:21 93:25 95:16 103:2 113:4 132:22 138:16 161:22 165:22

**pursuant** 142:14

**purview** 163:10

**pushback** 101:15

**put** 39:13 42:6,11 54:15 63:10 69:25 70:21 84:18 86:9,13 114:23 115:2 116:1 128:15 144:19 165:12 184:24 201:20 219:20 239:11 248:3 253:19 254:18 283:7 286:10

**puts** 144:12

**putting** 33:4 39:25 81:17 100:12 132:18,20 169:23 184:6 185:2 213:10 281:4

**Q**

**qualifications** 213:16,18 219:1 227:21

**qualified** 166:19 213:19 228:12

**quality** 99:23 100:13 133:2 215:20 218:19 219:10,12,14

**quantification** 49:2 68:8,23 133:4 139:12

**quantify** 68:20 140:1 187:22

**quantifying** 132:23 133:9 188:3

**quash** 240:2

**question** 15:1 19:2 20:11,13 28:4 30:24,25 31:2,7 62:1 77:21 78:14 79:8,23 81:21 88:18 97:7, 22 100:4 102:17 111:24 112:3,13 121:1 128:21 129:12 131:24 136:5 141:10 161:14 172:23 179:5 186:5 187:15 191:8 194:22 196:4,12 197:15 227:25 230:7 233:14 238:18 240:25 241:1 271:21 273:19 277:16

**questioned** 17:23 37:3 99:19 100:22

**questioning** 17:5 23:4 273:21

**questions** 18:13 29:9,18 34:11 35:19 38:7 49:6 83:17 87:7,9 89:8 98:19,22 99:8 101:9 128:3 131:22 143:9 163:14 172:6,10 173:3 178:10 185:11 187:1,8,13 205:16 226:1 233:9 242:5 246:16 259:6 282:4 288:20 289:19

**quibble** 77:22

**quick** 29:1 87:20

**quickly** 13:9 29:5 89:6 118:8

**quote** 43:18 53:23 54:4 68:16 131:7 139:23 154:25 157:2 166:21 189:23 214:18 218:4 223:2,6 232:11 249:7 267:4 273:9 274:18

**quotes** 196:23

**R**

**raise** 25:19,23 36:7 142:17 148:13 198:12 266:12

**raised** 25:17

**raises** 218:3

**range** 151:1

**rapid** 249:11

**rate** 151:3 184:12 289:11

**raw** 146:20

**rays** 176:4

**read** 12:16 15:14 19:13 22:24 34:16 70:14 74:9 87:3 96:9 108:14 110:5 115:1 121:14 149:20 168:8 196:19 208:1 210:11 211:22 248:7 249:3 252:2 255:4 256:19,21,23 259:15 262:16 285:17

**read/review** 184:25

**reader** 107:3

**readily** 15:23 277:19

**reading** 13:10 45:8 60:14 110:1 171:18 222:10 236:5 252:20 254:16

**ready** 61:6 148:12

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**real** 10:11,16 13:9 42:14 63:14 78:21 134:12 162:20 180:16 186:24 196:3 271:10

**real-time** 95:15

**realize** 141:6 224:5,7 230:22

**realizing** 169:2

**realm** 201:10

**reason** 11:3 12:3,6 17:12 48:6 79:12 140:16 141:11 143:10 144:12 207:22 226:24 237:21

**reasonable** 10:24 11:1,6,7 16:21 26:1 54:18 205:17 207:12,22 209:2,6 261:23

**reasons** 113:5 138:11 201:6 207:17 226:6 281:24

**reassess** 6:16

**rebut** 261:3

**recall** 42:10,14 54:24 66:10 96:1 114:1 122:25 124:19 129:16 138:23 140:15 169:22 171:25 173:3,7 199:22 200:11,13,14 204:1,6,7 205:9,12,15 206:14,17, 20,21 233:4,9,15 235:4 236:2,5 237:9 243:16 246:21 249:3 255:10 266:2

**recalls** 279:23

**recap** 150:1

**receipt** 260:10

**receipts** 177:20

**receive** 103:17 212:15,21

**received** 39:20 63:23 95:12 112:4 174:6 230:9 263:14

**receiving** 132:17

**recent** 82:8 196:10 254:2 264:17

**recently** 109:9 150:14 214:5

**recess** 81:6,7 148:10 216:1

**recognize** 39:5,8 71:6 221:7 275:23

**recognized** 274:10

**recollection** 39:16 47:3,23 61:8 67:1 70:17 93:19,21 122:21 128:1 133:17 138:9 183:2 232:7 235:9 249:15 282:8

**reconstitute** 238:4

**reconvene** 77:18 215:25

**record** 12:15 23:18 28:11 36:14 38:13 64:9 76:16 80:24 81:9 117:1,18 120:10 125:13 128:20 198:19 278:7

**records** 55:11 113:2 119:6,18 173:9 176:15,17,23 177:18,21,22 180:1,3,4,7,10,23 181:1,12 188:10 191:25 243:2,3,4,5,11,18, 19 244:1,2,10 248:19 250:5,8,11, 17,25 255:18 260:4,17 261:20,22, 25 262:3 272:22,25 273:15 274:1, 2,11,25 275:24 278:1,3,11,15,21 279:1

