**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3/18/21

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    * No. 1:18-cr-00192-JL
            v.                       * December 3, 2020
6                                    * 1:15 p.m.
                                     *
7    IMRAN ALRAI,                    *
                                     *
8                    Defendant.      *
                                     *
9    * * * * * * * * * * * * * * * * *

10

            TRANSCRIPT OF EVIDENTIARY MOTION HEARING
11               DAY 2 - AFTERNOON SESSION
                   VIA VIDEOCONFERENCE
12          BEFORE THE HONORABLE JOSEPH N. LAPLANTE

13

14   APPEARANCES:

15

     For the Government:      AUSA John S. Davis
16                            AUSA Matthew Hunter
                              AUSA Cam T. Le
17                            United States Attorney's Office

18

     For the Defendant:       Donna J. Brown, Esq.
19                            Michael Gregory Eaton, Esq.
                              Wadleigh Starr & Peters PLLC
20

     For the Intervenor:      John J. Commisso, Esq.
21                            Commisso Law P.C.

22

     Court Reporter:          Brenda K. Hancock, RMR, CRR
23                            Official Court Reporter
                              United States District Court
24                            55 Pleasant Street
                              Concord, NH 03301
25                            (603) 225-1454

1                              I   N   D   E   X

2    WITNESSES:                DIRECT   CROSS   REDIRECT   RECROSS

3    JOHN COMMISSO, ESQ.

4    By Ms. Brown                3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P  R  O  C  E  E  D  I  N  G  S

(Lunch recess taken)

THE COURT:  Defense counsel, please call your next witness.

MS. BROWN:  Yes, your Honor.  We are going to call John -- and I hope I'm getting it right now -- Commisso.  Am I getting it right?

MR. COMMISSO:  That's right.

MS. BROWN:  I can't remember whether the Court swore in the witnesses the last time or whether we --

THE COURT:  No.  We generally have the Deputy Clerk do it here.

MS. BROWN:  Okay, great.

THE CLERK:  Mr. Commisso, please raise your right hand.

**JOHN COMMISSO, ESQ.,** duly sworn by the Clerk.

THE CLERK:  For the record, please state your full name and spell your last name.

THE WITNESS:  My name is John Commisso.  It is J-o-h-n, C-o-m-m-i-s-s-o.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. BROWN:

Q.   Thank you.  And you are an attorney in Massachusetts, correct?

1    A.    That's correct.

2    Q.    And you're not an attorney in New Hampshire, correct?

3    A.    No, I'm not a member of the New Hampshire Bar.  I have

4    recently filed a motion for *pro hac vice* to be admitted in this

5    case.

6    Q.    I was going there next.  So, as of today you are an

7    attorney of record in this case, correct?

8    A.    Yes.  I have been admitted *pro hac vice*, and I've entered

9    a Notice of Appearance.

10   Q.    And that appearance is on behalf of, we've been using the

11   terms UWMB for the United Way in this case, correct?

12   A.    Yes, that's correct.

13   Q.    And you have been an attorney for the United Way since May

14   of 2018?

15   A.    Yes, that's correct.

16   Q.    Now, before we get into more of that role, I just want to

17   talk a little bit more about your history in this case.  Would

18   it be fair to say you have attended every single hearing in

19   this case?

20   A.    No, that's not correct.  I've attended almost every

21   hearing in this case.

22   Q.    Okay.  Which hearing did you miss?

23   A.    I know that there was a hearing, I want to say it was a

24   final pretrial conference that was held in chambers, that I did

25   not attend.  And there may have been others, but that's the one

1    that comes to mind.

2    Q.   Okay.  And that's a hearing that's usually not open to the

3    public, correct?

4    A.   I don't know.  This is my first case in this courthouse in

5    New Hampshire, so I don't know.

6    Q.   Okay.  So, other than the pretrial conference, you have

7    been at most other hearings in this case?

8    A.   Just about every one.

9    Q.   Okay.  And have you read every motion in this case?

10   A.   Yes.

11   Q.   And I think we hit the 200 mark a couple of days ago in

12   the motions in this case, so you've read all 200 motions?

13   A.   Yes.

14   Q.   And that would include the motion that is before the Court

15   today, which is the Motion to Dismiss?

16   A.   Yes.

17   Q.   And that motion has, last time I counted, there's probably

18   30-some attachments to it.  You've read all the attachments as

19   well?

20   A.   I certainly looked at them.  I certainly did not read

21   every word of them.  So, somewhere between looking at them and

22   reading them, yes.

23   Q.   Okay.  Now, what we are here for today is a continuation

24   of a hearing on the defendant's Motion to Dismiss, which is

25   docket 164.  That hearing started about two weeks ago, and you

1    were at that hearing, correct?

2    A.    Yes.

3    Q.    And at that hearing we heard from Greg Naviloff, right?

4    A.    Yes.

5    Q.    And Jason Sgro started his testimony and finished it

6    today, right?

7    A.    Yes.

8    Q.    And you, for lack of better words, listened in on the

9    testimony of both of those witnesses?

10   A.    I attended the hearing, yes, and I heard the witnesses'

11   testimony.

12   Q.    And in addition to all of the things we've discussed in

13   terms of your involvement in this case, you've also now written

14   a couple of motions in the case, correct?

15   A.    That is correct, yes, and I filed them.

16   Q.    All right.  So, separate from this motion before the Court

17   today, which is the Motion to Dismiss, there's also some

18   ongoing litigation regarding discovery and a subpoena, right?

19   A.    Yes.

20   Q.    And you have filed motions regarding those two pending

21   issues?

22   A.    Yes.

23   Q.    And in addition to that the government filed a reply to

24   the Motion to Dismiss, which I think is at Document 170, and

25   you filed a document or drafted a document called a

1    "Declaration" --

2    A.   Yes.

3    Q.   -- basically giving your recollection of the facts that

4    might be pertinent to the Motion to Dismiss?

5    A.   Yes, I filed a declaration that contains information.

6    Q.   And you had done that previously prior to trial.  You had

7    drafted a letter regarding some litigation regarding a motion

8    to strike the testimony of Naviloff.  Do you remember that,

9    that you drafted a letter?

10   A.   Yes.

11   Q.   And that was document 50-2, which was in support the

12   government's objection to striking the testimony of Naviloff,

13   right?

14   A.   I don't know the docket number, but, yes, it was in

15   response to the motion to strike the testimony of Naviloff,

16   yes.

17   Q.   And I'll come back to that later, but I just wanted to

18   sort of set the record as to what work you had done in the case

19   and what you had observed.

20        Now, I want to talk a little bit more about your

21   experience.  How long have you been an attorney?

22   A.   20 years, as it says in my declaration.

23   Q.   Okay.  And in your declaration, which is document 52 --

24   most of my questions have to do with that, so I won't keep

25   repeating that docket number or document number -- you are --

1    you described yourself as a white-collar criminal defense

2    attorney, right?

3    A.    That's been my primary area of practice for 15 years.

4    Q.    And I would imagine that, being a white-collar criminal

5    defense attorney, that would involve a fair amount of work in

6    federal court?

7    A.    That's correct.

8    Q.    Is the Federal Court that you've practiced in front of, is

9    that the federal court in Boston, or is it other federal

10   courts?

11   A.    Primarily in Boston, but over the years it's been many in

12   different states as well as Worcester and Springfield and this

13   state.  So, primarily in Boston but other places as well.

14   Q.    And as an experienced federal criminal defense attorney,

15   you would know something about federal criminal law, right?

16   A.    Yes.

17   Q.    So, one thing that you would know about federal criminal

18   law is the concept of restitution, right?

19   A.    I've represented victims in criminal cases before.

20   Q.    As well as criminal defendants?

21   A.    As well as defendants who have to pay restitution, yes.

22   Q.    So that you know that, if a defendant is convicted, he may

23   have to pay restitution to the victim?

24   A.    Yes.

25   Q.    In fact, may -- it's probably very likely that he will

1    have to pay restitution?

2    A.    Well, the federal Mandatory Victims Restitution Act says

3    "shall," the Court shall order victim restitution.

4    Q.    And as an experienced federal criminal defense attorney,

5    you're also familiar with the sentencing guidelines, right?

6    A.    Yes, I am.

7    Q.    And so, you know that specifically as to fraud or theft or

8    something along those lines the amount involved can be very

9    important as to what a criminal defendant is facing for a

10   sentence?

11   A.    Yes.  Theres's a guideline 2B1.1 that contains a table

12   that is a way of measuring the loss amount to the number of

13   points it adds to the sentencing calculation, and I'm familiar

14   with it.

15   Q.    Okay.  So, shorthand for that is, the higher the loss,

16   potentially the longer the sentence?

17   A.    That's the way the guidelines work, yes.  The bigger the

18   loss number, the higher the sentence; the more cooperation and

19   acceptance of responsibility, the lower the sentencing range.

20   So, there are various factors that play different roles.  Yes,

21   I'm familiar with them.

22   Q.    And you also know that cooperation in terms of pleading

23   guilty or giving information to the government can potentially

24   lower a person's sentence, right?

25   A.    Yes.  There's 5K1.1, where you can get substantial

1   assistance, or there's 3E1.1, where you can accept

2   responsibility and get credit for acceptance of responsibility.

3   Q.   And you also know, as a criminal defense attorney, if

4   someone -- or not someone -- a criminal defendant or a

5   potential criminal defendant is facing a very lengthy sentence,

6   that might put some greater incentive on that person to plead

7   guilty or cooperate with the government, correct?

8   A.   Yeah, it's certainly one of the issues that comes into

9   play.

10  Q.   Now, as a lawyer for United Way, if Mr. Alrai were to have

11  pled guilty as opposed to going to trial, that would have been

12  beneficial to United Way, correct?

13  A.   Would that have been beneficial to the United Way?  I

14  would say yes.

15  Q.   It would have saved a lot of attorneys' fees, right?

16  A.   Yes, and a lot of bad publicity and embarrassment and the

17  additional time and expense of all the people at the United Way

18  whose attention is distracted for this case and the $8 million

19  of restitution that they don't have access to while they're

20  trying to fund things like the Family Relief Fund during the

21  pandemic.

22  Q.   So, as an attorney for the United Way, you had an interest

23  in Mr. Alrai not fighting these charges and pleading guilty?

24          MR. DAVIS:  Objection.  Relevance, waste of time.

25          THE COURT:  Overruled.

1   A.   My interest throughout this entire case has been to

2   represent the best interests of my client, the United Way, to

3   obtain justice on behalf of the victim, and justice also

4   includes the appropriate amount of restitution as decided by

5   the Court.

6   Q.   But my question was that the best interests of the United

7   Way is that Mr. Alrai plead guilty and not have a drawn-out

8   trial?

9   A.   Actually, I would disagree with that.

10  Q.   Why do you disagree with that?

11  A.   The best interests of the United Way would have been to

12  have no fraud at all so that they don't have to live with the

13  headlines in the paper and having to communicate with their

14  donors and all of the other things that they've been struggling

15  with for 2 1/2 years, and that would have been in the best

16  interests of United Way, would be to have no case at all.

17  Q.   So, that wasn't my question.  My question was --

18  A.   Your question was what was in the best interests of the

19  United Way, so I was just telling you what I think was in the

20  best interests of the United Way.

21  Q.   Well, implied in that question the best interests of the

22  United Way was as to the criminal charges that were either

23  being investigated or brought against Mr. Alrai.  So, with the

24  assumption of that question is there were an investigation of

25  charges or the charges were pending.  Within that framework the

1    best interests of United Way was for Mr. Alrai to plead guilty?

2    A.   To have the case over as quickly as possible and to save

3    resources, save embarrassment, save negative publicity.  If

4    that meant a guilty plea, then, yes, that would have helped the

5    United Way.  If it meant a quick trial, that would have helped

6    the United Way.

7         THE COURT:  Mr. Davis's point is well taken, though.

8    I really do understand what you're trying to establish,

9    Attorney Brown.  It's not hard for me to accept what you're

10   trying to establish.  I get the point.  If you think you need

11   to spend more time on it I won't stop you, but I do understand

12   your point that it's in the United Way's interest if a crime

13   has been committed that it might maximize their recovery

14   through a criminal process in the same way it would in a civil

15   process.  So, I get the incentives.

16        MS. BROWN:  I get that, but I think my additional

17   points on this is that the incentives weren't just for it going

18   to pleading as opposed to going to trial.  The incentives went

19   beyond having him facing a very long sentence, him having a

20   strong case against him.  So that, to the extent that Attorney

21   Commisso was helping with those things as to building a case

22   against him -- obviously, not only facing a long sentence.

23   Criminal defendants who have a really strong case also are

24   incentivized to plead guilty.  So, that's where I was going

25   with that.

1          THE COURT:  Yeah, I get the strong case part, but I

2     don't get the long sentence part.  How does that play into it?

3     I don't get that part.

4          MS. BROWN:  Well, that if someone who is facing 10

5     years in prison might be more incentivized --

6          THE COURT:  Oh.

7          MS. BROWN:  -- as opposed to someone facing ten

8     months, they're like, Yeah, I can throw the dice for ten

9     months.  Ten month years, I don't know if I'm going to throw

10    the dice for that.

11         THE COURT:  Okay.  But, again, you don't need to spend

12    time on it.  I understand.

13         MS. BROWN:  Okay.  I think that was my last question,

14    anyway.

15    Q.   You said in your declaration, as an experienced

16    white-collar federal criminal defense attorney, you would also

17    be familiar with rules regarding discovery?

18    A.   I've been an attorney for 20 years, and I'm familiar with

19    the rules of discovery, yes.

20    Q.   Now, you're also familiar with the rules regarding the

21    subpoena process, correct?

22    A.   Yes.  I've handled many subpoenas.  I'm familiar with the

23    rules.

24    Q.   And so, have you ever filed a motion to quash a subpoena?

25    A.   I'm sure I have.  One doesn't come to mind, but I'm sure

1    that I have.

2    Q.   Okay.  If I told you that that was Rule 17, you would

3    agree with that, right?

4    A.   Yes.  I just filed an objection to your Rule 17 motion,

5    and I know that it talks about quashing the subpoena as well as

6    objecting to the subpoena.  Yes.

7    Q.   And so, you filed a Motion to Quash the defendant's Rule

8    17 subpoena, right?

9    A.   I filed an objection to the motion asking for

10   authorization to issue the subpoena.  So, yes, I objected to

11   it.

12   Q.   Okay.  We don't need to disagree as to what word we used

13   or not.

14   A.   No.

15   Q.   So, you also -- this is not the first subpoena you

16   received in this case, right?

17   A.   That's correct.

18   Q.   You received a subpoena from the government back in June

19   of 2018, right?

20   A.   Yes.

21   Q.   And that was before Mr. Alrai was even indicted in this

22   case, right?

23   A.   Yes.  A grand jury doesn't issue a subpoena after

24   somebody's indicted; they issue them before they're indicted.

25   Q.   And when you got the subpoena from the government back in

1      June of 2018, you did not file a motion to quash that subpoena,

2      did you?

3      A.    I did not, no.

4      Q.    Okay.  And that -- so, you turned over information

5      pursuant to that subpoena, correct?

6      A.    I did, yes.

7      Q.    And some of the information you turned over pursuant to

8      the government's subpoena was confidential, right?

9      A.    Well, I guess -- I would say probably all of it was

10     confidential.  If you mean, you know, business records of an

11     organization that doesn't want their business records out there

12     in the public, yes.  And, in fact, I think I stamped every

13     document "Confidential."

14     Q.    You stamped everything in this case "Confidential."

15     Emails were stamped "Confidential," documents were stamped

16     "Confidential."  Everything was stamped "Confidential," right?

17     A.    For at least 15 years of my practice when I produce

18     documents I stamp them 'Confidential.'

19     Q.    So, back in June of 2018 the government issued a subpoena,

20     and the subject of that subpoena were confidential records,

21     right?

22     A.    Yes.

23     Q.    And you did not object to that subpoena or file a Motion

24     to Quash that subpoena?

25     A.    I didn't file a motion to quash that subpoena.  I'm not

1    sure what you mean when you say "object," but --

2    Q.   I guess I should have just said --

3    A.   I did not file a motion to quash that subpoena.

4    Q.   And the reason you didn't do that is at that time you were

5    working with the government in their investigation of

6    Mr. Alrai, correct?

7    A.   I was not working with the government.  I was representing

8    a victim that was a witness in the case, and I was responding

9    to a grand jury subpoena because I was obligated to.  That's

10   what the subpoena is; it's a court order to produce documents.

11   Q.   Well, you had gone to the U.S. Attorney's Office to report

12   possible criminal activity, right?

13   A.   Yes.  I contacted the U.S. Attorney's Office before they

14   contacted me.

15   Q.   It wasn't like you just got the subpoena out of the blue

16   on June 4th saying, Hey, we need your records.  You knew there

17   was a criminal investigation going on, right?

18   A.   Yes.  I talked to the U.S. Attorney's Office, I knew what

19   was going on, and I received a grand jury subpoena.  That's the

20   indication that there is a criminal investigation going on.

21   Q.   And did you receive the subpoena by mail?  Did someone

22   drop it off?  Do you remember how you got it?

23   A.   I don't remember, but I would say very likely I received

24   it by email.

25   Q.   And that's because you had had contact with the U.S.

1    Attorneys about this case prior to June 4th, 2018?

2    A.   I definitely had telephone calls.  I don't know if I met

3    any of the prosecutors before the 4th, but I definitely had

4    telephone calls with them.

5    Q.   Now, we don't have a copy of the subpoena that you

6    received, but I, as an attorney, I've had other clients who've

7    received subpoenas from the government, and usually they say,

8    "Deliver these items by X date or show up to the grand jury on

9    X date."  Is that the kind of subpoena that you received?

10   A.   It's whatever the standard subpoena is.  It described

11   categories of documents, and it had a return date.  I don't

12   remember specifically everything that it said, but it was a

13   standard grand jury subpoena from a Federal Court.  It looks

14   like every one that I've received.

15   Q.   Well, that's what I'm trying to get at, because usually

16   they have some sort of deadline, you know, "You need to produce

17   these documents by a certain date."  That's what I'm trying to

18   get at.

19   A.   Okay.  So, I'm going to say it probably had a return date,

20   because they always do, but as I sit here right now, it's been

21   2 1/2 years probably since I've looked at the subpoena, so I

22   don't know what the return date was.

23   Q.   Well, here's what I'm asking, because when we see

24   throughout from June 4th of 2018 right up to trial, which was

25   in December of 2019, you make these statements of, Pursuant to

1   grand jury subpoena, and that's why I'm trying to figure out

2   did this grand jury subpoena have you give documents by a

3   certain date, or was it a forever subpoena?  Because, you know,

4   the way you complied with it sounds like it was a forever

5   subpoena.

