**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-22-2021**

```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE


 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                            *
 UNITED STATES OF AMERICA                   *
                                            *   18-cr-192-01-JL
               v.                           *   November 15, 2019
                                            *   11:12 a.m.
          IMRAN ALRAI                       *
                                            *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


              TRANSCRIPT OF CHAMBERS CONFERENCE
        BEFORE THE HONORABLE JOSEPH N. LAPLANTE


 APPEARANCES:


 For the Government:      John S. Davis, AUSA
                          Matthew Hunter, AUSA
                          Cam T. Le, AUSA
                          U.S. Attorney's Office




 For the Defendant:      Timothy M. Harrington, Esq.
                         Shaheen & Gordon, PA




 Court Reporter:         Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453
```

```
 1                      P R O C E E D I N G S

 2              THE COURT:  This is United States versus Imran

 3     Alrai, 18-cr-192-01-JL.  This is the final pretrial

 4     conference.

 5              Matthew Hunter, Cam Le, and John Davis here for the

 6     prosecution.

 7              Tim Harrington here for the defense.

 8              We're in chambers and we're on the record.

 9              Okay.  So this is a bench trial?

10              MR. HARRINGTON:  It is, Judge.

11              THE COURT:  You know, so I guess I'm going to have

12     to do some kind of colloquy where your client waives the right

13     to a jury trial.

14              MR. HARRINGTON:  Yeah, there was a document filed

15     by Peter Anderson because he had initially gone through it

16     with the client, but there's nothing -- there's no colloquy.

17     There's nothing else.

18              THE COURT:  I think we should do that.

19              MR. HARRINGTON:  No question.  Absolutely.

20              THE COURT:  Well, how do you feel about that, by

21     the way?

22              MR. HARRINGTON:  I'm mixed, Judge, and I told my

23     client so.

24              The issue that you're going to be presented with

25     from the defense perspective is going to be a somewhat narrow
```

1    one, and I think it will be mixed factum law so --

2          THE COURT:  The issue being whether the actual

3    services rendered somehow undermine any culpable mental state

4    or any other element to the offense, right?

5          MR. HARRINGTON:  Correct, Judge.

6          THE COURT:  Yeah.

7          MR. HARRINGTON:  And so that combined with -- he

8    had concerns with the potential makeup of a jury panel.  You

9    know, New Hampshire is a pretty white state.  Imran Alrai is

10   from Pakistan.  Funds are being wired over to Lahore.  He was

11   concerned that there might be some negative inferences that

12   would really go unnoticed in a jury panel.  So those two

13   things kind of formed his decision to kind of go jury-waived.

14        We talked about, you know, the aspects of it,

15   unanimity, things of that nature, and I answered all the

16   questions I could for him.  And ultimately, you know, it's his

17   right to waive, and he decided he would like to go with a

18   bench trial.

19        THE COURT:  All right.  We'll do a colloquy then

20   the first day of the trial.  We'll do it just before we get

21   started I guess.

22        We've told the jury to be here at 9:00, right,

23   Charli?

24        THE CLERK:  It's not a jury trial, Judge.

25        THE COURT:  That's right.  It's so funny.  It's

1    just so automatic to always thinking that.

2              I was going to say come in early to do it, but

3    there's no reason to come in early because we're not wasting a

4    jury's time.  I'll just do it on the record at the beginning.

5              MR. HARRINGTON:  What do you think our days are

6    going to be like, Judge, from like when to when, because I

7    know you might have other stuff.  I don't know if you're going

8    to have to interrupt proceedings.  When are you going to

9    start?  When are you going to end?

10             THE COURT:  When I have other stuff to do, I always

11   schedule it over the lunch hour or during breaks.  I try to go

12   till 5:00.  If you want to do something different, though,

13   both sides --

14             MR. HARRINGTON:  No, I would like to get -- from my

15   perspective, I would like to get in as much -- so if you're

16   talking 9:00 to 5:00, I would like to get in as much testimony

17   as we can because there's a lot of witnesses.

18             THE COURT:  Okay.

19             Is that okay with everybody here?

20             MR. DAVIS:  Yes.

21             MR. HUNTER:  Yes.

22             THE COURT:  All right.  9:00 to 5:00.  That's one

23   of the things I was going to ask you about.  Okay.  So we're

24   starting at -- and we'll have a waiver of the right to a jury

25   trial on the record at the beginning of trial.

1          Where are we now that you've really got your heads

2    into it, or getting closer, in terms of length of trial?  Any

3    changes to that?

4          MR. DAVIS:  I think two weeks is about right,

5    Judge.  Right now we have --

6          THE COURT:  About ten trial days?

7          MR. DAVIS:  We have 40 witnesses we will likely

8    call.  There's probably some of them who could be trimmed,

9    we're still talking stipulations, but --

10          THE COURT:  I wouldn't be surprised if once you got

11    rolling that you would even be able to stipulate to some

12    evidence almost on a daily basis, like figure it out the night

13    before.  I'm not asking you to do that.  I'm just saying that

14    it wouldn't surprise me that you would want to do because

15    there's going to be certain things given the defense you're

16    presenting that make certain case-in-chief evidence less

17    than -- you still want it in, but you might not want to put as

18    fine a point on it as you would in front of a jury.

19          MR. DAVIS:  We agree, Judge.  I mean, as I told

20    these guys, every trial I've ever been on started slow and

21    ended fast.

22          THE COURT:  You're right.

23          MR. DAVIS:  You know, we're going to be rolling

24    there at the end, but we're definitely going well into the

25    second week.  It's a lot of folks.

1          THE COURT:  Okay.  Okay.  The questions of law --
2    you know, there's two entries on a pretrial order, questions
3    of law and evidentiary issues.  They seem to be the same
4    issues in this case.  In other words, you don't have a
5    straight-up legal defense that as a matter of law the case
6    must fail.  You have certain questions about admissibility of
7    evidence, but any legal issues that you haven't raised that
8    you plan on raising?
9          MR. HARRINGTON:  The legal issues are laid out,
10   Judge.  John and I have talked about this so it's not
11   something that I'm kind of keeping close to my vest.
12          I think the government is going to be able to
13   demonstrate that my client withheld information from the
14   United Way about his relationship to DigitalNet.  I think they
15   will be able to demonstrate that whether it was my client or
16   somebody else information was given to DigitalNet -- excuse
17   me, given to United Way representing certain aspects of
18   DigitalNet and client lists, things of that nature, which I
19   think the government will be able to persuasively argue to you
20   was a misrepresentation.
21          So I think that they will be able to demonstrate --
22   whether you characterize that as fraud or not will be I think
23   a different question for you, but certainly
24   misrepresentation -- lies of omission or misrepresentation, I
25   think the government is going to be able to demonstrate that

1  to you.

2         The next step I think is whether or not -- relative

3  to the fraud charges, the way I looked at it is really two

4  steps.

5         One, do they show these misrepresentations.  If

6  they can show those, the question is going to be was there a

7  kind of infringement, if you will, on United Way's ability to

8  control its assets.  And if there was an infringement of the

9  ability to control its assets, was there a tangible economic

10 harm that resulted to the United Way.

11        So I think that's the rationale that I've looked

12 at, and so I throw that out there because I think that's your

13 consideration when you're thinking about the evidence.

14        THE COURT:  What count does that go to, all counts?

15        MR. HARRINGTON:  I think it does because all the

16 charges the way that I've looked at them are derivative.

17        MS. LE:  FBAR isn't.

18        MR. HARRINGTON:  Well, I agree with that, yeah, and

19 probably the aggravated identity theft.  But the wire fraud,

20 money laundering, all of that is derivative of the fraud and I

21 think that the government --

22        THE COURT:  Derivative of the scheme to defraud?

23        MR. HARRINGTON:  Yeah.  That's the way I've looked

24 at it anyway.

25        THE COURT:  So if I'm understanding your argument,

1    that if I don't find it -- even if I find all these statements

2    were false, et cetera, et cetera, your point is if I don't --

3    if the evidence doesn't establish, whether it's on a

4    sufficiency basis or just under a legal theory, that that's

5    part of a scheme to defraud, your point is not guilty?

6            MR. HARRINGTON:  And the government would need to

7    demonstrate a tangible economic harm to United Way.  And if

8    you feel that the government hasn't established that, then no

9    crime.

10           THE COURT:  Okay.  How do you plan to sort of

11   present that to me?

12           MR. HARRINGTON:  So part of it is going to be

13   through questioning of the government witnesses.

14           THE COURT:  Of course.

15           MR. HARRINGTON:  I also have two experts, a CPA and

16   an IT expert.

