**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-22-2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   18-cr-192-01-JL
            v.                  *   November 22, 2019
                                *   2:45 p.m.
        IMRAN ALRAI             *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Government:        John S. Davis, AUSA
                          Matthew Hunter, AUSA
                          Cam T. Le, AUSA
                          U.S. Attorney's Office


For the Defendant:        Timothy M. Harrington, Esq.
                          Shaheen & Gordon, PA


Also Present:             John J. Commisso, Esq.
                          Commisso Law P.C.


Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

<pre>
1                    P R O C E E D I N G S

2              THE CLERK:  The Court has before it for

3    consideration today a telephone conference in criminal case

4    number 18-cr-192-01-JL, United States of America versus Imran

5    Alrai.

6              THE COURT:  All right.  I've reviewed your

7    submissions.

8              The background -- as far as I can tell, there were

9    three issues that we discussed and attempted to resolve at the

10   last conference.  And we resolved two of them that appear to

11   have been already executed by you, but the third one remains

12   unresolved, right?

13             MR. HUNTER:  Correct, your Honor.  It remains

14   unresolved.  We did -- just literally fifteen minutes before

15   the conference we received a production from United Way

16   containing all the documents in the database --

17             THE COURT:  Hold on.  Hold on.  Hold on.  The

18   reporter can't hear you.

19             MR. HARRINGTON:  I'll move closer to the phone.

20             THE COURT:  Well, wait a minute.  Listen, I don't

21   want a recitation of things that you already resolved.

22             There were three issues, right?

23             There was the list of RSM personnel spoke with.

24   There was access to the 2 terabyte hard drive with images of

25   certain UWMB computers.  Those two things are done, right?
</pre>

1          MR. HUNTER:  Yes.

2          THE COURT:  All right.

3          The third issue is this -- it was a tough one that

4    we had some difficulty with.

5          I just wanted to point out though this submission

6    from the government, whoever wrote it, says that I asked you

7    to confer about these three issues?  I thought we resolved two

8    and I asked you to confer about the third.  It's sort of a

9    moot point.  You have resolved the first two already.

10         The third point is this additional documents

11   regarding the e-discovery database that UWMB's outside counsel

12   created as part of the internal, right?

13         MR. HUNTER:  Yes, your Honor.

14         THE COURT:  Okay.  I've read your submissions.

15         I mean, is there anything else anybody wants to say

16   to me?  I'm going to try to figure out a solution to this.

17         Look, I'm not going to bar the testimony of the

18   expert, but I'm also prepared to provide some discovery relief

19   to the defense in terms of what the government is able to

20   present, what opinions it's able to present, and

21   cross-examination permitted by defense counsel.

22         I feel I need to address this.  I don't accept many

23   of the propositions advanced by the government.  I don't think

24   it's about discovery.  I think it's about expert disclosure.

25         My general approach to expert testimony is that

```
 1   what one side has access to both sides have access to when it
 2   comes to experts.
 3            You've explained to me the difference between --
 4   your view of it between what was considered by the expert,
 5   actually considered, and what was available.  And I realize
 6   that it's not necessarily the case that defense counsel's
 7   expert can have access to every conceivable thing that was
 8   available to a prosecution expert, but I think the idea that
 9   only what an expert considers is relevant for discovery is not
10   exactly the case.  So I'm going to try to find the right
11   balance here.
12            Let me ask this question.  I do think, Mr.
13   Harrington, your extensive list here for search terms, search
14   terms and e-mail search, I think they were excessive, okay?  I
15   know you probably want this information and it's not based on
16   thin air, it's based on your knowledge and your client's
17   knowledge of the situation here, but that did appear to be a
18   lot.
19            So let me ask you, Mr. Davis, or whoever is
20   running -- who's running the tech part of this, Hunter, Davis?
21   Who's running it?
22            MR. DAVIS:  I'm the lead AUSA, Judge.
23            Matt has been the lead on discovery and tech and
24   Matt Hunter wrote the briefs on this motion, so it's Matt's
25   argument.
```

1          THE COURT:  Okay.  I'll take it up with Mr. Hunter

2   then.

