No copy of this transcript may be made prior to March 18, 2021

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

v.                                    18-cr-00192-JL-1
                                      December 7, 2020
IMRAN ALRAI                           9:17 a.m.

* * * * * * * * * * * * * * * *

EXCERPT TESTIMONY OF JOHN COMMISSO
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Government: Cam T. Le, AUSA
                    John S. Davis, AUSA
                    Matthew Hunter, AUSA


For the Defense:    Donna J. Brown, Esquire
                    Michael Gregory Eaton, Esquire


Court Reporter:     Molly K. Belshaw, LCR, RPR
                    Duffy & McKenna Court Reporters
                    P.O. Box 1658
                    Dover, New Hampshire 03820
                    (800) 600-1000

Also Present:       Jason Sgro
                    Robin Ephraimson
                    Imran Alrai
                    Nayha Arora, Esquire

```
1                    INDEX OF EXAMINATION

2

3   WITNESS:  JOHN COMMISSO                          Page

4   DIRECT EXAMINATION

5     By Ms. Brown                                    3

6   CROSS-EXAMINATION

7     By Mr. Davis                                    33

8   REDIRECT EXAMINATION

9     By Ms. Brown                                    65

10  RECROSS-EXAMINATION

11    By Mr. Hunter                                   100

12  REDIRECT EXAMINATION

13    By Ms. Brown                                    113

14

15              INDEX TO PRE-MARKED EXHIBITS

16

17  DEFENDANT'S   DESCRIPTION                         PAGE

18  EXHIBIT

19  A             November 21, 2019 Letter to

20                AUSA Davis                          13

21  Gg            Emails re: updated presentation     61

22

23

24

25
```

1              P R O C E E D I N G S

2          THE CLERK:  The Court has before it for

3      consideration this morning day three of an

4      evidentiary motion hearing in criminal case

5      18-cr-192-JL, United States of America versus

6      Imran Alrai.

7          Morning, Judge.

8          THE COURT:  Morning, everyone.  I

9      apologize.  I'm struggling to kind of master

10     all of the tech that goes on around here to

11     keep us going when the staff is remote or where

12     we're remote.  And between the stuff we use to

13     communicate with each other and just the

14     regular email, I find myself groping blindly.

15     So, I'm sorry to make you wait so long.

16     Anyway, let's get back underway.

17         I know we're still with Mr. Commisso, so

18     let's continue.

19         MS. BROWN:  Thank you, Your Honor.

20

21              DIRECT EXAMINATION

22     BY MS. BROWN:

23 Q.  Good morning, Mr. Commisso.

24 A.  Good morning.

25 Q.  We finished questioning -- I think it was

```
 1           Thursday afternoon; correct?
 2   A.      Yes.
 3   Q.      Between now and then, have you talked to anyone
 4           about your testimony in this matter on
 5           Thursday?
 6   A.      So, yes, conversations with some family members
 7           briefly just to let them know that I had
 8           testified for the first time in a case.  And I
 9           spoke with my client just to let him know that
10           we had the hearing and that it was continuing.
11           I spoke with John Meyer because we needed to
12           figure out the schedule and his availability.
13           I did not speak about the substance of my
14           testimony with John Meyer, but I needed to deal
15           with scheduling issues.
16                And I spoke with Mr. Davis for the same
17           reason, which was to talk about the scheduling
18           of John Meyer's testimony.  But we did not
19           discuss the substance of my testimony.
20   Q.      That's your complete -- nothing else?
21   A.      Right.
22   Q.      And along the same vein, after you testified on
23           Thursday, did you go back and review any
24           documents related to this case?
25   A.      Yes, I looked at several things since last
```

```
 1        Thursday.
 2   Q.   Is that because some of the questions made you
 3        think you had to go back and review them to
 4        refresh your memory?
 5   A.   Well, I guess partly, yes; and partly (audio
 6        interference) -- so I wanted to be fresh again
 7        this morning as I felt like I was fresh last
 8        Thursday.
 9             THE COURT REPORTER:  This is the court
10        reporter.  Your answer was somewhat garbled.
11             Will you please try to reconstruct your
12        answer?
13             THE WITNESS:  Is it a problem with my
14        audio connection?
15             THE COURT REPORTER:  It is for me.
16             THE COURT:  A little bit.
17             You said "partly yes and partly no" to the
18        question, and then you were explaining.
19             THE WITNESS:  Right.
20             So this was reviewing documents.  I had
21        reviewed the documents before Thursday's
22        hearing, and I felt like I was fresh on
23        Thursday for testimony.  And so since then,
24        I've reviewed several documents so that I would
25        feel fresh and have the information fresh in my
```

1       mind for this morning's testimony.

2   Q.  (By Ms. Brown)  I want to take you now back to

3       June of 2018.  Specifically, the day that

4       Mr. Alrai physically left the employment of the

5       United Way.

6           I remember at trial there was a term that

7       was used, "offboarding"; is that a term you

8       use, or somebody else might have used that at

9       trial?

10  A.  Well, I didn't testify at trial --

11  Q.  Obviously, but I just --

12  A.  I'm familiar with it in the employment law

13      context.

14  Q.  But you know what day I'm talking about?

15  A.  Well, June 12 was the day that I interviewed

16      him and he was placed on leave.

17  Q.  And that, as far as you know, was the last time

18      he was ever physically at the United Way

19      offices; correct?

20  A.  Yes, that's correct, as far as I know.

21  Q.  And the June 12 date that you just spoke about

22      -- that was also the date that both you and

23      Mr. Mulvaney, the Mr. Mulvaney we spoke about

24      on Thursday -- that was the day that both of

25      you interviewed Mr. Alrai; correct?

1    A.    That is correct.

2    Q.    And when you set that meeting up, you had that

3          date in mind.  It wasn't sort of a spontaneous

4          thing.

5                You had coordinated that was the day that

6          you were going to show up at United Way and

7          interview him with Mr. Mulvaney; correct?

8    A.    We had planned that that was going to be the

9          day of the interview, yes.

10   Q.    And just to go back a little bit.

11               We spoke on Thursday that prior to that

12         date, meaning June 12, you had already spoken

13         to the U.S. Attorney's Office at least once;

14         right?

15   A.    At least twice, I guess, yes.

16   Q.    And so one of those, as we discussed -- I'm not

17         going to go into it -- was a meeting about the

18         allegations of fraud against Mr. Alrai.

19               And there were other contacts regarding a

20         grand jury subpoena on June 4; right?

21   A.    Yes.  And I think the first meeting may have

22         been the one where Rich Vossio and I, together,

23         met with Mr. Davis and one or two agents, and

24         really began the discussion of what we

25         internally had been investigating.

1          THE COURT:  Let me just say this.

2          I think we are going to have a little bit

3     of a struggle today with the court reporter and

4     Mr. Commisso's audio.  I don't know if it's

5     your mic, or what's going on, John.

6          You're probably not in the office; right?

7          THE WITNESS:  No, I'm at home.  It usually

8     works well, but it's broken up.  What I can do

9     is plug in a headset and see if that works --

10    if that helps.  So just give me one minute to

11    get the headset.

12         THE COURT REPORTER:  Thank you.

13         THE COURT:  I'm definitely following, by

14    the way.  I'm hearing it all.  It's just that

15    it's -- I know the reporter's got to be typing

16    all day...

17         THE WITNESS:  I have two children who are

18    doing their school from home, so they're taking

19    up the bandwidth right now.  But maybe the

20    headset will help, if you'll just bear with me.

21         THE COURT:  How could you let trivialities

22    like that interfere with what we're doing here?

23         THE WITNESS:  Can you hear me through the

24    headset?

25         THE COURT:  About the same so far.  Let's

```
 1        see how it goes.
 2             Could you hear me?  Can you hear us,
 3        Mr. Commisso?
 4             THE WITNESS:  I can hear you clear.
 5             THE COURT:  It's about the same for now.
 6        Let's just see how it goes.
 7             THE COURT REPORTER:  And do me a favor.
 8             There was a name mentioned in your last
 9        answer and I didn't get the gentleman's name.
10             THE WITNESS:  Well, the gentleman I
11        referred to -- his name is Richard Vossio.
12   Q.   (By Ms. Brown)  If I recall, you were
13        describing a May meeting that involved
14        Mr. Vossio, Attorney Davis, and yourself.
15             I think -- did I capture -- some FBI
16        agents, you said, were in that May meeting?
17   A.   Yeah, at least one agent, maybe two.  And that
18        would have been in June.  There were no
19        face-to-face meetings in May --
20   Q.   Thank you for clarifying that.
21   A.   -- that I recall.
22   Q.   And if we are focusing on June 12 as the day
23        that you interviewed Mr. Alrai, that meeting or
24        meetings that you discussed happened before
25        that date?
```

1   A.   Yes.  There's an FBI 302 report that will give

2        you the date when the meeting with Mr. Davis

3        and Mr. Vossio took place.

4   Q.   And I'm not that interested in questioning you

5        about that right now.  I just want to set it in

6        a context of what happened before the

7        June 12th, so that's really where I'm going

8        with that.

9             So back to June 12.  You already said you

10       had set up this meeting for you and

11       Mr. Mulvaney to meet with Mr. Alrai.

12            Had you coordinated that meeting with

13       either the U.S. Attorney's Office or the FBI?

14  A.   I would not say that we coordinated it.  I

15       would say that we had discussions before the

16       meeting on June 12 with -- certainly, with

17       Mr. Davis.  I don't recall speaking to anyone

18       other than Mr. Davis.  We discussed a lot of

19       issues.  And to the extent that I was able to

20       share information with him, I shared

21       information with him.

22            My memory is he shared very little

23       information with me because there are rules and

24       laws that, I believe, prohibited him from

25       sharing information with me.  So I would not

1          say that we coordinated, but we communicated

2          about a lot of things before June 12.

3    Q.    Well, I guess when I was using the word

4          "coordinated," it's my understanding when

5          Mr. Alrai physically left the building of the

6          United Way, he was greeted by at least one, if

7          not more, FBI agents.  So they would have had

8          to have known he was going to be there that

9          day, speaking with you, to greet him.

10              So that's more what I meant by

11         "coordinated"; not necessarily discussions, but

12         the fact that the FBI would be there that day.

13   A.    So Mr. Alrai, in a typical workday or workweek,

14         he was only physically present in Boston on

15         Tuesdays and Thursdays.  And let me just pause.

16              If the audio is really bad, I can also

17         call in from my cell phone, and we might have a

18         much better connection if I was speaking

19         through my cell phone.

20              THE COURT REPORTER:  I would not try to

21         dissuade you from doing that if you think it

22         will be better.  This is the court reporter.

23              THE WITNESS:  So do you want to pause

24         right here and have me dial in through my cell

25         phone?

1           THE COURT:  Yeah.

2           Charli, that works; right?

3           THE CLERK:  It does.  The only caveat is

4     you should just mute your video so that there's

5     no echo.

6           THE WITNESS:  Yes.  So if we can just take

7     a three-minute pause here, and I'm going to do

8     some technical work on my end, so bear with me.

9           (Recess taken at 9:29 a.m., and the

10           proceedings resumed at 9:35 a.m.)

11  Q.  (By Ms. Brown)  My point was -- in the

12     questioning we just had was that you had

13     communicated with law enforcement, be it FBI or

14     U.S. Attorney, about this meeting on the 12th?

15  A.  Yes.  I communicated with them.  We had -- we

16     were planning a meeting on the 12th.  And I

17     provided information to law enforcement before

18     we had that meeting, yes.

19  Q.  I'm going to move on to another topic, and we

20     discussed this a little bit on Thursday.  And

21     that was the letter that you wrote that is now

22     Exhibit A -- was attached to the Government's

23     motion, which is document 50.

24           You know which letter I'm talking about?

25  A.  Yes.

| | | |
|---|---|---|
| 1 | | (Pre-marked Defendant's Exhibit A |
| 2 | | introduced.) |
| 3 | Q. | (By Ms. Brown)  And I specifically asked you |
| 4 | | about a section of that letter where you talked |
| 5 | | about trying to get additional -- produce |
| 6 | | additional documents from e-discovery regarding |
| 7 | | documents that RSM had either reviewed or |
| 8 | | assessed.  And that's on page 5 of document |
| 9 | | 50-1-2. |
| 10 | | Do you remember me asking you some |
| 11 | | questions about that? |
| 12 | A. | Yes. |
| 13 | Q. | And the one question I neglected to ask you |
| 14 | | about that was that either before or after you |
| 15 | | wrote that letter, did you communicate to RSM |
| 16 | | that you were looking for documents that they |
| 17 | | had reviewed or assessed?  Or did you do that |
| 18 | | search on your own without communicating with |
| 19 | | RSM? |
| 20 | A. | I just want to make sure I understand the |
| 21 | | question. |
| 22 | Q. | Okay.  It's a long question.  I can rephrase |
| 23 | | it, if you'd like. |
| 24 | A. | Sure.  Go ahead, and I'll try my best to answer |
| 25 | | it if I understand the question. |

1    Q.    Yeah.  So it's probably a good start -- so this

2          letter is dated November 21, 2019, document

3          50-1-2.

4                And as I said, you had stated in that

5          letter -- and I'll just read that sentence --

6          "Nevertheless, UWMB is currently working to

7          produce any documents from e-discovery database

8          which RSM reviewed and/or assessed, and which

9          were not previously produced."

10                So my question about that that I didn't

11          ask was, did you go on the search for those

12          documents?  Or did you communicate what you had

13          put in that letter to RSM to ask them to look

14          for documents that you had described?  Or did

15          you do both?

16   A.    So let me answer this way, and hopefully it'll

17          answer your question.

18                We had a request from Mr. Harrington.  I

19          think we had two requests from Tim Harrington.

20          And I think by this point, we actually may have

21          had the motion to exclude Naviloff's testimony.

22          And, I believe, the final pretrial conference

23          may have been on November 15.  Oh.  It's right

24          here on the first page of the letter.

25                "Final pretrial conference on

1        November 15."  There were lots of things that

2        happened from July to November 21 that were

3        all -- that were about, in part,

4        Tim Harrington's request for documents.  And so

5        my focus through this entire process was to

6        understand what he was requesting and

7        understand what may need to be produced, to

8        understand what could be produced in a

9        reasonable fashion without too much time,

10       delay, or burden.  And, most importantly, as

11       the representative of United Way, what did I

12       have access to or control over?

13            So my focus always was, are there United

14       Way documents that we haven't produced, that

15       Tim Harrington may be looking for, and what

16       could we do to produce them?  If we're not

17       going to produce them, why -- I guess is how I

18       was thinking.  So during those months from July

19       to November, from Tim's -- July is when

20       Naviloff was retained by the Government.

21            Mr. Harrington started making discovery

22       requests.  He made some in, I think, July,

23       August, September, and October.  He filed a

24       motion to exclude Naviloff's testimony.  Judge

25       held a final pretrial conference.  And during

```
 1         all that time, I was focused on what are they
 2         looking for from me with respect to United Way
 3         documents?
 4              And while I was focused on that, I was
 5         talking with RSM about documents that they may
 6         have, and I was talking with the Government to
 7         understand what the Government may be looking
 8         for in response to things from us.  But the
 9         Government didn't have the documents.
10              So, now, I'm not sure I answered your
11         question, but I tried to give you context so we
12         can hopefully get to the answer to your
13         question.
14    Q.   And I think you did not answer my question, so
15         I'm going to repeat it.  And just to be clear,
16         all I'm trying to find out here is -- you made
17         this representation in this letter that was
18         attached to a motion.
19              What did you do -- not the reason you did
20         it -- what I'm looking for is what you did
21         towards finding those documents that you said
22         that you were working to produce -- documents.
23         So what I don't understand from that sentence
24         is whether working to produce documents from
25         e-discovery means that all that happened from
```

1        that representation is you went and looked at

2        the e-discovery available to you.

3             Or did you pass along that effort to RSM

4        and ask them -- say, "Hey, can you send me

5        documents that you reviewed or assessed that

6        had not previously been produced?"  So that's

7        all I'm trying to find out -- what actions you

8        took towards that representation.

9   A.   So one piece of it is described in detail in

10       the letter, which was we had an e-discovery

11       database.  We had produced a whole lot of

12       documents already.

13            And what I described in the letter was an

14       effort to find out are there any documents in

15       that e-discovery database that anyone at RSM

16       had accessed in any way?  And, if so, if they

17       haven't been produced, let's produce them.

18            So if you just draw a box around the

19       e-discovery database, any document in that

20       database that any member of the RSM team

21       touched in any way -- accessed -- they didn't

22       have to study it, but they had to click on it

23       and they had to access it in some way -- all of

24       those documents were produced as a result of

25       the work that was done that is described in

1          that letter.  So that's one piece of it.

2    Q.    And I just want to clarify the term "we,"

3          because that can be confusing.

4                THE COURT:  Which letter now?  What's the

5          date on that letter?

6                MS. BROWN:  November 21, I believe.  Yes.

7                THE WITNESS:  It's marked as Exhibit A.

8                THE COURT:  Okay.  That one.  Yeah.

9    Q.    (By Ms. Brown)  So you used the term "we" in

10         referring to access to the e-discovery.

11               By "we," do you mean you, or you and RSM?

12   A.    I mean me.

13               When I'm talking about contacting Kroll,

14         the vendor, and saying "how can we find all the

15         documents that anyone at RSM may have touched?"

16         That's me.  I'm the one calling Kroll and

17         emailing Kroll.  RSM was not involved in that

18         process at all.  It was my e-discovery

19         database, for lack of a better term.  I mean,

20         it was United Way's database.  I was the

21         e-discovery expert or supervisor, for lack of a

22         better term.

23               So I'm in a relationship with Kroll.

24         They're my vendor.  So I communicate with Kroll

25         about the nuts and bolts of how do we find

1        these documents and produce them?

2              THE COURT:  We're really having trouble

3        with the audio now.

4              THE CLERK:  I have a suggestion.  It might

5        be easier if you leave the meeting and then

6        rejoin, just so that you have established a new

7        connection.  It's pretty garbled.

8              THE COURT:  You want him to basically --

9              THE CLERK:  Leave the meeting and then

10       just rejoin.

11             THE COURT:  I guess give it a try, John.

12       Try to just terminate and rejoin.

13             THE WITNESS:  I'm going to do that, and I

14       will be back in a minute.

15             (Recess taken at 9:44 a.m., and the

16             proceedings resumed at 9:47 a.m.)

