UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA

v.                                         18-cr-00192-JL-1
                                           December 7, 2020
IMRAN ALRAI                                9:10 a.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:

For the Government:  Cam T. Le, AUSA
                     John S. Davis, AUSA
                     Matthew Hunter, AUSA


For the Defense:     Donna J. Brown, Esquire
                     Michael Gregory Eaton, Esquire


Court Reporter:      Molly K. Belshaw, LCR, RPR
                     Duffy & McKenna Court Reporters
                     1 New Hampshire Avenue #125
                     Portsmouth, New Hampshire 03801
                     (800) 600-1000

Also Present:        Jason Sgro
                     Robin Ephraimson
                     Imran Alrai
                     Nayha Arora, Esquire

HEARING                                           2

1                    **INDEX OF EXAMINATION**

2

3   **WITNESS:   JOHN COMMISSO**                         Page

4   **DIRECT EXAMINATION**

5      By Ms. Brown                                    4

6   **CROSS-EXAMINATION**

7      By Mr. Davis                                   34

8   **REDIRECT EXAMINATION**

9      By Ms. Brown                                   66

10  **RECROSS-EXAMINATION**

11     By Mr. Hunter                                 101

12  **REDIRECT EXAMINATION**

13     By Ms. Brown                                  114

14  **CLOSING STATEMENT**

15     By Ms. Brown                                  151

16     By Mr. Hunter                                 198

17

18

19

20

21

22

23

24

25

1               INDEX TO PRE-MARKED EXHIBITS

2   DEFENDANT'S    DESCRIPTION                      PAGE

3   EXHIBIT

4   A              November 21, 2019 Letter to

5                  AUSA Davis                       14

6   Gg             Emails re: updated presentation  62

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|      |                                                    |
|------|----------------------------------------------------|
| 1    | P R O C E E D I N G S                              |
| 2    | THE CLERK:  The Court has before it for            |
| 3    | consideration this morning day three of an        |
| 4    | evidentiary motion hearing in criminal case       |
| 5    | 18-cr-192-JL, United States of America versus     |
| 6    | Imran Alrai.                                       |
| 7    | Morning, Judge.                                    |
| 8    | THE COURT:  Morning, everyone.  I                  |
| 9    | apologize.  I'm struggling to kind of master     |
| 10   | all of the tech that goes on around here to      |
| 11   | keep us going when the staff is remote or where  |
| 12   | we're remote.  And between the stuff we use to   |
| 13   | communicate with each other and just the         |
| 14   | regular email, I find myself groping blindly.    |
| 15   | So I'm sorry to make you wait so long.  Anyway,  |
| 16   | let's get back underway.                          |
| 17   | I know we're still with Mr. Commisso, so         |
| 18   | let's continue.                                    |
| 19   | MS. BROWN:  Thank you, Your Honor.                |
| 20   |                                                    |
| 21   | DIRECT EXAMINATION                                 |
| 22   | BY MS. BROWN:                                      |
| 23   | Q.  Good morning, Mr. Commisso.                    |
| 24   | A.  Good morning.                                  |
| 25   | Q.  We finished questioning -- I think it was     |

1           Thursday afternoon; correct?

2    A.    Yes.

3    Q.    Between now and then, have you talked to anyone

4          about your testimony in this matter on

5          Thursday?

6    A.    So, yes, conversations with some family members

7          briefly just to let them know that I had

8          testified for the first time in a case.  And I

9          spoke with my client just to let him know that

10         we had the hearing and that it was continuing.

11         I spoke with John Meyer because we needed to

12         figure out the schedule and his availability.

13         I did not speak about the substance of my

14         testimony with John Meyer, but I needed to deal

15         with scheduling issues.

16              And I spoke with Mr. Davis for the same

17         reason, which was to talk about the scheduling

18         of John Meyer's testimony.  But we did not

19         discuss the substance of my testimony.

20   Q.    That's your complete -- nothing else?

21   A.    Right.

22   Q.    And along the same vein, after you testified on

23         Thursday, did you go back and review any

24         documents related to this case?

25   A.    Yes, I looked at several things since last

1         Thursday.

2    Q.   Is that because some of the questions made you

3         think you had to go back and review them to

4         refresh your memory?

5    A.   Well, I guess partly, yes; and partly (audio

6         interference) -- so I wanted to be fresh again

7         this morning, as I felt like I was fresh last

8         Thursday.

9              THE COURT REPORTER:  This is the court

10        reporter.  Your answer was somewhat garbled.

11             Will you please try to reconstruct your

12        answer?

13             THE WITNESS:  It is a problem with my

14        audio connection?

15             THE COURT REPORTER:  It is for me.

16             THE COURT:  A little bit.

17             You said "partly yes and partly no" to the

18        question, and then you were explaining.

19             THE WITNESS:  Right.

20             So this was reviewing documents.  I had

21        reviewed the documents before Thursday's

22        hearing, and I felt like I was fresh on

23        Thursday for testimony.  And so since then,

24        I've reviewed several documents so that I would

25        feel fresh and have the information fresh in my

```
 1        mind for this morning's testimony.
 2   Q.   (By Ms. Brown)  I want to take you now back to
 3        June of 2018.  Specifically, the day that
 4        Mr. Alrai physically left the employment of the
 5        United Way.
 6             I remember at trial there was a term that
 7        was used, "offboarding"; is that a term you
 8        use, or somebody else might have used that at
 9        trial?
10   A.   Well, I didn't testify at trial --
11   Q.   Obviously, but I just --
12   A.   I'm familiar with it in the employment law
13        context.
14   Q.   But you know what day I'm talking about?
15   A.   Well, June 12 was the day that I interviewed
16        him and he was placed on leave.
17   Q.   And that, as far as you know, was the last time
18        he was ever physically at the United Way
19        offices; correct?
20   A.   Yes.  That's correct, as far as I know.
21   Q.   And the June 12 date that you just spoke about
22        -- that was also the date that both you and
23        Mr. Mulvaney, the Mr. Mulvaney we spoke about
24        on Thursday -- that was the day that both of
25        you interviewed Mr. Alrai; correct?
```

1    A.   That is correct.

2    Q.   And when you set that meeting up, you had that

3         date in mind.  It wasn't sort of a spontaneous

4         thing.

5              You had coordinated that was the day that

6         you were going to show up at United Way and

7         interview him with Mr. Mulvaney; correct?

8    A.   We had planned that that was going to be the

9         day of the interview, yes.

10   Q.   And just to go back a little bit.

11             We spoke on Thursday that prior to that

12        date, meaning June 12, you had already spoken

13        to the U.S. Attorney's Office at least once;

14        right?

15   A.   At least twice, I guess, yes.

16   Q.   And so one of those, as we discussed -- I'm not

17        going to go into it -- was a meeting about the

18        allegations of fraud against Mr. Alrai.

19             And there were other contacts regarding a

20        grand jury subpoena on June 4; right?

21   A.   Yes.  And I think the first meeting may have

22        been the one where Rich Vossio and I, together,

23        met with Mr. Davis and one or two agents, and

24        really began the discussion of what we

25        internally had been investigating.

1       THE COURT:  Let me just say this.

2       I think we are going to have a little bit

3   of a struggle today with the court reporter and

4   Mr. Commisso's audio.  I don't know if it's

5   your mic or what's going on, John.

6       You're probably not in the office; right?

7       THE WITNESS:  No, I'm at home.  It usually

8   works well, but it's broken up.  What I can do

9   is plug in a headset and see if that works --

10  if that helps.  So just give me one minute to

11  get the headset.

12      THE COURT REPORTER:  Thank you.

13      THE COURT:  I'm definitely following, by

14  the way.  I'm hearing it all.  It's just that

15  it's -- I know the reporter's got to be typing

16  all day...

17      THE WITNESS:  I have two children who are

18  doing their school from home, so they're taking

19  up the bandwidth right now.  But maybe the

20  headset will help, if you'll just bear with me.

21      THE COURT:  How could you let trivialities

22  like that interfere with what we're doing here?

23      THE WITNESS:  Can you hear me through the

24  headset?

25      THE COURT:  About the same so far.  Let's

```
1        see how it goes.
2              Could you hear me?  Can you hear us,
3        Mr. Commisso?
4              THE WITNESS:  I can hear you clear.
5              THE COURT:  It's about the same for now.
6        Let's just see how it goes.
7              THE COURT REPORTER:  And do me a favor.
8              There was a name mentioned in your last
9        answer and I didn't get the gentleman's name.
10             THE WITNESS:  Well, the gentleman I
11       referred to -- his name is Richard Vossio.
12  Q.   (By Ms. Brown)  If I recall, you were
13       describing a May meeting that involved
14       Mr. Vossio, Attorney Davis, and yourself.  I
15       think -- did I capture -- it was some FBI
16       agents, you said, were in that May meeting?
17  A.   Yeah, at least one agent, maybe two.  And that
18       would have been in June.  There were no
19       face-to-face meetings in May --
20  Q.   Thank you for clarifying that.
21  A.   -- that I recall.
22  Q.   And if we are focusing on June 12 as the day
23       that you interviewed Mr. Alrai, that meeting or
24       meetings that you discussed happened before
25       that date?
```

| | | |
|---|---|---|
| 1 | A. | Yes.  There's an FBI 302 report that will give |
| 2 | | you the date when the meeting with Mr. Davis |
| 3 | | and Mr. Vossio took place. |
| 4 | Q. | And I'm not that interested in questioning you |
| 5 | | about that right now.  I just want to set it in |
| 6 | | a context of what happened before the |
| 7 | | June 12th, so that's really where I'm going |
| 8 | | with that. |
| 9 | | So back to June 12.  You already said you |
| 10 | | had set up this meeting for you and |
| 11 | | Mr. Mulvaney to meet with Mr. Alrai. |
| 12 | | Had you coordinated that meeting with |
| 13 | | either the U.S. Attorney's Office or the FBI? |
| 14 | A. | I would not say that we coordinated it.  I |
| 15 | | would say that we had discussions before the |
| 16 | | meeting on June 12 with -- certainly, with |
| 17 | | Mr. Davis.  I don't recall speaking to anyone |
| 18 | | other than Mr. Davis.  We discussed a lot of |
| 19 | | issues.  And to the extent that I was able to |
| 20 | | share information with him, I shared |
| 21 | | information with him. |
| 22 | | My memory is he shared very little |
| 23 | | information with me because there are rules and |
| 24 | | laws that I believe prohibited him from sharing |
| 25 | | information with me.  So I would not say that |

```
 1          we coordinated, but we communicated about a lot
 2          of things before June 12.
 3   Q.     Well, I guess when I was using the word
 4          "coordinated," it's my understanding when
 5          Mr. Alrai physically left the building of the
 6          United Way, he was greeted by at least one, if
 7          not more, FBI agents.  So they would have had
 8          to have known he was going to be there that
 9          day, speaking with you, to greet him.
10              So that's more what I meant by
11          "coordinated"; not necessarily discussions, but
12          the fact that the FBI would be there that day.
13   A.     So Mr. Alrai, in a typical workday or workweek
14          -- he was only physically present in Boston on
15          Tuesdays and Thursdays.  And let me just pause.
16              If the audio is really bad, I can also
17          call in from my cell phone, and we might have a
18          much better connection if I was speaking
19          through my cell phone.
20              THE COURT REPORTER:  I would not try to
21          dissuade you from doing that if you think it
22          will be better.  This is the court reporter.
23              THE WITNESS:  So do you want to pause
24          right here and have me dial in through my cell
25          phone?
```

|    |    |                                              |
|----|----|----------------------------------------------|
| 1  |    | THE COURT:  Yeah.                            |
| 2  |    | Charli, that works; right?                   |
| 3  |    | THE CLERK:  It does.  The only caveat is     |
| 4  |    | you should just mute your video so that there's |
| 5  |    | no echo.                                     |
| 6  |    | THE WITNESS:  Yes.  So if we can just take   |
| 7  |    | a three-minute pause here, and I'm going to do |
| 8  |    | some technical work on my end, so bear with me. |
| 9  |    | (Recess taken at 9:29 a.m., and the          |
| 10 |    | proceedings resumed at 9:35 a.m.)            |
| 11 | Q. | (By Ms. Brown)  My point was -- in the       |
| 12 |    | questioning we just had was that you had     |
| 13 |    | communicated with law enforcement, be it FBI or |
| 14 |    | U.S. Attorney, about this meeting on the 12th? |
| 15 | A. | Yes.  I communicated with them.  We had -- we |
| 16 |    | were planning a meeting on the 12th.  And I  |
| 17 |    | provided information to law enforcement before |
| 18 |    | we had that meeting, yes.                    |
| 19 | Q. | I'm going to move on to another topic, and we |
| 20 |    | discussed this a little bit on Thursday.  And |
| 21 |    | that was the letter that you wrote that is now |
| 22 |    | Exhibit A -- was attached to the Government's |
| 23 |    | motion, which is document 50.                |
| 24 |    | You know which letter I'm talking about?     |
| 25 | A. | Yes.                                         |

1          (Pre-marked Defendant's Exhibit A

2          introduced.)

3    Q.   (By Ms. Brown)  And I specifically asked you

4         about a section of that letter where you talked

5         about trying to get additional -- produce

6         additional documents from e-discovery regarding

7         documents that RSM had either reviewed or

8         assessed.  And that's on page 5 of document

9         50-1-2.

10              Do you remember me asking you some

11         questions about that?

12   A.   Yes.

13   Q.   And the one question I neglected to ask you

14         about that was that either before or after you

15         wrote that letter, did you communicate to RSM

16         that you were looking for documents that they

17         had reviewed or assessed?  Or did you do that

18         search on your own without communicating with

19         RSM?

20   A.   I just want to make sure I understand the

21         question.

22   Q.   Okay.  It's a long question.  I can rephrase

23         it, if you like.

24   A.   Sure.  Go ahead, and I'll try my best to answer

25         it if I understand the question.

1   Q.   Yeah.  So it's probably a good start -- so this

2        letter is dated November 21, 2019, document

3        50-1-2.

4             And as I said, you had stated in that

5        letter -- and I'll just read that sentence --

6        "Nevertheless, UWMB is currently working to

7        produce any documents from e-discovery database

8        which RSM reviewed and/or assessed, and which

9        were not previously produced."

10            So my question about that that I didn't

11       ask was, did you go on to search for those

12       documents?  Or did you communicate what you had

13       put in that letter to RSM to ask them to look

14       for documents that you had described?  Or did

15       you do both?

16  A.   So let me answer this way, and hopefully it'll

17       answer your question.

18            We had a request from Mr. Harrington.  I

19       think we had two requests from Tim Harrington.

20       And I think by this point, we actually may have

21       had the motion to exclude Naviloff's testimony.

22       And, I believe, the final pretrial conference

23       may have been on November 15.  Oh.  It's right

24       here on the first page of the letter.

25            "Final pretrial conference on

1           November 15."  There were lots of things that

2           happened from July to November 21 that were

3           all -- that were about, in part,

4           Tim Harrington's request for documents.  And so

5           my focus through this entire process was to

6           understand what he was requesting and

7           understand what may need to be produced, to

8           understand what could be produced in a

9           reasonable fashion without too much time,

10          delay, or burden.  And, most importantly, as

11          the representative of United Way, what did I

12          have access to or control over?

13               So my focus always was, are there United

14          Way documents that we haven't produced, that

15          Tim Harrington may be looking for, and what

16          could we do to produce them?  If we're not

17          going to produce them, why -- I guess is how I

18          was thinking.  So during those months from July

19          to November, from Tim's -- July is when

20          Naviloff was retained by the Government.

21               Mr. Harrington started making discovery

22          requests.  He made some in, I think, July,

23          August, September, and October.  He filed a

24          motion to exclude Naviloff's testimony.  Judge

25          held a final pretrial conference.  And during

1       all that time I was focused on what are they

2       looking for from me with respect to United Way

3       documents?

4            And while I was focused on that, I was

5       talking with RSM about documents that they may

6       have, and I was talking with the Government to

7       understand what the Government may be looking

8       for in response to things from us.  But the

9       Government didn't have the documents.

10           So, now, I'm not sure I answered your

11      question, but I tried to give you context so we

12      can hopefully get to the answer to your

13      question.

14   Q.  And I think you did not answer my question, so

15      I'm going to repeat it.  And just to be clear,

16      all I'm trying to find out here is -- you made

17      this representation in this letter that was

18      attached to a motion.

19           What did you do -- not the reason you did

20      it -- what I'm looking for is what you did

21      towards finding those documents that you said

22      that you were working to produce -- documents.

23      So what I don't understand from that sentence

24      is whether working to produce documents from

25      e-discovery means that all that happened from

Case 1:18-cr-00192-JL  Document 232  Filed 01/06/21  Page 18 of 264

```
 1         that representation is you went and looked at
 2         the e-discovery available to you, or did you
 3         pass along that effort to RSM and ask them --
 4              Say, "Hey, can you send me documents that
 5         you reviewed or assessed that had not
 6         previously been produced?"  So that's all I'm
 7         trying to find out -- what actions you took
 8         towards that representation.
 9   A.    So one piece of it is described in detail in
10         the letter, which was we had an e-discovery
11         database.  We had produced a whole lot of
12         documents already.
13              And what I described in the letter was an
14         effort to find out are there any documents in
15         that e-discovery database that anyone at RSM
16         had accessed in any way?  And, if so, if they
17         haven't been produced, let's produce them.
18              So if you just draw a box around the
19         e-discovery database, any document in that
20         database that any member of the RSM team
21         touched in any way -- accessed -- they didn't
22         have to study it, but they had to click on it
23         and they had to access it in some way -- all of
24         those documents were produced as a result of
25         the work that was done that is described in
```

1           that letter.  So that's one piece of it.
2      Q.  And I just want to clarify the term "we,"
3           because that can be confusing.
4                THE COURT:  Which letter now?  What's the
5           date on that letter?
6                MS. BROWN:  November 21, I believe.  Yes.
7                THE WITNESS:  It's marked as Exhibit A.
8                THE COURT:  Okay.  That one.  Yeah.
9      Q.  (By Ms. Brown)  So you used the term "we" in
10          referring to access to the e-discovery.
11               By "we," do you mean you, or you and RSM?
12     A.  I mean me.
13               When I'm talking about contacting Kroll,
14          the vendor, and saying "how can we find all the
15          documents that anyone at RSM may have touched?"
16          That's me.  I'm the one calling Kroll and
17          emailing Kroll.  RSM was not involved in that
18          process at all.  It was my e-discovery
19          database, for lack of a better term.  I mean,
20          it was United Way's database.  I was the
21          e-discovery expert or supervisor, for lack of a
22          better term.
23               So I'm in a relationship with Kroll.
24          They're my vendor.  So I communicate with Kroll
25          about the nuts and bolts of how do we find

```
 1          these documents and produce them?
 2              THE COURT:  We're really having trouble
 3          with the audio now.
 4              THE CLERK:  I have a suggestion.  It might
 5          be easier if you leave the meeting and then
 6          rejoin, just so that you have established a new
 7          connection.  It's pretty garbled.
 8              THE COURT:  You want him to basically --
 9              THE CLERK:  Leave the meeting and then
10          just rejoin.
11              THE COURT:  I guess give it a try, John.
12          Try to just terminate and rejoin.
13              THE WITNESS:  I'm going to do that, and I
14          will be back in a minute.
15              (Recess taken at 9:44 a.m., and the
16              proceedings resumed at 9:47 a.m.)
17              THE COURT:  Okay.
18              THE WITNESS:  I am back.
19              THE CLERK:  Welcome back.
20              THE COURT:  You can pose your question,
21          Counsel.
22     Q.   (By Ms. Brown)  I think if I clarify what I'm
23          trying to get at, it might make the answers a
24          little shorter.
25              What I'm trying to understand from these
```

1      emails that we've been reading -- it sounds
2      like RSM has their own internal access to data,
3      and that you have this e-discovery file that's
4      managed by Kroll.
5          And what I don't understand -- are they
6      the same thing?  Do you have more?  Do they
7      have less?  So that's what I'm not
8      understanding of -- so here's the issue.  You
9      said you looked in the e-discovery to see if
10     they accessed it.
11         Did they have their own copy of that that
12     they could have accessed without you knowing
13     about it?  I guess that's where I'm going.
14  A. So a few things.  No, they did not have their
15     own copy of the e-discovery database.  They did
16     have the ability to access the e-discovery
17     database, but not at this point in time that
18     we're talking about.
19         At the time we got close to trial, that
20     e-discovery database had been taken offline and
21     nobody had access to it.  I had United Way
22     documents that were not in the e-discovery
23     database that I had access to.  And I assume
24     and believe that RSM had their own documents in
25     some sort of document management and document

```
 1          storage system, so I guess their own ability to
 2          do their own searches or to make whatever
 3          efforts they needed to do or felt they needed
 4          to do to respond to the Government's requests.
 5               Does that clarify?  There are documents in
 6          different places, and different people have
 7          different levels of control over those
 8          documents.
 9    Q.    And that's what I was trying to ascertain.  So,
10          thank you.  That does give a little bit of
11          clarity.
12    A.    Is the quality of the connection any better?
13               THE COURT:  No.
14               MS. BROWN:  It's not great, but it's a
15          little better.  I think there's kind of a tinny
16          quality.
17    Q.    (By Ms. Brown)  I just want to clarify this
18          point, which is when you put in the letter
19          that's Exhibit A that you were looking to
20          produce documents that RSM reviewed or
21          assessed, part of that effort --
22               It doesn't sound like you sent an email or
23          made a phone call to RSM saying, "Hey, can you
24          make sure that I have everything you reviewed
25          or assessed?"  Sounds like you didn't do that;
```

1           right?

2    A.     Well, no, I didn't, because my focus was on

3           United Way's documents.  And I had control over

4           United Way's documents, even if RSM may have

5           had similar documents that they received from

6           United Way.

7                So, for example, the e-discovery database

8           is one example.  I had control over United

9           Way's documents in the e-discovery database.  I

10          didn't need to talk to RSM to understand what

11          should be produced from that database.

12               In addition, if RSM asked for documents

13          from somebody -- just as an example, from the

14          accounting department, from somebody like

15          Domenic Pallaria, who was the controller -- if

16          RSM wanted a copy of a document, a spreadsheet,

17          a report, a bank statement -- those documents

18          would come to me so that I could then provide

19          them to RSM; but also so that I could have a

20          document collection and management system so

21          that I would know what I had sent to RSM, and

22          then I knew that I also needed to send it to

23          the Government.

24               So I think I'm answering your question,

25          because I don't need to talk to RSM about what

1       documents they have.  Because it's the United

2       Way's documents, I was confident that I already

3       had control of those documents.

4   Q.  So I think that was a longer way of saying that

5       my assumption was correct, which is you didn't,

6       either by email or phone call, contact RSM to

7       make sure that they had not assessed or

8       reviewed something that had not already been

9       produced?

10  A.  Well, I think -- let me explain.

11          So in addition to everything else I've

12      discussed, we did have phone calls.  And, in

13      fact, there are emails that show the series of

14      folders and names of folders.  And I think we

15      may have talked about it last time how they

16      shared some of that information with me.  And

17      then we had phone calls.

18          And so the purpose of that -- so in

19      addition to me feeling confident that I knew

20      what RSM had from the United Way, we went above

21      and beyond.  We went many steps further,

22      because I had calls and emails with

23      Christopher Fitzgerald and Greg Naviloff where

24      they sent me these names of folders and

25      described for me the types of documents they

1   had collected.

2     And we went through them and discussed

3   them.  And I was able to say for some large

4   number of those documents -- maybe all of them,

5   I don't remember.

6     I was able to say "that folder right there

7   that contains all the reports that

8   Domenic Pallaria generated from the accounting

9   department -- I've already produced that.  I

10   have that exact same folder with those exact

11   same documents.  You got these from me."

12     So we went through a process like that

13   where together, we tried to figure out "what do

14   I have for the United Way; and what do they

15   have?"  And when I say "what do they have" --

16   if they were RSM documents, that was not my

17   responsibility to produce.  My responsibility

18   only was to weigh in as to the possibility of

19   attorney-client privilege.

20 Q. Well, because you had a reviewing status as to

21   the posttrial discovery production as it

22   related to United Way, you're familiar that one

23   of the things that was produced after trial was

24   a network scan with multiple tabs on it;

25   correct?

1    A.   Yes.

2    Q.   And you would also agree with me that while

3         maybe one or two of those tabs might have been

4         produced pretrial, that entire network scan

5         that was produced after trial was not produced

6         pretrial?

7    A.   I don't know all the details, but what you just

8         described is what I understand.  But I'm not

9         familiar with all the details of that schedule

10        compared to other schedules.

11   Q.   Well, I guess what I'm trying to understand is

12        how that happened that only part of the network

13        scan was produced pretrial, and then

14        afterwards, we find that there are -- there was

15        more to the file than had been produced

16        pretrial.

17             So were you part of that, or are you

18        saying you don't understand how that happened?

19   A.   Well, I can tell you what I was part of and

20        what I understand.

21             Mr. Harrington made a request.

22             And I don't know if he specifically said

23        "network scan," but something like that.  And

24        so we went -- we took an effort to find

25        anything that we could produce that was a

1          network scan.  And from my perspective, the
2          effort was, if we have anything like this,
3          let's find it and let's produce it.  He
4          specifically asked for it, and we wanted him to
5          have it.  That's the approach that we took.
6               And I think he may have asked for it more
7          than once.  So my state of mind was, it seems
8          like this exists.  Let's find it and produce
9          it.  So what did I do?  I talked to the people
10         who might have it.  So I spoke with John Meyer.
11         I probably emailed him as well.
12              And I said, "Do we have something called a
13         network scan?" And I got a response from
14         John Meyer.
15              And I believe he sent me a document that's
16         called a "network scan" or something similar.
17         And we produced it -- one version of that
18         before trial, that I believe came from
19         John Meyer.
20              Similarly, I communicated with RSM and
21         said, "Tim Harrington is looking for something
22         called a network scan.  Do we have it?  Let's
23         find it and let's produce it."
24              THE COURT:  Audio is not happening.
25              Mr. Commisso, let me ask you a question.

1        Are you in a position to go to your office and

2        do this?  Or are you too far away?

3               THE WITNESS:  I'm too far away.  I'm

4        trying to think.  But my other options might be

5        from what I have at home.  One option --

6               THE COURT:  Let's go off the record here.

7               (Recess taken at 9:58 a.m., and the

8               proceedings resumed at 10:01 a.m.)

9               THE COURT:  This is pretty meandering

10       stuff.  If I'm supposed to be getting a lot out

11       of this, it's not happening.

12               I understand where you're trying to go,

13       Attorney Brown -- I really do.  But this isn't

14       very straightforward stuff.

15               I don't know why -- Mr. Commisso, why

16       don't you just answer the questions "yes" or

17       "no"?  You can always explain yourself.  But

18       these answers go on forever.  Just answer her

19       questions.  I tell witnesses this all the time,

20       and you must hear it.  You're a trial lawyer --

21       criminal defense lawyer.

22               Answer "yes" or "no," and then explain

23       your answer if you need to.  But let me just

24       say, if the situation of your involvement, and

25       RSM, and United Way, and all the players is

```
 1           supposed to be getting clearer to me, it's
 2           heading in the opposite direction.  And that's
 3           not good.  So I'd appreciate just some real
 4           straightforward examination and answers to
 5           questions.
 6     Q.    (By Ms. Brown)  And I will try to focus on what
 7           I'm actually looking for, so you don't have to
 8           give as long an answer, and maybe we can get
 9           right to it.
10                So we were talking about that in the
11           post-conviction document production, there was
12           a network scan that had 40-plus tabs on it of
13           information that had not been produced
14           pretrial.  So I don't need you to describe that
15           right now.  I'm just putting that on the
16           record.
17                So a minute ago, you described the process
18           where you tried to, for lack of a better word,
19           assess what RSM looked at and didn't look at.
20           Because whatever you had -- any discovery would
21           be what they had access to, as I'm
22           understanding this.  So we now know that there
23           was -- like, there was that one network scan
24           produced pretrial.  Now we know there were
25           multiple other network scans that were produced
```

1          after trial.

2               So it sounds like you were describing, as

3          I understood it before we took a break, that

4          you got those documents directly from

5          Mr. Meyer; correct?

6     A.   So before trial, I got a network scan from

7          Mr. Meyer.  Before trial, there was a second

8          network scan that I believe came from RSM.

9          Those were the only two network scans I was

10         aware of.  And now in the last month or so,

11         there was a third network scan.  And I don't

12         know the history and origin of that network

13         scan.

14    Q.   So you, personally, did not find this third

15         network scan.

16              It came from some other party?

17    A.   I did not, personally, find the third network

18         scan.

19    Q.   And you don't know whether it came from

20         Mr. Meyer or from RSM?

21    A.   When you say "came from," you mean in post

22         trial?

23    Q.   Post trial.

24    A.   Somebody found it recently.  I don't know for

25         certain, but I believe it was RSM that

| | | |
|---|---|---|
| 1 | | identified the third network scan that had not |
| 2 | | been previously produced. |
| 3 | Q. | And so can I assume from that that that third |
| 4 | | network scan was not in this e-discovery that |
| 5 | | we were talking about earlier? |
| 6 | A. | As far as I know, it was not. |
| 7 | Q. | That's where I was going with that.  Thank you. |
| 8 | A. | If it had been, then it should have been |
| 9 | | produced in the e-discovery process, but I |
| 10 | | can't confirm that. |
| 11 | Q. | But it wasn't produced; correct? |
| 12 | A. | I don't know.  I don't know if it was produced. |
| 13 | Q. | Just so you know where I'm going with the next |
| 14 | | question, I'm going to ask about your contact |
| 15 | | with witnesses in this case.  And I'm not |
| 16 | | asking for detail about what was said, anything |
| 17 | | like that.  It's just who you had contact with |
| 18 | | in preparation for trial. |
| 19 | | So a lot of the witnesses at trial were |
| 20 | | employees of United Way; right? |
| 21 | A. | Some of them were, yes. |
| 22 | Q. | And in preparation for trial, you met with and |
| 23 | | prepared witnesses who were employed by United |
| 24 | | Way for their testimony at trial? |
| 25 | A. | I met with them to help them prepare for their |

1          testimony, yes.
2     Q.   Would that apply to every United Way employee
3          who testified at trial?
4     A.   I believe that's correct.
5     Q.   Did you either meet with and/or talk to or
6          email Naviloff in preparation for his trial
7          testimony?
8     A.   I certainly communicated with him.  But for the
9          purposes of preparation, I don't -- I don't
10         remember meetings with him, and I don't know
11         that we really had any discussion that I would
12         characterize as preparing him for his
13         testimony.
14    Q.   And I'm not going to go into a lot of detail
15         about this.  And I asked some questions of
16         Mr. Naviloff a couple of weeks ago regarding
17         the October 4, 2018 email regarding --
18    A.   Excuse me.  I'm going to change my settings
19         here.  Hopefully, we'll have a better
20         connection here.  So just bear with me.
21              So I don't know if that will help or not,
22         but I thought of one idea that might improve
23         the connection.
24              So please start your question again.
25    Q.   Sure.

1              As I said, I was not going to go into a

2         lot of detail on this, but a couple weeks ago

3         when Mr. Naviloff was testifying, I asked him

4         about an email that you were involved in from

5         October 4, 2018, where you suggested revisions

6         to the RSM report.

7              You remember listening to that exchange of

8         testimony when Mr. Naviloff testified?

9    A.   Yes.

10   Q.   And you agree that as part of that exchange of

11        ideas on that email, you suggested revisions to

12        the report, including a suggestion that it be

13        titled -- or it say that Alrai "executed a

14        complex fraud scheme"?

15             You remember that email?

16   A.   Yes.  It may have already used those terms, but

17        I made a revision to that portion of the

18        PowerPoint presentation.

19   Q.   And, in fact, you also suggested including that

20        "this complex fraud scheme included gaining

21        trust and deceiving multiple individuals"; that

22        was part of that same suggestion?

23   A.   Yes, that's what my email said.

24             MS. BROWN:  I don't have any further

25        questions.

1          THE COURT:  Thank you.

2          Cross-examination, Mr. Davis, I assume?

3

4                  CROSS-EXAMINATION

5     BY MR. DAVIS:

6  Q.  Good morning.

7          Mr. Commisso, you were and are an outside

8      counsel for United Way on all matters relating

9      to the Imran Alrai DigitalNet case; is that

10     right?

