*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO APRIL 7, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:18-cr-192-JL
              v.                  *   December 3, 2020
                                  *   9:10 a.m.
IMRAN ALRAI                       *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF EVIDENTIARY HEARING
DAY TWO - MORNING SESSION
VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:        John S. Davis, AUSA
                           Matthew Hunter, AUSA
                           Cam T. Le, AUSA
                           United States Attorney's Office


For the Defendant:         Donna J. Brown, Esq.
                           Michael Gregory Eaton, Esq.
                           Wadleigh, Starr & Peters PLLC


Also Present:              John Commisso, Esq.
                           Commisso Law PC


Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|
| JASON SGRO | | 6 | 116 | 119 |

                    P R O C E E D I N G S

1              THE CLERK:  The Court has before it for

2    consideration this morning day two of an evidentiary

3    motion hearing in criminal case 18-cr-192-JL, United

4    States of America vs. Imran Alrai.

5              And, Mr. Sgro, the Court reminds you that

6    you're still under oath.

7              THE WITNESS:  Understood.

8              THE COURT:  Thank you for doing that, Charli.

9              I was -- Charli informs me that Mr. Davis may

10   have to take a break in the proceeding at about 10:00

11   for a sentencing and then will rejoin later.  That's not

12   a problem.

13             I want to apologize in advance if anything

14   happens similar with me.  If it does -- there might be a

15   couple of points during the day where I might need five

16   minutes to tend to something, just because there's a lot

17   of things going on at the moment.  But if it does

18   happen, it will be very brief.  I can -- it won't be any

19   kind of -- not even like a 15-minute break; like a

20   five-minute break to sign something or actually speak to

21   somebody that would direct my attention away from you.

22             If I can handle it while I'm listening, I

23   will, but if I can't, I'm going to have to take a --

24   maybe a couple times today -- a very short break.

1          Before we get started, Attorney Brown, why

2     don't you just tell me what you have in store today.

3          MS. BROWN:  Yes, your Honor.  We have a

4     continuation -- the government is continuing their

5     cross-examination of our expert.

6          We have two witnesses that are available:  One

7     is Attorney Commisso, who I see here; the other is

8     Mr. Meyer, who was a trial witness.

9          It might make sense, if the Court could give

10    us maybe even just two or three minutes after Mr. Sgro's

11    testimony -- I think it might be a good time for a break

12    anyway; they're saying -- the government's saying about

13    an hour and a half -- and we can evaluate whether we

14    need -- you know, who we're calling first and whether we

15    need both of them.

16          And so that -- so in sort of the more

17    expansive scenario, we'd be calling both of them after

18    the government's done with the cross-examination.  We

19    may reevaluate that and --

20          THE COURT:  Sure.

21          MS. BROWN:  -- we'll let you know.

22          THE COURT:  I know in the courtroom we try to

23    roll right through witnesses and all, but with people

24    isolated, I don't think it's unreasonable to give you

25    five minutes between witnesses to kind of communicate

1  with who you need to talk to and get your bearings.  So

2  that's totally reasonable.

3          MS. BROWN:  And along those lines, your Honor,

4  you may see me looking away from the computer at my cell

5  phone.  It's not that I'm double-tasking.  If my client

6  has a question of me, I've instructed him to send me a

7  text.  That's just better than emails and having to deal

8  with my emails.

9          So if I'm looking away, it's not that I'm

10  distracted from this hearing --

11          THE COURT:  Absolutely.

12          MR. BROWN:  -- it's to see if my client has a

13  question.

14          THE COURT:  No need to apologize.  You know, I

15  teach law students three semesters a year and I'm lucky

16  if I get them not to black out their screen sometimes.

17  So please don't worry about that.

18          Anybody -- you know, I understand life's

19  complicated.  If you've got to tend to something or look

20  away, it's not a big deal.

21          Okay.  Rest assured, though, I'm paying

22  attention.

23          Let's resume.  Attorney Le, you can resume

24  your cross of Mr. Sgro.

25          MS. LE:  Thank you, Judge.

```
 1                 CONTINUED CROSS-EXAMINATION
 2    BY MS. LE:
 3         Q.   Now, Mr. Sgro, when we left off on
 4    November 17th, we were discussing -- discussing whether
 5    you conducted an independent --
 6              THE COURT:  Time out.  Time out.
 7              Cam, you're very faint.
 8              MS. LE:  Oh, I am?
 9              THE COURT:  Yeah, at least in my mind.  I
10    don't know about Mr. Sgro.
11              How are you doing with that?
12              THE WITNESS:  Yeah, it's very quiet.
13              THE COURT:  Yeah, you're very faint.
14              MS. LE:  This is the one circumstance where
15    I'm actually quiet --
16              THE COURT:  Right.
17              MS. LE:  -- right?
18              THE COURT:  That's actually better.  Whatever
19    you're doing right now, it's working.
20              MS. LE:  I'm yelling.  Does that help?
21              THE COURT:  Yeah, I don't want --
22              THE WITNESS:  Yeah.
23         Q.   All right.  Mr. Sgro, sorry about that.  Is
24    this better?
25         A.   Yes.  And if I don't understand something,
```

1    I'll -- forgive me, but I'll just ask you to repeat.

2        Q.   No, that's exactly what I want you to do.

3    Okay?

4             So, Mr. Sgro, when we left off on

5    November 17th, I was asking you whether you conducted an

6    independent analysis of DigitalNet's services as it

7    related to CloudConnect.  Do you remember that?

8        A.   I do remember that, yes.

9        Q.   Okay.  And I think when we got into that

10   subject, you said -- and I'm quoting here:  So I was

11   never permitted to see the DigitalNet CloudConnect

12   services.

13            Do you remember that statement?

14       A.   Yes, I -- that sounds like the correct

15   statement, yes.

16       Q.   Okay.  Sir, are you aware that Mr. Alrai

17   discontinued CloudConnect as a vendor in April of 2016?

18       A.   I'm aware only of the contracts that I got to

19   review.  I'm not aware necessarily of when they -- when

20   things were in progress or being used or disconnected.

21       Q.   Okay.  But based on review of contracts as

22   well as invoice payments, there were no additional

23   payments to CloudConnect as it relates to United Way

24   after April 2016; will you agree with me about that?

25       A.   I believe that is correct.

1    Q.   Okay.  And so that would be about -- a little
2    over two years before RSM was retained by United Way in
3    this case, right?
4    A.   That -- that timeline seems to be true, yes.
5    Q.   Okay.  So it would be fair to say that RSM
6    also could not see DigitalNet's CloudConnect services
7    that ended before they became involved, right?
8    A.   It is reasonable that -- it's fair that you
9    can't analyze something that was disconnected before
10   you're involved.  However, that's not the only cloud
11   environment in question here, so I think it's important
12   that we understand that there was cloud environments
13   available during the RSM engagement --
14   Q.   Right.
15   A.   -- that were not made available to me.
16   Q.   Okay.  But my question is that RSM would not
17   have had access to the CloudConnect environment that had
18   ended two years before they were engaged.
19   A.   You can definitely not look at something that
20   doesn't exist before your engagement.
21   Q.   Thank you.
22        So is there anything new in the posttrial
23   discovery that suggests to you that Mr. Naviloff or
24   anyone at RSM reviewed anything beyond contract platform
25   specifications and invoices to determine loss as it

1  relates to CloudConnect for the period of January 2013

2  through April 2016?

3     A.   So I do recall in the posttrial discovery

4  production of documents conversation about a transfer of

5  services in the cloud environment that has to do with

6  moving -- I believe moving away from CloudConnect and

7  into the other data systems.

8     Q.   Okay.  Well, that dovetails perfectly into the

9  next exhibit that I want to talk about.  Okay, sir?

10          Tracy, can you pull up Defense Exhibit Nn?

11          Mr. Sgro, can you see that?

12     A.   Yes, I can.

13          MS. LE:  Is that Nn?  No, I'm sorry, Tracy.

14  N, as in night.

15     Q.   And, sir, are these the internal RSM emails

16  that you were just referring to from September 16

17  through September 17th, 2019?

18     A.   I apologize.  That is extremely small.  Could

19  we bring some of that out?

20     Q.   Yeah.  Let's see.

21     A.   So this is an email from Ryan, Mr. Ryan

22  Gilpin, to Mr. Chris Fitzgerald talking about an overlap

23  in services between Insight and CloudConnect.

24     Q.   So is this the email that you were just

25  referring to or the discussion that you were just

1  referring to?

2       A.   Yeah, this would be an example of that.

3       Q.   Okay.  Do you have a copy of this exhibit in

4  front of you?  Because it might be easier for us just to

5  review if you have it in front of you.

6       A.   I have a digital copy, but it will make our

7  window very small.

8       Q.   I see.

9       A.   Would you mind going through this?

10      Q.   Sure.

11           Well, Tracy, can you scroll down slowly to the

12  next section, the first contact on down right before the

13  signature block?  Maybe that'll help.

14      A.   Yes, that's much better.

15      Q.   Okay.  And I just want you to review this.

16  I'm not going to ask you to read everything out loud.

17           So are you familiar with the email I'm talking

18  about here?

19      A.   Yes, I'm familiar with this email.

20      Q.   Okay.  And would it be fair to say that in

21  these emails, Mr. Gilpin and his colleagues at RSM are

22  discussing invoices and records that they had obtained

23  related to CloudConnect and Insight, correct?

24      A.   That appears to be the case, yes.

25      Q.   Okay.  And it looked like at least in this

1    exchange that before they received those records, RSM

2    didn't know that CloudConnect was the vendor before

3    Insight; is that right?

4         A.   I couldn't speculate as to what they knew or

5    not from the email chain, but this is definitely talking

6    about the -- the fact that there's potentially an

7    overlap, in the opinion of Mr. Gilpin, between those --

8    those three to four months.

9              MS. LE:  Can we go down to the next section,

10   Tracy?

11        Q.   Okay.  Have you reviewed this?  Are you good

12   with that, Mr. Sgro?

13        A.   Yes.

14             MS. LE:  Tracy, can we go to the second page?

15   Or, actually, the bottom of that page.  I'm sorry.  I

16   missed a section.  The bottom of the page.

17             Do you see the body of the email at the

18   bottom?  Can we highlight that for Mr. Sgro?

19        Q.   Mr. Sgro, can you review that to yourself?

20        A.   Okay.

21        Q.   Okay.  So this goes into discussing how they

22   had some speculation about records and then they have to

23   essentially kind of reevaluate their opinion based on

24   the new records that they had obtained, right?

25        A.   That seems like a fair analysis.

1      Q.   Okay.  And is it fair to say based on the

2  stuff that we just looked at in the email exchange that

3  when Mr. Gilpin discussed -- makes comments about

4  certain records, he's citing the Bates number of those

5  documents; is that right?

6      A.   Where Mr. Gilpin is?

7      Q.   Yes, yes.

8      A.   I see some Bates number cites in this email

9  chain, yes.

10     Q.   Yes.  And are you aware that those Bates

11 numbered documents that Mr. Gilpin has cited were

12 obtained from CloudConnect through grand jury subpoena?

13     A.   I'm not aware of how they were obtained, but

14 they have Bates numbers, so I see that they were

15 obtained.

16     Q.   Okay.  And did you review those same Bates

17 numbered documents that are referenced in this email

18 chain?

19     A.   I couldn't be sure.  I can look at those Bates

20 numbers if you would like to.

21     Q.   Sure.  But are you aware that we have produced

22 the records obtained from CloudConnect through grand

23 jury subpoena in pretrial discovery?

24     A.   I believe there are documents pertaining to

25 that produced.  Whether or not those are comprehensive,

1   I do not know.

2        Q.   Okay.  And you understand that those records

3   that were obtained through CloudConnect were through

4   grand jury subpoena, not from RSM, right?

5        A.   I take your word for that, yes.

6        Q.   Okay.  And based on --

7        A.   I don't -- I apologize.

8             I don't know that for a fact.  I just --

9   I'm -- I assume that you're asserting the correct place

10  where they originated from.

11       Q.   Right.  Well, I'm an officer of the court, so

12  I'm going to represent to you that all of the records we

13  obtained from CloudConnect were produced in pretrial

14  discovery.

15       A.   I have no problem with that.

16       Q.   And if I'm wrong, I'm sure counsel will

17  correct me.  Okay?

18       A.   Fair enough.

19       Q.   All right.  So would it be fair to say based

20  on this line of questioning I've asked you, and this is

21  one example of an email, that no one at RSM could have

22  conducted what -- you know, for lack of a better word, a

23  live analysis of DigitalNet's services as it related to

24  CloudConnect?

25       A.   Based on the timeline, I think it's fair to

1    say that there's a possibility that there's not a live

2    analysis.  I think that what -- what happens is those

3    services were transitioned from one vendor to another

4    vendor and so my expectation would be that the services

5    do still exist, just being hosted by another vendor.

6         Q.   Okay.  And the person who would know whether

7    that cloud environment still exists, would that be your

8    client as a CIO of United Way and as the principal of

9    DigitalNet?

10        A.   During his tenure, I would expect him to have

11   knowledge of the infrastructure of United Way.

12        Q.   All right.  So, sir, let's move on.

13             United Way paid DigitalNet for infrastructure

14   hosting, desktop virtual -- virtual desktop --

15        A.   Virtual desktop.

16        Q.   -- data management and high availability

17   backup storage.

18             Wow, that was hard.

19             That totaled about $2.6 million, right?

20        A.   That seems fair, yup.  Those --

21        Q.   Okay.

22        A.   -- are the right services.  That's

23   approximately perhaps the right number.

24        Q.   Okay.  And during that time period, DigitalNet

25   paid CloudConnect about $300,000; isn't that right?

1    A.    From my recollection, that seems accurate.

2    Q.    Okay.  And those numbers I've cited to you,

3  that came from invoices and banking account records,

4  right?

5    A.    Yes.  I would assume so, yes.

6    Q.    Okay.  And to Mr. Naviloff at least, that

7  difference between 2.6 million and $300,000 suggested an

8  excessive billing for CloudConnect-related services; is

9  that fair?

10    A.    No, I don't think that's fair.  I think --

11    Q.    No, no.  Sir, let me be clear.  That's

12  Mr. Naviloff's opinion.  Is that a fair summary of his

13  opinion, that the gulf between --

14    A.    I think that -- I apologize.

15    Q.    -- what United Way paid and what DigitalNet

16  paid showed excessibility in his mind?

17    A.    I agree that he believes those numbers are

18  related in a more direct way than they're actually

19  related.

20    Q.    Sure.  And he based his analysis on review of

21  DigitalNet's Master Services Agreement with United Way,

22  with their IT Services Agreement with United Way, by

23  comparing those records and contract terms with the

24  CloudConnect agreement and CloudConnect platform

25  specifications; isn't that right?

1    A.    He did a -- my understanding is that he did a

2  contracts- and invoices-related financial analysis.

3    Q.    Okay.  And did you do the same kind of

4  analysis?

5    A.    So I did not do a financial-related analysis.

6  That would be beyond the scope of my technical

7  expertise.

8    Q.    Sure.  But how about a comparison of the terms

9  of DigitalNet's contracts with United Way and

10  DigitalNet's contracts with its vendor, CloudConnect?

11  Did you do that?

12    A.    I did look at those contracts, yes.

13    Q.    Okay.  And did you review the provisions --

14        Actually, Tracy, can we pull up Exhibit 3,

15  which is DigitalNet's Managed IT Services Agreement with

16  United Way.

17        Are you familiar with this document, sir?

18    A.    I am.

19    Q.    And did you review the provisions of this

20  contract as it related to infrastructure hosting?

21    A.    I believe so, but can we flip to that page

22  just to refresh me?

23    Q.    Yeah.  Let me turn to the right page.  I'm

24  going to use my hard copy because it'll be easier for me

25  to do than read here, if you don't mind.  So if you can

 1    just give me a minute.

 2         A.    Not a problem at all.  I just want to make

 3    sure we're talking about the same thing.

 4         Q.    Sure.  And do you have a hard copy, by any

 5    chance?

 6         A.    I do not.

 7              MS. LE:  All right.  So, Tracy, if you can go

 8    to the page that is Bates labeled at the bottom 15985.

