*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MAY 26, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  1:18-cr-192-JL
            v.                  *  December 31, 2020
                                *  9:39 a.m.
IMRAN ALRAI                     *
                                *
* * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF STATUS CONFERENCE
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:          John S. Davis, AUSA
                             Matthew Hunter, AUSA
                             Cam T. Le, AUSA
                             United States Attorney's Office




For the Defendant:           Donna J. Brown, Esq.
                             Wadleigh, Starr & Peters PLLC




For the Intervenor:          John J. Commisso, Esq.
                             Commisso Law PC




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

1                       P R O C E E D I N G S

2                   (Off-the-record discussion.)

3           THE CLERK:  The Court has before it for

4    consideration this morning a status conference in criminal case

5    18-cr-192-JL, United States of America vs. Imran Alrai.

6           THE COURT:  All right.  Counsel, I wanted to call --

7    I wanted to call you together today to talk about three issues,

8    hopefully to bring some order to what I think is an

9    increasingly -- I don't want to call it chaotic, but I

10   certainly think it's an increasingly messy litigation.  It

11   was -- the litigation's always been multifaceted, even when

12   conducted in a more smooth, orderly, collegial way in its

13   earlier -- in its earlier rendition, because it always had

14   these three different parts of guilt or innocence, forfeiture,

15   and then, of course, repatriation or reclamation.  I forget the

16   word offhand right now.

17           And -- but it's gotten messy.  And maybe necessarily

18   so.  That's an observation, not a critique.  But the tenor of

19   the filings -- the number of the filings and the way they're

20   coming sort of staccato is concerning to me, but I assume

21   defense counsel thinks it's necessary because she wants to make

22   sure certain things aren't overlooked and wants them on the

23   record.

24           Some type of more orderly approach would be

25   appreciated, even if it requires calling a conference like

1    this, informing the Court of the issues, and maybe coming up

2    with a plan on filing.  But, regardless, people are entitled to

3    litigate pretty much how they want and I don't want to

4    interfere too much.

5            But aside from the number of filings and the --

6    the -- that seek similar relief and are a little bit difficult

7    for the Court to distinguish, there's the tone.  There are a

8    lot of accusations here of deliberate misconduct.  Those may be

9    necessary allegations to make from defense counsel's

10   perspective, but there's a lot of characterization of other

11   people's motives and of their conduct.

12           On the other hand, I do have to say from a

13   substantive perspective -- you know, just before we went on the

14   record here, Attorney Brown was explaining to me that some of

15   the prosecutor's filings and statements were intended to

16   dissuade or discourage the defense -- defendant from

17   aggressively litigating, zealously litigating.  You know, I

18   don't share that at this point, but, you know, that doesn't

19   mean that -- and I don't think it's certainly had any effect,

20   but I also understand that those are points defense counsel

21   thinks is necessary to make.

22           And so on one level, a -- at a substantive level,

23   the Court wishes there wasn't so much of that in the defense

24   filings.  On the other hand, the Court does have to agree with

25   the defendant that there were several written responses by the

1    prosecution, and statements in our hearings, that characterized

2    what the defendant is doing here as fishing expeditions and

3    acts of desperation when it appears to the Court that that

4    certainly isn't the case.  Whether -- whether -- it seems to be

5    undisputed now that there were constantly -- constitutionally

6    required pretrial discovery disclosures that were not made.

7    And the import of those, of course, remains -- I think remains

8    a matter of dispute.  Well, I guess we'll see how it goes.

9           But there -- there -- those characterizations and

10   arguments were made by the prosecution.  That's true.  And I

11   guess my only point of this initial point I want to make about

12   the tenor is I'd really like to eliminate that going forward.

13   I'm going to ask both sides to make an effort here and to

14   enlist the Court's assistance if I can help.  But -- but that's

15   just not the tradition of litigation in this district, in this

16   state, where many of us have practiced, both in the -- in the

17   district and the state.  It's very distressing to see this type

18   of vitriol and characterization.  Frankly, I usually see it

19   much more in civil litigation.  In civil litigation, counsel

20   are very accustomed to -- to attributing ill motives to each

21   other on adversary sides of cases.  But the criminal practice

22   has always been so much better than that, frankly.  It's, by

23   and large, very professional and very collegial.  And it

24   doesn't lack for aggression or passion or zeal, but it has --

25   it has never really been characterized by this tendency to

1    denigrate the other side's case, denigrate the other side's

2    positions, and even describe the other side's motives for

3    making arguments.  It's just not in good form.  So I'm going to

4    ask you to stop.

5            There's a component of that, I think, that Attorney

6    Brown -- she'll probably mention this in a moment, but she

7    mentioned it just before we went on the record -- that she

8    thinks it's -- it's significant for her to point that out

9    because she thinks it was possibly motivated by a desire to

10   dissuade her from litigating zealously.  I think we all agree,

11   though, it hasn't had that effect.

12           But -- but -- so to the extent you think it's

13   necessary to mention that, I understand, Attorney Brown, but

14   the way it sort of pervades every page -- let me just say this:

15   Message received, and I understand your -- I understand your

16   position on that, but I would hope that we can do better in the

17   way we treat each other as professionals.  That includes

18   adverse counsel and counsel with the Court.  I want to pledge

19   to you I'm going to do my best, but I'm going to ask for your

20   cooperation in that.  That's point one.

21           The other two points I want to talk about were sort

22   of much more mundane and mechanical, but they're kind of

23   colored by this tenor, which was, one, the time line I asked

24   you to construct and, two -- and there's been a filing on that

25   by the prosecution that explained the inability to come up with

1    a jointly filed time line; and, two, this issue of what we're

2    going to do about prosecutor testimony in this case; is it --

3    is it required and, if so, what's the best way to approach it.

4          I guess my first question is this.  I don't know how

5    much you've been communicating.  Based on the conversation

6    we -- the very brief conversation we had before we went on the

7    record, it sounds like things are not particularly agreeable at

8    the moment between counsel because there -- it might be that we

9    could -- we could resolve some of these issues, even ultimate

10   issues, by agreement.  That's not unprecedented in situations

11   involving -- you know, I had a case a few years ago,

12   the -- geez, I can't remember his name offhand all of a

13   sudden -- where it involved not -- no type of prosecutorial

14   misconduct, but alleged defendant -- alleged prosecution

15   witness misconduct in a case that was investigated in Lowell.

16   But, you know, my -- my solution was to not continue a hearing

17   where I thought people were putting themselves in professional

18   peril -- and I'm not suggesting that's the case here, by the

19   way; I want to -- I don't want to throw that specter out -- but

20   I thought some law enforcement officials might be putting

21   themselves at professional peril, suspended the proceeding, and

22   counsel were able to work out a resolution.

