UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>USA</u>

     v.                             Civil No. 1:18-cr-192-JL
                                       Opinion No. 2021 DNH 116

<u>Imran Alrai</u>

### **<u>AMENDED ORDER</u>**

Before the court is the defendant's motion for a new trial or the dismissal of his charges based on allegations that the prosecution withheld evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and the court's decision turns on the materiality of this evidence and the prejudicial effect of its suppression. The defendant Imran Alrai was indicted in November 2018 on multiple counts of wire fraud and other crimes. The indictment was based on suspicions that Alrai used his role as Vice President of Information Technology (IT) at United Way of Massachusetts Bay and Merrimack Valley to cause United Way to hire DigitalNet Technology Solutions, a company with which Alrai had undisclosed ties, as a vendor for IT services, resulting in millions of dollars in payment from United Way to DigitalNet from 2012 to 2018. At the close of a ten-day bench trial in December 2019, this court convicted him on most counts and acquitted him on others. This court found Alrai guilty on 44 counts of wire fraud, money laundering, and transportation of stolen property and not guilty on nine counts of money laundering, aggravated identity theft, and failure to file reports of foreign banks and financial accounts ("FBAR violations").

In preparation for his sentencing hearing, Alrai moved for further discovery regarding the opinion of the prosecution's expert witness, Greg Naviloff, on the loss United Way incurred due to Alrai's alleged fraud.  In an unusual twist, Naviloff originally developed this opinion, in large part, while working as a consultant for United Way, the victim, under the supervision of United Way's outside counsel, John J. Commisso.  Alrai's post-conviction discovery requests led to the production of expert billing statements, expert emails, and technical data Naviloff and his team accessed and used, some of which the prosecution now agrees should have been produced prior to trial. Following months of post-conviction discovery, Alrai filed the instant Brady motion.

After reviewing the briefs and record and conducting a three-day evidentiary hearing on this motion, the court concludes that the prosecution withheld or otherwise failed to disclose evidence in violation of Brady.  In short, defense counsel could have used some of the withheld documents to challenge key aspects of the prosecution's case, by attacking the credibility and reliability of Naviloff's expert opinion and highlighting Commisso's potentially biased and excessive involvement in the development of the prosecution's case.  On top of these Brady violations,  the prosecution repeatedly asserted that it had satisfied or exceeded its discovery obligations, and that the defendant's discovery requests were desperate or excessive, further complicating and obstructing the discovery process in this case.  The court is disinclined to minimize the prejudice caused by each of these newly disclosed documents and the prosecution's distracting and false assertions regarding discovery, as such an exercise would be unreliable and speculative. Accordingly, the court grants Alrai a new trial, this time before a jury.

## I.     Applicable legal standard

Alrai moves for the dismissal of his indictment or a new trial based on alleged violations of Brady.  In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In this way, Brady places on the prosecution an "affirmative duty to disclose evidence favorable to a defendant . . . ."  Kyles v. Whitley, 514 U.S. 419, 432 (1995).  Importantly in this case, this includes "a duty to find any evidence favorable to the defendant that was known to those acting on the government's behalf[,] . . . includ[ing] other members of the prosecuting team [and] police investigators working for the prosecution."  United States v. Bender, 304 F.3d 161, 163–64 (1st Cir. 2002) (internal citations omitted).

A Brady violation consists of three elements: "[t]he evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued."  U.S. v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).  The test for prejudice under Brady "is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles, 514 U.S. at 434.

Under the Brady prejudice standard, the withheld evidence must be "considered collectively, not item by item."  Id. at 436.  Also, the evidence must be "evaluated in the

context of the entire record." <u>U.S. v. Agurs</u>, 427 U.S. 97, 112 (1976).  Once the elements

of favorability, suppression, and prejudice are satisfied, a <u>Brady</u> violation is found,

"regardless of [whether the defendant] request[ed]" the <u>Brady</u> material."  <u>Kyles</u>, 514 U.S.

at 433 (quoting <u>U.S. v. Bagley</u>, 473 U.S. 667, 685 (1985)).

## II.   Background

### A.   The lead-up to the criminal case

The defendant Imran Alrai served as Senior Director of IT and later Vice President

of IT at United Way from May 2012 until he was terminated in June 2018.  In these roles,

Alrai managed the IT department at United Way.  In August 2012, Alrai hired DigitalNet

to complete an IT Network Health and Security Assessment for United Way.  In 2013,

United Way decided to hire an IT vendor to "outsource much of the organization's IT

functions"; Alrai orchestrated the vetting process and ultimately selected DigitalNet.[1]  By

January 2013, United Way had contracted with DigitalNet to provide the following IT

services: hosting, data management and backup, virtual desktops, on-site support, after-

hours and weekend support, email and mobile device access, security, disaster recovery

and business continuity, and service level agreement.[2]  United Way paid DigitalNet over

$6 million for various IT services from 2012 to 2018.

In March 2018, United Way learned of a potential, personal connection between

Alrai and DigitalNet.  In May 2018, United Way hired John J. Commisso to "represent

---

[1] Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶ 24.

[2] <u>Id.</u> at ¶ 28.

[United Way] and provide legal services, advice, and counsel regarding allegations that Alrai was defrauding [United Way] while employed" there.[3]  That same month, Commisso began an internal investigation into the matter, and he contacted the United States Attorney's Office in Boston "to discuss Alrai's actions."[4]  Based on the internal investigation, United Way came to believe that Alrai had not disclosed to United Way that his father owned DigitalNet.[5]  In June, Commisso and two other United Way representatives spoke with the Assistant United States Attorney who became the lead prosecutor on this case, FBI Agent Jill Laroe and other representatives of the government regarding Alrai's allegedly fraudulent conduct.  According to FBI files from the meeting, at that time, the New Hampshire USAO had already initiated an investigation into overseas money transfers potentially involving DigitalNet and Alrai.[6]

During the same period, United Way hired the company Technology Business Solutions and its President John Meyer, "to provide services in connection with [United Way's] IT systems . . . and prepare to take control of the IT systems away from Alrai . . . ."[7]  United Way terminated Alrai on June 14, 2018, and TBS and Meyer took over United Way's IT systems.

---

[3] Doc. no. 170-4 at ¶ 13.

[4] Id. at ¶ 15.

[5] Doc. no. 170-2 at ¶ 6; see also June 26, 2018 FBI Investigation Report (doc. no. 177-3) at 7-8.

[6] See doc. no. 170-4 at ¶ 15; doc. no. 107 at 56-60 (trial testimony of FBI Agent Jill Laroe).

[7] See doc. no. 170-3 at ¶ 17.

United Way received a grand jury subpoena around June, as well.[8]  In order to respond to the subpoena, United Way gathered roughly 723,000 electronic and paper files and deposited them on an electronic database.[9]  United Way also retained Ralph Losey, National E-Discovery Counsel at Jackson Lewis P.C., and placed Commisso and Losey in charge of the document review process.  Ultimately, United Way produced more than 38,000 pages of documents regarding Alrai and DigitalNet to the government in response to the grand jury subpoena.[10]

Around July 2018, United Way launched another internal investigation into Alrai's alleged fraud, focusing on how it took place, the resulting economic impact, and future prevention.[11]  Commisso retained RSM US LLP to conduct the internal investigation.  Naviloff, a Director in the Dispute Advisory Services practice at RSM, served as the relationship lead.[12]  Naviloff is a "Certified Public Accountant [], Certified in Financial Forensics [], and Accredited in Business Valuation[,]" and he has been involved in forensic investigations, busines valuations, and breach of contract claims for years.[13]

---

[8] See id. at ¶ 13.

[9] See doc. no. 177-1 at 1.

[10] See id. at 2.

[11] Doc. no. 170-2 at 3.

[12] Id. at 2.

[13] Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶¶ 5-6.

RSM's work for United Way consisted of three different work streams – (i) the collection and preservation of electronic records and provision of digital forensics and incident response services ("data security investigation"), a workstream and team over which Naviloff had "no direct oversight"; (ii) an accounting analysis of the economic loss to United Way from Alrai's alleged fraud, resulting from "duplicative billing, excessive billing, and billing for services not provided to [United Way]" ("loss analysis"), completed under Naviloff's supervision; and (iii) an internal control evaluation, or root cause analysis, reviewing United Way's procurement of DigitalNet's services and ways to strengthen internal controls.[14]  The second workstream, Naviloff's loss analysis, is most pertinent to the instant motion.  RSM's findings in each workstream were reported to a Special Committee to United Way's Board in October 2018.[15]  RSM's findings from the loss analysis were also presented to United Way leadership; used to support United Way's insurance claim; and submitted to the IRS and other government agencies "to satisfy [United Way's] reporting obligations."[16]

### B.      The criminal case: Pre-trial discovery

In November 2018, Alrai was indicted for wire fraud, money laundering, aggravated identity theft, transportation of stolen property, and FBAR violations.  The prosecution team eventually expanded from a single AUSA to three AUSAs, and they

---

[14] Doc. no. 170-2 at ¶ 7.

[15] See id. at ¶ 7; doc. no. 170-4 at ¶ 34.

[16] See doc. no. 170-4 at ¶ 33.

continue to handle the case.  Alrai elected a bench trial scheduled by the court for December 2019.

Soon after the indictment, in January 2019, the prosecution produced to Alrai over 12,978 emails and documents pertaining to DigitalNet and Alrai, which United Way had submitted to the government in response to the grand jury subpoena.[17]  Months later, on July 19, 2019, after Naviloff completed his work for United Way, the prosecution retained Naviloff as an expert witness on the issue of the losses United Way incurred from Alrai's alleged fraud.[18]  Naviloff was tasked to "[u]pdate and refine the loss analysis[] performed for [United Way]," evaluating and incorporating additional information collected by the prosecution; "[c]alculate the potential personal enrichment of Alrai as a result of the alleged fraud"; and testify on the same.[19]  Naviloff testified at trial that he was hired by the prosecution to "provide the evaluation that [he] already had done . . . , [] share the relevant information with the government, . . . [and] evaluate any additional information they [the prosecution] had that would be relevant to [Naviloff's] opinion."[20]

For the purposes of his analysis, the prosecution instructed Naviloff to assume that Alrai obtained all of United Way's contracts with DigitalNet fraudulently.  After the

---

[17] See doc. no. 50 at 2.

[18] See doc. no. 164-22.

[19] Doc. no. 170-2 at ¶ 8.

[20] Doc. no. 130 at 85:8-12.

prosecution hired Naviloff, United Way waived its privilege with respect to RSM's loss analysis for United Way but did not waive privilege as to RSM's analysis in the separate, data security investigation workstream.[21]

Naviloff confined the loss analysis to "straightforward and objectively supportable" categories of IT expenditure—infrastructure hosting, virtual desktops, data management and high availability backup storage, and office phone services—though Naviloff considered a broader range of IT services for the loss analysis he completed for United Way.[22]  Together, these services accounted for $3.5 million of the roughly $6.8 million United Way paid DigitalNet.

