*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 30, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:18-cr-192-JL
              v.                    *   November 19, 2021
                                    *   2:34 p.m.
IMRAN ALRAI                         *
                                    *
* * * * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF MOTION HEARING
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:      Matthew Hunter, AUSA
                         John S. Davis, AUSA
                         Cam T. Le, AUSA
                         United States Attorney's Office


For the Defendant:       Donna J. Brown, Esq.
                         Michael Gregory Eaton, Esq.
                         Wadleigh Starr & Peters, PLLC


For the United Way:      John J. Commisso, Esq.
                         Commisso Law PC


Court Reporter:          Liza W. Dubois, RMR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, New Hampshire 03301
                         (603)225-1442

```
1                    P R O C E E D I N G S
2              THE CLERK:  Court is now in session and has before
3    it for consideration a motion hearing in criminal case
4    18-cr-192-01-JL, United States vs. Alrai.
5              THE COURT:  All right.  Good afternoon, everybody.
6              I want to talk a little bit about the motion to
7    withdraw, which I want to say from the outset, because I don't
8    want to give anybody the misimpression, I view this motion as
9    filed in good faith on legitimate grounds and I don't -- I
10   don't want to give the impression for a moment that -- that I'm
11   critical of this motion in any way.
12             That said, I want -- I do want to lay my cards on
13   the table, especially with Attorney Brown and Attorney Eaton,
14   that I -- I do want to explore the possibility today of keeping
15   you in the case, not so much from denying your motion, but
16   wondering if there are circumstances under which you might
17   withdraw it.  Okay?  So I have some questions that I'd like to
18   ask.
19             In preparation to do that, I spent some time with
20   the motion again today and the attachments and really read it
21   carefully.  And I'll admit a couple of things emerged to me
22   that -- a couple things emerged for me that I probably didn't
23   focus on as much the first time through and even when I
24   scheduled the hearing.  So while I have a number of questions,
25   I think today's review makes me want to front-load a couple of
```

1    them and put them right up front because they may be

2    dispositive.

3          You know, I looked at the -- the introductory line

4    of the motion says that the motion is filed due to COVID-19

5    pandemic-related scheduling conflicts creating the risk of

6    ineffective assistance, and that's very straightforward; and

7    failure to pay fees and expenses creating potential conflict of

8    interest.  And that's a little bit different and there was some

9    nuance there that I didn't focus on, I think, enough the first

10   time I read through it and scheduled the hearing, so let me

11   talk a little bit about that.

12         I do want to say, Attorney Brown, that on the first

13   issue, in terms of scheduling, I -- when I denied the motion to

14   extend some deadlines, I really wasn't aware of all those

15   pressures that you had in state court.  And I think I should be

16   flexible about addressing some of those issues if we can get to

17   a place where your continued involvement is possible.  So, that

18   said, let me move on to other issues.

19         I'm looking at page five of the motion, on page five

20   if anybody has it.  And there, Counsel, you made the point --

21   you made the point that you seek to withdraw regardless of

22   Mr. Alrai's eligibility for representation under the CJA and

23   that it's appropriate for the Court to appoint new counsel to

24   address the issue of repatriation so the Court may make a

25   determination about eligibility for appointment under the CJA.

1   And at the end of the paragraph you repeat it, that new counsel

2   should be appointed to address the issue, the issue being a

3   thorough accounting of the funds subject to the repatriation

4   order.

5             Okay.  So let me just sort of set the stage.  I

6   think I have a better understanding now maybe where you're

7   coming from and I just need to kind of lay it on the table.

8             We did have prior counsel.  There's been a number of

9   counsel in the case.  But counsel that served after trial but

10  before present counsel was Attorney Strauss and he -- he made a

11  filing where he withdrew certain representations made about the

12  repatriation issue and -- and sought to withdraw it, which was

13  granted.

14            And I guess I just need to ask you, Attorney Brown,

15  are you in a position where -- where even if -- where if you

16  were appointed as CJA counsel, as you had requested, if you

17  were proceeding under CJA for your compensation but the Court

18  wanted to pursue the repatriation issue and litigate it, would

19  you be in a position -- would you have ethical challenges to

20  being able to continue?  Would there be barriers to that?  Is

21  that what you're trying to tell me in this sort of -- the same

22  message that Attorney Strauss filed on?  Is that what you're

23  telling me or am I misinterpreting.

24            You're muted.  You're muted.

25            MS. BROWN:  I had my button -- I was muted.  I

1    wanted to answer that a hundred percent no.