**recoup** 52:23

**recover** 40:15 52:21 69:1

**recovered** 61:17

**recoveries** 40:11 41:2 70:11

**recovery** 42:9 56:20

**RECROSS-EXAMINATION** 191:10

**recurring** 265:13

**redacted** 126:20,21 127:3,9

**redirect** 185:13,16 196:15

**refer** 110:5,8 149:16 170:3

**reference** 17:12 33:5 76:18 92:19 106:1 148:21 150:15 186:23 205:15 229:21 246:9 248:25 277:24

**referenced** 72:5 140:18 141:1 227:17,18 278:1,22

**references** 31:5,16

**referencing** 88:3

**referred** 60:25 109:24

**referring** 15:18 53:21 257:16

**refers** 15:11 90:18 105:25 259:21

**refine** 53:23

**refined** 90:12 91:12,13

**reflected** 181:1

**reforms** 53:24

**refresh** 39:16

**regard** 108:24 183:24 200:16 202:14 203:12 217:10 232:10 269:6 273:10

**regions** 257:7,8

**rehashing** 137:4

**relate** 6:23

**related** 11:22 63:7 66:2 90:19 98:3 129:24 130:18 173:10 192:6 199:5,11 243:11 260:18,19 261:15

**relates** 204:4 257:15 266:17 269:4 287:20

**relating** 260:5

**relation** 217:19 259:4

**relative** 249:10

**relay** 216:15

**relaying** 160:19

**release** 8:6 216:8

**relevance** 28:9 151:11,20 156:19 175:20

**relevant** 30:8,20 64:11 89:20 94:18,21 107:18 112:8 114:22 116:25 125:6 129:21 130:11 141:22 142:6 152:7,9,16 153:24 154:9 157:13,18 178:6 272:5,12

**reliance** 100:3

**relied** 75:20 99:20 100:5 112:15 116:15 117:6 118:18,25 148:22 166:8 247:23 249:13 255:25

**relies** 183:16

**relieved** 277:14

**rely** 100:7 115:2,3 116:17 117:8 212:3,6 219:17 230:25

**relying** 118:10,13 134:18 160:16 161:5,10,12 165:23 218:4

**remained** 65:23

**remedial** 237:18

**remedy** 31:5,12,14,20 32:25 34:2,4,5

**remember** 9:16 18:14,15 21:6 53:25 55:1 63:13 66:25 95:5

115:11 125:1 131:20 138:21 140:10 148:6,7 158:15 159:10 167:10 197:10 233:14 251:8,10, 14,16 252:18 254:6 282:21 286:11,12,17

remote 265:21

removed 127:4

renamed 59:4

rendered 92:16 199:25 210:5 211:19 220:17 258:6 260:6 264:12

renders 179:2

Renshaw 52:9 229:15

reoccurring 137:19,22 192:5

reorienting 61:20

repeated 280:9

repeatedly 144:21

rephrase 111:24

replaced 270:10

replacing 211:2

replicate 249:13

replies 93:1

reply 50:8 205:15 254:11,14

report 12:16 38:13 41:21 42:1 43:14,17,19,23 48:23 52:18,20 63:11,16 67:16 68:24 69:24 72:11,14 73:18,24 75:8 76:3 81:18 93:13 94:25 95:22 96:16 98:17 99:25 100:3 105:6 107:3,8 109:1,10 114:23,25 115:2,4 116:25 117:4 120:10 124:21 139:8,9 148:21 156:22 159:2 161:19 162:2 165:13,16 169:24 170:2,23 194:10 199:10,15 200:2 223:4 224:25 235:22 248:12 251:7,8,9,10,24 252:6 253:3 254:8,9 255:20 256:2,14 258:25 259:12,20,22 264:17 266:12 267:24 283:23 286:6 288:10

reported 137:23

reportedly 139:24 258:18

reporter 77:14 110:1 203:19 215:24 227:22,23 228:3 253:12

reporting 140:2 280:8 283:22

reports 49:2 55:2 75:24 94:19 109:22 110:10,12 116:16 124:17 125:7

represent 20:6 22:10 121:3 283:8

representation 27:12 38:8,9 153:8

representations 141:21

representative 7:19 10:8 15:19 20:1,3

representatives 13:24 20:2

represented 8:10 10:7 152:12 189:5

representing 22:3 83:4,8

represents 7:12

request 14:12 28:17,19 66:1 74:6 83:16 92:2 109:17 112:6 119:11 121:8 138:22 140:11 142:4,9 143:16 148:23,25 154:8 175:14 212:16 230:6 260:17

requested 48:5 86:6 107:19 139:2 143:23 144:10,11 147:9,10, 23 231:24 232:17 235:24 238:22

requesting 109:21

requests 46:25 47:1 63:23 64:3, 5,7 84:8 102:19 124:25 131:10 141:13,15 174:19,22 175:7 211:17 244:14,17

require 74:11 135:15 193:10 218:16 270:5

required 221:19,21 252:15 267:17 269:6 276:4 281:1

requirement 164:2

requirements 73:6 74:19 252:16

requires 14:11 195:15 221:25

requiring 281:9

research 135:16

reseller 285:14 286:21,24 287:4, 7

resellers 285:8

resolution 19:25

resolutions 231:16

resolved 30:11

respect 22:12,17 47:20 48:11 51:3 68:11 74:19 75:22 90:21 91:17 93:7,22 94:5 96:13 97:25 98:17 99:24 104:6 114:4 115:18 120:6,8 121:16 130:7 131:24 137:16 161:17 163:10,11 164:25 165:24 168:17 180:14 184:7 200:15 204:14 274:15 279:22

respectfully 11:4

respond 203:11

responded 50:20

responding 89:21 120:21

response 46:13 84:19 85:9 87:5 89:20 113:9 123:7 125:3 173:22 185:21 186:10,12 207:6 223:12, 16 233:15 236:9 251:13

responses 46:15,24

responsibilities 157:6

responsible 48:7

responsive 64:5,10 107:19 111:17 122:8,11 124:12 212:16

rest 8:7 11:10 50:2 85:12 93:14

result 20:18 41:2 80:4 164:15 227:3 263:18

resulted 193:2

resume 148:12 228:18

resumed 81:8 148:11 216:2

retained 51:6 67:15 83:12 109:9 124:22 242:19,22

retention 125:13

return 247:24

reveal 174:11

revenues 174:5 181:2

review 13:6 65:6 84:15 100:13 110:24 115:7 136:19 143:19 173:14 176:16 179:22 180:12 181:21 199:3,7,15 213:2,18 217:12 231:2,3 236:1 243:12,23 248:6,14,18 249:8,10,12 251:25 259:12,19,21,23 263:18 266:13 275:15,25 276:7 281:12 284:2,15