6   A.   So, I guess I can explain my practice.  This is what I do

7   in every case, this was not unique to this case, which is, when

8   I'm representing a corporation that has obligations to third

9   parties and potential legal risks when they're disclosing

10  information, if they receive a grand jury subpoena, you know,

11  that gives them legal cover in a sense to be able to produce

12  documents.  So, for example, if they held private medical

13  information, or if these documents had social security numbers

14  in them, things like that, I would be very concerned about just

15  turning those documents over to just anyone.  I'm much less

16  concerned and it makes it much easier to protect my client's

17  interests, the corporation's interests, if I'm able to say I am

18  producing these documents pursuant to a grand jury subpoena.

19          And so, that's why I stamp documents "Confidential,

20  produced pursuant to a grand jury subpoena," because I'm

21  concerned about the person down the road who comes back and

22  sues my client and says, Hey, you disclosed my confidential

23  medical information, you violated HIPAA, and so I'm basically

24  trying to create a record that allows me and my client to say

25  we didn't violate HIPAA because we were operating under an

1     exception that allows us to produce documents pursuant to a

2     grand jury subpoena.

3     Q.   So, you wanted --

4     A.   One additional point.  Just one additional point is in

5     this case and every case I want know why I'm producing the

6     documents, right?  So, the reason why I'm producing these

7     documents is I have an outstanding grand jury subpoena, and if

8     the government asks me for something that's within the scope of

9     that subpoena, then I stamp them as confidential and they're

10     being produced pursuant to a grand jury subpoena.  The final

11     point is I also say "FOIA exempt," because I don't want these

12     to be, you know, subject to a FOIA request so that these

13     documents take on a life of their own because somebody with a

14     public interest subpoenas these records or seeks these records

15     pursuant to a FOIA request.  It's just my own practice.  It's

16     not about some specific issue in this case.

17           THE COURT:  But your practice is to do that as a

18     blanket on all documents produced?

19           THE WITNESS:  In response to a federal grand jury

20     subpoena, yes, that's what I do in every case.  I have the same

21     banner on every document when I'm producing documents in

22     response to a federal grand jury subpoena.

23     Q.   But you also know that Mr. Alrai was indicted in I think

24     it's November 28th, 2018, right?

25     A.   November 2018.  Yes, I know that.

1    Q.   And the reason I know you know that is you sent an email

2    about it, right?

3    A.   I don't know why -- how you know that I know that, but,

4    yes, I did send an email about it.

5    Q.   So, this is where I'm getting at.  So, to the extent that

6    you are complying with a grand jury subpoena from June till

7    November, there may be some argument for that, but after

8    November you're still turning over documents to the government,

9    even though the grand jury has already met and the grand jury

10   has already indicted Mr. Alrai?

11   A.   I'm sorry.  I guess I don't know what your question is.

12   Q.   Okay.  So, my question is, to the extent that you are

13   saying you're turning over these documents to the government,

14   despite trying to maintain confidentiality of these records,

15   you're turning over these documents after the grand jury has

16   met and indicted Mr. Alrai?

17   A.   Yes, I was turning over documents after the grand jury had

18   indicted Mr. Alrai.  Yes, that's correct.

19   Q.   And you didn't get a new subpoena after the government

20   indicted Mr. Alrai in November of '18?

21   A.   No, I did not.

22   Q.   And it's your testimony that you stamp all these things

23   "Confidential" as, quote, "legal cover," right?

24   A.   Yes, I think that's what I said.

25   Q.   So, it kind of gives you -- you can kind of have it both

1    ways, which is give the government documents that you want to

2    give them but also try, at least, to maintain confidentiality

3    towards other parties?  That was your intent?

4    A.   Well, that is part of it, that I would like to avoid these

5    being subject to a FOIA request, yes.

6    Q.   Well, you also wanted to avoid Mr. Alrai having access to

7    documents that you didn't turn over, right?

8    A.   Well, did I want to avoid having Mr. -- I'm sorry.  You'll

9    have to ask that again, because I want to make sure I answer

10   the question.

11   Q.   Well, when I asked you about your failure to assert

12   privilege after November 28, you said you were concerned about

13   FOIA violations, right?

14   A.   I did say I was concerned about FOIA violations.  I'm not

15   sure what you're talking about with the assertion of privilege.

16   Q.   Well, I'll clarify that, because I may not have made it

17   clear.  The point I'm making is to the extent that your

18   justification for turning these documents over after the

19   defendant is indicted and the grand jury is done with this

20   case, then you keep turning over items after the grand jury is

21   done.

22   A.   I can respond in a couple of ways, and then you can ask me

23   more questions.  The first thing is there was a superseding

24   indictment, so that says to me that the grand jury was still

25   operating.  But that's not necessarily part of my

1    decision-making process.  I represent the victim in this case,

2    and I continued producing documents to the government, as I

3    found them, for a number of reasons.  One was because I wanted

4    the government to have the documents that I found that I

5    thought were relevant to the case.

6    Q.   And that's exactly where I was going with that.  You

7    wanted the government to have documents that you thought were

8    relevant to the case, right?

9    A.   Right, and that were also responsive to the grand jury

10   subpoena.

11   Q.   And the reason you wanted the government to have documents

12   was because that would help them prosecute Mr. Alrai, correct?

13   A.   Yeah, I think that's correct.  That's certainly one of the

14   reasons why I wanted the government to have the documents,

15   because they were prosecuting Mr. Alrai, he was accused of

16   defrauding my client, and so the two things go together.

17   Q.   And to just carry that to what we talked about before, if

18   they successfully prosecuted Mr. Alrai you would have a better

19   chance, in fact, a very good chance of getting restitution in

20   the case, correct?

21   A.   That is one of the things that the victim wants in this

22   case, which is fair and just restitution.

23   Q.   Now, I talked a little bit before about the Motion to

24   Dismiss in this case, and specifically your declaration, which

25   is either at document number 170-3 or, for purposes of this

1    hearing, Exhibit B, and we talked a little bit about what that

2    was.  Now, did you work with the government in putting that

3    declaration together?

4    A.   I guess I don't know what you mean by the question, but I

5    can tell you that I drafted it, and I also discussed it with

6    the government.

7    Q.   With who?

8    A.   With the government.

9    Q.   The government.  Okay.  Anyone in particular at the

10   government?

11   A.   I know that I talked with Cam Le.  I believe John Davis

12   was on trial, so I'm not sure if I talked with him.  I think I

13   talked with Matt Hunter.  I apologize to Matt, but I can't

14   remember specifically.  But I definitely talked with at least

15   Cam Le and maybe Mr. Hunter and Mr. Davis as well.

16   Q.   And did you talk by phone, or did they send you emails?

17   A.   We definitely talked by phone.  I would assume there were

18   emails, but I'm not certain.

19   Q.   I'm also assuming they sent you a copy of the defendant's

20   Motion to Dismiss.

21   A.   No.  If that was filed through ECF, then I got it through

22   PACER.

23   Q.   Okay.  So, you already had it?

24   A.   Yes.  I get every filing -- I get notice of every filing

25   through PACER.

1    Q.    Okay.  And when you had these conversations with the

2    government did they ask you to address certain issues that were

3    posed by the Motion to Dismiss?

4    A.    I don't remember specifically.  I know that I had drafted

5    my affidavit, and we talked about what was in my affidavit.

6    So, I mean, what I don't remember specifically is if someone

7    said, you know, could you add a paragraph that addresses this

8    issue.  I don't remember that.

9    Q.    Now, one of the issues that is parallel between your

10   declaration and the government's reply motion, which is at 170,

11   document 170, is the assertion that Mr. Alrai did not file a

12   motion for subpoena prior to trial.  Do you remember putting --

13   do you remember that's in your declaration?

14   A.    In my declaration I stated that United Way had never

15   received a subpoena from Mr. Alrai or his attorneys.  Yes, I

16   remember that.

17   Q.    And you know that the government put that same thing in

18   their motion?

19   A.    In their --

20   Q.    Or reply motion.  I should clarify that.

21   A.    In their reply motion?  I assume so.  I read it, and if it

22   was in there I wouldn't have been surprised that they would put

23   it in there.  It's true.

24   Q.    And if you read the motion --

25   A.    I said I'm sure I've read the motion.

1    Q.   Okay.  So, if you did read the motion you know that the

2    relevance of that was that the government was arguing, you

3    know, this was available to Mr. Alrai prior to trial if he had

4    sought a subpoena, so he could have got these emails from RSM,

5    and he didn't file a subpoena asking for these records, and so

6    part of the government's argument here is that there's case law

7    that says if something -- if the defendant was on notice that

8    something might have existed and he didn't pursue it, then

9    there might not be a <u>Brady</u> violation.  Do you remember that

10   part of the government's motion?

11   A.   Generally, yes.  Specifically, no, I don't remember the

12   discussion of the case law, but generally I'm familiar with the

13   idea that one of the issues is, hey, the defendant never

14   requested this by way of subpoena from the United Way.  If they

15   were looking for records from the United Way the defendant has

16   never until three weeks ago requested any documents from the

17   United Way.

18   Q.   And what happened three weeks ago, when the defendant

19   asked for a Rule 17 subpoena?

20   A.   Well, you filed a motion asking for permission to issue

21   it, and I filed an objection, and the government filed an

22   objection.

23   Q.   And you would have done the exact same thing in 2019 that

24   you did three weeks ago?

25   A.   Well, not necessarily.  If they had asked for something

1    reasonable that could be produced, then we would have read it

2    and considered whether we could respond to it.

3    Q.    So, you're saying now that you would not have objected to

4    a Rule 17 subpoena in the fall of 2019?

5    A.    I'm saying not necessarily.  I don't know what that

6    hypothetical subpoena contains.  I can tell you that in the

7    summer and fall of 2019 we voluntarily produced a large volume

8    of documents in response to Tim Harrington's discovery request.

9    Q.    And who got to decide what those documents were?

10   A.    With respect to United Way documents, I decided.  With

11   respect to other parties' documents, I don't know the answer to

12   that.

13   Q.    Well, did documents -- I mean, obviously, other than

14   documents from the FBI were there any other documents in this

15   case other than from the United Way that you know of?

16   A.    Yeah.  There are RSM documents, and there are government

17   documents that aren't United Way's documents.

18   Q.    Well, let's talk about RSM.  Other than the documents the

19   government gave RSM, all the other documents from RSM had to go

20   through you, right?

21   A.    Well, no.  Documents from the United Way to RSM went

22   through me, but to the extent that RSM had its own internal

23   documents, things that they created or their own internal

24   emails, that didn't go through me; or if they did market

25   research or collected other data, that wouldn't go through me.

```
 1    So, I was -- documents that came from the United Way went
 2    through me.
 3    Q.   Well, you know that we've got a whole production of emails
 4    post conviction, right?
 5    A.   Yes.
 6    Q.   800 plus.  I'm not sure what the count is right now.
 7    A.   Yes.
 8    Q.   You're aware of that?
 9    A.   Yes, yes.
10    Q.   And those are, for lack of a better word, internal emails
11    from RSM, right?
12    A.   Yes, yes.
13    Q.   And those came through you, right?
14    A.   Well, technically, no.  I've reviewed them all, but RSM
15    produced them.
16    Q.   But you had the call as to what was going to get turned
17    over and what wasn't going to get turned over?
18    A.   Technically, no.  I reviewed them for privilege and so if
19    there were -- so I redacted certain documents and provided a
20    privilege log for other documents, but I didn't determine in
21    the first instance the body or, you know, the collection of
22    documents to be produced.  I was not the one who was making the
23    first determination.  That was RSM.  First, they made a
24    determination of what documents to produce, and then I looked
25    at them solely for the purpose of protecting United Way's
```

1    privilege, and therefore, if they were --

2    Q.   So, basically, you had the last call on whether they would

3    get produced?

4    A.   Well, no, I don't agree with that.  Maybe it's just

5    semantics, but it's just that it was RSM that was making a

6    decision about what to produce, and so they made calls before I

7    saw any documents, I presume.  I don't know the answer to this,

8    but assuming they made decisions before I saw any documents

9    about what to produce or not to produce, I then reviewed

10   everything and sent it back to RSM for RSM to produce with my

11   redactions on certain documents and certain documents withheld

12   and identified on a privilege log.

13   Q.   And just so we're clear from the record that this

14   post-conviction process you're describing, RSM is looking at

15   the judge's order, determining something is consistent with the

16   judge's order, it goes over to you, and then you can say, No,

17   even though it's consistent with the judge's order, I'm not

18   turning it over because I'm asserting privilege.  That's how

19   that worked?

20   A.   Well, it works in the sense that I could say I'm not

21   turning it over because I'm asserting privilege.  So, yes, it

22   was a privileged document that I asserted privilege, and then

23   we produced the privilege log.  Yes.

24   Q.   Now, in your declaration -- when I use that word I'm just

25   going to continuously be referring to Exhibit B, Document

1    173 -- in your declaration you said that, this is at paragraph

2    34, RSM prepared a report which was presented to the special

3    committee in October of 2018 regarding RSM's loss analysis.  Do

4    you remember saying that?

5    A.    Yes.  I don't have the document in front of me, but, yes,

6    I do remember saying it.

7    Q.    Okay.  And if you need to look at the document to refresh

8    your recollection, as long as you let us know for the record

9    that you're doing that, I'm --

10   A.    I'll let you know.

11   Q.    Okay.  And you also said in your report, At the time,

12   referring to what we just talked about, RSM's report and

13   presentation to the special committee were confidential and

14   protected by the attorney-client privilege.  Do you remember

15   stating that?

16   A.    Yes.

17   Q.    And as we talked about before, the materials you turned

18   over to the government pursuant to the subpoena in June of 2018

19   were privileged documents, right?

20   A.    They were marked "Confidential."  They weren't privileged.

21   Q.    So, they were not protected by attorney-client privilege?

22   A.    Now I'm confused about which documents you're talking

23   about.  Documents that I turned over to the government?

24   Q.    Yes, in June of 2018.

25   A.    I did not produce any privileged documents to the

1   government in June 2018.  I'm confused about what you're

2   referring to.  I don't recall producing any privileged

3   documents to the government until we waived the privilege with

4   respect to RSM's loss analysis.  So, if you're talking about

5   something other than waiving the privilege with respect to

6   RSM's loss analysis, you're going to have to help me get to

7   that place that you seem to be at.

8   Q.   Okay.  Well, that's a very good clarification.  I'd like

9   to talk about that.  So, you said that you waived the privilege

10  as to RSM's loss analysis.  When did that happen?

11  A.   You know, I don't know specifically, because it's not like

12  there was a light switch that went on or off.  It certainly

13  happened when the government hired RSM as its expert witness.

14  Q.   And if you recall the testimony from the earlier hearing,

15  that would have been sometime in July of 2019, right?

16  A.   Yes, sometime in July 2019.

17  Q.   So, if I said no later than mid-July of 2019 United Way

18  waived its privilege as to RSM's work for United Way, that

19  being the date where Naviloff and RSM became an expert for the

20  government, right?

21  A.   Yeah.  I guess I would just -- I guess I would only add a

22  caveat here, the caveat being I just don't know exactly what

23  you mean in terms of waiving the privilege.

24  Q.   Those are your words.

25  A.   I'm sorry?

1   Q.   Those were your words, not mine.

2   A.   Well, I guess I'm not sure what it means, if we're going

3   to talk about it probably for the next hour what that means,

4   and so I want to be able to say at some point we took action

5   that had the effect of operating or opening the door to a

6   waiver of the privilege.  So, I don't know exactly what that

7   means until somebody requests documents from me and/or files a

8   motion to compel or something and I actually have to sit down

9   and put my hat on, or whatever it is that you put on to think

10  hard about these things, and figure out, okay, you know, what

11  does that mean?  But certainly that event in July of 2019 had a

12  big impact on our ability to assert or no longer assert the

13  privilege.

14  Q.   And just so I understand your answers here, so you get the

15  subpoena in June of 2018; you turn over, as I heard you

16  describe, business records, but you didn't see those things as

17  falling under the attorney-client privilege.  Am I

18  understanding that correctly?

19  A.   Well, if they were privileged I wouldn't have turned them

20  over, so I guess I'm not sure why you're saying that the

21  records I turned over were under the attorney-client privilege.

22  Q.   I'm not saying that.  I'm asking you a question.

23  A.   I turned over United Way's documents, accounting invoices

24  and contracts and emails and, as you say, business records,

25  PowerPoint presentations, meeting minutes.  So, nowhere in

1   there am I thinking about anything having to do with privilege.

2   If they were privileged, I wouldn't have turned them over.

3   Q.   Well, that's what I just said, okay?  So, I'm repeating

4   what you've testified to, which is that in June of 2018 you

5   produced documents that you thought of as business records, but

6   you didn't produce anything that you thought fell under the

7   attorney-client privilege.  I understand that --

8   A.   Correct.  Yes, that's correct.

9   Q.   And that, as you put in your declaration, things that you

10  thought fell under the attorney-client privilege was work that

11  RSM had been retained to do for United Way in the summer of

12  2018, right?

13  A.   You're referring to my declaration, so I can't say you're

14  right, because I don't know what you're reading from my

15  declaration.  So, if you give me the paragraph, I'll pull it

16  out.  If it's from my declaration I just want to get it right.

17  Q.   Okay.  So, I just read it a minute ago.  I'll reread it.

18  In paragraph 34 you talk about October of 2018, and you said,

19  At the time RSM's report and presentation to the special

20  committee were confidential and protected by attorney-client

21  privilege.  So, that's what I'm talking about.  I'm just trying

22  to understand your testimony.  You're saying that as to the

23  subpoena you're giving over business records, but during that

24  period of time RSM is doing work for United Way involving

25  insurance loss, that's protected under attorney-client

1   privilege?

2   A.   Well, so RSM's work is protected.  The underlying business

3   records aren't protected.

4   Q.   Right.  And that's the point I was trying to make.

5   A.   Okay.

6   Q.   Okay?  And RSM worked for United Way from about July of

7   2018 right through the fall of 2018 and even I think a little

8   bit into early 2019, right?

9   A.   Yes, definitely into 2019.

10  Q.   And that material -- those materials from RSM, which are

11  separate from business records, those materials were still

12  protected by the attorney-client privilege because Naviloff and

13  RSM hadn't become a government expert at that point, right?

14  A.   They were privileged, and the privilege had not been

15  waived.

16  Q.   So, let's go back and talk about November of 2018, and

17  we've already established that's when Mr. Alrai was indicted,

18  on the 28th.  You're aware that during that period of time in

19  November of 2018 Mr. Naviloff met with the government on at

20  least two occasions about RSM's findings.  Do you remember

21  that?  That's in the emails you turned over this past summer.