17           THE COURT:  No, that's not what I meant.  I don't

18   mean how do you plan to establish it.  I mean, how do you plan

19   to present it.  Like, is that a Rule 29 motion?  Is that just

20   a trial brief that you want me to have this idea in mind as I

21   engage it?  Because it's not like it's -- it's a little more

22   ethereal than just they failed to prove that element.  Do you

23   know what I'm saying?  Like, oh, there's nine counts of --

24   nine statements and on the third one they forgot to, you know,

25   or they didn't present it.  How do you plan to present it?  Is

1   it just going to be an argument you're making sort of in your

2   closing or do you want to try to crystalize it with some kind

3   of motion or brief or something?

4              MR. HARRINGTON:  The way that I had planned on

5   doing it was going to be at the close of the government's case

6   and then at the close of my presentation to you.

7              THE COURT:  Okay.  I get it.  Well, that's helpful.

8              Anything you want to say about that?

9              MR. DAVIS:  I think Mr. Hunter is our expert on

10  loss, but we may not agree that we have to prove actual --

11             THE COURT:  Economic loss.

12             MR. DAVIS:  -- economic harm provided that it was

13  the intent in the scheme to defraud to cause such harm and

14  that there was a risk of harm created.

15             MR. HUNTER:  I think that's correct.

16             THE COURT:  Harm is not the element or economic

17  loss isn't the element.  It's the statements made as part of

18  the scheme to defraud.

19             MR. HUNTER:  Right.  Was there an intent to

20  defraud.  And our position is the government doesn't have to

21  prove actual loss to the victim as an element.  We think we

22  will prove it, but we don't think that's a required element.

23             THE COURT:  All right.

24             MR. HARRINGTON:  And that may be one of the areas,

25  Judge, that I know that I'm going to have some of my

1    associates do some more research.  There's some stuff out of

2    the circuits.  I'm sure the government is aware of it.  So

3    there may be a little bit of a split in the decision about

4    whether tangible economic harm has to be proven or not.

5              So that may be an issue of law that you or your

6    clerks want to --

7              THE COURT:  I'm sure there is law on that.  Most of

8    what I've been exposed to has been in that sort of, you know,

9    before they amended the statute to include honest government

10   services, and remember when the idea of kickbacks and losses

11   were required?  That's a long time ago now.

12             What I'll probably do then -- I'll probably issue

13   it after today.  After listening to you guys and your points,

14   we'll probably issue a little order asking you guys to file

15   some kind of trial brief to just at least tell us what you

16   think the elements are.

17             MS. LE:  The elements of the offense?

18             THE COURT:  The elements of the offense and also if

19   there's any sort of pesky issues around the edges of the

20   elements like this one, you know, to cover it for us.

21             MR. HARRINGTON:  Yeah, because I think, Judge, if

22   you find the scheme to defraud and the loss that the

23   government is saying, I think it just falls like dominos, all

24   the rest of the stuff, the money laundering, the wire fraud.

25             THE COURT:  Because the transactions are there.

1          MR. HARRINGTON:  Yeah.  So I think the derivative

2    nature of it, if you find there's fraud, you find there's

3    economic loss, I think the rest of the stuff falls.

4          THE COURT:  I get it.

5          MR. DAVIS:  Judge, we are certainly planning on

6    doing a trial brief, Cam has taken the lead on that, and we'll

7    definitely file that a week in advance.

8          MS. LE:  But given what the Court and counsel has

9    said, we'll probably add a little section to address the

10   economic harm aspect of whether that is an element or not.

11         THE COURT:  Yeah.  Absolutely.

12         The next question is really for Charli.

13         Charli, when do you want them to have their

14   exhibits premarked and submitted by?

15         THE CLERK:  I would think, because it's

16   Thanksgiving, on the Thursday or Friday.  We could say

17   Wednesday, Thursday, or Friday, but probably Wednesday because

18   it's a work day.  Wednesday, the 27th.

19         THE COURT:  Okay.  So Wednesday, the 27th.  Okay.

20   So that's the 27th.

21         That's also your witness lists, your actual

22   will-call, right?  So the 27th.

23         Now, let me ask you this.  What do you anticipate

24   in terms of -- we do have a couple of motions in limine on

25   certain sort of -- they're not so much exhibits as they are

1    types of evidence.  On the actual paper do you anticipate many

2    objections or disputes as to admissibility or do you think

3    most of it's going to be agreed to and ID stricken?  Have you

4    thought about that at all yet?

5               MR. HARRINGTON:  My guess is -- go ahead, Matt.

6               MR. HUNTER:  We just started talking about it.

7    I'll let Tim take it.

8               MR. HARRINGTON:  Obviously, I haven't seen the list

9    so I'll have to take a closer look.

10              THE COURT:  Okay.

11              MR. HARRINGTON:  But my guess is there's a lot of

12   stuff that we both agree is coming in.  There's probably a

13   dozen contracts that are out there with DigitalNet, and part

14   of it's going to depend on what your ruling is relative to

15   this Robert Allen Group, but definitely with the United Way

16   we're going to agree all those contracts come in.

17              THE COURT:  What about, like, e-mails from

18   Mohammad?  You think they're admissions, right?

19              MS. LE:  Yes.

20              THE COURT:  You don't agree they're admissions.

21              So what do we do with Mohammad e-mail?

22              MS. LE:  Or a statement of the party's agent.

23              MR. HARRINGTON:  Probably, yeah.  To be honest,

24   Judge, I think they're admissible.

25              THE COURT:  Okay.  All right.  So the 27th.  You're

1    working on it.  I'm just going to urge you to try to strike

2    the IDs on as much as you can, you know, but I'm not asking

3    you to give up any rights or sacrifice anything.  Just be

4    reasonable in terms of -- if stuff looks admissible, it means

5    I'll strike the ID, so we're not spending time in court on

6    laying foundations and all of that.  All right?

7              MR. DAVIS:  So just to sort of -- I haven't done

8    this before here, but, Judge, if we do come to an agreement,

9    are the parties free to actually on the physical exhibit, on

10   the label strike the ID and so that's in and it's already in?

11             THE COURT:  Yeah.  If you give -- when you give

12   Charli a final exhibit list, whatever you've already agreed to

13   that's a full exhibit, that ID can be stricken.

14             MR. DAVIS:  Right there?

15             THE COURT:  You can do it in advance.  You can,

16   like, literally do it as you agree to it.  Just submit it as

17   Exhibit 17 with the ID stricken.  But if you haven't agreed,

18   leave the ID on and we'll do it in the courtroom.

19             MR. DAVIS:  And then do we simply say -- at some

20   point at the beginning of the trial say the parties have

21   submitted an exhibit list or exhibit lists and have agreed

22   that ID is stricken on the following and read them all in?  Is

23   that the way to make a record?

24             THE COURT:  It can't hurt, but to the extent

25   anybody during the proceeding says, I'm showing the witness

1   Exhibit 10, if it's Exhibit 10, it's Exhibit 10.  If nobody is

2   talking about striking the ID or anything, it's going to be

3   Exhibit 10.

4             THE CLERK:  I typically read the exhibits into the

5   record just before we start trial.

6             THE COURT:  There you go.

7             THE CLERK:  So if there are any changes between the

8   27th and the 2nd, please let me know and I'll take care of

9   that.

10            MR. DAVIS:  Great.

11            MR. HARRINGTON:  What's the court's schedule,

12  Judge?  Are you guys open on Friday or are you guys closed?

13  So we have Thanksgiving and then Friday.

14            THE COURT:  We're open.

15            MR. HARRINGTON:  You guys -- you're open.  Okay.  I

16  just didn't know if there was a business day before we

17  started, you know.

18            THE COURT:  There's a federal statute that says

19  we're supposed to be open every single day.  Sometimes we do

20  it with a skeleton crew, but we're never closed.  Maybe we do

21  now, but when I was chief, we never did just because I didn't

22  think I had the authority to close it.  There's always

23  somebody here.

24            All right.  The same for witness lists.  The 27th.

25            Other than the issue regarding the expert's file,

1    is there any evidence that you think you're entitled to that

2    you haven't received in terms of Brady, Jencks, anything like

3    that?

4                  MR. HARRINGTON:  The only other thing that was

5    mentioned in the motion was relative to a 2 terabyte hard

6    drive.

7                  THE COURT:  Yeah, that's expert material.  That's a

8    basis for expert testimony, right?

9                  MR. HARRINGTON:  That was my argument, that it's

10   connected to that.  I think the government might disagree with

11   that.  But just not to take that off the table.

12                 Other than that, I mean, the government has given

13   me, like, I don't know, like, 49,000 documents.