3          Mr. Hunter, let me ask you this question.  Based on

4   your consultation with United Way's counsel, would it make any

5   difference if these search terms and e-mail searches were

6   narrowed significantly or would it still be the same, many

7   months and many thousands of dollars?

8          MR. HUNTER:  Well, your Honor, I think it really

9   depends on the nature of the negotiation and how much they're

10  narrowing it, and so it's hard to answer that in the abstract.

11         My understanding is anything approaching this was

12  going to be a month's long discovery process.

13         THE COURT:  Okay.

14         MR. HUNTER:  One thing I do want to note, your

15  Honor, is from our consultations with John Commisso, who is on

16  the line, we were able to identify every single document in

17  the database that was viewed or accessed by someone from RSM,

18  and we've produced this afternoon as soon as we got them every

19  document that has not previously been produced that was

20  accessed by RSM even if they never considered it.  So it's

21  anything they actually looked at.  We were able to identify

22  that and get it out to the defendant.

23         THE COURT:  Well, I appreciate that, and that

24  was -- I appreciate that you took the initiative just to get

25  it done.  So thank you for that.

1              Well, let me try this.  Let me ask you, Mr.

2    Harrington.  The search terms in the e-mail, are they in any

3    particular order in terms of, you know -- they don't look

4    alphabetized.  Are they in order of anything like relevance or

5    probative value to you?

6              MR. HARRINGTON:  They are not, Judge.

7              THE COURT:  All right.  So if we shorten the list,

8    you would have to work with your client to I guess make some

9    selections here.

10             MR. HARRINGTON:  Yes, Judge.

11             THE COURT:  Okay.  But what I'm trying to figure

12   out is if that would even help.  I mean, if it's still really

13   burdensome and impossible, you know, we have a couple of

14   solutions.  It's continue the trial so we can get all this

15   done and figure out who's going to pay for it.  It might be

16   your client, Mr. Harrington.  I'm not sure, but it might be.

17   So we have to figure out -- or if we can get this to a

18   manageable level so the prosecution and United Way's counsel

19   can get this ready for our trial that's going to start a week

20   from now, or a little over.  What is it, two weeks from now?

21   A week and a half, right?

22             So let me ask you then.  Did you work up this list,

23   Mr. Harrington -- without waiving any privileges, of course,

24   is this just based on your own study of the file or did you

25   work this with your client?

1        MR. HARRINGTON:  It was actually with my client as

2   well as the IT expert and a CPA expert, your Honor.

3        THE COURT:  All right.  And here's another

4   question.  Because I think Mr. Hunter makes one very good

5   point in his papers here, which is that, you know, the expert

6   is opining on a couple of narrow issues regarding economic

7   loss, right?  These searches to me -- can you really tell me

8   that these are all tailored to economic loss, which is the

9   topic of the expert testimony, or is some of this really just

10   guilt or innocence or impeachment material not of the expert

11   himself but of other witnesses?  I mean, how tailored is your

12   list to the expert opinion involved which is only on economic

13   loss?

14        MR. HARRINGTON:  We could tailor it more, Judge.  I

15   did think that all the information we were trying to seek

16   would be relevant to the expert.  You know, for example, part

17   of what the prosecution has indicated was that they told him

18   to just assume fraud, and I understand that they told him that

19   but I still think that would be an area where I could

20   cross-examine him.

21        THE COURT:  Of course.

22        MR. HARRINGTON:  So I think some of that

23   information -- even though the government said to assume it,

24   if I'm able to obtain information that would go to that issue,

25   I think I would cross-examine him on it, and that obviously is

1     the main part of what we're trying to get with these searches

2     is information about the procurement process, the fraud that

3     they're saying was used in that process, that it wasn't an

4     open process, my client controlled it all, which I think the

5     information I'm seeking would show that that's not accurate.

6     So that was the focus of what I was trying to get at.

7              THE COURT:  Okay.  I understand that and I

8     understand why you would be interested in it, but that's not

9     what the expert is going to talk about, the prosecution

10    expert.  He's not going to talk about -- he's not going to

11    provide evidence of guilt, at least as far as I understand.

12             I'm looking at the submission here, document No.

13    51, filed by the prosecution.  Let me take a second look at

14    it.