17             THE COURT:  Okay.

18             THE WITNESS:  I am back.

19             THE CLERK:  Welcome back.

20             THE COURT:  You can pose your question,

21       Counsel.

22   Q.   (By Ms. Brown)  I think if I clarify what I'm

23       trying to get at, it might make the answers a

24       little shorter.

25             What I'm trying to understand from these

Excerpt Testimony
JOHN COMMISSO                                            20

1          emails that we've been reading -- it sounds
2          like RSM has their own internal access to data,
3          and that you have this e-discovery file that's
4          managed by Kroll.
5               And what I don't understand -- are they
6          the same thing?  Do you have more?  Do they
7          have less?  So that's what I'm not
8          understanding of -- so here's the issue.  You
9          said you looked in the e-discovery to see if
10         they accessed it.
11              Did they have their own copy of that that
12         they could have accessed without you knowing
13         about it?  I guess that's where I'm going.
14   A.    So a few things.  No, they did not have their
15         own copy of the e-discovery database.  They did
16         have the ability to access the e-discovery
17         database, but not at this point in time that
18         we're talking about.
19              At the time we got close to trial, that
20         e-discovery database had been taken offline and
21         nobody had access to it.  I had United Way
22         documents that were not in the e-discovery
23         database that I had access to.  And I assume
24         and believe that RSM had their own documents in
25         some sort of document management and document

```
 1              storage system, so, I guess, their own ability
 2              to do their own searches or to make whatever
 3              efforts they needed to do or felt they needed
 4              to do to respond to the Government's requests.
 5                   Does that clarify?  There are documents in
 6              different places, and different people have
 7              different levels of control over those
 8              documents.
 9    Q.   And that's what I was trying to ascertain.  So,
10         thank you.  That does give a little bit of
11         clarity.
12    A.   Is the quality of the connection any better?
13              THE COURT:  No.
14              MS. BROWN:  It's not great, but it's a
15         little better.  I think there's kind of a tinny
16         quality.
17    Q.   (By Ms. Brown)  I just want to clarify this
18         point, which is when you put in the letter
19         that's Exhibit A that you were looking to
20         produce documents that RSM reviewed or
21         assessed, part of that effort --
22              It doesn't sound like you sent an email or
23         made a phone call to RSM saying, "Hey, can you
24         make sure that I have everything you reviewed
25         or assessed?"  Sounds like you didn't do that;
```

1       right?

2   A.  Well, no, I didn't, because my focus was on

3       United Way's documents.  And I had control over

4       United Way's documents, even if RSM may have

5       had similar documents that they received from

6       United Way.

7           So, for example, the e-discovery database

8       is one example.  I had control over United

9       Way's documents in the e-discovery database.  I

10      didn't need to talk to RSM to understand what

11      should be produced from that database.

12          In addition, if RSM asked for documents

13      from somebody -- just as an example, from the

14      accounting department, from somebody like

15      Domenic Pallaria, who was the controller -- if

16      RSM wanted a copy of a document, a spreadsheet,

17      a report, a bank statement -- those documents

18      would come to me so that I could then provide

19      them to RSM; but also so that I could have a

20      document collection and management system so

21      that I would know what I had sent to RSM, and

22      then I knew that I also needed to send it to

23      the Government.

24          So I think I'm answering your question,

25      because I don't need to talk to RSM about what

```
 1        documents they have.  Because it's the United
 2        Way's documents, I was confident that I already
 3        had control of those documents.
 4   Q.   So I think that was a longer way of saying that
 5        my assumption was correct, which is you didn't,
 6        either by email or phone call, contact RSM to
 7        make sure that they had not assessed or
 8        reviewed something that had not already been
 9        produced?
10   A.   Well, I think -- let me explain.
11             So in addition to everything else I've
12        discussed, we did have phone calls.  And, in
13        fact, there are emails that show the series of
14        folders and names of folders.  And I think we
15        may have talked about it last time how they
16        shared some of that information with me.  And
17        then we had phone calls.
18             And so the purpose of that -- so in
19        addition to me feeling confident that I knew
20        what RSM had from the United Way, we went above
21        and beyond.  We went many steps further,
22        because I had calls and emails with
23        Christopher Fitzgerald and Greg Naviloff where
24        they sent me these names of folders and
25        described for me the types of documents they
```

1        had collected.

2               And we went through them and discussed

3        them.  And I was able to say for some large

4        number of those documents -- maybe all of them,

5        I don't remember.

6               I was able to say "that folder right there

7        that contains all the reports that

8        Domenic Pallaria generated from the accounting

9        department -- I've already produced that.  I

10       have that exact same folder with those exact

11       same documents.  You got these from me."

12              So we went through a process like that

13       where together, we tried to figure out "what do

14       I have for the United Way; and what do they

15       have?"  And when I say "what do they have" --

16       if they were RSM documents, that was not my

17       responsibility to produce.  My responsibility

18       only was to weigh in as to the possibility of

19       attorney-client privilege.

20  Q.   Well, because you had a reviewing status as to

21       the posttrial discovery production as it

22       related to United Way, you're familiar that one

23       of the things that was produced after trial was

24       a network scan with multiple tabs on it;

25       correct?

1    A.    Yes.

2    Q.    And you would also agree with me that while

3          maybe one or two of those tabs might have been

4          produced pretrial, that entire network scan

5          that was produced after trial was not produced

6          pretrial?

7    A.    I don't know all the details, but what you just

8          described is what I understand.  But I'm not

9          familiar with all the details of that schedule

10         compared to other schedules.

11   Q.    Well, I guess what I'm trying to understand is

12         how that happened that only part of the network

13         scan was produced pretrial, and then

14         afterwards, we find that there are -- there was

15         more to the file than had been produced

16         pretrial.

17             So were you part of that, or are you

18         saying you don't understand how that happened?

19   A.    Well, I can tell you what I was part of and

20         what I understand.

21             Mr. Harrington made a request.

22             And I don't know if he specifically said

23         "network scan," but something like that.  And

24         so we went -- we took an effort to find

25         anything that we could produce that was a

```
 1        network scan.  And from my perspective, the
 2        effort was, if we have anything like this,
 3        let's find it and let's produce it.  He
 4        specifically asked for it, and we wanted him to
 5        have it.  That's the approach that we took.
 6             And I think he may have asked for it more
 7        than once.  So my state of mind was, it seems
 8        like this exists.  Let's find it and produce
 9        it.  So what did I do?  I talked to the people
10        who might have it.  So I spoke with John Meyer.
11        I probably emailed him as well.
12             And I said, "Do we have something called a
13        network scan?" And I got a response from
14        John Meyer.
15             And I believe he sent me a document that's
16        called a "network scan" or something similar.
17        And we produced it -- one version of that --
18        before trial that I believe came from
19        John Meyer.
20             Similarly, I communicated with RSM and
21        said, "Tim Harrington is looking for something
22        called a network scan.  Do we have it?  Let's
23        find it and let's produce it."
24             THE COURT:  Audio is not happening.
25             Mr. Commisso, let me ask you a question.
```

```
 1          Are you in a position to go to your office and
 2          do this?  Or are you too far away?
 3               THE WITNESS:  I'm too far away.  I'm
 4          trying to think.  But my other options might be
 5          from what I have at home.  One option --
 6               THE COURT:  Let's go off the record here.
 7               (Recess taken at 9:58 a.m., and the
 8               proceedings resumed at 10:01 a.m.)
 9               THE COURT:  This is pretty meandering
10          stuff.  If I'm supposed to be getting a lot out
11          of this, it's not happening.
12               I understand where you're trying to go,
13          Attorney Brown -- I really do.  But this isn't
14          very straightforward stuff.
15               I don't know why -- Mr. Commisso, why
16          don't you just answer the questions "yes" or
17          "no"?  You can always explain yourself.  But
18          these answers go on forever.  Just answer her
19          questions.  I tell witnesses this all the time,
20          and you must hear it.  You're a trial lawyer --
21          criminal defense lawyer.
22               Answer "yes" or "no," and then explain
23          your answer if you need to.  But let me just
24          say, if the situation of your involvement, and
25          RSM, and United Way, and all the players is
```

 1          supposed to be getting clearer to me, it's
 2          heading in the opposite direction.  And that's
 3          not good.  So I'd appreciate just some real
 4          straightforward examination and answers to
 5          questions.
 6   Q.     (By Ms. Brown)  And I will try to focus on what
 7          I'm actually looking for, so you don't have to
 8          give as long an answer, and maybe we can get
 9          right to it.
10              So we were talking about that in the
11          post-conviction document production, there was
12          a network scan that had 40-plus tabs on it of
13          information that had not been produced
14          pretrial.  So I don't need you to describe that
15          right now.  I'm just putting that on the
16          record.
17              So a minute ago, you described the process
18          where you tried to, for lack of a better word,
19          assess what RSM looked at and didn't look at.
20          Because whatever you had -- any discovery --
21          would be what they had access to, as I'm
22          understanding this.  So we now know that there
23          was -- like, there was that one network scan
24          produced pretrial.  Now we know there were
25          multiple other network scans that were produced

1          after trial.
2              So it sounds like you were describing, as
3          I understood it before we took a break, that
4          you got those documents directly from
5          Mr. Meyer; correct?
6     A.   So before trial, I got a network scan from
7          Mr. Meyer.  Before trial, there was a second
8          network scan that I believe came from RSM.
9          Those were the only two network scans I was
10         aware of.  And now in the last month or so,
11         there was a third network scan.  And I don't
12         know the history and origin of that network
13         scan.
14    Q.   So you, personally, did not find this third
15         network scan.
16             It came from some other party?
17    A.   I did not, personally, find the third network
18         scan.
19    Q.   And you don't know whether it came from
20         Mr. Meyer or from RSM?
21    A.   When you say "came from," you mean in
22         posttrial?
23    Q.   Posttrial.
24    A.   Somebody found it recently.  I don't know for
25         certain, but I believe it was RSM that

| | |
|---|---|
| 1 | identified the third network scan that had not |
| 2 | been previously produced. |
| 3 | Q. And so can I assume from that that that third |
| 4 | network scan was not in this e-discovery that |
| 5 | we were talking about earlier? |
| 6 | A. As far as I know, it was not. |
| 7 | Q. That's where I was going with that.  Thank you. |
| 8 | A. If it had been, then it should have been |
| 9 | produced in the e-discovery process, but I |
| 10 | can't confirm that. |
| 11 | Q. But it wasn't produced; correct? |
| 12 | A. I don't know.  I don't know if it was produced. |
| 13 | Q. Just so you know where I'm going with the next |
| 14 | question, I'm going to ask about your contact |
| 15 | with witnesses in this case.  And I'm not |
| 16 | asking for detail about what was said, anything |
| 17 | like that.  It's just who you had contact with |
| 18 | in preparation for trial. |
| 19 | So a lot of the witnesses at trial were |
| 20 | employees of United Way; right? |
| 21 | A. Some of them were, yes. |
| 22 | Q. And in preparation for trial, you met with and |
| 23 | prepared witnesses who were employed by United |
| 24 | Way for their testimony at trial? |
| 25 | A. I met with them to help them prepare for their |

Excerpt Testimony
JOHN COMMISSO                                          31

```
 1              testimony, yes.
 2   Q.    Would that apply to every United Way employee
 3         who testified at trial?
 4   A.    I believe that's correct.
 5   Q.    Did you either meet with and/or talk to or
 6         email Naviloff in preparation for his trial
 7         testimony?
 8   A.    I certainly communicated with him.  But for the
 9         purposes of preparation, I don't -- I don't
10         remember meetings with him, and I don't know
11         that we really had any discussion that I would
12         characterize as preparing him for his
13         testimony.
14   Q.    And I'm not going to go into a lot of detail
15         about this.  And I asked some questions of
16         Mr. Naviloff a couple of weeks ago regarding
17         the October 4, 2018 email regarding --
18   A.    Excuse me.  I'm going to change my settings
19         here.  Hopefully, we'll have a better
20         connection here.  So just bear with me.
21              So I don't know if that will help or not,
22         but I thought of one idea that might improve
23         the connection.
24              So please start your question again.
25   Q.    Sure.
```

Excerpt Testimony
JOHN COMMISSO                                                        32

1              As I said, I was not going to go into a

2         lot of detail on this, but a couple weeks ago

3         when Mr. Naviloff was testifying, I asked him

4         about an email that you were involved in from

5         October 4, 2018, where you suggested revisions

6         to the RSM report.

7              You remember listening to that exchange of

8         testimony when Mr. Naviloff testified?

9    A.   Yes.

10   Q.   And you agree that as part of that exchange of

11        ideas on that email, you suggested revisions to

12        the report, including a suggestion that it be

13        titled -- or it say that Alrai "executed a

14        complex fraud scheme"?

15             You remember that email?

16   A.   Yes.  It may have already used those terms, but

17        I made a revision to that portion of the

18        PowerPoint presentation.

19   Q.   And, in fact, you also suggested including that

20        "this complex fraud scheme included gaining

21        trust and deceiving multiple individuals"; that

22        was part of that same suggestion?

23   A.   Yes, that's what my email said.

24             MS. BROWN:  I don't have any further

25        questions.

1              THE COURT:   Thank you.

2              Cross-examination, Mr. Davis, I assume?

3

4                    CROSS-EXAMINATION

5       BY MR. DAVIS:

6    Q.   Good morning.

7              Mr. Commisso, you were and are an outside

8         counsel for United Way on all matters relating

9         to the Imran Alrai DigitalNet case; is that

10        right?

11   A.   Yes.

12             And I would say -- you said "case," but I

13        would say all matters.  So there were lots of

14        tentacles and spinoffs.

15   Q.   Is your role limited to the criminal case?

16   A.   No.

17   Q.   And can you summarize briefly the major areas

18        that are not the criminal case that you have

19        been working on since the spring of 2018?

20   A.   There are many of them, and they are described

21        in my declaration.  But a few of them that come

22        to mind include dealing with the IRS, the

23        Massachusetts Attorney General's Office, the

24        New Hampshire Attorney General's Office, the

25        annual audited financial statements, the

1       disclosure of those financial statements to

2       federal agencies and state agencies, responding

3       to federal and state agencies that provide

4       funding for United Way's social service

5       programs, dealing with public relations and

6       media relations issues, dealing with the

7       insurance company, dealing with Mr. Alrai's

8       attorneys before -- separate and apart from the

9       criminal case, and something called Charity

10      Navigator, which is a third-party watchdog

11      group.

12          And I've identified others in my

13      declaration, but that's a pretty good start.

14  Q.  Of all of the total fees that your law firm has

15      billed United Way, did you calculate the

16      approximate percentage that relate to the

17      criminal case?

18  A.  Yes.  And I don't have it in front of me.  It

19      is in the end of my declaration.  But it's less

20      than 50 percent of my time and fees.  And

21      that's just from my firm -- less than

22      50 percent concern the federal criminal case.

23  Q.  The Court asked in this case to hear more about

24      the practical affect on the Defense of your

25      involvement in the prosecution, including in

| | | |
|---|---|---|
| 1 | | the documents disclosed in discovery. |
| 2 | | Do you recall that question being asked? |
| 3 | A. | Yes. |
| 4 | Q. | What has your role been in the criminal matter |
| 5 | | on behalf of United Way? |
| 6 | A. | Well, I've already talked about the grand jury |
| 7 | | subpoena and responding to the grand jury |
| 8 | | subpoena.  Overall, my responsibility is with |
| 9 | | respect to United Way documents.  So I want to |
| 10 | | make sure that I produce documents in response |
| 11 | | to the grand jury subpoena.  And |
| 12 | | Mr. Harrington, before trial, had a number of |
| 13 | | requests, and I did my best to identify United |
| 14 | | Way documents that could be produced to the |
| 15 | | Government in response to Mr. Harrington's |
| 16 | | requests. |
| 17 | | And with respect to RSM documents, my |
| 18 | | primary role was to understand privilege issues |
| 19 | | and to make sure I protected my client's |
| 20 | | interest in not disclosing privileged |
| 21 | | information.  And there were probably some |
| 22 | | other things that I did.  But the number one |
| 23 | | thing was taking responsibility for United |
| 24 | | Way's documents and protecting the privilege. |
| 25 | Q. | In producing United Way's documents, did you |

```
 1            pick and choose among the documents you decided
 2            to produce?
 3     A.     Yes, in the sense that we had to run search
 4            terms to try to find documents.  But when we
 5            found relevant documents, that was the --
 6                 The picking and choosing was "is this
 7            relevant?"  Not "is this good or bad?"
 8                 "Is this relevant to the issues as I
 9            understand them or as they've been explained to
10            me?"
11     Q.     And can you explain briefly your criteria in
12            deciding relevance of a United Way document?
13     A.     So let's say it was broad in the sense that did
14            it concern Mr. Alrai, and DigitalNet, and their
15            dealings together?  That's the broad way that I
16            would describe it -- and the services that
17            Alrai or DigitalNet provided to United Way, and
18            who paid for that, and who was involved in that
19            process from day one through the day payments
20            were made.
21                 So just to give you an example, every time
22            somebody had trouble with the printer, just
23            getting a document to print on the printer, I
24            do not think that was a relevant document.
25            Because, frankly, we would have never finished
```

1          discovery if we treated each problem with the

2          printer as a relevant document.

3               But, broadly speaking, if it related to

4          Alrai's services and DigitalNet's services,

5          then it was relevant.

6     Q.   And did you produce every single relevant

7          document you identified that was not

8          privileged?

9     A.   Yes.

10    Q.   And in the posttrial discovery proceedings in

11         this case, have you become aware of any United

12         Way document that was exculpatory and that was

13         not produced before trial?

14    A.   No.

15    Q.   And have you become aware of any United Way

16         document that, under your relevancy criteria,

17         should have been produced before trial?

18              THE COURT:  Look, I really don't -- his

19         answers and his opinions about these issues?

20         I've seen documents that are exculpatory that

21         were not produced before trial.  We've been

22         talking about them in this hearing.

23              Now, you might disagree.  And I understand

24         that, because reasonable minds can disagree.