11 A.  Yes.

12         And I would say -- you said "case," but I

13     would say all matters.  So there were lots of

14     tentacles and spin-offs.

15 Q.  Is your role limited to the criminal case?

16 A.  No.

17 Q.  And can you summarize briefly the major areas

18     that are not the criminal case that you have

19     been working on since the spring of 2018?

20 A.  There are many of them, and they are described

21     in my declaration.  But a few of them that come

22     to mind include dealing with the IRS, the

23     Massachusetts Attorney General's Office, the

24     New Hampshire Attorney General's Office, the

25     annual audited financial statements, the

1        disclosure of those financial statements to

2        federal agencies and state agencies, responding

3        to federal and state agencies that provide

4        funding for United Way's social service

5        programs, dealing with public relations and

6        media relations issues, dealing with the

7        insurance company, dealing with Mr. Alrai's

8        attorneys before -- separate and apart from the

9        criminal case, and something called Charity

10       Navigator, which is a third-party watchdog

11       group.

12           And I've identified others in my

13       declaration, but that's a pretty good start.

14  Q.  Of all of the total fees that your law firm has

15       billed United Way, did you calculate the

16       approximate percentage that relate to the

17       criminal case?

18  A.  Yes.  And I don't have it in front of me.  It

19       is in the end of my declaration.  But it's less

20       than 50 percent of my time and fees.  And

21       that's just from my firm -- less than

22       50 percent concern the federal criminal case.

23  Q.  The Court asked in this case to hear more about

24       the practical effect on the Defense of your

25       involvement in the prosecution, including in

```
 1            the documents disclosed in discovery.
 2                 Do you recall that question being asked?
 3   A.    Yes.
 4   Q.    What has your role been in the criminal matter
 5         on behalf of United Way?
 6   A.    Well, I've already talked about the grand jury
 7         subpoena and responding to the grand jury
 8         subpoena.  Overall, my responsibility is with
 9         respect to United Way documents.  So I want to
10         make sure that I produce documents in response
11         to the grand jury subpoena.  And
12         Mr. Harrington, before trial, had a number of
13         requests, and I did my best to identify United
14         Way documents that could be produced to the
15         Government in response to Mr. Harrington's
16         request.
17                 And with respect to RSM documents, my
18         primary role was to understand privilege issues
19         and to make sure I protected my client's
20         interest in not disclosing privileged
21         information.  And there were probably some
22         other things that I did.  But the number one
23         thing was taking responsibility for United
24         Way's documents and protecting the privilege.
25   Q.    In producing United Way's documents, did you
```

1       pick and choose among the documents you decided
2       to produce?
3    A.  Yes, in the sense that we had to run search
4       terms to try to find documents.  But when we
5       found relevant documents, that was the --
6           The picking and choosing was "is this
7       relevant?"  Not "is this good or bad?"
8           "Is this relevant to the issues as I
9       understand them or as they've been explained to
10      me?"
11   Q.  And can you explain briefly your criteria in
12      deciding relevance of a United Way document?
13   A.  So let's say it was broad in the sense that did
14      it concern Mr. Alrai, and DigitalNet, and their
15      dealings together?  That's the broad way that I
16      would describe it -- and the services that
17      Alrai or DigitalNet provided to United Way, and
18      who paid for that, and who was involved in that
19      process from day one through the day payments
20      were made.
21          So just to give you an example, every time
22      somebody had trouble with the printer, just
23      getting a document to print on the printer, I
24      do not think that was a relevant document.
25      Because, frankly, we would have never finished

1            discovery if we treated each problem with the

2            printer as a relevant document.

3                 But, broadly speaking, if it related to

4            Alrai's services and DigitalNet's services,

5            then it was relevant.

6     Q.     And did you produce every single relevant

7            document you identified that was not

8            privileged?

9     A.     Yes.

10    Q.     And in the posttrial discovery proceedings in

11           this case, have you become aware of any United

12           Way document that was exculpatory and that was

13           not produced before trial?

14    A.     No.

15    Q.     And have you become aware of any United Way

16           document that, under your relevancy criteria,

17           should have been produced before trial?

18                 THE COURT:  Look, I really don't -- his

19           answers and his opinions about these issues?

20           I've seen documents that are exculpatory that

21           were not produced before trial.  We've been

22           talking about them in this hearing.

23                 Now, you might disagree.  And I understand

24           that, because reasonable minds can disagree.

25           But Mr. Commisso's opinion about what's

```
 1         exculpatory or what's relevant -- I'm not sure
 2         what I'm supposed to do with that.
 3              MR. DAVIS:  Your Honor, I beg to differ,
 4         only because I'm not asking about internal RSM
 5         communications.  I'm asking specifically about
 6         United Way documents.
 7              THE COURT:  Oh.  Okay.
 8              MR. DAVIS:  This man has been attacked 500
 9         ways about United Way documents.  So I'm just
10         asking if he's seen anything that should have
11         been produced from the United Way documents he
12         produced.
13              THE COURT:  Okay.  That's a distinction
14         that does matter.
15              Go ahead.
16              THE WITNESS:  So my response to that is
17         look at every one of the Defendant's filings
18         after trial, and look at every one of the
19         attachments to those filings, and there is not
20         a single United Way document.  I'm not talking
21         about RSM or anyone else's documents.  There's
22         not a single United Way document that supports
23         the attacks against me.  And I, frankly, find
24         it outrageous.
25    Q.    (By Mr. Davis)  I want to ask you about your
```

1          role in the prosecution.
2              Were you the puppet master of the
3          prosecution team in this case?
4   A.   No, I was not.
5   Q.   Did you play any role in the drafting of the
6          indictment in this case?
7   A.   No, I did not.
8   Q.   Did you play any role in the grand jury
9          exhibits that were used in this case?
10  A.   No, I did not.
11  Q.   Did you receive any grand jury material in
12         violation of Rule 6(d)?
13  A.   No.
14  Q.   Did you play any role in the gathering of
15         documents from the myriad other sources besides
16         United Way that were collected in this
17         investigation?
18  A.   No.
19  Q.   Did you have any role in crafting the
20         Government's exhibit list for trial?
21  A.   No.
22  Q.   Did you have any role in choosing the witnesses
23         on the 40-person exhibit list the Government
24         used?
25  A.   No.

1    Q.   Did you orchestrate the prosecution?

2    A.   No.

3    Q.   Now let's talk about preservation.

4              First of all, do you recall in the motion

5         in this case -- the motion to dismiss -- on

6         page two, the Defense assertion that on June 19

7         of 2018, Mr. Alrai sent you a message

8         requesting that you instruct United Way to

9         "preserve all IT data during the

10        investigation"; do you recall that assertion?

11   A.   Yes, I do.

12   Q.   And are you familiar with the letter from

13        Mr. Alrai's counsel on June 19 of 2018?

14   A.   Yes, I am.

15   Q.   And did that letter request that you instruct

16        United Way to "preserve all IT data during the

17        investigation"?

18   A.   No, it did not.

19   Q.   In fact, did it have specific requests about

20        what United Way was supposed to preserve?

21   A.   Yes.  There were seven or eight bullet points

22        of specifically identified data.

23   Q.   And was one of those bullet points "documents

24        or correspondence related to any and all

25        requests for proposal for IT or similar

1          technological support services"?
2    A.   I believe so.  I haven't looked through the
3          letter in a little while, but, yes.  It lists
4          the documents and data about IT services.
5    Q.   And were documents, in fact, preserved?
6    A.   Yes.  Every item on that list was, in fact,
7          preserved.  And 100 percent, or nearly
8          100 percent, of those items were, in fact,
9          produced to the Government.
10   Q.   And did that letter -- again, from Mr. Alrai's
11        counsel on June 19, just one week after he was
12        walked out -- did that include documents
13        related to committee meetings that Mr. Alrai
14        was on?
15   A.   Yes.
16   Q.   And did it include documents related to
17        committee meetings where the committee
18        discussed United Way's IT service providers and
19        structure?
20   A.   Yes, and we produced those.
21   Q.   And did it include documents or correspondence
22        related to all internal investigations, audits,
23        or reviews of the United Way's IT service
24        providers, structure, or operations, including
25        the recent information and audit by CBIZ and

1        MHM?
2    A.  So, yes, it requested those.  We did not
3        necessarily produce all of that if it was
4        privileged.  So if it was historic information
5        before the investigation, we would have
6        produced it.  But if it was --
7    Q.  But did you preserve all of that information?
8    A.  Yes.  Yes, it was all preserved.
9    Q.  Did the letter on June 19, 2018, also request
10       that you preserve documents or correspondence
11       from, or copying, Mr. Alrai's United Way email
12       address?
13   A.  Yes, we preserved those.  And we produced a lot
14       of them, but not all of them.
15   Q.  And did you also -- were you also asked to
16       produce or preserve documents or correspondence
17       related to Mr. Alrai's termination, including
18       Mr. Alrai's employee file and performance
19       reviews?
20   A.  Yes.  And, in fact, the employee file and
21       performance reviews, we produced directly to
22       Mr. Strauss (phonetic) within, I would say, two
23       to three weeks of his termination.  So that was
24       a separate production different from the grand
25       jury production.

1   Q.   And so of the items on Mr. Alrai's very

2        specific preservation letter --

3             THE COURT:  Can I interrupt, Mr. Davis,

4        with a question -- a clarifying question?

5             MR. DAVIS:  Yes.

6             THE COURT:  Mr. Commisso, when both of

7        you, Mr. Davis and Mr. Commisso, referred to

8        the grand jury production just then, what

9        exactly are you referring to?

10            THE WITNESS:  You're asking me?

11            THE COURT:  Sure.

12            THE WITNESS:  I'm referring to the

13       documents that I produced to the Government.

14            THE COURT:  Right, initially.

15            THE WITNESS:  Or throughout the case.

16       But, yeah, those types of documents we produced

17       before the original indictment.

18            THE COURT:  Yeah.  That's what I'm asking.

19       Okay.

20            THE WITNESS:  Yes.

21            THE COURT:  I've never been, like,

22       1,000 percent clear on that, so that's helpful.

23       Thank you.

24            I'm sorry, Mr. Davis.

25            MR. DAVIS:  Quite all right, Judge.

1   Q.   (By Mr. Davis)  Let's just talk briefly about

2        what has been preserved at United Way.  We

3        talked about network scans.

4             How many network scans have been

5        preserved?

6   A.   At least three have been preserved and produced

7        to the Government and the Defendant.

8   Q.   So the Defendant has three network scans right

9        now; is that correct?

10  A.   Yes.

11  Q.   Pictures or maps of the IT environment -- have

12       you produced those?

13  A.   Yes, to the extent that they exist.  And we

14       also -- to the extent they didn't exist, we

15       asked Mr. Alrai to either provide them or tell

16       us where we could find them.

17  Q.   And did you make that request almost

18       immediately after his termination?

19  A.   Yes, before the end of June, within two weeks

20       of his termination.

21  Q.   And that was 2018?

22  A.   Yes.

23  Q.   And did you discover whether Mr. Alrai actually

24       kept pictures or maps of the IT environment?

25  A.   Mr. Meyer, I believe, searched for that

1          information.  And he found one piece of paper

2          hanging in the IT room that just had a list of

3          computer names, or server names, or IP

4          addresses.  And that was the sum total of the

5          documentation or map of the IT system.

6    Q.    Did you preserve invoices and contracts

7          relevant to this case?

8    A.    Yes, absolutely.

9    Q.    Did you preserve emails relevant to this case?

10   A.    Yes.

11   Q.    Did you preserve PowerPoint presentations?

12   A.    Yes.

13   Q.    Did you preserve meeting minutes about IT

14         services of all kinds?

15   A.    Yes.

16   Q.    Did you preserve virtual desktop sessions at

17         United Way?

18   A.    Yes, for certain key employees who were related

19         to the IT function.

20   Q.    And did you preserve laptops and computers at

21         United Way?

22   A.    Yes, for certain key employees related to these

23         issues.

24   Q.    Did you preserve cell phones?

25   A.    Yes.

```
 1   Q.   And do you know how many?
 2   A.   I know there were at least two cell phones.
 3        There may have been three.  I just don't know
 4        the exact number.
 5   Q.   Did you preserve servers?
 6   A.   Yes.
 7   Q.   And did you preserve websites?
 8   A.   Yes.  And I don't know the technical side of
 9        what that means, but, yes.
10   Q.   And did you preserve log-in information?
11   A.   I believe so.  Of that, I'm not certain.  Maybe
12        that's a question for Mr. Meyer.
13   Q.   And at any point, have you suppressed any of
14        the IT information at United Way that has been
15        preserved?
16   A.   "Suppressed" -- I'm not sure what the meaning
17        is, but I know the answer is no.  So I guess
18        I'm not sure what you mean.  Have I
19        suppressed --
20   Q.   Meaning, have you been aware of an item that
21        Mr. Alrai was looking for that you had
22        preserved, that you decided not to turn over?
23   A.   No.  It was all driven by my obligation.  So we
24        preserved a lot of evidence, and we turned over
25        a lot of evidence.  But we didn't turn over
```

```
 1         everything, because I was following the rules
 2         as they applied to the United Way of
 3         Massachusetts Bay.
 4    Q.   Now, we've talked a lot in this case about
 5         your -- or in your testimony about the
 6         assertion of privilege on behalf of the United
 7         Way.
 8              Do you recall that?
 9    A.   Yes, I do.
10    Q.   And you have described that you have asserted
11         privilege, and continue to assert privilege,
12         regarding the data breach investigation that
13         RSM was part of after Mr. Alrai was terminated;
14         is that right?
15    A.   Yes, that's correct.
16    Q.   And have you made up, recently, that data
17         breach investigation as a new and different
18         basis to assert privilege?
19    A.   No, it's been asserted since the very beginning
20         of the engagement.
21    Q.   And, just briefly, was the data breach
22         investigation clearly asserted as a basis of
23         privilege before the trial in this case?
24    A.   Yes, it was.
25    Q.   And can you describe briefly how that was done
```

1       and when that happened?

2   A.  Well, I guess, at least two things.  One is

3       that I made it clear to the Government that we

4       considered it privileged, and that we had not

5       and would not produce documents concerning

6       that.

7           And then when Mr. Harrington began making

8       discovery requests in July, we produced

9       documents.  And in at least one of those

10      documents, there's a reference to the data

11      security investigation.

12          And then there are about 15 to 20 pages of

13      a document that are redacted and stamped

14      "redacted."

15  Q.  But you have never provided any privileged

16      documents related to the data breach

17      investigation to the Government; is that

18      correct?

19  A.  That's correct.  If I had, it would have been

20      inadvertent.  Because I made it clear that I

21      did not intend to and did not want to provide

22      any of those documents.

23  Q.  And as to the privilege log you recently filed

24      in this case, there are approximately 300

25      documents as to which you assert privilege; is

1            that right?

2    A.     Yes, that's correct.

3    Q.     And is the privilege you're asserting related

4           to the data breach investigation?

5    A.     Well, data breach and, in addition to that,

6           certain documents concerning the e-discovery

7           procedures that were in the Kroll database.

8    Q.     But do those relate to Naviloff's loss analysis

9           at RSM?

10   A.     No.  The documents on the privilege log do not

11          concern -- are not within the scope of

12          Naviloff's loss analysis.

13   Q.     And are you using the data breach investigation

14          or the Kroll e-discovery issue as a means of

15          masking or suppressing relevant information

16          from Mr. Alrai?

17   A.     No.  No, I've been working hard to turn over

18          everything from the United Way that concerns

19          Mr. Naviloff's loss analysis.  And I'm not

20          looking to withhold or suppress anything that I

21          understand somebody's looking for and that it

22          relates to Naviloff's loss analysis.

23   Q.     You've been accused of "selective assertion of

24          privilege"; do you recall that?

25   A.     Yes, I do.

1    Q.  After you waived privilege with respect to the

2        RSM loss analysis investigation, were you

3        selectively asserting privilege?

4    A.  No, I wasn't.  It's clear, based on everything

5        that's been produced, we have waived the

6        privilege regarding the loss analysis, and

7        we're not using that or any other privilege to

8        shield documents concerning the loss analysis.

9    Q.  At this moment, is there any document that

10       you're aware of regarding the RSM loss analysis

11       that is being withheld from Mr. Alrai on the

12       basis of an assertion of privilege?

13   A.  Not that I'm aware of.

14            THE COURT:  Well, data security privilege,

15       though; right?

16            THE WITNESS:  Right.  But that does not

17       concern the loss analysis.

18            THE COURT:  Right.  Understood.

19            When -- Mr. Davis, when you were

20       questioning a minute ago regarding selective

21       assertion of the privilege after the waiver,

22       from your perspective -- I want to be clear on

23       this -- when did the waiver occur as to the

24       loss and as to any privilege issues regarding

25       the loss analysis?  Mr. Davis.

1           MR. DAVIS:  Your Honor, from the

2      Government's perspective, there was arguably a

3      subject matter waiver that occurred in November

4      of 2018 once we sat down with Mr. Commisso and

5      Mr. Naviloff.  Because we clearly discussed the

6      findings that RSM had made regarding loss

7      analysis, including the general sort of

8      categories that included duplicate billing and

9      excessive billing, et cetera.

10          And so in my mind, not that I would have

11      any interest in litigating with United Way, and

12      not that United Way was being uncooperative,

13      but that was a subject matter waiver.  And I

14      would guess Mr. Commisso would agree on that.

15          THE COURT:  Was it declared understood?

16      Or is that just your -- if you had to litigate

17      it, you'd put it in November 2018, when you

18      started talking about loss analysis,

19      duplicative billing, overbilling?

20          MR. DAVIS:  If the question is to me,

21      Judge, I probably don't recall accurately.

22          I don't remember that one of us looked at

23      the other and said, "Okay.  This constitutes a

24      waiver."

25          THE COURT:  Sure.

1          MR. DAVIS:  Mr. Commisso probably

2      remembers better than I do.

3          THE COURT:  Go ahead.

4          MR. DAVIS:  Mr. Commisso, do you remember

5      on that point?

6          THE WITNESS:  So my memory is similar to

7      yours, which is we didn't have a discussion.  I

8      did not, on my own side, brief the issue or

9      determine what it would mean.  I do think that

10     the November 2018 meeting was the point where

11     we began to waive the privilege.  And it wasn't

12     until later that we had to figure out what that

13     meant.  And so in July of 2018, when Naviloff

14     became the Government's expert and

15     Mr. Harrington requested documents, we then had

16     to start figuring out where the lines were.

17         What was the scope of the waiver?  And it

18     still -- well, so, it evolved, I guess.  We

19     didn't sort it all out in November.  And we

20     began to really sort it out in July.

21         THE COURT:  July of...

22         THE WITNESS:  2019.

23         THE COURT:  2019.

24         Was there a point at which -- because a

25     waiver is not a small thing; right?

1           Was there a point at which you

2     acknowledged in your own file, Mr. Commisso, or

3     with your client, where you said, "Look, our

4     conduct constitutes a waiver.  This is going to

5     change the way we produce documents to the

6     Government"?

7           Did that ever get noted anywhere,

8     acknowledged, either internally or externally,

9     in your dealings with the Government?

10          THE WITNESS:  Internally, certainly, we

11    discussed waiver issues or privilege issues

12    from the beginning and throughout as we made

13    our decisions, and certainly with respect to

14    sharing Naviloff's work in November, and

15    certainly with respect to allowing the

16    Government to hire Naviloff, because I needed

17    to make sure my client understood what that

18    meant.

19          So we evaluated the issue and we made sure

20    we knew what it meant and what the risks would

21    be.

22          THE COURT:  But I guess what I want to

23    know is -- let me just -- I think I said very

24    clearly last week that Mr. Commisso didn't do a

25    thing here, I thought, that was not completely

1        predictable for any lawyer representing a
2        client, or inappropriate, unethical, unlawful,
3        or anything of the sort.  There's been a lot of
4        talk about accusations here today.  And I guess
5        one could consider -- Mr. Commisso's outraged.
6        Mr. Davis is not happy about it, it's clear.
7              But I certainly don't view this as
8        Mr. Commisso on trial at all.  I'm just trying
9        to understand what happened; okay?  I can't
10       imagine it would have gone much different with
11       any competent counsel.
12             But is there an acknowledgment -- I mean,
13       is there a day -- a document on which you said
14       to your client, "Listen, we've waived" -- or
15       you wrote in your own file to protect yourself,
16       right, "This is a waiver"?  Or you're
17       communicating with the Government?
18             Is there a rubicon -- is there an
19       imaginary line, a date -- some acknowledgement,
20       internally or externally, about a waiver that
21       would change the way you dealt with producing
22       evidence to the Government?
23             THE WITNESS:  Yes.  So, with respect to
24       communicating with my client, there are
25       certainly documents -- and I guess I'm

1           hesitating to say too much about it, because I

2           need to think about the privileged nature of

3           those communications.  But to your point, yes,

4           it is very easy for me, in my file, to

5           pinpoint, because I documented it extensively

6           exactly how that played out.

7                 With respect to communications with RSM, I

8           believe there will be communications between --

9           I'm hesitating a little bit because my memory

10          is vague -- but I expect there would be

11          communications between me and Greg Naviloff.

12          Because Greg Naviloff can't turn over documents

13          or sign a contract with the Government without

14          me acknowledging that the United Way is going

15          to waive the privilege.  Because if he does --

16          if he does it without our acknowledgment, he

17          risks having a liability to the United Way for

18          disclosing confidential information.

19                So there's a clear record with my client.

20          There should be a clear record with

21          Mr. Naviloff.  With Mr. Davis, I haven't

22          thought about what record may exist, but I know

23          that we talked about the issues.  And on

24          various issues of privilege, he might have

25          asked me things.

1           Or I might have told him, "Before you talk

2      to Mr. Naviloff, I need to make sure that I'm

3      okay with it and my client is okay with it."

4      So there were communications and different

5      types of documentation on these issues.

6           THE COURT:  Okay.

7           And if you want to stay with the issue,

8      Mr. Davis, vis-`-vis your client, your office's

9      dealings with Mr. Commisso or Mr. Naviloff,

10     feel free to develop it more.  It's up to you.

11  Q.  (By Mr. Davis)  So I'll say, Mr. Commisso, once

12     the Government began to deal with RSM and

13     Naviloff as the Government's expert, did you

14     assert any impediment to Mr. Naviloff's sharing

15     fully his work that had occurred, some of it

16     under United Way's contract?

17  A.  No.  No limitations, no impediment with respect

18     to Naviloff, and the loss analysis, and the

19     work that he was going to do for the

20     Government.

21  Q.  So the Government could and did communicate

22     freely with Naviloff after it hired him in July

23     of 2018; correct?

24  A.  Right.  And, in fact, my role at that time was

25     essentially something close to zero, unless it

1          dealt with documents that Mr. Harrington

2          needed, or maybe Naviloff and the Government

3          needed that I might be able to provide --

4          United Way documents.  But, otherwise, I was

5          not a participant in the Government's

6          relationship with Greg Naviloff.

7     Q.   I just have a few more questions.  I want to

8          ask you about internal RSM emails; that is,

9          emails within RSM, among the employees of RSM,

10         including Naviloff and other personnel.

11              You've seen those in the posttrial

12         discovery; correct?

13    A.   Yes.

14    Q.   Did you ever ask for all of those emails to do

15         a comprehensive review prior to trial?

16    A.   No.

17    Q.   Why not?

18    A.   It never occurred to me.  I can't think of any

19         reason why I would want them.  It just -- it

20         never crossed my mind, and I can't think of a

21         case in 20 years where I may have asked for

22         something like that.

23              THE COURT:  That last part of the answer

24         makes me think I misunderstood the question.

25              What was the question again, Mr. Davis?

1              MR. DAVIS:   The question was whether

2        Mr. Commisso requested from RSM all of its

3        internal email communications at any point.

4              THE COURT:   Okay.   Yeah.

5              MR. DAVIS:   May I proceed, Your Honor?

6              THE COURT:   Give me a second.

7              No, go ahead.   Thank you.

8    Q.   (By Mr. Davis)   Were there, before the trial in

9         this case, significant requests for some RSM

10        emails from Mr. Alrai?

11   A.   Yes, I believe there were.

12   Q.   And were there, in fact, RSM emails that were

13        produced, prior to the trial, to Mr. Alrai?

14   A.   Yes, there were.

15   Q.   And did you play a role in reviewing those

16        emails?

17   A.   Yes, if they concerned United Way employees --

18        for example, John Meyer.

19   Q.   And were you directly involved in the discovery

20        litigation just before trial -- that is, in the

21        October and November 2019 time frame?

22   A.   Yes.   Yes, I was.

23   Q.   And was it in that context that you filed

24        Defense Exhibit A, your six-page letter that

25        detailed exactly what you were doing in this

1     case?

2  A.  Yes, that's exactly right.

3  Q.  And in connection with that litigation, did

4      Mr. Harrington, the counsel for Mr. Alrai, ever

5      ask for every internal RSM email in this

6      engagement?

7  A.  No, not that I understood, or not that I'm

8      aware of.  And that certainly was not the focus

9      of the actual issues being litigated before the

10     Court.

11 Q.  And to your knowledge, was any such request --

12     again, for every internal RSM email about this

13     engagement -- was that ever made prior to

14     trial?

15 A.  No.  The first time it came up was a year

16     later, in August and September of 2020.

17 Q.  And in your communications with Mr. Naviloff,

18     at any point, did Mr. Naviloff indicate to you

19     that there might be RSM emails that could be

20     used to impeach him at trial?

21 A.  No.  We never discussed that.

22 Q.  And in your communications with Mr. Naviloff,

23     did Mr. Naviloff ever tell you that there might

24     be internal RSM emails that contained

25     exculpatory information to benefit Mr. Alrai?

1   A.   No, he never told me that.
2   Q.   So were you doing anything to suppress or
3        prevent the disclosure of RSM internal emails?
4   A.   No.
5   Q.   And, in fact, as you said, it never occurred to
6        you to request every RSM email in the
7        investigation; is that right?
8   A.   That's right.
9   Q.   And just one last question.
10            In dealing with -- well, have you dealt in
11       the past with forensic accounting consultants
12       who may be expert witnesses in litigation?
13  A.   Yes, I have.
14  Q.   And in any of those engagements, has it ever
15       been part of your practice to collect and
16       review every single internal email at that
17       forensic accounting consultant firm to review?
18  A.   No, it's not been part of my practice.  And, in
19       fact, it's sort of the last thing that I would
20       ever expect happening.
21            What we do focus on, in civil and criminal
22       litigation, is the -- what I call the raw
23       material, or the original source documents that
24       go to the expert.  And you want to know what
25       those are so that you can then provide them in

```
 1              discovery.  But the underlying business records
 2              and source documents -- the idea of producing
 3              internal emails or internal work product is not
 4              something that I've ever been involved in.
 5                   So, no, I would not have been thinking
 6              about it in this case.
 7    Q.    I want to ask you just briefly about the
 8          "fruitful" email, which is Defense Exhibit Gg.
 9                   Is that something that -- I'm not even
10          sure -- Tracy, if you're on, can we call up
11          Exhibit Gg?
12              THE CLERK:  Yep.  Just give me a moment to
13          share my screen.
14              (Pre-marked Defendant's Exhibit Gg
15               introduced.)
16    Q.    (By Mr. Davis)  You recognize that email to
17          Mr. Commisso?
18    A.    Yes.  I've seen this recently.
19    Q.    And this is the email that includes the -- at
20          the very bottom, the bullet "the trending of
21          total United Way budget versus IT budget was
22          not fruitful"; do you see that?
23    A.    Yes.
24    Q.    Do you recall that in a motion the Defense
25          filed in this case, on page five, in referring
```

1          to this same email, the Defense said that the
2          "new email revealed a discussion about an
3          earlier version of RSM's report where the RSM
4          team decided to leave out a chart that showed
5          that there was no significant change in IT cost
6          during Alrai's DigitalNet's tenure because it
7          was not fruitful"; do you recall that being in
8          the motion?
9    A.    Yes.  Yes, I do.
10   Q.    And, of course, Mr. Naviloff being questioned
11         about that same document; do you remember that?
12   A.    Right.  And I remember the first time I read
13         that motion.
14             And immediately my response was, "No,
15         that's not true."
16   Q.    And, in fact, is it true?
17   A.    No, it's not true.
18   Q.    And why is it not true?
19   A.    Well, because if you go to Exhibit Z, which is
20         a report prepared by RSM in October of 2018 --
21         it was presented to the special committee just
22         four days after that email -- and you turn to
23         page, I want to say, 58 and 59, you will see
24         that there are two charts and a whole lot of
25         narrative about the IT budget and how it

1       changed over time.

2   Q.   Right.

3           And included on page 59 of that same

4        exhibit, you recall the sentence that "total

5        functional expenses for United Way and IT

6        expenses each increased by 7 percent over the

7        period FY13 through FY17"; do you recall that?

8   A.   Yes, I do.

9   Q.   Do you recall further that the same note in the

10       same exhibit at page 59 said that IT

11       expenditures did not grow at a higher rate than

12       total expenses; do you recall that?

13  A.   Yes, I do.

14  Q.   So was there anything that the RSM team was

15       concealing from the special committee about

16       these facts?

17  A.   No.  They obviously put the facts in the

18       report.  There were two pages of those facts.

19       And as I remember the presentation or

20       understood the point of it, this information

21       helped to explain how Alrai was able to keep

22       the crime going for so long without being

23       detected.

24  Q.   So is the comment about things not being

25       fruitful in Exhibit Gg -- is that part of some

| | |
|---|---|
| 1 | deliberate effort to withhold exculpatory |
| 2 | information from Mr. Alrai? |
| 3 | A. I don't see any evidence of that, and I'm not |
| 4 | aware of any effort -- deliberate or joint |
| 5 | undertaking, or anything like that, to withhold |
| 6 | exculpatory evidence.  And I see no evidence of |
| 7 | it. |
| 8 | Q. So, Mr. Commisso, just to summarize, in your |
| 9 | role as United Way counsel in this engagement, |
| 10 | have you done anything to suppress evidence, |
| 11 | that you're aware of, that's favorable to |
| 12 | Mr. Alrai? |
| 13 | A. No, I have not. |
| 14 | Q. Have you destroyed evidence or failed to |
| 15 | preserve evidence in violation of any request |
| 16 | or duty that you were aware of? |
| 17 | A. No, I have not. |
| 18 | Q. Have you selectively produced documents so as |
| 19 | to choose documents that harmed Alrai and to |
| 20 | hide documents that help him? |
| 21 | A. No, I have not. |
| 22 | Q. And have you manipulated United Way's privilege |
| 23 | so as to deprive the Defendant of evidence that |
| 24 | he's entitled to? |
| 25 | A. No. |

```
 1              MR. DAVIS:  No further questions.
 2              THE WITNESS:  There are two issues that I
 3         think need clarification.
 4              THE COURT:  Well -- okay.  Proceed.
 5              MS. BROWN:  Are you allowing him to make a
 6         statement?
 7              THE COURT:  I would allow him to make a
 8         statement, but if you'd prefer to examine him,
 9         Attorney Brown, before he does, I'm fine with
10         that.
11              MS. BROWN:  I would prefer to do that.
12              THE COURT:  That's perfectly fine, and I
13         should have asked you first.  I'm sorry about
14         that.
15              MS. BROWN:  Thank you.
16
17                   REDIRECT EXAMINATION
18         BY MS. BROWN:
19    Q.   Mr. Commisso, one of the questions the
20         Government asked you was whether you were aware
21         of any documents -- I don't know if you used
22         the word "owned" or "possessed" -- by United
23         Way that were not produced and were
24         exculpatory; you remember that question?
25    A.   Yes.
```

1    Q.   And so I want to go back to -- you and I
2         discussed this earlier -- is the network scans
3         that were produced in this case.  And the
4         Government asked you about it.
5              And as of at least this date, there's been
6         three of them; correct?
7    A.   I'm aware of three.
8    Q.   But one of those three was produced after
9         trial -- the most recent one?
10   A.   Yes.
11   Q.   And I think I neglected when I was asking you
12        earlier about this -- just for the record, that
13        document is UUU -- U as in "under" -- and it's
14        actually an Excel spreadsheet.
15             Would you agree with that description of
16        what I'm talking about as to the third network
17        scan?
18   A.   I know it's a spreadsheet.  I don't know what
19        the exhibit number is, but present whatever you
20        want as the exhibit number.
21   Q.   Well, I guess I'm going back to that because as
22        I understood your testimony, you're saying that
23        there was nothing that United Way possessed
24        that was exculpatory, or even potentially
25        exculpatory, that you, as United Way, did not

1           turn over prior to trial.