 9         Q.    Do you see that, sir?

10         A.    I do.

11         Q.    Okay.  At the top we have a section called

12    Hosting.

13         A.    Correct.

14         Q.    Okay.  And are you familiar with those terms?

15         A.    Yes.

16         Q.    Okay.  Do you see Data Management and Backup

17    right below that?

18         A.    I do.

19         Q.    And you see the Virtual Desktop?

20         A.    I do.

21              MS. LE:  Tracy, can you go to the next page?

22         Q.    So we have Network Infrastructure and

23    Engineering.  Do you see that?

24         A.    I do.

25         Q.    Okay.  And it lists a bunch of other services,

```
 1   right?
 2        A.   Correct.
 3             MS. LE:  Okay.  Tracy, can you pull up
 4   Exhibit 4, which is CloudConnect's Partnership Agreement
 5   with Mr. Alrai's company, AISA.
 6        Q.   Are you familiar with this contract, sir?
 7        A.   I believe that I am, yes.
 8        Q.   You've read through various provisions of this
 9   document.  I don't want to go through the whole thing.
10        A.   Yeah, we don't -- we don't have to.
11             MS. LE:  Okay.  All right.  And then I want to
12   pull up Exhibit 5, Tracy, which is CloudConnect's
13   platform specifications.
14        Q.   Are you familiar with that document as well,
15   sir?
16        A.   I am.
17        Q.   All right.  And Mr. Naviloff, as part of his
18   expert report, actually created a comparison table,
19   right?
20        A.   Yes.  Yes, I believe he did.
21             MS. LE:  All right.  Tracy, can we pull up
22   Government's Exhibit 1?  And if you go to page 13 -- I
23   think it's 13.
24             All right.  Do you see that Table 1?  Can we
25   pull that up and highlight it?
```

1    Q.   So this is the table I was referring to.  This

2  one is a comparison of the CloudConnect agreement and

3  the IT services -- IT service agreement, right?

4    A.   Yes, it appears to --

5    Q.   Okay.  So based on your review of the relevant

6  documents, does Table 1 fairly and accurately describe

7  the similarities and differences between the relevant

8  provisions?

9    A.   This appears to be a fair side-by-side

10  comparison.  I can't be sure that everything is

11  accurate, but I think generally it's there.

12    Q.   Okay.  So do you -- do you see why

13  Mr. Naviloff in his assessment believed that there was

14  kind of a complete transfer of services in these

15  categories?

16    A.   I can see this is part of the mistake he made

17  in evaluating this, yes.

18        MS. LE:  Okay.  Tracy, can we pull up

19  Government's Exhibit 1a, which is Mr. Naviloff's summary

20  chart that we presented at trial.  I think I need you to

21  pull up page 13 as well for this one.

22        Can you go to the next page?  I'm sorry.

23        Here we go.

24    Q.   So this is a table -- this time Mr. Naviloff

25  compared CloudConnect's platform specifications with

1  DigitalNet's Managed IT Services Agreement terms; is

2  that right?

3      A.    This appears to be the same or very similar

4  chart.

5      Q.    Okay.  And based on your review of the

6  relevant documents, does this table fairly and

7  accurately describe the similarities and differences

8  between the relevant provisions?

9      A.    That seems fair.  If this is the same as the

10 last chart, I think that my comments would be the same,

11 yeah.

12     Q.    Well, it's not the same chart because the last

13 table related to CloudConnect's contract and this one is

14 a comparison of the platform specifications.  Does that

15 make sense?

16     A.    Oh, yeah.  Yeah.  Yup.  Yes, so these -- this

17 seems like a fair comparison.

18     Q.    Okay.  Great.

19           But -- and correct me if I'm wrong, but it's

20 your position that Mr. Naviloff's approach was not an

21 apples-to-apples comparison, right?

22     A.    That -- that is true.  I think we have to put

23 that in context.  It's not an apples-and-apples

24 comparison from the perspective of the invoices he's

25 analyzing on one side versus the other side.

1      Q.    Okay.

2      A.    Some of the services passed through in a

3 vendor model, right, in a value-added reseller, a VAR

4 model, are absolutely passed through from the -- the

5 originating vendor and then passed through by the

6 value-added reseller to the end client.

7           It's -- the -- those services, whether they're

8 at the platform level or at the contract level, are

9 definitely, you know, cumulative, right?

10          So as you go up the chain towards the actual

11 person consuming the services, you're -- you're going to

12 see the sum total of those types of services.

13     Q.    Okay.  Let me ask the question another way.

14     A.    Okay.

15     Q.    I think it's your position that these services

16 provided by CloudConnect can't be directly passed on to

17 United Way without substantial engineering, management

18 being performed by DigitalNet; is that right?

19     A.    So that's inaccurate, but only a little bit.

20     Q.    Okay.

21     A.    Let me explain.

22          So certain types of these services are passed

23 directly through the -- DigitalNet and consumed by the

24 United Way because they're infrastructural in nature,

25 right?

1       Q.   Okay.

2       A.   United Way doesn't necessarily change the

3  underpinnings of the sandbox, if you will.  If you think

4  of CloudConnect as a sandbox, then DigitalNet doesn't

5  change the nature of the sandbox.  Those services are

6  passed straight through to the United Way.  However,

7  those services by themselves are not really all that

8  useful to a company like the United Way without

9  engineering and an intermediary to build certain

10 components of it.

11          So it -- what you said is unfair of my

12 analysis only in that there are certain aspects that

13 need to be worked on by an intermediary and certain

14 aspects that are, in fact, passed through.  And that is

15 a normal business practice.

16      Q.   Okay.  So are you aware that DigitalNet

17 charged United Way -- charged United Way separately for

18 initial vendor deployments, setup and implementation,

19 the infrastructure equipment purchase setup and

20 implementation, the virtual desktop equipment purchase,

21 setup and implementation?

22      A.   Yeah.  So the not all of that is in direct

23 relation here.

24      Q.   Okay.

25      A.   You know, I want to make sure we're separating

 1    some of those items.

 2            When we talk about a cloud environment, we're

 3    not talking about equipment and things of that nature,

 4    right?  So that's kind of out of the scope of this

 5    particular conversation.

 6        Q.    Right.

 7        A.    But --

 8        Q.    Let me -- let me stop you there.

 9            In fact, $600,000 for that initial

10    implementation wasn't included in Mr. Naviloff's

11    assessment; isn't that right?

12        A.    Yeah, so I believe that he moved his

13    assessment into things he did analyze and things he

14    didn't analyze.  And there were certain projects

15    including things like you have just labeled that were

16    not part of his assessment.

17        Q.    Okay.  So can you be more specific about what

18    those added value services were that kind of explained

19    the gulf of about a million dollars between what United

20    Way paid to DigitalNet and what DigitalNet paid to

21    CloudConnect?

22        A.    Well, you know, without, you know, really

23    looking at the environments, it's hard to say exactly,

24    but I could give you some examples of those.  Right?  My

25    list here is not comprehensive.

1      Q.    Wait.  All I want to know is like not

2    hypothetical, but in this case --

3      A.    Yeah.

4      Q.    -- do you have any information for any extra

5    services that can account for that million-dollar

6    difference?

7      A.    Yes.  So let me give you an example in this

8    case, like that would be relevant to this exact example.

9      Q.    All right.

10      A.    When you talk about virtual desktop

11    environments, what -- which is -- I think we would agree

12    is part of this equation here, this actual example that

13    you've given me.

14          A virtual desktop environment, if you were to

15    purchase one from a vendor like CloudConnect, the

16    hosting, and then the end user were to sit down at

17    their -- their desktop, then nothing would happen.

18    Right?  There's an ongoing -- you first have to build

19    within that environment in order to make it useful to

20    the end user, which CloudConnect does not do.  There's

21    not anywhere in their contracts that they provide those

22    services.  They don't -- they're not providing the

23    updates to those images; they're not providing any of

24    the engineering that happens -- that is required for the

25    ongoing maintenance and whatnot of those images for the

1   actual desktop users.

2           And so, traditionally -- and I'll stray only

3   for a moment if you'll indulge me -- a virtual desktop

4   environment is not a service that you buy, set it, and

5   forget it.  It requires constant maintenance at an

6   engineering level and constant diligence with -- from an

7   expert.  Right?  These things do not run themselves.

8           And the use of the services inside of the

9   United Way is not something that CloudConnect, in my

10  version -- in my view of their contracts provides at

11  all.

12          So that's one example of the types of value

13  that an intermediary like DigitalNet would have to

14  provide.

15      Q.   But isn't it true that DigitalNet paid --

16  charged separately for the engineering work, too?

17      A.   No, I don't -- see, I don't think that that's

18  accurate.  I think what you're looking at is -- the

19  engineering work for the initial setup, I think you're

20  correct.  I think there are projects that would -- that

21  DigitalNet charged extra for, but that is not the

22  totality of what it takes to keep a service like this

23  operational over a long period of time like we're

24  talking about.

25          There's a significant amount of cost to any IT

1   organization.  The majority of the cost is actually in

2   head count.  Right?  It's generally salary for experts.

3   And that's where a lot of this cost comes from.  And I

4   think -- you know, I can't say to you definitively

5   there's a million dollars here.  I can tell you that

6   there's things here of the nature of which I just spoke

7   that are not part of initial setup and things of that

8   nature.

9        Q.    Right.  And I'm not talking about the initial

10  setup, which was specifically excluded by Mr. Naviloff.

11  What I'm talking about is what accounts for that

12  million-dollar difference, especially here, where we

13  know that the IT help desk folks, those two folks

14  embedded there, were not included.  Mr. Wahbe's salary,

15  who provided a lot of the engineering and off-hours

16  support were not included; and we have Imran Alrai, who

17  is also the CIO for United Way and the principal for

18  DigitalNet.

19             How do you account for that million dollars

20  when you take those persons out of it?

21       A.    So -- so that's a great question.  Thank you.

22             There's -- the CIO is not a person --

23  generally, the CIO is a not a technical expert at this

24  level, right?  So I wouldn't imagine that the CIO of an

25  organization has the ability to maintain a virtual

1    environment at all.  That would be very uncommon.

2            So -- so that would eliminate that from this

3    part of the puzzle.

4            A help desk really is limited in the type of

5    support -- generally in an IT organization, the help

6    desk is the lower rung of the technical expertise.  And

7    that's not to say anything against help desk folks.

8    That's where most of us started our careers.  But that's

9    not the type of engineering expertise that would be

10   required for an example like this.

11       Q.   Okay.  I think it's probably fair to say that

12   you and I probably won't agree on an explanation for

13   that million-dollar gulf, right?

14       A.   I mean, I -- I suppose that perhaps not, but I

15   would -- but I think that the point is just that there

16   is engineering expertise that is required to make use of

17   the CloudConnect services that the United Way doesn't

18   have, right, and has to be provided by DigitalNet at

19   that point.

20       Q.   Okay.  So that seems like there is some

21   subjective aspect related to evaluation in that regard;

22   would that be fair to say?

23       A.   See, I don't -- I don't see that as being

24   subjective at all.  I think it's an objective truth that

25   a virtual environment purchased by CloudConnect is not

1   useful to the United Way in the manner which

2   CloudConnect presents it, right, in that a help desk

3   person and a CIO don't bridge that gap.

4           So to the extent that maybe we don't agree

5   upon that, I think that's -- that is an objective truth,

6   though.  That's not really my point.

7       Q.   Okay.  But since Mr. Naviloff and RSM had to

8   conduct kind of an historical evaluation, would you

9   agree with me that their reliance on review of

10  contracts, comparison to platform specifications and

11  invoices is an objective and reasonable accounting

12  methodology?

13      A.   I believe that the review of contracts is

14  objective.  I can't speak to whether or not something is

15  reasonable from an accounting methodology perspective,

16  but I think this does illustrate the gap in their

17  analysis and why the numbers they come up with I feel

18  are not accurate, right?

19          Looking at these services through a

20  nontechnical lens will lead you to make comparisons

21  between contracts that are -- that are just

22  fundamentally inaccurate.

23      Q.   Right.  And didn't Mr. Naviloff basically

24  explain that he knew that there were shortcomings

25  through this type of historical analysis?

1      A.    And this is my recollection of his testimony.

2  He did say that, of course, nothing is perfect and I

3  agree that nothing is perfect, but this -- this isn't a

4  minor issue.  This is a fundamental misunderstanding of

5  the services and this becomes much like in my previous

6  testimony on -- last week or two weeks ago, I

7  apologize -- where a misunderstanding of the zip.us

8  services led them to compare invoices that are just not

9  related in the way that they are saying.  Right?

10          So to what degree that numbers might move a

11 little bit and there might be a yield where there's some

12 inaccuracy, I can accept that, but these are significant

13 oversights.

14     Q.    But you understand that that's part of the

15 reason, the limitations of this kind of historical

16 analysis and trying to find apples to compare to apples

17 was the reason Mr. Naviloff conducted his separate

18 personal enrichment analysis that result in a higher

19 loss amount.  You understand that, right?

20     A.    I understand that he provided two analysis --

21 two financial analyses, yes.

22     Q.    And Mr. Kennedy took no issues with that

23 separate personal enrichment analysis; isn't that right?

24     A.    I can't speak for Mr. Kennedy.

25     Q.    Okay.  So let's move on to the services that

1    were provided through Insight/OVH.  Okay, sir?

2         A.    Sure.

3         Q.    All right.  And it's my very basic summary

4    that you disagree with Mr. Naviloff that DigitalNet

5    double-billed United Way for Insight/OVH Services based

6    on his comparison of their invoices for infrastructure

7    as a service and hosting; is that right?

8         A.    That's fair.

9         Q.    Meaning you don't think they were

10   double-billing?

11        A.    I -- well, I -- what I think is that

12   there's -- I don't see evidence to suggest that there is

13   necessarily double-billing.  There are a couple of

14   scenarios in which case double-billing would not be the

15   answer.

16        Q.    Okay.  So have you -- and you understand that

17   RSM was unable to locate any contracts between United

18   Way and OVH/Insight.  Are you aware of that?

19        A.    I don't believe I was aware of that, but I'll

20   take your word for it.

21        Q.    Okay.  Nowhere do they -- in their analysis do

22   they make reference to contract comparisons; is that

23   right?

24        A.    I believe that's correct.

25        Q.    And they relied pretty heavily on invoices;

1   isn't that fair?

2        A.   I believe that is true.

3        Q.   Okay.  And had you reviewed the Insight

4   invoices that were submitted to United Way?

5        A.   Yes, I have reviewed some, but I'll be happy

6   to go through them with you if you'd like.

7             MS. LE:  Okay.  Tracy, can you pull up

8   Government Exhibit 6?

9        Q.   All right.  This is hundreds of pages of

10  invoices, Mr. Sgro, so I'm not going to make you look

11  through every one of them.  And I will represent to you

12  that these invoices were obtained and produced pretrial.

13  And does this comport with your recollection?

14       A.   Yes, that seems fair.

15       Q.   Okay.  And are you aware that United Way paid

16  each of these invoices directly to Insight?

17       A.   I am aware of that, yes.  I believe that's

18  true.

19       Q.   So let's pose an example, okay, one that's

20  kind of easy.  And I've picked this kind of at random;

21  there's no real theory to it.

22             Tracy, can you go to page 139?  And that

23  should be an invoice dated March 27, 2017.

24             Do you see the invoice date at the bottom,

25  sir?

1          A.    I do.

2          Q.    This should be for $5,924.13.  Do you see

3     that?

4          A.    That's correct.

5          Q.    And this invoice is two pages long, so we're

6     looking at the first page.

7                Can you go to the next page, Tracy, just so

8     Mr. Sgro can see it.

9                Do you see that, sir?

10          A.    Yup.

11          Q.    All right.  And can you tell me a little bit

12     about what these services are?

13          A.    So I think it's helpful if we go back to

14     the first page or do you want to know about these

15     particular --

16          Q.    You can go back to the first page.

17                Tracy, can you do that for me?

18          A.    So this is for a VMware, which is a

19     technology-based virtual private cloud, right, so a

20     cloud environment of a certain specification which is

21     detailed out here; a -- some licensing as a -- as part

22     of that; and a -- looks like a VMware subscription,

23     some -- some technical support for the private cloud.

24          Q.    Okay.  And there's technical support for the

25     private cloud.  What is a core subscription?

1    A.    So the core -- and I can't be a hundred

2    percent here, but generally core licensing is either --

3    is one of two things.   A core is the label of a service

4    offering or a core can be a processor or a

5    licensed-based unit.