23          This isn't exactly like that, but I'm wondering if

24   any type of resolution is possible.  You know, the defense has

25   been clear.  Their -- for remedies -- you can correct me if I'm

1    wrong, Attorney Brown, but your -- the remedies, in order of

2    preference for you, are, A, outright dismissal; B, if a new

3    trial is ordered, a jury trial; and then, C, and your least

4    favorite remedy, one you're not seeking -- well, would only --

5    would only seek if necessary, if denied every other form of

6    relief, would be some type of reopening of the record, the

7    bench trial.

8            So I understand that those are -- that's what you're

9    seeking here.  And it's unlikely, you know, there's going to be

10   an agreement to an outright dismissal, but I'm wondering if

11   there's any way of -- that counsel are going to be able to

12   reach a resolution, if not of the ultimate issue, of some of

13   these issues going forward so that we can get this back on

14   track.

15           There's that.  There's the time line, how to get

16   that done.  It can be done and, by the way, it's going to be

17   done.  This isn't the first time counsel haven't been able to

18   agree on every aspect of a time line.  That doesn't mean that

19   when the Court asks for a time line, counsel decline or refuse

20   to do it.  You just file a time line in a way where the

21   differences are noted.  It's very possible.  But the Court does

22   not want to synthesize your time lines.  All right?  The Court

23   wants one it can rely on, at least to the extent the parties

24   agree on some issues.  And then, again, there's prosecutor

25   testimony.

1          All right.  So before we get to the specific issues

2    of time line and testimony, I guess in terms of the overall

3    issue, I'll let the prosecution go first.

4          MR. DAVIS:  Thanks, Judge.  We're -- we will take

5    all of that to heart.  I'll just say a couple things.

6          One is we -- we are under attack and this is -- it's

7    very difficult, the situation that I'm in and we're in.  It's

8    not a pleasant litigation.  But like Ms. Brown, we are big

9    lawyers and my colleagues Matt and Cam are incredibly

10   professional and patient and thorough and we will redouble our

11   efforts to remain professional and constructive as we try to

12   get through this litigation.  So it's time for New Year's

13   resolutions and I certainly make that one on behalf of myself

14   and the team.

15         The second thing I'd say is we are -- the -- from

16   our perspective, it's very important that the Court resolve

17   such issues as it can, as soon as it can.  One of the

18   difficulties that we face is that so many of the postconviction

19   motions and issues raised remain unresolved and only the Court

20   can -- can move the process to termination and in the end make

21   a call between a ball and a strike and between something that's

22   collateral and something that's material or whether it is

23   permissible under the Rules of Criminal Procedure to file a

24   motion for judgment of acquittal four months after the verdict.

25         We have -- we have filed many, many responses and we

1    are frustrated.  But, again, from my perspective, and I just

2    say this to you from my heart, the best thing that could happen

3    in my professional life is to resolve some of these questions

4    and have them resolved, however they're going to be resolved,

5    because then we -- we know whether it was a ball or a strike

6    and we can throw the next pitch or decide what to do and move

7    on.

8            But we're -- we're more than a year after this

9    conviction and we have no idea, all three of us, when this ends

10   or how it ends.  And so I -- I just say that to you honestly

11   and sincerely.

12           The last thing I want to say is more of a technical

13   matter, but that is that I think the Court said there's no

14   dispute that constitutionally required discovery was withheld

15   in this case.  And that's not accurate, your Honor.  We --

16           THE COURT:  Okay.

17           MR. DAVIS:  We don't -- we -- we do agree we made

18   discovery mistakes and have very carefully attempted to

19   document what we did and to be as forthright and candid as

20   possible about it.  But a constitutional discovery error either

21   with respect to exculpatory information, that is, information

22   suggesting the defendant actually didn't commit the crimes he

23   was convicted of, or as to impeaching information that

24   undermines the testimony of a witness, both of those kinds of

25   evidence, to make it a constitutional requirement, must be

1   material.

2          And we -- and I -- I hope no one has said or

3   conveyed the thought or confused the Court, at least from the

4   prosecution's side, that -- that we differ on this point.  We

5   are -- we continue to be -- and in the next pleading we're

6   going to file on Monday and the one we'll file after that the

7   following Monday, we are trying to carefully show over and over

8   again that none of this is material in that it does not

9   undermine confidence in the verdict in this case.  And because

10  it isn't material, it isn't constitutionally required.  And

11  because it isn't material, in our view, much of the -- the

12  agony of this litigation could be cut through and could be

13  resolved.

14          But the Court said there appears to be no dispute

15  and we appear to have conceded, and I just want to be clear on

16  that last point.  We -- we very much have not conceded that and

17  do not believe that any of what we're seeing now is material

18  *Brady* evidence.  That's all.

19          THE COURT:  I think that -- explained that way,

20  Mr. Davis, I didn't misunderstand you.  Explained that way, I

21  understood your position correctly.  I -- I do -- I certainly

22  anticipated that you viewed whatever disclosures were not made

23  or that you failed to make as not requiring the relief

24  requested -- I don't know.  But it's a little bit -- so when

25  you say you -- when you say that things that should have been

1    disclosed were not -- because that has been -- at least as far

2    as I know, that's been conceded, that they were at least

3    arguably exculpatory from the standpoint of impeachment, okay,

4    but -- but not material, right?

5               MR. DAVIS:  Correct.

6               THE COURT:  But -- how -- how is --

7               MR. DAVIS:  *Jencks*, your Honor.  But *Jencks* is not a

8    constitutional requirement.  It's a statutory -- it's a

9    statutory rule.  And at least one of the emails that were in

10   the 18 emails, we agree now, I agree, that that email which

11   bore on Mr. Meyer's testimony was suddenly within the scope of

12   what we would have considered *Jencks* and had we to do it over

13   again, we would have considered it *Jencks* and disclosed it.

14              But that's not a constitutional requirement.  That's

15   a -- that's a statutory rule.

16              THE COURT:  Yeah.  Okay.

17              MR. DAVIS:  And just to -- and I know you don't want

18   to go too far into this, but I would also say we agree that we

19   should have disclosed all 18 of those emails.  Once the Court

20   had the conference in November of 2019 and was seeking

21   assurance that we had disclosed every -- everything that

22   Mr. Naviloff considered, because seeing it now in hindsight, we

23   realized all of those emails arguably were something he

24   considered and we made some clear representations and rather

25   categorical ones.  And in light of those representations, we

1    should have turned over all 18 of the emails in -- as part of

2    our duty of candor to the Court.  But we didn't recognize it

3    because we weren't thinking about it.  We were thinking

4    about --

5              THE COURT:  Yeah.

6              MR. DAVIS:  -- the discovery database.  And the 18

7    emails we felt we had addressed and were sort of parked in

8    their other place as things -- you know, I don't want to make

9    excuses, but we just missed -- we missed the connection --

10             THE COURT:  (Nods head.)

11             MR. DAVIS:  -- that when we're now in a conference

12   with the Court and the Court's asking about everything Naviloff

13   considered, we should have seen -- I should have said, oh,

14   yeah, there are those emails.

15             Anyway, so, yes, we agree we should have disclosed

16   them.  None of them is material in the constitutional sense.