In conducting the analysis, Naviloff and/or his team reviewed "financial and transactional documents," including bank statements and wire transfer records; analyzed DigitalNet invoices to identify "categories of products and services allegedly provided" to United Way; met with "various [United Way] employees" to understand United Way's "procurement of services from [DigitalNet]"; "collected and forensically copied laptop images contained within [United Way's] virtual desktop environments"; gathered "email records for key [United Way] personnel[;] and reviewed correspondence and documents

---

[21] This court previously determined that United Way has maintained its privilege as to documents pertaining to the data security investigation that RSM conducted for it.  See doc. no. 161 at 2  This court reiterated this finding in its order granting in part and denying in part Alrai's motion for discovery based on Brady.  See doc. no. 255 at 5-6.

[22] See Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶ 55 n.28 ("I previously analyzed additional categories for purposes of an insurance claim for [United Way], including certain web development and hosting services.  These are beyond the scope of what I have been asked to opine on for purposes of this [expert] report.").

relevant to [United Way's] procurement of IT related services."[23]  RSM transferred the documents it collected to United Way's outside counsel, who added them to the same electronic database used to respond to the grand jury subpoena.[24]  Naviloff completed "ad hoc searches" in the database for relevant documents.[25]

In July 2019, the prosecution informed Alrai that it intended to call Naviloff as an expert witness.  In the months before the prosecution filed Naviloff's expert report, Alrai requested discovery related to Naviloff's opinion.  Alrai requested, in part, a "copy of all documents and other data collected and reviewed by RSM in calculating United Way's loss" and in updating the loss calculation for the prosecution, documents and notes associated with RSM's interviews and meetings with United Way personnel, and the reports prepared by Naviloff and his team.[26]  The prosecution produced a number of documents, including "all of the final reports and analyses" that RSM completed for United Way, "the supporting documentation RSM had access to in conducting its

---

[23] See id. at ¶¶ 4, 17.

[24] See id. at ¶ 4 n.1; doc. no. 50 at 11 ("UWMB's outside counsel contracted with RSM and others to collect and review UWMB documents as part of its internal investigation into Alrai's alleged fraud.  Those documents were not retained by RSM; rather, they were provided to an e-discovery vendor retained by UWMB's outside counsel who uploaded those documents to a document review platform that RSM and others involved in the investigation could access and search for relevant documents. UWMB's outside counsel used this same database to produce over 39,000 pages of discovery relevant to DigitalNet's role at UWMB, Alrai's alleged fraud, and Mr. Naviloff's loss analysis.").

[25] See Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶ 4 n.1.

[26] See doc. no. 164-5 at 3-4.

analysis for [United Way]," and a "network scan of [United Way's] IT environment."[27]

In a September 2019 letter to Alrai's attorney, one AUSA wrote that the prosecution had

produced to Alrai "every document that RSM had access to when conducting its loss

analysis for [United Way] that is relevant to Mr. Alrai's criminal liability" and

"everything that the government [] provided RSM to conduct its analysis."[28]

The prosecution filed Naviloff's expert report in October 2019.  The next month,

Alrai moved to exclude Naviloff's expert testimony because "the [prosecution] ha[d] not

provided the defense with all of the information that was available to and relied on by

Naviloff."[29]  Alrai listed material that Naviloff described in his expert report, which the

prosecution had not produced: forensically copied laptop images contained in United

Way's virtual desktop environments, email records from United Way personnel, the

names of United Way personnel with whom RSM met, and the notes and reports

documenting those meetings.[30]  Alrai also contended that, according to other materials

produced during discovery, the prosecution had a two-terabyte hard drive with forensic

images of the computers of Alrai and two DigitalNet help desk employees, which the

prosecution had not produced yet, either.[31]

---

[27] See doc. no. 50 at 2-3.

[28] Doc. no. 220-1 at 101-02.

[29] Doc. no. 47 at ¶¶ 19.

[30] Id. at ¶¶ 17-21.

[31] See doc. no. 47 at ¶¶ 12, 13, 20; doc. no. 50 at 6.

In its objection to Alrai's motion, the prosecution explained that, "[f]or each of the defendant's requests, the government conferred with [United Way] counsel and RSM to determine if they possessed any documents responsive to the defendant's requests," and any such documents were "provided to the government and produced to the defendant."[32] According to the prosecution, it had produced evidence supporting each fact in Naviloff's report and "everything that Mr. Naviloff relied upon," and Alrai "ha[d] not identified any items not already produced that would be material to his defense, much less made any showing that supports his 'speculative theory' that there exists some undiscovered cache of documents that undermine the factual basis of Mr. Naviloff's analysis . . . ."[33]

Upon reviewing the parties' positions, this court instructed them to confer regarding three categories of material that Alrai requested—the list of United Way personnel with whom RSM spoke; the two-terabyte hard drive; and the United Way documents on the e-discovery database.[34]  In particular, this court encouraged broad discovery to enable Alrai to question Naviloff about the relevancy determinations he made with respect to the documents and data he accessed.  The prosecution produced the first two categories of information to Alrai in mid-November 2019.  By the end of the month, the prosecution also re-activated the e-discovery database and retrieved and

---

[32] See doc. no. 50 at 2.

[33] See id. at 3, 6-9.

[34] See doc. no. 51 at 1.

produced all the documents viewed or accessed by RSM.[35]  Following these productions,

this court denied the defendant's motion to preclude Naviloff's testimony without

prejudice, and Naviloff testified at trial.[36]  At trial, Naviloff testified as to his findings

that United Way "suffered a loss of at least $3,176,851 resulting from Alrai's alleged

fraudulent activity, . . . includ[ing] duplicative billing, excessive billing, and billing for

services not provided to [United Way] through [DigitalNet]," and that Alrai was enriched

by as much as $3,700,00, as well.[37]

At the close of the ten-day bench trial, this court found Alrai guilty of 44 counts of

wire fraud, money laundering, and transportation of stolen property, in part based on

Naviloff's findings of excessive billing, duplicative billing, and billing for services not

rendered.  This court also acquitted Alrai on nine counts of money laundering, aggravated

identity theft, and failure to file the FBARs.

### C.    Post-Conviction discovery

In June 2020, about six months after his conviction, Alrai made additional

discovery requests related to Naviloff's expert opinion, with the expectation that the

prosecution would rely on Naviloff's testimony again at sentencing.[38]  Many of Alrai's

requests focused on the IT expertise underlying Naviloff's opinion, about which Naviloff

---

[35] See doc. no. 51 at 2; doc. no. 218 at 13:15-14:25.

[36] Doc. no. 52.

[37] See Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶¶ 21-22; doc. no. 130 at 80:23-81:7.

[38] See doc. no. 138 at 2.

testified at trial.  During his cross-examination, Naviloff agreed that he was not an IT expert, but he consulted with IT experts while developing his report—specifically John Meyer, RSM's Diego Rosenfeld (who Naviloff described as an IT expert for over 20 years), and "another couple of [RSM] associates that report to [Rosenfeld].[39]  Naviloff agreed during his testimony that he did not mention Rosenfeld by name or detail the IT consultations in his expert report.[40]

Alrai requested, in part, documents detailing Rosenfeld's qualifications, documentation of Naviloff's communications with Rosenfeld or other RSM associates, data Rosenfeld had access to in forming his opinions, the names and CVs of any other RSM associates with whom Naviloff consulted in preparing his report, and communications between RSM or Naviloff and TBS or John Meyer.[41]  Alrai also requested RSM's billing statements to United Way and the USAO.[42]  Finally, Alrai reiterated his pre-trial request for notes from Naviloff's meetings with United Way's

---

[39] See id. at 1-2 (quoting doc. no. 130:88-89).

[40] See doc. no. 130 at 89:21-25 ("Q. [defense counsel:] Okay. You would agree with me that you didn't note in your report that you consulted with these [IT consultants] individuals?  A. [Naviloff:] I mentioned members of my team, and I use the term 'I' as referencing both the work that I performed as well as the work that I did—that was done for me under my supervision.").

[41] See doc. no. 138-1 at 1-2.

[42] See id.

personnel.[43]  Alrai asserted that the prosecution was obligated to produce these documents under Brady, as they are "material to the impeachment of Greg Naviloff."[44]

The prosecution, in turn, argued that Naviloff disclosed his IT consultations in his expert report, by noting that he received "assistance from professional staff at RSM" who worked under his "direct supervision," and that he learned about high availability server environments from RSM's IT professionals.[45]  The prosecution added that Naviloff referred to his "tech team" and "IT experts" in his direct testimony at trial.[46]  Further, the prosecution insisted that, though Naviloff relied on technology consulting experts to "answer certain factual questions regarding IT services," contrary to Alrai's characterization, Naviloff did not "state[] that he based his loss amount conclusions on opinions of his co-workers."[47]  Thus, the prosecution averred, it had fully complied with its disclosure obligations under the Federal Rules of Criminal Procedure and Brady, and Alrai "was furnished with everything necessary to cross-examine Naviloff, as well as to hire defense experts to counter Naviloff's loss opinions at trial."[48]  According to the

---

[43] See id. at 2.

[44] Doc. no. 138 at 3.

[45] Doc. no. 146 at 2-3 (quoting Expert Report of Greg W. Naviloff (doc. no. 154-2) at ¶¶ 10, 44).

[46] Doc. no. 146 at 3.

[47] Id. (emphasis in original).

[48] Id. at 5.

prosecution, Alrai's discovery requests constituted "a classic fishing expedition, borne of desperation" and "mere speculation."[49]

This court granted Alrai's discovery motion in part and denied it in part, finding that Alrai articulated a sufficient explanation of how he intended to challenge Naviloff's credibility at the sentencing hearing to require the disclosure of material including: documents pertaining to Rosenfeld's qualifications; RSM billing statements; documents (including emails, reports, and memoranda) pertaining to consultations between Naviloff and Rosenfeld, other RSM employees, Meyer, or TBS; and notes from RSM's meetings with United Way personnel.[50]

In July and early August 2020, the prosecution produced, in pertinent part, two summary billing statements from RSM to the USAO, six billing statements from RSM to United Way, Rosenfeld's CV, and the names and CVs of certain other RSM personnel on Naviloff's team.[51]  The prosecution explained that other requested materials did not exist. For example, the prosecution stated that Naviloff did not maintain notes or memos from his meetings with United Way personnel, and "Rosenfeld and his staff (Ryan Gilpin) . . . inspected invoices[,] . . . reviewed network scans and described what type of hardware was present in [] United Way's IT environment," but they did not create reports or

---

[49] Id. at 6-7.

[50] See doc. no. 156 at 5-6.  The court's order is dated August 10, 2020.  The court acknowledged that the prosecution had already produced some of the ordered discovery by that date.

[51] See doc. no. 154-4, 154-5.

document their opinions in the case.[52]  In response to Alrai's request for documentation of Naviloff's consultation with Rosenfeld and RSM associates, the prosecution stated that some relevant documents were already produced, and the remaining, "limited number of emails" would be burdensome to locate.[53]

On August 7, 2020, Alrai filed a second discovery motion, arguing that the prosecution's production was insufficient and requesting additional materials under Brady, including more detailed billing information from RSM specifying who completed different work items; the network scans reviewed by Rosenfeld and Gilpin; and RSM emails concerning RSM's work for the United Way and the USAO (including communications with Naviloff that the prosecution characterized as too burdensome to produce).