2              THE COURT:  Okay.

3              MS. BROWN:  That is not anywhere close to that.  I

4    think what the ethical issues are is that -- because I -- I'm

5    trying to -- I don't have all the motions pulled up to open

6    them, but I do remember one of the -- I don't know if it was an

7    order or pleading from the government of like, well, you can go

8    file a lien or you can do all that and I do not feel

9    comfortable, and my firm does not feel comfortable, pursuing

10   Mr. Alrai in civil court at the same time I'm representing him.

11   And, you know, so that -- that was the issue.  And -- and so --

12   but it has nothing to do with any false statements that I

13   believe that he's made regarding repatriation.

14              And, again, if we're laying all our cards on the

15   table, I will do that regarding repatriation.  You know, there

16   were a bunch of things when I went through that were stacking

17   on frustration:  The denial of the motion to appoint, just the

18   objection by the government -- I mean, that -- that was the

19   ultimate hubris of them delaying the Brady -- you know,

20   litigating Brady for a year and a half till my client ran out

21   of access to funds and then say, oh, you don't get a lawyer

22   now.

23              So that frustration was there.  The frustration of

24   the denial of the extension, and -- and the big one was like,

25   oh, my -- you know, literally I said this in my brain, not the

1    repatriation again.  You know, this is the third time.  And it

2    -- and it's just so frustrating to me because it keeps getting

3    put up when the government's back on the heels of something.

4            So it was brought up -- because I remember at the

5    very first hearing I was at, they were bringing it -- the

6    government was bringing it up, that we've got to deal with this

7    right away, and I said, well, it hasn't been dealt with since

8    November, why is it a big emergency, can't I get up to speed on

9    the case before I have to address repatriation.  And the -- and

10   the big urgency then was that, you know, he might leave the

11   country.  Of course, that was a spurious argument.

12           So then when I file a motion to get appointed at --

13   knowing that we will, you know, our firm will lose money on

14   getting appointed because that's not what we contracted with,

15   but I was willing to do that, then they bring up repatriation

16   again.  So I'm very frustrated by repatriation.  So -- so this

17   has nothing to do with my knowledge of any false statements

18   regarding repatriation.

19           THE COURT:  Okay.

20           MS. BROWN:  I want to make that a hundred percent

21   clear.

22           THE COURT:  Yeah.

23           MS. BROWN:  This has to do with not wanting to be a

24   civil litigant against Mr. Alrai at the same time that I am,

25   you know, litigating his case in --

```
 1                    THE COURT:  Yeah.

 2                    MS. BROWN:  -- in federal court.

 3               I also think, too, as you know, I've -- I do a fair

 4     amount of ineffective assistance of counsel claims and I've

 5     done -- I've done a couple in federal court.  I do more in

 6     state court.  And as someone who litigates ineffective

 7     assistance of counsel claims, one of the first things I'm going

 8     to look at is money.  You know, I had a case a couple years ago

 9     where someone paid their trial counsel $5,000 for a

10     week-and-a-half aggravated felonious sexual assault.

11                    THE COURT:  Yeah.

12                    MS. BROWN:  I'm like, okay, that's -- and then they

13     didn't do any investigation, didn't do any trial prep, didn't

14     write an opening argument.  I'm like, yeah, for $5,000, you're

15     not going to get those things.

16               And so not getting paid, you know, obviously there's

17     the financial loss to my firm and myself and Attorney Eaton,

18     but it also creates potential issues down the road for

19     ineffectiveness of, you know -- and I have no reason that

20     Mr. -- reason to believe Mr. Alrai would do this, but, you

21     know, successor counsel may say, hey, they were working for how

22     many months without money?  Let's go look and see what they

23     decided not to do.  So that -- that is the risk that --

24                    THE COURT:  Yeah.  Okay.

25                    MS. BROWN:  -- that's based on.  It has nothing to
```

1    do with repatriation.

2              THE COURT:  Understood.  I -- and by the way, in

3    terms of false statements -- you know, I don't even know if

4    false statements had anything to do with Attorney Strauss'

5    withdrawal, prior counsel.  I wasn't going to false statements.

6    I just was wondering if -- I was wondering if you were just

7    trying to discretely tell me you had a similar problem and you

8    needed to withdraw, but --

9              MS. BROWN:  No, that's not the case.

10             THE COURT:  -- you've answered that.  Thank you.

11             MS. BROWN:  Yes.

12             THE COURT:  I was hoping to just get my questions

13   answered today, but you've said a couple of things that the

14   government's probably going to want to respond to, so I need to

15   give them an opportunity to do that just on this one small

16   question.  But I want to say a couple things about it.

17             I've already explained, yeah, false statements is

18   not in my mind.  It's just, you know, that's one of any number

19   of things that could cause counsel to want to withdraw as

20   Attorney Strauss did.  But, again, you've addressed it.

21             Number two, I don't -- I don't want to suggest to

22   you that repatriation -- I mean, repatriation is my issue.