No Copy Of This Transcript May Be Made Prior to 2/28/2021

287:24

**reviewed** 48:23 110:19 111:4 112:1,15,17 116:8 118:17,25 119:25 121:11 133:1 143:20 150:21 176:25 179:25 202:3 213:15,25 222:23 227:19 228:8 229:5 234:17 241:3 244:1 245:7 276:19 286:6

**reviewing** 65:22 84:5 89:22 109:20 118:11,13 204:4 228:11 237:9

**reviews** 263:11,14

**revised** 124:20

**revision** 14:5

**RFP** 72:24 73:2,4,5,10,13,20 74:1,4,17 252:17

**rhetorical** 79:23

**rid** 104:24

**rides** 8:12

**riding** 274:21

**Rights** 14:19

**rise** 16:7 34:19 35:5

**rises** 32:2

**Riyal** 150:2,20

**road** 51:8 79:20 236:24 271:1

**role** 36:25 63:3 67:6,9 76:25 97:23 100:18 101:12 157:3,6 184:4 215:14 223:14

**roles** 68:14 272:9

**Ron** 82:12 85:21 131:12 132:6 170:12

**room** 19:10 36:3

**root** 72:15,19

**Rosenfeld** 57:6,12 85:24 149:18 156:16 158:22 159:7,8 166:9,20 186:3,23 218:7,16

**rough** 242:21

**roughly** 204:11 210:6 267:21

**roughshod** 8:12

**routine** 282:25

**Rr** 229:1,3

**RSM** 36:23,25 40:4 43:10 45:5, 16,20 47:2 48:18 49:19 51:13 52:19 53:12 55:20 56:7 58:3,11 60:22 61:25 62:2 68:13 75:8 76:19 81:17,24 82:15 85:14 86:2 90:6 100:21 109:22,24 110:10,12, 19 112:1 113:16 119:21 121:17 122:7,13 123:2 124:6,15 139:8,9 148:21 157:14 161:4 168:14 170:14 175:10 182:19,24 186:1 211:13 217:17 232:12,14,16,21 233:1,22 234:21 237:23 241:9 259:12,19,22 275:2 278:10

**RSM's** 49:23 84:9,11 125:3 183:8 279:1

**rule** 7:20 8:15,21,22 10:4 13:9 14:9,11,17 16:13,20 19:12,13,15 30:1,15 32:5,13,18,23 33:6 34:1 43:14,16,18,22 141:8 273:23 276:4

**rules** 14:9 19:11 281:1

**rules-based** 15:4

**ruling** 23:5 25:12 29:25

**run** 28:24 166:2 245:15

**running** 38:25

**runs** 206:2

**Russell** 83:12

**Ryan** 52:9 57:1,9,16,21 58:15,18 82:10 85:21 86:2 90:7 91:8 92:18 93:4,11,12 95:1 96:10,13,21 99:11,20 100:5,7,11 131:7,12,18 132:4,7,13,17 134:13,18 135:17 136:17 137:7 145:15 149:16,25 153:13 155:3,5,10 156:2,5,10 157:22 158:24 160:16 161:5,12 165:20 168:16,20,22 181:24 183:14,24 186:6 209:16 218:5 229:19

**Ryan's** 90:15 132:14 162:22 168:6

---

**S**

**S-G-R-O** 198:22

**Sack** 234:22 235:20

**safe** 289:14,17,20

**safeguard** 238:10

**salaries** 257:9

**salary** 196:25

**sandbox** 285:7,14,15 286:5

**sat** 137:25

**satisfied** 22:23 166:4

**savings** 257:10

**scan** 90:18 93:23 95:5,23,25 96:2,17 226:10,16

**scanning** 232:24 241:9,11,16

**scans** 92:22,24 226:11 241:13,14

**schedule** 288:16

**scheduled** 216:7

**scheme** 106:3,18 194:17

**scope** 212:3 219:18 226:8 245:3 246:2 248:4,24 250:9 260:15,22 269:13

**scrap** 271:3

**screen** 25:1 51:24 129:4 216:25 252:4 253:20 254:19 256:17

**scroll** 82:20

**seal** 12:12 26:18,21

**Sean** 52:9 229:15

**searching** 211:17

**seasoned** 162:24 186:11,15

**second-year** 99:15 135:7 214:19

**secondary** 54:21

**seconds** 42:22

**secret** 185:7

**section** 71:14 72:23 73:13 87:3 126:2 155:25 262:12 283:22 284:3,5

**sections** 72:3 73:9

**security** 119:10 126:20,21,25 127:3,9

**segue** 209:11

**seized** 176:21

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**select** 289:23

**sell** 225:6

**sells** 286:20

**send** 9:4 49:18 64:15 65:5 125:25 128:22 150:1 243:7 289:3,22

**sending** 53:9 127:18 197:4

**sends** 83:9 90:10

**senior** 57:15,17 99:16 160:17 161:6 218:6 234:20

**senior-level** 185:6

**sense** 12:5 19:17 35:15 76:11 141:4 142:2 194:24 208:2 273:22

**sensitivity** 175:19

**sentence** 102:12 112:14,20 155:2 159:21 171:23 285:6

**separate** 119:7 127:12 164:17 167:2,5 247:20 249:17 274:10

**separated** 224:2

**separately** 268:2,7

**September** 45:15 56:1 272:8

**sequester** 13:1,2 16:4 23:19 35:25

**sequestered** 9:7 10:19 21:24 23:8,21,25 24:5

**sequestration** 6:9 9:5 13:20 14:10 19:11,15 22:7 216:10

**serve** 117:1 175:15 181:17 197:21

**served** 110:25 111:2 120:10 133:3

**server** 64:10 128:20 192:8 253:18

**servers** 95:6 166:1 234:24

**serves** 154:13 269:3

**service** 73:5 136:3 200:23 201:13,19 203:5,6,9,13,17,24 204:12,13 205:18 206:5,6,18 207:20 212:12 233:17 246:22 263:4,5 268:11,17 269:1,4 270:24 285:12,18 286:2 287:15 288:3