22  A.   Yes, I remember one meeting for sure.  You said two

23  meetings, and I guess I'm just --

24  Q.   And one might be a phone call and one might have been a

25  meeting?

```
1    A.   Okay.  I know one meeting for sure I was present as well,

2    at least I think I was, it's my best memory that I was, and

3    maybe there was a phone call as well.  Yes, I am aware that

4    there were meetings, and perhaps there were also phone calls

5    between Greg Naviloff and the prosecutor.

6    Q.   So, you and Greg Naviloff had a meeting with the

7    prosecutor in November of 2018, right?

8    A.   That is correct.

9    Q.   And so, you've already testified that the attorney-client

10   privilege is still in effect in November of 2018, so you must

11   have asserted attorney-client privilege as to Naviloff talking

12   about his findings?

13   A.   No.  That would have been the point in time that we were

14   essentially -- that was the beginning of waiving the

15   attorney-client privilege.  To bring Naviloff in to have a

16   meeting with John Davis would have been the first time that we

17   had to make that important decision.

18   Q.   So, in November of 2018 you, on behalf of United Way,

19   waived the attorney-client privilege as to the work that RSM

20   did for United Way?

21   A.   I wouldn't agree with that, because it's not -- I don't

22   see it as black and white.  We went in, we discussed certain

23   topics, we shared a limited number of schedules that RSM had

24   prepared, and I knew that this, obviously, was going to be a

25   challenge in the future if we had to fight over whether the
```

1   privilege was waived or not.  So, I knew it was sort of the

2   beginning of that process.  But we've never litigated that

3   issue, because, frankly, it's all moot.  We are not asserting

4   the privilege with respect to Naviloff's work in the loss

5   analysis.  I don't want to get sidetracked by it.  I just want

6   to let you know I'm not going to buy into or agree with

7   wholesale what you're saying with respect to what we did on

8   November 8th, 2018.

9   Q.   So, you did not -- you asserted attorney-client privilege

10  on the -- I would say between September and December of 2019

11  you asserted attorney-client privilege regarding some

12  documents, correct?

13  A.   With respect to Naviloff's loss analysis or other --

14  Q.   With regard to anything involving RSM.

15  A.   No, I disagree.

16  Q.   Didn't you do a privilege log?

17  A.   We did assert privilege as to some documents; we waived

18  privilege as to other documents.

19  Q.   That was my point.

20  A.   Yes, yes.

21  Q.   So, you asserted privilege as to some documents, and those

22  were documents that the government requested of you, right?

23  A.   Or, actually, no.  Mr. Harrington requested them, not the

24  government.

25  Q.   But you didn't give Attorney Harrington everything he

1   requested, did you?

2   A.   I'm not sure what you mean.   I gave Attorney Harrington

3   what we agreed to give him.   I had no obligation to give him

4   everything he requested.   He requested things that I thought

5   were unreasonable and burdensome, and, in fact, I wrote a

6   six-page letter about it, and there was a decision that we

7   would not be required to give him the documents.   So, no, I did

8   not give him everything he requested.

9        THE COURT:   Let me ask you, Ms. Brown -- this is not a

10   challenge, it's an actual question.   When you say -- what do

11   you mean by that -- what do you mean to suggest or establish

12   when you say he didn't provide anything he asked for?   Because

13   I think counsel for both sides in the criminal litigation

14   actually came to an agreement, an accommodation with each

15   other, about what would be produced.   I think that was

16   produced.   What wasn't necessarily produced, according to this

17   motion, is exculpatory evidence but not a failure to produce

18   stuff that was agreed to, right?

19        MS. BROWN:   Correct.   And we discussed before there

20   was not a pending motion for discovery or an order on a motion

21   for discovery.   Prior counsel decided to litigate this

22   discovery issue as a way of saying, well, if you're not going

23   to give us all the evidence that this witness relied on, then

24   you can't call him.   That was their strategy.

25        THE COURT:   Yeah.

1          MS. BROWN:  Right, yeah.

2          THE COURT:  Okay.

3          MS. BROWN:  So, that's where I was going with that.

4          THE COURT:  Wait.  But tell me, though, where were you

5     going?  Because that was the question.  Like, let's suppose

6     Mr. Commisso agreed with you -- accepted your premise, Yeah, I

7     didn't give him what he asked for.  Where does it lead?

8          MS. BROWN:  Well, what's important here, your Honor,

9     is that, and I've got other questions with the citations about

10    he was on notice of what specifically Attorney Harrington was

11    looking for, and of course he already, as a defense attorney,

12    knows what Brady material is.  One thing that I think Attorney

13    Commisso has admitted to is he was selective about his

14    assertion of attorney-client privilege, and that was something

15    that we've asserted in our motion is something that's not

16    permissible to do, at least in this respect here, and that he

17    was selectively asserting that.  I'll get into it a little bit

18    more when I get into the privilege log, but he's just said the

19    privilege was in some way waived, partially or otherwise, in

20    November of 2018 --

21         THE COURT:  Yeah.

22         MS. BROWN:  -- yet it kept being asserted up until

23    very close to trial, and that's an important part of our

24    argument because of two things.  One is that he's in charge of

25    -- you know, the person who has a great deal invested in the

1    outcome of this case is in charge of deciding what is

2    exculpatory and what isn't exculpatory and when they're going

3    to assert privilege and when they aren't going to assert

4    privilege.  The other thing in the mix that I will get to later

5    in my cross-examination is the assertions that the defendant

6    had everything that Naviloff relied on --

7              THE COURT:  Yeah.

8              MS. BROWN:  -- which we believe, now we know is not

9    true, and so that is part of where I'm going with this.  But I

10   think it's important to -- and I think I have established that

11   there was selective enforcement of this privilege.

12             THE COURT:  Well, he said that.  He said, Sometimes I

13   asserted the privilege, sometimes I waived it.  Yeah.

14             MS. BROWN:  Yeah.

15             THE COURT:  That much is true.  I guess what I'm -- I

16   don't expect you to do it with one question here, but what I'm

17   trying to connect up here, then, is selective invocation and

18   waiver of the privilege is one thing, but I'm not sure I equate

19   that with what you just suggested, that he was the one who

20   decides what's exculpatory.  That's a little bit different.

21   What am I missing there, or are you getting there?

22             MS. BROWN:  I'm getting there, your Honor, because I

23   think the next part of that, and I haven't got there yet, is

24   the relationship with the government along those lines.

25             THE COURT:  Okay.

1          MS. BROWN:  And also, too, I just want to say, because
2     Attorney Commisso has sort of talked about a lot of different
3     things that I sort of was chasing down -- so if I take a
4     moment, that means I might have asked the question already and
5     I'm just looking at my notes, and I just want to make sure I
6     don't repeat questions.
7          THE COURT:  I don't have any problem with your pace at
8     all.
9          MS. BROWN:  Oh, great.  Thank you.
10         MR. DAVIS:  Your Honor, may I clarify just as to one
11    point?
12         THE COURT:  Yes.
13         MR. DAVIS:  Ms. Brown has asked a number of questions
14    about assertion of privilege of the work RSM did for you, and I
15    want to make sure the Court and the record aren't confused
16    about this, because there is no confusion about the fact that
17    United Way and Mr. Commisso have always consistently asserted
18    attorney-client privilege as to RSM's work not related to
19    calculating the fraud loss but to the data breach
20    investigation, and the Court has recognized in the past that
21    United Way retained RSM and people other than Greg Naviloff to
22    do significant work for United Way, and from the very beginning
23    through this day United Way has never waived privilege about
24    that.  There was nothing ever selective about that, and I just
25    want that to be clear.  Mr. Commisso still hasn't waived that

1    privilege, and there was never any confusion about that.

2          MS. BROWN:  I'll be happy to clarify that, your Honor,

3    because I think that is important.

4          MR. DAVIS:  We agree, and we'd appreciate that.

5          MS. BROWN:  Thank you.

6          MR. DAVIS:  I'll stop for now.

7          MS. BROWN:  Okay.

8          THE COURT:  I knew you wanted to say something,

9    Mr. Davis.  I was going to ask you, but you asserted yourself

10   there, and I appreciate that.  But I can't tell if you actually

11   agree about this point or not.

12         MS. BROWN:  We don't agree about the facts, but I

13   think we agree that it should be clarified.

14         THE COURT:  Okay.

15         MS. BROWN:  And I am very happy to do that.

16   Q.   So, Attorney Commisso, so I understood you to say a few

17   minutes ago, and I was trying to find my notes here, because I

18   wrote it down, that at some point the attorney-client privilege

19   -- well, let me back up a little, few more steps.  You said,

20   and you put this in your declaration, that the work that RSM

21   did for the United Way, which started sometime in summer, I

22   think July of 2018, and that work included helping prepare a

23   report for United Way committees and doing an evaluation but

24   also helping prepare information for an insurance claim, and

25   that that work, and as you said in your declaration, that work

1    was covered by attorney-client privilege, correct?

2    A.    RSM's work in connection with the loss analysis was

3    covered by the attorney-client privilege.  That is correct.

4    Q.    And when you complied with the grand jury subpoena in June

5    of 2018 you didn't turn that over, did you?

6    A.    No.  It was privileged.  We didn't turn it over.

7    Q.    And so, we had a discussion a few minutes ago about the

8    fact that the privilege was, I don't know if you used the word

9    partially, or somewhat, or kind of waived in November of 2018

10   when you and Mr. Naviloff met with the government to help

11   prepare for the grand jury, correct?

12   A.    Correct.  It was partially or somewhat waived when we had

13   that meeting, yes.

14   Q.    Because up until that point you had not shared any

15   information publicly, you had not shared any information with a

16   third party, would be a better way to say that, up until you

17   met with the government in November of 2018, correct?

18   A.    That's correct.  Yes.

19   Q.    And what I think we need to clarify here, and I think it's

20   a really important point, is so at some point in winter/spring

21   of '19 to summer of '19, when Naviloff and RSM goes to work for

22   the government, now RSM's taking on a new role, correct?

23   A.    In July they were retained to work for the government.

24   Q.    And I appreciate Attorney Davis raising this.  What we

25   want to clarify is are you asserting that when RSM went to work

1    for the government in the summer of 2019 that everything they

2    had done prior to that for you was still privileged?

3    A.    No.

4    Q.    Okay.

5    A.    It was clear, I think, a number of times, but I guess not

6    if we're still talking about it.

7    Q.    Well, I just wanted to -- because I wasn't sure where --

8    A.    We are no longer asserting the privilege regarding Greg

9    Naviloff's loss analysis, but we are still asserting the

10   privilege and have never waived the privilege with respect to

11   RSM's data security investigation.

12   Q.    And you laid that out in your affidavit as these two

13   completely separate things, right?

14   A.    Yeah.  Well, it's laid out in the greatest detail in my

15   opposition to the Motion to Compel.

16   Q.    Okay.  But it's also in your declaration, too.  Yeah,

17   you're right.  It is in your Motion to Compel, where you talk

18   about Sean Renshaw and all of it?

19   A.    Yes.  Exactly right.

20   Q.    And I think -- is that -- I have that somewhere else in

21   here.  Just for the record, do you remember the document

22   number?  I'll come back to it, but I'm pretty sure it's in the

23   190s.  I want to say 196.  So, in that document you lay out

24   this wall between work that is done -- did you use the word

25   "data security"?  I just want to use the right term.

1    A.    I call it the "data security investigation."  I also

2    called it the DFIR team, DFIR investigation.

3    Q.    So, and to clarify this even further -- and I apologize to

4    the Court if I'm being repetitive, because it is complicated

5    but important -- so you are saying that, once Naviloff and RSM

6    became a government witness, you waived this sort of subset of

7    information, which was RSM's loss analysis, but you didn't

8    waive information regarding data security, correct?

9    A.    You want to restate it differently than what I said.  What

10   I said is we are no longer asserting privilege regarding

11   Naviloff's loss analysis.  We are still asserting and have

12   never waived the privilege regarding the data security

13   investigation.

14   Q.    And I really wanted to clarify this, because I wasn't

15   sure.  So, it's not a situation where you were saying that as

16   part -- you understood that when the government hired Naviloff

17   that they were, for lack of a better word, importing his loss

18   analysis that he had done and RSM had done for United Way, that

19   they were importing that into the opinion they expected to use

20   at trial?

21   A.    I don't know about that, but I do know that they were

22   hiring him to be the expert witness with respect to the loss

23   analysis.  I know that's why they hired Naviloff.  Naviloff was

24   the government's witness with respect to loss analysis.

25   Q.    And you understand, as a criminal defense attorney, that

1    when you notice someone up as an expert, that brings with it

2    special discovery rules, right?

3    A.   Yes, there are rules that apply to expert discovery in

4    federal criminal cases.  Yes, I know that there are those

5    rules.

6    Q.   So, you knew that when the government retained Naviloff as

7    to the loss calculation?

8    A.   I knew what?  I knew that --

9    Q.   You knew that that could -- that that would bring with it

10   discovery requests, because he's an expert witness and there

11   are special discovery rules for expert witnesses?

12   A.   Yes.

13   Q.   And at that point, in the Summer of 2019, you did not

14   assert attorney-client privilege when RSM and Naviloff went to

15   work for the government, did you?

16   A.   Yes, I did for anything that was not part of Naviloff's

17   loss analysis.

18   Q.   But as to the loss analysis you did not assert

19   attorney-client privilege when Naviloff and RSM went to work

20   for the government?

21   A.   Well, no, because I produced documents that would have

22   otherwise been privileged.  So, we started producing documents

23   that until that point were, in fact, covered by the privilege,

24   and so at that point we knew the privilege was waived.  So, to

25   the extent we were required to produce documents, we weren't

1    withholding them based on an assertion of privilege.

2    Q.   So, I'd like to talk about some of the work that involved

3    RSM in the summer of 2018.  Did the government share the

4    exhibits in this case with you?

5    A.   The ones that were for this hearing?

6    Q.   Yes.

7    A.   Yes.  I don't know if I have all of them, but I have some

8    of them.

9    Q.   And you mentioned earlier you had access to ECF, but they

10   wouldn't be available by ECF, the exhibits, right?

11   A.   Right.

12   Q.   Right.  So, the only way you would have got them is if the

13   government shared them all with you?

14   A.   Right, or if you had shared them with me.

15   Q.   Exactly.  And just the reason I say that is I'm going to

16   ask you some questions about some of those exhibits.  If you

17   need to look at them, let me know.  If you remember from your

18   -- oh, sorry.

19        MS. LE:  Ms. Brown, if we're going to look at

20   exhibits, can we ask Tracy to pull them up so that we can all

21   see what we're talking about?

22        MS. BROWN:  Oh, yeah, that's what I would do anyway.

23        MS. LE:  Okay.  Thank you.

24        MS. BROWN:  I guess what I was trying to explain to

25   Attorney Commisso is I'm going to ask him some questions about

1    exhibits.  If he remembers in the first instance the answer to

2    my question he can answer it that way.  If he's not sure or he

3    needs to look at the exhibit, then I would have the Clerk pull

4    it up for everyone to look at.  Yes, I'm fine with it.  Is that

5    what you meant?

6            MS. LE:  Ma'am, whatever you want to do.  I just

7    thought it would be easier if just we had --

8            MS. BROWN:  Okay.

9    Q.   So, again, going back to the summer of 2018, at that point

10   you were working with RSM in terms of their investigation in

11   this case, correct?

12   A.   Yes, I guess so.

13   Q.   You were on a lot of email chains with RSM during the

14   summer of 2018, right?

15   A.   Yes.

16   Q.   Now, do you remember, and this is an email from July 30th,

17   where you said -- I think you were actually just talking about

18   setting up meetings, and you said something along the lines, It

19   would be helpful for me to attend these discussions, since the

20   issues in document requests overlap substantially with the

21   government investigation and our response to the government's

22   request for documents.  Do you remember saying that?

23   A.   Without looking at the document, no.  I mean, you're

24   reading from a document.  I assume that you're reading my

25   words, but I'm at a disadvantage here.

1          MS. BROWN:  Okay.  Tracy, can you pull up Triple B, as

2     in "boy."  And I think it's that first kind of small paragraph

3     after the word "Attachments" up at the top.

4     Q.   I'll read the whole thing.  It says, Chris, thanks for the

5     update.  I will plan to be on-site Tuesday and Wednesday during

6     these times.

7          That's referring to being on-site at United Way,

8     right?

9     A.   It appears to be, yes.

10    Q.   And you go on to say, I'll move my window here so I can

11    see it, It would be helpful for me to attend these discussions,

12    since these issues and document requests overlap substantially

13    with the government investigation and our responses to the

14    government's requests.

15    A.   Yes.

16    Q.   And it's signed John J. Commisso, correct?

17    A.   Yes, I see that, and it appears that I sent it.

18    Q.   Okay.  And this is July 30, 2018, right?

19    A.   Yes.

20    Q.   So, that would be what, August, September, October, four

21    months before Mr. Alrai is indicted, right?

22    A.   Yes.

23    Q.   Okay.  And about a little under two months after you get

24    the grand jury subpoena, right?

25    A.   Yes.

1    Q.   And so, at this point I think you've said that early in

2    the summer of 2018 one of your main focuses is preparing a

3    report for the United Way and making an insurance claim and

4    collecting evidence for the insurance claim.  Would that be

5    fair to say?

6    A.   I don't think I said that, but at this time we were

7    conducting an internal investigation.  We were responding to a

8    grand jury subpoena.  We were preparing a report so we could

9    report to the special committee.  We knew at some point we were

10   going to have to respond to the insurance company.  We were

11   focused on a lot of things.

12   Q.   But one of the things you were focused on was the

13   government investigation, right?

14   A.   Well, yes.  As I said, we had to respond to the grand jury

15   subpoena.  Yes.

16   Q.   And so, you wanted to be on site to be there to have input

17   regarding the government investigation and government request

18   for documents, right?

19   A.   Well, no.  No, I would not put it that way.

20   Q.   Okay.  But you had it on your mind that you were looking

21   for government documents in the summer -- documents to provide

22   to the government in the summer of 2018?

23   A.   I had it in my mind in this email that I wanted to be

24   present at meetings at the United Way so that I could collect

25   United Way's documents that needed to be produced in response

1    to the grand jury subpoena.

2    Q.   Now, you said earlier that you only waived privilege as to

3    Naviloff's and RSM's loss calculation, right, when you did

4    eventually waive it in the summer of 2019?

5    A.   Right.  Yes.

6    Q.   Okay.  And, as you've just talked about in your reply

7    motions to the Motion to Compel, you talked about how there

8    were two separate teams at RSM, one that was dealing with data

9    security and one that was dealing with loss calculation, right?

10   A.   Yes.

11   Q.   And that you eventually waived privilege as to the loss

12   calculation when Naviloff became an expert, but you've never

13   waived the privilege as to the data security, right?

14   A.   Yes.

15   Q.   And as explanation for that, you said there were two

16   different teams, right?

17   A.   Yes.

18   Q.   And one of the teams as to loss calculation involved Greg

19   Naviloff, Ryan Gilpin, Diego Rosenfeld.  Chris Fitzgerald

20   played a big role in that, correct?

21   A.   Yes.

22   Q.   Now, you said the other team, the data security team,

23   which was separate, was run by Sean Renshaw, right?

24   A.   Yes, yes.

25   Q.   Do you see his name in this email?

1    A.    Yeah.  It's right there in the CC line.

2    Q.    Okay.  So, Sean Renshaw is CC'd on this email regarding an

3    on-site plan at RSM, correct?