14                 THE COURT:  Are the prosecutors aware of any Brady,

15   Jencks, Giglio material you haven't provided yet?

16                 MS. LE:  Well, your Honor, yesterday we spoke to

17   the witness for the first time.  I've asked the agent to write

18   a report.  As soon as that is done, we'll send that, but

19   everything that we have that we needed to hand over we've

20   produced in discovery.

21                 THE COURT:  All right.  What's the witness's name?

22                 MS. LE:  Phil Kowalchek.  It's a Robert Allen

23   witness, your Honor.

24                 THE COURT:  All right.  Okay.  Yeah, we've got to

25   talk about that.

1           All right.  Okay.  I guess it's your motions in

2   limine.

3           What else do you want to talk about before we move

4   on to those evidentiary issues?  Anything you want to raise in

5   terms of how we can make things easier for you?

6           MR. DAVIS:  I'm not even sure what the agents want

7   on this, but we would -- if the Court is willing and the

8   defense is willing, I expect we would want to be able to have

9   two case agents, Jill Laroe and Todd Donnelly, FBI and HSI, as

10  our designated people in the courtroom who could then testify.

11          THE COURT:  So they're both going to testify?

12          MR. DAVIS:  Yes.

13          THE COURT:  Okay.

14          MR. DAVIS:  I'm not even sure exactly what Todd

15  will testify about.  Jill, at least about the search warrant.

16          So we would ask that.  We can talk about it further

17  if you want to think about it.  We would like to have two case

18  agents present with us who could testify under the rule.

19          THE COURT:  What do you say about that?

20          MR. HARRINGTON:  It's considered a complex case,

21  Judge, so I don't think I can really dispute them having a

22  case agent there under the rule.

23          THE COURT:  He's asking for two.

24          MR. HARRINGTON:  Yeah, that's the only thing I can

25  think of is why they need two.  I don't know why they would

1  need two versus one.

2          THE COURT:  Is that an objection?

3          MR. HARRINGTON:  It is, yeah.  If there's some

4  reason, John, I'm happy to think about it and talk about it

5  right now, but I don't know what the basis is for two versus

6  one.

7          THE COURT:  Yeah.  I mean, in the scheme of cases

8  like this it doesn't seem that it requires more anything, but

9  I have an open mind about it.

10          MR. DAVIS:  Well, I don't -- it's a lot of

11  exhibits, a lot of witnesses, and I can imagine situations

12  where we would want one or the other to be out but it would be

13  nice to have one, but I don't have a special argument.

14          THE COURT:  You want one or the other to be out?

15  What do you mean by that?

16          MR. DAVIS:  Say running --

17          THE COURT:  Oh.  Doing things for you.

18          MR. DAVIS:  To talk to a witness or dealing with

19  something or running back to our office to print something,

20  you know, all the stuff, but it's --

21          THE COURT:  Are you going to have Diane or somebody

22  with you?

23          MR. DAVIS:  Yeah, we'll have a paralegal.  I don't

24  have a special argument, Judge.  If the Court is inclined to

25  -- we can tell the agents we asked.  We'll designate one if

1    that's the preference.

2              THE COURT:  One for now.  But look, if you guys

3    horse trade between now and trial and you get something you

4    want and you want to have two, I don't care, but for now it's

5    just by the book and it's one, okay?  Just one for now.

6              MR. DAVIS:  I'll also just -- what we usually do is

7    we'll agree with defense counsel to the night before identify

8    the witnesses we're calling.

9              MR. HARRINGTON:  The next day?

10             THE COURT:  That's an order.  That's --

11             MR. DAVIS:  On condition that defense agrees to the

12   same.  Understanding that the defendant himself has the final

13   say.  But the other defense witnesses we would like to have

14   notice on the night before.  If so, we're willing to make that

15   agreement.

16             MR. HARRINGTON:  Yeah.  Absolutely, Judge.

17             THE COURT:  Okay.  That's an agreement.

18             MR. HARRINGTON:  And one of the things that will be

19   good is, you know, my witness list -- and it may cover some of

20   the same stuff and so it may be good to talk about the

21   witnesses because there's no sense in having like a double up

22   on it.  Primarily, it's going to be my experts and so it's

23   just going to be a coordination.

24             Because one of the things I would like to do is --

25   I don't want my experts having to sit in the courtroom for a

1    week.  So if we can get to the point where we know, you know,

2    Naviloff is going to testify on a particular day, I can have

3    my expert there so we can listen to Naviloff, you know, and

4    then obviously vice versa.

5              THE COURT:  Is there going to be -- do you want

6    regular witness sequestration, everybody sequestered?  That's

7    the rule if anybody wants it.

8              MR. DAVIS:  I think so, Judge.

9              MR. HARRINGTON:  Yes.

10             THE COURT:  Okay.  So witnesses will be sequestered

11   under the rule.

12             MR. DAVIS:  Related to that question is, we are not

13   going to raise a late filing objection to the expert witness

14   notice requirement for the defense provided we have it before

15   the trial starts.

16             MR. HARRINGTON:  We should have it -- to interrupt

17   you, I should have that to you no later than Monday,

18   additional reports from my CPA and the IT guy.

19             MR. DAVIS:  All right.  So that would be

20   appreciated.  That's all I had on that.

21             THE COURT:  Okay.  So sequestered witnesses.  We've

22   got one case agent at the table.  We've got an agreement that

23   both parties' counsel will provide adverse counsel the night

24   before each trial day the names of the witnesses they're going

25   to call the next day.  That's all good.

1              What else?  Anything?

2              MR. HARRINGTON:  I have -- nothing really with

3    this, Judge.

4              I have, like, a housekeeping matter about the

5    repatriation order, but we can take that up after we're done

6    with the other stuff if you would like.

7              THE COURT:  No.  Do it now.

8              MR. HARRINGTON:  Okay.

9              So my question about the repatriation order -- so

10   we'll be submitting some information to you.  He's not going

11   to repatriate the funds.  So that part is, you know, it's not

12   happening.

13             THE COURT:  Because he can't.

14             MR. HARRINGTON:  Yeah.  Exactly.  So we're going

15   to -- I think it's paragraph 4 of your order, which is he

16   needs to kind of, you know, come forth with an accounting.

17             So I just need to know kind of a general framework.

18   I can tell you what I'm anticipating.  I just want to get a

19   little guidance about what to give you and also how to give it

20   to you, whether you want that filed conventionally with the

21   court or whether you want that filed electronically.

22             So what I intend to try to get for the government

23   and for the Court is, there are a couple of letters that my

24   client received from the bank indicating that he doesn't have

25   access to the bank accounts anymore because of the failure to

1    do that biometric scan, so just to demonstrate to the Court

2    that he doesn't have access or control over the funds.

3          The bank records.  We're trying to assemble some

4    bank records.  And this time they would be unredacted bank

5    records and they should cover I think the period.  Because I

6    think you guys have the bank records but they were just

7    heavily redacted by Peter, and I think they cover that time

8    frame.  So there would be unredacted records for them to

9    review.

10          THE COURT:  Those initial disbursements you're

11   saying or no?

12          MR. HARRINGTON:  Correct.  It would be the bank

13   records of the account in Pakistan, because they were obtained

14   at some point by Peter or my client, you know, when Peter

15   represented him.  So I think it goes up to roughly December of

16   2018.  Does that sound about right?

17          MR. HUNTER:  That sounds right.

18          MR. HARRINGTON:  So we have those.  And that will

19   show, like, I think there's, like, some account balance of

20   $5,000 or something.  I forget off the top of my head.

21          I'm trying -- I've told my client that I don't

22   believe that -- I don't want him to create, like, his own

23   spreadsheet.  I can, if the Court feels it's appropriate, but

24   it's going to be something that, you know, why would the

25   government take him at his word.  I could have it notarized

1    and have him swear about the disbursements.  Kind of like an

2    accounting.

3              So this is the piece that I'm struggling with is an

4    actual kind of -- the money is over in the bank, and I think

5    your order can be fairly characterized to say if the money is

6    going out of the bank, you've got to kind of tell us where it

7    went.  I'm working on that piece now, and I'm just not sure

8    what I'm going to be able to put together to do that.  I could

9    have him do kind of an accounting, but I'm trying to do

10   something that would be more one step removed from him.

11             THE COURT:  Yeah, why don't you do it?  You don't

12   feel comfortable?

13             MR. HARRINGTON:  So this is all stuff that occurred

14   in Pakistan.  They're not local banks.  It's like a separate

15   company.  It's DigitalNet in Pakistan, so it's a separate

16   company.  So I'm trying to see if I can get some records,

17   things of that nature, that might do it.  I have some payroll

18   records for the staff that was employed there.  So that is

19   probably going to be part of it.  It shows, like, automatic

20   payroll deposits, that type of thing.