15             Yeah, there's a good passage here on page 4, right?

16    I'm looking at page 4, third full paragraph or second full

17    paragraph under Roman numeral I.  For purposes of his report

18    the government asked Naviloff to "assume that Alrai

19    fraudulently obtained all contracts between these two

20    entities.  Accordingly, Mr. Naviloff has not and will not

21    opine about the legitimacy of the contract procurement process

22    or the legal conclusion of whether the defendant defrauded

23    United Way.  Rather, his analysis is limited to determining

24    the loss to UWMB resulting from duplicative billing, excessive

25    billing, and billing for certain services United Way paid for

1    but DigitalNet did not provide, and separately, based on the

2    defendant's bank and tax records, how much the defendant was

3    personally enriched.  The defendant has every document

4    Naviloff considered in this accounting."

5            So I'm not sure how I would discern this, Mr.

6    Harrington.  When I read your, like, e-mail list, for example,

7    I'm assuming you're digging for information as anyone would in

8    your position, by the way, but you're digging for information

9    regarding procurement regarding fraud, right?  And I think if

10   you don't do that, you can probably reduce these lists I would

11   say dramatically.  Am I right about that?

12           MR. HARRINGTON:  I'm not certain, Judge.  Perhaps,

13   but I'm not certain.

14           I also think that some of the things that -- I know

15   the government is trying to limit what Naviloff can testify

16   about, but part of it is if you look at his own report, he

17   talks about reviewing and imaging, you know, laptops and all

18   the information that was on those laptops, the VDIs, virtual

19   desktop images, and so that was part of his review and we

20   don't have all that information.

21           THE COURT:  I know, but if he's not going to opine

22   about it -- if he's not going to opine about it, I think it

23   was up to you -- if this is just general discovery of

24   information, not information to either cross his expert on

25   economic loss or prepare your expert on the same topic, the

1    fact that their expert had access to something isn't really

2    the issue.  What you're entitled to for that reason is more

3    closely aligned with what Mr. Hunter has represented here in

4    his papers.

5            General discovery about the crime here, you know,

6    criminal liability for these counts, that's just information

7    that you could have sought on your own and sought relief from

8    the Court on your own.

9            A motion in limine to limit the expert's opinions

10   about those issues is not the proper vehicle for that.  I

11   think you understand what I'm saying, right?

12           MR. HARRINGTON:  I do, your Honor, but I think some

13   of this information is kind of hand in glove because trying to

14   demonstrate or cross-examine about economic loss or have my

15   expert prepare about economic loss, it also would entail going

16   through e-mails that circulate, you know, between the IT

17   teams.  For example, this idea that services were billed for

18   that weren't provided.

19           THE COURT:  But that is -- I understand, Mr.

20   Harrington, but that's general discovery.  That's not -- the

21   prosecution expert assumed that.  And you can cross-examine on

22   that topic and that's I think fertile for you, right?  He was

23   asked to assume the crime happened, and you're probably going

24   to make some hay with that, right?  At least you plan to,

25   right?

1        But what he had access to in terms of evidence of

2   procurement, misrepresentations, and fraud, that's not really

3   what he's going to opine about anyway.  So your lack of access

4   to that information -- it might be something you're entitled

5   to in normal discovery, like a subpoena, a subpoena duces

6   tecum to the trial or just some proceeding in advance of trial

7   in order to help you prepare, but it's not a reason to limit

8   the prosecution's expert.  I'm not prepared to grant that

9   relief.

10       I keep asking you about this and you keep going

11   back to fraud and procurement, but that's not the opinions

12   that this expert is going to provide.

13       MR. HARRINGTON:  I wouldn't necessarily say it's

14   all about procurement.  What I was going to say, Judge, is

15   that, for example, one of the areas that the expert would

16   testify about, as I understand it anyway, the allegation is my

17   client billed for services that weren't rendered is one area.

18       However, I believe that the discovery that I'm

19   seeking -- so if that goes to economic loss, billing for

20   services that weren't rendered and he's going to testify about

21   that, the discovery that I'm seeking, whether it's relative to

22   e-mails, it would be about communications between IT people

23   about the provision of those specific services.  So it does go

24   directly to the issue of the provision of services and the

25   economic loss.