25         But Mr. Commisso's opinion about what's

```
 1          exculpatory or what's relevant -- I'm not sure
 2          what I'm supposed to do with that.
 3               MR. DAVIS:  Your Honor, I beg to differ,
 4          only because I'm not asking about internal RSM
 5          communications.  I'm asking specifically about
 6          United Way documents.
 7               THE COURT:  Oh.  Okay.
 8               MR. DAVIS:  This man has been attacked 500
 9          ways about United Way documents.  So I'm just
10          asking if he's seen anything that should have
11          been produced from the United Way documents he
12          produced.
13               THE COURT:  Okay.  That's a distinction
14          that does matter.
15               Go ahead.
16               THE WITNESS:  So my response to that is
17          look at every one of the Defendant's filings
18          after trial, and look at every one of the
19          attachments to those filings, and there is not
20          a single United Way document.  I'm not talking
21          about RSM or anyone else's documents.  There's
22          not a single United Way document that supports
23          the attacks against me.  And I, frankly, find
24          it outrageous.
25     Q.   (By Mr. Davis)  I want to ask you about your
```

```
1              role in the prosecution.
2                   Were you the puppet master of the
3              prosecution team in this case?
4    A.   No, I was not.
5    Q.   Did you play any role in the drafting of the
6              indictment in this case?
7    A.   No, I did not.
8    Q.   Did you play any role in the grand jury
9              exhibits that were used in this case?
10   A.   No, I did not.
11   Q.   Did you receive any grand jury material in
12              violation of Rule 6(d)?
13   A.   No.
14   Q.   Did you play any role in the gathering of
15              documents from the myriad other sources besides
16              United Way that were collected in this
17              investigation?
18   A.   No.
19   Q.   Did you have any role in crafting the
20              Government's exhibit list for trial?
21   A.   No.
22   Q.   Did you have any role in choosing the witnesses
23              on the 40-person exhibit list the Government
24              used?
25   A.   No.
```

| 1 | Q. | Did you orchestrate the prosecution? |
|---|----|-----|

1    Q.    Did you orchestrate the prosecution?

2    A.    No.

3    Q.    Now let's talk about preservation.

4              First of all, do you recall in the motion

5         in this case -- the motion to dismiss -- on

6         page two, the Defense assertion that on June 19

7         of 2018, Mr. Alrai sent you a message

8         requesting that you instruct United Way to

9         "preserve all IT data during the

10        investigation"; do you recall that assertion?

11   A.    Yes, I do.

12   Q.    And are you familiar with the letter from

13        Mr. Alrai's counsel on June 19 of 2018?

14   A.    Yes, I am.

15   Q.    And did that letter request that you instruct

16        United Way to "preserve all IT data during the

17        investigation"?

18   A.    No, it did not.

19   Q.    In fact, did it have specific requests about

20        what United Way was supposed to preserve?

21   A.    Yes.  There were seven or eight bullet points

22        of specifically identified data.

23   Q.    And was one of those bullet points "documents

24        or correspondence related to any and all

25        requests for proposal for IT or similar

Excerpt Testimony
JOHN COMMISSO                                                              41

```
 1            technological support services"?
 2   A.    I believe so.  I haven't looked through the
 3         letter in a little while, but, yes.  It lists
 4         the documents and data about IT services.
 5   Q.    And were documents, in fact, preserved?
 6   A.    Yes.  Every item on that list was, in fact,
 7         preserved.  And 100 percent, or nearly
 8         100 percent, of those items were, in fact,
 9         produced to the Government.
10   Q.    And did that letter -- again, from Mr. Alrai's
11         counsel on June 19, just one week after he was
12         walked out -- did that include documents
13         related to committee meetings that Mr. Alrai
14         was on?
15   A.    Yes.
16   Q.    And did it include documents related to
17         committee meetings where the committee
18         discussed United Way's IT service providers and
19         structure?
20   A.    Yes, and we produced those.
21   Q.    And did it include documents or correspondence
22         related to all internal investigations, audits,
23         or reviews of the United Way's IT service
24         providers, structure, or operations, including
25         the recent information and audit by CBIZ and
```

```
 1          MHM?
 2    A.    So, yes, it requested those.  We did not
 3          necessarily produce all of that if it was
 4          privileged.  So if it was historic information
 5          before the investigation, we would have
 6          produced it.  But if it was --
 7    Q.    But did you preserve all of that information?
 8    A.    Yes.  Yes, it was all preserved.
 9    Q.    Did the letter on June 19, 2018, also request
10          that you preserve documents or correspondence
11          from, or copying, Mr. Alrai's United Way email
12          address?
13    A.    Yes, we preserved those.  And we produced a lot
14          of them, but not all of them.
15    Q.    And did you also -- were you also asked to
16          produce or preserve documents or correspondence
17          related to Mr. Alrai's termination, including
18          Mr. Alrai's employee file and performance
19          reviews?
20    A.    Yes.  And, in fact, the employee file and
21          performance reviews, we produced directly to
22          Mr. Strauss (phonetic) within, I would say, two
23          to three weeks of his termination.  So that was
24          a separate production different from the grand
25          jury production.
```

1   Q.   And so of the items on Mr. Alrai's very

2        specific preservation letter --

3             THE COURT:  Can I interrupt, Mr. Davis,

4        with a question -- a clarifying question?

5             MR. DAVIS:  Yes.

6             THE COURT:  Mr. Commisso, when both of

7        you, Mr. Davis and Mr. Commisso, referred to

8        the grand jury production just then, what

9        exactly are you referring to?

10            THE WITNESS:  You're asking me?

11            THE COURT:  Sure.

12            THE WITNESS:  I'm referring to the

13       documents that I produced to the Government.

14            THE COURT:  Right, initially.

15            THE WITNESS:  Or throughout the case.

16       But, yeah, those types of documents we produced

17       before the original indictment.

18            THE COURT:  Yeah.  That's what I'm asking.

19       Okay.

20            THE WITNESS:  Yes.

21            THE COURT:  I've never been, like,

22       1,000 percent clear on that, so that's helpful.

23       Thank you.

24            I'm sorry, Mr. Davis.

25            MR. DAVIS:  Quite all right, Judge.

Excerpt Testimony
JOHN COMMISSO                                          44

```
1   Q.   (By Mr. Davis)  Let's just talk briefly about
2        what has been preserved at United Way.  We
3        talked about network scans.
4              How many network scans have been
5        preserved?
6   A.   At least three have been preserved and produced
7        to the Government and the Defendant.
8   Q.   So the Defendant has three network scans right
9        now; is that correct?
10  A.   Yes.
11  Q.   Pictures or maps of the IT environment -- have
12       you produced those?
13  A.   Yes, to the extent that they exist.  And we
14       also -- to the extent they didn't exist, we
15       asked Mr. Alrai to either provide them or tell
16       us where we could find them.
17  Q.   And did you make that request almost
18       immediately after his termination?
19  A.   Yes, before the end of June, within two weeks
20       of his termination.
21  Q.   And that was 2018?
22  A.   Yes.
23  Q.   And did you discover whether Mr. Alrai actually
24       kept pictures or maps of the IT environment?
25  A.   Mr. Meyer, I believe, searched for that
```

```
 1          information.  And he found one piece of paper
 2          hanging in the IT room that just had a list of
 3          computer names, or server names, or IP
 4          addresses.  And that was the sum total of the
 5          documentation or map of the IT system.
 6     Q.   Did you preserve invoices and contracts
 7          relevant to this case?
 8     A.   Yes, absolutely.
 9     Q.   Did you preserve emails relevant to this case?
10     A.   Yes.
11     Q.   Did you preserve PowerPoint presentations?
12     A.   Yes.
13     Q.   Did you preserve meeting minutes about IT
14          services of all kinds?
15     A.   Yes.
16     Q.   Did you preserve virtual desktop sessions at
17          United Way?
18     A.   Yes, for certain key employees who were related
19          to the IT function.
20     Q.   And did you preserve laptops and computers at
21          United Way?
22     A.   Yes, for certain key employees related to these
23          issues.
24     Q.   Did you preserve cell phones?
25     A.   Yes.
```

Excerpt Testimony
JOHN COMMISSO                                          46

```
1    Q.   And do you know how many?
2    A.   I know there were at least two cell phones.
3         There may have been three.  I just don't know
4         the exact number.
5    Q.   Did you preserve servers?
6    A.   Yes.
7    Q.   And did you preserve websites?
8    A.   Yes.  And I don't know the technical side of
9         what that means, but, yes.
10   Q.   And did you preserve log-in information?
11   A.   I believe so.  Of that, I'm not certain.  Maybe
12        that's a question for Mr. Meyer.
13   Q.   And at any point, have you suppressed any of
14        the IT information at United Way that has been
15        preserved?
16   A.   "Suppressed" -- I'm not sure what the meaning
17        is, but I know the answer is no.  So I guess
18        I'm not sure what you mean.  Have I
19        suppressed --
20   Q.   Meaning, have you been aware of an item that
21        Mr. Alrai was looking for that you had
22        preserved, that you decided not to turn over?
23   A.   No.  It was all driven by my obligation.  So we
24        preserved a lot of evidence, and we turned over
25        a lot of evidence.  But we didn't turn over
```

```
 1              everything, because I was following the rules
 2              as they applied to the United Way of
 3              Massachusetts Bay.
 4      Q.      Now, we've talked a lot in this case about
 5              your -- or in your testimony about the
 6              assertion of privilege on behalf of the United
 7              Way.
 8                   Do you recall that?
 9      A.      Yes, I do.
10      Q.      And you have described that you have asserted
11              privilege, and continue to assert privilege,
12              regarding the data breach investigation that
13              RSM was part of after Mr. Alrai was terminated;
14              is that right?
15      A.      Yes, that's correct.
16      Q.      And have you made up, recently, that data
17              breach investigation as a new and different
18              basis to assert privilege?
19      A.      No, it's been asserted since the very beginning
20              of the engagement.
21      Q.      And, just briefly, was the data breach
22              investigation clearly asserted as a basis of
23              privilege before the trial in this case?
24      A.      Yes, it was.
25      Q.      And can you describe briefly how that was done
```

```
 1          and when that happened?
 2   A.     Well, I guess, at least two things.  One is
 3          that I made it clear to the Government that we
 4          considered it privileged, and that we had not
 5          and would not produce documents concerning
 6          that.
 7               And then when Mr. Harrington began making
 8          discovery requests in July, we produced
 9          documents.  And in at least one of those
10          documents, there's a reference to the data
11          security investigation.
12               And then there are about 15 to 20 pages of
13          a document that are redacted and stamped
14          "redacted."
15   Q.     But you have never provided any privileged
16          documents related to the data breach
17          investigation to the Government; is that
18          correct?
19   A.     That's correct.  If I had, it would have been
20          inadvertent.  Because I made it clear that I
21          did not intend to and did not want to provide
22          any of those documents.
23   Q.     And as to the privilege log you recently filed
24          in this case, there are approximately 300
25          documents as to which you assert privilege; is
```

1        that right?

2   A.   Yes, that's correct.

3   Q.   And is the privilege you're asserting related

4        to the date breach investigation?

5   A.   Well, data breach and, in addition to that,

6        certain documents concerning the e-discovery

7        procedures that were in the Kroll database.

8   Q.   But do those relate to Naviloff's loss analysis

9        at RSM?

10  A.   No.  The documents on the privilege log do not

11       concern -- are not within the scope of

12       Naviloff's loss analysis.

13  Q.   And are you using the data breach investigation

14       or the Kroll e-discovery issue as a means of

15       masking or suppressing relevant information

16       from Mr. Alrai?

17  A.   No.  No, I've been working hard to turn over

18       everything from the United Way that concerns

19       Mr. Naviloff's loss analysis.  And I'm not

20       looking to withhold or suppress anything that I

21       understand somebody's looking for and that it

22       relates to Naviloff's loss analysis.

23  Q.   You've been accused of "selective assertion of

24       privilege"; do you recall that?

25  A.   Yes, I do.

```
 1   Q.   After you waived privilege with respect to the
 2        RSM loss analysis investigation, were you
 3        selectively asserting privilege?
 4   A.   No, I wasn't.  It's clear, based on everything
 5        that's been produced, we have waived the
 6        privilege regarding the loss analysis.  And
 7        we're not using that, or any other privilege,
 8        to shield documents concerning the loss
 9        analysis.
10   Q.   At this moment, is there any document that
11        you're aware of regarding the RSM loss analysis
12        that is being withheld from Mr. Alrai on the
13        basis of an assertion of privilege?
14   A.   Not that I'm aware of.
15            THE COURT:  Well, data security privilege,
16        though; right?
17            THE WITNESS:  Right.  But that does not
18        concern the loss analysis.
19            THE COURT:  Right.  Understood.
20            When -- Mr. Davis, when you were
21        questioning a minute ago regarding selective
22        assertion of the privilege after the waiver,
23        from your perspective -- I want to be clear on
24        this -- when did the waiver occur as to the
25        loss and as to any privilege issues regarding
```

1          the loss analysis?  Mr. Davis.

2              MR. DAVIS:  Your Honor, from the

3          Government's perspective, there was arguably a

4          subject matter waiver that occurred in November

5          of 2018 once we sat down with Mr. Commisso and

6          Mr. Naviloff.  Because we clearly discussed the

7          findings that RSM had made regarding loss

8          analysis, including the general sort of

9          categories that included duplicate billing and

10         excessive billing, et cetera.

11             And so in my mind, not that I would have

12         any interest in litigating with United Way, and

13         not that United Way was being uncooperative,

14         but that was a subject matter waiver.  And I

15         would guess Mr. Commisso would agree on that.

16             THE COURT:  Was it declared understood?

17         Or is that just your -- if you had to litigate

18         it, you'd put it in November 2018, when you

19         started talking about loss analysis,

20         duplicative billing, overbilling?

21             MR. DAVIS:  If the question is to me,

22         Judge, I probably don't recall accurately.

23             I don't remember that one of us looked at

24         the other and said, "Okay.  This constitutes a

25         waiver."

```
1              THE COURT:  Sure.
2              MR. DAVIS:  Mr. Commisso probably
3        remembers better than I do.
4              THE COURT:  Go ahead.
5              MR. DAVIS:  Mr. Commisso, do you remember
6        on that point?
7              THE WITNESS:  So my memory is similar to
8        yours, which is we didn't have a discussion.  I
9        did not, on my own side, brief the issue or
10       determine what it would mean.  I do think that
11       the November 2018 meeting was the point where
12       we began to waive the privilege.  And it wasn't
13       until later that we had to figure out what that
14       meant.  And so in July of 2018, when Naviloff
15       became the Government's expert and
16       Mr. Harrington requested documents, we then had
17       to start figuring out where the lines were.
18             What was the scope of the waiver?  And it
19       still -- well, so, it evolved, I guess.  We
20       didn't sort it all out in November.  And we
21       began to really sort it out in July.
22             THE COURT:  July of...
23             THE WITNESS:  2019.
24             THE COURT:  2019.
25             Was there a point at which -- because a
```

1       waiver is not a small thing; right?

2              Was there a point at which you

3       acknowledged in your own file, Mr. Commisso, or

4       with your client --

5              Where you said, "Look, our conduct

6       constitutes a waiver.  This is going to change

7       the way we produce documents to the

8       Government"?

9              Did that ever get noted anywhere,

10      acknowledged, either internally or externally

11      in your dealings with the Government?

12             THE WITNESS:  Internally, certainly, we

13      discussed waiver issues or privilege issues

14      from the beginning and throughout as we made

15      our decisions, and certainly with respect to

16      sharing Naviloff's work in November, and

17      certainly with respect to allowing the

18      Government to hire Naviloff, because I needed

19      to make sure my client understood what that

20      meant.

21             So we evaluated the issue and we made sure

22      we knew what it meant and what the risks would

23      be.

24             THE COURT:  But I guess what I want to

25      know is -- let me just -- I think I said very

1          clearly last week that Mr. Commisso didn't do a

2          thing here, I thought, that was not completely

3          predictable for any lawyer representing a

4          client, or inappropriate, unethical, unlawful,

5          or anything of the sort.  There's been a lot of

6          talk about accusations here today.  And I guess

7          one could consider -- Mr. Commisso's outraged.

8          Mr. Davis is not happy about it, it's clear.

9               But I certainly don't view this as

10         Mr. Commisso on trial at all.  I'm just trying

11         to understand what happened; okay?  I can't

12         imagine it would have gone much different with

13         any competent counsel.

14              But is there an acknowledgment -- I mean,

15         is there a day -- a document on which you said

16         to your client, "Listen, we've waived" -- or

17         you wrote in your own file to protect yourself,

18         right, "This is a waiver"?  Or you're

19         communicating with the Government?

20              Is there a rubicon -- is there an

21         imaginary line, a date -- some acknowledgement,

22         internally or externally, about a waiver that

23         would change the way you dealt with producing

24         evidence to the Government?

25              THE WITNESS:  Yes.  So, with respect to

1      communicating with my client, there are

2      certainly documents -- and I guess I'm

3      hesitating to say too much about it because I

4      need to think about the privileged nature of

5      those communications.  But to your point, yes,

6      it is very easy for me, in my file, to

7      pinpoint, because I documented it extensively,

8      exactly how that played out.

9          With respect to communications with RSM, I

10     believe there will be communications between --

11     I'm hesitating a little bit because my memory

12     is vague -- but I expect there would be

13     communications between me and Greg Naviloff.

14     Because Greg Naviloff can't turn over documents

15     or sign a contract with the Government without

16     me acknowledging that the United Way is going

17     to waive the privilege.  Because if he does --

18     if he does it without our acknowledgement, he

19     risks having a liability to the United Way for

20     disclosing confidential information.