2               Did I understand your testimony correctly

3           on that?

4    A.    Yeah.  I was not aware of anything that we

5           didn't turn over prior to trial that we were

6           required to.  And now, after a year of

7           additional discovery, I'm not aware of

8           additional documents that have now been turned

9           over after trial that are exculpatory with

10          respect to United Way's documents.

11   Q.    And this is where I'm going with this.

12              That network scan -- we'll refer to it as

13          the third network scan produced after trial --

14   A.    Yes.

15   Q.    -- would you consider that a United Way

16          document?

17   A.    I don't know the answer to that because I don't

18          know enough about the history of that document.

19              I can tell you that before trial, I never

20          saw or heard of that document, and that after

21          trial, it was my understanding that RSM

22          produced that document.

23   Q.    In terms of your previous testimony, where at

24          least I understood it that you and RSM had an

25          identical batch of discovery that you had

1        access to, that just wouldn't be true if they

2        produced something after trial that you didn't

3        have; right?

4   A.   Well, no, no, they have their own internal RSM

5        documents.  You know, if they go on the web and

6        they do some market research where they talk to

7        a different department within RSM, they collect

8        their own documents.  I don't have access to

9        them.

10           If they're United Way documents and I

11       provide them to RSM, then I've got my own set

12       and I've provided a set to RSM.

13  Q.   But what we're talking about is a network scan

14       of the United Way computer system -- IT

15       system -- in the summer of 2018.

16           You would agree with me, if that's an

17       accurate description of this document, that

18       that's a United Way document; right?  No matter

19       where it came from, it originally came from the

20       IT system of the United Way?

21  A.   Well, yes.  I guess it's a question of

22       possession; right?

23           So I don't know the history -- the

24       provenance of that electronic file.  I don't

25       know who has control over it, where it resides.

1           I know I didn't get it.  So I didn't have it in

2        my collection of documents.  And I didn't -- as

3        far as I recall, I did not send it to Kroll --

4        to the e-discovery database.  And I did not

5        receive it, so I did not send it to RSM.

6              So if it originated at United Way and made

7        its way to RSM, then I don't know how that

8        happened.  I was not in the chain of

9        communication in that scenario.

10   Q.  And that goes back to my previous question.

11              That when you made the representation to

12        the Court about what documents from United Way

13        were going to be produced, just checking your

14        e-discovery database wouldn't have captured

15        that; correct?

16   A.  No, which is why we did additional steps -- we

17        took additional steps.

18   Q.  And that's what I was trying to get at before.

19              Those additional steps did not include

20        either picking up the phone or sending an email

21        to Naviloff and saying, "I'm just making this

22        representation to the Court that the Government

23        and the Defendant have everything that you've

24        reviewed or assessed.  Just want to make sure

25        that's true."

1              You didn't do that?

2    A.   No, in fact, we did do things like that.

3              So when I say there are multiple things we

4         did to verify, one thing would be for me to

5         contact John Meyer and ask John Meyer, "Do you

6         have these two or three categories of

7         documents?"

8              And another thing that I did is I worked

9         with Greg Naviloff and Chris Fitzgerald.  And

10        there are those emails that show that list of,

11        like, 15 folders that they want to discuss with

12        me.

13             And so that was a check on -- that was our

14        way of being comprehensive, so that I could

15        see, "Okay.  They've got the four folders that

16        look like documents I gave them, and so I'm

17        confident that I've already produced those four

18        folders."  Well, then they've got eight other

19        folders.  I don't know what's in those folders,

20        because they control them.

21             And so we're talking through the issues

22        together to see if we missed a United Way

23        document that I should be aware of that I know

24        that I have to produce it.

25             THE COURT:  We need to give the reporter a

```
 1        break.
 2             So let's take -- you can continue after
 3        this, Attorney Brown, but let's take the
 4        15-minute break.  We'll reconvene at 11:15.
 5        I've got to make a phone call on a case, but
 6        I'm going to do it right now so it doesn't drag
 7        into beyond 15 minutes.
 8             (Recess taken at 10:59 a.m., and the
 9             proceedings resumed at 11:16 a.m.)
10   Q.   (By Ms. Brown)  Before the break, we were
11        talking about this third network scan that was
12        produced post conviction that you did not -- I
13        want to choose the right word -- have access
14        to, see, or at least was aware of prior to
15        trial; correct?
16   A.   I was not aware of it, yes.
17   Q.   And I'm going to describe it how I at least
18        view this document, and correct me if your
19        understanding is different.
20             But I am describing it as an Excel
21        document.  And at the bottom of it, there are
22        different tabs for -- and I don't even know
23        what the tech term is for it -- like, different
24        files, but you can access different tabs.
25             If I told you there were 40-plus tabs in
```

| | | |
|---|---|---|
| 1 | | this Excel document produced post trial, would |
| 2 | | that sound about right? |
| 3 | A. | It does, but I'm really not familiar with the |
| 4 | | document, other than I know it exists.  So I'm |
| 5 | | not the best person to investigate the number |
| 6 | | of tabs. |
| 7 | Q. | And, again, just for the record, it's -- UUU is |
| 8 | | the document that I'm talking about.  I just |
| 9 | | want that to be clear, because it is an |
| 10 | | exhibit. |
| 11 | | Well, the reason I ask about it is the |
| 12 | | Government asked you if you were aware of any |
| 13 | | documents that came from United Way that were |
| 14 | | produced after trial that contained either |
| 15 | | exculpatory or potentially exculpatory |
| 16 | | evidence.  And so it sounds like you're not |
| 17 | | aware of whether that document contains either |
| 18 | | exculpatory or potentially exculpatory |
| 19 | | evidence; would that be a fair assessment? |
| 20 | A. | That is a fair assessment.  And I guess I don't |
| 21 | | know whether that document ultimately came from |
| 22 | | the United Way.  So I did not have that |
| 23 | | document in mind, because I don't know if it |
| 24 | | came from the United Way and I don't know if it |
| 25 | | contains exculpatory evidence. |

1   Q.   But let's just say, hypothetically, it purports
2        to come from United Way at some point.
3             If it purports to be a network scan of the
4        network at United Way at some point in time, at
5        least at some point, it came from United Way;
6        right?
7   A.   If it came from John Meyer -- if John Meyer ran
8        the network scan and then he sent that network
9        scan to RSM, which is possible, I would not
10       have received it.  I would not have put it in
11       the e-discovery database.  I would not have
12       produced it myself.
13            So, then, yes, that would come from United
14       Way.  If RSM created it, then maybe I would
15       think of that as RSM work product and not a
16       United Way document.  It's just -- that's where
17       I make a distinction.  I don't know if that
18       distinction matters to you, but there's a
19       difference between United Way's documents that
20       John Meyer creates and RSM work product --
21       something they create as they're doing their
22       work.  That's all.
23  Q.   And you would agree with me, if RSM was, for
24       lack of a better word, doing their work, and
25       they were doing that work for United Way

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | through the summer, fall, and early winter               |
| 2  |    | 2018/2019, those documents really belong to              |
| 3  |    | United Way; right?  United Way through -- you             |
| 4  |    | hired them; right?                                        |
| 5  | A. | So I think it's a technical issue that I can't            |
| 6  |    | say "yes" or "no" to.  If they create their own          |
| 7  |    | internal work product, then I would not say              |
| 8  |    | those are United Way documents.  Whether it's a          |
| 9  |    | spreadsheet they create, or notes, or a memo             |
| 10 |    | that they create for their own internal                  |
| 11 |    | purposes and they put in their own internal              |
| 12 |    | files, I don't consider that, for the purposes          |
| 13 |    | of this discussion, to be a United Way                   |
| 14 |    | document.                                                 |
| 15 |    | What I think of when I say a "United Way           |
| 16 |    | document" is an email that comes off of our              |
| 17 |    | email server, or an invoice, or a contract --           |
| 18 |    | something that can be found in the files of the         |
| 19 |    | United Way.                                               |
| 20 | Q. | And as I said, because you haven't really                |
| 21 |    | reviewed this network scan, Exhibit UUU, you            |
| 22 |    | can't say that, if it did come from United Way,         |
| 23 |    | that it doesn't contain exculpatory evidence?           |
| 24 | A. | I have not reviewed the document.  I don't know         |
| 25 |    | what it contains.  I have a general                      |

1          understanding of the document.  And I'm not in

2          a position to draw lines between what's

3          exculpatory and what's not.  You've got one

4          definition.  I've got -- I'm sure I have a

5          different definition in my mind.

6     Q.   Well, we heard on Thursday that anything that

7          relates to the work that RSM did for United

8          Way, if it's going to get produced to the

9          Government, it had to go through you so you

10         could vet it for privileged information.

11              Did I understand that testimony correctly?

12    A.   Well, that's probably too broad.  But if it

13         relates to Naviloff's loss analysis and relates

14         to his loss analysis for United Way, then I

15         would want to do a privilege review of those

16         documents.  If it concerned the Government's

17         work -- Naviloff's work for the Government,

18         then I wouldn't do a privilege review of those

19         documents.

20    Q.   Well, what I'm getting at is that there was a

21         much smaller version of this network scan given

22         prior to trial.  And what I'm getting at is, if

23         I understand this process, it would have gone

24         through you for a review to see if it contained

25         privileged information.

 1   A.   Possibly, although the nature of this document
 2        -- I'm not even sure what I would review.  It's
 3        a report, as I understand it.  So one version
 4        of it -- the first vision of it came from
 5        John Meyer.  He sent it to me.  I looked at it
 6        and I produced it in the sense there was some
 7        privilege review, but there's really no content
 8        that I can review for privilege so -- or
 9        produce.
10   Q.   Well, it talks about things like passwords and
11        security.
12             I mean, those are things you'd want to be
13        looking at; right?
14   A.   That's not attorney-client privilege.  That's
15        more confidentiality.  That's why we have the
16        protective order in place.
17   Q.   But what I'm getting at is that -- and it
18        sounds like you're saying "yes" to this, but I
19        just want to clarify.
20             The much smaller version of this, which
21        was just one tab of this network scan that was
22        produced pretrial -- that came through you
23        first to do some sort of review for privilege
24        analysis?
25   A.   Yes.  So let me try to be clear.

1              There were two versions produced before

2         trial.  One of them certainly came from

3         John Meyer.  I certainly obtained it and

4         reviewed it, and I was responsible for

5         producing it.

6              The second version -- I don't recall, as I

7         sit here right now, who produced that.  If

8         John Meyer produced it, that means I produced

9         it.  If RSM produced it, then I might not have

10        seen it before trial -- or before it was

11        produced.  I just don't know.  I just don't

12        recall the chain of custody, or whatever you

13        want to call it, with respect to the second

14        network scan.

15   Q.   And as to the third one, did it have to go

16        through you first to be produced, or you've

17        never seen it?

18   A.   I think -- I saw it after it was produced.  So,

19        no, it didn't go through me before it was

20        produced.

21              MR. HUNTER:  Your Honor, I don't mean to

22        interrupt, but if it's helpful, I could proffer

23        how the Government received these three network

24        scans, if it would help.

25              MS. BROWN:  I'm fine with that.

1           THE COURT:  You can proffer it, but -- I

2      guess I'm going to have you proffer it so you

3      can -- it might help the witness remember.

4           But after this hearing, I'm going to ask

5      for a timeline to be created about every

6      discovery request, and order, and production,

7      from the beginning of this litigation through

8      where we were now.  Because there's just too

9      much to keep track of and too much to

10     distinguish from.

11          By the way, Mr. Commisso has answered, I

12     thought, very appropriately a minute ago when

13     he said, "Look, what you think is exculpatory

14     is different things."  It's a very reasonable

15     position.

16          But that's why I didn't understand the

17     questions from the prosecution about "did you

18     withhold exculpatory evidence?"

19          That's not for the witness to decide.

20     That's not for anyone to decide except me.  And

21     although I do appreciate the distinction, and

22     it's very important, between United Way

23     documents and RSM work product -- because I

24     don't think there was a discovery allegation to

25     produce RSM work product, except possibly a

1    Brady obligation.

2         But it's a very fuzzy, gray area here,

3    because there's a question about whether the

4    prosecutors would have thought of it or had

5    the -- it's just not a normal situation.  We've

6    got to explore it and we're -- frankly, we're

7    spending way more time on -- for three days --

8    and I know you have a burden to meet,

9    Ms. Brown.  This is not a criticism.

10        But we're spending tons of time on RSM,

11   and United Way, and their counsel, when I think

12   the real questions here are for the

13   prosecutors.  That's what I think.  And I don't

14   know when we're going to -- I guess I'm just

15   going to have some questions for them myself.

16   I don't plan on putting anybody on the witness

17   stand, but you're all officers of the court.

18   And I know you're going to answer me

19   truthfully, but that's what the real questions

20   are here.

21        Because there's a difference between

22   Mr. Commisso representing a victim and how he

23   would approach issues, and how he would

24   approach them if he was, frankly, defending an

25   accused.  It's not really the same thing.

1              So go ahead and make your proffer,

2        Mr. Hunter, and try to make it succinct and

3        clear, please.

4              MR. HUNTER:  I will.  And if the Court has

5        questions later or after this witness, I can

6        fill in.

7              But, in essence, before trial,

8        Mr. Harrington is requesting information about

9        the IT environment.  We learned that John Meyer

10       had run a network scan, and that there might

11       also be a network scan that RSM had.  We asked

12       for them and we got them.  One was a 62-page

13       PDF that was produced before trial.  The other

14       is this one-page Excel spreadsheet that

15       Ms. Brown is referring to.

16             During this litigation -- and I make a

17       note of it in our surreply, I think -- during a

18       discussion with RSM, we realized that the

19       one-tabbed Excel spreadsheet was only part of

20       the larger scan that they did.  And so I asked

21       for it.  They produced it to us.  And we

22       produced it to the Defense.  And my

23       understanding was -- because through the

24       pretrial proceedings, our understanding was we

25       had received all network scans and had produced

1       them.  So when I learned there was this larger

2       network scan that RSM had, we produced them.

3               And that's the basic understanding of

4       where the Government got them and the timeline

5       of production.  There were two produced before

6       trial.  And this one larger one we produced

7       after trial as soon as we learned about it.

8               THE COURT:  Thank you.

9               MS. BROWN:  Thank you, Your Honor, for

10      clarifying that.

11  Q.  (By Ms. Brown)  And during your questioning by

12      Attorney Davis, if I understood this correctly

13      or wrote it down correctly, I understood that

14      you said that prior to trial, you did not

15      assert a privilege as to the work done by

16      Mr. Naviloff; did I understand that answer

17      correctly?

18  A.  Well, we had waived the privilege with respect

19      to the loss analysis -- Mr. Naviloff's loss

20      analysis.  So at that point, there was no more

21      privilege.  But we also hadn't litigated the

22      scope of that.  So I guess I'm not sure what --

23      well, maybe you have another question.

24  Q.  I do.  I didn't want to misstate what you had

25      said.  So I wanted to understand what you said

1          first, and it sounds like I did understand it

2          correctly.

3                My question as a follow-up to that was you

4          would agree with me, and I'm not going to go

5          through it all again -- we talked about this

6          last week -- there were several emails

7          involving Mr. Naviloff's loss analysis that you

8          had redacted because you felt they also

9          contained information relative to data

10         security, and we brought some of those up on

11         the screen last week that were emails that were

12         produced.

13               So they weren't held back under the

14         privilege log, but they had a notation of

15         "redacted" on them.  You remember there were

16         some of those emails last week; right?

17    A.   Yeah.  So you're now -- there's some moving

18         parts there.

19               So you first asked me a question about

20         before trial; right?  And about the use of

21         privilege before trial.  But now when you're

22         talking about those redacted documents, those

23         are all produced in August and September, maybe

24         October, of the year after trial; right.  So I

25         just want to make sure we're talking about the

1         same period of time and the same --

2    Q.   Correct.

3              I guess my question is that you're still

4         asserting the privilege as to some of the

5         emails involving Mr. Naviloff; correct?

6    A.   The portion of those emails that contain

7         information that is only related to the data

8         security investigation.

9    Q.   But you're still asserting privilege as to some

10        of the emails involving Mr. Naviloff?

11   A.   Yes.

12   Q.   And, in fact, we talked about it last week --

13        let me get the document number -- the privilege

14        log that was produced after trial -- many, if

15        not most, of those emails also have

16        Mr. Naviloff's name either -- that it's to him

17        or he's cc'd on those emails.

18             So you are still asserting some form of

19        privilege as to emails involving Greg Naviloff;

20        correct?

21   A.   Yes, because the scope of the Judge's order was

22        to produce only those documents related to

23        Naviloff's loss analysis.  And in addition to

24        that, I had to redact or withhold privileged

25        information regarding the data security

1            investigation.

2     Q.    Well, I just wanted to -- it wasn't clear from

3            the question from Attorney Davis.

4                  But I wanted to clarify that you are still

5            asserting privilege as to some of the work

6            Naviloff did in this case in terms of emails

7            relating to his discussion of this case with

8            his team members at RSM.

9     A.    Yes, but I just want to make sure we're clear.

10                 The content of those privileged documents

11           do not relate to the loss analysis.

12    Q.    And that's as to the documents that are in the

13           privilege log; right?

14    A.    And also the ones that have been marked as

15           redacted.

16                 And I also want to make clear -- there is

17           no motion, or letter, or any other

18           communication where you have challenged any of

19           those redactions that you showed me the other

20           day.

21    Q.    You would agree with me, it's hard to tell it's

22           a redaction if you can't see the document,

23           isn't it?

24    A.    Well, you challenged the privilege log.  And so

25           you could -- I'm not going to tell you how to

|     |     |                                          |
| --- | --- | ---------------------------------------- |
| 1   |     | do your job, but there are things that you |
| 2   |     | could do.                                |
| 3   | Q.  | Now, Attorney Davis -- and my notes indicate he |
| 4   |     | asked you the question that you have never |
| 5   |     | produced data breach investigation to the |
| 6   |     | Government; do you remember that question? |
| 7   | A.  | We have always asserted the privilege with |
| 8   |     | respect to the data security investigation. |
| 9   |     | And, therefore, we have never produced or |
| 10  |     | disclosed any documents concerning the data |
| 11  |     | security investigation.                  |
| 12  | Q.  | But we now know, because of your assertion of |
| 13  |     | the privilege on this, that Naviloff, in some |
| 14  |     | way, shape, or form, had access to information |
| 15  |     | relative to the data breach investigation |
| 16  |     | because you've asserted privilege as to his |
| 17  |     | emails regarding this?                   |
| 18  | A.  | So, correct, he was on emails that -- he was on |
| 19  |     | emails that contained privileged information |
| 20  |     | regarding the data security investigation.  He |
| 21  |     | was not part of the DFIR team, but the two |
| 22  |     | teams both worked at RSM.  And, sometimes, two |
| 23  |     | teams were together on the same emails.  |
| 24  | Q.  | Now, one of the questions -- the -- well,  |
| 25  |     | actually I forgot to come back to this.  I had |

1            one more question regarding the network scan we

2            were talking about, which is document Uuu.

3                 Do you recall being on an email exchange

4            where this network scan was discussed?

5       A.   No, I don't remember that email.

6       Q.   If I told you there was an email from

7            August 13, 2018, where you were copied, where

8            the subject line is "additional network device

9            scan, privileged and confidential," you don't

10           have a recollection of that email?

11      A.   I do recall emails in August of 2018 about the

12           network scan.  I just -- yes, I recall,

13           generally, there were emails.

14      Q.   And so you may have had access to the network

15           scan being on this email chain back in August

16           -- between August 13 and August 15 of 2018?

17      A.   I had access to that email discussion.  I did

18           not have access to the network scan.

19      Q.   So if there were an email from Ryan Gilpin

20           where he put a link into the scan saying "you

21           could navigate here," and then has the

22           hyperlink, "and download and run and file and

23           screenshot below."

24                You don't remember him sending a link to

25           access to that network scan?

1   A.   He sent that to John Meyer at the time.  I had

2        no memory -- paid no attention to it.  I only

3        know about it because I've seen it over the

4        last week or two.

5   Q.   And so -- you're correct.  So that's an email

6        chain between Ryan Gilpin and John Meyer.

7             And you and several other members of RSM

8        are on that chain; correct?

9   A.   I don't have it in front of me.

10  Q.   One of the questions Attorney Davis asked you

11       is whether trial counsel specifically asked

12       for, and to quote Attorney Davis, "every single

13       internal email from RSM."

14            And you answered "no," that trial counsel

15       did not ask for that.

16            Remember that exchange?

17  A.   Yes.

18  Q.   Do you remember defense counsel prior to trial

19       asking for all documents and data collected and

20       reviewed by RSM in calculating United Way's

21       loss?

22  A.   That sounds similar to the language in one of

23       the discovery requests.

24  Q.   In fact, that -- it wasn't one of the discovery

25       requests, but it's also in the actual motion to

1         exclude Naviloff, document 27, page two.

2              And do you also remember that trial

3         counsel also asked for any reports prepared by

4         Mr. Naviloff, RSM, and its employees?

5    A.   So with respect to those two issues, what I

6         remember is I had -- I had a duty or a role,

7         which was to focus on United Way's documents.

8         So with respect to your first question about

9         RSM emails, I don't really have much knowledge

10        or more to say that I haven't already said

11        because I was focused on United Way's

12        documents.

13             And on the second part of what you said,

14        he -- I don't think you read the entire

15        request.  Because what I remember is, he was

16        looking for reports that RSM had prepared

17        regarding the loss analysis for United Way.

18        And so from my side, focused on United Way's

19        documents, what I was focused on was the

20        reports that were for United Way.

21             And I guess the distinction I'm making is,

22        if they prepared a report that they use

23        internally, well, that -- I didn't get that.

24        That was not for the United Way.  But if they

25        put together a PowerPoint presentation for a

1        report to the special committee, that was a
2        report for the United Way.  And they also
3        helped with the insurance claim, so that was a
4        report for the United Way.  And, in fact, those
5        are the documents that I produced in response
6        to Mr. Harrington's request.
7   Q.   Well, I guess if I understood your testimony
8        earlier, you were saying that once Mr. Naviloff
9        started talking to the Government in November
10       of 2018, anything relative to Naviloff or RSM's
11       loss calculation -- there's no more privilege.
12       It was gone.  Because as Naviloff testified at
13       trial, he basically took his loss calculation
14       from RSM and carried it over to his work for
15       the Government.  So there wouldn't be any
16       distinction as to documents -- whether they
17       were for RSM's loss calculation or for the
18       Government's loss calculation.
19           As I understood your testimony, the
20       privilege didn't exist anymore as to the loss
21       calculation for RSM; is that right?
22   A.   I'm confused.  I'm not sure what you want me to
23       respond to.  I'm sorry.  I'm just confused.
24   Q.   Well, I was asking about the fact that you said
25       that the trial counsel didn't specifically use

1         the word "internal" emails.  And I will agree

2         with you that trial counsel did not use that

3         specific term.

4              But trial counsel did ask for reports

5         prepared by Mr. Naviloff, RSM, and its

6         employees, relative to RSM's investigation of

7         the loss resulting from Alrai's alleged

8         fraudulent conduct.  And the answer, as I

9         understood it, was you thought they were only

10        talking about work that involved United Way.

11             But what I'm pointing out to you is that

12        you're saying that there's no distinction; it's

13        the same analysis as to the loss calculation.

14   A.   You mean whether it was for the United Way or

15        for the Government?

16   Q.   Correct.

17   A.   Yeah, so I think we may have talked past each

18        other a little bit.  I was just trying to make

19        a point that as it concerned me, Mr. Harrington

20        wanted copies of reports that Naviloff prepared

21        for the United Way.

22             And so I had to think, "Okay.  What

23        reports did Naviloff prepare for the United

24        Way?"  Well, I know there were two that went to

25        the special committee.  I know that there was

```
 1          one that was a draft that ended up going to the
 2          insurance company.  And I'm sure there may have
 3          been others.
 4               But that's what I was thinking in response
 5          to that, which is "what are the reports of the
 6          loss that Naviloff prepared for the United
 7          Way?"
 8   Q.   Well, you spoke earlier that there might be
 9          internal documents at RSM.  Like, they may have
10          created a spreadsheet.
11               And that still is work that was done for
12          United Way, because you had hired RSM; right?
13   A.   But if you look at -- do you have
14          Mr. Harrington's requests?
15   Q.   I have it as document 47.  And what I'm reading
16          from that is what he basically does from
17          document 47, which is his -- Defendant's motion
18          to exclude expert testimony.
19               The first three or four pages, he
20          summarizes -- and maybe this is a good start on
21          what the Judge is requesting later -- Attorney
22          Harrington basically does a history up until
23          this point of both his requests for discovery
24          and the Government's response to that
25          discovery.  So I was reading from that
```

1          document, specifically on page two, paragraph

2          six.

3               And so that -- I guess the point I was

4          asking you about was that discovery isn't a

5          matter of "Simon Says."  They don't have to use

6          the exact word to invoke you having to turn it

7          over.  The spirit of that request was that

8          Attorney Harrington was trying to get to the

9          basis for the opinions of Naviloff.

10              That's what he was attempting to get to --

11         were their internal reports, where their

12         analysis -- he didn't have to use all those

13         magic words, or the magic word "email" to get

14         to what's the basis of Naviloff's opinion.

15              And you understood that; right?  You

16         understood that that's where Attorney

17         Harrington was trying to get to -- was what was

18         the basis of Naviloff's opinions; right?

19    A.   Yes.  So I understood his requests -- he was

20         trying to get to the original source documents;

21         right?  RSM gathered up all of this data, and a

22         lot of that were United Way's documents.  So

23         that he wanted United Way's documents that were

24         accessed, reviewed, relied on by Naviloff with

25         respect to loss analysis.  I understood that.

```
 1   Q.   And as I said, I just read to you paragraph 6A
 2        which says "all reports prepared by
 3        Mr. Naviloff, RSM, and its employees
 4        collectively referred to as 'RSM' relative to
 5        RSM's investigation of the loss resulting from
 6        Alrai's alleged fraudulent conduct."
 7             That does not limit it to documents in the
 8        possession of United Way, does it?
 9   A.   No, but for purposes of my responding to it,
10        I'm only responsible for documents in the
11        possession of United Way.
12   Q.   But you've asserted privilege as to documents
13        that were created and possessed by RSM?
14   A.   With respect to the data security analysis.
15   Q.   But my question is, you've asserted privilege
16        as to documents created and possessed by RSM?
17   A.   Yes.  Yes, I have for certain documents -- for
18        certain categories of documents.
19   Q.   So in some way, you are responsible for
20        documents from RSM, especially if they were
21        created while they were working for United Way
22        -- you're responsible for whether those
23        documents get to the Defendant?
24   A.   Yeah, I don't agree with that.
25             THE COURT:  Well, is it more "responsible"
```

1          you're focused on?

2     Q.   (By Ms. Brown)  Yeah, I guess I could rephrase

3          that.

4               You have some control over whether a

5          document gets to the Defendant?

6     A.   I have -- through asserting of privilege, and

7          providing a privilege log, and asking RSM not

8          to turn the documents over, yes.  That's my

9          role.

10    Q.   And I just have one final question.

11              Going back to the beginning of the case,

12         late May through June of '18, at any point

13         during that time, did any of the government

14         agents, either being FBI agents or the U.S.

15         Attorney's Office, ask you to preserve any

16         data, IT environment -- anything along those

17         lines?  Were you asked by the Government to

18         preserve anything relative to this case?

19    A.   Were we asked to preserve anything?  I don't --

20         bear with me, because it's been two and a half

21         years.

22              We were asked for things.  I guess the

23         short answer to your question is I don't

24         remember, but I can tell you what happened,

25         which is we were asked for things.  So in a

1          sense, that, I would say, is a server request

2          for preservation.  You know, when they say they

3          want us to produce certain types of documents,

4          we obviously preserve them.

5               And I know that I had discussions early on

6          where I described the types of things that we

7          were doing, like the fact that we were

8          collecting laptop computers, and cellphones,

9          and things like that.  And, in fact, we sent

10         them to a third party, StoneTurn Group.  And

11         then we had arrangements for an FBI agent to

12         obtain those images from StoneTurn Group.

13              So I don't remember any specific requests

14         for preservation, but I do remember periodic

15         discussions about what the Government may be

16         looking for and what we were doing to preserve,

17         collect, review, and produce the evidence.

18    Q.   And did you ever receive a request from the

19         Government -- and, again, focusing on this

20         period of time of late May through June of

21         2018 -- did you ever receive a request to

22         preserve, like, network scans, or preserve the

23         IT environment as it existed at the time

24         Mr. Alrai either worked there or shortly after

25         he worked there?

1    A.    Can you just say that -- sorry.

2          Say that one more time.

3    Q.    Sure.

4          Again, focusing on the time of June of

5    2018, when Mr. Alrai left the employ of United

6    Way, did the Government -- and by "the

7    Government," I mean the FBI or the U.S.

8    Attorney's Office -- did they ever make any

9    requests that you preserve network scans or IT

10   environment?

11   A.    No, not in those words, no.  To date, the

12   Defendant has not made a formal request that I

13   preserve the entire IT environment or network

14   scans.

15   Q.    And you -- strike that.

16         As I understood your answer, it sounded

17   like the way you were responding to the

18   subpoena was on, for lack of a better word, a

19   document-by-document request.

20   A.    No, I guess I wouldn't describe it that way.  I

21   would say we did it on a rolling basis.  It was

22   an enormous undertaking, and we searched

23   comprehensively and exhaustively.  And then we

24   produced relevant documents on a rolling basis.

25         THE COURT:  What does "relevant" mean to

1          you?  I mean, I don't understand how you have a

2          role in determining that.  I mean, it's

3          discovery.  What's relevant to an expert is the

4          expert's eyeballs at every side.  That's how I

5          view it.

6               Now, I realize in a civil litigation --

7          and in criminal too -- internal conversations

8          might not necessarily be subject to production.

9          And it doesn't appear that that was required

10         here, because no one set that forth and agreed

11         to it.  But you keep invoking relevancy in a

12         way that -- and earlier in this litigation, we

13         had conversation about what the expert relied

14         on.  What the expert relied on is what the

15         expert saw -- period.  Because choosing not to

16         rely on it is a decision that's very important

17         vis-`-vis an expert's competence and bias.

18         It's crucial information what an expert decides

19         not to rely on, if the expert saw it.

20              And it sounds like someone was making

21         determinations here before -- before the

22         posttrial orders, I mean.  It sounds like

23         someone was making determinations here about

24         what was appropriate and whether or not

25         Mr. Naviloff relied on it based on whether he

1          actually cited it or discussed it.  And from my

2          perspective, that's just not the standard.

3              Do you understand what I'm saying?

4              THE WITNESS:  Yes, but I guess there are

5          two different issues.  One issue is -- three

6          issues.  My internal investigation, the

7          Government's investigation, and the response to

8          the grand jury subpoena.  And then there's

9          Naviloff's investigation; right?

10             So Naviloff and RSM determine what's

11         relevant; right?  And my job in sort of

12         overseeing their work is to make sure they have

13         access to what they want.

14             Because if somebody says "don't let them

15         look in that room over there" or "don't let

16         them talk to those three witnesses," now we no

17         longer have a fair and independent

18         investigation; right?  So when it comes to

19         Naviloff requesting information, Naviloff asked

20         for what we thought he needed or wanted.  So

21         that's one.