6        Q.    Okay.   What is an add-on subscription?   Do you

7    know what that means in this context?

8        A.    Yeah.   An add-on would be something that is

9    not part of maybe the basis or the basic or, in my

10   previous example, the core.

11           MS. LE:   Okay.   And if you go to the next

12   page, Tracy -- wait.   Did I get everything?

13       Q.    Yeah, go to the second page.

14       A.    Yup.

15       Q.    Did I cover -- did we cover everything there,

16   Mr. Sgro?

17       A.    Yeah.   These are more -- more of the same

18   subscriptions, core and the desktop add-on, yup.

19       Q.    All right.   And, sir, have you reviewed all of

20   DigitalNet's invoices to United Way?

21       A.    I have reviewed what I believe is all of those

22   invoices, yes.

23           MS. LE:   Okay.   And, Tracy, can you pull up

24   Government's Exhibit 7?

25       Q.    And, sir, I'll represent to you that these are

1   hundreds of invoices that were obtained from the United

2   Way through grand jury subpoena and provided to the

3   defendant in pretrial discovery.

4           Does this comport with your recollection?

5       A.    Yeah, that seems fair.

6           MS. LE:  Okay.  Tracy, can you go to Bates

7   number page ending 01153, which is a bill for March to

8   April of 2017.

9           DEPUTY CLERK UHRIN:  Attorney Le, do you know

10  which page of the PDF that is?  Because there's 158

11  pages, so if I have to flip through them, it might --

12          MS. LE:  Oh, you can't search by Bates number?

13  I thought you could search by the Bates number.  That's

14  how I pulled it up.

15          DEPUTY CLERK UHRIN:  I'm using TrialPad and I

16  can only jump to a page number.

17          MS. LE:  Okay.  Let me -- if you give me just

18  a second, I can pull that up.

19          THE COURT:  Maybe you can give her the page

20  number from --

21          MS. LE:  Yes.

22          THE COURT:  -- correspondent to the Bates.

23          MS. LE:  All right.  That would be page 123.

24  That should be invoice number 15053.  Is that the right

25  page?  Let's see.  Yup, that's the right page.

1    Q.   Do you see it, sir?

2    A.   I see it.

3    Q.   All right.  So this invoice is not very -- how

4  should I say -- detailed, right?

5    A.   I would agree with that.

6    Q.   Okay.  And here we see that United Way paid

7  DigitalNet $19,200 for infrastructure as a service and

8  hosting.

9    A.   Correct.

10    Q.   Do you see that?

11         So do you know what additional services

12  DigitalNet provided in this category on top of what

13  DigitalNet -- I mean United Way paid Insight?

14    A.   Are you -- I'm sorry.  I don't understand.

15         Are you inferring that the infrastructure

16  service hosting is directly related to the previous

17  invoice we were talking about?

18    Q.   Yes.  So it's the same monthly invoice and

19  this was part of Mr. Naviloff's analysis --

20    A.   Uh-huh.

21    Q.   -- is that right, because he compared kind

22  of Insight's invoices to DigitalNet's invoices as it

23  related to infrastructure as a service and hosting?

24    A.   Uh-huh.

25    Q.   And it's our understanding that Insight was

1  the hosting vendor, correct?

2      A.    It's my understanding that they're -- yeah,

3  that they could be one -- maybe one of many, but yes,

4  the hosting vendor.

5      Q.    But for this relevant time, which is

6  November 2015 through July of 2018, Insight was the only

7  cloud computing hosting service that had been

8  identified.  Are you aware of others?

9      A.    I -- there the infrastructure is a service.

10  I'm not sure if they are -- hosting is a completely

11  separate kind of thing and so --

12      Q.    Okay.

13      A.    -- I'm not sure if the hosting is included in

14  that.  It would be very hard for me to draw a direct

15  relationship between this line and only that other

16  invoice.

17      Q.    Okay.  But is it -- but am I understanding

18  correctly that Insight/OVH was an infrastructure as a

19  service company?

20      A.    Yeah, their infrastructure is a service.  That

21  would be correct.

22      Q.    Okay.

23      A.    Cloud -- any kind of cloud could be,

24  presumably, put under the title of infrastructure as a

25  service.

1      Q.    But you don't believe that they would qualify

2  as the cloud hosting service?

3      A.    Well, it doesn't say cloud hosting.  It says

4  hosting.

5      Q.    A hosting service?

6      A.    Yeah.  So hosting could mean quite a bit of --

7  I mean, that's a very broad term.  And, unfortunately,

8  you're correct, there's not a lot of specificity in

9  these invoices.

10      Q.    Okay.  So are you aware of any additional

11  infrastructure services that were provided on top of

12  what OVH provided in March through April of 2017?

13      A.    Well, so to the degree that this is still a

14  VMware environment we're talking about, right, if we

15  follow your assumption that this infrastructure service

16  is directly related to OVH, then the example I gave

17  before about the VMware -- so VMware is a hosting

18  solution.  It does -- it does do the virtual desktop

19  environment.  And so the example that I gave about all

20  of the infrastructure engineering, the ongoing

21  engineering required to keep a service like that active

22  would -- would be, you know, perhaps reflected here.

23      Q.    Perhaps reflected.  Okay.

24      A.    Yeah.  Yeah.

25      Q.    So you see that on-site IT support was billed

1    separately.  Do you see that?

2         A.   Yeah.  On-site IT support, yeah.

3         Q.   After-hours support is billed separately,

4    right?

5         A.   Yes, it is.

6         Q.   What does virtual DAA services mean to you as

7    an IT professional?

8         A.   So that's -- that could be desktop as a

9    service, that could be database as a service.  I -- I

10   assume in the context of this that is a desktop

11   relation.

12        Q.   Is that separate from the cloud?

13        A.   Yeah, that would be separate -- yeah, that

14   would be separate from the cloud.

15        Q.   Okay.  And applications, database, and OS

16   management is also billed separately, right?

17        A.   Yes, that's separately.

18        Q.   Okay.  So is it your position that there could

19   be some additional services that just aren't kind of

20   spelled out in this invoice, right?

21        A.   Yeah.  I mean, it's my position that -- I

22   agree with you it's a little unfortunate that there's

23   not more detail here, but --

24        Q.   Yes.

25        A.   -- there's some conclusions that we -- we just

1    can't draw without detail.  And if we follow your logic,

2    which, okay, let's -- let's do that for a moment,

3    there's absolutely other services that would go into

4    these services that would make the cost of the

5    pass-through higher than what they paid from the vendor.

6            A value-added reseller takes a cost from their

7    vendors and adds services to it and passes it through

8    for a higher cost to the -- the end customer.  That's --

9    that's how that works.

10       Q.   Okay.  And so your client, as a CIO of United

11   Way and as the principal for DigitalNet, would know the

12   justification for that additional services that were not

13   passed on, right?

14       A.   I would assume, yes.

15       Q.   Okay.  And if they had records, if there were

16   records of those additional services and those costs,

17   DigitalNet should have those records, right?

18            MR. EATON:  Objection, your Honor.  I think

19   we've been over this point to exhaustion.  The point

20   is -- that the government I believe is trying to make is

21   that there's potentially some other records that may

22   exist, but that's not what's at issue here.  What's at

23   issue here is the material that was not produced prior

24   to trial and what would have impacted what was

25   produced -- or what was put in to evidence at trial.

1              So to the extent the government is saying that

2    there may be some other records, I think that point has

3    been made and -- at the last hearing and now today.

4         Q.   Let's follow Mr. Eaton's comment and change

5    gears a little bit.

6              In the posttrial discovery, have you located

7    any additional records or communications that contradict

8    Mr. Naviloff's assumptions in this regard about

9    Insight/OVH and infrastructure as a service?

10        A.   I believe we've -- I've read things in the

11   posttrial discovery that explained to me why his initial

12   opinion is incorrect.

13        Q.   His initial opinion?

14        A.   Well, his opinion.  I apologize.  I misspoke.

15        Q.   But -- but isn't it more of the same things

16   about his reliance on Ryan Gilpin reviewing materials,

17   including invoices in this case, in this incident with

18   respect to Insight/OVH?

19        A.   Well, in pretrial discovery we saw a lot of

20   invoices and things of that nature which, I agree with

21   you, Mr. Naviloff took into account in his financial

22   analysis of this case.

23             In posttrial discovery, we saw -- first of

24   all, we learned about Ryan Gilpin, right, that's

25   something, and his expertise and to what extent his

1  expertise or lack thereof -- and no offense to

2  Mr. Gilpin -- is supported and went into Mr. Naviloff's

3  analysis.

4           And so I think that that is -- that is the

5  issue that I raised.

6      Q.   Okay.  But here in his expert report, in his

7  testimony to the Court at trial, his analysis as it

8  relates to Insight was exclusively dependent upon his

9  review of invoices; isn't that true?

10     A.   You see, I don't actually know that.  And

11 indulge me just for a second.

12          I believe he said that, yes, but I also see a

13 lot of communications within the RSM staffers

14 underpinning some of these ideas in a technical way,

15 right?  And so -- and incorrectly in a technical way.

16          But one of the things that I think is a

17 question of mine, maybe not a statement of mine, is to

18 what degree were those incorporated in that.

19          Oh, I lost the document.  No.  Sorry.

20     Q.   That's okay.  Let's move on to the concept of

21 high availability backup after the transition from

22 CloudConnect to OVH/Insight.  Okay?

23     A.   Okay.

24     Q.   All right.  So we're still on that same bill,

25 right?

1      A.    Yup.

2      Q.    All right.  You see there's a $10,250 charge

3   for data management and high availability backup,

4   storage up to five terabytes; is --

5      A.    Up to 15 terabytes.

6      Q.    15, oh.

7      A.    Yes.  I see that.

8      Q.    That's much bigger, 15 terabytes.

9            Okay.  And, on average -- I don't think that

10  was consistent with the bills all around.  I think it

11  averaged about 9,500 to $10,000 a month for that

12  particular service; isn't that right?

13     A.    That seems in the ballpark, yes.

14     Q.    Okay.  Do you know how DigitalNet provided

15  high availability backup once they transitioned from

16  CloudConnect to Insight for United Way?

17     A.    I don't.

18     Q.    Okay.  But in a typical situation like when

19  CloudConnect was involved, CloudConnect actually

20  provided high availability backup according to their

21  specifications and contract, right?

22     A.    I believe that is correct.

23     Q.    Okay.  And it's my understanding that OVH did

24  not provide high availability backup.  Do you recall

25  that testimony at trial?

1    A.   Whose testimony was that?

2    Q.   Mr. Meyer's.

3    A.   I agree that Mr. Meyer spoke about high

4  availability backups.  However, he's not really

5  qualified to analyze that.

6    Q.   Okay.  So do you remember his testimony?

7    A.   I do recall it, yes.

8    Q.   Okay.  And do you remember that his testimony

9  was based on two different things, right?  Number one,

10  he talked to OVH and they said they did not provide high

11  availability backup, right?

12    A.   He did say that at -- I believe that that is

13  correct, yes.

14    Q.   Okay.  And, number two, he talked about an

15  incident in August of 2018 when OVH/Insight experienced

16  an outage.  I think it had something to do with like a

17  lightning strike or something.  Do you recall that?

18    A.   There was some kind of a power outage or

19  something that he discussed, yes.

20    Q.   Okay.  And then as a result of that incident

21  in August of 2018, United Way did not have cloud

22  computing for several days; isn't that right?

23    A.   I believe, yes.  I believe that that is --

24  there was an outage of the virtual desktop of the cloud

25  computing environment during that time.

1          MS. LE:   Tracy, can we pull up Exhibit 8?

2      Q.   And, sir, Exhibit 8 is an internal email that

3  Rich Voccio at United Way sent to his staff on August 7,

4  2018.  Do you see that?

5      A.   I do see that.

6      Q.   Okay.  And correct me if I'm wrong, but I'm

7  just going to read it into the record.

8          And I quote:  You have been receiving updates

9  from John Meyer.  He and his team have been working

10  around the clock on communications with our cloud

11  vendor, VMware, on the outage issue.  It is unfortunate

12  that VMware does not have a redundancy cloud environment

13  that could have avoided this service interruption.  You

14  have our -- and I'll stop there.

15          Did I read that correctly, sir?

16      A.   Yes.

17      Q.   Okay.  And this is part of the testimony of

18  Mr. Meyer and this relates to this incident you referred

19  to, right?

20      A.   Yup.  And I do think, just for clarification

21  for everyone, it's important to note that the cloud

22  vendor is not VMware.  I think he's --

23      Q.   That was wrong?

24      A.   Right.  So VMware is the -- this is a

25  nontechnical person talking about something technical.

1      Q.   Yeah, of course.

2      A.   But just for clarification, we're not talking

3  about some other vendor that is VMware.  That's a

4  technology.

5      Q.   And if we go back to the Insight contract, I

6  mean invoices, we see references to VMware and things

7  like that, right?

8      A.   Yeah.  That was the core technology they were

9  provided.

10     Q.   But we all know in this email in Exhibit 8

11 they're talking about the issue at OVH in Virginia,

12 right, or Washington, D.C.?

13     A.   That is correct.  In Virginia, yes, that's

14 correct.

15          MS. LE:  Okay.  Tracy, can you pull up

16 Exhibit 9 and go to page 9 of that document?

17          You'll see it when it starts being

18 highlighted.

19          Can you keep going, Tracy?

20          I think we passed it up, Tracy.

21          DEPUTY CLERK UHRIN:  I'm sorry, Attorney Le.

22 I'm not sure what you're asking for.

23          MS. LE:  Can you go back another -- up -- I

24 don't think it's highlighted.

25     Q.   All right.  Sir, are you familiar with this

1    document?

2        A.    Yes.  Yes, I believe I am.

3        Q.    Okay.  And you know that we provided this to

4    Mr. Harrington as well as current counsel?

5        A.    Yes, I believe that there was a highlighted

6    version of this, right.  Yeah.

7        Q.    And you remember that; I sent that to you?

8        A.    I do.

9        Q.    Or to counsel at least?

10       A.    To counsel, yes, that's correct.

11       Q.    Right.  And what I highlighted was

12   communications or at least information about a

13   substantial power event on August 6, 2018?

14       A.    Yes, that impacted the majority of their

15   services, you know, essentially took the building

16   down --

17       Q.    Okay.

18       A.    -- is what it looked like.

19       Q.    Okay.  So you understand that based on, you

20   know, Mr. Meyer's conversation with a representative at

21   OVH and then their experience of not having a high

22   availability backup led him to conclude that there was,

23   in fact, no high availability backup after Mr. Alrai

24   transitioned the services from CloudConnect to

25   Insight/OVH.  Do you understand that?

1      A.    So I understand that, but I think there's an

2   important piece of clarification here.  All right?

3           Computer systems, especially at a site level,

4   you're talking about an entire building full of

5   computers that essentially failed due to power.  Right?

6   Power's something that is absolutely required for

7   computers.

8           The presence of --

9      Q.    By computers, are we talking about OVH's

10   computers?

11      A.    OVH's computers --

12      Q.    Okay.

13      A.    -- right, in their data center.

14           The presence of a failure or not doesn't give

15   us any indication of what services are provided.

16           Now, what I mean by that is if you take the

17   example of like Google or Amazon who have thousands and

18   thousands of servers, right, and, you know, just give a

19   number, whatever the number is in data centers around

20   the world, they have outages and not because they don't

21   have high availability data backups.  In a lot of cases,

22   an engineer will build high availability through

23   redundant servers or through other third-party processes

24   that provide those types of availability.  However, a

25   lot of times that's within the same data center.

1           And so -- and I actually talked about this

2    during trial.  We're confusing the idea of high

3    availability with regional diversity.  Regional

4    diversity would have safeguarded against a building

5    going down or a lot of systems in simultaneity going

6    down because it would have been available maybe in

7    another region or in another building.

8           However, it's very reasonable for high

9    availability services to be built within the same

10   facility if regional diversity is not specified, in

11   which case there absolutely would have been high

12   availability services that still failed and caused an

13   outage of this size.  That is very typical in the

14   environment and that is very typical in the world.

15          I mean, just last week we saw the entire east

16   coast of Amazon Web Services go down for a period of

17   time, which was a very, very disruptive failure, and

18   they absolutely have these types of services.