17             THE COURT:  Is that a -- but is that a determination

18   that can only be made after the fact?  I mean, that -- that's

19   sort of the -- and I -- I -- by the way, I agree with you; I

20   don't want to get too deep in this in this conversation either,

21   so I appreciate you mentioning that, but I mean -- is that a --

22   is that a determination, materiality, that, you know, we should

23   be making after the fact?  It seems to me if stuff is arguably

24   discoverable, that doesn't mean it necessarily necessitates the

25   relief requested here.  I know that.  But -- I don't know.

```
 1   I --
 2              MR. DAVIS:  So --
 3              THE COURT:  My view of expert practice is what the
 4   expert had eyes on or his staff had eyes on is discoverable
 5   unless it's not discoverable under some exception.  But the
 6   idea that whether it's material or not from hindsight is
 7   different from pretrial.  And I understand the argument that
 8   looking at it now, you don't see any evidence as requiring
 9   relief, but I don't know if that means it shouldn't have been
10   produced in discovery --
11              MR. DAVIS:  Judge --
12              THE COURT:  -- whether it's a statutory rule or
13   constitutional requirement.
14              And that's -- I -- you know, that's -- the fact
15   that -- the fact that you might argue -- the fact that you
16   could argue it's not material and, therefore, there was no
17   prejudice in other words, right --
18              MR. DAVIS:  (Nods head.)
19              THE COURT:  -- that -- that would seem to be an
20   argument you -- that people make all the time in these
21   situations, but that's not the measure of whether something
22   should have been produced in the first place.
23              I guess the word constitutionally required --
24              MR. DAVIS:  Yes.
25              THE COURT:  Yeah.  But I don't know.  I don't know.
```

1    You're probably not going to want to hear this, but

2   I have a pretty expansive view of what *Brady*, *Giglio*, and

3   *Jencks* all require.  I'm not a fan of this kind of post hoc

4   parsing.  We've got to have confidence in the process.  I know

5   it's complicated and I know mistakes happen, but the idea that

6   something wasn't required because after the fact we can decide

7   that perhaps it wouldn't have changed the result is a little

8   difficult for the Court.

9    All right.  Go ahead, Attorney Brown.

10    MS. BROWN:  Thank you, your Honor.

11    I want to, you know, start off with some areas where

12   I think we can agree, and the Court's offer for guidance for

13   future litigation is welcome.

14    I do agree there -- I think the Court's word was

15   some messiness as to the litigation and I think there is some

16   opportunity to have some direction on that.  I do want to

17   address that issue.

18    To the extent that occurred, there are a lot of

19   reasons that were outside the control of present counsel.  We

20   didn't even come in the case in the middle of the case.  We

21   came in the case, you know, like in the fourth quarter.  And I

22   think what contributed to the messiness was -- my recollection

23   at least was that the government would agree to a very limited

24   extension of the then-existing deadlines and court dates, but

25   not much more than that.  I think the original date after we

1   came in the case was in July.  At best, that would have been
2   90 days to prepare for a sentencing with what they have
3   repeatedly said is a mega-gigabyte case.
4           And so that -- that is what it was, you know.  But
5   it put us on the defensive right away of having to prepare, of
6   having a very short leash in terms of getting prepared and
7   getting up to speed.  So we were immediately presented with a
8   situation of just start filing these motions because, you know,
9   if we don't, the issues may have been deemed to be waived or --
10  or not.  And, you know, I say thank goodness we did, because
11  this exculpatory evidence would not have been discovered but
12  for that.  The evidence that the government is giving now is
13  all derivative of your order in August of evidence that they
14  fought to disclose.
15          The other part of what's made it messy and it keeps
16  getting messy is that this -- and I don't want to say drip, but
17  this constant new discovery.  We got a -- we got new discovery
18  yesterday.  I haven't even gone through it all yet.  And I
19  understand what the government's trying to do.  Now they're
20  trying to overcorrect and, you know, err on the side of giving
21  us every single thing that could conceivably be covered by your
22  order, but we wish they had done that -- we wish they had done
23  that pretrial, but we definitely wish they had done it back in
24  August.  So that's what's, I think, contributing to that.
25          I know the government would respond to that, that it

1    takes a lot of time to get these materials.  I don't know that

2    that's necessarily the case about the materials yesterday,

3    because they came -- they appear to have come from RSM.  But,

4    anyway, that -- that's contributed to that.  So I agree with

5    that.

6            Again, I think the issue of tenor -- two things I

7    want to say about that.  One, what I said before is when we

8    came into the case, either beginning of April -- I don't have

9    the appearance date, but I -- I don't think -- my recollection

10   is we got the discovery from predecessor counsel second week of

11   April is my recollection.

12           But, again, when we came into this case, we were

13   immediately faced with, you know, we're going to have the

14   sentencing hearing as soon as possible; we'll give you a little

15   bit of time to prepare.  And so we were, you know -- we were

16   hitting the ground running.  That -- you know, talk about

17   things that are unusual.  That was very unusual for me.  I've

18   come into a lot of cases after original counsel was either let

19   go or defendant wanted new counsel or they fired the

20   previous -- I've had a lot of cases where I've come into that

21   and I've usually not had a problem with opposing counsel

22   saying, well, you take -- you know, you take what time you need

23   to get up to speed.

24           That was not the message I was getting.  Yes, there

25   was a brief -- very brief continuance of the then-existing

1   dates, but -- but not much more than that, and not that we

2   felt -- especially once we -- we learned that many of the exact

3   same issues that were litigated at trial were going to need to

4   be litigated again at sentencing because they very closely

5   impacted what the guideline range was going to be.  And, you

6   know, what the -- the loss calculations, that was going to be

7   huge.

8           So that led -- and so that was just a series of

9   things that led us into a deep dive as to the loss calculations

10  and led us to the messy litigation we have today.

11          The other thing I want to say on the tenor, and kind

12  of two things, and why we're recorded today, too, I don't think

13  we have -- I think it's been ordered, but I don't think we have

14  yet as of this date the transcript of the third day of the

15  evidentiary hearing, which I believe was December 7th.  And

16  that was the hearing of which I think you referenced a little

17  bit before as to hearing testimony from the government counsel.

18          And in that case, I think there was some testimony

19  from Attorney Davis and I think Attorney Hunter made some

20  representations about the network scan and when they got it and

21  when it was turned over and when they learned about it.  And

22  then, of course, the record will reflect.

23          My recollection of that hearing, without that

24  transcript, was when your Honor asked Attorney Davis about the

25  invoice that -- you know, one of the -- one of our arguments

1    is, well, maybe they didn't have physical possession of some of

2    these emails, but they definitely had physical possession of

3    this invoice that showed a lot of other people spent a lot more

4    time than their expert on this case and why didn't they turn

5    that over.