In its objection, the prosecution argued that Alrai's requests were "utterly unfounded," "scattershot, [and] groundless," went "well beyond what the government must produce under Brady," and encompassed a large amount of irrelevant and sensitive material.[54]  According to the prosecution, Alrai should issue a Rule 17 subpoena if he believed that third parties possessed the requested material, as the prosecution "ha[d] supplied all documents and evidence that it possesses on the issue of loss, and there is no requirement that the United States seek out mitigation evidence on behalf of the

---

[52] See doc. no. 154-4 at 1-2.

[53] See id. at 2.

[54] See doc. no 160 at 5-7.

defendant."[55]  The prosecution further asserted that Alrai "fail[ed] to establish why he should be permitted to go on a fishing expedition through information belonging to [United Way] and RSM that is wholly unrelated to the issue of loss sustained by the victims in this case."[56]

This court denied Alrai's second discovery motion after determining that several of the requests were mooted by the court's previous discovery order, the government's July and August 2020 productions, and/or the prosecution's representations that such documents do not exist.

In late August and early September 2020, pursuant to the court's first discovery order, the prosecution produced over 500 RSM emails related to the loss analysis completed for United Way, 29 RSM emails related to the engagement with the USAO, and over 150 emails "relating to the September-December 2019 time period when RSM was engaged by the USAO."[57]

D.    The **Brady** motion for dismissal or a new trial

In September 2020, Alrai filed the instant motion requesting a new trial or the dismissal of the charges against him based on alleged Brady violations.  Alrai argues in part,that the prosecution withheld evidence that defense counsel could have used to impeach Naviloff and undermine the credibility of the prosecution's investigation and

---

[55] Id. at 1.

[56] Id. at 2.

[57] See doc. no. 164-23; doc. no. 170 at 6-7.

case more broadly.  This court held a three-day evidentiary hearing on the <u>Brady</u> motion

("<u>Brady</u> hearing") on November 17, December 3, and December 7, 2020.  At the hearing

Naviloff, Commisso, and defense expert Jason Sgro testified as to the content,

materiality, and prejudicial value of the evidence disclosed after Alrai's conviction.

     The parties then submitted post-hearing briefs and a timeline of the discovery

requests and productions in this case.  While completing the timeline, the prosecution

identified and produced more discovery: a set 18 emails between Naviloff and Meyer,

which were in the prosecution's possession prior to trial but had only been produced in

part.  The prosecution conceded in a December 2020 filing to the court that all 18 emails

should have been produced prior to trial, as discussed further below.

     **E.**     **Information revealed in post-trial discovery**

     As discussed above, the prosecution produced a variety of materials to Alrai after

his conviction, in response to Alrai's discovery requests and this court's discovery order.

The productions can be separated into a few different types of documents—RSM billing

statements, RSM emails, the set of emails between Naviloff and Meyer that the

prosecution produced in December 2020, and a United Way network scan from 2018.

These materials are further grouped by subject matter and described in more detail below

in order to facilitate the <u>Brady</u> analysis.

     ***Billing statements and RSM emails detailing the IT expertise incorporated into***

***Naviloff's report.***  RSM billing information and certain RSM emails lend insight into the

IT expertise that informed Naviloff's loss analysis for both United Way and the USAO.

In particular, these documents detail the amount and type of work completed by the

individual technology specialists on the RSM team, something Naviloff and the

prosecution did not elaborate upon prior to or during trial.

RSM's six billing statements to United Way cover the period from July 2018 to

March 2019.  The statements list the number of hours billed by each member of the RSM

team, separating the team members into the "Forensics Team" (consisting of forensic

accountants including Naviloff and Chris Fitzgerald, a Manager at RSM)[58] and the

"technology specialists" (consisting of Rosenfeld, a Partner; Ron Draganowski, a

Director; and Gilpin, a Senior Associate).  In total, RSM billed 1,031 hours to the loss

analysis and internal control evaluation workstreams.  Of this, the technology specialists

billed 132.8 hours, with Rosenfeld billing seven hours, Draganowski billing 1.8 hours,

and Gilpin billing 86 hours.[59]

The two RSM billing statements for the USAO span the period from July 17,

2019, to December 16, 2019.[60]  One statement was available to the government before

Alrai's trial; it pertained to the period from July 17 to October 4, 2019, and it was dated

October 11, 2019.[61]  In this statement, six RSM personnel billed for a total of 203 hours –

---

[58] During the <u>Brady</u> hearing, Naviloff testified that the Forensics Team "could be . . . renamed 'forensic accounting,' as that's the primary background for most of my team in this list."  Doc. no. 200 at 59:3-6.

[59] <u>See</u> doc. no. 154-6.

[60] <u>See</u> doc. no. 154-5.

[61] <u>See</u> <u>id.</u> at 1.  The lead AUSA on the case confirmed during the <u>Brady</u> hearing that the prosecution "would have gotten [the bill] around early November[,]" the month before Alrai's trial.  Doc. no. 232 at 234:5-6.

Naviloff (38.5 hours), Fitzgerald (75.5 hours), Gilpin (18.5 hours), and three other Senior

Associates who billed 50, 105, and 10 hours individually.[62]  The prosecution explained in

a recent brief that all of the RSM employees listed in the bill were accountants, except for

Gilpin, who is an IT consultant.[63]  Rosenfeld was not listed in this statement.

While the billing statements indicate the number of hours Gilpin spent on RSM's

analysis, RSM emails detail the nature of Gilpin's contributions.  A number of emails

reference Gilpin's varied work product.  For example, Gilpin completed or contributed to

an agenda for an interview with Meyer[64] and an inventory of United Way's IT hardware;

estimated United Way's web development costs for comparison with DigitalNet's

invoice(s);[65] collected market pricing information in order to recalculate certain

DigitalNet invoices;[66] analyzed DigitalNet invoices to identify duplicative billing;[67]

analyzed the status of Microsoft licenses to determine whether DigitalNet provided

"Applications, Database, and [Operation System(s)] management" services, for which

United Way paid roughly $212,000;[68] and served as the point person on a question from

---

[62] See doc. no. 154-5 at 2.

[63] See doc. no. 236-1 at 24.

[64] Doc. no. 164-13 at 3.

[65] See doc. no. 164-14 at 1.

[66] See doc. no. 164-16 at 3.

[67] See doc. no. 164-12 at 3 (comparing an Insight invoice and a DigitalNet invoice from the same period).

[68] See Brady Hearing Exhibit Tt.

United Way's insurance company regarding the basis for RSM's finding that DigitalNet charged for, but did not provide, data management and high availability backup storage services to United Way. [69]

In other RSM emails, Naviloff and Fitzgerald acknowledge Gilpin's role on the team.  In July 2018, Naviloff advised Gilpin to be onsite when possible and stated that Gilpin was "central to the team."[70]  In November 2018, Naviloff instructed Fitzgerald that they should "get in [a] room with Ryan [Gilpin] for an hour to discuss" DigitalNet's invoices to United Way for data management and high-availability backup services.[71] Fitzgerald wrote in response that he was "happy to meet with [Gilpin]."[72]  Fitzgerald also wrote that he was "a bit worried [] that what [RSM was] communicating to the USAO [was] relying solely on [Gilpin] who [was] only a (newly promoted) Senior Associate." Fitzgerald added that, "[i]n the event Diego [Rosenfeld] needs to testify, we need to be sure he agrees with what we are relaying to Counsel / USAO."[73]

*RSM emails demonstrating Commisso's supervision of, and influence on, RSM's loss analysis for United Way.*  Commisso's involvement in Naviloff's analysis as counsel for United Way is pertinent to the Brady analysis because Naviloff went on to

---

[69] See Brady Hearing Exhibit Oo.

[70] Doc. no. 164-13 at 1.

[71] Doc. no. 164-1 at 1.

[72] Id.

[73] Id.

provide the same analysis, updated, to the prosecution as an expert witness in the criminal case.  RSM emails confirm that Commisso held a supervisory role in RSM's loss analysis for United Way.  These emails also illustrate the avenues through which Commisso could have influenced RSM's analysis and/or findings, and the interests and biases he may have carried into this role.

First, Commisso was copied or otherwise included in (at least some of) RSM's email correspondence regarding RSM's work plan, interviews with United Way personnel, and document and data requests.  In July 2018, Fitzgerald emailed both Commisso and Richard Voccio, United Way's Chief Administrative Officer, a work plan for one week during that month, when RSM would be on site.  The work plan detailed the meetings that RSM intended to conduct with United Way personnel, along with the central purpose of the meetings and information needed from each individual.[74]  That same month, Fitzgerald copied Commisso on an email to Allison Ginsberg, United Way's Vice President of Finance.  In that email, Fitzgerald requested United Way's financial statements as well as documents pertaining to cash disbursements, vendors, and accounting and spending policies.[75]

Second, Commisso provided edits to RSM's presentation on its findings, which was delivered to United Way's Special Committee in October 2018.  In an October 2018 email, Commisso sent the RSM team his "suggested edits" to the presentation, and

---

[74] See doc. no. 164-27 at 1.

[75] See doc. no. 164-29 at 1.

Naviloff replied, confirming that he had "incorporated John's [Commisso's] comments."[76]  In other email exchanges during the same month, Naviloff provided revisions directed at RSM's characterization of United Way's role in Alrai's alleged fraud.  Commisso suggested removing the word "collusion" when describing the fraud scheme, explaining that he was "not aware of evidence that there were knowing co-conspirators."[77]  Commisso wrote that RSM should "change" the wording so it reads, "Alrai executed a complex fraud scheme, which included gaining trust and deceiving multiple individuals."[78]  Commisso also suggested that RSM not "use [the] 'tone at the top' concern[,]" and he asked that the text be changed to "something like: Lack of leadership oversight of IT department."[79]  Below these edits, under the heading "things to note," Commisso wrote that certain United Way personnel developed positive relationships with Alrai, which "led to an environment where employees were less likely to speak up or ask questions or raise concerns, because of prior work place and morale issues."[80]

---

[76] See doc. no. 164-17 at 1-2.

[77] Doc. no. 164-4 at 1.

[78] Id.

[79] Id.  In an affidavit submitted to the court along with the prosecution's objection to the Brady motion, Naviloff explained that, to his "recollection," the phrase  'tone at the top' was "included in a section discussing recommendations to prevent future fraud, including establishing training and executing messaging to employees," and it "in no way suggested there was a poor 'tone at the top' of the organization."  Doc. no. 170-2 at ¶ 13.

[80] Doc. no. 164-4 at 2.

*RSM emails from its engagement with United Way, demonstrating Naviloff's and Fitzgerald's interest in the future criminal case against Alrai.*  In some emails exchanged during RSM's engagement with United Way, Naviloff and Fitzgerald discuss the future (and, at that time, potential) criminal case against Alrai.  These emails signal that, while Naviloff and Fitzgerald conducted a loss analysis for United Way, they had some notion that the same or similar work product could be utilized by the prosecution and/or United Way in a future criminal case against Alrai.