23   Like the fact that the government raised it -- frankly, I

24   didn't even remember that the government raised it.  It's --

25   it's my issue because I'm trying to evaluate someone's

1    eligibility for CJA counsel.  It's really nothing more

2    complicated than that.  And I don't think it's a small issue in

3    the case.  I think it's a large issue in the case because

4    there's a court order -- there's a court order that hasn't been

5    complied with to -- in my view.

6           But, you know, if the choice is losing very

7    competent counsel over it, it might be something I'm willing to

8    back-burner and maybe take another look at CJA appointment.

9    And I just -- so I don't view repatriation as sort of the

10   government's issue.  I guess it is important to them and I

11   guess they briefed it, but it is important to the Court.  It's

12   not just something I -- I view it as -- to evaluate a request

13   for CJA counsel, it's something I needed to do the Court's due

14   diligence on.  That's why I -- that's why I cited --

15          MS. BROWN:  Can I address that, your Honor?  What's

16   frustrating, though, is it never gets brought up in its own

17   right.  No one ever -- like if the government said, motion to

18   have Mr. Alrai found in contempt for failing to comply with

19   repatriation --

20          THE COURT:  I think they've done that.  I actually

21   think they've done that earlier in this case, to tell you the

22   truth.  I don't view it as just a reaction.  I mean, I hear

23   your point.  You're saying frustrating to hear it brought up as

24   a kind of a judo defensive move --

25          MS. BROWN:  Right.

1          THE COURT:  -- but --

2          MS. BROWN:  It's always brought up with something

3  else.

4          THE COURT:  Okay.

5          MS. BROWN:  It's always -- it's either bail or now

6  it's appointment of counsel.  And it hasn't been litigated.

7          And then, you know, as I said they --

8          THE COURT:  How's it -- but, see, here's the thing.

9  How's it going to be litigated?  I haven't examined the docket

10  on this and perhaps, you know, your perception is correct.  I

11  don't know.  But, to me, the repatriation issue is an issue

12  that's been steadily advanced by the government throughout this

13  litigation in a consistent way, not in a way that I've at least

14  noticed has been sort of a defensive counterpunch whenever

15  there's something raised by the defense.  It seems to me

16  that -- and I think they did request a contempt finding

17  sometime in the case, although I'm not sure.  It's been a long

18  case.  Let's face it.

19          Anyway, let me let the government respond to the

20  extent it needs to before I move on because I do want to

21  explore the issue of this motion to withdraw.

22          But I want -- whoever's speaking for the government,

23  you can respond to anything that you've heard that you want to

24  say anything about.

25          MS. LE:  Your Honor, my only comment is it's been

1    almost a year and a half since we filed a motion for a show

2    cause hearing related to the repatriation issue and I think the

3    Court is right on target about all the other times.  We've

4    addressed it; we addressed the issue of repatriation before

5    trial, twice; we addressed it after trial not only with

6    Ms. Brown and Mr. Eaton, with Mr. Strauss and his firm as well.

7              This is an ongoing issue that is important to the

8    government and to the Court for lots of reasons.  The defendant

9    has been released.  Part of the Court's release order was

10   dependent on or at least based in part on the idea that the

11   Court would be able to gain some kind of more thorough

12   accounting with the defendant out on release.  That hasn't

13   happened.

14             And then what the Court just identified now is

15   whether the defendant has the means, including the million

16   dollars that we've identified that was sent to Pakistan, in

17   order to pay counsel.  And certainly that is part of the

18   Court's due diligence, which is the thing that the government

19   brought up in its response.

20             We don't object -- if the defendant really is out of

21   funds and the Court is in a position to appoint Ms. Brown as

22   CJA counsel, we don't object to that, your Honor.  But the

23   Court, as you said, has to do its due diligence.  We don't know

24   what happened to that million dollars to this day.  It's been

25   well over two years since the Court's order regarding

1    repatriation.

2              So that is the only point the government wishes to

3    address regarding counsel's statements on this issue.

4              THE COURT:  Yeah.  Okay.  Let's move on to other

5    issues then.

6              Let me ask this -- let me ask you this question,

7    Attorney Brown.  You made the point in your motion that the

8    contentiousness of the litigation concerns you regarding the

9    effectiveness of your representation.

10             Is that something -- I mean, if you were -- if you

11   were appointed CJA counsel, because I'm not going to -- I'm not

12   going to require you to stay in the case as retained counsel

13   for -- for no compensation.  That's just not something I would

14   do.  There are times that I would do that, if I thought -- if I

15   thought an attorney was trying to ditch a client or a case, but

16   I don't -- that's not the case here at all.  I don't have any

17   reservation that that's not something you would ever do and not

18   what -- would not do in this case.