**services** 37:2,6 43:13 68:13 73:4,10,15,16,21 86:23 87:18

89:4 91:23 99:3 132:22 133:20,24 134:5,16,19 135:2,5 136:2 137:16,18 139:24 154:16 164:15 168:3,19 183:7 186:2 190:20 192:6 199:25 200:24 205:3,24,25 207:4,14,18,24 208:22 209:25 210:5,13 211:3,7 212:7,8 220:7, 17,20 221:14 223:21 225:3 230:16,18 231:18,20 242:25 243:6,14,15 245:19 246:18,22,23 248:20 249:25 250:4,6,13,19 251:4,17 258:2,5 259:13,20,24 260:6 261:8,9,10,16 263:22 264:9,10,12 265:13 266:23 267:2, 14 268:13,16 269:7 270:7,9,21 271:5,6,18 272:14,18,19 273:14, 15 285:3,22,23 286:9,21,22,23 287:13,19,23 288:6

**serving** 182:12

**set** 15:24 61:9 101:6 145:3 149:24 194:5 203:6 269:25

**sets** 155:21

**setting** 40:8 269:23 270:2

**setup** 137:17 138:13 268:1 269:9,10

**Sgro** 6:20 24:2 138:1 158:8 198:8,10,12,18,21 199:3 202:13, 21 217:7 220:22 229:5 242:14 253:2,16 255:2 265:4 274:9 276:18 277:23 278:8,13,24 279:16 281:17,22 284:2

**Sgro's** 264:17 274:15

**shading** 20:17

**shape** 65:16

**shaping** 20:17

**share** 48:8 64:4,6,10 65:8 66:11, 23 93:8 98:23 99:1,5,18 100:4 103:25 129:4 130:23 136:12 154:23 169:7 176:20 196:9 276:22,23

**shared** 12:11 47:18,21 48:5 66:13,15 68:1 77:2 93:18 95:23 96:2,19 97:12 98:17 103:11,19 107:13 112:8 115:18 116:23 120:18 125:8,9,13 128:20 129:13, 15,20,22 130:8,19 136:16 143:14 154:22 166:14

**sharing** 17:10 51:2 62:17 65:17 92:21 119:11

**shield** 176:4

**shore** 86:9 100:24

**short** 237:19

**shorter** 80:12

**shortly** 239:16

**show** 24:20,21 25:1 31:21,23 55:9 77:25 80:6 87:14 108:19 134:13 142:20 146:16,23 157:22 170:10,17 178:16 188:5,22 203:16 209:7 213:12 214:11 226:13

**showed** 95:6,21 96:17 181:13

**showing** 80:3,5 92:23 146:9 171:10 194:23

**shown** 57:16 93:24 154:14

**shows** 43:4 58:11 60:5,21 95:23 145:17 157:6 168:4 205:4,7 241:20

**side** 226:20,21 289:14,20

**sides** 31:16 35:18

**signaling** 23:10

**signature** 43:4

**signed** 37:24 62:2 109:3 204:4, 11 205:2 268:25

**significance** 165:1

**significant** 35:13 98:12 167:8 173:11 174:3 223:6 252:12 262:20 263:16

**significantly** 137:23

**similar** 68:2,3 95:10 207:3 208:24 211:6 232:18 270:16 273:6,7 287:21

**simple** 191:18

**simplifies** 214:24

**simplify** 192:12

**simplistically** 192:13

**simply** 8:12 10:12 167:22 234:8 257:6 285:7

**simultaneity** 207:25

No Copy Of This Transcript May Be Made Prior to 2/28/2021

single  27:6 154:21 172:23
276:13,22

SIP  266:17 267:1,14 268:17
269:1,7 271:18

SIP.US  201:7,8,17,21 202:15
203:4,12,16,21 204:5,19 205:23
224:4,20 266:19

SIP.US.  200:17,23

sir  179:16 242:22 251:24 256:20
262:14 271:20 284:21

sit  169:2

sits  163:8

situated  216:24

situation  9:2 16:16 34:13,23
79:15 238:23

situations  158:14

skills  252:15 255:16

skip  160:6

slide  39:21 40:13 42:6 70:9,14
139:10 170:10,14 171:10,19

slides  39:12 42:5 169:25

slightly  57:3

slow  147:16

small  124:24 210:12 224:8
225:13 267:15 284:10

smattering  230:9

snapshot  97:2

software  95:14 96:1 183:8 206:2
223:10,19 252:14 266:4 287:5

solely  160:16 163:20 218:5

solemnly  36:9 198:14

solid  167:19,20

solutions  159:9 183:9

solve  283:5

sophomore  214:5

sort  12:3 17:11 27:12 29:13
31:16 33:21 34:23 35:4 48:11
95:12 108:3 123:23 131:18
143:17 150:6 152:13 160:1
181:17 238:22 246:24 267:18

sorts  111:6 112:25 113:7 232:24

sought  64:2 100:23 165:5

sound  44:14 48:20 53:17,20 58:5
74:14 106:16 128:21 158:7

sounds  49:23 63:20 64:17 78:17
80:22 89:23 91:8,12 92:10 96:9
159:25 171:19 248:16 258:1
277:9

source  42:9,17 211:23 225:21
226:5 256:6,11 279:5

sources  40:14 41:13 70:11
244:13

speak  178:13 194:8 272:25
277:23

speaking  94:12 119:14 120:16
123:19 159:6 214:21 223:20
257:18 268:10 282:8 284:5

speaks  149:19 186:22 211:8
222:15 225:1

special  19:24 20:5 39:17 42:19
48:25 103:6,14 114:18 156:4,20
164:4 170:23 265:25

specialist  57:4,8,23 58:20

specific  53:18 96:8 104:6 105:21
106:21 148:23 168:7 175:25
185:1 193:5 202:3 246:20 255:18
269:22

specifically  19:12,14 37:8 38:23
39:9 70:25 71:8 87:19 92:12
107:18 140:13,18 141:1 144:10,
11 151:14,24 152:6,12 156:21
194:9 246:21 257:15,21 265:15
267:24 277:7