4    A.    Yes, that's what it says.

5          MS. BROWN:  You can take that down, Tracy.  Thank you.

6    Q.    Now, in these emails I'm going to ask you now about

7    Exhibit Triple C -- not triple -- Quadruple C, as in "cat."

8          MS. BROWN:  Tracy, if you can bring that up.  Yeah, I

9    think that first paragraph, if you could pull that out.

10   Q.    And this is an email from Greg Naviloff to Chris

11   Fitzgerald, right?

12         MS. BROWN:  Well, maybe if we -- sorry about that,

13   Tracy.  If you can do --

14   A.    No, that's okay.

15   Q.    Well, I just want you to be able to see the caption, you

16   know.

17   A.    It's from Chris Fitzgerald to Greg Naviloff and Andrew

18   Davis.

19   Q.    Correct.  And it's dated August 31st of 2018, right?

20   A.    Yes.

21   Q.    Okay.  So, you can see it actually says Greg, dash, Chris.

22         MS. BROWN:  If we call pull that paragraph out again.

23   Thank you, Tracy.

24   Q.    Now, in this paragraph -- and you're familiar with all

25   these documents, because you produced them -- or you reviewed

1   them before they were produced?

2   A.   At some point I reviewed them.

3   Q.   Okay.  In this document it says, Regarding hourly rates, I

4   think it could potentially be valuable from a qualitative

5   perspective for purposes of DOJ complaint, expert report, trial

6   exhibit and claim memo.  So, I mean, you didn't write this

7   email, but it talks about the Department of Justice complaint,

8   right?

9   A.   That's what it says there in that paragraph.

10  Q.   And you, as a part of -- you, as guiding this team from

11  RSM, were instructing them about looking for things that

12  involved the Department of Justice's investigation in this

13  case, correct?

14  A.   No, I do not agree with that.

15  Q.   So, on their own Greg Naviloff was talking about the

16  Department of Justice complaint without any guidance from you?

17         MR. DAVIS:  Objection.  Calls for speculation.  The

18  witness is being questioned about a document he didn't even

19  write.

20         MS. BROWN:  Well, I can clarify my question.  Did you

21  give any guidance to Naviloff or Chris Fitzgerald about looking

22  for documents that might be helpful for the government?

23  A.   At any point or in this --

24  Q.   At any point.

25  A.   -- in this context in August 2018?  First, this was

1    written by Chris Fitzgerald, not Greg Naviloff.  I have no idea

2    what's going on in this message.  I'm not copied on it.  I

3    don't think I ever received it.  I probably reviewed it to

4    determine whether it was privileged or not.  But with respect

5    to the subject matter of this email, I was not giving

6    instructions to Naviloff or Fitzgerald or anyone else regarding

7    the government's case.

8    Q.   So, you did not give them any guidance whatsoever as to

9    looking for documents that might be helpful to the government's

10   prosecution of Mr. Alrai?

11   A.   Well, let me put it this way:  not with respect to this

12   email.

13   Q.   No.  Forget this email.

14   A.   There may have been --

15   Q.   In general.

16   A.   There may have been points in time where either I had a

17   specific request that I was pursuing and I would ask RSM for

18   assistance and say, Have you seen any evidence of this, or, Can

19   you find this document for me and send it to me?  There may

20   have been times where I had a conversation with Mr. Davis and

21   he may have asked me for evidence on a certain topic.  As I'm

22   saying it, I'm trying to come up with an example of when that

23   may occur.  But what I'm trying to say is, generally speaking,

24   there may have been times where I went to RSM and instructed

25   them to look for something specific, and, generally speaking,

1    throughout the course of the investigation there may have been

2    times when Mr. Davis and I had conversations and I then took

3    back from those conversations that either I or RSM was going to

4    look for certain types of evidence.

5    Q.   And when you mean "look for certain types of evidence,"

6    look for certain types of evidence that the government would

7    want to review regarding their investigation?

8    A.   Yes.  Without a specific idea in mind, I'm not sure, but,

9    yes, that's what I'm thinking of, that there would be an

10   issue -- I mean, most likely there would be an issue that I

11   might have found that I wanted to provide information to the

12   government so that they could potentially investigate it.

13   Q.   And you would be in a special position to do that, as a

14   criminal defense attorney, you would be able to spot evidence

15   that might be of interest to the government's case?

16   A.   Well, I don't know if it's because I'm a criminal defense

17   attorney.  I would be in a position to do that because I'm an

18   attorney generally and because I'm representing a victim who is

19   investigating a crime for their own purposes and responding to

20   a grand jury subpoena about that crime.

21   Q.   You said that periodically you would have conversations

22   with Attorney Davis.  Are you referring to between May of 2018

23   and the end of November of 2018, when Mr. Alrai was indicted?

24   A.   I would say beginning in June, because I don't think I met

25   Mr. Davis until June of 2018, and it certainly continued

1    through the time of the indictment and after the indictment.

2    Q.   And let's just use that period of June of 2018 to November

3    of -- end of November, and I'm going to specifically pick

4    November 28th, 2018.  How many times did you speak with

5    Attorney Davis during that period of time?

6    A.   I don't recall.

7    Q.   Would it be more than ten or less than ten?

8    A.   I would say more than ten.

9    Q.   More than 20 or less than 20?

10   A.   It's harder to say as we get higher the numbers, but I

11   would say probably more than 20, but it's just, you know, I'm

12   guessing now.

13   Q.   We talked before about the emails.

14        MS. BROWN:  Tracy, if you could take down the last

15   exhibit, that would be great.  Thank you.

16   Q.   We talked before about the emails that were produced post

17   conviction.  Had you seen any of those email -- let's take out

18   of that equation emails that you were on the email chain on.

19   So, other than emails that you were personally involved with,

20   of the emails involving RSM that were produced post conviction

21   were you aware of any of those emails prior to them being

22   produced pursuant to the judge's post-conviction order?

23   A.   So, just so I'm clear, so the judge entered an order in

24   August, and then RSM collected and prepared to produce a bunch

25   of emails (inaudible).  Is that the collection that you're

1    talking about?

2    Q.   That is the collection I'm talking about.

3              (Discussion off the record with court reporter)

4                   (Record read by the court reporter)

5    A.   Right.  So, the judge entered an order in August and, in

6    response, RSM collected approximately 500 emails, and then

7    those emails were produced.  So, are those the emails that

8    you're asking me about?

9    Q.   It is.  Those are the exact same emails.  All I'm trying

10   to get to is when was the first time you saw those emails, with

11   the exception of the emails that you had been in on the email

12   chain originally?

13   A.   Right.  It would have been in August after the judge's

14   order.

15   Q.   So, you did not have those emails saved somewhere as part

16   of RSM's work for United Way?

17   A.   No.  Those emails came from RSM, and I didn't have access

18   to RSM's emails.

19   Q.   Even when RSM was working for United Way?

20   A.   I've never had access to RSM's emails unless they sent me

21   an email that I had access to on my own email server.

22              MS. BROWN:  Tracy, if you can pull up Exhibit Triple

23   E, it should say November 16th, and if we could pull out the

24   paragraph that starts "Hi, Greg" and ends with "Thanks, John."

25   Q.   So, I think you're talking about the weather there at the

1    beginning.  So, the first paragraph says, Proof of loss for

2    Chubb.  Chubb is the insurance company that United Way is

3    making a claim for the losses involving this case, right?

4    A.    Yes.  That's correct.

5    Q.    And so, mostly this paragraph is talking about that

6    insurance claim, that first bullet, right?

7    A.    Yes.  It's about the Chubb Insurance claim in the first

8    bullet.  That is correct.

9    Q.    The second bullet is talking about the criminal case.  It

10   says, Response to requests from AUSA John Davis, right?

11   A.    That's what it says, yes.

12   Q.    And it says, and this is directed to Greg Naviloff, Are

13   you able to provide a schedule or schedules with more details

14   breaking down the amounts of DigitalNet invoices that were,

15   quote, out of scope, end quote?  Those are your words, right?

16   A.    Yes.  This is my email.

17   Q.    What were you referring to as to DigitalNet invoices that

18   were, quote, out of scope, unquote?

19   A.    So, Naviloff had prepared a loss analysis, and this was in

20   November of 2018.  I believe this was after we had the meeting

21   with Attorney Davis and we had provided him the -- I think it

22   was either one schedule or one schedule with three or four

23   supporting exhibits.  That was basically the summary of

24   Naviloff's loss analysis.  And there's a part of that loss

25   analysis where RSM did not analyze all of the costs, all of the

1    DigitalNet invoices, because they were deemed to be out of the

2    scope.  So, "out of scope" refers to the part of the DigitalNet

3    payments that were not analyzed by Naviloff.

4    Q.   And this paragraph that we were just talking about, the

5    second bullet on this exhibit, Triple E, you are consulting

6    with Greg Naviloff and RSM about putting together a schedule or

7    schedules with more details with the idea of providing that to

8    the U.S. Attorney's Office, correct?

9    A.   Yes.  Well, two pieces to your question.  One, you said

10   "putting together."  I don't know whether it had to be put

11   together or not.  I think I was asking whether the information

12   already existed:  Can you provide a schedule with more details.

13   They may have already had that.  I don't know if I was asking

14   them to do something new as opposed to just printing a

15   schedule.  But, yes, obviously, from what I'm saying, if they

16   had that information, I am then going to provide it to Attorney

17   Davis.

18   Q.   And as we discussed before, at least up until November of

19   2018 information regarding RSM's loss analysis had been

20   protected by the attorney-client privilege, correct?

21   A.   Up until that meeting, just before this email.

22   Q.   And so, to the extent that you are asking RSM to provide

23   the schedule so that they had found or produced -- I'm not sure

24   of the correct word here -- you are, to the extent you turned

25   this over, waiving attorney-client privilege as to RSM's loss

1    analysis?

2    A.    I guess that would be the argument that would have been

3    made if we were litigating this at that time.

4    Q.    And you didn't litigate it, did you?

5    A.    No.  We waived the privilege and produced what we needed

6    to produce.

7    Q.    And do you remember from two weeks ago one of the emails I

8    asked Greg Naviloff about?  And I don't think you were on this

9    chain, but I have a question about it.  After the meeting that

10   you and he had with the U.S. Attorney's Office he sends out an

11   email to the RSM team that he's working with that said

12   something to the effect of, Sounds like much of the case will

13   fall upon RSM's testimony, if they bring criminal charges.  Do

14   you remember me asking that question?

15   A.    Generally, I remember an email like that, yeah.

16   Q.    So, if you were at that meeting with him did you also get

17   the impression that the government was going to use either RSM

18   and/or Naviloff as an expert in the criminal case?

19   A.    Sorry.  Can you just ask that again?

20   Q.    I sure can.  It's a long question.  As I understood you

21   said earlier, when Naviloff met with the government in November

22   of 2018, like pre-indictment, that when Naviloff testified I

23   asked him about the fact that after he met with the government

24   he sent out this email saying, It looks like much of the case,

25   meaning the government's case, is going to fall upon RSM's

1    testimony if they bring criminal charges, and my question is

2    that do you remember something -- you might not remember it

3    word for word, but do you remember coming away from the meeting

4    with the government having that same impression?

5    A.   No, I did not have that same impression.

6    Q.   Okay.  And so, you did not, at least in November of 2018,

7    think that Naviloff was going to be an expert for the

8    government?

9    A.   No, I did not think that at that time.

10   Q.   We talked earlier about your involvement in other aspects

11   of this case, and I know in your declaration you said that you

12   had interests that were different from the government's.  Do

13   you remember saying that?  I don't have the exact quote with

14   me, but that was your position, that your interests were

15   aligned with protecting United Way, and your interests were not

16   necessarily the same as the government's interest?

17   A.   That sounds accurate.  I don't remember a specific line

18   from my declaration, but what you just said sounds accurate.

19   Q.   Okay.  So, I want to talk about some of the positions that

20   you've taken in this case.  Ever since Mr. --

21        MS. BROWN:  Tracy, you can take down the last exhibit.

22   I think it was Triple E.  Yeah.  Thank you.

23   Q.   One of the positions that you've taken in this case is

24   that ever since Mr. Alrai's conviction in December you have

25   opposed his release pending sentencing, correct?

1    A.   I don't know -- wait.  I'm sorry.  Ever since his

2    conviction?

3    Q.   Right.  That would have been December of '19.

4    A.   Oh, I had the wrong date in mind.

5    Q.   Okay.  Sorry.

6    A.   So, ask the question again now that I'm --

7    Q.   Yes.  So, after Mr. Alrai was convicted in December of '19

8    there have been a couple of hearings or --

9    A.   Yes.

10   Q.   -- some pleadings regarding whether he should stay out

11   pending sentencing, stay out living at home, or whether he

12   should be -- well, I think I should clarify for the record at

13   his detention hearing, I mean after his sentencing he was

14   detained, right?

15   A.   Yes.

16   Q.   So, he was convicted, and then there was a hearing upon

17   the conviction, and he was detained at that point?

18   A.   Yes.

19   Q.   And at that point his lawyer had asked that he remain free

20   pending sentencing, and you and the government opposed that,

21   right?

22   A.   Yes.  And also Rich Voccio, who's the Chief Administrative

23   Officer for the United Way, also spoke at that detention

24   hearing.

25   Q.   Right.  But I'm specifically asking that you and the

1  government took the same position on detention, which was that

2  Mr. Alrai should be detained?

3  A.   Yes.

4  Q.   And I want to go back to May of 2018.  This was before Mr.

5  Alrai was even let go from United Way.  That's when you became

6  involved in the case, right?

7          THE COURT:  Let me interrupt.

8          MS. BROWN:  Sure.

9          THE COURT:  It's been 90 minutes.  I want to give the

10  court reporter a little break.

11          MS. BROWN:  Okay.

12          THE COURT:  All right.  15.  We're in recess.

13          THE WITNESS:  What should I tell Mr. Meyer about what

14  time he might need to be available?

15          THE COURT:  Good question.  How much longer do you

16  have on direct?

17          MS. BROWN:  I suspect during the break, if I go

18  through this, I will find that like half of these questions

19  have been asked and answered already.  I would say right now

20  about half hour, 45 minutes.  So, I don't know how late the

21  Court wants to go, and I'm sure the government has some

22  cross-examination.

23          THE COURT:  I plan to go till the end of the day.  I

24  mean, we've got to get through this at some point.

25          MS. BROWN:  Okay.  I would expect, at a minimum,

1    between the government's cross-examination and the additional

2    questions I have, it will be an hour.

3              THE COURT:  Okay.

4              MS. BROWN:  At a minimum.

5              THE COURT:  I guess you tell him be ready at 4:00.  I

6    doubt we're going to get to him, but we'll try.  15, recess.

7              (Recess taken from 2:48 p.m. to 3:07 p.m.)

8              THE COURT:  All right.  Mr. Davis.  Oh, no.

9              Did you wrap up, Donna?

10             MS. BROWN:  I did not, your Honor.  But the break was

11   very productive in me going through my questions and realizing

12   that I had asked a lot of them already, so hopefully we'll move

13   along a little productively.

14             There you are.

15             I was looking for Attorney Commisso.

16   Q.   So, the next thing I wanted to ask you about, you were

17   engaged in May of 2018 to represent the United Way, correct?

18   A.   Correct.

19   Q.   And at that time you hired -- and I want to get the title

20   correct -- John Mulvaney, and he acted as a forensic

21   accountant, or that was his experience was as a forensic

22   accountant with the FBI, right?

23   A.   Well, two different things.  He was with the FBI.  He's a

24   retired agent, but now he works at a company called CBIZ, where

25   he is a forensic accountant.

1    Q.   And I think you talked about that either in your

2    declaration, or your recent motion you talked about that.  So,

3    he had criminal investigation experience, right?

4    A.   He's a retired FBI agent.

5    Q.   So, we can assume he had criminal investigation

6    experience?

7    A.   That seems like it would be a good assumption.  He also

8    testified at the trial, so I'm sure he described his background

9    at the trial.

10        THE COURT:  Yeah, I'm familiar with it.  I'm familiar

11   with Agent Mulvaney.

12   Q.   And he was an agent actually in New Hampshire, right, or

13   did some work in New Hampshire?

14        THE COURT:  Yes, he was.  He was in charge of the New

15   Hampshire office for years.

16   Q.   Okay.  And let's see.  There's an email that, you're not

17   on it, but it talks about you, so I'm going to ask you some

18   questions about it.  If you want to see the email, let me know,

19   I'll pull it up.  But it's an email from September 7th, 2018,

20   and it's Exhibit Triple I, and in it Naviloff talks about

21   talking to you.  So, you're not in the email, but he says he

22   talked to you, and I wanted to ask you some questions about

23   that, and specifically he said that he had talked to you after

24   a meeting in -- it might just be easier to pull it up.

25        It's Triple I, Tracy.  I had it up.  I was looking at

1    it during the break.

2            THE CLERK:  Can I just interject?  It looks like we

3    just lost Attorney Le.

4            MR. DAVIS:  She needed to log off.

5            MR. HUNTER:  Yeah.  She's logged in through the VPN,

6    which has a 12-hour time limit.

7            THE CLERK:  I had the same thing happen.

8            THE COURT:  It's okay.  We can go without her.

9            MS. BROWN:  Oh, okay, okay.  So, we're pulling up

10   Triple I, and this, as I've already said, was an email that

11   Attorney (sic) Naviloff wrote.  If we can pull up where it says

12   "All," and right after that there's either one or two sentences

13   after the word, "All."

14   Q.   So, again, this is from Attorney Naviloff, said he had a

15   detailed discussion with John C today after the auditee

16   committee meeting, which I attended.  He talks about good flow

17   of questions.  I received timeline of meetings, John's

18   presentation plan and additional evidence collection requests

19   (all listed below).

20           So, he's saying that after talking with you he got

21   additional evidence collection requests.  Does that sound about

22   right?

23   A.   This is Greg Naviloff writing this?

24   Q.   Yeah.  If you want, we can go up to the top.

25   A.   Just give me one second.  No.  Timeline of meetings,

1    John's presentation plan and additional evidence collection

2    requests (all listed below).  Is your question did I give him

3    that additional evidence collection request?  If so, I don't

4    know.  I just don't know.

5    Q.   Okay.  Well, I just wanted to -- I'm going to ask you some

6    questions about specific evidence collection requests, so I,

7    just in all fairness, wanted you to see what was said up at the

8    top.  Obviously, you go with your own recollection of this, but

9    this is where the basis of my questions came.

10   A.   Okay.

11   Q.   The way I read it, at least, it sounds like he got

12   additional evidence requests after having this conversation

13   with you.  But you don't remember one way or the other?

14   A.   No, but if you show me the lists of requests, that may put

15   some meaning to it.

16   Q.   So, let's go down to -- let's see.  So, there's like a

17   box.  Well, actually, no.  It's so hard for me to see.  I think

18   it's in the middle there.  Is it 1, 2, 3, 4, I think in the

19   middle of that?  Yeah.  I will know better when we -- yes,

20   that's it.