21             I'm just letting the Court know what I'm trying to

22   get together and do.

23             THE COURT:  It seems to me -- I mean, I don't know,

24   because an accounting is not necessarily the raw data or

25   records that form the base of the accounting.  It's an

1   accounting.  It's a layout that lists transactions,

2   disbursements, and all that, balances.

3          It seems to me that -- I don't think they have to

4   be sworn to by your client.  At least that's not what I

5   envision.  It's just got to be something that -- the point of

6   this is to facilitate the eventual repatriation or forfeiture.

7   It's not to be evidence against your client.

8          So my suggestion is compile a summary that

9   summarizes the records.  You can provide the records, too, if

10  you want to show some substantiation, or have one of your

11  experts do it or some accountant employed by -- but that's how

12  I view it, a summary of an accounting.  An accounting is, you

13  know, generally a list of balances and transactions and the

14  like that explain the path of disbursements of these funds.

15         MS. LE:  The only thing I'm worried about because

16  the records are so heavily redacted, say he had a large

17  deposit of over $100,000.  The very next day he splits it into

18  three different bank accounts.  We would like to know who owns

19  those bank accounts.  That's it.

20         MR. HARRINGTON:  Yeah, I think you would see, and

21  if my client had to put something, like, under oath to satisfy

22  the government given that, you know, his Fifth Amendment is

23  protected, he would indicate that there are no other accounts

24  that funds were, you know, used for.

25         THE COURT:  Disbursed to.

1          MR. HARRINGTON:  It was this bank, and this bank

2   was used by DigitalNet Pakistan to pay staff, overhead,

3   everything related to the things that took place in Pakistan.

4          I know the government has this information through

5   various witnesses, but there were anywhere from, you know, 15

6   to 30 people working.

7          THE COURT:  Was your client also a member of the

8   staff over there as well receiving funds?

9          MR. HARRINGTON:  No.

10          THE COURT:  No?

11          MR. HARRINGTON:  No.  The money that would be kind

12   of I think accounted for here would be through, like, the tax

13   returns that he filed through DigitalNet and AISA Consulting,

14   which I think the government also has.  His money came through

15   that, not through Pakistan.

16          THE COURT:  So I would just describe it as some

17   type of summary.

18          MR. HARRINGTON:  Well, that helps, Judge.

19          THE COURT:  I think that complies with the order.

20          Does anybody disagree with that?  No?

21          MS. LE:  I think a combination of the summary plus

22   the unredacted statements should cover it, your Honor.

23          THE COURT:  Okay.

24          MR. HARRINGTON:  I'll get working on it, Judge.  I

25   know it's the 22nd it's due by.  No, I think the -- yeah, the

1    22nd, next Friday.  That's my goal.  If I need an extension,

2    I'll talk to the government and file something, but my goal

3    was to have it on or before that date.

4                    THE COURT:  All right.  Let me ask the prosecution

5    on this.

6                    There's a paragraph in that order that prohibits

7    the use of any of these disclosures as evidence in the trial.

8                    MS. LE:  That's right.

9                    THE COURT:  Do you anticipate any kind of sticky

10   issues around that where you're going to have to make a

11   showing that what you're presenting doesn't come from this

12   accounting?

13                   MS. LE:  The repatriation?  We don't plan to use

14   that as an exhibit at all.  We've already shown the movement

15   of monies from the U.S. to Pakistan, and that's all we need to

16   do.

17                   THE COURT:  That much I get.  I'm talking about

18   more like evidence derived from it, but you have the evidence

19   already you're going to present.

20                   MS. LE:  Right.

21                   THE COURT:  All right.

22                   MS. LE:  There won't be new evidence that comes

23   from this, your Honor.

24                   THE COURT:  All right.

25                   MR. HARRINGTON:  And then last question, Judge.

1              How would you want me to submit that?  Would it be

2    electronic or would you want me to hard copy that to the

3    Court, that accounting?

4              THE COURT:  The order says produce it to the Court

5    and not to the marshal?  It says to the Court?  I don't even

6    remember.

7              MR. HARRINGTON:  I think if it was repatriated,

8    it's to the marshal, and then I think it's to the Court if

9    it's an accounting, if I recall correctly.  I have the order

10   here.

11             THE COURT:  Okay.  I mean, I think you could

12   provide it to adverse counsel, to be honest.  If you're not

13   comfortable doing that, file it with the Court under seal at

14   level 1 so they have access to it.  Why don't you do that.

15   File it with the Court under seal at level 1.

16             MR. HARRINGTON:  Okay.

17             THE COURT:  File the -- I guess what I would

18   suggest is file the -- file it conventionally under seal with

19   copies to them.  All right?

20             MR. HARRINGTON:  Okay.  So say that one more time.

21   So file conventionally under seal?

22             THE COURT:  Conventionally under seal.

23             MR. HARRINGTON:  Under seal.  Okay.

24             MR. DAVIS:  A hard copy, not an electronic copy.

25             MR. HARRINGTON:  All right.

1          MR. HUNTER:  The convention has probably changed.

2          MR. HARRINGTON:  Of course.

3          THE COURT:  Anymore housekeeping?

4          THE LAW CLERK:  Judge, is there any chance you're

5   going to have to pick a jury that first week?

6          THE CLERK:  I was going to mention that, Judge.

7          We're slated for that civil trial Moody.

8          THE COURT:  Oh, Moody.

9          THE CLERK:  Yes.  That would be Tuesday, the 3rd.

10         THE COURT:  Yeah, and I would normally ask someone

11  else to do it for me, but since it's a pro se I'm not going to

12  ask someone else to do it for me because that could be a total

13  nightmare.

14         So there's a chance Tuesday morning we'll have to

15  start at about noon or 11:00 because I may have to pick a

16  civil jury.  I won't know yet until we have a final pretrial

17  on that case.

18         THE CLERK:  That's next Wednesday, the pretrial.

19         MR. HARRINGTON:  So end of the day on Wednesday we

20  should have an idea?

21         THE CLERK:  Yes, you will know.

22         THE COURT:  Thanks for that reminder.  I hadn't

23  thought about that.

24         Okay.  Let's talk about your motions.

25         There's two motions in limine.  I'm trying to

1   remember the docket number.  There's a motion in limine to

2   exclude evidence regarding -- is it Robert A. -- is it Gordon?

3            MS. LE:  No.  Robert Allen.

4            THE COURT:  Allen.

5            MR. DAVIS:  Robert Allen Group, RAG.

6            THE COURT:  RAG.

7            MR. DAVIS:  Robert Allen Group.

8            THE COURT:  Thanks.

9            So I have read your submissions.  It took me a

10  while to wrap my mind around it after reading the cases

11  because -- and, you know, when I first read the motion, I

12  thought, well, you know, if none of the wire fraud counts and

13  none of the substantive counts go to Robert Allen Group, this

14  sounds to me like it's not -- it sounds to me like it's prior

15  acts or other acts.

16           The objection points out the fact that there's an

17  allegation of a scheme to defraud Robert Allen Group, and

18  there is, but none of the substantive acts involve statements

19  to Robert Allen Group or specific, you know, I guess you call

20  it economic losses or specific acts to defraud Robert Allen

21  Group.

22           The cases cited by the prosecution, they're not the

23  same as this.  I don't know if there is a case out there

24  that's the same as this.  Isn't it true -- tell me if I'm

25  wrong about this.  Isn't it true that -- how many counts are

1    there, 52 or something?

2              MR. DAVIS:  Yes, 52.

3              MS. LE:  53.

4              THE COURT:  53.  Thanks.

5              Now, I have read and understand that there is an

6    allegation that this is a scheme to defraud two victims, but

7    isn't it true that the jury could return a guilty verdict on

8    all 53 counts without ever finding a single wire implicating

9    statement to Robert Allen Group or dollar obtained from Robert

10   Allen Group?

11             I think a jury could do that.  I think actually

12   your objection even says that.

13             MR. DAVIS:  I think the jury could, your Honor, but

14   I think the trial convictions would be subject to a variance

15   argument that might require an acquittal.  And what I mean by

16   that is -- because what the cases say is when the government

17   alleges a single scheme with multiple victims, it owns that,

18   right?