1          THE COURT:  Well, no, that's two different things.

2    Provision of services and -- look, here's the thing, though.

3    You're not seeking discovery, Mr. Harrington.  You're seeking

4    to exclude the testimony of an expert.  If you were seeking

5    discovery, this would be a different conversation and I assume

6    it would be happening much sooner than a week and a half

7    before trial.

8          You didn't file any discovery motion.  You filed a

9    motion to limit their expert's testimony, right?  And as a way

10   of trying to make testimony more fair, I thought, well, I'll

11   try to provide you some access to more fodder for

12   cross-examination and ability to prepare your expert to rebut,

13   but you didn't file a discovery motion.

14         What I need to know -- look, if you haven't done

15   the work to obtain the discovery you need to defend this

16   gentleman at trial, we need to figure out if we can get it to

17   you within trial here at a reasonable expense and -- I mean,

18   it's been represented to me this can't be done before the

19   current trial date.  So if you need to have a delay, that's

20   what you need to ask for, but asking me to limit the

21   prosecution's expert based on discovery misconduct, I don't

22   think I can find that.  I don't think I can find discovery

23   misconduct here on the part of the prosecution.

24         Do you think I can?

25         MR. HARRINGTON:  I wouldn't characterize the

1    government's conduct as misconduct, Judge.

2              THE COURT:  Okay.

3              MR. HARRINGTON:  But what I would say is this.  I

4    think their expert had access to information which is relevant

5    to his report and his opinion that he's going to render before

6    you that I haven't had access to.

7              So I'm not saying that the government has something

8    in its file that it hasn't given me.  So I don't want you to

9    think that I'm saying they've withheld something.

10             THE COURT:  No.

11             MR. HARRINGTON:  I think the United Way has this

12   database that government's expert had access to and used in

13   coming to his expert opinion, and I don't believe that we've

14   had equal access to that.

15             THE COURT:  Well, wait a minute.  I think we agree

16   though that what he used, what he relied on, what he actually

17   saw, and a subset of that is what he relied on, that has been

18   provided to you now, right, or is about to be.

19             Right, Mr. Hunter?

20             MR. HUNTER:  That's correct, your Honor.  We just

21   produced it.

22             I will raise one thing just for full candor.  My

23   understanding is there are 19 documents that Mr. Commisso is

24   providing a privilege log that are privileged, and I don't

25   know if that impacts anything but I just wanted to disclose

1    that.  Other than that, we've produced everything.

2           THE COURT:  Okay.  Whether it impacted the

3    privilege log, it depends what Mr. Harrington thinks about it.

4    I doubt that it's going to have any real problem because I

5    doubt we can break the privilege here.

6           Well, wait a minute.  Was this privileged material

7    accessed by your expert?

8           MR. HUNTER:  I don't know if Mr. Naviloff actually

9    accessed it.  My understanding -- and again, Mr. Commisso is

10   on the line if he wants to speak to it.  He just did this

11   review quickly over the last couple days.  He identified a

12   body of documents that people from RSM accessed, and of those

13   19 were privileged or privilege has been identified.

14          THE COURT:  All right.  Let's not have a privilege

15   firefight right now.  If Mr. Harrington identifies things that

16   he thinks that they're either not privileged or that you've

17   waived the privilege, we can have that discussion later.

18   Let's not complicate this now.

19          But presumably if anybody is not, you know, United

20   Way or their counsel or a contractor before going to work for

21   the U.S. government, all right, saw these documents, there

22   might have been a waiver there.

23          Now, getting back to this.  What's been produced

24   now is everything that Naviloff, the expert, saw and relied

25   on.  What he relied on is a subset of what he saw.  He didn't

1   rely on everything he saw.

2          What hasn't been produced is everything that he had

3   access to because he obviously declined to see certain things,

4   probably by using search terms, and the search terms wound up

5   excluding certain files, certain data, right, certain images,

6   I assume, and that's a choice.

7          Now, you can cross-examine him on that choice, Mr.

8   Harrington.  You understand that, right?

9          MR. HARRINGTON:  I do, Judge.

10          THE COURT:  All right.  And providing you with

11   access to everything -- I've been informed now that they're

12   providing you with access to everything that he had access to,

13   but declined to see or rely on would be very expensive and

14   very time-consuming.  So it obviously can't happen.  If I

15   could have ordered this months ago, I would have, but I can't

16   now.  It won't happen before the trial.