21         So there's a clear record with my client.

22     There should be a clear record with

23     Mr. Naviloff.  With Mr. Davis, I haven't

24     thought about what record may exist, but I know

25     that we talked about the issues.  And on

```
 1              various issues of privilege, he might have
 2              asked me things.
 3                   Or I might have told him, "Before you talk
 4              to Mr. Naviloff, I need to make sure that I'm
 5              okay with it and my client is okay with it."
 6              So there were communications and different
 7              types of documentation on these issues.
 8                   THE COURT:  Okay.
 9                   And if you want to stay with the issue,
10              Mr. Davis, vis-`-vis your client, your office's
11              dealings with Mr. Commisso or Mr. Naviloff,
12              feel free to develop it more.  It's up to you.
13         Q.   (By Mr. Davis)  So I'll say, Mr. Commisso, once
14              the Government began to deal with RSM and
15              Naviloff as the Government's expert, did you
16              assert any impediment to Mr. Naviloff's sharing
17              fully his work that had occurred, some of it
18              under United Way's contract?
19         A.   No.  No limitations, no impediment with respect
20              to Naviloff, and the loss analysis, and the
21              work that he was going to do for the
22              Government.
23         Q.   So the Government could and did communicate
24              freely with Naviloff after it hired him in July
25              of 2018; correct?
```

```
 1    A.   Right.  And, in fact, my role at that time was
 2         essentially something close to zero, unless it
 3         dealt with documents that Mr. Harrington
 4         needed, or maybe Naviloff and the Government
 5         needed that I might be able to provide --
 6         United Way documents.  But, otherwise, I was
 7         not a participant in the Government's
 8         relationship with Greg Naviloff.
 9    Q.   I just have a few more questions.  I want to
10         ask you about internal RSM emails; that is,
11         emails within RSM, among the employees of RSM,
12         including Naviloff and other personnel.
13              You've seen those in the posttrial
14         discovery; correct?
15    A.   Yes.
16    Q.   Did you ever ask for all of those emails to do
17         a comprehensive review prior to trial?
18    A.   No.
19    Q.   Why not?
20    A.   It never occurred to me.  I can't think of any
21         reason why I would want them.  It just -- it
22         never crossed my mind, and I can't think of a
23         case in 20 years where I may have asked for
24         something like that.
25              THE COURT:  That last part of the answer
```

 1  |     makes me think I misunderstood the question.
 2  |         What was the question again, Mr. Davis?
 3  |         MR. DAVIS:  The question was whether
 4  |     Mr. Commisso requested from RSM all of its
 5  |     internal email communications at any point.
 6  |         THE COURT:  Okay.  Yeah.
 7  |         MR. DAVIS:  May I proceed, Your Honor?
 8  |         THE COURT:  Give me a second.
 9  |         No, go ahead.  Thank you.
10  | Q.  (By Mr. Davis)  Were there, before the trial in
11  |     this case, significant requests for some RSM
12  |     emails from Mr. Alrai?
13  | A.  Yes, I believe there were.
14  | Q.  And were there, in fact, RSM emails that were
15  |     produced, prior to the trial, to Mr. Alrai?
16  | A.  Yes, there were.
17  | Q.  And did you play a role in reviewing those
18  |     emails?
19  | A.  Yes, if they concerned United Way employees --
20  |     for example, John Meyer.
21  | Q.  And were you directly involved in the discovery
22  |     litigation just before trial -- that is, in the
23  |     October and November 2019 time frame?
24  | A.  Yes.  Yes, I was.
25  | Q.  And was it in that context that you filed

Excerpt Testimony
JOHN COMMISSO

```
 1            Defense Exhibit A, your six-page letter that
 2            detailed exactly what you were doing in this
 3            case?
 4    A.    Yes, that's exactly right.
 5    Q.    And in connection with that litigation, did
 6            Mr. Harrington, the counsel for Mr. Alrai, ever
 7            ask for every internal RSM email in this
 8            engagement?
 9    A.    No, not that I understood, or not that I'm
10            aware of.  And that certainly was not the focus
11            of the actual issues being litigated before the
12            Court.
13    Q.    And to your knowledge, was any such request --
14            again, for every internal RSM email about this
15            engagement -- was that ever made prior to
16            trial?
17    A.    No.  The first time it came up was a year
18            later, in August and September of 2020.
19    Q.    And in your communications with Mr. Naviloff,
20            at any point, did Mr. Naviloff indicate to you
21            that there might be RSM emails that could be
22            used to impeach him at trial?
23    A.    No.  We never discussed that.
24    Q.    And in your communications with Mr. Naviloff,
25            did Mr. Naviloff ever tell you that there might
```

Excerpt Testimony
JOHN COMMISSO                                    60

```
 1         be internal RSM emails that contained
 2         exculpatory information to benefit Mr. Alrai?
 3    A.   No, he never told me that.
 4    Q.   So were you doing anything to suppress or
 5         prevent the disclosure of RSM internal emails?
 6    A.   No.
 7    Q.   And, in fact, as you said, it never occurred to
 8         you to request every RSM email in the
 9         investigation; is that right?
10    A.   That's right.
11    Q.   And just one last question.
12              In dealing with -- well, have you dealt in
13         the past with forensic accounting consultants
14         who may be expert witnesses in litigation?
15    A.   Yes, I have.
16    Q.   And in any of those engagements, has it ever
17         been part of your practice to collect and
18         review every single internal email at that
19         forensic accounting consultant firm to review?
20    A.   No, it's not been part of my practice.  And, in
21         fact, it's sort of the last thing that I would
22         ever expect happening.
23              What we do focus on, in civil and criminal
24         litigation, is the -- what I call the raw
25         material, or the original source documents that
```

```
 1          go to the expert.  And you want to know what

 2          those are so that you can then provide them in

 3          discovery.  But the underlying business records

 4          and source documents -- the idea of producing

 5          internal emails or internal work product is not

 6          something that I've ever been involved in.

 7               So, no, I would not have been thinking

 8          about it in this case.

 9    Q.    I want to ask you just briefly about the

10          "fruitful" email, which is Defense Exhibit Gg.

11               Is that something that -- I'm not even

12          sure -- Tracy, if you're on, can we call up

13          Exhibit Gg?

14               MS. UHRIN:  Yep.  Just give me a moment to

15          share my screen.

16               (Pre-marked Defendant's Exhibit Gg

17                introduced.)

18    Q.    (By Mr. Davis)  You recognize that email to

19          Mr. Commisso?

20    A.    Yes.  I've seen this recently.

21    Q.    And this is the email that includes the -- at

22          the very bottom, the bullet "the trending of

23          total United Way budget versus IT budget was

24          not fruitful"; do you see that?

25    A.    Yes.
```

```
 1   Q.   Do you recall that in a motion the Defense
 2        filed in this case, on page five, in referring
 3        to this same email, the Defense said that the
 4        "new email revealed a discussion about an
 5        earlier version of RSM's report where the RSM
 6        team decided to leave out a chart that showed
 7        that there was no significant change in IT cost
 8        during Alrai's/DigitalNet's tenure because it
 9        was not fruitful"; do you recall that being in
10        the motion?
11   A.   Yes.  Yes, I do.
12   Q.   And, of course, Mr. Naviloff being questioned
13        about that same document; do you remember that?
14   A.   Right.  And I remember the first time I read
15        that motion.
16             And immediately my response was, "No,
17        that's not true."
18   Q.   And, in fact, is it true?
19   A.   No, it's not true.
20   Q.   And why is it not true?
21   A.   Well, because if you go to Exhibit Z, which is
22        a report prepared by RSM in October of 2018 --
23        it was presented to the special committee just
24        four days after that email -- and you turn to
25        page, I want to say, 58 and 59, you will see
```

```
 1              that there are two charts and a whole lot of
 2              narrative about the IT budget and how it
 3              changed over time.
 4     Q.      Right.
 5                   And included on page 59 of that same
 6              exhibit, you recall the sentence that "total
 7              functional expenses for United Way and IT
 8              expenses each increased by 7 percent over the
 9              period FY13 through FY17"; do you recall that?
10     A.      Yes, I do.
11     Q.      Do you recall further that the same note in the
12              same exhibit at page 59 said that IT
13              expenditures did not grow at a higher rate than
14              total expenses; do you recall that?
15     A.      Yes, I do.
16     Q.      So was there anything that the RSM team was
17              concealing from the special committee about
18              these facts?
19     A.      No.  They obviously put the facts in the
20              report.  There were two pages of those facts.
21              And as I remember the presentation or
22              understood the point of it, this information
23              helped to explain how Alrai was able to keep
24              the crime going for so long without being
25              detected.
```

1    Q.   So is the comment about things not being

2         fruitful in Exhibit Gg -- is that part of some

3         deliberate effort to withhold exculpatory

4         information from Mr. Alrai?

5    A.   I don't see any evidence of that, and I'm not

6         aware of any effort -- deliberate or joint

7         undertaking, or anything like that, to withhold

8         exculpatory evidence.  And I see no evidence of

9         it.

10   Q.   So, Mr. Commisso, just to summarize, in your

11        role as United Way counsel in this engagement,

12        have you done anything to suppress evidence,

13        that you're aware of, that's favorable to

14        Mr. Alrai?

15   A.   No, I have not.

16   Q.   Have you destroyed evidence or failed to

17        preserve evidence in violation of any request

18        or duty that you were aware of?

19   A.   No, I have not.

20   Q.   Have you selectively produced documents so as

21        to choose documents that harmed Alrai and to

22        hide documents that help him?

23   A.   No, I have not.

24   Q.   And have you manipulated United Way's privilege

25        so as to deprive the Defendant of evidence that

```
 1         he's entitled to?
 2    A.   No.
 3              MR. DAVIS:  No further questions.
 4              THE WITNESS:  There are two issues that I
 5         think need clarification.
 6              THE COURT:  Well -- okay.  Proceed.
 7              MS. BROWN:  Are you allowing him to make a
 8         statement?
 9              THE COURT:  I would allow him to make a
10         statement, but if you'd prefer to examine him,
11         Attorney Brown, before he does, I'm fine with
12         that.
13              MS. BROWN:  I would prefer to do that.
14              THE COURT:  That's perfectly fine, and I
15         should have asked you first.  I'm sorry about
16         that.
17              MS. BROWN:  Thank you.
18
19                   REDIRECT EXAMINATION
20         BY MS. BROWN:
21    Q.   Mr. Commisso, one of the questions the
22         Government asked you was whether you were aware
23         of any documents -- I don't know if you used
24         the word "owned" or "possessed" -- by United
25         Way that were not produced and were
```

1          exculpatory; you remember that question?

2   A.    Yes.

3   Q.    And so I want to go back to -- you and I

4          discussed this earlier -- is the network scans

5          that were produced in this case.  And the

6          Government asked you about it.

7                And as of at least this date, there's been

8          three of them; correct?

9   A.    I'm aware of three.

10  Q.    But one of those three was produced after

11         trial -- the most recent one?

12  A.    Yes.

13  Q.    And I think I neglected when I was asking you

14         earlier about this -- just for the record, that

15         document is Uuu -- U as in "under" -- and it's

16         actually an Excel spreadsheet.

17               Would you agree with that description of

18         what I'm talking about as to the third network

19         scan?

20  A.    I know it's a spreadsheet.  I don't know what

21         the exhibit number is, but present whatever you

22         want as the exhibit number.

23  Q.    Well, I guess I'm going back to that because as

24         I understood your testimony, you're saying that

25         there was nothing that United Way possessed

1      that was exculpatory, or even potentially

2      exculpatory, that you, as United Way, did not

3      turn over prior to trial.

4           Did I understand your testimony correctly

5      on that?

6  A.  Yeah.  I was not aware of anything that we

7      didn't turn over prior to trial that we were

8      required to.  And now, after a year of

9      additional discovery, I'm not aware of

10     additional documents that have now been turned

11     over after trial that are exculpatory with

12     respect to United Way's documents.

13 Q.  And this is where I'm going with this.

14          That network scan -- we'll refer to it as

15     the "third network scan" produced after

16     trial --

17 A.  Yes.

18 Q.  -- would you consider that a United Way

19     document?

20 A.  I don't know the answer to that because I don't

21     know enough about the history of that document.

22          I can tell you that before trial, I never

23     saw or heard of that document, and that after

24     trial, it was my understanding that RSM

25     produced that document.

1    Q.   In terms of your previous testimony, where at
2         least I understood it that you and RSM had an
3         identical batch of discovery that you had
4         access to, that just wouldn't be true if they
5         produced something after trial that you didn't
6         have; right?
7    A.   Well, no, no, they have their own internal RSM
8         documents.  You know, if they go on the web and
9         they do some market research where they talk to
10        a different department within RSM, they collect
11        their own documents.  I don't have access to
12        them.
13            If they're United Way documents and I
14        provide them to RSM, then I've got my own set
15        and I've provided a set to RSM.
16   Q.   But what we're talking about is a network scan
17        of the United Way computer system -- IT
18        system -- in the summer of 2018.
19            You would agree with me, if that's an
20        accurate description of this document, that
21        that's a United Way document; right?  No matter
22        where it came from, it originally came from the
23        IT system of the United Way?
24   A.   Well, yes.  I guess it's a question of
25        possession; right?

1          So I don't know the history -- the

2     provenance of that electronic file.  I don't

3     know who has control over it, where it resides.

4     I know I didn't get it.  So I didn't have it in

5     my collection of documents.  And I didn't -- as

6     far as I recall, I did not send it to Kroll --

7     to the e-discovery database.  And I did not

8     receive it, so I did not send it to RSM.

9          So if it originated at United Way and made

10    its way to RSM, then I don't know how that

11    happened.  I was not in the chain of

12    communication in that scenario.

13 Q.   And that goes back to my previous question.

14         That when you made the representation to

15    the Court about what documents from United Way

16    were going to be produced, just checking your

17    e-discovery database wouldn't have captured

18    that; correct?

19 A.   No, which is why we did additional steps -- we

20    took additional steps.

21 Q.   And that's what I was trying to get at before.

22         Those additional steps did not include

23    either picking up the phone or sending an email

24    to Naviloff and saying, "I'm just making this

25    representation to the Court that the Government

1          and the Defendant have everything that you've

2          reviewed or assessed.  Just want to make sure

3          that's true."

4               You didn't do that?

5     A.   No, in fact, we did do things like that.

6               So when I say there are multiple things we

7          did to verify, one thing would be for me to

8          contact John Meyer and ask John Meyer, "Do you

9          have these two or three categories of

10         documents?"

11              And another thing that I did is I worked

12         with Greg Naviloff and Chris Fitzgerald.  And

13         there are those emails that show that list of,

14         like, 15 folders that they want to discuss with

15         me.

16              And so that was a check on -- that was our

17         way of being comprehensive, so that I could

18         see, "Okay.  They've got the four folders that

19         look like documents I gave them, and so I'm

20         confident that I've already produced those four

21         folders."  Well, then they've got eight other

22         folders.  I don't know what's in those folders,

23         because they control them.

24              And so we're talking through the issues

25         together to see if we missed a United Way

1          document that I should be aware of that I know
2          that I have to produce it.
3                THE COURT:  We need to give the reporter a
4          break.
5                So let's take -- you can continue after
6          this, Attorney Brown, but let's take the
7          15-minute break.  We'll reconvene at 11:15.
8          I've got to make a phone call on a case, but
9          I'm going to do it right now so it doesn't drag
10         into beyond 15 minutes.
11               (Recess taken at 10:59 a.m., and the
12               proceedings resumed at 11:16 a.m.)
13    Q.   (By Ms. Brown)  Before the break, we were
14         talking about this third network scan that was
15         produced post-conviction that you did not -- I
16         want to choose the right word -- have access
17         to, see, or at least was aware of prior to
18         trial; correct?
19    A.   I was not aware of it, yes.
20    Q.   And I'm going to describe it how I at least
21         view this document, and correct me if your
22         understanding is different.
23               But I am describing it as an Excel
24         document.  And at the bottom of it, there are
25         different tabs for -- and I don't even know

Excerpt Testimony
JOHN COMMISSO                                            72

```
 1            what the tech term is for it -- like, different
 2            files, but you can access different tabs.
 3                  If I told you there were 40-plus tabs in
 4            this Excel document produced posttrial, would
 5            that sound about right?
 6      A.    It does, but I'm really not familiar with the
 7            document, other than I know it exists.  So I'm
 8            not the best person to investigate the number
 9            of tabs.
10      Q.    And, again, just for the record, it's -- Uuu is
11            the document that I'm talking about.  I just
12            want that to be clear, because it is an
13            exhibit.
14                  Well, the reason I ask about it is the
15            Government asked you if you were aware of any
16            documents that came from United Way that were
17            produced after trial that contained either
18            exculpatory or potentially exculpatory
19            evidence.  And so it sounds like you're not
20            aware of whether that document contains either
21            exculpatory or potentially exculpatory
22            evidence; would that be a fair assessment?
23      A.    That is a fair assessment.  And I guess I don't
24            know whether that document ultimately came from
25            the United Way.  So I did not have that
```

1       document in mind, because I don't know if it

2       came from the United Way and I don't know if it

3       contains exculpatory evidence.

4    Q.  But let's just say, hypothetically, it purports

5       to come from United Way at some point.

6           If it purports to be a network scan of the

7       network at United Way at some point in time, at

8       least at some point, it came from United Way;

9       right?

10   A.  If it came from John Meyer -- if John Meyer ran

11      the network scan and then he sent that network

12      scan to RSM, which is possible, I would not

13      have received it.  I would not have put it in

14      the e-discovery database.  I would not have

15      produced it myself.