22             With respect to my investigation, and that

23         is directly related also to producing documents

24         to the Government, I would say it's guided by

25         all of my experience as a civil and as a

1          criminal defense litigator.  You start with an
2          enormous amount of data.  You can't review it
3          all.  You can't produce it all.  And so you end
4          up with this funnel effect as you're trying to
5          narrow it down to a reasonable number of
6          documents.  And you use very sophisticated
7          tools in 2018 that help you find the best
8          documents with the least amount of effort.
9               THE COURT:  That's two.  You said there
10         were three.
11              THE WITNESS:  I said we had Naviloff.
12              THE COURT:  Oh.  Naviloff, you, and the
13         Government.
14              THE WITNESS:  And the Government.
15              THE COURT:  I respectfully just
16         observed -- and I mean this respectfully,
17         because it's not meant to be a challenge, but I
18         don't understand how any of that addresses what
19         I just asked you.
20              THE WITNESS:  So you want to know how do I
21         determine relevance?
22              THE COURT:  No, I don't.  I don't.  It's
23         okay.
24              You can continue with your questions,
25         Attorney Brown.

1           MS. BROWN:  That was actually my last

2      question, Your Honor.  And I don't have any

3      follow-up based on the Court's questions.

4           So I don't know if the Government has

5      recross, but I don't have any other questions.

6           MR. HUNTER:  Briefly, Your Honor.  I'll

7      try to hone in, I think, on what the Court's

8      concern was.

9

10                RECROSS-EXAMINATION

11      BY MR. HUNTER:

12   Q.   So, Mr. Commisso, you were -- the Court raised

13      a concern about wanting every document that

14      Mr. Naviloff saw.  So that way, the Defense

15      could assess the relevancy determinations that

16      Mr. Naviloff made.  And defense counsel asked

17      you some questions related to this.

18           And so with respect to the e-discovery

19      database which you were talking about --

20      actually, I'll -- with the e-discovery

21      database -- from that database, you made

22      productions to the Government in response to

23      the grand jury subpoena; is that right?

24   A.   Yes, that's correct.

25   Q.   And in relation to this pretrial litigation

1          about Mr. Naviloff, Mr. Harrington was seeking

2          documents related to Greg Naviloff's expert

3          testimony; do you recall that?

4     A.   Yes.

5     Q.   And in order to identify every document in the

6          United Way e-discovery database that

7          Greg Naviloff could possibly have looked at,

8          did you work with Kroll to identify those

9          documents?

10    A.   Yes, every single one of them, without making a

11         determination if it was relevant or not.  We,

12         just turned it over.

13    Q.   And I just want to talk a little bit about how

14         the e-discovery database worked, as it's

15         relevant to that issue.

16             Did everyone who had access to this

17         e-discovery database have unique log-in

18         credentials?

19    A.   Yes, everyone from RSM had unique log-in

20         credentials.  And the system tracked every time

21         an RSM employee accessed a document in the

22         system.

23    Q.   And you addressed this in your letter when

24         defense counsel asked you some questions about

25         it, but is the work you did with Kroll pretrial

| | | |
|---|---|---|
| 1 | | related to this motion to exclude |
| 2 | | Greg Naviloff?  Did you work with Kroll to |
| 3 | | identify every document in the database that |
| 4 | | anyone with an RSM log-in credential had |
| 5 | | clicked on, viewed, accessed, et cetera? |
| 6 | A. | Yes, and then we produced the few documents |
| 7 | | that needed to be produced as a result of that. |
| 8 | Q. | So going to the Court's question, you did an |
| 9 | | initial review in response to the grand jury |
| 10 | | subpoena where you tried to identify, |
| 11 | | basically, all the documents relevant to this, |
| 12 | | the Imran Alrai case, to put it simply? |
| 13 | A. | Yes. |
| 14 | Q. | And then this second search that you did was a |
| 15 | | little more technical, where you tried to |
| 16 | | identify every document in that database that |
| 17 | | somebody from RSM had clicked on, or looked at, |
| 18 | | or viewed, or accessed? |
| 19 | A. | Yes. |
| 20 | | THE COURT:  Wait a minute. |
| 21 | | This second one you're talking about, |
| 22 | | Mr. Hunter -- which one is that?  Is that the |
| 23 | | one after Mr. Harrington's motion to exclude |
| 24 | | Mr. Naviloff? |
| 25 | | MR. HUNTER:  Yes, Your Honor.  I'll |

```
 1              clarify.
 2    Q.    (By Mr. Hunter)  So when you reactivated the
 3              database after Mr. Harrington filed his motion
 4              to exclude Greg Naviloff's testimony,
 5              Mr. Commisso, was that when you undertook the
 6              effort to identify any as yet non-produced
 7              documents?
 8                  THE COURT:  You froze.  Mr. Hunter froze;
 9              right?  This is really the first hearing I've
10              had, I think, since we've been Zooming hearings
11              starting -- I think it was in April -- where
12              we've had this many problems.
13                  THE WITNESS:  Yeah.
14                  THE COURT:  I'm sure Mr. Hunter can hear
15              us talking, but he knows that we're not hearing
16              him.  Oh.  He's gone.
17                  THE CLERK:  He actually dropped off a few
18              times this morning, Judge, as well.
19                  THE WITNESS:  There were two issues that I
20              wanted to clarify, if I can get the time to do
21              that.
22                  THE COURT:  Well, I'm happy to listen to
23              you, but the attorney conducting your cross is
24              not in on the hearing.  So I don't know if that
25              makes a difference to the Government's counsel
```

1        or not, if we want to let Mr. Davis -- look, I

2        have some questions for you too --

3            MR. DAVIS:  So, Judge, I think Ms. Le and

4        I can handle the rest of it.  And I apologize

5        for having to break.

6            Are we still on redirect now?  Or are we

7        on recross?

8            THE COURT:  Yeah, we're on recross.  Yes.

9            MS. LE:  Hey, Judge, can we do what you

10       were suggesting before -- we were just having a

11       break at 12:00.  Hopefully -- maybe Mr. Hunter

12       can go into the office.  Because I think the

13       next witness is his witness to cross, if

14       necessary.  Oh, look.

15           Mr. Hunter's back on.

16           THE COURT:  So we're on recross,

17       Mr. Davis.

18           Go ahead, Mr. Hunter.  Try your question

19       again.

20           MR. HUNTER:  I'm sorry about that.  I lost

21       power briefly.

22    Q.  (By Mr. Hunter)  So, Mr. Commisso, trying to

23       recall where I left off.

24           So after Mr. Harrington -- this is in the

25       context of after you reactivated the

1          e-discovery database, when Mr. Harrington had

2          moved to exclude Greg Naviloff's testify.

3               At that point, did you work with your

4          e-discovery vendor, Kroll, to identify every

5          document in the database that someone with an

6          RSM credential had clicked on, or looked at, or

7          accessed?

8               THE COURT:  Yeah, but you already asked

9          him that, Mr. Hunter.

10               And what I asked you was "what are you

11          talking about?"

12               Because you called it "the second time."

13          And I think you're trying to refer to not the

14          original grand jury production, but the time

15          immediately after the motion to exclude

16          Naviloff, where we resolved it rather than

17          excluding Naviloff by producing discovery;

18          right?

19               MR. HUNTER:  Yes.

20               THE COURT:  Okay.  But you're talking

21          about things like e-discovery databases and

22          things that aren't going to have much -- we've

23          got to talk about criminal procedure and

24          production.  How you get there is interesting,

25          I guess, to somebody, but I need to

1    understand -- we're having documents produced
2    in response to a motion to exclude an expert.
3    And then there were other documents produced
4    after the trial was over; right?
5         I think what you're trying to establish --
6    tell me if I'm not understanding.  The point
7    you're trying to make is that that second
8    production -- not the grand jury production,
9    but the pretrial production -- produced every
10   United Way document that anybody from RSM laid
11   eyes on; is that what you're trying to
12   establish?
13        MR. HUNTER:  Yes.  Every document in that
14   collection in the database, Your Honor.
15        And broader point that I'm --
16        THE COURT:  What's that mean, "in that
17   collection in the database"?  What's that mean?
18        MR. HUNTER:  So I believe Mr. Commisso has
19   testified to this.  That as part of his
20   internal investigation, he put together a large
21   e-discovery database of documents collected
22   from email accounts, from virtual desktop
23   images, from United Way's records, that RSM
24   then had access to for their analysis, and he
25   used for his internal investigation and to

1              respond to the grand jury subpoena.

2                    And the reason why I was asking these

3              questions is because the Court inquired about

4              how Mr. Commisso made a relevancy

5              determination, and, in particular, raised a

6              concern about -- regarding expert discovery.

7              The standard being, wanting to provide every

8              document that the expert laid eyes on.  And so

9              what I was trying to do was at least put on the

10             record the efforts that were made to identify

11             those documents and produce them.

12                   THE COURT:  Okay.

13                   But don't you understand that that plays

14             right -- that doesn't necessarily help you,

15             because what you're saying is a lawyer for the

16             victim decided what's relevant to produce.  And

17             that's, like, the whole point of the motion.

18             And if that's supposed to make me feel

19             better -- I guess it makes me understand more,

20             but it's -- and the problem is -- it isn't that

21             I'm questioning the relevancy determinations.

22                   The point is that someone needs to be

23             accountable and cross-examinable in a trial for

24             that.  That's how this works.  It's not

25             about -- that I question Mr. Commisso's

1           judgment, or even motives.  It's just that that

2           has to be something that everybody understands

3           during a trial.

4                And it isn't particularly helpful to say

5           after the fact, "Oh, none of this mattered.

6           None of this was relevant."  It's a difficult

7           thing to know.  That's up to a trier of fact --

8           that's me in this case -- and I don't know.  I

9           just keep venting like this at you guys, and I

10          know it doesn't help you.

11               You can continue with it, but I wasn't

12          questioning Mr. Commisso's definition of

13          relevancy.  I was more questioning the fact

14          that he was even making a determination to

15          begin with of -- how that really is justified;

16          right?

17               It's a criminal prosecution.  And the

18          victims in any criminal case produce evidence,

19          sometimes pursuant to a grand jury subpoena.

20          But when you have someone in the process that

21          might have motives that could -- not improper

22          motives, but motives that a trier of fact

23          should be exposed to, that matters.  And it's

24          very difficult to make this determination with

25          this.  Let me ask this question.

1               And I say "it's difficult to make this
2       determination."  It's harder to keep track of
3       all the different permutations of what was
4       produced here at different times.  I mentioned
5       earlier to Mr. Davis -- you might have been off
6       at the other hearing -- I mentioned of
7       requesting a timeline.  But I don't want to
8       make you do busywork and waste your time.
9               Is there a document that I already have
10      that kind of -- you're nodding, Ms. Le -- that
11      kind of lays this out?  Because you were just
12      referring to it in the testimony, I know.
13              What would that be?
14              MS. BROWN:  Well, I referred to document
15      47, which is the motion to exclude Naviloff's
16      testimony filed by Attorney Harrington.
17              So as a prelude to his request to exclude
18      Naviloff, he documents the history of the
19      discovery process, especially as it pertains to
20      Mr. Naviloff.  So he talks about -- they're
21      notified when they get the report.  There's
22      back-and-forth.  And I don't have that, but I
23      think there's even the letters -- or emails
24      that are in there, but Attorney Harrington's
25      document 47 documents the history up until the

1         time of the filing of that motion.

2              And then if you look at the two motions

3         that are responsive, which is document 50 and

4         51, then I think that even picks up on, like --

5         because I know from document 51, the Government

6         talks about the chambers conference, and what

7         happened in the chambers conference.

8              So if you put those three documents

9         together -- 47, 50, and 51 -- it gives a pretty

10        good timeline of what was happening.

11             THE COURT:  Through when?

12             MS. BROWN:  One's 52 -- I want to say this

13        all is going on through October, November.  It

14        was all pretrial.

15             THE COURT:  Yeah.  And, see, I want the

16        big picture.

17             Go ahead, Ms. Le.

18             MS. LE:  And I know this because I wrote

19        this part of the Government's response, Your

20        Honor.

21             So record document 170 -- and this

22        follows -- if you go to page five, starting at

23        page five and on to page six, I prepared the

24        charts about the posttrial discovery and the

25        Court's order.  We have listed for the Court

1        dates that we received certain records and
2        dates that we provided those records to defense
3        counsel, including the Bates number, as well as
4        the descriptions of the contents of the
5        posttrial discovery.
6               Which I think is what the Court is
7        concerned about; right, Judge?
8               THE COURT:  Yeah.  Yes.  I'm going to look
9        at that, though, because I really don't want to
10       create busywork for you guys just to have you
11       file more stuff.  You're very busy as it is,
12       and you've worked hard on this.
13              I'm going to look at these documents and
14       determine if they tell me what I want to know
15       before I make you do anything else.
16              MS. LE:  And it might help the Court when
17       you go back and look at certain of the
18       exhibits -- we did list all the Bates numbers
19       by sequence.  So if the Court has a particular
20       document that is a concern that was produced
21       posttrial, in our pleading on page six through
22       seven --
23              THE COURT:  What's your pleading -- 170?
24              MS. LE:  170, Your Honor.  That is our
25       objection to Defendant's motion to dismiss.

1          That was filed September 23, 2020.  And it goes

2          through the history of the Court's discovery

3          order and our litigation regarding discovery.

4                And when we created these charts, we did

5          that by documenting our production, including

6          when we received information from either RSM or

7          United Way, the Bates sequence, as well as a

8          description.  So that that might help the Court

9          if you're going to go back and compare the

10         exhibits that counsel has submitted during this

11         litigation.

12               THE COURT:  Thanks.

13               Look, Judge Johnson is trying to reach me

14         about something that we've got to deal with,

15         like, right now.  So I'm going to have to

16         suspend this.  It's 12:11.

17               We will resume at 1:15; okay?

18               (Recess taken at 12:11 p.m., and the

19               proceedings resumed at 1:17 p.m.)

20               THE COURT:  All right.

21               Let's resume, please.

22               MR. HUNTER:  No further questions from the

23         Government.

24               THE COURT:  Okay.

25               Attorney Brown?

1

2                    REDIRECT EXAMINATION

3       BY MS. BROWN:

4   Q.  I just want to clarify something,

5       Attorney Commisso.

6            You were asked questions about this

7       e-discovery database.  I think we already

8       established earlier that this e-discovery

9       database, we now know, didn't have everything

10      that RSM had access to?

11  A.  That's correct.

12           MS. BROWN:  That's my question.

13           THE WITNESS:  Okay.

14           THE COURT:  And, Mr. Commisso, you said

15      you wanted to clarify a couple of things.  And

16      even though it's unusual, I know you were

17      admitted pro hac vice, so I want to give you an

18      opportunity to do that.

19           THE WITNESS:  Okay.  And, really, I think

20      it's just one thing.

21           I gave an answer last Thursday.

22           The answer I gave was "we were all working

23      together."  And as soon as I said those words,

24      I knew that it needed clarification.  I believe

25      the context was pretrial discovery.

1           So after Mr. Naviloff was hired by the
2     Government, and after Mr. Harrington had
3     submitted requests for certain discovery
4     concerning Mr. Naviloff, there was a series of
5     email messages.  I don't remember the exact
6     exhibits.  I don't remember the exact question.
7     But I do know what I meant by my testimony when
8     I said we were all working together.
9           As I've explained, I was responsible for
10    producing United Way's documents and for
11    protecting United Way's privilege.  And so I
12    had conversations with Greg Naviloff and others
13    at RSM.  I had conversations with Mr. Davis and
14    others in the U.S. Attorney Office.  And, I
15    guess, in a sense together, we were working to
16    identify and produce documents, to the extent
17    that we could, in response to Mr. Harrington's
18    pretrial discovery request.
19          So I didn't want to just leave that
20    answer, "we were all working together," hanging
21    out there as something having bigger meaning
22    than I had intended.
23          THE COURT:  Okay.  That's understood.  I
24    hadn't seized on it in any kind of way like
25    that, but I understand your point.  Let me ask

1          you this question.

2                   You brought this case -- I think it was

3          you, personally, right, to the U.S. Attorney's

4          Office in Boston before the New Hampshire

5          office accepted it -- at least that's what some

6          of the briefing says.

7                   Were you involved in that?

8                   THE WITNESS:  I contacted the U.S.

9          Attorney's Office in Boston twice.  And before

10         we really got into a discussion, a prosecutor

11         in Boston notified me that the case was already

12         active in New Hampshire, and I was introduced

13         to Mr. Davis.

14                  THE COURT:  Oh.  All right.

15                  So what I've read -- that they twice

16         declined prosecution -- is that inaccurate?

17                  THE WITNESS:  I can only tell you my

18         understanding.  My first call to the U.S.

19         Attorney's Office in Boston, I asked some

20         questions and I did not identify my client.  So

21         there was no -- in the first call, there was no

22         declination.  There was just a discussion about

23         some issues in general without identifying a

24         client.

25                  In the second call, I called and said,

1    "Okay.  We want to move forward.  I'm going to
2    identify my client, and I would like to
3    schedule a meeting."  And very shortly after
4    that, I was told that I would be introduced to
5    Mr. Davis because they already had an active
6    investigation.
7              THE COURT:  Okay.
8              MR. DAVIS:  Judge, may I make a brief
9    proffer on that?
10             THE COURT:  Absolutely.  I was just going
11   to ask you to do that.  Yes.
12             MR. DAVIS:  So, Judge, the New Hampshire
13   federal investigators' open investigation at
14   the end of 2017 -- that was based on bank
15   information regarding the wires to Pakistan.
16   And so well before we knew anything about
17   anything at United Way, both the FBI and
18   Homeland Security had an open investigation
19   that I, at least, had a meeting and maybe two
20   meetings at.  Some subpoenas were issued.  So
21   we were -- and we were aware of Mr. Alrai's
22   travel in the spring of 2018.  And, if you
23   recall, there was evidence about the border
24   search as he came back in in April of 2018.
25             So all of that had happened in this case

1          with New Hampshire before Mr. Commisso called
2          Mass.  And the FBI notified me that United Way
3          had called Massachusetts.  I communicated with
4          the fraud chief in Boston.  And we quickly
5          resolved that, because we had the open case, we
6          would continue.
7                THE COURT:  Okay.  That's actually fairly
8          significant -- to me, anyway.  And I think
9          that's the fist time I've heard that.
10               The reason I say that is only because if
11         one has to sit -- I mean, look, I think the
12         motives of counsel representing a client who's
13         been victimized -- or allegedly victimized,
14         right, by an employee are not hard to
15         understand.
16               But it's a very different picture of
17         Mr. Commisso seeking twice to have a case
18         investigated and prosecuted by the Boston
19         federal authorities, being rebuffed, and then
20         coming to New Hampshire and affirmatively
21         seeking that out.  That's a very different
22         picture than you've presented, because it would
23         -- it might suggest more about the intensity of
24         counsel's or the client's wishes to have the
25         case prosecuted for any number of reasons.

1           So the fact that there's an open case
2      already and you knew it was underway is -- I
3      think that's significant information, and I'm
4      glad to have it now.
5           THE WITNESS:  And, Your Honor, I was never
6      rebuffed in my discussions with the prosecutor
7      in Massachusetts.
8           THE COURT:  Yeah, I gather that now.  I
9      gather that now.  It's just one of those things
10     that gets worked out between districts.  Okay.
11     Second question about that.
12          When you first dealt with federal
13     prosecutors, Mr. Commisso, be it Boston or
14     New Hampshire, I know you eventually produced
15     documents pursuant to a grand jury subpoena, or
16     a number of them; right?
17          But in your initial content -- I can think
18     of when I was a prosecutor, if I had received a
19     contact from a victim -- an alleged victim or
20     their counsel, I probably would have requested
21     some documents just to kind of get started --
22     to review the situation.
23          Did that happen here?
24          THE WITNESS:  So your question was broken
25     up and I might have missed the important part

1    of it.

2         So you said "did that happen here."  Did

3    what happen here?

4         THE COURT:  Before you began responding to

5    grand jury subpoenas, were you responding to

6    other sort of just more informal or less formal

7    requests for information?  Did any of the

8    prosecutors or federal agents ask you to give

9    them any documents so they could review your

10   situation and decide whether to open a case?

11        THE WITNESS:  So what I remember was a

12   first meeting with Mr. Davis at the very

13   beginning of June.

14        THE COURT:  As to what?

15        THE WITNESS:  The very beginning of June,

16   approximately June 3 or 4.  And Mr. Vossio

17   attended with me.

18        And at that meeting, we had a small binder

19   of documents, approximately 15 to 20 documents,

20   that we had put together that helped to tell

21   the basic story as we understood it.  And I

22   believe we left one or more copies of that

23   binder with Mr. Davis or with the agents.

24        And within 24 hours of that meeting, we

25   had a grand jury subpoena.  And I believe we

1        started producing and enrolling production --
2        batches of documents as quickly as we could.
3              THE COURT:  Okay.  Yep.
4              My other question, and I want to ask this
5        question again with Mr. Commisso still on the
6        witness stand, only because I think the next
7        witness won't have any information about it.
8              I want to explain how I remember
9        something, and to determine if I have it right
10       or wrong, through Counsel.  My memory is that
11       Mr. Harrington moved to exclude Mr. Naviloff.
12       And then we got -- this is before COVID, but we
13       got on the -- I think it was a telephone call
14       together, because it was kind of a discovery
15       dispute in a way.  At least that's the way I
16       saw it.  I was never really seriously
17       considering excluding Mr. Naviloff, but I
18       thought, I think maybe correctly, that this is
19       just an attempt to get information.
20             And what I said was -- and tell me if I
21       got this wrong -- I said, "Look" -- I asked him
22       on the phone, "Mr. Harrington, what do you
23       want?"  He kind of listed it out.
24             And I sort of charged you guys to -- the
25       prosecutors and defense lawyers to "go work it

1    out and get back to me if you can.  If there's

2    anything you disagree about, let the Court know

3    and I'll resolve it."  But my memory is you did

4    resolve it.  And that's -- I think the letter

5    we've seen in this hearing was part and parcel

6    to that process.  It was sort of a request from

7    Mr. Harrington about -- a bullet list of things

8    he wanted, and you were working through it

9    together.

10        I don't remember you coming back to the

11   Court saying, "We have these areas of

12   disagreement.  Could you resolve them?"

13        Do I have that right, roughly, if anybody

14   remembers -- Mr. Hunter, Ms. Le, Mr. Davis --

15   about what happened?

16        MR. HUNTER:  I think so, Your Honor.  I

17   think there was one point of disagreement.

18        And that was Mr. Harrington sent us a list

19   of search terms for John Commisso to run

20   through the e-discovery database.  And that's

21   what prompted Mr. Commisso's letter.

22        We forwarded it to him.  And it was -- the

23   cost to reactivate the database, and run the

24   searches, and do the review that would be

25   required -- so that was the thing we weren't

1          able to resolve.  But we were able to resolve

2          other issues, which goes to -- like, I've got

3          to find the documents anyone from RSM clicked

4          on, for example, was part of that resolution.

5               THE COURT:  Yeah.  I think -- did I sort

6          of give you a new list of search terms that was

7          somewhat narrowed?  Did I do that?  Or how did

8          we get that resolved?  Anybody remember?

9               MS. LE:  Go ahead, Mr. Commisso.

10              THE WITNESS:  So what I recall is we had a

11         hearing about the list of search terms and

12         about my letter.  And there was a discussion --

13         there certainly was no agreements.

14              I'm not sure about the resolution, but in

15         terms of how it was reported on the docket, I

16         believe if you look at one of the final orders

17         on the docket before trial, it makes a

18         reference to "the matter is resolved as stated

19         at the hearing," or something like that, so

20         that you have to read the transcript to know

21         how it was resolved.  That's what I remember.

22              THE COURT:  Okay.

23              But, certainly, nobody stood up and said,

24         "No, I'm entitled to something I haven't

25         received."  Or no one said, "Judge, we still

1          haven't produced this, and we'd like you to

2          resolve it."  Once I issued that order, I don't

3          think we heard anybody else object or counter

4          that.  Okay.

5              Ms. Brown, if you have any different

6          information, by the way, please share it.  You

7          weren't there at the time, I know, but you

8          might have a different understanding.

9              MS. BROWN:  Not about what was said at the

10         hearing.  I think -- in terms of understanding,

11         I think one of our issues is -- I kind of

12         referred to it at my cross-examination --

13             That discovery isn't about "Simon Says."

14         That you don't use -- it was very clear that

15         Attorney Harrington and his partner were trying

16         to get at the basis of Mr. Naviloff's opinion.

17             Where was it coming from?  What was it

18         based on?  Who did he consult with?  All of

19         those things.  And he may not have used the

20         precise words to trigger a search of -- but I

21         don't think that's necessary for Brady.

22             I think, first of all, the Government has

23         the obligation of Brady, regardless of whether

24         the Defendant asks for it.  Because if you

25         don't know it's there, you don't know what to

1        ask for.

2             But, secondly, there's no question that

3        counsel for Mr. Alrai was trying to get at the

4        bottom of this opinion, both on the advice of

5        his expert in IT, and because he wanted to be

6        able to cross-examine this witness about the

7        basis of his opinions.  And that's articulated

8        in document 47.  So I don't think it's a matter

9        -- it's not necessary for a Brady violation

10       that he used a magic term to get a magic

11       document.  And so I just wanted to add that.

12            But I will also agree that how the

13       litigation regarding Naviloff tied up was

14       somewhat loose in terms of whether that --

15       like, whether that motion was still live or

16       not.  It sounds like there was some resolution.

17       It's not like a situation where Attorney

18       Harrington filed a motion to withdraw the

19       motion to exclude Naviloff.

20            Or did he say, "Oh, well, yeah, I'll take

21       some discovery" -- was he withdrawing his

22       objection by accepting additional discovery?

23       That's not clear to me.

24            THE COURT:  Well, it's clear to me.  It's

25       clear to me only because I'm trying to keep

1           your motion in context.

2                 There wasn't a request, once the Court

3           said it was resolved or during the trial, where

4           anybody said, "Look, there's something I was

5           entitled to I didn't get."  But your point

6           about Brady is well received.  I understand

7           your point.

8                 It's just that -- I can't say that I'm

9           persuaded by it, but I understand that there's

10          a difference between you didn't comply with the

11          discovery rule or order and, well, during your

12          compliance, you either became aware or should

13          have become aware of Brady material, to which I

14          am entitled, regardless of any order or rule.

15          That's a different thing.

16                And that's your argument; right?

17                MS. BROWN:  That is my argument.  That's

18          what I'm going to address when I sum up the

19          presentation.

20                THE COURT:  Okay.  I just wanted to have a

21          conversation while we still have Mr. Commisso

22          here under oath.  I think I've got the answers

23          as best as I'm going to get.  And I think we

24          should move on to the next witness.

25                MS. BROWN:  Well, Your Honor, over the

```
 1            weekend and again this morning, cocounsel and I
 2            have conferred.  And I don't think we're going
 3            to call Mr. Meyer.  Most of what we get from
 4            him is rehashing his testimony, which is --
 5            there's a transcript of it, and it is what it
 6            is.  I don't think we need him to go through
 7            his testimony again, because it's the record.
 8            So we've elected not to call him.
 9                 I'll ask Attorney Commisso if he can
10            notify Mr. Meyer.  I know he's been waiting,
11            and I apologize for that.  But we couldn't make
12            that call until we had examined Mr. Commisso.
13            So that would be our final -- well,
14            Attorney Commisso would be our final witness.
15            We do have some summation for the Court.
16                 I don't know if the Government has any
17            witnesses.  I don't think they do, but --
18                 THE COURT:  Give me a second then.  I'm
19            just going to check my notes in case there's
20            anything I wanted to ask Mr. Commisso that I
21            would have asked Meyer.  Hold on a minute.
22            Okay.
23                 I have some questions, but I think only
24            one of them needs to be done now with
25            Mr. Commisso.
```

1        I'm looking at document 1-64-12,
2   Exhibit 12 to Attorney Brown's motion.  It's an
3   email -- we've talked about it.  It's an email
4   where Mr. Naviloff emailed Mr. Commisso some
5   folders.
6        And he said, "Let's discuss the contents
7   of these four folders for potentially providing
8   to the USAO"; right?  And I guess my question
9   is -- like, I'm not sure who to ask this of.
10       Which of the three of you prosecutors was
11  primarily dealing with Mr. Naviloff?  Was there
12  one of you who was doing it, or was it all of
13  you?
14       MR. DAVIS:  Judge, I would say
15  Mr. Naviloff was Matt Hunter's witness, but
16  that I was the lead.  And I think we talked
17  about -- Matt and I probably talked about every
18  issue of significance with Mr. Naviloff.
19       THE COURT:  Then here's my question for
20  both of you.  I'll ask you first, Mr. Davis.
21       Were you aware that Naviloff, who is by
22  this time your expert -- okay.  You retained
23  him -- were you aware he was consulting with
24  Mr. Commisso about his productions to you?
25       MR. DAVIS:  So, Judge, I would have said

1          what I was aware of was that anything that

2          potentially involved privilege -- that is,

3          United Way's privileges that were still being

4          asserted -- would be run through Commisso.  And

5          in numerous discussions with Naviloff, that

6          step in the process was always acknowledged and

7          something we expected.  And Matt may be able to

8          supplement that further, but I certainly --

9          well, I guess I'll leave it at that.

10              THE COURT:  Well, would you agree with me,

11         though, that this email, unless I misunderstood

12         the testimony from the witnesses in this

13         hearing -- this conversation seems to go beyond

14         that.  This isn't clearly a discussion of

15         what's privileged, unless I'm misunderstanding.

16         This seems to go beyond a discussion of

17         privilege.  And it has Mr. Commisso involved in

18         Naviloff's document productions in a way that

19         exceeds or that goes beyond the scope that you

20         just described about privilege discussions;

21         right?

22              MR. DAVIS:  I certainly agree it's beyond

23         the scope of privilege.  I think Mr. Commisso

24         can further illuminate that, and Matt, maybe,

25         as well.  Because I think it's fair to say that

1          Naviloff, at various times, would have

2          encountered a scope issue.  Because he's at

3          RSM.  And RSM, writ large, is doing several

4          different things for United Way.

5               And my understanding -- my broad

6          understanding of this issue is that it was a

7          scope question for Naviloff.  That is, are all

8          of the folders on this thing what we're talking

9          about here or not?  I don't read it as a

10         relevancy sort of conference between Naviloff

11         and Commisso.

12              THE COURT:  Yeah.  I almost wish I had

13         sequestered all of you before we had this

14         conversation, but I'm just going to continue

15         with you.  I don't mean that in an insulting

16         way.  I hope you don't take it that way.  It's

17         just we all, as human beings, have a tendency

18         to influence each other.

19              But, Mr. Davis -- so what you just said

20         there -- my understanding is that goes to this

21         scope issue involving RSM's work that goes

22         beyond loss calculation; okay?

23              And I guess my question -- and you said,

24         "I read this as a discussion of that kind of

25         scope issue, because we both agree it's not

1          privileged."
2               What's the basis for that understanding?
3          What makes you read it that way?  What is the
4          basis for your understanding that this isn't
5          Mr. Naviloff consulting with Mr. Commisso
6          regarding his production to your office
7          regarding loss calculation?
8               MR. DAVIS:  I think it's what I've been
9          told about it.  And I just -- I don't trust my
10         memory.  I'm not looking at the document,
11         either.  I would defer to Matt Hunter and
12         Commisso on the point.
13              And I'm sorry I'm not being helpful.  As
14         you might have guessed, Judge, I'm 62.
15         Questions about folders, I'm not as sharp on.
16         I don't mean to make excuses, but I would trust
17         Matt's memory and I would trust John Commisso's
18         memory much better than I.
19              THE COURT:  And I accept your answers, by
20         the way, as being as honest and straightforward
21         as your memory will allow.
22              Mr. Hunter, do you follow that line of
23         questioning?  It appears to Mr. Davis, and I
24         agree, that this conversation here in this
25         Exhibit 12, document 1-64-12, is not about

1        privilege.  Now, Mr. Davis has told me what he

2        thinks it refers to, and then he's explained to

3        me why he thinks that -- what the basis is.

4             What's your understanding of what this

5        conversation's about, if you have one?  Well,

6        let me ask you first a question that I asked

7        Mr. Davis first.

8             Were you aware that Mr. Naviloff was

9        consulting with Attorney Commisso, part and

10       parcel to this production of his expert file to

11       you?