19          So I see what Mr. Naviloff did here -- and

20   with respect to Mr. Naviloff, you know, I think his

21   financial analysis, he looked at this without a

22   technical lens and doesn't understand that the presence

23   of a failure in no way indicates or clues us in to what

24   was or was not provided.

25       Q.   Okay.  Do you know where DigitalNet maintained

 1   their high availability backup after the transition from

 2   CloudConnect to Insight?

 3        A.   I don't.  I only know that the presence of a

 4   failure doesn't indicate to me whether or not it was

 5   there.

 6        Q.   Okay.  But Mr. Meyer has talked to somebody at

 7   OVH and says OVH didn't offer it, right?

 8        A.   Yeah.  And OVH did not purport to offer it.

 9   That doesn't mean that DigitalNet didn't offer it.

10   Right.  Again, OVH is a sandbox.  What you build within

11   that sandbox is, you know, on you.

12             MS. LE:  All right.  Can we go back to

13   Exhibit 3, Tracy, and go to page 12?  You need to pull

14   that up so I can see it.

15        Q.   Can you see it, sir?

16        A.   I can.

17        Q.   Okay.  Under Hosting, do you see that?

18        A.   I do.

19        Q.   Okay.  Geographically dispersed high

20   availability environment.

21        A.   Uh-huh.

22        Q.   Okay.  What does that mean to you?

23        A.   So geographically dispersed high availability

24   environments would mean environments which were, you

25   know, in a different geography.  To what extent this is

1    talking about one service, I'm not sure.

2         Q.    Okay.  But in this contract, DigitalNet

3    promised that they would back up the servers in a

4    separate location than, say, CloudConnect's servers or

5    separate from if OVH had backup servers; it would be in

6    different physical locations, right?

7         A.    I don't think that's what this says.

8         Q.    Okay.  So what does this say to you?

9         A.    So this is just saying that some segment of

10   the file web application or DB services would be

11   geographically diverse from others.

12        Q.    Okay.

13        A.    It doesn't make any reference to whether or

14   not the backups would be local or would be

15   geographically diverse.

16        Q.    Okay.  So, sir, would it be reasonable to

17   expect that DigitalNet would have records of which

18   vendor it used to provide high availability backup from

19   April 2016 through July of 2018?

20        A.    If, in fact, they used a vendor and didn't

21   provide that them -- themselves through building in

22   these types of sandboxes, then it's possible they would

23   have records.

24        Q.    Okay.  So are you aware whether your client

25   and his company did, in fact, build in in this sandbox

1    that we've been talking about --

2        A.   I was not -- I was not able to view these

3    environments, so I can't speak definitively to what was

4    built or not.

5        Q.   Okay.  So we've been talking about this

6    invoice from March of 2017.  Fair to say that RSM and

7    Mr. Naviloff would not have been privy to that

8    environment either?

9        A.   As I said before, if there are environments

10   that existed or were destroyed before RSM's ability to

11   see them, then I would assume that they didn't see them

12   unless they saw them through backups or something like

13   that.

14       Q.   Okay.  Now, I'd like to change gears just a

15   little bit with you and talk about market data.  Do you

16   remember that line of questions that Ms. Brown had with

17   Mr. Naviloff?

18       A.   About the cost of services?

19       Q.   Market data comparisons, that kind of thing.

20       A.   Vaguely, yes.

21           MS. LE:  Well, it might help if I talk about

22   the exhibit that she pulled up.

23           Tracy, can we pull up Exhibit Z?

24           DEPUTY CLERK UHRIN:  Can you repeat that,

25   Exhibit --

1          MS. LE:  Z as in Zed or Zeus.

2          Yes, this is Z, right?  All right.

3     Q.   And this comes from the draft report that RSM

4   prepared for United Way's board dated October 12th,

5   2018; is that right, sir?

6     A.   That appears to be correct.

7     Q.   Okay.  And that was about a year before trial,

8   a little over a year before trial?

9     A.   That's correct.

10    Q.   And you'll agree with me that this

11  presentation in Exhibit Z is different than what

12  Mr. Naviloff prepared for the criminal trial?

13    A.   I -- I mean, we could do a side-by-side

14  comparison.  Could you let me know which points you

15  think are different?

16    Q.   But you know they're different, right?  We

17  don't have to do a point-by-point --

18    A.   Well, yeah, they're different documents.  Yes.

19    Q.   Right.

20         All right.  Tracy, can we go to page 6 of

21  Exhibit Z?  And I'd like to talk about that last bullet

22  point at the bottom, analysis of market data.

23         Mr. Sgro, could you just review that section?

24    A.   Yes.

25    Q.   So do you remember the line of questions that

1  Ms. Brown had for Mr. Naviloff about the existence of

2  market data in this context?

3       A.   Yes.

4       Q.   And the context is that RSM identified vendors

5  for third-party application development services, which

6  I believe Mr. Naviloff explained meant website

7  development, right?

8       A.   I believe he explained it to mean that.

9       Q.   Yeah.  And you understand that website

10  development was not part of the loss analysis conducted

11  in the criminal case, right?

12       A.   That's correct.

13       Q.   Okay.  Can you tell me in your understanding

14  what market data or market analysis would look like?

15       A.   Market analysis could be comparative quoting,

16  it could be like services, it could be an analysis of

17  what services would cost under certain circumstances

18  that are similar or what those services would cost in

19  other regions of the world, that sort of market

20  analysis.

21       Q.   So like -- like if I were to do some home

22  improvement project at my house, I would call -- like

23  say I wanted to get new plumbing and I wanted to call

24  three different plumbers to get a range of prices to

25  figure out, you know, the services, how much it's going

54

1   to cost, and make a decision about who I would hire,

2   right, something like that?

3        A.   That -- that could be a version of market

4   analysis, yes.

5        Q.   Right.  So could one do a similar kind of

6   analysis to calculate the value of services in this

7   case?

8        A.   Sure.

9        Q.   But are you aware that Mr. Naviloff didn't do

10  that with respect to the criminal case and loss?

11       A.   I believe Mr. Naviloff did not do a market

12  analysis.

13       Q.   Okay.  And you understand that to the extent

14  that RSM looked at a market analysis comparison, it was

15  for just the website, right?

16       A.   I -- I don't understand that.

17       Q.   Okay.

18       A.   Could you -- could you come at me again with

19  that?

20       Q.   That last bullet point that we're looking at.

21       A.   Yeah.

22       Q.   Okay.  So it looks like part of him did do

23  some kind of market data comparison, right?

24       A.   Yes.

25       Q.   But that was for that, quote, third-party

1   application development, right?

2        A.   I don't -- I can't correlate these two.  I

3   think this is -- this is a general statement in a slide

4   deck and then there are various analyses that were done

5   in other documents.  To what extent they relate

6   directly, I couldn't be sure.

7             MS. LE:  Okay.  Tracy, can we pull up Exhibit

8   Bb; so big boy, little boy.

9        Q.   All right.  Are you familiar with this

10  exhibit?

11       A.   Yes, I am.

12       Q.   I think the document shows up a bunch of times

13  in all of our exhibits for today's hearing, right?

14       A.   I think it does.

15       Q.   And this is an email dated November 3, 2019,

16  from Greg Naviloff to John Davis and Matt Hunter; is

17  that right?

18       A.   That's -- that's correct.  Could we blow up

19  the portion that you want to talk about?  This is

20  extremely small.

21            MS. LE:  Sort of the very top, the header,

22  Tracy, if you could highlight that for us.

23       A.   Yes, that is correct.

24       Q.   Okay.  And there's a series of attachments.

25  Do you see that?

1      A.    I see that there is.

2            MS. LE:  Okay.  And, Tracy, can you go to the

3      bottom of the document where the Bates number is and

4      highlight the Bates number?

5      Q.    Do you see the Bates number, sir?

6      A.    I do.

7      Q.    So that's 18R148_RSM-02638; is that right?

8      A.    That is correct.

9      Q.    Okay.  And are you aware that this particular

10     document was produced in pretrial discovery to

11     Mr. Harrington in an email exchange?

12     A.    I -- I will take your word for that, yes.

13     Q.    Well, let's pull up Exhibit 21, which is that

14     series of email exchanges.

15           Okay, Tracy?

16           All right.  Can you just scroll through

17     briefly so -- just give Mr. Sgro a few minutes to look

18     at each page or a few moments.

19     A.    Okay.  Yeah, I agree with you.

20           MS. LE:  Okay.  Tracy, can we go to the first

21     page and highlight the caption that's at the top.

22     Q.    All right.  And, sir, do you see this is an

23     email from Mr. Harrington?

24     A.    That is correct.

25     Q.    It's dated November 7, 2019?

57

```
 1        A.    Uh-huh.

 2        Q.    And do you see the attachment --

 3        A.    I do.

 4        Q.    -- that he's sending?

 5        A.    I do.

 6        Q.    And it's a PDF of basically Exhibit Bb, right?

 7        A.    That is correct.

 8        Q.    Okay.  So no question here that he got this

 9   stuff before trial?

10        A.    No.  Thank you for refreshing my memory.

11        Q.    Of course.

12              Tracy, can we go to page 3 of Exhibit 21.

13              And do you see -- can we bring forward

14   Mr. Hunter's response from November 7, 2019, at 1:47

15   p.m.?

16        A.    Yup.

17        Q.    So you're familiar with this exchange --

18        A.    Yes.

19        Q.    -- between Mr. Harrington and the government's

20   attorneys?

21        A.    Uh-huh.

22        Q.    And Mr. Harrington reviewed materials, it

23   looks like, and then was asking for -- to make sure that

24   he got all the records that were referred to in Exhibit

25   Bb, right?
```

1      A.   Yes.  Tim says that we've provided -- or to --

2  I don't know who's writing this.

3      Q.   That's Mr. Hunter.

4      A.   Mr. Hunter's saying that:  Tim, we've provided

5  everything we've received from the United Way.

6           So that's what they're talking about.

7      Q.   Okay.  And then he goes in and specifically

8  cites by Bates number a particular item that

9  Mr. Harrington had questions about, right?

10     A.   Yup.

11     Q.   Great.

12          Tracy, can we go to page 4 at Exhibit 21,

13 which is also defense Exhibit Bb and GGGG, right,

14 Mr. Sgro?

15     A.   Yes.

16          MS. LE:  Okay.  Can we go to the section that

17 is -- subsection Dd.  Do you see that, Tracy?

18          THE WITNESS:  It's about halfway down the

19 page.

20          MS. LE:  Yeah.

21          DEPUTY CLERK UHRIN:  Yeah, it's too small on

22 my screen as well.  Halfway?

23          MS. LE:  It's too small.

24          THE WITNESS:  Yeah, maybe just bring out a

25 little bit above that.

1          MS. LE:  Yeah, above that, Tracy, a little

2     section --

3          THE WITNESS:  It's basically the bullets in

4     the top half, yeah.

5          MS. LE:  Yeah.  There we go.

6     Q.    Can you see that, sir?

7     A.    Just missed.

8     Q.    Almost.  That's a little better, right?

9     A.    Yeah, that's a lot better.  Thank you.

10    Q.    Okay.  So let me just summarize what

11    subsection D says, which is Mr. Naviloff telling us in

12    an email, right, that basically they may not have

13    complete emails pertaining to all relevant DigitalNet

14    communications.  Is that right?

15    A.    That's what it says, right.

16    Q.    Okay.  And that RSM relied upon Attorney

17    Commisso and his team's e-discovery tools using keyword

18    searches to find emails for their review.

19          Is that what he says there?

20    A.    That is what he's saying there.

21    Q.    Okay.  And the bottom half of this email,

22    there is a -- a chart, right, that goes on to the next

23    page?

24    A.    That's correct.

25    Q.    Okay.  And that is kind of a breakdown of the,

1    quote, potential relevant emails regarding the RFP

2    process that they reviewed and relied upon as part of

3    their loss analysis; isn't that right?

4         A.    That appears to be true.

5         Q.    Okay.  And Mr. Naviloff identified the file

6    name for each email; is that right?

7         A.    That appears to be true, yes; generally the

8    file name and a brief description, something like that.

9              MS. LE:  Tracy, can you just highlight one

10   part of the section below there, you know, where the

11   green the -- the green is highlighted.

12        Q.    Right, Mr. Sgro?

13        A.    Yeah.  You mean the -- I apologize.  I'm

14   color-blind.  It's the darker part in the bottom of the

15   table, yeah.

16        Q.    Yeah.  So -- and provided a summary of what

17   each of those emails said, right?

18        A.    Yeah.  It's a breakdown of the -- I think just

19   a summation --

20        Q.    Okay.

21        A.    -- yeah, and notes.

22        Q.    And each of these emails were attached to --

23   each of the emails referenced in the chart was attached

24   to the email to the government, right?

25        A.    It appears that, yeah, these are all the

1    attachments that are listed from above.  To what degree

2    they're comprehensive, I mean, we'd have to go through

3    them, but I agree generally these are attached.

4         Q.   Right.  Well, do you want to do a comparison

5    by file name right now?

6         A.   I will take your word for it.

7         Q.   I mean -- yeah.  You don't have to take my

8    word for it.  It is what it is.  The defense has pulled

9    this as multiple exhibits, so I assume that you've seen

10   this.

11        A.   Yeah.  If you're telling me that they're all

12   there, then I believe you.

13        Q.   And each of the emails that are referred to in

14   this chart were produced in pretrial discovery, right?

15        A.   So this whole email exchange would have been

16   pretrial, yes.

17        Q.   Right.

18        A.   Yes.

19        Q.   So this is one of the topic of emails.  Can we

20   talk about a part of your supplemental expert report,

21   which I believe is Exhibit Kk; is that right, sir?  Is

22   that Exhibit Kk?

23             MR. EATON:  That's right, Cam.

24             MS. LE:  All right.  Thank you very much,

25   Michael.

1            And can we go to page 7 of Kk?

2       Q.   And what I'd like to talk about is paragraph

3  23D-three little Is.  I don't know how one speaks that.

4  It's about key communications from email accounts.

5            Do you see that?

6       A.   That's correct.

7       Q.   Okay.  Would you just read your assessment

8  right there?

9       A.   Sure.  The inability to review key

10 communications from email accounts, including a

11 comprehensive production of all emails sent by Mr. Alrai

12 and the IT service desk environment, because they were

13 not provided to defense counsel and were not made

14 available for me to -- to me for analysis.

15            I recall from Mr. Meyer's trial testimony that

16 he, in fact, did -- that he, I apologize, in fact, did

17 preserve these environments.

18      Q.   Okay.  So do you understand that RSM did not

19 review all the email messages exchanged between

20 Mr. Alrai and the IT service desk?

21      A.   I don't know what RSM reviewed or didn't

22 review.

23      Q.   Okay.  But fair to say that review of the

24 emails exchanged between Alrai and the IT service desk

25 were not part of Mr. Naviloff's loss calculation, at

1  least you didn't see that in any of his reports or

2  summaries, right?

3       A.   I don't see that in his reports or summaries.

4  I think that would have been valuable.

5       Q.   Okay.  But -- but it wasn't included in his

6  calculation that was presented, right?

7       A.   I haven't read anything to suggest that it

8  was.

9       Q.   Okay.  And is it your testimony that review of

10  all of the email messages exchanged between Mr. Alrai

11  and the IT service desk is required to evaluate the IT

12  services that DigitalNet provided over six years?

13       A.   So just -- just to clarify here, I mean,

14  emails sent by Mr. Alrai and the IT service desk

15  environment, right, as two separate things, not

16  necessarily communications between the two.

17       Q.   Okay.

18       A.   And so -- so there's a lot of ways of

19  analyzing an environment, right?  And, again, nothing's

20  ever, you know, perfect if you're not standing in front

21  of the environment, looking at it as an expert.  In that

22  case, you get very detailed information.

23       Q.   Right.

24       A.   When the environments aren't there to analyze,

25  one of the things we rely heavily on are email

1    communications from key stakeholders, right, Mr. Alrai,

2    of course, being one of those, where we would be able to

3    talk about services -- he would be talking about

4    services with his peers, with other technology people in

5    his organization.

6           The other place that we would look for

7    information about these services delivered would be in

8    the IT service desk, right?  That is the place where --

9    Q.    I'm sorry.  That's my --

10   A.    -- oh, no worries --

11   Q.    -- that's my dog.

12   A.    -- where -- where there would be tickets or

13   service outages, ongoing engineering work.  The issue

14   here is we're talking about millions of dollars' worth

15   of services and there's generally communication about

16   that in those types of environments.