6            My recollection of Attorney Davis's testimony on

7    that -- and I actually have this visual image of him looking at

8    his computer as if he was doing a search at the time through

9    his emails and that he said something to the effect of I'm --

10   you know, I'm not even sure I got it.  And -- suggesting

11   that -- you know, at least I took from this what he was saying,

12   and maybe I shouldn't, but what I took from that was, hey, this

13   could have just gone to some administrative person and I didn't

14   even see it.

15           And that's why the tenor is important, because

16   that -- at least if I were in your shoes, whether he --

17   Attorney Davis actually saw it and made a conscious decision

18   not to disclose that information or it was some sort of

19   administrative error goes to the remedy.  I would -- I think

20   the case law that we've presented is that if this was a more

21   conscious, deliberate decision to not turn this over, then that

22   would make a better case for a motion to dismiss.

23           So this all happens at the hearing.  After the

24   hearing, we get this affidavit from Attorney Davis and -- and

25   after this hearing your Honor also orders time lines from --

1   from the parties.  So when we get the first draft of the

2   government --

3            THE COURT:  I know, I know.  A time line.  I do it

4   all the time.

5            MS. BROWN:  Right.

6            THE COURT:  All right.  Not a -- a time --

7            MS. BROWN:  Did I say something different, your

8   Honor?

9            THE COURT:  You said time lines.

10           MS. BROWN:  Oh, okay.  I'm sorry.  Time line.

11           THE COURT:  That's very important.  Go ahead.

12           MS. BROWN:  You are right.  I misspoke.  Thank you.

13           THE COURT:  No big deal.

14           MS. BROWN:  The parties agree on a time line.  I

15   think I'm just sort of looking back at it because obviously

16   there have been multiple time lines now.

17           Attorney -- in his first drafts of a time line, one

18   of the entries was that Attorney Davis said he received an

19   email with the RSM invoice on October 11th, 2018, which would,

20   from our position, be very helpful to our case that it went to

21   his inbox and not to some, you know, administrative assistant's

22   inbox and what happened with that.

23           And so I sent a responsive email to Attorney Davis,

24   saying, well, if you're going to rely on the fact that you have

25   this email, you should give us this email.  And we have other

1   emails from the government that they've turned over, so they're

2   certainly not using work product, at least to some other

3   emails.

4           So I made what I thought was a very narrow,

5   specific -- document-specific request of saying, you made this

6   representation in court that at least suggested that you might

7   not have even seen this and now you're saying that it -- you

8   found something that said you personally received it.  I want a

9   copy of that specific document.

10          And as I recall Attorney Davis's response, he said,

11  oh, well, we'll just take that out of our time line.  And I'm

12  like, no, you can't take it out of your time line; it's

13  relevant; it's relevant to us.

14          And that's where I think things really broke down,

15  because we did not feel this was a good faith attempt for them

16  to say, here's everything that is relevant, especially things

17  that are relevant to remedy.

18          And that's one of the -- and I think that is

19  responsible for the tenor, your Honor, because, as you

20  acknowledge, there have been these, you know, dismissive -- you

21  know, this is -- I think they used the word dumbfounded at our

22  pleadings, wasting -- you know, just generally suggesting that

23  we were wasting the Court's time on fishing expeditions.  And

24  they may not admit to a *Brady* violation, but they've got to

25  admit those statements were not true.

1          This was not a fishing expedition.  This led to

2    evidence that is arguably *Brady* material.  That's why we're all

3    still here.  And combine that with the fact that when we were

4    trying to get very particular documents -- I know they've

5    accused us before of a fishing expedition, but we asked for two

6    specific documents for -- that they were referencing, one of

7    them referenced repeatedly, and they -- they said no.  And --

8    and, to us, that is just further signs of not wanting to share

9    information that is helpful to the defendant.

10          Obviously the Court knows there's a protective

11   order.  And the two -- I mean, right now the two documents that

12   we are looking at are a grand jury subpoena to Attorney

13   Commisso and they -- and that's why we put that in there.

14   There's lots of other grand jury subpoenas they turned over.

15   So saying, like, you know, they're protecting the sanctity of

16   the grand jury, that doesn't really wash with us when they --

17   they could give us that one document.

18          The other very specific request was the email that

19   that billing record that's very key to our litigation was

20   attached to.

21          And so, unfortunately, your Honor, the tenor issue

22   is linked to a history that we believe continues to this day of

23   not wanting to -- you know, it's like pulling teeth; it really

24   is pulling teeth to get the information that we need to

25   litigate this case.  And they continue to fight us on that.

1          That swings around back to what the Court said

2    earlier about guidance of future litigation.  As I said, I

3    think part of why this is messy is we came into it, you know,

4    weeks, if not maybe 60 or 90 days, before a sentencing hearing.

5    We had to go through a complex, extremely voluminous,

6    technological case and we've always been -- always been doing

7    catch-up.  And we have been trying to do that and I think

8    that's what's made it messy.

9          In retrospect, you know, I think it probably would

10   have been wise to take a timeout, give us six months to get up

11   to speed on the case, read what we needed to read, and get

12   prepared for the case.  It's been six months anyway.  It

13   probably would have been better to have it be organized.  But

14   we didn't know that.  We were coming into the case cold in

15   April of --

16         THE COURT:  And, look, it seems -- that's maybe a

17   good idea.  I really can't disagree with that.  But I have to

18   say this.

19         You've got to remember, Mr. -- Mr. Alrai terminated

20   his first counsel and then his second counsel basically

21   terminated him, I guess is the way I would put it.  But, I

22   mean, it isn't as if -- you know, it isn't as -- because a

23   six-month cool-down period, I doubt, without the Court's

24   involvement, you would have obtained all the information you

25   have at this point.  And it seems like we would have wound up

1    kicking that can down the road six months and all the things

2    we're doing now would have just been done six months later.  I

3    might be wrong about that, I know, but it seems likely to me.

4              Anyway, anything else you want to say about tenor

5    before I get to time line?

6              MS. BROWN:  I -- related to tenor -- and you used

7    the word communication, and I do want to address that because I

8    think I know what you were -- where you were going at on that.

9    And I think it also goes to our request for recording today.

10             THE COURT:  Sure.

11             MS. BROWN:  When I was putting together a time line

12   and putting it together with -- really scrutinizing the

13   affidavit that we received after the hearing and then going

14   back and looking at some of the emails that we had with the

15   government this summer -- and some of them are attached to our

16   time line; we reference them in our time line.  I'm not going

17   to go into them now.  But it is relevant to communication.

18             And when I was looking at Attorney Davis's

19   affidavit, it occurred to me that in going back and looking,

20   they chose their words extremely carefully last summer.  And I

21   took meaning from their word choice that was probably -- I

22   shouldn't have taken, but they were -- they weren't overly

23   candid, let's just say that, as to information about the case.

24   And I thought things existed or things didn't exist that did

25   exist and I -- and I know now that -- that the language that

1  they chose, while technically true, didn't -- you know,

2  didn't -- led us not to follow certain paths that we should

3  have followed because we -- I wasn't aware that they were

4  choosing their words very carefully as to production.