In an October 2018 email from Commisso to Naviloff and two RSM colleagues, Commisso wrote that the loss analysis presentation for the Special Committee was "very well done," and he suggested that it may be helpful to distribute the full presentation deck, instead of a shorter version, to the Special Committee before the meeting.[81] Naviloff replied to the group and asked, "[p]erhaps as much a question of priviledge [sic] and what would be available to Imran [Alrai] if he is charged and requests [documents] as part of discovery[.]"[82]

Subsequently, in November 2018, Fitzgerald emailed Naviloff a "list of items [Fitzgerald] would ask the USAO about."[83]  Fitzgerald proposed "[c]onsideration of the 'Net Worth Method.'"  Fitzgerald described the Method as follows—Alrai's net worth in December 2011 and June 2018 would be compared, and any change in his net worth,

---

[81] Doc. no. 164-3 at 1.

[82] Id.

[83] Brady Hearing Exhibit CCC.

"less known income . . . and known expenses" would be considered "fraudulent proceeds."[84]  Fitzgerald explained that "this method would take out of play the opportunity to dispute market valuations / complex IT issues."[85]  As discussed above, Naviloff did complete a personal enrichment analysis, like the one Fitzgerald describes, in his expert report for the prosecution.

A few days later, while still engaged with United Way, Naviloff wrote to Fitzgerald to ask about the status of the "proof of loss draft" and to inform him that he "had a good meeting with US Attorney—sounds like much of the case will fall upon RSM testimony if they are to bring criminal charges."[86]  Fitzgerald replied, "Great news."[87]  Later that month, Naviloff participated in a call with the USAO; afterwards, he emailed the RSM team, including Fitzgerald and Gilpin, and informed them that the "[c]all with [the] US [A]ttorney went well based on [the] info[rmation] you provided."[88]

*RSM emails illustrating Attorney Commisso's involvement in the prosecution's case.*  This court was aware before and during the trial that Commisso served as outside counsel for United Way, counseled the trial witnesses who worked for United Way, and appeared at many, if not most, of the proceedings in the criminal case.  The RSM emails

---

[84] Id.

[85] Id.

[86] Doc. no. 164-19 at 1-2.

[87] Id. at 1.

[88] Doc. no. 164-20 at 1.

produced after the conviction and testimony from the <u>Brady</u> hearing, however, elucidate the nature, depth, and breadth of Commisso's involvement in the prosecution's case, particularly in the discovery process.

Some RSM emails indicate that Commisso made determinations regarding which United Way documents should be produced in response to Alrai's discovery requests to the prosecution.  For example, in July 2019 (after Naviloff was hired as the prosecution's expert), defense counsel emailed the AUSAs on the prosecution team with a list of discovery requests related to Naviloff's loss analysis for United Way and the USAO.[89] Moments later, one AUSA forwarded the email to Naviloff and Commisso, copying the other AUSA, with the text, "Gentlemen: this just in."[90]  In subsequent email exchanges, Naviloff contacted Commisso and Fitzgerald alone, asking when Commisso was available "to discuss [the] list" of requests.[91]  Commisso replied with a list of documents "discussed on the call with [the USAO prosecutors]"; Commisso stated that he would "review [the documents] and consider any issues regarding redaction, privilege, disclosure to defendant, etc."[92]  There is no further discussion in the email exchange regarding the parameters on, or outcome of, Commisso's review of these documents.

---

[89] <u>See</u> doc. no. 164-5 at 4-5.

[90] <u>Brady</u> Hearing Exhibit LLL.

[91] Doc. no. 164-5 at 2-3.

[92] <u>Id.</u> at 2.

The next month, Naviloff emailed Commisso a screenshot of a file folder labeled "Case Documents" within another folder labeled "United Way Engagement."[93]  The screenshot showed four, checkmarked sub-folders labeled "Accounting Exports," "Financial Statements," "Policies and Procedures," and "Bank Statements."[94]  Naviloff wrote, ""let's discuss contents of these 4 folders for potentially providing to USAO."[95]  A week later, Commisso followed up, asking when Naviloff could send Commisso the contents of the folders so Commisso could "prepare to produce them to the USAO."[96]  Again, the email lacks further detail on Commisso's document review or the discussion between Naviloff and Commisso regarding the contents of the folders.

When questioned during the Brady hearing about the process for responding to Alrai's document requests, Naviloff described the same pattern depicted in these emails. Naviloff testified that when a document request came in, Naviloff "would ask the [RSM] team to look through . . . [RSM's] server folders, and share all responsive materials that were relevant and available."[97]  Naviloff explained that his team would either send the documents to Commisso "for his review" or they would discuss the documents with Commisso "and then share [the documents] directly [with the USAO] with a cc to

---

[93] See doc. no. 164-12 at 2.

[94] See id.

[95] See id. at 1.

[96] See id.

[97] Doc. no. 200 at 64:8-11.

Attorney Commisso."[98]  Thus, according to Naviloff, "in one way, shape, or form,

Attorney Commisso was apprised and aware of the documents that [RSM was] sharing

with the U.S. Attorney's Office," and, to Naviloff's recollection, Commisso allowed

Naviloff to share any document that was not privileged.

The breadth of Commisso's involvement in the prosecution's case is further

detailed in Commisso's testimony at the <u>Brady</u> hearing and his February 2020 letter to

U.S. Probation Officer Sean Buckley regarding victim restitution.  Commisso testified at

the <u>Brady</u> hearing that he "met with" each United Way employee who testified at trial "to

help them prepare for their testimony[.]"[99]  Commisso wrote in the letter to Officer

Buckley that United Way paid Commisso's law firm $182,750 for 365.5 hours of

services "directly related and necessary to participation in the government's investigation

and prosecution of this case," including production of documents regarding expert

discovery and pre-trial discovery issues, witness preparation and witness meetings with

prosecutors and agents, and meetings and correspondence with prosecutors and agents.[100]

**_RSM emails indicating the existence of certain requested documents not_**

**_produced by the prosecution._**  The prosecution asserted that some of the documents Alrai

listed in his post-conviction discovery requests did not exist.  RSM emails, however,

reference two categories of requested documents, suggesting that they do exist.

---

[98] <u>See</u> <u>id.</u> at 65:2-9.

[99] Doc. no. 219 at 30:25-31:7.

[100] <u>See</u> doc. no. 164-25 at 5-6.

First, as described above, Alrai requested any reports, memoranda, or opinions created by RSM team members, and the prosecution asserted that Rosenfeld and Gilpin did not develop reports or document their opinions; the prosecution added that "[t]he only additional documentation would be a limited number of emails" that were burdensome to produce and of limited benefit to Alrai.  In a September 2018 email, however, Fitzgerald distributed a list of tasks for the RSM team "to complete to wrap up the [United Way] engagement," and some of the tasks involved drafting and completing memoranda.  The tasks assigned to Gilpin, Fitzgerald, and others included "prepar[ing] a brief memo summarizing findings [on] adherence to policies[,] . . . [a] draft cover memo for quantification analysis[,] . . . [a] draft fixed asset memo, summarizing findings from Ryan's [Gilpin's] analysis[,] . . . and [a] memo [on the] root cause of [the] issue . . . [and] internal control observations."[101]  Relatedly, in a January 2019 email exchange, Commisso emailed the RSM team with some questions from the forensic accountants hired by United Way's insurance carrier to review United Way's insurance claim and internal controls.[102]  In subsequent emails, the RSM team discussed where to find the answers to the questions.  Gilpin replied with "[his] initial draft of the memo[random] on data management and backup [services] that [he] believe[d] Chris [Fitzgerald] had later refined."[103]

---

[101] Brady Hearing Exhibit Dd at 3-4.

[102] Brady Hearing Exhibit Oo at 3-4.

[103] Id. at 1.

Second, both before and after trial, Alrai requested notes from RSM's meetings with United Way personnel.  The prosecution and Naviloff repeatedly asserted that RSM did not retain notes memorializing these interviews.  Nevertheless, one of the RSM emails produced in August 2020 references notetaking during meetings with United Way personnel.  In the July 2018 email, Fitzgerald shared an on-site work plan for an upcoming week, which included interviews with John Meyer, Pat Latimore (United Way's Chief Operating Officer), and Voccio (United Way's Chief Administrative Officer).[104]  After that, Fitzgerald and Naviloff exchanged emails in which they discussed limiting the number of people present at certain meetings.  Fitzgerald explained that he added one RSM employee, Shan Cifarelli, to some of the meetings "for note taking purposes to avoid needing to type hand written notes we had for the first two days . . . but understand if you don't want to overload."[105]  Of course, this reference to notetaking does not conclusively prove that RSM <u>retained</u> the notes from its meetings with United Way personnel.  But it seems unlikely (and perhaps counterproductive) to take notes during these meetings and then discard or destroy them before the discovery period.

***Documents the prosecution identified in December 2020 as material that should have been disclosed before trial, but was "inadvertently not disclosed."***  On December 15, 2020, after the completion of the Brady hearing, the prosecution filed a supplemental

---

[104] See doc. no. 164-24 at 2-3.

[105] Id. at 1.

memorandum regarding the Brady motion.[106]  In this submission, the prosecution

identified emails "between RSM and United Way that were in the government's

possession prior to trial and not produced," some of which were "arguably" relied upon

by Naviloff and/or Jencks Act[107] statements by Meyer.[108]

In a sworn declaration, an AUSA on the prosecution team explained his

recollection of the sequence of events leading to the purportedly inadvertent omission of

the documents from the prosecution's pre-trial document productions, as follows.  While

completing a pre-trial brief objecting to Alrai's motion to preclude Naviloff from

testifying, the prosecution learned that Meyer sent 18 emails (some with attachments) to

Naviloff while RSM was conducting its loss analysis for United Way.  Naviloff sent the

emails to the prosecution on November 13, 2019, and they were uploaded to the USAO's

---

[106] See doc. no. 212.

[107] The Jencks Act is a statute that "establishes procedures whereby a criminal defendant may exercise his limited right to obtain previous statements made by government witnesses that are in possession of the United States Government to be used for impeachment purposes."  United States v. Neal, 36 F.3d 1190, 1197 (1st Cir. 1994) (citing 18 U.S.C. § 3500).  The statute provides that, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).  The following are "statements" covered by the Act: "(1) a written statement made by said [government] witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."  18 U.S.C. § 3500(e).  The Jencks Act is largely replicated in Federal Rule of Criminal Procedure 26.2, as well.

[108] AUSA Declaration (doc. no. 212-1) at ¶ 1.

document management platform.  The next day, two AUSAs spoke with Naviloff about

which of the emails were relevant to the formation of his opinion.  Naviloff identified

five relevant documents, but three had previously been produced.  That same day,

Commisso reviewed the two remaining documents for privilege, and the prosecution

produced them with redactions.