19             But you have raised this idea and I think I need to

20   deal with it if there's any chance of keeping you in the case

21   here.  Can you talk about that?  Are you -- are you concerned

22   that if you stayed with the case, the fact that you have

23   made -- you've reported one of your adverse counsel to

24   disciplinary authorities would in some way poison the

25   environment enough that would -- that would prevent you from

1    providing effective assistance?

2            MS. BROWN:  Your Honor, when I wrote this motion,

3    and I wrote this motion with the assistance of other counsel --

4            THE COURT:  Yeah.

5            MS. BROWN:  -- in my firm, I would describe what --

6    and it is a very difficult decision.  I love working for Imran.

7    I think he's a great client.  I would miss not working for him.

8    And so this was not an easy decision.

9            THE COURT:  Yeah.

10            MS. BROWN:  But what happened was this perfect storm

11    of like -- kind of like I just can't take this anymore.  Like,

12    you know, I'm getting personal insults from -- you know, in

13    pleadings of just being dismissive.  I'll throw the

14    repatriation in there.  I just looked it up.  The order -- the

15    motion that the State moved about was a year ago, September of

16    '20.  I was like, okay, we're doing the repatriation again.

17            And then it was -- it was then it was like, okay,

18    and I'm not going to get paid, and I'm not going to have any

19    way to recoup the extremely large debt -- which I haven't

20    shared that with the government, but you know that because I've

21    submitted our billings.  And so that was a part of it.

22            I mean, I will say getting ready for this hearing, I

23    was like -- like, oh, God, you know, it's just kind of this

24    stress level --

25            THE COURT:  Yeah.

1            MS. BROWN:  -- that just comes on --

2            THE COURT:  I'm sorry.  You want to take a little --

3            MS. BROWN:  No, I'm fine.  I'm fine.

4            THE COURT:  Okay.

5            MS. BROWN:  But it -- I can take anything when

6    someone apologizes.  They haven't apologized for anything.

7    They haven't apologized for wasting this Court's year and a

8    half of litigating Brady when they knew no longer -- no later

9    than August of 2020 they'd committed a Brady violation.  They

10   wasted my client's money, then they have the whatever to then

11   argue that he shouldn't get counsel after they've expended all

12   his money.

13            So it was; it was this perfect storm of them

14   objecting to us being appointed after having did -- doing

15   frivolous litigation for six months, not apologizing for any of

16   the insults that they lodged against us -- I mean, this is what

17   we're dealing with here, your Honor.  So it was part of it.

18   It's like, okay, I'm going to do this and not get paid for it

19   and go into debt and be treated like this.

20            THE COURT:  Well, let me ask you this.  I mean, I

21   also -- I -- I don't think it's the government's position that

22   they knowingly committed a Brady violation.  I don't think

23   that's ever been their position.  And I know you disagree.  I

24   do.

25            MS. BROWN:  Yes, very much so.

```
1              THE COURT:  I know you disagree.  But I have to -- I
2   have to ask you this, though.  See, you can see my trying to
3   keep you in the case here.  Okay?  You can see it.
4              MS. BROWN:  I can see that.
5              THE COURT:  But what I'm -- but what I don't want to
6   deal with, and I just need to be up front about it, is I don't
7   want to deal with a situation where you withdraw this motion or
8   I end up granting the CJA motion pretty much because I'm kind
9   of in a corner, okay, and I'm dealing with later you on the
10  witness stand saying, well, things were so contentious that I
11  couldn't provide effective assistance and I put that right in
12  my motion.  I -- I don't want to be dealing with that.
13             And so I'm asking you straight up.  Are you -- are
14  you telling me that it's got -- it's just reached the point of
15  no return, where you're -- you don't think you can provide
16  effective assistance based on the -- you know, what you
17  describe as sort of a poisoned relationship between counsel?
18             A straight answer is fine.  I -- I'm not trying to
19  put you in a corner here.  I just want to -- I want to run the
20  case in a way that -- that honors the defendant's rights --
21             MS. BROWN:  Right.
22             THE COURT:  -- and the professionals -- the
23  professionals' right to practice law in the way they want to.
24             MS. BROWN:  I mean, you know me.  If I'm -- if -- if
25  I remain in the case, I'm going after them just as hard next
```

1    year as I did last year.  That's just kind of how it's going to

2    go.

3             I -- I think what's difficult now -- you know, I

4    spent this week -- we picked two juries last week.  One of them

5    is supposed to start Monday.

6             THE COURT:  Yeah.

7             MS. BROWN:  We showed up on Monday, we lost three

8    jurors.  The judge had to declare a mistrial.