specifications  286:10,16

speculate  209:5 227:8

speculating  171:9

speculation  140:23 228:23

speed  210:16

spell  36:15 198:20

spend  29:16 84:25 147:4 152:15
238:19

spending  142:23 147:14 260:13,
14 262:2

spent  85:5 144:8 148:2 174:6

sphere  103:18

spoke  81:16 187:6 220:16
268:22

spoken  94:13 235:24 236:13

spreadsheet  184:22

spreadsheets  100:12 132:19
184:25

spring  37:22

stalemate  234:4

stand  281:5

standalone  166:2

standard  43:24

standards  162:15

standpoint  208:3

stands  229:23

stare  65:1

staring  64:25

start  17:3 24:17 71:3 85:6 87:24
191:22 192:13 200:4 203:23
210:1 246:12 264:25 265:4
266:16

started  6:7 24:14 47:10 70:9
191:19

starting  71:7 202:19 249:2

starts  46:12 49:9 57:6 82:23
108:5 131:6,12 203:15 207:20

state  36:15 49:21 99:25 198:19

stated  11:2 88:23 100:1 112:7
159:6 161:6 225:17

statement  74:18,21 129:25
155:9 186:13 252:18 255:20

statements  126:13,17 223:8
247:24 263:10

states  6:5 168:7 173:17 223:2
243:20

statute  14:15

stay  219:17

step  149:2 189:11 286:18

steps  150:4 252:22

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**stick** 158:11

**stop** 192:9

**stops** 215:19

**storage** 92:7 94:3,9 221:24 265:12

**stored** 230:1

**straightforward** 87:20 134:25 135:11 136:4,7,9 214:18

**strange** 80:25 224:23

**stream** 56:11 63:19 64:18,22

**streams** 55:16 56:4 58:7 62:22 64:17 67:23 130:17 175:19

**strike** 35:2 37:13

**strikes** 34:21

**structuring** 185:4

**struggle** 279:8

**struggling** 253:12

**stuff** 110:1 125:4 129:20 130:23 136:8 137:15 154:22 164:12 183:13 219:24 238:13 266:9 277:5 281:14

**subcontracted** 258:1

**subcontracting** 257:23,25

**subcontractor** 251:1,2

**subcontractors** 251:3 259:14, 21 260:1,3,5

**subdivision** 15:10,13

**subheaders** 60:16

**subheading** 58:19

**subheadings** 60:11

**subject** 26:6 28:2 173:14 215:16

**submit** 26:21

**submitted** 81:18 107:8 177:14

**submitting** 81:25

**subpoena** 8:7 173:23 239:22 278:20 279:2

**subpoenaed** 6:14

**subpoenas** 278:4

**subsequent** 151:2

**substance** 42:14 280:7

**substantive** 160:11,22

**substitute** 15:7

**suffer** 164:9

**sufficient** 32:24 98:10 135:24,25 136:22 137:9 144:24

**sufficiently** 32:9,12

**suggest** 11:4 80:13 90:15 128:10 140:19 143:7 147:19,25 248:17

**suggested** 273:8

**suggesting** 117:10 197:13 220:3

**suggestion** 11:7 81:2 148:2 223:13

**summaries** 151:8

**summarize** 137:12 150:3,19

**summarized** 153:14,20

**summarizing** 136:18 156:10 209:21

**summary** 72:2 97:2,3 108:25 109:20 151:5 154:3

**summer** 38:1,10 48:19 51:9 56:6 174:17

**sun's** 176:4

**super** 119:5 215:7

**supervision** 99:22

**supplement** 244:11

**supplemental** 108:13 254:8 283:23

**supplementary** 224:25

**support** 41:8 150:5 168:2 231:22 252:15 265:21 268:16 273:15

**supporting** 88:6 144:17

**supportive** 167:5

**supports** 208:8

**suppose** 78:9 248:2

**supposed** 100:18 181:2 184:11 247:25

**surprised** 20:25

**surreply** 179:15 251:13

**sustain** 158:11

**Suzanne** 79:16

**swear** 36:6,9 198:10,14

**switch** 59:21

**system** 64:9 128:20 162:20 164:13 200:15 201:23 204:3,20, 23 233:12 267:15 269:24 270:11, 13,15 271:9,11,12,13,15 273:10

**systems** 182:7 237:1 238:1 269:18

**T**

**table** 25:17

**tag** 142:20 239:7

**takes** 29:11

**taking** 62:11 132:19 147:6 191:18

**talk** 12:8 27:24 55:4 59:21 65:7 73:9 80:17 102:6,8 114:8 124:10 139:6 156:6 159:12 181:23 195:24 200:1 210:9 264:1,8 283:20

**talked** 47:6 48:17 59:9 72:9 75:6 81:23 101:22 119:2,4 138:19 149:1 167:11 236:20 260:21,24 268:15 277:8 280:13

**talking** 28:15 52:15 70:10 72:4 77:10 88:15 105:2 111:25 119:13 120:14 133:22 144:9 145:9,11,24 146:1,11,14 160:1 176:18 204:22 209:19 210:8,18 217:8,24 223:24 225:12 228:20 230:15 231:8,18 239:13 241:23 258:19 264:10 274:1 278:25 282:22 284:4

**talks** 44:11 46:14 47:8 139:11 203:7,21 270:9

**tangential** 17:12

**task** 137:10 156:2,5

**tasks** 56:7 67:24 155:21 156:18 157:7

**tax** 180:23 181:1,6 247:24

**TBS** 139:22 140:8,19

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**team** 40:4 50:2 51:5 52:10,11 58:22 59:6 64:8 82:15 85:13,21, 24 86:1,21 87:16 88:2 102:8 103:1,16 104:22 114:3,11,15 116:11 119:21 120:8 121:1,2 125:11 128:15 133:2 136:20 149:17 154:6 155:6,13,22 161:2, 11 162:3 168:5 169:5,6 170:14 186:11,16,24 239:5