21          So, I specifically want to look at paragraph or number

22   3 that's pulled out, which is in the middle of this document,

23   and it says DigitalNet invoices (work with Kroll).  Do you see

24   that?

25   A.   Yes.  Number 3, I see that.

1    Q.    And under that there's a, b and c, correct?

2    A.    Yes.

3    Q.    So, one thing it says is, Collect emails with DigitalNet

4    invoice attachments, right?

5    A.    Yes.

6    Q.    And b is, Identify IP address and physical location of IP

7    address.

8    A.    Yes.

9    Q.    Do you know what an IP address is?  And I'm not trying to

10   make you sound -- I just want to make for the record what that

11   is.

12   A.    I understand generally what that means.  It's sort of the

13   physical location of where a computer connects to the internet.

14   Q.    That's kind of my understanding.

15   A.    My lay understanding of the issue.

16   Q.    I don't have much more detail than that.  But it is

17   something that forensically could connect an email or

18   something, some other information that's generated on the

19   internet, it could connect it to a specific location or

20   address?  That's your understanding?

21   A.    Yes.

22   Q.    And then 3 -- I mean c, 3c, Assess whether emails came

23   from Imran's home, New Hampshire home.  (This would permit New

24   Hampshire additional jurisdiction over the alleged crime).

25            So, my question has to do with is that something that

1    you asked I think it was Greg Naviloff, or at least RSM, to

2    look at, evidence regarding IP address to assess whether the

3    emails came from his home?  Do you remember asking him to

4    collect evidence along those lines?

5    A.   So, I'll answer in two ways.  Specifically looking at this

6    email, I don't remember this list of requests and these issues

7    specifically.  But generally speaking, yes, I think it's fair.

8    I don't have a specific memory, I have a general memory that

9    Naviloff and I discussed these types of issues, which is

10   finding I guess what I would say forensic evidence or

11   additional evidence of things like IP address and things that

12   would tie the documents to the physical location at his home in

13   New Hampshire.

14   Q.   And Naviloff uses the word "jurisdiction," but, as a

15   lawyer, you know another word for that is "venue," right?

16   A.   Yes.

17   Q.   And you knew, because you've read all the pleadings in

18   this case, venue was litigated in this case, right?

19   A.   Yeah.  I think the defendant filed a Motion to Dismiss for

20   improper venue.  It's been a long time.  Something along those

21   lines.  It was a defendant motion before trial.

22   Q.   Right.  And something along the line like, Hey, United Way

23   is in Massachusetts, what are we doing trying this case in New

24   Hampshire?  Something along those lines?

25   A.   Well, it was filed.  I don't remember the exact arguments.

1    Q.   And do you remember that the government used the IP

2    address as a basis for a venue?

3    A.   I don't remember exactly how the government opposed that

4    motion.

5    Q.   Thank you.

6         MS. BROWN:   You can take that down, Tracy.  Thank you.

7         Can you pull up Exhibit Triple J, and the first

8    paragraph starts with John, before that box.  Yes, you can pull

9    that out.  Thank you.

10   Q.   So, this is an email that's addressed to you, and it's a

11   chain of emails, so if you want to look at it.  But this

12   particular email I wanted to ask you about because it talks

13   about in the last sentence -- well, it talks about the fact

14   that they found something called UltPult, and that's U-l-t

15   capital P-u-l-t in something called Google Play Games, and this

16   email seems to suggest that this is something that Mr. Alrai

17   created and had some proprietary interest in.  Would you agree

18   that that was the discussion going on here?

19   A.   Yes, that's consistent with my memory of this issue.

20   Q.   And the email that's directed to you says, This may

21   potentially be another avenue to collect restitution if proven

22   that funds obtained through the United Way scheme were used to

23   develop these games, in parentheses, subject to legal

24   determination, end parentheses.

25         So, did you have discussions with the RSM team about

1  ways to collect restitution?

2  A.    Not that I remember about the ways to collect restitution.

3  We certainly had conversations about the loss analysis, the

4  amount of loss, and generally about what that might mean, you

5  know, in terms of insurance claims or in the criminal case or

6  whatever it was.  So, I guess I don't know what it is that

7  you're asking, but I don't remember specifically discussing

8  restitution as opposed to quantifying a loss so that we could

9  then recover the amount of loss.

10  Q.    Well, I mean, this email is October 2nd, 2018.  So, I'm

11  guessing you made it pretty clear to RSM by October that you

12  were looking to identify loss, right?

13  A.    Well, what did you say the date was?

14  Q.    This is dated October 2nd, 2018.

15  A.    Yeah, yeah.  We had the meeting the next week where we

16  presented the loss analysis to the special committee.  So, yes,

17  that was what RSM was engaged to do, was to quantify loss.

18  Q.    But this email doesn't have anything to do with loss, does

19  it?  It has to do with collecting restitution?

20  A.    Right.  And so, I don't know what he means by the word

21  "restitution."  I don't know if Chris knows the difference

22  between restitution in a criminal case, damages in a civil

23  case, collecting from an insurance company or other sources.  I

24  don't know what Chris meant by the use of the word.

25  Q.    You know what the word means, right, in a criminal

1   context?

2   A.   What it means if I use it in a criminal context, yes.

3          MS. BROWN:  You can take that down, Tracy.  Thank you.

4   The next email is Exhibit X.  So, it's the first sentence that

5   starts with, Happy to discuss.  If you could pull that out,

6   Tracy.  Thank you.

7   Q.   So, this is an email from Greg Naviloff to you,

8   Mr. Nahass, N-a-h-a-s-s, and Mr. Fitzgerald, but I specifically

9   wanted to ask about the sentence that says, "Perhaps as much a

10  question of privilege and what would be available by Imran if

11  he is charged and requests docs as part of discovery.  Other

12  edits make sense to me.

13         Now, the word "discovery" also has special meaning in

14  criminal cases as well, right?

15  A.   Again, in certain contexts it does.  This was written by

16  Greg Naviloff.  I don't know what Greg knows about the special

17  meaning of the word "discovery" in a criminal case.

18  Q.   But this email is directed -- well, you're copied on this

19  email, correct?

20  A.   Yes.

21  Q.   So, you didn't have any discussions with the RSM team

22  about if certain things might be discoverable by Mr. Alrai in

23  the event of a criminal case?

24  A.   Sorry.  You're going to have to repeat that for me.

25  Q.   Okay.  Did you have any discussions with anyone at RSM

1    about what discovery might need to be produced if Mr. Alrai was

2    charged with a criminal offense?

3    A.    I'm just pausing to get the answer right and get the

4    question right.  Yes, we had discussions about issues like

5    privilege and what might or might not be produced.  Did we

6    specifically talk about it at this time in the context of a

7    criminal case?  I don't know.  You know, we could have been

8    talking about it in the context of civil discovery or any other

9    type of context where Imran Alrai or any other third party

10   might be seeking documents.  So, yes, we definitely discussed

11   the issue of privilege and what we were going to do with these

12   presentations that we were preparing to show to the special

13   committee on October --

14   Q.    So, you're saying this could have been talking about civil

15   discovery, right?

16   A.    It could have been talking about any kind of discovery,

17   not just with respect to Mr. Alrai.  Maybe I can tell you the

18   way I approached this issue at this time.  You can ask me

19   questions about it.

20   Q.    What I was going to say is it specifically says, What

21   would be available by Imran if he is charged.  "Charged"

22   doesn't sound like a civil case.  It sounds like a criminal

23   case, right?

24   A.    Well, I can't tell you why Mr. Naviloff wrote that or what

25   Mr. Naviloff was thinking.  It's not my -- it's not my -- those

1    are not my words.

2    Q.   Okay.  But my question to you was did you discuss the

3    discovery process and what might or might not have to be turned

4    over if there are criminal charges?  Did you have those

5    discussions with the RSM team?

6    A.   We certainly discussed the issue of privilege and what

7    documents might or might not be turned over, or what might be

8    protected or not protected by privilege.

9    Q.   Now, we talked I think earlier today about a document that

10   you drafted and was attached to pretrial litigation -- sorry.

11        MS. BROWN:  Tracy, can you take down the last exhibit?

12   Thank you.

13   Q.   And we talked earlier about a letter that you drafted and

14   was attached to the government's motion regarding whether

15   enough discovery had been produced regarding Mr. Naviloff to

16   justify his being able to testify, and that was specifically

17   document 51-2, and that's Exhibit A.

18        MS. BROWN:  And if I could have -- Tracy, if you could

19   pull up Exhibit A, I have some questions about that.  And I

20   think it's PDF page 5.  Okay, great.  And let's see.  I have to

21   see -- I'm trying to find -- if I could have a minute.

22                           (Pause)

23        MS. BROWN:  If I could have a minute, your Honor.  If

24   I could look at the actual document.  I don't know what page it

25   is on.  I think I have it over here.

1          (Pause)

2          MS. BROWN:  You know, I think it's actually -- okay.

3     Let me start and go back.  Oh, it's back a page.  I think

4     because there's an exhibit page on it, that threw me off.  I

5     apologize for that.  Okay.

6          So, Tracy, can you pull out the paragraph that says

7     "Nevertheless," which is the second paragraph?

8     Q.   So, this is, again, you can see at the top it says

9     document 52, and it says Commisso Law on it.  It says that,

10    Nevertheless, UWMB is currently working to produce any

11    documents from the e-discovery database which RSM reviewed

12    and/or assessed (sic) and which were not previously produced.

13    Do you see that?

14    A.   Yes, although it says "accessed."  I think you said

15    "assessed."

16    Q.   Accessed.  I'm sorry.

17    A.   Yeah.

18    Q.   So, you are representing to the Court that you are working

19    on producing documents that RSM reviewed, correct?

20    A.   From the E-Discovery database, documents that RSM reviewed

21    and/or accessed and which were not previously produced.  That's

22    what that sentence says.

23    Q.   Okay.  Now, let's talk about -- so the E-Discovery base,

24    E-Discovery database, you control that, right?

25    A.   Do I control it?  In a sense, yes.  I manage it.  I'm

1    responsible for it.

2    Q.   Well, I can't go there.  Who can go there?  And let's just

3    go back in time to --

4    A.   It's part of my attorney work product service team that I

5    have assembled in 2 1/2 years of working on this matter.

6    Q.   So, this was written in the fall of 2019.  Would the RSM

7    team that worked on the loss analysis, could they have gone to

8    that E-Discovery database?

9    A.   Not at that time, no, because if you read in the letter

10   previous to this it says that the E-Discovery database at that

11   time had been taken offline to save money, because it was

12   costing us over $3,000 a month to maintain.

13   Q.   So, at some point was the loss team at RSM, at some point

14   did they have kind of free rein to go into this E-Discovery

15   database?

16   A.   Some of them did.  In fact, it's described in the footnote

17   on the bottom of that page.

18   Q.   Okay.  So, at some point this was taken down, so at least

19   in terms of the fall -- when was this taken down in terms of

20   them losing access to this?

21   A.   I don't remember.  It was constantly a question of how can

22   we save money, when can we take it down, and I don't remember

23   when that decision was made, but we disabled it to save money

24   at some point in time.

25   Q.   So, how did you go about determining what RSM had reviewed

1    and/or assessed to turn that over to the government?

2    A.    You mean what's described in this paragraph?

3    Q.    Yeah, at that sentence, actually, that first sentence.

4    A.    Well, can I just look -- you don't have to take that down,

5    but just give me a second to look at it --

6    Q.    Sure.

7    A.    -- because maybe it's actually described in another

8    paragraph in this letter.  It's on page 4?  Is that right?

9    Q.    No.  Using the document number at the top that's stamped

10   by the Court, it's 5.  I think it actually shows up as 6 on the

11   exhibit number.

12   A.    Okay.  So, yeah.  No, it's right in this paragraph.  On

13   November 15th, after the final pretrial conference, I

14   instructed Kroll E-Discovery services to reactivate the

15   E-Discovery database, which had been inactive and taken offline

16   to help save United Way's limited resources.  On November 21,

17   Kroll completed the process to restore and reactive the

18   E-Discovery database.  Kroll has been able to identify all

19   documents that RSM reviewed and/or accessed and also whether

20   those documents were previously produced.  We are now preparing

21   to produce, as soon as possible, any of those documents RSM

22   reviewed and/or accessed and which were not previously

23   produced, subject to a review for attorney-client work product

24   or other applicable legal privileges.

25   Q.    Do you remember what my question was?

1    A.    How did we go about identifying what RSM had or had

2    accessed or reviewed?

3    Q.    Yes.  So, how did you go about doing that?

4    A.    Kroll has been able to identify all documents that RSM

5    reviewed and/or accessed and also whether those documents were

6    previously produced.  The machine has the information stored in

7    it.  Every time a user logs in the system records the user's

8    log-in.  Every time a user clicks on a document, reviews or

9    accesses the document, the Kroll system saves that data.  And

10   so, Kroll, meaning the organization that controls the machine,

11   was able to basically drill down and identify what documents

12   had been accessed or reviewed and had not yet been previously

13   produced.

14   Q.    So, because, as I understood your declaration, you said

15   that you had produced everything that was relied on by RSM.

16   This says that you produced everything that RSM reviewed.  You

17   would agree with me those are not necessarily the same two

18   things, right?

19   A.    Well, first you have to show me the declaration.  I have

20   no idea what part of my declaration you're talking about.

21   Q.    You do not remember saying that you provided everything

22   that RSM relied on?

23   A.    No.

24   Q.    Okay.

25   A.    So, I would need to see what it is that I said.  I don't

1    remember that representation.

2    Q.   Okay.  I'll come back to that later.  So, it's your

3    position that you turned over everything RSM reviewed, not just

4    relied on?

5    A.   Reviewed and/or accessed, meaning that they may have

6    clicked on the document.  As they were clicking from number one

7    through ten they might have clicked on a document, and that

8    gets recorded by the system.  Whether they actually reviewed it

9    or not we have no way of knowing.

10   Q.   In the recent production, and I mean by "recent" any of

11   the discovery produced after the trial, there was an Excel

12   document that had about 40-some tabs in it.  Was that something

13   you got to review?

14   A.   I'm not sure which document you're talking about --

15   Q.   Okay.

16   A.   -- from one that was recently produced by RSM.  It was not

17   a document that I had access to.

18   Q.   Okay.  But did you look at it before it was turned over to

19   do a privilege analysis?

20   A.   No.  If we're talking about the same document, I recently

21   got a document which was a March Excel spreadsheet that I had

22   never seen before, and I believe I got it after it was produced

23   to the defendant.

24   Q.   And do you know whether that got produced to the defendant

25   prior to trial or not?

1   A.   No.  The RSM document, I've never seen it before.  I have

2   no idea how it was handled before trial.

3   Q.   Well, do you know whether it was in the E-Discovery

4   database?

5   A.   I don't, but I would say I would not expect it to be in

6   that E-Discovery database, because -- well, I guess -- I don't

7   know whether it's there or not, but I would be surprised if it

8   was there, and if it was there and it had been clicked on or

9   accessed by RSM, then we would have produced it.

10  Q.   Because if I told you there's emails that say that recent

11  document was relied on by or at least viewed by RSM, at a

12  minimum, you don't know how they would -- if it wasn't in the

13  E-Discovery database, how would they have access to it?

14  A.   Well, it's either RSM's internal document that they

15  created, part of their work product, or they received it from

16  some other source.

17  Q.   Did RSM receive any documents, discovery or data like

18  from, say, John Meyer?

19  A.   Well, yeah.  We know we've seen emails during this

20  litigation where John Meyer communicates directly with RSM.

21  So, yes.

22  Q.   So, is it possible they could have got that document from

23  John Meyer?

24  A.   Yes.

25  Q.   Because you're saying you don't recall it being in the

1    E-Discovery database?

2    A.    Right, and I said I'd be surprised if it was in there.

3    Q.    Last week or two weeks ago Naviloff testified that, quote,

4    Investigation procedures were controlled by Commisso Law, and

5    he was assisted by several investigation teams.  Do you agree

6    with that statement?

7    A.    Sorry.  Say that again.

8    Q.    I will.  When Naviloff testified, he said that

9    investigation procedures were controlled by Commisso Law.

10   A.    Investigation procedures were controlled by Commisso Law?

11   I wouldn't necessarily agree with that statement.

12   Q.    Who controlled investigation procedures?

13   A.    I guess I would probably say it was a collaboration

14   between me and Naviloff and the client.  They approached -- the

15   approach to an independent investigation is you want it to be

16   full and fair and independent.  You don't want the client

17   interfering with what Naviloff wants, you don't want the client

18   interfering with what I want, and you don't want Naviloff or me

19   interfering with each other.  So, it would have been a

20   collaboration to make sure we were all doing what we thought

21   needed to be done.

22          MS. BROWN:  Tracy, can you pull up Exhibit KKK, and

23   just pull up the top section where it shows who it's addressed

24   to and that has the word "Attached."

25   Q.    So, in the recent production this is one of the emails

1    that we got.  It's from you, it's dated October 16th, 2019 to

2    Greg Naviloff, and the subject is a network scan, and it

3    specifically says United Way network V2.pdf, and the rest of

4    the email says, Redacted - attorney-client communication, work

5    product.  So, what I'm trying to understand, so the

6    attorney-client privilege would have been waived at least as to

7    the loss calculation by October 16th, 2019, right?

8    A.    Yes, that's correct.

9    Q.    And Greg Naviloff and Chris Fitzgerald, they're not on

10   that data security team, are they?

11   A.    This was not related to the data security issue.

12   Q.    Yet you've asserted attorney-client communication as to an

13   email between you and Greg Naviloff and Chris Fitzgerald after

14   Greg Naviloff went to work for the government, right?

15   A.    Well, I did briefly, and then about five days later I

16   produced the same document in an unredacted form.

17   Q.    So, when did you produce the redacted copy?

18   A.    About five days after I produced -- oh, I'm sorry.  I

19   produced the redacted copy first, so approximately August, I

20   want to say before August 20th, between August 10th and August

21   20th.

22   Q.    Why did you initially redact it?

23   A.    Because I was -- I guess in the context of what happened

24   was on August 10th the judge entered an order for RSM to

25   produce certain documents, and that order required the

1    production to be complete by August 20th, and so I was, one,

2    trying to understand the scope of that order and, number two,

3    trying to work very hard to get as many documents as I was

4    responsible for produced as quickly as possible.  This was also

5    the first time during that short period of time between August

6    10th and August 20th that I had to figure out these

7    attorney-client privilege and waiver issues, because I had

8    never been -- it really had never come to the front before on

9    this scale.  So, basically, I was working very quickly trying

10   to meet the deadline, and I looked at the document.  The part

11   that we're not looking at here down below is a communication

12   between me and John Meyer.

13        So, my concern was two things:  One, protect my

14   client's attorney-client privilege or work-product privilege;

15   and, two, comply with the judge's order, and I was trying to

16   figure out where the balance was going to be.  When I did this,

17   I marked it "Privileged" because of my communication between me

18   and John Meyer, and then about five days later I reviewed it

19   again and I produced an unredacted version of it.