19             THE COURT:  Yeah.

20             MR. DAVIS:  And we are doing that.  We acknowledge

21   that by charging a single scheme we have to prove that.  We

22   have to prove it beyond a reasonable doubt to you that there

23   is a course of conduct that is sufficiently related that is --

24             THE COURT:  You're saying if a jury found.

25             MR. DAVIS:  If a jury found or a judge found.

```
 1              THE COURT:  But you just said they could still --
 2   okay, they could find -- how would that ever transpire?
 3   Because if what you just said is true -- I think I understand
 4   your point.  If they could find evidence to prove guilt on all
 5   53 counts without ever finding -- are you saying that they're
 6   going to have to be told on every single count that it was
 7   part of a scheme to defraud Robert Allen Group, even every
 8   disbursement, every one of those wire frauds?  I don't think
 9   you're taking on that burden.  At least --
10              MR. DAVIS:  They would have -- it's like a multiple
11   conspiracy case.
12              THE COURT:  Yeah.
13              MR. DAVIS:  If the defense requests it and the
14   evidence allows it, the jury would be instructed that the --
15              THE COURT:  That Count 7 was part of a scheme to
16   defraud both victims.
17              MR. DAVIS:  Right.  That the scheme to defraud --
18              THE COURT:  And if they didn't find it was part of
19   a scheme to defraud Robert Allen Group, they could acquit on
20   that count?
21              MR. DAVIS:  I'm trying to get my head around that.
22   I know that the jury would have to be instructed, if the
23   evidence supports it, that you can't find that there were two
24   separate schemes.
25              Now, instead of -- to play it out, I think -- I
```

1   think the answer might be that if the substantive count -- and

2   I don't necessarily concede that every substantive count only

3   involves United Way, including the money laundering.

4            THE COURT:  Well, your objection does say that.

5            MR. DAVIS:  Well --

6            THE COURT:  Your objection does say that.

7            MR. DAVIS:  We could talk about that, certainly

8   most of it, but when the money goes into the bank account,

9   it's commingled.

10           THE COURT:  Yeah, yeah.

11           MR. DAVIS:  And there are funds in that Pentucket

12  account that are wired or that are accessed in other ways than

13  charged in the indictment, and I don't think we've even

14  thought about that or felt we needed to.

15           But I guess what I was going to say is I think the

16  Court -- if the Court instructs you have to find a single

17  scheme and then finds the government didn't prove a single

18  scheme but proved two schemes, then the question would be --

19           THE COURT:  Or just didn't prove it was part of

20  a -- it doesn't have to go that far.

21           MR. DAVIS:  Or any scheme.

22           THE COURT:  Or just it was a part of a scheme to

23  defraud United Way, that Count 7.  That each element was

24  proven, it was part of a scheme to defraud United Way, but it

25  was not part of -- a single scheme, though, is to defraud both

1    victims.  You're saying that could be an acquittal.

2              If that's his position, you might want this

3    evidence in.

4              MR. HARRINGTON:  Well, you're exactly right, Judge.

5              THE COURT:  I can't believe that's your position,

6    but if it is --

7              MR. HARRINGTON:  If that's the government's

8    position, then let's move on to the next motion.

9              THE COURT:  Yeah.  If that's the argument, this

10   isn't much to argue about.  I'm a little bit shocked you want

11   to take on that burden, but it's --

12             MR. DAVIS:  Well, I don't think it's an acquittal.

13   I do think there is a variance argument.

14             THE COURT:  Like a sentencing variance?

15             MR. DAVIS:  No.  That the proof at trial varied and

16   it was a prejudicial variance and it was error at trial, and

17   that may be -- so I think you're right.  There's no right to

18   an acquittal on the elements of that offense if Count 7 --

19             THE COURT:  Right.  So that means you could get 53

20   guilty verdicts without ever having proven a false statement

21   to Robert Allen Group or money derived or money defrauded from

22   Robert Allen Group, money laundering involving the funds of

23   Robert Allen Group.  There's literally -- you could -- this is

24   in the indictment as one single scheme, I concede, but you

25   haven't just said, like, give me one verdict on a scheme to

1    defraud against two victims.  You've asked for a substantive

2    verdict on transactions none of which involve Robert Allen

3    Group, unless you're going to show me I guess some way that

4    they do, but that's not what your papers say.  Your papers

5    say, no, they don't.  They only involve the United Way.

6    They're part of a larger scheme, but none of the substantive

7    counts.

8             I think a jury in this case could return a guilty

9    verdict on every single count without making a single finding

10   regarding a statement to Robert Allen Group or a wire

11   implicating statement to Robert Allen Group or a defrauding of

12   Robert Allen Group, and to me that makes -- even though

13   there's allegations in the indictment, that makes the evidence

14   about Robert Allen Group other acts evidence.

15            Now, I'm not saying it's not admissible, by the

16   way, because it might very well be admissible under 404(b),

17   but you kind of disavowed that.  You said this isn't 404(b),

18   and then you dropped a footnote that said, well, maybe it kind

19   of is.

20            You're not arguing in your papers that it's 404(b).

21   You argue in your papers that it's like res gestae.  It's part

22   of the scheme to defraud two victims.

23            MR. DAVIS:  It's intrinsic, correct.

24            THE COURT:  It's intrinsic in a way, though, that

25   kind of allows you to shovel in this evidence without any

1      burden of proving any bit of it beyond a reasonable doubt.

2                  MR. DAVIS:  Judge, you say none of the cases cited

3      address that.  Well, I strongly disagree.

4                  The Andrews case from the Sixth Circuit is exactly

5      this situation because it's a case involving 17 fraudulent

6      loans but only the last loan is within the statutory period.

7                  THE COURT:  Sure.

8                  MR. DAVIS:  All right?  And so you have a broad

9      scheme that goes back years, but you have one mailing or one

10     wiring within five years.  That's exactly what that indictment

11     proved.  I mean, it charged one count involving one victim and

12     one transaction, and that's the issue there, but the point --

13     so one of the practical realities about the indictment is that

14     much of the Robert Allen conduct, the actual wirings were

15     beyond the statute of limitations, and so -- I mean, if the

16     issue is, well, why didn't the government charge him, well,

17     they were barred by the statute of limitations.

18                 Now, there is -- as we also say in the papers,

19     there is some further conduct, including e-mails, that occur

20     in April of 2014 within the statutory period.

21                 THE COURT:  Involving Robert Allen Group.

22                 MR. DAVIS:  Right.  And so -- but the general point

23     that the government is absolutely -- if there's a single

24     scheme and the scheme goes back before the statutory period --

25                 THE COURT:  Then tell me how any one of your

1    counts -- because you can talk about the scheme all you want.

2    The jury isn't -- but you just said -- you just said if you

3    don't prove that it's part of the scheme for Robert Allen

4    Group, he doesn't get an acquittal.  I thought you were going

5    to say that, and you did say that at first, but now you're

6    saying, well, not necessarily an acquittal, a variance.

7            If you think I want to buy that kind of

8    complication, that's not going to happen.  I'm just not going

9    to allow you to do the evidence.

10           MR. DAVIS:  And we're not either.  We're going to

11   prove that Robert -- I mean, this is intertwined and

12   contemporaneous.  I mean, I don't think it's a close

13   question --

14           THE COURT:  Yeah, I hear what you're saying.

15           MR. DAVIS:  -- that this is a single scheme.  This

16   is happening at the same time at two different companies using

17   the same bank account, using the same kind of contracts, using

18   the same reputation, the same --

19           THE COURT:  That's like saying shooting two people

20   with the same gun is the same murder.  It's not.

21           MR. DAVIS:  But it's not, your Honor, because a

22   scheme is a continuing offense.  All of the cases talk about a

23   scheme can be complex.  The Prieto case is right on point

24   about that, it can involve multiple victims, and so --

25           THE COURT:  And it can, but you chose to charge

1    this the way you did.  You could have chose -- you could have

2    I think charged some way -- I think you could have charged

3    some statement or act vis-a-vis Robert Allen Group as a

4    substantive count.

5              MR. DAVIS:  And the example we get -- I mean, to

6    me --

7              THE COURT:  Which example, the Andrews?

8              MR. DAVIS:  The example of the April 2014 threat to

9    cut off the telephone service if they're not -- because of

10   nonpayment, which is exactly what he did four years later with

11   United Way.  He writes a letter with that same kind of threat.

12   This guy gets every crumb he can get even after he's been

13   discovered.

14             So we could have charged that, yes, but why should

15   that matter?  And as a legal matter, it doesn't matter.

16             THE COURT:  It matters because the jury is going to

17   hear a lot of evidence in this case about Robert Allen Group

18   now, yet it doesn't need any of that evidence.  It doesn't

19   need any of that evidence to return a single one of these 53

20   verdicts, and it's prejudicial.  It's prejudicial.