17          Unless you have some reason to dispute their

18   representation about time and money.

19          MR. HARRINGTON:  I don't have -- I just learned

20   about it as you did, Judge, so I don't have any other

21   information other than the kind of generalizations that the

22   government has made.

23          The only other thing I would give you just as far

24   as information on this is -- the discussions about the access

25   to the information that Mr. Naviloff had, I started my

1    requests with the government, it's in the pleadings and you

2    can see that, back in July I've been requesting information,

3    and the government had not indicated any real resistance to

4    that until we got to I think October 18th, I think it was,

5    when they provided me with Naviloff's report.  And it was on

6    that date that I realized that there was this database that we

7    had not had access to, and that was, as I said, on or about

8    October 18th.  And it was not long after that that the

9    government had taken the position that they had provided

10   everything.

11          So that was the time frame, Judge.  As far as,

12   like, filing a motion or something along those lines, it

13   seemed that the most appropriate path would have been at that

14   point to file the motion I did.  But I understand what you're

15   saying as far as, you know, filing a motion to compel back in

16   July.

17          THE COURT:  Yeah.  Exactly.  That was the most

18   appropriate method, but let me just make sure I understand

19   something.

20          Are you telling me that you made a document request

21   for everything Naviloff had access to and that it was

22   represented to you that you would get that or are you not

23   saying that?

24          MR. HARRINGTON:  It's a little bit of both I would

25   say, Judge.  I made the representation or the request, and the

1   government basically indicated they were looking into it.

2           THE COURT:  All right.

3           MR. HARRINGTON:  They didn't deny it.  They didn't

4   say, you know, we don't have it.  It was kind of an ongoing

5   process.  And the government, you know, through the last

6   couple of months, and especially in the last week or two, has

7   continued to provide discovery on a rolling basis.

8           THE COURT:  Right.  You're saying they didn't

9   decline or deny, but they also didn't represent to you that

10  you would see everything that Naviloff had access to?

11          MR. HARRINGTON:  I would say that's a fair

12  characterization, Judge.

13          THE COURT:  And you're not suggesting anybody here

14  on the prosecution side operated in bad faith?

15          MR. HARRINGTON:  No, I don't believe that any of

16  the prosecutors misrepresented anything to me, Judge.  I

17  assumed that they were in the process of seeing whether this

18  information existed.

19          The only thing that I could say that I was not made

20  aware of, if you will, would be when I did get Naviloff's

21  report, there was this footnote -- which you actually have the

22  report, Judge.  It was submitted as an exhibit by the

23  government.

24          THE COURT:  Yes.

25          MR. HARRINGTON:  And there's a footnote, and in

1    that footnote is where they reference Naviloff's use -- it's

2    Mr. Naviloff's reference, obviously -- his use of this

3    e-discovery platform to run ad hoc searches.  That's when I

4    became aware of that information.

5            Had I been aware of that information, you know,

6    back in July, I would have had a more specific, you know,

7    conversation with the government about it, but I wasn't made

8    aware of that until about I think it was October 18th or 19th.

9            THE COURT:  All right.  I'm going to take this in

10   steps then and try to resolve this.

11           Well, I've been talking to you a long time.

12           Mr. Hunter, is there anything else you want me to

13   know before I try to resolve this and make a few proposals

14   here?

15           MR. HUNTER:  Yes, your Honor.

16           I'll just note, just regarding the defendant's

17   summary of the discovery requests, the defendant did make

18   discovery requests and one of them was for all the images made

19   of the computers of everything that Mr. Naviloff had access

20   to.  We never promised everything and have always taken the

21   position that every computer or image from a computer would be

22   unreasonable and that we would confer with United Way and with

23   Mr. Naviloff and made rolling productions where the defendant

24   identified things or there was anything that we thought might

25   be missing.

1    My recollection is a little bit different.  I

2  thought in our discussions -- of course I don't think any of

3  this is written down, but in our discussions about forensic

4  images of computers that I mentioned that there was an

5  e-discovery database that Mr. Naviloff had access to that the

6  United Way used to provide documents to the government, but

7  that's the only difference and that would have been as a part

8  of negotiations about a whole bunch of different topics.