16          So then, yes, that would come from United

17      Way.  If RSM created it, then maybe I would

18      think of that as RSM work product and not a

19      United Way document.  It's just -- that's where

20      I make a distinction.  I don't know if that

21      distinction matters to you, but there's a

22      difference between United Way's documents that

23      John Meyer creates and RSM work product --

24      something they create as they're doing their

25      work.  That's all.

```
 1   Q.   And you would agree with me, if RSM was, for
 2        lack of a better word, doing their work, and
 3        they were doing that work for United Way
 4        through the summer, fall, and early winter
 5        2018/2019, those documents really belong to
 6        United Way; right?  United Way through -- you
 7        hired them; right?
 8   A.   So I think it's a technical issue that I can't
 9        say "yes" or "no" to.  If they create their own
10        internal work product, then I would not say
11        those are United Way documents.  Whether it's a
12        spreadsheet they create, or notes, or a memo
13        that they create for their own internal
14        purposes and they put in their own internal
15        files, I don't consider that, for the purposes
16        of this discussion, to be a United Way
17        document.
18             What I think of when I say a "United Way
19        document" is an email that comes off of our
20        email server, or an invoice, or a contract --
21        something that can be found in the files of the
22        United Way.
23   Q.   And as I said, because you haven't really
24        reviewed this network scan, Exhibit Uuu, you
25        can't say that if it did come from United Way,
```

Excerpt Testimony
JOHN COMMISSO                                                        75

```
 1          that it doesn't contain exculpatory evidence?
 2    A.    I have not reviewed the document.  I don't know
 3          what it contains.  I have a general
 4          understanding of the document.  And I'm not in
 5          a position to draw lines between what's
 6          exculpatory and what's not.  You've got one
 7          definition.  I've got -- I'm sure I have a
 8          different definition in my mind.
 9    Q.    Well, we heard on Thursday that anything that
10          relates to the work that RSM did for United
11          Way, if it's going to get produced to the
12          Government, it had to go through you so you
13          could vet it for privileged information.
14                Did I understand that testimony correctly?
15    A.    Well, that's probably too broad.  But if it
16          relates to Naviloff's loss analysis and relates
17          to his loss analysis for United Way, then I
18          would want to do a privilege review of those
19          documents.  If it concerned the Government's
20          work -- Naviloff's work for the Government,
21          then I wouldn't do a privilege review of those
22          documents.
23    Q.    Well, what I'm getting at is that there was a
24          much smaller version of this network scan given
25          prior to trial.  And what I'm getting at is, if
```

```
1              I understand this process, it would have gone

2         through you for a review to see if it contained

3         privileged information.

4    A.   Possibly, although the nature of this document

5         -- I'm not even sure what I would review.  It's

6         a report, as I understand it.  So one version

7         of it -- the first version of it came from

8         John Meyer.  He sent it to me.  I looked at it

9         and I produced it in the sense there was some

10        privilege review, but there's really no content

11        that I can review for privilege so -- or

12        produce.

13   Q.   Well, it talks about things like passwords and

14        security.

15             I mean, those are things you'd want to be

16        looking at; right?

17   A.   That's not attorney-client privilege.  That's

18        more confidentiality.  That's why we have the

19        protective order in place.

20   Q.   But what I'm getting at is that -- and it

21        sounds like you're saying "yes" to this, but I

22        just want to clarify.

23             The much smaller version of this, which

24        was just one tab of this network scan that was

25        produced pretrial -- that came through you
```

```
 1            first to do some sort of review for privilege
 2            analysis?
 3    A.      Yes.  So let me try to be clear.
 4                  There were two versions produced before
 5            trial.  One of them certainly came from
 6            John Meyer.  I certainly obtained it and
 7            reviewed it, and I was responsible for
 8            producing it.
 9                  The second version -- I don't recall, as I
10            sit here right now, who produced that.  If
11            John Meyer produced it, that means I produced
12            it.  If RSM produced it, then I might not have
13            seen it before trial -- or before it was
14            produced.  I just don't know.  I just don't
15            recall the chain of custody, or whatever you
16            want to call it, with respect to the second
17            network scan.
18    Q.      And as to the third one, did it have to go
19            through you first to be produced, or you've
20            never seen it?
21    A.      I think -- I saw it after it was produced.  So,
22            no, it didn't go through me before it was
23            produced.
24                  MR. HUNTER:  Your Honor, I don't mean to
25            interrupt, but if it's helpful, I could proffer
```

```
 1          how the Government received these three network
 2          scans, if it would help.
 3                  MS. BROWN:  I'm fine with that.
 4                  THE COURT:  You can proffer it, but -- I
 5          guess I'm going to have you proffer it so you
 6          can -- it might help the witness remember.
 7                  But after this hearing, I'm going to ask
 8          for a timeline to be created about every
 9          discovery request, and order, and production,
10          from the beginning of this litigation through
11          where we were now.  Because there's just too
12          much to keep track of and too much to
13          distinguish from.
14                  By the way, Mr. Commisso has answered, I
15          thought, very appropriately a minute ago when
16          he said, "Look, what you think is exculpatory
17          is different things."  It's a very reasonable
18          position.
19                  But that's why I didn't understand the
20          questions from the prosecution about "did you
21          withhold exculpatory evidence?"
22                  That's not for the witness to decide.
23          That's not for anyone to decide except me.  And
24          although I do appreciate the distinction, and
25          it's very important, between United Way
```

1          documents and RSM work product -- because I
2          don't think there was a discovery allegation to
3          produce RSM work product, except possibly a
4          Brady obligation.
5                  But it's a very fuzzy, gray area here,
6          because there's a question about whether the
7          prosecutors would have thought of it or had
8          the -- it's just not a normal situation.  We've
9          got to explore it and we're -- frankly, we're
10         spending way more time on -- for three days --
11         and I know you have a burden to meet,
12         Ms. Brown.  This is not a criticism.
13                 But we're spending tons of time on RSM,
14         and United Way, and their counsel, when I think
15         the real questions here are for the
16         prosecutors.  That's what I think.  And I don't
17         know when we're going to -- I guess I'm just
18         going to have some questions for them myself.
19         I don't plan on putting anybody on the witness
20         stand, but you're all officers of the court.
21         And I know you're going to answer me
22         truthfully, but that's what the real questions
23         are here.
24                 Because there's a difference between
25         Mr. Commisso representing a victim and how he

```
 1        would approach issues, and how he would
 2        approach them if he was, frankly, defending an
 3        accused.  It's not really the same thing.
 4             So go ahead and make your proffer,
 5        Mr. Hunter.  And try to make it succinct and
 6        clear, please.
 7             MR. HUNTER:  I will.  And if the Court has
 8        questions later or after this witness, I can
 9        fill in.
10             But in essence, before trial,
11        Mr. Harrington is requesting information about
12        the IT environment.  We learned that John Meyer
13        had run a network scan, and that there might
14        also be a network scan that RSM had.  We asked
15        for them and we got them.  One was a 62-page
16        PDF that was produced before trial.  The other
17        is this one-page Excel spreadsheet that
18        Ms. Brown is referring to.
19             During this litigation -- and I make a
20        note of it in our surreply, I think -- during a
21        discussion with RSM, we realized that the
22        one-tabbed Excel spreadsheet was only part of
23        the larger scan that they did.  And so I asked
24        for it.  They produced it to us.  And we
25        produced it to the Defense.  And my
```

1           understanding was -- because through the

2           pretrial proceedings, our understanding was we

3           had received all network scans and had produced

4           them.  So when I learned there was this larger

5           network scan that RSM had, we produced them.

6                And that's the basic understanding of

7           where the Government got them and the timeline

8           of production.  There were two produced before

9           trial.  And this one larger one, we produced

10          after trial as soon as we learned about it.

11               THE COURT:  Thank you.

12               MS. BROWN:  Thank you, Your Honor, for

13          clarifying that.

14   Q.     (By Ms. Brown)  And during your questioning by

15          Attorney Davis, if I understood this correctly

16          or wrote it down correctly, I understood that

17          you said that prior to trial, you did not

18          assert a privilege as to the work done by

19          Mr. Naviloff; did I understand that answer

20          correctly?

21   A.     Well, we had waived the privilege with respect

22          to the loss analysis -- Mr. Naviloff's loss

23          analysis.  So at that point, there was no more

24          privilege.  But we also hadn't litigated the

25          scope of that.  So I guess I'm not sure what --

```
1        well, maybe you have another question.
2    Q.  I do.  I didn't want to misstate what you had
3        said.  So I wanted to understand what you said
4        first, and it sounds like I did understand it
5        correctly.
6            My question as a follow-up to that was you
7        would agree with me, and I'm not going to go
8        through it all again -- we talked about this
9        last week -- there were several emails
10       involving Mr. Naviloff's loss analysis that you
11       had redacted because you felt they also
12       contained information relative to data
13       security, and we brought some of those up on
14       the screen last week that were emails that were
15       produced.
16           So they weren't held back under the
17       privilege log, but they had a notation of
18       "redacted" on them.  You remember there were
19       some of those emails last week; right?
20   A.  Yeah.  So you're now -- there's some moving
21       parts there.
22           So you first asked me a question about
23       before trial; right?  And about the use of
24       privilege before trial.  But now when you're
25       talking about those redacted documents, those
```

Excerpt Testimony
JOHN COMMISSO                                                     83

```
1         are all produced in August and September, maybe
2         October, of the year after trial; right?  So I
3         just want to make sure we're talking about the
4         same period of time and the same --
5    Q.   Correct.
6              I guess my question is that you're still
7         asserting the privilege as to some of the
8         emails involving Mr. Naviloff; correct?
9    A.   The portion of those emails that contain
10        information that is only related to the data
11        security investigation.
12   Q.   But you're still asserting privilege as to some
13        of the emails involving Mr. Naviloff?
14   A.   Yes.
15   Q.   And, in fact, we talked about it last week --
16        let me get the document number -- the privilege
17        log that was produced after trial -- many, if
18        not most, of those emails also have
19        Mr. Naviloff's name either -- that it's to him
20        or he's cc'ed on those emails.
21             So you are still asserting some form of
22        privilege as to emails involving Greg Naviloff;
23        correct?
24   A.   Yes, because the scope of the Judge's order was
25        to produce only those documents related to
```

Excerpt Testimony
JOHN COMMISSO                                                    84

1   |        Naviloff's loss analysis.  And, in addition to
2   |        that, I had to redact or withhold privileged
3   |        information regarding the data security
4   |        investigation.
5   |  Q.  Well, I just wanted to -- it wasn't clear from
6   |        the question from Attorney Davis.
7   |            But I wanted to clarify that you are still
8   |        asserting privilege as to some of the work
9   |        Naviloff did in this case in terms of emails
10  |        relating to his discussion of this case with
11  |        his team members at RSM.
12  |  A.  Yes, but I just want to make sure we're clear.
13  |            The content of those privileged documents
14  |        do not relate to the loss analysis.
15  |  Q.  And that's as to the documents that are in the
16  |        privilege log; right?
17  |  A.  And also the ones that have been marked as
18  |        redacted.
19  |            And I also want to make clear -- there is
20  |        no motion, or letter, or any other
21  |        communication where you have challenged any of
22  |        those redactions that you showed me the other
23  |        day.
24  |  Q.  You would agree with me, it's hard to tell it's
25  |        a redaction if you can't see the document,

```
 1            isn't it?
 2    A.      Well, you challenged the privilege log.  And so
 3            you could -- I'm not going to tell you how to
 4            do your job, but there are things that you
 5            could do.
 6    Q.      Now, Attorney Davis -- and my notes indicate he
 7            asked you the question that you have never
 8            produced data breach investigation to the
 9            Government; do you remember that question?
10    A.      We have always asserted the privilege with
11            respect to the data security investigation.
12            And, therefore, we have never produced or
13            disclosed any documents concerning the data
14            security investigation.
15    Q.      But we now know, because of your assertion of
16            the privilege on this, that Naviloff, in some
17            way, shape, or form, had access to information
18            relative to the data breach investigation,
19            because you've asserted privilege as to his
20            emails regarding this?
21    A.      So, correct, he was on emails that -- he was on
22            emails that contained privileged information
23            regarding the data security investigation.  He
24            was not part of the DFIR team, but the two
25            teams both worked at RSM.  And, sometimes, two
```

1        teams were together on the same emails.

2   Q.   Now, one of the questions -- the -- well,

3        actually, I forgot to come back to this.  I had

4        one more question regarding the network scan we

5        were talking about, which is document Uuu.

6             Do you recall being on an email exchange

7        where this network scan was discussed?

8   A.   No, I don't remember that email.

9   Q.   If I told you there was an email from

10       August 13, 2018, where you were copied, where

11       the subject line is "additional network device

12       scan, privileged and confidential," you don't

13       have a recollection of that email?

14  A.   I do recall emails in August of 2018 about the

15       network scan.  I just -- yes, I recall,

16       generally, there were emails.

17  Q.   And so you may have had access to the network

18       scan, being on this email chain back in August

19       -- between August 13 and August 15 of 2018?

20  A.   I had access to that email discussion.  I did

21       not have access to the network scan.

22  Q.   So if there were an email from Ryan Gilpin

23       where he put a link into the scan saying, "You

24       could navigate here," and then has the

25       hyperlink, "and download and run and file and

| | | |
|---|---|---|
| 1 | | screenshot below," you don't remember him |
| 2 | | sending a link to access that network scan? |
| 3 | A. | He sent that to John Meyer at the time.  I had |
| 4 | | no memory -- paid no attention to it.  I only |
| 5 | | know about it because I've seen it over the |
| 6 | | last week or two. |
| 7 | Q. | And so -- you're correct.  So that's an email |
| 8 | | chain between Ryan Gilpin and John Meyer. |
| 9 | | And you and several other members of RSM |
| 10 | | are on that chain; correct? |
| 11 | A. | I don't have it in front of me. |
| 12 | Q. | One of the questions Attorney Davis asked you |
| 13 | | is whether trial counsel specifically asked |
| 14 | | for, and to quote Attorney Davis, "every single |
| 15 | | internal email from RSM." |
| 16 | | And you answered "no," that trial counsel |
| 17 | | did not ask for that. |
| 18 | | Remember that exchange? |
| 19 | A. | Yes. |
| 20 | Q. | Do you remember Defense counsel prior to trial |
| 21 | | asking for all documents and data collected and |
| 22 | | reviewed by RSM in calculating United Way's |
| 23 | | loss? |
| 24 | A. | That sounds similar to the language in one of |
| 25 | | the discovery requests. |

Excerpt Testimony
JOHN COMMISSO                                              88

```
 1   Q.   In fact, that -- it wasn't one of the discovery
 2        requests, but it's also in the actual motion to
 3        exclude Naviloff, document 27, page two.
 4             And do you also remember that trial
 5        counsel also asked for any reports prepared by
 6        Mr. Naviloff, RSM, and its employees?
 7   A.   So with respect to those two issues, what I
 8        remember is I had -- I had a duty or a role,
 9        which was to focus on United Way's documents.
10        So with respect to your first question about
11        RSM emails, I don't really have much knowledge
12        or more to say that I haven't already said,
13        because I was focused on United Way's
14        documents.
15             And on the second part of what you said,
16        he -- I don't think you read the entire
17        request.  Because what I remember is he was
18        looking for reports that RSM had prepared
19        regarding the loss analysis for United Way.
20        And so from my side focused on United Way's
21        documents, what I was focused on was the
22        reports that were for United Way.
23             And I guess the distinction I'm making is,
24        if they prepared a report that they use
25        internally, well, that -- I didn't get that.
```

1           That was not for the United Way.  But if they
2           put together a PowerPoint presentation for a
3           report to the special committee, that was a
4           report for the United Way.  And they also
5           helped with the insurance claim, so that was a
6           report for the United Way.  And, in fact, those
7           are the documents that I produced in response
8           to Mr. Harrington's request.
9    Q.     Well, I guess if I understood your testimony
10          earlier, you were saying that once Mr. Naviloff
11          started talking to the Government in November
12          of 2018, anything relative to Naviloff or RSM's
13          loss calculation -- there's no more privilege.
14          It was gone.  Because as Naviloff testified at
15          trial, he basically took his loss calculation
16          from RSM and carried it over to his work for
17          the Government.  So there wouldn't be any
18          distinction as to documents -- whether they
19          were for RSM's loss calculation or for the
20          Government's loss calculation.
21               As I understood your testimony, the
22          privilege didn't exist anymore as to the loss
23          calculation for RSM; is that right?
24   A.     I'm confused.  I'm not sure what you want me to
25          respond to.  I'm sorry.  I'm just confused.

1   Q.   Well, I was asking about the fact that you said
2        that the trial counsel didn't specifically use
3        the word "internal" emails.  And I will agree
4        with you that trial counsel did not use that
5        specific term.
6             But trial counsel did ask for reports
7        prepared by Mr. Naviloff, RSM, and its
8        employees, relative to RSM's investigation of
9        the loss resulting from Alrai's alleged
10       fraudulent conduct.  And the answer, as I
11       understood it, was you thought they were only
12       talking about work that involved United Way.
13            But what I'm pointing out to you is that
14       you're saying that there's no distinction; it's
15       the same analysis as to the loss calculation.
16  A.   You mean whether it was for the United Way or
17       for the Government?
18  Q.   Correct.
19  A.   Yeah, so I think we may have talked past each
20       other a little bit.  I was just trying to make
21       a point that as it concerned me, Mr. Harrington
22       wanted copies of reports that Naviloff prepared
23       for the United Way.
24            And so I had to think "okay.  What reports
25       did Naviloff prepare for the United Way?"

```
 1         Well, I know there were two that went to the
 2         special committee.  I know that there was one
 3         that was a draft that ended up going to the
 4         insurance company.  And I'm sure there may have
 5         been others.
 6              But that's what I was thinking in response
 7         to that, which is "what are the reports of the
 8         loss that Naviloff prepared for the United
 9         Way?"
10    Q.   Well, you spoke earlier that there might be
11         internal documents at RSM.  Like, they may have
12         created a spreadsheet.
13              And that still is work that was done for
14         United Way, because you had hired RSM; right?
15    A.   But if you look at -- do you have
16         Mr. Harrington's requests?
17    Q.   I have it at document 47.  And what I'm reading
18         from that is what he basically does from
19         document 47, which is his -- Defendant's motion
20         to exclude expert testimony.
21              The first three or four pages, he
22         summarizes -- and maybe this is a good start on
23         what the Judge is requesting later -- Attorney
24         Harrington basically does a history up until
25         this point of both his requests for discovery
```

```
 1            and the Government's response to that
 2            discovery.  So I was reading from that
 3            document, specifically on page two, paragraph
 4            six.
 5                  And so that -- I guess the point I was
 6            asking you about was that discovery isn't a
 7            matter of "Simony says."  They don't have to
 8            use the exact word to invoke you having to turn
 9            it over.  The spirit of that request was that
10            Attorney Harrington was trying to get to the
11            basis for the opinions of Naviloff.
12                  That's what he was attempting to get to --
13            were their internal reports, where their
14            analysis -- he didn't have to use all those
15            magic words, or the magic word "email" to get
16            to what's the basis of Naviloff's opinion.
17                  And you understood that; right?  You
18            understood that that's where Attorney
19            Harrington was trying to get to -- was what was
20            the basis of Naviloff's opinions; right?
21      A.    Yes.  So I understood his requests -- he was
22            trying to get to the original source documents;
23            right?  RSM gathered up all of this data, and a
24            lot of that were United Way's documents.  So
25            that he wanted United Way's documents that were
```

| 1 | | accessed, reviewed, relied on by Naviloff with |
|---|---|---|
| 2 | | respect to loss analysis.  I understood that. |
| 3 | Q. | And as I said, I just read to you paragraph 6A |
| 4 | | which says "all reports prepared by |
| 5 | | Mr. Naviloff, RSM, and its employees, |
| 6 | | collectively referred to as 'RSM,' relative to |
| 7 | | RSM's investigation of the loss resulting from |
| 8 | | Alrai's alleged fraudulent conduct." |
| 9 | | That does not limit it to documents in the |
| 10 | | possession of United Way, does it? |
| 11 | A. | No, but for purposes of my responding to it, |
| 12 | | I'm only responsible for documents in the |
| 13 | | possession of United Way. |
| 14 | Q. | But you've asserted privilege as to documents |
| 15 | | that were created and possessed by RSM? |
| 16 | A. | With respect to the data security analysis. |
| 17 | Q. | But my question is, you've asserted privilege |
| 18 | | as to documents created and possessed by RSM? |
| 19 | A. | Yes.  Yes, I have, for certain documents -- for |
| 20 | | certain categories of documents. |
| 21 | Q. | So in some way, you are responsible for |
| 22 | | documents from RSM, especially if they were |
| 23 | | created while they were working for United Way |
| 24 | | -- you're responsible for whether those |
| 25 | | documents get to the Defendant? |

1   A.   Yeah, I don't agree with that.

2             THE COURT:  Well, is it more "responsible"

3        you're focused on?