12            MR. HUNTER:  So the part that I was aware

13       of, Your Honor, was that, similar to what

14       Mr. Davis said -- that United Way waived its

15       privilege as to RSM's loss analysis, but not

16       everything that RSM did.  So I was aware that

17       RSM, because they couldn't waive the privilege

18       or produce privileged materials, was consulting

19       with John Commisso to ensure that they were

20       producing things that were within the scope of

21       that waiver, and were not producing things that

22       had to do with other work that RSM was doing.

23       So that was my understanding of that.

24            And regarding -- and I don't know exactly

25       the title of this particular email, but I do

1          know that when we got it -- a discovery request
2          from --
3                  THE COURT:  It's August 2019.
4                  MR. HUNTER:  Okay.  So, yeah, this is when
5          we're getting discovery requests from
6          Mr. Harrington.  And I know what we asked RSM
7          for is we wanted basically the work file --
8          like, all of their analyses, any documents that
9          they had that they relied on or considered in
10         their analysis.  And we were looping in
11         John Commisso to ensure that RSM didn't produce
12         something that was outside the privilege
13         waiver.
14                 So my understanding was that was what the
15         consultation was about.  Not -- again, not to
16         discuss what is relevant to your loss
17         calculation; but is this something that relates
18         to other work streams that RSM was doing for
19         the United Way?
20                 THE COURT:  Okay.
21                 And what's the basis of that
22         understanding?  Where did you learn that?
23                 MR. HUNTER:  The basis for that
24         understanding -- it is where we were at this
25         stage in the litigation, the summer before

1          trial.  Because I think at that point there was

2          a general understanding that United Way had

3          waived all privileges to the work Naviloff did

4          for loss.  But we knew that there was other

5          work that RSM had done.

6               THE COURT:  So you're surmising that based

7          on the timing of the conversation?

8               MR. HUNTER:  And my understanding at that

9          time of the nature of United Way's privilege

10         assertion.  That we had asked RSM to -- we had

11         asked to ensure that -- we knew that RSM was

12         consulting with John Commisso regarding

13         privilege, and we asked them to do that.

14         Because we didn't have a right to seek

15         privileged material.

16              But what we asked for is we wanted

17         everything that had to do with the work

18         Greg Naviloff did as to loss.  So that was my

19         understanding of what -- the discussions we had

20         had and what we were seeking to get.

21              THE COURT:  But, again, you're surmising

22         it.  You're basing your understanding of what

23         this email means based on its timing and your

24         understandings of, as you point out, the scope

25         of the waiver and other work streams.

1           In other words, it's not like you know
2       today, one way or the other, whether Naviloff
3       was just plain consulting with Commisso about
4       what to produce.
5           MR. HUNTER:  I certainly -- we've had a
6       whole hearing about this.  I think that
7       Greg Naviloff and John Commisso haven't said
8       that there was that sort of activity going on.
9       And we certainly did not ask for that type of
10      activity to be going on.  And so I have no
11      reason to think that that activity was going
12      on.
13          I understand there's this email.  But I
14      see this email is consistent with what we did
15      understand, which was John Commisso was
16      protecting United Way's privilege.  I
17      suppose -- I have no reason to think or dispute
18      that that is what was happening, if
19      John Commisso testified about it and
20      Greg Naviloff testified about it.
21          THE COURT:  I know, but -- okay.  That's
22      true.  But Ms. Brown filed a motion about it.
23      And there's been a lot of time since you filed
24      the motion and we had the hearing.
25          So I guess I'm asking you, did you talk to

1           witnesses and say "what's this all about?"
2           Because you haven't told me that's the basis
3           for your understanding.  You're sort of
4           surmising it.  And, like, that's fine, but
5           there's also just preparing a witness.
6                "Hey, were you consulting with Commisso
7           about everything you did before you did it?
8           And in what way, and about what?"  I mean, did
9           you have those conversations?  It sounds like
10          you did not.
11               MR. HUNTER:  So those conversations are --
12          we asked Greg Naviloff and John Commisso to
13          prepare declarations of what they did and what
14          happened.  And those are the declarations that
15          we attached to our motion.
16               THE COURT:  And I don't mean to be flip
17          here, but I'm taking that as a "no," that you
18          didn't ask him these questions that I'm asking
19          you right now.
20               Like, "What was this conversation about?
21          What was your work -- what was the nature of
22          your working together?"  These are -- I don't
23          look at any of this as inappropriate, but I
24          want to understand it.  And we're all kind of
25          circling around it a little bit.  I guess

1        that's the best we're going to do.

2              MR. HUNTER:  Your Honor, the reason why --

3        we tried to go through every single email that

4        defense counsel attached to their motion.  We

5        did have, I think, the general conversation

6        that is reflected in the declaration -- that he

7        did a review for privilege.  And that was our

8        understanding.

9              THE COURT:  So you're telling me, then,

10       that defense counsel files a motion with an

11       email where your expert is talking to the

12       lawyer for the victim and saying, "Let's

13       discuss these documents before we produce them

14       to the U.S. Attorney."

15             And you didn't put that in front of the

16       witness and say, "What is this about?  What's

17       going on here?"  That didn't happen?

18             MR. DAVIS:  Judge, I would just add --

19             THE COURT:  Wait a minute.  Whoa.  Whoa.

20             MR. DAVIS:  I'm sorry.

21             I'm just saying, any prep of the witness

22       is mine, Judge, not Matt Hunter's.

23             THE COURT:  Oh, well, I guess I'll ask

24       you.

25             I mean, is that something you -- I realize

1          the answer could be yes or no, but I'm asking
2          what it is.
3               Did someone ask Naviloff, did someone ask
4          Commisso, "What's this about?"
5               Because I just asked you a minute ago,
6          "What's the basis for your understanding?"
7               And you didn't say, "I asked him before
8          the hearing and they told me."  You said -- I
9          don't know.
10              MR. DAVIS:  I don't believe I put either
11         of the emails in front of either witness.  And
12         I don't think we specifically discussed that
13         question.
14              THE COURT:  Okay.
15              THE WITNESS:  So, Judge, I'd be happy to
16         respond to any of these questions.
17              THE COURT:  No, I'm good, Mr. Commisso.  I
18         do have some questions about the process, but
19         that was really the only one.
20              Well, I guess, let me just ask you this,
21         Mr. Commisso:  Have you heard anything from the
22         prosecutors that's inconsistent with your
23         understanding of what's transpired here in
24         terms of your dealings with Naviloff or your
25         dealings with them?

1           THE WITNESS:  Well, I think there's a lot

2      that I could say that would clarify these

3      issues.  And I can tell you what I was doing

4      with Naviloff, and why, during that period of

5      time.

6           THE COURT:  And I'm sure you could.  The

7      question isn't so much your answers to it.  The

8      question is whether anybody -- is whether the

9      trier of fact in this trial had an opportunity

10     to hear all this.  All right?  Because there's

11     lots of inferences that can be drawn.  That

12     seems to be lost on everybody here.

13          The fact that you guys have an account of

14     what happened, whether or not I think it's

15     accurate based on any number of factors, like

16     your memories, your motives now, your motives

17     at the time -- those are all interesting

18     issues.  But those are

19     a-trier-of-fact-for-a-trial issues.

20          I know I'm supposed to do a privilege --

21     not privilege -- a prejudice assessment here.

22     It's part of the burden.  But I'm not -- I

23     think I have the information I need to make

24     that assessment.  Because if there's something

25     I don't understand, there will be explanations.

1       I know there will be.

2            And you're a defense lawyer.  You

3       understand.  Criminal trials are about

4       cross-examination.  They're about testing the

5       witnesses.  Let me just ask you this,

6       Mr. Commisso.

7            You've, I'm sure, represented clients

8       either facing trial or in trial where the

9       prosecution had expert witnesses; right?

10           THE WITNESS:  Yes.

11           THE COURT:  I mean, have you?

12           THE WITNESS:  Yes.

13           THE COURT:  And I assume that you make

14      your normal discovery requests, and you're

15      provided with the file or whatever you've

16      requested in some form; right?

17           THE WITNESS:  Correct.

18           THE COURT:  Have you ever had one when an

19      expert was working with a staff from his or her

20      business, whether it was an accounting firm or

21      something, where underlings or coworkers were

22      also working on the file?

23           THE WITNESS:  No, I can't think of

24      something in particular that matches that

25      circumstance.

1           THE COURT:  A straight answer.  I

2      appreciate it.

3           But if you did -- because there's a 6th

4      Amendment right to confrontation law on this;

5      right?  If you did, wouldn't you expect to see,

6      if you had an expert -- if you're dealing with

7      an expert testifying against your client facing

8      felony charges, I assume you wouldn't want to

9      just see what -- you wouldn't take the expert's

10     word, first of all, about what he relied on.

11          You'd want to see everything he reviewed;

12     am I right?

13          THE WITNESS:  Well, that gets to the heart

14     of the issues in this case.

15          THE COURT:  Well, that's exactly why I'm

16     asking you.

17          Are you telling me that an expert witness

18     testifying against your client in a federal

19     criminal trial -- you would take the expert's

20     word for what he relied on, and not everything

21     he reviewed?

22          THE WITNESS:  I would make a request for

23     all the documents that he reviewed and relied

24     on.

25          THE COURT:  Right.

1           And if he was working with underlings -- a
2      staff or coworkers, you'd want to see the
3      communications between them, wouldn't you?
4           THE WITNESS:  Well, I don't know that I
5      would have the right to.  The rules of
6      discovery don't go that far.
7           THE COURT:  Not my question.
8           Would you request it?
9           THE WITNESS:  If I was doing my job well,
10     yes, I would expect to request it.
11          THE COURT:  And wouldn't you expect, once
12     you requested it, the prosecutors at least to
13     review it to determine whether or not you were
14     entitled to it -- at least review it to
15     determine if there was exculpatory evidence?
16          THE WITNESS:  Well, no, not if it's
17     outside the bounds of discovery.
18          THE COURT:  So you'd make a request that's
19     outside the bounds of discovery, and not assume
20     that when they responded to it, maybe imposing
21     some restrictions on whatever you'd
22     requested -- you would assume they hadn't even
23     reviewed it?
24          THE WITNESS:  Well, now I'm thinking about
25     the context of this case.  And I'm thinking

1          about the fact that the Government didn't have

2          possession of this evidence, and the evidence

3          that we're talking about now was way outside

4          the bounds of permitted discovery.  So I would

5          not have expected the prosecutors to have

6          requested this discovery that nobody thought

7          the Defendant was ever entitled to.

8                  THE COURT:  So when you were going through

9          the items, because I -- by the way, I do accept

10         that Mr. Harrington didn't make a request for

11         internal communications.  I do, unless there

12         was no violation of any sort of rule or order

13         there.  I'm with you.

14                 But were there discussions between you and

15         the prosecutors about the internal

16         communications at RSM regarding this document

17         review?  It would seem strange to me that one

18         would rely on all these people that are

19         reflected in the bill that wasn't produced, and

20         not -- just at least discussed the

21         communications.

22                 THE WITNESS:  Well, I would say no.  And

23         the reason why I feel confident saying no is

24         I'm looking now at Mr. Harrington's discovery

25         request from July 30, which I think was the

1    first one.

2              THE COURT:  Yeah.

3              THE WITNESS:  And he asked for a copy of

4    all documents and other data "collected and

5    reviewed by RSM in calculating the loss."

6              And those words, "collected and reviewed,"

7    meant something to me, because that's exactly

8    what I think of when I think of expert

9    discovery.  And those are the United Way

10   documents.  Those are the invoices, the

11   contracts, the accounting record; right?

12             THE COURT:  Yeah.

13             THE WITNESS:  So that's what we're talking

14   about -- is where do we find the documents that

15   were collected and reviewed?

16             And then in another request it was

17   "reviewed and relied on."

18             But at no time do I remember saying "where

19   do we find" or "who's going to find" or "should

20   we find the internal work papers and the

21   internal email communications?"

22             THE COURT:  I understand -- believe me, I

23   understand that it wasn't requested --

24   demanded.

25             But to me, "relied on" -- I mean, if

1        you're going to rely on -- if you, as an
2        expert, are going to rely on underlings to
3        develop IT -- because he's not an IT expert.
4        He's an accountant; right?  We talked about
5        that ad nauseam.  It was trial testimony.  If
6        I'm going to rely on -- I forget his name...
7              THE WITNESS:  Ryan Gilpin.
8              THE COURT:  Ryan Gilpin.  Right.  And
9        there was another one that he did testify at
10       trial.  If you're going to rely on his work,
11       well, when he transmits that work to you, it
12       might very well include an explanation of his
13       analysis.  And that would seem to me something
14       that the expert relied on.
15             I realize it wasn't as specified as
16       "producible, discoverable."  But, to me, the
17       Brady obligation at least makes me wonder
18       whether that should be reviewed.  And that's
19       kind of what I'm stuck on here.
20             THE WITNESS:  And I guess I'm at least two
21       or three steps removed from that because I
22       wouldn't have been part of any decision-making
23       process about RSM's documents.  And my mind
24       never went anywhere in that direction with
25       respect to those kinds of internal

1          communications.  It's not something I've ever
2          talked about in any litigation that that would
3          be subject to discovery.
4               THE COURT:  I accept everything you say,
5          except the first thing you said is that you
6          were not involved in the production of RSM --
7          you were involved in the production of RSM
8          documents.  RSM's witness was asking you
9          questions about what to produce.
10              THE WITNESS:  With respect to United Way
11         documents.
12              THE COURT:  Oh, I see, not RSM.  Yeah, I
13         mean, I think of the RSM documents as what RSM
14         reviewed.  And I view it as their
15         communications with each other, although I do
16         realize that those were not requested or
17         ordered to be produced.  This puts this in a
18         very sort of odd posture.  Okay.
19              Listen, I asked Mr. Commisso some
20         questions.  If either side wants to pursue my
21         line of questioning with cross or direct, or
22         whatever you want to call it -- if you want to
23         cross my exam, I'll allow Ms. Brown first and
24         then Mr. Davis.
25              Any questions, Ms. Brown?

1          MS. BROWN:  I just wanted to clarify to
2     Mr. Commisso.
3  Q.  (By Ms. Brown)  As a criminal defense lawyer,
4     you're also familiar with constitutional law;
5     right?
6  A.  Yes.
7  Q.  And so you're familiar that there's case law
8     that says a defendant may object if the expert
9     who is giving the opinion on the witness stand
10    is not the person -- is, for lack of a better
11    word -- I use this -- ghost expert.
12         So if there is a testifying witness and
13    that witness is testifying to things that
14    would, arguably, be hearsay or at least not
15    allow the Defendant to cross-examine the
16    opinions that come from some other expert, a
17    criminal defense attorney may want to object to
18    that, because they can't cross-examine the
19    underlying opinions if that person isn't
20    called; do you understand that case --
21 A.  I'm familiar with the idea because you briefed
22    it in this case.
23 Q.  And so in order to make that objection that
24    someone's opinion is coming from -- some
25    expert's opinion is coming from someone else,

1          you'd have to know about it; right?
2    A.    I'm not sure what to say.  I haven't litigated
3          this issue outside of this case, so I don't
4          have any experience litigating this specific
5          issue about expert discovery in a criminal case
6          like this.
7    Q.    But you did have the billings that RSM sent to
8          you.  And, in fact, your name is right on the
9          bill that they sent to you for their work both
10         for RSM -- I don't think they would have sent
11         you the bills for the Government -- but they
12         sent you the work that they, meaning RSM, did
13         for United Way; right?
14   A.    Yes, I received bills from RSM.
15   Q.    And you understood that at least six or seven,
16         if not more, people worked on the loss
17         analysis; correct?
18   A.    I understood what the bills showed.  And, yes,
19         I met more than six or seven people over the
20         course of the engagement.
21   Q.    And that was information that you were privy to
22         that, as far as you know, the Defense attorney
23         didn't know about.
24              You didn't share your billings with
25         defense counsel prior to trial, did you?

```
 1    A.    I don't know whether he was privy to it or not.
 2          And I know he never asked me for that
 3          information.
 4                MS. BROWN:  I have nothing further.
 5                THE COURT:  Mr. Commisso, though -- didn't
 6          Naviloff say -- didn't he testify that he
 7          discussed the issue of internal RSM emails with
 8          you?
 9                THE WITNESS:  I know he testified -- you
10          mean at the first date of this hearing?
11                THE COURT:  Yeah.
12                THE WITNESS:  He testified about the
13          issue.  I don't remember specifically what he
14          said.
15                THE COURT:  What I remember is he said he
16          asked you about it and talked to you about it.
17          I think I was the one asking him questions.
18                MS. BROWN:  For the Court's convenience,
19          there's a transcript of it.  And it's at, I
20          think, page 127 -- of what you talked about.
21          Because you asked -- you did ask about it.  And
22          we can address that, but it is in the
23          transcript.
24                THE COURT:  I'll take a look at it.  I'm
25          sure you're going to point me to it when you
```

1    argue.
2         Ms. Brown, let me ask you a question
3    before I let Mr. Davis ask the witness.
4         Mr. Commisso just said, well, he's
5    familiar with that body of law because you
6    briefed it -- the idea of communications with
7    people relied on doing a forensic analysis.
8         I think of that issue as sort of part of a
9    Crawford, Davis, Bullcoming type of analysis;
10   right?  Is that what you're talking about?
11        MS. BROWN:  Exactly.
12        THE COURT:  Okay.  And that's not about
13   discovery.  That's not about Brady, but it's
14   about confrontation, which, to me, ties in a
15   little bit.
16        MS. BROWN:  It was just a follow-up to
17   your questions about his role as a criminal
18   defense attorney -- of what he would anticipate
19   Counsel would need.  And I just was following
20   up on that.
21        THE COURT:  Okay.
22        Mr. Davis, did you have any final
23   questions for Mr. Commisso?
24        MR. DAVIS:  No questions, Your Honor.
25        THE COURT:  Thank you.  Okay.

1              Thanks, Mr. Commisso.

2              THE WITNESS:  So should I let Mr. Meyer

3       know that he's released?

4              THE COURT:  Yeah, apparently so.  No one

5       wants to seem to call him.  All right.

6              Your motion, Ms. Brown -- to try to keep

7       this under control -- we can extend this longer

8       if we need to, but why don't we try to restrict

9       ourselves first to -- I'm going to say

10      15 minutes; okay?

11             MS. BROWN:  I think I can do that, Your

12      Honor.

13

14                  CLOSING STATEMENT

15             MS. BROWN:  What I've presented -- I

16      actually put together a PowerPoint to organize

17      some of the issues, and especially focus on the

18      issues either that the Court presented to us

19      prior to trial, or issues that have been more

20      of a contention during the trial, and to focus

21      on those.  And, obviously, I can go faster or

22      slower through the slides, depending on what

23      questions the Court has about -- the Court may

24      have more question about certain issues than

25      about other slides.

1           So I had spoken with Charli about this
2      before the hearing.  So there's a way that she
3      is -- she could share the screen with me and I
4      could pull up the PowerPoint.
5           THE COURT:  Sure.
6           THE CLERK:  Okay.  You should be able to
7      now.
8           MS. BROWN:  I'm getting a visual that
9      John Meyer entered the waiting room, so I'll
10     ignore that.
11          The right-hand side of the screen is
12     mostly -- I wanted to set out the three issues
13     that are in the motion to dismiss, which are
14     the Brady -- I have split up the Brady
15     violation issues, both into the billing records
16     from the Government that they were in
17     possession of, and the email exchanges and
18     network scans.  And the reason for this is one
19     group of documents were in the possession of
20     the Government, and one, arguably -- well, they
21     didn't possess them.
22          The question is, are they responsible for
23     the non-production?  So that's why I divided
24     those two issues.  The third issue is the due
25     process violation and failure to take steps to

1           preserve the IT information.  So that's how

2           I've divided them up.

3                   THE COURT:  Sure.

4                   MS. BROWN:  And for some reason, my screen

5           is not advancing.  Oh, I've got it now.

6                   So I wanted to just put up -- the Court,

7           obviously, knows the Brady test -- but

8           different parts of this test apply to different

9           documents.  First part, being whether it's

10          exculpatory, applies to everything.

11                  The second part, of whether it was -- the

12          Government either willfully or inadvertently

13          suppressed the evidence, and then whether

14          prejudice.  So some of these apply more than

15          others.

16                  In terms of the Brady issue, there's two

17          parts.  Again, I'll just kind of skip through.

18          So the billing records.

19                  So these are the records that have the

20          name "John Davis" on the top.  They are

21          addressed to the U.S. Attorney's Office.  And

22          the question on that is really two parts of the

23          three-part test, which is whether they are

24          exculpatory and whether they were prejudicial.

25          The Government clearly had them.  The

1    Government clearly did not turn them over.  I
2    know the Court asked some questions about
3    whether they had to or not, and I'm going to
4    address that shortly.  So I just wanted to
5    start off by -- I put up here what those
6    documents looked like.  On the left -- so I
7    basically cut it in half.
8         On the left-hand side it says
9    "John Davis," and it says the invoice for RSM.
10   And it -- on the right-hand side, it lists the
11   work done on the case, billed by hours.
12        So were these records exculpatory?  So
13   just to give a little bit of a breakdown of the
14   timeline, the first notice and request for
15   documents was July 22.  And this is when
16   defense counsel learns that Naviloff is going
17   to be an expert for the Government.  And they
18   ask for reports prepared by RSM or its
19   employees regarding loss calculation,
20   explanation of methodologies used, and
21   electronic data.  And I -- where I can, I put
22   the document number.  And then there's another
23   document request, October 18, by a defense
24   counsel.
25        Well, actually, I think I took this from

1          the motion 47-4, where Attorney Harrington

2          says, "The Government has not produced all

3          documents that were available to and reviewed

4          by Mr. Naviloff in preparing his opinion,"

5          which ended up being correct.  What's important

6          here is what information is available to the

7          Government that should have triggered them to

8          believe that these billing records were

9          exculpatory?  And we can talk about prejudicial

10         in a minute.

11              So just by having these records, the

12         Government knows that Naviloff had billed us in

13         25 percent of the time preparing the report for

14         the Government.  And the Government filed a

15         responsive pleading stating that the Defense

16         had everything Naviloff considered.  Knowing

17         that Naviloff had billed us in 25 percent of

18         the time preparing the report, the Government,

19         again, filed an attachment to the responsive

20         pleading.  That is actually Commisso's report

21         that we talked about, where he said that they

22         were working on producing all documents

23         reviewed and assessed.

24              You know, I would add here, Your Honor,

25         just what we didn't get from Commisso is "I

1          sent an email to RSM saying, 'Hey, I'm filing
2          something in court saying that I'm working on
3          producing all documents you reviewed and
4          assessed.  Please make sure I've done that.'"
5          He didn't do that.
6               And you're like, "Well that's not his
7          job."  That's another problem here -- is the
8          Government didn't do their job.  And their job
9          was to make sure that the Defendant got
10         exculpatory evidence.  And I'll get to that in
11         a minute, but that email exchange you were
12         asking about before, where Naviloff and
13         Commisso were talking amongst themselves about
14         what to turn over and what not to turn over --
15         there's another part of that exchange, which is
16         Exhibit Lll, and I'll talk about it a little
17         bit more.
18               But that -- so how we got some of these
19         documents, you might remember from
20         Attorney Commisso -- like, we'd get some
21         documents that were redacted.  And then he
22         reviewed them again and unredacted some of the
23         things he redacted.
24               And one of the things he unredacted is in
25         Exhibit Lll, where -- because we were trying to

1        figure out how it starts -- Attorney Hunter to

2        Harrington; Harrington to Attorney Hunter;

3        Attorney Hunter to Harrington.  So it's a

4        back-and-forth between counsel in the case.

5              Then, all of a sudden, the email pops over

6        to Naviloff and Commisso, and we're like, "how

7        did that happen?"  And there was a missing

8        email in the chain.  And it was Attorney Davis,

9        who forwarded those document requests from

10        Harrington to Commisso and Naviloff.  Well, why

11        is that important?

12              When we look at Exhibit Lll, when

13        Attorney Davis forwards those email exchanges,

14        which include defense counsel's document

15        request, it says, "Gentlemen, this just in."

16        And that really sums up the Government's role

17        here.

18              They abdicated their role of, like, "Hey,

19        you guys figure out what we need to turn over

20        here," and they turn over the role of figuring

21        out what's exculpatory to the lawyer for the

22        alleged victim and to their expert witness, and

23        didn't --

24              I mean, there's no guidance, like, "Hey,

25        can you really make sure that you've got

1          everything you relied on, or analysis?"

2              I mean, a few minutes ago, Attorney Hunter

3          said, "We were looking for all analyses."  How

4          do we know that?

5              We don't have an email where

6          Attorney Hunter sends it to Mr. Naviloff,

7          saying, "Hey, please give us any analysis you

8          relied on."  Because if he did, they didn't

9          comply with it, because there's definitely

10         analysis going on in these emails.  And so if

11         they asked for that, that's problematic.

12             So that's why they were on notice that

13         these billing records were exculpatory.  This

14         email shows it a little bit more -- I've got

15         the same side-by-side as before.  Well,

16         actually, no.  This is the trial testimony of

17         Naviloff.

18             And so the point I'm making with this

19         slide -- it says, "While it was clear that the

20         billing records were exculpatory before trial,

21         it is abundantly clear that the billing records

22         were exculpatory at trial."  And so what

23         happens is Attorney Harrington makes all these

24         efforts to get to the bottom of Mr. Naviloff's

25         opinions regarding the fraud evaluation issues.

1                   And at trial he asks Mr. Naviloff -- I

2          think what precedes this is that "you're not an

3          IT expert."  And then he asks him "and in this

4          particular case, did you consult with any IT

5          experts in writing your report?"

6                   "I did."

7                   "And who were those IT experts that you

8          consulted with?"

9                   "John Meyer, Diego Rosenfeld, and another

10         couple of associates that report to

11         Diego Rosenfeld."

12                  So this is at trial.  The Government knows

13         that this is a billing they have.  This billing

14         on the right is from the time period when this

15         report would have been written.  There's no

16         Diego Rosenfeld there.  Now, Mr. Harrington

17         doesn't know that, but the attorneys for the

18         Government do.  And if they were busy, not

19         paying attention to the fact that what these

20         bills -- but at trial, this became abundantly

21         clear that they were sitting on exculpatory

22         evidence that trial counsel could have

23         impeached Naviloff with.

24                  And that -- he's talking about

25         "Diego Rosenfeld is a principal with over

1        20 years of experience," and he's not listed

2        there as billing during that period, which

3        would have been July 17, which is around the

4        time Mr. Naviloff became an expert for the

5        Government up until October 4.  So this is a

6        really important -- to the extent that they

7        have some excuse for not turning over these

8        records before trial, it is our feeling that

9        these were exculpatory prior to trial.  But

10       they became very exculpatory.

11            And, yeah, I know it would be hard to stop

12       a trial and say, "Wait a minute here.  We've

13       got exculpatory evidence.  Now it's crystal

14       clear that it's exculpatory," but that's what

15       they had a duty to do.  And they didn't do it.

16            And it even became worse because, in that

17       same testimony that I just read, not only did

18       Greg Naviloff list his IT testimony coming from

19       Rosenfeld, he also listed it coming from Meyer.

20       Now, the Government has sent a letter before

21       trial saying that Mr. Meyer's -- they're not

22       going to offer him as expert witness.

23            The other thing that's even -- I didn't

24       even put this in my PowerPoint because we're

25       learning this today -- is that there was a

1         stream of documents from Mr. Meyer to
2         Mr. Naviloff that -- Mr. Commisso was out of
3         that stream.  And I'll come back to why that's
4         important in a minute.
5              So the Government is at trial.  Their
6         expert witness is saying that these two IT
7         experts were very important to his
8         consultation.
9              And they're not stepping up to say, "Wait
10        a minute.  We've got some information that's
11        not clear on that."  And that's very consistent
12        with what I said before -- is sort of a "hear
13        no evil; see no evil.  You guys figure it out"
14        kind of thing, and "you send us whatever you
15        want to send us."
16             So as I said, after this
17        cross-examination, the Government knows that
18        their key witness is not an IT expert, and that
19        this key witness had consulted with a --
20        consulted with a non-testifying IT -- well, it
21        should be just "expert" -- well, I mean, if you
22        consider other people at RSM.  And this factor
23        is not disclosed to Defendant.
24             Naviloff's claim, revealed at trial, that
25        he consulted with an IT expert to inform his

1        opinions is not consistent with the billing
2        records possessed by the Government.  And the
3        RSM billing records which were possessed by the
4        Government would have materially impeached
5        Mr. Naviloff, and they still did not turn them
6        over.
7              I want to come to one of the Court's
8        questions here.
9              THE COURT:  Can you go back to that slide?
10             I just have to ask you.  This is a heavy
11       document trial.  There's a lot of documents, a
12       lot of discovery.  I'm not sure I'm ready to
13       accept that it would be clear the minute -- I
14       agree, by the way, that the bill would have
15       been a good cross-examination tool after that
16       testimony.  I'm not disputing that at all.
17             But I'm not sure I'm ready to hold the
18       prosecutors responsible for not immediately
19       realizing that this bill -- we don't even know
20       why they didn't produce the bill, really.  It
21       could have been a conscious decision.  It could
22       have been inadvertent.  But the idea that they
23       would recall that and immediately recognize it
24       as exculpatory and realize they had to produce
25       it -- that seems like a lot to me.

1              Why do you make that argument?

2              MS. BROWN:  Well, first of all, going back

3         to the test that I set forth before,

4         inadvertent means we win.  That inadvertent

5         disclosure can be a Brady violation.

6              THE COURT:  Sure.  Doesn't mean you win.

7         It means -- you know what I mean.

8              MS. BROWN:  Right, but it would satisfy

9         that prong of the test.  I should have said

10        that.

11             And there's lots of Brady cases out there

12        where there were innocent reasons for not

13        turning it over.  Bundy.  The Government didn't

14        know about the documents in question -- that

15        there was someone working for them that didn't

16        produce or withheld the documents, but the

17        actual lawyers for the Government didn't know

18        about them.

19             And, in fact, Bundy is a really good case,

20        because what happened in Bundy is when they did

21        learn about the documents, they said, "Stop,"

22        and they turned them over in the middle of the

23        trial in Bundy.  This didn't happen here.  And

24        there are cases where the Government can kind

25        of save themselves, if they turn -- well, say,

1    "That wasn't really clear it was exculpatory.

2    Now that I see your defense, yeah, it's more

3    apparent."

4         But I don't think we need to prove

5    intentional.  It can be inadvertent, but they

6    -- I think you have to look at it cumulatively,

7    which is what I talked about before -- that

8    Exhibit Lll, which is -- they had -- they had

9    passed this off in terms of worrying what

10   documents the Defendant got.  They passed it

11   off to Naviloff and Commisso.

12        And to the extent it was inadvertent,

13   they're still to blame, because they had a role

14   in finding exculpatory evidence as to their own

15   expert witness when they were on notice.  And

16   that billing record put them on notice.

17        You're muted, Your Honor.

18        THE COURT:  Thank you.

19        It's not that I disagree with the analysis

20   you're giving.  It's more that I just don't

21   think -- in your papers, you have repeatedly

22   accused him of intentional misconduct.  And I

23   don't think I'm as ready as you are to assume

24   that, like, that bit of testimony from Naviloff

25   immediately registered with them as something

1          that alerted them to a particular document they

2          should have produced.

3               It's not that I disagree with your point

4          about inadvertence or anything like that.  It

5          just seems to be a view of adverse counsel that

6          attributes to them some degree of misconduct

7          that I'm just not ready to find based on this

8          evidence.

9               But you've got to make your argument, so

10         go ahead.

11              MS. BROWN:  Well, I think, Your Honor, the

12         error -- they've got a responsibility to keep

13         an eye out for this stuff.  And they had this

14         document.  And, as I said, you've got to look

15         at it cumulatively.

16              To the extent of being called -- being

17         accused of being on a fishing expedition,

18         repeatedly, and being accused of dilatory

19         discovery tactics, defense counsel was

20         persistent in saying, "We want to get to the

21         bottom of this opinion," and they kept doing

22         that.  And the Government was on notice of

23         that.

24              And they knew that -- and in these

25         requests it says "or their coworkers or people

1          who work for RSM."  Over and over,

2          Attorney Harrington was trying to get to the

3          bottom of this.  And then they get this bill

4          that has six people working on the case, and

5          the one who's testifying bills less than

6          25 percent.