17          And so one of the things that I would like --

18   would have liked to review would be a comprehensive list

19   of those emails and the help desk environment in order

20   to establish what is relevant and what is not to

21   allowing us to understand what happened within these

22   environments or when these environments were deployed

23   and how.

24   Q.    So, sir, have you ever determined the value of

25   IT services by reviewing email messages in another

1   matter over such a large period of six years?

2       A.    It's part of how we evaluate services, right?

3   So if you're looking for doing an evaluation of the cost

4   of services or the value of services, we have to

5   understand exactly what those services were.

6            And this is part of the vagueness of the

7   information that Mr. Naviloff and I have to look at.  We

8   have to look at some of these services.  And so this is

9   some of the ways that we would have gained insight into

10  those services and been able to color our analysis of

11  that.

12      Q.    Okay.  Sir, but you said that -- it sounds

13  like it's part of your work in the past, so can you give

14  me a specific example of when you have reviewed all

15  email communications or email communications of the

16  magnitude that you're suggesting in a --- in a similar

17  kind of case?

18      A.    So I can give you examples of when -- and when

19  we say reviewed, we don't mean I'm going to read every

20  single email, right?  So it's not an arduous effort,

21  right?  We use, you know, not only keyword searches --

22  keyword searches is one of them.  In the past I have

23  used searches between two people, right?  So all

24  communications between one person and another person,

25  say, a CIO and a CEO.

1          I've also used reviews and organization of

2   help desk tickets in order to understand the

3   comprehensive nature and maybe the quality of services

4   that are rendered by an organization.

5          Q.    Okay.  But going back to Exhibit Bb --

6          A.    Uh-huh.

7          Q.    -- and that chart that we talked about --

8                Tracy, can you pull back Bb again?

9                And, again, in this email that was relayed to

10  you and to counsel pretrial, it is clear that -- you

11  know, it appears that RSM did that; they did it through

12  asking Mr. Commisso to use his e-discovery tools to

13  search for relevant information and they pulled what

14  they thought were relevant and they included that --

15  those emails that they thought were relevant to their

16  analysis.  Isn't that fair to say, that that's what they

17  did?

18         A.    So there's this -- this pertains primarily to

19  the RFP process, right?

20         Q.    RFP process, yes.

21         A.    Right.  So to what degree they did that for

22  the totality of what we would have asked for, I don't

23  know.  I do know that a nontechnical expert providing

24  those key searches or performing that, you -- you have

25  maybe ten emails here, right, over a great deal of time.

1   I imagine, and I am speculating, that if I -- if I were

2   to run my own search on the totality of Mr. Alrai's

3   emails, I might come up with something that is relevant.

4       Q.    And, actually, I recall there was a -- I don't

5   think I was directly involved, but I recall that you,

6   with Mr. Harrington, proposed pages of search terms that

7   could have been run through the e-discovery platform

8   that Mr. Commisso had set up, right?  There was some

9   litigation about that.

10      A.    I do recall there was conversation about that.

11      Q.    Okay.  And then -- and I'm sure Ms. Brown will

12  cover this with Mr. Commisso when he testifies, but it

13  was his testimony that that would have caused a

14  significant amount of money and taken a significant

15  amount of time to run the queries that you suggested

16  over the -- the emails that were preserved by Mr. Meyer,

17  right?

18      A.    I believe that their case was that it was too

19  burdensome to look through the emails for the

20  information that I requested.

21      Q.    Okay.  And you were talking about the IT help

22  desk environment.  What does that mean to you, IT

23  service desk environment?

24      A.    Yeah.  So service desk and help desk, it's an

25  iteration of terms.  We used to call them help desks.

1   Now we call them service desks.  That's essentially the

2   ticketing system where end users, any employee, would

3   maybe submit a ticket or a help request in to the IT

4   organization.

5           And why that's important is that generally

6   those aren't just tickets that would be handled by one

7   or two people.  They would be escalated throughout the

8   IT organization and through contractors in order to

9   resolve issues.  That would give us critical insights

10   into the types, qualities, and the engineering work on

11   the services that were provided.

12       Q.   So would one expect that like because

13   DigitalNet had embedded employees at United Way that the

14   computers they use, the other devices they use, would be

15   part of this IT environment?

16       A.   So -- I'm trying to understand your question.

17   I -- I think what you're asking is would issues with

18   those equipments be reflected in the service desk; is

19   that what you're asking me?

20       Q.   Sir, I guess my question is -- let me break it

21   down.

22       A.   Sure.

23       Q.   You know that DigitalNet had two embedded

24   employees at United Way, right?

25       A.   I do.

1      Q.    And those were the IT help desk folks, right?

2      A.    That is correct.

3      Q.    Okay.  And they had computers, right?

4      A.    Correct.

5      Q.    And they had phones, right?

6      A.    That's correct.

7      Q.    And possibly other devices that they used to

8   do their work at United Way as DigitalNet employees,

9   right?

10     A.    That is correct.

11           MS. LE:  I'm going to pause for a moment

12   because my dog is about to bark at some folks.  Just one

13   second.

14           Thank you.  So sorry about that.

15           All right.

16           THE COURT:  No problem.

17     Q.    So when you talk about the help desk service

18   in an IT service desk environment, are you referring to

19   those folks?

20     A.    No.

21     Q.    No?

22     A.    No.

23     Q.    Would it include those individuals?

24     A.    So those people work -- part of their function

25   is to take tickets and issues out of the service desk

1  environment and work on them.  Yes, I would agree with

2  that.

3        Q.   So if they -- if there were tickets for work

4  to be done, would they not receive those tickets through

5  their computers and other devices?

6        A.   Typically, no.  So the way a service desk

7  software typically works, you log in to like a website

8  or a portal and all of that is there.

9             So I agree that they would have used those

10  computers' browsers, like Internet Explorer or Chrome or

11  Firefox, in order to access those tickets, but those

12  types of tickets would not exist on their personal

13  devices or their computers directly.

14        Q.   Okay.  But if, say, an employee at United Way

15  had an issue and they wanted to communicate those issues

16  with the IT service desk, one of the ways they did that

17  was through emails; isn't that fair?

18        A.   I assume to some degree people would send

19  emails with problems.  That's fairly typical.  But that

20  would be a speculation.  Generally an organization of

21  that size has an actual service desk where you put in a

22  ticket and that's how the official communication works.

23        Q.   Okay.  So do you have any specific information

24  about how DigitalNet set up the IT service desk for

25  United Way?

1      A.    I don't.

2      Q.    Okay.  So, sir, we were talking about IT

3  service environments and I just made the assumption, of

4  course, you know, being a layperson, that that

5  information would be on the devices used by the help

6  desk folks, DigitalNet's employees, right?

7      A.    Not typically, but I understand how you made

8  the assumption.

9      Q.    Sure.  Sure.  And we don't really know here

10  one way or the other how DigitalNet set up the help desk

11  environment for United Way, right?

12      A.    Yeah, I've not been able to analyze that

13  environment and that -- those tickets or none of that

14  information has been provided to me to analyze.

15      Q.    Okay.  And you understand that neither did

16  Mr. Naviloff or anyone at RSM?

17      A.    I don't know what RSM did.  I know that

18  Mr. Naviloff does not cite the IT service environment in

19  his opinion.

20      Q.    Right.  And in terms of like the help desk

21  area, they assume that services were provided and did

22  not include that in their loss calculation, right?

23      A.    That's tricky, right, because I agree with you

24  that the cost of the people that work on the service

25  desk environment, right, that activity, to what degree

1   that they're serving just the basic service desk

2   function was not -- was not analyzed as part of

3   Mr. Naviloff's opinion.

4          However, it's likely that higher level

5   engineering tasks would have passed through the

6   service -- the service desk environment and been

7   escalated to engineers to resolve VMware, for instance,

8   related issues.

9          So those would be there but, again, we don't

10  know because I haven't been able to analyze it.

11     Q.   Okay.  And, sir, are you aware that -- that

12  United Way conducted a -- or had another company conduct

13  a forensic imaging of various computers and phones used

14  by DigitalNet's employees?

15     A.   I believe, yes, that they did.

16     Q.   Okay.  And among those devices was Mr. Imran

17  Alrai's Dell laptop.  Are you aware of that?

18     A.   I am aware of that, yes.

19     Q.   Okay.  So if one assumed that he used that

20  laptop to communicate with the IT service environment

21  and the other stakeholders at United Way, it may be --

22  those emails may be on that device?

23     A.   Again, typically emails, especially kind of in

24  this day and age, don't necessarily reside directly on a

25  device.  In a lot of cases, especially for executives,

1   that's prohibited due to security reasons, so you're

2   viewing them more through a web portal for only a

3   specific time period.  It's also very typical for

4   laptops like that to only contain one or two weeks'

5   worth of emails.

6        Q.   Okay.

7        A.   So that's what I would expect from that.  I do

8   agree with you that it's possible he used that laptop to

9   communicate with stakeholders at the United Way.

10       Q.   And are you aware that the government produced

11  a two-terabyte hard drive with forensic images of

12  various computers and other devices during pretrial

13  discovery?

14       A.   Yes.  And I believe, if recollection serves,

15  that those were cell phones -- cell phone images and

16  desktop images primarily of the people that -- the

17  computers of the people working in the service desk

18  environment and Mr. Alrai.

19       Q.   Okay.  And you recall the testimony from

20  the FBI forensic expert about things that they -- he

21  recovered from Mr. Alrai's computer, right?

22       A.   I actually was not present for the FBI

23  expertise -- testimony.

24       Q.   But you're aware that there was an FBI

25  forensic expert who testified about information obtained

1  from Mr. Alrai's computer?

2      A.   I -- I am aware that there was an FBI expert

3  that was questioned as part of this case.

4      Q.   Okay.  And you -- did you review that

5  two-terabyte hard drive?

6      A.   I did.

7      Q.   Okay.  And did you search it for any relevant

8  email?

9      A.   I did.

10      Q.   Okay.  Did you prepare a report of your

11  findings, if any?

12      A.   No.  So when -- by the -- when we were

13  provided that hard drive -- and, forgive me, it was a

14  year ago -- I believe that was actually very close to

15  trial, so we did a cursory review to see if there were,

16  in fact, any significant email findings or communication

17  findings on those, including service desk tickets and

18  things of that like.  And we did not find any so that we

19  did not report on them.

20      Q.   Okay.  All right.  So if it wasn't relevant,

21  you didn't include them in a report in any way.  You

22  looked for them, you put -- you didn't write them down

23  in a report?

24      A.   The information that I requested wasn't

25  actually on there, so we did not use it as part of our

1    analysis.

2           MS. LE:  Okay.  Tracy, can we move on to

3    Exhibit 1a and go to page 8 of that exhibit.

4        Q.   We talked about this one earlier, right, this

5    exhibit, generally?

6        A.   Yes.

7        Q.   Okay.

8        A.   I mean, in general terms, the zip.us pricing

9    and markup, yes.

10          MS. LE:  Okay.  I think we're on the wrong

11   page here.

12          I would like to -- I think I counted out what

13   the pages were and they might not be the right page.

14          Judge, can we take just a quick minute?  I

15   need a water break and then I can pull up the right

16   page.  Would that be okay?

17          THE COURT:  We're at -- we're literally at

18   90 minutes right now anyway, so it's a perfect time to

19   take a break.  So let's take the morning recess.

20          I have a question, though, I wanted to pose.

21          No, I'll do it later.  Let's take the

22   15-minute break.  We are in recess.

23          MS. LE:  Thank you, Judge.

24        (Recess taken from 10:41 a.m. until 10:59 a.m.)

25          THE COURT:  Sorry about that.  I was on a

 1   phone call.  Okay.  I'm ready to go.

 2            MS. LE:  Judge, do you want us to pick up or

 3   did you want to address something?

 4            THE COURT:  I'm not getting AUSA Le's voice.

 5            MS. LE:  Judge, can you hear me?

 6            THE COURT:  Now I can.

 7            MS. LE:  Okay.

 8            All right.  Tracy, I'd like to pull up

 9   Exhibit 1b, as in boy, and page 8 of that exhibit,

10   please.

11       Q.   Mr. Sgro, can you see bullet point number 4?

12       A.   The one that starts with "we collected

13   laptops"?

14       Q.   Yes, sir.

15       A.   Yes, I can.

16       Q.   All right.  And there's a reference -- after

17   email records, there's a footnote.  Do you see that?

18       A.   The "see appendices" or "per discussions"?

19       Q.   Footnote.  Does it say footnote there after

20   the number one about email records for key United Way

21   personnel?  Do you see that?

22       A.   Yes.  The one that says "per discussions with

23   UWMV, email service was migrated from Outlook Exchange

24   to Google in or around March 2015"?

25       Q.   Yeah.  Why don't you read that full footnote.

1    A.    The decommissioned -- it continues to say:

2  The decommissioned Microsoft Outlook Exchange server has

3  not been located to date.   Therefore, if emails were not

4  migrated or were subsequently deleted from the Goggle

5  platform, we have no record of and, thus, could not

6  review such emails.

7    Q.    Okay.   So based on that footnote, it's fair to

8  say that this migration in March of 2015 from Outlook to

9  Gmail likely limited RSM's ability to pull even more

10  emails, right, that are relevant for the purposes of the

11  analysis?

12    A.    So I'm confused by that, only because -- and

13  as I learned at trial through the testimony of

14  Mr. Meyer, he actually preserved all of Mr. Alrai's

15  emails in the conversion from Google to Microsoft or

16  Microsoft Exchange in the Google transition.   So to what

17  degree those were actually preserved, I'm not sure why

18  they wouldn't be available.

19    Q.    I think the confusion for you might be from

20  two different migrations.   Okay?   So let me talk about

21  this first migration; that in March of 2015, your client

22  migrated United Way's emails from Microsoft to Google

23  and --

24    A.    Right.

25    Q.    -- Mr. Meyer later testified that he

1    transitioned it back from Google to Microsoft.

2           Does that make sense?

3       A.    Yes, that's -- that's good clarification.

4    Yes.  Thank you.

5       Q.    Okay.  I mean, you know, it's a year ago now,

6    right?

7       A.    Doing my best.

8       Q.    So let's talk about the March 2015 email

9    migration from Microsoft to Gmail that was done under

10   your client's direction and control.  Okay?

11      A.    Okay.

12      Q.    Okay.  So at least as related to emails that

13   existed at that time, the fact that RSM was unable to

14   locate the decommissioned Outlook Exchange limited their

15   ability to search for and locate even more emails; would

16   that be fair to say?

17      A.    That seems fair.  If something is deleted or

18   missing, it's hard to find.

19      Q.    Okay.  And Mr. Alrai would have been the one

20   responsible in 2015 to make sure to preserve or not

21   preserve any relevant email in that migration, right?

22      A.    Presumably his organization would have been

23   responsible for that migration.  I'm not aware who

24   actually performed that migration specifically.

25      Q.    Okay.  When you say his organization, do you

1  mean United Way or do you mean DigitalNet?

2     A.   I mean, ultimately I think that would have

3  been responsible -- the responsibility of the United Way

4  to make sure that data is preserved and whatnot.

5     Q.   Okay.  And that person at United Way that

6  would make sure it would be preserved would be the head

7  of the IT department, right?

8     A.   Yeah, that seems reasonable.

9     Q.   Okay.  Sir, are you aware that DigitalNet and

10  its employees, including Mr. Alrai, had separate

11  DigitalNet email accounts?

12     A.   I think it's a fair assumption that DigitalNet

13  employees may have DigitalNet emails.

14        MS. LE:  Okay.  Tracy, can we pull up

15  Exhibit 13?  Can you go to the header at the very top?

16     Q.   So, sir, this is a series of emails that were

17  exchanged on September 3rd, 2014, and I'll represent to

18  you were produced in pretrial discovery.  Okay?

19     A.   Okay.

20     Q.   And do you see at the top the name of the

21  sender and the sender's email address?

22     A.   Yup.  That's Kal, and it's Kal Wahbe -- I

23  apologize if I'm spelling that -- saying that wrong --

24  @DigitalNet.com.

25     Q.   And do you see who the recipients of that

1   email were?

2       A.    So the IT service desk is a recipient at

3   supportunitedway.org; Imran Alrai@digital --

4   digitalnet.com.