5       So I say that because I think I would not be

6  representing my client fairly if I didn't insist on everything

7  being in writing at this point.  I do -- I look back and I see

8  that there were some phone calls there and then after the phone

9  call I would say back to the prosecutors, hey, here's my

10  understanding of the phone call.  But, yes, it's my

11  understanding of the phone call.  There's no recording of it.

12       There's some -- and that's litigation.  That's

13  adversarialness that, you know, parties will choose their words

14  carefully because they don't want to give certain information.

15  But if that is going to be the way it's going to be, then I

16  just think that it's better for my client to have

17  communications by emails or writing.  And maybe that's

18  responsible for some of the tenor, but I just think that based

19  on the history of this case, that is probably the best way to

20  go.

21       THE COURT:  Okay.  Yeah, like I said, if people

22  think we're sort of past the point where we can do things

23  verbally or even ever off the record, then we're past that

24  point.

25       Okay.  Let me address time line then, because I

1    think -- I'm so accustomed to ordering time lines in, like,

2    similar situations in civil litigation, like in preliminary

3    injunctions or TROs, they're just sort of ways to marshal what

4    people agree on as to a chain of events.  They're very helpful

5    to the Court.  I'm very used to -- I didn't probably describe

6    it enough, okay, to counsel.

7            Because all I was looking for -- and counsel are

8    free to expand on this as much as they want, but what I'm

9    looking for at the minimum is -- what we're talking about in a

10   discovery time line is a line that sets forth the date

11   discovery productions were made and what was included in them

12   in a general sense and a date that discovery requests were made

13   and the date discovery orders were made, like those things.

14           Now, you might want to add to a time line

15   communications you had about discovery, whether they be emails

16   to each other or letters or even discussions, right?  They're

17   not -- they're not a vehicle for advocacy where, you know,

18   here's the point at which defense counsel neglected to do this,

19   or here's where the point that this production was -- this

20   production was insufficient.  That's not really what it's for.

21   You're free to argue those things and if there's two ways of

22   handling it, you just present evidence on it when we reach the

23   proceeding or you include on the time line -- you know, you put

24   a little different color or something or a put a little

25   different notation that says, this isn't agreed to, but our

1    position is this.

2           But there's no reason there can't be a joint time

3    line where probably 95 percent of it are just incontrovertible

4    events that took place on certain days.  Requests -- I do think

5    I said this -- discovery requests, discovery productions, and

6    discovery orders.  I -- I'd like to have that time line.  Okay?

7    I don't want to synthesize your doing time lines.  We'll come

8    up with a date that I want them by today.

9           But I do expect you to be able to work together to

10   do that even when you disagree about a lot of details.  Right?

11   Details that you disagree about can be included on the time

12   line and noted that way or you can present a separate filing of

13   those events that you want me to note or that you want to

14   prove.  But they're not a place for spin; they're not a place

15   for characterization; they're not a place for advocacy.

16          Now, look, Mr. Davis.  I sympathize that, you know,

17   you want to get on with this, but I don't see how we

18   short-circuit this *Brady* problem.  I just don't see how we do

19   it.

20          I know there are some posttrial motions out there.

21   There's the Rule 33, the Rule 29, that -- I'll be honest, I'll

22   be up front about it, I haven't ruled yet.  I have an open

23   mind.  We have hearings requested and we're going to hold them.

24   But they do appear to me to probably be untimely.  That's true.

25   But this motion isn't untimely, unless I'm misunderstanding

1    something, and the record continues to evolve and not in a way

2    that I consider to be undue or inappropriate.

3            So I don't know how to move this any faster and pay

4    attention to all the other cases we've got to do around here.

5    All right?  It's -- so I apologize for taking too long, but,

6    believe me, not my intention, because I don't want to be

7    dealing with a case forever any more than you do.

8            I will say this about -- just one proviso, though.

9    I don't fault the prosecution here or I don't want to penalize

10   them for continuing to produce things, whether it's like an

11   overcorrection or just an effort to be as forthcoming as -- as

12   possible at this point.  I don't -- I don't fault that at all.

13   I do think that's an effort to just make sure we don't have

14   continued problems.  And it might have a tendency to -- it

15   might have a tendency to string things out a bit.

16           On the other hand, you know, Ms. Brown, I mean, when

17   you -- when you say to me, well, we're just getting transcripts

18   of some of the discovery hearings -- I guess pretrial you're

19   referring to?

20           MS. BROWN:  (Nods head.)

21           THE COURT:  I mean, I would have thought you'd asked

22   for that many months ago and received it.  And that's kind

23   of -- frankly, that's sort of the information I figured would

24   be on the time line; that maybe -- because you'd be surprised.

25   Information doesn't always bleed through to the Court that

1    counsel knows very well or, apparently in this case, didn't

2    know very well.

3              But I'm not surprised that there might be some

4    statements made by counsel, both sides, or the Court, during

5    those hearings that are interesting to you now at all.

6    That's -- that's not surprising at all.  I just -- it is

7    surprising you're only getting your hands on them now.  Not a

8    criticism, just an observation.  I guess I'm going to see it

9    eventually here.

10             Okay.  So do people understand about the time line

11   or do you have questions about what should be on it?

12             I'll start with defense counsel.  Do you have

13   questions about what should be on the joint time line that you

14   are being ordered to file?

15             MS. BROWN:  Yes, your Honor, one -- one issue.

16             You know, obviously the point of a time line is were

17   requests made, what were the requests, how were they responded

18   to, and what was the timing of that.  And, obviously, some of

19   that is in the time lines that are before the Court right now.

20             One thing that I think we had some disagreement with

21   the government over that we think is a very important issue as

22   to timing and defense demands for discovery is representations

23   about discovery, whether -- you know, if the defendant says, I

24   want X, and the government responds, you've got X and you've

25   got everything related to X, that's relevant as to whether the

```
1    defendant abandons further efforts to get X.

2              THE COURT:  Yes.  It's -- to me --

3              MS. BROWN:  So that, we think --

4              THE COURT:  To me, it's irrelevant.

5              MS. BROWN:  Yeah.  So -- and I think those are

6    things that we want to include there.  They're things that

7    there can be no disagreement about because they either come in

8    a motion or they either come in a transcript or in some sort of

9    writing.  So they're things that aren't -- you know, you don't

10   have to recreate conversations or anything like that or case

11   law; that that -- we believe that that -- those things, the

12   government's representation about what the defendant had or

13   didn't have or, you know, what the source of things are, that

14   should be included.

15             So, in addition -- so I -- so I have the Court

16   saying is demand --

17             THE COURT:  Communication -- let me just cut through

18   it.

19             Yes, communications --

20             MS. BROWN:  Okay.

21             THE COURT:  -- communications about -- about

22   requests, productions, and orders is fine.

23             MS. BROWN:  Okay.

24             THE COURT:  Yup.

25             Okay.  Good.  So when do you want to file that?
```

1          MS. BROWN:  I have a pleading due to the First

2   Circuit Court of Appeals on Monday, so if I could -- if we

3   could have some time after that, at least a week.