The prosecution recounted the above sequence of events in a footnote in its brief

in opposition to Alrai's motion to exclude Naviloff's testimony, filed on the same

day.[109]  The prosecution also stated in the brief that "[t]he defendant has everything that

Naviloff relied upon."[110]  Roughly one week later, the prosecution marked all 18

documents as "do not produce" in the USAO's document management platform.  Just

two days after that, the prosecution stated in a brief submitted to this court that "[t]he

defendant has every document Mr. Naviloff considered in this accounting," and "[t]he

government expects the [United Way] will produce every document RSM viewed."

In June 2020, Alrai requested "[a]ny reports, emails or other communications

[from] . . . Meyer to RSM or Greg Naviloff."  The prosecution did not produce the 13

Meyer-Naviloff emails that had not yet been disclosed, and instead responded to the

request by noting that the prosecution previously produced two responsive emails.[111]

Later, in its objection to the instant motion, the prosecution wrote that it conferred with

---

[109] See doc. no. 50 at 9 n.10.

[110] Id. at 6.

[111] See doc. no. 54-4 at 2.

United Way and RSM about each of the defendant's discovery requests, and "[t]he government produced all the documents it received in response to the defendant's requests."

In December 2020, while reviewing the history of discovery requests and productions in connection with the instant motion, the two AUSAs involved revisited the 18 Meyer-Naviloff emails, which, as the USAO explains, they had mistakenly thought were withheld based on privilege, and not based on Naviloff's relevance determination. ~~Upon reviewing them, t~~The prosecution concluded that all of the documents should have been produced to Alrai, subject to a privilege review, following Alrai's November 2019 motion to preclude Naviloff's testimony (when the prosecution and United Way agreed to produce all of the documents that RSM accessed).[112]

The USAO identified a few documents with particular importance among the remaining 13 emails, as well.  It acknowledged that an email from Meyer concerning how long DigitalNet used SIP.us as a vendor for phone services should have been produced before trial because it was "arguably relied on" by Naviloff and "arguably" contained Jencks statements of Meyer.[113]  Second, the prosecution conceded that a statement of United Way's Microsoft Volume licensing was attached to one of the 18 emails, and it

---

[112] AUSA Declaration (doc. no. 212-1) at ¶¶ 43-45.

[113] Id. at ¶¶ 35, 44 (referencing doc. no. 215-23). As the USAO notes in its declaration, Naviloff assumed, in DigitalNet's favor, that it paid SIP.us and facilitated the Office Phone Service from 2013 through 2017; this assumption limits the prejudice caused by the failure to disclose this email.  See Expert Report of Greg W. Naviloff (doc. no. 154-2) at 21.  Based on this record, the court doubts that the email is Brady material, but the court does not make a finding on this issue.

should have been produced as "potential impeachment evidence . . . of Meyer's trial testimony relating to licensing."[114]  Finally, the prosecution also stated that an August 2018 email ("Network Scan Email"), in which Gilpin instructed Meyer to extract a detailed United Way "network scan," should have been produced prior to trial as a <u>Jencks</u> Act statement by Meyer.[115]  Again, these realizations arose only <u>after</u> Alrai's repeated requests for the documents that RSM relied on and accessed and communications between Meyer and Naviloff; multiple assertions by the prosecution that documents of this nature were already produced; and the completion of a three-day <u>Brady</u> hearing.

**United Way 2018 Network Scan.**  The Network Scan Email discussed above forms part of a larger story, as the 2018 network scan referenced in the email was not produced in full until after trial.  In the Network Scan Email, Gilpin sent Meyer instructions on how to obtain a "network scan . . . [that] gets into very granular detail about each device, [Operating System], and anything that exists on it to date . . . ."[116]  The

---

[114] AUSA Declaration (doc. no. 212-1) at ¶¶ 33, 44 (referencing doc. nos. 215-16, 215-17).  The prosecution argues that the email attachment is not material because software licensing is not one of the IT services considered in Naviloff's expert report, and the licensing statement shows when the licenses were purchased, but it does not support or refute Meyer's testimony that "some software was unlicensed and some software was licensed, but the software keys were not applied."  Doc. no. 79 at 108.  Again, on this record, the court doubts that the email is <u>Brady</u> material, but it does not make a finding on this issue.  As discussed further below, the court does consider the prosecution's failure to produce the Meyer-Naviloff emails to be important to its analysis of the prosecution's conduct with respect to discovery.

[115] AUSA Declaration (doc. no. 212-1) at ¶¶ 28, 45 (referencing doc. no. 215-13).

[116] Doc. no. 215-13 at 3-4.

email also indicates that Meyer obtained and was prepared to hand over the "detailed" network scan to RSM.

The network scan is referred to again a year later, in RSM emails from August 2019, when the prosecution was engaged in pre-trial expert discovery.  In the email chain, which is also described in part above, Naviloff and Commisso discussed four folders of United Way documents from the time of RSM's engagement with United Way, for "potential" production to the USAO.  Naviloff noted that one of the folders he sent, entitled "'Network Scans' contains many more documents than what I [Naviloff] would recommend [United Way] produce (many are clearly out of scope as they were generated to assess security and privacy concerns, not assess whether realtime backup was occurring.)"[117]  Naviloff wrote that he "sought guidance from [his] technology group as to the relevant network scan files that should be shared with the USAO," aside from the one file he attached, entitled "NetDetectiveResults.xlsx."[118]

In September 2019 the prosecution produced the "NetDetectiveResults.xlsx" spreadsheet that Naviloff attached.  The spreadsheet contained a single tab entitled "Security and Backup," and it described the antivirus, antispyware, and firewall protections on various United Way computers, as well as their backup status.[119]  In other words the prosecution produced an abridged version of the full 2018 network scan prior

---

[117] Doc. no. 224-6 at 1.

[118] Id.

[119] See Brady Hearing Exhibit VVV.

to trial.[120]  In a post-conviction declaration, the lead prosecutor explained that after trial,

in October 2020, the prosecution "learned from RSM that the scan previously provided

was not the full network scan.  The [prosecution] requested the full scan and produced it

to defense counsel on October 15, 2020."[121]  The prosecution's explanation for this

oversight is that it was a "simple mistake," and the prosecution "did not have" the other

tabs of the network scan.[122]

The full 2018 network scan contains 40 tabs and includes information about

password strength, password expiration, the major applications on the computers,

operating system installation dates, and an "assessment summary" tab enumerating the

number of servers, printers, installed applications, and "potential or severe security

risks."[123]

### III.  Analysis

The court finds that the prosecution violated Brady by withholding or failing to

provide evidence that is favorable to Alrai and, when considered collectively, is sufficient

to undermine confidence in the trial verdict.  See Kyles, 514 U.S. at 434.  The court finds

that a portion of the withheld documents described above are Brady material, as Alrai

could have used them to attempt to undermine the credibility of key facets of the

---

[120] See doc. no. 164-32 at 1-2.

[121] AUSA Declaration (doc. no. 212-1) at ¶ 28.

[122] Doc. no. 236-1 at 36.

[123] See Brady Hearing Exhibit UUU.

37

prosecution's case.[124]  In particular, Alrai could have utilized the Brady material to

present and support the theory that Naviloff and Commisso were motivated (by their

positions with United Way and the opportunity to obtain legal, forensic accounting,

and/or IT business) to elevate United Way management while degrading Alrai.

Consistent with this theory, defense counsel could have argued (and utilized certain

withheld documents to attempt to show) that Commisso and Naviloff made efforts to

present themselves and their work to United Way and the prosecution in a good light; to

distance United Way personnel from any appearance of misfeasance, malfeasance, or

negligence; and to shift blame to Alrai.  Further, defense counsel could have pointed out

Naviloff's and/or Commisso's opportunities to shape the prosecution's case in line with

their objectives—including the expert report, document production decisions, and witness

preparation.[125]  All together, these defense strategies could have undermined the force

and reliability of the prosecution's case.  In addition to these Brady violations, the

---

[124] In describing the Brady violations in this section, the court does not discuss each and every piece of withheld evidence described in this order.  This is partly because the analysis of the Brady violations is meant to be illustrative, and not exhaustive.  In some cases, withheld documents are not described as Brady material because the court is not wholly convinced that the favorability and prejudice elements of Brady are satisfied as to those pieces of evidence, on the current record.

[125] The court acknowledges that Naviloff served as an expert witness in the prosecution's case, and Commisso did not testify at trial at all.  Thus, the prosecution had specific discovery obligations with respect to Naviloff, which did not apply to Commisso.  Nevertheless, the prosecution's Brady obligations extend to evidence pertaining to both individuals.  In other words, the prosecution has a "duty to find any evidence favorable to the defendant that was known to those acting on the government's behalf," whether this evidence concerns a prosecution witness or another (in this case, key) figure in the case.  See Bender, 304 F.3d at 163.

prosecution engaged in insufficiently diligent discovery practices, which resulted in oversights and omissions in its disclosures.  Concurrently, the prosecution made several false representations about the status of discovery and disparaging remarks regarding Alrai's continued discovery requests.  These troubling practices could have also dissuaded Alrai from pursuing legitimate discovery and defense strategies, potential further prejudicing him.  Having found <u>Brady</u> violations, the court grants Alrai a new trial, this time before a jury.

### A. <u>Brady</u> violations

***The withheld evidence could have been used to suggest that, while completing the loss analysis for United Way, Commisso and Naviloff were motivated to protect United Way and inculpate Alrai.***  Defense counsel could have used a number of withheld documents (particularly RSM emails) to suggest that United Way's intention when hiring RSM to conduct a loss analysis was to minimize the impression of (or hide) United Way's involvement in Alrai's alleged fraudulent activity, and to strengthen the case against Alrai, in hopes of a criminal conviction resulting in restitution.  By attacking the credibility of RSM's loss analysis for United Way, defense counsel would have also generated doubt about the reliability of Naviloff's expert opinion on loss, since the latter simply updated and refined the former.  A few examples can illustrate how defense counsel could have developed this narrative.

To begin, defense counsel could have argued that Commisso was motivated—for the sake of his client and his relationship with his client— to maximize the restitution and insurance coverage due to United Way, and to position United Way and Alrai in the best

and worst possible lights, respectively.  Then, defense counsel could have focused on withheld documents that reflect that, as outside counsel for United Way, Commisso was in a position to influence both the inputs and outputs of RSM's analysis.

The RSM team included Commisso on emails regarding its plans for interviews with United Way personnel and document collection—key inputs into the loss analysis. Commisso also provided edits to RSM's output—the presentation of findings to United Way's Special Committee.  In two October 2018 emails, Commisso advised the RSM team to remove the term "collusion" from its presentation, and instead state that, as part of Alrai's fraud scheme, Alrai "gain[ed] trust and deceiv[ed] multiple individuals." Commisso also conveyed to the RSM team that United Way personnel may have hesitated to speak up about Alrai's alleged fraudulent activity because of Alrai's good relations within the organization.  Defense counsel could have used these emails to attempt to establish that Commisso used his influence over RSM's analysis to cast a positive light on his client, United Way, and further inculpate Alrai. The fact that Commisso met with the USAO in Boston to discuss Alrai's actions as early as May 2018, before hiring RSM, also could be utilized to suggest that Commisso went into the engagement with RSM with the hopes of building a criminal case against Alrai and strengthening United Way's position in that case.