9             THE COURT:  Yeah.

10            MS. BROWN:  That guy was in jail.  His trial's now

11   moved to January.  I had to call three other clients who were

12   going to get their trials in January to tell them their trials

13   were now bumped out to June because this guy was in jail.  I

14   mean, that's -- dealing with all that and, you know, so --

15            THE COURT:  Okay.

16            MS. BROWN:  I mean, there's a part of me that really

17   wants to stay on this case.  As I said, I -- you know, I'd like

18   to finish it through.  But dealing with -- I don't expect it to

19   get better.  I don't expect an apology.  And even if they

20   did -- and I know -- you're right, I don't buy it, that this

21   was a mistake -- but even if it was, that's something to

22   apologize for and they haven't even done that.

23            They haven't done it to you.  That's what frustrates

24   me.  They haven't said, your Honor, we're sorry; we wasted ten

25   days of your life, we've wasted this Court's time.  They

1   haven't given -- they have given no apologies whatsoever and

2   any concession has been pulled out like teeth from them.

3            THE COURT:  All right.  Well, that --

4            MS. BROWN:  I mean, that's -- that's what we're

5   dealing with here --

6            THE COURT:  Yup.

7            MS. BROWN:  -- and I don't see that getting better.

8            If -- if this was a case where we had a prosecutor

9   who said, you know, I made a mistake, you guys are entitled to

10  a new trial -- and I've read those cases; I think I've read

11  every Brady case in the country at this point --

12           THE COURT:  Yeah.

13           MS. BROWN:  -- and I've seen those cases.  If we had

14  that case and I felt that we could go forward in good faith and

15  that I would be dealing with prosecutors -- like I still -- you

16  know -- and I don't know if this is because of the history or

17  whatever, I don't trust them.  I just don't trust them.  And

18  we're going to have to deal with that, too; that, you know --

19           THE COURT:  Okay.  Okay.  Look.

20           MS. BROWN:  It's not -- it's not in a good place.

21  And that's because of them, not me, but I -- I'm just

22  frustrated that they haven't been held to account.

23           THE COURT:  Okay.  I -- while I don't want to -- I

24  don't want to restrict your -- I don't want to restrict your

25  presentation today at all, Attorney Brown, and I don't want to

1    step on anything you want to say, I -- I -- I don't -- I just

2    don't expect counsel to be apologizing to the Court for -- for

3    conduct that I believe -- that -- well, not so much that I

4    believe, but that they don't believe they undertook in bad

5    faith.

6         That's just -- you know, it would take a lot for me

7    to think that someone should apologize to me.  That's not for a

8    second, okay, critiquing or criticizing your -- your good faith

9    belief that you're entitled to an apology.  I don't mean to

10   undermine that for a minute.  But it's not something I expect.

11   I do expect it under some circumstances, but it's normally when

12   I know -- I know, because I'm watching counsel -- that they are

13   conducting themselves in bad faith, and I don't have that

14   feeling about this litigation.  I -- you know, I've made known,

15   I think, that it was a Brady violation and one that caused

16   prejudice, for sure, that's why we're having another trial.

17        But I think -- I think I understand your position

18   now, and I think I'd be remiss at this point, frankly, to

19   not -- to not grant your motion.

20        I was -- you know, I was very prepared to reschedule

21   things because, again, I didn't realize what you were dealing

22   with in state court.  Maybe I should have.  I just didn't.

23   Because I was talking to Nayha about it, my law clerk who's

24   working with me on the case, and I thought -- and we both said,

25   geez, that's a lot to deal with at the same time as our trial

1    and it's just not realistic.  Had I known that, I think I would

2    have been much more open to extending things, and I am right

3    now, but what you're describing to me, I think, is probably --

4    the better course is to -- is to allow you to withdraw.

5              And you've done some good work for this defendant,

6    by the way.  You've done some good work for this defendant and

7    it's also going to be terribly inefficient --

8              MS. BROWN:  If it makes you feel any better, I

9    wouldn't have been ready to try this case until next September

10   when I really sat down and looked at my schedule and what I

11   have.

12             THE COURT:  Yeah.

13             MS. BROWN:  So that was part of the analysis, too,

14   was that --

15             THE COURT:  Talk to me a little bit about your -- I

16   think it was something like -- it was six -- it was eight cases

17   in a few months and they were -- I mean, what's the state of

18   that now, if you can summarize?

19             MS. BROWN:  It's not getting -- as I said, it's got

20   worse since I filed the motion because, you know, once -- so

21   basically what the courts are doing is I -- I analogized it to

22   overbooking an airline.

23             THE COURT:  I saw what they're doing, yeah, stacking

24   it up.

25             MS. BROWN:  Yeah, overbooking knowing something will

1   settle, something will plea.