**team's** 120:5 166:12

**technical** 31:25 73:6 136:22 162:10 164:4,22 205:3,21 208:3 212:7,8,10,14,17 213:11 214:1,8, 20 219:12,13 220:7,9,25 221:3, 10,16 222:20 224:3,6 225:2,3,4, 14 226:11 227:6 228:16,19 231:18 233:25 236:12 242:23 243:14 244:16 245:4 246:8,13,18, 19 250:10 257:9 274:18

**technically** 59:3 165:25 211:21, 22 264:14 287:12

**technique** 172:21

**technologies** 210:15,19 228:18

**technologists** 257:14

**technology** 57:4,8,22 58:20 60:11 159:9 182:8,11,16,18 183:11 192:6 210:17 215:2 228:20 246:23 257:13

**teeth** 147:16

**telephone** 201:19

**telephones** 224:13

**telephonic** 73:10

**telephony** 200:15,24 201:13,18 204:23 205:24 206:5,6 224:13 266:23 267:2,14 270:20 272:14, 19 273:10

**telling** 13:21 50:2 275:20 277:9 282:22

**temporal** 240:18

**ten** 59:12,14,15

**ten-question** 142:17

**tend** 140:19

**tended** 170:17

**tenure** 74:2 171:4 271:14

**term** 170:20 171:7 213:8 236:3, 10 244:9

**terms** 11:17 12:5 17:2,9 29:25 34:17 35:9 39:6 46:22 50:7 55:17 61:11 62:17 78:3 81:25 83:5 95:18 96:14 102:1 104:10 106:13 120:9,25 121:19 122:7,16 130:8, 10,11 131:10 134:10,14 140:4 146:2,3,4,5 156:17 162:15 163:25 165:11 190:14 201:20 202:22 204:15 206:22 215:3 220:24 225:22 227:16 238:1 256:25 257:1 258:21

**testified** 59:19 100:2 136:16 154:10,15 166:17 187:4,9 200:11 206:15 214:14 232:10 235:4 243:19 247:12,15 266:22 279:20

**testifies** 101:4

**testify** 9:7 61:6 160:18 161:21 162:9,10,24 163:2 164:13,21 165:22 168:14,17 204:7 218:7

**testifying** 54:1 59:17 61:6 162:16,21,22,23,25 165:15 166:24 167:15 168:12 172:24

**testimony** 6:21,23 7:23,24 8:5 9:13 14:13,22,23,24 16:22,23 19:6,10 20:12,15,18,19 21:25 22:14,23 23:10,15,16 24:12,14 32:21 33:1 36:9 44:3 49:24 53:25 61:2 100:1 109:21 137:24,25 156:24 165:7 171:1 186:22 188:1, 5,13,14,20 189:14,18 195:9 198:15 200:4,14 201:1,4 204:6,17 206:17 219:22 220:2 224:11 225:18 227:13 246:14 247:10 249:1,3,16 255:11 261:4 263:9 274:15 280:13 282:7,9,21

**testing** 130:4

**text** 185:1

**Thanksgiving** 289:8

**theft** 39:15 70:15 71:17 72:20 83:6

**theme** 157:19

**theory** 65:12 239:4 240:17 265:7

**thereabouts** 265:9

**thin** 105:10

**thing** 33:23 35:15 78:17,21 116:3 125:4 134:2 146:9 153:5 155:1 196:5 215:6 224:8 230:25 267:18 268:21 283:5

**things** 6:7 11:15 14:2 57:20 72:14,19 75:25 78:20 79:1 80:5 104:8 105:9 115:3 119:5 127:13 135:6 140:3 145:11,13 149:22 175:23 176:16 177:23 185:14 197:3 205:21,25 216:4 221:21 223:17 226:21 228:19 232:25 235:11 238:10 239:10,11 268:14 269:18 287:1

**thinking** 102:23 104:20 133:16

**thinks** 50:21

**third-party** 139:21 279:11

**thought** 15:2 18:21 65:3 66:18 96:23 97:6 106:15 122:2,3 137:8 139:5 144:23 154:2 171:15,16,17

**thoughts** 98:5,7 114:21

**thousands** 154:19,20

**three-month** 210:13

**threshold** 95:17

**tie** 150:5

**tied** 193:5

**tight** 122:20

**Tim** 108:8

**time** 16:3 27:14 29:4 30:12 51:1 56:5 57:19 61:18 66:24 67:19 98:6 99:17 114:22 124:20 136:25 142:23 144:8 147:3,7,13 151:1,12 152:15 154:1,7 156:20,25 161:20 162:20 164:3 167:14 172:7 183:17 190:2 193:7 207:2,21 208:23 210:16 214:9 238:4,19 239:16,20,23 240:3,20 248:17 252:22 271:14 272:5,7 280:23 288:14,17

**time-consuming** 80:10

**timeline** 204:8 268:23

**times** 189:5 230:5 272:12 280:10

**timing** 283:13,16

**Timothy** 109:3

**tires** 225:7 267:10

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**title** 19:21 139:13

**titles** 126:6

**today** 9:3 29:3 38:2 77:19 78:15 136:17 187:3 188:14 214:15 216:6 217:15 219:22 227:13 228:20 240:7 241:22

**told** 39:11 41:22 53:17 58:3 94:7 106:6,10,19 107:6 189:10 279:20

**tone** 201:22 267:18

**tools** 232:13

**tooth** 21:16,17

**top** 40:10 59:14 82:11 85:10 105:24 126:2 155:3 202:25 268:14 284:25

**topic** 93:12 132:10 150:7

**total** 40:23 84:25 170:5

**totaled** 265:8

**totality** 137:18 162:1 201:24 230:13 267:16 272:2

**touch** 288:25 289:1,9

**tough** 253:9

**track** 214:2

**Tracy** 43:3 44:5,21 45:11 46:11 48:15 49:8 50:7 52:2,12 57:5 71:12 74:23 87:23 90:2 91:20 107:23 127:15 149:3 150:17 155:4 202:9,18 208:11 217:6 220:18 228:4 229:2 254:17,23,25 256:16 259:9 262:10 264:16 284:1,12,24