20   Q.   But this section we're looking at here, it doesn't have

21   John Meyer in it, right?

22   A.   No, but it's forwarding a message from John Meyer.

23   Q.   The subject is a network scan.  Were you sending a network

24   -- it looks like there's an attachment that says United Way

25   network V2?

1    A.    Yeah.  There's an unredacted version of this document

2    where I said to Greg Naviloff and Chris Fitzgerald, I don't

3    know if you had received this back in 2018, and what I was

4    attaching to it was the document called United Way Network

5    V2.pdf.

6    Q.    Is that an Excel document or a different kind of document?

7    A.    It's a pdf.  It has the .pdf on the end of it.  It looks

8    like it's a pdf.

9    Q.    And so, could I summarize what you just said as you are

10   sharing a document with Greg Naviloff, right?

11   A.    That's what the email says.  I sent a document to Greg

12   Naviloff and Chris Fitzgerald on October 16th, 2019.

13   Q.    Okay.  And at this point Greg Naviloff isn't working for

14   United Way anymore, right?

15   A.    No.  At this point he was -- his work with United Way had

16   finished by this point.

17   Q.    And at this point in October of 2019 Greg Naviloff is

18   working as an expert witness for the United States of America,

19   right?

20   A.    Yes.  They retained him in July of 2019.

21   Q.    So, you're sharing documents with the government's expert

22   witness in October of 2019?

23            MR. DAVIS:  Objection.  Cumulative.  Waste of time.

24            THE COURT:  Tell me what you mean by that, Mr. Davis.

25            MR. DAVIS:  It's already been established that

1    Mr. Naviloff is the government's expert as of December of '19,

2    and counsel has just asked, at least for the second time,

3    whether he was sharing a document with Mr. Naviloff at that

4    time.

5              THE COURT:  Okay.

6              MR. DAVIS:  More broadly, what is it relevant to?

7    Nothing.  This is cumulative, and we're wasting time.  It's

8    3:45.

9              THE COURT:  Yeah.  This has seemed more like a

10   discovery deposition than an examination, Attorney Brown, and I

11   know this is not an easy examination to conduct, I recognize

12   that, but you're presenting evidence here, and it's feeling

13   more like you're exploring.

14             MS. BROWN:  Well, your Honor, that was not my plan.  I

15   sometimes don't get direct answers, and so I have to -- we

16   sometimes take a scenic route to getting to the answers so that

17   I think --

18             THE COURT:  I understand.  My suggestion, you're free

19   to reject, is ask leading questions.  He's an adverse witness.

20   Ask him leading questions.  If he's evasive, I will impose

21   myself on the process.  If you're going to ask open-ended

22   questions it's very, very difficult for me to do that.

23             MS. BROWN:  I just want to also add, your Honor, I do

24   think this is relevant.  The government has argued that --

25             THE COURT:  I didn't say it wasn't relevant.

1          MS. BROWN:  Okay.  I won't address it, then.

2          THE COURT:  Let me say this, okay:  My assumption is,

3     there's very little anyone's testimony is going to do to

4     persuade me or dissuade me otherwise, is that everything Mr.

5     Commisso did in this case was to increase the likelihood that

6     Mr. Alrai would be convicted, to help build the strongest case

7     possible, to help maximize any restitution or forfeiture both

8     in terms of its likelihood and its amount, and I don't think

9     there's anything improper, inappropriate, unethical or unlawful

10    about that.  I think he was representing a client, and that is

11    what I would assume he would do within the confines of ethics

12    and law.  So, establishing that that was his motive is not

13    something you need to spend time on.

14         MS. BROWN:  I'm going to move to Exhibit Triple M, and

15    if we can pull out the middle section that's basically between

16    Greg and Chris.  Actually, I think it would be easier with this

17    document if we go back to the last page and move forward,

18    because it will make more sense that way.  Sorry about that,

19    Tracy.  If we can go to the last page, the second page.  Yeah.

20    Q.   So, this is originally an email from Greg Naviloff and to

21    you, and it says "Privileged and confidential."  Do you see

22    that?

23    A.   Yes.

24    Q.   And do you see the date is Tuesday, August 13th?

25    A.   Yes.

1 Q. August 13th, 2019, correct?

2 A. Yes.

3 Q. So, again, this is when Mr. Naviloff is working for the

4 government, correct?

5 A. Yes.

6 Q. Now, it appears that -- so, this is to you.  Is

7 Mr. Naviloff sending you some documents, is that how I'm

8 interpreting this email, or links to documents?

9 A. You know, it's not clear to me, looking back on it now,

10 whether that's just sort of like a screen shot or those are

11 actually live links.  Looking on the front page, there's a link

12 where I was able to go easily to a website and access certain

13 documents.

14 Q. Okay.  And if we can go back to the first page, just so we

15 can look at that.  So, this document almost looks like it's

16 scanned as opposed to like -- you know, if you say something is

17 a PDF without printing it, it's obviously a lot better quality

18 than if you print it and scan it.  Do you know whether this was

19 scanned or --

20 A. I have no idea.  This was -- the Bates number suggests it

21 came from RSM, so I don't know what process they used to

22 generate this document.

23   MS. BROWN:  Okay.  So, we're going to take that down,

24 Tracy, and pull up Triple N, and go back to the last page, and

25 move forward, and again move forward and come to the front

1  page.  I'm trying to find what I'm looking for here.  And if

2  you could pull up the first couple of paragraphs there.

3  Q.   So, this is a chain of emails regarding an update on the

4  United Way, correct?

5  A.   Subject line says, "Update on United Way."

6  Q.   And I'm wondering if this is -- it doesn't appear to be

7  the right exhibit, because it doesn't say -- I think I'll come

8  back to this in a minute.  Thank you.  I'm not finding it

9  matches up with what I have.

10      We talked a little bit before about your

11 representations in your recent pleading about the segregation

12 of the work on data security involving Sean Renshaw and that

13 being separate from the work of Naviloff and the rest of the,

14 for lack of a better word, loss calculation team at RSM.  You

15 represented that they were separate, correct?

16 A.   Yes.

17 Q.   Do you recall at trial that Greg Naviloff talked about the

18 fact that there was -- he initially used the word "firewall"

19 between the data security investigation and the loss

20 calculation investigation at RSM?  Do you remember him using

21 that word, "firewall"?

22 A.   No, I don't remember that.

23 Q.   In fact, he was asked if somebody else gave him that word.

24 Do you remember that?

25 A.   I don't recall.

1    Q.    You were at the trial, though, right?

2    A.    I was, yes.

3    Q.    And he said something to the effect of, We have a secure

4    lab, a digital forensic lab.  When it's collected it goes into

5    a dedicated server, which is restricted to only those

6    individuals within our digital forensic group that have a need

7    to access that information.  Do you remember that testimony?

8    A.    No, I don't.

9    Q.    Is that accurate?

10    A.    I don't know.  I don't work at RSM, so I don't know how

11    they handle their servers and access to their servers.

12    Q.    But you're the one who is asserting a privilege as to

13    RSM's work on data security, right?

14    A.    Yes, that's correct.

15    Q.    But you don't know how they manage it?

16    A.    How they manage what?

17    Q.    The separation between the work on data security and loss

18    calculation.

19    A.    No, I don't know.  I don't know how they manage it.

20    Q.    So, you don't know if there's a firewall or not between

21    those two projects?

22    A.    No, I don't know.

23    Q.    And we talked a little bit earlier very briefly about

24    privilege logs, and I want to talk in a little bit more detail

25    about that.  And you had in your declaration, the declaration

1    to the most recent pleadings, to 170, which is actually 173,

2    you said you wrote to Naviloff regarding producing documents in

3    response to Attorney Harrington's request.  Do you remember

4    saying that in your declaration?

5    A.   Yes.

6    Q.   And it said that you were required on behalf of United Way

7    to review the documents, to redact and withhold information

8    that was privileged, correct?

9    A.   Yes.

10   Q.   Now, again, when you're reviewing documents in response to

11   Attorney Harrington's request, we're either talking late summer

12   or fall of 2019, right?

13   A.   Yeah, I think the requests may have -- well, yes.  It was

14   summer or fall.  I don't remember specifically, but, yes.

15   Q.   And that would have been a period of time where there was

16   no longer any privilege as to work done by RSM as to loss

17   calculation, right?

18   A.   Well, we had been disclosing documents, and Naviloff had

19   been hired by the government, so we were -- we had waived the

20   privilege regarding the loss analysis.

21   Q.   So, let's look at that -- again, you produced something

22   called a "Privilege Log," right?

23   A.   Yes.

24   Q.   So, let's pull that up.  It's Triple O, OOO, and this is

25   really hard to read, so we'll just pull up maybe the top 25

1    percent just so we can know what we're all looking at.  That

2    still doesn't even help that much, does it?  But, generally, do

3    you recognize this document?

4    A.   Yes.  Let me just see if I have a printed copy.  I don't

5    think I do.

6         MS. BROWN:  Tracy what might help, the thing I'm

7    specifically going to ask about is the column on the far right.

8    If you can just pull out the last column on that and make that

9    bigger, that might help us all.  Okay.

10   Q.   The point I'm going to make, and I don't think you'll

11   disagree with me, that in this column is where you assert a

12   privilege, correct?

13   A.   Yes.

14   Q.   And in every single row of this column you assert

15   attorney-client communication, right?

16   A.   Yes, except --

17   Q.   Work product?

18   A.   -- at the bottom it's a little different, but, yes.  I

19   see, yes, every row I say "Attorney client communication," and

20   then at the bottom I say "Attorney work product."

21   Q.   And I can't see it, but my memory is that you produced

22   this in November -- actually, its in my notes.  Does November

23   26, 2019 sound about right?

24   A.   I think it's actually there on the upper left-hand corner,

25   but I can't read it.

1    Q.   I can't either.

2         MS. BROWN:  Tracy, if you can pull up the top, very

3    top.  Right there.  Yeah, exactly.

4    A.   11/26.

5    Q.   11/26/19.  So, this is pretty much on the eve of trial,

6    right, a couple of weeks out from trial?

7    A.   The trial was on December 1st, I believe.

8    Q.   So, a couple of weeks out, not even.  A week, if that,

9    before trial.  And if you need to look at your own copy, or we

10   can pull back that column again, but in nowhere did you assert

11   data security as a privilege, did you?

12   A.   I haven't read this document specifically, but -- I'm

13   going to have to take your word for it that data security isn't

14   in there, but I don't remember one way or the other.

15   Q.   But you do know that -- you'll agree with me we pulled it

16   out -- it either said "attorney-client communication" or "work

17   product" or both?

18   A.   Yes.  Yeah, it was not in that last column, for sure.

19   Q.   And this was in November of '19, so this is past the point

20   where attorney-client privilege has been waived as to loss

21   calculation, correct?

22   A.   Yes.  Yes, that's correct.

23   Q.   Okay.  And I'm not going to pull it up, but you know the

24   defendant filed a Motion to Dismiss, right?

25   A.   Yes.

1    Q.    And after -- while you were in the process of looking at

2    documents of the more recent Motion to Dismiss, which is the

3    document 164, you produced a second privilege log, correct?

4    A.    Yes.  This was in connection with RSM producing documents

5    in response to the judge's order from August 10th of 2020.

6            MS. BROWN:  And if we can pull that up, Tracy, it's

7    Triple P.

8    Q.    And this is much longer.  I don't even have how many pages

9    it is, but it's a fairly long document, correct?

10   A.    Yes, maybe 25 pages.  It could be more than 25 pages.

11           MS. BROWN:  So, if we could pull out the last column

12   on this document, PPP, and make that bigger.

13   Q.    Now, here, and again it's still hard to read, it says

14   "Privileged nonresponsive data security investigation."  Do you

15   see that?

16   A.    Yes.

17   Q.    And that's pretty much the same thing all the way down

18   that column, right?

19   A.    Well, except in some places, on other pages there's an

20   additional basis stated.

21   Q.    And what's the additional basis?

22   A.    E-Discovery procedures.

23   Q.    By that you mean it's burdensome?

24   A.    Well, no.

25   Q.    Okay.

1    A.    I mean it's privileged communications having to do with

2    E-Discovery procedures.

3    Q.    Now, as to the data security investigation, would you

4    agree with me that you had not raised that as a privilege prior

5    to trial?

6    A.    No, I would not agree with you.

7    Q.    Okay.  But it's not in that other privilege log that we

8    saw just a few minutes ago, is it?

9    A.    It is not in that other privilege log.  No, it's not.

10   Q.    And you know from the defendant's Motion to Dismiss that

11   the defendant was arguing that you had waived attorney-client

12   privilege as to RSM's work when Naviloff and RSM became an

13   expert.  You don't have to agree whether that's true or not,

14   but you know that that was in the defendant's pleadings,

15   correct?

16   A.    Well, with respect to RSM's loss analysis.

17   Q.    Correct.  And I'd like to bring up Exhibit D.  I'm not

18   sure which page we're on.  Okay.  Thank you.  And I'm going to

19   go to I think it's the next to the last page on this.  There we

20   go.  So, this, and I'm not going to go through every page, this

21   is kind of a long email chain, but do you remember this

22   particular email?  It starts off with Attorney Hunter sending

23   an email to Attorney Harrington with an attachment, which we

24   could probably presume refers to Naviloff being an expert for

25   the government.  Do you recall that email?

1    A.   No.  I'm not sure what this email is, but you can go ahead

2    and ask me questions.

3    Q.   Okay.  Well, I just wanted -- well, I'll represent to you

4    the beginning of this email, at least beginning chronology,

5    obviously it's in reverse order, but the beginning of it is a

6    back and forth between Attorney Hunter from the U.S.

7    Attorney's Office, Attorney Harrington, who was then counsel

8    for Mr. Alrai, about discovery.  So, they are going back and

9    forth between Attorney Hunter saying, We're probably going to

10   call Mr. Naviloff, Attorney Harrington making requests for

11   production of information about that, and they go back and

12   forth.

13        I'm going to come forward to the beginning of this

14   document, because that's where you sort of come in, because

15   you're not -- I will represent to you that you're not part of

16   the original chain on this.  And let's see.

17        MS. BROWN:  So, Tracy, can we pull out the bottom part

18   of this.

19   A.   Can I just stop you right there?

20   Q.   Sure.

21   A.   I know it says, "Hi, John," but if you look at the "To"

22   and "From," it's between Naviloff and Fitzgerald.  So, that's

23   going to be my response to the next thing you say, which is I

24   don't know that I ever received this document.

25   Q.   Well, is it possible that they cut and pasted this out of

1     some document you did and forwarded it to the RSM team?

2              MR. DAVIS:  Objection.  Calls for speculation.

3              THE COURT:  I don't think it's -- she said, Is it

4     possible."  I'll allow it.  It does call for speculation, but

5     I'll keep that in mind.

6     Q.   Okay.  Well, you're the only John that's involved in

7     talking with the -- there's no one else named John on the RSM

8     team, right, that you knew of?

9     A.   You can ask me questions, and I will answer them if I'm

10    able to.  I don't know what to tell you about this.  I don't

11    know why it looks that way, but I noticed it, and it is what it

12    is.

13             MS. BROWN:  Okay.  Well, let's go to page 2 of Exhibit

14    D.  After it says, "Many thanks, Greg," it starts, "From John

15    Commisso."  Can you pull that kind of middle section out,

16    Tracy.

17    Q.   So, this is from you, right?

18    A.   Yes.

19    Q.   Okay.  And it's directed to Greg Naviloff, correct?

20    A.   Yes.

21    Q.   And it says, "Greg, I've attached the docs that we

22    discussed on the call with John D and Matt," correct?

23    A.   Yes.

24    Q.   So, "John D and Matt," I'm guessing that's John Davis and

25    Matt Hunter.

1    A.   Yes, that's correct.

2    Q.   So, you had a phone call with the U.S. Attorney John Davis

3    and U.S. Attorney Matt Hunter at some point prior to Thursday,

4    August 1, 2019, correct?

5    A.   That's what this says.

6    Q.   Yes.  And then after that call you forward this email.  I

7    can't tell -- it sounds like these documents that are listed

8    here are attached to this email, right?

9    A.   Yeah, and I guess, because it's now been forwarded, the

10   attachment piece of it gets dropped off.  But I can tell you

11   all of those documents right there were produced to the

12   government --

13   Q.   Okay.

14   A.   -- shortly after this email was sent.

15   Q.   And, again, at this point Greg Naviloff is the

16   government's expert, right?

17   A.   Yes.  Yes, this is August 2019.

18   Q.   And you're having email exchanges with him without the

19   government being part of that?

20   A.   Yes.  That's what this email shows.

21        THE COURT:  Counsel, I need to take about a

22   five-minute break --

23        MS. BROWN:  Sure.

24        THE COURT:  -- to handle a phone call.  So, let's go

25   into a five-minute recess.

1          MS. BROWN:  Okay.

2          (Recess taken from 4:06 p.m. to 4:15 p.m.)

3          THE COURT:  All right.  Counsel, let's reconvene, if

4   you're near your screens.  All right.  I see defense counsel, I

5   see AUSA Le, I see AUSA Davis.  All right.  And I think we lost

6   Matt, right?  We lost Matt Hunter?  Oh, he's there.  I

7   apologize for that.  But I'm actually kind of relieved it took

8   us until after 4:00 for that to happen.

9          So, you can continue now, Ms. Brown.

10          MS. BROWN:  Okay.

11   Q.   So, I think I'm just going to sum up this slide, Attorney

12   Commisso, that basically this is an email exchange between you

13   and Greg Naviloff on August 1st, 2019 about documents to share

14   with the government, correct?

15   A.   Well, Attorney Harrington had made a request for

16   documents.  I had a call with Greg Naviloff, Matt Hunter and

17   John Davis, as we saw in the email message, and then I was

18   emailing Greg here about the process of identifying the

19   documents that would be produced in response to Attorney

20   Harrington's request.

21          MS. BROWN:  Okay.  If we can take down that document

22   and pull up Exhibit Triple M, and we'll go to page 2.  And if

23   we can pull out from where it says from John J. Commisso.  I

24   think it's about a third of the way down.  Yes.  Thank you.

25   Q.   So, this is another email from you to Greg Naviloff and

1    Chris Fitzgerald of RSM, correct?

2    A.    Yes.

3    Q.    And this is, again, while Naviloff is working as an expert

4    for the government, right?

5    A.    Yes, again.

6    Q.    And this email states that, and this is from you, that

7    you're following up on a call that you had last week with Greg

8    Naviloff, correct?

9    A.    We were trying to identify the documents we were going to

10   produce in response to Attorney Harrington's request, and

11   that's what this email is about.  The responsibility was for

12   producing United Way's documents, and I needed to communicate

13   with Greg Naviloff and Chris Fitzgerald to identify what

14   documents they had that had come from the United Way so that I

15   could make sure that we made a complete production of United

16   Way's documents that were related to Mr. Naviloff's loss

17   analysis.