21             Now you're saying it's not prejudicial because it's

22   part of the same scheme.

23             MR. DAVIS:  It's also not prejudicial because it's

24   a bench trial.

25             THE COURT:  Now, that's a good point, yeah.

1          MR. DAVIS:  Right.  And the Court can keep the

2    various things --

3          THE COURT:  That's a very good point.  I want to

4    have that conversation, yeah.

5          MR. DAVIS:  But I do think -- I mean, you asked me

6    the question -- I'm sorry I'm floundering, but I think you're

7    right, the jury could convict.  But if we don't prove a single

8    scheme, if we prove two schemes or we prove one is a scheme

9    and one isn't a scheme, there is a strong prejudicial variance

10   argument post-trial that may require acquittal or a judgment

11   of acquittal.

12          I've made those arguments.  I've had a defendant

13   who went to trial on a big conspiracy where she had a little

14   part, and there was a good argument that this is a multiple

15   conspiracy case.

16          THE COURT:  So are you conceding then -- are you

17   conceding then that if you don't prove a single scheme or you

18   prove two schemes, that's an acquittal?

19          MR. DAVIS:  I'm not conceding it's an acquittal,

20   no.

21          THE COURT:  Okay.

22          MR. DAVIS:  I'm conceding we have failed to prove

23   the single scheme alleged and there may be a remedy which may

24   include a judgment of acquittal.  I don't know.  I mean, I

25   don't know the -- now, to me it strikes me as different with a

1    judge than a jury, frankly.  I mean, the argument for --

2    because the defendant's argument would be I just got acquitted

3    in a trial where the jury heard Robert Allen Group stuff in a

4    case where the government charged it as a single scheme.  I am

5    now arguing, and the Court agrees with me, the government

6    didn't prove a single scheme.  It proved two different schemes

7    that are separated, all right, and so that -- and the jury was

8    prejudiced on the United Way stuff because they heard the

9    additional stuff about Robert Allen Group and it shouldn't

10   have been in there.  It wasn't a single scheme.  It was

11   improperly charged.  And then you have prejudicial variance.

12   At least the argument for it.

13              THE COURT:  What does prejudicial variance mean?

14              MR. DAVIS:  Prejudicial variance means a variance

15   from the indictment.

16              THE COURT:  Okay.

17              MR. DAVIS:  It's a basis for a rule -- it could be

18   a Rule 33 motion.  It could be a basis for a Rule 29(c)

19   motion.  I'm entitled to a judgment of acquittal because

20   the --

21              THE COURT:  The evidence varied from the

22   indictment.

23              MR. DAVIS:  The grand jury said something.

24              THE COURT:  Yeah.

25              MR. DAVIS:  And the proof at trial varied from what

1    the indicted facts are, the government didn't prove it, and

2    that's why you have a multiple conspiracy instruction.

3            THE COURT:  Sure.  We don't have any of that here.

4            MR. DAVIS:  But we have a multiple scheme at least

5    argument.

6            THE COURT:  Argument.  But your indictment says

7    it's one scheme.

8            MR. DAVIS:  Yes.

9            THE COURT:  It's one scheme to defraud two people.

10           MR. DAVIS:  Correct.

11           THE COURT:  Two victims.

12           MR. DAVIS:  Two victim companies.

13           THE COURT:  But when you ask the jury to return a

14   verdict, they don't have to make a single -- they either have

15   to make a finding -- I guess by this argument you're not

16   conceding that it's an acquittal, so I'm not sure what to do

17   with this, but you're not -- my view is -- based on what

18   you're saying, that these substantive counts have to be shown,

19   even if all the elements are proven, one of those elements has

20   to be that it's part of a single scheme to defraud not only

21   United Way but Robert A. Gordon's (sic) business.  That way

22   down the road, like the last wire transfer, right, that's part

23   of a scheme to defraud Robert A. Gordon.

24           MR. DAVIS:  Robert Allen Group.

25           THE COURT:  Robert Allen Group.  Sorry.  Robert

1    Allen Group.  I keep doing that.

2            I can't imagine how you're going to do that.  I

3    mean, I can imagine how you could argue it, that it's one

4    continuing scheme for the same reasons you said, the same

5    apparatus, the same devices, the same method, yeah, but that

6    just seems to put us after the fact, like trying to hair split

7    and decipher this evidence in a way that just seems totally

8    unnecessary.

9            I don't want to get into why do you need it or why

10   did you charge it this way, I really don't, because I don't

11   think that's the Court's role.  I wonder those things, but I

12   just don't think you should have to explain that, to be

13   honest.  You charged it how you did.

14           Don't you see how they have the potential for

15   allowing you to shovel in tons and tons of prejudicial

16   evidence that has nothing to do with the substantive counts

17   the jury doesn't need but could be prejudiced by?  Because it

18   looks very bad.  It does look very bad.  It's a very similar

19   scheme.  Assuming it's true, it's a very similar scheme.  Is

20   it one scheme or two schemes?  Is it two very similar schemes

21   directed at two different victims that work the same way?  I

22   don't know.  That seems like an issue I don't want to buy

23   after the fact under Rule 33 or 22(c) -- or 29(c).

24           MR. DAVIS:  29(c).

25           THE COURT:  That said, it doesn't seem like it's

1  inadmissible evidence to me.  It just seems like it's

2  inadmissible evidence under the theory that you advanced.

3          And the cases aren't the same.  I understand your

4  point about how a series of transactions, only one of which is

5  within the statute of limitations, can be part of this longer

6  scheme making all those transactions admissible and relevant.

7  I totally understand that.

8          But that's not prejudicial in the same way as a

9  different victim and with different money and different

10 statements is prejudicial where none of that evidence is

11 necessary for the finding of guilt on any of these substantive

12 counts.  I don't even know -- I haven't -- it's over on my

13 desk, the complaint, but -- the indictment, but I think it's

14 one of those indictments where you've got a different

15 paragraph number for each count and it's kind of, like, on a

16 chart or something, right?

17         MS. LE:  Yes.

18         THE COURT:  Do you anticipate standing up to the

19 jury and explaining to the jury on each of those how this is

20 part of the scheme to defraud Robert Allen Group?

21         MR. DAVIS:  So if I could just address that just a

22 little further, Judge, and address the nature of wire fraud.

23         Wire fraud has several elements.  One element, the

24 last element, is a particular execution of the scheme at a

25 date and time.  Now, necessarily every one of those wirings is

1    limited.

2              THE COURT:  To satisfy that element.

3              MR. DAVIS:  Right.  It's an event that happened.

4              And in a complex scheme where there are multiple

5    victims, as in this case, that particular wiring is always

6    limited to the context and the circumstance, but that's only

7    one element.

8              The other element that the jury is instructed on

9    and the Court has to find is that there was a scheme to

10   defraud substantially as described in the indictment.

11             THE COURT:  Yeah.

12             MR. DAVIS:  And so I don't agree with the --

13   respectfully, I don't agree with the Court when the Court

14   says, well, the factfinder here could -- you know, is being

15   asked to do something that has "nothing to do with Robert

16   Allen."  I don't agree with that at all.

17             THE COURT:  You don't agree with that at all, but

18   you did agree when I asked you the very first question I asked

19   you here, okay?  Because I know you don't agree that it's a

20   different scheme or nothing to do with it at all, but you did

21   agree that the jury could return guilty verdicts without any

22   evidence of a statement to the Robert Allen Group or money

23   defrauded from the Robert Allen Group, and I think that's

24   true.

25             MR. DAVIS:  Well, I don't want to be -- it depends,

1   your Honor, on what is the instruction on what a scheme to

2   defraud is and to what extent is that instruction bound to the

3   indictment.

4          I think the Court -- I would love to see what the

5   First Circuit --

6          THE COURT:  So let's get back to it then.

7          Are you going to agree to an instruction that they

8   have to find that each one of these substantive counts is part

9   of a scheme to defraud Robert Allen Group?

10          MR. DAVIS:  Is part of a single scheme to

11   defraud --

12          THE COURT:  Two victims.

13          MR. DAVIS:  -- that includes Robert Allen Group.

14          THE COURT:  Yeah.  If you're agreeing to that

15   instruction, we don't have a problem.  Because that was one of

16   my questions to you.  If you weren't with me on what it

17   proves, I was going to say, well, do they each have to be

18   proven to be part of the scheme involving the Robert Allen

19   Group.  If the answer to that is yes, again I don't think he

20   has an objection to it and it's -- I think it's taking on a

21   heavier burden than you need to take on.  Because although you

22   could call this one scheme, you could certainly think of it as

23   two schemes very easily.