9    THE COURT:  All right.  I'm going to try to cut

10 through it here and get to the real information.

11    Mr. Commisso, how do I pronounce your name

12 correctly?

13    (No response)

14    Sorry about that.  I was on mute.  I was trying to

15 speak there for a second.

16    I'm going to try to cut through this and solve this

17 the best I can.

18    Mr. -- is it Commisso?

19    MR. COMMISSO:  It's Commisso, your Honor.

20    THE COURT:  Commisso.  Thank you.  I appreciate you

21 being involved in this conversation today.

22    Let me ask this.  Well, first of all, Mr.

23 Harrington, what I have on the record here is a motion in

24 limine to limit the expert conversation.  I don't have a

25 discovery motion.

1          Are you asking at this point for any kind of motion

2     to continue the trial to allow you to get access to this

3     information?

4          MR. HARRINGTON:  I may do that, Judge.  I would

5     need to consult with my clients first about a continuance, but

6     that may be an option that I pursue.

7          THE COURT:  All right.  Then let me see what I can

8     figure out here with Mr. Commisso.

9          I haven't asked defense counsel this yet, Mr.

10    Commisso, so I have no idea if it will work, but I'm looking

11    at these two lists here, search terms and e-mail search.  Each

12    item has 27 items on it, and your point is that to conduct

13    this e-discovery, for lack of a better word, in a criminal

14    context would take -- would cost possibly up to $94,000 and

15    take -- how much time do you think it would take?

16         MR. COMMISSO:  It would take at least several

17    months and perhaps the same as the six months that we spent in

18    2018, your Honor.

19         THE COURT:  All right.  Understood.

20         If I reduce these lists by two-thirds, so nine

21    items on each list, could you do that between now and the end

22    of next week?

23         MR. COMMISSO:  Your Honor, the short answer is no,

24    and the reason is, first, the list of search terms isn't 27

25    terms.  If you look at it, each number contains multiple

1      terms.  And if you add them all up, it's 102.

2                    THE COURT:  Oh.  I see.  Okay.

3                    MR. COMMISSO:  And then the e-mail list includes

4      numerous e-mail users whose data is not currently in the

5      database as it exists.  So they're not just asking that we run

6      new search terms.  They're actually asking that we increase

7      the size of the database that would be used for those

8      searches.

9                    And there's an additional issue, which is just to

10     get started -- even if you were to say, your Honor, that you

11     wanted me to run five search terms, or pick any number, before

12     I could do that we have to get the database fully online,

13     restored, and ready to be searched, and that next step in the

14     process would cost about $5,000.

15                   And so I guess that's a long way of answering your

16     question, which is, no, there's no way to run even a short --

17     a small search by the end of next week, and just to get that

18     process started we're going to have to spend $5,000 to begin

19     to prepare the database for that search.

20                   THE COURT:  Right.  By the way, my -- for what it's

21     worth, my approach would not be that your client pay for that.

22     It would be that the defendant pay for that.

23                   MR. HARRINGTON:  Judge, just to interject briefly.

24     This is Tim Harrington.

25                   I heard Mr. Commisso talk about increasing the

1    database.  I certainly am not looking to increase the

2    database.  Whatever database existed for Mr. Naviloff, that's

3    all I'm looking for.

4              THE COURT:  Yeah, but that's been taken offline as

5    far as I can tell.

6              MR. HARRINGTON:  And if that's the case and I just

7    simply misunderstood Mr. Commisso, I apologize.  I just wanted

8    to make sure the Court and Mr. Commisso and the government

9    knew I'm not looking for them to add to the database.

10   Obviously there may be a technical reason that, you know,

11   that's not available as it was to Mr. Naviloff.

12             THE COURT:  All right.

13             MR. COMMISSO:  I guess I'm just -- I'm looking at

14   page 2 where it says e-mail search and it's a list of e-mail

15   users, and my understanding of the instructions on page 1 and

16   what you wanted us to do was basically to collect e-mail from

17   these various users, and that data may not be currently in the

18   database.  It's a technical issue.  I mean, the database is

19   what it is, but I don't know if these instructions would

20   actually require us to go and create a bigger database than

21   Mr. Naviloff had access to.

22             THE COURT:  All right.

23             MR. HARRINGTON:  And to answer that, obviously it

24   may have been good to have an IT expert speak to an IT expert,

25   but my understanding is that the search terms simply would

1    have been searched through those particular e-mail boxes.  So

2    that's my understanding.