4   Q.   (By Ms. Brown)  Yeah, I guess I could rephrase

5        that.

6             You have some control over whether a

7        document gets to the Defendant?

8   A.   I have -- through asserting of privilege, and

9        providing a privilege log, and asking RSM not

10       to turn the documents over, yes.  That's my

11       role.

12  Q.   And I just have one final question.

13            Going back to the beginning of the case,

14       late May through June of '18, at any point

15       during that time, did any of the government

16       agents, either being FBI agents or the U.S.

17       Attorney's Office, ask you to preserve any

18       data, IT environment -- anything along those

19       lines?  Were you asked by the Government to

20       preserve anything relative to this case?

21  A.   Were we asked to preserve anything?  I don't --

22       bear with me, because it's been two-and-a-half

23       years.

24            We were asked for things.  I guess the

25       short answer to your question is I don't

1          remember, but I can tell you what happened,

2          which is we were asked for things.  So in a

3          sense, that, I would say, is a server request

4          for preservation -- you know, when they say

5          they want us to produce certain types of

6          documents, we obviously preserve them.

7               And I know that I had discussions early on

8          where I described the types of things that we

9          were doing, like the fact that we were

10         collecting laptop computers, and cellphones,

11         and things like that.  And, in fact, we sent

12         them to a third party, Stoneturn Group.  And

13         then we had arrangements for an FBI agent to

14         obtain those images from Stoneturn Group.

15              So I don't remember any specific requests

16         for preservation, but I do remember periodic

17         discussions about what the Government may be

18         looking for and what we were doing to preserve,

19         collect, review, and produce the evidence.

20    Q.   And did you ever receive a request from the

21         Government -- and, again, focusing on this

22         period of time of late May through June of

23         2018 -- did you ever receive a request to

24         preserve, like, network scans, or preserve the

25         IT environment as it existed at the time

```
 1              Mr. Alrai either worked there or shortly after
 2         he worked there?
 3    A.   Can you just say that -- sorry.
 4              Say that one more time.
 5    Q.   Sure.
 6              Again, focusing on the time of June of
 7         2018, when Mr. Alrai left the employ of United
 8         Way, did the Government -- and by "the
 9         Government," I mean the FBI or the U.S.
10         Attorney's Office -- did they ever make any
11         requests that you preserve network scans or IT
12         environment?
13    A.   No, not in those words, no.  To date, the
14         Defendant has not made a formal request that I
15         preserve the entire IT environment or network
16         scans.
17    Q.   And you -- strike that.
18              As I understood your answer, it sounded
19         like the way you were responding to the
20         subpoena was on, for lack of a better word, a
21         document-by-document request.
22    A.   No, I guess I wouldn't describe it that way.  I
23         would say we did it on a rolling basis.  It was
24         an enormous undertaking, and we searched
25         comprehensively and exhaustively.  And then we
```

```
 1        produced relevant documents on a rolling basis.
 2             THE COURT:  What does "relevant" mean to
 3        you?  I mean, I don't understand how you have a
 4        role in determining that.  I mean, it's
 5        discovery.  What's relevant to an expert is the
 6        expert's eyeballs at every side.  That's how I
 7        view it.
 8             Now, I realize in a civil litigation --
 9        and in criminal too -- internal conversations
10        might not necessarily be subject to production.
11        And it doesn't appear that that was required
12        here, because no one set that forth and agreed
13        to it.  But you keep invoking relevancy in a
14        way that -- and earlier in this litigation, we
15        had conversation about what the expert relied
16        on.  What the expert relied on is what the
17        expert saw -- period.  Because choosing not to
18        rely on it is a decision that's very important
19        vis-`-vis an expert's competence and bias.
20        It's crucial information what an expert decides
21        not to rely on, if the expert saw it.
22             And it sounds like someone was making
23        determinations here before -- before the
24        posttrial orders, I mean -- it sounds like
25        someone was making determinations here about
```

```
 1         what was appropriate and whether or not
 2         Mr. Naviloff relied on it based on whether he
 3         actually cited it or discussed it.  And from my
 4         perspective, that's just not the standard.
 5              Do you understand what I'm saying?
 6              THE WITNESS:  Yes, but I guess there are
 7         two different issues.  One issue is -- three
 8         issues.  My internal investigation, the
 9         Government's investigation, and the response to
10         the grand jury subpoena.  And then there's
11         Naviloff's investigation; right?
12              So Naviloff and RSM determine what's
13         relevant; right?  And my job in sort of
14         overseeing their work is to make sure they have
15         access to what they want.
16              Because if somebody says, "Don't let them
17         look in that room over there," or, "Don't let
18         them talk to those three witnesses," now we no
19         longer have a fair and independent
20         investigation; right?  So when it comes to
21         Naviloff requesting information, Naviloff asked
22         for what we thought he needed or wanted.  So
23         that's one.
24              With respect to my investigation, and that
25         is directly related also to producing documents
```

1        to the Government, I would say it's guided by

2        all of my experience as a civil and as a

3        criminal defense litigator.  You start with an

4        enormous amount of data.  You can't review it

5        all.  You can't produce it all.  And so you end

6        up with this funnel effect as you're trying to

7        narrow it down to a reasonable number of

8        documents.  And you use very sophisticated

9        tools in 2018 that help you find the best

10       documents with the least amount of effort.

11            THE COURT:  That's two.  You said there

12       were three.

13            THE WITNESS:  I said we had Naviloff.

14            THE COURT:  Oh.  Naviloff, you, and the

15       Government.

16            THE WITNESS:  And the Government.

17            THE COURT:  I respectfully just

18       observed -- and I mean this respectfully,

19       because it's not meant to be a challenge, but I

20       don't understand how any of that addresses what

21       I just asked you.

22            THE WITNESS:  So you want to know how do I

23       determine relevance?

24            THE COURT:  No, I don't.  I don't.  It's

25       okay.

1          You can continue with your questions,

2     Attorney Brown.

3          MS. BROWN:  That was actually my last

4     question, Your Honor.  And I don't have any

5     follow-up based on the Court's questions.

6          So I don't know if the Government has

7     recross, but I don't have any other questions.

8          MR. HUNTER:  Briefly, Your Honor.  I'll

9     try to hone in, I think, on what the Court's

10     concern was.

11

12                    RECROSS-EXAMINATION

13     BY MR. HUNTER:

14  Q.  So, Mr. Commisso, you were -- the Court raised

15     a concern about wanting every document that

16     Mr. Naviloff saw.  So that way, the Defense

17     could assess the relevancy determinations that

18     Mr. Naviloff made.  And Defense counsel asked

19     you some questions related to this.

20          And so with respect to the e-discovery

21     database which you were talking about --

22     actually, I'll -- with the e-discovery

23     database -- from that database, you made

24     productions to the Government in response to

25     the grand jury subpoena; is that right?

1   A.   Yes, that's correct.

2   Q.   And in relation to this pretrial litigation

3        about Mr. Naviloff, Mr. Harrington was seeking

4        documents related to Greg Naviloff's expert

5        testimony; do you recall that?

6   A.   Yes.

7   Q.   And in order to identify every document in the

8        United Way e-discovery database that

9        Greg Naviloff could possibly have looked at,

10       did you work with Kroll to identify those

11       documents?

12  A.   Yes, every single one of them, without making a

13       determination if it was relevant or not.  We

14       just turned it over.

15  Q.   And I just want to talk a little bit about how

16       the e-discovery database worked, as it's

17       relevant to that issue.

18            Did everyone who had access to this

19       e-discovery database have unique log-in

20       credentials?

21  A.   Yes, everyone from RSM had unique log-in

22       credentials.  And the system tracked every time

23       an RSM employee accessed a document in the

24       system.

25  Q.   And you addressed this in your letter when

1          Defense counsel asked you some questions about

2          it, but is the work you did with Kroll pretrial

3          related to this motion to exclude

4          Greg Naviloff?  Did you work with Kroll to

5          identify every document in the database that

6          anyone with an RSM log-in credential had

7          clicked on, viewed, accessed, et cetera?

8    A.    Yes, and then we produced the few documents

9          that needed to be produced as a result of that.

10   Q.    So going to the Court's question, you did an

11         initial review in response to the grand jury

12         subpoena where you tried to identify,

13         basically, all the documents relevant to this,

14         the Imran Alrai case, to put it simply?

15   A.    Yes.

16   Q.    And then this second search that you did was a

17         little more technical, where you tried to

18         identify every document in that database that

19         somebody from RSM had clicked on, or looked at,

20         or viewed, or accessed?

21   A.    Yes.

22              THE COURT:  Wait a minute.

23              This second one you're talking about,

24         Mr. Hunter -- which one is that?  Is that the

25         one after Mr. Harrington's motion to exclude

1        Mr. Naviloff?

2            MR. HUNTER:  Yes, Your Honor.  I'll

3        clarify.

4   Q.   (By Mr. Hunter)  So when you reactivated the

5        database after Mr. Harrington filed his motion

6        to exclude Greg Naviloff's testimony,

7        Mr. Commisso, was that when you undertook the

8        effort to identify any as-yet-non-produced

9        documents?

10           THE COURT:  You froze.  Mr. Hunter froze;

11       right?  This is really the first hearing I've

12       had, I think, since we've been Zooming hearings

13       starting -- I think it was in April -- where

14       we've had this many problems.

15           THE WITNESS:  Yeah.

16           THE COURT:  I'm sure Mr. Hunter can hear

17       us talking, but he knows that we're not hearing

18       him.  Oh.  He's gone.

19           THE CLERK:  He actually dropped off a few

20       times this morning, Judge, as well.

21           THE WITNESS:  There were two issues that I

22       wanted to clarify, if I can get the time to do

23       that.

24           THE COURT:  Well, I'm happy to listen to

25       you, but the attorney conducting your cross is

```
1       not in on the hearing.  So I don't know if that
2       makes a difference to the Government's counsel
3       or not, if we want to let Mr. Davis -- look, I
4       have some questions for you too --
5            MR. DAVIS:  So, Judge, I think Ms. Le and
6       I can handle the rest of it.  And I apologize
7       for having to break.
8            Are we still on redirect now?  Or are we
9       on recross?
10           THE COURT:  Yeah, we're on recross.  Yes.
11           MR. LE:  Hey, Judge, can we do what you
12      were suggesting before -- we were just having a
13      break at 12:00.  Hopefully -- maybe Mr. Hunter
14      can go into the office.  Because I think the
15      next witness is his witness to cross, if
16      necessary.  Oh, look.
17           Mr. Hunter's back on.
18           THE COURT:  So we're on recross,
19      Mr. Davis.
20           Go ahead, Mr. Hunter.  Try your question
21      again.
22           MR. HUNTER:  I'm sorry about that.  I lost
23      power briefly.
24   Q.  (By Mr. Hunter)  So, Mr. Commisso, trying to
25      recall where I left off.
```

1              So after Mr. Harrington -- this is in the

2       context of after you reactivated the

3       e-discovery database when Mr. Harrington had

4       moved to exclude Greg Naviloff's testify.

5              At that point, did you work with your

6       e-discovery vendor, Kroll, to identify every

7       document in the database that someone with an

8       RSM credential had clicked on, or looked at, or

9       accessed?

10             THE COURT:  Yeah, but you already asked

11      him that, Mr. Hunter.

12             And what I asked you was "what are you

13      talking about?"

14             Because you called it "the second time."

15      And I think you're trying to refer to not the

16      original grand jury production, but the time

17      immediately after the motion to exclude

18      Naviloff, where we resolved it rather than

19      excluding Naviloff by producing discovery;

20      right?

21             MR. HUNTER:  Yes.

22             THE COURT:  Okay.  But you're talking

23      about things like e-discovery databases and

24      things that aren't going to have much -- we've

25      got to talk about criminal procedure and

1          production.  How you get there is interesting,

2          I guess, to somebody, but I need to

3          understand -- we're having documents produced

4          in response to a motion to exclude an expert.

5          And then there were other documents produced

6          after the trial was over; right?

7               I think what you're trying to establish --

8          tell me if I'm not understanding.  The point

9          you're trying to make is that that second

10         production -- not the grand jury production,

11         but the pretrial production -- produced every

12         United Way document that anybody from RSM laid

13         eyes on; is that what you're trying to

14         establish?

15              MR. HUNTER:  Yes.  Every document in that

16         collection in the database, Your Honor.

17              And the broader point that I'm --

18              THE COURT:  What's that mean, "in that

19         collection in the database"?  What's that mean?

20              MR. HUNTER:  So I believe Mr. Commisso has

21         testified to this.  That as part of his

22         internal investigation, he put together a large

23         e-discovery database of documents collected

24         from email accounts, from virtual desktop

25         images, from United Way's records, that RSM

1          then had access to for their analysis and he

2          used for his internal investigation and to

3          respond to the grand jury subpoena.

4              And the reason why I was asking these

5          questions is because the Court inquired about

6          how Mr. Commisso made a relevancy

7          determination, and in particular raised a

8          concern about -- regarding expert discovery.

9          The standard being, wanting to provide every

10         document that the expert laid eyes on.  And so

11         what I was trying to do was at least put on the

12         record the efforts that were made to identify

13         those documents and produce them.

14              THE COURT:  Okay.

15              But don't you understand that that plays

16         right -- that doesn't necessarily help you,

17         because what you're saying is a lawyer for the

18         victim decided what's relevant to produce.  And

19         that's, like, the whole point of the motion.

20         And if that's supposed to make me feel

21         better -- I guess it makes me understand more,

22         but it's -- and the problem is -- it isn't that

23         I'm questioning the relevancy determinations.

24              The point is that someone needs to be

25         accountable and cross-examinable in a trial for

1        that.  That's how this works.  It's not

2        about -- that I question Mr. Commisso's

3        judgment or even motives.  It's just that that

4        has to be something that everybody understands

5        during a trial.

6             And it isn't particularly helpful to say

7        after the fact, "Oh, none of this mattered.

8        None of this was relevant."  It's a difficult

9        thing to know.  That's up to a trier of fact --

10       that's me in this case -- and I don't know.  I

11       just keep venting like this at you guys, and I

12       know it doesn't help you.

13            You can continue with it, but I wasn't

14       questioning Mr. Commisso's definition of

15       relevancy.  I was more questioning the fact

16       that he was even making a determination to

17       begin with of -- how that really is justified;

18       right?

19            It's a criminal prosecution.  And the

20       victims in any criminal case produce evidence,

21       sometimes, pursuant to a grand jury subpoena.

22       But when you have someone in the process that

23       might have motives that could -- not improper

24       motives, but motives that a trier of fact

25       should be exposed to, that matters.  And it's

1        very difficult to make this determination with
2        this.  Let me ask this question.
3             And I say "it's difficult to make this
4        determination."  It's harder to keep track of
5        all the different permutations of what was
6        produced here at different times.  I mentioned
7        earlier to Mr. Davis -- you might have been off
8        at the other hearing -- I mentioned of
9        requesting a timeline.  But I don't want to
10       make you do busywork and waste your time.
11            Is there a document that I already have
12       that kind of -- you're nodding, Ms. Le -- that
13       kind of lays this out?  Because you were just
14       referring to it in the testimony, I know.
15            What would that be?
16            MS. BROWN:  Well, I referred to document
17       47, which is the motion to exclude Naviloff's
18       testimony filed by Attorney Harrington.
19            So as a prelude to his request to exclude
20       Naviloff, he documents the history of the
21       discovery process, especially as it pertains to
22       Mr. Naviloff.  So he talks about -- they're
23       notified when they get the report.  There's
24       back-and-forth.  And I don't have that, but I
25       think there's even the letters -- or emails

1          that are in there, but Attorney Harrington's

2          document 47 documents the history up until the

3          time of the filing of that motion.

4               And then if you look at the two motions

5          that are responsive, which is document 50 and

6          51, then I think that even picks up on, like --

7          because I know from document 51, the Government

8          talks about the chambers conference, and what

9          happened in the chambers conference.

10              So if you put those three documents

11         together -- 47, 50, and 51 -- it gives a pretty

12         good timeline of what was happening.

13              THE COURT:  Through when?

14              MS. BROWN:  One's 52 -- I want to say this

15         all is going on through October, November.  It

16         was all pretrial.

17              THE COURT:  Yeah.  And, see, I want the

18         big picture.

19              Go ahead, Ms. Le.

20              MR. LE:  And I know this because I wrote

21         this part of the Government's response, Your

22         Honor.

23              So record document 170 -- and this

24         follows -- if you go to page five, starting at

25         page five and onto page six, I prepared the

1          charts about the posttrial discovery and the

2          Court's order.  We have listed for the Court

3          dates that we received certain records and

4          dates that we provided those records to Defense

5          counsel, including the Bates number, as well as

6          the descriptions of the contents of the

7          posttrial discovery.

8               Which I think is what the Court is

9          concerned about; right, Judge?

10              THE COURT:  Yeah.  Yes.  I'm going to look

11         at that, though, because I really don't want to

12         create busywork for you guys just to have you

13         file more stuff.  You're very busy as it is,

14         and you've worked hard on this.

15              I'm going to look at these documents and

16         determine if they tell me what I want to know

17         before I make you do anything else.

18              MR. LE:  And it might help the Court when

19         you go back and look at certain of the

20         exhibits -- we did list all the Bates numbers

21         by sequence.  So if the Court has a particular

22         document that is a concern that was produced

23         posttrial, in our pleading on page six through

24         seven --

25              THE COURT:  What's your pleading -- 170?

1          MR. LE:  170, Your Honor.  That is our

2     objection to Defendant's motion to dismiss.