7               That's just clearly a red flag here when

8          you put that together.  Alone, maybe it

9          wouldn't have set off alarm bells; but with the

10         Defendant's persistent request for getting to

11         the bottom of Naviloff's testimony to be able

12         to have ability to impeach him -- when you put

13         that together, then it certainly put that --

14         put them on notice.  Or, as I said, we don't

15         have to prove that it was intentional -- just

16         that it was inadvertent.

17               THE COURT:  Yep.

18               MS. BROWN:  So the next slide has to do

19         with some of the questions the Court posed.

20         What is the authority for the proposition that

21         the Government must or should turn over

22         itemized expert bills?

23               And what we're saying is, we don't have to

24         prove that they always have to turn over expert

25         bills.  I don't think that's what the law is in

1          discovery.  What we're saying is, to the extent
2          that expert bills are covered by work product
3          or attorney-client privilege -- I think it
4          would probably be more work product if it was a
5          prosecution -- a prosecution still has a duty
6          to disclose Brady materials, even if that was
7          work product.  So that is what applies.
8               It's also worth noting that in one of the
9          -- I'm not sure if it's document 50 or 51.
10         Actually, it's 50.  I have it right there --
11         50:6.  They said that they had produced
12         documents consistent or akin to Rule 26.
13              Rule 26 provides that billing records for
14         a testifying expert are not work product.  And
15         that makes sense.  I mean, how much somebody's
16         getting paid is relative to their credibility
17         and bias.  So to the extent there was any
18         concern that these records were covered by work
19         product, and even -- it's not just a matter of
20         turning over the record.
21              It should have clued them in to picking up
22         the phone and talking to their expert witness,
23         like, "Whose opinion is this?"  And, "You've
24         told us that this is your opinion, but there's
25         a lot of people working on this case, and we

1         need to know that."  And there was no

2         curiosity, whatsoever, as to the basis of these

3         opinions, despite repeated attempts to get to

4         the bottom of it by defense counsel.

5              I wanted to mention this.  There was -- I

6         forgot if it was during the questioning of

7         Mr. Sgro or Mr. Naviloff, but Attorney Le

8         mentioned common sense.

9              And I think her question or statement was

10        "it would be common sense that there would be

11        emails in this case."  And I think we need to

12        put that in perspective.  Because if you knew

13        that six people worked on the expert report,

14        and that Naviloff did less than 25 percent of

15        the work on the report, yes, it would be common

16        sense that there were emails among the team

17        sharing their analysis and findings.

18             But if you didn't know that six people

19        worked on the expert report, and you'd been

20        told that you had everything Naviloff reviewed

21        and considered, it would not be commonsense

22        that much of the work and analysis had been

23        done by others.  So I think it's important to

24        look through the lens of the information the

25        Government had and the information defense

1          counsel had at that time.

2                They are exculpatory -- these billing

3          records -- I'm still on the billing records --

4          because the Court relied on Naviloff's

5          testimony when it found that "the duplicate

6          billing, failure to register services in some

7          cases, the astronomically expensive markups

8          established fraud."

9                They're also exculpatory because Naviloff

10         was the only witness who testified as to these

11         things -- the duplicate billing, et cetera.

12         And if the Government had provided the billing

13         records, it would have led to further discovery

14         and the emails.

15               I mean, that's how this happened after

16         trial -- is once we, as post-conviction

17         counsel, saw the emails combined with the

18         testimony, we knew what to ask for.  We knew to

19         ask for the emails.  And those emails rendered

20         additional exculpatory evidence that I'll talk

21         about next, which is the emails -- mostly

22         intra-RSM emails and the network scan.

23               And it's our opinion -- our position that

24         they were favorable evidence to the Defendant,

25         the Government willfully or inadvertently

1          suppressed the evidence, and that there is --
2          and so I think what I put in this last bullet
3          here -- "there's no Brady violation if the
4          Government did not suppress the evidence."  So
5          since that's sort of the, for lack of a better
6          word, the big issue, I'm going to address that
7          first instead of going prong by prong.
8              And so it's our position the Government
9          suppressed the evidence -- the RSM emails and
10         network scans -- either willfully or
11         inadvertently, when they represented the
12         Defendant had everything RSM considered or
13         reviewed.  And I'll get to that in that minute
14         in terms of those representations.
15             The key to understanding why the
16         Government is responsible for the nondisclosure
17         is the question that the Court also asked of
18         the parties -- is what is the meaning of and
19         reliance upon the Government's representations
20         as to its disclosures of documents considered
21         by Mr. Naviloff, and the existence of further
22         documents of this nature?
23             And going back -- I mean, it sort of goes
24         to your comments a few minutes ago, Your Honor,
25         about not believing that the Government did

1          this intentionally, or willfully, or
2          maliciously.  Again, we don't have to prove
3          that.
4               Let's just look at it as inadvertently and
5          maybe add the word "reckless" or "negligent" in
6          there.  So going back to what we said before,
7          they've handed off this duty.  Now, if you're
8          going to put in a motion that Defendant has
9          everything that RSM reviewed and considered,
10         you should check on that.
11              You should pick up the phone and say,
12         "Hey, Mr. Naviloff, I've got to respond to
13         this.  And I'm going to put in this motion I
14         have everything that you reviewed -- any
15         analysis."  That's what they said -- they said
16         they asked for analysis.  "Do I have all that?"
17              Hopefully, Mr. Naviloff would have been
18         honest enough to say, "Well, there was some
19         internal analysis.  There was some internal
20         documents.  We've got these network scans --
21         it's, like, 40 tabs of them."  That didn't --
22         we assume, even giving the Government the
23         benefit of the doubt and looking at it in a
24         light most favorable to them, they were
25         negligent, because they put these statements in

1           a motion that we now know just aren't accurate.

2                And even if they did it inadvertently --

3           even if they did it without double-checking,

4           they're still responsible, because that pretty

5           much sent the Defendant -- he's, like, "Okay.

6           I guess I got everything, because they've said

7           I've got everything he considered."

8                This is a list of cases.  And we talked

9           last week of doing the supplemental motion.  I

10          will put them in that supplemental motion of

11          where -- why it's significant that the

12          Government made representations regarding what

13          they produced, and what they didn't produce,

14          and why that's important to the Brady analysis.

15          I'm not going to go through every case here,

16          but we will include this information.  But

17          there is case law supporting our analysis that,

18          again, with the Government, inadvertently makes

19          -- it suppresses evidence.  And we're saying

20          they suppressed it by making these

21          representations.

22               These also go to the information about

23          the -- why the Defendant didn't file a Rule 17

24          subpoena as well.  Again, he was told

25          repeatedly -- what is interesting here on this

1       issue, Your Honor, at least how I'm
2       understanding them -- and I've learned a lot
3       from this hearing.  But at least how I'm
4       understanding things, the Government was
5       passing this off to Naviloff and Commisso.
6            But we're not sure what guidance -- again,
7       we know Commisso is putting in an affidavit or
8       declaration that he was going to check to make
9       sure the Defendant had everything that was
10      reviewed, but he can't say that he passed that
11      along to RSM.
12           And we haven't heard any evidence that the
13      Government passed along to RSM, "Hey, we're
14      filing a motion saying we've -- we're turning
15      over everything you considered or reviewed,
16      including consulting with internal IT experts."
17      So the Government can't save themselves from
18      this by having -- for having a hands-off
19      approach to discovery or finding exculpatory
20      evidence.
21           This is even more dense, and I know it's
22      hard to read.  This is a list, and we will
23      include it --
24           THE COURT:  Go back to the last slide,
25      please.

1            MS. BROWN:  Sure.

2            THE COURT:  Okay.  Thank you.

3            MS. BROWN:  And I want to emphasize that

4       there's been all sorts of parsing of words on

5       this, whether "relied" or "considered."

6            To the extent that you take the word

7       "relied" as being -- looked at it, decided it

8       wasn't important, it's important to remember

9       that Attorney Commisso, in that affidavit that

10      was attached to the Government's motion, said

11      "reviewed."

12           And there's -- "reviewed" means looked at,

13      even if you didn't find it important or

14      whatever.

15           THE COURT:  I view that as "relied."

16      "Relied" is anything the expert saw.  Because

17      disregarding is the same as considering.

18           MS. BROWN:  Exactly.

19           And so the next is just a compilation of

20      the representations.  I think most of this

21      comes from our motion.  We will include this

22      list.  But it's very -- as I say, if you just

23      focus on that affidavit -- I'm sorry.

24           This slide is about the misleading

25      representations -- the significance of that.

1          And we've found several cases -- in fact,

2          Badley, which -- this isn't new case law --

3              "In reliance on the misleading

4          representations, the Defendants might abandon

5          lines of independent investigation" -- in this

6          case we would say "filing a subpoena --

7          defenses or trial strategies that would have

8          pursued."  So this is very basic law that the

9          representations are really key to the

10         Government's role in the suppression of this

11         evidence.

12             And I also want to compare here -- if

13         there's any doubt that this is exculpatory, I

14         sort of will rely on the emails themselves.

15             Because this is one particular email from

16         Fitzgerald to Naviloff where they're having

17         this conversation about how "we need a

18         substantive meeting with Diego to get him in

19         the loop.  I'm a bit worried now that we are

20         communicating with the United States Attorney's

21         Office and relying on Ryan, who is only a newly

22         promoted senior associate."

23             So RSM knows it looks bad to have Gilpin

24         being the only one who is supplying the IT

25         analysis in this case.  And, so -- and what's

1         real important is -- maybe this makes a point
2         better than my previous slide of how Naviloff
3         was spinning here.
4             He has this internal email about "we've
5         got to bring the senior guy on board because
6         most of our IT work was done by Ryan Gilpin."
7         And then at trial, when he's asked about his IT
8         expert, he goes, "Oh, Diego Rosenfeld is a
9         principal with over 20 years of experience."
10        He's trying to sell the value of his report.
11        He wants to be a good expert.
12            Understandable, but it was testimony where
13        the Defendant was denied an ability to use very
14        -- to have the team -- the RSM team admitting a
15        weakness in their analysis, and the weakness
16        being that they had a more junior associate
17        working on the case.  That would have been
18        powerful.  And I think that the prejudice prong
19        is easily satisfied by what the Defendant could
20        have cross-examined versus the fact that he
21        didn't have the ability to do that because this
22        was not turned over.
23            Another analysis here is -- it's not just
24        about impeachment.  The Kyles v. Whitley case
25        talks about that "the suppressed evidence could

1          have discredited the caliber of the

2          investigation."  I know -- you may remember

3          some of the questioning -- in the previous

4          hearings, we talked about emails where they

5          were looking for an IP address to establish

6          venue, looking for restitution information,

7          talking about whether, if they pursued a

8          certain strategy, the Defendant would get the

9          information in discovery.

10              They were asked to create documents for

11         the Government -- "documents" meaning, like, an

12         analysis or a spreadsheet, I think is what

13         Commisso testified to.

14              So if defense counsel had had all this

15         information, that would have clearly

16         discredited the caliber of this investigation

17         of -- they've already got a witness who's

18         working both sides -- well, I don't want to say

19         sides of the fence, but had worked for RSM, the

20         alleged victim, and now is going to work for

21         the Government.  And that in his role for

22         working with RSM, that that witness or team of

23         witnesses were talking about how to help the

24         Government.  And this goes back to the summer

25         of 2018.

1           This information was exculpatory.  And
2      this is -- yeah, this is a better -- this is
3      the emails about -- and this is November 7.  So
4      this is before Mr. Alrai is even indicted.  And
5      I think this is after one of the meetings with
6      the U.S. Attorney's Office.
7           So there's much more to this email, but
8      there's a back-and-forth about this meeting
9      with the U.S. Attorney's Office.  And part of
10     that discussion is consideration of the net
11     worth method.  The reason that they suggest
12     this is using this method would put out of play
13     the opportunity to dispute market valuations
14     and complex IT issues.
15          Well, guess what the Government did?  And
16     this is right from their reply motion to our
17     motion to dismiss.  They're saying that the
18     non-disclosed evidence wasn't prejudicial
19     because they still had the personal enrichment
20     analysis, and it had nothing to do with the IT
21     issues, and it was completely unrelated to the
22     work RSM did for United Way UWMB.
23          Well, it's not completely unrelated,
24     because while Naviloff is still -- and
25     Fitzgerald -- are still working for United Way

1        in November of 2018, they're trying to see how
2        they can help the Government's case be --
3        defend against disputes as to market valuation.
4        And that's what happened at trial from the
5        previous emails.
6            Attorney Harrington is trying to attack
7        Naviloff of, like, "Hey, you're not an IT
8        expert.  How can you come in here and say that
9        this software is the same as this software, or
10       this IT application is the same as this IT
11       application, or there were duplicate billings
12       or services not rendered?  How can you
13       calculate the loss on something that you don't
14       have any underlying expertise?"
15           So what -- this is proof that RSM and
16       Naviloff -- and this could have been used
17       against them -- that they helped come up with
18       the Government's plan to not just rely on
19       market value and to look at personal
20       enrichment.  So that, I think, is another
21       reason why this evidence would have been -- the
22       nondisclosure was prejudicial.  I think that's
23       a better way I want to say that.
24           We've heard a lot about document scans,
25       Your Honor.  And I mentioned this during the

1          cross-examination of Mr. Commisso.  And as I

2          said, we learned today -- and I just want to

3          clarify what happened.

4              So you can see on this -- it's basically a

5          screenshot where it says -- at the bottom, you

6          can see -- the tabs aren't active because it's

7          a screenshot, but it'll say user's identity,

8          service account, security groups, group

9          policies.  So if this were the actual Excel

10         document, I could scan through that.  There

11         would be 40 tabs.  And this is at Uuu -- were

12         the actual Excel document.  So this is

13         something that was turned over after trial.

14             We assumed that it came from

15         Attorney Commisso.  Because based on what we

16         had had or the information we had, he was --

17         information was coming through him, document

18         requests were sent to him based on the letters

19         we talked about before.  And so what happened

20         is this network scan was produced after trial.

21         What was produced prior to trial was one of

22         these tabs.  So probably not an exact

23         measurement, but about 140th of what we got

24         after trial.

25             And so the question -- and I was asking

1          Attorney Commisso about this, because he had
2          testified, like, "As far as I know, nothing
3          that came from United Way that was exculpatory
4          wasn't turned over to the Defendant."
5               And I asked him about the network scan,
6          and he's, like, "Well, I'm not really familiar
7          with what's on there."
8               And so this is a quote from Meyer's
9          testimony where -- I think this is the
10         question:  "When you got there," number five,
11         "you were not able to find a password
12         expiration policy?"
13              "Yeah, there wasn't an expiration policy
14         and the complexity of the passwords were weak."
15              So from this network scan that we get
16         posttrial, we find information about the
17         passwords, and whether there's password --
18              So it says, "Password last set.  Password
19         expires."  And that's under one of the tabs
20         that was not turned over to us prior to trial.
21              Another example from the posttrial
22         scanned -- another quote from Mr. Meyer, "Okay.
23         And also when you got there," number five --
24         oh, actually, I did that one already.  Oh.
25         It's the same quote about the complexity of the

1       passwords.

2           So part of this scan under "password

3       strength assessment" -- the red is added by us

4       just to make it clear -- as part of the scan

5       that was run, it says "strong security, strong

6       security" -- I won't read it all the way down,

7       but that would have been something that we

8       could have impeached Meyer's statement about

9       the passwords being weak.  We could have

10      impeached him with this network scan that was

11      not turned over.

12          THE COURT:  Is it not turned over?  Is it

13      reviewed by Meyer and/or Naviloff and not

14      turned over?  Or is it never reviewed?  I can

15      see an argument either way, but I'm trying to

16      figure out which it is.

17          MS. BROWN:  See, that's the thing, Your

18      Honor.  As I understood the Government's

19      proffer and Commisso's testimony, that there

20      was some exchange of -- so as I understood it,

21      this 40-tab Excel network scan that was not

22      produced until after trial was -- came directly

23      from RSM.  And I would invite the Government to

24      correct me if I'm wrong, but that's how I

25      understood their proffer earlier.  And this

1          came from RSM after your discovery order this
2          summer, August-something.  And this was
3          produced.
4               I asked Attorney Commisso about it -- that
5          I was assuming everything was getting funneled
6          through him to do whatever data security
7          investigation -- or data security analysis as
8          to the privilege.  As I understood his
9          testimony, this didn't go through him.  This
10         came straight from RSM posttrial.
11              So that's -- if I, again, understood
12         Attorney Commisso's testimony, this must have
13         come directly from Mr. Meyer to Mr. Naviloff as
14         part of the RSM analysis.
15              THE COURT:  So it was that stream unknown
16         until today, in other words; right?
17              MS. BROWN:  Exactly.
18              THE COURT:  But it's your understanding
19         that Naviloff saw this before trial, or didn't
20         see it?  Either way, you can criticize, but
21         which is it?
22              MS. BROWN:  Well, there's an email that we
23         talked about earlier, and I can find that,
24         where Meyer is sending -- it's either Meyer is
25         sending it to Gilpin, or Gilpin's sending it to

1         Meyer, but there's a back-and-forth on that
2         email.  And Commisso cc'd -- remember I asked
3         Commisso about it?
4             Like, "Hey, this network scan was
5         forwarded from between Gilpin and Meyer, and it
6         says 'network scan' on there, and you're
7         copied."
8             And he was like, "Well, I wasn't really
9         paying attention to it.  I was just copied on
10        it.  That was kind of between Gilpin and
11        Meyer."
12            So there is evidence that they -- that
13        Meyer -- goes back to before.  He had access to
14        it.  He's forwarding it to RSM.  So I think
15        that's enough to make a connection that this is
16        information he had that he thought was --
17        either Gilpin's asking him to consider or, the
18        way I understood the email is, he was asking
19        Gilpin to consider it.  So if he's forwarding
20        it to Gilpin then --
21            THE COURT:  Yeah, I get it.  I get it.  I
22        understand.  I'm asking -- maybe the
23        prosecution knows.
24            Is this information that anybody at RSM
25        actually reviewed?

1           In other words, would Attorney Brown or

2     Mr. Harrington's cross have been, "How can you

3     say it's weak passwords, having reviewed this?"

4           Or is the cross, "You didn't even bother

5     to review this"?  Which is it?  Do we know if

6     Naviloff or someone on his staff actually saw

7     this, Mr. Hunter?

8           MR. HUNTER:  (Inaudible).

9           THE COURT:  Time out.  Your audio is,

10    like, beyond bad.

11          MS. LE:  I think he might be frozen,

12    Judge.

13          THE COURT:  Yeah.  He keeps freezing and

14    unfreezing.

15          MR. HUNTER:  Is this better, Your Honor?

16          THE COURT:  Yeah.

17          MS. LE:  Much better.

18          THE COURT:  You remember my question?

19          MR. HUNTER:  Yes.  Basically, did someone

20    from RSM see this document?  The short answer

21    is yes, as I understand it.  And then I can

22    explain my understanding of where this document

23    came from.

24          THE COURT:  So, wait a minute.  So RSM saw

25    this before trial; right?

1           MR. HUNTER:  Yes.

2           THE COURT:  But it wasn't produced

3      pretrial?

4           MR. HUNTER:  Correct.  What happened, Your

5      Honor, is the Government learned that there

6      were two network scans, one done by John Meyer.

7      And what we had understood before trial was RSM

8      had a separate network scan that they had for

9      their analysis.

10          We asked for both of those network scans

11     before trial, and we thought that we had

12     produced them.  One is the 62-page PDF

13     document, and the other is the one tab from

14     this spreadsheet that Ms. Brown is referring

15     to.  And we asked for them from the respective

16     parties and we thought that we had them.

17          THE COURT:  I see.

18          MR. HUNTER:  After trial -- well, through

19     this litigation, we learned that there was this

20     larger spreadsheet that had more tabs than just

21     the one that we had.  I requested it from RSM

22     and produced it to defense counsel.  And so

23     that's the timeline of what happened here in

24     regard to this network scan.

25          Just to be very frank and candid, if we

1    had it before trial, we would have produced it.
2    We wanted to produce the network scans that RSM
3    had before trial.
4         THE COURT:  All right.  So you explained
5    to me why you didn't have it, and I understand.
6         Do you concur with me?  I view this as
7    something that is colorably impeachment
8    material -- to cross-examine Meyer and/or
9    Naviloff.
10         Do you agree or disagree?
11         MR. HUNTER:  Yes, Your Honor, I agree.  I
12    think there are reasons why that might weaken
13    the impeachment.  But, yes, if I were a defense
14    attorney, I would want this to cross-examine
15    both of those witness.
16         THE COURT:  All right.  Thank you.
17         Go ahead, Ms. Brown.
18         MS. BROWN:  And just to clarify that
19    there's no doubt about this --
20         THE COURT:  I'm not saying there's any
21    doubt about this.
22         MS. BROWN:  Well, I just want to clarify
23    what this document is, Your Honor.  On the
24    left, we took a screenshot from an actual email
25    from Ryan Gilpin.

1          So Ryan Gilpin goes to the document on the
2    right, takes this information, takes a
3    screenshot, puts it in an email that he shares
4    with the team, saying, "Hey, look at this."  So
5    there's no question that -- it's not even about
6    had access to it.
7          It was, like, a "Hey, look at this.  This
8    is important" kind of email.  So that there's
9    just no question that RSM and Meyer had access
10   to this.  This is that same scan that was being
11   shared.
12         So, finally, to the third part, which is
13   the due process violation.  I'm not going to
14   spend a lot of time on that.  We have outlined
15   that fairly well in our motion.
16         THE COURT:  I have to kind of apologize to
17   you for this.  Because it was -- failure to
18   preserve evidence is obviously a very obvious
19   due process violation.  And for whatever reason
20   -- and you briefed it, by the way -- for
21   whatever reason, I was somehow stuck on, like,
22   a civil discovery freeze situation, which is
23   similar to this, because a request was made.
24         But, yeah, I guess what I was saying to
25   you, though, last week was, "What's the legal

1       basis for this?"  And I was sort of getting all

2       huffy about it.  It's obviously got a legal

3       basis.  I'm not sure if you can make the case,

4       but it's a clear body of law, and I get it.

5               MS. BROWN:  But it actually is very

6       similar to the idea of spoliation in civil

7       cases, which is you -- you're the party

8       bringing this case, and you were in a position

9       unique to make sure something valuable didn't

10      get destroyed.

11              So it's a simple argument, but, obviously,

12      there's a constitutional due process dimension

13      here.  And that's what we're arguing.  And

14      that's why I asked some of the questions of

15      Attorney Commisso.  I mean, there's no question

16      this investigation began in May.  Now we're

17      hearing it began before that.

18              But at least as to United Way, there's no

19      question that computer data was key to this

20      case -- that finding out what happened in this

21      case was key.  And the Government chose the

22      path of letting Attorney Commisso, and then

23      later RSM, decide what they get and what they

24      don't get.  As the Government, they could have

25      asked for things to be preserved.  They could

1          have asked for documents from their computers.
2          And that's done all the time that -- think
3          about child pornography cases, where they get
4          subpoenas to go in and get things from a party.
5               So they didn't do that.  They chose not to
6          do that in this case.  And that -- the case I
7          was referring to is the Cooper case, that they
8          can't just blindly allow a third party not to
9          preserve evidence.  And as I said, I think
10         we've articulated that fairly well.
11              THE COURT:  Wait a minute.  We've gone
12         90 minutes, so I wanted to give the reporter a
13         break.
14              MS. BROWN:  Oh, sure.
15              THE COURT:  But let me ask you one
16         question before that.
17              Given the timing of how this all lined
18         up -- your due process argument -- so what is
19         the evidence that the Government either
20         permitted or blindly allowed it?  I'm not sure
21         I've heard that.
22              MS. BROWN:  Yeah.  The FBI was involved in
23         the case in the end of May.
24              Attorney Commisso said there was -- he
25         didn't like the word "coordination."  There was

1        some communication between him, and the
2        Government, and the FBI as to this June 12 -- I
3        mean, June 12 is going to be the key date when
4        this data would become important.  So
5        Mr. Alrai's not there anymore.  And so they
6        would want to, as close to that date as
7        possible, figure out what's in the IT
8        environment.

9            And so they -- Attorney Commisso talked
10       about there being communications about the FBI
11       knowing about that meeting, and even being
12       outside to hand a subpoena to Mr. Commisso.
13       The thing is, why would the FBI want to be
14       there on the day that he's learning there's
15       this investigation?  Well, because he might go
16       home and destroy something; right?  They're
17       being smart about this.

18           Like, if this guy just knows that he's
19       been questioned about his role -- potential
20       fraud or misconduct, as the FBI, they're like,
21       "Okay.  We want to make sure that he can't go
22       mess with any evidence.  We're going to give
23       him a subpoena or a warrant right way, so that
24       we can prevent that." And they didn't do that.
25       They didn't trust Mr. Alrai, but they trusted

1          United Way to preserve evidence that didn't get

2          preserved.

3               So that's -- there's no email or document

4          that said, "Boy, it would really be nice if

5          you, like, didn't preserve this."  Obviously,

6          that's not what we're saying.  We're saying

7          it's neglect.

8               THE COURT:  All right.  Look, it's been a

9          little over 90 minutes, so we'll take the

10         afternoon break.  I'm sure the United States

11         will have a response to the argument you just

12         made about preservation.  And we will

13         reconvene -- you can finish up your argument,

14         Attorney Brown, at 3:10.

15              (Recess taken at 2:55 p.m., and the

16              proceedings resumed at 3:11 p.m.)

17              THE COURT:  Attorney Brown, you were on

18         your due process spoliation argument.

19              MS. BROWN:  Actually, I think I'm done

20         with this slide.

21              The remaining, I think, four slides that I

22         have, I've attempted to address some of the

23         questions that the Court posed prior to the

24         hearing.  And they may have been answered, but

25         I'll just go through them quickly.

1            One is authority for the proposition that

2       the Government must or should turn over

3       itemized expert bills or expert's internal

4       communications, documents, indicative of

5       expert's deliberative process.  And I talked

6       about that a little bit earlier -- that if it's

7       Brady, they've got to turn it over, regardless

8       of whether it's work product.  So we're not

9       saying they have to turn it over in every case.

10           But there's also plenty of case law that

11      talks about that these things are relevant.

12      Your Honor has expressed this already about

13      if -- in fact, almost same as what you said --

14      rejected documents could be more important to

15      cross-examination than documents actually

16      relied on.  And there's support for that

17      finding that the relevance of funds, documents

18      considered and not used -- all of that is

19      relevant.  So that, I don't think, is a barrier

20      to our Brady argument.

21           Another question the Court posed is the

22      effect on the Defense of Attorney Commisso's

23      involvement in the prosecution.  We've argued

24      that there's cases that say while ordinarily --

25      and we agree with this -- ordinarily, a

1          third-party -- the Government's not
2          responsible.  I guess a better way to say it
3          is, ordinarily, Brady does not apply to third
4          parties, even if those third parties helped the
5          prosecutor in the case.  And the Government
6          sets out all those cases.  We agree with that.
7               But as the Blaszczak (phonetic) case and
8          the other cases cited in our motion say, this
9          is a case-by-case, factual analysis.  I think
10         it would be an understatement to say that this
11         case is unique and unusual.  Very rarely do you
12         have a witness who's being paid by both the
13         alleged victim and the Government in the same
14         case.  It's unusual in terms of the role that
15         both the expert witness and the lawyer for the
16         alleged victim played in discovery.
17              But it still comes down to Government
18         conduct.  And the Government conduct in this
19         case is them turning over the reins to other
20         parties, and not exercising their duty to
21         review the evidence.  And it's -- that email
22         you brought up earlier --
23              When you combine it with Exhibit Ll,
24         there's nothing there except the Government
25         saying, "Hey, you guys work it out" -- two

1     people who have an interest in the case.  And
2     the Government obviously has an interest in the
3     case, but they also have an ethical obligation
4     to do justice that Attorney Commisso didn't
5     have in this case, and Mr. Naviloff certainly
6     didn't have.
7          Commisso's role also is that he used the
8     privilege as a sword and a shield.  He said
9     that he didn't withhold anything relevant to
10    Naviloff's loss calculation, but we pointed out
11    that there's hundreds of emails that he has
12    marked as privileged involving Mr. Naviloff,
13    and that he has redacted documents where
14    there's obvious discussions of loss calculation
15    involving Mr. Naviloff.  So he has withheld
16    documents.
17         Also, another analysis here is that there
18    is evidence that Commisso and RSM were
19    assisting the Government's investigation way
20    before Mr. Alrai was even indicted.  We've
21    talked about the emails involving helping the
22    Government establish venue, rebut expected
23    arguments regarding market value, increasing
24    loss amounts, finding assets for forfeiture and
25    restitution, potentially shielding exculpatory

1        evidence.  And instead of exercising scrutiny
2        towards Commisso's zealous efforts to obtain a
3        conviction against Mr. Alrai, they either
4        joined in his zealous efforts or took a
5        hands-off attitude, I would add to that.
6              The role of IT expertise in development of
7        Mr. Naviloff's expert opinion, and the evidence
8        of who provided this -- I mean, it boils down
9        to it -- and I know these questions are posed
10       prior to the hearing, so you may have answer to
11       all that.  But it's certainly uncontested that
12       Mr. Gilpin did most of the work.  The Court has
13       seen emails where he's doing findings and
14       analysis.  Those are the words of RSM -- not my
15       words.
16             So this is certainly not just, like, "Hey,
17       let's have a meeting on Tuesday" kind of
18       emails.  These are emails where there's
19       analysis and findings shared, and analysis from
20       another expert.  And we talked about just a few
21       minutes ago -- Gilpin was reviewing network
22       scans and analyzing that, along with Meyer, to
23       determine whether certain services were
24       rendered in this case.
25             Diego Rosenfeld, the person Naviloff

1    claimed -- so it's not just the billable hours

2    from Rosenfeld.  If you look at all these

3    emails where they're discussing findings, he's

4    not in most of them.  There's a couple that

5    he's in where he's cc'd, but most of them are

6    from Mr. Gilpin, which would have provided

7    great fodder for cross-examination and was

8    prejudicial to the Defendant's case.

9         And the fourth question the Court had

10   posed is the meaning of the reliance.  I think

11   I've probably addressed that.  I just would

12   note one other particular case, the McCambridge

13   case, noting the failure to respond completely

14   to a specific discovery request suggests to the

15   Defendant that such evidence does not exist and

16   can amount to a misleading representation.

17   And, again, you don't have to find misconduct

18   on the part of the Government for this.

19        And that was one of the -- in the Bundy

20   case that we talked about, that was one of the

21   issues that was discussed, is that there had

22   been representations that -- to the Defendant

23   that he had everything.  Or he had tried to get

24   specific things, and it had been represented to

25   him that he had everything.  And, so,

1          therefore, he may have abandoned lines of
2          defense, lines of argument, or theories of the
3          case.  And that's our argument as well.  So
4          that is the end.  I'm going to stop the share.
5               And I am done, Charli.
6               THE CLERK:  Thank you very much.
7               THE COURT:  Can you submit that slide
8          presentation, please?
9               MS. BROWN:  Yes, I will do that, Your
10         Honor.
11              THE COURT:  Somebody, I'm sure, is
12         handling the argument for the prosecution, so
13         please proceed.
14              MR. HUNTER:  Yes, Your Honor.  And I will
15         try to be close to my computer, but please let
16         me know, and if the court reporter could let me
17         know, if you can't hear me.
18              THE COURT:  Yep.
19
20                   CLOSING STATEMENT
21              MR. HUNTER:  So I'll just start -- defense
22         counsel made several -- argued several times
23         that she doesn't need to prove that the
24         Government intentionally did anything.  But
25         just trying to remember, at its core, what is

1          the Defendant's motion about?  It is a motion
2          to dismiss for prosecutorial misconduct.
3               And the first term has been very clear:
4          "The sanction for dismissing an indictment
5          after a Defendant's been convicted of an
6          offense is employed only in truly extreme cases
7          of egregious prosecutorial misconduct."
8               Similarly, the failure to preserve cases
9          that the Defendant cites require showing
10         Government bad faith.  Egregious conduct is
11         what we're talking about here.  And the
12         Defendant's failed to meet his burden that the
13         Government's conduct here is so egregious, so
14         truly extreme, as to require dismissal of the
15         indictment.  In essence, what the evidence here
16         shows -- the Government took steps to try to
17         identify and produce documents pursuant to
18         Defense discovery requests.
19              Now, another argument that the Defendant
20         made is that the Government essentially
21         outsourced this or passed this off to RSM and
22         United Way.  But as was discussed in a lot of
23         the pretrial litigation, the Government had to
24         talk with RSM and United Way, because the
25         Defendant was asking for documents that were

1        not in the Government's possession or control
2        under Rule 16, or as that's understood for
3        Brady purposes.  So the Government reached out
4        to the parties that had the documents or might
5        have the documents that the Defense was
6        requesting.
7             And as the Court's noted, there was the
8        added complexity, because the Government did
9        retain RSM to perform its loss analysis, of
10       making sure that when RSM was producing
11       documents to the Government, that it was not
12       producing something that United Way hadn't
13       waived privilege on.  For example, related to
14       the data breach investigation.
15            And so the correspondence -- a lot of the
16       correspondence that defense counsel cites,
17       where the Government is forwarding discovery
18       requests to defense counsel, are showing just
19       that -- that the Defendant's asking for
20       documents the Government doesn't have, and the
21       Government is forwarding those requests to the
22       parties that do.
23            One of the documents cited -- it's
24       Government Exhibit 21, but I think defense
25       counsel has it as a separate exhibit -- is an

1          example of this, where Mr. Harrington had an

2          October 11 letter requesting a number of

3          things, including RSM's work papers.  And

4          Mr. Naviloff wrote a response responding to

5          that about whether or not RSM had it, what they

6          had, what they didn't have, what they produced,

7          what they didn't produce.  And the Government

8          sent that response to defense counsel.