5       Q.    Have you reviewed other DigitalNet email?

6       A.    Emails specifically from DigitalNet?

7       Q.    Yes, like the -- at these -- the name of the

8   employee at DigitalNet.com.

9       A.    I'm not sure if they are from DigitalNet or

10  United Way email addresses.  There's certainly a lot of

11  emails.

12      Q.    Okay.  But separate and apart from what the

13  government produced to you in discovery, have you ever

14  asked your client to provide DigitalNet emails showing

15  the services they provided to United Way?

16      A.    So --

17            MR. EATON:  Objection, same as -- same as

18  before.  I think this is -- it misses the point and to

19  the extent the point is relevant, it's been made.

20            THE COURT:  Overruled.

21      Q.    You may answer the question.  Do you want me

22  to rephrase it, sir?

23      A.    So I -- I was retained to analyze the data

24  provided to me by counsel and I did not receive as part

25  of my analysis a direct -- you know, a storage of emails

1  from DigitalNet.

2       Q.    Okay.  So we know now that this is an example

3  that DigitalNet had emails and it was used between

4  DigitalNet's employees to communicate, right?

5       A.    Seems fair, yes.

6       Q.    And the subject of this email is GP, meaning

7  Great Plains, crashing, right?

8       A.    That appears to be correct, yes.

9       Q.    Okay.  And I think one of the things that you

10  talked about earlier is that, you know, what the help

11  desk folks do at United Way doesn't necessarily

12  correspond to the added value services that the

13  engineers would have to perform, right?

14       A.    In certain cases that would be correct, yes.

15       Q.    Okay.  And would it be a fair assumption that

16  if there were value-added services that were required of

17  DigitalNet's engineers, maybe they're in Pakistan or

18  somewhere else, that that kind of exchange would be

19  documented in any way in DigitalNet's email?

20       A.    It could be possible that there are

21  communications about ongoing services between DigitalNet

22  engineers.

23       Q.    Okay.  And like how you would have liked to

24  have reviewed emails between Mr. Alrai and other

25  stakeholders to determine what, if any, services were

1    provided and the value of those services, likewise, it

2    would have been beneficial to you to review DigitalNet's

3    internal emails in the same regard, right?

4         A.   Communications, no matter who they're from,

5    revolving around a service, especially of a technical

6    nature, are generally valuable in an analysis.

7         Q.   Okay.  And would it be fair to say that United

8    Way wouldn't necessarily have access to DigitalNet's

9    internal emails, right?

10        A.   I don't know why they would.

11        Q.   Right.  And based on your review of the

12   posttrial discovery, do you have any evidence that RSM

13   had access to any other additional DigitalNet internal

14   emails that were not produced in discovery?

15        A.   I did not read in posttrial discovery of any

16   indication that RSM has access to DigitalNet's email

17   servers.

18        Q.   Okay.  So I want to switch gears again,

19   talking about this terminology that's come up a fair bit

20   in the litigation since trial.  It's about this concept

21   of the IT environment.  Okay, sir?

22             And this is going to be one of those things

23   that I'm going to need you as the expert to explain to

24   me as a layperson.  What does an IT environment and the

25   forensic review of that environment entail?

1      A.    That's the --

2      Q.    Go ahead.

3      A.    -- question?

4      Q.    Yes.

5      A.    Oh, okay.

6            So an IT environment would be networks,

7    computers, servers, desktops, any -- pretty much

8    anything that's connected -- that is, a computer or

9    like -- telephony equipment.  All of that would be, you

10   know, part of the IT environment and that would include

11   cloud or data backup repositories.  That could include

12   everything, anything that's plugged into the network or

13   is used in a computing fashion.

14     Q.    Okay.  Does it mean that you look at each

15   computer that's part of the network, each phone that's

16   part of the network?

17     A.    So there's -- there's levels that you analyze

18   an IT environment.  Right?  Generally you don't analyze

19   every single phone.  If they are alike, then you analyze

20   one and you make some assumption -- reasonable

21   assumptions about the others.

22           In the case of desktop computers, especially

23   in a virtual desktop environment, you can look at the

24   specific image that's deployed to many systems and have

25   a general understanding of what's there for the

1    remainder of those systems.

2              So it's not necessarily that you have to look

3    at every single environment, but generally we look at

4    the totality of the environment and then narrow in about

5    what's reasonable and which parts of it will shed light

6    on other parts.

7              So in cases where there's redundancy or things

8    are very similar, significantly similar, we don't

9    individually analyze all of it.

10        Q.   Okay.  So you don't need to look at hundreds

11   of computers or every single server or every single

12   phone; is that right?

13        A.   So phones and computers are kind of in a

14   separate category.  You know, if it's one model of phone

15   and the phone is connected to the same phone system

16   then, no, I wouldn't think it was reasonable to look at

17   every single one.  And the same in a virtual desktop

18   environment would be true of those computers, where we

19   wouldn't look at every single computer.

20             Servers are a little bit different because

21   generally a server has a specific function and those

22   functions, the applications that they run, are

23   different.  So we would spend special attention on the

24   server environment because there's a like -- higher

25   likelihood for differences there.  And so we would have

1    to go through those, not necessarily one by one in all

2    cases, but in a lot of cases, we would look at most of

3    them.

4         Q.   So would you say for a computer have a

5    forensic image of that device?

6         A.   A desktop computer?

7         Q.   Yeah.

8         A.   Yeah, so it depends on who the person is,

9    right?  If there was -- if they were an executive and

10   they had, you know, direct involvement or they were an

11   engineer, that may have certain value, but the general

12   staff of the United Way, we wouldn't necessarily take

13   forensic images of every single computer, no.

14             And, remember, this is a -- this is -- to a

15   large degree, this is a virtual desktop environment, so

16   the computers and the software they're running are

17   actually in the cloud, not on the computer in a

18   traditional sense.  And so there wouldn't be a lot of

19   value in reimaging a bunch of computers that are -- that

20   are using the same cloud.  We would look at imaging the

21   cloud itself at that time.

22        Q.   Okay.  And so I -- and correct me if I'm

23   wrong, but like the cloud environment, that isn't a

24   static thing, right?  That's a dynamic kind of

25   situation, isn't it?

1     A.   Certain parts of it are static.  You know,

2   there's -- there's certainly the infrastructure that

3   it's running on.  It's virtual in that it's primarily

4   made up of software that is running on some hardware

5   that's kind of obscured from the end user, right?

6          So it's -- the cloud looks like you're using a

7   software application more than like you're using a

8   traditional brick and mortar, kind of bare-bones

9   computer that was metal and a chassis and all that.

10          However, certain parts of it are dynamic.  So

11   logging, network traffic, that sort of thing, those do

12   change over time.  But the general images and some of

13   the setup is static to a certain degree.

14     Q.   What about when DigitalNet is called upon to

15   do these engineering products or engineering events to

16   address whatever issue, is that -- would that change the

17   cloud environment?

18     A.   It wouldn't change the cloud environment.  It

19   would -- if they were applying maybe security patching

20   or something like that, it would change the image that

21   the people are booting from, right, the software that

22   they are using.  Certainly if they did software

23   maintenance, that would change the software, but not the

24   totality of the cloud environment itself.  The container

25   would stay roughly the same unless they were adjusting

1   that as part of the maintenance.

2            For instance, if something was running out of

3   memory or they needed to adjust it, the cloud

4   environment would look slightly different as a result of

5   that, but in general, you know, there would be changes

6   if the engineers were making changes.

7       Q.   So I guess one of the things I have a hard

8   part -- hard time wrapping my head around is even if you

9   could get access to the cloud for all these computers,

10  for all these servers and all these phones, wouldn't you

11  be just limited to, for the most part, a rather narrow

12  window of time versus like a period of like six years

13  that we are talking about here as a loss analysis?

14      A.   So I think I understand your question now.

15  Let me kind of attempt.

16           Forensic imaging is always a point in time

17  snapshot.  Right?  Computer systems vary from day to day

18  no matter what.  I mean, certain files do change just on

19  an ongoing basis.  And so from that perspective, any

20  kind of forensic image will only give you the exact

21  snapshot of what it was at that -- the moment that the

22  snapshot is taken.

23           And that said, generally these cloud

24  environments persist with a reasonable amount of

25  standardization throughout their life.  They don't

1    dramatically change to the point where an image from

2    today would be completely invalid a year ago.  Certainly

3    if you had images every year and looked at those, you

4    know, say, like a year-end backup, most companies do

5    take backups of their environments on a routine basis.

6    So if you were to line all of those backups up, you

7    would see changes for sure.

8         Q.   So that would assume that whoever's in charge

9    saved the backups and that that is something that can be

10   pulled relatively easily so that one can do a comparison

11   from one point to another, though, right?

12        A.   Yeah.  So in cloud environments, we're very

13   fortunate, right?  We live in an era of cloud computing

14   where backups are actually quite easy.  And so big

15   environments can be backed up as a single file which is

16   fairly mobile and portable to be made available for

17   recovery and things like that.  So that's -- that's more

18   a function of the time that we live in, which is nice.

19            And, but, yeah, of course, if the backups

20   aren't made or the backups aren't stored, then you can't

21   analyze something that doesn't exist.

22        Q.   Right.  So we can't go back, if it wasn't

23   preserved in 2015, to see what the environment was in

24   2015, right?

25        A.   You certainly cannot analyze something that

1   doesn't exist.

2       Q.   And same for 2016; if it wasn't preserved in

3   2016, it's not possible to go back to review that,

4   right?

5       A.   Yeah.  It's not possible to go back in time

6   and take a backup that you didn't take.  I presume

7   you're suggesting that there are no backups; that the

8   United Way doesn't have backups of any kind?

9       Q.   Well, are you aware of any backups from 2015,

10  2016, or any other backups --

11      A.   No.  So I haven't been allowed --

12      Q.   -- by comparison that you're talking about?

13      A.   So I haven't been allowed to review any of the

14  environments, so I couldn't tell you definitively if

15  there are or are not backups.

16      Q.   And we can all agree that Mr. Naviloff also

17  didn't review this IT environment either and that's part

18  of the issue that you have with his review, that he

19  wasn't technically qualified to do that kind of

20  analysis; right?

21      A.   There's two answers to that.  The first is

22  that I don't believe that Mr. Naviloff reviewed that

23  environment.  Surely that's outside the scope of his

24  expertise.

25          However, it does appear to me that RSM had

1    access to that environment, at least as it stands

2    pretrial.

3        Q.   Okay.  So do you remember Mr. Naviloff's

4    testimony in this regard about his access to the -- the

5    servers and -- which I assume is his -- his discussion

6    about the IT environment?  Do you remember that?

7        A.   I believe he said something to the effect of

8    he didn't take that into account or didn't utilize that

9    in the formation of his opinion.

10        Q.   Right.  And the fact that he and his team that

11    were conducting the loss analysis didn't have access

12    because there was a -- kind of a wall that was created

13    between his group and what they were hired for and

14    another group within RSM; isn't that right?

15        A.   I can't speak to the internal structure at

16    RSM, but I do know that various people at RSM were --

17    were permitted to enter the environment to some degree

18    or were given direct information from the environments.

19        Q.   Okay.  That was not part of his loss

20    calculation, right?

21        A.   According to him, he did not use that as part

22    of his loss calculation.

23        Q.   Okay.  And did you see evidence of him

24    reviewing or that you referenced to the -- the IT

25    environment as you understand it in his expert report or

1  any of the other materials that were submitted in

2  support of his conclusions?

3       A.    I don't quite understand the question.

4       Q.    So, I mean, you seem to question whether his

5  testimony was accurate or not.

6            Do you see any proof in the pretrial or

7  posttrial discovery that suggest that Mr. Naviloff and

8  the team that was working on the loss analysis had

9  access to the, quote, IT environment as a whole?

10      A.    I see in the posttrial discovery conversations

11 about Mr. Naviloff and his team discussing access to

12 that exact -- that environment.

13           To what degree -- I know he's aware of it and

14 I know that, you know, he was involved in those

15 conversations.  To what degree he's included that in his

16 analysis, I can't speak to.

17      Q.    Okay.  So let's talk about -- one minute.

18           So have you been called upon in other matters

19 to kind of conduct this evaluation of an IT environment

20 to evaluate loss in a fraud case?

21      A.    No.  So I don't deal with fraud.  I mean,

22 that's definitely the -- establishment of fraud is

23 definitely beyond the scope of my practice, but I have

24 helped clients evaluate IT environments for services

25 that -- the quality of services that were provided by a

1   third party.

2        Q.   Okay.  So kind of like what TBS did when they

3   came in after Mr. Alrai was terminated, trying to figure

4   out what was going on and what they needed to do to

5   transition services and/or approve them, like that?

6        A.   With one important difference.  So similar,

7   but one important difference.

8             TBS did this as -- not as an independent third

9   party.  This -- I would do that generally as an

10  independent third party looking objectively at it and I

11  think Mr. Meyer and TBS were contracted to kind of take

12  over this environment.

13            So to what degree that -- that creates

14  conflict for them, you know, I think we could all

15  speculate.

16       Q.   So were you present for Mr. Meyer's testimony?

17       A.   I was.

18       Q.   And do you recall that his -- there were

19  different levels of his company's involvement with

20  United Way?  There was a gradual transition and uptick

21  in services; do you remember that?

22       A.   Yeah, I do recall he was hired initially at

23  some point and eventually became their -- their interim

24  CIO or whatever his title is.

25            And those services -- in fact, all four of the

1    major categories that Mr. Naviloff cites in his

2    report -- were replaced by Mr. Meyer and his company

3    somewhere in the beginning of his tenure.

4         Q.   Right.  But when TBS was initially brought on

5    right before Mr. Alrai was terminated, do you remember

6    that testimony?

7         A.   I do.

8         Q.   Okay.  And I'm sure Mr. Meyer can talk about

9    this later, but the initial contract was to do this very

10   thing that you were talking about, which is to determine

11   what the services were, where things were, and how they

12   needed to be transitioned; isn't that right?

13        A.   That -- that's -- it's a fair comparison.

14   I -- still I maintain it's not exactly the same, but I

15   understand your point and I would agree that it's a

16   similar service.

17        Q.   Okay.  And then later on, TBS and Mr. Meyer

18   took on additional responsibility, including Mr. Meyer

19   becoming the CIO and his company basically taking over

20   what DigitalNet had been providing to United Way, right?

21        A.   Yeah, I agree that appears to be the pattern

22   of their engagement.

23        Q.   Okay.  So let me ask you this question.

24             Have you ever forensically preserved an IT

25   environment for review?

1    A.    Yes.

2    Q.    Okay.  And in what context was that?

3    A.    So I've been hired to preserve -- to

4  forensically preserve servers in cybersecurity cases,

5  provide them to law enforcement and things of that

6  nature.

7    Q.    Okay.  And can you tell me a name of a case or

8  a law enforcement agency and a time frame for when you

9  did that?

10    A.    I can't provide the name of the case because I

11  typically don't follow the cases to trial, but I can

12  tell you that I've provided forensic images to the

13  United States Secret Service.  That's primarily who we

14  provide forensic images for.

15    Q.    Let me stop you there.  I'm not talking about

16  forensic images for like one computer.  I'm talking

17  about this whole IT environment for a large company

18  equivalent to the size of United Way with over a hundred

19  employees, like that.

20    A.    Oh, I've never taken a forensic image of an

21  entire IT environment.

22    Q.    Okay.  And when you were just mentioning how

23  you've provided forensic support to Secret Service and

24  other law enforcement, are we talking about more

25  discrete activities, a handful of computers, cell

1  phones, that kind of thing?

2       A.   Sometimes they're the entire -- I mean,

3  certainly I've provided large forensic copies.  So

4  you're kind of -- you're alluding to it being

5  comprehensive like every single server or something like

6  that.  That's not something we've ever done, nor

7  something I think we would ever do.

8            However, I have provided numerous images, so a

9  handful of servers, five or six servers, multiple

10 desktops, in a fairly large image collection, not --

11      Q.   Something to the scope of what you would --

12 you would have liked in this case?

13      A.   So in this case, I would have just liked

14 forensic images of the four categories of things that

15 Mr. Naviloff cited as part of his loss calculation,

16 those categories.  I think, honestly, that doesn't have

17 to be a huge collection.  It doesn't need to be every

18 desktop.  And I'm -- I'm not trying to be a purist

19 about, well, you need to see everything or you can

20 establish nothing.  That's -- that's very far from the

21 truth.