4          I'm sure, like last time, the government's going to

5   take the first stab at it and send it to me and then we can go

6   from there.  So I don't know if we want to set a time line for

7   the government to make a draft to send to me and then I have

8   certain time to respond to them.  I don't know if that makes

9   sense or --

10         THE COURT:  You can work that out between

11  yourselves.

12         MS. BROWN:  Okay.

13         THE COURT:  But, look, you both have a lot of raw

14  material to work with.  You've both got a time line going,

15  right?

16         MS. BROWN:  Correct.

17         THE COURT:  Okay.  Speaking of the First Circuit, by

18  the way, this will give you a chance to talk about this issue

19  for a minute.

20         I'm sitting on the First Circuit as a substitute

21  judge Tuesday and I was supposed to have a 10:30 call about

22  that.  I just need a very brief recess so I can contact them

23  and tell them that I'm not showing up, I'm going to continue

24  with this.  Okay?

25         So very brief recess.  But I want to leave it out --

1    I'm going to mute out, go to a different room, make my call.

2    But if you guys want to talk about a time -- a date for that

3    time line, please do.  If you need to move other dates that you

4    have things due -- prosecutors, if you need to move those dates

5    to fit with this time line for some reason, you've got leave to

6    do that.

7              I'll be right back.

8          (Recess taken from 10:34 a.m. until 10:41 a.m.)

9              THE COURT:  Okay.  I'm sorry about that, everybody,

10   but I bought some time on that.

11             Yeah.  Okay.  A couple things.

12             Did you decide on a deadline for the time line?

13             MS. BROWN:  We did, your Honor.  We are -- we're

14   going to -- we've actually talked about more than one deadline

15   because they're somewhat related.

16             So the time line for the joint time line would be a

17   week from Monday, which would be the 11th.

18             THE COURT:  Okay.

19             MS. BROWN:  And just so -- we discussed what we

20   should do to the extent we have disputes and what my

21   understanding is from Attorney Davis, instead of having dueling

22   deadlines, have an extra column.  To the extent there's

23   disputes, we can note from there.

24             THE COURT:  Yeah.

25             MS. BROWN:  Okay.  That way the Court only has to

1   deal with one document.  So --

2           THE COURT:  That's -- yeah, that's -- that's what's

3   happening.  Okay.

4           MS. BROWN:  Okay.

5           THE COURT:  And that's a great idea.

6           You know, in terms of the formatting, look, there --

7   both of your formats are useful to me.  I think the

8   government's might be a little better, so if you're looking for

9   a base document that you want to supplement, I'd suggest that

10  one.  But, frankly, Donna, yours is fine, too.

11          So -- and like in a -- that event column, though, is

12  a helpful thing to have and I think that's on the prosecution

13  version.  So --

14          MS. BROWN:  I know this is hypertechnical, but if

15  we're adding another column, does it matter to you if it's in

16  portrait or landscape?

17          THE COURT:  (Shakes head.)

18          MS. BROWN:  Okay.  Sometimes when you get so many

19  columns, it's hard to keep it in a portrait --

20          THE COURT:  I get it.  Yeah.

21          MS. BROWN:  Yeah.

22          THE COURT:  No, landscape is fine.

23          MS. BROWN:  The other deadline that we discussed is

24  that -- so the parties could work toward the time line by the

25  11th, moving back the government's responsive time line to the

1    pending motions one week after that -- or a week and a day

2    because a week after that would be a holiday.  So it would be

3    the 19th that they would file their responsive pleadings.

4                THE COURT:  Okay.  The 19th is a responsive pleading

5    to what, your -- to what?

6                MS. BROWN:  To our motions regarding --

7                THE COURT:  Oh.

8                MS. BROWN:  I call them collectively the posthearing

9    motions.

10               THE COURT:  Yeah.  Okay.

11               MS. BROWN:  Because the motion --

12               MR. DAVIS:  It's our understanding that deadline is

13   for the motion for immediate dismissal --

14               THE COURT:  Yeah.

15               MS. BROWN:  Correct.

16               MR. DAVIS:  -- which is a new motion.  The defense

17   filed that Monday night.  So we would -- we would respond to

18   the motion for immediate dismissal on the 19th of January.

19               THE COURT:  Okay.

20               MR. DAVIS:  And we'll still respond to the remedy

21   pleading and the supplemental memo, both of which were also

22   filed with the motion for immediate dismissal, but we'll

23   respond to those on January 4th, on Monday.

24               MS. BROWN:  Okay.

25               THE COURT:  Okay.  I guess --

```
1              MS. BROWN:  And one other issue.

2              THE COURT:  I guess I was hoping to consolidate some

3    of this, but it sounds like it's not happening.  Okay.

4              Go ahead, Donna.

5              MS. BROWN:  And one other --

6              MR. DAVIS:  Your Honor, can I just say we are

7    consolidating our response.  There were two different pleadings

8    totaling 50 pages.

9              THE COURT:  I know.

10             MR. DAVIS:  One is the remedy pleading that was

11   filed and the second is the supplemental memo.  We're going to

12   file one response and not two to those pleadings.

13             THE COURT:  Okay.

14             MR. DAVIS:  But the motion for immediate dismissal

15   is a whole new motion, so ...

16             THE COURT:  Okay.

17             Donna, did I interrupt you?

18             MS. BROWN:  Yeah.  I was just saying since we're

19   trying to clean things up a little bit, one other potential

20   motion, and this is probably more than potential, as you know,

21   we've -- we -- since November 7th, we've gone back and forth on

22   some demand for very specific documents that we think are

23   important.  I mean, there's some documents that are important

24   to, like, sentencing or -- but there are some documents that

25   are very important to this litigation.
```

1          And what our plan was was to send a very specific

2   demand letter to the government next week saying, based on

3   information we've received since the conclusion of the hearing,

4   here's some other documents that we're requesting, get their

5   position on those, and if we can't come to an agreement, then

6   have a date for us to file a supplemental pleading.

7          And the supplemental pleading wouldn't be rehashing

8   all the previous discovery because there are obviously motions

9   on that, but the supplemental pleading would be for very

10  specific documents that we think are related to the litigation

11  that's going on right now.

12         So we would like to set a deadline for making that

13  request so we can make that demand next week and, you know,

14  hopefully maybe we work something out.  And if we don't, I

15  think we should set a -- a deadline.

16         THE COURT:  Set a deadline for you to file that

17  motion?

18         MS. BROWN:  Yes.

19         THE COURT:  All right.  So you want me to impose a

20  deadline on you.  All right.

21         MS. BROWN:  Well, I -- I'm just trying to -- yeah.

22  I'm just trying to let the Court know what's coming.

23         THE COURT:  That's fine.  That's fine.  Okay.

24         Now, the other issue is this -- so I'm done with the

25  time line.  I'm moving on.