Even if the prosecution could have demonstrated that Commisso's assessment regarding collusion, for example, was grounded in facts and evidence,[126] it still would have had to contend with defense counsel's arguments regarding Naviloff's bias against Alrai.  Defense counsel could have argued that Naviloff was incentivized to favor United Way in his analysis and maximize the loss calculation, based on his position as a consultant for United Way who was working closely alongside Commisso, who held similar interests.[127]  Following this, defense counsel could have pointed to withheld documents that indicate that, while Naviloff worked for United Way, he was aware of the possibility that a criminal case against Alrai could take place in the future, and he considered how RSM's work could factor into this case.  In October 2018, as Commisso, Naviloff, and the RSM team discussed whether to provide United Way's Special Committee an extended or abridged deck regarding RSM's analysis, Naviloff raised the potential, future criminal case as a consideration, noting that the team's decision could affect privilege and disclosure obligations "if [Alrai] is charged . . . ."  The following month, while RSM was still developing the "proof of loss draft" for United Way,

---

[126] Indeed, Commisso asserts that his suggestion to remove the term "collusion . . . was consistent with the evidence" available at the time.  Doc. no. 17-4 at ¶ 37.  Commisso does not explain why RSM decided to use the term in the first place, and/or why RSM's reasoning was flawed.  Needless to say, this court does not know whether the difference of opinion between Commisso and the RSM on this point would have been resolved if raised at trial, or which characterization would have been found more credible by the trier of fact.

[127] The court does not remotely suggest here, nor does it have any reason to believe, that Naviloff made misrepresentations or otherwise manufactured or falsified results in his analysis.  The court merely suggests that defense counsel could have identified areas within Naviloff's loss analysis in which there was room for subjective judgment and argued that Naviloff had an incentive to favor United Way in these judgments.

Naviloff met with the USAO in New Hampshire and learned that "much of the [criminal] case will fall upon RSM testimony if they are to bring criminal charges."  Fitzgerald considered this "[g]reat news" and proposed that Naviloff discuss with the government a "Net Worth Method" for calculating United Way's loss, as this method may be less susceptible to criticism and dispute.  Defense counsel could have used these documents to attempt to show that Naviloff and even Fitzgerald wanted to position RSM as an expert for the prosecution, and were thus motivated to strengthen the case against Alrai and maximize the loss calculation for United Way.  Finally, defense counsel could have argued that any concerns of bias within RSM's loss analysis for United Way naturally spill over into the prosecution's case because the prosecution hired Naviloff as their key expert witness, to testify on an "update[d]" version of the same loss analysis.

The prosecution contends that Alrai could not have been prejudiced by the withholding of evidence related to Naviloff's loss analysis because Naviloff did not opine on fraud.  Rather, the prosecution avers, Naviloff was instructed to assume that all of the contracts between United Way and DigitalNet were obtained fraudulently, and Naviloff simply calculated the loss to United Way resulting from this fraud.  This argument inaccurately portrays the nature of Naviloff's loss analysis.  Naviloff did not calculate the full value of each allegedly fraudulent contract and label that as United Way's loss. Instead, he calculated the loss associated with specific, fraudulent conduct: duplicative billing, excessive billing, and billing for services not rendered by DigitalNet.  In this way, Naviloff's loss analysis measures and provides proof of Alrai's fraud.  Further, the prosecution's argument overlooks that, although Naviloff was instructed to "assume"

fraud to perform his loss analysis in the criminal case, his prior work for United Way erected the framework for the allegations of fraud against Alrai, which led to the eventual loss analysis.

The prosecution also attempts to minimize the importance of the withheld evidence pertaining to Naviloff's loss analysis by asserting that Naviloff also completed a personal enrichment calculation, which is independent of any of the withheld evidence and confirms that United Way suffered over $3 million in losses from Alrai's alleged fraudulent conduct.  Naviloff's personal enrichment calculation can certainly help add credibility to Naviloff's loss analysis, but, in this court's opinion, it does not render the withheld evidence discussed here non-prejudicial.  While rendering the verdict, this court articulated that, "[t]he duplicate billing, the failure to render services in some cases, the astronomically excessive markups establish fraud . . . ."[128]  This aspect of Naviloff's loss analysis undoubtedly factored into the verdict, as the prosecution intended.  The court finds that Alrai was prejudiced by the withholding of documents suggesting that the analysis was not reliable.

***The withheld evidence reveals Commisso's involvement in the prosecution's case, which presented opportunities for Commisso to shape the case in United Way's favor.***  Defense counsel also could have used a series of withheld documents (again, particularly RSM emails) to attempt to demonstrate that Commisso meaningfully participated in the prosecution's case, with limited oversight from the prosecutors.  As

---

[128] Doc. no. 116 at 85:23-25.

outlined below, defense counsel could have presented this as another opportunity for

Commisso to taint the prosecution's investigation and case with his own biases in favor

of United Way and against Alrai, in order to facilitate a positive outcome for United Way

and, by extension, to facilitate and enhance his professional relationship with United

Way.

To begin, the documents demonstrate that the prosecution forwarded at least some

of Alrai's discovery requests to Naviloff and Commisso, and Commisso reviewed

documents prior to their production for loosely defined "issues regarding redaction,

privilege, disclosure to the defendant, etc."  The prosecution would likely agree that this

was its practice, given that the prosecution noted in its objection to the instant motion

that, prior to trial, it "conferred with [United Way's] counsel and with RSM to determine

if they possessed any non-privileged documents responsive to the defendant's [discovery]

requests."  Armed with this information, defense counsel could have elicited testimony

from Naviloff at trial regarding Commisso's role in the prosecution's case.  Presumably,

Naviloff would have testified (as he did at the Brady hearing) that, before any United

Way documents were produced to Alrai, Naviloff sent them to Commisso for his review

or otherwise discussed them with Commisso.  This testimony is made more favorable to

Alrai by the fact that the testimony from trial and the Brady hearing, as well as the

withheld documents, do not explain what, if any, control or oversight the prosecutors

exercised over Commisso's document review.  Rather, one email disclosed after trial

suggests that the prosecutors did not review or place limitations on Commisso's

document production decisions.  In this email from August 2019—after the prosecution

hired Naviloff as its expert—Naviloff conferred with Commisso regarding whether

certain United Way documents in RSM's possession should "potentially [be] provid[ed]

to USAO."  Presumably, the prosecution would not have been aware of this

communication, or whether Commisso decided to withhold any of the referenced

documents.

      If the information discussed above had been disclosed prior to Alrai's trial,

defense counsel may have been inclined to probe further into Commisso's contributions

to the prosecution's case.  Through these inquiries, counsel would have uncovered that

Commisso met with and helped prepare each United Way witness for trial, attended

meetings with prosecutors, and, in total, spent over 360 hours participating in "the

government's investigation and prosecution of [Alrai's] case"—something Commisso

testified to at the <u>Brady</u> hearing and wrote about in a February 2020 letter to Officer

Buckley regarding restitution for United Way.  Each of these areas of involvement would

have provided defense counsel new avenues to challenge the prosecution's case by

exposing potential biases against Alrai.  In sum, defense counsel could have attempted to

raise suspicions about the reliability and objectivity of the prosecution's case at large, by

demonstrating to the trier of fact that Commisso, who was aligned with the victim and

biased against Alrai, got to choose which documents Alrai received during discovery,

insert his opinion in meetings with prosecutors, and prepare witnesses for trial.[129]

---

[129] Alrai argues that the prosecution "ceded to Attorney [] Commisso their duty to discover exculpatory evidence," and Commisso was the "gatekeeper of evidence and decider of what as relevant to the prosecution . . . ."  Doc. no. 164 at 2, 3 n.3.  Alrai also describes Commisso as an

Naviloff and Commisso have denied any improper involvement in the prosecution's case, both in affidavits submitted to the court after the Brady motion was filed and testimony provided at the Brady hearing. Naviloff asserted that Commisso only reviewed documents for privilege prior to their production, and he "could not recall" an instance in which Commisso did not allow RSM to disclose a document to the government.[130] Commisso stated that he did not "interfere with or improperly influence RSM's work for the government," and that his "presence and roles as counsel [for United Way] was known and out in the open throughout [his] time representing [United Way]."[131] The court is not inclined to speculate after the fact as to whether these statements, one of which is based on Naviloff's recollection, would have effectively mitigated concerns that Commisso strategically withheld documents from Alrai or otherwise improperly influenced the prosecution's case. This determination should be made by the trier of fact in a new trial after weighing these individuals' credibility and the totality of the evidence.

***The withheld documents showing that Naviloff consulted with an RSM Senior Associate on IT-related questions could have been used in attempts to impeach Naviloff***

---

"arm of the prosecutor," such that his non-disclosure of Brady evidence is attributable to the prosecution. Doc. no. 174 at 4. The court does not find that the evidence conclusively establishes this. Regardless, as described herein, the court concludes that the prosecution committed Brady violations, and Commisso's involvement in the prosecution's case forms one part of this conclusion.

[130] See doc. no. 200 at 65:15-67:6.

[131] Doc. no. 170-4 at ¶¶ 39, 50.

***and undermine the reliability of his expert opinion at trial.***  By its nature, Naviloff's

loss analysis, which involved identifying and quantifying duplicative billing, excessive

billing, and billing for IT services not rendered by DigitalNet, required an understanding

and examination of DigitalNet's IT services.  Indeed, Naviloff notes in his expert report

that his team analyzed DigitalNet's invoices to identify "categories of products and

services [DigitalNet] allegedly provided," and "collected and forensically copied laptop

images" on United Way's virtual desktop environments.  Yet, prior to trial, Naviloff and

the prosecution revealed little of substance about the source of the IT analysis underlying

Naviloff's opinion.  A series of withheld documents—RSM's billing statements to the

USAO and United Way and RSM emails— suggest that Naviloff gathered the bulk of his

IT analysis from Gilpin, a Senior Associated at RSM.  Defense counsel could have used

these materials to attempt to impeach Naviloff's testimony at trial regarding his IT

consultations and to probe (and cast doubt on) Gilpin's qualifications as an IT expert.

During his cross examination at trial, Naviloff agreed that he is not an IT expert.

He testified that he consulted with Meyer, Rosenfeld (who Naviloff described as an IT

expert with over 20 years of experience), and "another couple of associates that report to

[Rosenfeld]" for their IT expertise while developing his loss analysis.  He did not

mention Gilpin.  Nor did Naviloff detail these consultations or mention Gilpin in his

expert report; rather, he referenced the "assistance" he received "from professional staff

at RSM," and stated that he learned about high availability server environments from RSM's IT professionals.[132]

The RSM billing statements to United Way and the USAO that predate Alrai's trial indicate that Gilpin billed over 100 hours to the engagements, while Rosenfeld billed 7 hours. In the single RSM bill to the USAO from before the trial, covering the period from July 17 to October 4, 2019, Rosenfeld did not bill any time, and Gilpin billed 18.5 hours. Gilpin's contributions to the loss analysis were also referenced or discussed in multiple RSM emails. On top of that, in two of those emails, Naviloff described Gilpin as "central to the team," and Naviloff sought answers to IT-related questions directly from Gilpin.