2          So I have a client that's actually coming up for

3   jury selection on Monday after Thanksgiving.  I've read three

4   separate groups of jury questionnaires, which he had to pay for

5   because he's -- I'm billing him hourly.  So he's had me read

6   jury questionnaires; he's had me subpoena witnesses, I have

7   out-of-state witnesses.  I've done that three times.  I've

8   about three or four cases like that this year where I've had to

9   prepare them for trial repeatedly and I think that is still the

10  case.

11         Hillsborough North is the worst.  You get a list of

12  40 cases scheduled for four slots of juries and you have to --

13  they tell you, you've got to be prepared and you've got to send

14  out subpoenas and you've got to spend your client's money even

15  though it might all be wasted because you don't get to go to

16  trial.

17         And so that -- I would -- everything I have right

18  now is scheduled out through June.

19         THE COURT:  It's not -- the bottom line, it's not

20  better; it's worse.

21         MS. BROWN:  Oh, yeah.  Yeah.  Definitely.

22         THE COURT:  Okay.

23         MS. BROWN:  It's not better, that's for sure.

24         THE COURT:  Okay.  Well, okay.  Let me hear from the

25  government.  I -- you know, you've heard what I've -- I've sort

1    of reached the conclusion, I think, here that -- I know you

2    took no position on the motion to withdraw.  I think it said --

3    the motion said, yeah, AUSA Cam Le takes no position, but is

4    there anything you want to say about the motion to withdraw

5    before I move ahead?

6              MS. LE:  Nothing on the motion to withdraw, your

7    Honor.

8              We do have a suggestion or a compromise of sorts

9    related to the CJA appointment if and when you want to hear

10   that, your Honor.

11             THE COURT:  Well, does it involve -- does it involve

12   Attorney Brown?

13             MS. LE:  No, your Honor.

14             THE COURT:  No, I don't want to prolong it then.

15   Yeah.

16             MS. LE:  Okay.

17             THE COURT:  But I appreciate that.

18             Actually, I guess I'll hear it, only because I don't

19   know how else I'm going to hear it --

20             MS. LE:  Right.

21             THE COURT:  -- because we need to have counsel

22   present and Attorney Brown's present.

23             So go ahead.  What's the suggestion?

24             MS. LE:  Your Honor, you know, obviously Mr. Strauss

25   was working with the defendant previously to address the

1    repatriation issue.  Ms. Brown filed a pleading which the

2    government, as you know, doesn't think that that resolves the

3    repatriation issue.  Without having that accounting, it's hard

4    for the Court to assess his ability to pay.

5            We propose that the Court tentatively appoint or

6    grant in part that the appointment with a -- kind of status

7    conference or a deadline to allow the new attorney to get up to

8    date to help his client or her client address the repatriation

9    order.  That way the Court can be satisfied that it's done its

10   due diligence and so then that the Court's -- the taxpayer

11   money is applied appropriately.

12           THE COURT:  Okay.

13           MS. LE:  If for some reason the Court learns through

14   the -- the repatriation accounting that there are funds

15   available, then we can revisit the issue, your Honor.

16           THE COURT:  I -- I understand.

17           MR. DAVIS:  That's a compromise.

18           THE COURT:  It's a perfectly good suggestion.  Of

19   course, I -- I think it -- look.  Attorney Brown's been willing

20   to address every issue.  I think if she was in a position to

21   address that issue --

22           I assume you're not just so frustrated over

23   repatriation, Attorney Brown, that you're not engaging it;

24   you'd address it if you could and I don't think -- I think it's

25   been addressed to the extent it can be addressed.  I don't have

1    a lot of confidence that even if I appoint interim CJA to

2    address it I'm going to make any real progress.

3            On the other hand, if I allow Attorney Brown to

4    withdraw, and I think I have to at this point based on what

5    she's said here today and what she's filed here in her motion,

6    what am I going to do?  I mean, he needs counsel to go to

7    trial.  I mean, I can't -- I can't let him go to trial -- he

8    doesn't want to go to trial *pro se*, and I wouldn't do that.

9            So I appreciate the suggestion.  I do.  A very

10   difficult situation.

11           Okay.  Just give me a moment here.  I just want to

12   check my notes to see if there's anything else I wanted to ask

13   Attorney Brown about before I -- while I still have access to

14   her about this case.

15           MS. BROWN:  And I will just add, to the extent I

16   haven't withdrawn, well, I think I still have duties towards

17   Mr. Alrai --

18           THE COURT:  Oh, yeah.

19           MS. BROWN:  I agree with the Court's assessment that

20   leaving him unrepresented for a period of time while the

21   repatriation -- I think that -- with the posture of this case,

22   that's just -- that's a recipe for disaster.