**traditional** 204:19

**traffic** 231:15

**transcript** 249:18

**transcripts** 159:1 199:16 245:7, 11 282:6

**transfer** 63:1,4

**transferred** 180:20

**transfers** 180:15

**transformation** 183:6

**transient** 91:16 93:7 94:17 98:4 113:20 114:2,17 116:19,20,22 120:25 123:22

**transition** 164:8 210:19 211:7

**transitional** 211:10

**transitioned** 207:19

**translate** 165:2 287:2

**translated** 288:5

**transparent** 194:6

**transpire** 184:15

**travel** 147:22

**trended** 170:8

**trending** 170:4

**trends** 171:16

**trial** 23:1 28:7,10,19 29:14,23 30:20 31:7,13 32:4,14,16,17,19 33:1,12 34:3,18 37:4 40:8 53:25 54:23,24 59:17 72:3,6 75:5,8,14, 17 76:8,11 78:10 79:24 82:7 97:13,17,21,24 98:24 107:14,21 111:11 112:4,5 119:8 135:10 136:6,11,15 137:25 144:7 145:19 146:25 150:14 157:20,23 158:16 169:9 174:18 175:15 179:8 185:19 187:4,9 189:6 190:14 194:18 199:8,16 203:13 204:1,8, 17 205:13 209:1 210:21 211:12 212:4,19,20,21,24 220:3 221:5 222:6 224:11 225:18,20 226:25 227:5,18 228:22 230:4,12 231:9 232:5,6,17 233:5 235:5,11,25 236:23 241:14 242:17 243:1 244:22,23 245:7,9 247:10 249:1 251:9 258:3 262:9 274:16 275:1 282:16

**trickery** 186:25

**tricky** 12:3

**trier** 21:23 24:22 79:21 189:15

**Trikinowsky** 149:18

**true** 152:1 171:13 191:2 211:25 225:11 247:14,24 255:25 263:25 265:18 283:1 284:9

**trust** 106:4

**trusted** 104:7

**truth** 36:10,11 198:16,17

**Tt** 234:10,11

**turn** 107:16 110:12 115:7 142:5 143:20 178:4 206:8 220:15

**turned** 97:16,20,24 107:21 111:5 117:11 119:23 175:2

**turning** 62:24 115:14 119:3 141:23

**twinning** 269:19

**type** 33:23 34:12 158:10 246:2 263:19

**types** 128:14 132:21 143:13 157:21 177:20 210:10 244:18 246:23 271:6

**typical** 257:11

**typically** 125:5 269:10

**typing** 184:21

### U

**U.S.** 38:3,5 41:4,8,19 42:13 46:15,22,25 47:11,14,21 48:1,12 49:22 50:3,18,22 51:2,22 52:5,15 59:10,22 60:2,6 61:14 62:13,18 63:5,11,18,24 64:12,15,20,22 65:18 68:6 108:6 109:18 112:23 113:9,14 115:10,24 116:6 117:24, 25 118:21 120:14 123:15,18 127:21 130:9,14 160:14,15 163:1 165:4 168:11 173:6,13 197:6 282:14

**U.s.-resident.** 255:12

**Uh-huh** 86:20

**Uhrin** 38:24 254:17 264:19

**ultimately** 32:4 47:16 67:7 91:18 92:14 93:18 154:12 163:3 171:25

**unclear** 236:4,22

**uncooperative** 143:2

**undecided** 16:10

**undelivered** 168:18 190:17

**underlie** 217:10

**underlying** 212:17 213:5 221:1 222:21 278:6,11

**underpinnings** 241:21

**understand** 21:25 27:7 29:18

31:22 33:6 62:1,21 65:24 77:24
84:19 85:4 93:9 95:3 101:11
115:22 121:22 123:8 124:8 127:7
141:4 151:15 158:3 187:23
192:10 195:8,22 212:11 236:6
245:2 246:4 247:15 263:21 265:6
271:10 273:21 275:19

**understanding** 43:16 65:10
69:21 87:11 94:10 103:12 117:16
120:22 122:5,13 123:6 125:3,11
134:4,9 135:20 164:11 168:9,13
173:24 174:12,16 176:24 178:10
182:17 183:13 189:8,13 193:21
227:16 228:17 244:21 257:1,19
258:7 263:25 264:7 280:1,12,21
282:8

**understood** 33:3 43:22 93:10
94:23 120:21 123:22 137:7
152:21 163:18 166:15

**underway** 35:20

**undisclosed** 100:17

**unfairly** 27:10

**unfitness** 214:11

**unique** 34:23

**United** 6:5 8:9 10:4,9 12:20,23
15:6,9 18:2 19:19 22:8,11,16
37:16,17,23 38:9,14 39:14,19
40:2,14,21 41:13 42:9,18,20,24
43:21 44:14,19,23,24 46:19,20
47:9 48:19 49:15 52:21,23 53:13,
23,24 54:14 55:19,20 56:2 58:11
59:12 62:5,6,8,9,12,16 63:8,14
65:11 67:21 68:11,25 69:5,6,8,19,
24 70:1,6 71:15 72:12,15,21
73:25 74:1,4,10,16 75:9,12 76:20,
21 81:17 82:16 83:5 84:11 86:7
102:10 105:6 107:1 109:2,24
110:20 111:8 113:2 120:2 124:7
133:18,19 139:11,20,25 140:2
148:21 169:24 170:5 171:2,12
173:8,17,19 174:8,13,19,24,25
175:11 176:12 177:4,8 178:18
184:9,13 185:8 188:9 193:19
194:12 198:1 200:25 201:14
204:12 211:13 234:25 235:6
237:16 238:7 243:20 244:12
245:20,23 248:21 249:5,20 250:1,
14,20 251:4,18 257:24,25 258:6,
10 259:25 260:7,19 261:17
262:21 263:11,23 266:22 268:19
270:20 271:14,25 272:5,10,19,24