18   Q.    And who would have had those documents, you or RSM?

19   A.    Both.

20   Q.    So, you both had documents regarding RSM's analysis for

21   United Way?

22   A.    I had United Way's documents that were related to

23   Naviloff's loss analysis.  Talking about me producing United

24   Way's documents, to the extent that they had not already been

25   produced, if those documents were responsive to Mr.

1    Harrington's request and if they related to Mr. Naviloff's loss

2    analysis.

3    Q.   And even though there's no longer any privilege as to

4    Naviloff's loss analysis, you were still involved in deciding

5    what documents were going to be produced?

6    A.   We wanted to make sure that we had produced all of the

7    documents, that the production was complete.  So, I was focused

8    on United Way documents, original source documents.  So, I was

9    communicating with Naviloff and Fitzgerald to understand what

10   documents they had received from the United Way so that I could

11   then determine if an additional production was to be made by

12   the United Way.  This looks to be cooperative and avoid

13   subpoena practice and avoid having to delay trial.

14   Q.   But the point is that the government isn't dealing

15   directly with Naviloff, at least as to this, you're dealing

16   with Naviloff as to obtaining documents?

17   A.   We were all working together.  You saw there was that

18   message that said we had a call with Matt, Matt Hunter, Mr.

19   Hunter and Mr. Davis.

20        MS. BROWN:   Can we pull up Document Triple Q, which is

21   also document number 198, page 4 through 5.  I'm not sure if

22   the 4 through 5 is going to match up on here.

23   Q.   This is the pleading we talked about a little earlier,

24   Attorney Commisso, that you filed, and this is the unredacted

25   version and the document -- I'm using document 198-4 through 5,

1   because that's how it shows up on the docket report.  I don't

2   think it actually shows that here, because it was filed under

3   seal.  The title is United Way of Massachusetts Bay's objection

4   to Motion to Compel Production of Privileged Documents.  That's

5   the title of this motion, correct?

6   A.   Yes.

7        MS. BROWN:  Okay.  And I would like to go to page, it

8   says 4 through 5, so I'm guessing it's the bottom of 4 and the

9   top of 5.  Okay.  And if we could pull out the bottom paragraph

10  on 4.

11  Q.   And we talked about this a little earlier.  This is the

12  DFIR team, and this is you in your motion describing the DFIR

13  team's work done in a privileged and confidential manner.

14  Legal counsel retained the DFIR team for the expressed purpose

15  of assisting legal counsel.  The attorneys, the client and the

16  DFIR team intended to keep the DFIR investigation confidential

17  and took proper steps to maintain the confidentiality of the

18  work --

19       MS. BROWN:  Now, if we can go to the top of the next

20  page, which should be 5, Tracy.

21  Q.   -- privy to information regarding the data privacy and

22  security investigation.  The DFIR team's communications were

23  made either to the attorneys directly or to the attorneys and

24  the client together.  UWMB has always maintained that DFIR

25  investigation was privileged and confidential, and UWMB has not

1    waived that privilege.  That's what you put in that motion,

2    correct?

3    A.   Yes.

4    Q.   And we talked earlier about you explaining that the DFIR

5    team was run by Sean, and that's S-e-a-n, Renshaw,

6    R-e-n-s-h-a-w, correct?

7    A.   Yes.

8    Q.   So, I want to talk to you about a series of emails

9    regarding that team and Sean Renshaw.

10        MS. BROWN:  And they're all, Tracy, in a series of

11   triple R, and it's triple R 1 through 8, and if we can pull

12   those emails up.  We'll start with RRR-1.

13   Q.   I cannot see -- now, that email is redacted, correct?

14   A.   Yes.  It's partially redacted, yes.

15   Q.   And it's redacted.  It says "Data security investigation,"

16   correct?

17   A.   Yes.

18   Q.   Okay.  Now, this email is from Naviloff, right, if we can

19   pull up the top?

20   A.   It's from Chris Fitzgerald.

21   Q.   Oh, I'm sorry.  I see now.  Okay.  It's from Chris

22   Fitzgerald to Naviloff, correct?

23   A.   Yes.

24   Q.   And also copied on this is Ronald Nahass and -- do you

25   know the correct pronunciation of that?  Is that Shan or?

1    A.    Shan Cifarelli.

2    Q.    Okay.  Those four people are on the RSM loss calculation

3    team, correct?

4    A.    Yes.

5    Q.    And so, they should have been separate from the data

6    security issues, at least is what you said in your motion,

7    correct?

8    A.    I'm not sure what you mean when you say, "They should have

9    been."

10           MS. BROWN:  Well, Tracy, if you can pull down the

11   pullout on that but leave the exhibit up.

12   Q.    You are asserting data security investigation as to work

13   that the loss calculation team is doing, right?

14   A.    Want to say that again?  What am I asserting?

15   Q.    It's late in the day.  So, we've just established that

16   this email involves people from the loss calculation team at

17   RSM, right?

18   A.    Yes, that's right.  Yes.  People on this email are the

19   loss analysis team, yes.

20   Q.    And in this email --

21           MS. BROWN:  And, Tracy, I'll have you just pull up the

22   three lines after it says Greg, right down --

23   A.    I see it.

24   Q.    Yeah.

25   A.    Yeah.  I don't know what was redacted there, but I know

1    that I said that it related to the data security investigation.

2    So, the substance of the information redacted concerns the data

3    security investigation; it does not concern the loss analysis.

4    If it did concern the loss analysis, I would not have redacted

5    it.

6    Q.   Well, my question is, if these two teams were separate,

7    how does Greg Naviloff and Chris Fitzgerald know about

8    information regarding the data security investigation?

9    A.   Well, I guess it depends on what you mean by the two teams

10    are separate.  They worked on different issues, but they worked

11    for the same firm.  They are on numerous emails together.  They

12    attended certain meetings together.  So, it depends on what you

13    mean by them being separate.  They were hired for different

14    reasons, and they did the work with two separate teams and for

15    two different reasons.

16    Q.   Well, you know, I'm not going by what I think is separate.

17    I was going by what we just read in the motion that you filed

18    with the court that they were separate that we just read

19    through, which was document 198-4 through 5.

20    A.   Right.

21    Q.   That's what you put to the Court, that these teams were

22    separate, and the people from the loss -- from the data

23    security team only reported to you.

24         MR. DAVIS:  Objection.  Cumulative, waste of time,

25    speculative.  Counsel is now arguing her interpretation of an

1    email that Mr. Commisso had nothing even to do with.  I think

2    to make the point that it isn't actually true that there was a

3    difference between the data security investigation and the loss

4    investigation, a point whose significance in this Brady motion

5    is perhaps entirely lost, this is such a waste of time, your

6    Honor.

7            THE COURT:  I'm going to sustain that, Ms. Brown.  I'm

8    not saying you have to drop the inquiry but just ask direct

9    questions.  You can make the arguments and inferences to me

10   later.  You don't need to do it with the witness.

11           MS. BROWN:  Okay.  I will try.

12           THE COURT:  Okay.

13   Q.   Attorney Commisso, this document says "Redacted - data

14   security investigation," right?

15   A.   Yes, that's what the document says.

16   Q.   And it says that, because you put those words in there,

17   right?

18   A.   That is correct.  I redacted that information, yes.

19   Q.   So, this email does relate to you, because you touched

20   this email, and you changed this email, right?

21   A.   I redacted this email, yes.

22   Q.   Well, redacting something is changing it, right?

23   A.   Yeah.  If you want to say I changed it, that's great.

24   Q.   Okay.  And so this email says that you redacted it because

25   of data security, right?

1   A.   Content underneath the redacted box concerns the data

2   security investigation.

3   Q.   And you filed a pleading with this court like last week

4   saying that the data security investigation was separate from

5   the loss calculation investigation at RSM, right?

6   A.   That is correct.

7   Q.   And you said that because you wanted to prevent discovery

8   of evidence, right?

9   A.   No.  I want to protect the privilege that my client -- I

10   want to protect my client's privilege.

11   Q.   And the way you want to protect it is you want to wall off

12   all these different investigations, right?

13   A.   No.  I just want to protect -- with respect to this issue

14   I want to protect the privileged information regarding the data

15   security investigation.

16   Q.   And as part of that you're saying that, well, we only

17   partially waived our privilege over here as to loss

18   calculation, but we didn't waive our privilege as to data

19   security, right?

20   A.   I'm not sure why you said partially waived our privilege

21   as to loss calculation.  I'm not sure what you mean by that.

22   Q.   Well, I'm trying to get to why you put that in your

23   pleading of that there's two different teams at RSM.  There

24   must have been a reason you put that in there, right?

25   A.   Yes, because there are.

1    Q.    But it's relevant to whether you want something to be

2    discovered by the defendant, right?

3    A.    It's relevant to protecting my client's privileged

4    information.

5    Q.    And you were trying to protect your client's privileged

6    information from a defendant's motion to get that information,

7    right?

8    A.    Yes.  You filed a motion to access documents on a

9    privilege log where I've asserted that those documents are

10   privileged.  So, yes, I'm providing this in response to your

11   motion to compel the production of privileged documents.

12   That's correct.

13   Q.    And what you, as I understand your pleading, are trying to

14   say, like, Well, maybe we have waived privilege as to Naviloff

15   testifying, and maybe we've waived privilege as to the RSM's

16   loss calculation, but we haven't waived privilege as to the

17   data security.  That's how I understand your argument.  Am I

18   wrong?

19   A.    That's what I said in my opposition.

20   Q.    Exactly.  And what I'm trying to get at is in your

21   opposition of trying to make the case that you haven't waived

22   privilege as to everything RSM did, you argued that these two

23   things were separate, right?  That's what you're trying to

24   convince the judge, correct?

25   A.    I said that there were two separate teams, and they were

1   engaged for two separate purposes.

2   Q.   Right.  And as we just read, you suggested that they

3   worked separately, right?

4   A.   I don't have it in front of me, but I stand by what I

5   wrote in my opposition, my objection.

6   Q.   Okay.  And I just read it, which is the teams'

7   communications were made either to the attorneys directly or to

8   the attorneys and client together, correct?

9   A.   I don't have it in front of me, but if you want to read it

10  into the record, then go ahead and read it into the record.

11  Q.   Well, I've already read it into the record.  We don't need

12  to repeat it.  It's already there.  So, what I am trying to get

13  at is you have asserted data security investigation as to

14  people on the loss team.  That's all I'm trying to get to.  You

15  agree with me on that, right?

16  A.   The substance of what is redacted here concerns the data

17  security investigation.  It does not concern Naviloff's loss

18  analysis.

19  Q.   And we just have to take your word for that, right?

20  A.   I don't know the answer to that question.

21  Q.   Well, no one else is reviewing this.  I mean, the judge

22  doesn't have it provided *ex parte*.  It's just your word on

23  this, right?

24  A.   I don't know the answer to that question.

25          MS. BROWN:  Okay.  So, let's bring up the next

1    document, which is Triple R-2, and if we can pull that out.

2    Now, the bottom part, Tracy, like probably the bottom third

3    down to including "Redacted - data security investigation."

4    Q.   So, this is another document that was produced post trial

5    where you have asserted Redacted - data security investigation,

6    correct?

7    A.   That's what that says on that document right there, yes.

8         MS. BROWN:  And, Tracy, can we pull out the top of

9    who's involved in this email.

10   Q.   So, this is from Chris Fitzgerald to you, Ronald Nahass,

11   Shan Cifarelli and Greg Naviloff, correct?

12   A.   Yes, that's what it says.

13   Q.   And, again, that's the loss calculation team that you've

14   agreed there's no privilege after July of, well, maybe even

15   August of -- maybe November of 2018, but definitely after July

16   of 2019, correct?

17   A.   We are not asserting privilege regarding Naviloff's loss

18   calculation.  That's correct.

19   Q.   But there's something that he talked about in an email

20   that you're asserting privilege about as to data security.

21   A.   I wouldn't have put that there if it didn't relate to data

22   security.  I don't know if it's there, because it's redacted,

23   but I can tell you I wouldn't have redacted it if it didn't

24   relate to data security.  I wouldn't have redacted it if it was

25   relevant to loss analysis.

1          MS. BROWN:  And if we can bring up Exhibit Triple R-3

2     and bring up the top all the way down to "Redacted."  Yeah,

3     that's great.  Thank you.

4     Q.   So, again, same group of people, except someone named

5     Andrew Davis is involved, and, again, it says it's redacted,

6     correct?

7     A.   Yes.  The difference here is that Andrew Davis is a member

8     of the DFIR team.

9     Q.   So, the DFIR team and the loss calculation team are

10    collaborating, right?

11    A.   I wouldn't say -- well, it depends on what they're

12    collaborating on.  They're certainly collaborating in the sense

13    that they shared this email.

14    Q.   Okay.  Well, let's go down to the next part of this email.

15    A.   I'm sorry.  I'm sorry.  Let me correct something.  Is that

16    Andrew Davis?

17    Q.   That's how I read that, yes.

18    A.   Andrew Davis actually may be a member of the loss analysis

19    team.  He may be an accountant.  There's somebody named Andrew

20    Carr, C-a-r-r, who is a member of the DFIR team.  But it's

21    still an email involving the loss analysis team that contained

22    information regarding the data security analysis.

23    Q.   And, again, this email involves you, because you're the

24    one who put the words "Redacted - data security investigation"

25    in there, right?

1    A.    Yes.  Yes, I did, and I did the redacting of this

2    document.

3           MS. BROWN:  And if we can pull up Exhibit 4 in a

4    series, which is Triple R-4, and pull like the top one-third.

5    Actually go down to, I apologize, the bottom half, Tracy,

6    starting after "RSM."  Bottom half, actually.  Yeah, there we

7    go.  Great.

8    Q.    So, this one is marked "redacted" on several points,

9    correct?

10   A.    Yes.

11   Q.    And this is, again, the loss calculation team, same people

12   we just talked about in the last email, right?

13   A.    Yeah.  They were compiling a list of control observations,

14   and so what I've redacted here are those issues that are

15   related to the data security investigation that are not related

16   to the loss analysis.

17   Q.    But, again, this is an email involving the loss

18   calculation team where you have redacted it on several

19   occasions?

20   A.    Yes.

21          MS. BROWN:  And the next one is Exhibit RRR-5, and the

22   bottom half, Tracy.

23   Q.    Again, something is redacted here, correct?

24   A.    Yes, that's what it says.

25   Q.    Yeah.  And you redacted it, right?

1   A.   Yes.  That's correct.

2   Q.   And you redacted this email involving the loss calculation

3   team, right?

4   A.   Yes.

5   Q.   And the title of this particular email is "Exhibits for

6   Project Delta."

7   A.   That's what it says.

8   Q.   Is Project Delta putting together a loss analysis for

9   United Way?

10  A.   You know, I'm not familiar with Project Delta, but I think

11  you'd have to ask RSM what that refers to.

12       MS. BROWN:  And, Tracy, if we can pull up -- that was

13  I think Exhibit 5 -- pull up 6 and the top half.

14  Q.   So, this is titled an agenda involving three members of

15  the loss calculation team, and it sounds like it's setting up

16  an agenda for a meeting.  You've redacted that as well,

17  correct?

18  A.   I'm just looking at what this is.  So, Notes on open items

19  for today's calls and remaining items to talk about with John.

20  So, yes, it's an agenda.  Apparently, there was a call, and I

21  redacted something here that referred to the data security

22  investigation.

23       MS. BROWN:  And, Tracy, can you bring up Exhibit 7 and

24  the top third.  Actually, yeah, top third for now.  Yeah.

25  Q.   And this is an email, again, involving members of the loss

1    calculation team where you, again, redacted it as data

2    security, right?

3    A.   Yes.  That's correct.

4         MS. BROWN:  And I think if we go down to the bottom

5    half, Tracy, there's another redaction as well.

6    Q.   Correct?  Do you see that before we pull this out?  Do you

7    see that there?  It's kind of -- yeah.  Again, members of the

8    loss calculation team, correct?

9    A.   Yes.

10        MS. BROWN:  And then -- I think this is 7.  If we can

11   pull out 8, which is the last in the series, and the top half.

12   Q.   Would it be fair to say you've redacted this entire email

13   other than, "Hi, Shan"?

14   A.   Well, I can't see the whole thing, but it appears to be

15   that way.

16   Q.   Okay.  And before we get rid of this -- so, there's a

17   backup of things attached to this, correct?  We can see several

18   JPEG documents?

19   A.   JPEG files, yes.

20   Q.   Yeah.  And it's the loss calculation team, right?

21   A.   Yes.

22   Q.   And we can take out the pullout, and you can see that

23   after "redacted" and "data," and then it just says, "Thanks,

24   Chris," right?

25   A.   Well, then down below there's another message.

1    Q.   Okay.  Well, then, why don't we pull that out, too.  So,

2    Mr. Cifarelli is part of the loss calculation team, correct?

3    A.   Yes.

4    Q.   And you redacted part of his documents, correct?

5    A.   Yes.

6         MS. BROWN:  You can take those documents down, Tracy.

7    Thank you.

8    Q.   I want to talk about interviewing witnesses in this case.

9    You interviewed several, at least I know of one, maybe a couple

10   of witnesses in this case, right?

11   A.   I interviewed witnesses in this case?

12   Q.   Stan Burrows.  You interviewed him, right?

13   A.   Yes, that's correct.

14   Q.   Do you remember interviewing anyone else?

15   A.   Yes.  Yes, I've interviewed numerous witnesses in this

16   case.  Well, when I say "in this case," in connection with my

17   internal investigation.

18   Q.   Of the witnesses that you interviewed in this case how

19   many of them ended up being government witnesses at trial?

20   A.   Oh, I have no idea.

21        THE COURT:  What would be unusual about an internal

22   conducted by counsel for a company and every single person

23   interviewed becoming a government witness at trial?  I don't

24   understand the inferences you're trying to draw.

25        MS. BROWN:  I'm not saying anything is improper, your

1    Honor.  I'm sorry.

2         THE COURT:  I'm just suggesting, look, I'm hearing,

3    I'm seeing a ton of evidence today about a lawyer representing

4    his client, but in terms of establishing connections between

5    the prosecution and this witness, yeah, there's some, but I

6    don't know.  We're spending a lot of time on prejudice in this

7    case, which is, based on what I've seen, I can see the

8    argument, but it's not particularly compelling, but I don't

9    hear anything about, after two days of evidence, it's the

10   obligation of these prosecutors to have turned this material

11   over, and we've got to get to that at some point.

12        MS. BROWN:  Well, you know, it's our position, and

13   it's set out in the motion, and I think he even said it a few

14   minutes ago, that they were working together, and there is case

15   law that says -- as I said, I'm not saying he's doing anything

16   wrong.  That's not the question here.

17        THE COURT:  Okay.

18        MS. BROWN:  The question is, and there's case law that

19   if he -- so, one of the cases -- and this will probably help a

20   little bit here.  One of the cases we've cited in our motion

21   talks about the kind of dividing line of when a third party --

22   whether a Brady violation could be attributable to another

23   party.