24          But if you think of it as one scheme, that's fine.

25   Just understand the jury is going to be instructed that these

1    substantive counts have to be proven to be part of that scheme

2    or artifice involving two victims.  That's the only way I can

3    understand the argument.

4              MR. DAVIS:  Does anyone have the First Circuit wire

5    fraud instruction?  Because I thought about that but --

6              THE COURT:  Yeah, I have it.  I have the book.  We

7    should probably look at the more recent one like the one the

8    judge --

9              MR. DAVIS:  The Court is saying if we were to fail

10   to prove that the scheme --

11             THE COURT:  Give me one moment.

12             MS. LE:  The first element is the scheme as

13   described or described in the indictment.

14             THE COURT:  In the indictment, right, which is both

15   victims.

16             MS. LE:  Right.

17             MR. DAVIS:  Right.  I think we're taking that on,

18   Judge.

19             THE COURT:  Okay.

20             MR. DAVIS:  And so if -- and then the question is,

21   if there is a material variance from the scheme described in

22   the indictment, I guess we don't prove the scheme, right?

23             THE COURT:  Here's what I think this does.  If this

24   is what you want, this is what you want.  I think it does two

25   things.  I think it gives him a terrific argument at closing

1    and I think it gives him a terrific appeal issue because I'm

2    going to have to now on sufficiency decide if there was one

3    scheme here.  And if your very last wire transfer -- okay, if

4    your very last wire transfer is part of a scheme to defraud

5    Robert Allen Group by finding it's one scheme to defraud two

6    victims, which is -- I guess if that's the burden you're

7    undertaking, that's the burden, but I just think that that's

8    -- I have no idea why you want to do that.

9              MR. DAVIS:  Because it's what happened here.

10             THE COURT:  It might be what happened here, but

11   it's not -- it's still not necessary to prove it.  You have an

12   easy way of proving it.

13             If you want to get some of this evidence in,

14   there's probably other ways.  Look, you know your case better

15   than me.  The last thing I should be doing is telling you

16   that's not what happened here.  You know what happened here.

17             MR. DAVIS:  Right.

18             THE COURT:  If that's your position, that's your

19   position, but that means that that's how the jury will be

20   instructed.  It sounds like you're telling me you're okay with

21   that, but maybe you're not.  I don't know.

22             MR. DAVIS:  Well, I'm thinking about it because the

23   Court is -- I mean, we would be foolish not to listen to

24   warnings.  There is, of course, no jury.  You're the

25   factfinder.

```
1              THE COURT:  Oh, yeah.  Yeah.
2              MR. DAVIS:  And there's no jury instruction.
3              THE COURT:  Well, let me be honest.  This sounds to
4     me like two very similar schemes that overlapped -- I mean,
5     with a very similar modus operandi.
6              I'm not ruling out the possibility that it's a
7     single scheme, I'm really not, but it's not a hundred percent
8     clear to me.
9              MR. DAVIS:  Well, so let me just add this, and I'm
10    sorry I'm going on.
11             We do not at all say, and I don't think we say in
12    our papers, that we don't think it would qualify as 404(b).
13    The only point in my footnote is to say if someone actually
14    says this is another crime and it is not intrinsic to the
15    scheme charged, there are --
16             THE COURT:  Another act.
17             MR. DAVIS:  Another act.
18             THE COURT:  It's footnote 3, and you do say -- no,
19    it's not footnote 3.  It is footnote 2 on page 6.
20             MR. DAVIS:  Yes.
21             THE COURT:  No, that's not it, either.
22             It is footnote 3.  It's on page 8.  I'm sorry.
23    Thanks.  It's footnote 3 on page 8.  "Even if evidence related
24    to RAG were properly characterized as other acts evidence
25    under Rule 404(b), the evidence would be readily admissible
```

1   under the rule to prove noncharacter matters, including

2   motive, intent, opportunity, plan, knowledge, and identity."

3          Now, so obviously you're reserving the right to

4   argue 404(b).

5          MR. DAVIS:  Right.

6          THE COURT:  But forgive me if I misinterpret that

7   as not your main argument since, you know, it's a footnote and

8   you've used the entire catchall of the rule.  It's not all of

9   these things.  It might be planned, right?

10          MR. DAVIS:  I didn't use absence of mistake, Judge.

11          THE COURT:  Fair enough.

12          MR. DAVIS:  So, Judge --

13          THE COURT:  Yeah.

14          MR. DAVIS:  It is perhaps -- I mean, if the Court

15   is saying you think there's significant doubt about whether

16   this is a single scheme, as long as we get a fair opportunity

17   to argue -- to present the same evidence under 404(b), we can

18   live with that and we don't have to take on the greater

19   burden.  The Court doesn't have to take it on.

20          I'm just saying if that's the Court's ruling --

21   again, I think it's clearly a single scheme and I think there

22   are many, many fraud cases where the government is limited by

23   the statute of limitations on which specific instances of

24   execution of the scheme it can charge, but it doesn't mean

25   that we can't prove the rest of the scheme.  That never means

1  that.  It just means --

2          THE COURT:  I don't disagree with that there.  I

3  don't disagree with that.

4          But let me ask you a question, though.  Will it be

5  sufficient -- see, the idea that it's a single scheme

6  involving two victims -- I've been saying to you, well, okay,

7  if that means to prove your substantive counts, you have to

8  prove it's part of a single scheme to defraud both victims,

9  right?  So if there's no chance of a wire communication

10 resulting in a defrauding disbursement, right, if there's no

11 chance that that defrauded Robert Allen Group and that it was

12 not conveyed to Robert Allen Group, are you saying that can

13 still be part of a single scheme?

14          MR. DAVIS:  No, no, because Robert Allen Group was

15 also communicated with via wire.  And it isn't that there's no

16 chance -- there's going to be ample evidence of wire fraud

17 related to Robert Allen Group.  It's just most of it occurred

18 before the statutory -- I mean, there's certainly plenty of

19 evidence about wires to United Way that occurred before March

20 of 2014.

21          So in both cases we're going to be showing fraud

22 and wire fraud communications that occurred before the statute

23 and that are not charged substantively.  It's part of the

24 scheme.

25          THE COURT:  I understand.  I understand that.

```
 1              MR. DAVIS:  Okay.

 2              THE COURT:  It's just that -- you've just brought

 3    so much complexity here that is so unnecessary that

 4    complicates this so much.

 5              I guess I could conceive of a set of circumstances,

 6    and these facts might be it, where your wire transfer in Count

 7    4 is part of a single scheme to defraud two victims, okay, but

 8    only as conveyed to and defrauds the United Way and not Robert

 9    Allen Group.

10              MR. DAVIS:  Right.  We could have one wire fraud

11    count.  We don't have to have 18.

12              THE COURT:  Absolutely.

13              MR. DAVIS:  We could have one count.

14              THE COURT:  Absolutely.

15              MR. DAVIS:  Now, that wire is going to be directed

16    to one victim or the other.

17              THE COURT:  Yep.

18              MR. DAVIS:  Right?

19              THE COURT:  Yep.

20              MR. DAVIS:  But it can't be that, well, the

21    government only has one wire fraud count, it is directed at

22    victim B, that wiring had nothing to do with victim A, and

23    therefore this whole thing is a mess.

24              Well, it isn't a mess.  The government has to prove

25    the scheme substantially as alleged in the indictment, and
```

1 that's what we're doing.

2   THE COURT:  But just suppose these overlapping

3 schemes went back ten years, okay?  It sounds like you're

4 saying that you could charge it that way and put in ten years'

5 worth of evidence based on one final <u>Andrews</u> style wire

6 transfer --

7   MR. DAVIS:  Correct.

8   THE COURT:  -- or wire communication.  Boy.

9   MR. DAVIS:  And I've been on the other end of that

10 in a tax evasion case that went back 13 years and they said it

11 was one tax evasion.  I filed a big objection on that.  I lost

12 but --

13   THE COURT:  But see, fraud involves victims

14 generally, people whose property -- have been separated from

15 their property by means of fraudulent or deceptive means.

16   To go back and back and back basically because it

17 was the same method, boy, that just seems problematic to me.

18   MR. DAVIS:  And I understand that, Judge, but it's

19 not this case because when you picked this up you go, oh,

20 Robert Allen Group, prior act.  That's what the defense

21 alleges.  It's not prior.

22   United Way was the initial victim.  The defendant

23 started -- I mean, his first job is at Robert Allen Group.

24 His first fraud is against United Way.  During the 18-month

25 period he's working both places and no one knows it, right?