3              THE COURT:  Well, can you add anything to that, Mr.

4    Commisso?  Mr. Commiso, can you illuminate that at all?

5              MR. COMMISSO:  Well, I guess -- I think the last

6    thing that Mr. Harrington said was to run the search terms

7    through those e-mail boxes, and that's just not the way that

8    e-discovery works.  The e-mail environment is Google Gmail,

9    and it doesn't really provide for e-discovery searching.

10             And so in order to run search terms against an

11   e-mail box, what you have to do is you have to have the

12   vendor, which is Kroll here, extract that data out of the

13   Gmail Google environment and then import it into the Kroll

14   e-discovery tool before you can run the search term.

15             There just isn't a tool within the Gmail

16   environment that allows us to just run search terms across

17   either one individual's e-mail account in any way that would

18   be efficient, which goes back to your first question, your

19   Honor, which is, you know, can we accomplish something by the

20   end of next week.

21             THE COURT:  Yeah, I understand.

22             MR. COMMISSO:  I can tell you in my experience in

23   doing this for 19 years, well, e-discovery for less than that

24   because there wasn't e-discovery 19 years ago, but nothing

25   happens quickly in the world of e-discovery and just basic

1      tasks take many days and usually weeks at the very least.

2                THE COURT:  All right.  Okay.  Look, here's the

3      ruling then.

4                Mr. Commisso, I don't want to waste your time.  If

5      you want to hang up, you're free to hang up because you're off

6      the hook here, okay?

7                The only way I can rule is this, as far as I can

8      tell:

9                The motion -- I'm talking about document 47, the

10     document to exclude expert testimony.  This isn't a discovery

11     motion.  It's a motion to exclude expert testimony.

12               I'm not prepared to prohibit the prosecution's

13     expert from testifying based on this record.

14               Much of what's been requested by the defense now to

15     prepare to cross him and prepare his own expert has been

16     provided.  A list of names was provided.

17               And the second item on the list, which was the

18     defense access to the 2 terabyte hard drive with images of

19     certain United Way computers, that's been provided.

20               Plus, in addition, Mr. Hunter has explained that

21     everything that Mr. Naviloff has seen and relied on has now

22     been provided.

23               I don't think that puts the defendant in a position

24     of prejudice.  However -- so I'm going to deny the motion.

25     However, this is without prejudice to one thing.

1              Mr. Harrington, if you can make a motion at trial

2    or before trial -- it would normally be jury instructions, but

3    it won't be because there's no jury in this bench trial.  But

4    if there are inferences that you want me to draw, all right,

5    inferences that limit the opinions or go to the credibility of

6    the expert that you want me to consider based on at least what

7    you perceive and what you want to persuade me was a denial of

8    access to some of the material that Naviloff saw, you can

9    propose that.

10             If I think it's supportable that I should draw

11   certain negative inferences, the same way we would instruct a

12   jury, based on some type of inequity between the information

13   access to the two experts, I will consider that.

14             I would also consider disregarding certain opinion

15   if you can make a case for it.  I'll consider that as well.

16   And of course I'll give the prosecution an opportunity to

17   respond to that.

18             But my point is, my ruling denying your motion,

19   which again is a motion to limit expert testimony, or exclude

20   it, it's not a discovery motion, that is without prejudice to

21   your opportunity to request the Court to draw certain negative

22   inferences about the proof offered and the expert opinions

23   offered.

24             And if you want to do that, you should do it in

25   advance of trial so the prosecution has an opportunity to

1    respond to it.  It doesn't necessarily have to be responded to

2    before the start of trial, but at some point that will allow

3    them to respond and for the Court to consider it.

4              Do you understand the ruling?

5              MR. HARRINGTON:  I do, Judge.

6              THE COURT:  Does the prosecution understand the

7    ruling?