3     That was filed September 23, 2020.  And it goes

4     through the history of the Court's discovery

5     order and our litigation regarding discovery.

6          And when we created these charts, we did

7     that by documenting our production, including

8     when we received information from either RSM or

9     United Way, the Bates sequence, as well as a

10    description.  So that that might help the Court

11    if you're going to go back and compare the

12    exhibits that Counsel has submitted during this

13    litigation.

14          THE COURT:  Thanks.

15          Look, Judge Johnson is trying to reach me

16    about something that we've got to deal with,

17    like, right now.  So I'm going to have to

18    suspend this.  It's 12:11.

19          We will resume at 1:15; okay?

20          (Recess taken at 12:11 p.m., and the

21          proceedings resumed at 1:17 p.m.)

22          THE COURT:  All right.

23          Let's resume, please.

24          MR. HUNTER:  No further questions from the

25    Government.

1           THE COURT:  Okay.

2           Attorney Brown?

3

4               REDIRECT EXAMINATION

5  Q.   I just want to clarify something,

6       Attorney Commisso.

7           You were asked questions about this

8       e-discovery database.  I think we already

9       established earlier that this e-discovery

10      database, we now know, didn't have everything

11      that RSM had access to?

12 A.   That's correct.

13          MS. BROWN:  That's my question.

14          THE WITNESS:  Okay.

15          THE COURT:  And, Mr. Commisso, you said

16      you wanted to clarify a couple of things.  And

17      even though it's unusual, I know you were

18      admitted pro hac vice, so I want to give you an

19      opportunity to do that.

20          THE WITNESS:  Okay.  And, really, I think

21      it's just one thing.

22          I gave an answer last Thursday.

23          The answer I gave was "we were all working

24      together."  And as soon as I said those words,

25      I knew that it needed clarification.  I believe

1           the context was pretrial discovery.

2                So after Mr. Naviloff was hired by the

3           Government, and after Mr. Harrington had

4           submitted requests for certain discovery

5           concerning Mr. Naviloff, there was a series of

6           email messages.  I don't remember the exact

7           exhibits.  I don't remember the exact question.

8           But I do know what I meant by my testimony when

9           I said we were all working together.

10               As I've explained, I was responsible for

11          producing United Way's documents and for

12          protecting United Way's privilege.  And so I

13          had conversations with Greg Naviloff and others

14          at RSM.  I had conversations with Mr. Davis and

15          others in the U.S. Attorney's Office.  And, I

16          guess, in a sense together, we were working to

17          identify and produce documents, to the extent

18          that we could, in response to Mr. Harrington's

19          pretrial discovery request.

20               So I didn't want to just leave that

21          answer, "we were all working together," hanging

22          out there as something having bigger meaning

23          than I had intended.

24               THE COURT:  Okay.  That's understood.  I

25          hadn't seized on it in any kind of way like

1          that, but I understand your point.  Let me ask

2          you this question.

3               You brought this case -- I think it was

4          you, personally, right, to the U.S. Attorney's

5          Office in Boston before the New Hampshire

6          office accepted it?  At least that's what some

7          of the briefing says.

8               Were you involved in that?

9               THE WITNESS:  I contacted the U.S.

10         Attorney's Office in Boston twice.  And before

11         we really got into a discussion, a prosecutor

12         in Boston notified me that the case was already

13         active in New Hampshire, and I was introduced

14         to Mr. Davis.

15              THE COURT:  Oh.  All right.

16              So what I've read -- that they twice

17         declined prosecution -- is that inaccurate?

18              THE WITNESS:  I can only tell you my

19         understanding.  My first call to the U.S.

20         Attorney's Office in Boston, I asked some

21         questions and I did not identify my client.  So

22         there was no -- in the first call, there was no

23         declination.  There was just a discussion about

24         some issues in general without identifying a

25         client.

```
 1              In the second call, I called and said,
 2         "Okay.  We want to move forward.  I'm going to
 3         identify my client, and I would like to
 4         schedule a meeting."  And very shortly after
 5         that, I was told that I would be introduced to
 6         Mr. Davis because they already had an active
 7         investigation.
 8              THE COURT:  Okay.
 9              MR. DAVIS:  Judge, may I make a brief
10         proffer on that?
11              THE COURT:  Absolutely.  I was just going
12         to ask you to do that.  Yes.
13              MR. DAVIS:  So, Judge, the New Hampshire
14         federal investigators' open investigation at
15         the end of 2017 -- that was based on bank
16         information regarding the wires to Pakistan.
17         And so well before we knew anything about
18         anything at United Way, both the FBI and
19         Homeland Security had an open investigation
20         that I, at least, had a meeting and maybe two
21         meetings at.  Some subpoenas were issued.  So
22         we were -- and we were aware of Mr. Alrai's
23         travel in the spring of 2018.  And, if you
24         recall, there was evidence about the border
25         search as he came back in in April of 2018.
```

1          So all of that had happened in this case

2     with New Hampshire before Mr. Commisso called

3     Mass.  And the FBI notified me that United Way

4     had called Massachusetts.  I communicated with

5     the fraud chief in Boston.  And we quickly

6     resolved that, because we had the open case, we

7     would continue.

8          THE COURT:  Okay.  That's actually fairly

9     significant -- to me, anyway.  And I think

10    that's the fist time I've heard that.

11         The reason I say that is only because if

12    one has to sit -- I mean, look, I think the

13    motives of counsel representing a client who's

14    been victimized -- or allegedly victimized,

15    right, by an employee are not hard to

16    understand.

17         But it's a very different picture of

18    Mr. Commisso seeking twice to have a case

19    investigated and prosecuted by the Boston

20    federal authorities, being rebuffed, and then

21    coming to New Hampshire and affirmatively

22    seeking that out.  That's a very different

23    picture than you've presented, because it would

24    -- it might suggest more about the intensity of

25    counsel's or the client's wishes to have the

1        case prosecuted for any number of reasons.

2               So the fact that there's an open case

3        already and you knew it was underway is -- I

4        think that's significant information, and I'm

5        glad to have it now.

6               THE WITNESS:  And, Your Honor, I was never

7        rebuffed in my discussions with the prosecutor

8        in Massachusetts.

9               THE COURT:  Yeah, I gather that now.  I

10       gather that now.  It's just one of those things

11       that gets worked out between districts.  Okay.

12       Second question about that.

13              When you first dealt with federal

14       prosecutors, Mr. Commisso, be it Boston or

15       New Hampshire, I know you eventually produced

16       documents pursuant to a grand jury subpoena, or

17       a number of them; right?

18              But in your initial contact -- I can think

19       of when I was a prosecutor, if I had received a

20       contact from a victim -- an alleged victim or

21       their counsel, I probably would have requested

22       some documents just to kind of get started --

23       to review the situation.

24              Did that happen here?

25              THE WITNESS:  So your question was broken

1          up and I might have missed the important part

2          of it.

3               So you said "did that happen here."  Did

4          what happen here?

5               THE COURT:  Before you began responding to

6          grand jury subpoenas, were you responding to

7          other sort of just more informal or less formal

8          requests for information?  Did any of the

9          prosecutors or federal agents ask you to give

10         them any documents so they could review your

11         situation and decide whether to open a case?

12              THE WITNESS:  So what I remember was a

13         first meeting with Mr. Davis at the very

14         beginning of June.

15              THE COURT:  As to what?

16              THE WITNESS:  The very beginning of June,

17         approximately June 3 or 4.  And Mr. Vossio

18         attended with me.

19              And at that meeting, we had a small binder

20         of documents, approximately 15 to 20 documents,

21         that we had put together that helped to tell

22         the basic story as we understood it.  And I

23         believe we left one or more copies of that

24         binder with Mr. Davis or with the agents.

25              And within 24 hours of that meeting, we

```
 1        had a grand jury subpoena.  And I believe we
 2        started producing and enrolling production --
 3        batches of documents as quickly as we could.
 4              THE COURT:  Okay.  Yep.
 5              My other question, and I want to ask this
 6        question again with Mr. Commisso still on the
 7        witness stand, only because I think the next
 8        witness won't have any information about it.
 9              I want to explain how I remember something
10        and to determine if I have it right or wrong
11        through Counsel.  My memory is that
12        Mr. Harrington moved to exclude Mr. Naviloff.
13        And then we got -- this is before COVID, but we
14        got on the -- I think it was a telephone call
15        together, because it was kind of a discovery
16        dispute in a way.  At least that's the way I
17        saw it.  I was never really seriously
18        considering excluding Mr. Naviloff, but I
19        thought, I think maybe correctly, that this is
20        just an attempt to get information.
21              And what I said was -- and tell me if I
22        got this wrong -- I said, "Look" -- I asked him
23        on the phone, "Mr. Harrington, what do you
24        want?"  He kind of listed it out.
25              And I sort of charged you guys to -- the
```

1    prosecutors and defense lawyers to "go work it

2    out and get back to me if you can.  If there's

3    anything you disagree about, let the Court know

4    and I'll resolve it."  But my memory is you did

5    resolve it.  And that's -- I think the letter

6    we've seen in this hearing was part and parcel

7    to that process.  It was sort of a request from

8    Mr. Harrington about -- a bullet list of things

9    he wanted, and you were working through it

10   together.

11        I don't remember you coming back to the

12   Court saying, "We have these areas of

13   disagreement.  Could you resolve them?"

14        Do I have that right, roughly, if anybody

15   remembers -- Mr. Hunter, Ms. Le, Mr. Davis --

16   about what happened?

17        MR. HUNTER:  I think so, Your Honor.  I

18   think there was one point of disagreement.

19        And that was Mr. Harrington sent us a list

20   of search terms for John Commisso to run

21   through the e-discovery database.  And that's

22   what prompted Mr. Commisso's letter.

23        We forwarded it to him.  And it was -- the

24   cost to reactivate the database, and run the

25   searches, and do the review that would be

1        required -- so that was the thing we weren't

2        able to resolve.  But we were able to resolve

3        other issues, which goes to -- like, I've got

4        to find the documents anyone from RSM clicked

5        on, for example, was part of that resolution.

6            THE COURT:  Yeah.  I think -- did I sort

7        of give you a new list of search terms that was

8        somewhat narrowed?  Did I do that?  Or how did

9        we get that resolved?  Anybody remember?

10           MR. LE:  Go ahead, Mr. Commisso.

11           THE WITNESS:  So what I recall is we had a

12       hearing about the list of search terms and

13       about my letter.  And there was a discussion --

14       there certainly was no agreements.

15           I'm not sure about the resolution, but in

16       terms of how it was reported on the docket, I

17       believe if you look at one of the final orders

18       on the docket before trial, it makes a

19       reference to "the matter is resolved as stated

20       at the hearing," or something like that, so

21       that you have to read the transcript to know

22       how it was resolved.  That's what I remember.

23           THE COURT:  Okay.

24           But, certainly, nobody stood up and said,

25       "No, I'm entitled to something I haven't

1       received."  Or no one said, "Judge, we still

2       haven't produced this, and we'd like you to

3       resolve it."  Once I issued that order, I don't

4       think we heard anybody else object or counter

5       that.  Okay.

6            Ms. Brown, if you have any different

7       information, by the way, please share it.  You

8       weren't there at the time, I know, but you

9       might have a different understanding.

10           MS. BROWN:  Not about what was said at the

11      hearing.  I think -- in terms of understanding,

12      I think one of our issues is -- I kind of

13      referred to it at my cross-examination --

14           That discovery isn't about "Simon Says."

15      That you don't use -- it was very clear that

16      Attorney Harrington and his partner were trying

17      to get at the basis of Mr. Naviloff's opinion.

18           Where was it coming from?  What was it

19      based on?  Who did he consult with?  All of

20      those things.  And he may not have used the

21      precise words to trigger a search of -- but I

22      don't think that's necessary for Brady.

23           I think, first of all, the Government has

24      the obligation of Brady, regardless of whether

25      the Defendant asks for it.  Because if you

1    don't know it's there, you don't know what to

2    ask for.

3        But, secondly, there's no question that

4    counsel for Mr. Alrai was trying to get at the

5    bottom of this opinion, both on the advice of

6    his expert in IT, and because he wanted to be

7    able to cross-examine this witness about the

8    basis of his opinions.  And that's articulated

9    in document 47.  So I don't think it's a matter

10   -- it's not necessary for a Brady violation

11   that he used a magic term to get a magic

12   document.  And so I just wanted to add that.

13       But I will also agree that how the

14   litigation regarding Naviloff tied up was

15   somewhat loose in terms of whether that --

16   like, whether that motion was still live or

17   not.  It sounds like there was some resolution.

18   It's not like a situation where Attorney

19   Harrington filed a motion to withdraw the

20   motion to exclude Naviloff.

21       Or did he say, "Oh, well, yeah, I'll take

22   some discovery" -- was he withdrawing his

23   objection by accepting additional discovery?

24   That's not clear to me.

25       THE COURT:  Well, it's clear to me.  It's

1          clear to me only because I'm trying to keep

2          your motion in context.

3               There wasn't a request, once the Court

4          said it was resolved or during the trial, where

5          anybody said, "Look, there's something I was

6          entitled to I didn't get."  But your point

7          about Brady is well-received.  I understand

8          your point.

9               It's just that -- I can't say that I'm

10         persuaded by it, but I understand that there's

11         a difference between you didn't comply with the

12         discovery rule or order and, well, during your

13         compliance, you either became aware or should

14         have become aware of Brady material to which I

15         am entitled, regardless of any order or rule.

16         That's a different thing.

17               And that's your argument; right?

18               MS. BROWN:  That is my argument.  That's

19         what I'm going to address when I sum up the

20         presentation.

21               THE COURT:  Okay.  I just wanted to have a

22         conversation while we still have Mr. Commisso

23         here under oath.  I think I've got the answers

24         as best as I'm going to get.  And I think we

25         should move on to the next witness.

Excerpt Testimony
JOHN COMMISSO                                      126

1              MS. BROWN:  Well, Your Honor, over the

2       weekend and again this morning, Cocounsel and I

3       have conferred.  And I don't think we're going

4       to call Mr. Meyer.  Most of what we get from

5       him is rehashing his testimony, which is --

6       there's a transcript of it, and it is what it

7       is.  I don't think we need him to go through

8       his testimony again, because it's the record.

9       So we've elected not to call him.

10              I'll ask Attorney Commisso if he can

11       notify Mr. Meyer.  I know he's been waiting,

12       and I apologize for that.  But we couldn't make

13       that call until we had examined Mr. Commisso.

14       So that would be our final -- well,

15       Attorney Commisso would be our final witness.

16       We do have some summation for the Court.

17              I don't know if the Government has any

18       witnesses.  I don't think they do, but --

19              THE COURT:  Give me a second then.  I'm

20       just going to check my notes in case there's

21       anything I wanted to ask Mr. Commisso that I

22       would have asked Meyer.  Hold on a minute.

23       Okay.

24              I have some questions, but I think only

25       one of them needs to be done now with

1    Mr. Commisso.

2         I'm looking at document 1-64-12,

3    Exhibit 12 to Attorney Brown's motion.  It's an

4    email -- we've talked about it.  It's an email

5    where Mr. Naviloff emailed Mr. Commisso some

6    folders.

7         And he said, "Let's discuss the contents

8    of these four folders for potentially providing

9    to the USAO"; right?  And I guess my question

10   is -- like, I'm not sure who to ask this of.

11        Which of the three of you prosecutors was

12   primarily dealing with Mr. Naviloff?  Was there

13   one of you who was doing it, or was it all of

14   you?

15        MR. DAVIS:  Judge, I would say

16   Mr. Naviloff was Matt Hunter's witness, but

17   that I was the lead.  And I think we talked

18   about -- Matt and I probably talked about every

19   issue of significance with Mr. Naviloff.

20        THE COURT:  Then here's my question for

21   both of you.  I'll ask you first, Mr. Davis.

22        Were you aware that Naviloff, who is by

23   this time your expert -- okay.  You retained

24   him -- were you aware he was consulting with

25   Mr. Commisso about his productions to you?

1           MR. DAVIS:  So, Judge, I would have said

2      what I was aware of was that anything that

3      potentially involved privilege -- that is,

4      United Way's privileges that were still being

5      asserted -- would be run through Commisso.  And

6      in numerous discussions with Naviloff, that

7      step in the process was always acknowledged and

8      something we expected.  And Matt may be able to

9      supplement that further, but I certainly --

10      well, I guess I'll leave it at that.

11           THE COURT:  Well, would you agree with me,

12      though, that this email, unless I misunderstood

13      the testimony from the witnesses in this

14      hearing -- this conversation seems to go beyond

15      that?  This isn't clearly a discussion of

16      what's privileged, unless I'm misunderstanding.

17      This seems to go beyond a discussion of

18      privilege.

19           And it has Mr. Commisso involved in

20      Naviloff's document productions in a way that

21      exceeds or that goes beyond the scope that you

22      just described about privilege discussions;

23      right?

24           MR. DAVIS:  I certainly agree it's beyond

25      the scope of privilege.  I think Mr. Commisso

1          can further illuminate that, and Matt, maybe,

2          as well.  Because I think it's fair to say that

3          Naviloff, at various times, would have

4          encountered a scope issue.  Because he's at

5          RSM.  And RSM, writ large, is doing several

6          different things for United Way.

7                And my understanding -- my broad

8          understanding of this issue is that it was a

9          scope question for Naviloff.  That is, are all

10         of the folders on this thing what we're talking

11         about here or not?  I don't read it as a

12         relevancy sort of conference between Naviloff

13         and Commisso.

14               THE COURT:  Yeah.  I almost wish I had

15         sequestered all of you before we had this

16         conversation, but I'm just going to continue

17         with you.  I don't mean that in an insulting

18         way.  I hope you don't take it that way.  It's

19         just we all, as human beings, have a tendency

20         to influence each other.

21               But, Mr. Davis -- so what you just said

22         there -- my understanding is that goes to this

23         scope issue involving RSM's work that goes

24         beyond loss calculation; okay?

25               And I guess my question -- and you said,

1        "I read this as a discussion of that kind of

2        scope issue, because we both agree it's not

3        privileged."

4            What's the basis for that understanding?

5        What makes you read it that way?  What is the

6        basis for your understanding that this isn't

7        Mr. Naviloff consulting with Mr. Commisso

8        regarding his production to your office

9        regarding loss calculation?