9               So, again, what the Defense is essentially

10         trying to do is use the Government's and the

11         victim's willingness to expedite things, to try

12         to produce things without going through a

13         formal Rule 17 process, against us.  We reached

14         out to the parties that had the documents, and

15         then we produced them if we received them.

16              THE COURT:  Yeah.

17              MR. HUNTER:  And the question here is, is

18         this -- so that goes to the prosecutorial

19         misconduct argument -- is essentially, the

20         Government didn't do anything to try to hide

21         the ball here.  We worked hard to try to find

22         everything that Defendant was asking for,

23         that -- everything that Mr. Naviloff considered

24         and relied on.  And we tried to find that and

25         get it to the Defendant before trial.

1           And so I think the Defendant fails to show
2      egregious Government misconduct that warrants
3      dismissal of the indictment.  But the basis of
4      the motion primarily is Brady.  And so the
5      question is, is any of this newly discovered
6      evidence -- Brady based on newly discovered
7      evidence?
8           So the question is, is any of this newly
9      discovered evidence Brady?  And for that, the
10     Defendant needs to show that not only is it
11     exculpatory because it's helpful for
12     impeaching, but that it's material, in that
13     there's a reasonable probability that the
14     evidence would have changed the result.  And
15     I'm putting the First Circuit Joslin (phonetic)
16     case, which we cite extensively in our
17     briefing.  And the Defendant needs to show that
18     the Government suppressed it; that the
19     Government had the material and didn't produce
20     it.  And the Defendant has to prove that he was
21     prejudiced by not receiving this material.
22          So just beginning with the suppression
23     point -- and, again, we've briefed it.  But I
24     think the case that the Defendant hasn't really
25     contended with is the U.S. v. Joslin, which is

1            a First Circuit case coming out of this
2            district that involved a cooperating
3            corporation that was cooperating with the
4            Government's investigation.
5                 The AUSA made some form of public
6            statement, according to the opinion, that the
7            corporation was part of the Government's team.
8            The First Circuit assumed for purposes of its
9            analysis that the corporation wrote the
10           Government's prosecution memo and did research
11           to establish venue -- so far more than even was
12           being alleged here with John Commisso.
13                And in that case, the First Circuit held
14           that the knowledge of that cooperating
15           corporation is not imputed to the Government
16           for Brady purposes.  Those documents that are
17           in the possession of that cooperating
18           corporation are not in the Government's
19           possession and control for purposes of Brady.
20                And the Government cites a similar line of
21           cases regarding experts.  Where, again, it
22           boils down to -- is the expert an arm of the
23           prosecution?  And defense counsel alluded to
24           some of these cases.  But, there again, it --
25           the question is, is the Government using the

1          expert for their area of expertise to testify
2          for their area of expertise?  And here we asked
3          Greg Naviloff to do these two accounting
4          analyses.  Or, is the Government using the
5          expert, essentially, as an agent?  Which,
6          again, I briefed the issue.  I won't repeat it.
7          But only here -- the evidence is the Government
8          used RSM as an accounting expert.  That's what
9          we put Greg Naviloff on the stand for.  That's
10         what we asked him to do.  And that's what he
11         testified to.

12              And, so, again, everything that RSM knows
13         can't be imputed to the Government for Brady
14         purposes either.  So the Government cannot
15         suppress what it doesn't have.  And for that
16         reason alone, the Defendant's argument fails as
17         to there being a Brady violation.

18              Just a couple of points just to address
19         what defense counsel brought up in her
20         summation.  She mentioned this new stream of
21         Meyer -- documents from John Meyer.  I just
22         point the Government to ECF Number 50, page
23         nine, footnote ten, which was a pleading the
24         Government filed when we were talking about
25         this exclusion of Greg Naviloff's testimony.

1          And, basically, there -- what the footnote
2    says is basically, as we were conferring with
3    RSM about this motion, we learned that they had
4    emails from John Meyer that bore on his
5    analysis.  So we asked them for them.  And we
6    determined some of them had already been
7    produced, and we produced the ones we didn't
8    have.  So, again, the point here is, again,
9    that the Government, when we learned or had
10   reason to know if some form of document that
11   was -- that Greg Naviloff might have viewed, or
12   relied on, or considered, we sought it out and
13   produced it.
14       So the next element of the Defendant's
15   burden is showing that the newly discovered
16   evidence is material.  And here, the First
17   Circuit -- there's a number of cases, again,
18   cited in our brief -- that evidence is not
19   material under a Brady if it's sort of
20   cumulative and weak impeachment evidence on an
21   issue tangential to the conviction.
22       So the question is -- okay.  Some of these
23   documents could have been used to impeach
24   Greg Naviloff.  And this network scan, which,
25   again, I addressed in the proffer and can

1       address further, could have been used to

2       impeach.  But is this the type of material

3       impeachment evidence?  And, again, sort of the

4       standard for impeachment in the Brady context

5       is there's a reasonable probability that the

6       evidence would have changed the result.

7            So just regarding materiality, there are

8       at least two reasons why this newly discovered

9       evidence isn't material.  And for the first

10      reason, I really want to focus on the argument

11      the Defendant put forth regarding materiality,

12      which mostly came in through Jason Sgro and his

13      testimony.  And I think the basic takeaway from

14      Jason Sgro's testimony is he disagrees with

15      Greg Naviloff's invoice analysis, because the

16      line items on the invoices, Mr. Sgro thinks,

17      might contain additional work that Mr. Alrai

18      and DigitalNet did that's not captured in the

19      invoice.

20           And Mr. Sgro said "there's a lack of

21      detail on these invoices.  It would help to

22      have more detail."  And so that's why he wanted

23      all of these emails from the IT help desk and

24      Mr. Alrai's email.  But what the Court hasn't

25      seen, and what the Defendant hasn't presented,

1          is any of this newly discovered evidence that

2          undercuts Greg Naviloff's assumption, which is

3          that he can compare those line items directly

4          to the invoices from other vendors.

5                  And Greg Naviloff explained what he did

6          is -- these are opaque invoices.  There's not a

7          lot of detail.  And so he goes to the

8          contracts, where there's more detail, and tries

9          to match up the language in the contracts to

10         the language on the invoices, and compare that

11         to other contracts.  So -- but this lack of

12         detail in DigitalNet invoices is not a new

13         issue.  It came out at trial.

14                 And I direct the Court to Dom Pallaria's

15         testimony.  Dom Pallaria was in the accounting

16         department.  And he testified that through his

17         years of having Alrai at United Way, he was

18         always troubled by, and often complained about,

19         the lack of detail in DigitalNet invoices.

20         Because United Way couldn't tell what they were

21         paying for.  This idea that the invoices are

22         somewhat opaque was part of the fraud, in other

23         words.  And Mr. Pallaria even confronted

24         Mr. Alrai about this with a particularly

25         egregious example -- about a $200,000 invoice

1    with very little detail.

2        And Mr. Alrai's response to

3    Mr. Pallaria -- and this is from Dom Pallaria's

4    trial testimony -- said, "Alrai said that

5    we" -- United Way -- "is saving a lot of money

6    by not requiring the vendor, DigitalNet, to

7    provide a lot of extra detail and extra work to

8    support their bill."

9        In other words, a key part of this fraud

10   was ensuring that only Alrai had oversight into

11   DigitalNet's bills, and only he could confirm

12   that DigitalNet was providing what United Way

13   was paying for.  And this is why

14   Greg Naviloff's second analysis is important --

15   and Mr. Naviloff explained this at trial -- is

16   that part of the reason for this second

17   analysis was because there was a limitation to

18   his contract and invoice-based analysis,

19   because there could be other areas of value or

20   expense to DigitalNet that aren't accounted for

21   in those invoices.  And so that's -- he

22   explained the personal enrichment analysis

23   tested the assumption that the other services

24   and the invoices weren't performed at a loss or

25   breakeven.

1            And, again, I point the Court to

2      Jason Sgro's testimony during this hearing.

3      Where, again, he's saying there's some

4      additional engineering expense baked into these

5      line items on the invoices that Naviloff

6      analyzed.  And that that additional cost would

7      be reflected in the salaries for engineers.

8            Well, that cost to DigitalNet would have

9      come through in Greg Naviloff's personal

10     enrichment analysis, where he looked at

11     DigitalNet bank records, he looked at Alrai's

12     personal bank records, and tried to find all

13     the costs to DigitalNet to providing services

14     to United Way.  And at the end of the day, he

15     didn't find additional salaries for engineers.

16     He didn't find additional cost to United Way

17     that might explain what else those line items

18     in the invoices provide.  He found that

19     Imran Alrai pocketed at least $3.7 million

20     through the fraud.

21            And there's another reason why the

22     separate analysis renders this evidence

23     immaterial.  Because taken most charitably, the

24     Defendant's materiality argument, again,

25     through Sgro, is that we can't rely on this

1        invoice contract analysis because Ryan Gilpin

2        didn't know enough about IT; therefore, you

3        can't rely on any IT assumptions that underlay

4        the comparison between the invoices and the

5        contracts.  And, so, therefore, you can't

6        reasonably determine loss.

7            And Sgro admitted, "I'm not looking for

8        perfection, but I'm looking for ways to

9        reasonably determine loss."  The way he would

10       do it is by getting all of the emails from the

11       help desk.  And, again, the way Greg Naviloff

12       did it was through this separate personal

13       enrichment analysis.  But the sentencing

14       guidelines, and the application notice to

15       Section 2(b)1.1, direct the Court what to do if

16       it can't reasonably determine the loss due to

17       fraud.

18           The guidelines direct "the Court shall use

19       the Defendant's gain if loss can't reasonably

20       be determined."  So if, again, Jason Sgro and

21       the Defendant are right that this evidence is

22       so impeaching that the Court can't consider the

23       line item analysis of the invoices, well, then

24       the guidelines direct the Court to consider the

25       Defendant's gain.

1            THE COURT:  The guidelines don't counsel

2     me to do that during the guilt phase of the

3     trial.

4            MR. HUNTER:  That goes to -- again, I

5     think it's black letter law that for wire

6     fraud, the Government doesn't have to prove

7     that the victim suffered any harm due to the

8     fraud.  And there's plenty of cases about that.

9     We cite some in our brief.  I can cite more.

10            THE COURT:  I know, but a jury could also

11     find harm to the victim as part of wire fraud.

12     It doesn't mean the jury -- the trier of fact

13     can't.

14            MR. HUNTER:  Yes, Your Honor, but the

15     point for materiality is, is it material to

16     guilt or innocence?

17            THE COURT:  I know.  Look, I understand.

18     My question, though, is -- see, to me, loss

19     calculation is very important.  And it's

20     inextricably connected to fraud because there's

21     a causation element to fraud.  I know it

22     doesn't have to cause harm, but under a view of

23     the evidence that it did cause harm -- and I

24     think this case is a case that can be viewed

25     that way.  At least that's the way I viewed it

1          when I sat there and listened to it; right?  I

2          saw defrauding conduct -- very specific

3          defrauding conduct that harmed the victim, no

4          question.  Economically -- you hit him in the

5          pocketbook.

6                And I don't know how one finds loss and

7          quantifies loss without connecting it with

8          defrauding conduct; okay?  To me, that makes it

9          material.  I know it could be done without that

10         connection, without that causation, but that

11         isn't that case to this Court -- at least the

12         way I viewed the evidences the first time I sat

13         through it.

14               And, frankly, I think the way that

15         Mr. Naviloff did his business confirms that.

16         Because he didn't just do math.  He relied on

17         IT expertise in areas involving things like

18         overbilling and duplicate billing.  He actually

19         rolled up his sleeves and did the hard work and

20         connected to the harm.  I'm not sure you can --

21         despite the fact that the law permits it,

22         Mr. Hunter, I'm not sure you can separate harm

23         to the victim from loss in a case like this,

24         despite the fact that the law permits it.

25               Do you follow what I'm asking you here?

1           MR. HUNTER:  I think so, Your Honor.  And

2     I guess I'd say a couple of things.

3           I think with regard to the IT questions in

4     Greg Naviloff's analysis, it's limited to these

5     four areas:  Was there high availability

6     backup?  Which, again, John Meyer testified to

7     it and was cross-examined about.

8           And then the other question is, is this --

9     basically, is this a fair reading of the line

10    item on the invoice?

11          THE COURT:  Yeah.

12          MR. HUNTER:  And so my materiality point

13    is everyone knew going into this that the

14    invoices were unclear, that they didn't have a

15    lot of detail.  And that one of the

16    difficulties is how do you line these things

17    up?  And, again, Mr. Naviloff's primary way of

18    doing that was looking at the language in the

19    contracts.  And he did have folks at his firm

20    who would help him with vocabulary,

21    understanding what this thing in the contract

22    means, and so on.

23          But the lack of detail in the contracts

24    was in no quantity going into trial.  And

25    that's where I think this personal enrichment

1          analysis goes to the materiality point the

2          Court just raised.  So I was raising it --

3          there are kind of two reasons.  One was the

4          loss is not required to prove fraud, which the

5          Court is pushing back on.

6               But the first reason was the second loss

7          analysis -- the personal enrichment analysis

8          was a way to check the IT assumptions, that

9          there's not something else in this line item

10         that DigitalNet's doing that DigitalNet's

11         paying for that's not accounted for.  So,

12         again, I go back to Jason Sgro's testimony.

13              He's saying, "Well, the reason why these

14         line items are so high is because you need

15         engineers to do this.  There are going to be

16         other employees doing things."  And, again, the

17         Court saw the trial testimony.  We know who the

18         engineers were at DigitalNet.  It was Cal Lobby

19         (phonetic).  And there are no other salaries --

20         there's no other information in DigitalNet's

21         financial records showing all this additional

22         cost expense and value.  So the second analysis

23         basically allows -- Naviloff recognizing the

24         limitations of this invoice analysis, because

25         of the lack of clarity, to check if there's not

1        some unaccounted for bucket of value here.

2            And I guess the one other point I'll just

3        raise regarding the Government's burden to

4        prove loss is the Court also made a finding

5        regarding United Way's intangible right to

6        control its own assets.  And I don't want to go

7        down the whole rabbit hole of that, but we

8        briefed it in our trial brief, and the Court

9        has said it's done some additional research

10       there.

11           And there, the Government alleged in the

12       indictment that the fraud also defrauded United

13       Way of their intangible right to control their

14       own assets.  And, again, the line of cases, I

15       think, is fairly clear that what we're talking

16       about is did the lie -- did the fraud that

17       Imran perpetrated go to the core of the

18       bargain?  And here the Court presided over a

19       ten-day bench trial, where it saw overwhelming

20       evidence of Alrai's fraud and deceit, and the

21       Court heard witness after witness -- the

22       Defendant's old friends, employees for both

23       victims, testified to this fraud.

24           The Defendant lying to United Way and

25       Robert Allen Group about DigitalNet's

1          qualifications, how long it's existed, how many

2          employees it has, its clients.  I mean, in

3          fact, one of the documents, and I think one of

4          the more incriminating documents, was a

5          document where United Way is trying to do their

6          due diligence on this contract and confirm that

7          DigitalNet is qualified.  They ask for a list

8          of clients.  And we have the Word document on

9          Mr. Alrai's computer showing him editing and

10         creating this document, and then sending it

11         back to United Way to do their due diligence.

12              So the Defendant's fraud regarding what

13         DigitalNet is, what experience it has, goes to

14         the core of the bargain, and falls right

15         directly within these line of cases saying that

16         the property that United Way can be defrauded

17         of is their intangible right to control their

18         own assets.  So that was, again, charged in the

19         indictment.

20              And I was looking through the transcript.

21         The Court made a finding that there are two

22         harms to United Way.  One was its -- the

23         overbilling, et cetera.  And one was this

24         intangible right or its ability to control its

25         own assets.

1          THE COURT:  You're saying I made that

2     finding on the record?

3          MR. HUNTER:  In the same sentence where

4     you reference the overbilling/duplicate

5     billing, you also mentioned United Way's right

6     and ability to control their own assets.

7          THE COURT:  Okay.

8          MR. HUNTER:  So, again, the evidence of

9     the Defendant's fraud through all of these

10    other witnesses, including his deceit, was

11    extensive.  A lot of the most damning evidence

12    was found on the Defendant's home computer,

13    which the Court, again, heard testimony about.

14         So then that comes down to prejudice.  And

15    so what prejudice has the Defendant shown here?

16    And, again, in essence, the issue was, was the

17    Defendant able to effectively cross-examine

18    Greg Naviloff about the assumptions in the IT

19    invoice and contract analysis?

20         And as the Court has observed during his

21    hearing, asking defense counsel, "What else

22    would you do if I reopened the trial and

23    reheard evidence?"  Defense counsel

24    cross-examined Mr. Naviloff extensively with

25    this new evidence.

1           And so we're talking about cross-examining
2       Greg Naviloff about these assumptions.  That's
3       what the Defendant could have done.  The
4       Defendant has not done that -- or could do that
5       under Rule 33.  But it's all not prejudicial
6       for the same reason it's not material; and that
7       is that even if these assumptions are
8       impeached, first, the Government would submit
9       they're not so impeached so as to completely
10      undercut the validity of Mr. Naviloff's loss
11      analysis.  I think his analysis is still sound
12      and still stands.
13           But, also, there's a second analysis that
14      recognizes the limitations of the initial one
15      and confirms it.  So it's not prejudicial for
16      those reasons, and because the Defendant has
17      effectively had a second bite at the apple, so
18      to speak.  He's been able to cross-examine
19      these witness.  He's been able to cross-examine
20      John Commisso.
21           And, again, the Defendant has not pointed
22      to a single document that contradicts the
23      assumption -- the IT assumptions that underlay
24      Greg Naviloff's loss analysis.  What it boiled
25      down to, I think -- what I saw on the slides

1       that defense counsel just presented -- was it

2       was impeaching because they could cross-examine

3       Greg Naviloff about the work that Ryan Gilpin

4       did.  But I haven't seen an argument that

5       there's something materially wrong with those

6       assumptions with the invoices.  So for those

7       reasons, the Government -- the Defendant failed

8       to meet his burden under Brady.

9           And, again, I would just point the Court

10      to Rule 33.  At the end of the day, if there's

11      anything more that defense counsel needs to do

12      with this newly discovered evidence, the Court

13      has the ability to reopen evidence,

14      essentially.  And in the context of Rule 33,

15      that's after a judgment's been entered, which

16      hasn't even happened here yet.

17          So the Court's the finder of fact.

18      Defendant counsel has all of these emails --

19          THE COURT:  I was wondering about that.  I

20      read the rule myself.

21          Are you telling me I can't order this

22      relief until I order a judgment first?

23          MR. HUNTER:  I don't know the answer to

24      that either.  There's not a lot of cases on

25      this.  As a practice --

1          THE COURT:  I doubt it.  I doubt that I

2     have to -- I did render guilty verdicts; right?

3          MR. HUNTER:  Right.  And as a matter of

4     common sense and practicality, I agree.

5          What difference does it make, you know,

6     other than add more paperwork for the clerk's

7     office?

8          THE COURT:  Okay.

9          MR. HUNTER:  So, again, the point here is

10    the Defendant either already has or the Court

11    could allow the Defendant to use this evidence

12    to cross-examine whatever Government witnesses

13    the Defendant wants to cross-examine.  And so

14    for that reason, there also cannot be prejudice

15    sufficient to warrant a dismissal of the

16    indictment.

17         THE COURT:  I think I'm with you there --

18    I really do.  I understand the Defendant has

19    lodged some serious allegations here, and is

20    very adamant, but I just don't view dismissal

21    here as a remotely likely outcome in this case.

22    I don't view the prosecutor's conduct as

23    intentional or egregious in a way that would

24    necessitate or warrant dismissal.

25         Let me ask you a question then,

| | |
|---|---|
| 1 | Attorney Brown.  Have you thought about -- if I |
| 2 | decide to order this relief, right, would you |
| 3 | want a jury trial?  Or would you just want |
| 4 | rehearing on certain evidence?  What are you |
| 5 | thinking? |
| 6 | MS. BROWN:  We've actually discussed that. |
| 7 | And, you know, not to get into a lot of detail, |
| 8 | but I think that the Defendant would certainly |
| 9 | have a right to reconsider waiving jury trial. |
| 10 | And I think -- and I talked about that last |
| 11 | week, and I can include that in the |
| 12 | supplemental briefing.  I found a brief from |
| 13 | another attorney addressing this issue. |
| 14 | But that's one of the arguments that that |
| 15 | other attorney made -- is that now that his |
| 16 | client has more impeachment ammunition, maybe |
| 17 | they don't -- the reasons a client might want |
| 18 | to waive a jury trial.  And then if they've got |
| 19 | more ammunition in the case and maybe a |
| 20 | different theory that goes after the |
| 21 | Government's investigation, then maybe they may |
| 22 | not want to waive. |
| 23 | So we may want a jury trial.  That was my |
| 24 | long answer, sorry, on that. |
| 25 | THE COURT:  You're telling me that you |

1    don't know yet, but you want it on the table?

2         MS. BROWN:  We want it on the table.  And

3    we will -- like I said, I didn't want to take

4    all day in my closing arguments.  I'll address

5    that issue.  I've got a couple of cases on it.

6    And I'll put a paragraph or two in the

7    supplemental pleading to the Court.

8         THE COURT:  Yeah.

9         I'm not sure how much I -- last week when

10   I was listening to your arguments, I thought I

11   might need more briefing on the merits.  I'm

12   less sure about that now.  I thought that I

13   would -- if you wanted to do it, I would

14   certainly accept it, but I'm not sure I'm going

15   to order it anymore.

16        But I definitely am going to order -- ask

17   you to brief for remedy.

18        MS. BROWN:  Okay.  Yeah, as long as I

19   get -- because I didn't address that in my

20   presentation.  So if I can do that and submit

21   the PowerPoint.

22        THE COURT:  Mr. Hunter, I want to let you

23   finish your argument, but I also don't want to

24   cut you off.

25        MR. HUNTER:  I think I'm just about done,

1        Your Honor.

2             Basically, the conclusion is the Defendant

3        hasn't shown egregious prosecutorial

4        misconduct, hasn't shown that the Government

5        suppressed any evidence, and hasn't shown that

6        the newly discovered evidence is material or

7        has failed to show prejudice.  So each of these

8        is independently fatal to the motions.

9             THE COURT:  Right.

10            No egregious conduct warranting dismissal.

11       No suppression.  No materiality.  No prejudice.

12       Right.

13            This is a question of fact:  Who can speak

14       to the retention -- the actual facts around the

15       retention of Naviloff?

16            Is it you, Mr. Hunter?  Or is there

17       somebody else who made that happen?

18            MR. HUNTER:  That would probably be

19       Mr. Davis.

20            THE COURT:  Do you remember, Mr. Davis,

21       how it was that you decided to retain and then

22       retained Mr. Naviloff -- how that came about?

23            MR. DAVIS:  Judge, it always struck me

24       that there were no conflicts -- at least

25       relevant conflicts -- between United Way and

1          the Government's position on the question of
2          calculating loss.  And once I saw that United
3          Way had retained Mr. Naviloff and the nature of
4          the work he had done and was doing, and also
5          his qualifications, it struck me at some point
6          that it would be efficient to simply build on
7          that work.
8                    And so at some point, I began to go
9          through the contract process.  Of course, we
10         have to go through a process -- we have a
11         contracting officer.
12                    THE COURT:  Yes.
13                    MR. DAVIS:  We had to separately negotiate
14         a raid, and so on.  But I don't know if that
15         gets to the Court's point, but it just -- I try
16         to be efficient in spending the Government's
17         money and in getting to what we need to get to.
18         And I certainly think it was my idea, and not
19         someone else's, to retain Naviloff as a
20         Government expert.
21                    THE COURT:  I've been wondering about that
22         with my law clerks throughout the litigation.
23         Because it seems like it makes sense.  From an
24         efficiency standpoint, it makes a lot of sense.
25         Looking back now, it probably feels like it

1          made things complicated, but I can certainly

2          see the impulse to do it at the time.  So

3          you've told me why, and it makes perfect sense

4          to me.

5               Can you tell me how?  In other words, I

6          don't mean the contracting officer, but did you

7          discuss it with representatives of the United

8          Way, including, but not limited to,

9          Mr. Commisso?

10              MR. DAVIS:  So I'm sure I discussed it

11         with Mr. Commisso, and I'm pretty sure I didn't

12         discuss it with anyone else.  That is, I

13         regarded United Way as a represented victim,

14         and I would not have called the CEO or did

15         something separate.  But I know that I talked

16         with him about it.  And, frankly, if he had

17         objected, of course, we wouldn't have done

18         that.

19              I think there wasn't an objection and,

20         perhaps, he shared my general views.  And the

21         Court's comment about the complications that

22         have ensued -- maybe I would have done it

23         differently.  I'm not going to deny that,

24         Judge.

25              THE COURT:  Oh.  Okay.  Thanks.

1          Mr. Hunter -- I'm going to pose the

2     questions to Mr. Hunter, since he made the

3     argument -- but, Mr. Hunter, any time you want

4     to delegate one of your cocounsel to answer the

5     question, feel free; okay?

6          MR. HUNTER:  Okay.

7          THE COURT:  What about the bill?  What

8     about the bill?  Because, understand, from the

9     Court's perspective, that's exculpatory.  Just

10    showing that -- and not necessarily in a way

11    that goes to concealing, or inconsistency, or

12    anything.  But it's exculpatory in the sense

13    that the expert isn't responsible for all the

14    work.  And that's just exculpatory in the

15    normal courts.

16          What about your obligation to produce

17    that?  That one didn't get produced and it was

18    in your possession -- unlike everything else

19    that, I concur, it's not a suppression of

20    evidence case at all.

21          But what about the bill?  What about your

22    obligation to produce that?  I know the Rule 16

23    doesn't specify it, but it's very, very -- it's

24    so customary that I was almost surprised it

25    wasn't produced.

1             What do you say about that?

2             MR. HUNTER:  So I'll say, at least -- I'll

3       let Mr. Davis talk about the bill as it came

4       in, just because I don't know about that.

5             But I will say this regarding the

6       materiality exculpatory point:  I would just

7       direct the Court -- on paragraph ten of

8       Mr. Naviloff's report, he discloses that he

9       received assistance from professional staff at

10      RSM working under his supervision, and it

11      disclosed their billable rate.

12            So at least regarding the fact that people

13      worked -- there were multiple people on the

14      team, and how much RSM was getting paid -- when

15      I was thinking of expert discovery, I was

16      seeing that has been disclosed.  I'll be

17      honest -- I didn't think about the bill,

18      personally.

19            THE COURT:  Okay.  That's a straight

20      answer.  So what were you just pointing me to?

21            MR. HUNTER:  Greg Naviloff's expert report

22      that was produced, obviously, pretrial.  And

23      paragraph ten talks a bit about that.

24            THE COURT:  Could you read that to me?

25      Please read slowly for the court reporter.

1           MR. HUNTER:  Will do, You Honor.  And we

2       filed this as an exhibit, docket No. 170-1.

3           On page seven of the PDF, paragraph ten of

4       the report, he says, "I received assistance

5       from professional staff at RSM working under my

6       direct supervision.  Throughout this report, I

7       make reference to procedures performed.

8       There's procedures that in some instances may

9       have been performed by staff under my

10      supervision.  RSM is being compensated at a

11      blended rate of $350 per hour and $580 per hour

12      for court testimony."

13          THE COURT:  So at least -- at the very

14      least, actually -- at least the fact of

15      compensation and the rate of compensation were

16      disclosed.  Okay.  That's not insignificant,

17      actually.  Because that's sort of basic cross;

18      right?  You go through that.  I don't remember

19      if Harrington did, but you go through that.

20      All right.  Well, that's something.  Thank you.

21          But I remain, though -- even with that, I

22      remain convinced that the varying amounts of

23      time, both relative to Naviloff himself and to

24      each other, have at least the potential for

25      exculpatory use -- impeachment use.  Given

1        that -- I mean, you said you didn't think about

2        it, so I guess it's -- there might not be much

3        you can say about it.

4             But don't you recognize that that's

5        impeachment material, and, therefore,

6        exculpatory material that was in your

7        possession?

8             MR. HUNTER:  I mean, I guess so, broadly,

9        yes.  It's impeaching.  And so the question is,

10       is it materially impeaching?  Does it go -- is

11       there a reasonable probability that that would

12       have changed the result of the trial is, I

13       guess, the question?

14            THE COURT:  In isolation, I guess not.

15       Fair.  That's a straight answer.  Okay.  Let me

16       see what else I want to -- I have a few

17       questions for you -- that, again, you can

18       either answer or bounce.

19            In your objection of the motion to

20       dismiss, you make the point that Commisso and

21       United Way had diverging interests from the

22       Government.  But Mr. Davis just made the point

23       that they weren't in conflict.  I think they

24       were divergent, but not in conflict.

25            But the objection says, quote, "including

1           privilege, protecting United Way's public image
2           and donor relationships, and protecting United
3           Way from tax, regulatory, and other fallout due
4           to Alrai's actions," end quote.  And those were
5           examples of divergencies; right -- divergences,
6           I guess, in the interest?
7               I guess I want to know your opinion -- and
8           I want to say this with all due respect to
9           Mr. Commisso for having handled it.  Should
10          there had been more distance between
11          Mr. Commisso and this prosecution effort?  Or
12          are you comfortable with how this played out?
13              And if that's something you want to
14          bounce, I don't mind, because I know you
15          haven't probably seen a ton of this over the
16          years.  But this is -- it's not unusual, and I
17          wouldn't call our case for the victim to have
18          counsel.  But this was a lot of involvement.
19              This is just my observation:  This was a
20          lot of involvement.  And there clearly was
21          economic motives here for the victim to
22          increase the loss.  That's just part of it.  I
23          mean, that stands to -- depending on how an
24          insurance carrier views it, and maybe
25          eventually at tribunal, that has impact on the

1          amount of a recovery.  And not in a criminal

2          remedy -- in a different remedy.  I view this

3          as very close.

4                Do you have any thoughts about that?

5                MR. HUNTER:  Yeah, I guess I'll say one

6          thing.  And, again, I'll defer to John Davis

7          regarding comfort based on his probably having

8          much more experience on this than me.

9                Certainly, my thinking and approach at the

10         time regarding Mr. Commisso's involvement

11         was -- it partially flowed from the fact that

12         we retained RSM, and RSM did work that -- like

13         the data breach investigation that was still

14         privileged.  And, therefore, Mr. Commisso

15         needed to remain involved to ensure that United

16         Way's privilege was asserted.

17                And so I was not uncomfortable with it for

18         that reason, but I'll defer to Mr. Davis.