22           But the fact that we have -- a phone system is

23 generally one server, right?  I don't need to see every

24 handset, but I would have liked to see the server.

25           In the -- in the virtual environment, I don't

1    need to see every single server in a virtual hosted

2    environment, but I would have liked to see one.

3             You know, so there's a big difference between

4    the totality of every single server and anything at all,

5    right.

6        Q.   But do you understand why there has been a lot

7    of confusion, for lack of a better word, when there's

8    reference repeatedly about an IT environment and of

9    virtual desktop, virtual hosting, backups and telephone

10   systems, without the level of specifications that you're

11   now going through with us?

12       A.   I -- truthfully, Attorney Le, I don't -- I

13   don't understand where the confusion is because when --

14   when IT professionals, right -- and RSM is a -- is, you

15   know, a well respected company in the space.  When

16   counselors and IT professionals get together and talk

17   about IT environments, especially when four specific IT

18   environments are in question, I -- I don't know where

19   the confusion really is.

20            And if there was confusion, I certainly would

21   have been happy to explain further.  This idea of

22   confusion is kind of talked about a lot lately or has

23   come up lately, but there didn't appear to be confusion,

24   at least in my conversations with counsel, in the

25   beginning.

1      Q.   And which counsel are you referring to?  It

2  wasn't somebody from the government.

3      A.   No, of course not.  Defense counsel.

4      Q.   All right.  Okay.  So you wouldn't be aware of

5  confusion on the part of the government or Attorney

6  Commisso or the individuals that Mr. Naviloff would have

7  spoken about about what would be involved in this IT

8  environment at United Way that you were interested in

9  looking at?

10     A.   I certainly never spoke with those people, not

11  directly.  I do understand and I would impress upon you

12  that the -- the direct analysis of some of these

13  environments is very important to a technical analysis

14  and understanding the services that are delivered.

15          And so to what extent they would have informed

16  Mr. Harrington as trial counsel of any kind of

17  confusion, I imagine that that might have passed back to

18  me.  I don't -- I'm not aware of any confusion that

19  existed pretrial.

20          THE COURT:  Can I -- can I get an offer of

21  proof from somebody here?  See, here's what I'm confused

22  about.

23          The -- the IT environment issue, right, is --

24  I mean, there was never -- was there -- there was never

25  an order from the -- there was an order of the Court to

1  do something on the -- when Attorney Harrington raised

2  this issue, right?

3          And what -- so what's the confusion?  Is it

4  confused -- is there confusion about what the Court's

5  order meant?  Because the issue here -- okay.

6          Can you just put it in context for me, Ms. Le.

7          MS. LE:  Sure.  I think what your Honor is

8  referring to about Mr. Harrington's pretrial discovery

9  as it related to Mr. Naviloff is about running those

10 keyword searches against the emails.

11         This issue of the IT environment goes back to

12 Mr. Strauss and has been picked up by Ms. Brown and

13 Mr. Eaton.  So this was not part of your pretrial

14 litigation.

15         THE COURT:  Okay.

16         MS. LE:  And I'll ask Mr. Davis and Mr. Hunter

17 to pick up on that, but it's my appreciation that there

18 was never a discovery dispute on this issue that

19 occurred between Mr. Harrington and the government and

20 it certainly wasn't escalated up to the Court.

21         THE COURT:  Okay.

22         MS. LE:  Does that make sense?  I'm sorry.

23         THE COURT:  It makes -- yes.

24         Now, I know it's -- this isn't some sort of

25 failure to comply with the pretrial discovery order or

1  pretrial discovery agreement, which is really what this

2  ended up being.  It's a -- it's a -- I mean, it's an

3  analysis of -- of what then?  I mean, is there -- is

4  there dispute over how the government complied with the

5  Court's posttrial discovery orders?  Like what -- I

6  don't understand what we're arguing about anymore.

7            MS. LE:  Not as related to the IT environment,

8  and Mr. Naviloff -- I mean, Mr. Sgro would have to

9  correct me, but a lot of Mr. Sgro's supplemental report,

10  which is Exhibit Kk, emphasized the difficulties he had

11  because he did not have access to this IT environment,

12  your Honor.

13            THE COURT:  Okay.

14            MS. LE:  So that's why I was trying to address

15  that.

16            THE COURT:  But how could that -- so am I to

17  assess that just in assessing Mr. Sgro's opinion or is

18  there some relief I'm supposed to be in a position to

19  grant about that?  I still don't know where that all

20  goes.

21            Maybe Ms. Brown --

22            MS. LE:  Your Honor --

23            THE COURT:  This might be something for

24  Ms. Brown to explain to me.

25            What is this conversation about?

1          MR. EATON:  I can -- I can jump in here.

2          So there was a -- there was a pretrial

3    discovery request which was advised by Mr. Sgro

4    regarding obtaining access to aspects of the IT

5    environment.  That request -- you know, nothing was

6    provided.

7          THE COURT:  Well, wait, wait, wait, wait,

8    wait.  Wait a minute.  So now you're making it sound

9    like there was a discovery violation pretrial and that's

10   not what this motion is about.

11         MR. EATON:  No, your Honor.  But as Mr. Sgro

12   testified on direct, there are indications that RSM

13   reviewed aspects of the IT environment that he was not

14   given access to.

15         THE COURT:  Oh.

16         MR. EATON:  So -- so that's really what this

17   is about is that it was requested pretrial, Mr. Sgro

18   thought it was useful, and now it appears that it did

19   exist, at least --

20         THE COURT:  Wait a minute.  Wait a minute.

21   No, I --

22         MR. DAVIS:  Just a question, Mr. Eaton.  Can

23   you state the date and form of the specific request you

24   refer to?

25         MR. EATON:  So one of the requests here -- and

1   so Mr. Sgro cites this in his report, which is Exhibit

2   Kk.  I believe this is Exhibit 2.  Yes, Exhibit 2.

3          And it discusses the IT environment, it

4   discusses system logs, engineering records, project

5   plans, et cetera.  It discusses on the second page, you

6   know, all these other items.  So Naviloff's work papers.

7          Then on page 3 is when he gets into the email

8   environment, the help desk communications, et cetera.

9          MS. LE:  I'm sorry, your Honor.

10          Mr. Eaton, what exhibit are you referring to

11   so that we can all be on the same page and maybe Tracy

12   can pull it up.

13          MR. EATON:  Yes, this is Exhibit Kk,

14   Mr. Sgro's report.  And down to page -- well, page 31 is

15   the exhibit page, but it's Exhibit 2 to Mr. Sgro's

16   supplemental report.

17          THE COURT:  Let me try it this way, because I

18   don't know what you're talking about.

19          And if -- Ms. Brown, if you need to -- let's

20   get back to the this -- Tracy, I'm sorry.  Let's get

21   back to the screen with the gallery view of counsel,

22   please.

23          Attorney Brown, what's your -- maybe I've just

24   lost track of the thread of it.  What is your argument

25   regarding the IT environment?  I know there's a failure

1    to preserve sort of argument, right, that -- that Mr. --

2    I'm talking about the version of Mr. Strauss that was

3    before Mr. Harrington made a request, right?  But that's

4    not something the government had any control over, as

5    far as I know.  Or is it?

6               MS. BROWN:  Well, we -- as the Court has

7    identified, we have two basic arguments:  One is the

8    Brady motion, which is we asked for things, we got them

9    after trial, we're now saying they're exculpatory and we

10   now have to go through the prejudice analysis.

11              Another part of our motion is a failure to

12   preserve.  And not to get too down in the weeds on that,

13   there -- as you may recall, I don't know if it's the

14   last hearing -- that the -- the government was involved

15   in this case prior to Mr. Alrai's, for lack of a better

16   word, offboarding of United Way.

17              And what we're seeing is they were in -- they

18   were investigating this case; they were -- meaning the

19   government, FBI, and the U.S. Attorney's Office.  They

20   were in a position to preserve information.

21              They were working with Attorney Commisso and

22   others in terms of getting ready for a grand jury.  The

23   grand jury subpoena, I think, was before Mr. Alrai was

24   even terminated.  I think it was January -- or June 4th,

25   2018.

1          So in that section of our motion, we're

2    arguing that there is a failure to preserve and also

3    part of that, too, is there was notice of a request to

4    preserve.

5          So the prior, way back counsel, even going

6    back before Mr. Harrington, I think the McLane firm

7    represented Mr. Alrai, and they sent a letter, I think

8    it was addressed to Mr. -- Attorney Commisso, and --

9    saying, preserve the environment.

10         And so it's my understanding what Mr. Sgro is

11   saying, like, hey, this is the first we've ever heard

12   that, you know, there's some question about what the

13   environment was.  And so -- but it goes to the

14   preserving; and doesn't go to the Brady.  So that

15   they're two separate issues.

16         THE COURT:  But the -- okay.  But the

17   preserving argument, you're saying it doesn't go to

18   Brady, so -- well, this is a Brady motion.  So what does

19   it go to?  Like what do I do about it?  How do I

20   evaluate it?  Does it go to sentencing and my evaluation

21   of the opinions involved?  Does it go to forfeit -- if

22   it doesn't go to Brady, what are we talking about?

23         MS. BROWN:  Well, part of -- I mean, I think

24   we're all referring to it as a Brady motion, but part of

25   our motion is a failure to preserve argument.  It's a

1   last argument and --

2           THE COURT:  Okay.  I -- yeah.  I --

3           MS. BROWN:  Yeah.  And the government's

4   putting a lot of -- obviously we put a lot of focus on

5   the Brady argument, which was here's these emails, we

6   can all look at them and see are they exculpatory or are

7   they not and we can have that analysis.  But the failure

8   to preserve is more complicated and they may be melding

9   together here.  I'm not sure.

10          I mean, Attorney Le can comment to where she's

11  going with this.  We didn't spend a lot of time on this

12  in our direct because we think the -- the issues

13  regarding the emails --

14          THE COURT:  Wait a minute.  I'm -- so you're

15  telling me it's -- you're telling me it's sort of an

16  additional argument --

17          MS. BROWN:  Exactly.

18          THE COURT:  -- but -- okay.

19          What relief are you requesting?  Like in terms

20  of Brady, you're basically saying, I need a dismissal

21  or, in the alternative, I need a new trial.  It's very

22  simple.  I can tell what you want, right, and I've got a

23  couple options here, about how to do it.  So put that

24  aside for a minute.

25          On the failure to preserve, what relief are

1   you asking for?  Like what can the Court order that you

2   would be interested in having?

3              MS. BROWN:  It would be the same remedy, your

4   Honor.  And we -- I think we've cited to a case which I

5   can talk about more later.  It's -- I refer to it as the

6   cell tower or the radio tower case, where they didn't

7   preserve --

8              THE COURT:  Okay.

9              MS. BROWN:  -- some evidence about that.  And

10  so that is a remedy --

11             THE COURT:  Okay.

12             MS. BROWN:  -- the same as Brady.  It's a

13  different analysis because one thing that's different --

14  I mean, with Brady we've got the evidence now and you

15  can make a decision as to whether it would have been

16  exculpatory.

17             THE COURT:  Yeah.

18             MS. BROWN:  We still don't have this, we never

19  had it, and so that -- then it's a whole different

20  analysis other than what is the remedy and we're asking

21  for the same remedy.

22             THE COURT:  I see.  Thank you.  I -- I

23  think -- this is as much on the Court as anybody else.

24  I think I conflated it with Brady.  And if it's a

25  different -- you know, I don't even know what the power

1    would be to do it, but you're telling me there's

2    authority for it and I'll focus on it.  Okay.

3            And, Ms. Le, did you want to respond to that

4    or did anybody want to respond to that in any kind of

5    way?  I was just trying to put it in a box of the

6    Court's authority to order relief.  Brady gives me

7    authority to order relief under some circumstances, but

8    this failure to preserve is one I'm not as familiar

9    with.

10           MS. LE:  Your Honor, before you get to, you

11   know, remedies in this area, number one, Ms. Brown,

12   Mr. Eaton have to explain what authority they have to

13   order the government to get a third party to provide

14   their, quote, IT environment, whatever that might mean,

15   that is not used as part of our -- our third-party

16   expert's testimony, number one.

17           Number two, the reason I focused on it is

18   because Mr. Sgro, in his original expert opinion, as

19   well as his supplemental expert opinion, placed

20   significant importance on this issue and that's why I'm

21   kind of wrapping up my cross on this area.  Because, to

22   be frank, I said this to Mr. Sgro, at least for the

23   government's attorneys, we don't understand what that

24   term, IT environment, means.  It's not a legal term of

25   art.  And I have yet to see any authority that would

1    compel the government to obtain such information and to

2    even provide it, your Honor.

3            So we don't, respectfully, think that we

4    should be punished for something we have no obligation

5    to do.  And my focus on it here is purely to kind of

6    parse out with Mr. Sgro what he means because he is, by

7    all accounts, the best person to educate the attorneys

8    and your Honor on this issue.

9            THE COURT:  I guess -- yeah, I -- I totally

10   understand your point.  I get -- as I try to piece it

11   together in my mind, you know -- I understand your point

12   about there's no -- there's no requirement that the

13   prosecutor even provide this information.  And that --

14   by the way, that's true of -- that's true of a lot of --

15   that's true of other evidence that we're talking about

16   here.  The rules of discovery don't -- don't necessarily

17   require every bit of what we're talking about here to be

18   produced and the parties pretrial kind of worked out

19   what they thought was reasonable and it seemed to work.

20           When it comes to Brady, my thought is during

21   that process, if the prosecution becomes aware of

22   exculpatory evidence, it should provide it.  Even if

23   it's not part of the discovery that they agreed to

24   provide eventually, if they become aware of exculpatory

25   evidence, they should provide it.

1          I think what I'm getting -- what I'm gleaning

2    from Attorney Brown's argument here is that I guess --

3    I'm not even sure this works factually in this case, but

4    if during the time the prosecution is working with

5    counsel for the victim, Mr. -- Mr. Commisso here, if

6    during that time a -- you know, sort of an evidence

7    freeze, right, a discovery freeze request is made -- in

8    this case, it was a preserve the environment request by

9    Strauss from the McLane firm.

10          If during that time, I guess, the prosecutor

11   and counsel for the victim are working together side by

12   side, I guess there's some argument -- and I'm not sure

13   about the authority either.  I don't want anybody to get

14   the impression I've adopted this, okay?  But there might

15   be an obligation to at that time take some measure,

16   knowing that the defendant has made this request as the

17   target to preserve evidence, and, therefore, be in a

18   position at some point to evaluate it for -- for some

19   type of due process angle involving exculpatory

20   evidence.  I don't know.

21          But I'll have to take a closer look at the

22   case Ms. Brown just talked to me about and whatever law

23   is there, I have in my mind is Brady.  And it's a little

24   bit different.

25          Your point's well taken, Ms. Le, that, you

1    know, these obligations are certainly not things we're

2    familiar with hearing about or seeing and I actually

3    approach it the same way.  I need to -- I need to know

4    what the authority is for my -- my ability to address

5    it, your obligation to preserve it, or anything else.

6    And that's -- that's something I'll work toward.  I'm

7    just trying to put this evidence in context as I -- as I

8    receive it.

9            You can continue to -- you can continue your

10   cross.

11           MS. LE:  Your Honor, I'm sure you and Mr. Sgro

12   are happy to hear that I'm almost done.

13       Q.   Mr. Sgro, are you a little relieved?

14       A.   I'm happy to be here as long as you and your

15   Honor want me here.

16           THE COURT:  Yeah.

17       Q.   Well, thank you for your time.

18           Sir, do you remember at the beginning of your

19   cross, when we talked on November 17th, I asked you

20   about your practice of citing in your expert report,

21   both the original and the supplement, to the sources and

22   documentation for your opinion?

23       A.   I do recall you asking questions to that

24   nature.

25           MS. LE:  Okay.  And can we pull up Exhibit Kk

1  for Mr. Sgro, Tracy?

2          Thank you.

3          Is that it?  Can we go to another page, just

4  make sure Mr. Sgro can see that that is his report that

5  we're referring to.