1          The other issue is this issue of -- in your last,

2    you know, fleet of filings, it was -- I can't remember which

3    one it was in, but there was some -- you were talking about how

4    the case has been further complicated and there's been -- one

5    of the ways you mentioned was the Court questioning, I think it

6    was Mr. Davis and it might have been Mr. Hunter, on some

7    things.

8          I mean, you know, my practice is usually to let

9    lawyers talk to me in court and to take their -- I figure

10   anything a lawyer says to me in court is as good as testimony.

11   It's not my practice to swear them in.  Doesn't mean it's --

12   although, Mr. Davis, you know, now that we have an affidavit,

13   which is a statement under oath -- I usually figure I owe that

14   dignity and that respect to counsel and I -- but I hold them

15   accountable for what they say to me in court, on both sides.

16         It sounds like that's not satisfactory to you,

17   Attorney Brown, and tell me what you want to do.

18         MS. BROWN:  Yeah.  And to the extent that whenever I

19   wrote that motion -- it was a week ago or ten days ago,

20   whenever it was -- it's got -- it's gotten more complicated.

21         As I said, we got transcripts from the pretrial

22   hearings.  I might have got them Monday or Tuesday, I don't

23   think I got around to reading them until yesterday, and there's

24   further things that are just not consistent with the facts or

25   what we learned.  And, again, as I've said, it's -- it's

1    relevant to the remedy issue of representations.

2            But attorneys for the government very clearly said

3    to you, and you actually repeated it back to them:  So as I

4    understand, defense counsel has everything that RSM looked at,

5    reviewed.  And they said yes.  And that wasn't true.

6            THE COURT:  That wasn't true -- that was pretrial?

7            MS. BROWN:  Yes.

8            THE COURT:  That would be my approach normally,

9    yeah.  And I guess you're telling me that that's what you did.

10            MS. BROWN:  Oh, yeah.  It's not that you did

11   anything wrong at all.  That's not what my point is.  My point

12   is that now we've got more misstatements.

13            And, you know, giving the government the benefit of

14   the doubt, at best, these government -- these statements are

15   reckless because they had documents in their possession that

16   were counter to what they said in court.

17            And so -- so you'll see this in the time line, where

18   they -- just a couple of days before they come in to talk to

19   you about the status of discovery, they make representations

20   that counsel for Mr. Alrai is going to get everything that

21   Naviloff reviewed and -- and they've just -- you know, and

22   they've just had conversations with Naviloff within the last

23   week or so that they know that's not true.

24            So, as I said, it's --

25            THE COURT:  So here's my usual thought about that.

38

1          MS. BROWN:  Yeah.

2          THE COURT:  My usual thought about that is,

3  you know, you've got -- you've found some statements in the

4  record made by counsel.  You're going to present those to me.

5  To me, those are statements of officers of the court.  I

6  realize those statements aren't always accurate.  Sometimes

7  people are mistaken.  Sometimes people lie to me.  It happens

8  sometimes.  I'm not suggesting any of that happened here, but

9  they're statements to me, and you're going to bring them to my

10  attention.

11          My normal way of looking at that would be, okay,

12  if -- if counsel want to correct that record in some way,

13  they'll do it.  Otherwise, I would decide the issues before me

14  based on what they represented all along.

15          If they filed -- but if they want to -- if they want

16  to testify about things, you'd normally have a right to

17  cross-examine them and -- or at least question them in some

18  type of normal discovery-type mode.  You know, we'd do

19  something about it, you know.  There's been situations I've had

20  occasionally where somebody sat for a deposition or something

21  based on something -- they didn't want to do it in court, they

22  wanted to present you with a record.

23          But that's how I would normally proceed.  If

24  their -- but, I mean, you know, I take their statements to me

25  that you're going to present to me as like testimony.

1      So what is it you want to do, I guess is my

2  question, if you know.

3      MS. BROWN:  As I said, it's more complicated than it

4  was a week ago.  I have not -- my cocounsel's on vacation this

5  week.  I haven't even had a chance to discuss that with him

6  yet.

7      I -- I think before we get to the next step, I think

8  discovery is first.  And I think that in the demand letter that

9  I send to the government next week will be requests for emails

10  regarding -- to further fill in the gap here of what -- what

11  was said and when it was said and what information they had

12  available when they said it.  And a lot of this is based on two

13  documents we got in the last 30 days, which is the affidavit of

14  Attorney Davis and the transcripts.

15      And just briefly on that, when I first got the case

16  and was looking for transcripts, the notation on the docket

17  report said it was a -- a conference.  So, you know, I assumed

18  it wasn't -- it wasn't transcribed, but I was wrong about that

19  and -- but here we are.  So it's very -- I think it's very

20  important now and I'm glad that it was transcribed.

21      But that's where I see the next step.  And if I get

22  the discovery that I need, I may not need to have a hearing

23  with --

24      THE COURT:  Okay.

25      MS. BROWN:  -- them testifying.  I may, you know --

1   and I think you even said this at the hearing, your Honor,

2   that, you know, people's memory -- you know, people's memories

3   aren't always accurate and getting the documents is going to

4   get us to what was said and when it was said and what

5   information was available when it was said.  That might be more

6   productive.

7          And so that's where I want to start with that before

8   I make a call as to whether we have to have another hearing --

9          THE COURT:  Okay.

10          MS. BROWN:  -- where Attorney Davis testifies and

11   Attorney Hunter testifies.  And I think before we get there, I

12   think some additional discovery needs to be done.  And I'll

13   start there where it needs to be started, which is me sending a

14   letter to the government.

15          THE COURT:  So you -- the bottom line at this point

16   is you're not yet requesting testimony from counsel and you're

17   going to make that decision at some point.

18          MS. BROWN:  Correct.  And even if I was going to

19   have that hearing, I'd want to have discovery to prepare for

20   it.  So, either way, but at this point I want to conduct the

21   discovery and see if it's necessary.

22          THE COURT:  Okay.  I'm -- look, I'm not guaranteeing

23   to you I'm going to permit that even if you ask for it, but

24   I'll have an open mind about it.  I just wanted to know what

25   you wanted now and your point right now is you're not quite

 1  sure yet.

 2          MS. BROWN:  Correct.

 3          THE COURT:  Okay.

 4          Prosecution side, anything -- you know, I've been

 5  listening to defense counsel for a while on this issue.  Is

 6  there anything you want to say about it or add to it?  I'm

 7  listening.

 8          MS. LE:  Your Honor, can I address a housekeeping

 9  issue?

10          THE COURT:  You can address -- does it have to do

11  with this testimony issue?

12          MS. LE:  No, your Honor, it does not.

13          THE COURT:  We'll address it after we get through

14  what I'm doing now.

15          MS. LE:  Sure.

16          THE COURT:  Anything anybody wants to say about what

17  Attorney Brown just said about she -- that she's not in a

18  position yet to know if she wants to require any kind of

19  testimony?  Is there anything you want me to have in mind in

20  the meantime until that gets --

21          MR. DAVIS:  No, your Honor.

22          THE COURT:  Okay.  Go ahead, Ms. Le.

23          MS. LE:  Your Honor -- and I think this might be an

24  overcorrection on Ms. Brown's part because there was a period

25  where certain documents were filed in a record that needed to

1   be filed under seal pursuant to the protective order.