Surely, defense counsel could have argued, Naviloff was well aware of Gilpin's role on the team, but Naviloff purposely downplayed Gilpin's contributions in his expert report and in his testimony because Gilpin was a relatively inexperienced Senior Associate, and not a seasoned IT expert, like Rosenfeld. Defense counsel could have bolstered this theory by presenting an email that Fitzgerald wrote to Naviloff in November 2018, expressing concern that the information that RSM was "communicating

---

[132] In addition to pointing out these references to IT consultations in Naviloff expert report, the prosecution asserts that Naviloff did not "base[] his loss amount conclusions on [the] opinions of his co-workers." Even if a trier of fact was required to accept this claim (and it was not), it does not change the fact that Naviloff considered the analysis of IT consultants, and Gilpin in particular, to inform his loss analysis. Naviloff and the prosecution should have put Alrai on notice as to the depth and breadth of Naviloff's IT consultations, as they formed part of the factual basis of his opinion, and Naviloff did not adequately do so through the limited references in his report to RSM's IT professionals and the professional staff at RSM.

to the USAO [was] relying solely on Ryan [Gilpin]," who Fitzgerald described as "only a (newly promoted) Senior Associate."

The importance of producing RSM's billing statement to the USAO is not lost on the prosecution, either. To his credit, the lead AUSA stated at the <u>Brady</u> hearing that he "wish[ed] [he] had produced the [RSM] bill," which was addressed to him; he also "assume[d] [he] received it . . . around early November[,]" roughly one month before trial.[133] Indeed, if the prosecution had produced the bill once the AUSA received it, defense counsel would have had the opportunity to learn of Gilpin's contributions to the loss analysis and request more information about Gilpin's credentials and experience prior to trial. Defense counsel could have asked its expert to opine on the same, and the witness, and thus the prosecution, would have had to answer to any resulting criticism. Further, if Gilpin's expertise proved too limited, as Fitzgerald's email suggests, defense counsel could have used this information to attempt to challenge the reliability of Naviloff's expert report and further undermine Naviloff's credibility. These opportunities to impeach Naviloff and undermine his report, of course, would have compounded the concerns discussed earlier, regarding Naviloff's biases against Alrai and in favor of United Way.

---

[133] Doc. no. 232 at 233:24-234:7.

**B.  The prosecution's oversights, omissions, and misleading assertions regarding discovery**

In addition to failing to produce favorable evidence and thereby prejudicing Alrai, the prosecution committed a number of discovery failings, mistakenly omitting documents from pre-trial productions and making false and misleading statements regarding its compliance with Alrai's discovery requests.  These failings demonstrate, at best, a careless approach to discovery that falls short of the standards required of the USAO, which are expected and normally routinely observed by this court.  More pertinent to this motion, the prosecution's discovery failings also contributed to the prosecution's failure to disclose some of the <u>Brady</u> material discussed above.

To begin, the prosecution admits that certain documents disclosed after Alrai's convictions should have been included in pre-trial productions.  This list consists of RSM's October 2019 billing statement to the USAO and all of the emails between Meyer and Naviloff, three of which (by the prosecution's own admission) contained <u>Jencks</u> Act material of Meyer and/or or were arguably relied upon by Naviloff.

The prosecution does not provide a satisfactory explanation for these oversights.  Notably, the prosecution's account of the withholding of the Meyer-Naviloff emails reveals a lack of diligence in its handling and review of documents.  The prosecution received and reviewed the Meyer-Naviloff emails in November 2019.[134]  According to an

---

[134] The court initially understood, based on the AUSA's declaration, that the prosecution wholly relied on Naviloff's relevance determinations when managing the production of the Meyer-Naviloff emails in November 2019, and prosecutors did not review the emails until December 2020, at which point the prosecution recognized that some contained <u>Jencks</u> Act statements

AUSA's sworn declaration, upon receiving the emails, the prosecution asked Naviloff

which ones were relevant to his opinion and then proceeded to produce only those to

Alrai.  As a result, 13 emails were not produced.  A few days later, the prosecution stated

in a brief submitted to this court that Alrai had every document that Naviloff considered

in his analysis.  Shortly thereafter, the prosecution produced all of the documents in

United Way's e-discovery database which RSM viewed, but it continued to withhold the

remaining Meyer-Naviloff emails—documents that Naviloff viewed.  Following that, in

June 2020, Alrai requested any "reports, emails or other communications" from Meyer to

RSM or Naviloff, and, once again, the prosecution failed to produce the remaining

emails.  After overlooking the emails at these junctures, the prosecution finally produced

them after another review in December 2020, one year after the trial.

A similar lack of diligence also appears to explain the prosecution's failure to

disclose 600+ RSM emails.  As discussed above, the prosecution produced over 650

RSM emails relating to RSM's engagements with United Way and the USAO in

September 2020, only after Alrai requested them in two post-conviction discovery

motions, and this court ordered their disclosure in August 2020.  As discussed above,

---

and/or were relied upon by Naviloff.  The prosecution corrected this misapprehension in an
assented-to motion, clarifying that it did review each of the emails in November 2019 (and
nevertheless withheld a portion of them).  The prosecution pointed, in part, to handwritten notes
taken by an AUSA during the November 2019 meeting with Naviloff, which show that each
email was discussed during the meeting.  See doc. no. 264 at ¶ 3 (citing doc. no.212-5) (asserting
that "the prosecutors did review the 18 emails in November 2019 . . . [and] addressed the emails
individually with Naviloff . . . .")

these emails contained <u>Brady</u> material.  This court learned during Naviloff's testimony at

the <u>Brady</u> hearing, however, that the prosecution could have avoided this <u>Brady</u> violation.

Naviloff testified at the <u>Brady</u> hearing that he "made it known" to the USAO and

Commisso that he exchanged emails with his team while developing his opinion, and that

he incorporated some of the information from these internal emails into his report and

discarded others.[135]  Naviloff further testified that he, Commisso, and potentially the

USAO also "discussed generally whether [they] needed to do an email review and turn

over [the RSM] emails."[136]

Once the prosecution learned that Naviloff received information and analysis from

his team over email, and that Naviloff incorporated some of this information into his

report, the prosecution had a responsibility to review these emails in order to understand

what information Naviloff did and did not rely on in forming his opinion, and to identify

<u>Brady</u> and <u>Jencks</u> material, whether or not Naviloff claimed to have relied on it.  The

prosecution should have been particularly interested to learn what IT expertise and

---

[135] <u>See</u> doc. no. 200 at 116:5-19 ("THE COURT: But did you have conversations with Attorney Commisso [and] the U.S. Attorney's Office about the fact that you had internal emails that you reviewed as part of your work?  THE WITNESS [Naviloff]:· Yes, I would have made it known that there were emails that had communications between me and my team that I considered part of Commisso's discussions -- privileged.  And that was made known.  THE COURT: And as you already explained, that information you relied on would be included in the reports; but information you chose not to rely on would not be included?  THE WITNESS:· That's correct, yes -- transient.").

[136] <u>See</u> <u>id.</u> at 115:5-13 ("THE WITNESS [Naviloff]: Yeah.  And we discussed generally whether we needed to do an email review and turn over emails.  THE COURT:  Who is "we"?  THE WITNESS:  Commisso and, I believe, the U.S. Attorney's Office as well.  I can't remember exact discussions.  THE COURT:  And you?  THE WITNESS:  Yeah.").

analysis Naviloff gathered from these emails, since Naviloff lacked this expertise himself, and, according to the prosecution, RSM team members like Gilpin and Rosenfeld did not maintain notes or memoranda memorializing their opinions in this case.  The prosecution should have also been motivated to review the RSM emails prior to trial upon receiving Alrai's discovery requests.  On July 30, 2019, defense counsel requested "all documents and other data collected and reviewed by RSM in calculating [United Way's] loss."  Given that the prosecution, at some point, was aware that Naviloff was not an IT expert, that Naviloff consulted with IT experts at RSM, and that these IT experts conveyed their opinions to Naviloff over email, and not through other notes or memoranda, the prosecution should have concluded that the RSM emails were an obvious source for documents responsive to this request.  Nevertheless, the prosecution did not review or produce these emails until forced to do so well after the trial.  The AUSAs on the case have argued that they had no such obligation.  The court simply disagrees.

By taking the necessary step of reviewing the RSM emails, the prosecution would have found and produced the <u>Brady</u> material discussed above, including emails between Naviloff and Commisso reflecting their potential bias against Alrai, emails demonstrating Gilpin's contributions to RSM's loss analysis, and Fitzgerald's email describing his concern over the team's "sole[]" reliance on Gilpin, as opposed to Rosenfeld, for IT expertise.  The prosecution would have also found other relevant documents that Alrai requested.  For example, the prosecution would have found the email between Naviloff and Gilpin discussing the full, detailed 2018 United Way network scan.  This

communication would have alerted the prosecution to the fact that the single-tab spreadsheet of United Way's network scan that it produced around September 2019 was incomplete.  Also, as discussed above, the RSM emails reference internal reports and memoranda created by members of the RSM team and notes from RSM's meetings with United Way personnel—two categories of documents that Alrai requested prior to trial, and the prosecution claimed did not exist.

Finally, the prosecution's discovery omissions and oversights are made even more problematic by the prosecution's repeated assertions that it had turned over all of the available documents that Alrai requested, and that Alrai's further discovery requests were excessive and baseless.  The record contains several of these false and misleading statements from the prosecution, with impermissibly unfortunate consequences for the discovery process.

Many of these false assertions were directed towards Alrai's discovery requests pertaining to Naviloff's expert report.  In September 2019, one AUSA wrote to Alrai that the prosecution had produced "every document that RSM had access to when conducting its loss analysis for [United Way] that is relevant to Mr. Alrai's criminal liability."  Two months later, the prosecution represented that Alrai had "everything Mr. Naviloff relied upon," and Alrai's continued discovery requests related to Naviloff were based on a "speculative theory that there exists some undiscovered cache of documents that undermine the factual basis of Mr. Naviloff's analysis . . . ."  The prosecution made these statements <u>before</u> turning over each of the documents that RSM accessed within United Way's e-discovery database in November 2019.  It also made these statements just days

after receiving 18 emails between Meyer and Naviloff and withholding 13 of them, two of which the prosecution conceded (in December 2020) were "arguably" relied upon by Naviloff.

As discussed above, upon learning more about Naviloff's IT consultations during trial, Alrai filed a discovery motion related to Naviloff's opinion in July 2020, requesting, in part, information regarding Naviloff's and Gilpin's credentials, communications between Naviloff and his RSM associates, and RSM billing statements to the USAO. The prosecution described these requests as "a classic fishing expedition, borne of desperation," and "based on mere speculation."  The prosecution also insisted that Alrai "was furnished with everything necessary to cross-examine Naviloff, as well as to hire defense experts to counter Naviloff's loss opinions at trial."  This claim proved untrue, as Alrai's requests resulted in the production of RSM's billing statements to United Way and the USAO—documents that could have been used to reveal Gilpin's involvement in Naviloff's loss analysis and thereby "counter Naviloff's loss opinion at trial."

Alrai's second post-conviction discovery motion in August 2020—which included a request for the RSM emails concerning RSM's work for United Way and the USAO— was also met with gratuitous criticism by the prosecution.  In its objection, the prosecution described Alrai's discovery requests as "scattershot [and] groundless," "utterly unfounded," and "a fishing expedition through information belonging to [United Way] and RSM that is wholly unrelated to the issue of loss sustained by the victims in this case[.]"  The prosecution also represented that there were only a "limited number of emails" responsive to Alrai's request for documentation of Naviloff's consultations with

Rosenfeld and other RSM associates.  In both criminal and civil litigation, the use of critical and derisive adjectives and adverbs to describe adverse counsel's case or requests for relief is, to put it charitably, the lease effective of all ineffective advocacy techniques. But in this case, it was not only ineffective; it was also inaccurate.  These assertions were proven untrue when the prosecution produced over 600 RSM emails related to RSM's engagement with United Way and the USAO, some of which contained <u>Brady</u> material, as discussed above.

The prosecution's dismissive and false assertions regarding discovery, particularly when combined with its insufficiently diligent approach to document review and production, inserted disorder and disruption into the discovery process, both before and after the trial.  The prosecution insists that any misrepresentations were inadvertent.  The court takes the prosecution at its word, but that is beside the point.  The prosecution's conduct complicated and slowed down defense counsel's development of its defenses and discovery requests, and contributed to the withholding of <u>Brady</u> material and other documents that Alrai legitimately requested.

## C.  Remedy

Having concluded that the prosecution committed <u>Brady</u> violations, the court turns to the issue of the proper remedy.  Alrai moves for the dismissal of his indictment or a new trial.  The prosecution proposes that the court reopen the bench trial and "take additional testimony," as permitted under Federal Rule of Criminal Procedure 33(a).  The court concludes that the proper remedy is a new trial before the traditional trier of fact in a criminal case: a jury of twelve.

To begin, "[a] dismissal [of an indictment] [is] ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." United States v. Giorgi, 80 F.2d 1022, 1030 (1st Cir. 1988) (quoting United States. v. Ogden, 703 F.2d 629, 636 (1st Cir. 1983)).  The First Circuit Court of Appeals has further elaborated that the dismissal of criminal charges is permitted "only in those very rare instances when the government's misconduct is so appalling and egregious as to violate due process by shocking the universal sense of justice." United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017) (internal quotation omitted).  The prosecution's conduct in this case does not rise to a level that "shock[s] the universal sense of justice." Id.  Dismissal is not warranted.[137, 138]

---

[137] The court further notes here that this order should not be read to suggest anything remotely improper in the conduct of Attorney Commisso or Mr. Naviloff.  The point here is not to suggest professional misconduct on their parts.  The point, rather, is that full discovery might have enabled defense counsel to elicit evidence and testimony highlighting their conduct, motivations, and incentives in order to appropriately test and challenge the prosecution's case.

[138] Alrai argues in his Brady motion that the government "allowed [United Way] to destroy the [United Way] IT environment," and this, in addition to the prosecution's Brady violations, provides grounds for dismissal.  Doc. no. 164 at 22.  Specifically, on June 18, 2018, roughly a week after Alrai was terminated, his counsel sent a letter to United Way requesting that certain IT data be preserved, including "[d]ocuments or correspondence related to any and all RFP for Information Technology or similar technological support services" and "[d]ocuments or correspondence to or from or copying Mr. Alrai's United Way email address: ialrai@supportunitedway.org."  Doc. no. 164-10 at 2.  Alrai argues that the government was "intimately involved with [United Way] prior to the destruction of the IT environment; it would have known that the environment would be important to both the prosecution and defense[;] . . . [a]nd there is little doubt that the government was aware of Mr. Alrai's specific attempts to ensure the preservation of the IT environment," such as the June 2018 letter.  Doc. no. 164 at 24.  Contrary to Alrai's assertion, Commisso testified at the Brady hearing that the evidence requested in the June 2018 letter was not destroyed, and "100 percent, or nearly 100 percent, of those items were, in fact, produced to the Government."  Doc. no. 219 at 41:6-9.  Also, in seeming contradiction to Alrai's claims of evidence destruction, Alrai has more recently asserted that, in January 2021, the prosecution produced "approximately 50 new documents including

In the alternative, Alrai seeks a new trial based on newly discovered evidence, under Rule 33.  "Rule 33 allows the district court, on motion of a party and in the interest of justice, to grant a new trial."  U.S. v. Lema, 909 F.2d 561, 564 (1st Cir. 1990).  "If the case was tried without a jury," Rule 33 also provides that "the court can take additional testimony and enter a new judgment."  Fed. R. Crim. P. 33(a).  "A district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a 'judgment call.'"  United States v. Connolly, 504 F.3d 206, 211 (1st Cir. 2007) (quoting United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir .2007)).  Furthermore, "[t]he remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result."  United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001).

To obtain a new trial under Rule 33 based on newly discovered evidence, a defendant must generally satisfy a four-part test, "show[ing] that the evidence (1) was either unknown or unavailable to him during the trial; (2) could not have been uncovered sooner with diligence; (3) is material, not just cumulative or impeaching; and (4) is

---

many technical documents related to IT Environment, Infrastructure, Network, Security, Network Drawings & Visuals . . . that the defendant and his IT Expert requested many times since the beginning of this case. Documents in this production consist of hundreds of pages . . . ." Doc. no. 243 at 83.  Even if the court accepts Alrai's claims that the IT environment was destroyed, that the June 2018 letter to United Way somehow put the government on notice as to Alrai's requests to preserve the IT environment, and that the government was in a position to halt the destruction of the IT environment but did not do so (none of which the court is prepared to accept based on the relatively undeveloped record on these issues), the court still does not consider this grounds for dismissal because Alrai has not shown that "the loss of the [requested evidence] was due to bad faith of any government agency." U.S. v. Sherlock, 962 F.2d 1349, 1355 (9th Cir. 1989); see also Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

sufficiently compelling that it would probably produce an acquittal at a retrial . . . ."
United States v. Laureano-Salgado, 933 F.3d 20, 28 (1st Cir. 2019) (internal citations
omitted), cert. denied, 140 S. Ct. 619 (2019).  But "[t]his formulation is somewhat
different if a movant colorably asserts that the government violated Brady." U.S. v.
Peake, 874 F.3d 65, 69 (1st Cir. 2017).

To obtain a new trial under Rule 33 upon establishing a Brady violation, as here,
the defendant "must [still] satisfy the first (unavailability) and second (due diligence)
elements of the conventional [Rule 33] test." Peake, 847 F.3d at 69.  But the third and
fourth elements of the Rule 33 test become "more defendant-friendly" when a Brady
violation is involved.  Connolly, 504 F.3d at 213.  The third and fourth elements "are
merged and 'replaced with [a] unitary requirement'" that follows the Brady prejudice
standard.  Peake, 847 F.3d at 69 (quoting Connolly, 504 F.3d at 213).  In other words,
"the defendant need demonstrate only 'a reasonable probability that, had the evidence
been disclosed to the defense' in a timely manner, 'the result of the proceeding would
have been different.'"  Id.  (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).
This reasonable probability standard is equated with "something sufficient to 'undermine
confidence in the outcome of the trial.'"  U.S. v. Mathur, 624 F.3d 498, 504 (1st Cir.
2010) (quoting Kyles, 514 U.S. at 434).

The court has already found that the unavailability and prejudice elements of the
Rule 33 test are satisfied, as discussed above.  The prosecution argues that Alrai did not
satisfy the remaining element regarding due diligence.  According to the prosecution, the
withheld evidence was not in the government's possession, but instead in the possession

of third parties (RSM and United Way), to which Alrai did not issue a subpoena.  The prosecution's argument is unavailing.  Alrai reasonably and diligently attempted to obtain the Brady material through discovery requests to the prosecution.  Alrai's failure to take the additional step of subpoenaing RSM and United Way does not reflect a lack of due diligence under the circumstances of this case.

The Brady material, as recited above, consists of RSM emails and RSM's billing statements to United Way and the USAO.  First, the prosecution has conceded that RSM's pre-trial bill to the USAO was in its possession prior to trial.  As to the RSM emails, Alrai took a reasonable approach to obtaining those documents through his July 2019, pre-trial request to the prosecution for "all documents and other data collected and reviewed by RSM in calculating United Way's loss."  Alrai would have had little reason to believe that a subpoena to RSM was necessary when, a couple months later, the prosecution asserted that Alrai had "every document that RSM had access to when conducting its loss analysis for [United Way] that is relevant to Mr. Alrai's credibility."  The court cannot conclude that a failure to subpoena RSM for its emails shows a lack of due diligence under these circumstances.  The final Brady document to consider is the RSM bill to United Way.  The court agrees that this was not in the government's possession prior to trial, but, again, it would have taken more than just 'due diligence' for Alrai to divine that these bills would contain favorable, material evidence, and then to craft a targeted request for them.  The court finds that the elements of the Rule 33 test are satisfied.

This court presided over the December 2019 bench trial, convicting the defendant of 44 felony counts, and acquitting him of nine counts. Since that time, the court has docketed and reviewed ten motions seeking post trial, pre-sentencing relief comprised of over 35 separate filings and over 2,000 pages. This court also presided over motion practice related to withheld evidence and the prosecution's conduct, and the court considered and recognized the defense strategies that Alrai could have employed if the withheld evidence had been produced prior to trial. In light of this immersion in evidence and information, both admissible and inadmissible at trial, the court concludes that a new jury trial is the appropriate remedy here, rather than a new bench trial or the reopening of the original bench trial. This will ensure that an impartial trier of fact views the evidence in its entirety with fresh eyes. Furthermore, the defendant has specifically requested this remedy,[139] and the prosecution has not cited any authority for the proposition that a jury trial, normally granted by the Sixth Amendment to the Constitution, is unavailable as a remedy for Brady violations uncovered following a bench trial.

## IV. Conclusion

For the foregoing reasons, Alrai's Motion to Dismiss[140] is GRANTED, and the court orders a new jury trial in this case. Counsel shall confer and jointly arrange jury selections and a trial date with the Deputy Clerk.

---

[139] See doc. no. 220 at 23 ("[I]f this Court does not dismiss the case against him with prejudice, Mr. Alrai will be asserting his Constitutional right to a jury trial with respect to any subsequent trial.").

[140] Doc. no. 164.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

September 10, 2021

cc:    John S. Davis, AUSA
       Cam T. Le, AUSA
       Matthew Hunter, AUSA
       Donna J. Brown, Esq.
       Michael Gregory Eaton, Esq.
       Kevin M. Sibbernsen, Esq.
       John J. Commisso, Esq.
       U.S. Probation
       U.S. Marshal