23           THE COURT:  I don't think that was a suggestion.

24   The suggestion was I appoint CJA counsel, sort of a -- as

25   interim to address this issue in particular.  And it's

1   something I'll think about, I just don't have a lot of

2   confidence we're going to make real progress.  You know, I

3   think if there was information forthcoming about the money in

4   Pakistan, I think it would be in the Court's possession by now,

5   but I could be wrong.

6            I will consider it, Ms. Le, I really will, as a way

7   of approaching this.

8            Okay.  Let me ask this question.  Before I proceed,

9   Attorney Brown, this might help me get -- make some progress

10  here.

11           I'm sure you've been -- you know, you've had your

12  eyeballs on this file now for a long time and you've litigated

13  hard.  Do you have questions -- I want you to answer freely.

14           Do you have questions about prior counsel, like --

15  in other words, this case was tried to a -- to a -- to a bench.

16  Are you critical of prior counsel's performance in a way that

17  you think ineffective assistance was provided?

18           MS. BROWN:  I actually filed a motion to that

19  effect.

20           THE COURT:  Oh.

21           MS. BROWN:  It's never been ruled on because it was

22  mooted out by the --

23           THE COURT:  Okay.

24           MS. BROWN:  -- motion.  Yeah, so we -- and, in fact,

25  it was very much related to Naviloff.  I mean, I think what we

1    argued is that there were smoke signals during the trial that

2    they hadn't got everything from Naviloff and that the

3    government's representations had -- about having everything,

4    there was definitely some issues with that in the middle of

5    trial.

6              If I had been trial counsel, and I think this is

7    what our motion -- I would have said, wait a minute, who's

8    this --

9              THE COURT:  I remember now.

10             MS. BROWN:  -- Ryan guy?  You know, where did he

11   come from?  We were asking if you'd consulted with anyone, and

12   you said no.

13             THE COURT:  I remember now.

14             MS. BROWN:  Yeah.  That was all in the file.  So the

15   short answer to your question is yes as to trial counsel.

16             THE COURT:  I'm on -- you know, I'm obviously on

17   tentative ground here and thin ice, but I want to ask you then.

18   Do you have a view, do you have a view -- I'm putting you on

19   the spot here, but do you have a view that armed with the

20   information now that you've been able to accumulate with a new

21   trial coming that trial counsel would be in a position to cure

22   that and, you know, because I viewed him as competent -- a

23   competent defense lawyer, and still do, despite some misgivings

24   you've expressed and I know what you're saying.

25             But with the information now that's been

1  forthcoming, do you think he'd be in a position to provide

2  effective assistance of counsel?  Do you have an opinion about

3  it?

4              MS. BROWN:  Well, first of all, to the extent you

5  don't think I'm being candid, I thought I was being very candid

6  during this hearing today.

7              THE COURT:  Yeah, I do.  I do.

8              MS. BROWN:  But I -- I do.  If I were Mr. Alrai, I

9  would not want to be represented by someone who I --

10             THE COURT:  Yeah.

11             MS. BROWN:  -- who your in-between lawyer said this

12 person made mistakes.  So, now, you're -- like I would --

13 because I won't --

14             THE COURT:  That's reasonable.

15             MS. BROWN:  Yeah.  I've pointed out other things I

16 would have done.  I mean, perfect example is the bench trial.

17 No offense, not a big fan of bench trials.  I -- I think, you

18 know, just better to have 12 people than one.  Just the math

19 works out for defendants usually on that one.

20             THE COURT:  Okay.  No offense taken.

21             MS. BROWN:  Yeah.  So there's other things that I

22 have pointed out to Mr. Alrai that I would -- would have done

23 differently at trial.  So I think that is problematic.

24             And I think we filed -- actually, did we file more

25 than one motion in -- for ineffective --

1            THE COURT:  Yeah, there was a lot filed.

2            MS. BROWN:  Yeah, I know there was a lot filed.

3    There's at least one ineffective motion against Attorney

4    Harrington and his cocounsel.

5            THE COURT:  Okay.  All right.  Thanks, everybody.

6            THE DEFENDANT:  Your Honor, this is the defendant.

7            THE COURT:  Whoa, whoa.  Time out.  Time out.  I

8    think before you say anything to me you should probably consult

9    with Attorney Brown and Attorney Eaton just briefly in a

10   breakout room.

11           THE DEFENDANT:  Yes.

12           THE COURT:  I assume that's what you want,

13   Ms. Brown?

14           THE DEFENDANT:  Yes.

15           MS. BROWN:  Yes.  That's fine.  Thank you, your

16   Honor.

17           THE COURT:  Can you arrange that, please, Kellie.

18           There should be something coming up on your screen.

19           MS. BROWN:  Yes.

20       (Defendant and counsel conferred in a breakout room.)

21               (Off-the-record discussion.)

22           MS. BROWN:  Sorry to take so long, your Honor, but

23   we were just finishing up when I saw that message, so we're all

24   set.

25           THE COURT:  That's okay.  I don't want your counsel

```
 1    to address me unless it's okay with you -- your client.
 2              MS. BROWN:  Yeah.  I think, Imran, you're good with
 3    not speaking to the judge, right?
 4              THE DEFENDANT:  I am.  Thank you.
 5              MS. BROWN:  Okay.  Thank you.
 6              THE COURT:  All right.  I guess I just want to cover
 7    one more issue then before we wrap up here, before ruling.
 8              I guess I do need to ask you one question, Attorney
 9    Brown, and it's not about the withdrawal, it's just more about
10    the -- the situation with the repatriation.
11              Because, you know, now that you're telling me that
12    your -- your withdrawal isn't based on any sort of ethical
13    quandary, which I accept and respect, the fact is you didn't
14    address it in your response.  And I guess if it's not an
15    ethical issue, I'm wondering, is it just because -- I mean, you
16    have described the fact that you don't think it's a legitimate
17    issue to be raised at this point.  Is that why you haven't
18    addressed it?  Because I'm not sure why it's not a legitimate
19    issue to be raised.  It's -- I mean, there's a court order and
20    it's part of the case.
21              MS. BROWN:  Right.  And Mr. Alrai has repeatedly
22    filed pleadings saying he's complied with it.  So there's
23    nothing -- you can't prove a negative, you know, and that's
24    what the government is trying to do is they're trying to argue
25    that he hasn't complied with it, but they have no proof that he
```

1    hasn't complied with it.  He said he's complied with it.  I

2    just don't know where else to --

3          THE COURT:  Oh, well, let me be clear about that.

4    He has not complied with it.  That's not even remotely true.

5    He's not complied with it.  I mean, there at least should be

6    answers to questions about -- you know, about what specific

7    accounts the money was deposited to and what information -- so

8    at least somebody could take a look at this.  I mean, the -- so

9    I understand he's said he's complied with it and your position

10   is that and --

11         MS. BROWN:  Well, is there a -- an order from this

12   Court finding that he hasn't complied with it?  I -- I am not

13   aware of one.

14         THE COURT:  Probably.  Well, I mean, certainly my --

15   certainly my order that I can't grant you CJA status -- I know

16   you don't want it anymore, I get it -- unless I -- unless I

17   have information is at least implicitly a ruling, but -- that

18   he hasn't complied with it, but you might be right; there might

19   not be a -- I certainly haven't held him in contempt or -- go

20   ahead, Ms. Le.

21         MS. LE:  Your Honor, the Court did exactly spell

22   when the Court's expectations were regarding repatriation.

23         THE COURT:  Yeah.  I mean, clearly I don't view it

24   as complied with but, it might be that you're right, Attorney

25   Brown, that I didn't, you know, issue an order saying --

1           MS. BROWN:  You didn't.

2           THE COURT:  -- there's been a lack of compliance or

3   a failure to comply.  I guess I'm going to make that clear.

4           MS. BROWN:  As I said before, I think that a motion

5   for appointment of counsel was the best vehicle for litigating

6   that.  And as I said before, the last pleading on the

7   repatriation was over a year ago and the government filed no

8   motion for a hearing, no motion for status or anything.

9           So I -- I'm standing by my -- my belief that this --

10          THE COURT:  Yeah.

11          MS. BROWN:  -- was totally raised a tad after we

12  filed the motion for appointment.

13          THE COURT:  Well, you can take them to task for

14  raising it, but understand that it -- my focus on it had

15  nothing to do with their raising it.  And I will say that -- I

16  will say that the -- the prosecutors have repeatedly expressed

17  frustration with me for not doing more about it.  I can tell

18  you that.  They have reminded me many times that this should be

19  dealt with.

20          You had your hand up, Attorney Le.

21          MS. LE:  We raised it and it still has not been

22  addressed in the show cause for why he should not be held in

23  contempt, your Honor, just to make the record clear.

24          THE COURT:  Document 163.  I saw that.  Yeah.  Okay.

25          MS. BROWN:  I agree with that.

1          THE COURT:  Regardless, okay.

2          Thank you, everybody.  I will -- I'll get a ruling

3    out on this shortly.

4          MS. BROWN:  Okay.

5          THE COURT:  Have a good weekend.  Thank you.

6          MS. BROWN:  Thank you.

7          MR. HUNTER:  Thank you, your Honor.

8          (Proceedings concluded at 3:24 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 12/30/2021        */s/  Liza W. Dubois*
                                  LIZA W. DUBOIS, RMR, CRR