278:16,18 285:22 286:3,8,17
288:1,6

**university** 182:19

**unjust** 68:8 178:18 187:10
189:24

**unjustly** 190:25

**unknown** 101:13

**unlicensed** 235:7,12

**unqualified** 157:16 183:25

**unquote** 68:17 189:24

**unreasonable** 123:11 280:25

**unrelated** 68:18

**unseal** 27:2

**unsuccessful** 157:21

**unsupervised** 218:13

**Update** 53:23

**updating** 49:1

**uptime** 286:25

**USAO** 161:4,10 196:21 218:4

**utilized** 61:10 111:9

**utmost** 162:4,5

**UWMB** 252:17

_____

**V**

**vacuum** 150:25

**valid** 63:17 220:10

**validity** 204:21 242:1

**valuation** 37:10

**value-added** 285:8,14 286:21
287:4,6

**variety** 68:14

**varying** 39:20

**vast** 26:15

**vastness** 113:11

**vendor** 129:19 273:13,14

**vendors** 74:13 76:5 139:20
252:9 255:22 278:21

**verbal** 95:20 247:4

**verbatim** 134:11 287:11

**verified** 86:22 87:17

**version** 105:5 169:25

**versions** 106:24 235:12

**versus** 6:5 60:12 113:5 196:24
204:19 244:2

**vetting** 218:22

**vice** 18:8,11,15 272:6

**victim** 7:12 8:4,17,18,23,24,25
10:23 13:4,14 15:18 16:4,6 19:8
22:1 34:25 69:9

**victim's** 7:19 8:18,23 10:2 11:5
13:15 14:22 15:19 16:22 35:1

**victims** 12:17 14:18

**view** 34:19 138:10 166:12 233:2
234:7 249:4 281:13

**viewed** 67:6 138:14

**views** 93:22

**violation** 11:25 29:20 30:15,16
31:8,9,11,25 32:9,25 33:12,13
34:10,22 35:13 141:8,9 178:3
273:23

**violative** 32:11,13

**virtual** 73:14 229:21 265:11
285:25

**viruses** 238:11

**visibility** 222:15

**voice** 118:2 214:7 220:8 268:11

**voicemail** 206:1 267:17 269:19

**voicemails** 229:22

**volume** 61:16 65:3 118:6

**VPN** 236:16

**vulnerabilities** 68:15

_____

**W**

**wait** 74:25 79:5 224:21 227:24
275:10 278:17 279:17

**waiting** 36:3

No Copy Of This Transcript May Be Made Prior to 2/28/2021

**waive** 47:17 62:25

**waived** 67:5 174:8

**wanted** 6:8 7:9 18:24 24:19,23 25:2,11 28:12 101:5 115:1 120:18 147:1 150:1 194:24 197:5 216:22

**warrants** 32:7

**waste** 136:25 151:11 156:20,24

**watch** 11:10

**Way'** 109:24

**Way's** 18:2 56:2 69:5,6 74:4,10, 16 75:12 84:11 86:7 110:20 111:8 113:2 124:7 173:8 174:9,24,25 177:8

**ways** 205:20 222:10 224:23 230:20 273:4,6,8

**we.'** 55:1

**web** 73:21 150:6,22 151:13,23 265:17

**Webex** 65:7 131:15

**website** 140:7,8 263:6,7

**Wednesday** 131:14

**weeds** 78:7

**weeks** 197:8 239:14

**weighed** 140:8

**weight** 25:20

**whatnot** 212:5,6 269:21

**whatsoever** 21:9

**whichever** 229:22

**whomever** 232:21

**wife's** 180:10

**wire-supported** 204:20

**wires** 67:25

**witness'** 18:1 157:8 194:24

**witnesses** 6:10,14,17 11:11,19 12:2 14:10,12,14 23:4,20 24:13 29:6 35:20 78:12 157:5 195:11 226:20 242:3 289:17

**witnesses'** 22:14

**wondering** 14:1 78:5 80:7,8

**word** 37:14 39:12 54:22,25 56:15 89:11 101:19 103:23 106:12,22 107:2 123:21 161:10,11,12 170:6 190:11 208:2,25 233:7 260:2

**words** 46:12 115:1 116:2 135:14 136:13 168:23 184:2

**work** 12:20 34:25 36:23 38:9 44:13,18 46:20 47:9 48:22 51:3 54:3,14 55:3,16 56:4,11,23 57:22 58:7 59:10,21 61:10,16 62:9,11, 13,21,22 63:5,7,19 67:23 69:22, 23 84:11 89:19 98:3 99:22 104:7 108:3 113:20 114:11,19 116:8 117:1 120:5,6 123:23 128:16,17 130:17 132:4 155:15 162:15 167:1 175:19 177:1 178:16 182:14,25 183:4 184:11 185:5 196:22 197:11,19,20,23 213:24 231:21 257:23,25

**worked** 37:15,17 48:18 63:13 69:8,11,14 100:8 143:17 182:17, 22 184:15 255:12

**working** 29:13 37:22 44:22 46:19 49:15 53:13 55:14,15 57:20 60:1, 6 61:23 64:24 67:12,20 68:6 69:7 70:4,5 82:16 184:1 198:1 201:19 242:16

**works** 234:22 235:16

**world** 257:8 258:2,21,23 259:1

**worried** 104:2 160:13 161:3

**worse** 178:15

**worth** 225:7 282:2

**worthy** 114:25

**write** 67:16 124:14 125:4 199:10

**writing** 69:24 91:9 124:19 199:15

**written** 87:5 247:5,6

**wrong** 47:2 171:17 178:23 287:12

**Ww** 70:24 71:1 74:10

---

**Y**

**year** 88:7 159:24 162:14 204:11 214:4

**years** 21:2 22:21 134:24 159:9 162:14 181:14 182:20,21,24

186:18

**years'** 100:25 101:1 136:21

**yesterday** 254:3

**young** 99:13 145:22 183:11 184:3 185:22,23

---

**Z**

**Z'** 67:17

**zoom** 208:12,19 217:16 220:20 234:13

Duffy & McKenna Court Reporters, LLC
1-800-600-1000