24        THE COURT:  Yeah.

25        MS. BROWN:  And the language in question is whether

1      that party is what's called an arm of the government.

2              THE COURT:  Yeah.

3              MS. BROWN:  And so the cases -- and this is why, you

4      know, the cases look at did the party, third party, who

5      withheld the Brady materials, did they interview witnesses,

6      were they helping with the investigation, were they looking to

7      find documents that were helpful to the government?  So, I'm

8      not just sort of pulling this out of nowhere.  I'm following

9      the case law that says these things are relevant as to whether

10     the Brady violation is attributable to the government by a

11     third party.  So, that's where I'm getting this from.  It's not

12     that he did anything wrong; it's just that it may be relevant.

13             THE COURT:  But don't those cases require some kind of

14     showing that he's doing it -- the fact that he's doing the same

15     thing that the government either might do or it did, doesn't he

16     have to be doing it at the behest of the government or at least

17     in some effort to, I don't know, to try to be part of the team?

18     I'm not surprised that Mr. Commisso is doing the things he was

19     doing, and they don't seem to me to be anything but what any

20     lawyer would do in this situation.  You tell me, Well, I don't

21     think it's improper, and I agree with you, Ms. Brown, it's not

22     improper, but I need to see what creates the obligation on the

23     part of the prosecutors to have reviewed and recognized this as

24     exculpatory and turned it over.

25             MS. BROWN:  Well, here's the thing, your Honor, and

1    one of the things we argue is the government under all the

2    cases that I won't repeat right now has an obligation to seek

3    out exculpatory evidence, has to turn over exculpatory

4    evidence.  The evidence that we have here is that they turned

5    over that duty to the lawyer working for the victim, and they

6    would send these emails saying, Hey, you guys work this out and

7    send -- so, yes, I don't think he's done anything illegal about

8    representing his client, but it's the government who is not

9    doing what they should have been doing, which is having some

10   oversight over making sure that they got the evidence that was

11   relevant to this case.  In fact, the government did the

12   opposite.  They just shipped -- I mean just think about that a

13   minute.  For a defense attorney to make a discovery request and

14   say, you know, We need these materials because you're calling

15   this person as an expert, this is the only way we can

16   cross-examine them to get to the basis, get to the bottom of

17   their opinions, and what does the government do?  Sends it to

18   the lawyer for the victim.  That's our problem here.  And the

19   other thing, too, and we haven't gotten to argument yet, but

20   the big problem here is they had some notice of this in terms

21   of the billing records, because the billing records show, you

22   know, how little --

23              THE COURT:  Yeah.

24              MS. BROWN:  -- Naviloff did, but that's not this.

25              THE COURT:  I understand your argument about the

1    billing records.  I think it's somewhat compelling.

2         MS. BROWN:  Yeah.

3         THE COURT:  But I guess here's my point:  It's more of

4    a frustration with the amount of time we're taking than

5    anything else.  It's not that I think you're making a frivolous

6    argument.  I don't.  It's just that, like, basically, as you go

7    through the records it's not making the inferences from the

8    records stronger.  If anything, Mr. Commisso is explaining them

9    in a way that makes them less compelling.  The records are what

10   they were.  I can read them.  You saw my reaction to them

11   initially.

12        If it's about argument, we should just be having

13   argument, you know?  Because the thing is what you're doing now

14   is what you would be doing at a new trial or a supplemental

15   proceeding.  Like, we're literally doing it, and we're doing it

16   for two days now.  I'm not going to stop you from doing it, but

17   I'm just trying to tell you that, look, I'm the trier of fact

18   here.  I'm the decider of the motion.  I'm trying to tell you

19   what I'm thinking.  That's all.

20        MS. BROWN:  And I appreciate that, your Honor, and I

21   think that your previous comments have been -- like at the last

22   hearing you talked about whether you could consider the

23   evidence under Rule 33.  We went and researched that.  So, the

24   comments are very helpful, and we listen and try to appreciate

25   them.  And I know this part is taking a little longer, because

1    when we read Attorney Commisso's pleadings, we took from that

2    and we took from the trial testimony -- remember Naviloff's

3    testimony using the word "firewall."  So, we have come into

4    this thinking that, oh, well, they have this, you know, we used

5    to call them Chinese walls when we were at the public defender.

6         THE COURT:  Yeah.

7         MS. BROWN:  But whatever it is, you know, imaginary

8    wall that everybody is honoring is there, and the emails are

9    showing that it's not there.  That was the point that we're

10   making.  We've obviously got the documents, but I think to the

11   extent that they are asserting the privilege and walling these

12   things off, we feel there's not a basis for it, and that was

13   the point that we wanted to make.  But it is relevant -- we

14   have the hurdle of overcoming privilege, we have the hurdle, as

15   you just said, of overcoming the third-party argument, that the

16   government's not responsible for third parties suppressing

17   evidence.

18        THE COURT:  Yeah.

19        MS. BROWN:  And so, we wanted to be able to confront

20   this witness with the evidence that there wasn't a firewall or

21   a Chinese wall or any other kind of wall, and that's relevant

22   to whether we can overcome a privilege argument.  As we said in

23   our pleadings, it's our belief that the government and RSM and

24   Attorney Commisso were using the privilege as a sword and a

25   shield.  And he said that also, too.  That was something, that

1    he wanted to help the government, and that's fine.  There's

2    nothing illegal about that.  Most people who represent victims

3    want to help the government.  There's nothing wrong with that.

4    But what there is something wrong with is the, like, Oh, you

5    need this?  Here.  Oh, you need that?  Here.  Oh, you know, you

6    want this?  No, we're going to assert privilege on this.  So,

7    that's why we're going through all this, and I apologize if

8    it's -- but I do think, because we have this burden, we have to

9    do that.  And I've tried to ask leading questions.  Sometimes

10   I've succeeded in getting a short answer, and sometimes I

11   haven't, but I will continue to try.

12          But I do think, just to kind of swing back to where I

13   was, the cases that are cited in our motion, a very significant

14   factor is an involvement in the investigation and asking

15   questions, and that's why I spent so much time with, if you

16   look at these emails, these emails talk about, Hey, look for

17   the IP address, let's get restitution, you know, let's think

18   about discovery, you know.  So, they are thinking about the

19   criminal case from the summer of '18, and they're involved in

20   helping the government from the summer of '18.

21          THE COURT:  All right.  Look, it's late, though, and

22   you just spoke for a minute.  I know we're in the middle of a

23   witness, but when you've argued that I want to give Mr. Davis a

24   chance just to be heard, if he wants to.

25          MS. BROWN:  Sure.

1          THE COURT:  We're almost at the end of the day,

2     anyway.  You don't have to speak, Mr. Davis, but since you just

3     listened to that, if there's something you want to say I want

4     to give you the opportunity.

5          MR. DAVIS:  I'd only say, your Honor, that I don't

6     think the defense has even made an offer of proof of how or why

7     the very few documents as to which privilege is being asserted

8     are even relevant to this motion, let alone are material and

9     exculpatory and would change the outcome in this case.  There's

10    not even speculation about how the 300-or-so privileged emails

11    actually help the defendant.  So, we're spending -- we spent

12    most, a good part of today about a privilege assertion and the

13    validity of it and the factual basis for it, and on and on we

14    go, but I don't even know why it's relevant to a motion that's

15    based on <u>Brady</u> and a new trial request.  I would also suggest

16    that --

17         THE COURT:  Let me ask you something, Mr. Davis.  The

18    documents we've seen with the redactions based on assertions of

19    privilege, are those available in their entirety now, or are

20    they still subject to certain redactions?

21         MR. DAVIS:  I would ask Mr. Commisso.

22         THE COURT:  Well, I'd ask Ms. Brown.  I mean, the

23    exhibits you're using --

24         MS. BROWN:  Well, it's very hard to tell, your Honor,

25    and I would probably -- because here's the thing:  We'll find a

1    document that's redacted, and then, after many hours of

2    searching, we'll find another one in some other place, and then

3    we've got to match them up to see what the title was.  Like,

4    just -- we had an example a few minutes ago where we got

5    something that was redacted and then it was produced later,

6    and, you know, it took some while -- we've been doing that all

7    weekend, is trying to match up these emails of there was

8    originally a claim of privilege and some were later produced,

9    some stuff was taken out and then put back in.  It's very hard

10   to follow, but that's what's been happening.

11           THE COURT:  Okay.  Because on Mr. Davis's point it

12   makes sense, to me, the extent that you had an assertion of

13   privilege and then later you -- but you also have the document

14   in its full form.  You should have to make some type of

15   prejudice argument based on the document.  I know you're doing

16   more than that, though, Ms. Brown.  You're trying to show that

17   selective invocation of the privilege is something that you

18   want me to draw an inference from.  That to me goes more to

19   like sort of the violation, the alleged violation, than it does

20   the prejudice.

21           But okay.  Are you saying, though, that there are

22   still documents that you're using here where you're showing me

23   assertions of privilege through redaction or logs that you

24   still don't have the documents?  Are you saying that?

25           MS. BROWN:  My understanding, and I'll let Attorney

1    Commisso, is that everything that says "data security" we don't

2    have and he doesn't want us to ever have.  That's my

3    understanding.

4              THE COURT:  Okay.  And maybe you shouldn't, if it's

5    privileged.

6              But the point is, Mr. Davis, I don't know how they

7    would ever make a prejudice argument on those documents when

8    they don't know what they say.  Am I missing the point,

9    Mr. Davis?

10             MR. DAVIS:  Only, your Honor, behind all of this I

11   think is a claim that the data security privileged documents

12   are relevant in some way to Mr. Alrai's trial.

13             THE COURT:  How do we know they're not if we don't

14   know what they say?

15             MR. DAVIS:  Well, respectfully, that could be true of

16   all manner of documents all over the world.  I'm just saying

17   we're spending --

18             THE COURT:  It could be true of documents all over the

19   world, but if you're aware of these documents and you've seen

20   the redactions, don't you have an obligation to find out what's

21   behind them?

22             MR. DAVIS:  Not if there's been a privileged

23   investigation by a corporation that's trying to see if its

24   donors' credit cards -- I mean, this is a very sensitive, very

25   important thing.  We have never asked to see them, no.

1              THE COURT:  Okay.

2              MS. BROWN:  Can I just put one more clarification on

3      that, your Honor?

4              THE COURT:  Sure.

5              MS. BROWN:  And the government can correct us if we're

6      wrong on recross, and we've got a lot of documents to go

7      through, so we may be mistaken on this, but at least from our

8      very comprehensive review of these documents, we had not ever

9      seen the data security raised as privileged prior to trial.

10     So, this is one of the points we're trying to make, is that

11     prior to trial there were requests for documents.  Some

12     documents were withheld, some were disclosed, and after trial

13     -- and the ones that were withheld, we went through that

14     document log, they were all listed as either attorney-client

15     privilege or work product; no other privilege was asserted

16     prior to trial.  We file a Motion to Dismiss saying, Hey, these

17     things should have been turned over, and there's no privilege

18     because they called Naviloff as an expert; the privilege was

19     waived.

20             And in support of that -- and then we get a bunch of

21     documents after trial that say "data security," and we're

22     thinking to ourselves, well, this is interesting.  Where did

23     this data security privilege come from?  Now, maybe there are

24     some documents pretrial.  We're talking about large things, and

25     maybe we missed them, but at least from what we've seen we have

1    not seen any privilege.  So, I think that's relevant to this

2    witness's credibility when he saw that we pretty much dissected

3    his attorney-client privilege argument for not turning this

4    over.

5         Now we have a new privilege, which is data security,

6    and it's very concerning that it's showing up in the loss

7    calculation team's emails, because he has said in these

8    pleadings that, oh, they're separate.  And so, here we have an

9    email from the government's expert talking about preparing for

10   the government's case, and there are things redacted under this

11   new privilege that was not asserted in the privilege log prior

12   to trial.  So, that's one of the issues that is very important

13   here, because we feel this is something new.  But, you know,

14   Attorney Commisso said earlier that he disputes that.  I

15   haven't found -- if he's got that, he can talk with the

16   government, and they can do that on cross-examination, but

17   that's our point.

18        THE COURT:  Okay.  Well, it's 5:00.

19        MS. LE:  Can I remind the Court and counsel about our

20   discussions when we were talking about the discovery order that

21   the Court issued, and we specifically address, and your Honor's

22   order specifically permitted Mr. Commisso to redact two of the

23   work streams that were unrelated to Mr. Naviloff's loss

24   analysis, and all of the exhibits that Ms. Brown has reviewed

25   with Mr. Commisso over the past hour predate Mr. Naviloff's

1    presentation during trial.  A lot of that presentation

2    information was related to the presentation to United Way's

3    board, the thick stack and thin stack and a good tranche of

4    those slides at the back end that were produced to the

5    government were redacted because the presentations to the Board

6    included the other work streams that were unrelated to the

7    loss, your Honor.  Several of those emails in which Mr.

8    Naviloff and his colleague, Mr. Fitzgerald, were included, they

9    were part of that entire presentation to the board.

10           So, the government would just like to remind the Court

11   that, when you ruled in the order, you specifically did not

12   order things that were protected under the other two work

13   streams unrelated to the loss analysis, your Honor.  Does that

14   make sense?

15           THE COURT:  It does make sense.  It does make sense as

16   far as it goes, which I understand your point.  The question is

17   always, though, whether either the government had an awareness

18   that there was anything exculpatory there -- it sounds like

19   you've never seen it, so you wouldn't know.  All right?  That's

20   what it sounds like to me.  You've never seen what was not

21   included, or whether you should have, that's what I'm trying to

22   grapple with.  It's the end of the day.  We're going to have to

23   keep continuing this.  I think this can go on alongside the

24   other motions, but I'll leave that up to you guys.

25           Here's the thing:  Ms. Brown, I've just got to ask

1    you, after lunch I said how long is this going to take?  I

2    think you said an hour half.  Well, it's 5:00, and you've got a

3    long way to go, you just said.  We've got to be somewhat

4    reasonable about the resources that we're using here, and I'm

5    just going to ask you to do your best, you know?  I know you

6    are, but I almost feel like I should be having a deposition

7    before we have these hearings or something so we can kind of

8    cut through all the meandering and get to the meat.

9         All right.  We're going to have to, of course,

10   schedule another day.  Listen, the next day we do is the last

11   day.  I probably should have said that last time.  The next day

12   we do is the last day.  We're going to have to get through the

13   witnesses and the argument.  All right?

14        MS. LE:  We're scheduled for Monday on the Rule 29

15   motion.  Is that right, Ms. Brown?

16        THE COURT:  I think it's Tuesday.

17        MS. LE:  Is it Tuesday or Monday?

18        MS. BROWN:  It's Monday.

19        THE CLERK:  Monday.

20        MS. LE:  Can we finish this up on Monday, Judge?

21        THE COURT:  What?

22        MS. LE:  Can we finish this up on Monday, then, since

23   we are already allotted time?

24        THE COURT:  It's not a bad idea, actually, since we're

25   going to be in court anyway.  I don't know why I didn't think

1    of that.  That's a good idea.  So, yeah.  The answer is yes,

2    okay?  Let's do that.

3         MS. BROWN:  I was just going to say, your Honor, I

4    talked about this with Attorney Eaton during the afternoon

5    break, and this might help, and I just want permission from the

6    Court to do this.  As the Court knows, you had sent out some

7    questions that you wanted to address, the parties to address at

8    oral argument regarding some of the issues in this case, and we

9    mentioned earlier that there's some research on whether Rule 33

10   can allow you to consider this.

11        THE COURT:  Yeah.

12        MS. BROWN:  So, what I was going to propose, so we've

13   done some additional research, but I don't want to file another

14   pleading, but what I would like to do and I've done in some

15   cases is a document with additional authority so that all I put

16   in there is, Here's some other cases that we found.

17        THE COURT:  Oh, no.  I mean yes and no --

18        MS. BROWN:  Okay.

19        THE COURT:  -- which is this:  I am going to have to

20   -- well, as you've said, we've got more going on now than was

21   going on in your original motion, at least by your cites, all

22   right?  So, I'm going to let you do a post-hearing brief on

23   this.  I don't want a pile of cases.  I want your argument.

24        So, look, that's a good idea, though, Cam.  We'll

25   continue with this at the next hearing date.  I did an order

1    during today, by the way, that just noted that on the merits of

2    those other motions you guys had addressed them but more in the

3    context of that detention and release.  You'll see it on the

4    docket.  I issued it over lunch.  It just tells you that, look,

5    if you're good on your briefing on the Rule 29 and 33 stuff,

6    fine, but if you're not you can brief it more, because you guys

7    focused on the timeliness, really, of that motion, not so much

8    the merits.  I'm okay with what you did, but if you want to do

9    more, I want to give you that opportunity, because you didn't

10   really get into the merits of those as much as you got --

11   really at all -- you got into the timing.  The only time you

12   addressed the merits of those motions was in your objection to

13   his motion for release way back, okay?  You'll understand it

14   when you read it.  You haven't really dove into the merits of

15   those motions.

16           Go ahead, John.

17           MR. DAVIS:  Just a question, Judge.  Whatever we do,

18   and we appreciate the order today, will we have oral argument

19   on both of those motions?  Would there still be other than

20   written argument?

21           THE COURT:  Yes.  Yeah, unless you're telling me you

22   don't want it.  Are you saying you don't want it?

23           MR. DAVIS:  No, no.  I think it's relevant to our

24   decision whether there will be oral argument.

25           THE COURT:  Oh, sure.  Yeah, you'll get argument.

1    Yup.

2          All right, everybody, I guess I'll see you -- anything

3    I'm forgetting to bring up?  No?

4          MS. BROWN:  Can I just clarify, that additional

5    pleading, that's not something that's going to be due Monday.

6          THE COURT:  Let me finish my conversation with --

7          MS. BROWN:  Oh, I'm sorry.

8          THE COURT:  That's all right.

9          Nayha, is there anything I didn't cover?

10         MS. ARORA:  No, nothing that's coming to my mind.

11         THE COURT:  Go ahead, Donna.

12         MS. BROWN:  I just want to be clear on the additional

13   pleading.  It's not something we would file on Monday, right?

14   We would argue on Monday, and then we would have an X amount of

15   time?

16                     (The Court nodded)

17         MS. BROWN:  Okay, great.

18         THE COURT:  I'd like you to brief something after we

19   know what the evidence is.

20         MS. BROWN:  Okay.

21         THE COURT:  Okay.  Thanks, everyone.  I will see you

22   Monday.

23         MS. BROWN:  Okay.

24      (WHEREUPON, the proceedings adjourned at 5:07 p.m.)

25

1          C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United States v. Imran*

9    *Alrai*, 1:18-r-00192-JL.

10

11

12

13

14   Date: ___12/18/20          */s/ Brenda K. Hancock*
                                Brenda K. Hancock, RMR, CRR
15                              Official Court Reporter

16

17

18

19

20

21

22

23

24

25