1          But he starts with United Way, he gets them on the
2    hook, and then six months after the initial, you know,
3    services contract with United Way he then goes to Robert
4    Allen.
5          It's not prior.  We're not going back ten years.
6          THE COURT:  I get that.
7          MR. DAVIS:  We're talking about the same --
8    literally the same period here.
9          THE COURT:  You haven't given me authority though
10   analogous to this, have you?  You haven't given me
11   authority -- I'm not saying it's impossible, but you haven't
12   given me authority with victims who were defrauded outside the
13   statute.
14          MR. DAVIS:  Andrews.  Four victims.
15          THE COURT:  Okay.
16          MR. DAVIS:  The last wire that occurred only
17   involved one loan and therefore must have been one victim, you
18   know, but that scheme went back years and the Court had no
19   problem with that.
20          THE COURT:  What do you want to say about all of
21   this, if anything I mean?
22          MR. HARRINGTON:  Not much, Judge.  If the
23   government is saying what it sounds like it's saying, they
24   want to admit evidence relative to Robert Allen Group to show
25   that this was one scheme and that it pertains to all counts,

1    then I accept that, that's their burden, and I would -- I'm

2    ready to go forward on it.

3            MR. DAVIS:  What the government accepts is the

4    elements of the offense as specified in the First Circuit and

5    for the wire fraud counts -- not for the theft counts I think,

6    but for the wire fraud counts the government has to prove the

7    scheme as alleged in the indictment.  Substantially as

8    alleged.  It's not ever going to be exactly as alleged in a

9    complex indictment, but that's what is charged, a single

10   scheme.

11           MR. HARRINGTON:  And if that pertains to --

12           THE COURT:  Both victims.

13           MR. HARRINGTON:  As the Court has laid out that,

14   you know, each wire transaction the government needs to prove

15   it, then I understand what the rationale is.

16           THE COURT:  Me, too.

17           MR. HARRINGTON:  So --

18           THE COURT:  Here's the argument I think we're going

19   to be dealing with later though, all right, when you move for

20   acquittal and I grant or deny, whatever, eventually.  What the

21   government's position is going to be is, well, we didn't have

22   to prove that the statement was made to Robert Allen Group or

23   defrauded Robert Allen Group.  We just had to prove it's part

24   of the same scheme.

25           I'm not sure how somebody makes that distinction, a

 1   trier of fact.  I really don't.

 2              MR. DAVIS:  Can I?

 3              THE COURT:  Please.  Please tell me.

 4              MR. DAVIS:  So, Judge, the distinction is among the

 5   different elements of wire fraud because element 1 says --

 6              THE COURT:  Yeah, it's a difference between element

 7   1 and element 4.  I get it.

 8              MR. DAVIS:  My only point is, and I've said it, but

 9   every wiring is only against one victim.

10              THE COURT:  One victim.

11              MR. DAVIS:  Every wiring, every mailing in a mail

12   fraud, it's always a particular instance of the fraud, and so

13   what --

14              THE COURT:  Yeah.  You had two contemporaneous

15   schemes though and it was sort of -- you wanted to call it one

16   scheme that was being operated at the same time.

17              What you've got here is overlap, right, and it

18   looks like the relationship and this, I don't want to say

19   scheme, the relationship and the engagement with, the

20   interactions with Robert Allen Group at some point stopped and

21   they continued on with United Way.

22              MR. DAVIS:  Correct.

23              THE COURT:  And even though you're taking on this

24   burden that it's one scheme, defense is going to have a pretty

25   good argument that I can't imagine how a wire communication on

1  Count 9 that defrauded the United Way is really part of a

2  scheme that includes a single scheme to defraud Robert Allen

3  Group when he hasn't had contact with them for a year.  That's

4  the argument, right?

5              MR. HARRINGTON:  Yeah.

6              MR. DAVIS:  But that argument is meritless because,

7  again, every wiring, every mailing is about a particular point

8  in time and a particular victim and --

9              THE COURT:  But is the scheme involving Robert

10 Allen Group still ongoing?

11             MR. DAVIS:  No, it isn't.

12             THE COURT:  No.

13             MR. DAVIS:  That phase of the single scheme is

14 completed.

15             THE COURT:  See, this is just semantics and

16 sophistry then at that point.  Well, yeah, it's not part of

17 the scheme to defraud.  It's part of the different phase of a

18 single scheme.  I mean, I just find that -- I find that to be

19 unnecessarily complex.

20             The bottom line is, though, you've taken on the

21 burden.  I'm going to have to figure out if I'm persuaded by

22 it come trial time.

23             MR. DAVIS:  So can we talk about the Court's

24 preferred -- I mean, is the Court saying --

25             THE COURT:  Well, let's get off the record then if

1    we're just going to talk.  I don't want to make her -- I'm

2    listening.

3              (OFF THE RECORD)

4              THE COURT:  We just had a little bit of a

5    discussion.  It wasn't at all inconsistent with what was on

6    the record.  The bottom line, as I understand it, is this.

7    I'll state it as I understand it.  If either counsel

8    disagrees, they can tell me.

9              This is a single scheme allegation because an

10   element of mail fraud -- wire fraud, sorry, is a scheme or

11   artifice to defraud.  The government's position is by its

12   indictment it has undertaken the burden on the wire fraud

13   counts to show that each of these instances of wire fraud are

14   part of a single scheme involving both victims, the United Way

15   and Robert Allen Group.

16             With that representation, the defense no longer

17   objects because they get to make that argument at trial.

18             Am I right?

19             MR. HARRINGTON:  That's right, Judge.

20             THE COURT:  Okay.  So that motion is withdrawn

21   based on the position the government has taken in this

22   hearing.

23             So let's talk about the other one.

24             Let's get off the record again.

25             (OFF THE RECORD)

```
1              THE COURT:  On the motion in limine regarding
2    expert materials, this is document No. 47, here's how we've
3    resolved it.  There's basically three components at issue.
4              One is a list of names of United Way personnel that
5    Naviloff interviewed or had access to.  There are not
6    summaries of those contacts, they don't exist, but the list of
7    those names is going to be provided to defense counsel.
8    That's number one.
9              Number two.  There were two imbedded employees from
10   DigitalNet at the United Way.  Their laptops were imaged, and
11   those laptop images are going to be provided to defense
12   counsel and his expert for their review.
13             MS. LE:  Can that be under FBI supervision, your
14   Honor?
15             THE COURT:  Sure.
16             MS. LE:  That's how we normally do it.
17             THE COURT:  That's completely reasonable.
18             MS. LE:  Thank you.
19             MR. HARRINGTON:  And I just want to make sure that
20   includes -- my client's computer was also.  So it was two
21   imbedded employees plus my client.
22             MR. HUNTER:  Yes.
23             MS. LE:  You returned his client's computer?
24             MR. HUNTER:  We returned his personal computer, not
25   his United Way.
```

1          MS. LE:  Okay.

2          MR. HARRINGTON:  This was the United Way.

3          THE COURT:  The third issue is regarding imaged

4    laptops of a number of laptops at the United Way during the

5    relevant time period.

6          Counsel and their experts are going to meet and

7    confer and by next Thursday, which is the 21st, are going to

8    file a stipulation with the Court about the parameters of

9    defense counsel's expert's access to those laptop images in

10   order to basically prepare the defense expert to make his

11   report and prepare defense counsel to cross-examine Mr.

12   Naviloff.

13         I have every confidence you're going to reach an

14   agreement on that, but of course I'm available to you if you

15   can't whether it's a disagreement between counsel here or

16   issues injected by the victim, United Way.  All right?

17         MR. HUNTER:  Thank you, your Honor.

18         THE COURT:  All right.

19         MR. HARRINGTON:  And just to make sure we're

20   talking the same, apples and apples, we're kind of thinking

21   about the e-discovery platform.  All that stuff was uploaded

22   to that.  That's my understanding, right?

23         MR. HUNTER:  My understanding from the

24   conversations, search terms that would be run on the

25   e-discovery platform that Mr. Naviloff had access to.

1          MR. HARRINGTON:  Okay.  We're on the same page.

2          THE COURT:  All right.  Anything else, counsel?

3          MR. HARRINGTON:  No.

4          MR. HUNTER:  No.

5          THE COURT:  All right.  This was kind of a long

6    pretrial, but I appreciate your high level of professionalism

7    and collegiality.  We're adjourned.

8          (Conclusion of hearing)

```
 1                    C E R T I F I C A T E

 2

 3

 4            I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate transcription of

 6   the within proceedings, to the best of my knowledge, skill,

 7   ability and belief.

 8

 9
     Submitted: 12-21-20    /s/   Susan M. Bateman _____
10                          SUSAN M. BATEMAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```