8              MR. HUNTER:  Yes, your Honor.

9              THE COURT:  All right.

10             Hold on one moment for me, please.

11             (OFF THE RECORD)

12             THE COURT:  Yeah, my law clerk just reminded me

13   that I maybe inadvisably brought up the idea of continuing the

14   trial.  That's not what I am encouraging here, by the way.

15   That's up to Mr. Harrington.

16             Let me say this, Mr. Harrington.  Whatever relief

17   you would want here, be it inferences about the expert

18   testimony or a trial continuance, which I hope you don't

19   request because we planned for it, but I also will consider it

20   if you ask, I think it needs to be focused on the expert

21   opinion if that's what you're focused on.  If you're focused

22   on Naviloff's opinion, it's got to be you need access to

23   information that could inform that opinion.

24             General discovery regarding procurement or any

25   other type of fraud of which the defendant is accused, that's

1    a good old discovery request and that needs to be framed that

2    way with a showing of need and relevance.

3              So please consider that if you request anymore

4    relief so I can consider it in its proper context.  Because as

5    far as I'm concerned, if it goes to the expert, it doesn't go

6    to those issues.  It doesn't go to fraud.  It doesn't go to

7    procurement or any other form of misconduct by the defendant.

8    It goes to economic loss which is the point of Naviloff's

9    testimony.  Understood?

10              MR. HARRINGTON:  I think so, Judge.

11              THE COURT:  Okay.  Is there anything --

12              MR. DAVIS:  Judge, can I add one point, please?

13              THE COURT:  Sure.

14              MR. DAVIS:  Judge, I'm going to file a notice that

15   corrects and clarifies the government's position on the

16   Court's questions about what the effect would be of a proof at

17   trial that failed to prove the Robert Allen scheme or that

18   proved a separate scheme.  I don't think I advised you

19   correctly.

20              THE COURT:  All right.

21              MR. DAVIS:  And the law is clear I think under

22   United States versus Miller, which is a Supreme Court case

23   from 1985.  It is 471 U.S. 130.  The law is clear that when

24   proof at trial narrows the scope of an alleged scheme, there's

25   not a constructive amendment of a charge and the question is

1    only whether there's been a prejudicial variance.

2         And there are many, many cases that state that

3    where the government has a conspiracy or a fraud scheme that

4    alleges more than it ends up proving, a conviction can still

5    be upheld and a conviction is still proper notwithstanding the

6    variance.

7         So I'm not going to file a law review article,

8    believe me, and I notified Mr. Harrington of this a few days

9    ago on the phone that I did want to file this because I want

10   you to be properly advised on the law from our perspective.

11        I also think that Mr. Harrington -- because he

12   withdrew the motion about Robert Allen Group and trying to

13   exclude that evidence, if he withdrew that motion based on my

14   representations, we, of course, would not object if he renews

15   the motion and the Court rules.

16        So I will file that notice no later than this

17   weekend.  I'm actually working on it now and it won't be long,

18   but I just want to notify the Court that's coming.

19        THE COURT:  So if I understand you correctly, what

20   you're going to -- your understanding of the law would be in

21   the context of this case if those substantive counts wind up

22   proving a scheme to defraud that only involves United Way and

23   doesn't wind up proving also a scheme that involves United Way

24   and Robert Allen Group, your point is you could still have a

25   conviction?

1            MR. DAVIS:  That's correct.

2            THE COURT:  That's what I thought.  All right.

3            Hold on a minute.

4            (OFF THE RECORD)

5            Understood.  Okay.  That's where I thought you were

6  going.  I see.

7            Look, obviously if Mr. Harrington disagrees with

8  you, he'll either renew his motion or have some other type of

9  response.

10           And of course I'll give you what time you need, Mr.

11 Harrington, to respond.

12           MR. HARRINGTON:  Thank you, Judge.

13           MR. DAVIS:  Thank you, Judge.

14           THE COURT:  All right then.  Okay.

15           Counsel, I look forward to seeing you a week from

16 Monday.

17           MR. HUNTER:  Thank you, your Honor.

18           MR. DAVIS:  Thank you, Judge.

19           MR. HARRINGTON:  Have a nice day.

20           (Conclusion of hearing at 3:30 p.m.)

21

22

23

24

25

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 12-21-20   /s/   Susan M. Bateman _____
                       SUSAN M. BATEMAN, RPR, CRR