10           MR. DAVIS:  I think it's what I've been

11       told about it.  And I just -- I don't trust my

12       memory.  I'm not looking at the document,

13       either.  I would defer to Matt Hunter and

14       Commisso on the point.

15           And I'm sorry I'm not being helpful.  As

16       you might have guessed, Judge, I'm 62.

17       Questions about folders, I'm not as sharp on.

18       I don't mean to make excuses, but I would trust

19       Matt's memory and I would trust John Commisso's

20       memory much better than I.

21           THE COURT:  And I accept your answers, by

22       the way, as being as honest and straightforward

23       as your memory will allow.

24           Mr. Hunter, do you follow that line of

25       questioning?  It appears to Mr. Davis, and I

1          agree, that this conversation here in this
2          Exhibit 12, document 1-64-12, is not about
3          privilege.  Now, Mr. Davis has told me what he
4          thinks it refers to, and then he's explained to
5          me why he thinks that -- what the basis is.
6               What's your understanding of what this
7          conversation's about, if you have one?  Well,
8          let me ask you first a question that I asked
9          Mr. Davis first.
10              Were you aware that Mr. Naviloff was
11         consulting with Attorney Commisso, part and
12         parcel to this production of his expert file to
13         you?
14              MR. HUNTER:  So the part that I was aware
15         of, Your Honor, was that, similar to what
16         Mr. Davis said -- that United Way waived its
17         privilege as to RSM's loss analysis, but not
18         everything that RSM did.  So I was aware that
19         RSM, because they couldn't waive the privilege
20         or produce privileged materials, was consulting
21         with John Commisso to ensure that they were
22         producing things that were within the scope of
23         that waiver, and were not producing things that
24         had to do with other work that RSM was doing.
25         So that was my understanding of that.

```
 1              And regarding -- and I don't know exactly
 2         the title of this particular email, but I do
 3         know that when we got it -- a discovery request
 4         from --
 5              THE COURT:  It's August 2019.
 6              MR. HUNTER:  Okay.  So, yeah, this is when
 7         we're getting discovery requests from
 8         Mr. Harrington.  And I know what we asked RSM
 9         for is we wanted basically the work file --
10         like, all of their analyses, any documents that
11         they had that they relied on or considered in
12         their analysis.  And we were looping in
13         John Commisso to ensure that RSM didn't produce
14         something that was outside the privilege
15         waiver.
16              So my understanding was that was what the
17         consultation was about.  Not -- again, not to
18         discuss what is relevant to your loss
19         calculation; but is this something that relates
20         to other work streams that RSM was doing for
21         the United Way?
22              THE COURT:  Okay.
23              And what's the basis of that
24         understanding?  Where did you learn that?
25              MR. HUNTER:  The basis for that
```

1        understanding -- it is where we were at this

2        stage in the litigation, the summer before

3        trial.  Because I think at that point there was

4        a general understanding that United Way had

5        waived all privileges to the work Naviloff did

6        for loss.  But we knew that there was other

7        work that RSM had done.

8              THE COURT:  So you're surmising that based

9        on the timing of the conversation?

10             MR. HUNTER:  And my understanding at that

11       time of the nature of United Way's privilege

12       assertion.  That we had asked RSM to -- we had

13       asked to ensure that -- we knew that RSM was

14       consulting with John Commisso regarding

15       privilege, and we asked them to do that.

16       Because we didn't have a right to seek

17       privileged material.

18             But what we asked for is we wanted

19       everything that had to do with the work

20       Greg Naviloff did as to loss.  So that was my

21       understanding of what -- the discussions we had

22       had and what we were seeking to get.

23             THE COURT:  But, again, you're surmising

24       it.  You're basing your understanding of what

25       this email means based on its timing and your

1              understandings of, as you point out, the scope

2              of the waiver and other work streams.

3                   In other words, it's not like you know

4              today, one way or the other, whether Naviloff

5              was just plain consulting with Commisso about

6              what to produce?

7                   MR. HUNTER:  I certainly -- we've had a

8              whole hearing about this.  I think that

9              Greg Naviloff and John Commisso haven't said

10             that there was that sort of activity going on.

11             And we certainly did not ask for that type of

12             activity to be going on.  And so I have no

13             reason to think that that activity was going

14             on.

15                  I understand there's this email.  But I

16             see this email is consistent with what we did

17             understand, which was John Commisso was

18             protecting United Way's privilege.  I

19             suppose -- I have no reason to think or dispute

20             that that is what was happening, if

21             John Commisso testified about it and

22             Greg Naviloff testified about it.

23                  THE COURT:  I know, but -- okay.  That's

24             true.  But Ms. Brown filed a motion about it.

25             And there's been a lot of time since you filed

1          the motion and we had the hearing.

2               So I guess I'm asking you, did you talk to

3          witnesses and say "what's this all about?"

4          Because you haven't told me that's the basis

5          for your understanding.  You're sort of

6          surmising it.  And, like, that's fine, but

7          there's also just preparing a witness.

8               "Hey, were you consulting with Commisso

9          about everything you did before you did it?

10         And in what way, and about what?"  I mean, did

11         you have those conversations?  It sounds like

12         you did not.

13              MR. HUNTER:  So those conversations are --

14         we asked Greg Naviloff and John Commisso to

15         prepare declarations of what they did and what

16         happened.  And those are the declarations that

17         we attached to our motion.

18              THE COURT:  And I don't mean to be flip

19         here, but I'm taking that as a "no," that you

20         didn't ask him these questions that I'm asking

21         you right now.

22              Like, "What was this conversation about?

23         What was your work -- what was the nature of

24         your working together?"  These are -- I don't

25         look at any of this as inappropriate, but I

1    want to understand it.  And we're all kind of

2    circling around it a little bit.  I guess

3    that's the best we're going to do.

4         MR. HUNTER:  Your Honor, the reason why --

5    we tried to go through every single email that

6    Defense counsel attached to their motion.  We

7    did have, I think, the general conversation

8    that is reflected in the declaration -- that he

9    did a review for privilege.  And that was our

10   understanding.

11        THE COURT:  So you're telling me, then,

12   that Defense counsel files a motion with an

13   email where your expert is talking to the

14   lawyer for the victim and saying, "Let's

15   discuss these documents before we produce them

16   to the U.S. Attorney."

17        And you didn't put that in front of the

18   witness and say, "What is this about?  What's

19   going on here?"  That didn't happen?

20        MR. DAVIS:  Judge, I would just add --

21        THE COURT:  Wait a minute.  Whoa.  Whoa.

22        MR. DAVIS:  I'm sorry.

23        I'm just saying, any prep of the witness

24   is mine, Judge, not Matt Hunter's.

25        THE COURT:  Oh, well, I guess I'll ask

1          you.
2                  I mean, is that something you -- I realize
3          the answer could be yes or no, but I'm asking
4          what it is.
5                  Did someone ask Naviloff, did someone ask
6          Commisso, "What's this about?"
7                  Because I just asked you a minute ago,
8          "What's the basis for your understanding?"
9                  And you didn't say, "I asked him before
10         the hearing and they told me."  You said -- I
11         don't know.
12                 MR. DAVIS:  I don't believe I put either
13         of the emails in front of either witness.  And
14         I don't think we specifically discussed that
15         question.
16                 THE COURT:  Okay.
17                 THE WITNESS:  So, Judge, I'd be happy to
18         respond to any of these questions.
19                 THE COURT:  No, I'm good, Mr. Commisso.  I
20         do have some questions about the process, but
21         that was really the only one.
22                 Well, I guess, let me just ask you this,
23         Mr. Commisso:  Have you heard anything from the
24         prosecutors that's inconsistent with your
25         understanding of what's transpired here in

1        terms of your dealings with Naviloff or your

2        dealings with them?

3            THE WITNESS:  Well, I think there's a lot

4        that I could say that would clarify these

5        issues.  And I can tell you what I was doing

6        with Naviloff, and why, during that period of

7        time.

8            THE COURT:  And I'm sure you could.  The

9        question isn't so much your answers to it.  The

10       question is whether anybody -- is whether the

11       trier of fact in this trial had an opportunity

12       to hear all this.  All right?  Because there's

13       lots of inferences that can be drawn.  That

14       seems to be lost on everybody here.

15           The fact that you guys have an account of

16       what happened, whether or not I think it's

17       accurate based on any number of factors, like

18       your memories, your motives now, your motives

19       at the time -- those are all interesting

20       issues.  But those are

21       a-trier-of-fact-for-a-trial issues.

22           I know I'm supposed to do a privilege --

23       not privilege -- a prejudice assessment here.

24       It's part of the burden.  But I'm not -- I

25       think I have the information I need to make

1          that assessment.  Because if there's something
2          I don't understand, there will be explanations.
3          I know there will be.
4               And you're a defense lawyer.  You
5          understand.  Criminal trials are about
6          cross-examination.  They're about testing the
7          witnesses.  Let me just ask you this,
8          Mr. Commisso.
9               You've, I'm sure, represented clients
10         either facing trial or in trial where the
11         prosecution had expert witnesses; right?
12              THE WITNESS:  Yes.
13              THE COURT:  I mean, have you?
14              THE WITNESS:  Yes.
15              THE COURT:  And I assume that you make
16         your normal discovery requests, and you're
17         provided with the file or whatever you've
18         requested in some form; right?
19              THE WITNESS:  Correct.
20              THE COURT:  Have you ever had one where an
21         expert was working with a staff from his or her
22         business, whether it was an accounting firm or
23         something, where underlings or coworkers were
24         also working on the file?
25              THE WITNESS:  No, I can't think of

```
 1        something in particular that matches that
 2        circumstance.
 3             THE COURT:  A straight answer.  I
 4        appreciate it.
 5             But if you did -- because there's a 6th
 6        Amendment right to confrontation law on this;
 7        right?  If you did, wouldn't you expect to see,
 8        if you had an expert -- if you're dealing with
 9        an expert testifying against your client facing
10        felony charges, I assume you wouldn't want to
11        just see what -- you wouldn't take the expert's
12        word, first of all, about what he relied on.
13             You'd want to see everything he reviewed;
14        am I right?
15             THE WITNESS:  Well, that gets to the heart
16        of the issues in this case.
17             THE COURT:  Well, that's exactly why I'm
18        asking you.
19             Are you telling me that an expert witness
20        testifying against your client in a federal
21        criminal trial -- you would take the expert's
22        word for what he relied on, and not everything
23        he reviewed?
24             THE WITNESS:  I would make a request for
25        all the documents that he reviewed and relied
```

1        on.

2                THE COURT:  Right.

3                And if he was working with underlings -- a

4        staff or coworkers, you'd want to see the

5        communications between them, wouldn't you?

6                THE WITNESS:  Well, I don't know that I

7        would have the right to.  The rules of

8        discovery don't go that far.

9                THE COURT:  Not my question.

10               Would you request it?

11               THE WITNESS:  If I was doing my job well,

12       yes, I would expect to request it.

13               THE COURT:  And wouldn't you expect, once

14       you requested it, the prosecutors at least to

15       review it to determine whether or not you were

16       entitled to it -- at least review it to

17       determine if there was exculpatory evidence?

18               THE WITNESS:  Well, no, not if it's

19       outside the bounds of discovery.

20               THE COURT:  So you'd make a request that's

21       outside the bounds of discovery, and not assume

22       that when they responded to it, maybe imposing

23       some restrictions on whatever you'd

24       requested -- you would assume they hadn't even

25       reviewed it?

1              THE WITNESS:  Well, now I'm thinking about

2         the context of this case.  And I'm thinking

3         about the fact that the Government didn't have

4         possession of this evidence, and the evidence

5         that we're talking about now was way outside

6         the bounds of permitted discovery.  So I would

7         not have expected the prosecutors to have

8         requested this discovery that nobody thought

9         the Defendant was ever entitled to.

10             THE COURT:  So when you were going through

11        the items, because I -- by the way, I do accept

12        that Mr. Harrington didn't make a request for

13        internal communications.  I do, unless there

14        was no violation of any sort of rule or order

15        there.  I'm with you.

16             But were there discussions between you and

17        the prosecutors about the internal

18        communications at RSM regarding this document

19        review?  It would seem strange to me that one

20        would rely on all these people that are

21        reflected in the bill that wasn't produced, and

22        not -- just at least discussed the

23        communications.

24             THE WITNESS:  Well, I would say no.  And

25        the reason why I feel confident saying no is

1          I'm looking now at Mr. Harrington's discovery
2      request from July 30, which I think was the
3      first one.
4              THE COURT:  Yeah.
5              THE WITNESS:  And he asked for a copy of
6      all documents and other data "collected and
7      reviewed by RSM in calculating the loss."
8              And those words, "collected and reviewed,"
9      meant something to me, because that's exactly
10     what I think of when I think of expert
11     discovery.  And those are the United Way
12     documents.  Those are the invoices, the
13     contracts, the accounting record; right?
14             THE COURT:  Yeah.
15             THE WITNESS:  So that's what we're talking
16     about -- is where do we find the documents that
17     were collected and reviewed?
18             And then in another request it was
19     "reviewed and relied on."
20             But at no time do I remember saying "where
21     do we find" or "who's going to find" or "should
22     we find the internal work papers and the
23     internal email communications?"
24             THE COURT:  I understand -- believe me, I
25     understand that it wasn't requested --

1      demanded.

2           But to me, "relied on" -- I mean, if

3      you're going to rely on -- if you, as an

4      expert, are going to rely on underlings to

5      develop IT -- because he's not an IT expert.

6      He's an accountant; right?  We talked about

7      that ad nauseam.  It was trial testimony.  If

8      I'm going to rely on -- I forget his name...

9           THE WITNESS:  Ryan Gilpin.

10          THE COURT:  Ryan Gilpin.  Right.  And

11     there was another one that -- he did testify at

12     trial.  If you're going to rely on his work,

13     well, when he transmits that work to you, it

14     might very well include an explanation of his

15     analysis.  And that would seem to me something

16     that the expert relied on.

17          I realize it wasn't as specified as

18     "producible, discoverable."  But, to me, the

19     Brady obligation at least makes me wonder

20     whether that should be reviewed.  And that's

21     kind of what I'm stuck on here.

22          THE WITNESS:  And I guess I'm at least two

23     or three steps removed from that because I

24     wouldn't have been part of any decision-making

25     process about RSM's documents.  And my mind

1      never went anywhere in that direction with

2      respect to those kinds of internal

3      communications.  It's not something I've ever

4      talked about in any litigation -- that that

5      would be subject to discovery.

6              THE COURT:  I accept everything you say,

7      except the first thing you said is that you

8      were not involved in the production of RSM --

9      you were involved in the production of RSM

10     documents.  RSM's witness was asking you

11     questions about what to produce.

12             THE WITNESS:  With respect to United Way

13     documents.

14             THE COURT:  Oh, I see, not RSM.  Yeah, I

15     mean, I think of the RSM documents as what RSM

16     reviewed.  And I view it as their

17     communications with each other, although I do

18     realize that those were not requested or

19     ordered to be produced.  This puts this in a

20     very sort of odd posture.  Okay.

21             Listen, I asked Mr. Commisso some

22     questions.  If either side wants to pursue my

23     line of questioning with cross or direct, or

24     whatever you want to call it -- if you want to

25     cross my exam, I'll allow Ms. Brown first and

```
 1              then Mr. Davis.
 2                   Any questions, Ms. Brown?
 3                   MS. BROWN:  I just wanted to clarify to
 4              Mr. Commisso.
 5    Q.   (By Ms. Brown)  As a criminal defense lawyer,
 6         you're also familiar with constitutional law;
 7         right?
 8    A.   Yes.
 9    Q.   And so you're familiar that there's case law
10         that says a defendant may object if the expert
11         who is giving the opinion on the witness stand
12         is not the person -- is, for lack of a better
13         word -- I use this -- ghost expert.
14              So if there is a testifying witness and
15         that witness is testifying to things that
16         would, arguably, be hearsay or at least not
17         allow the Defendant to cross-examine the
18         opinions that come from some other expert, a
19         criminal defense attorney may want to object to
20         that, because they can't cross-examine the
21         underlying opinions if that person isn't
22         called; do you understand that case --
23    A.   I'm familiar with the idea because you briefed
24         it in this case.
25    Q.   And so in order to make that objection that
```

```
1              someone's opinion is coming from -- some
2              expert's opinion is coming from someone else,
3              you'd have to know about it; right?
4     A.       I'm not sure what to say.  I haven't litigated
5              this issue outside of this case, so I don't
6              have any experience litigating this specific
7              issue about expert discovery in a criminal case
8              like this.
9     Q.       But you did have the billings that RSM sent to
10             you.  And, in fact, your name is right on the
11             bill that they sent to you for their work both
12             for RSM -- I don't think they would have sent
13             you the bills for the Government -- but they
14             sent you the work that they, meaning RSM, did
15             for United Way; right?
16    A.       Yes, I received bills from RSM.
17    Q.       And you understood that at least six or seven,
18             if not more, people worked on the loss
19             analysis; correct?
20    A.       I understood what the bills showed.  And, yes,
21             I met more than six or seven people over the
22             course of the engagement.
23    Q.       And that was information that you were privy to
24             that, as far as you know, the Defense attorney
25             didn't know about.
```

Excerpt Testimony
JOHN COMMISSO                                                          148

1              You didn't share your billings with

2         Defense counsel prior to trial, did you?

3    A.   I don't know whether he was privy to it or not.

4         And I know he never asked me for that

5         information.

6              MS. BROWN:  I have nothing further.

7              (The requested testimony concluded at 2:02

8         p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2               I, Molly K. Belshaw, a Licensed Shorthand
Reporter for the State of New Hampshire, and
3   Registered Professional Reporter, do hereby certify
that the foregoing is a true and accurate transcript
4   of my stenographic notes of the proceeding taken at
the place and on the date hereinbefore set forth to
5   the best of my skill and ability under the
conditions present at the time.  Read and sign was
6   not requested.

7               I further certify that I am neither
attorney or counsel for, nor related to or employed
8   by any of the parties to the action in which this
proceeding was taken, and further, that I am not a
9   relative or employee of any attorney or counsel
employed in this case, nor am I financially
10  interested in this action.

11              The foregoing certification of this
transcript does not apply to any reproduction of the
12  same by any means unless under the direct control
and/or direction of the certifying reporter.

13

14

15

16

17

18

19

20                    Molly K. Belshaw
                     RPR, LCR No. 00162

21

22

23

24

25

Duffy & McKenna Court Reporters, LLC
1-800-600-1000