19                THE COURT:  Only if you have thoughts,

20         Mr. Davis.

21                MR. DAVIS:  I will just say, Judge, that

22         part of my judgment in this case was informed

23         by Mr. Commisso's obvious ability and his

24         obvious strong moral compass and

25         professionalism.  And I'm not going to get into

1           making tributes, but I would just say it was

2           very, very reassuring in the difficult early

3           days of this whole situation to find that the

4           guy on the other end of the phone is this

5           thorough and calm, levelheaded, and always,

6           always truthful, as far as I could tell.

7                I never had a sense that the Government

8           was getting played, that there was BS, that --

9           any of that.  And so I certainly agree that the

10          Government relied to a great extent on

11          Mr. Commisso in this case.  But I would just

12          say part of that is never in the

13          relationship -- and I would say that to this

14          day -- did I see things that gave me pause

15          about the accuracy, or about the credibility,

16          or about the motives of what's going on at the

17          other end.

18                And I would also say that -- is there

19          bias?  Is there a motive to maximize

20          restitution?  Of course.  He's a victim.  He's

21          representing a victim.  And I know it's a

22          corporate victim and not a personal victim, but

23          that's what we do as prosecutors, as the Court

24          knows.  We work with victims.  And they have

25          statutory rights.  They have the right to

1          confer.  They have the right to respect of

2          their dignity and privacy.  They have a right

3          to notifications of all kinds of things.  They

4          have the right to appear.

5               And there should be no surprise -- or at

6          least there's no surprise on my part -- that

7          Mr. Commisso, representing United Way, is

8          seeking the best result for his client, which

9          has been horribly violated here.  And so the

10         Court says it's unusual.  I agree it's unusual.

11         This is a greater extent of involvement with

12         the Government than most cases.

13              But, again, as an officer of the court, I

14         will just say nothing that Mr. Commisso ever

15         did gave me pause about his credibility and his

16         professionalism.  And so when it came time to

17         hiring an expert, I hired the same expert he

18         did.  And maybe that was a mistake, but it

19         wasn't a bad faith mistake.

20              THE COURT:  No.

21              MR. DAVIS:  And I stand by the discovery

22         we provided in this case, both before trial and

23         after.

24              I guess the last thing I'll say is I wish

25         I had produced the bill.  And I see the bill is

```
1          addressed to me.  I'd assume I received it.
2          I've actually just looked in my inbox, and I
3          can't find where I got the email.  But my guess
4          is, Your Honor -- I think the one bill is dated
5          October 19.  I assume we would have gotten it
6          around early November.  I am sure that I
7          forwarded it to contracting.
8               And I wish and I kind of assume I would
9          have said, "We need to disclose that," and
10         would have sent that to the paralegal, but I
11         apparently didn't.
12              THE COURT:  Yeah.
13              MR. DAVIS:  And the only failure on that
14         score by the prosecution team is mine.  I would
15         have been the only person, I think, to actually
16         see the bill.
17              And I think that one bill before trial may
18         have been the first bill -- I didn't think of
19         it -- I certainly don't remember reading it.  I
20         probably wouldn't have even read it, other than
21         to note the total.  And I would certainly say
22         that the significance that there were multiple
23         parties working on the case under Naviloff
24         would have entirely escaped me; that is, I
25         would expect that RSM would have associates.
```

1          And RSM, of course, just in October had

2     produced a huge report with a huge number of

3     schedules.  It was a big production job.

4          And so -- wouldn't have struck me as odd

5     that Greg Naviloff, senior partner, is not the

6     only person on this bill.  I was in private

7     practice.  I assume --

8          THE COURT:  Oh, yeah.

9          MR. DAVIS:  And there are a whole lot of

10    engagements that are like that.  So I'm not

11    going to beat myself up too much, because I

12    don't think it would have struck me until now

13    that we're in the questions about IT expertise,

14    and who do you rely on, and was it Rosenfeld,

15    and so on.

16         Anyway -- but the shortcoming there is I

17    probably just sent that bill to contracting to

18    pay, and completely missed its significance as

19    something that should have been disclosed.

20         MS. BROWN:  Your Honor, can I add

21    something here?

22         THE COURT:  Not yet.  I promise I'll give

23    you a chance, but I can't lose my train of

24    thought.  Let me just make a note, then you can

25    say what you want to say, instead of losing my

1        train of thought that way.
2             MS. BROWN:  Well, just briefly, I want
3        to --
4             THE COURT:  Hold on a second.  Let me make
5        a note.  I want to not lose my train of
6        thought.  Sorry.
7             Go ahead, Attorney Brown.
8             MS. BROWN:  I apologize for interrupting,
9        but I didn't want you to consider what
10       Attorney Davis just said.
11            He's not under oath.  He's not a witness
12       in this case.  He just vouched for a witness.
13       He went on about the moral compass of this
14       witness.  It's one thing to summarize or make a
15       proffer to the Court about discovery and how he
16       got it, but it's another thing for a
17       non-witness lawyer in the case to vouch for the
18       moral compass, and also to give factual
19       testimony about the exhibits in this case and
20       whether he remembers reading them or didn't
21       read them.  That -- we don't have a way to
22       cross-examine on that.
23            And I'm not saying that, again, to say
24       that he's lying about that.  You said it
25       yourself earlier, that we all have a way of

1          remembering things in a way that supports our

2          beliefs, and our biases, and our opinions.

3               I think there's actually a saying out

4          there that "the faintest ink is better than the

5          best memory."  And that's because we all

6          remember things in a way that support what we

7          want to believe we did.  I'm included.  I'm not

8          saying that he did that.

9               But I think that to have him vouch for the

10         moral compass of the witness -- I think that's

11         inappropriate.  And I don't even know that the

12         Court expected that answer -- for him to go on

13         as long as that.  But I would ask that, to the

14         extent it's testimony, that it be stricken and

15         not be part of the record or the Court consider

16         it in making the fact findings in this case.

17              THE COURT:  Sure.  Okay.  For what it's

18         worth on both issues -- let me just take them

19         one at a time.

20              Regarding vouching for Mr. Commisso --

21         yeah, I don't know anything about

22         Mr. Commisso's moral compass.  But I will say

23         that nothing I've heard in this proceeding

24         makes me question his ethics or his honesty.

25         And like I said, he conducted himself as I

1      would expect counsel for a victim to do in
2      terms of its propriety, in terms of its ethics,
3      in terms of its lawfulness.  Okay.
4           As to the exhibit, though, I mean, I did
5      -- I have been saying I didn't plan to put the
6      prosecutors under oath, and I was going to ask
7      them some questions.  So I did plan to at least
8      rely on what Mr. Davis said about the bill.
9           And, so, I mean, if you want to
10     cross-examine him about that, I'll put him
11     under oath and have him repeat it.  Because it
12     matters to me.  That matters.  It's not -- you
13     didn't call any of these people as witnesses,
14     but there's more to the story here than
15     Commisso's conduct.
16          When you're accusing prosecutors of
17     intentionally suppressing evidence here --
18     which you've done, and as is your right to
19     do -- it's not unusual to call the prosecutors
20     as witnesses and ask them to account for it.
21     Now, I'm willing to accept their words about
22     the facts the same way I'm willing to accept
23     your words, but that doesn't mean you have to
24     accept it, Ms. Brown.
25          So if you'd like me to do that, I will do

1          that.  But I did plan on relying on what

2          Mr. Hunter said, and what Mr. Davis said about

3          the bill.  I'm talking about the bill -- not

4          about their opinion about Mr. Commisso.

5                So if that's something you'd like to cross

6          him on, or you want to test, I think we

7          probably should go through the formality.

8          Because to me, it matters.  And it matters

9          only -- honestly, it only matters on the issue

10         of intentional suppression and outrageous

11         conduct.  Based on what I've heard, I'm not

12         prepared to go there, but you might not be

13         willing to accept that.  And I mean this -- I'm

14         not trying to just talk you out of it.  If you

15         want to examine him on this, it's up to you.

16               MS. BROWN:  Well, he was not noticed as a

17         witness for this hearing, so I'm not prepared

18         to.  But more importantly, if he is going to be

19         a witness and the Court's going to accept his

20         representations, then I want to see the emails

21         on this case.

22               That's the point I've made all along --

23         they haven't produced any emails.  If they were

24         instructing RSM to give all of their analysis,

25         or instructing them to give exculpatory Brady

1        material, there's no evidence that they've done

2        that.  And if I were going to cross-examine

3        him, which I'm not prepared to do because he's

4        not noticed as a witness for this hearing -- if

5        I were going to cross-examine him, I would want

6        the Court to order production of any emails

7        that he had regarding this -- regarding

8        instructions to their expert and discussions

9        with their expert.

10            Did they send an email saying, "Hey, we've

11       represented in a hearing that we've given the

12       Court everything you've reviewed and any

13       analysis, any documents you've reviewed.  Is

14       that true?"  Those are things I would

15       cross-examine him on.  And that's important.

16            So I don't think the Court can take out

17       this part, of, "Oh, I don't even know that I

18       paid attention to it" as not a big deal.  I

19       would cross-examine him about things that I

20       don't have.  Which -- and we haven't gone there

21       yet, which is there are cases out there of

22       getting emails from prosecutors, if there's an

23       issue -- of whether those emails are relevant.

24       And we haven't gone there, but if the

25       prosecutor's going to testify and --

1          THE COURT:  Respectfully, it's your burden

2     here.

3          I mean, you just said, "We haven't gone

4     there yet."  Okay.  But one thing I don't want

5     to do is decide this motion and then have you

6     say you were somehow prejudiced, and your

7     client's rights were violated, in the way I

8     conducted this hearing.  I mean, this has to

9     end at some point.

10         MS. BROWN:  Absolutely.  If the Government

11    had noticed Attorney Davis as a witness for

12    this hearing, I would have asked for additional

13    documents.

14         THE COURT:  No, no, no.  You should have

15    noticed him for the hearing.  It's your burden.

16         Don't you think that their conduct --

17    you've alleged their conduct as misconduct.

18    You've alleged that they've intentionally

19    suppressed evidence.  And it's fair enough, but

20    I don't think it's up to them to notice him.

21    They could, but I don't think it's sort of a

22    shortcoming on their part not having done it.

23         And I guess maybe I shouldn't have said

24    I'm willing to listen to them without swearing

25    them in.  I try to treat officers of the court

1        a little differently than I treat fact

2        witnesses.  Frankly, if anybody wanted

3        Mr. Commisso to speak to me just as he had, I

4        would have done it as long as everybody agreed.

5        I really don't want to do yet a hearing about

6        how we did this hearing, okay, after its all

7        over.

8            I have a few more questions, but we might

9        be having another day of hearing, because

10       apparently, if I accept Mr. Davis' and

11       Mr. Hunter's representations, that's going to

12       be a problem.  And that's fine.  Let me see if

13       I have more questions about the law I want to

14       ask.

15           Well, I have to ask -- I don't know who

16       I'm asking.  This is just a legal question.

17       But, like, Mr. Hunter -- you said to the Court

18       earlier that you had been instructing, I guess,

19       Naviloff and Commisso that you wanted their

20       analysis.

21           So I'm not sure who gets this question;

22       okay.  Because Mr. Davis just told me that he

23       certainly was aware and would assume that

24       Mr. Naviloff would be working with staff;

25       right?  He's working with staff that aren't

1        accountants.  He's working with staff that are
2        IT professionals.
3             And you had a bill in your possession that
4        showed their names, and how many of them there
5        were, and even their relative amount of work.
6        I just can't imagine how one would not assume
7        that their communications internally included
8        analysis.
9             What did it include then?  I assume when
10       these gentlemen on the bill communicated --
11       we've seen a little bit of it -- with
12       Mr. Naviloff, they explain themselves about the
13       conclusions they reach and how they reach them.
14            How is that analysis not relied upon by
15       Naviloff?  Again, I've told you this so many
16       times -- that's where I'm struggling with this.
17       I'm not seeing intentional conduct to bury
18       exculpatory evidence.  I'm just seeing,
19       perhaps, a failure to appreciate an obligation
20       that goes beyond Rule 16 and beyond any order I
21       issued.
22            It just goes to -- if you understood -- if
23       you assume, whether you assumed that he'd be
24       working with staff or you had a bill that
25       showed you he'd be working with staff and named

1    them, I can't imagine how that doesn't trigger

2    in your mind either an obligation to produce

3    that stuff or at least examine it for

4    exculpatory evidence that must be produced.

5         So what's the answer to that question,

6    Mr. Hunter?  Because you've told me you talked

7    about analysis to them.  That was you today.

8    Ms. Brown doesn't want me to rely on it?  Well,

9    I'm relying on it; okay.  Mr. Davis has

10   explained to me that he assumed it.  He had a

11   bill.

12        How is that not analysis?  How did you not

13   -- if you don't think you had the obligation to

14   produce it -- and maybe you thought that

15   because Harrington wasn't demanding it with a

16   line item.  I get that much.  But what about

17   the obligation to at least examine it to see if

18   there was something there that was exculpatory

19   that should be produced?  We can't just take

20   expert witnesses as deciding what to produce

21   for themselves.

22        What's the answer?

23        MR. HUNTER:  And so, I'm sorry, Your

24   Honor.  You cut out a little bit.

25        But -- so I certainly -- I don't recall

1        the exact conversation with Greg Naviloff, but

2        I know one of the things that Mr. Harrington

3        requested was all the reports prepared by

4        people at RSM, including employees working

5        under Greg Naviloff.  And that was sometime --

6        and, again, I don't have a precise recollection

7        of that conversation.

8               THE COURT:  Time out.

9               We've just established -- you just spent a

10       long time establishing that your memory of what

11       happened is not really fair material for this

12       hearing.  I'm not asking you about that.

13              I'm telling you what I'm assuming, since

14       you've already told me that you were looking

15       for analysis.  And since I know now that you

16       had this bill with all their names on it, and

17       Mr. Davis, as the lead prosecutor, also would

18       just assume, even had he not received a bill,

19       that he was communicating with staff -- that

20       staff was not accountants.  It was people

21       outside of Naviloff's expertise.

22              So if you don't -- I want to know, one,

23       why you don't think you have the obligation to

24       produce that analysis.  And I view it as

25       analysis.  Or, B, why you didn't have the

1       minimal obligation to review it for exculpatory
2       evidence?  Because the discussion regarding the
3       low-level associates certainly would have been
4       producible.  And that was brought to light
5       during trial when Naviloff downplayed it,
6       because he did -- or at least a trier of fact
7       could assume that he did.
8            So didn't you have an obligation to do
9       that, as an attorney who has a constitutional
10      obligation to produce exculpatory evidence?
11           MR. HUNTER:  Judge, just so I understand
12      the first question.
13           Are you asking -- do we have a
14      constitutional obligation to collect RSM's
15      internal emails to review them for exculpatory
16      evidence?
17           THE COURT:  Well, you can reject my
18      definitions, but I'm saying, do you have an
19      obligation to produce analysis since you told
20      me you directed them to produce their analysis?
21      And I think communications with underlings
22      outside of one's area of expertise to form
23      one's opinions are analysis.
24           And I think -- and so my question is,
25      didn't you have an obligation to either produce

1          that or at least examine it for exculpatory

2          evidence?

3               MR. HUNTER:  And I guess I would say if we

4          knew that there was some bucket of exculpatory

5          evidence or potentially exculpatory evidence.

6          But I haven't -- I think that there may well be

7          an obligation to review that for Brady.  But I

8          think here, there's no evidence -- and I

9          certainly don't have a memory of any

10         conversation about -- well, I don't want to get

11         into that -- but of some knowledge of

12         undisclosed reports or analysis of RSM

13         underlings.

14              And so is there an obligation for the

15         Government to collect every bit of internal

16         communication or work product of one of their

17         experts?  I haven't been able to find a case or

18         any legal authority for the Government having

19         such an obligation under the rules of evidence

20         or Brady.

21              THE COURT:  Well, there's a lot of -- this

22         line of cases -- a criminal case, Bullcoming

23         and the First Circuit case.  Let me see.

24              The First Circuit case, Ramos-Gonzalez,

25         664-F-31 -- it's not a discovery case.  It's

1          not a Brady case.  But it's a 6th Amendment
2          confrontation case.  And it at least suggests
3          that underlings that the lead testifying expert
4          relied on in forming his opinion -- that a
5          defendant has a right to actually confront them
6          and cross-examine them.
7                I know it doesn't translate perfectly to
8          this, and it doesn't.  But that's what I'm
9          asking you.  I mean, look, I know there's not a
10         case that says you have to look at every
11         internal document.  I know.  That's why I've
12         repeated a hundred times in this hearing --
13         this wasn't a discovery rule or order
14         violation.
15               But you've told me today that you were
16         looking for analysis; okay -- analysis relied
17         upon by the expert.  And I'm asking you, right,
18         given that Mr. Davis just told me -- well, I
19         knew he already had the bill.  You had the
20         bill.  It was in your possession.  The team had
21         the bill.  And that the lead prosecutor assumed
22         that he would communicate with his staff.  And
23         these were staff that were not accountants.
24         They were IT experts.
25               So I'm asking you -- yeah.  If you think

1          the answer is no, you can tell me, or yes and
2          why.  But why was there no obligation to either
3          produce it as analysis or review it for
4          potential exculpatory evidence?  When people
5          communicate with each other, that's
6          bread-and-butter evidence.  There's statements
7          of witnesses.  That's what witnesses are
8          cross-examined with.  That's how this works.
9          We all know how it works in court.
10              Wasn't there an obligation to either
11         produce it or review it for exculpatory
12         evidence?
13              MR. HUNTER:  I don't think so, Your Honor,
14         unless we had some reason to believe that that
15         evidence existed.  I think we had a duty to --
16         we inquired to get evidence, especially in
17         response to Defense's discovery request, but I
18         don't think we had -- I don't think the
19         Government had an affirmative obligation to
20         look at all of the internal communications of
21         RSM and review all of them.  I think -- I just
22         don't think we did.
23              THE COURT:  Okay.
24              Let me ask you this, Ms. Brown.  Rosenfeld
25         billed one hour.  But a review of the records

1          looks like he worked more than one hour on
2          this.
3                  Would you concede it looks more like he
4          worked about five hours?
5                  MS. BROWN:  There were times -- he worked
6          more than one hour.  I would agree with that.
7          And I think part of it might have been during
8          the RSM kind of tenure of -- during RSM's
9          tenure of working with United Way.
10                 THE COURT:  Looks like Exhibit 30 on your
11         motion, Attorney Brown.  It's 164-30:  Another
12         four hours.  I'm not saying it's still not
13         fodder for cross.  It is fodder for cross, but
14         it's not one hour.  That's all I'm asking.  All
15         right.
16                 So, Mr. Hunter, this kind of goes back to
17         what we were just talking about.  I view the
18         Government as having backed away from one of
19         its positions in the brief, but I don't want to
20         put words in your mouth.  So if you don't agree
21         with this, I want you to tell me; okay?
22                 In the objection -- your objection to the
23         motion to dismiss, you said the itemized bills
24         don't have impeachment value.  Now, I think
25         they do have impeachment value; okay?  They

1          list out the time billed by each member of the

2          forensic team, right, and the technology

3          specialist separately.

4               I think they're relevant to the Defense

5          because they're an impeachment of Naviloff,

6          both in general -- the amount of work Naviloff

7          did, the amount of work others did -- and then

8          especially with respect to the fact that

9          Naviloff, at trial, kind of emphasized one who

10         did very little and didn't mention the others.

11         And there was material discussing the person

12         who did the most as being very junior; right?

13              Do you agree with me that there's some

14         impeachment value there?

15              MR. HUNTER:  So, I think, so, Your Honor,

16         which is what I said earlier in the hearing.

17              THE COURT:  I thought you did.  Okay.

18              MR. HUNTER:  And I think -- to what I said

19         -- and I think -- not to completely back away

20         from the argument in the brief, but I think it

21         goes to the materiality prong, given what was

22         disclosed in the expert report, which was that

23         he was consulting with other people at his

24         firm, including other IT professionals at his

25         firm, and the billable right.

1              But I agree, Your Honor, that it is

2       impeachable.

3              THE COURT:  Last question from me, then.

4              On the Rule 17 issue, right -- the "they

5       should have subpoenaed" issue -- which, by the

6       way, I think is a fair argument.  There could

7       have been subpoenas issued in this case that

8       weren't -- to the victim.  All right?  I think

9       Mr. Commisso would have been in there objecting

10      and moving to quash, I understand, but I think

11      we would have figured something out.

12             But Attorney Brown is saying that they

13      relied on these representations that it had

14      been given, quote, "every document Mr. Naviloff

15      considered when he developed his opinion," and

16      that, quote, "there were no notes or memos

17      memorializing RSM's interviews with United Way

18      personnel."

19             I don't know if you wrote that in the

20      pleading, but if you did, what was the basis

21      for that assertion?  Because it doesn't appear

22      that would have been true.  What was the basis

23      for that assertion at the time?  What were you

24      relying on?

25             MR. HUNTER:  So starting with the notes of

1          interviews -- we were relying on Mr. Naviloff
2          and RSM.  And I think a similar representation
3          is in Exhibit 21, because I think
4          Mr. Harrington asked about it.  And this is the
5          email from Greg Naviloff to us responding to
6          that.  And, actually, that's true of both parts
7          of the Court's question.
8               THE COURT:  Okay.  Every document and then
9          every interview.
10              Now, you'd agree with me, though, that the
11         Defense was entitled to rely on those
12         assertions in determining whether it should
13         issue subpoenas; right?  Or no?
14              MR. HUNTER:  I mean, I think so.  And part
15         of my -- and this, I think, goes to part of the
16         pretrial litigation we had over the -- even the
17         litigation database; right?  There was always a
18         set of documents that the Defense requested at
19         one point that he didn't get.
20              And those are the documents -- and I think
21         this is -- again, it goes to the materiality
22         point.  It's those documents that Mr. Sgro says
23         would be most material; right -- all of these
24         documents from -- the emails to the IT help
25         desk, and so on.

1            THE COURT:  Okay.

2            I know last week I said that I was going

3       to ask for more legal briefing.  I don't think

4       I need to.  I really do think you've briefed

5       it.  If you want it, I'm not going to deny it,

6       but I'm not going to require it.

7            I'm going to look at -- Attorney Le gave

8       me a lot of help today when she was referring

9       me to the various documents and exhibits that

10      kind of make up the timeline.  I'm going to put

11      them together, assess it.  If I'm still

12      confused, I'm going to ask you to jointly

13      submit one as one filing, to the extent you can

14      agree on one.  But I'll issue an order if I'm

15      going to have you do that.  I'll just issue it

16      and give you a deadline.

17            MS. LE:  Judge, can I interject right

18      there?

19            I think that that -- the last Excel

20      spreadsheet with the 40 tabs that Ms. Brown has

21      discussed -- we didn't know about that when we

22      filed our initial response.  So Mr. Hunter, in

23      his surreply, makes a notation about that

24      situation; but, otherwise, it should be listed

25      out relatively well -- when our team received

1          things, and what the Bates numbers were, and
2          what those items are.
3               THE COURT:  Surreply was -- probably
4          170-something?
5               MR. HUNTER:  176.
6               MS. BROWN:  I have 174.
7               THE COURT:  174, Donna?
8               MS. BROWN:  Yeah.
9               MS. LE:  That would have been your --
10               MS. BROWN:  Is that ours?
11               MR. HUNTER:  Yeah.  176 is --
12               MS. BROWN:  Thank you.
13               MR. HUNTER:  -- and it's footnote six
14          where I basically mention that.
15               THE COURT:  And that's that last
16          spreadsheet?
17               MR. HUNTER:  Yes.
18               And one thing I will say for the record on
19          this.  In our discovery correspondence with
20          Mr. Harrington, when this issue of network
21          scans came up, the Government believed it had
22          both network scans.
23               And when Tim is asking about it, we told
24          him, "Here's the Bates number for the two
25          network scans."  So, again, the Government

1          agrees -- or concedes; however you want to put
2          it -- that this document -- we asked for it.
3          We should have gotten it.  And it should have
4          been produced.
5                    THE COURT:  Okay.
6                    Attorney Brown, I'm going to put the ball
7          in your court on one issue.  Well, no, I'm not
8          going to ask for more briefing, except on one
9          issue, which is remedy.  I'm going to give you
10         one week, Attorney Brown.
11                   Is that enough time?
12                   MS. BROWN:  Yeah.  We've actually done
13         some research on this already, and so we can
14         address that.
15                   THE COURT:  Well, let me just put this
16         down.  Today's the 7th; okay?  By the 14th, you
17         can elect a remedy, if I grant the relief.
18         It's a tough one.  Very tough question.
19                   But if I grant the relief, what are you
20         going to want to do?  Anything you want to do,
21         you should tell me the authority for it; okay?
22         Because I know you've told me last time we met
23         that you don't think that the Rule 33 remedy is
24         constitutionally permissible.  I get it, and I
25         don't want to jerk you around, Attorney Brown.

```
1          I think I'd need a federal court telling
2     me that the rules of criminal procedure are
3     unconstitutional on that issue for me to -- I'm
4     not suggesting it's the only thing I'm thinking
5     about.  But, like, to be persuaded -- I think
6     it's taking, like you suggested -- but I'll
7     keep an open mind.
8          MS. BROWN:  Well, I think the Government
9     and I can both agree the law is very sparse on
10    this issue.
11         THE COURT:  So, now, I'll give you a
12    chance to respond to that.  The Government --
13    you can respond to that.  That's a Monday.  So
14    I'll give you until Friday to respond to that
15    remedy.  If you want longer, just make a filing
16    if you need more time.  But I'll say, for the
17    Government, the 18th on remedy.
18         Look, I don't think I'm inclined to
19    dismiss this case; okay.  I just haven't heard
20    about egregious conduct by the prosecutors in
21    this case, remotely, that would justify it.
22    This strikes me as people doing their jobs in
23    good faith in an unusual situation, where not
24    only was the victim's counsel heavily involved,
25    but also a choice was made, for what appeared
```

```
1         to be legitimate reasons, to retain a
2         professional that had also been retained by the
3         victim.  And it led to some irregularities that
4         I think might require some relief from the
5         Court, okay, but not egregious conduct.
6             Now, when I said I was going to put the
7         ball in your court, Ms. Brown -- I'm just going
8         to disclose to you, okay, leaving aside what
9         Mr. Davis said about his opinion about
10        Mr. Commisso, which he's entitled to, and I
11        don't have any reason to disbelieve it -- but
12        I'm not focused on that at all.
13            But in terms of what Mr. Hunter and
14        Mr. Davis told me about what they remember, I'm
15        prepared to rely on it as officers of the court
16        explaining it to me.  I realize that memories
17        can be tested, though.  So if you want, I don't
18        see any shortcoming with them not -- noticing
19        them up as witness.
20            If you want to examine them, file a
21        request; okay?  But the ball's in your court.
22            MS. LE:  Your Honor, obviously, if that
23        were to happen, there's going to be some
24        complications where management will have to be
25        involved; and, potentially, AUSAs would be
```

1           recused from this matter moving forward once
2           they've testified as a witness.  So that is
3           something we'll have to bring to the attention
4           of management, Your Honor.
5                THE COURT:  You do that.  That said, I
6           recognize what you're saying, and I'm not
7           saying I'm granting it.  I'm saying I want to
8           know if there's going to be a request for it;
9           okay?  Like I said, I don't want to leave that
10          unaddressed so it becomes an issue about the
11          way this hearing was conducted.  I don't want
12          that loose end untied -- that's my point.
13          Okay.
14               I am prepared to take the representations
15          of all the attorneys in this case -- counsel of
16          record -- including Ms. Brown, including you --
17          I'm prepared to rely on that.  I don't need
18          people to be under oath; okay?  I also don't
19          think, though, for what it's worth, it's
20          particularly unusual in a case involving an
21          allegation of prosecutorial misconduct that a
22          prosecutor has to go under oath.  It's
23          unfortunate, but it's not remotely
24          unprecedented.  But if Ms. Brown wants that,
25          she'll tell me.

1            And your deadline to do that is the same

2      deadline as your remedy file; okay, Ms. Brown?

3            MS. BROWN:  Yes.

4            THE COURT:  Okay.  Good.

5            MS. BROWN:  Can I just ask one quick

6      question, Your Honor?

7            You said before that you're not going to

8      require the parties to file supplemental

9      pleadings.  And there are a couple of issues

10     that, how do I say -- that came to light during

11     the hearing that I hadn't really dealt with in

12     the pleadings, because -- especially as to the

13     scans and things like that, we really didn't

14     learn until this hearing how it came about and

15     who had what.

16           I may want to file a brief pleading to

17     address that.  I promise I won't do anything

18     repetitive, or issues we've already addressed

19     here.

20           But if I can do that, would it be the same

21     deadline?

22           THE COURT:  Yeah, same deadline.  And it's

23     like I said before -- I'm not requiring any,

24     but if anybody wanted to do it, I'm not going

25     to stop you.  And when I get it, I'll give the

1        prosecution a chance to respond, if they want
2        it.
3             MS. LE:  Since we're all here, can I make
4        a suggestion about scheduling moving forward?
5        Depending -- based on what the Judge has just
6        indicated, there's unlikely to be a wholesale
7        dismissal.  So it might be a situation where
8        the Court -- if you are prepared to schedule a
9        forfeiture hearing or one of the other
10       hearings, or address any of the other pending
11       motions, since we're all here and have our
12       calendars, we can do that now.
13            THE COURT:  No.  I appreciate the offer,
14       but, no.  I want to get this resolved.  Because
15       it's not that I don't want to get in mind the
16       calendar, but if we're just going to move them
17       again, all it means is work for Charli.  And
18       I'm just not going to create that for no
19       reason.  I mean, I don't know how you do a
20       forfeiture of sentencing without resolving
21       this.  It's part and parcel.  It's all
22       together.
23            The other motions -- like I know there's a
24       couple of different motions to compel and for
25       contempt out there.  They're just not front and

1    center for the Court in terms of -- they're
2    just not front and center for the Court in
3    terms of getting this issue resolved.
4         There is one issue -- there's a motion.  I
5    know one of my law clerks would fill me in if I
6    asked them, but there is a motion to compel
7    involving subpoenas out there.
8         What is that about?
9         MS. BROWN:  There's two motions -- a
10   motion for a Rule 17 subpoena.  And the
11   Government's objected, and Attorney Commisso
12   has filed an objection.
13        And there's a motion to compel which I
14   think might also be similar to a motion to
15   reconsider one of the earlier discovery
16   requests that was denied, basically saying,
17   based on evidence that we've received in the
18   last three, four months, we're making a request
19   to compel certain documents.  So there's two
20   discovery-related requests out there.
21        THE COURT:  But those are for sentencing
22   and forfeiture; right?  Not for this.
23        MS. BROWN:  That's correct.
24        THE COURT:  And not for the 33 of the 29.
25        It's for sentencing and forfeiture; right?

1          MS. BROWN:  That is correct.

2          THE COURT:  Okay.

3          Ms. Le, it's not that I don't appreciate

4      the suggestion to get stuff on the calendar.

5      But I just don't want to put it on and take it

6      off again, as I've done way too many times in

7      this case.

8          Anything else for the Court?  All right

9      then.  We are adjourned.  I'll await your

10     filing on or before the 14th, Ms. Brown.

11          (The hearing was adjourned at 4:42 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2               I, Molly K. Belshaw, a Licensed Shorthand
   Reporter for the State of New Hampshire, and
3  Registered Professional Reporter, do hereby certify
   that the foregoing is a true and accurate transcript
4  of my stenographic notes of the proceeding taken at
   the place and on the date hereinbefore set forth to
5  the best of my skill and ability under the
   conditions present at the time.  Read and sign was
6  not requested.

7               I further certify that I am neither
   attorney or counsel for, nor related to or employed
8  by any of the parties to the action in which this
   proceeding was taken, and further, that I am not a
9  relative or employee of any attorney or counsel
   employed in this case, nor am I financially
10  interested in this action.

11              The foregoing certification of this
   transcript does not apply to any reproduction of the
12  same by any means unless under the direct control
   and/or direction of the certifying reporter.

13

14

15

16

17                                  

18

19

20              Molly K. Belshaw
                RPR, LCR No. 00162

21

22

23

24

25