6     Q.   Is that your report, Mr. Sgro, that we're

7  referring to here --

8     A.   Yes.

9     Q.   -- the supplement?

10         So -- so your supplement, you did a -- you

11  attached some exhibits, a handful of exhibits; is that

12  right?

13    A.   That's correct.

14    Q.   Okay.  Which is a little different than what

15  you did with your original opinion, which didn't

16  actually include any exhibits or citations; is that

17  right?

18    A.   That's correct.

19    Q.   Okay.  And in addition --

20    A.   Well, hold on.  I apologize.  It's not that it

21  didn't include any citations.  It didn't include any

22  exhibits.

23    Q.   But -- which one was your original exhibit?

24         Mr. Eaton, can you help me with the numbered

25  exhibit that you submitted, Mr. -- Mr. Sgro's original

1   supplemental -- I mean original expert report?

2          MR. EATON:  Original report, which exhibit it

3   is for this hearing?

4          MS. LE:  Yes.

5          MR. EATON:  I don't know that the original

6   report is an exhibit to this hearing.

7          MS. LE:  But it was attached to your motion;

8   is that right?

9          MR. EATON:  Yes.  Yeah.

10          THE COURT:  Yes.  Yeah, it's part of the

11   record.  It's part of the record.

12      Q.   Okay.

13      A.   Yeah.  Attorney Le --

14      Q.   So Exhibit G, that was attached as part of the

15   record.

16      A.   Attorney Le, I was just going to offer that I

17   acknowledge that there were no exhibits attached to --

18   as an addendum to that report or in the -- you know, in

19   the appendices of that report.  I was just pointing out

20   that there are Bates number citations in that report.  I

21   think you said you don't believe there are any cites and

22   there are.

23      Q.   Okay.  So -- but this -- so let's just go back

24   to Kk.  The exhibits you attached are just a select

25   number of exhibits, right?

1      A.    That's correct.

2      Q.    Okay.  And then you also cite to certain

3  records that were produced by the government in pretrial

4  discovery, right?

5      A.    Yes, that's correct.

6      Q.    Okay.  Now, can you tell me if you worked with

7  anyone else at your company, I believe it's called Atom

8  A-t-o-m, in preparing this report?

9      A.    That's correct.  I worked with a single

10  associate in preparing this report.

11      Q.    And who was that associate, sir?

12      A.    Her name is Heather Campbell.

13      Q.    And is Ms. Campbell credited in your report?

14  I can't remember off the top of my head.

15      A.    No.  She only worked with, you know, things of

16  a clerical nature like finding documents and things of

17  that.  She has no opinions or anything in the report.

18      Q.    Okay.  So she pulled documents and she kind of

19  helped organize materials for you to review later?

20      A.    Yeah, just stuff of a very basic

21  administration -- administrative.  Pardon.

22      Q.    All right.  And did you get any input from

23  defense counsel in preparing this supplemental report?

24      A.    Defense counsel helped me find exhibits and

25  that sort of thing.  There's certainly cases where we

1   discussed documents, but they don't provide direct input
2   into the report, no.
3        Q.   Okay.  And how about Mr. Alrai, did he provide
4   any input into the report?
5        A.   No, Mr. Alrai doesn't produce -- doesn't put
6   any input into the report.
7        Q.   Okay.  And, to your knowledge, have you
8   provided the government with all the sources and the
9   documentation for your opinions in your original as well
10   as supplemental expert report?
11        A.   I think in one case you may have pointed out a
12   clerical error or a missing cite in my original report.
13   I -- if there are any errors of a clerical nature, then
14   I will happily own those and would be happy to correct
15   them.  But to the best of my knowledge, I think I've
16   supported my opinion with cites where I deemed
17   appropriate.
18        Q.   Okay.  Now, sir, are you aware that the
19   government has requested that you produce materials
20   including sources and documentation for your original
21   opinion as well as your expert opinion?
22        A.   When was that request made?  Or in general?
23        Q.   That was by email.  Let me just pull it up.
24   One second.
25             I have the email printed up in my office,

1    Mr. Sgro, but I did not bring it home with me.

2         A.   Was it a request --

3         Q.   It was earlier this summer.

4         A.   Okay.  I don't believe I'm in receipt of a

5    request to produce any additional citations.

6         Q.   But you've preserved that information and if

7    we were to request that in a reciprocal discovery, are

8    you prepared to produce that material to us?

9         A.   I have copies of all of the documentation that

10   I was provided by counsel and I can resubmit that to

11   you.

12        Q.   Okay.  And anywhere in your either original

13   report or the supplemental report, did you incorporate

14   information that was provided to you by your client?

15        A.   I don't receive information directly from the

16   client, from the defendant.

17        Q.   Okay.  How about information that counsel

18   obtained from the client?

19        A.   I don't believe so.  I -- I generally try to

20   work only with defense counsel and -- and I believe

21   that's -- that's absolutely true in this case.

22             Where they get information from, it --

23   generally when they talk to me is cited -- they cite a

24   document and we maybe together review a document, that

25   sort of thing.

1        Q.   Okay.  So to the extent -- and, more

2   specifically, this relates to your original expert

3   report.

4            To the extent that you made conclusions and

5   references to RSM's -- I mean, not RSM's, I'm sorry --

6   DigitalNet's capabilities and services in Pakistan,

7   would those records have come from defense counsel?

8        A.   So all of the documents that I analyzed as

9   part of my opinion come from defense counsel.  Where

10  they obtain them from I'm not entirely sure, but I'm

11  provided documents only by defense counsel.

12       Q.   And do you maintain copies of that

13  documentation?

14       A.   I do.

15       Q.   Okay.  And will you be able to provide that to

16  us should we ask that they be produced in reciprocal

17  discovery?

18       A.   I believe so.

19            MS. LE:  Okay.  Well, thank you very much,

20  sir, for your patience.

21            And, Mr. Eaton, I will tender the witness to

22  you, sir.

23            THE COURT:  Redirect, Mr. Eaton?

24            MR. EATON:  Thank you.  I will be brief as

25  well.

1          REDIRECT EXAMINATION

2    BY MR. EATON:

3         Q.    So I want to go back, Mr. Sgro.

4              When you were first retained by Mr. Alrai's

5    counsel in this case, what were you hired to do?

6         A.    Analyze documents and IT environments and

7    review Mr. Naviloff's opinion and documents that they

8    provided me to review in this case.

9         Q.    Okay.  So as a technical expert, when you're

10   reviewing the findings of an expert such as

11   Mr. Naviloff, how do you approach that review and

12   evaluation?

13        A.    Well, you know, I read thoroughly through his

14   opinion and how he discusses the technical environments,

15   which environments and which services he finds issue

16   with regard to either the costing or the delivery of

17   those services.  And then independently I look at the

18   documentation, presumably the same documentation that

19   he's looking at, to form my own opinion of both, you

20   know, the potential for delivery or nondelivery of those

21   services, how they were used, what those services are,

22   things of that nature.

23        Q.    Okay.  So is it -- is it important to you to

24   review information that you know that Mr. Naviloff would

25   have relied upon?

1     A.   Yeah, absolutely.  So, you know, as part of

2  my -- my charge here to assist counsel in -- in things

3  like cross-examination of an expert and certainly in

4  forming my own opinion, it's really important that

5  Mr. Naviloff and I are looking at a similar set of both

6  documents and environments.

7     Q.   Okay.  So is it also important for you to

8  review and render your own opinions on information or

9  documents that Mr. Naviloff may have chosen not to rely

10  upon?

11     A.   Yeah, absolutely.  I think the -- the decision

12  to rely on something or not rely on something, you know,

13  it requires some expertise.  And in a technical case,

14  the -- you know, that was something that I would

15  definitely like to look at.  It would certainly help me

16  understand his opinion and inform my own.

17     Q.   And then, you know, to bring this back to the

18  emails, right, the posttrial emails that you've

19  reviewed, why, if at all, would it have been important

20  for you to have those prior to trial?

21     A.   So there's a lot of things discussed in those

22  emails.  One is the existence of Mr. Ryan Gilpin, right,

23  which certainly is someone whose expertise is absolutely

24  in question and to what effect he had on Mr. Naviloff's

25  opinion.

1          They also -- we had discovered scanning of the

2     environment that was done, of an environment that I had

3     never seen, scans that I had never seen as attachments

4     to those emails.

5          There's activity there from market analysis

6     to -- to certain discussions that they are having about

7     the technical underpinnings that are revealed in that

8     discovery -- that posttrial discovery that would have

9     been valuable.

10         Q.   All right.  Excuse me.  So do you recall you

11    were asked on cross about the -- and you discussed, you

12    know, if you recall, the specificity of the DigitalNet

13    invoices; I think you were discussing Insight/OVH, the

14    hosting services.  Do you recall that?

15         A.   Yeah, I recall that.

16         Q.   Okay.  So does the lack of specificity in

17    invoices or contracts or documents such as those, does

18    that affect the accuracy of an analysis that relies on

19    contract and invoice review --

20         A.   Absolutely.

21         Q.   -- of services provided?

22         Sorry.  Go ahead.

23         A.   Sure.  Yeah.  I mean, the lack of specificity

24    is perhaps unfortunate, like we -- we don't know what --

25    what is in some of those larger buckets.

1        And so from a purely financial -- if you're

2   just reading the letter of the contract, I think you're

3   severely limited in making apples-to-apples comparisons,

4   to use Mr. Naviloff's term.  And if you looked at it

5   through a -- so in that case, you have to look at it

6   through a technical lens.  And when you look at these

7   services through a technical lens, you can -- you can

8   infer quite a bit about some of these contracts, about

9   where they line up and where they, frankly, don't line

10  up.

11       MR. EATON:  All right.  Thank you, Mr. Sgro.

12  That's all I have for you.

13       THE COURT:  Is there any recross?

14       MS. LE:  Can I ask one question?

15       THE COURT:  Of course.

16                    RECROSS-EXAMINATION

17  BY MS. LE:

18  Q.   Mr. Sgro, by infer, that means -- that's

19  another word for to guess, right?  Because you don't

20  know.

21  A.   So, yeah.  I mean, what I would say is that

22  that's part of the trouble that I think we've discussed

23  in this case quite a bit.  Mr. Naviloff makes quite a

24  few inferences in informing his opinion.

25       And in some cases, inferences I think are the

1  best we can do with the information we have and they're

2  reasonable, and in some cases those inferences are very

3  wrong.  And I think we've pointed out some of those.

4          MS. LE:  Can I ask one more question, Judge?

5          THE COURT:  Yeah.

6      Q.  Okay.  But you know that Mr. Naviloff

7  recognized the challenges because of things that neither

8  you nor he can know for sure, so he conducted a separate

9  loss calculation that's based on personal enrichment

10  that results in a higher loss amount to kind of check

11  himself.  You know that, right?

12     A.  I understand that Mr. Naviloff did two loss

13  calculations.  To what effect the second calculation is

14  is definitely beyond my technical expertise.

15         MS. LE:  Thank you, sir.  Have a nice day.

16         THE COURT:  Okay.  Thank you, sir, Mr. Sgro.

17              (Witness excused.)

18         THE COURT:  Perfect actual time to -- it's

19  almost -- we'd normally go longer before the break, but

20  I've got to attend to something over the lunch break.

21  So I think what I'm going to do is try to break from

22  noon to 12:15 -- to 1:15 today.  All right?

23         I do have one question for you, Ms. Brown.

24  It's more just purely practical, really, but I just

25  wondered what your thoughts are on it, if you have any.

1              Here's what I'm wondering.  You know, as
2  Mr. Hunter pointed out for us last time, one of the ways
3  Rule 33 works is the Court can allow you to recall
4  witnesses and present, right?
5              MS. BROWN:  Correct.
6              THE COURT:  Now, if I ordered some relief here
7  based on your motion, I -- have you already done that?
8  Have you already done that or is that something -- how
9  would it look different from what you're doing now?
10             MS. BROWN:  Well, that's a very interesting
11 question.  I did some research on that and I found a
12 lawyer -- I forgot which state, Mike might remember --
13 who had done a brief on this.  He shared the brief with
14 me.
15             I've so far found two cases in the country
16 where there's been an issue and I don't think it's ever
17 happened, at least from what we can find out.  There's a
18 case in Maryland that's a state court case that's on
19 appeal -- there's two levels, appellate levels, in
20 Maryland -- and there's another federal case that I
21 found.
22             The brief that I have found and that I agree
23 with the position is that though Rule 33 says that you
24 can do that, it's our position that that wouldn't be
25 constitutional in this case because, you know, I kind --

1    we're going -- we're like a *Kyles v. Whitley* type of

2    argument; that this would have changed the whole tenor

3    of the trial; that we not only could have made specific

4    cross-examination points, but we could have took on the

5    entire investigation, which, you know, now that we have

6    these emails to kind of track -- and you'll see more of

7    this when we cross-examine Attorney Commisso -- that we

8    have these emails that we can track with sort of a

9    partnership between the alleged victim and the

10   government and how much the alleged victim was -- was

11   working with the government, that that just kind of --

12   like just say hypothetically if you could use this

13   evidence, we feel that you can't and that's an argument

14   that we intend to make this afternoon.

15           I would also argue, too, you know, it's kind

16   of like a -- a situation where you do a discovery

17   deposition and then the person dies.  And you're like,

18   wait a minute, I would have done it differently if, you

19   know, I knew it was going to be used at trial, you know,

20   because I was -- I was doing -- had one focus of the

21   discovery deposition, I was trying to find out

22   information, and I didn't really cross-examine the

23   witness, I didn't really present the witness in the same

24   way that I would have if this were a trial --

25           THE COURT:  Right.

1          MS. BROWN:  -- you know.

2          So I think we have problems both ways.  And I

3   have a couple cases, I can give them to you later on,

4   why we think you can't do that.  But that's --

5          THE COURT:  I guess -- there's sort of two

6   questions, right?

7          MS. BROWN:  Yeah.

8          THE COURT:  You answered -- I think you

9   answered both, but the one -- you're basically saying

10  that that procedure would not be sufficient to begin

11  with here.  And I -- I'm, of course, open to hearing

12  that, but my question was suppose I did order it,

13  suppose I disagreed with you and I ordered it, right?

14  Your point, I think, of what you just said was this is

15  not the record you'd want; you'd want to re-present it

16  if I did order it.  Right?

17         MS. BROWN:  Correct.

18         THE COURT:  Okay.  Thank you.

19         Okay.  It's 12:01.  Let's do our best to

20  reconvene at 1:15, please.

21         Anything for the Court before I recess here?

22         MS. BROWN:  Just real quick, your Honor.

23         And I don't know, you'll probably have time

24  over lunch, but what we were talking about earlier about

25  the failure to preserve, it's about four pages in our

1    motion.  It's from page 22 to 25 and it sums it up much

2    better than I did earlier.  It cites a couple of the

3    cases.

4              But I just -- that's why we haven't spent as

5    much time on that, but that's where that is.  It is

6    Document 164, 22 through 25.

7              THE COURT:  Nayha and I have been talking

8    about it between ourselves during the proceeding, so I'm

9    focused on it.

10             MS. BROWN:  Okay.  Great.

11             MR. COMMISSO:  One other thing, which is John

12   Meyer is on standby.  So we need to know, do you need

13   him available at 1:15 or some other time?

14             MS. BROWN:  No.  We're going to call you at

15   1:15.  So we would need him to be on standby for the

16   rest of the afternoon, but he doesn't -- you know, if he

17   wants to, you know, put -- I guess he'll be in the --

18             THE COURT:  Sounds like -- but he shouldn't

19   have to sit in the waiting room.  I mean --

20             MR. COMMISSO:  Right.

21             THE COURT:  So I guess -- it's 1:15.  I guess

22   just tell him to start -- I think Mr. Commisso's

23   probably going to take a while.

24             MS. BROWN:  I would say at least an hour and a

25   half.

1           THE COURT:  Yeah.  So I guess you can tell

2   him, Mr. Commisso, that he can be -- you know, he can at

3   least not sweat getting called until like 3:30.

4           MR. COMMISSO:  Okay.  I will let him know.

5           THE COURT:  That's my best guess.

6           MR. COMMISSO:  Thank you.

7           THE COURT:  Until then, we're in recess.

8           MR. HUNTER:  Thank you, your Honor.

9           (Lunch recess taken at 12:02 p.m.)

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 1/7/2021        /s/  Liza W. Dubois
                           LIZA W. DUBOIS, RMR, CRR