2           But I've noticed that counsel's pleadings have been

3   filed under seal.  And in the interests of public access, I

4   don't think all those filings need to be filed under seal.

5   Only the underlying documents that are protected by the court's

6   protective order need to be filed under seal.

7           So it's just an issue of public access --

8           THE COURT:  Yeah.

9           MS. LE:  -- that we need to make sure that when it's

10  appropriate, that pleadings be filed under seal.  I don't think

11  all of Ms. Brown's motions need to be filed under seal.  Only

12  certain exhibits should be filed under seal.

13          I mean, this is a public proceeding.  There are

14  certainly serious allegations against the government.  The

15  government will be responding to those allegations in a public

16  filing and I think Ms. Brown and her client should have those

17  pleadings and their allegations in the public record as well,

18  your Honor.

19          THE COURT:  I do, too.

20          MS. LE:  I don't know how the Court would address

21  that.

22          MS. BROWN:  We don't have any dispute with that at

23  all.

24          THE COURT:  Yeah.

25          MS. BROWN:  We were just erring on the side of --

```
1                    THE COURT:  Attorney Brown, wait.

2                    I thought that she was doing that to protect

3     Mr. Commisso's interests.  Not his personal interests, but his

4     client's interests.

5                    MS. BROWN:  Right.

6                    THE COURT:  I thought she was doing that in

7     accommodation to you.

8                    MS. LE:  No, your Honor.

9                    THE COURT:  Well, actually, yes.  You didn't

10    understand it that way, but that's why she was doing it.

11                   MS. BROWN:  Right.

12                   THE COURT:  And did you object to any of these

13    motions to seal?

14                   MS. LE:  Were we asked -- I don't know.

15                   Mr. Davis, Mr. Hunter, do you remember if we were --

16    do you have the answer?

17                   THE COURT:  Maybe I overlooked it.  I usually don't

18    grant unassented-to motions like without carefully scrutinizing

19    them, but when they're assented to, I tend to just kind of scan

20    them and make sure everything's in order.  If I've been

21    overdoing it on the sealing, I don't want to do that either.

22                   So have you been seeking assent, Ms. Brown, when you

23    file motions to seal?

24                   MS. BROWN:  We did.  I know in the last group,

25    because of -- we were right up against a time line, I think we
```

1   asked for the assent afterwards and we got it.  But we have

2   been erring on the side of caution of sealing things because of

3   what you just said.

4          If Attorney Le wants to identify documents that she

5   thinks shouldn't be sealed, we can file a joint pleading saying

6   they should be unsealed.  We're in total agreement with that.

7          THE COURT:  Yeah.  Absolutely.  Anybody who wants to

8   correct or shrink what's been sealed -- by the way, Ms. Le's

9   right.  It shouldn't be everything.

10          MS. BROWN:  Absolutely.

11          THE COURT:  It should only be certain -- I think

12   only certain documents and exhibits to protect the victim here.

13   That's -- that's the key.

14          Anything other than that, though, file whatever you

15   want to file and I'll grant it.  Sure.

16          It's a good point, Ms. Le.  I think it's just

17   that -- I don't think she's doing it for any reason except

18   observing the Court's prior orders about confidentiality.

19          MS. LE:  Right, and I understand that as an

20   overcorrection.  I appreciate it.  But I don't -- I don't think

21   we get advanced notice of what is being filed.  We get the

22   information kind of in tandem with the court staff.

23          So I just wanted to bring it out to Ms. Brown that

24   it's not -- it has never been our position that anything that

25   makes mention of documents that are under seal have to be filed

```
 1    under seal.
 2              THE COURT:  Okay.
 3              MS. BROWN:  As I said, identify what you think
 4    shouldn't be under seal and you can file an assented-to motion
 5    that they not be sealed.  We're in complete agreement with
 6    that.
 7              MS. LE:  With respect to -- I think that all of
 8    your pleadings themselves do not need to be filed under seal.
 9    Ms. Brown, you filed hundreds of exhibits and I have a hard
10    time going back and figuring out what of those materials are
11    from the protective order.
12              The -- your pleadings themselves I don't think need
13    to be under seal.  It's only certain exhibits that should be
14    sealed.  I don't know how the Court -- and if your staff could
15    also help us with some guidance about what we can unseal.  I
16    don't know that a motion is really necessary, your Honor, do
17    you think?
18              THE COURT:  Well, if I ordered something sealed,
19    yeah.
20              MS. LE:  Okay.
21              THE COURT:  It needs to be ordered unsealed.
22              MS. LE:  Right.
23              THE COURT:  But you could file a stipulation that
24    says the following may be unsealed.
25              I don't want to create a lot of work for Charli
```

1  here, but the public does need access to this and they should

2  have it.  Yeah.

3           MS. LE:  Right.  And since they are Ms. Brown's

4  motions, frankly, your Honor, I think Ms. Brown should be the

5  one filing the pleading and not the government.

6           MS. BROWN:  Okay.  I have no problem with that, your

7  Honor.

8           THE COURT:  Okay.  Okay.  But I -- I think you

9  should probably -- I think you should probably expect a phone

10 call because --

11          MS. LE:  Sure.

12          THE COURT:  -- it's -- it's mostly I think to

13 protect the victim's interest.

14          Okay.  So, look, I covered my issues:  The tenor,

15 the time line, and the prosecution testimony, if necessary.

16          Is there anything else anybody wants to raise before

17 we -- before we adjourn?

18          I'll start with the prosecution.

19          MR. DAVIS:  No, your Honor.  Thank you.

20          THE COURT:  Thank you.

21          MR. DAVIS:  Happy new year.

22          THE COURT:  Same to you.

23          Ms. Brown?

24          MS. BROWN:  No, your Honor.

25          THE COURT:  All right.

1          So the 11th, I'll get the new time line.

2          You expect -- I know you expect, Mr. Davis, to make

3    filings Monday, which means it sounds like the other deadlines

4    sort of remain in place.

5          Have any other -- have any other deadlines been sort

6    of canceled or taken off?

7          MR. DAVIS:  So, Judge, the response to the motion

8    for immediate dismissal was, again, January 19th.

9          THE COURT:  19th?

10          MR. DAVIS:  Right.

11          THE COURT:  Got it.

12          Okay.  Thank you, everyone.  I hope -- I haven't

13    heard any bad COVID news, so I hope everybody's fine and

14    continues to be fine.

15          It doesn't look like jury trials anytime real soon,

16    unfortunately, but we'll watch the numbers.

17          Thanks, and happy new year.

18          MS. BROWN:  Thank you.  You, too.

19          (Proceedings concluded at 11:00 p.m.)

20

21

22

23

24

25

                      C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 2/25/2021        */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR